# EXHIBIT   1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

(35)

**RECEIVED**

OCT 2 5 2004

**BLANK ROME**

| | |
|---|---|
| LML PATENT CORP., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Civil Action No. 04-858 SLR |
| | ) |
| TELECHECK SERVICES, INC., | ) |
| ELECTRONIC CLEARING HOUSE, INC., | ) |
| XPRESSCHEX, INC., and | ) |
| NOVA INFORMATION SYSTEMS, INC., | ) |
| | ) |
| Defendants. | ) |
| | ) |

### SCHEDULING ORDER

This ____ day of October, 2004, the Parties having satisfied their obligations under Fed. R.

Civ. P. 26(f), and the Court having conducted a pretrial scheduling conference pursuant to Fed.

R. Civ. P. 16 and D. Del. LR 16.2(a) and (b),

IT IS ORDERED that:

1. **Pre-Discovery Disclosures:** The Parties exchanged the information required by

Fed. R. Civ. P. 26(a)(1) and D. Del. LR 16.2 on October 19, 2004. On October 19, 2004, LML

produced to Defendants, along with its initial disclosures, an initial set of production documents.

2. **Discovery:**

   (a)    The Parties anticipate requiring discovery from each other and third
          parties to support their claims, affirmative defenses, and/or counterclaims,
          including discovery regarding LML's claims of infringement, willfulness
          and damages, and Defendants' claims of invalidity and unenforceability.

   (b)    All fact discovery shall be commenced in time to be completed by July 16,
          2005.

          (1)    Document production shall begin as soon as practicable and shall
                 continue on a rolling basis so that it is substantially completed by
                 January 21, 2005. Any remaining document production shall be
                 completed no later than March 4, 2005.

(2)    Maximum of 25 interrogatories by each named party to each other named party.

(3)    Maximum of 35 requests for admission by each party to any other party, not including requests directed to the authentication of documents and the proper translations of foreign documents.

(4)    In the absence of agreement among the Parties or by order of the Court, no deposition (other than those noticed under Fed. R. Civ. P. 30(b)(6)) shall be scheduled prior to the scheduled date for completion of document production. Any depositions pursuant to Rule 30(b)(6) prior to the scheduled date for completion of document production shall be limited to topics such as identification of documents and person(s) most knowledgeable.

(5)    LML is limited to 200 hours for depositions of all witnesses, except expert witnesses. Telecheck, NOVA, and ECHO ("ECHO" collectively includes Defendants Electronic Clearing House, Inc. and Xpresschex, Inc.) are each limited to 100 hours for depositions of all witnesses, except expert witnesses. The parties shall not engage in duplicative discovery.

The parties recognize that departure from the seven hour limit imposed by Fed.R.Civ.P. 30(d)(2) may be warranted for certain key witnesses, and will negotiate in good faith to secure additional deposition time from such witnesses.

(6)    Each Defendant shall advise LML by April 29, 2005 whether it intends to rely on advice of counsel in defense to LML's charge of willful infringement. If a Defendant intends to rely on the advice of counsel defense, it shall produce all documents within the scope of Defendants' waiver of privilege (as set forth by applicable case law) on or about April 29, 2005.

(7)    The parties agree that service of discovery, motions, or other materials during this case shall be made on lead counsel of record (with copies to all counsel of record) by hand-delivery, facsimile or e-mail. If service was made by facsimile or e-mail on a particular counsel, a confirmation hard copy shall be sent by overnight mail to that counsel. Exhibits to such materials are not required to be served with an e-mail or facsimile provided that the exhibits are served with the confirmation hard copy by overnight delivery. However, if a party chooses to serve such exhibits with the corresponding materials by e-mail or facsimile, confirmation hard copies may be served by First Class mail instead of overnight mail. Service by hand-delivery/facsimile/e-mail shall be considered served on the date hand-delivered, faxed or e-mailed provided that any necessary confirmation hard copies were sent by

overnight mail in accordance with this paragraph.  Nothing in this paragraph shall preclude any party from otherwise serving materials not filed with the Court by any other acceptable service methods under the Federal Rules.

(c)     Expert discovery shall be completed by September 30, 2005.

 (1)     Expert reports on issues for which the Parties have the burden of proof are due July 29, 2005.

 (2)     Rebuttal expert reports are due September 2, 2005.

 (3)     To the extent any objection to expert testimony is made pursuant to the principles announced in *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993), it shall be made by motion no later than the deadline for dispositive motions set forth herein, unless otherwise ordered by the Court.

(d)     Supplementations under Rule 26(e) shall take place in a timely manner throughout discovery, but at the very least shall be made on March 10, 2005 and May 19, 2005.

(e)     Discovery Disputes:

 (1)     The Court shall conduct at least two (2) discovery status conferences -- the first on February 1, 2005 at 4:30 p.m., and the second on June 21, 2005 at 4:30 p.m., or at some other date and time convenient for the Court.

 (2)     The Court shall remain available to resolve by telephone conference disputes that arise during the course of a deposition and disputes over the terms of a protective order.

 (3)     Absent express approval of the court following a discovery conference, no motions pursuant to Fed. R. Civ. P. 37 shall be filed.

(f)     Fact Witnesses to be called at trial:

Within one (1) month following the close of expert discovery, each party shall serve on the other parties a list of each fact witness (including any expert witness who is also expected to give fact testimony), who has previously been disclosed during discovery and that it intends to call at trial. Within one (1) month of receipt of such fact witness list, each party shall serve a list of each rebuttal fact witness that it intends to call at trial. The parties shall have the right to depose any such fact witnesses who have not previously been deposed in this case. Such deposition(s) shall be

3

held within one (1) month after service of the list of rebuttal fact witnesses and shall be limited to twenty (20) hours per side in the aggregate unless extended by agreement of the parties or upon order of the Court upon good cause shown.

3.    **Joinder of Other Parties and Amendment of Pleadings:**  All motions to join other Parties and/or amend the pleadings shall be filed on or before December 3, 2004.

4.    **Settlement Conference:**  Pursuant to 28 U.S.C. § 636, this matter is referred to Magistrate Judge Thynge for the purposes of exploring the possibility of a settlement.

5.    **Claim Construction Issue Identification:**  On April 15, 2005, the Parties shall exchange a list of those claim term(s)/phrase(s) that they believe need construction and their proposed claim construction of those term(s)/phrase(s). This document will not be filed with the Court. Subsequent to exchanging that list, the parties will meet and confer in person to prepare a Joint Claim Construction Statement to be submitted in conjunction with the briefing schedule in paragraph 7 below.

6.    **Summary Judgment Motions:**  All summary judgment motions shall be served and filed with an opening brief on or before October 28, 2005.  Response briefs in opposition to motions for summary judgment shall be filed no later than November 15, 2005.  Reply briefs in support of such motions for summary judgment shall be filed no later than November 23, 2005. No summary judgment motion may be filed more than ten (10) days before the above date without leave of Court.  Oral argument shall be conducted on December 19, 2005 at 1:30 p.m.

7.    **Claim Construction:**  Opening briefs on issues of claim construction shall be simultaneously submitted by all parties to the Court, along with the Joint Claim Construction Statement, on October 7, 2005, to be considered by the Court in conjunction with the summary judgment motions.  Response briefs on issues of claim construction shall be submitted to the Court no later than October 21, 2005.

8.    **Applications by Motion:**  Any application to the Court shall be by written motion filed with the clerk. The Court will not consider applications and requests submitted by letter or in a form other than a motion, absent express approval by the Court.

    (a)    Any non-dispositive motion should contain the statement required by D. Del. LR 7.1.1.

    (b)    No telephone calls shall be made to chambers.

    (c)    Any party with an emergency matter requiring the assistance of the Court shall e-mail chambers at: slr_civil@ded.uscourts.gov. The e-mail shall provide a short statement describing the emergency. NO ATTACHMENTS shall be submitted in connection with said e-mails.

9.    **Motions in Limine:**  All motions in limine shall be filed on or before the date that is two weeks before the pre-trial conference.  All responses to said motions shall be no later than one week before the pre-trial conference.

10.    **Pretrial Conference:**  A pretrial conference will be held on March 21, 2006, at 4:30 p.m. in courtroom 6B, Sixth Floor, Federal Building, 844 King Street, Wilmington, Delaware. The Federal Rules of Civil Procedure and D. Del. LR 16.4 shall govern the pretrial conference.

11.    **Trial:**  This matter is scheduled for one or more jury trial(s) commencing on April 17, 2006 in courtroom 6B, Sixth Floor, Federal Building, 844 King Street, Wilmington, Delaware.  The Court has tentatively scheduled a total of two weeks, beginning on April 17, 2006, on its calendar for the trial(s) of this case.  For purposes of completing pretrial preparations, the parties should plan on being allocated a total number of hours in which to present their respective cases.

                                        _____
                                        Honorable Sue L. Robinson
                                        United States District Judge

# EXHIBIT   2



**"Mark Mizrahi"**
**<MMizrahi@bjtlaw.com>**

06/02/2005 05:30 PM

To  "McDole, Jamie" <jmcdole@kirkland.com>

cc  "Robert Jacobs" <RJacobs@bjtlaw.com>

bcc

Subject  LML v. Telecheck et al.

Dear Jamie:

     Enclosed is a draft Second Amended Answer which we intend to file with the Court.  The changes vis-à-vis ECHO's first Amended Answer appear in "red-line."

     Please inform us as soon as practicable whether LML will consent to the filing of this document or whether we will have to move the Court unilaterally.

Regards,

```
Mark B. Mizrahi, Esq.
BELASCO JACOBS & TOWNSLEY, LLP
```
Howard Hughes Center
6100 Center Drive, Suite 630
Los Angeles, CA 90045
```
Phone:1-310-743-1188
Fax:1-310-743-1189
```
mmizrahi@bjtlaw.com



draft Second Amended Answer -06-02-05.pdf

# EXHIBIT  3

Westlaw.

Not Reported in F.Supp.2d
2004 WL 906259 (E.D.Pa.)
(Cite as: 2004 WL 906259 (E.D.Pa.))

H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
Gregory CUMMINGS, et al.
v.
CITY OF PHILADELPHIA, et al.
No. Civ.A. 03-0034.

April 26, 2004.
Tshaka LaFayette, LaFayette & Associates PC, Philadelphia, PA, for Plaintiffs.

Lynne A. Sitarski, City of Philadelphia Law Department, Deputy City Solicitor, Philadelphia, PA, for Defendants.

*MEMORANDUM AND ORDER*

HUTTON, J.

*1 Currently before the Court are Defendants City of Philadelphia and Detective Theodore Ryan's Motion for Summary Judgment (Docket Nos. 10 & 11), Plaintiffs' Response thereto (Docket Nos. 12 & 13), Defendants' Reply to Plaintiffs' Response (Docket No. 17), Plaintiffs' Motion for Leave to File a Second Amended Complaint (Docket No. 16), Defendants' Response thereto (Docket No. 18), and Plaintiffs' Reply to Defendants' Response.

