# EXHIBIT   1

(35)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

LML PATENT CORP.,  )
)
    Plaintiff,  )
)
    v.  )    Civil Action No. 04-858 SLR
)
TELECHECK SERVICES, INC.,  )
ELECTRONIC CLEARING HOUSE, INC.,  )
XPRESSCHEX, INC., and  )
NOVA INFORMATION SYSTEMS, INC.,  )
)
    Defendants.  )
)

### SCHEDULING ORDER

This ~~24~~ day of October, 2004, the Parties having satisfied their obligations under Fed. R.

Civ. P. 26(f), and the Court having conducted a pretrial scheduling conference pursuant to Fed.

R. Civ. P. 16 and D. Del. LR 16.2(a) and (b),

IT IS ORDERED that:

1.    **Pre-Discovery Disclosures:**  The Parties exchanged the information required by

Fed. R. Civ. P. 26(a)(1) and D. Del. LR 16.2 on October 19, 2004.  On October 19, 2004, LML

produced to Defendants, along with its initial disclosures, an initial set of production documents.

2.    **Discovery:**

    (a)    The Parties anticipate requiring discovery from each other and third parties to support their claims, affirmative defenses, and/or counterclaims, including discovery regarding LML's claims of infringement, willfulness and damages, and Defendants' claims of invalidity and unenforceability.

    (b)    All fact discovery shall be commenced in time to be completed by July 16, 2005.

        (1)    Document production shall begin as soon as practicable and shall continue on a rolling basis so that it is substantially completed by January 21, 2005.  Any remaining document production shall be completed no later than March 4, 2005.

(2)    Maximum of 25 interrogatories by each named party to each other named party.

(3)    Maximum of 35 requests for admission by each party to any other party, not including requests directed to the authentication of documents and the proper translations of foreign documents.

(4)    In the absence of agreement among the Parties or by order of the Court, no deposition (other than those noticed under Fed. R. Civ. P. 30(b)(6)) shall be scheduled prior to the scheduled date for completion of document production. Any depositions pursuant to Rule 30(b)(6) prior to the scheduled date for completion of document production shall be limited to topics such as identification of documents and person(s) most knowledgeable.

(5)    LML is limited to 200 hours for depositions of all witnesses, except expert witnesses. Telecheck, NOVA, and ECHO ("ECHO" collectively includes Defendants Electronic Clearing House, Inc. and Xpresschex, Inc.) are each limited to 100 hours for depositions of all witnesses, except expert witnesses. The parties shall not engage in duplicative discovery.

The parties recognize that departure from the seven hour limit imposed by Fed.R.Civ.P. 30(d)(2) may be warranted for certain key witnesses, and will negotiate in good faith to secure additional deposition time from such witnesses.

(6)    Each Defendant shall advise LML by April 29, 2005 whether it intends to rely on advice of counsel in defense to LML's charge of willful infringement. If a Defendant intends to rely on the advice of counsel defense, it shall produce all documents within the scope of Defendants' waiver of privilege (as set forth by applicable case law) on or about April 29, 2005.

(7)    The parties agree that service of discovery, motions, or other materials during this case shall be made on lead counsel of record (with copies to all counsel of record) by hand-delivery, facsimile or e-mail. If service was made by facsimile or e-mail on a particular counsel, a confirmation hard copy shall be sent by overnight mail to that counsel. Exhibits to such materials are not required to be served with an e-mail or facsimile provided that the exhibits are served with the confirmation hard copy by overnight delivery. However, if a party chooses to serve such exhibits with the corresponding materials by e-mail or facsimile, confirmation hard copies may be served by First Class mail instead of overnight mail. Service by hand-delivery/facsimile/e-mail shall be considered served on the date hand-delivered, faxed or e-mailed provided that any necessary confirmation hard copies were sent by

2

overnight mail in accordance with this paragraph. Nothing in this paragraph shall preclude any party from otherwise serving materials not filed with the Court by any other acceptable service methods under the Federal Rules.

(c)    Expert discovery shall be completed by September 30, 2005.

    (1)    Expert reports on issues for which the Parties have the burden of proof are due July 29, 2005.

    (2)    Rebuttal expert reports are due September 2, 2005.

    (3)    To the extent any objection to expert testimony is made pursuant to the principles announced in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), it shall be made by motion no later than the deadline for dispositive motions set forth herein, unless otherwise ordered by the Court.

(d)    Supplementations under Rule 26(e) shall take place in a timely manner throughout discovery, but at the very least shall be made on March 10, 2005 and May 19, 2005.

(e)    Discovery Disputes:

    (1)    The Court shall conduct at least two (2) discovery status conferences -- the first on February 1, 2005 at 4:30 p.m., and the second on June 21, 2005 at 4:30 p.m., or at some other date and time convenient for the Court.

    (2)    The Court shall remain available to resolve by telephone conference disputes that arise during the course of a deposition and disputes over the terms of a protective order.

    (3)    Absent express approval of the court following a discovery conference, no motions pursuant to Fed. R. Civ. P. 37 shall be filed.

(f)    Fact Witnesses to be called at trial:

Within one (1) month following the close of expert discovery, each party shall serve on the other parties a list of each fact witness (including any expert witness who is also expected to give fact testimony), who has previously been disclosed during discovery and that it intends to call at trial. Within one (1) month of receipt of such fact witness list, each party shall serve a list of each rebuttal fact witness that it intends to call at trial. The parties shall have the right to depose any such fact witnesses who have not previously been deposed in this case. Such deposition(s) shall be

held within one (1) month after service of the list of rebuttal fact witnesses and shall be limited to twenty (20) hours per side in the aggregate unless extended by agreement of the parties or upon order of the Court upon good cause shown.

3.    **Joinder of Other Parties and Amendment of Pleadings:**  All motions to join other Parties and/or amend the pleadings shall be filed on or before December 3, 2004.

4.    **Settlement Conference:**  Pursuant to 28 U.S.C. § 636, this matter is referred to Magistrate Judge Thynge for the purposes of exploring the possibility of a settlement.

5.    **Claim Construction Issue Identification:**  On April 15, 2005, the Parties shall exchange a list of those claim term(s)/phrase(s) that they believe need construction and their proposed claim construction of those term(s)/phrase(s). This document will not be filed with the Court. Subsequent to exchanging that list, the parties will meet and confer in person to prepare a Joint Claim Construction Statement to be submitted in conjunction with the briefing schedule in paragraph 7 below.

6.    **Summary Judgment Motions:**  All summary judgment motions shall be served and filed with an opening brief on or before October 28, 2005.  Response briefs in opposition to motions for summary judgment shall be filed no later than November 15, 2005.  Reply briefs in support of such motions for summary judgment shall be filed no later than November 23, 2005. No summary judgment motion may be filed more than ten (10) days before the above date without leave of Court.  Oral argument shall be conducted on December 19, 2005 at 1:30 p.m.

7.    **Claim Construction:**  Opening briefs on issues of claim construction shall be simultaneously submitted by all parties to the Court, along with the Joint Claim Construction Statement, on October 7, 2005, to be considered by the Court in conjunction with the summary judgment motions.  Response briefs on issues of claim construction shall be submitted to the Court no later than October 21, 2005.

8.    **Applications by Motion:**  Any application to the Court shall be by written motion filed with the clerk. The Court will not consider applications and requests submitted by letter or in a form other than a motion, absent express approval by the Court.

    (a)    Any non-dispositive motion should contain the statement required by D. Del. LR 7.1.1.

    (b)    No telephone calls shall be made to chambers.

    (c)    Any party with an emergency matter requiring the assistance of the Court shall e-mail chambers at: slr_civil@ded.uscourts.gov. The e-mail shall provide a short statement describing the emergency. NO ATTACHMENTS shall be submitted in connection with said e-mails.

9.    **Motions in Limine:**  All motions in limine shall be filed on or before the date that is two weeks before the pre-trial conference.  All responses to said motions shall be no later than one week before the pre-trial conference.

10.    **Pretrial Conference:**  A pretrial conference will be held on March 21, 2006, at 4:30 p.m. in courtroom 6B, Sixth Floor, Federal Building, 844 King Street, Wilmington, Delaware. The Federal Rules of Civil Procedure and D. Del. LR 16.4 shall govern the pretrial conference.

11.    **Trial:**  This matter is scheduled for one or more jury trial(s) commencing on April 17, 2006 in courtroom 6B, Sixth Floor, Federal Building, 844 King Street, Wilmington, Delaware.  The Court has tentatively scheduled a total of two weeks, beginning on April 17, 2006, on its calendar for the trial(s) of this case.  For purposes of completing pretrial preparations, the parties should plan on being allocated a total number of hours in which to present their respective cases.

_____
Honorable Sue L. Robinson
United States District Judge

# EXHIBIT   2

1

1                   IN THE UNITED STATES DISTRICT COURT

2                   IN AND FOR THE DISTRICT OF DELAWARE

3                              - - -

4    LML PATENT CORPORATION,          :         CIVIL ACTION
                                      :
5              Plaintiff             :
                                      :
6         vs.                        :
                                      :
7    TELECHECK SERVICES, INC.,        :
     ELECTRONIC CLEARING HOUSE,       :
8    INC., XPRESSCHEX, INC.          :
     and NOVA INFORMATION            :
9    SYSTEMS, INC.,                  :
                                      :
10            Defendants             :         NO. 04-858 (SLR)

11                             - - -

12                                    Wilmington, Delaware
                                      Tuesday, March 22, 2005
13                                    4:45 o'clock, p.m.

14                             - - -

15   BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge

16                             - - -

17   APPEARANCES:

18
            MORRIS, JAMES, HITCHENS & WILLIAMS
19          BY:  RICHARD K. HERRMANN, ESQ.

20                      -and-

21

22

23                                    Valerie J. Gunning
                                      Official Court Reporter
24

25

```
 1    APPEARANCES (Continued):

 2
              KIRKLAND & ELLIS
 3            BY:  RUSSELL LEVINE, ESQ. and
                   JAMIE H. McDOLE, ESQ.
 4                 (Chicago, Illinois)

 5                      Counsel for Plaintiff

 6
              FISH & RICHARDSON P.C.
 7            BY:  WILLIAM J. MARSDEN, JR., ESQ.,
                   TIMOTHY DEVLIN, ESQ.,
 8                 STAMTIOS STAMOULIS, ESQ. and
                   TARA ELLIOTT, ESQ.
 9
10                      Counsel for Defedant Telecheck
                        Services, Inc.
11

12            CONNOLLY, BOVE, LODGE & HUTZ LLP
              BY:  FRANCIS DiGIOVANNI, ESQ.
13

14                      -and-

15
              BELASCO JACOBS & TOWNSLEY, LLP
16            BY:  MARK B. MIZRAHI, ESQ.
                   (Los Angeles, California)
17
                        Counsel for Defendants Electronic
18                      Clearing House, Inc. and
                        Xpresschex, Inc.
19

20            THE BAYARD FIRM
              BY:  RICHARD D. KIRK, ESQ.
21
                        Counsel for Defendant Nova Information
22                      Systems, Inc.

23                      -  -  -

24

25
```

3

```
 1
 2                       P R O C E E D I N G S
 3
 4              (Proceedings commenced in the courtroom,
 5     beginning at 4:45 p.m.)
 6
 7              THE COURT:  Good evening.
 8              MR. HERRMANN:  Good evening, your Honor.
 9              Your Honor, on behalf of LML, I'd like to
10     re-introduce Russell Levine, from Kirkland & Ellis, and
11     Jamie McDole, from Kirkland & Ellis.
12              MR. LEVINE:  Good afternoon, your Honor.
13              MR. McDOLE:  Good afternoon, your Honor.
14              MR. MARSDEN:  Good afternoon, your Honor.
15     Richard Marsden, from Fish & Richardson, representing
16     the defendant TeleCheck.
17              I have from my office Tara Elliott, Stam
18     Stamoulis and Tim Devlin.
19              MR. DiGIOVANNI:  Your Honor, Frank DiGiovanni,
20     for defendants Xpresschex and Electronic Clearing House.
21              And with me is Mark Mizrahi, of the firm of
22     Belasco Jacobs & Townsley.
23              THE COURT:  Good afternoon.
24              MR. KIRK:  Richard Kirk, from The Bayard Firm,
25     for the defendant, Nova Information Systems, Inc.
```

4

1           THE COURT:  All right.  Thank you.

2           There's quite a list, so we need to get

3   started if, in fact, we have all of these issues to

4   address.

5           MR. HERRMANN:  Thank you, your Honor.

6           Your Honor, primarily the most important

7   issue has to do with the failure of the defendant,

8   TeleCheck, to comply with the Court's scheduling order

9   and the Federal Rules.

10          The production of documents was to be

11  substantially complete on January 21st and complete on

12  March 4th.  We received less than 2 percent of the total

13  document production by the 21st and less than 25 percent

14  of the production by the 4th.

15          The documents that we received on the 4th

16  were in disk form, which was agreed to by the parties,

17  but was unreadable.  It wasn't until the 18th of this

18  month, just a few days ago, we received the substantial

19  part of the production, over 800,000 pages.  We're still

20  receiving a hundred thousand pages, actually 200,000

21  pages, as of today.  We have not been told that we are

22  at the end of the document production, but have been

23  told that they are going to continue rolling in and have

24  not been told an end in sight.

25          So our first issue, your Honor, is to deal

1   with obtaining a date certain by which the documents

2   will be produced.  We have asked that it be at the end

3   of this month and it turns out that the 31st of March

4   ends on a Sunday, and so we'd like the documents to be

5   produced and completed by the 29th of March, which is a

6   Friday.

7           And I suppose the most orderly way to

8   proceed with this list, your Honor, is to deal with it

9   one item at a time.

10          THE COURT:  All right.  Actually, by my

11  count, the 31st is a Thursday.

12          MR. HERRMANN:  Is that right?

13          MR. McDOLE:  Yes.

14          MR. HERRMANN:  Then we would like it to be

15  produced on the 31st, your Honor.

16          THE COURT:  All right.

17          MR. MARSDEN:  May I respond, your Honor?

18          THE COURT:  Yes, you may.

19          MR. MARSDEN:  I know you've had a long day,

20  so I will try to spare you a blow by blow of how we got

21  to where we are.  But to try to summarize the very high

22  points, we have produced over 1.3 million pages of

23  documents, so this is a very substantial case in terms

24  of document production.

25          Production was complicated by two facts that

1    I pointed out in an e-mail to the Court at the original

2    due date, March 4th.  One was relating to the need to

3    review all of these documents a second time for

4    privilege because of the terms of the protective order

5    in this case, which was the subject of an earlier

6    conference with the Court, and the other was related

7    to another case in which these documents had been

8    produced and were subject to a discovery order in that

9    case.

10           That said, your Honor, we believe we're at

11   the stage of wrapping up the loose ends.  However, I'm

12   not certain that the 31st is going to do it for a few

13   of those loose ends.  Mr. Devlin has been dealing

14   directly with the client on a couple of those loose ends

15   and I think he would be able to speak to exactly how

16   much time we need for these couple loose ends.

17           MR. DEVLIN:  Your Honor, if I may, I'll be

18   happy to talk about the details to the extent you're

19   interested.  I don't think it's going to be that

20   interesting to you.  But in terms of what remains, it is

21   a very, very small fraction and we informed opposing

22   counsel yesterday of the exact nature of the various

23   categories of documents that remain to be produced.

24           We think that two weeks is probably a good

25   time frame for us to be looking at.  The 31st presses us

1    just slightly.  It really is only a matter of difference

2    in days between the 31st and what the two-week date

3    might be.

4            Most of those documents can be produced

5    within a week.  They've already been reviewed for

6    privilege and we can get those out the door, and we

7    talked about a mechanism for marking those documents in

8    electronic form yesterday through counsel that was

9    agreed to.

10            There is a small other subset of documents

11   that we're still collecting as part of a supplemental

12   collection and we're just working with the client on

13   those, and that's why we think a two-week date would be

14   a little more appropriate.

15            Thank you, your Honor.

16            THE COURT:  All right.

17            MR. HERRMANN:  Your Honor, the 21st of March

18   will mark the second month by which they should have

19   been substantially completed and we would ask that the

20   documents be produced by the end of the month.

21            MR. MARSDEN:  Your Honor, just so the record

22   is clear here, we also received over half of their

23   document production on the last day, that is March 4th,

24   so they also ignored the completion due date with a

25   much smaller volume of documents.

1          ·  I hoped we wouldn't get into this blow by

2     blow.  We thought we had worked this out yesterday and

3     told them we would produce the documents as quickly as

4     we could.  It will be a very small fraction of what has

5     been produced to date.

6               MR. HERRMANN:  I will respond to Mr.

7     Marsden's issue as to our production if he brings it up

8     during the course of whatever items on his agenda he

9     cares to discuss.

10               THE COURT:  All right.  Well, you know,

11     we're talking about five days, and I just, quite frankly,

12     can't spend any emotional energy on this.  I would rather

13     set a date that everyone agrees they can meet than set

14     another date that will create another controversy among

15     the parties if it's not met.

16               I don't have time for that, so it will be

17     two weeks from today, which is April 5th.  And may I say

18     that if document production isn't completed by April

19     5th, we'll start talking about sanctions because this

20     is your date and you told me you could do it and,

21     obviously, April 5th is substantially past March 4th.

22     All right?

23               All right.  Let's get on to the next most

24     important item.

25               MR. DEVLIN:  Thank you, your Honor.

1         MR. HERRMANN:   Item No. 2, your Honor, the

2    500 boxes that we've been dealing with with TeleCheck

3    were known to TeleCheck to be in existence in October

4    when these discussions started.   They knew that these

5    documents were subjected to the request for production

6    since October.   They knew that the documents were

7    involved in another litigation since October.

8         The reasons that Mr. Marsden has listed in

9    his e-mail to your Honor as to the reasons that the

10   production was not made seems to be somewhat

11   inconsistent with the record in the case.   We seem to,

12   I think, be penalized because we had negotiated the

13   protective order that your Honor signed.

14        What we would like to do is test the factors,

15   the reasons for the failure of discovery in this case

16   either directly or through the use of liaison.

17        Once again, the first production of 300,000

18   pages were not readable.   I don't know that we still

19   have resolved those issues.

20        But we would like to inquire as to why the

21   production took so long and why the document review

22   occurred when it did and --

23        THE COURT:   I mean, do you need to ask

24   my permission to do that?   I guess I'm sitting here

25   puzzled as to why you are asking my permission to take

1  discovery.

