# EXHIBIT A

(35)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

LML PATENT CORP.,                          )
                                           )
        Plaintiff,                         )
                                           )
    v.                                     )        Civil Action No. 04-858 SLR
                                           )
TELECHECK SERVICES, INC.,                  )
ELECTRONIC CLEARING HOUSE, INC.,           )
XPRESSCHEX, INC., and                      )
NOVA INFORMATION SYSTEMS, INC.,            )
                                           )
        Defendants.                        )
                                           )

**SCHEDULING ORDER**

This ꝺ4ᵗʰ day of October, 2004, the Parties having satisfied their obligations under Fed. R.

Civ. P. 26(f), and the Court having conducted a pretrial scheduling conference pursuant to Fed.

R. Civ. P. 16 and D. Del. LR 16.2(a) and (b),

IT IS ORDERED that:

1.      **Pre-Discovery Disclosures:** The Parties exchanged the information required by

Fed. R. Civ. P. 26(a)(1) and D. Del. LR 16.2 on October 19, 2004.  On October 19, 2004, LML

produced to Defendants, along with its initial disclosures, an initial set of production documents.

2.      **Discovery:**

        (a)     The Parties anticipate requiring discovery from each other and third
                parties to support their claims, affirmative defenses, and/or counterclaims,
                including discovery regarding LML's claims of infringement, willfulness
                and damages, and Defendants' claims of invalidity and unenforceability.

        (b)     All fact discovery shall be commenced in time to be completed by July 16,
                2005.

                (1)     Document production shall begin as soon as practicable and shall
                        continue on a rolling basis so that it is substantially completed by
                        January 21, 2005.  Any remaining document production shall be
                        completed no later than March 4, 2005.

(2)     Maximum of 25 interrogatories by each named party to each other named party.

(3)     Maximum of 35 requests for admission by each party to any other party, not including requests directed to the authentication of documents and the proper translations of foreign documents.

(4)     In the absence of agreement among the Parties or by order of the Court, no deposition (other than those noticed under Fed. R. Civ. P. 30(b)(6) shall be scheduled prior to the scheduled date for completion of document production. Any depositions pursuant to Rule 30(b)(6) prior to the scheduled date for completion of document production shall be limited to topics such as identification of documents and person(s) most knowledgeable.

(5)     LML is limited to 200 hours for depositions of all witnesses, except expert witnesses. Telecheck, NOVA, and ECHO ("ECHO" collectively includes Defendants Electronic Clearing House, Inc. and Xpresschex, Inc.) are each limited to 100 hours for depositions of all witnesses, except expert witnesses. The parties shall not engage in duplicative discovery.

The parties recognize that departure from the seven hour limit imposed by Fed.R.Civ.P. 30(d)(2) may be warranted for certain key witnesses, and will negotiate in good faith to secure additional deposition time from such witnesses.

(6)     Each Defendant shall advise LML by April 29, 2005 whether it intends to rely on advice of counsel in defense to LML's charge of willful infringement. If a Defendant intends to rely on the advice of counsel defense, it shall produce all documents within the scope of Defendants' waiver of privilege (as set forth by applicable case law) on or about April 29, 2005.

(7)     The parties agree that service of discovery, motions, or other materials during this case shall be made on lead counsel of record (with copies to all counsel of record) by hand-delivery, facsimile or e-mail. If service was made by facsimile or e-mail on a particular counsel, a confirmation hard copy shall be sent by overnight mail to that counsel. Exhibits to such materials are not required to be served with an e-mail or facsimile provided that the exhibits are served with the confirmation hard copy by overnight delivery. However, if a party chooses to serve such exhibits with the corresponding materials by e-mail or facsimile, confirmation hard copies may be served by First Class mail instead of overnight mail. Service by hand-delivery/facsimile/e-mail shall be considered served on the date hand-delivered, faxed or e-mailed provided that any necessary confirmation hard copies were sent by

overnight mail in accordance with this paragraph. Nothing in this paragraph shall preclude any party from otherwise serving materials not filed with the Court by any other acceptable service methods under the Federal Rules.

(c)     Expert discovery shall be completed by September 30, 2005.

(1)     Expert reports on issues for which the Parties have the burden of proof are due July 29, 2005.

(2)     Rebuttal expert reports are due September 2, 2005.

(3)     To the extent any objection to expert testimony is made pursuant to the principles announced in *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993), it shall be made by motion no later than the deadline for dispositive motions set forth herein, unless otherwise ordered by the Court.

(d)     Supplementations under Rule 26(e) shall take place in a timely manner throughout discovery, but at the very least shall be made on March 10, 2005 and May 19, 2005.

(e)     Discovery Disputes:

(1)     The Court shall conduct at least two (2) discovery status conferences — the first on February 1, 2005 at 4:30 p.m., and the second on June 21, 2005 at 4:30 p.m., or at some other date and time convenient for the Court.

(2)     The Court shall remain available to resolve by telephone conference disputes that arise during the course of a deposition and disputes over the terms of a protective order.

(3)     Absent express approval of the court following a discovery conference, no motions pursuant to Fed. R. Civ. P. 37 shall be filed.

(f)     Fact Witnesses to be called at trial:

Within one (1) month following the close of expert discovery, each party shall serve on the other parties a list of each fact witness (including any expert witness who is also expected to give fact testimony), who has previously been disclosed during discovery and that it intends to call at trial. Within one (1) month of receipt of such fact witness list, each party shall serve a list of each rebuttal fact witness that it intends to call at trial. The parties shall have the right to depose any such fact witnesses who have not previously been deposed in this case. Such deposition(s) shall be

3

held within one (1) month after service of the list of rebuttal fact witnesses and shall be limited to twenty (20) hours per side in the aggregate unless extended by agreement of the parties or upon order of the Court upon good cause shown.

3.    **Joinder of Other Parties and Amendment of Pleadings:**  All motions to join other Parties and/or amend the pleadings shall be filed on or before December 3, 2004.

4.    **Settlement Conference:**  Pursuant to 28 U.S.C. § 636, this matter is referred to Magistrate Judge Thynge for the purposes of exploring the possibility of a settlement.

5.    **Claim Construction Issue Identification:**  On April 15, 2005, the Parties shall exchange a list of those claim term(s)/phrase(s) that they believe need construction and their proposed claim construction of those term(s)/phrase(s). This document will not be filed with the Court. Subsequent to exchanging that list, the parties will meet and confer in person to prepare a Joint Claim Construction Statement to be submitted in conjunction with the briefing schedule in paragraph 7 below.

6.    **Summary Judgment Motions:**  All summary judgment motions shall be served and filed with an opening brief on or before October 28, 2005.  Response briefs in opposition to motions for summary judgment shall be filed no later than November 15, 2005.  Reply briefs in support of such motions for summary judgment shall be filed no later than November 23, 2005. No summary judgment motion may be filed more than ten (10) days before the above date without leave of Court.  Oral argument shall be conducted on December 19, 2005 at 1:30 p.m.

7.    **Claim Construction:**  Opening briefs on issues of claim construction shall be simultaneously submitted by all parties to the Court, along with the Joint Claim Construction Statement, on October 7, 2005, to be considered by the Court in conjunction with the summary judgment motions.  Response briefs on issues of claim construction shall be submitted to the Court no later than October 21, 2005.

4

8.   **Applications by Motion:**   Any application to the Court shall be by written motion filed with the clerk. The Court will not consider applications and requests submitted by letter or in a form other than a motion, absent express approval by the Court.

    (a)   Any non-dispositive motion should contain the statement required by D. Del. LR 7.1.1.

    (b)   No telephone calls shall be made to chambers.

    (c)   Any party with an emergency matter requiring the assistance of the Court shall e-mail chambers at: slr_civil@ded.uscourts.gov. The e-mail shall provide a short statement describing the emergency. NO ATTACHMENTS shall be submitted in connection with said e-mails.

9.   **Motions in Limine:**   All motions in limine shall be filed on or before the date that is two weeks before the pre-trial conference. All responses to said motions shall be no later than one week before the pre-trial conference.

10.   **Pretrial Conference:**   A pretrial conference will be held on March 21, 2006, at 4:30 p.m. in courtroom 6B, Sixth Floor, Federal Building, 844 King Street, Wilmington, Delaware. The Federal Rules of Civil Procedure and D. Del. LR 16.4 shall govern the pretrial conference.

