IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LML PATENT CORP.,

        Plaintiff,

        v.

TELECHECK SERVICES, INC.,
ELECTRONIC CLEARING HOUSE, INC.,
XPRESSCHEX, INC. and NOVA
INFORMATION SYSTEMS, INC.,

        Defendants.

C.A. 04-858 (SLR)

**PUBLIC VERSION**

---

**DEFENDANTS' OPENING BRIEF REGARDING CONSTRUCTION OF
DISPUTED CLAIM TERMS FOR THE PATENT-IN-SUIT**

William J. Marsden (#2247)
Timothy Devlin (#4241)
Tara D. Elliott (#4483)
FISH & RICHARDSON P.C
919 N. Market Street, Suite 1100
Wilmington, DE 19899-1114

*Attorneys for Telecheck Services, Inc*

Richard D. Kirk. (#922)
THE BAYARD FIRM
222 Delaware Avenue, Suite 900
Wilmington, DE 19801

*Attorneys for Nova Information Systems,
Inc.*

Collins J. Seitz, Jr. (#2237)
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19801

*Attorneys for Electronic Clearing House,
Inc. and XpressChex, Inc.*

Dated: October 14, 2005

## TABLE OF CONTENTS

**Page**

I.    NATURE AND STAGE OF PROCEEDINGS ....................................................1

II.   SUMMARY OF ARGUMENT ........................................................................1

III.  FACTUAL BACKGROUND .............................................................................3

    A.    The '988 Patent ...................................................................................3

    B.    The '988 Patent's Electronic Check Processing System
         and Method .........................................................................................4

    C.    Prior Art Point of Sale Electronic Check Processing
         Systems ...............................................................................................5

    D.    Prosecution History of the '988 Patent ...............................................7

         1.    The 1992 Application ...............................................................7

         2.    The 1994 Application ...............................................................8

    E.    LML's Pre-Litigation Patent Counsel's Assessment of
         the '988 Patent ..................................................................................10

IV.   DISCUSSION ...............................................................................................11

    A.    Legal Standards of Claim Construction..............................................11

    B.    Interpretation of Disputed Claim Terms Relating to
         "Any Bank Check" .............................................................................13

         1.    Claims 1 & 8:  "any bank check" means "any
              type of check drawn on a financial institution" .........................13

              a.    The specification and claims support
                    Defendants' proposed construction of
                    "any bank check" ..........................................................13

              b.    The prosecution history indicates that
                    "any bank check" means "any type of
                      check drawn on a financial institution" .........................14

               c.    Extrinsic evidence confirms that one of
                    ordinary skill in the art would construe
                    "any bank check" to mean "any type of
                    check drawn on a financial institution" .........................15

ii

# TABLE OF CONTENTS

**Page**

2. Claim 9: "any consumer bank check" means "any bank check drawn against a consumer bank account" .................................................................................16

3. Claims 1, 8 & 9: "any" means "one or some indiscriminately of whatever kind".............................................17

4. Claims 1, 8 & 9: "subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations" and "enabling automated clearing house communication for transferring funds" mean "electronically communicating with an automated clearing house for transferring funds electronically based upon the consumer bank account information obtained from any bank check presented at the point of sale ............................................18

C. Interpretation of Disputed Claim Terms Relating to "Negotiable Instrument" ..................................................................21

1. Claims 1, 8 and 9: "without using the bank check as a negotiable instrument" and corresponding limitations mean "the bank check (or 'the check'), at no time, takes on the status of a negotiable instrument" ............................................................21

a. The '988 specification supports Defendants' proposed construction of the negative limitation "without using a bank check as a negotiable instrument"....................................22

b. The prosecution history supports Defendants' construction ....................................23

c. LML's proposed construction of "without using the bank check as a negotiable instrument" is improper ....................................24

D. Interpretation of Disputed Claim Terms Related to the "Sole Purpose" of Obtaining "Consumer Bank Account Information"...............................................................................25

1. Claims 1-3, 8 & 9: "consumer bank account information" means "only the ABA/transit routing number and bank account number"...............................25

# TABLE OF CONTENTS

**Page**

a. The claim language supports Defendants' proposed construction of the term "consumer bank account information" ...........................26

b. The specification supports construction of "consumer bank account information" to mean "ABA/transit routing number and bank account number ................................26

c. The prosecution history supports Defendants' proposed construction.................................28

d. Extrinsic evidence conforms to Defendants' proposed construction of this phrase ..............................................................29

2. Claims 2, 8 & 9: "for the sole purpose".....................................29

a. The '988 prosecution history supports Defendants' interpretation of these limitations in claims 2, 8 and 9 ........................30

E. Interpretation of Disputed Claim Terms Relating to Account Verification................................................................30

1. Claim 8: "verifying that account numbers were accurately read at the point of sale" means "visually confirming that account numbers were accurately read by reference to the source document".................................................................30

F. Interpretation of Disputed Claim Terms Relating to Reading Information from Any Check ....................................32

1. Claim 1: "adapted to receive consumer bank information from any bank check" means "adapted to read consumer bank account information directly from any bank check"................................32

a. The claim language supports Defendants' proposed construction ......................................32

b. The specification supports Defendants' proposed construction ......................................32

c. The prosecution history supports Defendants' proposed construction of the term "adapted to receive consumer bank information from any bank check" ..................................33

iv

# TABLE OF CONTENTS

**Page**

2.     Claims 2 & 9: "(reading) means for reading magnetic ink character recognition numbers (appearing) on a (or "any") consumer (bank) check" require a MICR check reader or OCR equipment for the purpose of reading MICR numbers appearing on a, or any, consumer bank check ...................................................................34

     a.     Legal standards governing means-plus-function claims...................................................34

     b.     The specification supports Defendants' construction of these means-plus-function limitations ..........................................35

     c.     The prosecution history demonstrates that any broader interpretation of the corresponding structure was surrendered during prosecution ..........................................36

3.     Claims 1 & 9: "second communication means" ........................37

V.    CONCLUSION...................................................................38

# TABLE OF AUTHORITIES

**Page**

## CASES

*ACTV, Inc. v. Walt Disney, Co.*,
   346 F.3d 1082 (Fed. Cir. 2003)............................................................34

*B. Braun Medical, Inc. v. Abbott Laboratories*,
   124 F.3d 1419 (Fed. Cir. 1997)............................................................35

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*,
   296 F.3d 1106 (Fed. Cir. 2002).......................................................34, 35

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
   535 U.S. 722 (2002).............................................................................12

*Innova/Pure Water, Inc. v. Safari Water Filtration System, Inc.*,
   381 F.3d 1111 (Fed. Cir. 2004)..........................................12, 18, 21, 25

*Johnson & Johnston Associates Inc. v. R.E. Service Co.*,
   285 F.3d 1046 (Fed. Cir. 2002).......................................................33, 36

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996)..........................12

*Merck & Co. v. Mylan Pharm., Inc.*,
   190 F.3d 1335 (Fed. Cir. 1999)...................................................17, 34, 37

*Metabolite Laboratories, Inc. v. Laboratories Corp. of America Holdings*,
   370 F.3d 1354 (Fed. Cir. 2004).......................................................11, 12

*Nazomi Commc'ns. v. Arm Holdings, PLC*,
   403 F.3d 1364 (Fed. Cir. 2005)............................................................12

*PC Connector Solutions LLC v. SmartDisk Corp.*,
   406 F.3d 1359 (Fed. Cir. 2005)............................................................12

*Pause Tech., LLC v. TiVo Inc.*,
   419 F.3d 1326 (Fed. Cir. 2005)............................................................12

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005)...................................................... passim

*V-Formation, Inc. v. Benetton Group SpA*,
   401 F.3d 1307 (Fed. Cir. 2005)............................................................11

## STATUTES

35 U.S.C. § 102(b) ...................................................................................................7

35 U.S.C. § 103........................................................................................................8

35 U.S.C. § 112......................................................................................................34

## I.      NATURE AND STAGE OF PROCEEDINGS

This is a patent infringement litigation initiated by LML Patent Corporation ("LML") against defendants TeleCheck Services, Inc. ("TeleCheck"), Electronic Clearing House, Inc. ("ECHO"), XpressChex, Inc. ("XpressChex") and Nova Information Systems, Inc ("Nova") (collectively, "Defendants").  Fact and expert discovery has concluded, and the parties have conferred regarding claim construction.  As discussed below, the parties have asked the Court to construe a number of terms and phrases contained in the asserted claims of the patent-in-suit, U.S. Patent No. 5,484,988 ("the '988 patent").  Defendants collectively submit this opening brief regarding the construction of disputed terms and phrases set forth in the chart entitled Proposed Constructions of Disputed Claim Terms in the co-filed Joint Proposed Claim Construction Statement (Ex. A).

