U

# REDACTED DOCUMENT



# REDACTED DOCUMENT



**ChequeMARK Systems**

P.O.

**FOR YOUR CONVENIENCE**

We have subscribed to ChequeMARK Systems to facilitate our customers' access to banking account funds wherever situated throughout the United States. We trust you will find this service a welcomed convenience and a faster, less burdensome payment alternative. To make your future purchases even easier, we encourage each of our valued customers to Register your account with ChequeMARK or to apply for a ChequeMARK Card.

**REGISTER YOUR ACCOUNT TODAY!** Mail Your Receipt To:

ChequeMARK Systems
P.O. Box 1169
Kingsland, GA 31548
Or Call....(912) 729-4222

**TO APPLY FOR YOUR PERSONAL OR BUSINESS ChequeMARK CARD,** simply enclose a Specimen ("Voided") Check when mailing your sales receipt.

Mr. Don Dick
ROCKY MOUNTAIN RETAIL SYSTEMS
2400 Central Avenue - Ste B-1
Boulder, CO  80301

Dear Mr. Dick ;

    Enclosed please find preliminary, descriptive materials.  I will update these in our scheduled call this coming Tuesday, the 27th of April, 1993.

    I look forward to our conversation!

Cordially,

Robert R. Hills

LML v Telecheck
CA No. 04-cv-00858

**PX 453**

_____  "New Traditions In Excellence" _____

ECHO0002731

*Cheque*MARK SYSTEMS, INC.



*Cheque*MARK transaction events are conducted by authorized electronic access to personal or corporate banking accounts and settled through the Automated Clearing House (ACH).

WARNING:
THE USE OF ANY COUNTERFEIT, FICTITIOUS, LOST, STOLEN, OR FRAUDULENTLY OBTAINED DEBIT INSTRUMENT TO UNLAWFULLY INITIATE A DEBIT TRANSACTION IS PUNISHABLE BY A MAXIMUM FINE OF $10,000, IMPRISONMENT FOR A TERM OF TEN YEARS, OR BOTH.

ECHO0002732

*Cheque*MARK SYSTEMS . . .

*Cheque*MARK Systems has pioneered the most sophisticated and technologically advanced systems for financial transaction processing from the Point-of-Sale environment. Selected services can support automated, electronic processing for <u>all</u> <u>non-cash</u> <u>receipts</u>. Proprietary programming, available exclusively through *Cheque*MARK, can assure more comprehensive payment alternatives. In most instances, each service, or combinations of elective services, can be joined with existing POS Terminals otherwise dedicated to the comparatively simplistic function of administering bankcard sales. The impact upon the future of transaction event processing is truly revolutionary!

Enhanced Point-of-Sale capabilities include the *Cheque*MARK Debit Card, a national network of *Cheque*MARK and affinity card issuances. Possibly more impressive, our Check Replacement Service automates consumer payments initiated from bank checking or savings accounts. This service enables merchants and businesses to provide customers' their free, and virtually unrestricted access to funds domiciled in personal or corporate checking accounts but service subscribers will . . .

### *No Longer Accept "Paper" Checks !*

Both the *Cheque*MARK Card and our Check Replacement Service facilitate the processing, accuracy, and collection parameters for a merchant's or business' non-cash receipts. The total of each day's Transaction Events can be administered electronically from preauthorization through debiting of customer prenoted accounts with settlement deposited <u>as</u> <u>cash</u> to the designated business account with a merchant's local banking affiliate.

Resultantly, merchants may now enjoy the many benefits of systems automation for all consumer checking account events, administered under *Cheque*MARK Systems for the total electronic processing of both personal or corporate checks. Customers may be allowed to exercise their clear preference of "Paying-by-Check" under systems that enable merchants to place a virtual end to the acceptance and processing of commercial bank drafts.

ECHO0002733

*Cheque*MARK SYSTEMS,. INC.
NEW PRODUCT RELEASE ANNOUNCEMENT

February, 1993

PRODUCT :  PATENT-PENDING CHECK REPLACEMENT SERVICES

## Product Description

*Cheque*MARK Systems, Inc. sponsored Check Replacement Services are now available which provide for point-of-sale automation for events processed from personal and corporate checking account funds.  The available services are the first of their kind and fully automate every phase of processing initiating with dial-up account authorization through electronic debiting and settlement.  Programming application features support identification/approval of a designated banking account alternately by means of a magnetic stripped and encoded card or by use of a specimen check on the account from which funds are to be electronically debited in payment for goods and services.

Service installation may be activated either in a stand alone mode or interfaced with existing bankcard ("credit card") authorization and draft capture equipment under split-dial terminal capabilities.  Operational parameters are nearly identical to procedures involving credit card transactions with each approved event resulting in the automated printing of a transaction event slip which, when signed, authorizes electronic access to and debiting of the approved client account for the specified amount.  The total of checking account events representing each operational day will be settled through the Automated Clearing House ("ACH") with proceeds credited ("deposited") daily as cash to the service subscriber's business account, generally within forty-eight (48) hours.

Under *Cheque*MARK's Check Replacement Service, internal restrictions and previous geographic limitations, common with most checking acceptance policies, can be wholly eliminated. This new system will enable subscribers to process events from virtually every bank within the United States but you will . . .

*No Longer Accept Or Process "Paper Checks"!*

## Product Features

**::** Automated Processing for ALL Checking Account Events

**::** Terminal dial-up approval against national and proprietary checkwriter databases

ECHO0002734

** Processing time reduced from ninety seconds to events
   typically requiring less than twenty seconds

** Data from individual events captured initiating an
   Electronic Debit of clientele checking accounts

** Daily receipts deposited via the Automated Clearing
   House ("ACH") directly to a designated business
   account at your local banking affiliate

** The total of day's events typically posted within
   forty-eight (48) hours

** No restrictions on acceptance or geographic limitations

** Clientele assured their free and open access to checking
   account funds, wherever situated within United States

** An end to acceptance and processing of commercial bank
   drafts ("Paper Checks")

## Administrative Benefits

** Reduction to time required to process checking account
   events

** Improved accuracy and virtual elimination of ERRORS

** Lowered Administrative responsibilities

** Point-of-sale printing of daily activity summaries

** Interval statements to monitor monthly activity

** No participation with Returns or Collections

** Faster access to cash receipts of daily events

## SPECIAL FEATURE :

WHERE ELECTING COVERAGE UNDER THE ASSURED PAYMENT
PROGRAM, SERVICE SUBSCRIBERS WILL BE WHOLLY INSULATED
FROM THE FINANCIALLY ADVERSE IMPACT OF RETURNS.
ALTERNATELY, RECOVERY NOTIFICATIONS WILL BE AUTOMATICALLY
REFERRED ELECTRONICALLY TO NATIONAL REVENUE CORPORATION
FOR THE ADMINISTRATION OF RECOVERY.  AS A *Cheque*MARK
CLIENT, YOU WILL NEVER BE RESPONSIBLE FOR NOTICES OF
RETURNS OR REQUIRED TO PARTICIPATE IN ANY COLLECTION
ACTIVITIES.

ECHO0002735

## THE *Cheque*MARK SYSTEM AND
## PATENT FILING FOR PROTECTION OF PROPERTY

Description of System and Service:

The applicants, being Robert R. Hills and Henry R. Nichols, have designed and developed an overall system composed of the individual services any one of which, or combinations thereof, may be employed for the purpose of effecting payments for Point-of-Sale purchases paid from consumer funds secured in bank checking or depository accounts. Each sale or Transaction Event would be an electronic and "paperless" event negating the heretofore reliance on accepting and processing commercial bank drafts (personal or corporate checks).

The system is intended to be made available to subscribing merchants, businesses, and individuals as "system subscribers" wishing to employ selected services or combinations of services for the electronic processing and settlement of consumer purchases, the primary intent being to replace commercial bank drafts at the Point-of-Sale environment. Further, the system's operational parameters enable freedom from customary state or other geographically limiting criteria typical where accepting and processing "paper" checks. The system has been designed to respond as a national authorization and electronic settlement network negating the heretofore limitations to the locale of a particular system subscriber or the source bank of a consumer.

The system itself has been designed to perform in a fully automated manner enabling each Transaction Event to be processed by a system subscriber at Point-of-Sale in the presence the consumer causing thereafter, and in the event of an "Approval" of the Transaction Event, funds to be debited from an authorized consumer account for credit and electronic settlement by ACH ("Automated Clearing House") deposit to the subscriber's designated depository account. Authorized access to consumer accounts and credits to system subscriber depository accounts would be performed as "Off-Line" transactions by means of Electronic Funds Transfer ("EFT") through the Automated Clearing House ("ACH") Network or through the Federal Reserve System.

