IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LML PATENT CORP.               )
                               )
              Plaintiff,       )    Civil Action No.  04-858-SLR
        vs.                    )
                               )    Judge Sue L. Robinson
TELECHECK SERVICES, INC.       )
ELECTRONIC CLEARING HOUSE,     )
INC., XPRESSCHEX, INC., AND    )
NOVA INFORMATION SYSTEMS, INC. )    PUBLIC VERSION
                               )
              Defendants.      )
                               )

---

**PLAINTIFF LML PATENT CORP.'S OPENING BRIEF ON
ISSUES OF CLAIM CONSTRUCTION**

Richard K. Herrmann (I.D. No. 405)
MORRIS JAMES HITCHENS & WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
302.888.6800
rherrmann@morrisjames.com

Russell E. Levine, P.C.
Jamie H. McDole
Aaron D. Charfoos
Edward K. Runyan
Lesley G. Smith
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
312.861.2000

*Counsel for Plaintiff LML Patent Corp.*

Originally Filed: October 7, 2005
Public Version Filed: October 17, 2005

**TABLE OF CONTENTS**

I.      INTRODUCTION ...........................................................................................1

II.     BACKGROUND OF THE PATENTS IN SUIT....................................................2

        A.      Traditional paper check processing is time consuming and
                expensive..................................................................................2

        B.      The Technology of the '988 Patent..........................................................3

        C.      The Asserted Claims of the '988 Patent. ..................................................7

III.    SUMMARY OF LML'S ARGUMENTS...........................................................8

IV.     ARGUMENT ..............................................................................................9

        A.      Construction of the claim element "a point of sale terminal adapted
                to receive consumer bank account information from any bank
                check". ..................................................................................11

                1.      The term "adapted to receive" is easily understandable and
                        does not need to be construed. ...................................................12

                2.      "Consumer bank account information" should be given its
                        ordinary and customary meaning................................................14

                3.      "Any bank check" should be given its ordinary and
                        customary meaning based on the entirety of the intrinsic
                        evidence. ..................................................................................18

        B.      Construction of the element "enabling automated clearing house
                communication for transferring funds without using the bank check
                as a negotiable instrument.".....................................................21

                1.      "enabling automated clearing house communication for
                        transferring funds" ..................................................................22

                2.      "Without using the bank check as a negotiable instrument" ....................24

        C.      Construction of the term "means for reading the magnetic ink
                character recognition numbers on a consumer check for the sole
                purpose of identifying and reading consumer bank account
                information"...........................................................................31

1.     The specification discloses using a MICR reader, OCR equipment and manual entry of MICR information on a keyboard to read MICR numbers appearing on a check...........................31

2.     The Defendants' construction of "for the sole purpose" language improperly imports a limitation that is absent from the plain language of the claims........................................34

D.     Construction of the phrase "verifying that account numbers were accurately read at the point of sale"........................................35

E.     Construction of the phrase "subsequently transmitting the transaction event information to a bank for subsequent automated clearinghouse operations"........................................37

1.     The specification discloses transmitting the transaction event information to a bank for subsequent automated clearing house operations........................................37

2.     Defendant's construction improperly deletes the plain language "to a bank" from the disputed phrase. ........................38

3.     Defendants have again imported limitations not required by the claim language. ........................................39

V.     CONCLUSION........................................40

# TABLE OF AUTHORITIES

**Cases**

*Abtox, Inc. v. Exitron Corp.,*
    122 F.3d 1019 (Fed. Cir. 1997)........................................................... 22, 23, 24, 36

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.,*
    334 F.3d 1294 (Fed. Cir. 2003)........................................................ 12, 24, 35, 36

*Comark Communications, Inc. v. Harris Corp.,*
    156 F.3d 1182 (Fed. Cir. 1998)................................................................. 35, 36

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.,*
    No. 05-1043, 2005 WL 2403777 (Fed. Cir. Sept. 30, 2005) ............................... 34

*Dayco Prods., Inc. v. Total Containment, Inc.,*
    258 F.3d 1317 (Fed. Cir. 2001)........................................................................ 14

*E.I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.,*
    849 F.2d 1430 (Fed. Cir. 1988)................................................................ 22, 23, 39

*Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.,*
    222 F.3d 951 (Fed. Cir. 2000)........................................................................ 12

*Interactive Gift Express v. Compuserve, Inc.,*
    256 F.3d 1322 (Fed. Cir. 2001)........................................................................ 11

*K-2 Corp. v. Salomon S.A.,*
    191 F.3d 1356 (Fed. Cir. 1999)............................................................. 16, 38, 39

*Kinik Co. v. Int'l Trade Comm'n,*
    362 F.3d 1365 (Fed. Cir. 2004)........................................................................ 26

*Lemelson v. United States,*
    752 F.2d 1538 (Fed. Cir. 1985)........................................................................ 14

*Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc.,*
    152 F.3d 1368 (Fed. Cir. 1998)........................................................................ 14

*Medrad, Inc. v. MRI Devices Corp.,*
    401 F.3d 1313 (Fed. Cir. 2005)........................................................................ 10

*Microsoft Corp. v. Multi-Tech Sys., Inc.,*
    357 F.3d 1340 (Fed. Cir. 2004)........................................................................ 20

*Minnesota Mining and Manufacturing Co. v. Johnson & Johnson Orthopedics, Inc.,*
    976 F.2d 1559 (Fed. Cir. 1992)........................................................................ 26

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005).................................... 1, 9, 10, 11, 12, 25, 34, 40

*Playtex Prods., Inc. v. Proctor & Gamble Co.,*
    400 F.3d 901 (Fed. Cir. 2005)................................................................. 11

*Renishaw PLC v. Marposs Societa per Azioni,*
    158 F.3d 1243 (Fed. Cir. 1998)............................................................... 10

*Rexnard Corp v. Laitram Corp.,*
    274 F.3d 1336 (Fed. Cir. 2001)............................................................... 13

*SanDisk Corp. v. Memorex Products, Inc.,*
    415 F.3d 1278 (Fed. Cir. 2005)............................................................. 18, 28

*Spring Window Fashions LP v. Novo Industries, L.P.,*
    323 F.3d 989 (Fed. Cir. 2003)............................................................. 10, 20

*Standard Oil Co. v. Am. Cyanamid Co.,*
    774 F.2d 448 (Fed. Cir. 1985)................................................................. 25

*Texas Instruments, Inc. v. United States Int'l Trade Comm'n,*
    805 F.2d 1558 (Fed. Cir. 1986)............................................................... 36

*U.S. Surgical Corp. v. Ethicon, Inc.,*
    103 F.3d 1554 (Fed. Cir. 1997)......................................................... 13, 15, 35

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996)......................................................... 10, 11, 31, 37

**Statutes**

35 USC § 112................................................................................. 9, 31, 33

**Other Authorities**

Webster's Third New International Dictionary (1993)....................................... 34

## I.    INTRODUCTION

Plaintiff LML Patent Corp. ("LML") asserts infringement by Telecheck Services, Inc. ("TeleCheck"), Electronic Clearing House, Inc. ("ECHO"), Xpresschex, Inc. ("Xpresschex"), and Nova Information Systems, Inc. ("Nova") (collectively the "Defendants") of claims 1, 2, 4-6, 9, 10, 11, 14, 16 and 18 of United States Patent No. 5,484,988 (the " '988 Patent"). Ex. A.[1]  Pursuant to the Court's Scheduling Order, the parties have met and conferred regarding claim construction issues.  The Joint Claim Construction Statement identifying the disputed claim terms is submitted as Exhibit B.

As explained in detail below, in construing the disputed claim terms, LML has strictly adhered to the Federal Circuit's mandate regarding claim construction as set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*).  In particular, LML's proposed constructions give the claim terms their ordinary and customary meanings that originate directly from the intrinsic evidence, namely the claim language itself, as well as the specification and prosecution history of the '988 Patent.  In several instances the claim terms need no constructions as they are common everyday terms.

Defendants, on the other hand, have repeatedly construed well understood terms, such as "any" or "sole" in an effort to manufacture either a non-infringement or invalidity argument where one would not otherwise exist.  Moreover, Defendants propose claim constructions that have little or no support in the intrinsic evidence.  As such, LML's proposed constructions are correct and should be adopted by this Court in their entirety.

