IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LML PATENT CORP.,

        Plaintiff,

    v.

TELECHECK SERVICES, INC.,
ELECTRONIC CLEARING HOUSE, INC.,
XPRESSCHEX, INC. and NOVA
INFORMATION SYSTEMS, INC.,

        Defendants.

C.A. 04-858 (SLR)

**PUBLIC VERSION**

---

**DECLARATION OF TIMOTHY DEVLIN IN SUPPORT OF
DEFENDANTS' RESPONSE TO LML PATENT CORP.'S MOTION TO
STRIKE PORTIONS OF DAVID P. KURRASCH'S SUPPLEMENTAL
EXPERT REPORT REGARDING INVALIDITY**

FISH & RICHARDSON P.C
William J. Marsden (#2247)
Timothy Devlin (#4241)
Tara D. Elliott (#4483)
919 N. Market Street, Suite 1100
Wilmington, DE 19899-1114

Attorneys for Telecheck Services, Inc.

Dated: October 5, 2005
Public Version filed: October 26, 2005

I, TIMOTHY DEVLIN, declare as follows:

1.    I am a principal at the law firm of Fish & Richardson P.C., counsel of record for Defendant TeleCheck Services, Inc. ("Telecheck") in the above-captioned matter.  I make this declaration of my own personal knowledge, and if called upon as a witness would competently testify to the facts set forth below:

2.    I submit this declaration in support of the Defendants' Response to LML Patent Corp.'s Motion to Strike Portions of David P. Kurrasch's Supplemental Expert Report Regarding Invalidity.

3.    Attached hereto as Exhibit A is a true and correct copy of U.S. Patent No. 5,484,988 (the "'988 patent");

4.    Attached hereto as Exhibit B is a true and correct copy of excerpts of the

## REDACTED

5.    Attached hereto as Exhibit C is a true and correct copy of U.S. Patent No. 5,175,682 to Higashiyama et al. (the "Higashiyama patent");

6.    Attached hereto as Exhibit D is a true and correct copy of pages from the Supplemental Expert Report of David P. Kurrasch Regarding Invalidity ("Supplemental Report") containing paragraphs 164 and 245.

7.    Attached hereto as Exhibit E is a true and correct copy of an invalidity chart

## REDACTED

8.    Attached hereto as Exhibit F is a true and correct copy of *Cytyc Corp. v. TriPath Imaging, Inc.*, No. Civ.A. 03-11142-DPW, Civ.A. 03-12630-DPW, slip op., 2005 WL 1527883, at *4 (D. Mass. June 21, 2005);

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and this declaration was executed by me in Wilmington, Delaware on October 5, 2005.

Timothy Devlin (#4241)

# Exhibit   A

US005484988A

# United States Patent [19]

## Hills et al.

| | |
|---|---|
| [11] Patent Number: | **5,484,988** |
| [45] Date of Patent: | **Jan. 16, 1996** |

[54] **CHECKWRITING POINT OF SALE SYSTEM**

[75] Inventors: **Robert R. Hills**, St. Augustine, Fla.;
**Henry R. Nichols**, McLean, Va.

[73] Assignee: **Resource Technology Services, Inc.**,
Vienna, Va.

[21] Appl. No.: **257,390**

[22] Filed: **Jun. 9, 1994**

### Related U.S. Application Data

[63] Continuation of Ser. No. 975,717, Nov. 13, 1992, abandoned.

[51] Int. Cl.⁶ ............................................... G06F 15/30
[52] U.S. Cl. ............................................. 235/379; 235/380
[58] Field of Search ................................ 235/379, 380

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,824,544 | 7/1974 | Simjian | 340/147 A |
| 3,845,470 | 10/1974 | Schuller | 340/149 A |
| 4,270,042 | 5/1981 | Case | 235/379 |
| 4,404,649 | 9/1983 | Nunley et al. | 364/900 |
| 4,523,330 | 6/1985 | Cain | 382/7 |
| 4,580,040 | 4/1986 | Granzow et al. | 235/379 |
| 4,617,457 | 10/1986 | Granzow et al. | 235/379 |
| 4,672,377 | 6/1987 | Murphy et al. | 340/825.34 |
| 4,673,802 | 6/1987 | Ohmae et al. | 235/379 |
| 4,678,895 | 7/1987 | Tateisi et al. | 235/379 |
| 4,678,896 | 7/1987 | Carlson et al. | 235/380 |
| 4,743,743 | 5/1988 | Fukatsu | 235/379 |
| 4,810,866 | 3/1989 | Lord, Jr. | 235/379 |
| 4,823,264 | 4/1989 | Deming | 235/379 |
| 4,933,536 | 6/1990 | Lindemann et al. | 235/375 |
| 4,934,772 | 6/1990 | Sakuma et al. | 350/6.5 |
| 5,053,607 | 10/1991 | Carlson et al. | 235/379 |

Primary Examiner—Harold Pitts
Attorney, Agent, or Firm—Thomas M. Champagne; Jon L.
Roberts; Roberts & Associates

[57] **ABSTRACT**

A point of sale system designed to read information from a consumer's check, credit card, or manual input with a subsequent debiting of a consumer's account and crediting a merchant's account for the goods or services provided. Point of sale terminals are designed to accept a form of credit card with a consumer's bank account information encoded thereon or in the alternative to read the MICR number from a consumer's check in order to verify that a consumer has an appropriate balance to conduct the transaction with a given merchant. Thereafter the transaction of that information is transmitted to a central computer system which verifies the consumer's credit worthiness and stores the transaction event information for subsequent bank reconciliation via the ACH network. The invention eliminates the need for paper checks with all bank reconciliation being accomplished electronically.

**20 Claims, 8 Drawing Sheets**



FDC5000159



**FIG. 1**



**FIG. 2**

FDC5000160



# FIG. 3

FDC5000161



**FIG. 4**

Case 1:04-cv-00858-SLR    Document 304    Filed 10/26/2005    Page 9 of 46



*FIG. 5*

FDC5000163



**FIG. 6**



**FIG. 7**

Merchant Name
Street Address
City, ST  Zip
Merchant Acct #

TIME 00:00 _M                    DATE 00/00/00
BANK ACCT. NO. 000000000000
TRANSIT NO.  000000000

SALE AMOUNT                      $ 0,000.00

TERMINAL ID 0000000000

I herewith authorize ChequeMARK Systems
to  electronically  access  my  designated
checking  account  for  the  payment  of  the
above referenced purchase.

Name (PRINT) _____

Street _____

City _____ ST_____ Zip _____

Tel. Number:  (_____) _____ — _____

**I ACKNOWLEDGE THAT RETURN FEES WILL BE
IMPOSED SHOULD MY PAYMENT BE DISHONORED
AND UNDERSTAND THAT IT IS UNLAWFUL TO
AUTHORIZE PAYMENTS FOR WHICH ADEQUATE
MONIES  ARE  NQT  AVAILABLE  WITHIN  MY
ACCOUNT.**

X_____
    Authorizing Signature

## FIG. 8

Merchant Name
Street Address
City, ST  Zip
Merchant Acct #


CUSTOMER BANKING INFORMATION:

BANK ACCT. NO. _____

TRANSIT NO. _____

SALE AMOUNT . . . . . . . . . . . . . . . . . . . $ _____

I herewith authorize ChequeMARK Systems to electronically access my designated checking account for the payment of the above referenced purchase amount.   I acknowledge that sufficient funds are available for the payment of this sale.

Name (PRINT) _____

Street _____

City _____ ST _____ Zip _____

Tel. Number:  (_____) _____ — _____


**I FURTHER ACKNOWLEDGE THAT RETURN FEES WILL BE IMPOSED SHOULD MY PAYMENT BE DISHONORED AND UNDERSTAND THAT IT IS UNLAWFUL TO AUTHORIZE PAYMENTS FOR WHICH ADEQUATE MONIES ARE NOT AVAILABLE WITHIN MY ACCOUNT.**

X_____
Authorizing Signature

## FIG. 9

FDC5000167

5,484,988

1

# CHECKWRITING POINT OF SALE SYSTEM

## RELATED APPLICATION

This application is a continuation of Ser. No. 07/975,717 filed Nov. 13, 1992, now abandoned.

## FIELD OF THE INVENTION

This invention relates to the field of Point-of-Sale systems and more particularly to the integration and processing of purchases whereby a check is used as the basic source of identification of the individual and of the individual's bank and whereby the bank account is debited.

## Background Art

Numerous devices exist for processing checks. For example, U.S. Pat. No. 4,933,536 to Lindemann, et al., describes a check processing device which is used together with a Point-of-Sale terminal. This particular device involves copying and taking a picture of an individual whereby a dishonored check could then be traced to the person who has offered it.

U.S. Pat. No. 4,810,866 to Lloyd, Jr., describes a check validation system again located together with a Point-of-Sale system for imprinting and otherwise physically dealing with a check.

Other systems also deal an apparatus for handling checks at a point of sale. For example, U.S. Pat. No. 4,743,743 to Fukatsu describes one such transaction apparatus where a check is examined by a reader. U.S. Pat. No. 4,672,377 to Murphy, et al. describes a check authorization system wherein a check is imprinted with a bar code and information concerning customers which are stored in a database. U.S. Pat. No. 3,845,470 to Schuller discloses a vending system using a modified form of a check which is imprinted with identification codes, when someone attempts to use the check in purchasing goods and services, a vending operation will not place the order if information associated with the check is not valid in a particular database.

Other check-based financial systems have also been the subject of invention. U.S. Pat. No. 4,617,457 addresses an ATM or automatic teller machine form of cashing checks. Such systems create a picture of the check involved and also involves checking against a specialized database to insure that the check is a "valid" one (see also U.S. Pat. No. 4,580,040 to Granzow et al.).

Another generic category of financial systems deals with methods of handling the financial transactions apart from the physical handling of the check itself. For example, U.S. Pat. No. 3,824,544 to Simjian describes a merchant issued "check" which can be used in the purchase of goods and services and upon purchase, a specialized code is evaluated to determine if the check is being validly utilized.

U.S. Pat. No. 4,404,649 to Nunley et al. describes a document processing system which generally discloses a method of reading checks for processing a wide variety of financial documents.

U.S. Pat. No. 4,523,330 to Caine also describes a method for processing financial documents which systems also includes a Point-of-Sale terminal for generating image data from checks as they are being processed. This patent is drawn principally to the actual terminal itself.

2

U.S. Pat. No. 4,673,802 to Ohmae et al. describes a central processing system having stored data relating to the accounts of users. Users are approved or disapproved at the Point-of-Sale based upon information in the database.

U.S. Patent No. 4,270,042 to Case discloses a point of sale system that requires a consumer to prepay a sum of money into a special account that is accessed only by the system. This amount is inscribed on the card, and when a transaction is made using the system, the amount of the transaction is punched out of a designated area on the card. This amount, along with a signature and other information, is supplied on a draft negotiable instrument, which is given to the merchant at the time of the transaction. Thus, the Case system does away with the use of bank checks in effecting the transacion, but requires the use of specialized prepaid draft negotiable instruments that must be surrendered to the merchant.

U.S. Patent No. 4,823,264 to Deming discloses a home banking system that can be used to transfer funds to different payees in satisfaction of debts incurred through previous purchases, use of utilities, etc. The system is consumer driven; that is, it is contemplated for use by the payor on a home personal computer. While the Deming system does away with the use of bank checks, account and other information must be keyed into the system. The Deming system cannot be used to read account and other information directly from an ordinary bank check and has no use for bank checks as instruments other than negotiable paper. Further, the Deming system cannot be used to transfer funds at the time of purchase and is not workable at the point of sale; the system can only be used to pay debts that have been incurred in the past and have accumulated.

