IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LML PATENT CORP., | |
| Plaintiff, | |
| v. | C.A. 04-858 (SLR) |
| TELECHECK SERVICES, INC., ELECTRONIC CLEARING HOUSE, INC., XPRESSCHEX, INC. and NOVA INFORMATION SYSTEMS, INC., | PUBLIC VERSION |
| Defendants. | |

**DEFENDANTS' RESPONSE BRIEF REGARDING CONSTRUCTION OF
DISPUTED CLAIM TERMS FOR THE PATENT-IN-SUIT**

William J. Marsden (#2247)
Timothy Devlin (#4241)
Tara D. Elliott (#4483)
FISH & RICHARDSON P.C
919 N. Market Street, Suite 1100
Wilmington, DE 19899-1114

*Attorneys for TeleCheck Services, Inc*

Collins J. Seitz, Jr. (#2237)
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19801

*Attorneys for Electronic Clearing House,
Inc. and XpressChex, Inc.*

Richard D. Kirk. (#922)
THE BAYARD FIRM
222 Delaware Avenue, Suite 900
Wilmington, DE 19801

*Attorneys for Nova Information Systems,
Inc.*

Dated: October 21, 2005
Public Version filed October 28, 2005

**TABLE OF CONTENTS**

I.     INTRODUCTION ....................................................................................1

II.    DISCUSSION ..........................................................................................2

    A.    LML's Proposals Violate Fundamental Rules of Claim
        Construction.....................................................................................2

    B.    Interpretation of Disputed Terms Relating to "Any Bank
        Check"..............................................................................................4

        1.    As used in claims 1 and 8, "any bank check" is
            "any type of check drawn on a financial
            institution"................................................................................4

            a.    LML's interpretation of "any bank
                check" ignores the prosecution history
                and the term's plain meaning.............................................4

            b.    Defendants' construction of "any bank
                check" respects the term's ordinary
                meaning and the intrinsic evidence...................................7

        2.    As used in claims 1, 8 and 9, the word "any"
            means "one or some indiscriminately of
            whatever kind" ..........................................................................7

            a.    LML's tacit construction of "any" to
                mean "a" was disclaimed during
                prosecution......................................................................7

            b.    Defendants' construction of the term
                "any" is consistent with the language of
                the claims themselves ......................................................8

        3.    The terms "subsequently transmitting the
            transaction event information to a bank for
            subsequent automated clearing house
            operations," as used in claim 8, and "enabling
            automated clearing house communication for
            transferring funds," as used in claims 1 and 9,
            mean   "electronically communicating with an
            automated clearing house for transferring funds
            electronically based upon the consumer bank
            account information obtained from any bank
            check presented at the point of sale".............................9

# TABLE OF CONTENTS…continued

a.    LML's construction of these disputed
terms ignores their context in the patent's
claims ...............................................................................9

b.    Defendants have properly construed these
phrases in the context of their
surrounding claim language ...........................................11

C.    Interpretation of Claim Terms Relating to "Negotiable
Instrument" ......................................................................................12

1.    As used in claims 1, 8 and 9, the term "without
using the bank check as a negotiable instrument"
and corresponding limitations means "the bank
check (or 'the check'), at no time, takes on the
status of a negotiable instrument".................................12

a.    LML's proposed construction is barred
by the doctrine of prosecution history
estoppel ...........................................................12

b.    LML's proposed construction is improper
for additional reasons.......................................15

c.    Defendants' proposed construction of
"without using the bank check as a
negotiable instrument" is the only
reasonable interpretation in light of the
'988 prosecution history ..................................16

d.    LML's counsel's neutral opinions are
relevant evidence for construction of the
"negotiable instrument" limitations..................18

D.    Interpretation of Disputed Claim Terms Related to the
"Sole Purpose" of Obtaining "Consumer Bank Account
Information"......................................................................................20

1.    The term "consumer bank account information,"
as used in claims 1-3, 8 and 9, means "only the
ABA/transit routing number and bank account
number".............................................................................20

a.    LML's proposed construction of
"consumer bank account information"
ignores the intrinsic evidence and the
doctrine of claim differentiation ......................20

# TABLE OF CONTENTS…continued

b.    Defendants' construction of "consumer bank account information" is the only reasonable interpretation ................................................. 23

2.    The term "sole purpose," as used in claims 2, 8 and 9, requires no construction ..................................................... 24

a.    LML's construction of "for the sole purpose" to mean "for the only purpose" ignores the clear language of the claims ........................ 24

E.    Interpretation of Disputed Claim Terms Relating to Account Verification ................................................................. 25

1.    As used in claim 8, the term "verifying that account numbers were accurately read at the point of sale" requires "visually confirming that account numbers were accurately read by reference to the source document" ................................ 25

F.    Interpretation of Claim Terms Relating to Reading Information from Any Check ....................................................... 27

1.    The proper construction of "adapted to receive consumer bank information from any bank check," as used in claim 1, is "adapted to read consumer bank account information directly from any bank check" .................................................. 27

a.    LML's proposed construction of this term improperly ignores the prosecution history .......................................................... 27

b.    Defendants' proposed construction is the only plausible interpretation of "adapted to receive consumer bank account information from any bank check" in light of the entire intrinsic record .................................... 28

2.    "means for reading magnetic ink character recognition numbers (appearing) on a (or "any") consumer (bank) check" should be construed as a MICR check reader or OCR equipment for the purpose of reading MICR numbers appearing on a, or any, consumer bank check ................................. 28

III.    CONCLUSION ................................................................... 29

## TABLE OF AUTHORITIES

### CASES

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
  314 F.3d 1313 (Fed. Cir. 2003)............................................................................19

*Bell Atlantic Network Services, Inc. v. Covad Committees Group, Inc.*,
  262 F.3d 1258 (Fed. Cir. 2001)............................................................................26

*Comark Committees Inc. v. Harris Corp.*,
  156 F.3d 1182 (Fed. Cir. 1998)............................................................................21

*Dayco Products, Inc. v. Total Containment, Inc.*,
  258 F.3d 1317 (Fed. Cir. 2001)..........................................................................3, 5

*General America Transport Corp. v. Cryo-Trans, Inc.*,
  93 F.3d 766 (Fed. Cir. 1996)................................................................................26

*Innova/Pure Water, Inc. v. Safari Water Filtration System, Inc.*,
  381 F.3d 1111 (Fed. Cir. 2004)..........................................................................3, 5

*K-2 Corp. v. Salomon S.A.*,
  191 F.3d 1356 (Fed. Cir. 1999)...................................................................... passim

*Kinik Co. v. International Trade Commission*,
  362 F.3d 1359 (Fed. Cir. 2004)........................................................................2, 17

*Mantech Environmental Corp. v. Hudson Environmental Services, Inc.*,
  152 F.3d 1368 (Fed. Cir. 1998)..............................................................................3

*Microsoft Corp. v. Multi-Tech System, Inc.*,
  357 F.3d 1340 (Fed. Cir. 2004)...................................................................... passim

*Pause Tech. LLC v. Tivo Inc.*,
  2005 WL. 1950188 (Fed. Cir. Aug. 16, 2005)..................................................2, 10

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005)...................................................................... passim

