# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LML PATENT CORP. | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 04-858-SLR |
| vs. | ) |
| | ) |
| TELECHECK SERVICES, INC. | ) |
| ELECTRONIC CLEARING HOUSE, | ) |
| INC., XPRESSCHEX, INC., AND | ) |
| NOVA INFORMATION SYSTEMS, INC. | ) **PUBLIC VERSION** |
| | ) |
| Defendants. | ) |
| | ) |

## PLAINTIFF LML PATENT CORP.'S RESPONSIVE BRIEF ON ISSUES OF CLAIM CONSTRUCTION

Richard K. Herrmann (I.D. No. 405)
Mary B. Matterer (I.D. No. 2696)
MORRIS JAMES HITCHENS &
WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
302.888.6800

Russell E. Levine, P.C.
Jamie H. McDole
Aaron D. Charfoos
Edward K. Runyan
Lesley G. Smith
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
312.861.2000

*Counsel for Plaintiff LML Patent Corp.*

Originally filed October 21, 2005
Public version filed October 28, 2005

## TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................................................1

II.   ARGUMENT .........................................................................................................2

    A.   The analysis supporting many of Defendants' proposed
        constructions is flawed as a matter of law. ...............................................2

        1.   Defendants improperly rely on extrinsic evidence—as
            opposed to intrinsic evidence—to support their
            constructions. ...............................................................................2

        2.   Defendants improperly rely on extrinsic inventor testimony
            and limitations imported from the preferred embodiment to
            support their constructions. .............................................................4

        3.   Defendants erroneously contend that their constructions are
            the only way to preserve the validity of the claims. ....................5

    B.   Defendants' Construction Of "Any Bank Check" Lacks Support In
        The Intrinsic Evidence. ............................................................................8

        1.   The prosecution history contradicts Defendants'
            construction and supports LML's construction. .........................9

        2.   The specification repeatedly discusses using a regular bank
            check, not "any type of check" from any "financial
            institution" as Defendants claim. ...............................................11

        3.   The extrinsic evidence, even if considered, does not support
            Defendants' construction of "any bank check." ........................12

    C.   Defendants' Combined Construction Of "Subsequently
        Transmitting The Transaction Event Information To A Bank For
        Subsequent Automated Clearing House Operations" And
        "Enabling Automated Clearing House Communication For
        Transferring Funds" Is Flawed. ..............................................................14

        1.   The elements "subsequently transmitting the transaction
            event information to a bank for subsequent automated
            clearing house operations" and "enabling automated
            clearing house communication for transferring funds"
            require separate constructions. .....................................................15

2.   Defendants' construction of "enabling automated clearing house communications for transferring funds" is improper as a matter of law. ....................................................................17

3.   Defendants' construction of "subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations" rewrites, instead of construes, the element. ................................................................21

D.   Defendants' Construction Of The Element "Without Using The Bank Check As A Negotiable Instrument" Is Based On Extrinsic Evidence. ................................................................................22

1.   Defendants' claim construction relies upon two flawed legal arguments. ......................................................................23

2.   The intrinsic evidence specifically states that the check is used as a "source" of information and is not "accepted or processed" as LML's construction requires. ........................24

3.   The prosecution history support's LML's construction. ............27

4.   Defendants' premature attacks on LML's claim construction are simply wrong. ..............................................28

E.   Constructions Of The Terms "For The Sole Purpose" Of Obtaining "Consumer Bank Account Information". ...........................................29

1.   Construction of the phrase "for the sole purpose". ....................29

2.   "Consumer bank account information" is information relating to the consumer's bank account, not simply the arbitrary subset of that information proposed by Defendants. ..................................................................................29

F.   Defendants Improperly Construe The Phrase "Verifying That Account Numbers Were Accurately Read At The Point Of Sale". .......................34

G.   Defendants' Construction Of The Phrase "Adapted To Receive Consumer Bank Account Information From Any Bank Check" Is Wrong. ..........................................................................................35

H.   Defendants' Construction Of "Means For Reading Magnetic Ink Character Recognition Numbers Appearing On A Consumer Check" Disregards Portions Of The Specification. ........................38

III.   CONCLUSION ........................................................................................40

# TABLE OF AUTHORITIES

## Cases

*Abtox, Inc. v. Exitron, Corp.,*
    122 F.3d 1019 (Fed. Cir. 1997).............................................................. 24

*Akami Technologies Inc. v. Cable and Wireless Internet Services, Inc.,*
    344 F.3d 1186 (Fed. Cir. 2003).............................................................. 4

*Atofina v. Great Lakes Chem. Corp.,*
    No. Civ.02-1250-SLR, 2005 WL 984361 (D. Del. March 16, 2005)................. 2-3

*Comark Communications, Inc. v. Harris Corp.,*
    156 F.3d 1182 (Fed. Cir. 1998)................................ 5, 9, 15, 16, 17, 22, 32, 35, 37

*Commonwealth Ins., Co. v. Stone Container Corp.,*
    2002 WL 31833862 (N.D. Il. 2002) ......................................................... 7

*Cytologix Corp. v. Ventana Medical Systems, Inc.,*
    -- F.3d --, 2005 WL 2293079 (Fed. Cir. September 21, 2005)................ 19, 26, 31

*Dayco Prods., Inc. v. Total Containment, Inc.,*
    258 F.3d 1317 (Fed. Cir. 2001 ............................................................... 30

*E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co.,*
    849 F.2d 1430 (Fed. Cir. 1988)............................................................... 17

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.,*
    381 F.3d 1111 (Fed. Cir. 2004) ............................................ 15, 16, 17, 22, 35, 38

*Interactive Gift Express v. Compuserve, Inc.,*
    256 F.3d 1322 (Fed. Cir. 2001)............................................................. 3, 13, 23, 33

*K-2 Corp. v. Saloman S.A.,*
    191 F.3d 1356 (Fed. Cir. 1999)............................................................... 21, 31

*Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. De C.V.,*
    301 F. Supp. 2d 970 (S.D. Ia. 2004) ....................................................... 5

*Liebel-Flarsheim Co. v. Medrad Co.,*
    358 F.3d 898 (Fed. Cir. 2004)................................................................ 6

*Markman v. Westview,*
    52 F.3d 967 (Fed. Cir. 1995)................................................................. 4

*Microsoft Corp. v. Multi-Tech Systems, Inc.,*
   357 F.3d 1340 (Fed. Cir. 2004).................................................................... 10

*Nazomi Communications, Inc., v. ARM Holdings, PLC,*
   403 F.3d 1364 (Fed. Cir. 2005)............................................................ 2, 6, 24

*North American Container, Inc. v. Plastipak Packaging, Inc.,*
   415 F.3d 1335 (Fed. Cir. 2005).............................................................. 5, 18

*Omega Eng., Inc. v. Raytek Corp.,*
   334 F.3d 1314 (Fed. Cir. 2003)............................................................ 37, 40

*On-Line Technologies, Inc. v. Perkin-Elmer Corp.,*
   253 F. Supp. 2d 313 (D. Conn. 2003) ............................................................ 5

*Phillips v. AWH Corp.,*
   415 F.3d 1303 (Fed. Cir. 2005)........................................ 2, 3, 6, 12, 23, 24

*Playtex Prods., Inc. v. Proctor & Gamble Co.,*
   400 F.3d 901 (Fed. Cir. 2005)......................................... 3, 132, 23, 33

*Renishaw PLC v. Marposs Societa per Azioni,*
   158 F.3d 1243 (Fed. Cir. 1998)................................................................ 24

*Resonate Inc., v. Alteon Websystems Inc.,*
   338 F.3d 1360 (Fed. Cir. 2003)........................................................... 21, 22

*SanDisk Corp. v. Memorex Products, Inc.,*
   415 F.3d 1278 (Fed. Cir. 2005).................................................... 19, 26, 39

*Solomon v. Kimberly-Clark Corp.,*
   216 F.3d 1372 (Fed. Cir. 2000).................................................................. 4

*Springs Window Fashions LP v. Novo Industries, L.P.,*
   323 F.3d 989 (Fed Cir. 2003)................................................................... 10

*Texas Instruments, Inc. v. United States Int'l Trade Comm'n,*
   805 F.2d 1558 (Fed. Cir. 1986)...................................................... 5, 32, 35

*U.S. Surgical Corp. v. Ethicon, Inc.,*
   103 F.3d 1554 (Fed. Cir. 1997)................................................................ 36

*Vitronics Corp. v. Conceptronic, Inc.,*
   90 F.3d 1576 (Fed. Cir. 1996)........................................... 3, 13, 23, 33

*Xerox Corp. v. 3Com Corp.,*
   167 F.3d 1361 (Fed. Cir. 2001).......................................... 9, 15, 16, 17, 22, 35

**Statutes**

35 U.S.C. § 112(6) ...................................................................................... 38, 40

## I.    INTRODUCTION

LML's and Defendants' opening briefs on issues of claim construction stand in stark contrast to one another. LML's proposed claim constructions, on the one hand, give the disputed terms their ordinary and customary meaning consistent with all of the intrinsic evidence. Defendants' constructions, on the other hand, contradict the intrinsic evidence and are based almost exclusively on extrinsic evidence. Moreover, Defendants' constructions violate many well-settled claim construction principles, including those emphasized by the Federal Circuit in its recent *en banc* decision in *Phillips*. For instance, in contradiction of *Philips*, Defendants virtually ignore the intrinsic evidence, and instead focus their argument on unreliable (and in some cases inadmissible) extrinsic evidence. Defendants also defy Federal Circuit precedent by repeatedly importing limitations from the preferred embodiment into the claims and ignore the basic principles of claim differentiation. Defendants' litigation-driven constructions are simply a contorted effort to further either their non-infringement and/or invalidity defenses without regard to the facts or law.

