IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LML PATENT CORP.,

        Plaintiff,

    v.

TELECHECK SERVICES, INC.,
ELECTRONIC CLEARING HOUSE, INC.,
XPRESSCHEX, INC. and NOVA
INFORMATION SYSTEMS, INC.,

        Defendants.

C.A. 04-858 (SLR)

**ECHO AND XPRESSCHEX'S OPENING BRIEF IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT**

## I.    NATURE AND STAGE OF PROCEEDINGS

This is a patent infringement litigation initiated by LML Patent Corporation ("LML") against defendants TeleCheck Services, Inc., Electronic Clearing House, Inc. ("Electronic Clearing House"), XpressChex, Inc. ("XpressChex") and Nova Information Systems, Inc (collectively, "Defendants").    The patent in suit is U.S. Patent No. 5,484,988 ("the '988 patent").

Electronic Clearing House and XpressChex (collectively "ECHO") submit this opening brief in support of their Motion for Summary Judgment of Non-Infringement.

Fact and expert discovery has concluded, and claim construction briefing is complete.

At this stage of the litigation, it is clear that, as a matter of law, the ECHO services do not contain the limitations of the asserted claims because each of those claims require a system or process that can receive information from "any" check, and further requires that the check not be completed and signed; and there is no factual dispute that the accused ECHO services do not accept many different types of checks, and all checks must be completed and signed checks before being accepted.

The other Defendants are submitting separate motions for summary judgment of non-infringement, because each Defendants' respective accused products and services are not identical.    To minimize overlap, however, Defendants have coordinated regarding issues that do not relate to the individual features of the accused systems.    Accordingly, a number of sections below are set forth identically in each Defendant's brief, for example, facts related to the '988 patent and its prosecution history, and related discussion of

prosecution history estoppel. For clarity, each of the sections common to Defendants' briefs includes an introductory note to that effect.

## II.    SUMMARY OF ARGUMENT

The '988 patent is an extremely narrow patent. The patentees initially applied for a broad patent, but were forced to narrow the scope of its claims during prosecution because of the plethora of prior art that existed at the time. The claims were repeatedly rejected during a four year prosecution period until the patentees narrowed the claims sufficiently for the examiner to allow them to issue. The issued claims now being asserted were based on a narrow construction of the claim terms that both the Patent Office and the patentee believed was necessary to avoid the prior art. In its claim construction brief, LML tried to escape that narrow construction and the prosecution history that defines the patent. It is expected that LML will similarly try to ignore the prosecution history in opposing the instant motion.

The '988 patent generally relates to a specific system and method for processing electronic check transactions at the check-out counter, or "point of sale." There are two non-infringement issues that relate to every asserted claim. First, all of the asserted claims require that the check processing system of the '988 patent be capable of functioning with "any bank check" or "any consumer bank check." Second, each asserted claim requires that the system and method function "without using the [bank] check as a negotiable instrument."

ECHO markets two point-of-sale electronic check conversion services, one under the generic title "Electronic Check Conversion" (formerly XpressConversion, hereinafter "ECC Service" for short) and the other under the title "VISA POS Check Service." Both

services are able to clear only certain types of checks through the U.S. National Automated Clearing House, commonly known as and referred to herein as the ACH Network.

The accused ECHO check conversion services (hereinafter the "accused services") allow a merchant to take only certain completed and signed check from the customer and process it electronically using a Magnetic Ink Character Recognition ("MICR") reader that automatically reads the ABA transit/routing number, account number and check number directly from the check.

In order to try to read the '988 patent on the accused services, LML has based its claim for patent infringement on an improperly broad reading of the patent – a reading so broad that it would read on the prior art which was explicitly disclaimed during the application process. However, no matter how LML attempts to construe these claims, the fact is that the accused services simply do not work in the same way as the system and method claimed in the patent. To infringe a patent claim, a product must satisfy each and every limitation of the claim. The accused services do not meet many of the limitations of the '988 patent.

Each and every asserted claim in the patent requires a system or process that can receive bank account information from *any* bank check (or *any* consumer bank check), and to communicate that information to an automated clearing house for transferring funds from the account of that check. The accused services simply cannot receive bank account information from many, if not most, bank checks (or consumer checks), and further contains numerous road blocks to ensure that ECHO's computers will not communicate with an automated clearing house for transferring funds from the account of

3

many, if not most, checks. Based on this unmet limitation alone, summary judgment is appropriate as to all claims.

Each and every asserted claim in the patent requires that transactions occur "without using the check as a negotiable instrument." As set forth in Defendants' claim construction briefing, these limitations are properly construed to require that the check *never take on the status* of a negotiable instrument. Again, the accused ECHO services fail to meet this limitation. Instead, consumers at the point of sale are required to complete and sign the check prior to handing it to the merchant, giving the check the status of a negotiable instrument. The act of completing and signing the check is not merely a "technical" distinction, because it means that the accused ECHO services are much slower at the check-out counter than the system of the invention, lacking the type of speed that the lead inventor stated was "vitally" important. The accused ECHO services fail to meet the "negotiable instrument" limitation, and do not obtain the resulting speed at the check-out counter considered so important by the inventors. Based on this unmet limitation alone, summary judgment is appropriate as to every claim of the patent.

These substantial differences between the patented invention and the accused services also mean that, as a matter of law, ECHO does not infringe the '988 patent under the doctrine of equivalents. The Federal Circuit is clear: the "doctrine of equivalents" applies only in the absence of *any* substantial difference between the claim element in question and the allegedly equivalent aspects of the accused device. Under the doctrine of equivalents, the accused product and the patented invention must be substantially the same, not only in their function, but in the way in which they perform that function and in

4

the results that they achieve. The features of the accused services are so directly contradictory to the requirements of these claim limitations that to find infringement under the doctrine of equivalents would violate a cardinal rule of patent law by vitiating those limitations, effectively reading them out of the claims.

Also, as a matter of law, the doctrine of equivalents is precluded on both of these issues. The "any bank check" limitations and the "negotiable instrument" limitations were added to each independent claim during prosecution. Both sets of amendments narrowed the claims in order to overcome rejections based on the prior art. The Applicants also expressly relied on each limitation in arguing for allowance of the claims over the prior art. The *Festo* presumption barring equivalents clearly applies, and it is equally clear that none of the limited *Festo* exceptions is present here. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.,* 535 U.S. 722, 740 (2002). Accordingly, LML should be precluded from seeking any scope of equivalents with respect to these limitations.

