UNDERSTANDING THE ACH NETWORK: AN ACH PRIMER
QUICK FIND: A REFERENCE GUIDE TO THE ACH RULES

REVISIONS TO THE NACHA OPERATING RULES
AND NACHA OPERATING GUIDELINES

NACHA OPERATING RULES

NACHA OPERATING GUIDELINES

REGIONAL PAYMENTS ASSOCIATIONS
DIRECT FINANCIAL INSTITUTION MEMBERS

UNIFORM OPERATING CIRCULAR

REGULATION E
OFFICIAL STAFF INTERPRETATION
ELECTRONIC FUND TRANSFER ACT

FEDERAL TAX DEPOSIT PAYMENTS
(EFTPS)

TITLE 31 OF THE CODE OF FEDERAL REGULATIONS PART 210

2005 FEDERAL ACH PAYMENT SCHEDULE

LML-EP-055345

- UNDERSTANDING THE ACH NETWORK: AN ACH PRIMER
  QUICK FIND: A REFERENCE GUIDE TO THE ACH RULES

- REVISIONS TO THE NACHA OPERATING RULES
  AND NACHA OPERATING GUIDELINES

- NACHA OPERATING RULES

- NACHA OPERATING GUIDELINES

- REGIONAL PAYMENTS ASSOCIATIONS
  DIRECT FINANCIAL INSTITUTION MEMBERS

- UNIFORM OPERATING CIRCULAR

- REGULATION E
  OFFICIAL STAFF INTERPRETATION
  ELECTRONIC FUND TRANSFER ACT

- FEDERAL TAX DEPOSIT PAYMENTS
  (EFTPS)

- TITLE 31 OF THE CODE OF FEDERAL REGULATIONS PART 210

- 2005 FEDERAL ACH PAYMENT SCHEDULE

LML-EP-055346

### SUBSECTION 2.1.13 Sequence of Records for PBR Entries

#### PBR ENTRY DETAIL RECORD (Consumer)

| FIELD | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DATA ELEMENT NAME | RECORD TYPE CODE | TRANSACTION CODE | RECEIVING DFI IDENTIFICATION/ OGO IDENTIFICATION | CHECK DIGIT | DFI ACCOUNT NUMBER | AMOUNT | INDIVIDUAL IDENTIFICATION NUMBER | INDIVIDUAL NAME | DISCRETIONARY DATA | ADDENDA RECORD INDICATOR | TRACE NUMBER |
| Field Inclusion Requirement | M | M | M | M | R | M | O | R | O | M | M |
| Contents | '6' | Numeric | TTTTAAAA | Numeric | Alphameric | $$$$$$$¢¢ | Alphameric | Alphameric | Alphameric | Numeric | Numeric |
| Length | 1 | 2 | 8 | 1 | 17 | 10 | 15 | 22 | 2 | 1 | 15 |
| Position | 01-01 | 02-03 | 04-11 | 12-12 | 13-29 | 30-39 | 40-54 | 55-76 | 77-78 | 79-79 | 80-94 |

#### PBR ADDENDA RECORD (Consumer)

| FIELD | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|
| DATA ELEMENT NAME | RECORD TYPE CODE | ADDENDA TYPE CODE | TRANSACTION TYPE CODE | FOREIGN RECEIVING DFI IDENTIFICATION | FOREIGN PAYMENT AMOUNT | FOREIGN TRACE NUMBER | FOREIGN RECEIVER'S ACCOUNT NUMBER | TRACE NUMBER |
| Field Inclusion Requirement | M | M | R | R | R | O | R | M |
| Contents | '7' | 01 | Alphameric | Alphameric | $$$$$$$$$$$¢¢ | Numeric | Alphameric | Numeric |
| Length | 1 | 2 | 3 | 11 | 15 | 22 | 25 | 15 |
| Position | 01-01 | 02-03 | 04-06 | 07-17 | 18-32 | 33-54 | 55-79 | 80-94 |

## SUBSECTION 2.1.6 Sequence of Records for CBR Entries

### CBR ENTRY DETAIL RECORD (Corporate)

| FIELD | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DATA ELEMENT NAME | RECORD TYPE CODE | TRANSACTION CODE | RECEIVING DFI IDENTIFICATION/ OGO IDENTIFICATION | CHECK DIGIT | DFI ACCOUNT NUMBER | AMOUNT | IDENTIFICATION NUMBER | RECEIVING COMPANY NAME | DISCRETIONARY DATA | ADDENDA RECORD INDICATOR | TRACE NUMBER |
| Field Inclusion Requirement | M | M | M | M | R | M | O | R | O | M | M |
| Contents | '6' | Numeric | TTTTAAAA | Numeric | Alphameric | $$$$$$$$¢¢ | Alphameric | Alphameric | Alphameric | Numeric | Numeric |
| Length | 1 | 2 | 8 | 1 | 17 | 10 | 15 | 22 | 2 | 1 | 15 |
| Position | 01-01 | 02-03 | 04-11 | 12-12 | 13-29 | 30-39 | 40-54 | 55-76 | 77-78 | 79-79 | 80-94 |

### CBR ADDENDA RECORD (Corporate)

| FIELD | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|
| DATA ELEMENT NAME | RECORD TYPE CODE | ADDENDA TYPE CODE | TRANSACTION TYPE CODE | FOREIGN RECEIVING DFI IDENTIFICATION | FOREIGN PAYMENT AMOUNT | FOREIGN TRACE NUMBER | FOREIGN RECEIVER'S ACCOUNT NUMBER | TRACE NUMBER |
| Field Inclusion Requirement | M | M | R | R | R | O | R | M |
| Contents | '7' | 01 | Alphameric | Alphameric | $$$$$$$$$$$¢¢ | Numeric | Alphameric | Numeric |
| Length | 1 | 2 | 3 | 11 | 15 | 22 | 25 | 15 |
| Position | 01-01 | 02-03 | 04-06 | 07-17 | 18-32 | 33-54 | 55-79 | 80-94 |

