IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LML PATENT CORP.,<br><br>Plaintiff,<br><br>v.<br><br>TELECHECK SERVICES, INC.,<br>ELECTRONIC CLEARING HOUSE, INC.,<br>XPRESSCHEX, INC. and NOVA<br>INFORMATION SYSTEMS, INC.,<br><br>Defendants. | C.A. No. 04-858 (SLR) |

## DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT OF INVALIDITY

William J. Marsden (#2247)
Timothy Devlin (#4241)
Tara D. Elliott (#4483)
FISH & RICHARDSON P.C
919 N. Market Street, Suite 1100
Wilmington, DE 19899-1114

*Attorneys for TeleCheck Services, Inc*

Collins J. Seitz, Jr. (#2237)
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19801

*Attorney for Electronic Clearing House, Inc.
and XpressChex, Inc.*

Richard D. Kirk (#922)
THE BAYARD FIRM
222 Delaware Avenue, Suite 900
Wilmington, DE 19801

*Attorney for Nova Information Systems,
Inc.*

Dated: October 28, 2005

## TABLE OF CONTENTS

**Page**

I.    NATURE AND STAGE OF PROCEEDINGS ...................................................1

II.   SUMMARY OF ARGUMENT ...............................................................................1

III.  STATEMENT OF FACTS .....................................................................................2

    A.   The Alleged Invention of the '988 Patent..............................................2

    B.   The Prior Art Invalidates the '988 Patent Claims..................................4

    C.   LML's Proposed Claim Construction Renders the
        Claims Indefinite....................................................................................5

IV.   ARGUMENT ..........................................................................................................6

    A.   Legal Standards Governing Summary Judgment ....................................6

    B.   Legal Standards Governing Invalidity....................................................6

        1.   Anticipation.................................................................................6

        2.   Lack of Enablement ....................................................................7

        3.   Indefiniteness .............................................................................8

    C.   Every Asserted Claim Is Anticipated By Higashiyama............................9

        1.   The Higashiyama Patent Is Prior Art that Was
            Never Considered by the Examiner .............................................9

        2.   Higashiyama Discloses a "central computer
            system."......................................................................................11

        3.   Higashiyama Discloses a "first communication
            means"........................................................................................12

        4.   Higashiyama Discloses a "second
            communication means".............................................................13

    D.   The '988 Patent Claims Are Not Enabled..............................................15

    E.   The '988 Patent Claims Are Indefinite .................................................16

        1.   The Phrase "without using the check as a
            negotiable instrument" Is Indefinite Under
            LML's Proposed Construction....................................................16

## TABLE OF CONTENTS (cont'd)

**Page**

2.    The Phrases "any bank check" and "any consumer bank check" Are Indefinite Under LML's Proposed Construction....................................................19

V.    CONCLUSION.................................................................................................21

## TABLE OF AUTHORITIES

Page(s)

### FEDERAL CASES

*AK Steel Corp. v. Sollac & Ugine,*
  344 F.3d 1234 (Fed. Cir. 2003) ..................................................................8

*Abbott Laboratories v. Geneva Pharm., Inc.,*
  182 F.3d 1315 (Fed. Cir. 1999) ..................................................................6

*Advanced Display System, Inc. v. Kent State University,*
  212 F.3d 1272 (Fed. Cir. 2000) ..............................................................7, 10

*Atmel Corp. v. Information Storage Devices, Inc.,*
  198 F.3d 1374 (Fed. Cir. 1999) ..................................................................8

*Barmag Barmer Maschinenfabrik AG v. Murata Machine, Ltd.,*
  731 F.2d 831 (Fed. Cir. 1984) ....................................................................6

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,*
  489 U.S. 141 (1989) ....................................................................................7

*Durel Corp. v. Osram Sylvania Inc.,*
  256 F.3d 1298 (Fed. Cir. 2001) ..................................................................7

*Gen'l. Electric Co. v. Wabash Appliance Corp.,*
  304 U.S. 364 (1938) ....................................................................................9

*In re Glass,*
  492 F.2d 1228 (C.C.P.A. 1974) ..................................................................8

*U.S. Gypsum Co. v. National Gypsum Co.,*
  74 F.3d 1209 (Fed. Cir. 1996) ....................................................................6

*London v. Carson Pirie Scott & Co.,*
  946 F.2d 1534 (Fed. Cir. 1991) ................................................9, 17, 18, 19

*Markman v. Westview Instruments, Inc.,*
  517 U.S. 370 (1996) ....................................................................................9

*Merrill v. Yeomans,*
  94 U.S. 568 (1876) ................................................................................9, 19

*Midwest Canvas Corp. v. Cantar/Polyair Corp.,*
  No. 01 C 7055, 2003 WL 22053582 (N.D. Ill. Sept. 3, 2003) ....................8

## TABLE OF AUTHORITIES (cont'd)

Page(s)

