5,175,682

3

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 depicts the typical prior art process by which a check is written and ultimately returned to the issuing bank; and

FIG. 2 is a block diagram depicting one embodiment of a transaction system constructed in accordance with the teachings of this invention.

## DETAILED DESCRIPTION

FIG. 2 depicts one embodiment of a system for use by a merchant in accordance with the teachings of this invention. Merchant system 200 includes one or more point of sale systems 210 including, for example, point of sale terminal 201 such as a typical electronic cash register, or the like. Magnetic Ink Character Recognition (MICR) reader 202 is used for reading the magnetic account number printed on checks, which data is fed to POS terminal 201. Alternatively, the information pertaining to the check's account number, etc. can be entered in any convenient manner, for example via the keypad on the POS terminal 201, or via a customer identification card issued by the merchant. However, the use of the MICR reader allows greatest through put and accuracy. Printer 203 is used by POS terminal 201 for a variety of tasks, if desired, for example, printing a sales slip, printing validation information on a check, or printing a check receipt, as will be described in more detail later. POS terminal 201 is connected to backroom processor 204, such as those which are known in the prior art for maintaining sales information, performing price lookups, and inventory adjustment during the course of business. Telecommunications unit 205 is connected to backroom processor 204 and, if desired, directly to POS terminal 201 to allow data to be communicated to a check clearing house, for example.

The operation of the system of FIG. 2, in one embodiment, is as follows. The merchant utilizes POS terminal 201 to enter a transaction. POS terminal 201 can be, for example, a typical prior art electronic cash register, or a more sophisticated computer system. Alternatively, POS terminal 201 may be an accounts receivable system utilized by a public utility, for example, rather than the typical cash register found at a merchant.

The customer then tenders payment. Payments tendered utilizing credit cards, cash, or debit cards may be processed in a conventional manner. When the customer provides a check, however, the check is read by MICR reader 202 and the account information is provided to POS terminal 201. POS terminal 201 then provides additional information in order to create a data record for this transaction which is being paid for by check. Appropriate fields for this data record are, for example, as follows:

Date and Time
Merchant demand deposit account (DDA) number (checking account number)
Customer checking account No. and Routing information
Amount of check
Check No.
Any other discretionary data (electronic journaling)

Certain of this information can be provided automatically by POS terminal 201. Other information, such as amount the check is written for is provided by the merchant, for example via the POS keypad. Electronic journaling information is additional information which may either be retained by the merchant or used to pro-

4

vide a more precise indication of the nature of the purchase on the customer's monthly checking account statement. Such additional information may include, for example, the name of the merchant, the merchant's location, a summary of the goods for services provided, for example sorted by department in the department store. This electronic journaling information serves, for example, to reward the customer when reviewing his monthly statement that the charges appearing on the monthly statement are in fact correct. The merchant can use such additional information for other purposes, for example, to maintain some indication of a customer's buying preferences.

If desired, the data record is then used to verify check authorization, for example, by being compared to a positive file (which lists all allowable checking account numbers), or more likely against a negative file such as provided by SCAN of Seattle, Washington, Telecheck of Denver, Colorado or Telecredit of Florida, which provide information regarding known troublesome checking accounts. If such authorization is not provided, the transaction can, if desired, be cancelled by the merchant, thereby minimizing losses due to bad checks, as is well known.

Once authorization is provided (if the authorization step is performed), next the check is placed in printer 203 and validation information is printed on the check, if desired. Such validation information serves as an indication that electronic data pertaining to this check has been routed for collection, and that the check may thus be considered "cancelled." Such validation information includes, for example, information similar to a rubber endorsement stamp typically used by merchants who process checks in accordance with prior art techniques. Such information typically includes the merchant's name and the merchant's DDA number. The validation information prints in accordance with the teachings of this invention can also quite easily include the date and time of the transaction and language indicating that the check has been cancelled and is being cleared through to the customer's checking account electronically. Alternatively, other means can be used to provide validation information on the check, for example, a rubber stamp used for this purpose. While this is less desirable than using a printer, in certain circumstances it may obviate the need for additional printer, and a simple rubber stamp, or the like, can serve as a convenient backup in the event of printer failure. However, in a preferred embodiment, printer 203 is used for purposes in addition to providing validation information on a customer's check, for example, to assist in preparing credit card slips and the like.

The validated check is then returned to the customer for safekeeping, thus avoiding the need for the check to be physically transported through the system depicted in FIG. 1 for ultimate return to the customer. Alternatively, the check is retained by the merchant. This has the advantage of allowing the merchant to retain possession of the check in the event that there is a problem with its collection. In either event, whether the check is returned to the customer or retained by the merchant, a receipt is, if desired, printed and given to the customer indicating that payment has been made by check, and the check is being electronically cleared. This receipt can be either a part of or separate from another receipt indicating detailed information regarding the transaction just completed.

5,175,682

5

The data record thus created by POS terminal 201 can be added to a data file maintained by POS terminal 201 for batch uploading to backroom processor 204, for example, on a periodic basis or at the end of a shift. Alternatively, POS terminal 201 sends the data record to backroom processor 204 immediately, or as soon as backroom processor 204 is able to receive it. In this event, POS terminal 201 need only have sufficient storage capacity to serve as a buffer when there are delays in the ability of backroom processor 204 to receive data.

Periodically, backroom processor 204 will take the data records it has accumulated and upload them to a clearing house. Backroom processor 204 may first process the information, if desired. Various types of processing are possible, such as removing that data pertaining to checks written on the one or more banks with which a merchant does its own banking as well as those bank affiliate banks. This data is then uploaded to the appropriate bank directly, without the need of traveling through the clearing house system. Other types of backroom processing may be performed prior to transmitting check data to the clearing house or directly to one or more banks. For example, checks written over a threshold dollar amount, out-of-state checks, or other checks thought to be high risk based upon other criteria can be selected in order to prioritize data to be uploaded to the ACH or directly to a bank.

If desired, priority uploads may be performed either by backroom processor 204 or POS terminal 201 which, in one embodiment, is directly linked to telecommunications unit 205. Such priority uploads may serve a number of functions. For example, small batches of records may be uploaded relatively frequently by backroom processor 204 either directly to a bank or to the clearing house. Such priority uploads may include, for example, those which are greater than a pre-determined dollar amount. In one embodiment, priority uploads are performed by POS terminal 201 in a real time basis, for example, when the check amount exceeds a predetermined dollar amount, when the check is an out-of-state check, or any other criteria which may be programmed or selected by the merchant "on the fly" which may lead the merchant to view a particular check with some suspicion. In this event, the transaction is delayed pending the real time upload, thereby reducing losses due to bad checks.

