IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LML PATENT CORP.,

        Plaintiff,

    v.

TELECHECK SERVICES, INC.,
ELECTRONIC CLEARING HOUSE, INC.,
XPRESSCHEX, INC. and NOVA
INFORMATION SYSTEMS, INC.,

        Defendants.

C.A. 04-858 (SLR)

**PUBLIC VERSION**

---

**TELECHECK'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR
SUMMARY JUDGMENT OF NON-INFRINGEMENT**

William J. Marsden (#2247)
Timothy Devlin (#4241)
Tara D. Elliott (#4483)
FISH & RICHARDSON P.C
919 N. Market Street, Suite 1100
Wilmington, DE 19899-1114

*Attorneys for TeleCheck Services, Inc*

Dated: October 28, 2005

Public Version Filed: November 4, 2005

# TABLE OF CONTENTS

<u>Page</u>

I.    NATURE AND STAGE OF PROCEEDINGS ...................................................1

II.   SUMMARY OF ARGUMENT ....................................................................1

III.  STATEMENT OF FACTS .........................................................................3

   A.   The '988 Patent Claims - Common to All Defendants ...........................3

   B.   The '988 Patent System and Prior Art Systems -
        Common to All Defendants .................................................................5

   C.   Prosecution History of the '988 Patent - Common to All
        Defendants ......................................................................................6

        1.   The "Sole Purpose" Limitations ................................................6

        2.   The "Negotiable Instrument" Limitations ....................................7

        3.   The "Any Bank Check" Limitations .............................................8

        4.   Applicants' Amendments and Arguments
             Regarding the "Any Bank Check," "Negotiable
             Instrument," and "Sole Purpose" Limitations
             Secured Allowance of the Claims ..............................................8

   D.   TeleCheck's Accused Electronic Check Acceptance
        Service Works Differently than the System and Method
        of the '988 Patent .............................................................................9

IV.   ARGUMENT .......................................................................................13

   A.   Legal Standards for Summary Judgment .............................................13

   B.   Legal Standards for Determining Patent Infringement ..........................13

   C.   TeleCheck Does Not Infringe Because the ECA Service
        Does Not Conduct Electronic Checking Transactions
        Using "Any Bank Check" ..................................................................15

        1.   The Asserted Claims Require Conducting
             Electronic Transactions Using "Any Bank
             Check" .................................................................................15

        2.   NACHA Rules Governing "Point of Purchase"
             Transactions Preclude Infringement of the "Any
             Bank Check" Limitations ........................................................16

i

3.  TeleCheck's ECA Service Does Not Conduct Electronic Transactions Using "Any Bank Check" as Literally Recited by the Claims .................................18

4.  Prosecution History Estoppel Prohibits Any Scope of Equivalents with the "Any Bank Check" Limitations ........................................................19

D.  TeleCheck Does Not Infringe Because the ECA Service Does Not Conduct Electronic Checking Transactions "Without Using the [Bank] Check as a Negotiable Instrument" ..........................................................22

1.  The Asserted Claims Require Conducting Electronic Transactions where "the Check, at No Time, Takes on the Status of a Negotiable Instrument" ...................................................................22

2.  TeleCheck's ECA Service Does Not Meet the "Negotiable Instrument" Limitation as Literally Recited by the Claims Because the Check Takes on the Status of Negotiable Instrument ............................22

3.  Prosecution History Estoppel Prohibits Any Scope of Equivalents with the "Negotiable Instrument" Limitations ...............................................25

E.  TeleCheck Does Not Infringe Because the ECA Service Does Not Read the Check for the "Sole Purpose" of Obtaining "Consumer Bank Account Information" .............................27

V.  CONCLUSION...........................................................................28

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Bai v. L & L Wings, Inc.,*
  160 F.3d 1350 (Fed. Cir. 1998)..................................................................13

*Desper Products, Inc. v. QSound Labs, Inc.,*
  157 F.3d 1325 (Fed. Cir. 1998)..................................................................13

*Dolly, Inc. v. Spalding & Evenflo Cos., Inc.,*
  16 F.3d 394 (Fed. Cir. 1994)......................................................................15

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,*
  535 U.S. 722 (2002)..........................................................................passim

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,*
  344 F.3d 1359 (Fed. Cir. 2003)............................................................21, 26

*Glaxo Wellcome, Inc. v. Impax Laboratoriess, Inc.,*
  356 F.3d 1348 (Fed. Cir. 2004)....................................................20, 26, 27

*Johnston v. IVAC Corp.,*
  885 F.2d 1574 (Fed. Cir. 1989)..................................................................14

*K-2 Corp. v. Salomon S.A.,*
  191 F.3d 1356 (Fed. Cir. 1999)..................................................................14

*KCJ Corp. v. Kinetic Concepts, Inc.,*
  223 F.3d 1351 (Fed. Cir. 2000)..................................................................13

*Moore U.S.A., Inc. v. Standard Register Co.,*
  229 F.3d 1091 (Fed. Cir. 2000), *cert denied,* 532 U.S. 1008 (2001)............15

*NCR Corp. v. Palm, Inc.,*
  217 F. Supp. 2d 491 (D. Del. 2002)............................................................13

*Novartis Pharm. Corp. v. Eon Laboratories Manufacturing, Inc.,*
  234 F. Supp. 2d 464 (D. Del. 2002), *aff'd,* 363 F.3d 1306 (Fed. Cir. 2004)...............15

*Phillips Petroleum Co. Huntsman Polymers Corp.,*
  157 F.3d 866 (Fed. Cir. 1998)....................................................................14

*Pioneer Magnetics, Inc. v. Micro Linear Corp.,*
  330 F.3d 1352 (Fed. Cir. 2003)............................................................20, 26

