

CERTIFICATE OF FIRST CLASS MAILING

Date of Mailing: _____ January 30, 1995 _____

I hereby certify that the Response to Office Action dated 10/28/94 (27 pages) directed to the application of Robert H. Hills and Henry R. Nichols for a CHECKWRITING POINT OF SALE SYSTEM, Serial No. 08/257,390, filed 06/09/94, is being deposited with the United States Postal Service as first class mail under 37 C.F.R. § 1.8 on the date indicated above and is addressed to Commissioner of Patents and Trademarks, Box Non-Fee Amendment, Washington, D.C. 20231.

Jon L. Roberts, Esq.
Roberts & Associates
1953 Gallows Road
Suite 220
Vienna, Virginia 22182

LML-EP 000210

 

**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. |
|---|---|---|---|

08/257,390    06/09/94    PITTS

B5M1/0413

JON L. ROBERTS
ROBERTS & ASSOCIATES
1953 GALLOWS RD.
SUITE 220
VIENNA, VA 22182

| | |
|---|---|
| R **EXAMINER** PITTS,H | |
| **ART UNIT** | **PAPER NUMBER** |
| 2514 | 11 |

DATE MAILED: 04/13/95

This is a communication from the examiner in charge of your application.
COMMISSIONER OF PATENTS AND TRADEMARKS

☐ This application has been examined   ☑ Responsive to communication filed on 1/31/95   ☐ This action is made final.

A shortened statutory period for response to this action is set to expire _____ month(s), 30 days from the date of this letter.
Failure to respond within the period for response will cause the application to become abandoned. 35 U.S.C. 133

**Part I   THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. ☐ Notice of References Cited by Examiner, PTO-892.
2. ☐ Notice of Draftsman's Patent Drawing Review, PTO-948.
3. ☐ Notice of Art Cited by Applicant, PTO-1449.
4. ☐ Notice of Informal Patent Application, PTO-152.
5. ☐ Information on How to Effect Drawing Changes, PTO-1474.
6. ☐ _____

**Part II   SUMMARY OF ACTION**

1. ☑ Claims 1-4, 6-9, 11-21 are pending in the application.

   Of the above, claims _____ are withdrawn from consideration.

2. ☐ Claims _____ have been cancelled.

3. ☐ Claims _____ are allowed.

4. ☐ Claims _____ are rejected.

5. ☐ Claims _____ are objected to.

6. ☑ Claims 1-4, 6-9, 11-21 are subject to restriction or election requirement.

7. ☐ This application has been filed with informal drawings under 37 C.F.R. 1.85 which are acceptable for examination purposes.

8. ☐ Formal drawings are required in response to this Office action.

9. ☐ The corrected or substitute drawings have been received on _____. Under 37 C.F.R. 1.84 these drawings are ☐ acceptable; ☐ not acceptable (see explanation or Notice of Draftsman's Patent Drawing Review, PTO-948).

10. ☐ The proposed additional or substitute sheet(s) of drawings, filed on _____, has (have) been ☐ approved by the examiner; ☐ disapproved by the examiner (see explanation).

11. ☐ The proposed drawing correction, filed _____, has been ☐ approved; ☐ disapproved (see explanation).

12. ☐ Acknowledgement is made of the claim for priority under 35 U.S.C. 119. The certified copy has ☐ been received ☐ not been received ☐ been filed in parent application, serial no. _____; filed on _____.

13. ☐ Since this application appppears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.

14. ☐ Other

**EXAMINER'S ACTION**

PTOL-326 (Rev. 9/93)

12

LML-EP 000211

Serial No. 08/257,390                        -2-

Art Unit   2514

The applicant has submitted claims to separate inventions:

I.  Claim 1 and dependent thereon directed to a check operated point of sale.

II.  Claims 9, 11 and dependent thereon directed to "sole" MICR reading and account verification.

Election is required.

Any inquiry concerning this communication or earlier communications from the examiner should be directed to Harold Pitts whose telephone number is (703) 308-0717.

Any inquiry of a general nature or relating to the status of this application should be directed to the Group receptionist whose telephone number is (703) 308-0956.

Pitts/mj
April 11, 1995

HAROLD PITTS
PRIMARY EXAMINER
GROUP 2500

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In Re Application of Robert H. Hills and Henry R. Nichols

Serial No. 08/257,390                    Group Art Unit 2514

Filed:  06/09/94                         Examiner: Pitts, H.

For:  CHECKWRITING POINT OF SALE SYSTEM

\*       \*       \*       \*       \*

RESPONSE TO OFFICE ACTION OF 04/13/95

\*       \*       \*       \*       \*

RECEIVED

MAY 2 4 1995

GROUP 2500

Commissioner of Patents and Trademarks
Washington, D.C. 20231

Sir:

   Enclosed please find the following:

   1.  Response to the Office action of 04/13/95 (4 pages); and

   2.  Certificate of first class mailing.

                              Respectfully submitted,

                              Jon L. Roberts
                              Registration No. 31,293
                              Roberts & Associates
                              1953 Gallows Road
                              Suite 220
                              Vienna, Virginia 22182
                              (703) 356-7700

May 8, 1995

12

LML-EP 000213

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In Re Application of Robert H. Hills and Henry R. Nichols

Serial No. 08/257,390                                Group Art Unit: 2514

Filed:   06/09/94                                    Examiner: Pitts, H.

For:     CHECKWRITING POINT OF SALE SYSTEM

*     *     *     *     *

RESPONSE TO OFFICE ACTION OF 04/13/95

*     *     *     *     *

Commissioner of Patents and Trademarks
Washington, D.C. 20231

Sir:

Applicant hereby submits the following response to the Office action of 04/13/95.

<u>REMARKS</u>

Claims 1-4, 6-9, and 11-22 are pending in the application. Claims 1-4, 6-9, and 11-21 are subject to election requirement. It is assumed that claim 22 has been overlooked and was intended to be subject to election requirement as well. Claims 1, 9, and 11 are the independent claims.

The Examiner asserted that Applicant has submitted claims to separate inventions. The Examiner stated that the first invention is recited in claim 1 and claims dependent thereon, characterized by the Examiner as a check operated point of sale. The Examiner further stated that the second invention is recited in claims 9 and 11 and claims dependent thereon, characterized by the Examiner as "sole" MICR reading and account verification. The Examiner requires election.

LML-EP 000214

Applicant respectfully traverses the election requirement.

Claim 1 recites a checkwriting point of sale (POS) system which includes a point of sale terminal that can receive bank account information from any bank check.  The system also includes a central computer, a communications subsystem at the POS terminal for communicating with the central computer, memory at the point of sale terminal for storing the bank account information, and a communication subsystem at the central computer for communicating with a number of POS terminals.  The central computer communicates with external databases for performing consumer bank account status searches and for transferring funds through an automated clearinghouse without using a bank check as a negotiable instrument.

Claim 11 recites a checkwriting POS system which includes a POS terminal that can receive bank account information.  The system also includes a central computer, a communications subsystem at the POS terminal for communicating with the central computer, memory at the point of sale terminal for storing the bank account information, and a communication subsystem at the central computer for communicating with a number of POS terminals.  The central computer communicates with external databases for performing consumer bank account status searches and for transferring funds through an automated clearinghouse without using a bank check as a negotiable instrument.  The POS terminal also includes a MICR reader for reading MICR information from bank checks for the sole purpose of eliciting bank account information.

2

LML-EP 000215

Thus, claim 11 differs from claim 1 only in that claim 11 recites an MICR reader for eliciting consumer bank account information where claim 1 recites that the point of sale terminal is adapted to receive consumer bank account information from a check. Claims 1 and 11 recite the same invention, although claim 11 is more narrow in that it more particularly specifies an element recited more broadly in claim 1. It is respectfully asserted that claim 1 and claim 11 are not drawn to separate inventions.

Likewise, claim 9 is a process claim that is consistent in scope with claim 11. This was acknowledged by the Examiner, who grouped claims 9 and 11 together in the election requirement as a single invention. Thus, because claims 1 and 11 recite the same invention, albeit in varying scope, claims 1, 9, and 11 are all drawn to the same invention.

Because claims 1, 9, and 11 are all drawn to the same invention, it is respectfully asserted that an election requirement is not warranted. Applicant requests reconsideration and withdrawal of the requirement. In accordance with 37 CFR 1.143, Applicant indicates, as a provisional election, the invention recited in claim 1 and claims dependent thereon, indicated by the Examiner as invention I.

With regard to evaluating the claims in light of references previously cited by the Examiner, Applicant requests the opportunity to present a demonstration of a working model embodying the invention. The Examiner is encouraged to contact Applicant's

3

LML-EP 000216

undersigned attorney to arrange a mutually convenient date and time.

Respectfully submitted,

Jon L. Roberts
Registration No. 31,293
Roberts & Associates
1953 Gallows Road
Suite 220
Vienna, Virginia 22182
(703) 356-7700

May 2, 1995

4

LML-EP 000217

CERTIFICATE OF FIRST CLASS MAILING

Date of Mailing: _____ May 8, 1995 _____

I hereby certify that the Response to Office Action dated 04/13/95 (4 pages) directed to the application of Robert H. Hills and Henry R. Nichols  for a CHECKWRITING POINT OF SALE SYSTEM, Serial No. 08/257,390, filed 06/09/94, is being deposited with the United States Postal Service as first class mail under 37 C.F.R. § 1.8 on the date indicated above and is addressed to Commissioner of Patents and Trademarks, Washington, D.C. 20231.

Jon L. Roberts, Esq.
Roberts & Associates
1953 Gallows Road
Suite 220
Vienna, Virginia 22182

LML-EP 000218

 

UNITED STATES DEPARTMENT OF COMMERCE
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 08/257,390 | 06/09/94 | HILLS | R |

|  |
|---|
| EXAMINER |
| PITTS,H |

JON L. ROBERTS
ROBERTS & ASSOCIATES
1953 GALLOWS RD.
SUITE 220
VIENNA, VA 22182

B5M1/0807

| ART UNIT | PAPER NUMBER |
|---|---|
| 2514 | |

DATE MAILED: 08/07/95
13

## NOTICE OF ALLOWABILITY

**PART I.**

1. ☐ This communication is responsive to _____

2. ☒ All the claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice Of Allowance And Issue Fee Due or other appropriate communication will be sent in due course.

3. ☒ The allowed claims are 1-4, 6-9, 11-22

4. ☐ The drawings filed on _____ are acceptable.

5. ☐ Acknowledgment is made of the claim for priority under 35 U.S.C. 119. The certified copy has [..] been received. [..] not been received. [ ] been filed in parent application Serial No. _____ filed on _____

6. ☐ Note the attached Examiner's Amendment.

7. ☐ Note the attached Examiner Interview Summary Record, PTOL-413.

8. ☐ Note the attached Examiner's Statement of Reasons for Allowance.

9. ☐ Note the attached NOTICE OF REFERENCES CITED, PTO-892.

10. ☐ Note the attached INFORMATION DISCLOSURE CITATION, PTO-1449.

**PART II.**

A SHORTENED STATUTORY PERIOD FOR RESPONSE to comply with the requirements noted below is set to EXPIRE THREE MONTHS FROM THE "DATE MAILED" indicated on this form. Failure to timely comply will result in the ABANDONMENT of this application. Extensions of time may be obtained under the provisions of 37 CFR 1.136(a).

1. ☐ Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL APPLICATION, PTO-152, which discloses that the oath or declaration is deficient. A SUBSTITUTE OATH OR DECLARATION IS REQUIRED.

2. ☒ APPLICANT MUST MAKE THE DRAWING CHANGES INDICATED BELOW IN THE MANNER SET FORTH ON THE REVERSE SIDE OF THIS PAPER.

   a. ☒ Drawing informalities are indicated on the NOTICE RE PATENT DRAWINGS, PTO-948, attached hereto or to Paper No. 5. CORRECTION IS REQUIRED.

   b. ☐ The proposed drawing correction filed on _____ has been approved by the examiner. CORRECTION IS REQUIRED.

   c. ☐ Approved drawing corrections are described by the examiner in the attached EXAMINER'S AMENDMENT. CORRECTION IS REQUIRED.

   d. ☐ Formal drawings are now REQUIRED.

Any response to this letter should include in the upper right hand corner, the following information from the NOTICE OF ALLOWANCE AND ISSUE FEE DUE: ISSUE BATCH NUMBER, DATE OF THE NOTICE OF ALLOWANCE, AND SERIAL NUMBER.

