# EXHIBIT  13
# REDACTED  IN  ITS
# ENTIRETY

# EXHIBIT 14
# REDACTED IN ITS
# ENTIRETY

# EXHIBIT 15 REDACTED IN ITS ENTIRETY

# EXHIBIT 16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LML PATENT CORP.,

       Plaintiff,

    v.

TELECHECK SERVICES, INC.,
ELECTRONIC CLEARING HOUSE, INC.,
XPRESSCHEX, INC. and NOVA
INFORMATION SYSTEMS, INC.,

       Defendants.

C.A. 04-858 (SLR)

**TELECHECK'S SUPPLEMENTAL RESPONSE TO
LML'S AMENDED FIRST SET OF INTERROGATORIES (NOS. 1-5 and 7),
LML'S SECOND SET OF INTERROGATORIES (NOS. 10-11), LML'S THIRD
SET OF INTERROGATORIES (NOS. 12-13 and 16-18), AND LML'S FOURTH
SET OF INTERROGATORIES (NOS. 20 and 21)
DATED SEPTEMBER 23, 2005**

**RESERVATION OF RIGHTS**

Pursuant to Rules 26 and 33, TeleCheck Services, Inc. ("TeleCheck") hereby

provides this Supplemental Response to LML Patent Corp.'s ("LML") Amended First Set

of Interrogatories, Nos. 1-5 and 7, LML's Second Set of Interrogatories (Nos. 10-11),

LML's Third Set of Interrogatories (Nos. 12-13 and 16-18), and LML's Fourth Set of

Interrogatories (Nos. 20 and 21) ("Interrogatories"). TeleCheck provides these

supplemental responses without waiving any present or future objection, for example

such as any objection as to the relevance or admissibility of any information provided by

TeleCheck. TeleCheck's investigation regarding this litigation is ongoing, as is

TeleCheck's development of any contentions. These responses are provided subject to

TeleCheck's future investigation, supplementation, or modification. TeleCheck's

agreement to investigate the subject matter of any interrogatory or to provide responsive

information does not constitute an admission that relevant, non-privileged information

responsive to that interrogatory exists. All responses are subject to each of the General

2

Objections and Specific Objections set forth in TeleCheck's original Responses to LML's Amended First Set of Interrogatories, LML's Second Set of Interrogatories, LML's Third Set of Interrogatories and LML's Fourth Set of Interrogatories.

## SUPPLEMENTAL RESPONSES TO INTERROGATORIES

### INTERROGATORY NO. 1:

Describe in detail all bases for TeleCheck's contention that it does not infringe the Asserted Claims of the Patents-In-Suit, either literally or under the doctrine of equivalents, and its contention that it has not contributed to the infringement by others and/or has not induced others to infringe any Asserted Claim of the Patents-In-Suit including a claim chart explaining in detail all specific structural or functional differences between each Accused Product and the Asserted Claims.

(As used herein, "Patents-in-Suit" means U.S. Patent Nos. 5,484,988, 6,164,528, 6,283,366; "TeleCheck's Accused Products," "Accused Product," or "product" means any equipment, component, system, or services manufactured, sold, offered for sale, used, or imported by TeleCheck for or associated with the conversion of checks, presented at points of sale, to electronic transactions, including but not limited to, TeleCheck's "Electronic Check Acceptance Service"; and "Asserted Claims" means claims 1-6, 8-11, and 13 of the '988 patent, claims 11 and 18 of the '528 patent, and claims 3 and 25 of the '366 patent).

### RESPONSE TO INTERROGATORY NO. 1:

TeleCheck objects to this interrogatory as premature, in that it seeks expert discovery and contentions which TeleCheck has not yet fully developed at this stage of the litigation. TeleCheck further objects to this interrogatory as premature, because it requires contentions regarding claim construction, and is therefore in conflict with the Scheduling Order governing this case. TeleCheck further objects to LML's definition of "TeleCheck's Accused Products," "Accused Product," or "product" as vague, overly broad and unduly burdensome. TeleCheck further objects to this interrogatory insofar as LML is attempting to shift its burden of proof on infringement to TeleCheck. Plaintiffs, not defendants, bear the burden of proving infringement. TeleCheck has only recently received LML's infringement contentions and asserted claims. Subject to these

3

objections, TeleCheck will supplement its responses as necessary to reflect its contentions in a time and manner agreed-upon by the parties, or other reasonable time as contentions are developed.

## FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:

TeleCheck incorporates by reference its initial objections and response as though fully set forth herein. TeleCheck expressly reserves the right to supplement this response as discovery proceeds, and provides the following information in response to this Interrogatory:

TeleCheck does not infringe any of claims 1-6, 8-11, and 13 of the '988 patent; any of claims 11 and 18 of the '528 patent; nor any of claims 3 and 25 of the '366 patent, at least because the Accused Products do not meet the limitation "without using the check as a negotiable instrument" (the "negotiable instrument" limitation) either literally or (if available) under the doctrine of equivalents.

The TeleCheck Accused Products do not meet this limitation because the consumer bank check is in fact used as a negotiable instrument. In the TeleCheck system, the magnetic ink character recognition ("MICR") reader reads not only bank account information, but also the bank check number. Using the check number, the host system then clears and voids the check during the transaction. TeleCheck's scanning of the check number and subsequent cancellation of the check is consistent with use of the check as a negotiable instrument.

The electronic submission of the check information (including the check number, amount of the check and other MICR information) through the TeleCheck system constitutes a presentment of the check and is the time at which all of the warranties of

4

presentment attach. This is also consistent with using the check as a negotiable instrument. Having undergone presentment, the spent and voided check is returned to the customer, in materially the same way a customer receives presented and voided checks in the mail along with their monthly bank statements.

TeleCheck further requires its merchants to have consumers fill out and sign checks before handing them to the merchant. The signed bank check constitutes a negotiable instrument, and is used as such in the TeleCheck system. The signed bank check itself may be retained as part of a normal checking transaction, rather than carrying on the transaction electronically. This may occur in the TeleCheck system, when certain banks disallow conversion of the paper check to an electronic check at the terminal. In such cases, the terminal displays an appropriate prompt, and the merchant simply retains the signed bank check without any further information from the consumer. This treatment of the check is only possible because the signed check meets all criteria of a negotiable instrument, and is used as a negotiable instrument.

The "negotiable instrument" limitation can not be expanded to cover "equivalents." In general, negative limitations are not entitled to any scope of equivalents. *See Athletic Alternatives Inc. v. Prince Mfg.*, 73 F.3d 1573 (Fed. Cir. 1996); *Pennwalt v. Durand-Wayland Inc.*, 833 F.2d 931 (Fed. Cir. 1987). Further, with respect to the '988 patent, the limitation was added to each independent claim during prosecution to overcome prior art. (*See* Preliminary Amendment dated June 9, 1994, LML-EP-000170-175.) As a result, the *Festo* presumption applies to this limitation within the '988 patent and precludes any scope of equivalents.

5

The Applicants further relied on the "negotiable instrument" limitation during prosecution to obtain allowance of all Asserted Claims over the prior art. For example, during prosecution of the '528 patent the Applicants argued:

> As a convenience to the consumer, bank account information is read off of a check. However, the check is not utilized as a negotiable instrument. As such the check need not even be signed by the consumer. All of the information is stored in the check writing point of sale system, and transfer of the funds is handled electronically.

(Response dated May 20, 1999; *see also* Response dated January 30, 1995, LML-EP-000189-209; Response dated May 21, 1998, LML-EP 000414-18.) This disavowal of claim scope further precludes any application of the doctrine of equivalents.

Even if resort to the doctrine of equivalents is available, the Accused Products do not meet the "negotiable instrument" limitation because the differences between the Accused Products and the limitation (as described above) are not insubstantial.

TeleCheck does not infringe any of claims 2 and 8-11 of the '988 patent; nor any of claims 11 and 18 of the '528 patent at least because the Accused Product do not meet the limitation of reading MICR information for the "sole purpose of obtaining consumer bank account information," either literally or (if available) under the doctrine of equivalents.

In the TeleCheck system the check number is also read by the terminal. This additional information is not obtained for the "sole purpose" of obtaining bank account information, and therefore this limitation is not literally met by the TeleCheck system.

The "sole purpose" limitation was added to the claims during prosecution of the '988 patent. (Compare original claims, LML0EP 000104-06, with Preliminary Amendment dated June 8, 1994, LM-EP 000170-79.) As a result, the *Festo* presumption applies to this limitation within the '988 patent and precludes any scope of equivalents.

The Applicants expressly relied on this limitation to obtain allowance of the claims over the prior art. (*See, e.g.*, Amendment dated January 30, 1995, LML-EP-000189-209; "None of the references discloses a point-of-sale system that uses any bank check solely for the purposes of gathering customer information and not as a negotiable instrument;" *see also* Preliminary Amendment dated June 9, 1994, LML-EP-000170-000175.) This clear disavowal of claim scope precludes any scope of equivalents.

Even if resort to the doctrine of equivalents is available, the Accused Products do not meet the "sole purpose" limitation because the differences between the Accused Products and the limitation (as described above) are not insubstantial.

TeleCheck does not infringe any of claims 1-6, 8-11, and 13 of the '988 patent; nor claim 3 of the '366 patent, at least because the Accused Products do not meet the limitation of a terminal adapted to receive consumer bank account information from "any bank check," either literally or (if available) under the doctrine of equivalents.

The TeleCheck system cannot be used with foreign checks such as Canadian checks, or with checks from credit card companies (*i.e.*, checks that act as a cash advance from the credit card issuer).

The "any bank check" limitation was added to the claims during prosecution of the '988 patent to overcome the prior art. (Compare original claims, LML-EP 000104-06, with Response dated January 30, 1995, LML-EP 000183-209.) As a result, the *Festo* presumption applies to this limitation within the '988 patent and precludes any scope of equivalents. The Applicants further relied on this limitation to distinguish the prior art (*see* LML-EP 000207). Accordingly, no scope of equivalents is available.

