| | and returning the cancelled check to the customer at the point-of-sale as part of the customer's receipt. Col. 4, lines 26-32, 54-57.  When returned at the point-of-sale, the customer's signature on the cancelled check is the equivalent of a "sales slip" reflecting the customer's signature authorizing the electronic payment. |
|---|---|
| returning a copy of the signed authorization and the check to the payer; and | The Manta Systems point-of-sale system calls for "Printing of a REG E and, when needed, an off line receipt."  [FDC 1389758, FDC 1389793.]<br><br>Higashiyama describes using a completed check that includes the customer's signature, canceling the check at the point-of-sale terminal and printing authorization information on the back of the paper check, and returning the cancelled check to the customer at the point-of-sale as part of the customer's receipt. Col. 4, lines 26-32, 54-57.  When returned at the point-of-sale, the customer's signature on the cancelled check is the equivalent of a "sales slip" reflecting the customer's signature authorizing the electronic payment. |
| electronically debiting said payer bank account by said transaction amount based on the signed authorization, without using the check as a negotiable instrument. | The Manta Systems point-of-sale system calls for "Printing of a REG E and, when needed, an off line receipt."  [FDC 1389758, FDC 1389793.] |

| | |
|---|---|
| | Higashiyama teaches that the information from the paper check is electronically processed, and the paper check is returned to the customer at the point of sale (Col. 4, lines 54-57) and does not enter the traditional check clearing process at any point. Higashiyama also teaches that the point-of-sale terminal may be "directly linked to telecommunications unit 205" to transmit transaction records "directly to a bank" or to "perform priority uploads by POS terminal 201 in a real time basis." Col. 5, lines 28-46. |
| 25. The checkwriting point of sale process of claim 24, further comprising voiding the completed check prior to returning it to the payer. | Higashiyama teaches that validation information, indicating that electronic data pertaining to the check has been routed for collection and the check may be considered canceled, is printed on the check. Col. 4, lines 26-32. The validated and annotated check is returned to the customer at the point-of-sale. Col. 4, lines 54-57. |
| 27. The checkwriting point of sale process of claim 24, further comprising checking payer and/or account information on a database for an approval prior to printing the authorization; and | Before any transaction is authorized, the Manta Systems point-of-sale system verifies "each check submitted for payment against host files containing negative information, positive information, frequency/history data (velocity), VIP status, and retailers acceptance criteria." [FDC 1389756; FDC 1389791.] |

| proceeding with the transaction only upon an approval. | The Manta Systems process recommends denial of any transaction where "the submitted check authorization request fails limit checking or there is negative information on file" for that particular account. [FDC 1389771; FDC 1389806.] |
|---|---|

In addition to the references cited above, the following references are also invalidating prior art to one or more claims of the '366 patent under either 35 U.S.C. §102 or 35 U.S.C. § 103:

As disclosed in LML-EP-011549, Nova Payment Systems of California offered for sale and/or publicly disclosed a check conversion system that constitutes invalidating prior art to the '366 patent. At least as early as November, 1996, Nova Payment Systems was operating a pilot program to convert checks at the point of sale at the Piedmont Grocery, a 7-lane retailer in Oakland, California, and at a Food-4-Less supermarket in Rohnert Park, California.

The Nova Payment Systems electronic check conversion system enabled a merchant to scan a check at a point-of-sale terminal and verify the customer's account information against both a positive and negative consumer account database file. Once the check was verified and accepted, the terminal printed an authorization slip for the customer to sign. The check was cancelled at the point-of-sale and returned to the customer at the point-of-sale. The merchant then stored the day's electronic check transactions, batching them for transmission to the originating depository financial institution for routing through the ACH Network.

In addition, as disclosed in LML-EP-011768-92, in September, 1996, the Electronic Check Council ("ECC") issued a publication entitled "Electronic Checks at the Point of Sale: A Pilot Program Guide" that describes a system for the electronic

115

conversion of paper checks at the point of sale constituting invalidating prior art to one or more claims of the '366 patent.    The ECC disclosed a system by which the "MICR line data from the source document – the check, including the payer financial instituting routing number, account number and check serial number, along with transaction amount and the payee/merchant name.    Once the check is presented and accepted for payment, the POS system will produce a receipt for the check writer to sign, authorizing the conversion of the check to an ACH entry. . . .    Upon authorization, the merchant will mark the check with the words: 'VOID – Converted to Electronic Payment' or other suitable language to prevent duplicate processing.    The check is then returned to the customer. One copy of the receipt is provided to the consumer and one is retained by the merchant." LML-EP-011770, LML-EP-011782.

Under the ECC pilot program, "the check writer (the 'payer') initiates an electronic debit to the payer's account by providing the merchant (the 'payee') with a check which prescribes the payer's account number and the payer's financial institution routing number.    The payee, the amount and the date may or may not be indicated on the check, and the payer may or may not sign the check.    The check is not entered into the check collection process.    Rather, the check merely serves as a source of information to initiate an EFT.    Pursuant to the payer's agreement with the payee, the payee (or its agent), referencing the information provided on the check, initiates an ACH debit which is processed through the ACH network.    The check is returned by the payee to the payer." LML-EP-011775.  *See also* LML-EP-011719-20.

On information and belief, all asserted claims of the '528 and '366 patents are invalid under 35 U.S.C. § 102(f) because the inventors did not invent the subject matter of the patents.    Mr. Hills, the first-named inventor on the '528 and '366 patents, stated publicly that one purpose of the patent was to update the original '988 patent with regards to industry activity:

> As indicated, our second application accomplishes two principal objectives.  The first is to update the original patent with regards to industry activity and evolved  terminology since the date of the original patent's filing date . Secondly, the second patent is much more descriptive as to the specific operation and features of The ChequeMARK System, whereas the original patent was, by design, more general in scope.

[LML-EP 011994-97.] The first purpose indicates that the applicants did not invent the subject matter claimed in the '528 and '366 patents. To the extent LML asserts that the subject matter of the patents falls under the "second objective" described by Mr. Hills, the ChequeMARK System was publicly disclosed and on sale more than one year prior to the priority date of the '528 and '366 patents, and is therefore invalid under 35 U.S.C. §§ 102(a) and/or (b).

## SIXTH SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:

TeleCheck incorporates by reference its previous responses as though fully set forth herein. TeleCheck expressly reserves the right to supplement this response as discovery proceeds and provides this supplemental response subject to and without waiving its General and Specific Objections. In addition to the bases cited in TeleCheck's previous Responses to Interrogatory No. 2, the TeleCheck provides the following bases for invalidity of one or more claims of the patents-in-suit:

The claims of the '988 patent are invalid under 35 U.S.C. § 102(f) because the inventors did not invent the subject matter of the '988 patent. Prior to the filing of the application leading to the '988 patent, Mr. Hills contacted Mr. Steven R. Carlson and obtained information regarding the subject matter of the '988 patent. This information was incorporated into the '988 patent. Mr. Carlson's deposition was recently conducted, and TeleCheck reserves the right to supplement this response based on information recently discovered and to be discovered.

Regarding invalidity under 35 U.S.C. §§ 102 and 103, pursuant to Rule 33(d), in support of its defense of invalidity of the patents in suit, TeleCheck identifies all documents produced in this litigation that constitute prior art to one or more of the asserted patents. TeleCheck reserves the right to provide additional supplementation as it continues to develop its analysis and contentions.

