## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LML PATENT CORP. | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.    04-858-SLR |
| vs. | ) | |
| | ) | Judge Sue L. Robinson |
| TELECHECK SERVICES, INC. | ) | |
| ELECTRONIC CLEARING HOUSE, | ) | **PUBLIC VERSION** |
| INC., XPRESSCHEX, INC., AND | ) | |
| NOVA INFORMATION SYSTEMS, | ) | |
| INC. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

**DECLARATION OF AARON D. CHARFOOS IN SUPPORT OF LML'S
MOTION FOR SUMMARY JUDGMENT NO. 3:
FOR A RULING THAT NOVA INFORMATION SYSTEMS, INC.
INFRINGES CLAIMS 1, 2, 4, 5, 6, 9, 10, 11, AND 16 OF THE '988 PATENT**

Originally filed: October 28, 2005
Public version filed:  November 4, 2005

Richard K. Herrmann #405
Mary B. Matterer #2696
MORRIS JAMES HITCHENS &
WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware  19801
(302) 888-6800
rherrmann@morrisjames.com
mmatterer@morrisjames.com

Russell E. Levine, P.C.
Jamie H. McDole
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois  60601
(312) 861-2000
Attorneys for LML Patent Corp.

## DECLARATION OF AARON D. CHARFOOS

I, Aaron D. Charfoos, declare as follows:

1. I am an associate of the law firm of Kirkland & Ellis LLP, and counsel for plaintiff LML Patent Corp. ("LML"). I am a member in good standing of the bar of the state of Illinois, and I am admitted to practice *pro hac vice* in the United States District Court for the District of Delaware for this case. The facts set forth below are known to me personally and I could competently testify hereto if called as a witness in this action.

2. Attached hereto as Exhibit 1 is a true and correct copy of United States Patent Number 5,484,988.

3. Attached hereto as Exhibit 2 is a true and correct copy of the Declaration of Gary Tinkel in Support of LML's Motion for Summary Judgment Number 2: For a Ruling that ECHO Infringes Claims 1, 2, 4, 5, 6, 9, 10, 11 and 16 of the '988 Patent.

4. Attached hereto as Exhibit 3 is a true and correct copy of LML-EP-055336 - LML-EP-055769 (selected pages).

5. Attached hereto as Exhibit 4 is a true and correct copy of portions of the Deposition of Jane Larimer. This document has been designated For Outside Counsel's Eyes Only by NACHA.

6. Attached hereto as Exhibit 5 is a true and correct copy of NOVA 29174 - NOVA 29200. This document has been designated Attorneys' Eyes Only - OCO by Nova.

7. Attached hereto as Exhibit 6 is a true and correct copy of NOVA 33784 - NOVA 33796. This document has been designated Attorneys' Eyes Only - OCO by Nova.

8. Attached hereto as Exhibit 7 is a true and correct copy of NOVA 33035 - NOVA 33039. This document has been designated Attorneys' Eyes Only - OCO by Nova.

9. Attached hereto as Exhibit 8 is a true and correct copy of LML-EP- 061899 - LML-EP 061900.

10. Attached hereto as Exhibit 9 is a true and correct copy of portions of the Deposition of Stephen Schutze. This document has been designated Attorneys' Eyes Only - OCO by Defendants.

11. Attached hereto as Exhibit 10 is a true and correct copy of NOVA 33466 - NOVA 33493. This document has been designated Attorneys' Eyes Only - OCO by Nova.

12. Attached hereto as Exhibit 11 is a true and correct copy of NOVA 03025 - NOVA 03059. This document has been designated Attorneys' Eyes Only - OCO by Nova.

13. Attached hereto as Exhibit 12 is a true and correct copy of NOVA 37659 - NOVA 37699. This document has been designated Attorneys' Eyes Only - OCO by Nova.

14. Attached hereto as Exhibit 13 is a true and correct copy of NOVA 35819 - NOVA 35845. This document has been designated Attorneys' Eyes Only - OCO by Nova.

15. Attached hereto as Exhibit 14 is a true and correct copy of portions of the Deposition of Amy Goodson. This document has been designated Confidential - OCO - Subject to Protective Order by Nova.

16. Attached hereto as Exhibit 15 is a true and correct copy of Defendant Nova Information Systems, Inc.'s Response to Plaintiff's Amended First Set of Interrogatories.

17. Attached hereto as Exhibit 16 is a true and correct copy of Defendant Nova Information Systems, Inc.'s First Supplemental Response to Plaintiff's Amended First Set of Interrogatories

18. Attached hereto as Exhibit 17 is a true and correct copy of Defendant Nova Information Systems, Inc.'s Response to Plaintiff's Second Set of Interrogatories.

19. Attached hereto as Exhibit 18 is a true and correct copy of the Expert Report of Stephen Schutze Regarding Noninfringement. This document has been designated Attorneys' Eyes Only - OCO by Defendants.

20. Attached hereto as Exhibit 19 is a true and correct copy of NOVA 02391 - NOVA 02430. This document has been designated Attorneys' Eyes Only - OCO by Nova.

21. Attached hereto as Exhibit 20 is a true and correct copy of the Joint Proposed Claim Construction Chart filed with the Court on October 7, 2005.

22. Attached hereto as Exhibit 21 is a true and correct copy of NOVA 02455 - NOVA 02456. This document has been designated Attorneys' Eyes Only - OCO by Nova.

23. Attached hereto as Exhibit 22 is a true and correct copy of NOVA 34816 - NOVA 34828. This document has been designated Attorneys' Eyes Only - OCO by Nova.

24. Attached hereto as Exhibit 23 is a true and correct copy of portions of the Deposition of Geraldine Calabrese. This document has been designated Attorneys' Eyes Only - OCO by Nova.

25. Attached hereto as Exhibit 24 is a true and correct copy of NOVA 03768 - NOVA 03782.

26. Attached hereto as Exhibit 25 is a true and correct copy of NOVA 30232 - NOVA 30240. This document has been designated Attorneys' Eyes Only - OCO by Nova.

27. Attached hereto as Exhibit 26 is a true and correct copy of portions of the Deposition of Tina Davis. This document has been designated Attorneys' Eyes Only - OCO by Nova.

28. Attached hereto as Exhibit 27 is a true and correct copy of portions of the Deposition of John Waldron. This document has been designated Attorneys' Eyes Only - OCO by Nova.

29. Attached hereto as Exhibit 28 is a true and correct copy of NOVA 19761 - NOVA 19764. This document has been designated Attorneys' Eyes Only - OCO by Nova.

30. Attached hereto as Exhibit 29 are a true and correct copies of NOVA 01502 - NOVA 01544. This document has been designated Attorneys' Eyes Only - OCO by Nova.

31. Attached hereto as Exhibit 30 is a true and correct copy of portions of the Deposition of Elliot McEntee. This document has been designated Outside Counsel's Eyes Only by NACHA.

32. Attached hereto as Exhibit 31 is a true and correct copy of NOVA 37261 - NOVA 37276. This document has been designated Attorneys' Eyes Only - OCO by Nova.

33. Attached hereto as Exhibit 32 is a true and correct copy of NOVA 19716 - NOVA 19729. This document has been designated Attorneys' Eyes Only - OCO by Nova.

34. Attached hereto as Exhibit 33 is a true and correct copy of LML-EP-1462 - LML-EP-1463. This document has been designated Confidential by LML.

35. Attached hereto as Exhibit 34 is a true and correct copy of NOVA 19490 - NOVA 19499. This document has been designated Attorneys' Eyes Only - OCO by Nova.

36. Attached hereto as Exhibit 35 is a true and correct copy of NOVA 20679 - NOVA 20696. This document has been designated Attorneys' Eyes Only - OCO by Nova.

37. Attached hereto as Exhibit 36 is a true and correct copy of NOVA 01955 - NOVA 02043. This document has been designated Attorneys' Eyes Only - OCO by Nova.

38. Attached hereto as Exhibit 37 is a true and correct copy of NOVA 34333 - NOVA 34334. This document has been designated Attorneys' Eyes Only - OCO by Nova.

39. Attached hereto as Exhibit 38 is a true and correct copy of NOVA 02534 - NOVA 02568. This document has been designated Attorneys' Eyes Only - OCO by Nova.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on this 28th day of October 2005 in Chicago, Illinois.

Aaron D. Charfoos

4

# EXHIBIT 1
# REDACTED IN ITS
# ENTIRETY

# EXHIBIT  2
# REDACTED  IN  ITS
# ENTIRETY

# EXHIBIT 3

# 2 0 0 5

# A Complete Guide To Rules & Regulations Governing the ACH Network

LML-EP-055336

# 2 0 0 5

# ACH RULES

## A Complete GuideTo Rules &

## Regulations Governing the

## ACH Network

Copyright 2005 by the National Automated Clearing House Association

All Rights Reserved

Printed in the United States of America

13665 Dulles Technology Drive, Suite 300

Herndon, VA 20171

703-561-1100

LML-EP-055337

private sector adjustment factor (i.e., profit margin) is included in Federal Reserve processing so that the Federal Reserve Bank charges as though it were operating on a "for profit" basis.

<u>NACHA and the Regional Payments Associations</u>

NACHA oversees America's largest electronic payments network. NACHA's primary roles are to develop and maintain the *NACHA Operating Rules*, to promote growth in ACH volume, and to provide educational services to its members and other ACH participants. NACHA's member payment associations serve over 12,000 financial institutions across the United States, which in turn provide services to over 4 million corporations and one hundred thirty-five million consumers, with a transaction volume of ten billion payments and a dollar value $27.4 trillion in 2003.

Regional payment associations provide management, education, assistance, and services to link all types of financial institutions (commercial banks, saving banks, and credit unions) across the United States. Several of these associations also develop and implement local ACH rules that apply specifically to their own member financial institutions. The regional payment associations offer a wide variety of educational sessions ranging from origination and receipt operations to audit and control.

## H. ACH TERMINOLOGY

This section is intended to provide users of this book with an overview of basic ACH terminology. ACH terms, as defined specifically for purposes of the *NACHA Operating Rules*, may be found within Article Thirteen of the *NACHA Operating Rules*.

**ACH Operator**
means (1) a Federal Reserve Bank that performs all of the following, or (2) an entity that executes an annual agreement with the National Association in which the entity agrees to comply with or perform all of the following:
  (a) adhere to these rules (except to the extent inconsistent with the policies or practices of the Federal Reserve Banks) and other applicable laws, regulations, and policies;
  (b) execute agreements with a minimum of twenty independent (i.e., not owned by the same holding company) Participating DFIs that bind such entities to the ACH Operator's rules and to these rules (except that a Federal Reserve Bank shall not be required to bind a Participating DFI to any provision of such rules of the National Association that is not incorporated by the Uniform Operating Circular of the Federal Reserve Banks);
  (c) (i) provide clearing, delivery, and settlement services for ACH entries, as defined by these rules, between Participating DFIs that have selected that ACH Operator to perform ACH services (intra-ACH Operator services), and (ii) exchange transactions with other ACH Operators (inter-ACH Operator exchange);
  (d) process and edit files based on the requirements of these rules;
  (e) evaluate the credit worthiness of and apply risk control measures to their Participating DFIs;
  (f) adhere to the Federal Reserve's Policy Statement on Privately Operated Multilateral Settlement Systems (as applicable); and
  (g) adhere to any National ACH Operator Performance Standards of the National Association.

