IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LML PATENT CORP. | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.    04-858-SLR |
| vs. | ) | |
| | ) | Judge Sue L. Robinson |
| TELECHECK SERVICES, INC. | ) | |
| ELECTRONIC CLEARING HOUSE, | ) | **PUBLIC VERSION** |
| INC., XPRESSCHEX, INC., AND | ) | |
| NOVA INFORMATION SYSTEMS, | ) | |
| INC. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

**LML'S MEMORANDUM IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT NO. 4:
FOR A RULING THAT CLAIMS 1, 2, 4-6, 9-11, 14, 16 AND 18
OF THE '988 PATENT ARE NOT ANTICIPATED**


Originally filed: October 28, 2005
Public version filed:  November 4, 2005

Richard K. Herrmann #405
Mary B. Matterer #2696
MORRIS JAMES HITCHENS &
WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware  19801
(302) 888-6800
rherrmann@morrisjames.com
mmatterer@morrisjames.com

Russell E. Levine, P.C.
Jamie H. McDole
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois  60601
(312) 861-2000
Attorneys for LML Patent Corp.

# TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDINGS .................................................................1

SUMMARY OF THE ARGUMENT ....................................................................................1

STATEMENT OF FACTS .................................................................................................3

    I.      THE INVENTION DESCRIBED IN THE '988 PATENT ...............................3

    II.     THE CARLSON '607 REFERENCE .......................................................6

    III.    THE CARLSON '714 REFERENCE .......................................................6

    IV.    THE HIGASHIYAMA REFERENCE ......................................................7

ARGUMENT .................................................................................................................8

    V.     LEGAL STANDARDS .......................................................................8

             1.    *Standards for Summary Judgment* ........................................8

             2.    *Defendants' "Clear and Convincing" Burden of Proof* .......9

             3.    *Anticipation* ....................................................................10

    VI.    THE ASSERTED CLAIMS OF THE '988 PATENT ARE NOT ANTICIPATED ...............................................................................11

    VII.   THE CARLSON '607 PATENT DOES NOT ANTICIPATE THE ASSERTED CLAIMS OF THE '988 PATENT ....................................12

             1.    *Carlson '607 does not disclose a "central computer system" as required by claims 1, 2, 4, 9-10, 14, and 18* .......12

             2.    *Carlson '607 does not disclose a "second communication means" as required by claims 1, 2, 4, 9-10 and 14* .......13

    VIII.  THE CARLSON '714 PATENT DOES NOT ANTICIPATE THE ASSERTED CLAIMS OF THE '988 PATENT ....................................16

             1.    *Carlson '714 does not disclose a "central computer system" as required by claims 1, 2, 4, and 9-10* .......16

2.  *Carlson '714 does not disclose a "second communication means" as required by claims 1, 2, 4, and 9-10* .......................................................17

IX.  THE HIGASHIYAMA '682 PATENT DOES NOT ANTICIPATE THE ASSERTED CLAIMS OF THE '988 PATENT.........................................21

1.  *Higashiyama '682 does not disclose a "central computer system" as required by claims 1, 4 and 9-10*.......................................................21

2.  *Higashiyama does not disclose a "second communication means enabling said central computer system to communicate with external databases" as required by claims 1, 2, 4-6, 9-11 and 14* .......................................................23

3.  *Higashiyama '682 does not disclose a "first communication means integral to a point of sale terminal" as required by claims 1, 2, 4-6, 9-11, and 14*.......................................................28

4.  *Higashiyama '682 does not disclose a "resident third party database" as required by claims 5 and 11*.......................................................30

5.  *Higashiyama '682 does not disclose a "system subscriber database" as required by claim 6* .............31

X.  DEFENDANTS CANNOT PRESENT ANY ADMISSIBLE EVIDENCE THAT CLAIMS 5, 6, 11, 14, 16 AND 18 OF THE '988 PATENT ARE ANTICIPATED .........................................................32

CONCLUSION .........................................................................33

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................................... 9

*Avia Group Int'l Inc. v. L.A. Gear Calif., Inc.*,
    853 F.2d 1557 (Fed. Cir. 1988) .................................................................. 8

*Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*,
    731 F.2d 831 (Fed. Cir. 1984) .................................................................... 9

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ................................................................................... 9

*Continental Can Co. USA, Inc. v. Monsanto Co.*,
    948 F.2d 1264 (Fed. Cir. 1991) ........................................................... 8, 31

*Eli Lilly & Co. v. Barr Labs., Inc.*,
    251 F.3d 955 (Fed. Cir. 2001) .................................................................... 9

*Hewlett-Packard v. Bausch & Lomb Inc*
    909 F.2d 1464 (Fed. Cir. 1990) ............................................................... 17

*Hybritech Inc. v. Monoclonal Antibodies, Inc.*,
    802 F.2d 1367 (Fed. Cir. 1986) .................................................................. 9

*In re Spada*
    911 F.2d 705 (Fed.Cir.1990) .............................................................. 11, 20

*Interconnect Planning Corp. v. Feil*,
    774 F.2d 1132 (Fed. Cir. 1985) ..................................................... 10, 12, 16

*Key Pharms. v. Hercon Labs. Corp.*
    161 F.3d 709 (Fed. Cir. 1998) .................................................................. 10

*London v. Carson Pirie Scott*,
    946 F.2d 1534 (Fed. Cir. 1991) .................................................................. 8

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 57 (1986) ..................................................................................... 9

*Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*,
    370 F.3d 1354 (Fed. Cir. 2004) ..................................................... 10, 12, 16

*Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH*
    139 F.3d 877 (Fed. Cir. 1998) .................................................................... 9

*Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d 1253 (Fed. Cir. 2001) ........................ 9

*Schumer v. Lab. Computer Sys., Inc.,*
    308 F.3d 1304 (Fed. Cir. 2002)............................................................. 10

*Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc.*
    183 F.3d 1347 (Fed. Cir. 1999)............................................................. 10

*Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.,*
    308 F.3d 1167 (Fed. Cir. 2002)............................................................. 10

*Verve, LLC v. Crane Cams, Inc.,*
    311 F.3d 1116 (Fed. Cir. 2002)...................................................... 11, 29

**Statutes**

35 U.S.C. § 102............................................................................... 12, 15

35 U.S.C. § 282................................................................................. 9, 10

**Rules**

Fed. R. Civ. P. 56(c) ........................................................................ 8, 9

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff LML Patent Corp. ("LML") asserts infringement by Telecheck Services, Inc. ("TeleCheck"), Electronic Clearing House, Inc. ("ECHO"), Xpresschex, Inc. ("Xpresschex"), and Nova Information Systems, Inc. ("Nova") (collectively the "Defendants") of claims 1, 2, 4-6, 9, 10, 11, 14, 16 and 18 ("Asserted Claims") of United States Patent No. 5,484,988 (the '988 Patent). (Ex. 2).[1] The parties have concluded both fact and expert discovery as well as briefing on issues of claim construction. The Scheduling Order requires the parties to serve and file opening briefs for summary judgment on or before October 28, 2005. In accordance with the Amended Scheduling Order, LML respectfully submits this Opening Brief in Support of LML's Motion For Summary Judgment of No Anticipation.

