# EXHIBIT 6

# United States Patent [19]

## Carlson et al.

[11]  Patent Number:  **5,053,607**

[45]  Date of Patent:  **Oct. 1, 1991**

[54]  **POINT-OF-SALE DEVICE PARTICULARLY ADAPTED FOR PROCESSING CHECKS**

[76]  Inventors:  Steven R. Carlson; Paul R. Carlson, both of 417 2nd Ave., Beach, N. Dak. 58621

[21]  Appl. No.:  **362,164**

[22]  Filed:  **Jun. 6, 1989**

### Related U.S. Application Data

[63]  Continuation-in-part of Ser. No. 219,735, Jul. 15, 1988, which is a continuation-in-part of Ser. No. 70,816, Jul. 6, 1987, Pat. No. 4,758,714, which is a continuation-in-part of Ser. No. 915,505, Oct. 6, 1986, Pat. No. 4,678,896.

[51]  Int. Cl.$^5$ .......................................... G06F 15/30
[52]  U.S. Cl. ........................... 235/379; 235/432; 902/18; 902/39; 364/406
[58]  Field of Search ............... 235/379, 432, 433, 435; 902/18, 20; 364/406

[56]  **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,786,421 | 1/1974 | Wostl et al. | 340/149 |
| 4,027,142 | 5/1977 | Paup et al. | 235/475 X |
| 4,404,649 | 9/1983 | Nunley et al. | 235/379 X |
| 4,439,670 | 3/1984 | Bassett et al. | 235/382 |
| 4,453,074 | 6/1984 | Weinstein | 235/380 |
| 4,617,457 | 10/1986 | Granzow et al. | 902/18 X |
| 4,678,895 | 7/1987 | Tateisi et al. | 235/379 |
| 4,810,866 | 3/1989 | Lord | 235/379 |

*Primary Examiner*—David L. Trafton
*Attorney, Agent, or Firm*—Dorr, Carson, Sloan & Peterson

[57]  **ABSTRACT**

A check processing device is particularly adapted for retailer/customer use at the point-of-sale through use of a MICR read head means, printer means and keypad means which feed information into a CPU which communicates, through an existing telecommunication system, with the customer's bank and the retailer's bank in order to transfer funds from the account of the customer to the account of the retailer.

**18 Claims, 5 Drawing Sheets**





Fig. 1



*Fig. 2*



*Fig. 3*

Case 1:04-cv-00858-SLR    Document 393-2    Filed 11/04/2005    Page 5 of 51



*Fig. 4*



*Fig. 5*



*Fig. 6*



*Fig. 7*

5,053,607

1

## POINT-OF-SALE DEVICE PARTICULARLY ADAPTED FOR PROCESSING CHECKS

### CROSS REFERENCE TO RELATED APPLICATIONS

This patent application is a continuation-in-part of our co-pending U.S. patent application Ser. No. 219,735 filed July 15, 1988 which is a continuation-in-part of U.S. patent application Ser. No. 70,816 filed July 6, 1987, now U.S. Pat. No. 4,758,714 which, in turn, is a continuation-in-part of U.S. patent application Ser. No. 915,505 filed Oct. 6, 1986, now U.S. Pat. No. 4,678,896.

### FIELD OF THE INVENTION

Although there are several different ways to pay for goods or services today at the point of sale, among them cash, checks, credit cards, debit cards, drafts, the consensus seems to remain that a "cashless/checkless" society is not far in the future. Credit card trade is now highly competitive since it is profitable for the sponsoring banks as well as the merchant making the sale. Electronically transferred funds are made possible by "debit cards" which require "on line" or full-time hookups to the issuing bank, that is the bank of the cardholder [customer] and to the payee's bank (e.g., to the retailer's bank). However, this type of full time hookup requires sophisticated networking resources and a complicated interface switch system between the various participants.

Obviously "cash" sales are the most reliable (assuming no counterfeiting activities take place) for the retailer; that is to say, they are reliable because the retailer has his non-revokable funds in hand before the sale is completed. Most other kinds of transactions involve more risk. For example, credit card sales, even if "approved" by the issuing card company, have associated therewith some uncertainty on the part of the retailer because of the possibility of the sale being rescinded in view of the credit rights of the cardholder, including his right to instruct the issuing bank not to pay the retailer until whatever difficulty encountered by the customer has been resolved. Obviously, this right in effect holds the retailer's funds ransom subject to complete satisfaction of the customer in resolving the complaint whether real or imagined. Credit card sales are not a complete windfall to the card holder either; he or she is charged a percentage fee at usually higher than bank rates for "carrying" the card holder; such rates can range from a few points above prime rate to several points.

Smart cards also have received a great amount of attention; but to date, only a few experiments have been initiated in the United States. Hence the personal check remains one of the most widely used means of payment. The method of using the check has remained virtually unchanged since its conception, but the means of processing such checks has improved considerably over the years. Much of this change has come about by the Federal Reserve system's (FED's) introduction of a Magnetic Ink Character Recognition system (MICR), examples of which can be seen along the bottom of checks and other negotiable instruments. The MICR line allows high speed, electronic reading of that data designating the proper bank and account to be identified and converting such data into electronic messages to be sent through the National Automated Clearing House system.

2

However, the problems of handling the check at the point of sale, verifying the signature, the amount, stamping "for deposit only", etc. still remain. Moreover, the retailer usually does not know whether the presenter of the check has sufficient funds or whether the presentee of the check intends to honor the check by not filing a "stop payment" order at his bank. Several devices have been produced to aid the retailer in these situations.

### BRIEF DESCRIPTION OF THE PRIOR ART

U.S. Pat. No. 3,786,421 to Wolfgang J. Wostl teaches a personal identification code number that is used to insure that the party making the transaction is the person he claims to be. U.S. Pat. No. 4,453,074 teaches a smart card with encrypted material using a private key that is associated with a public key. U.S. Pat. No. 4,439,670 teaches use of a code comparison made upon reaching a predetermined number of rejections. None of these devices is however specifically suited to processing checks at the point-of-sale.

### SUMMARY OF THE INVENTION

The herein-disclosed point-of-sale device is specifically adapted to operate upon checks or other negotiable instruments in order to complete a business transaction such as a retail sale while the retailer and the customer are still face to face. It also gives both the retailer and the customer badly needed security with minimum economic expenditures to both parties. The device also can utilize several algorithm security codes simultaneously. It also can be programmed to give regional or local protection.

In its most fundamental form our point-of-sale device comprises a housing divided into two compartments. The two compartments are presented in an adjacent arrangement wherein the first compartment is located next to the second compartment, but separated from it by a slot. The compartments may be held in place relative to each other by a spacer means which holds the two compartments in their adjacent relationship relative to each other. That is to say a face of one compartment is vis-a-vis a face of the other compartment, but is separated from it by the slot which is, in effect, "sandwiched" between the two compartments. In effect the height of the spacer means is essentially the height of the slot. In some preferred embodiments hereinafter more fully described, the spacer means is provided with a hinge means in order to rotate one compartment away from the other in order to expose the slot region if need be (e.g., if the check becomes caught in said slot).

In a preferred arrangement the first compartment is presented in a stacked configuration over the second compartment. This arrangement is the one depicted in the drawings; but this is by no means the only arrangement possible. The two compartments could, for example, lay side by side. In the preferred "stacked" arrangement, the first compartment (in this case the top compartment) is the preferred compartment for locating a printer means which contacts one side of a check (preferably the rear side of the check) through a face in said first compartment. In the stacked arrangement that face would be the bottom face of the first (top) compartment. The second compartment is preferably the compartment provided with a MICR reader means which reads the other side of the check (preferably the face side of the check, i.e., the side of the check opposite the

5,053,607

3

side contacted by the printer means) through a face in said second compartment.

This is the most practical arrangement, but clearly the second (bottom) compartment might contain the printer and the first (top) compartment might contain the MICR read head. It should also be noted that in the event that FED regulations placed the MICR data on the rear side of a check (or in the event the MICR information could be read through the paper from which the check is made) then both the printer means and MICR read means could be located in either the first or the second compartment and operate on (read from and print on) the same side of the check.

The slot is also provided with means for transporting a check or other negotiable instrument into and out of said slot, means for positioning the check: (1) while it is being so transported, (2) while its MICR information is being read by the MICR head, and (3) while it is being printed upon by the printer means.

The device is provided with a CPU means which can be located inside the housing (in the first compartment and/or in the second compartment), outside the housing but still in the retail establishment where the business transaction is taking place, or outside the retail establishment in a central location which employs a central CPU to service a system of such point-of-sale devices.

The device also comprises at least one or more alpha/numeric keypad means electrically connected to the CPU. Obviously, the retailer and his customer could use the same keypad, but for reasons hereinafter more fully described, two, separate, but electronically interconnected, keypads, one for the retailer, one for the retailer's customer, are highly preferred for the check processing operations carried by our device.

Finally the device should comprise means for electronically connecting the point-of-sale device to a telecommunications system capable of electronically transferring funds from one bank account (e.g., the customer's bank account) to another bank account (e.g., the retailer's bank account).

Thus in its most general form, our point-of-sale negotiable instrument processing device comprises: (1) a housing having a first compartment, a second compartment and a spacer means which positions the first compartment next to the second compartment so as to define a slot between said first and second compartments; (2) MICR read head means for reading MICR information on a negotiable instrument; (3) printer means for printing on a negotiable instrument; (4) switching means to initiate preprogrammed CPU functions upon the negotiable instrument; (5) motive means for moving the negotiable instrument: (a) into position in the slot so as to be read by the MICR read head means, (b) into position to be printed upon and (c) into and out of the slot; (6) positioning means for positioning the negotiable instrument in the slot so that MICR information on the negotiable instrument can be read by the MICR read head means and for positioning the negotiable instrument in the slot so that the rear side of the negotiable instrument can be printed upon; (7) alpha/numerical keypad means for transmitting information to a CPU; (8) a CPU for receiving information from the alpha/numerical keypad means and the MICR read head means in order to communicate said information to a telecommunications system in order to transfer funds represented by the negotiable instrument from an account of the maker of the negotiable instrument to an account of the payee of the negotiable instrument; and

4

(9) means for electronically connecting the point-of-sale negotiable instrument processing device to a telecommunications system.

Various optional features and preferred embodiments of this device may also be employed to advantage. For example, aside from the printer, the first compartment may also have a plurality of signal devices indicating the condition of a plurality of circuits contained in said device A keypad which is especially adapted for the customer's use (e.g., for entry of the customer's personal identification number) is preferably located outside the housing A keypad which is especially adapted for the retailer's use (e.g., for entry of the retailer's personal identification number may be located on, or outside of, the housing.

The slot for receiving the monetary negotiable instrument can be disposed between said first and second portions, and further comprise guide means which aid in receiving, locating, electronically processing and dispensing the check from the point-of-sale device. In a preferred embodiment of this device the check travels "through" the device (i.e., in one end of the slot and out the other); however, the check may also exit the device from the same part of the slot through which it entered. Other optional features may serve to identify the payee of said transactions and to establish the transaction selling price to the satisfaction of both the customer and the retailer.

This secured point-of-sale device also can be modified and/or augmented in several other ways to produce several other preferred embodiments thereof. For example, it could include one or more of the following features: (1) means to access a computer system maintained by a system of retailers using one central CPU with which this device is integrated, (2) means to access a computer system maintained by an issuer of a negotiable instrument such as a check and the like; (3) means to access an external communication system to identify a payor of a negotiable instrument (such as through the use of a personal identification number) and to perform an electronic funds transfer only with a proper PIN number; (4) telephonic means (such as a telephone headset and appropriate communication system) to communicate with the issuer of a negotiable instrument; (5) a standard 8 bit microprocessor capable of accessing 64 K bytes of memory; and means connecting a plurality of switching mechanisms to a microprocessor and upon any one of said switching mechanisms not being actuated, said mechanisms seeking an inoperable position; (6) a printing mechanism specially adapted for printing upon the rear side of a negotiable instrument such as a check, (7) an actuating mechanism cooperating with said printing mechanism for producing an imprinted copy of said transaction, (8) read head means for producing movement of said read head means with respect to said negotiable instrument as long as a code is being detected by said read head, (9) PIN identification number entry means connected to a CPU for receiving a PIN number, (10) means, including a CPU connecting the read head means and the PIN identification number entry means to the printing means, so that the printing means is actuated only when certain signals are compatible, (11) a data entry override means, and (12) a personal identification number module having a key tab matrix connected to a CPU, said key tab matrix is set to match a transaction amount to be recorded with the override means connected to the CPU for actuating said printing means.

5,053,607

5

It is also a preferred object of this invention to provide a secured point-of-sale device that is connected to a CPU that completes all transactions while the device is in a secured mode. It is yet another preferred object of this invention to abort any improper transaction while the device is in a secured mode.

