102.    Following this submission, the claims were allowed.  (LML-EP 000219-20.)  The '988 patent issued on January 16, 1996.  At issuance, former claim 9 (during prosecution) became issued claim 8, while former claim 11 became issued claim 9.

### 3.    Invention Date and Effective Priority Date of the '988 Patent Claims

103.    I understand that, absent proof by the inventor of an earlier invention date, the effective date of invention is deemed to be the filing date of the priority application leading to the patent.  In this case, there are two applications in the string leading to the '988 patent, the 1992 application and the 1994 application.

104.    I understand that LML has asserted a conception date of January 9, 1992 and a date of reduction to practice of November 13, 1992.

105.    In my opinion, the claims of the '988 patent should obtain an invention date no earlier than June 8, 1994, the filing date of the 1994 application.  This is the date that the Applicants amended the specification to add all text regarding "negotiable instrument."  As set forth above, in my opinion, the disclosure added by the June 8, 1994 Preliminary Amendment in fact constituted "new matter" compared to the original disclosure of the 1992 application.

106.    It is my understanding that at the time the 1994 application was filed under 37 C.F.R. 1.62, that Rule allowed for a "continuation-in-part" by filing an amendment on the same date as the continuing application to add disclosure to the specification.  I understand that under Rule 1.62 as it existed at that time, this requires the 1994 application to be treated as a continuation-in-part.

107.    In my opinion, the description added by the June 8, 1994 preliminary amendment is the only support in the '988 patent specification for the limitations "without using the check as a negotiable instrument" and "without using the bank check as a negotiable instrument" in each of the claims.  Because every asserted claim recites one of these two limitations, and because the only disclosure supporting these limitations

35

was added as part of the 1994 application, the effective priority date of each asserted

claim is, in my opinion, the filing date of the 1994 application, namely June 8, 1994.

**B.    The '528 Patent**

**1.    Disclosure of the '528 Patent**

108.    The disclosure of the '528 patent includes substantially all of the

description of the '988 patent, plus additional description.  Mr. Hills, the first-named

inventor on the '528 and '366 patents, stated publicly that one purpose of those patents

was to update the original '988 patent with regards to industry activity:

> As indicated, our second application accomplishes two principal
> objectives.  The first is to update the original patent with regards to
> industry activity and evolved terminology since the date of the original
> patent's filing date.  Secondly, the second patent is much more descriptive
> as to the specific operation and features of the ChequeMARK System,
> whereas the original patent was, by design, more general in scope.

(LML-EP 011994-97.)

109.    In addition to the description contained in the '988 patent, the '528 patent

describes particular ACH networks such as the network administered by NACHA or

other regional ACH networks, ('528 patent at 3:22-29), and indicates that other electronic

networks may be used. (*Id.* at 6:23-30.)

110.    The '528 patent further describes using the purported invention with on-

line transactions.  "'On-Line' transactions are also contemplated by the present invention

once national networking and other present and proposed support mechanisms have

become functional." (*Id.* at 3:42-45; *also see* 12:3-5.)  Various electronic equipment may

be used to facilitate these features. (*Id.* at 6:50-65 and 7:3-13.)

111.    The '528 patent also describes an embodiment in which the consumer can

prepare a paper check, and the transaction "would proceed in a fully electronic manner

with the consumer retaining the 'paper' check as an additional receipt." (*Id.* at 4:12-18.)

The description further states that, "[i]f preferred or requested by the subscribing

merchant, the present invention would further allow for a consumer's check to be written

and thereafter voided, canceled, and returned to the consumer or, in the alternate, submitted to lock box or similar storage facilities." (*Id.* at 4:51-56, 5:64-6:3, 12:60-67.)

112.    The '528 patent description indicates that the system is compatible with SMART card technology. (*Id.* at 5:6-7 and 5:40-47.)  According to the '528 patent description, the system may receive a consumer's Social Security number as a form of fraud protection.  (*Id.* at 5:53-64 and 8:38-9:3.)

113.    The described system includes velocity controls (*Id.* at 9:4-8), as well as additional fraud protections. (*Id.* at 9:32-40.)

114.    The Detailed Description of the '528 patent sets forth specific definitions applicable throughout the patent, including "Card Acceptance," "Authorization Only," "Check Replacement Service," "Access Only," and "Electronic Checking." (*Id.* at 9:52-10:21.) The definition for Check Replacement Service reads as follows:

> This is a service sponsored by the present invention which enables a consumer's specimen ("paper") check to be utilized to access the central computer of the present system thereby denoting the consumer banking account to be electronically captured and settled by presenting a debit notation through the facilities of the ACH, or other competing service, for a purchase conducted from a system subscriber's point-of-sale.

(*Id.* at 9:64-10:6.)

115.    The specification also includes more detailed descriptions of each of these transactions. (*Id.* at 13:38-15:17.) The description of Check Replacement Service indicates that transactions are passed through the known checkwriter and other databases, to generate an approved or declined message. (*Id.* at 14:30-60.) Formerly unknown accounts are entered into the "Known" checkwriter file. (*Id.* at 14:60-62.) Approved sales are submitted through the ACH or similar network. (*Id.* at 14:65-15:2.) The consumer provides authorization for an electronic debit by signing a printed sales receipt. (*Id.* at 15:6-8.)

116.    The specification states that the system subscriber database comprises the "Merchant" database, while a consumer file comprises a "Checkwriter" database that

may include a number of verifications. (*Id.* at 11:13-32.) The system also comprises a third "transaction" database that records all transaction between the terminals and central database. (*Id.* at 11:33-42.) The described system is also capable of communicating with third party databases. (*Id.* at 11:43-55.)

117.    As described, the check number may be captured and retained for future reference or security purposes. (*Id.* at 12:32-37.) "Access to the check number proves critical when performing a sequence review to resolve such matters." (*Id.* at 12:37-38.) In some cases, the described system may utilize the check number can be used in lieu of an assigned transaction identifier to effect settlement and credit of the Transaction Event. (*Id.* at 16:10-13.)

118.    The specification indicates that the MICR reader reads the ABA number, consumer bank account number, and check serial number. (*Id.* at 15:29-34.) The specification states that the system uses the entire MICR string for accurate identification of both the "consumer bank and a specific checking or depository account to participate in a sale." (*Id.* at 15:46-50.) According to the specification, the described system complies will all pending guidelines and/or proposals and rules changes. (*Id.* at 15:50-56.)

119.    A unique transaction number may be assigned to each transaction. (*Id.* at 15:57-16:18.) A printer is described as generating transaction event slips. (*Id.* at 16:19-33.) Transactions may be voided during processing. (*Id.* at 16:34-46.) As described, the POS terminal may also generate printed activity reports. (*Id.* at 16:47-61.)

## 2.    Prosecution History of the '528 Patent

120.    The initial application leading to the '528 patent was filed on December 31, 1996, and was designated Serial No. 08/775,400 (the "1996 application"). (LML-EP 000267-316.)

121.    The 1996 application as filed included 18 claims, two of which (1 and 10) were independent claims. (LML-EP 000304-05.) Independent claim 1 recited a system

for certain checkwriting transactions conducted over the Internet. (LML-EP 000304.)

Independent claim 10 recited a checkwriting point of sale process including the limitation

of "reading a magnetic ink character recognition number information on the check for the

sole purpose of obtaining consumer bank account information, without using the check as

a negotiable instrument" and the limitation "returning the bank check specimen to the

consumer." (LML-EP 000305-06.)

      122.    In April and May, 1997, the Applicants submitted a series of Information

Disclosure Statements. (LML-EP 000326-38.) An Information Disclosure Statement

filed on May 7, 1997 disclosed the Carlson '607 patent. (LML-EP 000331-34.) An

Information Disclosure Statement filed on May 15, 1997 disclosed the Higashiyama '682

patent. (LML-EP 000331-35.)

      123.    In an Office Action dated July 6, 1998, the Examiner rejected claims 1-3,

10 and 11 under 35 U.S.C. § 102 as anticipated by Carlson and the '988 patent. (LML-

EP 000343-46.) The Examiner further asserted that all claims were unpatentable under

35 U.S.C. § 103 as obvious over Carlson and Hills in view of U.S. Patent No. 5,500,513

to Langhons, U.S. Patent No. 5,703,344 to Bezy and U.S. Patent No. 5,569,938 to

Templeton. (LML-EP 000344.) The Examiner stated:

> The dependent claims recite well known point of sale expedients, i.e.,
> velocity checking (Fig. 10 of Langhans), internet usage (col. 4, line 19 of
> Bezy) and social security check (col. 9, lines 62 and col. 14, line 46 of
> Templeton) that would have been obvious to employ with the primary
> references by one of ordinary skill in the art of the time the invention was
> made for more effective FET under the rationale [of] interchangeable
> teachings or similar systems.

(LML-EP 000344.)

      124.    On December 22, 1998, the Applicants filed a Continued Prosecution

Application (CPA), which I understand to utilize the same file and application number as

the 1996 application. (LML-EP 000351-402.) As part of the CPA, the Applicants re-

39

submitted the specification and claims from the 1996 application. (LML-EP 000355-401.)

125.    On February 1, 1999, the Examiner issued an Office Action re-iterating the rejections under 35 U.S.C. §§ 102 and 103 made in the July 6, 1998 Office Action. (LML-EP 000403-07.) The Examiner also appeared to object to the specification and claims under 35 U.S.C. § 112. (LML-EP 000404.)

