# EXHIBIT 15

## INVALIDITY CLAIM CHART
## PART 1 OF 2

| '988 PATENT | CARLSON '714 PATENT |
|---|---|
| 1. A checkwriting point of sale system comprising: | "This invention relates to point-of-sale devices and more particularly to point-of-sale devices in which all of the transactions are completed without possible outside intervention. It is directed to cost-effective, OEM address-o-graph style mechanisms designed to utilize several types of existing credit cards such as a 'PIN/ALGORITHM' or verifiable consumer oriented point-of-sale format plug all types of checks using the Federal magnetic ink character recognition (MICR) system." (1:10-18.)<br><br>"the mechanism also permits verification of travelers checks, smart card capability, electronic funds transfer from cards or checks, and lost or stolen credit card verification." (1:39-45.) |
| a point of sale terminal adapted to receive consumer bank account information from any bank check; | "This groove 16-91 in the 16-16A verifier access door insures reliable reading of the MICA line and all tracks of the credit cards. This is accomplished since proper insertion by the retailer will necessarily eliminate folds and wrinkles in checks and food stamps and may even accommodate minor tears and destruction of the MICA line area." (11:22-28.)<br><br>"For the purposes of this disclosure, the term 'Check' shall mean traveler's checks, government checks, personal checks, food stamps or any means of monetary payment which utilizes the Federal Reserve Bank's MICA system." (11:57-63.) |
| a central computer system; | The point-of-sale device could include "means to access a computer system maintained by an issuer of a negotiable instrument, credit card and the like . . . ." (2:9-13.) |
| first communication means integral to said point of sale terminal for electronically communicating with the central computer | The point-of-sale device could include "means to access a computer system maintained by an issuer of a negotiable |

| '988 PATENT | CARLSON '714 PATENT |
|---|---|
| system; | instrument, credit card and the like . . . ." (2:9-13.) |
| memory means integral to said point of sale terminal for temporarily storing the consumer bank account information | The point-of-sale device could include "standard 8 bit microprocessor capble [*sic*] of accessing 64K bytes of memory." (2:25-27.) |
| the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; | It is inherent that a central computer system receiving information from a plurality of point of sale terminals has a second communication means for receiving the information. |
| the central computer system having second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the bank check as a negotiable instrument. | "means to access an external communication system to identify a payor of a negotiable instrument (such as through the use of a personal identification number) and to perform an electronic funds transfer" (2:14-18; *see also* 12:65-13:8.) |
| 2. The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further includes means for reading magnetic ink character recognition numbers appearing on a consumer check for the sole purpose of identifying and reading the consumer bank account information. | "Triggering of switch 15-86 signals the CPU that a 'check' is present and to switch to the 'Check Mode.' For the purposes of this disclosure, the term 'Check' shall mean traveler's checks, government checks, personal checks, food stamps or any means of monetary payment which utilizes the Federal Reserve Bank's MICA system. The CPU will automatically select the 15-76 MICA reader head and all 'check' verification systems and functions which shall include the phone-in module, the disk-drive, etc." (11:57-66; *see also* 11:22-28) |
|  | "This alternative design more readily accommodates traveler's checks, personal checks, food stamps, etc. . . . A MICA reader device, 14-76, 15-76, and 16-76, such as that in common use by the Federal Reserve Banking System is installed adjacent to the 13-36 (14-36 and 15-36) mag-stripe reader head." (13:36-43.) |
|  | "The 1-2 cover would then pop open and the cancelled check would be presented to the customer as part of his receipt." (9:62-64.) |
| 3. The checkwriting point of sale system | "A purchase amount display, 4-40, which |

| '988 PATENT | CARLSON '714 PATENT |
|---|---|
| according to claim 1 wherein said point of sale terminal further comprises an alphanumeric display means for receiving said consumer bank account information from the memory means and for displaying the consumer bank account information. | matches the mainframe display 1-23 allows the customer and the retailer to monitor the purchase being selected by the retailer on the print matrix." (7:45-49.) |
| 4.  The checkwriting point of sale system according to claim 1 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sales slip. | The point-of-sale device can include "a printing mechanism specially adapted for printing upon an invoice, negotiable instrument, etc. by means of a pair of plates spatially disposed about any of said credit cards, invoices, checks or other monetary negotiable instruments." (2:32-37.)<br><br>"after the EFT had taken place, the payer's bank computer would wire the appropriate check cancellation information to the POS terminal which would then (A) print it on the back of the check via the dot matrix printer and (B) if the "daily totals" option is onboard, would add the amount of the EFT to the daily total. The 1-2 cover would then pop open and the cancelled check would be presented to the customer as part of his receipt." (9:56-65; *see also* 9:66-10:3)<br><br>"When all security, verification/authorization and transaction conditions have been correctly met, the 3-17 actuator carries the appropriate embossments and matrices upward and squeezes them and the invoice or check between plates 3-14 and 3-19 thereby printing the information on the check or invoice." (10:17-23.) |
| 8.  A checkwriting point of sale process comprising: | "This invention relates to point-of-sale devices and more particularly to point-of-sale devices in which all of the transactions are completed without possible outside intervention. It is directed to cost-effective, OEM address-o-graph style mechanisms designed to utilize several types of existing credit cards such as a 'PIN/ALGORITHM' or verifiable consumer oriented point-of-sale format plug all types of checks using the Federal magnetic ink character recognition |

| '988 PATENT | CARLSON '714 PATENT |
|---|---|
| | (MICR) system." (1:10-18.)<br><br>"the mechanism also permits verification of travelers checks, smart card capability, electronic funds transfer from cards or checks, and lost or stolen credit card verification." (1:39-45.) |
| (a)  presenting any bank check specimen to a point of sale terminal located at a merchant or service provider; | "This groove 16-91 in the 16-16A verifier access door insures reliable reading of the MICA line and all tracks of the credit cards. This is accomplished since proper insertion by the retailer will necessarily eliminate folds and wrinkles in checks and food stamps and may even accommodate minor tears and destruction of the MICA line area."  (11:22-28.)<br><br>"For the purposes of this disclosure, the term 'Check' shall mean traveler's checks, government checks, personal checks, food stamps or any means of monetary payment which utilizes the Federal Reserve Bank's MICA system."  (11:57-63.) |
| (b)  reading the magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument. | "When the 1-2 lid closes the device's CPU (which may or may not contain the customer's PIN entry at this time) will trigger the function of the MICA read head assembly to "read" the data on the check. If a mag-stripe is located on the check, it will also read that information. The CPU will then compare the PIN entered by the customer to that interbolated from the MICA information" (9:11-16; *see also* 1:16-18; 3:15-28; 7:13-17; 13:36-43)<br><br>"The 1-2 cover would then pop open and the cancelled check would be presented to the customer as part of his receipt." (9:62-64) |
| (c)  storing the consumer bank account information obtained from the check and verifying that account numbers were accurately read at the point of sale terminal; | "trigger the function of the MICA read head assembly to 'read' the data on the check.  If a mag-stripe is located on the check, it will also read that information. The CPU will then compare the PIN entered by the customer to that interbolated from the MICA information." (9:14-18.) |

4

| '988 PATENT | CARLSON '714 PATENT |
|---|---|
| | "if the onboard CPU cannot interpret the PIN matchup, then it would automatically call up the MICA network and using the routing and transit numbers on the face of the check would locate the very bank this particular check issued from." (9:24-29.) |
| (d) providing transaction event information to the point of sale terminal; | "The retailer would punch in the check amount at 2-10 which would read out at 2-23 for the retailer and the customer to see and then place the check in the device and close the 1-2 lid." (8:68-9:4.) |
| (e) transmitting the transaction event information and consumer bank account information to a central computer system; | "This would connect the system to the customer's own bank and the check could be verified for sufficient funds and proper I.D." (8:28-30.)<br><br>The point-of-sale device could include "means to access a computer system maintained by an issuer of a negotiable instrument, credit card and the like . . . ." (2:9-17.) |
| (f) storing the transaction event information and consumer banking account information; and | "The main system CPU keeps a running total of all sales for a given day or shift and will display them following a predescribed key command at 4-23. This display will show the total of funds paid to the retailer by cash, check or credit card at the POS; a separate total of all 'EFT' funds transferred to the retailer's account in his bank (as per common practice) and a grand total of both." (13:13-20.) |
| (g) subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations. | The point-of-sale device could include "means to access an external communication system to identify a payor of a negotiable instrument (such as through the use of a personal identification number) and to perform an electronic funds transfer." (2:14-17; see also 12:64-13:8.) |
| 9. A checkwriting point of sale system comprising: | "This invention relates to point-of-sale devices and more particularly to point-of-sale devices in which all of the transactions are completed without possible outside intervention. It is directed to cost-effective, OEM address-o-graph style mechanisms |

| '988 PATENT | CARLSON '714 PATENT |
|---|---|
| | designed to utilize several types of existing credit cards such as a 'PIN/ALGORITHM' or verifiable consumer oriented point-of-sale format plug all types of checks using the Federal magnetic ink character recognition (MICR) system." (1:10-18.)

"the mechanism also permits verification of travelers checks, smart card capability, electronic funds transfer from cards or checks, and lost or stolen credit card verification." (1:39-45.) |
| a point of sale terminal adapted to receive consumer bank account information; | "This groove 16-91 in the 16-16A verifier access door insures reliable reading of the MICA line and all tracks of the credit cards. This is accomplished since proper insertion by the retailer will necessarily eliminate folds and wrinkles in checks and food stamps and may even accommodate minor tears and destruction of the MICA line area." (11:22-28.)

