**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| LML PATENT CORP. | ) |
| | ) |
| Plaintiff, | ) Civil Action No.        04-858-SLR |
| vs. | ) |
| | ) Judge Sue L. Robinson |
| TELECHECK SERVICES, INC. | ) |
| ELECTRONIC CLEARING HOUSE, | ) **PUBLIC VERSION** |
| INC., XPRESSCHEX, INC., AND | ) |
| NOVA INFORMATION SYSTEMS, | ) |
| INC. | ) |
| | ) |
| Defendants. | ) |
| | ) |

---

**DECLARATION OF LESLEY G. SMITH IN SUPPORT OF LML'S**
**MOTION FOR SUMMARY JUDGMENT NO. 5:**
**FOR A RULING THAT CLAIMS 1, 2, 4, 5, 6, 9, 10, 11, 14, 16 AND 18 OF THE**
**'988 PATENT ARE NOT INVALID UNDER 35 U.S.C. §§ 112 AND 132**

Originally filed: October 28, 2005

Public version filed: November 4, 2005

Richard K. Herrmann #405
Mary B. Matterer #2696
MORRIS JAMES HITCHENS &
WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
(302) 888-6800
mmatterer@morrisjames.com

Russell E. Levine, P.C.
Jamie H. McDole
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

Attorneys for LML Patent Corp.

## DECLARATION OF LESLEY G. SMITH

I, Lesley G. Smith, declare as follows:

1. I am an associate of the law firm of Kirkland & Ellis LLP, and counsel for plaintiff LML Patent Corp. ("LML"). I am a member in good standing of the bar of the state of Illinois, and I am admitted to practice *pro hac vice* in the United States District Court for the District of Delaware for this case. The facts set forth below are known to me personally and I could competently testify hereto if called as a witness in this action.

2. Attached hereto as Exhibit 1 is a true and correct copy of United States Patent Number 5,484,988 to Hills.

3. Attached hereto as Exhibit 2 is a true and correct copy of the Office Action of the United States Patent and Trademark Office dated September 22, 1993.

4. Attached hereto as Exhibit 3 is a true and correct copy of the Office Action of the United States Patent and Trademark Office dated March 8, 1994.

5. Attached hereto as Exhibit 4 is a true and correct copy of the Preliminary Amendment submitted to the United States Patent and Trademark Office dated June 8, 1994.

6. Attached hereto as Exhibit 5 is a true and correct copy of Telecheck's First Supplemental Response to LML's Amended First Set of Interrogatories dated January 28, 2005.

7. Attached hereto as Exhibit 6 is a true and correct copy of select portions of the Supplemental Expert Report of David P. Kurrasch Regarding Invalidity that has been marked "Outside Counsel Eyes Only" by Defendants.

8. Attached hereto as Exhibit 7 is a true and correct copy of the Declaration of Gary Tinkel in Support of LML's Motion for Summary Judgment No. 5: For a Ruling That Claims 1, 2, 4, 5, 6, 9, 10, 11, 14, 16, and 18 of the '988 Patent Are Not Invalid Under 35 U.S.C. §§ 112 and 132.

9. Attached hereto as Exhibit 8 is a true and correct copy of Patent Application Serial No. 07/975,717 dated November 13, 1992.

10. Attached hereto as Exhibit 9 is a true and correct copy of the Office Action of the United States Patent and Trademark Office dated October 26, 1994.

11. Attached hereto as Exhibit 10 is a true and correct copy of the parties' Joint Claim Construction Statement, including the claim terms that the parties have agreed that the Court needs to construe.

12. Attached hereto as Exhibit 11 is a true and correct copy of excerpts from the deposition testimony of Robert R. Hills, dated August 25, 2005.

2

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on this 27th day of October 2005 in Chicago, Illinois.

Lesley G. Smith

# EXHIBIT 1

US005484988A

# United States Patent [19]

## Hills et al.

| [11] | Patent Number: | 5,484,988 |
| [45] | Date of Patent: | Jan. 16, 1996 |

[54] CHECKWRITING POINT OF SALE SYSTEM

[75] Inventors: Robert R. Hills, St. Augustine, Fla.; Henry R. Nichols, McLean, Va.

[73] Assignee: Resource Technology Services, Inc., Vienna, Va.

[21] Appl. No.: 257,390

[22] Filed: Jun. 9, 1994

### Related U.S. Application Data

[63] Continuation of Ser. No. 975,717, Nov. 13, 1992, abandoned.

[51] Int. Cl.⁶ ............................................. G06F 15/30
[52] U.S. Cl. .......................... 235/379; 235/380
[58] Field of Search ........................... 235/379, 380

[56]                 References Cited

#### U.S. PATENT DOCUMENTS

| 3,824,544 | 7/1974 | Simjian | 340/147 A |
| 3,845,470 | 10/1974 | Schuller | 340/149 A |
| 4,270,042 | 5/1981 | Case | 235/379 |
| 4,404,649 | 9/1983 | Nunley et al. | 364/900 |
| 4,523,330 | 6/1985 | Cain | 382/7 |
| 4,580,040 | 4/1986 | Granzow et al. | 235/379 |
| 4,617,457 | 10/1986 | Granzow et al. | 235/379 |
| 4,672,377 | 6/1987 | Murphy et al. | 340/825.34 |
| 4,673,802 | 6/1987 | Ohmae et al. | 235/379 |
| 4,678,895 | 7/1987 | Tateisi et al. | 235/379 |
| 4,678,896 | 7/1987 | Carlson et al. | 235/380 |
| 4,743,743 | 5/1988 | Fukatsu | 235/379 |
| 4,810,866 | 3/1989 | Lord, Jr. | 235/379 |
| 4,823,264 | 4/1989 | Deming | 235/379 |
| 4,933,536 | 6/1990 | Lindemann et al. | 235/375 |
| 4,934,772 | 6/1990 | Sakuma et al. | 350/6.5 |
| 5,053,607 | 10/1991 | Carlson et al. | 235/379 |

Primary Examiner—Harold Pitts
Attorney, Agent, or Firm—Thomas M. Champagne; Jon L. Roberts; Roberts & Associates

[57]                 ABSTRACT

A point of sale system designed to read information from a consumer's check, credit card, or manual input with a subsequent debiting of a consumer's account and crediting a merchant's account for the goods or services provided. Point of sale terminals are designed to accept a form of credit card with a consumer's bank account information encoded thereon or in the alternative to read the MICR number from a consumer's check in order to verify that a consumer has an appropriate balance to conduct the transaction with a given merchant. Thereafter the transaction of that information is transmitted to a central computer system which verifies the consumer's credit worthiness and stores the transaction event information for subsequent bank reconciliation via the ACH network. The invention eliminates the need for paper checks with all bank reconciliation being accomplished electronically.

20 Claims, 8 Drawing Sheets



300 — POINT OF SALE TERMINAL

302 — CENTRAL COMPUTER

304 — BANK

306 — ACH

LML v. Telecheck
CA No. 04-cv-00858
PX 1
Espinoza 4/19/05

CONFIDENTIAL



FIG. 1



FIG. 2

CONFIDENTIAL

LML-EP 000002

**U.S. Patent**      Jan. 16, 1996      Sheet 2 of 8      5,484,988



FIG. 3

CONFIDENTIAL                                   LML-EP 000003



U.S. Patent          Jan. 16, 1996          Sheet 3 of 8          5,484,988



FIG. 4

CONFIDENTIAL

LML-EP 000004



FIG. 5

CONFIDENTIAL

LML-EP 000005



FIG. 6

LML-EP 000006



FIG. 7

Merchant Name
Street Address
City, ST  Zip
Merchant Acct #

TIME 00:00 _M                                DATE 00/00/00
BANK ACCT. NO. 000000000000
TRANSIT NO.  000000000

SALE AMOUNT                                  $ 0,000.00

TERMINAL ID 0000000000

I herewith authorize ChequeMARK Systems
to electronically access my designated
checking account for the payment of the
above referenced purchase.

Name (PRINT) _____

Street _____

City _____ ST _____ Zip _____

Tel. Number: (_____) _____ — _____

I ACKNOWLEDGE THAT RETURN FEES WILL BE
IMPOSED SHOULD MY PAYMENT BE DISHONORED
AND UNDERSTAND THAT IT IS UNLAWFUL TO
AUTHORIZE PAYMENTS FOR WHICH ADEQUATE
MONIES ARE NOT AVAILABLE WITHIN MY
ACCOUNT.

X_____
    Authorizing Signature

*FIG. 8*

CONFIDENTIAL

LML-EP 000008

Merchant Name
Street Address
City, ST Zip
Merchant Acct #

CUSTOMER BANKING INFORMATION:

BANK ACCT. NO. _____

TRANSIT NO. _____

SALE AMOUNT . . . . . . . . . . . . . . . $ _____

I herewith authorize ChequeMARK Systems to electronically access my designated checking account for the payment of the above referenced purchase amount.    I acknowledge that sufficient funds are available for the payment of this sale.

Name (PRINT) _____

Street _____

City _____ ST _____ Zip _____

Tel. Number: ( _____ ) _____ — _____

I FURTHER ACKNOWLEDGE THAT RETURN FEES WILL BE IMPOSED SHOULD MY PAYMENT BE DISHONORED AND UNDERSTAND THAT IT IS UNLAWFUL TO AUTHORIZE PAYMENTS FOR WHICH ADEQUATE MONIES ARE NOT AVAILABLE WITHIN MY ACCOUNT.

X_____
Authorizing Signature

*FIG. 9*

LML-EP 000009

CONFIDENTIAL

5,484,988

1

## CHECKWRITING POINT OF SALE SYSTEM

### RELATED APPLICATION

This application is a continuation of Ser. No. 07/975,717 filed Nov. 13, 1992, now abandoned.

### FIELD OF THE INVENTION

This invention relates to the field of Point-of-Sale systems and more particularly to the integration and processing of purchases whereby a check is used as the basic source of identification of the individual and of the individual's bank and whereby the bank account is debited.

### Background Art

Numerous devices exist for processing checks. For example, U.S. Pat. No. 4,933,536 to Lindemann, et al., describes a check processing device which is used together with a Point-of-Sale terminal. This particular device involves copying and taking a picture of an individual whereby a dishonored check could then be traced to the person who has offered it.

U.S. Pat. No. 4,810,866 to Lloyd, Jr., describes a check validation system again located together with a Point-of-Sale system for imprinting and otherwise physically dealing with a check.

