# EXHIBIT 6
# REDACTED IN ITS ENTIRETY

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LML PATENT CORP. | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.    04-858-SLR |
| vs. | ) | |
| | ) | Judge Sue L. Robinson |
| TELECHECK SERVICES, INC. | ) | |
| ELECTRONIC CLEARING HOUSE, | ) | |
| INC., XPRESSCHEX, INC., AND | ) | |
| NOVA INFORMATION SYSTEMS, INC. | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

DECLARATION OF GARY TINKEL IN SUPPORT OF LML'S MOTION FOR
SUMMARY JUDGMENT NO. 5:  FOR A RULING THAT
CLAIMS 1, 2, 4, 5, 6, 9, 10, 11, 14, 16 AND 18 OF THE '988 PATENT
ARE NOT INVALID UNDER 35 U.S.C. §§ 112 AND 132

I, Gary Tinkel, declare as follows:

1. My name is Gary Tinkel and I am president of HilBren Consulting Services. The facts set forth below are known to me personally and I could competently testify hereto if called as a witness in this action.

2. I have a Bachelor of Science Degree in Electrical Engineering from Polytechnic Institute of Brooklyn and a Masters of Science Degree in Operations Research from Polytechnic Institute of Brooklyn. I also attended finance courses towards an MBA in Finance at New York University from 1975 through 1978 towards a MBA in Finance. I have been retained as an expert in this case by LML Patent Corp. ("LML").

## I.     EXPERT QUALIFICATIONS

3. I am the president of HilBren Consulting Services, a software consulting firm headquartered in North Brunswick, New Jersey, and have worked in that capacity since 1988. In that capacity, I have, and continue to, consult for banks, brokerage firms and the federal government, including the Department of Defense, in designing and programming financial systems. This includes payment and check processing systems, direct deposit, and electronic funds transfer ("EFT") systems and most commercial banking applications.

4. As my curriculum vitae (attached at Tab A) details, I have extensive experience in electronic payment processing, including check processing systems and electronic funds transfer systems. For instance, I received a B.S. in Electrical Engineering from Polytechnic Institute of Brooklyn in 1970. I also received an M.S. in Operations Research from Polytechnic Institute of Brooklyn in 1973. I also attended finance courses towards an MBA in Finance at New York University from 1975 through 1978 towards a MBA in Finance. I have also attended many seminars and training classes which included such topics as foreign exchange and money

transfer, database design (ORACLE, Sybase,  SQL Server, Access, and others), operating systems, programming languages (C, COBOL, FORTRAN, Visual Basic, SQL) and various design courses.

5.  In addition, from 1974 to 1977, I was employed as the project leader for systems and programming for the Federal Reserve Bank, New York Branch where my responsibilities included supporting and maintaining the Federal Reserve Reporting and Discount Loan Rate system  including supporting an on-line data transmission to other Federal Reserve Banks. While there, I acquired in-depth knowledge of the Federal Banking system and the operations of the Federal Reserve.  From 1977 to 1984, I was manager of systems and programming for various New York City banks including CitiBank and Chemical Bank where I worked on payment processing, electronic fund transfers (EFT), foreign exchange and accounting systems.  From 1984 to 1987, I was the manager of the Financial Products Development and Support Group for General Automation, a computer manufacturer where I designed and programmed EFT payment systems using the Society of Worldwide Interbank Financial Telecommunications (SWIFT) network and the New York Clearing House (CHIPS) network.

6.  Additionally, I have been a member of the Independent Computer Consultants Association (ICCA) for the past sixteen years.  I have served the ICCA in various capacities, including president of the New Jersey Chapter, director, and treasurer.  I have also designed, programmed and maintained databases for various clients using such packages as Oracle, Sybase ASA, and Access.

7.  I believe my extensive experience in electronic payment processing, including check processing systems and electronic funds transfer systems, qualify me to render an accurate

technical opinion regarding the technical issues in the pending litigation between LML and TeleCheck, ECHO, and Nova.

8.  A list of cases in which I have provided expert testimony is attached also at Tab A. For my work as an expert in this case, I am being compensated at a rate of $ 125 per hour.  My compensation does not depend upon the outcome of this litigation, the opinions I express, or my testimony.

## II.    MATERIALS REVIEWED IN FORMULATING OPINIONS

9.  In formulating my opinions, I considered and relied upon the claims and the specification of the '988 patent; my analysis of the complete file histories of the '988 patent; the parties' interrogatory responses; deposition testimony of numerous LML, TeleCheck, ECHO, and Nova personnel, as well as third parties; documents produced by LML, the Defendants, and third parties during this litigation; the Expert Report of David P. Kurrasch Regarding Invalidity; the Supplemental Expert Report of David P. Kurrasch Regarding Invalidity; all of the documents cited to in both the Expert Report of David P. Kurrasch Regarding Invalidity and the Supplemental Expert Report of David P. Kurrasch Regarding Invalidity; and my extensive experience in electronic payment processing, including check processing systems and electronic funds transfer systems.

## III.    LEVEL OF ORDINARY SKILL IN THE ART

10. It is my opinion, based upon my years of experience in the electronic payment and computer systems industries and research that I have done in connection with this case, a person of ordinary skill in the art with respect to the patent-in-suit would have a high school education plus one to three years of experience or equivalent training in the electronic payment industry and some experience or training in computer systems.

- 3 -

11. Thus, in my opinion, and based on my experience in the industry, one of ordinary skill in the art of the electronic payment industry would have a high school education plus one to three years of experience or equivalent training in the electronic payment industry and some experience or training in computer systems.

## IV.    WRITTEN DESCRIPTION REQUIREMENT OF § 112/NEW MATTER PROHIBITION OF § 132

12. It is my understanding that the first paragraph of 35 U.S.C. § 112 requires that a patent specification support the recited claims and that a patent can be found invalid if the party asserting invalidity proves that the patent specification does not contain "a written description of the invention" including all of the claimed elements.  It is also my understanding that 35 U.S.C. § 132 prohibits the introduction of new matter into the disclosure of the invention and that this means any material added by amendment after the initial filing of a patent must be contained in the original disclosure and cannot be used as a basis for support of the claims.

13. I understand that the claim element "without using the [bank] check as a negotiable instrument was not part of the original claims but was added to the claims as part of the June 8, 1994 Preliminary Amendment.  After reviewing the specification and prosecution history for the '988 patent, I conclude that the addition of this element to the claims does not violate the written description requirement of § 112.  I believe the specification in the original disclosure fully supports this claim element.

14. It is my understanding that the claim limitation "without using the [bank] check as a negotiable instrument" was added to the claims as part of the June 8, 1994 Preliminary Amendment to overcome prior art that did use the checks as "negotiable instruments."  While it this element was specifically added to the claims later, I believe that the specification *always*

- 4 -

disclosed a system that avoided the use of checks as negotiable instruments and instead used them as source documents which was the object of the invention.

15. It was clear to me from the original disclosure that the "without using the [bank] check as a negotiable instrument" element was one of the most significant aspects of the patented invention. For example, the specification in the original disclosure (Ex. 8 at LML-EP 000081-103) includes the following:

- "The invention eliminates the need for paper checks with all bank reconciliation being accomplished electronically." "Abstract" at 14-15.

- "whereby a check is used as the basic source of identification of the individual and of the individual's bank and whereby the bank account is debited." 1:6-7

- "Each sale or 'Transaction Event' would be an electronic and 'paperless' event thereby eliminating the reliance on accepting and processing commercial bank drafts (personal or corporate checks) and the physical handling of those bank drafts thus replacing commercial bank drafts at the point-of-sale." 3:27-4:5.

- "It is the objective of the present invention to automate the point-of-sale environment for processing consumer purchases of goods and services which, other than for the system of the present invention, would necessitate the more traditional acceptance and processing of commercial bank drafts (personal and/or corporate checks)." 5:4-9.

- "It is a further objective of the present invention to eliminate the need for 'paper' checks as an accepted means of consumer payment. In the place of personal and business checks, consumers would be provided free and unrestricted access to funds secured in bank accounts of various types by means of preauthorized electronic events. System subscribers electronically communicate with the data center of the present invention for individual Transaction Event authorizations which, upon reconciliation of a day's activity, result in an EFT by means of the Automated Clearing House accommodating an 'Off-Line' debiting of preauthorized consumer Transaction Events from authorized accounts." 5:14-25.

- Check Replacement: an electronic slip is created at the point of sale that authorizes electronic accessing of funds through the ACH "in lieu of the more traditional method of issuing personal and business checks. Funding settlement to the system subscriber would be effectuated by means of Electronic Funds Transfer via ACH or the Federal Reserve System as opposed to physically processing and transferring checks among banks." 6:15-26.

- The transaction begins by taking an "electronic recording of consumer information" using a POS terminal by using a card or inputting bank account numbers. Then a transaction slip is printed to allow the consumer to authorize the transfer of funds. 8:6-22 and 8:26-9:4.

- The POS terminal has "magnetic stripe reading capabilities,...a MICR check reader, optical character recognition equipment, or other device." 9:16-23.

- "The system subscriber then enters the appropriate MICR number either manually or by passing the check through a check reader which determines the MICR number 112." 14:14-16.

- Talks about returning check and having the consumer sign the receipt. "Once the transaction is approved, the central computer captures the MICR information and the sale amount and stores that information 146." 14-15 and 15:23-25.

- Pg. 17 discusses how Check Authorization specifically occurs.

- Pg. 18-19 discusses how Check Replacement occurs. "The total of daily, approved Transaction Events are 'checkless' sales whereby the service subscriber merchant has submitted requests for electronic ACH settlement for all preauthorized consumer purchases. No commercial bank note ("Paper Check") is accepted or processed by the service subscriber. In each Transaction Event, a Consumer, at the point-of-sale, has executed an electronic access ("Off-Line Debit") authority "Sales Slip" which is automatically printed upon a terminal's receipt of an "Approved" notice. All terminal programming and all prompt strings for MICR Check Reader interfacing are stored in the POS terminal and the computer center of the present invention controls interactions between the plurality of terminals and the central system. " 19:2-14.

- Pg. 19 describes the exact process for the consumer at the POS terminal.

- "It is important to note that account information may be entered manually as well at the point of sale with the other financial advantages of the present invention still in effect." 20:16-19.

- Summary "A flexible purchase transaction system is described which precisely fits within existing ACH procedures for checking account events for processing of pre-authorized electronic debits as a replacement for commercial bank drafts (paper checks). The main advantage to the proposed invention is the fact that a truly paperless transaction may occur." Pg. 22:7-12.

I believe these places in the specification show that the patent was designed to do away with the traditional paper system where the merchant accepts and processes the paper check  and was designed instead to use the paper check as a source of consumer bank account information for a

- 6 -

subsequent electronic funds transfer. I believe the applicants described how this was done at great length.

16. I believe that the original disclosure for the '988 patent clearly describes the subject matter of the "without using the [bank] check as a negotiable instrument" element and that one of ordinary skill would have understood from the original disclosure what was meant by that phrase.

