# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LML PATENT CORP.,

      Plaintiff,

    v.

TELECHECK SERVICES, INC.,
ELECTRONIC CLEARING HOUSE, INC.,
XPRESSCHEX, INC. and NOVA
INFORMATION SYSTEMS, INC.,

      Defendants.

C.A. 04-858 (SLR)

**TELECHECK'S FIRST SUPPLEMENTAL RESPONSE TO
LML'S AMENDED FIRST SET OF INTERROGATORIES**

**RESERVATION OF RIGHTS**

      Pursuant to Rules 26 and 33, TeleCheck Services, Inc. ("TeleCheck") hereby

provides a First Supplemental Response to LML Patent Corp.'s ("LML") Amended First

Set of Interrogatories, Nos. 1-9 ("Interrogatories"). TeleCheck provides these

supplemental responses without waiving any present or future objection, for example

such as any objection as to the relevance or admissibility of any information provided by

TeleCheck. TeleCheck's investigation regarding this litigation is ongoing, as is

TeleCheck's development of any contentions. These responses are provided subject to

TeleCheck's future investigation, supplementation, or modification. TeleCheck's

agreement to investigate the subject matter of any interrogatory or to provide responsive

information does not constitute an admission that relevant, non-privileged information

responsive to that interrogatory exists. All responses are subject to each of the General

Objections and specific Objections set forth in TeleCheck's original Response to LML's

Amended First Set of Interrogatories.

## FIRST SUPPLEMENTAL RESPONSES TO INTERROGATORIES

### INTERROGATORY NO. 1:

Describe in detail all bases for TeleCheck's contention that it does not infringe the Asserted Claims of the Patents-In-Suit, either literally or under the doctrine of equivalents, and its contention that it has not contributed to the infringement by others and/or has not induced others to infringe any Asserted Claim of the Patents-In-Suit including a claim chart explaining in detail all specific structural or functional differences between each Accused Product and the Asserted Claims.

(As used herein, "Patents-in-Suit" means U.S. Patent Nos. 5,484,988, 6,164,528, 6,283,366; "TeleCheck's Accused Products," "Accused Product," or "product" means any equipment, component, system, or services manufactured, sold, offered for sale, used, or imported by TeleCheck for or associated with the conversion of checks, presented at points of sale, to electronic transactions, including but not limited to, TeleCheck's "Electronic Check Acceptance Service"; and "Asserted Claims" means claims 1-6, 8-11, and 13 of the '988 patent, claims 11 and 18 of the '528 patent, and claims 3 and 25 of the '366 patent).

### RESPONSE TO INTERROGATORY NO. 1:

TeleCheck objects to this interrogatory as premature, in that it seeks expert discovery and contentions which TeleCheck has not yet fully developed at this stage of the litigation. TeleCheck further objects to this interrogatory as premature, because it requires contentions regarding claim construction, and is therefore in conflict with the Scheduling Order governing this case. TeleCheck further objects to LML's definition of "TeleCheck's Accused Products," "Accused Product," or "product" as vague, overly broad and unduly burdensome. TeleCheck further objects to this interrogatory insofar as LML is attempting to shift its burden of proof on infringement to TeleCheck. Plaintiffs, not defendants, bear the burden of proving infringement. TeleCheck has only recently received LML's infringement contentions and asserted claims. Subject to these objections, TeleCheck will supplement its responses as necessary to reflect its contentions in a time and manner agreed-upon by the parties, or other reasonable time as contentions are developed.

## FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:

TeleCheck incorporates by reference its initial objections and response as though fully set forth herein. TeleCheck expressly reserves the right to supplement this response as discovery proceeds, and provides the following information in response to this Interrogatory:

TeleCheck does not infringe any of claims 1-6, 8-11, and 13 of the '988 patent; any of claims 11 and 18 of the '528 patent; nor any of claims 3 and 25 of the '366 patent, at least because the Accused Products do not meet the limitation "without using the check as a negotiable instrument" (the "negotiable instrument" limitation) either literally or (if available) under the doctrine of equivalents.

The TeleCheck Accused Products do not meet this limitation because the consumer bank check is in fact used as a negotiable instrument. In the TeleCheck system, the magnetic ink character recognition ("MICR") reader reads not only bank account information, but also the bank check number. Using the check number, the host system then clears and voids the check during the transaction. TeleCheck's scanning of the check number and subsequent cancellation of the check is consistent with use of the check as a negotiable instrument.

The electronic submission of the check information (including the check number, amount of the check and other MICR information) through the TeleCheck system constitutes a presentment of the check and is the time at which all of the warranties of presentment attach. This is also consistent with using the check as a negotiable instrument. Having undergone presentment, the spent and voided check is returned to the customer, in materially the same way a customer receives presented and voided checks in the mail along with their monthly bank statements.

TeleCheck further requires its merchants to have consumers fill out and sign checks before handing them to the merchant. The signed bank check constitutes a negotiable instrument, and is used as such in the TeleCheck system. The signed bank check itself may be retained as part of a normal checking transaction, rather than carrying on the transaction electronically. This may occur in the TeleCheck system, when certain banks disallow conversion of the paper check to an electronic check at the terminal. In

3

such cases, the terminal displays an appropriate prompt, and the merchant simply retains the signed bank check without any further information from the consumer. This treatment of the check is only possible because the signed check meets all criteria of a negotiable instrument, and is used as a negotiable instrument.

The "negotiable instrument" limitation can not be expanded to cover "equivalents." In general, negative limitations are not entitled to any scope of equivalents. *See Athletic Alternatives Inc. v. Prince Mfg.*, 73 F.3d 1573 (Fed. Cir. 1996); *Pennwalt v. Durand-Wayland Inc.*, 833 F.2d 931 (Fed. Cir. 1987). Further, with respect to the '988 patent, the limitation was added to each independent claim during prosecution to overcome prior art. (*See* Preliminary Amendment dated June 9, 1994, LML-EP-000170-175.) As a result, the *Festo* presumption applies to this limitation within the '988 patent and precludes any scope of equivalents.

The Applicants further relied on the "negotiable instrument" limitation during prosecution to obtain allowance of all Asserted Claims over the prior art. For example, during prosecution of the '528 patent the Applicants argued:

> As a convenience to the consumer, bank account information is read off of a check. However, the check is not utilized as a negotiable instrument. As such the check need not even be signed by the consumer. All of the information is stored in the check writing point of sale system, and transfer of the funds is handled electronically.

(Response dated May 20, 1999; *see also* Response dated January 30, 1995, LML-EP-000189-209; Response dated May 21, 1998, LML-EP 000414-18.) This disavowal of claim scope further precludes any application of the doctrine of equivalents.

Even if resort to the doctrine of equivalents is available, the Accused Products do not meet the "negotiable instrument" limitation because the differences between the Accused Products and the limitation (as described above) are not insubstantial.

TeleCheck does not infringe any of claims 2 and 8-11 of the '988 patent, nor any of claims 11 and 18 of the '528 patent at least because the Accused Product do not meet the limitation of reading MICR information for the "sole purpose of obtaining consumer bank account information," either literally or (if available) under the doctrine of equivalents.

4

In the TeleCheck system the check number is also read by the terminal. This additional information is not obtained for the "sole purpose" of obtaining bank account information, and therefore this limitation is not literally met by the TeleCheck system.

