

# In The Matter Of:

*LML Patent Corp.   v.*
*Telecheck Services, Inc., et al.*

---

*Hearing*
*October 25, 2005*

---

*Hawkins Reporting Service*
*715 N. King Street, Suite 3*
*Wilmington, DE  19801*
*(302) 658-6697*

*Original File 102505~2.TXT, 179 Pages*
*Min-U-Script® File ID: 3383112980*

# Word Index included with this Min-U-Script®

## Page 22

[1] MR. DEVLIN: I want to keep them in [2] order. So that's Number 83, Your Honor.

[3] SPECIAL MASTER: We'll identify [4] these numbers for the record. While you're [5] getting a few more, just let me do my job and [6] look at these for a few seconds, see if I can get [7] it done in ten seconds.

[8] MR. DEVLIN: While you are reading [9] that, let me just note the numbers for the [10] record. For the record, we have handed up [11] Documents Number 1, 2, 14, 83, 84, 86, and 99 [12] through 103. For the — let me — I think these [13] are from Telecheck's first privilege log.

[14] SPECIAL MASTER: Sure    [15]    MR. DEVLIN: Your Honor, may I [16] approach? I have another 20 if you want to —

[17] SPECIAL MASTER: Oh, good. Just put [18] them up here.

[19] MR. DEVLIN: Thank you.

[20] SPECIAL MASTER: Okay. All right.

[21] MR. DEVLIN: With Your Honor's [22] permission, I'll read the additional numbers into [23] the record that we have collected.

[24] SPECIAL MASTER: You can do that. I

## Page 23

[1] don't need to know if they are being read into [2] the record.

[3] MR. DEVLIN: Sure. The numbers are [4] 107, 108, 112, 114, 115, 119, 131, 158, 159, 161 [5] through 165, 168 through 171, 173 and 181 through [6] 183.

[7] If Your Honor has questions about [8] names of individuals and so forth, we'll be happy [9] to provide those to you by context.

[10] SPECIAL MASTER: All right. Sure.

[11] MR. DEVLIN: Thanks.

[12] SPECIAL MASTER: Let's see. Let me [13] just make one or two — I've gone through the [14] first batch of about ten. I've gone through 1, [15] 2, 14, 83, 84, 86, 99, 101, 102, 103.

[16] Now, let me just mention a few [17] things.

[18] And the first thing I have to know [19] is these were considered to be eligible [20] presumably for discovery, but they're subject to [21] privilege. I mean, the first decision was made [22] by somebody at Telecheck that these did respond [23] to a proper discovery request.

[24] MR. DEVLIN: Let me actually give

## Page 24

[1] you a little background on that, if it's helpful. [2] Because of the volume in play — well, let me [3] give you a little further background.

[4] There's another litigation going on, [5]

completely separate from this one, and the [6] defendant is — it's either Telecheck, the same [7] defendant here, or First Data Corporation, which [8] is the parent corporation of Telecheck. This [9] will all make sense in a minute.

[10] That litigation was filed a year or [11] so before this litigation.

[12] SPECIAL MASTER: Okay.

[13] MR. DEVLIN: And I'm just going to [14] say Telecheck, even though it might be First [15] Data, Telecheck is represented by Sidley & Austin [16] in that case. And they had already done a [17] document production and so forth.

[18] And they had done very, very broad [19] document collection. And although the patents [20] are different in the two cases, the scope of the [21] accused products and systems are the same.

[22] And so we partly relied on the [23] review and pull that they had done. They did an [24] original pull.

## Page 25

[1] And we produced those documents. [2] What Sidley & Austin had also done was collect a [3] huge broad set of documents. It was, roughly, [4] 500 boxes of documents.

[5] And they had offered those documents [6] pursuant to court order in that other case, the [7] Data Treasury case we'll call it.

[8] So pursuant to a order in the Data [9] Treasury case, they had made those or were making [10] these documents available for inspection for the [11] plaintiff in this case. What we did here was [12] make that same set of documents available for [13] inspection, hoping that we could reduce the [14] document — volume of documents in play.

[15] Lawyers for LML went and reviewed [16] those boxes of documents. And as I understand [17] it, they selected virtually every document. They [18] excluded, I believe, roughly five boxes or so out [19] of the 500 boxes that were offered for [20] inspection.

[21] And so, based on that, rather than [22] initiate a dispute in this lawsuit about the [23] relevance of those documents or not or the [24] adequacy of that review and inspection of

## Page 26

[1] documents or not, we simply decided to produce [2] them. What that meant was there was a fairly [3] broad range of material that we — that we [4] produced in discovery. And as a result, there is [5] a fairly broad range of information pursuant to [6] that, that wide topic area that's privileged.

[7] And so we didn't expressly make a [8] decision to — now, we get to the final

point. [9] We didn't expressly make a decision that that [10] information was relevant to a particular document [11] request that was promulgated by LML in this case.

[12] We used a very, very broad set of [13] documents that were collected by Sidley & Austin, [14] offered those documents for inspection. And, in [15] our view, the inspection was very broad.

[16] We, nevertheless, decided to avoid a [17] dispute and simply produce those documents or, of [18] course, review them for privilege. And so many [19] of the documents that you see here that are [20] contested, as I understand it, flow from that [21] broad set.

[22] MR. McDOLE: Your Honor, may I [23] respond to that?

[24] SPECIAL MASTER: Yes, Mr. McDole.

## Page 27

[1] MR. DEVLIN: If I may say one thing, I [2] don't mean to imply that LML did anything [3] improper in their collection and review. It was [4] a very broad inspection. The selection of [5] documents was broad.

[6] SPECIAL MASTER: I understand.

[7] MR. DEVLIN: We decided not to [8] dispute — I'm not making a issue of that here.

[9] MR. McDOLE: And Your Honor, I guess [10] I'm — you know, this is an instance of [11] Telecheck — First Data is a very large company, [12] and LML is a very small company. And what [13] Telecheck has decided to do in this case is [14] produce — instead of produce the small subset of [15] relevant documents to us, has turned around and [16] produced millions of documents to us.

[17] They put 500 boxes in the basement [18] of Sidley & Austin, literally in the basement at [19] the loading dock, and told us to go look at the [20] documents in a room next to the loading dock. [21] Going down there, sitting in hard chairs, doing [22] it.

[23] So, yes, we made the decision at [24] that point to take 495 of the 500 boxes and did

## Page 28

[1] do a quick review in a couple days.

[2] The documents that are part of an [3] inspection must be relevant. And what Mr. Devlin [4] is saying here is that, well, they may not have [5] been relevant. You know, that may be an issue [6] for fees at another point if we had to review [7] documents that he doesn't consider to be [8] relevant.

[9] But at this point, if Telecheck made [10] the affirmative decision that they were going to [11] try to snow LML with a large subset of documents, [12] they have to

take the consequences that go with [13] that legal strategy. They can't have it both [14] ways.

[15] Snowing LML with millions of [16] documents and then turn around and say, We [17] shouldn't have to have a proper log because [18] there's so many documents, that's not the way [19] that it should work.

[20] **MR. DEVLIN:** Your Honor, if I may [21] just respond. I don't want this to get into [22] finger pointing. That was not my intention at [23] all.

[24] I don't contest LML's inspection of

---

Page 29

[1] those documents. We decided not to — we offered [2] them for inspection and —

[3] **SPECIAL MASTER:** Okay.

[4] **MR. DEVLIN:** — so forth.

[5] **SPECIAL MASTER:** I've heard your [6] view. Let me express my view about this.

[7] **MR. DEVLIN:** Thank you.

[8] **SPECIAL MASTER:** I've gone over [9] these ten documents, and I have a description [10] here. I don't know anything about these [11] companies.

[12] I'm a stranger to all this. But I'm [13] assuming most, maybe many of the companies in [14] here, that is, Concord, ICS, FPC, it's all these [15] acronyms.

[16] And I'm assuming that they are not [17] related to the litigation, LML versus Telecheck. [18] Okay. I mean, maybe they are.

[19] AAFAS, ACS was mentioned here in [20] some business context. All right.

[21] Now, just going through, and I [22] agree, Mr. Devlin, it takes about ten seconds, [23] maybe 12 if you have to go back and look at [24] something. Now, Document Number 1 it seemed to

---

Page 30

[1] be a fair description would be merger [2] investigation team report.

[3] Now, the overlay is a communication [4] to your adversary, that rather than just repeat [5] unrelated party, we're saying all these documents [6] affect an unrelated party, or a customer, or [7] consumer. Okay.

[8] So Number 1, merely saying merger [9] investigation team report.

[10] Number 2, merger investigation team [11] report regarding product comparison. It doesn't [12] identify it. It doesn't give away any secrets, [13] it doesn't seem to me.

[14] Number 14, software agreement with [15] unrelated party.

[16] Number 83, set-up of merchant number [17] per customer. Plural, merchant numbers for a [18] customer.

[19] 84 and 86 appear to be the same. [20]

---

They have to do with company policy concerning [21] communication with consumers.

[22] 99, this retains to innovation and [23] consent and extension of a contract with an [24] unrelated party.

---

Page 31

[1] 101, 102, 103, all seem to be [2] connected to something that's happening in [3] Denver. And it would seem to me this would have [4] to do with the contract discussion with ACS.

[5] Now, I mean, I just — what's [6] happened here is I think Telecheck has avoided [7] the first step of this process. The first step [8] is to see whether or not this document is [9] responsive to a discovery request. Either it is [10] or it isn't.

[11] If it is, then the next step is, [12] even though it's discoverable, it is subject to [13] some privilege, some reason why it should not be [14] discovered? But I think as a matter of [15] apparently administrative, economic or some other [16] convenience, you've simply said, Well, let's give [17] LML — we'll say, Here's everything.

[18] But because of saying, Here's [19] everything, we have a huge log because these [20] things are attorney-client privilege. Many of [21] these are not, but we will say they are.

[22] They're attorney client. We're not [23] going to give them to you.

[24] So all you've done is pass over,

---

Page 32

[1] quite frankly, Mr. Devlin, to Judge Robinson this [2] decision making that your firm should make.

[3] At the first instance: Is it [4] discoverable? None of this is discoverable as I [5] see it.

