# EXHIBIT J

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
LML PATENT CORP., )
        Plaintiff, )
                                )
v.                              ) C.A. No. 04-858 SLR
                                )
TELECHECK SERVICES, INC., )
ELECTRONIC CLEARING HOUSE,)
INC., EXPRESSCHEX, INC., )
and NOVA INFORMATION )
SYSTEMS,                      )
        Defendants.    )
        Tuesday, October 25, 2005
        9:33 a.m.
        Courtroom 2B
BEFORE: SPECIAL MASTER LOUIS C. BECHTLE
APPEARANCES:
MORRIS, JAMES, HITCHENS & WILLIAMS, LLP.
BY:  RICHARD K. HERRMANN, ESQ.
                -and-
KIRKLAND & ELLIS, LLP
BY:  JAMIE H. McDOLE, ESQ.
        Counsel for the Plaintiff

Page 2

APPEARANCES CONTINUED:
FISH & RICHARDSON, LLP
BY:  TIMOTHY DEVLIN, ESQ
BY:  SEAN P. HAYES, ESQ.
        Counsel for the Defendant
        Telecheck Services, Inc.

Page 3

[1] MR. DEVLIN: For Fish & Richardson [2] on behalf of Telecheck, Tim Devlin. And with me, [3] my colleague, Sean Hayes.

[4] SPECIAL MASTER: All right. Thank [5] you.

[6] All right. I'm going to ask counsel [7] to suggest to me the best way to proceed. I know [8] we — I know there's been some correspondence [9] that followed special order four that listed a [10] lot of documents that were provided.

[11] So how about if counsel brings me up [12] to date, and then we'll take it from there.

[13] MR. McDOLE: Your Honor, with the [14] suggestion of how to proceed, I think one of the [15] first issues we should address is with respect to [16] I think the bulk of documents that are involved [17] here. I think· there are still a lot of documents [18] we have at issue.

[19] But specifically 271 of them, our [20] argument and for these purposes, our sole [21] argument with respect to those documents is that [22] the description on Telecheck's privilege log [23] simply has the description of subject matter re [24] business operation. It will say legal advice

Page 4

[1] containing correspondence, re business operation [2] or something of that sort. Some sort of claim as [3] to re business operation.

[4] SPECIAL MASTER: Okay.        They [5] appear [5] on which log?

[6] MR. McDOLE: Telecheck's log of July [7] 28th.

[8] SPECIAL MASTER: Right. That's the [9] one we're working off of.

Page 5

[1] There are documents they've pro-duced [2] relating to the patents in suit that some of the [3] description would say re patents in suit and re [4] business operations.

[5] SPECIAL MASTER: Okay.

[6] MR. McDOLE: The third point is that [7] there's 200 — I've just looked at the first part [8] of Telecheck's privilege log. And in counting [9] those documents, just on that first part, [10] Telecheck has already produced off the privilege [11] log 243 documents just on that first privilege [12] log of that description re business operations.

[13] So any privilege that they may be [14] able to claim, they've certainly waived at this [15] point by producing, you know, well over 200 [16] documents just on that first privilege log that [17] have that same description. And —

[18] SPECIAL MASTER: Okay.

[19] MR. DEVLIN: Your Honor, Tim Dev-lin.

[20] SPECIAL MASTER: Mr. Devlin, sure.

[21] MR. DEVLIN: First, let me bring you [22] up to speed about where we are and what we've [23] done since we met last.

[24] SPECIAL MASTER: Okay. Sure.

Page 6

[1] MR. DEVLIN: And then we can talk [2] about where we are today, and what we should do [3] today to get through things most efficiently.

[4] SPECIAL MASTER: Okay.

[5] MR. DEVLIN: As Your Honor knows, we [6] gave to you, pursuant to a tele-conference a few [7] weeks ago, 50 odd documents that were identified [8] by LML. And then Your Honor had re-quested [9] another 12 or 15 documents, and we provided all [10] those to you.

[11] That was the basis for the special [12] order number four which delineated from Your [13] Honor's perspective what

Page 7

[1] documents, among those [14] set, were privileged and which should be [15] produced.

[16] SPECIAL MASTER: Mm-hmm.

[17] MR. DEVLIN: So what we did is we [18] went back, based on that order, and looked at all [19] of the documents that are still contested by LML [20] as being privileged. And we tried to draw the [21] same lines that you drew based on your selection [22] of documents, and we produced — I'm not sure of [23] the volume, but I would suspect it's in the [24] couple hundred document range of the contested

Page 7

[1] documents.

[2] And you may know this better than I [3] do, Jamie, but it is, roughly, 50 percent or more [4] of the documents that were contested. So we made [5] a good effort to go back and draw the lines that [6] Your Honor drew.

[7] So that's what we did. And now [8] there are still a number of remaining documents [9] that need to be discussed today.

[10] Now, the question of how to do that [11] today, if we can, there are still several hundred [12] documents still at issue here. It's a large [13] volume we've gone through before.

[14] Telecheck produced a tremendous [15] volume of documents in this case. And as a [16] result, the privilege logs are correspondingly [17] large.

[18] SPECIAL MASTER: Okay.

[19] MR. DEVLIN: And the documents in [20] contest, because of that, are large. So we are [21] all dealing in large numbers here in as much as [22] how to deal with it.

[23] I don't think it would be too [24] difficult, to be honest, to cruise through many

Page 8

[1] of the documents that are at issue. A lot of [2] them are very easy to look at in camera, simply [3] look at them. It takes about ten seconds to draw [4] the same lines that you drew before.

[5] We can talk about some of the areas [6] that we thought were privileged, where privilege [7] was maintained in terms of subject matter or in [8] terms of where we thought your lines were drawn.

[9] SPECIAL MASTER: Mm-hmm.

[10] MR. DEVLIN: In terms of what [11] Mr. McDole just said, and the descriptions on the [12] logs, because of the volume of documents in play. [13] It's impossible, virtually impossible to come up [14] with a different description for every doc-ument.

[15] And some documents that are [16]

privileged are going to have the same ultimate [17] description as other documents that Your Honor [18] suggested to produce — ordered to produce, which [19] we did.

[20] So the fact that certain documents [21] share the same description in the log, to me, [22] doesn't seem dispositive.

[23] SPECIAL MASTER: Right.

[24] MR. DEVLIN: We've come past that

**Page 9**

[1] stage, first of all. We can give you examples [2] from LML's log.

[3] We can give you examples from every [4] log on earth where there are consistencies in the [5] types of descriptions that are used to classify [6] certain types of documents. And when there's [7] disputes, some of those may get produced and some [8] of those may not.

[9] And that's the situation that we [10] have here. So the fact that there's consistency [11] in description, I don't think should be the basis [12] for production at this point.

[13] We have the documents here that are [14] in dispute. There are — let me tell you a [15] couple things about the set of documents and how [16] we got to the set of documents that we have here.

[17] LML gave us four or five categories [18] of documents that were contested for various [19] reasons, one reason or another. Based on, for [20] example, LML believed it was produced to a third [21] party or they believed that —

[22] SPECIAL MASTER: Right. I think [23] that was in their motion of August the 18th —

[24] MR. DEVLIN: Exactly.

**Page 10**

[1] SPECIAL MASTER: — of those [2] categories.

[3] MR. DEVLIN: Exactly. So based on [4] those categories, that's how we selected those [5] documents. And it's from those categories of [6] those documents that we are still dealing with, [7] the set that we're dealing with today. Although [8] half of them have now been produced.

[9] Before when we actually received [10] those lists, there were a number of those [11] documents that had already been produced. So [12] there's — and I don't know how many that is, 10, [13] 20 or more documents that were on that list were [14] in error on their list, because they had been [15] produced.

[16] There's also four documents that are [17] on that list that we think have been produced, [18] but don't show that designation on our log. In [19] other words, I don't have the four documents [20] right now that are at issue. But we have the [21] rest, and we're getting our hands on

those four.

[22] But apart from those four, we've got [23] the other documents that are at issue. There [24] are, roughly, three redwell folders of them,

**Page 11**

[1] three inches thick. So it is a large number.

[2] SPECIAL MASTER: About how many [3] would you say, just give or take?

[4] MR. DEVLIN: I would, give or take, [5] 200 to 300.

[6] SPECIAL MASTER: Okay.

[7] MR. DEVLIN: It's a rough guess. I [8] could be a hundred or more off one way or the [9] other.

[10] SPECIAL MASTER: Okay.

[11] MR. DEVLIN: And we can — I know in [12] your last hearing, you went through document by [13] document, and it was relatively slow and took a [14] long time.

[15] I think we can go through much [16] quicker, or take more samples, or whatever Your [17] Honor thinks makes sense. But we're happy [18] starting with document one and just going from [19] there.

[20] SPECIAL MASTER: We just mentioned a [21] moment ago of those 271 in the 300 —

[22] MR. McDOLE: Those are 271 that our [23] sole argument with respect to those is with [24] respect to the adequacy of the description of re

**Page 12**

[1] business operation.

[2] SPECIAL MASTER: Are they included [3] in the three redwell folders mentioned by [4] Mr. Devlin?

[5] MR. McDOLE: I assume they are. [6] They were contested with respect to our letter of [7] August 18th.

[8] SPECIAL MASTER: All right.

[9] MR. McDOLE: May I respond?

[10] SPECIAL MASTER: Briefly, yes.

[11] MR. McDOLE: Your Honor, consistency [12] does not mean that you can have 700 entries on [13] your log or over that, have the same description. [14] Consistency, I understand that there may be a [15] subject matter, Emails going back and forth that [16] have the same description. That's not what we're [17] arguing.

[18] What we're arguing is what LML [19] should be able to do by a privilege log. If [20] somebody produces over 200 documents that have [21] the same description, we should be able to go to [22] their log, figure out where the waiver is and ask [23] for those documents. That's what we're arguing [24] here.

**Page 13**

[1] They simply cannot argue, sit here [2] and say that this Court is — it's the Court's [3] obligation to now go through and review over 300 [4] documents, or 271 documents at this point, to [5] determine whether they really are privileged. [6] That's something that should have been on the [7] privilege log a long time ago.

[8] SPECIAL MASTER: All right. Just [9] one second.

[10] MR. McDOLE: And I would estimate [11] there's probably 80 to a hundred other documents [12] that —

[13] SPECIAL MASTER: Okay.

[14] MR. McDOLE: Besides those [15] documents.

[16] SPECIAL MASTER: All right. You [17] said you had a list?

[18] MR. McDOLE: Yes, sir.

[19] SPECIAL MASTER: Is there just a [20] list made up for this hearing, or is there a list [21] in some other form?

[22] MR. McDOLE: On the plane last [23] night, I had gone through and looked through last [24] night, and have written it down on a pad of

**Page 14**

[1] paper. I can read it into the record or provide [2] it to Your Honor, make a copy of it, whatever [3] you'd like.

[4] SPECIAL MASTER: Can I just see it [5] for a moment, please? I'll give it back to you, [6] but I just want to see it.

[7] And then I'll have you show [8] Mr. Devlin. I just want to have an idea the form [9] it's in.

[10] All right. So what you have, as I [11] look at it, you have — you've listed the —

[12] MR. McDOLE: They are — what I've [13] listed on that sheet is the document numbers.

[14] SPECIAL MASTER: From the log?

[15] MR. McDOLE: From the log.

[16] SPECIAL MASTER: Oh, I see. So [17] Document 131, if you turn to 131 in the July 28th [18] log, you'd see that document here; right?

[19] MR. McDOLE: That is correct.

[20] SPECIAL MASTER: Or if you go on [21] 544.

[22] MR. McDOLE: Or I would say, for [23] instance, you're pointing to 348 through 349, [24] those are two documents.

**Page 15**

[1] SPECIAL MASTER: All right. I see.

[2] So we have several pages of these; [3] right?

[4] MR. McDOLE: Yes.

[5] SPECIAL MASTER: And okay. Here's

[6] what I think we should do here.

[7] Oh, one last thing. [8] These have the description in the [9] log that may not be exactly the same, but it's [10] essentially the same.

[11] MR. McDOLE: It's essentially the [12] same. The subject line is going to say either re [13] business operations or re internal business [14] operations.

[15] SPECIAL MASTER: Okay. Okay.

[16] Here's what I think I'd like you to [17] do. Are the documents here, these documents?

[18] MR. DEVLIN: They are here. If I [19] may make one note, Your Honor.

[20] SPECIAL MASTER: Yes.

[21] MR. DEVLIN: In your own in camera [22] review of the documents and when you selected [23] documents that you thought should be produced, [24] which we have produced and chose documents that

Page 16

[1] you maintained as privileged, there were — we [2] just checked. At least one of those has that [3] description on there re business operations.

[4] SPECIAL MASTER: Yeah.

[5] MR. DEVLIN: I would understand [6] Mr. McDole's point if this was a business case, [7] if there was a commercial dispute and all our [8] privilege logs said was re business operations. [9] But this is a patent dispute.

[10] And there are many patent issues, [11] and those are delineated clearly on our privilege [12] log. You can tell when something relates to the [13] patents in suits. You can tell when it relates [14] to other issues.

[15] And you can tell when it relates to [16] peripheral things like business operations. So [17] that description is adequate in the context of [18] this case.

[19] It's not as if every entry in our [20] log says the same thing. The log has plenty of [21] different descriptions that allow people to [22] delineate what types of documents that are being [23] maintained as privilege. And as I said, some of [24] those documents that had that very description

Page 17

[1] were ordered by Your Honor to be maintained as [2] privileged in order number four.

[3] SPECIAL MASTER: All right. Well, [4] let me suggest this, in this group — oh, by the [5] way, does somebody have a copy of the transcript [6] from last week in the courtroom?

[7] MR. HERRMANN: I can get a copy [8] while we're here.

[9] SPECIAL MASTER: I don't want you

to [10] go out of the building.

[11] MR. HERRMANN: I can have someone [12] bring one over.

[13] SPECIAL MASTER: Do you mind doing [14] that?

[15] MR. HERRMANN: The argument that we [16] had, the last hearing we had?

[17] SPECIAL MASTER: Yeah, just a [18] transcript, if you could.

[19] MR. HERRMANN: Certainly.

[20] SPECIAL MASTER: If you could do [21] that, I would appreciate that. I left that with [22] my secretary, because she was working with that [23] on something else.

[24] She had to go through some papers,

Page 18

[1] so I couldn't bring it with me. Would you mind [2] doing that?

[3] MR. HERRMANN: Not a bit, Your [4] Honor.

[5] SPECIAL MASTER: It's no big thing. [6] I want a reference here, so we have a reference [7] here.

[8] All right. Let me tell you what I [9] think we should do here.

[10] I'd like you to pick out 20, say, 30 [11] of those. All right. Just pick them out, [12] scatter through that list.

[13] Are they available here somewhere?

[14] MR. DEVLIN: Yes.

[15] SPECIAL MASTER: Just either [16] attorney can do it. Don't read them, just [17] pick [17] out 30. Just go through them and pick some out.

[18] MR. DEVLIN: Sure.

[19] SPECIAL MASTER: Both of you [20] together go do it.

[21] MR. McDOLE: Your Honor, we can do [22] the first 30, because I don't know the [23] different — they're all the same description to [24] me, so I don't — there's no — I don't have any

Page 19

[1] rhyme or reason to pick one versus the other. [2] They're all the same to me.

[3] SPECIAL MASTER: Well, I don't care [4] how you do it.

[5] MR. DEVLIN: Take them in numerical [6] order.

[7] SPECIAL MASTER: Yeah, just give me [8] the first 30. Let me get some idea here.

[9] MR. DEVLIN: Let me see how those [10] documents are ordered here.

[11] You mean the first 30 with the [12] description of business operation?

[13] SPECIAL MASTER: Well, in other [14] words —

[15] MR. McDOLE: First, I guess — okay. [16] You want me to read them out to you?

[17] MR. DEVLIN: Let's just bring that [18]

list over here.

[19] Give us a few — probably few [20] minutes.

[21] SPECIAL MASTER: Just pick ten and [22] give them to me, and then go back, and you can [23] discuss while I'm looking at those ten to save [24] time.

Page 20

[1] MR. DEVLIN: Thank you.

[2] SPECIAL MASTER: Okay. Just give me [3] ten to kind of look at to get a feel for this.

[4] (Following a discussion held off the [5] record.)

[6] SPECIAL MASTER: Just let me see the [7] first ten.

[8] MR. DEVLIN: These are roughly ten.

[9] SPECIAL MASTER: When you get 20 [10] more in some selection process, let me just get [11] an idea of the flavor of these.

[12] MR. DEVLIN: I should note this [13] probably isn't a random system. They're ordered [14] in a way that — some were similarly grouped, so [15] you will see a bunch there that relates to the [16] same topic area, for example.

[17] SPECIAL MASTER: But these do have [18] these business purpose description; is that [19] right?

[20] MR. DEVLIN: I'm relying on [21] Mr. McDole's chart as that being the case, but we [22] can double check right now.

[23] SPECIAL MASTER: Is that okay with [24] the numbers I have, Mr. McDole?

Page 21

[1] MR. DEVLIN: It's the first — no, [2] the first — it's the first numbers up through [3] 103. Although for some reason, we don't have [4] this one handy right now.

[5] MR. McDOLE: Okay.

[6] MR. DEVLIN: I'm not sure what the [7] story is with that one.

[8] MR. McDOLE: Yes, Your Honor. All [9] their descriptions read correspondence containing [10] legal advice from, and generally there's [11] attorneys listed. Sometimes it just says an [12] attorney and then it says re business operations.

[13] SPECIAL MASTER: Okay. But your [14] complaint is that re business operation doesn't [15] give you any guidance in what to do, as I [16] understand.

[17] MR. McDOLE: That's correct.

[18] SPECIAL MASTER: Let me look at [19] these while you're getting a few more. All [20] right?

[21] MR. DEVLIN: I was going to insert [22] this one, because I couldn't find one for a [23] second, and then I just found it.

[24] SPECIAL MASTER: Oh, good.

**Hearing**
**October 25, 2005**

###### Page 22

[1] MR. DEVLIN: I want to keep them in [2] order. So that's Number 83, Your Honor.

[3] SPECIAL MASTER: We'll identify [4] these numbers for the record. While you're [5] getting a few more, just let me do my job and [6] look at these for a few seconds, see if I can get [7] it done in ten seconds.

[8] MR. DEVLIN: While you are reading [9] that, let me just note the numbers for the [10] record. For the record, we have handed up [11] Documents Number 1, 2, 14, 83, 84, 86, and 99 [12] through 103. For the — let me — I think these [13] are from Telecheck's first privilege log.

[14] SPECIAL MASTER: Sure [15] MR. DEVLIN: Your Honor, may I [16] approach? I have another 20 if you want to —

[17] SPECIAL MASTER: Oh, good. Just [18] put them up here.

[19] MR. DEVLIN: Thank you.

[20] SPECIAL MASTER: Okay. All right.

[21] MR. DEVLIN: With Your Honor's [22] permission, I'll read the additional numbers into [23] the record that we have collected.

[24] SPECIAL MASTER: You can do that. I

###### Page 23

[1] don't need to know if they are being read into [2] the record.

[3] MR. DEVLIN: Sure. The numbers are [4] 107, 108, 112, 114, 115, 119, 131, 158, 159, 161 [5] through 165, 168 through 171, 173 and 181 through [6] 183.

[7] If Your Honor has questions about [8] names of individuals and so forth, we'll be happy [9] to provide those to you by context.

[10] SPECIAL MASTER: All right. Sure.

[11] MR. DEVLIN: Thanks.

[12] SPECIAL MASTER: Let's see. Let me [13] just make one or two — I've gone through the [14] first batch of about ten. I've gone through 1, [15] 2, 14, 83, 84, 86, 99, 101, 102, 103.

[16] Now, let me just mention a few [17] things.

[18] And the first thing I have to know [19] is these were considered to be eligible [20] presumably for discovery, but they're subject to [21] privilege. I mean, the first decision was made [22] by somebody at Telecheck that these did respond [23] to a proper discovery request.

[24] MR. DEVLIN: Let me actually give

###### Page 24

[1] you a little background on that, if it's helpful. [2] Because of the volume in play — well, let me [3] give you a little further background.

[4] There's another litigation going on, [5] completely separate from this one, and the [6] defendant is — it's either Telecheck, the same [7] defendant here, or First Data Corporation, which [8] is the parent corporation of Telecheck. This [9] will all make sense in a minute.

[10] That litigation was filed a year or [11] so before this litigation.

[12] SPECIAL MASTER: Okay.

[13] MR. DEVLIN: And I'm just going to [14] say Telecheck, even though it might be First [15] Data, Telecheck is represented by Sidley & Austin [16] in that case. And they had already done a [17] document production and so forth.