I. *PROCEDURAL AND FACTUAL BACKGROUND*
[FN1]

FN1. To the extent the facts are in dispute, they are presented in the light most favorable to the Plaintiff. *See Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

This case arises out of the allegedly wrongful arrests of Plaintiffs Gregory Cummings ("Cummings") and his mother, Shirley Baker ("Baker") (collectively "Plaintiffs"). On January 2, 2001, Cummings was

arrested by Philadelphia police officers on warrant # 254785. On May 15, 2001, Baker was arrested on warrant # 254786. The arrest warrants were signed by a bail commissioner of the Philadelphia County Court of Common Pleas pursuant to Criminal Complaints from the Office of the District Attorney that were based on affidavits of probable cause filled out by Defendant Detective Theodore Ryan. In the Amended Complaint, Plaintiffs challenge the validity of these warrants arguing, *inter alia,* that Detective Ryan did not have probable cause to obtain them and that Defendant City of Philadelphia ("City") failed to adequately train its investigating officers.

Warrants # 254785 and # 254786 are based on the story of Tiffany Robinson, the daughter of Cummings' ex-girlfriend, Defendant Katherine Sessions. Cummings and Sessions had been in an ongoing custody battle over Cummings' son Jabree, who was then in Sessions' custody. On November 27, 2000, Robinson, who was 15 years old at the time, reported to police that Baker pulled alongside her in a car and yelled, "Listen you little bitch, tell your mother to give me my grandson back, or I'll kill her." Robinson also reported that before the car drove off, Baker fired three gun shots at her. Robinson was uninjured. Cummings was allegedly in the passenger seat during the incident.

After the incident, Robinson was taken to a police station where she met with Detective Ryan and recited the above story. Robinson also told him that she had no doubt that she saw her "stepbrother" Jabree's grandmother Baker and his father Cummings in the car. *See* Investigation Interview Record, Nov. 27, 2000, Docket No. 11, Ex. C. The next day, November 28, 2000, Detective Ryan visited the scene of the alleged shooting. While there, he did not find any bullet casings to evidence the alleged shooting. *See* Ryan Dep. at 47, Docket No. 13, Ex. B. He interviewed Karo Sharpe, a school crossing guard on duty at the time of the shooting, who reported that she did not hear or see anything out of the ordinary. *See* Investigation Report of Det. Ryan, Docket No. 11, Ex. G.

Detective Ryan filed two Affidavits of Probable Cause in support of arrest warrants for Plaintiffs Gregory Cummings and Shirley Cummings, a.k.a. Shirley Baker. In the Affidavits, Detective Ryan recounted Tiffany Robinson's story and stated that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                            Page 2
2004 WL 906259 (E.D.Pa.)
**(Cite as: 2004 WL 906259 (E.D.Pa.))**

there was a custody battle between Sessions and
Cummings and that there was a Protection from
Abuse Order on Cummings. Detective Ryan also
stated that he had an approved arrest warrant for
Cummings for an incident on November 13, 2000
when Cummings allegedly threatened Sessions. The
details of the incident were not included in the
affidavit. [FN2] Ryan also did not include the report
of the crossing guard or the fact that he had visited
the scene of the alleged shooting and did not find
bullet casings. *See* Affidavits of Probable Cause for
Arrest Warrants, Docket No. 11, Exs. H & I.

>       FN2. Katherine Sessions alleges that on
>       November 13, 2000, Cummings threw a
>       brick into a window of her house with a
>       threatening note on it. Detective Ryan
>       investigated the brick throwing incident on
>       November 15, 2000, when he also learned of
>       the custody dispute and the Protection from
>       Abuse Order. *See* Ryan Dep. at 21, Docket
>       No. 13, Ex. B.

**\*2** Detective Ryan submitted the Affidavits to the
Office of the District Attorney for approval. Both
Affidavits were approved and Detective Ryan then
applied for the arrest warrants with a Philadelphia
bail commissioner. The bail commissioner
determined there was probable cause to arrest
Plaintiffs and issued Arrest Warrants # 254785 and #
254786.

On January 2, 2001, Cummings was arrested on
Warrant # 254785. [FN3] Cummings explains that he
was at a courthouse on January 2 for a custody
hearing at which he expected to regain custody of his
son Jabree. Before the hearing took place, however,
Sessions identified Cummings to the police, telling
them there was a warrant out for Cummings' arrest.
*See* Cummings Dep. at 40, Docket No. 13, Ex. B-1.
Cummings was arrested and subsequently
incarcerated for 17 months, until May 17, 2002, when
a jury found him not guilty of all charges against him
arising out of the allegations of Sessions and her
daughter Tiffany Robinson.

>       FN3. Cummings was also arrested on
>       Warrant # 254514, issued for the alleged
>       November 13, 2000 brick throwing incident.
>       The specifics of this warrant are discussed
>       below in conjunction with Plaintiffs' Motion
>       to Amend.

Shirley Baker was arrested on May 15, 2001, on
Warrant # 254786. [FN4] She was held for nine days

before her release. She, too, was found not guilty of
the alleged November 27, 2000 shooting.

>       FN4. Baker alleges her arrest took place on
>       May 15, 2001. The Arrest Report, however,
>       indicates she was arrested on May 31, 2001.
>       *See* Arrest Report, Docket No. 11, Ex. M.

The Amended Complaint states claims under 42
U.S.C. § 1983 against Detective Ryan, alleging
Plaintiffs' Fourth Amendment rights were violated
when Ryan made false statements and misleading
omissions in the Affidavits of Probable Cause for
warrants # 254785 and # 254786. Plaintiffs also bring
§ 1983 malicious prosecution claims against
Detective Ryan. Lastly, Plaintiffs bring § 1983
claims against the City for failure to adequately train
its investigating officers. [FN5]

>       FN5. The Amended Complaint also states
>       claims for abuse of process and intentional
>       infliction of emotional distress against
>       Katherine Sessions. Sessions has not moved
>       for summary judgment and has not filed a
>       motion in opposition to Plaintiffs' motion to
>       amend.

## II. *LEAVE TO AMEND*

In the first motion before the Court, Plaintiffs seek
leave to amend the first Amended Complaint to
allege a constitutional violation arising out of arrest
warrant # 254514. This third warrant was issued for
the alleged brick throwing incident of November 13,
2000.

### A. *Legal Standard*

Federal Rule of Civil Procedure 15(a) allows a
plaintiff to seek leave of court to amend a complaint
even after the defendant has filed an answer:

>   A party may amend the party's pleading once as a
>   matter of course at any time before a responsive
>   pleading is served.... Otherwise a party may amend
>   the party's pleading only by leave of court or by
>   written consent of the adverse party; and leave
>   shall be freely given when justice so requires.

Fed.R.Civ.P. 15(a). The United States Supreme
Court has noted that leave should be freely granted
because a plaintiff ought to be afforded an
opportunity to test his claim on the merits. *See*
*Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9
L.Ed.2d 222 (1962). Leave can be denied, however,
where allowing the amendment would cause undue
prejudice to the defendant or where the amendment is
futile. *See id.; Burlington Coat Factory Sec. Litig.,*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 906259 (E.D.Pa.)
(Cite as: 2004 WL 906259 (E.D.Pa.))

Page 3

114 F.3d 1410, 1434 (3d Cir.1997); *Hairston-Lash v. R.J.E. Telecom, Inc.,* No. 00-2070, 2000 U.S. Dist. LEXIS 15697 (E.D.Pa. Oct. 26, 2000). Prejudice and futility are the bases of Defendants' arguments in opposition to the instant motion.

B. *Discussion*

**\*3** This case involves the validity of the two arrest warrants used to arrest Plaintiffs on January 2, 2001 and May 15, 2001. Those warrants were based on the story of Tiffany Robinson. Plaintiffs seek leave to include allegations regarding the validity of another warrant pursuant to which Cummings was arrested on January 2, 2001. This third warrant, # 254514, is mentioned only once in the Amended Complaint and the Defendants did not have notice that Plaintiffs would challenge the validity of the warrant until the motion to amend was filed.

The proposed amendment would allege that warrant # 254514 was based on the story of Katherine Sessions, who reported to police that "she discovered someone had thrown a rock through her window and that there was a threatening note. She told police investigating the incident that she recognized the handwriting on the note to be that of Cummings." *See* Pl.'s Proposed Second Amended Complaint, para. 11, Docket No. 16, Ex. A. The proposed amendments would also allege that Detective Ryan failed to conduct an investigation of Sessions' story and made an application for an arrest warrant against Cummings in which he recklessly made misleading statements and material omissions. *Id.* at para. 12, 17.

Plaintiffs assert they are entitled to leave to amend because the proposed amendment merely adds facts to the pleading that came to Plaintiffs' counsel's attention during discovery. Defendants oppose the motion arguing that the amendment does not just add facts, but a new legal claim. Specifically, Defendants claim (1) that they will be unduly prejudiced if leave is granted at this late juncture and (2) that the amendment asserts a time-barred claim and is, thus, futile.

The Court of Appeals for the Third Circuit has noted that prejudice to the non-moving party is the touchstone for the denial of an amendment. *See Lorenz v. CSX Corp.,* 1 F.3d 1406, 1413 (3d Cir.1993); *Hairston-Lash,* 2000 U.S. Dist. LEXIS 15697, at \*5. Prejudice is more than mere delay or passage of time; it involves showing that the non-moving party "was unfairly disadvantaged or deprived of the opportunity to present facts or

evidence which it would have offered had the [moving party's] amendments been timely." *Heyl & Patterson Int'l, Inc. v. F.D. Rich Housing of the Virgin Is., Inc.,* 663 F.2d 419, 426 (3d Cir.1981); *see also United States v. Duffus,* 174 F.3d 333, 337 (3d Cir.1999); *Lorenz,* 1 F.3d at 1413-14. Prejudice means "undue difficulty in prosecuting [or defending] a law suit as a result of a change in tactics or theories on the part of the other party." *Deakyne v. Comm'rs of Lewes,* 416 F.2d 290, 300 (3d Cir.1969).

Courts in this Circuit have traditionally allowed amendments where the amendment clarified the plaintiff's legal theory or provided specific facts concerning the claims already asserted. *See Johnston v. City of Phila.,* 158 F.R.D. 352, 354 (E.D.Pa.1994); *see also Downey v. Coalition Against Rape & Abuse,* 143 F.Supp.2d 423, 436-37 (D.N.J.2001) (allowing amendment because it did not present new causes of action and would require very little new briefing by non-moving party); *Cuffy v. Getty Ref. & Mktg.,* 648 F.Supp. 802 (D.Del.1986).

**\*4** Courts have found undue prejudice to the non-moving party and denied leave to amend where the amendment would have asserted new claims, where new discovery would have been necessary, where the motion for leave was filed months after the factual basis of the amendment was discovered by the moving party, and where the motion for leave was brought after summary judgment motions were filed. *See Berger v. Edgewater Steel Co.,* 911 F.2d 911, 924 (3d Cir.1990) (discussing all factors listed in upholding trial court's denial of leave); *Johnston,* 158 F.R.D. at 354 (denying leave to amend to add a gender discrimination claim to the previously claimed racial discrimination); *Ellwood City v. Pa. Power Co.,* 570 F.Supp. 553, 556 (W.D.Pa.1983) (denying leave to amend because it would require new discovery and discovery period had already expired).