2          MR. HERRMANN:  We're concerned, your Honor.

3  The issue, one of relevancy and, two, work product will

4  be raised as a result of our inquiries to the issues

5  that we think that we are going to need to establish to

6  indicate that there has been a substantial violation to

7  the scheduling order.

8          THE COURT:  Well, it seems to me that in any

9  case I allow 30(b)(6) depositions so -- to confirm that

10  the appropriate document searches have been done and to

11  confirm that document production is complete.  And to

12  confirm that that document production was done in good

13  faith.

14          I think that's standard.  So you certainly

15  have my permission to take that kind of a deposition.

16          Now, I suppose that if during the deposition,

17  the work product privilege arises as an obstacle to the

18  kind of factual information you are looking for, you can

19  call me during the deposition, and I will determine at

20  that time during the deposition what's going on.

21          But, certainly, I think that's what 30(b)(6)

22  depositions are for.

23          MR. HERRMANN:  Thank you, your Honor.

24          THE COURT:  All right.

25          MR. MARSDEN:  Your Honor, if I could just

11

1    address that briefly...

2              We will undoubtedly have a 30(b)(6) of their

3    records custodian as well.  I hope this is not some

4    effort to start a witch hunt about sanctions.  The fact

5    of the matter is here we are within a couple of weeks of

6    the cutoff and we've produced a million-three in

7    documents and we'll have the rest in in the next couple

8    of weeks.

9              But there are explanations for why it took

10   that long and we'll provide those through a 30(b)(6)

11   witness.  But I don't think it should go beyond that.

12             MR. HERRMANN:  Well, your Honor, we are going

13   to take whatever discovery we believe we're entitled to

14   take in terms of determining how the process occurred

15   and when it occurred.

16             THE COURT:  All right.  You know, you do

17   what you've got to do here.  I'm here to make sure that

18   if you have complaints, they are addressed in some

19   fashion and to make sure that no one is playing fast

20   and loose with the rules.

21             So as long as we're all on the same page,

22   take your 30(b)(6) and we'll see where it leads.

23             I do have to say, though -- well, I'm not

24   going to say anything more.

25             All right.  Let's get on to not necessarily

12

1   number three on your list, but the most important thing

2   on your list because I don't -- I'm not confident that

3   all of these things we can get to.

4           MR. HERRMANN:  3 and 4, your Honor, probably

5   are the next most important things on the list.  These

6   have to do with privilege logs.

7           I'd like to have a date certain by which the

8   Court will compel the defendants to supply privilege logs

9   and at which point, if the logs aren't produced, that the

10  privilege will be considered waived.

11          THE COURT:  And I take it plaintiff has

12  provided its privilege log for all of these documents?

13          MR. HERRMANN:  We have, your Honor.

14          THE COURT:  All right.

15          MR. MARSDEN:  Your Honor, we obviously have

16  no problem.  I understand we have an obligation to

17  provide the privilege log.  Our focus an effort has been

18  on getting the documents out the door to them.  And

19  because of this issue with the protective order and I

20  don't need to go back into it, but the bottom line is,

21  both because of the terms of the protective order in

22  this case and because of our inability to reach agreement

23  with them on things that we're ordinarily able to work

24  out in terms of the scope of the waiver, for example,

25  relating to simple transmittal documents, we wanted an

1  agreement that a simple transmittal document won't be

2  construed to be a waiver of the privilege with respect to

3  all communications, for example, regarding a particular

4  patent application.  We couldn't get agreement on that.

5  For that reason it's going to be longer than we'd like

6  and would take a little longer to prepare them than we'd

7  like.

8         Mr. Devlin?

9         MR. DEVLIN:  I think two weeks we could get

10 that out, your Honor.

11        THE COURT:  I thought you said you had gone

12 through and before you produced theoretically you'd

13 identify it, so it's just a matter of translating that

14 information.  So two weeks, April 5th.

15        MR. DEVLIN:  That's right.  It's just a

16 matter of the volume.  With your Honor's permission, I'm

17 going to excuse myself from the conference.  I need to

18 catch a plane, if I may.

19        THE COURT:  All right.  All right.  Let's go

20 on to the next most important issue.

21        MR. HERRMANN:  With regard to the defendants,

22 Echo and TeleCheck, your Honor, we would like to have

23 the same ruling with regard to privilege logs.  We

24 understand that the defendant, Echo, has objected to

25 approximately 75 percent of the requests as privileged,

# EXHIBIT 3



**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
Gregory CUMMINGS, et al.
v.
CITY OF PHILADELPHIA, et al.
**No. Civ.A. 03-0034.**

April 26, 2004.
Tshaka LaFayette, LaFayette & Associates PC,
Philadelphia, PA, for Plaintiffs.

Lynne A. Sitarski, City of Philadelphia Law
Department, Deputy City Solicitor, Philadelphia, PA,
for Defendants.

*MEMORANDUM AND ORDER*

HUTTON, J.

**\*1** Currently before the Court are Defendants City of
Philadelphia and Detective Theodore Ryan's Motion
for Summary Judgment (Docket Nos. 10 & 11),
Plaintiffs' Response thereto (Docket Nos. 12 & 13),
Defendants' Reply to Plaintiffs' Response (Docket
No. 17), Plaintiffs' Motion for Leave to File a Second
Amended Complaint (Docket No. 16), Defendants'
Response thereto (Docket No. 18), and Plaintiffs'
Reply to Defendants' Response.

I. *PROCEDURAL AND FACTUAL BACKGROUND*
[FN1]

> FN1. To the extent the facts are in dispute,
> they are presented in the light most
> favorable to the Plaintiff. *See Big Apple
> BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d
> 1358, 1363 (3d Cir.1992), *cert. denied,* 507
> U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659
> (1993).

This case arises out of the allegedly wrongful arrests
of Plaintiffs Gregory Cummings ("Cummings") and
his mother, Shirley Baker ("Baker") (collectively
"Plaintiffs"). On January 2, 2001, Cummings was

arrested by Philadelphia police officers on warrant #
254785. On May 15, 2001, Baker was arrested on
warrant # 254786. The arrest warrants were signed by
a bail commissioner of the Philadelphia County Court
of Common Pleas pursuant to Criminal Complaints
from the Office of the District Attorney that were
based on affidavits of probable cause filled out by
Defendant Detective Theodore Ryan. In the
Amended Complaint, Plaintiffs challenge the validity
of these warrants arguing, *inter alia,* that Detective
Ryan did not have probable cause to obtain them and
that Defendant City of Philadelphia ("City") failed to
adequately train its investigating officers.

Warrants # 254785 and # 254786 are based on the
story of Tiffany Robinson, the daughter of
Cummings' ex-girlfriend, Defendant Katherine
Sessions. Cummings and Sessions had been in an
ongoing custody battle over Cummings' son Jabree,
who was then in Sessions' custody. On November 27,
2000, Robinson, who was 15 years old at the time,
reported to police that Baker pulled alongside her in a
car and yelled, "Listen you little bitch, tell your
mother to give me my grandson back, or I'll kill her."
Robinson also reported that before the car drove off,
Baker fired three gun shots at her. Robinson was
uninjured. Cummings was allegedly in the passenger
seat during the incident.

After the incident, Robinson was taken to a police
station where she met with Detective Ryan and
recited the above story. Robinson also told him that
she had no doubt that she saw her "stepbrother"
Jabree's grandmother Baker and his father Cummings
in the car. *See* Investigation Interview Record, Nov.
27, 2000, Docket No. 11, Ex. C. The next day,
November 28, 2000, Detective Ryan visited the scene
of the alleged shooting. While there, he did not find
any bullet casings to evidence the alleged shooting.
*See* Ryan Dep. at 47, Docket No. 13, Ex. B. He
interviewed Karo Sharpe, a school crossing guard on
duty at the time of the shooting, who reported that
she did not hear or see anything out of the ordinary.
*See* Investigation Report of Det. Ryan, Docket No.
11, Ex. G.

Detective Ryan filed two Affidavits of Probable
Cause in support of arrest warrants for Plaintiffs
Gregory Cummings and Shirley Cummings, a.k.a.
Shirley Baker. In the Affidavits, Detective Ryan
recounted Tiffany Robinson's story and stated that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 906259 (E.D.Pa.)
**(Cite as: 2004 WL 906259 (E.D.Pa.))**

there was a custody battle between Sessions and Cummings and that there was a Protection from Abuse Order on Cummings. Detective Ryan also stated that he had an approved arrest warrant for Cummings for an incident on November 13, 2000 when Cummings allegedly threatened Sessions. The details of the incident were not included in the affidavit. [FN2] Ryan also did not include the report of the crossing guard or the fact that he had visited the scene of the alleged shooting and did not find bullet casings. *See* Affidavits of Probable Cause for Arrest Warrants, Docket No. 11, Exs. H & I.

> FN2. Katherine Sessions alleges that on November 13, 2000, Cummings threw a brick into a window of her house with a threatening note on it. Detective Ryan investigated the brick throwing incident on November 15, 2000, when he also learned of the custody dispute and the Protection from Abuse Order. *See* Ryan Dep. at 21, Docket No. 13, Ex. B.

 **\*2** Detective Ryan submitted the Affidavits to the Office of the District Attorney for approval. Both Affidavits were approved and Detective Ryan then applied for the arrest warrants with a Philadelphia bail commissioner. The bail commissioner determined there was probable cause to arrest Plaintiffs and issued Arrest Warrants # 254785 and # 254786.

 On January 2, 2001, Cummings was arrested on Warrant # 254785. [FN3] Cummings explains that he was at a courthouse on January 2 for a custody hearing at which he expected to regain custody of his son Jabree. Before the hearing took place, however, Sessions identified Cummings to the police, telling them there was a warrant out for Cummings' arrest. *See* Cummings Dep. at 40, Docket No. 13, Ex. B-1. Cummings was arrested and subsequently incarcerated for 17 months, until May 17, 2002, when a jury found him not guilty of all charges against him arising out of the allegations of Sessions and her daughter Tiffany Robinson.

> FN3. Cummings was also arrested on Warrant # 254514, issued for the alleged November 13, 2000 brick throwing incident. The specifics of this warrant are discussed below in conjunction with Plaintiffs' Motion to Amend.

 Shirley Baker was arrested on May 15, 2001, on Warrant # 254786. [FN4] She was held for nine days

before her release. She, too, was found not guilty of the alleged November 27, 2000 shooting.

> FN4. Baker alleges her arrest took place on May 15, 2001. The Arrest Report, however, indicates she was arrested on May 31, 2001. *See* Arrest Report, Docket No. 11, Ex. M.

 The Amended Complaint states claims under 42 U.S.C. § 1983 against Detective Ryan, alleging Plaintiffs' Fourth Amendment rights were violated when Ryan made false statements and misleading omissions in the Affidavits of Probable Cause for warrants # 254785 and # 254786. Plaintiffs also bring § 1983 malicious prosecution claims against Detective Ryan. Lastly, Plaintiffs bring § 1983 claims against the City for failure to adequately train its investigating officers. [FN5]

> FN5. The Amended Complaint also states claims for abuse of process and intentional infliction of emotional distress against Katherine Sessions. Sessions has not moved for summary judgment and has not filed a motion in opposition to Plaintiffs' motion to amend.

## II. *LEAVE TO AMEND*
 In the first motion before the Court, Plaintiffs seek leave to amend the first Amended Complaint to allege a constitutional violation arising out of arrest warrant # 254514. This third warrant was issued for the alleged brick throwing incident of November 13, 2000.

 A. *Legal Standard*

 Federal Rule of Civil Procedure 15(a) allows a plaintiff to seek leave of court to amend a complaint even after the defendant has filed an answer:
> A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served.... Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

 Fed.R.Civ.P. 15(a). The United States Supreme Court has noted that leave should be freely granted because a plaintiff ought to be afforded an opportunity to test his claim on the merits. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Leave can be denied, however, where allowing the amendment would cause undue prejudice to the defendant or where the amendment is futile. *See id.; Burlington Coat Factory Sec. Litig.,*

114 F.3d 1410, 1434 (3d Cir.1997); *Hairston-Lash v. R.J.E. Telecom, Inc.,* No. 00-2070, 2000 U.S. Dist. LEXIS 15697 (E.D.Pa. Oct. 26, 2000). Prejudice and futility are the bases of Defendants' arguments in opposition to the instant motion.

B. *Discussion*

**\*3** This case involves the validity of the two arrest warrants used to arrest Plaintiffs on January 2, 2001 and May 15, 2001. Those warrants were based on the story of Tiffany Robinson. Plaintiffs seek leave to include allegations regarding the validity of another warrant pursuant to which Cummings was arrested on January 2, 2001. This third warrant, # 254514, is mentioned only once in the Amended Complaint and the Defendants did not have notice that Plaintiffs would challenge the validity of the warrant until the motion to amend was filed.

The proposed amendment would allege that warrant # 254514 was based on the story of Katherine Sessions, who reported to police that "she discovered someone had thrown a rock through her window and that there was a threatening note. She told police investigating the incident that she recognized the handwriting on the note to be that of Cummings." *See* Pl.'s Proposed Second Amended Complaint, para. 11, Docket No. 16, Ex. A. The proposed amendments would also allege that Detective Ryan failed to conduct an investigation of Sessions' story and made an application for an arrest warrant against Cummings in which he recklessly made misleading statements and material omissions. *Id.* at para. 12, 17.

Plaintiffs assert they are entitled to leave to amend because the proposed amendment merely adds facts to the pleading that came to Plaintiffs' counsel's attention during discovery. Defendants oppose the motion arguing that the amendment does not just add facts, but a new legal claim. Specifically, Defendants claim (1) that they will be unduly prejudiced if leave is granted at this late juncture and (2) that the amendment asserts a time-barred claim and is, thus, futile.

The Court of Appeals for the Third Circuit has noted that prejudice to the non-moving party is the touchstone for the denial of an amendment. *See Lorenz v. CSX Corp.,* 1 F.3d 1406, 1413 (3d Cir.1993); *Hairston-Lash,* 2000 U.S. Dist. LEXIS 15697, at \*5. Prejudice is more than mere delay or passage of time; it involves showing that the non-moving party "was unfairly disadvantaged or deprived of the opportunity to present facts or

evidence which it would have offered had the [moving party's] amendments been timely." *Heyl & Patterson Int'l, Inc. v. F.D. Rich Housing of the Virgin Is., Inc.,* 663 F.2d 419, 426 (3d Cir.1981); *see also United States v. Duffus,* 174 F.3d 333, 337 (3d Cir.1999); *Lorenz,* 1 F.3d at 1413-14. Prejudice means "undue difficulty in prosecuting [or defending] a law suit as a result of a change in tactics or theories on the part of the other party." *Deakyne v. Comm'rs of Lewes,* 416 F.2d 290, 300 (3d Cir.1969).

Courts in this Circuit have traditionally allowed amendments where the amendment clarified the plaintiff's legal theory or provided specific facts concerning the claims already asserted. *See Johnston v. City of Phila.,* 158 F.R.D. 352, 354 (E.D.Pa.1994); *see also Downey v. Coalition Against Rape & Abuse,* 143 F.Supp.2d 423, 436-37 (D.N.J.2001) (allowing amendment because it did not present new causes of action and would require very little new briefing by non-moving party); *Cuffy v. Getty Ref. & Mktg.,* 648 F.Supp. 802 (D.Del.1986).

**\*4** Courts have found undue prejudice to the non-moving party and denied leave to amend where the amendment would have asserted new claims, where new discovery would have been necessary, where the motion for leave was filed months after the factual basis of the amendment was discovered by the moving party, and where the motion for leave was brought after summary judgment motions were filed. *See Berger v. Edgewater Steel Co.,* 911 F.2d 911, 924 (3d Cir.1990) (discussing all factors listed in upholding trial court's denial of leave); *Johnston,* 158 F.R.D. at 354 (denying leave to amend to add a gender discrimination claim to the previously claimed racial discrimination); *Ellwood City v. Pa. Power Co.,* 570 F.Supp. 553, 556 (W.D.Pa.1983) (denying leave to amend because it would require new discovery and discovery period had already expired).

In this case, Defendants Ryan and the City will be unduly prejudiced if leave to amend is granted. First, Plaintiffs filed the motion for leave to amend after the close of discovery, after summary judgment motions were filed, after pre-trial memoranda were filed, and after the case was put in the trial pool. Second, Plaintiffs discovered information about the third warrant no later than September 29, 2003, prior to the discovery deadline and over two months prior to filing the instant motion. Third, as noted above, since the inception of this litigation against Detective Ryan and the City, the case has concerned the conduct of Detective Ryan with regards to arrest warrants #

254785 and # 254786. Granting leave to amend at this juncture would introduce a new claim based on warrant # 254514. Fourth, additional discovery would be needed for the third warrant so that Detective Ryan and the City could adequately defend themselves. The fact that Defendants were aware of the third warrant, as Plaintiffs point out in their brief, is of no consequence. Although Defendants knew the warrant existed, they did not know that Plaintiffs were challenging its validity and, in fact, were expecting that Plaintiffs would not challenge its validity. *See* Ryan Dep. at 26, Docket No. 13, Ex. B.

In sum, the totality of circumstances indicates that Detective Ryan and the City would suffer undue prejudice in defending this case if the Court were to grant Plaintiffs' motion. Accordingly, the motion for leave to amend Counts I, II, III, VI, VII, and VIII of the Amended Complaint against the instant Defendants is denied. [FN6]

> FN6. The Court need not reach the Defendants' futility argument.

### III. *SUMMARY JUDGMENT*

The next motion before the Court is Defendants' motion for summary judgment. The City and Detective Ryan move for summary judgment on all counts against them.

### A. *Legal Standard*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment has the initial burden of showing the basis for its motion. *See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).* Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to go beyond the mere pleadings and present evidence through affidavits, depositions, or admissions on file showing a genuine issue of material fact for trial. *See id.* at 324. The substantive law determines which facts are material. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).* If the evidence is such that a reasonable jury could return a verdict for the nonmoving party, then there is a genuine issue of fact. *See id.*

**\*5** When deciding a motion for summary judgment,

all reasonable inferences are drawn in the light most favorable to the non-moving party. *See Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir.1992), cert. denied, 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).* Moreover, a court may not consider the credibility or weight of the evidence in deciding a motion for summary judgment, even if the quantity of the moving party's evidence far outweighs that of its opponent. *See id.* Nonetheless, a party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements. *See Trap Rock Indus., Inc. v. Local 825, 982 F.2d 884, 890 (3d Cir.1992).*

### B. Counts I & VI: *Section 1983* Fourth Amendment Claims against Detective Ryan

Section 1983 imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States. [FN7] To prevail under section 1983, a plaintiff must establish (1) that the defendants were "state actors," and (2) that they deprived the plaintiffs of a right protected by the Constitution. *Groman v. Township of Manalapan, 47 F.3d 628, 633 (3d Cir.1995).* Because Detective Ryan has raised a qualified immunity defense, Plaintiffs have a further burden. *See Wilson v. Russo, 212 F.3d 781, 786 (3d Cir.2000).* Plaintiffs must first show that Detective Ryan's alleged conduct violated a federal statute or constitutional right. If step one is met, Plaintiffs must show that the right violated was clearly established at the time of the defendant's conduct. Summary judgment is appropriate if no reasonable juror could conclude that Plaintiffs' clearly established right was violated. *See id.* (citing *Orsatti v. New Jersey State Police, 71 F.3d 480, 482 (3d Cir.1995)*).