11.   **Trial:**   This matter is scheduled for one or more jury trial(s) commencing on April 17, 2006 in courtroom 6B, Sixth Floor, Federal Building, 844 King Street, Wilmington, Delaware. The Court has tentatively scheduled a total of two weeks, beginning on April 17, 2006, on its calendar for the trial(s) of this case. For purposes of completing pretrial preparations, the parties should plan on being allocated a total number of hours in which to present their respective cases.

 

                                 _____

                                    Honorable Sue L. Robinson
                                    United States District Judge

# EXHIBIT   B

CM/ECF LIVE - U.S. District Court:ded

**Other Documents**

1:04-cv-00858-SLR LML Patent Corp. v. Telecheck Services, et al

**U.S. District Court**

**District of Delaware**

Notice of Electronic Filing

The following transaction was received from Herrmann, Richard entered on 7/25/2005 at 1:47 PM EDT and filed on 7/25/2005

| | |
|---|---|
| **Case Name:** | LML Patent Corp. v. Telecheck Services, et al |
| **Case Number:** | 1:04-cv-858 |
| **Filer:** | Telecheck Services, Inc. |
| | LML Patent Corp. |
| | Electronic Clearing House, Inc. |
| | Xpresschex Inc. |
| | Nova Information Systems, Inc. |

**Document Number:** 243

**Docket Text:**
STIPULATION to Amend Scheduling Order re [35] Order,,,,,,,,,,,,,,,,,,,,,,,,, by LML Patent Corp., Telecheck Services, Inc., Electronic Clearing House, Inc., Xpresschex Inc., Nova Information Systems, Inc.. (Herrmann, Richard)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=7/25/2005] [FileNumber=74096-0]
[5d2eff8e7e2578e7c50385f9fcbe683932003087eca0469b47ae0851c256fe183d8dc
d34c6af2212bb9b3fd22cdfe1de2dac761ce3d9e049ed9ed9b3a9081747]]

**1:04-cv-858 Notice will be electronically mailed to:**

Timothy Devlin    tdevlin@fr.com, manis@fr.com

Francis DiGiovanni    fdigiovanni@cblh.com, sfaulk@cblh.com

Richard K. Herrmann    rherrmann@morrisjames.com,

Richard D. Kirk    bankserve@bayardfirm.com, rkirk@bayardfirm.com

William J. Marsden , Jr    marsden@fr.com, manis@fr.com;wsd@fr.com;sub@fr.com;kilby@fr.com

**1:04-cv-858 Notice will be delivered by other means to:**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LML PATENT CORP.,                          )
                                           )
    Plaintiff,                         )
                                           )
    v.                                 )     Civil Action No. 04-858 SLR
                                           )
TELECHECK SERVICES, INC.,                  )
ELECTRONIC CLEARING HOUSE, INC.,           )
XPRESSCHEX, INC., and                      )
NOVA INFORMATION SYSTEMS, INC.,            )
                                           )
    Defendants.                        )

---

### STIPULATION AND ORDER TO AMEND SCHEDULING ORDER

    IT IS HEREBY STIPULATED AND AGREED, subject to the approval and order of the

Court, that the October 22, 2004 Scheduling Order is amended as follows:

    2(c): Expert discovery shall be completed by September 30, 2005.

        (1)    Expert reports on issues for which the Parties have the burden of proof are due August 12, 2005. Supplementations of opening expert reports required as a result of the deposition of Robert R. Hills are due September 6, 2005.

        (2)    Rebuttal expert reports are due September 16, 2005.

    (g)    The deposition of Robert R. Hills will take place on August 25, 26 and 27, 2005, per the agreement of the parties and Mr. Hills.

    All other deadlines as set forth in the Court's October 22, 2004 Scheduling Order shall

remain in full force and effect.

/s/ Richard K. Herrmann
Richard K. Herrmann (I.D. No. 405)
Mary B. Matterer  (I.D. No. 2696)
MORRIS JAMES HITCHENS
& WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
302.888.6800
rherrmann@morrisjames.com
mmatterer@morrisjames.com

*Counsel for Plaintiff*
*LML Patent Corp.*

/s/ Timothy Devlin
William J. Marsden, Jr. (I.D. No. 2247)
Timothy Devlin (I.D. No. 4241)
Sean Hayes (I.D. No. 4413)
FISH & RICHARDSON
919 North Market Street, Suite 1000
Wilmington, Delaware 19801
302.652.5070
marsden@fr.com
hayes@fr.com

*Counsel for Defendant*
*TeleCheck Services, Inc.*

/s/ Francis DiGiovanni
Francis DiGiovanni (I.D. No. 3189)
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 N. Orange Street
Wilmington, Delaware 19801
302.658.9141
fdigiovanni@cblh.com

*Counsel for Defendants*
*Electronic Clearing House, Inc.*
*and Xpresschex, Inc.*

/s/ Richard D. Kirk
Richard D. Kirk (I.D. No. 922)
THE BAYARD FIRM
222 Delaware Avenue, Suite 900
Wilmington, DE  19801
302.429.4208
rkirk@bayardfirm.com

*Counsel for Defendant*
*NOVA Information Systems, Inc.*

**SO ORDERED** this _____ day of _____, 2005.

_____
Judge Sue L. Robinson

- 2 -

# EXHIBIT  C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LML PATENT CORP.,

        Plaintiff,

    v.

TELECHECK SERVICES, INC.,
ELECTRONIC CLEARING HOUSE, INC.,
XPRESSCHEX, INC. and NOVA
INFORMATION SYSTEMS, INC.,

        Defendants.

C.A. 04-858 (SLR)

## EXPERT REPORT OF DAVID P. KURRASCH

## REGARDING INVALIDITY

## I.    INTRODUCTION

1.      I have been retained by Fish & Richardson P.C. as an expert witness in this matter on behalf of defendants TeleCheck Services, Inc. ("TeleCheck"). For purposes of issues related to invalidity and unenforceability of the patents-in-suit, I have also been retained as an expert witness by O'Melveny & Myers LLP and Belasco, Jacobs and Townsley, LLP, on behalf of Electronic Clearing House, Inc. ("ECHO"), XpressChex, Inc. ("XpressChex"), and Nova Information Systems, Inc. ("NOVA"). Collectively, TeleCheck, ECHO, XpressChex and Nova are referred to herein as "defendants."

2.      I have reviewed the patents asserted by LML in this litigation, U.S. Patent Nos. 5,484,988 ("the '988 patent"), 6,164,528 ("the '528 patent") and 6,283,366 ("the '366 patent"), and I am familiar with the their subject matter. Copies of the patents are attached as Exhibits 1, 2 and 3.

3.      I am being compensated at my usual rate of $250.00 per hour for work on this case. My compensation is in no way dependent upon my opinions or testimony or upon the outcome of this litigation.

4.      This expert report contains nine sections, including this overview. The additional parts are my qualifications (Part II), materials reviewed (Part III), technology background (Part IV), history of electronic check conversion (Part V), the patents in suit (Part VI), claim construction (Part VII) invalidity (Part VIII) and unenforceability (Part IX).

5.      I have been asked by defendants to provide opinions regarding the patents-in-suit in this case, and related matters, which are set forth below.

## II.    QUALIFICATIONS

6.      Attached to this Report as Exhibit 4 is a copy of my most recent *curriculum vitae*.

7.      I am over the age of eighteen and I am a citizen of the United States.

8.      I received a Bachelor of Arts degree with majors in Economics, Communications and History, with a minor in Mathematics, from the University of Wisconsin - Madison in 1973. I received a Masters of International Management degree, with an emphasis in Finance, from the American Graduate School of International Management located in Glendale, Arizona in 1975. I completed the Graduate School of Credit and Financial Management curriculum at the Amos Tuck School at Dartmouth College in 1992.

9.      From 1976 until 1982, I served as Manager of Cash Management for The Greyhound Corporation ("TGC") in Phoenix, Arizona. While at TGC, I oversaw the firm's working capital management and its relations with approximately 200 domestic and international banks. I was also responsible for all payment services utilized by TGC, including credit card, lockbox, Automated Clearing House ("ACH"), check disbursements and wire transfer payments.

10.     From 1982 until 1995, I was hired as Vice President and then promoted to Senior Vice President at Wells Fargo Bank, San Francisco, California. From 1982 until 1988, I was Wells Fargo's National Sales Manager for Wholesale Non-Credit Products. In that role, I was responsible for all non-credit relationships in the bank's wholesale unit, as well as all of the bank's relationships with other financial institutions, including correspondent banks, title companies, mutual funds, dealer-brokers and investment houses.