## II.      SUMMARY OF ARGUMENT

The '988 patent is a narrow patent relating to a specific system and method for conducting electronic check transactions at a retail check-out counter, or "point of sale."  The '988 patent's inventors, Robert Hills and Henry Nichols, were not the first to invent "electronic check conversion" at the point of sale.  As set forth in the prior art and confirmed by LML's own expert, other forms of electronic check conversion at the point of sale were known in advance of the purported invention of the '988 patent.

As originally filed, the '988 patent claims sought a broad scope of protection, but the claims were successively amended to narrow and then further narrow their scope.  The result are patent claims that require, among other limitations:

- conducting electronic transactions and transferring funds using bank account information from "any bank check;"

- conducting transactions "without using the check as a negotiable instrument," so that, as properly construed, "the check, at no time, takes on the status of a negotiable instrument;"

- reading only "consumer bank account information" from a check, rather than also reading the check serial number, so that the same check can be used over and over again; and

- "verifying that account numbers were accurately read at the point of sale" by visually confirming the account numbers on the check against a display screen.

**REDACTED**

1

A broader construction like that proposed now by LML renders many of the claims, including all independent claims, anticipated by the prior art. (*Id*.) LML's attempt to now assert a contrary construction for purposes of litigation should be rejected.

All of Defendants' constructions are fully supported by the patent claims, specification, prosecution history, and prior art cited during prosecution. They are fully consistent with the understanding of one of ordinary skill in the art at the time of the invention. This last point is significant because of LML's apparent reliance on "evidence" created many years after the filing of the patent-in-suit. For example, LML

and its expert rely on guidelines relating to Point-of-Purchase ("POP") transactions issued by the National Automated Clearinghouse Association ("NACHA"). These rules were adopted long after the date of invention of the '988 patent, and are improper evidence for purposes of claim construction. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). LML's attempt to rely on such evidence should be rejected.

In short, each claim construction proposed by Defendants is consistent with the understanding of one of ordinary skill in the art at the time of the invention, based on the intrinsic record of the '988 patent. In contrast, LML ignores the intrinsic record, and proposes overly-broad definitions crafted to support its litigation positions.

**REDACTED**

## III.     FACTUAL BACKGROUND

### A.     The '988 Patent

The '988 patent issued January 16, 1996 from an application filed June 9, 1994. (Ex. X.) LML asserts priority back to the original application, filed November 13, 1992. (*Id.*) The '988 patent generally describes a system and method for converting paper checks to electronic transactions at the point of sale, using the check "as the basic source of identification of the individual and of the individual's bank and whereby the bank account is debited." (*Id.* at 1:13-15.)[2] The '988 patent claims were not allowed until *after* the claims were narrowed to recite conducting transactions "without using the check as a negotiable instrument" (or equivalent language), and further narrowed to recite the capability to transfer funds using account information "from any bank check."

---

[1]   Unless otherwise noted, all emphasis in this brief has been added.
[2]   In this brief, citations to patent text are of the form x:y, where "x" represents the column number and "y" the line number.

**B.    The '988 Patent's Electronic Check Processing System and Method**

The '988 patent's system and method for electronically converting paper checks presented at the point of sale begins when a customer making a purchase initiates a transaction by providing the merchant any bank check.  According to the patent specification, the check presented by the customer is preferably a "specimen" or "blank" check.  (*Id.* at 7:48.)

The merchant obtains certain account information from the consumer's check. Many, but not all, bank checks bear Magnetic Ink Character Recognition ("MICR") numbers across the bottom of the check.  (*Id.* at 6:66; 7:64-65.)   This MICR information includes the "ABA/Transit" and routing number of the check writer's bank, as well as the check writer's account number.  (*Id.* at 10:29-31.)  The MICR line may also include the check number, although in the '988 patent system this information can be "dropped" before proceeding with the electronic transaction.  (*Id.* at 10:31-34.)  The '988 patent specification describes that MICR information may be entered into a point of sale terminal manually via a keypad, or may be entered by reading the check with a check reader.  (*Id.* at 7:57-62.)  The patent describes magnetic "MICR" readers and optical "OCR" readers as equipment that may be used to read the information from the check. (*Id.* at 5:44-49.)

Once the account information is entered, the merchant verifies that the information was read properly by visually checking the terminal's display panel, and then enters the amount of sale to initiate a check "verification" process.  (*Id.* at 7:63-8:22.) Check verification was a well known process many years before the '988 patent.  It involves accessing one or more databases to determine whether a check presented at the point of sale is likely to clear.  (*Id.* at 7:19-31.)  The '988 patent describes the use of then-existing verification databases such the SCAN® database.  (*Id.* at 7:31-34.)

If the verification is approved, the merchant returns the check to the customer at the point of sale and the terminal prints an authorization receipt for the customer's

signature.  (*Id*. at 8:23-29.)  At the time the '988 patent was filed, and still today, an express written authorization is required for any electronic debit of a consumer's bank account.  The transaction is later electronically processed for payment through an automated clearinghouse or an "ACH" network.  (*Id*. at 8:30-42.)

> C.    **Prior Art Point of Sale Electronic Check Processing Systems**

Long before the effective priority date of the '988 patent, various methods of electronic check conversion at the point of sale were well known in the prior art. Systems and methods enabling the electronic processing of paper checks presented at the point of sale have been discussed in the payments industry, disclosed in prior art patents, and implemented by payment processing corporations since the early 1980's.

For example, U.S. Patent No. 5,053,607 to Carlson ("the '607 patent"), U.S. Patent No. 4,321,672 to Braun *et al*., U.S. Patent No. 5,175,682 to Higashiyama *et al*. ("the '682 patent"), and commercial payment processing systems described and/or offered by a number of entities described electronic check processing systems having many or all of the features of the '988 patent.  These systems each included a terminal and a MICR reader for automatically reading the ABA/transit routing number and bank account number from checks presented at the point of sale, communication with databases for check verification, and communication with an automated clearing house for electronic debiting of the consumer's account based on the information obtained from the check.

The '607 patent, for instance, discloses a point of sale device adapted for electronic check processing and funds transfer and a system for performing check authorization and electronic funds transfer at the point of sale.  (Ex. S at 2:24-28; 15:38-42; 22:32-25:10.)  The described system includes a point of sale terminal capable of reading information from any bank check containing a MICR line.  (*Id*. at 3:47-48; 6:38-41, 49-57; 25:27-28.)  The terminal has a MICR reader (*id*. at 8:1-3; 11:40-43), alphanumeric keypad (*id*. at 13:39-40), merchant and customer display screens (*id*. at

9:18-31), a printer (*id*. at 4:50-52), and memory for storing information within the terminal (*id*. at 4:44-46; 19:12-17).

      To initiate a transaction according to the '607 patent, the merchant inserts the check into the terminal, enters the amount of the transaction using the alphanumeric keypad and requests check verification.  (*Id*. at 22:57-23:22; 23:60-24:36.)  The terminal reads the MICR information from any check, even one that is folded, wrinkled, or has a torn or partially damaged MICR line.  (*Id*. at 6:38-52.)  The system initiates a verification process to confirm that sufficient funds exist in the customer's account (*id*. at 24:24-36), and if approved the terminal communicates with a computer "to perform an electronic funds transfer" (*id*. at 4:40-41).  The printer prints authorization information on the check.  (*Id*. at 24:45-60, 10:13-53.)  If insufficient funds exist, the transaction is terminated.  (*Id*. at 17:24-31.)  At the end of a transaction, the "cancelled check would be presented to the customer as part of his receipt."  (*Id*. at 18:52-60; 25:4-10.)