Scope of Imminent Patent Filing:

The applicants have designed a Point-of-Sale processing system composed of individual services selections which provide automated, electronic processing from bank checking or depository accounts. It is the objective of the applicants' system to automate the Point-of-Sale environment for processing consumer purchases of goods and services which, other than for the applicants' system, would necessitate the more traditional acceptance and processing of commercial bank drafts (personal and/or corporate checks). Individual Transaction Events would be administered under the applicants' system initiating a

ECHO0002736

terminal authorization inquiry and continuing through the electronic settlement of funds representing the Transaction Event from pre-approved consumer banking accounts.

Most dramatically, the system could virtually eliminate "paper" checks as an accepted means of consumer payment. In the place of personal and business checks, consumers would be provided their free and unrestricted access to funds secured in banking accounts by means of preauthorized electronic events. Participating merchants, businesses, and individuals, as "system subscribers", would electronically communicate with the system's data center for individual Transaction Event authorizations which, upon reconciliation of a day's activity, would result in an Electronic Funds Transfer ("EFT") by means of the Automated Clearing House ("ACH") accommodating an "Off-Line" debiting of preauthorized consumer Transaction Events from authorized and prenoted accounts. Subsequent thereto, each system subscriber would be credited with the total of all such daily authorized Transaction Events to its designated banking depository account.

Description of Services Provided Under Applicants' System:

It is contemplated that the applicants' overall electronic processing system will be comprised, at a minimum, of the following services which when individually\performed or where combined with other services establish a wholly unique processing medium enabling preauthorized access to consumers' checking account or bank depository reserves.

The primary services contemplated under the system would comprise, at a minimum, the following:

1. <u>Authorization</u> - This service supports electronic communication from Point-of-Sale to the system's data center (positive and negative) files thereby providing accurate inquiry responses as to the current posting status of a consumer's banking account and signaling the system subscriber that said account may be reasonably relied upon for consummating a Transaction Event ("Approval") or, where listed as delinquent, indicating that the account could not be so relied upon ("Denial").

2. <u>Check Replacement</u> - This service operates as an extension of Authorization enabling the system subscriber the capability of completing a Transaction Event by electronically logging the sale whereupon a Transaction Event Slip will be printed or manually prepared for consumer execution at the Point-of-Sale. By execution, the consumer authorizes the electronic accessing of funds secured in his/her authorized banking account in lieu of the more traditional issuance of personal or business checks. Funding settlement to the system subscriber would be effectuated by means of Electronic Funds Transfer via ACH or the Federal Reserve System.

3. <u>*ChequeMARK* Acceptance</u> - This service further speeds the Point-of-Sale processing of Transaction Events by consumer use

ECHO0002737

of an encoded, "Off-Line" Debit Card on which is inscribed the
pertinent information relative to the prenoted banking account
from which funds representing the Transaction Event would be
debited for payment to the system subscriber. Electronic
authorization of the cardholder's account status and subsequent
electronic settlement procedures would remain essentially
identical to processing under the Check Replacement Service.
Information pertaining to the consumer-cardholder and the
prenoted banking account to be employed for a Transaction Event
will be encoded upon the magnetic stripe portion of the plastic,
and terminal-readable, card.

The applicants' overall system has been configured to
support the *Cheque*MARK Card as a national, rather than regional
or localized debit card. Further, all cardholder issuances are
contemplated to be made directly under the *Cheque*MARK name or,
where local issuers are permitted, restricting such cardholder
issuances to those where an affinity were established to the
*Cheque*MARK system including thereto visible logo evidence for
easy recognition by all system subscribers.

4. Other Services — It is further contemplated that other
services, for which operational parameters have been designed,
will similarly be performed as optional components of the
applicants' system but are considered less "generic" in nature
and therefore the subject of complementary services available
per the request of individual system subscribers. Such would
include, but not be limited to, Point-of-Sale Check Truncation,
non-Point-of-Sale Check Truncation, and the electronic
processing/ACH settlement for pre-scheduled or Interval
Payments.

5. **Assured Payment Program** — The Assured Payment Program
provides payments to service subscribers for sale events
authorized at point-of-sale regardless of any subsequent
inability by individual sale events to be electronically settled
by ACH debiting of consumers' designated accounts. Service
coverage will be unilaterally applied for all ChequeMARK Card or
affinity card transactions and will be an available service
option for all Check Replacement Service service subscribers.
The base assessment rate by Payment Assurance Corporation will
be 1.40% of which a minimum of 0.05% and a maximum of 0.10% will
be allocated for commissioned residuals.

*Cheque*MARK Systems, Inc. will offer the Assured Payment
Program through its affiliate, Payment Assurance Corporation
("PAC"). PAC will internally monitor and track all ACH
point-of-sale debit events through daily automated computer
reporting. Sale events returned or rejected will, within
twenty-four hours, be re-submitted via the Automated Clearing
House (ACH) network. An item failing to settle after a second
such ACH effort will be set aside for collection and recovery.
The service subscriber's designated depository account will be
credited electronically with the total of each such authorized
but unsettled sale event from the PAC Reserve Account.
Thereafter, unsettled accounts will be noted ("flagged") on the
authorization database precluding additional transaction sale

ECHO0002738

events for any consumer where such a deficiency has arisen.

**Not A "Guarantee" . . . *DIRECT PAYMENT TO SUBSCRIBERS' ACCOUNTS !*** A fundamental and substantial distinction should be drawn between *Cheque*MARK's Assured Payment Program and the more familiar "Check Guarantee" programs. Under the latter, participating merchants are required to process "paper" checks, including all pre-processing informational and identification compliances. Further, the burden for notice in cases of returns falls either on the merchant directly or, where authority has been conveyed, to the merchant's depository banking affiliate. Thereafter, the merchant's submitted claims will, in most instances (10% industry procedural rejection rate), be paid or frequently "credited" against overall monthly service fee assessments. In addition, uncollected submittals commonly require various degrees of merchant participation with legal and/or court proceedings.

As the predecessor to *Cheque*MARK's Assured Payment Program, check guarantee programs have been and remain prolific within the marketplace but, upon review, offer little real benefits in reducing point-of-sale procedures, providing an accurate and more prompt checkout, or improving the time parameters for collecting the cash receipts of sales. Further, their costs and the duration of time typically demanded to collect and/or be "credited" for claims lay significant question as to the existence of any true value.

In stark contrast, the Assured Payment Program supports merchant payment, not deferred "credits", within forty-eight (48) hours for the total of each terminal authorized transaction sale event, regardless of any subsequent returns or the necessity of submitting individual transaction sale events for collection/recovery. The Assured Payment Program is the logical extension of *Cheque*MARK's Check Replacement Service. Having automated a merchant's point-of-sale and thereby creating a "checkless" environment, the merchant is released from and "uninvolved" with the processing of electronic checking events, mandatory notice for transfer of accounts to recovery, or any direct participation in collections.

Resultantly, a merchant subscriber's responsibilities are lowered to those more commonly associated with cash or automated credit card sales. Complicated procedural compliances are eliminated. And, the merchant does not have to be hampered by or participate in the processing of commercial bank drafts ("paper checks") or the negative impact of their return.

Summarization of Unique Nature of Applicants' System:

In each of the above described services, the system's designed objective has remained fundamentally constant. The intent is to provide and support an alternate means for consumer payments that, above all else, operates to replace commercial bank drafts in the Point-of-Sale environment but, in their stead, assure consumers greater access and use to funds

ECHO0002739

domiciled in personal or corporate banking accounts.    Further,
the system provides service subscribers a significantly improved
prospect of collecting the underlying monies represented by
Transaction Events, reduced time parameters for the collecting
the cash receipts from Transaction Events, and a pronounced
lowering of cumbersome procedures otherwise mandated where
accepting and processing commercial bank drafts.

    The uniqueness of the applicants' system is in part defined
by the numerous benefits derived by system subscribers.    The
system, however, will function to the mutual advantage and best
interests of both the system subscriber and the consumer.    The
system subscriber will be provided the means to electronically
authorize and settle Transaction Events absent the delays and
increased risks common where accepting paper checks for payment.
Consumers will be assured their unrestricted access to banking
account funds absent traditional limitations and cumbersome
checkout procedures otherwise attributable with efforts to "pay
by check".

    More germane to the applicants' determination to proceed
with patenting of the system and its integrated services are the
resulting effects which produce a wholly new payment medium for
Transaction Events conducted at the Point-of-Sale.    By design,
the objective of the applicants' system is to create and support
a "checkless" Point-of-Sale environment yet foster easier
consumer access to and use of funds domiciled in bank checking
or depository accounts.    Each Transaction Event performed by a
system subscriber would occur in the presence of the affected
consumer.    In each such instance, the Transaction Event would be
authorized against the system's data base files and consummated
only with a consumer acknowledgement and express consent for
electronic access to personal or corporate banking accounts.