---

[1] Exhibits are attached as the Declaration of Aaron D. Charfoos in Support of LML Patent Corp.'s Opening Brief on Issues of Claim Construction, hereinafter "Ex. __".

II.        **BACKGROUND OF THE PATENTS IN SUIT**

The application leading to the '988 Patent was filed on June 9, 1994, and issued on January 16, 1996.[2] Ex. C, '988 Patent Prosecution History. The '988 Patent was a patentable combination of three previously known elements, namely: 1) the use of a point of sale terminal at the merchant's location; 2) connected to a central computer system enabled for verifying the trustworthiness of the consumer's account; and 3) the central computer system is also enabled to transmit a request to transfer funds electronically through an automated clearing house. *See generally*, Ex. A.

A.        **Traditional paper check processing is time consuming and expensive.**

Prior to filing the application that matured into the '988 Patent, paper checks had been a consumer's overwhelming choice for non-cash payment of goods. Indeed, they remain immensely popular even today. Traditionally, when a consumer purchased an item (goods, services or both) using a paper check, the merchant endorsed the consumer's check, physically transported the paper check to the merchants' bank, which in turn physically transported the paper check among various entities to ultimately transfer the funds from the consumer's account to the merchant's account.

**REDACTED**

---

[2] The application that matured into the '988 Patent, 08/257,390, was a continuation of application 07/975,717 filed November 13, 1992. Ex. A.

In an attempt to resolve these issues, various individuals developed systems to try to speed up the traditional processing of these paper checks. Ex. A, '988 patent, col. 1:20-2:33. For example, as disclosed in the '988 Patent, U.S. Patent No. 4,678,896 ("Carlson '896") described a point of sale system "whereby an apparatus is provided to secure the processing and imprinting of checks." Ex. A, col. 2, lns. 31-33. Similarly, U.S. Patent No. 4,617,457 disclosed an "ATM or automatic teller machine form of cashing checks." *Id.* at col. 1, lns. 45-47. However, these systems suffered from two critical disadvantages. First, they continued to rely on "use of a bank check as a negotiable instrument" *i.e.* the merchant processed the paper copy of the check. *Id.* at col. 2, lns. 47-49. Second, the prior art failed to provide a complete system whereby a consumer presented a check to the merchant, the check was verified to ensure the trustworthiness of the consumer and then is enabled to send the check to an automated clearing house to electronically transfer the funds. *Id.* at col. 2, lns. 34-46.

**B.    The Technology of the '988 Patent.**

The invention in the '988 Patent solved many of the problems found in the prior art by disclosing a patentable combination of three elements, namely: 1) the use of a point of sale terminal at the merchant's location; 2) connected to a central computer system enabled for verifying the trustworthiness of the consumer's account; and 3) the central computer system is enabled to transmit a request to transfer funds electronically through an automated clearing house.

In 1992, faced with the problems associated with the traditional processing of paper checks and inadequacies of prior systems as described above, '988 Patent inventors Robert Hills and Henry Nichols developed a complete system and process for electronic

check conversion that finally solved the challenges in the prior art. Specifically, Messrs. Hills and Nichols invented a system and process to effectuate the electronic transfer of funds from a consumer's account to a merchant's account using only the consumer bank account information obtained from a check, usually the MICR line of a check (*i.e.* consumer account number, bank routing number, and check number).[3]  *See* Ex. A, '988 patent, col. 6:60-col. 7:11. In other words, the Hills/Nichols invention allowed merchants to use paper checks at the Point-of-Purchase as a source of information, as opposed to the prior art's use of the check as a negotiable instrument by accepting and processing the paper check through the convoluted traditional method. *See* Ex. A,  col. 2:47-57. Messrs. Hills and Nichols filed a patent application and were awarded the '988 Patent.

In general terms, the invention of the '988 Patent allows merchants to utilize checks presented by consumers at the point of sale as a source of information to convert the transaction into an electronic funds transfer. The invention in the '988 Patent discloses a system and process whereby the merchant captures information, typically the MICR line, contained on the check at the merchant's point of sale terminal, using either a MICR reader, optical character recognition ("OCR") equipment or manually inputting the

---

[3] All printed checks for funds in the United States have a Magnetic Ink Character Recognition (MICR) line imprinted on the bottom of each check. This line is printed using an ink with iron-oxide pigments capable of being magnetized. In this way the characters encoded on this line can be read either magnetically or optically. The MICR line typically, contains the following information:  (1) Bank Routing Number – A number that uniquely identifies the bank at which the checking account is established (sometimes known as the ABA number); (2) Account number of the consumer's checking account; and (3) Check Serial Number. *See generally,* Ex. F at LML-EP-055363 (2005 ACH Rules, ACH Primer 16);

**REDACTED**

information to the terminal keyboard. Ex. A, col. 5:45-49, col. 6:62-63. The amount of the transaction is then typically entered into the terminal keyboard. *Id.* at col. 8:11-13.

The terminal then sends data to a central computer system operated by an electronic check processing provider (such as LML, TeleCheck, ECHO or Nova) by modem or other similar communication methods that transfers packets of information electronically. *Id.* at col. 7:12-16; col. 5:62-66. The processing provider may run verification/risk analysis by searching the consumer's information against both internal and external databases to determine whether a particular consumer has a history of writing fraudulent checks or other negative history. *Id.* at col. 7:19-34. This process is graphically represented by the following:



**FIG. 1**

Ex. A, '988 Patent, Fig. 1. If the transaction is approved, an approval message is sent to the point of sale terminal which prints out an authorization slip for the consumer to sign. *Id.* at col. 8, lns. 24-29. The consumer bank account and transaction information is then formatted by the electronic check processing provider and thereafter sent (typically in a batch file at the end of the day) to the provider's selected bank, also known as the Originating Depository Financial Institution (ODFI) or directly to the Federal Reserve of

an automated clearing house. The ODFI then effectuates the electronic funds transfer from the consumer's bank account to the merchant's bank account through an automated clearing house. *Id.* at col. 7:40-45.

The Invention in the '988 Patent revolutionized the check processing industry. In the years following the issuance of the patent, the industry, including a number of entities which had traditionally processed other non-check transactions electronically, adopted the system in the '988 Patent.

**REDACTED**

For example, checks converted at the point of purchase (a.k.a. point of sale) are classified with a code of "POP" (Point-of-Purchase).[4] Exhibit F at LML-EP-055354-56 (2005 ACH Rules; ACH Primer 7-9). Other types of transactions, not at issue here, include accounts receivable (ARC), etc.     **REDACTED**

---

[4] The '988 patent relates to, and thus the focus of this litigation is on, the point of purchase field of use (*i.e.* POP transactions).

**REDACTED**

In fact, this "conversion" of paper checks into electronic transactions—which virtually eliminates the transfer of the paper check between the merchant and financial institutions—significantly reduced the merchant's costs.

**REDACTED**

C.     **The Asserted Claims of the '988 Patent.**

LML asserts that Defendants infringe claims 1, 2, 4-6, 9, 10, 11, 14, 16 and 18 of the '988 patent. Claim 1 is representative of the system claims of the '988 patent:[5]

1. A check writing point of sale system comprising:

> [1]   a point of sale terminal adapted to receive consumer bank account information from any bank check;
>
> [2]  a central computer system;
>
> [3]   first communication means integral to said point of sale terminal for electronically communicating with the central computer system;
>
> [4]   memory means integral to said point of sale terminal for temporarily storing the consumer bank account information;
>
> [5]   the central computer system having second communication means for receiving information from a plurality of said point of sale terminals;

---

[5] The asserted process claims 16 and 18 of the '988 patent depend from claim 8 and both parties, therefore, construe various claim terms in claim 8.

[6]   the central computer system second communication means
enabling said central computer system to communicate with
external databases for performing a consumer bank account status
search   and   further   enabling   automated   clearing   house
communication for transferring funds without using the bank check
as a negotiable instrument.

Ex. A, '988 Patent.  The parties agree that most of the terms in the asserted claims of the

'988 Patent are clear on their face and require no construction.  However, the parties

dispute the construction of a few elements of the asserted claims.  Thus, in accordance

with the Court's Scheduling Order, LML hereby submits its proposed constructions, with

support, for these disputed terms.