Finally, U.S. Pat. No. 4,678,896 to Carlson et al. describes a Point-of-Sale system whereby an apparatus is provided to secure the processing and imprinting of checks.

All of these above patents deal with the specific problem of how to accept a check from a customer for the purchase of goods and services. They do not in any way address the subsequent processing of checks nor do they address the process by which checks are cleared through the normal automatic check handling clearinghouse operations that exist in the financial world. Thus, the interaction of these systems with the automated clearing house ("ACH") process is not addressed in any way. This is particularly important since if any Point-of-Sale check handling system is to interact with the ACH mechanism it must adhere to that processing scheme and must lend itself to use with a processing scheme.

Further, some of the currently used systems described above require the use of a bank check as a negotiable instrument which must be surrendered to a merchant. Some of the systems do away with the use of a bank check altogether, but require a debit card or a specialized draft instrument to be used only with the particular system. None of these systems completely does away with the need and use for a negotiable draft instrument while using the consumer's bank check for identification and verification only. It is therefore an objective of the present invention to provide such a system.

It is an objective of the present invention to be adaptable for use with the ACH system and to be smoothly incorporated into it. In this fashion, the present invention will immediately be useful for a much wider range of financial transactions above and beyond those contemplated and disclosed in the background references discussed above.

## Summary of the Invention

The present invention comprises a process and apparatus which may be employed for the purpose of effecting pay-

5,484,988

3

ments for point-of-sale purchases of goods and services paid from consumer funds secured in bank checking or depository accounts. Each sale or "Transaction Event" would be an electronic and "paperless" event thereby eliminating reliance on accepting and processing commercial bank drafts (personal or corporate checks) and the physical handling of those bank drafts thus replacing commercial bank drafts at the point-of-sale.

In contrast to known systems, the present invention is a merchant driven system that can be used to process a transaction at the point of sale and at the time of purchase. The system is intended to be made available to subscribing merchants, businesses, and individuals herein referred to as "system subscribers" wishing to employ the method and apparatus of the present invention for the electronic processing and settlement of consumer purchases. Further, operational parameters of the present invention allow freedom from customary state or other geographically limiting criteria typical when accepting and processing "paper" checks. The system is designed to act with the national authorization and electronic settlement network known as the ACH system.

The system is designed to perform in a fully automated manner enabling each Transaction Event to be processed by a system subscriber as a point-of-sale transaction in the presence of the consumer. When the transaction event is "approved" funds are debited from an authorized consumer account for credit to the system subscriber and electronic settlement by ACH deposits the transaction amount to the subscriber's designated depository account. Authorized access to consumer accounts and credits to system subscriber depository accounts are performed as "Off-Line" transactions by means of Electronic Funds Transfer ("EFT") through the ACH Network or through the Federal Reserve System.

The invention comprises a point-of-sale processing system comprising electronic data processing equipment which allows individual services selections which provide automated, electronic processing from bank checking or depository accounts. It is the objective of the present invention to automate the point-of-sale environment for processing consumer purchases of goods and services which, other than for the system of the present invention, would necessitate the more traditional acceptance and processing of commercial bank drafts (personal and/or corporate checks). Individual Transaction Events are administered under the system of the present invention by initiating a terminal authorization inquiry and continuing through the electronic settlement of funds representing the Transaction Event from the pre-approved consumer banking accounts.

It is a further objective of the present invention to eliminate the need for "paper" checks as an accepted means of consumer payment. In the place of personal and business checks, consumers would be provided free and unrestricted access to funds secured in bank accounts of various types by means of preauthorized electronic events. System subscribers electronically communicate with the data center of the present invention for individual Transaction Event authorizations which, upon reconciliation of a day's activity, result in an EFT by means of the Automated Clearing House accommodating an "Off-Line" debiting of preauthorized consumer Transaction Events from authorized accounts. Thereafter, each system subscriber is credited with the total of all such daily authorized Transaction Events to its designated banking depository account.

The present invention comprises logic which allows the following services which when individually performed or

4

where combined with other services establish a wholly unique processing medium enabling preauthorized access to consumers' checking account or bank depository reserves.

Authorization—This service supports electronic communication from point-of-sale to the system's central computer. The data center stores positive and negative files concerning consumer accounts thereby providing accurate inquiry responses regarding the current posting status of a consumer's banking account and signaling the system subscriber that said account may be reasonably relied upon for consummating a Transaction Event (i.e., an "Approval") or, where listed as delinquent, indicating that the account may not be so relied upon (i.e., a "Denial").

Check Replacement—This capability operates as an extension of Authorization enabling the system subscriber the capability of completing a Transaction Event by electronically logging the sale whereupon a Transaction Event Slip will be printed or manually prepared for consumer execution at the point-of-sale. By execution of the Transaction Event Slip, the consumer authorizes the electronic accessing of funds secured in his/her authorized banking account in lieu of the more traditional method of issuing personal and business checks. Funding settlement to the system subscriber would be effectuated by means of Electronic Funds Transfer via ACH or the Federal Reserve System as opposed to physically processing and transferring checks among banks.

Bank Transaction Card—As part of this invention on "Off-Line" Debit Card is established on which is stored the information relating to the banking account from which funds representing the Transaction Event would be debited for payment to the system subscriber. This information may be stored on the card itself in encrypted or unencrypted form or may be stored in the central computer where access to such information is gained via special control characters or access codes stored on the card. Electronic authorization for withdrawal of funds from the cardholder's account and subsequent electronic settlement procedures remain essentially identical to processing under the Check Replacement service described above. Information relating to the consumer-cardholder and the appropriate banking account to be debited for a Transaction Event will be encoded upon the magnetic stripe portion of the plastic, and terminal-readable, card.

Thus, the overall objective of the present invention is to provide and support an alternate means for consumer payments for goods and services that operates to replace commercial bank drafts in the point-of-sale environment. Simultaneously, the present invention assures consumers greater access to and use of funds in personal or corporate banking accounts. Further, the system provides system subscribers a significantly improved prospect of collecting the underlying monies for Transaction Events, reduced time for the collecting the cash receipts from Transaction Events, and a pronounced lowering of the present cost of cumbersome procedures otherwise mandated by the existing ACH system for accepting and processing commercial bank drafts.

A further objective of the present invention is to significantly reduce the use of checks as negotiable instruments in effecting the purchases of goods or services and to further reduce the consumers reliance on credit cards or cash for transaction events.

Detailed Description of the Preferred Embodiment

The method of the present invention begins with the electronic recording of consumer information at a system

FDC5000169

5,484,988

5

subscriber's location using a point-of-sale terminal. This information is obtained in the presence of the consumer and occurs prior to any "Approval" either for the Transaction Event or for the ultimate crediting of the System subscriber's designated depository account. A Transaction Event involves a series of events initiated by a system subscriber's request to sell goods or services by payment from funds secured in a consumer's banking account. First, the consumer's banking account status will be verified through accessing the central computer files of the present invention. Verification that an account may be accessed is established alternatively by means of an encoded, magnetic strip card, or by input of account identification numbers from a consumer's bank account. A more traditional identification of the consumer could also occur including visual examination of driver's license or similar and acceptable picture "ID" however this is not considered part of the present invention.

As an integral portion of each Transaction Event, the system subscriber's location, date and time, and requested sale amount is automatically logged into the system when a system subscriber first accesses the invention. Finally, a Transaction Event Slip ("Sales Slip") will be produced by a printer integral to the point-of-sale terminal and will be executed by the consumer in the amount of the stated purchase with inscribed language defining the Transaction Event and specifically providing consumer authorization for electronic access to his/her banking account. Thereafter, the consumer account will be debited and the proceeds credited to the system subscriber's designated depository account along with all other similar Transaction Events representing the total of the system subscriber's daily activity. Debiting of consumer accounts and settlement deposits to each system subscriber is performed by means of Off-Line electronic funds transfer through and by the ACH or Federal Reserve System.

Equipment Configuration—The present invention can operate with nearly every conceivable point-of-sale equipment system. The central computer system accepts data transmitted from the system subscriber's existing point-of-sale equipment or that which is added to augment service performance. The point of sale terminal of the present invention is implemented in a number of ways, most preferred, however, being activation under a fully automated format. Such a fully automated system generally comprises a dual-port terminal with magnetic stripe reading capabilities interfaced with a logging printer capable of providing individual Transaction Event Slips for consumer execution, and a MICR check reader, optical character recognition ("OCR") equipment, or other device. Variations to this configuration are particularly possible where the system of the present invention is to be activated under a "Split-Dial" feature installed to function within the operational parameters of existing point-of-sale equipment primarily dedicated to bankcard ("credit card") processing. It is contemplated that services may in the future be administered using the present invention with a singular point-of-sale hardware device which, as a function of its design, would incorporate all or most of the service capabilities of an integrated terminal, logging printer, and MICR Check Reading device. The system of the present invention can alternately be interfaced with electronic cash registers now on the market.

Communications links from point-of-sale terminals to the central computer of the present invention will typically be in the form of telephonic network communications over a public switched telephone network ("PSTN") or over other approved networks. Transaction Event verification will occur as a result of point-of-sale terminal access to the

6

central computer's positive and/or negative data files. "Approved" or "Declined" notifications are made to the Point-of-Sale device over the PSTN. All data files will be centrally located and maintained on the invention's central computer data bases. Portions of the data base include but are not limited to third party data files such as the Shared Check Authorization Network ("SCAN") (trademark) data base.

Individual transactions or groupings of transactions are first approved by soliciting an "Authorization" prior to the completion of any requests for electronic funds transfer. To maintain an accurate status of file information for authorizations to subscribing merchants, businesses, and/or individuals, separate data bases are maintained. Current cardholder or banking account status are updated daily and instantly available for point-of-sale inquiry for Transaction Event authorizations, updated daily and are instantly available for point-of-sale inquiry for Transaction Event authorizations.

System subscribers point-of-sale equipment is interfaced to the central computer of the present invention by means of a telephonic network which is able to support communication from a plurality of point-of-sale terminals. Programming of the point-of-sale terminal causes an automatic "Dial-Up" to the central computer and provides an automatic query and response sequence affirming or denying the Transaction Event. The addition of local entry hubs may be installed to better facilitate the speed or economics of communications with the data files. Alternatives to telephonic networks may involve use of satellite communications or enhanced radio transmissions. Similarly, the system's data files and associated Check Replacement Service are contemplated to be responsive to emerging point-of-sale devices intended to seek authorizations by the alternate means of voice pattern recognition, fingerprint identification, retina scan, "smart" chips, and/or consumer or check image and/or signature broadcasting.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1—System overview of the present invention

FIG. 2—The point-of-sale terminal

FIG. 3—The Central Computer System

FIGS. 4–7—The process Data Flow

FIG. 8—Transaction Event Sales Slip

FIG. 9—Manual Transaction Event Sales Slip

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring to FIG. 1 an overall schematic of the present invention is described. Point-of-sale terminals 300 communicate over normal PSTN telephone lines with a central computer system 302 which in turn communicates with a banking institution 304 for purposes of debiting consumer accounts and crediting system subscriber accounts. The banking institution performs its function via normal automated clearing house ("ACH") transactions 306.

Referring to FIG. 2 the point-of-sale terminal is described. The point-of-sale terminal comprises several different entry means. A key board 310 can be used to input consumer information manually. Alternatively a card reader 312 can be used whereby the magnetic stripe on the card is read by the point-of-sale terminal and finally a check reader 314 is also included to read the MICR number on checks as a substitute for either a specific card or key board input. These various

5,484,988

7

input means provide information to a microprocessor **316** which comprises logic means **318**, memory means **320**, and communication means **322**. The logic means **318** comprises logic which allows the information received from the various input means to be processed and stored in the memory **320**. The logic means further drives a display **324** which provides a visual output of the account number of the consumer for verification. The communication means **322** allows the subscriber terminal to communicate with the central computer **302** for purposes of processing the consumer's purchase.