*Renishaw PLC v. Marposs Societa'Per Azioni*,
  158 F.3d 1243 (Fed. Cir. 1998)............................................................................25

*Spring Window Fashions LP v. Novo Industrial, L.P.*,
  323 F.3d 989 (Fed. Cir. 2003)...........................................................1, 2, 27, 28

*Standard Oil Co. v. American Cyanamid Co.*,
  774 F.2d 448 (Fed. Cir. 1985)................................................................................8

*Toro Co. v. White Consolidated Industrial, Inc.*,
  199 F.3d 1295 (Fed. Cir. 1999)............................................................................26

*V-Formation, Inc. v. Benetton Group SPA*,
  401 F.3d 1307 (Fed. Cir. 2005)..............................................................................3

iv

**TABLE OF AUTHORITIES…continued**

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)....................................................................3, 19, 25

*Wang Laboratories, Inc. v. America Online, Inc.*,
    197 F.3d 1377 (Fed. Cir. 1999)............................................................................26

# I.      INTRODUCTION

A fundamental principle of claim construction in any patent litigation is that the claims must be construed consistently with the intrinsic record of the patent, including its prosecution history.  In particular, when a broad claim construction would be inconsistent with the prosecution history, then the prosecution acts to narrow the construction:

> [T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, ***making the claim scope narrower than it would otherwise be***.

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005).[1]  In particular, where claims were amended during prosecution, the prosecution history "limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution."  *Spring Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 994 (Fed. Cir. 2003) (citations omitted).

The reason for this principle is clear: a patent owner cannot ignore representations it made to the Patent Office to obtain allowance of the claims, simply because those representations are inconvenient in later litigation.  In its Opening Brief (D.I. 286), Plaintiff LML never expressly disputes this basic rule.  Instead, it simply ignores it by giving only a cursory treatment of the prosecution history of the patent-in-suit, the '988 patent.  The reason for this omission is clear.  The file wrapper reflects the Applicants' clear intent during prosecution to disclaim the very subject matter LML now seeks to recapture in litigation.

As LML's earlier patent counsel acknowledged following a diligent review of the intrinsic record, the scope of the '988 patent claims is narrow, in part because the Applicants were not the first to "invent" electronic check conversion.   The prior art in front of the Patent Office during prosecution described many of the elements claimed in

---

[1] Unless otherwise noted, emphasis in this Brief has been added.

the '988 patent, including electronic check systems in which a check presented at the point of sale was converted to an electronic item and then returned to the customer at the end of a transaction, thus obviating the need for the merchant to accept or process the paper check.  Given this prior art, the '988 patent claims were narrowed to recite something more than a basic electronic check conversion system.  Ignoring this prosecution history, LML now seeks to expand the '988 patent far beyond what the Applicants bargained for in prosecution.

Through its omissions, LML's Opening Brief exposes a lack of support in the intrinsic record for LML's proposed constructions, while highlighting why Defendants' proposed constructions of the disputed terms should be adopted.  Defendants' proposed construction of disputed claim terms should be adopted in full.

## II.     DISCUSSION

### A.     LML's Proposals Violate Fundamental Rules of Claim Construction

LML's proposed constructions of disputed terms violate five fundamental tenets of claim construction.  First, it is axiomatic that prosecution history estoppel excludes any construction disavowed during prosecution in order to obtain allowance of the claims. *See*, *e.g*., *Pause Tech. LLC v. TiVo Inc*., 419 F.3d 1326, 133-35 (Fed. Cir. 2005); *Kinik Co. v. Int'l Trade Comm'n*, 362 F.3d 1359, 1365 (Fed. Cir. 2004); *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1347-50 (Fed. Cir. 2004).  As discussed below, many of LML's proposed constructions violate this basic maxim, illegitimately attempting to recapture subject matter disclaimed during prosecution to obtain allowance of the claims.  For this reason alone, LML's proposed interpretation of these disputed terms should be rejected.  *See*, *e.g.*, *Spring Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 993-96 (Fed. Cir. 2003).

Second, LML's proposed constructions violate the claim differentiation doctrine, which presumes that distinct terms used in the same claim or in separate claims of a patent must be assigned distinct meanings, so that no claim term is rendered unnecessary

or superfluous.  "[W]hen an applicant uses different terms in a claim it is permissible to infer that he intended his choice of different terms to reflect a differentiation in the meaning of those terms."  *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004); *see also Microsoft*, 357 F.3d at 1352; *Pause Tech.*, 419 F.3d at 1334.  As detailed below, many of LML's constructions simply do not properly differentiate claim terms.

Third, LML improperly attempts to expand the scope of the patent by rewriting these claim elements using phrases that are unsupported by the intrinsic record and do nothing to elucidate the meaning of the disputed terms.  *See*, *e.g.*, *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364-65 (Fed. Cir. 1999) ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee."); *Dayco Prods., Inc. v. Total Containment, Inc.*, 258 F.3d 1317, 1324 (Fed. Cir. 2001) ("If an argument offered in support of a particular claim construction is so convoluted and artificial that it would not be apparent to a skilled artisan reading the patent and the prosecution history, the argument is simply unhelpful to the performance of our task.").  Rather than interpreting the claim language to make it clear to the jury, LML inappropriately relies on extrinsic evidence to "vary or contradict the claim language" and to "contradict the import of other parts of the specification."  *Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1584 (Fed. Cir. 1996); *see also Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc.*, 152 F.3d 1368, 1373 (Fed. Cir. 1998).

Fourth, LML improperly attempts to support its constructions using publications issued ***long after the date of invention and application***.  Resources relied upon during claim construction must be contemporaneous with the invention, and extrinsic resources consulted must have been published as of the date of application.  *Phillips v. AWH Corp*., 415 F.3d 1303, 1313 (Fed. Cir. 2005); *V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005).  Information from after the application date of the '988

3

patent – and of course information developed after the entire prosecution history – must be disregarded.

Finally, many of LML's proposed constructions ignore the simple maxim that, where a claim term's meaning is not limited by the file history, it should be construed according to its plain and ordinary meaning to one of ordinary skill in the art at the time of the invention.  *See*, *e.g.*, *Phillips*, 415 F.3d at 1312-13; *Innova*, 381 F.3d at 1116.  For this additional reason, many of LML's proposed constructions, for example its strained construction of the phrases "any bank check" and "sole purpose," must be rejected.  *See*, *e.g.*, *K-2 Corp.*, 191 F.3d at 1363 ("[A] party wishing to alter the meaning of a clear claim term must overcome the presumption that the ordinary and accustomed meaning is the proper one, demonstrating why such an alteration is required.").