This Court should follow the repeated chorus from the Federal Circuit holding that the intrinsic evidence is the "primary tool" for determining the meaning of claim terms, not Defendants' unreliable extrinsic evidence. The intrinsic evidence—as shown in LML's Opening Brief—is consistent with, and fully supports, LML's constructions. Thus, this Court should adopt LML's claim constructions.

## II.  ARGUMENT

### A.  The analysis supporting many of Defendants' proposed constructions is flawed as a matter of law.

Many of Defendants' claim constructions are based upon three fundamental flaws that render those constructions improper as a matter of law: 1) Defendants heavily rely on extrinsic evidence as the primary tool for construing the claims; 2) Defendants rely on the extrinsic testimony of the inventor and his unclaimed commercial embodiment to construe the claims; and 3) Defendants propose claim constructions solely to maintain the validity of the patents and gloss over the intrinsic evidence.  LML will first discuss each of these overarching flaws with Defendants' constructions below, and then will specifically discuss each of the claim elements at issue in sections II.B through II.H.

#### 1.  Defendants improperly rely on extrinsic evidence—as opposed to intrinsic evidence—to support their constructions.

As LML stated in its opening brief—and consistent with LML's proposed constructions—claim terms should be given their ordinary and customary meaning. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-3 (Fed. Cir. 2005).  In determining the ordinary and customary meaning, this Court should look to the intrinsic evidence as the "primary tool" for claim construction:

> [t]he patent's intrinsic record is the ***primary tool to*** supply the context for interpretation of disputed claim terms.  This tool usually provides the technological and temporal context to enable the court to ascertain the meaning of the claim to one of ordinary skill in the art at the time of the invention.

*Nazomi Communications, Inc., v. ARM Holdings, PLC*, 403 F.3d 1364, 1368 (Fed. Cir. 2005) (citations omitted) (emphasis added); *Atofina v. Great Lakes Chem. Corp.*, No.

Civ.02-1250-SLR, 2005 WL 984361, at *12 n.9 (D. Del. March 16, 2005) (denying proposed claim construction because it failed to rely on intrinsic evidence for support).

The Federal Circuit has long held that, if based on a review of the intrinsic evidence, the Court can fairly determine the meaning of claim terminology, the inquiry ends. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1581-83 (Fed. Cir. 1996). As the *Phillips* Court warned, a district court should not use extrinsic evidence to contravene the clear language set out in the intrinsic evidence.

> Undue reliance on extrinsic evidence poses the risk that it will be used to change the meaning of claims in derogation of the 'indisputable public records consisting of the claims, the specification and the prosecution history,' thereby undermining the public notice function of the patents.

*Phillips*, 415 F.3d at 1318-9.  *See also, Playtex Prods., Inc. v. Proctor & Gamble Co.*, 400 F.3d 901, 908 n.1 (Fed. Cir. 2005); *Interactive Gift*, 256 F.3d at 1332; *Vitronics*, 90 F.3d at 1581-82.

Despite this well-settled principle, Defendants, in their brief, regularly turn a blind-eye to the intrinsic evidence in favor of extrinsic evidence.  Indeed, Defendants often derive their constructions from the extrinsic evidence and then attempt to find inapplicable or out-of-context statements in the intrinsic evidence to support their constructions.  For example, in supporting their definition of "without using the check as a negotiable instrument," Defendants begin with the extrinsic evidence—as this is where they derive their proposed construction.  Defendants then scantly attempt to justify their construction with inapplicable quotes from the intrinsic evidence.  The significant amount of time Defendants' Brief devotes to the extrinsic evidence, as opposed to the intrinsic evidence, is telling of the veracity of their constructions.

LML's proposed constructions, on the other hand, stay true to the intrinsic evidence. In fact, for virtually every disputed term, LML's constructions are derived directly from the specification or prosecution history of the '988 Patent. Thus, unlike Defendants', LML's constructions correctly follow the Federal Circuit's long-standing precedent relying on intrinsic evidence as the "primary tool" for construing claim terms.

> 2. *Defendants improperly rely on extrinsic inventor testimony and limitations imported from the preferred embodiment to support their constructions.*

One form of evidence Defendants rely on as support for their constructions is the extrinsic deposition testimony of one of the inventors, Robert Hills, regarding the system sold by his company ChequeMARK. (Defendants' Brief at pgs. 15-16). Again, the Federal Circuit has specifically condemned such an approach to claim construction.

*First,* the Federal Circuit has specifically rejected using extrinsic inventor testimony to support claim constructions and cautioned that inventor's deposition testimony is not helpful in claim construction. *Akami Technologies Inc. v. Cable and Wireless Internet Services, Inc.,* 344 F.3d 1186, 1194 (Fed. Cir. 2003) (rejecting attempt to give special meaning to the term "identifying" in claim based on inventor testimony); *Solomon v. Kimberly-Clark Corp.,* 216 F.3d 1372, 1379 (Fed. Cir. 2000) ("what the patentee subjectively intended his claims to mean is largely irrelevant to the claim's objective meaning and scope."); *Markman v. Westview,* 52 F.3d 967, 985-86 (Fed. Cir. 1995), *aff'd,* 517 U.S. 370 (1996) (same). Thus, Defendants' attempts to use Mr. Hills' testimony are improper on that basis alone.

*Second,* **REDACTED**

-4-

**REDACTED**                        is improper extrinsic evidence and, if anything, is only a preferred embodiment of the '988 Patent and cannot be used to define the full scope of the claims. *North American Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1349 (Fed. Cir. 2005) (improper for court to import dimensions of device from preferred embodiment); *See Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998) ("Further, the language that [the Defendant] argues should limit claim 1 is clearly found in the '904 patent's description of the preferred embodiment.  It is precisely against this type of claim construction that our prior case law counsels."); *Texas Instruments, Inc. v. United States Int'l Trade Comm'n*, 805 F.2d 1558, 1563 (Fed. Cir. 1986) (same); *Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. De C.V.*, 301 F. Supp. 2d 970, 981 (S.D. Iowa 2004) ("it is improper for the court to consider the patentee's commercial embodiment of the patent in determining claim meaning."); *On-Line Technologies, Inc. v. Perkin-Elmer Corp.*, 253 F. Supp. 2d 313, 321-2 (D. Conn. 2003) (same). Defendants' arguments are again contrary to bedrock principles and cannot be correct.  LML's constructions, on the other hand, properly follow the intrinsic evidence without regard to Mr. Hills' alleged physical embodiments of the patent.

3.        *Defendants erroneously contend that their constructions are the only way to preserve the validity of the claims.*

Defendants also attempt to improperly mix their invalidity arguments with claim construction in an attempt to convince the Court to adopt their claim constructions. (*See, e.g.* Defendants' Brief at pg. 7 ("any purported novelty in the '988 Patent claims may only be maintained (if at all) through a narrow construction . . .")).  Defendants' contentions in this regard are wrong as a matter of law and a matter of fact.

-5-

First, Defendants' efforts to construe the claims of the '988 Patent to allegedly preserve its validity are incorrect as a matter of law.    The very cases Defendants cite in their brief state this Court may not—as Defendants ask—simply "gloss over" the intrinsic evidence to adopt a construction simply to maintain the validity of the patent:

> In thus focusing on validity, this limited approach glosses over, if it does not ignore entirely, the intrinsic evidence -- the claims, specification, and prosecution history -- that must inform the court's claim construction.  It is an old axiom that patents "are to receive a liberal construction, and under the fair application of the rule, *ut res magis valeat quam pereat*, are, *if practicable*, to be so interpreted as to uphold and not to destroy the right of the inventor...."    However, the phrase "if practicable" cannot be ignored, and courts should not rewrite claims to preserve validity.