Claims 2, 8, 9, 10, 11, 16 and 18 each require reading the MICR information off the check for the "sole purpose" of obtaining the consumer bank account information. As set forth in Defendants' claim construction briefing, consumer bank account information is limited to only the ABA/transit routing number and the bank account number, not the number of the check itself (the "check serial number"). There is no dispute that rules governing these types of transactions require inclusion of the check serial number, and so there can be no literal infringement. The "sole purpose" limitation was also added to the claims during prosecution, and *Festo* precludes any scope of equivalents.

5

LML does not, and indeed cannot, dispute how the accused services operate. Because there is no factual dispute about how the accused services work, ECHO respectfully requests that the Court grant its motion for summary judgment of non-infringement.

## III.    STATEMENT OF FACTS

### A.    The '988 Patent Claims – Common to all Defendants

The '988 patent generally describes a system and method for converting paper checks to electronic transactions at the point of sale, using the check "as the basic source of identification of the individual and of the individual's bank and whereby the bank account is debited." (Ex. A at 1:13-15.)[1] The '988 patent claims were not allowed until *after* the claims were narrowed to recite conducting transactions "without using the check as a negotiable instrument" (or corresponding language), and further narrowed to recite the capability to transfer funds using account information from "any bank check" or "any consumer bank check." The '988 patent claims therefore require very specific features not present in TeleCheck's ECA product.

The '988 patent includes three independent claims, numbered 1, 8 and 9. Claim 1 is representative:

1.    A checkwriting point of sale system comprising:

a point of sale terminal adapted to receive consumer bank account information from *any bank check*;

a central computer system;

---

[1] Unless otherwise indicated, exhibits cited in this brief are attached to the co-filed Declaration of Timothy Devlin in Support of TeleCheck's Motion for Summary Judgment of Non-Infringement. Citations to patent text in this brief are of the form x:y, where "x" represents the column number and "y" the line number.

first communications means integral to said point of sale terminal for electronically communicating with the central computer system;

memory means integral to said point of sale terminal for temporarily storing the consumer bank account information;

the central computer system having second communication means for receiving information from a plurality of said point of sale terminals;

the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further *enabling automated clearing house communication for transferring funds without using the bank check as a negotiable instrument.*

(*Id.* at 11:36-56.)[2]  An "automated clearing house" ("ACH") referred to in claim 1 is a network of entities, typically financial institutions, that work together to electronically transfer funds between bank or checking accounts.

Claims 8 and 9 recite limitations similar to those highlighted in claim 1.  Claim 8 is a process claim, and recites "presenting any bank check specimen" to a point of sale terminal, reading magnetic ink numbers "without using the check as a negotiable instrument," and transmitting transaction information for "subsequent automated clearing house operations."  (*Id.* at 12:21-42.)  Claim 9 is a system claim, and recites means for reading magnetic ink numbers on "any consumer bank check," and means for "enabling automated clearinghouse communication for transferring funds without using a bank check as a negotiable instrument."  (*Id.* at 12:43-67.)

As set forth in Defendants' briefing regarding claim construction, the "any bank check" limitations should be construed to require receiving information from *any* bank check or *any* consumer bank check and transferring funds using information from any

---

[2] Unless otherwise indicated, emphasis in this brief has been added.

bank check. The "negotiable instrument" limitations should be construed to require that the check used in the process "at no time, takes on the status of a negotiable instrument."

Independent claims 8 and 9 also recite that the check is read for the "sole purpose" of obtaining "consumer bank account information." As set forth in Defendants' claim construction briefing, the phrase "consumer bank account information" should be construed to mean "only the ABA/transit routing number and bank account number," which identify the bank account associated with the check.

**B.    The '988 Patent System and Prior Art Systems – Common to all Defendants**

The '988 patent discloses that the claimed system and method begins when a customer making a purchase initiates a transaction by providing the merchant with any bank check, preferably a "specimen" or "blank" check. (*Id.* at 7:48.) This bank check is used only for purposes of obtaining bank account information from the check, and each transaction is "an electronic or 'paperless' event thereby eliminating reliance on accepting and processing commercial bank drafts (personal or corporate checks) and the physical handling of those bank drafts thus replacing commercial bank drafts at the point of sale." (*Id.* at 3:4-8.)

Specifically, the merchant obtains bank account information from the Magnetic Ink Character Recognition numbers ("MICR" numbers) across the bottom of the check. (*Id.* at 6:66; 7:64-65.)  The bank account information is the "ABA/Transit" and routing number of the check writer's bank. (*Id.* at 10:29-31.) Once the account information is entered, the merchant can initiate a check "verification" process, a well known prior art process in which one or more databases are accessed to determine if a check transaction is likely to be processed successfully. (*Id.* at 7:19-34, 7:63-8:22.) If the verification is

8

approved, the merchant returns the check to the customer at the point of sale and the terminal prints an authorization receipt for the customer's signature. (*Id.* at 8:23-29.) The transaction is later electronically processed for payment through an automated clearinghouse or "ACH" network. (*Id.* at 8:30-42.)

This type of system and method was well known in the art long before the effective priority date of the '988 patent. Systems and methods enabling the electronic processing of paper checks presented at the point of sale have been discussed in the payments industry, disclosed in prior art patents, and implemented by payment processing corporations since the early 1980s. Two such patents are U.S. Patent No. 5,053,607 to Carlson ("the '607 patent"), and U.S. Patent No. 5,175,682 to Higashiyama *et al.* ("the '682 patent").

Both the '607 patent and '682 patent describe electronic check processing systems having many or all of the features of the '988 patent. The described systems each included a terminal and a MICR reader for automatically reading the ABA/transit routing number and bank account number from checks presented at the point of sale, communication with databases for check verification, and automated electronic debiting of the consumer's account based on the information obtained from the check. (*See* Defendants' Opening Brief on claim construction, D.I. 288, pp. 5-7.)

### C.    Prosecution History of the '988 Patent – Common to all Defendants

#### 1.    The "Sole Purpose" Limitations

The original application leading to the '988 patent, Serial No. 07/975,717, was filed on November 13, 1992. (Ex. B.) The original independent claims 1 and 9 recited point-of sale electronic payment processing systems and methods designed to receive

consumer bank account information from either debit-type cards or checks, transmit that information to a central computer, perform a verification process, and transfer funds through an automated clearing house network. (*Id.* at LML-EP 000104-06.)