LML-EP-055465

## SUBSECTION 2.1.3 Company/Batch Header Record Format for Cross-Border (CBR and PBR) Entries

### CBR and PBR COMPANY/BATCH HEADER RECORD

| FIELD | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DATA ELEMENT NAME | RECORD TYPE CODE | SERVICE CLASS CODE | COMPANY NAME | FOREIGN EXCHANGE INDICATOR | FOREIGN EXCHANGE REFERENCE INDICATOR | FOREIGN EXCHANGE REFERENCE | ISO DESTINATION COUNTRY CODE | COMPANY IDENTIFICATION | STANDARD ENTRY CLASS CODE | COMPANY ENTRY DESCRIPTION | ISO ORIGINATING CURRENCY CODE | ISO DESTINATION CURRENCY CODE | EFFECTIVE ENTRY DATE | SETTLEMENT DATE (JULIAN) | ORIGINATOR STATUS CODE | ORIGINATING DFI IDENTIFICATION | BATCH NUMBER |
| Field Inclusion Requirement | M | M | M | R | R | R | R | M | M | M | R | R | R | Inserted by ACH Operator | M | M | M |
| Contents | '5' | Numeric | Alphameric | Alphameric | Numeric | Alphameric | Alphameric | Alphameric | Alphameric | Alphameric | Alphameric | Alphameric | YYMMDD | Numeric | Alphameric | TTTTAAAA | Numeric |
| Length | 1 | 3 | 16 | 2 | 1 | 15 | 2 | 10 | 3 | 10 | 3 | 3 | 6 | 3 | 1 | 8 | 7 |
| Position | 01-01 | 02-04 | 05-20 | 21-22 | 23-23 | 24-38 | 39-40 | 41-50 | 51-53 | 54-63 | 64-66 | 67-69 | 70-75 | 76-78 | 79-79 | 80-87 | 88-94 |

LML-EP-055461

**SECTION 3.7 Obligations of Originators of ARC Entries**

SUBSECTION 3.7.1 Notice Obligation

The Originator must, in advance of receiving from the Receiver each source document used as the basis for the origination of an ARC entry, provide the Receiver with notice that clearly and conspicuously states that receipt of the Receiver's source document will authorize an ACH debit entry to the Receiver's account in accordance with the terms of the source document. If the Originator has received notice in accordance with the reasonable procedures established by the Originator that the receipt of the check does not authorize an ACH debit entry, then receipt of a check by the Originator does not authorize an ACH debit entry to the account on which the check is drawn.

SUBSECTION 3.7.2 Source Documents

For an ARC entry, a check or sharedraft provided to the Originator by the Receiver via the U.S. mail or at a dropbox location must be used by the Originator as the source document for the Receiver's routing number, account number, check serial number, and dollar amount. To be used as the source document for an ARC entry, a check or sharedraft must (1) contain a pre-printed serial number, (2) be drawn on a Consumer Account, and (3) be completed and signed by the Receiver.

The following may not be used as the source document for ARC entries: (1) checks drawn on corporate or business accounts, (2) third-party checks, (3) demand drafts and third-party drafts that do not contain the signature of the Receiver, (4) credit card checks, (5) obligations of a financial institution (e.g, travelers checks, cashier's checks, official checks, money orders, etc.), (6) checks drawn on the Treasury of the United States, a Federal Reserve Bank, or a Federal Home Loan Bank, (7) checks drawn on a state or local government, or (8) checks payable in a medium other than United States currency.

SUBSECTION 3.7.3 Copy of Source Document

The Originator must retain a reproducible, legible, image, microfilm, or copy of the front of the Receiver's source document for each ARC entry for two years from the Settlement Date of the ARC entry. At the request of the ODFI, the Originator must provide a copy of the front of the source document to the ODFI for its use or for the use of an RDFI requesting such information pursuant to subsection 2.9.3.2 (Copy of Source Document).

SUBSECTION 3.7.4 Source Document Will Not Be Presented for Payment

The source document to which the ARC entry relates may not be used by the Originator as a check to obtain payment.

SUBSECTION 3.7.5 Destruction of Source Document

The source document to which the ARC entry relates must be destroyed within fourteen days of the Settlement Date of the entry.

SUBSECTION 3.7.6 Capture of MICR Information

During initial processing of an ARC entry, the Originator may not key-enter the routing number, account number, or check serial number from the Receiver's source document. An Originator may, however, key-enter such information to correct errors relating to MICR misreads, misencoding, or processing rejects.

**SECTION 3.8 Obligations of Originators of POP Entries**

SUBSECTION 3.8.1 Source Documents

For a POP entry, a check or sharedraft provided by the Receiver at the point-of-purchase must be used by the Originator as a source document for the Receiver's routing number, account number, and check serial number. The source document must then be voided by the Originator. Only a check or sharedraft that contains a pre-printed serial number and that is drawn on a Consumer Account may be used as a source document for this type of transaction.

For POP entries, the following may not be used as source documents: (1) checks drawn on corporate or business deposit accounts, (2) third-party checks, (3) credit card checks, (4) obligations of a financial institution (e.g., traveler's checks, cashier's checks, official checks, money orders, etc.), (5) checks drawn on the Treasury of the United States, a Federal Reserve Bank, or a Federal Home Loan Bank, (6) checks drawn on a state or local government, or (7) checks payable in a medium other than United States currency. For POP entries, a previously voided check or sharedraft that has been used by the Receiver for a prior POP entry may not be used as a source document for this type of transaction.