*Morton International Inc. v. Cardinal Chemical Co.,*
    5 F.3d 1464 (Fed. Cir. 1993)................................................................................19

*Permutit Co. v. Graver Corp.,*
    284 U.S. 52 (1931)................................................................................18

*Refac International, Ltd. v. IBM,*
    689 F. Supp. 422 (D.N.J. 1988) ................................................................................8

*SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.,*
    225 F.3d 1349 (Fed. Cir. 2000)................................................................................6, 10

*Telemac Cellular Corp. v. Topp Telecom, Inc.,*
    247 F.3d 1316 (Fed. Cir. 2001)................................................................................7, 14

*Ultradent Products, Inc. v. Life-Like Cosmetics, Inc.,*
    127 F.3d 1065 (Fed. Cir. 1997)................................................................................7

*Union Pac. Resources Co. v. Chesapeake Energy Corp.,*
    236 F.3d 684 (Fed. Cir. 2001)................................................................................7

*In re Wands,*
    858 F.2d 731 (Fed. Cir. 1988)................................................................................15

## OTHER AUTHORITIES

35 U.S.C. § 102................................................................................1, 2, 3, 4, 9

35 U.S.C. § 102(e) ................................................................................4, 5 10

35 U.S.C. § 112................................................................................ passim

Fed. R. Civ. P. 56 (c) ................................................................................6

## I.     NATURE AND STAGE OF PROCEEDINGS

This is a patent infringement litigation initiated by LML Patent Corporation ("LML") against defendants TeleCheck Services, Inc. ("TeleCheck"), Electronic Clearing House, Inc. ("ECHO"), XpressChex, Inc. ("XpressChex") and Nova Information Systems, Inc ("Nova") (collectively, "Defendants"). The patent in suit is U.S. Patent No. 5,484,988 ("the '988 patent"). Fact and expert discovery has concluded, and claim construction briefing is complete. Defendants submit this opening brief in support of their Motion for Summary Judgment of Invalidity.

## II.    SUMMARY OF ARGUMENT

1.     Under LML's overly broad construction, there is no reasonable dispute that U.S. Patent No. 5,175,682 to Higashiyama ("Higashiyama") anticipates claims 1-2, 4-6, 9-11, 14, 16 and 18 of the '988 patent under 35 U.S.C. § 102. As set forth below, Higashiyama discloses each and every element of the purported inventions of these claims. There is no dispute that Higashiyama is prior art to the '988 patent, because the application leading to the Higashiyama patent was filed before the earliest asserted invention date of the '988 patent.

2.     The asserted claims of the '988 patent are not enabled as the written description of the '988 patent fails to sufficiently describe the manner and process of using "any bank check." As set forth in Defendants' claim construction briefing, the '988 patent claims should be construed to require the capability to receive information and transfer funds using any type of check, including foreign checks, but the patent specification includes no description regarding how one would conduct such transactions. Even under LML's proposed construction, the claims require the ability to read multiple forms of checks, namely "regular" checks drawn on "normal" bank or credit union accounts. This would include any "regular" foreign check drawn on a "normal" foreign bank account. Many of these checks are not readable, however, by the types of readers described in the '988 patent, and the patent includes no description regarding how checks

with different font systems and other variations would be readable in the purported invention.

     3.    For two independent reasons, no one in the field could reasonably determine the boundaries of the purported invention. Specifically, the asserted claims of the '988 patent are indefinite based on the following bases:

- Applying LML's proposed constructions of the disputed terms, claims that include the limitation "without using the check as a negotiable instrument" are indefinite. One of ordinary skill in the art would have no way to determine when a check is being used as a "source document" rather than a negotiable instrument, or as both a source document and a negotiable instrument.

- Applying LML's proposed constructions of the disputed terms, claims that include the limitation "any bank check" or "any consumer bank check" are indefinite in that one of ordinary skill in the art would not understand what constitutes a "regular" check or "normal" account.

## III.   STATEMENT OF FACTS

### A.   The Alleged Invention of the '988 Patent

The '988 patent issued January 16, 1996 from an application filed June 9, 1994. (Ex. A.) LML asserts priority back to the original application, filed November 13, 1992. (*Id.*) LML currently asserts eleven claims against the Defendants: claims 1-2, 4-6, 9-11, 14, 16 and 18. Claim 1 is representative:

    1. A checkwriting point of sale system comprising:

       a point of sale terminal adapted to receive consumer bank account information from any bank check;
       a central computer system;
       first communications means integral to said point of sale terminal for electronically communicating with the central computer system;
       memory means integral to said point of sale terminal for temporarily storing the consumer bank account information;
       the central computer system having second communication means for receiving information from a plurality of said point of sale terminals;
       the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the bank check as a negotiable instrument.

The '988 patent generally describes a system and method for converting paper checks to electronic transactions at the point of sale, using the check "as the basic source of identification of the individual and of the individual's bank and whereby the bank account is debited." (*Id.* at 1:13-15.)   The '988 patent claims were not allowed until after the claims were narrowed to recite conducting transactions "without using the check as a negotiable instrument" (or equivalent language), and further narrowed to recite the capability to transfer funds using account information "from any bank check."