Following the upload by backroom processor 204 to one or more banks and clearing houses, an exception report is printed by backroom processor 204 indicating problem checks contained within the uploaded data file, for example, checks written on closed accounts, or accounts having non-sufficient funds. This exception report is prepared from information received from the issuing bank, and is either sent electronically or by printed media either directly to the merchant or to the merchant via the Merchant Bank, the Federal Reserve Bank, and/or an automated clearing house. In one embodiment, backroom processor 204 will again upload for clearing those checks which have not cleared. If desired, a predetermined delay can be used prior to uploading this data again, in order to allow the customer to replenish his checking account before the second and subsequent tries. Alternatively, other criteria can be established by the merchant for determining how to handle such problem checks noted in the exception report. For example, the time delay, if any, before uploading for clearing such problem checks which have not cleared, can be selected based upon a predetermined

6

set of criteria. Such criteria can include, for example, the time of day the check was written, the date the check was written, the day of the week the check was written, whether the check was written on an out-of-state bank account, or any other criteria selected by the merchant. For example, the merchant may determine that, statistically, different categories of checks should be handled differently in order to maximize the collection of such checks.

Thus, in accordance with the teachings of this invention, a check has essentially become the equivalent of an electronic debit card, but with significant advantages. The vast majority of consumers already have checking accounts, as compared with a smaller number have electronic debit cards. Therefore, the use of checks as debit cards in accordance with the teachings of this invention avoids the need for distributing or maintaining a separate debit card, with their associated costs. Furthermore, most consumers feel fairly comfortable with utilizing checks as a method of payment, far more comfortable than the use of electronic debit cards. The savings which will accrue to even a small merchant due to reduced bank paper handling fees, reduced losses due to bad checks, and more rapid availability of funds from checks will easily pay for the installation of hardware and software for use in accordance with the teachings of this invention.

In one embodiment to this invention, a primary record is used of, for example, 94 bytes as specified by the National Automated Clearinghouse Association (NACHA) 1990 ACH rules, specifically Appendix I entitled "ACH File Exchange Specifications". The "1990 ACH Rules" and the "1990 NACHA Operating Rules, Corporate Edition" are published by the National Automated Clearinghouse Association of Herndon, Virginia and are hereby incorporated by reference.

When such a primary record alone is used, the customer's monthly checking account statement will indicate for each check the date, check no., and amount without specific merchant information. Alternatively, each primary record is used with one or more appended records, for example each of an additional 94 bytes, to provide information such as the merchant's name and location and, if desired, more specific information such as the type of goods or services purchased, the quantity, and/or the exact name of the goods or services purchased can be included in such appended records for each purchase.

Due to the relatively small percentage of disputed checks, a preferred embodiment provides that the merchant electronically store all sales receipt line items, and provide to the clearing house a primary record only. In the case of disputed charges, the clearing house will request further information from the merchant, and the merchant transmit additional information to the clearing house as appended records to allow the clearing house to address the disputed charges. This minimizes the amount of information being transmitted, but allows full documentation to be transmitted in the event a particular check is disputed.

There are advantages in utilizing the teachings of this invention to the consumer, the merchant, and the banking system. The consumer advantages are that their time spent at a point of sale is reduced, as checks can be processed more quickly. Savings associated with bank processing of a customer's checking account may be passed on to the consumer.

FDC5000156

5,175,682

7

8

The merchant benefits from a number of advantages in accordance with the teachings of this invention. Merchants can receive a quicker deposit and thus faster access to funds from checks received from customers. Deposit fees will likely be less, since the merchant is providing electronic data, rather than a paper check. Additional deposit fees can be saved if the merchant provides encoding on each check, such as MICR encoding, indicating the amount of the check. Since this encoding of the check amount saves the merchant bank processing time, merchant banks typically charge the merchant approximately 10 cents per check deposited if the merchant encodes the amount on each check, as compared with approximately 15 cents per check deposited which are not so encoded by the merchant. Depositing is much easier as a merchant need not fill out paper deposit slips, including various information pertaining to each check, as well as a total, and need not physically transport a batch of checks with their deposit slips to a bank. Checks which do not clear, for example because they are drawn on an account which is closed or an account with non-sufficient funds, are detected much quicker, thereby allowing a greater likelihood of collecting on returned checks as it is well known that collectibility decreases rapidly with age. A merchant having multiple stores benefits in that a central location may be used for consolidating check data, thereby providing the benefit that a merchant's check processing facilities can be consolidated, if desired, and allow check processing to be accomplished in a timely manner without delays associated with physically transporting paper checks to the central location prior to electronically processing those checks. The merchants are also afforded a greater flexibility on check deposits and bank relationships in that, because paper checks need not be physically transported to the merchant's bank, the merchant can select a bank solely on the basis of business consideration rather than the banks geographical proximity to the merchant.

The advantages to the banks are decreased processing costs, decreased float, and an ability to achieve their desired automated transaction plans which have not been achieved to date in large part due to the failure in the debit card programs. Furthermore, the banks are able to compete on a national basis with greater ease since the need not be geographically close to their customers for the purposes of depositing checks. Also, the banks are capable of eliminating handling of the physical check and its ultimate return to the consumer. This saves a great deal of physical infrastructure, as well as costs. Furthermore, the banks are able to receive the benefits of a debit card system without the need to educate consumers and without the attendant costs involved in the issuance of separate debit cards.

Other benefits are available as well. For example, in one embodiment of this invention, notification to a number of parties who are interested in learning of problem checks is made automatically, routinely, and in a cost effective and timely manner. For example, when the issuing bank does not honor a check, the issuing bank issues an exception report. If desired, this exception report can be used by either the issuing bank, the Federal Reserve Bank, the Automated Clearing House, the merchant's bank, or the merchant itself in order to notify other interested parties. Such other interested parties include the merchant's bank which must deduct the amount of the check which has not be honored by the issuing bank, the merchant, the merchant's collec-

tion agency, check authorization services, and check verification services. By promptly notifying each of these parties, collections can be speeded, and problem checks can be minimized. Furthermore, by notifying each of these parties automatically, notification costs are decreased.

Accordingly, the teachings of this invention provide a novel method and structure for handling checks having significant advantages over the prior art check clearing system. In accordance with the teachings of this invention, check are utilized much as are debit cards, but without the attendant disadvantages experienced in debit cards which have thus far led to their poor acceptance.

The invention now being fully described, it will be apparent to one of ordinary skill in the art that many changes and modifications can be made thereto without departing from the spirit or scope of the appended claims.

All publications and patent applications mentioned in this specification are herein incorporated by reference to the same extent as if each individual publication or patent application was specifically and individually indicated to be incorporated by reference.

What is claimed is:

1. A method for processing a check written on an account provided by a financial institution comprising the steps of:

receiving from a customer a check as a method of payment;

creating an electronic data record containing information pertaining to said check; and

electronically transmitting said data record to said financial institution to obtain payment of said check by said financial institution, said step of transmitting said electronic record to said bank comprising the steps of:

determining if said electronic record meets a test indicating said electronic record should be transmitted to said bank in real time;

if said test is met, transmitting said electronic record to said bank in real time; and

if said test is not met, adding said electronic record to a file including other electronic records pertaining to other checks, and transmitting said file to said bank in a batch mode.