*Searfoss v. Pioneer Consolidated Corp.,*
  374 F.3d 1142 (Fed. Cir. 2004)............................................................21, 26

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
    247 F.3d 1316 (Fed. Cir. 2001)............................................................13, 14

*Terlep v. Brinkmann Corp.*,
    418 F.3d 1379 (Fed. Cir. 2005)..............................................................21, 26

*Warner-Jenkinson Co. Inc. v. Hilton-Davis Chemical Co.*,
    520 U.S. 17 (1997)..........................................................14, 19, 21, 25, 26

**RULES STATUTES**

U.C.C. §3-104............................................................................................10

Fed. R. Civ. P. 56(c) ................................................................................13

## I.    NATURE AND STAGE OF PROCEEDINGS

This is a patent infringement litigation initiated by LML Patent Corporation ("LML") against defendants TeleCheck Services, Inc. ("TeleCheck"), Electronic Clearing House, Inc. ("ECHO"), XpressChex, Inc. ("XpressChex") and Nova Information Systems, Inc ("Nova") (collectively, "Defendants"). The patent in suit is U.S. Patent No. 5,484,988 ("the '988 patent," Ex. A). Fact and expert discovery has concluded, and claim construction briefing is complete. TeleCheck submits this opening brief in support of its Motion for Summary Judgment of Non-Infringement.

Because Defendants' accused products and services are not identical, Defendants are submitting separate motions for summary judgment of non-infringement. To minimize overlap, however, Defendants have coordinated regarding issues that do not relate to the individual features of the accused systems. Accordingly, a number of sections below are set forth identically in each Defendant brief, for example facts related to the '988 patent and its prosecution history, and related discussion of prosecution history estoppel. For clarity, each of the sections common to Defendants' briefs includes an introductory footnote to that effect.

## II.    SUMMARY OF ARGUMENT

1.    The '988 patent generally relates to a specific system and method for processing electronic check transactions at the check-out counter, or "point of sale." There are two bases for non-infringement that relate to every asserted claim. First, all of the asserted claims require that the check processing system of the '988 patent be capable of functioning with "any bank check" or "any consumer bank check." Second, each asserted claim requires that the system and method function "without using the [bank] check as a negotiable instrument." These limitations are absent from TeleCheck's accused Electronic Check Acceptance Service ("ECA Service").

2.    With respect to the first issue, each independent claim of the '988 patent recites a capability to conduct transactions using "any bank check" or "any consumer

1

bank check." As set forth in Defendants' joint claim construction, these limitations require the ability to process electronic transactions at the point of sale using "*any* bank check" or "*any* consumer bank check," as expressly recited in the claims. In contrast to these requirements, the TeleCheck ECA Service has no such capability. In fact, industry rules governing this type of electronic check transaction expressly prohibit the use of certain kinds of checks, for example corporate checks or foreign checks. TeleCheck adheres to these rules, and therefore cannot infringe the "any bank check" limitations and "any consumer bank check" limitations.

      3.    With respect to the second issue, every claim requires that transactions occur "without using the check as a negotiable instrument" (or corresponding limitations). As set forth in Defendants' claim construction briefing, these limitations are properly construed to require that the check *never take on the status* of a negotiable instrument. Again, TeleCheck's ECA Service fails to meet this limitation. Instead, consumers at the point of sale are required to complete and sign the check prior to handing it to the merchant, giving the check the status of a negotiable instrument. This treatment of the check distinguishes the TeleCheck ECA Service with the '988 patent. For example, while filling out and signing the check slows down the overall process, it allows the merchant to simply keep the check as paper when required in many circumstances.

      4.    As a matter of law, the doctrine of equivalents is precluded on both of these issues. The "any bank check" limitations and the "negotiable instrument" limitations were added to each independent claim during prosecution. Both sets of amendments narrowed the claims in order to overcome rejections based on the prior art. The Applicants also expressly relied on each limitation in arguing for allowance of the claims over the prior art. The *Festo* presumption barring equivalents clearly applies, and it is equally clear that none of the limited *Festo* exceptions is present here. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 740-41 (2002). Accordingly,

LML should be precluded from seeking any scope of equivalents with respect to these limitations.

5.    Claims 2, 8, 9, 10, 11, 16 and 18 each require reading the MICR information off the check for the "sole purpose" of obtaining the consumer bank account information. As set forth in Defendants' claim construction briefing, consumer bank account information is limited to only the ABA/transit routing number and the bank account number, not the number of the check itself (the "check serial number"). There is no dispute that rules governing these types of transactions require inclusion of the check serial number, and so there can be no literal infringement. The "sole purpose" limitation was also added to the claims during prosecution, and *Festo* precludes any scope of equivalents.

## III.    STATEMENT OF FACTS

### A.    The '988 Patent Claims - Common to All Defendants

The '988 patent generally describes a system and method for converting paper checks to electronic transactions at the point of sale, using the check "as the basic source of identification of the individual and of the individual's bank and whereby the bank account is debited." (Ex. A at 1:13-15.)[1] The '988 patent claims were not allowed until *after* the claims were narrowed to recite conducting transactions "without using the check as a negotiable instrument" (or corresponding language), and further narrowed to recite the capability to transfer funds using account information from "any bank check" or "any consumer bank check." The '988 patent claims therefore require very specific features not present in TeleCheck's ECA product.

The '988 patent includes three independent claims, numbered 1, 8 and 9. Claim 1 is representative:

---

[1] Exhibits cited in this brief are attached to the co-filed Declaration of Timothy Devlin in Support of TeleCheck's Motion for Summary Judgment of Non-Infringement. Citations to patent text in this brief are of the form x:y, where "x" represents the column number and "y" the line number.