Attachments:
- Examiner's Amendment
- Examiner Interview Summary Record, PTOL-413
- Reasons for Allowance
- Notice of References Cited, PTO-892
- Information Disclosure Citation, PTO-1449

- Notice of Informal Application, PTO-152
- Notice re Patent Drawings, PTO-948
- Listing of Bonded Draftsmen
- Other

HAROLD PITTS
PRIMARY EXAMINER
GROUP 2500

14

LML-EP 000219



**UNITED STATES DEPARTMENT OF COMMERCE**
Patent and Trademark Office

Address: Box ISSUE FEE
COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

JOH L. ROBERTS
ROBERTS & ASSOCIATES
1950 GALLOWS RD.
SUITE 220
VIENNA, VA 22182

☐ Your Docketed communication from the Examiner
☐ This notice is issued in view of applicant's communication filed

**NOTICE OF ALLOWANCE
AND ISSUE FEE DUE**

| SERIES CODE/SERIAL NO. | FILING DATE | TOTAL CLAIMS | EXAMINER AND GROUP ART UNIT | | DATE MAILED |
|---|---|---|---|---|---|
| First Named Applicant | 08/257,490 | 06/09/94 | 020 | PITTS, H | 2514 | 08/07/95 |

TITLE OF INVENTION

| | |
|---|---|
| HILLS | ROBERT P. |

CHECKWRITING POINT OF SALE SYSTEM

| ATTY'S DOCKET NO. | CLASS-SUBCLASS | BATCH NO. | APPLN. TYPE | SMALL ENTITY | FEE DUE | DATE DUE |
|---|---|---|---|---|---|---|
| 2 | 235-379.000 | N97 | UTILITY | YES | $605.00 | 11/07/95 |

*THE APPLICATION IDENTIFIES ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT.
PROSECUTION ON THE MERITS IS CLOSED.*

*THE ISSUE FEE MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS
APPLICATION SHALL BE REGARDED AS ABANDONED. THIS STATUTORY PERIOD CANNOT BE EXTENDED.*

**HOW TO RESPOND TO THIS NOTICE:**

I. Review the SMALL ENTITY Status shown above.
  If the SMALL ENTITY is shown as YES, verify your
  current SMALL ENTITY status:

  A. If the status is changed, pay twice the amount of the
  FEE DUE shown above and notify the patent and
  Trademark Office of the change in status, or
  B. If the Status is the same, pay the FEE DUE shown
  above.

If the SMALL ENTITY is shown as NO:
A. Pay FEE DUE shown above, or
B. File verified statement of Small Entity Status before, or with,
   pay of 1/2 the FEE DUE shown above.

II. Part B of this notice should be completed and returned to the Patent and Trademark Office (PTO) with your ISSUE FEE.
  Even if the ISSUE FEE has already been paid by charge to deposit account, Part B should be completed and returned.
  If you are charging the ISSUE FEE to your deposit account, Part C of this notice should also be completed and returned.

III. All communications regarding this application must give series code (or filing date), serial number and batch number.
  Please direct all communication prior to issuance to Box ISSUE FEE unless advised to contrary.

*IMPORTANT REMINDER: Patents Issuing on applications filed on or after Dec. 12, 1980 may require payment of
maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance
fees when due.*

PTOL-85 (REV. 12-93) (0651-0033)          4. PATENT AND TRADEMARK OFFICE COPY

LML-EP 000220

605-242
75-861 E

**PART B—ISSUE FEE TRANSMITTAL**

IS: This form should be used for transmitting the ISSUE FEE. Blocks 2 through 6 should be completed where appropriate.
...ence including the Issue Fee Receipt, the Patent, advance orders and notification of maintenance fees will be mailed to addressee
...x 1 unless you direct otherwise, by: (a) specifying a new correspondence address in Block 3 below; or (b) providing the PTO with a separate
'FEE ...SS' for maintenance fee notifications with the payment of Issue Fee or thereafter. See reverse for Certificate of Mailing.

| 1. CORRESPONDENCE ADDRESS | 2. INVENTOR(S) ADDRESS CHANGE (Complete only if there is a change) |
|---|---|
| | INVENTOR'S NAME |
| | Street Address |
| JON L. ROBERTS    B5M1/0807 | City, State and ZIP Code |
| ROBERTS & ASSOCIATES | CO-INVENTOR'S NAME |
| 1953 GALLOWS RD. | Street Address |
| SUITE 220 | City, State and ZIP Code |
| VIENNA, VA  22182 | ☐ Check if additional changes are on reverse side |

| SERIES CODE/SERIAL NO. | FILING DATE | TOTAL CLAIMS | EXAMINER AND GROUP ART UNIT | | DATE MAILED |
|---|---|---|---|---|---|
| 08/257,390 | 06/09/94 | 020 | PITTS, M | 2514 | 08/07/9 |

| First Named Applicant | HILLS, | | ROBERT R. | | |
|---|---|---|---|---|---|

TITLE OF INVENTION    CHECKWRITING POINT OF SALE SYSTEM

| | ATTY'S DOCKET NO. | CLASS-SUBCLASS | BATCH NO. | APPLN. TYPE | SMALL ENTITY | FEE DUE | DATE DUE |
|---|---|---|---|---|---|---|---|
| 2 | | 235-379.000 | N97 | UTILITY | YES | $605.00 | 11/07/9 |

| 3. Correspondence address change (Complete only if there is a change) | 4. For printing on the patent front page, list the names of not more than 3 registered patent attorneys or agents OR, alternatively, the name of a firm having as a member a registered attorney or agent. If no name is listed, no name will be printed. | 1 Thomas M. Champagne |
|---|---|---|
| | | 2 Jon L. Roberts |
| | | 3 Roberts & Associates |

DO NOT USE THIS SPACE

1 PSO VR 10/18/95 08257390:    1 242    605.00 CK
1 PSO VR 10/18/95 08257390:    1 566    75.00 CK

5. ASSIGNMENT DATA TO BE PRINTED ON THE PATENT (print or type)

(1) NAME OF ASSIGNEE    Resource Technology Services, Inc.

(2) ADDRESS: (CITY & STATE OR COUNTRY)  Vienna, VA

6a. The following fees are enclosed:    25
☒ Issue Fee    ☒ Advance Order - # of Copies
☐ Issue Fee    ☐ Address Order - # of Copies
6b. The following fees should be charged to:
DEPOSIT ACCOUNT NUMBER _____
(ENCLOSE PART C)
☐ Issue Fee    ☐ Advance Order - # of Copies
☐ Any Deficiencies in Enclosed Fees

The COMMISSIONER OF PATENTS AND TRADEMARKS is requested to apply the Issue Fee to the application identified above.

(Authorized Signature) _____    (Date) 9/27/9

A* ☐ This application is NOT assigned.
☒ Assignment previously submitted to the Patent and Trademark Office.
☐ Assignment is being submitted under separate cover. Assignments should be directed to Box ASSIGNMENTS.
PLEASE NOTE: Unless an assignee is identified in Block 5, no assignee data will appear on the patent. Inclusion of assignee data is only appropriate when an assignment has been previously submitted to the PTO or is being submitted under separate cover. Completion of this form is NOT a substitute for filing an assignment.

NOTE: The Issue Fee will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the Patent and Trademark Office.

1. TRANSMIT THIS FORM WITH FEE-CERTIFICATE OF MAILING ON REVERSE.

PTOL-85B (REV.12-93)(0651-0033)

LML-EP 000221

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of Robert H. Hills and Henry R. Nichols

Serial No.: 08/257,390                    Group Art Unit: 2514

Filed: 06/09/94                            Examiner: Pitts, H.

Notice of Allowance: 08/07/95             Batch No.: N97

For: CHECKWRITING POINT OF SALE SYSTEM

\*      \*      \*      \*      \*
            TRANSMITTAL OF ISSUE FEE AND FORMAL DRAWINGS
\*      \*      \*      \*      \*

Commissioner of Patents and Trademarks
Box Issue Fee
Washington, D.C.  20231

Dear Sir:

        Enclosed please find the following:

    1.    Issue fee transmittal;

    2.    Two checks totaling $680.00 ($605.00 to cover the issue
          fee and $75.00 for 25 copies);

    3.    Transmittal of Formal Drawings;

    4.    Formal drawings(9 figures, 8 sheets); and

    5.    Certificate of Express mailing.

                              Respectfully submitted,

                              Thomas M. Champagne
                              Reg. No. 36,478
                              Roberts & Associates
                              1953 Gallows Road
                              Suite 220
                              Vienna, VA  22182

September 27, 1995

15

LML-EP 000222



## CERTIFICATE OF EXPRESS MAILING

Date of Mailing: _____ September 27, 1995 _____

Express Mail Number: _____ EM016206064US _____

I hereby certify that the Issue Fee Transmittal, along with the Transmittal of Formal Drawings, Formal Drawings (9 figures, 8 sheets) and two checks totaling $680.00 to cover the issue fee and 25 additional copies directed to the application of Robert H. Hills and Henry R. Nichols, Serial No. 08/257,390 for a CHECKWRITING POINT OF SALE SYSTEM are being deposited with the United States Postal Service for Express mail service under 37 C.F.R. § 1.10 on the date indicated above and are addressed to the Commissioner of Patents and Trademarks, Box Issue Fee, Washington, D.C. 20231.

Thomas M. Champagne, Esq.
Registration No. 36,478
Roberts & Associates
1953 Gallows Road
Suite 220
Vienna, Virginia 22182

LML-EP 000223

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of Robert H. Hills and Henry R. Nichols

Serial No.: 08/257,390          Group Art Unit: 2514

Filed:  06/09/94               Examiner: Pitts, H.

Notice of Allowance: 08/07/95   Batch No.: N97

For: CHECKWRITING POINT OF SALE SYSTEM

\*      \*      \*      \*      \*

TRANSMITTAL OF FORMAL DRAWINGS

\*      \*      \*      \*      \*

Official Draftsperson
Box Issue Fee
Washington, D.C.  20231

Dear Sir/Madam:

     Enclosed please find the formal drawings (9 figures, 8 sheets) for filing in the above-referenced patent application.

                          Respectfully submitted,

                          Thomas M. Champagne
                          Reg. No. 36,478
                          Roberts & Associates
                          1953 Gallows Road
                          Suite 220
                          Vienna, VA  22182

September 27, 1995

LML-EP 000224





**FIG. 1**



**FIG. 2**

LML-EP 000225





**FIG. 3**

LML-EP 000226



**FIG. 4**

LML-EP 000227



FIG. 5

LML-EP 000228

08/257 3.



FIG. 6

LML-EP 000229



**FIG. 7**

Merchant Name
Street Address
City, ST Zip
Merchant Acct #

TIME 00:00 _M                    DATE 00/00/00

BANK ACCT. NO. 000000000000

TRANSIT NO. 000000000

SALE AMOUNT                    $ 0,000.00

TERMINAL ID 0000000000

I herewith authorize ChequeMARK Systems to electronically access my designated checking account for the payment of the above referenced purchase.

Name (PRINT) _____

Street _____

City _____ ST_____ Zip _____

Tel. Number: (_____) _____ — _____

I ACKNOWLEDGE THAT RETURN FEES WILL BE IMPOSED SHOULD MY PAYMENT BE DISHONORED AND UNDERSTAND THAT IT IS UNLAWFUL TO AUTHORIZE PAYMENTS FOR WHICH ADEQUATE MONIES ARE NOT AVAILABLE WITHIN MY ACCOUNT.

X_____

Authorizing Signature

# FIG. 8

LML-EP 000231

Merchant Name
Street Address
City, ST  Zip
Merchant Acct #


**CUSTOMER BANKING INFORMATION:**

BANK ACCT. NO. _____

TRANSIT NO. _____


SALE AMOUNT . . . . . . . . . . . . . . . . . . . $ _____


I herewith authorize ChequeMARK Systems to electronically access my designated checking account for the payment of the above referenced purchase amount.   I acknowledge that sufficient funds are available for the payment of this sale.


Name (PRINT) _____

Street _____

City _____ ST_____ Zip _____

Tel. Number:  (_____) _____ — _____


I FURTHER ACKNOWLEDGE THAT RETURN FEES WILL BE IMPOSED SHOULD MY PAYMENT BE DISHONORED AND UNDERSTAND THAT IT IS UNLAWFUL TO AUTHORIZE PAYMENTS FOR WHICH ADEQUATE MONIES ARE NOT AVAILABLE WITHIN MY ACCOUNT.