7

Even if the doctrine of equivalents is applicable, the Accused Products do not infringe under the doctrine of equivalents because the differences between the Accused Products and the claim limitation are not insubstantial.

## SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:

TeleCheck incorporates by reference its previous responses as though fully set forth herein. TeleCheck expressly reserves the right to supplement this response as discovery proceeds and provides this supplemental response subject to and without waiving its General and Specific Objections. In addition to the bases cited in TeleCheck's previous Responses to Interrogatory No. 1, the TeleCheck provides the following bases for non-infringement of one or more claims of the patents-in-suit:

TeleCheck does not infringe claim 18 of the '528 patent because the accused products and services do not include any velocity check on a merchant's sales activity, as recited by claim 18, nor is any equivalent check conducted.

## THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:

TeleCheck incorporates by reference its previous responses as though fully set forth herein. TeleCheck expressly reserves the right to supplement this response as discovery proceeds and provides this supplemental response subject to and without waiving its General and Specific Objections. In addition to the bases cited in TeleCheck's previous Responses to Interrogatory No. 1, TeleCheck incorporates by reference the September 20, 2005 Expert Report of David P. Kurrasch Regarding Non-Infringement and the September 23, 2005 Supplement to Expert Report of David P. Kurrasch Regarding Non-Infringement.

## INTERROGATORY NO. 2:

Separately for each Asserted Claim of the Patents-In-Suit, describe in detail all legal and factual bases for TeleCheck's contention that the Asserted Claims of the Patents-In-Suit are invalid, and for each piece of alleged prior art, and/or combination of

alleged prior art, that TeleCheck contends invalidates each Asserted Claim, provide a detailed claim chart that identifies each element of the Asserted Claims that TeleCheck contends is disclosed or taught by the prior art with citations to each instance where such element is allegedly disclosed or taught by the prior art.

## RESPONSE TO INTERROGATORY NO. 2:

TeleCheck objects to this interrogatory as premature, in that it seeks expert discovery and contentions which TeleCheck has not yet fully developed at this stage of the litigation. TeleCheck further objects to this interrogatory as premature, because it requires contentions regarding claim construction, and is therefore in conflict with the Scheduling Order governing this case. Subject to these objections, TeleCheck will produce charts and other information as necessary, reflecting its contentions in a time and manner agreed-upon by the parties.

## FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:

TeleCheck incorporates by reference its initial objections and response as though fully set forth herein. TeleCheck expressly reserves the right to supplement this response as discovery proceeds, and provides the following information in response to this Interrogatory:

Based on the claim construction apparently asserted by LML, as presently understood by TeleCheck, the Asserted Claims are invalid as set forth below:

### 1.    The '988 Patent

Claims 1, 4, 9-10, and 13 of the '988 patent are invalid under as anticipated 35 U.S.C. § 102 by U.S. Patent No. 5,175,682 to Higashiyama ("Higashiyama"). Each and every element of claims 1, 4, 9-10 and 13 of the '988 patent is taught by Higashiyama.

| The '988 Patent | Higashiyama |
|---|---|
| 1. A checkwriting point of sale system comprising: | A system for processing checks presented at the point of sale. (*See* col. 2, lines 43-46; col. 3, lines 11-14.) |

9

| | |
|---|---|
| a point of sale terminal adapted to receive consumer bank account information from any bank check; | Point of sale system 210 including a MICR reader 202 used for reading the magnetic account number printed on checks. (*See* col. 3, lines 13-18.) |
| a central computer system; | Backroom processor 204 to which one or more point of sale systems are connected. (*See* Figure 2; col. 3, lines 13-14, 29-33.) |
| first communications means integral to said point of sale terminal for electronically communicating with the central computer system; | POS terminal 201 (which is part of the point of sale system) is connected to the backroom processor 204. (*See* col. 3, lines 29-30.) |
| memory means integral to said point of sale terminal for temporarily storing the consumer bank account information; | Data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201. (*See* col. 3, lines 55-62; col. 5, lines 1-4.) |
| the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; | Backroom processor 204 receives data records from the POS terminal 201. (*See* col. 5, lines 1-10.) Since the backroom processor 204 is connected to one or more point of sale systems 210, each having a POS terminal 201 that supplies data records, the backroom processor 204 receives data records from one or more (plurality) of point of sale systems 210. |
| the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the bank check as a negotiable instrument. | Backroom processor 204 will take the data records it has accumulated and upload them to a clearing house. (*See* col. 5, lines 11-13.) The data record is also used to verify check authorization by being compared to a file. (*See* col. 4, lines 14-24.) The information from the paper check is electronically processed and the check is returned to the customer at the point of sale. (*See* col. 4, lines 54-57.) |
| 4. The checkwriting point of sale system according to claim 1 further comprising a printer means for receiving information from the | Printer 203 for printing a sales slip. (*See* col. |

10

| | |
|---|---|
| memory means of the point of sale terminal and for generating a transaction event sale slip. | 3, lines 25-27.) |
| 9. A checkwriting point of sale system comprising: | A system for processing checks presented at the point of sale. (*See* col. 2, lines 43-46; col. 3, lines 11-14.) |
| a point of sale terminal adapted to receive consumer bank account information; | Point of sale system 210 including a MICR reader 202 used for reading the magnetic account number printed on checks. (*See* col. 3, lines 13-18.) |
| a central computer system; | Backroom processor 204 to which one or more point of sale systems are connected. (*See* Figure 2; col. 3, lines 13- 14, 29-33.) |
| first communications means integral to said point of sale terminal for electronically communicating with the central computer system; and | POS terminal 201 (which is part of the point of sale system) is connected to the backroom processor 204. (*See* col. 3, lines 29-30.) |
| memory integral to said point of sale terminal for temporarily storing the consumer bank account information; | Data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201. (*See* col. 3, lines 55-62; col. 5, lines 1-4.) |
| the point of sale terminal comprising reading means for reading magnetic ink character recognition numbers on any consumer bank check for the sole purpose of eliciting consumer bank account information; | MICR reader 202 reads the account information on the check. (*See* col. 3, lines 48-50.) |
| the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; | Backroom processor 204 receives data records from the POS terminal 201. (*See* col. 5, lines 1-10.) Since the backroom processor 204 is connected to one or more point of sale systems 210, each having a POS terminal 201 that supplies data records, the backroom processor 204 receives data records from one or more (plurality) of point of sale systems |

|  | 210. |
|---|---|
| the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using a bank check as a negotiable instrument. | Backroom processor 204 will take the data records it has accumulated and upload them to a clearing house. (*See* col. 5, lines 11-13.) The data record is also used to verify check authorization by being compared to a file. (*See* col. 4, lines 14-24.) Further, the information from the paper check is electronically processed, and the check is returned to the customer at the point of sale. (*See* col. 4, lines 54-57.) |
| 10. The checkwriting point of sale system according to claim 9 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip. | Printer 203 for printing a sales slip. (*See* col. 3, lines 25-27.) |
| 13. The checkwriting point of sale system according to claim 4, wherein the sales slip includes means for execution by the consumer for proof of bank account access authorization. | A fully automated system generally comprises a dual-port terminal with magnetic stripe reading capabilities interfaced with a logging printer capable of providing individual transaction event slips for consumer execution. (*See* col. 5, lines 44-47.) |

Claim 2 of the '988 patent is obvious under 35 U.S.C. § 103 as unpatentable over Higashiyama.

| The '988 Patent | Higashiyama |
|---|---|
| 2. The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further includes means for reading magnetic ink character recognition numbers appearing on a consumer check for the sole purpose of identifying and reading the consumer bank account information. | MICR reader 202, which is disclosed as part of the point of sale system 210, reads the consumer account information. (*See* col. 3, lines 47-50.) |

12

Claim 3 of the '988 patent is obvious under 35 U.S.C. § 103 as unpatentable over Higashiyama in view of U.S. Patent No. 5,053,607 to Carlson ("Carlson").

| The '988 Patent | Higashiyama + Carlson |
|---|---|
| 3. The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further comprises an alphanumeric display means for receiving said consumer bank account information from the memory means and for displaying the consumer bank account information. | Carlson teaches an alphanumeric display used in connection with a point-of-sale device for reading MICR numbers from checks. When the MICR data is entered manually by the merchant, the MICR data is displayed digit-for-digit/stroke-for-stroke at the display. (*See* col. 21, lines 5-8.) It would have been obvious to include alphanumeric display means in the system described by Higashiyama. |

Claim 6 of the '988 patent is obvious under 35 U.S.C. § 103 as unpatentable over Higashiyama in view of an article about a POS terminal network known as the Cactus Switch ("Cactus Switch article"). The Cactus Switch article was published September 1986 and constitutes § 102(b) prior art against the '988, '528 and '366 patents.

| The '988 Patent | Higashiyama + Cactus Switch article |
|---|---|
| 6. The checkwriting point of sale system according to claim 1 wherein the central computer system further comprises a system subscriber database, the system subscriber database comprising information regarding merchants and service providers that are authorized to use the checkwriting point of sale system. | The central computer of Higashiyama serves one or more POS terminals of a single merchant. The Cactus Switch network serves multiple merchants and the transaction is cleared through the Arizona Clearing House Association. It would have been obvious to modify Higashiyama's POS system to service multiple merchants (e.g., multiple merchants belonging to the same retail chain) such that its central computer comprises a system subscriber database so that proper accounting of sales and credits can be made. |

Claim 13 of the '988 patent is further invalid as obvious under 35 U.S.C. § 103 over Higashiyama in view of another article about the Cactus Switch ("second Cactus Switch article"). The second Cactus Switch article was published on November 17, 1986 and constitutes § 102(b) prior art against the '988, '528 and '366 patents.