117

## SEVENTH SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:

TeleCheck incorporates by reference its previous responses as though fully set forth herein. TeleCheck expressly reserves the right to supplement this response as discovery proceeds and provides this supplemental response subject to and without waiving its General and Specific Objections. In addition to the bases cited in TeleCheck's previous Responses to Interrogatory No. 2, TeleCheck incorporates by reference the August 12, 2005 Expert Report of David P. Kurrasch Regarding Invalidity, the September 6, 2005 Supplemental Expert Report of David P. Kurrasch Regarding Invalidity, and the September 28, 2005 Second Supplement to Expert Report of David P. Kurrasch Regarding Invalidity.

## INTERROGATORY NO. 3:

If TeleCheck contends any Asserted Claim of the Patents-In-Suit is invalid as obvious under 35 U.S.C. § 103, state in detail and with specificity the education, experience and/or technical training of a person of ordinary skill in the art of the Patents-In-Suit, the motivation to combine each alleged combination of prior art identified in Interrogatory No. 2 above, and any objective indicia of non-obviousness.

## RESPONSE TO INTERROGATORY NO. 3:

TeleCheck objects to this interrogatory as premature, in that it seeks expert contentions which TeleCheck has not yet fully developed at this stage of the litigation. Subject to these objections, TeleCheck will produce information reflecting its contentions in a time and manner agreed-upon by the parties, or other reasonable time as contentions are developed.

## FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:

TeleCheck incorporates by reference its previous responses as though fully set forth herein. TeleCheck expressly reserves the right to supplement this response as discovery proceeds and provides this supplemental response subject to and without waiving its General and Specific Objections. In addition to the bases cited in TeleCheck's previous Responses to Interrogatory No. 3, TeleCheck incorporates by reference the August 12, 2005 Expert Report of David P. Kurrasch Regarding Invalidity, the September 6, 2005 Supplemental Expert Report of David P. Kurrasch Regarding

Invalidity, and the September 28, 2005 Second Supplement to Expert Report of David P. Kurrasch Regarding Invalidity.

## INTERROGATORY NO. 4:

Describe in detail all legal and factual bases for TeleCheck's contentions that the Patents-In-Suit are unenforceable, and for any allegation of inequitable conduct provide a detailed description of the materiality of any alleged prior art including why such prior art is not cumulative of other prior art cited to, or of record in, the Patent Office, and describe with specificity how the inventors of the Patents-In-Suit, or their agents, allegedly intended to deceive the Patent Office.

## RESPONSE TO INTERROGATORY NO. 4:

Upon information and belief, the systems within the scope of the Patents-In-Suit were on sale and in public use more than one year prior to the effective filing date of the '528 and '366 patents. On information and belief, this public use and sale was known to the named inventor of the Patents-In-Suit during the pendency of the applications leading to the '528 and '366 patents, but was intentionally withheld from the U.S.P.T.O. The earliest-filed application leading to the '528 patent was filed on December 31, 1996. The '366 patent is a continuation of the '528 patent and therefore shares the same December 31, 1996 priority date.

In an April 13, 2000 deposition from the litigation captioned *LML Payment Systems, Inc. v. Hills*, CA 99-217-CIV-J-20A (M.D. Fla.), the named inventor on the three patents-in-suit, Mr. Robert R. Hills, was asked the following regarding the '988 patent: "Beginning in 1991, did you and/or Mr. Nichols ever license the technology, which would later become subject to this patent, to any other companies?" Mr. Hills answered, "At some point, I - - at some point, ChequeMark Systems received exclusive marketing rights." Upon information and belief, ChequeMark Systems offered for sale and sold a point-of-sale system covered by the '988 patent more than one year prior to the December 31, 1996 priority date of the '528 and '366 patents, and Mr. Hills was aware of the offer for sale or sale.

119

On November 7, 1995, the Sacramento Bee published a news article about a point of sale system being marketed by ChequeMark Systems (attached as Exhibit A). Upon information and belief, and as further indicated within the news article, by the time the news article was published, the system had been marketed in the United States. Thus the point-of-sale system described in the Sacramento Bee was on sale and/or in public use more than one year prior to the December 31, 1996 priority date of the '528 and '366 patents. The November 7, 1995 Sacramento Bee news article describes the ChequeMark Systems point of sale system and process.

The described system and process include every element of one or more claims of the '528 patent, including at least claim 10, and every element of one or more claims of the '366 patent, including at least claim 10. The November 7, 1995 Sacramento Bee article, and the system offered for sale, are material prior art to the '528 and '366 patents. Upon information and belief, the applicants knew about the licensing, offer for sale and sale of the point-of-sale system described in the Sacramento Bee article, more than one year prior to the effective priority date of the '528 patent and the '366 patent, and intentionally withheld this material information with the intent to deceive the U.S.P.T.O. This constitutes inequitable conduct that renders the '528 patent and the '366 patent unenforceable.

TeleCheck will supplement its response to this Interrogatory as appropriate as information is uncovered from TeleCheck's ongoing investigation.

## FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4:

TeleCheck incorporates by reference its previous responses as though fully set forth herein. TeleCheck expressly reserves the right to supplement this response as discovery proceeds and as it develops its contentions. TeleCheck provides this supplemental response subject to and without waiving its General and Specific Objections. Additional acts of inequitable conduct include the following:

*Failure to Disclose Prior Public Disclosure*

In 1993 ChequeMark Systems, Inc. ("CSI"), a company formed by applicants, publicly disclosed material prior art to the '528 and '366 patents more than one year before their December 31, 1996 priority date. Applicants were aware of that disclosure, but failed to cite the disclosure and documents related to the disclosure to the U.S.P.T.O. In particular, the applicants failed to disclose at least the following documents to the U.S.P.T.O. during the pendency of the applications underlying the '528 and '366 patents: ECHO 0002719-0002748. These documents disclose a system and/or method within the scope of the '988 patent, and within the scope of at least one claim of each of the '528 and '366 patents.

The applicants knew about the public disclosure of the alleged inventions described in and claimed by the '528 and '366 patents more than one year before the priority date of the '528 and '366 patents, and intentionally withheld this material information during the pendency of the applications underlying the '528 and '366 patents with the intent to deceive the U.S.P.T.O. This constitutes inequitable conduct that renders the '528 patent and the '366 patent unenforceable.

### *False and Misleading Declarations to the Patent Office*

On July 22, 1999, attorneys for ChequeMark Patent Inc. ("CPI"), an LML subsidiary, filed a terminal disclaimer and affidavit in the application leading to the '528 patent, in order to overcome a rejection based on the '988 patent. [LML-EP000424-000428; LML-EP006104-006105.] In filing the terminal disclaimer, CPI and/or its attorneys were required to and did state that CPI owned all rights in the application leading to the '528 patent.

Contrary to its statements to the U.S.P.T.O, CPI did not own all rights in the application, and was aware that it did not own all such rights at the time the terminal disclaimer was filed. At the time the terminal disclaimer was filed, inventor Robert Hills had never assigned his interest in the application leading to the '528 patent to CPI, and refused to do so because of a dispute.