**Addenda Record**
An ACH record type that carries the supplemental data needed to completely identify an account holder(s) or provide information concerning a payment to the RDFI and the Receiver.

**Authorization**
A written agreement with the originating company signed or similarly authenticated by an employee or customer to allow payments processed through the ACH Network to be deposited in or withdrawn from his or her account at a financial institution. (For specific applications, written authorization for debits to consumer accounts is not required. Refer to the *NACHA Operating Rules* for details.) Can also be a written

LML-EP-055361

agreement that defines the terms, conditions and legal relationship between trading partners. For ACH credit entries, authorization may also be by verbal or other non-written means.

**Automated Clearing House (ACH) Network**
A funds transfer system, governed by the *NACHA Operating Rules*, that provides for the interbank clearing of electronic entries for participating financial institutions.

**Banking Day**
Any day on which a participating depository financial institution is open to the public during any part of the day for carrying on substantially all its banking functions.

**Batch**
A group of records or documents considered as a single unit for the purpose of data processing.

**Consumer Account**
A deposit account held by a financial institution and established by a natural person primarily for personal, family, or household use and not for commercial purposes.

**Corporate-to-Corporate Payments**
Any of the class of automated payment formats developed for the ACH Network that allow concurrent exchange of funds and remittance information between trading partners.

**Credit Entry**
An entry to the record of an account to represent the transfer or placement of funds into the account.

**Data Transmission**
The electronic exchange of information between two data processing points.

**Debit Entry**
An entry to the record of an account to represent the transfer or removal of funds from the account.

**Direct Debit**
A method of collection used in the ACH for certain claims, generally those that are repeated over a period of time, under which the debtor gives his or her financial institution authorization to debit his or her account upon the receipt of an entry issued by a creditor.

**Direct Deposit**
An ACH service that provides for the electronic transfer of funds directly into the account of a payee, usually an employee receiving pay or a Social Security beneficiary receiving retirement benefits.

**Direct Payment**
A method of collection used in the ACH Network for certain claims, generally those that are repeated over a period of time, for which the debtor gives the Originator an authorization to debit his or her account.

**EDI Payment**
The computer-to-computer transmission of a payment and related information in a standard format.

**Effective Entry Date**
The date the originating company expects payment to take place. The ACH Operator reads the effective entry date to determine the settlement date.

**Electronic Funds Transfer (EFT)**
A generic term used to describe any ACH or wire transfer.

LML-EP-055362

**Entry**
An electronic item representing the transfer of funds in the ACH.

**Field**
One or more consecutive character positions within an ACH entry mapped to contain specific information. For credit, debit or ATM cards, a defined area within an information track of the magnetic stripe of fixed or variable length.

**File**
A group of ACH batches initiated into the ACH Network or sorted for delivery to ACH receiving point(s). A file must be transmitted electronically via data transmission between the sending point and the receiving point. A file may be delivered to an end-point via direct data transmission, magnetic tape, or floppy diskette. A file may contain one or more batches of entries.

**Financial EDI**
Electronic data interchange for financial transactions/applications between companies and financial institutions, including payment and remittance advice, account analysis, and balance reporting.

**Funds Availability**
The time at which the funds resulting from a funds transfer are made available to the customer.

**Green Book**
A publication assembled by the U.S. Department of the Treasury that specifies the procedures to be used in Automated Clearing House transactions originated on behalf of the United States Federal Government.

**Live Dollar Entry**
"Live" refers to an entry that affects a funds transfer rather than non-dollar entries, such as prenotifications.

**MICR line**
The magnetic ink character recognition inscription at the bottom of a paper check.

**National Automated Clearing House Association (NACHA)**
The national association that establishes the standards, rules and procedures that enable depository financial institutions to exchange payments on a national basis.

**NACHA Formats**
The ACH record format specifications described in the *NACHA Operating Rules and Guidelines* are the accepted and warranted payment format standards for payments delivered through the ACH.

**Notification of Change (NOC)**
Information sent by an RDFI to notify the ODFI that previously valid information for a receiver has become outdated or that information contained in a prenotification is erroneous. The standard entry class code is COR.

**On-Us Entries**
Entries within an ACH file destined for accounts held at the ODFI.

**Originating Depository Financial Institution (ODFI)**
A participating financial institution that initiates ACH entries at the request of and by agreement with its customers. ODFIs must abide by the provisions of the *NACHA Operating Rules and Guidelines*.

**Originator**
Any individual, corporation or other entity that initiates entries into the Automated Clearing House Network.

LML-EP-055363

**Posting**
The process of recording debits and credits to individual account balances.

**Prenotification**
A non-dollar entry that may be sent through the ACH Network by an Originator to alert an RDFI that a live-dollar transaction will be forthcoming and that verification of the Receiver's account number is required.

**Receiver**
An individual, corporation or other entity who has authorized an originator to initiate a credit or debit entry to an account held at an RDFI.

**Receiving Depository Financial Institution (RDFI)**
Any financial institution qualified to receive ACH entries that agrees to abide by the *NACHA Operating Rules and Guidelines*.

**Receiving Point**
A site where entries are received from an ACH Operator for processing. It may be the RDFI, its data center or a data processing service bureau authorized to receive entries on behalf of a RDFI.

**Regulation E**
A regulation promulgated by the Federal Reserve Board of Governors in order to ensure consumers of a minimum level of protection in disputes arising from electronic funds transfers.

**Returns**
Any ACH entry that has been returned to the ODFI by the RDFI or by the ACH Operator because it cannot be processed. The reason for each return is included with the return in the form of a "return reason code." (See the *NACHA Operating Rules and Guidelines* for complete return reason code listing.)

**Reversals**
Any ACH entries or files sent within required deadlines to "correct" or reverse previously originated erroneous entries or files.

**Routing Number**
A nine-digit number (eight digits and a check digit) that identifies a specific financial institution. Also referred to as the ABA number. Numbers are assigned by the Thomson Financial Publishing and are listed in its publication *Key to Routing Numbers*.

**Sending Point**
A processing site from which entries are transmitted to the ACH Operator. It may be the ODFI on its own behalf or a financial institution or private data processing service bureau on behalf of the ODFI.

**Settlement**
A transfer of funds between two parties in cash, or on the books of a mutual depository institution, to complete one or more prior transactions, made subject to final accounting. Settlement for the ACH Network usually occurs through the Federal Reserve.

**Settlement Date**
The date on which an exchange of funds with respect to an entry is reflected on the books of the Federal Reserve Bank(s).

**Standard Entry Class Codes**
Three character code within an ACH company/batch header record that identifies payment types within an ACH batch (e.g., CCD, CTX, etc.).

LML-EP-055364

**Transaction Code**
The two digit code in the ACH record that determines whether an entry is a debit or a credit to a DDA account, savings account, or general ledger account, or whether an entry is a credit to a loan account.

LML-EP-055365

**SECTION 3.7  Obligations of Originators of ARC Entries**

SUBSECTION 3.7.1 Notice Obligation

The Originator must, in advance of receiving from the Receiver each source document used as the basis for the origination of an ARC entry, provide the Receiver with notice that clearly and conspicuously states that receipt of the Receiver's source document will authorize an ACH debit entry to the Receiver's account in accordance with the terms of the source document. If the Originator has received notice in accordance with the reasonable procedures established by the Originator that the receipt of the check does not authorize an ACH debit entry, then receipt of a check by the Originator does not authorize an ACH debit entry to the account on which the check is drawn.

SUBSECTION 3.7.2 Source Documents

For an ARC entry, a check or sharedraft provided to the Originator by the Receiver via the U.S. mail or at a dropbox location must be used by the Originator as the source document for the Receiver's routing number, account number, check serial number, and dollar amount. To be used as the source document for an ARC entry, a check or sharedraft must (1) contain a pre-printed serial number, (2) be drawn on a Consumer Account, and (3) be completed and signed by the Receiver.

The following may not be used as the source document for ARC entries: (1) checks drawn on corporate or business accounts, (2) third-party checks, (3) demand drafts and third-party drafts that do not contain the signature of the Receiver, (4) credit card checks, (5) obligations of a financial institution (e.g., travelers checks, cashier's checks, official checks, money orders, etc.), (6) checks drawn on the Treasury of the United States, a Federal Reserve Bank, or a Federal Home Loan Bank, (7) checks drawn on a state or local government, or (8) checks payable in a medium other than United States currency.

SUBSECTION 3.7.3 Copy of Source Document

The Originator must retain a reproducible, legible, image, microfilm, or copy of the front of the Receiver's source document for each ARC entry for two years from the Settlement Date of the ARC entry. At the request of the ODFI, the Originator must provide a copy of the front of the source document to the ODFI for its use or for the use of an RDFI requesting such information pursuant to subsection 2.9.3.2 (Copy of Source Document).

SUBSECTION 3.7.4 Source Document Will Not Be Presented for Payment

The source document to which the ARC entry relates may not be used by the Originator as a check to obtain payment.

SUBSECTION 3.7.5 Destruction of Source Document

The source document to which the ARC entry relates must be destroyed within fourteen days of the Settlement Date of the entry.

SUBSECTION 3.7.6 Capture of MICR Information

During initial processing of an ARC entry, the Originator may not key-enter the routing number, account number, or check serial number from the Receiver's source document. An Originator may, however, key-enter such information to correct errors relating to MICR misreads, misencoding, or processing rejects.

**SECTION 3.8  Obligations of Originators of POP Entries**

SUBSECTION 3.8.1 Source Documents

For a POP entry, a check or sharedraft provided by the Receiver at the point-of-purchase must be used by the Originator as a source document for the Receiver's routing number, account number, and check serial number. The source document must then be voided by the Originator. Only a check or sharedraft that contains a pre-printed serial number and that is drawn on a Consumer Account may be used as a source document for this type of transaction.

For POP entries, the following may not be used as source documents: (1) checks drawn on corporate or business deposit accounts, (2) third-party checks, (3) credit card checks, (4) obligations of a financial institution (e.g., traveler's checks, cashier's checks, official checks, money orders, etc.), (5) checks drawn on the Treasury of the United States, a Federal Reserve Bank, or a Federal Home Loan Bank, (6) checks drawn on a state or local government, or (7) checks payable in a medium other than United States currency. For POP entries, a previously voided check or sharedraft that has been used by the Receiver for a prior POP entry may not be used as a source document for this type of transaction.

SUBSECTION 3.8.2 Capture of MICR Information

The Originator may not key-enter the routing number, account number, or check serial number from the Receiver's source document.