## SUMMARY OF THE ARGUMENT

Defendants allege that some (but not all) of the Asserted Claims of the '988 patent are anticipated by three references: U.S. Patent No. 5,053,607 to Carlson (the '607 patent), U.S. Patent No. 4,758,714 to Carlson (the '714 patent), and U.S. Patent No. 5,175,682 to Higashiyama (Higashiyama or the '682 patent). However, each of these references is missing at least one element of the Asserted Claims and therefore does not anticipate.

The '607 patent is directed generally to a "check processing device" rather than a checkwriting system such as the one disclosed by the '988 patent. The '607 patent was

---

[1] Exhibits are attached as the Declaration of Edward K. Runyan in Support of LML Patent Corporation's Opening Brief in support of its motion for summary judgment of no anticipation, hereinafter "Ex. __".

considered by the Examiner during prosecution of the '988 patent, and the Examiner allowed the '988 patent to issue over the '607 patent. Because it is directed to a point of sale device rather than a check processing system, the '607 patent does not disclose either a "central computer system" or a "second communication means" that enables a central computer system to communicate with external databases as required by all Asserted Claims of the '988 patent. Further, because it is directed to a point of sale device and not a system, all references to a bank's computer in the '607 patent are vague and tangential at best.

The '714 patent is directed generally to a "secured point-of-sale mechanism" rather than a checkwriting system. The '714 patent is related to and merely cumulative to the '607 patent that was considered (and found not to anticipate) by the Examiner during prosecution of the '988 patent. Because it is directed to a point of sale mechanism rather than a check processing system, the '607 patent does not disclose either a "central computer system" or a "second communication means" that enables a central computer system to communicate with external databases as required by all Asserted Claims of the '988 patent.

The Higashiyama patent discloses a system for large retail merchants to more efficiently process paper checks. In the preferred embodiment, each merchant location includes a backroom processor, resulting in a system of distributed backroom processors rather than a central computer system. The backroom processor communicates with a clearing house at the end of a shift or the end of a day (e.g., after transactions have completed), but check verifications or authorizations that might include communication with an external database are done by a *POS terminal* before transactions are completed.

Accordingly, Higashiyama does not disclose a central computer system or a "second communication means" that enables a central computer system to communicate with external databases as required by all Asserted Claims of the '988 patent.

Because none of the references cited by Defendants include each and every limitation of the '988 patent, no genuine issue of material fact regarding anticipation exists, and LML is entitled to summary judgment of no anticipation as a matter of law.

## STATEMENT OF FACTS

**I.    The Invention Described In The '988 Patent**

In the early 1990's, two inventors, Robert Hills and Henry Nichols, developed a new way of processing checks at the point of sale. Their innovative process greatly simplified traditional check processing and helped merchants facilitate the way that they received payment on checks presented by their costumers and was captured in the '988 Patent. (*See generally* Ex. 2). Instead of traditional processing where the merchant accepted a check and physically took it to the bank for processing, the invention disclosed in the '988 Patent permitted the merchant to obtain approval for a transaction at the point of sale in the presence of the consumer and then process the check electronically, as shown in Fig. 1 of the '988 Patent:



## FIG. 1

(Ex. 2, Fig. 1). This process negated the need for physically taking the check to the issuing bank, eliminating the significant cost and expense associated with traditional processing of paper checks and reducing the merchant's risk of fraud.

In general terms, the '988 Patent allowed merchants to accept paper checks whereby the MICR data[2] contained on the check is captured at the retailer's point of sale terminal, using either a commercially available MICR reader, optical character recognition scanner or physically inputting the information to the terminal keypad, in order to capture a consumer's bank account information. (Ex. 2, 5:45-49; 6:62-63).

---

[2] All printed checks for funds in the United States have a Magnetic Ink Character Recognition (MICR) line imprinted on the bottom of each check. This line is printed using an ink with iron-oxide pigments capable of being magnetized. In this way the characters encoded on this line can be read either magnetically or optically. The MICR line typically, contains the following information:  (1) Bank Routing Number – A number that uniquely identifies the bank at which the checking account is established (sometimes known as the ABA number); (2) Account number of the consumer's checking account; and (3) Check Serial Number. *See generally,* Ex. 3, Declaration of Gary Tinkel In Support of LML's Motion of Summary Judgment of Infringement of TeleCheck Services, Inc. ("Tinkel Declaration") at ¶ 13; Ex. 19, LML-EP-055363; and Ex. 4, Deposition of Jane Larimer at 77.

The amount of the transaction is then entered into the terminal keypad. (Ex. 2, 8:11-13). Information relating to the merchant's location, date and time of transaction along with other information, such as the MICR information may be automatically captured by the terminal as well. (Ex. 2, 5:18-21). The terminal then sends data to an electronic check processing provider by modem or other such communication methods to transfer packets of information electronically. (Ex. 2, 5:62-6:8; 6:20-38). The electronic check processing provider may run verification/risk analysis for the account and the bank routing number (i.e. the bank that the consumers account is located at) may also be verified. (Ex. 2, 6:9-19).

The point of sale terminal prints out a customer authorization receipt which authorizes the retailer to initiate an  ACH or EFT transaction from the customer's checking account. (Ex. 2, 8:18-23). The customer signs the authorization form and the retailer often voids the paper check. *Id.* The consumer bank account and transaction information is formatted by the electronic check processing provider so that it can be read and processed by the Automated Clearing House ("ACH")[3] or other Electronic Funds Transfer ("EFT") networks. (Ex. 2, 8:30-42). The ACH or other EFT networks, in turn, transmits the payment information to the consumer's bank, where their account is debited and the retailer's bank, sometimes called the Originating Depository Financial Institution (ODFI), is credited via an electronic funds transfer.

---

[3] The ACH network is a group of independent operators who are governed by rules developed collectively by the National Automated Clearing House Association ("NACHA"). The rules developed by NACHA include those governing POP transactions. (*See, e.g.* Ex. 5, LML-EP-052494).

## II.    The Carlson '607 Reference

The Carlson '607 patent was before the Examiner during the prosecution of the '988 patent.  Where the '988 patent is directed to a system and method that transfers funds "without using the check as a negotiable instrument," the Carlson '607 patent utilizes the check as a negotiable instrument and the system only serves to expedite processing.  (Ex. 3, Tinkel Declaration ¶ 43).  "Thus in its most general form, our point-of-sale negotiable instrument processing device comprises . . ." (Ex. 6, Carlson '607, 3:41-42).  In fact, both independent claims 1 and 2 of the Carlson '607 patent *explicitly* require using the check as a negotiable instrument.  ("A point-of-sale negotiable instrument processing device comprising . . ." (Ex. 6, claims 1 and 9).