These and other objects and advantages of the invention will more fully appear from the following, more detailed, descriptions, made in connection with the accompanying drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an isometric view of the point-of-sale device;

FIG. 2 is a cut-away side view of the device;

FIG. 3 is a top view of the device in partial cut-away;

FIG. 4 is a front view of the device shown in partial cut-away;

FIG. 5 is a rear view of the device;

FIG. 6 is a bottom view of the device as it is about to receive a check; and

FIG. 7 is a diagrammatic presentation of the device, emphasizing the functions of the keypad devices used by the customer and the customer.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

The "Point-of-Sale" (POS) check processing device of this patent disclosure is further described in FIGS. 1 through 7 wherein specific detailed items will be numbered by both a figure designation and an item designation as, for example, "1-3" or "1-6." Thus, the first numeral "1" directs the reader to FIG. 1 and the second numeral (following the hyphen) directs him to a specific item, i.e., item 3, item 6, etc., in FIG. 1. It follows that no two specific items will have the same number, however, the same item designation may appear in more than one figure. For example, the designations 1-6 and 6-6 each represent the same specific item, i.e., a check 6 to be processed by this device.

FIG. 1 shows point-of-sale device 100 in a "stacked" configuration wherein 1-1 represents a lower compartment or base which may or may not also act as a main frame for the entire device 100. Item 1-2 represents a table, located on top of the base 1-1, which serves as a guide for the check 6 being processed. Located above the base 1-1 (preferably located by a spacer means, e.g. a "vertical" side element), is an upper compartment 1-5. The upper compartment 1-5 may sometimes be referred to as a "first compartment" for purposes of this patent disclosure, while the lower compartment 1-1 may be referred to as a "second compartment". Item 1-4 represents an extended, tapered portion of the upper compartment 1-5 of said device 100. All parts of the device's housing (including 1-1, 1-4 and 1-5) are preferably constructed of high-impact resistant materials offering optimum durability and longevity. Metals and hard plastic are preferable construction materials. Similarly, all other portions of the device 100 and all associated peripheral key-pads, electronics housings, electrical wires and cables, electrical connectors and any or all mechanical or electrical components are most preferably constructed from materials resistant to normal physical wear and tear, common types of solvents and cleansing solutions, the effects of smog, sunlight, oxidation and the like, as well as to those petroleum products which might be encountered in gasoline service stations. In the same vein, all electrical circuitry are most preferably

6

designed to be unharmed by local, high-energy radio frequency interference, highly inductive or magnetic fields such as those encountered near electric motor windings, electric solenoids and the like.

It is also important that this point-of-sale device 100 be protected against unauthorized intrusion for the purpose of affecting, manipulating, defeating, duplicating, counterfeiting or in any way circumventing the normal, authorized operation of the device 100, its peripherals or any part of the communication network(s) or system(s) connected to said device. Similarly, the central processing unit 16A (see FIGS. 2 and 6) of the device 100 also may be protected from, for example, x-ray penetration, infra-red photography, serial scanning and various types of remote electronic probing techniques known to the art. Finally, this point-of-sale device 100, as well as all its peripherals, also can be designed to be aesthetically pleasing in all respects with due attention given to color coordination, ease of operation and physical refinements.

FIG. 1 also indicates that the base 1-1 preferably will rest upon a system of sturdy, non-marking, non-skid feet 1-3 while the device 100 is in its standard, "right-side-up" orientation depicted in FIG. 1. It should be noted, however, that operation in an optional "lay-down" mode of operation may be more desirable in some cases. Feet to accommodate this lay-down mode are depicted as 4-3A. This laydown mode of operation follows from the fact that the retailer's (operator's) alpha-numeric keypad (see item 2-20), can rest on its normal mounting hinge axis, 2-21, or from another hinge axis rotated 90° as shown in 3-21A or 4-21A or from a "stand-alone" location inferred by FIG. 7. A rugged wire bundle control cable (2-22) of sufficient length connects a retailer's keypad 7-20 with the main housing (1-1) and thereby allowing the retailer a great deal of latitude in locating the keypad 2-20 for convenient use.

Item 1-6 depicts the customer's check (or any negotiable instrument utilizing the FED's MICR system) just as it is about to begin its functional travel into the point-of-sale device 100. In effect the check 1-6 is laid on a table 1-2 (2-2) having a perpendicular (and in this case a vertically perpendicular) rear guide surface 1-2A (2-2A). In effect the table 2-2 forms a substantial portion of the top surface of the base 1-1. A check receiver slot 2-23 is defined between the bottom surface 2-2B of the upper compartment 1-5 and the top surface 2-2C of the table 2-2 which, in turn, rests upon the base 1-1. The tapered or "nose" shape 1-4 of the upper compartment 1-5 is employed to facilitate "hands-on" assistance by the operator in placing worn, wrinkled, folded or damaged checks into the device 100. Damage to the MICR line area on the check, which renders it unreadable in the automatic mode of this device, may also be overcome by the operator who can visually read and manually enter the MICR information into the device via his keypad 2-20. In addition to housing certain hereinafter described check guide means such table 2-2 and its associated guide means 2-2A and certain check transport means and check "feed" apparatus hereinafter described, the housing nose 1-4 also may offer a convenient location for certain condition (prompt) lamps 1-25 which may conveniently indicate certain commands and operations of the device 100 and/or the network(s). These commands will be more fully described in later portions of this patent disclosure.

FIG. 2 represents a side view of the device wherein an upper edge 2-2B and lower edge 2-2C of an "open"

5,053,607

7

slot 23 (see 4-23) are shown facing toward the reader. Such an open slot 23 can extend along essentially the entire bottom surface of the upper part of the case 2-5A and the extension portion 2-4. The arrows titled "IN-SERT CHECK" and "CHECK EXIT" in FIG. 2 depict a preferred direction of check movement through the device. The check could, however, also be: (1) inserted at the INSERT CHECK location, (2) processed and (3) exited in some other direction e.g., back out at the INSERT CHECK location or out the side opening of the slot 2-23.

It also should be noted that the Federal Reserve Bank's MICR printing regulations strictly dictate the type, size, location, tolerances, etc. of the MICR line (see 6-24) and the distance from the left edge and bottom of the check. However, since checks of different overall size are currently in circulation, an "open slot", feed through path, such as the one depicted in FIG. 2, is probably a preferred form of opening for receiving and processing checks of widely varying sizes.

As is better seen in FIG. 6, proper insertion of a check 6-6 is required to enable the MICR read head 2-15 to scan and interpret information 6-24 shown on said check 6-6. Under present FED regulations and/or custom wherein the MICR information is printed on face side of the check or other negotiable instrument, the operator would place the check inverted (upside down) on the (2-2) guide table taking care that the bottom edge (nearest the MICR line) touches a vertical edge (see 4-2A, 5-2A or 6-2A) of the table 2-2. So placing the check in the device 100 insures that its read head 2-15 will be the correct distance from the bottom of the check to properly "scan" or "read" the MICR line 6-24 as it is drawn across the read head 2-15. Although it has been stated that the Federal Reserve Bank's MICR 35 Printing Regulations strictly dictate the height of the 6-24 MICR line above the bottom edge of the check, provisions have been made in order to tolerate small variances in this height allowing for worn edges, water damage, etc.

As the check is first manually introduced into the machine, it preferably automatically passes under the first of several guide means 2-14 (shown here as small springs) to promote the check's smooth and unimpeded progression across the MICR head 2-15, under and through a printer head means 2-16, and finally on to a smooth exit from the device 100, preferably, at the arrow designated "CHECK EXIT." When the check 6-6 has been moved far enough into the device 100, it preferably encounters and then trips a trigger means 2-12 causing contact (or lack thereof) of a switch means 2-13 and thereby alerting a CPU and preferably alerting an on-board central processing unit (CPU) to begin a programmed transaction cycle of the device. This triggering of switch means 2-13 instantly initiates one or a series of (pre-programmed) CPU functions. These functions may include, but are not limited to, the following operations:

1) The CPU 16A memory stands by to receive and store (most preferably, for the duration of this transaction only) all necessary MICR information printed on the check (6-6).

2) The CPU 16A stands by to interpret (if necessary) information fed to it by the MICR head 2-15 and to convert said information into useable data for the CPU's memory.

3) The CPU 16A signals a motive means such as an electric motor 2-7 to operate a document "feed" means

8

such as wheels (2-8 and 2-9) and thereby drawing the check 6-6 across the MICR read head 2-15. The MICR data (see 6-24) is read and stored; a MICR "stop code" (see 6-24 and 6-24B) could be employed to cause the CPU 16A to stop motor means 2-7 at appropriate times in the processing of said check.

4) An "ENTER PIN" prompt lamp 7-20D and 7-27D preferably lights and the CPU 16A stands by to receive and store (again, for the duration of this transaction only) the customer's personal identification number (PIN) which the customer preferably enters at a keypad 7-27 which is, preferably, separately provided for the customer's private use. A second or retailer's keypad 20 is also depicted. As the customer keys in his appropriate PIN, it is preferably displayed digit-for-digit/stroke-for-stroke at a customer's display window 7-29 depicted on keypad 7-27. Thus, if the customer, while watching his PIN entry on display window 7-29, notices a mistake, he can cancel his entry by pressing a "CANCEL ERROR" button, 7-31 (located on keypad 7-27), and begin again. When the customer has entered the proper PIN digits on the keypad, for example four digits, "OK the PIN" prompt lamps 7-27H and 7-20H will preferably light; thereafter the customer pushes an "OK" button 7-33, located on the customer's keypad 7-27.

To this end, the CPU 16A could be programmed to recognize a four digit (for example) PIN entry as a "complete" PIN entry and to automatically "accept" it as the customer's preferred entry. More preferably, however, to allow the customer sufficient time to visually verify the correctness of his PIN entry and consequently the chance to change and/or correct it even after the final digit has been entered, the CPU 16A means can be programmed to allow a time interval such as for example a three second (interval variable and programmable) delay period between the time of entry of the final PIN digit and the time when the CPU 16A means "accepts" it as the customer's desired entry and consequently lights the "OK THE PIN" prompt lamps, 7-20-H and 7-27-H. The CPU 16A could also be programmed to immediately light the "OK THE PIN" prompt lamps, e.g., 7-H following the entry of the final digit to help draw the customer's attention to his task of visually verifying the PIN at 7-29 and still allow the customer the prescribed time delay for a possible correction of the entry. By this means the customer could recognize a mistake in his pin entry, even after all digits have been entered, and cancel it for correction by pressing the 7-31 "CANCEL ERROR" button and begin again. Another embodiment may include a case where the CPU 16A will not accept the PIN entry unless or until the customer presses the "OK" button 7-33 within say one minute, for example, time limit (here again, the time limit is variable and programmable). In this case the CPU 16A would leave lit the "OK THE PIN" prompt lamps 7-20-H and 7-27-H until either the customer presses the "OK" button 7-33 or the time limit is reached. If the time limit is reached before the customer "OK's" the PIN, the CPU 16A most preferably will automatically abort the transaction.

Still another embodiment may be a case where the "ENTER PIN" lamps 7-20-D and 7-27-D prompt the customer to enter his PIN. When the desired PIN is entered, the customer would press a "ENTER PIN" button 7-30A whereupon the CPU 16A would accept the entry, extinguish said "ENTER PIN" prompt lamps and light the "OK THE PIN" prompt lamps 7-20-H and 7-27-H calling on the customer to press the "OK" but-

5,053,607

**9**

ton 7-33 which would cause the CPU 16A to recognize the PIN as valid, place it into the appropriate 16A memory means for all described and intended functional uses. In any of the above embodiments, when the entered PIN is "OK'd" by the customer, and received and stored by the CPU, the prompt lamps at 7-20-D and 7-27-D ("ENTER PIN") plus 7-20-H and 7-27-H ("OK the PIN") lamps will preferably extinguish. Under these operating circumstances, the customer's secret PIN number is not displayed on the retailer's (operator's) 7-28 display window.

5) An "ENTER CHECK AMOUNT" prompt lamp 7-20-C, preferably lights at the retailer's keypad (2-20, 7-20) and the CPU 16A stands by to receive and store (again for the duration of this transaction only) the face value, e.g. the $8.16 shown as 6-24D of the check 6-6 which is entered by the retailer on the retailer's keypad 7-20. As the retailer keys in the check amount, it is displayed digit-for-digit/stroke-for-stroke at a retailer's display window 7-28 shown on retailer's keypad 7-20. If 20 the retailer, while watching his check amount entry coming up on display window 7-28 notices a mistake in check amount, he can cancel his entry by pressing a "CANCEL ERROR" button 7-32 (located on the retailer's keypad 7-20), and begin again. After the retailer 25 has keyed in the proper amount of the check, he then presses a "ENTER" key 7-30 (also located on retailer's keypad 7-20, 2-20); this extinguishes an "ENTER CHECK AMOUNT" lamp 7-20-C. The check amount 6-24D is then displayed on the customer's display win- 30 dow 7-29 and "OK THE AMOUNT" prompt lamps 7-20-F and 7-27-F respectively light on the retailer's keypad 7-20 and on the customer's keypad 7-27. The check amount 6-24D remains displayed on the retailer's window 7-28. After the check amount entered by the 35 retailer is "OK'd" by the customer's pushing of an "OK" (amount) button 7-33 located on customer keypad 7-27 and the CPU 16A has received and stored the "OK" command, the "OK THE AMOUNT" prompt lamps 7-20-F and 7-27-F are extinguished. The CPU 40 16A is now ready to access the communication means to the (financial) network(s) and complete the prescribed electronic funds transfer. The CPU 16A may also interface with electronic cash registers, local area networks (LANS), or other peripheral gear at this time 45 as desired.