126.    On April 22, 1999, the Applicants submitted a Supplemental Information Disclosure Statement disclosing U.S. Patent No. 4,321,672 to Braun et al. (LML-EP 000408-10.)

127.    On May 20, 1999, the Applicants submitted a Response to the Office Action, and argued that the Hills '988 patent was not prior art to the claims of the 1996 application under any paragraph of 35 U.S.C. § 102. (LML-EP 000413-19.) The Applicants also argued over the Carlson '896 and '607 patents. (*Id.*)

128.    With respect to the Carlson patents, the Applicants listed the limitations of claim 1, including the limitation that the transaction take place "without using the bank check as a negotiable instrument." (LML-EP 000415, emphasis in original.) Applicants also listed the limitations of claim 10, including the limitation that transactions take place "without using the check as a negotiable instrument" and the limitation "returning the bank check to the consumer." (LML-EP 000415, emphasis in original.)

129.    The Applicants argued that the Carlson '896 patent discloses processing only instruments that are negotiated as part of the transaction at the point of sale, and further that in the Carlson '607 patent the check is used as a negotiable instrument and is turned over to the merchant to complete the transaction. (LML-EP 000415-18.) According to Applicants, Carlson '607 requires negotiation of the check. (*Id.*)

130.    Regarding the rejections under 35 U.S.C. § 103, the applicants again reiterated two requirements of the pending claims:

> The various elements of the present claims have been discussed above. However, for the sake of this section, emphasis will be placed on the two requirements present in the independent claims: (1) the bank check offered by the consumer at the point of sale is not utilized as a negotiable instrument, and (2) the bank check specimen is returned to the consumer at the store.

(LML EP 000417.)

131.    The Applicants asserted that these two elements were not found in either Carlson reference, nor any of the secondary references. (*Id.*) The Applicants further stated regarding the negotiable instrument element that, for consumer convenience, the consumer need not even sign the check:

> The present invention provides the means for eliminating the costs associated with check processing. As a convenience to the consumer, bank account information is read off of a check. However, the check is not utilized as a negotiable instrument. As such, the check need not even be signed by the consumer.

(LML-EP 000417.)

132.    The Applicants further argued that none of the cited references "disclose the utilization of a check for informational purposes only <u>and not for utilization as a negotiable instrument</u> that is presented to a bank or a clearinghouse for payment. Consequently, the requirement present in claim 10, of returning the check to the consumer at the store, cannot be achieved by any of the systems of the references cited by the examiner." (LML-EP 000416-17, emphasis in original.) I note that the Applicants' assertion appears to be incorrect, in that the Carlson '607 patent describes returning the check to the consumer at the point of sale. ('607 patent, 25:5-8.)

133.    The Applicants' response appears to have overcome, in the Examiner's opinion, the rejections based on the Carlson patents and the secondary references. In an Office Action dated July 19, 1999, the Examiner no longer asserted rejections based on those references. (LML-EP 000420.) The Examiner asserted that a terminal disclaimer must be filed to overcome the rejections based on the '988 patent, that the specification

41

required certain amendments, and that the Applicants were required to argue over the art cited in the Supplemental Information Disclosure Statement (*i.e.,* the Braun patent). (*Id.*)

134.    In a Response filed July 28, 1999, the Applicants filed a terminal disclaimer, made certain amendments to the specification, and argued over the Braun. (LML-EP 000421-96.)  With respect to Braun, the Applicants asserted that communication is made directly with the consumer's bank, and that the amount of the transaction is deducted from the bank at the time of the transaction.  (LML-EP 000422.)

135.    The Examiner rejected the terminal disclaimer as defective on October 25, 1999, stating that it was directed to certain claims and not to the patent as a whole. (LML-EP 000498.)  On November 24, 1999, the Applicants filed another Continuing Prosecution Application and initially argued over the need for a terminal disclaimer (LML-EP 000499-507), but following a discussion with Mr. Edward Glick of the Patent Office (LML-EP 000513), the Applicants filed the requested terminal disclaimer on January 31, 2000 (LML-EP 000511).  The claims were subsequently allowed on February 1, 2000.  (LML-EP 000508-09.)

### 3.    Invention Date and Effective Priority Date of the '528 Patent Claims

136.    I understand that, absent proof by the inventor of an earlier invention date, the effective date of invention is deemed to be the filing date of the priority application leading to the patent.  In this case, the '528 patent issued from a single application number, originally filed on December 31, 1996.

137.    I understand that LML has asserted an invention date of December 31, 1996 for the claims of the '528 patent.  Based on the information I have reviewed, in my opinion both the invention date and effective filing date of the '528 patent claims are December 31, 1996.

## C.    The '366 Patent Disclosure

### 1.    Disclosure of the '366 Patent

138.    The '366 patent is a continuation of the '528 patent. Apart from the patent claims and a reference claiming priority to the '528 patent ('366 patent at 1:3-5), the '366 patent contains the same disclosure and Figures as the '528 patent.

### 2.    Prosecution History of the '366 Patent

139.    The application leading to the '366 was filed on May 1, 2000, and was designated Serial No. 09/562,303 (the "2000 application"). (LML-EP 000558-623.) The 2000 application appears to have been assigned to the same Examiner, Mr. Harold Pitts, assigned to the 1996 application. (LML-EP 000624.)

140.    As originally filed, the 2000 application included the same original claims as the '528 application. Specifically, the 2000 application included 18 claims, including two independent claims (claims 1 and 10). (LML-EP 000600-03.)

141.    The Applicants also filed on May 1, 2000, a Preliminary Amendment amending the claims and adding new claims. (LML-EP 000617-23.) Claim 1 was amended to change "consumer" to "payer," delete the limitation relating to the Internet, and change "automated clearing house communication" to "communication with an electronic funds transfer system," among other amendments. (LML-EP 000617-18.)

142.    Claim 10 included similar amendments related to the terms "consumer" and "automated clearing house," as well as an amendment deleting the limitation of returning the check to the consumer. (LML-EP 000619.)

143.    The Preliminary Amendment also added a number of new claims, including independent claims 24 and 31. (LML-EP 000620-23.)

144.    On August 29, 2000, the Examiner issued an initial Office Action rejecting all pending claims under 35 U.S.C. § 112, and required election between claims 1-23 and 24-35. (LML-EP 000624-27.)

43

145.    In a Response dated November 29, 2000, the Applicants argued over the need for a restriction requirement, and sought to provide support for the claims. (LML-EP 000634-40.) In particular, the Applicants noted that at least one supporting passage for the phrase, "A method of authorizing the debit of funds from a bank account without negotiating a check" could be found at page 9, lines 20-22 of the application. (LML-EP 000638.) This appears to be among the disclosure added during the June 8, 1994 Preliminary Amendment described above wherein page 8, line 2 of the specification was amended. (LML-EP 000172.)

146.    In an Office Action dated February 13, 2001, the Examiner objected to the Applicants' previous Response as non-responsive, because it failed to address one of the Examiner's rejections. (LML-EP 000643.)

147.    On February 23, 2001, the Applicants conducted an Interview with the Examiner. (LML-EP 000644.) A copy of the Examiner Interview Summary Record indicates that the Applicants would remove claims 24-30 from consideration, as well as file a terminal disclaimer. (*Id.*)

148.    On February 26, 2001, the Examiner issued a Notice of Allowability canceling claims 24-30 and expressly requiring that a terminal disclaimer be filed. (LML-EP 000645-46.) The Applicant subsequently filed terminal disclaimers over both the '988 and '528 patents. (LML-EP 000649; LML-EP 000660.)

### 3.    Invention Date and Effective Priority Date of the '366 Patent Claims

149.    I understand that, absent proof by the inventor of an earlier invention date, the effective date of invention is deemed to be the filing date of the priority application leading to the patent. In this case, the '366 patent issued from an application claiming priority to the 1996 application.

150.    I understand that LML has asserted an invention date of December 31, 1996 for the claims of the '366 patent. Based on the information I have reviewed, in my

44

opinion both the invention date and effective filing date of the '366 patent claims are December 31, 1996.

## VII.    CLAIM CONSTRUCTION

151.    I understand that terms in patent claims must be construed as a first step in analyzing whether a claim is infringed and/or whether the claim is invalid.  I further understand that patent claims must be construed the same way for infringement and invalidity analyses.

152.    It is my further understanding that the meaning of claim terms must be determined from the standpoint of a person of ordinary skill in the relevant art at the time of the alleged invention.  It is also my understanding that intrinsic evidence, such as the claims, specification and prosecution history of the patent are considered, and after that, if necessary, extrinsic evidence, such as dictionaries, treatises and other evidence, may be considered to construe the claims.

153.    I understand that the Judge in this case will construe the legal meaning of the claim terms in the asserted claims of the patents-in-suit, but that the claims have not yet been construed.  I also understand that the parties have proposed preliminary claim constructions for the relevant terms in the asserted claims.  Those proposed constructions are attached to this report as Exhibit 6.