"For the purposes of this disclosure, the term 'Check' shall mean traveler's checks, government checks, personal checks, food stamps or any means of monetary payment which utilizes the Federal Reserve Bank's MICA system." (11:57-63.) |
| a central computer system; | The point-of-sale device could include "means to access a computer system maintained by an issuer of a negotiable instrument, credit card and the like . . . ." (2:9-13.) |
| first communication means integral to said point of sale terminal for electronically communicating with the central computer system; and | The point-of-sale device could include "means to access a computer system maintained by an issuer of a negotiable instrument, credit card and the like . . . ." (2:9-13.) |
| memory means integral to said point of sale terminal for temporarily storing the consumer bank account information; | The point-of-sale device could include "staridard 8 bit microprocessor capble [sic] of accessing 64K bytes of memory." (2:25-27.) |
| the point of sale terminal comprising reading means for reading magnetic ink character recognition numbers on any consumer bank check for the sole purpose of eliciting | "Triggering of switch 15-86 signals the CPU that a 'check' is present and to switch to the 'Check Mode.' For the purposes of this disclosure, the term "Check" shall mean |

| '988 PATENT | CARLSON '714 PATENT |
|---|---|
| consumer bank account information; | traveler's checks, government checks, personal checks, food stamps or any means of monetary payment which utilizes the Federal Reserve Bank's MICA system. The CPU will automatically select the 15-76 MICA reader head and all 'check' verification systems and functions which shall include the phone-in module, the disk-drive, etc." (11:57-66; *see also* 11:22-28.)

"This alternative design more readily accommodates traveler's checks, personal checks, food stamps, etc. . . . A MICA reader device, 14-76, 15-76, and 16-76, such as that in common use by the Federal Reserve Banking System is installed adjacent to the 13-36 (14-36 and 15-36) mag-stripe reader head." (13:36-43.)

"The 1-2 cover would then pop open and the cancelled check would be presented to the customer as part of his receipt." (9:62-64.) |
| the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; | It is inherent that a central computer system receiving information from a plurality of point of sale terminals has a second communication means for receiving information. |
| the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using a bank check as a negotiable instrument. | "means to access an external communication system to identify a payor of a negotiable instrument (such as through the use of a personal identification number) and to perform an electronic funds transfer" (2:14-18; *see also* 12:65-13:8.)

The 1-2 cover would then pop open and the cancelled check would be presented to the customer as part of his receipt." (9:62-64; *see also* 9:45-48.) |
| 10. The checkwriting point of sale system according to claim 9 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip. | The point-of-sale device can include "a printing mechanism specially adapted for printing upon an invoice, negotiable instrument, etc. by means of a pair of plates spatially disposed about any of said credit cards, invoices, checks or other monetary negotiable instruments;" (2:32-37.) |

| '988 PATENT | CARLSON '714 PATENT |
|---|---|
| | "after the EFT had taken place, the payer's bank computer would wire the appropriate check cancellation information to the POS terminal which would then (A) print it on the back of the check via the dot matrix printer and (B) if the 'daily totals' option is onboard, would add the amount of the EFT to the daily total. The 1-2 cover would then pop open and the cancelled check would be presented to the customer as part of his receipt." (9:52-64; *see also* 9:66-10:3)<br><br>"When all security, verification/authorization and transaction conditions have been correctly met, the 3-17 actuator carries the appropriate embossments and matrices upward and squeezes them and the invoice or check between plates 3-14 and 3-19 thereby printing the information on the check or invoice." (10:17-23.) |

| '528 PATENT | CARLSON '714 PATENT |
|---|---|
| 10.  A checkwriting point of sale process comprising: | "This invention relates to point-of-sale devices and more particularly to point-of-sale devices in which all of the transactions are completed without possible outside intervention. It is directed to cost-effective, OEM address-o-graph style mechanisms designed to utilize several types of existing credit cards such as a "PIN/ALGORITHM" or verifiable consumer oriented point-of-sale format plug all types of checks using the Federal magnetic ink character recognition (MICR) system." (1:10-18.)<br><br>"the mechanism also permits verification of travelers checks, smart card capability, electronic funds transfer from cards or checks, and lost or stolen credit card verification." (1:39-45.) |
| (a) presenting a bank check specimen to a point of sale terminal located at a merchant or service provider; | "This groove 16-91 in the 16-16A verifier access door insures reliable reading of the MICA line and all tracks of the credit cards. |

| '528 PATENT | CARLSON '714 PATENT |
|---|---|
| | This is accomplished since proper insertion by the retailer will necessarily eliminate folds and wrinkles in checks and food stamps and may even accommodate minor tears and destruction of the MICA line area." (11:22-28.)<br><br>"For the purposes of this disclosure, the term 'Check' shall mean traveler's checks, government checks, personal checks, food stamps or any means of monetary payment which utilizes the Federal Reserve Bank's MICA system." (11:57-63.) |
| (b) reading a magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument; | "Triggering of switch 15-86 signals the CPU that a 'check' is present and to switch to the 'Check Mode.'  For the purposes of this disclosure, the term 'Check' shall mean traveler's checks, government checks, personal checks, food stamps or any means of monetary payment which utilizes the Federal Reserve Bank's MICA system.  The CPU will automatically select the 15-76 MICA reader head and all 'check' verification systems and functions which shall include the phone-in module, the disk-drive, etc." (11:57-66; *see also* 11:22-28)<br><br>"This alternative design more readily accommodates traveler's checks, personal checks, food stamps, etc. . . .  A MICA reader device, 14-76, 15-76, and 16-76, such as that in common use by the Federal Reserve Banking System is installed adjacent to the 13-36 (14-36 and 15-36) mag-stripe reader head." (13:36-43.)<br><br>"The 1-2 cover would then pop open and the cancelled check would be presented to the customer as part of his receipt." (9:62-64.) |
| (c) storing the consumer bank account information obtained from the check and verifying that account numbers were accurately read at the point of sale terminal; | If a mag-stripe is located on the check, it will also read that information. The CPU will then compare the PIN entered by the customer to that interbolated from the MICA information." (9:14-18.) |

9

| '528 PATENT | CARLSON '714 PATENT |
|---|---|
| | "if the onboard CPU cannot interpret the PIN matchup, then it would automatically call up the MICA network and using the routing and transit numbers on the face of the check would locate the very bank this particular check issued from." (9:24-29.) |
| (d) providing transaction event information to the point of sale terminal; | "The retailer would punch in the check amount at 2-10 which would read out at 2-23 for the retailer and the customer to see and then place the check in the device and close the 1-2 lid." (8:68-9:4.) |
| (e) transmitting the transaction event information and consumer bank account information to a central computer system; | "This would connect the system to the customer's own bank and the check could be verified for sufficient funds and proper I.D." (8:28-30.)<br><br>The point-of-sale device could include "means to access a computer system maintained by an issuer of a negotiable instrument, credit card and the like . . . ." (2:9-17.) |
| (f) storing the transaction event information and consumer banking account information; | "The main system CPU keeps a running total of all sales for a given day or shift and will display them following a predescribed key command at 4-23.  This display will show the total of funds paid to the retailer by cash, check or credit card at the POS; a separate total of all 'EFT' funds transferred to the retailer's account in his bank (as per common practice) and a grand total of both."  (13:13-20.) |
| (g) subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations; and | The point-of-sale device could include "means to access an external communication system to identify a payor of a negotiable instrument (such as through the use of a personal identification number) and to perform an electronic funds transfer."  (2:14-17; see also 12:64-13:8.) |
| (h) returning the bank check specimen to the consumer. | "The 1-2 cover would then pop open and the cancelled check would be presented to the customer as part of his receipt." (9:62-64.) |
| 11.  The checkwriting point of sale process of claim 10 further comprising annotating the bank check specimen before returning the bank check specimen to the consumer. | "The above mentioned check cancellation information would usually include something like, "Point-of-Sale Cancelled - Pay any Bank PEG 011386 FRB MPLS 0911-00036" and so |

10

| '528 PATENT | CARLSON '714 PATENT |
|---|---|
| | on." (9:66-10:1.) |
| | The point-of-sale device can include "a printing mechanism specially adapted for printing upon an invoice, negotiable instrument, etc. by means of a pair of plates spatially disposed about any of said credit cards, invoices, checks or other monetary negotiable instruments." (2:32-37.) |
| | "after the EFT had taken place, the payer's bank computer would wire the appropriate check cancellation information to the POS terminal which would then (A) print it on the back of the check via the dot matrix printer and (B) if the "daily totals" option is onboard, would add the amount of the EFT to the daily total. The 1-2 cover would then pop open and the cancelled check would be presented to the customer as part of his receipt." (9:56-65; *see also* 9:66-10:3) |
| | "When all security, verification/authorization and transaction conditions have been correctly met, the 3-17 actuator carries the appropriate embossments and matrices upward and squeezes them and the invoice or check between plates 3-14 and 3-19 thereby printing the information on the check or invoice." (10:17-23.) |

| '366 PATENT | CARLSON '714 PATENT |
|---|---|
| 1.  A checkwriting point of sale system comprising: | "This invention relates to point-of-sale devices and more particularly to point-of-sale devices in which all of the transactions are completed without possible outside intervention. It is directed to cost-effective, OEM address-o-graph style mechanisms designed to utilize several types of existing credit cards such as a "PIN/ALGORITHM" or verifiable consumer oriented point-of-sale format plug all types of checks using the Federal magnetic ink character recognition (MICR) system." (1:10-18.) |

| '366 PATENT | CARLSON '714 PATENT |
|---|---|
| | "the mechanism also permits verification of travelers checks, smart card capability, electronic funds transfer from cards or checks, and lost or stolen credit card verification." (1:39-45.) |
| a point of sale terminal adapted to receive payer bank account information from any bank check; | "This groove 16-91 in the 16-16A verifier access door insures reliable reading of the MICA line and all tracks of the credit cards. This is accomplished since proper insertion by the retailer will necessarily eliminate folds and wrinkles in checks and food stamps and may even accommodate minor tears and destruction of the MICA line area." (11:22-28.)<br><br>"For the purposes of this disclosure, the term 'Check' shall mean traveler's checks, government checks, personal checks, food stamps or any means of monetary payment which utilizes the Federal Reserve Bank's MICA system." (11:57-63.) |
| a central computer system; | The point-of-sale device could include "means to access a computer system maintained by an issuer of a negotiable instrument, credit card and the like . . . ." (2:9-13.) |
| first communication means integral to said point of sale terminal for electronically communicating with the central computer system; | The point-of-sale device could include "means to access a computer system maintained by an issuer of a negotiable instrument, credit card and the like . . . ." (2:9-13.) |
| memory means integral to said point of sale terminal for temporarily storing the payer bank account information; | The point-of-sale device could include "standard 8 bit microprocessor capble [sic] of accessing 64K bytes of memory." (2:25-27.) |
| the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; and | It is inherent that a central computer system receiving information from a plurality of point of sale terminals has a second communication means for receiving the information. |
| the central computer system second communication means enabling said central computer system to communicate with external databases for performing a payer bank account status search and further enabling | "means to access an external communication system to identify a payor of a negotiable instrument (such as through the use of a personal identification number) and to perform an electronic funds transfer" (2:14- |