Other systems also deal an apparatus for handling checks at a point of sale. For example, U.S. Pat. No. 4,743,743 to Fukatsu describes one such transaction apparatus where a check is examined by a reader. U.S. Pat. No. 4,672,377 to Murphy, et al. describes a check authorization system wherein a check is imprinted with a bar code and information concerning customers which are stored in a database. U.S. Pat. No. 3,845,470 to Schuller discloses a vending system using a modified form of a check which is imprinted with identification codes, when someone attempts to use the check in purchasing goods and services, a vending operation will not place the order if information associated with the check is not valid in a particular database.

Other check-based financial systems have also been the subject of invention. U.S. Pat. No. 4,617,457 addresses an ATM or automatic teller machine form of cashing checks. Such systems create a picture of the check involved and also involves checking against a specialized database to insure that the check is a "valid" one (see also U.S. Pat. No. 4,580,040 to Granzow et al).

Another generic category of financial systems deals with methods of handling the financial transactions apart from the physical handling of the check itself. For example, U.S. Pat. No. 3,824,544 to Simjian describes a merchant issued "check" which can be used in the purchase of goods and services and upon purchase, a specialized code is evaluated to determine if the check is being validly utilized.

U.S. Pat. No. 4,404,649 to Nunley et al. describes a document processing system which generally discloses a method of reading checks for processing a wide variety of financial documents.

U.S. Pat. No. 4,523,330 to Cain also describes a method for processing financial documents which systems also includes a Point-of-Sale terminal for generating image data from checks as they are being processed. This patent is drawn principally to the actual terminal itself.

2

U.S. Pat. No. 4,673,802 to Ohmae et al. describes a central processing system having stored data relating to the accounts of users. Users are approved or disapproved at the Point-of-Sale based upon information in the database.

U.S. Patent No. 4,270,042 to Case discloses a point of sale system that requires a consumer to prepay a sum of money into a special account that is accessed only by the system. This amount is inscribed on the card, and when a transaction is made using the system, the amount of the transaction is punched out of a designated area on the card. This amount, along with a signature and other information, is supplied on a draft negotiable instrument, which is given to the merchant at the time of the transaction. Thus, the Case system does away with the use of bank checks in effecting the transaction, but requires the use of specialized prepaid draft negotiable instruments that must be surrendered to the merchant.

U.S. Patent No. 4,823,264 to Deming discloses a home banking system that can be used to transfer funds to different payees in satisfaction of debts incurred through previous purchases, use of utilities, etc. The system is consumer driven; that is, it is contemplated for use by the payor on a home personal computer. While the Deming system does away with the use of bank checks, account and other information must be keyed into the system. The Deming system cannot be used to read account and other information directly from an ordinary bank check and has no use for bank checks as instruments other than negotiable paper. Further, the Deming system cannot be used to transfer funds at the time of purchase and is not workable at the point of sale; the system can only be used to pay debts that have been incurred in the past and have accumulated.

Finally, U.S. Pat. No. 4,678,896 to Carlson et al. describes a Point-of-Sale system whereby an apparatus is provided to secure the processing and imprinting of checks.

All of these above patents deal with the specific problem of how to accept a check from a customer for the purchase of goods and services. They do not in any way address the subsequent processing of checks nor do they address the process by which checks are cleared through the normal automatic check handling clearinghouse operations that exist in the financial world. Thus, the interaction of these systems with the automated clearing house ("ACH") process is not addressed in any way. This is particularly important since if any Point-of-Sale check handling system is to interact with the ACH mechanism it must adhere to that processing scheme and must lend itself to use with a processing scheme.

Further, some of the currently used systems described above require the use of a bank check as a negotiable instrument which must be surrendered to a merchant. Some of the systems do away with the use of a bank check altogether, but require a debit card or a specialized draft instrument to be used only with the particular system. None of these systems completely does away with the need and use for a negotiable draft instrument while using the consumer's bank check for identification and verification only. It is therefore an objective of the present invention to provide such a system.

It is an objective of the present invention to be adaptable for use with the ACH system and to be smoothly incorporated into it. In this fashion, the present invention will immediately be useful for a much wider range of financial transactions above and beyond those contemplated and disclosed in the background references discussed above.

### Summary of the Invention

The present invention comprises a process and apparatus which may be employed for the purpose of effecting pay-

CONFIDENTIAL

LML-EP 000010

5,484,988

| 3 | 4 |

ments for point-of-sale purchases of goods and services paid from consumer funds secured in bank checking or depository accounts. Each sale or "Transaction Event" would be an electronic and "paperless" event thereby eliminating reliance on accepting and processing commercial bank drafts (personal or corporate checks) and the physical handling of those bank drafts thus replacing commercial bank drafts at the point-of-sale.

In contrast to known systems, the present invention is a merchant driven system that can be used to process a transaction at the point of sale and at the time of purchase. The system is intended to be made available to subscribing merchants, businesses, and individuals herein referred to as "system subscribers" wishing to employ the method and apparatus of the present invention for the electronic processing and settlement of consumer purchases. Further, operational parameters of the present invention allow freedom from customary state or other geographically limiting criteria typical when accepting and processing "paper" checks. The system is designed to act with the national authorization and electronic settlement network known as the ACH system.

The system is designed to perform in a fully automated manner enabling each Transaction Event to be processed by a system subscriber as a single transaction in the presence of the consumer. When the transaction event is "approved" funds are debited from an authorized consumer account for credit to the system subscriber and electronic settlement by ACH deposits the transaction amount to the subscriber's designated depository account. Authorized access to consumer accounts and credits to system subscriber depository accounts are performed as "Off-Line" transactions by means of Electronic Funds Transfer ("EFT") through the ACH Network or through the Federal Reserve System.

The invention comprises a point-of-sale processing system comprising electronic data processing equipment which allows individual services selections which provide automated, electronic processing from bank checking or depository accounts. It is the objective of the present invention to automate the point-of-sale environment for processing consumer purchases of goods and services which, other than for the system of the present invention, would necessitate the more traditional acceptance and processing of commercial bank drafts (personal and/or corporate checks). Individual Transaction Events are administered under the system of the present invention by initiating a terminal authorization inquiry and continuing through the electronic settlement of funds representing the Transaction Event from the pre-approved consumer banking accounts.

It is a further objective of the present invention to eliminate the need for "paper" checks as an accepted means of consumer payment. In the place of personal and business checks, consumers would be provided free and unrestricted access to funds secured in bank accounts of various types by means of preauthorized electronic events. System subscribers electronically communicate with the data center of the present invention for individual Transaction Event authorizations which, upon reconciliation of a day's activity, result in an EFT by means of the Automated Clearing House accommodating an "Off-Line" debiting of preauthorized consumer Transaction Events from authorized accounts. Thereafter, each system subscriber is credited with the total of all such daily authorized Transaction Events to its designated banking depository account.

The present invention comprises logic which allows the following services which when individually performed or

where combined with other services establish a wholly unique processing medium enabling procurement access to consumers' checking account or bank depository reserves.

Authorization—This service supports electronic communication from point-of-sale to the system's central computer. The data center stores positive and negative files concerning consumer accounts thereby providing accurate inquiry responses regarding the current posting status of a consumer's banking account and signaling the system subscriber that said account may be reasonably relied upon for consummating a Transaction Event (i.e., an "Approval") or, where listed as delinquent, indicating that the account may not be so relied upon (i.e., a "Denial").

Check Replacement—This capability operates as an extension of Authorization enabling the system subscriber the capability of completing a Transaction Event by electronically logging the sale whereupon a Transaction Event Slip will be printed or manually prepared for consumer execution at the point-of-sale. By execution of the Transaction Event Slip, the consumer authorizes the electronic accessing of funds secured in his/her authorized banking account in lieu of the more traditional method of issuing personal and business checks. Funding settlement to the system subscriber would be effectuated by means of Electronic Funds Transfer via ACH or the Federal Reserve System as opposed to physically processing and transferring checks among banks.

Bank Transaction Card—As part of this invention on "Off-Line" Debit Card is established on which is stored the information relating to the banking account from which funds representing the Transaction Event would be debited for payment to the system subscriber. This information may be stored on the card itself in encrypted or unencrypted form or may be stored in the central computer where access to such information is gained via special control characters or access codes stored on the card. Electronic authorization for withdrawal of funds from the cardholder's account and subsequent electronic settlement procedures remain essentially identical to processing under the Check Replacement service described above. Information relating to the consumer-cardholder and the appropriate banking account to be debited for a Transaction Event will be encoded upon the magnetic stripe portion of the plastic, and terminal-readable, card.

Thus, the overall objective of the present invention is to provide and support an alternate means for consumer payments for goods and services that operates to replace commercial bank drafts in the point-of-sale environment. Simultaneously, the present invention assures consumers greater access to and use of funds in personal or corporate banking accounts. Further, the system provides system subscriber's a significantly improved prospect of collecting the underlying monies for Transaction Events, reduced time for the collecting the cash receipts from Transaction Events, and a pronounced lowering of the present cost of cumbersome procedures otherwise mandated by the existing ACH system for accepting and processing commercial bank drafts.

A further objective of the present invention is to significantly reduce the use of checks as negotiable instruments in effecting the purchases of goods or services and to further reduce the consumers reliance on credit cards or cash for transaction events.

Detailed Description of the Preferred Embodiment

The method of the present invention begins with the electronic recording of consumer information at a system

5,484,988

5

subscriber's location using a point-of-sale terminal. This information is obtained in the presence of the consumer and occurs prior to any "Approval" either for the Transaction Event or for the ultimate crediting of the System subscriber's designated depository account. A Transaction Event involves a series of events initiated by a system subscriber's request to sell goods or services by payment from funds secured in a consumer's banking account. First, the consumer's banking account status will be verified through accessing the central computer files of the present invention. Verification that an account may be accessed is established alternatively by means of an encoded, magnetic strip card, or by input of account identification numbers from a consumer's bank account. A more traditional identification of the consumer could also occur including visual examination of driver's license or similar and acceptable picture "ID" however this is not considered part of the present invention.

As an integral portion of each Transaction Event, the system subscriber's location, date and time, and requested sale amount is automatically logged into the system when a system subscriber first accesses the invention. Finally, a Transaction Event Slip ("Sales Slip") will be produced by a printer integral to the point-of-sale terminal and will be executed by the consumer in the amount of the stated purchase with inscribed language defining the Transaction Event and specifically providing consumer authorization for electronic access to his/her banking account. Thereafter, the consumer account will be debited and the proceeds credited to the system subscriber's designated depository account along with all other similar Transaction Events representing the total of the system subscriber's daily activity. Debiting of consumer accounts and settlement deposits to each system subscriber is performed by means of Off-Line electronic funds transfer through and by the ACH or Federal Reserve System.