17. It appears, based on my review of the specification that the changes made as part of the June 8, 1994 Preliminary Amendment were only to more distinctly point out the invention by describing additional potential prior art and problems with existing systems, and not to add new matter. I do not believe that any of the amendments to claims or the specification constituted "new matter' under § 132.

V.    ENABLEMENT REQUIREMENT OF § 112

18. It is my understanding that the first paragraph of 35 U.S.C. § 112 also requires that the patent specification, when it is filed, teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation and that, as with other invalidity defenses, a party must prove a patent invalid for lack of enablement by clear and convincing evidence.

19. I have reviewed the claims and specifications of the '988 patent and believe that there is an enabling disclosure for the claim limitations of reading information from "any bank check" or "any consumer bank check" as well as for conducting transactions using business checks or foreign bank checks.

20. I believe that Mr. Kurrasch is misinterpreting the "reading information from any [consumer] bank check" limitation in claims when he argues that they are invalid because there

is no enabling disclosure for *conducting transactions* using business or foreign bank checks. I believe that *receiving* or *reading information* from any bank check is a completely different limitation than *conducting transactions* using any bank check. Furthermore, I believe that *receiving* and *reading* are two different terms with distinct meanings and should not be treated interchangeably.

21. The specification is clear that any bank check containing bank account information, be it a foreign check or a business check, can be read into the point of sale terminal either manually via a keyboard or automatically via a check (MICR) reader. (Ex. 1, '988 patent, col. 6, lns. 61-67, col. 9, lns. 9-16) I believe these disclosures are sufficient to teach one of ordinary skill how to read information from any bank check or any consumer bank check. Although Mr. Kurrasch did not specifically mention the limitation of *receiving* information from any bank check (recited in independent claim 1), I also believe the same disclosures in the specifications can be used to show that this limitation is enabled and that the specifications of the '988 Patents teach one of ordinary skill how a point of sale terminal receives information from any bank check.

22. Mr. Kurrasch's does not explain how his argument that there is no enabling disclosure for *conducting transactions* using foreign or business checks is relevant to the "reading information from any bank check or consumer bank check" limitation. However, I believe that the specification of the '988 Patent teaches one of ordinary skill to conduct the claimed transactions using business checks and/or foreign checks. Technical and regulatory issues, such as currency translation, would have no impact on any of the asserted claims of the '988 patent. As shown above, the bank account information from foreign checks and business checks can be read and/or received into a point of sale terminal and I do not believe there are any "regulatory"

- 8 -

or "technical" issues (including currency translation) arising from foreign or business checks that would require any further disclosure in order for one of ordinary skill to practice the invention.

## VI.    DEFINITENESS REQUIREMENT OF § 112

23. It is my understanding that whether a claim is invalid for indefiniteness under the second paragraph of 35 U.S.C. § 112 depends on whether those skilled in the art would understand what is claimed, or the scope or bounds of the claim, when it is read in light of the specification. If one skilled in the art would understand the bounds of the claim when read in light of the specification, then the claim satisfies the definiteness requirement of 35 U.S.C. § 112. I further understand that a claim is not indefinite merely because it poses a difficult issue of claim construction and that a claim will only be held indefinite if reasonable efforts at claim construction prove futile.

24. I believe that the meaning of the limitation "without using the [bank] check as a negotiable instrument" was certain at the time of the invention and is definite enough that one of ordinary skill would understand what is claimed when read in light of the specification.

25. Having reviewed the specification and prosecution history of the '988 Patent, I believe that the limitation "without using the check [bank check] as a negotiable instrument" is one of the most significant aspects of the invention and that its meaning, that the paper check is neither accepted nor processed as a form of payment, but instead used as a source document, is clear from the specification. In addition to the references that I cited above to show that the "without using the check as a negotiable instrument" limitation was supported by the specification in the original disclosure, the following references from the specification also show that the meaning of this limitation was not indefinite.

- "Further, some of the currently used systems described above require the use of a bank check as a negotiable instrument which must be surrendered to a merchant. Some of the

- 9 -

- systems do away with the use of a bank check altogether, but require a debit card or a specialized draft instrument to be used only with the particular system. None of these systems completely does away with the need and use for a negotiable draft instrument while using the consumer's bank check for identification and verification only. It is therefore an objective of the present invention to provide such a system." (Ex. 1, '988 patent at 2:47-57).

- "A further objective of the present invention is to significantly reduce the use of checks as negotiable instruments in effecting the purchases of goods or services and to further reduce the consumers reliance on credit cards or cash for the transaction events. (*Id.* at 4:59-63).

1. Mr. Kurrasch argues that the claims reciting the "without using the check as a negotiable instrument" limitation are ambiguous and indefinite because the phrase would have been subject to various interpretations imposed by laws and regulations. (Ex. 7; Kurrasch Report at ¶ 373). This is not true. In the first place, Mr. Kurrasch does not provide any specifics as to how these various interpretations would have rendered the claims ambiguous and indefinite, particularly in light of the detailed explanation as to the meaning of the limitation in the specification. Additionally, based on my understanding of the various laws and regulations in place at the time of the invention, the limitation, as used in the claims, did not contradict the way the limitation was being used by any other source and so would not have been rendered indefinite. I would also note that subsequent regulations relating to electronic checking are also consistent with the meaning of this limitation, reinforcing my belief that the claims containing this limitation are not indefinite. Also, the patent discloses what is meant by the phrase as I discussed in relation to Mr. Kurrasch's new matter arguments above.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 27 day of October, 2005.

Gary Tinkel
Hilbren Consulting Services, Inc.

# TAB A

**Gary L. Tinkel**

President, HilBren Consulting Services Inc.
8 Poplar Avenue
North Brunswick, NJ 08902
Phone/Fax: (732) 545-7913
Cell: (908) 705-2648
E-Mail: gtinkel@hilbren.com

## Areas of Expertise

Consulting to various Federal agencies in the area of automated Travel Reimbursement Systems, Accounting applications, Payroll and payment/disbursing processing. Experience includes designing systems calculating and apply Government regulations, automate office procedures, track outstanding funds and agency hardware procurement.

Expert Consultant/Witness in Computer based Financial, Brokerage, Banking and Accounting systems. Proficiencies include fraud, systems tampering, false product claims, financial systems modeling, litigation support and copyright infringement.

Wholesale Banking applications, specializing in Foreign Exchange, Loans and Deposits, CD, Eurodollar and Precious Metals Trading, Funds Transfer and Accounting Support systems. This also includes the design and programming of trading simulation systems and evaluation and recommendation of commercial products.

Project management and systems design for networked minicomputer and PC based systems including Feasibility, design, Network selection, Database design and installation and implementation.

Design of Brokerage Trading systems which included Block Trading, Corporate and Municipal Bonds, OTC Trading, Precious Metals and Financial Futures. Additional expertise in payment processing systems including Electronic Funds Transfer and check processing.

## Education

B.S. in Electrical Engineering from Polytechnic Institute of Brooklyn, 1970

M.S. in Operations Research from Polytechnic Institute of Brooklyn, 1973

MBA program in Finance, New York University

Thirty Five years of experience in the Finance and Data Processing field, the past twenty as President of HilBren Consulting Services.

Various seminars and college level courses in the computer, networking and International Finance fields.

Accomplishments

Expert Consultant in Patent Infringement matter between two software firms. Work involved deconstructing a Financial Software package to determine if and how it infringed on existing patents and reporting on findings.

Expert Consultant/Witness in Computer based Commodities Trading fraud case.  Work product included reconstruction of Commodities trades, computer modeling of Plaintiff's trading system for damage analysis and possible fraud. Additional support work included analyzing algorithms contained within a computer system for validity and the proper use of data, the resulting in a re-constructed computer model to calculate alternate damage analysis. Testified in court and at Arbitration hearing.

Expert Consultant/Witness in computer software copyright infringement suit involving specialized financial software. Involvement included study of system software and hardware, commercial applicability of the product based on industry study and an overall product design analysis. Testified at Arbitration hearing

Expert Consultant in a fraudulent computer system design, hardware selection and installation. Matter involved study of clients' document work flow and volume, presentation of data and data retrieval. Additional duties included program code analysis, study of the causes of errors within the system and problems due to incorrect system specifications and user error

Designed, implemented and supported various Foreign Exchange Trading and Accounting systems, Commercial Loans and Deposits Trading systems (which included Letters of Credit, Euro-Dollars and CD'S), Precious Metals trading systems and Financial Futures trading systems. Responsibilities included Trader support, automated funds transfer and trade simulation sub-systems (developed internally or enhanced from commercially available packages), generating and implementing test plans and interface with back office operations staff and management.

Designed and implemented several Automated Funds & Message Transfer systems for a major Money Center banks as well as a software development company.

Designed an Automated Funds & Message Transfer system including SWIFT and FEDWIRE interfaces.

Supported and maintained Federal Reserve Reporting & Discount Loan Rate system including supporting an on-line data transmission to other Federal Reserve Banks. Retained in-depth knowledge of the Federal Banking system and the operations of the Federal Reserve.

Financial Systems product manager for a major mini-computer vendor. Responsibilities included commercial Banking and Brokerage systems design, sales support and hardware installation.

Consultant to several money center and foreign banks in the area of PC and Mainframe based Foreign Exchange and Precious Metals Trading systems.

Designed, programmed and supported a PC based inventory posting and reporting system for a Human Tissue Bank company.

Supported and maintained a PC based system for a major Blood Plasma Distributing company.

Designed an Automated Funds & Message Transfer system including SWIFT and FEDWIRE interfaces.

Expert Consultant to a Plastics Manufacturing company in the area of computer loss insurance litigation

Design, Installation & Support of a PC Network based Travel Reimbursement, Tracking and History system. System software which included interfaces with other Government accounting, payroll and disbursing systems. Responsibilities also included knowledge of Federal Government Contract bidding and procurement. This system is currently in use in all branches of the US Military, DFAS, DLA, HUD,

the Coast Guard and other agencies.

<u>Professional History</u>

Principal - HilBren Consulting Services Financial & Banking EDP consulting company.
Clients includes various Department of Defense and Federal Agencies, five major NYC Commercial
Banks, several major NYC Law firms, Investment Banking Companies, National Brokerage
firms and other commercial corporations.

Manager, Financial Products Development and Support Group - Major Minicomputer manufacturer.
Responsibilities included Product design and development of Financial products, staff and budgetary
responsibility and sales support.

Project Manager – New products development department at Dean Witter, Reynolds & Co.
Responsibilities included research and design of an online Block Trading system for volume stock trades.

Manager, Systems and Programming – Foreign Exchange and Loans & Deposits departments in several
major NYC banks. Duties also included trader support and data center manager.

Project Leader, Systems and Programming - Reserve Banking & Foreign Exchange departments for the
Federal Reserve Bank.

Engineering Project Manager - Programming, design and installation analysis for a major
telecommunications corporation.