The "sole purpose" limitation was added to the claims during prosecution of the '988 patent. (Compare original claims, LML0EP 000104-06, with Preliminary Amendment dated June 8, 1994, LM-EP 000170-79.) As a result, the *Festo* presumption applies to this limitation within the '988 patent and precludes any scope of equivalents.

The Applicants expressly relied on this limitation to obtain allowance of the claims over the prior art. (*See, e.g.*, Amendment dated January 30, 1995, LML-EP-000189-209; "None of the references discloses a point-of-sale system that uses any bank check solely for the purposes of gathering customer information and not as a negotiable instrument;" *see also* Preliminary Amendment dated June 9, 1994, LML-EP-000170-000175.) This clear disavowal of claim scope precludes any scope of equivalents.

Even if resort to the doctrine of equivalents is available, the Accused Products do not meet the "sole purpose" limitation because the differences between the Accused Products and the limitation (as described above) are not insubstantial.

TeleCheck does not infringe any of claims 1-6, 8-11, and 13 of the '988 patent; nor claim 3 of the '366 patent, at least because the Accused Products do not meet the limitation of a terminal adapted to receive consumer bank account information from "any bank check," either literally or (if available) under the doctrine of equivalents.

The TeleCheck system cannot be used with foreign checks such as Canadian checks, or with checks from credit card companies (*i.e.*, checks that act as a cash advance from the credit card issuer).

The "any bank check" limitation was added to the claims during prosecution of the '988 patent to overcome the prior art. (Compare original claims, LML-EP 000104-06, with Response dated January 30, 1995, LML-EP 000183-209.) As a result, the *Festo* presumption applies to this limitation within the '988 patent and precludes any scope of equivalents. The Applicants further relied on this limitation to distinguish the prior art (*see* LML-EP 000207). Accordingly, no scope of equivalents is available.

5

Even if the doctrine of equivalents is applicable, the Accused Products do not infringe under the doctrine of equivalents because the differences between the Accused Products and the claim limitation are not insubstantial.

## INTERROGATORY NO. 2:

Separately for each Asserted Claim of the Patents-In-Suit, describe in detail all legal and factual bases for TeleCheck's contention that the Asserted Claims of the Patents-In-Suit are invalid, and for each piece of alleged prior art, and/or combination of alleged prior art, that TeleCheck contends invalidates each Asserted Claim, provide a detailed claim chart that identifies each element of the Asserted Claims that TeleCheck contends is disclosed or taught by the prior art with citations to each instance where such element is allegedly disclosed or taught by the prior art.

## RESPONSE TO INTERROGATORY NO. 2:

TeleCheck objects to this interrogatory as premature, in that it seeks expert discovery and contentions which TeleCheck has not yet fully developed at this stage of the litigation. TeleCheck further objects to this interrogatory as premature, because it requires contentions regarding claim construction, and is therefore in conflict with the Scheduling Order governing this case. Subject to these objections, TeleCheck will produce charts and other information as necessary, reflecting its contentions in a time and manner agreed-upon by the parties.

## FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:

TeleCheck incorporates by reference its initial objections and response as though fully set forth herein. TeleCheck expressly reserves the right to supplement this response as discovery proceeds, and provides the following information in response to this Interrogatory:

Based on the claim construction apparently asserted by LML, as presently understood by TeleCheck, the Asserted Claims are invalid as set forth below:

6

### 1.    The '988 Patent

Claims 1, 4, 9-10, and 13 of the '988 patent are invalid under as anticipated 35

U.S.C. § 102 by U.S. Patent No. 5,175,682 to Higashiyama ("Higashiyama").  Each and

every element of claims 1, 4, 9-10 and 13 of the '988 patent is taught by Higashiyama.

| The '988 Patent | Higashiyama |
|---|---|
| 1. A checkwriting point of sale system comprising: | A system for processing checks presented at the point of sale.  (*See* col. 2, lines 43-46; col. 3, lines 11-14.) |
| a point of sale terminal adapted to receive consumer bank account information from any bank check; | Point of sale system 210 including a MICR reader 202 used for reading the magnetic account number printed on checks.  (*See* col. 3, lines 13-18.) |
| a central computer system; | Backroom processor 204 to which one or more point of sale systems are connected.  (*See* Figure 2; col. 3, lines 13-14, 29-33.) |
| first communications means integral to said point of sale terminal for electronically communicating with the central computer system; | POS terminal 201 (which is part of the point of sale system) is connected to the backroom processor 204.  (*See* col. 3, lines 29-30.) |
| memory means integral to said point of sale terminal for temporarily storing the consumer bank account information; | Data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201.  (*See* col. 3, lines 55-62; col. 5, lines 1-4.) |
| the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; | Backroom processor 204 receives data records from the POS terminal 201.  (*See* col. 5, lines 1-10.)  Since the backroom processor 204 is connected to one or more point of sale systems 210, each having a POS terminal 201 that supplies data records, the backroom processor 204 receives data records from one or more (plurality) of point of sale systems 210. |
| the central computer system second communication means enabling | Backroom processor 204 will take the data records it has accumulated and upload them |

7

| | |
|---|---|
| said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the bank check as a negotiable instrument. | to a clearing house. (*See* col. 5, lines 11-13.) The data record is also used to verify check authorization by being compared to a file. (*See* col. 4, lines 14-24.) The information from the paper check is electronically processed and the check is returned to the customer at the point of sale. (*See* col. 4, lines 54-57.) |
| 4. The checkwriting point of sale system according to claim 1 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip. | Printer 203 for printing a sales slip. (*See* col. 3, lines 25-27.) |
| 9. A checkwriting point of sale system comprising: | A system for processing checks presented at the point of sale. (*See* col. 2, lines 43-46; col. 3, lines 11-14.) |
| a point of sale terminal adapted to receive consumer bank account information; | Point of sale system 210 including a MICR reader 202 used for reading the magnetic account number printed on checks. (*See* col. 3, lines 13-18.) |
| a central computer system; | Backroom processor 204 to which one or more point of sale systems are connected. (*See* Figure 2; col. 3, lines 13- 14, 29-33.) |
| first communications means integral to said point of sale terminal for electronically communicating with the central computer system; and | POS terminal 201 (which is part of the point of sale system) is connected to the backroom processor 204. (*See* col. 3, lines 29-30.) |
| memory means integral to said point of sale terminal for temporarily storing the consumer bank account information; | Data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201. (*See* col. 3, lines 55-62; col. 5, lines 1-4.) |
| the point of sale terminal comprising reading means for reading magnetic ink character recognition numbers on any consumer bank check for the sole | MICR reader 202 reads the account information on the check. (*See* col. 3, lines 48-50.) |

8

| | |
|---|---|
| purpose of eliciting consumer bank account information; | |
| the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; | Backroom processor 204 receives data records from the POS terminal 201. (*See* col. 5, lines 1-10.) Since the backroom processor 204 is connected to one or more point of sale systems 210, each having a POS terminal 201 that supplies data records, the backroom processor 204 receives data records from one or more (plurality) of point of sale systems 210. |
| the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using a bank check as a negotiable instrument. | Backroom processor 204 will take the data records it has accumulated and upload them to a clearing house. (*See* col. 5, lines 11-13.) The data record is also used to verify check authorization by being compared to a file. (*See* col. 4, lines 14-24.) Further, the information from the paper check is electronically processed, and the check is returned to the customer at the point of sale. (*See* col. 4, lines 54-57.) |
| 10. The checkwriting point of sale system according to claim 9 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip. | Printer 203 for printing a sales slip. (*See* col. 3, lines 25-27.) |
| 13. The checkwriting point of sale system according to claim 4, wherein the sales slip includes means for execution by the consumer for proof of bank account access authorization. | A fully automated system generally comprises a dual-port terminal with magnetic stripe reading capabilities interfaced with a logging printer capable of providing individual transaction event slips for consumer execution. (*See* col. 5, lines 44-47.) |

Claim 2 of the '988 patent is obvious under 35 U.S.C. § 103 as unpatentable over Higashiyama.