[6] There's not one paper here that's [7] discoverable. Has absolutely nothing to do with [8] the case.

[9] It's irrelevant to the case, will [10] not lead to admissible evidence in this case. [11] But you've simply pushed that onto a log that [12] pushes it onto Judge Robinson's desk.

[13] This is merely unreasonable. I [14] mean, I'm quite disturbed about this, because [15] I've already put — I thought I put almost like [16] Privilege 101 in the special discovery order [17] number three, some examples about what to do. [18] Now, I've just read ten more, and [19] I'm not going to read 271 more. I'm not going to [20] do that.

[21] I will read the others you have [22] given to me. I'll just see if it's any message [23] here that comes through that changes my mind.

[24] But when you tell me that it was

---

Page 33

[1] just easier to give over everything, that's not [2] how discovery is done. You can't respond and [3] say, Look, you can have it all.

[4] Now, if you had 15 boxes, give it [5] all to us. We'll go through it.

[6] But 500 boxes. Well, sorry, 495 [7] boxes, that's not how it's done.

[8] Not a judge in the land is going to [9] put up with that. And now she happens for the [10] time being to have asked me to help out, which [11] I'm trying to do.

[12] So I have some reason to say what [13] I'm going to say in a few minutes. You can [14] appeal that.

[15] But I'm sure Judge Robinson is not [16] going to take a kindly view of the notion that, [17] Oh, well, we'll assume it's all discoverable, but [18] we have this huge log, because there are [19] attorney-client privileges, or maybe some work [20] product somewhere having to do with unrelated [21] parties that have nothing to do with this case.

[22] Now, that's how I see this. Yes.

[23] **MR. DEVLIN:** If I may clarify?

[24] **SPECIAL MASTER:** Yes.

---

Page 34

[1] **MR. DEVLIN:** And to give you a [2] little more background.

[3] **SPECIAL MASTER:** I'm going to need a [4] lot more.

[5] **MR. DEVLIN:** Just so we're all on [6] the same page, in the Data Treasury case, again, [7] this relates to the same set of products that are [8] accused here. It's a patent dispute.

[9] Different patents, so different [10] aspects of the products are in play.

[11] **SPECIAL MASTER:** Okay.

[12] **MR. DEVLIN:** The same essential [13] products are in play. And in that case, First [14] Data/Telecheck produced a fairly large set of [15] documents.

[16] **SPECIAL MASTER:** You told me that [17] already.

[18] **MR. DEVLIN:** That's right.

[19] **SPECIAL MASTER:** You're burning the [20] record now. Don't repeat anything.

[21] Give me something new and different.

[22] **MR. DEVLIN:** Pursuant to court [23] order, they collected all the documents that [24] related to these particular products.

---

Page 35

[1] **SPECIAL MASTER:** Okay.

[2] **MR. DEVLIN:** That was the source of [3] the 500 boxes of documents. So it wasn't just a [4] willy nilly selection of

---

documents.

[5] It had been — Telecheck had been [6] ordered in that case in a patent dispute on the [7] same products —

[8] **SPECIAL MASTER:** Right.

[9] **MR. DEVLIN:** — to provide that [10] collection of documents for inspection. And we [11] thought it would be prudent in this case, a [12] patent dispute on those same products to do.

[13] **SPECIAL MASTER:** There's not a court [14] order to do that in this case. Judge Robinson [15] didn't say do that, did she?

[16] **MR. DEVLIN:** I understand. Well, I [17] thought, to be honest, Your Honor, if the Court [18] orders a large set of documents to be made [19] available in a patent dispute on a certain set of [20] products, we thought it would be unreasonable for [21] us to simply draw a different line than that [22] Court had drawn and to say —

[23] **SPECIAL MASTER:** Well, that was your [24] first mistake. You should have gone to Judge

### Page 36

[1] Robinson and said, Judge Robinson, this other [2] judge made us turn over 500 boxes which we don't [3] think is relevant.

[4] We will do the same thing here. [5] We'd like to be heard on that.

[6] We don't think it's relevant. I [7] would bet a month's pay, she'll say we'll have a [8] argument Monday morning on that. Because if [9] you're going to give me 500 boxes and only 150 [10] are pertinent, I don't think this is really how [11] this case should go off on this discovery course [12] in six or seven months.

[13] That's not going to get you [14] anywhere. Just the fact that Judge A did it, I [15] guess every judge in the country that functions [16] this way. It's not how it works. They go by the [17] rules.

[18] It's just not — it's just a [19] shortcut to all it does is pass over to other [20] persons the responsibilities that your client [21] has.

[22] You pass over to someone else the [23] decision whether or not this is even responsive [24] to a discovery request. That's A.

### Page 37

[1] Secondly, it totally burdens the [2] system to deliver 500 documents maybe to the [3] Clerk of the Court or something.

[4] I don't know. They're going to end [5] up in the courtroom somewhere.

[6] Someone will go through those. [7] Well, who's the someone?

[8] Well, we're not going to do it. So, [9] therefore, let the Court do it. The Court is

[10] busy.

[11] The Court says, We'll get a special [12] master at "X" dollars per hour, and the parties [13] can share that. Let him do it or let her do it.

[14] That isn't how it works. I'm very [15] disappointed in that approach.

[16] All 271 documents will be produced. [17] There is no privilege, because you — Telecheck [18] has waived the right to assert any privilege of [19] any kind of these documents, if they've been [20] produced on the basis you've just mentioned.

[21] And I'm going to go through the [22] others, and I'll do it — we'll take a break, and [23] I'll go through it just to confirm what I believe [24] it is true.

### Page 38

[1] A, none of these have anything to do [2] with this case. And B, the activity here is not [3] something that is even pertinent.

[4] Even if the document is relevant, [5] how do you communicate with consumers in general [6] across the board in America when they have [7] inquiries about refunds or whatever it is, that's [8] nothing to do with this case?

[9] I agree with you, it only takes ten [10] seconds, maybe 15 on a stretch. So what we'll do [11] is —

[12] **MR. DEVLIN:** Your Honor.

[13] **SPECIAL MASTER:** Yes.

[14] **MR. DEVLIN:** I'm willing to say that [15] I'd be happy to respond to explain how some of [16] these might be relevant, why we thought that [17] this —

[18] **SPECIAL MASTER:** We're not going to [19] do it again.

[20] **MR. DEVLIN:** I understand if Your [21] Honor has —

[22] **SPECIAL MASTER:** There's —

[23] **MR. DEVLIN:** I just want a chance to [24] offer —

### Page 39

[1] **SPECIAL MASTER:** If this went [2] through that way with some paralegals putting [3] stuff in boxes and responding to a discovery [4] request, you're not going to get a Court or the [5] Court's arm to start to read this paper when [6] these examples, including the ones we did on [7] order number three. That should have been kind [8] of a second red flag.

[9] So today we have the third one. [10] Hold on a second, please

[11] And I state for the record so [12] there's no mistake about it, on 26(b)1, it reads, [13] among other things, "Parties may obtain discovery [14] regarding any matter not privileged that is [15] relevant to the claim or defense of any party, [16] including the existence, description, nature, [17] custody, condition and loc-

ation of any books, [18] documents or other tangible things, and the [19] identity and location of persons having knowledge [20] of any discoverable material.

[21] It goes on further, "Relevant [22] information need not be admissible at trial if [23] the trial for discovery appears reasonably [24] calculated to lead to discovery of admissible

### Page 40

[1] evidence."

[2] You have talked about square one. [3] That's where discovery begins.

[4] Now, if that's side stepped, it [5] distorts the entire process.

[6] We'll take a 15-minute break. And [7] as I assured Mr. Devlin, I'll go through these [8] and see if they're kind of the same category.

[9] And maybe not. Maybe there's one or [10] two that are not.

[11] But I'll check. So we'll take a [12] 15-minute recess. Counsel will.

[13] Thank you. And the court reporter [14] as well. Thank you.

[15] And while I am doing this, you [16] should approach what remains. All right.

[17] **MR. McDOLE:** I'm going to go [18] through my list now, Your Honor.

[19] **SPECIAL MASTER:** Well, talk to [20] Mr. Devlin, if there's some way we can get [21] through on that basis.

[22] **MR. DEVLIN:** Thank you.

[23] **SPECIAL MASTER:** Thank you.

[24] (A brief recess was taken.)

### Page 41

[1] **SPECIAL MASTER:** Tell me about [2] the — as much as you can, about the VeriFone [3] dispute, a little bit, you know, without [4] disclosing anything.

[5] This is no waiver. We don't need [6] attorney-client privilege.

[7] **MR. DEVLIN:** Thank you. I'll choose [8] my words carefully.

[9] And if you want more information, [10] maybe we'll do it that way.

[11] **SPECIAL MASTER:** Sure.

[12] **MR. DEVLIN:** There was a dispute [13] about some — let me back up. VeriFone is a [14] manufacturer of some of the equipment that is in [15] dispute here. So they're a third party in the [16] case.

[17] **SPECIAL MASTER:** Some terminals.

[18] **MR. DEVLIN:** Exactly. They're [19] terminals that are at check-out counters.

[20] VeriFone is a manufacturer. There [21] is a dispute about some defective terminals and [22] whether the warranty in the contracts between the [23] VeriFone and Telecheck would cover costs for the [24] defects or for replacement of those terminals.

Page 42

[1] SPECIAL MASTER: And who's Sandy [2] Mollett?

[3] MR. DEVLIN: Sandy Mollett is a [4] business person within Telecheck. She is — I'm [5] trying to think of her role.

[6] SPECIAL MASTER: Executive?

[7] MR. DEVLIN: An executive in [8] Telecheck. I can't recall if she's on the [9] marketing and sales side or the technical side, [10] but I believe she's on the technical side.

[11] SPECIAL MASTER: Okay.

[12] Okay. So the documents 158 through [13] 165 appear to focus upon that subject matter. [14] Simply says a dispute. They're trying to resolve [15] it.

[16] And it's Alan Bethscheider, an [17] attorney for Telecheck is involved. Sandy [18] Mollett is involved. Andrea Brett, she's also an [19] attorney.

[20] On the list here for First Data, I [21] see the name Randy Rutledge. Does that ring a [22] bell?