[18] And they had done very, very broad [19] document collection. And although the patents [20] are different in the two cases, the scope of the [21] accused products and systems are the same.

[22] And so we partly relied on the [23] review and pull that they had done. They did an [24] original pull.

###### Page 25

[1] And we produced those documents. [2] What Sidley & Austin had also done was collect a [3] huge broad set of documents. It was, roughly, [4] 500 boxes of documents.

[5] And they had offered those documents [6] pursuant to court order in that other case, the [7] Data Treasury case we'll call it.

[8] So pursuant to a order in the Data [9] Treasury case, they had made those or were making [10] these documents available for inspection for the [11] plaintiff in this case. What we did here was [12] make that same set of documents available for [13] inspection, hoping that we could reduce the [14] document — volume of documents in play.

[15] Lawyers for LML went and reviewed [16] those boxes of documents. And as I understand [17] it, they selected virtually every document. They [18] excluded, I believe, roughly five boxes or so out [19] of the 500 boxes that were offered for [20] inspection.

[21] And so, based on that, rather than [22] initiate a dispute in this lawsuit about the [23] relevance of those documents or not or the [24] adequacy of that review and inspection of

###### Page 26

[1] documents or not, we simply decided to produce [2] them. What that meant was there was a fairly [3] broad range of material that we — that we [4] produced in discovery. And as a result, there is [5] a fairly broad range of information pursuant to [6] that, that wide topic area that's privileged.

[7] And so we didn't expressly make a [8] decision to — now, we get to the final

###### Page 27 (right column)

point. [9] We didn't expressly make a decision that that [10] information was relevant to a particular document [11] I request that was promulgated by LML in this case.

[12] We used a very, very broad set of [13] documents that were collected by Sidley & Austin, [14] offered those documents for inspection. And, in [15] our view, the inspection was very broad.

[16] We, nevertheless, decided to avoid a [17] dispute and simply produce those documents or, of [18] course, review them for privilege. And so many [19] of the documents that you see here that are [20] contested, as I understand it, flow from that [21] broad set.

[22] MR. McDOLE: Your Honor, may I [23] respond to that?

[24] SPECIAL MASTER: Yes, Mr. McDole.

###### Page 27

[1] MR. DEVLIN: If I may say one thing, [2] I don't mean to imply that LML did anything [3] improper in their collection and review. It was [4] a very broad inspection. The selection of [5] documents was broad.

[6] SPECIAL MASTER: I understand.

[7] MR. DEVLIN: We decided not to [8] dispute — I'm not making a issue of that here.

[9] MR. McDOLE: And Your Honor, I guess [10] I'm — you know, this is an instance of [11] Telecheck — First Data is a very large company, [12] and LML is a very small company. And what [13] Telecheck has decided to do in this case is [14] produce — instead of produce the small subset of [15] relevant documents to us, has turned around and [16] produced millions of documents to us.

[17] They put 500 boxes in the basement [18] of Sidley & Austin, literally in the basement at [19] the loading dock, and told us to go look at the [20] documents in a room next to the loading dock. [21] Going down there, sitting in hard chairs, doing [22] it.

[23] So, yes, we made the decision at [24] that point to take 495 of the 500 boxes and did

###### Page 28

[1] do a quick review in a couple days.

[2] The documents that are part of an [3] inspection must be relevant. And what Mr. Devlin [4] is saying here is that, well, they may not have [5] been relevant. You know, that may be an issue [6] for fees at another point if we had to review [7] documents that he doesn't consider to be [8] relevant.

[9] But at this point, if Telecheck made [10] the affirmative decision that they were going to [11] try to snow LML with a large subset of documents, [12] they have to

take the consequences that go with [13] that legal strategy. They can't have it both [14] ways.

[15] Snowing LML with millions of [16] documents and then turn around and say, We [17] shouldn't have to have a proper log because [18] there's so many documents, that's not the way [19] that it should work.

[20] MR. DEVLIN: Your Honor, if I may [21] just respond. I don't want this to get into [22] finger pointing. That was not my intention at [23] all.

[24] I don't contest LML's inspection of

[1] those documents. We decided not to — we offered [2] them for inspection and —

[3] SPECIAL MASTER: Okay.

[4] MR. DEVLIN: — so forth.

[5] SPECIAL MASTER: I've heard your [6] view. Let me express my view about this.

[7] MR. DEVLIN: Thank you.

[8] SPECIAL MASTER: I've gone over [9] these ten documents, and I have a description [10] here. I don't know anything about these [11] companies.

[12] I'm a stranger to all this. But I'm [13] assuming most, maybe many of the companies in [14] here, that is, Concord, ICS, FPC, it's all these [15] acronyms.

[16] And I'm assuming that they are not [17] related to the litigation, LML versus Telecheck. [18] Okay. I mean, maybe they are.

[19] AAFAS, ACS was mentioned here in [20] some business context. All right.

[21] Now, just going through, and I [22] agree, Mr. Devlin, it takes about ten seconds, [23] maybe 12 if you have to go back and look at [24] something. Now, Document Number 1 it seemed to

[1] be a fair description would be merger [2] investigation team report.

[3] Now, the overlay is a communication [4] to your adversary, that rather than just repeat [5] unrelated party, we're saying all these documents [6] affect an unrelated party, or a customer, or [7] consumer. Okay.

[8] So Number 1, merely saying merger [9] investigation team report.

[10] Number 2, merger investigation team [11] report regarding product comparison. It doesn't [12] identify it. It doesn't give away any secrets, [13] it doesn't seem to me.

[14] Number 14, software agreement with [15] unrelated party.

[16] Number 83, set-up of merchant number [17] per customer. Plural, merchant numbers for a [18] customer.

[19] 84 and 86 appear to be the same. [20]

They have to do with company policy concerning [21] communication with consumers.

[22] 99, this retains to innovation and [23] consent and extension of a contract with an [24] unrelated party.

[1] 101, 102, 103, all seem to be [2] connected to something that's happening in [3] Denver. And it would seem to me this would have [4] to do with the contract discussion with ACS.

[5] Now, I mean, I just — what's [6] happened here is I think Telecheck has avoided [7] the first step of this process. The first step [8] is to see whether or not this document is [9] responsive to a discovery request. Either it is [10] or it isn't.

[11] If it is, then the next step is, [12] even though it's discoverable, is it subject to [13] some privilege, some reason why it should not be [14] discovered? But I think as a matter of [15] apparently administrative, economic or some other [16] convenience, you've simply said, Well, let's give [17] LML — we'll say, Here's everything.

[18] But because of saying, Here's [19] everything, we have a huge log because these [20] things are attorney-client privilege. Many of [21] these are not, but we will say they are.

[22] They're attorney client. We're not [23] going to give them to you.

[24] So all you've done is pass over,

[1] quite frankly, Mr. Devlin, to Judge Robinson [2] this decision making that your firm should make.

[3] At the first instance: Is it [4] discoverable? None of this is discoverable as I [5] see it.

[6] There's not one paper here that's [7] discoverable. Has absolutely nothing to do with [8] the case.

[9] It's irrelevant to the case, will [10] not lead to admissible evidence in this case. [11] But you've simply pushed that onto a log that [12] pushes it onto Judge Robinson's desk.

[13] This is merely unreasonable. I [14] mean, I'm quite disturbed about this, because [15] I've already put — I thought I put almost like [16] Privilege 101 in the special discovery order [17] number three, some examples about what to do.

[18] Now, I've just read ten more, and [19] I'm not going to read 271 more. I'm not going to [20] do that.

[21] I will read the others you have [22] given to me. I'll just see if it's any message [23] here that comes through that changes my mind.

[24] But when you tell me that it was

[1] just easier to give over everything, that's not [2] how discovery is done. You can't respond and [3] say, Look, you can have it all.

[4] Now, if you had 15 boxes, give it [5] all to us. We'll go through it.

[6] But 500 boxes. Well, sorry, 495 [7] boxes, that's not how it's done.

[8] Not a judge in the land is going to [9] put up with that. And now she happens for the [10] time being to have asked me to help out, which [11] I'm trying to do.

[12] So I have some reason to say what [13] I'm going to say in a few minutes. You can [14] appeal that.

[15] But I'm sure Judge Robinson is not [16] going to take a kindly view of the notion that, [17] Oh, well, we'll assume it's all discoverable, but [18] we have this huge log, because there are [19] attorney-client privileges, or maybe some work [20] product somewhere having to do with unrelated [21] parties that have nothing to do with this case.

[22] Now, that's how I see this. Yes.

[23] MR. DEVLIN: If I may clarify?

[24] SPECIAL MASTER: Yes.

[1] MR. DEVLIN: And to give you a [2] little more background.

[3] SPECIAL MASTER: I'm going to need a [4] lot more.

[5] MR. DEVLIN: Just so we're all on [6] the same page, in the Data Treasury case, again, [7] this relates to the same set of products that are [8] accused here. It's a patent dispute.

[9] Different patents, so different [10] aspects of the products are in play.

[11] SPECIAL MASTER: Okay.

[12] MR. DEVLIN: The same essential [13] products are in play. And in that case, First [14] Data/Telecheck produced a fairly large set of [15] documents.

[16] SPECIAL MASTER: You told me that [17] already.

[18] MR. DEVLIN: That's right.

[19] SPECIAL MASTER: You're burning the [20] record now. Don't repeat anything.

[21] Give me something new and different.

[22] MR. DEVLIN: Pursuant to court [23] order, they collected all the documents that [24] related to these particular products.

[1] SPECIAL MASTER: Okay.

[2] MR. DEVLIN: That was the source of [3] the 500 boxes of documents. So it wasn't just a [4] willy nilly selection of

documents.

[5] It had been — Telecheck had been [6] ordered in that case in a patent dispute on the [7] same products —

[8] SPECIAL MASTER: Right.

[9] MR. DEVLIN: — to provide that [10] collection of documents for inspection. And we [11] thought it would be prudent in this case, a [12] patent dispute on those same products to do.

[13] SPECIAL MASTER: There's not a [14] court order to do that in this case. Judge Robinson [15] didn't say do that, did she?

[16] MR. DEVLIN: I understand. Well, I [17] thought, to be honest, Your Honor, if the Court [18] orders a large set of documents to be made [19] available in a patent dispute on a certain set of [20] products, we thought it would be unreasonable for [21] us to simply draw a different line than that [22] Court had drawn and to say —

[23] SPECIAL MASTER: Well, that was your [24] first mistake. You should have gone to Judge

### Page 36

[1] Robinson and said, Judge Robinson, this other [2] judge made us turn over 500 boxes which we don't [3] think is relevant.

[4] We will do the same thing here. [5] We'd like to be heard on that.

[6] We don't think it's relevant. I [7] would bet a month's pay, she'll say we'll have a [8] argument Monday morning on that. Because if [9] you're going to give me 500 boxes and only 150 [10] are pertinent, I don't think this is really how [11] this case should go off on this discovery course [12] in six or seven months.

[13] That's not going to get you [14] anywhere. Just the fact that Judge A did it, I [15] guess every judge in the country that functions [16] this way. It's not how it works. They go by the [17] rules.

[18] It's just not — it's just a [19] shortcut to — all it does is pass over to other [20] persons the responsibilities that your client [21] has.

[22] You pass over to someone else the [23] decision whether or not this is even responsive [24] to a discovery request. That's A.

### Page 37

[1] Secondly, it totally burdens the [2] system to deliver 500 documents maybe to the [3] Clerk of the Court or something.

[4] I don't know. They're going to end [5] up in the courtroom somewhere.

[6] Someone will go through those. [7] Well, who's the someone?

[8] Well, we're not going to do it. So, [9] therefore, let the Court do it. The Court is

[10] busy.

[11] The Court says, We'll get a special [12] master at "X" dollars per hour, and the parties [13] can share that. Let him do it or let her do it.

[14] That isn't how it works. I'm very [15] disappointed in that approach.

[16] All 271 documents will be produced. [17] There is no privilege, because you — Telecheck [18] has waived the right to assert any privilege of [19] any kind of these documents, if they've been [20] produced on the basis you've just mentioned.

[21] And I'm going to go through the [22] others, and I'll do it — we'll take a break, and [23] I'll go through it just to confirm what I believe [24] is true.

### Page 38

[1] A, none of these have anything to do [2] with this case. And B, the activity here is not [3] something that is even pertinent.

[4] Even if the document is relevant, [5] how do you communicate with consumers in general [6] across the board in America when they have [7] inquiries about refunds or whatever it is, that's [8] nothing to do with this case?

[9] I agree with you, it only takes ten [10] seconds, maybe 15 on a stretch. So what we'll do [11] is —

[12] MR. DEVLIN: Your Honor.

[13] SPECIAL MASTER: Yes.

[14] MR. DEVLIN: I'm willing to say that [15] I'd be happy to respond to explain how some of [16] these might be relevant, why we thought that [17] this —

[18] SPECIAL MASTER: We're not going to [19] do it again.

[20] MR. DEVLIN: I understand if Your [21] Honor has —

[22] SPECIAL MASTER: There's —

[23] MR. DEVLIN: I just want a chance to [24] offer —

### Page 39

[1] SPECIAL MASTER: If this went [2] through that way with some paralegals putting [3] stuff in boxes and responding to a discovery [4] request, you're not going to get a Court or the [5] Court's arm to start to read this paper when [6] these examples, including the ones we did on [7] order number three. That should have been kind [8] of a second red flag.

[9] So today we have the third one. [10] Hold on a second, please.

[11] And I state for the record so [12] there's no mistake about it, on 26(b)1, it reads, [13] among other things, "Parties may obtain discovery [14] regarding any matter not privileged that is [15] relevant to the claim or defense of any party, [16] including the existence, description, nature, [17] custody, condition and loc-

ation of any books, [18] documents or other tangible things, and the [19] identity and location of persons having knowledge [20] of any discoverable material.

[21] It goes on further, "Relevant [22] information need not be admissible at trial if [23] the trial for discovery appears reasonably [24] calculated to lead to discovery of admissible

### Page 40

[1] evidence."

[2] You have talked about square one. [3] That's where discovery begins.

[4] Now, if that's side stepped, it [5] distorts the entire process.

[6] We'll take a 15-minute break. And [7] as I assured Mr. Devlin, I'll go through these [8] and see if they're kind of the same category.

[9] And maybe not. Maybe there's one or [10] two that are not.

[11] But I'll check. So we'll take a [12] 15-minute recess. Counsel will.

[13] Thank you. And the court reporter [14] as well. Thank you.

[15] And while I am doing this, you [16] should approach what remains. All right.

[17] MR. McDOLE: I'm going to go [18] through my list now, Your Honor.

[19] SPECIAL MASTER: Well, talk to [20] Mr. Devlin, if there's some way we can get [21] through on that basis.

[22] MR. DEVLIN: Thank you.

[23] SPECIAL MASTER: Thank you.

[24] (A brief recess was taken.)

### Page 41

[1] SPECIAL MASTER: Tell me about [2] the — as much as you can, about the VeriFone [3] dispute, a little bit, you know, without [4] disclosing anything.

[5] This is no waiver. We don't need [6] attorney-client privilege.

[7] MR. DEVLIN: Thank you. I'll choose [8] my words carefully.

[9] And if you want more information, [10] maybe we'll do it that way.

[11] SPECIAL MASTER: Sure.

[12] MR. DEVLIN: There was a dispute [13] about some — let me back up. VeriFone is a [14] manufacturer of some of the equipment that is in [15] dispute here. So they're a third party in the [16] case.

[17] SPECIAL MASTER: Some terminals.

[18] MR. DEVLIN: Exactly. They're [19] terminals that are at check-out counters.

[20] VeriFone is a manufacturer. There [21] is a dispute about some defective terminals and [22] whether the warranty in the contracts between the [23] VeriFone and Telecheck would cover costs for the [24] defects or for replacement of those terminals.

Page 42

[1] SPECIAL MASTER: And who's Sandy [2] Mollett?

[3] MR. DEVLIN: Sandy Mollett is a [4] business person within Telecheck. She is — I'm [5] trying to think of her role.

[6] SPECIAL MASTER: Executive?

[7] MR. DEVLIN: An executive in [8] Telecheck. I can't recall if she's on the [9] marketing and sales side of the technical side, [10] but I believe she's on the technical side.

[11] SPECIAL MASTER: Okay.

[12] Okay. So the documents 158 through [13] 165 appear to focus upon that subject matter. [14] Simply says a dispute. They're trying to resolve [15] it.

[16] And it's Alan Bethscheider, an [17] attorney for Telecheck is involved. Sandy [18] Mollett is involved. Andrea Brett, she's also an [19] attorney.

[20] On the list here for First Data, I [21] see the name Randy Rutledge. Does that ring a [22] bell?

[23] Probably an executive.

[24] MR. DEVLIN: An executive within

Page 43

[1] Telecheck.

[2] SPECIAL MASTER: Okay. Let me ask [3] it: Does this have anything to do with this case [4] here?

[5] MR. DEVLIN: I hate to make argument [6] on behalf of the relevance of documents that the [7] plaintiff might want to use, but I'll say this, [8] Your Honor, in a patent case, in a damages [9] context, there is a fairly wide ranging area of [10] inquiry regarding all sorts of topics, everything [11] that could relate to the patent itself and the [12] breadth and the impact in the industry.

[13] But also down to the success of the [14] particular products in the marketplace in some [15] instances. And when you're looking at the [16] successor or lack of success of products in the [17] marketplace, it's often relevant to look at the [18] surrounding causes or reasons that something may [19] have been successful or unsuccessful in the [20] market place.

[21] You have to draw — so that would [22] relate to that issue. We have context to the [23] success or lack there of for products in the [24] marketplace either for damages or for potentially

Page 44

[1] other areas such as the obviousness equally in [2] patent cases.

[3] SPECIAL MASTER: This Sandy Mollett [4] is vice president of product marketing in [5] Telecheck, according to this paper.

[6] MR. DEVLIN: That sounds correct.

[7] SPECIAL MASTER: I remember that was [8] mentioned earlier.

[9] MR. DEVLIN: Your Honor, I don't [10] mean to interrupt.

[11] SPECIAL MASTER: Yeah.

[12] MR. DEVLIN: But there may be [13] another relevant fact to the procedures of our [14] production that you might want to hear. I don't [15] know if it would make a difference, but I thought [16] I would note it for the record when Your Honor is [17] prepared to hear it.

[18] SPECIAL MASTER: Okay. Just one [19] second. I'm almost through this group here, [20] please.

[21] SPECIAL MASTER: Was IEC related [22] to this action at all? IEC, Mr. Devlin, do you [23] know [24] offhand?

[24] MR. DEVLIN: IEC, as far as I know,

Page 45

[1] is not.

[2] SPECIAL MASTER: Okay. I haven't [3] seen it anywhere, but I thought —

[4] MR. DEVLIN: They're not a party to [5] the dispute, and they're not a third party [6] that's been involved in third-party discovery in any [7] way.

[8] SPECIAL MASTER: All right. I'm [9] almost finished now.

[10] I have —

[11] MR. DEVLIN: Your Honor, if you [12] could point me to the document number you saw [13] that on.

[14] SPECIAL MASTER: 181.

[15] MR. DEVLIN: I may be able to read [16] it. Thank you.

[17] SPECIAL MASTER: 181.

[18] MR. DEVLIN: Thank you. [19] Do you have that list you had [20] earlier?

[21] SPECIAL MASTER: I'm almost done.

[22] MR. McDOLE: Tim, are these your [23] documents?

[24] MR. DEVLIN: Thanks.

Page 46

[1] SPECIAL MASTER: Okay. I see [2] apparently just a non-involved party here.

[3] MR. DEVLIN: I'm sorry. I'm still [4] pulling that document, Your Honor.

[5] SPECIAL MASTER: Oh, okay. I'll [6] wait.

[7] MR. DEVLIN: And you said Document [8] 183, Your Honor?

[9] SPECIAL MASTER: I think it's 181. [10] I thought.

[11] MR. DEVLIN: Okay.

[12] SPECIAL MASTER: It may spill over [13] to 183.

[14] MR. DEVLIN: Oh, okay.

[15] IEC is a manufacturer of one of the [16] other terminals involved in this case.

[17] SPECIAL MASTER: And 183 is a [18] VeriFone document. It looks like it's a VeriFone [19] document.

[20] MR. DEVLIN: Correct.

[21] SPECIAL MASTER: It looks that way [22] to me. All right.

[23] Well, on these, again, let me just [24] say they started with, what was it, 107?

Page 47

[1] MR. DEVLIN: 107, I believe.

[2] SPECIAL MASTER: 107. [3] Again, this is simply a [4] communication from a Doug Pratt to a Clay Spitz. [5] I don't see — they don't seem to be attorneys. [6] Business, it seems to be a business [7] communication.