In this case, Defendants Ryan and the City will be unduly prejudiced if leave to amend is granted. First, Plaintiffs filed the motion for leave to amend after the close of discovery, after summary judgment motions were filed, after pre-trial memoranda were filed, and after the case was put in the trial pool. Second, Plaintiffs discovered information about the third warrant no later than September 29, 2003, prior to the discovery deadline and over two months prior to filing the instant motion. Third, as noted above, since the inception of this litigation against Detective Ryan and the City, the case has concerned the conduct of Detective Ryan with regards to arrest warrants #

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 906259 (E.D.Pa.)
**(Cite as: 2004 WL 906259 (E.D.Pa.))**

Page 4

254785 and # 254786. Granting leave to amend at this juncture would introduce a new claim based on warrant # 254514. Fourth, additional discovery would be needed for the third warrant so that Detective Ryan and the City could adequately defend themselves. The fact that Defendants were aware of the third warrant, as Plaintiffs point out in their brief, is of no consequence. Although Defendants knew the warrant existed, they did not know that Plaintiffs were challenging its validity and, in fact, were expecting that Plaintiffs would not challenge its validity. *See* Ryan Dep. at 26, Docket No. 13, Ex. B.

In sum, the totality of circumstances indicates that Detective Ryan and the City would suffer undue prejudice in defending this case if the Court were to grant Plaintiffs' motion. Accordingly, the motion for leave to amend Counts I, II, III, VI, VII, and VIII of the Amended Complaint against the instant Defendants is denied. [FN6]

> FN6. The Court need not reach the Defendants' futility argument.

### III. SUMMARY JUDGMENT

The next motion before the Court is Defendants' motion for summary judgment. The City and Detective Ryan move for summary judgment on all counts against them.

### A. Legal Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment has the initial burden of showing the basis for its motion. *See* Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to go beyond the mere pleadings and present evidence through affidavits, depositions, or admissions on file showing a genuine issue of material fact for trial. *See id.* at 324. The substantive law determines which facts are material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the evidence is such that a reasonable jury could return a verdict for the nonmoving party, then there is a genuine issue of fact. *See id.*

**\*5** When deciding a motion for summary judgment,

all reasonable inferences are drawn in the light most favorable to the non-moving party. *See* Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir.1992), cert. denied, 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993). Moreover, a court may not consider the credibility or weight of the evidence in deciding a motion for summary judgment, even if the quantity of the moving party's evidence far outweighs that of its opponent. *See id.* Nonetheless, a party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements. *See* Trap Rock Indus., Inc. v. Local 825, 982 F.2d 884, 890 (3d Cir.1992).

### B. Counts I & VI: *Section 1983* Fourth Amendment Claims against Detective Ryan

Section 1983 imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States. [FN7] To prevail under section 1983, a plaintiff must establish (1) that the defendants were "state actors," and (2) that they deprived the plaintiffs of a right protected by the Constitution. Groman v. Township of Manalapan, 47 F.3d 628, 633 (3d Cir.1995). Because Detective Ryan has raised a qualified immunity defense, Plaintiffs have a further burden. *See* Wilson v. Russo, 212 F.3d 781, 786 (3d Cir.2000). Plaintiffs must first show that Detective Ryan's alleged conduct violated a federal statute or constitutional right. If step one is met, Plaintiffs must show that the right violated was clearly established at the time of the defendant's conduct. Summary judgment is appropriate if no reasonable juror could conclude that Plaintiffs' clearly established right was violated. *See id.* (citing Orsatti v. New Jersey State Police, 71 F.3d 480, 482 (3d Cir.1995)).

> FN7. Section 1983 states:
> Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress.
> 42 U.S.C. § 1983 (2004); see also Conn v. Gabbert, 526 U.S. 286, 289, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999); Gruenke v. Seip, 225 F.3d 290, 298 (3d Cir.2000).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 906259 (E.D.Pa.)
**(Cite as: 2004 WL 906259 (E.D.Pa.))**

Page 5

In Counts I and VI Cummings and Baker claim, respectively, that they were arrested without probable cause in violation of their Fourth Amendment right to be free from unreasonable seizure. Plaintiffs acknowledge the warrants, but argue that the warrants were not supported by probable cause because they were obtained through Detective Ryan's false affidavits.

The standard for challenging the validity of the underlying affidavit of an arrest warrant was established by the United States Supreme Court in _Franks v. Delaware,_ 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); _Sherwood v. Mulvihill,_ 113 F.3d 396 (3d Cir.1997). A plaintiff may succeed in a § 1983 action for false arrest made pursuant to a warrant if the plaintiff shows, by a preponderance of the evidence: (1) that the police officer "knowingly and deliberately, or with reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant;" and (2) that "such statements or omissions are material, or necessary, to the finding of probable cause." _Wilson,_ 212 F.3d at 786-87 (quoting _Sherwood,_ 113 F.3d at 399).

1. _Reckless Disregard for the Truth_

**\*6** In step one of the _Franks_ analysis, the Court must determine whether a reasonable jury could conclude that Detective Ryan made statements or omissions that he either knew or should have known were false except for his reckless disregard for the truth. _Wilson,_ 212 F.3d at 787 (citing _United States v. Leon,_ 468 U .S. 897, 923 (1984)). The Third Circuit has noted that a reckless disregard for the truth means different things when dealing with omissions and assertions. _See id._ Omissions are made with reckless disregard "if an officer withholds a fact in his ken that '[a]ny reasonable person would have known that this was the kind of thing the judge would wish to know." ' _Id._ (quoting _United States v. Jacobs,_ 986 F.2d 1231, 1235 (8th Cir.1993)). "Unlike omissions, assertions can be made with reckless disregard for the truth even if they involve minor details--recklessness is measured not by the relevance of the information, but by the demonstration of willingness to affirmatively distort the truth." _Id._ at 788. "An assertion is made with reckless disregard when 'viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." ' _Id._ (quoting _United States v. Clapp,_ 46 F.3d 795, 801 n. 6 (8th Cir.1995)).

Cummings and Baker claim that Detective Ryan made omissions and false assertions in the affidavits of probable cause for arrest warrants # 254785 and # 254786. [FN8] The affidavits are identical in substance. They explain Tiffany Robinson's story about the shooting, the existence of a protection from abuse order on Cummings, and the custody dispute between Cummings and Sessions over Sessions' stepson Jabree. Detective Ryan states that Robinson positively identified Cummings from a police photograph and that there was an approved affidavit from Cummings' arrest for the incident on November 13, 2000.

> FN8. Cummings also raises an issue concerning the Criminal Complaint filed against him by the Commonwealth of Pennsylvania. Docket No. 13, Ex. C-2. The District Attorney's Office prepares and issues the Criminal Complaint, not Detective Ryan. Thus, Detective Ryan's potential liability lies only in the Affidavit of Probable Cause, the document he prepared.

Plaintiffs claim that Detective Ryan misstated the following assertions with reckless disregard for the truth: (1) Tiffany Robinson is not the stepsister of Cummings' son Jabree, and (2) Jabree is not Katherine Sessions' stepson because Sessions and Cummings were never married. As set forth above, the appropriate inquiry is whether Detective Ryan made the assertions with a high degree of awareness of their probable falsity. _See Wilson,_ 212 F.3d at 788. Detective Ryan did have some background knowledge of the familial relationships of Cummings, Sessions, Robinson, and Jabree. He did not know, however, the precise relationships among the parties involved. The Court finds that Detective Ryan did not have a high degree of awareness of these facts sufficient to conclude that he acted with reckless disregard for the truth with respect to his assertions of the family relationships in the affidavit. [FN9]

> FN9. Moreover, even if Plaintiffs could prove reckless disregard, the allegedly false assertions are not material under _Franks_ because probable cause to arrest still exists when the challenged assertions are removed from the affidavit.

Plaintiffs next claim that Detective Ryan omitted from the affidavit the following information: (1) Karo Sharpe, the school crossing guard on duty at the time of the shooting, reported to Detective Ryan that she

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

did not hear or see anything out of the ordinary on the morning of the alleged shooting; (2) Detective Ryan searched the alleged crime scene and did not find bullet casings or any other evidence to corroborate Tiffany Robinson's story; and (3) Detective Ryan never questioned Plaintiffs regarding their whereabouts at the time of the alleged shooting.

**\*7** To prove reckless disregard with respect to the omissions, Plaintiffs must show that any reasonable person would have known that the omissions were highly relevant and that a judge would want to know about them to make the probable cause determination. *See Wilson,* 212 F.3d at 788 (citing *Jacobs,* 986 F.2d at 1234). In *Wilson,* the Third Circuit instructed that, while we cannot demand that police officers relate the entire history of events leading up to a warrant application, a police officer cannot make unilateral decisions about the materiality of information and merely inform the magistrate of inculpatory evidence. *Id.* at 787. For example, in *Jacobs* the court found reckless disregard where the officer omitted from his affidavit the fact that a drug sniffing dog failed to alert on the defendant's bag that was searched pursuant to the search warrant the officer obtained. *See Jacobs,* 986 F.2d at 1234.

Here, the Court finds that any reasonable person would recognize that a judge would want to know about the lack of corroborating evidence at a crime scene, including a bystander who did not see or hear anything out of the ordinary and the absence of bullet casings at an alleged shooting scene. On the other hand, Detective Ryan had no responsibility to report the fact that he never questioned Cummings or Baker about their whereabouts. Thus, Detective Ryan acted with reckless disregard of the truth by omitting exculpatory facts about the crossing-guard and the bullet casings from the affidavit of probable cause.

*2. Materiality*

Under the next step in the *Franks* analysis, the Court must determine whether Detective Ryan's omissions made with reckless disregard of the truth were "material, or necessary, to the finding of probable cause." *Sherwood,* 113 F.3d at 399. To determine materiality, we insert the facts recklessly omitted and ask whether the "corrected" warrant establishes probable cause. *See Wilson,* 212 F.3d at 789 (citing *Sherwood* ). If probable cause still exists, the inquiry stops there and summary judgment may be granted in favor of the police officer.

To assess whether or not probable cause exists, a court must weigh the inculpatory evidence against any exculpatory evidence to determine whether a reasonable person would believe that an offense has been or is being committed by the person to be arrested. *See Wilson,* 212 F.3d at 791; *Orsatti v. New Jersey State Police,* 71 F.3d 480, 483 (3d Cir.1995). Here, the strongest inculpatory evidence is the positive identification of Plaintiffs by the victim Tiffany Robinson. There is also evidence of the custody dispute and the protection from abuse order issued against Cummings. The exculpatory facts recklessly omitted by Detective Ryan concern the lack of evidence from the crime scene, including the crossing guard's statement and the lack of bullet shells.

The Third Circuit has rejected the argument that positive identification by a victim is absolute proof of probable cause. *See Wilson,* 212 F.3d at 790. "Independent exculpatory evidence or substantial evidence of the witness's own unreliability that is known by the officer could outweigh the identification such that probable cause would not exist." *Id.* Nonetheless, weighing the exculpatory evidence against the positive identification of Plaintiffs by Robinson, the exculpatory facts are not sufficient to undermine a finding of probable cause. *See, e.g., id.* (holding positive identification by victim outweighs exculpatory evidence on specific facts of case); *Roberts v. Toal,* No. 94-0608, 1997 WL 83748 (E.D.Pa. Feb. 20.1997) (same); *Thomas v. Piree,* No. 95-956, 1995 WL 709938 (E.D.Pa. Dec.1, 1995) (same). The Court concludes, therefore, that no reasonable jury could find that Detective Ryan's affidavit, after inserting the omissions, lacked probable cause to arrest Cummings and Baker for allegedly firing shots at Robinson. Summary judgment on Counts I and VI is granted in favor of Detective Ryan. [FN10]

> FN10. Because the Court holds that Detective Ryan did not knowingly or recklessly omit facts that could negate probable cause, the Court also holds that Detective Ryan did not violate Plaintiffs' Fourth Amendment rights and that Detective Ryan is entitled to qualified immunity. *See Sherwood,* 113 F.3d at 402; *Thomas,* 1995 WL 709938 at \*6 n. 12.