> FN7. Section 1983 states:
> Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress.
> 42 U.S.C. § 1983 (2004); *see also Conn v. Gabbert, 526 U.S. 286, 289, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999); Gruenke v. Seip, 225 F.3d 290, 298 (3d Cir.2000).*

In Counts I and VI Cummings and Baker claim, respectively, that they were arrested without probable cause in violation of their Fourth Amendment right to be free from unreasonable seizure. Plaintiffs acknowledge the warrants, but argue that the warrants were not supported by probable cause because they were obtained through Detective Ryan's false affidavits.

The standard for challenging the validity of the underlying affidavit of an arrest warrant was established by the United States Supreme Court in *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); *Sherwood v. Mulvihill,* 113 F.3d 396 (3d Cir.1997). A plaintiff may succeed in a § 1983 action for false arrest made pursuant to a warrant if the plaintiff shows, by a preponderance of the evidence: (1) that the police officer "knowingly and deliberately, or with reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant;" and (2) that "such statements or omissions are material, or necessary, to the finding of probable cause." *Wilson,* 212 F.3d at 786-87 (quoting *Sherwood,* 113 F.3d at 399).

1. *Reckless Disregard for the Truth*

*6 In step one of the *Franks* analysis, the Court must determine whether a reasonable jury could conclude that Detective Ryan made statements or omissions that he either knew or should have known were false except for his reckless disregard for the truth. *Wilson,* 212 F.3d at 787 (citing *United States v. Leon,* 468 U.S. 897, 923 (1984)). The Third Circuit has noted that a reckless disregard for the truth means different things when dealing with omissions and assertions. *See id.* Omissions are made with reckless disregard "if an officer withholds a fact in his ken that '[a]ny reasonable person would have known that this was the kind of thing the judge would wish to know.' " *Id.* (quoting *United States v. Jacobs,* 986 F.2d 1231, 1235 (8th Cir.1993)). "Unlike omissions, assertions can be made with reckless disregard for the truth even if they involve minor details--recklessness is measured not by the relevance of the information, but by the demonstration of willingness to affirmatively distort the truth." *Id.* at 788. "An assertion is made with reckless disregard when 'viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.' " *Id.* (quoting *United States v. Clapp,* 46 F.3d 795, 801 n. 6 (8th Cir.1995)).

Cummings and Baker claim that Detective Ryan made omissions and false assertions in the affidavits of probable cause for arrest warrants # 254785 and # 254786. [FN8] The affidavits are identical in substance. They explain Tiffany Robinson's story about the shooting, the existence of a protection from abuse order on Cummings, and the custody dispute between Cummings and Sessions over Sessions' stepson Jabree. Detective Ryan states that Robinson positively identified Cummings from a police photograph and that there was an approved affidavit from Cummings' arrest for the incident on November 13, 2000.

> FN8. Cummings also raises an issue concerning the Criminal Complaint filed against him by the Commonwealth of Pennsylvania. Docket No. 13, Ex. C-2. The District Attorney's Office prepares and issues the Criminal Complaint, not Detective Ryan. Thus, Detective Ryan's potential liability lies only in the Affidavit of Probable Cause, the document he prepared.

Plaintiffs claim that Detective Ryan misstated the following assertions with reckless disregard for the truth: (1) Tiffany Robinson is not the stepsister of Cummings' son Jabree, and (2) Jabree is not Katherine Sessions' stepson because Sessions and Cummings were never married. As set forth above, the appropriate inquiry is whether Detective Ryan made the assertions with a high degree of awareness of their probable falsity. *See Wilson,* 212 F.3d at 788. Detective Ryan did have some background knowledge of the familial relationships of Cummings, Sessions, Robinson, and Jabree. He did not know, however, the precise relationships among the parties involved. The Court finds that Detective Ryan did not have a high degree of awareness of these facts sufficient to conclude that he acted with reckless disregard for the truth with respect to his assertions of the family relationships in the affidavit. [FN9]

> FN9. Moreover, even if Plaintiffs could prove reckless disregard, the allegedly false assertions are not material under *Franks* because probable cause to arrest still exists when the challenged assertions are removed from the affidavit.

Plaintiffs next claim that Detective Ryan omitted from the affidavit the following information: (1) Karo Sharpe, the school crossing guard on duty at the time of the shooting, reported to Detective Ryan that she

did not hear or see anything out of the ordinary on the morning of the alleged shooting; (2) Detective Ryan searched the alleged crime scene and did not find bullet casings or any other evidence to corroborate Tiffany Robinson's story; and (3) Detective Ryan never questioned Plaintiffs regarding their whereabouts at the time of the alleged shooting.

**\*7** To prove reckless disregard with respect to the omissions, Plaintiffs must show that any reasonable person would have known that the omissions were highly relevant and that a judge would want to know about them to make the probable cause determination. *See Wilson,* 212 F.3d at 788 (citing *Jacobs,* 986 F.2d at 1234). In *Wilson,* the Third Circuit instructed that, while we cannot demand that police officers relate the entire history of events leading up to a warrant application, a police officer cannot make unilateral decisions about the materiality of information and merely inform the magistrate of inculpatory evidence. *Id.* at 787. For example, in *Jacobs* the court found reckless disregard where the officer omitted from his affidavit the fact that a drug sniffing dog failed to alert on the defendant's bag that was searched pursuant to the search warrant the officer obtained. *See Jacobs,* 986 F.2d at 1234.

Here, the Court finds that any reasonable person would recognize that a judge would want to know about the lack of corroborating evidence at a crime scene, including a bystander who did not see or hear anything out of the ordinary and the absence of bullet casings at an alleged shooting scene. On the other hand, Detective Ryan had no responsibility to report the fact that he never questioned Cummings or Baker about their whereabouts. Thus, Detective Ryan acted with reckless disregard of the truth by omitting exculpatory facts about the crossing-guard and the bullet casings from the affidavit of probable cause.

2. *Materiality*

Under the next step in the *Franks* analysis, the Court must determine whether Detective Ryan's omissions made with reckless disregard of the truth were "material, or necessary, to the finding of probable cause." *Sherwood,* 113 F.3d at 399. To determine materiality, we insert the facts recklessly omitted and ask whether the "corrected" warrant establishes probable cause. *See Wilson,* 212 F.3d at 789 (citing *Sherwood* ). If probable cause still exists, the inquiry stops there and summary judgment may be granted in favor of the police officer.

To assess whether or not probable cause exists, a court must weigh the inculpatory evidence against any exculpatory evidence to determine whether a reasonable person would believe that an offense has been or is being committed by the person to be arrested. *See Wilson,* 212 F.3d at 791; *Orsatti v. New Jersey State Police,* 71 F.3d 480, 483 (3d Cir.1995). Here, the strongest inculpatory evidence is the positive identification of Plaintiffs by the victim Tiffany Robinson. There is also evidence of the custody dispute and the protection from abuse order issued against Cummings. The exculpatory facts recklessly omitted by Detective Ryan concern the lack of evidence from the crime scene, including the crossing guard's statement and the lack of bullet shells.

The Third Circuit has rejected the argument that positive identification by a victim is absolute proof of probable cause. *See Wilson,* 212 F.3d at 790. "Independent exculpatory evidence or substantial evidence of the witness's own unreliability that is known by the officer could outweigh the identification such that probable cause would not exist." *Id.* Nonetheless, weighing the exculpatory evidence against the positive identification of Plaintiffs by Robinson, the exculpatory facts are not sufficient to undermine a finding of probable cause. *See, e.g., id.* (holding positive identification by victim outweighs exculpatory evidence on specific facts of case); *Roberts v. Toal,* No. 94-0608, 1997 WL 83748 (E.D.Pa. Feb. 20.1997) (same); *Thomas v. Piree,* No. 95-956, 1995 WL 709938 (E.D.Pa. Dec.1, 1995) (same). The Court concludes, therefore, that no reasonable jury could find that Detective Ryan's affidavit, after inserting the omissions, lacked probable cause to arrest Cummings and Baker for allegedly firing shots at Robinson. Summary judgment on Counts I and VI is granted in favor of Detective Ryan. [FN10]

FN10. Because the Court holds that Detective Ryan did not knowingly or recklessly omit facts that could negate probable cause, the Court also holds that Detective Ryan did not violate Plaintiffs' Fourth Amendment rights and that Detective Ryan is entitled to qualified immunity. *See Sherwood,* 113 F.3d at 402; *Thomas,* 1995 WL 709938 at *6 n. 12.

C. *Counts III & VIII:* Section 1983 *Malicious Prosecution Claims against Detective Ryan*

**\*8** To prove a claim for malicious prosecution under

§ 1983, Plaintiffs must establish a deprivation of liberty consistent with the Fourth Amendment concept of seizure and the common law elements of the tort. *See Gallo v. City of Phila.*, 161 F.3d 217, 222 (3d Cir.1998) (interpreting *Albright v. Oliver*, 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994); *Backof v. New Jersey State Police*, No. 02-4131, 2004 WL 260779 (3d Cir. Feb.13, 2004) (unpublished); *Colbert v. Angstadt*, 169 F.Supp.2d 352, 355 (E.D.Pa.2001). Under the common law of Pennsylvania, Plaintiffs must show: (1) Detective Ryan initiated a criminal proceeding; (2) the proceeding ended in Plaintiffs' favor; (3) Detective Ryan initiated the proceeding without probable cause to arrest; and (4) Detective Ryan acted with actual malicious purpose. *See Patterson v. Sch. Dist. of Phila. .*, No. 99-4792, 2000 WL 1020332, *5 (E.D.Pa. July 19, 2000).

Plaintiffs meet the constitutional element of their malicious prosecution claims. Cummings was arrested and incarcerated for 17 months before trial and Baker was arrested and allegedly incarcerated for nine days, constituting a seizure under the Fourth Amendment. However, Plaintiffs fail at least the third prong of the common law inquiry. As discussed above, Plaintiffs were arrested with probable cause, even after correcting for Detective Ryan's reckless omissions. Thus, Plaintiffs cannot prove their § 1983 malicious prosecution claim. Summary judgment is granted in favor of Detective Ryan on Counts III and VIII.

D. *Counts II & VII: Section 1983 Claims against the City*

In Counts II and VII, Plaintiffs assert a § 1983 claim against the City of Philadelphia claiming that it fails to adequately train its investigating police officers. In *Monell v. Department of Social Services*, 436 U.S. 658, 694-95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court of the United States ruled that a municipality is a "person" under federal civil rights statutes and that it can be found liable under § 1983. To establish a claim, a plaintiff must predicate recovery on the existence of a particular municipal policy or established custom. *See id.; City of Okla. City v. Tuttle*, 471 U.S. 808, 829, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion) (Brennan, J., concurring). Further, a plaintiff must prove that this policy or custom caused the deprivation of a constitutional right. *See Tuttle*, 471 U.S. at 829-30; *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

Here, Plaintiffs have offered no evidence to substantiate their *Monell* claim beyond the facts of this case. Summary judgment is granted in favor of the City on Counts II and VII.

An appropriate Order follows.

*ORDER*

AND NOW, this 26th day of April, 2004, upon consideration of Defendants City of Philadelphia and Detective Theodore Ryan's Motion for Summary Judgment (Docket Nos. 10 & 11), Plaintiffs' Response thereto (Docket Nos. 12 & 13), Defendants' Reply to Plaintiffs' Response (Docket No. 17), Plaintiffs' Motion for Leave to File a Second Amended Complaint (Docket No. 16), Defendants' Response thereto (Docket No. 18), and Plaintiffs' Reply to Defendants' Response, and for the reasons set forth in the accompanying Memorandum, IT IS HEREBY ORDERED that:

*9 (1) Plaintiffs' Motion for Leave to Amend is DENIED; and

(2) Defendants City of Philadelphia and Detective Ryan's Motion for Summary Judgment is GRANTED.

2004 WL 906259 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2003 WL 23905177 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Further Support of Motion for Summary Judgment of Defendants the City of Philadelphia and Detective Theodore Ryan (Dec. 05, 2003)

• 2003 WL 23905194 (Trial Motion, Memorandum and Affidavit) Memorandum of Law of the City of Philadelphia and Detective Ted Ryan in Opposition to Plaintiff's Motion to Amend Complaint (Dec. 05, 2003)

• 2003 WL 23905151 (Trial Motion, Memorandum and Affidavit) Defendants' Pre-Trial Memorandum (Nov. 25, 2003)

• 2003 WL 23905163 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Pre-Trial Memorandum (Nov. 20, 2003)

• 2003 WL 23905136 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Opposition to

Not Reported in F.Supp.2d
2004 WL 906259 (E.D.Pa.)
**(Cite as: 2004 WL 906259 (E.D.Pa.))**

Page 8

Defendants' Motion for Summary Judgement (Nov. 17, 2003)

• 2003 WL 23905119 (Trial Motion, Memorandum and Affidavit) Motion for Summary Judgment of Defendants the City of Philadelphia and Detective Theodore Ryan (Oct. 30, 2003)

• 2003 WL 23905100 (Trial Pleading) Answer and Affirmative Defenses of Defendants the City of Philadelphia and Detective Ted Ryan to Plaintiffs' Amended Complaint (May. 29, 2003)

• <u>2:03cv00034</u> (Docket) (Jan. 02, 2003)

• 2003 WL 23905083 (Trial Pleading) 42 U.S.C. § 1983 Floor Fourth Amendment Hed False Arrest Malicious Prosecution Abuse of Process (2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT  4



**Briefs and Other Related Documents**

This case was not selected for publication in the Federal Reporter.

NOT PRECEDENTIAL

Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)

United States Court of Appeals,
Third Circuit.
Cora F. LINDQUIST, Individually and as Executrix
of the Estate of James O.
Lindquist,
v.
BUCKINGHAM TOWNSHIP;  Board of Supervisors
of Buckingham Township;  Ernest
Knight II;  Lynn Bush, Executrix of the Estate of
George M. Bush, Esq.
Cora F. Lindquist, Appellant,
Buckingham Township;  Board of Supervisors of
Buckingham Township, Appellants.
**Nos. 03-2431, 03-2971.**

Case No. 03-2431 Argued Case No. 03-2971
Submitted Under Third Circuit
LAR 34.1(a) Feb. 23, 2004.
Decided July 19, 2004.

**Background:**  Landowners brought § 1983 action alleging that township's denial of their development plans violated their due process rights. The United States District Court for the Eastern District of Pennsylvania, Harvey Bartle, III, J., 2003 WL 22757894, in a bench trial, found for township. Parties appealed.

 **Holdings:**  The Court of Appeals, Rendell, Circuit Judge, held that:
 (1) township's actions were not so egregious as to shock the conscience;
 (2) motion for leave to amend complaint was properly denied on basis of undue delay;
 (3) Pennsylvania court's findings that township

acted in violation of its own ordinances and a court order, were not entitled to preclusive effect; and
 (4) township was not entitled to attorneys' fees.
Affirmed.

 Rosenn, Circuit Judge, filed dissenting opinion.

West Headnotes

**[1] Constitutional Law** 278.2(1)
92k278.2(1) Most Cited Cases
"Shocks the conscience" standard was proper standard to be applied in § 1983 action alleging that township violated landowners' due process rights by disapproving their proposed development of the property. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

**[2] Constitutional Law** 278.2(1)
92k278.2(1) Most Cited Cases

**[2] Zoning and Planning** 381.5
414k381.5 Most Cited Cases
Even if township violated state court orders and its own ordinances, and acted in bad faith, when disapproving landowners' plans for developing their property, township's actions were not so egregious as to shock the conscience, as required to establish a substantive due process violation based solely on violations of state law. U.S.C.A. Const.Amend. 14.

**[3] Federal Civil Procedure** 840
170Ak840 Most Cited Cases
Township's alleged failure to turn over certain documents, to landowners who brought § 1983 action alleging that their due process rights were violated by township's disapproval of their proposed development plans, was not sufficient reason for landowners' delay in moving for leave to amend their complaint, and therefore motion was properly denied on basis of "undue delay";  documents sought were public documents to which landowners had access, landowners never moved to compel production, and case had been pending for two years and was ready for trial. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

**[4] Zoning and Planning** 727
414k727 Most Cited Cases
Pennsylvania court's findings that township, in

106 Fed.Appx. 768, 2004 WL 1598735 (3rd Cir.(Pa.))
**(Cite as: 106 Fed.Appx. 768, 2004 WL 1598735 (3rd Cir.(Pa.)))**

disapproving landowners' development plans, acted in violation of its own ordinances and a court order, were not essential to its final judgment that landowners' plan was deemed approved under Pennsylvania law, and therefore were not entitled to preclusive effect in landowners' § 1983 action alleging that the disapproval of their plans violated their due process rights. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983; 53 P.S. § 10508.

**[5]** Civil Rights ⌇⌐1411
78k1411 Most Cited Cases
District court did not abuse its discretion, in § 1983 action alleging that township violated landowners' due process rights by disapproving their proposed development plans, in refusing to permit landowners to introduce evidence of the township's treatment of a third party's subdivision application; evidence was not relevant to question of township's treatment of landowners' applications, and ascertaining the facts with regard to the third party application would have required conduct of a trial within the trial. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

**[6]** Civil Rights ⌇⌐1484
78k1484 Most Cited Cases
In light of fact that landowners might have been able to prevail, in their § 1983 action alleging that their due process rights were violated by township's disapproval of their proposed development plans, under the improper motive standard in effect at the time of the trial, landowners' action was not frivolous, unreasonable or without foundation, and therefore township was not entitled to attorneys' fees even though it was the prevailing party. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. §§ 1983, 1988.
***769** Appeals from the United States District Court for the Eastern District of Pennsylvania. (D.C. Civil No. 00-cv-01301). District Judge: Honorable Harvey Bartle, III.