11.     I was promoted to Head of Product Management and Development in 1988 and continued in that role until 1995. As Head of Product Development, I was responsible for the development, design, management and profitability of Wells Fargo's wholesale banking products, including its commercial credit card, ACH, wire transfer, lockbox, wholesale Demand Deposit Account ("DDA"), wholesale loan and check processing services. I was also responsible for the cash vault, balance/transaction reporting, account reconcilement and controlled disbursement services at Wells Fargo.

2

My responsibilities also included creating and executing each wholesale banking product's rolling, five-year business plan. As Head of Product Development, I was also responsible for wholesale risk and credit policies, bank-wide float management, unit costing, and preparing and analyzing all product financials. My duties also included responsibility for designing all non-credit incentive compensation programs, product marketing and training for the wholesale bank.

12.    From 1995 through 1997, I served as Vice President of Cash Management Operations for Fidelity Management and Research Company in Boston, Massachusetts. In that role, I oversaw all cash-related issues in the Fidelity Group of Mutual Funds; assessed operating, compliance and financial risks; and managed over $30 billion of average daily cash in- and outflows from the Fidelity Group of Mutual Funds.

13.    From 1999 through 2001, I served as President of Virtual Purchase Card, Inc. ("VPC") in Alameda, California. As President, I wrote the company's business plan, raised approximately $18 million of equity, and designed, constructed and introduced a secure online payments tool for business-to-business purchase transactions. The VPC product was eventually sold to RaboBank of the Netherlands.

14.    From 1998 through the present, I have served as President of Global Payment Advisors, Inc. ("GPA") in Alameda, California. GPA provides financial services and payments product development, and cash and risk management consulting. GPA offers cash and product management assistance to corporate and financial services firms worldwide. As President of GPA, I am responsible for the design and development of payment and related products; marketing and strategy support; audit, risk assessment and compliance projects; and working capital advisory services relating to inventory, payables, receivables, short-term borrowings and investment; and cash. Representative clients of GPA include the University of California, Intuit Corp., eBay Corporation, VISA International, Wells Fargo Bank, JP MorganChase, BankBoston, PNC Bank and BankWest, Thompson Financial Products.

3

15.     Throughout my tenure in the financial services and payment processing industries, I have participated in a number of industry-related professional organizations, committees, and associations.  Since 1977, I have been a member of the Treasury Management Association and its successor entities.  From 1988 through 1991, I served as Chairman of the California Automated Clearinghouse Association ("CACHA").  From 1989 through 1995, I was a member of the VISA Payments Advisory Committee.  From 1993 through 1995, I served as a member of the Board of Directors of the Electronic Check Clearinghouse Organization ("ECCHO") and a member of the MasterCard Commercial Card Advisory Committee.  From 1996 through 1998, I served as a member of the Federal Reserve Board High Dollar Transfer Risk Advisory Committee.  I serve as an instructor of working capital finance at Golden Gate University in San Francisco, CA, an advisor to several payments-related companies and investment firms, and have testified as an expert witness before the California State Banking Committee on payments-related matters.

16.     As a result of this experience, I am familiar with the history of electronic payments processing and in particular electronic check processing.  I have also personally designed, implemented, analyzed and managed electronic payment processing tools.

17.     I have not testified as an expert at trial or by deposition within the preceding four years.

## III.   MATERIALS REVIEWED

18.     In the process of preparing this report, I reviewed the materials set forth in Exhibit 5, as well as any materials cited in the body of this report or its Exhibits.

## IV.   TECHNOLOGY BACKGROUND

19.     This section provides background information relating to the technology at issue in this case and gives a high-level discussion of the claimed inventions of the asserted patents.

4

20.    The history and development of paper drafts and checks in the United States has been a continuous path of progress toward improved efficiency, safety, reliability and certainty in the exchange of economic value between two or more parties, whether they be individuals or businesses.  Prior to 1913 and the creation of the United States Federal Reserve Bank, the acceptance and processing of drafts and checks was managed and overseen by private banks and consortiums and those institutions wielded considerable influence over the nascent "monetary policy" of the United States.  Paper drafts and checks have been accepted as payment for goods and services and in the exchange of value in the United States since the 1760s (and likely before that but the first recorded use of checks in the colonies dates from the 1760s), using various systems for processing them.

21.    Rudimentary, private local and regional check clearing houses that sorted and processed checks among financial institutions and individual counterparties surfaced in the 1700's and became widely employed to affect the transportation, presentation and settlement of checks. Clearinghouses, an early effort to enhance the efficiency and viability of checks as a reliable form of payment, grew into very common use after the Civil War  and multiplied in use during the decades that followed.

22.    The process inefficiencies and uncertainty of payment settlement among the private clearinghouses were contributing factors to the creation of the United States Federal Reserve Bank in 1913.  The opening of Regional Federal Reserve Offices and secondary check clearing sites in the years thereafter made the U.S. government a sponsor of, participant in, and overseer of the nationwide check clearing and settlement processes.

23.    The breakdown of the U.S. banking system in the late 1920s contributed to the drafting and approval of the Uniform Commercial Code ("UCC") and the creation of the Federal Deposit Insurance Corporation ("FCIC"), both occurring in 1933.  The UCC and numerous Federal Reserve Bank Regulations that followed provided bankers and

5

check payors/payees with understandable policies and procedures for the proper, safe, fair and efficient handling and settlement of checks among counterparties. The illustration below depicts the ordinary path that a check follows to transfer value between the payor (buyer or remitter) to the payee (merchant/supplier or remittee):



24.    Before the 1950's, checks in the United States were processed manually. Prior to the use of computerized automation to facilitate electronic check processing, the steps shown in the above illustration were all manual including, but not limited to:

- Preparation of the check by the payor

- Delivery of the check to the payee

- Endorsement of the check by the payee

- Delivery of the check to the payee's bank

6

- Sorting of checks by the payee's bank, and each of the clearing agents, to determine the most efficient route for delivery of the check to the payor's bank

- Posting and proofing of accounting entries to both the payee's and the payor's bank accounts

- Posting of accounting entries at each of the transportation steps along the path (each clearinghouse, correspondent, or Federal Reserve Bank office)

- Confirmation of the posting of entries to the payee's and the payor's bank accounts via paper-based bank statements.

25.     At the operational center of the payee's bank (bank of first deposit), checks were gathered and sorted for transport to their respective payor banks. Typically, all checks drawn on payor banks in a specific city were sent to one of many correspondent banks that specialized in forward clearance of checks (for instance, Chase Bank in New York may be named as Bank of America's correspondent, check clearing agent for the Northeastern States). As needed "correspondent banks" sorted the checks again for physical delivery to each payor bank in the city and surrounding communities. After delivery to their respective payor banks, each check would be posted manually against the bank's general ledger and manually debited to the payee's specific account. These manual processes that existed before automated check clearing techniques became available often required ten business days or more for a check to be sorted, transported, presented, and accurately posted. Generally, practices at the time required the payor bank to cancel and temporarily store each paper check, returning it at the designated time intervals (typically at the end of each month) with the payor's typewritten bank statement.

26.     In 1933, the introduction of the UCC Sections 3 and 4, adopted in virtually identical form by all 50 states, introduced the concept of provisional credit to the payee's bank account. The bank of first deposit was obligated to provisionally credit the depositor's (payee or merchant) bank account on the day of deposit. Each depositor's bank would maintain an account at one or more correspondent banks that would be

7

credited provisionally within the requisite time period, subject to later confirmation of sufficient funds. Alternatively, a check could be processed manually by the merchant's nearest branch of the Federal Reserve Bank. Both of these methods of check processing are still in use today.

27.    When the UCC was adopted, it was the general practice that every check would be processed manually through the banking system, resulting in a float of days, if not weeks. This was a reflection of the technology that existed at the time. Computers were in their infancy and not in wide use, therefore, banks were forced to process checks entirely manually. Additionally, the United States had not yet developed a high-speed, reliable form of cross-country transportation which meant that checks were moved from one geography to another by train or ground courier rather than by today's more efficient air transportation. In the absence of alternatives, this level of float (check clearing time) was tolerable and not particularly punishing to the participants since the opportunity cost of not being paid quickly remained relatively low until the mid-1960s (intrinsic interest rates were low by comparison to those of the 1970s, 1980s and early 1990s).

28.    In the late 1940s, the first operator, unassisted long distance telephone call was enabled, permitting messages to be sent beyond each local telephone exchange and switched over the long distance telephone network without a human operator.