      The '682 patent to Higashiyama discloses another system and method for electronically processing checks presented at the point of sale, in a manner that treats a check as the "equivalent of an electronic debit card."  (Ex. T at 2:43-50; 3:11-16; 6:10-12; 10:27-30.)  The'682 patented system includes one or more point of sale terminals (*id*. at 3:13-16), each of which includes a MICR reader for reading information from the consumer's check (*id*. at 3:16-19; 10:24-26), a printer for "printing a sales slip, printing validation information on a check, or printing a check receipt" (*id*. at 3:25-28), and a keypad (*id*. at 3:66).  The '682 central computer is connected to a telecommunications unit capable of data communications with automated clearinghouses, financial institutions and verification services.  (*Id*. at 7:55-8:2; *see also* 3:33-36.)

      When a transaction is initiated using the system described by the '682 patent, the MICR reader receives customer account information directly from any check presented at the point of sale.  (*Id*. at 3:45-50.)  The account number is verified against authorization files maintained by an external verification service.  (*Id*. at 4:14-22.)  If a transaction is

authorized, validation and cancellation information is printed on the check. (*Id*. at 4:26-43; 8:55-59.) The merchant then returns the check to the customer at the point of sale. (*Id*. at 4:54-57; 7:16-20, 35-36; 8:60-62.) If the merchant desires, a separate receipt may be printed and given to the customer stating that payment was made by check and the check is being electronically processed. (*Id*. at 4:61-68; 9:4-6). The electronic data is then batch transmitted for processing, for example, through an automated clearing house. (*Id*. at 5:1-7, 10-13, 18-20, 28-31, 37-46; 9:12-15.)

These and other prior art references confirm that any purported novelty in the '988 patent claims may only be maintained (if at all) through a narrow construction involving the specific embodiments set forth in the patent specification. Indeed, during prosecution of the '988 patent, the '607 patent and other references were distinguished on specific grounds related to limitations added to the claims by amendment.

### D.    Prosecution History of the '988 Patent

#### 1.    The 1992 Application

The original application leading to the '988 patent, Serial No. 07/975,717, was filed on November 13, 1992. (Ex. B.) Nine claims were included in that application, two of which were independent (claims 1 and 9). The original independent claims recited point-of sale electronic payment processing systems and methods designed to receive consumer bank account information from either debit-type cards or checks, transmit that information to a central computer, perform a verification process, and transfer funds through an automated clearing house network. (Ex. B at LML-EP-000104-06.)

In an initial Office Action dated September 23, 1993, the Examiner rejected claims 1-9 under 35 U.S.C. § 102(b) as anticipated by U.S. Patent No. 4,270,042 to Deming or U.S. Patent No. 4,823,264 to Case. (Ex. C.) In response, among other changes, the Applicants deleted language from claim 9 relating to the card-based embodiment, and added a new claim 10 directed to the same embodiment. (Ex. D at

7

LML-EP-000151-55.)  Applicants also argued that their claims were not anticipated by Case or Deming.  (*Id*. at LML-EP-000156-59.)

In a Final Office Action dated March 9, 1994, the examiner again rejected Applicants' amended claims as unpatentable under 35 U.S.C. § 103 over Case and Deming, as well as U.S. Patent Nos. 5,053,607 and 4,678,896 to Carlson and U.S. Patent No. 4,672,377 to Murphy *et al*.  (Ex. E.)

### 2.    The 1994 Application

Applicants filed a continuation application and a Preliminary Amendment on June 8, 1994.  (Exs. F, G.)  The 1994 Preliminary Amendment contained additional disclosure relating to the use of a check as a negotiable instrument.  The new disclosure included text characterizing Case and Deming as systems in which checks are treated as negotiable instruments, and further stated that none of the prior art "completely does away with the need and use for a negotiable draft instrument while using the consumer's bank check for identification and verification only."  (Ex. G at LML-EP-000172.)  The new disclosure also stated that a "further object of the present invention is to significantly reduce the use of checks <u>as negotiable instruments in effecting the</u> purchases of goods or services."  (*Id*. (underlining identifying amended language).)

The 1994 Preliminary Amendment also included narrowing amendments to the claims.  Claim 1 was amended to recite that transactions take place "without using a bank check as a negotiable instrument."  (*Id*. at LML-EP 000172-73.)  Claim 9 (which would eventually issue as claim 8) was amended to recite reading MICR information on the check "for the sole purpose of obtaining consumer bank account information."  (*Id*. at LML-EP 000173-74.)

The Preliminary Amendment further added 12 new claims, including independent claim 11 (which would eventually issue as claim 9).  (*Id*. at LML-EP 000175-78.)  Independent claim 11 also recited the limitations "for the sole purpose of eliciting

consumer bank account information" and transferring funds "without using a bank check as a negotiable instrument." (*Id*. at LML-EP 000175-76.)

Following this submission, the Examiner again rejected all pending claims as indefinite in an Office Action dated October 28, 1994, concluding among other things that claim 1 did not capture the argued novelty in the specification. (Ex. H. at LML-EP 000181.) The Examiner also stated that use of the check "solely" for access would be a trivial modification from the prior art. (*Id.* at LML-EP 000181.)

Applicants filed another Response to Office Action on January 30, 1995, further narrowing the claims to recite processing transactions not from "a" single bank check, but rather from "any" bank check. Specifically, the Applicants amended claim 1 to recite a point of sale terminal adapted to receive information from "any bank check," amended claim 9 to recite presenting "any bank check" at the point of sale, and amended claim 11 to recite means for reading information from "any consumer bank check." (Ex. I at LML-EP-000183-85.) Claim 9 was further amended to include the limitation "without using the check as a negotiable instrument," conforming to the similar limitations previously added to claims 1 and 11. (*Id*. at LML-EP-000184.)

To overcome the Examiner's rejections, Applicants repeatedly argued that the prior art did "not disclose the use of *any bank check* solely to derive consumer information and *not for use as a negotiable instrument*, as recited in independent claims 1, 9 and 11." (*Id*. at LML-EP-000190, 207; *see also* LML-EP-000192-206.) After persuading the examiner that no election between claims was necessary, the '988 patent issued on January 16, 1996. At issuance, what was claim 9 during prosecution issued as claim 8, and former claim 11 issued as claim 9.[3]

---

[3] In the remainder of this brief, for clarity and convenience Defendants refer to claims 8 and 9 of the '988 patent by these issued claim numbers, recognizing that issued claim 8 was prosecuted as "claim 9," and issued claim 9 was prosecuted as "claim 11."

**REDACTED**

**REDACTED**

**IV.    DISCUSSION**

    **A.    Legal Standards of Claim Construction**

       The goal of claim construction, repeatedly affirmed by the Federal Circuit, is to determine the meaning of claim terms within their appropriate technical context and time frame.  *See*, *e.g.*, *Nazomi Commc'ns. v. Arm Holdings, PLC*, 403 F.3d 1364, 1368 (Fed. Cir. 2005); *V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1310 (Fed. Cir. 2005).  As the Federal Circuit recently confirmed in *Phillips*, the court interprets claim terms as they would have been understood ***at the time the patent application was filed***.

415 F.3d at 1313; *see also Nazomi Comms.*, 403 F.3d at 1368.  Interpretation of disputed

claim terms in their appropriate technical context requires the construction of terms as

they would have been understood by one of ordinary skill in the art.  *See*, *e.g*., *Phillips*,

415 F.3d at 1313;  *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354,

1361 (Fed. Cir. 2004).

      In construing disputed claim terms, intrinsic evidence should be considered first;

and if ambiguity remains the court may resort to extrinsic evidence.  *See*, *e.g*., *Phillips*,

415 F.3d at 1314; *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,* 381 F.3d

1111, 1116 (Fed. Cir. 2004).  Claim terms are generally given their ordinary meaning

unless the intrinsic evidence reveals a special definition different from the meaning one

of ordinary skill in the art, at the time the application was filed, would understand it to

have.  *See*, *e.g.*, *Phillips*, 415 F.3d at 1316; *PC Connector Solutions LLC v. SmartDisk

Corp.,* 406 F.3d 1359, 1363 (Fed. Cir. 2005).  Claim language is read in the context of the

entire patent, including language in other claims, both asserted and not.  *See*, *e.g*.,

*Phillips*, 415 F.3d at 1313-14; *Pause Techn., LLC v. TiVo Inc*., 419 F.3d 1326, 1331 (Fed.

Cir. 2005).  Where terms appear repeatedly, those common terms should be assigned the

same meaning.  *See*, *e.g*., *Innova*, 381 F.3d at 1119.