    System subscribers will realize increased accuracy in
processing, be provided a more prompt settlement of funds, and
realize an improved prospect for collecting the cash receipts
representative of Transaction Events.    Further, the processing
of Transaction Events will be performed in substantially less
time and at a fraction of the overall costs typically required
for acceptance and processing of commercial bank drafts.
Additional benefits inuring to the system subscribers include
the prospect for their lowered reliance upon and consumers
reduced usage of more expensive payment options such as credit
cards which typically assess excessively high discount fees per
transaction.    Reductions may also be evidenced to sales paid by
"cash" thereby reducing the risks to consumers forced otherwise
to carry this form of negotiable instrument and benefiting the
system subscriber by a lowered incidence of employee theft.

    The applicants' system has been designed for national
accessibility and use.    Regional and demographic limitations
indigenous to existing Point-of-Sale processing for commercial
bank drafts or their "automated" counterpart, ATM ("On-Line")
debit cards have been, in their entirety, overcome.    The
system's operational parameters, founded upon Off-Line
electronic funds transfers by ACH or Federal Reserve, negate the

ECHO0002740

common necessity of consumer usage and system subscriber acceptance of personal or business checks for Point-of-Sale payment. As a direct result of the applicants' system and proprietary programming combined with available technologies and an "Off-Line" ACH settlement format, the system will not suffer the adverse impact typical with the regional efficiencies and consumer-absorbed expenses of ATM Debit Cards. Resultantly, activation of the applicants' system will not impose geographic or regional limitations on any system subscribers. System subscribers may process Transaction Events and consumers may purchase goods and services that require electronic settlement requests from and to literally any banking institution within the United States. Processing beyond the geographic boundaries of the United States is further contemplated as similar agencies, regulatory bodies, and inter-banking mechanics exist in foreign countries capable of facilitating the means of electronic monetary transfers from preauthorized banking accounts.

ECHO0002741

THE *Cheque*MARK SYSTEM

RE : <u>SCOPE AND SUMMARY OF TECHNOLOGICAL REQUIREMENTS</u>

<u>Description of Date Base Files</u>:

   *Cheque*MARK will require the establishment and maintenance for access searches of three interconnected but separate data files. Each must be accessible by dial-up procedures operating, in most instances, under "Split Dial" format from a point-of-sale terminal device installed for the primary purpose of bankcard authorizations and/or draft capture. Terminal prompts would direct an operator/user to process one of three optional inquiry types. It should be further noted that, whether by employment of multiple Split Dial keys or consolidating with an expanded prompt string under a singular key, any one or all three primary functions must be capable of being performed at a single POS terminal with the discretionary choice and control vested to the system using service subscriber. The inquiry types and data base format responses would be as follows :

   1. *Cheque*MARK Card Authorization - Having depressed the assigned Split Dial key and thereafter been prompted, the POS terminal operator would "slide" a magnetic stripped *Cheque*MARK or *Cheque*MARK affinity encoded card through the POS terminal and enter the "Sale Amount" requested for authorization. Thereupon, the terminal's dial-up capabilities would direct the inquiry to the computer data file center for authorization against the *Cheque*MARK "POSITIVE" file of current cardholders whose accounts were listed in "good standing". Inquiries where such a "Match" were found would require an "Approved" return message from the data file to the inquiring POS terminal. Conversely, a "No-Match" to inquiry would result in a "Declined" notice. *Cheque*MARK, presumedly in an automated uploading mode, would be capable of forwarding daily status notifications to the central data files activating new cardholder accounts on the POSITIVE cardholder file or submitting corrective entries to delete delinquent or terminated accounts.

   2. <u>Check Authorization</u> - Having depressed the assigned Split Dial key and thereafter been prompted, the POS terminal operator would manually enter account numbers from a personal or business check or, where fully automated, enter a specimen check through a MICR Check Reader device interfaced with the terminal, whereupon the terminal's screen would display the check's numbers for verification. Thereafter, the operator would enter the "Sale Amount" requested for authorization. The terminal's dial-up capabilities would then direct the inquiry to the computer data file center for authorization <u>first</u> against the *Cheque*MARK POSITIVE file of "prenoted" bank/checking account

numbers whose accounts were listed in "good standing". A
successful "Match" to an inquiry would result in an "Approved"
notice from the data file to the inquiring terminal. A
"No-Match" to inquiry would <u>not</u>, however, immediately result in
a "Declined" response. Each inquiry preliminarily resulting in
a No-Match would be instantly forwarded/"rolled" to the third
data file preceding any return notice to the inquiring terminal.
This third file is anticipated to be.the Shared Check
Authorization Network ("SCAN") data base maintained on our
computer data file center. Referrals to SCAN, a NEGATIVE data
file, enable potential acceptance of Transaction Events
involving consumers "Unknown" to *Cheque*MARK's proprietary,
POSITIVE files. A "Match" on the SCAN NEGATIVE file would
result in a "Declined" notice; a "No-Match" would conversely
send notification to the inquiring POS terminal of an "Approved"
event. Of significant importance, the bank/checking account
information for each such "Unknown" consumer's transaction
would, subsequent to a SCAN "Approved" notice, be posted to the
*Cheque*MARK POSITIVE file and prenoted through the ACH
("Automated Clearing House") for future Transaction Events.
*Cheque*MARK, presumably in an automated mode, would be capable of
uploading daily corrections to the POSITIVE data file including
notices of new accounts approved through SCAN and deletions
where settlement for consumer checking account events, initially
approved, were subsequently dishonored. The SCAN data base is
similarly uploaded with daily activity status corrections
through the underlying arrangements with Electronic Transaction
Corporation, the proprietary administrator for the SCAN data
base.

   3. <u>Check Replacement Service</u> - Inquiries initiated as  Check
Replacement requests would function in nearly an identical
manner as prescribed for Check Authorization but the records for
these events, where culminating in "Approved" notices, would be
separately preserved. Check Replacement inquiries would be
processed first through the *Cheque*MARK POSITIVE data file and,
where no match were found, proceed to the SCAN data base file
prior to transmitting an "Approved" or "Declined" notice to the
inquiring POS terminal. A Match in the *Cheque*MARK data file
would denote a prenoted consumer-user whose account was in "good
standing" and would not be required to "roll" to SCAN. Check
Replacement events would be reported to and stored by the
computer data file center under a file classification
identifying the unique and revolutionary nature of the Check
Replacement Service. The total of daily, approved Transaction
Events would be "checkless" sales whereby the service
subscribing merchant will have submitted requests for electronic
ACH settlement for all preauthorized consumer purchases. No
commercial bank note ("Paper Check") would have been accepted or
processed by the service subscriber. In each such event, a
Consumer, at the point-of-sale, will have executed an electronic
access ("Off-Line Debit") authority "Sales Slip" which are
automatically printed upon a terminal's receipt of an "Approved"
notice.

ECHO0002743

## Terminal Programming and MICR Check Reader Interface

### Requirements:

It is presumed that Split Dial POS terminal programming and all prompt strings for MICR Check Reader interfacing would be designed and logged onto the *Cheque*MARK computer center for terminal programming downloads and service subscriber account activations. Critical components of such programming include the following :

1. Programming for MICR / Terminal Interface - Most service subscriber locations to be activated with *Cheque*MARK Systems will either possess or acquire a POS terminal and logging printer. Those utilizing or being upgraded to a dual port Tranz 330 or higher terminal would facilitate MICR interface through the pin port rather than printer port. Thusly, support programming and the cables provided must be responsive to this planned input format for MICR integration. Instances involving the singular port of a Zon Jr, XL terminal would require a "Smart Y-Cable" enabling both a printer and the MICR Check Reader to operate during each Transaction Event.

2. Singular Split-Dial Key Format - As cited above, the preferred format for terminal operations would suggest all *Cheque*MARK services initiate from a singular split dial key. Thereafter, the "prompt string" would proceed in a manner such as i) "Card = 1" ; "Check = 2" requiring operator selection; then, where selecting a checking account inquiry ii) the operator would respond to a secondary prompt of "Auth = 1" ; "Replace = 2". Under either a *Cheque*MARK card or a checking account event, these entry selections would precede the mag stripe "reading" of a card/submittal of a check through the MICR (Account Identification), the entry of the requested sale amount, and the terminal's dial-up for authorization against the computer data file center.

3. Terminal Acceptance of MICR String - Terminal programming and MICR interface should result in the transmittal for data center approval of the entire ABA/Transit and personal or corporate checking account numbers. Instances where printed checks add the individual check's number to the end of the account number can be "dropped" by MICR Check Reader dip switch settings. Subsequent to a terminal's receipt of the MICR number string but prior to the operator's entry of the requested sale amount and authorization dial-up, a verification prompt "flashing" the ABA and account numbers must be displayed on the terminal's screen requiring the operator to depress "Enter" to proceed, if correct, or "Clear", if incorrect and thereby enabling the terminal operator to resubmit the specimen check through the MICR Check Reader.