## III.    SUMMARY OF LML'S ARGUMENTS

The claim terms should be given their ordinary and customary meanings based on

the intrinsic evidence of record alone including the claims, specification and prosecution

history.  Below LML provides a summary claim chart of its proposed constructions as

consistent with this intrinsic evidence.

| Claim Terms[6] | LML's Construction | Relevant Claim(s) |
|---|---|---|
| adapted to receive consumer bank account information from any bank check | Adapted to receive consumer bank account information from any bank check | 1 |
| consumer bank account information | Information relating to a consumer's bank account including the MICR line (magnetic ink character recognition line). | 1-3 and 8-9 |
| any bank check | Any regular check used to draw funds from a normal bank or credit union checking account. | 1, 8 and 9 |
| enabling automated clearing house communication for | Enabling communication with an automated clearing house for electronically transferring funds. | 1 and 9 |

---

[6] As will be discussed in detail below, while these claim terms may have different
iterations throughout the claims, they have been construed consistently throughout
LML's brief.

| Claim Terms[6] | LML's Construction | Relevant Claim(s) |
|---|---|---|
| transferring funds | | |
| without using the bank check as a negotiable instrument | Where the paper check is used as a source of information, and is not accepted or processed. | 1, 8 and 9 |
| means for reading magnetic ink character recognition numbers appearing on a consumer check for the sole purpose of identifying and reading the consumer bank account information | This limitation should be construed pursuant to 35 USC § 112, para. 6. The recited function is "reading magnetic ink character recognition numbers appearing on a consumer check." The structures in the '988 Patent that perform that function is any mechanism such as a MICR check reader, optical character recognition ("OCR") equipment, a keyboard for manual entry, or equivalent | 2 and 9 |
| for the sole purpose of identifying and reading the consumer bank account information | For the only purpose of identifying and reading the consumer bank account information. | 2, 8 and 9 |
| verifying that account numbers were accurately read at the point of sale | Verifying that the account numbers from the check were read accurately at the point of sale terminal. | 8 |
| subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations | Subsequently transmitting the information relating to the transaction to a bank for subsequent automated clearing house operations. | 8 |

## IV.    ARGUMENT

The Federal Circuit's *en banc* decision in *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005), reiterated and clarified the well known legal principles applicable to claim construction. First and foremost, claim terms should be given their ordinary and customary meaning. *Phillips*, 415 F.3d at 1312-13. "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person

of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313. In this vein, "the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id.* at 1314, *citing Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). However, claim terms cannot be construed in a vacuum:

> Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the *context of the particular claim* in which the disputed term appears, but in the *context of the entire patent,* including the specification.

*Id.* at 1313 (emphasis added); *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."). Indeed, "[t]he construction that stays true to the claim language and *most naturally aligns with the patent's description of the invention* will be, in the end, the correct construction." *Phillips*, 415 F.3d at 1316 (quoting *Renishaw PLC v. Marposs Societa per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)) (emphasis added).

In addition to the written description, "a court 'should also consider the patent's prosecution history, if it is in evidence.'" *Phillips*, 415 F.3d at 1317. "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Id.* The prosecution history represents the "public record of the patentee's representations concerning the scope and the meaning of the claims." *Spring Window Fashions LP v. Novo Industries, L.P.*, 323 F.3d 989, 995 (Fed. Cir. 2003).

In addition to the intrinsic evidence, the Court may, in its sound discretion, also consider extrinsic evidence. *Phillips*, 415 F.3d at 1318-19. However, "extrinsic evidence is *less reliable* than the patent and its prosecution history in determining how to read claim terms." *Id.* at 1318 (emphasis added). For instance, the Federal Circuit recognized that extrinsic evidence is typically self-serving and litigation-driven, and generally is not created at the time of the invention or written by or for skilled artisans. *See id.* As such, extrinsic evidence must always be considered "*in the context of the intrinsic evidence*." *Id.* at 1319 (emphasis added). But, "undue reliance on extrinsic evidence poses the risk that it will be used to change the meaning of claims in derogation of the 'indisputable public records consisting of the claim, the specification and the prosecution history.'" *Id.* Thus, "the court should keep in mind the flaws inherent in each type of evidence and assess the evidence accordingly." *Id.*

Indeed, while a trial court may use extrinsic evidence to educate itself about the invention and the relevant technology, it may not use extrinsic evidence to arrive at a claim construction that is at odds with the intrinsic evidence. *Playtex Prods., Inc. v. Proctor & Gamble Co.*, 400 F.3d 901, 908 n.1 (Fed. Cir. 2005); *Interactive Gift Express v. Compuserve, Inc.*, 256 F.3d 1322, 1332 (Fed. Cir. 2001); *Vitronics*, 90 F.3d at 1583. In this case, the intrinsic evidence alone provides clear guidance as to the meaning of the claim terms. Therefore, extrinsic evidence is not necessary to construe the claims.

A.    **Construction of the claim element "a point of sale terminal adapted to receive consumer bank account information from any bank check".**

Independent claim 1 recites "a point of sale terminal adapted to receive consumer bank account information from any bank check" and independent claim 9 recites "a point

of sale terminal adapted to receive consumer bank account information."[7]  Based on the
claim terms themselves, as well as the intrinsic evidence, these elements should be
construed to mean "a point of sale terminal adapted to receive information relating to a
consumer's bank account including the MICR line (magnetic ink character recognition
line) from any regular check used to draw funds from a normal bank or credit union
checking account."

> 1.    The term "adapted to receive" is easily understandable
>        and does not need to be construed.

As a starting point in claim construction, the court should give claim terms "their
ordinary and accustomed meaning as understood by one of ordinary skill in the art."
*Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 955 (Fed. Cir. 2000)
*cert. denied*, 538 U.S. 1058 (2003);  *Phillips*, 415 F.3d at 1312-13 (Fed. Cir. 2005).
However, the ordinary and customary meaning of the claim language is often directed by
the surrounding claim language.  Therefore, the context in which a term is used within
the claim as well as the way the term might be used in other claims of the patent must be
considered.  *See Phillips*, 415 F.3d at 1314 ("The context in which a term is used in the
asserted claim can by highly instructive....the use of a term within a claim provides a
firm basis for construing the term.").  *Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*,
334 F.3d 1294, 1299 (Fed. Cir. 2003) ("While certain terms may be at the center of the
claim construction debate, the context of the surrounding words of the claim also must be

---

[7] Independent claims 8 and 9 similarly use the terms "any bank check", "bank check" and
"consumer bank check."  For the purposes of claim construction, there are few
substantive differences, and these will be dealt with in detail below.  However, for the
purposes of discussion, these terms will be discussed under the general discussion of
"any bank check."

considered in determining the ordinary and customary meaning of those terms.");
*Rexnard Corp v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001) ("[A] claim term should be construed consistently with its appearance...in other claims of the same patent.").

Few of the terms and phrases used in the element "adapted to receive consumer bank account information [from any bank check]" need to be construed as their meanings are clear and would be understandable to a jury. *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). This is especially true for the "adapted to receive" language contained in the claims. These plain English terms need not, and should not, be construed. To the extent that the Defendants require construction of this phrase, it should be given its ordinary meaning that the point of sale terminal is "adapted to receive consumer bank account information", that is, that the point of sale terminal simply needs to have some mechanism (such as a port or keyboard) or internal check reader or scanner. Importantly, the terminal need only be "adapted to receive" information, nothing more. This interpretation is consistent with the '988 Patent specification.

The specification discloses at least three possible ways to receive the MICR information off of the bank check - a MICR reader, optical character recognition ("OCR") equipment, or through manual keypad entry or other device. *See* Ex. A '988 Patent col. 5, lns. 44-49 and col. 7, lns. 55-62. Some of these devices can be external and connected to the point of sale terminal through a port on the point of sale terminal itself. Others may be enclosed within the physical housing of the terminal. In any event, the point of sale terminal is merely "adapted to receive" consumer bank account information

as long as it can either connect to, or has included in it, one of these mechanisms or equivalents.