Referring to FIG. 3 the central computer system **329** is described. The central computer system receives input from a plurality of point-of-sale terminals which provide transaction information from a system subscriber and a consumer desiring to purchase goods or services. The central computer system comprises a system subscriber **330** file which is a file of those merchants who have elected to use the present invention for processing purchases. The central system also comprises an approved consumer file **332** which stores the names of those consumers who have already been approved for allowing purchases to take place through the various input means as well as a third party database such as the SCAN (trademark) data base relating to consumer credit. The computer system also comprises a communications means **334**. The communication means communicates with other outside third party data bases to allow any consumer that has not been approved by the system to have a rapid check of the status of the consumer's banking account and of whether the consumer has current outstanding returns (i.e. bad checks). Once this SCAN (trademark) or other outside third party data base search is performed and where an approval is given, the approved consumer file **332** is updated with the name of the new approved consumer.

As presently configured the central computer **329** already has a third party database known as the SCAN (trademark) database **333** resident on the central computer. Thus credit worthiness can be checked using this SCAN database. The SCAN (trademark) database is updated daily.

The communication means **334** also communicates with a banking institution **338** to instruct the bank to debit the account of the consumer and credit the account of the system subscriber (merchant) with the amount of the purchase. These transactions then take place via the normal ACH transaction process.

Referring to FIG. 4 the process begins by a consumer presenting a specimen or "blank" check complete with MICR number to the system subscriber (the merchant) **100**. The system subscriber next determines if the check meets appropriate store policy procedures **102**, i.e., that the check has appropriate information on the check. If the check does not meet the store policies, it is returned to the consumer **104**. If the check does meet appropriate store policies the on-line verification process proceeds **106**. The subscriber begins the process by first pressing the appropriate key on a terminal to access the host computer **108**. Thereafter the point of sale terminal prompts the system subscriber to enter the appropriate MICR number **110**. The system subscriber then enters the appropriate MICR number either manually or by passing the check through a check reader which determines the MICR number **112**.

Referring to FIG. 6 the subscriber would verify that the numbers appearing on the terminal match the MICR numbers on the check **114**. During the comparison, the subscriber determines that the check number compares accurately **116** to the number displayed on the terminal. If they

8

do compare the verification process proceeds **120**. If the check numbers do not compare with that of the terminal the system subscriber clears the terminal and begins the transaction process again **118**. If the process is to be reinitiated, the subscriber enters the MICR number into the point of sale terminal **130**. Thereafter the system subscriber compares the MICR numbers as before **132**. If the MICR numbers compare to the system display **134** the process proceeds. If the numbers do not compare **136** the check is returned to the consumer and the process terminates **137**.

Referring to FIG. 5, if the verification process proceeds the terminal next prompts the system subscriber to enter the amount of the sale **122**. The subscriber enters the amount of the sale **124** and the terminal thereafter transmits an inquiry to the host data base for verification **126**.

The check approval process next takes place **128**. If the check is not approved by the central computer the terminal displays a message declining the transaction **140**. Thereafter a printer record of the declined transaction is made for purposes of the system subscriber **142** to comply with the Fair Credit Reporting Act and Regulation E of the Board of Governors of the Federal Reserve System.

If the check is approved the terminal displays a message noting the approval **138** and the specimen check is returned to the consumer. The printer further makes a paper record of the transaction **142** and the consumer places any required information on the paper receipt and signs the receipt authorizing the transaction **144**.

Referring to FIG. 7, the process description continues. Once the transaction is approved the central computer captures the MICR information and the sale amount and stores that information **146**. The central computer subsequently generates a batch message regarding all transaction events for the prior period and transmits all the transaction event information for the day into the ACH network **148**.

During the ACH process each checkwriter's account is debited for the exact purchase amount and such an amount is deposited into a system subscriber designated account **150**. Thereafter, collected funds for a total day's events are deposited into a subscriber's account **152**. The transaction is then complete **154**.

### How to Use

The present invention will require the establishment and maintenance of three interconnected but separate data files for the purpose of performing access searches. Each data file will be accessible by dial-up procedures operating, in most instances, under "Split Dial" format from a point-of-sale ("POS") terminal device or electronic cash register installed for the primary purpose of bankcard and/or bank draft authorizations. The terminal prompts an operator/user to process one of three optional inquiry types. Any one or all of three primary functions are capable of being performed at a single point-of-sale terminal within the control of the system subscriber. The inquiry types and data base format responses are as follows:

Card Authorization—Having depressed the assigned Split Dial key and thereafter being prompted, the system subscriber "slides" an encoded magnetic stripped transaction card through the point-of-sale terminal and enters the "Sale Amount" requested for authorization. Thereupon, the terminal's dial-up capabilities direct the inquiry to the central computer for authorization against "POSITIVE" file of current cardholders whose accounts were listed in "good standing". Inquiries where such a "Match" are found cause

FDC5000171

5,484,988

9                    10

an "Approved" return message from the data file to the inquiring POS terminal. Conversely, a "No-Match" to inquiry would result in a "Declined" notice to the POS terminal. An uploading mode of the present invention causes forwarding of daily status notifications to the central data files activating new cardholder accounts in the "POSITIVE" cardholder file or submitting corrective entries to delete delinquent or terminated accounts.

Check Authorization—Having depressed the assigned Split Dial key and thereafter being prompted, the system subscriber manually enters account numbers from a personal or business check or, where fully automated, enters a specimen check through a MICR Check Reader device interfaced with the terminal, whereupon the terminal's screen would display the check's numbers, and hence the account number, for verification. Thereafter, the operator would enter the "Sale Amount" requested for authorization. The terminal's dial-up capabilities then direct the inquiry to the computer data file center for authorization first against the "POSITIVE" file of "prenoted" bank/checking account numbers whose accounts were listed in "good standing". A successful "Match" to an inquiry would result in an "Approved" notice from the data file to the inquiring terminal. A "No-Match" to inquiry would not, however, immediately result in a "Declined" response. Each inquiry preliminarily resulting in a No-Match would be instantly forwarded/"rolled" to the third data file preceding any return notice to the inquiring terminal. This third file is anticipated to be the Shared Check Authorization Network ("SCAN") a negative data file data base maintained in the system computer data file center. Referrals to SCAN or any other positive or negative data files, enable potential acceptance of Transaction Events involving consumers "Unknown" to the invention's proprietary, "POSITIVE" files. A "Match" on the SCAN "NEGATIVE" file would result in a "Declined" notice; a "No-Match" would conversely send notification to the inquiring POS terminal of an "Approved" event. Of significant importance, the bank/checking account information for each such "Unknown" consumer's transaction would, subsequent to a SCAN "Approved" notice, be posted to the invention's "POSITIVE" file and prenoted through the ACH ("Automated Clearing House") for future Transaction Events. The invention, presumably in an automated mode, is capable of uploading daily corrections to the POSITIVE data file including notices of new accounts approved through SCAN (trademark) and deletions where settlement for consumer checking account events, initially approved, were subsequently dishonored. The SCAN data base is similarly uploaded with daily activity status corrections.

Check Replacement Service—Inquiries initiated as Check Replacement requests function in nearly an identical manner as that of Check Authorization. Records for such events, when culminating in "Approved" notices, are separately preserved. Check Replacement inquiries are processed first through the system's "POSITIVE" data file and, where no match is found, proceed to the SCAN data file or other data base file prior to transmitting an "Approved" or "Declined" notice to the inquiring POS terminal. A Match in the system data file indicates a consumer-user whose account was in "good standing" and would not be required to "roll" to SCAN. Check Replacement events are reported to and stored by the computer data file center under a file classification identifying the transaction as a Check Replacement Service. The total of daily, approved Transaction Events are "checkless" sales whereby the service subscribing merchant has submitted requests for electronic ACH settlement for all preauthorized consumer purchases. No commercial bank

note ("Paper Check") is accepted or processed by the service subscriber. In each Transaction Event, a Consumer, at the point-of-sale, has executed an electronic access ("Off-Line Debit") authority "Sales Slip" which is automatically printed upon a terminal's receipt of an "Approved" notice.

All terminal programming and all prompt strings for MICR Check Reader interfacing are stored in the POS terminal and the computer center of the present invention controls interactions between the plurality of terminals and the central system. The following modules are present.

Programming for MICR/Terminal Interface—system subscriber locations to be activated with the present invention must possess or acquire a terminal. Those utilizing or being upgraded to terminals such as a Tranz (trademark) 330 or other terminals with interface capabilities with the check reader for all suitable point-of-sale terminals.

The preferred format for terminal operations is generated from a singular split dial key. Thereafter, the "prompt string" would proceed in a manner such as i) "Card=1"; "Check=2" requiring operator selection; then, where selecting a checking account inquiry ii) the operator would respond to a secondary prompt of "Auth=1"; "Replace=2". These entry selections precede the magnetic stripe "reading" of a card/ submittal or a check through the MICR (Account Identification), the entry of the requested sale amount, and the terminal's dial-up for authorization against the computer data file center.

The MICR interface results in the transmittal of a query for data center approval of the entire ABA/Transit and personal or corporate checking account numbers. Instances where printed checks add the individual check's number to the end of the account number can be "dropped" by Check Reader switch settings. Subsequent to a terminal's receipt of the MICR number string but prior to the operator's entry of the requested sale amount and authorization dial-up, a verification prompt "flashing" the ABA and account numbers must be displayed on the terminal's screen requiring the operator to depress "Enter" to proceed, if correct, or "Clear", if incorrect and thereby enabling the terminal operator to resubmit the specimen check through the MICR Check Reader. It is important to note that account information may be entered manually as well at the point of sale with the other financial advantages of the present invention still in effect.

The computer data file center receives and processes Transaction Event authorization requests utilizing the entire MICR string for accurate, error-free identification of both the consumer bank and a specific checking or depository account to participate in a sale. ACH settlement criteria mandate exact recall for the bank and checking account numbers to properly complete any debit request. This invention conforms to each and every requirement of the ACH transaction regulations.

Each Transaction Event is completed with the logging printer generation of a Transaction Event ("Sales") Slip for each "Approved" authorization inquiry processed (FIG. 8). Alternatively, a manually created transaction event slip can also be prepared (FIG. 9). Each such Transaction Event Slip must be exacting in its retention of account numbers and the sale amount enabling both the consumer and system subscriber to be provided "hard copy" receipts of the event. Also included would be a clear printing of the transaction type; "Bank Card", "Check Authorization", or "Check Replacement". Authorization language is printed immediately preceding the consumer's signature line specifically authorizing electronic access in payment of the requested transaction sale amount.

FDC5000172

5,484,988

11

In addition to the primary functions for POS terminal programming and MICR Check Reader interface, each Point-of-Sale terminal location is capable of generating printed summations of daily activity. These reports list and separately total each authorization/service type, whether produced as a singular report or as the result of multiple terminal "closeout" procedures.

Instances will arise with either the Bank Card or Check Replacement Service where previously authorized Transaction Events will require the operational equivalent of a bankcard "Void" or "Credit" notation. The methodology will be available for Split Dial messages to the computer data file center of a post-authorization "Error" or "Transaction Cancellation" notice. The "Cancel" procedure is instituted by depressing for example the "3" key (i.e. "Cancel=3"). By so doing, the system subscriber may cancel a previously approved and logged event. This Transaction Event which was recorded on the data files and reported on the service subscriber's daily Activity Summation Report, thereafter carries an offsetting, "Flagged" cancellation notice

## Summary

A flexible purchase transaction system is described which precisely fits within existing ACH procedures for checking account events for processing of pre-authorized electronic debits as a replacement for commercial bank drafts (paper checks). The main advantage to the proposed invention is the fact that a truly paperless transaction may occur. Departures from the proposed system especially with respect to the Point-of-Sale terminals will be apparent to those skilled in the art without departing from the spirit of the invention as described.