   **B.     Interpretation of Disputed Terms Relating to "Any Bank Check"[2]**

      **1.     As used in claims 1 and 8, "any bank check" is "any type of check drawn on a financial institution"**

         **a.     LML's interpretation of "any bank check" ignores the prosecution history and the term's plain meaning**

LML's interpretation of the term "any bank check" to mean "any regular check used to draw funds from a normal bank or credit union checking account" is at odds with both the prosecution history and the plain and ordinary meaning of the term.  *See*, *e.g.*, *Phillips*, 415 F.3d at 1312-13. (*See also* LML's Opening Brief.)  As it would have been understood by one of ordinary skill in the art at the time of the invention, the term "any bank check" would not be restricted to "regular checks" drawn on "normal bank or credit union checking account[s]."  Instead, the use of the word "any" implies that even "irregular" checks drawn on an account that is not a "normal bank or credit union

---

[2] LML does not separately discuss the term "any consumer bank check" in its Opening Brief, stating only that it should be construed in accordance with LML's construction of "any bank check" with the addition of the word "consumer." Because Defendants' proposed construction of "any consumer bank check" similarly modifies the term "any bank check," Defendants do not separately discuss the term "any consumer bank check" in this Reply Brief.

4

checking account" are encompassed within this term. (Ex. X at 11:37-38; 12:21-23.)[3] Because LML fails to offer any analysis whatsoever to justify its departure from the plain and ordinary meaning of this term, its construction should be rejected. *K-2 Corp.*, 191 F.3d at 1362-63.

   The words and limitations proposed by LML in its construction of "any bank check" appear ***nowhere*** in the specification. They are nothing more than a jumble of complicated and technical banking terms – terms which themselves would require further construction by the Court to render them understandable and useful to the jury. Rather than clarifying the meaning of the term, LML's proposed construction simply re-writes the claim without any legitimate grounding in the specification or prosecution history. This exercise would provide no help to the jury, and should be rejected. *See Dayco Prods.*, 258 F.3d at 1324.

   LML cites a series of disparate excerpts from the specification in an attempt to support its construction, none of which include the term "any bank check," and none of which shed any light on what the term "any bank check" means in the context of the '988 patent and its prosecution history. (LML's Opening Brief at 20-21.) Instead, these excerpts focus on the meaning of the separate and distinct claim terms "bank check," "a check" and "consumer bank check," rather than the meaning of the term "***any*** bank check." (Ex. X at Abstract ("a consumer's check"); 1:10-15 ("a check"); 2:23-26 ("bank check"); 3:12-15 (no mention of a check at all); 22-34 (same); 51-53 ("paper checks").)

   All of these terms are used in other parts of the claims or specification and, under the claim differentiation doctrine, should be construed in such as way as to give meaning to every word of the claims. *See Innova*, 381 F.3d at 1119. LML offers no analysis as to why or how any of these particular excerpts regarding other terms or phrases should

---

[3] In this brief, all references to Exhibits are to the Exhibits submitted with Defendants' Opening Brief, D.I. 289, unless otherwise noted  All citations to patent text are of the form x:y, where "x" represents the column number and "y" the line number.

guide the Court's interpretation of the term "any bank check."  Moreover, LML does not explain how its interpretation gives effect to these different claim terms.

LML's attempted reliance on the prosecution history to support its proposed construction is similarly unavailing.  LML asserts that arguments made to overcome the Case, Simjian and Schuller references support its construction of "any bank check," but LML ignores the fact that those references described systems in which no "bank check" was used at all.  Case discloses a system involving a unique draft instrument, not a "bank check;" Simjian discloses a coded sales ticket system; and Schuller discloses a system for using pre-paid tickets with a vending machine.  (Ex. I at LML-EP-000190, 202-03; LML's Opening Brief at 19-20.)  The Applicants' statements regarding these references were unrelated to the "any" portion of the "*any* bank check" limitation now at issue. Indeed, they were made years before the "any bank check" limitation was added to the claims.  (Ex. D at LML-EP-000157; Ex. I at LML-EP-000183-85.)  LML's cited portions of the prosecution history simply do not speak to the proper meaning of the disputed term "any bank check."

LML itself acknowledges that the claims in which this term appears were amended during prosecution to encompass not just "*a* bank check," but "*any* bank check."  (LML's Opening Brief  at 19 n. 10.)  This substantive change in the scope of the claimed invention was clearly important to the Examiner, as LML's claims were rejected repeatedly as unpatentable over the prior art until the term "a" was changed to "any." (Exs. C, E, H.)  It is the prosecution history surrounding this amendment that is relevant to construction here, not LML's hand-plucked comments from years earlier.  LML's proposed construction has no support in the specification or prosecution history, and should be rejected.

  **b. Defendants' construction of "any bank check" respects the term's ordinary meaning and the intrinsic evidence**

  Defendants' interpretation of this disputed term to mean "any type of check drawn on a financial institution" is fully supported by both the plain and ordinary meaning of the term and the full body of the intrinsic evidence.

  The specification indicates that the claimed invention "allow[s] freedom from customary state or other geographically limiting criteria typical when accepting and processing 'paper' checks," as well as "free and unrestricted access to funds secured in bank accounts of various types." (Ex. X at 3:16-20, 51-56.)  While the specification highlights the claimed invention's ability to process literally any bank check, nothing in the specification describes a system processing only "regular checks" tied to "normal bank or credit union checking account[s]."

  Defendants' proposed construction is also consistent with the plain and ordinary meaning of the term "any bank check" to one of ordinary skill in the art at the time of the invention . (*See* Defendants' Opening Brief at Section IV(B)(1).)  Since the intrinsic record suggests no reason to depart from the plain and ordinary meaning, Defendants' construction of the term "any bank check" should be adopted.  *See*, *e.g.*, *K-2 Corp.*, 191 F.3d at 1362-63.

  **2. As used in claims 1, 8 and 9, the word "any" means "one or some indiscriminately of whatever kind"**

   **a. LML's tacit construction of "any" to mean "a" was disclaimed during prosecution**

  Without explicitly making the argument or requesting a separate construction of the term by the Court, LML's Opening Brief makes clear that LML interprets the term "any," in the context of claims 1, 8 and 9, to mean "a." (LML's Opening Brief at 19-20.) LML's proposal is directly contradicted by the prosecution history.

  LML asserts that even after Applicants amended the claims to enable the processing of "any" bank check instead of "a" bank check, their arguments for issuance

remained the same.  (*Id.* at 19 n.10.)  LML further asserts that the Applicants defined "any bank check" during prosecution to mean "a regular check," giving the term "any" a meaning synonymous with the word "a."  (*Id.* at 20.)  This disingenuous characterization of the prosecution history stands in direct contrast to the clear amendments and arguments the Applicants made to secure allowance of the claims.

The fact is that claims 1, 8 and 9 were ***repeatedly rejected*** as unpatentable over the prior art when they pertained to "*a* bank check," and were only allowed to issue once amended to recite the ability to function with "*any* bank check."  (*See, e.g.,* Ex. I at LML-EP-000183-85.)  The law of claim construction is clear that "the prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance."  *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985).  (*see also* Defendants' Opening Brief at Section IV(B)(3).)

LML chooses to ignore the significant difference between the two words, and provides no evidence in the prosecution history or the rest of the intrinsic record to support its construction of the term "any" to mean "a."  LML's proposed construction should be rejected.

### b.    Defendants' construction of the term "any" is consistent with the language of the claims themselves

The doctrine of claim differentiation dictates that "a" and "any" be assigned separate and distinct meanings to prevent rendering either claim term superfluous.  *See, e.g.*, *Microsoft Corp.*, 357 F.3d at 1352. (*See also* Ex. X at 11:60; 12:66.)  Because the specification provides no special definition of the term "any," it should be given its plain meaning, which for this non-technical word is the same in both its common English usage and its technical usage by one of ordinary skill in the art: "one or some indiscriminately of whatever kind."  (http://www.m-w.com/cgibin/dictionary?book=

8

Dictionary&va=any.)  Only the construction proposed by the Defendants is legally proper, and it should be adopted.