*Nazomi*, 403 F.3d at 1368 (citations omitted); *Phillips*, 415 F.3d at 1327 (". . . we have certainly not endorsed a regime in which validity analysis is a regular component of claim construction.").   Indeed, this Court may only look to the validity of the claims if, ***after*** having reviewed all of the intrinsic evidence—not ***before*** as Defendants argue—the claim language remains ambiguous:

> Accordingly, unless the court concludes, after applying all the available tools of claim construction, that the claim is still ambiguous, the axiom regarding the construction to preserve the validity of the claim does not apply.

*Liebel-Flarsheim Co. v. Medrad Co.*, 358 F.3d 898, 911 (Fed. Cir. 2004).   Defendants simply have no basis in the law to make this argument as none exists.

Second, Defendants' arguments are also flawed as a matter of fact.[1]  If this Court adopts LML's claim constructions, the '988 Patent will not be invalidated in light of the

---

[1]

-6-

Carlson '607, Braun '672 and Higashiyama '682 patents as Defendants claim. (*See* Defendants' Brief at pg. 5).

None of these pieces of prior art anticipate the '988 Patent for a whole host of reasons. For example, the Carlson '607 reference was before the Examiner during prosecution of the '988 Patent. Indeed the Carlson '607 reference is missing at least the claim elements of a central computer system and/or a second communication means, no communication with external databases and/or enabling automated clearing house communications does not store any transaction information between transactions, requires PIN verification entry to verify account, no transaction slip is printed, no verification that account information is correctly read, no resident third party database, and no automatic logging of information at the point of sale terminal. (Exhibit 6, Declaration of Gary Tinkel in Support of LML's Rebuttal Brief on Issues of Claim Construction ("Tinkel Decl.") ¶¶ 32-36).[2]

The Braun '672 reference also fails to disclose the claim elements of a first communication means, a central computer system, enabling communication with external

**REDACTED**

---

[2] LML provides this declaration for the purpose of rebutting Defendants' validity contentions, nothing else.

databases and a communication means enabling automated clearing house communication for transferring funds. (Ex. 6, Tinkel Decl. ¶¶ 37-38). Similarly, the Higashiyama '682 reference is missing a number of elements from the '988 Patent including a first communication means integral to the point of sale terminal, a central computer system, a second communication means for receiving information from a plurality of point of sale terminals and enabling communication with external databases. (Ex. 6, Tinkel Decl. ¶¶ 11-31).

**B.     Defendants' Construction Of "Any Bank Check" Lacks Support In The Intrinsic Evidence.**

Defendants and LML take two very different approaches to the construction of "any bank check" as found in claims 1 and 8 of the '988 Patent.[3]  Defendants' construction—"any type of check drawn on a financial institution"—on the one hand, lacks any actual support in the intrinsic evidence.  While Defendants claim to support their construction with intrinsic evidence, a cursory review of this alleged evidence reveals that no such support exists.  Indeed, Defendants' alleged support actually contradicts their own construction.[4]  On the other hand, LML's construction, "any regular check used to draw funds from a normal bank or credit union checking account", comes directly from language used by the Applicants in describing their invention during

---

[3] The phrase "any consumer bank check" appears in claim 9 and both parties agree to simply add the term "consumer" to the constructions of "any bank check."

[4] Defendants merge their discussion of the term "any bank check" in claim 1 and 8. While these claim terms should certainly be construed consistently, their effect on the claims of which they are a part are much different.  While claim 1 is a system claim and recites particular system features, claim 8 is a process claim which recites process steps of a single transaction.

prosecution.  Ex. S at LML-EP 000157.[5]   This approach is consistent with the Federal Circuit's precedent requiring claims to be construed with the intrinsic evidence.

> 1.    *The prosecution history contradicts Defendants' construction and supports LML's construction.*

As reflected in LML's construction of "any bank check", the Applicants distinguished their invention during prosecution over prior art systems that either could not use any type of check or that required a specialized type of check.  (Ex. S at LML-EP 00157; Ex T at LML-EP 000190, 000202 and 000203).   In doing so, Applicants specifically defined the scope of their invention, and thus the term "any bank check", as limited to "regular" and "ordinary" checks drawn from "a normal bank or credit union checking account."[6]  In response to an Examiner's rejection, the Applicants distinguished the prior art Case reference's use of a "draft instrument unique to the system" whereas the '988 Patent application only included regular checks:

> Further, the consumer using Applicants' system is not required to furnish
> the merchant with a special draft instrument.  The consumer merely uses *a*

---

[5] All citations to exhibits attached to the Declaration of Aaron Charfoos in Support of LML's Responsive Brief on Issues of Claim Construction will simply be to the numbered exhibit number (*e.g.* Ex. 1).  All citations to exhibits to LML's Opening Brief will simply cite to the exhibit letter. (*e.g.* Ex. A).

[6] Defendants make several unsupported statements in their brief that the "system" of the '988 Patent must be able to "process all types of checks."   Regardless of the construction of this term, these statements are misplaced and incorrect.  The "any bank check" limitation is in the asserted claim only when discussing the features of a process step relating to "point of sale terminals," not the system as a whole. Defendants' attempts to import the "any bank check" limitation into other elements of the claims outside the "point of sale terminal" contradicts well-settled Federal Circuit precedent.  *Xerox Corp. v. 3Com Corp.*, 167 F.3d 1361, 1366-7 (Fed. Cir. 2001) (refusing to import limitations from one claim to another) *citing Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) ("There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims.").

> *regular check used to draw funds from a normal bank or credit union*
> *checking account.*

(Ex. S at LML-EP 000157 (emphasis added)).   As explained in LML's Opening Brief (pp. 18-20), the Applicants continued to make this same distinction throughout the prosecution.  LML's construction is drawn directly from these statements.

Defendants' construction, however, directly contradicts these clear statements in the prosecution history.  Defendants' proposed construction—"any type of check drawn on a financial institution"—would improperly include the very specialized or unique checks disclaimed by the Applicants throughout prosecution.  Defendants' construction cannot be correct on this basis alone.  *Microsoft Corp. v. Multi-Tech Systems, Inc.*, 357 F.3d 1340, 1347 (Fed. Cir. 2004) ("[a] patentee may also limit the scope of the claims by disclaiming a particular interpretation during prosecution."); *Springs Window Fashions LP v. Novo Industries, L.P.*, 323 F.3d 989, 994 (Fed Cir. 2003) ("[T]he prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution").  Moreover, Defendants' construction runs afoul as it would include checks drawn on more than just a bank (the claim language), let alone a "normal bank or credit union checking accounts" as Applicants defined the term during prosecution.

Indeed, Defendants use of "financial institution" in their construction encompasses a much broader group of checks than those drawn on banks; it would include essentially any institution dealing with finances.   As such, Defendants' construction again violates the fundamental principles of claim construction requiring claims to be construed in accordance with their plain and ordinary meaning and based on the meaning given to them during prosecution.

Despite these statements in the prosecution and Federal Circuit precedent, Defendants attempt to argue that the prosecution history supports their claim construction. However, Defendants' citations provide nothing more than parroting back the claim language "any bank check" and provide no insight as to the definition of the term. But even more telling is Defendants' failure to discuss at all Applicants' discussion of the Case reference and their limiting of the scope of their patent to "regular" and "ordinary" checks drawn from "a normal bank or credit union checking account." Defendants gloss over these statements and their effect on the construction of "any bank check."

> 2.    *The specification repeatedly discusses using a regular bank check, not "any type of check" from any "financial institution" as Defendants claim.*

The specification of the '988 Patent reinforces the construction of "any bank check" set forth in the prosecution history, and adopted by LML. As discussed at length in LML's Opening Brief (pp.20-21), the specification discloses a system to conduct ordinary *consumer* transactions at the point of sale involving consumer payments (Ex. A, col. 2, lns 23-26), consumer accounts (*Id.* at Abstract, col. 3, lns. 22-34), consumer checks (*Id.* at Abstract, col. 2, lns. 52-57), and consumer purchases (*Id.* at col. 3, lns. 12-15). Such ordinary consumer transactions would involve regular checks drawing funds from a normal bank account or credit union checking account. Moreover, as with the prosecution history of the '988 Patent, the specification distinguishes prior art systems that utilize specialized negotiable instruments as opposed to regular or ordinary checks used in the invention of the '988 Patent. (Ex. A, col. 1, lns. 54-58, col. 2, lns. 5-15).

Despite the specification reiterating the meaning of "any bank check" set forth during prosecution as "any regular check used to draw funds from a normal bank or credit union checking account", Defendants cite to inapplicable portions of the specification that have nothing to do with the types of checks used as part of the invention, but instead relate to geographic areas and operation parameters. (Defendants' Brief at 13). In fact, the very next sentence from the passage cited by Defendants relating to "geographic areas" (and omitted by Defendants) supports LML's construction by explaining that "[t]he system is designed to act with the national authorization and electronic settlement known as the ACH system." (Ex. A, col. 3, lns. 19-21).