The Examiner initially rejected the pending claims, (*Id.* at LML-EP 000139-43), and the Applicants amended the claims in an attempt to overcome the rejections (*Id.* at LML-EP 000144-161).    The Applicants' amendments and related arguments were insufficient to overcome the Examiner's rejections.    In a second Office Action, the Examiner maintained rejections based on prior art patents referred to as "Carlson et al." and "Murphy." (*Id.* at LML-EP 000163.)

Following the second rejection, the Applicants filed a continuation application and Preliminary Amendment.    (*Id.* at LML-EP 000170-179.)    In the Preliminary Amendment, the Applicants narrowed pending claim 9 by adding the limitation of reading information from the check "for the sole purpose of obtaining consumer bank account information." (*Id.* at LML-EP 000174.)    The Preliminary Amendment further added 12 new claims, including another independent claim, that recited an corresponding "sole purpose" limitation. (*Id.* at LML-EP 000176.)    These and other amendments were eventually successful in obtaining allowance of the claims.

### 2.    The "Negotiable Instrument" Limitations

The same Preliminary Amendment included narrowing amendments that limited independent claim 1 to transactions that take place "without using a bank check as a negotiable instrument." (*Id.* at LML-EP 000172-73.)    The new independent claim similarly recited transferring funds "without using a bank check as a negotiable instrument." (*Id.* at LML-EP 000175-76.)

10

The Examiner again rejected all pending claims as indefinite, concluding among other things that claim 1 did not capture the argued novelty in the specification. (*Id.* at LML-EP 000181.) The Examiner re-asserted his rejections set forth in previous Office Actions. (*Id.* at LML-EP 000181.)

Applicants filed another Response on January 30, 1995, further narrowing the claims. Claim 9 was amended to include the limitation "without using the check as a negotiable instrument," similar to the limitations previously added to claims 1 and 11. (*Id.* at LML-EP-000184.) Accordingly, at the time of the January 30, 1995 amendment, each independent claim recited a limitation that transactions took place "without using the check as a negotiable instrument." As set forth below, these and other amendments were critical in the eventual allowance of the claims.

### 3.    The "Any Bank Check" Limitations

In the January 30, 1995 Response, the Applicants made other amendments that further narrowed the claims. Each independent claim was also amended to recite processing transactions not from "a" single bank check, but rather from "any" bank check. Specifically, the Applicants amended claim 1 to recite a point of sale terminal adapted to receive information from "any bank check," amended claim 9 to recite presenting "any bank check" at the point of sale, and amended claim 11 to recite means for reading information from "any consumer bank check." (*Id.* at LML-EP-000183-85.)

At first blush, the "any bank check" amendments might appear to broaden the claims, but in fact the new limitations narrowed the claims considerably. Before the word "any" was added to the claims, a system capable of receiving information and transferring funds using just a single type of check ("a" check), or a small number of

11

checks, could meet this limitation and potentially infringe the claim. Following the amendment, however, a system that functioned with only one type of check, or just a few types of checks, could no longer meet the limitation. Instead only systems that could receive information and transfer funds using *any* type of check or *any* type of consumer check could potentially infringe.

### 4. Applicants' Amendments and Arguments Regarding the "Any Bank Check," "Negotiable Instrument," and "Sole Purpose" Limitations Secured Allowance of the Claims

The "any bank check," "negotiable instrument," and "sole purpose" limitations were critical to obtaining allowance of the claims. To overcome the Examiner's rejections, Applicants repeatedly argued that the prior art did not disclose these limitations. The Examiner allowed the claims only after they were narrowed, and only after Applicants relied on these limitations in distinguishing the prior art.

In a Remarks section of the January 30, 1995 Response, the Applicants described the purported invention recited in the amended claim 1:

> The point of sale terminal accepts bank account information from *any bank check.* The system transfers funds as part of a transaction *without using the check as a negotiable instrument.*

(Ex. B at LML-EP 000189.)

Likewise, in arguing over the prior art, the Applicants repeatedly relied on the "any bank check" and "negotiable instrument" limitation. Distinguishing one prior art patent, the Applicants asserted that "Case does not disclose the use of *any bank check solely* to derive consumer information and *not for use as a negotiable instrument,* as recited in independent claims 1, 9 and 11." (*Id.* at LML-EP-000190.) The Applicants also argued over other references based on the negotiable instrument limitation. (*See id.*

at LML-EP 000192-206.) In the summary of Applicants' Remarks, the Applicants again highlighted these differences between the purported invention and the prior art, namely that "none of the references discloses a point-of-sale system that uses *any bank check solely* for the purpose of gather customer information and *not as a negotiable instrument* used to pay for goods received in a transaction." (*Id.* at LML-EP 000207.)

These amendments and arguments were essential to securing allowance of the claims. In the following Office Action, the Examiner withdrew the previous rejections based on Carlson, Murphy and other prior art references, instead only asserting a "restriction requirement" that would force the Applicants to "elect" certain of the pending claims. (Ex. B at LML-EP 000212.) After Applicants argued that no election between claims was necessary, the claims were allowed and the '988 patent issued on January 16, 1996.

**D.    ECHO's Accused Electronic Check Acceptance Service Works Differently than the System and Method of the '988 Patent**

Redacted

The aforementioned checks will hereinafter be referred to as "acceptable checks." (Winckler Decl., ¶ 10.)[3]

The ECC Service is configured not to accept checks printed in non-magnetic ink, checks printed in the wrong font, checks that lack serial numbers, corporate checks, third party checks, credit card checks, cashier's checks, money orders, traveler's checks, official checks, checks drawn on the Treasury of the United States, checks drawn on a

---

[3] "Winckler Decl." refers to the Declaration Kris Winckler in support of Electronic Clearing House Inc.'S And Express Checks Inc.'S Motion For Summary Judgment Of Non-Infringment submitted herewith.

Federal Reserve Bank, checks drawn on a Federal Home Loan Bank, checks drawn on a state or local government, checks payable in a medium other than United States currency (foreign checks), or checks that were not filled out and signed. The aforementioned checks will hereinafter be referred to as "unacceptable checks." (Winckler Decl., ¶ 11.)

There are numerous barriers ("roadblocks") within ECHO's ECC Service ensuring that unacceptable checks are not accepted and/or processed. (Winckler Decl., ¶ 12.)