SUBSECTION 3.8.2 Capture of MICR Information

The Originator may not key-enter the routing number, account number, or check serial number from the Receiver's source document.

SUBSECTION 3.8.3 Receipts

An Originator must provide to each Receiver a receipt containing the following information with respect to each POP entry to the Receiver's account:

(a)     Originator name (merchant)
(b)     company (merchant)/third-party service
        provider telephone number;
(c)     date of transaction;
(d)     transaction amount;

LML-EP-055429

(e)  source document check serial number;
(f)  merchant number (or other unique number that identifies the location of the transaction);
(g)  Terminal City; and
(h)  Terminal State.

The National Association strongly recommends, but these rules do not require, that the Originator also provide the following information on the receipt provided to the Receiver:

(a)  merchant address;
(b)  merchant identification number;
(c)  Receiver's financial institution routing number;
(d)  Receiver's truncated account number;
(e)  Receiver's truncated identification number; and
(f)  transaction reference number.

Note: The Receiver's complete account number and complete identification number are not permitted to be placed on the receipt.

### SECTION 3.9 Obligations of Originators of Internet-Initiated Entries

SUBSECTION 3.9.1 Fraud Detection Systems

Each Originator originating WEB entries must employ a commercially reasonable fraudulent transaction detection system to screen each entry.

SUBSECTION 3.9.2 Verification of Routing Numbers

Each Originator that originates WEB entries must use commercially reasonable procedures to verify that routing numbers are valid.

♦ [SUBSECTION 3.9.3 *Verification of Receiver's Identity*

*Each Originator that originates WEB entries must employ commercially reasonable methods of authentication to verify the identity of the Receiver.*]

SUBSECTION 3.9.4 Security of Internet Session

Each Originator that originates WEB entries must establish a secure Internet session with each Receiver utilizing a commercially reasonable security technology providing a level of security that, at a minimum, is equivalent to 128-bit encryption technology prior to the Receiver's key entry and through transmission to the Originator of any banking information, including, but not limited to, the Receiver's routing number, account number, and personal identification number (PIN) or other identification symbol.

SUBSECTION 3.9.5 WEB Annual Audit

Each Originator that originates WEB entries shall conduct or have conducted annual audits to ensure that the financial information it obtains from Receivers is protected by security practices and procedures that include, at a minimum, adequate levels of (1) physical security to protect against theft, tampering, or damage, (2) personnel and access controls to protect against unauthorized access and use, and (3) network security to ensure secure capture, storage, and distribution.

### SECTION 3.10 Obligations of Originators of Telephone-Initiated Entries

SUBSECTION 3.10.1 Verification of Receiver Identity

Each Originator that initiates TEL entries must employ commercially reasonable procedures to verify the identity of the Receiver.

SUBSECTION 3.10.2 Verification of Routing Numbers

Each Originator that initiates TEL entries must use commercially reasonable procedures to verify that routing numbers are valid.

◊ SECTION 3.11 Payment to ODFI

Each Originator that utilizes a Third-Party Sender to authorize an ODFI to transmit credit or debit entries agrees to make payment to the ODFI for any such credit entries originated and for any debit entries returned by the RDFI to the extent that the ODFI does not receive payment from the Third-Party Sender.

### SECTION 3.12 Record of Authorization

An Originator must retain the original or a microfilm or microfilm-equivalent copy of each authorization of a Receiver for two years from the termination or revocation of the authorization. In the case of TEL entries, the Originator must retain the original or a microfilm or microfilm-equivalent copy of the written notice or the original or a duplicate tape recording of the oral authorization for two years from the date of the authorization. At the request of its ODFI, the Originator must provide the original or copy of the authorization to the ODFI for its use or for the use of an RDFI requesting the information pursuant to subsection 4.1.1 (Right to Information Regarding Entries). This section 3.12 does not apply to SHR or MTE entries if the ODFI and RDFI are parties to an agreement (other than these rules) for the provision of services relating to SHR or MTE entries.

---

♦ *Approved November 9, 2004; Effective March 18, 2005*
◊ *Approved December 2, 2003; Effective December 10, 2004*

LML-EP-055430

4. *Why is a separate Standard Entry Class code necessary?*

   A separate Standard Entry Class code (XCK) is needed to allow editing for Destroyed Check Entries as exceptions to regular ACH items and to communicate to RDFIs that special handling of such entries may be required.

5. *Is a Destroyed Check Entry a truncated check?*

   No. A Destroyed Check Entry is considered to be a separate ACH item initiated <u>in place of</u> the lost or destroyed check. The entry does not constitute electronic presentment of the check, and no check will follow the ACH item.

6. *Is an XCK entry subject to Regulation E?*

   No. Although a Destroyed Check Entry is an ACH item, because the payment was initiated by the consumer as a paper check it is not subject to Regulation E's rights and requirements.

7. *Is an RDFI required to accept Destroyed Check Entries?*

   No. An RDFI may determine at its sole discretion to return a Destroyed Check Entry. A Destroyed Check Entry may be returned by transmitting a return entry using return reason code R33.

8. *Does an RDFI assume any liability by accepting Destroyed Check Entries?*

   No. The ODFI initiating Destroyed Check Entries warrants the appropriateness of such entries and assumes all liability related to the initiation of Destroyed Check Entries. An ODFI breaching any of the warranties indemnifies the RDFI against any and all resulting claims, demands, loss, liability, or expense, including attorneys' fees and costs.

9. *Why is the dollar limit for Destroyed Check Entries set at $2,500?*

   A limit of $2,500 was chosen because, under Regulation CC, different handling requirements apply to checks with a value greater than $2,500. A similar limit has been set on Destroyed Check Entries to parallel the limit found in the check world.