The '988 patent's system and method for electronically converting paper checks presented at the point of sale begins when a customer making a purchase initiates a transaction by providing the merchant any bank check.  According to the patent specification, the check presented by the customer is preferably a "specimen" or "blank" check. (*Id.* at 7:48.)

The merchant obtains certain account information from the consumer's check. Many, but not all, bank checks bear Magnetic Ink Character Recognition ("MICR") numbers across the bottom of the check.  (*Id.* at 6:66; 7:64-65.)   This MICR information includes the "ABA/Transit" and routing number of the check writer's bank, as well as the check writer's account number. (*Id.* at 10:29-31.)  The MICR line may also include the check number, although in the '988 patent system this information can be "dropped" before proceeding with the electronic transaction. (*Id.* at 10:31-34.)  The '988 patent specification describes that MICR information may be entered into a point of sale terminal manually via a keypad, or may be entered by reading the check with a check reader. (*Id.* at 7:57-62.)  The patent describes magnetic "MICR" readers and optical "OCR" readers as equipment that may be used to read the information from the check. (*Id.* at 5:44-49.)

Once the account information is entered, the merchant verifies that the information was read properly by visually checking the terminal's display panel, and then

3

enters the amount of sale to initiate a check "verification" process. (*Id.* at 7:63-8:22.)
Check verification was a well-known process many years before the '988 patent. It
involves accessing one or more databases to determine whether a check presented at the
point of sale is likely to clear. (*Id.* at 7:19-31.) The '988 patent describes the use of then-
existing verification databases such the SCAN® database. (*Id.* at 7:31-34.)

If the verification is approved, the merchant returns the check to the customer at
the point of sale and the terminal prints an authorization receipt for the customer's
signature. (*Id.* at 8:23-29.) At the time the '988 patent was filed, and still today, an
express written authorization is required for any electronic debit of a consumer's bank
account. The transaction is later electronically processed for payment through an
automated clearinghouse or an "ACH" network. (*Id.* at 8:30-42.)

### B. The Prior Art Invalidates the '988 Patent Claims

The technical field relevant to the '988 patent is a crowded field of art, with prior
art electronic check systems dating back to the early 1980s. While the Defendants have
disclosed a plethora of prior art references that establish both anticipation and
obviousness of the asserted claims, this motion is based on anticipation under U.S. Patent
No. 5,175,682 to Connie Higashiyama ("Higashiyama"). (Ex. B) Higashiyama issued on
December 29, 1992 from an application filed December 14, 1990, while LML's earliest
asserted invention date of the '988 patent is January 9, 1992. Accordingly, there is no
dispute that Higashiyama constitutes prior art to the '988 patent under 35 U.S.C.
§ 102(e).

Higashiyama discloses a system and method for electronically processing checks
presented at the point of sale. The system and method operate using a point-of-sale
terminal to read the MICR line of a check for electronically transferring funds. The
electronic check transaction is processed via the U.S. national Automated Clearinghouse
("national ACH") in a manner where "the validated check is then returned to the
customer for safekeeping, thus avoiding the need for the check to be physically

transported through the system," (*Id.* at 4:54-57).  This is the very object of the purported invention of the '988 patent:

> It is the objective of the present invention to automate the point-of-sale environment for processing consumer purchases of goods and services which, other than for the system of the present invention, would necessitate the more traditional acceptance and processing of commercial bank drafts (personal and/or corporate checks). . . . It is a further objective of the present invention to eliminate the need for "paper" checks as an accepted means of consumer payment.

(Ex. A at 3:39-56.)  A more detailed description of the Higashiyama disclosure is provided in Exhibit C.

### C.    LML's Proposed Claim Construction Renders the Claims Indefinite

The parties filed a Joint Proposed Claim Construction Chart on October 7, 2005. (Ex. D, D.I. 281)  The following terms and proposed claim constructions are relevant to this motion.

The phrase "any bank check" is used in claims 1 and 8 of the '988 patent. Defendants propose that this phrase be construed to mean "any type of check drawn on a financial institution."  (*Id.*)  LML proposes that this phrase be construed to mean "any *regular* check used to draw funds from a *normal* bank or credit union checking account."[1]  (Ex. D)  Similarly, the phrase "any consumer bank check" is used in claim 9. Defendants propose that this phrase be construed to have the same meaning as the phrase "any bank check," with the added limitation that the check be "drawn against a consumer bank account."  LML proposes that this phrase be construed to mean "any *regular* check used to draw funds from a *normal* bank or credit union consumer checking account." (*Id.*)  As set forth below, LML's proposed constructions are hopelessly vague, and offer no clear delineation of the scope of the claims to those skilled in the art.  Moreover, under either construction proposed by the parties, these limitations are not enabled by the '988 patent specification.