2. A method as in claim 1 wherein said test indicating said electronic record should be transmitted to said bank in real time serve to detect one or more of the following conditions: the amount of the check is greater than a threshold amount, the check is an out-of-state check, the check has not been preapproved by a check verification or check guarantee service, and the check is deemed to be of high risk.

3. A method as in claim 1 which further comprises the step of, after creating said electronic data record, imprinting information on the check indicating that the check has been cancelled and sent for collection by electronic data transfer.

4. A method as in claim 3 which further comprises the step of, after said step of printing, returning said check to the customer.

5. A method as in the claim 3 which further comprises the step of, after said step of printing, causing said merchant to retain said check.

6. A method as in claim 5 wherein, when the check is retained by the merchant, a receipt for the check is issued to the customer.

FDC5000157

5,175,682

9

7. A method as in claim 6 wherein said receipt for the check comprises a portion of the standard sales receipt issued by the merchant.

8. A method as in claim 6 wherein said check receipt comprises a receipt separate from the normal sales receipt issued to the customer by the merchant.

9. A method as in claim 1 which further comprises the step of creating one or more additional electronic data records associated with said electronic data record for storing discretionary information regarding the sales transaction.

10. A method as in claim 9 which further comprises the step of electronically transmitting one or more of said additional data records with said data record to said financial institution.

11. A method as in claim 9 wherein said one or more additional data records are retained by the merchant in the event they are needed to verify a disputed transaction.

12. A method as in claim 11 wherein said one or more of said additional data records are electronically transmitted to said bank in the event of a disputed charge.

13. A method as in claim 1 which further comprises the steps of:

receiving an exception report indicating whether said check has not been honored by said financial institution; and

if said check has not been honored, again electronically transmitting said data record to said financial institution to obtain payment of said check by said

10

financial institution after a predetermined period of time.

14. A method as in claim 13 wherein said predetermined period of time is selected in accordance with a set of one or more parameters of said check.

15. A method as in claim 14 wherein said one or more parameters are selected from the group of parameters consisting of: time the check was written, date the check was written, amount of the check, location of said financial institution, and other criteria for believing said check to be high risk.

16. A method as in claim 1 which further comprises the steps of:

issuing an exception report if said check has not been honored by said financial institution; and

automatically notifying one or more of said merchant, said merchant's bank, a check verification service, a check authorization service, and a collection firm.

17. A method as in claim 1 wherein said electronic data record comprises transaction information provided by an electronic device and information from said check.

18. A method as in claim 17 wherein at least some of said information from said check is detected by a MICR reader.

19. A method as in claim 17 wherein said electronic device comprises a POS terminal or a computer system controlling the transaction information for which payment is being made by said check.

* * * * *

FDC5000158



## U.S. PATENT NO. 5,175,682 TO HIGASHIYAMA ET AL.

U.S. Patent No. 5,175,682 ("the '682 patent"), entitled "Check System and Method Including Prioritizing Checks for Transmission to Banks for Processing," issued to Connie Higashiyama, William Melton and Ashok Narasimham on December 29, 1992 from an application filed December 14, 1990. I understand, based on the respective filing and issue dates of the '682 patent and the patents-in-suit, that the '682 patent constitutes prior art to the patents-in-suit under at least under 35 U.S.C. § 102(e).

The '682 patent discloses a method and structure for electronically processing checks presented to merchants by customers using a point-of-sale terminal in a manner that treats a check as the "equivalent of an electronic debit card." (2:43-50; 3:11-16; 6:10-12; 10:27-30.)[1] The point-of-sale terminal system described by the '682 patent is comprised of one or more point-of-sale terminals (3:13-16), each of which includes a MICR reader for reading magnetically-printed customer account information from the consumer's bank check (3:16-19; 10:24-26), a printer for "printing a sales slip, printing validation information on a check, or printing a check receipt" (3:25-28), and a keypad (3:66). The point-of-sale terminal is described as a "typical prior art electronic cash register, or a more sophisticated computer system," and both an alphanumeric keypad and a visual display are inherent in the system described by the '682 patent. (3:38:41.)

Point-of-sale terminals may be located in separate stores, linked by a central check processing system. (7:25:33.) "A merchant having multiple stores benefits in that a central location may be used for consolidating check data, thereby providing the benefit that a merchant's check processing facilities can be consolidated, if desired, and allow check processing to be accomplished in a timely manner without delays associated with physically transporting paper checks to the central location prior to electronically processing those checks." (*Id.*)

---

[1] Unless otherwise noted, all citations in this Exhibit are to the '682 patent.

## U.S. PATENT NO. 5,175,682 TO HIGASHIYAMA ET AL.

The '682 point-of-sale terminal is directly connected to a backroom central processing computer and, if desired, a modem. (3:33-36.) The backroom central processing computer is connected to a telecommunications unit capable of data communications with check clearing houses, as well as the "merchant's bank . . . the issuing bank . . . the merchant's collection agency, check authorization services, and check verification services." (7:55-8:2; *see also* 3:33-36.)

In the check processing method taught by the '682 patent, a customer presents a check to a merchant as payment, and the merchant uses the point-of-sale terminal's MICR reader to automatically read the customer's account information from the check. (3:45-50.) The point-of-sale terminal automatically provides additional information to create a complete transaction record, including the date and time, merchant DDA number, customer checking account number and routing information, check number, and other discretionary data the merchant wishes, such as the merchant's name, location and a summary of goods or services provided. (3:50-4:5.) The merchant enters the amount of the check using the terminal's keypad. (3:63-66.) The customer requires no separate check authorization card to utilize the point-of-sale electronic check processing system. (6:15-18.)

Using the data record created by the point-of-sale terminal, a merchant next compares the customer's checking account number to a positive customer file and/or a negative customer file that can be maintained by an external credit authorization or verification service. (4:14-22.) If authorization is declined because of negative information pertaining to the customer's account, the transaction may be cancelled. (4:22-25.) Transaction-level information may be stored by the backroom central processing computer. (6:50-53; 9:7-11, 16-19.)

The '682 patent teaches that if a transaction is authorized after consultation of positive and/or negative customer database files, the check is placed in the terminal printer and validation information, including the merchant's name and DDA number, the date and time of the transaction, and "language indicating that the check has been cancelled" is printed on the check. (4:26-43; 8:55-59.) Return of this validation information to the point-of-sale terminal indicates

U.S. PATENT NO. 5,175,682 TO HIGASHIYAMA ET AL.

that the paper check has been converted to an electronic transaction and data pertaining to the check routed for collection. (4:28-32 ("Such validation information serves as an indication that electronic data pertaining to this check has been routed for collection, and that the check may thus be considered 'cancelled.'").)

The merchant then returns the cancelled check to the customer. (4:54-57 ("The validated check is then returned to the customer for safekeeping, thus avoiding the need for the check to be physically transported through the system depicted in Figure 1 for ultimate return to the customer."); 7:16-20, 35-36; 8:60-62.) If the merchant desires, a separate receipt may be printed and given to the customer stating that payment was made by check and the check is being electronically processed. (4:61-68; 9:4-6.)