1.    A checkwriting point of sale system comprising:

a point of sale terminal adapted to receive consumer bank account information from *any bank check*;

a central computer system;

first communications means integral to said point of sale terminal ~~for electronically communicating with the central computer system;~~

memory means integral to said point of sale terminal for temporarily storing the consumer bank account information;

the central computer system having second communication means for receiving information from a plurality of said point of sale terminals;

the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further *enabling automated clearing house communication for transferring funds without using the bank check as a negotiable instrument*.

(*Id.* at 11:36-56.)[2]  An "automated clearing house" ("ACH") referred to in claim 1 is a network of entities, typically financial institutions, that work together to electronically transfer funds between bank or checking accounts.

Claims 8 and 9 recite limitations similar to those highlighted in claim 1.  Claim 8 is a process claim, and recites "presenting any bank check specimen" to a point of sale terminal, reading magnetic ink numbers "without using the check as a negotiable instrument," and transmitting transaction information for "subsequent automated clearing house operations."  (*Id.* at 12:21-42.)  Claim 9 is a system claim, and recites means for reading magnetic ink numbers on "any consumer bank check," and means for "enabling automated clearinghouse communication for transferring funds without using a bank check as a negotiable instrument."  (*Id.* at 12:43-67.)

As set forth in Defendants' briefing regarding claim construction, the "any bank check" limitations should be construed to require receiving information from *any* bank check or *any* consumer bank check and transferring funds using information from any

4

bank check. The "negotiable instrument" limitations should be construed to require that the check used in the process "at no time, takes on the status of a negotiable instrument."

Independent claims 8 and 9 also recite that the check is read for the "sole purpose" of obtaining "consumer bank account information." As set forth in Defendants' claim construction briefing, the phrase "consumer bank account information" should be construed to mean "only the ABA/transit routing number and bank account number," which identify the bank account associated with the check.

**B.    The '988 Patent System and Prior Art Systems - Common to All Defendants**

The '988 patent discloses that the claimed system and method begins when a customer making a purchase initiates a transaction by providing the merchant with any bank check, preferably a "specimen" or "blank" check. (*Id.* at 7:48.) This bank check is used only for purposes of obtaining bank account information from the check, and each transaction is "an electronic or 'paperless' event thereby eliminating reliance on accepting and processing commercial bank drafts (personal or corporate checks) and the physical handling of those bank drafts thus replacing commercial bank drafts at the point of sale." (*Id.* at 3:4-8.)

Specifically, the merchant obtains bank account information from the Magnetic Ink Character Recognition numbers ("MICR" numbers) across the bottom of the check. (*Id.* at 6:66; 7:64-65.) The bank account information is the "ABA/Transit" and routing number of the check writer's bank. (*Id.* at 10:29-31.) Once the account information is entered, the merchant can initiate a check "verification" process, a well known prior art process in which one or more databases are accessed to determine if a check transaction is likely to be processed successfully. (*Id.* at 7:19-34, 7:63-8:22.) If the verification is approved, the merchant returns the check to the customer at the point of sale and the terminal prints an authorization receipt for the customer's signature. (Ex. A at 8:23-29.)

---

[2] Unless otherwise indicated, emphasis in this brief has been added.

The transaction is later electronically processed for payment through an automated clearinghouse or "ACH" network. (*Id.* at 8:30-42.)

This type of system and method was well-known in the art long before the effective priority date of the '988 patent. Systems and methods enabling the electronic processing of paper checks presented at the point of sale have been discussed in the payments industry, disclosed in prior art patents, and implemented by payment processing corporations since the early 1980s. Two such patents are U.S. Patent No. 5,053,607 to Carlson ("the '607 patent"), and U.S. Patent No. 5,175,682 to Higashiyama *et al.* ("the '682 patent").

Both the '607 patent and '682 patent describe electronic check processing systems having many or all of the features of the '988 patent. The described systems each included a terminal and a MICR reader for automatically reading the ABA/transit routing number and bank account number from checks presented at the point of sale, communication with databases for check verification, and automated electronic debiting of the consumer's account based on the information obtained from the check. (*See* Defendants' Opening Brief on claim construction, D.I. 288, pp. 5-7.)

## C.    Prosecution History of the '988 Patent - Common to All Defendants

### 1.    The "Sole Purpose" Limitations

The original application leading to the '988 patent, Serial No. 07/975,717, was filed on November 13, 1992. (Ex. B.) The original independent claims 1 and 9 recited point-of sale electronic payment processing systems and methods designed to receive consumer bank account information from either debit-type cards or checks, transmit that information to a central computer, perform a verification process, and transfer funds through an automated clearing house network. (*Id.* at LML-EP 000104-06.)

The Examiner initially rejected the pending claims, (*Id.* at LML-EP 000139-43), and the Applicants amended the claims in an attempt to overcome the rejections (*Id.* at LML-EP 000144-61). The Applicants' amendments and related arguments were

6

insufficient to overcome the Examiner's rejections. In a second Office Action, the Examiner maintained rejections based on prior art patents referred to as "Carlson et al." and "Murphy." (*Id.* at LML-EP 000163.)

Following the second rejection, the Applicants filed a continuation application and Preliminary Amendment. (*Id.* at LML-EP 000170-79.) In the Preliminary Amendment, the Applicants narrowed pending claim 9 by adding the limitation of reading information from the check "for the sole purpose of obtaining consumer bank account information." (*Id.* at LML-EP 000174.) The Preliminary Amendment further added 12 new claims, including another independent claim, that recited a corresponding "sole purpose" limitation. (*Id.* at LML-EP 000176.) These and other amendments were eventually successful in obtaining allowance of the claims.