X_____
Authorizing Signature

# FIG. 9

LML-EP 000232

JAN 22 1999   IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of Robert R. Hills and Henry R. Nichols

Serial No.:    08/257,390        Filed:    06/09/94

Patent No.:    5,484,988         Issued:    01/16/96

For: CHECKWRITING POINT OF SALE SYSTEM

### ASSOCIATE POWER OF ATTORNEY

Commissioner of Patents and Trademarks
Washington, D.C. 20231

Dear Sir:

   I hereby appoint: John K. Abokhair, Registration No. 30,537
whose post office address is Roberts & Brownell, LLC, 8381 Old
Courthouse Road, Suite 212, Vienna, Virginia 22182 as my
associate attorney in the above-entitled application, to
prosecute this application, to make alterations and amendments
therein, and to transact all business in the Patent and Trademark
Office connected therewith.

   Please continue to address all future communications to
Roberts & Brownell, LLC.

                    Respectfully submitted,

                    Jon L. Roberts, Esq.
                    Registration No. 31,293
                    Roberts & Brownell, LLC
                    8381 Old Courthouse Road, Suite 212
                    Vienna, Virginia 22182
                    (703) 356-7700

January 22, 1999                    Atty. Docket No.2419

LML-EP 000233

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of Robert R. Hills and Henry R. Nichols

Serial No.:    08/257,390        Filed:    06/09/94

Patent No.:    5,484,988        Issued:    01/16/96

For: CHECKWRITING POINT OF SALE SYSTEM

Assistant Commissioner of Patents
  and Trademarks
Box Assignment
Washington, D.C.  20231

Dear Sir:

    Enclosed please find the following:

    1.    Discharge of Recorded Security Interest;

    2.    Restated Certificate of Incorporation.

    These documents are filed to remove the security interst
from the official record.  The assignment record should indicate
that the related security interest is released and terminated.

                            Respectfully submitted,

                            John K. Abohkair, Esq.
                            Registration No. 30,537
                            Roberts & Brownell, LLC
                            8381 Old Courthouse Road, Suite 212
                            Vienna, VA 22182-3818
                            (703) 356-7700

January 22, 1999                        Atty. Docket No.2419

LML-EP 000234

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of Robert R. Hills and Henry R. Nichols

Serial No.:     08/257,390          Filed:      06/09/94

Patent No.:     5,484,988          Issued:     01/16/96

For: CHECKWRITING POINT OF SALE SYSTEM

Assistant Commissioner of Patents
 and Trademarks
Box Assignment
Washington, D.C.  20231

Dear Sir:

    Enclosed please find the following:

1.    Discharge of Recorded Security Interest with Recordation
      Sheet;

2.    Associate Power of Attorney;

3.    One check in the amount of $40.00; and

4.    Certificate of Express mailing.

    The Commissioner is hereby authorized to charge any fee
deficiency, or credit any overpayment, to Deposit Account No. 18-
1579. The Commissioner is also authorized to charge Deposit Account
No. 18-1579 for any future fees connected in any way to this
application.  Two copies of this letter are enclosed.

                    Respectfully submitted,


                    John K. Abohkair, Esq.
                    Registration No. 30,537
                    Roberts & Brownell, LLC
                    8381 Old Courthouse Road, Suite 212
                    Vienna, VA 22182-3818
                    (703) 356-7700


January 22, 1999                    Atty. Docket No.2419

LML-EP 000235



**UNITED STATES DEPARTMENT OF COMMERCE**
Patent and Trademark Office

**ASSISTANT SECRETARY AND COMMISSIONER**
**OF PATENTS AND TRADEMARKS**
Washington, D.C. 20231

## CHANGE OF ADDRESS/POWER OF ATTORNEY

LOCATION   .9200    SERIAL NUMBER 08257390    PATENT NUMBER 5484988

    THE CORRESPONDENCE ADDRESS HAS BEEN CHANGED TO CUSTOMER # 22208

    THE PRACTITIONERS OF RECORD HAVE BEEN CHANGED TO CUSTOMER # 22208

    THE FEE ADDRESS HAS BEEN CHANGED TO CUSTOMER # 22208

    ON 08/26/99 THE ADDRESS OF RECORD FOR CUSTOMER NUMBER  22208 IS:

                ROBERTS AND ABOKHAIR
                SUITE 1000
                11800 SUNRISE VALLEY DRIVE
                RESTON VA 20191

    AND THE PRACTITIONERS OF RECORD FOR CUSTOMER NUMBER  22208 ARE:

30537    31293    37512    42439

        PTO INSTRUCTIONS: PLEASE TAKE THE FOLLOWING ACTION WHEN THE
        CORRESPONDENCE ADDRESS HAS BEEN CHANGED TO CUSTOMER NUMBER:
        RECORD, ON THE NEXT AVAILABLE CONTENTS LINE OF THE FILE JACKET,
        'ADDRESS CHANGE TO CUSTOMER NUMBER'.  LINE THROUGH THE OLD
        ADDRESS ON THE FILE JACKET LABEL AND ENTER ONLY THE 'CUSTOMER
        NUMBER' AS THE NEW ADDRESS.  FILE THIS LETTER IN THE FILE JACKET.
        WHEN ABOVE CHANGES ARE ONLY TO FEE ADDRESS AND/OR PRACTITIONERS
        OF RECORD, FILE LETTER IN THE FILE JACKET.

PTO-FMD
TALBOT-1/97

LML-EP 000236



UNITED STATES DEPARTMENT OF COMMERCE
Patent and Trademark Office

ASSISTANT SECRETARY AND COMMISSIONER
OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

## CHANGE OF ADDRESS/POWER OF ATTORNEY

LOCATION    9200    SERIAL NUMBER 08257390    PATENT NUMBER 5484988

THE CORRESPONDENCE ADDRESS HAS BEEN CHANGED TO CUSTOMER # 22208

THE PRACTITIONERS OF RECORD HAVE BEEN CHANGED TO CUSTOMER # 22208

THE FEE ADDRESS HAS BEEN CHANGED TO CUSTOMER # 22208

ON 08/26/99 THE ADDRESS OF RECORD FOR CUSTOMER NUMBER  22208 IS:

                    ROBERTS AND ABOKHAIR
                    SUITE 1000
                    11800 SUNRISE VALLEY DRIVE
                    RESTON VA 20191


    AND THE PRACTITIONERS OF RECORD FOR CUSTOMER NUMBER  22208 ARE:

30537    31293    37512    42439


PTO INSTRUCTIONS: PLEASE TAKE THE FOLLOWING ACTION WHEN THE
CORRESPONDENCE ADDRESS HAS BEEN CHANGED TO CUSTOMER NUMBER:
RECORD, ON THE NEXT AVAILABLE CONTENTS LINE OF THE FILE JACKET,
'ADDRESS CHANGE TO CUSTOMER NUMBER'.  LINE THROUGH THE OLD
ADDRESS ON THE FILE JACKET LABEL AND ENTER ONLY THE 'CUSTOMER
NUMBER' AS THE NEW ADDRESS.  FILE THIS LETTER IN THE FILE JACKET.
WHEN ABOVE CHANGES ARE ONLY TO FEE ADDRESS AND/OR PRACTITIONERS
OF RECORD, FILE LETTER IN THE FILE JACKET.

PTO-FMD
TALBOT-1/97

LML-EP 000237



PTO UTILITY GRANT

Paper Number

## The Commissioner of Patents and Trademarks

Has received an application for a patent for a new and useful invention. The title and description of the invention are enclosed. The requirements of law have been complied with, and it has been determined that a patent on the invention shall be granted under the law.

Therefore, this

### United States Patent

Grants to the person or persons having title to this patent the right to exclude others from making, using or selling the invention throughout the United States of America for the term of seventeen years from the date of this patent, subject to the payment of maintenance fees as provided by law.

The United States of America

*Bruce Lehman*
Commissioner of Patents and Trademarks

*Marjorie V. Turner*
Attest

PTO-1584

(RIGHT INSIDE)

LML-EP 000238

**PATENT APPLICATION FEE DETERMINATION RECORD**

Effective October 1, 1992

Application or Docket Number

## CLAIMS AS FILED - PART I

| FOR | | (Column 1) NUMBER FILED | (Column 2) NUMBER EXTRA | SMALL ENTITY | | OR OTHER THAN SMALL ENTITY | |
|---|---|---|---|---|---|---|---|
| | | | | RATE | FEE | RATE | FEE |
| BASIC FEE | | | | | $355.00 | OR | $710.00 |
| TOTAL CLAIMS | | 9 minus 20 = | * | x$11= | | OR x$22= | |
| INDEPENDENT CLAIMS | | 2 minus 3 = | * | x 37= | | OR x 74= | |
| MULTIPLE DEPENDENT CLAIM PRESENT | | | | +115= | | OR +230= | |
| * If the difference in column 1 is less than zero, enter "0" in column 2 | | | | TOTAL 355.00 | | OR TOTAL | |

## CLAIMS AS AMENDED - PART II

|  | | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA | SMALL ENTITY | | OR OTHER THAN SMALL ENTITY | |
|---|---|---|---|---|---|---|---|---|
| | | | | | RATE | ADDI-TIONAL FEE | RATE | ADDI-TIONAL FEE |
| **AMENDMENT A** | Total | * 19 | Minus ** 20 | | x$11= | | OR x$22= | |
| | Independent | * 3 | Minus *** 3 | | x 37= | | OR x 74= | |
| | FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | + 115= | | OR +230= | |
| | | | | | TOTAL ADDIT. FEE | | OR TOTAL ADDIT. FEE | |

|  | | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA | RATE | ADDI-TIONAL FEE | RATE | ADDI-TIONAL FEE |
|---|---|---|---|---|---|---|---|---|
| **AMENDMENT B** | Total | * 19 | Minus ** 20 | | x$11= | | OR x$22= | |
| | Independent | * 3 | Minus *** 3 | | x 37= | | OR x 74= | |
| | FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | + 115= | | OR + 230= | |
| | | | | | TOTAL ADDIT. FEE | | OR TOTAL ADDIT. FEE | |

|  | | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA | RATE | ADDI-TIONAL FEE | RATE | ADDI-TIONAL FEE |
|---|---|---|---|---|---|---|---|---|
| **AMENDMENT C** | Total | * | Minus ** | | x$11= | | OR x$22= | |
| | Independent | * | Minus *** | | x 37= | | OR x 74= | |
| | FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | +115= | | OR +230= | |
| | | | | | TOTAL ADDIT. FEE | | OR TOTAL ADDIT. FEE | |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".
*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".
The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

FORM PTO-875
(Rev. 10-92)

Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE



LML-EP 000240

# PATENT APPLICATION FEE DETERMINATION RECORD
Effective October 1, 1992

**Application or Docket Number**

995 717

## CLAIMS AS FILED - PART I

| FOR | (Column 1) NUMBER FILED | (Column 2) NUMBER EXTRA | SMALL ENTITY RATE | FEE | OR | OTHER THAN SMALL ENTITY RATE | FEE |
|-----|----|----|----|----|----|----|----|
| BASIC FEE | | | | $355.00 | OR | | $710.00 |
| TOTAL CLAIMS | 9 | minus 20 = | x$11= | | OR | x$22= | |
| INDEPENDENT CLAIMS | 2 | minus 3 = | x 37= | | OR | x 74= | |
| MULTIPLE DEPENDENT CLAIM PRESENT | | | +115= | | OR | +230= | |
| * If the difference in column 1 is less than zero, enter "0" in column 2 | | | TOTAL | 355 | OR | TOTAL | |

## CLAIMS AS AMENDED - PART II

| | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA | SMALL ENTITY RATE | ADDI-TIONAL FEE | OR | OTHER THAN SMALL ENTITY RATE | ADDI-TIONAL FEE |
|---|----|----|----|----|----|----|----|----|
| **AMENDMENT A** Total | * | Minus ** | | x$11= | | OR | x$22= | |
| Independent | * | Minus *** | | x 37= | | OR | x 74= | |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | + 115= | | OR | +230= | |
| | | | | TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |
| **AMENDMENT B** Total | 10 | Minus ** | | x$11= | | OR | x$22= | |
| Independent | 3 | Minus *** 3 | | x 37= | | OR | x 74= | |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | + 115= | | OR | +230= | |
| | | | | TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |
| **AMENDMENT C** Total | * | Minus ** | | x$11= | | OR | x$22= | |
| Independent | * | Minus *** | | x 37= | | OR | x 74= | |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | +115= | | OR | +230= | |
| | | | | TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".
*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".
The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

FORM PTO-875
(Rev. 10-92)

Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

LML-EP 000241





# CONFIDENTIAL DOCUMENT

# D

# CONFIDENTIAL DOCUMENT

E

**Westlaw.**

Unif.Commercial Code § 3-104

**C**

Uniform Laws Annotated Currentness
  Uniform Commercial Code
    Revised Article 3 Negotiable Instruments (Last Revised or Amended in 2002) (Refs & Annos)
      Part 1. General Provisions and Definitions

→ **§ 3-104. Negotiable Instrument.**

(a) Except as provided in subsections (c) and (d), "negotiable instrument" means an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order, if it:

(1) is payable to bearer or to order at the time it is issued or first comes into possession of a holder;

(2) is payable on demand or at a definite time; and

(3) does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money, but the promise or order may contain (i) an undertaking or power to give, maintain, or protect collateral to secure payment, (ii) an authorization or power to the holder to confess judgment or realize on or dispose of collateral, or (iii) a waiver of the benefit of any law intended for the advantage or protection of an obligor.