13

| The '988 Patent | Higashiyama + second Cactus Switch article |
|---|---|
| 13. The checkwriting point of sale system according to claim 4, wherein the sales slip includes means for execution by the consumer for proof of bank account access authorization. | The second Cactus Switch article teaches that checking account debit authorizations may be provided by personal identification numbers or signatures. (*See* p. 4.) In view of this teaching, it would have been obvious to modify Higashiyama's POS system to include a sales receipt with a signature space for the consumer to provide authorization to debit his or her checking account. |

Claim 8 of the '988 patent is obvious under 35 U.S.C. § 103 as unpatentable over

Higashiyama in view of U.S. Patent No. 4,321,672 to Braun ("Braun").

| The '988 Patent | Higashiyama + Braun[1] |
|---|---|
| 8. A checkwriting point of sale process comprising: | A method for processing checks presented at the point of sale. (*See* col. 2, lines 43-46; col. 3, lines 11-14.) |
| a) presenting any bank check specimen to a point of sale terminal located at a merchant or service provider, | Customer provides a check to the merchant. (*See* col. 3, lines 47-48.) |
| b) reading the magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument, | MICR reader 202 reads the account information on the check. (*See* col. 3, lines 48-50.) |
| c) storing the consumer bank account information obtained from the check and verifying that account numbers were accurately read at the point of sale terminal, | Data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201, i.e., stored at the POS terminal 201. (*See* col. 3, lines 55-62; col. 5, lines 1-4.) The step of |

[1] Unless otherwise noted, citations are to Higashiyama.

| | verifying is made obvious in view of Braun, which teaches use of error detector circuits 52 which identify errors in the ABA code from the reader 38. (*See* Braun, col. 7, lines 31-33; col. 19, lines 46-49.) |
|---|---|
| d) providing transaction event information to the point of sale terminal, | The amount the check is written for is provided by the merchant via the POS keypad. (*See* col. 3, lines 64-66.) |
| e) transmitting the transaction event information and consumer bank account information to a central computer system, | POS terminal 201 sends the data record to the backroom processor 204. (*See* col. 5, lines 1-10.) |
| f) storing the transaction event information and consumer banking account information, and | Backroom processor 204 accumulates the data records that it receives. (*See* col. 5, lines 11-12.) |
| g) subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations. | The data records are batch uploaded to a clearing house. (*See* col. 5, lines 11-13.) |

Claims 1, 8 and 9, and the asserted claims of the '988 patent which depend from claims 1, 8 and 9 are further invalid under 35 U.S.C. § 112, first paragraph, because the original disclosure failed to provide sufficient written description for claim language subsequently added in a June 1994 Office Action response. Further, the subsequent addition to the written description constituted new matter, in violation of 35 U.S.C. § 132.

Claims 1-6, 9-11 and 13 are further invalid under 35 U.S.C. § 112, first paragraph, for failure to provide in the patent specification an enabling disclosure for a second communication means "enabling automated clearing house communications for transferring funds without using the bank check as a negotiable instrument."

Claim 8 is further invalid under 35 U.S.C. § 112, first paragraph, for failure to provide in the patent specification an enabling disclosure for a checkwriting point of sale

15

process comprising the step of "reading the magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument."

Claims 1-6, 9-11 and 13 are further invalid under 35 U.S.C. § 112, second paragraph, because they recite means-plus-function claims without describing a corresponding structure for such means in the specification as required under 35 U.S.C. § 112, sixth paragraph.

2.      The '528 Patent

Claim 10 and asserted claim 11 of the '528 patent are obvious under 35 U.S.C. § 103 as unpatentable over Higashiyama in view of Braun.

| The '528 Patent | Higashiyama + Braun[2] |
|---|---|
| 10. A checkwriting point of sale process comprising: | A method for processing checks presented at the point of sale. (*See* col. 2, lines 43-46; col. 3, lines 11-14.) |
| (a) presenting a bank check specimen to a point of sale terminal located at a merchant or service provider; | Customer provides a check to the merchant. (*See* col. 3, lines 47-48.) |
| (b) reading a magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument; | MICR reader 202 reads the account information on the check. (*See* col. 3, lines 48-50.) |
| (c) storing the consumer bank account information obtained from the check and verifying that account numbers were accurately read at the point of sale terminal; | Data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201, i.e., stored at the POS terminal 201. (*See* col. 3, lines 55-62; col. 5, lines 1-4.) The step of |

[2] Unless otherwise noted, citations are to Higashiyama.

16

| | verifying is made obvious in view of Braun, which teaches use of error detector circuits 52 which identify errors in the ABA code from the reader 38. (*See* Braun, col. 7, lines 31-33; col. 19, lines 46-49.) |
|---|---|
| (d) providing transaction event information to the point of sale terminal; | The amount the check is written for is provided by the merchant via the POS keypad. (*See* col. 3, lines 64-66.) |
| (e) transmitting the transaction event information and consumer bank account information to a central computer system; | POS terminal 201 sends the data record to the backroom processor 204. (*See* col. 5, lines 1-10.) |
| (f) storing the transaction event information and consumer banking account information; | Backroom processor 204 accumulates the data records that it receives. (*See* col. 5, lines 11-12.) |
| (g) subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations; and | The data records are batch uploaded to a clearing house. (*See* col. 5, lines 11-13.) |
| (h) returning the bank check specimen to the consumer. | Check is returned to the customer for safekeeping. (*See* col. 4, lines 54-55.) |
| 11. The checkwriting point of sale process of claim 10 further comprising: annotating the bank check specimen before returning the bank check specimen to the consumer. | Validation information, indicating that electronic data pertaining to the check has been routed for collection and the check may be considered canceled, is printed on the check. (*See* col. 4, lines 26-32.) The validated check is returned to the customer. (*See* col. 4, lines 54-55.) |

Claims 11 and 18 of the '528 are invalid under 35 U.S.C. § 112, first paragraph, because the original disclosure failed to provide sufficient written description for a checkwriting point of sale process comprising the step of "reading the magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument."

All Asserted Claims of the '528 are further invalid under 35 U.S.C. § 102(b) based on both the public use bar and the on-sale bar.

17

### 3.    The '366 Patent

Claim 24 and asserted claim 25 of the '366 patent are invalid under 35 U.S.C. §

103 as unpatentable over a Sacramento Bee article published on November 7, 1995 ("the

Sacramento Bee article") in view of Braun or Carlson.

| The '366 Patent | Sacramento Bee Article + Braun/Carlson[3] |
|---|---|
| 24. A checkwriting point of sale process comprising: | Process is referred to as point-of-sale electronic draft capture. (*See* ¶¶ 3, 10.) |
| a payer completing a check for a transaction with a merchant or service provider; | A number of prior art references, including Braun (col. 24, lines 61- 66) and Carlson (col. 22, lines 57-58), teaches a point-of-sale process that includes the step of completing the check, followed by its cancellation and return to the payer.  It would have been obvious to include a step of completing the check with the method of the Sacramento Bee Article.  For example, Braun teaches that upon receipt of the monthly statement, the customer can verify the accuracy of the monthly statement using the cancelled checks.  (*See* Carlson col. 26, lines 58- 62.) |
| using a point of sale terminal associated with said merchant or service provider to read MICR information on the check to obtain payer bank account information; | The automated system reads the check (account) number and checks the status of the account. (*See* ¶ 10.) |
| inputting transaction information, including at least a transaction amount, into the point of sale terminal; | If the customer's account is in good standing and covers the amount of the purchase, the system authorizes an approval. (*See* ¶ 11.) The purchase amount, which corresponds to transaction event information, had to have been entered. |
| printing an authorization to debit the payer bank account by the transaction amount for the payer to sign; | The system prints out a statement similar to those consumers sign for credit card purchases. (*See* ¶ 11.) |

[3] Unless otherwise noted, citations are to the Sacramento Bee article.

18

| | |
|---|---|
| the payer signing the authorization; | The customer signs the statement. (*See* ¶ 11.) |
| returning a copy of the signed authorization and the check to the payer; and | The statement is similar to those used for credit card purchases, so a copy of the statement is returned to the customer. (*See* ¶ 11.) The same check may be used over and over again, so the check is also returned to the customer. (*See* ¶ 1.) |
| electronically debiting said payer bank account by said transaction amount based on the signed authorization, without using the check as a negotiable instrument. | Each transaction is electronically debited from the customer's checking account within 24 to 48 hours. (*See* ¶ 12.) Further, the information from the paper check is electronically processed, and the check is returned to the customer at the point of sale. |
| 25. The checkwriting point of sale process of claim 24, further comprising voiding the completed check prior to returning it to the payer. | Carlson teaches cancellation (voiding) of the check prior to returning it to the customer. (*See* Carlson col. 24, lines 58- 60.) |

Claims 24 and 25 of the '366 patent are further invalid under 35 U.S.C. § 103 as unpatentable over a report authored by Robert Ballen ("the Ballen Report") in view of Higashiyama or Carlson. The Ballen Report was distributed to members of the Electronic Check Council ("ECC") during a meeting on August 3, 1995. ECC members, totaling about 95 in number, represented banks, retailers, remittance processors, and other service providers in the field of check processing. The Ballen Report is § 102(b) prior art against the '528 and '366 patents as a publication, because (i) it was made available without any confidentiality obligations or restrictions as to further distribution, and (ii) it was distributed to the those skilled in the relevant technical field, namely the field of electronic check processing.