In March, 1999, while the '528 patent application was pending, LML and CPI filed a lawsuit in the United States District Court for the Middle District of Florida

121

against Robert R. Hills seeking a declaratory judgment stating that LML and/or CSI had all title and interest in the '528 patent. Attorneys for LML submitted an affidavit stating that Mr. Hills' refusal to assign his interest forced "alternative procedures" in the U.S.P.T.O. to secure allowance, and that the declaratory judgment regarding ownership was required to "clear all doubt" as to CPI's ownership of the application leading to the '528 patent. [LML-EP 006081-006087.]

On July 27, 2000, before conclusion of the lawsuit, CPI and/or its attorneys filed a second terminal disclaimer again claiming all rights in the application leading to the '528 patent. [LML-EP 000511.] These statements regarding rights in the patent were material, because they were required for effective filing of the terminal disclaimers, which were required to overcome the rejection based on the '988 patent. In allowing the application, the Examiner stated that failure to file a proper terminal disclaimer would constitute an abandonment of the application. [LML-EP 000508.]

LML and/or CPI intentionally withheld this material information regarding ownership of the '528 patent with the intent to deceive the U.S.P.T.O. This constitutes inequitable conduct rendering the '528 patent unenforceable.

*Failure to Disclose Material Prior Art Discovered by LML's Counsel*

In 1998 attorneys for LML, as part of their due diligence search regarding the validity and strength of the '988 patent, conducted a prior art search and discovered prior art they considered "to be relevant to U.S. Patent 5,484,988." Attorneys for LML believed and stated that the Examiner of the '988 patent had not conducted a thorough search for prior art regarding the '988 patent. [LML-EP 061874-061877.] The attorneys conducted a further search, and the search results were provided to LML during the pendency of the applications leading to the '528 and '366 patents. [LML-EP 061853-061864.] Several of the references uncovered in the search were never cited to the U.S.P.T.O.

LML discovered, but did not disclose to the U.S.P.T.O., the following references, which its attorneys stated were "relevant to U.S. Patent 5,484,988": U.S. Patent 5,496,991 issued to Delfer, III et al.; U.S. Patent 5,38,186 issued to Nair et al.; U.S.

122

Patent 5,373,550 issued to Campbell et al.; U.S. Patent 5,305,196 issued to Deaton et al.; U.S. Patent 4,727,243 issued to Savar; and U.S. Patent 3,852,571 issued to Hall et al.

These prior art references were also material to the '528 and '366 patents.

LML and/or the applicants knew of these relevant prior art references during the pendency of the applications leading to the '528 and '366 patents but intentionally withheld this material information with the intent to deceive the U.S.P.T.O. This constitutes inequitable conduct rendering the '528 and '366 patents unenforceable.

*Failure to Disclose Material Prior Art to the '988 Patent*

Applicants intentionally withheld material prior art from the U.S.P.T.O., with the intent to deceive, during the pendency of the application leading to the '988 patent.

On December 29, 1992, U.S. Patent No. 5,175,682 to Higashiyama et al. ("the '682 patent," FDC 110131-138) issued from an application filed December 14, 1990. The '682 patent constitutes material prior art to the '988 patent that discloses each and every element of one or more claims of the '988 patent and thus anticipates and/or renders obvious one or more claims of the '988 patent.

The applicants knew about the issuance and existence of the '682 patent during the pendency of the application leading to the '988 patent, as confirmed by Connie Higashiyama, the inventor of the '682 patent, during her deposition. Mr. Henry Nichols, inventor on the '988 patent, further admitted that he sought to purchase the '682 patent. This attempt to purchase occurred during the pendency of the application leading to the '988 patent, as also confirmed by Ms. Higashiyama during her deposition. The applicants intentionally withheld this material information with the intent to deceive the U.S.P.T.O. This constitutes inequitable conduct rendering the '988 patent unenforceable.

## SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4:

TeleCheck incorporates by reference its previous responses as though fully set forth herein. TeleCheck expressly reserves the right to supplement this response as discovery proceeds and provides this supplemental response subject to and without waiving its General and Specific Objections. In addition to the bases cited in

TeleCheck's previous Responses to Interrogatory No. 4, TeleCheck incorporates by reference the August 12, 2005 Expert Report of David P. Kurrasch Regarding Invalidity, the September 6, 2005 Supplemental Expert Report of David P. Kurrasch Regarding Invalidity, and the September 28, 2005 Second Supplement to Expert Report of David P. Kurrasch Regarding Invalidity.

**INTERROGATORY NO. 5:**

Describe in detail all bases for TeleCheck's contention that it does not willfully infringe each of the Patents-In-Suit, including but not limited to, identifying the date TeleCheck first became aware of each Patent-In-Suit.

**RESPONSE TO INTERROGATORY NO. 5:**

TeleCheck objects to this interrogatory as premature, because it can be reasonably interpreted as requiring TeleCheck to advise whether TeleCheck intends to rely on advice of counsel as a defense, and is therefore in conflict with the Scheduling Order governing this case. TeleCheck further objects to this interrogatory as overly broad and unduly burdensome. Subject to these objections, TeleCheck will respond in a time and manner consistent with the Court's Scheduling Order.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:**

TeleCheck incorporates by reference its previous responses as though fully set forth herein. TeleCheck expressly reserves the right to supplement this response as discovery proceeds and provides this supplemental response subject to and without waiving its General and Specific Objections. In addition to the bases cited in TeleCheck's previous Responses to Interrogatory No. 5, TeleCheck incorporates by reference the September 20, 2005 Expert Report of David P. Kurrasch Regarding Non-Infringement and the September 23, 2005 Supplement to Expert Report of David P. Kurrasch Regarding Non-Infringement.

**INTERROGATORY NO. 7:**

Describe in detail how each TeleCheck Accused Product converts paper checks presented at the point of sale into electronic transactions, including but not limited to, describing with specificity each step of converting paper checks into electronic

124

transactions from the initial tender of a paper check at the point of sale to the deposit of funds into the merchant's bank account.

## RESPONSE TO INTERROGATORY NO. 7:

TeleCheck objects to this interrogatory as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. TeleCheck reiterates its objection of LML's definition of "TeleCheck's Accused Products," "Accused Product," or "product" as vague, overly broad and unduly burdensome, as defined by LML in Interrogatory No. 1. Subject to these objections and pursuant to Fed. R. Civ. P. 33(d), TeleCheck refers LML to the documents that will be produced by TeleCheck.

## FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7:

TeleCheck repeats all of its objections above as if fully set forth herein. The bates ranges for documents responsive to LML Interrogatory No. 7 is attached as Exhibit A to TeleCheck's Fourth Supplemental Response to LML's Amended First Set of Interrogatories, served April 5, 2005.

## SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7:

TeleCheck incorporates by reference its previous responses as though fully set forth herein. TeleCheck expressly reserves the right to supplement this response as discovery proceeds and provides this supplemental response subject to and without waiving its General and Specific Objections. In addition to the bases cited in TeleCheck's previous Responses to Interrogatory No. 7, TeleCheck incorporates by reference the September 20, 2005 Expert Report of David P. Kurrasch Regarding Non-Infringement and the September 23, 2005 Supplement to Expert Report of David P. Kurrasch Regarding Non-Infringement

## INTERROGATORY NO. 10:

Separately for each Patent-in-Suit, describe in detail all legal and factual bases for TeleCheck's contentions that LML is barred from asserting the present cause of action, in whole or in part, by the doctrine of estoppel as set forth in paragraph 100 of TeleCheck's Amended Answer and Affirmative Defenses of Defendant TeleCheck Services, Inc. to

Complaint, including, but not limited to all specific instances of how LML allegedly misled TeleCheck, how TeleCheck allegedly relied on LML's alleged misleading conduct, and as a result of such reliance, how TeleCheck is allegedly materially prejudiced by the present action.

## RESPONSE TO INTERROGATORY NO. 10:

TeleCheck objects to this interrogatory as premature, in that it seeks discovery and contentions which TeleCheck has not yet fully developed at this stage of the litigation. TeleCheck has only recently received any meaningful production from LML. TeleCheck further objects to this interrogatory as vague, overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. TeleCheck further objects to this interrogatory to the extent it seeks information subject to the attorney-client privilege, work product doctrine or other applicable privilege.

Subject to these objections, TeleCheck contends that LML is barred by the doctrine of estoppel due to LML's course of conduct from 1996 to the filing of its Complaint in 2004, during which time representatives of LML made early, initial contacts with TeleCheck regarding the patents-in-suit, followed by inaction. Such lengthy inaction led TeleCheck to believe that LML would not attempt to enforce its patents against TeleCheck. TeleCheck reasonably relied on LML's misleading conduct.

## FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 10:

TeleCheck incorporates by reference its previous responses as though fully set forth herein. TeleCheck expressly reserves the right to supplement this response as discovery proceeds and provides this supplemental response subject to and without waiving its General and Specific Objections. In addition to the bases cited in TeleCheck's previous Responses to Interrogatory No. 10, the TeleCheck provides the

126

following bases for TeleCheck's defense that LML's claims are barred by the doctrine of estoppel:

Attorneys for the inventors effectively accused Defendant TeleCheck of infringement of at least the '988 patent by letter dated May 6, 1997. [*See, e.g.,* LML-EP 012327-012342.] However, Mr. Hills never filed a suit against TeleCheck during the time he owned the '988 patent and the other patents-in-suit. Following Mr. Hills' 1997 letter, he and his attorneys engaged in discussions with TeleCheck during which Mr. Hills and his attorneys characterized his purported invention, including distinctions between the purported invention and the prior art. Mr. Hills was apparently aware of TeleCheck's activities by this time. TeleCheck relied on these representations in designing, developing, launching, and/or providing the accused products and services.

In 1998, LML conducted due diligence in conjunction with its acquisition of the '988 patent and related applications. LML's specially retained intellectual property counsel, Birch, Stewart, Kolasch & Birch, LLP, reviewed the '988 patent, the file wrapper, and relevant prior art and advised LML that the patent had "a narrow scope of protection." [*See, e.g.,* LML-EP 061853-061864.] They further explained that the interpretation of the phrase "without using the bank check as a negotiable instrument" must be construed to mean that "the bank check, at no time, takes on the status of a negotiable instrument" or the patent would be invalid. This same phrase appears in every asserted claim of the patents in suit.

After LML acquired the patents-in-suit, it sent a letter to the President of NACHA, Mr. McEntee, dated March 19, 1999, distancing LML and CPI from Mr. Hills, requesting membership to the ECC, and stating that LML's objective was the

127

"advancement of the interests of the membership as a whole." He specifically requested the opportunity for LML to participate "in the rule setting for Electronic Checking products." Mr. Gaines further represented that LML did not "seek membership in order to utilize resources for adverse purposes." [LML-EP 010871-010873.] This letter was distributed to the Steering Committee of the ECC. Following its 1999 letter, LML did not file any patent infringement action against TeleCheck. Furthermore, despite its representation that it would not use its participation in the NACHA rule setting process for "adverse purposes," it has now become clear that LML intends to argue that compliance with the NACHA rule for Point of Sale Purchases ("the POP rule") adopted in 2000 necessarily results in infringement of the patents-in-suit.

LML subsequently engaged in discussions with TeleCheck in the 2000-2001 time frame. When those discussions failed to result in any agreement, LML went away for nearly four years, further leading TeleCheck to believe that LML did not intend to enforce its patents against Telecheck's products and services. LML did not file suit until July, 2004.

During the more than seven years that Mr. Hills, and subsequently LML, delayed in bringing any action to enforce the '988 and other patents-in-suit, critical documents, including virtually all documentation of the inventors' work on the alleged invention, were deliberately destroyed or were lost and are no longer available. For example, in response to a subpoena Mr. Hills stated that he had divested or destroyed documents over the preceding five years, so that Mr. Hills had no documents in his possession responsive to the subpoena: "[P]lease be advised that, after greater than 5 years, three moves, and contractual requirements to have divested and/or destroyed documents, I no longer

128

possess any portion of the information requested." [*See* Letter from Robert Hills to Sean Hayes dated May 27, 2005.] The destruction and/or failure to preserve these documents has severely prejudiced the defendants.

LML's belatedly-filed complaint depends on a broad scope of patent protection that is in direct contradiction of the opinion it received from its intellectual property due diligence counsel that the '988 patent has "a narrow scope of protection." LML seeks to use this broad interpretation to hold an entire industry hostage by reading its patents to cover the NACHA POP rule, in direct contradiction to its representation to the President of NACHA that it would use its membership in NACHA to "advance the interests of the membership as a whole."

## SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 10:

TeleCheck incorporates by reference its previous responses as though fully set forth herein. TeleCheck expressly reserves the right to supplement this response as discovery proceeds and provides this supplemental response subject to and without waiving its General and Specific Objections. In addition to the bases cited in TeleCheck's previous Responses to Interrogatory No. 10, TeleCheck incorporates by reference the August 12, 2005 Expert Report of David P. Kurrasch Regarding Invalidity, the September 6, 2005 Supplemental Expert Report of David P. Kurrasch Regarding Invalidity, and the September 28, 2005 Second Supplement to Expert Report of David P. Kurrasch Regarding Invalidity.

## INTERROGATORY NO. 11:

Separately for each Patent-In-Suit, describe in detail all legal and factual bases for TeleCheck's contentions that LML is barred from asserting the present cause of action, in whole or in part, by the doctrine of laches as set forth in paragraph 99 of TeleCheck's Amended Answer and Affirmative Defenses of Defendant TeleCheck Services, Inc. to Complaint, including, but not limited to the date or time LML allegedly knew or should have known of its claim against TeleCheck; how LML allegedly delayed filing suit for an unreasonable and inexcusable length of time from the time it knew or should have known

129

of its claim against TeleCheck; and how the alleged delay operated to allegedly prejudice TeleCheck.

## RESPONSE TO INTERROGATORY NO. 11:

TeleCheck objects to this interrogatory to the extent it calls for legal conclusions. TeleCheck further objects to this interrogatory as premature, in that it seeks discovery and contentions which TeleCheck has not yet fully developed at this stage of the litigation. TeleCheck has only recently received any meaningful production from LML. TeleCheck further objects to this interrogatory as vague, overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. TeleCheck further objects to this interrogatory to the extent it seeks information subject to the attorney-client privilege, work product doctrine or other applicable privilege. TeleCheck further objects to this interrogatory to the extent the term "inexcusable" is vague, ambiguous, and undefined.