SUBSECTION 3.8.3 Receipts

An Originator must provide to each Receiver a receipt containing the following information with respect to each POP entry to the Receiver's account:

(a)     Originator name (merchant)
(b)     company (merchant)/third-party service provider telephone number;
(c)     date of transaction;
(d)     transaction amount;

LML-EP-055429

(e)　　source document check serial number;
(f)　　merchant number (or other unique number that identifies the location of the transaction);
(g)　　Terminal City; and
(h)　　Terminal State.

The National Association strongly recommends, but these rules do not require, that the Originator also provide the following information on the receipt provided to the Receiver:

(a)　　merchant address;
(b)　　merchant identification number;
(c)　　Receiver's financial institution routing number;
(d)　　Receiver's truncated account number;
(e)　　Receiver's truncated identification number; and
(f)　　transaction reference number.

Note: The Receiver's complete account number and complete identification number are not permitted to be placed on the receipt.

**SECTION 3.9 Obligations of Originators of Internet-Initiated Entries**

SUBSECTION 3.9.1 Fraud Detection Systems

Each Originator originating WEB entries must employ a commercially reasonable fraudulent transaction detection system to screen each entry.

SUBSECTION 3.9.2 Verification of Routing Numbers

Each Originator that originates WEB entries must use commercially reasonable procedures to verify that routing numbers are valid.

◆ [SUBSECTION 3.9.3 Verification of Receiver's Identity

*Each Originator that originates WEB entries must employ commercially reasonable methods of authentication to verify the identity of the Receiver.*]

SUBSECTION 3.9.4 Security of Internet Session

Each Originator that originates WEB entries must establish a secure Internet session with each Receiver utilizing a commercially reasonable security technology providing a level of security that, at a minimum, is equivalent to 128-bit encryption technology prior to the Receiver's key entry and through transmission to the Originator of any banking information, including, but not limited to, the Receiver's routing number, account number, and personal identification number (PIN) or other identification symbol.

SUBSECTION 3.9.5 WEB Annual Audit

Each Originator that originates WEB entries shall conduct or have conducted annual audits to ensure that the financial information it obtains from Receivers is

protected by security practices and procedures that include, at a minimum, adequate levels of (1) physical security to protect against theft, tampering, or damage, (2) personnel and access controls to protect against unauthorized access and use, and (3) network security to ensure secure capture, storage, and distribution.

**SECTION 3.10 Obligations of Originators of Telephone-Initiated Entries**

SUBSECTION 3.10.1 Verification of Receiver Identity

Each Originator that initiates TEL entries must employ commercially reasonable procedures to verify the identity of the Receiver.

SUBSECTION 3.10.2 Verification of Routing Numbers

Each Originator that initiates TEL entries must use commercially reasonable procedures to verify that routing numbers are valid.

◇ **SECTION 3.11 Payment to ODFI**

Each Originator that utilizes a Third-Party Sender to authorize an ODFI to transmit credit or debit entries agrees to make payment to the ODFI for any such credit entries originated and for any debit entries returned by the RDFI to the extent that the ODFI does not receive payment from the Third-Party Sender.

**SECTION 3.12 Record of Authorization**

An Originator must retain the original or a microfilm or microfilm-equivalent copy of each authorization of a Receiver for two years from the termination or revocation of the authorization. In the case of TEL entries, the Originator must retain the original or a microfilm or microfilm-equivalent copy of the written notice or the original or a duplicate tape recording of the oral authorization for two years from the date of the authorization. At the request of its ODFI, the Originator must provide the original or copy of the authorization to the ODFI for its use or for the use of an RDFI requesting the information pursuant to subsection 4.1.1 (Right to Information Regarding Entries). This section 3.12 does not apply to SHR or MTE entries if the ODFI and RDFI are parties to an agreement (other than these rules) for the provision of services relating to SHR or MTE entries.

---

◆ *Approved November 9, 2004; Effective March 18, 2005*
◇ *Approved December 2, 2003; Effective December 10, 2004*

LML-EP-055430

# SECTION IV
# SPECIAL TOPICS

# CHAPTER XII
# POINT-OF-PURCHASE ENTRIES

## A. INTRODUCTION

The *NACHA Operating Rules* support an application that enables Originators (i.e., merchants, billers, etc.) to initiate a Single-Entry ACH debit entry to a Receiver's account for in-person purchases made at the point-of-purchase. This application, which is based on a written authorization and account information drawn from a source document (check) obtained from the consumer at the point-of-purchase, provides Originators with an alternative to accepting consumers' checks as the method of payment. This chapter addresses issues relating to the origination and receipt of Point-of-Purchase Entries (POP.

A POP entry is a Single-Entry ACH debit used by Originators as an alternative method of payment for goods or services purchased in person. These one-time debit entries are initiated by the Originator to the consumer's account based on a written authorization and account information drawn from a source document (a check) obtained from the consumer at the point-of-purchase. To initiate a POP entry, the consumer must present a check or sharedraft that has not been previously voided or negotiated to the Originator. The Originator uses a check reading device to capture the MICR information from the check (i.e., routing number, account number, and serial number), which will be used by the Originator to generate a debit entry to the consumer's account. The Originator may not key enter the MICR information from the check, nor may the Originator key enter the MICR information after the check reader has captured this data. The Originator then key enters the amount of the transaction, after which an authorization will be provided to the consumer to sign, authorizing the debit to his account. The Originator must provide to the consumer (1) the consumer's source document, which the Originator has voided, (2) a copy of the consumer's authorization, and (3) a receipt containing specific information relating to the purchase.

## B. LEGAL FRAMEWORK

POP entries are subject to the requirements of the *NACHA Operating Rules*, the Electronic Fund Transfer Act, and the Federal Reserve's Regulation E. POP entries are considered to be ACH entries from start to finish, with the consumer's check used by the Originator solely as a source document for the consumer's routing and account number information. Such transactions are not considered

to be truncated checks and do not fall under the requirements of check law or the Uniform Commercial Code for the following reasons:

(1) the check is not accepted by the merchant as a negotiable instrument; and
(2) the check is not negotiated by the merchant or accepted into the check collection system.

## C. OBLIGATIONS OF ORIGINATORS

### 1. AGREEMENTS WITH ODFIs

Originators choosing to utilize the ACH Network for POP transactions should consider modifications to their agreements with their ODFIs to address the origination of these entries. These modifications should address the extent to which the Originator and ODFI will share liability for point-of-purchase transactions and should define any specific processing obligations relating to such transactions.

### 2. AUTHORIZATION REQUIREMENT

Originators of POP entries must obtain the consumer's written authorization prior to initiating a debit entry under this application. Although the *NACHA Operating Rules* do not prescribe specific authorization language for the point-of-purchase application, the authorization must conform to the requirements of the *NACHA Operating Rules*, which require that the authorization (1) be in writing, signed or similarly authenticated by the Receiver, (2) be readily identifiable as an ACH debit authorization, and (3) clearly and conspicuously state its terms. It is strongly recommended that authorization language for point-of-purchase entries specifically state that the check will not be processed. This will assist consumers in understanding the nature of the transaction. Originators must provide a copy of the authorization to the consumer as required by the *NACHA Operating Rules*.

Unlike authorization requirements for most consumer debit entries, Originators of point-of-purchase entries need not include on the authorization the method by which the consumer must revoke the authorization, as these entries can not be returned using Return Reason Code R07 (Authorization Revoked). Consumers retain their rights to stop payment on the ACH entry (R08) or to have it returned as unauthorized/improper (R10) when appropriate.

### 3. SOURCE DOCUMENTS

*Acceptable Source Documents*

Originators may only accept a check or sharedraft as a source document for a point-of-purchase debit entry if the check or sharedraft:

- has not been previously negotiated;

- has not been previously voided;
- contains a pre-printed serial number; and
- is drawn on a consumer account.

***Unacceptable Source Documents***

Checks that may not be used as source documents for point-of-purchase entries include:

- corporate checks;
- third-party checks;
- credit card checks;
- obligations of a financial institution (e.g., cashier's checks, money orders, traveler's checks, official checks, etc.);
- checks drawn on the Treasury of the United States, a Federal Reserve Bank, or a Federal Home Loan Bank;
- checks drawn on a state or local government; or
- checks payable in a medium other than United States currency.

**4. RECEIPT REQUIREMENTS**

Originators must, at the point-of-purchase, provide Receivers with a receipt that contains the following minimum amount of information:

- Originator name (merchant);
- company (merchant)/third-party service provider telephone number;
- date of transaction;
- transaction amount;
- source document check serial number;
- merchant number (or other unique number that identifies the location of the transaction);
- Terminal City; and
- Terminal State.

Note: The Federal Reserve Board's Official Staff Commentary on Regulation E requires the inclusion of terminal location information on the receipt provided to the consumer at the point of purchase. When a POS terminal is used to capture data electronically to initiate an EFT, the Regulation E Official Staff Commentary considers the POS terminal to be an electronic terminal, even if no access device is used, such as when a check is used to capture information to initiate a one-time EFT. As a result, when a check is used as a source document at the point of purchase and run through a terminal to read the MICR information, as is the case with POP entries, it is necessary to ensure compliance with Regulation E's requirements for electronic terminals, which mandate the inclusion of the terminal location on the receipt for POP entries.

It is also recommended, but not required, that the Originator provide the following information on the receipt provided to the Receiver:

- merchant address;
- merchant identification number;
- Receiver's financial institution routing number;
- Receiver's truncated account number;
- Receiver's truncated identification number; and
- transaction reference number.

Originators must be aware that the Receiver's complete account number and complete identification number are not permitted to be placed on the receipt. At the Originator's discretion, the receipt and the authorization required for point-of-purchase entries may be provided to the consumer on the same document or on different documents.

**5. FORMATTING REQUIREMENTS**

- Individual Name

  Originators should be aware that, with the POP SEC Code, the inclusion of information in the Individual Name Field is optional. If the Originator chooses to utilize this field, it must include either (1) the Receiver's (consumer's) name, or (2) a reference number, identification number, or code that the merchant uses to identify a particular transaction or customer. (Note: When a reference number, identification number, or code is used to identify the transaction or customer, it should be uniquely related to the individual or transaction. A generic description is not an acceptable means to identify the Receiver or transaction.)

- Check Serial Number

  The rules governing POP entries require that the Originator ensure that the check serial number from the Receiver's source document is placed within the Check Serial Number Field of the POP entry. Originators should understand that the *NACHA Operating Rules* permit Originators to place only the check serial number within the Check Serial Number Field of the POP Entry Detail Record. The word "check," abbreviations such as "ck" or "chk," or other merchant codes must not be included within the field. Because the Check Serial Number Field is defined as an alphanumeric one, the *NACHA Operating Rules* require information within this field to be left justified and space filled. The serial number of the check must begin in the leftmost position of the Check Serial Number field, and any unused spaces within the field must be left blank.