Like the '714 patent, the '607 patent is focused on a "check processing device" rather than a larger system in which the device might operate.  (Ex. 6, Abstract; Ex. 3, Tinkel Declaration ¶ 44).  The '607 patent only tangentially discusses a check processing system.  The '607 patent discloses an invention where the check processing device directly communicates with a check-writer's bank to request a funds transfer.  (Ex. 6, 24:4-7; 24:21-22; Ex. 3, Tinkel Declaration ¶ 46).  Thus, the '607 patent's check processing device must be able to contact a disbursed, unrelated group of computers, not a centralized computer system.  (Ex. 3, Tinkel Declaration ¶ 46).

## III.    The Carlson '714 Reference

The Carlson '714 patent is related to two other patents, the Carlson '896 and '607 Patents, which were both considered by the Examiner during the prosecution of the '988 patent.   Specifically, the '714 Patent is a Continuation-In-Part of the Carlson '896 Patent. The Examiner cited the '896 and '607 Patents in Office Actions during the prosecution of

the '988 patent and allowed the claims to issue over those references. (Ex. 7, LML-EP-000192-94).

The '714 patent utilizes the check as a negotiable instrument and the system only serves to expedite processing. (*See generally*, Ex. 8, '714 Patent, 2:9-20; 3:40-43 ("It is a further object of this invention to use all forms of negotiable instruments at the point of sale and secure the transaction taking place."); 8:12-30; 8:55-60; 8:64 to 9:1-4; Ex. 3, Tinkel Declaration ¶ 40). The '714 patent is focused on a "secured point of sale mechanism" and only tangentially discusses a system in which the "mechanism" might operate. (Ex. 8, Abstract; Ex. 3, Tinkel Declaration ¶ 41). The '714 patent discloses an invention where the mechanism directly communicates with a check-writer's bank to request a funds transfer. (Ex. 8, 2:9-20; 8:28-30; 8:55-60; Ex. 3, Tinkel Declaration ¶ 41). Thus, the '714 patent's mechanism must be able to contact a disbursed, unrelated group of computers, not a centralized computer system. (Ex. 3, Tinkel Declaration ¶ 41).

## IV.    The Higashiyama Reference

Higashiyama discloses a system for large retail merchants, such as grocery stores, to more efficiently process paper checks using "a reader for reading the MICR account information printed" on checks to create data records that may be used by a "backroom processor" for "future batch data transmission to a clearing house or the issuing bank itself." (Ex. 9, Abstract; Ex. 3, Tinkel Declaration ¶ 49). In the preferred embodiment of Higashiyama, each merchant system includes a backroom processor, resulting in a system of distributed backroom processors rather than a central computer system. (Ex. 9, 3:31-33): The backroom processor is of a type "known in the prior art for maintaining sales information, performing price lookups, and inventory adjustment during the course of

business." (Ex. 9, 3:30-33). Higashiyama's backroom processor may upload data to a bank or clearing house "on a periodic basis or at the end of a shift" (e.g., after transactions have completed), but check verifications or authorizations are done by a POS terminal before transactions are completed. (Ex. 9, 5:4; Ex. 3, Tinkel Declaration ¶ 56-58).

In Higashiyama, a POS terminal establishes communications for check verifications through an *external* telecommunications device 205 (in contrast to the unshared, integral communication means of the '988 patent) which it shares with backroom processor 204. (Ex. 9, Fig. 2; Ex. 3, Tinkel Declaration ¶ 73).

## ARGUMENT

### V.    Legal Standards

#### 1.    *Standards for Summary Judgment*

Summary judgment is available in patent cases as in other areas of litigation, and the summary judgment standard for a patent claim is the same as the standard for other claims. *Avia Group Int'l Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1560-61 (Fed. Cir. 1988); *Cont'l Can Co. USA, v. Monsanto Co.*, 948 F.2d 1264, 1265 (Fed. Cir. 1991). Under Federal Rule of Civil Procedure 56, summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A principal purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *London v. Carson Pirie Scott*, 946 F.2d 1534, 1537 (Fed. Cir. 1991).

Once the moving party has demonstrated the absence of a genuine issue of material fact, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . the nonmoving party must come forward 'with specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(c)) (citations omitted).  The non-movant cannot simply make conclusory denials concerning the evidence.  *See Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 836 (Fed. Cir. 1984) ("[T]he court may not simply accept a party's statement that a fact is challenged").  Unless there is sufficient evidence to enable a jury to find for the nonmoving party on the issue for which summary judgment is sought, there is no issue for trial, and summary judgment should be granted.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Thus, to create a genuine issue of material fact, the opposing party must "go beyond the pleadings" and set forth specific facts to support their contention.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## 2.  *Defendants' "Clear and Convincing" Burden of Proof*

LML's '988 patent is presumed valid.  35 U.S.C. § 282.  *See Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH*, 139 F.3d 877, 881 (Fed. Cir. 1998); *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1375 (Fed. Cir. 1986).  Defendants can only overcome this presumption if they meet the heavy burden of establishing invalidity by clear and convincing evidence.  *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001); *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d 1253, 1257 (Fed. Cir. 2001).  When assessing the validity of the claims of a patent, the fact finder must *separately* consider each claim.  35 U.S.C. § 282 ("Each claim of a patent . . . shall be

presumed valid independently of the validity of other claims."); *Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1316 (Fed. Cir. 2002).

Where, as here, "the PTO previously considered the prior art reference, [a defendant] bears an even heavier burden to prove invalidity." *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1368 (Fed. Cir. 2004); *see also, e.g., Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1139 (Fed. Cir. 1985). This heavier burden applies not only when a defendant cites a *specific* reference that was before the Examiner, but also when the defendant cites prior art that is *cumulative* of the references that the Examiner considered. *Metabolite,* 370 F.3d at 1368.

### 3. *Anticipation*

The first step of an anticipation analysis is to construe the claims of the patent that are alleged to be invalid. *Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc.*, 183 F.3d 1347, 1353 (Fed. Cir. 1999) ("It is well-established that the first step in any validity analysis is to construe the claims of the invention . . ."); *Key Pharms. v. Hercon Labs. Corp.*, 161 F.3d 709, 714 (Fed. Cir. 1998). Then, the claims *as construed* must be compared on a limitation-by-limitation basis to the prior art. *Id at 714*. In comparing the claim limitations to the prior art, Defendants must also show with "clear and convincing evidence that every limitation of [a patentee's] Asserted Claims was contained, either expressly or inherently, in a single prior art reference." *Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*, 308 F.3d 1167, 1188 (Fed. Cir. 2002). Further, in order to anticipate, a single reference must describe the "claimed invention sufficiently to have placed a person of ordinary skill in the field of the invention in possession of it."

*Verve, LLC v. Crane Cams, Inc.*, 311 F.3d 1116, 1120 (Fed. Cir. 2002), *quoting In re Spada*, 911 F.2d 705, 708 (Fed. Cir. 1990).

## VI.    The Asserted Claims Of The '988 Patent Are Not Anticipated

LML moves for summary judgment that the Asserted Claims of the '988 patent are not invalid as anticipated under 35 U.S.C. § 102.  Each of the alleged anticipatory references fails to disclose at least one element of each Asserted Claim and thus, the references do not anticipate as a matter of law.  *See Union Carbide,* 308 F.3d at 1188.