As noted above, once switch means 2-13 is engaged, the check is drawn or pulled into the device 100 by the action of a motive means such as electric motor 2-7 which mechanically drives (via drive means not shown, 50 but known to the art) one or more feed means such as "feed wheels" 2-8 and 2-9. Said feed wheels 2-8 and 2-9 touch and in turn drive respective idle or "slave" wheels 2-10 and 2-11 and thereby rotate them in the opposite rotational direction. Operating in concert, the 55 counter-rotating action of said document feed wheels 2-8 and 2-9 propels the check 6-6 through the device 100 at appropriate speeds, times and distances which are controlled by the CPU 16A or other appropriate control means known to this art. 60

A document printer matrix head 2-16 is shown in association with an associated printer head drive means 2-17 which propels the matrix printer head in a preferred, customary lateral "back and forth", i.e., in the direction of arrow 3-17, field of motion defined, by the 65 region depicted as 3-17A. Item 2-18 generally depicts a printer control electronics system (if necessary) which controls the printer head drive means 2-17 and printer

**10**

matrix head 2-16. The printer head 2-16 may or may not interface and interact with the CPU 16A, the document feed means (2-7, 2-8 and 2-9 with 2-10 and 2-11) and/or certain commands such as may originate from associated electronic cash register(s), local area network(s) (LAN), financial network(s) services and/or financial institutions. The region of motion 3-17A, in cooperation with the described document feed means, should be adapted to allow for clear and accurate printing (by printer head 2-16) on the check or other negotiable instrument (preferably on their back surfaces) in all forms, fashions and locations required by the FED or other regulatory agency. For example the information printed may include, but not be limited to:

1) The payee's legal printed endorsement in its correct location as mandated by the FED's Reg. CC. Endorsement example:

FOR DEPOSIT ONLY

METROPOLITAN STATE BANK OF IDAHO

ABC HARDWARE COMPANY

2) Use of bold and clear letters, the exact amount of funds transferred from the payor account to the payee's account as entered by the retailer on keypad 2-20 (7-20) AND "OK'd" by the customer on his "OK (the amount)" button 7-33. ALSO, in equally bold letters next to the amount transferred, the fact that the check is "truncated" or cancelled at the point of sale by this device. Example:

FUNDS TRANSFERRED

$18.07

CHECK CANCELLED—POS

19:08 hrs.—19Jun1989

3) Use of all such language, numbers, dates, codes and data as is, or may be, required by law and the Federal Reserve System's Rules and Regulations. For Example:

PAY ANY BANK

P.E.G.

Spruce Nat'l Bank

Bennet, Idaho 71838-4066

19 June 1989

Again, it should be noted that all printing on the check such as the endorsement(s), date(s), amount, etc. and other data with regard to content and location or placement is strictly regulated by the U.S. Federal Reserve Bank System and its Board of Governors including Regulation CC as it may change from time to time.

This device 100 may or may not utilize "Stop Codes" (see for example items 6-24 and 6-24B) contained within the FED's MICR line, 6-24, to control the "Start/Stop" mode(s) of the document feed motor 2-7. It should also be appreciated that by "keying" from these "stop codes"—using them as bench marks of location—it is possible to locate the desired "target zone" for the correct placement of regulated printing on the back side of the check. Such stop codes, integral parts of the FED's MICR system, may enter the device's CPU 16A along with all other MICR data, and are, in fact, a part of that data. However, the CPU 16A also can be programmed to "under-shoot" or "overshoot" the stop code locations for the sake of the printing and document feeding processes.

5,053,607

11

FIG. 2 also depicts a magnetic stripe ("magstripe") read head means 2-19 which is shown as an optional feature in anticipation of any future use of a magnetic strip, much the same as the mag-stripe found on the back of common credit/debit cards, to contain, capture, record or disseminate any such transaction information or identification means as may be mandated by laws, conventions, convenience and/or regulation. This magstripe read head means (see for example items 2-19, 3-19, 4-19 and 7-19) also may be replaced by and/or augmented with an optical read head means to optically scan and retrieve printed data employing "Optical Character Recognition" (OCR) technology and/or an appropriate read head to capture "Universal Product Code" (UPC) data printed on the check or other negotiable instruments processed by this device 100. Again such additional read head means are optional. Moreover, they could reside on the face of the check as well as its rear side as suggested in FIG. 2.

FIG. 3 depicts a top view of the device 100 showing certain other preferred embodiments. For example, it shows the preferred direction of the check 6 as it passes across the MICR read head 3-15 (and/or optical or an optional mag-stripe head 3-19), through the printer and out of the device 100. In a less preferred embodiment, the check could be inserted as shown in FIG. 3, processed and then be ejected back to the place where it was originally introduced. Item 3-14 indicates a preferred guide means strategically located to minimize paper jamming of the documents and any adverse reaction of said documents to the printing process. Again, item 3-17A generally shows the region or reciprocating field of motion of the printer head 2-16 which preferably moves perpendicularly to the travel of the check 6-6 in the manner suggested by the printer head arrow 16-3 shown in FIG. 2. Item 3-34 depicts a prescribed distance between the MICR read head 3-15 and the printer matrix field 3-16A. Use of such a distance 3-34 insures that after the check 3-6 trips trigger means 2-12 (thereby starting the document feed process), all necessary MICR information is read by the MICR head 3-15 before the MICR "stop code" stops the document feed process. Generally speaking the "stop code" can be used to halt the check's travel beneath the print head means 2-16 at or just before the location of the first line to be printed. To optimize motion efficiency, it is preferred that the check 3-6 will not have to back up or reverse its direction of travel, and travel minimum distances (if any), before the printing process begins. The actual printing process most preferably will resemble any common, high quality ticket printer in that the matrix will print while moving in either direction and the document will advance line by line as necessary by means known to the art.

It should also be noted that, as of the date of this patent application, actual printer control may or may not be accomplished totally on-board within the device itself, but may in fact be partially or wholly dictated by financial network services and/or the financial institutions connected thereby. Some determining factors include financial security of the entire system, available and/or required network "connect time", software availability (for high speed printer control and high speed encryption/decryption of sensitive data), Federal Reserve regulations (if any) and legal restraints (if any), among others may dictate these features. As software and signal processing develops allowing shorter and shorter network "connect" times, the CPU 16A and

12

printer buffer may receive the necessary transaction data to print the check faster than the printer can transfer it to the check. At that time, total check truncating control may or may not be a totally on-board function of the device.

FIG. 3 also shows an alternative hinge mount location 3-21A, e.g., alternative to the hinge mount depicted as 2-21 for the retailer keypad 2-20. This alternative location 3-21 could be used when the device is operating in a "lay-down" position. In such a position, the check would be inserted from the left and progress to and exit from the right. Again, this lay-down position may be beneficial in certain applications where the user has limited operating space (see for example, FIG. 4 which shows the 2-20 keypad attached at such an alternate 3-21A (4-21A) site).

FIG. 4 represents a front view of the device 100; it particularly demonstrates an open slot or "open shoe" (generally depicted by item 4-23) whose upper edge 2B and lower edge 2C were described earlier in this patent disclosure in conjunction with FIGS. 1 and 2. FIG. 4 also shows how hinge system 4-35, which allows the upper housing and components attached thereto to be conveniently swung up and pivoted away (on the radially direction generally depicted by arrow 35A) in order to provide physical access to the interior components exposed by this action. Item 4-36 shows a release means by which the operator or service person unlocks or releases the upper portion(s), e.g., upper compartments 4-4 (and/or 4-5), swinging it open to clear paper jams, adjust or service interior components or to access any seldom used data entry means which may be located within the housing(s) 1-5 and/or 1-1. Associated with the release means 4-36 is an appropriate switch means 4-36A which preferably indicates to the 16A CPU that the release means 4-36 has been activated. Said activation of the release 4-36 and subsequent simultaneous activation of the release switch 4-36A, 7-36A most preferably causes the CPU to automatically abort a transaction if said transaction has not already entered the network means.

The MICR 4-15 read head as well as the document feed means 4-7, 4-8 and 4-10 are depicted in their respective relative positions to the table 4-2 and its vertical guide edge 4-2A. When a check is inserted in the described manner, it will be positioned in its proper functional alignment with certain important operational elements of the device, including the trigger means 2-12, the document feed means 2-8, 2-9, etc., the MICR read head means 4-15, as well as any anticipated magstripe read head means, and/or optic read head means generally shown as item 4-19. FIG. 4 also shows the counter rotating motion of drive wheel 4-8 and idle wheel 4-10 which cause a pinching and drawing action which propels the check or other negotiable instrument through the device 100.

FIG. 5 is a rear view of the point-of-sale device 100 wherein arrow 5-37 depicts the rotational path taken by the upper housing 5-5 following release of the release means 5-36. A main power switch 5-26, controls the flow of AC current to the device and a condition lamp (see 1-25-A) may indicate, when lit, the presence of said current. Electric cable entry points are shown as 5-38, 5-39, 5-40, 5-41 and 5-42; each may or may not utilize suitable connectors or plugs allowing connection to components or functions previously described. For example, the retailer's (operator's) keypad 7-20 can be connected via suitable cable and connector means to the

5,053,607

**13**

device's lower housing 5-1 at cable entry point 5-38. In like fashion, the customer's (PIN entry) keypad 7-27 can be connected at cable entry point 5-39. The device connects to a network means (e.g., AT&T and/or LAN) at cable entry point 5-40. Suitable AC power enters at cable entry point 5-42. Cable entry point 5-41 depicts an optional but anticipated connection to an electronic cash register or similar device. The device may or may not operate on suitable 110 volt and/or 220 volt power requiring a voltage selector switch 7-43, which may be located inside the lower 1-1 housing as is generally indicated by 5-43.

FIG. 6 shows a (partial) bottom view of the device 100 wherein the preferred insertion and direction of movement of the 6-6 check or other suitable negotiable instruments is illustrated. The check 6-6 is inserted upside down as shown using the table 6-2 and vertical guide 6-2A to help insure proper alignment of the MICR line 6-24 with the MICR read head 6-15. The table 6-2 and vertical guide means 6-2A may at the same time align other forms of readable transaction and/or identification data with a proper read head such as previously depicted as item 2-19, 3-19, and 4-19. It is anticipated that such other forms of transaction data will either be magnetic in nature requiring a suitable "magstripe" similar to that found on a common credit/debit card and/or of an optically scanned ("read") type similar to the common "bar code" (UPC) or one requiring an optical character recognition (OCR) technology. However, regardless of the form of such additional operations, transactions and/or identification, the read mechanism depicted as item 2-19 and 7-19 will be of a type to scan and read it and it will be processed with the aid of suitable software so that the CPU 16A can effectively decipher and process it in ways well known to the art.

FIG. 7 is a component block diagram of this device which particularly illustrates the retailer's alphanumeric keypad 7-20 and the customer's alphanumeric (PIN entry) keypad 7-27. Certain numbered items depicted on FIG. 7 have been heretofore discussed and others will be more specifically described in later portions of this patent disclosure.

Since it is anticipated that this device 100 and its associated components (if any) will interact with a number of financial networks and they in turn with a number of banking institutions, many obvious, and some proprietary security precautions, may be taken to promote the security interests of those involved. The retailer's keypad 7-20 and the customer's keypad 7-27 will play an important role in these matters. For example, use of a personal identification number (PIN) by the customer at the time of point-of-sale transaction is an obvious example of such a precaution. Proprietary encryption and decryption methods also may be employed to "scramble" or encode financial data transmitted to and from certain locations on the network system. Each banking institution and/or each network participant may or may not have its own encryption/decryption methods and/or other security requirements. Therefore, it would not be possible to describe future developments in detail in this area, that is as they relate to the point-of-sale check processing device of this patent disclosure. However, it most probably can be said that at that point in time, as now, after each transaction is as completed, and after the network communications connection has been dropped, the CPU's memory means will most probably completely "dump" (erase from

**14**

memory) all data that was required for the previous transaction. Thus, when not in use between transactions, the device will, most probably, not contain means or data which can be used to transfer funds. Hence, the device will begin each transaction with a clear memory ready to receive MICR and PIN information as well as the entered check amount.

Before describing a typical verification/transaction/-print cycle of this device, a few background conditions should be understood. First, the "MICR" (magnetic ink character recognition) line 6-24 was developed to allow high speed, computer controlled processing of checks by the twelve Federal Reserve Banks (and their branches) and the various Automated Clearing Houses throughout the country. The MICR characters themselves are exactly what the name implies, "magnetic," thereby causing electric current pulses in a circuit when "read" by a proper electronic read head such as the one generally depicted herein as MICR read head 2-15. The Federal Reserve Bank has published many regulations and booklets describing their MICR system. Suffice it to say for our purposes that each check 6-6 has a unique MICR number 6-24 enabling a central computer(s) system to identify, sort it, and process it as an individual item. The characters in the check's MICR line identify the customer's bank and the FED district in which it is located, his check account number as well as the check's serial number. Specifically, from left to right, the MICR line identifies:

1) The first two digits identify the bank's Federal Reserve District.