154.    In many instances, my opinions regarding invalidity are not dependent on which party's claim construction is applied, and in such cases I have not specified any particular given construction when setting forth my analysis and opinions.  In other cases, my opinions and analysis relate to LML's claim construction.  In particular, with respect to the limitations "without using the check as a negotiable instrument" and "without using the bank check as a negotiable instrument," in my opinion those limitations are found in the following references under both parties' attached claim construction: 1993 ChequeMARK Systems, Inc. ("CSI") marketing materials (the "1993 CSI references"); November 7, 1995 Sacramento Bee article by Mark Glover entitled "Cashless Society

45

Expands" (the "Sacramento Bee article"); August 3, 1995 report by Robert Ballen et al. (the "Ballen Report"); September 1996 publication issued by the ECC entitled "Electronic Checks at the Point of Sale: A Pilot Program Guide" (the "ECC Pilot Program Guide"). Otherwise, in my opinion, those limitations are found in the applied references under LML's construction.

155.    With respect to the limitation involving reading checks for the "sole purpose of obtaining consumer bank account information," or similar elements involving the "sole purpose" of reading the check, in my opinion those limitations are found in the following references under both parties' claim construction: the 1993 CSI references; October 1995 ("Report #2"), November 1995 ("Report No. 3"), and January 1996 ("Report No. 4") eFunds Corporation Reports, each entitled "Data Analysis: A Report on the Data of Checks Using Electronic Funds Transfer;" U.S. Patent Nos. 5,237,620 and 5,305,196 to Deaton et al.; the Ballen Report and the Sacramento Bee article.

156.    As the Court has not yet ruled as to the meaning of the claims, I reserve the right to apply whatever claim construction is eventually adopted to the cited prior art. Moreover, should the claims be construed in ways I have not anticipated, I reserve the right to apply such a construction. My prior art search is not complete, and I may cite additional references or prior art as soon as feasible following my awareness of this prior art.

## VIII.  INVALIDITY ANALYSIS AND OPINIONS

### A.    Summary of Opinions

#### 1.    Anticipation

157.    In my opinion each of the asserted claims is invalid as anticipated under 35 U.S.C. § 102(b) over certain prior art references.  In particular:

158.    Claims 1, 4, 9-10 and 13 of the '988 patent and claim 1 of the '366 patent are invalid as anticipated under 35 U.S.C. § 102(e) by U.S. Patent No. 5,175,682 to Higashiyama ("Higashiyama"), which discloses each and every element of the purported

inventions of these claims and which was publicly disclosed in the United States before the '988 patent application was filed.

159.    Claims 10 and 11 of the '528 patent and claims 1-3, 24-25 and 27 of the '366 patent are anticipated under § 102(b) by an eFunds Corporation November 1995 Data Analysis Report.

160.    Claims 10 and 11 of the '528 patent and claims 1-3, 24-25 and 27 of the '366 patent are anticipated by eFunds Corporation's commercial check processing method as disclosed in eFunds Corporation's publicly-disclosed Reports beginning at least as early as November, 1995.

161.    Claims 10 and 11 of the '528 patent and claims 1, 24, 25 and 27 of the '366 patent are also anticipated under § 102(b) by a check conversion system offered for sale and/or publicly disclosed by Nova Payment Systems of California at least as early as November 1996.

162.    Claims 10 and 11 of the '528 patent and claims 1, 24, 25 and 27 of the '366 patent are also anticipated under § 102(b) by a September, 1996 ECC publication entitled "Electronic Checks at the Point of Sale: A Pilot Program Guide."

163.    Claims 1-4 and 8-10 of the '988 patent, claims 10 and 11 of the '528 patent, and claims 1-3 of the '366 patent are anticipated under § 102(b) by U.S. Patent No. 4,758,714 ("Carlson '714").

164.    Claims 1-4, 8-10, 14 and 18 of the '988 patent, claims 10 and 11 of the '528 patent, and claims 1-3 of the '366 patent are anticipated under § 102(b) by U.S. Patent No. 5,053,607 ("Carlson '607").

165.    Claim 10 of the '528 patent is anticipated under § 102(b) by the CheckMate Commercial Processing System disclosed in CheckMate's 1987 and 1989 Business Plans.

### 2.    Public Disclosure and On-Sale Bar

166.    In my opinion, all asserted claims of the '528 and '366 patents are invalid under 35 U.S.C. § 102(b) based on both the public use and on-sale bars.

167.    Moreover, if the Court finds that the effective priority date of the '988 patent claims is June 8, 1994, then in my opinion all asserted claims of the '988 patent are invalid under 35 U.S.C § 102 based on the inventors' public disclosure, sale and/or offer for sale of the purported invention.

### 3.    Lack of Invention

168.    In my opinion, all asserted claims of the '538 and '366 patents are invalid under 35 U.S.C. § 102(f) based on lack of invention by the named inventors.

### 4.    Obviousness

169.    To the extent any claim is not considered anticipated, it is my opinion that each asserted claim would have been obvious under 35 U.S.C. § 103(a) in view of the prior art.  For example, in my opinion, the asserted claims are invalid as obvious over the following combinations of references:

170.    Claims 1-6, 8-11, 13-14, 16 and 18 of the '988 patent are obvious under § 103(a) as unpatentable over a May 19, 1987 and an August, 1989 CheckMate Electronic Inc. Business Analysis and Plan in view of Carlson '607.

171.    Claims 1-6, 8-11 and 13 of the '988 patent are obvious under § 103(a) as unpatentable over a May 19, 1987 and an August 1989 CheckMate Electronic Inc. Business Analysis and Plan in view of Carlson '714.

172.    Claims 1-6, 8-11, 13-14, 16 and 18 of the '988 patent are also obvious under § 103(a) as unpatentable over July 24 and 27, 1989 Manta Systems, Inc. documents entitled "Electronic Payment Systems No ID Tendering Store Requirements" in view of Higashiyama.

173.    Claim 2 of the '988 patent is obvious under § 103(a) as unpatentable over Higashiyama.

48

174.    Claim 3 of the '988 patent is obvious under § 103(a) as unpatentable over Higashiyama in view of Carlson '607.

175.    Claim 3 of the '988 patent is obvious under § 103(a) as unpatentable over Higashiyama in view of Carlson '714.

176.    Claims 5 and 11 of the '988 patent are obvious under § 103(a) as unpatentable over Higashiyama in view of a publicly-distributed September 2, 1983 CheckCash Associates, Ltd. Private Placement Memorandum ("the CheckCash PPM").

177.    Claim 6 of the '988 patent is obvious under § 103(a) as unpatentable over Higashiyama in view of a September 1986 article in the *ABA Banking Journal* about an Arizona-based POS terminal network known as the Cactus Switch ("First Cactus Switch Article").

178.    Claim 13 of the '988 patent is obvious under § 103(a) as unpatentable over Higashiyama in view of a November 17, 1986 article in the *American Banker* about the Cactus Switch network ("Second Cactus Switch Article").

179.    Claims 8, 14 and 18 of the '988 patent are obvious under § 103(a) as unpatentable over Higashiyama in view of U.S. Patent No. 4,321,572 to Braun ("Braun").

180.    Claim 16 of the '988 patent is invalid as obvious under § 103(a) as unpatentable over Higashiyama in view of Braun and the Cactus Switch Article II.

181.    Claims 10 and 11 of the '528 patent are obvious under § 103(a) as unpatentable over Higashiyama in view of Braun.

182.    Claim 18 of the '528 patent is obvious under § 103(a) as unpatentable over Higashiyama in view of Braun and U.S. Patent No. 5,500,513 to Langhans ("Langhans").

183.    Claim 18 of the '528 patent is obvious under § 103(a) as unpatentable over an eFunds Corporation November 1995 Data Analysis Report in view of Langhans.

184.    Claims 10, 11 and 18 of the '528 patent are obvious under § 103(a) as unpatentable over May 1987 and August 1989 CheckMate Electronics Inc. Business Analyses and Plans in view of Carlson '607.

185.    Claims 10, 11 and 18 of the '528 patent are obvious under § 103(a) as unpatentable over May 1987 and August 1989 CheckMate Electronics Inc. Business Analyses and Plans in view of Carlson '714.

186.    Claims 10, 11 and 18 of the '528 patent are further obvious under § 103(a) as unpatentable over July 14 and 27, 1989 Manta Systems Inc. documents entitled "Electronic Payment Systems No ID Tendering Store Requirements" in view of Higashiyama.

187.    Claims 1-3, 24-25 and 27 of the '366 patent are obvious under § 103(a) as unpatentable over May 1987 and August 1989 CheckMate Electronics Inc. Business Analyses and Plans in view of Carlson '607.

188.    Claims 1-3, 24-25 and 27 of the '366 patent are obvious under § 103(a) as unpatentable over May 1987 and August 1989 CheckMate Electronics Inc. Business Analyses and Plans in view of Carlson '714.

189.    Claims 1-3, 24-25 and 27 of the '366 patent are also obvious under § 103(a) as unpatentable over July 14 and 27, 1989 Manta Systems Inc. documents entitled "Electronic Payment Systems No ID Tendering Store Requirements" in view of Higashiyama.

190.    Claim 2 of the '366 patent is obvious under § 103(a) as unpatentable over Higashiyama in view of a May 1973 *Banking* magazine article entitled "*Just Cashing a Check? Diebold's Way Is Faster*" (the "May 1973 *Banking* Article").

191.    Claim 3 of the '366 patent is obvious under § 103(a) as unpatentable over Higashiyama in view of the CheckCash PPM.

192.    Claims 24 and 25 of the '366 patent are obvious under § 103(a) as unpatentable over a Sacramento Bee article published on November 7, 1995 ("the Sacramento Bee article") in view of Braun or Carlson '607.