| '366 PATENT | CARLSON '714 PATENT |
|---|---|
| communication with an electronic funds transfer system for transferring funds without using the bank check as a negotiable instrument. | 18; *see also* 12:65-13:8.)<br><br>"The 1-2 cover would then pop open and the cancelled check would be presented to the customer as part of his receipt." (9:62-64; *see also* 9:45-48.) |
| 2. The checkwriting point of sale system of claim 1 wherein the point of sale terminal is further adapted to print activity reports of transaction events occurring at the point of sale terminal. | "The main system CPU keeps a running total of all sales for a given day or shift and will display them following a predescribed key command at 4-23. This display will show the total of funds paid to the retailer by cash, check or credit card at the POS; a separate total of all 'EFT' funds transferred to the retailer's account in his bank (as per common practice) and a grand total of both." (13:13-20.)<br><br>It is inherent to print activity reports of transaction events that are displayed. |
| 3. The checkwriting point of sale system of claim 2 wherein the point of sale terminal is further adapted to annotate the bank check that is used at the point of sale terminal to provide the payer bank account information. | "The above mentioned check cancellation information would usually include something like, "Point-of-Sale Cancelled - Pay any Bank PEG 011386 FRB MPLS 0911-00036" and so on." (9:66-10:1.)<br><br>The point-of-sale device can include "a printing mechanism specially adapted for printing upon an invoice, negotiable instrument, etc. by means of a pair of plates spatially disposed about any of said credit cards, invoices, checks or other monetary negotiable instruments." (2:32-37.)<br><br>"after the EFT had taken place, the payer's bank computer would wire the appropriate check cancellation information to the POS terminal which would then (A) print it on the back of the check via the dot matrix printer and (B) if the "daily totals" option is onboard, would add the amount of the EFT to the daily total. The 1-2 cover would then pop open and the cancelled check would be presented to the customer as part of his receipt." (9:56-65; *see also* 9:66-10:3.) |

| '366 PATENT | CARLSON '714 PATENT |
|---|---|
| | "When all security, verification/authorization and transaction conditions have been correctly met, the 3-17 actuator carries the appropriate embossments and matrices upward and squeezes them and the invoice or check between plates 3-14 and 3-19 thereby printing the information on the check or invoice." (10:17-23.) |

| '988 PATENT | CHEQUEMARK REFERENCES |
|---|---|
| 1.  A checkwriting point of sale system comprising: | ECHO0002736 ("The applicants have designed a Point-of-Sale processing system composed of individual services selections which provide automated, electronic processing from bank checking or depository accounts.") |
| a point of sale terminal adapted to receive consumer bank account information from any bank check; | ECHO0004431 ("All point-of-sale input of transaction data will mandatorially be conducted through a MICR Check Reader.")<br><br>ECHO0004439-41 ("This new system will enable subscribers to process events from virtually every bank within the United States")<br><br>ECHO0004438-40 (promising "Automated Processing for ALL Checking Account Events"). |
| a central computer system; | ECHO0004442 ("'system subscribers' would electronically communicate with the system's data center for individual Transaction Event authorizations"); *see also* ECHO0004448. |
| first communication means integral to said point of sale terminal for electronically communicating with the central computer system; | ECHO0004442 ("The terminal's dial-up capabilities would then direct the inquiry to the computer data file center for authorization"). |
| memory means integral to said point of sale terminal for temporarily storing the consumer bank account information | ECHO0004431 (discussing "terminal memory") |
| the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; | ECHO0002737 ("Participating merchants, businesses, and individuals, as 'system subscribers,' would electronically communicate with the system's data center for individual Transaction Event |

| '988 PATENT | CHEQUEMARK REFERENCES |
|---|---|
|  | authorizations.") |
| the central computer system having second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the bank check as a negotiable instrument. | ECHO0004447-48 ("The terminal's dial up capabilities would then direct the inquiry to the computer data file center for authorization first against the ChequeMARK POSITIVE file of 'prenoted' bank/checking account numbers whose accounts were listed in 'good standing.' . . . "Each inquiry preliminarily resulting in a No-Match would be instantly forwarded/'rolled' to the third data file preceding any return notice to the inquiring terminal.  This third file is anticipated to be the Shared Check Authorization Network ('SCAN') data base. . . ."

ECHO0004441 ("in the event of an 'Approval' of the Transaction Event, funds to be debited from an authorized computer account for credit and electronic settlement by ACH")

ECHO0004439 ("Programming application features support identification/approval of a designated banking account . . . by use of a specimen check on the account from which funds are to be electronically debited in payment for goods and services."); see also ECHO0004427. |
| 2.  The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further includes means for reading magnetic ink character recognition numbers appearing on a consumer check for the sole purpose of identifying and reading the consumer bank account information. | ECHO0004447 ("The POS terminal operator would . . . enter a specimen check through a MICR Check Reader device interfaced with the terminal. . . .").

ECHO0004449: ("Terminal programming and MICR interface should result in the transmittal for data center approval of the entire ABA/Transit and personal or corporate checking account numbers. Instances where printed checked add the individual's check number to the end of the account number can be 'dropped' by MICR Check Reader dip switch settings.") |
| 3.  The checkwriting point of sale system according to claim 1 wherein said point of | ECHO0004447: (after check swiped through MICR reader, "the terminal's screen would |

| '988 PATENT | CHEQUEMARK REFERENCES |
|---|---|
| sale terminal further comprises an alphanumeric display means for receiving said consumer bank account information from the memory means and for displaying the consumer bank account information. | display the check's numbers for verification.")<br><br>ECHO0004449: ("Subsequent to a terminal's receipt of the MICR number string but prior to the operator's entry of the requested sale amount and authorization dial-up, a verification prompt 'flashing' the ABA and account numbers must be displayed on the terminal's screen requiring the operator to depress 'Enter' to proceed, if correct, or 'Clear,' if incorrect and thereby enabling the terminal operator to resubmit the specimen check through the MICR Check Reader.") |
| 4. The checkwriting point of sale system according to claim 1 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sales slip. | ECHO0004449-50 (each point-of-sale terminal has a "logging printer" and the point-of-sale terminal "must complete each Transaction Event with the logging printer generation of a Transaction Event ('Sales') Slip for each 'Approved' authorization inquiry processed. Each such Transaction Event Slip must be exacting in its retention of account numbers and the sale amount enabling both the consumer and the system subscriber to be provided 'hard copy' receipts of the event. Also included would be a clear printing of the transaction type. . . . More germane to the legal compliances and mandatory criteria associated with electronic access and debits, preferential scripted language would be printed immediately preceding the customer's signature line specifically authorizing electronic access in payment of the requested transaction sale amount.") |
| 5. The checkwriting point of sale system according to claim 1 further comprising a resident third party database wherein consumer banking account status information is stored, the consumer banking account status information being used for verification of consumer banking account status. | ECHO0004439 (point-of-sale terminal provides "[t]erminal dial-up approval against national and proprietary checkwriter databases.")<br><br>ECHO0004442 ("Participating merchants, business, and individuals, as 'system subscribers,' would electronically communicate with the system's data center |

| '988 PATENT | CHEQUEMARK REFERENCES |
|---|---|
| | for individual Transaction Event authorizations.") |
| 6.  The checkwriting point of sale system according to claim 1 wherein the central computer system further comprises a system subscriber database, the system subscriber database comprising information regarding merchants and service providers that are authorized to use the checkwriting point of sale system. | The ChequeMARK system was explicitly subscriber-based, and a subscriber database was a necessary and inherent component of ChequeMARK's subscriber-based service offerings.  *See* ECHO0004441 ("The system is intended to be made available to subscribing merchants, businesses and individuals as 'system subscribers' wishing to employ selected services or combinations of services for the electronic processing and settlement of consumer purchases.") |
| 8.  A checkwriting point of sale process comprising: | ECHO0002736 ("The applicants have designed a Point-of-Sale processing system composed of individual services [sic] selections which provide automated, electronic processing from bank checking or depository accounts.") |
| (a)  presenting any bank check specimen to a point of sale terminal located at a merchant or service provider; | ECHO0004439 ("Programming application features support identification/approval of a designated banking account . . . by use of a specimen check on the account from which funds are to be electronically debited in payment for goods and services."); see also ECHO0004427. |
| (b) reading the magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument. | ECHO0004447 ("The POS terminal operator would . . . enter a specimen check through a MICR Check Reader device interfaced with the terminal. . . ."). <br><br> ECHO0004449: ("Terminal programming and MICR interface should result in the transmittal for data center approval of the entire ABA/Transit and personal or corporate checking account numbers. Instances where printed checked add the individual's check number to the end of the account number can be 'dropped' by MICR Check Reader dip switch settings.") |
| (c) storing the consumer bank account information obtained from the check and verifying that account numbers were accurately read at the point of sale terminal; | ECHO0004431 (discussing "terminal memory") <br><br> ECHO0002737 (describing the system's "capability of completing a Transaction |

| '988 PATENT | CHEQUEMARK REFERENCES |
|---|---|
|  | Event by electronically logging the sale") ECHO0002742 ("the terminal's screen would display the check's numbers for verification.") |
| (d) providing transaction event information to the point of sale terminal; | ECHO0002742 ("Thereafter, the operator would enter the "Sale Amount" requested for authorization.") |
| (e) transmitting the transaction event information and consumer bank account information to a central computer system; | ECHO0002742 ("The terminal's dial-up capabilities would then direct the inquiry to the computer data file center. . . .") |
| (f) storing the transaction event information and consumer banking account information; and | ECHO0004440 ("[d]ata from individual events captured" by system) ECHO0004442 (transaction events logged electronically) ECHO0004448 ("Check replacement events would be reported to and stored by the computer data file center under a file classification identifying the unique and revolutionary nature of the Check Replacement Service.") |
| (g) subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations. | ECHO0004441 ("The system itself has been designed to perform in a fully automated manner enabling each Transaction Event to be processed by a system subscriber at Point-of-Sale in the presence [of] the consumer causing thereafter, and in the event of an 'Approval' of the Transaction Event, funds to be debited from an authorized consumer account for credit and electronic settlement by ACH ("Automated Clearing House") deposit to the subscriber's designated depository account.") |
| 9.  A checkwriting point of sale system comprising: | ECHO0002736 ("The applicants have designed a Point-of-Sale processing system composed of individual services [sic] selections which provide automated, electronic processing from bank checking or depository accounts.") |
| a point of sale terminal adapted to receive consumer bank account information; | ECHO0004431 ("All point-of-sale input of transaction data will mandatorially [sic] be conducted through a MICR Check Reader.") |