Equipment Configuration—The present invention can operate with nearly every conceivable point-of-sale equipment system. The central computer system accepts data transmitted from the system subscriber's existing point-of-sale equipment or that which is added to augment service performance. The point of sale terminal of the present invention is implemented in a number of ways, most preferred, however, being activation under a fully automated format. Such a fully automated system generally comprises a dual-port terminal with magnetic stripe reading capabilities interfaced with a logging printer capable of providing individual Transaction Event Slips for consumer execution, and a MICR check reader, optical character recognition ("OCR") equipment, or other device. Variations to this configuration are particularly possible where the system of the present invention is to be activated under a "Split-Dial" feature installed to function within the operational parameters of existing point-of-sale equipment primarily dedicated to bankcard ("credit card") processing. It is contemplated that services may in the future be administered using the present invention with a singular point-of-sale hardware device which, as a function of its design, would incorporate all or most of the service capabilities of an integrated terminal, logging printer, and MICR Check Reading device. The system of the present invention can alternately be interfaced with electronic cash registers now on the market.

Communications links from point-of-sale terminals to the central computer of the present invention will typically be in the form of telephonic network communications over a public switched telephone network ("PSTN") or over other approved networks. Transaction Event verification will occur as a result of point-of-sale terminal access to the

6

central computer's positive and/or negative data files. "Approved" or "Declined" notifications are made to the Point-of-Sale device over the PSTN. All data files will be centrally located and maintained on the invention's central computer data bases. Portions of the data base include but are not limited to third party data files such as the Shared Check Authorization Network ("SCAN") (trademark) data base.

Individual transactions or groupings of transactions are first approved by soliciting an "Authorization" prior to the completion of any requests for electronic funds transfer. To maintain an accurate status of file information for authorizations to subscribing merchants, businesses, and/or individuals, separate data bases are maintained. Current cardholder or banking account status are updated daily and instantly available for point-of-sale inquiry for Transaction Event authorizations, updated daily and are instantly available for point-of-sale inquiry for Transaction Event authorizations.

System subscribers point-of-sale equipment is interfaced to the central computer of the present invention by means of a telephonic network which is able to support communication from a plurality of point-of-sale terminals. Programming of the point-of-sale terminal causes an automatic "Dial-Up" to the central computer and provides an automatic query and response sequence affirming or denying the Transaction Event. The addition of local entry hubs may be installed to better facilitate the speed or economics of communications with the data files. Alternatives to telephonic networks may involve use of satellite communications or enhanced radio transmissions. Similarly, the system's data files and associated Check Replacement Service are contemplated to be responsive to emerging point-of-sale devices intended to seek authorizations by the alternate means of voice pattern recognition, fingerprint identification, retina scan, "smart" chips, and/or consumer or check image and/or signature broadcasting.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1—System overview of the present invention

FIG. 2—The point-of-sale terminal

FIG. 3—The Central Computer System

FIGS. 4-7—The process Data Flow

FIG. 8—Transaction Event Sales Slip

FIG. 9—Manual Transaction Event Sales Slip

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring to FIG. 1 an overall schematic of the present invention is described. Point-of-sale terminals 300 communicate over normal PSTN telephone lines with a central computer system 302 which in turn communicates with a banking institution 304 for purposes of debiting consumer accounts and crediting system subscriber accounts. The banking institution performs its function via normal automated clearing house ("ACH") transactions 306.

Referring to FIG. 2 the point-of-sale terminal is described. The point-of-sale terminal comprises several different entry means. A key board 310 can be used to input consumer information manually. Alternatively a card reader 312 can be used whereby the magnetic stripe on the card is read by the point-of-sale terminal and finally a check reader 314 is also included to read the MICR number on checks as a substitute for either a specific card or key board input. These various

CONFIDENTIAL

LML-EP 000012

5,484,988

7

input means provide information to a microprocessor 316 which comprises logic means 318, memory means 320, and communication means 322. The logic means 318 comprises logic which allows the information received from the various input means to be processed and stored in the memory 320. The logic means further drives a display 324 which provides a visual output of the account number of the consumer for verification. The communication means 322 allows the subscriber terminal to communicate with the central computer 302 for purposes of processing the consumer's purchase.

Referring to FIG. 3 the central computer system 329 is described. The central computer system receives input from a plurality of point-of-sale terminals which provide transaction information from a system subscriber and a consumer desiring to purchase goods or services. The central computer system comprises a system subscriber 330 file which is a file of those merchants who have elected to use the present invention for processing purchases. The central system also comprises an approved consumer file 332 which stores the names of those consumers who have already been approved for allowing purchases to take place through the various input means as well as a third party database such as the SCAN (trademark) data base relating to consumer credit. The computer system also comprises a communications means 334. The communication means communicates with other outside third party data bases to allow any consumer that has not been approved by the system to have a rapid check of the status of the consumer's banking account and of whether the consumer has current outstanding returns (i.e. bad checks). Once this SCAN (trademark) or other outside third party data base search is performed and where an approval is given, the approved consumer file 332 is updated with the name of the new approved consumer.

As presently configured the central computer 329 already has a third party database known as the SCAN (trademark) database 333 resident on the central computer. Thus credit worthiness can be checked using this SCAN database. The SCAN (trademark) database is updated daily.

The communication means 334 also communicates with a banking institution 338 to instruct the bank to debit the account of the consumer and credit the account of the system subscriber (merchant) with the amount of the purchase. These transactions then take place via the normal ACH transaction process.

Referring to FIG. 4 the process begins by a consumer presenting a specimen or "blank" check complete with MICR number to the system subscriber (the merchant) 100. The system subscriber next determines if the check meets appropriate store policy procedures 102, i.e., that the check has appropriate information on the check. If the check does not meet the store policies, it is returned to the consumer 104. If the check does meet appropriate store policies the on-line verification process proceeds 106. The subscriber begins the process by first pressing the appropriate key on a terminal to access the host computer 108. Thereafter the point of sale terminal prompts the system subscriber to enter the appropriate MICR number 110. The system subscriber then enters the appropriate MICR number either manually or by passing the check through a check reader which determines the MICR number 112.

Referring to FIG. 6 the subscriber would verify that the numbers appearing on the check match the MICR numbers on the check 114. During the comparison, the subscriber determines that the check number compares accurately 116 to the number displayed on the terminal. If they

8

do compare the verification process proceeds 120. If the check numbers do not compare with that of the terminal the system subscriber clears the terminal and begins the transaction process again 118. If the process is to be reinitiated, the subscriber enters the MICR number into the point of sale terminal 130. Thereafter the system subscriber compares the MICR numbers as before 132. If the MICR numbers compare to the system display 134 the process proceeds. If the numbers do not compare 136 the check is returned to the consumer and the process terminates 137.

Referring to FIG. 5, if the verification process proceeds the terminal next prompts the system subscriber to enter the amount of the sale 122. The subscriber enters the amount of the sale 124 and the terminal thereafter transmits an inquiry to the host data base for verification 126.

The check approval process next takes place 128. If the check is not approved by the central computer the terminal displays a message declining the transaction 140. Thereafter a printer record of the declined transaction is made for purposes of the system subscriber 142 to comply with the Fair Credit Reporting Act and Regulation E of the Board of Governors of the Federal Reserve System.

If the check is approved the terminal displays a message noting the approval 138 and the specimen check is returned to the consumer. The printer further makes a paper record of the transaction 142 and the consumer places any required information on the paper receipt and signs the receipt authorizing the transaction 144.

Referring to FIG. 7, the process description continues. Once the transaction is approved the central computer captures the MICR information and the sale amount and stores that information 146. The central computer subsequently generates a batch message regarding all transaction events for the prior period and transmits all the transaction event information for the day into the ACH network 148.

During the ACH process each checkwriter's account is debited for the exact purchase amount and such an amount is deposited into a system subscriber designated account 150. Thereafter, collected funds for a total day's events are deposited into a subscriber's account 152. The transaction is then complete 154.

## How to Use

The present invention will require the establishment and maintenance of three interconnected but separate data files for the purpose of performing access searches. Each data file will be accessible by dial-up procedures operating, in most instances, under "Split Dial" format from a point-of-sale ("POS") terminal device or electronic cash register installed for the primary purpose of bankcard and/or bank draft authorizations. The terminal prompts an operator/user to process one of three optional inquiry types. Any one or all of three primary functions are capable of being performed at a single point-of-sale terminal within the control of the system subscriber. The inquiry types and data base format responses are as follows:

Card Authorization—Having depressed the assigned Split Dial key and thereafter being prompted, the system subscriber "slides" an encoded magnetic stripped transaction card through the point-of-sale terminal and enters the "Sale Amount" requested for authorization. Thereupon, the terminal's dial-up capabilities direct the inquiry to the central computer for authorization against "POSITIVE" file of current cardholders whose accounts were listed in "good standing". Inquiries where such a "Match" are found cause

CONFIDENTIAL

5,484,988

9

an "Approved" return message from the data file to the inquiring POS terminal. Conversely, a "No-Match" to inquiry would result in a "Declined" notice to the POS terminal. An uploading mode of the present invention causes forwarding of daily status notifications to the central data files activating new cardholder accounts in the "POSITIVE" cardholder file or submitting corrective entries to delete delinquent or terminated accounts.

Check Authorization—Having depressed the assigned Split Dial key and thereafter being prompted, the system subscriber manually enters account numbers from a personal or business check or, when fully automated, enters a specimen check through a MICR Check Reader device interfaced with the terminal, whereupon the terminal's screen would display the check's numbers, and hence the account number for verification. Thereafter, the operator would enter the "Sale Amount" requested for authorization. The terminal's dial-up capabilities then direct the inquiry to the computer data file center for authorization first against the "POSITIVE" file of "prescreened" bank/checking account numbers whose accounts were listed in "good standing". A successful "Match" to an inquiry would result in an "Approved" notice from the data file to the inquiring terminal. A "No-Match" to inquiry would not, however, immediately result in a "Declined" response. Each inquiry preliminarily resulting in a No-Match would be instantly forwarded/"rolled" to the third data file preceding any return notice to the inquiring terminal. This third file is anticipated to be the Shared Check Authorization Network ("SCAN") a negative data file data base maintained in the system computer data file center. Referrals to SCAN or any other positive or negative data files, enable potential acceptance of Transaction Events involving consumers "Unknown" to the invention's proprietary, "POSITIVE" files. A "Match" on the SCAN "NEGATIVE" file would result in a "Declined" notice; a "No-Match" would conversely send notification to the inquiring POS terminal of an "Approved" event. Of significant importance, the bank/checking account information for each such "Unknown" consumer's transaction would, subsequent to a SCAN "Approved" notice, be posted to the invention's "POSITIVE" file and prescreened through ACH ("Automated Clearing House") for future Transaction Events. The invention, presumably in an automated mode, is capable of uploading daily notices to the POSITIVE data file including notices of new accounts approved through SCAN (trademark) and deletions where settlement for consumer checking account events, initially approved, were subsequently dishonored. The SCAN data base is similarly uploaded with daily activity status corrections.