<u>Hardware and Software Expertise</u>

Intel Based PC Based systems
Digital Equipment Corporation PDP 11/30, 11/45, 11/70, VAX
IBM 1140, 360 370 43xx series
PC Networking including Novell Netware and Windows NT/2000/XP

Operating Systems: OS, MVS, VM, RSTS-E, RSX-11, VMS, IAS, CP/M MS-DOS &
Windows 95/98/NT/2000/XP and others.

Languages: Basic, Visual Basic, VB.NET, ASP.NET, COBOL, FORTRAN, PL-1, C, C++, SQL.

Software: Written applications using ORACLE , SQL Server, Access, Sybase relational database
systems, Clipper, Paradox, Btrieve, and Excel.
Working knowledge of other like software packages.

<u>Professional Associations & Education</u>

Treasurer and former President of the Northern New Jersey chapter of the Independent Computer
Consultants Association. Member for 18 years.

Database Administrators certificates for Novell NetWare, Sybase SQL Anywhere and Oracle 7 & 8
systems.

Certified Btrieve Applications Consultant.

Former member IEEE

Litigation Experience

*5/1/05 – Present: Logicom, et.al v. W.P.Stewart & Co.Et.al.*
Expert consultant services relating to copyright infringement for a computer based Trading and Order Entry System. Work includes production of a Experts Report and follow up analysis.
Representing the Plaintiff. Case is ongoing

*6/1/04 – Present: Kirkland & Ellis, LLP*
Expert consultant services relating to a Patent Infringement issue for an Automated Check Clearing System. Work includes Patent research and analysis, program code analysis and discovery support and production of a Experts Report.
Representing the Plaintiff. Case is ongoing

*3/10/03 – Present: Gibbons, Del Deo, Dolan Griffinger & Vecchione*
Expert consultant service relating to Patent Infringement for an Automated Check Writing system. Work includes analysis of Patents with respect to operation, coding and design of competing software Packages and preparation of Experts Report. Representing the Plaintiff. Case is ongoing
Intell-A-Check v. AutoScribe , et al. Civil Action No: 01-4625

*7/13/01 – 12/31/01: Epstein Becker & Greene, P.C.*
Expert consultant services in a matter relating restraint of trade between a software company and brokerage firm. Work included technical analysis, document review and preparation of Experts report. Represented the Defendant. Case settled favorably.
InterVest Financial Services v. Bear Stearns Co.,et.al  E.D.Pa No.99-CV-5463

*8/25/00 – 11/01/00: Elliott, Reihner, Siedzikowski & Egan, P.C.*
Expert consulting services relating to dispute concerning breach of contract of a custom created software system. Represented the Defendant. Case settled favorably.
Palma, Lazar & Ulsh, LLP v. Paragon Systems Inc.  Civil Action 00-108

*4/23/00 – 2/10/01: Paul Johnson Park & Niles*
Expert consulting services relating to dispute concerning improper consulting services and project management.  Represented the Plaintiff. Case settled favorably.
Straub Clinic & Hospital , Inc. v. Peat Marwick, et al.  Civil No. 93-0646-02

*6/19/99 – 8/31/99: Dwyer Imanaka Schraff Kudo Meyer & Fujimoto*
Expert consultant services in dispute involving breach of services due to improperly designed custom financial software. Represented the Plaintiff. Case settled.
City Bank v. CFI ProServices Inc. Arbitration #99-0044-A

*8/13/97 – 11/17/97: Gadsby & Hannah LLP*
Expert consultant services in dispute involving custom software and off-the shelf banking software. Represented the Plaintiff. Case settled.
Ceska Sporitelna a.s.v. Unisys Corp.  C.A. 96-CV-4152

*12/1/94 – 6/31/96: Morrison Cohen Singer & Weinstein*
Expert consultant services in dispute involving software piracy, copyright violation and intellectual property theft. Work included production of an Experts Report. Testified at Deposition and Arbitration hearing.
Represented the Plaintiff. Case settled favorably.
Boyd et al. v. McMahan & Co.et al.  NASD Case 93-02114

*8/31/92 – 8/30/94: Morrison Cohen Singer & Weinstein*
Expert consultant services in dispute involving in financial loses due to systems changes and cash withdrawals. Involved in litigation support and production of an Experts Report. Testified at Arbitration hearing.
Represented the Defendant.  Case settled favorably.
Dunn New Funds v. McMahan & Co.  American Stock Exchange Arbitration Index No. 14819/92

*4/29/91- 8/30/92: Morrison Cohen Singer & Weinstein*

Expert consultant services in dispute involving in financial loses due to systems tampering and program modifications. Extensive litigation support involved. Court testimony in Florida and Arbitration hearing testimony in New York. Represented the Plaintiff. Case settled favorably.
McMahan & Co. v. Dunn et al American Stock Exchange Arbitration

*6/31/89 – 2/28/90: Cadwalader, Wickersham & Taft*

Expert consultant services in dispute involving in financial loses due to systems tampering and program modifications. Represented the Plaintiff. Change in venue. - McMahan & Co. v. Dunn et al.

# EXHIBIT 8

PATENT APPLICATION SERIAL NO. 07/975717

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE
FEE RECORD SHEET

060 MB 11/27/92 07975717                    1 201     395.00 CK

030042  12/15/92  07975717          01-2520  130  201      40.00CR

PTO-1556
(5/87)

CONFIDENTIAL

LML-EP 000079

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of Robert H. Hills and Henry R. Nichols

Serial No. NOV 13 1992

Filed:

FOR:  CHECKWRITING POINT OF SALE SYSTEM

Group Art Unit:

Examiner:

\*    \*    \*    \*    \*

Hon. Commissioner of Patent
    and Trademarks
Washington, D.C. 20231

Dear Sir:

    Enclosed please find the following:

1.    Declaration and Power of Attorney of Henry R. Nichols and Robert R. Hills (separate documents)

2.    Verified Statement Claiming Small Entity (Inventor) (separate documents)

3.    Specification, 9 Claims, and Abstract

4.    8 informal drawing sheets (11 figures)

5.    Submitted herewith is a check for $395.00 to cover the cost of the filing. Any deficiency or overpayment should be charged or credited to the Deposit Account of Arter & Hadden, No. 01-2520.

Respectfully submitted,

Jon L. Roberts
Registration No. 31,293
Arter & Hadden
1801 K Street, N.W.
Suite 400K
Washington, D.C. 20006

DATED:  November 13, 1992

CONFIDENTIAL

LML-EP 000080

08 /057390
995,717

1    ABSTRACT

2        A point of sale system designed to read information from a
3    consumer's check, credit card, or manual input with a subsequent
4    debiting of a consumer's account and crediting a merchant's account
5    for the goods or services provided.   Point of sale terminals are
6    designed to accept a form of credit card with a consumer's bank
7    account information encoded thereon or in the alternative to read
8    the MICR number from a consumer's check in order to verify that a
9    consumer has appropriate balance to conduct the transaction with a
10   given merchant.   Thereafter the transaction of that information is
11   transmitted to a central computer system which verifies the
12   consumer's credit worthiness and stores the transaction event
13   information for subsequent bank reconciliation via the ACH network.
14   The invention eliminates the needs for paper checks with all bank
15   reconciliation being accomplished electronically.

16

17

18

19   jtr-1808

20

26
-31-

CONFIDENTIAL

LML-EP 000081

395- 201- A
97571

# CHECKWRITING POINT OF SALE SYSTEM

INVENTORS:   ROBERT H. HILLS AND HENRY R. NICHOLS

*Related application*

*This application is a continuation of 07/975717 now abandoned.*

## FIELD OF THE INVENTION

This invention relates to the field of Point-of-Sale systems and more particularly to the integration and processing of purchases whereby a check is used as the basic source of identification of the individual and the bank and bank account is debited.

## BACKGROUND ART

Numerous devices exist for processing checks. For example, U.S. patent number 4,933,536 to Lindemann, et al., describes a check processing device which is used together with a Point-of-Sale terminal. This particular device involves copying and taking a picture of an individual whereby a dishonored check could then be traced to the person who has offered it.

U.S. Patent No. 4,810,866 to Lloyd, Jr., describes a check validation system again located together with a Point-of-Sale system for imprinting and otherwise physically dealing with a check.

Other systems also deal with an apparatus for handling checks at a point of sale. For example, U.S. Patent No. 4,743,743 to Fukatsu describes one such transaction apparatus where a check is examined by a reader. U.S. Patent No. 4,672,377 to Murphy, et al. describes a check authorization system wherein a check is imprinted with a bar code and information concerning customers which are stored in a database. U.S. Patent No. 3,845,470 to Schuller, discloses a vending system using a modified form of a check which is imprinted with identification codes, when someone attempts to use the check in

-1-

CONFIDENTIAL

LML-EP 000082

1  purchasing goods and services, and wherein a vending operation will

2  not place the order, if information associated with the check is not valid in

3  a particular database.

4     Other check-based financial systems have also been the subject

5  of invention. U.S. Patent No. 4,617,457 addresses an ATM or automatic

6  teller machine form of cashing checks. Such systems create a picture

7  of the check involved and also involves checking against a

8  specialized database to insure that the check is a "valid" one (see

9  also U.S. Patent No. 4,580,040 to Granzow et al.).

10     Another generic category of financial systems deals with

11  methods of handling the financial transactions apart from the

12  physical handling of the check itself. For example, U.S. Patent No.

13  3,824,544 to Simjian describes a merchant issued "check" which can

14  then be used in the purchase of goods and services and upon

15  purchase, a specialized code is evaluated to determine if the check

16  is being validly utilized.

17     U.S. Patent No. 4,404,649 to Nunley et al. describes a document

18  processing system which generally discloses a method of reading

19  checks for processing a wide variety of financial documents.

20     U.S. Patent No. 4,523,330 to Caine also describes a method for

21  processing financial documents which systems also includes a Point-

22  of-Sale terminal for generating image data from checks as they are

23  being processed. This patent is drawn principally to the actual

24  terminal itself.

25     U.S. Patent No. 4,673,802 to Ohmae et al. describes a central

26  processing system having stored data relating to the accounts of

-2-

LML-EP 000083

1    users, which users are approved or disapproved at the Point-of-Sale

2    based upon information in the database.

3    Finally, Patent No. 4,678,896 to Carlson et al. describes a

4    Point-of-Sale system whereby, apparatuses provided to restore the

5    processing and imprinting of checks.

6    All of these above patents deal with the specific problem of

7    how to accept a check from customer for the purchase of goods and

8    services. It does not in anyway address the subsequent processing

9    of checks or indeed address that the issue in anyway of how checks

10   are cleared through the normal automatic check handling

11   clearinghouse operation that exist the financial world. Thus, the

12   interaction of these systems with the ACH process is not addressed

13   in anyway. This is particularly important since if any Point-of-

14   Sale check handling system is to interact with the ACH mechanism it

15   must adhere to that processing scheme and indeed lend itself to use

16   with a processing scheme.

17   It is an objective of the present invention to be adaptable

18   for use with the ACH system and to be smoothly incorporated into

19   it. In this fashion, it will immediately be useful for a much

20   wider range of financial transactions above and beyond those

21   contemplated by the background I discussed above.