9

| The '988 Patent | Higashiyama |
|---|---|
| 2. The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further includes means for reading magnetic ink character recognition numbers appearing on a consumer check for the sole purpose of identifying and reading the consumer bank account information. | MICR reader 202, which is disclosed as part of the point of sale system 210, reads the consumer account information. (*See* col. 3, lines 47-50.) |

Claim 3 of the '988 patent is obvious under 35 U.S.C. § 103 as unpatentable over Higashiyama in view of U.S. Patent No. 5,053,607 to Carlson ("Carlson").

| The '988 Patent | Higashiyama + Carlson |
|---|---|
| 3. The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further comprises an alphanumeric display means for receiving said consumer bank account information from the memory means and for displaying the consumer bank account information. | Carlson teaches an alphanumeric display used in connection with a point-of-sale device for reading MICR numbers from checks. When the MICR data is entered manually by the merchant, the MICR data is displayed digit-for-digit/stroke-for-stroke at the display. (*See* col. 21, lines 5-8.) It would have been obvious to include alphanumeric display means in the system described by Higashiyama. |

Claim 6 of the '988 patent is obvious under 35 U.S.C. § 103 as unpatentable over Higashiyama in view of an article about a POS terminal network known as the Cactus Switch ("Cactus Switch article"). The Cactus Switch article was published September 1986 and constitutes § 102(b) prior art against the '988, '528 and '366 patents.

| The '988 Patent | Higashiyama + Cactus Switch article |
|---|---|
| 6. The checkwriting point of sale system according to claim 1 wherein the central computer system further comprises a system subscriber database, the system subscriber database comprising | The central computer of Higashiyama serves one or more POS terminals of a single merchant. The Cactus Switch network serves multiple merchants and the transaction is cleared through the Arizona Clearing House Association. It would have been obvious to |

| | |
|---|---|
| information regarding merchants and service providers that are authorized to use the checkwriting point of sale system. | modify Higashiyama's POS system to service multiple merchants (e.g., multiple merchants belonging to the same retail chain) such that its central computer comprises a system subscriber database so that proper accounting of sales and credits can be made. |

Claim 13 of the '988 patent is further invalid as obvious under 35 U.S.C. § 103 over Higashiyama in view of another article about the Cactus Switch ("second Cactus Switch article"). The second Cactus Switch article was published on November 17, 1986 and constitutes § 102(b) prior art against the '988, '528 and '366 patents.

| The '988 Patent | Higashiyama + second Cactus Switch article |
|---|---|
| 13. The checkwriting point of sale system according to claim 4, wherein the sales slip includes means for execution by the consumer for proof of bank account access authorization. | The second Cactus Switch article teaches that checking account debit authorizations may be provided by personal identification numbers or signatures. (*See* p. 4.) In view of this teaching, it would have been obvious to modify Higashiyama's POS system to include a sales receipt with a signature space for the consumer to provide authorization to debit his or her checking account. |

Claim 8 of the '988 patent is obvious under 35 U.S.C. § 103 as unpatentable over Higashiyama in view of U.S. Patent No. 4,321,672 to Braun ("Braun").

| The '988 Patent | Higashiyama + Braun[1] |
|---|---|
| 8. A checkwriting point of sale process comprising: | A method for processing checks presented at the point of sale. (*See* col. 2, lines 43-46; col. 3, lines 11-14.) |
| a) presenting any bank check specimen to a point of sale terminal located at a merchant or | Customer provides a check to the merchant. (*See* col. 3, lines 47-48.) |

---

[1] Unless otherwise noted, citations are to Higashiyama.

| | |
|---|---|
| service provider, | |
| b) reading the magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument, | MICR reader 202 reads the account information on the check.  (*See* col. 3, lines 48-50.) |
| c) storing the consumer bank account information obtained from the check and verifying that account numbers were accurately read at the point of sale terminal, | Data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201, i.e., stored at the POS terminal 201.  (*See* col. 3, lines 55-62; col. 5, lines 1-4.)  The step of verifying is made obvious in view of Braun, which teaches use of error detector circuits 52 which identify errors in the ABA code from the reader 38.  (*See* Braun, col. 7, lines 31-33; col. 19, lines 46-49.) |
| d) providing transaction event information to the point of sale terminal, | The amount the check is written for is provided by the merchant via the POS keypad.  (*See* col. 3, lines 64-66.) |
| e) transmitting the transaction event information and consumer bank account information to a central computer system, | POS terminal 201 sends the data record to the backroom processor 204.  (*See* col. 5, lines 1-10.) |
| f) storing the transaction event information and consumer banking account information, and | Backroom processor 204 accumulates the data records that it receives.  (*See* col. 5, lines 11-12.) |
| g) subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations. | The data records are batch uploaded to a clearing house.  (*See* col. 5, lines 11-13.) |

Claims 1, 8 and 9, and the asserted claims of the '988 patent which depend from claims 1, 8 and 9 are further invalid under 35 U.S.C. § 112, first paragraph, because the original disclosure failed to provide sufficient written description for claim language

12

subsequently added in a June 1994 Office Action response. Further, the subsequent addition to the written description constituted new matter, in violation of 35 U.S.C. § 132.

Claims 1-6, 9-11 and 13 are further invalid under 35 U.S.C. § 112, first paragraph, for failure to provide in the patent specification an enabling disclosure for a second communication means "enabling automated clearing house communications for transferring funds without using the bank check as a negotiable instrument."

Claim 8 is further invalid under 35 U.S.C. § 112, first paragraph, for failure to provide in the patent specification an enabling disclosure for a checkwriting point of sale process comprising the step of "reading the magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument."

Claims 1-6, 9-11 and 13 are further invalid under 35 U.S.C. § 112, second paragraph, because they recite means-plus-function claims without describing a corresponding structure for such means in the specification as required under 35 U.S.C. § 112, sixth paragraph.