[23] Probably an executive.

[24] MR. DEVLIN: An executive within

Page 43

[1] Telecheck.

[2] SPECIAL MASTER: Okay. Let me ask [3] it: Does this have anything to do with this case [4] here?

[5] MR. DEVLIN: I hate to make argument [6] on behalf of the relevance of documents that the [7] plaintiff might want to use, but I'll say this, [8] Your Honor, in a patent case, in a damages [9] context, there is a fairly wide ranging area of [10] inquiry regarding all sorts of topics, everything [11] that could relate to the patent itself and the [12] breadth and the impact in the industry.

[13] But also down to the success of the [14] particular products in the marketplace in some [15] instances. And when you're looking at the [16] success or lack of success of products in the [17] marketplace, it's often relevant to look at the [18] surrounding causes or reasons that something may [19] have been successful or unsuccessful in the [20] market place.

[21] You have to draw — so that would [22] relate to that issue. We have context to the [23] success or lack there of for products in the [24] marketplace either for damages or for potentially

Page 44

[1] other areas such as the obviousness equally in [2] patent cases.

[3] SPECIAL MASTER: This Sandy Mollett [4] is vice president of product marketing in [5] Telecheck, according to this paper.

[6] MR. DEVLIN: That sounds correct.

[7] SPECIAL MASTER: I remember that was [8] mentioned earlier.

[9] MR. DEVLIN: Your Honor, I don't [10] mean to interrupt.

[11] SPECIAL MASTER: Yeah.

[12] MR. DEVLIN: But there may be [13] another relevant fact to the procedures of our [14] production that you might want to hear. I don't [15] know if it would make a difference, but I thought [16] I would note it for the record when Your Honor is [17] prepared to hear it.

[18] SPECIAL MASTER: Okay. Just one [19] second. I'm almost through this group here, [20] please.

[21] SPECIAL MASTER: Was IEC related to [22] this action at all? IEC, Mr. Devlin, do you know [23] offhand?

[24] MR. DEVLIN: IEC, as far as I know,

Page 45

[1] is not.

[2] SPECIAL MASTER: Okay. I haven't [3] seen it anywhere, but I thought —

[4] MR. DEVLIN: They're not a party to [5] the dispute, and they're not a third party that's [6] been involved in third-party discovery in any [7] way.

[8] SPECIAL MASTER: All right. I'm [9] almost finished now.

[10] I have —

[11] MR. DEVLIN: Your Honor, if you [12] could point me to the document number you saw [13] that on.

[14] SPECIAL MASTER: 181.

[15] MR. DEVLIN: I may be able to read [16] it. Thank you.

[17] SPECIAL MASTER: 181.

[18] MR. DEVLIN: Thank you. [19] Do you have that list you had [20] earlier?

[21] SPECIAL MASTER: I'm almost done.

[22] MR. McDOLE: Tim, are these your [23] documents?

[24] MR. DEVLIN: Thanks.

Page 46

[1] SPECIAL MASTER: Okay. I see [2] apparently just a non-involved party here.

[3] MR. DEVLIN: I'm sorry. I'm still [4] pulling that document, Your Honor.

[5] SPECIAL MASTER: Oh, okay. I'll [6] wait.

[7] MR. DEVLIN: And you said Document [8] 183, Your Honor?

[9] SPECIAL MASTER: I think it's 181. [10] I thought.

[11] MR. DEVLIN: Okay.

[12] SPECIAL MASTER: It may spill over [13] to 183.

[14] MR. DEVLIN: Oh, okay.

[15] IEC is a manufacturer of one of the [16] other terminals involved in this case.

[17] MR. DEVLIN: And 183 is a [18] VeriFone document. It looks like it's a VeriFone [19] document.

[20] MR. DEVLIN: Correct.

[21] SPECIAL MASTER: It looks that way [22] to me. All right.

[23] Well, on these, again, let me just [24] say they started with, what was it, 107?

Page 47

[1] MR. DEVLIN: 107, I believe.

[2] SPECIAL MASTER: 107. [3] Again, this is simply a [4] communication from a Doug Pratt to a Clay Spitz. [5] I don't see — they don't seem to be attorneys. [6] Business, it seems to be a business [7] communication.

[8] Copy went to Sandy Mollett. And it [9] seemed to be focusing on some errors in accounts [10] or something.

[11] So it seems to me you could say that [12] communication regarding errors on accounts [13] between non-attorneys. Was there an [14] attorney-client privilege claim on this?

[15] MR. DEVLIN: Yes, Your Honor. This [16] relates to a subset of documents in order number [17] four where you see an Email chain. This is very [18] common today in how companies seem to work.

[19] You will see an Email chain and [20] attorney advice is provided in the context of the [21] Email chain. And then it gets carried through [22] and utilized by the people involved.

[23] And so on Page 3 of the document, [24] you'll see an Email — Emails to and from Alan

Page 48

[1] Bethscheider, who is in-house counsel for [2] Telecheck/First Data.

[3] SPECIAL MASTER: Okay. All I'm [4] saying, if this — see, the problem is the other [5] party in the case, LML, sees communication re [6] business operations. They don't know whether [7] they should be trying to get that or knowing more [8] about it or not.

[9] Now, I don't know what's difficult [10] about saying communication regarding, which I [11] did, which I get from that, maybe not very well [12] done. But I just said communication concerning [13] errors in accounts, which is the subject of it.

[14] Just say that, then they know what [15] to do with it, what to tell their client. Their [16] client says, Should we be asking for that? The [17] attorney says, I have no idea.

[18] And maybe VeriFone is something [19] else. Maybe VeriFone — they say that it [20] pertains to this case, and we want to

know more [21] information about it.

[22] So Number 108 has to do with the [23] First Data merger. Number 112, same thing.

[24] Number 114 is, I think, a fair

---

Page 49

[1] description. The communication sent to ICS [2] merchants regarding frequently asked — FAQs, [3] frequently asked questions from subscribers.

[4] You've got to give a fair guidance [5] on a log. Nothing says that every line on the [6] log has to be an 18th of an inch in width.

[7] Number 115, an example would be [8] regarding innovation and ICS similar to document [9] 99.

[10] 119, this is in regard to weekly [11] reports and files concerning billing cycles.

[12] 131. Now, this one I would — it [13] appears to be pertinent. It has to do with [14] communication, third-party vendors regarding [15] Email search.

[16] And this had to do with an Email [17] search associated with litigation. We then [18] begin, 158 — looks like 158 pretty much through [19] 168 all have to do with the VeriFone dispute. I [20] don't know why you can't say that.

[21] 169 had to do with the new POS [22] terminal design.

[23] 170 concerns a contract with a [24] provider of material.

---

Page 50

[1] And 171, I don't know what I did [2] with that. Oh, I left that open because this [3] appears as though it might be connected with the [4] VeriFone dispute.

[5] I can't totally tell a lot of that, [6] because it has some terms in here, acceptance, [7] and repaid, and the like.

[8] But something could be said about [9] that other than just business matter.

[10] 173 is a need for a letter of intent [11] regarding development of software to a customer.

[12] 181 is regarding the repairs, [13] warranty repairs with IEC.

[14] 182 is an IEC matter as well about a [15] payment. Payment and IEC.

[16] 183 seems to be VeriFone. But the [17] point is here we can't get the Court to go [18] through and do what I just did.

[19] So I think there's been more than [20] enough opportunity here, and the process here [21] that's described, those documents should all be [22] turned over except VeriFone. VeriFone documents [23] need not be turned over.

[24] But the others, I think the

---

Page 51

[1] privilege has been waived in the

manner in which [2] this has been handled. I've given my reasons for [3] it.

[4] I think there's been more than [5] enough opportunity to — there's been meet and [6] confers.

[7] I don't want to go through what — [8] the correspondence is loaded with it. And the [9] district appeal will be in the briefs.

[10] But there's been opportunities to [11] raise these things before properly. In the [12] special discovery master order number three, I [13] gave some samples of what would be required.

[14] And that was — the date of that was [15] what? September 27th.

[16] And here we are, whatever today is, [17] the 23rd, 24th, and all we do is hand these up [18] again, and say, Judge, that's the best we can do.

[19] I don't agree with it. I think [20] you've waived it. They should be turned over.

[21] MR. DEVLIN: I would just like to [22] note for the record, Your Honor, in case it makes [23] a difference.

[24] SPECIAL MASTER: Sure.

---

Page 52

[1] MR. DEVLIN: A clarification [2] regarding that document production procedure [3] which seems to be the heart of all this.

[4] It wasn't only an inspection that [5] was offered. There were rough — there was a [6] smaller subset of documents that were reviewed, [7] found to be relevant, and produced that was, [8] roughly, 200,000 pages of documents.

[9] And then the 500 boxes, which again [10] was ordered in a previous case, were offered as a [11] broader set of documents for inspection. So [12] there was some delineation of documents between [13] ones that had been reviewed and found to be [14] relevant.

[15] And then as I said, as you know, [16] pursuant to court order, the broader set was [17] ordered to be made available for inspection. And [18] so it's not as if the entire burden was placed on [19] the plaintiff in either case.

[20] I don't know if that makes a [21] difference to you, but I wanted to note it for [22] the record.

[23] SPECIAL MASTER: Well, it's really a [24] burden shifting circumstances here. A person —

---

Page 53

[1] the person who is responsible for responding to [2] discovery is met with a burden.

[3] And the burden is to decide those [4] things that should be — that could be eligible [5] for turnover under Rule 26, like I read into the [6] record, and those

that have nothing to do with [7] it.

[8] And it seemed like many of these [9] issues have nothing to do with this case. And [10] even though they're attorney-client privilege, [11] I just say, well, let the Court decide it, and [12] we'll put down stock answer, business operations [13] or whatever you put.

[14] So I just — that's not how it's [15] done. So as far as I'm concerned, I think [16] they've been waived.

[17] Unless the Court directs me, I won't [18] go through the other 235 that are left and come [19] up essentially with the same answer.

[20] So what else is there to decide [21] here?

[22] MR. McDOLE: Your Honor.

[23] SPECIAL MASTER: How do we do the [24] other documents? There's, approximately, only 44

---

Page 54

[1] documents.