[8] Copy went to Sandy Mollett. And it [9] seemed to be focusing on some errors in accounts [10] or something.

[11] So it seems to me you could say that [12] communication regarding errors on accounts [13] between non-attorneys. Was there an [14] attorney-client privilege claim on this?

[15] MR. DEVLIN: Yes, Your Honor. This [16] relates to a subset of documents in order number [17] four where you see an Email chain. This is very [18] common today in how companies seem to work.

[19] You will see an Email chain and [20] attorney advice is provided in the context of the [21] Email chain. And then it gets carried through [22] and utilized by the people involved.

[23] And so on Page 3 of the document, [24] you'll see an Email — Emails to and from Alan

Page 48

[1] Bethscheider, who is in-house counsel for [2] Telecheck/First Data.

[3] SPECIAL MASTER: Okay. All I'm [4] saying, if this — see, the problem is the other [5] party in the case, LML, sees communication re [6] business operations. They don't know whether [7] they should be trying to get that or knowing more [8] about it or not.

[9] Now, I don't know what's difficult [10] about saying communication regarding, which I [11] did, which I get from that, maybe not very well [12] done. But I just said communication concerning [13] errors in accounts, which is the subject of it.

[14] Just say that, then they know what [15] to do with it, what to tell their client. Their [16] client says, Should we be asking for that? The [17] attorney says, I have no idea.

[18] And maybe VeriFone is something [19] else. Maybe VeriFone — they say that it [20] pertains to this case, and we want to

know more [21] information about it.

[22] So Number 108 has to do with the [23] First Data merger. Number 112, same thing.

[24] Number 114 is, I think, a fair

---

Page 49

[1] description. The communication sent to ICS [2] merchants regarding frequently asked — FAQs, [3] frequently asked questions from subscribers.

[4] You've got to give a fair guidance [5] on a log. Nothing says that every line on the [6] log has to be an 18th of an inch in width.

[7] Number 115, an example would be [8] regarding innovation and ICS similar to document [9] 99.

[10] 119, this is in regard to weekly [11] reports and files concerning billing cycles.

[12] 131. Now, this one I would — it [13] appears to be pertinent. It has to do with [14] communication, third-party vendors regarding [15] Email search.

[16] And this had to do with an Email [17] search associated with litigation. We then [18] begin, 158 — looks like 158 pretty much through [19] 168 all have to do with the VeriFone dispute. I [20] don't know why you can't say that.

[21] 169 had to do with the new POS [22] terminal design.

[23] 170 concerns a contract with a [24] provider of material.

---

Page 50

[1] And 171, I don't know what I did [2] with that. Oh, I left that open because this [3] appears as though it might be connected with the [4] VeriFone dispute.

[5] I can't totally tell a lot of that, [6] because it has some terms in here, acceptance, [7] and repaid, and the like.

[8] But something could be said about [9] that other than just business matter.

[10] 173 is a need for a letter of intent [11] regarding development of software to a customer.

[12] 181 is regarding the repairs, [13] warranty repairs with IEC.

[14] 182 is an IEC matter as well about a [15] payment. Payment and IEC.

[16] 183 seems to be VeriFone. But the [17] point is here we can't get the Court to go [18] through and do what I just did.

[19] So I think there's been more than [20] enough opportunity here, and the process here [21] that's described, those documents should all be [22] turned over except VeriFone. VeriFone documents [23] need not be turned over.

[24] But the others, I think the

---

Page 51

[1] privilege has been waived in the

---

manner in which [2] this has been handled. I've given my reasons for [3] it.

[4] I think there's been more than [5] enough opportunity to — there's been meet and [6] confers.

[7] I don't want to go through what — [8] the correspondence is loaded with it. And the [9] district appeal will be in the briefs.

[10] But there's been opportunities to [11] raise these things before properly. In the [12] special discovery master order number three, I [13] gave some samples of what would be required.

[14] And that was — the date of that was [15] what? September 27th.

[16] And here we are, whatever today is, [17] the 23rd, 24th, and all we do is hand these up [18] again, and say, Judge, that's the best we can do.

[19] I don't agree with it. I think [20] you've waived it. They should be turned over.

[21] MR. DEVLIN: I would just like to [22] note for the record, Your Honor, in case it makes [23] a difference.

[24] SPECIAL MASTER: Sure.

---

Page 52

[1] MR. DEVLIN: A clarification [2] regarding that document production procedure [3] which seems to be the heart of all this.

[4] It wasn't only an inspection that [5] was offered. There were rough — there was a [6] smaller subset of documents that were reviewed, [7] found to be relevant, and produced that was, [8] roughly, 200,000 pages of documents.

[9] And then the 500 boxes, which again [10] was ordered in a previous case, were offered as a [11] broader set of documents for inspection. So [12] there was some delineation of documents between [13] ones that had been reviewed and found to be [14] relevant.

[15] And then as I said, as you know, [16] pursuant to court order, the broader set was [17] ordered to be made available for inspection. And [18] so it's not as if the entire burden was placed on [19] the plaintiff in either case.

[20] I don't know if that makes a [21] difference to you, but I wanted to note it for [22] the record.

[23] SPECIAL MASTER: Well, it's really a [24] burden shifting circumstances here. A person —

---

Page 53

[1] the person who is responsible for responding to [2] discovery is met with a burden.

[3] And the burden is to decide those [4] things that should be — that could be eligible [5] for turnover under Rule 26, like I read into the [6] record, and those

---

that have nothing to do with [7] it.

[8] And it seemed like many of these [9] issues have nothing to do with this case. And [10] even though they're attorney-client privilege, [11] I just say, well, let the Court decide it, and [12] we'll put down stock answer, business operations [13] or whatever you put.

[14] So I just — that's not how it's [15] done. So as far as I'm concerned, I think [16] they've been waived.

[17] Unless the Court directs me, I won't [18] go through the other 235 that are left and come [19] up essentially with the same answer.

[20] So what else is there to decide [21] here?

[22] MR. McDOLE: Your Honor.

[23] SPECIAL MASTER: How do we do the [24] other documents? There's, approximately, only 44

---

Page 54

[1] documents.

[2] Do you want to do them one at a [3] time, something like that?

[4] MR. McDOLE: Yes. Just one point of [5] clarification.

[6] SPECIAL MASTER: Yes.

[7] MR. McDOLE: You had said that the [8] VeriFone documents are not — that Telecheck does [9] not have to produce those documents. Could we [10] get a list of what those — I'm not sure what [11] those are, because there's no description.

[12] SPECIAL MASTER: The ones that [13] seem that way to me, and I know Mr. Devlin will be [14] able to tell more quickly than I will. But the [15] ones that were given to me as a sample appear to [16] be the documents 158 through 168. And also 183.

[17] Okay.

[18] MR. DEVLIN: Your Honor, if this [19] procedure is acceptable to you, what we can do is [20] to go through, select the ones we believe are [21] VeriFone documents, and we can update the log [22] accordingly at this point, if that makes sense.

[23] SPECIAL MASTER: Okay. But I want [24] to make it plain, it's only the VeriFone dispute

---

Page 55

[1] documents that I am allowing you to do that with. [2] Right?

[3] MR. DEVLIN: I understand. And we [4] can update the log.

[5] I'm not even sure if we'll do that, [6] I just so it's clear. And if there's any problem, [7] we'll talk about it.

[8] MR. McDOLE: And again, I'm talking, [9] because I haven't seen what the

dispute is. Is [10] it a dispute relating to an issue that they have [11] with the terminal, because VeriFone does have [12] patents that may come into relevance if [13] there's — I'm not sure —

[14] SPECIAL MASTER: All I am saying is [15] the documents that qualify for attorney-client [16] privilege, and I'm depending on Telecheck to — [17]

[17] MR. McDOLE: Okay.

[18] SPECIAL MASTER: — describe that in [19] the log, you know. And we did cover the notion [20] about a chain of Emails, connected Emails.

[21] And I agree with them, that if [22] embedded in there is a communication that then is [23] swapped back and forth by non-attorneys, that [24] attorney communication is strong enough, I think,

### Page 56

[1] to hold them together.

[2] Okay. If that's a chain, not just a [3] topic over several months, but kind of a [4] continuous unbroken, is what that means, [5] communication, held together by Mr. Bethscheider [6] or one of the other attorneys, advice to his [7] clients.

[8] And so all I'm saying is the extent [9] to which the ones I see touch upon Veri-Fone, [10] Mr. Devlin's given me some explanation as to why [11] his belief is that that could fit into the —[12] maybe if there are damages, the damage portion of [13] this case; right?

[14] MR. DEVLIN: Correct.

[15] SPECIAL MASTER: Is that —

[16] MR. DEVLIN: Yes.

[17] SPECIAL MASTER: On that [18] representation, I'm saying today, that the [19] VeriFone documents would qualify for the [20] attorney-client privilege, the ones I've just [21] mentioned.

[22] MR. McDOLE: Okay.

[23] SPECIAL MASTER: And I don't know if [24] there are others, but I depend on Mr. Devlin, and

### Page 57

[1] I think for good reason, that he will be assuring [2] the Court by saying, Here's some others that are [3] also included in that.

[4] And the remainder of the documents [5] included in the 271 described as business [6] operations or kind of equivalent, they're turned [7] over. They're waived, no matter what they say.

[8] They're waived. All right. [9] They should be turned over.

[10] MR. McDOLE: Thank you.

[11] SPECIAL MASTER: All right, [12] Mr. Devlin.

[13] MR. DEVLIN: Thank you, Your Honor.

[14] SPECIAL MASTER: Okay. And you will [15] be able to make that check on VeriFone documents [16] by when? We're really outside the baseline here [17] on time now.

[18] MR. DEVLIN: We can make an attempt [19] to do that very quickly. I would say within two [20] days.

[21] SPECIAL MASTER: All right. I [22] appreciate you doing that, and then advising [23] Mr. McDole or Mr. Herrmann. And those other [24] documents should be produced.

### Page 58

[1] MR. McDOLE: Your Honor, as I said [2] previously, we're down to, approximately, 43, 44 [3] documents.

[4] SPECIAL MASTER: Right.

[5] MR. McDOLE: And I suggest with [6] these, a lot of them relate to advice of counsel, [7] that we just go through these one by one as we [8] did with the Echo hearing.

[9] SPECIAL MASTER: All right. I think [10] that's the best way to do it.

[11] Does the court reporter need a [12] little break here?

[13] THE REPORTER: No, Your Honor. I'm [14] fine.

[15] Thank you.

[16] SPECIAL MASTER: Oh, no?

[17] (Following a discussion held off the [18] record:)

[19] SPECIAL MASTER: All right. Let's [20] do one at a time.

[21] And I'll hear briefly, just a couple [22] minutes on each one like we've done before. I [23] have the — Telecheck has kindly furnished me the [24] list of the attorneys and also the — let me see.

### Page 59

[1] All the attorneys.

[2] MR. McDOLE: Okay.

[3] SPECIAL MASTER: All right.

[4] MR. McDOLE: Your Honor, the first [5] document that is left is a document identified on [6] Telecheck's July 28th privilege log as Document [7] 563.

[8] SPECIAL MASTER: Can I ask a [9] question? Do I have that log with me?

[10] MR. McDOLE: It was a color-coded [11] log.

[12] Maybe the easiest way to do this [13] is —

[14] SPECIAL MASTER: Let me see. I know [15] I received the Telecheck — oh, no. These are [16] the documents I did.

[17] I might have a log here. I might. [18] Do I have the log?

[19] MR. McDOLE: If not, Your Honor, I [20] can just hand it up as we go along.

[21] SPECIAL MASTER: Okay. Let's do it [22] that way if you don't mind.

[23] MR. McDOLE: Okay. I'll read you [24] the description first, as we did with Echo, and

### Page 60

[1] then hand it up to you. The first document is [2] Document 563.

[3] The description reads communication [4] from law firm reflecting mental impression and [5] transmitting facts in confidence for purposes of [6] rendering legal advice, re status report.

[7] SPECIAL MASTER: Right.

[8] MR. McDOLE: And it's from the law [9] firm of Knobb, Martin, Olsen & Bayer in October [10] of 2001.

[11] SPECIAL MASTER: Thank you. Oh, [12] yes.

[13] I remember this.

[14] SPECIAL MASTER: Is this —

[15] MR. McDOLE: Your Honor, the issue [16] we have with this document or this description is [17] that it's referring to it as legal advice [18] regarding patent status.

[19] By way of history, Telecheck had [20] learned of the patent in suit back in 1996, 1997 [21] shortly after it issued, and it had engaged in a [22] practice of maintaining numerous advice of [23] counsel from the 1997 period up — all the way up [24] through trial.

### Page 61

[1] There are — you know, we're talking [2] constant legal advice on this issue. Whether [3] they're consistent or not is an argument for [4] another day.

[5] But here we're in a time frame of [6] when they're obtaining opinions of counsel. And [7] when I see a description that says getting mental [8] impressions regarding patent status report, I'm [9] not even sure which patent they're referring to [10] in that.

[11] And my only assumption can be that [12] that patent relates to the patent in suit. [13] That's the only reason it would be in a log that [14] would be relevant.

[15] So that is our argument that there [16] is a waiver of attorney-client privilege based on [17] that description. And we'd ask for it to be [18] produced.

[19] SPECIAL MASTER: Okay. Did you say [20] 553?

[21] MR. McDOLE: 563, the one [22] highlighted in orange.

[23] SPECIAL MASTER: I see it in the [24] bottom in orange. It's punched there, which is

### Page 62

[1] okay.

[2] I think —

[3] MR. McDOLE: Let me — if I could [4] see that.

[5] SPECIAL MASTER: Is that right, 563?

[6] MR. McDOLE: I may be at a different [7] document here. Let me see.

[8] Yes. Yes. That's the one.

[9] SPECIAL MASTER: Okay. Which one is [10] it again?

[11] MR. McDOLE: It's the one [12] highlighted in orange, 563.

[13] SPECIAL MASTER: Knobb, Martin, [14] Olsen & Bayer.

[15] MR. McDOLE: Yes.

[16] SPECIAL MASTER: All right. [17] Mr. Devlin.

[18] MR. DEVLIN: Your Honor, I have — I [19] should have two copies of each of these with the [20] caveat that I said earlier, that there's one or [21] two that I may not have here today.

[22] SPECIAL MASTER: Sure.

[23] MR. DEVLIN: I can hand you a copy [24] if you'd like.

Page 63

[1] SPECIAL MASTER: That would be a [2] good way to do it.

[3] Maybe we could — okay.

[4] MR. DEVLIN: Just as a general [5] point, the simple fact that something comes from [6] an attorney during a time period doesn't make it [7] part of a privilege waiver, even if it came from [8] the same attorney. And we will be talking about [9] that more later.

[10] This particular document happens to [11] be a patent status report about potential patents [12] that Telecheck itself might be seeking in this [13] general financial check area and other areas that [14] Telecheck is involved in.

[15] And so it has nothing to do with the [16] opinions of counsel that were rendered in the [17] case or obtained by Telecheck relating to the [18] patent in suit. It's different patents entirely.

[19] MR. McDOLE: Your Honor, if that's [20] the case, we don't think it's relevant. We'll [21] just move onto the next one.

[22] There's no reason to waste [23] everyone's time.

[24] SPECIAL MASTER: As I see it, it

Page 64

[1] seems to be kind of an overall just report about [2] many different things.

[3] MR. DEVLIN: If I may, Your Honor? [4] As you see, it's a chart.

[5] Each individual chart entry, each [6] row that has a description of a particular patent [7] application or developing idea and so forth. [8] Under — I don't have the citation, but it's the [9] Spalding case, which is commonly cited in patent [10] cases, materials provided to attorneys pursuant [11] to invention, disclosures for patent application, [12] and so forth.

[13] Our privilege, and that privilege is [14] maintained. And there are status recommendations [15] on the left hand — excuse me, the right-hand [16] column.

[17] SPECIAL MASTER: The right-hand [18] side, yes.

[19] MR. DEVLIN: From the attorneys and [20] so forth.

[21] SPECIAL MASTER: I feel that's [22] privileged.

[23] MR. DEVLIN: Thank you.

[24] SPECIAL MASTER: And let's see.

Page 65

[1] MR. McDOLE: And Your Honor, we [2] may run into this a little more today. I just [3] want to highlight the fact, and I understand I'll [4] withdraw my argument with respect to these, but [5] I'm not sure why a document like that is relevant [6] and appears on a privilege log.

[7] You know, I think this is the same [8] situation. This just has nothing to do with [9] this.

[10] SPECIAL MASTER: We kind of went [11] over that before how they ended up on this [12] privilege log.

[13] MR. McDOLE: Right.

[14] SPECIAL MASTER: I'm not saying — [15] I'm not saying this is the case. But let's go [16] through this a little bit and see where we're [17] going.

[18] MR. McDOLE: Okay.

[19] SPECIAL MASTER: Again, I continue [20] to believe that this privilege log is a two-step [21] process. The first is whether it's discoverable [22] at all.

[23] And secondly, then whether it's [24] entitled to privilege protection. In any

Page 66

[1] event —

[2] MR. DEVLIN: I believe, Your Honor, [3] and I'm not totally sure of that, but I believe [4] there was a specific document request from LML.

[5] SPECIAL MASTER: Okay. No. I'm not [6] suggesting that this is the same.

[7] This may be a distant relative to [8] that other problem. It's not a close relative.

[9] MR. McDOLE: Just for a point of [10] clarification, we asked for the documents. And [11] Mr. Devlin refused, and the issue was brought [12] before Judge Robinson.

[13] SPECIAL MASTER: Let's move on.

[14] We'll call that E, confidential. It [15] satisfies attorney-client privilege.

[16] I am going to stay with the code [17] system until I'm told not to. We'll call that [18] E stays within it.

[19] All right. That's 563.

[20] MR. McDOLE: Your Honor, the next [21] document —

[22] SPECIAL MASTER: That is [23] attorney-client privilege, yes, and code E. [24] Okay.

Page 67

[1] MR. McDOLE: The next document is a [2] document identified on Telecheck's July 28th [3] privilege log with the number PR 2504. And the [4] description here is correspondence drafted at the [5] direction of attorney re claimed construction. [6] And it is authored by an individual, Chris [7] Schmitt and received by an individual Carrie [8] Sowen. Neither of which I believe are attorneys.

[9] SPECIAL MASTER: All right. [10] Mr. Devlin.

[11] MR. McDOLE: Sure. I only have one [12] copy of this one, Your Honor, but I'm going to [13] hand it to you.

[14] SPECIAL MASTER: I'm sorry you [15] have to do all this walking.

[16] MR. DEVLIN: That's okay. I need [17] the exercise.

[18] I've been sedentary lately. This [19] document also relates to an ongoing patent [20] application by Telecheck.

[21] Chris Schmitt is providing comments [22] to a patent application draft.

[23] SPECIAL MASTER: And Chris Schmitt [24] is who?

Page 68

[1] MR. DEVLIN: He's system analyst at [2] Telecheck. I don't know — my understanding is [3] he would be an inventor on the application that [4] would be filed, someone providing comments for [5] attorneys for draft of a patent application.

[6] There is not an attorney listed on [7] that document. I believe Carrie Sowen is his [8] supervisor. Carrie Sowen is the executive at [9] Telecheck.

[10] SPECIAL MASTER: And what was Chris [11] Schmitt's job? Is that a he or a she?

[12] You may know.

[13] MR. DEVLIN: I don't know, to be [14] honest.

[15] SPECIAL MASTER: Okay.

[16] MR. DEVLIN: And I'm not sure. I [17] believe part of the technical team at Telecheck.

[18] I think his title is listed at the [19] bottom underneath his name, system analyst.

[20] SPECIAL MASTER: It says that. Oh, [21] yes, it does at the bottom.

[22] So...

[23] MR. DEVLIN: So there's not an [24] attorney on that document. But based on our

Page 69

LML Patent Corp.   v.
Telecheck Services, Inc., et al.

Hearing
October 25, 2005

[1] understanding, that is a document that would have [2] been provided as part of the patent application [3] process, again under Spalding.

[4] It should be maintained as [5] privileged. I can get a cite to Spalding for you [6] if we take a break.

[7] MR. McDOLE: And Your Honor, simply [8] because —

[9] SPECIAL MASTER: No. No. No.

[10] MR. McDOLE: Okay.

[11] SPECIAL MASTER: Not privileged. [12] Turn it over.

[13] That would be a N. And —

[14] MR. DEVLIN: Your Honor, may I [15] request that copy back?

[16] SPECIAL MASTER: No. I ruled.

[17] MR. DEVLIN: I just want the copy [18] back.

[19] SPECIAL MASTER: Oh, yeah. You can [20] have that.

[21] Thank you.

[22] MR. DEVLIN: Thanks.

[23] SPECIAL MASTER: Very good. [24] That will be D, code D with an N.