*C. Counts III & VIII: Section 1983 Malicious Prosecution Claims against Detective Ryan*

**\*8** To prove a claim for malicious prosecution under

Not Reported in F.Supp.2d
2004 WL 906259 (E.D.Pa.)
**(Cite as: 2004 WL 906259 (E.D.Pa.))**

Page 7

§ 1983, Plaintiffs must establish a deprivation of liberty consistent with the Fourth Amendment concept of seizure and the common law elements of the tort. *See Gallo v. City of Phila.,* 161 F.3d 217, 222 (3d Cir.1998) (interpreting *Albright v. Oliver,* 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994); *Backof v. New Jersey State Police,* No. 02-4131, 2004 WL 260779 (3d Cir. Feb.13, 2004) (unpublished); *Colbert v. Angstadt,* 169 F.Supp.2d 352, 355 (E.D.Pa.2001). Under the common law of Pennsylvania, Plaintiffs must show: (1) Detective Ryan initiated a criminal proceeding; (2) the proceeding ended in Plaintiffs' favor; (3) Detective Ryan initiated the proceeding without probable cause to arrest; and (4) Detective Ryan acted with actual malicious purpose. *See Patterson v. Sch. Dist. of Phila. .,* No. 99-4792, 2000 WL 1020332, *5 (E.D.Pa. July 19, 2000).*

Plaintiffs meet the constitutional element of their malicious prosecution claims. Cummings was arrested and incarcerated for 17 months before trial and Baker was arrested and allegedly incarcerated for nine days, constituting a seizure under the Fourth Amendment. However, Plaintiffs fail at least the third prong of the common law inquiry. As discussed above, Plaintiffs were arrested with probable cause, even after correcting for Detective Ryan's reckless omissions. Thus, Plaintiffs cannot prove their § 1983 malicious prosecution claim. Summary judgment is granted in favor of Detective Ryan on Counts III and VIII.

### D. *Counts II & VII:* Section 1983 *Claims against the City*

In Counts II and VII, Plaintiffs assert a § 1983 claim against the City of Philadelphia claiming that it fails to adequately train its investigating police officers. In *Monell v. Department of Social Services,* 436 U.S. 658, 694-95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court of the United States ruled that a municipality is a "person" under federal civil rights statutes and that it can be found liable under § 1983. To establish a claim, a plaintiff must predicate recovery on the existence of a particular municipal policy or established custom. *See id.; City of Okla. City v. Tuttle,* 471 U.S. 808, 829, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion) (Brennan, J., concurring). Further, a plaintiff must prove that this policy or custom caused the deprivation of a constitutional right. *See Tuttle,* 471 U.S. at 829-30; *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

Here, Plaintiffs have offered no evidence to substantiate their *Monell* claim beyond the facts of this case. Summary judgment is granted in favor of the City on Counts II and VII.

An appropriate Order follows.

### ORDER

AND NOW, this 26th day of April, 2004, upon consideration of Defendants City of Philadelphia and Detective Theodore Ryan's Motion for Summary Judgment (Docket Nos. 10 & 11), Plaintiffs' Response thereto (Docket Nos. 12 & 13), Defendants' Reply to Plaintiffs' Response (Docket No. 17), Plaintiffs' Motion for Leave to File a Second Amended Complaint (Docket No. 16), Defendants' Response thereto (Docket No. 18), and Plaintiffs' Reply to Defendants' Response, and for the reasons set forth in the accompanying Memorandum, IT IS HEREBY ORDERED that:

***9** (1) Plaintiffs' Motion for Leave to Amend is DENIED; and

(2) Defendants City of Philadelphia and Detective Ryan's Motion for Summary Judgment is GRANTED.

2004 WL 906259 (E.D.Pa.)

### Motions, Pleadings and Filings (Back to top)

• 2003 WL 23905177 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Further Support of Motion for Summary Judgment of Defendants the City of Philadelphia and Detective Theodore Ryan (Dec. 05, 2003)

• 2003 WL 23905194 (Trial Motion, Memorandum and Affidavit) Memorandum of Law of the City of Philadelphia and Detective Ted Ryan in Opposition to Plaintiff's Motion to Amend Complaint (Dec. 05, 2003)

• 2003 WL 23905151 (Trial Motion, Memorandum and Affidavit) Defendants' Pre-Trial Memorandum (Nov. 25, 2003)

• 2003 WL 23905163 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Pre-Trial Memorandum (Nov. 20, 2003)

• 2003 WL 23905136 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Opposition to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 906259 (E.D.Pa.)
**(Cite as: 2004 WL 906259 (E.D.Pa.))**

Page 8

Defendants' Motion for Summary Judgement (Nov. 17, 2003)

• 2003 WL 23905119 (Trial Motion, Memorandum and Affidavit) Motion for Summary Judgment of Defendants the City of Philadelphia and Detective Theodore Ryan (Oct. 30, 2003)

• 2003 WL 23905100 (Trial Pleading) Answer and Affirmative Defenses of Defendants the City of Philadelphia and Detective Ted Ryan to Plaintiffs' Amended Complaint (May. 29, 2003)

• 2:03cv00034 (Docket) (Jan. 02, 2003)

• 2003 WL 23905083 (Trial Pleading) 42 U.S.C. § 1983 Floor Fourth Amendment Hed False Arrest Malicious Prosecution Abuse of Process (2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT   4

Westlaw.

106 Fed.Appx. 768                                                                          Page 1
106 Fed.Appx. 768, 2004 WL 1598735 (3rd Cir.(Pa.))
**(Cite as: 106 Fed.Appx. 768, 2004 WL 1598735 (3rd Cir.(Pa.)))**

**H**

**Briefs and Other Related Documents**

This case was not selected for publication in the
Federal Reporter.

NOT PRECEDENTIAL

Please use FIND to look at the applicable circuit
court rule before citing this opinion. Third Circuit
Local Appellate Rule 28.3(a) and Internal Operating
Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3
IOP APP I 5.3.)

United States Court of Appeals,
Third Circuit.
Cora F. LINDQUIST, Individually and as Executrix
of the Estate of James O.
Lindquist,
v.
BUCKINGHAM TOWNSHIP; Board of Supervisors
of Buckingham Township; Ernest
Knight II; Lynn Bush, Executrix of the Estate of
George M. Bush, Esq.
Cora F. Lindquist, Appellant,
Buckingham Township; Board of Supervisors of
Buckingham Township, Appellants.
**Nos. 03-2431, 03-2971.**

Case No. 03-2431 Argued Case No. 03-2971
Submitted Under Third Circuit
LAR 34.1(a) Feb. 23, 2004.
Decided July 19, 2004.

**Background:** Landowners brought § 1983 action
alleging that township's denial of their development
plans violated their due process rights. The United
States District Court for the Eastern District of
Pennsylvania, Harvey Bartle, III, J., 2003 WL
22757894, in a bench trial, found for township.
Parties appealed.

**Holdings:** The Court of Appeals, Rendell, Circuit
Judge, held that:

(1) township's actions were not so egregious as to
shock the conscience;

(2) motion for leave to amend complaint was
properly denied on basis of undue delay;

(3) Pennsylvania court's findings that township

acted in violation of its
own ordinances and a court order, were not entitled
to preclusive effect; and

(4) township was not entitled to attorneys' fees.
Affirmed.

Rosenn, Circuit Judge, filed dissenting opinion.

West Headnotes

**[1] Constitutional Law** ⚷278.2(1)
92k278.2(1) Most Cited Cases
"Shocks the conscience" standard was proper
standard to be applied in § 1983 action alleging that
township violated landowners' due process rights by
disapproving their proposed development of the
property. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. §
1983.

**[2] Constitutional Law** ⚷278.2(1)
92k278.2(1) Most Cited Cases

**[2] Zoning and Planning** ⚷381.5
414k381.5 Most Cited Cases
Even if township violated state court orders and its
own ordinances, and acted in bad faith, when
disapproving landowners' plans for developing their
property, township's actions were not so egregious as
to shock the conscience, as required to establish a
substantive due process violation based solely on
violations of state law. U.S.C.A. Const.Amend. 14.

**[3] Federal Civil Procedure** ⚷840
170Ak840 Most Cited Cases
Township's alleged failure to turn over certain
documents, to landowners who brought § 1983
action alleging that their due process rights were
violated by township's disapproval of their proposed
development plans, was not sufficient reason for
landowners' delay in moving for leave to amend their
complaint, and therefore motion was properly denied
on basis of "undue delay"; documents sought were
public documents to which landowners had access,
landowners never moved to compel production, and
case had been pending for two years and was ready
for trial. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. §
1983.

**[4] Zoning and Planning** ⚷727
414k727 Most Cited Cases
Pennsylvania court's findings that township, in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

disapproving landowners' development plans, acted in violation of its own ordinances and a court order, were not essential to its final judgment that landowners' plan was deemed approved under Pennsylvania law, and therefore were not entitled to preclusive effect in landowners' § 1983 action alleging that the disapproval of their plans violated their due process rights. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983; 53 P.S. § 10508.

[5] Civil Rights ⟐1411
78k1411 Most Cited Cases
District court did not abuse its discretion, in § 1983 action alleging that township violated landowners' due process rights by disapproving their proposed development plans, in refusing to permit landowners to introduce evidence of the township's treatment of a third party's subdivision application; evidence was not relevant to question of township's treatment of landowners' applications, and ascertaining the facts with regard to the third party application would have required conduct of a trial within the trial. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

[6] Civil Rights ⟐1484
78k1484 Most Cited Cases
In light of fact that landowners might have been able to prevail, in their § 1983 action alleging that their due process rights were violated by township's disapproval of their proposed development plans, under the improper motive standard in effect at the time of the trial, landowners' action was not frivolous, unreasonable or without foundation, and therefore township was not entitled to attorneys' fees even though it was the prevailing party. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. §§ 1983, 1988.
*769 Appeals from the United States District Court for the Eastern District of Pennsylvania. (D.C. Civil No. 00-cv-01301). District Judge: Honorable Harvey Bartle, III.

Barbara Anisko [Argued], Daniel R. Utain, Kaplin, Stewart, Meloff, Reiter & Stein, Blue Bell, PA, for Cora L. Lindquist;    Appellant in 03-2431 and Appellee in 03-2971.

*770 Harry G. Mahoney [Argued], Michael L. Barbieri, Deasey, Mahoney & Bender, Philadelphia, PA, for Buckingham Township and Board of Supervisors of Buckingham Township, Appellees in 03-2431 and Appellants in 03- 2971.

Before: RENDELL, BARRY and ROSENN, Circuit Judges.

OPINION OF THE COURT

RENDELL, Circuit Judge.