Barbara Anisko [Argued], Daniel R. Utain, Kaplin, Stewart, Meloff, Reiter & Stein, Blue Bell, PA, for Cora L. Lindquist; Appellant in 03-2431 and Appellee in 03-2971.

***770** Harry G. Mahoney [Argued], Michael L. Barbiero, Deasey, Mahoney & Bender, Philadelphia, PA, for Buckingham Township and Board of Supervisors of Buckingham Township, Appellees in 03-2431 and Appellants in 03-2971.

Before: RENDELL, BARRY and ROSENN, Circuit Judges.

OPINION OF THE COURT

RENDELL, Circuit Judge.

**\*\*1** Cora F. Lindquist, individually and as executrix of the estate of James O. Lindquist, appeals the District Court's order granting judgment in favor of Buckingham Township and the Board of Supervisors of Buckingham Township on the Lindquists' civil rights action under 42 U.S.C. § 1983. This case presented, at both the district court level and on appeal before us, a heavily fact-laden saga of the attempted development of land by plaintiffs, seemingly thwarted at every turn by defendants. The plaintiffs' forty-five page complaint leveled allegations of bad faith and conspiracy against defendants based on their conduct. The District Court held a six-day non-jury trial, hearing first hand both sides of the story. Before the District Court's twenty-one page opinion issued, we made clear in *United Artists Theatre Circuit, Inc. v. Township of Warrington*, 316 F.3d 392 (3d Cir.2003), that the standard applicable to substantive due process claims involving executive action in land-use disputes is the "shocks the conscience" standard. The District Court held that "there [was] nothing in the facts ... to prove that the defendants' conduct was so egregious as to be 'conscience shocking.' " We can find nothing in the record that would cause us to find error in the District Court's reasoning or ruling. Our dissenting colleague paints a picture of dastardly deeds, and, while we might credit such a portrayal if the trial court had perceived in the extensive recounting of the saga the reprehensible animus, attitude and scheming upon which the dissent relies, that is not the case. Moreover, the objective facts, as revealed in the hefty 5,559-page appendix before us, do not necessarily take us in the direction the dissent suggests, causing us to find no error. Clearly, we and the trial judge just view the record differently from our dissenting colleague. We see no clear-cut constitutional violation and will therefore affirm.

I.

The Lindquist farm, located between York Road and Upper Mountain Road in Buckingham, Pennsylvania, consists of a 100-acre parcel owned by James O. Lindquist and Cora F. Lindquist, and a 150-acre parcel owned by James O. Lindquist and his three children. [FN1] Beginning in early 1994, the Lindquists sought to develop the property as a cluster subdivision. Throughout 1994 and 1995, they and their representatives worked with the Township, its Board of Supervisors, its Planning Commission and

its consultant to facilitate the proposed development of the property.

> FN1. James O. Lindquist died while this case was before the District Court. Cora F. Lindquist was substituted as executrix of his estate.

 Based on these discussions, the Lindquists prepared a set of preliminary plans. Development was to occur in two stages: Phase I, consisting of 111 single-family lots on the front parcel, and Phase II, consisting of 110 single-family lots on the back parcel. On March 29, 1996, the Lindquists submitted an application for preliminary subdivision approval of Phase I ("Original Phase I Plan").

 **\*771** The Township's consultants evaluated the Original Phase I Plan for compliance with the Township's Subdivision and Land Development Ordinance ("SALDO") and the Zoning Ordinance. [FN2] It was understood that waivers from certain SALDO requirements would be necessary before the plan would be approved, and there appeared to be no objection to these waivers at a May 1, 1996 meeting of the Planning Commission. However, later that month, one consultant issued a review letter concerning the plan's proposed storm water management facilities that imposed upon plaintiffs what they believed to be "onerous" and unwarranted requirements with respect to water run-off.

> FN2. Under SALDO, a party seeking subdivision and land development approval must first file an application and plans for preliminary approval by the Board. In addition, the party must also submit an application for final plan approval. The Board is the only Township entity with the authority to grant approvals and denials of these plans.

 **\*\*2** The Lindquists made a formal request for SALDO waivers to the Board on August 9, 1996. The Board took no action on the waiver request, but recommended that the Lindquists meet further with the Township staff to settle the waiver and other issues. The Lindquists met several times with the Township staff, but the parties were unable to reach a compromise that would be accepted by the Board. Finally, the Lindquists went back to the Board for clarification, submitting two proposed plans, including the Original Phase I Plan and a "by-right" alternate plan that met all SALDO requirements. [FN3] In response, the Board: (1) directed the

Lindquists to proceed with the Original Phase I Plan; (2) consented to grant the SALDO waivers necessary to develop the property under the Phase I Plan; (3) determined that the Plan would be processed under the August 24, 1994 Zoning ordinance, as amended December 13, 1995; and (4) required the Lindquists to work with the Township to develop a wastewater system that would integrate the development with the regional sewage system.

> FN3. The zoning ordinance permitted the cluster subdivision of a property as a "by-right" use. Thus, the Board would have been required to accept this alternate plan if formally submitted. However, the alternate plan would have subdivided and developed a portion of the property that the Township wanted to preserve.

 In late 1996 and early 1997, the Lindquists and the Township's consultants worked on the wastewater issue. Meanwhile, the Board enacted an amendment to SALDO that prohibited cul-de-sac streets within subdivisions and an amendment to the Zoning Ordinance which eliminated cluster subdivisions as a "by-right" use.

 In early June, the Township informed the Lindquists that the Original Phase I Plan would be on the Board's agenda at its June 25, 1997 meeting. The Lindquists informed the Township that they intended to submit a revised Phase I plan within the next few weeks, and proposed that the ninety-day statutory review period for the Original Phase I Plan be extended, as had been done several times throughout the process. The Board did not accept this proposal, and rejected the application for preliminary approval of the plan ("the First Denial Resolution"). As the result of this denial, any new proposals submitted by the Lindquists would be subject to the zoning amendments enacted in early 1997.

 On September 3, 1997, the Lindquists commenced legal proceedings against the Board in the Court of Common Pleas of Bucks County. These actions were resolved by a stipulation of settlement signed by the parties on November 12, 1997, and entered as a Court Order on December 12, 1997 ("the December 1997 Order"). Under **\*772** the terms of the settlement, the Board withdrew the First Denial Resolution and permitted the submission of revised Phase I plans to be reviewed under the Zoning Ordinance and SALDO as they existed on December 13, 1995. The settlement did not address the issue of how many times the Lindquists would be permitted to submit

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

further revised plans.

 On November 18, 1997, the Lindquists submitted a revised Phase I subdivision application ("Revised Phase I Plan").  In early 1998, the Lindquists and the Township met several times to discuss the Revised Phase I Plan.  The Lindquists agreed to submit a further revised plan ("Further Revised Phase I Plan"), and the Board agreed to extend the review period for the Further Revised Phase I Plan to July 30, 1998.

 **3  On July 20, the Lindquists informed the Township that the Further Revised Plan I would be submitted by the end of July, and proposed that the review period be extended until the end of August.  The Township declined to extend the review period.

 On July 22, the Board passed a resolution ("Second Denial Resolution"), which was apparently intended to reject the Revised Phase I Plan.  However, the resolution actually rejected the Original Phase I Plan.  The Board subsequently realized it had rejected the wrong plan, and on August 12, 1998, passed a new resolution that "readopted and confirmed" the Second Denial Resolution and amended it to include a rejection of the Revised Plan ("Third Denial Resolution").

 Meanwhile, the Lindquists had filed the Further Revised Phase I Plan on July 31, 1998.  The Township accepted the Further Revised Plan, but informed the Lindquists that it would not treat the Further Revised Plan as a revised plan under the December 1997 Order for the reason that the Second Denial Resolution had denied the subdivision application.  The Third Denial Resolution set an August 31, 1998 deadline for review of the Further Revised Plan.  The Lindquists informed the Township that it was obligated to treat the Further Revised Plan as a revised plan under the settlement, and that, if it treated the Further Revised Plan as a new plan, they were entitled to a ninety-day review period as provided by statute.

 The Board disagreed.  On August 26, 1998, the Board adopted another resolution ("Fourth Denial Resolution"), which rejected the Further Revised Plan as a revised plan.  The Township also informed the Lindquists that it would accept the Further Revised Plan as a new plan, subject to review under the Zoning Ordinance and SALDO as they existed on the date of its submission. The Board eventually rejected the Further Revised Plan as a new plan on October 28, 1998.

 On September 3, 1998, the Lindquists filed a mandamus action in the Court of Common Pleas of Bucks County, alleging that the Revised Plan should be "deemed approved" under § 508 of the Municipalities Planning Code, Pa. Stat. Ann. tit 53, § 10508.  On January 19, 2000, the Bucks County Court held that the Second Denial Resolution of July 22, 1998 had rejected the wrong plan, that the Board had failed to comply with § 508 through its failure to take action on the Revised Plan by the July 30, 1998 deadline, and that, as a result, the Revised Plan was "deemed approved."  In his opinion, Judge Clark found that "the Township ha[d] acted in this case not only in violation of Order of December 12, 1997 of the Bucks County Court, but also in violation of its own ordinances requiring review of subdivision applications."  However, the basis for the court's ruling that the Revised Plan was "deemed approved" was the Township's *773 failure to reject the Revised Plan by the statutory deadline.

 The Township appealed the Bucks County Court Order.  However, in December 2000, the parties reached a settlement that ended the state court litigation, but permitted the Lindquists to proceed with this action alleging violations of their substantive due process rights, which they had filed in federal court in March of that year.  The District Court, following a six-day non-jury trial, ultimately granted judgment in favor of the Township and its Board of Supervisors.

                                 II.
 **4  The Lindquists' appeal challenges several aspects of the District Court's ruling, including: (1) the application of the "shocks the conscience" standard to their substantive due process claim; (2) the determination that the Township's actions did not violate the "shocks the conscience" standard; (3) the denial of their motion to amend their complaint to include an equal protection claim; (4) the failure to give preclusive effect to certain state court findings; and (5) the decision to exclude evidence regarding the Township's treatment of other subdivision plans.  The Township and the Board of Supervisors appeal the District Court's denial of their post-trial motion for attorneys' fees and costs.

                                 A.
 [1]  First, the Lindquists contend that the District Court erred in applying the "shocks the conscience" standard because such a standard is inappropriate to apply to substantive due process claims against municipalities arising from land use decisions.  We exercise plenary review over the District Court's

choice and interpretation of legal standards. *Beta Spawn, Inc. v. FFE Transportation Services, Inc.,* 250 F.3d 218, 223 (3d Cir.2001).

In *United Artists,* we noted that "our cases have repeatedly acknowledged that executive action violates substantive due process only when it shocks the conscience." *Id.* at 399-400. We saw no reason why land-use cases should be exempted from the shocks-the-conscience test, stating that "[l]and-use decisions are matters of local concern, and such disputes should not be transformed into substantive due process claims based only on allegations that government officials acted with 'improper' motives." *Id.* at 401-02. Accordingly, we conclude that the District Court applied the proper standard to the Lindquists' claim.

### B.

[2] Second, the Lindquists argue that "the Township deliberately acted in bad faith, violated its own ordinances and customary practices and procedures and violated two separate court orders," and that "[t]he Township participated in such egregious conduct because of their personal animus to [the Lindquists' representative] and with the intent of preventing the Lindquists from developing their property so that the Township would be in a better position to acquire the Lindquist property at a minimal cost to the Township." The District Court concluded that the Township "may have been negligent at times and in 1998 may have acted with improper motive toward the Lindquists and their representatives. However, there is nothing in the facts we have found to prove that the defendants' conduct was so egregious as to be 'conscience shocking.'" The Lindquists maintain that this conclusion is in error and that the Township's actions do satisfy the standard.

We exercise plenary review over the District Court's application of legal standards to the facts of the case. \*774*Beta Spawn,* 250 F.3d at 223. We review the District Court's findings of fact for clear error. *Id.*

\*\*5 In *United Artists,* we joined other Courts of Appeals in applying the "shocks the conscience" standard to substantive due process claims in land use disputes. For example, in *Chesterfield Development Corp. v. City of Chesterfield,* 963 F.2d 1102 (8th Cir.1992), a developer brought a § 1983 action claiming that the city had violated its substantive due process rights by enforcing an invalid zoning plan against it. In affirming the District Court's denial of the developer's claim, the Eighth Circuit stated that "a

state-law error, no matter how fundamental, cannot in and of itself create a federal due-process violation." *Id.* at 1105. Furthermore, it noted that "[its] decision would be the same even if the City had knowingly enforced the invalid zoning ordinance in bad faith" because "[a] bad faith violation of state law remains only a violation of state law." *Id.* In its view, the enforcement of an invalid zoning ordinance was not a "truly irrational" governmental action giving rise to a substantive due process claim. *Id.*

The First Circuit considered a similar situation in *PFZ Properties, Inc. v. Rodriguez,* 928 F.2d 28 (1st Cir.1991). There, a developer brought a civil rights action against a Puerto Rico agency following the agency's rejection of the developer's application for a construction permit. The court held that "[the developer's] allegations that [agency] officials failed to comply with agency regulations or practices in the review and approval process for the construction drawings are not sufficient to support a substantive due process claim." *Id. at 32.* The court also stated that "even assuming that [the agency] engaged in delaying tactics and refused to issue permits for the ... project based on considerations outside the scope of its jurisdiction under Puerto Rico law, such practices, without more, do not rise to the level of violations of the federal constitution." *Id.*

These cases stand for the proposition that, without more, a violation of state law, even a bad faith violation of state law, will not support a substantive due process claim in a land-use dispute. *See also Baker v. Coxe,* 230 F.3d 470, 474 (1st Cir.2000) ("[E]ven an arbitrary denial of [a building] permit in violation of state law--even in bad faith--does not rise above the constitutional threshold for equal protection and substantive due process claims."); *Natale v. Town of Ridgefield,* 170 F.3d 258, 262 (2d Cir.1999) ( "Arbitrary conduct that might violate zoning regulations as a matter of state law is not sufficient to demonstrate conduct so outrageously arbitrary as to constitute a gross abuse of governmental authority that will offend the substantive component of the Due Process Clause.") Rather, the governmental action must be so egregious and extraordinary that it "shocks the conscience."

Here, we are not entirely convinced that there has even been a violation of state law, much less any "conscience-shocking" behavior. The Lindquists maintain that the Township's actions were in defiance of the December 1997 Order. We view this to be not entirely clear-cut. And, even if the Township did violate the Order, the record is largely devoid of any

facts that would suggest that the Township's actions were so egregious and extraordinary that they "shock the conscience." The Lindquists have suggested that the Township was motivated by financial concerns and bias against their attorney, and that these motivations render the Township's actions "conscience-shocking." Yet, we find little evidence that the Township or its officers were motivated by pecuniary gain. In addition, although it is clear that the relationship between the Township and the Lindquists' **\*775** attorney became bitter during the course of these events, the Township's actions cannot be said to have been due to any bias against him. The District Court concluded that while the Township "may have been negligent" and "may have acted with an improper motive," desirous of thwarting development of the property, its conduct did not shock the conscience. We concur.

 **\*\*6** Our dissenting colleague cites *Leamer v. Fauver,* 288 F.3d 532 (3d Cir.2002), for the proposition that "deliberate indifference" and "protracted failure to even care" may be conscience shocking when officials have time to make unhurried judgments. *Id.* at 547. However, *Leamer* involved a prison inmate challenging the deprivation of a liberty interest. Given that "[t]he assessment of what constitutes conscience-shocking behavior differs according to the factual setting," *id.,* the test may be more easily satisfied in a prison setting than in a land-use setting. More importantly, our view of the record does not indicate indifference or a failure to care on the part of the Township.

C.

 [3] Third, the Lindquists challenge the District Court's denial of their motion for leave to amend their complaint to include an equal protection claim, based on the Township's favorable treatment of a third party's subdivision application. We review a grant or denial of leave to amend for abuse of discretion. *Lake v. Arnold,* 232 F.3d 360, 373 (3d Cir.2000).

 The Supreme Court has stated that the Rule 15(a) mandate that leave to amend "shall be freely given when justice so requires" is to be heeded.

> In the absence of any apparent or declared reason--such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc.--the leave sought should, as the rules require, be "freely given."

 *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

 Here, the District Court denied the Lindquists' motion to amend for "undue delay." With regards to the issue of delay, our Court has stated that

> the passage of time, without more, does not require that a motion to amend a complaint be denied; however, at some point, the delay will become "undue," placing an unwarranted burden on the court, or will become "prejudicial," placing an unfair burden on the opposing party. The question of undue delay, as well as the question of bad faith, requires that we focus on the plaintiff's motives for not amending their complaint to assert this claim earlier; the issue of prejudice requires that we focus on the effect on the defendants.

 *Adams v. Gould, Inc.,* 739 F.2d 858, 868 (3d Cir.1984), *cert. denied,* 469 U.S. 1122, 105 S.Ct. 806, 83 L.Ed.2d 799 (internal citations omitted). *See also* Cureton v. NCAA, 252 F.3d 267, 273 (3d Cir.2001) (stating that "the question of undue delay requires that we focus on the movant's reasons for not amending sooner"). Here, in its discussion, the District Court followed our directive in *Adams* that the Court should focus on the plaintiff's motives. First, it noted the Lindquists' proffered reason for their two-year delay, namely, the Township's alleged failure to turn over certain documents. Then, it disposed of this reason because the documents were public documents to which the Lindquists had access and, in addition, the Lindquists could have filed a motion to **\*776** compel production. In light of this reasoning, and given the fact that this case had already been pending for two years and was ready for trial, we cannot say that the District Court abused its discretion in denying the Lindquists leave to amend.

D.

 **\*\*7** [4] Fourth, the Lindquists urge that the District Court erred when it failed to give preclusive effect to certain findings outlined in the state court's January 19, 2000 order. We exercise plenary review over the District's Court decision regarding the preclusive effect of a state court judgment. *Del.* River Port Auth. v. Fraternal Order of Police, 290 F.3d 567, 572 (3d Cir.2002).

 The Full Faith and Credit Act, 28 U.S.C. § 1738, requires a federal court to give a state court judgment the same preclusive effect that it would be entitled to in a court of that state. *Gregory v. Chehi,* 843 F.2d 111, 118 (3d Cir.1988). Thus, the District Court was required to give the state court's findings preclusive effect if a Pennsylvania court would have been required to give them preclusive effect.