29.    In the 1950s, Magnetic Ink Character Recognition ("MICR") technology was developed and patented by the Stanford Research Institute ("SRI"). This technology allowed documents printed with magnetic ink characters to be machine readable. Its development, combined with the expansion of airline service nationwide and the introduction of operator unassisted long distance telephone connectivity, enabled electronic check processing. IBM and other technology firms licensed SRI's MICR reading solutions and began developing accompanying implementation systems in the late 1950s. With the invention of automatic check processing technology, checks began gaining prominence as a dominant form of payment for products and services in the

8

United States in the early 1960's, and banks increased their marketing of checking accounts to the public.

30.    Check volumes processed in the United States increased throughout the 1960s. Banks began devoting additional resources to the procurement of technology to process checks automatically during the 1960s and 1970s. During the 1980s and 1990s check transactions in the United States continued to increase, reaching 70 billion checks processed annually by the 1990s.

31.    In 1968, the Special Committee on Paperless Entries ("SCOPE") was formed by the Los Angeles and San Francisco Clearing Houses to explore the possibility of replacing paper checks with computer-facilitated transactions requiring no paper. Over the course of several years, SCOPE developed specifications to govern and standardize the entry and management of electronic data from paper checks. The Los Angeles and San Francisco Clearing Houses, whose members included Wells Fargo Bank, Bank of America, Security Pacific National Bank, and Crocker Bank, merged in 1979 to form the California Bankers Clearing House Association.

32.    SCOPE was transformed into the California Automated Clearing House Association ("CACHA") in 1972, becoming the first operational Automated Clearing House ("ACH") in the United States. CACHA's initial focus was on the electronic processing of payroll checks, and its method of automatic check processing was eventually adopted by clearing houses across the country, including the Chicago, New York, Atlanta and Dallas clearing houses. CACHA later became the Calwestern Automated Clearing House Association.

33.    In 1974, CACHA, the Upper Midwest ACH, the New England ACH and the Georgia ACH associations together established the National Automated Clearing House Association ("NACHA"). Before the creation of NACHA, there was no nationwide ACH network, but instead there were 32 separate and distinct regional ACH's. With the support of the Federal Reserve, NACHA became the first body to

9

organize a set of standardized operating rules that would allow for electronic check replacement and processing nationwide and the electronic debiting and crediting of accounts.

34.     In 1978, an inter-regional exchange was formed to facilitate national ACH interchanges.  NACHA adopted the transaction specifications developed by SCOPE to govern the first round of nationwide checks converted for payroll and pension payments (using the first Standard Entry Class code named the "PPD") which began in November 1979 at a number of companies, including my then-employer, The Greyhound Corporation.  Banks began processing payroll checks from paper lists or magnetic tapes/cartridges, all written in the NACHA approved formats.

35.     As banks began taking an interest in electronic check processing and the credit card industry matured, Congress passed the Electronic Funds Transfer Act ("EFTA") in 1978 to regulate electronic payments, including credit card and ACH transactions.  In accordance with Section 904 of the EFTA, the Federal Reserve promulgated a set of implementing rules, Regulation E, beginning in 1979.  With the adoption of Regulation E, banks increasingly sought to conduct their transactions electronically.  The Social Security Administration soon followed offering all Social Security recipients direct deposit for electronic delivery of their entitlements.

36.     In the early 1980s, further methods were implemented to utilize ACH networks to accelerate cash flow and reduce the cost of processing checks.  For example, banks moved to begin processing depository transfer checks ("DTCs") through the nationwide ACH.   DTCs were and still are used by corporations to electronically consolidate deposits to a single account controlled by corporate headquarters, so that those funds could be made available for use by a company's central treasury.  By this time, interest rates were high compared to historical benchmarks which made the use of the ACH for cash concentration more compelling because the Cash Concentration Debit/Deposit ("CCD") Standard Entry Code settles in one business day.  DTCs were

(and still are) processed electronically through the ACH from lockboxes, chain stores, and other businesses with regional or national offices, allowing funds to be moved more quickly and less expensively from local depositories to corporate treasury.

37.    At least as early as the 1980s, individuals and entities within the payment industry were considering additional uses for the ACH and other electronic payment systems. These uses included handling returned check transactions through the ACH, truncating the flow of paper checks at the point of sale, and electronically converting checks deposited at ATM machines. A number of prominent payment processing industry figures, among them George White and Alan Lipis, advocated the conversion of all checks to electronic transactions, whether presented at the point-of-sale, a lockbox, to a bank teller or otherwise.

38.    Electronic check conversion programs were a regular topic of discussion in the payments processing industry from the mid-1980s through the 1990s. At first, such programs did not obtain widespread practice due to uncertainty regarding the regulation of such programs. Bankers like certainty and when the question: "is it a UCC transaction or a Regulation E transaction?" was asked with no clear answer, many bankers viewed potential advances in conversion of checks to the ACH as pilots looking for a definition of the rules and regulations.

39.    For example, there was uncertainty regarding what position the Federal Reserve Bank would take as to whether paper checks processed electronically were subject to the requirements of Regulation E. While the Federal Reserve Board issued amendments to Regulation E in 1996 that defined electronic fund transfers subject to those rules to include transfers facilitated by an ACH, the 1996 amendments continued to exclude check verification and guarantee services from the Regulation's coverage because "debiting of the consumer's account occurs when the check or draft is payment," notwithstanding any temporary hold memo-posted electronically on the customer's account at the time of the check's authorization.

11

40.     Uncertainty surrounding the legal status of electronically processed paper checks persisted until at least 2001, when Regulation E was amended to clarify that "where a consumer authorizes a one-time EFT from the consumer's account using information from a check to initiate the transfer, the transaction is covered by Regulation E . . . . [T]he result is the same whether the check is blank, partially completed, or fully completed and signed . . . or whether the check is retained by the consumer, the merchant, or the merchant's financial institution."

41.     Before 2001, electronic check conversion programs existed, but operated in the absence of legal clarity as to what regulatory scheme controlled, for example whether a paper check processed electronically was subject to the electronic funds transfer rules set forth in Regulation E, governed by the paper check provisions of the UCC, or some combination of both.

42.     In part because of the rise of Internet-based electronic transactions, the Federal Reserve Board conducted an electronic payment processing study in 1996 and 1997 directed by Alice Rivlin.  I was a member of the Federal Reserve committee responsible for conducting that study, during which we collected ideas and issued proposed guidelines based on input provided to the committee. After studying those proposed guidelines and soliciting public comment throughout the 1990s for proposed changes to Regulation E, the Federal Reserve Board in 2001 amended Regulation E to further address the legal status of paper checks processed electronically.  The 2001 amendment clarified that "where a consumer authorizes a one-time EFT from the consumer's account using information from a check to initiate the transfer, the transaction is covered by Regulation E," and that Regulation E applied to such transfers "whether the check is blank, partially completed, or fully completed and signed" and "whether the check is retained by the consumer, the merchant, or the merchant's financial institution."

12

43.    When NACHA and the Federal Reserve Bank implemented their rules for new Standard Entry Classes ("SEC"), namely RCK (resubmitted check), POP (Point of Purchase), ARC (Account Receivable Check conversion), TEL (Telephone single authorization payment) and Web (Web – Internet – single authorization payment), they included a consumer's right to stop payment on each of the SECs.  Quoting John Burnet who writes for Compliance@Bankersonline.com:

> It's clear that the RCK transaction would be subject to a stop order, since it attempts to collect a check that has at least once been returned for insufficient or uncollected funds. The consumer's original instruction to pay (on the check) remains the authority for the RCK transaction. If the original check is stopped, the RCK loses its authorization. Since the RCK was the first in this series of five ACH entries to be authorized by NACHA, it has served in some fashion as a template for the other four. In each case, it was clear that the consumer would retain a right to stop the payment.
>
> NACHA undoubtedly included stop payment rights for the other four entry types in order to make them palatable to consumers. It's likely that acceptance of these transactions would have been doubtful if important rights inherent in the paper check world were forsaken with conversion. It's also true that customers whose checks are converted into ARC or POP entries might expect a stop payment right, since they had tendered checks for payment at the start of the transaction.

(*See* www.bankersonline.com/compliance/ci-checkconv.html.)

44.    In the 1980s and early 1990s, NACHA solicited input from association groups representing corporate treasurers, interested attorneys, retailers, bankers and wholesalers having an interest in expanding the use of the ACH to convert paper checks to electronic entries.