      The patent's prosecution history is also deemed part of the intrinsic evidence and

is of "***primary significance in understanding the claims***."  *Markman v. Westview

Instruments, Inc*., 52 F.3d 967, 980 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996); *see also*,

*e.g*., *Phillips*, 415 F.3d at 1317.  Narrowing amendments made during prosecution limit

the subsequent scope of the claims and must be considered during claim construction.

*See*, *e.g*., *Pause Tech*., 419 F.3d at 1331-32; *Festo Corp. v. Shoketsu Kinzoku Kogyo

Kabushiki Co*., 535 U.S. 722, 736 (2002).

**B.    Interpretation of Disputed Claim Terms Relating to "Any Bank Check"**

    **1.    Claims 1 & 8:  "any bank check" means "any type of check drawn on a financial institution"**

Independent claims 1 and 8 of the '988 patent both recite transactions involving "any bank check." (Ex. X at 11:37-38, 12:21-23.)  Consistent with the intrinsic evidence and its plain and ordinary meaning, the term "any bank check" should be construed to mean "any type of check drawn on a financial institution."  *See*, *e.g.*, *Phillips*, 415 F.3d at 1316.  That plain and ordinary meaning of "any bank check" includes, without limitation, personal or corporate checks drawn on U.S. bank accounts, personal or corporate checks drawn on foreign bank accounts, payroll checks, two-party checks, traveler's checks, damaged checks, and checks in which the MICR line is not able to be read by an automated check reader.

<strong>REDACTED</strong>

    **a.    The specification and claims support Defendants' proposed construction of "any bank check"**

The '988 specification provides no explanation of the term "any bank check" to differentiate it from the plain and ordinary meaning it would be assigned by one of ordinary skill in the art at the time of the invention.  The specification states, for example, that the patent is not limited in geographic boundary: "operational parameters of the present invention allow freedom from customary state or other geographically limiting criteria typical when accepting and processing 'paper' checks." (Ex. X at 3:16-20.)  The specification further describes processing business and corporate checks.  (*Id*. at 3:45, 4:23 and 4:49-51.)

The specification contains no special definition of "bank" excluding from its scope credit unions or other types of financial institutions that issue checks.  For example, the specification states that the central computer communicates with a banking "institution" for purposes of debiting consumer accounts and crediting system subscriber

13

accounts. (*Id*. at 6:53-59; *see also* 7:40-43.) Likewise, the purported invention provides consumers "free and unrestricted access to funds secured in bank accounts of various types," including "consumers' checking account or bank depository reserves." (*Id*. at 3:51-56; 4:2-3.)

**b.     The prosecution history indicates that "any bank check" means "any type of check drawn on a financial institution"**

The '988 prosecution history also supports a construction of the term "any bank check" consistent with its plain and ordinary meaning. During prosecution, the claims were narrowed to recite the ability to process checks using "any bank check" in response to the Examiner's pending rejection of all proposed claims. (Ex. I at LML-EP-000183.) In other words, the ability to process a single type of bank check was no longer sufficient to meet the claims. Instead, the system had to have the capability to process ***all types*** of checks, for example, personal checks, corporate checks, foreign checks, official checks, etc.

In the accompanying Remarks, the Applicants described newly amended claim 1 as reciting a checkwriting point of sale system including a point of sale terminal that "accepts bank account information from any bank check." (*Id*. at LML-EP-000189.) Amended claim 8 was described as a "point of sale process comprising presenting any bank check to a merchant's terminal. . . ." (*Id*.) Applicants characterized amended claim 9 as a "checkwriting point of sale system including a point of sale terminal which "accepts bank account information by reading the MICR information from any bank check." (*Id*.)

In the same Response to Office Action, Applicants repeatedly distinguished the claimed invention over the prior art by stating that none of those references "disclose the use of any bank check solely to derive consumer information and not for use as a negotiable instrument." (Ex. I at LML-EP-000190, LML-EP-000207.) Because all the intrinsic evidence indicates that one of ordinary skill in the art at the time of the invention

14

would have understood the term "any bank check" to have its plain and ordinary meaning, the Court should construe the phrase accordingly to mean "any type of check drawn on a financial institution."

      **c.**    **Extrinsic evidence confirms that one of ordinary skill in the art would construe "any bank check" to mean "any type of check drawn on a financial institution"**

**REDACTED**

      In addition, documents describing the purported invention distributed by the patent's prior owner, ChequeMARK, confirm that Applicants defined "any bank check"

15

not as simply "a bank check," but as a bank check drawn on "literally any banking institution within the United States." (Ex. W at ECHO 00002741.) In that summary , ChequeMARK explained that "(p)rocessing beyond the geographic boundaries of the United States is further contemplated as similar agencies, regulatory bodies, and inter-banking mechanics exist in foreign countries capable of facilitating the means of electronic monetary transfers from preauthorized banking accounts." (*Id*.) Both the intrinsic and extrinsic evidence supports an interpretation of the term "any bank check" to mean "any type of check drawn on a financial institution."

### 2. Claim 9: "any consumer bank check" means "any bank check drawn against a consumer bank account"

Independent claim 9 recites a "checkwriting point of sale system" including a terminal "comprising reading means for reading magnetic ink character recognition numbers on any consumer bank check . . . ." (Ex. X at 12:42, 53-56.) One of ordinary skill in the art would interpret this portion of claim 9 to mean "any type of check drawn on a financial institution," with the added limitation that the check be "drawn against a consumer bank account," as is consistent with the plain and ordinary meaning of the phrase. This construction is consistent with the specification, as set forth above with respect to the "any bank check" limitation.

Defendants' construction is further supported by the prosecution history. As with the "any bank check" limitations, claim 9 was narrowed during prosecution to recite "any" consumer bank check. (Ex. I at LML-EP-000185.) Applicants also argued during prosecution that their "invention can read in account and other information directly from the consumer's ordinary bank check." (Ex. C at LML-EP-000158-59.) Consistent with its ordinary meaning, the phrase "any consumer bank check" should be interpreted to mean "any bank check drawn against a consumer bank account."

### 3.    Claims 1, 8 & 9:  "any" means "one or some indiscriminately of whatever kind"

Claims 1, 8 and 9 of the '988 patent all preface their description of a bank check with the adjective "any."  (Ex. X at 11:38, 12:22, 55.)  In the parties' Joint Proposed Claim Construction Chart, LML states that the term "any" is a "plain English term" that "needs no construction."  (Ex. A.)  LML is incorrect, because the prosecution history requires that a broad dictionary reading of "any" is improper.  In this case, the prosecution history indicates that Applicants surrendered the broad "plain English" definition of the word "any" that LML seeks now to adopt for purposes of this litigation.

While resort to a dictionary may be proper, only a definition consistent with the prosecution history of the '988 patent should be adopted.  Merriam-Webster's dictionary defines the term "any" as "one or some indiscriminately of whatever kind."  (*See* http://www.m-w.com/cgibin/dictionary?book= Dictionary&va=any.)  This dictionary definition is consistent with the prosecution history, in which the patent claims were amended to recite the ability to process "any" bank check, rather than a single type of bank check.

In particular, the Applicants surrendered during prosecution any broad dictionary definition of the word "any" that would mean simply "a."  *See*, *e.g.*, *Merck & Co. v. Mylan Pharm., Inc.*, 190 F.3d 1335, 1340-41 (Fed. Cir. 1999).  In a January 30, 1995 Response to Office Action (Ex. I), Applicants amended claims 1, 8 and 9 to include the word "any" in that Response, expressly replacing the word "a" in claim 8 (designated claim 9 at the time).  In the Remarks, Applicants sought to distinguish the prior art by arguing that "Case does not disclose the use of ***any*** bank check . . . ."  (*Id*. at LML-EP-000190.)  It was not until the term "any" was added to independent claims 1, 8 and 9 that the '988 patent was allowed to issue.

The doctrine of claim construction also requires that the definition of "any" be restricted from meaning "a."  Claims 2 recites "a consumer check" (Ex. X at 11:60),

while claim 9 recites "any consumer bank check" (*id.* at 12:66).  There is no dispute that "check and "bank check" should be read similarly, and so the only distinction between these two terms are the words "any" and "a."  The doctrine of claim differentiation dictates that these separate words be given separate and distinct constructions, so as not to render any claim term unnecessary or superfluous.  *See, e.g., Innova*, 381 F.3d at 1119.