ECHO0002744

4. <u>Processing by Entire MICR String Recognition</u> - The computer data file center must receive and process Transaction Event authorization requests utilizing the entire MICR string for accurate, error-free identification of both the consumer bank and specific checking account to participate in a sale. Such is of particularly critical importance for those Transaction Events submitted under the Check Replacement Service where no paper check is accepted or processed. ACH settlement criteria mandate exact recall for the bank and checking account numbers to properly complete any debit request.

5. <u>Transaction Event ("Sales") Slips</u> - System programming for MICR/POS terminal activation must complete each Transaction Event with the logging printer generation of a Transaction Event ("Sales") Slip for each "Approved" authorization inquiry processed. Each such Transaction Event Slip must be exacting in its retention of account numbers and the sale amount enabling both the consumer and system subscriber to be provided "hard copy" receipts of the event. Also included would be a clear printing of the transaction type; "*Cheque*MARK Card", "Check Authorization", or "Check Replacement". More germane to the legal compliances and mandatory criteria associated with electronic access and debits, preferential scripted language would be printed immediately preceding the consumer's signature line specifically authorizing electronic access in payment of the requested transaction sale amount.     \

6. <u>Miscellaneous System Programming Requirements</u> - In addition to the primary functions and workings required for POS terminal programming and MICR Check Reader interface, other matters are of equal consequence. These include, but are not necessarily restricted to, the following :

a) <u>Daily Activity Summation Reports</u> - Whether programmed for printing under a terminal's "shadow memory" capabilities or more likely accommodated by terminal dial-up to the "Host" files, each point-of-sale terminal location must be capable of generating printed summations of daily activity. These reports must list and separately total each authorization/service type, whether produced as a singular report or the result of multiple terminal "closeout" procedures.

b) <u>Transaction Event Cancellation Notices</u> - Instances will arise with either the *Cheque*MARK Card or Check Replacement Service where previously authorized Transaction Events will require the operational equivalent of a bankcard "Void" or "Credit" notation. The methodology must be available for Split Dial messages to the computer data file center of a post-authorization "Error" or "Transaction Cancellation" notice. Such need not be programmed for operation as an extension of the initial terminal key prompt. This method could, however, be utilized whereby the initial "Card = 1" ; "Check = 2" prompt could similarly process a third, either visible or

ECHO0002745

non-disclosed, "Cancel" procedure instituted by depressing the "3" key (i.e "Cancel = 3"). If determined operationally superior, the "Cancel" procedure could be programmed for service under a separate key or at an alternate terminal prompt location. Under either format, a previously approved and logged event, while recorded on the data files and reported on the service subscriber's daily Activity Summation Report, would also carry an offsetting, "Flagged" cancellation notice. The underlying detail both as to the initially authorized event and its subsequent cancellation must both be readily discernible in summation reports for each affected party.

**SPECIMEN :**

### Activity Summation Report

| Type | Item# | Acc# | Amt |
|------|-------|------|-----|
| Card | 001 | 455000678 | $100.00 |
| Auth | 002 | 112334556 | $ 50.00 |
| Repl | 003 | 333455566 | $ 75.00 |
| *Canc* | *004* | *222987450* | *$ 95.00* |

**TOTALS:**

| | | |
|------|------|------|
| Card ...... | 1 ........ | $100.00 |
| Auth ...... | 1 ........ | $ 50.00 |
| Repl ...... | 2 ........ | $ 75.00 |

NOTE - "Canc" identifies detail of a "Repl" event later canceled and deleted from the "TOTALS".

**CHECK REPLACEMENT SALES SLIP :**

Merchant Name
Street Address
City, ST Zip
Merchant Act #

TIME 00:00 _M            DATE 00/00/00
BANK ACT NO. 000000000000
TRANSIT NO   000000000

SALE AMOUNT              **$ 0,000.00**

TERMINAL ID  0000000000

I herewith authorize *Cheque*MARK Systems
to electronically access my designated
checking account for the payment of the
above referenced purchase.  I acknowledge
that sufficient funds are available within
my account for the payment of this sale.

Name (PRINT)_____
Street _____
City _____ST_____Zip_____

Tel. Number: (_____) _____ - _____

**I ACKNOWLEDGE THAT RETURN FEES WILL BE
IMPOSED SHOULD MY PAYMENT BE DISHONORED AND
UNDERSTAND THAT IT IS UNLAWFUL TO AUTHORIZE
PAYMENTS FOR WHICH ADEQUATE MONIES ARE NOT
AVAILABLE WITHIN MY ACCOUNT.**

X_____
 **Authorizing Signature**

  APPLY FOR YOUR *Cheque*MARK CARD TODAY!

ECHO0002747

**MANUAL POS SALES SLIP :**

Merchant Name
Street Address
City, ST Zip
Merchant Act #

**CUSTOMER BANKING INFORMATION:**

BANK ACT NO. _____

TRANSIT NO   _____

**SALE AMOUNT** . . . . . . . . . . . . . . . . **$**
_____

   I herewith authorize ChequeMARK Systems to electronically
access my designated checking account for the payment of the
above referenced purchase amount.  I acknowledge that sufficient
funds are available for the payment of this sale.

Name (PRINT)_____
Street _____
City _____ST_____Zip_____

Tel #   (_____) _____ - _____

**I FURTHER ACKNOWLEDGE THAT RETURN FEES WILL BE IMPOSED SHOULD MY
PAYMENT BE DISHONORED AND UNDERSTAND THAT IT IS ILLEGAL TO
AUTHORIZE PAYMENTS FOR WHICH ADEQUATE MONIES ARE NOT AVAILABLE
WITHIN MY ACCOUNT.**

X_____
                        **Authorizing Signature**

**APPLY FOR YOUR *Cheque*MARK CARD TODAY!**

ECHO0002748



US005484988A

# United States Patent [19]

## Hills et al.

| | |
|---|---|
| [11] | Patent Number: | 5,484,988 |
| [45] | Date of Patent: | Jan. 16, 1996 |

[54] **CHECKWRITING POINT OF SALE SYSTEM**

[75] Inventors: **Robert R. Hills**, St. Augustine, Fla.; **Henry R. Nichols**, McLean, Va.

[73] Assignee: **Resource Technology Services, Inc.**, Vienna, Va.

[21] Appl. No.: **257,390**

[22] Filed: **Jun. 9, 1994**

### Related U.S. Application Data

[63] Continuation of Ser. No. 975,717, Nov. 13, 1992, abandoned.

[51] Int. Cl.⁶ ........................................ G06F 15/30
[52] U.S. Cl. .......................... 235/379; 235/380
[58] Field of Search ........................ 235/379, 380

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,824,544 | 7/1974 | Simjian .................... 340/147 A |
| 3,845,470 | 10/1974 | Schuller ................... 340/149 A |
| 4,270,042 | 5/1981 | Case ........................... 235/379 |
| 4,404,649 | 9/1983 | Nunley et al. ............... 364/900 |
| 4,523,330 | 6/1985 | Cain ............................... 382/7 |
| 4,580,040 | 4/1986 | Granzow et al. ............ 235/379 |
| 4,617,457 | 10/1986 | Granzow et al. ............ 235/379 |
| 4,672,377 | 6/1987 | Murphy et al. ........... 340/825.34 |
| 4,673,802 | 6/1987 | Ohmae et al. ............... 235/379 |
| 4,678,895 | 7/1987 | Tateisi et al. ............... 235/379 |
| 4,678,896 | 7/1987 | Carlson et al. ............. 235/380 |
| 4,743,743 | 5/1988 | Fukatsu ...................... 235/379 |
| 4,810,866 | 3/1989 | Lord, Jr. ..................... 235/379 |
| 4,823,264 | 4/1989 | Deming ....................... 235/379 |
| 4,933,536 | 6/1990 | Lindemann et al. ......... 235/375 |
| 4,934,772 | 6/1990 | Sakuma et al. ............. 350/6.5 |
| 5,053,607 | 10/1991 | Carlson et al. ............. 235/379 |

Primary Examiner—Harold Pitts
Attorney, Agent, or Firm—Thomas M. Champagne; Jon L. Roberts; Roberts & Associates

[57] **ABSTRACT**

A point of sale system designed to read information from a consumer's check, credit card, or manual input with a subsequent debiting of a consumer's account and crediting a merchant's account for the goods or services provided. Point of sale terminals are designed to accept a form of credit card with a consumer's bank account information encoded thereon or in the alternative to read the MICR number from a consumer's check in order to verify that a consumer has an appropriate balance to conduct the transaction with a given merchant. Thereafter the transaction of that information is transmitted to a central computer system which verifies the consumer's credit worthiness and stores the transaction event information for subsequent bank reconciliation via the ACH network. The invention eliminates the need for paper checks with all bank reconciliation being accomplished electronically.