Defendants, however, in their construction of this element attempt to improperly limit the meaning by construing "adapted to receive" to mean "adapted to read…directly". There is no reason to add this limitation to terms that are clear and understandable and not in need of construction. *Dayco Prods., Inc. v. Total Containment, Inc.,* 258 F.3d 1317, 1327 (Fed. Cir. 2001) ("adding limitations to claims not required by the claim terms themselves, or unambiguously required by the specification or prosecution history, is impermissible."); *Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc.*, 152 F.3d 1368, 1375 (Fed. Cir. 1998) (district court erred in requiring that claim term "well" required the "well" to be capable of monitoring and injecting even though every reference in the specification and preferred embodiment discussed "monitoring and injecting wells"); *Lemelson v. United States*, 752 F.2d 1538, 1552 (Fed. Cir. 1985) ("prepositioning" not limited to automatic prepositioning even if specification repeatedly referred to automatic prepositioning and never manual prepositioning). No language in the claim compels the information to be "read," let alone read "directly," from the bank check. The express claim language only requires that the point of sale terminal be "adapted to *receive*", nothing else. Ex. A, '988 Patent claim 1. In short, "adapted to receive" means that the point of sale terminal must be adapted to receive information, just as the claim states, and LML's construction requires.

> 2.    *"Consumer bank account information" should be given its ordinary and customary meaning.*

This element should be given its ordinary and customary meaning—"information relating to a consumer's bank account including MICR line (magnetic ink character

recognition line)." The phrase "consumer bank account information" is clear and understandable to the jury without explanation and thus, no extended claim construction analysis of those terms is necessary. *See U.S. Surgical*, 103 F.3d at 1568 (holding that claim construction is required only "when the meaning or scope of technical terms and words of art is unclear *and* in dispute *and* requires resolution to determine" the issue before the court) (emphasis added). Yet, because Defendants attempt to limit the interpretation of this claim language from its plain meaning by limiting this element to "only the ABA/transit routing number and bank account number"—specifically excluding check serial numbers included in the MICR line as well as other information— LML proposes the ordinary and customary meaning of these terms as stated in the '988 Patent.

                     a)      The claim language discloses the ordinary and customary meaning.

The '988 Patent discloses and claims a system whereby a check is merely used as a source of information relating to a consumer's bank account to effectuate an electronic funds transfer. Ex. A '988 Patent "Field of Invention" col. 1, lns. 10-15. In this vein, the claim language itself suggests that the information received at the point of sale terminal is broadly any "information relating to a consumer's bank account" that could be used to effectuate a funds transfer.

The surrounding claims, which should be reviewed to determine the scope of consistently used claim language, demonstrate that one form of consumer bank account information is the MICR line on a check. For example, claims 2, 8 and 9 of the '988 Patent all recite "reading magnetic ink character recognition numbers" appearing on a check to identify, read, obtain, and/or elicit the "consumer bank account information."

Ex. A claims 2, 8 and 9. The MICR line typically includes the consumer's bank routing/transit numbers, the account number and the check serial number. *See generally,* Ex. F at LML-EP-055363 (2005 ACH Rules, ACH Primer 16);

**REDACTED**

According to these claims, the *entire* MICR line is read from the check as a form of consumer bank account information. Ex. A '988 Patent claims 2, 8 and 9. This information is then used to effectuate an electronic funds transfer. *Id.* Therefore, the only reasonable interpretation of "consumer bank account information" is "information relating to a consumer's bank account including MICR line (magnetic ink character recognition line)." There is no basis in the claims to limit the type of consumer bank account information. The claims are not limited to any particular information and neither should this court. *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999). ("Courts do not rewrite claims; instead we give effect to the terms chosen by the patentee.").

> b) The specification supports a broad construction of the term "consumer bank account information."

The specification supports LML's construction as it repeatedly discusses obtaining "consumer bank account information" off of the face of the check by, among other things, reading and utilizing the <u>entire</u> MICR line—including the check serial number if present[8]—both at the point of sale and at the central computer system:

---

[8]        **REDACTED**

Necessarily, the fact that the specification discloses using the entire MICR line to obtain consumer bank account information is evidence that the check serial number is included in "consumer bank account information" as contemplated by the inventors.

- "The system subscriber then enters the appropriate MICR number either manually or by passing the check through a check reader which determines the MICR number 112." '988 Col. 7, lns. 57-62.

- "Referring to FIG. 7, the process description continues.  Once the transaction is approved the central computer recaptures the MICR information and the sale amount and stores that information." Col. 8, lns. 30-34.

- "The computer data file center receives and processes Transaction Event authorization requests utilizing the *entire* MICR string for accurate, error-free identification of both the consumer bank and a specific checking or depository account to participate in the sale."  Col. 10, lns. 45-49 (emphasis added).

*See also* 6:65-67; 10:14. Fig. 2; Fig. 5; Fig. 6; 5:48-49.

Indeed, the '988 Patent specification also discloses using optical character recognition equipment which, in essence, takes a picture of either all or part of the check. Ex. A '988 Patent, Col. 5, lns. 44-49.  This equipment often captures not only the check serial number but also other information, such as the consumer's address, off of the face of the check.  Therefore, the specification supports the ordinary and customary meaning of the claim terms suggested by LML.

Defendants' proposed construction limits consumer bank account information to two pieces of information, "only the ABA/transit routing number and bank account number."  Again, Defendants attempt to limit the term without justification.  Indeed, the "Preferred Embodiment" of the '988 Patent discloses that the point of sale terminal reads the entire MICR string and then can parse the data out after that:

> The MICR interface results in the transmittal of a query for data center approval of the entire ABA/Transit and personal or corporate checking account numbers.  Instances where printed checks add the individual check's number to the end of the account number can be 'dropped' by Check Reader switch settings.

Ex. A '988 Patent col. 10, lns. 28-33 (emphasis added). This Court should not entertain Defendants' invitation to limit the claims to read the preferred embodiment out of the claims. *SanDisk Corp. v. Memorex Products, Inc.,* 415 F.3d 1278, 1285 (Fed. Cir. 2005) ("A claim construction that excludes a preferred embodiment, moreover, 'is rarely, if ever, correct.'"). Because LML's construction is consistent with the claim terms and the specification, this Court should construe "consumer bank account information" to mean "information relating to a consumer's bank account including MICR line (magnetic ink character recognition line)."

         3.      *"Any bank check" should be given its ordinary and customary meaning based on the entirety of the intrinsic evidence.*

The "any bank check" limitation should be given its ordinary and customary meaning, "any regular check used to draw funds from a normal bank or credit union checking account."[9] LML's construction is properly derived from the express language of the intrinsic evidence.

         a)      LML's construction of "any bank check" is derived directly from applicants' statements in the prosecution history.

During prosecution, the Applicants stated on a number of occasions that their invention (the '988 Patent) did not include certain "specialized" negotiable instruments—that often were not even drawn on banks—but instead only included "regular check[s]". For instance, in a September 1993 Office Action, the Examiner rejected the pending

---

[9] Claim 9 includes the claim term "any **consumer** bank check." LML's proposed construction is "any regular check used to draw funds from a normal bank or credit union consumer checking account"—adding only the word "consumer" to LML's construction of "any bank check." Therefore, it will not be separately discussed in LML's Brief.

claims, which included the limitations of reading bank account information from "a check" in light of the Case reference (U.S. Patent No. 4,270,042). Ex. R at LML-EP 000140. The applicants distinguished the Case reference's use of a "draft instrument unique to the system" whereas the '988 Patent application only included regular checks:

> Further, the consumer using Applicants' system is not required to furnish the merchant with a special draft instrument. The consumer merely uses *a regular check used to draw funds from a normal bank or credit union checking account.*

Ex. S at LML-EP 000157 (December 22, 1993, Response) (emphasis added). It is this clear intrinsic evidence that serves as the express basis for LML's construction.

The Applicants continued to make this exact same argument throughout the prosecution of the '988 Patent,[10] including that their system used any regular bank check and did not require a specialized instrument to work:

- The [Case] system "includes use of a letter of credit card and a draft instrument unique to the Case system. Case does not disclose the use of *any bank check* . . . Further, it would not be trivial to modify Case so that an *ordinary bank draft* is used for information purposes only. The entire Case system is set up around a unique pre-paid (and therefore pre-authorized) account in which a system-unique draft instrument is given up, that is, negotiated as part of the transaction. To include the missing elements of Applicants' claims would be to change the entire nature of the Case system from a closed, pre-paid system using unique draft negotiable instruments to one which electronically debits a bank account based on information derived from *any ordinary check.*" Ex. T at LML-EP 000190 (1/30/95 Office Action Response, p. 8) (emphasis added);

- "Simjian [United States Patent 3,824,544] discloses a merchandizing arrangement utilizing a coded sales ticket. . . Thus, Simjian does not disclose the use of *a bank check* at the point-of-sale transaction in order to derive consumer information and not for use as a negotiable instrument . . ." *Id.* at LML-EP 000202 (*Id.* at 20) (emphasis added); and

---

[10] Even after the claim language was subsequently amended by the Applicants to change "a check" above to "any bank check" in the issued claims, the Applicants' argument remained the same.