We claim:

1. A checkwriting point of sale system comprising:

a point of sale terminal adapted to receive consumer bank account information from any bank check;

a central computer system;

first communications means integral to said point of sale terminal for electronically communicating with the central computer system;

memory means integral to said point of sale terminal for temporarily storing the consumer bank account information;

the central computer system having second communication means for receiving information from a plurality of said point of sale terminals;

the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the bank check as a negotiable instrument.

2. The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further includes means for reading magnetic ink character recognition numbers appearing on a consumer check for the sole purpose of identifying and reading the consumer bank account information.

3. The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further comprises an alphanumeric display means for receiving said consumer bank account information from the memory means and for displaying the consumer bank account information.

12

4. The checkwriting point of sale system according to claim 1 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip.

5. The checkwriting point of sale system according to claim 1 further comprising a resident third party database wherein consumer banking account status information is stored, the consumer banking account status information being used for verification of consumer banking account status.

6. The checkwriting point of sale system according to claim 1 wherein the central computer system further comprises a system subscriber database, the system subscriber database comprising information regarding merchants and service providers that are authorized to use the checkwriting point of sale system.

7. The checkwriting point of sale system according to claim 6 wherein the central computer system further comprises a database comprising information regarding consumers whose consumer banking account status is not verified as bad.

8. A checkwriting point of sale process comprising:

a) presenting any bank check specimen to a point of sale terminal located at a merchant or service provider,

b) reading the magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument,

c) storing the consumer bank account information obtained from the check and verifying that account numbers were accurately read at the point of sale terminal,

d) providing transaction event information to the point of sale terminal,

e) transmitting the transaction event information and consumer bank account information to a central computer system,

f) storing the transaction event information and consumer banking account information, and

g) subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations.

9. A checkwriting point of sale system comprising:

a point of sale terminal adapted to receive consumer bank account information;

a central computer system;

first communications means integral to said point of sale terminal for electronically communicating with the central computer system; and

memory means integral to said point of sale terminal for temporarily storing the consumer bank account information;

the point of sale terminal comprising reading means for reading magnetic ink character recognition numbers on any consumer bank check for the sole purpose of eliciting consumer bank account information;

the central computer system having second communication means for receiving information from a plurality of said point of sale terminals;

the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using a bank check as a negotiable instrument.

5,484,988

13

10. The checkwriting point of sale system according to claim 9 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip.

11. The checkwriting point of sale system according to claim 9 further comprising a resident third party database wherein consumer banking account status information is stored, the consumer banking account status information being used for verification of consumer banking account status.

12. The checkwriting point of sale system according to claim 9 wherein the central computer system further comprises a system subscriber database, the system subscriber database comprising information regarding merchants and service providers that are authorized to use the checkwriting point of sale system.

13. The checkwriting point of sale system according to claim 4, wherein the sales slip includes means for execution by the consumer for proof of bank account access authorization.

14. The checkwriting point of sale system of claim 1, wherein the point of sale terminal further comprises means for automatically logging a point of sale terminal location and transaction date, time, and sales amount.

15. The checkwriting point of sale process of claim 8, further comprising:

a) verifying the status of the consumer bank account,

b) verifying the consumer bank account status of the consumer via a query to a third party database if the consumer bank account is verified as bad, and

14

c) sending an approval message to the point of sale terminal if the consumer's banking account status is approved for the transaction.

16. The checkwriting point of sale process of claim 8, further comprising:

(A) printing a transaction event sales slip following the sending of an approval message; and

(B) executing of the sales slip by the consumer as proof of bank account access authorization.

17. The checkwriting point of sale process of claim 15, further comprising:

(A) printing a transaction event sales slip following the sending of an approval message; and

(B) executing of the sales slip by the consumer as proof of bank account access authorization.

18. The checkwriting point of sale process of claim 8, further comprising automatically logging point of sale terminal location information and transaction date, time, and sales amount information into the point of sale terminal.

19. The checkwriting point of sale system according to claim 10, wherein the sales slip includes means for execution by the consumer of proof of bank account access authorization.

20. The checkwriting point of sale system of claim 9, wherein the point of sale terminal further comprises means for automatically logging a point of sale terminal location and transaction date, time, and sales amount.

* * * * *

# Exhibit  B

# SEALED DOCUMENT

# Exhibit  C



US005175682A

# United States Patent [19]

## Higashiyama et al.

| | |
|---|---|
| [11] | Patent Number: **5,175,682** |
| [45] | Date of Patent: **Dec. 29, 1992** |

[54] **CHECK SYSTEM AND METHOD INCLUDING PRIORITIZING CHECKS FOR TRANSMISSION TO BANKS FOR PROCESSING**

[75] Inventors: Connie Higashiyama, Redwood City, Calif.; William Melton, Herndon, Va.; Ashok Narasimhan, Los Altos, Calif.

[73] Assignee: Verifone, Inc., Redwood City, Calif.

[21] Appl. No.: **627,640**

[22] Filed: **Dec. 14, 1990**

[51] Int. Cl.⁵ .................................. G06F 15/30
[52] U.S. Cl. ...................... 364/408; 235/379
[58] Field of Search ...................... 364/401, 406, 408; 235/379–383

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,187,498 | 2/1980 | Creekmore | 235/379 |
| 4,321,672 | 3/1982 | Braun et al. | |
| 4,436,992 | 3/1984 | Simjian | 235/381 |
| 4,454,414 | 6/1984 | Benton | 235/383 |
| 4,948,174 | 8/1990 | Thompson et al. | |
| 4,972,463 | 11/1990 | Danielson et al. | 235/381 |
| 4,974,878 | 12/1990 | Josephson | |
| 4,977,595 | 12/1990 | Ohta et al. | 235/381 |
| 5,053,607 | 10/1990 | Carlson et al. | 235/379 |

#### OTHER PUBLICATIONS

"A complete guide to rule & Regulations Governing the Ach Network," 1990 Ach Rules, Copyright 1990, *National Automated Clearing House Assoc.*, OR 51–75.

Primary Examiner—Gail O. Hayes
Attorney, Agent, or Firm—Cooley, Godward, Castro, Huddleson, & Tatum

[57] **ABSTRACT**

A method and structure are provided for processing checks in an extremely timely and cost-effective manner. A check recipient, such as a merchant, utility billing department, and the like, utilize hardware and software for quickly gathering data from checks received in order to allow prompt processing of those checks. Such hardware preferably includes a reader for reading the MICR account information printed on the check, and means for associating that data with information pertaining to the transaction at hand, including for example, the dollar amount of the transaction. This information is combined in a data record which is stored for future batch data transmission to a clearing house or the issuing bank itself. In an alternative embodiment, this data is communicated in real time to the clearing house or issuing bank. In another embodiment, one or more selection criteria are used to determine which checks will be processed in real time, with the remaining checks being processed in the batch mode. For example, checks written above a threshold dollar amount, out of state checks, or any other high risk checks are processed in real time in order to minimize losses due to fraudulent check use.

**19 Claims, 2 Drawing Sheets**





**FIGURE 1**   (PRIOR ART)

FDC5000152



FIGURE 2

FDC5000153

5,175,682

1

# CHECK SYSTEM AND METHOD INCLUDING PRIORITIZING CHECKS FOR TRANSMISSION TO BANKS FOR PROCESSING

## INTRODUCTION

### 1. Technical Field

This invention pertains to electronic data processing of financial instruments, and more specifically to a method and structure for clearing checks written by a customer.

### 2. Background

FIG. 1 shows the typical path by which a check 101 finds its way to the issuing bank such that the checking account user's account is debited. As shown in FIG. 1, the customer writes check 101 and presents it to merchant 102 as a convenient way for the customer to make a payment to merchant 102. The merchant will then, typically at the end of the day, provide the check (together with others received that day) to the merchant bank 103, as a deposit to the account which merchant 102 maintains in merchant bank 103. Merchant bank 103, after posting the checks to Merchant 102 account, forwards a batch of checks to the automated clearing house (ACH) 104, such as that provided by the National Automated Clearing House Association (NACHA) of Washington, D.C. ACH 104 sorts the checks by their issuing banks, electronically transmits information pertaining to the checks to Federal Reserve Bank 105, and forward the paper checks to the appropriate issuing banks. Federal Reserve Bank 105 in turn electronically transmits information to issuing bank 106 so that each check 101 is debited to the check writer's account maintained in issuing bank 106. Since the vast majority of checks clear without problems, checks are assumed to be valid. If, the account has been closed, or the account contains non-sufficient funds, issuing bank 106 has a certain period of time in which it must issue an exception report indicating that the check has not cleared. This information is communicated to Merchant Bank 103 so that the check amount can be deducted from the merchant's account in order to nullify the deposit to the merchant's account made by Merchant Bank 103 when it assumed that the check was valid.

Table 1 depicts the typical time delay and costs associated with each check taking the prior art path shown in FIG. 1. While these costs and time delays do not seem particularly large to the uninitiated, partly due to the fact that most consumers are accustomed to the time delays involving clearing checks, it is highly advantageous to merchants and financial institutions to speed the check clearing process and reduce the costs associated therewith. Over 55 billion checks are written annually, of which 10 to 15 billion are written to merchants at the point of sale (POS). Thus, the cost associated with processing these checks, as well as the time delays involved in transferring funds (i.e., the "float") result in a very large cost associated with check processing. Magnetically encoded checking account numbers are printed on checks in order to speed this process, yet as shown in Table 1 the process remains inherently slow and costly.

TABLE 1

| | Appropriate Time Delay | Approximate Cost per check |
|---|---|---|
| Merchant to Merchant Bank | 1–5 days | $.05–.10 |
| Merchant Bank to ACH | 1 day | .01–.02 |

2

TABLE 1-continued

| | Appropriate Time Delay | Approximate Cost per check |
|---|---|---|
| ACH to Federal Reserve | 1 day | .01 |
| Federal Reserve to Issuing Bank | 1 day | .01 |

It has been attempted to utilize debit cards in place of checks and credit cards in order to allow merchants to instantly debit a customer's account. However, there are a number of disadvantages with debit card systems. First, debit card systems require processing in real time. Not only does this cause a time delay to both the consumer and the merchant, but the costs of maintaining communication links for real time processing are expensive, on the order of $0.15 per transaction. Furthermore, checking accounts and credit cards are already widely held, and there is some reluctance on the part of consumers to embrace debit cards. Merchants who accept debit cards, such as those gas stations which allow customers to pay using their automated teller machine (ATM) cards, find many consumers unwilling to utilize their ATM cards due to the additional expense (typically $0.15–0.25 per transaction) and perhaps the psychological reluctance to allow a merchant direct debit access to their bank account.

Furthermore, due to a lack of industry standards, for example pertaining to electronic networks, personal identification numbers (PINs), and encryption keys, inadequate customer incentives, and high costs, the use of debit cards has not become widely accepted.

Another disadvantage utilizing the present method for clearing checks is that the long time delay allows fraudulent check writers an excessive amount of time during which they are free to write fraudulent checks before their checking account numbers are added to a list of problem checking accounts.

## SUMMARY OF THE INVENTION

In accordance with the teachings of this invention, a novel method and structure are provided for processing checks in an extremely timely and cost-effective manner. In accordance with the teachings of this invention, a check recipient, such as a merchant, utility billing department, and the like, utilize hardware and software for quickly gathering data from checks received in order to allow prompt processing of those checks. Such hardware preferably includes a reader for reading the MICR account information printed on the check, and means for associating that data with information pertaining to the transaction at hand, including for example, the dollar amount of the transaction. This information is combined in a data record which is stored for future batch data transmission to a clearing house or the issuing bank itself. In an alternative embodiment, this data is communicated in real time to the clearing house or issuing bank. In yet another embodiment of this invention, one or more selection criteria are used to determine which checks will be processed in real time, with the remaining checks being processed in the batch mode. For example, checks written above a threshold dollar amount, out of state checks, or any other high risk checks are processed in real time in order to minimize losses due to fraudulent check use.