> **3.**     **The terms "subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations," as used in claim 8, and "enabling automated clearing house communication for transferring funds," as used in claims 1 and 9,**
> **mean**
> **"electronically communicating with an automated clearing house for transferring funds electronically based upon the consumer bank account information obtained from any bank check presented at the point of sale"**

> **a.**     **LML's construction of these disputed terms ignores their context in the patent's claims**

LML's construction of the phrases "enabling automated clearing house communication for transferring funds" and "subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operation" (LML's Opening Brief at 21, 37) wholly ignores the context of these disputed terms in claims 1, 8 and 9.   The claims make clear that bank account information is used to facilitate the transfer of funds, and that the bank account information is obtained from "any bank check" presented at the point of sale.  (Ex. X at 11:37-38, 44-45; 12: 12:22-26, 28-29, 35, 37-38, 44-45, 51-52, 65-66.)   LML's proposed construction suggests that the claims would be infringed simply by *receiving information* from "any bank check," regardless of whether funds could be transferred using that information.  This line of thinking makes no sense in the context of a patent whose stated "Field of the Invention" is systems "whereby the bank account is debited."  (Ex. X at 1:15.)

Furthermore, LML's construction of the phrase "enabling communication with an automated clearing house for electronically transferring funds" relies on the erroneous premise that claims 1 and 9 are "system" claims which, according to LML, only require that "one part of the system . . . enables communication with the automated clearing house for electronically transferring funds."  (LML's Opening Brief at 22.)  LML's

argument would improperly read other recited elements out of the claim, and should be rejected. *See*, *e.g.*, *Pause Tech.*, 419 F.3d at 1334.

Under LML's proposed construction, the structure of the "second communication means" that "performs the recited functions" refers simply to a modem or similar device, which could transfer information. (LML's Opening Brief at 22.) If these elements are collectively interpreted to require only a modem, however, then the functional limitation of "further enabling automated clearing house communication for transferring funds" would add nothing to the claim and would effectively be ignored. (Ex. X at 11:49-55; 12:60-66.) More specifically, the second communication means already is recited for the function of "enabling said central computer system to communicate with external databases for performing a consumer bank account status search." (Ex. X at 11:49-52; 12:60-63.) This language alone requires the type of structure for communicating electronically that LML deems sufficient to meet the claim. If LML's construction is adopted, the additional function of "further enabling automated clearing house communication for transferring funds" would have no effect whatsoever. Such a result would be improper. *See*, *e.g.*, *Innova*, 381 F.3d at 1119.

These disputed phrases must be interpreted according to their functionality as described in the claims. To distinguish their invention from the prior art, the Applicants claimed specific functionality requirements in the patent—the same functionality requirements that Defendants have included in their constructions. (Ex. I at LML-EP-000183-85, 189-90.) If the claims are now construed to require only the basic structural elements, then decades of prior art, including prior art involving only check verification systems (which also have a modem to communicate with a central computer), would invalidate the claims. The prior art over which Applicants repeatedly sought allowance described point of sale check processing and verification systems having the very same structure required under LML's proposed construction. (*See*, *e.g.*, Ex. S at 2:24-28; 3:47-48; 4:40-41, 44-46; 6:38-41, 49-57; 8:1-3; 11:40-43; 15:38-42; 19:12-17; 22:32-25:10;

25:27-28; Ex. T at 3:13-19, 33-36, 45-50; 5:1-7, 10-13, 18-20, 28-31, 37-46; 7:55-8:2;
9:12-15; 10:24-26.)  LML's re-writing of the claim is improper.

             **b.**     **Defendants have properly construed these phrases in
the context of their surrounding claim language**

Contrary to LML's assertions (LML's Opening Brief at 22-23, 29), Defendants'
proposed construction of these disputed terms to mean "electronically communicating
with an automated clearing house for transferring funds electronically based upon the
consumer bank account information obtained from any bank check presented at the point
of sale" gives appropriate force and effect to the context of these disputed phrases,
consistent with the context in which they appear.  Each independent claim recites the
phrase "any bank check" or "any consumer bank check."  The claims clearly relate not
just to obtaining information from checks, but to transferring funds based on that
information.  It is this surrounding context that informs and supports Defendants'
construction of the disputed phrases here at issue.  (Ex. X at 11:37-38, 44-45; 12:23, 27,
29-30, 36, 38-39).[4]

**REDACTED**

               The claims recite that "any" bank check can be
presented and used to obtain account information.       **REDACTED**     the
transferred funds are tied to the check provided at the point of sale, namely the "any bank
check" asserted previously in the claims.  (Ex. X at 2:66-3:3; 3:26-28; 5:21-28; 8:37-38
**REDACTED**)

Because Defendants' interpretation of these disputed terms is the only
construction that gives appropriate effect to their context within the language of claims 1,

---

[4] LML notes that Defendants' proposed construction of the term "subsequently
transmitting the transaction event information to a bank for subsequent automated
clearing house operations" omitted the language "to a bank."  (LML's Opening Brief at
38.)  Defendants' omission was inadvertent, and Defendants agree that the phrase "to a
bank" should be included in the Court's construction of this term.

8 and 9, Defendants' proposed construction of these terms should be adopted.  (*See* Defendants' Opening Brief at Section IV(B)(4).)

###### C.    Interpretation of Claim Terms Relating to "Negotiable Instrument"

> **1.    As used in claims 1, 8 and 9, the term "without using the bank check as a negotiable instrument" and corresponding limitations means "the bank check (or 'the check'), at no time, takes on the status of a negotiable instrument"**

>> **a.    LML's proposed construction is barred by the doctrine of prosecution history estoppel**

LML argues that the disputed term "without using the bank check as a negotiable instrument" should be construed to mean "where the paper check is used as a source of information, and is not accepted or processed."  (LML's Opening Brief at 24.)  This construction contradicts the '988 prosecution history, which dictates a narrow construction of this disputed phrase.  *See, e.g.*, *Microsoft Corp.*, 357 F.3d at 1347-50. While LML suggests that claim construction should be guided by the patentee's description in the specification, this argument only underscores the impropriety of LML's construction of this disputed term.  (LML's Opening Brief at 27.)  The prior art cited during prosecution of the '988 patent clearly described using the paper check as described in the specification of the '988 patent, and only the Applicants' narrowing amendments and arguments secured allowance of the claims.  (Ex. S at 6:38-52; 7:59-8:3; 17:17-31; 18:52-60; 19:22-28; 25:4-10.)

LML has provided no fewer than six separate interpretations of this term and its shifting positions only underscore that the construction LML now offers was tactically chosen for purposes of litigation.  (*See* Defendant's Opening Brief, Section IV(C)(1) and Exhibits 1 and 2 attached to the co-filed Declaration of Timothy Devlin in Support of Defendants' Response Brief.)