Defendants also attempt to use out of context quotes from the specification to support their inclusion of the overbroad term "financial institution" to their definition. Not only does Defendants' construction run directly contrary to the plain language of the claims (which uses the term "bank," not the broader genus of "financial institution"), but it also contradicts their own citations to the specification. Indeed, in every instance in the specification that Defendants cite in an attempt to support their use of "financial institution" in their construction, the specification uses the word "bank" not "financial institution." (Defendants' Brief at 13-14). Defendants' own brief recognizes this fact, admitting that the specification uses the phrases "*banking* institution," "*bank* accounts," and "*bank* depository reserves." (*Id.*) Defendants simply provide no support for their inclusion of "financial institution" in their construction.

         3.      *The extrinsic evidence, even if considered, does not support Defendants' construction of "any bank check."*

Since the intrinsic evidence is clear and unambiguous as to the meaning of "any bank check," extrinsic evidence should not be considered. *Phillips*, 415 F.3d at 1318-19.

-12-

Certainly, the extrinsic evidence may not be used to arrive at a construction that is at odds with the intrinsic evidence. *Playtex Prods., Inc. v. Proctor & Gamble Co.*, 400 F.3d 901, 908 n.1 (Fed. Cir. 2005); *Interactive Gift Express v. Compuserve, Inc.,* 256 F.3d 1322, 1332 (Fed. Cir. 2001); *Vitronics*, 90 F.3d at 1583.    However, even if considered, the extrinsic evidence does little, if anything, to support Defendants' construction.

For example, Defendants first argue that LML's expert, Gary Tinkel, stated that "any bank check" is not restricted to consumer checks and includes a variety of different types of checks.    (Defendants' Brief at 15).

**REDACTED**

Defendants also attempt to use extrinsic evidence relating to the inventors' systems at some undisclosed point in time to somehow support their construction.

---

[7] Defendants also fail to note that Mr. Tinkel qualified his responses to Defendants' questions by stating that to be a bank check, a check would need the proper MICR encoding. (*See, e.g.*, Ex. 1 at 96:3-6).

(Defendants' Brief at 15-16.)

# REDACTED

In sum, Defendants' construction of "any bank check" is wrong as a matter of law and fact. The intrinsic evidence establishes that "any bank check" means "*any regular check used to draw funds from a normal bank or credit union checking account*" -- the construction proposed by LML.

**C.    Defendants' Combined Construction Of "Subsequently Transmitting The Transaction Event Information To A Bank For Subsequent Automated Clearing House Operations" And "Enabling Automated Clearing House Communication For Transferring Funds" Is Flawed.**

Claims 1 and 9 are both system claims reciting a "central computer system second communication means…further enabling automated clearing house communications for transferring funds." Claim 8, on the other hand, is a process claim that recites the step of "subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations." Despite the clear difference in claim language between these two elements, Defendants propose the same construction for both. Not only does LML believe that these two elements should be given separate constructions, LML does not believe Defendants' proposed construction is appropriate for either.

-14-

     1.     *The elements "subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations" and "enabling automated clearing house communication for transferring funds" require separate constructions.*

As an initial matter, Defendants' attempt to construe these two elements identically is improper as a matter of law and fact. It is well-settled that claims with different claim language are entitled to a different scope. *Xerox*, 167 F.3d at 1366-7 (refusing to import limitations from one claim to another) *citing Comark Communications,*, 156 F.3d at 1187 ("There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims."); *Innova*, 381 F.3d at 1119 ("when an applicant uses different terms in a claim it is permissible to infer that he intended his choice of different terms to reflect a differentiation in the meaning of those terms."). Defendants attempt to justify their identical constructions by claiming that the language in claims 1 and 9 ("enabling automated clearing house communication for transferring funds") is similar to the language in claim 8 ("subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations").[8] Even a cursory review of these elements dispels that notion.

---

[8] Defendants cite to *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004) in an attempt to support their identical constructions. (Defendants' Brief at 18.) However, Defendants' reliance on *Innova* is misplaced as it holds that "when different claims of a patent use the ***same language***, we give that language the same effect in each claim." *Id.* (emphasis added). Clearly, the language of the two phrases in the '988 Patent is not the same (or even similar) so this claim construction principle would not apply. In fact, just the opposite is true. As *Innova* explains, the doctrine of claim differentiation dictates that these separate words be given separate and distinct constructions, so as not to render any claim term unnecessary or superfluous. *See Innova*, 381 F.3d at 1119 ("when an applicant uses different terms in a claim it is permissible to infer that he intended his choice of different terms to reflect a differentiation in the meaning of those terms.")

One of the obvious differences between the two elements is the type of claim in which they appear. Claims 1 and 9 are system claims where the elements describe particular features of the systems, where claim 8 is a process claim where the elements describe process steps of a particular transaction. Defendants completely ignore this distinction by proposing the same construction for both types of claims, effectively requiring a system claim (describing only a system feature) to affirmatively perform a process step. These elements have different language and appear in distinctly different types of claims and must be construed differently. *Xerox*, 167 F.3d at 1366-7 *citing Comark Communications*, 156 F.3d at 1187; *Innova*, 381 F.3d at 1119.

Defendants' attempt to construe these terms identically also ignores several other glaring differences between the two elements. For instance, claim 8 discloses "transmitting" while claims 1 and 9 describe only "enabling." Under any reasonable interpretation, these two words mean much different things. Also, Defendants fail to recognize that claim 8 discloses "transmitting ***transaction event information***" whereas claims 1 and 9 disclose a communication means enabled to transfer "***funds.***" Again, "transaction event information" and "funds" are not the same from any vantage point.

Moreover, claim 8 discloses "transmitting the transaction event information to a ***bank***" whereas claims 1 and 9 disclose "enabling ***automated clearing house*** communication." (Ex. A (emphasis added)). Again, the two terms mean very different things as a bank may be an automated clearing house, but is not necessarily so because an automated clearing house exchanges electronic transactions and a bank may not do so.

**REDACTED**

-16-

**REDACTED**        Despite this difference, Defendants improperly construe the

two terms identically. *Xerox*, 167 F.3d at 1366-7; *Comark Communications*, 156 F.3d at

1187; *Innova*, 381 F.3d at 1119.

As a result, these two claim elements must be construed separately and in the

context they appear.    Moreover, as described in more detail below, Defendants'

construction of the two elements is not appropriate for either element.

> 2.    *Defendants' construction of "enabling automated clearing*
> *house communications for transferring funds" is improper*
> *as a matter of law.*

Claims 1 and 9 both recite the element of "enabling automated clearing house

communications for transferring funds."    LML's construction—"enabling communication

with an automated clearing house for electronically transferring funds"—properly reflects

the ordinary and customary meaning of the element by: 1) construing this element as a

system capability since claims 1 and 9 are system claims; and 2) not importing limitations

that confuse the element's plain language or the ordinary and customary meaning.

> a)    Defendants' construction improperly imports
> extraneous limitations into the element in violation
> of Federal Circuit precedent.

Defendants' construction not only treats this claim limitation as if it is part of a

process claim instead of a system claim, but it also improperly imports the additional

limitation "based upon the consumer bank account information obtained from any bank

check presented at the point of sale" into this element without support. *See, e.g., E.I.*

*DuPont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir.

1988) (holding that it is inappropriate to import an "extraneous limitation" into a claim

that is "wholly apart from any need to interpret what the patentee meant by particular

words or phrases in the claim"); *North American Container, Inc. v. Plastipak Packaging Inc.,* 415 F.3d 1335, 1348 (Fed. Cir. 2005) ("As we have stated previously, unless required by the specification, limitations that do not otherwise appear in the claims should not be imported into the claims.").   The plain language of the claims does not have any such limitation.   Indeed, a side by side comparison of this element with Defendants' construction clearly reveals Defendants' efforts to import these limitations.

| Claim Language | Defendants' Construction |
|---|---|
| "enabling automated clearing house communication for transferring funds" | "electronically communicating with an automated clearing house for transferring funds electronically <u>based upon the consumer bank account information obtained from any bank check presented at the point of sale</u>" |

(underlining added).[9]

Even assuming that this element should be construed to be a process step (which it is not; it describes a system feature), Defendants have added the phrase "based upon the consumer bank account information obtained from any bank check presented at the point of sale".   In fact, Defendants attempt to import a limitation from other claim elements (such as "any bank check") into this claim element despite the fact that the term "any bank check" only modifies elements describing the "point of sale terminal"—a device that resides at the point of sale.   In contrast, the present element ("enabling automated clearing house communication for transferring funds") is describing a feature of the

---

[9] Defendants have defined an eight (8) word element with a twenty-nine (29) word construction.  Not only is this construction wrong as a matter of law (as explained herein), but this long convoluted construction will only serve to confuse the jury.