The first roadblock is set up at the very beginning of ECHO's ECC Service, when a customer hands a check to the merchant. The merchant inspects the check to ensure that it meets the criteria set forth in the ECHO merchant manuals and the individual merchant's check acceptance criteria (i.e., that it is an acceptable check). If it is not an acceptable check, the merchant's clerk is directed <u>not</u> to insert the check into the MICR reader and the point of sale terminal will thus not receive any information from the check. Instead, the ECC Service transaction will be terminated.    (Winckler Decl., ¶ 13.)

In ECHO's merchant manuals relating to ECHO's ECC Service, the merchant is instructed by ECHO not to put the check into the point-of-sale terminal (i.e., no information is received from the check) if the check is a business check, company check, payroll check, credit card convenience check or draft, money order, traveler's check, a check that does not contain a pre-printed serial number, a check that has been previously negotiated, a check that has been previously voided in connection with another Electronic Check Service Transaction or with another program pursuant to NACHA check conversion rules, a Federal Home Loan Bank check, a Government check (including checks drawn on a state or local government), a third party check, a U.S. Treasury

checks, a cashiers check, an official check, or a check payable in a medium other than U.S. currency. (Winckler Decl., ¶ 14 and Winckler Exhibit 1).

The second roadblock is a contractual obligation of ECHO's merchants to ensure that merchants perform the first roadblock. ECHO contractually requires merchants and service providers to agree to certain conditions as part of its Electronic Check Services and Processing Agreements with its customers and individual merchants before they can offer ECHO's ECC Services.

Redacted

ECHO's merchants are contractually obligated not to accept business checks, company checks, payroll checks, credit card convenience checks or drafts, money orders, traveler's check or other checks that are prohibited by NACHA or VISA POS Check Services rules or regulations, including (1) checks drawn on corporate or business deposit accounts, (2) third-party checks, (3) credit card checks, (4) obligations of a financial institution (e.g., traveler's checks, cashier's checks, official checks, money orders, etc.), (5) checks drawn on the Treasury of the United States, a Federal Reserve Bank, or a Federal Home Loan Bank, (6) checks drawn on a state or local government, or (7) checks payable in a medium other than United States currency." (Winckler Decl., ¶¶ 15-17, and Winckler Exhibit2 at ECHO0004492-4496, and Winckler Exhibit 3 at LML-EP-055429.)

The third roadblock is set up at the point in time when the merchant presents an acceptable check to the POS terminal's MICR reader, which may be peripheral to or

integrated with the POS terminal. The MICR reader attempts to automatically read the MICR line, if any, printed on the check. The failure of the check reader to read this information is an indication that the check is unacceptable – the MICR line is not magnetic, the MICR line is not E13-B font, or the MICR line is not positioned in the place it should be on a personal U.S. check. If it is not an acceptable check, the POS terminal will not receive complete and accurate account information from the check, and the ECC Service transaction will be terminated. (Winckler Decl., ¶ 19.)

Redacted


Redacted


Redacted


The POS terminals used with ECHO's system can only read the E13B font, these POS terminals are not adapted to receive consumer bank account information off of foreign checks, or other checks, in which the MICR line is not in E13B font including, but not limited to, checks from Japan, Germany, France, Brazil, United Kingdom, Spain, Italy, Austria, Greece, Denmark, Finland, Holland, Netherlands, Norway, Portugal,

Scotland, Switzerland, Belgium, Israel, Sweden and Chile. (Winckler Decl., ¶¶ 28-37, and exhibits referenced therein.) (Schutze Decl., ¶¶ 9-10.)[4]

Other than a MICR reader, the only other way to automatically read the MICR line directly from a check is through OCR (optical character recognition) equipment. This equipment reads MICR lines optically, not magnetically. None of the MICR-Readers used by merchants in connection with ECHO's ECC Service use OCR equipment to read MICR lines on checks, other than those printed using E13-B font. (Winckler Decl., ¶ 38.)

The fourth roadblock consists of ECHO requiring that the only check readers used with the ECC Service be MICR-Readers. Many of the Electronic Check Services and Processing Agreements with its customers and individual merchants specify that

Redacted

The fifth roadblock is that ECHO's merchants are contractually obligated

Redacted

The sixth roadblock is set up in the POS terminal's software, which prevents certain operations, including Redacted

Redacted

Redacted                                                is the only way to enter MICR

information into a POS terminal for checks which cannot be read by the associated MICR

---

[4] "Schutze Decl." refers to the Declaration of Stephen A. Schutze in support of Electronic Clearing House, Inc.'s and Express Checks, Inc.'s Motion for Summary Judgment of Non-Infringement submitted herewith.

reader, e.g., for checks with MICR information appearing in fonts other than E13B. (Winckler Decl., ¶ 41.)

There is a keypad on some POS terminals, which allow manual entry of MICR information when these terminals are used in conjunction only with ECHO's check verification products and services and not with ECHO's ECC Service. However, the sixth roadblock includes software that disables the POS terminals from receiving manual input of bank account information when being used in conjunction with ECHO's ECC Service.[5] (Winckler Decl., ¶ 42-54.)

Therefore, even if merchants were inclined to Redacted                    and not follow the rules set forth in the manuals, these merchants cannot Redacted
Redacted                    while using the terminals in conjunction with ECHO's ECC Service. (Winckler Decl., ¶ 55.)

Where the MICR line is read by the MICR-Reader, it is then transmitted to the POS terminal and then, upon being prompted to do so, the merchant then enters the sale amount into the POS terminal. Redacted
Redacted

---

[5] Redacted

Redacted

Redacted

The eighth roadblock appears at ECHO's ACH Engine to prevent ECHO's central computer from communicating with an automated clearing house, and thus preventing the transfer of funds, from the accounts of unacceptable checks.  (Winckler Decl., ¶ 68.)

It is important to explain that what I refer to as ECHO's "ACH Engine" is not an "engine", and is not run by the ACH.  This unfortunate nomenclature can be confusing. The word "engine" is a reference to routines built into a computer controlled by ECHO. The reference to "ACH" Redacted

Redacted                                      To summarize, ECHO's

19

"ACH Engine" is a set of routines used by ECHO to determine whether transactions will

Redacted        (Winckler Decl., ¶ 69.)