10. *What does an RDFI do if a customer requires a copy of the destroyed check?*

    The RDFI must send a written request to the ODFI asking it to provide a photocopy of the original check. Upon receipt of the written request, the ODFI is required to provide a copy of the check within thirty days, provided that the request is received by the ODFI within six years of the date of the XCK transaction.

11. *How long must the ODFI retain a copy of the original item?*

    The ODFI must retain a copy of the item to which the Destroyed Check Entry relates for a period of six years from the date of the origination of the Destroyed Check Entry.

12. *Must the initiation of Destroyed Check Entries be authorized by the Originator and/or Receiver?*

    XCK transactions are explicitly exempted from the authorization requirements of the *NACHA Operating Rules*.

13. *What happens if the original check is also paid?*

    If the original check is paid in addition to the Destroyed Check Entry, the ODFI that initiated the Destroyed Check Entry may be held accountable for any resulting loss due to its breach of warranty. In this case, the RDFI should return the ACH transaction.

# SECTION IV
# SPECIAL TOPICS

# CHAPTER X
# CROSS-BORDER PAYMENTS

A. **INTRODUCTION**

This chapter is designed to provide ACH participants in the United States with an understanding of the cross-border ACH payment process, as prescribed by the *NACHA Operating Rules* and the *Cross-Border Payment Operating Rules* (see Section C-1 within this Chapter). This framework for cross-border ACH payments was developed through the efforts of the NACHA Cross-Border Council, which was established in 1993 to develop a standardized process for exchanging ACH payments across national borders. This undertaking was predicated upon the assumption that by making the business rules and technical standards more uniform, the cross-border payment process would be more cost-effective, streamlined, predictable and accessible.

The cross-border ACH payment framework consists of the following basic components:

- *NACHA Operating Rules*

- Underlying Agreements
- Gateway Operators

In order to understand these components, it is useful to first describe the cross-border payment process.

## B. CROSS-BORDER PAYMENT PROCESS

The cross-border payment process includes the origination of cross-border entries through an entity serving as an Originating Gateway Operator (OGO). The OGO is defined as a participant of a national payment system (i.e., an ACH Operator or an RDFI as defined by the *NACHA Operating Rules*) or an entity acting as an agent for that participant, that (1) is capable of clearing and settling payments in that system, and (2) transfers transactions to a Receiving Gateway Operator (RGO) of a foreign payment system, in accordance with the *Cross-Border Payment Operating Rules*. After receiving cross-border entries from an ODFI, the OGO transmits the entries to a Receiving Gateway Operator (RGO) in the receiving country. The RGO subsequently transmits the entries into its national payments system for delivery to participating RDFIs.

Figure 11 illustrates the origination of a cross-border entry by a U.S. ODFI to a Canadian RDFI. In this example, a U.S. business initiates a cross-border credit entry in the Consumer Cross-Border Payment (PBR) format to a consumer Receiver in Canada. The entry is cleared and settled via the ACH Network in U.S. Dollars. The OGO receives the entry from its ACH Operator. The OGO, which is either an ACH Operator or a U.S. RDFI, is deemed under the *NACHA Operating Rules* to have assumed the specific responsibilities and warranties of the RDFI with respect to cross-border transactions. Upon transfer of the entry to the Canadian RGO, the OGO agrees that settlement for the entry is irrevocable. This provision of the *Cross-Border Payment Operating Rules* is intended to contain credit risk and prevent the unwinding of transactions that have been exchanged via the receiving country's national payment system and posted to the account of the Receiver (or beneficiary). The format mapping and translation, foreign exchange conversion, and inter-gateway settlement for the entry occur in accordance with the underlying agreement between the OGO and RGO, as prescribed by the *Cross-Border Payment Operating Rules*. The RGO then transmits the entry via the Canadian Direct Clearing System (Automated Funds Transfer/Automated Clearing Settlement System) to the Canadian RDFI for posting to the Receiver's account.

It is important to note that the roles and responsibilities of an OGO (for outbound payments) and of a RGO (for inbound payments) in the United States could be assumed by either an ACH Operator or a DFI. Thus, the entity serving as the Gateway Operator could play multiple roles from a rules perspective. The diagram illustrates the cross-border payment credit process; however, debit entries may also be exchanged within this framework.

Transmission of Cross-Border Entries

Within the United States, cross-border entries are subject to the requirements of the *NACHA Operating Rules* when transmitted between the ODFI and OGO and between the RGO and RDFI. Payment instructions initiated within the United States for beneficiaries abroad are transmitted by an originating company to its ODFI in the same manner as domestic payments, but with cross-border-specific data provided within the appropriate fields of the ACH records. The ODFI, in turn, transmits the cross-border payments to its ACH Operator with cross-border entries contained in a unique batch or batches within the file.



Figure 13

Special formatting and data requirements require that cross-border entries be batched separately from other ACH transactions. Specific coding requirements, as defined by the *NACHA Operating Rules*, denote that the entries in that batch are cross-border, indicate the foreign exchange conversion methodology and the effective rate (as applicable), the currency denomination in which the entries were originated, the currency denomination in which the entries are to be received, and the country in which they are to be received.

To transfer the entries to the receiving country, the OGO transmits the payments to the RGO with which it is conducting business. The execution of the foreign exchange conversion, mapping between payment formats, storing of data, and settlement between the Gateway Operators occur in accordance with the *Cross-Border Payment Operating Rules* and their OGO/RGO Agreement. The RGO then transmits the entries into its national system. For cross-border payments inbound to the United States, this scenario works back through the ACH Operator to the RDFI and Receiver.

Settlement

Three instances of settlement occur for cross-border entries: (1) domestically in the origination country, (2) cross-border between Gateway Operators, and (3) domestically in the receiving country. Domestic settlement occurs in accordance with the rules and practices of the national payments system. Inter-Gateway Operator settlement is typically accomplished through correspondent banking relationships, employing wire transfer, S.W.I.F.T. messages, due to/due from accounts, etc.