---

[1] Unless otherwise noted, emphasis in this Brief has been added.

5

The phrase "without using the bank check as a negotiable instrument," and the related phrases "without using the check as a negotiable instrument" and "without using a bank check as a negotiable instrument" are used in claims 1, 8 and 9 of the '988 patent. The parties agree that because these phrases are substantially alike, they should be given the same construction. Defendants propose that these phrases be construed to mean "the [bank] check, at no time, takes on the status of a negotiable instrument." (*Id.*) LML proposes that these phrases be construed to mean "where the paper check is used as a source of information, and is not *accepted* or *processed*." (*Id.*) As with the "any bank check" limitations, LML's construction is hopelessly vague and provides insufficient clarity as to the scope of the claims.

## IV.    ARGUMENT

### A.    Legal Standards Governing Summary Judgment

Summary judgment is appropriate in patent cases as in any other. *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 835 (Fed. Cir. 1984). The Court should grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c); *U.S. Gypsum Co. v. National Gypsum Co.*, 74 F.3d 1209, 1212 (Fed. Cir. 1996).

### B.    Legal Standards Governing Invalidity

#### 1.    Anticipation

While invalidity requires proof by clear and convincing evidence, *see, e.g., Abbott Labs. v. Geneva Pharm., Inc.*, 182 F.3d 1315, 1318 (Fed. Cir. 1999), the burden of proving invalidity "may be more easily carried" where, as here, the challenge to validity is based upon a reference that was not before the Examiner. *SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1355-56 (Fed. Cir. 2000). Anticipation is a question of fact, but it may be decided on summary judgment if the record reveals no

6

genuine dispute of material fact. *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1327 (Fed. Cir. 2001).

Where a prior art reference discloses every limitation of the claimed invention, either explicitly or inherently, it anticipates the claimed invention. *Id.* If material not explicitly contained in the document is incorporated by reference, the referenced document may be considered for anticipation purposes:

> Incorporation by reference provides a method for integrating material from various documents into a host document—a patent or printed publication in an anticipation determination—by citing such material in a manner that makes clear that the material is effectively part of the host document as if it were explicitly contained therein.

*Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282-1283 (Fed. Cir. 2000) (citations omitted); *see also Ultradent Prods., Inc. v. Life-Like Cosmetics, Inc.*, 127 F.3d 1065, 1069 (Fed. Cir. 1997).

### 2.    Lack of Enablement

The question of enablement is a matter of law based on factual underpinnings. *Union Pac. Res. Co. v. Chesapeake Energy Corp.*, 236 F.3d 684, 690 (Fed. Cir. 2001); *Durel Corp. v. Osram Sylvania Inc.*, 256 F.3d 1298, 1307 (Fed. Cir. 2001). Accordingly, the issue of enablement is particularly amenable for summary disposition.

The "enablement" requirement is set forth in 35 USC § 112:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same . . . .

The policy behind the enablement requirement is at the very core of the patent system. In return for the patent grant, a patentee must teach others how to make and use his invention. *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 150-51 (1989). This is the bargain outlined in the United States Constitution (Art. 1, § 8, Cl. 8), and recognized as a fundamental purpose of the patent system. *Id.* ("The federal patent system thus embodies a carefully crafted bargain for encouraging the creation and

7

disclosure of new, useful, and nonobvious advances in technology and design in return for the exclusive right to practice the invention for a period of years. . . . Moreover, the ultimate goal of the patent system is to bring new designs and technologies into the public domain through disclosure.")

Enablement is determined as of the time the application is filed. *In re Glass*, 492 F.2d 1228, 1232 (C.C.P.A. 1974). The test for whether the patent claims are enabled is whether the specification teaches those of ordinary skill in the art how to process any bank check in the manner claimed *without undue experimentation*. *AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234, 1244 (Fed. Cir. 2003). As set forth below, the '988 patent in suit fails to meet this established standard.

### 3.    Indefiniteness

Whether the claims of a patent are indefinite is a question of law, *Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d 1374, 1378 (Fed. Cir. 1999), so summary judgment of indefiniteness is frequently appropriate. *See, e.g., Refac Int'l, Ltd. v. IBM*, 689 F. Supp. 422 (D.N.J. 1988) (granting summary judgment of indefiniteness); *Midwest Canvas Corp. v. Cantar/Polyair Corp.*, No. 01 C 7055, 2003 WL 22053582, at *5 (N.D. Ill. Sept. 3, 2003) (summary judgment for indefiniteness appropriate).

The definiteness requirement flows from the second paragraph of 35 U.S.C. § 112, which states that the "specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." The test for indefiniteness turns on whether a person of ordinary skill in the art would understand what is claimed (and what is not claimed) in light of the specification:

> [Patent] claims must be 'particular' and 'distinct,' as required by 35 U.S.C. § 112, so that the public has fair notice of what the patentee and the patent and Trademark Office have agreed constitute the metes and bounds of the claimed invention.