The '682 patent describes several methods of transmitting the electronic data record for processing, including adding the data record to a terminal file periodically uploaded by batch to the central processing computer, sending the data record to the central computer immediately for priority upload to the ACH or directly to the payor bank, or sending the data record directly from the point-of-sale terminal to a bank or clearing house in a real time basis. (5:1-7, 10-13, 18-20, 28-31, 37-46; 9:12-15.)

The '682 patent also describes a report-printing function whereby the central computer prints an "exception report" reflecting bad checks processed at the point-of-sale terminal. (5:47-52; 10:12-15.) Checks processed by the system described by the '682 patent that are dishonored by the issuing bank may be automatically reported by the system to the merchant's bank or collection agency and to check authorization and verification services. (7:55-8:2; 10:12-19.)

D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LML PATENT CORP., | |
| Plaintiff, | |
| v. | C.A. 04-858 (SLR) |
| TELECHECK SERVICES, INC.,<br>ELECTRONIC CLEARING HOUSE, INC.,<br>XPRESSCHEX, INC. and NOVA<br>INFORMATION SYSTEMS, INC., | |
| Defendants. | |

## JOINT PROPOSED CLAIM CONSTRUCTION STATEMENT

Pursuant to the Court's Rule 16 Scheduling Order in this matter, the Parties hereby submit the following claim charts to present their respective, proposed constructions of disputed claim terms and their proposed constructions of agreed claim terms in the patent-in-suit, namely, U.S. Patent No. 5,484,988 ("the '988 patent").

## Proposed Constructions of Disputed Claim Terms

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **any bank check** (claims 1, 8) | Any regular check used to draw funds from a normal bank or credit union checking account | any type of check drawn on a financial institution |
| **any consumer bank check** (claim 9) | Any regular check used to draw funds from a normal bank or credit union consumer checking account | same meaning as the phrase "any bank check" set forth above, with the added limitation that the check be "drawn against a consumer bank account" |
| **any** (claims 1, 8, 9) | LML believes that this term should not be separately construed from the entire element in which it appears in the claims, namely the "any bank check" or "any consumer bank check" language construed below. In any event, this plain English term needs no construction. | one or some indiscriminately of whatever kind |
| **consumer bank account information** (claims 1, 2, 3, 8, 9) | Information relating to a consumer's bank account including the MICR line (magnetic ink character recognition line) | only the ABA/transit routing number and bank account number |
| **without using the bank check as a negotiable instrument** (claim 1) | Where the paper check is used as a source of information, and is not accepted or processed | the bank check, at no time, takes on the status of a negotiable instrument |
| **without using the check as a negotiable instrument** (claim 8) | Where the paper check is used as a source of information, and is not accepted or processed | the check, at no time, takes on the status of a negotiable instrument |

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| without using a bank check as a negotiable instrument (claim 9) | Where the paper check is used as a source of information, and is not accepted or processed | the check, at no time, takes on the status of a negotiable instrument |
| subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations (claim 8) | Subsequently transmitting the information relating to the transaction to a bank for subsequent automated clearing house operations | electronically communicating with an automated clearing house for transferring funds electronically based upon the consumer bank account information obtained from any bank check presented at the point-of-sale |
| enabling automated clearing house communication for transferring funds (claims 1, 9) | Enabling communication with an automated clearing house for electronically transferring funds | electronically communicating with an automated clearing house for transferring funds electronically based upon the consumer bank account information obtained from any bank check presented at the point-of-sale |
| for the sole purpose (claims 2, 8 and 9) | For the only purpose | Defendants contend that this term needs no construction. |
| adapted to receive consumer bank account information from any bank check (claim 1) | adapted to receive consumer bank account information from any bank check | adapted to read consumer bank account information directly from any bank check |

2

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| means for reading magnetic ink character recognition numbers appearing on a consumer check (claim 2) | This limitation should be construed pursuant to 35 U.S.C. Section 112(6). The recited function is "reading magnetic ink character recognition numbers appearing on a consumer check." The structures in the '988 patent that perform that function is any mechanism such as a MICR check reader, optical character recognition ("OCR") equipment, a keyboard for manual entry, or equivalent. | This limitation should be construed pursuant to 35 U.S.C. Section 112(6). The recited function is "reading magnetic ink character recognition numbers appearing on a consumer check." The structures described in the '988 patent that perform that function are a MICR reader and optical character recognition equipment. |
| reading means for reading magnetic ink character recognition numbers on any consumer bank check (claim 9) | This limitation should be construed pursuant to 35 U.S.C. Section 112(6). The recited function is "reading magnetic ink character recognition numbers appearing on a consumer check." The structures in the '988 patent that perform that function is any mechanism such as a MICR check reader, optical character recognition ("OCR") equipment, a keyboard for manual entry, or equivalent. | This limitation should be construed pursuant to 35 U.S.C. Section 112(6). The recited function is "reading magnetic ink character recognition numbers on any consumer bank check." The structures described in the '988 patent that perform that function are a MICR reader and optical character recognition equipment. |
| verifying that account numbers were accurately read at the point of sale (claim 8) | Verifying that the account numbers from the check were read accurately at the point of sale terminal | visually confirming that account numbers were accurately read by reference to the source document |

3

## Proposed Constructions of Agreed Claim Terms

| Claim Term | Parties' Agreed Proposed Construction |
|---|---|
| consumer (claim 9) | person, business or corporation |
| second communication means enabling said central computer system to communicate with external databases and for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the bank check as a negotiable instrument (claim 1); | This function is written in means-plus-function format pursuant to 35 U.S.C. 112(6). |
| second communication means enabling said central computer system to communicate with external databases and for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using a bank check as a negotiable instrument (claim 9) | The recited function of this limitation is enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the [a] bank check as a negotiable instrument.

The structures disclosed in the patent for performing the recited function of this limitation are a modem, network interface, enhanced radio transmission interface, satellite communication interface or equivalent.[1] |
| automated clearing house (claims 1, 8, 9) | an automated clearing house including, but not limited to, the national U.S. clearing house sometimes referred to as the "ACH" |

4

---

[1] While the parties agree to the recited function of this claim element pursuant to 35 U.S.C. 112(6), the parties dispute the meaning of limitations within that function, as set forth in the Parties' Proposed Construction of Disputed Claim Terms and the parties' briefs.