### 2.    The "Negotiable Instrument" Limitations

The same Preliminary Amendment included narrowing amendments that limited independent claim 1 to transactions that take place "without using a bank check as a negotiable instrument." (*Id.* at LML-EP 000172-73.) The new independent claim similarly recited transferring funds "without using a bank check as a negotiable instrument." (*Id.* at LML-EP 000175-76.)

The Examiner again rejected all pending claims as indefinite, concluding among other things that claim 1 did not capture the argued novelty in the specification. (*Id.* at LML-EP 000181.) The Examiner re-asserted his rejections set forth in previous Office Actions. (*Id.* at LML-EP 000181.)

Applicants filed another Response on January 30, 1995, further narrowing the claims. Claim 9 was amended to include the limitation "without using the check as a negotiable instrument," similar to the limitations previously added to claims 1 and 11. (*Id.* at LML-EP 000184.) Accordingly, at the time of the January 30, 1995 amendment, each independent claim recited a limitation that transactions took place "without using

7

the check as a negotiable instrument." As set forth below, these and other amendments were critical in the eventual allowance of the claims.

### 3.    The "Any Bank Check" Limitations

In the January 30, 1995 Response, the Applicants made other amendments that further narrowed the claims. Each independent claim was also amended to recite processing transactions not from "a" single bank check, but rather from "any" bank check. Specifically, the Applicants amended claim 1 to recite a point of sale terminal adapted to receive information from "any bank check," amended claim 9 to recite presenting "any bank check" at the point of sale, and amended claim 11 to recite means for reading information from "any consumer bank check." (*Id.* at LML-EP 000183-85.)

At first blush, the "any bank check" amendments might appear to broaden the claims, but in fact the new limitations narrowed the claims considerably. Before the word "any" was added to the claims, a system capable of receiving information and transferring funds using just a single type of check ("a" check), or a small number of checks, could meet there limitations and potentially infringe the claims. Following the amendment, however, a system that functioned with only one type of check, or just a few types of checks, could no longer meet the limitations. Instead only systems that could receive information and transfer funds using *any* type of check or *any* type of consumer check could potentially infringe.

### 4.    Applicants' Amendments and Arguments Regarding the "Any Bank Check," "Negotiable Instrument," and "Sole Purpose" Limitations Secured Allowance of the Claims

The "any bank check," "negotiable instrument," and "sole purpose" limitations were critical to obtaining allowance of the claims. To overcome the Examiner's rejections, Applicants repeatedly argued that the prior art did not disclose these limitations. The Examiner allowed the claims only after they were narrowed, and only after Applicants relied on these limitations in distinguishing the prior art.

8

In a Remarks section of the January 30, 1995 Response, the Applicants described the purported invention recited in the amended claim 1:

> The point of sale terminal accepts bank account information from *any bank check.* The system transfers funds as part of a transaction *without using the check as a negotiable instrument.*

(Ex. B at LML-EP 000189.)

Likewise, in arguing over the prior art, the Applicants repeatedly relied on the "any bank check" and "negotiable instrument" limitation. Distinguishing one prior art patent, the Applicants asserted that "Case does not disclose the use of *any bank check solely* to derive consumer information and *not for use as a negotiable instrument*, as recited in independent claims 1, 9 and 11." (*Id.* at LML-EP-000190.) The Applicants also argued over other references based on the negotiable instrument limitation. (*See id.* at LML-EP 000192-206.) In the summary of Applicants' Remarks, the Applicants again highlighted these differences between the purported invention and the prior art, namely that "none of the references discloses a point-of-sale system that uses *any bank check solely* for the purpose of gather customer information and *not as a negotiable instrument* used to pay for goods received in a transaction." (*Id.* at LML-EP 000207.)

These amendments and arguments were essential to securing allowance of the claims. In the following Office Action, the Examiner withdrew the previous rejections based on Carlson, Murphy and other prior art references, instead only asserting a "restriction requirement" that would force the Applicants to "elect" a subset of the pending claims. (*id.* at LML-EP 000212.) After Applicants argued that no election between claims was necessary, the claims were allowed and the '988 patent issued on January 16, 1996.

### D.    TeleCheck's Accused Electronic Check Acceptance Service Works Differently than the System and Method of the '988 Patent

In this case, LML has accused TeleCheck's Electronic Check Acceptance Service ("ECA Service") of infringing certain claims of the '988 patent. The TeleCheck ECA

Service utilizes equipment available in the prior art, namely a point of sale terminal and printer, a modem that provides electronic communications, and a computer system that performs back-end processing.

REDACTED

REDACTED

**REDACTED**

The electronic entry is later delivered from the point of sale terminal to TeleCheck in a batch that may include other transactions.  (Ex. D at FDC 213445-446.) TeleCheck uses the national ACH within the United States ("national ACH") to process these electronic transactions.  (Ex. C at FDC 1081299.)  The national ACH is administered by the National Automated Clearinghouse Association ("NACHA"), which has developed rules governing such "Point of Purchase" ("POP") transactions. TeleCheck's POP entries comply with the NACHA operating rules, which limit the categories of checks that may be converted under the POP class.  (Ex. R at FDC 08533.)

The NACHA operating rules also require the inclusion of the check number as part of the POP entry.  (Ex. S at LML-EP 055420, 055432, 055504.)

Based on the POP entry created by the TeleCheck ECA system, the consumer's account is debited in accordance with the NACHA operating rules.  The NACHA operating rules specify that the transaction will appear on the consumer's bank account statement.  (*Id.* at LML-EP 055432, 055504.)  The transaction entry on the consumer's statement will include the check serial number of the transaction.  (Ex. C at FDC 1081289; Ex. S at LML-EP 055504.)