(b) "Instrument" means a negotiable instrument.

(c) An order that meets all of the requirements of subsection (a), except paragraph (1), and otherwise falls within the definition of "check" in subsection (f) is a negotiable instrument and a check.

(d) A promise or order other than a check is not an instrument if, at the time it is issued or first comes into possession of a holder, it contains a conspicuous statement, however expressed, to the effect that the promise or order is not negotiable or is not an instrument governed by this Article.

(e) An instrument is a "note" if it is a promise and is a "draft" if it is an order. If an instrument falls within the definition of both "note" and "draft," a person entitled to enforce the instrument may treat it as either.

(f) "Check" means (i) a draft, other than a documentary draft, payable on demand and drawn on a bank or (ii) a cashier's check or teller's check. An instrument may be a check even though it is described on its face by another term, such as "money order."

(g) "Cashier's check" means a draft with respect to which the drawer and drawee are the same bank or branches of the same bank.

(h) "Teller's check" means a draft drawn by a bank (i) on another bank, or (ii) payable at or through a bank.

(i) "Traveler's check" means an instrument that (i) is payable on demand, (ii) is drawn on or payable at or through a bank, (iii) is designated by the term "traveler's check" or by a substantially similar term, and (iv) requires, as a condition to payment, a countersignature by a person whose specimen signature appears on the instrument.

(j) "Certificate of deposit" means an instrument containing an acknowledgment by a bank that a sum of money has been received by the bank and a promise by the bank to repay the sum of money. A certificate of deposit is a note of the bank.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Unif.Commercial Code § 3-104

OFFICIAL COMMENT

2004 Main Volume

1. The definition of "negotiable instrument" defines the scope of Article 3 since Section 3-102 states: "This Article applies to negotiable instruments." The definition in Section 3-104(a) incorporates other definitions in Article 3. An instrument is either a "promise," defined in Section 3-103(a)<< (9)->>·<<+(12)+>>, or "order," defined in Section 3-103(a)<< (6)->>·<<+(8)+>>. A promise is a written undertaking to pay money signed by the person undertaking to pay. An order is a written instruction to pay money signed by the person giving the instruction. Thus, the term "negotiable instrument" is limited to a signed writing that orders or promises payment of money. "Money" is defined in Section 1-201(24) and is not limited to United States dollars. It also includes a medium of exchange established by a foreign government or monetary units of account established by an intergovernmental organization or by agreement between two or more nations. Five other requirements are stated in Section 3-104(a): First, the promise or order must be "unconditional." The quoted term is explained in Section 3-106. Second, the amount of money must be "a fixed amount * * * with or without interest or other charges described in the promise or order." Section 3-112(b) relates to "interest." Third, the promise or order must be "payable to bearer or to order." The quoted phrase is explained in Section 3-109. An exception to this requirement is stated in subsection (c). Fourth, the promise or order must be payable "on demand or at a definite time." The quoted phrase is explained in Section 3-108. Fifth, the promise or order may not state "any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money" with three exceptions. The quoted phrase is based on the first sentence of N.I.L. Section 5 which is the precursor of "no other promise, order, obligation or power given by the maker or drawer" appearing in former Section 3-104(1)(b). The words "instruction" and "undertaking" are used instead of "order" and "promise" that are used in the N.I.L. formulation because the latter words are defined terms that include only orders or promises to pay money. The three exceptions stated in Section 3-104(a)(3) are based on and are intended to have the same meaning as former Section 3-112(1)(b), (c), (d), and (e), as well as N.I.L. § 5(1), (2), and (3). Subsection (b) states that "instrument" means a "negotiable instrument." This follows former Section 3-102(1)(e) which treated the two terms as synonymous.

2. Unless subsection (c) applies, the effect of subsection (a)(1) and Section 3-102(a) is to exclude from Article 3 any promise or order that is not payable to bearer or to order. There is no provision in revised Article 3 that is comparable to former Section 3-805. The comment to former Section 3-805 states that the typical example of a writing covered by that section is a check reading "Pay John Doe." Such a check was governed by former Article 3 but there could not be a holder in due course of the check. Under Section 3-104(c) such a check is governed by revised Article 3 and there can be a holder in due course of the check. But subsection (c) applies only to checks. The comment to former Section 3-805 does not state any example other than the check to illustrate that section. Subsection (c) is based on the belief that it is good policy to treat checks, which are payment instruments, as negotiable instruments whether or not they contain the words "to the order of". These words are almost always pre-printed on the check form. Occasionally the drawer of a check may strike out these words before issuing the check. In the past some credit unions used check forms that did not contain the quoted words. Such check forms may still be in use but they are no longer common. Absence of the quoted words can easily be overlooked and should not affect the rights of holders who may pay money or give credit for a check without being aware that it is not in the conventional form.

Total exclusion from Article 3 of other promises or orders that are not payable to bearer or to order serves a useful purpose. It provides a simple device to clearly exclude a writing that does not fit the pattern of typical negotiable instruments and which is not intended to be a negotiable instrument. If a writing could be an instrument despite the absence of "to order" or "to bearer" language and a dispute arises with respect to the writing, it might be argued that the writing is a negotiable instrument because the other requirements of subsection (a) are somehow met. Even if the argument is eventually found to be without merit it can be used as a litigation ploy. Words making a promise or order payable to bearer or to order are the most distinguishing feature of a negotiable instrument and such words are frequently referred to as "words of negotiability." Article 3 is not meant to apply to contracts for the sale of goods or services or the sale or lease of real property or similar writings that may contain a promise to pay money. The use of words of negotiability in such contracts would be an aberration. Absence of the words precludes any argument that such contracts might be negotiable instruments.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Unif.Commercial Code § 3-104

An order or promise that is excluded from Article 3 because of the requirements of Section 3-104(a) may nevertheless be similar to a negotiable instrument in many respects. Although such a writing cannot be made a negotiable instrument within Article 3 by contract or conduct of its parties, nothing in Section 3- 104 or in Section 3-102 is intended to mean that in a particular case involving such a writing a court could not arrive at a result similar to the result that would follow if the writing were a negotiable instrument. For example, a court might find that the obligor with respect to a promise that does not fall within Section 3-104(a) is precluded from asserting a defense against a bona fide purchaser. The preclusion could be based on estoppel or ordinary principles of contract. It does not depend upon the law of negotiable instruments. An example is stated in the paragraph following Case #2 in Comment 4 to Section 3- 302.

Moreover, consistent with the principle stated in Section 1-102(2)(b), the immediate parties to an order or promise that is not an instrument may provide by agreement that one or more of the provisions of Article 3 determine their rights and obligations under the writing. Upholding the parties' choice is not inconsistent with Article 3. Such an agreement may bind a transferee of the writing if the transferee has notice of it or the agreement arises from usage of trade and the agreement does not violate other law or public policy. An example of such an agreement is a provision that a transferee of the writing has the rights of a holder in due course stated in Article 3 if the transferee took rights under the writing in good faith, for value, and without notice of a claim or defense.

Even without an agreement of the parties to an order or promise that is not an instrument, it may be appropriate, consistent with the principles stated in Section 1-102(2), for a court to apply one or more provisions of Article 3 to the writing by analogy, taking into account the expectations of the parties and the differences between the writing and an instrument governed by Article 3. Whether such application is appropriate depends upon the facts of each case.

3. Subsection (d) allows exclusion from Article 3 of a writing that would otherwise be an instrument under subsection (a) by a statement to the effect that the writing is not negotiable or is not governed by Article 3. For example, a promissory note can be stamped with the legend NOT NEGOTIABLE. The effect under subsection (d) is not only to negate the possibility of a holder in due course, but to prevent the writing from being a negotiable instrument for any purpose. Subsection (d) does not, however, apply to a check. If a writing is excluded from Article 3 by subsection (d), a court could, nevertheless, apply Article 3 principles to it by analogy as stated in Comment 2.

4. Instruments are divided into two general categories: drafts and notes. A draft is an instrument that is an order. A note is an instrument that is a promise. Section 3-104(e). The term "bill of exchange" is not used in Article 3. It is generally understood to be a synonym for the term "draft." Subsections (f) through (j) define particular instruments that fall within the categories of draft and note. The term "draft," defined in subsection (e), includes a "check" which is defined in subsection (f). "Check" includes a share draft drawn on a credit union payable through a bank because the definition of bank (Section <<+4-104->> <<+4-105+>>) includes credit unions. However, a draft drawn on an insurance company payable through a bank is not a check because it is not drawn on a bank. "Money orders" are sold both by banks and non-banks. They vary in form and their form determines how they are treated in Article 3. The most common form of money order sold by banks is that of an ordinary check drawn by the purchaser except that the amount is machine impressed. That kind of money order is a check under Article 3 and is subject to a stop order by the purchaser-drawer as in the case of ordinary checks. The seller bank is the drawee and has no obligation to a holder to pay the money order. If a money order falls within the definition of a teller's check, the rules applicable to teller's checks apply. Postal money orders are subject to federal law. "Teller's check" is separately defined in subsection (h). A teller's check is always drawn by a bank and is usually drawn on another bank. In some cases a teller's check is drawn on a nonbank but is made payable at or through a bank. Article 3 treats both types of teller's check identically, and both are included in the definition of "check." A cashier's check, defined in subsection (g), is also included in the definition of "check." Traveler's checks are issued both by banks and non-banks and may be in the form of a note or draft. Subsection (i) states the essential characteristics of a traveler's check. The requirement that the instrument be "drawn on or payable at or through a bank" may be satisfied without words on the instrument that identify a bank as drawee or paying agent so long as the instrument bears an appropriate routing number that identifies a bank as paying agent. <<+*Previous incorrect cross reference corrected by Permanent Editorial Board action November 1992.+*>>

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Unif.Commercial Code § 3-104

The definitions in Regulation CC § 229.2 of the terms "check," "cashier's check," "teller's check," and "traveler's check" are different from the definitions of those terms in Article 3.

Certificates of deposit are treated in former Article 3 as a separate type of instrument. In revised Article 3, Section 3-104(j) treats them as notes.

<<+5. There are some differences between the requirements of Article 3 and the requirements included in Article 3 of the Convention on International Bills of Exchange and International Promissory Notes. Most obviously, the Convention does not include the limitation on extraneous undertakings set forth in Section 3-104(a)(3), and does not permit documents payable to bearer that would be permissible under Section 3-104(a)(1) and Section 3-109. See Convention Article 3. In most respects, however, the requirements of Section 3-104 and Article 3 of the Convention are quite similar.+>> *Amendments approved by the Permanent Editorial Board for Uniform Commercial Code November 2, 2002.*

## ACTION IN ADOPTING JURISDICTIONS

2005 Electronic Pocket Part Update

**Variations from Official Text:**

## MAINE

In subsec. (f), adds a subdivision [designated (c) in the Maine act], which provides:

"(c) A demand draft."

Adds a subsection [designated (11) in the Maine act], which provides:

"(11) 'Demand draft' means a writing not signed by a customer that is created by a 3rd party under the purported authority of the customer for the purpose of charging the customer's account with a bank. A demand draft must contain the customer's account number and may contain any or all of the following:

"(a) The customer's printed or typewritten name;

"(b) A notation that the customer authorized the draft; and

"(c) The statement 'No Signature Required' or words to that effect.

" 'Demand draft' does not include a check purportedly drawn by and bearing the signature of a fiduciary, as defined in section 3-1307, subsection 1, paragraph (a)."

## VERMONT

In subsec. (f), the first sentence provides: " 'Check' means (i) a draft, other than a documentary draft, payable on demand and drawn on a bank; (ii) a cashier's check or teller's check; or (iii) a demand draft."