The Ballen Report expressly teaches that, in a paper-initiated electronic funds transfer ("PI-EFT"), the amount and the date may or may not be indicated on the check and the payer may or may not sign the check, but that the check merely serves as a source of information to initiate an EFT processed through the ACH. The Ballen Report, in

19

combination with the Sacramento Bee article renders claims 24 and 25 of the '366 invalid.

| The '366 Patent | Ballen Report + Sacramento Bee Article[4] |
|---|---|
| 24. A checkwriting point of sale process comprising: | PI-EFT refers to a model whereby the payer initiates an EFT debit to the payer's account by providing the payee with a check which prescribes the payer's account number and the payer's bank's routing number. (*See* § II.A.I.) |
| a payer completing a check for a transaction with a merchant or service provider; | The payer may sign the check. (*See* § II.A.I.) |
| using a point of sale terminal associated with said merchant or service provider to read MICR information on the check to obtain payer bank account information; | The Ballen Report suggests use of the electronic terminal. § III.D. The Sacramento Bee Article teaches use of an automated system to read the check (account) number and check the status of the account. (See ¶ 11.) It would have been obvious to utilize the automated terminal of the Sacramento Bee article with the system of the Ballen Report for speed and accuracy. |
| inputting transaction information, including at least a transaction amount, into the point of sale terminal; | When an electronic terminal is used for PI-EFT, it is inherent that a transaction amount is inputted into the electronic terminal. |
| printing an authorization to debit the payer bank account by the transaction amount for the payer to sign; | The Ballen Report teaches that a written authorization from the payer is required for the payee to initiate an electronic debit. (*See* § III.B.1.) |
| the payer signing the authorization; | In circumstances where the authorization is printed out for the payer, the payer may sign the authorization. (*See* § III.B.2.) |
| returning a copy of the signed authorization and the check to the payer; and | A copy of the authorization may be provided to the customer. (*See* § III.B.2.) |
| Electronically debiting said payer | In PI-EFT, the check serves as a source of |

---

[4] Unless otherwise noted, citations are to the Ballen Report.

| | |
|---|---|
| bank account by said transaction amount based on the signed authorization, without using the check as a negotiable instrument. | information to initiate an EFT. (*See* § II.A.1.) The payer may provide a blank or partially completed check to initiate the EFT. (*See* § III.4.) |

Claim 3 of the '366 patent is invalid under 35 U.S.C. § 112, second paragraph, because it recites a means-plus-function claim without describing a corresponding structure for such means in the specification as required under 35 U.S.C. § 112, sixth paragraph.

Claim 25 of the '366 patent is further invalid under 35 U.S.C. § 112, first paragraph, because the original disclosure failed to provide sufficient written description support for a checkwriting point of sale process comprising the step of "electronically debiting, . . . without using the check as a negotiable instrument."

All Asserted Claims of the '366 are further invalid under 35 U.S.C. § 102(b) based on both the public use bar and the on-sale bar.

**4. All Patents-in-Suit**

All Asserted Claims of the '988, '528 and '366 patents are invalid under 35 U.S.C. § 102(f) and/or § 116 because of improper inventorship.

All Asserted Claims of the patents-in-suit are invalid under the second paragraph of 35 U.S.C. § 112 because the claims either recite, or depend from a claim that recites the negative limitation "without using the check [or bank check] as a negotiable instrument," rendering the claims indefinite.

All Asserted Claims of the patents-in-suit are invalid under the second paragraph of 35 U.S.C. § 112 because the term "negotiable instrument" is a legal term subject to various interpretations, including various interpretations under state law and/or the UCC, and therefore ambiguous.

21

TeleCheck's investigation into its defenses is continuing, and it reserves the right to supplement these defenses and/or assert additional invalidity defenses as discovery progresses.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:**

TeleCheck incorporates by reference its previous responses as though fully set forth herein. TeleCheck expressly reserves the right to supplement this response as discovery proceeds and provides this second supplemental response subject to and without waiving its General and Specific Objections:

In addition to the references cited in TeleCheck's previous Responses to Interrogatory No. 2, the following reference is also invalidating prior art to one or more of the patents-in-suit under either 35 U.S.C. §102 or 35 U.S.C. § 103:

Signature Guarantee Systems, Inc. of Georgia sold, offered for sale and/or publicly disclosed a system that met the limitations of the asserted claims more than one year before the priority date for the asserted claims.

In addition to the references cited in TeleCheck's previous Responses to Interrogatory No. 2, one or more of the references in TeleCheck's document production entitled FDC 5000000-5000569 is also invalidating prior art to one or more of the patents-in-suit under either 35 U.S.C. §102 or 35 U.S.C. § 103.

TeleCheck's investigation into its defenses is continuing, and it reserves the right to supplement these defenses and/or assert additional invalidity defenses as discovery progresses.

**THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:**

TeleCheck incorporates by reference its previous responses as though fully set forth herein. TeleCheck expressly reserves the right to supplement this response as discovery proceeds and provides this third supplemental response subject to and without waiving its General and Specific Objections. In addition to the references cited in

22

TeleCheck's previous Responses to Interrogatory No. 2, the following references are also invalidating prior art to one or more of the patents-in-suit under either 35 U.S.C. §102 or 35 U.S.C. § 103:

1.    **The '988 Patent**

Claim 14 of the '988 patent is obvious under 35 U.S.C. § 103 as unpatentable over Higashiyama in view of Braun.

| The '988 Patent | Higashiyama + Braun[5] |
|---|---|
| 14. The checkwriting point of sale system according to claim 4, wherein the point of sale terminal further comprises means for automatically logging a point of sale terminal location and transaction date, time, and sales amount. | Data record includes additional information such as date, time, amount of check, and merchant location (as part of the electronic journaling information). *See* Col. 3, lines 53-60; Col. 4, lines 4-5. Certain of this information, except the check amount, may be provided automatically by POS terminal 201. *See* Col. 3, lines 63-66. The check amount may be provided automatically by using a Universal Product Code (UPC) read station as taught in Braun. *See* Braun, Col. 23, lines 12-20. It would have been obvious to include means for automatically logging transaction information in the system described by Higashiyama. |

Claim 16 of the '988 patent is obvious under 35 U.S.C. § 103 as unpatentable over Higashiyama in view of Braun and the second Cactus Switch article.

| The '988 Patent | Higashiyama + Braun + second Cactus Switch article[6] |
|---|---|
| 16. The checkwriting point of sale process of claim 8, further comprising:<br><br>(A) printing a transaction event sales slip following the sending of an approval message; and | Printer 203 prints a sales slip, but does not teach that the sales slip is executed by the consumer. *See* Col. 3, lines 25-27. However, the second Cactus Switch article teaches that checking account debit authorizations may be provided by personal identification numbers |

---

[5] Unless otherwise noted, all citations are to Higashiyama.
[6] Unless otherwise noted, all citations are to Higashiyama.

23

| | |
|---|---|
| (B) executing of the sales slip by the consumer as proof of bank account access authorization. | or signatures. *See* second Cactus Switch article, top of p. 4. It would have been obvious to modify Higashiyama's system in view of this teaching to include a sales receipt with a signature space for the consumer to provide authorization to debit his or her checking account. |

Claim 18 of the '988 patent is obvious under 35 U.S.C. § 103 as unpatentable over Higashiyama in view of Braun.

| The '988 Patent | Higashiyama + Braun[7] |
|---|---|
| 18. The checkwriting point of sale process of claim 8, further comprising automatically logging point of sale terminal location information and transaction date, time, and sales amount information into the point of sale terminal. | Data record includes additional information such as date, time, amount of check, and merchant location (as part of the electronic journaling information). *See* Col. 3, lines 53-60, Col. 4, lines 4-5. Certain of this information, except the check amount, may be provided automatically by POS terminal 201. *See* Col. 3, lines 63-66. The check amount may be provided automatically by using a Universal Product Code (UPC) read station as taught in Braun. *See* Braun, Col. 23, lines 12-20. It would have been obvious to modify the process described by Higashiyama to include a step whereby transaction information is automatically logged into the point of sale terminal. |

---

[7] Unless otherwise noted, all citations are to Higashiyama.

2.    The '366 Patent

Claim 1 of the '366 patent is invalid as anticipated under 35 U.S.C. § 102 by Higashiyama. Each and every element of claim 1 of the '366 patent is taught by Higashiyama.

| The '366 Patent | Higashiyama |
|---|---|
| 1.  A checkwriting point of sale system comprising: | A system for processing checks presented at the point of sale. *See* Col. 2, lines 43-46; Col. 3, lines 11-14. |
| a point of sale terminal adapted to receive payer bank account information from any bank check; | Point of sale system 210 including a MICR reader 202 used for reading the magnetic account number printed on checks. *See* Col. 3, lines 13-18.  It is generally understood in the art that MICR read reads MICR numbers which include the bank's RTN, the consumer's bank account number, and the check number from any bank check that has MICR numbers printed in a conventional manner. |
| a central computer system; | Backroom processor 204 to which one or more point of sale systems are connected. *See* Fig. 2; Col. 3, lines 13-14, 29-33. |
| first communications means integral to said point of sale terminal for electronically communicating with the central computer system; | POS terminal 201 (which is part of the point of sale system) is connected to the backroom processor 204. *See* Col. 3, lines, 29-30. |
| memory means integral to said point of sale terminal for temporarily storing the payer bank account information; | Data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201. *See* Col. 3, lines 55-62; Col. 5, lines 1-4. |
| the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; and | Backroom processor 204 receives data records from the POS terminal 201. *See* Col. 5, lines 1-10. Since the backroom processor 204 is connected to one or more point of sale systems 210, each having a POS terminal 201 that supplies data records, the backroom |

| | |
|---|---|
| | processor 204 receives data records from one or more (plurality) of point of sale systems 210. |
| the central computer system second communication means enabling said central computer system to communicate with external databases for performing a payer bank account status search and further enabling communication with an electronic funds transfer system for transferring funds without using the bank check as a negotiable instrument. | Backroom processor 204 will take the data records it has accumulated and upload them to a clearing house. *See* Col. 5, lines 11-13. The data record is also used to verify check authorization by being compared to a positive file (which lists all allowable checking account numbers), or more likely against a negative file such as provided by SCAN of Seattle, Washington, TeleCheck of Denver, Colorado or Telecredit of Florida (i.e., external databases), which provide information regarding known troublesome checking accounts. *See* Col. 4, lines 14-24. Further, because the information from the paper check is electronically processed, it is returned to the customer at the point of sale (*see* Col. 4, lines 54-57) and does not enter the traditional check clearing process at any point. Therefore, the system enables transferring of funds "without using the bank check as a negotiable instrument." |