Subject to these objections, TeleCheck contends that LML unreasonably delayed filing suit, to the prejudice of TeleCheck. LML was knowledgeable of TeleCheck's conduct—the same conduct asserted in this suit—in the late nineties. After making initial early contacts, LML failed to bring suit until July of 2004.

## FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11:

TeleCheck incorporates by reference its previous responses as though fully set forth herein. TeleCheck expressly reserves the right to supplement this response as discovery proceeds and provides this supplemental response subject to and without waiving its General and Specific Objections. In addition to the bases cited in TeleCheck's previous Responses to Interrogatory No. 11, the TeleCheck provides the

130

following bases for TeleCheck's defense that LML's claims are barred by the doctrine of laches:

Attorneys for the inventors effectively accused Defendant TeleCheck of infringement of at least the '988 patent by letter dated May 6, 1997. [*See, e.g.,* LML-EP 012327-012342.] However, Mr. Hills never filed a suit against TeleCheck during the time he owned the '988 patent and the other patents-in-suit. Following Mr. Hills' 1997 letter, he and his attorneys engaged in discussions with TeleCheck during which Mr. Hills and his attorneys characterized his purported invention, including distinctions between the purported invention and the prior art. Mr. Hills was apparently aware of TeleCheck's activities by this time. TeleCheck relied on these representations in designing, developing, launching, and/or providing the accused products and services.

In 1998, LML conducted due diligence in conjunction with its acquisition of the '988 patent and related applications. LML's specially retained intellectual property counsel, Birch, Stewart, Kolasch & Birch, LLP, reviewed the '988 patent, the file wrapper, and relevant prior art and advised LML that the patent had "a narrow scope of protection." [*See, e.g.,* LML-EP 061853-061864.] They further explained that the interpretation of the phrase "without using the bank check as a negotiable instrument" must be construed to mean that "the bank check, at no time, takes on the status of a negotiable instrument" or the patent would be invalid. This same phrase appears in every asserted claim of the patents in suit.

After LML acquired the patents-in-suit, it sent a letter to the President of NACHA, Mr. McEntee, dated March 19, 1999, distancing LML and CPI from Mr. Hills, requesting membership to the ECC, and stating that LML's objective was the

131

"advancement of the interests of the membership as a whole." He specifically requested the opportunity for LML to participate "in the rule setting for Electronic Checking products." Mr. Gaines further represented that LML did not "seek membership in order to utilize resources for adverse purposes." [LML-EP 010871-010873.] This letter was distributed to the Steering Committee of the ECC. Following its 1999 letter, LML did not file any patent infringement action against TeleCheck. Furthermore, despite its representation that it would not use its participation in the NACHA rule setting process for "adverse purposes," it has now become clear that LML intends to argue that compliance with the NACHA rule for Point of Sale Purchases ("the POP rule") adopted in 2000 necessarily results in infringement of the patents-in-suit.

LML subsequently engaged in discussions with TeleCheck in the 2000-2001 time frame. When those discussions failed to result in any agreement, LML went away for nearly four years, further leading TeleCheck to believe that LML did not intend to enforce its patents against Telecheck's products and services. LML did not file suit until July, 2004.

During the more than seven years that Mr. Hills, and subsequently LML, delayed in bringing any action to enforce the '988 and other patents-in-suit, critical documents, including virtually all documentation of the inventors' work on the alleged invention, were deliberately destroyed or were lost and are no longer available. For example, in response to a subpoena Mr. Hills stated that he had divested or destroyed documents over the preceding five years, so that Mr. Hills had no documents in his possession responsive to the subpoena: "[P]lease be advised that, after greater than 5 years, three moves, and contractual requirements to have divested and/or destroyed documents, I no longer

132

possess any portion of the information requested." [*See* Letter from Robert Hills to Sean Hayes dated May 27, 2005.] The destruction and/or failure to preserve these documents has severely prejudiced the defendants.

LML's belatedly-filed complaint depends on a broad scope of patent protection that is in direct contradiction of the opinion it received from its intellectual property due diligence counsel that the '988 patent has "a narrow scope of protection." LML seeks to use this broad interpretation to hold an entire industry hostage by reading its patents to cover the NACHA POP rule, in direct contradiction to its representation to the President of NACHA that it would use its membership in NACHA to "advance the interests of the membership as a whole."

## SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11:

TeleCheck incorporates by reference its previous responses as though fully set forth herein. TeleCheck expressly reserves the right to supplement this response as discovery proceeds and provides this supplemental response subject to and without waiving its General and Specific Objections. In addition to the bases cited in TeleCheck's previous Responses to Interrogatory No. 11, TeleCheck incorporates by reference the August 12, 2005 Expert Report of David P. Kurrasch Regarding Invalidity, the September 6, 2005 Supplemental Expert Report of David P. Kurrasch Regarding Invalidity, and the September 28, 2005 Second Supplement to Expert Report of David P. Kurrasch Regarding Invalidity.

## INTERROGATORY NO. INTERROGATORY NO. 12:

Describe in detail all bases for TeleCheck's contention that it does not infringe claims 14, 16, and 18 of the '988 patent, claim 10 of the '528 patent, and claims 1, 2 and 24 of the `366 patent either literally or under the doctrine of equivalents, and its contention that it has not contributed to the infringement by others and/or has not induced others to infringe such claims, including a claim chart explaining in detail all specific structural or functional differences between each Accused Product and each claim.

(As used herein, the `"988 patent" refers to U.S. Patent No. 5,484,988: the '528 patent" refers to U.S. Patent No. 6,164,528; the '366 patent" refers to U.S. Patent No. 6.283,366; and "TeleCheck's Accused Products", "Accused Product", or "product" means

133

TeleCheck's Eclipse and Accelera terminals and TeleCheck's "Electronic Check Acceptance Service," and all optional equipment or services sold therewith as well as any other product, equipment, component, system, or services manufactured, sold, offered for sale, used, or imported by TeleCheck that reasonably relate to conversion of checks, presented at points of sale, to electronic transactions).

## RESPONSE TO INTERROGATORY NO. 12:

TeleCheck objects to this interrogatory as premature, in that it seeks expert discovery and contentions which TeleCheck has not yet fully developed at this stage of the litigation. TeleCheck further objects to this interrogatory as premature, because it requires contentions regarding claim construction, and is therefore in conflict with the Scheduling Order governing this case. TeleCheck further objects to LML's definition of "TeleCheck's Accused Products," "Accused Product," or "product" as vague, overly broad and unduly burdensome. TeleCheck further objects to this interrogatory insofar as LML is attempting to shift its burden of proof on infringement to TeleCheck. Plaintiffs, not defendants, bear the burden of proving infringement.

TeleCheck does not infringe any of claims 14, 16 and 18 of the '988 patent; claim 10 of the '528 patent; nor any of claims 1, 2 and 24 of the '366 patent, at least because the Accused Products do not meet the limitation "without using the check as a negotiable instrument" (the "negotiable instrument" limitation) either literally or (if available) under the doctrine of equivalents.