INCORRECT        0001234
                 000000000001234
                 CK# 001234
                 CK1234
                 1234 6532986002
                 CK1234 48832817

LML-EP-055766

CORRECT          1234

Originators should be aware that the *NACHA Operating Rules* require RDFIs to print the check serial number on the consumer's bank statement.

- Terminal City/Terminal State

To ensure compliance with both the *NACHA Operating Rules* and Regulation E, which require the inclusion of terminal location information on the consumer's monthly bank account statement for POP entries, Originators must ensure that they have included a four-character name or abbreviation of the city in which the electronic terminal is located within the Terminal City Field, and a two-character abbreviation for the state in which the electronic terminal is located within the Terminal State Field of the POP Entry Detail Record. This information is used to identify the location of the electronic terminal used to originate the POP entry.

## 6. RETURN OF POINT-OF-PURCHASE ENTRIES

Originators should be aware that POP entries, like other ACH transactions, may be returned for a variety of reasons. Originators should be aware, however, that RDFIs can not return POP entries based on a consumer's claim that his authorization had been revoked (R07) since these are one-time transactions where the Originator will generally process the transactions immediately after the purchase is complete. As appropriate, however, the consumer may (1) request his RDFI to stop the payment of a POP entry (Return Reason Code R08), (2) request his RDFI to return an unauthorized/improper POP entry (Return Reason Code R10), or (3) go directly to the Originator (merchant) to request a refund of the transaction.

Originators should also be aware that, because the POP entry application does not require the Originator to capture the consumer's name for inclusion on the point-of-purchase entry, the RDFI must rely on the ODFI's warranty regarding the validity of the consumer's account number for posting purposes. The RDFI, therefore, may not return a point-of-purchase entry using Return Reason Codes R03 or R17 solely because the consumer's name is not included in the Individual Name Field of the entry. The RDFI may, however, use these Return Reason Codes if otherwise appropriate.

Originators must be prepared to handle returned point-of-purchase entries and must establish procedures that enable them to identify and contact the Receiver relating to any unpaid debit entry. Because the Originator does not retain the consumer's voided check as a source document, and because the consumer's name and address are not included as part of the MICR-capture process, Originators will need to develop alternative methods for retaining information necessary to identify the consumer for whom

a point-of-purchase debit has been returned. The *NACHA Operating Rules* limit the number of times an entry returned due to insufficient or uncollected funds may be reinitiated to no more than two times following the return of the original entry. Originators should establish procedures to ensure that returned POP entries are not reinitiated in excess of the limits prescribed by the *NACHA Operating Rules*.

## D. RESPONSIBILITIES OF ODFIs

### 1. WARRANTIES AND LIABILITIES

In addition to all other general ODFI warranties contained within the *NACHA Operating Rules*, each ODFI that chooses to transmit POP entries on behalf of its Originator also warrants to each RDFI, ACH Operator, and ACH Association that:

- the source document provided to the Originator for use in obtaining the Receiver's routing number, account number, and check serial number for the initiation of the POP entry

  - is returned voided to the Receiver after use by the Originator, and

  - has not been provided by the Receiver for use in any prior POP entry.

ODFIs should consider modifications to their agreements with their Originators to address the origination of POP entries on behalf of their Originators. These modifications should address the extent to which the Originator and ODFI would share liability for POP transactions and should define any specific processing obligations relating to such transactions.

### 2. FORMATTING REQUIREMENTS

ODFIs must ensure that, prior to transmission to the ACH Operator, POP entries comply with all technical specifications and formatting requirements in accordance with the *NACHA Operating Rules*. ODFIs must ensure that:

- the check serial number from the Receiver's source document is placed within the Check Serial Number Field of the POP entry.

ODFIs should understand that the *NACHA Operating Rules* permit Originators to place only the check serial number within the Check Serial Number Field of the POP Entry Detail Record. The word "check," abbreviations such as "ck" or "chk," or other merchant codes must not be included within the field. Because the Check Serial Number Field is defined as an alphanumeric one, the *NACHA Operating Rules* require information within this field to be left justified and space filled. The serial number of the

LML-EP-055767

check must begin in the leftmost position of the Check Serial Number field, and any unused spaces within the field must be left blank.

| INCORRECT | 0001234 |
|---|---|
| | 000000000001234 |
| | CK# 001234 |
| | CK1234 |
| | 1234 6532986002 |
| | CK1234 48832817 |
| CORRECT | 1234 |

ODFIs should be aware that the *NACHA Operating Rules* require RDFIs to print the check serial number on the consumer's bank statement.



• they are aware that use of the Individual Name Field by the Originator is optional. When used, it must contain either (1) the Receiver's name, or (2) a reference number, identification number, or code that the merchant uses to identify a particular transaction or customer. (Note: When a reference number, identification number, or code is used to identify the transaction or customer, it should be uniquely related to the individual or transaction. A generic description is not an acceptable means to identify the Receiver or transaction.)

### 3. RETURN OF POINT-OF-PURCHASE ENTRIES

ODFIs should be aware that POP entries, like other ACH transactions, may be returned for a variety of reasons in accordance with the return time frames prescribed by the *NACHA Operating Rules*. ODFIs should be aware, however, that RDFIs can not return POP entries based on a consumer's claim that his authorization had been revoked (R07) since these are single entry transactions where the Originator will generally process the transactions immediately after the purchase is complete. As appropriate, however, the consumer may (1) request his RDFI to stop the payment of a POP entry (Return Reason Code R08), (2) request his RDFI to return an unauthorized/improper POP entry (Return Reason Code R10, R37), or (3) go directly to the Originator (merchant) to request a refund of the transaction.

ODFIs should also be aware that, because the Point of Purchase application does not require the Originator to capture the consumer's name for inclusion on the POP entry, the RDFI must rely on the ODFI's warranty regarding the validity of the consumer's account number for posting purposes. The RDFI, therefore, may not return a point-of-purchase entry using Return Reason Codes R03 or R17 solely because the consumer's name is not included in the Individual Name Field of the entry. The RDFI may, however, use these Return Reason Codes if otherwise appropriate.

ODFIs should ensure that their Originators are prepared to handle returned POP entries and have established procedures that enable them to identify and contact the Receiver relating to any unpaid debit entry. Because the Originator does not retain the consumer's voided check as a source document, and because the consumer's name and address are not included as part of the MICR-capture process, ODFIs should ensure that their Originators understand the need to develop alternative methods for retaining information necessary to identify the consumer for whom a point-of-purchase debit entry has been returned. ODFIs must ensure that their Originators have established policies and practices to ensure that POP entries that are returned because of insufficient or uncollected funds are not reinitiated more than two times following the return of the original entry.

### 4. STOP PAYMENTS ON POINT-OF-PURCHASE ENTRIES

ODFIs should be aware that, in general, the *NACHA Operating Rules* regarding ACH stop payments require consumers to place a stop payment order on a debit at least three banking days prior to the scheduled date of the entry. Because the merchant will generally process POP transactions quickly, consumers are unlikely to be able to meet the three-day advance notice requirement for placing a stop payment order on such entries. To ensure that a consumer has the ability to place a stop payment order on a POP entry, the *NACHA Operating Rules* require a consumer to provide a stop payment order to his financial institution in such a time and manner that allows the RDFI a reasonable opportunity to act on the stop payment order prior to acting on the debit entry.

### E. RESPONSIBILITIES OF RDFIs

### 1. RETURN OF POINT-OF-PURCHASE ENTRIES

POP entries may be returned for a variety of reasons in accordance with the requirements of the *NACHA Operating Rules*. With the exception of entries for which the consumer claims there was no authorization, the source document used for the POP entry is improper, and the source document to which the POP entry relates has also been presented for payment, the RDFI must transmit POP entry returns by its ACH Operator's deposit deadline for the return entry to be made available to the ODFI no later than the opening of business on the second banking day following the settlement date of the original entry. For an entry that the consumer claims is unauthorized/improper (R10) or (R37), the RDFI must transmit the return by its ACH Operator's deposit deadline for the return to be made available to the ODFI no later than the opening of business on the banking day following the sixtieth calendar day following the settlement date of the original entry. For the return of unauthorized entries, the RDFI must obtain a written statement under penalty of perjury from the consumer stating that the entry was not authorized. (Note: For

LML-EP-055768

additional information on written statements under penalty of perjury, refer to the RDFIs chapter within Section II of these Guidelines.)

RDFIs must be aware that, under certain circumstances, specific Return Reason Codes may not be used with POP entries:

- **Return Reason Code R03** (*No Account/Unable to Locate Account*) **and Return Reason Code R17** (*File Record Edit Criteria*)

   RDFIs must be aware that, for transactions initiated at the point-of-purchase, it is difficult for the Originator to capture the Receiver's name in an automated fashion. For this reason, the Originator is not required to include the individual's name in the POP entry, and the RDFI must rely on the ODFI's warranty regarding the validity of the consumer's account number for posting purposes.

   The RDFI can not return POP entries solely because they lack an Individual Name. In general, typical Return Reason Codes used to return entries for which there is no Individual Name (e.g., R03, R17) may not be used by the RDFI to return POP entries under these circumstances. These Return Reason Codes may, however, be used with POP entries for other valid reasons.

- **Return Reason Code R07** (*Authorization Revoked by Customer*)

   If appropriate, the consumer may (1) request his RDFI to stop the payment of a POP entry (Return Reason Code R08); (2) request his RDFI to return an unauthorized/improper point-of-purchase entry using Return Reason Code R10 or R37 (Reminder: the RDFI must obtain a written statement under penalty of perjury when using these Return Reason Codes); or (3) go directly to the Originator (merchant or biller) to request a refund for the transaction.

   RDFIs must be aware that they are prohibited from returning POP entries using Return Reason Code R07 (Authorization Revoked by Customer) based on a consumer's claim that his authorization had been revoked since these are single entry payments where the Originator will generally process the transactions immediately after the purchase is complete.

## 2. STOP PAYMENTS ON POINT-OF-PURCHASE ENTRIES

In general, the *NACHA Operating Rules* regarding ACH stop payments require consumers to place a stop payment order on a debit at least three banking days prior to the scheduled date of the entry. Because the merchant will generally process POP transactions quickly, consumers are unlikely to be able to meet the three-day advance notice requirement for placing a stop payment order on such entries. To ensure that a consumer has the ability to place a stop payment order on a POP entry, the *NACHA Operating Rules* require a consumer to provide a stop payment order to his financial institution in such a time and manner that allows the RDFI a reasonable opportunity to act on the stop payment order prior to acting on the debit entry.

## 3. STATEMENT REQUIREMENTS

RDFIs are required to provide the Check Serial Number of the consumer's source document on the consumer's monthly bank account statement for all POP entries. The RDFI must also provide on the statement the Terminal City and the Terminal State in which the POP entry was originated. RDFIs need to ensure that this information is provided on the consumer's statement.