Defendants' own technical expert, Mr. David Kurrasch, offers no admissible opinion whatsoever that claims 5, 6, 11, or 16 of the '988 are anticipated[4], and Defendants offer no other evidence or opinion that those claims are anticipated.  Also, Mr. Kurrasch offers only an unsupported conclusion that claims 14 and 18 are anticipated.  Finally, although Mr. Kurrasch opines that claims 1-4, 8-10, and 13 of the '988 patent are anticipated by one or more references, his opinions are severely flawed and based on assumptions and mischaracterizations of the explicit teachings of the prior art, and thus cannot support a finding of anticipation as a matter of law.

---

[4] Mr. Kurrasch has attempted to belatedly insert into this case a new opinion that claims 5, 6, 11, 14, 16 and 18 are anticipated by inserting gratuitous citations to Robert Hills' deposition into two untimely supplemental expert reports.  As explained at length in LML's motions to strike Mr. Kurrasch's first and second supplemental expert reports, only Mr. Kurrasch's original "Expert Report of David P. Kurrasch Regarding Invalidity" was timely filed and served.  In Kurrasch's original report, there is no allegation that claims 5, 6, 11, and 16 are anticipated, and there is only a conclusory statement with no analysis regarding the alleged anticipation of claims 14 and 18.

**VII.    The Carlson '607 Patent Does Not Anticipate The Asserted Claims Of The '988 Patent**

Defendants contend in conclusory fashion that Carlson '607 anticipates claims 1, 2, 4, 9-10, 14, and 18 of the '988 patent.[5]  (Ex. 10, ¶ 238).  However, Carlson '607 does not teach at least a central computer system as required by claims 1-4, 8-10, 14 and 18 or a second communication means as required by claims 1-4 and 9-10 and 14, and so LML is entitled to summary judgment that claims 1-4, 8-10, 14 and 18 of the '988 patent are not anticipated by Carlson '607.

> 1.    *Carlson '607 does not disclose a "central computer system" as required by claims 1, 2, 4, 9-10, 14, and 18*

As an initial matter, the Carlson '607 patent was considered by the Examiner during prosecution of the '988 patent, and the Examiner allowed the '988 patent to issue over the '607 patent.  "Where, as here, the PTO previously considered the prior art reference, [a defendant] bears an even heavier burden to prove invalidity." *Metabolite*, 370 F.3d at 1368; *see also, e.g., Interconnect Planning Corp.*, 774 F.2d at 1139. Defendants cannot overcome this "heavy burden" to prove the '607 patent anticipates the '988 patent for the following reasons.

Claims 1 and 9 of the '988 Patent both require a "central computer system," and accordingly the asserted dependent claims 2, 4, 10, 14, 16 and 18 (i.e., the claims Defendants assert are anticipated by Carlson '607) also require a central computer

---

[5] Defendants do not contend, and have never even alleged, that Carlson '607 anticipates claims 5, 6, 9, 11, and 16.  (*See, e.g.,* Ex. 10, ¶ 238).  Therefore, LML is entitled to summary judgment that the '607 patent does not anticipate claims 5, 6, 9, 11, and 16 as a matter of law.

system.  Under any possible construction of a "central computer system",[6] claims 1 and 9 of the '988 Patent are not anticipated by the Carlson '607 patent because it does not disclose such a central computer system.  Instead, the '607 patent discloses a point-of-sale device that directly communicates with multiple check-writer's banks and merchant's banks to request funds transfers between these banks.  (Ex. 6 at 3:35-40; Ex. 3, Tinkel Declaration ¶ 44).  In a system serving even part of a country such as the United States, this would require contacting a large number of individual, unrelated banks over a wide area.  Thus, the '607 patent contemplates a point of sale device that will contact a disbursed and unrelated group of computers, not a central computer system.

> 2.  *Carlson '607 does not disclose a "second communication means" as required by claims 1, 2, 4, 9-10 and 14*

Moreover, the Carlson '607 reference does not disclose a central computer system having a *second communication means* for receiving information from a plurality of point of sale terminals and for enabling the central computer system to communicate with external databases for performing consumer bank account status searches as required by the '988 patent.  The parties have to the construction of this term under 35 U.S.C. § 112, ¶6:

> This function is written in means-plus-function format pursuant to 35 U.S.C. 112(6).
>
> The recited function of this limitation is enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the [a] bank check as a negotiable instrument.

_____

[6] The parties agree that the term "central computer system" is clear on its face and needs no construction.

> The structures disclosed in the patent for performing the recited function of this limitation are a modem, network interface, enhanced radio transmission interface, satellite communication interface or equivalent.

(Ex. 12, Joint Claim Construction Statement).

Under this construction, the '607 patent does not disclose such a second communication means for communicating with a plurality of terminals. The '607 patent makes it clear that the "verification of the existence of the payor's account" is done by the payor's bank CPU and not a central computer: "(a) the payor's bank CPU means encrypts/decrypts the data package as necessary, (b) there is verification of the existence of the payor's account." (Ex. 6, 24:10-13; Ex. 3, Tinkel Declaration ¶ 45). Since the '607 patent is directed to a *point of sale device* that only communicates with multiple, unrelated banks, it does not expressly or inherently disclose a second communication means that enables a *central computer system* to receive information from a plurality of point of sale terminals.

Similarly, there is no express or inherent disclosure in the '607 patent of a central computer system that is enabled to communicate with external databases or for transferring funds, the second required function of the second communication means of claims 1 and 9 of the '988. The '607 patent does not disclose any computer system having such a communication means for communicating with an external database for performing a consumer bank account status search. (Ex. 3, Tinkel Declaration ¶ 46). As discussed above, the '607 patent makes it clear that any verification that occurs involves a POS device (not a central computer) contacting the "payor's bank CPU" for "verification of the existence of the payor's account" rather than accessing a database of account information. (Ex. 6, 24:10-13; Ex. 3, Tinkel Declaration ¶ 46).

-14-

Furthermore, neither Defendants nor their expert, David Kurrasch, provide any analysis whatsoever that the '607 patent anticipates any claim element of the '988 patent. (Kurrasch provides no analysis showing the '607 patent anticipates in his original report, nor does he provide *any* analysis in any of his untimely supplemental reports). In the *summary* section of his original report, Mr. Kurrasch merely concludes that claims "1-4, 8-10, 14 and 18 of the '988 patent . . . are anticipated under § 102(b) by U.S. Patent No. 5,053,607 ("Carlson '607")." (Ex. 10, Kurrasch Report, ¶ 164). This conclusion is repeated nearly verbatim at ¶ 238 of the report, along with the *promise* of an analysis in the form of a claim chart at Exhibit 32 (the claim charts) to the report. (Ex. 10, Kurrasch Report, ¶ 239). Kurrasch, however, provides no such analysis showing anticipation of the '988 patent by the '607 patent in Exhibit 32. Instead, the only discussion of Carlson '607 in Mr. Kurrasch's claim charts is with respect to obviousness when combined with other references. (Ex. 11, Kurrasch Report Claim Chart Part 2 of 2 at 1-8).

In addition, Defendants have provided no analysis in their interrogatory responses showing how the '607 patent anticipates *any* claims of the '988 patent. Defendants have not even *alleged* that the '607 patent anticipates the Asserted Claims in their responses.