2) The third digit identifies the Federal Reserve Office (head office or branch) or a special collection arrangement.

3) The fourth digit shows the bank's state or a special collection arrangement and completes the check's "routing symbol."

4) The next four digits are the bank's "Institutional Identifier." Each bank has its own identifier.

5) The next number is the "check digit." This number, combined with the first eight digits, verifies the routing number's accuracy in computer processing.

6) The next group of numbers (digits may vary) identify the customer's account number.

7) The next group of numbers (digits may vary) identifies the customer's check serial number.

8) Cancelled checks that have passed through the FED's (and/or ACH) collection system as it exists at the date of this patent application will have a final group of numbers located at the right (under the signature) indicating the dollar amount of the check. This dollar amount is printed by the first bank receiving the check.

It should also be understood that the personal identification number (PIN) with which the customer identifies himself or herself to the appropriate (and necessary) computer(s) is normally a matter between the individual customer and his bank since each bank may insist on its own means of generating and protecting the PINs. In like manner, each bank may insist on its own encryption/decryption means to protect its own computer (and/or LAN) from unlawful entry. In these cases, the individual bank would be responsible for that software/hardware which produces a secure interface with the network(s). In turn, the financial network(s) may insist on its own security arrangements and would assume responsibility for fulfilling its own hardware/software needs. Further, it is assumed that banking institutions wishing to participate in a national EFT or "check

5,053,607

15

debit" network will voluntarily make prior arrange-
ments with their customers in the event that any EFT
check transaction places the customer's account in a
"non-sufficient funds" (NSF) status. Such arrangements
may be similar to those made between banks and their
debit card customers or may take the direction of auto-
matic loans, sometimes called "overdraft protection",
for the amount overdrawn by a customer's debit check
transaction. Upper limits of said overdraft protection
and the number of days of allowable "float" (a time
period between the customer's writing of a check and
his depositing into his account of sufficient funds to
"cover" the [NSF] check he has written) afforded the
customer again are matters between the bank and its
customers. Limiting overdraft protection and "float"
time is merely a matter of computer programming at the
bank. It is anticipated that the topics discussed briefly in
this paragraph may become the target of existing and-
/or new Federal Reserve regulations and/or local,
State or Federal legislation similar to that body of debit
card law which already exists.

However, it should be understood that before the
device 100 of this patent disclosure can function auto-
matically as designed, the retailer must first make suit-
able arrangements with a financial network and/or
carrier. Second, the retailer must, upon taking delivery
of this device, "program" or enter his security "pass-
word" into the device's CPU and then the desired payee
account number. This account number may or may not
be (subject to applicable law and regulations) the same
MICR information as is presently found on a standard
check used to withdraw funds from that account. It is
anticipated that the retailer may wish to deposit EFT
check credits to another bank account not associated
with check withdrawal. In any case, the correct ac-
count number must be entered along with the remainder
of the necessary MICR information allowing the net-
work to "locate" the desired payee account. If, for
example, a retailer purchases a machine and wants the
debit check deposits (EFT credits) made directly to his
company's checking account immediately at each check
transaction made with this device, he may easily do so.
In such case the retailer would first activate the housing
release 4-36 (5-36) and swing open the upper housing
1-5 (4-5) thereby gaining access to the switch means
7-45 (5-45) located inside the upper and/or lower
housing(s). He would then enter, using a proprietary
series of alpha-numeric entries at keypad 7-20 in con-
junction with switch means 7-45, a (personal and secret)
"password" of his choosing to activate the programma-
ble portion of the device's CPU 16A; this password
limits access to the CPU 16A to inhibit unauthorized
reprogramming of any such data as might be contained
therein. Next the retailer would enter a "retailer identi-
fication number" using a series of keystrokes at retailer
keypad 7-20 in conjunction with switch 7-45. This re-
tailer identification number (RIN) identifies this retail
location to the network and consequently to the appro-
priate banks. The RIN also would be recorded at the
retailer's bank (payee's account location) to provide
various means of security and to connect the RIN with
a proper name and address of the retail establishment to
be printed on the back of the check for endorsement,
etc. In the same manner, using keypad 7-20 with 7-45,
the retailer enters his payee account number and its
(bank) location by entering the appropriate FED MICR
data for this account such as that data outlined in sub-
paragraphs 1 through 5 of the MICR line description

16

6-24 discussed previously. In like fashion, using the
same keypad 7-20 and switch means 7-45, the retailer
will program the correct network and/or carrier access
codes to allow this device to connect to the network
and subsequently to the proper financial institutions.
The retailer now terminates programming of the de-
vice's CPU 16A and closes the housing to begin normal
operation. It should be stated that various methods of
encryption and decryption of the transaction data and-
/or utilization of the PIN's, RIN's, account numbers,
etc. also would produce an added measure of security
for all stations and parties involved, and said step may
be partially or wholly initiated and employed within
this device at the point of sale.

To better understand the actual transaction process
executed by this device, certain other preferred fea-
tures, functions and conditions also should be noted;
these may include:

1) A "system fault" condition lamp such as the one
depicted by 7-20-B (located on keypad 7-20) could indi-
cate one or more of the following conditions: (a) The
device is unable to access or establish contact with the
network or communications carrier, or; (b) The finan-
cial network is unable to access or establish contact
with one or a number of the required or appropriate
financial institutions in order to complete the transac-
tion, or; (c) the device cannot receive necessary data
from either the network (carrier) or any number of
necessary financial institution(s) to complete the trans-
action. Should such a system fault be present, the CPU
16A would most preferably erase or "dump" all entered
transaction data; the customer's MICR information
(from 6-24), the customer's PIN number and the check
amount. The CPU 16A also would direct the document
feed means (2-7) to expel the check or MICR document
from the device by activating the mechanical means for
expelling the check. The motor 2-7 will continue to
operate (expulsion mode) until an "exit switch" means
2-46 (3-46, 7-46) indicates (by a proper contact or lack
thereof) to the CPU 16A that the document is no longer
present, and in fact has exited the device, at which time
the CPU 16A would stop motor 2-7. The same transac-
tion can be re-attempted immediately.

2) A "clear paper" prompt lamp 7-20-I could instruct
the retailer or operator to open the device (using 4-36
release means) and physically clear or remove any
fouled or otherwise impeded document. Lamp 7-20-I
can be lit by the CPU 16A after a MICR document has
entered the device (indicated by the switch 2-13) but the
CPU 16A has not received the expected MICR infor-
mation and/or the document has not properly activated
the "check present/exit" switch 2-46 which indicates
that the check 6-6 has not reached its proper position
directly under the printer head means 2-16. The retailer
could attempt the expulsion or "clearing" process by
activating an "index" switch 7-44, (located on keypad
7-20) which will in turn activate feed means 2-7. If the
attempted "indexing" does not clear a fouled check,
then the retailer must open the housing by utilizing
release 4-36. Preferably, either the act of pressing the
indexing key 7-44 or releasing release means 4-36, and
thereby activating 4-36A switch means, will cause the
CPU 16A to dump transaction data and the entire trans-
action cycle must begin again. This "indexing" (mo-
mentary) switch 7-44 may also be useful if, after enter-
ing the check into the device to start a transaction, the
retailer has forgotten the customer's check amount.
Since the CPU 16A should not accept transaction data

5,053,607

17

until the switch 2-13 has been activated, the check amount can only be entered after the check has entered the device 100. This would help to insure that the funds being transferred are leaving the account indicated by the MICR line 6-24 held within the device at the time of the transaction. If the "check present/exit" switch 2-46 or the release 4-36 and switch means 4-36A used to notify CPU 16A is prematurely activated before the entire transaction cycle has been completed, the transaction is preferably aborted and the CPU 16A dumps transaction data and expels the document by activating motor 2-7.

3) A "transaction completed" indicator lamp is located on the retailer's keypad 7-20 and is shown as item 7-20-E. "Transaction completed" is also indicated by an analogous lamp 7-27-E on the customer's (PIN) keypad 7-27. These "E" condition lamps are to notify both the retailer and the customer at the earliest moment that the amount of the check, as entered by the retailer at keypad 7-20, has been electronically transferred from the payor's to the payee's account. This amount can be printed on the back of the check as described elsewhere in order that the customer (payor) can verify the figure.

4) An "amount declined" indicator lamp located both on the retailer's keypad and the customer's keypad is shown as 7-20-G and 7-27 G respectively. This 7-20-G condition lamp indicates either/or: (a) The customer has exceeded his checking account balance, and/or; (b) The customer has exceeded his special arrangement with the bank to pay non-sufficient (NSF) (debit) check demands by "overdraft protection" in whatever form that may take, and/or; (c) The account indicated by the 6-24 MICR line on this particular check (within the device) cannot be reached by the network(s) being used. It is anticipated that the banking community will cause to be printed on the checks of participating customers a small symbol showing which checks can be used in this device. A small symbol of such a type would alert the retailer before accepting the check of the potential, or lack thereof, of transferring electronically the funds represented by the offered check. It is also anticipated that another condition lamp, shown as item 7-20-J, will show the retailer that the check he (the retailer) has inserted into the device is one of a non-participating customer and/or bank and will help avoid any embarrassment at the point of sale for all concerned. This additional lamp, said 7-20-J, will merely indicate that the check in question is that of a non-participating customer and/or bank and will not mean that the check is in any way suspect.

5) For the retailer's convenience, an optional "cash ticket" could be easily printed by this device by placing a "no-carbon-required" slip of paper of an appropriate size against the back of the check before inserting the pair into the device. Special paper (e.g., known to the art as NCR paper) may be on the back of the check in order to allow for proper MICR scanning of the device and in order to allow the "no-carbon-required" page to print the necessary information on the check. The resulting NCR page could then be inserted into the retailer's cash register drawer to represent the (EFT'd) debit-check sale as a written record of a "cash" item.

6) Provision can also be made (e.g., at 5-41) for an appropriate connector and cable means allowing essential and/or useful digitized transaction data to pass to and from common types of electronic cash registers. One example of said data communication would be the automatic entry into the retailer's (appropriate and suit-

18

able) electronic cash register by this device's CPU means of the "amount tendered" by the customer's check located within this device (see for example the note at the end of this paragraph). The actual "amount tendered" by the check will be the face value of the check as entered by the retailer at 7-20 (as described elsewhere) and "OK'd" by the customer's keystroke at 7-33. However, the "amount tendered" data would not pass from this device's CPU to the (electronic) cash register until after the funds represented by the check had, in fact, been electronically transferred (via financial network means and operations) to the payee's account. At this point the funds transferred from the payor to the payee (to payee's account) amount to "cash tendered" and/or "cash paid" and would require all appropriate treatment as cash.

After the device's CPU 16A had been notified (by the financial network means) that the amount of funds represented by the check had been transferred, the CPU would then electronically enter into the cash register the "amount tendered" yielding the same results as if the retailer had entered it in his customary manner into the register. The retailer's cash register then would proceed in its normal routine by printing the invoice slip (or customer's ticket) and its own running tally means making note of this transaction's total value of purchase, appropriate tax(s), amount tendered, amount of change paid out, etc. From the moment this device's CPU received the appropriate notification that the funds (face value of the check) had been transferred to payee's account, it would resume its normal, prescribed routine as stated elsewhere.

Note: a scenario wherein the customer tenders a check for an amount smaller than the amount of the sale and then tenders the remainder in cash, may or may not require different procedures. Recognizing that different electronic cash register manufacturers' devices and systems may each necessitate its own software protocol, formats, etc., individual software for each cash register model/make/type may or may not be developed by said manufacturers facilitating a proper working interface with this point-of-sale device. Hence, at this time, applicants can only suggest that resolving said scenario would require software allowing the retailer to enter the amount of tendered "cash" in his usual fashion on his register's data entry keypad, and that said cash register software would then add the (cash) amount to the amount tendered by the customer's check via said check device's CPU means. This procedure would yield an overall "total amount tendered" to be recognized by the cash register and the retailer could proceed normally with the transaction. In this particular case, the customer's check would be returned to him verified, endorsed, EFT'd, printed and truncated (processed and cancelled via the financial network means and operations) along with his copy of the cash register receipt (ticket). Thus, the customer would receive a written account of the complete transaction and the retailer's (electronic) cash register means would contain the same information in its own format.

7) A preferred embodiment of this device also would employ and utilize an appropriate and suitable "liquid crystal display" (LCD) means or similar means at 7-28 and 7-29 in preference to the "condition prompt lamps" mentioned throughout this text. Said LCD means may or may not be accompanied by a audible alarm means alerting both customer and retailer when appropriate conditions and functions are spelled out on the LCD.

19

Said LCD display means would be controlled by suitable CPU means and software and would have adequate capacity to spell out letter-for-letter and/or numeral-for-numeral and convey the appropriate message(s) and/or data to the appropriate person(s).