193.    Claims 24 and 25 of the '366 patent are obvious under § 103(a) as unpatentable over a Sacramento Bee article published on November 7, 1995 ("the Sacramento Bee article") in view of Braun or Carlson '714.

194.    Claims 24 and 25 of the '366 patent are further invalid as obvious under § 103(a) as unpatentable over a report authored by Robert Ballen ("the Ballen Report") and distributed to members of the ECC on August 3, 1995 in view of Higashiyama, the Sacramento Bee article, Carlson '607 or Carlson '714.

195.    Claim 27 of the '366 patent is obvious under § 103(a) as unpatentable over the Sacramento Bee Article in view of Braun or Carlson '607 or Carlson '714 and the CheckCash PPM.

196.    Claim 27 of the '366 patent is obvious under § 103(a) as unpatentable over the Ballen Report in view of Higashiyama or Carlson '607 or Carlson '714 and the CheckCash PPM.

197.    Claim 27 of the '366 patent is obvious under § 103(a) as unpatentable over the Ballen Report in view of the Sacramento Bee Article and the CheckCash PPM.

### 5.    Section 112 Invalidity

198.    All asserted claims of the patents-in-suit are invalid for failure to satisfy certain statutory requirements of patentability under 35 U.S.C. § 112 including the written description, enablement, and definiteness.

### 6.    Addition of New Matter

199.    If it is determined that the priority date of the '988 patent claims is November 13, 1992, then in my opinion all asserted claims of the '988 patent are invalid under 35 U.S.C. § 132 as violating the prohibition against the addition of new matter to the written description during prosecution.

### B.    Description of Selected Prior Art References

200.    I have reviewed a number of prior art references that, in my opinion, are relevant to the validity of one or more of the patents-in-suit.  I have provided summary

51

descriptions of certain references as Exhibits to this report. While I have summarized and cited certain portions of these references, I reserve the right to rely on any disclosure within any of the references described in the Exhibits or otherwise cited in this report. The references summarized in the Exhibits are listed below.

201.    U.S. Patent No. 5,175,682 to Higashiyama et al. ("Higashiyama") is described in Exhibit 7.

202.    U.S. Patents No. 4,678,896 ("Carlson '896"), 4,758,714 ("Carlson '714") and 5,053,607 ("Carlson '607") to Carlson et al. are described in Exhibit 8.

203.    U.S. Patent No. 4,321,672 to Braun et al. ("Braun") is described in Exhibit 9.

204.    A May 9, 1984 presentation and publication by Edward L. Braun entitled *"The FlexaCheck System,"* delivered at the Bank Stationers Association Annual Meeting, is described in Exhibit 10.

205.    May 19, 1987 and August 1989 CheckMate Electronics, Inc. Business Analyses and Plans, issued by CheckMate Electronics, Inc. and describing the CheckMate Electronics point-of-sale electronic processing system, are described in Exhibit 11.

206.    A September 2, 1983 Private Placement Memorandum for CheckCash Associates, Ltd. (the "CheckCash PPM"), issued by CheckCash Associates, Ltd. and disclosing the Signature Guarantee Systems electronic check processing system, is described in Exhibit 12.

207.    October 1995 ("Report #2"), November 1995 ("Report No. 3"), and January 1996 ("Report No. 4") eFunds Corporation Reports, each entitled "Data Analysis: A Report on the Data of Checks Using Electronic Funds Transfer," a March 7, 1996 presentation by the President of eFunds Corporation to the ECC, and a 1995 eFunds marketing brochure, all reflecting the operation of the eFunds electronic check processing system, are described in Exhibit 13.

208.   A November 1995 eFunds Corporation Report entitled "Data Analysis: A Report on the Data of Checks Using Electronic Funds Transfer ("eFunds Report #3"), is described in Exhibit 14.

209.   A September 1986 *ABA Banking Journal* article entitled "*POS: Is the Future Now?*" (the "First Cactus Switch Article"), describing the Arizona-based Cactus Switch System, is described in Exhibit 15.

210.   A November 17, 1986 American Banker article by Jeffrey Kutler entitled "*Strategies Differ, But Not Prospects: Common Aims Link Banking Networks*" (the "Second Cactus Switch Article"), describing the Arizona-based Cactus Switch System, is described in Exhibit 16.

211.   A November 7, 1995 Sacramento Bee article by Mark Glover entitled "*Cashless Society Expands*" (the "Sacramento Bee article") is described in Exhibit 17.

212.   1993 ChequeMARK Systems, Inc. ("CSI") marketing materials (the "1993 CSI references") and the Sacramento Bee article, both disclosing the operation of the ChequeMARK Systems Inc. electronic check processing system, are described in Exhibit 18.

213.   An August 3, 1995 report by Robert Ballen et al. (the "Ballen Report") entitled "*Electronic Checks and the Selection of a Legal Framework*," distributed to members of the Electronic Check Council on August 3, 1995, is described in Exhibit 19.

214.   A July 27, 1989 document entitled "Electronic Payment Systems No ID Tendering Store Requirements," issued by Manta Systems, Inc., is described in Exhibit 20.

215.   U.S. Patent No. 5,500,513 to Langhans et al. ("Langhans") is described in Exhibit 21.

216.   A May 1973 article in *Banking* magazine entitled "*Just Cashing a Check? Diebold's Way Is Faster*" (the "May 1973 *Banking* article") is described in Exhibit 22.

217.    November 22, 1996 notes of an October 23, 1996 meeting of the Electronic Check Council ("ECC") during which the CEO of Nova Payment Systems delivered a presentation describing an electronic check processing pilot program conducted by Nova Payment Systems of California is described in Exhibit 23.

218.    A September 1996 publication issued by the ECC entitled "*Electronic Checks at the Point of Sale: A Pilot Program Guide*" (the "ECC Pilot Program Guide") is described in Exhibit 24.

219.    A sales brochure from 1984 entitled "*The Complete Point-of-Sale System Designed by Bankers For Bankers, Consumers and Retailers,*" a February 1986 *United States Banker* article by Paul F.P. Coenen entitled "*The Nonfinancial Uses of EFT,*" and a May 8, 1995 P.R. Newswire press release entitled "*BUYPASS Corporation Introduces Corporation Check Router Solutions for Supermarkets,*" all disclosing the operation of BUYPASS Corporation's electronic check processing services, are described in Exhibit 25.

220.    An April 10, 1990 *American Banker* article by Karen Gullo entitled "*An Alternative to Check Handling: Western Union Unit to Test Point-of-Sale Payments*" (the "Western Union article") is described in Exhibit 26.

221.    U.S. Patent No. 4,727,243 to Savar ("Savar") is described in Exhibit 27.

222.    U.S. Patent Nos. 5,237,620 and 5,305,196 to Deaton et al. ("Deaton") are described in Exhibit 28.

223.    U.S. Patent No. 5,256,863 to Ferguson et al. ("Ferguson '863") is described in Exhibit 29.

224.    U.S. Patent No. 4,810,866 to Lord, Jr. ("Lord Jr.") is described in Exhibit 30.

225.    July 14 and July 29, 1989 Manta Systems, Inc. system descriptions entitled "Manta Systems, Inc. Electronic Payment Systems No ID Tendering Store Requirements and a 1989 Manta Systems product brochure entitled "No ID Tendering:

54

Concept and Justification," all describing the operation of the Manta Systems electronic check processing system, are described in Exhibit 31.

### C.    Anticipation

226.    I understand that a patent claim is invalid as "anticipated" under 35 U.S.C. § 102(b) if the claimed invention was "patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."

227.    I understand that in order to anticipate a claim, a single prior art reference, such as a U.S. or foreign patent, article, presentation, sale brochure or other material must explicitly or inherently disclose all the elements of the claim at issue. I am informed that anything claimed to be inherently disclosed in a prior art reference must be necessarily present in the reference and that it would be so recognized by persons of ordinary skill in the art. Below, I discuss each prior art reference or product that anticipates the asserted claims of the patents-in-suit.

228.    I have satisfied myself that the prior art discussed below qualifies as prior art under § 102(b), as discussed above. All the documents cited herein are of the type that a person of ordinary skill in the art of electronic check transactions would be aware of, and each qualifies as prior art, as such references were published and publicly available by the necessary dates.

### 1.    Higashiyama

229.    In my opinion, claims 1, 4, 9-10 and 13 of the '988 patent and claim 1 of the '366 patent are invalid as anticipated under 35 U.S.C. § 102(b) by U.S. Patent No. 5,175,682 to Higashiyama.

A claim chart comparing Higashiyama to these claims is attached to this Report in Exhibit 32.

### 2.    eFunds Corporation

230.    In my opinion, claims 10 and 11 of the '528 patent and claims 1-3, 24-25 and 27 of the '366 patent are also anticipated under § 102(b) by an eFunds Corporation November 1995 Data Analysis Report, as well as by eFunds Corporation's commercial check processing method as disclosed in eFunds Corporation's publicly-disclosed Reports beginning at least as early as November, 1995.

231.    A claim chart comparing the eFunds 1995 Data Analysis Report to these claims is attached to this Report in Exhibit 32.

232.    A claim chart comparing eFunds' commercial check processing method to these claims is attached to this Report in Exhibit 32.

### 3.    Nova Payment Systems

233.    In my opinion, claims 10 and 11 of the '528 patent and claims 1, 24, 25 and 27 of the '366 patent are also anticipated under § 102(b) by a check conversion system offered for sale and/or publicly disclosed by Nova Payment Systems of California at least as early as November 1996.