18

| '988 PATENT | CHEQUEMARK REFERENCES |
|---|---|
| | ECHO0004439-41 ("This new system will enable subscribers to process events from virtually every bank within the United States")<br><br>ECHO0004438-40 (promising "Automated Processing for ALL Checking Account Events"). |
| a central computer system; | ECHO0004442 ("'system subscribers' would electronically communicate with the system's data center for individual Transaction Event authorizations"); *see also* ECHO0004448. |
| first communication means integral to said point of sale terminal for electronically communicating with the central computer system; and | ECHO0004442 ("The terminal's dial-up capabilities would then direct the inquiry to the computer data file center for authorization"). |
| memory means integral to said point of sale terminal for temporarily storing the consumer bank account information; | ECHO0004431 (discussing "terminal memory") |
| the point of sale terminal comprising reading means for reading magnetic ink character recognition numbers on any consumer bank check for the sole purpose of eliciting consumer bank account information; | ECHO0004447 ("The POS terminal operator would . . . enter a specimen check through a MICR Check Reader device interfaced with the terminal. . . .").<br><br>ECHO0004449: ("Terminal programming and MICR interface should result in the transmittal for data center approval of the entire ABA/Transit and personal or corporate checking account numbers. Instances where printed checked add the individual's check number to the end of the account number can be 'dropped' by MICR Check Reader dip switch settings.") |
| the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; | ECHO0002737 ("Participating merchants, businesses, and individuals, as 'system subscribers,' would electronically communicate with the system's data center for individual Transaction Event authorizations.") |
| the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and | ECHO0004447-48 ("The terminal's dial up capabilities would then direct the inquiry to the computer data file center for authorization first against the ChequeMARK POSITIVE file of 'prenoted' bank/checking |

| '988 PATENT | CHEQUEMARK REFERENCES |
|---|---|
| further enabling automated clearing house communication for transferring funds without using a bank check as a negotiable instrument. | account numbers whose accounts were listed in 'good standing.' . . . "Each inquiry preliminarily resulting in a No-Match would be instantly forwarded/'rolled' to the third data file preceding any return notice to the inquiring terminal. This third file is anticipated to be the Shared Check Authorization Network ('SCAN') data base. . . ."<br><br>ECHO0004441 ("in the event of an 'Approval' of the Transaction Event, funds to be debited from an authorized computer account for credit and electronic settlement by ACH")<br><br>ECHO0004439 ("Programming application features support identification/approval of a designated banking account . . . by use of a specimen check on the account from which funds are to be electronically debited in payment for goods and services."); *see also* ECHO0004427. |
| 10.  The checkwriting point of sale system according to claim 9 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip. | ECHO0004449-50 (each point-of-sale terminal has a "logging printer" and the point-of-sale terminal "must complete each Transaction Event with the logging printer generation of a Transaction Event ('Sales') Slip for each 'Approved' authorization inquiry processed. Each such Transaction Event Slip must be exacting in its retention of account numbers and the sale amount enabling both the consumer and the system subscriber to be provided 'hard copy' receipts of the event. Also included would be a clear printing of the transaction type. . . . More germane to the legal compliances and mandatory criteria associated with electronic access and debits, preferential scripted language would be printed immediately preceding the customer's signature line specifically authorizing electronic access in payment of the requested transaction sale amount.") |
| 11.  The checkwriting point of sale system | ECHO0004439 (point-of-sale terminal |

| '988 PATENT | CHEQUEMARK REFERENCES |
|---|---|
| according to claim 9 further comprising a resident third party database wherein consumer banking account status information is stored, the consumer banking account status information being used for verification of consumer banking account status. | provides "[t]erminal dial-up approval against national and proprietary checkwriter databases.")<br><br>ECHO0004442 ("Participating merchants, business, and individuals, as 'system subscribers,' would electronically communicate with the system's data center for individual Transaction Event authorizations.") |
| 13.  The checkwriting point of sale system according to claim 4, wherein the sales slip includes means for execution by the consumer for proof of bank account access authorization. | ECHO0004442 ("a Transaction Event Slip will be printed or manually prepared for customer execution at the point of sale.  By execution, the customer authorizes the electronic accessing of funds secured in his/her authorized banking account in lieu of the more traditional issuance of personal or business checks.") |
| 16.  The checkwriting point of sale process of claim 8, further comprising: | ECHO0002736 ("The applicants have designed a Point-of-Sale processing system composed of individual services [sic] selections which provide automated, electronic processing from bank checking or depository accounts.") |
| (A)  printing a transaction event sales slip following the sending of an approval message; and | ECHO0004449-50 (each point-of-sale terminal has a "logging printer" and the point-of-sale terminal "must complete each Transaction Event with the logging printer generation of a Transaction Event ('Sales') Slip for each 'Approved' authorization inquiry processed.  Each such Transaction Event Slip must be exacting in its retention of account numbers and the sale amount enabling both the consumer and the system subscriber to be provided 'hard copy' receipts of the event.  Also included would be a clear printing of the transaction type. . . . More germane to the legal compliances and mandatory criteria associated with electronic access and debits, preferential scripted language would be printed immediately preceding the customer's signature line specifically authorizing electronic access in payment of the requested transaction sale amount.") |

| '988 PATENT | CHEQUEMARK REFERENCES |
|---|---|
| (B) executing of the sales slip by the consumer as proof of bank account access authorization. | ECHO0004442 ("By execution, the consumer authorizes the electronic accessing of funds secured in his/her authorized banking account in lieu of the more traditional issuance of personal or business checks.") |

| '528 PATENT | CHEQUEMARK REFERENCES |
|---|---|
| 10.  A checkwriting point of sale process comprising: | ECHO0002736 ("The applicants have designed a Point-of-Sale processing system composed of individual services [sic] selections which provide automated, electronic processing from bank checking or depository accounts.") |
| (a) presenting a bank check specimen to a point of sale terminal located at a merchant or service provider; | ECHO0004439 ("Programming application features support identification/approval of a designated banking account . . . by use of a specimen check on the account from which funds are to be electronically debited in payment for goods and services."); *see also* ECHO0004427. |
| (b) reading a magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument; | ECHO0004447 ("The POS terminal operator would . . . enter a specimen check through a MICR Check Reader device interfaced with the terminal. . . ."). <br><br> ECHO0004449: ("Terminal programming and MICR interface should result in the transmittal for data center approval of the entire ABA/Transit and personal or corporate checking account numbers. Instances where printed checked add the individual's check number to the end of the account number can be 'dropped' by MICR Check Reader dip switch settings.") <br><br> ECHO0004439 ("Programming application features support identification/approval of a designated banking account . . . by use of a specimen check on the account from which funds are to be electronically debited in payment for goods and services."); *see also* ECHO0004427. |
| (c) storing the consumer bank account information obtained from the check and | ECHO0004431 (discussing "terminal memory") |

| '528 PATENT | CHEQUEMARK REFERENCES |
|---|---|
| verifying that account numbers were accurately read at the point of sale terminal; | ECHO0002737 (describing the system's "capability of completing a Transaction Event by electronically logging the sale")<br><br>ECHO0002742 ("the terminal's screen would display the check's numbers for verification.") |
| (d) providing transaction event information to the point of sale terminal; | ECHO0002742 ("Thereafter, the operator would enter the "Sale Amount" requested for authorization.") |
| (e) transmitting the transaction event information and consumer bank account information to a central computer system; | ECHO0002742 ("The terminal's dial-up capabilities would then direct the inquiry to the computer data file center. . . .") |
| (f) storing the transaction event information and consumer banking account information; | ECHO0004431 (discussing "terminal memory")<br><br>ECHO0004440 ("[d]ata from individual events captured" by system)<br><br>ECHO0004442 (transaction events logged electronically)<br><br>ECHO0004448 ("Check replacement events would be reported to and stored by the computer data file center under a file classification identifying the unique and revolutionary nature of the Check Replacement Service.") |
| (g) subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations; and | ECHO0004441 ("The system itself has been designed to perform in a fully automated manner enabling each Transaction Event to be processed by a system subscriber at Point-of-Sale in the presence [of] the consumer causing thereafter, and in the event of an 'Approval' of the Transaction Event, funds to be debited from an authorized consumer account for credit and electronic settlement by ACH ("Automated Clearing House") deposit to the subscriber's designated depository account.") |
| (h) returning the bank check specimen to the consumer. | ECHO0004438 ("service subscribers will No Longer Accept 'Paper' Checks!)<br><br>ECHO0004440 ("An end to acceptance and |