Check Replacement Service—Inquiries initiated as Check Replacement requests function in nearly an identical manner as that of Check Authorization. Records for such events, when culminating in "Approved" notices, are separately preserved. Check Replacement inquiries are processed first through the system's "POSITIVE" data file and, where no match is found, proceed to the SCAN data file or other data base file prior to transmitting an "Approved" or "Declined" notice to the inquiring POS terminal. A Match in the system data file indicates a consumer-user whose account was in "good standing" and would not be required to "roll" to SCAN. Check Replacement events are reported to and stored by the computer data file center under a file classification identifying the transaction as a Check-Replacement Service. The total of daily, approved Transaction Events are "checkless" sales, whereby the service subscribing merchant has submitted requests for electronic ACH settlement for all preauthorized consumer purchases. No commercial bank

10

note ("Paper Check") is accepted or processed by the service subscriber. In each Transaction Event, a Consumer, at the point-of-sale, has executed an electronic access ("Off-Line Debit") authority "Sales Slip" which is automatically printed upon a terminal's receipt of an "Approved" notice.

All terminal programming and all prompt strings for MICR Check Reader interfacing are stored in the POS terminal and the computer center of the present invention controls interactions between the plurality of terminals and the central system. The following modules are present.

Programming for MICR/Terminal Interface—system subscriber locations to be activated with the present invention must possess or acquire a terminal. Those utilizing or being upgraded to terminals such as a Tranz (trademark) 330 or other terminals with interface capabilities with the check reader for all suitable point-of-sale terminals.

The preferred format for terminal operations is generated from a singular split dial key. Thereafter, the "prompt string" would proceed in a manner such as i) "Card=1"; "Check=2" requiring operator selection; then, where selecting a checking account inquiry ii), the operator would respond to a secondary prompt of "Auth=1"; "Replace=2". These entry selections precede the magnetic stripe "reading" of a card/submittal or a check through the MICR (Account Identification), the entry of the requested sale amount, and the terminal's dial-up for authorization against the computer data file center.

The MICR interface results in the transmittal of a query for data center approval of the entire ABA/Transit and personal or corporate checking account numbers. Instances where printed checks add the individual check's number to the end of the account number can be "dropped" by Check Reader switch settings. Subsequent to a terminal's receipt of the MICR number string but prior to the operator's entry of the requested sale amount and authorization dial-up, a verification prompt "flashing" the ABA and account numbers must be displayed on the terminal's screen requiring the operator to depress "Enter" to proceed, if correct, or "Clear", if incorrect and thereby enabling the terminal operator to resubmit the specimen check through the MICR Check Reader. It is important to note that account information may be entered manually as well at the point of sale with the other financial advantages of the present invention still in effect.

The computer data file center receives and processes Transaction Event authorization requests utilizing the entire MICR string for accurate, error-free identification of both the consumer bank and a specific checking or depository account to participate in a sale. ACH settlement criteria mandate exact recall for the bank and checking account numbers to properly complete any debit request. This invention conforms to each and every requirement of the ACH transaction regulations.

Each Transaction Event is completed with the logging printer generation of a Transaction Event ("Sales") Slip for each "Approved" authorization inquiry processed (FIG. 8). Alternatively, a manually created transaction event slip can also be prepared (FIG. 9). Each such Transaction Event Slip must be exacting in its retention of account numbers and the sale amount enabling both the consumer and system subscriber to be provided "hard copy" receipts of the event. Also included would be a clear printing of the transaction type: "Bank Card", "Check Authorization", or "Check Replacement". Authorization language is printed immediately preceding the consumer's signature line specifically authorizing electronic access in payment of the requested transaction sale amount.

CONFIDENTIAL

LML-EP 000014

5,484,988

11

In addition to the primary functions for POS terminal programming and MICR Check Reader interface, each Point-of-Sale terminal location is capable of generating printed summations of daily activity. These reports list and separately total each authorization/service type, whether produced as a singular report or as the result of multiple terminal "closeout" procedures.

Instances will arise with either the Bank Card or Check Replacement Service where previously authorized Transaction Events will require the operational equivalent of a bankcard "Void" or "Credit" notation. The methodology will be available for Split Dial messages to the computer data file center of a post-authorization "Error" or "Transaction Cancellation" notice. The "Cancel" procedure is instituted by depressing for example the "3" key (i.e. "Cancel=3"). By so doing, the system subscriber may cancel a previously approved and logged event. This Transaction Event which was recorded on the data files and reported on the service subscriber's daily Activity Summation Report, thereafter carries an offsetting, "Flagged" cancellation notice.

Summary

A flexible purchase transaction system is described which precisely fits within existing ACH procedures for checking account events for processing of pre-authorized electronic debits as a replacement for commercial bank drafts (paper checks). The main advantage to the proposed invention is the fact that a truly paperless transaction may occur. Departures from the proposed system especially with respect to the Point-of-Sale terminals will be apparent to those skilled in the art without departing from the spirit of the invention as described.

We claim:

1. A checkwriting point of sale system comprising:

a point of sale terminal adapted to receive consumer bank account information from any bank check;

a central computer system;

first communications means integral to said point of sale terminal for electronically communicating with the central computer system;

memory means integral to said point of sale terminal for temporarily storing the consumer bank account information;

the central computer system having second communication means for receiving information from a plurality of said point of sale terminals;

the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the bank check as a negotiable instrument.

2. The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further includes means for reading magnetic ink character recognition numbers appearing on a consumer check for the sole purpose of identifying and reading the consumer bank account information.

3. The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further comprises an alphanumeric display means for receiving said consumer bank account information from the memory means and for displaying the consumer bank account information.

12

4. The checkwriting point of sale system according to claim 1 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip.

5. The checkwriting point of sale system according to claim 1 further comprising a resident third party database wherein consumer banking account status information is stored, the consumer banking account status information being used for verification of consumer banking account status.

6. The checkwriting point of sale system according to claim 1 wherein the central computer system further comprises a system subscriber database, the system subscriber database comprising information regarding merchants and service providers that are authorized to use the checkwriting point of sale system.

7. The checkwriting point of sale system according to claim 6 wherein the central computer system further comprises a database comprising information regarding consumers whose consumer banking account status is not verified as bad.

8. A checkwriting point of sale process comprising:

a) presenting any bank check specimen to a point of sale terminal located at a merchant or service provider;

b) reading the magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument;

c) storing the consumer bank account information obtained from the check and verifying that account numbers were accurately read at the point of sale terminal;

d) providing transaction event information to the point of sale terminal;

e) transmitting the transaction event information and consumer bank account information to a central computer system;

f) storing the transaction event information and consumer banking account information; and

g) subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations.

9. A checkwriting point of sale system comprising:

a point of sale terminal adapted to receive consumer bank account information;

a central computer system;

first communications means integral to said point of sale terminal for electronically communicating with the central computer system; and

memory means integral to said point of sale terminal for temporarily storing the consumer bank account information;

the point of sale terminal comprising reading means for reading magnetic ink character recognition numbers on any consumer bank check for the sole purpose of eliciting consumer bank account information;

the central computer system having second communication means for receiving information from a plurality of said point of sale terminals;

the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using a bank check as a negotiable instrument.

CONFIDENTIAL

5,484,988

13

10. The checkwriting point of sale system according to claim 9 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip.

11. The checkwriting point of sale system according to claim 9 further comprising a resident third party database wherein consumer banking account status information is stored, the consumer banking account status information being used for verification of consumer banking account status.

12. The checkwriting point of sale system according to claim 9 wherein the central computer system further comprises a system subscriber database, the system subscriber database comprising information regarding merchants and service providers that are authorized to use the checkwriting point of sale system.

13. The checkwriting point of sale system according to claim 4, wherein the sales slip includes means for execution by the consumer for proof of bank account access authorization.

14. The checkwriting point of sale system of claim 1, wherein the point of sale terminal further comprises means for automatically logging a point of sale terminal location and transaction date, time, and sales amount.

15. The checkwriting point of sale process of claim 8, further comprising:

a) verifying the status of the consumer bank account,

b) verifying the consumer bank account status of the consumer via a query to a third party database if the consumer bank account is verified as bad, and

14

c) sending an approval message to the point of sale terminal if the consumer's banking account status is approved for the transaction.

16. The checkwriting point of sale process of claim 8, further comprising:

(A) printing a transaction event sales slip following the sending of an approval message; and

(B) executing of the sales slip by the consumer as proof of bank account access authorization.

17. The checkwriting point of sale process of claim 15, further comprising:

(A) printing a transaction event sales slip following the sending of an approval message; and

(B) executing of the sales slip by the consumer as proof of bank account access authorization.

18. The checkwriting point of sale process of claim 8, further comprising automatically logging point of sale terminal location information and transaction date, time, and sales amount information into the point of sale terminal.

19. The checkwriting point of sale system according to claim 10, wherein the sales slip includes means for execution by the consumer of proof of bank account access authorization.

20. The checkwriting point of sale system of claim 9, wherein the point of sale terminal further comprises means for automatically logging a point of sale terminal location and transaction date, time, and sales amount.

* * * * *

LML-EP 000016

CONFIDENTIAL

# EXHIBIT 2



**UNITED STATES DEPARTMENT OF COMMERCE**
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 07/975,717 | 11/13/92 | HILLS | |

2SM1/0923

JON L. ROBERTS
ARTER & HADDEN
1201 K STREET, N.W.
SUITE 400K
WASHINGTON, DC 20006

This is a communication from the examiner in charge of your application.
COMMISSIONER OF PATENTS AND TRADEMARKS

| | EXAMINER |
|---|---|
| R | PITTS, H |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2505 | |

DATE MAILED: 09/23/93

☑ This application has been examined    ☐ Responsive to communication filed on _____    ☐ This action is made final.