22

23   SUMMARY OF THE INVENTION

24   The present invention comprises a process and apparatus which

25   may be employed for the purpose of effecting payments for point-of-

26   sale purchases  of goods and services paid from consumer funds

27   secured in bank checking or depository accounts.  Each sale or

-3-

CONFIDENTIAL

LML-EP 000084

1    "Transaction Event" would be an electronic and "paperless" event

2    thereby eliminating reliance on accepting and processing commercial

3    bank drafts (personal or corporate checks) and the physical

4    handling of those bank drafts thus replacing commercial bank drafts

5    at the point-of-sale.

6    The system is intended to be made available to subscribing

     merchants, businesses, and individuals, *herein* referred to in this

8    application as "system subscribers" wishing to employ the method

9    and apparatus of the present invention for the electronic

10   processing and settlement of consumer purchases. Further, the

11   present invention's operational parameters *of the present invention* allow freedom from

12   customary state or other geographically limiting criteria typical

13   when accepting and processing "paper" checks. The system is

14   designed to act with the national authorization and electronic

15   settlement network *known* as the ACH ("Automated Clearing House")

16   system.

17   The system is designed to perform in a fully automated manner

18   enabling each Transaction Event to be processed by a system

19   subscriber as a point-of-sale transaction in the presence of the

20   consumer. When the transaction event is "approved" funds are

21   debited from an authorized consumer account for credit to the

22   system subscriber and electronic settlement by ACH deposit *deposits the transaction amount* to the

23   subscriber's designated depository account. Authorized access to

24   consumer accounts and credits to system subscriber depository

25   accounts would be *are* performed as "Off-Line" transactions by means of

26   Electronic Funds Transfer ("EFT") through the ACH Network or

27   through the Federal Reserve System.

-4-

CONFIDENTIAL

LML-EP 000085

1    The invention comprises a point-of-sale processing system

2    comprising electronic data processing equipment which allows

3    individual services selections which provide automated, electronic

4    processing from bank checking or depository accounts.  It is the

5    objective of the present invention to automate the point-of-sale

6    environment for processing consumer purchases of goods and services

7    which, other than for the ~~applicants'~~ system, would necessitate the *of the present invention*

8    more traditional acceptance and processing of commercial bank

9    drafts (personal and/or corporate checks).  Individual Transaction

10   Events ~~would be~~ administered under the ~~applicants'~~ system *are* *of the present invention by*

11   initiating a terminal authorization inquiry and continuing through

12   the electronic settlement of funds representing the Transaction

13   Event from the pre-approved consumer banking accounts.

14       It is a further objective of the present invention to

15   eliminate the need for "paper" checks as an accepted means of

16   consumer payment.  In the place of personal and business checks,

17   consumers would be provided ~~their~~ free and unrestricted access to

18   funds secured in bank accounts of various types by means of

19   preauthorized electronic events.  System subscribers electronically

20   communicate with the ~~invention's~~ data center for individual *of the present invention*

21   Transaction Event authorizations which, upon reconciliation of a

22   day's activity, result in an ~~Electronic Funds Transfer ("EFT")~~ by *EFT*

23   means of the Automated Clearing House accommodating an "Off-Line"

24   debiting of preauthorized consumer Transaction Events from

25   authorized accounts.  Thereafter, each system subscriber ~~would be~~ *is*

26   credited with the total of all such daily authorized Transaction

27   Events to its designated banking depository account.

-5-

CONFIDENTIAL

LML-EP 000086

1    The present invention comprises logic which allows the
2    following services which when individually performed or where
3    combined with other services establish a wholly unique processing
4    medium enabling preauthorized access to consumers' checking account
5    or bank depository reserves.

6    Authorization – This service supports electronic communication
7    from point-of-sale to the system's central computer.    The data
8    center stores positive and negative files concerning consumer
9    accounts thereby providing accurate inquiry responses regarding the
10    current posting status of a consumer's banking account and
11    signaling the system subscriber that said account may be reasonably
12    relied upon for consummating a Transaction Event (i.e., an
13    "Approval") or, where listed as delinquent, indicating that the
14    account may not be so relied upon (i.e., a "Denial").

15    Check Replacement – This capability operates as an extension
16    of Authorization enabling the system subscriber the capability of
17    completing a Transaction Event by electronically logging the sale
18    whereupon a Transaction Event Slip will be printed or manually
19    prepared for consumer execution at the point-of-sale.    By
20    execution of the transaction event slip the consumer authorizes the electronic accessing of
21    funds secured in his/her authorized banking account in lieu of the
22    more traditional method of issuing personal and business checks.
23    Funding settlement to the system subscriber would be effectuated by
24    means of Electronic Funds Transfer via ACH or the Federal Reserve
25    System as opposed to physically processing and transferring checks
26    among banks.

-6-

CONFIDENTIAL

LML-EP 000087

1    Bank Transaction Card - As part of this invention on "Off-
2    Line" Debit Card is established on which is stored the information
3    relating to the banking account from which funds representing the
4    Transaction Event would be debited for payment to the system
5    subscriber. This information may be stored on the card itself in
6    encrypted or unencrypted form or *may* be stored in the central computer
7    where access to such information is gained via special control
8    characters or access codes stored on the card.    Electronic
9    authorization for withdrawal of funds from the cardholder's account
10   and subsequent electronic settlement procedures *would* remain
11   essentially identical to processing under the Check Replacement
12   service described above.    Information relating to the consumer-
13   cardholder and the appropriate banking account to be debited for a
14   Transaction Event will be encoded upon the magnetic stripe portion
15   of the plastic, and terminal-readable, card.

16       Thus, the overall objective of the present invention is to
17   provide and support an alternate means for consumer payments for
18   goods and services that operates to replace commercial bank drafts
19   in the point-of-sale environment.    Simultaneously, the present
20   invention assures consumers greater access *to and use of* ~~and use to~~ funds in
21   personal or corporate banking accounts.    Further, the system
22   provides system subscribers a significantly improved prospect of
23   collecting the underlying monies for Transaction Events, reduced
24   time for the collecting the cash receipts from Transaction Events,
25   and a pronounced lowering of the present cost of cumbersome
26   procedures otherwise mandated by the existing ACH system for
27   accepting and processing commercial bank drafts.

-7-

CONFIDENTIAL

LML-EP 000088

1   A further objective of the present invention is to
2   significantly reduce the use of checks as a means of conducting
3   purchases of goods or services and to further reduce the consumers
4   reliance on credit cards or cash for transaction events as well.

5   DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT
6   The present invention begins with the electronic recording of
7   consumer information at a system subscribers location using a at a
8   point-of-sale terminal.  This information is obtained in the
9   presence of the consumer and occurs prior to any "Approval" either
10  for the Transaction Event or the ultimate crediting of the System
11  subscriber's designated depository account.  A Transaction Event
12  involves a series of events initiated by a system subscriber's
13  request to sell goods or services by payment from funds secured in
14  a consumer's banking account.  First, the consumer's banking
15  account status will be verified through accessing the invention's
16  central computer files.  Verification that an account may be
17  accessed is established alternatively by means of an encoded,
18  magnetic strip card, or by input of account identification numbers
19  from a consumer's bank account.  A more traditional identification
20  of the consumer could also occur including visual examination of
21  driver's license or similar and acceptable picture "ID" however
22  this is not part of the invention.
23  As an integral portion of each Transaction Event, the system
24  subscriber's location, date and time, and requested sale amount is
25  automatically logged into the system when a system subscriber first
26  accesses the invention.  Finally, a Transaction Event Slip ("Sales
27  Slip") will be produced by an printer integral to the point-of-sale

-8-

CONFIDENTIAL
LML-EP 000089

1    terminal and *will be* executed by the consumer in the amount of the stated

2    purchase with inscribed language defining the Transaction Event and

3    specifically providing consumer authorization for electronic access

4    to his/her banking account.  Thereafter, the consumer account will

5    be debited and the proceeds credited to the system subscriber's

6    designated    depository    account    along    with    all    other    similar

7    Transaction    Events    representing    the    total    of    the    system

8    subscriber's daily activity.  Debiting of consumer accounts and

9    settlement deposits to each system subscriber is performed by means

10   of Off-Line electronic funds transfer through and by the ACH or

11   Federal Reserve System.

12       Equipment Configuration - The present invention can operate

13   with nearly every conceivable point-of-sale equipment system.  The

14   central computer system accepts data transmitted from the system

15   subscriber's existing point-of-sale equipment or that which is

16   added to augment service performance.  The point of sale terminal

17   of the present invention is implemented in a number of ways, most

18   preferred,    however,    being    activation    under    a    fully    automated

19   format.  Such a fully automated system generally comprises a dual-

20   port terminal with magnetic stripe reading capabilities interfaced

21   with a logging printer capable of providing individual Transaction

22   Event Slips for consumer execution, and a MICR check reader, optical

23   character, *recognition* ("OCR") equipment, or other device.  Variations to this

24   configuration are particularly possible where the ~~applicants'~~

25   system ~~were~~ *of the present invention is* to be activated under a "Split-Dial" feature installed

26   to function within the operational parameters of existing point-of-

27   sale equipment primarily dedicated to bankcard ("credit card")

-9-

CONFIDENTIAL

LML-EP 000090

1  processing. *It is contemplated* ~~The present invention contemplates~~ that services may

2  in the future be administered on a singular point-of-sale hardware *using the present invention with*

3  device which, as a function of its design, would incorporate all or

4  most of the service capabilities of an integrated terminal, logging

5  printer, and MICR Check Reading device. The system/can alternately *of the present invention*

6  be interfaced with electronic cash registers now on the market.

7      Communications links from point-of-sale terminals to the

8  central computer of the present invention will typically be in *the* form

9  of telephonic network communications over a public switched

10  telephone network ~~(PSTN)~~ *("PSTN") or over* other approved networks. Transaction

11  Event verification will occur as a result of point-of-sale terminal

12  access to the central computer's positive and/or negative data

13  files. "Approved" or "Declined" notifications are made to the

14  Point-of-Sale device over the PSTN. All data files will be

15  centrally located and maintained on the invention's central

16  computer data bases. Portions of the data base include but are not

17  limited to third party data files such as the Shared Check

18  Authorization Network ("SCAN") (trademark) data base.

19      Individual *transactions* or groupings of transactions are first approved by

20  soliciting an "Authorization" prior to the completion of any

21  requests for electronic funds transfer. To maintain an accurate

22  status of file information for authorizations to subscribing

23  merchants, businesses, and/or individuals, separate data bases are

24  maintained. Current cardholder or banking account status are

25  updated daily and instantly available for point-of-sale inquiry for

26  Transaction Event authorizations.

CONFIDENTIAL

LML-EP 000091

1  updated daily and instantly available for point-of-sale inquiry for

2  Transaction Event authorizations.

3      System subscribers' point-of-sale equipment are interfaced to

4  the invention's central computer by means of telephonic network-

5  able to support communication from a plurality of point-of-sale

6  terminals.  Programming of the point-of-sale terminal causes an

7  automatic "Dial-Up" to the central computer and provides an

8  automatic query and response, affirming or denying the Transaction

9  Event.  The addition of local entry hubs may be installed to better

10  facilitate the speed or economics of communications with the data

11  files.  Alternatives to telephonic networks may involve use of

12  satellite   communications   or   enhanced   radio   transmissions.