### 2. The '528 Patent

Claim 10 and asserted claim 11 of the '528 patent are obvious under 35 U.S.C. § 103 as unpatentable over Higashiyama in view of Braun.

| The '528 Patent | Higashiyama + Braun[2] |
|---|---|
| 10. A checkwriting point of sale process comprising: | A method for processing checks presented at the point of sale. (*See* col. 2, lines 43-46; col. 3, lines 11-14.) |
| (a) presenting a bank check specimen to a point of sale terminal located at a merchant or service | Customer provides a check to the merchant. (*See* col. 3, lines 47-48.) |

---

[2] Unless otherwise noted, citations are to Higashiyama.

| provider; | |
|---|---|
| (b) reading a magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument; | MICR reader 202 reads the account information on the check.  (*See* col. 3, lines 48-50.) |
| (c) storing the consumer bank account information obtained from the check and verifying that account numbers were accurately read at the point of sale terminal; | Data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201, i.e., stored at the POS terminal 201.  (*See* col. 3, lines 55-62; col. 5, lines 1-4.)  The step of verifying is made obvious in view of Braun, which teaches use of error detector circuits 52 which identify errors in the ABA code from the reader 38.  (*See* Braun, col. 7, lines 31-33; col. 19, lines 46-49.) |
| (d) providing transaction event information to the point of sale terminal; | The amount the check is written for is provided by the merchant via the POS keypad.  (*See* col. 3, lines 64-66.) |
| (e) transmitting the transaction event information and consumer bank account information to a central computer system; | POS terminal 201 sends the data record to the backroom processor 204.  (*See* col. 5, lines 1-10.) |
| (f) storing the transaction event information and consumer banking account information; | Backroom processor 204 accumulates the data records that it receives.  (*See* col. 5, lines 11-12.) |
| (g) subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations; and | The data records are batch uploaded to a clearing house.  (*See* col. 5, lines 11-13.) |
| (h) returning the bank check specimen to the consumer. | Check is returned to the customer for safekeeping.  (*See* col. 4, lines 54-55.) |
| 11. The checkwriting point of sale process of claim 10 further comprising: annotating the bank check specimen before returning the bank check specimen to the | Validation information, indicating that electronic data pertaining to the check has been routed for collection and the check may be considered canceled, is printed on the check.  (*See* col. 4, lines 26-32.)  The |

14

| consumer. | validated check is returned to the customer. (*See* col. 4, lines 54-55.) |
|---|---|

Claims 11 and 18 of the '528 are invalid under 35 U.S.C. § 112, first paragraph, because the original disclosure failed to provide sufficient written description for a checkwriting point of sale process comprising the step of "reading the magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument."

All Asserted Claims of the '528 are further invalid under 35 U.S.C. § 102(b) based on both the public use bar and the on-sale bar.

3.    **The '366 Patent**

Claim 24 and asserted claim 25 of the '366 patent are invalid under 35 U.S.C. § 103 as unpatentable over a Sacramento Bee article published on November 7, 1995 ("the Sacramento Bee article") in view of Braun or Carlson.

| The '366 Patent | Sacramento Bee Article + Braun/Carlson[3] |
|---|---|
| 24. A checkwriting point of sale process comprising: | Process is referred to as point-of-sale electronic draft capture. (*See* ¶¶ 3, 10.) |
| a payer completing a check for a transaction with a merchant or service provider; | A number of prior art references, including Braun (col. 24, lines 61-66) and Carlson (col. 22, lines 57-58), teaches a point-of-sale process that includes the step of completing the check, followed by its cancellation and return to the payer. It would have been obvious to include a step of completing the check with the method of the Sacramento Bee Article. For example, Braun teaches that upon receipt of the monthly statement, the customer can verify the accuracy of the monthly statement using the cancelled checks. (*See* Carlson col. 26, lines 58- 62.) |

---

[3] Unless otherwise noted, citations are to the Sacramento Bee article.

| | |
|---|---|
| using a point of sale terminal associated with said merchant or service provider to read MICR information on the check to obtain payer bank account information; | The automated system reads the check (account) number and checks the status of the account. (*See* ¶ 10.) |
| inputting transaction information, including at least a transaction amount, into the point of sale terminal; | If the customer's account is in good standing and covers the amount of the purchase, the system authorizes an approval. (*See* ¶ 11.) The purchase amount, which corresponds to transaction event information, had to have been entered. |
| printing an authorization to debit the payer bank account by the transaction amount for the payer to sign; | The system prints out a statement similar to those consumers sign for credit card purchases. (*See* ¶ 11.) |
| the payer signing the authorization; | The customer signs the statement. (*See* ¶ 11.) |
| returning a copy of the signed authorization and the check to the payer; and | The statement is similar to those used for credit card purchases, so a copy of the statement is returned to the customer. (*See* ¶ 11.) The same check may be used over and over again, so the check is also returned to the customer. (*See* ¶ 1.) |
| electronically debiting said payer bank account by said transaction amount based on the signed authorization, without using the check as a negotiable instrument. | Each transaction is electronically debited from the customer's checking account within 24 to 48 hours. (*See* ¶ 12.) Further, the information from the paper check is electronically processed, and the check is returned to the customer at the point of sale. |
| 25. The checkwriting point of sale process of claim 24, further comprising voiding the completed check prior to returning it to the payer. | Carlson teaches cancellation (voiding) of the check prior to returning it to the customer. (*See* Carlson col. 24, lines 58- 60.) |

Claims 24 and 25 of the '366 patent are further invalid under 35 U.S.C. § 103 as

unpatentable over a report authored by Robert Ballen ("the Ballen Report") in view of

Higashiyama or Carlson. The Ballen Report was distributed to members of the

16

Electronic Check Council ("ECC") during a meeting on August 3, 1995. ECC members, totaling about 95 in number, represented banks, retailers, remittance processors, and other service providers in the field of check processing. The Ballen Report is § 102(b) prior art against the '528 and '366 patents as a publication, because (i) it was made available without any confidentiality obligations or restrictions as to further distribution, and (ii) it was distributed to the those skilled in the relevant technical field, namely the field of electronic check processing.

The Ballen Report expressly teaches that, in a paper-initiated electronic funds transfer ("PI-EFT"), the amount and the date may or may not be indicated on the check and the payer may or may not sign the check, but that the check merely serves as a source of information to initiate an EFT processed through the ACH. The Ballen Report, in combination with the Sacramento Bee article renders claims 24 and 25 of the '366 invalid.

| The '366 Patent | Ballen Report + Sacramento Bee Article[4] |
|---|---|
| 24. A checkwriting point of sale process comprising: | PI-EFT refers to a model whereby the payer initiates an EFT debit to the payer's account by providing the payee with a check which prescribes the payer's account number and the payer's bank's routing number. (*See* § II.A.I.) |
| a payer completing a check for a transaction with a merchant or service provider; | The payer may sign the check. (*See* § II.A.I.) |
| using a point of sale terminal associated with said merchant or service provider to read MICR information on the check to obtain payer bank account information; | The Ballen Report suggests use of the electronic terminal. § III.D. The Sacramento Bee Article teaches use of an automated system to read the check (account) number and check the status of the account. (See ¶ 11.) It would have been obvious to utilize the automated terminal of the Sacramento Bee article with the system of the Ballen Report for speed and accuracy. |

---

[4] Unless otherwise noted, citations are to the Ballen Report.

| inputting transaction information, including at least a transaction amount, into the point of sale terminal; | When an electronic terminal is used for PI-EFT, it is inherent that a transaction amount is inputted into the electronic terminal. |
| --- | --- |
| printing an authorization to debit the payer bank account by the transaction amount for the payer to sign; | The Ballen Report teaches that a written authorization from the payer is required for the payee to initiate an electronic debit. (*See* § III.B.1.) |
| the payer signing the authorization; | In circumstances where the authorization is printed out for the payer, the payer may sign the authorization. (*See* § III.B.2.) |
| returning a copy of the signed authorization and the check to the payer; and | A copy of the authorization may be provided to the customer. (*See* § III.B.2.) |
| Electronically debiting said payer bank account by said transaction amount based on the signed authorization, without using the check as a negotiable instrument. | In PI-EFT, the check serves as a source of information to initiate an EFT. (*See* § II.A.1.) The payer may provide a blank or partially completed check to initiate the EFT. (*See* § III.4.) |

Claim 3 of the '366 patent is invalid under 35 U.S.C. § 112, second paragraph, because it recites a means-plus-function claim without describing a corresponding structure for such means in the specification as required under 35 U.S.C. § 112, sixth paragraph.