[2] Do you want to do them one at a [3] time, something like that?

[4] MR. McDOLE: Yes. Just one point of [5] clarification.

[6] SPECIAL MASTER: Yes.

[7] MR. McDOLE: You had said that the [8] VeriFone documents are not — that Telecheck does [9] not have to produce those documents. Could we [10] get a list of what those — I'm not sure what [11] those are, because there's no description.

[12] SPECIAL MASTER: The ones that seem [13] that way to me, and I know Mr. Devlin will be [14] able to tell more quickly than I will. But the [15] ones that were given to me as a sample appear to [16] be the documents 158 through 168. And also 183.

[17] Okay.

[18] MR. DEVLIN: Your Honor, if this [19] procedure is acceptable to you, what we can do is [20] to go through, select the ones we believe are [21] VeriFone documents, and we can update the log [22] accordingly at this point, if that makes sense.

[23] SPECIAL MASTER: Okay. But I want [24] to make it plain, it's only the VeriFone dispute

---

Page 55

[1] documents that I am allowing you to do that with. [2] Right?

[3] MR. DEVLIN: I understand. And we [4] can update the log.

[5] I'm not even sure if we'll do that, [6] just so it's clear. And if there's any problem, [7] we'll talk about it.

[8] MR. McDOLE: And again, I'm talking, [9] because I haven't seen what the

---

dispute is. Is [10] it a dispute relating to an issue that they have [11] with the terminal, because VeriFone does have [12] patents that may come into relevance if [13] there's — I'm not sure —

[14] **SPECIAL MASTER:** All I am saying is [15] the documents that qualify for attorney-client [16] privilege, and I'm depending on Telecheck to —

[17] **MR. McDOLE:** Okay.

[18] **SPECIAL MASTER:** — describe that in [19] the log, you know. And we did cover the notion [20] about a chain of Emails, connected Emails.

[21] And I agree with them, that if [22] embedded in there is a communication that then is [23] swapped back and forth by non-attorneys, that [24] attorney communication is strong enough, I think,

Page 56

[1] to hold them together.

[2] Okay. If that's a chain, not just a [3] topic over several months, but kind of a [4] continuous unbroken, is what that means, [5] communication, held together by Mr. Bethscheider [6] or one of the other attorneys, advice to his [7] clients.

[8] And so all I'm saying is the extent [9] to which the ones I see touch upon VeriFone, [10] Mr. Devlin's given me some explanation as to why [11] his belief is that that could fit into the —[12] maybe if there are damages, the damage portion of [13] this case; right?

[14] **MR. DEVLIN:** Correct.

[15] **SPECIAL MASTER:** Is that —

[16] **MR. DEVLIN:** Yes.

[17] **SPECIAL MASTER:** On that [18] representation, I'm saying today, that the [19] VeriFone documents would qualify for the [20] attorney-client privilege, the ones I've just [21] mentioned.

[22] **MR. McDOLE:** Okay.

[23] **SPECIAL MASTER:** And   I   don't know if [24] there are others, but I depend on Mr. Devlin, and

Page 57

[1] I think for good reason, that he will be assuring [2] the Court by saying, Here's some others that are [3] also included in that.

[4] And the remainder of the documents [5] included in the 271 described as business [6] operations or kind of equivalent, they're turned [7] over. They're waived, no matter what they say.

[8] They're waived. All right. [9] They should be turned over.

[10] **MR. McDOLE:** Thank you.

[11] **SPECIAL MASTER:** All right, [12] Mr. Devlin.

[13] **MR. DEVLIN:** Thank you, Your Honor.

[14] **SPECIAL MASTER:** Okay. And you will [15] be able to make that check on VeriFone documents [16] by when? We're really outside the baseline here [17] on time now.

[18] **MR. DEVLIN:** We can make an attempt [19] to do that very quickly. I would say within two [20] days.

[21] **SPECIAL MASTER:** All right. I [22] appreciate you doing that, and then advising [23] Mr. McDole or Mr. Herrmann. And those other [24] documents should be produced.

Page 58

[1] **MR. McDOLE:** Your Honor, as I said [2] previously, we're down to, approximately, 43, 44 [3] documents.

[4] **SPECIAL MASTER:** Right.

[5] **MR. McDOLE:** And I suggest with [6] these, a lot of them relate to advice of counsel, [7] that we just go through these one by one as we [8] did with the Echo hearing.

[9] **SPECIAL MASTER:** All right. I think [10] that's the best way to do it.

[11] Does the court reporter need a [12] little break here?

[13] **THE REPORTER:** No, Your Honor. I'm [14] fine.

[15] Thank you.

[16] **SPECIAL MASTER:** Oh, no?

[17] (Following a discussion held off the [18] record:)

[19] **SPECIAL MASTER:** All right. Let's [20] do one at a time.

[21] And I'll hear briefly, just a couple [22] minutes on each one like we've done before. I [23] have the — Telecheck has kindly furnished me the [24] list of the attorneys and also the — let me see.

Page 59

[1] All the attorneys.

[2] **MR. McDOLE:** Okay.

[3] **SPECIAL MASTER:** All right.

[4] **MR. McDOLE:** Your Honor, the first [5] document that is left is a document identified on [6] Telecheck's July 28th privilege log as Document [7] 563.

[8] **SPECIAL MASTER:** Can I ask a [9] question? Do I have that log with me?

[10] **MR. McDOLE:** It was a color-coded [11] log.

[12] Maybe the easiest way to do this [13] is —

[14] **SPECIAL MASTER:** Let me see. I know [15] I received the Telecheck — oh, no. These are [16] the documents I did.

[17] I might have a log here. I might. [18] Do I have the log?

[19] **MR. McDOLE:** If not, Your Honor, I [20] can just hand it up as we go along.

[21] **SPECIAL MASTER:** Okay. Let's do it [22] that way if you don't mind.

[23] **MR. McDOLE:** Okay. I'll read you [24] the description first, as we did with Echo, and

Page 60

[1] then hand it up to you. The first document is [2] Document 563.

[3] The description reads communication [4] from law firm reflecting mental impression and [5] transmitting facts in confidence for purposes of [6] rendering legal advice, re status report.

[7] **SPECIAL MASTER:** Right.

[8] **MR. McDOLE:** And it's from the law [9] firm of Knobb, Martin, Olsen & Bayer in October [10] of 2001.

[11] **SPECIAL MASTER:** Thank you. Oh, [12] yes.

[13] I remember this.

[14] **SPECIAL MASTER:** Is this —

[15] **MR. McDOLE:** Your Honor, the issue [16] we have with this document or this description is [17] that it's referring to it as legal advice [18] regarding patent status.

[19] By way of history, Telecheck had [20] learned of the patent in suit back in 1996, 1997 [21] shortly after it issued, and it had engaged in a [22] practice of maintaining numerous advice of [23] counsel from the 1997 period up — all the way up [24] through trial.

Page 61

[1] There are — you know, we're talking [2] constant legal advice on this issue. Whether [3] they're consistent or not is an argument for [4] another day.

[5] But here we're in a time frame of [6] when they're obtaining opinions of counsel. And [7] when I see a description that says getting mental [8] impressions regarding patent status report, I'm [9] not even sure which patent they're referring to [10] in that.

[11] And my only assumption can be that [12] that patent relates to the patent in suit. [13] That's the only reason it would be in a log that [14] would be relevant.

[15] So that is our argument that there [16] is a waiver of attorney-client privilege based on [17] that description. And we'd ask for it to be [18] produced.

[19] **SPECIAL MASTER:** Okay. Did you say [20] 553?

[21] **MR. McDOLE:** 563, the one [22] highlighted in orange.

[23] **SPECIAL MASTER:** I see it in the [24] bottom in orange. It's punched there, which is

Page 62

[1] okay.

[2] I think —

[3] **MR. McDOLE:** Let me — if I could [4] see that.

[5] **SPECIAL MASTER:** Is that right, 563?

[6] **MR. McDOLE:** I may be at a different [7] document here. Let me see.

[8] Yes. Yes. That's the one.

[9] **SPECIAL MASTER:** Okay. Which one is [10] it again?

[11] **MR. McDOLE:** It's the one [12] highlighted in orange, 563.

[13] **SPECIAL MASTER:** Knobb, Martin, [14] Olsen & Bayer.

[15] **MR. McDOLE:** Yes.

[16] **SPECIAL MASTER:** All right. [17] Mr. Devlin.

[18] **MR. DEVLIN:** Your Honor, I have — I [19] should have two copies of each of these with the [20] caveat that I said earlier, that there's one or [21] two that I may not have here today.

[22] **SPECIAL MASTER:** Sure.

[23] **MR. DEVLIN:** I can hand you a copy [21] if you'd like.

---

Page 63

[1] **SPECIAL MASTER:** That would be a [2] good way to do it.

[3] Maybe we could — okay.

[4] **MR. DEVLIN:** Just as a general [5] point, the simple fact that something comes from [6] an attorney during a time period doesn't make it [7] part of a privilege waiver, even if it came from [8] the same attorney. And we will be talking about [9] that more later.

[10] This particular document happens to [11] be a patent status report about potential patents [12] that Telecheck itself might be seeking in this [13] general financial check area and other areas that [14] Telecheck is involved in.

[15] And so it has nothing to do with the [16] opinions of counsel that were rendered in the [17] case or obtained by Telecheck relating to the [18] patent in suit. It's different patents entirely.

[19] **MR. McDOLE:** Your Honor, if that's [20] the case, we don't think it's relevant. We'll [21] just move onto the next one.

[22] There's no reason to waste [23] everyone's time.

[24] **SPECIAL MASTER:** As I see it, it

---

Page 64

[1] seems to be kind of an overall just report about [2] many different things.

[3] **MR. DEVLIN:** If I may, Your Honor? [4] As you see, it's a chart.

[5] Each individual chart entry, each [6] row that has a description of a particular patent [7] application or developing idea and so forth. [8] Under — I don't have the citation, but it's the [9] Spalding case, which is commonly cited in patent [10] cases, materials provided to attorneys pursuant [11] to invention, disclosures for patent application, [12] and so forth.