Page 70

[1] You can have this one back as well, [2] Mr. Devlin.

[3] MR. DEVLIN: Oh, thank you, Your [4] Honor.

[5] SPECIAL MASTER: Maybe you can have [6] your assistant help.

[7] MR. DEVLIN: He's actually doing the [8] record keeping.

[9] SPECIAL MASTER: I just want to be [10] able to make sure we have enough time here.

[11] MR. McDOLE: Your Honor, the next [12] document on Telecheck's July 28th privilege log [13] we contest is identified as PR 2925 through 26.

[14] It is a description on the privilege [15] log of correspondence to attorney responding to [16] attorneys' questions re patents in suit.

[17] SPECIAL MASTER: All right. Let me [18] see the document.

[19] I do care about — oh, okay. Let me [20] see the document.

[21] You can walk it up here. Can you [22] get through there? You can't.

[23] All right. Let me see the document, [24] please.

Page 71

[1] MR. DEVLIN: Your Honor, this is one [2] of a class of documents that we can talk about [3] generally. And I think —

[4] SPECIAL MASTER: Okay.

[5] MR. DEVLIN: I think it will help us [6] get speeded along.

[7] SPECIAL MASTER: Good.

[8] MR. DEVLIN: What LML is arguing, [9] and they can certainly speak for themselves, but [10] they're arguing this document would be part of [11] the waiver that would result from Telecheck's [12] production of its opinions of counsel that it [13] received regarding the patent in suit.

[14] What this is and what we realize [15] now, probably something that we wouldn't — well, [16] we may have logged it, but it does relate to the [17] patents in suit.

[18] And it is advice from counsel. But [19] it does not relate at all to the advice that [20] Telecheck received recently within the last year [21] or two.

[22] Telecheck purchased a company called [23] Concord. And previously in advance of that [24] purchase when Telecheck was not involved at all,

Page 72

[1] you see this document is dated around the 2000 [2] time frame.

[3] Concord had received its own advice [4] regarding the patents in suit. Marsha Heister [5] was an attorney within Concord at that time. And [6] she's listed as a recipient of this document.

[7] Leslie Caston, also listed as a [8] recipient on the initial Email, is an outside [9] counsel for Concord at that time.

[10] So this document is privileged. [11] It's attorney-client communications.

[12] It does not fall within the scope of [13] waiver related to Telecheck's production of its [14] opinions of counsel, because this was never an [15] opinion of counsel received by Telecheck.

[16] And it was never relied on by [17] Telecheck as a basis for launching its products, [18] or non-willfulness. So for all those reasons [19] that someone might produce opinion of counsel, [20] the opinions of counsel that are discussed here [21] are not relied on for any of those reasons or [22] relevant to any of these reasons in this case.

[23] SPECIAL MASTER: So Marsha Heister [24] is counsel for Concord?

Page 73

[1] MR. DEVLIN: That's correct. [2] In-house counsel at Concord.

[3] SPECIAL MASTER: And Leslie Caston [4] is?

[5] MR. DEVLIN: Outside counsel in the [6] law firm, Akin, Gump. I believe Akin Gump law [7] firm, Your Honor.

[8] And was at least at that time and [9] was providing advice to Concord and Ms. Heister.

[10] SPECIAL MASTER: This is January [11] '00?

[12] MR. DEVLIN: Yes. The purchase of [13] Concord by First Data, which is Telecheck's [14] parent, occurred much more recently, maybe within [15] the last year. But I believe within the last two [16] years certainly.

[17] MR. McDOLE: Your Honor.

[18] SPECIAL MASTER: Yes.

[19] MR. McDOLE: This document, if it's [20] an opinion relating to the patents in suit, it's [21] in Telecheck's possession, regardless if they [22] bought a company, if they had received it, if [23] they personally went out and sought it or not. [24] The fact remains that it's still in

Page 74

[1] Telecheck's possession. This is very similar to [2] the incident.

[3] It's a little different, but very [4] similar to the incident with Echo trying — [5] having a Visa opinion in its possession.

[6] And while they said we're not [7] relying on the Visa opinion, it still goes to the [8] state of mind of Telecheck. If Telecheck has it [9] in its possession is doing a merger and [10] acquisition of Concord, and all of a sudden [11] Concord pops up with an opinion with we infringe [12] or there's something wrong with the patents in [13] suit, then that's something that, regardless if [14] they want to say it's relying on it or not, that [15] we should be able to test the veracity of their [16] defense.

[17] MR. DEVLIN: Whether Concord's [18] products in the year 2000 did or did not infringe [19] the patents in suit isn't relevant here. Those [20] products, even though Concord has now been [21] purchased by First Data, those are not at issue.

[22] I don't even know if they're still [23] in existence or offered by anyone. But they [24] don't have anything to do with the issues in this

Page 75

[1] case, Your Honor.

[2] MR. McDOLE: And Your Honor, I [3] still —

[4] SPECIAL MASTER: No. I've heard [5] enough.

[6] MR. McDOLE: Okay.

[7] SPECIAL MASTER: Who's Don Roscelli? [8] Do we know?

[9] MR. DEVLIN: One second, Your Honor.

[10] SPECIAL MASTER: Okay.

[11] MR. DEVLIN: Okay. I don't know [12] specifically.

[13] It's my understanding he would have [14] been an employee of Concord at that time. But I [15] can confirm that.

[16] SPECIAL MASTER: Okay. Are those

[17] two ladies?

[18] MR. DEVLIN: Leslie Caston, I [19] believe is a man. And Marsha Heister a woman.

[20] SPECIAL MASTER: That's privileged.

[21] MR. DEVLIN: Thank you, Your Honor.

[22] SPECIAL MASTER: Why? Code F. [23] Next.

[24] MR. DEVLIN: If I have your list

### Page 76

[1] right, Jamie, we may have a series of [2] documents —

[3] MR. McDOLE: This may relate to a [4] series of documents such as that, Your Honor. [5] I'm not sure if they're any different or if you'd [6] like to take a look at those first.

[7] SPECIAL MASTER: What numbers are [8] they?

[9] MR. McDOLE: Tim, you would know [10] better than I would.

[11] MR. DEVLIN: Why don't you read your [12] list that you've gone through, Jamie? I'm not [13] sure I have it right.

[14] We're leaving a lot of piles of [15] paper here. I just want to ask counsel for LML [16] to read the list.

[17] The next —

[18] SPECIAL MASTER: Let's do this. [19] Let's — maybe your colleague can work on getting [20] these together, and we'll go to another document.

[21] Will that be a good idea? We'll [22] save time.

[23] MR. DEVLIN: Right. Okay. [24] 3022 is the same. 3032, is that the

### Page 77

[1] next — that's the same.

[2] 3065. 3068. 3070. 3072. 3080. [3] 3083. 3091.

[4] 3093. 3095. 3099. 3100. [5] And 3313. Is that what you put down [6] on your first list?

[7] MR. McDOLE: The only thing I want [8] to make sure of with these documents, Your Honor, [9] is that we're not talking validity. I understand [10] the products are not —

[11] SPECIAL MASTER: Yeah.

[12] MR. McDOLE: The Concord products [13] may be a little different, but if there's patent [14] infringement, which we're talking about claim [15] construction, something of that nature, those are [16] issues that would be relevant, that they don't go [17] to Concord's products, and they would go over to [18] these.

[19] That's all I want to make sure with [20] this. I understand your —

### Page 78

[1] think may be relevant. That's why I'm trying to [2] be cautious.

[3] SPECIAL MASTER: I'm looking at the [4] documents, and then we'll talk about them.

[5] MR. DEVLIN: Would you like to do [6] that now or set those aside?

[7] SPECIAL MASTER: Well, if you have [8] them there. Do you have them there?

[9] MR. DEVLIN: Yeah. I have the group [10] there.

[11] SPECIAL MASTER: Okay. While I'm [12] looking at those, you can recite those for the [13] record.

[14] You can bring them up and recite the [15] numbers for the record. Let me begin to get [16] organized a little bit.

[17] Make sure —

[18] MR. DEVLIN: Your Honor, if I may.

[19] MR. McDOLE: Is this through 119?

[20] MR. DEVLIN: I believe so. We'll [21] check it.

[22] Your Honor, if I may just note one [23] thing, which is that even those documents that [24] may relate to the opinions Concord received about

### Page 79

[1] the validity or unenforceability, do not relate [2] at all to Telecheck's reliance on opinions of [3] counsel. And that should be outside the scope of [4] the case.

[5] But those are set there.

[6] MR. McDOLE: And, I mean, I just [7] disagree. If it relates to validity, they have [8] an opinion on validity. If they have it in their [9] possession and they've looked at it, it's in [10] their privilege log, it's the same subject [11] matter. It's the subject matter waiver.

[12] Concord is now part of Telecheck. [13] It's Telecheck's opinion at this point.

[14] You know, it relates to the same [15] issue. They may make an argument at trial that [16] says that it has — that that wasn't us that [17] received it, that that was someone else. But it [18] still goes to their state of mind, and the mental [19] state that they were in at the time with respect [20] to validity.

[21] For instance, if they have six [22] opinions that say the patents are invalid, they [23] have an opinion in their hand that says, oh, the [24] patents are completely valid and enforceable. We

### Page 80

[1] should be able to look at that, if it's in

their [2] possession, to be able to counter what they have.

[3] SPECIAL MASTER: Okay. What patent [4] number are we talking about? I know —

[5] MR. DEVLIN: Single patent in suit, [6] the last three digits are — it's the '988 [7] patent.

[8] SPECIAL MASTER: Right. I [9] understand that.

[10] But what about the '682?

[11] MR. DEVLIN: There was a '528 [12] patent, and there was a '306 patent.

[13] MR. McDOLE: The '682 patent, Your [14] Honor, is the VeriFone patent, which is a piece [15] of prior part that Telecheck is relying on. [16] They attempt to invalidate the '988 patent in [17] this case.

[18] MR. DEVLIN: Your Honor, Mr. McDole [19] just argued to you that these documents related [20] to Telecheck's state of mind. Mr. McDole told [21] you it's earlier that when Telecheck launched [22] this product in the '97, '98 time frame.

[23] They received numerous opinions of [24] counsel. This was long before they received any

### Page 81

[1] of these documents, and these documents simply do [2] not have anything to do with Telecheck's state of [3] mind.

[4] MR. McDOLE: Your Honor, just for [5] the record, they received an opinion of counsel [6] that they're affirmatively relying on. Correct [7] me if I'm wrong, Mr. Devlin, that they received [8] just prior to this litigation.

[9] So like I said, it's an ongoing [10] process for them. And I'm not going to argue [11] today whether those are consistent opinions or [12] not. That's a story for trial.

[13] But this place in that whole theme [14] of, you know, they were getting —

[15] SPECIAL MASTER: All right. Your [16] view is if they're claiming invalidity, and [17] they have patents that support validity, you're [18] saying that's pertinent. You should have that.

[19] MR. McDOLE: If they have an opinion [20] with respect to the '988 patent that says the [21] '988 patent is either invalid or unenforceable [22] based on any prior art, that those arguments [23] would be waived, because it relates directly to [24] the exact subject matters of the opinions that

### Page 82

[1] they do have.

[2] They started getting these opinions [3] in 1997, and they got them all the way up through [4] trial. There wasn't a time

LML Patent Corp.   v.
Telecheck Services, Inc., et al.

Hearing
October 25, 2005

where they got them [5] and then they said, We satisfied ourselves.

[6] They were literally doing this from [7] day one all the way through to trial.

[8] SPECIAL MASTER: Okay. For our [9] record again, doing what?

[10] MR. McDOLE: They were obtaining [11] opinions. They have 10, 12 opinions that I've [12] seen.

[13] They're constantly seeking legal [14] advice. And LML's position in this case —

[15] SPECIAL MASTER: I know legal [16] advice. And your understanding, if the-[17]y're seeking advice, that would point them in what [18] direction?

[19] MR. McDOLE: That   would   point them [20] in the direction that the patents are either [21] invalid, unenforceable or not infringed. There's [22] three different things they obtain opinion of [23] counsel on.

[24] SPECIAL MASTER: Okay. So if they

### Page 83

[1] have an opinion here, if it bears upon that [2] conduct either way, you think you're entitled to [3] see that?

[4] MR. McDOLE: And I understand your [5] position with respect to infringement. If [6] Concord received an opinion on infringement and [7] it relates to a product not at issue, I'm willing [8] to accept the fact that a different product may [9] not fall into that category.

[10] But invalidity and unenforceability [11] are a completely different animal when you start [12] talking then, because it's not product related. [13] It's patent related. And those issues don't [14] change as products change.

[15] And if Telecheck has that in their [16] possession, we should certainly be able to see [17] something of that nature to be able to show our [18] story that Telecheck is obtaining inconsistent [19] opinions from 1998 all the way up to trial.

[20] And it wasn't truly an effort to [21] avoid infringement, but was merely a protective [22] device to try to avoid itself from the finding of [23] willful infringement if the suit was brought.

[24] MR. DEVLIN: What Mr. McDole just

### Page 84

[1] said exposes the flaw in that line of thinking, [2] Your Honor. Telecheck did not do anything to [3] obtain these opinions.

[4] There's nothing in here that would [5] implicate Telecheck in any way whatsoever in [6] terms of its state of mind. Telecheck had [7] opinion counsel.

[8] LML believes they've had different [9] opinion counsel. But in fact, it's been a [10] consistent team of opinion counsel from 1997 up [11] through 2004.

[12] And Telecheck didn't obtain those [13] opinions.

[14] SPECIAL MASTER: Well, what we're [15] saying is whether you obtain it or not, if you [16] know they have them, that's what you are saying; [17] right?

[18] MR. McDOLE: That's exactly right, [19] Your Honor. It goes to their state of mind.

[20] It doesn't matter if they [21] affirmatively obtain it or not. It's whether [22] they have it, and they have knowledge of it.

[23] MR. DEVLIN: Well, now the story is [24] changing. I still would say, Your Honor, it does

### Page 85

[1] matter.

[2] It matters what opinions Telecheck [3] obtained and relied on. And Telecheck is not [4] obtaining these opinions, and Telecheck did not [5] rely on these opinions.

[6] MR. McDOLE: Your Honor, I just go [7] back to my hypothetical. Let's say the opinion [8] says that the patents are probably valid and they [9] merge with Concord. They credit all these [10] opinions saying the patent is invalid up to then.

[11] All of a sudden, they get the [12] documents from the merger and acquisition. They [13] are flipping along.

[14] One of their people looks at a [15] document that says counsel for Concord thought [16] the patent was valid. Let's not worry about [17] that.

[18] It goes to their state of mind. [19] It's what are they thinking when they have that [20] document? They have it in their possession.

[21] SPECIAL MASTER: All right. I've [22] heard enough.

[23] Let me just look at it for a minute.

[24] MR. McDOLE: I'll read into the

### Page 86

[1] record the numbers, Your Honor. The numbers that [2] we're discussing here are PR 3022 through 31. PR [3] 3032 through 41.

[4] PR 3065 through 67. PR 3068 through [5] 69.

[6] PR 3070 through 71. PR 3072 through [7] 79.

[8] PR 3080 through 81. PR 3083 through [9] 90.

[10] PR 3091 through 92. PR 3093 through [11] 94.

[12] PR 3095 through 98. PR 3099. [13] PR 3100 through 09. PR 3113 through 14 [14] 14.

[15] And PR 3117 through 19.

[16] MR. DEVLIN: There are additional [17] numbers. I'm compiling those now, Your Honor.

[18] SPECIAL MASTER: Who is — oh, never [19] mind for now. I'll get to that.

[20] I'm just trying to get these in the [21] chronology here.

[22] Could we state for the record who [23] Leslie Caston is? Did we?

[24] MR. DEVLIN: Leslie Caston is

### Page 87

[1] in-house counsel for Concord, or at least was at [2] the time of these documents.

[3] SPECIAL MASTER: Oh, okay. And [4] Marsha Heister was?

[5] MR. DEVLIN: Oh, I'm sorry. I [6] misspoke, Your Honor.

[7] Leslie Caston was outside counsel [8] for Concord, I believe at the Akin Gump law firm. [9] Marsha Heister was in-house counsel —

[10] SPECIAL MASTER: In-house.

[11] MR. DEVLIN: — for Concord at this [12] time.

[13] SPECIAL MASTER: Okay.       Thank you.

[14] MR. DEVLIN: Your Honor, when you'-[15]re prepared, I have the remainder of those set of [16] documents.

[17] SPECIAL MASTER: Oh, okay. Fine.

[18] MR. DEVLIN: For the record, I'll [19] read the numbers in now that will be handed up.

[20] SPECIAL MASTER: You can do that. [21] Sure. Sure.

[22] MR. DEVLIN: The additional num-[23]bers, and I don't think there's any overlap here, [24] are FDC PR 3133. 3134 through 40.

### Page 88

[1] 3150. 3165. [2] 3182 through 83. 3215 through 17. [3] 3305. And 3331 through 32.

[4] MR. DEVLIN: Your Honor, if you will [5] just put these at the bottom of your pile.

[6] SPECIAL MASTER: Oh, thanks. Yeah.

[7] Okay. This begins in late '99 from [8] this correspondence. And this was just at that [9] time within Concord; right?

[10] MR. DEVLIN: That's correct, Your [11] Honor.

[12] SPECIAL MASTER: Yeah.       There were [13] two opinions, primary opinions in this case; [14] right, sought by Telecheck?

[15] MR. McDOLE: Your Honor, that was [16] Echo we're referring to, Telecheck, I'm not sure [17] how many they're relying on at this point.

[18] But there's several letters, several [19] opinions I'd say. There's probably over 10 at [20] this point that we actually have

in our [21] possession that range from the '97 to 2004 time [22] frame.

[23] SPECIAL MASTER: And for the record, [24] do I understand it that Telecheck is relying on

Page 89

[1] its reliance on those opinions as a defense to [2] willful infringement?

[3] MR. DEVLIN: That's correct. [4] Telecheck worked with a patent attorney.

[5] I think many of the documents that [6] Mr. McDole is referring to were developed around [7] the '97, 1998 time frame when Telecheck was [8] developing and then launching its product. There [9] were additional updated opinions done later on.

[10] But throughout that time, Telecheck [11] had its own counsel separate and apart from the [12] Concord counsel that are implicated here.

[13] SPECIAL MASTER: Okay. And [14] Telecheck has in this action — just so we're [15] clear, has raised the defense of invalidity.

[16] MR. DEVLIN: That's correct, Your [17] Honor.

[18] SPECIAL MASTER: And the defense of [19] reliance on counsel to the extent that there's [20] any evidence or proof of willful infringement.

[21] MR. DEVLIN: Telecheck is relying on [22] its opinions of counsel as a defense to [23] willfulness.

[24] I should say as part of its defense

Page 90

[1] to willfulness, Your Honor.

[2] SPECIAL MASTER: All right. And [3] let's complete the circle here for a minute.

[4] And, Mr. McDole, your view is, as it [5] has been, that on the issue of opinions regarding [6] validity or invalidity, that they're [7] discoverable. And on what basis?

[8] MR. McDOLE: They're discoverable, [9] Your Honor, based on waiver, based on the [10] reliance on the advice of counsel. The varied [11] advice of counsel that Telecheck is relying on is [12] based on at least, in part, invalidity in these [13] opinions.

[14] And this is why I was cautious about [15] what we were — where we were going with these [16] documents. To the extent that they relate to [17] invalidity, the very same subject matter as the [18] opinions that they've already produced in this [19] case, they have made the affirmative decision to [20] waive that privilege.

[21] They can't withhold other documents [22] in their possession that still go to their state [23] of mind, because

they're in their possession. [24] And, therefore, they must be produced to LML.

Page 91

[1] SPECIAL MASTER: On the notion of [2] invalidity; right?

[3] MR. McDOLE: That's correct.

[4] SPECIAL MASTER: Because of the [5] defense of invalidity reliance?

[6] MR. McDOLE: Correct.

[7] SPECIAL MASTER: Okay.

[8] MR. DEVLIN: Your Honor.

[9] SPECIAL MASTER: I just want to [10] focus here today, because we're now looking at [11] some documents that seem to bear upon that. Yes.

[12] MR. DEVLIN: Simply because another [13] entity received an opinion of counsel, that [14] doesn't bear on Telecheck's state of mind. I'm [15] not sure what happened with the Visa opinion in [16] which Echo had obtained.

[17] But this is not a case either of a [18] situation where a third party provided its [19] opinions of counsel —

[20] SPECIAL MASTER: Yeah.

[21] MR. DEVLIN: — outside the context [22] of attorney-client privilege. Telecheck — so it [23] was waived in that sense.