**1 Cora F. Lindquist, individually and as executrix of the estate of James O. Lindquist, appeals the District Court's order granting judgment in favor of Buckingham Township and the Board of Supervisors of Buckingham Township on the Lindquists' civil rights action under 42 U.S.C. § 1983. This case presented, at both the district court level and on appeal before us, a heavily fact-laden saga of the attempted development of land by plaintiffs, seemingly thwarted at every turn by defendants. The plaintiffs' forty-five page complaint leveled allegations of bad faith and conspiracy against defendants based on their conduct. The District Court held a six-day non-jury trial, hearing first hand both sides of the story. Before the District Court's twenty-one page opinion issued, we made clear in United Artists Theatre Circuit, Inc. v. Township of Warrington, 316 F.3d 392 (3d Cir.2003), that the standard applicable to substantive due process claims involving executive action in land-use disputes is the "shocks the conscience" standard. The District Court held that "there [was] nothing in the facts ... to prove that the defendants' conduct was so egregious as to be 'conscience shocking.'" We can find nothing in the record that would cause us to find error in the District Court's reasoning or ruling. Our dissenting colleague paints a picture of dastardly deeds, and, while we might credit such a portrayal if the trial court had perceived in the extensive recounting of the saga the reprehensible animus, attitude and scheming upon which the dissent relies, that is not the case. Moreover, the objective facts, as revealed in the hefty 5,559-page appendix before us, do not necessarily take us in the direction the dissent suggests, causing us to find no error. Clearly, we and the trial judge just view the record differently from our dissenting colleague. We see no clear-cut constitutional violation and will therefore affirm.

I.

The Lindquist farm, located between York Road and Upper Mountain Road in Buckingham, Pennsylvania, consists of a 100-acre parcel owned by James O. Lindquist and Cora F. Lindquist, and a 150-acre parcel owned by James O. Lindquist and his three children. [FN1] Beginning in early 1994, the Lindquists sought to develop the property as a cluster subdivision. Throughout 1994 and 1995, they and their representatives worked with the Township, its Board of Supervisors, its Planning Commission and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

its consultant to facilitate the proposed development of the property.

> FN1. James O. Lindquist died while this case was before the District Court. Cora F. Lindquist was substituted as executrix of his estate.

Based on these discussions, the Lindquists prepared a set of preliminary plans. Development was to occur in two stages: Phase I, consisting of 111 single-family lots on the front parcel, and Phase II, consisting of 110 single-family lots on the back parcel. On March 29, 1996, the Lindquists submitted an application for preliminary subdivision approval of Phase I ("Original Phase I Plan").

*771 The Township's consultants evaluated the Original Phase I Plan for compliance with the Township's Subdivision and Land Development Ordinance ("SALDO") and the Zoning Ordinance. [FN2] It was understood that waivers from certain SALDO requirements would be necessary before the plan would be approved, and there appeared to be no objection to these waivers at a May 1, 1996 meeting of the Planning Commission. However, later that month, one consultant issued a review letter concerning the plan's proposed storm water management facilities that imposed upon plaintiffs what they believed to be "onerous" and unwarranted requirements with respect to water run-off.

> FN2. Under SALDO, a party seeking subdivision and land development approval must first file an application and plans for preliminary approval by the Board. In addition, the party must also submit an application for final plan approval. The Board is the only Township entity with the authority to grant approvals and denials of these plans.

**2 The Lindquists made a formal request for SALDO waivers to the Board on August 9, 1996. The Board took no action on the waiver request, but recommended that the Lindquists meet further with the Township staff to settle the waiver and other issues. The Lindquists met several times with the Township staff, but the parties were unable to reach a compromise that would be accepted by the Board. Finally, the Lindquists went back to the Board for clarification, submitting two proposed plans, including the Original Phase I Plan and a "by-right" alternate plan that met all SALDO requirements. [FN3] In response, the Board: (1) directed the

Lindquists to proceed with the Original Phase I Plan; (2) consented to grant the SALDO waivers necessary to develop the property under the Phase I Plan; (3) determined that the Plan would be processed under the August 24, 1994 Zoning ordinance, as amended December 13, 1995; and (4) required the Lindquists to work with the Township to develop a wastewater system that would integrate the development with the regional sewage system.

> FN3. The zoning ordinance permitted the cluster subdivision of a property as a "by-right" use. Thus, the Board would have been required to accept this alternate plan if formally submitted. However, the alternate plan would have subdivided and developed a portion of the property that the Township wanted to preserve.

In late 1996 and early 1997, the Lindquists and the Township's consultants worked on the wastewater issue. Meanwhile, the Board enacted an amendment to SALDO that prohibited cul-de-sac streets within subdivisions and an amendment to the Zoning Ordinance which eliminated cluster subdivisions as a "by-right" use.

In early June, the Township informed the Lindquists that the Original Phase I Plan would be on the Board's agenda at its June 25, 1997 meeting. The Lindquists informed the Township that they intended to submit a revised Phase I plan within the next few weeks, and proposed that the ninety-day statutory review period for the Original Phase I Plan be extended, as had been done several times throughout the process. The Board did not accept this proposal, and rejected the application for preliminary approval of the plan ("the First Denial Resolution"). As the result of this denial, any new proposals submitted by the Lindquists would be subject to the zoning amendments enacted in early 1997.

On September 3, 1997, the Lindquists commenced legal proceedings against the Board in the Court of Common Pleas of Bucks County. These actions were resolved by a stipulation of settlement signed by the parties on November 12, 1997, and entered as a Court Order on December 12, 1997 ("the December 1997 Order"). Under *772 the terms of the settlement, the Board withdrew the First Denial Resolution and permitted the submission of revised Phase I plans to be reviewed under the Zoning Ordinance and SALDO as they existed on December 13, 1995. The settlement did not address the issue of how many times the Lindquists would be permitted to submit

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

further revised plans.

On November 18, 1997, the Lindquists submitted a revised Phase I subdivision application ("Revised Phase I Plan"). In early 1998, the Lindquists and the Township met several times to discuss the Revised Phase I Plan. The Lindquists agreed to submit a further revised plan ("Further Revised Phase I Plan"), and the Board agreed to extend the review period for the Further Revised Phase I Plan to July 30, 1998.

**3 On July 20, the Lindquists informed the Township that the Further Revised Plan I would be submitted by the end of July, and proposed that the review period be extended until the end of August. The Township declined to extend the review period.

On July 22, the Board passed a resolution ("Second Denial Resolution"), which was apparently intended to reject the Revised Phase I Plan. However, the resolution actually rejected the Original Phase I Plan. The Board subsequently realized it had rejected the wrong plan, and on August 12, 1998, passed a new resolution that "readopted and confirmed" the Second Denial Resolution and amended it to include a rejection of the Revised Plan ("Third Denial Resolution").

Meanwhile, the Lindquists had filed the Further Revised Phase I Plan on July 31, 1998. The Township accepted the Further Revised Plan, but informed the Lindquists that it would not treat the Further Revised Plan as a revised plan under the December 1997 Order for the reason that the Second Denial Resolution had denied the subdivision application. The Third Denial Resolution set an August 31, 1998 deadline for review of the Further Revised Plan. The Lindquists informed the Township that it was obligated to treat the Further Revised Plan as a revised plan under the settlement, and that, if it treated the Further Revised Plan as a new plan, they were entitled to a ninety-day review period as provided by statute.

The Board disagreed. On August 26, 1998, the Board adopted another resolution ("Fourth Denial Resolution"), which rejected the Further Revised Plan as a revised plan. The Township also informed the Lindquists that it would accept the Further Revised Plan as a new plan, subject to review under the Zoning Ordinance and SALDO as they existed on the date of its submission. The Board eventually rejected the Further Revised Plan as a new plan on October 28, 1998.

On September 3, 1998, the Lindquists filed a mandamus action in the Court of Common Pleas of Bucks County, alleging that the Revised Plan should be "deemed approved" under § 508 of the Municipalities Planning Code, Pa. Stat. Ann. tit 53, § 10508. On January 19, 2000, the Bucks County Court held that the Second Denial Resolution of July 22, 1998 had rejected the wrong plan, that the Board had failed to comply with § 508 through its failure to take action on the Revised Plan by the July 30, 1998 deadline, and that, as a result, the Revised Plan was "deemed approved." In his opinion, Judge Clark found that "the Township ha[d] acted in this case not only in violation of Order of December 12, 1997 of the Bucks County Court, but also in violation of its own ordinances requiring review of subdivision applications." However, the basis for the court's ruling that the Revised Plan was "deemed approved" was the Township's *773 failure to reject the Revised Plan by the statutory deadline.

The Township appealed the Bucks County Court Order. However, in December 2000, the parties reached a settlement that ended the state court litigation, but permitted the Lindquists to proceed with this action alleging violations of their substantive due process rights, which they had filed in federal court in March of that year. The District Court, following a six-day non-jury trial, ultimately granted judgment in favor of the Township and its Board of Supervisors.

II.

**4 The Lindquists' appeal challenges several aspects of the District Court's ruling, including: (1) the application of the "shocks the conscience" standard to their substantive due process claim; (2) the determination that the Township's actions did not violate the "shocks the conscience" standard; (3) the denial of their motion to amend their complaint to include an equal protection claim; (4) the failure to give preclusive effect to certain state court findings; and (5) the decision to exclude evidence regarding the Township's treatment of other subdivision plans. The Township and the Board of Supervisors appeal the District Court's denial of their post-trial motion for attorneys' fees and costs.

A.

[1] First, the Lindquists contend that the District Court erred in applying the "shocks the conscience" standard because such a standard is inappropriate to apply to substantive due process claims against municipalities arising from land use decisions. We exercise plenary review over the District Court's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

choice and interpretation of legal standards. *Beta Spawn, Inc. v. FFE Transportation Services, Inc., 250 F.3d 218, 223 (3d Cir.2001).*

In *United Artists,* we noted that "our cases have repeatedly acknowledged that executive action violates substantive due process only when it shocks the conscience." *Id.* at 399-400. We saw no reason why land-use cases should be exempted from the shocks-the-conscience test, stating that "[l]and-use decisions are matters of local concern, and such disputes should not be transformed into substantive due process claims based only on allegations that government officials acted with 'improper' motives." *Id.* at 401-02. Accordingly, we conclude that the District Court applied the proper standard to the Lindquists' claim.

### B.

[2] Second, the Lindquists argue that "the Township deliberately acted in bad faith, violated its own ordinances and customary practices and procedures and violated two separate court orders," and that "[t]he Township participated in such egregious conduct because of their personal animus to [the Lindquists' representative] and with the intent of preventing the Lindquists from developing their property so that the Township would be in a better position to acquire the Lindquist property at a minimal cost to the Township." The District Court concluded that the Township "may have been negligent at times and in 1998 may have acted with improper motive toward the Lindquists and their representatives. However, there is nothing in the facts we have found to prove that the defendants' conduct was so egregious as to be 'conscience shocking.' " The Lindquists maintain that this conclusion is in error and that the Township's actions do satisfy the standard.