Turning to Pennsylvania law, we note that Pennsylvania has adopted the requirements of the Restatement (Second) of Judgments, regarding when a prior determination of a legal issue is conclusive in a subsequent action. *Clark v. Troutman,* 509 Pa. 336, 502 A.2d 137, 139 (Pa.1985). In Pennsylvania, the doctrine of issue preclusion applies if: (1) the issue decided in the prior case is identical to the one presented in the subsequent action; (2) there was a final judgment on the merits; (3) the party against whom the doctrine is asserted was a party or in privity with a party in the subsequent case; (4) the party or person in privity with a party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding; and (5) the determination in the prior proceeding was essential to the judgment. *City of Pittsburgh v. Zoning Bd. of Adjustment,* 522 Pa. 44, 559 A.2d 896, 901 (Pa.1989).

Here, the January 19, 2000 state court order concluded that the Lindquists' Revised Plan was "deemed approved" under § 508 of the Municipalities Planning Code, Pa. Stat. Ann. tit. 53 § 10508. In concluding that the Plan was "deemed approved," the Court of Common Pleas relied solely upon facts related to the Township's Board of Supervisors' failure to take action upon the Plan prior to the statutory deadline. While the court did make other findings and agreed with the Lindquists that the Township had acted in violation of both its own ordinances and the December 1997 Order, these findings were not essential to its final judgment. Accordingly, issue preclusion does not apply. As a result, the District Court's decision to give preclusive effect only to the facts that the Board had failed to take timely action and that the Revised Plan was "deemed approved" upon the Township's failure to take action, while not giving preclusive effect to any other state court findings, was appropriate.

## E.

[5] Fifth, the Lindquists claim that the District Court abused its discretion in making certain evidentiary rulings. During the course of the trial, the Lindquists sought to introduce documents and to solicit testimony regarding the Township's treatment of a third party's subdivision application, the Yerkes/Orleans plan, that was pending during the same time period when the Lindquists' application was being considered, as relevant to the issue of motive. In sustaining the Township's objection, the District Court noted that evidence regarding the Yerkes/Orleans application **777** was not necessarily

probative of whether the Township had acted improperly with regards to the Lindquists' application because there were different facts, because the Township could exercise discretion in granting waivers, and because the complexity and uniqueness of these situations makes comparisons cumbersome if not impossible. We review the District Court's ruling regarding the admissibility of evidence for abuse of discretion. *Rinehimer v. Cemcolift, Inc.,* 292 F.3d 375 (3d Cir.2002).

**8** In assessing whether the Lindquists had proven their claim, the key question before the Court was whether the Township's treatment of the Lindquists "shocked the conscience," not whether the Township treated the Lindquists differently than it treated a third party. The evidence the Lindquists sought to introduce had nothing to do with the Township's treatment of the Lindquists. [FN4] Further, even if it were arguably relevant, we agree with the District Court that ascertaining whether the Yerkes/Orleans development was comparable to the Lindquist development in all important respects would have forced the District Court to conduct "a trial within a trial." As a result, we conclude that the District Court did not abuse its discretion in refusing to permit the introduction of this evidence. [FN5]

> FN4. The dissent posits that even if the evidence of the treatment afforded Yerkes/Orleans was not probative of the motive of the Township vis a vis the Lindquist, it could be probative as to whether the treatment "shocked the conscience." We are at a loss to determine how this could be so unless the facts of the two situations were the same. The Lindquists contend that the same sixty reasons listed to justify denial of their application were listed as conditions for approval of the Yerkes/Orleans preliminary plan, and the dissent appears to read this contention as meaning the Lindquists' plan was rejected for the same reasons as the Yerkes/Orleans plan was approved. However, the record merely indicates that the Township had some of the same problems with the Lindquists' plan that the Township's consultants had with the Yerkes/Orleans preliminary plan, and that the consultants conditioned their recommendations regarding approval of the Yerkes/Orleans plan on these problems being rectified. It does not indicate what steps the Yerkes/Orleans developers took to

address the problems identified in the preliminary plan, nor that the final Yerkes/Orleans plan eventually approved by the Township continued to exhibit these problems. The proffered evidence would only be relevant to the District Court's inquiry to the extent that the facts of the two proposed developments were virtually identical. Considering the maxim that every parcel of land is unique, this was highly unlikely.

FN5. Our dissenting colleague believes that, as an alternative to finding a constitutional violation, we should remand the claim so that the Lindquists could have the opportunity to present new evidence in light of the heightened standard adopted between the close of trial and the District Court's judgment. While we have, as the dissent points out, acknowledged that "a change in law may warrant the reopening of a case where additional [evidence] would be pertinent to the change of law." Skehan v. Bd. of Trustees of Bloomsberg State College, 590 F.2d 470, 479 (3d Cir.1978), rev'd on other grounds by Smith v. City of Pittsburgh, 764 F.2d 188 (3d Cir.1985), here the Lindquists did not move to reopen for additional proof in light of the changed standard.

F.

[6] Finally, the Township and the Board claim the District Court erred when it denied their motion for attorneys' fees. We review a denial or grant of attorneys' fees for abuse of discretion. Loughner v. University of Pittsburgh, 260 F.3d 173, 177 (3d Cir.2001).

42 U.S.C. § 1988 provides that "in any action or proceeding to enforce a provision of § ...1983 ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." A prevailing *778 defendant is entitled to attorney's fees upon a finding that the plaintiff's action was frivolous, unreasonable or without foundation. Barnes Found. v. Township of Lower Merion, 242 F.3d 151, 157-58 (3d Cir.2001).

The Township and the Board of Supervisors contend that they, as prevailing defendants, are entitled to attorneys' fees because the Lindquists' lawsuit was not brought to redress the Lindquists' alleged constitutional grievances, but rather to generate

attorneys' fees for the Lindquists' legal representative. Even if we were to credit this theory, it does not necessarily render the action frivolous, unreasonable or without foundation. We note that at the time the Lindquists brought this action, the standard applicable to their due process claim was not settled. Only after the conclusion of trial did we announce in United Artists that a plaintiff pursuing a substantive due process claim in a land-use dispute must prove that the defendant's conduct "shocked the conscience." 316 F.3d at 401. This standard departed from our prior precedent, under which a plaintiff merely had to prove that the defendant had acted with an improper motive. See, e.g., Bello v. Walker, 840 F.2d 1124, 1129 (3d Cir.1988). Here, the District Court stated that the Township and the Board "may have acted with an improper motive toward the Lindquists and their representatives," which would suggest that it might have been possible for the Lindquists to prevail under the "improper motive" standard. In light of the fact that the Lindquists might have been able to succeed under the standard in effect at the time they brought their claim, we cannot say that the action was frivolous, unreasonable or without foundation. Accordingly, the District Court did not abuse its discretion in denying attorneys' fees.

III.

**9 For the reasons stated above, we will affirm.

ROSENN, Circuit Judge, dissenting.

In the struggle to develop their land in Buckingham Township, Pennsylvania, the Lindquists encountered severe resistance from Township officials. The officials frustrated the Lindquists' efforts and wasted their time and resources. Because the majority holds that the Township's conduct is not sufficiently "conscience shocking" to constitute a violation of the Lindquists' substantive due process rights, I respectfully dissent. [FN6] Additionally, because the legal standard for this substantive due process claim changed while the District Court deliberated in this case, I believe the claim should be remanded so that the Lindquists may have the opportunity to present evidence that is now relevant under the new heightened standard. *779 Lastly, I disagree with the majority's interpretation of our circuit's case law regarding a plaintiff's ability to amend a complaint. I believe that because the District Court's analysis of the Lindquists' motion to amend failed to articulate any undue burden on the court or prejudice to the non-moving party, denial of the motion was an abuse of discretion.

FN6. The majority defers heavily to the District Court's finding after a six day trial that nothing in the facts "was so egregious as to be 'conscience shocking,' " and fails to find error in the District Court's reasoning or ruling. (Maj. Op. at 770-71) While clear error review applies to the District Court's findings of fact, the application of those facts to the "conscience shocking" standard is a legal question that we review *de novo*. *See, e.g., Srein v. Frankford Trust Co., 323 F.3d 214, 220 (3d Cir.2003)* (discussing the "mixed" standard of review). I take no exception to the facts as described by the District Court, and I also find the facts described by the Court of Common Pleas of Bucks County after its lengthy trial to be informative. However, after finding the facts, the District Court offered little analysis, and simply stated in conclusory fashion that these facts did not rise to the "shock the conscience" standard. I disagree with both the majority and the District Court because in my opinion, the facts presented in this record display arbitrary and malicious conduct on the part of the Township that rises to a conscience shocking level.

## I.

The majority has explained the basic sequence of events that occurred between the Lindquists and the Township during the six year development application ordeal. I write to supplement the factual account, and to explain several points of divergence between us.

### A. The Township's Misconduct

Even though the standard for this substantive due process claim changed from  "improper motive" to "shocks the conscience" while the District Court deliberated in this case, the District Court still acknowledged in its opinion that the Township "may have acted with an improper motive toward the Lindquists and their representatives."  Although improper motive is no longer sufficient to prove a substantive due process violation, identifying an improper motive is a factor in the conscience shocking behavior of a state actor.  The Court of Common Pleas of Bucks County candidly addressed the Township's improper motive, acknowledging that "the Township proudly admits that it would like to preserve the Lindquist property."  The Township's motivation to preserve the Lindquists' land was improper because under the zoning and land-use

ordinances in effect at the time of the Lindquists' initial application, the cluster subdivision developments they sought were allowed on the Lindquists' land as a "by-right" use.

As the majority opinion acknowledges, the Township Board of Supervisors (the  "Board") requested that the Lindquists forego their by-right use and pursue an alternate plan favored by the Board, in exchange for assurances that the Board would grant the required SALDO waivers and process the plans under the zoning ordinances as amended December 13, 1995 (the "1995 ordinances").  However, after inducing the Lindquists to surrender their by-right use of the cluster development, the Board rejected the plan revisions in June of 1997 and denied the original plans in Resolution No. 1533.  This action forced the Lindquists to resubmit new plans to be reviewed now under the zoning ordinances as amended in 1997.  This action was significant because the 1997 amendments to the ordinances prohibited several of the items in the Lindquists' original plans, and strategically removed the by-right use.  This action set the tone for a series of other bad faith maneuvers launched by the Township against the Lindquists.

 **\*\*10** In response, the Lindquists filed suit against the Township in the Court of Common Pleas of Bucks County.  The parties agreed to a settlement, which was entered as a court order (the "Court Order") requiring that the Township withdraw its denial of the plans and permit the Lindquists to submit revised plans to address the comments raised by the Township.

 The majority here asserts that the settlement did not address how many times the Lindquists would be allowed to submit further revised plans after the original re-submission.  However, the Court Order clearly stated that "[t]he Board will process and review the Revised Plans for Phase I, and *any revisions thereto* in accordance with the Zoning Ordinance and SALDO, as they existed on December 13, 1995." (emphasis added) So, while the Court Order may not have explicitly stated **\*780** how many revisions would be allowed, it clearly anticipated the need for multiple revisions and required that *any* revisions would be considered under the 1995 ordinances.

 The Board realized that as long as the Lindquists were cooperating with the Township Planning Commission and consultants to revise and improve the original plans, the Court Order required that the Board consider the plans under the 1995 ordinances,

and this would eventually lead to an approval. Therefore, the Board adopted a strategy to work around the Court Order almost immediately after the Order was signed. For example, the District Court acknowledged that "[a]t the Board's direction, the Planning Commission had treated the revised plans as a new filing that did not relate back to the earlier submission." Even in its pleadings before the Court of Common Pleas, the Township admitted that it attempted to reject the revised Phase I subdivision plan because it knew that the Lindquists "were getting closer to compliance with the Township Ordinances and wanted to reject the Revised Phase I Subdivision Plan before the Lindquists submitted any further revised plans."

Furthermore, during deposition, the Township Manager, Deborah Rendon, admitted the following:
Q: So they acted--the Board of Supervisors acted to deny the revised subdivision application before the Lindquists had an opportunity to submit further plans to the Township, even though the [Court Order] specifically permitted further revised plans to be submitted, right?
A: Yes.

The Township argues that after the Court Order was signed in 1997, it proceeded in good faith, as evidenced by a series of six meetings between the Lindquists and the Planning Commission aimed at reaching an agreement on the plans. To begin, this argument is undercut by the Township's admission that it rejected the plans because the Lindquists were getting closer to compliance. Furthermore, the Township's claim of good faith is absurd, in light of the shameless tactics on which the Township embarked in its effort to reject the plans.

As the majority recognizes in its footnote 2, the Board was the only Township entity empowered to approve the Lindquist plans. Any amount of progress made between the Lindquists and the Planning Commission was irrelevant if the Board had predetermined that it would not provide its approval. On July 22, 1998, when the Township's deadline for taking action on the plans was fast approaching, the Board rejected a routine request from the Lindquists to submit further revised plans and hastily enacted Resolution No. 1598 rejecting the plans. The District Court noted that "the Lindquists had no prior knowledge that the Board was set to act on the plan on this date." (D. Ct. Op. at 12) In its haste, the Board actually denied the wrong plans, and the deadline for action on the Lindquists' most current submission passed. In an attempt to correct its

mistake, the Board adopted Resolution No. 1599 rejecting the most current plans.

**11 In the meantime, the Lindquists submitted a revised set of plans and argued that the Board had violated the 1997 Court Order by not considering them to be revised plans subject to consideration under the 1995 ordinances. Alternatively, the Lindquists argued that if the plans were in fact a new submission, they were entitled to a 90-day statutory review period including review letters by the Township's consultants. (D. Ct. Op. at 13) The Board disagreed, and less than one month after *781 receiving the latest submission, the Board enacted Resolution No. 1600 denying Lindquist's most recent submission without full review. This denial was issued on the same day that the Township consultants submitted their review letters, leaving the Lindquists no conceivable opportunity to respond to the comments. (D. Ct. Op. at 13)

Throughout this process, the Township flagrantly violated its own ordinances and procedures, as well as the 1997 Court Order. To further underscore the Board's bad faith and arbitrary approach, the first 57 reasons for denial stated in Resolution No. 1600 in August 1998 were the same reasons verbatim as those listed in the first denial filed in June of 1997, Resolution No. 1533. (D. Ct. Op. at 13) However, in the intervening 14 months, the Lindquists had addressed all of those issues. Thus, it became clear that the Board did not actually evaluate the Lindquists' plans, but arbitrarily denied them. The Township's claim that the Lindquists were provided with a meaningful review process and access to the Planning Commission to negotiate acceptable plans is disingenuous. The Township actually wasted the Lindquists' time and resources in seeking an approval when the Township knew that it had no intention of ever granting it.

## B. Conscience Shocking Standard

In *United Artists Theatre Circuit, Inc. v. Township of Warrington, 316 F.3d 392 (3d Cir.2003)*, this court adopted a new heightened standard for substantive due process cases in the land-use context. "Improper motive" was no longer the standard; the new standard was conduct that "shocks the conscience." Therefore, it is no longer sufficient for a developer to prove that a state actor intentionally worked against the developer's interests in violation of state laws or ordinances. The developer must now show that the state actor's behavior was so egregious that it was "shocking." Despite the inherently subjective nature of this inquiry, the courts have attempted to set some

guiding standards in this area. For example, when a suit is brought against a state actor challenging conduct in response to an emergency situation, "more culpability is required to shock the conscience to the extent that the state actors are required to act promptly under pressure." *Schieber v. City of Philadelphia,* 320 F.3d 409, 419 (3d Cir.2003). Conversely, when officials have time to make unhurried judgments, as was true in this case, indifference and "protracted failure even to care" may be truly conscience shocking. *Leamer v. Fauver,* 288 F.3d 532, 547 (3d Cir.2002). [FN7]

> FN7. The majority at p. 775 distinguishes *Leamer* because it deals with a liberty interest in a prison setting, where the conscience shocking standard may be more easily satisfied. Yet, state actors in a prison setting share a commonality with municipal zoning boards; they both maintain complete control over their subjects' interests and may abuse their positions of power if they fail to follow their designated rules and regulations. In both instances, the Constitution may be the only check on abusive practices, regardless of whether it is a liberty or a property interest at stake. When state actors show egregious indifference, bordering on malfeasance and contempt in my view of this case, Constitutional protection is appropriate.

**\*\*12** The First Circuit has explained that "even where state officials have allegedly violated state law or administrative procedures, such violations do not ordinarily rise to the level of a constitutional deprivation." *PFZ Properties, Inc. v. Rodriguez,* 928 F.2d 28, 31 (1st Cir.1991) (on petition for rehearing). Furthermore, "mere bad faith refusal to follow state law in such local administrative matters simply does not amount to deprivation of due process **\*782** where the state courts are available to correct the error." *Chiplin Enterprises v. City of Lebanon,* 712 F.2d 1524, 1528 (1st Cir.1983).

In *United Artists,* this court agreed with the Court of Appeals for the First Circuit that the federal courts should not sit as a "zoning board of appeals," particularly when state courts are available for such a task. 316 F.3d at 402 (citing *Creative Environments, Inc. v. Estabrook,* 680 F.2d 822, 833 (1st Cir.1982)). I, of course, agree. However, in this case the Lindquists sought relief in the state courts, but the Township blatantly ignored the state Court Order. The Township persisted in arbitrary and abusive

treatment toward the Lindquists. Our court has observed that " 'the core of the concept' of due process is 'protection against arbitrary action' and that 'only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.' " *United Artists,* 316 F.3d at 399 (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 845-46, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). In my view, the Township deliberately played cat-and-mouse with the Lindquists, wasting their resources and time for a half-dozen years, arbitrarily denying multiple versions of their applications for a development to which they were initially entitled as a matter of right. To this arbitrary and egregious behavior, the Township added insult to injury by flagrantly disobeying the county Court Order.

When a township lures one of its landowners to give up a right established by township ordinance, induces him to comply with its demands for development approval only to have such compliance arbitrarily rejected, deliberately engages in a frustrating pattern to waste the landowner's resources and time over a period of years, and then flagrantly disregards the Order of a state court, such egregious conduct "shocks the conscience" in a constitutional sense. Under such circumstances, I disagree with the majority and the District Court; a federal court should grant relief.

II.

The Lindquists also claim that the District Court abused its discretion by denying their attempt to introduce evidence regarding the Yerkes/Orleans application, a neighboring land owner's application for a similar development project that was approved by the Township without any of the strong resistance encountered by the Lindquists. The majority finds no abuse of discretion because the evidence does not involve the Township's treatment of the Lindquists, and because it could not aid the Court in determining whether the treatment "shocked the conscience." I do not agree.