45.    In 1992, NACHA formed the Electronic Check Committee, in part to give retailers a voice within NACHA.  I was a member of this committee at its inception.  The Electronic Check Committee became the Electronic Check Council (collectively "ECC") in 1995.  The ECC conducted meetings and recommended various SEC codes and rule changes to NACHA, including rules involving POP, RCK and ARC transactions.

46.     Other individuals and groups studied methods of electronic check conversion. For example, in 1990, the Electronic Check Clearing House Organization ("ECCHO") was formed by a group of leading payments banks with the intention of accelerating the inter-bank exchange of paper checks by delivering an electronic version of the check to the payor bank with paper to follow. In order to achieve clarity of law, the players in ECCHO concluded that, although a check was presented between banks electronically, the paper check continued to be the negotiable instrument and the prevailing law was the UCC.

47.     In 1993, the Minneapolis branch of the Federal Reserve Bank began testing different forms of electronic check presentment based on the presentment of electronic data, rather than the delivery of a paper check. The intention of these programs was to truncate the flow of paper checks at the Federal Reserve or at the Bank of First Deposit. The Minneapolis Federal Reserve electronic check presentment pilot experiments continued until 2001.

48.     Further specific implementations of electronic check transactions are discussed in greater detail below.

## V.     HISTORY OF DEVELOPMENTS IN ELECTRONIC CHECK CONVERSION SYSTEMS

### A.     State of the Art Before November, 1992

49.     Well before the effective priority date of the '988 patent, the purported "inventions" claimed by the '988 patent were well known in the prior art. Various methods for the electronic processing of paper checks presented at the point-of-sale have been widely discussed in the payments industry and implemented since the early 1980's by inventors such as Braun and Carlson, and by payment processing corporations, for example BUYPASS and CheckMate Electronics. (*See, e.g.*, Braun '672 Patent, FDC5000501-28, at 1:5-9, 5:13-17; Carlson '714 patent, SC003265-80, at 1:10-18, 1:39-42, 2:9-17, 9:62-10:3; FDC 1390354-56; FDC 1390361; ECHO0003484.)

14

50. These and other electronic point-of-sale check processing systems have, since the 1980's and continuing through the early 1990s, incorporated features such as a central host computer;[1] communication means from the central computer to a plurality of point-of-sale terminals;[2] local positive and negative customer database files, for example stored in the central host computer;[3] a MICR reader for automatically reading the checking account and routing and transit ("R/T" or "T/R") numbers from the paper check presented at the point-of-sale terminal;[4] communication means between the central computer and each point-of-sale terminal in the system;[5] an alphanumeric display

---

[1] *See, e.g.*, FDC 1389439-40; FDC 1389445; FDC 1389466; FDC 1389475; Braun '672 patent at 4:39-47, 51-56; 5:7-8, 13-17; 34:7-10, 54-65; ECHO0003504; ECHO0003627; Deaton '196 patent at 4:17-19, 37-42, 53-54; 5:34-45; 8:62-66; 9:1-8; 10:5-7; 45:6-13; Deaton '620 patent at Fig. 1; 4:14-21, 50-51; 59:8-21; Higashiyama '682 patent at 3:33-36.

[2] *See, e.g.*, FDC 1389439-40; FDC 1389465-67; FDC 1389475; Braun '672 patent at 4:39-47, 51-56; 5:7-8, 13-17; 34:7-10, 54-65; FDC 1390358; Deaton '196 patent at 4:17-19, 53-54; 9:1-8; 10:5-7; 45:6-13; Deaton '620 patent at Fig. 1; 4:14-16, 50-51; Higashiyama '682 patent at 3:13-16; 7:25-33.

[3] *See, e.g.*, FDC 1389439-40; FDC 1389445; FDC 1389466; FDC 1389475; FDC 1389492; FDC 5000445; ECHO0003504; ECHO0003517; ECHO0003544; ECHO0003564; ECHO0003577; FDC 1389752; FDC 1389756; FDC 1389759; FDC 1389771; FDC 1389787; FDC 1389790; FDC 1389793; FDC 1389804; FDC 1389838-39; Deaton '196 patent at 1:26-33; 4:37-42; 4:7-16; 5:11-23; 6:1-16; 7:59-8:2; 8:56-61; 20:63-22:9; 22:56-24:2; 40:32-35; 58:8-21; Deaton '620 patent at Fig. 3; 4:4-13, 34-39, 59-63; 5:8-20; 41:27-30; 59:8-21; Higashiyama '682 patent at 4:14-25.

[4] *See, e.g.*, FDC 1389439-40; FDC 1389445; FDC 1389465-66; FDC 1389471; FDC 1389494-96; Braun '672 patent at 33:7-10; 12:42-50; 25:1-3; Fig. 8; Carlson '896 patent at 1:19-14; 2:6-8; 7:66-8:1; 9:25-34, 43-49; 11:1-6; 12:12-27; Carlson '714 patent at 1:13-18; 11:22-28, 57-63; 3:15-28; 9:11-15; 13:35-43; Carlson '607 patent at 3:47-48; 6:38-41, 49-57; 8:1-3; 11:40-43; 25:27-28; ECHO0003479-80; ECHO0003544; ECHO0003557; ECHO0003564; Deaton '196 patent at 4:55-58; 10:15-16, 48-52; 10:67-11:22; 11:59-62; 12:5-10, 58-61; 79:11-18; Deaton '620 patent at Fig. 2A; 3:64-4:4; 10:20-21, 53-57; 11:4-27, 63-66; 12:9-14, 62-65; 27:21-25; 67:9-11; 80:1-68; Higashiyama '682 patent at 3:16-19, 45-50; 10:24-26; FDC 1389757; FDC 1389762; FDC 1389766; FDC 1389769; FDC 1389775; FDC 1389779; FDC 1389791; FDC 1389796; FDC 1389800; FDC 138902; FDC 1389808; FDC 1389812; FDC 1389838; FDC 1390361.

[5] *See, e.g.*, FDC 1389439; FDC 1389466; Braun '672 patent at 4:39-44, 51-54; 5:17-21; 34:18-19; ECHO0003564; Deaton '620 patent at 4:14-21, 50-51; 9:7-11; 32:47-49; Deaton '196 patent at 4:17-19, 53-54; 9:1-5; 45:6-13; FDC 1389762; FDC 1389769;

15

monitor;[6] a printer mechanism;[7] internal terminal memory;[8] and means to communicate with external third party financial institutions, networks, databases and processing systems.[9]

51.    MICR reading technology continued to be disclosed for point-of-sale electronic check conversion into the late 1980s, as reflected by the Carlson '896, '714 and '607 patents issued in 1987, 1988 and 1991 respectively, as well as the Deaton '196 and '620 patents issued based on applications filed May 19, 1992.  The Carlson patents, for example, describe a MICR reader capable of reading the MICR line from a folded or wrinkled bank check, or even from a bank check with a damaged or torn MICR line. (*See* Carlson '896 patent at 5:63-64; 7:29-39; Carlson '714 patent at 8:20-24; 11:22-28, 57-66; 13:35-43; Carlson '607 patent at 6:38-52.)

52.    A number of pre-1992 prior art references disclose methods for confirming that the MICR data was accurately read.  For example, a private placement

---

FDC 1389775; FDC 1389779; FDC 1389796; FDC 1389802; FDC 1389808; FDC 1389812; FDC 1390358.

[6] *See, e.g.*, FDC 1389498; Braun '672 patent at 23:43-54; 25:3-6; 33:3-6, 11-14; 25:14-20; Carlson '896 patent at 4:15-17; 5:20-24; Carlson '714 patent at 6:18-23; 7:41-45; Carlson '607 patent at 9:18-31; ECHO0003527; ECHO0003565; ECHO0003627; Deaton '620 patent at Fig. 2A; 4:55-58; 10:22, 30-31; 15:2, 36-42; Deaton '196 patent at 4:59-61; 10:17-18, 22-27; 14:68; 15:34-49; 80:31-34; FDC 1389762; FDC 1389769; FDC 1389775; FDC 1389779; FDC 1389796; FDC 1389802; FDC 1389808; FDC 1389812; FDC 5000471; FDC 1390356; FDC 1390358.

[7] *See, e.g.*, ECHO0003527; ECHO0003563; FDC 1390363; Carlson '896 patent at 6:24-33; Carlson '714 patent at 2:32-34; Carlson '607 patent at 4:50-52; 21:47-54.

[8] *See, e.g.*, Braun '672 patent at 12:42-50; 25:1-3; Carlson '896 patent at 10:31-33; Carlson '714 patent at 2:25-27; Carlson '607 patent at 4:44-46; 19:12-17; ECHO0003527; Deaton '620 patent at 14:65-67; 81:15-16; Deaton '196 patent at 14:65-67; 15:9-17.