> **4.     Claims 1, 8 & 9:  "subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations" and "enabling automated clearing house communication for transferring funds"**
> **mean**
> **"electronically communicating with an automated clearing house for transferring funds electronically based upon the consumer bank account information obtained from any bank check presented at the point of sale**

Claim 8 recites a checkwriting point of sale process including the step of "subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations."  (Ex. X at 12:21, 39-41.)  Claims 1 and 9 similarly recite a point of sale checkwriting system "enabling automated clearing house communication for transferring funds."  (*Id.* at 11:36, 50-55; 12:42, 60-66.)

In accordance with the overall context of the claims, the language of the specification and their plain and ordinary meaning, these phrases should be construed to mean "electronically communicating with an automated clearing house for transferring funds electronically based upon the consumer bank account information obtained from any bank check presented at the point of sale."  Since claims 1, 8 and 9 all contain similar language directed to the same limitation, this common limitation of claims 1, 8 and 9 must be interpreted consistently.  *See Innova*, 381 F.3d at 1119.

As described above, each of claims 1, 8 and 9 recites a system or method involving "any bank check."  The claims and specification establish that the claimed system and method require not just obtaining information from any bank check, as LML's proposed constructions suggest, but ***conducting transactions*** using any bank

check, as Defendants' proposed construction states.  The very first description in the Field of the Invention of the '988 patent states:

> This invention relates to the field of Point-of-Sale systems and more particularly to the integration and ***processing of purchases whereby a check is used as the basic source of identification of the individual and of the individual's bank and whereby the bank account is debited***.

(Ex. X at 1:11-15.)

This context is reflected in the '988 patent claims.  Claims 1 and 9 recite means for "transferring funds" as part of the claimed system.  (Ex. X at 11:54; 12:65.)  The term "funds" in this context clearly relates to funds in the account identified by the "bank check" recited earlier in the claims.  As described in the specification, the claimed invention enables "point of sale purchases of goods and services paid from consumer funds secured in bank checking or depository accounts."  (*Id*. at 2:66-3:3.)  "When the transaction event is 'approved' funds are debited from an authorized consumer account for credit to the system subscriber. . . ."  (*Id*. at 3:26-28; *see also* 8:37-38.)

**REDACTED**

Accordingly, the "transferring funds" recited in claims 1 and 9 must refer to funds associated with the bank check presented earlier in the claim, namely the "any bank check" recited in claims 1 and 9.  Similarly, the "subsequent automated clearing house operations" recited in claim 8 must relate to operations based on the information obtained from "any bank check," as earlier recited in the claim.

The specification of the patent-in-suit lends support to Defendants' proposed construction of these phrases, stating that "(o)nce the transaction is approved the central

computer captures the MICR information and the sale amount and stores that information 146. The central computer subsequently generates a batch message regarding all transaction events for the prior period and transmits all the transaction event information for the day into the ACH network." (Ex. X at 8:30-35.) Accordingly, the transactions described at end of the process are expressly tied to the bank check provided by the consumer, *i.e.,* the "any bank check" recited earlier in the claims. LML's proposed constructions wrongly ignore this relationship between the "any bank check" presented earlier in the claims, and the subsequent transfer of funds or automated clearinghouse operations.

The '988 patent also makes clear that transactions occur electronically, as set forth in Defendants' proposed construction. The specification states generally that in the '988 patented system, "(f)unding settlement to the system subscriber would be effectuated by means of Electronic Funds Transfer via ACH. . . ." (*Id.* at 4:23-28.) This statement accords with the means-plus-function language of claims 1 and 9, which describe communications by a computer, which would be understood to occur electronically: "second communication means enabling said central computer system to communicate . . . ." (*Id.* at 11:49-51, 12:60-62.)

The overall context of the claims and specification support Defendants' proposed construction, as they relate to transactions "whereby the bank account is debited," each transaction is an "electronic or 'paperless' event," and electronic funds transfer is enabled for "personal or corporate" checks. (*Id.* at 1:15, 3:3-7.) All intrinsic sources establish that these limitations should be interpreted to require mean "electronically communicating with an automated clearing house for transferring funds electronically based upon the consumer bank account information obtained from any bank check presented at the point of sale."

C.    **Interpretation of Disputed Claim Terms Relating to "Negotiable Instrument"**

1.    **Claims 1, 8 and 9: "without using the bank check as a negotiable instrument" and corresponding limitations mean "the bank check (or 'the check'), at no time, takes on the status of a negotiable instrument"**

Independent claim 1 of the '988 patent includes the negative limitation "without using the check as a negotiable instrument." (Ex. X at 11:54-55.) This phrase, as used in claim 1, should be construed to mean that "the bank check, at no time, takes on the status of a negotiable instrument." Similarly, claim 8 recites "without using the check as a negotiable instrument," and claim 9 recites "without using a bank check as a negotiable instrument." These phrases should be construed to mean "the check, at no time, takes on the status of a negotiable instrument." These consistent constructions are appropriate for these similar phrases in claims 1, 8 and 9. *See Innova*, 381 F.3d at 1119. For purposes of clarity and convenience, Defendants' proposed constructions are discussed together below using the form "the (bank) check, at no time, takes on the status of a negotiable instrument."

**REDACTED**

21

**REDACTED**

LML now asserts that the limitation should be interpreted to mean "where the paper check is used as a source of information, and is not accepted or processed."  (Ex. A.)

**REDACTED**

Instead, LML's proposed construction has progressively morphed into whatever definition is needed at a given moment.  In contrast, Defendants' construction is supported by the '988 patent itself and its intrinsic record        **REDACTED**

> a.  **The '988 specification supports Defendants' proposed construction of the negative limitation "without using a bank check as a negotiable instrument"**

The specification of the patent-in-suit supports the Defendants' proposed interpretation of the phrase "without using a (bank) check as a negotiable instrument." This definition is consistent with the specification's statement that "(n)one of these (prior art) systems completely does away with the need and use for a negotiable draft instrument while using the consumer's bank check for identification and verification only." (Ex. X at 2:52-55.)

The specification recites that, preferably, a "specimen" or "blank" check is used to initiate transactions, *i.e.* a check that is neither filled out nor signed.  (*Id*. at 7:46-48.)

Such a check would never take on the status of a negotiable instrument, as reflected in Defendants' proposed construction. The specification also seeks to distinguish the Case reference by characterizing it as requiring the use of a draft negotiable instrument, stating that the Case system compels the customer to inscribe his or her check with the "amount, along with a signature and other information. . . ." (*Id*. at 2:5-12.) This information is the type that would give rise to the status of a negotiable instrument. The specification provides no other definition of the phrase "without using the (bank) check as a negotiable instrument" to give it meaning separate and apart from this plain and ordinary one.

### b.     The prosecution history supports Defendants' construction

The prosecution history further supports Defendants' construction of these phrases. Each independent claim was narrowed by amendment to include the phrase "without using the bank check as a negotiable instrument" or the corresponding phrases of claims 8 and 9. This narrowing amendment acts as a disclaimer of any system or method in which the check takes on the status of a negotiable instrument.

During prosecution, the Applicants specifically argued that the '607 patent to Carlson uses the check as a negotiable instrument. (Ex. I at LML-EP-000192-94.) The '607 patent, however, teaches that a check may be scanned to obtain consumer bank account information (Ex. S at 6:38-52), that the information may be used to verify the check and transfer funds (*id*. at 3:35-40; 4:29-42; 24:19-44), and that the check may be returned to the consumer at the point of sale (*id*. at 18:52-60; 25:4-7). The only difference in this overall process is that Carlson teaches that the consumer provides a "negotiable instrument" to the merchant.

### REDACTED

Based on this intrinsic record during prosecution, the only reasonable construction of the phrase "without using the bank check as a negotiable instrument," and the

corresponding phrases in claims 8 and 9, is that "the bank check, at no time, takes on the status of a negotiable instrument." Any broader meaning was lost when the claim was narrowed by amendment.