**20 Claims, 8 Drawing Sheets**



```
   ,300              ,302            ,304        ,306
┌─────────────┐   ┌─────────────┐   ┌──────┐   ╭──────╮
│ POINT OF SALE│   │   CENTRAL   │   │ BANK │   │  ACH │
│   TERMINAL   │   │  COMPUTER   │   │      │   ╰──────╯
└─────────────┘   └─────────────┘   └──────┘
```



## FIG. 1



## FIG. 2

**U.S. Patent**      Jan. 16, 1996      Sheet 2 of 8      5,484,988



**FIG. 3**

LML-EP 000003



*FIG. 4*

LML-EP 000004



FIG. 5

LML-EP 000005

U.S. Patent          Jan. 16, 1996          Sheet 5 of 8          5,484,988



*FIG. 6*

LML-EP 000006



*FIG. 7*

U.S. Patent        Jan. 16, 1996        Sheet 7 of 8        5,484,988

Merchant Name
Street Address
City, ST  Zip
Merchant Acct #

TIME 00:00 _M                    DATE 00/00/00
BANK ACCT. NO. 000000000000
TRANSIT NO.  000000000

SALE AMOUNT                       $  0,000.00

TERMINAL ID  0000000000

I herewith authorize ChequeMARK Systems
to electronically access my designated
checking account for the payment of the
above referenced purchase.

Name (PRINT) _____

Street _____

City _____ ST_____ Zip _____

Tel. Number:  (_____) _____ — _____

I ACKNOWLEDGE THAT RETURN FEES WILL BE
IMPOSED SHOULD MY PAYMENT BE DISHONORED
AND UNDERSTAND THAT IT IS UNLAWFUL TO
AUTHORIZE PAYMENTS FOR WHICH ADEQUATE
MONIES ARE NOT AVAILABLE WITHIN MY
ACCOUNT.

X_____
    Authorizing Signature

# FIG. 8

LML-EP 000008

**U.S. Patent**      Jan. 16, 1996      Sheet 8 of 8      5,484,988

Merchant Name
Street Address
City, ST  Zip
Merchant Acct #

CUSTOMER BANKING INFORMATION:

BANK ACCT. NO. _____

TRANSIT NO. _____

SALE AMOUNT . . . . . . . . . . . . . . . . . . . $ _____

I herewith authorize ChequeMARK Systems to electronically access my designated checking account for the payment of the above referenced purchase amount.   I acknowledge that sufficient funds are available for the payment of this sale.

Name (PRINT) _____

Street _____

City _____ ST _____ Zip _____

Tel. Number: ( _____ ) _____ — _____

I FURTHER ACKNOWLEDGE THAT RETURN FEES WILL BE IMPOSED SHOULD MY PAYMENT BE DISHONORED AND UNDERSTAND THAT IT IS UNLAWFUL TO AUTHORIZE PAYMENTS FOR WHICH ADEQUATE MONIES ARE NOT AVAILABLE WITHIN MY ACCOUNT.

X_____
Authorizing Signature

# FIG. 9

5,484,988

1

# CHECKWRITING POINT OF SALE SYSTEM

## RELATED APPLICATION

This application is a continuation of Ser. No. 07/975,717 filed Nov. 13, 1992, now abandoned.

## FIELD OF THE INVENTION

This invention relates to the field of Point-of-Sale systems and more particularly to the integration and processing of purchases whereby a check is used as the basic source of identification of the individual and of the individual's bank and whereby the bank account is debited.

## Background Art

Numerous devices exist for processing checks. For example, U.S. Pat. No. 4,933,536 to Lindemann, et al., describes a check processing device which is used together with a Point-of-Sale terminal. This particular device involves copying and taking a picture of an individual whereby a dishonored check could then be traced to the person who has offered it.

U.S. Pat. No. 4,810,866 to Lloyd, Jr., describes a check validation system again located together with a Point-of-Sale system for imprinting and otherwise physically dealing with a check.

Other systems also deal an apparatus for handling checks at a point of sale. For example, U.S. Pat. No. 4,743,743 to Fukatsu describes one such transaction apparatus where a check is examined by a reader. U.S. Pat. No. 4,672,377 to Murphy, et al. describes a check authorization system wherein a check is imprinted with a bar code and information concerning customers which are stored in a database. U.S. Pat. No. 3,845,470 to Schuller discloses a vending system using a modified form of a check which is imprinted with identification codes, when someone attempts to use the check in purchasing goods and services, a vending operation will not place the order if information associated with the check is not valid in a particular database.

Other check-based financial systems have also been the subject of invention. U.S. Pat. No. 4,617,457 addresses an ATM or automatic teller machine form of cashing checks. Such systems create a picture of the check involved and also involves checking against a specialized database to insure that the check is a "valid" one (see also U.S. Pat. No. 4,580,040 to Granzow et al.).

Another generic category of financial systems deals with methods of handling the financial transactions apart from the physical handling of the check itself. For example, U.S. Pat. No. 3,824,544 to Simjian describes a merchant issued "check" which can be used in the purchase of goods and services and upon purchase, a specialized code is evaluated to determine if the check is being validly utilized.

U.S. Pat. No. 4,404,649 to Nunley et al. describes a document processing system which generally discloses a method of reading checks for processing a wide variety of financial documents.

U.S. Pat. No. 4,523,330 to Caine also describes a method for processing financial documents which systems also includes a Point-of-Sale terminal for generating image data from checks as they are being processed. This patent is drawn principally to the actual terminal itself.

2

U.S. Pat. No. 4,673,802 to Ohmae et al. describes a central processing system having stored data relating to the accounts of users. Users are approved or disapproved at the Point-of-Sale based upon information in the database.

U.S. Patent No. 4,270,042 to Case discloses a point of sale system that requires a consumer to prepay a sum of money into a special account that is accessed only by the system. This amount is inscribed on the card, and when a transaction is made using the system, the amount of the transaction is punched out of a designated area on the card. This amount, along with a signature and other information, is supplied on a draft negotiable instrument, which is given to the merchant at the time of the transaction. Thus, the Case system does away with the use of bank checks in effecting the transaction, but requires the use of specialized prepaid draft negotiable instruments that must be rendered to the merchant.

U.S. Patent No. 4,823,264 to Deming discloses a home banking system that can be used to transfer funds to different payees in satisfaction of debts incurred through previous purchases, use of utilities, etc. The system is consumer driven; that is, it is contemplated for use by the payor on a home personal computer. While the Deming system does away with the use of bank checks, account and other information must be keyed into the system. The Deming system cannot be used to read account and other information directly from an ordinary bank check and has no use for bank checks as instruments other than negotiable paper. Further, the Deming system cannot be used to transfer funds at the time of purchase and is not workable at the point of sale; the system can only be used to pay debts that have been incurred in the past and have accumulated.

Finally, U.S. Pat. No. 4,678,896 to Carlson et al. describes a Point-of-Sale system whereby an apparatus is provided to secure the processing and imprinting of checks.

All of these above patents deal with the specific problem of how to accept a check from a customer for the purchase of goods and services. They do not in any way address the subsequent processing of checks nor do they address the process by which checks are cleared through the normal automatic check handling clearinghouse operations that exist in the financial world. Thus, the interaction of these systems with the automated clearing house ("ACH") process is not addressed in any way. This is particularly important since if any Point-of-Sale check handling system is to interact with the ACH mechanism it must adhere to that processing scheme and must lend itself to use with a processing scheme.

Further, some of the currently used systems described above require the use of a bank check as a negotiable instrument which must be surrendered to a merchant. Some of the systems do away with the use of a bank check altogether, but require a debit card or a specialized draft instrument to be used only with the particular system. None of these systems completely does away with the need and use for a negotiable draft instrument while using the consumer's bank check for identification and verification only. It is therefore an objective of the present invention to provide such a system.

It is an objective of the present invention to be adaptable for use with the ACH system and to be smoothly incorporated into it. In this fashion, the present invention will immediately be useful for a much wider range of financial transactions above and beyond those contemplated and disclosed in the background references discussed above.

## Summary of the Invention

The present invention comprises a process and apparatus which may be employed for the purpose of effecting pay-

LML-EP 000010

5,484,988

3

ments for point-of-sale purchases of goods and services paid from consumer funds secured in bank checking or depository accounts. Each sale or "Transaction Event" would be an electronic and "paperless" event thereby eliminating reliance on accepting and processing commercial bank drafts (personal or corporate checks) and the physical handling of those bank drafts thus replacing commercial bank drafts at the point-of-sale.