- "Schuller [United States Patent Number 3,845,470] . . . uses pre-paid tickets, or "checks", as a payment means for a vending machine. . . Thus, Schuller does not disclose the use of *a bank check* in a point-of-sale transaction in order to derive consumer information and not for use as a negotiable instrument. . ." *Id.* at LML-EP 000203 (*Id.* at 21) (emphasis added).

Thus, applicants specifically and repeatedly provided the scope of the "any bank check" language during prosecution, namely "a regular check used to draw funds from a normal bank or credit union checking account." *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1347 (Fed. Cir. 2004); *Spring Window Fashion LP v. Novo Industries, L.P.*, 323 F.3d 989, 994 (Fed. Cir. 2003) ("It is well established that 'the prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution.").

        b)     The specification also discloses using regular bank checks.

The specification of the '988 Patent similarly reinforces that "any bank check" is simply a regular bank check that would be drawn on the consumer's account:

- This invention relates to the field of Point-of-Sale systems and more particularly to the integration and processing of purchases whereby a check is used as the basic source of identification of the individual and of the individual's bank and whereby the bank account is debited. Ex. A "Field of Invention" col. 1, lns. 10-15.

- The Deming system [U.S. Patent No. 4,823,264] cannot be used to read account and other information directly from an ordinary bank check and has no use for bank checks as instruments other than negotiable paper. *Id.* at col. 2, lns. 23-26.

- "It is a further objective of the present invention to eliminate the need for 'paper' checks as an accepted means of *consumer payment*." *Id.* at col. 3, lns. 51-53 (emphasis added).

- "A point of sale system designed to read information from a *consumer's check*...with a subsequent debiting of a *consumer's account*" *Id.* Abstract (emphasis added)

- "The system is intended to be made available to subscribing merchants, businesses, and individuals herein referred to as 'system subscribers' wishing to employ the method and apparatus of the present invention for the electronic processing and settlement of *consumer purchases*." *Id.* at col. 3, lns. 12-15 (emphasis added)

- "When the transaction event is 'approved,' funds are debited from an authorized *consumer account* for credit to the system subscriber and electronic settlement by ACH deposits the transaction amount to the subscriber's designated depository account. Authorized access to *consumer accounts* and credits to system subscriber depository accounts are performed as 'Off-Line' transactions by means of Electronic Funds Transfer ("EFT") through the ACH Network or through the Federal Reserve System." *Id.* at col. 3, lns. 22-34 (emphasis added).

The intrinsic evidence provides specific guidance as to the meaning of "any bank check, which means "any regular check used to draw funds from a normal bank or credit union checking account." As such, this construction should be adopted by this Court.

**B.    Construction of the element "enabling automated clearing house communication for transferring funds without using the bank check as a negotiable instrument."**

Claims 1 and 9 of the '988 patent both contain the element "second communication means . . . enabling automated clearing house communication for transferring funds without using the bank check as a negotiable instrument."[11]    This phrase should be construed to mean, "enabling communication with an automated clearing house for electronically transferring funds where the paper check is used as a source of information, and is not accepted or processed."

---

[11] Claims 1 and 9 use slight variations, claiming either "without using the bank check as a negotiable instrument" or "without using a bank check as a negotiable instrument." Similarly, claim 8 also includes the element "without using the check as a negotiable instrument" Because LML does not believe there is any substantive difference between these elements, it construes them together with a single consistent construction.

LML's construction is consistent with the ordinary and customary meaning of the claim terms themselves, as well as the intrinsic evidence. Defendants' construction again eschews the claim language and improperly imports extraneous limitations.

       1.    *"enabling automated clearing house communication for transferring funds"*

This element should be construed as "enabling communication with an automated clearing house for electronically transferring funds." LML's construction gives the term its ordinary and customary meaning. This term appears in system claims 1 and 9 of the '988 Patent and only requires that one part of the system, here the second communication means (typically a modem, network, connection or other device), enables communication with the automated clearing house for electronically transferring funds. Ex. A '988 Patent col. 6, lns. 20-38. This Court should give full force to the claim terms selected by the patentees. *Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997) ("the language of the claim frames and ultimately resolves all issues of claim interpretation.").

The parties agree that "transferring funds" means "electronically transferring funds." Indeed this is consistent with the specification which states that communication with the automated clearing house effectuates an "electronic funds transfer" ("EFT"). Ex. A col. 3, lns. 56-65 ("an EFT by means of the Automated Clearing House . . .").

However, Defendants' proposed construction not only is a much more complex construction than is required by the claim language itself but also does not give the claim terms their full force and scope. *Abtox.*, 122 F.3d at 1023. Defendants construction attempts to add a number of extraneous limitations to avoid infringement. *See E.I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988)

(it is inappropriate to import an "extraneous limitation" that is "wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim.").

First, Defendants attempt to turn this element into a process claim by requiring that the second communication means actually "electronically communicate" with the automated clearing house.  The plain language of these *system* claims do not require the step of the central computer system actually communicating with the automated clearing house as the later process claims, *i.e.* claim 8, does.  *See e.g.,* Ex. A claims 1, 8 and 9.  Therefore, Defendants' construction misinterprets the claim language itself.  *Abtox,* 122 F.3d at 1023 ("the language of the claim frames and ultimately resolves all issues of claim interpretation.").

Second, the Defendants have also imported the limitation, "electronically communicating . . . based upon the consumer bank account information obtained from any bank check presented at the point-of-sale" into the second half of their claim construction.  Indeed, the first part of their claim construction, "electronically communicating with an automated clearing house for transferring funds electronically" appears to have already construed every relevant term in the claim language.  Importing this further limitation disregards the patentee's clear choice not to repeat the element "consumer bank account information" and "any bank check" in both claims 1 and 9.

Therefore, because LML's proposed construction is soundly based on the plain language of the claim terms, and is consistent with the intrinsic evidence, this Court should adopt LML's construction.

2.    *"Without using the bank check as a negotiable instrument"*

Independent claims 1, 8 and 9 include the element "without using the [bank] check as a negotiable instrument." This element should be construed as "where the paper check is used as a source of information, and is not accepted or processed." LML's construction of the phrase is based on the ordinary and customary meaning of the phrase as well as the intrinsic evidence.

a)    LML's construction clarifies the meaning of the claim element, instead of changing it.

The language of the claim, always the first place to look when construing a claim, states that the bank check is not ***used as a*** negotiable instrument. "In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is the language that the patentee chose to use to 'particularly point [ ] out and distinctly claim [ ] the subject matter which the patentee regards as his invention.'" *Brookhill-Wilk 1, LLC*, 334 F.3d at 1298 (internal citations and quotations omitted); *Abtox*, 122 F.3d at 1023 ("Nonetheless, throughout the interpretation process, the focus remains on the meaning of claim language." And "the language of the claim frames and ultimately resolves all issues of claim interpretation.").

The language in the '988 Patent does not prohibit the check from ***becoming a*** negotiable instrument. The claim language is largely agnostic to whether the check is filled out—properly or improperly—or even blank, focusing instead on whether the check is ***used as*** a negotiable instrument. Indeed, the entire thrust of the patent is alleviating the merchant's need to keep the check, endorse it, send it to the merchant's bank and thereby process the check through traditional means because the check is

merely used as a source of consumer bank account information and the transaction is then electronically settled. Ex. A, '988 Patent col. 1, lns. 10-15; col. 2, lns. 34-57.

This is a critical distinction that the Defendants ignore. LML's construction reflects the "using…as a" language by requiring that the bank check be used *"as a* source of information." However, Defendants again ignore the plain language of the claim and construe the phrase as "the bank check, at no time, *takes on the status* of a negotiable instrument." Defendants improperly make the characteristics of the check itself the focus of their construction. According to the plain language of this element, the characteristics of the check itself are irrelevant as long as the bank check is not *used as a* negotiable instrument.