5,175,682

3

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 depicts the typical prior art process by which a check is written and ultimately returned to the issuing bank; and

FIG. 2 is a block diagram depicting one embodiment of a transaction system constructed in accordance with the teachings of this invention.

## DETAILED DESCRIPTION

FIG. 2 depicts one embodiment of a system for use by a merchant in accordance with the teachings of this invention. Merchant system 200 includes one or more point of sale systems 210 including, for example, point of sale terminal 201 such as a typical electronic cash register, or the like. Magnetic Ink Character Recognition (MICR) reader 202 is used for reading the magnetic account number printed on checks, which data is fed to POS terminal 201. Alternatively, the information pertaining to the check's account number, etc. can be entered in any convenient manner, for example via the keypad on the POS terminal 201, or via a customer identification card issued by the merchant. However, the use of the MICR reader allows greatest through put and accuracy. Printer 203 is used by POS terminal 201 for a variety of tasks, if desired, for example, printing a sales slip, printing validation information on a check, or printing a check receipt, as will be described in more detail later. POS terminal 201 is connected to backroom processor 204, such as those which are known in the prior art for maintaining sales information, performing price lookups, and inventory adjustment during the course of business. Telecommunications unit 205 is connected to backroom processor 204 and, if desired, directly to POS terminal 201 to allow data to be communicated to a check clearing house, for example.

The operation of the system of FIG. 2, in one embodiment, is as follows. The merchant utilizes POS terminal 201 to enter a transaction. POS terminal 201 can be, for example, a typical prior art electronic cash register, or a more sophisticated computer system. Alternatively, POS terminal 201 may be an accounts receivable system utilized by a public utility, for example, rather than the typical cash register found at a merchant.

The customer then tenders payment. Payments tendered utilizing credit cards, cash, or debit cards may be processed in a conventional manner. When the customer provides a check, however, the check is read by MICR reader 202 and the account information is provided to POS terminal 201. POS terminal 201 then provides additional information in order to create a data record for this transaction which is being paid for by check. Appropriate fields for this data record are, for example, as follows:

Date and Time

Merchant demand deposit account (DDA) number (checking account number)

Customer checking account No. and Routing information

Amount of check

Check No.

Any other discretionary data (electronic journaling)

Certain of this information can be provided automatically by POS terminal 201. Other information, such as amount the check is written for is provided by the merchant, for example via the POS keypad. Electronic journaling information is additional information which may either be retained by the merchant or used to pro-

4

vide a more precise indication of the nature of the purchase on the customer's monthly checking account statement. Such additional information may include, for example, the name of the merchant, the merchant's location, a summary of the goods for services provided, for example sorted by department in the department store. This electronic journaling information serves, for example, to reward the customer when reviewing his monthly statement that the charges appearing on the monthly statement are in fact correct. The merchant can use such additional information for other purposes, for example, to maintain some indication of a customer's buying preferences.

If desired, the data record is then used to verify check authorization, for example, by being compared to a positive file (which lists all allowable checking account numbers), or more likely against a negative file such as provided by SCAN of Seattle, Washington, Telecheck of Denver, Colorado or Telecredit of Florida, which provide information regarding known troublesome checking accounts. If such authorization is not provided, the transaction can, if desired, be cancelled by the merchant, thereby minimizing losses due to bad checks, as is well known.

Once authorization is provided (if the authorization step is performed), next the check is placed in printer 203 and validation information is printed on the check, if desired. Such validation information serves as an indication that electronic data pertaining to this check has been routed for collection, and that the check may thus be considered "cancelled." Such validation information includes, for example, information similar to a rubber endorsement stamp typically used by merchants who process checks in accordance with prior art techniques. Such validation information typically includes the merchant's name and the merchant's DDA number. The validation information prints in accordance with the teachings of this invention can also quite easily include the date and time of the transaction and language indicating that the check has been cancelled and is being cleared through to the customer's checking account electronically. Alternatively, other means can be used to provide validation information on the check, for example, a rubber stamp used for this purpose. While this is less desirable than using a printer, in certain circumstances it may obviate the need for additional printer, and a simple rubber stamp, or the like, can serve as a convenient backup in the event of printer failure. However, in a preferred embodiment, printer 203 is used for purposes in addition to providing validation information on a customer's check, for example, to assist in preparing credit card slips and the like.

The validated check is then returned to the customer for safekeeping, thus avoiding the need for the check to be physically transported through the system depicted in FIG. 1 for ultimate return to the customer. Alternatively, the check is retained by the merchant. This has the advantage of allowing the merchant to retain possession of the check in the event that there is a problem with its collection. In either event, whether the check is returned to the customer or retained by the merchant, a receipt is, if desired, printed and given to the customer indicating that payment has been made by check, and the check is being electronically cleared. This receipt can be either a part of or separate from another receipt indicating detailed information regarding the transaction just completed.

5,175,682

5

The data record thus created by POS terminal 201 can be added to a data file maintained by POS terminal 201 for batch uploading to backroom processor 204, for example, on a periodic basis or at the end of a shift. Alternatively, POS terminal 201 sends the data record to backroom processor 204 immediately, or as soon as backroom processor 204 is able to receive it. In this event, POS terminal 201 need only have sufficient storage capacity to serve as a buffer when there are delays in the ability of backroom processor 204 to receive data.

Periodically, backroom processor 204 will take the data records it has accumulated and upload them to a clearing house. Backroom processor 204 may first process the information, if desired. Various types of processing are possible, such as removing that data pertaining to checks written on the one or more banks with which a merchant does its own banking as well as those bank affiliate banks. This data is then uploaded to the appropriate bank directly, without the need of traveling through the clearing house system. Other types of backroom processing may be performed prior to transmitting check data to the clearing house or directly to one or more banks. For example, checks written over a threshold dollar amount, out-of-state checks, or other checks thought to be high risk based upon other criteria can be selected in order to prioritize data to be uploaded to the ACH or directly to a bank.

If desired, priority uploads may be performed either by backroom processor 204 or POS terminal 201 which, in one embodiment, is directly linked to telecommunications unit 205. Such priority uploads may serve a number of functions. For example, small batches of records may be uploaded relatively frequently by backroom processor 204 either directly to a bank or to the clearing house. Such priority uploads may include, for example, those which are greater than a pre-determined dollar amount. In one embodiment, priority uploads are performed by POS terminal 201 in a real time basis, for example, when the check amount exceeds a predetermined dollar amount, when the check is an out-of-state check, or any other criteria which may be programmed or selected by the merchant "on the fly" which may lead the merchant to view a particular check with some suspicion. In this event, the transaction is delayed pending the real time upload, thereby reducing losses due to bad checks.

Following the upload by backroom processor 204 to one or more banks and clearing houses, an exception report is printed by backroom processor 204 indicating problem checks contained within the uploaded data file, for example, checks written on closed accounts, or accounts having non-sufficient funds. This exception report is prepared from information received from the issuing bank, and is either sent electronically or by printed media either directly to the merchant or to the merchant via the Merchant Bank, the Federal Reserve Bank, and/or an automated clearing house. In one embodiment, backroom processor 204 will again upload for clearing those checks which have not cleared. If desired, a predetermined delay can be used prior to uploading this data again, in order to allow the customer to replenish his checking account before the second and subsequent tries. Alternatively, other criteria can be established by the merchant for determining how to handle such problem checks noted in the exception report. For example, the time delay, if any, before uploading for clearing such problem checks which have not cleared, can be selected based upon a predetermined

6

set of criteria. Such criteria can include, for example, the time of day the check was written, the date the check was written, the day of the week the check was written, whether the check was written on an out-of-state bank account, or any other criteria selected by the merchant. For example, the merchant may determine that, statistically, different categories of checks should be handled differently in order to maximize the collection of such checks.

Thus, in accordance with the teachings of this invention, a check has essentially become the equivalent of an electronic debit card, but with significant advantages. The vast majority of consumers already have checking accounts, as compared with a smaller number have electronic debit cards. Therefore, the use of checks as debit cards in accordance with the teachings of this invention avoids the need for distributing or maintaining a separate debit card, with their associated costs. Furthermore, most consumers feel fairly comfortable with utilizing checks as a method of payment, far more comfortable than the use of electronic debit cards. The savings which will accrue to even a small merchant due to reduced bank paper handling fees, reduced losses due to bad checks, and more rapid availability of funds from checks will easily pay for the installation of hardware and software for use in accordance with the teachings of this invention.

In one embodiment to this invention, a primary record is used of, for example, 94 bytes as specified by the National Automated Clearinghouse Association (NACHA) 1990 ACH rules, specifically Appendix I entitled "ACH File Exchange Specifications". The "1990 ACH Rules" and the "1990 NACHA Operating Rules, Corporate Edition" are published by the National Automated Clearinghouse Association of Herndon, Virginia and are hereby incorporated by reference.

When such a primary record alone is used, the customer's monthly checking account statement will indicate for each check the date, check no., and amount without specific merchant information. Alternatively, each primary record is used with one or more appended records, for example each of an additional 94 bytes, to provide information such as the merchant's name and location and, if desired, more specific information such as the type of goods or services purchased, the quantity, and/or the exact name of the goods or services purchased can be included in such appended records for each purchase.

Due to the relatively small percentage of disputed checks, a preferred embodiment provides that the merchant electronically store all sales receipt line items, and provide to the clearing house a primary record only. In the case of disputed charges, the clearing house will request further information from the merchant, and the merchant transmits additional information to the clearing house as appended records to allow the clearing house to address the disputed charges. This minimizes the amount of information being transmitted, but allows full documentation to be transmitted in the event a particular check is disputed.

There are advantages in utilizing the teachings of this invention to the consumer, the merchant, and the banking system. The consumer advantages are that their time spent at a point of sale is reduced, as checks can be processed more quickly. Savings associated with bank processing of a customer's checking account may be passed on to the consumer.

FDC5000156

5,175,682

7

The merchant benefits from a number of advantages in accordance with the teachings of this invention. Merchants can receive a quicker deposit and thus faster access to funds from checks received from customers. Deposit fees will likely be less, since the merchant is providing electronic data, rather than a paper check. Additional deposit fees can be saved if the merchant provides encoding on each check, such as MICR encoding, indicating the amount of the check. Since this encoding of the check amount saves the merchant bank processing time, merchant banks typically charge the merchant approximately 10 cents per check deposited if the merchant encodes the amount on each check, as compared with approximately 15 cents per check deposited which are not so encoded by the merchant. Depositing is much easier as a merchant need not fill out paper deposit slips, including various information pertaining to each check, as well as a total, and need not physically transport a batch of checks with their deposit slips to a bank. Checks which do not clear, for example because they are drawn on an account which is closed or an account with non-sufficient funds, are detected much quicker, thereby allowing a greater likelihood of collecting on returned checks as it is well known that collectibility decreases rapidly with age. A merchant having multiple stores benefits in that a central location may be used for consolidating check data, thereby providing the benefit that a merchant's check processing facilities can be consolidated, if desired, and allow check processing to be accomplished in a timely manner without delays associated with physically transporting paper checks to the central location prior to electronically processing those checks. The merchants are also afforded a greater flexibility on check deposits and bank relationships in that, because paper checks need not be physically transported to the merchant's bank, the merchant can select a bank solely on the basis of business consideration rather than the banks geographical proximity to the merchant.