**REDACTED**

12

LML's discussion of the prosecution history focuses on a series of statements the Applicants made to distinguish other, separate claim elements over the prior art. As with the "any bank check" limitation, LML relies on statements made *before* the disputed term at issue was added to the application. Specifically, LML seeks to rely on the Applicants' December 22, 1993 Response to Office Action, written more than a year before the application was amended on January 30, 1995 to include this negative limitation. (LML's Opening Brief at 29). That 1993 Response to Office Action cannot possibly shed any light on the meaning of claim limitations that were not added until 1995. Once again, LML's attempted reliance on the prosecution history is misplaced.

LML further attempts to rely on remarks made in the Response that added the "negotiable instrument" limitations, but these remarks actually support Defendants' proposed construction. In that Response, Applicants attempted to distinguish the pending claims over the Carlson '607 reference by relying on these newly-added limitations. (Ex. I at LML-EP-000192.) Applicants argued to the Examiner that the '607 patent uses the check as a negotiable instrument and requires that the check be "turned over to the merchant to complete the transaction," requiring "negotiation of the check." (Ex. I at LML-EP-000192-93.)

The Carlson '607 patent, however, further discloses using the check as a source of information to convert the transaction to an electronic item and then returning that check to the customer at the conclusion of a transaction. (Ex. S at 6:38-52; 7:59-8:3; 17:17-31; 18:52-60; 19:22-28; 25:4-10.) Because the Applicants characterized and distinguished this prior art reference as still "us[ing] the check as a negotiable instrument," the claims must be construed to mean something more than the prior-art concept of returning the check to the customer at the point of sale without accepting or processing the check. *See Pause Tech. LLC*, 419 F.3d at 1333-1335.

Throughout its entire argument on this issue, LML seeks to run away from the very claim language Applicants sought and obtained during prosecution, including the

words "negotiable instrument." These words have legal meaning in the financial industry that must be taken into account in any proper construction. During prosecution, the Applicants had every opportunity to seek claims that would have included the exact language LML now seeks to have this Court adopt. Nothing prevented Applicants from seeking claims that included limitations such as "where the check is used as a source document" or "where the check is returned to the consumer," instead of the phrases at issue here. The Applicants chose their language, and LML cannot alter it now.

**REDACTED**

As discussed at greater length in Defendants' Opening Brief,

**REDACTED**

the only viable construction of the phrase "without using the bank check as a negotiable instrument" is that "the bank check, at no time, takes on the status of a negotiable instrument."          **REDACTED**

**REDACTED**                                                    While validity cannot control claim construction, it can assist in a proper claim construction analysis based on the intrinsic record. *Philips v. AWH Corp.*, 415 F.3d at 1327.

**REDACTED**

14

>    b.    **LML's proposed construction is improper for additional reasons**

LML's construction of the term "without using the bank check as a negotiable instrument" suffers from additional problems.  First, LML argues that the '988 patent "does not actually prohibit the check from becoming a negotiable instrument," suggesting that the check can "be" a negotiable instrument without being "used as" a negotiable instrument.  (LML's Opening Brief at 24-25, 28.)  This argument not only ignores the prosecution history as described above, but mischaracterizes the nature of a negotiable instrument and its uses.

When a check is filled out and signed by a consumer, the consumer uses it as a negotiable instrument by offering it as payment for goods or services.  The merchant uses that completed and signed check as a negotiable instrument, at least for some time, by receiving it from the customer as payment for goods or services rendered.  The merchant also uses the completed, signed check as a negotiable instrument from the time the check is completed and signed by the customer until such time as it becomes clear that the check will be processed electronically instead of as a paper item.  As described by the '988 patent, the merchant does not know until midway through the transaction whether the customer will authorize the electronic conversion and processing of his or her paper check.  (Ex. X at Fig. 5 (consumer authorization of electronic conversion takes place after check verification and authorization).)  All of these prohibited "uses" essentially preclude from the scope of the claims any transaction in which the consumer completes and signs the check and hands it to a merchant for payment, and this is exactly coincident with the definition of a "negotiable instrument" within the U.C.C.  (*See* Defendants' Opening Brief at Section I(E).),

Second, LML's construction of this limitation essentially reads the "sole purpose" limitation out of the claims by conflating the two terms, improperly assigning them effectively identical import and meaning for purposes of claims 1, 2, 8 and 9.  *See e.g.,*

15

*Pause Tech.*, 419 F.3d at 1334. (*See also* LML's Opening Brief at 28; Ex. X at 11:54-55, 59-61; 12:26-28, 55-56, 65-66.)  The Court should not accept LML's invitation to assign effectively the same meaning to separate and distinct claim terms.

Third, LML's proposed construction would be unhelpful to the jury, because it merely gives rise to more questions of construction.  For example, LML's current construction requires that the check is not "accepted" by the merchant.  The term "accepted" itself, however, has different meanings in different contexts, and is amenable to multiple interpretations here.  If adopted, LML's construction would lead to further arguments about what the terms and phrases within its own construction should mean. The same is true for the term "processed" as proposed in LML's current construction.

Finally, as discussed at greater length in Defendants' Opening Brief, LML's reliance on sources published many years after the '988 patent application was filed, including NACHA Rules published in 2000 and 2005 (LML's Opening Brief at 4, 6-7, 16), is flatly contrary to proper standards governing claim interpretation.  *Phillips v. AWH Corp.*, 415 F.3d at 1313.  Even LML admits that the proper time frame for reference during claim construction is the "time of the invention."  (LML's Opening Brief at 10.)

### c.     Defendants' proposed construction of "without using the bank check as a negotiable instrument" is the only reasonable interpretation in light of the '988 patent prosecution history

Defendants' proposed construction that "the bank check, at no time, takes on the status of a negotiable instrument" is fully supported by the entire intrinsic record. Defendants' proposed construction of this disputed term properly takes into account the "without using" language of this element of claims 1, 8 and 9, requiring that the check ***never be used*** as a negotiable instrument by ***anyone***, neither the check writer nor the merchant, at any stage in the point-of-sale transaction.

Defendants have not, as LML suggests, improperly made the "characteristics of the check itself the focus of their construction" (LML's Opening Brief at 26); rather,

Defendants propose, consistent with the intrinsic evidence, that this limitation requires that the check never be used by anyone as a negotiable instrument during the course of the transaction such that the bank check never takes on the status of a negotiable instrument. (Ex. X at 2:5-12, 52-55; 7:46-48.) This simply means that the check, at no point in the transaction, takes on the status of a negotiable instrument.

The specification supports Defendants' proposed construction of this limitation and is decidedly *not*, as LML asserts, "largely agnostic as to whether the check is filled out – properly or improperly – or even blank." (LML's Opening Brief at 24.) The specification clearly states in the Description of the Preferred Embodiment that the "process begins by a consumer presenting a specimen or "blank" check complete with MICR number to the system subscriber (the merchant)." (Ex. X at 7:46-48.)


**REDACTED**

If the same specimen check could not be used over and over, the claimed invention could not meet its stated objective of "eliminat[ing] the need for 'paper' checks as an accepted means of customer payment." (Ex. X at 2:52-55; 3:51-53; 4:45-48, 59-61.)