"central computer system"—a feature that resides at a location other than the point of sale.

> b)    Defendants' construction improperly reads a preferred embodiment out of the claims.

As explained above, it is well-settled that a claim construction that reads a preferred embodiment out of the claims is rarely, if ever, correct. *SanDisk Corp. v. Memorex Products, Inc.*, 415 F.3d 1278, 1285 (Fed. Cir. 2005) ("A claim construction that excludes a preferred embodiment, moreover, 'is rarely, if ever, correct.'"); *Cytologix Corp. v. Ventana Medical Systems, Inc.* -- F.3d --, 2005 WL 2293079 (Fed. Cir. September 21, 2005). Defendants offer a construction which would do exactly what the Federal Circuit prohibits, read a preferred embodiment of the patent out of the claims.

One of the benefits of the claimed system of the '988 Patent is described as the ability for the merchant or service provider to ***approve only those bank checks*** that meet a criteria of their own choosing if the transaction is approved, then a communication is sent to the automated clearing house:

- "***When the transaction event is "approved"*** funds are debited from an authorized consumer account." Ex. A at col. 3, lns. 25-27 (emphasis added).

- "***If the check is not approved*** by the central computer the terminal displays a message declining the transaction." *Id.* at col. 8, lns. 16-18 (emphasis added).

- "***Once the transaction is approved*** the central computer captures the MICR information and the sale amount and stores that information 146. The central computer subsequently…transmits all the transaction information for the day into the ACH network." *Id.* at col. 8, lns. 31-36 (emphasis added).

Thus, while the system is enabled to communicate with the automated clearing house, it only needs to do so for approved transactions.

Defendants' construction, on the other hand, would only encompass systems that "communicate with an automated clearing house to transfer funds" for any bank check presented at the point of sale or, in other words, a system that approved *every* check. This construction excludes the preferred embodiment of the '988 Patent. It also ignores another limitation in this same element which recites a communication means "enabling said central computer system to communicate with external databases for performing a consumer bank account status search." According to the '988 Patent, this "status search" is performed to determine whether the bank account or consumer may be relied upon for "consummating" the transaction. (Ex. A at col. 4, lns. 4-13). There would be no need to perform such a status search if the system approved all bank checks received at the point of sale terminal. The plain language of claims 1 and 9 clearly describes a system that receives bank checks at the point of sale that will not be transmitted into the ACH network.[10] (Ex. A claims 1 and 9). As such, the system (and specifically the central computer system of the system) described by claims 1 and 9 only requires the feature of "enabling communication with an automated clearing house for electronically transferring funds."

Therefore, this Court should construe this element to mean, *"enabling communication with an automated clearing house for electronically transferring funds."*

---

[10] Defendants' construction does not contemplate this possibility. In fact, Defendants ignore this fact throughout their brief.

3.    *Defendants' construction of "subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations" rewrites, instead of construes, the element.*

LML's construction of this element recited in claim 8—"subsequently transmitting the information relating to the transaction to a bank for subsequent automated clearing house operations"—stays true to the specific terms of this element, as well as the intrinsic evidence.  As such, LML's construction reflects the ordinary and customary meaning of those terms such that they would be easily understood by a jury.

On the other hand, Defendants' construction -- "electronically communicating with an automated clearing house for transferring funds electronically based upon the consumer bank account information obtained from any bank check presented at the point of sale"—improperly rewrites the element instead of construing it.  *See, e.g.*, *Resonate Inc., v. Alteon Websystems Inc.*, 338 F.3d 1360, 1365 (Fed. Cir. 2003) ("Courts may not rewrite claim language based on what has been omitted from a claim. . ."); *K-2 Corp. v. Saloman S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999) ("Courts do not rewrite claims; instead we give effect to the terms chosen by the patentee.").

First, this element discloses "transmitting transaction event information" but Defendants' construction instead references transferring "funds" based upon "consumer bank account information", neither of which terms are mentioned in this element.  Moreover, the specification makes clear that "transaction event information" is not synonymous with either "funds" or "consumer bank account information" but has a distinct meaning of its own.  (Ex. A at col. 8, lns. 31-36 ("Once the transaction is approved the central computer captures *the MICR information and the sale amount* and stores that information 146.  The central computer subsequently...*transmits all the*

-21-

*transaction event information* for the day into the ACH network 148.") (emphasis added)).

Second, Defendants' construction ignores the phrase "to a bank" used in this element by instead requiring "communicating with an automated clearing house" in their construction. Figure 1 illustrates the embodiment recited in claim 8 and makes clear that transaction event information can first be transmitted to a bank and then to an automated clearing house. (Ex. A Fig. 1). Defendants' construction ignores this fact.

Defendants' constructions are also improper as explained above with respect to the element "enabling automated clearing house communications for transferring funds." Indeed, Defendants' construction imports extraneous limitations into the element. *Xerox*, 267 F.3d at 1366-7; *Comark Communications*, 156 F.3d at 1187; *Innova*, 381 F.3d at 1119. Defendants' construction merely rewrites the claim language into a self-serving definition that has no support in the intrinsic or extrinsic evidence. *Resonate,* 338 F.3d at 1365; *K-2*, 191 F.3d at 1364. As such, Defendants' definition is wrong as a matter of law. LML's construction on the other hand is consistent with the intrinsic evidence (*see* LML Opening Brief at 37-40).

Therefore, this Court should construe this element to mean, "*subsequently transmitting the information relating to the transaction to a bank for subsequent automated clearing house operations.*"

### D.    Defendants' Construction Of The Element "Without Using The Bank Check As A Negotiable Instrument" Is Based On Extrinsic Evidence.

Defendants construe the term "without using the bank check as a negotiable instrument" as "the bank check, at no time, takes on the status of a negotiable instrument." Importantly, Defendants readily admit that their construction comes, not

from the intrinsic evidence, but directly from the *extrinsic* evidence. In contrast, LML's construction is adopted directly from the intrinsic evidence, to mean "where the paper check is used as a source of information, and is not accepted or processed." LML's construction is the proper construction, and thus should be adopted by this Court.

1.    *Defendants' claim construction relies upon two flawed legal arguments.*

The primary source for Defendants' claim construction is a 1998 letter by pre-acquisition counsel for LML, and Defendants' primary justification for adopting this construction is to maintain the validity of the '988 Patent. Despite Defendants' apparently altruistic motives, their claim construction is flawed as a matter of law and belies an attempt to avoid infringement (Defendants argue that checks take on the "status" of a negotiable instrument in their system).

As discussed above, the Federal Circuit recently stated in the *Phillips* case that the intrinsic evidence of record is the "primary tool" in claim construction, while "extrinsic evidence is *less reliable* than the patent and its prosecution history in determining how to read claim terms." *Phillips,* 415 F.3d at 1318 (emphasis added). Indeed, while a trial court may use extrinsic evidence to educate itself about the invention and the relevant technology, it may not use extrinsic evidence to arrive at a claim construction that is at odds with the intrinsic evidence. *Playtex,* 400 F.3d at 908 n.1; *Interactive Gift,* 256 F.3d at 1332; *Vitronics,* 90 F.3d at 1583.

It is, therefore, disturbing that Defendants' primary source for their proposed construction, indeed it is adopted word for word, is the extrinsic evidence. (*See, e.g.* Defendants' Brief at 21-22.) As will be discussed below, this extrinsic evidence is at odds with the intrinsic evidence and, therefore, cannot be used to overcome LML's

construction. "The construction that stays true to the claim language and *most naturally aligns with the patent's description of the invention* will be, in the end, the correct construction." *Phillips*, 415 F.3d at 1316 (quoting *Renishaw PLC v. Marposs Societa per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)) (emphasis added).

Moreover, Defendants' erroneously urge this Court to adopt their construction because if the Court adopts LML's construction, the '988 Patent would be anticipated by three prior art references. First, a district court may not adopt a claim construction simply to uphold the validity of the patent and "gloss over" the intrinsic evidence as Defendants would have this Court do. *Nazomi*, 403 F.3d at 1368. Second, as discussed above, the Carlson, Braun and Higashiyama references do not anticipate the '988 Patent under *either* claim construction. (Tinkel Decl. at ¶¶ 11-38).

> 2. *The intrinsic evidence specifically states that the check is used as a "source" of information and is not "accepted or processed" as LML's construction requires.*

Without Defendants' primary extrinsic evidentiary support, Defendants' Brief provides little in the way of support for their claim construction. Indeed, Defendants' construction is at odds with the intrinsic evidence. As a preliminary matter, the claim language is focused on the fact that the check is not *used as* a negotiable instrument. (Ex. A, claims 1, 8 and 9). Defendants' construction is divorced from the language of the claims and instead seeks to define whether the check takes on the "status" of a negotiable instrument. *Abtox, Inc. v. Exitron, Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997) ("Nonetheless, throughout the interpretation process, the focus remains on the meaning of claim language" and "the language of the claim frames and ultimately resolves all issues of claim interpretation.").