        Redacted                                        then NCN sends the

"approved" files to ECHO's ACH Engine, which then would determine how a transaction

may be cleared (i.e., through the ACH Network, Redacted            or

not at all).  While some decision-making is undertaken at the ECHO ACH ENGINE

level, in many cases, Redacted

Redacted                (Winckler Decl., ¶¶ 70-79 and Exhibits referenced

therein.)

        The fact that ECHO's ACH Engine is not able to communicate with any

automated clearing house other than the U.S national clearinghouse serves as the ninth

roadblock, thereby further preventing the processing of foreign checks.  The fact that

ECHO's ECC Engine does not communicate with foreign automated clearing houses

prevents direct conversion of those foreign currencies through their respective ACH's.

(Winckler Decl., ¶¶ 80-81.)

        The tenth road block prevents the processing of checks that are not filled-out and

signed.  (Winckler Decl., ¶ 82.)

Redacted

                        (Winckler Decl., ¶¶ 85-89, and Winckler Exhibit 1 at

ECHO0027574.)

The eleventh roadblock prevents the processing of checks that do not contain a check serial number. The serial number is required for ultimate clearance through the ACH Network. If the serial number is not present, then the transaction will not be electronically processed. Redacted

Redacted

Moreover, the current NACHA regulations require customers to be provided receipts that include the "source document check serial number." (Winckler Decl., ¶¶ 90-94, and documents bearing document control numbers LML-EP-055429-055430, attached and Exhibits referenced therein.)

In the Visa POS Check Service, Redacted

21

Redacted

## IV.    ARGUMENT

### A.    Legal Standards for Summary Judgment

Federal Rule of Civil Procedure 56(c) authorizes this Court to grant summary judgment where there is "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Patent cases are amenable to disposition by summary judgment. *See Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998); *NCR Corp. v. Palm, Inc.*, 217 F. Supp. 2d 491 (D. Del. 2002) (Thynge, M.J.) (granting motion for summary judgment of non-infringement).

### B.    Legal Standards for Determining Patent Infringement

In a patent infringement analysis, the court first determines the meaning of the asserted claims, and second, compares the properly construed claims to the allegedly infringing device. *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed. Cir. 2001); *see also KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1355 (Fed. Cir. 2000). In comparing the device with the construed claims, the court first considers whether the claims are literally infringed, and if not found, whether the claims are infringed under the doctrine of equivalents. *See Desper Prods Inc. v. QSound Labs, Inc.*, 157 F.3d 1325, 1332 (Fed. Cir. 1998).

Literal infringement is found only where each limitation of a claim is present exactly in the accused product. Any missing element precludes a finding of literal infringement. *See Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323, 1330 (Fed. Cir. 2001); *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1577-78 (Fed. Cir. 1989).

Infringement under the doctrine of equivalents is only found if the differences between elements in the accused device and elements of the claimed invention are insubstantial. *See Warner-Jenkinson Co. Inc. v. Hilton-Davis Chemical Co.*, 520 U.S. 17, 39 (1997).

There are a number of recognized legal limitations on the doctrine of equivalents. Whether these limitations apply in a given case are questions of law that are properly determined on summary judgment. "Of course, the various legal limitations on the application of the doctrine of equivalents are to be determined by the court." *Warner-Jenkinson*, 520 U.S. at 39 n.8.

Prosecution history estoppel is one legal limitation. It presumptively precludes any scope of equivalents where a patentee narrows the claims during prosecution for reasons relating to patentability. Under these circumstances, a presumption arises that the patentee surrendered all subject matter between the broader language and the narrower language. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 740. The patentee bears the burden of overcoming the presumption, and if it cannot, equivalence is barred. *Id.* at 740-41.

The "all-elements" rule and the "claim vitiation" doctrine are two other limitations on the doctrine of equivalents. These dictate that the doctrine of equivalents cannot be employed to read a limitation out of the claims. "It is important to ensure that the application of the doctrine [of equivalents], even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety." *Warner-Jenkinson*, 520 U.S. at 29; *see also K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1367 (Fed. Cir. 1999); *Phillips Petroleum Co. Huntsman Polymers Corp.*, 157 F.3d 866, 877 (Fed. Cir. 1998).

23

If a theory of equivalents "would entirely vitiate" a claim limitation, entry of summary judgment is required. *Warner-Jenkinson Co.*, 520 U.S. at 39 n.8; *see e.g.*, *Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1106 (Fed. Cir. 2000), *cert denied*, 532 U.S. 1008 (2001). *Dolly, Inc. v. Spalding & Evenflo Cos., Inc.*, 16 F.3d 394,398 (Fed. Cir. 1994); *Novartis Pharma. Corp. v. Eon Labs Mfg., Inc.*, 234 F. Supp. 2d 464, 469 (D. Del. 2002).

**C.    ECHO Does Not Infringe Because the ECC Service Does Not Conduct Electronic Checking Transactions Using "Any Bank Check"**

**1.    The Asserted Claims Require Conducting Electronic Transactions Using "Any Bank Check"**

Each of claims 1, 8 and 9 includes the phrase "any bank check." (Ex. A at 11:38, 12:22 and 12:56.)

Each independent claim also includes a limitation requiring an electronic transaction based on the information obtained from the bank check. For example, independent claims 1 and 9 each recite "enabling automated clearing house communication for transferring funds." (*Id.* at 11:50-55 and 12:61-66.) Claim 8 recites "subsequently transmitting the transaction event information to a bank for subsequent automated clearinghouse operations." (*Id.* at 12:40-42.)

As set forth in Defendants' claim construction briefing, these limitations should be construed to mean that the claims require receiving information and transferring funds using any bank check. Specifically, the phrase "any bank check" should be construed to mean "any type of check drawn on a financial institution." The latter phrases should be construed to mean "electronically communicating with an automated clearing house for

24

transferring funds electronically based upon the consumer bank account information obtained from any bank check presented at the point-of-sale."

Under these proper constructions, there is no legitimate dispute that ECHO's ECC Service fails to meet the "any bank check" limitations, either literally or under the doctrine of equivalents.

> **2.    NACHA Rules Governing "Point of Purchase" Transactions Preclude Infringement of the "Any Bank Check" Limitations**

None of the Defendants' systems meets the "any bank check" limitations because the very rules governing these types of transactions expressly prohibit the use of certain types of checks to transfer funds. Specifically, each Defendant complies with NACHA's rules governing "Point of Purchase" or "POP" transactions.