Foreign Exchange

The cross-border payment process provides flexibility to participants with respect to the foreign exchange component of cross-border payments. The terms and conditions for foreign exchange execution are stipulated by the OGO/RGO Agreement that is required by the *Cross-Border Payment Operating Rules* and the *NACHA Operating Rules*. The treatment of foreign exchange is then addressed in the separate agreements between the ODFI and the OGO, the Originator and the ODFI, and between the Originator and Receiver.

Three types of foreign exchange scenarios are possible under this payment model for conducting cross-border payments: fixed exchange rate to variable exchange rate, variable exchange rate to fixed exchange rate, and fixed exchange rate to fixed exchange rate. For processing and reporting purposes, coding has been provided for each methodology within the technical specifications as defined by the *NACHA Operating Rules*.

C. **OPERATING RULES & AGREEMENTS**

The standardized legal and operational framework that was created to support the exchange of cross-border ACH payments is realized by bridging the national payment system rules of both the ODFI and RDFI in a cross-border transaction with a common set of rules governing the international transfer and processing of cross-border payments. This body of rules is called the *Cross-Border Payment Operating Rules*. The *Cross-Border Payment Operating Rules* provide a uniform platform for entities serving as Gateway Operators in various countries to interact. The *Cross-Border Payment Operating Rules* govern the business relationships between OGOs and RGOs.

1. **CROSS-BORDER PAYMENT OPERATING RULES (Effective February 1, 1999)**

   ARTICLE I -- SCOPE OF THE RULES – The *Cross-Border Payment Operating Rules* apply to certain electronic Automated Clearing House (ACH) Transactions and transaction data exchanged between Gateway Operators subscribing to these rules.

   ARTICLE II -- GATEWAY OPERATORS –

   Originating Gateway Operator (OGO) – An Originating Gateway Operator shall be a participant of a national payment system or an entity acting as an agent for that participant that (1) is capable of clearing and settling payments in that system, and (2) transfers transactions to a Receiving Gateway Operator of a foreign payment system, in accordance with the *Cross-Border Payment Operating Rules*.

   Receiving Gateway Operator (RGO) – A Receiving Gateway Operator shall be a participant of a national payment system or an entity acting as an agent for that participant that (1) is capable of clearing and settling payments in that system, and (2) receives transactions from an Originating Gateway Operator of a foreign payment system, in accordance with the *Cross-Border Payment Operating Rules*.

   ARTICLE III -- COMPLIANCE WITH RULES – Each participating Gateway Operator agrees to be bound by these rules and warrants that it is legally able to comply with all applicable requirements thereof.

   ARTICLE IV -- ADDITIONAL BODIES OF LAW – Gateway Operators shall comply with all additional laws, rules, regulations and court orders to which they are subject governing the exchange or effecting of transactions.

   ARTICLE V -- OGO/RGO AGREEMENT – An OGO and RGO shall have in place an agreement under which the parties agree to (1) be bound by the *Cross-Border Payment Operating Rules*, (2) the terms and conditions for the time-value of execution, allocation of gains, losses and the assumption of risk for foreign exchange conversion, (3) the technical and operational responsibilities of each party, (4) the procedures for settlement between the parties, and (5) define what constitutes a commercially reasonable time frame with a clear definition of force majeure provisions. Unless otherwise agreed to, the relationship between the OGO and RGO shall be governed by the law of the State (country) of the RGO.

ARTICLE VI -- TRANSACTION RETURNS – The rights, obligations, and procedures associated with returning a cross-border transaction are determined by the national payment system operating rules of the receiving country of the original transaction.

ARTICLE VII -- ERRONEOUS TRANSACTIONS BY GATEWAY OPERATORS – An OGO may request an RGO to return or adjust an Erroneous Transaction initiated by the OGO. The RGO may, but is not obligated to, comply with such request.

ARTICLE VIII -- IRREVOCABILITY OF CROSS-BORDER SETTLEMENT – Upon funding of a transaction between Gateway Operators, settlement is irrevocable.

ARTICLE IX -- PROCESSING, SCHEDULING & TIMING – A Gateway Operator shall process and transfer a transaction to the appropriate subsequent party within a commercially reasonable time frame.

ARTICLE X -- RECORD RETENTION – A Gateway Operator shall retain record of each transaction it processes for a period of one-year from the date that the transaction was transmitted or received.

ARTICLE XI -- CONTINGENCY NOTIFICATION – In the event of a delay that affects its ability to process a transaction, the RGO shall duly notify the OGO of the transaction within a commercially reasonable time frame.

ARTICLE XII -- ARBITRATION & COMPENSATION – Unless otherwise agreed to, disputes arising out of or in connection with these rules and underlying agreements shall be resolved under the Rules of Arbitration of the International Chamber of Commerce.

ARTICLE XIII -- GATEWAY OPERATOR TECHNICAL CAPABILITIES – A Gateway Operator is responsible for the exchange of transactions in accordance with applicable national payment system rules, and the exchange of transactions with other Gateway Operators in accordance with the OGO/RGO agreements.

ARTICLE XIV -- GATEWAY OPERATOR WARRANTY – A Gateway Operator warrants to all other Gateway Operators that such transaction received from its national payment system or another Gateway Operator will be processed in compliance with these rules.

ARTICLE XV -- LIABILITY FOR BREACHING GATEWAY OPERATOR WARRANTY – Each Gateway Operator breaching the warranty prescribed in Section XIV of these rules shall be limited to (1) transaction charges and fees charged by the Gateway Operator, which shall indemnify another participant in connection with the transaction, (2) interest (at the short-term offer money market rate of the originating country for the originated currency) for the period during which the relevant Gateway Operator failed to perform its obligations under the terms of its OGO/RGO agreement, and (3) reimbursement of the original principal amount which the Gateway Operator failed to transfer in accordance with its OGO/RGO agreement regardless of any foreign exchange fluctuation, to the exclusion always of indirect or consequential damages.