8

*London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1538 (Fed. Cir. 1991); *see also Gen'l. Elec. Co. v. Wabash Appliance Corp.*, 304 U.S. 364, 369 (1938) ("The limits of a patent must be known for the protection of the patentee, [and] the encouragement of the inventive genius of others. . . . The inventor must 'inform the public during the life of the patent of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license and which may not.'") (citations omitted).

The policy behind the definiteness requirement has long been recognized as putting the public on fair notice of what is and is not covered by a patent. As pronounced by the Supreme Court:

> Turning our attention to the first claim, we are compelled to say that the language is far from possessing that *precision and clearness of statement* with which one who proposes to secure a monopoly at the expense of the public ought to describe the thing which no one but himself can use or enjoy, without paying him for the privilege of doing so.
>
>             \*     \*     \*
>
> The developed and improved condition of the patent law, and of the principles which govern the exclusive rights conferred by it, leave no excuse for ambiguous language or vague descriptions. *The public should not be deprived of rights supposed to belong to it, without being clearly told what it is that limits these rights.*

*Merrill v. Yeomans*, 94 U.S. 568, 573 (1876); *see also Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996) (*citing United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 236 (1942); *Gen'l. Elec. Co. v. Wabash Appliance Corp.*, 304 U.S. at 369).

### C.    Every Asserted Claim Is Anticipated By Higashiyama

#### 1.    The Higashiyama Patent Is Prior Art that Was Never Considered by the Examiner

Claims 1-2, 4-6, 9-11, 14, 16 and 18 of the '988 patent are invalid as anticipated under 35 U.S.C. § 102 by U.S. Patent No. 5,175,682 to Higashiyama ("Higashiyama"), which discloses each and every element of the purported inventions of the asserted '988

9

claims. There is no dispute that Higashiyama is prior art at least under 35 U.S.C. § 102(e), because it was filed before the earliest invention date asserted by LML, and issued before the '988 patent. *See* 35 U.S.C. § 102(e).

Anticipation based on Higashiyama can more readily meet the burden required for finding invalidity, because the patent was never considered by the Examiner during prosecution. *SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d at 1355-56. It is apparent from the face of the '988 patent and review of its prosecution history that the Examiner did not review or consider Higashiyama. LML makes the illogical assertion that because Higashiyama would fall within the apparent Field of Search conducted by the Examiner, that the Examiner "considered" the Higashiyama patent. LML offers no evidence, however, that the Examiner ever saw the Higashiyama patent let alone considered it in the examination of the '988 patent. The Manual of Patent Examining Procedure ("MPEP") rules governing examination of patents establish that LML's speculation is false. *See* MPEP 1302.12 ("All references which have been cited by the examiner during the prosecution [. . .] must be listed on either a form PTO-892 or on an Information Disclosure Statement (PTO/SB/08, old PTO-1449) and initialed. All such reference citations will be printed in the patent.").

Higashiyama incorporates by reference the "1990 ACH Rules" and the "1990 NACHA Operating Rules, Corporate Edition." (Ex. B at Col. 6, lines 32-36). Therefore, Higashiyama is treated as containing the complete disclosures of the "1990 ACH Rules" and the "1990 NACHA Operating Rules." *See Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000). A claim chart comparing Higashiyama to the claims of the '988 is attached to this brief in Exhibit E.

Neither LML nor its expert dispute that Higashiyama discloses many of the features of the '988 patent claims. For example, neither LML nor its expert have asserted that Higashiyama fails to disclose a point of sale terminal, a memory, or a printer. Accordingly, Defendants address the presence of these uncontested elements only in the

10

comparison claim chart attached as Exhibit E. The elements apparently contested by LML are addressed in the claim chart as well as the following sections of this brief, all of which demonstrate why even those elements "disputed" by LML are clearly present in Higashiyama.[2] No reasonable jury could find that claims 1-2, 4-6, 9-11, 14, 16 and 18 are not anticipated, and summary judgment of anticipation of these claims is proper.

##### 2.    Higashiyama Discloses a "central computer system."

Claims 1 and 9 of the '988 patent recite a "central computer system." (Ex. A at 11:39 and 12:46.) Although LML contends that Higashiyama fails to disclose a central computer system, it is clear that only an improperly narrow construction of "central computer system" – never proposed by any party – would justify LML's contention.

Neither LML nor Defendants proposed the term "central computer system" for construction. Accordingly, the term takes on its ordinary meaning, and there is no legitimate dispute that Higashiyama describes a "central computer system" within the ordinary meaning of that term. Higashiyama discloses a backroom processor 204 to which one or more point of sale systems are connected. (*See* Ex.B at Figure 2; col. 3, lines 13-14, 29-33; *see also* col. 3, lines 29-33 ("POS terminal 201 is connected to backroom processor 204 . . . ."). The backroom processor receives information from point of sale terminals and processes transactions, for example through an ACH. (See Ex. B at 5:1-7, 10-13, 18-20, 28-31, 37-46; 9:12-15.))