DATED:  October 7, 2005

_/s/ Mary B. Matterer_
Richard K. Herrmann (I.D. No. 405)
Mary B. Matterer  (I.D. No. 2696)
MORRIS JAMES HITCHENS
& WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
302.888.6800
rherrmann@morrisjames.com
mmatterer@morrisjames.com

_Counsel for Plaintiff_
_LML Patent Corp._

_/s/ Timothy Devlin_
William J. Marsden, Jr. (I.D. No. 2247)
Timothy Devlin (I.D. No. 4241)
Sean Hayes (I.D. No. 4413)
FISH & RICHARDSON P.C.
919 North Market Street, Suite 1000
Wilmington, Delaware 19801
302.652.5070
marsden@fr.com
hayes@fr.com

_Counsel for Defendant_
_TeleCheck Services, Inc._

_/s/ Francis DiGiovanni_
Francis DiGiovanni (I.D. No. 3189)
CONNOLLY BOVE LODGE & HUTZ
LLP
The Nemours Building
1007 N. Orange Street
Wilmington, Delaware 19801
302.658.9141
fdigiovanni@cblh.com

_Counsel for Defendants_
_Electronic Clearing House, Inc._
_and Xpresschex, Inc._

_/s/ Richard D. Kirk (rk0922)_
Richard D. Kirk (I.D. No. 922)
THE BAYARD FIRM
222 Delaware Avenue, Suite 900
Wilmington, DE  19801
302.429.4208
rkirk@bayardfirm.com

_Counsel for Defendant_
_NOVA Information Systems, Inc._

5

# E

### INVALIDITY CLAIM CHART
### ANTICIPATION OF '988 PATENT BY HIGASHIYAMA
### (U.S. PATENT NO. 5,175,682)

| '988 PATENT | ANTICIPATION BY HIGASHIYAMA, INCLUDING 1990 ACH RULES AND 1990 NACHA OPERATING RULES INCORPORATED BY REFERENCE[1] |
|---|---|
| 1.  A checkwriting point of sale system comprising: | A system for processing checks presented at the point of sale.  (*See* col. 2, lines 43-46; col. 3, lines 11-14.) |
| a point of sale terminal adapted to receive consumer bank account information from any bank check; | Point of sale system 210 including a MICR reader 202 used for reading the magnetic account number printed on checks.  (*See* col. 3, lines 13-18.)<br><br>To the extent this claim is construed as being applicable to voided checks, ". . . the transit/routing number and account number can best be obtained and transcribed from the preprinting on a voided check."  (NACHA 016800; DK 000332.)  "The DFI Account number, the RDFI's customer identification, is obtained from the 'on-us' field of the MICR line of a voided check or deposit ticket."  (ECHO 0022759; DK 000220.) |
| a central computer system; | Backroom processor 204 to which one or more point of sale systems are connected. (*See* Figure 2; col. 3, lines 13-14, 29-33.)<br><br>"POS terminal 201 is connected to backroom processor 204 . . . ."  (Col. 3, lines 29-33.)<br><br>"A merchant having multiple stores benefits in that a central location may be used for consolidating check data . . . ."  (Col. 7, lines 25-27.) |
| first communications means integral to said point of sale terminal for electronically | POS terminal 201 (which is part of the point of sale system) is connected to the backroom |

---

[1]  Higashiyama incorporates by reference the "1990 ACH Rules" and the "1990 NACHA Operating Rules, Corporate Edition."  (Col. 6, lines 32-36).  Therefore, Higashiyama is treated as containing the complete disclosures of the "1990 ACH Rules" and the "1990 NACHA Operating Rules."  The 1991 ACH Rules (produced in this litigation as ECHO 0022652-0022861) contain annotations where changes were made to the 1990 ACH Rules.  (*See* ECHO 0022681.)  Portions of the 1991 Rules that were not amended or revised relative to 1990 have been referred to herein as evidence of the information set forth in the 1990 Rules.  There are also referenced pages from the 1990 Rules apparently supplied by NACHA to a third party.  The 1990 ACH Rules have been produced in this litigation as DK 000128-930.

## INVALIDITY CLAIM CHART
### PART 3 OF 3

| '988 PATENT | ANTICIPATION BY HIGASHIYAMA, INCLUDING 1990 ACH RULES AND 1990 NACHA OPERATING RULES INCORPORATED BY REFERENCE[1] |
|---|---|
| communicating with the central computer system; | processor 204.  (*See* col. 3, lines 29-30.) |
| | "POS terminal 201 is connected to backroom processor 204 . . . ."  (Col. 3, lines 29-33.) |
| memory means integral to said point of sale terminal for temporarily storing the consumer bank account information | The MICR account information and transaction information is gathered and stored. (*See* col. 2, lines 56-58.)<br><br>"POS terminal 201 then provides additional information in order to create a data record for this transaction which is being paid by check." (Col. 3, lines 50-53.)<br><br>Data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201.  (*See* col. 3, lines 55-62; col. 5, lines 1-4.) |
| the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; | Backroom processor 204 receives data records from the POS terminal 201. (*See* col. 5, lines 1-10.)  Since the backroom processor 204 is connected to one or more point of sale systems 210, each having a POS terminal 201 that supplies data records, the backroom processor 204 receives data records from one or more (plurality) of point of sale systems 210.<br><br>"A merchant having multiple stores benefits in that a central location may be used for consolidating check data . . . ."  (Col. 7, lines 25-27.) |
| the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the bank check as a negotiable instrument. | Backroom processor 204 will take the data records it has accumulated and upload them to a clearing house. (*See* col. 5, lines 11-13.)  The data record is also used to verify check authorization by being compared to a file. (*See* col. 4, lines 14-24.)  The information from the paper check is electronically processed and the check is returned to the customer at the point of sale. (*See* col. 4, lines 54-57.) |
| 2.  The checkwriting point of sale system | Point of sale system 210 including a MICR |

INVALIDITY CLAIM CHART
PART 3 OF 3

| '988 PATENT | ANTICIPATION BY HIGASHIYAMA, INCLUDING 1990 ACH RULES AND 1990 NACHA OPERATING RULES INCORPORATED BY REFERENCE[1] |
|---|---|
| according to claim 1 wherein said point of sale terminal further includes means for reading magnetic ink character recognition numbers appearing on a consumer check for the sole purpose of identifying and reading the consumer bank account information. | reader 202 used for reading the magnetic account number printed on checks. (*See* col. 3, lines 13-18.)<br><br>To the extent this claim is construed as being applicable to voided checks, "... the transit/routing number and account number can best be obtained and transcribed from the preprinting on a voided check." (NACHA 016800; DK 000332.) |
| 4. The checkwriting point of sale system according to claim 1 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip. | Data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201. (*See* col. 3, lines 55-62; col. 5, lines 1-4.)<br><br>Printer 203 for printing a sales slip. (*See* col. 3, lines 25-27.)<br><br>The MICR account information and transaction information is gathered and stored. (*See* col. 2, lines 56-58.)<br><br>"POS terminal 201 then provides additional information in order to create a data record for this transaction which is being paid for by check." (Col. 3, lines 50-53.)<br><br>"Printer 203 is used by POS terminal 201 for a variety of tasks, if desired, for example, printing a sales slip, printing validation information on a check, or printing a check receipt . . . ." (Col. 3, lines 25-27.)<br><br>"Receiver Authorization and Agreement – Except as provided in subsection 2.1.3, such Receiver shall have authorized such Originator to initiate such entry to such Receiver's account . . . . In the case of debit entries to a consumer account pursuant to a standing authorization, such authorization shall be in writing." (ECHO |