## IV.    ARGUMENT

### A.    Legal Standards for Summary Judgment

Federal Rule of Civil Procedure 56(c) authorizes this Court to grant summary judgment where there is "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Patent cases are amenable to disposition by summary judgment.  *See Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998); *NCR Corp. v. Palm, Inc.*, 217 F. Supp. 2d 491 (D. Del. 2002) (granting motion for summary judgment of non-infringement).

### B.    Legal Standards for Determining Patent Infringement

In a patent infringement analysis, the court first determines the meaning of the asserted claims, and second, compares the properly construed claims to the allegedly infringing device.  *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed. Cir. 2001); *see also KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1355 (Fed. Cir. 2000).  In comparing the device with the construed claims, the court first considers whether the claims are literally infringed, and if not found, whether the claims are infringed under the doctrine of equivalents.  *See Desper Prods., Inc. v. QSound Labs, Inc.*, 157 F.3d 1325, 1332 (Fed. Cir. 1998).

Literal infringement is found only where each limitation of a claim is present exactly in the accused product.  Any missing element precludes a finding of literal

infringement. *See Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d at 1323; *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1577-78 (Fed. Cir. 1989). Infringement under the doctrine of equivalents is only found if the differences between elements in the accused device and elements of the claimed invention are insubstantial. *See Warner-Jenkinson Co. Inc. v. Hilton-Davis Chem. Co.*, 520 U.S. 17, 39 (1997).

There are a number of recognized legal limitations on the doctrine of equivalents. Whether these limitations apply in a given case are questions of law that are properly determined on summary judgment. "Of course, the various legal limitations on the application of the doctrine of equivalents are to be determined by the court." *Warner-Jenkinson*, 520 U.S. at 39 n.8.

Prosecution history estoppel is one legal limitation. It presumptively precludes any scope of equivalents where a patentee narrows the claims during prosecution for reasons relating to patentability. Under these circumstances, a presumption arises that the patentee surrendered all subject matter between the broader language and the narrower language. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 740 (2002). The patentee bears the burden of overcoming the presumption, and if it cannot, equivalence is barred. *Id.* at 740-41.

The "all-elements" rule and the "claim vitiation" doctrine are two other limitations on the doctrine of equivalents. These dictate that the doctrine of equivalents cannot be employed to read a limitation out of the claims. "It is important to ensure that the application of the doctrine [of equivalents], even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety." *Warner-Jenkinson*, 520 U.S. at 29; *see also K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1367 (Fed. Cir. 1999); *Phillips Petroleum Co. Huntsman Polymers Corp.*, 157 F.3d 866, 877 (Fed. Cir. 1998).

If a theory of equivalents "would entirely vitiate" a claim limitation, entry of summary judgment is required. *Warner-Jenkinson Co.*, 520 U.S. at 39 n.8; *see, e.g.,*

*Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1106 (Fed. Cir. 2000), *cert. denied*, 532 U.S. 1008 (2001); *Dolly, Inc. v. Spalding & Evenflo Cos., Inc.*, 16 F.3d 394, 398 (Fed. Cir. 1994); *Novartis Pharm. Corp. v. Eon Labs Mfg., Inc.*, 234 F. Supp. 2d 464, 469 (D. Del. 2002), *aff'd*, 363 F.3d 1306 (Fed. Cir. 2004).

### C.    TeleCheck Does Not Infringe Because the ECA Service Does Not Conduct Electronic Checking Transactions Using "Any Bank Check"

#### 1.    The Asserted Claims Require Conducting Electronic Transactions Using "Any Bank Check"

Each of claims 1, 8 and 9 includes the phrase "any bank check." (Ex. A at 11:38, 12:22, 12:56.) Each independent claim also includes a limitation requiring an electronic transaction based on the information obtained from the bank check. For example, independent claims 1 and 9 each recite "enabling automated clearing house communication for transferring funds." (*Id.* at 11:50-55, 12:61-66.) Claim 8 recites "subsequently transmitting the transaction event information to a bank for subsequent automated clearinghouse operations." (*Id.* at 12:40-42.)

As set forth in Defendants' claim construction briefing, these limitations should be construed to mean that the claims require receiving information and transferring funds using any bank check. Specifically, the phrase "any bank check" should be construed to mean "any type of check drawn on a financial institution." The latter phrases should be construed to mean "electronically communicating with an automated clearing house for transferring funds electronically based upon the consumer bank account information obtained from any bank check presented at the point-of-sale."

Under these proper constructions, there is no legitimate dispute that the TeleCheck ECA Service fails to meet the "any bank check" limitations, either literally or under the doctrine of equivalents. Accordingly, summary judgment of no infringement should be granted for all asserted claims.

15

2.    **NACHA Rules Governing "Point of Purchase" Transactions Preclude Infringement of the "Any Bank Check" Limitations**

None of the Defendants' systems meets the "any bank check" limitations because the very rules governing these types of transactions expressly prohibit the use of certain types of checks to transfer funds. Specifically, each Defendant complies with NACHA's rules governing "Point of Purchase" or "POP" transactions.[3]

Under those rules, certain checks are not eligible for use in POP transactions. Subsection 3.8.1 of the Operating Rules provides that for POP entries:

> the following may not be used as source documents: (1) checks drawn on corporate or business deposit accounts, (2) third-party checks, (3) credit card checks, (4) obligations of a financial institution (e.g., traveler's checks, cashier's checks, official checks, money orders, etc.), (5) checks drawn on the Treasury of the United States, a Federal Reserve Bank, or a Federal Home Loan Bank, (6) checks drawn on a state or local government, or (7) checks payable in a medium other than United States currency.