Adds a subsection [designated (k) in the Vermont act], which provides:

"(k) 'Demand draft' means a writing not signed by a customer that is created by a third party under the purported authority of the customer for the purpose of charging the customer's account with a bank. A demand draft shall contain the customer's account number and may contain any or all of the following: (i) the customer's printed or typewritten name; (ii) a notation that the customer authorized the draft; and (iii) the statement 'No Signature Required' or words to that effect. A demand draft shall not include a check purportedly drawn by and bearing the signature of a fiduciary, as defined in subdivision (a)(1) of section 3-307 of this title."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

F

# CONFIDENTIAL DOCUMENT

# G

# CONFIDENTIAL
# DOCUMENT

# H

# CONFIDENTIAL DOCUMENT

I

# CONFIDENTIAL DOCUMENT

# CONFIDENTIAL DOCUMENT

J

# CONFIDENTIAL
# DOCUMENT

K

# CONFIDENTIAL DOCUMENT

L

# CONFIDENTIAL DOCUMENT

M

# CONFIDENTIAL DOCUMENT



# CONFIDENTIAL
# DOCUMENT



# CONFIDENTIAL DOCUMENT

P

# CONFIDENTIAL
# DOCUMENT



# CONFIDENTIAL DOCUMENT



# Hot off the Press

## NEWS FROM PUBLIC RELATIONS

*The following press release was issued on December 8, 1999*

## TELECHECK REACHES BILLION DOLLAR MARK WITH ELECTRONIC CHECK ACCEPTANCE SERVICE

HOUSTON, December 8, 1999 – TeleCheck Services, Inc., the world's leading check acceptance company and a subsidiary of Atlanta-based First Data Corp. (NYSE: FDC), today announced that it has settled one billion dollars of electronic transactions since the nationwide introduction of the TeleCheck® Electronic Check Acceptance℠ (ECA®) service last year. TeleCheck has electronically processed over 13 million transactions for their ECA® merchant base, which has grown almost 280 percent in the past year.

The TeleCheck® Electronic Check Acceptance℠ (ECA®) service converts and processes a customer's paper check as an electronic item at the point of purchase in a process that is similar to a credit card transaction. When making a purchase, the consumer presents a completed paper check as usual. Then, TeleCheck converts the paper check into an electronic item through the new Eclipse™ integrated payment terminal that reads the banking information off the bottom of the check.

The consumer then simply signs a printed receipt authorizing the electronic transaction and the cancelled paper check, along with a copy of the authorization slip, is returned to the consumer. A complete description of the transaction is included in the check writer's bank statement for reconciliation purposes, and consumers retain the same rights as today in disputing any fraudulent items posted to their account. In addition, since the check writer keeps the cancelled physical check, the risk of name, address and other personal information being used fraudulently is substantially reduced.

"Having processed over a billion dollars of electronic transactions in 18 months indicates that ECA® is reaching critical points in market acceptance," said Steve Shaper, chief executive officer of TeleCheck. "Consumers like it because they continue to benefit from the float of their paper check and the merchant benefits from faster processing and reduced paperwork since funds are automatically deposited into their account, reducing time-consuming trips to the bank."

- more -



TeleCheck Reaches Billion Dollar Mark / Page 2

The TeleCheck® ECA® process moves transactions through the Automated Clearing House (ACH) network. The transactions follow interim rules instituted in September 1999 by NACHA – The Electronic Payments Association – for paper checks converted to electronic items at the point of sale. A final NACHA rule, called Point of Purchase or POP, will take effect in September 2000. TeleCheck was actively involved in the development of the rules, serving as co-sponsor during the rules process.

The Eclipse™ terminal is capable of processing checks, credit cards and debit cards and is the first integrated payment terminal to securely, effectively and economically read and image all pre-printed information off the face of a check. Eclipse reads the check MICR line (the bank numbers in magnetic ink along the bottom of the check) both magnetically and optically, virtually eliminating errors in reading the MICR number.

TeleCheck is the world's leading provider of paper and electronic check services, helping more than 210,000 retail, financial institution, grocery and other industry clients to increase their profitability, reduce risk and streamline operations. TeleCheck's check acceptance and electronic commerce solutions help businesses safely and efficiently accept payment at the point of sale, by telephone, over the Internet, and through recurring ACH payments. TeleCheck services are offered through a sales and service network in more than 90 cities in the United States and in Canada, Puerto Rico, Australia and New Zealand. In 1998, TeleCheck authorized more than $112 billion in checks, representing 2.2 billion transactions. For more information about TeleCheck, visit the Internet site at www.telecheck.com.

Atlanta-based First Data Corp. (NYSE: FDC) helps move the world's money. As the leader in electronic commerce and payment services, First Data serves more than two million merchant locations, 1,400 card issuers and millions of consumers, making it easier, faster and more secure for people and businesses to buy goods and services. For more information, please visit the company's web site at www.firstdatacorp.com.

# # #

FDC08533

S



# 2 0 0 5

# A Complete Guide To Rules & Regulations Governing the ACH Network

LML-EP-055336

# 2 0 0 5

# ACH RULES

## A Complete GuideTo Rules & Regulations Governing the ACH Network

Copyright 2005 by the National Automated Clearing House Association

All Rights Reserved

Printed in the United States of America

13665 Dulles Technology Drive, Suite 300

Herndon, VA 20171

703-561-1100

LML-EP-055337

SUBSECTION 2.2.1.4 Revocation of Authorization

♦ At the time the entry is transmitted to an Originating ACH Operator, the Originator's authorization has not been revoked, the agreements required by subsection 2.1.1 (Originator Authorization and Agreement) concerning the entry have not been terminated, and neither the ODFI, any Third-Party Sender, nor the Originator has actual knowledge of the revocation of the Receiver's authorization or of the termination of the arrangement between the RDFI and the Receiver concerning the entry.

SUBSECTION 2.2.1.5 Termination of Authorization by Operation of Law

At the time the entry is processed by an RDFI, the authorization for that entry has not been terminated, in whole or in part, by operation of law. This subsection shall not apply if the RDFI has actual knowledge of the circumstances giving rise to such termination at the time it processes the entry and the ODFI does not have such actual knowledge.

◊ SUBSECTION 2.2.1.6 Transmission of ACH Information Via Unsecured Electronic Networks

For each entry for which any banking information, including, but not limited to, an Entry, Entry Data, a routing number, an account number, and a PIN or other identification symbol, is transmitted or exchanged between a Receiver and an Originator, or an Originator and an ODFI, via an Unsecured Electronic Network, the Originator has, prior to the key entry and through transmission of any banking information, (1) encrypted the banking information using a commercially reasonable security technology that, at a minimum, is equivalent to 128-bit RC4 encryption technology, or (2) transmitted or received the banking information via a secure session using a commercially reasonable security technology that provides a level of security that, at a minimum, is

□ equivalent to 128-bit RC4 encryption technology. *[For each entry for which any banking information, including, but not limited to, an Entry, Entry Data, a routing number, an account number, and a PIN or other identification symbol, is transmitted or exchanged between a Receiver and an Originator, or an Originator and an ODFI, an ODFI and an ACH Operator, or an Originator or ODFI and a Third-Party Service Provider, via an Unsecured Electronic Network, the Originator has, prior to the key entry and through transmission of any banking information, (1) encrypted the banking information using a commercially reasonable security technology that, at a minimum, is equivalent to 128-bit RC4 encryption technology, or (2) transmitted or received the banking information via a secure session using a commercially reasonable security technology that provides a level of security that, at a minimum, is equivalent to 128-bit RC4 encryption technology.]*

◊ Transmissions or exchanges of banking information over an Unsecured Electronic Network by means of voice or keypad inputs from a wireline or wireless telephone are not subject to this Subsection 2.2.1.6 unless the telephone is used to access the Internet.

◊ SUBSECTION 2.2.1.7 Verification of Identity of Originator

The ODFI has utilized a commercially reasonable method to establish the identity of each Originator that uses an Unsecured Electronic Network to enter into a contractual relationship with an ODFI for the origination of ACH transactions.

SUBSECTION 2.2.1.8 PIN Requirements

If a personal identification number (PIN) is required in connection with the authorization for an MTE, POS, or SHR entry, the Originator has complied with the American National Standards Institute's (ANSI) Accredited Standards Committee (ASC) X9.8 concerning PIN Management and Security. This warranty does not apply to SHR or MTE entries if the ODFI and the RDFI are parties to an agreement (other than these rules) for the provision of services relating to these entries, or if a card issued by the ODFI or Originator of the entry is used in connection with the authorization for these entries.

SUBSECTION 2.2.1.9    Transmittal of Required Information

Each entry transmitted by the ODFI to an ACH Operator contains the correct Receiver account number and all other information necessary to enable the RDFI to comply with the requirements of section 4.5 (Periodic Statements) except for information within the purview of the RDFI's relationship with the Receiver. Information transmitted with an entry is payment related and conforms to the requirements of Appendix Two (ACH Record Format Specifications).

SUBSECTION 2.2.1.10 Reclamation Entries

(a) In the case of a reclamation entry initiated pursuant to section 2.6 (Reclamation Entries) or a written demand for payment initiated pursuant to section 4.8 (Liability of RDFI for Benefit Payments), all information is accurate and applies to the Receiver and account identified in the reclamation entry or written demand; (b) Each such reclamation entry or written demand for payment falls within the time requirements of section 4.8.4 (Timing), has been properly authorized by the intended Receiver of the reclamation entry or written demand, and the authorization for the entry or written demand has not been revoked or otherwise terminated at the time it is received by the RDFI; (c) Any payments subject to section 4.8 are made with no restriction on the number of parties having an interest in the account.

♦ *Approved December 2, 2003; Effective December 10, 2004*
◊ *Approved December 2, 2003; Effective September 10, 2004*
□ *Approved November 9, 2004; Effective March 18, 2005*

                                                        *OR 5*

LML-EP-055420

## SECTION 3.7  Obligations of Originators of ARC Entries

### SUBSECTION 3.7.1 Notice Obligation

The Originator must, in advance of receiving from the Receiver each source document used as the basis for the origination of an ARC entry, provide the Receiver with notice that clearly and conspicuously states that receipt of the Receiver's source document will authorize an ACH debit entry to the Receiver's account in accordance with the terms of the source document. If the Originator has received notice in accordance with the reasonable procedures established by the Originator that the receipt of the check does not authorize an ACH debit entry, then receipt of a check by the Originator does not authorize an ACH debit entry to the account on which the check is drawn.

### SUBSECTION 3.7.2 Source Documents

For an ARC entry, a check or sharedraft provided to the Originator by the Receiver via the U.S. mail or at a dropbox location must be used by the Originator as the source document for the Receiver's routing number, account number, check serial number, and dollar amount. To be used as the source document for an ARC entry, a check or sharedraft must (1) contain a pre-printed serial number, (2) be drawn on a Consumer Account, and (3) be completed and signed by the Receiver.

The following may not be used as the source document for ARC entries: (1) checks drawn on corporate or business accounts, (2) third-party checks, (3) demand drafts and third-party drafts that do not contain the signature of the Receiver, (4) credit card checks, (5) obligations of a financial institution (e.g. travelers checks, cashier's checks, official checks, money orders, etc.), (6) checks drawn on the Treasury of the United States, a Federal Reserve Bank, or a Federal Home Loan Bank, (7) checks drawn on a state or local government, or (8) checks payable in a medium other than United States currency.

### SUBSECTION 3.7.3 Copy of Source Document

The Originator must retain a reproducible, legible, image, microfilm, or copy of the front of the Receiver's source document for each ARC entry for two years from the Settlement Date of the ARC entry. At the request of the ODFI, the Originator must provide a copy of the front of the source document to the ODFI for its use or for the use of an RDFI requesting such information pursuant to subsection 2.9.3.2 (Copy of Source Document).

### SUBSECTION 3.7.4 Source Document Will Not Be Presented for Payment

The source document to which the ARC entry relates may not be used by the Originator as a check to obtain payment.

### SUBSECTION 3.7.5 Destruction of Source Document

The source document to which the ARC entry relates must be destroyed within fourteen days of the Settlement Date of the entry.

### SUBSECTION 3.7.6 Capture of MICR Information

During initial processing of an ARC entry, the Originator may not key-enter the routing number, account number, or check serial number from the Receiver's source document. An Originator may, however, key-enter such information to correct errors relating to MICR misreads, miscoding, or processing rejects.

## SECTION 3.8  Obligations of Originators of POP Entries

### SUBSECTION 3.8.1  Source Documents

For a POP entry, a check or sharedraft provided by the Receiver at the point-of-purchase must be used by the Originator as a source document for the Receiver's routing number, account number, and check serial number. The source document must then be voided by the Originator. Only a check or sharedraft that contains a pre-printed serial number and that is drawn on a Consumer Account may be used as a source document for this type of transaction.