## FOURTH SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:

TeleCheck incorporates by reference its previous responses as though fully set forth herein. TeleCheck expressly reserves the right to supplement this response as discovery proceeds and provides this third supplemental response subject to and without waiving its General and Specific Objections. In addition to the references cited in TeleCheck's previous Responses to Interrogatory No. 2, the following references are also invalidating prior art to one or more of the patents-in-suit under either 35 U.S.C. §102 or 35 U.S.C. § 103:

### 1.    The '988 Patent

Claims 5 and 11 of the '988 patent are obvious under 35 U.S.C. § 103 as unpatentable over Higashiyama in view of a publicly disclosed September 2, 1983

26

Private Placement Memorandum for CheckCash Associates, Ltd. (the "CheckCash PPM"):

| The '988 Patent | Higashiyama + CheckCash PPM[8] |
|---|---|
| 5.  The checkwriting point of sale system according to claim 1 further comprising a resident third party database wherein consumer banking account status information is stored, the consumer banking account status information being used for verification of consumer banking account status. | The CheckCash PPM describes a point-of-sale terminal and processing system designed to guarantee and process bank check and charge card transactions electronically and teaches that the heart of the system is a "data center" designed and maintained directly by CheckCash "for the purpose of check authorizations and guarantees from electronic POS terminals.  The master computer program will generate and maintain several data bases as well as control the switching of the telecommunications network connecting the POS terminals to the main data center computer." *See* CheckCash PPM at 28, 61, A-6, D-5.  It would have been obvious to include such a resident third party database in the system described by Higashiyama and to use the information contained in that database to verify customer banking account status. |
| 11. The checkwriting point of sale system according to claim 9 further comprising a resident third party database wherein consumer banking account status information is stored, the consumer banking account status information being used for verification of consumer banking account status. | The CheckCash PPM describes a point-of-sale terminal and processing system designed to guarantee and process bank check and charge card transactions electronically and teaches that the heart of the system is a "data center" designed and maintained directly by CheckCash "for the purpose of check authorizations and guarantees from electronic POS terminals.  The master computer program will generate and maintain several data bases as well as control the switching of the telecommunications network connecting the POS terminals to the main data center computer." *See* CheckCash PPM at 28, 61, A-6, D-5.  It would have been obvious to include such a resident third party database in the system described by Higashiyama and to use the information contained in that database to verify customer banking account status. |

---

[8] Unless otherwise noted, all citations are to Higashiyama.

2.    The '528 Patent

Claim 18 of the '528 patent is obvious under 35 U.S.C. § 103 as unpatentable

over Higashiyama in view of Braun and U.S. Patent No. 5,500,513 to Langhans.

| The '528 Patent | Higashiyama + Braun + Langhans |
|---|---|
| 18.  The checkwriting point of sale process of claim 10 further comprising performing a "velocity check" on the merchants sales activity to avoid fraud. | Langhans describes an automatic purchasing control system using point-of-sale terminals that performs a "velocity check" that monitors transaction activity to detect fraudulent activity.  *See* Langhans, Col. 1, lines 47-59, Col. 7, lines 44-47, Col. 8, lines 25-28, Col. 11, lines 35-63.  It would have been obvious to include the velocity check taught by Langhans in the system described by Higashiyama in order to avoid fraud. |

3.    The '366 Patent

Claim 2 of the '366 patent is obvious under 35 U.S.C. § 103 as unpatentable over

Higashiyama in view of a May, 1973 article in *Banking Magazine* entitled "Just Cashing

A Check? Diebold's Way Is Faster" (the "May 1973 *Banking* article").

| The '366 Patent | Higashiyama + May 1973 Banking article[9] |
|---|---|
| 2.  The checkwriting point of sale system of claim 1 wherein the point of sale terminal is further adapted to print activity reports of transaction events occurring at the point of sale terminal. | Printer 203 prints validation information on the bank check, but does not teach that the terminal may be adapted to print activity reports of transaction events occurring at that terminal.  *See* Col. 4, lines 25-43.  The May 1973 *Banking* article describes a check cashing terminal that "keeps a running total of the day's transactions, including total cash dispensed," to permit the teller to "balance out quickly after the bank closes."  *See* May 1973 *Banking* article at 77. |

---

[9] Unless otherwise noted, all citations are to Higashiyama.

Claim 3 of the '366 patent is obvious under 35 U.S.C. § 103 as unpatentable over Higashiyama in view of a publicly disclosed September 2, 1983 Private Placement Memorandum for CheckCash Associates, Ltd. (the "CheckCash PPM").

| The '366 Patent | Higashiyama + CheckCash PPM[10] |
|---|---|
| 3. The checkwriting point of sale system of claim 1 wherein the point of sale terminal is further adapted to annotate the bank check that is used at the point of sale terminal to provide the payer bank account information. | Printer 203 prints validation information on the bank check, but does not teach that the bank check is annotated to provide payer bank account information. *See* Col. 4, lines 25-43. The CheckCash PPM describes a point-of-sale terminal designed to guarantee and process bank check and charge card transactions electronically and teaches that, after verification has occurred, the point-of-sale terminal prints on the back of the bank check information that includes the check's MICR number. *See* CheckCash PPM at 59. |

Claim 27 of the '366 patent is obvious under 35 U.S.C. § 103 as unpatentable over the Sacramento Bee article in view of Braun or Carlson and the CheckCash PPM.

| The '366 Patent | Sacramento Bee article + Braun/Carlson + CheckCash PPM[11] |
|---|---|
| 27. The checkwriting point of sale process of claim 24, further comprising checking payer and/or account information on a database for an approval prior to printing the authorization; and | Braun and Carlson both teach a point-of-sale process that includes the step of completing the check, followed by its cancellation and return to the customer. The CheckCash PPM teaches a process by which a resident database comprised of customer account information is consulted for transaction approval before a transaction authorization is printed on the customer's bank check. *See* CheckCash PPM at 28, 61, A-6, D-5. It would have been obvious in view of these teachings to modify the system described in the Sacramento Bee article to include the step of checking customer account information in a database for approval prior to authorization. |

---

[10] Unless otherwise noted, all citations are to Higashiyama.
[11] Unless otherwise noted, all citations are to the Sacramento Bee article.

29

| | |
|---|---|
| proceeding with the transaction only upon an approval. | The CheckCash PPM teaches that a transaction may be electronically processed by consulting a resident database containing customer account information for transaction approval. *See* CheckCash PPM at 61. "After approval, the Data Center computer will proceed to contact the customer's bank and debit his account, while crediting the merchant's account at his respective bank." *Id.* |

Claim 27 of the '366 patent is also obvious under 35 U.S.C. § 103 as unpatentable over the Ballen Report in view of Higashiyama or Carlson and the CheckCash PPM.

| The '366 Patent | Ballen Report + Higashiyama/Carlson + CheckCash PPM[12] |
|---|---|
| 27. The checkwriting point of sale process of claim 24, further comprising checking payer and/or account information on a database for an approval prior to printing the authorization; and | Braun and Carlson both teach a point-of-sale process that includes the step of completing the check, followed by its cancellation and return to the customer. The CheckCash PPM teaches a process by which a resident database comprised of customer account information is consulted for transaction approval before a transaction authorization is printed on the customer's bank check. *See* CheckCash PPM at 28, 61, A-6, D-5. It would have been obvious in view of these teachings to modify the system described in the Ballen Report to include the step of checking customer account information in a database for approval prior to authorization. |
| proceeding with the transaction only upon an approval. | The CheckCash PPM teaches that a transaction may be electronically processed by consulting a resident database containing customer account information for transaction approval. *See* CheckCash PPM at 61. "After approval, the Data Center computer will proceed to contact the customer's bank and debit his account, while crediting the merchant's account at his respective bank." *Id.* |

---

[12] Unless otherwise noted, all citations are to the Ballen Report.

30

Claim 27 of the '366 patent is also obvious under 35 U.S.C. § 103 as unpatentable over the Ballen Report in view of the Sacramento Bee article and the CheckCash PPM.

| The '366 Patent | Ballen Report + Sacramento Bee article + CheckCash PPM[13] |
|---|---|
| 27. The checkwriting point of sale process of claim 24, further comprising checking payer and/or account information on a database for an approval prior to printing the authorization; and | Braun and Carlson both teach a point-of-sale process that includes the step of completing the check, followed by its cancellation and return to the customer. The CheckCash PPM teaches a process by which a resident database comprised of customer account information is consulted for transaction approval before a transaction authorization is printed on the customer's bank check. *See* CheckCash PPM at 28, 61, A-6, D-5. It would have been obvious in view of these teachings to modify the system described in the Ballen Report to include the step of checking customer account information in a database for approval prior to authorization. |
| proceeding with the transaction only upon an approval. | The CheckCash PPM teaches that a transaction may be electronically processed by consulting a resident database containing customer account information for transaction approval. *See* CheckCash PPM at 61. "After approval, the Data Center computer will proceed to contact the customer's bank and debit his account, while crediting the merchant's account at his respective bank." *Id.* |

## FIFTH SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:

TeleCheck incorporates by reference its previous responses as though fully set forth herein. TeleCheck expressly reserves the right to supplement this response as discovery proceeds and provides this fifth supplemental response subject to and without waiving its General and Specific Objections. In addition to the references cited in TeleCheck's previous Responses to Interrogatory No. 2, the following references are also

---

[13] Unless otherwise noted, all citations are to the Ballen Report.