The TeleCheck Accused Products do not meet this limitation because the consumer bank check is in fact used as a negotiable instrument. In the TeleCheck system, the magnetic ink character recognition ("MICR") reader reads not only bank account information, but also the bank check number. Using the check number, the host system then clears and voids the check during the transaction. TeleCheck's scanning of the check number and subsequent cancellation of the check is consistent with use of the check as a negotiable instrument.

The electronic submission of the check information (including the check number, amount of the check and other MICR information) through the TeleCheck system constitutes a presentment of the check and is the time at which all of the warranties of presentment attach. This is also consistent with using the check as a negotiable

134

instrument. Having undergone presentment, the spent and voided check is returned to the customer, in materially the same way a customer receives presented and voided checks in the mail along with their monthly bank statements.

TeleCheck further requires its merchants to have consumers fill out and sign checks before handing them to the merchant. The signed bank check is a negotiable instrument, and is used as such in the TeleCheck system. The signed bank check itself may be retained as part of a traditional checking transaction, rather than carrying on the transaction electronically. For example, this may occur in the TeleCheck system, when a bank disallows conversion of the paper check to an electronic check at the terminal. In such cases, the terminal displays an appropriate prompt, and the merchant simply retains the signed bank check without any further information from the consumer. This treatment of the check is only possible because the signed check meets all criteria of a negotiable instrument, and is used as a negotiable instrument.

The "negotiable instrument" limitation can not be expanded to cover "equivalents." In general, negative limitations are not entitled to any scope of equivalents. *See Athletic Alternatives Inc. v. Prince Mfg.*, 73 F.3d 1573 (Fed. Cir. 1996); *Pennwalt v. Durand-Wayland Inc.*, 833 F.2d 931 (Fed. Cir. 1987). Further, with respect to the '988 patent, the limitation was added to each independent claim during prosecution to overcome prior art. (*See* Preliminary Amendment dated June 9, 1994, LML-EP-000170-175.) As a result, the *Festo* presumption applies to this limitation within the '988 patent and precludes any scope of equivalents.

The Applicants further relied on the "negotiable instrument" limitation during prosecution to obtain allowance of all Asserted Claims over the prior art. For example, during prosecution of the '528 patent the Applicants argued:

> As a convenience to the consumer, bank account information is read off of a check. However, the check is not utilized as a negotiable instrument. As such the check need not even be signed by the consumer. All of the information is stored in the check writing point of sale system, and transfer of the funds is handled electronically.

(Response dated May 20, 1999; *see also* Response dated January 30, 1995, LML-EP-000189-209; Response dated May 21, 1998, LML-EP 000414-18.) This disavowal of claim scope further precludes any application of the doctrine of equivalents.

135

Even if resort to the doctrine of equivalents is available, the Accused Products do not meet the "negotiable instrument" limitation because the differences between the Accused Products and the limitation (as described above) are not insubstantial.

TeleCheck does not infringe any of claims 16 and 18 of the '988 patent; nor claim 10 of the '528 patent at least because the Accused Product do not meet the limitation of reading MICR information for the "sole purpose of obtaining consumer bank account information," either literally or (if available) under the doctrine of equivalents.

In the TeleCheck system the check number is also read by the terminal. This additional information is not obtained for the "sole purpose" of obtaining bank account information, and therefore this limitation is not literally met by the TeleCheck system.

The "sole purpose" limitation was added to the claims during prosecution of the '988 patent. (Compare original claims, LML0EP 000104-06, with Preliminary Amendment dated June 8, 1994, LM-EP 000170-79.) As a result, the *Festo* presumption applies to this limitation within the '988 patent and precludes any scope of equivalents.

The Applicants expressly relied on this limitation to obtain allowance of the claims over the prior art. (*See, e.g.*, Amendment dated January 30, 1995, LML-EP-000189-209; "None of the references discloses a point-of-sale system that uses any bank check solely for the purposes of gathering customer information and not as a negotiable instrument;" *see also* Preliminary Amendment dated June 9, 1994, LML-EP-000170-000175.) This clear disavowal of claim scope precludes any scope of equivalents.

Even if resort to the doctrine of equivalents is available, the Accused Products do not meet the "sole purpose" limitation because the differences between the Accused Products and the limitation (as described above) are not insubstantial.

TeleCheck does not infringe any of claims 14, 16 and 18 of the '988 patent; nor any of claims 1 and 2 of the '366 patent, at least because the Accused Products do not meet the limitation of a terminal adapted to receive consumer bank account information from "any bank check," either literally or (if available) under the doctrine of equivalents.

The TeleCheck system cannot be used with foreign checks such as Canadian checks, or with checks from credit card companies (*i.e.*, checks that act as a cash advance from the credit card issuer).

The "any bank check" limitation was added to the claims during prosecution of the '988 patent to overcome the prior art. (Compare original claims, LML-EP 000104-06, with Response dated January 30, 1995, LML-EP 000183-209.) As a result, the *Festo* presumption applies to this limitation within the '988 patent and precludes any scope of equivalents. The Applicants further relied on this limitation to distinguish the prior art (*see* LML-EP 000207). Accordingly, no scope of equivalents is available.

Even if the doctrine of equivalents is applicable, the Accused Products do not infringe under the doctrine of equivalents because the differences between the Accused Products and the claim limitation are not insubstantial.

TeleCheck's investigation into its defenses is continuing, and it reserves the right to supplement these defenses and/or assert additional invalidity defenses as discovery progresses.

## FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 12:

TeleCheck incorporates by reference its previous response as though fully set forth herein. TeleCheck expressly reserves the right to supplement this response as discovery proceeds and provides this supplemental response subject to and without waiving its General and Specific Objections. In addition to the bases cited in TeleCheck's previous Responses to Interrogatory No. 12, TeleCheck incorporates by reference the September 20, 2005 Expert Report of David P. Kurrasch Regarding Non-Infringement and the September 23, 2005 Supplement to Expert Report of David P. Kurrasch Regarding Non-Infringement.

## INTERROGATORY NO. 13:

Describe in detail all legal and factual bases for TeleCheck's contention that each of claims 14, 16, and 18 of the '988 patent, claim 10 of the '528 patent, and claims 1, 2 and 24 of the '366 patent are invalid and for each piece of alleged prior art, and/or combination of alleged prior art that TeleCheck contends invalidates each such claim, provide a detailed claim chart that identifies each element of the claim that TeleCheck contends is disclosed or taught by the prior art with citations to each instance where such element is allegedly disclosed or taught by the prior art..

137

# EXHIBIT 17

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LML PATENT CORP.,

        Plaintiff,

    v.                                                    C.A. 04-858 (SLR)

TELECHECK SERVICES, INC.,
ELECTRONIC CLEARING HOUSE, INC.,
XPRESSCHEX, INC. and NOVA
INFORMATION SYSTEMS, INC.,

        Defendants.

## JOINT PROPOSED CLAIM CONSTRUCTION STATEMENT

Pursuant to the Court's Rule 16 Scheduling Order in this matter, the Parties hereby submit the following claim charts to present their respective, proposed constructions of disputed claim terms and their proposed constructions of agreed claim terms in the patent-in-suit, namely, U.S. Patent No. 5,484,988 ("the '988 patent").