Note: The Federal Reserve Board's Official Staff Commentary on Regulation E requires the inclusion of terminal location information on the consumer's monthly bank account statement. When a POS terminal is used to capture data electronically to initiate an EFT, the Regulation E Official Staff Commentary considers the POS terminal to be an electronic terminal, even if no access device is used, such as when a check is used to capture information to initiate a one-time EFT. As a result, when a check is used as a source document at the point of purchase and run through a terminal to read the MICR information, as is the case with POP entries, it is necessary to ensure compliance with Regulation E's requirements for electronic terminals, which mandate the inclusion of the terminal location on the monthly bank statement.

# SECTION IV
# SPECIAL TOPICS

# CHAPTER XIII
# ACCOUNTS RECEIVABLE ENTRIES

## A. INTRODUCTION

Accounts Receivable Entries (ARC) are Single-Entry debits used by Originators for the conversion of a consumer check received via the U.S. mail or at a dropbox location for the payment of goods or services. This application enhances the efficiency of the ACH Network by expanding the scope of consumer electronic check activity.

LML-EP-055769

# EXHIBIT 4
# REDACTED IN ITS ENTIRETY

# EXHIBIT  5
# REDACTED  IN  ITS
# ENTIRETY

# EXHIBIT 6
# REDACTED IN ITS
# ENTIRETY

# EXHIBIT 7
# REDACTED IN ITS ENTIRETY

# EXHIBIT 8



# The NOVA Network rated #1 for reliability by MasterCard

About NOVA
Sign Up Now
The NOVA Advantage
Products & Services




■ Terminal Products
Software & Internet Products
Reporting Tools
Dynamic Currency Conversion
Electronic Check Service
Electronic Gift Card
MerchantConnect
Partner Programs
Contact NOVA
Sitemap
Home

NOVA HOME : PRODUCTS : TERMINAL PRODUCTS

## The Terminal You Need

Whether you process two or two hundred transactions a day, we have a terminal solution that will work for you. We offer a variety of terminals from all the top terminal manufacturers in order to ensure we can meet your needs.

### Omni 3750



The VeriFone Omni 3750 features a compact all-in-one design that makes it a great solution for virtually any merchant environment. It supports multiple merchants and is ideal if you run both a retail and mail order/phone order business. The internal PIN pad allow you to accept PIN based debit transactions at no additional cost. The Omni 3750 can quickly and efficiently process Credit, Debit, Electronic Benefits Transfer, Electronic Check Service and Electronic Gift Card transactions. This is one of the smallest terminals on the market; and at the same time, one of the fastest and most powerful. The ATM-style customer interface and thermal "drop in paper" printer make this terminal extremely easy to learn and use.

<u>Download a PDF fact sheet.</u>

### Omni 3200 SE



The Omni 3200SE has been designed to deliver full functionality at an attractive cost. The ATM-like interface makes the Omni 3200SE easy to learn and easy to use, minimizing training costs and improving productivity and accuracy. The Omni 3200SE supports credit, debit, Electronic Check Service, Electronic Benefits Transactions, and Electronic Gift Card transactions. An integrated thermal printer, with built-in paper cover, helps eliminate paper jams and reduce maintenance costs.

<u>Download a PDF fact sheet.</u>

### Hypercom T7 Plus



The Hypercom T7 Plus is ideal if you are looking for a compact, full-featured terminal with simplicity in mind. Dedicated function keys allow a one-step operation for everyday processes. The T7 Plus supports credit, debit, Electronic Check Service, Electronic Benefits Transactions, and Electronic Gift Card transactions. Simplicity and price are key benefits to the T7 PLUS.

<u>Download a PDF fact sheet.</u>



Returned checks costing you money?

Convert paper checks into electronic transactions at the point of sale!

Introducing


Electronic Check Service.

Powered by the NOVA Network.



**LML-EP 061899**

**Lipman NURIT 8000 Wireless Terminal**

 The Nurit 8000 Secure is an all-in-one mobile payment solution that allows you to process all of your electronic transactions quickly and efficiently - anywhere, anytime. Whether it's at the table, at a delivery stop, or in a taxi, the wireless Lipman NURIT 8000 Secure with integrated PIN pad is specifically designed to go where the money is! This high performance solution incorporates a magnetic card swipe; a quiet, fast thermal printer; as well as a secure PIN pad.

The Nurit 8000 Secure operates on the Mobitex Packet-Data Network. **Click Here** to check coverage.

**Download a PDF fact sheet.**

**Lipman NURIT 2085**

 The NURIT 2085 from Lipman supports all major credit, debit and check card payments. It also generates current and batch history reports to help you run your business. It is compact, menu driven, and user-friendly.

**Download a PDF fact sheet.**

**back to top**

euroConex    MERCHANT CONNECT    Click    to sign up now!

**terms of use | privacy statement | linking agreement**

LML-EP 061900

# EXHIBIT 9
# REDACTED IN ITS ENTIRETY

# EXHIBIT  10
# REDACTED  IN  ITS
# ENTIRETY

# EXHIBIT  11
# REDACTED  IN  ITS
# ENTIRETY

# EXHIBIT 12
# REDACTED IN ITS
# ENTIRETY

# EXHIBIT   13
# REDACTED   IN   ITS
# ENTIRETY

# EXHIBIT 14
# REDACTED IN ITS
# ENTIRETY

# EXHIBIT 15

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

LML PATENT CORP.,

               Plaintiff,

    v.

TELECHECK SERVICES, INC.,
ELECTRONIC CLEARING HOUSE, INC.,
XPRESSCHEX, INC. and NOVA
INFORMATION SYSTEMS, INC.,

               Defendants.

C.A. 04-858 (SLR)

## DEFENDANT NOVA INFORMATION SYSTEMS, INC.'S
## RESPONSE TO PLAINTIFF'S AMENDED FIRST SET OF INTERROGATORIES

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant Nova Information

Systems, Inc. ("Nova") hereby responds and objects to Plaintiff's Amended First Set of

Interrogatories as set forth below:

### GENERAL OBJECTIONS:

Each interrogatory is answered to the best of Nova's knowledge, information and belief

as of the date of the response, however, Nova's investigation into the issues of this action are in

preliminary stages. Nova reserves the right to supplement or amend without prejudice its

responses to these interrogatories pursuant to the Federal Rules of Civil Procedure.

The following General Objections apply to each and every interrogatory contained

therein, and are incorporated by reference in each of the specified responses set forth below as

though fully set forth therein. The failure to mention one of the following objections in any of

the specific responses set forth below shall not be deemed to waive or limit the objection.

1.    Nova objects to the Interrogatories to the extent they purport to impose any duty or obligation other than those imposed by the Federal Rules of Civil Procedure. Nova will not comply with any such unauthorized or inconsistent instructions.

2.    Nova objects to the Interrogatories to the extent they seek documents or information protected by the attorney-client privilege, work product immunity, common interest privilege, or any other applicable privilege. The disclosure of any privileged information or document by Nova is unintentional, and Nova does not intend to waive any applicable objection or privilege as a result of such production or disclosure.

3.    Nova objects to the Interrogatories to the extent they seek the disclosure of proprietary or confidential technical or business information, trade secrets, or other sensitive information without the entry of an appropriate Protective Order. Nova will provide Plaintiff with this type of information only after a protective order has been entered in this case.

4.    Nova objects to the Interrogatories to the extent they seek information that Nova is not permitted to disclose pursuant to confidentiality obligations or agreements with third parties.

5.    Nova objects to the Interrogatories to the extent they purport to require the disclosure of information that is not within Nova's possession, custody or control.

6.    Nova objects to the Interrogatories to the extent they seek information that is publicly available, is as readily available to Plaintiff as it is to Nova, or is already in Plaintiff's possession, custody or control.

7.    Nova objects to the Interrogatories to the extent they are unreasonably cumulative or duplicative, and to the extent that the information sought is more conveniently obtainable from some other source.

8.    Nova objects to the Interrogatories to the extent they purport to impose a requirement on Nova to disclose information about Nova's products or programs other than those at issue in this case as unreasonable, unduly burdensome, and not reasonably calculated to lead to discoverable information.

9.    Nova objects to the Interrogatories to the extent they seek information that is neither relevant to the claims or defenses of any party nor reasonably calculated to lead to the discovery of admissible evidence.

10.    Nova objects to each and every interrogatory to the extent that it is a premature contention interrogatory because discovery is still in its early stages and Nova is still formulating its contentions regarding the claims and defenses of the parties.

11.    Nova objects to each and every interrogatory to the extent that they use the terms "NOVA's Accused Products," "Accused Product," "product," which, as defined, or as used therein, are vague, ambiguous and overbroad.

## RESPONSES TO INTERROGATORIES

### INTERROGATORY NO. 1:

Describe in detail all bases for NOVA's contention that it does not infringe the Asserted Claims of the Patents-In-Suit, either literally or under the doctrine of equivalents, and its contention that it has not contributed to the infringement by others and/or has not induced others to infringe any Asserted Claim of the Patents-In-Suit, including a claim chart explaining in detail all specific structural or functional differences between each Accused Product and the Asserted

3

Claims. (As used herein, "Patents-in-Suit" means U.S. Patent Nos. 5,484,988, 6,164,528,

6,283,366; "NOVA's Accused Products", "Accused Product", or "product" means any

equipment, component, system, or services manufactured, sold, offered for sale, used, or

imported by NOVA for or associated with the conversion of checks, presented at points of sale,

to electronic transactions, including but not limited to, NOVA's "Electronic Check Service"; and

"Asserted Claims" means claims 1-6, 8-11, and 13 of the '988 patent, claims 11 and 18 of the

'528 patent, and claims 3 and 25 of the '366 patent).

## RESPONSE TO INTERROGATORY NO. 1:

Nova objects to this interrogatory on the grounds that it is compound, vague, ambiguous

and unduly complex including in its use of multiple subparts contrary to Fed. R. Civ. P. 33(a).

Nova also objects to this interrogatory as premature in that it seeks Nova's contentions and

analysis before Nova has completed its investigation and discovery relating to non-infringement

issues, before Nova has conducted expert discovery on non-infringement, before Plaintiff has

offered its claim construction, and before the Court has construed the claims of the patent.

Subject to and without waiving its General and Specific Objections, Nova responds as

follows:

Nova's Electronic Check Service does not meet every limitation of the Asserted Claims.

For example, every Asserted Claim of the Patents-in-Suit contain the limitation "without using

the bank check as a negotiable instrument" (Claim 1-6 and 13, '988 patent; Claim 3, '366 patent)

or "without using the check as a negotiable instrument" (Claim 8, '988 patent; Claims 11 and 18,

'528 patent; Claim 25, '366 patent) or "without using a bank check as a negotiable instrument"

(Claim 9-11, '988 patent). Nova's Electronic Check Service does not meet this limitation.

4

Pursuant to the Federal Rules of Civil Procedure, Nova will supplement this response as discovery continues and otherwise as circumstances warrant.