Because the '607 patent does not disclose the central computer system required by claims 1-4, 8-10, 14 and 18 or the second communication means required by claims 1-4, 8-10, and 14 of the '988 patent, and because Defendants have presented no evidence or analysis that the '607 patent anticipates any claims of the '988 patent, LML is entitled to summary judgment as a matter of law that the '607 patent does not anticipate any asserted claims (claims 1, 2, 4-6, 9-11, 14, 16 and 18) of the '988 patent.

**VIII.  The Carlson '714 Patent Does Not Anticipate The Asserted Claims Of The '988 Patent**

Defendants contend that Carlson '714 anticipates claims 1, 2, 4, and 9-10 of the '988 patent.[7]  (Ex. 10, ¶ 236).  However, Carlson '714 does not teach at least a central computer system or a second communication means as required by claims 1, 2, 4, and 9-10.  Thus, LML is entitled to summary judgment that claims 1-4 and 8-10 are not anticipated by Carlson '714.

> 1.  *Carlson '714 does not disclose a "central computer system" as required by claims 1, 2, 4, and 9-10*

As a preliminary matter, the '714 is a continuation-in-part of the Carlson '896 patent which was considered by the Examiner during the prosecution of the '988 patent. Regarding any possible elements the '714 patent discloses that are arguably present in the '988 patent, the '714 patent is merely cumulative to the '896 patent.  The Examiner considered the '607 and '896 Patents in Office Actions but still allowed the claims of the '988 patent to issue.  (Ex. 7, LML-EP-000192-94).  "Where, as here, the PTO previously considered the prior art reference, [a defendant] bears an even heavier burden to prove invalidity."  *Metabolite*, 370 F.3d at 1368; *see also, e.g., Interconnect Planning Corp.*, 774 F.2d at 1139.  This heavier burden applies not only when the defendant cites a *specific* reference that was before the Examiner, but also when the defendant cites prior art that, like the '714 patent, is *cumulative* of the references the Examiner considered. *Metabolite,* 370 F.3d at 1368.  ("The one reference that the examiner did not consider is

---

[7] Defendants do not contend, and have never even alleged, that Carlson '714 anticipates claims 5, 6, 11, 14, 16 and 18.  (*See, e.g.,* Ex. 10, ¶ 236).  Therefore, LML is entitled to summary judgment that the '714 patent does not anticipate claims 5, 6, 9, 11, and 16 as a matter of law.

cumulative of the others. Thus, the heavy burden of proof in the anticipation case also applies to obviousness," *citing Hewlett-Packard v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1467 (Fed. Cir. 1990)).

Claims 1 and 9 of the '988 Patent both require a "central computer system," and accordingly dependent claims 2, 4, and 10 (i.e., the remaining claims Defendants allege are anticipated by Carlson '714) also require a central computer system.    Under any possible construction of a "central computer system",[8] claims 1 and 9 of the '988 Patent are not anticipated by the Carlson '714 patent because it does not disclose such a central computer system.    The '714 patent discloses a point-of-sale device that directly communicates with a check-writer's bank to request a funds transfer.    (Ex. 8, 2:9-20: The "secured point-of-sale mechanism" has a CPU that "would connect the system to the customer's own bank and the check could be verified for sufficient funds"; Ex. 3, Tinkel Declaration ¶ 41).   In a system serving even part of a country such as the United States, connecting to each "customer's own bank" would require contacting a large number of individual banks over a wide area.   Thus, the '714 patent contemplates that the device will contact a disbursed and unrelated group of computers, not a central computer system.

### 2. *Carlson '714 does not disclose a "second communication means" as required by claims 1, 2, 4, and 9-10*

Moreover, the Carlson '714 reference does not disclose a central computer system having a *second communication means* for receiving information from a plurality of point of sale terminals and for enabling the central computer system to communicate with

---

[8] As noted above, the parties agree that the term "central computer system" is clear on its face and needs no construction.

external databases for performing consumer bank account status searches as required by

the '988 patent.  The parties have to the construction of this term under 35 U.S.C. § 112,

¶6:

> This function is written in means-plus-function format pursuant to 35 U.S.C. 112(6).
>
> The recited function of this limitation is enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the [a] bank check as a negotiable instrument.
>
> The structures disclosed in the patent for performing the recited function of this limitation are a modem, network interface, enhanced radio transmission interface, satellite communication interface or equivalent.

(Ex. 12, Joint Claim Construction Statement).

Under this construction, the '714 patent does not disclose any computer system

having such a second communication means for communicating with a plurality of

terminals.  Since the '714 patent is directed to a *point of sale device* that only

communicates with multiple, unrelated banks, it does not expressly or inherently disclose

a second communication means that receives information from a plurality of point of sale

terminals.

Similarly, there is no express or inherent disclosure in the '714 patent of a central

computer system that is enabled to communicate with external databases or for

transferring funds, the second required function of the second communication means of

the '988 patent.  The '714 patent does not disclose any computer system having such a

second communication means for communicating with an external database for

performing a consumer bank account status search. (Ex. 3, Tinkel Declaration ¶ 42).  The

'714 patent makes it clear that any verification that occurs involves a POS device (not a central computer) contacting "the very bank [a] particular check issued from," rather than accessing a database of account information. (Ex. 8, 9:28; Ex. 3, Tinkel Declaration ¶ 41-42).

Mr. Kurrasch attempts to infer without stating directly that the '714 patent discloses a central computer system by simply parroting a portion of the '714 patent itself: "[t]he point-of-sale device could include means to access a computer system maintained by an issuer of a negotiable instrument, credit card and the like . . ." (Ex. 15, Kurrasch Report Claim Chart 1 of 2, at 1). This is the totality of Mr. Kurrasch's purported analysis.[9] Tellingly, the cited passage says nothing about the computer system being "central" and Mr. Kurrasch offers no further explanation why he believes the '714 patent discloses a *central* computer system. It is not at all surprising that the '714 patent does not offer more detail regarding any possible computer or system to which a point of sale device may connect: the '714 patent is focused on a "secured point of sale mechanism" and only tangentially discusses a system in which the mechanism might operate. (Ex. 8, Abstract; Ex. 3, Tinkel Declaration ¶ 41).

The '714 patent provides no details regarding any computer system, let alone a central computer system. The '714 patent has 16 Figures, and none of them show *any* equipment or system beyond the point of sale. (Ex. 8, Figs. 1-16). Amazingly, Mr. Kurrasch finds that the '714 patent discloses a central computer system with all the features claimed in the '988 patent based on, and *only* on, the Carlson '714 patent's mere

_____

[9] Mr. Kurrasch offers a shorter version of the above quote in Exhibit 8 to his report, again with no further explanation.

mention that the claimed <u>point of sale mechanism</u> could "be modified [to include] means to access a computer system." (Ex. 15, Kurrasch Report Claim Chart, Pt. 1 of 2 at 1, 6; Ex. 8, 2:9-12). This simply does not show that the '714 patent's inventor had "possession of" the invention of the '988 patent. *In re Spada*, 911 F.2d at 708 (Fed.Cir.1990) ("the reference must describe the applicant's claimed invention sufficiently to have placed a person of ordinary skill in the field of the invention in possession of it").