The preceding retailer entered data—namely the RIN, the access codes, phone number(s), etc., need only be entered once under normal conditions and can only be "re-programmed" by the retailer or his authorized agent(s) having access to the CPU "password" and then only by following similar proprietary procedure (using 7-20 and 7-45) as was used previously. Given that the retailer entered transaction data is stored within the CPU's memory means for automatic and constant use, the CPU's memory means need only capture the point of sale transaction data to form a complete transaction memory "package." Said point of sale transaction data would generally comprise: (a) The customer's PIN as entered by same at 7-27 and the required "OK" as entered at 7-33, and; (b) The customer's check amount as entered by the retailer at 7-20 and the customer's required "OK" response entered at 7-33. Having completed the transaction data "package", the CPU now automatically cites the access codes and numbers to connect with the appropriate financial network(s) means and transmits all necessary transaction data to complete the prescribed funds transfer and all associated designed functions of this device. A preferred embodiment of this device would include automatic "re-dialing" or repeated network access attempts until a suitable, working connection has been established. This re-dialing feature of the device's CPU means would help insure minimal time frames for customers and retailers alike at the point of sale during busy seasons and periods for the networks and retail establishments.

9) As previously mentioned, another feature of this device is its ability, via suitable CPU means and program(s), to allow the retailer to manually overcome random and occasional failures of the automatic MICR read function. Such failure would most likely be resultant from mutilated or damaged 6-24 MICR data which would preclude the 2-15(7-15) MICR read head means from properly scanning and/or "reading" said MICR document data. (The Federal Reserve Bank's high speed MICR read means typically experience a 1% to 2% "rejection" rate with said rejections having to be entered manually at the FED.) Failure of the designed automatic MICR read function (via the 2-15[6-15] read head means and connected, suitable CPU means) can be overcome manually be using the 7-20 keypad. The following scenario will describe this function. Expecting a normal "automatic" MICR scan and EFT/cancellation of the check, the retailer has entered the check into the device in the normal fashion. Instead of the device's normal "holding" of the check within itself directly under the 2-16 print means and the CPU's normal "waiting" for proper entry of PIN, check amount, "OK's", etc., the check is "indexed" or passed right out of the machine (for example, in the direction of the arrows seen on FIG. 2) by the CPU's engaging of the document feed means 2-7 (until the 2-46 "exit" switch determines the check has completely exited and notifies the CPU to stop 2-7). The check should automatically be expelled from the device when the device's CPU 16A means has NOT received and/or recorded the expected proper and suitable MICR data immediately following the triggering of the 2-13 switch means and subsequent MICR scan made possible by the action of the docu-

20

ment feed means 2-7. Since the 2-13 switch began a normal cycle and the 2-7 was engaged, but a suitable MICR data package was not read and/or received by the CPU, the CPU means assumes that a MICR scan/-read malfunction has occurred. The CPU may or may not trigger the "CLEAR PAPER" prompt means. If the retailer has determined that a fouled document is the cause of the MICR read malfunction, he can: (1) push the 7-44 index button to try to clear the impeded document which will automatically abort the entire transaction cycle, in which case no PIN, or "OK's" will be accepted, and/or (2) release the 4-36 (5-36) means to lift the 4-5 housing and physically remove said jammed document (if any). Said releasing of the 4-36 (5-36) means will activate the associated 4-36A switch means and notify the CPU 16A to abort the transaction cycle and no PIN or "OK's" or check amount can be accepted by the CPU. If a fouled document was the cause of the MICR read malfunction, then the retailer can clear the check from the device, attempt to restore and refurbish the document, and re-enter the document for a second trial of the transaction. Since the retailer cleared the fouled document by activating the (document) index button 7-44 and/or the release means 4-36 (5-36) and its associated 4-36A switch, and thereby "aborting" the normal transaction cycle, the device's CPU means 16A will view said "re-entry" of the (previously fouled) document as a new and separate transaction and operate accordingly. If the document in question was NOT fouled or "jammed" and instead the CPU (for lack of suitable, automatically entered [via 7-15 read head] MICR data) indexed the MICR document completely through and out of the device as confirmed by an indicative response light, the device's CPU concludes that a MICR read malfunction has occurred. In such case it could begin a second countdown (e.g., 30 second, but the time period is programmable and variable) in which time the customer must enter his PIN and "OK" the PIN when asked (prompted) by the CPU. This PIN entry and "OK" of PIN by customer will be received and placed in transaction memory by the CPU as if this were a normal transaction of the type previously described; but in this case, if the PIN is NOT received and "OK'd" within the allotted time, the CPU will abort the transaction (preparing itself for the next transaction automatically). However, assuming that the PIN and PIN "OK" have been (will be) received within the allotted time period, the CPU begins (at the same instant it began the PIN countdown) a similar 30 second countdown (here again, the time period is programmable and variable) in which the device's appropriate CPU (memory) means stands to receive the MICR data from the document in question which will be manually entered by the retailer at the 2-20 (7-20) keypad means. Reading from left to right (in the same direction as if the check were normally inserted into the device for automatic scanning of the MICR) the retailer would enter digit-for-digit the entire MICR line which includes the elements of routing and transfer, Institutional Identifier, account number and check serial number as described previously. The retailer will read and enter the first nine digits, which include the check routing symbols, the institutional identifier and the check digit, and then press the 7-30 "ENTER" key. Then the retailer (continuing from left to right) will then enter the customer's account number and press (7-30) "ENTER" and likewise the check (serial) number and depress the (7-30) "ENTER" key. Pressing the (7-30) "ENTER" key in

5,053,607

21

this case duplicates the "stop codes" of the (6-24) MICR line as if the 7-15 MICR read head means were being employed at this time and tells the CPU means how long to operate the 2-7(7-7) document feed means to correctly position the check within the device. While entering said MICR line manually, said MICR data is displayed digit-for-digit/stroke-for-stroke at the 7-28 retailer display means and if the retailer (operator) recognizes a mistake in his entry, he can press the 7-32 ("CANCEL ERROR" button which will restart automatically the timed (MICR entry) countdown and he may begin again.

After he has entered all required (6-24) MICR data, except the check amount, the retailer again enters the same check into the device (normally, as if manual entry had not been required) to complete the transaction. However, since the MICR data has already been entered (into CPU's memory) using the 2-20(7-20) keypad and the customer's PIN entry and "OK" is incoming and/or expected by the CPU, the re-triggering (this time) of the 2-13(7-13) switch (due to the re-entry of the check): (1) alerts the on-board CPU to begin operation of the 2-7(7-7) document feed means for proper and suitable positioning of the MICR document within the device with regard to all designed functions of said device, (2) causes the CPU to activate the 7-20-C "ENTER CHECK AMOUNT" prompt lamp and to stand by for the retailer's entry (at 7-20) of the check amount and thereby to receive said amount into the appropriate CPU memory means, (3) extinguish the 7-20-C "ENTER CHECK AMOUNT" prompt lamp upon the receiving of the check amount into memory, and cause the entered check amount to be displayed at both 7-28 and 7-29, (4) cause the CPU to light the 7-20-F and 7-21-F "OK THE AMOUNT" prompt lamps and to stand by to receive the "OK" from 7-33 (customer's "OK" button) and (5) cause the CPU, after receiving the "OK'd" check amount, to extinguish the 7-20-F and 7-21-F "OK THE AMOUNT" prompt lamps (or some other type of suitable prompt means). In such manner a "normal automatic" MICR entry made by the 7-15(2-15) read head means and associated CPU means which was "rejected" can be manually introduced into the device and the transaction can thereby proceed normally to completion.

10) A common, reliable printer means (2-16 and 2-17) with its electronic printer control means (2-18), if required, should also offer ease of service and/or replacement by qualified service personnel. It may or may not use a common ink "ribbon" which could be replaced by the retailer. Applicants anticipate use of printer means already in manufacture as of the date of this patent application.

11) Since pressing the 7-44 "index" key prior to the device's (CPU's) automatic network access results in an aborted transaction, this same 7-44 "index" key can be thought of as an "abort" key. It should be noted, however, that due to (financial) network and/or financial institution(s) software, once the transaction data package has "entered" the network (LAN) this abortion function may not operate effectively. It is intended that pushing key 7-44 to achieve an "abort" function will be effective if it is pressed prior to the device's (CPU) connection to the network means.

12) Software and/or hardware means and functions other than those described in this patent disclosure may also be employed in ways well known to this art.

22

13) A specific version of this device, especially adapted for use in a larger installation, would be the device as otherwise described herein, but without its own on site CPU. That is to say, all "CPU" functions may be carried out by a "PC" computer located somewhere in the building (installation) but not necessarily at the point of sale as in a large department store, or by a centralized, off-site, CPU utilized by several point-of-sale mechanisms. In such case the on-site point-of-sale device would require only the MICR read head and means to connect it to the LAN and thereby transmit the MICR data along with the amount of the check as entered by the retailer at 7-20 and the PIN and the PIN OK and the "OK the amount" as entered by the customer at 7-27. The retailer identification number(s) and the network access code(s) and all required network numbers to access the carrier and/or network(s) also could be supplied by an "outboard" computer such as a suitable PC. Said PC or similar means could also tally the transferred (EFT'd) total for the retailer at the end of each shift or day. Said PC may also, if necessary, control the printing of the negotiable MICR documents and thereby eliminating the 7-18 "printer control" electronics. Thus the machine would contain the MICR read head means and communication means to the central (LAN) computer. It would also contain the keypads, both 7-20 and 7-27 and all their functions. Also, it would contain the print means to endorse the check and print all required data on the reverse side of the check and, of course, the 2-7 document feed means.

TRANSACTION/VERIFICATION/EFT/CANCEL CYCLE

A normal transaction cycle would begin with the device and it's CPU completely void of any transaction data from the previous transaction; namely, the device would NOT contain the previous customer's personal identification number, his "OK" of PIN command, his "OK the amount" command or the amount of the check as entered by the retailer at 7-20. The CPU means (if NOT connected to a LAN and/or central computer) would however have at its continual disposal the retailer identification number(s), and the network(s) and carrier(s) access codes or means enabling the device to automatically "dial" and access the appropriate carriers and networks and to identify this particular retailer to all required network(s), financial institutions, carriers, etc. The device's CPU means (whether external or onboard [internal]) automatically "dumps" or erases all customer transaction data (PIN, OK's, check amount) immediately upon completion of each transaction, but retains for each use the retailer transaction information. A typical transaction scenario would include:

1) The retailer would verbally or by means of his cash register means, indicate to the customer the amount of the sale.

2) The customer would fill out and sign his check (or other MICR document) and pass it to the retailer.

3) Retailer could visually examine the check and perform any personal identification procedures he wishes at this time. If a printed symbol on the check indicating a participating bank and customer is used, the retailer could note such at this time. If such a symbol will be used in the future by check printing companies, and if this check has said symbol, the retailer could enter the check into the device as described elsewhere.

4) Immediately upon the check entering the device and engaging the 7-13 switch, the CPU performs a

5,053,607

23

number of functions including: (A) The "ENTER PIN" prompt lamps light at 7-20 and 7-27; (B) the "ENTER CHECK AMOUNT" prompt lamp lights at 7-20.

5) The CPU can receive data in any order and/or simultaneously from both keypads 7-20 and 7-27; and if used receive data from a proper and suitable electronic cash register connected to said device in the previously described manner. The retailer would then enter the amount of the check using keypad 7-20. As the retailer enters the amount of the check, it is displayed at window 7-28 digit-for-digit/stroke-for-stroke and should the retailer notice an error in his entry of the amount, he can depress the "CANCEL ERROR" button 7-32 and re-enter the amount. If the amount entered is correct, then the retailer would press the "ENTER" button 7-30.

6) At the same time as #5 above, the customer would see the "ENTER PIN" prompt lamp and enter his PIN. If the customer notices that he has erred, he can press his "CANCEL ERROR" 7-31 button and begin again. When the customer has entered his correct PIN, he would then press the "ENTER" button 7-30A which would place the PIN entry into the CPU memory means (or send it to the LAN CPU). This pressing of the "ENTER" (PIN) button 7-30A would extinguish the "ENTER PIN" prompt lamps 7-20 and 7-27 and the "OK THE PIN" prompt lamps 7-20 and 7-27 would light. Several embodiments of PIN entry and PIN "OK" processes are described elsewhere.

7) Immediately after the retailer's entry of the check amount and his pressing of the "ENTER" (amount) key 7-30, the "ENTER CHECK AMOUNT" prompt lamp 7-20 would extinguish and (a) the check amount would be displayed at the customer's amount display means 7-29; (b) the check amount, which was being displayed digit-by-digit at window 7-28 as the retailer entered it, would continue to be displayed at 7-28, (c) the "OK THE AMOUNT" prompt lamp would light at the customer's keypad 7-27 and 7-20. When the customer presses the "OK" (the amount) key 7-33, the "OK THE AMOUNT" prompt lamps extinguish at 7-20 and 7-27 and the "OK'd" amount then enters the appropriate CPU memory and is sent to the electronic cash register (if used) to become a part of the cash register's tally and printing.

It also should be understood that when the "OK" the amount button 7-33 is pushed, said action allows the entered amount to become part of the transaction information. However, it is NOT tallied or recorded as a part of the completed sale UNTIL AFTER the amount has actually been transferred into the payee's account and acknowledgement of this fact is received from the computer means governing the payee's account. Only when this amount is paid to payee's account and verification of that fact received is the amount entered into the CPU 16A, the LAN computer or electronic cash register to become part of a record of cash paid and received by the retailer.