A claim chart comparing the Nova check conversion system to these claims is attached to this Report in Exhibit 32.

### 4.    September, 1996 ECC Pilot Program Guide

234.    In my opinion, claims 10 and 11 of the '528 patent and claims 1, 24, 25 and 27 of the '366 patent are also anticipated under § 102(b) by a September 1996 ECC publication entitled "Electronic Checks at the Point of Sale: A Pilot Program Guide."

235.    A claim chart comparing the September 1996 ECC publication entitled "Electronic Checks at the Point of Sale: A Pilot Program Guide" to these claims is attached to this Report in Exhibit 32.

### 5.     Carlson '714 Patent

236.     In my opinion, claims 1-4 and 8-10 of the '988 patent, claims 10 and 11 of the '528 patent, and claims 1-3 of the '366 patent are anticipated under § 102(b) by the Carlson '714 patent.

237.     A claim chart comparing the Carlson '714 patent to these claims is attached to this Report in Exhibit 32.

### 6.     Carlson '607 Patent

238.     In my opinion, claims 1-4, 8-10, 14 and 18 of the '988 patent, claims 10 and 11 of the '528 patent, and claims 1-3 of the '366 patent are anticipated under § 102(b) by the Carlson '607 patent.

239.     A claim chart comparing the Carlson '607 patent to these claims is attached to this Report 32.

### 7.     CheckMate Commercial Processing System

240.     In my opinion, claim 10 of the '528 patent is anticipated under § 102(b) by the CheckMate Commercial Processing System disclosed in CheckMate's 1987 and 1989 Business Plans.

241.     A claim chart comparing the CheckMate Commercial Processing System to these claims is attached to this Report in Exhibit 32.

### D.     Prior Public Use and On-Sale Bar

242.     I understand that a patent claim is invalid under 35 U.S.C. §§ 102(a) and/or (b) as violating the public use and/or on-sale bars if it was publicly disclosed or on sale in the United States more than one year prior to the priority date of the patent-at-issue.

243.     It is my opinion that all asserted claims of the '528 and '366 patents are invalid under 35 U.S.C. §§ 102(a) and (b) based on both the public use and on-sale bars. The ChequeMARK System implementing those claims was publicly disclosed and on

sale more than one year prior to the priority date of the '528 and '366 patents, rendering all claims asserted under those patents invalid under §§ 102(a) and (b).

244.    Documents produced in this litigation indicate that the inventors had a working system in commercial use more than one year before the priority date of the '528 and '366 patents.  1993 marketing materials produced and distributed by ChequeMARK Systems, Inc., a company run by the two named inventors of the patents-in-suit, disclose an "automated, electronic processing" system for "all non-cash receipts" that allowed "service subscribers" to "no longer accept 'paper' checks."   (ECHO0004438-40 (promising "Automated Processing for ALL Checking Account Events"); ECHO0004441 ("Each sale or Transaction Event would be an electronic and 'paperless' event negating the heretofore reliance on accepting and processing commercial bank drafts (personal or corporate checks)."); ECHO0004442 ("the system could virtually eliminate 'paper' checks as an accepted means of consumer payment"); ECHO0004444 ("the merchant does not have to be hampered by or participate in the processing of commercial bank drafts ('paper checks')"); ECHO0004450 ("under the Check Replacement Service ... no paper check is accepted or processed").

245.    Documents produced in this litigation indicate further that ChequeMARK Systems also offered a companion service called "Point-of-Sale Check Truncation." (ECHO0004443.)  Use of the ChequeMARK system was designed to "fully automate every phase of processing initiating with dial-up account authorization through electronic debiting and settlement."  (ECHO0004439; ECHO0004441-42.)  As advertised, the ChequeMARK system was capable of overcoming "previous geographical limitations" to "enable subscribers to process events from virtually every bank within the United States." (ECHO0004439-41; ECHO0004445-46.)

246.    As described by the 1993 ChequeMARK marketing materials, the ChequeMARK point-of-sale check processing system as of February 1993, included existing point-of-sale terminals manufactured by Verifone (ECHO0004431;

58

ECHO0004438; ECHO0004449), a dial-up modem (ECHO0004439), a central host computer maintained by ChequeMARK (ECHO0004442; ECHO0004448), external and resident databases containing information pertaining to checkwriters, both positive and negative files (ECHO0004427; ECHO0004439; ECHO0004442; ECHO0004447-48), communication means linking each point-of-sale terminal with the ChequeMARK central host computer (ECHO0004442; ECHO0004427), a terminal MICR reader (ECHO0004431; ECHO0004447; ECHO0004449), an alphanumeric terminal keyboard and display monitor (ECHO0004447; ECHO0004449; ECHO0004433), communication means through the central ChequeMARK computer linking the point-of-sale terminal to external checkwriter databases (ECHO0004427; ECHO0004448), communication means connecting the central ChequeMARK computer and a multiplicity of point-of-sale terminals (ECHO0004432), and a printer (ECHO0004449).  The MICR reader contained in the CSI System was capable of identifying and omitting an individual check's sequence number from the MICR line data transmitted to the CSI host computer. (ECHO0004449.)

247.    As further described in the same ChequeMARK marketing materials, upon arriving at a retail point-of-sale to make a purchase using funds deposited in a checking account, a customer presents a "specimen check on the account from which funds are to be electronically debited in payment for goods and services."  (ECHO0004439; ECHO0004427.)  In the event the merchant wished to obtain only check authorization from the ChequeMARK system, the merchant swiped a "specimen check through a MICR reader device interfaced with the terminal, whereupon the terminal's screen would display the check's numbers for verification."  (ECHO0004447; ECHO0004427; ECHO0004449.)  After verifying that the MICR reader correctly reads the customer's account number, the merchant entered the sale amount requested for authorization. (ECHO0004447.)

59

248.    The 1993 ChequeMARK marketing documents indicate that the terminal then connected via modem and transmitted the transaction information, along with the customer's "entire ABA/Transit or personal or corporate checking account numbers," to the ChequeMARK central host computer to examine its checkwriter database files for information about the customer's account number. (ECHO0004447-48.) A successful match to ChequeMARK's positive database file resulted in a message being sent to the terminal approving the requested transaction. (ECHO0004448.) If no match to a ChequeMARK positive file was found, the inquiry would be forwarded to an external database of checkwriter files for further examination (in this case, the SCAN database). (ECHO0004448.) Information retrieved from the SCAN database was subsequently stored in the ChequeMARK proprietary checkwriter databases. (ECHO0004448.)

249.    As further described in the same 1993 ChequeMARK marketing materials, in the event the merchant wished to use ChequeMARK's "Check Replacement Service," the merchant would proceed as described above, except that "[n]o commercial bank note ("Paper Check") would have been accepted or processed by the service subscriber." (ECHO0004448.) "In each such event, a Consumer, at the point-of-sale, will have executed an electronic access ('Off-Line Debit') authority 'Sales Slip' which is automatically printed upon a terminal's receipt of an 'Approved' notice." (ECHO0004448; ECHO0004427.) This "transaction event slip" would, when signed, authorize[] electronic access to and debiting of the approved client account for the specified amount." (ECHO0004439; ECHO0004442.) "Each such Transaction Event Slip must be exacting in its retention of account numbers and the sale amount. . . . Also included would be a clear printing of the transaction type. . . .More germane to the legal compliance and mandatory criteria associated with electronic access and debits, preferential scripted language would be printed immediately preceding the consumer's signature line specifically authorizing electronic access in payment of the requested transaction sale amount." (ECHO0004450.)

60

250.    Each Transaction Event Slip described by the 1993 ChequeMARK marketing materials also included the merchant's name, address, and account number; the date and time; the customer's bank account and transit numbers; and a unique point-of-sale terminal identification number. (ECHO0004452.) No Check Replacement transaction would be authorized by the ChequeMARK system in the absence of a positive response from the system's checkwriter authorization files or in the absence of a "customer acknowledgement and express consent for electronic access to personal or corporate banking accounts." (ECHO0004445.)

251.    As further described by the 1993 ChequeMARK materials, transactions processed electronically during the business day by the ChequeMARK point-of-sale terminal were transmitted to and settled through the ACH. (ECHO0004427; ECHO0004437; ECHO0004439-42; ECHO00004445; ECHO0004448; ECHO0004450.) Information relating to each individual transaction was stored by the ChequeMARK system for later report generation. (ECHO0004440; ECHO0004442; ECHO0004448.) At the end of each business day, each ChequeMARK terminal printed "daily activity summaries." (ECHO0004440; ECHO0004450; ECHO0004431.) "These reports must list and separately total each authorization/service type, whether produced as a singular report or the result of multiple terminal 'closeout' procedures." (ECHO0004450-51.)

252.    The 1993 marketing materials indicate that ChequeMARK services were available only to system subscribers and reflect the use of a system subscriber database in the system. (ECHO0004439; ECHO0004441; ECHO0004442; ECHO0004445.)

253.    My review of the April 13, 2000 deposition of Mr. Robert R. Hills further supports my opinion that systems within the scope of the patents-in-suit were on sale and in public use more than one year prior to the effective filing date of the '528 and '366 patents.