| '528 PATENT | CHEQUEMARK REFERENCES |
|---|---|
| | processing of commercial bank drafts ("paper checks")) <br><br> ECHO0004444 ("the merchant does not have to be hampered by or participate in the processing of commercial bank drafts ('paper checks')") <br><br> ECHO0004450 ("no paper check is accepted or processed") |

| '366 PATENT | CHEQUEMARK REFERENCES |
|---|---|
| 1. A checkwriting point of sale system comprising: | ECHO0002736 ("The applicants have designed a Point-of-Sale processing system composed of individual services [sic] selections which provide automated, electronic processing from bank checking or depository accounts.") |
| a point of sale terminal adapted to receive payer bank account information from any bank check; | ECHO0004431 ("All point-of-sale input of transaction data will mandatorially [sic] be conducted through a MICR Check Reader.") <br><br> ECHO0004439-41 ("This new system will enable subscribers to process events from virtually every bank within the United States") <br><br> ECHO0004438-40 (promising "Automated Processing for ALL Checking Account Events"). |
| a central computer system; | ECHO0004442 ("'system subscribers' would electronically communicate with the system's data center for individual Transaction Event authorizations"); *see also* ECHO0004448. |
| first communication means integral to said point of sale terminal for electronically communicating with the central computer system; | ECHO0004442 ("The terminal's dial-up capabilities would then direct the inquiry to the computer data file center for authorization"). |
| memory means integral to said point of sale terminal for temporarily storing the payer bank account information; | ECHO0004431 (discussing "terminal memory") |
| the central computer system having second communication means for receiving information from a plurality of said point of | ECHO0002737 ("Participating merchants, businesses, and individuals, as 'system subscribers,' would electronically |

| '366 PATENT | CHEQUEMARK REFERENCES |
|---|---|
| sale terminals; and | communicate with the system's data center for individual Transaction Event authorizations.") |
| the central computer system second communication means enabling said central computer system to communicate with external databases for performing a payer bank account status search and further enabling communication with an electronic funds transfer system for transferring funds without using the bank check as a negotiable instrument. | ECHO0004447-48 ("The terminal's dial up capabilities would then direct the inquiry to the computer data file center for authorization <u>first</u> against the ChequeMARK POSITIVE file of 'prenoted' bank/checking account numbers whose accounts were listed in 'good standing.' . . . "Each inquiry preliminarily resulting in a No-Match would be instantly forwarded/'rolled' to the third data file preceding any return notice to the inquiring terminal. This third file is anticipated to be the Shared Check Authorization Network ('SCAN') data base. . . ." |
| | ECHO0004441 ("in the event of an 'Approval' of the Transaction Event, funds to be debited from an authorized computer account for credit and electronic settlement by ACH") |
| | ECHO0004439 ("Programming application features support identification/approval of a designated banking account . . . by use of a specimen check on the account from which funds are to be electronically debited in payment for goods and services."); *see also* ECHO0004427. |
| 2. The checkwriting point of sale system of claim 1 wherein the point of sale terminal is further adapted to print activity reports of transaction events occurring at the point of sale terminal. | ECHO0004440 ("daily activity summaries" printed) |
| | ECHO0004450 ("each point of sale terminal location must be capable of generating printed summations of daily activity") |
| | ECHO0004450-51 ("These reports must list and separately total each authorization/service type, whether produced as a singular report or the result of multiple terminal 'closeout' procedures") |

| '988 PATENT | HIGASHIYAMA |
|---|---|
| 1. A checkwriting point of sale system comprising: | A system for processing checks presented at the point of sale. (*See* col. 2, lines 43-46; col. 3, lines 11-14.) |
| a point of sale terminal adapted to receive consumer bank account information from any bank check; | Point of sale system 210 including a MICR reader 202 used for reading the magnetic account number printed on checks. (*See* col. 3, lines 13-18.) |
| a central computer system; | Backroom processor 204 to which one or more point of sale systems are connected. (*See* Figure 2; col. 3, lines 13-14, 29-33.) |
| first communications means integral to said point of sale terminal for electronically communicating with the central computer system; | POS terminal 201 (which is part of the point of sale system) is connected to the backroom processor 204. (*See* col. 3, lines 29-30.) |
| memory means integral to said point of sale terminal for temporarily storing the consumer bank account information; | Data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201. (*See* col. 3, lines 55-62; col. 5, lines 1-4.) |
| the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; | Backroom processor 204 receives data records from the POS terminal 201. (*See* col. 5, lines 1-10.) Since the backroom processor 204 is connected to one or more point of sale systems 210, each having a POS terminal 201 that supplies data records, the backroom processor 204 receives data records from one or more (plurality) of point of sale systems 210. |
| the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the bank check as a negotiable instrument. | Backroom processor 204 will take the data records it has accumulated and upload them to a clearing house. (*See* col. 5, lines 11-13.) The data record is also used to verify check authorization by being compared to a file. (*See* col. 4, lines 14-24.) The information from the paper check is electronically processed and the check is returned to the customer at the point of sale. (*See* col. 4, lines 54-57.) |
| 4. The checkwriting point of sale system according to claim 1 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip. | Printer 203 for printing a sales slip. (*See* col. 3, lines 25-27.) |
| 9. A checkwriting point of sale system comprising: | A system for processing checks presented at the point of sale. (*See* col. 2, lines 43-46; col. 3, lines 11-14.) |
| a point of sale terminal adapted to receive consumer bank account | Point of sale system 210 including a MICR reader 202 used for reading the magnetic account number printed |

| '988 PATENT | HIGASHIYAMA |
|---|---|
| information; | on checks. (*See* col. 3, lines 13-18.) |
| a central computer system; | Backroom processor 204 to which one or more point of sale systems are connected. (*See* Figure 2; col. 3, lines 13- 14, 29-33.) |
| first communications means integral to said point of sale terminal for electronically communicating with the central computer system; and | POS terminal 201 (which is part of the point of sale system) is connected to the backroom processor 204. (*See* col. 3, lines 29-30.) |
| memory means integral to said point of sale terminal for temporarily storing the consumer bank account information; | Data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201. (*See* col. 3, lines 55-62; col. 5, lines 1-4.) |
| the point of sale terminal comprising reading means for reading magnetic ink character recognition numbers on any consumer bank check for the sole purpose of eliciting consumer bank account information; | MICR reader 202 reads the account information on the check. (*See* col. 3, lines 48-50.) |
| the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; | Backroom processor 204 receives data records from the POS terminal 201. (*See* col. 5, lines 1-10.) Since the backroom processor 204 is connected to one or more point of sale systems 210, each having a POS terminal 201 that supplies data records, the backroom processor 204 receives data records from one or more (plurality) of point of sale systems 210. |
| the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using a bank check as a negotiable instrument. | Backroom processor 204 will take the data records it has accumulated and upload them to a clearing house. (*See* col. 5, lines 11-13.) The data record is also used to verify check authorization by being compared to a file. (*See* col. 4, lines 14-24.) Further, the information from the paper check is electronically processed, and the check is returned to the customer at the point of sale. (*See* col. 4, lines 54-57.) |
| 10. The checkwriting point of sale system according to claim 9 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip. | Printer 203 for printing a sales slip. (*See* col. 3, lines 25-27.) |
| 13. The checkwriting point of sale system according to claim 4, wherein the sales slip includes means for | A fully automated system generally comprises a dual-port terminal with magnetic stripe reading capabilities interfaced with a logging printer capable of providing |

| '988 PATENT | HIGASHIYAMA |
|---|---|
| execution by the consumer for proof of bank account access authorization. | individual transaction event slips for consumer execution. (*See* col. 5, lines 44-47.) |

| '988 PATENT | HIGASHIYAMA + CARLSON |
|---|---|
| 3. The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further comprises an alphanumeric display means for receiving said consumer bank account information from the memory means and for displaying the consumer bank account information. | Carlson teaches an alphanumeric display used in connection with a point-of-sale device for reading MICR numbers from checks. When the MICR data is entered manually by the merchant, the MICR data is displayed digit-for-digit/stroke-for-stroke at the display. (*See* col. 21, lines 5-8.) Therefore, one of ordinary skill in the art would have been motivated to combine the teachings of both references to include alphanumeric display means in the system described by Higashiyama, which discloses a keypad. (*See* Higashiyama, col. 3, lines 19-22.) |

| '988 PATENT | HIGASHIYAMA + CACTUS SWITCH ARTICLE |
|---|---|
| 6. The checkwriting point of sale system according to claim 1 wherein the central computer system further comprises a system subscriber database, the system subscriber database comprising information regarding merchants and service providers that are authorized to use the checkwriting point of sale system. | The central computer of Higashiyama serves one or more POS terminals of a single merchant. The Cactus Switch network serves multiple merchants and the transaction is cleared through the Arizona Clearing House Association. Therefore, one of ordinary skill in the art would have been motivated to combine the teachings of the references to modify Higashiyama's POS system to service multiple merchants such that its central computer comprises a system subscriber database so that proper accounting of sales and credits can be made. |

| '988 PATENT | HIGASHIYAMA + SECOND CACTUS SWITCH ARTICLE |
|---|---|
| 13. The checkwriting point of sale system according to claim 4, wherein the sales slip includes means for execution by the consumer for proof of bank account access authorization. | The second Cactus Switch article teaches that checking account debit authorizations may be provided by personal identification numbers or signatures. (*See* p. 4.) In view of this teaching, it would have been obvious to one of ordinary skill in the art to modify Higashiyama's POS system to include a sales receipt with a signature space for the consumer to provide authorization to debit his or her checking account. Additionally, it would be obvious to a person of ordinary skill in the art to implement such a system in a way that would comply with the relevant regulatory framework at the time of the invention, including Regulation E, which requires the consumer's signature to authorize consumer account |

| | debits. |
|---|---|

| '988 PATENT | HIGASHIYAMA + BRAUN[1] |
|---|---|
| 8. A checkwriting point of sale process comprising: | A method for processing checks presented at the point of sale. (*See* col. 2, lines 43-46; col. 3, lines 11-14.) |
| a) presenting any bank check specimen to a point of sale terminal located at a merchant or service provider, | Customer provides a check to the merchant. (*See* col. 3, lines 47-48.) |
| b) reading the magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument, | MICR reader 202 reads the account information on the check. (*See* col. 3, lines 48-50.) |
| c) storing the consumer bank account information obtained from the check and verifying that account numbers were accurately read at the point of sale terminal, | Data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201, i.e., stored at the POS terminal 201. (*See* col. 3, lines 55-62; col. 5, lines 1-4.) The step of verifying is made obvious in view of Braun, which teaches use of error detector circuits 52 which identify errors in the ABA code from the reader 38. (*See* Braun, col. 7, lines 31-33; col. 19, lines 46-49.) Therefore, one of ordinary skill in the art would have been motivated to combine the teachings of both references. |
| d) providing transaction event information to the point of sale terminal, | The amount the check is written for is provided by the merchant via the POS keypad. (*See* col. 3, lines 64-66.) |
| e) transmitting the transaction event information and consumer bank account information to a central computer system, | POS terminal 201 sends the data record to the backroom processor 204. (*See* col. 5, lines 1-10.) |
| f) storing the transaction event information and consumer banking account information, and | Backroom processor 204 accumulates the data records that it receives. (*See* col. 5, lines 11-12.) |
| g) subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations. | The data records are batch uploaded to a clearing house. (*See* col. 5, lines 11-13.) |

---

[1] Unless otherwise noted, citations are to Higashiyama.