A shortened statutory period for response to this action is set to expire ___ month(s), _____ days from the date of this letter.
Failure to respond within the period for response will cause the application to become abandoned. 35 U.S.C. 133

**Part I  THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. ☑ Notice of References Cited by Examiner, PTO-892.    2. ☒ Notice re Patent Drawing, PTO-948.
3. ☐ Notice of Art Cited by Applicant, PTO-1449.    4. ☐ Notice of Informal Patent Application, Form PTO-152.
5. ☐ Information on How to Effect Drawing Changes, PTO-1474.    6. ☐

**Part II  SUMMARY OF ACTION**

1. ☑ Claims **1-9** are pending in the application.
   Of the above, claims _____ are withdrawn from consideration.
2. ☐ Claims _____ have been cancelled.
3. ☐ Claims _____ are allowed.
4. ☑ Claims **1-7** are rejected.
5. ☐ Claims _____ are objected to.
6. ☐ Claims _____ are subject to restriction or election requirement.
7. ☐ This application has been filed with informal drawings under 37 C.F.R. 1.85 which are acceptable for examination purposes.
8. ☐ Formal drawings are required in response to this Office action.
9. ☐ The corrected or substitute drawings have been received on _____. Under 37 C.F.R. 1.84 these drawings are ☐ acceptable. ☐ not acceptable (see explanation or Notice re Patent Drawing, PTO-948).
10. ☐ The proposed additional or substitute sheet(s) of drawings, filed on _____ has (have) been ☐ approved by the examiner. ☐ disapproved by the examiner (see explanation).
11. ☐ The proposed drawing correction, filed on _____ has been ☐ approved. ☐ disapproved (see explanation).
12. ☐ Acknowledgment is made of the claim for priority under U.S.C. 119. The certified copy has ☐ been received ☐ not been received ☐ been filed in parent application, serial no. _____ on _____.
13. ☐ Since this application appears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.
14. ☐ Other

PTOL-326 (Rev. 9-82)    **EXAMINER'S ACTION**

CONFIDENTIAL

LML-EP 000139

Serial No. 975,717                          -2-

Art Unit  2505

The following is a quotation of the appropriate paragraphs
of 35 U.S.C. § 102 that form the basis for the rejections under
this section made in this Office action:

A person shall be entitled to a patent unless —
(b) the invention was patented or described in a printed
publication in this or a foreign country or in public use or
on sale in this country, more than one year prior to the
date of application for patent in the United States.

Claims 1-9 are rejected under 35 U.S.C. § 102(b) as being
anticipated by Case or Deming.

Note col. 1, lines 53 et. seq. of Case and col. 2 lines 17
et. Seq. of Deming.

Any inquiry concerning this communication or earlier
communications from the examiner should be directed to Harold
Pitts whose telephone number is (703) 308-0717.

Any inquiry of a general nature or relating to the status of
this application should be directed to the Group receptionist
whose telephone number is (703) 308-0956.

                                          HAROLD PITTS
                                       PRIMARY EXAMINER
                                         GROUP 2500

Pitts/tj
September 22, 1993

CONFIDENTIAL                                    LML-EP 000140

# EXHIBIT 3

  **UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address : COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 07/975,717 | 11/13/92 | | R |

PITTS, EXAMINER

JON L. ROBERTS
ARTER & HADDEN
1801 K STREET, N.W.
SUITE 400K
WASHINGTON, DC  20006

| ART UNIT | PAPER NUMBER |
|---|---|
| 2505 | 7 |

DATE MAILED:    03/09/94

This is a communication from the examiner in charge of your application.
COMMISSIONER OF PATENTS AND TRADEMARKS

☐ This application has been examined   ☒ Responsive to communication filed on  12/22/93  ☒ This action is made final.

A shortened statutory period for response to this action is set to expire  3  month(s),  days from the date of this letter.
Failure to respond within the period for response will cause the application to become abandoned.  35 U.S.C. 133

**Part I    THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. ☐ Notice of References Cited by Examiner, PTO-892.
3. ☒ Notice of Art Cited by Applicant, PTO-1449.
5. ☐ Information on How to Effect Drawing Changes, PTO-1474.
2. ☐ Notice re Patent Drawing, PTO-948.
4. ☐ Notice of Informal Patent Application, Form PTO-152.
6. ☐ _____

**Part II    SUMMARY OF ACTION**

1. ☒ Claims  1-10  are pending in the application.

   Of the above, claims _____ are withdrawn from consideration.

2. ☐ Claims _____ have been cancelled.

3. ☐ Claims _____ are allowed.

4. ☒ Claims  1-10  are rejected.

5. ☐ Claims _____ are objected to.

6. ☐ Claims _____ are subject to restriction or election requirement.

7. ☐ This application has been filed with informal drawings under 37 C.F.R. 1.85 which are acceptable for examination purposes.

8. ☐ Formal drawings are required in response to this Office action.

9. ☐ The corrected or substitute drawings have been received on _____. Under 37 C.F.R. 1.84 these drawings
   are ☐ acceptable. ☐ not acceptable (see explanation or Notice re Patent Drawing, PTO-948).

10. ☐ The proposed additional or substitute sheet(s) of drawings, filed on _____ has (have) been ☐ approved by the
    examiner. ☐ disapproved by the examiner (see explanation).

11. ☐ The proposed drawing correction, filed on _____ has been ☐ approved. ☐ disapproved (see explanation).

12. ☐ Acknowledgment is made of the claim for priority under U.S.C. 119. The certified copy has ☐ been received ☐ not been received
    ☐ been filed in parent application, serial no. _____ ; filed on _____.

13. ☐ Since this application appears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in
    accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.

14. ☐ Other

PTOL-326 (Rev. 9-89)                    **EXAMINER'S ACTION**

8

CONFIDENTIAL                    LML-EP 000162

Serial No. 075,717                                      -2-

Art Unit  2505

The following is a quotation of 35 U.S.C. § 103 which forms
the basis for all obviousness rejections set forth in this Office
action:

A patent may not be obtained though the invention is not
identically disclosed or described as set forth in section
102 of this title, if the differences between the subject
matter sought to be patented and the prior art are such that
the subject matter as a whole would have been obvious at the
time the invention was made to a person having ordinary
skill in the art to which said subject matter pertains.
Patentability shall not be negatived by the manner in which
the invention was made.

Subject matter developed by another person, which qualifies
as prior art only under subsection (f) or (g) of section 102
of this title, shall not preclude patentability under this
section where the subject matter and the claimed invention
were, at the time the invention was made, owned by the same
person or subject to an obligation of assignment to the same
person.

Claims 1-10 are rejected under 35 U.S.C. § 103 as being

unpatentable over the prior art as discussed previously in view

of the check operated systems set forth in the prior art

statement, for example, the carlson et al. patents, Murphy etc.

These patents teach that referenced portions of Case and

Deming would have been obvious to one of ordinary skill in the

art at the time the invention was made to employ with checks at a

point-of-sale for on line transactions, under the rationale of

interchangeable teachings of similar systems.

Applicant's amendment necessitated the new grounds of

rejection. Accordingly, THIS ACTION IS MADE FINAL.  See M.P.E.P.

§ 706.07(a).  Applicant is reminded of the extension of time

policy as set forth in 37 C.F.R. § 1.136(a).

CONFIDENTIAL                                          LML-EP 000163

Serial No. 975,717                    -3-

Art Unit   2505


A SHORTENED STATUTORY PERIOD FOR RESPONSE TO THIS FINAL
ACTION IS SET TO EXPIRE THREE MONTHS FROM THE DATE OF THIS
ACTION.   IN THE EVENT A FIRST RESPONSE IS FILED WITHIN TWO MONTHS
OF THE MAILING DATE OF THIS FINAL ACTION AND THE ADVISORY ACTION
IS NOT MAILED UNTIL AFTER THE END OF THE THREE-MONTH SHORTENED
STATUTORY PERIOD, THEN THE SHORTENED STATUTORY PERIOD WILL EXPIRE
ON THE DATE THE ADVISORY ACTION IS MAILED, AND ANY EXTENSION FEE
PURSUANT TO 37 C.F.R. § 1.136(a) WILL BE CALCULATED FROM THE
MAILING DATE OF THE ADVISORY ACTION.   IN NO EVENT WILL THE
STATUTORY PERIOD FOR RESPONSE EXPIRE LATER THAN SIX MONTHS FROM
THE DATE OF THIS FINAL ACTION.


Any inquiry concerning this communication should be directed

to Harold Pitts at telephone number (703) 308-0956.


HAROLD PITTS
PRIMARY EXAMINER
GROUP 2500


Pitts/tj
March 08, 1994

CONFIDENTIAL
LML-EP 000164

# EXHIBIT 4

08/257390

8/C
8-19-94
p.D

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In Re Application of Robert H. Hills and Henry R. Nichols

Serial No.                                 Group Art Unit:

Filed:  Herewith                           Examiner:

For:   CHECKWRITING POINT OF SALE SYSTEM

              *     *     *     *     *

                  PRELIMINARY AMENDMENT

              *     *     *     *     *

Commissioner of Patents and Trademarks
Washington, D.C. 20231

Sir:

        Applicants hereby submit the following preliminary amendment
to the above captioned patent application.

In the Specification:

        Please amend the specification as follows:

        Page 3, between lines 2 and 3, insert the following
paragraphs:

        -- U.S. Patent No. 4,270,042 to Case discloses a point of sale
system that requires a consumer to prepay a sum of money into a
special account that is accessed only by the system.  This amount
is inscribed on the card, and when a transaction is made using the
system, the amount of the transaction is punched out of a
designated area on the card.  This amount, along with a signature
and other information, is supplied on a draft negotiable
instrument, which is given to the merchant at the time of the
transaction.  Thus, the Case system does away with the use of bank
checks in effecting the transacion, but requires the use of

9

CONFIDENTIAL

specialized prepaid draft negotiable instruments that must be surrendered to the merchant.

U.S. Patent No. 4,823,264 to Deming discloses a home banking system that can be used to transfer funds to different payees in satisfaction of debts incurred through previous purchases, use of utilities, etc. The system is consumer driven; that is, it is contemplated for use by the payor on a home personal computer. While the Deming system does away with the use of bank checks, account and other information must be keyed into the system. The Deming system cannot be used to read account and other information directly from an ordinary bank check and has no use for bank checks as instruments other than negotiable paper. Further, the Deming system cannot be used to transfer funds at the time of purchase and is not workable at the point of sale; the system can only be used to pay debts that have been incurred in the past and have accumulated. --.

Page 3, between lines 16 and 17, insert the following paragraph:

-- Further, some of the currently used systems described above require the use of a bank check as a negotiable instrument which must be surrendered to a merchant. Some of the systems do away with the use of a bank check altogether, but require a debit card or a specialized draft instrument to be used only with the particular system. None of these systems completely does away with the need and use for a negotiable draft instrument while using the consumer's bank check for identification and verification only. It

2

CONFIDENTIAL

LML-EP 000171

is therefore an objective of the present invention to provide such a system. ⟨

Page 4, line 6, before "The system is intended" insert --/In contrast to known systems, the present invention is a merchant driven system that can be used to process a transaction at the point of sale and at the time of purchase. ⊥.