13  Similarly, the system's data files and associated Check Replacement

14  Service are contemplated to be responsive to emerging point-of-sale

15  devices intended to seek authorizations by the alternate means of

16  voice pattern recognition, fingerprint identification, retina scan,

17  "smart" chips, and/or consumer or check image and/or signature

18  broadcasting.

19  Brief Description of the Drawings

20  Figure 1 –      System overview of the present invention

21  Figure 2 –      The point-of-sale terminal

22  Figure 3 –      The Central Computer System

23  Figures 4 –     The process Data Flow

24  Figure 1a –     Transaction Event Sales Slip

25  Figure N –      Manual Transaction Event Sales Slip

26

-11-

CONFIDENTIAL

LML-EP 000092

Detailed Description of the Preferred Embodiment

2      Referring to Figure 1 an overall schematic of the present
3   invention is described.  Point-of-sale terminals 300 communicate
4   normal PSTN telephone lines with a central computer system 302
5   which in turn communicates with a banking institution 304 for
6   purposes of debiting consumer accounts and crediting system
7   subscriber accounts.  The banking institution performs its function
8   via normal automated clearing house ("ACH") transactions 306.

9      Referring to Figure 2 the point-of-sale terminal is described.
10   The point-of-sale terminal comprises several different entry means.
11   A key board 310 can be used to input consumer information manually.
12   Alternatively a card reader 312 can be used whereby the magnetic
13   stripe on the card is read by the point-of-sale terminal and
14   finally a check reader 314 is also included to read the MICR number
15   on checks as a substitute for either a specific card or key board
16   input.  These various input means provide information to a micro-
17   processor 316 which comprises logic means 318, memory means 320,
18   and communication means 322.  The logic means 318 comprises logic
19   which allows the information received from the various input means
20   to be processed and stored in the memory 320.  The logic means
21   further drives a display 324 which provides a visual output of the
22   account number of the consumer for verification.  The communication
23   means 322 allows the subscriber terminal to communicate with the
24   central computer 302 for purposes of processing the consumer's
25   purchase.

26      Referring to Figure 3 the central computer system 329 is
27   described.  The central computer system receives input from a

-12-

CONFIDENTIAL

LML-EP 000093

1  plurality of point-of-sale terminals which provide transaction

2  information from a system subscriber and a consumer desiring to

3  purchase goods or services.  The central computer system comprises

4  a system subscriber 330 file which is a file of those merchants who

5  have elected to use the present invention for processing purchases.

6  The central system also comprises an approved consumer file 332

7  which stores the names of those consumers who have already been

8  approved for allowing purchases to take place through the various

9  input means as well as a third party database such as the SCAN

10  (trademark) data base relating to consumer credit.  The computer

11  system also comprises a communications means 334.  The

12  communication means communicates with other outside third party

13  data bases which allows the consumer, that has not been approved by

14  the system, to have a rapid check of the status of the consumer's

15  banking account and whether the consumer has current outstanding

16  returns (i.e. bad checks).  Once this SCAN (trademark) or outside

17  third party data base search is performed and where an approval is

18  given, the approved consumer file 332 is updated with the name of

19  the new approved consumer.

20      As presently configured the central computer 329 already has

21  a third party database known as the SCAN (trademark) database 333

22  resident on the central computer.  Thus credit worthiness can be

23  checked using this SCAN database.  The SCAN (trademark) database is

24  updated daily.

25      The communication means 334 also communicates with a banking

26  institution 338 which instructs the bank to debit the account of

27  the consumer and credit the account of the system subscriber

-13-

CONFIDENTIAL

LML-EP 000094

1    (merchant) with the amount of the purchase.    These transactions

2    then take place via the normal ACH transaction process.

3        Referring to Figure 4 the process begins by a consumer

4    presenting a specimen or "blank" check complete with MICR number to

5    the system subscriber (the merchant) 100.    The system subscriber

6    next determines if the check meets appropriate store policy

7    procedures 102, that the check has appropriate information on the

8    check.    If the check does not meet the store policies, it is

9    returned to the consumer 104.    If the check does meet appropriate

10   store policies the on-line verification process proceeds 106.    The

11   subscriber enters the process by first pressing the appropriate key

12   on a terminal to access the host computer 108.    Thereafter the

13   point of sale terminal prompts the system subscriber to enter the

14   appropriate MICR number 110.    The system subscriber then enters the

15   appropriate MICR number either manually or by passing the check

16   through a check reader which determines the MICR number 112.

17       Referring to Figure 5 the subscriber would verify that the

18   numbers appearing on the terminal match the MICR numbers on the

19   check 114.    During the comparison, the subscriber determines that

20   the check number compares accurately 116 to the number displayed on

21   the terminal.    If they do compare the verification process proceeds

22   120.    If the check numbers do not compare with that of the terminal

23   the system subscriber clears the terminal and begins the

24   transaction process again 118.    If the process is to be

25   reinitiated, the subscriber enters the MICR number into the point

26   of sale terminal 130.    Thereafter the system subscriber compares

27   the MICR numbers as before 132.    If the MICR numbers compare to the

-14-

CONFIDENTIAL

LML-EP 000095

1    system display 134 the process proceeds.  If the numbers do not

2    compare 136 the check is returned to the consumer and the process

3    terminates 137.

4         Referring to Figure 5, if the verification process proceeds

5    the terminal next prompts the system subscriber to enter the amount

6    of the sale 122.  The subscriber enters the amount of the sale 124

7    and the terminal thereafter transmits an inquiry to the host data

8    base for verification 126.

9         The check approval process next takes place 128.  If the check

10   is not approved by the central computer the terminal displays a

11   message declining the transaction 140.  Thereafter a printer record

12   of the declined transaction is made for purposes of the system

13   subscriber 142 to comply with the Fair Credit Reporting Act and

14   Regulation E of the Board of Governors of the Federal Reserve

15   System.

16        If the check is approved the terminal displays a message

17   noting the approval 138 and the specimen check is returned to the

18   consumer.   The printer further makes a paper record of the

19   transaction 142 and the consumer places any required information on

20   the paper receipt and signs the receipt authorizing the transaction

21   144.

22        Referring to Figure 7, the process description continues.

23   Once the transaction is approved the central computer captures the

24   MICR information and the sale amount and stores that information

25   146.  The central computer subsequently generates a batch message

26   regarding all transaction events for the prior period and transmits

-15-

CONFIDENTIAL

LML-EP 000096

1   all the transaction event information for the day into the ACH

2   network 148.

3        During the ACH process each checkwriter's account is debited

4   for the exact purchase amount and such an amount is deposited into

5   a system subscriber designated account 150. Thereafter, collected

6   funds for a total day's events are deposited into a ~~subscribers~~ subscriber's

7   account 152. The transaction is then complete 154.

8   HOW TO USE

9        The present invention will require the establishment and

10  maintenance for ~~access searches~~ of three interconnected but

11  separate data files. Each *data file* will be accessible by dial-up procedures

12  operating, in most instances, under "Split Dial" format from a

13  point-of-sale *("POS")* terminal device or electronic cash register installed

14  for the primary purpose of bankcard and/or bank draft

15  authorizations. *The terminal* ~~Terminal~~ prompts an operator/user to process one

16  of three optional inquiry types. Any one or all of three primary

17  functions are capable of being performed at a single point-of-sale

18  terminal within the control of the system subscriber. The inquiry

19  types and data base format responses *are* ~~would be~~ as follows :

20       Card Authorization - Having depressed the assigned Split Dial

21  key and thereafter being prompted, the system subscriber ~~would~~ *slides an*

22  ~~"slide" a~~ encoded magnetic stripped transaction card through the

23  point-of-sale terminal and *enters* ~~enter~~ the "Sale Amount" requested for

24  authorization. Thereupon, the terminal's dial-up capabilities

25  direct the inquiry to the central computer for authorization

26  against "POSITIVE" file of current cardholders whose accounts were

27  listed in "good standing". Inquiries where such a "Match" are

-16-

CONFIDENTIAL

LML-EP 000097

1    found cause an "Approved" return message from the data file to the

2    inquiring POS terminal.  Conversely, a "No-Match" to inquiry would

3    result in a "Declined" notice to the POS terminal.  An uploading

4    mode of the present invention causes forwarding of daily status

5    notifications to the central data files activating new cardholder

6    accounts in the "POSITIVE" cardholder file or submitting corrective

7    entries to delete delinquent or terminated accounts.

8        Check Authorization - Having depressed the assigned Split Dial

9    key and thereafter being prompted, the system subscriber manually

10   enters account numbers from a personal or business check or, where

11   fully automated, enters a specimen check through a MICR Check Reader

12   device interfaced with the terminal, whereupon the terminal's

13   screen would display the check's numbers, and hence the account number,

14   for verification.  Thereafter, the operator would enter the "Sale

15   Amount" requested for authorization.  The terminal's dial-up

16   capabilities then direct the inquiry to the computer data file

17   center for authorization first against the "POSITIVE" file of

18   "prenoted" bank/checking account numbers whose accounts were listed

19   in "good standing".  A successful "Match" to an inquiry would

20   result in an "Approved" notice from the data file to the inquiring

21   terminal.  A "No-Match" to inquiry would not, however, immediately

22   result in a "Declined" response.  Each inquiry preliminarily

23   resulting in a No-Match would be instantly forwarded/"rolled" to

24   the third data file preceding any return notice to the inquiring

25   terminal.  This third file is anticipated to be the Shared Check

26   Authorization Network ("SCAN") a negative data file data base

27   maintained in the system computer data file center.  Referrals to

-17-

LML-EP 000098

1    SCAN or any other positive or negative data files, enable potential
2    acceptance of Transaction Events involving consumers "Unknown" to
3    the invention's proprietary, "POSITIVE" files. A "Match" on the
4    SCAN "NEGATIVE" file would result in a "Declined" notice; a
5    "No-Match" would conversely send notification to the inquiring POS
6    terminal of an "Approved" event. Of significant importance, the
7    bank/checking account information for each such "Unknown"
8    consumer's transaction would, subsequent to a SCAN "Approved"
9    notice, be posted to the invention's "POSITIVE" file and prenoted
10   through the ACH ("Automated Clearing House") for future Transaction
11   Events. The invention, presumably in an automated mode, is capable
12   of uploading daily corrections to the POSITIVE data file including
13   notices of new accounts approved through SCAN (trademark) and
14   deletions where settlement for consumer checking account events,
15   initially approved, were subsequently dishonored. The SCAN data
16   base is similarly uploaded with daily activity status corrections.
17       Check Replacement Service - Inquiries initiated as Check
18   Replacement requests function in nearly an identical manner as that
19   of Check Authorization. Records for such events, when culminating
20   in "Approved" notices, are separately preserved. Check Replacement
21   inquiries are processed first through the system's "POSITIVE" data
22   file and, where no match is found, proceed to the SCAN data file or
23   other data base file prior to transmitting an "Approved" or
24   "Declined" notice to the inquiring POS terminal. A Match in the
25   system data file indicates a consumer-user, whose account was in
26   "good standing" and would not be required to "roll" to SCAN. Check
27   Replacement events are reported to and stored by the computer data

-18-

CONFIDENTIAL

LML-EP 000099

1    file center under a file classification identifying the transaction

2    was a Check Replacement Service.  The total of daily, approved

3    Transaction Events are "checkless" sales whereby the service

4    subscribing merchant has submitted requests for electronic ACH

5    settlement for all preauthorized consumer purchases.  No commercial

6    bank note ("Paper Check") is accepted or processed by the service

7    subscriber.   In each Transaction Event, a Consumer, at the

8    point-of-sale, has executed an electronic access ("Off-Line Debit")

9    authority "Sales Slip" which are automatically printed upon a

10   terminal's receipt of an "Approved" notice.