Claim 25 of the '366 patent is further invalid under 35 U.S.C. § 112, first paragraph, because the original disclosure failed to provide sufficient written description support for a checkwriting point of sale process comprising the step of "electronically debiting, . . . without using the check as a negotiable instrument."

All Asserted Claims of the '366 are further invalid under 35 U.S.C. § 102(b) based on both the public use bar and the on-sale bar.

**4. All Patents-in-Suit**

All Asserted Claims of the '988, '528 and '366 patents are invalid under 35 U.S.C. § 102(f) and/or § 116 because of improper inventorship.

All Asserted Claims of the patents-in-suit are invalid under the second paragraph of 35 U.S.C. § 112 because the claims either recite, or depend from a claim that recites the negative limitation "without using the check [or bank check] as a negotiable instrument," rendering the claims indefinite.

All Asserted Claims of the patents-in-suit are invalid under the second paragraph of 35 U.S.C. § 112 because the term "negotiable instrument" is a legal term subject to various interpretations, including various interpretations under state law and/or the UCC, and therefore ambiguous.

TeleCheck's investigation into its defenses is continuing, and it reserves the right to supplement these defenses and/or assert additional invalidity defenses as discovery progresses.

Dated: January 28, 2005              FISH & RICHARDSON P.C.

                                     By: _____
                                         William J. Marsden, Jr. (#2247)
                                         Timothy Devlin (#4241)
                                         Tara D. Elliott (#4483)
                                         919 N. Market Street, Suite 1100
                                         P.O. Box 1114
                                         Wilmington, DE  19899-1114
                                         (302) 652-5070

                                     *Attorneys for Defendant*
                                     *TeleCheck Services, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 28th day of February, 2005, a true and correct copy of

**TELECHECK'S FIRST SUPPLEMENTAL RESPONSE TO LML'S AMENDED**

**FIRST SET OF INTERROGATORIES** was caused to be served on the attorneys of

record at the following addresses as indicated:

**BY HAND DELIVERY**
Richard K. Herrmann, Esq.
Mary B. Matterer, Esq.
Blank Rome LLP
1201 North Market Street, Suite 800
Wilmington, DE 19801-4226

**BY EMAIL AND FIRST CLASS MAIL**
Robert Jacobs, Esq.
Belasco Jacobs & Townsley, LLP
Howard Hughes Center
6100 Center Drive, Suite 630
Los Angeles, CA 90045

**BY HAND DELIVERY**
Richard D. Kirk, Esq.
Morris, James Hitchens & Williams LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19899

**BY EMAIL AND FIRST CLASS MAIL**
Russell E. Levine, Esq.
Kirkland & Ellis LLP
200 E. Randolph Dr.
Chicago, IL 60601

**BY HAND DELIVERY**
collins J. Seitz, Jr., Esq.
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19801

**BY EMAIL AND FIRST CLASS MAIL**
Mark C. Scarsi, Esq.
O'Melveny & Myers LLP
400 S Hope Street
Los Angeles, CA 90071

Tara D. Elliott

80022436.doc

# EXHIBIT 3

RECEIVED

JUL 1 9 2005

RICHARD K. HERRMANN

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LML PATENT CORP.,

        Plaintiff,

     v.

TELECHECK SERVICES, INC.,
ELECTRONIC CLEARING HOUSE, INC.,
XPRESSCHEX, INC. and NOVA
INFORMATION SYSTEMS, INC.,

        Defendants.

C.A. 04-858 (SLR)

### TELECHECK'S SUPPLEMENTAL RESPONSE TO LML'S AMENDED FIRST SET OF INTERROGATORIES (NOS. 1 AND 2) AND LML'S SECOND SET OF INTERROGATORIES (NOS. 10 AND 11) DATED JULY 18, 2005

### RESERVATION OF RIGHTS

Pursuant to Rules 26 and 33, TeleCheck Services, Inc. ("TeleCheck") hereby

provides a further Supplemental Response to LML Patent Corp.'s ("LML") Amended

First Set of Interrogatories, Nos. 1-9 and LML's Second Set of Interrogatories, Nos. 10-

11. TeleCheck provides these supplemental responses without waiving any present or

future objection, for example such as any objection as to the relevance or admissibility of

any information provided by TeleCheck. TeleCheck's investigation regarding this

litigation is ongoing, as is TeleCheck's development of any contentions. These responses

are provided subject to TeleCheck's future investigation, supplementation, or

modification. TeleCheck's agreement to investigate the subject matter of any

interrogatory or to provide responsive information does not constitute an admission that

relevant, non-privileged information responsive to that interrogatory exists. All

responses are subject to each of the General Objections and specific Objections set forth

in TeleCheck's original Response to LML's Amended First Set of Interrogatories.

## INTERROGATORY NO. 1:

Describe in detail all bases for TeleCheck's contention that it does not infringe the Asserted Claims of the Patents-In-Suit, either literally or under the doctrine of equivalents, and its contention that it has not contributed to the infringement by others and/or has not induced others to infringe any Asserted Claim of the Patents-In-Suit including a claim chart explaining in detail all specific structural or functional differences between each Accused Product and the Asserted Claims.

(As used herein, "Patents-in-Suit" means U.S. Patent Nos. 5,484,988, 6,164,528, 6,283,366; "TeleCheck's Accused Products," "Accused Product," or "product" means any equipment, component, system, or services manufactured, sold, offered for sale, used, or imported by TeleCheck for or associated with the conversion of checks, presented at points of sale, to electronic transactions, including but not limited to, TeleCheck's "Electronic Check Acceptance Service"; and "Asserted Claims" means claims 1-6, 8-11, and 13 of the '988 patent, claims 11 and 18 of the '528 patent, and claims 3 and 25 of the '366 patent).

## RESPONSE TO INTERROGATORY NO. 1:

TeleCheck objects to this interrogatory as premature, in that it seeks expert

discovery and contentions which TeleCheck has not yet fully developed at this stage of

the litigation. TeleCheck further objects to this interrogatory as premature, because it

requires contentions regarding claim construction, and is therefore in conflict with the

Scheduling Order governing this case. TeleCheck further objects to LML's definition of

"TeleCheck's Accused Products," "Accused Product," or "product" as vague, overly

broad and unduly burdensome. TeleCheck further objects to this interrogatory insofar as

LML is attempting to shift its burden of proof on infringement to TeleCheck. Plaintiffs,

not defendants, bear the burden of proving infringement. TeleCheck has only recently

received LML's infringement contentions and asserted claims. Subject to these

objections, TeleCheck will supplement its responses as necessary to reflect its

2

contentions in a time and manner agreed-upon by the parties, or other reasonable time as contentions are developed.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:**

TeleCheck incorporates by reference its initial objections and response as though fully set forth herein. TeleCheck expressly reserves the right to supplement this response as discovery proceeds, and provides the following information in response to this Interrogatory:

TeleCheck does not infringe any of claims 1-6, 8-11, and 13 of the '988 patent; any of claims 11 and 18 of the '528 patent; nor any of claims 3 and 25 of the '366 patent, at least because the Accused Products do not meet the limitation "without using the check as a negotiable instrument" (the "negotiable instrument" limitation) either literally or (if available) under the doctrine of equivalents.