---

Page 65

[13] Our privilege, and that privilege is [14] maintained. And there are status recommendations [15] on the left hand — excuse me, the right-hand [16] column.

[17] **SPECIAL MASTER:** The right-hand [18] side, yes.

[19] **MR. DEVLIN:** From the attorneys and [20] so forth.

[21] **SPECIAL MASTER:** I feel that's [22] privileged.

[23] **MR. DEVLIN:** Thank you.

[24] **SPECIAL MASTER:** And let's see.

---

Page 65

[1] **MR. McDOLE:** And Your Honor, we may [2] run into this a little more today. I just want [3] to highlight the fact, and I understand I'll [4] withdraw my argument with respect to these, but [5] I'm not sure why a document like that is relevant [6] and appears on a privilege log.

[7] You know, I think this is the same [8] situation. This just has nothing to do with [9] this.

[10] **SPECIAL MASTER:** We kind of went [11] over that before how they ended up on this [12] privilege log.

[13] **MR. McDOLE:** Right.

[14] **SPECIAL MASTER:** I'm not saying — [15] I'm not saying this is the case. But let's go [16] through this a little bit and see where we're [17] going.

[18] **MR. McDOLE:** Okay.

[19] **SPECIAL MASTER:** Again, I continue [20] to believe that this privilege log is a two-step [21] process. The first is whether it's discoverable [22] at all.

[23] And secondly, then whether it's [24] entitled to privilege protection. In any

---

Page 66

[1] event —

[2] **MR. DEVLIN:** I believe, Your Honor, [3] and I'm not totally sure of that, but I believe [4] there was a specific document request from LML.

[5] **SPECIAL MASTER:** Okay. No. I'm not [6] suggesting that this is the same.

[7] This may be a distant relative to [8] that other problem. It's not a close relative.

[9] **MR. McDOLE:** Just for a point of [10] clarification, we asked for the documents. And [11] Mr. Devlin refused, and the issue was brought [12] before Judge Robinson.

[13] **SPECIAL MASTER:** Let's move on.

[14] We'll call that F, confidential. It [15] satisfies attorney-client privilege.

[16] I am going to stay with the code [17] system until I'm told not to. We'll call that [18] F, [18] stays within it.

[19] All right. That's 563.

[20] **MR. McDOLE:** Your Honor, the next [21] document —

---

Page 67

[22] **SPECIAL MASTER:** That is [23] attorney-client privilege, yes, and code F. [24] Okay.

---

Page 67

[1] **MR. McDOLE:** The next document is a [2] document identified on Telecheck's July 28th [3] privilege log with the number PR 2504. And the [4] description here is correspondence drafted at the [5] direction of attorney re claimed construction. [6] And it is authored by an individual, Chris [7] Schmitt and received by an individual Carrie [8] Sowen. Neither of which I believe are attorneys.

[9] **SPECIAL MASTER:** All right. [10] Mr. Devlin.

[11] **MR. DEVLIN:** Sure. I only have one [12] copy of this one, Your Honor, but I'm going to [13] hand it to you.

[14] **SPECIAL MASTER:** I'm sorry you [15] have [15] to do all this walking.

[16] **MR. DEVLIN:** That's okay. I need [17] the exercise.

[18] I've been sedentary lately. This [19] document also relates to an ongoing patent [20] application by Telecheck.

[21] Chris Schmitt is providing comments [22] to a patent application draft.

[23] **SPECIAL MASTER:** And Chris Schmitt [24] is who?

---

Page 68

[1] **MR. DEVLIN:** He's system analyst at [2] Telecheck. I don't know — my understanding is [3] he would be an inventor on the application that [4] would be filed, someone providing comments for [5] attorneys for draft of a patent application.

[6] There is not an attorney listed on [7] that document. I believe Carrie Sowen is his [8] supervisor. Carrie Sowen is the executive at [9] Telecheck.

[10] **SPECIAL MASTER:** And what was Chris [11] Schmitt's job? Is that a he or a she?

[12] You may know.

[13] **MR. DEVLIN:** I don't know, to be [14] honest.

[15] **SPECIAL MASTER:** Okay.

[16] **MR. DEVLIN:** And I'm not sure. I [17] believe part of the technical team at Telecheck.

[18] I think his title is listed at the [19] bottom underneath his name, system analyst.

[20] **SPECIAL MASTER:** It says that. Oh, [21] yes, it does at the bottom.

[22] So...

[23] **MR. DEVLIN:** So there's not an [24] attorney on that document. But based on our

---

Page 69

[1] understanding, that is a document that would have [2] been provided as part of the patent application [3] process, again under Spalding.

[4] It should be maintained as [5] privileged. I can get a cite to Spalding for you [6] if we take a break.

[7] MR. McDOLE: And Your Honor, simply [8] because —

[9] SPECIAL MASTER: No. No. No.

[10] MR. McDOLE: Okay.

[11] SPECIAL MASTER: Not privileged.
[12] Turn it over.

[13] That would be a N. And —

[14] MR. DEVLIN: Your Honor, may I [15] request that copy back?

[16] SPECIAL MASTER: No. 1 ruled.

[17] MR. DEVLIN: I just want the copy [18] back.

[19] SPECIAL MASTER: Oh, yeah. You can [20] have that.

[21] Thank you.

[22] MR. DEVLIN: Thanks.

[23] SPECIAL MASTER: Very good. [24] That will be D, code D with an N.

---

Page 70

[1] You can have this one back as well, [2] Mr. Devlin.

[3] MR. DEVLIN: Oh, thank you, Your [4] Honor.

[5] SPECIAL MASTER: Maybe you can have [6] your assistant help.

[7] MR. DEVLIN: He's actually doing the [8] record keeping.

[9] SPECIAL MASTER: I just want to be [10] able to make sure we have enough time here.

[11] MR. McDOLE: Your Honor, the next [12] document on Telecheck's July 28th privilege log [13] we contest is identified as PR 2925 through 26.

[14] It is a description on the privilege [15] log of correspondence to attorney responding to [16] attorneys' questions re patents in suit.

[17] SPECIAL MASTER: All right. Let me [18] see the document.

[19] I do care about — oh, okay. Let me [20] see the document.

[21] You can walk it up here. Can you [22] get through there? You can't.

[23] All right. Let me see the document, [24] please.

---

Page 71

[1] MR. DEVLIN: Your Honor, this is one [2] of a class of documents that we can talk about [3] generally. And I think —

[4] SPECIAL MASTER: Okay.

[5] MR. DEVLIN: I think it will help us [6] get speeded along.

---

[7] SPECIAL MASTER: Good.

[8] MR. DEVLIN: What LML is arguing, [9] and they can certainly speak for themselves, but [10] they're arguing this document would be part of [11] the waiver that would result from Telecheck's [12] production of its opinions of counsel that it [13] received regarding the patent in suit.

[14] What this is and what we realize [15] now, probably something that we wouldn't — well, [16] we may have logged it, but it does relate to the [17] patents in suit.

[18] And it is advice from counsel. But [19] it does not relate at all to the advice that [20] Telecheck received recently within the last year [21] or two.

[22] Telecheck purchased a company called [23] Concord. And previously in advance of that [24] purchase when Telecheck was not involved at all,

---

Page 72

[1] you see this document is dated around the 2000 [2] time frame.

[3] Concord had received its own advice [4] regarding the patents in suit. Marsha Heister [5] was an attorney within Concord at that time. And [6] she's listed as a recipient of this document.

[7] Leslie Caston, also listed as a [8] recipient on the initial Email, is an outside [9] counsel for Concord at that time.

[10] So this document is privileged. [11] It's attorney-client communications.

[12] It does not fall within the scope of [13] waiver related to Telecheck's production of its [14] opinions of counsel, because this was never an [15] opinion of counsel received by Telecheck.

[16] And it was never relied on by [17] Telecheck as a basis for launching its products, [18] or non-willfulness. So for all those reasons [19] that someone might produce opinion of counsel, [20] the opinions of counsel that are discussed here [21] are not relied on for any of those reasons or [22] relevant to any of these reasons in this case.

[23] SPECIAL MASTER: So Marsha Heister [24] is counsel for Concord?

---

Page 73

[1] MR. DEVLIN: That's correct. [2] In-house counsel at Concord.

[3] SPECIAL MASTER: And Leslie Caston [4] is?

[5] MR. DEVLIN: Outside counsel in the [6] law firm, Akin, Gump. I believe Akin Gump law [7] firm, Your Honor.

[8] And was at least at that time and [9] was providing advice to Concord and Ms. Heister.

[10] SPECIAL MASTER: This is January [11] '00?

---

[12] MR. DEVLIN: Yes. The purchase of [13] Concord by First Data, which is Telecheck's [14] parent, occurred much more recently, maybe within [15] the last year. But I believe within the last two [16] years certainly.

[17] MR. McDOLE: Your Honor.

[18] SPECIAL MASTER: Yes.

[19] MR. McDOLE: This document, if it's [20] an opinion relating to the patents in suit, it's [21] in Telecheck's possession, regardless if they [22] bought a company, if they had received it, if [23] they personally went out and sought it or not. [24] The fact remains that it's still in

---

Page 74

[1] Telecheck's possession. This is very similar to [2] the incident.

[3] It's a little different, but very [4] similar to the incident with Echo trying — [5] having a Visa opinion in its possession.

[6] And while they said we're not [7] relying on the Visa opinion, it still goes to [8] the state of mind of Telecheck. If Telecheck has it [9] in its possession is doing a merger and [10] acquisition of Concord, and all of a sudden [11] Concord pops up with an opinion with we infringe [12] or there's something wrong with the patents in [13] suit, then that's something that, regardless if [14] they want to say it's relying on it or not, that [15] we should be able to test the veracity of their [16] defense.

[17] MR. DEVLIN: Whether Concord's [18] products in the year 2000 did or did not infringe [19] the patents in suit isn't relevant here. Those [20] products, even though Concord has now been [21] purchased by First Data, those are not at issue.

[22] I don't even know if they're still [23] in existence or offered by anyone. But they [24] don't have anything to do with the issues in this

---

Page 75

[1] case, Your Honor.

[2] MR. McDOLE: And Your Honor, I [3] still —

[4] SPECIAL MASTER: No. I've heard [5] enough.