[24] SPECIAL MASTER: Yeah. Well, a

Page 92

[1] client can get different opinions and may say, [2] you know, we believe generally, and truly, and [3] honestly that there's more vitality to Opinion A, [4] even though we have in our possession Opinion B.

[5] And that A will be our position. So [6] the fact that they might have differences doesn't [7] necessarily mean that they lose their right to [8] defend, I suppose.

[9] Because if I asked for three [10] opinions and if I get one, and I might have to [11] explain why that didn't persuade me in my [12] position and why the two — that can happen; [13] right?

[14] Because you get diversion of [15] opinions, it doesn't mean you lose the right to [16] make a defense; right?

[17] MR. DEVLIN: All of that makes [18] sense, but we need to keep in mind that Telecheck [19] did not obtain this opinion. Telecheck never [20] asked for this opinion.

[21] Telecheck was never involved in [22] getting this opinion. Telecheck never relied on [23] it.

[24] The only reason it's in Telecheck's

Page 93

[1] possession is it became — and Concord, by the [2] way, was not purchased

by Telecheck. Concord was [3] purchased by First Data, the parent company.

[4] So it's a different entity entirely. [5] And Telecheck is simply not relying on these [6] opinions whatsoever.

[7] SPECIAL MASTER: But you are relying [8] on opinions for that position of invalidity; [9] right?

[10] MR. DEVLIN: We are relying on [11] opinions that were obtained by Telecheck. That's [12] correct. Telecheck/First Data itself.

[13] SPECIAL MASTER: You're saying not [14] on those opinions?

[15] MR. DEVLIN: Telecheck was simply [16] not involved. They weren't around in 2000 when [17] these opinions were written.

[18] They had no stake in it. It didn't [19] prompt them to go get another opinion.

[20] They never compared that opinion to [21] their own opinion. It's simply not part of their [22] state of mind.

[23] MR. McDOLE: And I would — I'm not [24] going to beat a dead horse again.

Page 94

[1] I'm not going to repeat my argument. [2] The fact that they were in Telecheck's [3] possession, they have them. They do go to their [4] state of mind.

[5] Okay. They're —

[6] SPECIAL MASTER: In other words, [7] your view is that the fact that they have the [8] knowledge is a pertinent fact. It's relevant to [9] the extent to which they're viewing that invalid.

[10] MR. McDOLE: Correct. And as of the [11] date those opinions were obtained, even when [12] Concord got merged over, when it was a merger [13] and acquisition, probably some of the same people [14] got brought over.

[15] That knowledge is in Telecheck. And [16] now, at trial, they may try to, just as Your [17] Honor says, Well, we were relying on these [18] opinions and not these. Those really aren't [19] ours.

[20] That is an admissibility issue. [21] That's a weight issue.

[22] But with respect to relying on the [23] advice of counsel, they can't simply say, We're [24] relying on this set of opinions and not this one.

Page 95

[1] That's exactly what the law of waiver based on [2] advice of counsel is meant to prevent, to prevent [3] somebody from relying on these opinions.

[4] SPECIAL MASTER: Let me think about [5] that. I'm going to look at them over the lunch [6] hour, which isn't quite upon us, but I'm going to [7] look at them.

[8] MR. DEVLIN: These documents never

LML Patent Corp.   v.
Telecheck Services, Inc., et al.

Hearing<br>October 25, 2005

[9] came into Telecheck, nor did people come into [10] Telecheck. Telecheck's parent company, First [11] Data, purchased Concord.

[12] SPECIAL MASTER: Yeah. Well, that [13] may — if they're subject to turn over, that may [14] distance Telecheck somewhat, may have some value. [15] But let me look at them again.

[16] There's a group of them. I want to [17] look at them again.

[18] MR. DEVLIN: Thank you, Your Honor.

[19] SPECIAL MASTER: So those records [20] will be set into the record, and we'll look at [21] them again.

[22] All right. The next item.

[23] MR. McDOLE: Your Honor, the next [24] document has the number on Telecheck's July 28th

Page 96

[1] privilege log of PR 3759. And has a description [2] correspondence to attorney seeking review and [3] comments re patent in suit.

[4] And this does have Telecheck [5] personnel on it. I'll hand you the privilege log [6] entry.

[7] And, again, this is in the 1999 time [8] period, same time around those Concord opinions.

[9] SPECIAL MASTER: 3759.

[10] MR. McDOLE: And the argument LML [11] has on this is the same argument, reliance of [12] advice of counsel. It's asking for legal advice [13] regarding the patents in suit. It should be [14] produced.

[15] SPECIAL MASTER: Okay.

[16] MR. DEVLIN: Your Honor, I'm going [17] to hand you first three documents that you had [18] previously looked at.

[19] SPECIAL MASTER: All right.

[20] MR. DEVLIN: And in your order [21] number four came out that you maintained their [22] privilege.

[23] SPECIAL MASTER: Okay.

[24] MR. DEVLIN: These documents are

Page 97

[1] outside the scope of — again, these are ones [2] you've already ruled on, and I'm going to give [3] you those for context.

[4] These documents simply don't have to [5] do with the issues that relate to the opinions. [6] They're about some licensing discussions that [7] were ongoing and attorney advice about that.

[8] One or two of them. [9] There's also, I think, a handwritten [10] document that relates to sort of options that [11] someone has when faced with a patent issue, what [12] you can do, different strategic options, and [13] their implications and so

forth.

[14] And those documents properly were [15] maintained by you to be outside the scope of [16] waiver in this case. And that's what a lot of [17] these remaining documents are going to be like.

[18] And we're going to have this same [19] discussion just like we had with this Concord [20] issue. This same discussion impacts a lot of [21] different documents, and I just wanted to make [22] that general

[23] SPECIAL MASTER: All right. Let me [24] get 3759.

Page 98

[1] MR. DEVLIN: Here is 3759, Your [2] Honor.

[3] SPECIAL MASTER: That's the one I [4] want to see. That's the one that Mr. McDole [5] mentioned.

[6] All right. Thank you. [7] I'll do that one first.

[8] MR. McDOLE: And this issue came up [9] with respect to Echo as well, Your Honor. You [10] held that the privilege was waived in a similar [11] instance, because once you start laying options [12] down on the table — when you're in licensing [13] discussions, for instance, I've seen documents [14] from Telecheck that say, Well, it will cost us [15] 20, $40,000 a month to litigate this thing, but [16] we'll be making tens of millions of dollars. [17] Here's our options.

[18] It's in notes that someone's taken. [19] That's willful infringement.

[20] That's relating to the patents in [21] suit. That goes directly to their state of mind, [22] what they're thinking.

[23] That's exactly relevant to — it's [24] exactly what we're talking about with respect to

Page 99

[1] willful infringement. That is the type of [2] information we need.

[3] If they're throwing out different [4] options that say take a license, you know, go [5] against the validity of the patent. Oh, you have [6] a 30 percent chance of success, and you start [7] laying out options like that.

[8] That's the exact type of document [9] that is meant to be produced for a defense of [10] willful infringement just to get to the person's [11] state of mind.

[12] SPECIAL MASTER: Who is Judith [13] McGuire on 3759? From Judith McGuire to Alan [14] Bethscheider. Do you know offhand?

[15] MR. DEVLIN: Alan Bethscheider is [16] in-house counsel. I know that.

[17] Judith McGuire, I don't know [18] offhand, which means she would have been [19] in-house.

[20] SPECIAL MASTER: A copy went to [21] Carolyn Hassell.

[22] MR. DEVLIN: Carolyn Hassell is a [23] business executive, and I think Judith — what [24] was the first name, Your Honor?

Page 100

[1] SPECIAL MASTER: Judith McGuire.

[2] MR. DEVLIN: Is that document dated [3] in the '97 time frame?

[4] SPECIAL MASTER: Well, it's '99. [5] Mid-'99. [6] It's all right. I just —

[7] MR. DEVLIN: Yeah.

[8] SPECIAL MASTER: She's the author. [9] Let's see.

[10] Well, do we know who Judith McGuire [11] is?

[12] MR. DEVLIN: I do not offhand, Your [13] Honor. But I understand that she would be [14] in-house at Telecheck.

[15] When I say in-house, I don't mean an [16] attorney. An employee of Telecheck.

[17] SPECIAL MASTER: A non-attorney [18] in-house; right?

[19] MR. DEVLIN: I believe that's [20] correct. Non-attorney.

[21] SPECIAL MASTER: She's not here on [22] the attorney list.

[23] MR. DEVLIN: On the attorney — on [24] that page I believe it's Alan Bethscheider.

Page 101

[1] SPECIAL MASTER: I think it's [2] privileged. 3759.

[3] MR. DEVLIN: Your Honor, there are a [4] fairly large number of documents similar to that. [5] Some are handwritten. Some are not.

[6] And they relate to the same issue. [7] If you'd like, I could read those into the record [8] and hand those to you.

[9] SPECIAL MASTER: Are they numbers of [10] documents we'll have to go over today?

[11] MR. DEVLIN: Yeah, these are. In [12] fact, this is the bulk of what we have to go over [13] today. There are a handful of other ones, but [14] the bulk of the remaining documents are here.

[15] SPECIAL MASTER: Why don't you read [16] them into the record. That's what you read — I'll [17] hear briefly from both sides. 3941.

[18] MR. DEVLIN: Thank you, Your Honor. [19] Through 44. 3945 through 47.

[20] 3955 through 57. 4360. [21] 4367. 4370 through 73. [22] 4374 through 75. 4385 through 86. [23] 4403 through 04. 4407. [24] 4409 through 12. 4418.

Page 102

[1] 4419 through 20. I'm sorry. [2] 4419. I can't tell if we lost a [3] staple. I have

pages 4419 and 4420.

[4] 19 through 22. So we lost the [5] staple. It's a single document, 4419 through [6] 4422.

[7] SPECIAL MASTER: Okay.

[8] MR. DEVLIN: We'll put a clip on [9] that, Your Honor. And 4526 is the last of them.

[10] And Your Honor, just to make a quick [11] note, as we were going through these ourselves [12] early on, an attorney within our firm wrote a [13] small note on each one asking whose handwriting [14] it was.

[15] And that note wasn't redacted for [16] this particular discussion. So there is [17] questions about whose writing.

[18] In the mean time, we've ascertained [19] that. So for each of these, I can tell you [20] whose it [20] writing it is.

[21] SPECIAL MASTER: Oh, okay.

[22] MR. DEVLIN: Some are attorneys and [23] some are non-attorneys who were speaking with [24] attorneys, which are usually listed at the top.

___

Page 103

[1] SPECIAL MASTER: Let me give you [2] these back. I don't want to get them mixed up.

[3] Okay.

[4] MR. DEVLIN: Sure. Thank you, Your [5] Honor.

[6] SPECIAL MASTER: All right. Now, [7] Mr. McDole, your view on these is?

[8] MR. McDOLE: Your Honor, I think we [9] have to go through these one by one, because the [10] descriptions that I'm reading here —

[11] SPECIAL MASTER: Okay.

[12] MR. McDOLE: — are ones that there [13] is a person who's already providing opinion in [14] the case, who is authoring it. And it uses the [15] word patent analysis.

[16] Now, when I see the word patent [17] analysis, I'm thinking that there's something [18] beyond simple licensing discussions. I think [19] there's something substantive there.

[20] And the description I understand [21] from the previous ones re patents in suit. I [22] have no idea what that means.

[23] But from what Your Honor says, it's [24] dealing with licensing. But I have — I think we

___

Page 104

[1] have to go through these one by one.

[2] SPECIAL MASTER: All right. Well, [3] let's do this then. I have PR 3941.

[4] Should we start with that?

[5] MR. DEVLIN: Yes, Your Honor.

[6] SPECIAL MASTER: Now, that's a [7] handwritten document. And the hand-

writing is [8] who?

[9] MR. DEVLIN: That's Alan [10] Bethscheider's handwriting.

[11] SPECIAL MASTER: Attorney's [12] handwriting.

[13] Okay. Thank you. [14] Alan Bethscheider. And the [15] description is what, Mr. McDole?

[16] MR. McDOLE: The description on this [17] one has no author, no recipient. And simply is [18] notes reflecting legal advice re patents in suit. [19] And there's a work product claim to it.

[20] No attorney-client claim.

[21] MR. DEVLIN: I'm not sure what [22] version of our privilege log Mr. McDole is [23] working on. But as of August, we had produced an [24] updated log that had these individuals.

___

Page 105

[1] SPECIAL MASTER: We're working [2] off the July 28th log.

[3] MR. McDOLE: Yes. I'll hand it up.

[4] SPECIAL MASTER: That's okay. [5] You've read it.

[6] That's the one we're working on.

[7] SPECIAL MASTER: You kind of have [8] to — the Merry-Go-Round has to stop so we can [9] get on.

[10] All right. Let's see. [11] Well, do we know, was this [12] communicated to anybody? Do we know?

[13] MR. DEVLIN: In terms of other than [14] the author of the handwritten notes?

[15] SPECIAL MASTER: Yeah.

[16] MR. DEVLIN: I believe not, Your [17] Honor.

[18] To be more particular, we collected [19] documents from many people, including Alan [20] Bethscheider. And it's my understanding that [21] would have come from his file.

[22] SPECIAL MASTER: Well, I guess it's [23] going to depend on whether or not these reflects [24] minutes of the meeting or just Mr. Bethscheider's

___

Page 106

[1] own individual non-communicated thinking.

[2] Some it's hard to tell what they [3] are. They're just typical hand notes about — [4] a word here or two, some sentences, some other [5] references.

[6] Work product is being claimed here. [7] This is May 23rd, '01. That's the date of it.

[8] SPECIAL MASTER: That's what it [9] shows.

[10] MR. DEVLIN: Yes, Your Honor.

[11] SPECIAL MASTER: Okay. All right. [12] Privileged.

[13] MR. DEVLIN: Thank you, Your Hon-

or.

[14] SPECIAL MASTER: Work product. [15] Privileged.

[16] MR. McDOLE: Your Honor, the next [17] document may be very similar again.

[18] It's — again, it's — the number is [19] PR 3945 through 47. This is an undated document.

[20] Again, has no author. No recipient. [21] And simply says no notes reflecting legal advice [22] re patents in suit.

[23] MR. DEVLIN: Your Honor.

[24] MR. McDOLE: That's from the July

___

Page 107

[1] 28th privilege log.

[2] MR. DEVLIN: With respect to this [3] updated privilege log, this was produced, and, I [4] think, pursuant to conversation, I think, with [5] Your Honor, you said we could do some minor [6] updates.

[7] And that's what we did. And this [8] was produced very early on in this process.

[9] In any case, they are notes from [10] Alan Bethscheider, again.

[11] SPECIAL MASTER: Notes of Alan [12] Bethscheider?

[13] MR. DEVLIN: Yes, Your Honor.

[14] MR. McDOLE: Again, Your Honor, just [15] by the mere fact that they can update their [16] privilege log shows that their July, the one [17] we're working off by order of you is —

[18] SPECIAL MASTER: Well, that's true. [19] I mean, some of this is not tangential. This is [20] work product by its nature.

[21] And I think its significance as work [22] product under Rule 26 as courts require take [23] greater care to protect notions and impressions, [24] whatever they are. It's hard to tell what they

___

Page 108

[1] are, but they are impressions in the lawyer — in [2] his own hand.

[3] In any case, that's privileged.

[4] MR. DEVLIN: Thank you.

[5] SPECIAL MASTER: 3945 is priv-[6] ileged. Now, that's the one I'm looking at.

[7] MR. DEVLIN: Yes.

[8] SPECIAL MASTER: And it goes through [9] and includes 47.

[10] MR. DEVLIN: Correct. Thank you, [11] Your Honor.

[12] SPECIAL MASTER: Put it as work [13] product.

[14] MR. DEVLIN: Thank you, Your Hon-or.

[15] SPECIAL MASTER: Which means [16] category M. I'm looking at 3955.

[17] MR. McDOLE: And Your Honor —

[18] SPECIAL MASTER: Oh, yes.

[19] MR. McDOLE: This one probably made [20] it on our list by accident. This had a [21] description of in re business operation. It's [22] already been ordered produced.

[23] SPECIAL MASTER: 3955?

[24] MR. McDOLE: Yes, Your Honor.

Page 109

[1] SPECIAL MASTER: So we can skip that [2] one.

[3] 56, 57.

[4] MR. McDOLE: Yes. The next one [5] would be document bearing number PR 4360 on [6] Telecheck's July 28th privileged log.

[7] SPECIAL MASTER: 43?

[8] MR. McDOLE: 4360.

[9] SPECIAL MASTER: I have it. Yes. [10] PR stands for what?

[11] MR. DEVLIN: Privileged. It's just [12] an annotation.

[13] SPECIAL MASTER: Oh, okay.

[14] MR. McDOLE: This is where we start [15] getting into the documents that I was talking [16] about in respect to patent analysis, Your Honor. [17] This document has no author, no recipient.

[18] And the description is handwritten [19] notes containing mental impressions of Ronny [20] Laurie and Alan Bethscheider re patent analysis.

[21] And that notes to me that somebody [22] did an analysis, and somebody has internal — is [23] having a discussion, Alan Bethscheider, with [24] outside counsel, Ron Laurie, who is one of the

Page 110

[1] opinion counsel, I believe.

[2] And it appears to me to be something [3] that should be produced based on scope of [4] reliance on opinion of counsel.

[5] MR. DEVLIN: Again, Your Honor, [6] based on your previous rulings in this case, it [7] doesn't necessarily mean simply that because [8] someone gets an opinion of counsel from someone, [9] that every conversation they have with that [10] counsel is thereafter waived.

[11] There are different topic areas that [12] related to patent disputes and different topic [13] areas related to patents as a whole, Your Honor.

[14] SPECIAL MASTER: The marking here [15] says whose writing. That was done — the process [16] you mentioned?

[17] MR. DEVLIN: That was —

[18] SPECIAL MASTER: So ignore that?

[19] MR. DEVLIN: We can ignore that.

[20] SPECIAL MASTER: Put a line through [21] that, or I'll put my initials, so

we know that's [22] off.

[23] MR. DEVLIN: Thank you.

[24] SPECIAL MASTER: And this is

Page 111

[1] described as patent analysis.

[2] MR. McDOLE: Yes, Your Honor. And [3] I'd like to read you another entry that is [4] similar, and in fact, it's almost identical that [5] Telecheck has already voluntarily produced.

[6] That is document PR 4381, and it is [7] no author, no recipient. And it's handwritten [8] notes containing mental impression and reflecting [9] advice of counsel re patent analysis.

[10] That is something that has already [11] been produced in this case, based on reliance of [12] opinions of counsel. The descriptions are [13] virtually identical except for the fact that they [14] identify some attorneys.

[15] And the one we're arguing about now, [16] it's the same thing.

[17] SPECIAL MASTER: I think this is [18] discoverable. This is discoverable.

[19] MR. DEVLIN: What was the number, [20] Your Honor?

[21] SPECIAL MASTER: 4360.

[22] MR. DEVLIN: Thank you.

[23] MR. McDOLE: Your Honor, the next [24] one, we have the same exact situation. The

Page 112

[1] document identified on Telecheck's July 28th, [2] 2005 privilege log is PR 4367. And, again, no [3] author, no recipient, same description.

[4] Handwritten notes containing mental [5] impressions of Ron Laurie re patent analysis.

[6] Again, this has been waived based on [7] reliance of advice of counsel. And they've also [8] produced documents with the same description [9] already based on the reliance of advice of [10] counsel.

[11] SPECIAL MASTER: Laurie is an [12] attorney at Skadden Arps.

[13] MR. McDOLE: Yes. He's also one — [14] the opinion counsel. One of the opinions that [15] Telecheck is relying on.

[16] MR. DEVLIN: Your Honor, this [17] document relates to analysis of multiple patents. [18] And, like I said before, it is outside the scope [19] of waiver.

[20] SPECIAL MASTER: It is expected — [21] is it expected that the authors of these opinions [22] will testify at the trial?

[23] MR. DEVLIN: We're still not sure of [24] that, Your Honor, to be honest.

Page 113

[1] That may be the case. Neither of [2] the

opinion counsel was deposed in this case. [3] But if they will — excuse me.

[4] We're just not sure is the bottom [5] line. They are third parties, I believe.

[6] SPECIAL MASTER: I'm not pushing you [7] to make a decision now.

[8] MR. DEVLIN: Yeah.

[9] SPECIAL MASTER: I'm just asking.

[10] MR. DEVLIN: I'm not sure is the [11] bottom line.

[12] SPECIAL MASTER: But they could; [13] right?

[14] MR. DEVLIN: It's possible.

[15] SPECIAL MASTER: They're — I mean, [16] they're still living and available, I guess.

[17] MR. DEVLIN: That's correct.

[18] SPECIAL MASTER: Are they to be [19] deposed?