We exercise plenary review over the District Court's application of legal standards to the facts of the case. *\*774Beta Spawn, 250 F.3d at 223.* We review the District Court's findings of fact for clear error. *Id.*

**\*\*5** In *United Artists,* we joined other Courts of Appeals in applying the  "shocks the conscience" standard to substantive due process claims in land use disputes.  For example, in *Chesterfield Development Corp. v. City of Chesterfield, 963 F.2d 1102 (8th Cir.1992),* a developer brought a § 1983 action claiming that the city had violated its substantive due process rights by enforcing an invalid zoning plan against it.  In affirming the District Court's denial of the developer's claim, the Eighth Circuit stated that "a

state-law error, no matter how fundamental, cannot in and of itself create a federal due-process violation." *Id.* at 1105. Furthermore, it noted that "[its] decision would be the same even if the City had knowingly enforced the invalid zoning ordinance in bad faith" because "[a] bad faith violation of state law remains only a violation of state law." *Id.* In its view, the enforcement of an invalid zoning ordinance was not a "truly irrational" governmental action giving rise to a substantive due process claim. *Id.*

The First Circuit considered a similar situation in *PFZ Properties, Inc. v. Rodriguez, 928 F.2d 28 (1st Cir.1991).* There, a developer brought a civil rights action against a Puerto Rico agency following the agency's rejection of the developer's application for a construction permit.  The court held that "[the developer's] allegations that [agency] officials failed to comply with agency regulations or practices in the review and approval process for the construction drawings are not sufficient to support a substantive due process claim." *Id.* at 32.  The court also stated that "even assuming that [the agency] engaged in delaying tactics and refused to issue permits for the ... project based on considerations outside the scope of its jurisdiction under Puerto Rico law, such practices, without more, do not rise to the level of violations of the federal constitution." *Id.*

These cases stand for the proposition that, without more, a violation of state law, even a bad faith violation of state law, will not support a substantive due process claim in a land-use dispute. *See also Baker v. Coxe, 230 F.3d 470, 474 (1st Cir.2000)* ("[E]ven an arbitrary denial of [a building] permit in violation of state law--even in bad faith--does not rise above the constitutional threshold for equal protection and substantive due process claims."); *Natale v. Town of Ridgefield, 170 F.3d 258, 262 (2d Cir.1999)* ( "Arbitrary conduct that might violate zoning regulations as a matter of state law is not sufficient to demonstrate conduct so outrageously arbitrary as to constitute a gross abuse of governmental authority that will offend the substantive component of the Due Process Clause.") Rather, the governmental action must be so egregious and extraordinary that it "shocks the conscience."

Here, we are not entirely convinced that there has even been a violation of state law, much less any "conscience-shocking" behavior.  The Lindquists maintain that the Township's actions were in defiance of the December 1997 Order. We view this to be not entirely clear-cut.  And, even if the Township did violate the Order, the record is largely devoid of any

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

facts that would suggest that the Township's actions were so egregious and extraordinary that they "shock the conscience." The Lindquists have suggested that the Township was motivated by financial concerns and bias against their attorney, and that these motivations render the Township's actions "conscience-shocking." Yet, we find little evidence that the Township or its officers were motivated by pecuniary gain. In addition, although it is clear that the relationship between the Township and the Lindquists' *775 attorney became bitter during the course of these events, the Township's actions cannot be said to have been due to any bias against him. The District Court concluded that while the Township "may have been negligent" and "may have acted with an improper motive," desirous of thwarting development of the property, its conduct did not shock the conscience. We concur.

**6 Our dissenting colleague cites _Leamer v. Fauver,_ 288 F.3d 532 (3d Cir.2002), for the proposition that "deliberate indifference" and "protracted failure to even care" may be conscience shocking when officials have time to make unhurried judgments. _Id._ at 547. However, _Leamer_ involved a prison inmate challenging the deprivation of a liberty interest. Given that "[t]he assessment of what constitutes conscience-shocking behavior differs according to the factual setting," _id.,_ the test may be more easily satisfied in a prison setting than in a land-use setting. More importantly, our view of the record does not indicate indifference or a failure to care on the part of the Township.

### C.

[3] Third, the Lindquists challenge the District Court's denial of their motion for leave to amend their complaint to include an equal protection claim, based on the Township's favorable treatment of a third party's subdivision application. We review a grant or denial of leave to amend for abuse of discretion. _Lake v. Arnold,_ 232 F.3d 360, 373 (3d Cir.2000).

The Supreme Court has stated that the Rule 15(a) mandate that leave to amend "shall be freely given when justice so requires" is to be heeded.

> In the absence of any apparent or declared reason-- such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc.--the leave sought should, as the rules require, be "freely given."

_Foman v. Davis,_ 371 U.S. 178, 182, 83 S.Ct. 227, 9

L.Ed.2d 222 (1962).

Here, the District Court denied the Lindquists' motion to amend for "undue delay." With regards to the issue of delay, our Court has stated that

> the passage of time, without more, does not require that a motion to amend a complaint be denied; however, at some point, the delay will become "undue," placing an unwarranted burden on the court, or will become "prejudicial," placing an unfair burden on the opposing party. The question of undue delay, as well as the question of bad faith, requires that we focus on the plaintiff's motives for not amending their complaint to assert this claim earlier; the issue of prejudice requires that we focus on the effect on the defendants.

_Adams v. Gould, Inc.,_ 739 F.2d 858, 868 (3d Cir.1984), _cert. denied,_ 469 U.S. 1122, 105 S.Ct. 806, 83 L.Ed.2d 799 (internal citations omitted). _See also Cureton v. NCAA,_ 252 F.3d 267, 273 (3d Cir.2001) (stating that "the question of undue delay requires that we focus on the movant's reasons for not amending sooner"). Here, in its discussion, the District Court followed our directive in _Adams_ that the Court should focus on the plaintiff's motives. First, it noted the Lindquists' proffered reason for their two-year delay, namely, the Township's alleged failure to turn over certain documents. Then, it disposed of this reason because the documents were public documents to which the Lindquists had access and, in addition, the Lindquists could have filed a motion to *776 compel production. In light of this reasoning, and given the fact that this case had already been pending for two years and was ready for trial, we cannot say that the District Court abused its discretion in denying the Lindquists leave to amend.

### D.

**7 [4] Fourth, the Lindquists urge that the District Court erred when it failed to give preclusive effect to certain findings outlined in the state court's January 19, 2000 order. We exercise plenary review over the District's Court decision regarding the preclusive effect of a state court judgment. _Del. River Port Auth. v. Fraternal Order of Police,_ 290 F.3d 567, 572 (3d Cir.2002).

The Full Faith and Credit Act, 28 U.S.C. § 1738, requires a federal court to give a state court judgment the same preclusive effect that it would be entitled to in a court of that state. _Gregory v. Chehi,_ 843 F.2d 111, 118 (3d Cir.1988). Thus, the District Court was required to give the state court's findings preclusive effect if a Pennsylvania court would have been required to give them preclusive effect.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Turning to Pennsylvania law, we note that Pennsylvania has adopted the requirements of the Restatement (Second) of Judgments, regarding when a prior determination of a legal issue is conclusive in a subsequent action. *Clark v. Troutman,* 509 Pa. 336, 502 A.2d 137, 139 (Pa.1985). In Pennsylvania, the doctrine of issue preclusion applies if: (1) the issue decided in the prior case is identical to the one presented in the subsequent action; (2) there was a final judgment on the merits; (3) the party against whom the doctrine is asserted was a party or in privity with a party in the subsequent case; (4) the party or person in privity with a party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding; and (5) the determination in the prior proceeding was essential to the judgment. *City of Pittsburgh v. Zoning Bd. of Adjustment,* 522 Pa. 44, 559 A.2d 896, 901 (Pa.1989).

Here, the January 19, 2000 state court order concluded that the Lindquists' Revised Plan was "deemed approved" under § 508 of the Municipalities Planning Code, Pa. Stat. Ann. tit. 53 § 10508. In concluding that the Plan was "deemed approved," the Court of Common Pleas relied solely upon facts related to the Township's Board of Supervisors' failure to take action upon the Plan prior to the statutory deadline. While the court did make other findings and agreed with the Lindquists that the Township had acted in violation of both its own ordinances and the December 1997 Order, these findings were not essential to its final judgment. Accordingly, issue preclusion does not apply. As a result, the District Court's decision to give preclusive effect only to the facts that the Board had failed to take timely action and that the Revised Plan was "deemed approved" upon the Township's failure to take action, while not giving preclusive effect to any other state court findings, was appropriate.

### E.

[5] Fifth, the Lindquists claim that the District Court abused its discretion in making certain evidentiary rulings. During the course of the trial, the Lindquists sought to introduce documents and to solicit testimony regarding the Township's treatment of a third party's subdivision application, the Yerkes/Orleans plan, that was pending during the same time period when the Lindquists' application was being considered, as relevant to the issue of motive. In sustaining the Township's objection, the District Court noted that evidence regarding the Yerkes/Orleans application *777 was not necessarily probative of whether the Township had acted improperly with regards to the Lindquists' application because there were different facts, because the Township could exercise discretion in granting waivers, and because the complexity and uniqueness of these situations makes comparisons cumbersome if not impossible. We review the District Court's ruling regarding the admissibility of evidence for abuse of discretion. *Rinehimer v. Cemcolift, Inc.,* 292 F.3d 375 (3d Cir.2002).

**8 In assessing whether the Lindquists had proven their claim, the key question before the Court was whether the Township's treatment of the Lindquists "shocked the conscience," not whether the Township treated the Lindquists differently than it treated a third party. The evidence the Lindquists sought to introduce had nothing to do with the Township's treatment of the Lindquists. [FN4] Further, even if it were arguably relevant, we agree with the District Court that ascertaining whether the Yerkes/Orleans development was comparable to the Lindquist development in all important respects would have forced the District Court to conduct "a trial within a trial." As a result, we conclude that the District Court did not abuse its discretion in refusing to permit the introduction of this evidence. [FN5]

> FN4. The dissent posits that even if the evidence of the treatment afforded Yerkes/Orleans was not probative of the motive of the Township vis a vis the Lindquist, it could be probative as to whether the treatment "shocked the conscience." We are at a loss to determine how this could be so unless the facts of the two situations were the same. The Lindquists contend that the same sixty reasons listed to justify denial of their application were listed as conditions for approval of the Yerkes/Orleans preliminary plan, and the dissent appears to read this contention as meaning the Lindquists' plan was rejected for the same reasons as the Yerkes/Orleans plan was approved. However, the record merely indicates that the Township had some of the same problems with the Lindquists' plan that the Township's consultants had with the Yerkes/Orleans preliminary plan, and that the consultants conditioned their recommendations regarding approval of the Yerkes/Orleans plan on these problems being rectified. It does not indicate what steps the Yerkes/Orleans developers took to

address the problems identified in the preliminary plan, nor that the final Yerkes/Orleans plan eventually approved by the Township continued to exhibit these problems. The proffered evidence would only be relevant to the District Court's inquiry to the extent that the facts of the two proposed developments were virtually identical. Considering the maxim that every parcel of land is unique, this was highly unlikely.

FN5. Our dissenting colleague believes that, as an alternative to finding a constitutional violation, we should remand the claim so that the Lindquists could have the opportunity to present new evidence in light of the heightened standard adopted between the close of trial and the District Court's judgment. While we have, as the dissent points out, acknowledged that "a change in law may warrant the reopening of a case where additional [evidence] would be pertinent to the change of law." *Skehan v. Bd. of Trustees of Bloomsberg State College, 590 F.2d 470, 479 (3d Cir.1978), rev'd on other grounds by Smith v. City of Pittsburgh, 764 F.2d 188 (3d Cir.1985),* here the Lindquists did not move to reopen for additional proof in light of the changed standard.