**\*\*13** When the District Court ruled on this evidence at trial, it was still operating under the "improper motive" standard. The Court clearly stated that favorable treatment of a similar development application would not be relevant to determine if there was "improper motive" towards the Lindquists' application. However, after the trial concluded, but before issuing its decision, this court issued its decision in *United Artists,* changing the standard of review to "shocks the conscience." Although evidence relevant to a determination of an "improper

motive" might have been limited to the interaction between the Lindquists and the Township, "shocks the conscience" is a much broader standard. Under this standard, therefore, a wider range of evidence is relevant.

In *United Artists,* we noted that "the measure of what is conscience-shocking is no calibrated yard stick." 316 F.3d at 399 (quoting *Lewis,* 523 U.S. at 847). Rather, "conduct that is sufficiently egregious to **783** shock the conscience varies depending on the *context." United Artists,* 316 F.3d at 399 n. 5 (emphasis added). Under this standard, evidence of the Township's treatment of a similar application much more favorably than the Lindquists' and with much greater dispatch could provide important information and perspective to show "conscience shocking" conduct.

The Lindquists assert that denying the multiple iterations of their plan outright, rather than approving it with conditions, was not the standard practice for the Township. The Lindquists proffer that the Yerkes/Orleans application for a cluster subdivision development submitted in January 1997 was almost identical to the Lindquists application. The Township approved the Yerkes/Orleans application after only six months of review with 276 conditions and comments. In contrast, the Lindquists' plans were denied after four years of review based on 60 comments. After reviewing Township records, the Lindquists determined that the same 60 reasons listed to justify denial of the Lindquists' application were also listed as conditions for approval in the Yerkes/Orleans application. If the Lindquists could substantiate these claims with reliable evidence, I believe that the evidence would be an important relevant factor in the fact finder's determination with the other evidence referred to above, whether the Township was acting with the requisite level of capriciousness that "shocks the conscience."

We have acknowledged that "a change in legal standards may warrant the reopening of a case where additional testimony would be pertinent to the change of law." *Skehan v. Board of Trustees of Bloomsburg State College,* 590 F.2d 470, 479 (3d Cir.1978) *rev'd on other grounds by Smith v. City of Pittsburgh,* 764 F.2d 188 (3d Cir.1985). Precedent in this circuit and simple fairness require that this case be remanded to allow the Lindquists the opportunity to present all of their evidence that would now be relevant under the new standard established in *United Artists.*

III.

**\*\*14** The District Court denied the Lindquists' motion to amend their complaint to add an equal protection claim. The District Court denied the motion on the basis of "undue delay." The majority here advances an abbreviated analysis of this issue, which in my view does not comport with the clear precedent in our circuit.

The majority cites to *Adams v. Gould, Inc.,* 739 F.2d 858, 868 (3d Cir.1984), which provides a thorough explanation of the standard for review for a denial of a motion to amend. *Adams* explained that the mere passage of time will not require a motion to be denied; the delay must be deemed "undue" by either placing a burden on the court or causing prejudice to the opposing party. *Id.* The *Adams* opinion further clarified that questions of delay and bad faith require inquiry into the moving party's motives for not amending the complaint earlier, and questions of prejudice require a focus on the effects on the non-moving party. *Id.*

The majority asserts that when the District Court reviewed the Lindquists' explanation for failing to amend their complaint earlier in the proceedings, the Court was actually following our directive in *Adams* by exploring the Lindquists' motives. I do not think this is so. First, the District Court considered the Lindquists' explanation for the delay in their motion to amend, but did not actually explore any improper motivations. Second, even if the District Court's brief inquiry into this matter could be considered a focus on motivations, the District Court did not find that Lindquists **\*784** harbored any bad faith or improper motivations that would justify denial of the motion.

The Lindquists explained that they requested documentation of the Yerkes/Orleans application during discovery, and the Township failed to provide the records. Therefore, the Lindquists did not learn about the preferential treatment afforded to the Yerkes/Orleans application until after discovery when they uncovered these documents themselves from public records. Rather than criticizing the Township for any discovery violation, the District Court blamed the Lindquists for not seeking the public records sooner, and failing to file a motion to compel discovery. It is unmistakable from the District Court's terse order denying the motion that the Court did not actually inquire into the Lindquists' motivation for delay in amending their complaint. Nor did the Court find any improper motivation by them. Rather, the District Court concluded that the Lindquists could have discovered the information

sooner, and denied the motion for an apparent lack of diligence.

 This court has held that "prejudice to the non-moving party is the touchstone for the denial of an amendment [of a claim]." *Cornell & Co. v. Occupational Safety & Health Review Comm'n,* 573 F.2d 820, 823 (3d Cir.1978) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330-31, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971)). Furthermore, "the obligation of the trial court in its disposition of the motion is to *articulate* the imposition or prejudice caused by the delay, and to balance those concerns against the movant's reason for delay in asserting the motion." *Coventry v. United States Steel Corp.,* 856 F.2d 514, 520 (3d Cir.1988) (emphasis added). In this case, the District Court did not articulate any prejudice to the Township or burden on the Court. The Court's explanation of actions that the Lindquists could have taken to obtain the evidence sooner does not amount to an articulation of burden or prejudice. Furthermore, any cursory inquiry into the Lindquists' "motivation" does not satisfy the Court's obligation in this matter, particularly when the Court failed to find any bad faith motivation. In my view, the District Court abused its discretion in denying the Lindquists' motion to amend. [FN8]

> FN8. Furthermore, as a prudential matter, I believe that an equal protection claim would be preferable in this case because it avoids the cumbersome and subjective "shocks the conscience" analysis. As Justice Scalia noted in a concurring opinion in *City of Cuyahoga Falls, Ohio v. Buckeye Community Hope Foundation,* 538 U.S. 188, 200-01, 123 S.Ct. 1389, 155 L.Ed.2d 349 (2003), more specific constitutional claims such as equal protection are preferable to generalized substantive due process claims.

                              IV.

 **\*\*15** In conclusion, our opinion in *United Artists* brought this circuit in line with most other circuits by adopting the "shocks the conscience" standard for substantive due process claims in a land-use setting. However, if substantive due process claims are to remain viable under this standard, we must be willing to recognize when a state actor's conduct is so egregious and arbitrary so as to violate the requirements of the Fourteenth Amendment. "Shocks the conscience" is an extremely difficult standard to meet, but it is not insurmountable. I believe that the evidence in this case shows that the Township

purposefully obstructed the Lindquists' right to pursue a legitimate use of their land, and consistently and systematically abused its authority and discretion. Not only did the Township violate its own laws, but when the Lindquists sought relief in the state court, the Township frustrated that relief by violating **\*785** the county Court Order. At this point, I believe that the Township violated the Lindquists' due process rights.

 Furthermore, even if reasonable minds may differ regarding what shocks their conscience, I believe that the District Court abused its discretion by denying the Lindquists' motion to amend their claim, and by failing to admit evidence of the Township's more favorable treatment of other land-use applicants. I would reverse the District Court on both of these grounds, remand the case to permit the Lindquists to pursue both equal protection and substantive due process claims, and allow the evidence of the Yerkes/Orleans application.

 Regarding the other issues raised on appeal, I would concur with the majority that "shocks the conscience" is the appropriate standard, and that preclusive effect should not be given to the findings of the county court. I agree that the District Court did not abuse its discretion by denying the Township and Board's motion for attorneys' fees.

 106 Fed.Appx. 768, 2004 WL 1598735 (3rd Cir.(Pa.))

### Briefs and Other Related Documents (Back to top)

- 03-2971 _____ (Docket) (Jul. 09, 2003)

- 03-2431 _____ (Docket) (May. 16, 2003)

END OF DOCUMENT

# EXHIBIT  5

Not Reported in F.Supp.2d                                                                      Page 1
2004 WL 2958664 (D.Del.)
**(Cite as: 2004 WL 2958664 (D.Del.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Dannette G. MCLAUGHLIN, Plaintiff,
v.
DIAMOND STATE PORT CORP., Defendant.
**No. C.A.03-617(GMS).**

Dec. 21, 2004.

Laurence V. Cronin, Smith, Katzenstein, & Furlow,
Wilmington, DE, for Plaintiff.

Donald E. Reid, Jason A. Cincilla, Morris, Nichols,
Arsht & Tunnell, Wilmington, DE, for Defendants.

*MEMORANDUM*

SLEET, J.

I. INTRODUCTION

**\*1** Presently before the court is plaintiff Dannette
McLaughlin's Motion For Leave To File Her
Amended Complaint. (D.I.34.) In McLaughlin's
original complaint, filed July 1, 2003, she alleged one
count of unlawful gender discrimination in violation
of Title VII of the Civil Rights Act of 1964, *as
amended,* 42 U.S.C. § 2000e *et seq.* ("Title VII"),
and one count of unequal pay in violation of the
Equal Pay Act, 29 U.S.C. § 206 (1998). (D.I.1.) She
now seeks to amend by adding a retaliation claim
under Title VII, and an equal protection claim under
42 U.S.C. § 1983 (2003). (D.I.34.) Because
McLaughlin has unduly delayed her request to
amend, and because of the undue prejudice to the
defendant that would result from an amendment,
McLaughlin's motion will be denied.

II. JURISDICTION

The court has jurisdiction pursuant to 28 U.S.C. §
1331 (1993).

III. BACKGROUND

As of the time the complaint was filed, McLaughlin
had been a part-time employee of Diamond State Port
Corp. ("Diamond State") for six years. (D.I. 1 ¶ 12-
13.) From September 2000 through May 2002,
McLaughlin applied for various full-time positions
with Diamond State. (Id.¶ 18.) However, she was
unsuccessful in her bid to become full time and each
position for which she applied was eventually filled
by a man. (Id.¶ 20.) Although Diamond State
proffered nondiscriminatory reasons for not hiring
McLaughlin (id.¶ ¶ 21, 26), she has reason to believe
gender discrimination to be the true reason (id.¶ ¶
21-42). As a result, McLaughlin filed a Charge of
Discrimination with the Equal Employment
Opportunity Commission ("the EEOC") on May 28,
2002. (D.I. 34 Ex. A.) On April 3, 2003, the EEOC
issued McLaughlin a right-to-sue letter. (Id.Ex. B.)
She then proceeded to file suit against Diamond State
and the International Longshoreman's Assoc. on July
1, 2003. [FN1] (D.I.1.) A scheduling conference was
held on February 25, 2004 during which the court set
the deadline for amendments to the pleadings to be
April 30, 2004. The discovery deadline was set at
August 31, 2004, and the deadline for case-
dispositive motions was set at September 14, 2004.
(D.I.17.)

> FN1. International Longshoreman's Assoc.
> was dismissed as a defendant and only
> Diamond State remains. (Order of the Court,
> January 16, 2004.)

On July 29, 2004, McLaughlin signed a second
EEOC Charge of Discrimination in which she alleges
Diamond State retaliated against her for filing the
first discrimination charge by passing her over for
promotion. (D.I. 39 Ex. C.) The second charge is
based on McLaughlin's assertion that Diamond State
supervisor William Stansberry told James Woolford,
who told Malik Davidum, who told McLaughlin, that
"because [she] put this suit out, that [she'll] never get
a job." (McLaughlin Dep. at 165:16-166:6, D.I. 39
Ex. D.) McLaughlin was issued another right-to-sue
letter on September 20. (D.I. 34 Ex. D.) In the
meantime, on August 30 plaintiff's counsel informed
counsel for Diamond State of McLaughlin's intention
to amend the complaint to add the retaliation and §
1983 claims:

> Please be advised that plaintiff has filed a new
> EEOC charge alleging retaliation. As soon as we
> receive the right to sue, we will be filing a Motion

Not Reported in F.Supp.2d                                                                  Page 2
2004 WL 2958664 (D.Del.)
**(Cite as: 2004 WL 2958664 (D.Del.))**

to Amend the Complaint. In addition, as discovery has revealed the Port to be a "state actor," we will also be adding a claim under 42 U.S.C. § 1983. I wanted you to be aware of these issues before our Conference with Judge Sleet currently scheduled for September 1, 2004 at 9:00 a.m.
**\*2** I am on trial this week and will be difficult to reach. Please leave me a message if you have any questions and I will try to return your call before September 1, 2004. Thank you.
(August 30, 2004 Letter from Plaintiff's Attorney to Defendant's Attorney, D.I. 34 Ex. 2.)

Diamond State replied the same day:
I received your letter of today in which you noted that McLaughlin intends to move to amend her complaint to add a claim or [sic] retaliation and a section 1983 claim. You closed your letter by asking that I call if I have any questions. I will do so now. I am writing as well in the event that you are carrying a Blackberry. The schedule entered by the court provides that the time to amend pleadings expired over 4 months ago. Obviously we will oppose any effort on the of [sic] McLaughlin to amend her pleadings to add additional, baseless claims. In all events, if you intend to raise this issue with the Court in any substantive manner at the September 1 teleconference, please send me a detailed email identifying what exactly you intend to present so that I can be prepared to respond.
(August 30, 2004 Email from Defendant's Attorney to Plaintiff's Attorney, D.I. 41 Ex. C.)

The teleconference referenced in the above correspondence actually took place on September 3, and resulted in a revised scheduling order. In particular, the court acceded to the parties' requests to move the discovery deadline to October 1 and the deadline for case-dispositive motions to October 18. (D.I.26.) No mention of McLaughlin's desire to amend her complaint was made to the court by either party.

Pursuant to the amended scheduling order, McLaughlin was deposed on September 28. At her deposition, counsel for Diamond State requested a copy of the second EEOC Charge. (D.I. 41 at 8-9.) It was provided on October 8, along with an offer to make McLaughlin available for another deposition. (Id.Ex. A.) According to McLaughlin, Diamond State declined to re-depose her. (Id. at 9.) McLaughlin filed the present motion on October 14 (D.I.34), and Diamond State filed a motion for summary judgment as to the claims in the original complaint on October 18 (D.I.36.)

A pre-trial conference in this case is scheduled for January 5, 2005, and trial is scheduled for January 24, 2005.

IV. DISCUSSION

Bearing in mind that leave to amend a pleading is to "be freely given," Fed.R.Civ.P. 15(a), it is within the discretion of the court to deny leave where a party will be substantially or unduly prejudiced, or where the court finds "bad faith or dilatory motives, truly undue or unexplained delay, repeated failures to cure the deficiency by amendments previously allowed, or futility of amendment," *Lorenz v. CSX Corp.,* 1 F.3d 1406, 1413-14 (3d Cir.1993).

As to McLaughlin's § 1983 claim, the court is truly at a loss as to how it escaped counsel for McLaughlin that Diamond State is a state actor. Diamond State correctly points out that McLaughlin should have been alerted to this fact by the reference to Del.Code Ann., tit. 29, § 8735(a) (2003), in Diamond State's answer, filed on July 15, 2003 (D.I. 4 ¶ 3). Section 8735(a) states:
**\*3** There shall be established within the Department of State a body corporate and politic, with corporate succession, constituting a public instrumentality of the State, and created for the purpose of exercising essential governmental functions which is to be known as the "Diamond State Port Corporation."

Thus, McLaughlin should have discovered Diamond State's status as a state actor as soon as counsel read the answer and did even cursory research as to its substance. Either this research did not happen, or counsel did not realize the potential for a § 1983 claim. Moreover, the court finds it difficult to believe McLaughlin worked for Diamond State for six years without knowing it is an arm of the State of Delaware. It is noteworthy that McLaughlin's submissions are conspicuously vague in outlining the reasons for this oversight. The only concrete explanation for delay the court can discern from the briefs is that McLaughlin "delayed raising the § 1983[sic] until the retaliation claim had perfected in order to avoid a multiplicity of amendment motions." (D.I. 41 at 10.) Yet McLaughlin did not sign her second EEOC complaint until July 29, 2004, which was over one year after she was put on notice of Diamond State's status as a state actor. The court doubts counsel really thought it was proper to sit idly on its § 1983 claim for over a year (allowing the deadline for amendments to pass) in anticipation of a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 3
2004 WL 2958664 (D.Del.)
(Cite as: 2004 WL 2958664 (D.Del.))

retaliation claim. Therefore, the court accords very little weight to McLaughlin's justification for the extraordinary delay in seeking to add the § 1983 claim.

 As to the retaliation claim, the court is sympathetic to the plight of the employee who is retaliated against by her employer after the deadline for amendments to the pleadings has passed. Indeed, had McLaughlin's counsel raised the amendment issue at the September 3 teleconference, the court would have given it serious consideration (especially since the whole purpose of the teleconference was to amend the scheduling order). Instead, counsel chose to be inconsiderate of the court's time and burden it with lengthy, eleventh-hour briefing on an issue that could have been disposed at the teleconference with relative ease. Furthermore, counsel offers no excuse for this failure other than to say the defendant requested the issue not be brought up at the teleconference. Based on the defendant's email of August 30, Diamond State merely requested details of the proposed amendment in order to properly prepare his response for the teleconference. Certainly, this was not an unreasonable request. Counsel for McLaughlin argues that such a request was, in fact, unreasonable because counsel for the defendant knew counsel for the plaintiff was on trial and would be unable to respond to a request for details. (D.I. 41 at 9.) In other words, McLaughlin's counsel sprung notification of amendment on Diamond State on the eve of the teleconference, and then condemns Diamond State for not accommodating counsel's busy trial schedule. It goes without saying that McLaughlin's position is untenable. Even further undermining her argument is the fact that the teleconference was actually delayed by two days (from September 1 to September 3), giving McLaughlin ample opportunity to fulfill Diamond State's request for details.

 *4 McLaughlin also argues that delay was necessary because she needed to receive a right-to-sue letter before seeking to amend. (Id. at 8.) However, McLaughlin fails to account for the fact that she could have sought leave to amend *before* the end of discovery. She received her right-to-sue letter on September 20, which was eight days before her own deposition and ten days before the end of discovery. Knowing of the impending deadlines, McLaughlin should have been fully prepared to file her motion to amend immediately upon receiving the letter. Instead she delayed until October 14, just two business days before the deadline for case-dispositive motions.

Another explanation is offered in a footnote:
> Plaintiff notes as well that much of the evidence of retaliation was not developed until very recently, after defendant first withheld and then provide [sic] documents and required that plaintiff return to depose a witness about issues on which Defendant prohibited discovery in prior depositions. See, Markow deposition (Affidavit of Laurence V. Cronin ("Cronin Aff.") at Ex. B). Indeed, it was not until Stansbury's deposition in September that defendant finally acknowledged that there had been promotions subsequent to the EEOC charge being filed, having failed to provide any documentation regarding those promotions and assured counsel that there was none. See Stansbury deposition (Cronin Aff. at Ex. D).