[9] *See, e.g.*, Braun '672 patent at 24:31-44; FDC 1361724; Carlson '896 patent at 5:63-6:4; 7:9-13; 8:58-59; Carlson '714 patent at 2:9-18; 8:20-30; 12:65-13:8; Carlson '607 patent at 3:35-40; 4:29-42; 23:17-23; 24:13-14, 24-36; ECHO0003504; ECHO0003544; ECHO0003557; ECHO0003564; FDC 1389762; FDC 1389769; FDC 1389775; FDC 1389779; FDC 1389796; FDC 1389802; FDC 1389808; FDC 1389812; Deaton '196 patent at 9:5-8; Higashiyama '682 patent at 3:33-36; 7:55-8:2; 10:12-19.

memorandum from Checkcash Associates Ltd. (later CheckMate) describes a look-up in the central computer to determine whether the entered PIN matches with the MICR numbers read from the check. (FDC 1389497.) The Lord '866 patent indicates that the system transmits the check information to confirm the existence of the indicated account. (Lord '866 patent at 1:49-53.)

53.     The Carlson and Deaton references explicitly describe a MICR reading method capable of automatically reading the MICR characters printed on "any" and "all" bank checks presented at the point-of-sale.[10] The Deaton references, furthermore, provide a detailed description of a MICR reader capable of reading the MICR line from any bank check, capturing the MICR data, then parsing out and omitting the check sequence number from the data packet subsequently transmitted for electronic processing.[11]

---

[10] *See* Carlson '896 patent at 1:9-14 (terminal designed to read "all types of checks using Fed. MICR system"); 2:6-8 (invention designed to "use all forms of negotiable instruments at the point of sale"); 7:66-8:1 (checks read by the terminal include "traveler's checks, government checks, personal checks . . . or any means of monetary payment which utilizes the Federal Reserve Bank's MICR system"); Carlson '714 patent at 1:17-18 (terminal capable of reading "all types of checks using the Federal magnetic ink character recognition (MICR) system"); 3:40-41 (terminal reads "all forms of negotiable instruments at the point of sale"); 8:50-52 (terminal MICR reader capable of reading "personal checks, Gov't checks, Travelers checks or any negotiable instrument using the Fed's MICA system"); 11:59-63; Carlson '607 patent at 6:38-39 (terminal reads "any negotiable instrument utilizing the FED's MICR system"); Deaton '196 patent at 13:30-32 ("the automatic check reader can read the MICR code of all banks"); 14:40-43 (invention able to "always recognize a customer's checking account number in a MICR line automatically, no matter which bank or which type of account is involved"); 24:58-60 ("an advantage of the present check reader [] is its ability to detect the customer account number on any and all bank checks"); 59:3-6 ("[d]ue to the unique nature of the reader [], all checks from all banks can be read"); Deaton '620 patent at 14:40-45 (MICR reader able to "always recognize a checking account number in a MICR line automatically, no matter which bank or which type of account is involved"); 25:9-11; 27:21-25; 60:4-11.

[11] *See, e.g.,* Deaton '196 patent at 10:62-11:22, 12:58-61, 13:21-41, 25:4-26:51, 79:11-18 (claiming a method whereby the "customer's checking account number is determined by automatically scanning the MICR code on the customer's check" and "excluding the check sequence number portions of the MICR code while retaining the customer's checking account number and bank transit number"); Deaton '620 patent at 10:53-57; 10:67-11:27 (the "present automatic check reader is thus provided with circuitry which enables the customer's checking account number and the bank transit number

17

54.    In addition to describing the physical features and MICR reader capabilities of point-of-sale electronic check processing terminals, several pre-1992 references also publicly disclosed the same basic process for electronic check conversion subsequently claimed by the patents-in-suit. Prior art references teach that when a customer presents a paper check for processing at a retail point-of-sale terminal, the merchant may enter the amount of the transaction into the point-of-sale terminal.[12] The check presented at the point-of-sale need not be completed and signed. (*See, e.g.,* FDC 1361723-25.) Certain transaction-related information, including a unique terminal ID number, the date and time of the transaction, and the amount of the transaction may be generated automatically by the point-of-sale terminal system.[13] The point-of-sale terminal then transmits the transaction and payer account information from the retail terminal to a central host computer for authorization against positive and negative customer database files.[14]

55.    In addition to comparing the customer's account number to positive and negative customer transaction database files, the Deaton and Manta Systems references also disclose methods by which velocity checking – monitoring of the frequency of

---

to be parsed or detected and the remainder of the data extracted or omitted"); 12:9-12, 62-65; 13:50-53; 27:20-25; 82:12-18.

[12] *See, e.g.,* FDC 5000471; FDC 1389499; Braun '672 patent at 25:3-13; 1984 Braun FlexaCheck reference at 6; Carlson '896 patent at 5:55-63; 7:6-14; Carlson '714 patent at 8:12-20; 8:68-9:4; Carlson '607 patent at 22:57-23:22; 23:60-24:36; FDC 1389766; FDC 1389800; FDC 1389838; ECHO0003627; Deaton '620 patent at 10:32-37; 67:7-8; 69:50-52; Deaton '196 patent at 63:19; Higashiyama '682 patent at 3:63-66.

[13] *See, e.g.,* Braun '672 patent at 14:62; 32:67-33:2; 34:4-6; Carlson '896 patent at 3:15-16; Carlson '714 patent at 5:1-2; 9:51-55; Carlson '607 patent at 15:47-64; Deaton '620 patent at 9:32-33; 47:20-33; 71:44-50; 74:46-47; Deaton '196 patent at 9:32-34; 27:23-24; 46:22-36; 68:67-69:6; Higashiyama '682 patent at 3:50-4:5.

[14] *See, e.g.,* FDC 1389499; Braun '672 patent at 25:22-27; ECHO0003565; Deaton '196 patent at 4:19-24; 9:9-25; 24:54-56; 59:1-3; Deaton '620 patent at 4:16-21; 10:32-40; 71:63-65; FDC 1389766; FDC 1389800; FDC 1389838-39.

18

transactions over a specified period of time – is utilized to determine whether or not a particular check should be accepted at the point-of-sale.[15]  In fact, the concept of velocity checking was well known in the credit card and checking industries in the 1970s and 1980's.  For example, when I joined Wells Fargo in 1982, velocity checking was used in the demand deposit accounting systems to monitor potential misuse of bank checks.

56.    Provided the transaction is authorized, the point-of-sale terminal may print a sales receipt[16] and may print endorsement and cancellation information on the back of the paper check itself.[17]

57.    Certain prior art references teach that the receipt printed by the terminal should include any language required pursuant to applicable regulations, one of which was Regulation E.[18]  The printed receipt may also include a space for the customer's signature providing express written authorization to convert his or her paper check to an electronic transaction.  (*See, e.g.,* FDC 5000380.)  According to the CheckCash Associates, Braun, Carlson, CheckMate Electronics and Higashiyama references, the check is then cancelled or voided at the point of sale[19] and the check is returned to the

---

[15] *See, e.g.,* FDC 1389756; FDC 1389771; FDC 1389790; FDC 139804; FDC 1389838; Deaton '196 patent at 3:56-61; 5:11-23; 6:16-27; 22:44-55; 27:37-43; 32:48-33:3; Deaton '620 patent at 5:8-20; 6:12-24; 21:1-9, 35-46; 22:59-60; 33:34-57.

[16] *See, e.g.,* FDC 1389499; FDC 5000379; Carlson '714 patent at 1:55-56; 10:27-32; Carlson '607 patent at 24:60-63; 18:17-25, 52-60; Higashiyama '682 patent at 3:25-28; 4:61-68; 9:4-6; FDC 1389766; FDC 1389800; FDC 1389838-40.

[17] *See, e.g.,* FDC 5000471; Braun '672 patent at 15:38-53; 25:41-58; 27:59-63; 34:4-6, 12-17; FDC 1361725-26 (printing the payee, amount, date, time, account balance, transaction reference number and cancellation code); Carlson '896 patent at 6:24-33; Carlson '714 patent at 9:56-60; 9:62-10:3; 10:17-23; Carlson '607 patent at 10:13-53; 24:45-63; ECHO0003627; Higashiyama '682 patent at 3:25-28; 4:26-43; 8:55-59.

[18] *See, e.g.,* Carlson '607 patent at 10:13-53.