**REDACTED**

Any such broader interpretation was disclaimed during prosecution in an effort to overcome Carlson and similar prior art references.          **REDACTED**

      **c.**      **LML's proposed construction of "without using the bank check as a negotiable instrument" is improper**

      LML and its expert suggest a number of definitions for this phrase, suggesting that the limitation "without using the bank check as a negotiable instrument" is met when a check is used to obtain information and then returned to the consumer at the point of sale. Such a construction is erroneous for several reasons. First, LML's proposed construction renders the asserted claims containing this limitation invalid. As set forth above, the Carlson '607 patent teaches that a check may be returned to the consumer at the point of sale. (Ex. S at 25:4-7.)

**REDACTED**

      Another prior art reference, the '682 patent to Higashiyama, also describes returning the check to the consumer at the point of sale (Ex. T at 4:54-68),

**REDACTED**

**REDACTED**

Moreover, LML's apparent reliance on rules and regulations enacted well after the date of invention in construing the limitation is improper.  **REDACTED**     LML and its expert cite to NACHA rules regarding "POP" transactions that were first proposed years after the '988 patent filing dates, and adopted almost a decade after the original 1992 filing date.              **REDACTED**

The use of this untimely evidence is wholly inconsistent with well-settled principles of claim construction requiring that claims be interpreted within their appropriate temporal context.  *See*, *e.g.*, *Phillips*, 415 F.3d at 1313.

**D.    Interpretation of Disputed Claim Terms Related to the "Sole Purpose" of Obtaining "Consumer Bank Account Information"**

**1.    Claims 1-3, 8 & 9:  "consumer bank account information" means "only the ABA/transit routing number and bank account number"**

Claims 1, 2, 3, 8 and 9 of the '988 patent each contain the phrase "consumer bank account information" when referring to the information read by the point of sale terminal from a customer's bank check.  (Ex. X at 11:37-38, 44-45, 61-62, 65-67; 12:26, 28, 35, 37-38, 43-44, 51-52, 56.)  The common term "consumer bank account information" must be construed consistently throughout claims 1, 2, 3, 8 and 9.  *See Innova*, 381 F.3d at 1119.

The plain and ordinary meaning of the term "consumer bank account information" is information that identifies a consumer bank account.  **REDACTED**

25

Identification of a particular consumer account requires only identification of the bank at which the consumer account is maintained and identification of the individual account maintained by the consumer at that bank, and does not require identification of any particular check associated with that account.  As encoded in the MICR line of most consumer bank checks, consumer bank information consists of and should be interpreted to mean the "only the ABA/transit routing number and bank account number."

In the parties' Joint Proposed Claim Construction Chart, LML interprets the term "consumer bank account information" to mean "any information relating to a consumer's bank account including, but not limited to, magnetic ink character recognition numbers." (Ex. A;  **REDACTED**                                    LML thus defines the check serial number as part of the "consumer bank account information," but this interpretation is inconsistent with the plain and ordinary meaning and the intrinsic record.

        a.        **The claim language supports Defendants' proposed construction of the term "consumer bank account information"**

The language of the claims of the '988 patent provide context and meaning to the phrase "consumer bank account information."  As described in dependent claims 3, 5 and 11 of the patent-in-suit, "consumer bank account information" is that information shown on the terminal's display for verification of the customer's account number and used for subsequent verification of account status.  (Ex. X at 11:64-67; 12:6-10; 13:6-10.)  The specification describes in detail that those numbers are the customer's ABA/transit routing and bank account number, and this is the only information required to identify a given bank account.

        b.        **The specification supports construction of "consumer bank account information" to mean "ABA/transit routing number and bank account number**

The '988 patent specification further supports construing "consumer bank account information" to mean only the ABA/transit routing number and bank account number. The specification provides that the claimed system captures the MICR numbers printed

on a consumer's bank check (*Id*. at 7:57-61), and the "MICR interface results in the transmittal of a query for data center approval of the entire ***ABA/Transit and personal or corporate checking account numbers***." (*Id*. at 10:29-31.)

The specification does not teach that the check number is captured or transmitted during the approval or payment process. In other words, while the check serial number is part of the broader set of "MICR information," it does not constitute part of the subset of "MICR information" consisting of only "consumer bank account information." LML's construction of this limitation improperly conflates the separate terms "MICR information" and "consumer bank account information."                    **REDACTED**

The '988 specification is specific about what information constitutes "consumer bank account information, stating that "ACH settlement criteria mandate exact recall for the ***bank and checking account numbers*** to properly complete any debit request." (Ex. X at 10:49-51.) It is the "ABA and account numbers," not the check's serial number, that must be displayed for accuracy. (*Id*. at 10:33-39.) Likewise, it is the check's "bank/checking account information" that is used by the system's central computer to determine whether the customer's account is in good standing. (*Id*. at 9:17-21, 37-42.) The "consumer banking information" depicted on the sales slip shown in Figure 9 also does not include a check serial number. (*Id*. at Fig. 9.)

Moreover, the Abstract of the '988 patent describes that the "consumer bank information" may be encoded on a plastic card. "Point-of-sale terminals are designed to accept a form of credit card with a consumer's bank account information encoded thereon." (Ex. X at LML-EP-000063) No such plastic card would contain a check serial number, lending further support to Defendants' construction of "consumer bank account information" as including only the ABA/Transit number and bank account number.

**REDACTED**

27

In fact, the '988 patent expressly describes disregarding the check serial number when it is included in MICR information. "Instances where printed checks add the individual's check number to the end of the account number can be 'dropped' by Check Reader switch settings."  (*Id*. at 10:31-34.)  The distinction drawn in the specification between the check's serial number on the one hand and the ABA/transit routing number and bank account number on the other hand is reflected in Defendants' construction of the term "consumer bank account information."

Nothing in the specification assigns a special definition to the term "customer bank account information" that would deviate from the plain and ordinary meaning it would be given by one of ordinary skill in the art.  The specification instead repeatedly defines "customer bank account information" as only the ABA/transit routing number and bank account number.

c.     **The prosecution history supports Defendants' proposed construction**

The '988 prosecution history confirms that "consumer bank account information" should be construed to mean "ABA/transit routing number and bank account number." In their September 23, 1993 Response to Office Action, Applicants argued that in the purported invention, "***checking account information*** is simply read from the check." (Ex. C at LML-EP-000157.)  Applicants stated further in an October 28, 1994 Response to Office Action that the "point of sale terminal accepts ***bank account information by reading the MICR information*** from any bank check."  (Ex. H at LML-EP-000189; *see also* Ex. L at LML-EP-000215-16.)

This disparate use of the terms "bank account information" and "MICR information" confirms that the two terms have different meanings.  Whereas the MICR information may include all the information on the MICR line, including the check serial number, the "consumer bank account information" includes only the subset of that information that identifies the bank account.  The prosecution history thus confirms that

28

"consumer bank account information" should be construed to mean "only the ABA/transit routing number and bank account number."

        **d.**      **Extrinsic evidence conforms to Defendants' proposed construction of this phrase**

**REDACTED**

The information that identifies the "source depository account" is simply the bank number (ABA/Transit number) and the account number.

Defendants' construction is also consistent with the fact that in the system and method of the '988 patent, the same check can be used over and over again

**REDACTED**

This feature demonstrates that the check serial number does not constitute "consumer bank account information," because if the check serial number were utilized by the system to identify or otherwise affect the transaction, then a single check could not be used to complete more than one transaction.

        **2.**      **Claims 2, 8 & 9:  "for the sole purpose"**

Dependent claim 2 and independent claims 8 and 9 describe means for reading MICR information appearing on a consumer bank check "for the sole purpose" of gathering consumer bank account information.  (Ex. X at 11:56-61; 12:25-28, 43, 53-56.) In the parties' Joint Proposed Claim Construction Chart, LML proposes that the limitation "for the sole purpose" be interpreted, in the context of all three claims, to mean "for the only purpose."  (Ex. A; **REDACTED**)          There is no basis for this unilateral change from the ordinary meaning of the phrase "sole purpose."  While

Defendants provided an alternative construction of this phrase as part of its construction of a broader element, agreement on the broader element focused discussion on the simple phrase "for the sole purpose."  Standing alone, this phrase needs no construction, and LML's attempt to modify this straightforward language should be rejected.