In contrast to known systems, the present invention is a merchant driven system that can be used to process a transaction at the point of sale and at the time of purchase. The system is intended to be made available to subscribing merchants, businesses, and individuals herein referred to as "system subscribers" wishing to employ the method and apparatus of the present invention for the electronic processing and settlement of consumer purchases. Further, operational parameters of the present invention allow freedom from customary state or other geographically limiting criteria typical when accepting and processing "paper" checks. The system is designed to act with the national authorization and electronic settlement network known as the ACH system.

The system is designed to perform in a fully automated manner enabling each Transaction Event to be processed by a system subscriber as a point-of-sale transaction in the presence of the consumer. When the transaction event is "approved" funds are debited from an authorized consumer account for credit to the system subscriber and electronic settlement by ACH deposits the transaction amount to the subscriber's designated depository account. Authorized access to consumer accounts and credits to system subscriber depository accounts are performed as "Off-Line" transactions by means of Electronic Funds Transfer ("EFT") through the ACH Network or through the Federal Reserve System.

The invention comprises a point-of-sale processing system comprising electronic data processing equipment which allows individual services selections which provide automated, electronic processing from bank checking or depository accounts. It is the objective of the present invention to automate the point-of-sale environment for processing consumer purchases of goods and services which, other than for the system of the present invention, would necessitate the more traditional acceptance and processing of commercial bank drafts (personal and/or corporate checks). Individual Transaction Events are administered under the system of the present invention by initiating a terminal authorization inquiry and continuing through the electronic settlement of funds representing the Transaction Event from the pre-approved consumer banking accounts.

It is a further objective of the present invention to eliminate the need for "paper" checks as an accepted means of consumer payment. In the place of personal and business checks, consumers would be provided free and unrestricted access to funds secured in bank accounts of various types by means of preauthorized electronic events. System subscribers electronically communicate with the data center of the present invention for individual Transaction Event authorizations which, upon reconciliation of a day's activity, result in an EFT by means of the Automated Clearing House accommodating an "Off-Line" debiting of preauthorized consumer Transaction Events from authorized accounts. Thereafter, each system subscriber is credited with the total of all such daily authorized Transaction Events to its designated banking depository account.

The present invention comprises logic which allows the following services which when individually performed or

4

where combined with other services establish a wholly unique processing medium enabling preauthorized access to consumers' checking account or bank depository reserves.

Authorization—This service supports electronic communication from point-of-sale to the system's central computer. The data center stores positive and negative files concerning consumer accounts thereby providing accurate inquiry responses regarding the current posting status of a consumer's banking account and signaling the system subscriber that said account may be reasonably relied upon for consummating a Transaction Event (i.e., an "Approval") or, where listed as delinquent, indicating that the account may not be so relied upon (i.e., a "Denial").

Check Replacement—This capability operates as an extension of Authorization enabling the system subscriber the capability of completing a Transaction Event by electronically logging the sale whereupon a Transaction Event Slip will be printed or manually prepared for consumer execution at the point-of-sale. By execution of the Transaction Event Slip, the consumer authorizes the electronic accessing of funds secured in his/her authorized banking account in lieu of the more traditional method of issuing personal and business checks. Funding settlement to the system subscriber would be effectuated by means of Electronic Funds Transfer via ACH or the Federal Reserve System as opposed to physically processing and transferring checks among banks.

Bank Transaction Card—As part of this invention on "Off-Line" Debit Card is established on which is stored the information relating to the banking account from which funds representing the Transaction Event would be debited for payment to the system subscriber. This information may be stored on the card itself in encrypted or unencrypted form or may be stored in the central computer where access to such information is gained via special control characters or access codes stored on the card. Electronic authorization for withdrawal of funds from the cardholder's account and subsequent electronic settlement procedures remain essentially identical to procedures under the Check Replacement service described above. Information relating to the consumer-cardholder and the appropriate banking account to be debited for a Transaction Event will be encoded upon the magnetic stripe portion of the plastic, and terminal-readable, card.

Thus, the overall objective of the present invention is to provide and support an alternate means for consumer payments for goods and services that operates to replace commercial bank drafts in the point-of-sale environment. Simultaneously, the present invention assures consumers greater access to and use of funds in personal or corporate banking accounts. Further, the system provides system subscribers a significantly improved prospect of collecting the underlying monies for Transaction Events, reduced time for the collecting the cash receipts from Transaction Events, and a pronounced lowering of the present cost of cumbersome procedures otherwise mandated by the existing ACH system for accepting and processing commercial bank drafts.

A further objective of the present invention is to significantly reduce the use of checks as negotiable instruments in effecting the purchases of goods or services and to further reduce the consumers reliance on credit cards or cash for transaction events.

Detailed Description of the Preferred Embodiment

The method of the present invention begins with the electronic recording of consumer information at a system

LML-EP 000011

5,484,988

5

subscriber's location using a point-of-sale terminal. This information is obtained in the presence of the consumer and occurs prior to any "Approval" either for the Transaction Event or for the ultimate crediting of the System subscriber's designated depository account. A Transaction Event involves a series of events initiated by a system subscriber's request to sell goods or services by payment from funds secured in a consumer's banking account. First, the consumer's banking account status will be verified through accessing the central computer files of the present invention. Verification that an account may be accessed is established alternatively by means of an encoded, magnetic strip card, or by input of account identification numbers from a consumer's bank account. A more traditional identification of the consumer could also occur including visual examination of driver's license or similar and acceptable picture "ID" however this is not considered part of the present invention.

As an integral portion of each Transaction Event, the system subscriber's location, date and time, and requested sale amount is automatically logged into the system when a system subscriber first accesses the invention. Finally, a Transaction Event Slip ("Sales Slip") will be produced by a printer integral to the point-of-sale terminal and will be executed by the consumer in the amount of the stated purchase with inscribed language defining the Transaction Event and specifically providing consumer authorization for electronic access to his/her banking account. Thereafter, the consumer account will be debited and the proceeds credited to the system subscriber's designated depository account along with all other similar Transaction Events representing the total of the system subscriber's daily activity. Debiting of consumer accounts and settlement deposits to each system subscriber is performed by means of Off-Line electronic funds transfer through and by the ACH or Federal Reserve System.

Equipment Configuration—The present invention can operate with nearly every conceivable point-of-sale equipment system. The central computer system accepts data transmitted from the system subscriber's existing point-of-sale equipment or that which is added to augment service performance. The point of sale terminal of the present invention is implemented in a number of ways, most preferred, however, being activation under a fully automated format. Such a fully automated system generally comprises a dual-port terminal with magnetic stripe reading capabilities interfaced with a logging printer capable of providing individual Transaction Event Slips for consumer execution, and a MICR check reader, optical character recognition ("OCR") equipment, or other device. Variations to this configuration are particularly possible where the system of the present invention is to be activated under a "Split-Dial" feature installed to function within the operational parameters of existing point-of-sale equipment primarily dedicated to bankcard ("credit card") processing. It is contemplated that services may in the future be administered using the present invention with a singular point-of-sale hardware device which, as a function of its design, would incorporate all or most of the service capabilities of an integrated terminal, logging printer, and MICR Check Reading device. The system of the present invention can alternately be interfaced with electronic cash registers now on the market.

Communications links from point-of-sale terminals to the central computer of the present invention will typically be in the form of telephonic network communications over a public switched telephone network ("PSTN") or over other approved networks. Transaction Event verification will occur as a result of point-of-sale terminal access to the

6

central computer's positive and/or negative data files. "Approved" or "Declined" notifications are made to the Point-of-Sale device over the PSTN. All data files will be centrally located and maintained on the invention's central computer data bases. Portions of the data base include but are not limited to third party data files such as the Shared Check Authorization Network ("SCAN") (trademark) data base.

Individual transactions or groupings of transactions are first approved by soliciting an "Authorization" prior to the completion of any requests for electronic funds transfer. To maintain an accurate status of file information for authorizations to subscribing merchants, businesses, and/or individuals, separate data bases are maintained. Current cardholder or banking account status are updated daily and instantly available for point-of-sale inquiry for Transaction Event authorizations. updated daily and are instantly available for point-of-sale inquiry for Transaction Event authorizations.

System subscribers point-of-sale equipment is interfaced to the central computer of the present invention by means of a telephonic network which is able to support communication from a plurality of point-of-sale terminals. Programming of the point-of-sale terminal causes an automatic "Dial-Up" to the central computer and provides an automatic query and response sequence affirming or denying the Transaction Event. The addition of local entry hubs may be installed to better facilitate the speed or economics of communications with the data files. Alternatives to telephonic networks may involve use of satellite communications or enhanced radio transmissions. Similarly, the system's data files and associated Check Replacement Service are contemplated to be responsive to emerging point-of-sale devices intended to seek authorizations by the alternate means of voice pattern recognition, fingerprint identification, retina scan, "smart" chips, and/or consumer or check image and/or signature broadcasting.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1—System overview of the present invention

FIG. 2—The point-of-sale terminal

FIG. 3—The Central Computer System

FIGS. 4–7—The process Data Flow

FIG. 8—Transaction Event Sales Slip

FIG. 9—Manual Transaction Event Sales Slip

DETAILED DESCRIPTION OF THE
PREFERRED EMBODIMENT

Referring to FIG. 1 an overall schematic of the present invention is described. Point-of-sale terminals 300 communicate over normal PSTN telephone lines with a central computer system 302 which in turn communicates with a banking institution 304 for purposes of debiting consumer accounts and crediting system subscriber accounts. The banking institution performs its function via normal automated clearing house ("ACH") transactions 306.