<blockquote>
b)    The '988 Patent specification repeatedly discloses using the check as a source of information, and is not accepted or processed.
</blockquote>

The specification, which is "the primary basis for construing the claims" includes numerous references to how the check is used which are entirely consistent with the ordinary and customary meaning set forth in LML's construction. *Phillips*, 415 F.3d at 1315 *citing Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985) (internal citations omitted). The specification pays a great deal of attention to explaining the meaning of the phrase "without using the bank check as a negotiable instrument," most likely because it reflects such a key feature of the invention.

Indeed, LML's proposed construction is taken directly from the specification itself. The "Field of the Invention" specifically states that the check in the '988 Patent is "used as *the source*" of consumer account information or identification. Ex. A col. 1, lns. 10-15 (emphasis added). The specification goes on to explain that "No commercial bank

-25-

note ("Paper Check") is ***accepted or processed*** by the service subscriber." Ex. A '988

Patent col. 9, ln. 64 through col. 10, ln. 2 (emphasis added).  Thus, LML's construction is

consistent with the specification because it is directly drawn from it.  Indeed, LML's

construction is consistent with the entire concept of the '988 Patent.

The specification provides a wealth of other statements that support LML's

construction.  For example, the Background section of the patent begins with a discussion

of the problems found in the prior art:

- Lloyd, Jr. describes a check validation system again located together with a Point-of-Sale system for imprinting and otherwise physically dealing with a check.  Col. 1, lns. 27-30; and

- Carlson et al. describes a Point-of-Sale system whereby an apparatus is provided to secure the processing and imprinting of checks.  Col. 2, lns. 31-33.

The patentees then respond by specifically stating the solution to one of the key

problems found in the prior art references:

> Further, ***some of the currently used systems described above require the use of a bank check as a negotiable instrument*** which must be surrendered to a merchant. Some of the systems do away with the use of a bank check altogether, but require a debit card or specialized draft instrument to be used with only this particular system.  ***None of these systems completely does away with the need and use for a negotiable draft instrument while using the consumer's bank check for identification and verification only.***  It is therefore an objection of the present invention to provide such a system.

'988 patent, 2:46-55 (emphasis added).  "The inventor's discussion of the disadvantages

of the . . . prior art sheds light on the scope of the invention.  *Kinik Co. v. Int'l Trade*

*Comm'n*, 362 F.3d 1359, 1365 (Fed. Cir. 2004)."  Moreover, claim terms may be

interpreted in light of the problems discussed, as well as the solution provided by the

patentee.  *Minnesota Mining and Manufacturing Co. v. Johnson & Johnson Orthopedics,*

*Inc.*, 976 F.2d 1559, 1566 (Fed. Cir. 1992).  Again, the focus of the specification is on

eliminating using the check as a negotiable instrument and instead using the check—whether actually a negotiable instrument or not—as a source of information.

The specification continues with a number of other explanations discussing how the check is used and how it is not used:

- It is a further objective of the present invention to *eliminate the need for "paper" checks* as an accepted means of consumer payment. Ex. A Abstract (emphasis added) and col. 3, lns. 51-53;

- "Each sale or 'Transaction Event' would be an electronic and *'paperless'* event thereby *eliminating reliance on accepting and processing commercial bank drafts* (personal or corporate checks) and the physical handling of those bank drafts thus replacing commercial bank drafts at the point-of-sale." *Id.* at col. 3. lns. 3-8 (emphasis added)

- "Further, operational parameters of the present invention allow freedom from customary state or other geographically limiting criteria typical when *accepting and processing 'paper' checks." Id.* at col. 3, lns. 3-8 (emphasis added)

- Thus, the overall objective of the present invention is to provide and support an alternate means for consumer payments for goods and services that operates to replace commercial bank drafts in the point-of-sale environment. *Id.* at col. 4, lns. 46-49.

- "[T]he system provides system subscribers...a pronounced lowering of the present cost of cumbersome procedures otherwise mandated by the existing ACH system *for accepting and processing commercial bank drafts." Id.* at col. 4, lns. 52-58 (emphasis added)

- "If the check is approved the terminal displays a message noting the approval 138 and *the specimen check is returned to the consumer*." *Id.* at col. 8, lns. 24-29 (emphasis added)

- "The total of daily, approved Transaction Events are 'checkless' sales whereby the service subscribing merchant has submitted requests for electronic ACH settlement for all preauthorized consumer purchases. *No commercial bank note ("Paper Check") is accepted or processed* by the service subscriber. *Id.* at col. 9, lns. 64 through col. 10, ln. 2 (emphasis added)

Thus, the specification specifically discloses that "where the paper check is used as a source of information, and is not accepted or processed," as LML's construction requires.

Defendants' construction of "without using the bank check as a negotiable instrument" suffers from a number of fundamental flaws.  For example, it is unclear what the Defendants mean by the language that the check takes on the "status" of a negotiable instrument potentially requiring further claim construction of Defendants' own construction.    In addition, Defendants' construction is without support from the specification, and, in fact, contradicts the specification.  For example, if a check is completely filled out and handed to the merchant, but the merchant only uses the check as a source of information, it is not used as a negotiable instrument.  This is one of the very transactions disclosed as a "Preferred Embodiment" in the '988 Patent.  However, such an example would violate Defendants' proposed claim construction because, ostensibly, as soon as the check was filled out, regardless of what the merchant actually does with it, it takes on the status of a negotiable instrument.  A claim construction that excludes a preferred embodiment is "rarely, if ever, correct."  *SanDisk*, 445 F.3d at 1285.  As such, Defendants' construction cannot be correct.

> c) LML's construction is supported by the prosecution history

During prosecution of the '988 Patent, the Applicants emphasized and explained that their invention enables the electronic transfer of funds "without using the bank check as a negotiable instrument" to distinguish the invention from other prior art references cited by the Examiner.  The Applicants' explanation reinforces what was clear from the claim language as well as the specification – that the element has nothing to do with the

characteristics or status of the check but instead is referring to the fact that the invention

only uses the paper check as a source of information, it is not accepted or processed.

As an example, again referring to the applicants' December 22, 1993 Office

Action Response, the applicants distinguished the Case reference.  In doing so, they

stated that:

> the consumer using Applicants' system is not required to furnish the merchant with a special draft instrument.  The consumer merely uses a regular check used to draw funds from a normal bank or credit union checking account.  ***This check needn't even be given to the merchant. The checking account information is simply read from the check, which is returned to the consumer***....It is respectfully submitted that Applicants' claimed system, which obviates the use of checks in a checking account transaction, is completely different from the Case system, which replaces ordinary bank checks with special draft instruments.

Ex. S at LML-EP 000157 (December 22, 1993, Office Action Response at p. 14)

(emphasis added).

Additionally, in their January 30, 1995 Office Action Response, the applicants

distinguish several prior art patents, stating in summary that "none of the references

discloses a point-of-sale system ***that uses any bank check solely for the purposes of

gathering customer information and not as a negotiable instrument*** used to pay for

goods received in a transaction."  Ex. T at LML-EP 000207 (January 30, 1995, Office

Action Response at 25).  Specifically applicants distinguished the following patents:

- Case '402 patent which relies on a "letter of credit card, and the negotiable draft instrument": "Case does not disclose the use of any bank check ***solely to derive consumer information and not for use as a negotiable instrument***, as recited in independent claims 1, 9, and 11."  *Id.* at LML-EP 000190 (*Id.* at 8).

- U.S. Patent No. 4,823,254 issued to Deming: it "does not disclose the use of a bank check in a point-of-sale transaction ***solely to derive***

*consumer information and not for use as a negotiable instrument*." *Id* at LML-EP 000191 (*Id* at 9).

- Carlson et al. U.S. Patent No. 5,053,607 which "speeds up processing of the check at the point of sale": "the check is still used as a negotiable instrument, however, and is turned over to the merchant to complete the transaction. Thus, Carlson et al. does not disclose the use of a bank check in a point-of-sale transaction *solely to derive consumer information and not for use as a negotiable instrument*....Rather, the Carlson et al. system requires negotiation of the check. *Id.* at LML-EP 000192 (*Id.* at 10).