The advantages to the banks are decreased processing costs, decreased float, and an ability to achieve their desired automated transaction plans which have not been achieved to date in large part due to the failure in the debit card programs. Furthermore, the banks are able to compete on a national basis with greater ease since the need not be geographically close to their customers for the purposes of depositing checks. Also, the banks are capable of eliminating handling of the physical check and its ultimate return to the consumer. This saves a great deal of physical infrastructure, as well as costs. Furthermore, the banks are able to receive the benefits of a debit card system without the need to educate consumers and without the attendant costs involved in the issuance of separate debit cards.

Other benefits are available as well. For example, in one embodiment of this invention, notification to a number of parties who are interested in learning of problem checks is made automatically, routinely, and in a cost effective and timely manner. For example, when the issuing bank does not honor a check, the issuing bank issues an exception report. If desired, this exception report can be used by either the issuing bank, the Federal Reserve Bank, the Automated Clearing House, the merchant's bank, or the merchant itself in order to notify other interested parties. Such other interested parties include the merchant's bank which must deduct the amount of the check which has not been honored by the issuing bank, the merchant, the merchant's collec-

8

tion agency, check authorization services, and check verification services. By promptly notifying each of these parties, collections can be speeded, and problem checks can be minimized. Furthermore, by notifying each of these parties automatically, notification costs are decreased.

Accordingly, the teachings of this invention provide a novel method and structure for handling checks having significant advantages over the prior art check clearing system. In accordance with the teachings of this invention, check are utilized much as are debit cards, but without the attendant disadvantages experienced in debit cards which have thus far lead to their poor acceptance.

The invention now being fully described, it will be apparent to one of ordinary skill in the art that many changes and modifications can be made thereto without departing from the spirit or scope of the appended claims.

All publications and patent applications mentioned in this specification are herein incorporated by reference to the same extent as if each individual publication or patent application was specifically and individually indicated to be incorporated by reference.

What is claimed is:

1. A method for processing a check written on an account provided by a financial institution comprising the steps of:

receiving from a customer a check as a method of payment;

creating an electronic data record containing information pertaining to said check; and

electronically transmitting said data record to said financial institution to obtain payment of said check by said financial institution, said step of transmitting said electronic record to said bank comprising the steps of:

determining if said electronic record meets a test indicating said electronic record should be transmitted to said bank in real time;

if said test is met, transmitting said electronic record to said bank in real time; and

if said test is not met, adding said electronic record to a file including other electronic records pertaining to other checks, and transmitting said file to said bank in a batch mode.

2. A method as in claim 1 wherein said test indicating said electronic record should be transmitted to said bank in real time serve to detect one or more of the following conditions: the amount of the check is greater than a threshold amount, the check is an out-of-state check, the check has not been preapproved by a check verification or check guarantee service, and the check is deemed to be of high risk.

3. A method as in claim 1 which further comprises the step of, after creating said electronic data record, imprinting information on the check indicating that the check has been cancelled and sent for collection by electronic data transfer.

4. A method as in claim 3 which further comprises the step of, after said step of printing, returning said check to the customer.

5. A method as in the claim 3 which further comprises the step of, after said step of printing, causing said merchant to retain said check.

6. A method as in claim 5 wherein, when the check is retained by the merchant, a receipt for the check is issued to the customer.

FDC5000157

5,175,682

9

7. A method as in claim 6 wherein said receipt for the check comprises a portion of the standard sales receipt issued by the merchant.

8. A method as in claim 6 wherein said check receipt comprises a receipt separate from the normal sales receipt issued to the customer by the merchant.

9. A method as in claim 1 which further comprises the step of creating one or more additional electronic data records associated with said electronic data record for storing discretionary information regarding the sales transaction.

10. A method as in claim 1 which further comprises the step of electronically transmitting one or more of said additional data records with said data record to said financial institution.

11. A method as in claim 9 wherein said one or more additional data records are retained by the merchant in the event they are needed to verify a disputed transaction.

12. A method as in claim 11 wherein said one or more of said additional data records are electronically transmitted to said bank in the event of a disputed charge.

13. A method as in claim 1 which further comprises the steps of:

receiving an exception report indicating whether said check has not been honored by said financial institution; and

if said check has not been honored, again electronically transmitting said data record to said financial institution to obtain payment of said check by said

10

financial institution after a predetermined period of time.

14. A method as in claim 13 wherein said predetermined period of time is selected in accordance with a set of one or more parameters of said check.

15. A method as in claim 14 wherein said one or more parameters are selected from the group of parameters consisting of: time the check was written, date the check was written, amount of the check, location of said financial institution, and other criteria for believing said check to be high risk.

16. A method as in claim 1 which further comprises the steps of:

issuing an exception report if said check has not been honored by said financial institution; and

automatically notifying one or more of said merchant, said merchant's bank, a check verification service, a check authorization service, and a collection firm.

17. A method as in claim 1 wherein said electronic data record comprises transaction information provided by an electronic device and information from said check.

18. A method as in claim 17 wherein at least some of said information from said check is detected by a MICR reader.

19. A method as in claim 17 wherein said electronic device comprises a POS terminal or a computer system controlling the transaction information for which payment is being made by said check.  * * * * *

FDC5000158

# Exhibit  D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LML PATENT CORP.,

          Plaintiff,

     v.

TELECHECK SERVICES, INC.,
ELECTRONIC CLEARING HOUSE, INC.,
XPRESSCHEX, INC. and NOVA
INFORMATION SYSTEMS, INC.,

          Defendants.

C.A. 04-858 (SLR)

## SUPPLEMENTAL EXPERT REPORT OF DAVID P. KURRASCH

## REGARDING INVALIDITY

**OUTSIDE COUNSEL EYES ONLY**

*OUTSIDE COUNSEL EYES ONLY*

the "sole purpose" of reading the check, in my opinion those limitations are found in the following references under both parties' claim construction: the 1993 CSI references; October 1995 ("Report #2"), November 1995 ("Report No. 3"), and January 1996 ("Report No. 4") eFunds Corporation Reports, each entitled "Data Analysis: A Report on the Data of Checks Using Electronic Funds Transfer;" U.S. Patent Nos. 5,237,620 and 5,305,196 to Deaton et al.; the Ballen Report and the Sacramento Bee article.

161.

# REDACTED

LML appears to assert a broader construction and/or application of this limitation.  In my opinion, this element is described by the 1993 CSI marketing materials under either construction.  Otherwise the limitation is present under LML's apparent construction

162.    As the Court has not yet ruled as to the meaning of the claims, I reserve the right to apply whatever claim construction is eventually adopted to the cited prior art. Moreover, should the claims be construed in ways I have not anticipated, I reserve the right to apply such a construction.  My prior art search is not complete, and I may cite additional references or prior art as soon as feasible following my awareness of this prior art.

## VIII.   INVALIDITY ANALYSIS AND OPINIONS

### A.    Summary of Opinions

#### 1.    Anticipation

163.    In my opinion each of the asserted claims is invalid as anticipated under 35 U.S.C. § 102(b) over certain prior art references.  In particular:

164.    Claims 1, 2, 4, 5, 8-11, 13-14, 16, 18 of the '988 patent, claims 10-11 of the '528 patent, and claims 1, 2, 24, 25 of the '366 patent are invalid as anticipated under 35 U.S.C. § 102(e) by U.S. Patent No. 5,175,682 to Higashiyama ("Higashiyama").

*OUTSIDE COUNSEL EYES ONLY*

## C.    Anticipation

241.    I understand that a patent claim is invalid as "anticipated" under 35 U.S.C. § 102(b) if the claimed invention was "patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."

242.    I understand that in order to anticipate a claim, a single prior art reference, such as a U.S. or foreign patent, article, presentation, sale brochure or other material must explicitly or inherently disclose all the elements of the claim at issue. I am informed that anything claimed to be inherently disclosed in a prior art reference must be necessarily present in the reference and that it would be so recognized by persons of ordinary skill in the art. Below, I discuss each prior art reference or product that anticipates the asserted claims of the patents-in-suit.

243.    I have satisfied myself that the prior art discussed below qualifies as prior art under § 102(b), as discussed above. All the documents cited herein are of the type that a person of ordinary skill in the art of electronic check transactions would be aware of, and each qualifies as prior art, as such references were published and publicly available by the necessary dates.

### 1.    Higashiyama

244.    In my opinion, claims 1, 4, 9-10 and 13 of the '988 patent and claim 1 of the '366 patent are invalid as anticipated under 35 U.S.C. § 102(b) by U.S. Patent No. 5,175,682 to Higashiyama.

245.    In my opinion, claims 1, 2, 4, 5, 8-11, 13-14, 16, 18 of the '988 patent, claims 10-11 of the '528 patent, and claims 1, 2, 24, 25 of the '366 patent are invalid as anticipated under 35 U.S.C. § 102(e) by U.S. Patent No. 5,175,682 to Higashiyama.

A claim chart comparing Higashiyama to these claims is attached to this Report in Exhibit 32.

# Exhibit  E

# SEALED DOCUMENT

# Exhibit  F

Westlaw.

Slip Copy                                                                                    Page 1
Slip Copy, 2005 WL 1527883 (D.Mass.)
(Cite as: 2005 WL 1527883 (D.Mass.))

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Massachusetts.
CYTYC CORPORATION, Plaintiff/Defendant,
v.
TRIPATH IMAGING, INC., Defendant/Plaintiff.
No. Civ.A. 03-11142-DPW, Civ.A. 03-12630-DPW.

June 21, 2005.

Amr O. Aly, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, Lisa J. Pirozzolo, Patrick M. Callahan, Timothy R. Shannon, William F. Lee, Wilmer Cutler Pickering Hale and Dorr LLP, Boston, MA, for Plaintiff/Defendant.

Charles A. Burke, Christopher G. Daniel, John F. Morrow, Jr., Michael E. Ray, Womble Carlyle Sandridge & Rice PLLC, Winston-Salem, NC, Francis C. Lynch, Kenneth W. Salinger, Rafael E. Rosado, Palmer & Dodge LLP, Boston, MA, for Defendant/Plaintiff.

*MEMORANDUM AND ORDER*

WOODLOCK, J.

*1 Before me in this patent litigation--where fact discovery has closed and expert discovery is ongoing--are various motions based upon alleged discovery abuses by the opposing parties. TriPath Imaging, Inc. ("TriPath") has moved for a court order excluding any invalidity or unenforceability defenses raised by Cytyc Corporation ("Cytyc") based upon its CDS-1000 product, a precursor to the accused ThinPrep Imaging System ("TIS") device. TriPath also seeks leave to amend the scheduling order to permit it to designate a rebuttal expert to respond to a "surprise expert report" by one of Cytyc's experts or, in the alternative, to exclude the latter's report. For its part, Cytyc has moved to exclude four "rebuttal" expert reports it contends were late-filed by TriPath and to preclude TriPath from further pursuing defenses or arguments raised for the first time in those reports. The parties seek a revision of scheduling orders to complete discovery.

I. BACKGROUND
Before turning to the merits of the motions, I briefly outline the relevant procedural background and, specifically, the allegedly abusive discovery conduct being challenged by the parties.

Cytyc commenced a declaratory judgment action against TriPath in this court in June 2003, seeking a finding of invalidity and non-infringement with respect to six TriPath patents. [FN1] This action, which has been designated the lead case, was later consolidated with an infringement action TriPath had filed against Cytyc in North Carolina. TriPath contends that TIS infringes four of its patents related to screening Pap test slides; Cytyc argues that TIS does not infringe the patents and also that the patents are invalid as anticipated by prior art.

FN1. Cytyc subsequently dropped its claims relating to two of the six patents initially challenged.