Thus, Defendants' proposed construction does not "contradict[] the specification" by excluding the preferred embodiment, as LML argues, because the preferred embodiment is the presentation of a blank specimen check at the point of sale. (LML's Opening Brief at 28; Ex. X at 7:46-48.) The filled-in check is an embodiment ***disclaimed during prosecution*** by the addition of the limitation "without using the bank check as a negotiable instrument" in order to overcome the prior art. S*ee, e.g*., *Kinik Co.*, 362 F3d at 1364-65. (Ex. I at LML-EP-000189-90 **REDACTED**.)

17

      **d.**    **REDACTED**    **are relevant evidence for construction of the "negotiable instrument" limitations**

LML has sought to downplay the impact of

**REDACTED**

.

Unlike normal "extrinsic" evidence,   **REDACTED**

is relevant to the issues presented here for a number of reasons.

**REDACTED**

represents an unbiased view of the

patent ***based on the intrinsic record*** and   **REDACTED**

These facts distinguish **REDACTED** from the type of extrinsic evidence

normally presented on claim construction.  There is no dispute that

**REDACTED**

LML cannot argue that the constructions set forth were created or selected by Defendants

in a calculated effort to obtain litigation advantage.  This potential issue with other types

of extrinsic evidence is simply not present here.  *See, e.g., Phillips v. AWH Corp.*, 415

F.3d at 1318.

Second, Defendants do not seek to rely on   **REDACTED**   to advocate a

different construction than that established by the intrinsic record.  On the contrary,

Defendants' proposed construction is expressly based on the claims, specification and

prosecution history of the '988 patent.   **REDACTED**   merely supports and

confirms Defendants' proposed construction, which should come as no surprise since

**REDACTED**

but this construction was only adopted by

18

Defendants because it is fully consistent with the patent specification and prosecution history.

**REDACTED**                    provides a useful measuring stick for the parties' opposing constructions and their support within the intrinsic record. During the claim construction process, this Court must decide between two competing views of the claims and their interpretation. With respect to the "negotiable instrument" limitation in particular, **REDACTED** provides the Court guidance on which of those two views is reasonable and proper. Defendants respectfully submit that there can be little better evidence of the reasonableness of its construction than the fact that

**REDACTED**


Third,                    **REDACTED**




**REDACTED**                    This fact also tends to bolster the relevance of    **REDACTED**. One reason intrinsic evidence is typically preferred is that the evidence forms part of the public record of the patent, and therefore satisfies a notice function. *Vitrionics Corp. v. Conceptronic*, 90 F.3d 1576, 1583. The same can be said for   **REDACTED**. This concept of public notice is not abstract here
**REDACTED**

Finally, it is well-settled that claims should be construed in the same manner for the issues of invalidity and infringement. *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1330 (Fed. Cir. 2003) ("It is axiomatic that claims are construed the same way for both invalidity and infringement."). **REDACTED**

19

REDACTED

**D.     Interpretation of Disputed Claim Terms Related to the "Sole Purpose" of Obtaining "Consumer Bank Account Information"**

      **1.     The term "consumer bank account information," as used in claims 1-3, 8 and 9, means "only the ABA/transit routing number and bank account number"**

            **a.     LML's proposed construction of "consumer bank account information" ignores the intrinsic evidence and the doctrine of claim differentiation**

LML contends that the term "consumer bank account information" is "clearly understandable to the jury without explanation" and thus no claim construction is necessary.  (LML's Opening Brief at 15.)  LML nonetheless offers a construction of this disputed term, equating it with the MICR information appearing on most consumer bank checks.  (LML's Opening Brief at 15-17.)  LML's interpretation is incorrect.

The MICR line of a check typically includes two types of information: (1) information identifying a bank account (e.g., the routing/transit number and customer account number), and (2) additional information that is not specific to the bank account (e.g., the check's serial number).  The plain and ordinary meaning of "consumer bank account information" encompasses the first type of information, i.e., that which identifies a particular consumer bank account.  (Ex. X at 9:17-21, 37-42, 10:29-39, 49-51; Figs. 8, 9 **REDACTED**.)

The asserted claims recite "magnetic ink character recognition number information" and "consumer bank account information" as separate terms, giving rise to a presumption weighing against LML's proposed construction. *See K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999) (applying the doctrine of claim differentiation).  The term "consumer bank account information" is a subset of the larger category of "magnetic ink character recognition information," both as used in the '988

patent and according to the plain and ordinary meaning of those two terms.  (Defendants'

Opening Brief, Section IV(D)(1); Ex. X at 10:29-34.)  Both the terms "magnetic ink

character recognition [information] numbers" and "consumer bank account information"

appear in claims 2, 8 and 9, indicating that these two distinct claim terms cannot mean the

same thing.  *Comark Comm'ns. Inc. v. Harris Corp*., 156 F.3d 1182, 1187 (Fed. Cir.

1998).  (Ex. X at 11:58-61; 12:25-27, 29, 36, 38-39, 44-45, 51-52, 54-56).

     The '988 specification also contradicts LML's proposed construction.  Figures 8

and 9 of the '988 patent depict the authorization slip described by the '988 patent, on

which "consumer bank account information" is to be printed.  (Ex. X at 10:54-67.)  As

these drawings show, "consumer bank account information" refers only to the bank

account number and routing/transit number and does not include the check sequence

number.  (*Id*. at Figs. 8, 9.)

     Likewise, the specification text does not teach using the entire MICR line to

identify a particular consumer bank account, as LML argues.  (LML's Opening Brief at

16.)  Instead, the specification teaches reading the entire MICR line, ***dropping the check

serial number*** and then transmitting the remaining MICR line information – "consumer

bank account information" – to the central computer for account verification and

subsequent transmission to an ACH.  (Ex. X at 10:28-50.)  The portion of the

specification LML cites to support its claim that the check sequence number constitutes

"consumer bank account information" (*id*. at 10:45-49) actually describes the sequence of

events ***after*** the check serial number already has been "dropped" by the MICR reader (*id*.

at 10:28-49).

     The sentence in which the phrase "entire MICR string" appears confirms that this

portion of the specification refers to the entirety of the MICR information left after the

check sequence number has been dropped.  The specification is clear that the remaining

MICR information identifies only the "consumer bank and a specific checking or

depository account" – information supplied by the check's routing/transit and account

number but not by its sequence number.  (*Id.* at 10:44-48.)  The next sentence in the specification, moreover, states that ACH rules require "exact recall for the bank and checking account numbers to properly complete any debit request" without any mention at all of the check sequence number.  (*Id.* at 10:49-51.)

Indeed, the specification of the '988 patent is replete with references indicating that the term "consumer bank account information" should be construed more narrowly than the separate term "magnetic ink character recognition [number] information."  The specification states that the customer's "account numbers" are entered at the beginning of a check authorization transaction (*id.* at 9:10-12), whereupon the check's "account number" is displayed on the terminal screen for verification (*id*. at 9:14-16).  During check authorization, the "bank/checking account information" for each previously unknown customer transaction is stored in a central computer file.  (*Id.* at 9:37-41.)