The specification specifically discusses how to use the check as a "source" of information and that the paper check is not "accepted or processed." For example, the "Field of the Invention" specifically states that the check in the '988 Patent is "used as *the source*" of consumer account information or identification. ( Ex. A col. 1, lns. 10-15 (emphasis added)). The specification goes on to explain that "No commercial bank note ("Paper Check") is *accepted or processed* by the service subscriber." (Ex. A '988 Patent col. 9, ln. 64 through col. 10, ln. 2 (emphasis added)). Thus, LML's construction is consistent with the specification because it is directly drawn from it. These requirements are repeated over and over in the specification:

- "Each sale or 'Transaction Event' would be an electronic and *'paperless'* event thereby *eliminating reliance on accepting and processing commercial bank drafts* (personal or corporate checks) and the physical handling of those bank drafts thus replacing commercial bank drafts at the point-of-sale." (*Id.* at col. 3. lns. 3-8 (emphasis added))

- "Further, operational parameters of the present invention allow freedom from customary state or other geographically limiting criteria typical when *accepting and processing 'paper' checks."* (*Id.* at col. 3, lns. 3-8 (emphasis added))

- "[T]he system provides system subscribers…a pronounced lowering of the present cost of cumbersome procedures otherwise mandated by the existing ACH system *for accepting and processing commercial bank drafts."* (*Id.* at col. 4, lns. 52-58 (emphasis added))

Indeed, LML's construction is consistent with the entire concept of the '988 Patent.

Defendants rely on only two misconstrued references in the specification. First, Defendants argue that because the specification contemplates using a blank check in some circumstances that the patentee meant to require that the check be blank and thus never take on the "status" of a negotiable instrument. However, Defendants admit, as they must, that the '988 Patent does not *require* that the check be blank. (Defendants' Brief at pg. 22 ("The specification recites that, *preferably*, a 'specimen' or 'blank' check

-25-

is used . . .") (emphasis added)).  In fact, the specification states that "the process begins by a consumer presenting a specimen *or* 'blank' check complete with MICR number to the system subscriber (the merchant) 100."  (Ex. A, col. 7, lns. 46-49 (emphasis added)).

In this context, where specimen and blank are contrasted, the patentee disclosed an invention that could accept either "specimen", *i.e.* filled out, or "blank", *i.e.* not filled out, checks.  Because Defendants' construction does not permit the check to be filled out, it improperly excludes one of the preferred embodiments—accepting a completed check. *Cytologix Corp.*, -- F.3d --; *SanDisk*, 415 F.3d at 1285.  Defendants' construction is incorrect as a matter of law.

Defendants also state that the Applicants' discussion of the Case reference supports their claim construction because the Case system requires the check to be filled out.  (Defendants' Br, at 22-23).  However, Defendants have misrepresented the discussion of the Case reference.  The Applicants distinguished Case because it disclosed a combination card and specialized draft negotiable instrument that was surrendered to the merchant (the language cited by the Defendants is italicized):

> U.S. Patent No. 4,270,042 to Case discloses a point of sale system that requires a consumer to prepay a sum of money into a special account that is accessed only by the system.  This amount is inscribed on the card, and when a transaction is made using the system, the amount of the transaction is punched out of a designated area on the card. *This amount, along with a signature and other information,* is supplied on a draft negotiable instrument, which is given to the merchant at the time of the transaction.  Thus, the case system does away with the use of bank checks in effecting the transaction but requires the use of specialized prepaid draft negotiable instruments that must be surrendered to the merchant.

(Ex. A, col. 2, lns. 5-120.   Therefore, LML's construction is consistent with the specification; Defendants' construction is not.

-26-

### 3. *The prosecution history supports LML's construction.*

As discussed in LML's Opening Brief, the prosecution history is replete with examples that support LML's construction. (LML's Brief at 28-31.) Defendants' only attempt to support their construction with the prosecution history is to reference Applicants' efforts to distinguish the Carlson '607 patent from their invention. But, Defendants never even fully explain how the Applicants' language supports their claim construction. Instead, Defendants make unsupported conclusory statements as to what the Carlson '607 patent teaches and summarily conclude that it supports their construction.

Applicants distinguished the Carlson '607 patent (which claims a "negotiable instrument processing device") because the device in Carlson reads the MICR information printed on a check to "speed[] up processing of the check at the point of sale. The check is still used as a negotiated instrument, however, and is turned over to the merchant to complete the transaction." (Ex. T at LML-EP-000192). Applicants went on to say that "it would not be trivial to modify Carlson et al. so that a bank draft is used for informational purposes only. The entire Carlson system is set up to process checks in order to speed the debiting and crediting of the negotiated amount at a later date." (*Id.*).

Nothing in Applicants' statements supports Defendants' claim construction. Indeed, Applicants properly emphasized the distinctions between how the Carlson '607 patent *used* the check as a negotiable instrument and the fact that the Applicants' invention used the check as a source document for "information purposes only." (*Id.*). As discussed at length in LML's Opening Brief (pg. 30), this citation, and others, support

-27-

LML's claim construction which requires the check to be used as a "source" of information and "not accepted or processed."

> 4.    *Defendants' premature attacks on LML's claim construction are simply wrong.*

In Defendants' zeal to cast LML's claim constructions in a poor light, Defendants criticize LML for LML's alleged "reliance on rules and regulations enacted well after the date of invention", using the NACHA "POP" rules as an example. (Defendants' Brief at 25.) However, a review of LML's Opening Brief demonstrates that LML never relied on the NACHA rules (or LML's expert Gary Tinkel) to support their constructions. LML did cite to the rules to provide the Court with a background of the invention and explain what information is included in a MICR line. (LML's Brief at 3-7.) This is a far cry from Defendants' accusations. In fact, LML clearly stated that it did not believe it was appropriate or necessary to turn to such extrinsic evidence to support the substantive arguments advanced in support of the proper claim constructions. (*Id.* at 11.)

Defendants also incorrectly accused LML of relying on "untimely evidence" because "claims [must] be interpreted within their appropriate temporal context." (Defendants' Brief at 25). LML agrees that the claims must be interpreted at the time the patent application was filed and thus, LML relied solely on the claims, specification and prosecution history to support their claim constructions. Defendants have repeatedly turned to extrinsic sources that post-date the 1996 issuance of the '988 Patent for substantive support for their arguments. For example, Defendants rely on pre-acquisition counsel's February 6, 1998 letter (Defendants' Brief at 2, 10-11 and 21-22), a current internet dictionary for their definition of "any" (*Id.* at 17), deposition testimony taken in the instant case (*Id.* at 15-16 and 25), an October 1997 letter (*Id.* at 29) and others. This

-28-

Court should not be swayed by Defendants' mistaken attempts to cast LML in a negative light, when it is Defendants themselves who violate their own principles.    LML's constructions are based solely on the intrinsic evidence.

Therefore, this Court should construe the claim element "without using the bank check as a negotiable instrument" to mean, *"where the paper check is used as a source of information, and is not accepted or processed."*

### E.    Constructions Of The Terms "For The Sole Purpose" Of Obtaining "Consumer Bank Account Information".

#### 1.    Construction of the phrase "for the sole purpose".

As LML explained in its Opening Brief, Defendants had maintained since the initial exchange of claim construction terms in April 2005, that the "for the sole purpose" claim element needed to be construed.    On several occasions, LML attempted to work out an agreed-upon construction, but Defendants did not respond to these requests.    Just hours before filing LML's Opening Brief, Defendants suddenly dropped their construction of the claim element.    This eleventh hour decision did not permit LML sufficient time to evaluate Defendants' new position, and/or make the necessary changes to LML's Opening Brief.    LML's construction of "sole purpose" is "only purpose."    In LML's view, these two constructions are exactly the same.    Thus, LML is indifferent and agrees that this term needs no construction—a position LML has advocated for many months.

#### 2.    *"Consumer bank account information" is information relating to the consumer's bank account, not simply the arbitrary subset of that information proposed by Defendants.*

In an effort to narrow the claims, Defendants' proposed an arbitrary construction for "consumer bank account information," to mean "only the ABA/transit routing number

-29-

and bank account number." Defendants' construction is a classic case of attempting to limit a claim term where no such limitation is required by the plain language of the claim. In fact, the Court need only look to the first word of Defendants' construction—"only"—to reveal their blatant attempt to unnecessarily limit this term. LML's construction,[11] on the other hand, is again based solely on the intrinsic evidence, which defines "consumer bank account information to mean "information relating to a consumer's bank account including the MICR line (magnetic ink character recognition line)."