Under those rules, certain checks are not eligible for use in POP transactions. Subsection 3.8.1 of the Operating Rules provides that for POP entries:

> the following may not be used as source documents: (1) checks drawn on corporate or business deposit accounts, (2) third-party checks, (3) credit card checks, (4) obligations of a financial institution (e.g., traveler's checks, cashier's checks, official checks, money orders, etc.), (5) checks drawn on the Treasury of the United States, a Federal Reserve Bank, or a Federal Home Loan Bank, (6) checks drawn on a state or local government, or (7) checks payable in a medium other than United States currency.

(LML-EP-055429.)

Each of these instruments are types of checks according to LML's own expert. Specifically, LML's expert Mr. Tinkel testified Redacted

---

[6]    The relevant portions of Mr. Tinkel's September 28, 2005 deposition are attached as Exhibit 1 to the Declaration of Don H. Min in Support of Electronic Clearing House, Inc.'s and Xpresschex, Inc.'s Motion for Summary Judgment of Non-Infringement ("Min Decl.") submitted herewith.

Redacted

- 
- 
- 
- 
- 
- 
- 
- 
- 
- 
- 
- 
- 
- 
- 
-

Redacted

•

Each of these instruments is a "check," and could be used within the '988 patent system. Indeed, business checks and corporate checks are specifically disclosed to be used with the claimed system (*see* '988 Patent, col. 3, lines 1-8, col. 4, lines 14-23 and col. 4, lines 49-52). Further, foreign checks are clearly anticipated by the disclosure that there are no geographical boundaries to using the patented system. (*See* '988 Patent, col. 3, lines 15-18). Further, Mr. Tinkel testified,

Redacted

The POP rules, however, prohibit the use of checks "payable in a medium other than United States currency." (Ex. S at LML-EP-055429.) Based on the POP rules, foreign checks utilizing foreign clearinghouses are not eligible as source documents to conduct transactions. Mr. Tinkel himself testified Redacted

Redacted

In short, the '988 patent requires specific functionality that allows the system and method to receive information and transfer funds using any bank check. The rules covering these transactions through the U.S. national ACH prohibit the use of many types

27

of bank checks. Accordingly, the "any bank check" limitations cannot be literally infringed.

### 3. ECHO's ECC Service Does Not Conduct Electronic Transactions Using "Any Bank Check" as Literally Recited by the Claims

Claims 1, 8, and 9 are the only independent asserted claims. Claim 1 requires "a point of sale terminal adapted to **receive** consumer bank account **information from any bank check.**" Claim 8 requires the step of "**presenting any bank check** specimen to a point of sale terminal." Claim 9 requires "a point of sale terminal comprising **reading means** for reading [MICR] numbers on **any consumer bank check.**"

Because ECHO complies with NACHA rules limiting the types of checks that can be used, the ECC Service cannot meet these "any bank check" limitations. The evidence discussed above regarding the ECC Service confirms the fact that the point of sale terminals used in conjunction with this service are not adapted to read or receive, and will not read or receive, information from checks prohibited by NACHA rules, including (1) checks drawn on corporate or business deposit accounts, (2) third-party checks, (3) credit card checks, (4) obligations of a financial institution (e.g., traveler's checks, cashier's checks, official checks, money orders, etc.), (5) checks drawn on the Treasury of the United States, a Federal Reserve Bank, or a Federal Home Loan Bank, (6) checks drawn on a state or local government, or (7) checks payable in a medium other than United States currency.

### 4. Prosecution History Estoppel Prohibits Any Scope of Equivalents with the "Any Bank Check" Limitations

LML is precluded from asserting the doctrine of equivalents with respect to the "any bank check" limitations. The amendments adding these limitations served to

28

narrow the claims, and LML cannot overcome the Festo presumption that no doctrine of equivalents should apply. *Festo v. Shoketsu Kinzoku Kogyo Kabushiki*, 535 U.S. 722, 740.

As noted above, the amendments that converted the claims from "a" bank check to "any" bank check substantially narrowed the claims. No longer could a system that simply functioned with one type of check infringe the claims. Instead the system needed to function with any type of check, which would require additional functionality and features to meet the limitation. The prosecution history itself confirms that these amendments narrowed the claims. Before the "any bank check" limitations were added to the claims, the claims were rejected over the prior art. Only after adding the limitations were those rejections withdrawn, a result that would never happen if the amendment had broadened the claims.

Indeed, given the record over years of prosecution, there can be no question that these narrowing limitations were added to avoid prior art, the classic basis for prosecution history estoppel. *See Warner-Jenkinson*, 520 U.S. at 30-31. Under the Supreme Court Festo precedent, these amendments give rise to a presumption that precludes the doctrine of equivalents with respect to these limitations. *Festo*, 535 U.S. at 740.

LML cannot overcome the *Festo* presumption, which applies in all but the following limited circumstances:

> The equivalent [was] unforeseeable at the time of the application; the rationale underlying the amendment [bears] no more than a tangential relation to the equivalent in question; or there [was] some other reason suggesting that the patentee could not reasonably be expected to have described the insubstantial substitute in question.

*Festo*, 535 U.S. at 740-41.

29

In this case, none of these exceptions apply. First, the claimed equivalent here – a system that can process some checks but not all types of checks – was clearly foreseeable. The claims pending before the amendment was made would have arguably applied to such systems, and in fact the prior art taught systems that could be used with one or more types of check. Thus at the time Applicants added the "any bank check" limitations, conducting electronic check transactions using only a subset of all checks would have been foreseeable. *See Pioneer Magnetics Inc. v. Micro Linear Corp.*, 330 F.3d 1352, 1357 (Fed. Cir. 2003); *Glaxo Wellcome, Inc. v. Impax Laboratories, Inc.*, 356 F.3d 1348, 1355-56 (Fed. Cir. 2004).

Second, the ability to conduct electronic transactions using all types of bank checks was the direct, not tangential, reason for Applicants narrowing amendment to the asserted claims. Applicants repeatedly argued that, unlike the prior art, the claimed invention purportedly could be used with "any bank check." In the "Summary" of Applicants' Remarks relating to the amendment, the Applicants specifically asserted that this feature distinguished the purported invention from the prior art. "[N]one of the references discloses a point-of-sale system that uses *any bank check* solely for the purpose of gather customer information and not as a negotiable instrument used to pay for goods received in a transaction." (Ex. B at LML-EP 000207.) Because distinguishing systems that used only one type or several types of checks was the direct reason for the amendment, the doctrine of equivalents is precluded. *Terlep v. Brinkmann Corp.*, 418 F.3d 1379, 1385-86 (Fed. Cir. 2005).