ARTICLE XVI -- AMENDMENT OF CROSS-BORDER PAYMENT OPERATING RULES – Any amendment (including any addition to or repeal) of these rules may be made as follows: by the vote at a meeting or by the written consent of the members of the Cross-Border Council in accordance with the Charter of the Cross-Border Council.

ARTICLE XVII -- DEFINITION OF TERMS

"ACH Transactions" or "Automated Clearing House Transactions" – An electronic batch-oriented transaction.

"Charter" or "Cross-Border Council Charter" – A document which defines the nature, structure, procedures and policies governing the Cross-Border Council adopted August 1995, as amended from time to time.

"Cross-Border Council" or "Council" – The Cross-Border Council is an emancipated entity of the National Automated Clearing House Association (NACHA).

"Erroneous Transaction" – An erroneous transaction is a transaction that (1) is a duplicate of a transaction previously initiated by the OGO, (2) orders payment not intended to be credited or debited by the Originator, or (3) orders payment in an amount different than was intended by the Originator.

"Gateway Operator" – Gateway Operator means either an Originating Gateway Operator or a Receiving Gateway Operator.

"Originating Gateway Operator" or "OGO" – An Originating Gateway Operator shall be a participant of a national payment system or an entity acting as an agent for that participant, that (1) is capable of clearing and settling payments in that system, and (2) transfers transactions to a Receiving Gateway Operator of a foreign payment system, in accordance with the *Cross-Border Payment Operating Rules*.

"Receiving Gateway Operator" or "RGO" – A Receiving Gateway Operator shall be a participant of

a national payment system or an entity acting as an agent for that participant, that (1) is capable of clearing and settling payments in that system, and (2) receives transactions from an Originating Gateway Operator of a foreign payment system, in accordance with the *Cross-Border Payment Operating Rules*.

"State" – State refers to a defined territory of governmental jurisdiction.

"Transaction(s)" – Transaction means an order or request for the (1) credit of money to an account, (2) the debit of money from an account, or (3) a zero value entry.

## 2. NATIONAL PAYMENT SYSTEM RULES

The national payment system rules that are referred to in the cross-border payment process are the rules that govern the domestic ACH system (or its equivalent). In the United States, these are the *NACHA Operating Rules*. For a cross-border entry that is being processed inbound into the United States and is transmitted via the ACH Network by an RGO for delivery to an RDFI in the United States, the rights and responsibilities of the RDFI are as stipulated by the *NACHA Operating Rules*. To facilitate the handling of cross-border entries, the legal framework has been crafted such that the RDFI treats a cross-border entry as it would a domestically-originated ACH entry. However, the SEC Codes used for cross-border entries allows the RDFI to identify a cross-border entry and provides certain data within that entry for customer service, reporting, and tracking purposes.

Because of differences that exist between the two national payment systems involved in a cross-border transaction, or as a course of business of transacting outbound cross-border payments (i.e., those payments that are originated within the United States and destined for another country), certain provisions of the *NACHA Operating Rules* may not apply or additional responsibilities may be assumed by the Originating parties, as addressed in an agreement between the ODFI and OGO. These provisions were previously included in the *Cross-Border Payment Operating Rules*. However, the provisions, which are specific to the United States and the ACH Network, have been removed from the international body of rules and are currently addressed within Article Ten (Cross-Border Payments) as exceptions to the *NACHA Operating Rules* and in the service agreements between ODFIs and OGOs. The following provisions of the *NACHA Operating Rules* do not apply to cross-border payments:

- Receiver Authorization and Agreement
- Authorization by Originator and Receiver
- Revocation of Authorization
- Termination of Authorization by Operation of Law
- Consumer Accounts - Copy of Debit Authorization

All matters pertaining to the Receiver's authorization are governed by the applicable rules, laws, and/or regulations in the Receiver's country. Therefore, it is incumbent upon the U.S. Originator and its ODFI to understand and comply with those rules on a country-by-country basis. Under the warranties within the *NACHA Operating Rules* assumed by the ODFI with respect to cross-border entries, the ODFI bears the responsibility and liability for compliance with this requirement.

- *Transmittal of Required Information*

The periodic statement requirements for outbound cross-border entries are governed by the applicable rules, laws, and/or regulations in the Receiver's country. Cross-border entries originated by an ODFI must, however, conform to the requirements of Appendix Two (ACH Record Format Specifications) of the *NACHA Operating Rules*.

- *Reclamation Entries*
- *Prenotifications*

Reclamation and Prenotification entries as defined by the *NACHA Operating Rules* are typically not supported in other countries' payment systems and may not be transmitted to an OGO unless otherwise agreed to and instructed by the OGO.

- *Reversing Files*
- *Reversing Entries*

The rules with respect to reversing files and reversing entries vary from country to country, and, in some countries, such transactions may be prohibited. An outbound cross-border entry may only be reversed pursuant to the *NACHA Operating Rules* up to the point of the OGO and prior to the transmission of the cross-border entries to the RGO. Although the *Cross-Border Payment Operating Rules* permit an OGO to request that an RGO return or adjust an erroneous transaction, the RGO is not obligated to comply with such a request. In situations where an outbound cross-border entry has been transmitted to the RGO for processing by the foreign receiving country and the OGO is unable to retrieve the entry, the ODFI and/or the Originator would be required to address any issues outside the ACH Network and seek resolution directly with the foreign RDFI or Receiver.