Higashiyama expressly teaches that this backroom processor 204 may support terminals within multiple stores in separate locations. "A merchant having multiple stores benefits in that a central location may be used for consolidating check data . . . ."

---

[2]    LML's expert opined that claims 4 and 10 of the '988 are not anticipated by Higashiyama based solely on his contention that claims 1 and 9, from which claims 4 and 10 respectively depend, are not anticipated by Higashiyama. Neither LML nor its expert offer any analysis to support the unsubstantiated assertion that Higashiyama fails to anticipate claims 4 and 10. Likewise, LML contends in interrogatory responses that elements of dependent claims 2, 6, and 13 are not disclosed. LML has offered no support, from its expert or in interrogatory responses for these contentions. As such, Defendants refer the Court to Ex. E, which shows that every asserted claim is anticipated by Higashiyama.

(*Id.* at 7:25-27.) Only by interpreting the patent to require *separate merchants* could one distinguish between the central computer system of the '988 patent and the backroom processor of Higashiyama. This limited interpretation has no basis in the patent or its prosecution history.

REDACTED

There is no support for any construction of "computer" or "computer system" that excludes the backroom processor of Higashiyama. Accordingly, no reasonable factual dispute exists with respect to the disclosure of the claimed "central computer system" in Higashiyama.

### 3.    Higashiyama Discloses a "first communication means"

Claims 1 and 9 of the '988 patent recite a "first communications means integral to said point of sale terminal for electronically communicating with the central computer system." (Ex. A.) Higashiyama expressly discloses this element. (Ex. B at 3:29-33 ("POS terminal 201 is connected to backroom processor 204 . . . .").) Figure 2 of Higashiyama shows this direct connection between the point of sale terminal and the backroom processor, establishing that the terminal 201 must have some means to facilitate that communication. (*See id.* at Fig. 2.)

LML's only attempt to distinguish Higashiyama is to assert that the only description of a first communication means in Higashiyama is telecommunications unit 205, which according to LML, is not integral with the point of sale terminal as required by the '988 patent claims. LML's argument is directly contradicted by the undisputed disclosure of Higashiyama itself. Higashiyama expressly recites that POS terminal 201 is connected to backroom processor 204. (*Id.* at 3:29-33.) In that same paragraph, Higashiyama teaches that the telecommunications unit 205 *may be* connected to POS terminal 201, "if desired." (*Id.* at 3:33-34.) Thus the POS terminal 201 itself must have means to facilitate the direct connection to backroom processor 204, as shown in Figure

12

2. In short, no reasonable factual dispute exists as to the disclosure of a first communication means by the Higashiyama prior art patent.

### 4.    Higashiyama Discloses a "second communication means"

Claims 1 and 9 of the '988 patent recite a "second communication means for receiving information from a plurality of said point of sale terminals" and a "second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search." (Ex. A at 11:47-55 and 12:57-67.)

As noted above, Higashiyama expressly discloses communication from the point of sale terminal 201 to the backroom processor 204 (the central computer system). (Ex. B at Fig. 2; 3:29-30.) Accordingly, the backroom processor must have a communication means that facilitates communication with the point of sale terminal. Moreover, Higashiyama teaches that the backroom processor may periodically take date records and "upload them to a clearing house." (Id. at 5:12-13.) Thus there is no dispute that the backroom processor also includes a communication means. Since the "first" communication means is located in the point of sale terminal, the "second" communication means resides within backroom processor.

This backroom processor communication means clearly enables communication with a third party database for performing verification. In fact, the verification procedure is also expressly disclosed:

> If desired, the data record is then used *to verify check authorization*, for example, by being compared to a positive file (which lists all allowable checking account numbers), or more likely against a negative file such as provided by SCAN of Seattle, Washington, Telecheck of Denver, Colorado or Telecredit of Florida, which provide information regarding known troublesome checking accounts. If such authorization is not provided, the transaction can, if desired, be cancelled by the merchant, thereby minimizing losses due to bad checks, as is well known.

(Id. at 4:14-24.) Therefore, no genuine issue of fact exists with regard to whether this limitation is disclosed in the Higashiyama prior art reference.

13

LML attempts to overcome the undisputed disclosure of Higashiyama by suggesting that somehow the point of sale terminal of Higashiyama must perform the verification.

REDACTED

This unduly narrow reading of Higashiyama ignores that the reference also teaches an embodiment where the data record is sent to the backroom processor immediately. (*Id.* at 5:5-6.)