3

## INVALIDITY CLAIM CHART
### PART 3 OF 3

| '988 PATENT | ANTICIPATION BY HIGASHIYAMA, INCLUDING 1990 ACH RULES AND 1990 NACHA OPERATING RULES INCORPORATED BY REFERENCE[1] |
|---|---|
| | 0022688; DK 000150.) |
| | "Consumer Accounts – Copy of Debit Authorization – In the case of debit entries to a consumer account pursuant to a standing authorization, an Originator shall provide each Receiver with a copy of the Receiver's written authorization." (ECHO 0022694; DK 000156.) |
| | "Records – An Originator that initiates an entry to a Receiver's account shall retain an original or a microfilm or [similar] copy of each written authorization of such Receiver authorizing the initiation of such entry for a period of two years . . ., or, in the case of a single entry authorization, after initiating such entry . . . ." (ECHO 0022694; DK 000156.) This provision applies to POS entries absent separate contractual arrangements between an RDFI and an ODFI. (ECHO 0022694; DK 000156.) |
| | A sample form for "Preauthorized Payments (Debits)" in consumer application is found at NACHA 016802 and DK 000334. |
| 5.  The checkwriting point of sale system according to claim 1 further comprising a resident third party database wherein consumer banking account status information is stored, the consumer banking account status information being used for verification of consumer banking account status. | "[T]he data record is then used to verify check authorization, for example, by being compared to a positive file (which lists all allowable checking account numbers), or more likely against a negative file such as provided by SCAN of Seattle, Washington, TeleCheck of Denver, Colorado or Telecredit of Florida . . . ." (Col. 4, lines 21.) |
| 6. The checkwriting point of sale system according to claim 1 wherein the central computer system further comprises a system subscriber database, the system subscriber database comprising information regarding merchants and service providers that are authorized to use the checkwriting point of sale system. | "[T]he data record is then used to verify check authorization, for example, by being compared to a positive file (which lists all allowable checking account numbers), or more likely against a negative file such as provided by SCAN of Seattle, Washington, TeleCheck of Denver, Colorado or Telecredit of Florida . . . ." (Col. 4, lines 21.) |

INVALIDITY CLAIM CHART
PART 3 OF 3

| '988 PATENT | ANTICIPATION BY HIGASHIYAMA, INCLUDING 1990 ACH RULES AND 1990 NACHA OPERATING RULES INCORPORATED BY REFERENCE[1] |
|---|---|
| | "a check recipient, such as a merchant, utility billing department, and the like, utilize hardware and software for quickly gathering data from checks received in order to allow prompt processing of those checks." (Col. 2, lines 47-50.)<br><br>A list of merchants eligible to utilize the system is inherent. |
| 8.  A checkwriting point of sale process comprising: | A system for processing checks presented at the point of sale. (*See* col. 2, lines 43-46; col. 3, lines 11-14.) |
| (a)  presenting any bank check specimen to a point of sale terminal located at a merchant or service provider; | "a check recipient, such as a merchant, utility billing department, and the like, utilize hardware and software for quickly gathering data from checks received in order to allow prompt processing of those checks." (Col. 2, lines 47-50.)<br><br>"When the customer provides a check, however, the check is read by MICR reader 202 and the account information is provided to POS terminal 201." (Col. 3, lines 47-50.) |
| (b)  reading the magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument. | Point of sale system 210 including a MICR reader 202 used for reading the magnetic account number printed on checks.  (*See* col. 3, lines 13-18.)<br><br>To the extent this claim is construed as being applicable to voided checks,  "the transit/routing number and account number can best be obtained and transcribed from the preprinting on a voided check."  (NACHA 016800; DK 000332.)<br><br>"The DFI Account number, the RDFI's customer identification, is obtained from the 'on-us' field of the MICR line of a voided check or deposit ticket." (ECHO 0022759; DK 000220.) |
| (c)  storing the consumer bank account | The MICR account information and transaction |

5

## INVALIDITY CLAIM CHART
### PART 3 OF 3

| '988 PATENT | ANTICIPATION BY HIGASHIYAMA, INCLUDING 1990 ACH RULES AND 1990 NACHA OPERATING RULES INCORPORATED BY REFERENCE[1] |
|---|---|
| information obtained from the check and verifying that account numbers were accurately read at the point of sale terminal; | information is gathered and stored. (*See* col. 2, lines 56-58.)<br><br>"POS terminal 201 then provides additional information in order to create a data record for this transaction which is being paid by check." (Col. 3, lines 50-53.)<br><br>"Once authorization is provided (if the authorization step is performed), next the check is placed in printer 203 and validation information is printed on the check, if desired. Such validation information serves as an indication that electronic data pertaining to this check has been routed for collection . . . ." (Col. 4, lines 25-31.)<br><br>"The RDFI <u>must</u> verify the accuracy of the account number and should also verify the account type (checking or savings)." (ECHO 0022936 (emphasis in original); *see also* DK 000406-407.) |
| (d) providing transaction event information to the point of sale terminal; | The amount the check is written for is provided by the merchant via the POS keypad. (*See* col. 3, lines 64-66.)<br><br>Point of sale system 210 including a MICR reader 202 used for reading the magnetic account number printed on checks. (*See* col. 3, lines 13-18.)<br><br>To the extent this claim is construed as being applicable to voided checks, "the transit/routing number and account number can best be obtained and transcribed from the preprinting on a voided check." (NACHA 016800; DK 000332.) |
| (e) transmitting the transaction event information and consumer bank account information to a central computer system; | Backroom processor 204 receives data records from the POS terminal 201. (*See* col. 5, lines 1-10.) |

INVALIDITY CLAIM CHART
PART 3 OF 3

| '988 PATENT | ANTICIPATION BY HIGASHIYAMA, INCLUDING 1990 ACH RULES AND 1990 NACHA OPERATING RULES INCORPORATED BY REFERENCE[1] |
|---|---|
|  | "POS terminal 201 is connected to backroom processor 204 . . . ." (Col. 3, lines 29-33.) |
| (f) storing the transaction event information and consumer banking account information; and | "The data record thus created by POS terminal 201 can be added to a data file maintained by POS terminal 201 . . . or POS terminal 201 sends the data record to backroom processor 204 . . . ." (Col. 5, lines 1-7.) |
| (g) subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations. | Backroom processor 204 uploads the data records to a clearing house. (*See* col. 5, lines 11-13.) |
| 9.  A checkwriting point of sale system comprising: | A system for processing checks presented at the point of sale. (*See* col. 2, lines 43-46; col. 3, lines 11-14.) |
| a point of sale terminal adapted to receive consumer bank account information; | Point of sale system 210 including a MICR reader 202 used for reading the magnetic account number printed on checks. (*See* col. 3, lines 13-18.) |
| a central computer system; | Backroom processor 204 to which one or more point of sale systems are connected. (*See* Figure 2; col. 3, lines 13- 14, 29-33.)<br><br>"POS terminal 201 is connected to backroom processor 204 . . . ." (Col. 3, lines 29-33.) |
| first communications means integral to said point of sale terminal for electronically communicating with the central computer system; and | POS terminal 201 (which is part of the point of sale system) is connected to the backroom processor 204. (*See* col. 3, lines 29-30.)<br><br>"POS terminal 201 is connected to backroom processor 204 . . . ." (Col. 3, lines 29-33.) |
| memory means integral to said point of sale terminal for temporarily storing the consumer bank account information; | The MICR account information and transaction information is gathered and stored. (*See* col. 2, lines 56-58.)<br><br>"POS terminal 201 then provides additional information in order to create a data record for this transaction which is being paid by check." (Col. 3, lines 50-53.)<br><br>Data record, including customer checking account number and routing information and |