(Ex. S at LML-EP 055429.)

Each of these instruments are types of checks according to LML's own expert.

**REDACTED**

---

[3] LML has attempted to rely on the current POP rules in its claim construction briefing on the "negotiable instrument" limitations. LML's reliance in that situation is improper, because of the specialized meaning of those limitations in the '988 patent, which was developed long before the POP rules were implemented in 1999. Here there is no dispute regarding what constitutes a "check," as established by Mr. Tinkel's testimony. The POP rules merely demonstrate what type of checks are not eligible for use with the accused Defendant services.

**REDACTED**

The POP rules, however, prohibit the use of checks "payable in a medium other than United States currency." (Ex. S at LML-EP 055429.) Based on the POP rules, foreign checks utilizing foreign clearinghouses are not eligible as source documents to conduct transactions.

**REDACTED**

In short, the '988 patent requires specific functionality that allows the system and method to receive information and transfer funds using any bank check. The rules covering these transactions through the U.S. national ACH prohibit the use of many types of bank checks. Accordingly, the "any bank check" limitations cannot be literally infringed.

3.     **TeleCheck's ECA Service Does Not Conduct Electronic Transactions Using "Any Bank Check" as Literally Recited by the Claims**

Because TeleCheck complies with NACHA rules limiting the types of checks that can be used, TeleCheck's ECA Service cannot meet the "any bank check" limitations. Evidence regarding TeleCheck's own system confirms these facts.

**REDACTED**

18

# REDACTED

Moreover, even if correct Mr. Tinkel's assertion would be legally insufficient to find infringement of the "any bank check" limitations. Even if these few types of foreign checks were eligible for use with the ECA Service, there is no assertion by Mr. Tinkel or LML that the ECA Service can be used with *any* foreign check, much less all types of U.S. and foreign checks.

### 4. Prosecution History Estoppel Prohibits Any Scope of Equivalents with the "Any Bank Check" Limitations

LML is precluded from asserting the doctrine of equivalents with respect to the "any bank check" limitations. The amendments adding these limitations served to narrow the claims, and LML cannot overcome the *Festo* presumption that no doctrine of equivalents should apply. *Festo v. Shoketsu Kinzoku Kogyo Kabushiki,* 535 U.S. 722, 740 (2002).

As noted above, the amendments that converted the claims from "a" bank check to "any" bank check substantially narrowed the claims. No longer could a system that simply functioned with one type of check infringe the claims. Instead the system needed to function with any type of check, which would require additional functionality and features to meet the limitation. The prosecution history itself confirms that these amendments narrowed the claims. Before the "any bank check" limitations were added to the claims, the claims were rejected over the prior art. Only after adding the limitations were those rejections withdrawn, a result that would never happen if the amendment had broadened the claims.

Indeed, given the record over years of prosecution, there can be no question that these narrowing limitations were added to avoid prior art, the classic basis for prosecution

history estoppel. *See Warner-Jenkinson*, 520 U.S. at 30-31. Under the Supreme Court *Festo* precedent, these amendments give rise to a presumption that precludes the doctrine of equivalents with respect to these limitations. *Festo*, 535 U.S. at 740.

LML cannot overcome the *Festo* presumption, which applies in all but the following limited circumstances:

> [t]he equivalent [was] unforeseeable at the time of the application; the rationale underlying the amendment [bears] no more than a tangential relation to the equivalent in question; or there [was] some other reason suggesting that the patentee could not reasonably be expected to have described the insubstantial substitute in question.

*Festo*, 535 U.S. at 740-41.

In this case, none of these exceptions apply. First, the claimed equivalent here – a system that can process some checks but not all types of checks – was clearly foreseeable. The claims pending before the amendment was made would have arguably applied to such systems, and in fact the prior art taught systems that could be used with one or more types of check. Thus at the time Applicants added the "any bank check" limitations, conducting electronic check transactions using only a subset of all checks would have been foreseeable. *See Pioneer Magnetics, Inc. v. Micro Linear Corp.*, 330 F.3d 1352, 1357 (Fed. Cir. 2003); *Glaxo Wellcome, Inc. v. Impax Labs., Inc.*, 356 F.3d 1348, 1355-56 (Fed. Cir. 2004).

Second, the ability to conduct electronic transactions using all types of bank checks was the direct, not tangential, reason for Applicants narrowing amendment to the asserted claims. Applicants repeatedly argued that, unlike the prior art, the claimed invention purportedly could be used with "any bank check." In the "Summary" of Applicants' Remarks relating to the amendment, the Applicants specifically asserted that this feature distinguished the purported invention from the prior art. "[N]one of the references discloses a point-of-sale system that uses *any bank check* solely for the purpose of gather customer information and not as a negotiable instrument used to pay for goods received in a transaction." (Ex. B at LML-EP 000207.) Because

distinguishing systems that used only one type or several types of checks was the direct reason for the amendment, the doctrine of equivalents is precluded. *Terlep v. Brinkmann Corp.*, 418 F.3d 1379, 1385-86 (Fed. Cir. 2005).

Finally, no "other reason" for avoiding estoppel can be proffered by LML. This last exception "while vague, must be a narrow one." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 344 F.3d 1359, 1370 (Fed. Cir. 2003) (on remand from Supreme Court). Based on the prosecution history and the '988 patent's disclosure, it is clear that Applicants were aware of that a system for processing certain types of checks could be described and claimed. Applicants gave up such systems by limiting the claims to systems and methods for processing "any bank check." There is simply no other reason "suggesting that the patentee could not reasonably have been expected to have described the alleged equivalent." *Id.* Under the circumstances, any claim of equivalence for the "any bank check" limitations is barred. *Festo*, 535 U.S. at 740-41.