For POP entries, the following may not be used as source documents: (1) checks drawn on corporate or business deposit accounts, (2) third-party checks, (3) credit card checks, (4) obligations of a financial institution (e.g., traveler's checks, cashier's checks, official checks, money orders, etc.), (5) checks drawn on the Treasury of the United States, a Federal Reserve Bank, or a Federal Home Loan Bank, (6) checks drawn on a state or local government, or (7) checks payable in a medium other than United States currency. For POP entries, a previously voided check or sharedraft that has been used by the Receiver for a prior POP entry may not be used as a source document for this type of transaction.

### SUBSECTION 3.8.2  Capture of MICR Information

The Originator may not key-enter the routing number, account number, or check serial number from the Receiver's source document.

### SUBSECTION 3.8.3  Receipts

An Originator must provide to each Receiver a receipt containing the following information with respect to each POP entry to the Receiver's account:

(a)     Originator name (merchant)
(b)     company (merchant)/third-party service provider telephone number;
(c)     date of transaction;
(d)     transaction amount;

LML-EP-055429

5:00 p.m. (RDFI's local time) on the banking day prior to the Settlement Date must be made available to the Receiver for withdrawal or cash withdrawal at the opening of business on the Settlement Date. For purposes of the preceding sentence, opening of business is defined as the later of 9:00 a.m. (RDFI's local time) or the time the RDFI's teller facilities (including ATMs) are available for customer account withdrawals.

### SUBSECTION 4.4.2 Time of Debiting of Entries

An RDFI must not debit the amount of any entry to a Receiver's account prior to the Settlement Date of the entry, even if the effective entry date of the entry is different from the Settlement Date of the entry.

### SUBSECTION 4.4.3 Provision of Payment-Related Information to Receiver

Upon the request of the Receiver, an RDFI must provide to its Receiver all Payment-Related Information contained within the Addenda Records transmitted with CCD, CIE, and CTX entries. The RDFI must provide this information to its Receiver by the opening of business on the second banking day following the Settlement Date of the entry.

### SUBSECTION 4.4.4 Crediting of Originators' Accounts by Receiver

A Receiver must credit the Originator with the amount of an entry credited to the Receiver's account as of the Settlement Date. The Receiver shall have a reasonable period of time after the entry is credited to the Receiver's account to post the amount of the credit to the Originator's account or return the entry to the RDFI. For purposes of this section, a Receiver shall be considered to act within a reasonable period of time if the Receiver posts the credit or returns the entry no later than the time at which the Receiver would usually complete the process of posting credits resulting from payments received to its customers' accounts or returning these payments. A Receiver that returns an entry according to the requirements of this subsection 4.4.4 is not considered to have accepted the entry. This subsection 4.4.4 does not apply to MTE, POS, PPD, or SHR entries.

### SUBSECTION 4.4.5 Rights of Receiver Upon Unauthorized Debit to Its Account

A Receiver or other person whose account is debited by an entry which is, in whole or in part, not authorized by such person shall have rights, including the right to have the account recredited as provided by law or agreement. Except as provided for in subsection 8.6.7 (Waiver of Right to Recredit), these rules shall not provide for or restrict any such rights.

### SUBSECTION 4.4.6 Reliance on Standard Entry Class Codes

An RDFI may consider an entry containing a Standard Entry Class Code specified in Appendix Two (ACH Record Format Specifications) as complying with the requirements of these rules for that type of entry.

### SUBSECTION 4.4.7 Reimbursement of RDFI

For a credit entry subject to Article 4A, credit given to the Receiver by the RDFI as provided in subsection 4.4.1 (Availability of Credit Entries to Receivers) is provisional until the RDFI has received final settlement through a Federal Reserve Bank or has otherwise received payment as provided in Section 4A-403(a) of Article 4A. If such settlement or payment is not received, the RDFI is entitled to a refund from the Receiver of the amount credited, and the Originator is considered not to have paid the Receiver the amount of the entry. This subsection applies only if the Receiver has agreed to be bound by the rules contained in this subsection 4.4.7.

## SECTION 4.5 Periodic Statements

An RDFI must send or make available to each of its Receivers information concerning each credit and debit entry to a Consumer Account of the Receiver in accordance with Appendix Four (Minimum Description Standards). In the case of CIE entries, this requirement and the requirements of Appendix Four apply to the ODFI for each credit entry debited to a Consumer Account of the Originator.

## SECTION 4.6 Notice to Receiver

An RDFI is not required to notify a Receiver of receipt of an entry to its account unless otherwise provided for in an agreement between the RDFI and Receiver or required by a federal or state statute or regulation which cannot be varied by these rules or by agreement of the parties.

## SECTION 4.7 Release of Information

Each RDFI agrees that each ACH Operator may release to the National Association data regarding ACH return entries transmitted to or by the RDFI.

## SECTION 4.8 Liability of RDFI for Benefit Payments

### SUBSECTION 4.8.1 Liability of RDFI

If a Receiver has died and the Receiver's right to receive one or more pension, annuity, or other benefit payments by PPD entry has terminated before the receipt by the RDFI of one or more credit entries to the Receiver's account representing those payments, the RDFI may be liable to the Originator for the amount of those entries credited to the Receiver's account if neither the Receiver's estate nor any other holder of the account is entitled to the

LML-EP-055432

**R36**   *Return of Improper Credit Entry*

- ACH credit entries (with the exception of reversals) are not permitted for use with the ARC Standard Entry Class Code.

- ACH credit entries (with the exception of reversals) are not permitted for use with the POP Standard Entry Class Code.

- RCK entries must be limited to debits to demand accounts, with the exception of reversals to correct erroneous entries.

- ACH credit entries (with the exception of reversals) are not permitted for use with the WEB Standard Entry Class Code.

- ACH credit entries (with the exception of reversals) are not permitted for use with the TEL Standard Entry Class Code.

Creation of the resulting automated return entries shall be in accordance with the specifications in Appendix Five (Return Entries).

# APPENDIX FOUR - MINIMUM DESCRIPTION STANDARDS

These rules require each RDFI to send or make available to each Receiver specific minimum descriptive information concerning each credit or debit entry to the Receiver's account. This descriptive information, which is consistent with the requirements of Section 205.9(b) of Federal Regulation E, is as follows:

(a) Posting date to customer's account
(b) Dollar amount of the entry
(c) Company name
(d) Company entry description
(e) Type of account (e.g., checking)
(f) Number of the account
(g) Amount of any charges assessed against the account for electronic fund transfer services
(h) Balances in the customer's account at the beginning and at the close of the statement
(i) Terminal Identification Code (MTE, POS, and SHR entries)
(j) Terminal Location (MTE, POS, and SHR entries)
(k) Terminal City (MTE, POP, POS, and SHR entries)
(l) Terminal State (MTE, POP, POS, and SHR entries)
(m) Address and telephone number to be used for inquiries or notices of errors preceded by "Direct Inquiries To" or similar language

The above requirements do not apply to Receivers' passbook accounts which may not be accessed by electronic fund transfers other than preauthorized credit transfers. However, they do apply whether or not Regulation E imposes certain of those requirements on a person other than the RDFI and whether or not the Regulation exempts a Participating DFI from all such requirements with respect to certain types of entries.

For Accounts Receivable (ARC) Entries, Destroyed Check Entries (XCK), Re-presented Check (RCK) Entries and Point-of-Purchase (POP) Entries, these rules require that, in addition to the information noted above, the RDFI also provide the Receiver with the following information relating to the entry:

(a)  Check Serial Number.

NACHA strongly recommends, but these Rules do not require, that a RDFI also send or make available to each of its Receivers the following additional information with respect to a credit or debit entry made to such Receiver's account.

(a)  Company Descriptive Date
(b)  Individual Identification Number/ Identification Number

Terms used herein shall have the meanings set forth in Appendix Two (ACH Record Format Specifications) of these Rules.

# APPENDIX FIVE - RETURN ENTRIES

Except as otherwise provided in Article Six, section 6.1 (Return of Entries) of these rules, an RDFI may return entries for any reason, provided it uses an appropriate Return Reason Code as specified in this Appendix and, if it uses Return Reason Code R11 or R17, provided it specifies the reason for the return. If no appropriate Return Reason Code is specified in this Appendix Five, the RDFI shall use the code which most closely approximates the reason for return.

### SECTION 5.1  Automated Return Entries

NOTE:  Throughout this section, DFIs will always be designated by their original names. For example, the ODFI is the DFI that initially prepared the original entry, and which will eventually have the Automated Return Entry delivered to it. The RDFI is the DFI that was supposed to receive the original entry and will usually be preparing the Automated Return Entry. In some cases an Automated Return Entry may be prepared by an intervening ACH Operator if the entry cannot be delivered or if it contains an erroneous condition.

LML-EP-055504

T

# CONFIDENTIAL DOCUMENT

U

# CONFIDENTIAL DOCUMENT



US005175682A

# United States Patent [19]

## Higashiyama et al.

[11] Patent Number: 5,175,682

[45] Date of Patent: Dec. 29, 1992

[54] CHECK SYSTEM AND METHOD INCLUDING PRIORITIZING CHECKS FOR TRANSMISSION TO BANKS FOR PROCESSING

[75] Inventors: Connie Higashiyama, Redwood City, Calif.; William Melton, Herndon, Va.; Ashok Narasimhan, Los Altos, Calif.

[73] Assignee: Verifone, Inc., Redwood City, Calif.

[21] Appl. No.: 627,640

[22] Filed: Dec. 14, 1990

[51] Int. Cl.⁵ .................................... G06F 15/30
[52] U.S. Cl. ............................ 364/408; 235/379
[58] Field of Search ............ 364/401, 406, 408; 235/379-383

[56]                  References Cited

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,187,498 | 2/1980 | Creekmore | 235/379 |
| 4,321,672 | 3/1982 | Braun et al. | |
| 4,436,992 | 3/1984 | Simjian | 235/381 |
| 4,454,414 | 6/1984 | Benton | 235/383 |
| 4,948,174 | 8/1990 | Thompson et al. | |
| 4,972,463 | 11/1990 | Danielson et al. | 235/381 |
| 4,974,878 | 12/1990 | Josephson | |
| 4,977,595 | 12/1990 | Ohta et al. | 235/381 |
| 5,053,607 | 10/1990 | Carlson et al. | 235/379 |

### OTHER PUBLICATIONS

"A complete guide to rule & Regulations Governing

the Ach Network," 1990 Ach Rules, Copyright 1990, *National Automated Clearing House Assoc.*, OR 51–75.

*Primary Examiner*—Gail O. Hayes
*Attorney, Agent, or Firm*—Cooley, Godward, Castro, Huddleson, & Tatum

[57]                  ABSTRACT

A method and structure are provided for processing checks in an extremely timely and cost-effective manner. A check recipient, such as a merchant, utility billing department, and the like, utilize hardware and software for quickly gathering data from checks received in order to allow prompt processing of those checks. Such hardware preferably includes a reader for reading the MICR account information printed on the check, and means for associating that data with information pertaining to the transaction at hand, including for example, the dollar amount of the transaction. This information is combined in a data record which is stored for future batch data transmission to a clearing house or the issuing bank itself. In an alternative embodiment, this data is communicated in real time to the clearing house or issuing bank. In another embodiment, one or more selection criteria are used to determine which checks will be processed in real time, with the remaining checks being processed in the batch mode. For example, checks written above a threshold dollar amount, out of state checks, or any other high risk checks are processed in real time in order to minimize losses due to fraudulent check use.

19 Claims, 2 Drawing Sheets



**U.S. Patent**         Dec. 29, 1992         Sheet 1 of 2         **5,175,682**



*FIGURE 1*   (PRIOR ART)

FDC5000152



**FIGURE 2**

FDC5000153

5,175,682

| 1 | 2 |

# CHECK SYSTEM AND METHOD INCLUDING PRIORITIZING CHECKS FOR TRANSMISSION TO BANKS FOR PROCESSING

## INTRODUCTION

### 1. Technical Field

This invention pertains to electronic data processing of financial instruments, and more specifically to a method and structure for clearing checks written by a customer.