31

invalidating prior art to one or more of the patents-in-suit under either 35 U.S.C. §102 or
35 U.S.C. § 103:

### 1.    The '988 Patent

Claims 1, 2, 3, 4, 5, 6, 8, 9, 10, 11, 13, 14, 16 and 18 of the '988 patent are
obvious under 35 U.S.C. § 103 as unpatentable over a May 19, 1987 and an August, 1989
CheckMate Electronics Inc. Business Analysis and Plan in view of U.S. Patent No.
5,053,607 to Carlson ("Carlson").

| '988 PATENT | CHECKMATE 1987 AND 1989 BUSINESS PLANS + CARLSON ' 607 PATENT[14] |
|---|---|
| 1. A checkwriting point of sale system comprising: | Describes system for the "[e]lectronic processing of checks at hundreds of thousands of point-of-sale locations where CHECKMATE MICR readers can be incorporated into terminals that read checks at retail counters and are linked to remote data bases for verification and later on-line processing of checks."  [ECHO0003557] |
| a point of sale terminal adapted to receive consumer bank account information from any bank check; | In the CheckMate system, "[a] typical configuration (see Figure 2) includes one or more terminals containing the patented MICR reader at each cash register location. . . . Customer checks are validated by reading the MICR encoded account information at the bottom of the check in a reader. . . ." [ECHO0003564] |

---

[14] All references are to Carlson unless otherwise specified.
[15] All references are to Carlson unless otherwise specified.

| a central computer system; | CheckMate point-of-sale terminals are connected to a "remote regional CV/G database," the CheckMate central computer. [ECHO0003564] |
|---|---|
| first communications means integral to said point of sale terminal for electronically communicating with the central computer system; | In the CheckMate system, "one or more terminals containing the patented MICR reader at each cash register location, which are connected to an in-store PC controller. The store accesses an external communications network through dial-up modem, leased line or radio communications methods, and transactions are switched to a remote regional CV/G database. . . ." [ECHO0003564] |
| memory means integral to said point of sale terminal for temporarily storing the consumer bank account information; | "Checkmate will truncate the paper (i.e. check) at the point-of-sale, and transmit electronically the financial information for the transaction to the appropriate financial institutions for batch processing against both the consumer and merchant accounts." [ECHO0003484].  "Checkmate POS Terminals . . . include[e] the following components: . . . down-loadable, programmable terminal with sufficient memory for data capture. . . ."  [ECHO 0003527]<br><br>Carlson describes a terminal that incorporates "a CPU for receiving information from the alpha/numerical keypad means and the MICR read head means . . . ." |

33

| | |
|---|---|
| | Col. 3, lines 62-64.<br><br>"The CPU memory stands by to receive and store (most preferably, for the duration of this transaction only) all necessary MICR information reprinted on the check (6-6)." Col 7 lines 59-62. |
| the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; | "A typical configuration [of the CheckMate system] (see Figure 2) includes one or more terminals containing the patented MICR reader at each cash register location, which are connected to an in-store PC controller. The store accesses an external communications network through dial-up modem, leased line or radio communications methods, and transactions are switched to a remote regional CV/G database. . . ." [ECHO 0003564] |
| the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the bank check as a negotiable instrument. | Carlson teaches that the central computer contains "communication means to the (financial) network(s)" to "complete the prescribed electronic funds transfer" [Col. 9, lines 41-43], and teaches a means for communicating with the consumer's bank for "verification of the existence of the payer's account," "verification of the PIN," "recordation of the transaction" and verification of sufficient funds [Col. 24 lines 4-44].<br><br>Carlson also teaches that at the conclusion of a point-of-sale transaction in which a check |

| | is presented for payment, the 'retailer can then pass the cancelled check back to the customer as part of the customer's sales record and receipt." [Col. 25 lines 5-8.]<br><br>The CheckMate Business Plan discloses that the "Automated Clearing House (ACH), and electronic payment transfer system" would be utilized to process check transactions initiated at the point-of-sale [ECHO0003558, ECHO0003565], and it would have been obvious to incorporate the above-described features of the Carlson system into the CheckMate system to using the ACH for transaction processing.<br><br>"The [Checkmate] process is the essence of the EFT which banks are trying to achieve with debit cards . . . ." [ECHO0003558] |
|---|---|
| 2. The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further includes means for reading magnetic ink character recognition numbers appearing on a consumer check for the sole purpose of identifying and reading the consumer bank account information. | At a CheckMate point-of-sale terminal, "[c]ustomer checks are validated by reading the MICR encoded account information at the bottom of the check in a reader. . . ." [ECHO0003564] |
| 3. The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further comprises an alphanumeric display means for receiving said consumer bank account information from the memory means and for displaying the consumer bank | Carlson also teaches the use of a display means for displaying the MICR data entered into the CPU's memory "digit-for-digit/stroke-for-stroke." Col. 21, lines 6-25. |

35

| account information. | |
|---|---|
| 4. The checkwriting point of sale system according to claim 1 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip. | Carlson teaches that "an optional 'cash ticket' could be easily printed by this device by placing a 'no-carbon-required' slip of paper of an appropriate size against the back of the check before inserting the pair into the [printer] device." Col. 17, lines 51-55. |
| 5.  The checkwriting point of sale system according to claim 1 further comprising a resident third party database wherein consumer banking account status information is stored, the consumer banking account status information being used for verification of consumer banking account status. | "The SGS central computer, through the terminal's display, then advises the merchant if . . . the checking account has bad checks written against it" and whether "the checks or driver's license have been reported lost or stolen." [ECHO0003627] |
| 6. The checkwriting point of sale system according to claim 1 wherein the central computer system further comprises a system subscriber database, the system subscriber database comprising information regarding merchants and service providers that are authorized to use the checkwriting point of sale system. | Inherent in CheckMate system, which teaches that if "a check is submitted to a merchant who has an Insta-Check terminal and the check is written on a non-participating bank, the check is declined only if there is negative data in the SGS/BSC computer. . . . At the time that the SGS system is initiated in an area, all banks are invited to become participating banks." [ECHO 0003418 – 1978 EFT Paper] |
| 8. A checkwriting point of sale process comprising: | Describes system for the "[e]lectronic processing of checks at hundreds of thousands of point-of-sale locations where CHECKMATE MICR readers can be incorporated into terminals that read checks at retail counters and are linked to remote |

| | |
|---|---|
| | data bases for verification and later on-line processing of checks." [ECHO0003557] |
| a) presenting any bank check specimen to a point of sale terminal located at a merchant or service provider, | The point-of-sale check processing terminal described by Carlson can be employed with "any negotiable instrument utilizing the FED's MICR system." Col. 6, lines 38-39. |
| b) reading the magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument, | "A typical configuration [of the CheckMate system] (see Figure 2) includes one or more terminals containing the patented MICR reader at each cash register location. . . . Customer checks are validated by reading the MICR encoded account information at the bottom of the check in a reader. . . ." [ECHO0003564]<br><br>"The [Checkmate] process is the essence of the EFT which banks are trying to achieve with debit cards . . . ." [ECHO0003558]<br><br>Carlson teaches that at the conclusion of a point-of-sale transaction in which a check is presented for payment, the 'retailer can then pass the cancelled check back to the customer as part of the customer's sales record and receipt." [Col. 25 lines 5-8.] |
| c) storing the consumer bank account information obtained from the check and verifying that account numbers were accurately read at the point of sale terminal, | Carlson teaches the use of a display means for displaying the MICR data entered into the CPU's memory "digit-for-digit/stroke-for-stroke." Col. 21, lines 6-25. |
| d) providing transaction event information to the point of sale terminal, | The CheckMate system specifies that the merchant "enters the customer's driver's |

37

| | |
|---|---|
| | license number and the amount of purchase on the terminal keyboard." [ECHO0003626] |
| e) transmitting the transaction event information and consumer bank account information to a central computer system, | In the CheckMate system, the "Insta-Check terminal takes driver's license, credit card or check information and communicates directly with the SGS computer.;" information transmitted to by the terminal to the central computer includes the "amount of purchase."  [ECHO0003626] |
| f) storing the transaction event information and consumer banking account information, and | The CheckMate central computer system stores "closed and invalid account information provided by local banks, accumulated negative information on specific active accounts provided by area retail merchants, and current customer positive files" [ECHO0003564], and relies on updated "experience files and invalid account information acquired from banks and retailers" to keep its resident stored consumer banking account information current [ECHO0003565].  The CheckMate central computer contains "historical information about customer accounts." [ECHO0003544.] |
| g) subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations. | The CheckMate Business Plan explains that the "Automated Clearing House (ACH), and electronic payment transfer system" would be utilized to funnel check transactions initiated at the point-of-sale "to the depository bank, which would then |

38

| | electronically clear the items."<br>[ECHO0003558, ECHO0003565] |
|---|---|
| 9. A checkwriting point of sale system comprising: | Describes system for the "[e]lectronic processing of checks at hundreds of thousands of point-of-sale locations where CHECKMATE MICR readers can be incorporated into terminals that read checks at retail counters and are linked to remote data bases for verification and later on-line processing of checks."  [ECHO0003557] |
| a point of sale terminal adapted to receive consumer bank account information; | In the CheckMate system, "[a] typical configuration (see Figure 2) includes one or more terminals containing the patented MICR reader at each cash register location. . . . . Customer checks are validated by reading the MICR encoded account information at the bottom of the check in a reader. . . ." [ECHO0003564] |
| a central computer system; | CheckMate point-of-sale terminals are connected to a "remote regional CV/G database," the CheckMate central computer. [ECHO0003564] |
| first communications means integral to said point of sale terminal for electronically communicating with the central computer system; and | In the CheckMate system, "one or more terminals containing the patented MICR reader at each cash register location, which are connected to an in-store PC controller. The store accesses an external communications network through dial-up modem, leased line or radio communications methods, and transactions are switched to a |

39

| | |
|---|---|
| | remote regional CV/G database. . . ." [ECHO0003564] |
| memory means integral to said point of sale terminal for temporarily storing the consumer bank account information; | Carlson describes a terminal that incorporates "a CPU for receiving information from the alpha/numerical keypad means and the MICR read head means . . . ." Col. 3, lines 62-64. "The CPU memory stands by to receive and store (most preferably, for the duration of this transaction only) all necessary MICR information printed on the check (6-6)." Col 7 lines 59-62. |
| the point of sale terminal comprising reading means for reading magnetic ink character recognition numbers on any consumer bank check for the sole purpose of eliciting consumer bank account information; | At a CheckMate point-of-sale terminal, "[c]ustomer checks are validated by reading the MICR encoded account information at the bottom of the check in a reader. . . ." [ECHO0003564] |
| the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; | "A typical configuration [of the CheckMate system] (see Figure 2) includes one or more terminals containing the patented MICR reader at each cash register location, which are connected to an in-store PC controller. The store accesses an external communications network through dial-up modem, leased line or radio communications methods, and transactions are switched to a remote regional CV/G database. . . ." [ECHO 0003564] |
| the central computer system second | Carlson teaches that the central computer |