## Proposed Constructions of Disputed Claim Terms

| Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| **any bank check** (claims 1, 8) | Any regular check used to draw funds from a normal bank or credit union checking account | any type of check drawn on a financial institution |
| **any consumer bank check** (claim 9) | Any regular check used to draw funds from a normal bank or credit union consumer checking account | same meaning as the phrase "any bank check" set forth above, with the added limitation that the check be "drawn against a consumer bank account" |
| **any** (claims 1, 8, 9) | LML believes that this term should not be separately construed from the entire element in which it appears in the claims, namely the "any bank check" or "any consumer bank check" language construed below. In any event, this plain English term needs no construction. | one or some indiscriminately of whatever kind |
| **consumer bank account information** (claims 1, 2, 3, 8, 9) | Information relating to a consumer's bank account including the MICR line (magnetic ink character recognition line) | only the ABA/transit routing number and bank account number |
| **without using the bank check as a negotiable instrument** (claim 1) | Where the paper check is used as a source of information, and is not accepted or processed | the bank check, at no time, takes on the status of a negotiable instrument |
| **without using the check as a negotiable instrument** (claim 8) | Where the paper check is used as a source of information, and is not accepted or processed | the check, at no time, takes on the status of a negotiable instrument |

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| without using a bank check as a negotiable instrument (claim 9) | Where the paper check is used as a source of information, and is not accepted or processed | the check, at no time, takes on the status of a negotiable instrument |
| subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations (claim 8) | Subsequently transmitting the information relating to the transaction to a bank for subsequent automated clearing house operations | electronically communicating with an automated clearing house for transferring funds electronically based upon the consumer bank account information obtained from any bank check presented at the point-of-sale |
| enabling automated clearing house communication for transferring funds (claims 1, 9) | Enabling communication with an automated clearing house for electronically transferring funds | electronically communicating with an automated clearing house for transferring funds electronically based upon the consumer bank account information obtained from any bank check presented at the point-of-sale |
| for the sole purpose (claims 2, 8 and 9) | For the only purpose | Defendants contend that this term needs no construction |
| adapted to receive consumer bank account information from any bank check (claim 1) | adapted to receive consumer bank account information from any bank check | adapted to read consumer bank account information directly from any bank check |

2

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| means for reading magnetic ink character recognition numbers appearing on a consumer check (claim 2) | This limitation should be construed pursuant to 35 U.S.C. Section 112(6).<br><br>The recited function is "reading magnetic ink character recognition numbers appearing on a consumer check."<br><br>The structures in the '988 patent that perform that function is any mechanism such as a MICR check reader, optical character recognition ("OCR") equipment, a keyboard for manual entry, or equivalent. | This limitation should be construed pursuant to 35 U.S.C. Section 112(6).<br><br>The recited function is "reading magnetic ink character recognition numbers appearing on a consumer check."<br><br>The structures described in the '988 patent that perform that function are a MICR reader and optical character recognition equipment. |
| reading means for reading magnetic ink character recognition numbers on any consumer bank check (claim 9) | This limitation should be construed pursuant to 35 U.S.C. Section 112(6).<br><br>The recited function is "reading magnetic ink character recognition numbers appearing on a consumer check."<br><br>The structures in the '988 patent that perform that function is any mechanism such as a MICR check reader, optical character recognition ("OCR") equipment, a keyboard for manual entry, or equivalent. | This limitation should be construed pursuant to 35 U.S.C. Section 112(6).<br><br>The recited function is "reading magnetic ink character recognition numbers on any consumer bank check."<br><br>The structures described in the '988 patent that perform that function are a MICR reader and optical character recognition equipment. |
| verifying that account numbers were accurately read at the point of sale (claim 8) | Verifying that the account numbers from the check were read accurately at the point of sale terminal | visually confirming that account numbers were accurately read by reference to the source document |

3

## Proposed Constructions of Agreed Claim Terms

| Claim Term/Limitation | Parties' Agreed Proposed Construction |
| --- | --- |
| consumer (claim 9) | person, business or corporation |
| second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the bank check as a negotiable instrument (claim 1); second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using a bank check as a negotiable instrument (claim 9) | This function is written in means-plus-function format pursuant to 35 U.S.C. 112(6). The recited function of this limitation is enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the [a] bank check as a negotiable instrument. The structures disclosed in the patent for performing the recited function of this limitation are a modem, network interface, enhanced radio transmission interface, satellite communication interface or equivalent.[1] |
| automated clearing house (claims 1, 8, 9) | an automated clearing house including, but not limited to, the national U.S. clearing house sometimes referred to as the "ACH" |

[1] While the parties agree to the recited function of this claim element pursuant to 35 U.S.C. 112(6), the parties dispute the meaning of limitations within that function, as set forth in the Parties' Proposed Construction of Disputed Claim Terms and the parties' briefs.

4

DATED: October 7, 2005


/s/ Mary B. Matterer
Richard K. Herrmann (I.D. No. 405)
Mary B. Matterer (I.D. No. 2696)
MORRIS JAMES HITCHENS
& WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
302.888.6800
rherrmann@morrisjames.com
mmatterer@morrisjames.com

Counsel for Plaintiff
LML Patent Corp.


/s/ Timothy Devlin
William J. Marsden, Jr. (I.D. No. 2247)
Timothy Devlin (I.D. No. 4241)
Sean Hayes (I.D. No. 4413)
FISH & RICHARDSON P.C.
919 North Market Street, Suite 1000
Wilmington, Delaware 19801
302.652.5070
marsden@fr.com
hayes@fr.com

Counsel for Defendant
TeleCheck Services, Inc.


/s/ Francis DiGiovanni
Francis DiGiovanni (I.D. No. 3189)
CONNOLLY BOVE LODGE & HUTZ
LLP
The Nemours Building
1007 N. Orange Street
Wilmington, Delaware 19801
302.658.9141
fdigiovanni@cblh.com

Counsel for Defendants
Electronic Clearing House, Inc.
and Xpresschex, Inc.


/s/ Richard D. Kirk (rk0922)
Richard D. Kirk (I.D. No. 922)
THE BAYARD FIRM
222 Delaware Avenue, Suite 900
Wilmington, DE 19801
302.429.4208
rkirk@bayardfirm.com

Counsel for Defendant
NOVA Information Systems, Inc.