**INTERROGATORY NO. 2:**

Separately for each Asserted Claim of the Patents-In-Suit, describe in detail all legal and factual bases for NOVA's contention that the Asserted Claims of the Patents-In-Suit are invalid, and for each piece of alleged prior art, and/or combination of alleged prior art, that NOVA contends invalidates each Asserted Claim, provide a detailed claim chart that identifies each element of the Asserted Claims that NOVA contends is disclosed or taught by the prior art with citations to each instance where such element is allegedly disclosed or taught by the prior art.

**RESPONSE TO INTERROGATORY NO. 2:**

Nova objects to this interrogatory on the grounds that it is compound, vague, ambiguous and unduly complex including in its use of multiple subparts contrary to Fed. R. Civ. P. 33(a). Nova also objects to this interrogatory as premature in that it seeks Nova's contentions and analysis before Nova has completed its investigation and discovery relating to invalidity issues, before Nova has conducted expert discovery on invalidity, before Plaintiff has offered its claim construction, and before the Court has construed the claims of the patent.

Subject to and without waiving its General and Specific Objections, Nova responds as follows:

Nova presently contends that at least the following references are invalidating prior art to one or more of the Patents-in-Suit under either 35 U.S.C. §102 or 35 U.S.C. § 103:

- U.S. Patent No. 5,175,682 (Higashiyama)

- U.S. Patent No. 5,500,513 (Langhans)

5

- U.S. Patent No. 5,679,938 (Templeton)

- U.S. Patent No. 5,703,344 (Bezy)

- U.S. Patent No. 5,455,407 (Rosen)

- Mark Glover, *Cashless Society Expands,* Sacramento Bee, Nov. 7, 1995 at E1

Pursuant to the Federal Rules of Civil Procedure, Nova will supplement this response as discovery continues and otherwise as circumstances warrant.

## INTERROGATORY NO. 3:

If NOVA contends any Asserted Claim of the Patents-In-Suit is invalid as obvious under 35 U.S.C. § 103, state in detail and with specificity the education, experience and/or technical training of a person of ordinary skill in the art of the Patents-In-Suit, the motivation to combine each alleged combination of prior art identified in Interrogatory No. 2 above, and any objective indicia of non-obviousness.

## RESPONSE TO INTERROGATORY NO. 3:

Nova objects to this interrogatory on the grounds that it is compound, vague, ambiguous and unduly complex including in its use of multiple subparts contrary to Fed. R. Civ. P. 33(a). Nova also objects to this interrogatory as premature in that it seeks Nova's contentions and analysis before Nova has completed its investigation and discovery relating to invalidity issues, before Nova has conducted expert discovery on invalidity, before Plaintiff has offered its claim construction, and before the Court has construed the claims of the patent.

Subject to and without waiving its General and Specific Objections, Nova will supplement this response upon further investigation.

6

**INTERROGATORY NO. 4:**

Describe in detail all legal and factual bases for NOVA's contentions that the Patents-In-Suit are unenforceable, and for any allegation of inequitable conduct provide a detailed description of the materiality of any alleged prior art including why such prior art is not cumulative of other prior art cited to, or of record in, the Patent Office, and describe with specificity how the inventors of the Patents-In-Suit, or their agents, allegedly intended to deceive the Patent Office.

**RESPONSE TO INTERROGATORY NO. 4:**

Nova objects to this interrogatory on the grounds that it is compound, vague, ambiguous and unduly complex including in its use of multiple subparts contrary to Fed. R. Civ. P. 33(a). Nova also objects to this interrogatory as premature in that it seeks Nova's contentions and analysis before Nova has completed its investigation and discovery relating to unenforceability issues, before Nova has conducted expert discovery on unenforceability, before Plaintiff has offered its claim construction, and before the Court has construed the claims of the patent.

Subject to and without waiving its General and Specific Objections, Nova responds as follows:

On December 29, 1992, the USPTO issued United States Patent No. 5,175,682, entitled "Check System and Method Including Prioritizing Checks for Transmission to Banks for Processing" ("the '682 patent"). The '682 patent has an invention date of December 14, 1990, which precedes the invention date of the '988 patent by almost two years. Since the '682 patent fully discloses the invention claimed in the '988 patent, the '682 patent would have been material to the USPTO's decision on whether to issue the '988 patent. On information and belief, Mr. Robert Hills, one of the named inventors of the '988 patent, was aware of the '682 patent during

7

the pendency of the application that led to the '988 patent and intentionally withheld this material information with the intent to deceive the USPTO. This action constitutes inequitable conduct, which renders the '988 patent unenforceable.

On November 7, 1995, a Sacramento Bee news article reported that a company named ChequeMark Systems was actively marketing a system within the scope of the '528 and '366 patents. This was more than one year prior to the December 31, 1996 effective filing date of the '528 and '366 patents. On information and belief, Mr. Robert Hills, one of the named inventors of the '528 and '366 patents, was aware of the public use and sale during the pendency of the applications that led to the '528 and '366 patents and intentionally withheld this material information with the intent to deceive the USPTO. This action constitutes inequitable conduct, which renders the '528 and '366 patents unenforceable.

Pursuant to the Federal Rules of Civil Procedure, Nova will supplement this response as discovery continues and otherwise as circumstances warrant.

**INTERROGATORY NO. 5:**

Describe in detail all bases for NOVA's contention that it does not willfully infringe each of the Patents-In-Suit, including but not limited to, identifying the date NOVA first became aware of each Patent-in-Suit.

**RESPONSE TO INTERROGATORY NO. 5:**

Nova objects to this interrogatory on the grounds that it improperly calls for legal conclusions and expert opinion. Furthermore, this interrogatory is unreasonable and unduly burdensome in that it prematurely seeks Nova's contentions and analysis before Nova has completed its investigation and discovery related to the Patents-in-Suit, before Nova has

conducted expert discovery on the Patents-in-Suit, before Plaintiff has offered its claim construction, and before the Court has construed the claims of the patent. Nova further objects to the extent that this request seeks information protected by the attorney-client privilege, work product immunity, or other privileges.

Subject to and without waiving its General and Specific Objections, Nova responds as follows:

This interrogatory is premature at this stage of the discovery process. If Nova intends to rely on advice of counsel in defense to Plaintiff's charge of willful infringement, Nova will produce documents within the scope of Nova's waiver of privilege (as set forth by applicable case law) on or about April 29, 2005.

Pursuant to the Federal Rules of Civil Procedure, Nova will supplement this response as discovery continues and otherwise as circumstances warrant.

## INTERROGATORY NO. 6:

Identify each and every NOVA point-of-sale electronic check conversion system and associated equipment and services that NOVA has made, imported, used, sold, and/or offered to sell subsequent to January 1996, including the name of each such product, system, equipment and/or service, and the dates/time period NOVA manufactured, sold, offered for sale, used, and/or imported each such product, system, equipment and/or service.

## RESPONSE TO INTERROGATORY NO. 6:

Nova objects to this interrogatory on the grounds that it calls for information that is neither relevant to the claim or defense of any party nor reasonably calculated to lead to the discovery of admissible evidence, and is overbroad, unduly burdensome, harassing and

9

oppressive. Nova further objects to this interrogatory on the grounds that it is compound, vague, ambiguous and unduly complex including in its use of multiple subparts contrary to Fed. R. Civ. P. 33(a) and its use of the broad and undefined term "associated equipment and services."

Subject to and without waiving its General and Specific Objections, Nova responds as follows:

The non-objectionable portion of the answer to this interrogatory may be derived or ascertained from business records in the possession, custody or control of Nova, and the burden of deriving or ascertaining the non-objectionable portion of the answer to this interrogatory is substantially the same for LML as it is for Nova. Therefore, pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, Nova will produce documents from which the non-objectionable portion or this interrogatory may be derived or ascertained.

Pursuant to the Federal Rules of Civil Procedure, Nova will supplement this response as discovery continues and otherwise as circumstances warrant.

**INTERROGATORY NO. 7:**

Describe in detail how each NOVA Accused Product converts paper checks presented at the point of sale into electronic transactions, including but not limited to, describing with specificity each step of converting paper checks into electronic transactions from the initial tender of a paper check at the point of sale to the deposit of funds into the merchant's bank account.

**RESPONSE TO INTERROGATORY NO. 7:**

Nova objects to this interrogatory on the grounds that it calls for information that is neither relevant to the claim or defense of any party nor reasonably calculated to lead to the

10

discovery of admissible evidence, and is overbroad, unduly burdensome, harassing and oppressive. Nova further objects to this interrogatory on the grounds that it is vague and ambiguous in its use of the undefined term "merchant's bank account."

Subject to and without waiving its General and Specific Objections, Nova responds as follows:

The non-objectionable portion of the answer to this interrogatory may be derived or ascertained from business records in the possession, custody or control of Nova, and the burden of deriving or ascertaining the non-objectionable portion of the answer to this interrogatory is substantially the same for LML as it is for Nova. Therefore, pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, Nova will produce documents from which the non-objectionable portion or this interrogatory may be derived or ascertained.

Pursuant to the Federal Rules of Civil Procedure, Nova will supplement this response as discovery continues and otherwise as circumstances warrant.

**INTERROGATORY NO. 8:**

Identify the person or persons most knowledgeable about the conception, development, engineering, marketing and promotion, technical support, manufacture, operation, sale and/or offer to sell, and use for each of NOVA's Accused Products.

**RESPONSE TO INTERROGATORY NO. 8:**

Subject to the General Objections, Nova responds as follows:

The non-objectionable portion of the answer to this interrogatory may be derived or ascertained from business records in the possession, custody or control of Nova, and the burden of deriving or ascertaining the non-objectionable portion of the answer to this interrogatory is

11

substantially the same for LML as it is for Nova. Therefore, pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, Nova will produce documents from which the non-objectionable portion or this interrogatory may be derived or ascertained. Because its investigation into information responsive to this interrogatory is ongoing, Nova reserves the right to modify or supplement this initial list of persons most knowledgeable.

Pursuant to the Federal Rules of Civil Procedure, Nova will supplement this response as discovery continues and otherwise as circumstances warrant.

**INTERROGATORY NO. 9:**

For every year from 1996 to the present, state the number of electronic check conversions processed at the point-of-sale (POP field) using the NOVA Accused Products as well as NOVA's revenue (by year) generated from such electronic check conversions.

**RESPONSE TO INTERROGATORY NO. 9:**

Nova objects to this interrogatory on the grounds that it calls for information that is neither relevant to the claim or defense of any party nor reasonably calculated to lead to the discovery of admissible evidence, and is overbroad, unduly burdensome, harassing and oppressive.

Subject to and without waiving its General and Specific Objections, Nova responds as follows:

The non-objectionable portion of the answer to this interrogatory may be derived or ascertained from business records in the possession, custody or control of Nova, and the burden of deriving or ascertaining the non-objectionable portion of the answer to this interrogatory is substantially the same for LML as it is for Nova. Therefore, pursuant to Rule 33(d) of the

Federal Rules of Civil Procedure, Nova will produce documents from which the non-objectionable portion or this interrogatory may be derived or ascertained.