In addition, Mr. Kurrasch states, without citation or explanation, that he believes a second communication means for receiving information from a plurality of point of sale terminals is "inherent" in the '714 patent. (Ex. 15, Kurrasch Report Claim Chart Part 1 of 2 at 2). This is incorrect. As discussed above, the POS devices in the '714 patent communicate with a number of dispersed computers, not a central computer system; the '714 patent does not disclose a single *central* computer system that can receive information from a plurality of terminals. The citations in Mr. Kurrasch's claim chart refer <u>not</u> to a central computer system but to the device <u>at the point of sale</u> directly communicating with a check writer's financial institution. (*Id.*).

Because the '714 patent does not disclose the central computer system or the second communication means required by claims 1, 2, 4, and 9-10 of the '988 patent, and because Defendants have presented no evidence or analysis that the '714 patent anticipates claims 5, 6, 11, 14, 16, or 18 of the '988 patent, LML is entitled to summary judgment as a matter of law that the '714 patent does not anticipate any Asserted Claims (claims 1, 2, 4-6, 9-11, 14, 16 and 18) of the '988 patent.

**IX.    The Higashiyama '682 Patent Does Not Anticipate The Asserted Claims Of The '988 Patent**

Defendants contend that Higashiyama '682 anticipates claims 1, 4 and 9-10 of the '988 patent.  (Ex. 10, ¶ 229).  However, Higashiyama '682 does not teach at least a central computer system or a second communication means as required by claims 1, 4 and 9-10.  Thus, LML is entitled to summary judgment that claims 1, 4 and 9-10 are not anticipated by Carlson '714.[10]

> 1.    *Higashiyama '682 does not disclose a "central computer system" as required by claims 1, 4 and 9-10*

Claims 1 and 9 of the '988 Patent both require a "central computer system," and accordingly the asserted dependent claims 4 and 10 (i.e., the only claims Defendants have alleged are anticipated by Higashiyama in Mr. Kurrasch's original expert report) also require a central computer system.    Defendants' only evidence that Higashiyama discloses a central computer system is in an opinion from their alleged expert, Mr. Kurrasch, who implies that the "backroom processor" of Higashiyama is a "central computer system" as recited in claims 1, 4 and 9-10 of the '988 Patent.  (Ex. 15, Kurrasch Report, Claim Chart 1 of 2 at 26-27).  However, the backroom processor of Higashiyama

---

[10] The Higashiyama reference was considered by the Examiner during prosecution of LML's '528 and '366 patents.  The Examiner allowed those patents to issue with claims nearly identical to the asserted claims of the '988 patent.  (*See* Ex. 14 (the cover page of the '366 patent, indicating it is a continuation of the '528 patent, and also listing Higashiyama '682 as a reference considered by the Examiner).

is *not* a central computer system as required in the '988 Patent.[11]   (Ex. 3, Tinkel Declaration, ¶ 50-51).

The central computer system of the '988 patent, in addition to serving multiple merchants, must also be enabled to communicate with external databases for account verification.  (Ex. 2, 11:51-53; 12:62-64; Ex. 3, Tinkel Declaration ¶ 51).  The backroom processor of Higashiyama, on the other hand, is not a central computer system but only a front-end computer.

**REDACTED**

In addition, the backroom processor of Higashiyama is not enabled to communicate with any external databases; the only suggestion in Higashiyama of any function even requiring the backroom processor to communicate outside of a merchant's system is uploading "data records" to banks or a clearing house.  (Ex. 9, 5:11-13: "Periodically, backroom processor 204 will take the data records it has accumulated and upload them to a clearing house.").  As will be explained in detail in the next section, only *POS terminal 201* is enabled to communicate with any external databases in Higashiyama.   Thus, Higashiyama does not disclose a central computer system as required by claims 1, 2, 4-6, 9-11, 14, 16 and 18 of the '988 patent.

------------

[11]
**REDACTED**

2.  *Higashiyama does not disclose a "second communication*
*means enabling said central computer system to communicate*
*with external databases" as required by claims 1, 2, 4-6, 9-11*
*and 14*

Claims 1 and 9 of the '988 Patent both require a "second communication means
enabling said central computer system to communicate with external databases," and
accordingly the asserted dependent claims 2, 4-6, 10, 11 and 14 also require the second
communication means.

Higashiyama does not disclose a second communication means that enables a
central computer system (or even the "backroom processor") to communicate with
external databases for performing a consumer bank account status search.  The parties
have to the construction of this term under 35 U.S.C. § 112, ¶6:

> This function is written in means-plus-function format pursuant to 35
> U.S.C. 112(6).
>
> The recited function of this limitation is enabling said central computer
> system to communicate with external databases for performing a
> consumer bank account status search and further enabling automated
> clearing house communication for transferring funds without using the [a]
> bank check as a negotiable instrument.
>
> The structures disclosed in the patent for performing the recited function
> of this limitation are a modem, network interface, enhanced radio
> transmission interface, satellite communication interface or equivalent.

(Ex. 12, Joint Claim Construction Statement).

Under this construction, Higashiyama '682 does not disclose such a second
communication means.   The only communication interface shown or discussed in
Higashiyama that could be used by the backroom processor for external communications
is telecommunications unit 205. (Ex. 9, 5:30-31; Fig. 2; Ex. 3, Tinkel Declaration ¶ 65).
However, telecommunications unit 205 of Higashiyama does not enable the backroom

-23-

processor to communicate with external databases for consumer bank account status searches. (Ex. 3, Tinkel Declaration ¶ 66-69).

Higashiyama makes *no mention* of its "backroom processor" communicating with external databases or performing bank account status searches. Instead, the backroom processor merely receives "data file[s] maintained by POS terminal 201," either "on a periodic basis or at the end of a shift." (Ex. 9, 5:2-4; Ex. 3, Tinkel Declaration ¶ 66). The backroom processor uses these data files to upload information to a clearing house or a bank, not for communication with external databases or for account verification. (Ex. 9, 5:26-27; Ex. 3, Tinkel Declaration ¶ 66).

In Higashiyama, it is not the backroom processor but "POS terminal 201" that performs all communications for authorizing transactions, as explained in detail above. This is clear from the specification because POS terminal 201 creates data records that are required for check authorizations that must be made during transactions; these data records may not be communicated to backroom processor 204 until well *after* transactions have been completed. (Ex. 3, Tinkel Declaration ¶ 67).


## REDACTED


In Higashiyama's system, checks are read by a "MICR reader 202," and "POS terminal 201 then provides additional information in order to create a data record for this transaction which is being paid for by check." (Ex. 9, 3:49-53; Ex. 3, Tinkel Declaration ¶ 69). "Data records" are thus created by POS terminal 201, not by the backroom

processor 204. (Ex. 9, 5:1; Ex. 3, Tinkel Declaration ¶ 69-70). "If desired, the data record is then used to verify check authorization, for example, by being compared to a positive file (which lists all allowable checking account numbers)." (Ex. 9, 4:14-17). The data record can also be compared against a negative file. (Ex. 9, 4:17-22). Thus, data records are *required* for authorizations of checks since they have critical information regarding transaction amounts and account numbers. (Ex. 3, Tinkel Declaration ¶ 69).