8) When all "local" transaction data has been entered, namely the check amount, the PIN and customer's "OK" of both the PIN and the check amount, the device's CPU means 16A immediately calls up the carrier and or network access codes and begins the process of contacting the carrier(s) and/or network(s). The CPU 16A would complete the transaction data package by adding to the customer's transaction data the stored retailer transaction data which includes his retailer iden-

24

tification number and any other such security data as may be required by the network.

9) When the complete transaction data "package" is in the network means, the network means would automatically route the "package" to the appropriate payer's bank using the FED's routing and transit symbols to locate the payor's bank institution. The transaction from here (and perhaps from the point the data package enters the network) resembles a common "debit card" transaction in that: (a) the payor's bank CPU means encrypts/decrypts the data package as necessary, (b) there is verification of the existence of the payor's account, (c) there is verification of the PIN through whatever means this particular institution chooses to use, (d) recordation of the transaction is made and, (e) the amount of the check (or MICR document) along with the transaction data package is transmitted back to the appropriate network means.

10) The network means, receiving the appropriate transaction package back along with the cash transfer, would then route said package to the payee's banking institution using the payor's routing and transit numbers (entered when the retailer bought the device as described elsewhere). When the data package has reached the payee's financial institution, it would also proceed much the same as if this were a common debit card transaction. Among other things, said institution would: (a) encrypt and decrypt the information as necessary, (b) verify the retailer identification number (RIN), (c) verify the payee account number and perform any security checks which connect the RIN with the payee account number as it chooses, (d) deposit the funds into the payee account, (e) verify that the funds have been deposited, and (f) return verification of deposited funds along with endorsement data and all necessary routing data back to the network. The RIN and/or payee's account number or other proprietary means may be used to enable the payee's bank's CPU means to transmit a (partially prerecorded) endorsement and cancellation data package to properly endorse the check with the payee's required name and bank, amount deposited, time, etc. as previously described. Time affected data, such as time of day and amount deposited would not be "prerecorded."

11) When the transaction data package returns from the network to the device's CPU means, said device's CPU means: (a) verifies that the amount has been deposited, (b) records all endorsement data and all other such necessary data to endorse and cancel the check upon verification of transfer of funds, (c) send all necessary information to associated electronic cash register means upon receiving verification that the funds have been transferred in order that it might take notice of the "amount tendered", which in this case is the same as "cash tendered" and (d) disconnects from all network means upon receiving of the data returned from the network so recorded.

12) At this point the CPU will engage the print means to print the endorsement and cancellation data on the check as described elsewhere. The electronic cash register (if used) can now print its sales slip taking note of the transferred funds as "amount tendered" or "cash tendered."

13) The check is printed and expelled from the device and the CPU erases or dumps from memory all entered customer transaction data AND all cancellation data which includes the endorsement data, the amount time, etc. The CPU only retains the retailer transaction data

5,053,607

**25**

as described elsewhere. When this transaction is completed and the check has been expelled as verified by the "exit switch" 7-46, the "TRANSACTION COMPLETE" prompt lamps 7-20-E and 7-27-E light. The retailer can then pass the cancelled check back to the customer as part of the customer's sales record and receipt. If necessary, the retailer could print a "cash ticket" to place into his cash register by placing an NCR page behind the check and inserting the pair into the device to be printed simultaneously.

It will, of course, be understood that various changes may be made in the form, details and arrangements of the components, as well as in the procedures and functions carried out by them, without departing from the scope of the invention which consists of the matter shown and described herein and set forth in the appended claims.

Thus having disclosed our invention; we claim:

1. A point-of-sale negotiable instrument processing device comprising:

   (1) a housing having a first compartment, a second compartment and a spacer means which positions the first compartment next to the second compartment so as to define a slot between said first and second compartments;

   (2) MICR read head means for reading MICR information on a negotiable instrument;

   (3) printer means for printing on a negotiable instrument;

   (4) switching means to initiate preprogrammed CPU functions upon the negotiable instrument;

   (5) motive means for moving the negotiable instrument: (a) into position in the slot so as to be read by the MICR read head means, (b) into position to be printed upon and (c) into and out of the slot;

   (6) positioning means for positioning the negotiable instrument in the slot so that MICR information on the negotiable instrument can be read by the MICR read head means and for positioning the negotiable instrument in the slot so that the rear side of the negotiable instrument can be printed upon;

   (7) alpha/numerical keypad means for transmitting information to a CPU;

   (8) a CPU for receiving information from the alpha/-numerical keypad means and the MICR read head means in order to communicate said information to a telecommunications system in order to transfer funds represented by the negotiable instrument from an account of the maker of the negotiable instrument to an account of the payee of the negotiable instrument; and

   (9) means for electronically connecting the point-of-sale negotiable instrument processing device to a telecommunications system.

2. A point-of-sale negotiable instrument processing device comprising:

   (1) a housing having a first compartment, a second compartment and a spacer means which positions the first compartment above the second compartment in a stacked configuration so as to define a slot between said first and second compartments;

   (2) MICR read head means, located in said second compartment, for reading MICR information on a face side of a negotiable instrument;

   (3) printer means, located in said first compartment, for printing on a rear side of the negotiable instrument;

**26**

   (4) switching means to initiate preprogrammed CPU functions upon the negotiable instrument;

   (5) motor means for moving the negotiable instrument (a) into position in the slot so that MICR information on the negotiable instrument can be read by the MICR read head means, (b) moving the negotiable instrument into position in the slot so that the rear side of the negotiable instrument can be printed upon and (c) moving the negotiable instrument out of the slot;

   (6) means for positioning the negotiable instrument so that MICR information on said negotiable instrument can be read by the MICR read head means;

   (7) means for positioning the negotiable instrument so that the printer means can print on said negotiable instrument;

   (8) a retailer's alpha/numerical keypad for transmitting information to a CPU;

   (9) a customer's alpha/numerical keypad for transmitting information to a CPU;

   (10) a CPU for receiving information from the retailer's alpha/numerical keypad, the customer's alpha/numerical keypad and the MICR read head means in order to communicate said information to a telecommunications system in order to transfer funds represented by the negotiable instrument from an account of the maker of the negotiable instrument to an account of the payee of the negotiable instrument; and

   (11) means for electronically connecting the point-of-sale negotiable instrument processing device to a telecommunications system.

3. The device of claim 2 which further comprises a security code system.

4. The device of claim 2 which further comprises means to access a computer system maintained by an issuer of a negotiable instrument.

5. The device of claim 2 which further comprises means to access a computer system maintained by a group of retailers using a centralized CPU system.

6. The device of claim 2 which further comprises means to enter a customer's PIN identification number.

7. The device of claim 2 which further comprises means to connect the MICR read head means and a PIN identification number entry means to the printing means so that the printing means is actuated only when signals are compatible.

8. The device of claim 2 which further comprises means to access an external communications system to identify a payor of a negotiable instrument through use of a personal identification number.

9. The device of claim 2 which further comprises a plurality of signal devices indicating the condition of a plurality of circuits contained in said device.

10. The device of claim 2 which further comprises means to display the amount of the transaction, as indicated on the negotiable instrument, to both the retailer and the customer.

11. The device of claim 2 which further comprises means to produce an imprinted copy of a transaction processed by use of the device.

12. The device of claim 2 which further comprises a data entry override means.

13. The device of claim 2 which further comprises a personal identification number module having a key tab matrix connected to the CPU, wherein said key tab matrix is set to match a transaction amount to be re-

5,053,607

**27**

corded with an override means connected to the CPU for actuating said printing means.

14. The device of claim 2 which further comprises hinge means to separate the first compartment from the second compartment and thereby expose a space defined by the slot.

15. The device of claim 2 which further comprises a table having a perpendicular edge which table is located on the second compartment in order to facilitate travel

**28**

of, and MICR head reading of, the negotiable instrument while it is in the slot.

16. The device of claim 2 which further comprises magnetic stripe read head means.

17. The device of claim 2 which further comprises means to read Universal Product Code data.

18. The device of claim 2 which employs optical read head means in place of the MICR read head means.

* * * * *

# EXHIBIT 7

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In Re Application of Robert H. Hills and Henry R. Nichols

Serial No. 08/257,390                Group Art Unit: 2514

Filed: 06/09/94                      Examiner: Pitts, H.

For:   CHECKWRITING POINT OF SALE SYSTEM

\*      \*      \*      \*      \*

RESPONSE TO OFFICE ACTION OF 10/28/94

\*      \*      \*      \*      \*

RECEIVED
FEB 06 1995
GROUP 2500

Commissioner of Patents and Trademarks
Box Non-Fee Amendment
Washington, D.C. 20231

Sir:

    Enclosed please find the following:

    1.   Response to Office action dated 10/28/94 (27 pages); and

    2.   Certificate of First Class mailing.

                        Respectfully submitted,

                        Jon L. Roberts
                        Registration No. 31,293
                        Roberts & Associates
                        1953 Gallows Road
                        Suite 220
                        Vienna, Virginia 22182
January 7, 1995         Phone: (703) 356-7700

CONFIDENTIAL

LML-EP 000182

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In Re Application of Robert H. Hills and Henry R. Nichols

Serial No. 08/257,390          Group Art Unit: 2514

Filed:  06/09/94               Examiner: Pitts, H.

For:   CHECKWRITING POINT OF SALE SYSTEM

\*     \*     \*     \*     \*

RESPONSE TO OFFICE ACTION OF 10/28/94

\*     \*     \*     \*     \*

RECEIVED
FEB 0 6 1995
GROUP 2500

Commissioner of Patents and Trademarks
Box Non-Fee Amendment
Washington, D.C. 20231

Sir:

Applicant hereby submits the following response to the Office action of 10/28/94.

In the Claims:

1.   (Twice Amended)     A checkwriting point of sale system comprising:

a point of sale terminal adapted to receive consumer bank account information from any bank check;

a central computer system;

first communications means integral to said point of sale terminal for electronically communicating with the central computer system;

memory means integral to said point of sale terminal for temporarily storing the consumer bank account information;

CONFIDENTIAL

LML-EP 000183

the central computer system having second communication means for receiving information from a plurality of said point of sale terminals;

the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using [a] the bank check as a negotiable instrument.

8. (Twice Amended)     A checkwriting point of sale process comprising [the steps of]:

a)     presenting [a] any bank check specimen to a point of sale terminal located at a merchant or service provider,

b)     reading the magnetic ink character recognition number information on the check for the sole purpose of obtaining without using the check as a negotiable instrument, consumer bank account information,

c)     storing the consumer bank account information obtained from the check and verifying that account numbers were accurately read at the point of sale terminal,

d)     [inputting] providing transaction event information [into] to the point of sale terminal,

e)     transmitting the transaction event information and consumer bank account information to a central computer system,

f)     storing the transaction event information and consumer banking account information, and

2

CONFIDENTIAL

g) subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations.

11. (Amended) A checkwriting point of sale system comprising:

a point of sale terminal adapted to receive consumer bank account information;

a central computer system;

first communications means integral to said point of sale terminal for electronically communicating with the central computer system; and

memory means integral to said point of sale terminal for temporarily storing the consumer bank account information;

the point of sale terminal comprising reading means for reading magnetic ink character recognition numbers on any consumer bank [checks] check for the sole purpose of eliciting consumer bank account information;

the central computer system having second communication means for receiving information from a plurality of said point of sale terminals;

the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using a bank check as a negotiable instrument.

3

CONFIDENTIAL

LML-EP 000185

15 17. (Amended) The checkwriting point of sale process of claim
8 9, further comprising [the steps of]:

    a)   verifying the status of the consumer bank account,

    b)   verifying the consumer bank account status of the
consumer via a query to a third party database if the consumer bank
account is verified as bad, and

    c)   sending an approval message to the point of sale
terminal if the consumer's banking account status is approved for
the transaction.

16 18. (Amended) The checkwriting point of sale process of claim
8 9, further comprising [the steps of]:

    (A) printing a transaction event sales slip following the
sending of an approval message; and

    (B) executing of the sales slip by the consumer as proof of
bank account access authorization.

17 19. (Amended) The checkwriting point of sale process of claim
15 17, further comprising [the steps of]:

    (A) printing a transaction event sales slip following the
sending of an approval message; and

    (B) executing of the sales slip by the consumer as proof of
bank account access authorization.

18 20. (Amended) The checkwriting point of sale process of claim
8 9, further comprising [the step of] automatically logging point of
sale terminal location information and transaction date, time, and
sales amount information into the point of sale terminal.

4

CONFIDENTIAL

LML-EP 000186

## REMARKS

Claims 1-4, 6-9, and 11-22 are pending in the application. Claims 1-4, 6-9, and 11-21 were rejected. It is assumed that claim 22 has been overlooked and was intended to be rejected as well. Claims 1, 9, 11, and 17-20 have been amended. Claims 1, 9, and 11 are the independent claims.

The Examiner rejected claims 1-4, 6-9, and 11-21 (and presumably claim 22) under 35 U.S.C. § 112 as being indefinite for failing to particularly point out and distinctly claim the subject matter that Applicants regard as the invention. The Examiner stated that Applicants have discussed the Case and Deming patents in the specification but have not claimed the argued novelty. The Examiner further stated that there has been no specific comparison of claim language vis-a-vis the references cited in the previously submitted I.D.S. or the references cited in combination by the Examiner in the previous final rejection. The Examiner also stated that only one set of claims should be selected as the three sets of claims appear to embody separate inventions.