254.    In an April 13, 2000 deposition from the litigation captioned *LML Payment Systems, Inc. v. Hills*, CA 99-217-CIV-J-20A (M.D. Fla.), Mr. Hills was asked:

"Beginning in 1991, did you and/or Mr. Nichols ever license the technology which would later become subject to this patent to any other companies?" Mr. Hills replied that "At some point, I – at some point, ChequeMARK Systems received exclusive marketing rights." The Sacramento Bee article shows that ChequeMARK Systems, Inc. ("CSI") offered for sale and sold a point-of-sale system covered by the '988 patent more than one year prior to the December 31, 1996 priority date of the '528 and '366 patents.

255.    In addition, on November 7, 1995, the Sacramento Bee published a news article about a point-of-sale check processing system being marketed by CSI. A description of the Sacramento Bee article is attached to this Report as Exhibit 17. As indicated in that article, at the time of its publication in November 1995, the CSI system had been marketed within the United States, more than one year prior to the December 31, 1996 priority date of the '528 and '366 patents.

256.    The Sacramento Bee article provides a detailed description of the CSI point-of-sale system and process. The system and process described in the Sacramento Bee article, in conjunction with other prior art references, renders obvious claims 24-27 of the '366 patent. A claim chart comparing the Sacramento Bee description with these claims is set forth in Exhibit 32.

257.    In 1993, Mr. Hills and CSI publicly disclosed each and every element of each asserted claim of the '528 and '366 patents more than one year before their December 31, 1996 priority date. In a letter from Mr. Hills to Mr. Don Dick, Rocky Mountain Retail Services ("RMRS") (ECHO 0002719-0002748), Applicants disclosed a system and method within the scope of the '988 patent, and within the scope of claim 10 of the '528 patent and claims 1-2 of the '366 patent. A claim chart comparing the 1993 ChequeMARK marketing materials sent by Mr. Hills to Mr. Dick to these claims is set forth in Exhibit 32.

258.    If the claims of the '988 patent are determined to have a priority date of June 8, 1994, then the asserted claims of the 1993 ChequeMARK marketing materials

also constitute prior art to these claims, rendering the claims 1-6, 8-11, 13 and 16 of the '988 patent invalid because their subject matter was on sale more than one year before their priority date. A claim chart comparing the 1993 ChequeMARK marketing materials sent by Mr. Hills to Mr. Dick to these claims of the '988 patent is set forth in Exhibit 32.

**E.    Obviousness**

259.    I understand that a patent claim is invalid as "obvious" under 35 U.S.C. § 103(a) if the "differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person of ordinary skill in the art to which said subject matter pertains."

260.    I understand that an obviousness determination involves analysis of four factors: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the prior art and the claims at issue; and (4) objective evidence of nonobviousness.

261.    In my opinion, a person of ordinary skill in the art of electronic check processing on November 13, 1992, the filing date of the original application for what eventually issued as the '988 patent, would have had a bachelors degree and at least three to five years experience in the checking, electronic payments and corporate cash management industry, along with a working knowledge of applicable rules and regulations. I applied this definition of one of ordinary skill in the art in the analysis that follows.

**1.    Combination of CheckMate Electronics and Carlson '607 References**

262.    In my opinion, claims 1-6, 8-11, 13-14, 16 and 18 of the '988 patent, claims 10, 11 and 18 of the '528 patent and claims 1-3, 24-25 and 27 of the '366 patent are obvious under § 103(a) as unpatentable over May 19, 1987 and August, 1989 CheckMate Electronic Inc. Business Analyses and Plans in view of Carlson '607.

63

263.    A claim chart comparing these references to these claims is attached to this Report in Exhibit 32.

264.    Based on the information set forth in the attached Exhibits, a person of ordinary skill in the art, who I understand is considered to be aware of all relevant prior art, would be motivated to combine the CheckMate Electronics reference with the Carlson '607 patent to obtain the purported invention of claims 1-6, 8-11, 13-14, 16 and 18 of the '988 patent, claims 10, 11 and 18 of the '528 patent and claims 1-3, 24-25 and 27 of the '366 patent.

### 2.    Combination of CheckMate Electronics and Carlson '714 References

265.    In my opinion, claims 1-6, 8-11, and 13 of the '988 patent, claims 10, 11 and 18 of the '528 patent and claims 1-3, 24-25 and 27 of the '366 patent are obvious under § 103(a) as unpatentable over May 19, 1987 and August 1989 CheckMate Electronic Inc. Business Analyses and Plans in view of Carlson '714.

266.    A claim chart comparing these references to these claims is attached to this Report in Exhibit 32.

267.    Based on the information set forth in the attached Exhibits, a person of ordinary skill in the art, who I understand is considered to be aware of all relevant prior art, would be motivated to combine the CheckMate Electronics reference with the Carlson '714 patent to obtain the purported invention of claims 1-6, 8-11, and 13 of the '988 patent, claims 10, 11 and 18 of the '528 patent and claims 1-3, 24-25 and 27 of the '366 patent.

### 3.    Combination of Manta Systems and Higashiyama

268.    In my opinion, claims 1-6, 8-11, 13-14, 16 and 18 of the '988 patent, claims 10, 11 and 18 of the '528 patent and claims 1-3, 24-25 and 27 of the '366 patent are obvious under § 103(a) as unpatentable over July 24 and 27, 1989 Manta Systems,

Inc. documents entitled "Electronic Payment Systems No ID Tendering Store
Requirements" in view of Higashiyama.

269.    A claim chart comparing these references to these claims is attached to
this Report in Exhibit 32.

270.    Based on the information set forth in the attached Exhibits, a person of
ordinary skill in the art, who I understand is considered to be aware of all relevant prior
art, would be motivated to combine the Manta Systems references with the Higashiyama
reference to obtain the purported invention of claims 1-6, 8-11, 13-14, 16 and 18 of the
'988 patent, claims 10, 11 and 18 of the '528 patent and claims 1-3, 24-25 and 27 of the
'366 patent.

### 4.    Combination of Higashiyama and Carlson

271.    In my opinion, claim 3 of the '988 patent is obvious under § 103(a) as
unpatentable over Higashiyama in view of Carlson '714 or Carlson '607.

272.    A claim chart comparing these references to these claims is attached to
this Report in Exhibit 32.

273.    Based on the information set forth in the attached Exhibits, a person of
ordinary skill in the art, who I understand is considered to be aware of all relevant prior
art, would be motivated to combine the Carlson references with the Higashiyama
reference to obtain the purported invention of claim 3 of the '988 patent.

### 5.    Combination of Higashiyama and the CheckCash PPM

274.    In my opinion, claims 5 and 11 of the '988 patent and claim 3 of the '366
patent are obvious under § 103(a) as unpatentable over Higashiyama in view of a
publicly-distributed September 2, 1983 CheckCash Associates, Ltd. Private Placement
Memorandum ("the CheckCash PPM").

275.    A claim chart comparing these references to these claims is attached to
this Report in Exhibit 32.

65

276.    Based on the information set forth in the attached Exhibits, a person of ordinary skill in the art, who I understand is considered to be aware of all relevant prior art, would be motivated to combine the CheckCash PPM reference with the Higashiyama reference to obtain the purported invention of claims 5 and 11 of the '988 patent and claim 3 of the '366 patent.

**6.    Combination of Higashiyama and the First Cactus Switch Article**

277.    In my opinion, claim 6 of the '988 patent is obvious under § 103(a) as unpatentable over Higashiyama in view of the First Cactus Switch Article.

278.    A claim chart comparing these references to these claims is attached to this Report in Exhibit 32.

279.    Based on the information set forth in the attached Exhibits, a person of ordinary skill in the art, who I understand is considered to be aware of all relevant prior art, would be motivated to combine the First Cactus Switch Article reference with the Higashiyama reference to obtain the purported invention of claim 6 of the '988 patent.

**7.    Combination of Higashiyama and the Second Cactus Switch Article**

280.    In my opinion, claim 13 of the '988 patent is obvious under § 103(a) as unpatentable over Higashiyama in view of the Second Cactus Switch Article.

281.    A claim chart comparing these references to these claims is attached to this Report in Exhibit 32.

282.    Based on the information set forth in the attached Exhibits, a person of ordinary skill in the art, who I understand is considered to be aware of all relevant prior art, would be motivated to combine the Second Cactus Switch Article reference with the Higashiyama reference to obtain the purported invention of claim 13 of the '988 patent.

### 8.    Combination of Higashiyama and Braun

283.    In my opinion, claims 8, 14 and 18 of the '988 patent and claims 10 and 11 of the '528 patent are obvious under § 103(a) as unpatentable over Higashiyama in view of Braun.

284.    A claim chart comparing these references to these claims is attached to this Report in Exhibit 32.

285.    Based on the information set forth in the attached Exhibits, a person of ordinary skill in the art, who I understand is considered to be aware of all relevant prior art, would be motivated to combine the Braun reference with the Higashiyama reference to obtain the purported invention of claims 8, 14 and 18 of the '988 patent and claims 10 and 11 of the '528 patent.

### 9.    Combination of Higashiyama, Braun and Second Cactus Switch Article

286.    In my opinion, claim 16 of the '988 patent is obvious under § 103(a) as unpatentable over Higashiyama in view of Braun and the Second Cactus Switch Article.

287.    A claim chart comparing these references to these claims is attached to this Report in Exhibit 32.

288.    Based on the information set forth in the attached Exhibits, a person of ordinary skill in the art, who I understand is considered to be aware of all relevant prior art, would be motivated to combine the Higashiyama reference with the Braun reference and the Second Cactus Switch Article to obtain the purported invention of claim 16 of the '988 patent.