29

| '528 PATENT | HIGASHIYAMA + BRAUN[2] |
|---|---|
| 10. A checkwriting point of sale process comprising: | A method for processing checks presented at the point of sale. (*See* col. 2, lines 43-46; col. 3, lines 11-14.) |
| (a) presenting a bank check specimen to a point of sale terminal located at a merchant or service provider; | Customer provides a check to the merchant. (*See* col. 3, lines 47-48.) |
| (b) reading a magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument; | MICR reader 202 reads the account information on the check. (*See* col. 3, lines 48-50.) |
| (c) storing the consumer bank account information obtained from the check and verifying that account numbers were accurately read at the point of sale terminal; | Data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201, i.e., stored at the POS terminal 201. (*See* col. 3, lines 55-62; col. 5, lines 1-4.) The step of verifying is made obvious in view of Braun, which teaches use of error detector circuits 52 which identify errors in the ABA code from the reader 38. (*See* Braun, col. 7, lines 31-33; col. 19, lines 46-49.) Therefore, one of ordinary skill in the art would have been motivated to combine the teachings of both references. |
| (d) providing transaction event information to the point of sale terminal; | The amount the check is written for is provided by the merchant via the POS keypad. (*See* col. 3, lines 64-66.) |
| (e) transmitting the transaction event information and consumer bank account information to a central computer system; | POS terminal 201 sends the data record to the backroom processor 204. (*See* col. 5, lines 1-10.) |
| (f) storing the transaction event information and consumer banking account information; | Backroom processor 204 accumulates the data records that it receives. (*See* col. 5, lines 11-12.) |
| (g) subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations; and | The data records are batch uploaded to a clearing house. (*See* col. 5, lines 11-13.) |
| (h) returning the bank check specimen to the consumer. | Check is returned to the customer for safekeeping. (*See* col. 4, lines 54-55.) |
| 11. The checkwriting point of sale | Validation information, indicating that electronic data |

---

[2] Unless otherwise noted, citations are to Higashiyama.

| '528 PATENT | HIGASHIYAMA + BRAUN[2] |
|---|---|
| process of claim 10 further comprising: annotating the bank check specimen before returning the bank check specimen to the consumer. | pertaining to the check has been routed for collection and the check may be considered canceled, is printed on the check. (*See* col. 4, lines 26-32.) The validated check is returned to the customer. (*See* col. 4, lines 54-55.) Additionally, it would be obvious to a person of ordinary skill in the art to implement such a system in a way that would comply with the relevant regulatory framework at the time of the invention. |

| '988 PATENT | HIGASHIYAMA + BRAUN[3] |
|---|---|
| 14.  The checkwriting point of sale system according to claim 4, wherein the point of sale terminal further comprises means for automatically logging a point of sale terminal location and transaction date, time, and sales amount. | Data record includes additional information such as date, time, amount of check, and merchant location (as part of the electronic journaling information). *See* Col. 3, lines 53-60; Col. 4, lines 4-5.  Certain of this information, except the check amount, may be provided automatically by POS terminal 201.  *See* Col. 3, lines 63-66.  The check amount may be provided automatically by using a Universal Product Code (UPC) read station as taught in Braun.  *See* Braun, Col. 23, lines 12-20.  Therefore, one of ordinary skill in the art would have been motivated to combine the teachings of the references to include a means for automatically logging transaction information in the system described by Higashiyama. |

| '988 PATENT | HIGASHIYAMA + BRAUN + SECOND CACTUS SWITCH ARTICLE[4] |
|---|---|
| 16.  The checkwriting point of sale process of claim 8, further comprising: (A) printing a transaction event sales slip following the sending of an approval message; and (B) executing of the sales slip by the consumer as proof of bank account access authorization. | Printer 203 prints a sales slip. *See* Col. 3, lines 25-27.  However, the second Cactus Switch article teaches that checking account debit authorizations may be provided by personal identification numbers or signatures. *See* second Cactus Switch article, top of p. 4.  Therefore, one of ordinary skill in the art would have been motivated to combine the teachings of the references to modify Higashiyama's system in view of the teaching in the Cactus Switch article to include a sales receipt with a signature space for the consumer to provide authorization to debit his or her checking account.  Additionally, it would be obvious to a person of ordinary skill in the art to implement such a system in a way that would comply with the relevant regulatory framework at the time of the invention, including Regulation E, which requires the |

---

[3] Unless otherwise noted, all citations are to Higashiyama.
[4] Unless otherwise noted, all citations are to Higashiyama.

| | consumer's signature to authorize consumer account debits. |
|---|---|

| '988 PATENT | HIGASHIYAMA + BRAUN[5] |
|---|---|
| 18. The checkwriting point of sale process of claim 8, further comprising automatically logging point of sale terminal location information and transaction date, time, and sales amount information into the point of sale terminal. | Data record includes additional information such as date, time, amount of check, and merchant location (as part of the electronic journaling information). *See* Col. 3, lines 53-60, Col. 4, lines 4-5. Certain of this information, except the check amount, may be provided automatically by POS terminal 201. *See* Col. 3, lines 63-66. The check amount may be provided automatically by using a Universal Product Code (UPC) read station as taught in Braun. *See* Braun, Col. 23, lines 12-20. Therefore, one of ordinary skill in the art would have been motivated to combine the teachings of the references to modify the process described by Higashiyama to include a step whereby transaction information is automatically logged into the point of sale terminal. |

| '366 PATENT | HIGASHIYAMA |
|---|---|
| 1. A checkwriting point of sale system comprising: | A system for processing checks presented at the point of sale. *See* Col. 2, lines 43-46; Col. 3, lines 11-14. |
| a point of sale terminal adapted to receive payer bank account information from any bank check; | Point of sale system 210 including a MICR reader 202 used for reading the magnetic account number printed on checks. *See* Col. 3, lines 13-18. It is generally understood in the art that MICR reader reads MICR numbers which include the bank's RTN, the consumer's bank account number, and the check number from any bank check that has MICR numbers printed in a conventional manner. |
| a central computer system; | Backroom processor 204 to which one or more point of sale systems are connected. *See* Fig. 2; Col. 3, lines 13-14, 29-33. |
| first communications means integral to said point of sale terminal for electronically communicating with the central computer system; | POS terminal 201 (which is part of the point of sale system) is connected to the backroom processor 204. *See* Col. 3, lines, 29-30. |
| memory means integral to said point of sale terminal for temporarily storing the payer bank account information; | Data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201. *See* Col. 3, lines 55-62; Col. 5, lines 1-4. |

---

[5] Unless otherwise noted, all citations are to Higashiyama.

| '366 PATENT | HIGASHIYAMA |
|---|---|
| the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; and | Backroom processor 204 receives data records from the POS terminal 201. *See* Col. 5, lines 1-10. Since the backroom processor 204 is connected to one or more point of sale systems 210, each having a POS terminal 201 that supplies data records, the backroom processor 204 receives data records from one or more (plurality) of point of sale systems 210. |
| the central computer system second communication means enabling said central computer system to communicate with external databases for performing a payer bank account status search and further enabling communication with an electronic funds transfer system for transferring funds without using the bank check as a negotiable instrument. | Backroom processor 204 will take the data records it has accumulated and upload them to a clearing house. *See* Col. 5, lines 11-13. The data record is also used to verify check authorization by being compared to a positive file (which lists all allowable checking account numbers), or more likely against a negative file such as provided by SCAN of Seattle, Washington, TeleCheck of Denver, Colorado or Telecredit of Florida (i.e., external databases), which provide information regarding known troublesome checking accounts. *See* Col. 4, lines 14-24. Further, because the information from the paper check is electronically processed, it is returned to the customer at the point of sale (*see* Col. 4, lines 54-57) and does not enter the traditional check clearing process at any point. |

| '988 PATENT | HIGASHIYAMA + CHECKCASH PPM[6] |
|---|---|
| 5.   The checkwriting point of sale system according to claim 1 further comprising a resident third party database wherein consumer banking account status information is stored, the consumer banking account status information being used for verification of consumer banking account status. | The CheckCash PPM describes a point-of-sale terminal and processing system designed to guarantee and process bank check and charge card transactions electronically and teaches that the heart of the system is a "data center" designed and maintained directly by CheckCash "for the purpose of check authorizations and guarantees from electronic POS terminals. The master computer program will generate and maintain several data bases as well as control the switching of the telecommunications network connecting the POS terminals to the main data center computer." *See* CheckCash PPM at 28, 61, A-6, D-5. Therefore, one of ordinary skill in the art would have been motivated to combine the teachings of the references to include such a resident third party database in the system described by Higashiyama and to use the information contained in that database to verify customer banking account status. |