Page 8, line 2, delete "as a means of conducting" and insert ⊤⊥ as negotiable instruments in effecting the ⊤⊦.

In the Claims:

Please cancel claims 5 and 10.

Please amend the remaining claims as follows:

1.    (Amended) A checkwriting point of sale system comprising: a point of sale terminal adapted to receive consumer bank account information [and further adapted to accept such information from consumer cards on which the bank account information is stored];

a central computer system;

[a] first communications means integral to said point of sale terminal for electronically communicating with [a] the central computer system;

[a] memory means integral to said point of sale terminal for [allowing the temporary storage of] temporarily storing the consumer bank account information [from the consumer cards];

the central computer system having second communication means [capability adapted to receive] for receiving information from a plurality of said point of sale terminals;

3

CONFIDENTIAL

LML-EP 000172

the central computer system second communication means [allowing] enabling said central computer system to communicate with external [data bases] databases for performing a consumer bank account status [verification] search and [allowing] further enabling automated clearing house communication [with banking institutions] for [purposes of transfer of] transferring funds without using a bank check as a negotiable instrument.

2. (Amended) [A] The checkwriting point of sale system according to claim 1 wherein said point of sale terminal [is] further [adapted to read MICR] includes means for reading magnetic ink character recognition numbers appearing on a consumer check [and wherein said consumer check is used to identify] for the sole purpose of identifying and reading the consumer bank account information.

3. (Amended) The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further comprises an alphanumeric display means [adapted to receive] for receiving said consumer bank account information from the memory means [of the point of sale terminal such that said point of sale terminal is adapted to display] and for displaying the consumer bank account information.

4. (Amended) The checkwriting point of sale system according to claim 1 further comprising a printer means for [adapted to receive] receiving information from the memory means of the point of sale terminal [to create point of] and for generating a transaction event sale slip[s].

4

CONFIDENTIAL

5 6̶. (Amended) The checkwriting point of sale system according to claim 1 further comprising a resident third party [data base] database wherein consumer banking account status information is stored, the consumer banking account status information being [which is] used for verification of consumer banking account status.

6 7̶. (Amended) The checkwriting point of sale system according to claim 1 wherein the central computer system further comprises a system subscriber [data base] database, the system subscriber database comprising information regarding merchants and service providers that are authorized to use the checkwriting point of sale system.

7 8̶. (Amended) The checkwriting point of sale system according to claim 7 wherein the central computer system further comprises a database comprising information regarding consumers [approved to use the checkwriting point of sale system] whose consumer banking account status is not verified as bad.

9. (Amended) A checkwriting point of sale process comprising the steps of:

a) presenting a bank check specimen to a point of sale terminal located at a merchant or service provider,

b) reading the [MICR] magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information,

5

CONFIDENTIAL

LML-EP 000174

c) storing the consumer bank account information obtained from the check and verifying that account numbers were accurately read at the point of sale terminal,

d) inputting transaction event information into the point of sale terminal,

e) transmitting the transaction event information and consumer bank account information to a central computer system,

[f) verifying the authorization status of the consumer,

g) verifying the banking account status of the consumer via a query to a third party data base if a particular consumer is not authorized to use the system ,

h) sending an "approved" message to the point of sale terminal, if the consumer's banking account status is approved for the transaction, and]

f) storing the transaction event information and consumer banking account information, and

[i]g) subsequently transmitting the transaction event information to a bank for subsequent [ACH] automated clearing house operations.

Please add the following new claims:

11. (New) A checkwriting point of sale system comprising:

a point of sale terminal adapted to receive consumer bank account information;

a central computer system;

6

CONFIDENTIAL

LML-EP 000175

first communications means integral to said point of sale terminal for electronically communicating with the central computer system; and

memory means integral to said point of sale terminal for temporarily storing the consumer bank account information;

the point of sale terminal comprising reading means for reading magnetic ink character recognition numbers on consumer bank checks for the sole purpose of eliciting consumer bank account information;

the central computer system having second communication means for receiving information from a plurality of said point of sale terminals;

the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using a bank check as a negotiable instrument.

12. 9 (New)    The checkwriting point of sale system according to claim 11 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip.

13. 9 (New)    The checkwriting point of sale system according to claim 11 further comprising a resident third party database wherein consumer banking account status information is stored, the

7

LML-EP 000176

consumer banking account status information being used for
verification of consumer banking account status.

14. (New)    The checkwriting point of sale system according
to claim 11 wherein the central computer system further comprises
a system subscriber database, the system subscriber database
comprising information regarding merchants and service providers
that are authorized to use the checkwriting point of sale system.

15. (New)    The checkwriting point of sale system according
to claim 4, wherein the sales slip includes means for execution by
the consumer for proof of bank account access authorization.

16. (New)    The checkwriting point of sale system of claim
1, wherein the point of sale terminal further comprises means for
automatically logging a point of sale terminal location and
transaction date, time, and sales amount.

17. (New)    The checkwriting point of sale process of claim
9, further comprising the steps of:

    a)    verifying the status of the consumer bank account,

    b)    verifying the consumer bank account status of the
consumer via a query to a third party database if the consumer bank
account is verified as bad, and

    c)    sending an approval message to the point of sale
terminal if the consumer's banking account status is approved for
the transaction.

18. (New)    The checkwriting point of sale process of claim
9, further comprising the steps of:

8

CONFIDENTIAL

LML-EP 000177

(A) printing a transaction event sales slip following the sending of an approval message; and

(B) executing of the sales slip by the consumer as proof of bank account access authorization.

19.  (New)    The checkwriting point of sale process of claim 17, further comprising the steps of:

(A) printing a transaction event sales slip following the sending of an approval message; and

(B) executing of the sales slip by the consumer as proof of bank account access authorization.

20.  (New)    The checkwriting point of sale process of claim 9, further comprising the step of automatically logging point of sale terminal location information and transaction date, time, and sales amount information into the point of sale terminal.

21.  (New)    The checkwriting point of sale system according to claim 12, wherein the sales slip includes means for execution by the consumer of proof of bank account access authorization.

22.  (New)    The checkwriting point of sale system of claim 11, wherein the point of sale terminal further comprises means for automatically logging a point of sale terminal location and transaction date, time, and sales amount.

9

CONFIDENTIAL

LML-EP 000178

## REMARKS

This preliminary amendment is being filed as part of the above-captioned file wrapper continuation application, the parent application of which is Serial No. 07/975,717, filed November 13, 1992. No new matter has been added by this amendment. The parent application is abandoned as of the filing date of the present application. It is respectfully requested that this amendment be entered, the claims allowed, and the case passed to issue.

Respectfully submitted,

Jon L. Roberts
Registration No. 31,293
Roberts & Associates
1953 Gallows Road
Suite 220
Vienna, Virginia 22182
(703) 356-7700

June 8, 1994

10

CONFIDENTIAL

LML-EP 000179

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LML PATENT CORP.,

Plaintiff,

v.

TELECHECK SERVICES, INC.,
ELECTRONIC CLEARING HOUSE, INC.,
XPRESSCHEX, INC. and NOVA
INFORMATION SYSTEMS, INC.,

Defendants.

C.A. 04-858 (SLR)

## TELECHECK'S FIRST SUPPLEMENTAL RESPONSE TO LML'S AMENDED FIRST SET OF INTERROGATORIES

## RESERVATION OF RIGHTS

Pursuant to Rules 26 and 33, TeleCheck Services, Inc. ("TeleCheck") hereby provides a First Supplemental Response to LML Patent Corp.'s ("LML") Amended First Set of Interrogatories, Nos. 1-9 ("Interrogatories"). TeleCheck provides these supplemental responses without waiving any present or future objection, for example such as any objection as to the relevance or admissibility of any information provided by TeleCheck. TeleCheck's investigation regarding this litigation is ongoing, as is TeleCheck's development of any contentions. These responses are provided subject to TeleCheck's future investigation, supplementation, or modification. TeleCheck's agreement to investigate the subject matter of any interrogatory or to provide responsive information does not constitute an admission that relevant, non-privileged information responsive to that interrogatory exists. All responses are subject to each of the General Objections and specific Objections set forth in TeleCheck's original Response to LML's Amended First Set of Interrogatories.

Even if the doctrine of equivalents is applicable, the Accused Products do not infringe under the doctrine of equivalents because the differences between the Accused Products and the claim limitation are not insubstantial.

## INTERROGATORY NO. 2:

Separately for each Asserted Claim of the Patents-In-Suit, describe in detail all legal and factual bases for TeleCheck's contention that the Asserted Claims of the Patents-In-Suit are invalid, and for each piece of alleged prior art, and/or combination of alleged prior art, that TeleCheck contends invalidates each Asserted Claim, provide a detailed claim chart that identifies each element of the Asserted Claims that TeleCheck contends is disclosed or taught by the prior art with citations to each instance where such element is allegedly disclosed or taught by the prior art.

## RESPONSE TO INTERROGATORY NO. 2:

TeleCheck objects to this interrogatory as premature, in that it seeks expert discovery and contentions which TeleCheck has not yet fully developed at this stage of the litigation. TeleCheck further objects to this interrogatory as premature, because it requires contentions regarding claim construction, and is therefore in conflict with the Scheduling Order governing this case. Subject to these objections, TeleCheck will produce charts and other information as necessary, reflecting its contentions in a time and manner agreed-upon by the parties.

## FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:

TeleCheck incorporates by reference its initial objections and response as though fully set forth herein. TeleCheck expressly reserves the right to supplement this response as discovery proceeds, and provides the following information in response to this Interrogatory:

Based on the claim construction apparently asserted by LML, as presently understood by TeleCheck, the Asserted Claims are invalid as set forth below:

6

### 1.    The '988 Patent

Claims 1, 4, 9-10, and 13 of the '988 patent are invalid under as anticipated 35

U.S.C. § 102 by U.S. Patent No. 5,175,682 to Higashiyama ("Higashiyama"). Each and

every element of claims 1, 4, 9-10 and 13 of the '988 patent is taught by Higashiyama.

| The '988 Patent | Higashiyama |
|---|---|
| 1. A checkwriting point of sale system comprising: | A system for processing checks presented at the point of sale. (*See* col. 2, lines 43-46; col. 3, lines 11-14.) |
| a point of sale terminal adapted to receive consumer bank account information from any bank check; | Point of sale system 210 including a MICR reader 202 used for reading the magnetic account number printed on checks. (*See* col. 3, lines 13-18.) |
| a central computer system; | Backroom processor 204 to which one or more point of sale systems are connected. (*See* Figure 2; col. 3, lines 13-14, 29-33.) |
| first communications means integral to said point of sale terminal for electronically communicating with the central computer system; | POS terminal 201 (which is part of the point of sale system) is connected to the backroom processor 204. (*See* col. 3, lines 29-30.) |
| memory means integral to said point of sale terminal for temporarily storing the consumer bank account information; | Data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201. (*See* col. 3, lines 55-62; col. 5, lines 1-4.) |
| the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; | Backroom processor 204 receives data records from the POS terminal 201. (*See* col. 5, lines 1-10.) Since the backroom processor 204 is connected to one or more point of sale systems 210, each having a POS terminal 201 that supplies data records, the backroom processor 204 receives data records from one or more (plurality) of point of sale systems 210. |
| the central computer system second communication means enabling | Backroom processor 204 will take the data records it has accumulated and upload them |

7

| | |
|---|---|
| said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the bank check as a negotiable instrument. | to a clearing house.  (*See* col. 5, lines 11-13.) The data record is also used to verify check authorization by being compared to a file. (*See* col. 4, lines 14-24.)  The information from the paper check is electronically processed and the check is returned to the customer at the point of sale.  (*See* col. 4, lines 54-57.) |
| 4. The checkwriting point of sale system according to claim 1 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip. | Printer 203 for printing a sales slip.  (*See* col. 3, lines 25-27.) |
| 9. A checkwriting point of sale system comprising: | A system for processing checks presented at the point of sale. (*See* col. 2, lines 43-46; col. 3, lines 11-14.) |
| a point of sale terminal adapted to receive consumer bank account information; | Point of sale system 210 including a MICR reader 202 used for reading the magnetic account number printed on checks.  (*See* col. 3, lines 13-18.) |
| a central computer system; | Backroom processor 204 to which one or more point of sale systems are connected. (*See* Figure 2; col. 3, lines 13- 14, 29-33.) |
| first communications means integral to said point of sale terminal for electronically communicating with the central computer system; and | POS terminal 201 (which is part of the point of sale system) is connected to the backroom processor 204.  (*See* col. 3, lines 29-30.) |
| memory means integral to said point of sale terminal for temporarily storing the consumer bank account information; | Data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201.  (*See* col. 3, lines 55-62; col. 5, lines 1-4.) |
| the point of sale terminal comprising reading means for reading magnetic ink character recognition numbers on any consumer bank check for the sole | MICR reader 202 reads the account information on the check.  (*See* col. 3, lines 48-50.) |

| | |
|---|---|
| purpose of eliciting consumer bank account information; | |
| the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; | Backroom processor 204 receives data records from the POS terminal 201. (*See* col. 5, lines 1-10.) Since the backroom processor 204 is connected to one or more point of sale systems 210, each having a POS terminal 201 that supplies data records, the backroom processor 204 receives data records from one or more (plurality) of point of sale systems 210. |
| the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using a bank check as a negotiable instrument. | Backroom processor 204 will take the data records it has accumulated and upload them to a clearing house. (*See* col. 5, lines 11-13.) The data record is also used to verify check authorization by being compared to a file. (*See* col. 4, lines 14-24.) Further, the information from the paper check is electronically processed, and the check is returned to the customer at the point of sale. (*See* col. 4, lines 54-57.) |
| 10. The checkwriting point of sale system according to claim 9 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip. | Printer 203 for printing a sales slip. (*See* col. 3, lines 25-27.) |
| 13. The checkwriting point of sale system according to claim 4, wherein the sales slip includes means for execution by the consumer for proof of bank account access authorization. | A fully automated system generally comprises a dual-port terminal with magnetic stripe reading capabilities interfaced with a logging printer capable of providing individual transaction event slips for consumer execution. (*See* col. 5, lines 44-47.) |

Claim 2 of the '988 patent is obvious under 35 U.S.C. § 103 as unpatentable over Higashiyama.

9

| The '988 Patent | Higashiyama |
|---|---|
| 2. The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further includes means for reading magnetic ink character recognition numbers appearing on a consumer check for the sole purpose of identifying and reading the consumer bank account information. | MICR reader 202, which is disclosed as part of the point of sale system 210, reads the consumer account information. (*See* col. 3, lines 47-50.) |

Claim 3 of the '988 patent is obvious under 35 U.S.C. § 103 as unpatentable over Higashiyama in view of U.S. Patent No. 5,053,607 to Carlson ("Carlson").

| The '988 Patent | Higashiyama + Carlson |
|---|---|
| 3. The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further comprises an alphanumeric display means for receiving said consumer bank account information from the memory means and for displaying the consumer bank account information. | Carlson teaches an alphanumeric display used in connection with a point-of-sale device for reading MICR numbers from checks. When the MICR data is entered manually by the merchant, the MICR data is displayed digit-for-digit/stroke-for-stroke at the display. (*See* col. 21, lines 5-8.) It would have been obvious to include alphanumeric display means in the system described by Higashiyama. |

Claim 6 of the '988 patent is obvious under 35 U.S.C. § 103 as unpatentable over Higashiyama in view of an article about a POS terminal network known as the Cactus Switch ("Cactus Switch article"). The Cactus Switch article was published September 1986 and constitutes § 102(b) prior art against the '988, '528 and '366 patents.

| The '988 Patent | Higashiyama + Cactus Switch article |
|---|---|
| 6. The checkwriting point of sale system according to claim 1 wherein the central computer system further comprises a system subscriber database, the system subscriber database comprising | The central computer of Higashiyama serves one or more POS terminals of a single merchant. The Cactus Switch network serves multiple merchants and the transaction is cleared through the Arizona Clearing House Association. It would have been obvious to |

10

| information regarding merchants and service providers that are authorized to use the checkwriting point of sale system. | modify Higashiyama's POS system to service multiple merchants (e.g., multiple merchants belonging to the same retail chain) such that its central computer comprises a system subscriber database so that proper accounting of sales and credits can be made. |
| --- | --- |

Claim 13 of the '988 patent is further invalid as obvious under 35 U.S.C. § 103 over Higashiyama in view of another article about the Cactus Switch ("second Cactus Switch article"). The second Cactus Switch article was published on November 17, 1986 and constitutes § 102(b) prior art against the '988, '528 and '366 patents.

| The '988 Patent | Higashiyama + second Cactus Switch article |
| --- | --- |
| 13. The checkwriting point of sale system according to claim 4, wherein the sales slip includes means for execution by the consumer for proof of bank account access authorization. | The second Cactus Switch article teaches that checking account debit authorizations may be provided by personal identification numbers or signatures. (*See* p. 4.)  In view of this teaching, it would have been obvious to modify Higashiyama's POS system to include a sales receipt with a signature space for the consumer to provide authorization to debit his or her checking account. |

Claim 8 of the '988 patent is obvious under 35 U.S.C. § 103 as unpatentable over Higashiyama in view of U.S. Patent No. 4,321,672 to Braun ("Braun").

| The '988 Patent | Higashiyama + Braun[1] |
| --- | --- |
| 8. A checkwriting point of sale process comprising: | A method for processing checks presented at the point of sale.  (*See* col. 2, lines 43-46; col. 3, lines 11-14.) |
| a) presenting any bank check specimen to a point of sale terminal located at a merchant or | Customer provides a check to the merchant. (*See* col. 3, lines 47-48.) |

[1] Unless otherwise noted, citations are to Higashiyama.

11

| | |
|---|---|
| service provider, | |
| b) reading the magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument, | MICR reader 202 reads the account information on the check. (*See* col. 3, lines 48-50.) |
| c) storing the consumer bank account information obtained from the check and verifying that account numbers were accurately read at the point of sale terminal, | Data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201, i.e., stored at the POS terminal 201. (*See* col. 3, lines 55-62; col. 5, lines 1-4.) The step of verifying is made obvious in view of Braun, which teaches use of error detector circuits 52 which identify errors in the ABA code from the reader 38. (*See* Braun, col. 7, lines 31-33; col. 19, lines 46-49.) |
| d) providing transaction event information to the point of sale terminal, | The amount the check is written for is provided by the merchant via the POS keypad. (*See* col. 3, lines 64-66.) |
| e) transmitting the transaction event information and consumer bank account information to a central computer system, | POS terminal 201 sends the data record to the backroom processor 204. (*See* col. 5, lines 1-10.) |
| f) storing the transaction event information and consumer banking account information, and | Backroom processor 204 accumulates the data records that it receives. (*See* col. 5, lines 11-12.) |
| g) subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations. | The data records are batch uploaded to a clearing house. (*See* col. 5, lines 11-13.) |

Claims 1, 8 and 9, and the asserted claims of the '988 patent which depend from

claims 1, 8 and 9 are further invalid under 35 U.S.C. § 112, first paragraph, because the

original disclosure failed to provide sufficient written description for claim language

12

subsequently added in a June 1994 Office Action response.  Further, the subsequent

addition to the written description constituted new matter, in violation of 35 U.S.C. §

132.

　　Claims 1-6, 9-11 and 13 are further invalid under 35 U.S.C. § 112, first paragraph,

for failure to provide in the patent specification an enabling disclosure for a second

communication means "enabling automated clearing house communications for

transferring funds without using the bank check as a negotiable instrument."

　　Claim 8 is further invalid under 35 U.S.C. § 112, first paragraph, for failure to

provide in the patent specification an enabling disclosure for a checkwriting point of sale

process comprising the step of "reading the magnetic ink character recognition number

information on the check for the sole purpose of obtaining consumer bank account

information, without using the check as a negotiable instrument."

　　Claims 1-6, 9-11 and 13 are further invalid under 35 U.S.C. § 112, second

paragraph, because they recite means-plus-function claims without describing a

corresponding structure for such means in the specification as required under 35 U.S.C. §

112, sixth paragraph.

2.　　The '528 Patent

　　Claim 10 and asserted claim 11 of the '528 patent are obvious under 35 U.S.C. §

103 as unpatentable over Higashiyama in view of Braun.

| The '528 Patent | Higashiyama + Braun[2] |
|---|---|
| 10. A checkwriting point of sale process comprising: | A method for processing checks presented at the point of sale.  (*See* col. 2, lines 43-46; col. 3, lines 11-14.) |
| (a) presenting a bank check specimen to a point of sale terminal located at a merchant or service | Customer provides a check to the merchant.  (*See* col. 3, lines 47-48.) |

[2] Unless otherwise noted, citations are to Higashiyama.