11       All terminal programming and all prompt strings for MICR Check

12   Reader  interfacing  are  stored  in  the  POS  terminal  and  the

13   invention's computer center controls interactions between the

14   plurality of terminals and the central system.   The following

15   modules are present.

16       Programming for MICR/Terminal Interface – system subscriber

17   locations  to be  activated  with  the  invention  must possess  or

18   acquire a terminal.  Those utilizing or being upgraded to terminals

19   such as a Tranz (trademark) 330 or other terminals with interface

20   capabilities  with  the  check  reader  all  suitable  point-of-sale

21   terminals.

22       The  preferred  format  for  terminal  operations  are  from  a

23   singular split dial key.  Thereafter, the "prompt string" would

24   proceed in a manner such as i) "Card = 1" ; "Check = 2" requiring

25   operator  selection;  then,  where  selecting  a  checking  account

26   inquiry ii) the operator would respond to a secondary prompt of

27   "Auth = 1" ; "Replace = 2".  These entry selections precede the

-19-

CONFIDENTIAL

LML-EP 000100

1   magnetic stripe "reading" of a card/submittal or a check through

2   the MICR (Account Identification), the entry of the requested sale

3   amount, and the terminal's dial-up for authorization against the

4   computer data file center.

5       The MICR interface results in the transmittal of a query for

6   data center approval of the entire ABA/Transit and personal or

7   corporate checking account numbers. Instances where printed checks

8   add the individual check's number to the end of the account number

9   can be "dropped" by Check Reader switch settings. Subsequent to a

10  terminal's receipt of the MICR number string but prior to the

11  operator's entry of the requested sale amount and authorization

12  dial-up, a verification prompt "flashing" the ABA and account

13  numbers must be displayed on the terminal's screen requiring the

14  operator to depress "Enter" to proceed, if correct, or "Clear", if

15  incorrect and thereby enabling the terminal operator to resubmit

16  the specimen check through the MICR Check Reader. It is important

17  to note that account information may be entered manually as well at

18  the point of sale with the other financial advantages of the present

19  invention still in effect.

20      The computer data file center receives and processes

21  Transaction Event authorization requests utilizing the entire MICR

22  string for accurate, error-free identification of both the consumer

23  bank and specific checking or depository account to participate in

24  a sale. ACH settlement criteria mandate exact recall for the bank

25  and checking account numbers to properly complete any debit

26  request. This invention conforms to each and every requirement of

27  the ACH transaction regulations.

-20-

CONFIDENTIAL

LML-EP 000101

1    Each Transaction Event is completed with the logging printer
2   generation of a Transaction Event ("Sales") Slip for each
3   "Approved" authorization inquiry processed (Figure 19).
4   Alternatively, a manually created transaction event slip can also
5   be prepared (Figure 19). Each such Transaction Event Slip must be
6   exacting in its retention of account numbers and the sale amount
7   enabling both the consumer and system subscriber to be provided
8   "hard copy" receipts of the event. Also included would be a clear
9   printing of the transaction type; "Bank Card", "Check
10  Authorization", or "Check Replacement". Authorization language is
11  printed immediately preceding the consumer's signature line
12  specifically authorizing electronic access in payment of the
13  requested transaction sale amount.

14   In addition to the primary functions for POS terminal
15  programming and MICR Check Reader interface, each Point-of-Sale
16  terminal location is capable of generating printed summations of
17  daily activity. These reports list and separately total each
18  authorization/service type, whether produced as a singular report
19  or the result of multiple terminal "closeout" procedures.

20   Instances will arise with either the Bank Card or Check
21  Replacement Service where previously authorized Transaction Events
22  will require the operational equivalent of a bankcard "Void" or
23  "Credit" notation. The methodology will be available for Split
24  Dial messages to the computer data file center of a
25  post-authorization "Error" or "Transaction Cancellation" notice.
26  The "Cancel" procedure is instituted by depressing for example the
27  "3" key (i.e. "Cancel = 3"). By so doing, the system subscriber

-21-

CONFIDENTIAL

LML-EP 000102

1    may cancel a previously approved and logged event. This

2    Transaction Event which was recorded on the data files and reported

3    on the service subscriber's daily Activity Summation Report,

4    thereafter carries an offsetting, "Flagged" cancellation notice.

5

6    SUMMARY

7        A flexible purchase transaction system is described which

8    precisely fits within existing ACH procedures for checking account

9    events for processing of pre-authorized electronic debits as a

10   replacement for commercial bank drafts (paper checks). The main

11   advantage to the proposed invention is the fact that a truly

12   paperless transaction may occur. Departures from the proposed

13   system especially with respect to the Point-of-Sale terminals will

14   be apparent to those skilled in the art, without departing from the

15   spirit of the invention as described.

-22-

CONFIDENTIAL

LML-EP 000103

1    We claim:

2     1.   A checkwriting point of sale system comprising:

3          a point of sale terminal adapted to receive consumer bank

4     account information and further adapted to accept such information

5     from consumer cards on which the bank account information is

6     stored;

7          a communications means integral to said point of sale terminal

8     to electronically communicate with a central computer;

9          a memory means integral to said point of sale terminal that

10    allows the temporary storage of the consumer bank account

11    information from the consumer cards;

12         the central computer system having communication means

13    capability adapted to receive information from a plurality of point

14    of sale terminals;

15         the central computer system communication means allowing said

16    central computer system to communicate with external data bases for

17    consumer credit verification and to allow communication with

18    banking institutions for purposes of transfer of funds.

19         2.   A checkwriting point of sales system according to claim

20    1 wherein said point of sale terminal is further adapted to read

21    MICR numbers appearing on a consumer check and wherein said

22    consumer check is used to identify the consumer bank account

23    information.

24         3.   The checkwriting point of sale according to claim 1

25    wherein said point of sale terminal further comprises an alpha

26    numeric display adapted to receive consumer bank account

CONFIDENTIAL

LML-EP 000104

1  information from the memory of the point of sale terminal and
2  display the consumer bank account information.

3      4.   The checkwriting point of sale system according to claim
4  1 further comprising a printer adapted to receive information from
5  the memory of the point of sale terminal to create point of sale
6  slips.

7      5.   The checkwriting point of sale system according to claim
8  1 wherein said central computer system communication means
9  comprises means for communicating with third party data bases for
10  verification of consumer credit.

11      6.   The checkwriting point of sale system according to claim
12  1 further comprising a resident third party data base wherein
13  consumer credit information is stored and used for verification of
14  consumer credit.

15      7.   The checkwriting point of sale system according to claim
16  1 wherein the central computer system further comprises a system
17  subscriber data base comprising those merchants and service
18  providers authorized to use the invention.

19      8.   The checkwriting point of sale system according to claim
20  7 wherein the central computer further comprises a database
21  comprising those consumers approved to use the invention.

22      9.   A checkwriting point of sale process comprising the steps
23  of:

24          a)   presenting a check or consumer card to a point of
25  sale terminal located at a merchant or service provider,

26          b)   reading the magnetic stripe or MICR number
27  information on the credit card or consumer check,

-29-

LML-EP 000105

1        c)    storing the consumer bank account information from

2    the card or check and verifying account numbers at the point of

3    sale terminal,

4        d)    inputting transaction event information into the

5    point of sale terminal,

6        e)    transmitting the transaction event information and

7    consumer bank account information to a central computer system,

8        f)    verifying the authorization status of the consumer,

9        g)    if a particular consumer is not authorized to use

10    the system, verifying the credit worthiness of the consumer via a

11    query to a third party data base,

12        h)    sending an "approved" message to the point of sale

13    terminal, if the consumer's credit is approved for the transaction

14    and

15        i)    subsequently transmitting the transaction event

16    information to a bank for subsequent ACH operations.

17

18

19

20

21    Jlr-1808

22

CONFIDENTIAL

LML-EP 000106

975717

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of Robert R. Hills and Henry R. Nichols

Serial No.:                          Group Art Unit:

Filed:                               Examiner:

FOR:  CHECKWRITING POINT OF SALE SYSTEM

DECLARATION

As below inventors, we hereby declare that:

Our residences, post office address and citizenship are as stated
below next to our name.

We believe we are the original, first and sole inventors of the
subject matter which is claimed and for which a patent is sought on
the invention entitled CHECKWRITING POINT OF SALE SYSTEM the
specification of which is attached hereto.

We hereby state that we have reviewed and understand the contents
of the above identified specification, including the claims, as
amended by any amendment referred to above.

We acknowledge the duty to disclose information which is material
to the examination of this application in accordance with Title 37,
Code of Federal Regulations, § 1.56(a).

POWER OF ATTORNEY

We hereby appoint the following attorney(s) to prosecute this
application and to transaction all business in the Patent and
Trademark Office connected therewith:

Jon L. Roberts
Arter & Hadden
1801 K Street, N.W.
Suite 400K
Washington, D.C. 20006
(202) 775-7980

We declare that all statements made herein of our own knowledge are
true and that all statements made on information and belief are
believed to be true; and further that these statements were made
with the knowledge that willful false statements and the like so
made are punishable by fine or imprisonment, or both, under Section

CONFIDENTIAL

LML-EP 000107

1001 of Title 18 of the United States Code and that such willful
false statements may jeopardize the validity of the application or
any patent issued thereon.

Full name of inventor  Robert R. Hills

Inventor's Signature _____  Date 10-1-92

Residence  5170 Avenue B

St. Augustine (FL 32095

Citizenship  United States

Full name of inventor  Henry R. Nichols

Inventor's Signature _____  Date_____

Residence_____

Citizenship  United States

jlr-1883

CONFIDENTIAL

LML-EP 000108

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of Robert R. Hills and Henry R. Nichols

Serial No.:                          Group Art Unit:

Filed:                               Examiner:

FOR:   CHECKWRITING POINT OF SALE SYSTEM

### DECLARATION

As below inventors, we hereby declare that:

Our residences, post office address and citizenship are as stated below next to our name.

We believe we are the original, first and sole inventors of the subject matter which is claimed and for which a patent is sought on the invention entitled CHECKWRITING POINT OF SALE SYSTEM the specification of which is attached hereto.