The TeleCheck Accused Products do not meet this limitation because the consumer bank check is in fact used as a negotiable instrument. In the TeleCheck system, the magnetic ink character recognition ("MICR") reader reads not only bank account information, but also the bank check number. Using the check number, the host system then clears and voids the check during the transaction. TeleCheck's scanning of the check number and subsequent cancellation of the check is consistent with use of the check as a negotiable instrument.

The electronic submission of the check information (including the check number, amount of the check and other MICR information) through the TeleCheck system constitutes a presentment of the check and is the time at which all of the warranties of presentment attach. This is also consistent with using the check as a negotiable

3

instrument. Having undergone presentment, the spent and voided check is returned to the customer, in materially the same way a customer receives presented and voided checks in the mail along with their monthly bank statements.

TeleCheck further requires its merchants to have consumers fill out and sign checks before handing them to the merchant. The signed bank check constitutes a negotiable instrument, and is used as such in the TeleCheck system. The signed bank check itself may be retained as part of a normal checking transaction, rather than carrying on the transaction electronically. This may occur in the TeleCheck system, when certain banks disallow conversion of the paper check to an electronic check at the terminal. In such cases, the terminal displays an appropriate prompt, and the merchant simply retains the signed bank check without any further information from the consumer. This treatment of the check is only possible because the signed check meets all criteria of a negotiable instrument, and is used as a negotiable instrument.

The "negotiable instrument" limitation can not be expanded to cover "equivalents." In general, negative limitations are not entitled to any scope of equivalents. *See Athletic Alternatives Inc. v. Prince Mfg.*, 73 F.3d 1573 (Fed. Cir. 1996); *Pennwalt v. Durand-Wayland Inc.*, 833 F.2d 931 (Fed. Cir. 1987). Further, with respect to the '988 patent, the limitation was added to each independent claim during prosecution to overcome prior art. (*See* Preliminary Amendment dated June 9, 1994, LML-EP-000170-175.) As a result, the *Festo* presumption applies to this limitation within the '988 patent and precludes any scope of equivalents.

The Applicants further relied on the "negotiable instrument" limitation during prosecution to obtain allowance of all Asserted Claims over the prior art. For example, during prosecution of the '528 patent the Applicants argued:

> As a convenience to the consumer, bank account information is read off of a check. However, the check is not utilized as a negotiable instrument. As such the check need not even be signed by the consumer. All of the information is stored in the check writing point of sale system, and transfer of the funds is handled electronically.

(Response dated May 20, 1999; *see also* Response dated January 30, 1995, LML-EP-000189-209; Response dated May 21, 1998, LML-EP 000414-18.) This disavowal of claim scope further precludes any application of the doctrine of equivalents.

Even if resort to the doctrine of equivalents is available, the Accused Products do not meet the "negotiable instrument" limitation because the differences between the Accused Products and the limitation (as described above) are not insubstantial.

TeleCheck does not infringe any of claims 2 and 8-11 of the '988 patent; nor any of claims 11 and 18 of the '528 patent at least because the Accused Product do not meet the limitation of reading MICR information for the "sole purpose of obtaining consumer bank account information," either literally or (if available) under the doctrine of equivalents.

In the TeleCheck system the check number is also read by the terminal. This additional information is not obtained for the "sole purpose" of obtaining bank account information, and therefore this limitation is not literally met by the TeleCheck system.

The "sole purpose" limitation was added to the claims during prosecution of the '988 patent. (Compare original claims, LML0EP 000104-06, with Preliminary Amendment dated June 8, 1994, LM-EP 000170-79.) As a result, the *Festo* presumption applies to this limitation within the '988 patent and precludes any scope of equivalents.

5

The Applicants expressly relied on this limitation to obtain allowance of the claims over the prior art. (*See, e.g.*, Amendment dated January 30, 1995, LML-EP-000189-209; "None of the references discloses a point-of-sale system that uses any bank check solely for the purposes of gathering customer information and not as a negotiable instrument;" *see also* Preliminary Amendment dated June 9, 1994, LML-EP-000170-000175.) This clear disavowal of claim scope precludes any scope of equivalents.

Even if resort to the doctrine of equivalents is available, the Accused Products do not meet the "sole purpose" limitation because the differences between the Accused Products and the limitation (as described above) are not insubstantial.

TeleCheck does not infringe any of claims 1-6, 8-11, and 13 of the '988 patent; nor claim 3 of the '366 patent, at least because the Accused Products do not meet the limitation of a terminal adapted to receive consumer bank account information from "any bank check," either literally or (if available) under the doctrine of equivalents.

The TeleCheck system cannot be used with foreign checks such as Canadian checks, or with checks from credit card companies (*i.e.*, checks that act as a cash advance from the credit card issuer).

The "any bank check" limitation was added to the claims during prosecution of the '988 patent to overcome the prior art. (Compare original claims, LML-EP 000104-06, with Response dated January 30, 1995, LML-EP 000183-209.) As a result, the *Festo* presumption applies to this limitation within the '988 patent and precludes any scope of equivalents. The Applicants further relied on this limitation to distinguish the prior art (*see* LML-EP 000207). Accordingly, no scope of equivalents is available.

Even if the doctrine of equivalents is applicable, the Accused Products do not infringe under the doctrine of equivalents because the differences between the Accused Products and the claim limitation are not insubstantial.

## SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:

TeleCheck incorporates by reference its previous responses as though fully set forth herein. TeleCheck expressly reserves the right to supplement this response as discovery proceeds and provides this supplemental response subject to and without waiving its General and Specific Objections. In addition to the bases cited in TeleCheck's previous Responses to Interrogatory No. 1, the TeleCheck provides the following bases for non-infringement of one or more claims of the patents-in-suit:

TeleCheck does not infringe claim 18 of the '528 patent because the accused products and services do not include any velocity check on a merchant's sales activity, as recited by claim 18, nor is any equivalent check conducted.

## INTERROGATORY NO. 2:

Separately for each Asserted Claim of the Patents-In-Suit, describe in detail all legal and factual bases for TeleCheck's contention that the Asserted Claims of the Patents-In-Suit are invalid, and for each piece of alleged prior art, and/or combination of alleged prior art, that TeleCheck contends invalidates each Asserted Claim, provide a detailed claim chart that identifies each element of the Asserted Claims that TeleCheck contends is disclosed or taught by the prior art with citations to each instance where such element is allegedly disclosed or taught by the prior art.

## PREVIOUS RESPONSES AND SUPPLEMENTAL RESPONSES:

For convenience, TeleCheck has not re-typed its previous responses and supplemental responses to Interrogatory No. 2 in this document. Previous responses were served July 15, 2005.

**SIXTH SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:**

TeleCheck incorporates by reference its previous responses as though fully set forth herein. TeleCheck expressly reserves the right to supplement this response as discovery proceeds and provides this supplemental response subject to and without waiving its General and Specific Objections. In addition to the bases cited in TeleCheck's previous Responses to Interrogatory No. 2, the TeleCheck provides the following bases for invalidity of one or more claims of the patents-in-suit:

The claims of the '988 patent are invalid under 35 U.S.C. § 102(f) because the inventors did not invent the subject matter of the '988 patent. Prior to the filing of the application leading to the '988 patent, Mr. Hills contacted Mr. Steven R. Carlson and obtained information regarding the subject matter of the '988 patent. This information was incorporated into the '988 patent. Mr. Carlson's deposition was recently conducted, and TeleCheck reserves the right to supplement this response based on information recently discovered and to be discovered.