[6] MR. McDOLE: Okay.

[7] SPECIAL MASTER: Who's Don Roscelli? [8] Do we know?

[9] MR. DEVLIN: One second, Your Honor.

[10] SPECIAL MASTER: Okay.

[11] MR. DEVLIN: Okay. I don't know [12] specifically.

[13] It's my understanding he would have [14] been an employee of Concord at that time. But I [15] can confirm that.

[16] SPECIAL MASTER: Okay. Are those

---

[11] these all back to you, Mr. Devlin, the ones I've [12] been going through.

[13] Thanks for giving them to me.

[14] **MR. DEVLIN:** Thank you, Your Honor.

[15] **SPECIAL MASTER:** I just think — [16] okay. Thank you.

[17] **MR. DEVLIN:** Thanks.

[18] **SPECIAL MASTER:** I have your [19] color-coded logs here.

[20] **MR. McDOLE:** Okay.

[21] **SPECIAL MASTER:** These are those [22] that you left.

[23] **MR. McDOLE:** We have four documents [24] left.

Page 129

[1] **SPECIAL MASTER:** Do you want to [2] finish up? We may as well.

[3] **MR. McDOLE:** Do you still want to [4] take a lunch break to decide the Concord document [5] issues?

[6] **SPECIAL MASTER:** Well, let me think [7] about that a little bit. I think I want to look [8] at them again.

[9] The Concord issue. I think we'll do [10] that if you don't mind.

[11] **MR. McDOLE:** Okay.

[12] **SPECIAL MASTER:** We'll take a lunch [13] break, and let me look at those. Then I'll have [14] you back again to argue those Concord documents.

[15] All right.

[16] **MR. DEVLIN:** That works. Thank you, [17] Your Honor.

[18] **SPECIAL MASTER:** As I understand the [19] Concord, this was in Concord's — it matriculated [20] through the Concord entity before they were [21] acquired?

[22] **MR. McDOLE:** It matriculated, right.

[23] **MR. DEVLIN:** That is right. And [24] then when Concord came on board, so to speak,

Page 130

[1] some of those documents came with it.

[2] That's right. First Data, the [3] parent company, obtained possession of all the [4] documents that Concord had.

[5] **SPECIAL MASTER:** I'll look at the [6] documents at the break if you don't mind.

[7] **MR. McDOLE:** Okay. The next [8] disputed document is identified on Telecheck's [9] July 28th privilege log as PR 4652.

[10] It is a document from Sue Shaper who [11] provided an opinion of counsel in this case to [12] Karen Williams and Randy Templeton, two in-house [13] Telecheck employees.

[14] The description is correspondence

[15] from attorney containing legal advice re prior [16] art patent. A prior art patent, Your Honor, is a [17] patent that is — essentially can be used to [18] invalidate a patent at issue in the case.

[19] So, for instance, an issue in this [20] case is the '988 patent. And there's certain [21] references that would qualify, by statute, as [22] being considered prior art.

[23] So when you make the statement of [24] prior art patent, you must be — you must have it

Page 131

[1] in the context of something. It must be prior [2] art to something.

[3] For instance, just having a [4] reference is not necessarily prior art. It must [5] be prior art to a patent.

[6] And since it's on the privilege log, [7] and given the date of February 12th, 1997, we [8] believe that the document is related to a prior [9] art patent to the '988 patent. Now, again, it [10] doesn't say what prior art patent it is.

[11] If the document says it, then I can [12] tell you whether it's an issue in the case or [13] whether they've used it in their opinions of [14] counsel. But in any event, I think it still [15] flows into that same thinking of they're relying [16] on advice of counsel with respect to invalidity.

[17] This falls directly within that [18] scope. It's a prior art patent.

[19] It relates to invalidity, and it [20] should be produced.

[21] **MR. DEVLIN:** This document has [22] nothing to do with the validity of the patent in [23] suit, the '988 patent. The prior art patent was [24] just a reference to it being some other patent.

Page 132

[1] What this document is — I'll hand [2] it up to you Your Honor — it is a [3] noninfringement analysis of one claim of that [4] prior art patent.

[5] And as Your Honor knows, in order to [6] conduct a patent validity analysis on the patent [7] in suit, you've got to look at the full [8] disclosure of a prior art reference and compare [9] that to the claims of the '988 patent.

[10] It's a very extensive analysis, [11] typically if you get a long claim.

[12] **SPECIAL MASTER:** Right, [13] MR. DEVLIN: Okay. When you're [14] looking at the noninfringement of a patent, you [15] can simply look at one tiny feature that's [16] recited in the claims of that patent and say, We [17] don't do that. And that analysis can be very [18] quick and short, and have nothing to do with the [19] full disclosure of what that patent and what that [20] full disclosure of that patent may mean to the [21] validity of a

second patent.

[22] So what this is, it's a [23] non-infringement analysis regarding just one [24] claim, and I think only one little element of one

Page 133

[1] claim of a prior art patent.

[2] It doesn't have anything to do, and [3] you can take — you can take whatever time you [4] want. But you can probably read it in 30 seconds [5] and see it is not a validity analysis. It has [6] nothing to do with the '988 patent.

[7] They have noninfringement patents.

[8] **MR. McDOLE:** If I'm understanding [9] Mr. Devlin's argument, they have opinions of [10] counsel they're relying on with respect to [11] infringement or noninfringement as well.

[12] It's not limited to invalidity, [13] because we said prior art patent. I assumed it [14] went to validity, because the description is very [15] cursory.

[16] But what Mr. Devlin just said is you [17] can look at a piece of prior art and you can look [18] at one little piece and determine and look at how [19] it relates to invalidity. He just made the [20] argument for us of why it's related.

[21] **MR. DEVLIN:** That's not what I said. [22] Your Honor. You can look at a patent, and you [23] can look at one small piece of a claim of a [24] patent and determine that you do not infringe

Page 134

[1] that patent.

[2] Let's refer to this document as [3] talking about Patent A. You could look at Patent [4] A, and you can look at a claim of Patent A. And [5] you can look at the minutest portion of a claim [6] of that patent and determine, based on that, that [7] you don't infringe that patent.

[8] That's what that document is doing. [9] The patent in this suit is not Patent A.

[10] It's Patent B. It's the '988 patent. [11] And to conduct a validity analysis [12] of Patent B, you've got to look at the full [13] disclosure of Patent A or any other prior art [14] reference, and compare that disclosure in its [15] entirety to the claims of Patent B.

[16] So it's a vastly different analysis. [17] The fact that Telecheck may or may not infringe a [18] completely different patent has nothing to do [19] with the question of whether it may infringe the [20] patent in suit here, because the question of [21] infringement is very particular to the claims of [22] each patent. And so, of course, Patent A has [23] different claims than Patent B.

[24] The patent in suit here and the fact

Page 135

[1] of whether Telecheck meets one of the limitations [2] of the claims of Patent A has nothing to do with [3] whether it meets the limitations of the claims of [4] Patent B. So it doesn't have anything to do with [5] the infringement analysis of Patent B of what I'm [6] saying, because the claims of the two patents are [7] different.

[8] I can't look at a patent and say, [9] Well, you infringe some other patent; therefore, [10] you infringe mine. That's just a legal [11] impossibility. It's a legally insignificant [12] analysis. It means nothing.

[13] And, again, that simply doesn't have [14] to do with the other issue, which could be the [15] validity of Patent B, because that's not looking [16] at disclosure of Patent A. It's just looking at a [17] tiny piece or pieces of Patent A.

[18] SPECIAL MASTER: Let me just look at [19] that with both of those thoughts in mind.

[20] MR. DEVLIN: Your Honor, if I may [21] make just a note, I think when you handed [22] something back to me, you handed me something of [23] yours.

[24] SPECIAL MASTER: Oh, yeah.

Page 136

[1] MR. DEVLIN: I just want to hand [2] that back.

[3] SPECIAL MASTER: I think that was a [4] copy of order three. Yeah, it was a memorandum. [5] Yes.

[6] Yes.

[7] MR. McDOLE: Your Honor, just given [8] Mr. Devlin's argument, I mean, I don't have the [9] document in front of me, but I'm questioning, if [10] his argument is really true, what the relevance [11] of the document is, and why it's on the privilege [12] log.

[13] Because he's essentially arguing it [14] has nothing to do with the case, and here we are, [15] again, in a situation where I look at the [16] privilege log. It talks about a prior art [17] patent, and I have to assume it has something to [18] do with the case.

[19] And his argument is it has nothing [20] to do with it, and that there's no way to [21] determine that, you know, without seeing the [22] document. And even knowing what the prior art [23] is, I can't respond any further.

[24] SPECIAL MASTER: It seems to be

Page 137

[1] essentially, as Mr. Devlin says. And it doesn't [2] appear to be relevant to what's before the Court [3] in this case.

[4] MR. McDOLE: The only thing, as [5] Mr. Herrmann just pointed out to me, that the [6] relevance that they may have is if they're trying [7] to, you know, somehow construe the claims, [8] interpret the claims of a prior art patent to [9] avoid infringing that patent.

[10] But it — you know, and making sure [11] that it's not inconsistent with what they have [12] here.

[13] SPECIAL MASTER: Well, in the most [14] generic sense, it has to do with the overall [15] legal topic that the case has to do with, that [16] we're concerned with here. I don't think it does [17] any harm onto anybody letting them see this.

[18] But it falls in that category. [19] Well, there it is.

[20] Let somebody else find out why it [21] should apply. I think it's discoverable.

[22] You say, Mr. Devlin, it's harmless [23] discovery. So, it's discoverable.

[24] MR. DEVLIN: Your Honor, I guess

Page 138

[1] we've dealt with this issue before about the [2] problems of waiver, and I assume we'll be [3] producing these subject to appeal, of course.

[4] But if they are produced, they will [5] be produced under order which would reduce waiver [6] in a separate situation.

[7] SPECIAL MASTER: Yeah. I have no [8] problem with that.

[9] I think the waiver is, if you will, [10] Court ordered. And for that reason, that doesn't [11] waive a lot of other things.

[12] The kind of waiver I'm talking [13] about, the waiver is —

[14] MR. DEVLIN: Restricted to this [15] case?