[20] MR. McDOLE: Your Honor, what had [21] happened there was we had sent out notices of [22] deposition, and Telecheck refused to produce them [23] for deposition based on a Judge Robinson ruling.

[24] They later recanted, offered them

Page 114

[1] up. There is a period for being able to depose [2] people if they're put on a witness list in the [3] future.

[4] But certainly we intend, if they are [5] on that list, as we wanted to do during [6] discovery, to take those depositions.

[7] SPECIAL MASTER: Why did Judge [8] Robinson decide that shouldn't be deposed?

[9] MR. DEVLIN: Yeah. There is an [10] order that relates — that comes from Judge [11] Robinson, an older order that said that opinion [12] counsel's testimony really isn't relevant. It's [13] about the state of mind of the recipient of the [14] opinion.

[15] SPECIAL MASTER: Sure.

[16] MR. DEVLIN: And so you don't need [17] to depose them, and that's what we originally [18] said or based our decision on, that we would not [19] allow LML to depose them.

[20] In the midst of this litigation, [21] Judge Robinson came out with another opinion [22] that I'm not sure if it flips it, but at least [23] allows it, opens up the door to testimony by [24] authors of opinion counsel.

Page 115

[1] SPECIAL MASTER: So if you were — [2] your opinion counsel might — so, obviously, your [3] opinion counsel might render their opinion. [4] That's it.

[5] And then it's handed over, and it's [6] relied upon in that sense.

[7] So what do you want to depose? [8] There it is. But sometimes that same opinion [9] counsel can become, if you will, involved or [10] entangled in other features of the activity of [11] the parties. And that might become pertinent [12] then, too.

[13] MR. DEVLIN: Well, to continue the [14] story, once that order from Judge Robinson came [15] out, we informed LML that, yes, we made these [16] individuals available for deposition. And we [17] made them available.

[18] The offer was open, and LML refused [19] to take their depositions at that time.

[20] MR. McDOLE: Your Honor.

[21] SPECIAL MASTER: Yes.

[22] MR. McDOLE: Just trying to read [23] between the lines here of what you're thinking, [24] this is not something that is only seen by Ron

---

Page 116

[1] Laurie. These are handwritten notes containing [2] mental impressions of Ron Laurie re patent [3] analysis.

[4] This is a document that is in [5] Telecheck's possession, you know. So Telecheck [6] had these handwritten notes.

[7] They are either handwritten notes of [8] somebody at Telecheck, or they are handwritten [9] notes of Ron Laurie that ended up at Telecheck [10] somehow. So, however, it is indicated to tell [11] there are people at Telecheck that are relying [12] on those opinions of counsel. And certainly [13] they will be witnesses, regardless if the opinion [14] counsel is on the stand or not.

[15] SPECIAL MASTER: Okay. And the [16] description, again, on the log?

[17] MR. McDOLE: Your Honor, same [18] description as the ones they had produced, [19] handwritten notes containing mental impressions [20] of Ron Laurie re patent analysis.

[21] MR. DEVLIN: Again, Your Honor, [22] simply because the descriptions are consistent [23] doesn't mean that a document is waived. In fact, [24] LML has consistent descriptions where it's

---

Page 117

[1] produced redacted portions of documents.

[2] SPECIAL MASTER: All right. I won't [3] hear that.

[4] Well, I think this ought to be [5] turned over.

[6] MR. McDOLE: 4367, Your Honor.

[7] SPECIAL MASTER: 4367.

[8] MR. DEVLIN: Thank you, Your Honor.

[9] MR. McDOLE: Your Honor, the next [10] document on Telecheck's July 28th

---

privilege log [11] that is contested is, again, same thing that [12] we've had before. It is PR 4370 through 73.

[13] SPECIAL MASTER: 43?

[14] MR. McDOLE: 70 through 73. Again, [15] it's a document, no author, no recipient.

[16] It has the same description as [17] previous documents that have been produced. Has [18] a description handwritten notes containing mental [19] impressions of Ron Laurie.

[20] Henry Ableman and Dallas Martin re [21] patent analysis. Ron Laurie is opinion counsel. [22] Henry Ableman is an in-house attorney at [23] Telecheck. And Dallas Martin, I believe, is an [24] outside counsel.

---

Page 118

[1] SPECIAL MASTER: Okay. Same thing.

[2] Waived.

[3] No privilege.

[4] MR. McDOLE: Your Honor, the next [5] document in Telecheck's July 28th privilege log [6] disputed is a document with the identification PR [7] 4374 through 75.

[8] Again, it's a document that it has [9] no author or recipient. The description is [10] handwritten notes containing mental impressions [11] of Ron Laurie and Henry Ableman re patent [12] analysis, just like the previous documents.

[13] SPECIAL MASTER: What number is that, [14] Your Honor?

[15] SPECIAL MASTER: 4374 and 4375.

[16] MR. DEVLIN: Your Honor, for your [17] information, the author of this document is [18] Cynthia Somervill, who is an in-house attorney.

[19] SPECIAL MASTER: Cynthia [20] Somervill?

[20] MR. DEVLIN: Yes.

[21] SPECIAL MASTER: Okay. You can [22] note that somewhere. All right.

[23] MR. DEVLIN: And, again, this [24] relates to the issue of the fact that lawyers can

---

Page 119

[1] give more than one type of advice. And as Your [2] Honor found in order number four, certain [3] communications even with these varied attorneys [4] are still privileged and not part of the [5] privileged waiver.

[6] SPECIAL MASTER: Well, I don't think [7] that — I think you have to look at each document [8] separately and see the content and what's been [9] stated about it.

[10] This reliance on opinion of counsel [11] is a very certain and destructive instrument. I [12] mean, it just sweeps an

---

awful lot of protection [13] that otherwise you might have.

[14] MR. McDOLE: And Your Honor, the [15] Federal Circuit —

[16] SPECIAL MASTER: That's just the [17] consequence of that, quite frankly, very powerful [18] position. And it is a powerful position to take.

[19] MR. McDOLE: And the Federal Circuit [20] recognized that six months ago.

[21] SPECIAL MASTER: I note that for the [22] record, it has a different rank than some other [23] things. It has a different rank because it's [24] such a sweeping instrument used in that party's

---

Page 120

[1] position, which they should be entitled to use.

[2] But it has, if you will, wide, wide, [3] wide sweeping consequences, as it should. So its [4] value, its power that it has to protect somebody [5] by doing that, it has to be accompanied by a [6] corresponding disclosure of everything associated [7] with it.

[8] Almost — I mean, I just — it can [9] be said in different ways, but that's what we're [10] talking about here. And to that extent, in this [11] instance, it's waived.

[12] So that would be the same category [13] 4385 and 6.

[14] MR. McDOLE: Yes, Your Honor. The [15] next document on —

[16] SPECIAL MASTER: 4385 and 6 says, I [17] believe, Cynthia Somervill, who is the attorney.

[18] MR. DEVLIN: That's correct, Your [19] Honor. And again, that was —

[20] SPECIAL MASTER: So those comments [21] were just added during the litigation process.

[22] I'll just cross that off this [23] one. All right.

[24] MR. DEVLIN: That is correct, Your

---

Page 121

[1] Honor.

[2] SPECIAL MASTER: We should do that, [3] so there's no misunderstanding about that.

[4] 4385 and 6, waived. [5] And these other, going through here, [6] have the description, the same format, the same [7] character. They seem to have the same — similar [8] names, other than one or two earlier ones that [9] are very illegible.

[10] And apparently it's [11] Ms. Somervill's writing on all of these. We will [12] say whose writing, it's Ms. Somervill, I assume.

[13] So it's 4303.

[14] MR. McDOLE: Yes, Your Honor. [15] Would you like me to read you the [16] description?

---

LML Patent Corp.  v.
Telecheck Services, Inc., et al.

Hearing
October 25, 2005

[17] SPECIAL MASTER: Yes. Do that, [18] please.

[19] MR. McDOLE: Description of document [20] identified on Telecheck's July 28th privilege log [21] is PR 4403, 04. And the description is [22] handwritten notes containing mental impressions [23] of Ron Laurie re patent analysis.

[24] MR. McDOLE: Again, that is the same

---
Page 122
---

[1] description as we've been talking about all [2] along.

[3] SPECIAL MASTER: 4403 is waived. [4] 4407.

[5] MR. McDOLE: 4407, the description [6] is handwritten notes containing mental [7] impressions of Joseph Yang re patent analysis.

[8] Joseph Yang is one of the attorneys [9] that provided Telecheck an early opinion of [10] counsel. And they produced that letter already [11] from Mr. Yang to us.

[12] This seems to fall under that same [13] line.

[14] SPECIAL MASTER: Waived.

[15] MR. DEVLIN: Your Honor.

[16] SPECIAL MASTER: Yeah. Go ahead.

[17] MR. DEVLIN: It was a handwritten [18] document with a conversation of Joe Yang that you [19] maintained as privileged in your previous order. [20] It relates to the strategic options of dealing [21] with someone coming at you with a patent, not to [22] other issues.

[23] SPECIAL MASTER: Well,    there's [24] some material on here. 4407, waived.

---
Page 123
---

[1] 4409, 10 and 11 and 12.

[2] MR. McDOLE: 4409 through 12 has a [3] description, handwritten notes containing mental [4] impressions of attorneys re patent analysis.

[5] No author. No recipient. [6] And it's dated March 7th, 1997. [7] Again, along the same lines, we believe that it's [8] been waived.

[9] MR. DEVLIN: This is also [10] handwriting of Cynthia Somervill as reflected on [11] the August report.

[12] SPECIAL MASTER: I see that, yes. [13] She has good handwriting.

[14] Same ruling. Waived. [15] Almost ready for a lunch break here.

[16] MR. McDOLE: We've got about five [17] documents left.

[18] SPECIAL MASTER: 4418.

[19] MR. McDOLE: 4418, Your Honor, is [20] dated February 26th, 1997. It has a description [21] handwritten notes containing mental impressions [22] of Joseph Yang re patent analysis.

[23] This is the same description as we [24]

---
Page 124
---

[1] there is no author or recipient.

[2] MR. DEVLIN: Again, Your Honor, [3] authored by Cynthia Somervill.

[4] SPECIAL MASTER: Well, it would be [5] the same ruling.

[6] MR. McDOLE: Your Honor, the next [7] document identified as PR 4419 through 22 is [8] dated February 5th, 1997. No author. No [9] recipient.

[10] And it has a description handwritten [11] notes containing mental impressions of Ron Laurie [12] and Joseph Yang re patent analysis and internal [13] business operations.

[14] SPECIAL MASTER: These are all [15] written by — all the documents we have [16] considered were written by Ms. Somervill, the [17] author.

[18] MR. DEVLIN: That's right. There [19] are one or two others that are not [20] Ms. Somervill. This is Ms. Somervill.

[21] SPECIAL MASTER: This one and the [22] previous one, I think, is Ms. Somervill. It's [23] 4418.

[24] MR. DEVLIN: Yes.

---
Page 125
---

[1] SPECIAL MASTER: This is [2] February 5th, '97?

[3] MR. DEVLIN: That's right, Your [4] Honor.

[5] SPECIAL MASTER: Same ruling. [6] Waived.

[7] MR. McDOLE: Your Honor, the next [8] document is identified as PR 4526 dated [9] October 29th, 1996. No author or recipient [10] identified on Telecheck's July 28th privilege log [11] with it.

[12] And it has a description of [13] handwritten notes containing mental impressions [14] of Ron Laurie and Joseph Yang re NACHA rules and [15] patent analysis.

[16] Again, for the same reason, we [17] believe that this has been waived. With respect [18] to the NACHA rules, one of the arguments that's [19] been made in this case is by following certain [20] NACHA rules, that is by way of background, by [21] following certain NACHA rules, you would infringe [22] the patent.

[23] And that's why that probably pops in [24] there in conjunction with patent analysis. But

---
Page 126
---

[1] you have the document in front of you. Probably [2] you know better than I do.

[3] SPECIAL MASTER: Tell me that again [4] now.

[5] MR. McDOLE: One of the positions [6] LML is taking in this case, there's certain [7] industry rules that you have to follow in order [8] to conduct one of these transactions in [9] electronic check transactions.

[10] And they're called the NACHA or the [11] ACH rules. So that's an issue with respect to [12] infringement in this case of whether the NACHA [13] rules may cover the patent or whether the [14] patent —

[15] SPECIAL MASTER: Is that like an [16] industry standard?

[17] MR. DEVLIN: That's correct, Your [18] Honor. You must follow those rules in order to [19] conduct a transaction. So...

[20] SPECIAL MASTER: And that's an [21] association, NACHA?

[22] MR. McDOLE: Yes, it is. It's the [23] biggest industry organization with respect to [24] electronic check conversion.

---
Page 127
---

[1] SPECIAL MASTER: And in this [2] discipline; correct?

[3] MR. McDOLE: That's correct, Your [4] Honor.

[5] And since the description refers to [6] a patent analysis, I'm assuming that the two go [7] together.

[8] SPECIAL MASTER: So persons that get [9] involved in this are expected, indeed required by [10] contract from time to time to conform with the [11] NACHA standard.

[12] MR. McDOLE: That's correct, Your [13] Honor.

[14] MR. DEVLIN: There are different [15] mechanisms to facilitate electronic funds. NACHA [16] runs the automated clearing house, which is one [17] of those mechanisms.

[18] SPECIAL MASTER: I've seen that run [19] through all this discovery. I've referred to [20] NACHA as kind of a satellite entity.

[21] There's a system that everybody [22] seems to adhere to or should adhere to.

[23] MR. DEVLIN: If you are conducting [24] transactions through the national ACH, then NACHA

---
Page 128
---

[1] rules control those transactions.

[2] SPECIAL MASTER: All right. Thanks [3] for the explanation, counsel.

[4] Who's Bev Kennedy? Do we know [5] offhand, Bev Kennedy?

[6] MR. DEVLIN: I do not know offhand.

[7] SPECIAL MASTER: Oh, okay. It's a [8] name here.

[9] MR. DEVLIN: Yeah.

[10] SPECIAL MASTER: Waived. I'll give

[11] these all back to you, Mr. Devlin, the ones I've [12] been going through.

[13] Thanks for giving them to me.

[14] MR. DEVLIN: Thank you, Your Honor.

[15] SPECIAL MASTER: I just think — [16] okay. Thank you.

[17] MR. DEVLIN: Thanks.

[18] SPECIAL MASTER: I have your [19] color-coded logs here.

[20] MR. McDOLE: Okay.

[21] SPECIAL MASTER: These are those [22] that you left.

[23] MR. McDOLE: We have four documents [24] left.

Page 129

[1] SPECIAL MASTER: Do you want to [2] finish up? We may as well.

[3] MR. McDOLE: Do you still want to [4] take a lunch break to decide the Concord document [5] issues?

[6] SPECIAL MASTER: Well, let me think [7] about that a little bit. I think I want to look [8] at them again.

[9] The Concord issue, I think we'll do [10] that if you don't mind.

[11] MR. McDOLE: Okay.

[12] SPECIAL MASTER: We'll take a [13] lunch break, and let me look at those. Then I'll have [14] you back again to argue those Concord documents.

[15] All right.

[16] MR. DEVLIN: That works. Thank you, [17] Your Honor.

[18] SPECIAL MASTER: As I understand the [19] Concord, this was in Concord's — it matriculated [20] through the Concord entity before they were [21] acquired?

[22] MR. McDOLE: It matriculated, right.

[23] MR. DEVLIN: That is right. And [24] then when Concord came on board, so to speak,

Page 130

[1] some of those documents came with it.

[2] That's right. First Data, the [3] parent company, obtained possession of all the [4] documents that Concord had.

[5] SPECIAL MASTER: I'll look at the [6] documents at the break if you don't mind.

[7] MR. McDOLE: Okay. The next [8] disputed document is identified on Telecheck's [9] July 28th privilege log as PR 4652.

[10] It is a document from Sue Shaper who [11] provided an opinion of counsel in this case to [12] Karen Williams and Randy Templeton, two in-house [13] Telecheck employees.

[14] The description is correspondence

[15] from attorney containing legal advice re prior [16] art patent. A prior art patent, Your Honor, is a [17] patent that is — essentially can be used to [18] invalidate a patent at issue in the case.

[19] So, for instance, an issue in this [20] case is the '988 patent. And there's certain [21] references that would qualify, by statute, as [22] being considered prior art.

[23] So when you make the statement of [24] prior art patent, you must be — you must have it

Page 131

[1] in the context of something. It must be prior [2] art to something.

[3] For instance, just having a [4] reference is not necessarily prior art. It must [5] be prior art to a patent.

[6] And since it's on the privilege log, [7] and given the date of February 12th, 1997, we [8] believe that the document is related to a prior [9] art patent to the '988 patent. Now, again, it [10] doesn't say what prior art patent it is.

[11] If the document says it, then I can [12] tell you whether it's an issue in the case or [13] whether they've used it in their opinions of [14] counsel. But in any event, I think it still [15] flows into that same thinking of they're relying [16] on on advice of counsel with respect to invalidity.

[17] This falls directly within that [18] scope. It's a prior art patent.

[19] It relates to invalidity, and it [20] should be produced.

[21] MR. DEVLIN: This document has [22] nothing to do with the validity of the patent in [23] suit, the '988 patent. The prior art patent was [24] just a reference to it being some other patent.

Page 132

[1] What this document is — I'll hand [2] it up to you Your Honor — it is a [3] noninfringement analysis of one claim of that [4] prior art patent.

[5] And as Your Honor knows, in order to [6] conduct a patent validity analysis on the patent [7] in suit, you've got to look at the full [8] disclosure of a prior art reference and compare [9] that to the claims of the '988 patent.

[10] It's a very extensive analysis, [11] typically if you get a long claim.

[12] SPECIAL MASTER: Right, [13] MR. DEVLIN: Okay. When you're [14] looking at the noninfringement of a patent, you [15] can simply look at one tiny feature that's [16] recited in the claims of that patent and say, We [17] don't do that. And that analysis can be very [18] quick and short, and have nothing to do with the [19] full disclosure of what that patent and what that [20] full disclosure of what that patent may mean to the [21] validity of a

second patent.

[22] So what this is, it's a [23] non-infringement analysis regarding just one [24] claim, and I think only one little element of one

Page 133

[1] claim of a prior art patent.

[2] It doesn't have anything to do, and [3] you can take — you can take whatever time you [4] want. But you can probably read it in 30 seconds [5] and see it is not a validity analysis. It has [6] nothing to do with the '988 patent.

[7] They have noninfringement patents.

[8] MR. McDOLE: If I'm understanding [9] Mr. Devlin's argument, they have opinions of [10] counsel they're relying on with respect to [11] infringement or noninfringement as well.

[12] It's not limited to invalidity, [13] because we said prior art patent. I assumed it [14] went to validity, because the description is very [15] cursory.

[16] But what Mr. Devlin just said is you [17] can look at a piece of prior art and you can look [18] at one little piece and determine and look at how [19] it relates to invalidity. He just made the [20] argument for us of why it's related.

[21] MR. DEVLIN: That's not what I said. [22] Your Honor. You can look at a patent, and you [23] can look at one small piece of a claim of a [24] patent and determine that you do not infringe

Page 134

[1] that patent.

[2] Let's refer to this document as [3] talking about Patent A. You could look at Patent [4] A, and you can look at a claim of Patent A. And [5] you can look at the minutest portion of a claim [6] of that patent and determine, based on that, that [7] you don't infringe that patent.

[8] That's what that document is doing. [9] The patent in this suit is not Patent A.

[10] It's Patent B. It's the '988 patent. [11] And to conduct a validity analysis [12] of Patent B, you've got to look at the full [13] disclosure of Patent A or any other prior art [14] reference, and compare that disclosure in its [15] entirety to the claims of Patent B.

[16] So it's a vastly different analysis. [17] The fact that Telecheck may or may not infringe a [18] completely different patent has nothing to do [19] with the question of whether it may infringe the [20] patent in suit here, because the question of [21] infringement is very particular to the claims of [22] each patent. And so, of course, Patent A has [23] different claims than Patent B.

[24] The patent in suit here and the fact

Page 135

**LML Patent Corp.    v.**
**Telecheck Services, Inc., et al.**

**Hearing**
**October 25, 2005**

[1] of whether Telecheck meets one of the limitations [2] of the claims of Patent A has nothing to do with [3] whether it meets the limitations of the claims of [4] Patent B. So it doesn't have anything to do with [5] the infringement analysis of Patent B of what I'm [6] saying, because the claims of the two patents are [7] different.

[8] I can't look at a patent and say, [9] Well, you infringe some other patent; therefore, [10] you infringe mine. That's just a legal [11] impossibility. It's a legally insignificant [12] analysis. It means nothing.