### F.

[6] Finally, the Township and the Board claim the District Court erred when it denied their motion for attorneys' fees. We review a denial or grant of attorneys' fees for abuse of discretion. *Loughner v. University of Pittsburgh, 260 F.3d 173, 177 (3d Cir.2001).*

42 U.S.C. § 1988 provides that "in any action or proceeding to enforce a provision of § ...1983 ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." A prevailing *778 defendant is entitled to attorney's fees upon a finding that the plaintiff's action was frivolous, unreasonable or without foundation. *Barnes Found. v. Township of Lower Merion, 242 F.3d 151, 157-58 (3d Cir.2001).*

The Township and the Board of Supervisors contend that they, as prevailing defendants, are entitled to attorneys' fees because the Lindquists' lawsuit was not brought to redress the Lindquists' alleged constitutional grievances, but rather to generate

attorneys' fees for the Lindquists' legal representative. Even if we were to credit this theory, it does not necessarily render the action frivolous, unreasonable or without foundation. We note that at the time the Lindquists brought this action, the standard applicable to their due process claim was not settled. Only after the conclusion of trial did we announce in *United Artists* that a plaintiff pursuing a substantive due process claim in a land-use dispute must prove that the defendant's conduct "shocked the conscience." 316 F.3d at 401. This standard departed from our prior precedent, under which a plaintiff merely had to prove that the defendant had acted with an improper motive. *See, e.g., Bello v. Walker, 840 F.2d 1124, 1129 (3d Cir.1988).* Here, the District Court stated that the Township and the Board "may have acted with an improper motive toward the Lindquists and their representatives," which would suggest that it might have been possible for the Lindquists to prevail under the "improper motive" standard. In light of the fact that the Lindquists might have been able to succeed under the standard in effect at the time they brought their claim, we cannot say that the action was frivolous, unreasonable or without foundation. Accordingly, the District Court did not abuse its discretion in denying attorneys' fees.

### III.

**9 For the reasons stated above, we will affirm.

ROSENN, Circuit Judge, dissenting.

In the struggle to develop their land in Buckingham Township, Pennsylvania, the Lindquists encountered severe resistance from Township officials. The officials frustrated the Lindquists' efforts and wasted their time and resources. Because the majority holds that the Township's conduct is not sufficiently "conscience shocking" to constitute a violation of the Lindquists' substantive due process rights, I respectfully dissent. [FN6] Additionally, because the legal standard for this substantive due process claim changed while the District Court deliberated in this case, I believe the claim should be remanded so that the Lindquists may have the opportunity to present evidence that is now relevant under the new heightened standard. *779 Lastly, I disagree with the majority's interpretation of our circuit's case law regarding a plaintiff's ability to amend a complaint. I believe that because the District Court's analysis of the Lindquists' motion to amend failed to articulate any undue burden on the court or prejudice to the non-moving party, denial of the motion was an abuse of discretion.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 Fed.Appx. 768                                                                 Page 9
106 Fed.Appx. 768, 2004 WL 1598735 (3rd Cir.(Pa.))
(Cite as: 106 Fed.Appx. 768, 2004 WL 1598735 (3rd Cir.(Pa.)))

FN6. The majority defers heavily to the District Court's finding after a six day trial that nothing in the facts "was so egregious as to be 'conscience shocking,' " and fails to find error in the District Court's reasoning or ruling. (Maj. Op. at 770-71) While clear error review applies to the District Court's findings of fact, the application of those facts to the "conscience shocking" standard is a legal question that we review *de novo*. *See, e.g., Srein v. Frankford Trust Co.*, 323 F.3d 214, 220 (3d Cir.2003) (discussing the "mixed" standard of review). I take no exception to the facts as described by the District Court, and I also find the facts described by the Court of Common Pleas of Bucks County after its lengthy trial to be informative. However, after finding the facts, the District Court offered little analysis, and simply stated in conclusory fashion that these facts did not rise to the "shock the conscience" standard. I disagree with both the majority and the District Court because in my opinion, the facts presented in this record display arbitrary and malicious conduct on the part of the Township that rises to a conscience shocking level.

I.

The majority has explained the basic sequence of events that occurred between the Lindquists and the Township during the six year development application ordeal. I write to supplement the factual account, and to explain several points of divergence between us.

A. The Township's Misconduct

Even though the standard for this substantive due process claim changed from "improper motive" to "shocks the conscience" while the District Court deliberated in this case, the District Court still acknowledged in its opinion that the Township "may have acted with an improper motive toward the Lindquists and their representatives." Although improper motive is no longer sufficient to prove a substantive due process violation, identifying an improper motive is a factor in the conscience shocking behavior of a state actor. The Court of Common Pleas of Bucks County candidly addressed the Township's improper motive, acknowledging that "the Township proudly admits that it would like to preserve the Lindquist property." The Township's motivation to preserve the Lindquists' land was improper because under the zoning and land-use ordinances in effect at the time of the Lindquists' initial application, the cluster subdivision developments they sought were allowed on the Lindquists' land as a "by-right" use.

As the majority opinion acknowledges, the Township Board of Supervisors (the "Board") requested that the Lindquists forego their by-right use and pursue an alternate plan favored by the Board, in exchange for assurances that the Board would grant the required SALDO waivers and process the plans under the zoning ordinances as amended December 13, 1995 (the "1995 ordinances"). However, after inducing the Lindquists to surrender their by-right use of the cluster development, the Board rejected the plan revisions in June of 1997 and denied the original plans in Resolution No. 1533. This action forced the Lindquists to resubmit new plans to be reviewed now under the zoning ordinances as amended in 1997. This action was significant because the 1997 amendments to the ordinances prohibited several of the items in the Lindquists' original plans, and strategically removed the by-right use. This action set the tone for a series of other bad faith maneuvers launched by the Township against the Lindquists.

**10 In response, the Lindquists filed suit against the Township in the Court of Common Pleas of Bucks County. The parties agreed to a settlement, which was entered as a court order (the "Court Order") requiring that the Township withdraw its denial of the plans and permit the Lindquists to submit revised plans to address the comments raised by the Township.

The majority here asserts that the settlement did not address how many times the Lindquists would be allowed to submit further revised plans after the original re-submission. However, the Court Order clearly stated that "[t]he Board will process and review the Revised Plans for Phase I, and *any revisions thereto* in accordance with the Zoning Ordinance and SALDO, as they existed on December 13, 1995." (emphasis added) So, while the Court Order may not have explicitly stated *780 how many revisions would be allowed, it clearly anticipated the need for multiple revisions and required that *any* revisions would be considered under the 1995 ordinances.

The Board realized that as long as the Lindquists were cooperating with the Township Planning Commission and consultants to revise and improve the original plans, the Court Order required that the Board consider the plans under the 1995 ordinances,

106 Fed.Appx. 768                                                                                                            Page 10
106 Fed.Appx. 768, 2004 WL 1598735 (3rd Cir.(Pa.))
**(Cite as: 106 Fed.Appx. 768, 2004 WL 1598735 (3rd Cir.(Pa.)))**

and this would eventually lead to an approval. Therefore, the Board adopted a strategy to work around the Court Order almost immediately after the Order was signed. For example, the District Court acknowledged that "[a]t the Board's direction, the Planning Commission had treated the revised plans as a new filing that did not relate back to the earlier submission." Even in its pleadings before the Court of Common Pleas, the Township admitted that it attempted to reject the revised Phase I subdivision plan because it knew that the Lindquists "were getting closer to compliance with the Township Ordinances and wanted to reject the Revised Phase I Subdivision Plan before the Lindquists submitted any further revised plans."

Furthermore, during deposition, the Township Manager, Deborah Rendon, admitted the following:
Q: So they acted--the Board of Supervisors acted to deny the revised subdivision application before the Lindquists had an opportunity to submit further plans to the Township, even though the [Court Order] specifically permitted further revised plans to be submitted, right?
A: Yes.

The Township argues that after the Court Order was signed in 1997, it proceeded in good faith, as evidenced by a series of six meetings between the Lindquists and the Planning Commission aimed at reaching an agreement on the plans. To begin, this argument is undercut by the Township's admission that it rejected the plans because the Lindquists were getting closer to compliance. Furthermore, the Township's claim of good faith is absurd, in light of the shameless tactics on which the Township embarked in its effort to reject the plans.

As the majority recognizes in its footnote 2, the Board was the only Township entity empowered to approve the Lindquist plans. Any amount of progress made between the Lindquists and the Planning Commission was irrelevant if the Board had predetermined that it would not provide its approval. On July 22, 1998, when the Township's deadline for taking action on the plans was fast approaching, the Board rejected a routine request from the Lindquists to submit further revised plans and hastily enacted Resolution No. 1598 rejecting the plans. The District Court noted that "the Lindquists had no prior knowledge that the Board was set to act on the plan on this date." (D. Ct. Op. at 12) In its haste, the Board actually denied the wrong plans, and the deadline for action on the Lindquists' most current submission passed. In an attempt to correct its

mistake, the Board adopted Resolution No. 1599 rejecting the most current plans.

**11 In the meantime, the Lindquists submitted a revised set of plans and argued that the Board had violated the 1997 Court Order by not considering them to be revised plans subject to consideration under the 1995 ordinances. Alternatively, the Lindquists argued that if the plans were in fact a new submission, they were entitled to a 90-day statutory review period including review letters by the Township's consultants. (D. Ct. Op. at 13) The Board disagreed, and less than one month after *781 receiving the latest submission, the Board enacted Resolution No. 1600 denying Lindquist's most recent submission without full review. This denial was issued on the same day that the Township consultants submitted their review letters, leaving the Lindquists no conceivable opportunity to respond to the comments. (D. Ct. Op. at 13)

Throughout this process, the Township flagrantly violated its own ordinances and procedures, as well as the 1997 Court Order. To further underscore the Board's bad faith and arbitrary approach, the first 57 reasons for denial stated in Resolution No. 1600 in August 1998 were the same reasons verbatim as those listed in the first denial filed in June of 1997, Resolution No. 1533. (D. Ct. Op. at 13) However, in the intervening 14 months, the Lindquists had addressed all of those issues. Thus, it became clear that the Board did not actually evaluate the Lindquists' plans, but arbitrarily denied them. The Township's claim that the Lindquists were provided with a meaningful review process and access to the Planning Commission to negotiate acceptable plans is disingenuous. The Township actually wasted the Lindquists' time and resources in seeking an approval when the Township knew that it had no intention of ever granting it.