(D.I. 41 at 1 n. 2.) This explanation is inadequate for two reasons. First and foremost, McLaughlin obviously had enough information to file a charge with the EEOC in July 2004. Thus, it was not a discovery problem that prevented her from seeking to amend her complaint. Second, the above footnote asks the court to draw inferences from three deposition transcripts with no pinpoint cites. The two Markow depositions total 220 pages and the Stansbury deposition is 137 pages. Counsel once again shows its disregard for the court's time by asking it to sift through 357 pages of testimony to find evidence of dilatory tactics. It is counsel's responsibility to point the court to relevant evidence. Consequently, the court does not accept McLaughlin's explanation for the delay in seeking to add her retaliation claim.

 Another consideration in deciding whether to permit an amendment is prejudice to the defendant. Although Diamond State does not explicitly argue this point, the court finds implicit prejudice. The purpose of a scheduling order is to provide concrete deadlines on which the parties can rely in planning their respective litigation strategies. If the court were to permit parties to ignore these deadlines, unfair surprise would abound.

 In this case, briefing on McLaughlin's motion was completed on November 1. Even if the court would have decided the motion that day, Diamond State would have required time to file another answer. Additionally, it is quite likely that more discovery would have been necessary. [FN2] With the schedule now so compressed, it is likely that the filing of dispositive motions would have been precluded by the court or the time for trial postponed. Clearly, the loss to the defendant of the opportunity to achieve summary disposition of the matter or the delay

Not Reported in F.Supp.2d                                                                                                  Page 4
2004 WL 2958664 (D.Del.)
**(Cite as: 2004 WL 2958664 (D.Del.))**

resulting from an accommodation of the plaintiff's
request to amend would be prejudicial to Diamond
State.

> FN2. McLaughlin disagrees that more
> discovery would be necessary. She is clearly
> mistaken. For instance, her main piece of
> retaliation evidence is at least double
> hearsay. Although Stansbury's statement
> may be non-hearsay as an admission of a
> party opponent, Fed.R.Evid. 801(d)(2), the
> statement would only become admissible if
> Woolford testified, or if there were an
> applicable exception for Woolford's recital
> of Stansbury's statement to Davidum and for
> Davidum's recital of Woolford's statement to
> McLaughlin. Thus, it seems most likely that
> Woolford would need to be deposed.

V. CONCLUSION

**\*5** Since McLaughlin does not adequately explain
the prolonged delay in filing her motion to amend,
and since permitting such an amendment would
impose undue prejudice on Diamond State, the court
will deny her motion.

*ORDER*

IT IS HEREBY ORDERED that:

The plaintiff's Motion For Leave To File Her
Amended Complaint (D .I. 34) be DENIED.


**Motions, Pleadings and Filings (Back to top)**


•         1:03CV00617         (Docket)
(Jul. 01, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT   6

Slip Copy                                                                                          Page 1
2005 WL 1397217 (E.D.Pa.)
**(Cite as: 2005 WL 1397217 (E.D.Pa.))**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
John S. RIZZO, Plaintiff
v.
PPL SERVICE CORPORATION, Defendant
Gregory GORSKY, Plaintiff
v.
PPL SERVICE CORPORATION, Defendant
Kim GORSKY, Plaintiff
v.
PPL SERVICE CORPORATION, Defendant
**No. Civ.A. 03-5779, Civ.A. 03-5780, Civ.A. 03-5781.**

June 10, 2005.

Donald P. Russo, Donald P. Russo, Esquire, Bethlehem, PA, for Plaintiff.

Malcolm J. Gross, Gross, McGinley, Labarre & Eaton, LLP, Allentown, PA, Daniel R. Halem, Peter Rahbar, Proskauer Rose, LLP, New York, NY, for Defendant.

*MEMORANDUM*

PRATTER, J.

**\*1** Plaintiffs in these three related matters filed a Joint Motion for Reconsideration on April 25, 2005 following the Court's grant of summary judgment to Defendant PPL Service Corporation ("PPL") in all three matters on April 19, 2005. Plaintiffs make four arguments in their Joint Motion. First, they contend that the Court erred by not examining the circumstantial evidence of discrimination under a mixed motive standard. Second, Plaintiffs claim that they should be granted leave to amend their complaints to advance the theory of disparate impact and to take limited discovery under the new theory of liability. Third, Plaintiffs argue that the Court inappropriately relied on PPL's Corporate Policy that is dated April 11, 2001, while the punitive employment actions taken against Plaintiffs occurred in February of 2001. Finally, the Joint Motion includes the argument that the Court erred in holding that Plaintiffs had proffered no evidence that PPL has

a progressive discipline policy.

PPL filed a Memorandum of Law in Opposition to the Joint Motion on May 9, 2005. In response to PPL's Memorandum of Law, Plaintiffs filed a Joint Motion Seeking Leave of Court to File a Memorandum of Law in Reply [FN1] to which PPL filed a response.

> FN1. The Court grants this Motion and has considered the arguments made in both Plaintiffs' Memorandum of Law in Reply and PPL's Surreply in Opposition.

For the reasons discussed below, the Court denies the Joint Motion for Reconsideration.

**I. *STANDARD OF REVIEW***

The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence. *Harsco Corp. v. Zlotnicki,* 779 F.2d 906, 909 (3d Cir.1985), *cert. denied,* 476 U.S. 1171, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986). A court should grant a motion for reconsideration "only if the moving party establishes one of three grounds: (1) there is newly available evidence; (2) an intervening change in the controlling law; or (3) there is a need to correct a clear error of law or prevent manifest injustice." *Drake v. Steamfitters Local Union No. 420,* No. 97-585, 1998 WL 564486, at \*3 (E.D.Pa. Sept.3, 1998) (citing *Smith v. City of Chester,* 155 F.R.D. 95, 96-97 (E.D.Pa.1994)). "Because federal courts have a strong interest in finality of judgments, motions for reconsideration should be granted sparingly." *Continental Casualty Co. v. Diversified Industries, Inc.,* 884 F.Supp. 937, 943 (E.D.Pa.1995). The moving party must show more than mere disappointment with the Court's ruling for reconsideration to be granted. *Burger King Corp. v. New England Hood and Duct Cleaning Co.,* 2000 WL 133756, at \*2 (E.D.Pa. Feb.4, 2000); *Glendon Energy Co. v. Borough of Glendon,* 836 F.Supp. 1109, 1122 (E.D.Pa.1993).

**II. *DISCUSSION***

At the outset, the Court observes that none of the grounds contained in the Joint Motion for Reconsideration relate to Plaintiff Kim Gorsky's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 2
2005 WL 1397217 (E.D.Pa.)
**(Cite as: 2005 WL 1397217 (E.D.Pa.))**

complaint or the basis on which summary judgment was granted against her. As to Ms. Gorsky's claim, the Court held that summary judgment was proper due to Ms. Gorsky's failure to produce evidence that she suffered an adverse employment action. Even if the Court were to accept all of the arguments in the Joint Motion for Reconsideration, there would be no basis to reconsider the finding that Ms. Gorsky had not suffered an adverse employment action and, thus, had not established a *prima facie* case of discrimination. Therefore, for purposes of the remainder of this Memorandum, reference to "Plaintiffs" means Plaintiffs Gregory Gorsky and John Rizzo.

A. *Circumstantial Evidence of Discrimination Using Mixed Motives Standard*

**\*2** Plaintiffs contend that the traditional *McDonnell-Douglas* model that the Court applied in this case has been modified by *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), to allow plaintiffs to demonstrate discrimination by showing it was "a motivating factor" for an employment-related action, not necessarily the only factor. *Desert Palace,* 539 U.S. at 92-94; *see also, Lloyd v. City of Bethlehem,* 2004 WL 540452, at \*3 (E.D.Pa. Mar.3, 2004); *Campetti v. Career Educ. Corp.,* 2003 WL 21961438, at \*7 (E.D.Pa. June 25, 2003). Plaintiffs then argue that "[h]ad the Court applied a mixed motives analysis in the case at bar, it would have become evident that one of the Defendant's motivating reasons for the investigation of a very small group of older employees may have been to rid itself of older workers." (Pls .' Jt. Motion for Reconsideration, at 4).

PPL responds to this argument by noting initially that the *Desert Palace* reasoning has not been formally applied to ADEA claims, such as those at issue in these cases. PPL further argues that, even if circumstantial evidence is permissible to show a mixed motive, the Court has already ruled on this issue by finding that "neither Mr. Gorsky nor Mr. Rizzo have produced evidence that age was a factor in any manner in PPL's decision to terminate their employment." Further, PPL contends that Plaintiffs have not demonstrated any "manifest error of law or fact" that would require the Court to reconsider the original decision.

The "mixed-motives" test was originally described in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Under this test, the plaintiff has the initial burden to demonstrate that

the adverse employment action was "the result of mixed motives (i.e. that it is the 'result of multiple factors, at least one of which is illegitimate' and the illegitimate factor played 'a motivating part' in the adverse decision)." *Watson v. Southeastern Pa. Transp. Auth.,* 207 F.3d 207, 215 (3d Cir.2000) (quoting *Price Waterhouse,* 490 U.S. at 244-45). If the plaintiff satisfies this initial burden, "the burden shifts to the employer to persuade the jury by a preponderance of the evidence that it would have reached the same decision even if the protected trait had not been considered." *Id.* In *Desert Palace,* the Supreme Court found that, in a Title VII discrimination case, either direct or circumstantial evidence can be used to satisfy the plaintiff's burden to show a "mixed-motive." *Desert Palace,* 539 U.S. at 100. However, the Court of Appeal for the Third Circuit in *Monaco v. American Gen. Assurance Co.,* 359 F.3d 296 (3d Cir.2004), held that direct evidence was still required in ADEA cases to show "mixed-motive" without any discussion of *Desert Palace. Monaco,* 359 F.3d at 300.

The Court finds that neither the circumstantial nor the direct evidence presented by Plaintiffs satisfied their initial burden of demonstrating that PPL's motivations in the termination of Messrs. Gorsky and Rizzo were illegitimate. Therefore, the Court has no reason to decide whether Plaintiffs could have satisfied their burden by presenting circumstantial evidence. As stated in the earlier Memoranda and Orders, after examining all evidence tendered to the Court, including circumstantial and direct evidence, the Court found that no genuine issue of material fact exists to support an inference of any discrimination. Plaintiffs simply have failed to produce any evidence showing that discrimination was a factor, let alone a motivating factor, in the termination of Messrs. Gorsky and Rizzo.

B. *Leave to Amend Complaint to Include Disparate Impact Claim*

**\*3** Plaintiffs note that the recent Supreme Court opinion in *Smith v. City of Jackson,* --- U.S. ----, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005), recognizes a plaintiff's right to bring a disparate impact claim under the ADEA. Therefore, Plaintiffs request leave to file an Amended Complaint and to reopen discovery for the limited purpose of pursuing the alleged disparate impact claim. Plaintiffs argue that leave to amend should be granted, according to *Rule 15(a) of the Federal Rules of Civil Procedure,* "when justice so requires," and the burden is generally on

the non-moving party to demonstrate why leave to amend should not be granted. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). In fact, a court should generally allow amendment of a complaint "absent undue or substantial prejudice ... unless 'denial [can] be grounded in bad faith or dilatory motive, truly undue or unexplained delay, repeated failure to cure deficiency by amendments previously allowed or futility of amendment.' " ' *Lundy v. Adamar of New Jersey, Inc.,* 34 F.3d 1173, 1196 (3d Cir.1994) (quoting *Bechtel v. Robinson,* 886 F.2d 644, 652-53 (3d Cir.1989)). As to the reopening of discovery, Plaintiffs specifically request the opportunity to perform statistical analysis to determine if the investigation at issue did target a disproportionate number of over forty-year-old employees and to determine the average age of the PPL's employees. [FN2]

> FN2. In the Court's earlier Memoranda and Opinion, at page 17, reference is made to "the demonstrable fact that the average age of PPL employees is 46 years old" as one of the points raised by PPL to demonstrate that the investigation affected predominantly older people. Plaintiffs correctly have noted that this age was provided by counsel for PPL during oral argument and is not evidence. However, the Court did not rely on this number as evidence, but merely was a reference point for discussing PPL's arguments in their brief and at oral argument. Further, Plaintiffs may wish to review the earlier Memoranda and Opinions, as the Court rejected PPL's argument in this regard.

 PPL argues that leave to amend a complaint after summary judgment has been granted makes "the interests in judicial economy and finality of litigation ... particularly compelling." *Beverly v. Desmond Hotel & Conference Ctr.,* 2004 WL 632707, at *4 n. 2 (E.D.Pa. Feb.25, 2004). PPL further contends that Plaintiffs have not offered any legitimate reason for having delayed in requesting leave to amend. PPL asserts that the *Smith v. City of Jackson* opinion did not change the law of the Third Circuit, where the Court of Appeals had not specifically precluded disparate impact claims in ADEA claims prior to the *Smith* opinion. *See Massarsky v. Gen. Motors Corp.,* 706 F.2d 111, 121 (3d Cir.1983). Further, PPL argues that *Smith* was issued on March 30, 2005 and Plaintiffs, who were aware of the *Smith* decision, did not seek leave to amend their complaint until nearly a month later and after the Court had issued an order

granting summary judgment. Finally, PPL contends that granting leave would be highly prejudicial to PPL, because PPL would need to do additional burdensome and expensive discovery after many years and after completing extensive discovery already in these matters.

 In *Foman v. Davis,* the Supreme Court clarified the role of the district court in deciding whether to grant such leave:

> In the absence of any apparent or declared reason-- such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.--the leave sought should, as the rules require, be 'freely given.' Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.
> **\*4** *Foman,* 371 U.S. at 182.

 After consideration of Plaintiffs' request and with full recognition of the principle that generally leave should be granted, the Court declines to grant leave in any of these caes for the filing of an amended complaint.

 The Court finds that three of the reasons enumerated in *Foman* apply here and supply compelling grounds for denying the requested leave to amend. First, the Court finds that Plaintiffs' delay in requesting leave to amend the complaints was undue. Prior to the Court's grant of summary judgment, Messrs. Gorsky and Rizzo were aware of the *Smith* decision. Nonetheless, Messrs. Gorsky and Rizzo did not request leave to amend their complaints at that time, but only made such a request after the Court had granted summary judgment against them. Although it may well be, as PPL suggests, that the law in the Third Circuit was such that Plaintiffs could have originally alleged disparate impact claims, it is clear that, once *Smith* was issued on March 30, 2005, a plaintiff would not have had to deal with any ambiguity and could have filed a disparate impact claim under the ADEA. These Plaintiffs simply failed to request leave to amend their complaint in a prompt manner and have not presented any reason for that delay. As a result, both PPL and the Court have expended resources in connection with the summary judgment motion.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 4
2005 WL 1397217 (E.D.Pa.)
**(Cite as: 2005 WL 1397217 (E.D.Pa.))**

Reopening this matter via amended pleadings to advance new theories would result in undue prejudice to PPL. The Court has little doubt that all parties have expended a great deal of time, resources, and energy in these matters. To reopen them now would not only require PPL to expend even more time, resources, and energy, but, at this extremely late stage, also requires all parties and witnesses to try to recall events and dates now several years in the past.

Finally, the Court finds that disparate impact claims by these Plaintiffs are futile, because the proposed Amended Complaints and the evidence do not support a disparate impact claim. In *Smith,* the Supreme Court held "it is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact. Rather, the employee is 'responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities.' ' *Smith,* 125 S.Ct. at 1545 (quoting *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 656, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989) (quoting *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 994, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988))). In *Smith,* the Supreme Court found that a pay plan that was "relatively less generous to older workers than to younger workers" did not disparately impact the older workers because "the plan was based on reasonable factors other than age." *Id.* The test established by the Supreme Court is not whether "there may have been other reasonable ways" to accomplish a goal, but whether the method used was reasonable. *Id.* at 1546.

**\*5** In these cases, Messrs. Gorsky and Rizzo rely solely on the assertion that because the internal PPL investigation that resulted in their termination included mostly older employees, it had a disparate impact on older employees. Further, Plaintiffs contend that PPL should have had a larger investigation that did not "target" older workers. Although Plaintiffs' proposal may be a reasonable method for PPL to achieve the goal of preventing misuse of its email services and ensuring that offensive material is not displayed on its computers, the Court finds that the method used by PPL, namely tracking certain inappropriate emails and investigating the distributors and recipients of those emails, was reasonable (and effective). Even if Plaintiffs were to produce evidence that the investigation affected older employees at a disproportionate rate, the Court finds that Plaintiffs cannot show that the investigation was a specific

employment practice that illegally disparately impacted older employees.

Any of the individual reasons discussed alone may have been sufficient to overcome the prejudice in favor of granting leave to amend where possible, but all of the foregoing reasons combined lead the Court to the conclusion that allowing leave in this situation would be an unwarranted disservice to the parties and the Court.

*C. Date of Corporate Policy No. 405*

Plaintiffs argue that Corporate Policy No. 405, which prohibited non-business use of email, was dated April 11, 2001. Further, even if PPL's statement that the actual date the Corporate Policy was issued was November 8, 2000, the investigation at issue began in September of 2000. Therefore, Plaintiffs contend that this Policy was not available to them at the time of the investigation and their eventual termination. In other words, Plaintiffs contend that the Court evaluated Plaintiffs' conduct by using a PPL standard that was not even in effect at the time.

The Court is willing to consider, taking the evidence in the light most favorable to Plaintiffs and making all inferences in favor of Plaintiffs, that Corporate Policy No. 405 may not have been available to Plaintiffs at the time of the investigation. However, the Court finds that the removal of Corporate Policy No. 405 from evidence presented here does not have any impact on the Court's granting of summary judgment in favor of PPL. Corporate Policy No. 405 simply stated that "the use of company e-mail or internet [was] for only business purposes." The PPL Standards of Conduct and Integrity states substantially the same policy. Further, both Mr. Gorsky and Mr. Rizzo admitted that they were aware that the PPL email facility was intended for only business purposes. (Greg Gorsky Deposition Transcript, at 37-38, 56-58, 61-62, 70-71; John Rizzo Deposition Transcript, at 32-33, 35, 48-49, 51). Therefore, the Court finds that the mention of Corporate Policy No. 405 in the Memoranda and Orders granting summary judgment was not a "manifest injustice," and did not control the outcome of the Court's decision granting summary judgment in favor of PPL.