[19] *See, e.g.,* 1983 FDC 1389499; Braun '672 patent at 15:38-53; 25:41-58; 27:59-63; 34:4-6, 12-17; FDC 1361725-26; Carlson '896 patent at 6:4-5; 8:62-64; Carlson '714 patent at 8:30-33; 9:62-10:3; Carlson '607 patent at 10:13-53; 24:58-63; ECHO0003484; Higashiyama '682 patent at 4:26-43; 8:55-59.

19

customer at the point-of-sale.[20] Transactional and customer information related to that

particular transaction are then stored in the central computer system.[21] Transaction

information, such as merchant identifier, dollar amount of transaction, and customer

account number and transit number, is subsequently transmitted for batch processing

through the ACH network.[22] Stored customer and transactional information may then be

used to compile daily reports of all transactions at a particular point-of-sale terminal or

merchant location.[23]

**B.    State of the Art Before December, 1996**

58.    The applications eventually resulting in the '528 and '366 patents also

disclosed alleged "inventions" that, at the time those applications were filed, were well

known in the prior art. In addition to the pre-November 1992 literature and systems

referenced above, a number of additional prior art references published before the

application date of the '528 and '366 further disclose the remaining "inventions" of the

two latter patents-in-suit. From 1993 until the end of 1996, the payments processing

---

[20] *See, e.g.*, FDC 1389477; Braun '672 patent at 26:4-7; 27:42-48; 31:48-52; FDC 1361719; FDC 1361721; FDC 1361723; FDC 1361726-27; FDC 1361734; Carlson '714 patent at 9:62-65; Carlson '607 patent at 18:52-60; 25:4-10; ECHO0003479; ECHO0003482; ECHO0003484; ECHO0003502; ECHO0003545; ECHO0003556; Higashiyama '682 patent at 4:54-57; 7:16-20, 35-36; 8:60-62.

[21] *See, e.g.*, FDC 1389463; FDC 1361723; ECHO0003502; ECHO0003504; Deaton '620 patent at 4:11-13, 44-46; 5:21-25; 7:68-8:5; 19:53-68; 39:35-42; 40:35-39; Deaton '196 patent at 4:47-49; 8:2-10; 19:51-57; 27:25-29; 38:45-47; Higashiyama '682 patent at 6:50-53; 9:7-11, 16-19; FDC 1389766; FDC 139771; FDC 1389800; FDC 1389804; FDC 1389838-40.

[22] *See, e.g.*, FDC 5000379; FDC 5000444; ECHO0003483; ECHO0003495; ECHO0003502; ECHO0003519; ECHO0003557-58; ECHO0003565; ECHO0003567; Higashiyama '682 patent at 3:33-36; 5:1-7, 10-13, 18-20, 28-31, 37-46; 7:55-8:2; 9:12-15.

[23] *See, e.g.*, May FDC 5000471; Braun '672 patent at 22:58-63; 23:17-20; 24:22-26; 25:65-68; 26:1-3; Carlson '896 patent at 9:3-10; Carlson '714 patent at 13:13-20; Carlson '607 patent at 18:23-28; 22:19-21; Deaton '620 patent at 32:5-8; Higashiyama '682 patent at 5:47-52; 10:12-15; FDC 1389756; FDC 1389790.

industry continued to develop methods of converting paper checks presented at a retail point-of-sale into electronic transactions.[24]

59.    Methods for completing such EFT transactions are described, for example, in the 1995 Ballen Report and a 1995 eFunds Report.[25]  The Ballen Report teaches that an EFT may be initiated by the presentation of a paper check to a merchant, which would be scanned by the merchant's point-of-sale terminal.  (FDC 5000389.)  The point-of-sale terminal scanned the "payer's account number and the payer's bank's account number. The payee, the amount and the date may or may not be indicated on the check, and the payer may or may not sign the check.  The check is not submitted to the check collection process.  Rather, the check merely serves as a source of information to initiate an EFT." (FDC 5000383.)  Similarly, a November1995 eFunds Corporation Report indicates that a point-of-sale terminal could "read the MICR from the check," capturing the MICR information, and once the amount of the transaction is entered, the data is transmitted to eFunds to be checked for "validity, potential fraud, and negative information against that account holder" and to initiate the electronic funds transfer.  (FDC 102691.)

60.    A number of pre-1996 references describe verifying that the MICR numbers were properly read by the MICR reader.  ChequeMARK Corporation's 1993 marketing materials, for example, teach that once a "specimen check" is swiped through a MICR reader device, the "terminal's screen would display the check's numbers for verification" thus "requiring the operator to press 'Enter' to proceed, if correct, or 'Clear,' if incorrect and thereby enabling the terminal operator to resubmit the specimen check through the MICR Check Reader."  (ECHO0004447; ECHO0004449.)  Likewise, the eFunds Corporation system automatically captured account, transit and routing information from the MICR line of a customer's check, and those numbers were checked

---

[24] A number of prior art references published between 1993 and the end of 1996 describe the use of the ACH network for electronic check processing.  *See, e.g.*, FDC5000383; FOCO FDC 102695; LML-EP-011770; LML-EP-011775-76.

[25] *See, e.g.*, FDC5000382-84; FOCO FDC 102700.

for accuracy against the files in the eFunds central computer. (FDC 102691; NACHA 035051; NACHA 035060.)

61.    Upon approval of the transaction, the 1995 eFunds reference teaches that a sales receipt automatically prints containing the merchant's location, date, time, amount, and transaction number; and customer bank account and routing number. (See FOCO FDC 102691; FOCO FDC 102696.) The 1995 and 1996 eFunds references and a 1996 ECC Pilot Program Guide teach that the paper check, once scanned for MICR information, may then be voided or cancelled at the point-of-sale.[26] Prior art references including the Ballen Report, the eFunds references, the ECC Pilot Guide and a 1995 Sacramento Bee article disclosing the operation of an electronic check processing system embodying the claims of the patents-in-suit all teach that the voided or cancelled check may then be immediately returned to the customer at the point-of-sale.[27]

62.    Prior art references published between 1993 and the end of 1996, including the Ballen Report, the ECC Pilot Program Guide and the Sacramento Bee article, also make clear that checks may be processed electronically at the point-of-sale whether completed and signed or left blank.[28] The same references indicate that a check

---

[26] *See, e.g.*, FOCO FDC 102692 ("Another process that has been suggested is to cancel the check as it is processed through the check reader. Technically, it would be possible to stripe in red ink the words ACH processed in such a way as to deface the check. . . ."; FOCO FDC 102700 (once read by the reader, the check "needs to be defaced. . . . At this time we are looking into marking in red ink across the face of the check "ACH PROCESSED."); LML-EP-011770 ("Upon authorization, the merchant will mark the check with the words: 'VOID – Converted to Electronic Payment' or other suitable language to prevent duplicate processing."); LML-EP-011776 ("language stamped or printed across the face of the check when it is converted to an electronic entry . . . . must read: 'Void – Converted to Electronic Payment.'").

[27] *See, e.g.*, FDC5000383; FOCO FDC 102691-92 (if the check is accepted, "it is then handed back to the customer" and the "writer of the check still has her/his check for their records"); LML-EP-011770 (after cancellation, the "check is then returned to the consumer"); LML-EP-011775-76 (After the ACH debit is initiated, the "check is returned by the payee to the payer" at the point-of-sale); FDC 5000412 ("the check is never surrendered and never signed").

[28] *See, e.g.*, FDC5000383 (the "payer, the amount and the date may or may not be indicated on the check, and the payer may or may not sign the check"); FDC5000385

22

may still be processed electronically at the point-of-sale even if not signed.[29]  According to these references, in such a system, the paper check itself serves only as a "source document" from which the customer's account information is gleaned to initiate the electronic transfer.[30]  Written authorization from the customer may be required to initiate the conversion of his or her paper check into an electronic transaction, and the Ballen Report, the 1995 eFunds Report and the 1996 ECC Pilot Program Guide disclose how such authorization slips may be generated by the point-of-sale terminal and suggest draft language for them.[31]

---

("the payer provides the payee with a blank or partially or fully completed check in order to initiate the PI-EFT"); FDC 5000412 ("a blank or voided check is scanned instead of a credit card's magnetic stripe"); LML-EP-011775 (the "payee, the amount and the date may or may not be indicated on the check, and the payer may or may not sign the check.  These pilot operating requirements do not require that the check be filled out/and or signed.").

[29] *See, e.g.,* FDC5000383 ("the payer may or may not sign the check"); FDC 5000412 ("the check is never surrendered and never signed"); LML-EP-011775 ("the payer may or may not sign the check").