**a.    The '988 prosecution history supports Defendants' interpretation of these limitations in claims 2, 8 and 9**

The "sole purpose" limitation was added to claim 2 during prosecution in a June 8, 1994 Preliminary Amendment.  (Ex. G at LML-EP-000173.)   In the same Preliminary Amendment, Applicants added claim 8 (Ex. G at LML-EP-000174-76), and later described that claim in a January 3, 1995 Response to Office Action as a "point of sale process comprising . . . reading MICR information from the check *for the sole purpose* of obtaining bank account information. . . ." (Ex. I at LML-EP-000189).

Throughout the same Response, Applicants repeatedly sought to distinguish the claimed invention over the asserted prior art by stating that none of those references "disclose the use of any bank check *solely* to derive consumer information and not for use as a negotiable instrument."  (*Id*. at LML-EP-000190-206.)  Summarizing their efforts to overcome the asserted prior art, Applicants argued in their January 30, 1995 Response that "none of the references discloses a point of sale system that uses any bank check *solely* for the purposes of gathering customer information . . . ." (*Id*. at LML-EP-000207.)  Each of these arguments confirms that the phrase "for the sole purpose" would be understood to obtain its plain and ordinary meaning to one of ordinary skill in the art.

**E.    Interpretation of Disputed Claim Terms Relating to Account Verification**

**1.    Claim 8:  "verifying that account numbers were accurately read at the point of sale" means "visually confirming that account numbers were accurately read by reference to the source document"**

Claim 8 describes a checkwriting point of sale system that includes the step of "verifying that account numbers were accurately read at the point of sale terminal." (Ex.

30

X at 12:30-32.)   In accordance with the intrinsic evidence, this limitation instead should be construed to mean "visually confirming that account numbers were accurately read by reference to the source document."

The '988 specification states that "logic means further drives a display 324 which provides a visual output of the account number of the consumer for verification."  (Ex. X at 7:6-8; *see also* 9:14-16 ("the terminal's screen would ***display*** the check's numbers, and hence the account number, for verification.").)  Similarly, the specification states that "(r)eferring to FIG. 6 the subscriber would verify that the numbers on the terminal match the MICR numbers on the check 114.  During the comparison, the subscriber determines that the check number compares accurately 116 to the number ***displayed*** on the terminal." (*Id*. at 7:62-66.)

According to the specification, if the numbers do not match, the merchant enters the MICR number into the terminal again and "compares the MICR numbers as before 132.  ***If the MICR numbers compare to the system display 134 the process proceeds***.  If the numbers do not compare 136 the check is returned to the consumer and the process terminates."  (*Id*. at 8:1-10; *see also* 10:33-41 ("Subsequent to a terminal's receipt of the MICR number string . . . a verification prompt 'flashing' the ABA and account numbers must be displayed on the terminal's screen requiring the operator to depress 'Enter' to proceed, if correct, or 'Clear,' if incorrect and thereby enabling the terminal operator to resubmit the specimen check through the MICR Check Reader.").)

All of these statements are consistent with Defendants' interpretation of the limitation "verifying that account numbers were accurately read at the point of sale terminal" to mean "visually confirming that account numbers were accurately read by reference to the source document."  Verifying that numbers are accurate on the display requires a visual verification.

F.     **Interpretation of Disputed Claim Terms Relating to Reading Information from Any Check**

    1.     **Claim 1: "adapted to receive consumer bank information from any bank check" means "adapted to read consumer bank account information directly from any bank check"**

As used in claim 1 of the '988 patent, the term "adapted to receive consumer bank information from any bank check" should be interpreted to mean "adapted to read consumer bank account information directly from any bank check." (Ex. X at 11:37-38.) This construction is consistent with the claim language itself, which calls for reading information "from the check," and also comports with the prosecution history.

LML proposes that the limitation "adapted to receive consumer bank information from any bank check" should be interpreted to mean "adapted to receive consumer bank account information from any bank check." (Ex. A; **REDACTED**)       LML's construction simply parrots the claim language. It ignores the prosecution history, and seeks to encompass the disclaimed embodiment of manual keypad entry.

    a.     **The claim language supports Defendants' proposed construction**

The claim language itself supports a construction of the phrase "adapted to receive consumer bank account information from any bank check" to mean "adapted to read consumer bank account information directly from any bank check." Claim 1 recites that the point of sale terminal is adapted to receive information "from any bank check." This recitation expressly states that the information must be received "from" the bank check, not from a clerk or other human operator. LML's construction would read this limitation out of the claim, and is therefore improper.

    b.     **The specification supports Defendants' proposed construction**

The '988 specification supports Defendants' proposed construction. The specification distinguishes the purported invention from prior art systems enabling the manual entry of consumer account information. For example, the '988 patent

32

specification describes that in the Deming system, "account and other information must be keyed into the system. The Deming system cannot be used to read account and other information directly from an ordinary bank check. . . ." (Ex. X at 2:22-26.) The claimed invention, by contrast, is "designed to perform in a fully automated manner . . . ." (*Id.* at 3:23-26, 36-42.)

While the '988 patent describes a manual means of information entry via the terminal keyboard (*id.* at 6:61-63), other portions of the specification, as well as the patent's prosecution history, make clear that manual keyboard entry is at best an unclaimed embodiment. *See, e.g., Johnson & Johnston Associates Inc. v. R.E. Service Co.*, 285 F.3d 1046, 1054-55 (Fed. Cir. 2002). The specification expressly states that the means provided for "reading" consumer bank account information directly from any bank check is "a MICR check reader, optical character recognition ('OCR') equipment, or other device." (*Id.* at 5:48-49; 6:65-67; 9:11-16.)

### c. The prosecution history supports Defendants' proposed construction of the term "adapted to receive consumer bank information from any bank check"

The '988 prosecution history confirms that the term "adapted to receive consumer bank information from any bank check" should be construed to mean "adapted to read consumer bank account information directly from any bank check."

In a September 23, 1993 Response to Office Action, Applicants attempted to distinguish the prior art Deming patent by arguing that the claimed invention allowed funds to be "transferred from the consumer's checking account based on information derived ***directly*** from an ordinary bank check." (Ex. C at LML-EP-000158.) The same Response argued that "(a)pplicant's invention ***can read in account and other information directly from the consumer's ordinary bank check***." (*Id.* at LML-EP-000158-59.) In a later submission, the Applicants similarly argued with respect to claim 9 that the "Deming system cannot be used to read account and other information directly from an ordinary bank check." (Id. at LML-EP-000171.) In short, manual keyboard

33

entry of consumer account information was disclaimed during prosecution in order to overcome the Deming reference, and cannot now be recaptured.  *See, e.g., Merck*, 190 F.3d at 1340-41.

> **2.      Claims 2 & 9:  "(reading) means for reading magnetic ink character recognition numbers (appearing) on a (or "any") consumer (bank) check" require a MICR check reader or OCR equipment for the purpose of reading MICR numbers appearing on a, or any, consumer bank check**

The phrase "means for reading magnetic ink character recognition numbers appearing on a consumer check" in claim 2, and the phrase "reading means for reading magnetic ink character recognition numbers on any consumer bank check" in claim 9, are means-plus-function limitations that must be construed pursuant to 35 U.S.C. § 112, paragraph 6.  (Ex. X at 11:58-61; 12:53-55.)  The recited function in claim 2 is "reading magnetic ink character recognition numbers appearing on a consumer check."  (*Id.* at 11:58-59.)  The recited function in claim 9 is "reading magnetic ink character recognition numbers on any consumer bank check."  (*Id.* at 12:53-56.)  The structure described for performing these functions should be construed to be a magnetic "MICR" check reader or optical "OCR" equipment.  LML's attempt to include a keypad as a "means for reading" should be rejected.

> **a.      Legal standards governing means-plus-function claims**

35 U.S.C. § 112, paragraph 6, permits a patentee to generically define a structure for performing a particular function through the use of a means expression, provided that the specific structures corresponding to those means are disclosed in the specification. The Federal Circuit follows a two-step approach when construing 'means-plus-function' claims, first "identify(ing) the claimed function."  *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1113 (Fed. Cir. 2002).  The claimed function is that function explicitly recited in the claim.  *See ACTV, Inc. v. Walt Disney, Co.*, 346 F.3d 1082, 1087 (Fed. Cir. 2003).