Referring to FIG. 2 the point-of-sale terminal is described. The point-of-sale terminal comprises several different entry means. A key board 310 can be used to input consumer information manually. Alternatively a card reader 312 can be used whereby the magnetic stripe on the card is read by the point-of-sale terminal and finally a check reader 314 is also included to read the MICR number on checks as a substitute for either a specific card or key board input. These various

LML-EP 000012

5,484,988

7

input means provide information to a microprocessor 316 which comprises logic means 318, memory means 320, and communication means 322. The logic means 318 comprises logic which allows the information received from the various input means to be processed and stored in the memory 320. The logic means further drives a display 324 which provides a visual output of the account number of the consumer for verification. The communication means 322 allows the subscriber terminal to communicate with the central computer 302 for purposes of processing the consumer's purchase.

Referring to FIG. 3 the central computer system 329 is described. The central computer system receives input from a plurality of point-of-sale terminals which provide transaction information from a system subscriber and a consumer desiring to purchase goods or services. The central computer system comprises a system subscriber 330 file which is a file of those merchants who have elected to use the present invention for processing purchases. The central system also comprises an approved consumer file 332 which stores the names of those consumers who have already been approved for allowing purchases to take place through the various input means as well as a third party database such as the SCAN (trademark) data base relating to consumer credit. The computer system also comprises a communications means 334. The communication means communicates with other outside third party data bases to allow any consumer that has not been approved by the system to have a rapid check of the status of the consumer's banking account and of whether the consumer has current outstanding returns (i.e. bad checks). Once this SCAN (trademark) or other outside third party data base search is performed and where an approval is given, the approved consumer file 332 is updated with the name of the new approved consumer.

As presently configured the central computer 329 already has a third party database known as the SCAN (trademark) database 333 resident on the central computer. Thus credit worthiness can be checked using this SCAN database. The SCAN (trademark) database is updated daily.

The communication means 334 also communicates with a banking institution 338 to instruct the bank to debit the account of the consumer and credit the account of the system subscriber (merchant) with the amount of the purchase. These transactions then take place via the normal ACH transaction process.

Referring to FIG. 4 the process begins by a consumer presenting a specimen or "blank" check complete with MICR number to the system subscriber (the merchant) 100. The system subscriber next determines if the check meets appropriate store policy procedures 102, i.e., that the check has appropriate information on the check. If the check does not meet the store policies, it is returned to the consumer 104. If the check does meet appropriate store policies the on-line verification process proceeds 106. The subscriber begins the process by first pressing the appropriate key on a terminal to access the host computer 108. Thereafter the point of sale terminal prompts the system subscriber to enter the appropriate MICR number 110. The system subscriber then enters the appropriate MICR number either manually or by passing the check through a check reader which determines the MICR number 112.

Referring to FIG. 6 the subscriber would verify that the numbers appearing on the terminal match the MICR numbers on the check 114. During the comparison, the subscriber determines that the check number compares accurately 116 to the number displayed on the terminal. If they

8

do compare the verification process proceeds 120. If the check numbers do not compare with that of the terminal the system subscriber clears the terminal and begins the transaction process again 118. If the process is to be reinitiated, the subscriber enters the MICR number into the point of sale terminal 130. Thereafter the system subscriber compares the MICR numbers as before 132. If the MICR numbers compare to the system display 134 the process proceeds. If the numbers do not compare 136 the check is returned to the consumer and the process terminates 137.

Referring to FIG. 5, if the verification process proceeds the terminal next prompts the system subscriber to enter the amount of the sale 122. The subscriber enters the amount of the sale 124 and the terminal thereafter transmits an inquiry to the host data base for verification 126.

The check approval process next takes place 128. If the check is not approved by the central computer the terminal displays a message declining the transaction 140. Thereafter a printer record of the declined transaction is made for purposes of the system subscriber 142 to comply with the Fair Credit Reporting Act and Regulation E of the Board of Governors of the Federal Reserve System.

If the check is approved the terminal displays a message noting the approval 138 and the specimen check is returned to the consumer. The printer further makes a paper record of the transaction 142 and the consumer places any required information on the paper receipt and signs the receipt authorizing the transaction 144.

Referring to FIG. 7, the process description continues. Once the transaction is approved the central computer captures the MICR information and the sale amount and stores that information 146. The central computer subsequently generates a batch message regarding all transaction events for the prior period and transmits all the transaction event information for the day into the ACH network 148.

During the ACH process each checkwriter's account is debited for the exact purchase amount and such an amount is deposited into a system subscriber designated account 150. Thereafter, collected funds for a total day's events are deposited into a subscriber's account 152. The transaction is then complete 154.

How to Use

The present invention will require the establishment and maintenance of three interconnected but separate data files for the purpose of performing access searches. Each data file will be accessible by dial-up procedures operating, in most instances, under "Split Dial" format from a point-of-sale ("POS") terminal device or electronic cash register installed for the primary purpose of bankcard and/or bank draft authorizations. The terminal prompts an operator/user to process one of three optional inquiry types. Any one or all of three primary functions are capable of being performed at a single point-of-sale terminal within the control of the system subscriber. The inquiry types and data base format responses are as follows:

Card Authorization—Having depressed the assigned Split Dial key and thereafter being prompted, the system subscriber "slides" an encoded magnetic stripped transaction card through the point-of-sale terminal and enters the "Sale Amount" requested for authorization. Thereupon, the terminal's dial-up capabilities direct the inquiry to the central computer for authorization against "POSITIVE" file of current cardholders whose accounts were listed in "good standing". Inquiries where such a "Match" are found cause

5,484,988

9

an "Approved" return message from the data file to the inquiring POS terminal. Conversely, a "No-Match" to inquiry would result in a "Declined" notice to the POS terminal. An uploading mode of the present invention causes forwarding of daily status notifications to the central data files activating new cardholder accounts in the "POSITIVE" cardholder file or submitting corrective entries to delete delinquent or terminated accounts.

Check Authorization—Having depressed the assigned Split Dial key and thereafter being prompted, the system subscriber manually enters account numbers from a personal or business check or, where fully automated, enters a specimen check through a MICR Check Reader device interfaced with the terminal, whereupon the terminal's screen would display the check's numbers, and hence the account number. for verification. Thereafter, the operator would enter the "Sale Amount" requested for authorization. The terminal's dial-up capabilities then direct the inquiry to the computer data file center for authorization first against the "POSITIVE" file of "prenoted" bank/checking account numbers whose accounts were listed in "good standing". A successful "Match" to an inquiry would result in an "Approved" notice from the data file to the inquiring terminal. A "No-Match" to inquiry would not, however, immediately result in a "Declined" response. Each inquiry preliminarily resulting in a No-Match would be instantly forwarded/rolled to the third data file preceding any return notice to the inquiring terminal. This third file is anticipated to be the Shared Check Authorization Network ("SCAN") a negative data file data base maintained in the system computer data file center. Referrals to SCAN or any other positive or negative data files, enable potential accepted acceptance of Transaction Events involving consumers "Unknown" to the invention's proprietary, "POSITIVE" files. A "Match" on the SCAN "NEGA-TIVE" file would result in a "Declined" notice; a "No-Match" would conversely send notification to the inquiring POS terminal of an "Approved" event. Of significant importance, the bank/checking account information for each such "Unknown" consumer's transaction would, subsequent to a SCAN "Approved" notice, be posted to the invention's "POSITIVE" file and prenoted through the ACH ("Automated Clearing House") for future Transaction Events. The invention, presumedly in an automated mode, is capable of uploading daily corrections to the POSITIVE data file including notices of new accounts approved through SCAN (trademark) and deletions where settlement for consumer checking account events, initially approved, were subsequently, dishonored. The SCAN data base is similarly uploaded with daily activity status corrections.