- Carlson et al. 4,678,896 which "only processes instruments that are negotiated as part of the transaction taking place at the point of sale": "do not disclose the use of a bank check in a point-of-sale transaction *in order to derive consumer information and not for use as a negotiable instrument* . . . Rather, Carlson et al. require negotiation of the check." *Id.* at LML-EP 000193 (*Id.* at 11).

- U.S. Patent No. 4,672,377 issued to Murphy et al.: "the check is then negotiated as it would be in any normal transaction....Further, it would not be trivial to modify Murphy et al. so that *a bank draft is used for informational purposes only*. The entire Murphy et al. system is set up to authorize the acceptance of a check as a negotiable instrument in payment for goods." *Id.* at LML-EP 000194 (*Id.* at 12).

- U.S. Patent No. 4,810,866 issued to Lord: In Lord, "[i]f sufficient funds are present, a blank check is printed using the device, which imprints the date, transaction total, etc. and presents the check to the customer for signature. Once the check is executed, it is given to the merchant as payment and *is negotiated as would be any normal check* in such a transaction." *Id.* at LML-EP 000196 (*Id.* at 14).

As with the specification, the prosecution history distinguishes and disclaims prior art systems that use checks "as" negotiable instruments from the invention disclosed in the '988 Patent which does not use a check as a negotiable instrument, regardless of whether the instrument itself is a negotiable instrument. These positions are consistent with LML's proposed construction.

Because the ordinary and customary meaning, specification and prosecution history and the entire concept of the '988 Patent all support LML's proposed

construction, this Court should construe this element to mean "where the paper check is used as a source of information, and is not accepted or processed."

**C.    Construction of the term "means for reading the magnetic ink character recognition numbers on a consumer check for the sole purpose of identifying and reading consumer bank account information"**

Dependent claim 2 and independent claim 9 recite the element "means for reading the magnetic ink character recognition numbers on a consumer check [any consumer bank check] for the sole purpose of identifying and reading consumer bank account information." Ex. A '988 Patent at claims 2, 8 and 9. The recited function is "reading magnetic ink character recognition numbers appearing on a consumer check." The structures disclosed in the '988 Patent specification are any mechanism such as a MICR check reader, optical character recognition ("OCR") equipment, a keyboard for manual entry, or equivalent.

> *1.    The specification discloses using a MICR reader, OCR equipment and manual entry of MICR information on a keyboard to read MICR numbers appearing on a check.*

The parties agree this phrase is a means-plus-function element that should be construed pursuant to 35 U.S.C. § 112, ¶ 6. The parties further agree that the recited function is "reading magnetic ink character recognition numbers appearing on a consumer check." Where the parties disagree is in the structure disclosed in the specification. Section 112, ¶ 6 requires that an element expressed as a means without the recital of structure "shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." Thus it is necessary, as in all other instances, to consult the specification to determine the proper claim construction. *Vitronics*, 90 F.3d at 1582.

The '988 Patent specification explicitly discloses at least three structures for reading the MICR line on a check.  The '988 Patent discloses that this structure is a MICR reader, Optical Character Recognition ("OCR") equipment, manual keyboard entry of the MICR string or equivalent:

- Such a fully automated system generally comprises a dual-port terminal with magnetic stripe reading capabilities interfaced with a logging printer capable of providing individual Transaction Event Slips for consumer execution, and a *MICR check reader, optical character recognition ("OCR") equipment, or other device*. Ex. A '988 Patent at col. 5, lns. 44-49 (emphasis added)

- The subscriber begins the process by first pressing the appropriate key on a terminal to access the host computer 108. Thereafter the point of sale terminal prompts the system subscriber to enter the appropriate MICR number 110. *The system subscriber then enters the appropriate MICR number either manually or by passing the check through a check reader which determines the MICR number 112.*  Ex. A '988 Patent at col. 7, lns. 55-62 (emphasis added).

- Having depressed the assigned Split Dial key and thereafter being prompted, *the system subscriber manually enters account numbers from a personal or business check or, where fully automated, enters a specimen check through a MICR Check Reader device interfaced with the terminal* . . Check Replacement Service--Inquiries initiated as Check Replacement requests function in nearly an identical manner as that of Check Authorization.  Ex. A '988 Patent at col. 9, ln. 9-14 and lns. 50-52 (emphasis added).

- It is important to note that account information may be entered manually as well at the point of sale with the other financial advantages of the present invention still in effect.  Ex. A '988 Patent at col. 10, lns. 41-44.

Similarly, the patent's discussion of FIG. 2 is particularly instructive:

Referring to FIG. 2 the point-of-sale terminal is described. The point-of-sale terminal comprises several different entry means. *A key board 310 can be used to input consumer information manually.* Alternatively a card reader 312 can be used whereby the magnetic stripe on the card is read by the point-of-sale terminal and finally *a check reader 314 is also included to read the MICR number on checks as a substitute for either a specific card or key board input.*

-32-

Ex. A '988 Patent at col. 6, lns. 60-67 (emphasis added). Figure 2, reproduced below, very clearly shows that consumer bank account information may be inputted either through the keyboard 310 or check reader 314.



FIG. 2

Ex. A, Fig. 2.[12] Therefore, the structures disclosed in the specification associated with this function are a MICR reader, OCR equipment keyboard or equivalent as LML's construction requires.

Defendants' construction, however, only includes the MICR reader and OCR equipment structures despite the express inclusion of the keyboard in the '988 Patent specification. Furthermore, Defendants' construction ignores the language of § 112, ¶ 6 that requires any "equivalent" of the structure disclosed in the specification to also be construed as a structure for performing the recited function. Therefore this Court should

---

[12] The card reader is relevant to another embodiment of the invention which discloses using a card with information encoded in the magnetic strip and would not, therefore, be a structure that would read MICR numbers from a consumer *check* as recited in the function. Ex. A '988 Patent at col. 8, lns 59-63.

-33-

adopt LML's proposed construction.

> 2. *The Defendants' construction of "for the sole purpose" language improperly imports a limitation that is absent from the plain language of the claims.*

LML gives the limitation "for the sole purpose of" its ordinary and customary meaning and construes the limitation to mean "for the only purpose."[13]    LML's construction is based on contemporaneous English dictionaries as the *Phillips* Court specifically contemplated:

> In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.  In such circumstances, general purpose dictionaries may be helpful.

*Phillips*, 415 F.3d at 1314.  Webster's Third New International Dictionary (1993) defines "sole" as "3 a : having no sharer (as in a right or status) : being the only one <the ~ heir> <the ~ product of all this industry>"  Ex. U at 2168.   The Federal Circuit has previously relied upon Webster's Third New International Dictionary for the construction of plain English terms.  *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, No. 05-1043, 2005 WL 2403777, at *9 (Fed. Cir. Sept. 30, 2005).

This construction is consistent with the specification which states that "None of these systems completely does away with the need and use for a negotiable instrument while ***using the consumer's bank check for identification and verification only.***"  Ex. A

---

[13] Until just prior to filing this brief, Defendants insisted on construing the term "sole purpose" and the parties disputed the meaning of such term.  Only 2 hours before the deadline for filing, however, Defendants changed their position to insisting that no construction was required for this term.   While LML maintains its proposed construction as set forth above, LML is evaluating Defendants' new position and will inform the Court if agreement can be reached.

'988 Patent col. 2, lns. 52-55. Thus, this Court should adopt LML's construction, based on the ordinary and customary meaning of the claim term.

> **D.    Construction of the phrase "verifying that account numbers were accurately read at the point of sale"**

Independent claim 8 recites the step of "verifying that account numbers were accurately read at the point of sale terminal." This phrase should be construed according to the ordinary and customary meaning of the words to mean "verifying that the account numbers from the check were read accurately at the point of sale terminal."

LML believes this element does not need any claim construction. Where the proper scope and meaning of a particular claim term is clear and understandable to the jury without explanation, no claim construction is necessary, and none should be given. *See U.S. Surgical Corp*, 103 F.3d at 1568. The claim language is clear on its face and needs no further interpretation. Despite this unambiguous claim language, Defendants have proposed a strained construction of this term. Defendants attempt to import additional limitations by construing the phrase to mean "visually confirming that account numbers were accurately read by reference to the source document" in order to avoid infringement. This construction violates a number of well-settled Federal Circuit tenets prohibiting importing limitations and preferred embodiments into the claims. *Comark Comm. Inc. v. Harris Corp.,* 156 F.3d 1182, 1186 (Fed. Cir. 1998).