An initial scheduling order was entered on October 30, 2003, and provided for fact discovery to conclude on June 30, 2004 and expert discovery to close on October 15, 2004. Thereafter, on two occasions the parties jointly moved to amend the scheduling order to extend the discovery deadlines. Pursuant thereto, fact discovery was to conclude on January 31, 2005 and expert discovery on April 29, 2005.

On January 10, 2005, a Cytyc employee discovered source code for the CDS-1000 device on an outdated and discarded computer he came across while cleaning out a laboratory in preparation for the company's relocation to a new facility. [FN2] Cytyc's counsel notified counsel for TriPath of this development the same day and suggested that the depositions of two former Cytyc employees who were involved in the development of the CDS-1000-- depositions scheduled to take place only a few days later--be postponed to allow the parties to review the newly-discovered materials. The depositions of the witnesses were postponed until January 27 and 28, 2005. Cytyc provided TriPath with copies of the computer code, readable in several formats, on January 11, 2005. Cytyc supplemented this production on January 21, 2005 and then again on January 27, 2005. The cover letter accompanying the January 27, 2005 production indicated that it

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                  Page 2
Slip Copy, 2005 WL 1527883 (D.Mass.)
(Cite as: 2005 WL 1527883 (D.Mass.))

"contained files not present on the two previously produced disks." [Ex. 9 to Memorandum in Support of TriPath's Motion to Exclude Defenses Based on Cytyc's CDS-1000 ("TriPath Exclude Memo") at p. 3.]

FN2. The computer was discovered--amidst various other old, discarded equipment--under a table in a laboratory at Cytyc's former facility in Boxborough, Massachusetts.

*2 Both parties supplemented their interrogatory responses on the final day of fact discovery--January 31, 2005--after the close of business hours. [FN3] Cytyc submitted a second set of objections and supplemental responses to two of the interrogatories propounded by TriPath, only one of which--Interrogatory No. 6--is now at issue. Interrogatory No. 6 called upon Cytyc to:

FN3. The content of the supplemental responses filed by TriPath on January 31, 2005 are not directly relevant to the motions under consideration.

State the basis for Cytyc's contention that the TriPath patents listed in the First Amended Complaint are invalid or unenforceable, including but not limited to a detailed description of any and all prior art upon which any claim of invalidity or unenforceability is based.

[Ex. 1 to TriPath Exclude Memo at p. 4.] In its January 31, 2005 supplemental response to this interrogatory, Cytyc alleged for the first time that two of the patents-in-suit were invalid due to the prior art of Cytyc's CDS-1000, which it claimed also had implications for the anticipation due to obviousness issue present in the case. [Id. at p. 5-7.] TriPath thereafter demanded that Cytyc "withdraw all claims that the CDS-1000 invalidates, or constitutes prior art" to the patents at issue, claiming that Cytyc "failed to disclose these theories of invalidity in a timely fashion," thereby prejudicing TriPath. [Ex. 7 to TriPath Exclude Memo at p. 1-2.] Cytyc did not agree to withdraw the claims. [Id. at p. 3-4.]

Pursuant to the scheduling order, the parties were to serve expert reports on the issues on which they bore the burden of proof on March 7, 2005, and rebuttal expert reports on April 14, 2005. [FN4] Accordingly, the initial expert reports served by TriPath concerned infringement and remedy, and those served by Cytyc invalidity; the rebuttal expert reports from TriPath addressed invalidity, and those from Cytyc took up

infringement and remedy.

FN4. This two-phase expert report process was negotiated by the parties, set forth in their Local Rule 16.1 Joint Statement, and incorporated by the court into the scheduling order.

Regarding the damages component of remedy, TriPath submitted an expert report from an economist, Christopher Bokhart, who offered opinions about both the lost profits suffered by TriPath due to the alleged infringing conduct by Cytyc, as well as the reasonable royalty fees owed to TriPath by Cytyc for its infringement. Among the rebuttal reports served by Cytyc was one from Ralph Richart, M.D ., an expert in obstetrics/gynecology and pathology. After setting forth his qualifications and technical background information about cervical cancer and its diagnosis, Dr. Richart offered the following three expert opinions: (1) the Pap test product offered by Cytyc--ThinPrep Pap Test--was clinically superior to SurePath Test Kit, the competing product sold by TriPath; (2) Cytyc's semi-automated cervical cancer screening system--ThinPrep Imaging System--was both clinically superior to and more efficient than FocalPoint Slide Profiler, TriPath's competing automated primary screening system; and (3) an injunction barring the use or sale of Cytyc's ThinPrep Imaging System would have a "negative impact on women" because it would prevent laboratories from "avail[ing] themselves of this labor-saving device or its increased detection rate," thereby resulting in "a continuation of the backlogs [in processing Pap test results], a continuation of the cytotechnologist shortage and potentially, in some patients, neoplastic lesions going undetected." [Exhibit B to Memorandum in Support of TriPath Imaging, Inc.'s Motion to Amend ("TriPath Amend Memo") at p. 18.]

*3 On May 2, 2005--two-and-a-half weeks after the rebuttal expert reports were circulated--Cytyc served four "response" expert reports, which purported to supplement its previously-filed expert reports on infringement in light of (1) "new positions" raised by Cytyc in its non-infringement expert reports and (2) contentions in Cytyc's rebuttal expert reports that TriPath's initial expert reports had failed to address the Doctrine of Equivalents theory of infringement.

## II. DISCUSSION
Three discovery-related motions are now pending:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 1527883 (D.Mass.)
**(Cite as: 2005 WL 1527883 (D.Mass.))**

Page 3

(1) TriPath's motion to exclude defenses based on Cytyc's CDS-1000 product; (2) TriPath's motion to amend the scheduling order to designate a rebuttal expert or, in the alternative, to strike one of the expert reports filed by Cytyc; and (3) Cytyc's motion to exclude TriPath's late-served expert reports. I address the motions in turn before taking up TriPath's recently filed Motion to Compel the Timely Completion of Expert Depositions.

A. *TriPath's Motion to Exclude CDS-1000 Defenses*

TriPath argues that Cytyc "failed to supplement its interrogatory responses during the fact discovery period to disclose any defenses" based on its CDS-1000 product. TriPath further contends that this alleged failure to disclose was without substantial justification and resulted in "severe prejudice" to TriPath, which was deprived of the opportunity to conduct discovery on the defenses related to the CDS-1000. As a remedy, TriPath moves for the exclusion of any defense of patent invalidity or unenforceability based on the CDS-1000 but not, notably, for leave to pursue additional discovery to remedy the purported prejudice.

In response to the motion, Cytyc points out that it produced all materials related to the CDS-1000 before the close of fact discovery; that it supplemented its initial production as new materials-- for example, the computer code discovered on January 10, 2005 and produced to TriPath the very next day-- were discovered; and that it supplemented its responses to the contention interrogatory at issue once it reached the conclusion that the CDS-1000 was prior art, a supplementation made within, albeit at the end of, the fact discovery period. Cytyc denies engaging in a "litigation strategy" to keep the information from TriPath or "purposefully" failing to disclose its contentions, as TriPath alleges.

TriPath's argument that the defenses should be excluded pursuant to Rule 37(c)(1) [FN5] because of Cytyc's failure to comply with Rule 26(e)(2) [FN6] is unavailing. Cytyc satisfied its supplementation obligations under Rule 26, both by providing TriPath with the CDS-1000 computer code as soon as reasonably possible after discovering the information and also by supplementing its contention interrogatory response to assert the CDS-1000 as prior art. TriPath has made no showing that Cytyc's supplementation--with regard to the CDS-1000 computer code, any other CDS-1000 materials, or the contention interrogatory response--was intentionally delayed so as to prejudice TriPath or was otherwise untimely.

FN5. Regarding the failure to disclose, Fed.R.Civ.P. 37 states that:
A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed. In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions. In addition to requiring payment of reasonable expenses, including attorney's fees, caused by the failure, these sanctions may include any of the actions authorized under Rule 37(b)(2)(A), (B), and (C) and may include informing the jury of the failure to make the disclosure.
Fed.R.Civ.P. 37(c)(1).

FN6. Fed.R.Civ.P. 26(e)--which applies to supplementation of disclosures and responses--provides, in relevant part:
A party who has ... responded to a request for discovery with a disclosure or response is under a duty to supplement or correct the disclosure or response to include information thereafter acquired if ordered by the court or in the following circumstances:
...
(2) A party is under a duty seasonably to amend a prior response to an interrogatory, request for production, or request for admission if the party learns that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.
Fed.R.Civ.P. 26(e).

*4 Cytyc represents that it supplemented its interrogatory response to indicate the CDS-1000 was prior art "once it reached that conclusion." TriPath has offered no evidence to the contrary. The contention interrogatory at issue concerns a legal conclusion--i.e., how the patents-in-suit were invalid or unenforceable. That Cytyc determined an additional basis for its invalidity and unenforceability arguments at the very end of the fact discovery

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 1527883 (D.Mass.)
(Cite as: 2005 WL 1527883 (D.Mass.))

Page 4

process does not render it in violation of the applicable discovery rules. The outcome would be different had Cytyc withheld all of the CDS-1000 materials from TriPath until the waning hours of the fact discovery period and only then sprung both its expanded invalidity theory and also the materials upon which it was based. Here, however, Cytyc had provided TriPath with the vast majority of the CDS-1000 materials many months earlier and both parties had relied upon the prior production in conducting their fact discovery. [FN7] TriPath, therefore, was in possession of these materials and also of Cytyc's supplemental response to the contention interrogatory more than two months before its rebuttal expert reports on the issue of invalidity were due.

> FN7. As set forth *supra,* the fact that the CDS-1000 computer code was not disclosed until January 2005 was not due to misconduct on the part of Cytyc and did not cause significant prejudice to TriPath.

In a declaration submitted in support of the motion to exclude, counsel for TriPath sets forth what he would have done differently in the course of fact discovery had he known at the time that Cytyc would assert the CDS-1000 as prior art. Specifically, counsel avers that he would have "covered a number of additional topics with technical witnesses in depositions" and that there were "a number of additional witnesses that I would have very seriously considered deposing in addition to witnesses that were in fact deposed." [Declaration of Michael E. Ray in Support of TriPath's Motion to Exclude Defenses Based on Cytyc's CDS-1000 at p. 2-3.] Had TriPath requested the opportunity to conduct some further specific fact discovery based upon the CDS-1000-as-prior-art theory being disclosed so late in the fact discovery process, I likely would have granted the request. Instead, however, TriPath seeks the wholesale exclusion of the defense, a draconian remedy unwarranted in these circumstances. That TriPath regarded the relevance of the CDS-1000 as limited to the issue of infringement--and did not appreciate or inquire into its potential as invalidating prior art--does not entitle it to a ruling excluding the defense. And TriPath having chosen to seek an all-or-nothing remedy, I will not now entertain a request for any further fact discovery.

B. *TriPath's Motion to Amend Scheduling Order*

As noted above, among the rebuttal expert reports served by Cytyc was one from Dr. Richart, an obstetrics/gynecology and pathology expert. Dr.

Richart offered several expert opinions, including that the issuance of an injunction against Cytyc would have a "negative impact on women." TriPath argues that Cytyc would bear the burden of proof on the issue of a public health defense to the issuance of a permanent injunction following a finding of patent infringement and, therefore, that Dr. Richart's report should have been provided during the first stage of expert reports. TriPath further maintains that Dr. Richart's report cannot fairly be characterized as being in "rebuttal" to the report submitted by Mr. Bokhart, TriPath's economist expert on damages, as Mr. Bokhart did not address the effect of the entry of a permanent injunction either generally or with respect to public health in particular. TriPath characterizes the other two opinions offered by Dr. Richard--*i.e.,* the clinical superiority and enhanced efficiency of certain Cytyc products in comparison to competing TriPath products--as being made in support of his conclusion regarding the deleterious public health effects of issuing an injunction and, furthermore, as non-responsive to Mr. Bokhart's report, which supposedly offered no opinions on the relative "clinical or qualitative abilities" of the competing products.