Similarly, when the check replacement service is initiated, it is only the "ABA/Transit and personal or corporate checking account numbers" which are transmitted for transaction approval.  (*Id.* at 10:28-30.)  In the event the MICR line contains a check sequence number, that number is "dropped" by the MICR reader immediately.  (*Id*. at 10:30-33.)  The point of sale terminal then "flash[es]" the "ABA and account numbers" for verification, not the check sequence number, before the transaction may proceed.  (*Id*. at 10:36-39.)  The consumer bank account information subsequently received by the central computer identifies "both the consumer bank and a specific checking or depository account," not a specific check sequence number (*id*. at 10:45-49), since ACH regulations require "exact recall for the bank and checking account numbers" but not, apparently, for the check sequence number (*id*. at 10:49-51.)  Each of these references in the specification supports a construction of "consumer bank account information" that is distinct from the entire MICR line.

LML refers to the fact that the specification discloses using OCR equipment to take a picture of part or all of the check, but this does not support an interpretation of

"consumer bank account information" that also includes the check sequence number. While the specification does reference this equipment, it simply demonstrates that, just as the MICR reader captures more information on a check's MICR line than simply "consumer bank account information," OCR equipment also captures additional information beyond that constituting "consumer bank account information," including the consumer's address. (LML's Opening Brief at 17; Ex. X at 5:41-49.) This is confirmed by the clear statement in the specification that "consumer bank account information" can be read from a plastic card as well as a check. (Ex. X at Abstract; 4:29-32, 40-44; 6:60-65.) The only data related to a consumer bank account commonly shared by those payment devices are the check's routing/transit number and consumer bank account number, as the plastic card device necessarily contains no check sequence number.

**REDACTED**

> **b.    Defendants' construction of "consumer bank account information" is the only reasonable interpretation**

Defendants' construction of the term "consumer bank account information" to mean "only the ABA transit/routing number and bank account number" is fully consistent with both the plain and ordinary meaning of the term to one of ordinary skill in the art and the entire intrinsic record. The plain and ordinary meaning of the term "consumer bank account information" is that information identifying a consumer's bank account, nothing more and nothing less. (Ex. X at 9:17-21, 37-42, 10:29-39, 49-51; Figs. 8, 9 **REDACTED**) It does not include the check serial number, which does nothing to identify a particular consumer bank account. Virtually every consumer checking account shares identical check sequence numbers; no two consumer checking accounts, however, share the same routing/transit and bank account numbers.

Claim 8(b) includes the element "consumer bank account information," and recites a process for "reading the magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information,

without using the check as a negotiable instrument." (Ex. X at 12:25-28.) This logically implies that the MICR number information includes more than simply "consumer bank account information" because, if MICR number information and consumer bank account information mean the same thing, then the requirement that the MICR information be read for the "sole purpose" of obtaining "consumer bank account information" would be rendered meaningless. (*See* Section II(B)(1)(a), *supra*.) Defendants' construction of this term in a manner that differentiates it from a separate term contained in the same claim is not an improper effort to rewrite the claim as LML suggests (LML's Opening Brief at 16), but rather a straightforward application of the doctrine of claim differentiation. *See K-2 Corp.*, 191 F.3d at 1363.

Finally, LML's assertion that Defendants have read the preferred embodiment out of the claims with its construction of "consumer bank account information" is wholly without merit. (LML's Opening Brief at 17-18.) In the "How to Use" portion of the specification, Applicants teach that the preferred embodiment "drops" the check serial number from the information read by the MICR reader before any information is transmitted to the central computer. (Ex. X at 10:28-33.) Nothing in Defendants' proposed construction unduly narrows the claims. Defendants' proposed construction is fully supported by the intrinsic record, and should be adopted.

2. **The term "sole purpose," as used in claims 2, 8 and 9, requires no construction**[5]

a. **LML's construction of "for the sole purpose" to mean "for the only purpose" ignores the clear language of the claims**

LML relies exclusively upon an extrinsic resource as its sole support for its substitution of the word "only" for the word "sole" in its construction of the term "for the

---

[5] LML's assertion that Defendants waited too long to try to narrow the number of terms in dispute by attempting to reach an agreement on a term like "sole" (LML's Opening Brief at 34 n. 13) is simply a waste of judicial resources and demonstrates that LML is more interested in gamesmanship than on focusing on the real claim construction issues at hand.

sole purpose." (LML's Opening Brief at 34.) This definition, however, is unnecessary. As used in the context of claims 2, 8 and 9, the word "sole" is easily understood in light of its plain and ordinary meaning to one of ordinary skill in the art and requires no further explanation for the jury. *See, e.g.*, *Microsoft Corp.*, 357 F.3d at 1346-47 ("Claim language generally carries the ordinary meaning of the words in their normal usage in the field of invention.")

The equally well-understood word "only" does not impart any additional meaning or nuance to the ordinary meaning of the word "sole." Reliance upon dictionary definitions and other extrinsic evidence is improper where the plain and ordinary meaning of the claim language itself is readily understandable to a jury. *See, e.g.*, *Vitronics v. Conceptronic*, 90 F.3d 1576, 1583. It is also improper where, as here, such extrinsic definitions are offered to vary the claim terms themselves. *Id.* at 1584.

The Applicants themselves recognized that no additional definition of the term "sole" was necessary. In their January 30, 1995 Response to Office Action, Applicants repeatedly stated that none of the prior art asserted disclosed the "use of any bank check solely to derive consumer information." (Ex. I at LML-EP-000190-207.) Because the Applicants saw no need to further define the term "sole" for the Examiner there is no need for this Court to render an express construction of the term "sole purpose."

    **E.**    **Interpretation of Disputed Claim Terms Relating to Account Verification**

        **1.**    **As used in claim 8, the term "verifying that account numbers were accurately read at the point of sale" requires "visually confirming that account numbers were accurately read by reference to the source document"**

Where, as here, the specification indicates that a "preferred embodiment" is in fact a "requirement" of the claimed system or method, the Court must construe related claim language in accordance with the description of that preferred embodiment. *Renishaw PLC v. Marposs Societa Per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998).

In this case, the '988 patent specification states that the "logic means further drives a display 324 which provides a visual output of the account number of the consumer for verification." (Ex. X at 7:6-8.) This visual verification is further confirmed by the specification. "Referring to Fig. 6 the subscriber would verify that the numbers appearing on the terminal match the MICR numbers on the check 114. During the comparison, the subscriber determines that the check number compares accurately 116 to the number displayed on the terminal." (*Id*. at 7:62-66; *see also id*. at 9:11-16; 10:33-41.) Because visual verification of consumer bank account information is a required step of the claimed invention and not an optional process reserved only for the preferred embodiment, Defendants' construction of this disputed claim term is proper.

Ignoring this clear language, LML argues that the claim term "verifying that account numbers were accurately read at the point of sale" requires no construction and that this disputed term should not be construed so as to limit this element of claim 8 to "visual" verification of account numbers by the system subscriber. (LML's Opening Brief at 35-36.) LML's contentions are wrong on both counts. The proper construction of the term must be guided by the language set forth in the specification defining such verification, and the visual verification method described in the specification is the only embodiment suggested therein, not just the preferred embodiment. *See*, *e.g*., *Toro Co. v. White Consol. Indus., Inc*., 199 F.3d 1295, 1301 (Fed. Cir. 1999); *Wang Labs., Inc. v. America Online, Inc*., 197 F.3d 1377, 1383 (Fed. Cir. 1999); *General Am. Transp. Corp. v. Cryo-Trans, Inc*., 93 F.3d 766, 770 (Fed. Cir. 1996).