Defendants are attempting to import a number of limitations into a relatively simple claim element in an attempt to manufacture a non-infringement argument (all of the Defendants' systems also read the check serial number and thus, Defendants argue that they therefore do not infringe claims 2, 8 and 9). However, this limitation is not required by the claim terms themselves and this Court should not import such extraneous limitations. *Dayco Prods., Inc. v. Total Containment, Inc.,* 258 F.3d 1317, 1327 (Fed. Cir. 2001) ("adding limitations to claims not required by the claim terms themselves, or unambiguously required by the specification or prosecution history, is impermissible."). Therefore, this Court should adopt LML's construction which lacks such impermissible limitations.

---

[11] Defendants' Brief does not properly cite LML's construction of this term. (Defendants' Brief at pg. 26 (stating that LML's construction is "any information relating to a consumer's bank account including, but not limited to, magnetic ink character recognition numbers")). The correct construction is supplied in the Joint Proposed Claim Construction Chart and in both of LML's briefs.

a)     The plain claim language support's LML's construction.

This Court should give effect to the broad language chosen by the patentees and discard Defendants' attempts to narrow the claim terms. *Cytologix Corp.*, -- F.3d --,; *K-2*, 191 F.3d at 1364 ("Courts do not rewrite claims; instead we give effect to the terms chosen by the patentee.").   As discussed in LML's Opening Brief, the claim terms, which generally refer to "consumer bank account information", and surrounding claims, which discuss consumer bank account information in the context of reading the entire MICR line off of a check, support LML's construction of the claim terms.  (LML's Brief at 15-16.)   Although this MICR line may include the ABA/transit and bank account information, it may also include a check serial number and other information relating to a consumer's bank account.  (LML's Brief at 15-16.)

Defendants point to claims 3, 5 and 7 in an apparent claim differentiation argument.  (Defendants' Brief at 26.)  However, these claims do not support such an overly narrow understanding of the claim element.  First, claim 3 is a system claim where the point of sale terminal has a display to display consumer bank account information generally.  (Ex. A at claim 3.)  The claim language does not, as Defendants suggest, require display of only the ABA/transit and account information to verify an account.  In fact, the display could actually display an entire image of the check if scanned, thus displaying numerous different types of consumer bank account information.  Defendants' reliance on claims 5 and 11 for this proposition is even more mysterious as these claims do not even include the claim element "consumer bank account information."  Instead, these claims recite a different claim element —namely including the claim element

-31-

"consumer bank account status information."[12]  (*Id.* at claims 5 and 7).  LML, therefore, is at a loss as to how these elements relate to the claim terms actually at issue.

> b)      The specification repeatedly refers to reading the entire face of the check, including the whole MICR line.

The specification of the '988 Patent discloses either reading the entire MICR line—not just the transit and account numbers—off of the check (regardless of what information is contained on the MICR line) or scanning the entire check itself to read the information on the face of the check.  The entire MICR line is then sent to the central computer system for verification:

- "The system subscriber then enters the appropriate MICR number either manually or by passing the check through a check reader which determines the MICR number 112." (Ex. A at col. 7, lns. 57-62).

- "The computer data file center receives and processes Transaction Event authorization requests utilizing the ***entire*** MICR string for accurate, error-free identification of both the consumer bank and a specific checking or depository account to participate in the sale."  (*Id.* at col. 10, lns. 45-49 (emphasis added)).

*(See also* Ex. A at  col. 6, lns. 65-67; col. 10, ln. 14; Figs. 2,. 5, 6 and 7; col. 5, lns. 48-49; col. 8, lns. 30-34).

Indeed, Defendants are basing their construction on a single reading from the preferred embodiment which merely states that the check serial number "***can be 'dropped'***" not that it ***must be*** dropped.  (Ex. A col. 10, lns. 31-34).  Not only is it impermissible to read in a limitation from the "Preferred Embodiment", this citation merely presents the ***option*** of dropping the check serial number from the consumer bank account information.  *Comark* , 156 F.3d at 1187; *Texas Instruments,* 805 F.2d at 1563.

---

[12] These claims actually support LML's construction in any event.  Claim 5 and 11 recite using consumer bank account status information to verify account status.

Moreover, this citation indicates that the check serial number may be dropped, if at all, only *after* the point of sale terminal receives *all* of the consumer bank account information off of the check, including the entire MICR line with the check serial number in it—in contrast, the claims only require that this information be received or read by the point of sale terminal. Therefore, Defendants' construction is impermissibly at odds with the specification.

   c)    Defendants' reliance on the prosecution history is misplaced.

Defendants' reliance on the prosecution history, which discusses accepting "bank account information by reading the MICR information from any bank check" is misplaced.[13] Indeed, if one thing is clear from the prosecution history, it is that MICR information is part of a larger group of consumer bank account information. It does not limit the information as Defendants suggest. Defendants' evidence simply does not support the argument they are trying to make—it does not exclude check numbers from "consumer bank account information" as Defendants suggest.

   d)    Defendants' reliance on the extrinsic evidence is improper.

Defendants must again resort to the extrinsic evidence to attempt to support their claim constructions. (Defendants' Brief at 29.) Defendants cannot use the extrinsic evidence to contravene the construction required by the intrinsic evidence. *Playtex*, 400 F.3d at 908 n.1; *Interactive Gift,* 256 F.3d at 1332; *Vitronics*, 90 F.3d at 1583. The extrinsic evidence Defendants proffer does not even support their argument.

---

[13] LML also notes that the term "bank account information" is not the same as the claim term used in the '988 Patent "consumer bank account information."

**REDACTED**

In addition, Defendants' arguments represent a strained reading of this extrinsic evidence. For example, the '988 Patent does not discuss, much less require, that the same check be used over and over again.

**REDACTED**

Similarly, LML's pre-acquisition counsel's statements also do not require using only the ABA/transit and bank account information to the exclusion of all other consumer bank account information.

Therefore, this Court should construe "consumer bank account information' to mean, *"information relating to a consumer's bank account including the MICR line (magnetic ink character recognition line)."*

> **F.    Defendants Improperly Construe The Phrase "Verifying That Account Numbers Were Accurately Read At The Point Of Sale."**

As with previous arguments and disputed terms, Defendants' construction of this claim element improperly imports limitations from the specification into the claims to manufacture the construction of "visually confirming that account numbers were accurately read by reference to the source document." LML believes that this phrase is clear on its face and does not need to be construed.

Defendants are attempting to rewrite the claim language by improperly importing limitations from the preferred embodiment into the claims. However, the claim language itself does not require that the account numbers be "visually confirmed" at the point of sale. (Ex. A at claim 8). Indeed, as LML discussed in its Opening Brief, this step could be performed electronically by the check reader or optical character recognition

-34-

equipment. (LML's Opening Brief at 35-36.) Applicants specifically chose not to use the word visually in their claims, and thus, such a limitation should not be imported into the claim through claim construction. *Xerox*, 267 F.3d at 1366-7 *citing Comark Communications,*, 156 F.3d at 1187; *Innova*, 381 F.3d at 1119.

While the preferred embodiment does, in fact, disclose using a display on a point of sale terminal to verify that account numbers were accurately read, *see, e.g.* Ex. A at col. 9, lns. 14-16, it is well-established that importing limitations from the preferred embodiment is improper. *See Comark,* 156 F.3d at 1186; *Texas Instruments,* 805 F.2d at 1563. Defendants' construction clearly defies this basic tenent of claim construction.

Moreover, claim 3 of the '988 Patent specifically recites including an "alpha-numeric display" on the point of sale terminal. (Ex. A at claim 3). Claim 8 does not specifically require a display and only includes the generic requirement of verifying the account numbers. (*Id.* at claim 8). Thus, if the patentees had desired visual confirmation against a display, they would have included such a limitation in the claim.

Defendants' construction does that which the Federal Circuit prohibits - imports limitations from the specification into the claims. As such, Defendants' construction cannot be correct. Therefore, this Court should adopt LML's claim construction, the plain language of the claim element itself.

**G.    Defendants' Construction Of The Phrase "Adapted To Receive Consumer Bank Account Information From Any Bank Check" Is Wrong.**

LML does not believe that the phrase "adapted to receive" requires any further construction as its ordinary and customary meaning is clear and would be understandable

-35-

to a jury from the claim language itself.[14] *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (trial judges do not need to "repeat or restate every claim term . . ."). On the other hand, Defendants construe this element to mean "adapted to **read** consumer bank account information **directly** from any bank check." (emphasis added). Defendants' construction is improper because it imports the limitation of "reading directly" into the claim language without justification. The term "adapted to receive" is clear on its face, and thus needs no construction.