Finally, no "other reason" for avoiding estoppel can be proffered by LML. This last exception "while vague, must be a narrow one." *Festo Corp. v. Shoketsu Kinzoku*

*Kogyo Kabushiki Co., Ltd.*, 344 F.3d 1359, 1370 (Fed. Cir. 2003) (on remand from Supreme Court). Based on the prosecution history and the '988 patent's disclosure, it is clear that Applicants were aware of that a system for processing certain types of checks could be described and claimed. Applicants gave up such systems by limiting the claims to systems and methods for processing "any bank check." There is simply no other reason "suggesting that the patentee could not reasonably have been expected to have described the alleged equivalent." *Id.* at 1370. Under the circumstances, any claim of equivalence for the "any bank check" limitations is barred. *Festo*, 535 U.S. at 740-41.

In addition, reading in under equivalents would as a practical matter entirely vitiate the "any bank check" limitations. *See Warner-Jenkinson*, 520 U.S. at 29, 39 n.8. Allowing LML to cover by equivalents systems and methods that process only certain types of bank checks would bring the claims back to the same broader scope that was disclaimed during prosecution, effectively removing the word "any" from the claims and replacing it with "a." Such an application of the doctrine of equivalents would effectively gut these limitations from the claims, and must be rejected. *Searfoss v. Pioneer Consol. Corp.*, 374 F.3d 1142, 1151 (Fed. Cir. 2004).

### D. ECHO Does Not Infringe Because the ECC Service Does Not Conduct Electronic Checking Transactions "Without Using the [Bank] Check as a Negotiable Instrument"

#### 1. The Asserted Claims Require Conducting Electronic Transactions where "the Check, at No Time, Takes on the Status of a Negotiable Instrument"

Each independent claim of the '988 patent includes the phrase "without using the check as a negotiable instrument" or a corresponding limitation (without using "the bank check" or "a check" as a negotiable instrument). (Ex. A 11:19-20, 12:6-7, and 12:23-24.)

As set forth in Defendants' claim construction briefing, these limitations should be construed to mean "the [bank] check, at no time, takes on the status of a negotiable instrument." In contrast, in ECHO's ECC Service, the check takes on the status of the negotiable instrument, and thus fails to meet these limitations either literally or under the doctrine of equivalents.

> ### 2.    The ECC Service Does Not Meet the "Negotiable Instrument" Limitation as Literally Recited by the Claims Because the Check Takes on the Status of Negotiable Instrument

The ECC Service processes checks that have taken on the status of a negotiable instrument, and therefore the ECC Service fails to satisfy the "negotiable instrument" limitations. (*See Schutze* Decl., at ¶ 15.)

The Uniform Commercial Code defines a negotiable instrument as "an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order, if it:

> (1) is payable to bearer or to order at the time it is issued or first comes into possession of a holder;
>
> (2) is payable on demand or at a definite time; and
>
> (3) does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money . . . .

(Ex. E, UCC at § 3-104.)

Accordingly, a check becomes a negotiable instruments under the UCC when (1) at the time it is provided or "issued" to another party, it specifies the party to be paid, a date, and the amount, and (2) the customer has signed the check. Redacted

Redacted

32

As LML's expert has stated, Redacted

Redacted

From the consumer's perspective, the procedure for handing over a check as payment is no different regardless of whether the check is processed as paper or through the ECC Service. Unlike the instance of handing over a blank or unsigned check, as described in the '988 patent, a consumer purchasing goods at ECHO's ECC merchant simply pays by check as usual, i.e., using the check as a negotiable instrument.

Other evidence confirms that the check takes on the status of a negotiable instrument. Redacted

Redacted                                    (Winckler Decl. at ¶ 89.) This is consistent with NACHA Operating Rule 3.8.1, which states that the check is voided after it is provided to the merchant by the consumer. (Ex. S at LML-EP 055429.) Where the check has been fully filled out and signed, it remains a negotiable instrument until it is canceled in this manner. Redacted

Redacted

LML's own prosecution and litigation counsel Mr. Jon Roberts stated

Redacted

Redacted                                    (Ex. U at 1389398.) This is true even

33

Redacted

Redacted    (Ex. V at 4:54-57.)

Redacted


Redacted                                         (Winckler Decl., at ¶ 85.)  For

example, certain checks are not eligible to be processed electronically, or consumers may

refuse to sign the authorization receipt necessary for electronic debiting.  Redacted

Redacted

Redacted                                         (Winckler Decl., at ¶ 86.)  This treatment

of the check is only possible because the check has taken on the status of a negotiable

instrument.

In short, there is no legitimate dispute that checks allowed to be used in ECHO's

ECC Service take on the status of negotiable instruments.  The real dispute here relates to

claim construction, and when the claims are properly construed to exclude systems and

methods in which the check takes on the status of a negotiable instrument, there can be

no literal infringement.

### 3.    Prosecution History Estoppel Prohibits Any Scope of Equivalents with the "Negotiable Instrument" Limitations

LML is precluded from asserted the doctrine of equivalents with respect to the

"negotiable instrument" limitations.  The amendments adding these limitations served to

narrow the claims, and LML cannot overcome the Festo presumption that no doctrine of

equivalents should apply.

There can be no legitimate dispute that the "negotiable instrument" limitations narrowed the claims. These narrowing limitations were added to avoid prior art, the classic basis for prosecution history estoppel. See Warner-Jenkinson, 520 U.S. at 30-31. Under the Supreme Court Festo precedent, these amendments give rise to a presumption that precludes resort to the doctrine of equivalents. Festo, 535 U.S. at 740.

As noted above, the Festo presumption applies in all but the following limited circumstances:

> The equivalent [was] unforeseeable at the time of the application; the rationale underlying the amendment [bears] no more than a tangential relation to the equivalent in question; or there [was] some other reason suggesting that the patentee could not reasonably be expected to have described the insubstantial substitute in question.

Festo, 535 U.S. at 740-41.