- *Reinitiation of Returned Entries by Originators*

Provisions for reinitiating outbound cross-border entries that have been returned are determined by the national payment system rules of the foreign receiving country. The U.S. Originator and its ODFI must ensure that they understand and are compliant

with the rules governing reinitiation on a county-by-country basis.

- *Consumer Accounts – Notice by Originator to Receiver of Variable Debits*

The requirements for an Originator to notify a Receiver when the amount of a recurring debit entry varies are governed by the applicable rules, laws, and/or regulations of the foreign receiving country. The U.S. Originator and its ODFI must understand and ensure compliance with such rules on a country-by-country basis. Under the warranties within the *NACHA Operating Rules* assumed by the ODFI with respect to cross-border entries, the ODFI bears the responsibility and liability for compliance with this requirement.

- *Records*

At a minimum, the Originator of an outbound cross-border debit entry must retain and provide, upon request, the original or copy of the Receiver's authorization in accordance with the requirements of the *NACHA Operating Rules*. However, if the applicable rules, laws, and/or regulations in the foreign receiving country impose record retention requirements that are longer in duration, specify an additional form, or have additional requirements for providing the original or copy, the Originator must also comply with the requirements of the foreign receiving country.

- *General Rights and Obligations of RDFI*

The rights and obligations of the RDFI in a cross-border transaction are defined by the national payment system rules of the receiving country. The U.S. Originator and the ODFI of an outbound cross-border entry must understand the rights and responsibilities of foreign RDFIs and how these requirements differ from the requirements for RDFIs under the *NACHA Operating Rules*.

- *Receipt and Availability of Entries*
- *Availability of Entries and Entry Information, Crediting and Debiting of Entries*
- *Periodic Statements*
- *Notice to Receiver*

The foreign RDFI of an outbound cross-border entry is subject to the national payment system rules of the receiving country governing receipt, availability, crediting and debiting of entries, periodic statements, and notice to Receiver. The U.S. Originator and ODFI must be familiar with such rules and understand how they differ from those prescribed by the *NACHA Operating Rules*.

- *Liability of RDFI for Benefit Payments*

The liability of a foreign RDFI for benefit payments, if applicable, is determined by the national payment system rules of the foreign receiving country. The U.S. Government and its disbursing agents must ensure that they are familiar with the treatment of benefit payments, RDFI liability, etc., within the foreign receiving country and establish procedures to manage such matters outside the scope of the *NACHA Operating Rules*.

- *Return of Entries*

The return of entries by the RDFI of an outbound cross-border entry is subject to the requirements of the national payment system rules of the foreign receiving country. The U.S. Originator and ODFI must be familiar with the rules governing returns for each country to which cross-border entries are transmitted.

- *Dishonor of Return Entries*

It is important to note that many countries do not provide for the dishonor of a return entry within their national payment system rules. Instead, such matters are handled outside the scope of their rules directly between the sending and receiving institutions. In accordance with the *NACHA Operating Rules*, a U.S. ODFI may dishonor the return of an outbound cross-border entry, provided that (1) it is permitted to do so by the payment system rules of the receiving country of the original outbound entry, and (2) the return does not comply with the payment system rules of the receiving country of the original outbound cross-border entry or the return contains incorrect information, does not include all information required by the *NACHA Operating Rules*, or otherwise fails to comply with the requirements of the *NACHA Operating Rules*. If the payment system rules of the foreign receiving country permit the dishonor of a return, the ODFI must be prepared to determine whether the return was transmitted by the foreign RDFI in accordance with the foreign payment system rules. If the return contains incorrect or incomplete information, or otherwise fails to comply with the requirements of the *NACHA Operating Rules*, the dishonor is limited in scope between the ODFI and the OGO. It is recommended that the OGO take steps to remedy the entry, regardless of the presence or lack of dishonor capability within the foreign payment system rules.

- *Notification of Change*

Notification of Change entries are not typically supported by the payment system rules of other countries. Therefore, unless otherwise agreed to with the OGO, the U.S. ODFI of an outbound cross-border

LML-EP-055758

entry will not receive such a transaction. U.S. RDFIs, however, may transmit NOCs in response to inbound cross-border entries in accordance with the requirements of the *NACHA Operating Rules*. In such cases, it is recommended that the U.S. RGO take steps to convey the NOC data to the foreign ODFI.

- *Accountability for Entries*

The foreign RDFI of an outbound cross-border entry is subject to the national payment system rules of the foreign receiving country.

- *Stop Payment Affecting Consumer Accounts*
- *Stop Payment Affecting Non-Consumer Accounts*
- *Receiver's Right to Recredit*
- *Adjustment Entries*

A foreign RDFI of an outbound cross-border entry will apply rules governing stop payment orders, adjustment entries, and the Receiver's right to recredit in accordance with the payment system rules of the foreign receiving country. The U.S. Originator and ODFI must ensure that they are familiar with the rules governing such transactions for each country to which cross-border entries are transmitted.

- *Minimum Description Standards*

The *NACHA Operating Rules* addressing minimum description standards and the application of Regulation E apply only to financial institutions within the U.S. The national payment system rules of the receiving foreign country apply to the handling of all outbound cross-border entries.

Agreements

An OGO and RGO shall have in place an agreement under which the parties agree to (1) be bound by the *Cross-Border Payment Operating Rules*, (2) the terms and conditions for the time-value of execution, allocation of gains, losses and the assumption of risk for foreign exchange conversion, (3) the technical and operational responsibilities of each party, (4) the procedures for settlement between the parties, and (5) define what constitutes a commercially reasonable time frame with a clear definition of force majeure provisions. Unless otherwise agreed to, the relationship between the OGO and RGO shall be governed by the law of the State (country) of the RGO.