REDACTED

LML is not disputing the disclosure of the claimed element, namely a second communication means that enables connection to a third party database. Rather, LML creates a red herring by suggesting that Higashiyama describes an optional embodiment that is not claimed in the '988 patent, one in which the point of sale terminal communicates with the third party database for verification. The disclosure of an *unclaimed* embodiment, however, does not *negate* anticipation by another embodiment of Higashiyama. The only issue is whether Higashiyama discloses the purported invention as defined by the claims. *Telemac*, 247 F.3d at 1327. Nothing in Higashiyama limits the functioning of the backroom processor's communication means where the transaction data records are uploaded "immediately" to the backroom processor, and the express disclosure of Higashiyama shows that verification with a third party database is performed. Higashiyama discloses a "second communication means" as recited by the claims.

Accordingly, there exists no reasonable dispute that Higashiyama describes each element of the asserted claims, as set forth above and in the attached claim chart. Summary judgment of anticipation is proper.

### D.    The '988 Patent Claims Are Not Enabled

Every asserted claim of the '988 patent is invalid under 35 U.S.C. § 112, first paragraph, for failure to provide in the patent specification an enabling disclosure for reading information from "any bank check" or "any consumer bank check," and transferring funds based on that information from "any bank check" or "any consumer bank check."

There is no enabling disclosure in the specification for conducting transactions using "any bank check," for example a business check or a foreign bank check. The Federal Circuit, in *In re Wands,* 858 F.2d 731, 736-37 (Fed. Cir. 1988), listed eight factors that can be considered in an enablement analysis:

(1)    the quantity of experimentation necessary,

(2)    the amount of direction or guidance presented,

(3)    the presence or absence of working examples,

(4)    the nature of the invention,

(5)    the state of the prior art,

(6)    the relative skill of those in the art,

(7)    the predictability or unpredictability of the art, and

(8)    the breadth of the claims.

Taking foreign checks for example, the application of these factors shows that the '988 specification lacks the disclosure necessary to teach one of ordinary skill in the art how to use the purported invention. Issues related to foreign currency translations and foreign regulatory issues (a necessary consideration in the check processing field) are not addressed in the specification of the '988 patent. There is no guidance and no working examples regarding these issues whatsoever. The amount of experimentation required to make such systems work would have been substantial.



15

REDACTED

LML has no countervailing evidence on this issue.

REDACTED

This is the sum total of all "evidence" offered by LML and its expert under Defendants' proposed claim construction, and is legally insufficient to overcome the undisputed evidence provided by the '988 patent itself.

### E.    The '988 Patent Claims Are Indefinite

#### 1.    The Phrase "without using the check as a negotiable instrument" Is Indefinite Under LML's Proposed Construction

Under the claim construction proposed by LML, all of the asserted claims of the '988 patent are invalid under the second paragraph of 35 U.S.C. § 112 based on the limitation "without using the check [or bank check] as a negotiable instrument."

16

Only by grounding the interpretation of this phrase within the intrinsic record of the patent and its prosecution history, as set forth in Defendants' proposed claim construction and supporting briefs, does the limitation obtain any clear and definite scope.

REDACTED

Of the proposed constructions, this is the only construction that provides sufficiently definite bounds to these limitations to satisfy the critical notice function of the claims. *London v. Carson Pirie Scott & Co.*, 946 F.2d at 1538 ("[Patent] claims must be 'particular' and 'distinct,' as required by 35 U.S.C. § 112, so that the public has fair notice of what the patentee and the patent and Trademark Office have agreed constitute the metes and bounds of the claimed invention.").

In contrast, if the Court adopts LML's current construction of this limitation, each of these claims are ambiguous and indefinite. LML has proposed the construction "where the paper check is used as a source of information, and is not *accepted* or *processed*." (D.I. 281.) The terms "accepted" and "processed" are individually subject to multiple interpretations.

REDACTED

REDACTED

Notably, this further explanation of "accepted" never made its way into the specification of the '988 patent. In fact, the '988 patent contains no express definition of the terms "accept" or "process" that would delineate what is meant by those terms. If they are to be included as limitations to the claims, these explanations were required to be clear from the '988 patent itself. "[C]laims must be 'particular' and 'distinct,' as required by 35 U.S.C. § 112, so that the public has fair notice of what the patentee and the patent and Trademark Office have agreed constitute the metes and bounds of the claimed invention." *London v. Carson Pirie Scott & Co.*, 946 F.2d at 1538; *see also Permutit Co. v. Graver Corp.*, 284 U.S. 52, 60 (1931). With no definition of "accepted" and "processed" in the '988 specification, LML's proposed construction is hopelessly ambiguous, and represents exactly the moving target that the public policy behind the law on indefiniteness sought to prevent.

Indeed, the lack of particularity and clarity created by LML's currently proposed construction is demonstrated by the inconsistency between LML's litigation constructions and the earlier definitions provided by Mr. Hills and LML's own counsel. The definition of "accepted" provided by Mr. Hills and his attorneys is decidedly not the one apparently proposed by LML today. In fact, none of the many constructions of the "negotiable instrument" limitation proposed by LML since the beginning of this litigation is consistent with the constructions provided by Mr. Hills or by LML's due diligence counsel:



18

REDACTED

LML's departure from these early constructions during litigation, and its many different litigation constructions, demonstrate a failure to set forth a clear and definite meaning to one of ordinary skill in the art. Once LML departed from the clear and definite construction provided by its own opinion counsel, its interpretations lacked the type of clarity required by § 112. LML's proposed construction is ambiguous and indefinite, and if accepted, renders the claims invalid.