7

INVALIDITY CLAIM CHART
PART 3 OF 3

| '988 PATENT | ANTICIPATION BY HIGASHIYAMA, INCLUDING 1990 ACH RULES AND 1990 NACHA OPERATING RULES INCORPORATED BY REFERENCE[1] |
|---|---|
| | check amount, can be added to a data file maintained by POS terminal 201. (*See* col. 3, lines 55-62; col. 5, lines 1-4.) |
| the point of sale terminal comprising reading means for reading magnetic ink character recognition numbers on any consumer bank check for the sole purpose of eliciting consumer bank account information; | MICR reader 202 reads the account information on the check. (*See* col. 3, lines 48-50.)<br><br>To the extent this claim is construed as being applicable to voided checks, "the transit/routing number and account number can best be obtained and transcribed from the preprinting on a voided check." (NACHA 016800; DK 000332.)<br><br>"The DFI Account number, the RDFI's customer identification, is obtained from the 'on-us' field of the MICR line of a voided check or deposit ticket." (ECHO 0022759; DK 000220.) |
| the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; | Backroom processor 204 receives data records from the POS terminal 201. (*See* col. 5, lines 1-10.)<br><br>"A merchant having multiple stores benefits in that a central location may be used for consolidating check data . . . ." (Col. 7, lines 25-27.)<br><br>Since the backroom processor 204 is connected to one or more point of sale systems 210, each having a POS terminal 201 that supplies data records, the backroom processor 204 receives data records from one or more (plurality) of point of sale systems 210. |
| the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using a bank check as a negotiable | Backroom processor 204 will take the data records it has accumulated and upload them to a clearing house. (*See* col. 5, lines 11-13.) The data record is also used to verify check authorization by being compared to a file. (*See* col. 4, lines 14-24.) Further, the information from the paper check is electronically processed, and the check is returned to the customer at the |

INVALIDITY CLAIM CHART
PART 3 OF 3

| '988 PATENT | ANTICIPATION BY HIGASHIYAMA, INCLUDING 1990 ACH RULES AND 1990 NACHA OPERATING RULES INCORPORATED BY REFERENCE[1] |
|---|---|
| instrument. | point of sale. (*See* col. 4, lines 54-57.) |
| 10.  The checkwriting point of sale system according to claim 9 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip. | The MICR account information and transaction information is gathered and stored. (*See* col. 2, lines 56-58.)<br><br>Printer 203 for printing a sales slip. (*See* col. 3, lines 25-27.)<br><br>Data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201.  (See col. 3, lines 55-62; col. 5, lines 1-4.)<br><br>"POS terminal 201 then provides additional information in order to create a data record for this transaction which is being paid for by check." (Col. 3, lines 50-53.)<br><br>"Printer 203 is used by POS terminal 201 for a variety of tasks, if desired, for example, printing a sales slip . . . ." (Col. 3, lines 25-27.)<br><br>"Receiver Authorization and Agreement – Except as provided in subsection 2.1.3, such Receiver shall have authorized such Originator to initiate such entry to such Receiver's account . . . . In the case of debit entries to a consumer account pursuant to a standing authorization, such authorization shall be in writing." (ECHO 0022688; DK 000150.)<br><br>"Consumer Accounts – Copy of Debit Authorization – In the case of debit entries to a consumer account pursuant to a standing authorization, an Originator shall provide each Receiver with a copy of the Receiver's written authorization." (ECHO 0022694; DK 000156.)<br><br>"Records – An Originator that initiates an entry to a Receiver's account shall retain an original |

9

INVALIDITY CLAIM CHART
PART 3 OF 3

| '988 PATENT | ANTICIPATION BY HIGASHIYAMA, INCLUDING 1990 ACH RULES AND 1990 NACHA OPERATING RULES INCORPORATED BY REFERENCE[1] |
|---|---|
| | or a microfilm or [similar] copy of each written authorization of such Receiver authorizing the initiation of such entry for a period of two years . . ., or, in the case of a single entry authorization, after initiating such entry . . . ." (ECHO 0022694; DK 000156.)  This provision applies to POS entries absent separate contractual arrangements between an RDFI and an ODFI.  (ECHO 0022694; DK 000156.)<br><br>A sample form for "Preauthorized Payments (Debits)" in consumer application is found at NACHA 016802 and DK 000334. |
| 11. The checkwriting point of sale system according to claim 9 further comprising a resident third party database wherein consumer banking account status information is stored, the consumer banking account status information being used for verification of consumer banking account status. | "[T]he data record is then used to verify check authorization, for example, by being compared to a positive file (which lists all allowable checking account numbers), or more likely against a negative file such as provided by SCAN of Seattle, Washington, TeleCheck of Denver, Colorado or Telecredit of Florida . . . ." (Col. 4, lines 21.) |
| 14.  The checkwriting point of sale system according to claim 4, wherein the point of sale terminal further comprises means for automatically logging a point of sale terminal location and transaction date, time, and sales amount. | "POS terminal 201 then provides additional information in order to create a data record for this transaction which is being paid for by check." (Col. 3, lines 50-53.) |
| 16.  The checkwriting point of sale process of claim 8, further comprising:<br>(A) printing a transaction event sales slip following the sending of an approval message; and<br>(B) executing of the sales slip by the consumer as proof of bank account access authorization. | "Printer 203 is used by POS terminal 201 for a variety of tasks, if desired, for example, printing a sales slip, printing validation information on a check, or printing a check receipt . . . ." (Col. 3, lines 25-27.)<br><br>"Receiver Authorization and Agreement – Except as provided in subsection 2.1.3, such Receiver shall have authorized such Originator to initiate such entry to such Receiver's account . . . . In the case of debit entries to a consumer account pursuant to a standing authorization, |