In addition, reading in TeleCheck's ECA Service under the doctrine of equivalents would as a practical matter entirely vitiate the "any bank check" limitations. *See Warner-Jenkinson*, 520 U.S. at 29, 39 n.8. Allowing LML to cover by equivalents systems and methods that process only certain types of bank checks would bring the claims back to the same broader scope that was disclaimed during prosecution, effectively removing the word "any" from the claims and replacing it with "a." Such an application of the doctrine of equivalents would effectively gut these limitations from the claims, and must be rejected. *Searfoss v. Pioneer Consol. Corp.*, 374 F.3d 1142, 1151 (Fed. Cir. 2004).

**D.** **TeleCheck Does Not Infringe Because the ECA Service Does Not Conduct Electronic Checking Transactions "Without Using the [Bank] Check as a Negotiable Instrument"**

**1.** **The Asserted Claims Require Conducting Electronic Transactions where "the Check, at No Time, Takes on the Status of a Negotiable Instrument"**

Each independent claim of the '988 patent includes the phrase "without using the check as a negotiable instrument" or a corresponding limitation (without using "the bank check" or "a check" as a negotiable instrument). (Ex. A 11:19-20, 12:6-7, and 12:23-24.) As set forth in Defendants' claim construction briefing, these limitations should be construed to mean "the [bank] check, at no time, takes on the status of a negotiable instrument." In contrast, in the TeleCheck ECA Service, the check takes on the status of a negotiable instrument, and thus fails to meet these limitations either literally or under the doctrine of equivalents. Accordingly, summary judgment of no infringement should be granted for all asserted claims.

**2.** **TeleCheck's ECA Service Does Not Meet the "Negotiable Instrument" Limitation as Literally Recited by the Claims Because the Check Takes on the Status of Negotiable Instrument**

TeleCheck's ECA Service processes checks that have taken on the status of a negotiable instrument, and therefore TeleCheck's ECA Service fails to satisfy the "negotiable instrument" limitations.

The Uniform Commercial Code defines a negotiable instrument as:

an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order, if it:

(1) is payable to bearer or to order at the time it is issued or first comes into possession of a holder;

(2) is payable on demand or at a definite time; and

(3) does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money . . . .

22

(Ex. E, UCC at § 3-104.)

Accordingly, a check becomes a negotiable instrument under the UCC when (1) at the time it is provided or "issued" to another party, it specifies the party to be paid, a date, and the amount, and (2) the customer has signed the check.

**REDACTED**

As LML's expert has stated, customers of subscriber merchants using TeleCheck's ECA Service are required to fill out and sign the check before handing that check to the subscriber merchant for payment.

**REDACTED**

Accordingly, the checks provided by customers to merchants using the ECA Service meet the UCC definition of negotiable instruments.

From the consumer's perspective, the procedure for handing over a check as payment is no different regardless of whether the check is processed as paper or through TeleCheck's ECA Service. Unlike the instance of handing over a blank or unsigned check, as described in the '988 patent, a consumer purchasing goods at a TeleCheck ECA merchant simply pays by check as usual, *i.e.*, using the check as a negotiable instrument.

The act of completing and signing the check is not merely a "technical" distinction, because it means that TeleCheck's ECA Service is much slower at the check-out counter than the system of the invention.

23

**REDACTED**

The requirement of filling out and signing the check alone obviates this "vital" advantage.

Other evidence confirms that the check takes on the status of a negotiable instrument.

**REDACTED** This is consistent with NACHA Operating Rule 3.8.1, which states that the check is voided after it is provided to the merchant by the consumer. (Ex. S at LML-EP 055429.) Where the check has been fully filled out and signed, it remains a negotiable instrument until it is canceled in this manner.

**REDACTED**

The check's status as a negotiable instrument allows flexibility for TeleCheck ECA merchants in how checks are ultimately processed. In situations when the ECA Service is not permitted for a specific check, the check may be "kept as paper" by the merchant, without further action on the part of the consumer.



24

# REDACTED

This treatment of the check is *only possible* because the check has taken on the status of a negotiable instrument.

In short, there is no legitimate dispute that in the TeleCheck ECA Service checks take on the status of negotiable instruments. The real dispute here relates to claim construction, and when the claims are properly construed to exclude systems and methods in which the check takes on the status of a negotiable instrument, there can be no literal infringement.

### 3.    Prosecution History Estoppel Prohibits Any Scope of Equivalents with the "Negotiable Instrument" Limitations

LML is precluded from asserting the doctrine of equivalents with respect to the "negotiable instrument" limitations. The amendments adding these limitations served to narrow the claims, and LML cannot overcome the *Festo* presumption that no doctrine of equivalents should apply.

There can be no legitimate dispute that the "negotiable instrument" limitations narrowed the claims. These narrowing limitations were added to avoid prior art, the classic basis for prosecution history estoppel. *See Warner-Jenkinson*, 520 U.S. at 30-31. Under the Supreme Court *Festo* precedent, these amendments give rise to a presumption that precludes resort to the doctrine of equivalents. *Festo*, 535 U.S. at 740.

As noted above, the *Festo* presumption applies in all but the following limited circumstances:

> [t]he equivalent [was] unforeseeable at the time of the application; the rationale underlying the amendment [bears] no more than a tangential relation to the equivalent in question; or there [was] some other reason suggesting that the patentee could not reasonably be expected to have described the insubstantial substitute in question.

*Festo*, 535 U.S. at 740-41.