### 2. Background

FIG. 1 shows the typical path by which a check 101 finds its way to the issuing bank such that the checking account user's account is debited. As shown in FIG. 1, the customer writes check 101 and presents it to merchant 102 as a convenient way for the customer to make a payment to merchant 102. The merchant will then, typically at the end of the day, provide the check (together with others received that day) to the merchant bank 103, as a deposit to the account which merchant 102 maintains in merchant bank 103. Merchant bank 103, after posting the checks to Merchant 102 account, forwards a batch of checks to the automated clearing house (ACH) 104, such as that provided by the National Automated Clearing House Association (NACHA) of Washington, D.C. ACH 104 sorts the checks by their issuing banks, electronically transmits information pertaining to the checks to Federal Reserve Bank 105, and forward the paper checks to the appropriate issuing banks. Federal Reserve Bank 105 in turn electronically transmits information to issuing bank 106 so that each check 101 is debited to the check writer's account maintained in issuing bank 106. Since the vast majority of checks clear without problems, checks are assumed to be valid. If, the account has been closed, or the account contains non-sufficient funds, issuing bank 106 has a certain period of time in which it must issue an exception report indicating that the check has not cleared. This information is communicated to Merchant Bank 103 so that the check amount can be deducted from the merchant's account in order to nullify the deposit to the merchant's account made by Merchant Bank 103 when it assumed that the check was valid.

Table 1 depicts the typical time delay and costs associated with each check taking the prior art path shown in FIG. 1. While these costs and time delays do not seem particularly large to the uninitiated, partly due to the fact that most consumers are accustomed to the time delays involving clearing checks, it is highly advantageous to merchants and financial institutions to speed the check clearing process and reduce the costs associated therewith. Over 55 billion checks are written annually, of which 10 to 15 billion are written to merchants at the point of sale (POS). Thus, the cost associated with processing these checks, as well as the time delays involved in transferring funds (i.e., the "float"), result in a very large cost associated with check processing. Magnetically encoded checking account numbers are printed on checks in order to speed this process, yet as shown in Table 1 the process remains inherently slow and costly.

### TABLE 1

| | Appropriate Time Delay | Approximate Cost per check |
|---|---|---|
| Merchant to Merchant Bank | 1–5 days | $.05–.10 |
| Merchant Bank to ACH | 1 day | .01–.02 |

### TABLE 1-continued

| | Appropriate Time Delay | Approximate Cost per check |
|---|---|---|
| ACH to Federal Reserve | 1 day | .01 |
| Federal Reserve to Issuing Bank | 1 day | .01 |

It has been attempted to utilize debit cards in place of checks and credit cards in order to allow merchants to instantly debit a customer's account. However, there are a number of disadvantages with debit card systems. First, debit card systems require processing in real time. Not only does this cause a time delay to both the consumer and the merchant, but the costs of maintaining communication links for real time processing are expensive, on the order of $0.15 per transaction. Furthermore, checking accounts and credit cards are already widely held, and there is some reluctance on the part of consumers to embrace debit cards. Merchants who accept debit cards, such as those gas stations which allow customers to pay using their automated teller machine (ATM) cards, find many consumers unwilling to utilize their ATM cards due to the additional expense (typically $0.15–0.25 per transaction) and perhaps the psychological reluctance to allow a merchant direct debit access to their bank account.

Furthermore, due to a lack of industry standards, for example pertaining to electronic networks, personal identification numbers (PINs), and encryption keys, inadequate customer incentives, and high costs, the use of debit cards has not become widely accepted.

Another disadvantage utilizing the present method for clearing checks is that the long time delay allows fraudulent check writers an excessive amount of time during which they are free to write fraudulent checks before their checking account numbers are added to a list of problem checking accounts.

## SUMMARY OF THE INVENTION

In accordance with the teachings of this invention, a novel method and structure are provided for processing checks in an extremely timely and cost-effective manner. In accordance with the teachings of this invention, a check recipient, such as a merchant, utility billing department, and the like, utilize hardware and software for quickly gathering data from checks received in order to allow prompt processing of those checks. Such hardware preferably includes a reader for reading the MICR account information printed on the check, and means for associating that data with information pertaining to the transaction at hand, including for example, the dollar amount of the transaction. This information is combined in a data record which is stored for future batch data transmission to a clearing house or the issuing bank itself. In an alternative embodiment, this data is communicated in real time to the clearing house or issuing bank. In yet another embodiment of this invention, one or more selection criteria are used to determine which checks will be processed in real time, with the remaining checks being processed in the batch mode. For example, checks written above a threshold dollar amount, out of state checks, or any other high risk checks are processed in real time in order to minimize losses due to fraudulent check use.

FDC5000154

5,175,682

3

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 depicts the typical prior art process by which a check is written and ultimately returned to the issuing bank; and

FIG. 2 is a block diagram depicting one embodiment of a transaction system constructed in accordance with the teachings of this invention.

## DETAILED DESCRIPTION

FIG. 2 depicts one embodiment of a system for use by a merchant in accordance with the teachings of this invention. Merchant system 200 includes one or more point of sale systems 210 including, for example, point of sale terminal 201 such as a typical electronic cash register, or the like. Magnetic Ink Character Recognition (MICR) reader 202 is used for reading the magnetic account number printed on checks, which data is fed to POS terminal 201. Alternatively, the information pertaining to the check's account number, etc. can be entered in any convenient manner, for example via the keypad on the POS terminal 201, or via a customer identification card issued by the merchant. However, the use of the MICR reader allows greatest through put and accuracy. Printer 203 is used by POS terminal 201 for a variety of tasks, if desired, for example, printing a sales slip, printing validation information on a check, or printing a check receipt, as will be described in more detail later. POS terminal 201 is connected to backroom processor 204, such as those which are known in the prior art for maintaining sales information, performing price lookups, and inventory adjustment during the course of business. Telecommunications unit 205 is connected to backroom processor 204 and, if desired, directly to POS terminal 201 to allow data to be communicated to a check clearing house, for example.

The operation of the system of FIG. 2, in one embodiment, is as follows. The merchant utilizes POS terminal 201 to enter a transaction. POS terminal 201 can be, for example, a typical prior art electronic cash register, or a more sophisticated computer system. Alternatively, POS terminal 201 may be an accounts receivable system utilized by a public utility, for example, rather than the typical cash register found at a merchant.

The customer then tenders payment. Payments tendered utilizing credit cards, cash, or debit cards may be processed in a conventional manner. When the customer provides a check, however, the check is read by MICR reader 202 and the account information is provided to POS terminal 201. POS terminal 201 then provides additional information in order to create a data record for this transaction which is being paid for by check. Appropriate fields for this data record are, for example, as follows:

Date and Time
Merchant demand deposit account (DDA) number (checking account number)
Customer checking account No. and Routing information
Amount of check
Check No.
Any other discretionary data (electronic journaling)

Certain of this information can be provided automatically by POS terminal 201. Other information, such as amount the check is written for is provided by the merchant, for example via the POS keypad. Electronic journaling information is additional information which may either be retained by the merchant or used to provide a more precise indication of the nature of the purchase on the customer's monthly checking account statement. Such additional information may include, for example, the name of the merchant, the merchant's location, a summary of the goods for services provided, for example sorted by department in the department store. This electronic journaling information serves, for example, to reward the customer when reviewing his monthly statement that the charges appearing on the monthly statement are in fact correct. The merchant can use such additional information for other purposes, for example, to maintain some indication of a customer's buying preferences.

If desired, the data record is then used to verify check authorization, for example, by being compared to a positive file (which lists all allowable checking account numbers), or more likely against a negative file such as provided by SCAN of Seattle, Washington, Telecheck of Denver, Colorado or Telecredit of Florida, which provide information regarding known troublesome checking accounts. If such authorization is not provided, the transaction can, if desired, be cancelled by the merchant, thereby minimizing losses due to bad checks, as is well known.

Once authorization is provided (if the authorization step is performed), next the check is placed in printer 203 and validation information is printed on the check, if desired. Such validation information serves as an indication that electronic data pertaining to this check has been routed for collection, and that the check may thus be considered "cancelled." Such validation information includes, for example, information similar to a rubber endorsement stamp typically used by merchants who process checks in accordance with prior art techniques. Such information typically includes the merchant's name and the merchant's DDA number. The validation information prints in accordance with the teachings of this invention can also quite easily include the date and time of the transaction and language indicating that the check has been cancelled and is being cleared through to the customer's checking account electronically. Alternatively, other means can be used to provide validation information on the check, for example, a rubber stamp used for this purpose. While this is less desirable than using a printer, in certain circumstances it may obviate the need for additional printer, and a simple rubber stamp, or the like, can serve as a convenient backup in the event of printer failure. However, in a preferred embodiment, printer 203 is used for purposes in addition to providing validation information on a customer's check, for example, to assist in preparing credit card slips and the like.

The validated check is then returned to the customer for safekeeping, thus avoiding the need for the check to be physically transported through the system depicted in FIG. 1 for ultimate return to the customer. Alternatively, the check is retained by the merchant. This has the advantage of allowing the merchant to retain possession of the check in the event that there is a problem with its collection. In either event, whether the check is returned to the customer or retained by the merchant, a receipt is, if desired, printed and given to the customer indicating that payment has been made by check, and the check is being electronically cleared. This receipt can be either a part of or separate from another receipt indicating detailed information regarding the transaction just completed.

FDC5000155

5,175,682

| 5 | 6 |

The data record thus created by POS terminal 201 can be added to a data file maintained by POS terminal 201 for batch uploading to backroom processor 204, for example, on a periodic basis or at the end of a shift. Alternatively, POS terminal 201 sends the data record to backroom processor 204 immediately, or as soon as backroom processor 204 is able to receive it. In this event, POS terminal 201 need only have sufficient storage capacity to serve as a buffer when there are delays in the ability of backroom processor 204 to receive data.

Periodically, backroom processor 204 will take the data records it has accumulated and upload them to a clearing house. Backroom processor 204 may first process the information, if desired. Various types of processing are possible, such as removing that data pertaining to checks written on the one or more banks with which a merchant does its own banking as well as those bank affiliate banks. This data is then uploaded to the appropriate bank directly, without the need of traveling through the clearing house system. Other types of backroom processing may be performed prior to transmitting check data to the clearing house or directly to one or more banks. For example, checks written over a threshold dollar amount, out-of-state checks, or other checks thought to be high risk based upon other criteria can be selected in order to prioritize data to be uploaded to the ACH or directly to a bank.

If desired, priority uploads may be performed either by backroom processor 204 or POS terminal 201 which, in one embodiment, is directly linked to telecommunications unit 205. Such priority uploads may serve a number of functions. For example, small batches of records may be uploaded relatively frequently by backroom processor 204 either directly to a bank or to the clearing house. Such priority uploads may include, for example, those which are greater than a pre-determined dollar amount. In one embodiment, priority uploads are performed by POS terminal 201 in a real time basis, for example, when the check amount exceeds a predetermined dollar amount, when the check is an out-of-state check, or any other criteria which may be programmed or selected by the merchant "on the fly" which may lead the merchant to view a particular check with some suspicion. In this event, the transaction is delayed pending the real time upload, thereby reducing losses due to bad checks.

Following the upload by backroom processor 204 to one or more banks and clearing houses, an exception report is printed by backroom processor 204 indicating problem checks contained within the uploaded data file, for example, checks written on closed accounts, or accounts having non-sufficient funds. This exception report is prepared from information received from the issuing bank, and is either sent electronically or by printed media either directly to the merchant or to the merchant via the Merchant Bank, the Federal Reserve Bank, and/or an automated clearing house. In one embodiment, backroom processor 204 will again upload for clearing those checks which have not cleared. If desired, a predetermined delay can be used prior to uploading this data again, in order to allow the customer to replenish his checking account before the second and subsequent tries. Alternatively, other criteria can be established by the merchant for determining how to handle such problem checks noted in the exception report. For example, the time delay, if any, before uploading for clearing such problem checks which have not cleared, can be selected based upon a predetermined

set of criteria. Such criteria can include, for example, the time of day the check was written, the date the check was written, the day of the week the check was written, whether the check was written on an out-of-state bank account, or any other criteria selected by the merchant. For example, the merchant may determine that, statistically, different categories of checks should be handled differently in order to maximize the collection of such checks.

Thus, in accordance with the teachings of this invention, a check has essentially become the equivalent of an electronic debit card, but with significant advantages. The vast majority of consumers already have checking accounts, as compared with a smaller number have electronic debit cards. Therefore, the use of checks as debit cards in accordance with the teachings of this invention avoids the need for distributing or maintaining a separate debit card, with their associated costs. Furthermore, most consumers feel fairly comfortable with utilizing checks as a method of payment, far more comfortable than the use of electronic debit cards. The savings which will accrue to even a small merchant due to reduced bank paper handling fees, reduced losses due to bad checks, and more rapid availability of funds from checks will easily pay for the installation of hardware and software for use in accordance with the teachings of this invention.

In one embodiment to this invention, a primary record is used of, for example, 94 bytes as specified by the National Automated Clearinghouse Association (NACHA) 1990 ACH rules, specifically Appendix I entitled "ACH File Exchange Specifications". The "1990 ACH Rules" and the "1990 NACHA Operating Rules, Corporate Edition" are published by the National Automated Clearinghouse Association of Herndon, Virginia and are hereby incorporated by reference.