40

| | |
|---|---|
| communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using a bank check as a negotiable instrument. | contains "communication means to the (financial) network(s)" to "complete the prescribed electronic funds transfer" [Col. 9, lines 41-43], and teaches a means for communicating with the consumer's bank for "verification of the existence of the payor's account," "verification of the PIN," "recordation of the transaction" and verification of sufficient funds [Col. 24 lines 4-44].<br><br>Carlson also teaches that at the conclusion of a point-of-sale transaction in which a check is presented for payment, the 'retailer can then pass the cancelled check back to the customer as part of the customer's sales record and receipt." [Col. 25 lines 5-8.]<br><br>The CheckMate Business Plan discloses that the "Automated Clearing House (ACH), and electronic payment transfer system" would be utilized to process check transactions initiated at the point-of-sale [ECHO0003558, ECHO0003565], and it would have been obvious to incorporate the above-described features of the Carlson system into the CheckMate system to using the ACH for transaction processing.<br><br>"The [Checkmate] process is the essence of the EFT which banks are trying to achieve with debit cards . . . ." [ECHO0003558] |
| 10. The checkwriting point of sale system | Carlson teaches that "an optional 'cash |

41

| | |
|---|---|
| according to claim 9 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip. | ticket' could be easily printed by this device by placing a 'no-carbon-required' slip of paper of an appropriate size against the back of the check before inserting the pair into the [printer] device." Col. 17, lines 51-55. |
| 11. The checkwriting point of sale system according to claim 9 further comprising a resident third party database wherein consumer banking account status information is stored, the consumer banking account status information being used for verification of consumer banking account status. | "The SGS central computer, through the terminal's display, then advises the merchant if . . . the checking account has bad checks written against it" and whether "the checks or driver's license have been reported lost or stolen." [ECHO0003627] |
| 13. The checkwriting point of sale system according to claim 4, wherein the sales slip includes means for execution by the consumer for proof of bank account access authorization. | Carlson describes using a completed check that includes the customer's signature [Col. 22, lines 53-58], canceling the check at the point-of-sale terminal and returning the cancelled check to the customer at the point-of-sale as part of the customer's receipt [Col. 24 lines 58-60, Col. 25 lines 4-10]. When returned at the point-of-sale, the customer's signature on the cancelled check is the equivalent of a "sales slip" reflecting the customer's signature authorizing the electronic payment. |
| 14. The checkwriting point of sale system according to claim 4, wherein the point of sale terminal further comprises means for automatically logging a point of sale terminal location and transaction date, time, and sales amount. | The Carlson system teaches that the point-of-sale terminal automatically logs and prints on the back of each cancelled check a unique point-of-sale terminal identifier, the transaction date and time, and the transaction amount. Col. 10 lines 13-53. |

| | |
|---|---|
| 16. The checkwriting point of sale process of claim 8, further comprising:<br><br>(A) printing a transaction event sales slip following the sending of an approval message; and<br><br>(B) executing of the sales slip by the consumer as proof of bank account access authorization. | Carlson describes using a completed check that includes the customer's signature [Col. 22, lines 53-58], canceling the check at the point-of-sale terminal and returning the cancelled check to the customer at the point-of-sale as part of the customer's receipt [Col. 24 lines 58-60, Col. 25 lines 4-10]. When returned at the point-of-sale, the customer's signature on the cancelled check is the equivalent of a "sales slip" reflecting the customer's signature authorizing the electronic payment.<br><br>The Carlson system teaches that a transaction will not be completed and a check will not be cancelled and returned to the customer if "the customer has exceeded his checking account balance" or has "exceeded his special arrangement with the bank to pay non-sufficient (NSF) (debit) check demands by 'overdraft protection'. . . ." Col. 17 lines 24-32. |
| 18. The checkwriting point of sale process of claim 8, further comprising automatically logging point of sale terminal location information and transaction date, time, and sales amount information into the point of sale terminal. | The Carlson system teaches that the point-of-sale terminal automatically logs and prints on the back of each cancelled check a unique point-of-sale terminal identifier, the transaction date and time, and the transaction amount. Col. 10 lines 13-53. |

Claims 1, 2, 3, 4, 5, 6, 8, 9, 10, 11, 13, 14, 16 and 18 of the '988 patent are also

obvious under 35 U.S.C. § 103 as unpatentable over July 24 and 27, 1989 Manta Systems

43

Inc. documents entitled "Electronic Payment Systems No ID Tendering Store Requirements" in view of U.S. Patent No. 5,175,682 to Higashiyama ("Higashiyama").

| '988 PATENT | MANTA SYSTEMS NO ID TENDERING STORE REQUIREMENTS + HIGASHIYAMA '682 PATENT |
|---|---|
| 1. A checkwriting point of sale system comprising: | The Manta Systems No-ID Tendering documents describe a system for processing and verifying checks presented at the point-of-sale. [FDC 1389752-59; FDC 1389789-94; FDC 1389768; FDC 1389776-77; FDC1389779-80; FDC 1389803; FDC1389811-12; FDC 1389814-15.] |
| a point of sale terminal adapted to receive consumer bank account information from any bank check; | The Manta Systems terminal is adapted to permit "MICR reading of the account information at the bottom of the check," as is the system described by Higashiyama. [FDC 1389757; FDC 1389792; Col. 3, lines 11-25.] |
| a central computer system; | The Manta Systems point-of-sale system includes a central "host" computer. [FDC 1389756; FDC 1389791.] |
| first communications means integral to said point of sale terminal for electronically communicating with the central computer system; | The Manta Systems point-of-sale processing system includes communication means between the point-of-sale terminal and the central host computer whereby "check authorization, debit and credit transactions will be routed by Buypass." [FDC 1389766; FDC 1389801.] |

44

| | |
|---|---|
| memory means integral to said point of sale terminal for temporarily storing the consumer bank account information; | The Manta Systems point-of-sale system has a memory means. For example, it stores "Negative information, primarily returned check data, associated with a customer is kept for 6 months." FDC 1389770; FDC 1389805.<br><br>The Higashiyama system teaches that a data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201. Col. 3, lines 55-62; col. 5, lines 1-4. |
| the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; | The Manta Systems point-of-sale system contemplates "Support for multiple venders customer and operator terminals." FDC 1389758; FDC 1389793.<br><br>The Higashiyama system teaches that the backroom processor 204 receives data records from the POS terminal 201. Col. 5, lines 1-10. Since the backroom processor 204 is connected to one or more point of sale systems 210, each having a POS terminal 201 that supplies data records, the backroom processor 204 receives data records from one or more (plurality) of point of sale systems 210. |
| the central computer system second communication means enabling said central | The Manta Systems point-of-sale terminal enables interface via communication means |

45

| | |
|---|---|
| computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the bank check as a negotiable instrument. | with both a central Buypass database and "transaction authorizers" to obtain consumer bank account status information. [FDC 1389770; FDC 1389805.] The Manta Systems processing system also contemplates the clearance of check transactions through the ACH. [FDC 1389794, FDC 1389800.]<br><br>Higashiyama teaches that the information from the paper check is electronically processed and the check is returned to the customer at the point of sale. Col. 4, lines 54-57. |
| 2. The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further includes means for reading magnetic ink character recognition numbers appearing on a consumer check for the sole purpose of identifying and reading the consumer bank account information. | The Manta Systems terminal provides means for "MICR reading of the account information at the bottom of the check . . . ." [FDC 1389757; FDC 1389792.] "The purpose of this process is to capture the routing, transit and account number information preprinted in a machine readable format on the bottom of most checks." [FDC 1389775; FDC 1389810.] |
| 3. The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further comprises an alphanumeric display means for receiving said consumer bank account information from the memory means and for displaying the consumer bank account information. | The Manta Systems point-of-sale terminal includes an alpha-numeric display that receives and stores transaction information, and a MICR reader to "capture the routing, transit and account number information preprinted in a machine readable format on the bottom of most checks." [FDC 1389775; |

46

| | |
|---|---|
| | FDC 1389810]. Inherent in this system is the ability to display the MICR information captured by the MICR reader on such an alpha-numeric display, and the ability to do so would have been obvious to one of ordinary skill in the art. |
| 4. The checkwriting point of sale system according to claim 1 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip. | The Manta Systems point-of-sale system calls for "Printing of a REG E and, when needed, an off line receipt." [FDC 1389758, FDC 1389793.]<br><br>Higashiyama discloses a means by which point-of-sale Printer 203 prints a sales slip. Col. 3, lines 25-27. |
| 5. The checkwriting point of sale system according to claim 1 further comprising a resident third party database wherein consumer banking account status information is stored, the consumer banking account status information being used for verification of consumer banking account status. | The Manta Systems point-of-sale system verifies "each check submitted for payment against host files containing negative information, positive information, frequency/history data (velocity), VIP status, and retailers acceptance criteria." [FDC 1389756; FDC 1389791.] |
| 6. The checkwriting point of sale system according to claim 1 wherein the central computer system further comprises a system subscriber database, the system subscriber database comprising information regarding merchants and service providers that are authorized to use the checkwriting point of sale system. | The Manta Systems host computer maintains a subscriber database containing "merchant acceptance profile data" and permitting the merchant to opt out of sharing proprietary check cashing information with other system subscribers. [FDC 1389757; FDC 1389792.] "The application must be able to share or not share as the merchant decides." [FDC |