5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
**CERTIFICATE OF SERVICE**

I hereby certify that on October 7, 2005, I electronically filed a JOINT PROPOSED
CLAIM CONSTRUCTION STATEMENT with the Clerk of Court using CM/ECF which
will send notification of such filing(s) to the following:

Richard K. Herrmann
Mary B. Matterer, Esq.
Morris James Hitchens & Williams
222 Delaware Avenue, 10th Floor
Wilmington, DE  19801-4226

Richard D. Kirk, Esq.
The Bayard Firm
222 Delaware Avenue, 9th Floor
Wilmington, DE  19899

Collins J. Seitz, Jr., Esq.
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 North Orange Street
Wilmington, DE  19801

I hereby certify that on October 7, 2005, I have sent by Electronic mail, the

document(s) to the following non-registered participants:

Robert Jacobs, Esq.                          Russell E. Levine, Esq.
Belasco Jacobs & Townsley, LLP               Kirkland & Ellis LLP
Howard Hughes Center                         200 E. Randolph Dr.
6100 Center Drive, Suite 630                 Chicago, IL 60601
Los Angeles, CA  90045

Mark C. Scarsi, Esq.
O'Melveny & Myers LLP
400 S Hope Street
Los Angeles, CA 90071

_/s/ Timothy Devlin_
Timothy Devlin

6

# EXHIBIT  18
# REDACTED  IN  ITS
# ENTIRETY

# EXHIBIT 19
# REDACTED IN ITS ENTIRETY

# EXHIBIT  20
# REDACTED  IN  ITS
# ENTIRETY

# EXHIBIT 21 REDACTED IN ITS ENTIRETY

# EXHIBIT  22
# REDACTED  IN  ITS
# ENTIRETY

# EXHIBIT 23
# REDACTED IN ITS ENTIRETY

# EXHIBIT  24
# REDACTED  IN  ITS
# ENTIRETY

# EXHIBIT 25
# REDACTED IN ITS ENTIRETY

# EXHIBIT  26
# REDACTED  IN  ITS
# ENTIRETY

# EXHIBIT   27
# REDACTED   IN   ITS
# ENTIRETY

# EXHIBIT 28
# REDACTED IN ITS ENTIRETY

# EXHIBIT  29
# REDACTED  IN  ITS
# ENTIRETY

# EXHIBIT 30

# Hot off the Press

NEWS FROM PUBLIC RELATIONS

*The following press release was issued on December 8, 1999*

## TELECHECK REACHES BILLION DOLLAR MARK WITH ELECTRONIC CHECK ACCEPTANCE SERVICE

**HOUSTON, December 8, 1999** – TeleCheck Services, Inc., the world's leading check acceptance company and a subsidiary of Atlanta-based First Data Corp. (NYSE: FDC), today announced that it has settled one billion dollars of electronic transactions since the nationwide introduction of the TeleCheck® Electronic Check Acceptance$^{SM}$ (ECA®) service last year.  TeleCheck has electronically processed over 13 million transactions for their ECA® merchant base, which has grown almost 280 percent in the past year.

The TeleCheck® Electronic Check Acceptance$^{SM}$ (ECA®) service converts and processes a customer's paper check as an electronic item at the point of purchase in a process that is similar to a credit card transaction.  When making a purchase, the consumer presents a completed paper check as usual.  Then, TeleCheck converts the paper check into an electronic item through the new Eclipse$^{TM}$ integrated payment terminal that reads the banking information off the bottom of the check.

The consumer then simply signs a printed receipt authorizing the electronic transaction and the cancelled paper check, along with a copy of the authorization slip, is returned to the consumer.  A complete description of the transaction is included in the check writer's bank statement for reconciliation purposes, and consumers retain the same rights as today in disputing any fraudulent items posted to their account.  In addition, since the check writer keeps the cancelled physical check, the risk of name, address and other personal information being used fraudulently is substantially reduced.

"Having processed over a billion dollars of electronic transactions in 18 months indicates that ECA® is reaching critical points in market acceptance," said Steve Shaper, chief executive officer of TeleCheck. "Consumers like it because they continue to benefit from the float of their paper check and the merchant benefits from faster processing and reduced paperwork since funds are automatically deposited into their account, reducing time-consuming trips to the bank."

- more -



TeleCheck Reaches Billion Dollar Mark / Page 2

The TeleCheck® ECA® process moves transactions through the Automated Clearing House (ACH) network. The transactions follow interim rules instituted in September 1999 by NACHA – The Electronic Payments Association – for paper checks converted to electronic items at the point of sale. A final NACHA rule, called Point of Purchase or POP, will take effect in September 2000. TeleCheck was actively involved in the development of the rules, serving as co-sponsor during the rules process.

The Eclipse™ terminal is capable of processing checks, credit cards and debit cards and is the first integrated payment terminal to securely, effectively and economically read and image all pre-printed information off the face of a check. Eclipse reads the check MICR line (the bank numbers in magnetic ink along the bottom of the check) both magnetically and optically, virtually eliminating errors in reading the MICR number.

TeleCheck is the world's leading provider of paper and electronic check services, helping more than 210,000 retail, financial institution, grocery and other industry clients to increase their profitability, reduce risk and streamline operations. TeleCheck's check acceptance and electronic commerce solutions help businesses safely and efficiently accept payment at the point of sale, by telephone, over the Internet, and through recurring ACH payments. TeleCheck services are offered through a sales and service network in more than 90 cities in the United States and in Canada, Puerto Rico, Australia and New Zealand. In 1998, TeleCheck authorized more than $112 billion in checks, representing 2.2 billion transactions. For more information about TeleCheck, visit the Internet site at www.telecheck.com.

Atlanta-based First Data Corp. (NYSE: FDC) helps move the world's money. As the leader in electronic commerce and payment services, First Data serves more than two million merchant locations, 1,400 card issuers and millions of consumers, making it easier, faster and more secure for people and businesses to buy goods and services. For more information, please visit the company's web site at www.firstdatacorp.com.

# # #

FDC08533

# EXHIBIT 31
# REDACTED IN ITS
# ENTIRETY

# EXHIBIT  32
# REDACTED  IN  ITS
# ENTIRETY

# EXHIBIT  33
# REDACTED  IN  ITS
# ENTIRETY

# EXHIBIT 34 REDACTED IN ITS ENTIRETY

# EXHIBIT 35
# REDACTED IN ITS ENTIRETY

# EXHIBIT 36
# REDACTED IN ITS
# ENTIRETY

# EXHIBIT 37
# REDACTED IN ITS ENTIRETY

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of November, 2005, I electronically filed the foregoing document, **PUBLIC VERSION OF DECLARATION OF AARON D. CHARFOOS IN SUPPORT OF LML'S MOTION FOR SUMMARY JUDGMENT NO. 1: FOR A RULING THAT TELECHECK INFRINGES CLAIMS 1, 2, 4, 5, 6, 9, 10, 11, AND 16 OF THE '988 PATENT**, with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Collins J. Seitz, Jr., Esq.
Francis DiGiovanni, Esq.
Connolly Bove Lodge & Hutz LLP
1007 North Orange Street
Wilmington, DE 19801

William J. Marsden, Jr., Esq.
Timothy Devlin, Esq.
Fish & Richardson, P.C.
919 North Market Street, Suite 1100
Wilmington, DE 19801

Richard D. Kirk, Esq.
The Bayard Firm
222 Delaware Avenue, 9th Floor
Wilmington, DE 19801

Additionally, I hereby certify that on the 4th day of November, 2005, the foregoing document was served via email on the following non-registered participants:

Robert Jacobs, Esq.
Mark B. Mizrahi, Esq.
Belasco Jacobs & Townsley, LLP
Howard Hughes Center
6100 Center Drive, Suite 630
Los Angeles, CA 90045

Mark C. Scarsi, Esq.
Vision L. Winter, Esq.
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071

_/s/ Mary B. Matterer_
Richard K. Herrmann (#405)
Mary B. Matterer (#2696)
MORRIS, JAMES, HITCHENS & WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
(302) 888-6800
mmatterer@morrisjames.com

Attorneys for Plaintiff LML PATENT CORP.

-38-