Pursuant to the Federal Rules of Civil Procedure, Nova will supplement this response as discovery continues and otherwise as circumstances warrant.

November 22, 2004

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

_(signature)_

Richard D. Kirk (Bar No. 922)
222 Delaware Avenue, 10th Floor
P.O. Box 2306
Wilmington, DE  19899
(302) 888-6800
Attorneys for defendant,
NOVA Information Systems, Inc.

OF COUNSEL:

Mark C. Scarsi
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA  90071
(213) 430-6000

# EXHIBIT 16

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| LML PATENT CORP.,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>TELECHECK SERVICES, INC.,<br>ELECTRONIC CLEARING HOUSE, INC.,<br>XPRESSCHEX, INC. and NOVA<br>INFORMATION SYSTEMS, INC.,<br><br>　　　　　Defendants. | C.A. 04-858 (SLR) |

**DEFENDANT NOVA INFORMATION SYSTEMS, INC.'S**
**FIRST SUPPLEMENTAL RESPONSE TO**
**PLAINTIFF'S AMENDED FIRST SET OF INTERROGATORIES**

　　　　　Pursuant to Rules 26 and 33, Nova Information Systems, Inc. ("Nova") hereby

provides a First Supplemental Response to LML Patent Corp.'s ("LML") Amended First Set of

Interrogatories, Nos. 1-9 ("Interrogatories"). Nova provides these supplemental responses

without waiving any present or future objection, for example such as any objection as to the

relevance or admissibility of any information provided by Nova. Nova's investigation regarding

this litigation is ongoing, as is Nova's development of any contentions. These responses are

provided subject to Nova's future investigation, supplementation, or modification. Nova's

agreement to investigate the subject matter of any interrogatory or to provide responsive

information does not constitute an admission that relevant, non-privileged information

responsive to that interrogatory exists. All responses are subject to each of the General and

Specific Objections set forth in NOVA's original Response to LML's Amended First Set of

Interrogatories.

574431v1

1

## FIRST SUPPLEMENTAL RESPONSES TO INTERROGATORIES

## INTERROGATORY NO. 1:

Describe in detail all bases for NOVA's contention that it does not infringe the Asserted Claims of the Patents-In-Suit, either literally or under the doctrine of equivalents, and its contention that it has not contributed to the infringement by others and/or has not induced others to infringe any Asserted Claim of the Patents-In-Suit, including a claim chart explaining in detail all specific structural or functional differences between each Accused Product and the Asserted Claims. (As used herein, "Patents-in-Suit" means U.S. Patent Nos. 5,484,988, 6,164,528, 6,283,366; "NOVA's Accused Products", "Accused Product", or "product" means any equipment, component, system, or services manufactured, sold, offered for sale, used, or imported by NOVA for or associated with the conversion of checks, presented at points of sale, to electronic transactions, including but not limited to, NOVA's "Electronic Check Service"; and "Asserted Claims" means claims 1-6, 8-11, and 13 of the '988 patent, claims 11 and 18 of the '528 patent, and claims 3 and 25 of the '366 patent).

## FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:

Nova incorporates by reference its initial response as though fully set forth herein. Nova expressly reserves the right to supplement this response as discovery proceeds and provides this first supplemental response subject to and without waiving its General and Specific Objections:

| CLAIM 1 OF THE '988 PATENT | |
|---|---|
| 1.     A checkwriting point of sale system comprising:<br><br>a point of sale terminal adapted to receive consumer bank account information from any bank check; | The Nova Electronic Check Service does not have a point of sale terminal adapted to receive consumer bank account information from any bank check. |
| a central computer system; | Nova's analysis and investigation of this limitation is ongoing.   Nova will supplement this response as appropriate. |
| first communications means integral to said point of sale terminal for electronically communicating with the central computer system; | Nova's analysis and investigation of this limitation is ongoing.   Nova will supplement this response as appropriate. |
| memory means integral to said point of sale terminal for temporarily storing the consumer bank account information; | Nova's analysis and investigation of this limitation is ongoing.   Nova will supplement this response as appropriate. |
| the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; | Nova's analysis and investigation of this limitation is ongoing.   Nova will supplement this response as appropriate. |
| the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the bank check as a negotiable instrument. | The Nova Electronic Check Service does not have a central computer system with second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the bank check as a negotiable instrument. |

| CLAIM 2 OF THE '988 PATENT | |
|---|---|
| 2.     The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further includes means for reading magnetic ink character recognition numbers appearing on a consumer check for the sole purpose of identifying and reading the consumer bank account information. | Nova does not infringe this claim because Nova does not infringe claim 1 from which this claim depends.   Further, the Nova Electronic Check Service does not include means for reading the magnetic ink character recognition numbers appearing on a consumer check for the sole purpose of identifying and reading the consumer bank account information. |

574431v1

3

| CLAIM 3 OF THE '988 PATENT | |
|---|---|
| 3.    The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further comprises an alphanumeric display means for receiving said consumer bank account information from the memory means and for displaying the consumer bank account information. | Nova does not infringe this claim because Nova does not infringe claim 1 from which this claim depends.  Further, the Nova Electronic Check Service does not have a point of sale terminal further comprising an alphanumeric display means for receiving consumer bank account information from the memory means and for displaying the consumer bank account information. |

| CLAIM 4 OF THE '988 PATENT | |
|---|---|
| 4.    The checkwriting point of sale system according to claim 1 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip. | Nova does not infringe this claim because Nova does not infringe claim 1 from which this claim depends.    Nova's analysis and investigation of this limitation is ongoing and Nova will supplement this response as appropriate. |

| CLAIM 5 OF THE '988 PATENT | |
|---|---|
| 5.    The checkwriting point of sale system according to claim 1 further comprising a resident third party database wherein consumer banking account status information is stored, the consumer banking account status information being used for verification of consumer banking account status. | Nova does not infringe this claim because Nova does not infringe claim 1 from which this claim depends.    Nova's analysis and investigation of this limitation is ongoing and Nova will supplement this response as appropriate. |

| CLAIM 6 OF THE '988 PATENT | |
|---|---|
| 6.    The checkwriting point of sale system according to claim 1 wherein the central computer system further comprises a system subscriber database, the system subscriber database comprising information regarding merchants and service providers that are authorized to use the checkwriting point of sale system. | Nova does not infringe this claim because Nova does not infringe claim 1 from which this claim depends.  Further, the Nova Electronic Check does not have a central computer system that further comprises a system subscriber database, the system subscriber database comprising information regarding merchants and service providers that are authorized to use the checkwriting point of sale system. |

| CLAIM 8 OF THE '988 PATENT | |
|---|---|
| 8.    A checkwriting point of sale process comprising:<br><br>a)    presenting any bank check specimen to a point of sale terminal located at a merchant or service provider; | The Nova Electronic Check Service does not involve the process of presenting any bank check specimen to a point of sale terminal located at a merchant or service provider. |
| b)    reading the magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument; | The Nova Electronic Check Service does not read the magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument. |
| c)    storing the consumer bank account information obtained from the check and verifying that account numbers were accurately read at the point of sale terminal; | The Nova Electronic Check Service does not store the consumer bank account information obtained from the check and verify that account numbers were accurately read at the point of sale terminal. |
| d)    providing transaction event information to the point of sale terminal; | Nova's analysis and investigation of this limitation is ongoing.  Nova will supplement this response as appropriate. |
| e)    transmitting the transaction event information and consumer bank account information to a central computer system; | Nova's analysis and investigation of this limitation is ongoing.  Nova will supplement this response as appropriate. |
| f)    storing the transaction event information and consumer banking account information; and | Nova's analysis and investigation of this limitation is ongoing.  Nova will supplement this response as appropriate. |
| g)    subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations. | Nova's analysis and investigation of this limitation is ongoing.  Nova will supplement this response as appropriate. |

| CLAIM 9 OF THE '988 PATENT | |
|---|---|
| 9.    A checkwriting point of sale system comprising:<br><br>a point of sale terminal adapted to receive consumer bank account information; | Nova's analysis and investigation of this limitation is ongoing.  Nova will supplement this response as appropriate. |
| a central computer system; | Nova's analysis and investigation of this limitation is ongoing.  Nova will supplement this response as appropriate. |
| first communications means integral to said point of sale terminal for electronically | Nova's analysis and investigation of this limitation is ongoing.  Nova will supplement |

574431v1

5

| | |
|---|---|
| communicating with the central computer systems; | this response as appropriate. |
| memory means integral to said point of sale terminal for temporarily storing the consumer bank account information; | Nova's analysis and investigation of this limitation is ongoing. Nova will supplement this response as appropriate. |
| the point of sale terminal comprising reading means for reading magnetic ink character recognition numbers on any consumer bank check for the sole purpose of eliciting consumer bank account information; | The Nova Electronic Check Service does not have reading means for reading magnetic ink character recognition numbers on any consumer bank check for the sole purpose of eliciting consumer bank account information. |
| the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; and | Nova's analysis and investigation of this limitation is ongoing. Nova will supplement this response as appropriate. |
| the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using a bank check as a negotiable instrument. | The Nova Electronic Check Service does not have a central computer system second communication means enabling the central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using a bank check as a negotiable instrument. |

| CLAIM 10 OF THE '988 PATENT | |
|---|---|
| 10.    The checkwriting point of sale system according to claim 9 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip. | Nova does not infringe this claim because Nova does not infringe claim 9 from which this claim depends. Nova's analysis and investigation of this limitation is ongoing. Nova will supplement this response as appropriate. |

| CLAIM 11 OF THE '988 PATENT | |
|---|---|
| 11.    The checkwriting point of sale system according to claim 9 further comprising a resident third party database wherein consumer banking account status information is stored, the consumer banking account status information being used for verification of consumer banking account status. | Nova does not infringe this claim because Nova does not infringe claim 9 from which this claim depends. Further, the Nova Electronic Check Service does not have a resident third party database wherein consumer banking account status information is stored, the consumer banking account status information being used for verification of consumer banking account status. |

| CLAIM 13 OF THE '988 PATENT | |
|---|---|
| 13.   The checkwriting point of sale system according to claim 4, wherein the sales slip includes means for execution by the consumer for proof of bank account access authorization. | Nova does not infringe this claim because Nova does not infringe claim 4 from which this claim depends.  Further, the Nova Electronic Check Service does not have a sales slip that includes means for execution by the consumer for proof of bank account access authorization. |