Moreover, Higashiyama discloses that *after* POS terminal 201 creates a data record and performs an optional authorization, POS terminal 201 can send a data file that includes multiple data records to the backroom processor. This is usually done "on a periodic basis or at the end of a shift." (Ex. 9, 5:4). In contrast, check authorizations using Higashiyama's system occur *before* transactions are completed at the terminal 201. (Ex. 9, 4: 22-25; Ex. 3, Tinkel Declaration ¶ 70). This is clear because if "authorization is not provided, the transaction can, if desired, be cancelled by the merchant." (Ex. 9, 4:22-25).

Since the transmittal of data records at the time of transactions are required for authorizations in Higashiyama, and because the backroom processor typically only receives data records periodically or at the end of a shift, the backroom processor cannot perform "a consumer bank account status search" as required in the '988 patent. (Ex. 3, Tinkel Declaration ¶ 71). Thus, Higashiyama does not disclose a second communication means that enables its "backroom processor" to "communicate with external databases for performing a consumer bank account status search" as required by claims 1 and 9 of the '988 Patent.

Mr. Kurrasch implies that Higashiyama discloses a second communication means as recited in claims 1 and 9 of the '988 Patent. (Ex. 15, Kurrasch Report Claim Chart 1 of 2 at 26-27). He implies this by juxtaposing a description of some functions of Higashiyama's backroom processor across from the second communication means element in his claim chart. (Ex. 15, Kurrasch Report Claim Chart 1 of 2, at 26-27). The following paragraph is the "analysis" offered by Mr. Kurrasch to purportedly show that Higashiyama discloses a second communication means that enables a central computer system to communicate with external databases:

> Backroom processor 204 will take the data records it has accumulated and upload them to a clearing house. (See col. 5, lines 11-13.) The data record is also used to verify check authorization by being compared to a file. (See col. 4, lines 14-24.) The information from the paper check is electronically processed and the check is returned to the customer at the point of sale. (See col. 4, lines 54-57.)

*Id.* This is really not an analysis at all. In his chart, Mr. Kurrasch does not point to ***any*** particular structure in Higashiyama that he believes anticipates the '988 patent's "second communication means," nor does he explain how this "ghost" structure enables a "central computer system to communicate with external databases." Mr. Kurrasch ignores the fact that, as detailed above, check verifications occur <u>before</u> data uploads, which defeats his implication that the backroom processor performs the check verifications.

In his preface to Exhibit 7 of his expert report, Mr. Kurrasch also claims that the "backroom central processing computer is connected to a telecommunications unit capable of data communications with check clearing houses, as well as the '*merchant's bank . . . the merchant's collection agency, check authorization services, and check*

*verification services.*'"  (Ex. 18, Kurrasch Expert Report Exhibit #7 comments, at 2). (*quoting* Higashiyama, Ex. 9 at 7:55-8:2) (emphasis added).

The composite of Mr. Kurrasch's words and the quoted portion of Higashiyama (in italics above) results in an outrageously false implication--that the telecommunications unit links a "backroom central processing computer" to a check verification service.   As an initial matter, Higashiyama <u>never</u> uses the term "backroom central processing computer" -- that phrase is Mr. Kurrasch's invention.   More importantly, the quoted portion is completely out of context.  According to Higashiyama, when an issuing bank does not honor a check, the issuing bank issues an exception report:

> If desired, this exception report can be used by either the issuing bank, the Federal Reserve Bank, the Automated Clearing House, the merchant's bank, or the merchant itself in order to notify other interested parties. Such other interested parties include the *merchant's bank* which must deduct the amount of the check which has not be [sic] honored by the issuing bank, the merchant, *the merchant's collection agency, check authorization services, and check verification services.*

(Ex. 9, 7:61-8:2)   (emphasis added to the non-contextual portion quoted by Mr. Kurrasch).  There is absolutely no mention here, or anywhere else in Higashiyama, of a central computer communicating with an external database, a check authorization service, or a check verification service.  In fact, there is simply no disclosure in Higashiyama regarding how an exception report is "used", but clearly Higashiyama did not contemplate electronically sending it to all the entities listed as possible recipients, as there is not even any suggestion that merchants or collection agencies, for example, could electronically receive and process exception reports.

Because Higashiyama does not disclose a second communication means enabling a central computer system to communicate with external databases, claims 1, 2, 4-6, 9-11 and 14 of the '988 Patent are not anticipated by Higashiyama.

> 3. *Higashiyama '682 does not disclose a "first communication means integral to a point of sale terminal" as required by claims 1, 2, 4-6, 9-11, and 14*

Higashiyama '682 also fails to disclose a first communications means integral to a point of sale terminal for electronically communicating with a central computer system as required by claims 1, 2, 4-6, 9-11 and 14.[12]    Under any reasonable construction, Higashiyama '682 does not teach this element.

While Higashiyama discloses a "telecommunications unit 205" connected to POS terminal 201, this telecommunications unit is not *integral* to the POS terminal as required by the claims.  Indeed, Figure 2 of Higashiyama '682 (reproduced below) shows a point of sale system inside a dotted box.  (Ex. 9, Fig. 2).  Figure 2 also shows that telecom unit 205 is not only separate from the POS terminal, but separate from the entire POS system 210.  (Ex. 9, Fig. 2).

While the specification states, without further details, that the POS terminal and the backroom processor are "connected," this is *far* from a clear and convincing description of a communication means "integral" to the point of sale terminal. (Ex. 9, 3:29).[13]

_____

[12] The parties agree that the term "first communication means integral to a point of sale terminal" is clear on its face and needs no construction.

[13] Mr. Kurrasch does not even offer an opinion that Higashiyama discloses a first communication means *integral* to a point of sale terminal.  He merely states that



**FIGURE 2**

Thus, Higashiyama does not explicitly disclose an integral communication interface, nor is it clear what kind of "connection" was intended. "A single reference must describe the claimed invention with sufficient precision and detail to establish that the subject matter existed in the prior art." *See, e.g. Verve,* 311 F.3d at 1120 , *quoting In re Spada*, 911 F.2d at 708 ("the reference must describe the applicant's claimed invention sufficiently to have placed a person of ordinary skill in the field of the invention in possession of it"). Here, Higashiyama simply does not have that level of precision and detail regarding a "first

---

"POS terminal 201 (which is part of the point of sale system) is connected to the backroom processor 204." (Ex. 15, Kurrasch Report Claim Chart 1 of 2 at 26).

-29-

communication means **integral** to [a] point of sale terminal." In fact, just the opposite is true--the telecommunications unit 205 is separate and apart from the POS terminal in Higashiyama. (Ex. 9, Fig. 2).