The Examiner concluded by stating that the claims are rejected as set forth in the previous final rejection, with the further notation that to use the check "solely" for access would be the most trivial modification of systems such as Granzow etc.

The specification was previously amended to discuss the patents to Case and Deming in the Background section. Applicants consider these patents to provide good background material for understanding their invention, which is an improvement on previous

5

CONFIDENTIAL

LML-EP 000187

systems. The Case and Deming patents were merely discussed in this manner; no matters of novelty were argued. The Examiner stated that Applicants have not claimed the novelty of the invention. Applicants assert that the claims, as presented in the preliminary amendment, do in fact recite such novelty, which will be pointed out in the paragraphs that follow.

Applicants respectfully assert that, contrary to the Examiner's contention, specific claim language has been compared to the teachings of the references cited in prior Office actions in order to overcome the Examiner's previous rejections. An examination of responses to prior Office actions will confirm this. Applicants have taken pains to completely review all prior responses to Office actions in this regard. Unfortunately, a comparison of cited references to particular claim language was not provided in the most recent Office action. Nevertheless, in the following paragraphs, each reference, whether cited by Applicants or by the Examiner, will be compared with specific claim language in order to overcome what Applicants presume the Examiner's rejection to be. It will be shown that it is not necessary to compare each element of every claim with each referenced patent because there is at least one element recited in all the independent claims that is not disclosed by any of the referenced patents, and thus any combination of the references could not render the claims obvious.

CONFIDENTIAL

LML-EP 000188

Applicants' Invention

The following are brief summaries of the elements recited in Applicants' independent claims.

Claim 1

Claim 1 recites a checkwriting point-of-sale system comprising a point of sale terminal, a central computer, first and second communication means, and memory. The point of sale terminal accepts bank account information from any bank check. The system transfers funds as part of a transaction without using the bank check as a negotiable instrument.

Claim 9

Claim 9 recites a checkwriting point-of-sale process comprising presenting any bank check to a merchant's terminal, reading MICR information from the check for the sole purpose of obtaining bank account information, storing the information, providing transaction event information to the terminal, transmitting the transaction information to a central computer, storing all the information, and transmitting the transaction information to a bank for clearing house functions.

Claim 11

Claim 11 recites a checkwriting point-of-sale system comprising a point of sale terminal, a central computer, first and second communication means, and memory. The point of sale terminal accepts bank account information by reading the MICR information from any bank check. The system transfers funds as part of a

7

CONFIDENTIAL

transaction without using the bank check as a negotiable instrument..

Case 4,270,042

Case discloses an electronic funds transfer system. The system includes use of a letter of credit card and a draft instrument unique to the Case system. Case does not disclose the use of any bank check solely to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11. Rather, Case uses a combination of letter of credit card and system-unique negotiable instrument that is negotiated as part of the transaction. Consumer information is provided by the letter of credit card, and the negotiable draft instrument is given to the vendor to pay for the transaction.

Thus, an element recited in all of Applicants' claims is not disclosed by Case. Further, it would not be trivial to modify Case so that an ordinary bank draft is used for informational purposes only. The entire Case system is set up around a unique pre-paid (and therefore pre-authorized) account in which a system-unique draft instrument is given up, that is, negotiated as part of the transaction. To include the missing elements of Applicants' claims would be to change the entire nature of the Case system from a closed, pre-paid system using unique draft negotiable instruments to one which electronically debits a bank account based on information derived from any ordinary check. Including elements of Applicants' claims is unecessary for Case because each transaction is preauthorized through prepayment. Thus, it is neither possible

8

nor proper to combine the system of Case with another system in an effort to result in Applicants' claimed system.

Deming 4,823,264

Deming discloses an electronic funds transfer system used in conjunction with home banking, not a point-of-sale transaction. Deming does not disclose the use of a bank check in a point-of-sale transaction solely to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11. Rather, Deming discloses a home banking method by which all payor and payee information is entered manually into a computer. A bank check is never used, except when a routing and transfer number is not available for the payee, in which case a paper check is issued and mailed for later negotiation by the payee.

Thus, an element recited in all of Applicants' claims is not disclosed by Deming. Further, it would not be trivial to modify Deming so that a bank draft is used for informational purposes only. The Deming system is a home banking system used by a single payor to pay a number of payees. Thus, the payor's information will always be stored on the system; there is no reason to read it from a check. In contrast, Applicants' system will always be used at the payee's place of business, and information must be gathered from a great number of payors. Therefore, the payee's information will always be stored on the system and the payor's information will have to be entered. This is done by reading it from the check. To include the missing elements of Applicants' claims would

9

LML-EP 000191

be to change the very nature of the Deming system from a personal bank at home system to a point-of-sale system. Thus, it is neither possible nor proper to combine the system of Deming with a point-of-sale system in an effort to assemble Applicants' claimed system.

<u>Carlson et al. 5,053,607</u>

Carlson et al. disclose a system adapted for processing checks. The system includes a device that reads MICR information printed on the check. This reading of the MICR data speeds up processing of the check at the point of sale. The check is still used as a negotiated instrument, however, and is turned over to the merchant to complete the transaction. Thus, Carlson et al. do not disclose the use of a bank check in a point-of-sale transaction solely to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11. Rather, the Carlson et al. system requires negotiation of the check.

Thus, an element recited in all of Applicants' claims is not disclosed by Carlson et al. Further, it would not be trivial to modify Carlson et al. so that a bank draft is used for informational purposes only. The entire Carlson et al. system is set up to process checks in order to speed the debiting and crediting of the negotiated amount at a later date. To include the missing elements of Applicants' claims would be to change the very nature of the Carlson et al. system from a system that prepares checks for negotiation to one which doesn't negotiate checks at all. Thus, it is neither possible nor proper to combine the system

10

CONFIDENTIAL

LML-EP 000192



of Carlson et al. with another system in an effort to result in Applicants' claimed system.

Carlson et al. 4,678,896

Carlson et al. here disclose a mechanism that includes security features to prevent unauthorized tampering. This device includes a MICR reader, but again only processes instruments that are negotiated as part of the transaction taking place at the point of sale. Thus, Carlson et al. do not disclose the use of a bank check in a point-of-sale transaction in order to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11. Rather, Carlson et al. require negotiation of the check.

Thus, an element recited in all of Applicants' claims is not disclosed by Carlson et al. Further, it would not be trivial to modify Carlson et al. so that a bank draft is used for informational purposes only. The entire Carlson et al. system is set up to process checks in order to speed the debiting and crediting of the negotiated amount at a later date and to provide security against tampering with checks accepted to complete the transaction. To include the missing elements of Applicants' claims would be to change the very nature of the Carlson et al. system from a system that prepares checks for negotiation to one which doesn't negotiate checks at all. Further, the protection of negotiated checks after the transaction provided by Carlson et al. is completely unnecessary using Applicants' system as the vendor never takes a check from the purchaser. The check is only

11

CONFIDENTIAL

temporarily given to the vendor so that information may be read. Thus, it is neither possible nor proper to combine the system of Carlson et al. with another system in an effort to result in Applicants' claimed system.

Murphy et al. 4,672,377

Murphy et al. disclose a check authorization system whereby a supermarket customer is assigned a UPC code which is used to access a database used to check the credit status of the customer at each transaction. If the customer's credit is good, acceptance of the check in payment for the transaction is authorized. The check is then negotiated as it would be in any normal transaction. Thus, Murphy et al. do not disclose the use of a bank check in a point-of-sale transaction in order to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11. Rather, Murphy et al. provide a credit check before a check is negotiated.

Thus, an element recited in all of Applicants' claims is not disclosed by Murphy et al. Further, it would not be trivial to modify Murphy et al. so that a bank draft is used for informational purposes only. The entire Murphy et al. system is set up to authorize the acceptance of a check as a negotiable instrument in payment for goods. To include the missing elements of Applicants' claims would be to change the very nature of the Murphy et al. system from a system that authorizes the acceptance of negotiable instruments to one which does not accept negotiable instruments at all. To process checks in the manner provided by Applicants'

12

CONFIDENTIAL

invention would go beyond modification of the Murphy et al.
invention; it would do away with the entire purpose behind the
Murphy et al. invention. Thus, it is neither possible nor proper
to combine the system of Murphy et al. with another system in an
effort to result in Applicants' claimed system.

<u>Lindemann et al. 4,933,536</u>

Lindemann et al. disclose a check processing device whereby
some form of customer identification, such as a photograph, is
reproduced on a bank check that is presented for tender. This
identification feature is used as a deterrence to the passing of
bad checks. After the identification has been added to the check,
the check is processed as it would in any normal transaction,
including acceptance of the check as a negotiable instrument in
payment for goods and services. Thus, Lindemann et al. do not
disclose the use of a bank check in a point-of-sale transaction in
order to derive consumer information and not for use as a
negotiable instrument, as recited in independent claims 1, 9, and
11. Rather, Lindemann et al. provide an identification feature
before the check is negotiated.

Thus, an element recited in all of Applicants' claims is not
disclosed by Lindemann et al. Further, it would not be trivial to
modify Lindemann et al. so that a bank draft is used for
informational purposes only. The entire Lindemann et al. system is
set up to add an identification feature to a check in order to
deter passing bad checks as negotiable instruments. To include the
missing elements of Applicants' claims would be to change the very

13

CONFIDENTIAL

LML-EP 000195

nature of the Lindemann et al. system from one which provides security against the acceptance in payment of bad checks to one that doesn't accept checks for payment at all.  To process checks in the manner provided by Applicants' invention would go beyond modification of the Lindemann et al. invention; it would do away with the entire purpose behind the Lindemann et al. invention. Thus, it is neither possible nor proper to combine the system of Lindemann et al. with another system in an effort to result in Applicants' claimed system.

<u>Lord, Jr. 4,810,866</u>

Lord discloses a check validation and check writing system whereby coded information is read from a consumer's bank check in order to determine if the associated bank account has sufficient funds to cover a transaction taking place.  If sufficient funds are present, a blank check is printed using the device, which imprints the date, transaction total, etc. and presents the check to the customer for signature.  Once the check is executed, it is given to the merchant as payment and is negotiated as would be any normal check in such a transaction.  Thus, Lord does not disclose the use of a bank check in a point-of-sale transaction in order to derive consumer account information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11.  Rather, Lord <u>requires</u> the negotiation of a system-unique check as payment for a transaction.

Thus, an element recited in all of Applicants' claims is not disclosed by Lord.  Further, it would not be trivial to modify Lord

14

CONFIDENTIAL

LML-EP 000196

so that a bank draft is used for informational purposes only. The entire Lord system is set up to print transaction information on a check so that it can be used as a negotiable instrument. To include the missing elements of Applicants' claims would be to change the very nature of the Lord system from one which produces a negotiable instrument to one which does not use a negotiable instrument. To process checks in the manner provided by Lord is contrary to the entire purpose behind Applicants' invention. Printing of transaction information on checks using Applicants' system is unnecessary because the checks are never surrendered to the vendor. Thus, it is neither possible nor proper to combine the system of Lord with another system in an effort to result in Applicants' claimed system.

## Fukatsu 4,743,743

Fukatsu discloses a transaction apparatus. This apparatus is not part of a point-of-sale system, but rather is an automatic teller machine system. The machine accepts checks along with a "bill" which indicates whether money is to be deposited, withdrawn, etc. As a check is entered into the machine, the MICR code is read, simplifying post-processing, which takes place manually at a later time. Thus, Fukatsu does not disclose the use of a bank check in a point-of-sale transaction in order to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11. Rather, Fukatsu discloses a system for processing negotiable instruments prior to later manual reconciliation of the checking account.

15

CONFIDENTIAL

Thus, an element recited in all of Applicants' claims is not disclosed by Fukatsu. Further, it would not be trivial to modify Fukatsu so that a bank draft is used for informational purposes only. The entire Fukatsu system is set up to accept and process checks for deposit to a bank. To include the missing elements of Applicants' claims would be to change the very nature of the Fukatsu system to one which does not process negotiated checks at all. To process checks in the manner provided by Applicants' invention is not necessary, beneficial, or consistent with the service provided by Fukatsu, which is not contemplated for use in a merchant setting and would not work in such a setting. Thus, it is neither possible nor proper to combine the system of Fukatsu with another system in an effort to result in Applicants' claimed system.

<u>Cain 4,523,330</u>

Cain discloses a banking system used to process checks. This system scans checks deposited with the bank in order to read MICR data printed on the checks, and also to read handwritten data using character recognition software. Once character recognition is accomplished, the data is converted to MICR data and printed on the check. Thus, Cain does not disclose the use of a bank check in a point-of-sale transaction in order to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11. Rather, Cain discloses a system for processing previously negotiated checks.