### 10.    Combination of Higashiyama, Braun and Langhans

289.    In my opinion, claim 18 of the '528 patent is obvious under § 103(a) as unpatentable over Higashiyama in view of Braun and Langhans.

290.    A claim chart comparing these references to these claims is attached to this Report in Exhibit 32.

67

291.    Based on the information set forth in the attached Exhibits, a person of ordinary skill in the art, who I understand is considered to be aware of all relevant prior art, would be motivated to combine the Higashiyama reference with the Braun reference and the Langhans reference to obtain the purported invention of claim 18 of the '528 patent.

### 11.    Combination of eFunds Corporation Reports and Langhans

292.    In my opinion, claim 18 of the '528 patent is obvious under § 103(a) as unpatentable over eFunds Report No. 3 in view of Langhans.

293.    A claim chart comparing these references to these claims is attached to this Report in Exhibit 32.

294.    Based on the information set forth in the attached Exhibits, a person of ordinary skill in the art, who I understand is considered to be aware of all relevant prior art, would be motivated to combine the eFunds reference with the Langhans reference to obtain the purported invention of claim 18 of the '528 patent.

### 12.    Combination of Higashiyama and May 1973 *Banking* Article

295.    In my opinion, claim 2 of the '366 patent is obvious under § 103(a) as unpatentable over Higashiyama in view of the May 1973 *Banking* Article.

296.    A claim chart comparing these references to these claims is attached to this Report in Exhibit 32.

297.    Based on the information set forth in the attached Exhibits, a person of ordinary skill in the art, who I understand is considered to be aware of all relevant prior art, would be motivated to combine the Higashiyama reference with the May 1973 *Banking* article reference to obtain the purported invention of claim 2 of the '366 patent.

### 13.    Combination of Sacramento Bee Article and Braun or Carlson

298.    In my opinion, claims 24 and 25 of the '366 patent are obvious under § 103(a) as unpatentable over the Sacramento Bee Article in view of Braun or Carlson '714 or Carlson '607.

299.    A claim chart comparing these references to these claims is attached to this Report in Exhibit 32.

300.    Based on the information set forth in the attached Exhibits, a person of ordinary skill in the art, who I understand is considered to be aware of all relevant prior art, would be motivated to combine the Sacramento Bee Article reference with the Braun reference or either of the Carlson references to obtain the purported invention of claims 24 and 25 of the '366 patent.

### 14.    Combination of the Ballen Report and Higashiyama, the Sacramento Bee Article or Carlson

301.    In my opinion, claims 24 and 25 of the '366 patent are obvious under § 103(a) as unpatentable over the Ballen Report in view of Higashiyama, the Sacramento Bee Article, Carlson '714 or Carlson '607.

302.    A claim chart comparing these references to these claims is attached to this Report in Exhibit 32.

303.    Based on the information set forth in the attached Exhibits, a person of ordinary skill in the art, who I understand is considered to be aware of all relevant prior art, would be motivated to combine the Ballen Report reference with the Higashiyama reference, the Sacramento Bee Article reference or either of the Carlson references to obtain the purported invention of claims 24 and 25 of the '366 patent.

### 15.    Combination of the Sacramento Bee Article, the CheckCash PPM and Braun or Carlson

304.    In my opinion, claim 27 of the '366 patent is obvious under § 103(a) as unpatentable over the Sacramento Bee Article in view of the CheckCash PPM and Braun or Carlson '714 or Carlson '607.

305.    A claim chart comparing these references to these claims is attached to this Report in Exhibit 32.

306.    Based on the information set forth in the attached Exhibits, a person of ordinary skill in the art, who I understand is considered to be aware of all relevant prior

69

art, would be motivated to combine the Sacramento Bee Article reference with the CheckCash PPM reference and the Braun reference or either of the Carlson references to obtain the purported invention of claim 27 of the '366 patent.

### 16.    Combination of the Ballen Report, the CheckCash PPM, and Higashiyama or Carlson

307.    In my opinion, claim 27 of the '366 patent is obvious under § 103(a) as unpatentable over the Ballen Report in view of the CheckCash PPM and Higashiyama or Carlson '714 or Carlson '607.

308.    A claim chart comparing these references to these claims is attached to this Report in Exhibit 32.

309.    Based on the information set forth in the attached Exhibits, a person of ordinary skill in the art, who I understand is considered to be aware of all relevant prior art, would be motivated to combine the Ballen Report reference with the CheckCash PPM reference and the Higashiyama reference or either of the Carlson references to obtain the purported invention of claim 27 of the '366 patent.

### 17.    Combination of the Ballen Report, the Sacramento Bee Article and the CheckCash PPM

310.    In my opinion, claim 27 of the '366 patent is obvious under § 103(a) as unpatentable over the Ballen Report in view of the Sacramento Bee Article and the CheckCash PPM.

311.    A claim chart comparing these references to these claims is attached to this Report in Exhibit 32.

312.    Based on the information set forth in the attached Exhibits, a person of ordinary skill in the art, who I understand is considered to be aware of all relevant prior art, would be motivated to combine the Ballen Report reference with the Sacramento Bee Article reference and the CheckCash PPM reference to obtain the purported invention of claim 27 of the '366 patent.

70

F.    **Objective Indicia of Nonobviousness**

313.    In my opinion, objective indicia (or "secondary considerations") of
nonobviousness such as long-felt need, commercial success (included the required nexus
between any commercial success and the patented invention), and trial and failure of
others, do not render the asserted claims nonobvious.

314.    The purported inventions of the asserted claims did not address some
unfulfilled, long-felt need.  Instead, as set forth above, the inventors recited what others
in the electronic check processing industry had known and/or implemented years before
the '988, '528 and '366 patent applications were filed.  In my opinion, the absence of any
widespread adoption of these systems before 1992 related largely to the absence of a
well-understood regulatory scheme, which created reluctance in the often-conservative
banking and payments industry.

315.    I am not aware of any evidence that any plaintiffs' product that allegedly
practices the asserted claims of the patents-in-suit was ever commercially successful.  I
understand that Mr. Hills and Mr. Nichols never achieved any significant market
presence with their purported invention.  Likewise, LML has not had any substantial
market presence since purchasing the patents.  In fact, I understand that LML's revenues
and profits have generally decreased over the last several years.  (Schulz Ex. 4, LML
Payment Systems Inc. Annual Report 2003, p. F-3; Schulz Ex. 5, LML Payment Systens
Inc. Annual Report 2004, p. F-3; Schulz Ex. 6, Form 10-K, Annual Report Pursuant to
Section 13 or 15(d) of the Securities Exchange Act for the Fiscal Year Ended March 31,
2005 for LML Payment Systems, Inc., p. F-4 (p. 57 of 86); Schulz Ex. 7, LML Payment
Systems Corp. Statement of Operations by Location with Variance for the Twelve
Months Ending March 31, 2005; Shulz Ex. 8, LML Payment Systems Corp. Statement of
Operations by Location with Variance for the Twelve Months Ending March 31, 2004.)

316.    Finally, in my opinion, plaintiffs cannot legitimately assert that the
purported inventions succeeded where others had tried and failed, because the patents

71

claim what had already been practiced successfully for years prior to the filing of the '988, '528 and '366 patent applications.

> ### G.    Section 112 Invalidity

> #### 1.    Legal Standards

317.    It is my understanding that a patent claim is invalid for lack of "written description" under 35 U.S.C. § 112, first paragraph, if the patent specification does not contain "a written description of the invention," including all of the claimed elements.  I am informed that the patent specification includes the as-filed specification, including the as-filed claims.  I am also informed that any "new matter" added to the specification after the application is filed may not be used as "written description."

318.    It is my understanding that a patent claim is invalid for lack of "enablement" under 35 U.S.C. § 112, first paragraph, if the patent specification does not contain a description of the "manner and process of making and using" the invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains" to make and use the invention without undue experimentation.  I am informed that "new matter" added to the specification after the application is filed may not be used as "enablement."

319.    It is my understanding that, under 35 U.S.C. § 112, sixth paragraph, a patentee may generically define a structure for performing a particular function through the use of a means expression, provided that the specified structures corresponding to the means are disclosed in the patent specification.

320.    It is my understanding that a patent claim is invalid as "indefinite" under 35 U.S.C. § 112, second paragraph, for those claims not "particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."  I further understand that the "definiteness" requirement exists to permit a person of ordinary skill in the art to understand the meaning and scope of the claims.

321.     I have reviewed the file histories of the '988, '528 and '366 patents. It is my opinion that all of the claims of the patents-in-suit are invalid for failure to comply with the written description, enablement, definiteness and/or "no new matter" requirements described above.

### 2.     Lack of Written Description and New Matter

322.     If the June 8, 1994 Preliminary Amendment is not considered part of the as-filed subject matter of the 1994 application, it is my opinion that claims 1-6, 8-11, 13-14, 16, 18 of the '988 patent and their dependent claims are invalid under 35 U.S.C. §112, first paragraph, because the original patent disclosure failed to provide sufficient written description for claim language subsequently added in the June 8, 1994 Preliminary Amendment. In particular, the claim limitations "without using the check as a negotiable instrument" and "without using the bank check as a negotiable instrument" have no support in the '988 patent specification outside of the disclosure added by the June 8, 1994 Preliminary Amendment.