---

[6] Unless otherwise noted, all citations are to Higashiyama.

| '988 PATENT | HIGASHIYAMA + CHECKCASH PPM[6] |
|---|---|
| 11. The checkwriting point of sale system according to claim 9 further comprising a resident third party database wherein consumer banking account status information is stored, the consumer banking account status information being used for verification of consumer banking account status. | The CheckCash PPM describes a point-of-sale terminal and processing system designed to guarantee and process bank check and charge card transactions electronically and teaches that the heart of the system is a "data center" designed and maintained directly by CheckCash "for the purpose of check authorizations and guarantees from electronic POS terminals. The master computer program will generate and maintain several data bases as well as control the switching of the telecommunications network connecting the POS terminals to the main data center computer." *See* CheckCash PPM at 28, 61, A-6, D-5. Therefore, one of ordinary skill in the art would have been motivated to combine the teachings of the references to include such a resident third party database in the system described by Higashiyama and to use the information contained in that database to verify customer banking account status. |

| '528 PATENT | HIGASHIYAMA + BRAUN + LANGHANS |
|---|---|
| 18. The checkwriting point of sale process of claim 10 further comprising performing a "velocity check" on the merchants sales activity to avoid fraud. | Langhans describes an automatic purchasing control system using point-of-sale terminals that performs a "velocity check" that monitors transaction activity to detect fraudulent activity. *See* Langhans, Col. 1, lines 47-59; Col. 7, lines 44-47; Col. 8, lines 25-28; Col. 11, lines 35-63. Therefore, one of ordinary skill in the art would have been motivated to combine the teachings of the references to include the velocity check taught by Langhans in the system described by Higashiyama in order to avoid fraud. |

| '366 PATENT | HIGASHIYAMA + MAY 1973 BANKING ARTICLE[7] |
|---|---|
| 2. The checkwriting point of sale system of claim 1 wherein the point of sale terminal is further adapted to print activity reports of transaction events occurring at the point of sale terminal. | Printer 203 prints validation information on the bank check. *See* Col. 4, lines 25-43. The May 1973 *Banking* article describes a check cashing terminal that "keeps a running total of the day's transactions, including total cash dispensed," to permit the teller to "balance out quickly after the bank closes." *See* May 1973 *Banking* article at 77. One of ordinary skill in the art would be motivated to combine what is taught in both references in using the printer to print activity reports as well as printing validation information on |

---

[7] Unless otherwise noted, all citations are to Higashiyama.

| | |
|---|---|
| | the bank check. |

| '366 PATENT | HIGASHIYAMA + CHECKCASH PPM[8] |
|---|---|
| 3.  The checkwriting point of sale system of claim 1 wherein the point of sale terminal is further adapted to annotate the bank check that is used at the point of sale terminal to provide the payer bank account information. | The CheckCash PPM describes a point-of-sale terminal designed to guarantee and process bank check and charge card transactions electronically and teaches that, after verification has occurred, the point-of-sale terminal prints on the back of the bank check information that includes the check's MICR number.  *See* CheckCash PPM at 59.  One of ordinary skill in the art would be motivated to combine what is taught in the CheckCash PPM with the system disclosed in the Higashiyama patent. |

---

[8] Unless otherwise noted, all citations are to Higashiyama.

# EXHIBIT 16
# REDACTED IN ITS
# ENTIRETY

# EXHIBIT 17
# REDACTED IN ITS ENTIRETY

# EXHIBIT 18

**EXHIBIT 7: '682 PATENT TO HIGASHIYAMA ET AL.**

U.S. Patent No. 5,175,682 ("the '682 patent"), entitled "Check System and Method Including Prioritizing Checks for Transmission to Banks for Processing," issued to Connie Higashiyama, William Melton and Ashok Narasimham on December 29, 1992 from an application filed December 14, 1990.  I understand, based on the respective filing and issue dates of the '682 patent and the patents-in-suit, that the '682 patent constitutes prior art to the patents-in-suit under at least under 35 U.S.C. § 102(e).

The '682 patent discloses a method and structure for electronically processing checks presented to merchants by customers using a point-of-sale terminal in a manner that treats a check as the "equivalent of an electronic debit card." (2:43-50; 3:11-16; 6:10-12; 10:27-30.)[1] The point-of-sale terminal system described by the '682 patent is comprised of one or more point-of-sale terminals (3:13-16), each of which includes a MICR reader for reading magnetically-printed customer account information from the consumer's bank check (3:16-19; 10:24-26), a printer for "printing a sales slip, printing validation information on a check, or printing a check receipt" (3:25-28), and a keypad (3:66).  The point-of-sale terminal is described as a "typical prior art electronic cash register, or a more sophisticated computer system," and both an alphanumeric keypad and a visual display are inherent in the system described by the '682 patent.  (3:38:41.)

Point-of-sale terminals may be located in separate stores, linked by a central check processing system.  (7:25:33.)  "A merchant having multiple stores benefits in that a central location may be used for consolidating check data, thereby providing the benefit that a merchant's check processing facilities can be consolidated, if desired, and allow check processing to be accomplished in a timely manner without delays associated with physically transporting paper checks to the central location prior to electronically processing those checks." (*Id.*)

---

[1] Unless otherwise noted, all citations in this Exhibit are to the '682 patent.

**EXHIBIT 7: '682 PATENT TO HIGASHIYAMA ET AL.**

The '682 point-of-sale terminal is directly connected to a backroom central processing computer and, if desired, a modem. (3:33-36.) The backroom central processing computer is connected to a telecommunications unit capable of data communications with check clearing houses, as well as the "merchant's bank . . . the issuing bank . . . the merchant's collection agency, check authorization services, and check verification services." (7:55-8:2; *see also* 3:33-36.)

In the check processing method taught by the '682 patent, a customer presents a check to a merchant as payment, and the merchant uses the point-of-sale terminal's MICR reader to automatically read the customer's account information from the check. (3:45-50.) The point-of-sale terminal automatically provides additional information to create a complete transaction record, including the date and time, merchant DDA number, customer checking account number and routing information, check number, and other discretionary data the merchant wishes, such as the merchant's name, location and a summary of goods or services provided. (3:50-4:5.) The merchant enters the amount of the check using the terminal's keypad. (3:63-66.) The customer requires no separate check authorization card to utilize the point-of-sale electronic check processing system. (6:15-18.)

Using the data record created by the point-of-sale terminal, a merchant next compares the customer's checking account number to a positive customer file and/or a negative customer file that can be maintained by an external credit authorization or verification service. (4:14-22.) If authorization is declined because of negative information pertaining to the customer's account, the transaction may be cancelled. (4:22-25.) Transaction-level information may be stored by the backroom central processing computer. (6:50-53; 9:7-11, 16-19.)

The '682 patent teaches that if a transaction is authorized after consultation of positive and/or negative customer database files, the check is placed in the terminal printer and validation information, including the merchant's name and DDA number, the date and time of the transaction, and "language indicating that the check has been cancelled" is printed on the check. (4:26-43; 8:55-59.) Return of this validation information to the point-of-sale terminal indicates

2

## EXHIBIT 7: '682 PATENT TO HIGASHIYAMA ET AL.

that the paper check has been converted to an electronic transaction and data pertaining to the check routed for collection. (4:28-32 ("Such validation information serves as an indication that electronic data pertaining to this check has been routed for collection, and that the check may thus be considered 'cancelled.'").)

The merchant then returns the cancelled check to the customer. (4:54-57 ("The validated check is then returned to the customer for safekeeping, thus avoiding the need for the check to be physically transported through the system depicted in Figure 1 for ultimate return to the customer."); 7:16-20, 35-36; 8:60-62.) If the merchant desires, a separate receipt may be printed and given to the customer stating that payment was made by check and the check is being electronically processed. (4:61-68; 9:4-6.)

The '682 patent describes several methods of transmitting the electronic data record for processing, including adding the data record to a terminal file periodically uploaded by batch to the central processing computer, sending the data record to the central computer immediately for priority upload to the ACH or directly to the payor bank, or sending the data record directly from the point-of-sale terminal to a bank or clearing house in a real time basis. (5:1-7, 10-13, 18-20, 28-31, 37-46; 9:12-15.)

The '682 patent also describes a report-printing function whereby the central computer prints an "exception report" reflecting bad checks processed at the point-of-sale terminal. (5:47-52; 10:12-15.) Checks processed by the system described by the '682 patent that are dishonored by the issuing bank may be automatically reported by the system to the merchant's bank or collection agency and to check authorization and verification services. (7:55-8:2; 10:12-19.)

3

# EXHIBIT 19

# 2 0 0 5

# A Complete Guide To Rules & Regulations Governing the ACH Network

LML-EP-055336

# 2 0 0 5

# ACH RULES

## A Complete GuideTo Rules &
## Regulations Governing the
## ACH Network

Copyright 2005 by the National Automated Clearing House Association
All Rights Reserved
Printed in the United States of America
13665 Dulles Technology Drive, Suite 300
Herndon, VA 20171
703-561-1100

LML-EP-055337

private sector adjustment factor (i.e., profit margin) is included in Federal Reserve processing so that the Federal Reserve Bank charges as though it were operating on a "for profit" basis.

<u>NACHA and the Regional Payments Associations</u>

NACHA oversees America's largest electronic payments network. NACHA's primary roles are to develop and maintain the *NACHA Operating Rules*, to promote growth in ACH volume, and to provide educational services to its members and other ACH participants. NACHA's member payment associations serve over 12,000 financial institutions across the United States, which in turn provide services to over 4 million corporations and one hundred thirty-five million consumers, with a transaction volume of ten billion payments and a dollar value $27.4 trillion in 2003.

Regional payment associations provide management, education, assistance, and services to link all types of financial institutions (commercial banks, saving banks, and credit unions) across the United States. Several of these associations also develop and implement local ACH rules that apply specifically to their own member financial institutions. The regional payment associations offer a wide variety of educational sessions ranging from origination and receipt operations to audit and control.