13

| | |
|---|---|
| provider; | |
| (b) reading a magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument; | MICR reader 202 reads the account information on the check. *(See* col. 3, lines 48-50.) |
| (c) storing the consumer bank account information obtained from the check and verifying that account numbers were accurately read at the point of sale terminal; | Data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201, i.e., stored at the POS terminal 201. *(See* col. 3, lines 55-62; col. 5, lines 1-4.) The step of verifying is made obvious in view of Braun, which teaches use of error detector circuits 52 which identify errors in the ABA code from the reader 38. *(See* Braun, col. 7, lines 31-33; col. 19, lines 46-49.) |
| (d) providing transaction event information to the point of sale terminal; | The amount the check is written for is provided by the merchant via the POS keypad. *(See* col. 3, lines 64-66.) |
| (e) transmitting the transaction event information and consumer bank account information to a central computer system; | POS terminal 201 sends the data record to the backroom processor 204. *(See* col. 5, lines 1-10.) |
| (f) storing the transaction event information and consumer banking account information; | Backroom processor 204 accumulates the data records that it receives. *(See* col. 5, lines 11-12.) |
| (g) subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations; and | The data records are batch uploaded to a clearing house. *(See* col. 5, lines 11-13.) |
| (h) returning the bank check specimen to the consumer. | Check is returned to the customer for safekeeping. *(See* col. 4, lines 54-55.) |
| 11. The checkwriting point of sale process of claim 10 further comprising: annotating the bank check specimen before returning the bank check specimen to the | Validation information, indicating that electronic data pertaining to the check has been routed for collection and the check may be considered canceled, is printed on the check. *(See* col. 4, lines 26-32.) The |

14

| consumer. | validated check is returned to the customer. (*See* col. 4, lines 54-55.) |

Claims 11 and 18 of the '528 are invalid under 35 U.S.C. § 112, first paragraph, because the original disclosure failed to provide sufficient written description for a checkwriting point of sale process comprising the step of "reading the magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument."

All Asserted Claims of the '528 are further invalid under 35 U.S.C. § 102(b) based on both the public use bar and the on-sale bar.

### 3.    The '366 Patent

Claim 24 and asserted claim 25 of the '366 patent are invalid under 35 U.S.C. § 103 as unpatentable over a Sacramento Bee article published on November 7, 1995 ("the Sacramento Bee article") in view of Braun or Carlson.

| The '366 Patent | Sacramento Bee Article + Braun/Carlson[3] |
|---|---|
| 24. A checkwriting point of sale process comprising: | Process is referred to as point-of-sale electronic draft capture. (*See* ¶¶ 3, 10.) |
| a payer completing a check for a transaction with a merchant or service provider; | A number of prior art references, including Braun (col. 24, lines 61- 66) and Carlson (col. 22, lines 57-58), teaches a point-of-sale process that includes the step of completing the check, followed by its cancellation and return to the payer. It would have been obvious to include a step of completing the check with the method of the Sacramento Bee Article. For example, Braun teaches that upon receipt of the monthly statement, the customer can verify the accuracy of the monthly statement using the cancelled checks. (*See* Carlson col. 26, lines 58- 62.) |

[3] Unless otherwise noted, citations are to the Sacramento Bee article.

15

| | |
|---|---|
| using a point of sale terminal associated with said merchant or service provider to read MICR information on the check to obtain payer bank account information; | The automated system reads the check (account) number and checks the status of the account. (*See* ¶ 10.) |
| inputting transaction information, including at least a transaction amount, into the point of sale terminal; | If the customer's account is in good standing and covers the amount of the purchase, the system authorizes an approval. (*See* ¶ 11.) The purchase amount, which corresponds to transaction event information, had to have been entered. |
| printing an authorization to debit the payer bank account by the transaction amount for the payer to sign; | The system prints out a statement similar to those consumers sign for credit card purchases. (*See* ¶ 11.) |
| the payer signing the authorization; | The customer signs the statement. (*See* ¶ 11.) |
| returning a copy of the signed authorization and the check to the payer; and | The statement is similar to those used for credit card purchases, so a copy of the statement is returned to the customer. (*See* ¶ 11.) The same check may be used over and over again, so the check is also returned to the customer. (*See* ¶ 1.) |
| electronically debiting said payer bank account by said transaction amount based on the signed authorization, without using the check as a negotiable instrument. | Each transaction is electronically debited from the customer's checking account within 24 to 48 hours. (*See* ¶ 12.) Further, the information from the paper check is electronically processed, and the check is returned to the customer at the point of sale. |
| 25. The checkwriting point of sale process of claim 24, further comprising voiding the completed check prior to returning it to the payer. | Carlson teaches cancellation (voiding) of the check prior to returning it to the customer. (*See* Carlson col. 24, lines 58- 60.) |

Claims 24 and 25 of the '366 patent are further invalid under 35 U.S.C. § 103 as unpatentable over a report authored by Robert Ballen ("the Ballen Report") in view of Higashiyama or Carlson. The Ballen Report was distributed to members of the

16

Electronic Check Council ("ECC") during a meeting on August 3, 1995. ECC members, totaling about 95 in number, represented banks, retailers, remittance processors, and other service providers in the field of check processing. The Ballen Report is § 102(b) prior art against the '528 and '366 patents as a publication, because (i) it was made available without any confidentiality obligations or restrictions as to further distribution, and (ii) it was distributed to the those skilled in the relevant technical field, namely the field of electronic check processing.

The Ballen Report expressly teaches that, in a paper-initiated electronic funds transfer ("PI-EFT"), the amount and the date may or may not be indicated on the check and the payer may or may not sign the check, but that the check merely serves as a source of information to initiate an EFT processed through the ACH. The Ballen Report, in combination with the Sacramento Bee article renders claims 24 and 25 of the '366 invalid.

| The '366 Patent | Ballen Report + Sacramento Bee Article[4] |
|---|---|
| 24. A checkwriting point of sale process comprising: | PI-EFT refers to a model whereby the payer initiates an EFT debit to the payer's account by providing the payee with a check which prescribes the payer's account number and the payer's bank's routing number. (*See* § II.A.l.) |
| a payer completing a check for a transaction with a merchant or service provider; | The payer may sign the check. (*See* § II.A.I.) |
| using a point of sale terminal associated with said merchant or service provider to read MICR information on the check to obtain payer bank account information; | The Ballen Report suggests use of the electronic terminal. § III.D. The Sacramento Bee Article teaches use of an automated system to read the check (account) number and check the status of the account. (See ¶ 11.) It would have been obvious to utilize the automated terminal of the Sacramento Bee article with the system of the Ballen Report for speed and accuracy. |

[4] Unless otherwise noted, citations are to the Ballen Report.

17

| | |
|---|---|
| inputting transaction information, including at least a transaction amount, into the point of sale terminal; | When an electronic terminal is used for PI-EFT, it is inherent that a transaction amount is inputted into the electronic terminal. |
| printing an authorization to debit the payer bank account by the transaction amount for the payer to sign; | The Ballen Report teaches that a written authorization from the payer is required for the payee to initiate an electronic debit. (*See* § III.B.1.) |
| the payer signing the authorization; | In circumstances where the authorization is printed out for the payer, the payer may sign the authorization. (*See* § III.B.2.) |
| returning a copy of the signed authorization and the check to the payer; and | A copy of the authorization may be provided to the customer. (*See* § III.B.2.) |
| Electronically debiting said payer bank account by said transaction amount based on the signed authorization, without using the check as a negotiable instrument. | In PI-EFT, the check serves as a source of information to initiate an EFT. (*See* § II.A.1.) The payer may provide a blank or partially completed check to initiate the EFT. (*See* § III.4.) |

Claim 3 of the '366 patent is invalid under 35 U.S.C. § 112, second paragraph, because it recites a means-plus-function claim without describing a corresponding structure for such means in the specification as required under 35 U.S.C. § 112, sixth paragraph.

Claim 25 of the '366 patent is further invalid under 35 U.S.C. § 112, first paragraph, because the original disclosure failed to provide sufficient written description support for a checkwriting point of sale process comprising the step of "electronically debiting, . . . without using the check as a negotiable instrument."

All Asserted Claims of the '366 are further invalid under 35 U.S.C. § 102(b) based on both the public use bar and the on-sale bar.

### 4. All Patents-in-Suit

18

All Asserted Claims of the '988, '528 and '366 patents are invalid under 35 U.S.C. § 102(f) and/or § 116 because of improper inventorship.

All Asserted Claims of the patents-in-suit are invalid under the second paragraph of 35 U.S.C. § 112 because the claims either recite, or depend from a claim that recites the negative limitation "without using the check [or bank check] as a negotiable instrument," rendering the claims indefinite.

All Asserted Claims of the patents-in-suit are invalid under the second paragraph of 35 U.S.C. § 112 because the term "negotiable instrument" is a legal term subject to various interpretations, including various interpretations under state law and/or the UCC, and therefore ambiguous.

TeleCheck's investigation into its defenses is continuing, and it reserves the right to supplement these defenses and/or assert additional invalidity defenses as discovery progresses.

Dated: January 28, 2005

FISH & RICHARDSON P.C.

By: _____
William J. Marsden, Jr. (#2247)
Timothy Devlin (#4241)
Tara D. Elliott (#4483)
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE 19899-1114
(302) 652-5070

*Attorneys for Defendant*
*TeleCheck Services, Inc.*

19

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of February, 2005, a true and correct copy of

**TELECHECK'S FIRST SUPPLEMENTAL RESPONSE TO LML'S AMENDED**

**FIRST SET OF INTERROGATORIES** was caused to be served on the attorneys of

record at the following addresses as indicated:

**BY HAND DELIVERY**
Richard K. Herrmann, Esq.
Mary B. Matterer, Esq.
Blank Rome LLP
1201 North Market Street, Suite 800
Wilmington, DE 19801-4226

**BY EMAIL AND FIRST CLASS MAIL**
Robert Jacobs, Esq.
Belasco Jacobs & Townsley, LLP
Howard Hughes Center
6100 Center Drive, Suite 630
Los Angeles, CA 90045

**BY HAND DELIVERY**
Richard D. Kirk, Esq.
Morris, James Hitchens & Williams LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19899

**BY EMAIL AND FIRST CLASS MAIL**
Russell E. Levine, Esq.
Kirkland & Ellis LLP
200 E. Randolph Dr.
Chicago, IL 60601

**BY HAND DELIVERY**
collins J. Seitz, Jr., Esq.
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19801

**BY EMAIL AND FIRST CLASS MAIL**
Mark C. Scarsi, Esq.
O'Melveny & Myers LLP
400 S Hope Street
Los Angeles, CA 90071

80022436.doc

_____
Tara D. Elliott

2