We hereby state that we have reviewed and understand the contents of the above identified specification, including the claims, as amended by any amendment referred to above.

We acknowledge the duty to disclose information which is material to the examination of this application in accordance with Title 37, Code of Federal Regulations, § 1.56(a).

### POWER OF ATTORNEY

We hereby appoint the following attorney(s) to prosecute this application and to transaction all business in the Patent and Trademark Office connected therewith:

Jon L. Roberts
Arter & Hadden
1801 K Street, N.W.
Suite 400K
Washington, D.C. 20006
(202) 775-7980

We declare that all statements made herein of our own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section

CONFIDENTIAL

1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

Full name of inventor   Robert R. Hills

Inventor's Signature _____ Date_____

Residence_____

_____

Citizenship___United States_____

Full name of inventor   Henry R. Nichols

Inventor's Signature ____*Henry R. Nichols*____ Date 10/19/92

Residence____8456 Holly Leaf Dr.

____McLean, VA  22102

Citizenship___United States_____

CONFIDENTIAL

LML-EP 000110

PT09071

| VERIFIED STATEMENT CLAIMING SMALL ENTITY STATUS (37 CFR 1.9(f) & 1.27(b))--INDEPENDENT INVENTOR | Docket Number (Optional) |
|---|---|

Applicant or Patentee: ROBERT R. HILLS AND HENRY R. NICHOLS

Serial or Patent No.: _____

First or Issued: _____

Title: CHECKWRITING POINT OF SALE SYSTEM

As a below named inventor, I hereby declare that I qualify as an independent inventor as defined in 37 CFR 1.9(c) for purposes of paying reduced fees to the Patent and Trademark Office described in:

[X] the specification filed herewith with title as listed above.

[ ] the application identified above.

[ ] the patent identified above.

I have not assigned, granted, conveyed or licensed and am under no obligation under contract or law to assign, grant, convey or license, any rights in the invention to any person who would not qualify as an independent inventor under 37 CFR 1.9(c) if that person had made the invention, or to any concern which would not qualify as a small business concern under 37 CFR 1.9(d) or a nonprofit organization under 37 CFR 1.9(e).

Each person, concern or organization to which I have assigned, granted, conveyed, or licensed or am under an obligation under contract or law to assign, grant, convey, or license any rights in the invention is listed below:

[ ] No such person, concern, or organization exists.

[ ] Each such person, concern or organization is listed below.

Separate verified statements are required from each named person, concern or organization having rights to the invention averring to their status as small entities. (37 CFR 1.27)

I acknowledge the duty to file, in this application or patent, notification of any change in status resulting in loss of entitlement to small entity status prior to paying, or at the time of paying, the earliest of the issue fee or any maintenance fee due after the date on which status as a small entity is no longer appropriate. (37 CFR 1.28(b))

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the application, any patent issuing thereon, or any patent to which this verified statement is directed.

| ROBERT R. HILLS | HENRY R. NICHOLS | |
|---|---|---|
| NAME OF INVENTOR | NAME OF INVENTOR | NAME OF INVENTOR |
| Signature of inventor | Signature of inventor | Signature of inventor |
| October 1, 1992 | | |
| Date | Date | Date |

PTO/SB/09 (11-90)                    Patent and Trademark Office; U.S. DEPATMENT OF COMMERCE

CONFIDENTIAL

LML-EP 000111

PTO/SB/09 (11-90)

| VERIFIED STATEMENT CLAIMING SMALL ENTITY STATUS (37 CFR 1.9(f) & 1.27(b))--INDEPENDENT INVENTOR | Docket Number (Optional) |
|---|---|

Applicant or Patentee: ROBERT R. HILLS AND HENRY R. NICHOLS

Serial or Patent No.: 173

Filed or Issued: 1992

Title: CHECKWRITING POINT OF SALE SYSTEM

As a below named inventor, I hereby declare that I qualify as an independent inventor as defined in 37 CFR 1.9(c) for purposes of paying reduced fees to the Patent and Trademark Office described in:

[X] the specification filed herewith with title as listed above.

[ ] the application identified above.

[ ] the patent identified above.

I have not assigned, granted, conveyed or licensed and am under no obligation under contract or law to assign, grant, convey or license, any rights in the invention to any person who would not qualify as an independent inventor under 37 CFR 1.9(c) if that person had made the invention, or to any concern which would not qualify as a small business concern under 37 CFR 1.9(d) or a nonprofit organization under 37 CFR 1.9(e).

Each person, concern or organization to which I have assigned, granted, conveyed, or licensed or am under an obligation under contract or law to assign, grant, convey, or license any rights in the invention is listed below:

[ ] No such person, concern, or organization exists.

[ ] Each such person, concern or organization is listed below.

Separate verified statements are required from each named person, concern or organization having rights to the invention averring to their status as small entities. (37 CFR 1.27)

I acknowledge the duty to file, in this application or patent, notification of any change in status resulting in loss of entitlement to small entity status prior to paying, or at the time of paying, the earliest of the issue fee or any maintenance fee due after the date on which status as a small entity is no longer appropriate. (37 CFR 1.28(b))

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the application, any patent issuing thereon, or any patent to which this verified statement is directed.

| ROBERT R. HILLS | HENRY R. NICHOLS | |
|---|---|---|
| NAME OF INVENTOR | NAME OF INVENTOR | NAME OF INVENTOR |
| | _Henry R. Nichols_ | |
| Signature of inventor | Signature of inventor | Signature of inventor |
| | 10/19/92 | |
| Date | Date | Date |

PTO/SB/09 (11-90)                                        Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

CONFIDENTIAL

LML-EP 000112



fig. 1



fig 2

CONFIDENTIAL

LML-EP 000113



#/4757]
08/25/79



figure 3

CONFIDENTIAL

LML-EP 000114





08/25/77



Fig. 4

CONFIDENTIAL

LML-EP 000115



figure 5

CONFIDENTIAL







Fig. 6

CONFIDENTIAL

LML-EP 000117



PRINT OF DRAWINGS
AS ORIGINALLY FILED





fig 7

CONFIDENTIAL



08/25/73:

```
                    Merchant Name
                    Street Address
                    City, ST Zip
                    Merchant Acct #


        TIME 00:00 _M              DATE 00/00/00
        BANK ACT NO. 000000000000
        TRANSIT NO. 000000000

        SALE AMOUNT               $ 0,000.00

        TERMINAL ID  0000000000


        I herewith authorize ChequeMARK Systems
        to electronically access my designated
        checking account for the payment of the
        above referenced purchase.

        Name (PRINT) _____
        Street _____
        City _____ST ___Zip_____
        Tel. Number: (_____) _____ - _____


        I ACKNOWLEDGE THAT RETURN FEES WILL BE
        IMPOSED SHOULD MY PAYMENT BE DISHONORED
        AND UNDERSTAND THAT IT IS UNLAWFUL TO
        AUTHORIZE PAYMENTS FOR WHICH ADEQUATE
        MONIES ARE NOT AVAILABLE WITHIN MY
        ACCOUNT.



        X_____
        Authorizing Signature
```

fig. 8

CONFIDENTIAL

LML-EP 000119





08/2573 9c

Merchant Name

Street Address

City, ST Zip

Merchant Act #

CUSTOMER BANKING INFORMATION:

BANK ACT NO. _____

TRANSIT NO. _____

SALE AMOUNT  . . . . . . . . . . . . . . . . . $ _____

    I herewith authorize ChequeMARK Systems to electronically access my designated checking account for the payment of the above referenced purchase amount.  I acknowledge that sufficient funds are available for the payment of this sale.

Name (PRINT) _____

Street _____

City _____ ST ____ Zip _____

Tel. Number: (_____) _____ - _____

I FURTHER ACKNOWLEDGE THAT RETURN FEES WILL BE IMPOSED SHOULD MY PAYMENT BE DISHONORED AND UNDERSTAND THAT IT IS UNLAWFUL TO AUTHORIZE PAYMENTS FOR WHICH ADEQUATE MONIES ARE NOT AVAILABLE WITHIN MY ACCOUNT.

X _____

Authorizing Signature

fig. 9

CONFIDENTIAL

# EXHIBIT 9



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 08/257,390 | 06/09/94 | HILLS | B5M1/1028 |

R

| EXAMINER |
|---|
| PITTS,H |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2514 | |

JON L. ROBERTS
ROBERTS & ASSOCIATES
1953 GALLOWS RD.
SUITE 220
VIENNA, VA 22182

DATE MAILED:
10/28/94

*9*

This is a communication from the examiner in charge of your application.
COMMISSIONER OF PATENTS AND TRADEMARKS

☑ This application has been examined    ☐ Responsive to communication filed on _____    ☐ This action is made final.

A shortened statutory period for response to this action is set to expire ____3____ month(s), _____ days from the date of this letter.
Failure to respond within the period for response will cause the application to become abandoned. 35 U.S.C. 133

**Part I   THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. ☐ Notice of References Cited by Examiner, PTO-892.
2. ☐ Notice of Draftsman's Patent Drawing Review, PTO-948.
3. ☐ Notice of Art Cited by Applicant, PTO-1449.
4. ☐ Notice of Informal Patent Application, PTO-152.
5. ☐ Information on How to Effect Drawing Changes, PTO-1474.
6. ☐

**Part II   SUMMARY OF ACTION**

1. ☑ Claims ____1-4, 6-9, 11-21____ are pending in the application.

Of the above, claims _____ are withdrawn from consideration.

2. ☐ Claims _____ have been cancelled.

3. ☐ Claims _____ are allowed.

4. ☑ Claims ____1-4, 6-9, 11-21____ are rejected.

5. ☐ Claims _____ are objected to.

6. ☐ Claims _____ are subject to restriction or election requirement.

7. ☐ This application has been filed with informal drawings under 37 C.F.R. 1.85 which are acceptable for examination purposes.

8. ☐ Formal drawings are required in response to this Office action.

9. ☐ The corrected or substitute drawings have been received on _____. Under 37 C.F.R. 1.84 these drawings are ☐ acceptable; ☐ not acceptable (see explanation or Notice of Draftsman's Patent Drawing Review, PTO-948).

10. ☐ The proposed additional or substitute sheet(s) of drawings, filed on _____, has (have) been ☐ approved by the examiner; ☐ disapproved by the examiner (see explanation).

11. ☐ The proposed drawing correction, filed _____, has been ☐ approved; ☐ disapproved (see explanation).

12. ☐ Acknowledgement is made of the claim for priority under 35 U.S.C. 119. The certified copy has ☐ been received ☐ not been received ☐ been filed in parent application, serial no. _____; filed on _____.

13. ☐ Since this application appeears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.

14. ☐ Other

**EXAMINER'S ACTION**

PTOL-326 (Rev. 2/93)

*10*

CONFIDENTIAL

LML-EP 000180

Serial No. 257,390                        -2-

Art Unit    2514

    Claims 1-4, 6-9, 11-21 rejected under 35 U.S.C. § 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention.