Regarding invalidity under 35 U.S.C. §§ 102 and 103, pursuant to Rule 33(d), in support of its defense of invalidity of the patents in suit, TeleCheck identifies all documents produced in this litigation that constitute prior art to one or more of the asserted patents. TeleCheck reserves the right to provide additional supplementation as it continues to develop its analysis and contentions.

**INTERROGATORY NO. 10:**

Separately for each Patent-in-Suit, describe in detail all legal and factual bases for TeleCheck's contentions that LML is barred from asserting the present cause of action, in whole or in part, by the doctrine of estoppel as set forth in paragraph 100 of TeleCheck's Amended Answer and Affirmative Defenses of Defendant TeleCheck Services, Inc. to Complaint, including, but not limited to all specific instances of how LML allegedly

misled TeleCheck, how TeleCheck allegedly relied on LML's alleged misleading conduct, and as a result of such reliance, how TeleCheck is allegedly materially prejudiced by the present action.

## RESPONSE TO INTERROGATORY NO. 10:

TeleCheck objects to this interrogatory as premature, in that it seeks discovery and contentions which TeleCheck has not yet fully developed at this stage of the litigation. TeleCheck has only recently received any meaningful production from LML. TeleCheck further objects to this interrogatory as vague, overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. TeleCheck further objects to this interrogatory to the extent it seeks information subject to the attorney-client privilege, work product doctrine or other applicable privilege.

Subject to these objections, TeleCheck contends that LML is barred by the doctrine of estoppel due to LML's course of conduct from 1996 to the filing of its Complaint in 2004, during which time representatives of LML made early, initial contacts with TeleCheck regarding the patents-in-suit, followed by inaction. Such lengthy inaction led TeleCheck to believe that LML would not attempt to enforce its patents against TeleCheck. TeleCheck reasonably relied on LML's misleading conduct.

## FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 10:

TeleCheck incorporates by reference its previous responses as though fully set forth herein. TeleCheck expressly reserves the right to supplement this response as discovery proceeds and provides this supplemental response subject to and without waiving its General and Specific Objections. In addition to the bases cited in TeleCheck's previous Responses to Interrogatory No. 10, the TeleCheck provides the

9

following bases for TeleCheck's defense that LML's claims are barred by the doctrine of estoppel:

Attorneys for the inventors effectively accused Defendant TeleCheck of infringement of at least the '988 patent by letter dated May 6, 1997. [*See, e.g.,* LML-EP 012327-012342.] However, Mr. Hills never filed a suit against TeleCheck during the time he owned the '988 patent and the other patents-in-suit. Following Mr. Hills' 1997 letter, he and his attorneys engaged in discussions with TeleCheck during which Mr. Hills and his attorneys characterized his purported invention, including distinctions between the purported invention and the prior art. Mr. Hills was apparently aware of TeleCheck's activities by this time. TeleCheck relied on these representations in designing, developing, launching, and/or providing the accused products and services.

In 1998, LML conducted due diligence in conjunction with its acquisition of the '988 patent and related applications. LML's specially retained intellectual property counsel, Birch, Stewart, Kolasch & Birch, LLP, reviewed the '988 patent, the file wrapper, and relevant prior art and advised LML that the patent had "a narrow scope of protection." [*See, e.g.,* LML-EP 061853-061864.] They further explained that the interpretation of the phrase "without using the bank check as a negotiable instrument" must be construed to mean that "the bank check, at no time, takes on the status of a negotiable instrument" or the patent would be invalid. This same phrase appears in every asserted claim of the patents in suit.

After LML acquired the patents-in-suit, it sent a letter to the President of NACHA, Mr. McEntee, dated March 19, 1999, distancing LML and CPI from Mr. Hills, requesting membership to the ECC, and stating that LML's objective was the

"advancement of the interests of the membership as a whole." He specifically requested the opportunity for LML to participate "in the rule setting for Electronic Checking products." Mr. Gaines further represented that LML did not "seek membership in order to utilize resources for adverse purposes." [LML-EP 010871-010873.] This letter was distributed to the Steering Committee of the ECC. Following its 1999 letter, LML did not file any patent infringement action against TeleCheck. Furthermore, despite its representation that it would not use its participation in the NACHA rule setting process for "adverse purposes," it has now become clear that LML intends to argue that compliance with the NACHA rule for Point of Sale Purchases ("the POP rule") adopted in 2000 necessarily results in infringement of the patents-in-suit.

LML subsequently engaged in discussions with TeleCheck in the 2000-2001 time frame. When those discussions failed to result in any agreement, LML went away for nearly four years, further leading TeleCheck to believe that LML did not intend to enforce its patents against Telecheck's products and services. LML did not file suit until July, 2004.

During the more than seven years that Mr. Hills, and subsequently LML, delayed in bringing any action to enforce the '988 and other patents-in-suit, critical documents, including virtually all documentation of the inventors' work on the alleged invention, were deliberately destroyed or were lost and are no longer available. For example, in response to a subpoena Mr. Hills stated that he had divested or destroyed documents over the preceding five years, so that Mr. Hills had no documents in his possession responsive to the subpoena: "[P]lease be advised that, after greater than 5 years, three moves, and contractual requirements to have divested and/or destroyed documents, I no longer

11

possess any portion of the information requested." [*See* Letter from Robert Hills to Sean Hayes dated May 27, 2005.] The destruction and/or failure to preserve these documents has severely prejudiced the defendants.

LML's belatedly-filed complaint depends on a broad scope of patent protection that is in direct contradiction of the opinion it received from its intellectual property due diligence counsel that the '988 patent has "a narrow scope of protection." LML seeks to use this broad interpretation to hold an entire industry hostage by reading its patents to cover the NACHA POP rule, in direct contradiction to its representation to the President of NACHA that it would use its membership in NACHA to "advance the interests of the membership as a whole."

## INTERROGATORY NO. 11:

Separately for each Patent-In-Suit, describe in detail all legal and factual bases for TeleCheck's contentions that LML is barred from asserting the present cause of action, in whole or in part, by the doctrine of laches as set forth in paragraph 99 of TeleCheck's Amended Answer and Affirmative Defenses of Defendant TeleCheck Services, Inc. to Complaint, including, but not limited to the date or time LML allegedly knew or should have known of its claim against TeleCheck; how LML allegedly delayed filing suit for an unreasonable and inexcusable length of time from the time it knew or should have known of its claim against TeleCheck; and how the alleged delay operated to allegedly prejudice TeleCheck.

## RESPONSE TO INTERROGATORY NO. 11:

TeleCheck objects to this interrogatory to the extent it calls for legal conclusions. TeleCheck further objects to this interrogatory as premature, in that it seeks discovery and contentions which TeleCheck has not yet fully developed at this stage of the litigation. TeleCheck has only recently received any meaningful production from LML. TeleCheck further objects to this interrogatory as vague, overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. TeleCheck further objects to this interrogatory to the extent it seeks

12

information subject to the attorney-client privilege, work product doctrine or other applicable privilege.  TeleCheck further objects to this interrogatory to the extent the term "inexcusable" is vague, ambiguous, and undefined.