[16] SPECIAL MASTER: Right.

[17] MR. DEVLIN: Which is what I think [18] we're talking about.

[19] MR. McDOLE: I think the case law —

[20] SPECIAL MASTER: Well, what I'm [21] saying is it's obviously subject to case law, but [22] no one should read into what the case law applies [23] any notion that I have to accept that it's waived [24] for everything, as far as I'm concerned.

Page 139

[1] But if the law provides, you know, [2] under these circumstances, it's waived by law, [3] then it is. I can't change that.

[4] It's not my belief that there's any [5] sort of a general waiver here. Okay.

[6] I'm just — for purposes of what I'm [7] doing here, it's waived for LML's use in this [8] case. And the extent to which some other Court [9] might say, Well, you waived it for everything, [10] that's another argument on another day.

[11] So that I — but I have no — I'm [12] not saying it's a blanket waiver of everything [13] here.

[14] MR. McDOLE: Your Honor, the next [15] document is identified on Tele-check's July 28th [16] privilege log as PR 4655 through 62.

[17] And this is a document from John [18] Harris to Cynthia Somervill with a description [19] correspondence from attorney containing legal [20] advice re patentability search.

[21] Again, patentability search tells me [22] it relates to invalidity if it's relevant to this [23] case and it appears on their privilege log.

[24] You'll be able to look at the

Page 140

[1] document, be able to tell. But patentability [2] search essentially is you give a search firm a [3] criteria or a topic, and you say I want to know [4] if this patent — if there's prior art on this [5] patent.

[6] I want to know if it's patentable. [7] You know, sometimes you do it with respect to [8] prosecution. Sometimes you do it with respect to [9] a defensive action and invalidity.

[10] Just given what they've said here, I [11] think our opinion is that they would avoid this [12] based on a reliance on advice of counsel based on [13] the description that they have.

[14] MR. DEVLIN: Mr. McDole made an [15] important distinction. When you are doing it to [16] see if a patent involved in a dispute is invalid, [17] that is invalidity.

[18] When you are doing it to see whether [19] one of your own engineer's ideas may be [20] patentable, that's a patentability search that's [21] covered by Spalding as privileged information. [22] It has nothing to do with the validity or [23] infringement of those patents of the '988 patent [24] in suit.

Page 141

[1] MR. McDOLE: And Your Honor, if [2] what Mr. Devlin is saying, if this isn't [3] relevant in [3] any way to the case, that's fine. You know, but [4] just appearing on their privilege log, I don't [5] want to beat a dead horse. I just — I can't [6] tell from the privilege log.

[7] SPECIAL MASTER: I understand [8] what you're both saying. Let me look at it.

[9] How's it described in the log, [10] please?

[11] MR. McDOLE: Your Honor, it's [12] described as correspondence from attorney [13] containing legal advice re patentability search.

[14] MR. DEVLIN: And, again, Your Honor [15] patentability search is not an invalidity [16] search. I'm not saying this document is [17] completely irrelevant to every issue in the case.

[18] I'm saying it's not part of the [19] scope of waiver. It's irrelevant to the opinions [20] of counsel that were obtained in this

Case 1:04-cv-00858-SLR    Document 411-2    Filed 11/14/2005    Page 13 of 26

LML Patent Corp.  v.                                                    **Hearing**
Telecheck Services, Inc., et al.                                October 25, 2005

[13] This is the quote, "generally then a [14] document, which predates the patent at issue, is [15] not discoverable unless the record indicates that [16] it was brought to bear on the decision-making [17] process."

[18] Now, these documents here, they're [19] not before the patent issued, but they're long [20] after Telecheck implemented its system and its [21] management made decisions about how to do that. [22] And there's absolutely nothing in this record [23] that indicates that the Telecheck management ever [24] relied on these Concord opinions for any part of

---

Page 162

[1] its decision-making process, either in the 1997 [2] '98 time frame, or in the 2000 time frame, or [3] even in the 2003, 2004 time frame, which was when [4] First Data purchased Concord.

[5] At no time is there anything in the [6] record that suggests that those Concord opinions [7] impacted Telecheck's management's [8] decision-making process in any way. And as you can see from this [9] case from Judge Robinson, that's really the crux [10] of where the scope of waiver reaches.

[11] Outside of that, the information is [12] not discoverable. That's the ruling from this [13] case.

[14] **MR. McDOLE:** And Your Honor, I would [15] just say that the fact of doing nothing is [16] affecting a decision making. If they received [17] these patents and did nothing, that's affecting [18] their decision making.

[19] They don't have to make an [20] affirmative act to go and do these tasks. They [21] were clearly in the possession of Telecheck.

[22] **SPECIAL MASTER:** Well, I think the [23] yeah when Concord was acquired by First Data; [24] right?

---

Page 163

[1] **MR. DEVLIN:** Yes.

[2] **SPECIAL MASTER:** And actually, was [3] Concord a going enterprise?

[4] **MR. DEVLIN:** Concord was a going [5] enterprise.

[6] **SPECIAL MASTER:** Did they disappear [7] and become part of Telecheck?

[8] **MR. DEVLIN:** They're not part of [9] Telecheck. I think they are still — I think [10] they're still an independent entity called [11] Concord First Data.

[12] It's a wide-ranging company. It's [13] all sorts of subsidiaries. I think they maintain [14] the subsidiary as an independent operating entity [15] in some way.

[16] I'm not sure what happened to [17]

---

Concord here, apart from the fact that I'm fairly [18] sure it wasn't integrated with Telecheck. So [19] there's no combination like that.

[20] **MR. McDOLE:** Your Honor, if that's [21] the case, then they're in possession of [22] Telecheck, and it's a third-party waiver. I [23] mean, it can't be a separate entity. Telecheck [24] has possession of the documents.

---

Page 164

[1] So...

[2] **MR. DEVLIN:** I don't think that's [3] proper argument, Your Honor. They're both First [4] Data.

[5] **SPECIAL MASTER:** I just didn't know [6] how it evolved. Okay.

[7] Let me say, first of all, I went [8] through all these papers, and I think half of [9] them are just duplicates. You know how Emails [10] are, they kind of repeat.

[11] So it's not this great treasure cove [12] of information. The only thing that gets me is [13] that I understood that LML will hope to and [14] presumably expects to offer some proof of ongoing [15] conduct pertinent to this patent.

[16] And for that reason, knowledge that [17] Telecheck has, it seems to be pertinent if it's [18] consistent with or if it corroborates something [19] what was being done. Now, maybe it doesn't.

[20] Maybe Telecheck has a totally [21] plausible explanation for things like that. But [22] it just seems to me that prima facie, LML should [23] be permitted to offer any evidence it has that [24] shows knowledge by Telecheck of the interest in

---

Page 165

[1] comparison of patents at issue with other [2] patents.

[3] I mean, I just think that's [4] pertinent. It may be totally benign in terms of [5] being persuasive, but I don't think you can shut [6] it out, that it may be repetitious of something [7] else. And it may be the time segments that you [8] mentioned, Mr. Devlin, this '96, '97 time period [9] is the period that Telecheck will focus upon as [10] being the time when it was developing its [11] policies and strategies.

[12] But LML has a different idea that [13] presumably they will be offering evidence that [14] it's not confined to that box, that other things [15] have happened.

[16] I just think — and I can understand [17] that. I don't know if they'll get anywhere with [18] that, whether it will be persuasive or whether it [19] may be deemed admissible by the trial judge.

[20] But it just seems to me, as I read [21] these documents, we're talking about important — [22] well, the reference leads

---

to the Hills invention. [23] That is all I'm saying.

[24] Maybe it's meaningless. Maybe it's

---

Page 166

[1] too early.

[2] Maybe it's repetitious. Maybe it's [3] so speculative, it's not admissible.

[4] But the fact that it's here at this [5] juncture, I just think they should see it.

[6] Again, we're talking about a [7] relatively stiff defense being raised here by [8] Telecheck, which allows a corresponding, I think, [9] wider opportunity for LML to see information to [10] meet that defense.

[11] So I know what you're saying, and I [12] think it's — I think you're sincere making it. [13] I think you have good ground to make it, but you [14] just — these Concord papers are discoverable.

[15] So for that reason, they'll be [16] deemed discoverable. And then number — I think [17] you have the numbers we cited somewhere.

[18] **MR. DEVLIN:** Thank you, Your Honor.

[19] I think we put those into the record [20] earlier. I don't think there will be an issue.

[21] **SPECIAL MASTER:** I might say some [22] of them are duplicates. You just can't help it. So [23] they're deemed waived.

[24] Okay. Do you have another document?

---

Page 167

[1] Any others?

[2] **MR. McDOLE:** Just two more documents [3] left, Your Honor.

[4] **SPECIAL MASTER:** Yes.

[5] **MR. McDOLE:** It's a document [6] identified as 3117 on Telecheck's privilege log. [7] I believe it's the first page of part six.

[8] It is a document from October 1998 [9] from an author of James Price to what appears to [10] be a number of individuals. Three individuals at [11] Telecheck.

[12] With the description correspondence [13] containing legal advice from attorney re patent [14] review.

[15] Again, this is a situation — I'm [16] not sure what the patent review is, but based on [17] being on the privilege log and assuming that that [18] document is going to be relevant —

[19] **SPECIAL MASTER:** The date?

[20] **MR. McDOLE:** October 6th, 1998. [21] Based on the record, patent review and being on [22] the log, I believe it's '1988.

[23] **SPECIAL MASTER:** Maybe it's some [24] relationship to what we are talking about here.

---

LMI. Patent Corp.   v.
Telecheck Services, Inc., et al.

still have one involving, was [18] it Hills'
deposition or something?

[19] **MR. McDOLE:** Yes, Your Honor.

[20] **MR. DEVLIN:** Yes.

[21] **SPECIAL MASTER:** Four or five [22]
documents.

[23] I'm halfway through that. We'll get [24]
to that.

---

Page 175

[1] We'll get to that. Okay.

[2] **MR. McDOLE:** Okay. Would you like [3]
us to put, as with the Echo hearing,
together a [4] chart with your rulings?

[5] **SPECIAL MASTER:** Yes. I'd like you [6]
to make a chart of this.