[13] And, again, that simply doesn't have [14] to do with the other issue, which could be the [15] validity of Patent B, because that's not looking [16] at disclosure of Patent A. It's just looking at a [17] tiny piece or pieces of Patent A.

[18] SPECIAL MASTER: Let me just look at [19] that with both of those thoughts in mind.

[20] MR. DEVLIN: Your Honor, if I may [21] make just a note, I think when you handed [22] something back to me, you handed me something of [23] yours.

[24] SPECIAL MASTER: Oh, yeah.

**Page 136**

[1] MR. DEVLIN: I just want to hand [2] that back.

[3] SPECIAL MASTER: I think that was a [4] copy of order three. Yeah, it was a memorandum. [5] Yes.

[6] Yes.

[7] MR. McDOLE: Your Honor, just given [8] Mr. Devlin's argument, I mean, I don't have the [9] document in front of me, but I'm questioning, if [10] his argument is really true, what the relevance [11] of the document is, and why it's on the privilege [12] log.

[13] Because he's essentially arguing it [14] has nothing to do with the case, and here we are, [15] again, in a situation where I look at the [16] privilege log. It talks about a prior art [17] patent, and I have to assume it has something to [18] do with the case.

[19] And his argument is it has nothing [20] to do with it, and that there's no way to [21] determine that, you know, without seeing the [22] document. And even knowing what the prior art [23] is, I can't respond any further.

[24] SPECIAL MASTER: It seems to be

**Page 137**

[1] essentially, as Mr. Devlin says, it doesn't [2] appear to be relevant to what's before the Court [3] in this case.

[4] MR. McDOLE: The only thing, as [5] Mr. Herrmann just pointed out to me, that the [6] relevance that they may have is if [7] they're trying [7] to, you know, somehow

construe the claims, [8] interpret the claims of a prior art patent to [9] avoid infringing that patent.

[10] But it — you know, and making sure [11] that it's not inconsistent with what they have [12] here.

[13] SPECIAL MASTER: Well, in the most [14] generic sense, it has to do with the overall [15] legal topic that the case has to do with, that [16] we're concerned with here. I don't think it does [17] any harm onto anybody letting them see this.

[18] But it falls in that category. [19] Well, there it is.

[20] Let somebody else find out why it [21] should apply. I think it's discoverable. [22] You say, Mr. Devlin, it's harmless [23] discovery. So, it's discoverable.

[24] MR. DEVLIN: Your Honor, I guess

**Page 138**

[1] we've dealt with this issue before about the [2] problems of waiver, and I assume we'll be [3] producing these subject to appeal, of course.

[4] But if they are produced, they will [5] be produced under order which would reduce waiver [6] in a separate litigation.

[7] SPECIAL MASTER: Yeah, I have no [8] problem with that.

[9] I think the waiver is, if you will, [10] Court ordered. And for that reason, that doesn't [11] waive a lot of other things.

[12] The kind of waiver I'm talking [13] about, the waiver is —

[14] MR. DEVLIN: Restricted to this [15] case?

[16] SPECIAL MASTER: Right.

[17] MR. DEVLIN: Which is what I think [18] the case law —

[19] MR. McDOLE: I think the case law —

[20] SPECIAL MASTER: Well, what I'm [21] saying is it's obviously subject to case law, but [22] no one should read into what the case law applies [23] any notion that I have to accept that it's waived [24] for everything, as far as I'm concerned.

**Page 139**

[1] But if the law provides, you know, [2] under these circumstances, it's waived by law, [3] then it is. I can't change that.

[4] It's not my belief that there's any [5] sort of a general waiver here. Okay.

[6] I'm just — for purposes of what I'm [7] doing here, it's waived for LML's use in this [8] case. And the extent to which some other Court [9] might say, Well, you waived it for everything, [10] that's another argument on another day.

[11] So that I — but I have no — I'm [12] not saying it's a blanket waiver of everything [13] here.

[14] MR. McDOLE: Your Honor, the next [15] document is identified on Tele-

check's July 28th [16] privilege log as PR 4655 through 62.

[17] And this is a document from John [18] Harris to Cynthia Somervill with a description [19] correspondence from attorney containing legal [20] advice re patentability search.

[21] Again, patentability search tells me [22] it relates to invalidity if it's relevant to this [23] case and it appears on their privilege log.

[24] You'll be able to look at the

**Page 140**

[1] document, be able to tell. But patentability [2] search essentially is you give a search firm a [3] criteria or a topic, and you say I want to know [4] if this patent — if there's prior art on this [5] patent.

[6] I want to know if it's patentable. [7] You know, sometimes you do it with respect to [8] prosecution. Sometimes you do it with respect to [9] a defensive action and invalidity.

[10] Just given what they've said here, I [11] think our opinion is that they would avoid this [12] based on a reliance on advice of counsel based on [13] the description that they have.

[14] MR. DEVLIN: Mr. McDole made an [15] important distinction. When you are doing it to [16] see if a patent involved in a dispute is invalid, [17] that is invalidity.

[18] When you are doing it to see whether [19] one of your own engineer's ideas may be [20] patentable, that's a patentability search that's [21] covered by Spalding as privileged information. [22] It has nothing to do with the validity or [23] infringement of those patents of the '988 patent [24] in suit.

**Page 141**

[1] MR. McDOLE: And Your Honor, if [2] what Mr. Devlin is saying, if this isn't [3] relevant in [3] any way to the case, that's [4] fine. You know, but [4] I just appearing on [5] their privilege log, I don't [5] want to beat a dead horse. I just — I can't [6] tell from the privilege log.

[7] SPECIAL MASTER: I understand [8] what you're both saying. Let me look at it.

[9] How's it described in the log, [10] please?

[11] MR. McDOLE: Your Honor, it's [12] described as correspondence from attorney [13] containing legal advice re patentability search.

[14] MR. DEVLIN: And, again, Your Honor [15] patentability search is not an invalidity search. [16] I'm not saying this document is completely [17] irrelevant to every issue in the case.

[18] I'm saying it's not part of the [19] scope of waiver. It's irrelevant to the opinions [20] of counsel that were obtained in this

**Min-U-Script®**        **(23)    Page 136 - Page 141**

Hearing
October 25, 2005

LML Patent Corp.   v.
Telecheck Services, Inc., et al.

case.

[21] I don't know whether it's — I [22] haven't read it thoroughly enough. Let me back [23] up.

[24] That's really what I'm saying.

**Page 142**

[1] Mr. McDole misstated our position.

[2] The position is it's clearly a [3] privileged document. I don't think there's an [4] issue about that or a dispute.

[5] What is in dispute is whether it [6] falls within the scope of a disclosure of [7] opinions of counsel. Because opinions of counsel [8] relate to the infringement, the noninfringement, [9] invalidity of the patent in suit.

[10] This document doesn't have anything [11] to do with these issues. This document talking [12] about the potential patentability of an idea that [13] was developed by one of Telecheck's [14] employees.

[14] And under the Spalding case, it is a [15] privileged document.

[16] SPECIAL MASTER: And Spalding [17] applies why?

[18] MR. DEVLIN: Spalding is a case from [19] the Federal Circuit that indicates that well, [20] Spalding is very particular actually. It [21] indicates that when you provide an invention [22] disclosure, that is, information from a potential [23] inventor to to a patent attorney pursuant to [24] a patent application, that that itself is

**Page 143**

[1] privileged, even though it came from a [2] non-attorney, and even though it typically is [3] full of technical information.

[4] There was a previous case called the [5] Jack Winter case, I think, that said that those [6] things had been discoverable. And Spalding [7] reversed that decision essentially.

[8] Spalding has been around for [9] probably eight or ten years now. Maybe a little [10] less.

[11] SPECIAL MASTER: Yeah.

[12] MR. DEVLIN: And so it's fairly [13] consistently the law applied with respect to [14] patent prosecution documents. This document is [15] probably privileged for more reasons than [16] Spalding, because it's actually discussions [17] between counsel relating to a search that was [18] done pursuant to determining whether this idea [19] that has been disclosed by a potential inventor [20] is, in fact, potentially patentable or not.

[21] So it has to do with an idea that a [22] Telecheck employee had, and whether Telecheck was [23] going to file a patent application on behalf of [24] that employee.

**Page 144**

[1] SPECIAL MASTER: Mm-hmm.

[2] MR. DEVLIN: And it just simply [3] doesn't have to do with the issues of scope of [4] waiver here.

[5] SPECIAL MASTER: Was there any [6] outcome of this object, if you will? I'll call [7] it this subject.

[8] MR. DEVLIN: In terms of whether an [9] application was ultimately filed?

[10] SPECIAL MASTER: Yeah.

[11] MR. DEVLIN: I don't know, Your [12] Honor. I could probably find that out for [13] you.

[13] But I don't think it's actually [14] relevant to the question of whether it's covered [15] by attorney-client privilege. But I would be [16] happy to find that information for you if it's [17] available.

[18] SPECIAL MASTER: Okay. All right. [19] Let me just make this observation [20] about this. I understand — I understand what [21] you're saying about learning about, we'll say, a [22] new idea, and what that might turn up.

[23] The opinion here is, I think, [24] moderately thorough, and does, to a certain

**Page 145**

[1] extent, seem to me that the defendants will [2] notice about certain features of patentability, [3] and certain features about obviousness. And some [4] of those elements which, again, gets to be, if [5] you will, I guess, the total corporate knowledge [6] or state of mind of the defendant here.

[7] Even though it's another one, it [8] outlines certain things that can or cannot, if [9] you will, pass muster regarding a patent. And [10] isn't that the — isn't that the sum total of [11] knowledge, if you will, state of mind the [12] defendant has when they're able to function [13] through this field when told this by someone, [14] albeit maybe another patent or closely related [15] one?

[16] MR. DEVLIN: Respectfully, Your [17] Honor, I think not, because you have to judge the [18] patentability of any particular idea on the [19] combination of features that's being disclosed at [20] that time.

[21] So a patent — you look at the [22] combination of elements and determine whether [23] that combination is patentable.

[24] SPECIAL MASTER: I understand.

**Page 146**

[1] MR. DEVLIN: And every analysis is [2] individualized because of that. Every analysis [3] that relates to whether something can be [4] patentable or not is individualized. Even to [5] some extent

the claims within a patent, you have [6] to look at individually.

[7] Certainly patent to patent. And of [8] course, we're — even before the patent stage to [9] patent application, as I understand where this is [10] coming from, no patent application would have [11] been drafted yet.

[12] SPECIAL MASTER: No. But I guess [13] what I'm saying, though, is the author of this is [14] explaining the standards that apply in [15] patentability, and the standards to be avoided, [16] and the steps to be taken, and the like.

[17] I don't want to go into too much of [18] what he's saying here, but there's several pages [19] here back in 1996, how the system works in regard [20] to a matter that's very closely related to what [21] we're talking about in this lawsuit.

[22] I mean, it's not a tire or something [23] like that.

[24] MR. DEVLIN: This document cannot be

**Page 147**

[1] admitted as evidence regarding what the standards [2] for patentability are. Judge, it simply cannot [3] be, I don't think.

[4] SPECIAL MASTER: I am not saying it [5] is right, but knowledge communicated to the [6] defendant of this, of the area of what —

[7] MR. DEVLIN: I see what you're [8] saying, I think. And again, I don't think that [9] there was any — you just simply said — let me [10] just, if I can, ask you a question, Your Honor.

[11] SPECIAL MASTER: Sure.

[12] MR. DEVLIN: It seems to me that [13] you're saying that simply because it sets forth [14] what the standards are, what the legal standards [15] are for patentability, it gives Telecheck some [16] idea of what those standards are and how they [17] might apply.

[18] SPECIAL MASTER: Well, I don't [19] know. Maybe it would stimulate inquiries later on [20] about something that, quite frankly, they once knew [21] about the notion of whether or not a patent —

[22] MR. DEVLIN: I think that would lead [23] to a scope of waiver, Your Honor, that was so [24] extensive to sweep in every — the document that

**Page 148**

[1] related to anything related to patents.

[2] And that — that — I don't think [3] that can be considered properly the scope of [4] waiver, simply because it sets forth what the [5] legal standards were.

[6] The opinions themselves, LML has [7] these. The opinions themselves that

LML Patent Corp.  v.
Telecheck Services, Inc., et al.

**Hearing**
October 25, 2005

Telecheck [8] received set forth what the legal standard is, [9] and there's no debate about what the legal [10] standard is.

[11] The issue is whether applying those [12] standards leads to a certain result. In other [13] words, in this case, with the opinions of [14] counsel, the issue is applying those standards [15] which I don't think anyone disputes what the [16] general standards are applying those. Is the [17] patent valid versus is this thing patented?

[18] SPECIAL MASTER: The reference in [19] here by the author of — there's a comparison, [20] what he's looking at in the '988 —

[21] MR. DEVLIN: Excuse me?

[22] SPECIAL MASTER: There's a [23] comparison between what he's being asked to [24] examine in the Hills '988 patent.

**Page 149**

[1] MR. DEVLIN: I think a brief one is [2] part of an overall examination.

[3] SPECIAL MASTER: Well, I'm saying [4] that's just part of this. I'm simply saying that [5] I think it kind of hits close to home in terms of [6] the — if you will, the knowledge that the [7] defendant has at this juncture about that [8] prospect.

[9] I think it's very — I think it's [10] been waived as to that.

[11] MR. DEVLIN: Thank you, Your Honor.

[12] SPECIAL MASTER: Those are the [13] reasons for that. So 4635 waived.

[14] We ought to take a lunch break now. [15] The court reporter is starving.

[16] MR. McDOLE: We have two more [17] documents. We can finish those up after lunch.

[18] SPECIAL MASTER: Let's not go [19] through it now. All right.

[20] It's about 20 of 1:00. Should we [21] take an hour? Everyone agree on an hour?

[22] MR. DEVLIN: Yeah.

[23] MR. McDOLE: Sounds good.

[24] (A luncheon recess was taken.)

**Page 150**

[1] SPECIAL MASTER: Okay. Before we [2] start, I've seen this in the papers as time has [3] gone on, as time has rolled on here the last [4] several months. And the patent in issue in this [5] trial is '988.

[6] Primarily '988?

[7] MR. McDOLE: Yes, Your Honor.

[8] MR. DEVLIN: It's totally the '988 [9] now, Your Honor.

[10] SPECIAL MASTER: What's the [11] inventor? Who are the inventors of record [12] legally on '988?

[13] MR. McDOLE: The inventors are [14] actually two third parties. They don't work for [15] the company anymore.

[16] Their names are Henry Nichols and [17] Robert Hills. Henry Nichols lives in Washington, [18] D.C., and Mr. Hills lives in Key West.

[19] SPECIAL MASTER: All right. I [20] understood that.

[21] I didn't know if — I just wanted to [22] make sure about that.

[23] Will they be witnesses?

[24] MR. McDOLE: They may be.

**Page 151**

[1] SPECIAL MASTER: They may be. [2] Sometimes I know it happens, sometimes I know it [3] doesn't. But I didn't know if they were or not.

[4] MR. McDOLE: They are certainly on [5] our witness list, and they have been deposed in [6] the case.

[7] SPECIAL MASTER: Oh, okay. Well, [8] these Concord documents go back to early 1999.

[9] They do make reference to the patent [10] in suit here, the patent that's before the Court, [11] even though they're earlier in Concord's — [12] presumably Concord's interest.

[13] So I don't know how we can avoid [14] having these disclosed since First Data merged [15] with or acquired Concord. It just seems to me [16] that we're talking about something that may be of [17] no moment when any of this is explained.

[18] But the fact that these papers do [19] touch upon that, I don't — I'm not entirely sure [20] if — I don't know even — how do you even touch [21] upon it?

[22] But they do touch upon it. And I [23] just don't see how we can avoid having this being [24] part of the reservoir of knowledge that could be

**Page 152**

[1] pertinent to the issues in the case.

[2] MR. DEVLIN: Your Honor, I said — [3] earlier I spoke about this concept —

[4] SPECIAL MASTER: Yeah.

[5] MR. DEVLIN: — that First Data — [6] Telecheck wasn't relying on these opinions.

[7] Telecheck had its own opinion [8] counsel and so forth. We have an order from [9] Judge Robinson.

[10] I don't have an extra copy. I have [11] a single copy, unfortunately. I'll be glad to [12] make a copy.

[13] It's from E.I. DuPont Nemours v. [14] Millenium Chemical Inc., Civil Action 93- [15] excuse me 97-237 SLR. It's a Judge Robinson case [16] from April 1999.

[17] SPECIAL MASTER: Okay.

[18] MR. DEVLIN: And she's talking about

[19] the scope of waiver in a patent case. And she [20] says that "a document is properly within the [21] scope of the waiver created when a defendant [22] produces the opinions of counsel only when said [23] document has been communicated to or otherwise [24] considered by management during the period when

**Page 153**

[1] management has evaluated a patent in its conduct [2] in relation thereto."

[3] So you can see this concept here [4] about how these were documents that the Telecheck [5] management never would have looked at when [6] evaluating its conduct with respect to these [7] patents that happened in the '96 and 1997, I [8] think, early 1998 time frame.

[9] At the time, they had no [10] relationship, you know, no ownership interest or [11] relationship of that sort with Concord. There's [12] nothing in the record that indicates that the [13] management of Telecheck would have been reviewing [14] these opinions of Concord at any time, much less [15] the time it made its decisions about how to [16] implement this product.

[17] There are two later opinions. One [18] comes around in the 2001 time frame and one in [19] 2004.

[20] And those do have information about [21] the '988 patent in there, but they were [22] developed — that 2001 time frame was when the [23] later two patents issued in the case that were [24] previously in this case, the '528 and the '366

**Page 154**

[1] patents. And they're no longer in this case.

[2] And so when you even look at the [3] temporal context of when first — excuse me, when [4] Telecheck was analyzing this patent and making [5] its decisions about what conduct it was going to [6] take part in with respect to these patents, that [7] happened in the '96 time frame or earlier than —

[8] SPECIAL MASTER: That was when?

[9] MR. DEVLIN: That was in — starting [10] in '96, 1997 into 1998. And Telecheck, as far as [11] I know, and as far as I think can be discerned, [12] never had any access to these opinions until [13] Concord was purchased by First Data.

[14] I may have said 2004 before. It [15] might be 2003. I think it was 2004.

[16] SPECIAL MASTER: Sure.

[17] MR. DEVLIN: But in any case, nearly [18] six years after Telecheck began looking at the [19] '988 patent, and five or six years after [20] Telecheck launched its product.

[21] That was in 1998. And, you know, [22]

there was work in '96 to '97 to develop that [23] product, and there was ongoing work with counsel [24] during that time to analyze the '988 patent and

**Page 155**

[1] to make sure that the product that was ultimately [2] launched was outside the scope of that patent.

[3] That work largely ended in 1998, and [4] there was silence until 2000, 2001. There were a [5] couple things that happened then.

[6] But the issuance of the '528 and [7] then about a year or two later, the '366 patent [8] in that 2000, 2001 time frame. So any way that's [9] the real crux of the issue here.

[10] Do these patent opinions that [11] Concord obtained have any bearing on the state of [12] mind that Telecheck's management had at the time [13] that it was making its decisions about how to act [14] in light of the '988 patent? And the facts [15] demonstrate that these opinions had nothing to do [16] with that decision-making process.

[17] SPECIAL MASTER: Okay. So that, [18] pardon me, the operative time period from that [19] approach, Mr. Devlin, puts the decision-making [20] time by Telecheck in the 1996, '97 period.

[21] MR. DEVLIN: Beginning in '96, but I [22] think it's fair to say that that decision-making [23] time period carried through 1998. And like I [24] said, there were later opinions that — there was

**Page 156**

[1] a draft opinion that Telecheck obtained in —

[2] SPECIAL MASTER: Right.

[3] MR. DEVLIN: — mid-2000 or 2001 time [4] frame. And then that opinion was finalized when [5] Telecheck was ultimately sued for infringement in [6] 2004.

[7] SPECIAL MASTER: Yeah. Oral [8] opinion?

[9] Was that reduced to writing or [10] something like that?

[11] MR. DEVLIN: There were written [12] opinions in the '96, '97, '98 time. And there's [13] lots of documentation that wasn't in dispute [14] today that has been produced, you know, letters [15] going back and forth and discussions between [16] counsel and Telecheck.

[17] And so there's a series of — [18] talking about opinions, but letters back and [19] forth, and resulting in final opinions that were [20] provided to Telecheck in the '97, '98 time frame. [21] And then there was sort of a drop off and then [22] again it picks up in the 2000 time frame.

[23] And, again, you see another blip on [24] the radar in 2004 with those two later

two

**Page 157**

[1] opinions being prompted by the issuance of the [2] '528 and the '366 patents, and some accusations [3] by LML at that time of potential infringement.