B. Conscience Shocking Standard
In *United Artists Theatre Circuit, Inc. v. Township of Warrington,* 316 F.3d 392 (3d Cir.2003), this court adopted a new heightened standard for substantive due process cases in the land-use context. "Improper motive" was no longer the standard; the new standard was conduct that "shocks the conscience." Therefore, it is no longer sufficient for a developer to prove that a state actor intentionally worked against the developer's interests in violation of state laws or ordinances. The developer must now show that the state actor's behavior was so egregious that it was "shocking." Despite the inherently subjective nature of this inquiry, the courts have attempted to set some

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 Fed.Appx. 768                                                                                   Page 11
106 Fed.Appx. 768, 2004 WL 1598735 (3rd Cir.(Pa.))
**(Cite as: 106 Fed.Appx. 768,  2004 WL 1598735 (3rd Cir.(Pa.)))**

guiding standards in this area. For example, when a suit is brought against a state actor challenging conduct in response to an emergency situation, "more culpability is required to shock the conscience to the extent that the state actors are required to act promptly under pressure." *Schieber v. City of Philadelphia,* 320 F.3d 409, 419 (3d Cir.2003). Conversely, when officials have time to make unhurried judgments, as was true in this case, indifference and "protracted failure even to care" may be truly conscience shocking. *Leamer v. Fauver,* 288 F.3d 532, 547 (3d Cir.2002). [FN7]

> FN7. The majority at p. 775 distinguishes *Leamer* because it deals with a liberty interest in a prison setting, where the conscience shocking standard may be more easily satisfied. Yet, state actors in a prison setting share a commonality with municipal zoning boards; they both maintain complete control over their subjects' interests and may abuse their positions of power if they fail to follow their designated rules and regulations. In both instances, the Constitution may be the only check on abusive practices, regardless of whether it is a liberty or a property interest at stake. When state actors show egregious indifference, bordering on malfeasance and contempt in my view of this case, Constitutional protection is appropriate.

**\*\*12** The First Circuit has explained that "even where state officials have allegedly violated state law or administrative procedures, such violations do not ordinarily rise to the level of a constitutional deprivation." *PFZ Properties, Inc. v. Rodriguez,* 928 F.2d 28, 31 (1st Cir.1991) (on petition for rehearing). Furthermore, "mere bad faith refusal to follow state law in such local administrative matters simply does not amount to deprivation of due process **\*782** where the state courts are available to correct the error." *Chiplin Enterprises v. City of Lebanon,* 712 F.2d 1524, 1528 (1st Cir.1983).

In *United Artists,* this court agreed with the Court of Appeals for the First Circuit that the federal courts should not sit as a "zoning board of appeals," particularly when state courts are available for such a task. 316 F.3d at 402 (citing *Creative Environments, Inc. v. Estabrook,* 680 F.2d 822, 833 (1st Cir.1982)). I, of course, agree. However, in this case the Lindquists sought relief in the state courts, but the Township blatantly ignored the state Court Order. The Township persisted in arbitrary and abusive

treatment toward the Lindquists. Our court has observed that " 'the core of the concept' of due process is 'protection against arbitrary action' and that 'only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.' " *United Artists,* 316 F.3d at 399 (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 845-46, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). In my view, the Township deliberately played cat-and-mouse with the Lindquists, wasting their resources and time for a half-dozen years, arbitrarily denying multiple versions of their applications for a development to which they were initially entitled as a matter of right. To this arbitrary and egregious behavior, the Township added insult to injury by flagrantly disobeying the county Court Order.

When a township lures one of its landowners to give up a right established by township ordinance, induces him to comply with its demands for development approval only to have such compliance arbitrarily rejected, deliberately engages in a frustrating pattern to waste the landowner's resources and time over a period of years, and then flagrantly disregards the Order of a state court, such egregious conduct "shocks the conscience" in a constitutional sense. Under such circumstances, I disagree with the majority and the District Court; a federal court should grant relief.

II.

The Lindquists also claim that the District Court abused its discretion by denying their attempt to introduce evidence regarding the Yerkes/Orleans application, a neighboring land owner's application for a similar development project that was approved by the Township without any of the strong resistance encountered by the Lindquists. The majority finds no abuse of discretion because the evidence does not involve the Township's treatment of the Lindquists, and because it could not aid the Court in determining whether the treatment "shocked the conscience." I do not agree.

**\*\*13** When the District Court ruled on this evidence at trial, it was still operating under the "improper motive" standard. The Court clearly stated that favorable treatment of a similar development application would not be relevant to determine if there was "improper motive" towards the Lindquists' application. However, after the trial concluded, but before issuing its decision, this court issued its decision in *United Artists,* changing the standard of review to "shocks the conscience." Although evidence relevant to a determination of an "improper

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

motive" might have been limited to the interaction between the Lindquists and the Township, "shocks the conscience" is a much broader standard. Under this standard, therefore, a wider range of evidence is relevant.

In *United Artists,* we noted that "the measure of what is conscience-shocking is no calibrated yard stick." 316 F.3d at 399 (quoting *Lewis,* 523 U.S. at 847). Rather, "conduct that is sufficiently egregious to **\*783** shock the conscience varies depending on the *context." United Artists,* 316 F.3d at 399 n. 5 (emphasis added). Under this standard, evidence of the Township's treatment of a similar application much more favorably than the Lindquists' and with much greater dispatch could provide important information and perspective to show "conscience shocking" conduct.

The Lindquists assert that denying the multiple iterations of their plan outright, rather than approving it with conditions, was not the standard practice for the Township. The Lindquists proffer that the Yerkes/Orleans application for a cluster subdivision development submitted in January 1997 was almost identical to the Lindquists application. The Township approved the Yerkes/Orleans application after only six months of review with 276 conditions and comments. In contrast, the Lindquists' plans were denied after four years of review based on 60 comments. After reviewing Township records, the Lindquists determined that the same 60 reasons listed to justify denial of the Lindquists' application were also listed as conditions for approval in the Yerkes/Orleans application. If the Lindquists could substantiate these claims with reliable evidence, I believe that the evidence would be an important relevant factor in the fact finder's determination with the other evidence referred to above, whether the Township was acting with the requisite level of capriciousness that "shocks the conscience."

We have acknowledged that "a change in legal standards may warrant the reopening of a case where additional testimony would be pertinent to the change of law." *Skehan v. Board of Trustees of Bloomsburg State College,* 590 F.2d 470, 479 (3d Cir.1978) *rev'd on other grounds by Smith v. City of Pittsburgh,* 764 F.2d 188 (3d Cir.1985). Precedent in this circuit and simple fairness require that this case be remanded to allow the Lindquists the opportunity to present all of their evidence that would now be relevant under the new standard established in *United Artists.*

III.

**\*\*14** The District Court denied the Lindquists' motion to amend their complaint to add an equal protection claim. The District Court denied the motion on the basis of "undue delay." The majority here advances an abbreviated analysis of this issue, which in my view does not comport with the clear precedent in our circuit.

The majority cites to *Adams v. Gould, Inc.,* 739 F.2d 858, 868 (3d Cir.1984), which provides a thorough explanation of the standard for review for a denial of a motion to amend. *Adams* explained that the mere passage of time will not require a motion to be denied; the delay must be deemed "undue" by either placing a burden on the court or causing prejudice to the opposing party. *Id.* The *Adams* opinion further clarified that questions of delay and bad faith require inquiry into the moving party's motives for not amending the complaint earlier, and questions of prejudice require a focus on the effects on the non-moving party. *Id.*

The majority asserts that when the District Court reviewed the Lindquists' explanation for failing to amend their complaint earlier in the proceedings, the Court was actually following our directive in *Adams* by exploring the Lindquists' motives. I do not think this is so. First, the District Court considered the Lindquists' explanation for the delay in their motion to amend, but did not actually explore any improper motivations. Second, even if the District Court's brief inquiry into this matter could be considered a focus on motivations, the District Court did not find that Lindquists **\*784** harbored any bad faith or improper motivations that would justify denial of the motion.

The Lindquists explained that they requested documentation of the Yerkes/Orleans application during discovery, and the Township failed to provide the records. Therefore, the Lindquists did not learn about the preferential treatment afforded to the Yerkes/Orleans application until after discovery when they uncovered these documents themselves from public records. Rather than criticizing the Township for any discovery violation, the District Court blamed the Lindquists for not seeking the public records sooner, and failing to file a motion to compel discovery. It is unmistakable from the District Court's terse order denying the motion that the Court did not actually inquire into the Lindquists' motivation for delay in amending their complaint. Nor did the Court find any improper motivation by them. Rather, the District Court concluded that the Lindquists could have discovered the information

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

sooner, and denied the motion for an apparent lack of diligence.

This court has held that "prejudice to the non-moving party is the touchstone for the denial of an amendment [of a claim]." *Cornell & Co. v. Occupational Safety & Health Review Comm'n,* 573 F.2d 820, 823 (3d Cir.1978) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330-31, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971)). Furthermore, "the obligation of the trial court in its disposition of the motion is to *articulate* the imposition or prejudice caused by the delay, and to balance those concerns against the movant's reason for delay in asserting the motion." *Coventry v. United States Steel Corp.,* 856 F.2d 514, 520 (3d Cir.1988) (emphasis added). In this case, the District Court did not articulate any prejudice to the Township or burden on the Court. The Court's explanation of actions that the Lindquists could have taken to obtain the evidence sooner does not amount to an articulation of burden or prejudice. Furthermore, any cursory inquiry into the Lindquists' "motivation" does not satisfy the Court's obligation in this matter, particularly when the Court failed to find any bad faith motivation. In my view, the District Court abused its discretion in denying the Lindquists' motion to amend. [FN8]

> FN8. Furthermore, as a prudential matter, I believe that an equal protection claim would be preferable in this case because it avoids the cumbersome and subjective "shocks the conscience" analysis. As Justice Scalia noted in a concurring opinion in *City of Cuyahoga Falls, Ohio v. Buckeye Community Hope Foundation,* 538 U.S. 188, 200-01, 123 S.Ct. 1389, 155 L.Ed.2d 349 (2003), more specific constitutional claims such as equal protection are preferable to generalized substantive due process claims.

                            IV.

**15** In conclusion, our opinion in *United Artists* brought this circuit in line with most other circuits by adopting the "shocks the conscience" standard for substantive due process claims in a land-use setting. However, if substantive due process claims are to remain viable under this standard, we must be willing to recognize when a state actor's conduct is so egregious and arbitrary so as to violate the requirements of the Fourteenth Amendment. "Shocks the conscience" is an extremely difficult standard to meet, but it is not insurmountable. I believe that the evidence in this case shows that the Township

purposefully obstructed the Lindquists' right to pursue a legitimate use of their land, and consistently and systematically abused its authority and discretion. Not only did the Township violate its own laws, but when the Lindquists sought relief in the state court, the Township frustrated that relief by violating **785** the county Court Order. At this point, I believe that the Township violated the Lindquists' due process rights.

Furthermore, even if reasonable minds may differ regarding what shocks their conscience, I believe that the District Court abused its discretion by denying the Lindquists' motion to amend their claim, and by failing to admit evidence of the Township's more favorable treatment of other land-use applicants. I would reverse the District Court on both of these grounds, remand the case to permit the Lindquists to pursue both equal protection and substantive due process claims, and allow the evidence of the Yerkes/Orleans application.

Regarding the other issues raised on appeal, I would concur with the majority that "shocks the conscience" is the appropriate standard, and that preclusive effect should not be given to the findings of the county court. I agree that the District Court did not abuse its discretion by denying the Township and Board's motion for attorneys' fees.

106 Fed.Appx. 768, 2004 WL 1598735 (3rd Cir.(Pa.))

**Briefs and Other Related Documents (Back to top)**

• _____03-2971_____(Docket) (Jul. 09, 2003)

• _____03-2431_____(Docket) (May. 16, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.