*D. Progressive Discipline Policy*

**\*6** Plaintiffs argue that the Court erred by finding that there was no evidence of a progressive discipline policy. Plaintiffs assert that the "Responsible

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Behavior Program," which lists various levels of discipline, is a progressive discipline policy. Additionally, Plaintiffs now proffer PPL's answer from an interrogatory in another, unrelated, litigation in which PPL answers the question "Does [PPL] have a progressive discipline policy? If so, how and when was the progressive discipline policy applied to Plaintiff prior to his termination?" by stating "Yes. Consistent with PPL's Responsible Behavior Program, which permits termination as the first step under certain circumstances...."

 PPL argues that Plaintiffs are merely attempting to relitigate an issue that has already been decided by the Court. Further, PPL contends that the evidence, in these cases, clearly shows that the PPL Responsible Behavior Program was not a "progressive discipline policy," as Plaintiffs try to characterize it, because, although it contains five levels of discipline, the Program does not mandate that the steps be utilized progressively, i.e. the least drastic step used as a first effort of discipline. Further, PPL asserts that the interrogatory answer provided by Plaintiffs should not be considered by the Court now because it was information available to Plaintiffs prior to the Court's granting summary judgment and Plaintiffs failed to produce it for the Court's consideration at that time.

 The Court declines to speculate as to the meaning of an interrogatory answer in an unrelated case. If Plaintiffs wanted the Court to consider that material here, they should have made it part of the record here in a timely fashion. They did not. The Court found that there was no evidence that PPL had a "progressive" disciplinary policy that precluded PPL's termination of these Plaintiffs in response to their email abuses and infractions. Nothing presented by Plaintiffs has convinced the Court that the earlier conclusion was erroneous.

III. *CONCLUSION*

 For the foregoing reasons, the Court denies the Plaintiffs' Motion for Reconsideration. An Order to be entered consistent with this Memorandum follows.

 AND NOW, this 10th day of June, 2005, upon consideration of the Plaintiff Kim Gorsky's Motion for Reconsideration (Docket No. 33), Ms. Gorsky's Memorandum of Law (Docket No. 34), Defendant PPL Service Corporation's Response in Opposition (Docket No. 35), Ms. Gorsky's Motion for Leave to File Memorandum of Law in Reply (Docket No. 36) and the accompanying Memorandum of Law, and PPL's Reply to Response to Motion (Docket No. 37),

it is hereby ORDERED that:

 1. Plaintiff Kim Gorsky's Motion for Leave to File Memorandum of Law in Reply is GRANTED; and

 2. Plaintiff Kim Gorsky's Motion for Reconsideration is DENIED.

 2005 WL 1397217 (E.D.Pa.)

END OF DOCUMENT

# EXHIBIT  7

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
UNIVERSAL COMPUTER CONSULTING, INC.,
et al., Plaintiffs,
v.
PITCAIRN ENTERPRISES, INC., et al., Defendants.
**No. Civ.A. 03-2398.**

May 18, 2005.

James G. Wiles, Yardley, PA, for Plaintiffs.

Robert J. Lohr, II, The Law Offices of Robert J.
Lohr, II, West Chester, PA, Jayson R. Wolfgang,
Buchanan Ingersoll P.C., Harrisburg, PA, for
Defendants.

MEMORANDUM AND ORDER

SCHILLER, J.

**\*1** Plaintiffs Universal Computer Consulting, Inc.
and Universal Computer Maintenance, Inc. bring this
action against Defendants Kean Company, Kean
Pitcairn, Kris Pitcairn, Pitcairn Enterprises, Inc.
("PE"), and 1862 Lincoln Highway Associates, L.P.
("1862 Associates") for fraudulent conduct in
connection with an asset sale. The Complaint
currently contains two counts: (1) equitable fraud;
and (2) violation of the Uniform Fraudulent Transfers
Act. [FN1] Plaintiffs now move for leave to amend
the Complaint to add five new counts and an
additional defendant. Because Plaintiffs have unduly
delayed seeking amendment, and because allowing
amendment at this late stage would substantially
prejudice Defendants, Plaintiffs' motion is denied.

> FN1. On February 23, 2004, the Court
> dismissed Plaintiffs' claims for unjust
> enrichment and tortious interference with
> contract. (Mem. & Order of Feb. 23, 2004 at
> 12-16 [hereinafter "Feb. 23 Order"].)

I. BACKGROUND

This case arises from an asset sale allegedly
designed to frustrate Plaintiffs' attempt to collect on a
judgment. Plaintiffs are Texas corporations that
design and install inventory and spare parts control
systems, including hardware and software, for car
dealers. (*See* Feb. 23 Order at 3.) In 1989, Plaintiffs
entered into a series of computer services contracts
with PE, a Pennsylvania corporation doing business
as "Rcairn Motorcars." (*Id.*) Kean Pitcairn is
currently the president and sole shareholder of PE;
prior to 2002, Kris Pitcairn, Kean Pitcairn's wife,
owned 80% of PE. (Compl. ¶¶ 10-11; Ans. of Defs.
Kean Co., Kean Pitcairn, Kris Pitcairn & PE
[hereinafter "PE's Ans."] ¶¶ 10-11.)

In 2000, pursuant to a contractual provision
requiring arbitration of the parties' disputes, Plaintiffs
commenced an American Arbitration Association
arbitration against PE in Houston, Texas for various
breaches of the computer services contracts. (Feb. 23
Order at 3-4.) In August 2001, the arbitration panel
issued an opinion and award in favor of Plaintiffs.
(*Id.* at 4.) On April 16, 2002, the United States
District Court for the Southern District of Texas
confirmed that award and entered a judgment in favor
of Plaintiffs and against PE. (*Id.* at 5.)

Thereafter, PE prepared and circulated a bid package
for the sale of its assets. (Compl. ¶ 43; PE's Ans. ¶
46.) On August 5, 2002, PE sold substantially all of
its assets to non-party R & S Imports, Ltd. ("Buyer")
for a total price of $8.322 million. (Compl. ¶¶ 45,
50, 48[sic]; PE's Ans. ¶¶ 48, 52, 54.) Plaintiffs,
despite the arbitration award and judgment in their
favor, did not receive any of the $8.322 million
purchase price. Instead, a portion of this money was
distributed to Torrance Pitcairn, Kean Pitcairn's
brother, and to 1862 Associates, a company in which
Kean Pitcairn is alleged to have a partnership interest.
(Feb. 23 Order at 6-7.) Plaintiffs also allege that, at
the asset sale, Buyer and PE entered into a real estate
sublease, under which PE had the right to receive a
$43,000.00 payment. (*Id.* at 7.) Plaintiffs contend that
PE assigned this right to Kean Company, a
corporation wholly owned by Kean and Kris Pitcairn,
without receiving any consideration for the
assignment. (*Id.*) Finally, Plaintiffs aver that, since
the asset sale, Kean Pitcairn has transferred
$700,000.00 to his personal trust and to Kris Pitcairn,
even though neither is a secured creditor of PE. (*Id.*
at 6.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 2
2005 WL 1213884 (E.D.Pa.)
(Cite as: 2005 WL 1213884 (E.D.Pa.))

*2 On August 31, 2002, Plaintiffs transferred the federal district court's judgment to the Court of Common Pleas for Bucks County and filed a writ of execution. (*Id.* at 5.) Though the parties dispute the precise value of the judgment recorded on that date, they agree that the judgment is valued at over $500,000.00. (Compl. ¶ 9; PE's Ans. ¶ 9.) On November 27, 2002, Plaintiffs filed a petition for supplemental relief in aid of execution in the Court of Common Pleas, which was denied on December 23, 2002. (Feb. 23 Order at 5.) On March 4, 2003, Plaintiffs filed a motion to correct judgment, a petition for hearing on all pending motions, and a motion to modify the December 23, 2003 Order, all of which were denied on March 19, 2003. (*Id.*) On April 21, 2003, Plaintiffs commenced the instant action, seeking a constructive trust upon the unsecured proceeds of PE's asset sale, as well as punitive damages.

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 15(a), leave to amend a complaint shall be freely given when justice so requires. Fed. R. Civ. P. 15(a) (2005). Nevertheless, amendment may be inappropriate where the underlying circumstances show "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, [or] futility of the amendment." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). The Third Circuit has emphasized that, of these considerations, prejudice to the non-moving party is the touchstone for the denial of an amendment. *Bechtel v. Robinson,* 886 F.2d 644, 652 (3d Cir.1989). Moreover, "the moving party bears the burden of proof in explaining the reasons for delay in seeking leave to amend." *Tarkett v. Congoleum Corp.,* 144 F.R.D. 289, 290 (E.D.Pa.1992) (citing *Cresswell v. Sullivan & Cromwell,* 922 F.2d 60, 70 (2d Cir.1990)). Ultimately, a motion for leave to amend a complaint is addressed to the sound discretion of the district court. *See, e.g., Howze v. Jones & Laughlin Steel Corp.,* 750 F.2d 1208, 1212 (3d Cir.1984).

## III. DISCUSSION

Plaintiffs filed their motion for leave to amend on September 29, 2004, over seventeen months after the commencement of this action and just two days before the close of discovery. (*See* Scheduling Order

of May 20, 2004 (setting discovery deadline of Oct. 1, 2004).) The motion proposes: (1) adding a count against Defendants PE, Kean Pitcairn, Kris Pitcairn, and Kean Company for breach of fiduciary duty; (2) adding a count against Defendant Kean Pitcairn based on the "participation doctrine"; (3) dismissing the primary liability claims against Defendant 1862 Associates; (4) adding three counts against Defendant 1862 Associates for secondary liability (i.e., conspiracy, aiding and abetting, and equitable subordination); and (5) adding Torrance Pitcairn, Kean Pitcairn's brother, as a defendant on the new secondary liability claims. (Pls.' Mot. at 1-2.)

*3 Plaintiffs assert that their proposed amendments should be allowed because they are based on newly discovered evidence. Specifically, Plaintiffs claim to have recently learned that PE was insolvent from 2000-2002 and that, during this time, Torrance Pitcairn, 1862 Associates, and Kean Pitcairn loaned money to PE. (Pls.' Mem. of Law in Supp. of Mot. at 6.) These loan transactions, according to Plaintiffs, actually deepened PE's insolvency and were intended to prolong PE's life and frustrate Plaintiffs' attempt to collect on their judgment. (*Id.*) The record, however, belies Plaintiffs' argument that this evidence is newly discovered. Furthermore, at this late stage in the proceedings, Plaintiffs' amendments would substantially prejudice the existing Defendants and the proposed new defendant. Therefore, Plaintiffs' motion is denied.

### A. Undue Delay

"Although passage of time alone will not support denial of leave to amend, undue delay by a movant in seeking leave to amend will support such a denial." *Tarkett,* 144 F.R.D. at 291 (citing *Foman,* 371 U.S. at 182). In general, the question of undue delay requires the court to focus on the movant's reasons for not amending sooner. *Cureton v. Nat'l Collegiate Athletic Ass'n,* 252 F.3d 267, 273 (3d Cir.2001). Delay may become undue when a movant has failed to amend despite previous opportunities to do so. *See, e.g., Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644, 654-55 (3d Cir.1998) (rejecting proposed second amended complaint when plaintiffs were repleading facts that could have been pled earlier).

Plaintiffs contend that they have not unduly delayed in moving to amend the Complaint because they only recently learned of the facts upon which the proposed amendments are based. Plaintiffs purportedly uncovered this evidence after July 1, 2004 via third-party subpoenas and through a review of PE's

business records. (Ltr. from Pls. to Ct. of Oct. 11, 2004 Memorializing Arguments on Mot. at 5 [hereinafter "Pls.' Ltr."].) It is undisputed, however, that in April of 2002, counsel for PE sent Plaintiffs PE's 2000 and 2001 financial statements. (*Id.* at 13; *see also* Rep. of Defs. Kean Co., Kean Pitcairn, Kris Pitcairn & PE [hereinafter "PE's Resp."] Ex. 1 (Ltr. from McNees Law Firm to Pls. of Apr. 24, 2002 Enclosing PE's Fin. Stmts).) According to Plaintiffs, those statements show that PE's current assets exceeded its current liabilities; that PE had a seven-figure negative net worth at the beginning of 2000; that PE lost millions of dollars over those two years, despite being lent $3 million by insiders; and that at the end of 2001, PE was still operating on bank overdrafts. (Pls.' Ltr. at 6-7.) Plaintiffs, therefore, possessed evidence of PE's insolvency and the loan transactions in question for as long as a year before the Complaint was originally filed. Mr. Wiles, counsel of record for Plaintiffs, protests that he did not see and was not aware of the 2000 and 2001 financial statements until July 2004. (Aff. of James Wiles ¶ 4.) Nonetheless, Mr. Wiles concedes that these documents were sent to his co-counsel, Mr. Allen, in April of 2002. (Pls.' Ltr. at 13.) Mr. Wiles thus had ample opportunity to obtain and review the documents well before July 2004, and his failure to do so does not serve as an adequate justification for delay. *See, e.g., L.D. Schreiber Cheese Co. v. Clearfield Cheese Co., 495 F.Supp. 313, 316 (W.D.Pa.1980)* (denying leave to amend where movant did not act in bad faith, but nevertheless delayed over two and a half years in bringing motion).

**\*4** Accordingly, the Court finds that Plaintiffs have unduly delayed in seeking amendment, which alone warrants denial of their motion. The Court's decision is fortified, however, by the fact that the proposed amendments would result in substantial prejudice.

B. Substantial Prejudice

Leave to amend may also be denied if amendment would result in substantial or undue prejudice to the non-moving party. *Cureton, 252 F.3d at 273; see also Bechtel, 886 F.2d at 652* (describing prejudice to non-moving party as "the touchstone" for denial of amendment). "The issue of prejudice requires that we focus on the hardship to the defendants if the amendment were permitted." *Cureton, 252 F.3d at 273* (citing *Adams v. Gould Inc., 739 F.2d 858, 868 (3d Cir.1984)*). For instance, a defendant who is put to added expense and forced to engage in additional discovery suffers hardship. *See, e.g., Kuhn v. Phila.*

*Elec. Co., 85 F.R.D. 86, 88 (E.D.Pa.1979)* (denying leave to amend where discovery had already been completed and amendment would have necessitated additional discovery). A defendant may also be burdened by being required to defend itself against new facts or legal theories. *See, e.g., Tarkett, 144 F.R.D. at 291* (denying leave to amend where proposed amendment raised entirely new issues of law that would have required new defenses).

In this case, Plaintiffs' proposed amendments would result in substantial prejudice to the existing Defendants. Plaintiffs are seeking to dramatically alter the Complaint at the eleventh hour by adding over one hundred new paragraphs, five new counts, and a new defendant. (Pls.' Mot. Ex. A (Proposed Am. Compl.).) As the discovery deadline has long passed, these amendments would force Defendants to incur additional costs by revisiting the discovery process with respect to Plaintiffs' new claims. For instance, were amendment permitted, Defendants would have to retain an expert to determine PE's solvency during the pertinent time period. (PE's Resp. at 11-12; Pls.' Ltr. at 13-14.) Further prejudice would result from the fact that all five new counts are based on new facts and legal theories that Defendants have not yet had an opportunity to defend against. Granting leave to amend at this late juncture would force Defendants to investigate these claims, respond to them, and decide whether to seek dismissal of any or all of them. This is especially burdensome here, where Defendants have already filed and partially succeeded on one motion to dismiss. (*See* Feb. 23 Order (granting in part and denying in part Defendants' motion to dismiss the Complaint).)

Furthermore, if leave to amend were granted, the prejudice to the proposed new defendant, Torrance Pitcairn, would be overwhelming. Plaintiffs insist that Torrance Pitcairn would not be prejudiced because he "has already been deposed, has already produced his documents and has trial counsel in place." (Pls.' Mot. at 2.) But Plaintiffs ignore the crucial fact that Torrance Pitcairn's "participation" to this point has been as a non-party. It would be extremely prejudicial to expect him to file dispositive motions and/or proceed to trial at any time in the near future. Even more significantly, he has not had a chance to participate in the discovery process as a named defendant and it is simply too late for him to conduct meaningful discovery.

**\*5** Accordingly, Plaintiffs' motion is denied because Plaintiffs have unduly delayed in seeking amendment and because amendment would cause substantial

Slip Copy                                                                                                Page 4
2005 WL 1213884 (E.D.Pa.)
**(Cite as: 2005 WL 1213884 (E.D.Pa.))**

prejudice.

IV. CONCLUSION

 For the reasons stated above, Plaintiffs' motion for
leave to amend is denied. An appropriate Order
follows.

*ORDER*

 AND NOW, this 18th day of May, 2005, upon
consideration of Plaintiffs' Motion for Leave to Serve
an Amended Complaint Adding Certain Claims,
Dropping Certain Claims, and Adding an Additional
Party, all responses thereto and replies thereon, and
for the foregoing reasons, it is hereby ORDERED
that:
   1. Plaintiffs' Motion (Document No. 37) is
DENIED.
   2. The Scheduling Order of May 20, 2004 is
VACATED and replaced by this Court's
Scheduling Order of May 18, 2005.

 2005 WL 1213884 (E.D.Pa.)

 **Motions, Pleadings and Filings (Back to top)**

• 2004 WL 2716411 (Trial Motion, Memorandum
and Affidavit) Response of Defendants Pitcairn
Enterprises, Inc., Kean Pitcairn, Kris Pitcairn and
Kean Co. to Plaintiffs' Motion for Leave to Serve an
Amended Complaint Adding Certain Claims,
Dropping Certain Claims and Adding an Additional
Party (Oct. 01, 2004)

• 2004 WL 2716408 (Trial Motion, Memorandum
and Affidavit) Order (Jul. 30, 2004)

• 2004 WL 2716403 (Trial Pleading) Answer With
Affirmative Defenses of Defendant 1862 Lincoln
Highway Associates, L.P. to Plaintiffs' Complaint
(Apr. 26, 2004)

• 2004 WL 2716401 (Trial Pleading) First
Supplemental Answer of Defendants Pitcairn
Enterprises, Inc., d/b/a Pitcairn Motorcars, Kean
Pitcairn, Kris Pitcairn and Kean Co., to Plaintiffs'
Complaint in Equity (Apr. 13, 2004)

• 2004 WL 2716398 (Trial Pleading) Answer of
Defendants Pitcairn Enterprises, Inc., d/b/a Pitcairn
Motorcars, Kean Pitcairn, Kris Pitcairn and Kean
Co., to Plaintiffs' Complaint in Equity (Mar. 25,
2004)

• 2003 WL 23902681 (Trial Motion, Memorandum

and Affidavit) Order (Jun. 18, 2003)

•      2:03cv02398                    (Docket)
(Apr. 21, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.