[30] *See, e.g.,* FDC5000383 (in the PI-EFT process, the "check is not submitted to the check collection process.  Rather, the check merely serves as a source of information to initiate an EFT."); FDC5000385 ("When the payer provides the payee with a blank or partially or fully completed check in order to initiate the PI-EFT, this piece of paper should not be viewed as a 'check' under the UCC."); FOCO FDC 102692 ("We at the company do not consider this action to be the accepting of checks but merely the creation of a customer initiated EFT transaction using the check to guarantee that the account number is correct and a method to give the writer of the check a way to keep a record of what has transpired."); FOCO FDC 102698 (defining check truncation as the "acceptance of an EFT transaction at the point of sale using a check to obtain the bank and account information"); LML-EP-011770 ("The Electronic Check Entry is designed to carry the MICR line data from the source document – the check, including the payer financial institution routing number, account number and check serial number, along with transaction amount and the payee/merchant name."); LML-EP-011773 (stating that a "source document used to initiate an ACH debit entry" must be a "check drawn on or payable through a depository financial institution" and be "MICR-encoded"); LML-EP-011775-76 ("The check is not entered into the check collection process.  Rather, the check merely serves as a source of information to initiate an EFT.").

[31] *See, e.g.,* FDC5000386; FDC5000388-89 (receipt includes amount, date, type of transaction and account, terminal ID number, payer account number, and payer name); FOCO FDC 102691; FOCO FDC 102696; LML-EP-011770; LML-EP-011773; LML-EP-011775-76; LML-EP-011781-82.

23

63.     Prior art references published between 1993 and the end of 1996 also teach 1) that daily transaction reports may be printed from the point-of-sale terminal summarizing the day's transactions,[32] and 2) the use of social security numbers as customer identifiers to be entered at the point-of-sale terminal.[33] These same references also provide more detailed disclosure of various velocity checking methods and parameters, and how such methods and parameters are commercial implemented.[34]

64.     The presence of these disclosures in the prior art extant before the priority dates of the '988, '528 and '366 patent applications is confirmed by deposition testimony of Mr. Henry R. Nichols, one of the two named inventors of the three patents-in-suit. During his June 20, 2005 deposition, when asked under oath whether, prior to priority date of the '988 patent, point-of-sale check processing terminals connected to or including MICR readers and printers were well-known in the art, Mr. Nichols agreed that they were. (Nichols Depo at 25:3-25; 32:5-14; 33:7-18; 72:23-25; 84:19-8; 86:1-14; 115:9-13.)

65.     The point-of-sale terminals described by Mr. Nichols in existence before the priority dates of the patents-in-suit also included modems for remote communications, alphanumeric keypads for the manual entry of information, and terminal display monitors. (*Id.* at 85:9-25.) Mr. Nichols also described the use of third party negative customer database files beginning in the 1980s in connection with electronic check authorization at the point-of-sale. (*Id.* at 41:1-42:15; 44:5-7.) In addition, Mr. Nichols conceded that the concept of processing paper checks presented at the point-of-sale electronically through the ACH dates back to the 1970s. (*Id.* at 89:16-24.) Mr. Nichols further stated that neither he nor Mr. Hills invented the concept of

---

[32] *See, e.g.,* '513 Patent at 6:60-62; 8:51-60; 16:35-17:10; 1995 BUYPASS press release at 1.

[33] *See* FDC 5000412.

[34] *See, e.g.,* '513 Patent at 1:47-49; 2:9-14; 3:2-7; 6:52-60; 11:35-38; 13:25-34; 19:25-20:8; BUYPASS press release at 1.

velocity checking, conceding that "velocity checks in general were known before the '528 patent." (*Id.* at 184:13-18; 185:9-21; 195:2-196:1.)

## VI.    PATENTS-IN-SUIT

66.    Below I have provided summaries of the disclosures of the patents-in-suit and their prosecution histories, as well as other pertinent information regarding the patents-in-suit. While these summaries describe certain portions of the patent disclosures and prosecution histories, I have reviewed the entire contents of these documents, and my analysis and opinions take into account these documents as a whole. Accordingly, I reserve the right to rely on any portion of the patents-in-suit or their prosecution histories in providing my analysis and opinions.

### A.    The '988 Patent

#### 1.    Disclosure of the '988 Patent

67.    The '988 patent discloses a system and method for converting paper checks to electronic transactions at the point of sale. According to the '988 patent disclosure, the patent relates to point of sale systems and processing of purchases in which a "a check is used as the basic source of identification of the individual and of the individual's bank and whereby the bank account is debited." ('988 patent, 1:13-15.)[35]

68.    In the Background Art section, the '988 patent describes a number of prior art patents dealing with the processing of checks. The patent asserts, however, that none of the patents address the interaction of check processing systems with the automated clearinghouse process in any way. (*Id.* at 2:40-42.) According to the patent, none of the prior art systems described does away with using the check as a negotiable instrument.

> None of these systems completely does away with the need and use for a
> negotiable draft instrument while using the consumer's bank check for

---

[35]    In this report, column and line numbers are designated in the format x:y, where x designates the column number and y designates the line number.

identification and verification only. It is therefore an objective of the
present invention to provide such a system.

(*Id.* at 2:52-57.)

69.    According to the Summary of the Invention, each transaction would be
"an electronic or 'paperless' event thereby eliminated reliance on accepting and
processing commercial bank drafts (personal or corporate checks) and the physical
handling of those bank drafts thus replacing commercial bank drafts at the point of sale."
(*Id.* at 3:4-8.) The described system is intended to be a subscriber-based system. "The
system is intended to be made available to subscribing merchants, businesses, and
individuals herein referred to as 'system subscribers' wishing to employ the method and
apparatus of the present invention for the electronic processing and settlement of
consumer purchases." (*Id.* at 3:12-16.)

70.    The system is further designed to utilize the pre-existing "national
authorization and electronic settlement network known as the ACH system." (*Id.* at 3:19-
21.) Funds are transferred "off-line" by means of electronic funds transfer through the
ACH network or the Federal Reserve system. (*Id.* at 3:30-35.) An objective of the
invention is to eliminate the need for paper checks as a means of consumer payment.
(3:51-53.)

71.    The described system includes a point of sale processing system including
electronic equipment providing automated, electronic processing. (*Id.* at 3:36-40.) The
system further includes logic that performs a number of functions to "establish a wholly
unique processing medium enabling preauthorized access to consumers' checking
account or bank depository reserves." (*Id.* at 4:1-3.) The logic provides the following
functions:

- authorization – the transaction is checked against positive and
  negative files for either approval or denial (*id.* at 4:4-13);

- check replacement – the consumer signs a "Transaction Event
  Slip" authorizing the electronic accessing of funds in his or her

26

banking account "in lieu of the more traditional method of issuing personal and business checks" (*id* at 4:15-27);

- bank transaction card – information regarding the subscriber consumer account is stored on a magnetically readable bank card to initiate a transaction (*id.* at 4:28-45).

72.    The Summary of the Invention states that transactions take place in essentially the same manner in both the check replacement embodiment and in the bank transaction card embodiment.  "Electronic authorization for withdrawal of funds from the cardholder's account and subsequent electronic settlement procedures remain essentially identical to processing under the Check Replacement service described above."  (*Id.* at 4:37-41.)  An specified objective of the system is to "significantly reduce the use of checks as negotiable instruments in effecting the purchase of goods or services and to further reduce the consumer's reliance on credit cards or cash for transaction events." (*Id.* at 4:59-63.)

73.    A transaction event involves a series of steps in which the consumer account is first verified through a central computer file (*Id.* at 5:5-10), information about the transaction is logged (*Id.* at 5:18-21), a Transaction Event Slip is printed and executed by the consumer authorizing electronic access to the consumer's account (*Id.* at 5:21-27), and funds are transferred via the ACH or Federal Reserve system (*Id.* at 5:27-35.)

74.    Preferred point of sale equipment includes a "dual-port terminal with magnetic stripe reading capabilities interfaced with a logging printer capable of providing individual Transaction Event Slips for consumer execution, and a MICR check reader, optical character recognition ("OCR") equipment, or other device."  (*id.* at 5:45-48.)  The '988 patent describes that the system can be interfaced with pre-existing cash registers on the market.  (*id.* at 5:60-61.)

75.    The terminal communicates with a central computer system with positive and negative files.  (*Id.* at 5:62-6:5.)  According to the specification, the database files include third party data files such as the SCAN ® database.