"After identifying the claimed function, the court must then determine what structure, if any, disclosed in the specification corresponds to the claimed function." *Cardiac Pacemakers*, 296 F.3d at 1113. The specification "must clearly associate the structure with performance of the function." *Id.*; *see also B. Braun Med., Inc. v. Abbott Labs*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). The determination of whether a corresponding structure" exists is "undertaken from the perspective of a person of ordinary skill in the art." *Cardiac Pacemakers*, 296 F.3d at 1113.

### b.     The specification supports Defendants' construction of these means-plus-function limitations

The parties agree as to the proper functions of these means-plus-function limitations, but disagree as to what constitutes the applicable corresponding structure for each. In the parties' Joint Proposed Claim Construction Chart, LML proposes that the "structures in the '988 patent that perform that function is any mechanism such as a MICR check reader, optical character recognition ("OCR") equipment, a keyboard for manual entry, or equivalent." (Ex. A.) Manual entry, however, does not constitute "reading" the check, and any claim to manual entry was disclaimed during prosecution.

Contrary to LML's argument, the corresponding structures recited in the specification to perform the functions recited in claims 2 and 9 is limited to a MICR reader or optical character recognition equipment. (Ex. X at 5:48-49.) The specification attempts to distinguish the claimed invention from prior art systems enabling manual entry of consumer information, stating that in the Deming system, "account and other information must be keyed into the system. The Deming system cannot be used to read account and other information directly from an ordinary bank check. . . ." (*Id.* at 2:22-26.) The claimed invention, by contrast, is "designed to perform in a fully automated manner. . . ." (*Id.* at 3:23-26, 40-42.)

While the '988 patent describes a manual means of information entry via the terminal keypad (*id.* at 6:61-63), other portions of the specification, as well as the

patent's prosecution history, make clear that the keyboard means of entry is at best an unclaimed embodiment. *See, e.g., Johnson & Johnston Associates v. R.E. Service*, 285 F.3d 1046, 1054-55. The specification expressly states that the means provided for "reading" consumer bank account information directly from any bank check is "a MICR check reader, optical character recognition ('OCR') equipment, or other device" (*id*. at 5:48-49; 6:65-67; 9:10-14). This term, therefore, must be interpreted to require a MICR check reader or OCR equipment for the purpose of reading magnetic ink character recognition numbers appearing on a consumer check, as the term appears in claim 2, or for the purpose of reading magnetic ink character recognition numbers on any consumer bank check, as recited in claim 9.

The language of the claims themselves supports Defendants' construction. Claim 2 recites that the "means for reading" is included within the "point of sale terminal." (Ex. X, 11:58-58.) Similarly, claim 9 recites that the "reading means for reading" is part of the "point of sale terminal." This naturally implies that the structure referred to forms a part of the terminal. In manual entry, a keypad cannot "read" information from the check; that function is performed by a human. Under LML's construction, this human would be construed as a component of the point of sale terminal – an absurd result, but one that flows directly from LML's overly-broad reading of the claim.

> ### c. The prosecution history demonstrates that any broader interpretation of the corresponding structure was surrendered during prosecution

Contrary to the position LML now takes for purposes of this litigation, the Applicants disclaimed during prosecution any broader interpretation of the structure providing the means for "reading magnetic ink character recognition numbers appearing on a consumer bank check" described in claim 2 and the means for "reading magnetic ink character recognition numbers on any consumer bank check," as recited in claim 9. In their Response to Office Action dated December 21, 1993, the Applicants attempted to distinguish the Deming reference by arguing that "(a)ccount and other ***information must***

***be keyed into the Deming system; Applicants' invention can read in account and other
information directly*** from the consumer's ordinary bank check." (Ex. D at LML-EP-
000158-59.)

Applicants reiterated this argument in a Preliminary Amendment dated June 8,
1994, again attempting to distinguish Deming on the grounds that "account and other
information must be keyed into the (Deming) system. The Deming system cannot be
used to read account information and other information directly from an ordinary bank
check. . . ." (Ex. G at LML-EP-000171.) Applicants asserted in their January 30, 1995
Response to Office Action that Deming discloses a method "by which all payor and
payee information is entered manually . . . ." (Ex. I at LML-EP-000191.) By contrast,
the Applicants argued, their invention entered customer account information by "***reading
it from the check***." (*Id.*) For LML to now claim that the means described in claim 2 for
"reading magnetic ink character recognition numbers appearing on a consumer bank
check" include manual entry via terminal keypad violates the doctrine of file wrapper
estoppel and constitutes an illegitimate attempt to recapture what was surrendered during
prosecution. *See, e.g., Merck*, 190 F.3d at 1340-41.

### 3.    Claims 1 & 9:  "second communication means"

Independent claims 1 and contain similar limitations reciting a "second
communication means" having certain recited features.

The parties agree that on the generally recited function of these claim elements
and the structure disclosed for purportedly performing those functions, the parties dispute
the meaning of certain aspects of the functions, such as the phrase "without using the
check as a negotiable instrument. The parties have forwarded disparate definitions of
certain terms contained in this limitation, as described throughout this brief and in the
parties Joint Proposed Claim Construction. (Ex. A) Defendants' agreement regarding
the general construction of "second communication means" should not be construed as
any waiver of such arguments.

## V.    CONCLUSION

For the foregoing reasons, Defendants' proposed constructions of the disputed claim terms should be adopted.

Dated:  October 7, 2005                    FISH & RICHARDSON P.C.


By:    */s/ Timothy Devlin*
      William J. Marsden, Jr. (#2247)
      Timothy Devlin (#4241)
      Tara D. Elliott (#4483)
      919 N. Market Street, Suite 1100
      P.O. Box 1114
      Wilmington, DE  19801

*Attorneys for Defendant TeleCheck Services, Inc.*

CONNOLLY BOVE LODGE & HUTZ LLP


By:    */s/ Kevin Baird (I.D. 4219)*
      Colin Seitz (I.D. No. 2237)
      The Nemours Building
      1007 N. Orange Street
      Wilmington, Delaware 19801
      302.658.9141
      cjs@cblh.com

*Attorneys for Defendants Electronic Clearing
House, Inc.  and Xpresschex, Inc.*

THE BAYARD FIRM


By:    */s/ Richard D. Kirk*
      Richard D. Kirk (I.D. No. 922)
      222 Delaware Avenue, Suite 900
      Wilmington, DE  19801
      302.429.4208
      rkirk@bayardfirm.com

*Attorneys for Defendant
NOVA Information Systems, Inc*

## CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2005, I electronically filed REDACTED

DEFENDANTS' OPENING BRIEF REGARDING CONSTRUCTION OF DISPUTED

CLAIM TERMS FOR THE PATENT-IN-SUIT with the Clerk of Court using CM/ECF

which will send notification of such filing(s) to the following:

| | |
|---|---|
| Richard K. Herrmann Esq. | Attorneys for Plaintiff |
| Mary B. Matterer, Esq. | LML Patent Corp. |
| Morris James Hitchens & Williams | |
| PNC Bank Center | |
| 222 Delaware Avenue, 10th Floor | |
| P.O. Box 2306 | |
| Wilmington, DE 19899-2306 | |
| | |
| Collins J. Seitz, Jr. | Attorneys for Defendants |
| Connolly Bove Lodge & Hutz LLP | Electronic Clearing House, Inc. and |
| The Nemours Building | Xpress Check, Inc. |
| 1007 North Orange Street | |
| P.O. Box 2207 | |
| Wilmington, DE 19801 | |
| | |
| Richard D. Kirk, Esq. | Attorney for Defendants |
| The Bayard Firm | Nova Information Systems, Inc. |
| 222 Delaware Avenue, Suite 900 | |
| Wilmington, DE 19801 | |

I hereby certify that on October, I have sent by electronic mail, the document(s) to

the following non-registered participants:

| | |
|---|---|
| Robert Jacobs, Esq. | Russell E. Levine, Esq. |
| Belasco Jacobs & Townsley, LLP | Kirkland & Ellis LLP |
| Howard Hughes Center | 200 E. Randolph Dr. |
| 6100 Center Drive, Suite 630 | Chicago, IL 60601 |
| Los Angeles, CA 90045 | |
| | |
| Mark C. Scarsi, Esq. | |
| O'Melveny & Myers LLP | |
| 400 S Hope Street | |
| Los Angeles, CA 90071 | |

_/s/ Timothy Devlin_
Timothy Devlin

80027773.doc