Check Replacement Service—Inquiries initiated as Check Replacement requests function in nearly an identical manner as that of Check Authorization. Records for such events, when culminating in "Approved" notices, are separately preserved. Check Replacement inquiries are processed first through the system's "POSITIVE" data file and, where no match is found, proceed to the SCAN data file or other data base file prior to transmitting an "Approved" or "Declined" notice to the inquiring POS terminal. A Match in the system data file indicates a consumer-user whose account was in "good standing" and would not be required to "roll" to SCAN. Check Replacement events are reported to and stored by the computer data file center under a file classification identifying the transaction as a Check Replacement Service. The total of daily, approved Transaction Events are "checkless" sales whereby the service subscribing merchant has submitted requests for electronic ACH settlement for all preauthorized consumer purchases. No commercial bank

10

note ("Paper Check") is accepted or processed by the service subscriber. In each Transaction Event, a Consumer, at the point-of-sale, has executed an electronic access ("Off-Line Debit") authority "Sales Slip" which is automatically printed upon a terminal's receipt of an "Approved" notice.

All terminal programming and all prompt strings for MICR Check Reader interfacing are stored in the POS terminal and the computer center of the present invention controls interactions between the plurality of terminals and the central system. The following modules are present.

Programming for MICR/Terminal Interface—system sub-scriber locations to be activated with the present invention must possess or acquire a terminal. Those utilizing or being upgraded to terminals such as a Tranz (trademark) 330 or other terminals with interface capabilities with the check reader for all suitable point-of-sale terminals.

The preferred format for terminal operations is generated from a singular split dial key. Thereafter, the "prompt string" would proceed in a manner such as i) "Card=1"; "Check=2" requiring operator selection; then, where selecting a check-ing account inquiry ii) the operator would respond to a secondary prompt of "Auth=1"; "Replace=2". These entry selections precede the magnetic stripe "reading" of a card/submittal or a check through the MICR (Account Identification), the entry of the requested sale amount, and the terminal's dial-up for authorization against the computer data file center.

The MICR interface results in the transmittal of a query for data center approval of the entire ABA/Transit and personal or corporate checking account numbers. Instances where printed checks add the individual check's number to the end of the account number can be "dropped" by Check Reader switch settings. Subsequent to a terminal's receipt of the MICR number string but prior to the operator's entry of the requested sale amount and authorization dial-up, a verification prompt "flashing" the ABA and account num-bers must be displayed on the terminal's screen requiring the operator to depress "Enter" to proceed, if correct, or "Clear", if incorrect and thereby enabling the terminal operator to resubmit the specimen check through the MICR Check Reader. It is important to note that account information may be entered manually as well at the point of sale with the other financial advantages of the present invention still in effect.

The computer data file center receives and processes Transaction Event authorization requests utilizing the entire MICR string for accurate, error-free identification of both the consumer bank and a specific checking or depository account to participate in a sale. ACH settlement criteria mandate exact recall for the bank and checking account numbers to properly complete any debit request. This inven-tion conforms to each and every requirement of the ACH transaction regulations.

Each Transaction Event is completed with the logging printer generation of a Transaction Event ("Sales") Slip for each "Approved" authorization inquiry processed (FIG. 8). Alternatively, a manually created transaction event slip can also be prepared (FIG. 9). Each such Transaction Event Slip must be exacting in its retention of account numbers and the sale amount enabling both the consumer and system sub-scriber to be provided "hard copy" receipts of the event. Also included would be a clear printing of the transaction type; "Bank Card", "Check Authorization", or "Check Replacement". Authorization language is printed immedi-ately preceding the consumer's signature line specifically authorizing electronic access in payment of the requested transaction sale amount.

LML-EP 000014

5,484,988

| 11 | 12 |

In addition to the primary functions for POS terminal programming and MICR Check Reader interface, each Point-of-Sale terminal location is capable of generating printed summations of daily activity. These reports list and separately total each authorization/service type, whether produced as a singular report or as the result of multiple terminal "closeout" procedures.

Instances will arise with either the Bank Card or Check Replacement Service where previously authorized Transaction Events will require the operational equivalent of a bankcard "Void" or "Credit" notation. The methodology will be available for Split Dial messages to the computer data file center of a post-authorization "Error" or "Transaction Cancellation" notice. The "Cancel" procedure is instituted by depressing for example the "3" key (i.e. "Cancel=3"). By so doing, the system subscriber may cancel a previously approved and logged event. This Transaction Event which was recorded on the data files and reported on the service subscriber's daily Activity Summation Report, thereafter carries an offsetting, "Flagged" cancellation notice

Summary

A flexible purchase transaction system is described which precisely fits within existing ACH procedures for checking account events for processing of pre-authorized electronic debits as a replacement for commercial bank drafts (paper checks). The main advantage to the proposed invention is the fact that a truly paperless transaction may occur. Departures from the proposed system especially with respect to the Point-of-Sale terminals will be apparent to those skilled in the art without departing from the spirit of the invention as described.

We claim:

1. A checkwriting point of sale system comprising:

a point of sale terminal adapted to receive consumer bank account information from any bank check;

a central computer system;

first communications means integral to said point of sale terminal for electronically communicating with the central computer system;

memory means integral to said point of sale terminal for temporarily storing the consumer bank account information;

the central computer system having second communication means for receiving information from a plurality of said point of sale terminals;

the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the bank check as a negotiable instrument.

2. The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further includes means for reading magnetic ink character recognition numbers appearing on a consumer check for the sole purpose of identifying and reading the consumer bank account information.

3. The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further comprises an alphanumeric display means for receiving said consumer bank account information from the memory means and for displaying the consumer bank account information.

4. The checkwriting point of sale system according to claim 1 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip.

5. The checkwriting point of sale system according to claim 1 further comprising a resident third party database wherein consumer banking account status information is stored, the consumer banking account status information being used for verification of consumer banking account status.

6. The checkwriting point of sale system according to claim 1 wherein the central computer system further comprises a system subscriber database, the system subscriber database comprising information regarding merchants and service providers that are authorized to use the checkwriting point of sale system.

7. The checkwriting point of sale system according to claim 6 wherein the central computer system further comprises a database comprising information regarding consumers whose consumer banking account status is not verified as bad.

8. A checkwriting point of sale process comprising:

a) presenting any bank check specimen to a point of sale terminal located at a merchant or service provider,

b) reading the magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument,

c) storing the consumer bank account information obtained from the check and verifying that account numbers were accurately read at the point of sale terminal,

d) providing transaction event information to the point of sale terminal,

e) transmitting the transaction event information and consumer bank account information to a central computer system,

f) storing the transaction event information and consumer banking account information, and

g) subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations.

9. A checkwriting point of sale system comprising:

a point of sale terminal adapted to receive consumer bank account information;

a central computer system;

first communications means integral to said point of sale terminal for electronically communicating with the central computer system; and

memory means integral to said point of sale terminal for temporarily storing the consumer bank account information;

the point of sale terminal comprising reading means for reading magnetic ink character recognition numbers on any consumer bank check for the sole purpose of eliciting consumer bank account information;

the central computer system having second communication means for receiving information from a plurality of said point of sale terminals;

the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using a bank check as a negotiable instrument.

LML-EP 000015

5,484,988

13

10. The checkwriting point of sale system according to claim 9 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip.

11. The checkwriting point of sale system according to claim 9 further comprising a resident third party database wherein consumer banking account status information is stored, the consumer banking account status information being used for verification of consumer banking account status.

12. The checkwriting point of sale system according to claim 9 wherein the central computer system further comprises a system subscriber database, the system subscriber database comprising information regarding merchants and service providers that are authorized to use the checkwriting point of sale system.

13. The checkwriting point of sale system according to claim 4, wherein the sales slip includes means for execution by the consumer for proof of bank account access authorization.

14. The checkwriting point of sale system of claim 1, wherein the point of sale terminal further comprises means for automatically logging a point of sale terminal location and transaction date, time, and sales amount.

15. The checkwriting point of sale process of claim 8, further comprising:

a) verifying the status of the consumer bank account,

b) verifying the consumer bank account status of the consumer via a query to a third party database if the consumer bank account is verified as bad, and

14

c) sending an approval message to the point of sale terminal if the consumer's banking account status is approved for the transaction.

16. The checkwriting point of sale process of claim 8, further comprising:

(A) printing a transaction event sales slip following the sending of an approval message; and

(B) executing of the sales slip by the consumer as proof of bank account access authorization.

17. The checkwriting point of sale process of claim 15, further comprising:

(A) printing a transaction event sales slip following the sending of an approval message; and

(B) executing of the sales slip by the consumer as proof of bank account access authorization.

18. The checkwriting point of sale process of claim 8, further comprising automatically logging point of sale terminal location information and transaction date, time, and sales amount information into the point of sale terminal.

19. The checkwriting point of sale system according to claim 10, wherein the sales slip includes means for execution by the consumer of proof of bank account access authorization.

20. The checkwriting point of sale system of claim 9, wherein the point of sale terminal further comprises means for automatically logging a point of sale terminal location and transaction date, time, and sales amount.

* * * * *

LML-EP 000016