First, there is no justification for adding the modifier "visually" to this claim element. The claim language itself does not require that the merchant who is physically at the point of sale terminal visually verify that the account numbers were accurately read. "In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves. . .'" *Brookhill-Wilk*, 334 F.3d at 1298 (internal

citations and quotations omitted); *Abtox*, 122 F.3d at 1023 ("Nonetheless, throughout the interpretation process, the focus remains on the meaning of claim language." And "the language of the claim frames and ultimately resolves all issues of claim interpretation."). Instead, the claim language states only that some verification that the account numbers were accurately read at the point of sale terminal must occur, regardless of how that verification occurs—indeed the MICR reader itself could perform this function electronically. Indeed, had the patentees wanted visual verification on, for example, a display on the point of sale terminal they would have required that the point of sale terminal to include such as display as they did in Claim 3. *Compare* Ex. A '988 Patent claims 3 and 8. However, claim 8 does not require any such display.

While the patent also discloses in the preferred embodiment that visually verifying account numbers is possible, it is not required. (Col. 7, lns. 65-67: "During the comparison, the subscriber determines that the check number compares accurately 116 to the number displayed on the terminal."). It is well-established that importing limitations from the preferred embodiment is improper. *See Comark Communications,* 156 F.3d at 1186 ("Further, the language that [the Defendant] argues should limit claim 1 is clearly found in the '904 patent's description of the preferred embodiment. It is precisely against this type of claim construction that our prior case law counsels."); *Texas Instruments, Inc. v. United States Int'l Trade Comm'n*, 805 F.2d 1558, 1563 (Fed. Cir. 1986) ("This court has cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification.").

Accordingly, the step of "verifying that account numbers were accurately read at the point of sale" should be construed to have its plain meaning, "verifying that the account numbers from the check were read accurately at the point of sale terminal."

**E.    Construction of the phrase "subsequently transmitting the transaction event information to a bank for subsequent automated clearinghouse operations"**

Independent claim 8 recites the step of "subsequently transmitting the transaction event information to a bank for subsequent automated clearinghouse operations." This phrase should be construed to mean "subsequently transmitting the information relating to the transaction to a bank for subsequent automated clearing house operations." This phrase uses ordinary words that do not require extensive construction for the jury.

*1.    The specification discloses transmitting the transaction event information to a bank for subsequent automated clearing house operations.*

Even if the claim language has a readily ascertainable "ordinary meaning", "it is always necessary to review the specification to determine whether the invention has used any terms in a manner inconsistent with their ordinary meaning." *Vitronic*, 90 F.3d at 1582. The '988 Patent repeatedly discloses transmitting transaction event information to a bank for subsequent automated clearing house operations, consistent with the claim term's ordinary and customary meaning:

- "Referring to FIG. 1 an overall schematic of the present invention is described. Point-of-sale terminals 300 communicate over normal PSTN telephone lines with a central computer system 302 which in turn communicates with a banking institution 304 for purposes of debiting consumer accounts and crediting system subscriber accounts. The banking institution performs its function via normal automated clearing house ("ACH") transactions 306" '988 Col. 6, lns. 52-59.

- Referring to FIG. 7, the process description continues. Once the transaction is approved the central computer captures the MICR

information and the sale amount and stores that information 146. The central computer subsequently generates a batch message regarding all transaction events for the prior period and transmits all the transaction event information for the day into the ACH network 148.

Accordingly, in this claimed embodiment, transaction information is transmitted first to a bank and then, in batch form, to the ACH network for "subsequent electronic clearing house operations". Figure 1 in the '988 Patent, reproduced below, similarly shows that transaction event information can be transmitted to a bank (bank 304) and then to an automated clearing house (ACH 306).



## FIG. 1

Therefore, this Court should adopt LML's construction, which is consistent with the specification.

> 2.    *Defendant's construction improperly deletes the plain language "to a bank" from the disputed phrase.*

Defendants construe "subsequently transmitting the transaction event information *to a bank* for subsequent automated clearinghouse operations" to mean "electronically communicating with an automated clearing house for transferring funds electronically based upon the consumer bank account information obtained from any bank check presented at the point-of-sale." Defendants are quite simply asking the Court to rewrite rather than construe claim 8 by eliminating the entire term "to a bank". It is well established that, in construing claims, courts may not rewrite them. *See K-2 Corp. v.*

-38-

*Salomon S.A.*, 191 F.3d 1356 (Fed. Cir. 1999). ("Courts do not rewrite claims; instead we give effect to the terms chosen by the patentee."). There is simply no justification or precedent for Defendants' radical construction. Nothing in the '988 specification or the prosecution history justifies or even suggests the term "to a bank" should be eliminated, nor have Defendants provided any justification for doing so.

> 3.    *Defendants have again imported limitations not required by the claim language.*

As with Defendants' construction of the "enabling automated clearing house communications . . ." limitation, Defendants have again proposed a much more complex construction than is required by the claim language itself. Defendants' construction adds a number of extraneous limitations to the end of their construction, namely, requiring the transfer "based upon the consumer bank account information obtained from any bank check presented at the point-of-sale." This effort to add extraneous limitations to this claim element violates established Federal Circuit precedent which prohibits such constructions. *See E.I. Du Pont*, 849 F.2d at 1434.

Like the "enabling automated clearing house communications . . ." limitation from claim 1, the "subsequently transmitting . . ." element in claim 8 does not include any language regarding "consumer bank account information" or "any bank check." Moreover, the "subsequently transmitting . . ." limitation of claim 8 specifically calls for only "transaction event information"—not consumer bank account information as Defendants suggest—to be transmitted. While earlier steps in process claim 8 included the transmission of both "the transaction event information and consumer bank account information to a central computer system," the "subsequently transmitting . . ." element only requires transmitting transaction event information. Again, Defendants' efforts in

this regard violate established Federal Circuit precedent. *Phillips*, 415 F.3d at 1314 ("Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims.").

Because LML's construction is soundly based on the ordinary and customary meaning of the claim terms themselves, and is consistent with the intrinsic evidence, this Court should adopt LML's construction, "subsequently transmitting the information relating to the transaction to a bank for subsequent automated clearing house operations."

## V.    CONCLUSION

For the foregoing reasons, LML respectfully requests that this Court adopt its proposed constructions for the disputed terms of the '988 Patent.

      */s Richard K. Herrmann*
Richard K. Herrmann (I.D. No. 405)
MORRIS JAMES HITCHENS & WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
302.888.6800
rherrmann@morrisjames.com

Russell E. Levine, P.C.
Jamie H. McDole
Aaron D. Charfoos
Edward K. Runyan
Lesley G. Smith
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
312.861.2000

*Counsel for Plaintiff LML Patent Corp.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of October, 2005, I electronically filed the foregoing document, **PUBLIC VERSION OF PLAINTIFF LML PATENT CORP.'S OPENING BRIEF IN ISSUES OF CLAIM CONSTRUCTION**, with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Collins J. Seitz, Jr., Esq.
Francis DiGiovanni, Esq.
Connolly Bove Lodge & Hutz LLP
1007 North Orange Street
Wilmington, DE 19801

William J. Marsden, Jr., Esq.
Timothy Devlin, Esq.
Fish & Richardson, P.C.
919 North Market Street, Suite 1100
Wilmington, DE 19801

Richard D. Kirk, Esq.
The Bayard Firm
222 Delaware Avenue, 9th Floor
Wilmington, DE 19801

Additionally, I hereby certify that on the 17th day of October, 2005, the foregoing document was served via email on the following non-registered participants:

Robert Jacobs, Esq.
Mark B. Mizrahi, Esq.
Belasco Jacobs & Townsley, LLP
Howard Hughes Center
6100 Center Drive, Suite 630
Los Angeles, CA 90045

Mark C. Scarsi, Esq.
Vision L. Winter, Esq.
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071

_/s Richard K. Herrmann_
Richard K. Herrmann (#405)
Mary B. Matterer (#2696)
MORRIS, JAMES, HITCHENS & WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
(302) 888-6800
rherrmann@morrisjames.com
mmatterer@morrisjames.com

Attorneys for Plaintiff LML PATENT CORP.