\*5 The alleged late-filing of Dr. Richart's report deprived TriPath, so it contends, of the opportunity for rebuttal via its own responsive expert report. To remedy this harm, TriPath moves to amend the scheduling order to allow it to designate a rebuttal expert to Dr. Richart or, alternatively, to strike Dr. Richart's report from the record.

In response, Cytyc first objects to TriPath's characterization of Dr. Richart's report as "primarily" about the public health effects of issuing an injunction. Additionally, Cytyc argues that Dr. Richart's report was responsive to Mr. Bokhart's in that it addressed factual assumptions upon which the latter report was based, namely that (1) demand for imagers from laboratories in the cytological-screening market was driven by the increased reliability and diagnostic accuracy offered by these products, (2) the imagers offered by the parties equally satisfied this demand criteria, and (3) sales of Cytyc's product therefore displaced sales of TriPath's competing product.

A review of Mr. Bokhart's expert report indicates that it was based upon various assumptions regarding market-driving forces and product equivalency, at least with respect to satisfying the identified demand criteria. Accordingly, Cytyc was entitled to submit a rebuttal expert report addressing these issues. Cytyc

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 1527883 (D.Mass.)
**(Cite as: 2005 WL 1527883 (D.Mass.))**

is correct in its contention that TriPath bears the initial burden of proof both with respect to infringement and also to remedy, including injunctive relief. Nevertheless, should patent infringement and validity be found, a rebuttal presumption of irreparable harm to the patentee would arise. Under those circumstances, Cytyc, not TriPath, would bear the burden of establishing a "sufficient reason"--such as harm to the public health--for denying injunctive relief.

Accordingly, to the extent that Dr. Richart's report addresses the potential deleterious effects on public health of enjoining Cytyc, TriPath is entitled to submit a rebuttal expert report. This rebuttal report should not extend beyond those matters explicitly raised in the portion of Dr. Richart's report concerning the effects of injunctive relief, namely paragraphs 59 through 63. In other words, TriPath has leave to respond to the two other expert opinions offered by Dr. Richart only to the extent that they are explicitly referenced, if at all, in his injunction-related conclusions.

### 3. Cytyc's Motion to Exclude Late-Served Expert Reports

Several weeks after the parties exchanged their rebuttal expert reports, TriPath served four "response" expert reports. The scheduling order provided only for two rounds of expert reports--initial and rebuttal. Cytyc has moved to exclude the "response" reports offered by TriPath on grounds including that the reports cite new extrinsic evidence, contain new claim constructions, and raise new infringement arguments--among them the contention that seventeen claims of the patents-in-suit are infringed by Cytyc under the Doctrine of Equivalents ("DOE")--that should have been raised in fact discovery or in TriPath's initial expert reports. Cytyc alleges that TriPath was obligated to set forth its DOE arguments in its interrogatory responses, and that Cytyc would be "severely prejudiced" were TriPath allowed to introduce new evidence and arguments to which Cytyc could not respond.

*6 TriPath argues that it had a duty under Rule 26(e)(1) to supplement its expert reports based upon the content of Cytyc's rebuttal reports on the issue of non-infringement. In Cytyc's rebuttal reports, so TriPath alleges, the company's experts both asserted "new positions that had not been stated ... in its interrogatory responses" and contended that "TriPath's initial reports failed to address the Doctrine of Equivalents." TriPath maintains that it

was substantially justified in serving the "response" reports and also that Cytyc suffered no prejudice as a result of its doing so because, as expert discovery is ongoing, Cytyc still has the opportunity to depose TriPath's experts regarding their "response" reports. TriPath also argues that its interrogatory responses were not defective, in that the relevant contention interrogatory did not call upon it to parse its infringement analysis into literal infringement and DOE infringement, but simply to "identify[ ] each claim allegedly infringed and each Accused Cytyc Product and set[ ] forth an element-by-element comparison of the claim to the Accused Cytyc Product."

While TriPath is correct that the contention interrogatory propounded by Cytyc did not by its terms obligate TriPath to set forth a separate DOE analysis, it should have done so explicitly in its initial expert reports. The DOE theory is such a fundamental form of infringement opinion, I will not permit that theory to be developed for the first time in "response" expert reports.

### D. TriPath's Motion to Compel the Timely Completion of Expert Depositions

While the motions considered above have been pending, the parties have engaged in the customary squabbling about the quotidian details of scheduling. TriPath, without complying with the obligation under Local Rule 7.1(a)(2) to consult before seeking relief from the court, filed an overwrought motion to compel "timely completion of expert depositions." The apparent purpose was to vie for expedited court attention to its disputes. The disposition of the pending motions apparently leaves the parties in agreement about a new schedule. Consequently, TriPath's motion will be allowed to the extent it seeks to extend the deadlines for the completion of both non-damages and damages expert depositions, as well as the deadlines for the submission of claim construction briefs and responsive claim construction briefs. Granting this relief does *not* impact the timing of the Markman hearing, which will proceed as scheduled on September 6-8, 2005.

### III. CONCLUSION

For the reasons set forth more fully above:

(1) TriPath's Motion to Exclude Defenses Based on the CDS-1000 is DENIED;

(2) TriPath's Motion to Amend Scheduling Order to Designate Rebuttal Expert is GRANTED in part;

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 6
Slip Copy, 2005 WL 1527883 (D.Mass.)
**(Cite as: 2005 WL 1527883 (D.Mass.))**

(3) Cytyc's Motion to Exclude TriPath's Late-Served Expert Reports is ALLOWED to the extent the reports seek to frame a Doctrine of Equivalents infringement theory;

(4) TriPath's Motion to Compel the Timely Completion of Expert Depositions is ALLOWED to the extent that:

\*7 (a) the deadline for the completion of non-damages expert depositions is extended to July 8, 2005; (b) the deadline for the completion of damages expert depositions is extended to July 29, 2005; and (c) the deadline for the submission of claim construction briefs is extended to July 18, 2005 and the deadline for the submission of responsive claim construction briefs is extended to August 8, 2005.

Slip Copy, 2005 WL 1527883 (D.Mass.)

**Motions, Pleadings and Filings (Back to top)**

• 2004 WL 2648779 (Trial Motion, Memorandum and Affidavit) Cytyc Corporation's Reply Brief in Further Support of Cross-Motion to Bifurcate Willfulness and Liability (Oct. 05, 2004)

• 2004 WL 2648776 (Trial Motion, Memorandum and Affidavit) Cytyc Corporation's Opposition to Tripath Imaging, Inc.'s Renewed Motion to Compel and Incorporated Memorandum in Support of its Cross-Motion to Bifurcate Willfulness and Liability (Jul. 16, 2004)

• 2004 WL 2648772 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Tripath Imaging, Inc.'s Renewed Motion to Compel Cytyc Corporation to Make an Election on the Advice of Counsel Defense to Willful Patent Infringement and to Produce All Advice of Counsel Documents (Jul. 02, 2004)

• 2004 WL 2648763 (Trial Motion, Memorandum and Affidavit) Reply to Counterclaims of Cytyc Corporation (May. 25, 2004)

• 2004 WL 2648767 (Trial Motion, Memorandum and Affidavit) Cytyc's Reply to Tripath's Counterclaim (May. 25, 2004)

• 2004 WL 2648753 (Trial Pleading) Second Amended Complaint (Jury Trial Demanded) (May. 19, 2004)

• 2004 WL 2648757 (Trial Pleading) Cytyc's Answer and Counterclaims to Tripath's Second Amended Complaint (Jury Trial Demanded) (May. 19, 2004)

• 2004 WL 2648759 (Trial Pleading) Answer to Second Amended Complaint and Counterclaim (May. 19, 2004)

• 2004 WL 2648742 (Trial Pleading) Amended Answer and Counterclaim (May. 07, 2004)

• 2004 WL 2648748 (Trial Pleading) Second Amended Complaint (Jury Trial Demanded) (May. 07, 2004)

• 2004 WL 2648733 (Trial Motion, Memorandum and Affidavit) Cytyc Corporation's Opposition to Tripath Imaging, Inc.'s Motion to Compel and Incorporated Mem Orandum in Support of Cross-Motion to Bifurcate Willfulness and Liability (Feb. 13, 2004)

• 2004 WL 2648727 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Tripath Imaging, Inc.'s Motion to Compel Cytyc Corporation to Make an Election on the Advice of Counsel Defense to Willful Patent Infringement and to Produce All Advice of Counsel Documents (Jan. 30, 2004)

• _____1:03cv12630_____(Docket) (Dec. 30, 2003)

• 2003 WL 23885319 (Trial Motion, Memorandum and Affidavit) Cytyc's Reply to Tripath's Counterclaim (Dec. 01, 2003)

• 2003 WL 23885311 (Trial Pleading) Answer and Counterclaim (Nov. 10, 2003)

• 2003 WL 23885303 (Trial Motion, Memorandum and Affidavit) Defendant's Reply Memorandum to Plaintiff's Opposition to Defendant's Motion to Dismiss (Aug. 21, 2003)

• 2003 WL 23885291 (Trial Motion, Memorandum and Affidavit) Defendant's Reply Memorandum to Plaintiff's Opposition to Defendant's Motion to Dismiss (Aug. 15, 2003)

• 2003 WL 23885275 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Defendant's Motion to Dismiss (Jul. 24, 2003)

• 2003 WL 23885267 (Trial Pleading) First Amended

Slip Copy
Slip Copy, 2005 WL 1527883 (D.Mass.)
(Cite as: 2005 WL 1527883 (D.Mass.))

Page 7

Complaint (Jury Trial Demanded) (Jun. 17, 2003)

• 2003 WL 23885251 (Trial Pleading) Complaint (Jury Trial Demanded) (Jun. 16, 2003)

•                    1:03cv11142              (Docket) (Jun. 16, 2003)

• 2003 WL 23885283 (Trial Motion, Memorandum and Affidavit) Cytyc's Opposition to Tripath's Motion to Dismiss (2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I hereby certify that on October 5, 2005, I electronically filed the

**DECLARATION OF TIMOTHY DEVLIN IN SUPPORT OF DEFENDANTS'**

**RESPONSE TO LML PATENT CORP.'S MOTION TO STRIKE PORTIONS OF**

**DAVID P. KURRASCH'S SUPPLEMENTAL EXPERT REPORT REGARDING**

**INVALIDITY** with the Clerk of Court using CM/ECF which will send notification of

such filing(s) to the following:

Richard K. Herrmann, Esq.                 Attorneys for Plaintiff
Mary B. Matterer, Esq.                  LML Patent Corp.
Morris James Hitchens & Williams
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801

Collins J. Seitz, Jr.                      Attorneys for Defendants
Connolly Bove Lodge & Hutz LLP      Electronic Clearing House, Inc. and Xpress
The Nemours Building                  Check, Inc.
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19801

Richard D. Kirk, Esq.                   Attorney for Defendants
The Bayard Firm                     Nova Information Systems, Inc.
222 Delaware Avenue, Suite 900
Wilmington, DE 19801

I hereby certify that on October 5, 2005, I have sent via electronic mail and via United

States Postal Service, the document(s) to the following non-registered participants:

Robert Jacobs, Esq.                   Russell E. Levine, Esq.
Belasco Jacobs & Townsley, LLP       Kirkland & Ellis LLP
Howard Hughes Center               200 E. Randolph Dr.
6100 Center Drive, Suite 630        Chicago, IL 60601
Los Angeles, CA 90045

Mark C. Scarsi, Esq.
O'Melveny & Myers LLP
400 S Hope Street
Los Angeles, CA 90071

Timothy Devlin

1