Because visual verification is the only type of verification recited in the specification, claims of the '988 patent reciting this verification function are limited to visual verification alone. *See Bell Atl. Network Servs., Inc. v. Covad Commc'ns. Group, Inc*., 262 F.3d 1258, 1273 (Fed. Cir. 2001).

26

**F.    Interpretation of Claim Terms Relating to Reading Information from Any Check**

**1.    The proper construction of "adapted to receive consumer bank information from any bank check," as used in claim 1, is "adapted to read consumer bank account information directly from any bank check"**

**a.    LML's proposed construction of this term improperly ignores the prosecution history**

LML argues that the term "adapted to receive consumer bank information from any bank check" should be construed to mean "adapted to receive information relating to a consumer's bank account including the MICR line from any regular check used to draw funds from a normal bank or credit union checking account." (LML's Opening Brief at 12.) LML asserts further that the term "adapted to receive" is "easily understandable" and requires no specific construction. (*Id*.) Once again, LML offers no analysis to support its assertion. (*Id*. at 13.) On the contrary, LML's suggestion that this disputed term be assigned its plain and ordinary meaning without further construction must be rejected, as the ordinary meaning of this element is limited by concessions made by the Applicants during prosecution when they added the clause "from any bank check" to the claims in dispute. *See*, *e.g*., *Spring Window Fashions LP v. Novo Indus., L.P*., 323 F.3d 989, 993-96 (Fed. Cir. 2003).

LML's construction, for example, would include receipt of consumer bank information through the disclaimed embodiment of the terminal keypad. Manual keyboard entry of consumer bank account information, while described in the '988 specification, is in fact a disclaimed embodiment in light of Applicants' statements in the patent itself and during prosecution to distinguish the claimed invention over cited prior art. In the specification itself, Applicants distinguish the Deming prior art reference by stating that Deming requires manual entry of consumer information, while the claimed invention "is designed to perform in a fully automated manner." (Ex. X at 2:22-26; 3:23-26, 36-42.) Applicants made similar statements during prosecution of the '988 patent

27

effectively limiting the patentable scope of the disputed claims to automated methods of receiving consumer bank information directly "from a bank check," not from a human or other intermediary. (Ex. C at LML-EP-000158-59; Ex. G at LML-EP-000171.) LML cannot now expand the scope of the '988 patent to recover what was claimed during prosecution. *See, e.g.*, *Spring Window Fashions*, 323 F.3d at 993-96.

> **b.** **Defendants' proposed construction is the only plausible interpretation of "adapted to receive consumer bank account information from any bank check" in light of the entire intrinsic record**

Defendants' proposed construction of this limitation is entirely consistent with the intrinsic record. Claim 1 requires that the point of sale terminal obtain consumer account information "from the check" itself, not from a human or other intermediary. (Ex. X at 11:37-38.) The only way a point of sale terminal can accomplish this function is to read the information from the check directly.

The limitation that the information be read directly from the check was added during prosecution, further supporting Defendants' claim construction. During prosecution, claim 1 was amended to recite "a point of sale terminal adapted to receive consumer bank account information." (Ex. G at LML-EP-000172.) Only after the proposed claims were again rejected by the Examiner did the Applicants narrow the claim to recite a "point of sale terminal adapted to receive consumer bank account information *from any bank check*," this time specifying that the check itself was the source of consumer bank account information obtained by the terminal. (Ex. I at LML-EP-000183.) These facts further support and confirm Defendants' proposed construction.

> **2.** **"means for reading magnetic ink character recognition numbers (appearing) on a (or "any") consumer (bank) check" should be construed as a MICR check reader or OCR equipment for the purpose of reading MICR numbers appearing on a, or any, consumer bank check**

In construing the structure described to perform the function recited in this disputed means-plus-function limitation, LML improperly attempts to sweep in subject

matter that was disclaimed during prosecution in order to overcome the asserted prior art. LML would have the Court declare that the structures disclosed to perform the agreed-upon function of this element include not only a MICR check reader and OCR equipment, but also a keyboard for manual entry of information and equivalents.  As discussed more fully in Defendants' Opening Brief, the Applicants disclaimed manual keyboard entry during prosecution as a means by which consumer bank information is obtained by the point of sale terminal in order to overcome the Deming prior art reference.  It is telling that LML's discussion of this claim term wholly omits any consideration of the '988 prosecution history, which in this case is dispositive of the applicable claim construction.  (LML's Opening Brief at 31-33.)

## III.    CONCLUSION

For the foregoing reasons, Defendants' proposed constructions of the disputed claim terms should be adopted.

Dated:  October 21, 2005                FISH & RICHARDSON P.C.
Public Version:  October 28, 2005

By:/s/ Timothy Devlin
     William J. Marsden, Jr. (#2247)
     Timothy Devlin (#4241)
     Tara D. Elliott (#4483)
     919 N. Market Street, Suite 1100
     P.O. Box 1114
     Wilmington, DE  19801

*Attorneys for Defendant TeleCheck Services, Inc.*


CONNOLLY BOVE LODGE & HUTZ LLP

By:/s/ Collins J. Seitz, Jr.
     Collins J. Seitz, Jr. (I.D. No. 2237)
     The Nemours Building
     1007 N. Orange Street
     Wilmington, Delaware 19801
     302.658.9141

*Attorneys for Defendants Electronic Clearing
House, Inc.  and XpressChex, Inc.*


THE BAYARD FIRM

By: /s/ Richard D. Kirk
     Richard D. Kirk (I.D. No. 922)
     222 Delaware Avenue, Suite 900
     Wilmington, DE  19801
     302.429.4208

*Attorneys for Defendant
NOVA Information Systems, Inc*

30

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
**CERTIFICATE OF SERVICE**

I hereby certify that on October 28, 2005, 2005, I electronically filed the Public Version of Defendants' Response Brief Regarding Construction Of Disputed Claim Terms For The Patent-In-Suit with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

Richard K. Herrmann
Mary B. Matterer, Esq.
Morris James Hitchens & Williams
222 Delaware Avenue, 10th Floor
Wilmington, DE  19801-4226

Richard D. Kirk, Esq.
The Bayard Firm
222 Delaware Avenue, 9th Floor
Wilmington, DE  19899

Collins J. Seitz, Jr., Esq.
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 North Orange Street
Wilmington, DE  19801

I hereby certify that on October 28, 2005, I have mailed by First Class Mail, the

document(s) to the following non-registered participants:

Robert Jacobs, Esq.
Belasco Jacobs & Townsley, LLP
Howard Hughes Center
6100 Center Drive, Suite 630
Los Angeles, CA  90045

Russell E. Levine, Esq.
Kirkland & Ellis LLP
200 E. Randolph Dr.
Chicago, IL 60601

Mark C. Scarsi, Esq.
O'Melveny & Myers LLP
400 S Hope Street
Los Angeles, CA 90071

_____ */s/ Timothy Devlin* _____
Timothy Devlin

80027967.doc