Defendants first argue that the claim language itself, which does not contain either the word "read" or the word "directly," supports their construction. But, a side-by-side comparison of the claim language and Defendants' construction dispels that notion:

| Claim Language | Defendants' Construction |
|---|---|
| "adapted to **receive** consumer bank account information from any bank check" | "adapted to **read** consumer bank account information **directly** from any bank check" |

Clearly, Defendants are importing the terms "read" and "directly" into the claims. In fact, Defendants appear to interpret "receive" to mean "read" while the word "directly" appears out of thin air. The claim language clearly does not support Defendants' construction as it is a clear attempt to rewrite the claims.[15]

---

[14] The construction of the terms "consumer bank account information" and "any bank check" are addressed elsewhere in this brief.

[15] Interestingly, in discussing their importation of the term "read" and "directly" into the claims, Defendants claim that "LML's construction would read this limitation out of the claim, and is therefore improper." (Defendants' Brief at 32.) Amazingly, LML's construction is identical to the claim language -- in other words, LML does not believe any construction of this term is necessary. Defendants' argument is telling of their intent to import limitations that simply are not there.

Moreover, Defendants efforts to interpret receive to mean "read . . . directly" is at odds with the common everyday usage of these terms. Indeed, the definitions of "read" and "receive" in the 1993 edition of the Webster's Third New International Dictionary demonstrate that they have two distinct meanings. (Ex. 3 Webster's Third New International Dictionary (1993) definitions of "read" and "receive"). Certainly, Defendants have not shown a "clear and unambiguous disavowal of claim scope" by the Applicants to give this term a special meaning as they are attempting to do. *Omega Eng., Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325 (Fed. Cir. 2003).

Additionally, Defendants' construction would violate the Federal Circuit prohibition against excluding one of the preferred embodiments from the claims. *Comark*, 156 F.3d at 118. For example, the '988 Patent teaches a situation where the merchant is handed a bank check and proceeds to enter the consumer bank account information from that check manually into the point of sale terminal. (Ex. A, col. 6, lns. 60-67). The consumer bank account information is "received" by the point of sale terminal "from the bank check." The bank check is the source of the consumer bank account information which is what is required by the language of the claims.

The prosecution history also does not support Defendants' argument. During prosecution, Applicants distinguished their invention from the system disclosed in Deming by saying that the Deming could not "read" account and other information "directly" from an ordinary bank check. (Ex. S at LML-EP-000158). This argument has no relevance to construction of the phrase "adapted to *receive*." There is nothing in the intrinsic evidence, that shows that the patentees intended "receiving" and "reading" be given the same meaning. Defendants cannot arbitrarily assign them the same meaning

-37-

with no justification from the intrinsic evidence. *Id.; see also Innova*, 381 F.3d at 1119. Moreover, as discussed below, Defendants' reading of the prosecution history on the Applicants' discussion of Deming is flawed in any event.

Defendants' construction violates numerous, well-settled claim construction principles. This element simply requires no construction, as it is clear on its face.

**H.     Defendants' Construction Of "Means For Reading Magnetic Ink Character Recognition Numbers Appearing On A Consumer Check" Disregards Portions Of The Specification.**

Defendants' sole motivation in construing this claim element appears to be to exclude a keyboard as a means for reading the MICR number to bolster their non-infringement arguments, even at the expense of ignoring portions of the specification. The specification explicitly discloses that the structure for "reading magnetic ink character recognition numbers" as disclosed in claims 2 and 9 can be a MICR reader, optical character recognition ("OCR") equipment, manual keyboard entry of the MICR string, or equivalent. (Ex. A at Fig. 2, col. 5, lns. 44-49; col. 7, lns 55-62, col. 9, lns. 9-14 and lns. 50-52, col. 10, lns. 41-44, and col. 6, lns. 60-67). Defendants, however, only include the MICR reader and OCR equipment in their construction of the structure despite the multiple references to keyboard entry in the specification. Defendants also ignore the language of 35 U.S.C. § 112(6) that requires any "equivalent" of the structure disclosed in the specification to also be construed as a structure for performing the recited function.

Defendants acknowledge that the specification describes a manual means of information entry via the keyboard, but ignore many of the '988 Patent's discussions of keyboard entry. (Defendants' Brief at 35.) Most notably, Defendants do not include the

-38-

portions of the specification which state that keyboard entry is a "substitute" for a MICR

reader or OCR equipment for "reading" consumer bank account information:

> The point-of-sale terminal comprises *several different entry means*. A key board 310 can be used to input consumer information manually. Alternatively a card reader 312 can be used whereby the magnetic stripe on the card is read by the point-of-sale terminal and finally *a check reader* 314 is also included to *read the MICR number on checks as a substitute* for either a specific card *or key board input.* (Ex. A col. 6, lns. 60-67 (emphasis added)).

The use of the phrase "as a substitute" shows that the patentees considered keyboard

input and an MICR reader to be interchangeable, both performing the function of

"reading" the MICR number on checks recited in the claims. Defendants' construction

improperly prohibits keyboard entry and excludes this preferred embodiment. *SanDisk*,

415 F.3d at 1285.

Defendants' justification for ignoring all of the references to manual entry in the

specification is, again, that the Applicants distinguished the system described in the

Deming '264 Patent during prosecution.   (Defendants' Brief at 36). Defendants'

argument is misplaced and incorrect. Applicants did not disclaim manual keyboard entry

to overcome Deming, but instead, distinguished Deming for a host of other reasons.

Applicants' comments in this regard were directed at these other distinctions. (Ex. 4 at

LML-EP 000171).   At the most basic level, the Deming system does not even cover

transactions at the point of sale. Rather, it is a home banking system that runs on an

individual's home computer. (Ex. 5 at col. 1, lns. 27-29). The Deming system does not

include a point of sale terminal, does not require any type of check, is not used to transfer

funds at the time of purchase, and can only be used to pay past debts. (Ex. 4 at LML-EP

000171). Applicants *never* stated that their invention excluded manual keyboard entry.

-39-

Despite this evidence, Defendants argue that Applicants excluded manual keyboard entry from their invention. This argument is flatly wrong. In fact, Defendants quote the prosecution of the '988 Patent that states "[a]ccount and other information must be keyed into the Deming system; Applicants' invention *can* read in account and other information directly from the consumer's ordinary bank check." (Ex. S LML-EP 000158-59.) The use of the word "can" is a giant leap from a "clear and unambiguous disavowal of claim scope" by the Applicants. *Omega*, 334 F.3d at 1325.

The specification of the '988 Patent unequivocally identifies manual keyboard entry as an option for reading MICR numbers off a check. As such, this structure is properly included as a structure under 35 U.S.C. § 112(6). Thus, the structures identified to perform the agreed upon function recited in claims 1 and 9 are *a MICR reader, OCR, manual keyboard entry of the MICR string, or equivalent.*

**III.     CONCLUSION**

For the foregoing reasons, LML respectfully requests that this Court adopt its proposed constructions for the disputed terms of the '988 Patent.

Dated:  October 21, 2005

Richard K. Herrmann (I.D. No. 405)
Mary B. Matterer (I.D. No. 2696)
MORRIS JAMES HITCHENS &
WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
302.888.6800
mmatterer@morrisjames.com

-40-
**COUNSEL'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

Russell E. Levine, P.C.
Jamie H. McDole
Aaron D. Charfoos
Edward K. Runyan
Lesley G. Smith
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
312.861.2000

*Counsel for Plaintiff LML Patent Corp.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of October, 2005, I electronically filed the foregoing document, **PUBLIC VERSION OF DECLARATION OF AARON D. CHARFOOS IN SUPPORT OF PLAINTIFF LML PATENT CORP.'S RESPONSIVE BRIEF ON ISSUES OF CLAIM CONSTRUCTION**, with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Collins J. Seitz, Jr., Esq.
Francis DiGiovanni, Esq.
Connolly Bove Lodge & Hutz LLP
1007 North Orange Street
Wilmington, DE 19801

William J. Marsden, Jr., Esq.
Timothy Devlin, Esq.
Fish & Richardson, P.C.
919 North Market Street, Suite 1100
Wilmington, DE 19801

Richard D. Kirk, Esq.
The Bayard Firm
222 Delaware Avenue, 9th Floor
Wilmington, DE 19801

Additionally, I hereby certify that on the 28th day of October, 2005, the foregoing document was served via email and via federal express on the following non-registered participants:

Robert Jacobs, Esq.
Mark B. Mizrahi, Esq.
Belasco Jacobs & Townsley, LLP
Howard Hughes Center
6100 Center Drive, Suite 630
Los Angeles, CA 90045

Mark C. Scarsi, Esq.
Vision L. Winter, Esq.
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071

_____ /s/ Mary B. Matterer _____
Richard K. Herrmann (#405)
Mary B. Matterer (#2696)
MORRIS, JAMES, HITCHENS
& WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
(302) 888-6800
rherrmann@morrisjames.com
mmatterer@morrisjames.com

Attorneys for Plaintiff LML PATENT CORP.