In this case, none of the exceptions applies. First, processing checks electronically in a manner that uses the check as a negotiable instrument was foreseeable. In fact, the Applicants argued that the prior art Carlson '607 patent described processing negotiable instruments in this very manner, and that this feature purportedly distinguished Carlson from the pending claims. (Ex. B at LML-EP 000192.) Accordingly, Applicants were aware of electronic check processing systems in which the check was used, in Applicants' view, as a negotiable instrument. Thus no scope of equivalents is permitted. Pioneer Magnetics, 330 F.3d at 1357; Glaxo Wellcome, 356 F.3d at 1355-56.

Second, the ability to conduct electronic transactions without using the check as a negotiable instrument was the direct, not tangential reason for Applicants' narrowing amendment. Applicants distinguished no less than seventeen references based on the "negotiable instrument" limitations. (Ex. B at LML-EP 190-206.) Thus the second Festo

exception is not applicable, again precluding any scope of equivalents. *Terlep*, 418 F.3d at 1385-86.

Finally, no "other reason" for avoiding estoppel can be proffered by LML. This last exception "while vague, must be a narrow one." *Festo*, 344 F.3d 1359, 1370. Based on the prosecution history and the '988 patent's disclosure, it is clear that Applicants were aware of check processing systems that utilized a check as a negotiable instrument. Applicants gave up such systems by limiting the claims to systems and methods that process check transactions "without using the [bank] check as a negotiable instrument. There is simply no other reason "suggesting that the patentee could not reasonably have been expected to have described the alleged equivalent." Id. at 1370. Under the circumstances, any claim of equivalence for the "negotiable instrument" limitations is barred. *Festo*, 535 U.S. at 740-41.

In addition, reading in under equivalents would entirely vitiate the "negotiable instrument" limitations. *See Warner-Jenkinson*, 520 U.S. at 29, 39 n.8. Allowing LML to cover by equivalents systems and methods that conduct transactions using the check as a negotiable instrument, would bring the claims back to the same broader scope that was disclaimed during prosecution, effectively removing the limitations from the claims. Such an application of the doctrine of equivalents must be rejected.

Accordingly, *Festo* clearly applies, and no scope of equivalents should be permitted with respect to the "negotiable instrument" limitations.

E.    **ECHO Does Not Infringe Claims 2, 8, 9, 10, 11, 16 And 18 Of The '988 Patent Because The ECC Service** Redacted

As the Defendants have detailed in their claim construction brief, claims 2, 8, 9,

36

10, 11, 16 and 18 all require that a system read the MICR information off the check for the *sole purpose* of reading the consumer bank account information.[7]  Consumer bank account information is limited to only the ABA/transit routing number and the bank account number, which are the first  numbers along the bottom of the check on Figure 1. (Ex T, Parties' Joint Proposed Claim Construction Statement.)

Redacted

(Winckler Decl. ¶¶ 90-94.)    The ECC Service complies with NACHA rules governing "point of purchase" transactions.  These regulations preclude infringement of the "sole purpose" limitations because they require that customers be provided with a receipt that includes the Redacted                                    (Winckler Decl. ¶¶ 90-94).

Given that the ECC Service reads the MICR information for a purpose other than reading only the consumer bank account information, ECHO does not meet this limitation and, therefore, cannot infringe claims 2, 8, 9, 10, 11, 16 and 18.

The "sole purpose" limitations were also added to the claims by amendment.

---

[7] Claim 2 recites "reading magnetic ink character recognition numbers appearing on a consumer check for the sole purpose of identifying and reading the consumer bank account information."  Claim 8 recites "reading the magnetic ink character recognition number information on the check for the sole purpose of obtaining the consumer bank account information."  Claim 9 reads: "reading magnetic ink character recognition numbers on any consumer bank check for the sole purpose of eliciting consumer bank account information."

*Festo* therefore prohibits any scope of equivalents. Although at least one of the claims included the "sole purpose" limitation at the time the claim was originally added during prosecution, the *Festo* presumption applies to all claims having this limitation. *Glaxo Wellcome, Inc. v. Impax Laborities, Inc.*, 356 F.3d 1348, 1356 (Fed. Cir. 2004) ("subject matter surrendered via claim amendments during prosecution is also relinquished for other claims containing the same limitation") (citation omitted). As with the "any bank check" and "negotiable instrument" limitations, no *Festo* exception applies. Accordingly, summary judgment of no infringement with respect to claims 2, 8, 9, 10, 11, 16 and 18 should be granted.

## V.    CONCLUSION

For the foregoing reasons, ECHO's motion for summary judgment of non-infringement should be granted.

/s/ Francis DiGiovanni
Francis DiGiovanni, Esq. (#3189)
CONNOLLY BOVE LODGE &
HUTZ LLP
The Nemours Building
1007 North Orange Street
Wilmington, DE 19801
Phone: 302-658-9141
Fax: 302-658-5614
Attorneys for Electronic Clearing
House, Inc. and XpressChex, Inc.

OF COUNSEL:
Robert Jacobs, Esq. (Pro Hac Vice)
Mark Mizrahi, Esq. (Pro Hac Vice)
Don H. Min, Esq. (Pro Hac Vice)
BELASCO JACOBS & TOWNSLEY, LLP
6100 Center Drive, Suite 630
Los Angeles, CA 90045
Phone: (310) 743-1188
Fax:  (310) 743-1189

## CERTIFICATE OF SERVICE

I, Francis DiGiovanni, hereby certify that on October 28, 2005, a true and correct copy of the foregoing document was caused to be served in the manner indicated on the attorneys of record at the following addresses:

**VIA E-MAIL AND HAND DELIVERY**
Richard K. Herrmann, Esquire
Morris James Hitchens
  & Williams LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801

**VIA E-MAIL AND HAND DELIVERY**
William J. Marsden, Esquire
Fish & Richardson, P.C.
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE 19899-1114

**VIA E-MAIL AND HAND DELIVERY**
Richard D. Kirk, Esquire
The Bayard Firm
222 Delaware Avenue, 9th Floor
P.O. Box 25130
Wilmington, DE 19899

**VIA E-MAIL AND FIRST CLASS MAIL**
Russell E. Levine, Esquire, P.C.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois 60601

**VIA E-MAIL AND FIRST CLASS MAIL**
Mark C. Scarsi, Esquire
O'Melveny & Myers LLP
400 S. Hope Street
Los Angeles, CA 90071

**VIA E-MAIL AND FIRST CLASS MAIL**
Dale M. Cendali, Esquire
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036

/s/ Francis DiGiovanni
Francis DiGiovanni (#3189)