The OGO/RGO Agreement defines certain aspects of the OGO/RGO business relationship and also binds the two parties to the common body of rules. In order to initiate a cross-border entry for processing by an OGO, an ODFI must also have an agreement in place with that OGO. The ODFI/OGO agreement should also address the handling of foreign exchange and other business and operational aspects of the relationship, bind the OGO to the *Cross-Border Payment Operating Rules*, and address cross-border ACH service and responsibility aspects that are not explicitly addressed in the *NACHA Operating Rules*. Likewise, the ODFI should incorporate appropriate operational and legal aspects critical to its OGO relationship in its agreement with an Originator. An Originator of a cross-border ACH payment enters into an agreement with a Receiver in accordance with the national payment system rules of that Receiver's country.

D. **CROSS-BORDER PAYMENT TECHNICAL STANDARDS**

Cross-border payments are transmitted using the Consumer Cross-Border Payment (PBR) and Corporate Cross-Border Payment (CBR) Standard Entry Class (SEC) Codes. The CBR SEC Code is used for the transmission of corporate cross-border payment entries, and the PBR SEC Code for the transmission of consumer cross-border payment entries. These SEC Codes allow cross-border transactions to be readily identified by financial institutions so that they may apply special handling requirements for cross-border payments, as appropriate. These formats also enable ACH participants to transmit and receive detailed information that is unique to cross-border payments.

A unique Company/Batch Header Record is used to convey information relating to foreign exchange, origination and destination currencies, and destination country. Each Entry Detail Record is accompanied by one Addenda Record, within which information relating to the foreign receiving DFI, foreign payment amount, foreign trace number, and foreign receiver's account number is conveyed.

In the CBR/PBR Company/Batch Header Record, fields 4, 5, and 6 provide information on the foreign exchange process. Field 4 (Foreign Exchange Indicator) indicates whether the item is a fixed-to-fixed (FF), fixed-to-variable (FV), or variable-to-fixed (VF) transaction. The field will contain a 1, 2, or 3, indicating the use of a Foreign Exchange Rate (1), a Foreign Exchange Reference Number (2), or it may be space filled (3). The codes in the Foreign Exchange Reference Indicator (Field 5) are used to indicate the content of the Foreign Exchange Reference (Field 6). When coding Field 5, if the Foreign Exchange Indicator Field contains "VF" or "FV," then Field 5 should have a 1, 2, OR 3, and Field 6 will contain a foreign exchange rate, a foreign exchange contract number, or it may be space filled. If the foreign exchange information is not available at the time the batch is created, Field 5 will have a 3 and Field 6 will be space filled.

Additionally, in the Service Class Code Field (Field 2) of the Company/Batch Header Record, depending on the cross border operator arrangement, you may be required to segregate debits and credits into separate batches. The Service Class Code for Debits is 225 and a credit is 220.

ACH participants should be aware that unique Company/Batch Header Records and Addenda Records are used to accommodate the return of cross-border payments. However, the existing Entry Detail Record for return entries is used to accommodate cross-border information. Similarly, a new Company/Batch Header Record is used for cross-border dishonored returns, contested dishonored returns, NOCs, and refused NOCs. The existing Entry Detail Records and Addenda Records for dishonored returns, contested dishonored returns, NOCs, and refused NOCs are used to accommodate cross-border payments. Please refer to Appendix Two (ACH Record Format Specifications) of the *NACHA Operating Rules* for the ACH record format specifications for CBR and PBR entries.

### E. CROSS-BORDER REFERENCE INFORMATION

<u>ISO Codes:</u>

ISO Country and Currency code lists are available for purchase from the International Organization for Standardization (ISO). The web address for the ISO is www.iso.ch. Currently, cross-border payments are being processed between the US and Canada. Appropriate ISO codes for Canada are:

Currency: CAD or USD
Country: CA

<u>Foreign ACH Rules Contacts:</u>

**Australia**
Australian Payments Clearing Association (APCA)
Level 24, 25 Bligh Street
Sydney NSW 2000
Australia
www.apca.com.au

**Canada**
Canadian Payment Association
1212-50 O'Connor St.
Ottawa, ON K1P6L2
Canada
1 (613) 238-4173
www.cdnpay.ca

**France**
GSIT
31 Rue de Berri
Cedex 08
Paris 75408 France
www.gsit.fr

**Norway**
Bankenes Betalingssentral AS BBS
Haavard Martinsens vei 54
Postal Address N-0045
Oslo
Norway
www.bbsas.no

**Sweden**
Bankgirocentralen BGC AB
Palmfeltsvagen 5 A
Stockholm 10519
Sweden
www.bgc.nu

**Switzerland**
Telekurs SIC, Ltd.
Hardturmstrasse 201
CH 8021
Zurich CH 8021
Switzerland
www.telekurs.com

**United Kingdom**
BACS, Ltd.
De Havilland Road Edgeware
Middlesex HA8 5QA
United Kingdom
www.bacs.co.uk

# SECTION IV
# SPECIAL TOPICS

# CHAPTER XI
# RE-PRESENTED CHECK ENTRIES

### A. INTRODUCTION

The *NACHA Operating Rules* permit the ACH Network to be utilized to transmit a Single Entry ACH debit transaction to re-present a paper check after the paper check has been returned for insufficient or uncollected funds. This chapter addresses issues relating to the origination and receipt of Re-presented Check Entries.

### B. LEGAL FRAMEWORK

Re-presented Check Entries (RCK entries) are subject to applicable *NACHA Operating Rules*, the Uniform Commercial Code, and Federal Reserve Regulation CC. These entries are not, however, subject to the Electronic Funds Transfer Act or Regulation E. The legal framework for Re-presented Check Entries is premised on the fact that the origin of each re-presented check entry is a paper check that has been dishonored. Transfers of

LML-EP-055760