2.    The Phrases "any bank check" and "any consumer bank
      check" Are Indefinite Under LML's Proposed Construction

Under the claim construction proposed by LML, all of the asserted claims of the '988 patent are invalid under the second paragraph of 35 U.S.C. § 112 because the limitations "any bank check" and "any consumer bank check" are indefinite.

As proposed by LML, "any bank check" means "any *regular* check used to draw funds from a *normal* bank account or credit union checking account." (D.I. 281.) By use of the inherently ambiguous words "regular" and "normal," LML again advances a claim construction that includes terms requiring additional construction. As with the terms "accepted" and "processed," these terms are susceptible to multiple meanings, and therefore lack the necessary *precision and clearness of statement* that the law requires. *See Merrill v. Yeomans*, 94 U.S. at 573; *London v. Carson Pirie Scott & Co.*, 946 F.2d at 1538; *Morton Int'l Inc. v. Cardinal Chem. Co.*, 5 F.3d 1464, 1470 (Fed. Cir. 1993).

For example, "regular check" might include: any check readable by a Veriphone 3890 check reader; any check drawn on an account offered to the public, consumer or business; or any check that can be posted to a financial institution's general ledger,

19

including internal debit entries. The patent offers no guidance as to whether any of these definitions, or any other definition, is appropriate.

Similarly, a "normal bank or credit union checking account" could have multiple, disparate meanings to one of ordinary skill in the art, including: any checking account offered to the public (consumer, business, and state government); any account offered to consumers but not businesses; any account that is carried on the financial institution's ledger; any account bearing interest; any account upon which a check can be written. Again, the '988 patent offers no guidance as to what definition should apply.

Should the Court adopt LML's construction of "any bank check," one of ordinary skill in the art would not understand which features of the '988 may be safely used or manufactured without a license and which may not. This uncertainty stems from the ambiguity of "regular" in describing checks and "normal" in describing accounts in a purported invention centered around the transfer of funds from an *account* identified by a *check* read at the point of sale. LML's construction, if adopted, would render the claims invalid, and summary judgment would be proper.

20

## V.    CONCLUSION

For the reasons set forth above, the Court should grant Defendants' Motion for

Summary Judgment of Invalidity.

Dated:  October 28, 2005            FISH & RICHARDSON P.C.


By:    /s/ Timothy Devlin
      William J. Marsden, Jr. (#2247)
      Timothy Devlin (#4241)
      Tara D. Elliott (#4483)
      919 N. Market Street, Suite 1100
      P.O. Box 1114
      Wilmington, DE  19801

*Attorneys for Defendant TeleCheck Services, Inc.*

CONNOLLY BOVE LODGE & HUTZ LLP


By:    /s/ Francis DiGiovanni
      Colin Seitz (I.D. No. 2237)
      Francis DiGiovanni (#3189)
      The Nemours Building
      1007 N. Orange Street
      Wilmington, Delaware 19801
      302.658.9141
      cjs@cblh.com

*Attorney for Defendants Electronic Clearing House,
Inc.  and Xpresschex, Inc.*

THE BAYARD FIRM


By:    /s/ Richard D. Kirk
      Richard D. Kirk (I.D. No. 922)
      222 Delaware Avenue, Suite 900
      Wilmington, DE  19801
      302.429.4208
      rkirk@bayardfirm.com

*Attorney for Defendant
NOVA Information Systems, Inc*

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of October, 2005, a true and correct copy of

**DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY**

**JUDGMENT OF INVALIDITY** was caused to be served on the attorneys of record at

the following addresses as indicated:

**BY HAND DELIVERY**
Richard K. Herrmann, Esq.
Morris, James Hitchens & Williams LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19899

**BY EMAIL AND FIRST CLASS MAIL**
Robert Jacobs, Esq.
Belasco Jacobs & Townsley, LLP
Howard Hughes Center
6100 Center Drive, Suite 630
Los Angeles, CA 90045

**BY HAND DELIVERY**
Richard D. Kirk, Esq.
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, DE 19801

**BY EMAIL AND FIRST CLASS MAIL**
Russell E. Levine, Esq.
Kirkland & Ellis LLP
200 E. Randolph Dr.
Chicago, IL 60601

**BY HAND DELIVERY**
Collins J. Seitz, Jr., Esq.
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19801

**BY EMAIL AND FIRST CLASS MAIL**
Mark C. Scarsi, Esq.
O'Melveny & Myers LLP
400 S Hope Street
Los Angeles, CA 90071

*/s/ Timothy Devlin*
Timothy Devlin

80027736.doc