INVALIDITY CLAIM CHART
PART 3 OF 3

| '988 PATENT | ANTICIPATION BY HIGASHIYAMA, INCLUDING 1990 ACH RULES AND 1990 NACHA OPERATING RULES INCORPORATED BY REFERENCE[1] |
|---|---|
| | such authorization shall be in writing." (ECHO 0022688; DK 000150.) |
| | "Consumer Accounts – Copy of Debit Authorization – In the case of debit entries to a consumer account pursuant to a standing authorization, an Originator shall provide each Receiver with a copy of the Receiver's written authorization." (ECHO 0022694; DK 000156.)<br><br>"Records – An Originator that initiates an entry to a Receiver's account shall retain an original or a microfilm or [similar] copy of each written authorization of such Receiver authorizing the initiation of such entry for a period of two years . . ., or, in the case of a single entry authorization, after initiating such entry . . . ." (ECHO 0022694; DK 000156.) This provision applies to POS entries absent separate contractual arrangements between an RDFI and an ODFI. (ECHO 0022694; DK 000156.)<br><br>A sample form for "Preauthorized Payments (Debits)" in consumer application is found at NACHA 016802 and DK 000334. |
| 18. The checkwriting point of sale process of claim 8, further comprising automatically logging point of sale terminal location information and transaction date, time, and sales amount information into the point of sale terminal. | "POS terminal 201 then provides additional information in order to create a data record for this transaction which is being paid for by check." (Col. 3, lines 50-53.) |

F

# CONFIDENTIAL DOCUMENT

G

# CONFIDENTIAL
# DOCUMENT

H

# CONFIDENTIAL DOCUMENT

I

08/257390

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In Re Application of Robert H. Hills and Henry R. Nichols

Serial No.                          Group Art Unit:

Filed:  Herewith                    Examiner:

For:    CHECKWRITING POINT OF SALE SYSTEM

\*     \*     \*     \*     \*

PRELIMINARY AMENDMENT

\*     \*     \*     \*     \*

Commissioner of Patents and Trademarks
Washington, D.C. 20231

Sir:

    Applicants hereby submit the following preliminary amendment
to the above captioned patent application.

In the Specification:

    Please amend the specification as follows:

    Page 3, between lines 2 and 3, insert the following
paragraphs:

    -- U.S. Patent No. 4,270,042 to Case discloses a point of sale
system that requires a consumer to prepay a sum of money into a
special account that is accessed only by the system.  This amount
is inscribed on the card, and when a transaction is made using the
system, the amount of the transaction is punched out of a
designated area on the card.  This amount, along with a signature
and other information, is supplied on a draft negotiable
instrument, which is given to the merchant at the time of the
transaction.  Thus, the Case system does away with the use of bank
checks in effecting the transacion, but requires the use of

LML-EP 000170

specialized prepaid draft negotiable instruments that must be surrendered to the merchant.

U.S. Patent No. 4,823,264 to Deming discloses a home banking system that can be used to transfer funds to different payees in satisfaction of debts incurred through previous purchases, use of utilities, etc. The system is consumer driven; that is, it is contemplated for use by the payor on a home personal computer. While the Deming system does away with the use of bank checks, account and other information must be keyed into the system. The Deming system cannot be used to read account and other information directly from an ordinary bank check and has no use for bank checks as instruments other than negotiable paper. Further, the Deming system cannot be used to transfer funds at the time of purchase and is not workable at the point of sale; the system can only be used to pay debts that have been incurred in the past and have accumulated. --.

Page 3, between lines 16 and 17, insert the following paragraph:

-- Further, some of the currently used systems described above require the use of a bank check as a negotiable instrument which must be surrendered to a merchant. Some of the systems do away with the use of a bank check altogether, but require a debit card or a specialized draft instrument to be used only with the particular system. None of these systems completely does away with the need and use for a negotiable draft instrument while using the consumer's bank check for identification and verification only. It

2

is therefore an objective of the present invention to provide such a system. ╫

Page 4, line 6, before "The system is intended" insert --/In contrast to known systems, the present invention is a merchant driven system that can be used to process a transaction at the point of sale and at the time of purchase. ⊥▾.

Page 8, line 2, delete "as a means of conducting" and insert ╫ as negotiable instruments in effecting the ╫.

In the Claims:

Please cancel claims 5 and 10.

Please amend the remaining claims as follows:

1.    (Amended) A checkwriting point of sale system comprising: a point of sale terminal adapted to receive consumer bank account information [and further adapted to accept such information from consumer cards on which the bank account information is stored];

a central computer system;

[a] first communications means integral to said point of sale terminal for electronically communicating with [a] the central computer system;

[a] memory means integral to said point of sale terminal for [allowing the temporary storage of] temporarily storing the consumer bank account information [from the consumer cards];

the central computer system having second communication means [capability adapted to receive] for receiving information from a plurality of said point of sale terminals;

3

LML-EP 000172

the central computer system <u>second</u> communication means [allowing] <u>enabling</u> said central computer system to communicate with external [data bases] <u>databases</u> for <u>performing a</u> consumer bank account status [verification] <u>search</u> and [allowing] <u>further enabling</u> automated clearing house communication [with banking institutions] for [purposes of transfer of] <u>transferring</u> funds <u>without using a bank check as a negotiable instrument</u>.

2.    (Amended) [A] <u>The</u> checkwriting point of sale system according to claim 1 wherein said point of sale terminal [is] further [adapted to read MICR] <u>includes means for reading magnetic ink character recognition</u> numbers appearing on a consumer check [and wherein said consumer check is used to identify] <u>for the sole purpose of identifying and reading</u> the consumer bank account information.

3.    (Amended) The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further comprises an alphanumeric display <u>means</u> [adapted to receive] <u>for receiving said</u> consumer bank account information from the memory means [of the point of sale terminal such that said point of sale terminal is adapted to display] <u>and for displaying</u> the consumer bank account information.

4.    (Amended) The checkwriting point of sale system according to claim 1 further comprising a printer <u>means for</u> [adapted to receive] <u>receiving</u> information from the memory means of the point of sale terminal [to create point of] <u>and for generating a transaction event</u> sale slip[s].

4

31

LML-EP 000173

5 6. (Amended) The checkwriting point of sale system according
to claim 1 further comprising a resident third party [data base]
database wherein consumer banking account status information is
stored, the consumer banking account status information being
[which is] used for verification of consumer banking account
status.

7. (Amended) The checkwriting point of sale system according
to claim 1 wherein the central computer system further comprises a
system subscriber [data base] database, the system subscriber
database comprising information regarding merchants and service
providers that are authorized to use the checkwriting point of sale
system.

8. (Amended) The checkwriting point of sale system according
to claim 7 wherein the central computer system further comprises a
database comprising information regarding consumers [approved to
use the checkwriting point of sale system] whose consumer banking
account status is not verified as bad.

9. (Amended) A checkwriting point of sale process comprising
the steps of:

    a)   presenting a bank check specimen to a point of sale
terminal located at a merchant or service provider,

    b)   reading the [MICR] magnetic ink character
recognition number information on the check for the sole purpose of
obtaining consumer bank account information,

5