25

In this case, none of the exceptions applies. First, processing checks electronically in a manner that uses the check as a negotiable instrument was foreseeable and in fact known. Applicants argued that the prior art Carlson '607 patent described processing negotiable instruments in this very manner, and that this feature purportedly distinguished Carlson from the pending claims. (Ex. B at LML-EP 000192.) Accordingly, Applicants were aware of electronic check processing systems in which the check was used, in Applicants' view, as a negotiable instrument. Thus no scope of equivalents is permitted. *Pioneer Magnetics*, 330 F.3d at 1357; *Glaxo Wellcome*, 356 F.3d at 1355-56.

Second, the ability to conduct electronic transactions without using the check as a negotiable instrument was the direct, not tangential reason for Applicants' narrowing amendment. Applicants distinguished no less than seventeen references based on the "negotiable instrument" limitations. (Ex. B at LML-EP 190-206.) Thus the second *Festo* exception is not applicable, again precluding any scope of equivalents. *Terlep*, 418 F.3d at 1385-86.

Finally, no "other reason" for avoiding estoppel can be proffered by LML. This last exception "while vague, must be a narrow one." *Festo*, 344 F.3d at 1370. Based on the prosecution history and the '988 patent's disclosure, it is clear that Applicants were aware of check processing systems that utilized a check as a negotiable instrument. Applicants gave up such systems by limiting the claims to systems and methods that process check transactions without using the [bank] check as a negotiable instrument. There is simply no other reason "suggesting that the patentee could not reasonably have been expected to have described the alleged equivalent." *Id.* at 1368. Under the circumstances, any claim of equivalence for the "negotiable instrument" limitations is barred. *Festo*, 535 U.S. at 740-41.

In addition, reading in TeleCheck's ECA Service under equivalents would entirely vitiate the "negotiable instrument" limitations. *See Warner-Jenkinson*, 520 U.S.

26

at 29, 39 n.8.  Allowing LML to cover by equivalents systems and methods that conduct

transactions using the check as a negotiable instrument, would bring the claims back to

the same broader scope that was disclaimed during prosecution, effectively removing the

limitations from the claims.  Such an application of the doctrine of equivalents must be

rejected.  *Searfoss*, 374 F.3d at 1151.

Accordingly, *Festo* clearly applies, and no scope of equivalents should be

permitted with respect to the "negotiable instrument" limitations.

### E.    TeleCheck Does Not Infringe Because the ECA Service Does Not Read the Check for the "Sole Purpose" of Obtaining "Consumer Bank Account Information"

Claims 2, 8, 9, 10, 11, 16 and 18 recite reading the check for the "sole purpose" of

obtaining "consumer bank account information."  As set forth in Defendants' claim

construction briefing, these limitations should be construed to mean reading the check for

the sole purpose of obtaining the ABA/transit routing number and bank account number

only.

## REDACTED

NACHA rules governing POP transactions require that

the check number be included as part of the POP electronic entry.  (Ex. S at LML-EP

055420, 055432, 055504.)  Reading the check to obtain the serial number is therefore not

the "sole purpose" of reading the check in the TeleCheck ECA Service.  Thus summary

judgment of no literal infringement is proper.

The "sole purpose" limitations were also added to the claims by amendment.

*Festo* therefore prohibits any scope of equivalents.  Although at least one of the claims

included the "sole purpose" limitation at the time the claim was originally added during

prosecution, the *Festo* presumption applies to all claims having this limitation.  *Glaxo*

*Wellcome, Inc. v. Impax Laboraties, Inc.*, 356 F.3d 1348, 1356 (Fed. Cir. 2004) ("subject

matter surrendered via claim amendments during prosecution is also relinquished for

other claims containing the same limitation" (citation omitted)).  As with the "any bank

check" and "negotiable instrument" limitations, no *Festo* exception applies.

Accordingly, summary judgment of no infringement with respect to claims 2, 8, 9, 10, 11,

16 and 18 should be granted.

## V.     CONCLUSION

For the foregoing reasons, TeleCheck's motion for summary judgment of non-

infringement should be granted.


Dated:  October 28, 2005                    FISH & RICHARDSON P.C.


                                            By:_____
                                               William J. Marsden, Jr. (#2247)
                                               Timothy Devlin (#4241)
                                               Tara D. Elliott (#4483)
                                               919 N. Market Street, Suite 1100
                                               P.O. Box 1114
                                               Wilmington, DE  19801

                                            *Attorneys for Defendant TeleCheck Services, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 28st day of October, 2005, a true and correct copy of

**TELECHECK'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR**

**SUMMARY JUDGMENT OF NON-INFRINGEMENT** was caused to be served on

the attorneys of record at the following addresses as indicated:

**BY HAND DELIVERY**
Richard K. Herrmann, Esq.
Morris, James, Hitchens & Williams LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE  19899

**BY EMAIL AND FIRST CLASS MAIL**
Robert Jacobs, Esq.
Belasco Jacobs & Townsley, LLP
Howard Hughes Center
6100 Center Drive, Suite 630
Los Angeles, CA  90045

**BY HAND DELIVERY**
Richard D. Kirk, Esq.
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, DE  19801

**BY EMAIL AND FIRST CLASS MAIL**
Russell E. Levine, Esq.
Kirkland & Ellis LLP
200 E. Randolph Dr.
Chicago, IL 60601

**BY HAND DELIVERY**
Collins J. Seitz, Jr., Esq.
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, DE  19801

**BY EMAIL AND FIRST CLASS MAIL**
Mark C. Scarsi, Esq.
O'Melveny & Myers LLP
400 S Hope Street
Los Angeles, CA 90071

Timothy Devlin

80027750.doc

29