When such a primary record alone is used, the customer's monthly checking account statement will indicate for each check the date, check no., and amount without specific merchant information. Alternatively, each primary record is used with one or more appended records, for example each of an additional 94 bytes, to provide information such as the merchant's name and location and, if desired, more specific information such as the type of goods or services purchased, the quantity, and/or the exact name of the goods or services purchased. Such information can be included in such appended records for each purchase.

Due to the relatively small percentage of disputed checks, a preferred embodiment provides that the merchant electronically store all sales receipt line items, and provide to the clearing house a primary record only. In the case of disputed charges, the clearing house will request further information from the merchant, and the merchant transmits additional information to the clearing house as appended records to allow the clearing house to address the disputed charges. This minimizes the amount of information being transmitted, but allows full documentation to be transmitted in the event a particular check is disputed.

There are advantages in utilizing the teachings of this invention to the consumer, the merchant, and the banking system. The consumer advantages are that their time spent at a point of sale is reduced, as checks can be processed more quickly. Savings associated with bank processing of a customer's checking account may be passed on to the consumer.

FDC5000156

5,175,682

7

The merchant benefits from a number of advantages in accordance with the teachings of this invention. Merchants can receive a quicker deposit and thus faster access to funds from checks received from customers. Deposit fees will likely be less, since the merchant is providing electronic data, rather than a paper check. Additional deposit fees can be saved if the merchant provides encoding on each check, such as MICR encoding, indicating the amount of the check. Since this encoding of the check amount saves the merchant bank processing time, merchant banks typically charge the merchant approximately 10 cents per check deposited if the merchant encodes the amount on each check, as compared with approximately 15 cents per check deposited which are not so encoded by the merchant. Depositing is much easier as a merchant need not fill out paper deposit slips, including various information pertaining to each check, as well as a total, and need not physically transport a batch of checks with their deposit slips to a bank. Checks which do not clear, for example because they are drawn on an account which is closed or an account with non-sufficient funds, are detected much quicker, thereby allowing a greater likelihood of collecting on returned checks as it is well known that collectibility decreases rapidly with age. A merchant having multiple stores benefits in that a central location may be used for consolidating check data, thereby providing the benefit that a merchant's check processing facilities can be consolidated, if desired, and allow check processing to be accomplished in a timely manner without delays associated with physically transporting paper checks to the central location prior to electronically processing those checks. The merchants are also afforded a greater flexibility on check deposits and bank relationships in that, because paper checks need not be physically transported to the merchant's bank, the merchant can select a bank solely on the basis of business consideration rather than the banks geographical proximity to the merchant.

The advantages to the banks are decreased processing costs, decreased float, and an ability to achieve their desired automated transaction plans which have not been achieved to date in large part due to the failure in the debit card programs. Furthermore, the banks are able to compete on a national basis with greater ease since the need not be geographically close to their customers for the purposes of depositing checks. Also, the banks are capable of eliminating handling of the physical check and its ultimate return to the consumer. This saves a great deal of physical infrastructure, as well as costs. Furthermore, the banks are able to receive the benefits of a debit card system without the need to educate consumers and without the attendant costs involved in the issuance of separate debit cards.

Other benefits are available as well. For example, in one embodiment of this invention, notification to a number of parties who are interested in learning of problem checks is made automatically, routinely, and in a cost effective and timely manner. For example, when the issuing bank does not honor a check, the issuing bank issues an exception report. If desired, this exception report can be used by either the issuing bank, the Federal Reserve Bank, the Automated Clearing House, the merchant's bank, or the merchant itself in order to notify other interested parties. Such other interested parties include the merchant's bank which must deduct the amount of the check which has not been honored by the issuing bank, the merchant, the merchant's collec-

8

tion agency, check authorization services, and check verification services. By promptly notifying each of these parties, collections can be speeded, and problem checks can be minimized. Furthermore, by notifying each of these parties automatically, notification costs are decreased.

Accordingly, the teachings of this invention provide a novel method and structure for handling checks having significant advantages over the prior art check clearing system. In accordance with the teachings of this invention, check are utilized much as are debit cards, but without the attendant disadvantages experienced in debit cards which have thus far lead to their poor acceptance.

The invention now being fully described, it will be apparent to one of ordinary skill in the art that many changes and modifications can be made thereto without departing from the spirit or scope of the appended claims.

All publications and patent applications mentioned in this specification are herein incorporated by reference to the same extent as if each individual publication or patent application was specifically and individually indicated to be incorporated by reference.

What is claimed is:

1. A method for processing a check written on an account provided by a financial institution comprising the steps of:

   receiving from a customer a check as a method of payment;

   creating an electronic data record containing information pertaining to said check; and

   electronically transmitting said data record to said financial institution to obtain payment of said check by said financial institution, said step of transmitting said electronic record to said bank comprising the steps of:

      determining if said electronic record meets a test indicating said electronic record should be transmitted to said bank in real time;

      if said test is met, transmitting said electronic record to said bank in real time; and

      if said test is not met, adding said electronic record to a file including other electronic records pertaining to other checks, and transmitting said file to said bank in a batch mode.

2. A method as in claim 1 wherein said test indicating said electronic record should be transmitted to said bank in real time serve to detect one or more of the following conditions: the amount of the check is greater than a threshold amount, the check is an out-of-state check, the check has not been preapproved by a check verification or check guarantee service, and the check is deemed to be of high risk.

3. A method as in claim 1 which further comprises the step of, after creating said electronic data record, imprinting information on the check indicating that the check has been cancelled and sent for collection by electronic data transfer.

4. A method as in claim 3 which further comprises the step of, after said step of printing, returning said check to the customer.

5. A method as in claim 3 which further comprises the step of, after said step of printing, causing said merchant to retain said check.

6. A method as in claim 5 wherein, when the check is retained by the merchant, a receipt for the check is issued to the customer.

FDC5000157

5,175,682

9

7. A method as in claim 6 wherein said receipt for the check comprises a portion of the standard sales receipt issued by the merchant.

8. A method as in claim 6 wherein said check receipt comprises a receipt separate from the normal sales receipt issued to the customer by the merchant.

9. A method as in claim 1 which further comprises the step of creating one or more additional electronic data records associated with said electronic data record for storing discretionary information regarding the sales transaction.

10. A method as in claim 9 which further comprises the step of electronically transmitting one or more of said additional data records with said data record to said financial institution.

11. A method as in claim 9 wherein said one or more additional data records are retained by the merchant in the event they are needed to verify a disputed transaction.

12. A method as in claim 11 wherein said one or more of said additional data records are electronically transmitted to said bank in the event of a disputed charge.

13. A method as in claim 1 which further comprises the steps of:

receiving an exception report indicating whether said check has not been honored by said financial institution; and

if said check has not been honored, again electronically transmitting said data record to said financial institution to obtain payment of said check by said

10

financial institution after a predetermined period of time.

14. A method as in claim 13 wherein said predetermined period of time is selected in accordance with a set of one or more parameters of said check.

15. A method as in claim 14 wherein said one or more parameters are selected from the group of parameters consisting of: time the check was written, date the check was written, amount of the check, location of said financial institution, and other criteria for believing said check to be high risk.

16. A method as in claim 1 which further comprises the steps of:

issuing an exception report if said check has not been honored by said financial institution; and

automatically notifying one or more of said merchant, said merchant's bank, a check verification service, a check authorization service, and a collection firm.

17. A method as in claim 1 wherein said electronic data record comprises transaction information provided by an electronic device and information from said check.

18. A method as in claim 17 wherein at least some of said information from said check is detected by a MICR reader.

19. A method as in claim 17 wherein said electronic device comprises a POS terminal or a computer system controlling the transaction information for which payment is being made by said check.

* * * * *



CONFIDENTIAL
DEWAYNE E. PERRY   OCTOBER 3, 2005

Page 1

1             IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF DELAWARE

3                         - - -

4    LML PATENT CORPORATION,              :

                                          :

5              Plaintiff,                 :

                                          :

6              vs.                        : C. A. No. 04-858

                                          : (SLR)

7    TELECHECK SERVICES, INC.,            :

     et al,                               :

8                                         :

               Defendants.                :

9                         - - -

10             C O N F I D E N T I A L

11             October 3rd, 2005

12                        - - -

13                      Videotape deposition of DEWAYNE

14   E. PERRY, taken pursuant to notice before Deborah J.W.

15   Moquin, a Certified Shorthand Reporter and Notary

16   Public, in the law offices of FISH & RICHARDSON,

17   located at 919 North Market Street, Suite 1100,

18   Wilmington, Delaware, on the above date, beginning at

19   11:00 a.m.

20                        - - -

21             ESQUIRE DEPOSITION SERVICES

22          1201 North Orange Street, Suite 760

23             Wilmington, Delaware 19801

24                   (302) 426-9857

CONFIDENTIAL
DEWAYNE E. PERRY   OCTOBER 3, 2005

Page 130

1    host source code to determine that, in
2    fact, TeleCheck does not infringe as
3    Mr. Tinkel has claimed.
4    BY MS. SMITH:
5    Q.    Do you know whether the paper
6    transaction processing service and the ECA service
7    run on the same point of sale terminal?
8            MS. ELLIOTT:  Objection, vague?
9            THE WITNESS:  Um --
10           MS. ELLIOTT:  And also object -- I'm
11    sorry, also object to the extent that the
12    expert report speaks for itself and the
13    question has been asked and answered.
14           THE WITNESS:  Right.  I have -- I
15    have -- as I said, I focused on the source
16    code that runs on the central computer and
17    have in that context no expert knowledge
18    about what goes on outside of that, and my
19    expert report and opinion is based on what
20    is done in the ECA source host code
21    relative to the claimed as infringing.
22    BY MS. SMITH:
23    Q.    It's your opinion though, isn't it,
24    that the checks you referenced in paragraph 24,

Page 131

1    that being traveler's checks, payroll checks,
2    two-party checks and then the four types of
3    foreign checks, that those are capable of being
4    processed through TeleCheck's automated guarantee
5    service?
6            MS. ELLIOTT:  I'm going to object
7    just to form and also I'm going to object
8    to the extent the question has been asked
9    and answered, and that the report speaks
10    for itself.
11           THE WITNESS:  It -- it is my
12    understanding, as I've stated in my -- my
13    report, that the -- the checks that are not
14    ECA processed, are, in fact, processed via
15    the traditional paper forms, and I believe
16    I say that in paragraph 29 where I say
17    there's -- let's see, yes, "TeleCheck --
18    because TeleCheck guarantees and verifies
19    checks for traditional paper processing,"
20    that's where we get the references to the
21    code for these other -- other checks, but
22    they are not eligible for ECA processing.
23    So that would mean that yes, they are
24    processed via the traditional paper

Page 132

1    processing technique.
2            MS. SMITH:  I'm going to mark
3    Exhibit-6 of your report as plaintiff's
4    exhibit 2353.
5            (Deposition Exhibit Number
6            PX-2353 was marked for
7            identification.)
8            MS. ELLIOTT:  Thanks.  Did you say
9    2353?
10           MS. SMITH:  Yes.
11    BY MS. SMITH:
12    Q.    If you could review that document
13    and let me know when you've had a chance to do so.
14    A.    Okay.
15    Q.    Have you ever seen this document
16    before?
17    A.    Yes.  It's Exhibit-6 in my expert
18    report.
19    Q.    And how was this document generated?
20    A.    From the ECA -- from the -- the
21    relevant source code that I was provided as --
22    as -- as a basis for my analysis.
23    Q.    And specifically did you print this
24    out from the source code that you were provided?

Page 133

1    A.    Yes.  I basically cut and paste the
2    relevant pieces of code together to produce this
3    exhibit.
4    Q.    And did you make any alterations to
5    the code?
6    A.    No.  They are --
7            MS. ELLIOTT:  I'm just going to
8    remind the witness to please allow
9    Ms. Smith to finish her question.
10           THE WITNESS:  Sorry.
11           MS. ELLIOTT:  -- before you answer
12    and so I can interpose an objection if
13    necessary.
14           I'm sorry, can you repeat the
15    question or were you finished with your
16    question?
17           MS. SMITH:  I'm going to have her
18    read back.
19           MS. ELLIOTT:  Okay.
20           MS. SMITH:  Can you read the
21    question back?  Sorry.
22           (At this point, the court reporter
23    repeated the last question as requested.)
24           MS. ELLIOTT:  Objection, vague.

34 (Pages 130 to 133)



# CONFIDENTIAL
# DOCUMENT