47

| | |
|---|---|
| | 1389794.] |
| 8. A checkwriting point of sale process comprising: | The Manta Systems No-ID Tendering document describes a system for processing and verifying checks presented at the point-of-sale. [FDC 1389752-59; FDC 1389789-94; FDC 1389768; FDC 1389776-77; FDC1389779-80; FDC 1389803; FDC1389811-12; FDC 1389814-15.] |
| a) presenting any bank check specimen to a point of sale terminal located at a merchant or service provider, | In both the Manta Systems and Higashiyama systems, the customer provides a check to the merchant at the point-of-sale terminal. FDC 1389766; FDC 1389768; FDC 1389773-80; FDC 1389801; FDC 1389803-15; Col. 3, lines 47-48.] |
| b) reading the magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument, | The Manta Systems terminal provides means for "MICR reading of the account information at the bottom of the check. . . ." [FDC 1389757; FDC 1389792.] "The purpose of this process is to capture the routing, transit and account number information preprinted in a machine readable format on the bottom of most checks." [FDC 1389775; FDC 1389810.] <br><br> Higashiyama teaches that at the conclusion of a transaction, the "validated check is then returned to the consumer for safekeeping, thus avoiding the need for the check to be physically transported through the system depicted in Fig. 1 for ultimate return to the |

48

| | |
|---|---|
| | customer." Col. 4, lines 54-57. |
| c) storing the consumer bank account information obtained from the check and verifying that account numbers were accurately read at the point of sale terminal, | The Manta Systems point-of-sale terminal includes an alpha-numeric display that receives and stores transaction information, and a MICR reader to "capture the routing, transit and account number information preprinted in a machine readable format on the bottom of most checks." [ FDC 1389775; FDC 1389810]. Inherent in this system is the ability to display and verify the MICR information captured by the MICR reader on such an alpha-numeric display, and the ability to do so would have been obvious to one of ordinary skill in the art. Higashiyama discloses that a data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201, i.e., stored at the POS terminal 201. Col. 3, lines 55-62; col. 5, lines 1-4. |
| d) providing transaction event information to the point of sale terminal, | The Manta Systems point-of-sale terminal prompts the cashier to "select the method of payment" and "enter the amount to be authorized including any cash back." [FDC 1389766; FDC 1389801.] |
| e) transmitting the transaction event information and consumer bank account | Once the amount and type of check are entered into and the MICR line is read by the Manta Systems point-of-sale terminal, |

| information to a central computer system, | transaction and customer account information are transmitted to the Manta Systems host computer for check authorization. [FDC 1389776; FDC 1389811.] |
|---|---|
| f) storing the transaction event information and consumer banking account information, and | The Manta Systems process allows the merchant to "create inquiry and maintenance transactions against the host authorization data display" and to "update negative and status information." [FDC 1389757; FDC 1389792.] The Manta Systems process requires an "audit trail of all transactions." [FDC 1389759; FDC 1389794.] |
| g) subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations. | The Manta Systems payment process enables the merchant to "record, store and forward" transactions for processing at a later time, such as through an automatic clearing house. [FDC 1389759; FDC 1389765; FDC 1389794; FDC 1389800.] |
| 9. A checkwriting point of sale system comprising: | The Manta Systems No-ID Tendering document describes a system for processing and verifying checks presented at the point-of-sale. [ FDC 1389752-59; FDC 1389789-94; FDC 1389768; FDC 1389776-77; FDC1389779-80; FDC 1389803; FDC1389811-12; FDC 1389814-15.] |
| a point of sale terminal adapted to receive consumer bank account information; | The Manta Systems terminal is adapted to permit "MICR reading of the account information at the bottom of the check." |

| | |
|---|---|
| | [FDC 1389757, FDC 1389792] |
| a central computer system; | The Manta Systems point-of-sale system includes a central "host" computer. [FDC 1389752-59; FDC 1389789-94; FDC 1389768; FDC 1389776-77; FDC1389779-80; FDC 1389803; FDC1389811-12; FDC 1389814-15] |
| first communications means integral to said point of sale terminal for electronically communicating with the central computer system; and | The Manta Systems point-of-sale processing system includes communication means between the point-of-sale terminal and the central host computer whereby "check authorization, debit and credit transactions will be routed by Buypass." [FDC 1389766; FDC 1389801.] |
| memory means integral to said point of sale terminal for temporarily storing the consumer bank account information; | The Higashiyama system teaches that a data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201. Col. 3, lines 55-62; col. 5, lines 1-4. |
| the point of sale terminal comprising reading means for reading magnetic ink character recognition numbers on any consumer bank check for the sole purpose of eliciting consumer bank account information; | The Manta Systems terminal provides means for "MICR reading of the account information at the bottom of the check. . . ." [FDC 1389757; FDC 1389792.] "The purpose of this process is to capture the routing, transit and account number information preprinted in a machine readable format on the bottom of most checks." [FDC |

51

| | |
|---|---|
| | 1389775; FDC 1389810] |
| the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; | The Higashiyama system teaches that the backroom processor 204 receives data records from the POS terminal 201. Col. 5, lines 1-10. Since the backroom processor 204 is connected to one or more point of sale systems 210, each having a POS terminal 201 that supplies data records, the backroom processor 204 receives data records from one or more (plurality) of point of sale systems 210. |
| the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using a bank check as a negotiable instrument. | The Manta Systems point-of-sale terminal enables interface via communication means with both a central Buypass database and "transaction authorizers" to obtain consumer bank account status information. [FDC 1389770; FDC 1389805.] The Manta Systems processing system also contemplates the clearance of check transactions through the ACH. [FDC 1389794, FDC 1389800.]<br><br>Higashiyama teaches that the information from the paper check is electronically processed and the cancelled check is returned to the customer at the point of sale. Col. 4, lines 54-57. |
| 10. The checkwriting point of sale system according to claim 9 further comprising a printer means for receiving information from | The Manta Systems point-of-sale system calls for "Printing of a REG E and, when needed, an off line receipt." [FDC 1389758, |

52

| | |
|---|---|
| the memory means of the point of sale terminal and for generating a transaction event sale slip. | FDC 1389793.]<br><br>Higashiyama discloses a means by which point-of-sale Printer 203 prints a sales slip. Col. 3, lines 25-27. |
| 11. The checkwriting point of sale system according to claim 9 further comprising a resident third party database wherein consumer banking account status information is stored, the consumer banking account status information being used for verification of consumer banking account status. | The Manta Systems point-of-sale system verifies "each check submitted for payment against host files containing negative information, positive information, frequency/history data (velocity), VIP status, and retailers acceptance criteria." [FDC 1389756; FDC 1389791.] |
| 13. The checkwriting point of sale system according to claim 4, wherein the sales slip includes means for execution by the consumer for proof of bank account access authorization. | The Manta Systems point-of-sale system calls for "Printing of a REG E and, when needed, an off line receipt." [FDC 1389758, FDC 1389793.]<br><br>Higashiyama describes using a completed check that includes the customer's signature, canceling the check at the point-of-sale terminal and returning the cancelled check to the customer at the point-of-sale as part of the customer's receipt. [Col. 4, lines 54-57]. When returned at the point-of-sale, the customer's signature on the cancelled check is the equivalent of a "sales slip" reflecting the customer's signature authorizing the electronic payment. |
| 14.  The checkwriting point of sale system according to claim 4, wherein the point of sale | The Manta Systems process permits the automatic "logging of all transactions and |

53

| | |
|---|---|
| terminal further comprises means for automatically logging a point of sale terminal location and transaction date, time, and sales amount. | their associated responses." [FDC 1389756; FDC 1389791.]<br><br>Higashiyama discloses that a data record includes additional information such as date, time, amount of check, and merchant location (as part of the electronic journaling information). *See* Col. 3, lines 53-60; Col. 4, lines 4-5. Certain of this information, except the check amount, may be provided automatically by POS terminal 201. Col. 3, lines 63-66. |
| 16. The checkwriting point of sale process of claim 8, further comprising:<br><br>(A) printing a transaction event sales slip following the sending of an approval message; and<br><br>(B) executing of the sales slip by the consumer as proof of bank account access authorization. | The Manta Systems point-of-sale system calls for "Printing of a REG E and, when needed, an off line receipt." [FDC 1389758, FDC 1389793.]<br><br>Higashiyama describes using a completed check that includes the customer's signature, canceling the check at the point-of-sale terminal and returning the cancelled check to the customer at the point-of-sale as part of the customer's receipt once a transaction has been approved. [Col. 4, lines 54-57]. When returned at the point-of-sale, the customer's signature on the cancelled check is the equivalent of a "sales slip" reflecting the customer's signature authorizing the electronic payment. |
| 18. The checkwriting point of sale process of claim 8, further comprising automatically | The Manta Systems process permits the automatic "logging of all transactions and |

| | |
|---|---|
| logging point of sale terminal location information and transaction date, time, and sales amount information into the point of sale terminal. | their associated responses." [FDC 1389756; FDC 1389791.]<br><br>Higashiyama discloses that a data record includes additional information such as date, time, amount of check, and merchant location (as part of the electronic journaling information). *See* Col. 3, lines 53-60; Col. 4, lines 4-5. Certain of this information, except the check amount, may be provided automatically by POS terminal 201. Col. 3, lines 63-66. |

### 2.    The '528 Patent

Claims 10 and 11 of the '528 patent are invalid as anticipated under 35 U.S.C. § 102 by an E-Funds Corporation's November 1995 Data Analysis Report. Each and every element of claims 10 and 11 of the '528 patent are taught by E-Funds Corporation.

| '528 PATENT | E-Funds Corporation Data Analysis Report # 3 November 1995 |
|---|---|
| 10. A checkwriting point of sale process comprising: | "E-Funds Corporation started to use checks as a method of making payments at the point of sale in September of 1995." NACHA 014346. |
| (a) presenting a bank check specimen to a point of sale terminal located at a merchant or service provider; | "at each point of sale where checks are to be truncated, a machine is installed that will read the MICR from the check. . . . . On presentment of the check the item is read through the machine." NACHA 014346.<br><br>"Check is presented and read through check |

55