| CLAIM 11 OF THE '528 PATENT | |
|---|---|
| 10.   A checkwriting point of sale process comprising:<br><br>(a)   presenting a bank check specimen to a point of sale terminal located at a merchant or service provider; | The Nova Electronic Check Service does not include the process of presenting a bank check specimen to a point of sale terminal located at a merchant or service provider. |
| (b)   reading a magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument; | The Nova Electronic Check Service does not read the magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument. |
| (c)   storing the consumer bank account information obtained from the check and verifying that account numbers were accurately read at the point of sale terminal; | The Nova Electronic Check Service does not store the consumer bank account information obtained from the check and verify that account numbers were accurately read at the point of sale terminal. |
| (d)   providing transaction event information to the point of sale terminal; | Nova's analysis and investigation of this limitation is ongoing.  Nova will supplement this response as appropriate. |
| (e)   transmitting the transaction event information and consumer bank account information to a central computer system; | Nova's analysis and investigation of this limitation is ongoing.  Nova will supplement this response as appropriate. |
| (f)   storing the transaction event information and consumer banking account information; | Nova's analysis and investigation of this limitation is ongoing.  Nova will supplement this response as appropriate. |
| (g)   subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations; and | Nova's analysis and investigation of this limitation is ongoing.  Nova will supplement this response as appropriate. |
| (h)   returning the bank check specimen to | Nova's analysis and investigation of this |

| | |
|---|---|
| the consumer. | limitation is ongoing. Nova will supplement this response as appropriate. |

| CLAIM 11 OF THE '528 PATENT | |
|---|---|
| 11.    The checkwriting point of sale process of claim 10 further comprising:<br><br>annotating the bank check specimen before returning the bank check specimen to the consumer. | Nova does not infringe this claim because Nova does not infringe claim 10 from which this claim depends.<br><br>Nova's analysis and investigation of this limitation is ongoing. Nova will supplement this response as appropriate. |

| CLAIM 18 OF THE '528 PATENT | |
|---|---|
| 18.    The checkwriting point of sale process of claim 10 further comprising performing a "velocity check" on the merchants sales activity to avoid fraud. | Nova does not infringe this claim because Nova does not infringe claim 10 from which this claim depends.    Further, the Nova Electronic Check Service does not perform a "velocity check" on the merchants sales activity to avoid fraud. |

| CLAIM 3 OF THE '366 PATENT | |
|---|---|
| 1.    A checkwriting point of sale system comprising:<br><br>a point of sale terminal adapted to receive payer bank account information from any bank check; | The Nova Electronic Check Service does not have a point of sale terminal adapted to receive payer bank account information from any bank check. |
| a central computer system; | Nova's analysis and investigation of this limitation is ongoing. Nova will supplement this response as appropriate. |
| first communications means integral to said point of sale terminal for electronically communicating with the central computer system; | Nova's analysis and investigation of this limitation is ongoing. Nova will supplement this response as appropriate. |
| memory means integral to said point of sale terminal for temporarily storing the payer bank account information; | Nova's analysis and investigation of this limitation is ongoing. Nova will supplement this response as appropriate. |
| the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; and | Nova's analysis and investigation of this limitation is ongoing. Nova will supplement this response as appropriate. |
| the central computer system second | The Nova Electronic Check Service does not |

| | |
|---|---|
| communication means enabling said central computer system to communicate with external databases for performing a payer bank account status search and further enabling communication with an electronic funds transfer system for transferring funds without using the bank check as a negotiable instrument. | have a central computer system second communication means enabling said central computer system to communicate with external databases for performing a payer bank account status search and further enabling communication with an electronic funds transfer system for transferring funds without using the bank check as a negotiable instrument. |
| 3.    The checkwriting point of sale system of claim 1 wherein the point of sale terminal is further adapted to annotate the bank check that is used at the point of sale terminal to provide the payer bank account information. | Nova does not infringe this claim because Nova does not infringe claim 1 from which this claim depends.  Further, The Nova Electronic Check Service does not have a point of sale terminal that is further adapted to annotate the bank check that is used at the point of sale terminal to provide the payer bank account information. |

| CLAIM 25 OF THE '366 PATENT | |
|---|---|
| 24.    A checkwriting point of sale process comprising: <br><br> a payer completing a check for a transaction with a merchant or service provider; | |
| using a point of sale terminal associated with said merchant or service provider to read MICR information on the check to obtain payer bank account information; | Nova's analysis and investigation of this limitation is ongoing.  Nova will supplement this response as appropriate. |
| inputting transaction information, including at least a transaction amount, into the point of sale terminal; | |
| printing an authorization to debit the payer bank account by the transaction amount for the payer to sign; | The Nova Electronic Check Service does not include the process of printing an authorization to debit the payer bank account by the transaction amount for the payer to sign. |
| the payer signing the authorization; | The Nova Electronic Check Service does not include the process of having the payer sign the authorization. |
| returning a copy of the signed authorization and the check to the payer; and | The Nova Electronic Check Service does not include the process of returning a copy of the signed authorization and the check to the payer. |
| electronically debiting said payer bank account | The Nova Electronic Check Service does not |

| by said transaction amount based on the signed authorization, without using the check as a negotiable instrument. | electronically debit the payer bank account by the transaction amount based on the signed authorization, without using the check as a negotiable instrument. |
|---|---|
| 25.    The checkwriting point of sale process of claim 24, further comprising voiding the completed check prior to returning it to the payer. | Nova does not infringe this claim because Nova does not infringe claim 24 from which this claim depends. |

Pursuant to the Federal Rules of Civil Procedure, Nova will supplement this response as discovery continues and otherwise as circumstances warrant.

## INTERROGATORY NO. 2:

Separately for each Asserted Claim of the Patents-In-Suit, describe in detail all legal and factual bases for NOVA's contention that the Asserted Claims of the Patents-In-Suit are invalid, and for each piece of alleged prior art, and/or combination of alleged prior art, that NOVA contends invalidates each Asserted Claim, provide a detailed claim chart that identifies each element of the Asserted Claims that NOVA contends is disclosed or taught by the prior art with citations to each instance where such element is allegedly disclosed or taught by the prior art.

## FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:

Nova incorporates by reference its initial response as though fully set forth herein. Nova expressly reserves the right to supplement this response as discovery proceeds and provides this first supplemental response subject to and without waiving its General and Specific Objections:

In addition to the references cited in Nova's original Response to Interrogatory No. 2, the following reference is also invalidating prior art to one or more of the Patents-in-Suit under either 35 U.S.C. §102 or 35 U.S.C. § 103:

- U.S. Patent No. 4,321,672 (Braun)

Pursuant to the Federal Rules of Civil Procedure, Nova will supplement this response as discovery continues and otherwise as circumstances warrant.

## INTERROGATORY NO. 6:

Identify each and every NOVA point-of-sale electronic check conversion system and associated equipment and services that NOVA has made, imported, used, sold, and/or offered to sell subsequent to January 1996, including the name of each such product, system, equipment and/or service, and the dates/time period NOVA manufactured, sold, offered for sale, used, and/or imported each such product, system, equipment and/or service.

## FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:

Nova incorporates by reference its initial response as though fully set forth herein. Nova expressly reserves the right to supplement this response as discovery proceeds and provides this first supplemental response subject to and without waiving its General and Specific Objections:

The non-objectionable portion of the answer to this interrogatory may be derived or ascertained from business records that Nova has produced or from business records in the possession, custody or control of Nova and the burden of deriving or ascertaining the non-objectionable portion of the answer to this interrogatory is substantially the same for LML as it is

574431v1

11

for Nova. Therefore, pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, Nova specifies the following records from which information responsive to this interrogatory may be derived or ascertained:

- NOVA-02532 to NOVA-02533

- NOVA 02582 to NOVA-02595

- NOVA-02726 to NOVA-02738

- NOVA-2742 TO NOVA-2917

Pursuant to the Federal Rules of Civil Procedure, Nova will supplement this response as discovery continues and otherwise as circumstances warrant.

**INTERROGATORY NO. 7:**

Describe in detail how each NOVA Accused Product converts paper checks presented at the point of sale into electronic transactions, including but not limited to, describing with specificity each step of converting paper checks into electronic transactions from the initial tender of a paper check at the point of sale to the deposit of funds into the merchant's bank account.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7:**

Nova incorporates by reference its initial response as though fully set forth herein. Nova expressly reserves the right to supplement this response as discovery proceeds and provides this first supplemental response subject to and without waiving its General and Specific Objections:

The Nova Electronic Check Service processes checks as follows:

1) Customer presents a paper check meeting Nova's acceptance guidelines

574431v1

12

2) Purchase amount is entered into the point-of-sale terminal and the check is inserted through a check reader

3) Terminal connects to the Nova network for verification

4) Terminal prints a receipt for the consumer's signature

5) Original check is voided and returned to customer

6) Check is electronically processed via the ACH network or with a participating bank resulting in a deposit to the merchant account

7) Checks which cannot be processed via the ACH network or with a participating bank are possessed via other means

Pursuant to the Federal Rules of Civil Procedure, Nova will supplement this response as discovery continues and otherwise as circumstances warrant.

## INTERROGATORY NO. 8:

Identify the person or persons most knowledgeable about the conception, development, engineering, marketing and promotion, technical support, manufacture, operation, sale and/or offer to sell, and use for each of NOVA's Accused Products.

## FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8:

Nova incorporates by reference its initial response as though fully set forth herein. Nova expressly reserves the right to supplement this response as discovery proceeds and provides this first supplemental response subject to and without waiving its General and Specific Objections:

The person most knowledgeable is Amy Goodson.

Pursuant to the Federal Rules of Civil Procedure, Nova will supplement this response as discovery continues and otherwise as circumstances warrant.

## INTERROGATORY NO. 9:

For every year from 1996 to the present, state the number of electronic check conversions processed at the point-of-sale (POP field) using the NOVA Accused Products as well as NOVA's revenue (by year) generated from such electronic check conversions.

## FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 9:

Nova incorporates by reference its initial response as though fully set forth herein. Nova expressly reserves the right to supplement this response as discovery proceeds and provides this first supplemental response subject to and without waiving its General and Specific Objections:

The non-objectionable portion of the answer to this interrogatory may be derived or ascertained from business records that Nova has produced or from business records in the possession, custody or control of Nova and the burden of deriving or ascertaining the non-objectionable portion of the answer to this interrogatory is substantially the same for LML as it is for Nova. Therefore, pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, Nova specifies the following records from which information responsive to this interrogatory may be derived or ascertained:

- NOVA 02528 to NOVA-02533

- NOVA-02585 to NOVA-02595

- NOVA-02722 to NOVA-02725

574431v1

14

Pursuant to the Federal Rules of Civil Procedure, Nova will supplement this response as discovery continues and otherwise as circumstances warrant.

January 31, 2005

THE BAYARD FIRM

Richard D. Kirk (Bar No. 922)
222 Delaware Avenue, 9th Floor
P.O. Box 25130
Wilmington, DE 19899
(302) 655-5000
Attorneys for defendant,
NOVA Information Systems, Inc.

OF COUNSEL:

Mark C. Scarsi
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
(213) 430-6000

574431v1

15