Because Higashiyama does not disclose a first communication means integral to a point of sale terminal, Higashiyama does not anticipate claims 1, 2, 4-6, 9-11 and 14. Thus, LML is entitled to summary judgment as a matter of law that claims 1, 2, 4-6, 9-11 and 14 are not anticipated by Higashiyama.

> 4. *Higashiyama '682 does not disclose a "resident third party database" as required by claims 5 and 11*

Higashiyama '682 also fails to disclose a resident third party database as required by claims 5 and 11.[14] Under any reasonable construction, Higashiyama '682 does not teach this element. In his untimely-filed supplemental report, Mr. Kurrasch refers to several remote "positive" and "negative" files that are mentioned in Higashiyama, but there is simply no indication that any of these "databases" are resident to any particular computer. (Ex. 3, Tinkel Declaration, ¶ 75). Also, as discussed below, Mr. Kurrasch's supplemental report is not admissible evidence, and it is the **only** place Defendants even allege that claims 5 and 11 are anticipated.

Because Higashiyama does not disclose a resident third party database, Higashiyama does not anticipate claims 5 and 11, and in addition, Defendants cannot offer any admissible evidence that claims 5 and 11 are anticipated. Thus, LML is entitled

---

[14] The parties agree that the term "resident third party database" is clear on its face and needs no construction.

to summary judgment as a matter of law that claims 5 and 11 are not anticipated by Higashiyama.

### 5. *Higashiyama '682 does not disclose a "system subscriber database" as required by claim 6*

Higashiyama '682 also fails to disclose a system subscriber database as required by claim 6.[15]  Under any reasonable construction, Higashiyama '682 does not teach this element.  (Ex. 3, Tinkel Declaration, ¶ 76).  In his untimely-filed supplemental report,[16] Mr. Kurrasch makes the conclusory statement that "[a] list of merchants eligible to utilize the system is inherent," and that is the *only* evidence Defendants have that Higashiyama discloses a system subscriber database.  Indeed, Mr. Kurrasch concedes that Higashiyama does not explicitly disclose a "system subscriber database," but merely states without explanation that the element is "inherent."

This is far from sufficient evidence, let alone the clear and convincing evidence needed to avoid summary judgment.  "To serve as an anticipation when the reference is silent about the asserted inherent characteristic, such gap in the reference may be filled with recourse to extrinsic evidence.  Such evidence must make clear that the missing descriptive matter is *necessarily* present in the thing described in the reference, and that it would be so recognized by persons of ordinary skill."  *Continental Can*, 948 F.2d at 1268 (emphasis added).  Mr. Kurrasch has done *nothing* to fill this "gap" in the Higashiyama reference.  Also, as discussed below, Mr. Kurrasch's supplemental report is not

---

[15] The parties agree that the term "system subscriber database" is clear on its face and needs no construction.

[16] Mr. Kurrasch did not even opine that claim 6 was anticipated by Higashiyama in his original expert report.  (Ex. 10, ¶ 229).

admissible evidence, and it is the only place Defendants even allege that claim 6 is anticipated.

Because Higashiyama does not disclose a system subscriber database, Higashiyama does not anticipate claim 6, and in addition, Defendants cannot offer any admissible evidence that claim 6 is anticipated. Thus, LML is entitled to summary judgment as a matter of law that claim 6 is not anticipated by Higashiyama.

## X.    Defendants Cannot Present Any Admissible Evidence That Claims 5, 6, 11, 14, 16 And 18 Of The '988 Patent Are Anticipated

During discovery, Defendants made no argument, and presented no evidence through response to interrogatories or otherwise, that claims 5, 6, 11, 14, 16 and 18 of the '988 patent were invalid as anticipated by any reference. Moreover, Defendants' expert on issues of invalidity, David P. Kurrasch, offered no such opinion in his Original Expert Report.[17] While Mr. Kurrasch later improperly supplemented his expert report to add new, previously undisclosed anticipation argument with respect to claims 5, 6, 11, 14, 16 and 18, these opinions are not admissible. *See* LML's Motion To Strike Portions Of David P. Kurrasch's Supplemental Expert Report Regarding Invalidity (filed September 21, 2005) and LML's Motion To Strike The Second Supplemental Expert Report Of David P. Kurrasch Regarding Invalidity (filed October 7, 2005). Moreover, Mr. Kurrasch did not perform the proper invalidity analysis because he failed to construe, or even have an understanding of, the claim terms on which he opined. *See* LML's Daubert

---

[17] As discussed above, Mr. Kurrasch did make a conclusory statement that claims 14 and 18 were anticipated. (Ex. 10, ¶ 238:"In my opinion, claims [14 and 18] of the '988 patent . . . are anticipated under §102(b) by the Carlson '607 patent"). However, he provided no element-by-element analysis whatsoever showing how he believed claims 14 and 18 were anticipated.

Motion No. 1: For A Ruling Limiting The Testimony Of David P. Kurrasch (filed concurrently with this motion). Accordingly, Defendants can present no evidence of invalidity with respect to claims 5, 6, 11, 14, 16 and 18, and thus LML is entitled to summary judgment of no anticipation with respect to claims 5, 6, 11, 14, 16 and 18 as a matter of law.

## CONCLUSION

For the foregoing reasons, LML respectfully requests that this Court grant LML summary judgment that all the Asserted Claims (1, 2, 4-6, 9-11, 14, 16 and 18) of the '988 Patent are not anticipated.

DATED: October 28, 2005

Richard K. Herrmann #405
Mary B. Matterer #2696
MORRIS JAMES HITCHENS &
WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
(302) 888-6800
rherrmann@morrisjames.com
mmatterer@morrisjames.com

Russell E. Levine, P.C.
Jamie H. McDole
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000
Attorneys for LML Patent Corp.

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of November, 2005, I electronically filed the foregoing document, **PUBLIC VERSION OF LML'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT NO. 4: FOR A RULING THAT CLAIMS 1, 2, 4-6, 9-11, 14, 16 AND 18 OF THE '988 PATENT ARE NOT ANTICIPATED**, with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Collins J. Seitz, Jr., Esq.
Francis DiGiovanni, Esq.
Connolly Bove Lodge & Hutz LLP
1007 North Orange Street
Wilmington, DE 19801

William J. Marsden, Jr., Esq.
Timothy Devlin, Esq.
Fish & Richardson, P.C.
919 North Market Street, Suite 1100
Wilmington, DE 19801

Richard D. Kirk, Esq.
The Bayard Firm
222 Delaware Avenue, 9th Floor
Wilmington, DE 19801

Additionally, I hereby certify that on the 4th day of November, 2005, the foregoing document was served via email on the following non-registered participants:

Robert Jacobs, Esq.
Mark B. Mizrahi, Esq.
Belasco Jacobs & Townsley, LLP
Howard Hughes Center
6100 Center Drive, Suite 630
Los Angeles, CA 90045

Mark C. Scarsi, Esq.
Vision L. Winter, Esq.
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071

_____/s/ Mary B. Matterer_____
Richard K. Herrmann (#405)
Mary B. Matterer (#2696)
MORRIS, JAMES, HITCHENS
& WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
(302) 888-6800
mmatterer@morrisjames.com

Attorneys for Plaintiff LML PATENT CORP.