16

CONFIDENTIAL

Thus, an element recited in all of Applicants' claims is not disclosed by Cain. Further, it would not be trivial to modify Cain so that a bank draft is used for informational purposes only. The entire Cain system is set up to accept and process checks that have been deposited to a bank. To include the missing elements of Applicants' claims would be to change the very nature of the Cain system to one which does not accept negotiated checks at all. To process checks in the manner provided by Applicants' invention is not necessary, beneficial, or consistent with the service provided by Cain. Thus, it is neither possible nor proper to combine the system of Cain with another system in an effort to result in Applicants' claimed system.

<u>Nunley et al. 4,404,649</u>

Nunley et al. disclose a document processing system. This system scans checks deposited with a bank in order to read MICR data printed on the checks, and to tag the check with a source item control number. Thus, Nunley et al. do not disclose the use of a bank check in a point-of-sale transaction in order to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11. Rather, Nunley et al. provide processing of previously negotiated checks.

Thus, an element recited in all of Applicants' claims is not disclosed by Nunley et al. Further, it would not be trivial to modify Nunley et al. so that a bank draft is used for informational purposes only. The entire Nunley et al. system is set up to accept and process checks that have been deposited to a bank. To include

17

CONFIDENTIAL

LML-EP 000199

the missing elements of Applicants' claims would be to change the
very nature of the Nunley et al. system to one which does not
accept negotiated checks at all. To process checks in the manner
provided by Applicants' invention is not necessary, beneficial, or
consistent with the service provided by Nunley et al, which is not
contemplated for use in a merchant setting and would not work in
such a setting. In fact, Nunley et al. specifically rule out the
possible use of the system at the point-of-sale. Thus, it is
neither possible nor proper to combine the system of Nunley et al.
with another system in an effort to result in Applicants' claimed
system.

Granzow et al. 4,580,040

Graznow et al. disclose a teller-assisted, customer-operated
automatic teller machine check cashing system. According to this
system, the automatic teller machine is linked to a teller station
equiped with a MICR data reader. When a customer presents a check
to be cashed, the MICR data is read, the customer's or the third
party payor's checking account balance is check for sufficiency of
funds, and cash is dispensed if the account balance is sufficient.
Thus, Graznow et al. do not disclose the use of a bank check in a
point-of-sale transaction in order to derive consumer information
and not for use as a negotiable instrument, as recited in
independent claims 1, 9, and 11. Rather, Graznow et al. disclose
a bank system for verifying checks to be negotiated.

Thus, an element recited in all of Applicants' claims is not
disclosed by Graznow et al. Further, it would not be trivial to

18

CONFIDENTIAL

LML-EP 000200

modify Graznow et al. so that a bank draft is used for informational purposes only. The entire Graznow et al. system is set up to cash checks that have been presented to a bank. To include the missing elements of Applicants' claims would be to change the very nature of the Graznow et al. system from one that has the sole function of accepting checks for negotiation to one which is used as part of a point-of-sale transaction and does not accept the check for negotiation. To process checks in the manner provided by Applicants' invention is not necessary, beneficial, or consistent with the service provided by Graznow et al. Thus, it is neither possible nor proper to combine the system of Graznow et al. with another point-of-sale system in an effort to assemble Applicants' claimed system.

<u>Granzow et al. 4,617,457</u>

Here, Graznow et al. disclose the same invention as that discussed above, with the addition of an image for presenting an image of the check to be cashed to the teller present at the teller station. Again, Graznow et al. do not disclose the use of a bank check in a point-of-sale transaction in order to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11. Rather, Graznow et al. disclose a bank system for verifying checks to be negotiated.

Thus, an element recited in all of Applicants' claims is not disclosed by Graznow et al. Further, it would not be trivial to modify Graznow et al. so that a bank draft is used for informational purposes only. The entire Graznow et al. system is

19

CONFIDENTIAL

LML-EP 000201

set up to cash checks that have been presented to a bank.  To
include the missing elements of Applicants' claims would be to
change the very nature of the Graznow et al. system from one that
has the sole function of accepting checks for negotiation to one
which is used as part of a point-of-sale transaction and does not
accept the check for negotiation.  To process checks in the manner
provided by Applicants' invention is not necessary, beneficial, or
consistent with the service provided by Graznow et al.  Thus, it is
neither possible nor proper to combine the system of Graznow et al.
with another system in an effort to result in Applicants' claimed
system.

Simjian 3,824,544

     Simjian discloses a merchandizing arrangement utilizing a
coded sales ticket.  The customer obtains the coded sales ticket by
selecting an item for purchase and paying for the item.  The coded
ticket is then brought to a merchandise dispensing area and is
exchanged for the purchased item.  Thus, Simjian does not disclose
the use of a bank check in a point-of-sale transaction in order to
derive consumer information and not for use as a negotiable
instrument, as recited in independent claims 1, 9, and 11.  Rather,
Simjian discloses a merchandise vending security system, the point-
of-sale aspect of which is conventional.

     Thus, an element recited in all of Applicants' claims is not
disclosed by Simjian.  Further, it would not be trivial to modify
Simjian so that a bank draft is used for informational purposes
only.  The entire Simjian system is set up to provide security

20

against shoplifting by controlling access to merchandise. The invention is not even directed to the payment part of the transaction. To include the missing elements of Applicants' claims would be to change the very nature of the Simjian system by adding a new inventive element to the system. To process checks in the manner provided by Applicants' invention is not necessary, beneficial, or consistent with the service provided by Simjian. Thus, it is neither possible nor proper to combine the system of Simjian with another system in an effort to result in Applicants' claimed system.

Schuller 3,845,470

Schuller discloses a check-controlled vending system. This system uses pre-paid tickets, or "checks", as a payment means for a vending machine. These tickets are coded to provide security features. Thus, Schuller does not disclose the use of a bank check in a point-of-sale transaction in order to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11. Rather, Schuller discloses a payment system for vending machines which uses specialized tickets as negotiable instruments.

Thus, an element recited in all of Applicants' claims is not disclosed by Schuller. Further, it would not be trivial to modify Schuller so that a bank draft is used for informational purposes only. The entire Schuller system is set up to provide security against shoplifting by controlling access to merchandise using pre-paid tickets. The invention is not even directed to the payment

21

LML-EP 000203

part of the transaction.   To include the missing elements of Applicants' claims would be to change the very nature of the Schuller system by adding a new inventive element to the system. To process checks in the manner provided by Applicants' invention is not necessary, beneficial, or consistent with the service provided by Schuller.  Thus, it is neither possible nor proper to combine the system of Schuller with another system in an effort to result in Applicants' claimed system.

Ohmae et al. 4,673,802

Ohmae et al. disclose a system for using a bank debit card to pay for merchandise at a point of sale.  Unlike normal debit card transactions, the Ohmae et al. system allows for a grace period between the time the sale is made and the time the cash is debited from the customer's account.  Thus, Ohmae et al. do not disclose the use of a bank check in a point-of-sale transaction in order to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11.  Rather, Ohmae et al. disclose a system for delaying the posting of a debit to a user's account.

Thus, an element recited in all of Applicants' claims is not disclosed by Ohmae et al.  Further, it would not be trivial to modify Ohmae et al. so that a bank draft is used for informational purposes only.  The entire Ohmae et al. system is set around the use of a debit card.  To include the missing elements of Applicants' claims would be to change the very nature of the Ohmae et al. system to one which electronically debits a bank account

22

CONFIDENTIAL

based only on information derived from a bank check to complete a point-of-sale transaction. To process checks in the manner provided by Applicants' invention is not necessary, beneficial, or consistent with the service provided by Ohmae et al. Thus, it is neither possible nor proper to combine the system of Ohmae et al. with another system in an effort to result in Applicants' claimed system.

Tateisi et al. 4,678,895

Tateisi et al. disclose a normal system for using a bank debit card to pay for merchandise at a point of sale. The system includes a terminal device, connected to a cash register, for performing the account debit function while the cash register rings up the sale. Thus, Tateisi et al. do not disclose the use of a bank check in a point-of-sale transaction in order to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11. Rather, Tateisi et al. disclose a system for performing a debit function separate from a tallying function in order to speed transactions.

Thus, an element recited in all of Applicants' claims is not disclosed by Tateisi et al. Further, it would not be trivial to modify Tateisi et al. so that a bank draft is used for informational purposes only. The entire Tateisi et al. system is set around the use of a debit card. To include the missing elements of Applicants' claims would be to change the very nature of the Tateisi et al. system to one which electronically debits a bank account based only on information derived from a bank check to

23

CONFIDENTIAL

complete a point-of-sale transaction. To process checks in the manner provided by Applicants' invention is not necessary, beneficial, or consistent with the service provided by Tateisi et al. Thus, it is neither possible nor proper to combine the system of Tateisi et al. with another system in an effort to result in Applicants' claimed system.

<u>Sakuma et al. 4,934,772</u>

Sakuma et al. disclose a light beam scanning lens and light beam scanning device. Sakuma et al. disclose a scanning system that has potential utility in scanning information from a check, but such use is not disclosed. Thus, Sakuma et al. do not disclose the use of a bank check in a point-of-sale transaction in order to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11. Rather, Sakuma et al. disclose a light beam scanning device.

Thus, an element recited in all of Applicants' claims is not disclosed by Sakuma et al. Further, it would not be trivial to modify Sakuma et al. so that a bank draft is used for informational purposes only. Sakuma et al. merely disclose the optical scanning elements of an undisclosed system. To include the missing elements of Applicants' claims would be to completely redefine the Sakuma et al. invention and is beyond the scope of the Sakuma et al. invention. Thus, it is neither possible nor proper to combine the device of Sakuma et al. with a point-of-sale system in an effort to assemble Applicants' claimed system.

24

CONFIDENTIAL

LML-EP 000206

Summary

None of the referenced patents discloses at least one element recited in all of Applicants' claims. That is, none of the references discloses a point-of-sale system that uses any bank check solely for the purposes of gathering customer information and not as a negotiable instrument used to pay for goods received in a transaction. Because none of these references discloses this element, no combination of these references can disclose Applicants' claimed system, because such a combination would also be missing this element. Further, the addition of this missing element to any of the references is not trivial or obvious, and in fact is not compatible with the stated purpose of the references. None of the references teaches or suggests the utility of adding features of Applicants' claimed invention to the cited reference inventions. Thus, Applicants' claimed invention cannot be rendered obvious by any combination of these references, nor is the combination of these references proper.

It is important to note that Applicants have focussed on only one particular element of the claimed invention in response to the Examiner's rejection. Applicants in no way acknowledge the disclosure of any of the other claimed elements in any of the references, nor do Applicants concede that the chosen element is the only novel and non-obvious aspect of the claimed invention. For organizational ease and clarity in response to the Examiner's broad rejection of the claims, in which no particular reference was applied to any particular claim or element, Applicants chose to

25

LML-EP 000207

rely on one novel element in order to overcome the rejection. As shown in the above discussion, one element that is missing from all cited references is enough to show that the claimed invention is novel and non-obvious.

Regarding the Examiner's contention that three separate inventions are present, and that only one set of claims should be selected for continued prosecution, Applicants respectfully traverse. There are in fact three sets of claims. The first set includes independent claim 1 and dependent claims 2-4, 6-8, 15, and 16. The second set includes independent claim 9 and dependent claims 17-20. The third set includes independent claim 11 and dependent claims 12-14, 21, and 22. The first set and the third set recite the system of the present invention as an apparatus. Although the claims differ in scope and in the particular terms used, they do not recite patentably distinct inventions. See MPEP 806.03. The second set of claims recites the system of the present invention as a process. Claiming an invention in terms of two different statutory classes of invention does not in itself render the two sets of claims patentably distinct. These differences among these claims do not satisfy the criteria for a proper restriction under MPEP 803. Applicants will respond to a formal restriction requirement from the Examiner, but respectfully decline to voluntarily cancel two sets of properly submitted claims in response to the Examiner's comments.

It is respectfully urged that all rejections have been overcome. It is therefore respectfully requested that this

26

CONFIDENTIAL

amendment be entered, the claims allowed, and the case passed to
issue. Because Applicants have compared all cited references with
the recited elements of Applicants' claims, it would be appreciated
if the Examiner would reject with more particularity in the future,
should more rejections be forthcoming. That is, it would be
helpful if the Examiner would compare cited references to the
rejected claims and point out which aspects of Applicants'
traversal he finds lacking. Please see MPEP 707.07 (d)-(f).

Respectfully submitted,

Jon L. Roberts
Registration No. 31,293
Roberts & Associates
1953 Gallows Road
Suite 220
Vienna, Virginia 22182
Phone: (703) 356-7700

January 22, 1995

27

CONFIDENTIAL

LML-EP 000209



## CERTIFICATE OF FIRST CLASS MAILING

Date of Mailing: _____ January 30, 1995 _____

I hereby certify that the Response to Office Action dated 10/28/94 (27 pages) directed to the application of Robert H. Hills and Henry R. Nichols  for a CHECKWRITING POINT OF SALE SYSTEM, Serial No. 08/257,390, filed 06/09/94, is being deposited with the United States Postal Service as first class mail under 37 C.F.R. § 1.8 on the date indicated above and is addressed to Commissioner of Patents and Trademarks, Box Non-Fee Amendment, Washington, D.C. 20231.

Jon L. Roberts, Esq.
Roberts & Associates
1953 Gallows Road
Suite 220
Vienna, Virginia 22182

CONFIDENTIAL