323.     If it is determined that the disclosure added by the June 8, 1994 Preliminary Amendment should not be construed as part of the original 1994 application disclosure, then in my opinion, the asserted claims of the '988 patent are further invalid under 35 U.S.C. § 132 based on the inclusion of "new matter" within the specification. As set forth above, it is my opinion that the description added by the June 8, 1994 amendment constitutes new matter compared to the original disclosure of the 1992 application. As set forth above, it is also my opinion that all asserted claims of the '988 patent require at least this disclosure as support. Accordingly, if the disclosure added by the June 8, 1994 Preliminary Amendment is not treated as part of the as-filed 1994 application, then the claims are invalid under 35 U.S.C. § 132.

### 3.     Lack of Enablement

324.     It is my opinion that claims 1-6, 8-11, 13-14, 16 and 18 of the '988 patent, and claims 1-3 of the '366 patent are further invalid under 35 U.S.C. § 112, first

paragraph, for failure to provide in the patent specification an enabling disclosure for the limitations of reading information from "any bank check" or "any consumer bank check." There is no enabling disclosure in the specification for conducting transactions using, for example, business checks or foreign bank checks. For many foreign bank checks, conducting transactions as described and claimed would at least require knowledge of currency translations and regulatory and technical issues not addressed in the specifications of the '988 patent or '366 patent.

### 4. Indefiniteness

325.    It is also my opinion that, under the current claim construction proposed by LML as presently understood, all of the asserted claims of the patents-in-suit are invalid under the second paragraph of 35 U.S.C. § 112 because the claims either recite or depend from a claim that recites the limitation "without using the check [or bank check] as a negotiable instrument," rendering the claims indefinite. At the time the patent applications leading to the '988 patent were filed, the interpretation of the phrase "without using the check [or bank check] as a negotiable instrument" as applied to electronic transactions was uncertain. The limitation "without using the check [or bank check] as a negotiable instrument," would have been subject to various interpretations, including various interpretations imposed by state law, the UCC and/or other regulatory sources such as Regulation E, and therefore renders each of these claims ambiguous and indefinite.

### H. Improper Inventorship

326.    I understand that 35 U.S.C. §§ 102(f) and 116 provide that a patent is invalid for improper inventorship.

327.    In my opinion all of the asserted claims of the '528 patent and '366 patent are invalid under § 102(f) and/or § 116 for improper inventorship. Mr. Hills, the first-named inventor of the patents-in-suit conceded publicly that the named inventors did not invent various elements of the subject matter of the asserted claims. Mr. Hills, the first-

named inventor on the '528 and '366 patents, stated publicly that one purpose of those patents was to update the original '988 patent with regards to industry activity:

> As indicated, our second application accomplishes two principal objectives. The first is to update the original patent with regards to industry activity and evolved terminology since the date of the original patent's filing date. Secondly, the second patent is much more descriptive as to the specific operation and features of the ChequeMARK System, whereas the original patent was, by design, more general in scope.

(LML-EP 011994-97.)

328.    In my opinion, the first purpose stated by Mr. Hills indicates that the applicants did not invent the subject matter claimed in the '528 and '366 patents. Mr. Hills' statement is consistent with my personal knowledge that the subject of electronic check conversion at the point of sale was openly discussed and examined in the 1980's and early 1990's, well before these applications were filed.

## IX.    PATENT UNENFORCEABILITY

329.    I am informed that a patent obtained through inequitable conduct is unenforceable. My understanding is that all "material" prior art of which an applicant is aware must be provided to the United States Patent and Trademark Office ("Patent Office").

330.    I further understand that a reference is considered "material" when:

it is not cumulative to information already of record or being made of record in the application, and

(1)    It establishes, by itself or in combination with other information, a *prima facie* case of unpatentability of a claim; or

(2)    It refutes, or is inconsistent with, a position the applicant takes in:

(i)    Opposing an argument of unpatentability relied on by the Office, or

(ii)    Asserting an argument of patentability.

75

331.    Below, I provide my opinions regarding the materiality of certain prior art not before the Examiner in one or more of the applications leading to the patents-in-suit.

332.    As set forth above, I have reviewed the Higashiyama patent. A description of the Higashiyama patent is attached to this Report as Exhibit 7, and claim charts involving the Higashiyama patent are attached to this Report. As set forth above, in my opinion the Higashiyama patent discloses each element of certain claims of the '988 patent. Based on the disclosure of the Higashiyama patent as set forth above, the relevance of that disclosure to the claims of the '988 patent, and the references before the Examiner during prosecution, in my opinion the Higashiyama patent was material to the prosecution of the '988 patent, and not cumulative to the prior art before the Examiner.

333.    Mr. Henry Nichols, named inventor on the '988 patent, admitted that he sought to the purchase the Higashiyama patent. This attempt to purchase occurred during the pendency of the application leading to the '988 patent, as confirmed by Ms. Higashiyama during her deposition. These facts further support my opinion regarding materiality of the Higashiyama patent.

334.    As set forth above, I have reviewed the Carlson'714 patent. A description of the Carlson'714 patent is attached to this Report as Exhibit 8, and claim charts involving the Carlson'714 patent are attached to this Report. As set forth above, in my opinion the Carlson'714 patent discloses each element of certain claims of the asserted patents. Based on the disclosure of the Carlson'714 patent as set forth above, the relevance of that disclosure to the claims of the asserted patents, and the references before the Examiner during prosecution, in my opinion the Carlson'714 patent was material to the prosecution of the asserted patents, and not cumulative to the prior art before the Examiner.

335.    As set forth above, based on my review of materials in this case, it is my opinion that systems within the scope of the patents-in-suit were on sale and in public use more than one year prior to the effective filing date of the '528 and '366 patents. These

76

documents disclose a system and/or method within the scope of certain claims of the patents in suit. Based on the information demonstrating public use and sale of the purported invention, the relevance of that disclosure to the claims of the asserted patents, and the references before the Examiner during prosecution of the '528 and '366 patents, in my opinion the early disclosure and sale of the invention was material to the prosecution of the '528 and '366 patents, and not cumulative to the prior art before the Examiner.

336.    As set forth above, I have reviewed the November 1995 Sacramento Bee article. A description of the November 1995 Sacramento Bee article is attached to this Report as Exhibit 17, and claim charts involving the November 1995 Sacramento Bee article are attached to this Report. As set forth above, in my opinion the November 1995 Sacramento Bee article discloses each element of certain claims of the '528 and '366 patent. Based on the disclosure of the November 1995 Sacramento Bee article as set forth above, the relevance of that disclosure to the claims of the '528 and '366 patents, and the references before the Examiner during prosecution, in my opinion, the November 1995 Sacramento Bee article was material to the prosecution of the '528 and '366 patents, and not cumulative to the prior art before the Examiner.

337.    On July 22, 1999, attorneys for ChequeMark Patent Inc. ("CPI"), an LML subsidiary, filed a terminal disclaimer and affidavit in the application leading to the '528 patent in order to overcome a rejection based on the '988 patent.[36] On July 27, 2000, LML and/or its attorneys filed a second terminal disclaimer again claiming all rights in the application leading to the '528 patent.[37] In my opinion, these statements regarding rights in the patent were material, because they were required for effective filing of the terminal disclaimers, which were required to overcome the rejection based on the '988

---

[36] LML-EP 000424-000428; LML-EP 006104-006105.

[37] LML-EP 000511.

patent. In allowing the application, the Examiner stated that failure to file a proper terminal disclaimer would constitute an abandonment of the application.[38]

338.     In 1998, attorneys for LML, as part of their due diligence search regarding the validity and strength of the '988 patent, conducted a prior art search and discovered prior art they considered "to be relevant to U.S. Patent 5,484,988." Attorneys for LML believed and stated that the Examiner of the '988 patent had not conducted a thorough search for prior art regarding the '988 patent.[39] The attorneys conducted a further search, and the search results were provided to LML during the pendency of the applications leading to the '528 and '366 patents.[40] LML's attorneys considered "relevant to U.S. Patent 5,484,988": U.S. Patent No. 5,496,991 to Delfer III et al.; U.S. Patent No. 5,438,186 to Nair et al.; U.S. patent No. 5,373,550 to Campbell et al; U.S. Patent 5,305,196 to Deaton et al.; U.S. patent No. 4,727,243 to Savar; and U.S. Patent No. 3,852,571 to Hall et al. I agree with LML's counsel that these references were relevant to the '988 patent, and in my opinion these prior art references were material to the prosecution of the '528 and '366 patents, and not cumulative to the prior art before the Examiner.

339.     As set forth above, during the '988 patent prosecution, the Applicants did not obtain allowance of the claims until after they amended claim 1 to recite a terminal adapted to receive consumer account information "from any bank check;" amended pending claim 9 to recite presenting "any" bank check specimen to a point of sale terminal; and amended pending claim 11 to recite means for reading magnetic ink character recognition numbers on "any" consumer bank check. (LML-EP 000183-85.) In my opinion, this amendment to the claims was material to securing allowance of the '988 patent claims. In the subsequent prosecution of the '528 and '366 patents, the

---

[38] LML-EP 000508.

[39] LML-EP 061874-061877.

[40] LML-EP 061853-061864.

Applicants did not cite to the Examiner the earlier rejections during the '988 patent, and the Applicants' amendments regarding "any" check. In my opinion, this information was material to the prosecution of the '528 and '366 patent, and was not cumulative to the prior art before the Examiner.


Dated:  August 12, 2005              _____ /s/ David P. Kurrasch _____
                                            David P. Kurrasch


79