## H. ACH TERMINOLOGY

This section is intended to provide users of this book with an overview of basic ACH terminology. ACH terms, as defined specifically for purposes of the *NACHA Operating Rules*, may be found within Article Thirteen of the *NACHA Operating Rules*.

**ACH Operator**
means (1) a Federal Reserve Bank that performs all of the following, or (2) an entity that executes an annual agreement with the National Association in which the entity agrees to comply with or perform all of the following:
- (a) adhere to these rules (except to the extent inconsistent with the policies or practices of the Federal Reserve Banks) and other applicable laws, regulations, and policies;
- (b) execute agreements with a minimum of twenty independent (i.e., not owned by the same holding company) Participating DFIs that bind such entities to the ACH Operator's rules and to these rules (except that a Federal Reserve Bank shall not be required to bind a Participating DFI to any provision of such rules of the National Association that is not incorporated by the Uniform Operating Circular of the Federal Reserve Banks);
- (c) (i) provide clearing, delivery, and settlement services for ACH entries, as defined by these rules, between Participating DFIs that have selected that ACH Operator to perform ACH services (intra-ACH Operator services), and (ii) exchange transactions with other ACH Operators (inter-ACH Operator exchange);
- (d) process and edit files based on the requirements of these rules;
- (e) evaluate the credit worthiness of and apply risk control measures to their Participating DFIs;
- (f) adhere to the Federal Reserve's Policy Statement on Privately Operated Multilateral Settlement Systems (as applicable); and
- (g) adhere to any National ACH Operator Performance Standards of the National Association.

**Addenda Record**
An ACH record type that carries the supplemental data needed to completely identify an account holder(s) or provide information concerning a payment to the RDFI and the Receiver.

**Authorization**
A written agreement with the originating company signed or similarly authenticated by an employee or customer to allow payments processed through the ACH Network to be deposited in or withdrawn from his or her account at a financial institution. (For specific applications, written authorization for debits to consumer accounts is not required. Refer to the *NACHA Operating Rules* for details.) Can also be a written

LML-EP-055361

agreement that defines the terms, conditions and legal relationship between trading partners. For ACH credit entries, authorization may also be by verbal or other non-written means.

**Automated Clearing House (ACH) Network**
A funds transfer system, governed by the *NACHA Operating Rules*, that provides for the interbank clearing of electronic entries for participating financial institutions.

**Banking Day**
Any day on which a participating depository financial institution is open to the public during any part of the day for carrying on substantially all its banking functions.

**Batch**
A group of records or documents considered as a single unit for the purpose of data processing.

**Consumer Account**
A deposit account held by a financial institution and established by a natural person primarily for personal, family, or household use and not for commercial purposes.

**Corporate-to-Corporate Payments**
Any of the class of automated payment formats developed for the ACH Network that allow concurrent exchange of funds and remittance information between trading partners.

**Credit Entry**
An entry to the record of an account to represent the transfer or placement of funds into the account.

**Data Transmission**
The electronic exchange of information between two data processing points.

**Debit Entry**
An entry to the record of an account to represent the transfer or removal of funds from the account.

**Direct Debit**
A method of collection used in the ACH for certain claims, generally those that are repeated over a period of time, under which the debtor gives his or her financial institution authorization to debit his or her account upon the receipt of an entry issued by a creditor.

**Direct Deposit**
An ACH service that provides for the electronic transfer of funds directly into the account of a payee, usually an employee receiving pay or a Social Security beneficiary receiving retirement benefits.

**Direct Payment**
A method of collection used in the ACH Network for certain claims, generally those that are repeated over a period of time, for which the debtor gives the Originator an authorization to debit his or her account.

**EDI Payment**
The computer-to-computer transmission of a payment and related information in a standard format.

**Effective Entry Date**
The date the originating company expects payment to take place. The ACH Operator reads the effective entry date to determine the settlement date.

**Electronic Funds Transfer (EFT)**
A generic term used to describe any ACH or wire transfer.

LML-EP-055362

**Entry**
An electronic item representing the transfer of funds in the ACH.

**Field**
One or more consecutive character positions within an ACH entry mapped to contain specific information. For credit, debit or ATM cards, a defined area within an information track of the magnetic stripe of fixed or variable length.

**File**
A group of ACH batches initiated into the ACH Network or sorted for delivery to ACH receiving point(s). A file must be transmitted electronically via data transmission between the sending point and the receiving point. A file may be delivered to an end-point via direct data transmission, magnetic tape, or floppy diskette. A file may contain one or more batches of entries.

**Financial EDI**
Electronic data interchange for financial transactions/applications between companies and financial institutions, including payment and remittance advice, account analysis, and balance reporting.

**Funds Availability**
The time at which the funds resulting from a funds transfer are made available to the customer.

**Green Book**
A publication assembled by the U.S. Department of the Treasury that specifies the procedures to be used in Automated Clearing House transactions originated on behalf of the United States Federal Government.

**Live Dollar Entry**
"Live" refers to an entry that affects a funds transfer rather than non-dollar entries, such as prenotifications.

**MICR line**
The magnetic ink character recognition inscription at the bottom of a paper check.

**National Automated Clearing House Association (NACHA)**
The national association that establishes the standards, rules and procedures that enable depository financial institutions to exchange payments on a national basis.

**NACHA Formats**
The ACH record format specifications described in the *NACHA Operating Rules and Guidelines* are the accepted and warranted payment format standards for payments delivered through the ACH.

**Notification of Change (NOC)**
Information sent by an RDFI to notify the ODFI that previously valid information for a receiver has become outdated or that information contained in a prenotification is erroneous. The standard entry class code is COR.

**On-Us Entries**
Entries within an ACH file destined for accounts held at the ODFI.

**Originating Depository Financial Institution (ODFI)**
A participating financial institution that initiates ACH entries at the request of and by agreement with its customers. ODFIs must abide by the provisions of the *NACHA Operating Rules and Guidelines*.

**Originator**
Any individual, corporation or other entity that initiates entries into the Automated Clearing House Network.

LML-EP-055363

**Posting**
The process of recording debits and credits to individual account balances.

**Prenotification ·**
A non-dollar entry that may be sent through the ACH Network by an Originator to alert an RDFI that a live-dollar transaction will be forthcoming and that verification of the Receiver's account number is required.

**Receiver**
An individual, corporation or other entity who has authorized an originator to initiate a credit or debit entry to an account held at an RDFI.

**Receiving Depository Financial Institution (RDFI)**
Any financial institution qualified to receive ACH entries that agrees to abide by the *NACHA Operating Rules and Guidelines*.

**Receiving Point**
A site where entries are received from an ACH Operator for processing. It may be the RDFI, its data center or a data processing service bureau authorized to receive entries on behalf of a RDFI.

**Regulation E**
A regulation promulgated by the Federal Reserve Board of Governors in order to ensure consumers of a minimum level of protection in disputes arising from electronic funds transfers.

**Returns**
Any ACH entry that has been returned to the ODFI by the RDFI or by the ACH Operator because it cannot be processed. The reason for each return is included with the return in the form of a "return reason code." (See the *NACHA Operating Rules and Guidelines* for complete return reason code listing.)

**Reversals**
Any ACH entries or files sent within required deadlines to "correct" or reverse previously originated erroneous entries or files.

**Routing Number**
A nine-digit number (eight digits and a check digit) that identifies a specific financial institution. Also referred to as the ABA number. Numbers are assigned by the Thomson Financial Publishing and are listed in its publication entitled *Key to Routing Numbers*.

**Sending Point**
A processing site from which entries are transmitted to the ACH Operator. It may be the ODFI on its own behalf or a financial institution or private data processing service bureau on behalf of the ODFI.

**Settlement**
A transfer of funds between two parties in cash, or on the books of a mutual depository institution, to complete one or more prior transactions, made subject to final accounting. Settlement for the ACH Network usually occurs through the Federal Reserve.

**Settlement Date**
The date on which an exchange of funds with respect to an entry is reflected on the books of the Federal Reserve Bank(s).

**Standard Entry Class Codes**
Three character code within an ACH company/batch header record that identifies payment types within an ACH batch (e.g., CCD, CTX, etc.).

LML-EP-055364

**Transaction Code**
The two digit code in the ACH record that determines whether an entry is a debit or a credit to a DDA account, savings account, or general ledger account, or whether an entry is a credit to a loan account.

LML-EP-055365

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of November, 2005, I electronically filed the foregoing document, **PUBLIC VERSION OF DECLARATION OF EDWARD K. RUNYAN IN SUPPORT OF LML'S MOTION FOR SUMMARY JUDGMENT NO. 4: FOR A RULING THAT CLAIMS 1, 2, 4-6, 9-11, 14, 16 AND 18 OF THE '988 PATENT ARE NOT ANTICIPATED**, with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Collins J. Seitz, Jr., Esq.
Francis DiGiovanni, Esq.
Connolly Bove Lodge & Hutz LLP
1007 North Orange Street
Wilmington, DE  19801

William J. Marsden, Jr., Esq.
Timothy Devlin, Esq.
Fish & Richardson, P.C.
919 North Market Street, Suite 1100
Wilmington, DE  19801

Richard D. Kirk, Esq.
The Bayard Firm
222 Delaware Avenue, 9th Floor
Wilmington, DE  19801

Additionally, I hereby certify that on the 4th day of November, 2005, the foregoing document was served via email on the following non-registered participants:

Robert Jacobs, Esq.
Mark B. Mizrahi, Esq.
Belasco Jacobs & Townsley, LLP
Howard Hughes Center
6100 Center Drive, Suite 630
Los Angeles, CA  90045

Mark C. Scarsi, Esq.
Vision L. Winter, Esq.
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA  90071

_____ */s/ Mary B. Matterer* _____
Richard K. Herrmann (#405)
Mary B. Matterer (#2696)
MORRIS, JAMES, HITCHENS
& WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
(302) 888-6800
mmatterer@morrisjames.com

Attorneys for Plaintiff LML PATENT CORP.