    Which the applicant has discussed *ease* and ~~demand~~ *Demand* in the specification, claim 1, for example, does not claim the argued novelty. In addition, there has been no specific comparison of claim language vis-a-vis the prior art of the I.D.S. and as applied in combination in the previous final rejection. One set of independent/dependent claims should be selected as they appear to embody separate inventions.

    As understood, the claims, are rejected as set forth in the previous final rejection, with the further notation that to use the check "solely" for the access would be the most trivial modification of systems such as Gransow, etc.

    Any inquiry concerning this communication or earlier communications from the examiner should be directed to Harold Pitts whose telephone number is (703) 308-0717.

    Any inquiry of a general nature or relating to the status of this application should be directed to the Group receptionist whose telephone number is (703) 308-0956.

HAROLD PITTS
PRIMARY EXAMINER
GROUP 2500

Pitts/dw
October 26, 1994

CONFIDENTIAL

LML-EP 000181

# EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LML PATENT CORP.,

        Plaintiff,

v.

TELECHECK SERVICES, INC.,
ELECTRONIC CLEARING HOUSE, INC.,
XPRESSCHEX, INC. and NOVA
INFORMATION SYSTEMS, INC.,

        Defendants.

C.A. 04-858 (SLR)

## JOINT PROPOSED CLAIM CONSTRUCTION STATEMENT

Pursuant to the Court's Rule 16 Scheduling Order in this matter, the Parties hereby submit the following claim charts to present their respective, proposed constructions of disputed claim terms and their proposed constructions of agreed claim terms in the patent-in-suit, namely, U.S. Patent No. 5,484,988 ("the '988 patent").

# Proposed Constructions of Disputed Claim Terms

| Claim Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **any bank check** (claims 1, 8) | Any regular check used to draw funds from a normal bank or credit union checking account | any type of check drawn on a financial institution |
| **any consumer bank check** (claim 9) | Any regular check used to draw funds from a normal bank or credit union consumer checking account | same meaning as the phrase "any bank check" set forth above, with the added limitation that the check be "drawn against a consumer bank account" |
| **any** (claims 1, 8, 9) | LML believes that this term should not be separately construed from the entire element in which it appears in the claims, namely the "any bank check" or "any consumer bank check" language construed below. In any event, this plain English term needs no construction. | one or some indiscriminately of whatever kind |
| **consumer bank account information** (claims 1, 2, 3, 8, 9) | Information relating to a consumer's bank account including the MICR line (magnetic ink character recognition line) | only the ABA/transit routing number and bank account number |
| **without using the bank check as a negotiable instrument** (claim 1) | Where the paper check is used as a source of information, and is not accepted or processed | the bank check, at no time, takes on the status of a negotiable instrument |
| **without using the check as a negotiable instrument** (claim 8) | Where the paper check is used as a source of information, and is not accepted or processed | the check, at no time, takes on the status of a negotiable instrument |

| Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| without using a bank check as a negotiable instrument (claim 9) | Where the paper check is used as a source of information, and is not accepted or processed | the check, at no time, takes on the status of a negotiable instrument |
| subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations (claim 8) | Subsequently transmitting the information relating to the transaction to a bank for subsequent automated clearing house operations | electronically communicating with an automated clearing house for transferring funds electronically based upon the consumer bank account information obtained from any bank check presented at the point-of-sale |
| enabling automated clearing house communication for transferring funds (claims 1, 9) | Enabling communication with an automated clearing house for electronically transferring funds | electronically communicating with an automated clearing house for transferring funds electronically based upon the consumer bank account information obtained from any bank check presented at the point-of-sale |
| for the sole purpose (claims 2, 8 and 9) | For the only purpose | Defendants contend that this term needs no construction. |
| adapted to receive consumer bank account information from any bank check (claim 1) | adapted to receive consumer bank account information from any bank check | adapted to read consumer bank account information directly from any bank check |

2

| Claim Language | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **means for reading magnetic ink character recognition numbers appearing on a consumer check** (claim 2) | This limitation should be construed pursuant to 35 U.S.C. Section 112(6).<br><br>The recited function is "reading magnetic ink character recognition numbers appearing on a consumer check."<br><br>The structures in the '988 patent that perform that function is any mechanism such as a MICR check reader, optical character recognition ("OCR") equipment, a keyboard for manual entry, or equivalent. | This limitation should be construed pursuant to 35 U.S.C. Section 112(6).<br><br>The recited function is "reading magnetic ink character recognition numbers appearing on a consumer check."<br><br>The structures described in the '988 patent that perform that function are a MICR reader and optical character recognition equipment. |
| **reading means for reading magnetic ink character recognition numbers on any consumer bank check** (claim 9) | This limitation should be construed pursuant to 35 U.S.C. Section 112(6).<br><br>The recited function is "reading magnetic ink character recognition numbers appearing on a consumer check."<br><br>The structures in the '988 patent that perform that function is any mechanism such as a MICR check reader, optical character recognition ("OCR") equipment, a keyboard for manual entry, or equivalent. | This limitation should be construed pursuant to 35 U.S.C. Section 112(6).<br><br>The recited function is "reading magnetic ink character recognition numbers on any consumer bank check."<br><br>The structures described in the '988 patent that perform that function are a MICR reader and optical character recognition equipment. |
| **verifying that account numbers were accurately read at the point of sale** (claim 8) | Verifying that the account numbers from the check were read accurately at the point of sale terminal | visually confirming that account numbers were accurately read by reference to the source document |

3

## Proposed Constructions of Agreed Claim Terms

| Claim Term | Parties' Agreed Proposed Construction |
|---|---|
| consumer (claim 9) | person, business or corporation |
| second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the bank check as a negotiable instrument (claim 1); second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using a bank check as a negotiable instrument (claim 9) | This function is written in means-plus-function format pursuant to 35 U.S.C. 112(6).<br><br>The recited function of this limitation is enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the [a] bank check as a negotiable instrument.<br><br>The structures disclosed in the patent for performing the recited function of this limitation are a modem, network interface, enhanced radio transmission interface, satellite communication interface or equivalent.[1] |
| automated clearing house (claims 1, 8, 9) | an automated clearing house including, but not limited to, the national U.S. clearing house sometimes referred to as the "ACH" |

4

---

[1] While the parties agree to the recited function of this claim element pursuant to 35 U.S.C. 112(6), the parties dispute the meaning of limitations within that function, as set forth in the Parties' Proposed Construction of Disputed Claim Terms and the parties' briefs.

DATED: October 7, 2005

/s/ Mary B. Matterer
Richard K. Herrmann (I.D. No. 405)
Mary B. Matterer (I.D. No. 2696)
MORRIS JAMES HITCHENS
& WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
302.888.6800
rherrmann@morrisjames.com
mmatterer@morrisjames.com

*Counsel for Plaintiff*
*LML Patent Corp.*

/s/ Timothy Devlin
William J. Marsden, Jr. (I.D. No. 2247)
Timothy Devlin (I.D. No. 4241)
Sean Hayes (I.D. No. 4413)
FISH & RICHARDSON P.C.
919 North Market Street, Suite 1000
Wilmington, Delaware 19801
302.652.5070
marsden@fr.com
hayes@fr.com

*Counsel for Defendant*
*TeleCheck Services, Inc.*

/s/ Francis DiGiovanni
Francis DiGiovanni (I.D. No. 3189)
CONNOLLY BOVE LODGE & HUTZ
LLP
The Nemours Building
1007 N. Orange Street
Wilmington, Delaware 19801
302.658.9141
fdigiovanni@cblh.com

*Counsel for Defendants*
*Electronic Clearing House, Inc.*
*and Xpresschex, Inc.*

/s/ Richard D. Kirk (rk0922)
Richard D. Kirk (I.D. No. 922)
THE BAYARD FIRM
222 Delaware Avenue, Suite 900
Wilmington, DE 19801
302.429.4208
rkirk@bayardfirm.com

*Counsel for Defendant*
*NOVA Information Systems, Inc.*

5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
**CERTIFICATE OF SERVICE**

I hereby certify that on October 7, 2005, I electronically filed a JOINT PROPOSED
CLAIM CONSTRUCTION STATEMENT with the Clerk of Court using CM/ECF which
will send notification of such filing(s) to the following:

> Richard K. Herrmann
> Mary B. Matterer, Esq.
> Morris James Hitchens & Williams
> 222 Delaware Avenue, 10th Floor
> Wilmington, DE 19801-4226

> Richard D. Kirk, Esq.
> The Bayard Firm
> 222 Delaware Avenue, 9th Floor
> Wilmington, DE 19899

> Collins J. Seitz, Jr., Esq.
> Connolly Bove Lodge & Hutz LLP
> The Nemours Building
> 1007 North Orange Street
> Wilmington, DE 19801

I hereby certify that on October 7, 2005, I have sent by Electronic mail, the

document(s) to the following non-registered participants:

| | |
|---|---|
| Robert Jacobs, Esq. | Russell E. Levine, Esq. |
| Belasco Jacobs & Townsley, LLP | Kirkland & Ellis LLP |
| Howard Hughes Center | 200 E. Randolph Dr. |
| 6100 Center Drive, Suite 630 | Chicago, IL 60601 |
| Los Angeles, CA 90045 | |

> Mark C. Scarsi, Esq.
> O'Melveny & Myers LLP
> 400 S Hope Street
> Los Angeles, CA 90071

> _____/s/ Timothy Devlin_____
> Timothy Devlin

# EXHIBIT 11
# REDACTED IN ITS ENTIRETY

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of November, 2005, I electronically filed the foregoing document, **PUBLIC VERSION OF DECLARATION OF LESLEY G. SMITH IN SUPPORT OF LML'S MOTION FOR SUMMARY JUDGMENT NO. 5:  FOR A RULING THAT CLAIMS 1, 2, 4, 5, 6, 9, 10, 11, 14, 16 AND 18 OF THE '988 PATENT ARE NOT INVALID UNDER 35 U.S.C. §§ 112 AND 132,** with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Collins J. Seitz, Jr., Esq.
Francis DiGiovanni, Esq.
Connolly Bove Lodge & Hutz LLP
1007 North Orange Street
Wilmington, DE  19801

William J. Marsden, Jr., Esq.
Timothy Devlin, Esq.
Fish & Richardson, P.C.
919 North Market Street, Suite 1100
Wilmington, DE  19801

Richard D. Kirk, Esq.
The Bayard Firm
222 Delaware Avenue, 9th Floor
Wilmington, DE  19801

Additionally, I hereby certify that on the 4th day of November, 2005, the foregoing document was served via email on the following non-registered participants:

Robert Jacobs, Esq.
Mark B. Mizrahi, Esq.
Belasco Jacobs & Townsley, LLP
Howard Hughes Center
6100 Center Drive, Suite 630
Los Angeles, CA  90045

Mark C. Scarsi, Esq.
Vision L. Winter, Esq.
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA  90071

_/s/ Mary B. Matterer_
Richard K. Herrmann (#405)
Mary B. Matterer (#2696)
MORRIS, JAMES, HITCHENS
& WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
(302) 888-6800
mmatterer@morrisjames.com

Attorneys for Plaintiff LML PATENT CORP.