Subject to these objections, TeleCheck contends that LML unreasonably delayed filing suit, to the prejudice of TeleCheck.  LML was knowledgeable of TeleCheck's conduct—the same conduct asserted in this suit—in the late nineties.  After making initial early contacts, LML failed to bring suit until July of 2004.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11:**

TeleCheck incorporates by reference its previous responses as though fully set forth herein.  TeleCheck expressly reserves the right to supplement this response as discovery proceeds and provides this supplemental response subject to and without waiving its General and Specific Objections.  In addition to the bases cited in TeleCheck's previous Responses to Interrogatory No. 11, the TeleCheck provides the following bases for TeleCheck's defense that LML's claims are barred by the doctrine of laches:

Attorneys for the inventors effectively accused Defendant TeleCheck of infringement of at least the '988 patent by letter dated May 6, 1997.  [*See, e.g.,* LML-EP 012327-012342.]  However, Mr. Hills never filed a suit against TeleCheck during the time he owned the '988 patent and the other patents-in-suit.  Following Mr. Hills' 1997 letter, he and his attorneys engaged in discussions with TeleCheck during which Mr. Hills and his attorneys characterized his purported invention, including distinctions between the purported invention and the prior art.  Mr. Hills was apparently aware of

13

TeleCheck's activities by this time. TeleCheck relied on these representations in designing, developing, launching, and/or providing the accused products and services.

In 1998, LML conducted due diligence in conjunction with its acquisition of the '988 patent and related applications. LML's specially retained intellectual property counsel, Birch, Stewart, Kolasch & Birch, LLP, reviewed the '988 patent, the file wrapper, and relevant prior art and advised LML that the patent had "a narrow scope of protection." [*See, e.g.,* LML-EP 061853-061864.] They further explained that the interpretation of the phrase "without using the bank check as a negotiable instrument" must be construed to mean that "the bank check, at no time, takes on the status of a negotiable instrument" or the patent would be invalid. This same phrase appears in every asserted claim of the patents in suit.

After LML acquired the patents-in-suit, it sent a letter to the President of NACHA, Mr. McEntee, dated March 19, 1999, distancing LML and CPI from Mr. Hills, requesting membership to the ECC, and stating that LML's objective was the "advancement of the interests of the membership as a whole." He specifically requested the opportunity for LML to participate "in the rule setting for Electronic Checking products." Mr. Gaines further represented that LML did not "seek membership in order to utilize resources for adverse purposes." [LML-EP 010871-010873.] This letter was distributed to the Steering Committee of the ECC. Following its 1999 letter, LML did not file any patent infringement action against TeleCheck. Furthermore, despite its representation that it would not use its participation in the NACHA rule setting process for "adverse purposes," it has now become clear that LML intends to argue that

14

compliance with the NACHA rule for Point of Sale Purchases ("the POP rule") adopted in 2000 necessarily results in infringement of the patents-in-suit..

LML subsequently engaged in discussions with TeleCheck in the 2000-2001 time frame. When those discussions failed to result in any agreement, LML went away for nearly four years, further leading TeleCheck to believe that LML did not intend to enforce its patents against Telecheck's products and services. LML did not file suit until July, 2004.

During the more than seven years that Mr. Hills, and subsequently LML, delayed in bringing any action to enforce the '988 and other patents-in-suit, critical documents, including virtually all documentation of the inventors' work on the alleged invention, were deliberately destroyed or were lost and are no longer available. For example, in response to a subpoena Mr. Hills stated that he had divested or destroyed documents over the preceding five years, so that Mr. Hills had no documents in his possession responsive to the subpoena: "[P]lease be advised that, after greater than 5 years, three moves, and contractual requirements to have divested and/or destroyed documents, I no longer possess any portion of the information requested." [*See* Letter from Robert Hills to Sean Hayes dated May 27, 2005.] The destruction and/or failure to preserve these documents has severely prejudiced the defendants.

LML's belatedly-filed complaint depends on a broad scope of patent protection that is in direct contradiction of the opinion it received from its intellectual property due diligence counsel that the '988 patent has "a narrow scope of protection." LML seeks to use this broad interpretation to hold an entire industry hostage by reading its patents to cover the NACHA POP rule, in direct contradiction to its representation to the President

15

of NACHA that it would use its membership in NACHA to "advance the interests of the

membership as a whole."

Dated: July 18, 2005

FISH & RICHARDSON P.C.

By:  _____

William J. Marsden, Jr. (#2247)
Timothy Devlin (#4241)
Tara D. Elliott (#4483)
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE  19899-1114
(302) 652-5070

*Attorneys for Defendant*
*TeleCheck Services, Inc.*

16

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of July, 2005, a true and correct copy of

**TELECHECK'S SUPPLEMENTAL RESPONSE TO LML'S AMENDED FIRST**

**SET OF INTERROGATORIES (NOS. 1 AND 2) AND LML'S SECOND SET OF**

**INTERROGATORIES (NOS. 10 AND 11) DATED JULY 18, 2005** was caused to be

served on the attorneys of record at the following addresses as indicated:

**BY HAND DELIVERY**
Richard K. Herrmann, Esq.
Morris, James Hitchens & Williams LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19899

**BY EMAIL AND FIRST CLASS MAIL**
Robert Jacobs, Esq.
Belasco Jacobs & Townsley, LLP
Howard Hughes Center
6100 Center Drive, Suite 630
Los Angeles, CA 90045

**BY HAND DELIVERY**
Richard D. Kirk, Esq.
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, DE 19801

**BY EMAIL AND FIRST CLASS MAIL**
Russell E. Levine, Esq.
Kirkland & Ellis LLP
200 E. Randolph Dr.
Chicago, IL 60601

**BY HAND DELIVERY**
Collins J. Seitz, Jr., Esq.
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19801

**BY EMAIL AND FIRST CLASS MAIL**
Mark C. Scarsi, Esq.
O'Melveny & Myers LLP
400 S Hope Street
Los Angeles, CA 90071

Timothy Devlin

17

# EXHIBIT  4
# REDACTED  IN  ITS
# ENTIRETY

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of November, 2005, I electronically filed the foregoing document, **PUBLIC VERSION OF DECLARATION OF LESLEY G. SMITH IN SUPPORT OF LML'S MOTION FOR SUMMARY JUDGMENT NO. 6:  FOR A RULING THAT CLAIMS 1, 2, 4, 5, 6, 9, 10, 11, 14, 16, AND 18 OF THE '988 PATENT ARE NOT INVALID FOR IMPROPER INVENTORSHIP UNDER § 102(F)**, with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Collins J. Seitz, Jr., Esq.
Francis DiGiovanni, Esq.
Connolly Bove Lodge & Hutz LLP
1007 North Orange Street
Wilmington, DE  19801

William J. Marsden, Jr., Esq.
Timothy Devlin, Esq.
Fish & Richardson, P.C.
919 North Market Street, Suite 1100
Wilmington, DE  19801

Richard D. Kirk, Esq.
The Bayard Firm
222 Delaware Avenue, 9th Floor
Wilmington, DE  19801

Additionally, I hereby certify that on the 4th day of November, 2005, the foregoing document was served via email on the following non-registered participants:

Robert Jacobs, Esq.
Mark B. Mizrahi, Esq.
Belasco Jacobs & Townsley, LLP
Howard Hughes Center
6100 Center Drive, Suite 630
Los Angeles, CA  90045

Mark C. Scarsi, Esq.
Vision L. Winter, Esq.
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA  90071

_____/s/ Mary B. Matterer_____
Richard K. Herrmann (#405)
Mary B. Matterer (#2696)
MORRIS, JAMES, HITCHENS
& WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
(302) 888-6800
mmatterer@morrisjames.com

Attorneys for Plaintiff LML PATENT CORP.