[7] And mostly this will be a W, [8]
withheld. Where privilege is allowed, it
will be [9] a Y, yes.

[10] And then we use whatever the code
[11] is. I think it was F for attorney-client
[12] privilege.

[13] **MR. McDOLE:** Okay. You said F or W
[14] withheld. I think you meant waived,
just so the [15] record is clear.

[16] **SPECIAL MASTER:** Yeah. I meant Y
[17] for yes.

[18] **MR. McDOLE:** Okay.

[19] **SPECIAL MASTER:** And if you use a
Y, [20] then I want you to put the F.

[21] **MR. McDOLE:** Right. I meant W.

[22] **SPECIAL MASTER:** W is all it takes.
[23] W just means waived.

[24] **MR. McDOLE:** Okay.

---

Page 176

[1] **SPECIAL MASTER:** All right. Thanks,
[2] counsel.

[3] And I want the record to note that I [4]
think counsel here are — I think they're
doing [5] the very best they can for their
clients, I think [6] in a highly professional
way.

[7] I think there are differences here, [8] of
course, but I've received all the argume-
nts. I [9] think, with the spirit of sincerity,
which I [10] think they're made.

[11] And as they say, you've got to call [12]
balls and strikes; right? And I'm doing the
best I [13] can.

[14] **MR. DEVLIN:** Thank you very much
for [15] your time and assistance.

[16] **MR. McDOLE:** Your Honor, as with
[17] Echo, may we make an application
for fees?

[18] **SPECIAL MASTER:** Yeah, you may
do [19] so.

[20] **MR. McDOLE:** Thank you.

[21] **SPECIAL MASTER:** My allowing you
to [22] do so is no indication that I agree
with that. [23] But I think you should be
allowed to do that. [24] Sure.

---

Page 177

[1] **MR. McDOLE:** Thank you.

[2] **MR. DEVLIN:** Thank you. [3] We, of
course, object to the [4] application.

[5] **SPECIAL MASTER:** I'm sure you do.

[6] **MR. DEVLIN:** Thank you.

[7] **SPECIAL MASTER:** All right. Thank [8]
you.

[9] Thanks, court reporter. Thank you [10]
very much.

[11] I have the log of the 60 or so [12]
documents that we did.

[13] Do you want me to keep these [14]
documents?

[15] **MR. DEVLIN:** The only — we may,
you [16] know, appeal some of your
decisions.

[17] **SPECIAL MASTER:** That is right.

[18] **MR. DEVLIN:** I'm not sure of the [19]
procedural aspect of that and whether
anything [20] could actually come back
down to you.

[21] **SPECIAL MASTER:** I guess it could.
[22] I guess if Judge Robinson —

[23] **MR. DEVLIN:** Provide some guid-
ance.

[24] **THE COURT:** — reviews something
and

---

Page 178

[1] says, Well, I recommend we revisit
certain series [2] of documents, that
could happen.

[3] **MR. DEVLIN:** If they are a pain to [4]
carry, we can box them and send them
back up to [5] you.

[6] **SPECIAL MASTER:** Oh, no, because it
[7] will come a time when this is all over,
I'll [8] probably shred this stuff in my
office.

[9] So...

[10] **MR. DEVLIN:** Join the club.

[11] **SPECIAL MASTER:** I'm not asking
you [12] to take it now, but I will give back
this [13] transcript that was furnished to
me, —

[14] **MR. HERRMANN:** Certainly.

[15] **SPECIAL MASTER:** — because I do
have [16] one in the office. I appreciate
you giving me [17] that.

[18] I did check over lunch for a couple
[19] entries that I wanted to have. Thank
you very [20] much.

[21] (Court was recessed at 2:19 p.m.)

---

Page 179

State of Delaware          )
New Castle County          )
            CERTIFICATE OF REPORTER
    I, Heather M. Triozzi, Registered
Professional Reporter, Certified Shorthand
Reporter, and Notary Public, do hereby certify
that the foregoing record, Pages 1 to 179
inclusive, is a true and accurate transcript of
my stenographic notes taken on October 25, 2005,
in the above-captioned matter.

IN WITNESS WHEREOF, I have hereunto
set my hand and seal this 26th day of October,
2005, at Wilmington.
        Heather M. Triozzi, RPR, CSR

# B

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

E.I. DU PONT DE NEMOURS          )
AND COMPANY,                     )
                                 )
            Plaintiff,           )
                                 )
      v.                         )  Civil Action No. 97-237-SLR
                                 )
MILLENNIUM CHEMICALS, INC.       )
and MILLENNIUM INORGANIC         )
CHEMICALS, INC.,                 )
                                 )
            Defendants.          )

O R D E R

At Wilmington this 14th day of April, 1999, having

reviewed the papers submitted in connection with various

discovery disputes;

IT IS ORDERED that:

1.  Plaintiff's motion to compel discovery (D.I. 95) is

granted in part and denied in part.

a.  **Testing documents.**  Defendants shall produce

the documents related to the tests referred to in counsel's

opinions, without simultaneous reciprocity by plaintiff.

b.  **The remaining privileged documents.**  Although

a defendant's state of mind is generally relevant to a

determination of whether its reliance on the opinions of counsel

is reasonable, that principle does not lead inexorably to the wholesale discovery of the universe of information available to a party both before and after the issuance of a competitor's patent. A document is properly within the scope of the waiver created when a defendant produces the opinions of counsel only when said document has been communicated to or otherwise considered by management during the period when management is evaluating the patent and its conduct in relation thereto. Generally, then, a document which predates the patent at issue is not discoverable unless the record indicates that it was brought to bear on the decision making process.[1] If, within two weeks from the date of this order, the parties remain unable to reach agreement on the appropriate production, the court will conduct an _in camera_ inspection to make such determinations.

2. Plaintiff's motion for production of two inadvertently disclosed documents (D.I. 109) is denied. The court understands the documents to be: 1) a request for legal advice by an employee, which request includes a recitation of the factual context of the issue to be addressed; and 2) the response to a request by counsel for technical information required as a factual context for the legal advice sought. The court finds the

---

[1] The court concludes that legal bills are not discoverable under this analytical framework.

documents privileged and the privilege not waived.[2] <u>Hercules,</u>
<u>Inc. v. Exxon Corp.</u>, 434 F. Supp. 136, 145-46 (D. Del. 1977)("The
policy of full disclosure underlying the attorney-client
privilege requires the preservation of the confidentiality of
[necessary technical information and expertise] when it is
communicated at the direction of a member of the control group,
for the purpose of soliciting legal advice.").


 

United States District Judge

---

[2]Of course, these documents would fall within the scope of
the waiver discussed above if they were communicated to the
decision makers during the relevant time frame.

2



## Exhibit C

1, 2, 14, 83, 84, 86, 99-103, 107-08, 112, 114-15, 119, 131, 169, 173, 181-82, 189, 204-05, 211-12, 218-19, 222, 237, 245-47, 264-68, 272-74, 282-89, 297, 299, 305-06, 308, 315, 319-21, 325, 328-30, 333, 335, 338-41, 345-46, 348-49, 351, 358, 361, 364-65, 368-70, 374, 381, 384, 386, 393, 400, 403, 405-06, 411-12, 417, 419, 421, 427-29, 438, 445-47, 452, 498-99, 538-39, 554, 573, 577, 621, 625-29, 641, 643, 668, 732, 734-42, 744, 747, PR918-19, PR1770-71, PR1846-47, PR1848-49,  PR1884, PR1888, PR1889-90, PR1913-14, PR1968-70, PR1971-73, PR2034-35, PR2043-44, PR20453-46, PR2047, PR2049, PR2054-55, PR2078-79, PR2080-81, PR2103-05, PR2114-17, PR2256-58, PR2259-62,  PR2263-65, PR2334, PR2338-41, PR2355-56, PR2357-59, PR2360-62, PR2363-66, PR2367-70, PR2371-73, PR2374-76, PR2397-98, PR2399-401, PR2402-03, PR2424-25, PR2426-28, PR2429-31, PR2432-34, PR2452-54, PR2469-70, PR2494-95, PR2554, PR2576-77, PR2578, PR 2583, PR 2594, PR2655-56, PR2662-63, PR2666, PR2667, PR2668-72, PR2674, PR2675-79, PR2682-86, PR2687-90, PR2691, PR2692-704, PR2709-19, PR2721-29, PR2730-38, PR2739-46, PR2747-53, PR2754-59, PR2760-65, PR2772-75, PR 2795-97, PR 2798-802,  PR 2803-06, PR 2807-09, PR 2810-12, PR 2813-815, PR2827-28, PR2830-31, PR2877-78, PR2879-80, PR3018, PR3019-20, PR3021, PR3042-44, PR3045-46, PR3082, PR3110-11, PR3115-16, PR3142-43, PR3280-81, PR3282-83, PR3853-72, PR3885-86, PR3887-90, PR3893-94, PR3948-52, PR3955-57, PR4406, PR4408, 1362113-18, 1362189-90, 1362167-69, 1362209-12, 1362213-15, 1362182-83, 1362840, 54687, 113602-54, 113758-62, 113991-92, 180703, 180755-58, 180762-64, 180765-68, 189744, 189745-46, 190837-40, 201060-64, 513844-45, 788519-20, 789716-18, 857418-19, 857420-21, 857422-23, 859680, 931943-44, 1010169, 1012830-33, 1163825-28, 1163829-32, 1163834-36

80028188.doc

D

## **Exhibit D**

1, 2, 14, 83, 84, 86, 99-103, 107, 108, 112, 114, 115, 119, 131, 158, 159, 161-5, 168-71, 173, and 181-3

80028226.doc

E

**Exhibit E**

PR 3022-31, PR 3032-41, PR3065-7, PR 3068-9, PR3070-1, PR 3072-9, PR 3080-1, PR 3083-90, PR 3091-2, PR 3093-4, PR 3095-8, PR 3099, PR 3100-9, PR 3113-4, PR 3117-9, PR 3133, PR 3134-40, PR 3150, PR 3165, PR 3182-3, PR 3215-7, PR 3305, PR 3331-2

80028220.doc

F

**Exhibit F**

PR 2504, PR 4652