[4] SPECIAL MASTER: Okay. So the [5] patent opinions that Telecheck is relying on are [6] dated when?

[7] MR. DEVLIN: The patent opinions are [8] in the '96 through '98 time frame.

[9] SPECIAL MASTER: Mm-hmm.

[10] MR. DEVLIN: And the later opinions, [11] like I said, were prompted primarily by the later [12] two opinions in the case.

[13] SPECIAL MASTER: All right.

[14] MR. DEVLIN: And that was just to [15] be — really the crux of the issue is Telecheck [16] designed, and modeled, and launched its system, [17] the one that is accused today in the '97 and [18] '98 — sorry, started maybe '96, but '97 and '98 [19] time frame.

[20] And by the middle of 1998, that [21] system was commercialized and launched in the [22] marketplace. And that's what's accused of [23] infringement.

[24] MR. McDOLE: You're going to hear —

**Page 158**

[1] we're talking about a continuing pattern of [2] willful infringement that LML is claiming. It [3] started in 1997 and continued through to the date [4] of trial.

[5] And it continues on today. This is [6] a continuing defense.

[7] This isn't something that started in [8] '97, stopped in 2000, and then started again in [9] 2004. You can't base a waiver of privilege based [10] on, all right, Well, we'll go from '96 to '2000 [11] here.

[12] We'll skip over a few years. Then [13] we will go to 2004.

[14] As Mr. Devlin submitted, there's [15] several opinions. There's a conduct of getting [16] these opinions '96, '97 '98 '99, 2000.

[17] If there's a drop off, I don't know [18] if there really is. Maybe there is a drop off [19] there, because they got the Concord opinions.

[20] That's when it happened. They [21] didn't feel they needed to go get more. They [22] adopted that. They got more opinions as of the [23] date of trial.

[24] This is a continuing pattern of

**Page 159**

[1] receiving this legal advice over a long period of [2] time. As far as these documents go, as far as [3] Telecheck's management goes, these documents were [4] in the possession of Telecheck.

[5] The quote from Judge Robinson's case [6] is directly at issue that supports the

argument [7] of these documents that were in the possession of [8] Telecheck. When the two companies merged, [9] Telecheck had those documents in their hand.

[10] You have personnel that [11] acknowledges — ends up with the personnel that [12] are imputed over.

[13] SPECIAL MASTER: What was the [14] '682 patent?

[15] MR. McDOLE: The '682 patent is what [16] we refer to as the VeriFone patent. That is the [17] main piece of prior art that Telecheck is relying [18] on to invalidate the '988 patent in this case.

[19] So I don't think you can —

[20] SPECIAL MASTER: Well, that's the [21] thing that actually kind of troubles me. It's [22] kind of hard to see the bright line here, you [23] know.

[24] MR. DEVLIN: If I may address two

**Page 160**

[1] points, Your Honor.

[2] SPECIAL MASTER: Sure.

[3] MR. DEVLIN: Two things that [4] Mr. McDole just said.

[5] He said that maybe Telecheck in 1999 [6] received these Concord opinions, and that's what [7] prompted them to stop. That's what's not in the [8] record at all.

[9] The record completely contradicts [10] that concept. We need to be absolutely clear [11] about what happened here.

[12] Concord obtained these opinions. [13] There's nothing anywhere in the record or [14] otherwise of which I'm aware that suggests that [15] Telecheck obtained these opinions before that [16] time. I mean, before the time that the parent [17] company ended up purchasing Concord.

[18] And there's another quote from this [19] opinion by Judge Robinson. And I'm on the second [20] page.

[21] It's a non-published order. I'll [22] get copies of this to everybody.

[23] And this opinion, as I can discern [24] from it, related to a situation where there was a

**Page 161**

[1] document that was provided before the patent had [2] issued as sort of an opinion before the patent [3] had issued. It predates the patent.

[4] But the key is, as you will see from [5] this quote, that nothing in the record indicates [6] that that document bears on the decision-making [7] process of management; and therefore, the [8] document is not discoverable.

[9] We're not talking about [10] admissibility here. We're talking about [11] discoverable information in the context of a [12] waiver of opinion of counsel.

[13] This is the quote, "generally then a [16] document, which predates the patent at issue, is [15] not discoverable unless the record indicates that [16] it was brought to bear on the decision-making [17] process."

[18] Now, these documents here, they're [19] not before the patent issued, but they're long [20] after Telecheck implemented its system and its [21] management made decisions about how to do that. [22] And there's absolutely nothing in this record [23] that indicates that the Telecheck management ever [24] relied on these Concord opinions for any part of

Page 162

[1] its decision-making process, either in the 1997 [2] '98 time frame, or in the 2000 time frame, or [3] even in the 2003, 2004 time frame, which was when [4] First Data purchased Concord.

[5] At no time is there anything in the [6] record that suggests that those Concord opinions [7] impacted Telecheck's management's decision-making [8] process in any way. And as you can see from this [9] case from Judge Robinson, that's really the crux [10] of where the scope of waiver reaches.

[11] Outside of that, the information is [12] not discoverable. That's the ruling from this [13] case.

[14] MR. McDOLE: And Your Honor, I would [15] just say that the fact of doing nothing is [16] affecting a decision making. If they received [17] these patents and did nothing, that's affecting [18] their decision making.

[19] They don't have to make an [20] affirmative act to go and do these tasks. They [21] were clearly in the possession of Telecheck.

[22] SPECIAL MASTER: Well, I think the [23] yeah when Concord was acquired by First Data; [24] right?

Page 163

[1] MR. DEVLIN: Yes.

[2] SPECIAL MASTER: And actually, was [3] Concord a going enterprise?

[4] MR. DEVLIN: Concord was a going [5] enterprise.

[6] SPECIAL MASTER: Did they disappear [7] and become part of Telecheck?

[8] MR. McDOLE: They're not part of [9] Telecheck. I think they are still — I think [10] they're still an independent entity called [11] Concord First Data.

[12] It's a wide-ranging company. It's [13] all sorts of subsidiaries. I think they maintain [14] the subsidiary as an independent operating entity [15] in some way.

[16] I'm not sure what happened to [17]

Concord here, apart from the fact that I'm fairly [18] sure it wasn't integrated with Telecheck. So [19] there's no combination like that.

[20] MR. McDOLE: Your Honor, if that's [21] the case, then they're in possession of [22] Telecheck, and it's a third-party waiver. I [23] mean, it can't be a separate entity. Telecheck [24] has possession of the documents.

Page 164

[1] So...

[2] MR. DEVLIN: I don't think that's [3] proper argument, Your Honor. They're both First [4] Data Company.

[5] SPECIAL MASTER: I just didn't know [6] how it evolved. Okay.

[7] Let me say, first of all, I went [8] through all these papers, and I think half of [9] them are just duplicates. You know how Emails [10] just get, they kind of repeat.

[11] So it's not this great treasure cove [12] of information. The only thing that gets me is [13] that I understood that LML will hope to and [14] presumably expects to offer some proof of ongoing [15] conduct pertinent to this patent.

[16] And for that reason, knowledge that [17] Telecheck has, it seems to be pertinent if it's [18] consistent with or if it corroborates something [19] was being done. Now, maybe it doesn't.

[20] Maybe Telecheck has a totally [21] plausible explanation for things like that. But [22] it just seems to me that prima facie, LML should [23] be permitted to offer any evidence it has that [24] shows knowledge by Telecheck of the interest in

Page 165

[1] comparison of patents at issue with other [2] patents.

[3] I mean, I just think that's [4] pertinent. It may be totally benign in terms of [5] being persuasive, but I don't think you can shut [6] it out, that it may be repetitious of something [7] else. And it may be the time segments that you [8] mentioned, Mr. Devlin, this '96, '97 time period [9] is the period that Telecheck will focus upon as [10] being the time when it was developing its [11] policies and strategies.

[12] But LML has a different idea that [13] presumably they will be offering evidence that [14] it's not confined to that box, that other things [15] have happened.

[16] I just think — and I can understand [17] that. I don't know if they'll get anywhere with [18] that, whether it will be persuasive or whether it [19] may be deemed admissible by the trial judge.

[20] But it just seems to me, as I read [21] these documents, we're talking about [22] important — well, the reference leads

to the Hills invention. [23] That is all I'm saying.

[24] Maybe it's meaningless. Maybe it's

Page 166

[1] too early.

[2] Maybe it's repetitious. Maybe it's [3] so speculative, it's not admissible.

[4] But the fact that it's here at this [5] juncture, I just think they should see it.

[6] Again, we're talking about a [7] relatively stiff defense being raised here by [8] Telecheck, which allows a corresponding, I think, [9] wider opportunity for LML to see information to [10] meet that defense.

[11] So I know what you're saying, and I [12] think it's — I think you're sincere making it. [13] I think you have good ground to make it, but you [14] just — these Concord papers are discoverable.

[15] So for that reason, they'll be [16] deemed discoverable. And then number — I think [17] you have the numbers we cited somewhere.

[18] MR. DEVLIN: Thank you, Your Honor.

[19] I think we put those into the record [20] earlier. I don't think there will be an issue.

[21] SPECIAL MASTER: I might say some [22] of them are duplicates. You just can't help it. So [23] they're deemed waived.

[24] Okay. Do you have another document?

Page 167

[1] Any others?

[2] MR. McDOLE: Just two more documents [3] left, Your Honor.

[4] SPECIAL MASTER: Yes.

[5] MR. McDOLE: It's a document [6] identified as 3117 on Telecheck's privilege log. [7] I believe it's the first page of part six.

[8] It is a document from October 1998 [9] from an author of James Price to what appears to [10] be a number of individuals. Three individuals at [11] Telecheck.

[12] With the description correspondence [13] containing legal advice from attorney re patent [14] review.

[15] Again, this is a situation — I'm [16] not sure what the patent review is, but based on [17] being on the privilege log and assuming that that [18] document is going to be relevant —

[19] SPECIAL MASTER: The date?

[20] MR. McDOLE: October 6th, 1998. [21] Based on the record, patent review and being on [22] the log, I believe it's '988.

[23] SPECIAL MASTER: Maybe it's some [24] relationship to what we are talking about here.

Page 168

[1] MR. DEVLIN: Your Honor, the accused [2] product is called the ECA service, electronic [3] checking acceptance service. This is a document [4] related to patent review for a different [5] Telecheck product.

[6] SPECIAL MASTER: That seems to be [7] the — so the plain meaning that's here would [8] suggest that to search for a new — in a new [9] design that's titled totally different than any [10] other title I've seen in the case. I'll take [11] counsel's word that it's a totally different [12] product.

[13] So privileged.

[14] MR. McDOLE: That's fine with us, [15] Your Honor, —

[16] SPECIAL MASTER: Yeah.

[17] MR. McDOLE: — if that's the case.

[18] SPECIAL MASTER: Okay. FDC 3117, [19] attorney-client privilege is allowed.

[20] And I think we're using M. Are we [21] using M?

[22] I think. I forget.

[23] MR. McDOLE: Your Honor, the last [24] document we have is a document identified on the

Page 169

[1] July 28th privilege log as 766090. It is a [2] document dated October 22nd, 2002 from David [3] Smith to a recipient of Data Treasury. The [4] description is correspondence reflecting legal [5] advice from legal counsel re patent information.

[6] Your Honor, Data Treasury is a [7] company that Telecheck is in a lawsuit with down [8] in Texas. When we talk about other litigation, [9] Data Treasury has sued Telecheck in Texas for [10] patent infringement. This is a third party.

[11] I assume that by the word patent [12] information that they're referring to patents in [13] that case and not this case. I don't know, [14] because I haven't seen the document.

[15] But this has been to a third party [16] who's been waived.

[17] MR. DEVLIN: I think there's a [18] little bit of a misconception on behalf of [19] Mr. McDole. There was a — this document [20] relates to the collection of documents for that [21] Data Treasury case, including a collection of [22] documents that was placed in a folder called Data [23] Treasury.

[24] And it by itself is a privileged

Page 170

[1] document, and a work product document that [2] relates to the efforts by counsel regarding the [3] collection of documents for that case.

[4] The underlying documents, as I [5] understand it, are documents that would

have been [6] produced in this case if they're still in [7] exhibits or attachments to that Email.

[8] SPECIAL MASTER: David Smith is?

[9] MR. DEVLIN: David Smith is an [10] employee of Telecheck. He's in the — he's a [11] designer. An engineer in Telecheck's — not an [12] engineer by background, but by trade he is these [13] days.

[14] SPECIAL MASTER: And he's sending [15] this to Data Treasury.

[16] MR. DEVLIN: Data Treasury was the [17] name of a folder that was created within [18] Telecheck to facilitate the collection of [19] documents for the Data Treasury litigation, which [20] was among the collection of documents that we [21] utilized in this case to produce to LML.

[22] So that document reflects the [23] activities of collecting documents in the midst [24] of a litigation. It was created for the very

Page 171

[1] purpose of transmitting stuff to attorneys. [2] That's part of a collection of documents in [3] litigation.

[4] SPECIAL MASTER: And you're saying [5] for that other lawsuit?

[6] MR. DEVLIN: Yes.

[7] SPECIAL MASTER: Well, it doesn't [8] contain much, bottom line. What are all these [9] symbols on here?

[10] MR. DEVLIN: I think those are [11] attachments, as I understand it. I'm not sure [12] if that document was provided to someone in hard [13] copy or whether, in other words, it's some older [14] document, or whether that Email is a printout of [15] an electronic Email that was sent to that folder, [16] which is what I suspect.

[17] If it was, then the attachments [18] themselves also would have been printed out or [19] provided in electronic form.

[20] SPECIAL MASTER: Tell me what [21] HTML means.

[22] MR. DEVLIN: HTML is higher text [23] markup language. It's basically a web document, [24] a web page.

Page 172

[1] So someone may have taken a copy of [2] a part of a web page or a document that's on the [3] web page. It may not be a web page itself that [4] gives you a sense it's a public document or [5] something.

[6] But often documents that are placed [7] on even internal intranets as opposed to [8] internets will get an HTML extension.

[9] MR. McDOLE: From what I'm hearing, [10] it sounds like they're just putting documents in [11] a folder with this. I'm

not sure why that's [12] privileged.

[13] SPECIAL MASTER: It sounds like [14] what?

[15] MR. McDOLE: I am not sure why it's [16] privileged if they're just putting production [17] documents. It's a collection of documents, and [18] they're just putting it in a single folder.

[19] At the very least, I'd like to make [20] sure that we have those documents and maybe [21] there's some indication on that, although it [22] doesn't sound like they're relevant, and I don't [23] care at all.

[24] MR. DEVLIN: The document is

Page 173

[1] reflected of work product in the patent case in [2] collection of documents in the midst of a [3] litigation.

[4] SPECIAL MASTER: Well, I'm not sure [5] why it's responding to a document request. I'll [6] rely on counsel's representation, it has to do [7] with an unrelated litigation in Texas and a [8] transmittal by Mr. Smith in that regard; [9] right?

[9] MR. DEVLIN: That's correct, Your [10] Honor. And it is an internal transmission within [11] Telecheck.

[12] SPECIAL MASTER: I'll say it's [13] privileged.

[14] MR. DEVLIN: Thank you, Your Honor.

[15] SPECIAL MASTER: 766090 preceded by [16] FDC.

[17] MR. DEVLIN: Your Honor, can I have [18] those copies back?

[19] MR. McDOLE: I think that's it, Your [20] Honor.

[21] SPECIAL MASTER: All right. Thank [22] you, counsel.

[23] And I know I have — I have a couple [24] letters from you with a couple loose ends that

Page 174

[1] we'll address when we get a chance. [2] I want to give these to you, also. [3] Give these back to you. Okay. This and this. [4] This group. That's one group.

[5] MR. DEVLIN: This is the Concord [6] group.

[7] SPECIAL MASTER: And then here's [8] 4655 and 4652.

[9] MR. DEVLIN: Thank you.

[10] SPECIAL MASTER: They're your [11] copies you gave to me, and then you'll be [12] providing Mr. McDole with some documents. And I [13] have two log sheets of yours, Mr. McDole.

[14] MR. McDOLE: Thank you.

[15] SPECIAL MASTER: And we'll work on [16] a couple matters we still have pending. I have a [17] couple — I know I

**LML Patent Corp.  v.**
**Telecheck Services, Inc., et al.**

still have one involving, was [18] it Hills'
deposition or something?

[19] MR. McDOLE: Yes, Your Honor.

[20] MR. DEVLIN: Yes.

[21] SPECIAL MASTER: Four or five [22]
documents.

[23] I'm halfway through that. We'll get [24]
to that.

---

Page 175

[1] We'll get to that. Okay.

[2] MR. McDOLE: Okay. Would you like [3]
us to put, as with the Echo hearing,
together a [4] chart with your rulings?

[5] SPECIAL MASTER: Yes. I'd like you [6]
to make a chart of this.

[7] And mostly this will be a W, [8]
withheld. Where privilege is allowed, it
will be [9] a Y, yes.

[10] And then we use whatever the code
[11] is. I think it was F for attorney-client
[12] privilege.

[13] MR. McDOLE: Okay. You said F or W
[14] withheld. I think you meant waived,
just so the [15] record is clear.

[16] SPECIAL MASTER: Yeah. I meant Y
[17] for yes.

[18] MR. McDOLE: Okay.

[19] SPECIAL MASTER: And if you use a
Y, [20] then I want you to put the F.

[21] MR. McDOLE: Right. I meant W.

[22] SPECIAL MASTER: W is all it takes.
[23] W just means waived.

[24] MR. McDOLE: Okay.

---

Page 176

[1] SPECIAL MASTER: All right. Thanks,
[2] counsel.

[3] And I want the record to note that I [4]
think counsel here are — I think they're
doing [5] the very best they can for their
clients, I think [6] in a highly professional
way.

[7] I think there are differences here, [8] of
course, but I've received all the argume-
nts, I [9] think, with the spirit of sincerity,
which I [10] think they're made.

[11] And as they say, you've got to call [12]
balls and strikes; right? And I'm doing the
best [13] I can.

[14] MR. DEVLIN: Thank you very much
for [15] your time and assistance.

[16] MR. McDOLE: Your Honor, as with
[17] Echo, may we make an application
for fees?

[18] SPECIAL MASTER: Yeah, you may
do [19] so.

[20] MR. McDOLE: Thank you.

[21] SPECIAL MASTER: My allowing you
to [22] do so is no indication that I agree
with that. [23] But I think you should be
allowed to do that. [24] Sure.

---

Page 177

[1] MR. McDOLE: Thank you.

[2] MR. DEVLIN: Thank you. [3] We, of
course, object to the [4] application.

[5] SPECIAL MASTER: I'm sure you do.

[6] MR. DEVLIN: Thank you.

[7] SPECIAL MASTER: All right. Thank [8]
you.

[9] Thanks, court reporter. Thank you [10]
very much.

[11] I have the log of the 60 or so [12]
documents that we did.

[13] Do you want me to keep these [14]
documents?

[15] MR. DEVLIN: The only — we may,
you [16] know, appeal some of your
decisions.

[17] SPECIAL MASTER: That is right.

[18] MR. DEVLIN: I'm not sure of the [19]
procedural aspect of that and whether
anything [20] could actually come back
down to you.

[21] SPECIAL MASTER: I guess it could.
[22] I guess if Judge Robinson —

[23] MR. DEVLIN: Provide some guid-
ance.

[24] THE COURT: — reviews something
and

---

Page 178

[1] says, Well, I recommend we revisit
certain series [2] of documents, that
could happen.

[3] MR. DEVLIN: If they are a pain to [4]
carry, we can box them and send them
back up to [5] you.

[6] SPECIAL MASTER: Oh, no, because it
[7] will come a time when this is all over,
I'll [8] probably shred this stuff in my
office.

[9] So...

[10] MR. DEVLIN: Join the club.

[11] SPECIAL MASTER: I'm not asking
you [12] to take it now, but I will give back
this [13] transcript that was furnished to
me, —

[14] MR. HERRMANN: Certainly.

[15] SPECIAL MASTER: — because I do
have [16] one in the office. I appreciate
you giving me [17] that.

[18] I did check over lunch for a couple
[19] entries that I wanted to have. Thank
you very [20] much.

[21] (Court was recessed at 2:19 p.m.)

---

Page 179

State of Delaware          )
New Castle County          )
    CERTIFICATE OF REPORTER
    I, Heather M. Triozzi, Registered
Professional Reporter, Certified Shorthand
Reporter, and Notary Public, do hereby certify
that the foregoing record, Pages 1 to 179
inclusive, is a true and accurate transcript of
my stenographic notes taken on October 25, 2005,
in the above-captioned matter.

IN WITNESS WHEREOF, I have hereunto
set my hand and seal this 26th day of October,
2005, at Wilmington.

        Heather M. Triozzi, RPR, CSR