# EXHIBIT 12

# In The Matter Of:

*LML Patent Corp.   v.*
*Telecheck Services, Inc., et al.*

---

*Hearing*
*October 12, 2005*

---

*Hawkins Reporting Service*
*715 N. King Street, Suite 3*
*Wilmington, DE   19801*
*(302) 658-6697*

Original File 101205–1.TXT, 204 Pages
Min-U-Script® File ID: 1345542299

## Word Index included with this Min-U-Script®

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
LML PATENT CORP.,)
         Plaintiff, )
              ) C.A. No. 04-858 SLR
v.        )
TELECHECK SERVICES, INC.,)
ELECTRONIC CLEARING HOUSE,)
INC., EXPRESSCHEX, INC.,)
and NOVA INFORMATION )
SYSTEMS,   )
         Defendants.  )
      Wednesday, October 12, 2005
              9:50 a.m.
            Courtroom 2B
BEFORE:  SPECIAL MASTER LOUIS C. BECHTLE
    APPEARANCES:
MORRIS, JAMES, HITCHENS & WILLIAMS, LLP.
    BY:  RICHARD K. HERRMANN, ESQ.
            -and-
        KIRKLAND & ELLIS, LLP
    BY:  JAMIE H. McDOLE, ESQ.
        Counsel for the Plaintiff

**Page 2**

APPEARANCES CONTINUED:
    CONNOLLY, BOVE, LODGE & HUTZ, LLP
    BY:  RICHARD K. HERRMANN, ESQ.
            -and-
    BELASCO, JACOBS & TOWNSLEY, LLP
    BY:  DONALD MIN, ESQ.
        Counsel for the Defendants
        Electronic Clearing House, Inc.
        and Xpresschex, Inc.

**Page 3**

[1] SPECIAL MASTER: All right. I think [2] what we probably should do is just state for the [3] transcript, we'll make a record of the [4] appearances. But we're here in the USDC [5] Courthouse in Wilmington, Delaware on Wednesday, [6] October 12th in Courtroom 2B at about 20 of [7] 10:00.

[8] And the appearances are as follows. [9] Counsel.

[10] MR. HERRMANN: Richard Herrmann for [11] Morris James for the plaintiff.

[12] MR. McDOLE: Jamie McDole from [13] Kirkland & Ellis for the plaintiff.

[14] MR. DIGIOVANNI: Frank DiGiovanni [15] from Connolly Bove for defendants, Expresschex [16] and ECHO.

[17] MR. MIN: And this is Don Min for [18] defendant, Electronic Clearing House and [19] Expresschex.

[20] SPECIAL MASTER: All right. And I [21] am Louis C. Bechtle, a special master appointed [22] by Judge Robinson to serve in respect to [23] discovery matters. And while we're on that, as [24] we know, at least in this part of the country,

**Page 4**

[1] it's a long-standing practice, if not a custom, [2] that when persons serve as judges retire, they [3] often are referred to with respect to sometimes [4] affection as Judge, and that happens to me. I've [5] been retired about four years.

[6] And that's — it's something that I [7] don't seek out. I don't require it.

[8] Indeed, I don't even always expect [9] it. I don't discourage it.

[10] So it makes it easier in the normal [11] communication between myself and the persons I [12] deal with, and I'm now in private practice in law [13] in Philadelphia. So that's how that works. [14] That's very good.

[15] However, in this case, there's only [16] one judge, and that's Judge Robinson. So I think [17] I'm going to ask counsel in respect to this [18] transcript that I'll just be referred to as [19] either Mr. Bechtle or Discovery Master, and not [20] judge, because that could get confusing because [21] we do have some court orders in place here.

[22] So with that background, we'll [23] proceed. We're here to review portions of the [24] privilege log of July the 28th that was provided

**Page 5**

[1] by ECHO, one of the defendants in this case.

[2] The privilege log was developed over [3] a period of time and correspondence reflects [4] that. And there came a time when, because of [5] differences between the defendants in this [6] instance, just today ECHO and the plaintiff, LML [7] Patent Corporation, as I'll refer to as LML, came [8] at a time beginning in July when the parties [9] working with a special master provided some information, [10] some explanation.

[11] And ultimately, on August the 18th, [12] LML filed a letter motion seeking production of a [13] number of documents on the July 28th ECHO log.

[14] Following that, and discussion about [15] that, and some meet and confer sessions that have [16] been several, I suggested that there be provided [17] to the special master for in camera review what [18] turned out to be, am I correct, 88 documents? [19] Something like that.

[20] Was it 82 or 88?

[21] MR. DIGIOVANNI: Your Honor, [22] actually it ends up being less than that that we [23] will be providing you.

[24] SPECIAL MASTER: I know that, but

**Page 6**

[1] originally I think there were 50 for the [2] plaintiff to pick at random selection, and then [3] an additional 10. But they didn't all involve [4] ECHO.

[5] MR. DIGIOVANNI: No.

[6] SPECIAL MASTER: I'm just saying [7] they picked them for all parties.

[8] MR. DIGIOVANNI: Okay.

[9] SPECIAL MASTER: And a very smaller [10] number involved ECHO, because there was some [11] overlap in the plaintiff's motion. So as a [12] consequence of that, they were reviewed, and the [13] special master issued a order that commented [14] about the special

**Page 7**

[1] documents, as well as the inference, to the [2] extent that it had any, on the parties by special [3] discovery master order number three.

[4] Now, that said, I would assume we'll [5] go over those documents, hear some reference as [6] to the parties' concern on the documents that [7] remain.

[8] I've since been referring status [9] between the ruling on order number three and [10] today have been provided with a list of attorneys [11] that appear on the July 28, 2005 privilege log. [12] And, also, a list of non-attorneys.

[13] The discovery master requested this [14] information, because there are many names [15] appearing on the log that are not known to the [16] special master. They're known presumably, [17] certainly to ECHO, and in many instances, [18] presumably by LML.

[19] And I expect that in the meet and [20] confer sessions, there was some discussion about [21] who certain of these people were. So that's [22] where we are.

[23] And I'll hear counsel as to their [24] view as the best way to proceed. In the absence

**Page 8**

[1] of any ticket requirements, I expect we get the [2] first document challenged and see where we stand [3] on that.

[4] MR. McDOLE: Your Honor, I believe [5] that sounds good. There may be — I suggest we [6] just go one by one down the privilege log as ECHO [7] has produced it.

[8] And there are some documents that [9] have been produced that there was a question in a [10] meet and confer after letters had been filed.

[11] SPECIAL MASTER: Okay.

[12] MR. McDOLE: And we have [13] subsequently gone and checked with respect to a [14] lot of those documents, and we do have those. So [15] I think as we come to those, we can simply say [16] those were produced; that issue is resolved.

[17] However, this morning we were

given [18] a log of documents that have been produced with [19] the Bates numbers. And there's some additional [20] documents on here that we are finding out for the [21] first time today this morning that those [22] documents have allegedly been produced by ECHO.

[23] For instance, in their August 25th [24] letter to Your Honor, they identify seven

### Page 9

[1] documents as being produced, and that's what [2] prompted us to go back and check our documents. [3] And these documents are nowhere on there.

[4] So I don't know how Your Honor would [5] like to handle those. I would like the [6] opportunity to be able to check that. If ECHO [7] didn't know they had produced it as of August [8] 25th, I'm a bit skeptical as to what those [9] documents are.

[10] And I'd at least like to check out [11] what those documents say, and make sure that they [12] correspond to the descriptions on the log.

[13] SPECIAL MASTER: All right. Well, [14] let me see if we can, so anyone who reads this [15] transcript will know what we're talking about. [16] Can you hear us, Mr. Min?

[17] MR. MIN: Yes, I can. But I'm [18] having a problem hearing counsel.

[19] SPECIAL MASTER: Oh, okay. Let's do [20] this, let me make this suggestion. If it's all [21] right, when counsel speak, it may be better for [22] them to come to the lectern, and then speak into [23] that telephone microphone.

[24] Can you do that? It's a little

### Page 10

[1] inconvenient, but in order to keep Mr. Min in the [2] loop here, I think we should do that.

[3] Do you want to just come up and [4] summarize what you said just a minute ago, [5] Mr. McDole, on behalf of LML?

[6] MR. McDOLE: Sure. I think the best [7] way to proceed is to simply go through the [8] privilege log in the order in which it was [9] provided by ECHO Documents 1 through 75. There's [10] some documents that were not challenged.

[11] There are also some documents which [12] the parties met and conferred on in ECHO's April [13] 25th, 2005 letter to Your Honor, in response to [14] LML's letter motion to compel.

[15] ECHO had provided a list of [16] documents that have been produced.

[17] SPECIAL MASTER: What was the date [18] of that letter?

[19] MR. McDOLE: August 25th, 2005.

[20] SPECIAL MASTER: I thought you said [21] April. August 25th.

[22] August 25th?

[23] MR. McDOLE: Yes. So at that point, [24] LML had checked its documents. Mr. Min had given

### Page 11

[1] us an approximate time of when those documents [2] had been produced.

[3] We were able to go through lining [4] those documents up with respect to the claims in [5] the April 25th letter, and it satisfied ourselves [6] with respect to, approximately, 15 documents.

[7] However, this morning, ECHO's [8] counsel provided me with a list of documents that [9] had been produced. And in addition to the [10] documents identified in the August 25th, 2005 [11] letter, identified approximately seven more [12] documents that it now claims have been produced, [13] and apparently along with the other documents.

[14] And the only question I have is how [15] Your Honor would like to handle this?

[16] SPECIAL MASTER: Okay. Well, let [17] me make this suggestion, and then I'll hear from [18] counsel.

[19] I know you'll take this the right [20] way, but I'm not interested in what you produced. [21] Okay.

[22] I'm interested in what's not been [23] produced and is challenged. That's the way we [24] should approach.

### Page 12

[1] In other words, LML has certain [2] challenges, and ECHO has produced certain things. [3] Okay.

[4] That's off the table. Right. If [5] that's true.

[6] MR. McDOLE: And that's the [7] question, Your Honor. For most of these, I agree [8] that those are off the table.

[9] But just this morning for the first [10] time, we were told these documents were produced, [11] and we have no idea with respect to these certain [12] documents whether they have or not.

[13] SPECIAL MASTER: You mean there-[14] 's seven documents?

[15] MR. McDOLE: Yes.

[16] SPECIAL MASTER: Let's put that over [17] to the side. I think the best thing is for you [18] just to discuss that with counsel, and see the [19] extent to which there's some miscommunication [20] about that.

[21] MR. McDOLE: Okay. And we can just [22] check our records.

[23] SPECIAL MASTER: They have been [24] produced. Maybe if they're lost somewhere, get

### Page 13

[1] another copy, unless they're extensive

or [2] something. I'm not going to worry myself about [3] those unless it's a genuine dispute that they say [4] have been produced, you say we don't have them. [5] Then either you have to get another copy and find [6] out what that means.

[7] Okay. Let's put that aside.

[8] MR. McDOLE: Okay.

[9] SPECIAL MASTER: I think what we [10] want to do is get the very first document on the [11] log that has not been produced that you believe, [12] Mr. McDole, should be produced. That's why we're [13] here, and we want to review that with ECHO.

[14] MR. McDOLE: Okay. Would you like [15] me to go to the first document or would you —

[16] MR. DiGIOVANNI: Could I say one [17] thing?

[18] SPECIAL MASTER: By all means.

[19] MR. DiGIOVANNI: A couple things, [20] Your Honor.

[21] The chart that I provided to [22] Mr. McDole this morning addresses a comment on [23] Page 3.

[24] SPECIAL MASTER: Do I have that?

### Page 14

[1] MR. DiGIOVANNI: The chart?

[2] SPECIAL MASTER: Whatever you're [3] reading from, do I have a copy?

[4] MR. DiGIOVANNI: Yeah. It's a [5] September 1, 2005 letter from plaintiff's [6] counsel.

[7] Any way, I know you don't want to [8] deal with documents that were already produced. [9] I want to make this very short.

[10] SPECIAL MASTER: I have it here, [11] September 1 letter.

[12] Yeah, I have it.

[13] MR. DiGIOVANNI: On Page 3, under [14] the Roman Numeral II heading, the first [15] subheading says Documents 1, 4 through 8, 10 [16] through 11.

[17] SPECIAL MASTER: I have it. I see [18] it.

[19] MR. DiGIOVANNI: Those are 16 [20] documents that, remember, they asked in that [21] paragraph for us to identify where they were [22] produced. So we did that.

[23] And that's what this chart [24] represents. And this chart also contains other

### Page 15

[1] documents that had been produced in this case.

[2] So the chart was meant to assist [3] them and, in fact, address an exact point that [4] they asked for in a letter. That's all the chart [5] does. And it makes it easier

LML Patent Corp.  v.
Telecheck Services, Inc., et al.

Hearing
October 12, 2005

for everybody.

[6] SPECIAL MASTER: All right. [7] I think we can save a lot of time [8] here.

[9] MR. DIGIOVANNI: Okay. And the next [10] thing, Your Honor —

[11] SPECIAL MASTER: No. Let me finish [12] this first.

[13] MR. DIGIOVANNI: Okay.

[14] SPECIAL MASTER: Anything that ECHO [15] says has been produced that LML says we don't [16] have it, that we're talking about; right?

[17] MR. McDOLE: Mm-hmm.

[18] SPECIAL MASTER: We don't think we [19] have it, that's something you just have to work [20] out.

[21] MR. McDOLE: Okay.

[22] SPECIAL MASTER: And for some [23] reason, it's lost, or missing, or whatever, then [24] unless it's burdensome, then I guess ask them to

Page 16

[1] provide another copy. And if it's extensive, I [2] guess, you could reasonably expect them to pay [3] for it, if you have to work that out.

[4] So there's no dispute about those. [5] It's just where we are. That's kind of where we [6] are with those.

[7] All right. So I think that's the [8] end of that topic.

[9] The next topic is what documents [10] exist that LML believes it should have that ECHO [11] says is not required to produce. That's the very [12] first document, wherever it is on the log.

[13] Let's look at it, and take it from [14] there.

[15] MR. DIGIOVANNI: Thank you, Your [16] Honor. Right before we do that, I want to hand [17] to you a redwell folder that contains in it [18] individual manilla folders containing each of the [19] documents that, based on our review of the [20] papers that are now back and forth, are still in [21] dispute. So you can make the in camera review.

[22] SPECIAL MASTER: Okay.

[23] MR. DIGIOVANNI: Also included in [24] this redwell folder are privileged Documents 4

Page 17

[1] and 5, which have been produced. But I recall [2] Your Honor asking to see those documents, because [3] they, in fact, are the two opinions of counsel [4] that have been produced in this case. So these [5] are documents that are produced; however, [6] potentially they bear a relationship to the scope [7] of the waiver that we'll be talking about.

[8] SPECIAL MASTER: Okay.

[9] MR. DIGIOVANNI: Now —

[10] SPECIAL MASTER: And does [11] Mr. McDole have the same sequence and the same [12] order that you have?

[13] MR. DIGIOVANNI: These are the [14] privileged documents, so Mr. McDole does not have [15] these.

[16] MR. DIGIOVANNI: Oh, let me see [17] these.

[18] MR. DIGIOVANNI: He does have the [19] opinions of — two opinions of counsel.

[20] SPECIAL MASTER: Of course.

[21] MR. DIGIOVANNI: If I can make one [22] note, also, I'm going to hand to you a clean copy [23] of the privilege log.

[24] SPECIAL MASTER: I appreciate that.

Page 18

[1] Thanks.

[2] MR. DIGIOVANNI: Because, in fact, [3] while we were provided with a color coded one, we [4] found that very difficult to use, and we [5] preferred —

[6] SPECIAL MASTER: I did mention it in [7] my letter that I had that that would be [8] important. This is probably a better way to do [9] it.

[10] MR. DIGIOVANNI: Your Honor, the [11] envelope or the folder containing the two [12] opinions of counsel, I will note that one of the [13] opinions of counsel is on United States Patent [14] '988. Actually it's 5,484,988. And the other [15] U.S. —

[16] SPECIAL MASTER: Make sure she can [17] hear you.

[18] MR. DIGIOVANNI: And the other U.S. [19] patent is — okay. I can do that.

[20] The two opinions of counsel, I'll [21] use Bates numbers as counsel has requested.

[22] One of them is dated May 5th, 2000, [23] and it — and the re line of the document is U.S. [24] patent 5,484,988. And it's Bates stamped ECHO

Page 19

[1] OP000244 through 271.

[2] And the second one is formally known [3] as privilege Document Number 4 dated March 7, [4] 2003. Reference United States patent 6,164,258.

[5] SPECIAL MASTER: Not too fast. The [6] court reporter has to get all of this down.

[7] MR. DIGIOVANNI: And it's Bates [8] stamped ECHO OP000001 through 000042.

[9] SPECIAL MASTER: All right.

[10] MR. DIGIOVANNI: I'll hand this to [11] you, Your Honor.

[12] I will note that the opinion of [13] counsel marked Number 4 pertaining to U.S. patent [14] '528 is no longer an issue in this case. I don't [15] know if Your

Honor is aware that two of the three [16] patents in this case have been dismissed.

[17] So while this case had been [18] proceeding along as an infringement case on three [19] patents, —

[20] SPECIAL MASTER: Right.

[21] MR. DIGIOVANNI: — it is now only an [22] infringement case on one of the patents, the '988 [23] patent.

[24] SPECIAL MASTER: All right. Well, I

Page 20

[1] think as long as this opinion plays some part, [2] we'll keep it in the record.

[3] It may end up to have no meaning or [4] may end up to be duplicate of something. But I [5] think we'll just keep it as you presented, Mr. [6] DiGiovanni. And I'll refer to it as the '988 [7] patent.

[8] That's how I understand it. It's [9] very general, but I think that's the way.

[10] MR. DIGIOVANNI: Just one additional [11] note, and the reason I gave the description of [12] this document is because the '528 patent is no [13] longer an issue in this case. ECHO and [14] Expresschex are no longer relying on the '528 [15] opinion of counsel.

[16] So there is no reliance on that [17] opinion of counsel. And, therefore, there's no [18] issue regarding any waiver of privilege regarding [19] reliance of counsel.

[20] SPECIAL MASTER: Yeah. [21] Thank you, Mr. DiGiovanni.

[22] MR. McDOLE: Your Honor, with [23] respect to the '528 patent, the privilege has [24] already been waived. The document has been

Page 21

[1] produced to us.

[2] Whether they're intending to rely on [3] it now or not is maybe a question of relevance [4] and admissibility at trial. That is not a [5] question of privilege or waiver anymore.

[6] SPECIAL MASTER: I agree with that.

[7] MR. DIGIOVANNI: Your Honor, can I?

[8] SPECIAL MASTER: I mean, once it's [9] waived, you know, once the box has been opened, [10] it's opened. And it just may — it may be [11] there's something that comes from a waived item [12] that was previously protected, it turns out to be [13] admissible. And the cat's out of the bag, so to [14] speak.

[15] In very general terms, we don't have [16] to get into it now. This is not the trial.

[17] We're not talking about [18] admissibility now. We're talking about [19] discoverability. So I don't see — it can't [20] be much prejudice of things that have been waived.

[21] MR. DIGIOVANNI: Well, Your Honor,

Hearing
October 12, 2005

LML Patent Corp.   v.
Telecheck Services, Inc., et al.

[22] actually ECHO does believe it's a very [23] significant issue, because we are not using —

[24] SPECIAL MASTER: Okay. Can I say

Page 22

[1] one thing?

[2] MR. DiGIOVANNI: Sure.

[3] SPECIAL MASTER: We're here for one [4] purpose today. If you want to brief that, file a [5] brief with that.

[6] All right. You can file a brief on [7] behalf of ECHO to the extent to which you think [8] there's some change by reason of that event.

[9] All right. And we'll get a response [10] from LML. And the brief is not to exceed five [11] pages.

[12] Now, I have a copy of the current [13] log that's been provided to me by Mr. DiGiovanni. [14] And I also have his presentation of the documents [15] that ECHO believes continued to be entitled to [16] protection under either attorney-client privilege [17] or the work product doctrine.

[18] So I think the best way to proceed [19] would simply be to — I mean, I'm just putting [20] things away. I brought the logs up.

[21] I put that away. Except I did have [22] some notations on it.

[23] Yes. I'll need my log here. [24] The best way to proceed, I think, is

Page 23

[1] to simply go down the list beginning with the [2] first document at issue, and see where we go with [3] that.

[4] Is that all right, counsel, to [5] proceed that way?

[6] MR. McDOLE: Absolutely, Judge [7] Bechtle or Mr. Bechtle.

[8] SPECIAL MASTER: All right. Sure.

[9] All right. I just have to line up a [10] few of these things I have, because I have a [11] number of references I have to simultaneously [12] refer to.

[13] I don't want to be shuffling a lot [14] of papers here. If I can get them just set up [15] here on the bench, I'll be able to move from one [16] to the other without either delay or confusion.

[17] MR. McDOLE: A patent case with a [18] lot of paper, it seems to be always the case.

[19] SPECIAL MASTER: It's not like you [20] can look at one paper. You've got to look at [21] several.

[22] I'm not complaining. I'm just [23] saying — let me get this set up. I feel like a [24] blackjack dealer here with all these different

Page 24

[1] items I have to consider before me.

[2] All right. Now, we're all set here. [3] All right. Let me put that there. [4] This one here.

[5] List of attorneys. List of [6] non-attorneys. I have a blank chart.

[7] Okay. First, is going to be the [8] log.

[9] All right. Before we leave that [10] other topic, if I could have that brief within a [11] week, I'd appreciate it, Mr. DiGiovanni, on that [12] topic.

[13] MR. DiGIOVANNI: Okay.

[14] SPECIAL MASTER: Concerning about [15] the opinions on the non-'988 patents.

[16] MR. DiGIOVANNI: Thank you.

[17] SPECIAL MASTER: And, also, you [18] should say what relief you want, what you're [19] asking for, either — I don't want to hear it [20] now, but you can put that in your brief, move for [21] whatever you want the Court to do because of that [22] change. And then we'll get a response from LML. [23] Okay.

[24] Now, the first document. Start with

Page 25

[1] the first document.

[2] MR. McDOLE: Yes, Your Honor. And I [3] suggest we just march through the documents.

[4] I can identify them for you. The [5] procedure you had outlined in your letter to [6] parties regarding this hearing was for the [7] description to be read out, for LML's argument [8] for the document to be provided for you, and to [9] make a ruling.

[10] I'm not sure if that's where you'd [11] still like to — how you would like to handle it [12] or if there's another procedure.

[13] SPECIAL MASTER: Well, let's make [14] this description as it appears in the July 28th [15] log is the description we're proceeding on today.

[16] MR. McDOLE: Okay.

[17] SPECIAL MASTER: And the other [18] entries in the log, we're proceeding on that [19] today.

[20] MR. McDOLE: Okay. Right.

[21] SPECIAL MASTER: Right.

[22] MR. McDOLE: Then we won't —

[23] SPECIAL MASTER: The primary issue [24] is whether or not that description satisfies the

Page 26

[1] burden of establishing protection of by privilege [2] or the doctrine of work product.

[3] MR. McDOLE: Okay.

[4] SPECIAL MASTER: All right.

[5] MR. McDOLE: The first document that [6] LML challenged was document

I.D. Number I. Just [7] so we have it on the record, that document has [8] been produced.

[9] SPECIAL MASTER: Okay. Let me just [10] do just one thing. I apologize to counsel.

[11] I forgot. I want to do this so we [12] don't have any confusion here.

[13] MR. DiGIOVANNI: Your Honor, did you [14] need some additional forms?

[15] SPECIAL MASTER: Oh, I have plenty.

[16] MR. DiGIOVANNI: Okay.

[17] SPECIAL MASTER: Do you need some? [18] I have some extras.

[19] MR. DiGIOVANNI: I have plenty, [20] also.

[21] SPECIAL MASTER: I don't. No. [22] I find that system works pretty [23] good. If all the elements are right, it works [24] pretty good. At least we can find things.

Page 27

[1] Just don't go away. Just one thing. [2] Off the record for a moment, please. [3] (A brief recess was taken.)

[4] SPECIAL MASTER: Will we be needing [5] the list of attorneys for Telecheck?

[6] MR. McDOLE: No.

[7] SPECIAL MASTER: We will not be [8] needing it. I didn't know if we needed that.

[9] All right. Got that. [10] That's good, then. We won't need [11] that.

[12] MR. McDOLE: This is going to be [13] more difficult than I thought to not refer to you [14] as Judge or Your Honor.

[15] SPECIAL MASTER: No. Okay. [16] You do whatever the spirit moves [17] you. I just want Judge Robinson to understand [18] we're not crossing wires here.

[19] So you — whatever. I don't want [20] you to feel like you're running down the up [21] escalator. You get that feeling, I think.

[22] So I just made that statement for [23] the record, and you do what you want. And there [24] won't be any admonition.

Page 28

[1] We'll understand that. All right. [2] Just bear with me for one moment. [3] There's one document I want to have available to [4] me.

[5] Here, I think I have it here. [6] Now, let me, just before we begin, I [7] want to get one more thing for the record that I [8] think will be helpful to us.

[9] These are, it says, information [10] counsel know, I think, by heart. And I think [11] they're not in dispute.

[12] There are a number of things that we [13] should have; right? When was the — I recall [14] seeing in the papers a time

LML Patent Corp.   v.
Telecheck Services, Inc., et al.

when LML, I think, [15] communicated the very first time to Telecheck [16] about the prospect of the product being subject [17] to LML's patent, and the prospect of maybe some [18] discussion whether there should be some [19] licensing.

[20] And what it looks like, it was a [21] letter that went out. Do you remember at or about [22] when that was, even a month or a year?

[23] MR. McDOLE: It is going to be late [24] 2000, early 2001.

Page 29

[1] SPECIAL MASTER: All right. For our [2] present purposes, that is okay.

[3] MR. DIGIOVANNI: Your Honor.

[4] SPECIAL MASTER: Yes.

[5] MR. DiGIOVANNI: If I may address [6] that. Mr. Min.

[7] MR. MIN: Yes.

[8] MR. DIGIOVANNI: I believe it was in [9] May of 2001. That was my records.

[10] I'd ask Mr. Min if he has something [11] to say on that point.

[12] MR. MIN: It was actually a letter [13] from patent counsel of LML to the CEO of ECHO [14] dated, I believe, May of 2001.

[15] But prior to that, the first time [16] that ECHO got wind of the patent at issue was [17] during their acquisition of a company called [18] Magic Software back in 1999.

[19] Magic Software was approached by LML [20] and was informed of the patents. And [21] subsequently after ECHO had acquired Magic [22] Software in 1999, they had plans — they [23] eventually obtained the '988 opinion, which is [24] dated May 2000.

Page 30

[1] SPECIAL MASTER: All right. That's [2] good enough for present purposes. We'll get some [3] idea about that.

[4] All right. And remind me when the [5] suit was filed here.

[6] MR. McDOLE: It was filed the end of [7] July 2004.

[8] SPECIAL MASTER: Okay. And as I [9] take it, document requests were transmitted by [10] plaintiff to defendants at the same time?

[11] MR. McDOLE: No, Your Honor. We [12] needed a Rule 26 conference.

[13] So the initial document request [14] actually did not go out until, I believe it was, [15] September, October time frame when it — when [16] those actually went out.

[17] SPECIAL MASTER: All right. Then [18] let's say October '04, something like that.

[19] And I take it, according to the [20] present scheduling order of Judge Robinson, [21] discovery is closed.

[22] MR. McDOLE: Discovery is closed. [23] It closed mid-July, Your Honor.

[24] And document production was broken

Page 31

[1] out separately from depositions. The document [2] production in this case was originally scheduled [3] to end at the beginning of March, and the Court [4] extended it until the beginning of April to allow [5] Telecheck to produce some documents in this case.

[6] SPECIAL MASTER: Okay. These are [7] not strange dates. I just thought — I want to [8] have them all in one place.

[9] I've seen them. They lurk here in [10] the letters and then other references.

[11] Okay. So we should begin with — [12] you say Document 1 has been produced; right?

[13] MR. McDOLE: Document 1 has been [14] produced.

[15] SPECIAL MASTER: Okay.

[16] MR. McDOLE: Document 2, Your Honor, [17] is a memo — is described as a memo, re LML [18] patents - summary of outside counsel's advice, re [19] general legal advice, re procedure available to [20] invalidate and/or handle patent infringement [21] allegations. Dated April 18th, 2002.

[22] Your Honor, as your order, special [23] master order number three found, there is a [24] waiver of privilege as a result of ECHO's

Page 32

[1] reliance on advice of counsel with respect to [2] this document.

[3] Those opinions deal — one of the [4] subjects that those opinions deals with is [5] invalidity. And this goes directly to the heart [6] of the invalidity case, referencing prior art and [7] ways to invalidate the patent.

[8] This was also disclosed to ECHO's [9] Board of Directors, the very people who would [10] rely on this opinion. And it's also very similar [11] to the description of Document Number 1, which [12] has already been produced, which is a summary of [13] outside counsel's analysis re '988, '528 and '366 [14] patents.

[15] There's — and when you look at [16] those together with the opinions that have been [17] produced, the subject — part of the subject [18] matter, being the validity of the patents, the [19] two coincide together.

[20] SPECIAL MASTER: Mr. DiGiovanni.

[21] MR. DiGIOVANNI: Yes, Your Honor.

[22] Document Number 2, I first want to [23] say that the description of Document Number 2 is [24] very different than the description for Document

Page 33

[1] Number 1.

[2] The description for Document Number [3] 1 says summary of outside counsel's analysis [4] regarding patent '988. Okay.

[5] The description for Document Number [6] 2 says memo re LML patents - summary of outside [7] counsel's advice, re general legal advice, re [8] procedure available to invalidate or handle [9] patent infringement allegation.

[10] And the key word there is procedure. [11] And Your Honor has the document.

[12] SPECIAL MASTER: I'm looking at it.

[13] MR. DIGIOVANNI:   Excellent. [14] The document deals purely with [15] procedures, and various avenues that a party may [16] take as a course of action.

[17] And, thus, the subject matter of [18] that memorandum or that document, it is a [19] memorandum, is not the same subject matter as the [20] subject matter in the opinion of counsel on the [21] '988 patent.

[22] The document deals with various [23] procedures going forward. There's no case [24] specific discussion regarding invalidity in this

Page 34

[1] document.

[2] And that's — invalidity is the [3] subject of the opinion of counsel. In Judge [4] Robinson's opinion of Cytyc, that's a case that [5] has been submitted that is one of Judge [6] Robinson's opinions regarding the scope of [7] waiver.

[8] SPECIAL MASTER: Mm-hmm.

[9] MR. DiGIOVANNI: I have a copy of [10] that if Your Honor would like that.

[11] SPECIAL MASTER: You can provide [12] that. Yes.

[13] MR. DIGIOVANNI: Okay. That case, [14] Your Honor, at Footnote 2, Judge Robinson [15] specifically says in terms of this argument [16] regarding waiver, trial strategy is not [17] discoverable as opposed to substantive issues of [18] infringement and validity.

[19] I have another copy of the case.

[20] SPECIAL MASTER: For the record, [21] that's the C-Y-T-Y-C, Cytyc Corporation vs. [22] AutoCyte, Inc., C-Y-T-E [23] MR. DiGIOVANNI: That's right, Your [24] Honor. The date is on the last — fourth page of

Page 35

[1] the document, September 13th, 2000.

[2] SPECIAL MASTER: Mm-hmm.

[3] MR. DiGIOVANNI: And on that same [4] fourth page, the footnote discusses how trial [5] strategy is not discoverable as opposed to [6] substantive issues of

infringement and validity. [7] That is — that's the exact issue in this [8] particular document situation, document [9] privileges.

[10] Document Number 2, the only mention [11] of procedures in that document. No mention of [12] substantive matter of the '988 opinion.

[13] MR. McDOLE: Your Honor, may I [14] respond?

[15] SPECIAL MASTER: Yes.

[16] MR. McDOLE: Federal Circuit in June [17] of 2005, this year, outlined exactly what it [18] believes waiver of privilege is. It's after [19] Judge Robinson's opinion.

[20] I'm going to hand you up a copy of [21] this case.

[22] SPECIAL MASTER: Mm-hmm.

[23] MR. McDOLE: Federal Circuit starts [24] off stating that a widely applied standard for

**Page 36**

[1] determining the scope of a waiver of [2] attorney-client privilege is that the waiver [3] applies to all other communications relating to [4] the same subject matter. Waiver extends beyond [5] the documents initially produced out of concern [6] for fairness, so that a party is prevented from [7] disclosing communications that support its [8] position while simultaneously concealing [9] communications that do not.

[10] This is at the top of Page 8 of the [11] opinion. The issue that we're dealing with here [12] is that in 2002, more than two years before this [13] document had been produced, they are claiming [14] that this is trial strategy, that they're [15] preparing for trial two years early.

[16] This is not trial strategy. This is [17] not something that's in anticipation of [18] litigation.

[19] This actually falls between the two [20] opinions that ECHO got in this case. They're [21] seeking out how they can invalidate the patent. [22] It goes directly to their reliance and whether [23] their reliance is reasonable.

[24] What they're doing is they're going

**Page 37**

[1] out to an opinion or to their opinion counsel, [2] and they're trying to find every possible way to [3] invalidate the patent versus simply seeing if [4] they have a reasonable basis for going forward [5] that is relevant to.

[6] SPECIAL MASTER: All right. I've [7] had a chance to look at the pertinent provision [8] here.

[9] I think, it seems to me, that as I [10] read this entirely, while there is some reference [11] to procedure here, there's other things as well.

[12] And other than procedures proceeding [13] in a Court proceeding, a number of other features [14] on the second page, also, throughout. So I rule [15] that's waived.

[16] It should be produced.

[17] MR. DiGIOVANNI: Your Honor, I just [18] have to say one more thing.

[19] SPECIAL MASTER: Say one more thing, [20] please.

[21] MR. DiGIOVANNI: Judge Robinson's [22] opinion in Allergan, again, I'm going to hand [23] that up to you.

[24] SPECIAL MASTER: I've seen that. I

**Page 38**

[1] understand that.

[2] MR. DiGIOVANNI: Okay. Your Honor, [3] in that document, in that opinion, Judge Robinson [4] states that "the only way for a patentee, the [5] only equitable way for a patentee to test the [6] knowledge of an alleged willful infringer (so as [7] to test the reasonableness of its evaluation of [8] counsel's opinion) is for the alleged willful [9] infringer to disclose all of the information it [10] possessed prior to or at the time it obtained [11] opinions of counsel as to the subject matters [12] discussed in such opinions".

[13] SPECIAL MASTER: Mm-hmm.

[14] MR. DiGIOVANNI: The opinion of [15] counsel on the '988 patent was in 2000.

[16] SPECIAL MASTER: Mm-hmm.

[17] MR. DiGIOVANNI: This document is [18] in [sic] 2002. So it was not prior to or at the time of [19] that opinion.

[20] SPECIAL MASTER: But it relates [21] back. There's information that relates back to [22] the era where this activity was taking place.

[23] Waived. [24] Next.

**Page 39**

[1] MR. McDOLE: Your Honor, the next [2] document —

[3] SPECIAL MASTER: Could I just say [4] one more thing? What's the basis for the work [5] product claim?

[6] MR. DiGIOVANNI: Your Honor, the [7] basis for the work product claim —

[8] SPECIAL MASTER: I think it's [9] somewhat academic, because this is communicated [10] work product. But I'm just interested in that.

[11] What's the basis for that?

[12] MR. DiGIOVANNI: That this document, [13] which is in your possession, was created in [14] anticipation of litigation. And there is —[15] there is a heading called suggested action, et [16] cetera. It's talking about various legal [17] procedures —

[18] SPECIAL MASTER: All right.

[19] MR. DiGIOVANNI:— including [20] anticipation of litigation. So that's the basis [21] of work product.

[22] SPECIAL MASTER: All right. And [23] this was communicated to the directors of your [24] client?

**Page 40**

[1] MR. DiGIOVANNI: That's correct.

[2] SPECIAL MASTER: Waived.

[3] MR. McDOLE: Your Honor, the next [4] document is Document Number 3.

[5] SPECIAL MASTER: All right.

[6] MR. McDOLE: This is a — if you [7] would like me to read the description into the [8] record?

[9] SPECIAL MASTER: I think you [10] should for the record, so somebody who reads this [11] doesn't have to shuffle through a lot of papers [12] like we're doing.

[13] MR. McDOLE: Document Number 3 on [14] ECHO's privilege log a July 28, 2005 memo [15] reflecting summary of teleconference with Ed [16] Poplawski, Esquire, P-O-P-L-A-W-S-K-I, and Mark [17] Mizrahi, Esquire, re prospective options for [18] defending patent infringement allegations by LML.

[19] Your Honor, this is a document that [20] you referred to in your letter as "by their very [21] description to define any notion that the [22] document does not fall within the coverage of [23] waiver of attorney-client privilege."

[24] This document is clearly waived.

**Page 41**

[1] This is also, again, very similar to [2] documents that have already been produced in this [3] case.

[4] For instance, if you look at [5] Document Number 10, the description is almost [5] identical. The description of Document Number 10 [6] is Minutes of ECHO Board of Directors meeting of [7] 12/2/2002 by Mr. Frost summarizing status of LML [8] patent infringement allegation and prospective [9] actions by ECHO.

[10] It is the same subject matter of [11] something they've already produced, and on top of [12] which, it's the same subject matter of the [13] opinions that they've already produced.

[14] SPECIAL MASTER: Mr. DiGiovanni.

[15] MR. DiGIOVANNI: Your Honor, I, [16] again, disagree that the descriptions are the [17] same. They're very different.

[18] And these various nuances that the [19] words that are used in these descriptions are [20] important, and counsel continues to gloss over [21] them and try to say that the descriptions are the [22] same; therefore, there's some sort of waiver. We [23] disagree with that.

LML Patent Corp. v.
Telecheck Services, Inc., et al.

**Hearing**
October 12, 2005

---

[24] And as this document shows on its

**Page 42**

[1] face, it, again, deals with procedures, and it [2] does not deal with anything.

[3] SPECIAL MASTER: But it doesn't have [4] to do with defending against LML's charges. [5] That's the essence of it.

[6] And there's options and choices. [7] And one choice that's offered in this proceeding [8] to defend is relying on the opinion of counsel.

[9] I mean, just...

[10] MR. DiGIOVANNI: Your Honor, we [11] disagree, because first of all, this document, [12] again, deals with the '528 patent, which is no [13] longer in the case. And it doesn't deal with the [14] subject matter of the opinion that we're relying [15] on.

[16] The subject matter of the opinion [17] we're relying on, LML's counsel has cited this [18] Federal Circuit that says that the subject matter [19] is waived. We don't disagree with that.

[20] But what we do want to emphasize is [21] what subject matter means and Judge Robinson has [22] made it clear in her opinions, that subject [23] matter does not include procedures or trial [24] strategy. It only includes the subject matter

**Page 43**

[1] such as validity or infringement.

[2] SPECIAL MASTER: But the important [3] thing here, the trial practice and trial [4] strategy, you don't agree with that?

[5] MR. DiGIOVANNI: I don't agree with [6] that.

[7] SPECIAL MASTER: Then you and I have [8] a different English teacher from grammar school [9] up to date. I'm just reading the plain words of [10] this.

[11] There's lots of choices and options. [12] And one concern here is that turning to opinion [13] of counsel, indeed, may not be genuine.

[14] I mean, that may — that's one issue [15] that will be in this trial that — because if [16] things were discussed and exchanged back and [17] forth, it could influence the extent to which [18] reliance on opinion of counsel is a genuine [19] defense.

[20] I mean, I think that's generically [21] what we're talking about here.

[22] MR. DiGIOVANNI: Your Honor, I [23] understand that, but —

[24] SPECIAL MASTER: Yes.

**Page 44**

[1] MR. DiGIOVANNI: — the essence of [2] the waiver is you don't want a litigant to use [3] the attorney-client privilege as a sword and a [4] shield.

[5] What ECHO is using their opinion on

[6] the '988 patent on is to make the — to establish [7] facts that it, in fact, had a reasonable belief [8] that it does not infringe the '988 patent, [9] because the '988 — because it relied on the [10] attorney's opinion that the '988 patent is [11] invalid.

[12] So that's the subject matter, and [13] that's the, you could say, sword that ECHO is [14] using. So it should not be allowed, and I agree [15] that ECHO should not be allowed to use that also [16] as a shield in terms of hiding or protecting [17] documents that relate to any sort of opinion [18] regarding the validity or invalidity of the '988 [19] patent.

[20] And this document, we say, does not [21] relate — does not inform the reader of anything [22] regarding the validity or invalidity of the '988 [23] patent.

[24] That is the subject matter as Judge

**Page 45**

[1] Robinson has defined in her case and as meant, we [2] would say, by the Federal Circuit in the recent [3] case where the Federal Circuit does not elaborate [4] on what subject matter means.

[5] SPECIAL MASTER: Well, isn't an [6] issue in the case willful infringement?

[7] MR. DiGIOVANNI: Willful [8] infringement of the '988 patent is, in fact, an [9] issue in the case.

[10] SPECIAL MASTER: All right.

[11] MR. DiGIOVANNI: Yes. So what ECHO [12] has — how ECHO has defended it is to say we're [13] not willfully infringing, because we have an [14] opinion of counsel telling us that the '988 [15] patent is invalid.

[16] And that defines the subject matter. [17] Invalidity of the '988 patent.

[18] MR. DiGIOVANNI: That's the subject [19] matter. Nothing to do with various avenues to [20] proceed, nothing to do with, we would say, the [21] '528 patent, which we're not relying on that [22] opinion of counsel.

[23] It's just the invalidity of the '988 [24] patent. That is the subject matter.

**Page 46**

[1] And that's around in Judge [2] Robinson's opinions in Cytyc. That footnote [3] makes it clear that procedures are not to be [4] considered subject matter, just invalidity or [5] non-infringing as the case may be. In this case, [6] it's invalidity because that's the only thing [7] that the '988 opinion deals with.

[8] MR. McDOLE: Your Honor, may I [9] briefly respond?

[10] SPECIAL MASTER: Just a minute. In [11] a minute.

[12] All right. Yes.

[13] MR. McDOLE: Two points, Your Hon-

or. [14] Mr. DiGiovanni had mentioned that this document [15] deals with the '528 patent. If you read their [16] description, we have no way of knowing that. [17] There's nothing in this description that says [18] that.

[19] That's the first point. [20] The second point is, as I think [21] we've made our argument with respect to why we [22] believe it's waived with respect to opinions and [23] counsel. We believe they are doing this, the [24] different procedures that they have to go with,

**Page 47**

[1] and the different things that they're trying to [2] do to invalidate the patent go to the heart of [3] whether they're willfully infringing or not.

[4] And the last point is, again, this [5] is — if Mr. DiGiovanni doesn't like the [6] description in 10 that matches Number 3, you just [7] have to go to 7 and 8.

[8] Number 3 deals with subject matter [9] defending patent infringement allegations by LML. [10] 7 and 9 there, which have been produced [11] summarizing defensive strategies re patents in [12] suit, they may have little nuances as to tenths [13] and where the caret is placed, but they're the [14] same subject matters, and they've already been [15] produced. They've admitted that those are [16] relevant to the advice of counsel defense, and [17] they've produced those.

[18] And here you have a situation, not [19] only are they producing the favorable opinions [20] that they want to rely on at trial, but they [21] are — then they're producing only the supporting [22] documents which they believe doesn't support [23] them.

[24] SPECIAL MASTER: Well, I think and

**Page 48**

[1] as a whole, I think it's waived. Number 3, [2] waived.

[3] Number 4.

[4] MR. McDOLE: Your Honor, Documents [5] 4 through 8 have been produced.

[6] SPECIAL MASTER: Okay. Let me mark [7] that down, please. 4 through 8, produced.

[8] All right. Yeah, that appeared in [9] prior correspondence.

[10] I understand that. All right.

[11] MR. McDOLE: The next document we [12] have is Document Number 9, and this is the same [13] as — Document Number 9 has been produced.

[14] MR. DiGIOVANNI: Document Number [15] 9 has not been produced. Let me take that back.

[16] Document Number 9 has been produced [17] in redacted form, I believe. But let me just [18] check that.

---

**Min-U-Script®**

[19] One second.

[20] MR. MIN: I do not believe Document [21] Number 9 has been produced.

[22] SPECIAL MASTER: It has been [23] produced, Mr. Min?

[24] MR. MIN: It has not.

Page 49

[1] MR. DIGIOVANNI: Has not.

[2] SPECIAL MASTER: Has not been [3] produced.

[4] MR. McDOLE: Your Honor, here [5] again, this is a document we have in your special master [6] order as defined, any notion of not falling [7] within the waiver. The reason is simply that [8] it's the same situation we have with Document [9] Number 3.

[10] It still relates to the advice of [11] counsel. And in this case, Documents 10 and 11, [12] I believe, from the chart that we have from ECHO [13] have been produced. And the description is [14] virtually identical.

[15] I mean, there's no wordsmithing [16] here. This is an identical description.

[17] So, again, we're left at a loss as [18] to why we're still arguing about this document.

[19] I'll just keep it short.

[20] MR. DIGIOVANNI: Your Honor, if I [21] can refer you to what we think is the relevant [22] portion of that document.

[23] SPECIAL MASTER: All right.

[24] MR. DIGIOVANNI: I probably should

Page 50

[1] have put a Post It ahead of time. The third page [2] of it, there's a heading entitled Legal. And the [3] first paragraph of that section starts out LML, [4] and then it goes on, maybe there's three or four [5] sentences that describe the relevant matters.

[6] So I do want to direct you to that, [7] so you can make your evaluation based on the [8] portion of the document that relates to this [9] case.

[10] SPECIAL MASTER: Okay. Now, let me [11] just ask you: If these minutes are dated [12] October 7th, '02, give me some sense, if you can, [13] Mr. DiGiovanni, your understanding of what was [14] happening here on the potential patent [15] infringement engagement between LML and ECHO [16] letters, or where are we in this time line?

[17] MR. DIGIOVANNI: All right. Can I [18] ask Mr. Min to do that, Your Honor?

[19] SPECIAL MASTER: Oh, sure. Any-one. [20] And this is just general, not specific.

[21] Mr. Min, can you help us there?

[22] MR. MIN: I can, Your Honor. As [23] we've indicated before, that same — this

May of [24] 2001 letter was sent by patent counsel for LML to

Page 51

[1] the CEO of ECHO.

[2] Since then ECHO and LML peri-odically [3] communicated with no real movement. And this is [4] the minutes in the year 2002.

[5] ECHO was still investigating what [6] their options and what their next step would [7] be —

[8] SPECIAL MASTER: All right.

[9] MR. MIN: — in terms of the patents [10] that were being potentially asserted against us.

[11] SPECIAL MASTER: All right. I just [12] kind of want to get the environment between the [13] two companies at this stage.

[14] MR. DIGIOVANNI: And Your Honor, [15] what Mr. Min said about evaluating the next step, [16] I think that applies to this paragraph here. The [17] discussion in it talks about —

[18] SPECIAL MASTER: Let me see it now. [19] I have that part of Page 3 you referred me to.

[20] MR. DIGIOVANNI: Okay.

[21] SPECIAL MASTER: Because there's a [22] lot of other business things that aren't [23] pertinent to the case in the minutes.

[24] All right. Let me just make this

Page 52

[1] observation having read that pro-vision.

[2] To a certain extent, I would just [3] say I consider this reference — I'd say that [4] this is a report by Mr. Frost, counsel at the [5] time, to the Board. So counsel is discussing [6] this with the Board.

[7] The first paragraph is the one that [8] appears to be what's referred to in the log.

[9] It's not lengthy. Several [10] sentences. Okay.

[11] Although it appears to be somewhat [12] benign, I'll put it that way, a benign report, [13] kind of an update of a general nature, I continue [14] to feel that when the privilege is waived, it's a [15] subject matter. And this addresses a subject [16] matter.

[17] Even though it may not have a [18] precision to it as to what's happened or what's [19] going to happen, it shows that, if you will, the [20] environment of knowledge that the Board of [21] Directors is in at this time.

[22] In this period of time when [23] apparently something is going on, but decisions, [24] sharp positions are not being taken yet. So I

Page 53

[1] think, to that extent, I think it's waived.

[2] I just can't cut that out and say [3] that has nothing to do with the overall subject [4] matter of possible in-fringement by ECHO of the [5] LML patent. That's all.

[6] I guess, mine can differ, but I feel [7] that way about it.

[8] MR. DIGIOVANNI: That was the [9] argument I was going to make in terms of subject [10] matter. Same argument I made previously.

[11] SPECIAL MASTER: I think it's waiv-ed [12] on the ground that I've men-tioned.

[13] See, I guess we have to make sure — [14] at least I have to make sure that I'm [15] communicating properly here, but I think the [16] waiver here is waiving attor-ney-client privilege is [17] a very, very serious matter. And it's only [18] serious because of the intent to which when it's [19] in place, it's frankly vigorously pro-tected.

[20] So when it's waived, it's a big [21] step. And what we're confronted with here is the [22] waiver because of, if you will, a major defense [23] in this case.

[24] This is not a trivial defense. This

Page 54

[1] is a major defense.

[2] It would be considerable testimony [3] about this, and so I think it just escalates. It [4] escalates the significance of what we're [5] considering can or cannot be a waiver.

[6] So for that reason, even though [7] someone might look at that and say, Well, it [8] doesn't disclose much, but it does disclose [9] reports of the officials of ECHO by primary [10] counsel of the status of the prospect of [11] infringe-ment litigation.

[12] And I think that's enough to pass [13] mustard. That's just my thought about it.

[14] I know you have a difference, [15] Mr. DiGiovanni, your client does, but I think [16] somebody has to decide. And that's why I'm here.

[17] MR. DIGIOVANNI: And, Your Honor, [18] obviously, we disagree with that respectfully. [19] And in terms of what is meant by subject matter, [20] I again refer to Judge Robinson's Footnote 2 in [21] the Cytyc decision where she talked — in the [22] very sentence where she's talking about the [23] waiver, she has a footnote. The Court has a [24] footnote stating trial strategy is not

Page 55

[1] discoverable as opposed to the sub-stantive issues [2] of infringement and validity. And our position [3] is that defines what is meant by subject matter

[4] in terms of reliance on opinion of counsel and [5] the scope of waiver.

[6] SPECIAL MASTER: I understand you [7] take that view. Nevertheless, it's waived.

[8] Number 9, waived.

[9] MR. McDOLE: Your Honor, the next [10] document, Document 10 and 11, according to the [11] chart that we were provided this morning, shows [12] that these documents have been produced.

[13] SPECIAL MASTER: All right. Thank [14] you.

[15] 12.

[16] MR. McDOLE: That brings us to [17] Document 12. The description reads cover memo [18] forwarding requested information re brief [19] description of ECHO's implementation of [20] electronic check conversion.

[21] Now, Your Honor, this goes into a [22] sequence of documents that when read in together [23] shows that the information that is being [24] discussed here is actually information that is

Page 56

[1] being given to opinion counsel. And the reason [2] is if you look at Documents 12 and 13 together [3] and 20 and 21, which are separated out in the [4] log, the dates correspond and show that [5] Mr. Mizrahi, one of ECHO's litigation counsel in [6] this case, is acting as a go between between ECHO [7] and opinion counsel to get counsel information [8] regarding ECHO's process.

[9] Now, ECHO has argued that this [10] relates — the subject matter of the opinions of [11] counsel relate only to invalidity. That is [12] simply not true.

[13] The opinions only deal with specific [14] claims on invalidity. It specifically ignores [15] claims stating that, for instance, with respect [16] to the March 7, 2003 opinion, Claims 8, and 13 [17] through 18 were not analyzed as to validity, [18] because they do not appear to have potential [19] relevance according to information received by [20] you.

[21] SPECIAL MASTER: Not so fast. Not [22] too fast.

[23] MR. McDOLE: Including the [24] functional specification and related documents

Page 57

[1] that you provided to us. Electronic Clearing [2] House does not make, use, sell any [3] products/services which contain the elements that [4] are recited in Claims 8 and 13 through 18.

[5] The '988 patent opinion has a [6] similar statement and doesn't analyze one of the [7] claims in that opinion for the same reason. That [8] is an independent subject matter.

[9] And irregardless, the Federal [10] Circuit has made clear as to what the subject [11] matter being waived is. Defendant ECHO's [12] argument in this case is that allegedly LML [13] cannot both argue infringement, while at the same [14] time keeping the patents valid.

[15] They say if we construe the claims [16] to cover their products, that our patents would [17] be invalid. The two are hopelessly intertwined [18] in the case, in any event.

[19] SPECIAL MASTER: All right.

[20] MR. DiGIOVANNI: Your Honor?

[21] SPECIAL MASTER: Yes.

[22] MR. DiGIOVANNI: While on Document [23] 12, I think the argument I just heard was an [24] argument that, in fact, the document is not

Page 58

[1] privileged. This is the first time they've made [2] the argument.

[3] In fact, the argument that they had [4] previously made in their submissions to you, Your [5] Honor, was that there was inadequate description. [6] So I don't — there is no argument that that's [7] been presented to the Court as to my knowledge [8] that, in fact, there's some sort of waiver or [9] that the document is not privileged.

[10] SPECIAL MASTER: Well, I think what [11] their position is that the absence of adequate [12] description, which is a burden on the party [13] seeking protection, has not been met. Therefore, [14] it's not privileged. I think that is what LML is [15] saying.

[16] MR. McDOLE: That is correct, Your [17] Honor.

[18] SPECIAL MASTER: I mean, they're — [19] okay. So let's — I don't want to really fence [20] with words like that.

[21] They say these aren't privileged [22] documents. For example, they say a [23] correspondence just between executives [24] is not attorney-client privilege. And the description

Page 59

[1] says just executives; therefore, it should be [2] turned over.

[3] I think that's — it's that chain of [4] logic they're using, which they're basing, I [5] think I understand.

[6] MR. DiGIOVANNI: Your Honor, the [7] issue, then, as it has been presented, is the [8] description on Log Item Number 12 sufficient to [9] preserve the privilege of attorney-client [10] privilege and work product doctrine, and we [11] contend it certainly is.

[12] The description is cover memo [13] forwarding requested information regarding brief [14] description of ECHO's

implementation of [15] electronic check conversion. And it's received [16] by an attorney from somebody at ECHO.

[17] So here you have, just looking at [18] the log entry, you know, that somebody from [19] ECHO —

[20] SPECIAL MASTER: Well, wait. You [21] said it's sent by somebody in ECHO?

[22] MR. DiGIOVANNI: Mr. Brown.

[23] SPECIAL MASTER: Isn't he a [24] customer? He's a customer of.

Page 60

[1] Okay. Right.

[2] MR. MIN: No, he's not, Your Honor.

[3] SPECIAL MASTER: No, he's not?

[4] MR. MIN: If you look at the [5] non-attorneys listed, the cast of characters, [6] Mr. Brown is titled vice president/chief [7] information officer for ECHO.

[8] SPECIAL MASTER: He's not?

[9] MR. MIN: No.

[10] SPECIAL MASTER: All right. Let me [11] get that.

[12] Oh, I see that. Okay. [13] Yes. L. Brown, vice president, [14] chief information officer for ECHO. Okay.

[15] MR. DiGIOVANNI: So, Your Honor, [16] looking at only the log entry, you know that it [17] was sent by the client, a vice president to the [18] attorney. It says M. Mizrahi Esquire.

[19] And then you have a description of [20] what was sent, requested information. Therefore, [21] the attorney has requested the information [22] regarding description of implementation. And [23] then privilege is made attorney-client privilege, [24] which itself states that.

Page 61

[1] SPECIAL MASTER: Oh, yeah. It [2] actually has — it has on the paper Mr. Brown's [3] title.

[4] MR. DiGIOVANNI: Yes. So by stating [5] attorney-client privilege and work product in [6] connection with that, the statement is being made [7] that it was — the communication was made in [8] furtherance of the provision of legal advice.

[9] SPECIAL MASTER: All right. I think [10] that's privileged having read that. Thank you.

[11] MR. DiGIOVANNI: Thank you, Your [12] Honor.

[13] MR. McDOLE: Your Honor, may we make [14] a claim of waiver of privilege based on the [15] advice of counsel that they did receive? And the [16] reason I say that —

[17] SPECIAL MASTER: Say that again.

[18] MR. McDOLE: In addition to the [19] inadequate description, although it was

not in [20] our papers, and I fully admit that.

[21] SPECIAL MASTER: Right.

[22] MR. McDOLE: The subject matter of [23] the opinions of counsel had the terms of [24] infringement as — the paragraph I read to you

Page 62

[1] described the opinion of counsel. It did not [2] identify certain claims or did not address [3] certain claims with respect to validity, because [4] of information provided to them by ECHO.

[5] If you take log entries 12 and 13, [6] you'll see Mr. Brown, who is an ECHO employee, —

[7] SPECIAL MASTER: Right.

[8] MR. McDOLE: — provide the [9] information to Mr. Mizrahi. The very next log [10] entry is Mr. Mizrahi providing that information [11] to opinion counsel.

[12] That is how opinion counsel got that [13] information. And the opinion of counsel simply [14] says because of the information you gave us, you [15] don't meet those limitations.

[16] We'd at least like to see what that [17] information is. And if it is only describing [18] information, it's not providing legal advice, and [19] that's where the inadequate description comes in. [20] If it's just a client providing a description of [21] services to a client, then it's not legal advice.

[22] SPECIAL MASTER: Well, no. I think [23] it's too late for a new claim. It's privileged.

[24] 13 is deemed approved. Work product

Page 63

[1] and attorney client. That was 12.

[2] 13? [3] I have one here. Yeah, I — yeah. [4] I have 13.

[5] MR. DiGIOVANNI: Your Honor, could I [6] just state something with regard to the documents [7] in your possession?

[8] SPECIAL MASTER: Yes.

[9] MR. DiGIOVANNI: When there are [10] Email chains of documents, it would be an Email [11] and then below it would be the Email that would [12] have preceded it. What we did, and in many of [13] the instances there, you'll see a Number 12 or [14] Number 13 on the top part, and then below that [15] you'll see number — another number.

[16] So that the number that's next to [17] that particular individual communication relates [18] to only that individual communication.

[19] SPECIAL MASTER: I think that was [20] mentioned in several of the letters, but it [21] has — I think I refer to that in the special — [22] in my order, too, that if

you read the chain, [23] put it together, that you have to look at it that [24] way.

Page 64

[1] It seemed to be kind of a continuous [2] exchange, because unfortunately, it [3] facilitates — Email allows people to chit chat [4] sometimes. It's not good news to do that, but [5] they do that.

[6] But I think as long as they're [7] permitted to do it, and they do it, we have to [8] read it that way. So reading it as a whole, I [9] think is the best way to do it and understand [10] that.

[11] MR. DiGIOVANNI: Okay. My point [12] being you'll see handwritten numbers next to each [13] of the individuals.

[14] SPECIAL MASTER: I see. You've [15] marked — you did it yourself or someone in your [16] office marked a number on it on 12 and 13, and [17] put them together, even though they're in the [18] same folder.

[19] MR. DiGIOVANNI: That's correct.

[20] SPECIAL MASTER: I understand that.

[21] MR. DiGIOVANNI: All right.

[22] MR. McDOLE: Your Honor, I believe [23] the next document is Document 14.

[24] SPECIAL MASTER: Document?

Page 65

[1] MR. McDOLE: Document Number 14.

[2] SPECIAL MASTER: 14.

[3] MR. McDOLE: Which I think makes [4] sense to discuss in a block of 14 through 17 all [5] relating to ECHO and Visa discussing Visa's [6] opinion of counsel.

[7] And the reason for this is, Your [8] Honor, if you look as to who is copied on [9] receiving information with respect to the Visa [10] opinion, which all of these entries relate, and [11] which is the same subject matter as the opinions [12] that ECHO has produced, —

[13] SPECIAL MASTER: Yes.

[14] MR. McDOLE: — it shows that opinion [15] counsel is actually copied on it on discussions [16] relating to the Visa opinion.

[17] Certainly opinion counsel receiving [18] information with respect to another opinion of [19] counsel from Visa on top of which ECHO has seen [20] Visa's opinion and is relying on that as well in [21] this case, whether they want to admit that [22] they're relying on it or not, they received it.

[23] They discussed it. And they used it [24] in their own opinions of counsel resulting in a

Page 66

[1] waiver. Again, ECHO cannot only

produce those [2] opinions which it believes are favorable to it [3] and not produce the Visa opinion, which [4] presumably is not favorable.

[5] I don't know what it says. But all [6] of these 14 through 17 deal with this Visa [7] opinion.

[8] SPECIAL MASTER: Who was opinion [9] counsel on here?

[10] MR. McDOLE: Denise McKenzie.

[11] SPECIAL MASTER: McKenzie?

[12] MR. McDOLE: Yes, Your Honor.

[13] SPECIAL MASTER: Yes, [14] Mr. DiGiovanni.

[15] MR. DiGIOVANNI: Yes. As to the [16] question who was opinion counsel, I guess that [17] actually goes back to the issue of opinion of [18] '988, the '988 written opinion of counsel, and [19] the '528 written opinion of counsel.

[20] And you have those documents, Your [21] Honor, to see who is opinion counsel on each. I [22] believe Mr. Min will correct me if I'm wrong, Ms. [23] McKenzie was opinion counsel on the latter [24] opinion of counsel, the 2003 opinion of counsel

Page 67

[1] relating to the '528 patent.

[2] MR. MIN: Ms. McKenzie was co-author [3] of both the '528 and the '988 opinion [4] of counsel.

[5] MR. DiGIOVANNI: I stand corrected, [5] Your Honor.

[6] SPECIAL MASTER: Mr. Min.

[7] MR. MIN: Yes.

[8] SPECIAL MASTER: I see a signature [9] line of Denise L. McKenzie on both —

[10] MR. DiGIOVANNI: Okay.

[11] SPECIAL MASTER: — as co-counsel. [12] One was on the — well, —

[13] MR. DiGIOVANNI: Your Honor, with [14] regard to the —

[15] SPECIAL MASTER: — March 7th, '03. [16] The other was May 5, '00. Earlier. [17] All right.

[18] MR. DiGIOVANNI: With regard to [19] Document Number 14, we state that this document [20] does not deal with the subject matter of the '988 [21] opinion. The document pertains to Visa and [22] the — I'm trying to — I don't want to reveal [23] the content of the document, Your Honor, but what [24] is being discussed here is the Visa system, and

Page 68

[1] that can only have to do with, and it does only [2] have to do with non-infringement. It has nothing [3] whatsoever to do with invalidity of the '988 [4] patent, which is the subject matter of the [5] opinion of counsel opinion upon which LML is [6] relying as its defense to

LML Patent Corp.  v.
Telecheck Services, Inc., et al.

Hearing
October 12, 2005

willfulness.

[7] In addition, the document is dated [8] in 2002, which is after the opinion of counsel in [9] the '988 patent. Thus, it doesn't fall into the [10] scope of waiver as defined by Judge Robinson in [11] the Allergan case.

[12] And I don't believe counsel [13] mentioned — counsel for LML mentioned the [14] inadequate description argument. I'm not sure if [15] that's still being preserved, but we would state [16] concern, certainly as with previous documents, [17] the description is suffice to state why the [18] document is being claimed as privileged.

[19] **SPECIAL MASTER:** Yes. Mr. McDole.

[20] **MR. McDOLE:** Your Honor, the Visa [21] opinion, first of all, we didn't waive. While we [22] may have with respect to Documents 12 and 13, we [23] did make our waiver argument on these documents.

[24] These documents relate to the

Page 69

[1] subject matter of the opinions, not just [2] validity. It is validity and infringement.

[3] Regardless, even if you don't accept [4] that, which you know it specifically states that [5] he's not construing claims, because the product [6] wouldn't fall into the claims of certain — or [7] into certain claims, which is infringement.

[8] The fact is the Federal Circuit has [9] held, whether it's fair or not, you have to look [10] at whether ECHO can use one document, produce it, [11] and not other ones. And here, ECHO's CEO had the [12] Visa opinion.

[13] He looked at the Visa opinion. One [14] of the very products at issue in this case is [15] ECHO's Visa product, a product that ECHO uses and [16] a system that uses Visa products in part.

[17] So it's at the heart and soul of [18] this case as to Visa's products. And it's an [19] opinion that's on the same exact subject matter.

[20] **MR. DiGIOVANNI:** Your Honor, if I [21] may?

[22] **SPECIAL MASTER:** Go ahead.

[23] **MR. DiGIOVANNI:** We don't disagree [24] that, in fact, the Visa product and the ECHO

Page 70

[1] products, and how they — whether or not they [2] infringe is a big part of this case. It is.

[3] It's in the case. It's an issue. [4] However, the issue in the '988 [5] patent opinion is invalidity of the '988 patent. [6] And you have a copy of that.

[7] And we do not agree whatsoever that [8] the issues of invalidity and non-

infringement are [9] so intertwined that every item that reflects on [10] infringement or noninfringement is within the [11] subject matter realm of the invalidity opinion.

[12] We just — we believe that Judge [13] Robinson's decisions outline how subject matter [14] is to be determined. And if it's an invalidity [15] opinion, then that is the subject matter.

[16] Documents talking about the various [17] aspects of the accused product deal only and can [18] only deal with non-infringement. Because an [19] invalidity analysis, you don't even take a look [20] at the accused product.

[21] And in this case, when there's a [22] description, when the document is dealing with a [23] description of the Visa product and/or the ECHO [24] product, which is an accused product in this

Page 71

[1] case, it's the Visa product that only deals with [2] noninfringement. Has nothing at all to do with [3] invalidity.

[4] **MR. McDOLE:** And, Your Honor, again, [5] this is an issue of whether, for instance, if you [6] just think of the hypothetical that could happen [7] at trial, allowing them to limit the scope of [8] waiver to validity.

[9] They could put up an opinion that [10] their opinion counsel says you do not infringe [11] claims X through Y, claims at issue in the case. [12] Allow them to put that in front of the jury, and [13] not allow us to discover any facts as to the [14] basis of that opinion.

[15] It's not as if that's blacked out of [16] their opinion, and it's not going to be shown to [17] a jury. That's something that could — will be [18] shown to a jury.

[19] It's privileged communication, and [20] it should be — it's a waiver that we should be [21] entitled to all documents that concern that same [22] subject matter.

[23] **SPECIAL MASTER:** Well, okay. It's [24] going to be pertinent, I suppose, on the notion

Page 72

[1] of invalidity, whether or not there is conduct [2] that's consistent with willful infringement. [3] They could run parallel courses here.

[4] I mean, one doesn't blot out the [5] other. An infringer could be infringing [6] knowingly and be hoping that they prevail in [7] invalidity. I mean, that could actually happen.

[8] That could be part of the decision [9] making. And if invalidity prevails, then that's [10] the end of it; right?

[11] I mean, the patent is invalid. [12] That's a problem for the patent holder.

[13] But I think the state of mind as [14] used in cases, and Judge Robinson has used it, [15] and that has a place here. State of mind [16] automatically doesn't mean you've waived [17] anything.

[18] But state of mind is an issue in a [19] manner in which the accused infringer functioned [20] in doing it and during the period when [21] infringement conducts evidence, if it's received [22] and it's admitted.

[23] That's pertinent here. Even though [24] it seems to me, and by saying, oh, we just went

Page 73

[1] ahead, because we understood that it was not [2] valid. It's invalid.

[3] Well, it might be conduct that [4] overrides that conclusion. So I just think it's [5] broader than what we're talking about here. I [6] don't think we can departmentalize it into an [7] invalidity opinion.

[8] Therefore, absolutely no evidence of [9] willful infringement. I just think — I think [10] that defense can't be willful infringement [11] conduct just because a defense is made.

[12] It has to be proven. LML has the [13] burden of proving willful infringement.

[14] And it seems to me that that's a [15] heavier burden now, because there is an opinion [16] of counsel on validity or invalidity. So I don't [17] think — I don't think the two are necessarily [18] exclusive.

[19] I think they have to be considered [20] ultimately exclusive, and the jury will decide [21] the case. But in terms of discovery and [22] admissibility, I think there will be evidence of [23] both. There will be evidence of invalidity.

[24] There could be evidence of

Page 74

[1] willfulness. And the question is: Is a defense [2] enough to carry the day, the weekend, of evidence [3] of willfulness, if it exists at all, to a point [4] where it can be said, well, it's not willful?

[5] Parallel conduct, and it could be [6] willful. But in view of the opinion of counsel [7] we think that the plaintiff hadn't met its burden [8] of that the defendant did rely on invalidity and [9] proceeded that way.

[10] Proceeding without that is an [11] entirely different defense. But proceeding with [12] that opinion and performing that way, as a [13] permissible barrier that LML has to get over.

[14] And that's their burden. They don't [15] get over it, they're not going to win.

[16] So I don't think they're — I don't [17] think you can say merely because of the opinion [18] on validity, that then all this

other information [19] being exchanged had no meaning. It will be [20] admissible.

[21] Some of this, whether or not it's [22] enough to carry the day, of course, is a matter [23] of satisfying the burden of proof.

[24] So I think it's waived. Privilege

---

**Page 75**

[1] is waived.

[2] MR. DiGIOVANNI: Your Honor.

[3] SPECIAL MASTER: I've heard enough. [4] It's waived.

[5] Thank you very much.

[6] MR. DiGIOVANNI: I'm not going to [7] make an argument, Your Honor.

[8] SPECIAL MASTER: All right.

[9] MR. DiGIOVANNI: I would ask for the [10] opportunity to submit a five-page brief on the [11] issue of separating the two issues.

[12] SPECIAL MASTER: No. I won't [13] receive that.

[14] Look, we admitted this for a year. [15] We've had logs and logs and logs.

[16] I want to make the statement, too, [17] because I think it's pertinent, and ECHO is [18] correct, and Telecheck is correct when we get to [19] them, a lot of documents here, a huge production [20] by the defendants, and they've advanced that, [21] much larger than by the plaintiffs.

[22] And that's understandable, because [23] the defendant party would have it. But we've [24] been at this now for months and months.

---

**Page 76**

[1] I think the time has come just to [2] decide these things.

[3] And I understand the arguments, and [4] they've been made, they've been spread throughout [5] the record here. And I'm going to ask LML's [6] counsel to file a declaration.

[7] It will be non-argumentative facto [8] declaration of the number of logs that have been [9] prepared and revised.

[10] Okay. And, also, I've received [11] letter briefs. And I do it for that reason, [12] these letter briefs are not a record.

[13] And they shouldn't be, because they [14] are — they will burden the record. But also the [15] declarations will cite the letter briefs and [16] responses that have been filed in this regard, [17] not filed, provided to the special master in this [18] regard.

[19] MR. McDOLE: Are you looking for a [20] time line of all of the events that have [21] happened?

[22] SPECIAL MASTER: Well, more or less. [23] I think we have to begin, as far as my [24] functioning with counsel is

---

concerned, because

---

**Page 77**

[1] the record is complete at that time, because [2] Judge Robinson functioned up to that point. More [3] or less, July the 5th when we had our first sit [4] down, I think. And thereafter, we've had briefs.

[5] Well, we've had — the April 18th, [6] letter of LML I consider a motion. And then we [7] had responses and then replies.

[8] And they were not filed with the [9] Court, but they're part of the reservoir that I'm [10] working on. So I think the Court should just — [11] the file should show a declaration set forth [12] beginning with the July 5th, I think it was. [13] That's when we began the discussion how to get [14] through some of this.

[15] And there was a reference to taking [16] a hard look at some of these claims. And it was [17] taken, and there was response by counsel to that.

[18] And then it developed into the [19] motion, and then a recommendation and order, if [20] you will, that by letter that the special master [21] considers reviewing some of this in camera. And [22] we had responses to that.

[23] But I think that those declarations, [24] and there's also a number of meet and confer

---

**Page 78**

[1] sessions, some of them I guess were face to face. [2] Some might have been by telephone.

[3] I think that shows counsel's [4] dedication to trying to solve this. I think that [5] should be in the declaration, any meet and [6] confers. And before you finish that, give [7] Mr. DiGiovanni a copy so he can see if he agrees [8] with the dates.

[9] This is not argument. I don't want [10] argument of this thing, just a chronicle.

[11] So provide some background for why [12] we're here now. We have to decide these things. [13] I think we're doing the best we can with all this [14] knowledge and information.

[15] And I did ask for that one brief [16] today having to do with the notion made by [17] Mr. DiGiovanni about the opinions and the like. [18] I'll take that brief, but I don't want any briefs [19] on these documents anymore.

[20] We've had enough. I'm hearing [21] argument now. We'll just rule and do the best we [22] can.

[23] Let's try to file the end of the [24] week, if you can. It should just be a list of

---

**Page 79**

[1] dates and describe what happened.

[2] Check with Mr. DiGiovanni, see if we [3] can get a joint chronicle of that. And

---

that will [4] be a substitute, if you will, of the record, [5] because none of this is a record other than [6] today.

[7] Okay. And then — that first [8] hearing we had was a transcript, I think, was it [9] not?

[10] MR. McDOLE: Yeah. I think every [11] hearing was a transcript.

[12] SPECIAL MASTER: Yeah. But we've [13] had correspondence, and we're not filing all [14] that. But maybe Judge Robinson might want to see [15] that or eventually.

[16] MR. McDOLE: I have a feeling she [17] won't.

[18] SPECIAL MASTER: Or if it's appealed [19] or something else, I want to make sure counsel [20] have their position, that they can refer to it [21] later.

[22] Okay. Enough said.

[23] MR. McDOLE: Your ruling with [24] respect to Document 14 —

---

**Page 80**

[1] SPECIAL MASTER: Covers 15 as well.

[2] MR. McDOLE: 15, 16, and 17 as well.

[3] SPECIAL MASTER: And 16, 17.

[4] MR. DiGIOVANNI: Your Honor, we have [5] separate arguments for 16 and 17.

[6] SPECIAL MASTER: We'll just do 15.

[7] MR. McDOLE: Well, 14 and 16 appear [8] to be almost identical. 15 was what we were [9] talking about.

[10] MR. DiGIOVANNI: Your Honor, we do [11] have separate arguments for 16 and 17.

[12] MR. McDOLE: All right.

[13] MR. DiGIOVANNI: 14 and 15. That's [14] waived. Privilege waived.

[15] MR. DiGIOVANNI: 14 and 15.

[16] SPECIAL MASTER: Not 16, 17. We'll [17] take that now. All right.

[18] MR. McDOLE: Just to make this as [19] brief as possible, Your Honor, the description on [20] 16 is the same as the description on 14.

[21] SPECIAL MASTER: Right.

[22] MR. McDOLE: And the description on [23] 16 actually includes Denise McKenzie as opinion [24] counsel. And just to note for the record that Ed

---

**Page 81**

[1] Poplawski, —

[2] SPECIAL MASTER: Yes.

[3] MR. McDOLE: — while he is not a [4] signatory on the opinions, one of the opinions [5] came from his firm, which he is a named partner. [6] And I think the two go to together.

[7] MR. DiGIOVANNI: Your Honor, we [8] submit the description is very different

---

between [9] the two documents.

[10] SPECIAL MASTER: Okay. The [11] documents you are talking about now are 16 and [12] 17?

[13] MR. DiGIOVANNI: Well —

[14] MR. McDOLE: I thought we were only [15] addressing 16, Your Honor.

[16] SPECIAL MASTER: We're talking abut [17] 16.

[18] All right. Let's talk about 16 [19] first.

[20] MR. DiGIOVANNI: Okay. Your Honor, [21] it says Email communication forwarding log items [22] 15.

[23] SPECIAL MASTER: That's right.

[24] MR. DiGIOVANNI: The key

**Page 82**

[1] distinction — the key piece of important [2] information, Your Honor, regarding Document 16 is [3] the recipients and the authors, the only people [4] who ever saw this document.

[5] If you look at who that is, it's [6] written by counsel, Mr. Mizrahi, and sent to [7] Ms. McKenzie, counsel, and Mr. Poplawski, [8] counsel. Never did this document find itself in [9] the possession of the client.

[10] That was a mistaken assumption on [11] the behalf of LML. In their briefing they make [12] the argument that, hey, it's on the privilege [13] log. It must have been in the possession of the [14] client.

[15] It's not the case, Your Honor. The [16] document never was in the possession of the [17] client.

[18] It only came from files of counsel. [19] So that is a mistaken assumption on behalf of [20] LML.

[21] Therefore, this document is pure [22] work product. And under Judge Robinson's [23] decision in Cytyc, Judge Robinson expressly [24] states, therefore, this is the last line of her

**Page 83**

[1] opinion, counsel's work product not shared with [2] the client remains irrelevant and not [3] discoverable. And, in fact, LML has never argued [4] that, in fact, work product not shared with the [5] client is discoverable.

[6] MR. McDOLE: I completely disagree [7] with that, Your Honor.

[8] SPECIAL MASTER: Yes.

[9] MR. McDOLE: And I've already made [10] the argument today that Mr. Mizrahi was a go [11] between. If you simply look at Documents 14 and [12] 16, you'll see where the argument is going.

[13] The client, Mr. Frost, provides — [14] forwards the document to Mr. Mizrahi. [15] Mr. Mizrahi, the same day, forwards the opinion [16] counsel or the Visa opinion to Denise McKenzie [17] and Ed Poplawski, two of the people involved in

[18] the patent or the opinions of counsel.

[19] I also note that the case that [20] Mr. DiGiovanni keeps citing, Allergan by Judge [21] Robinson, states the patentee should be entitled [22] to discover facts relating to what the alleged [23] willful infringer "knew and had concluded about [24] the credibility, value and reasonableness of the

**Page 84**

[1] opinions". That's what we're trying to do here, [2] we're trying to figure out exactly what was going [3] on.

[4] The fact that this went between [5] Mr. Mizrahi, that opinion counsel wasn't [6] communicating directly with the client, and [7] Mr. Mizrahi was simply a go between is irrelevant [8] to the fact. This goes directly to the heart of [9] the opinions of counsel.

[10] SPECIAL MASTER: Okay. What he is [11] saying is Frost sends it to Mizrahi on 14; right?

[12] MR. McDOLE: That's correct, Your [13] Honor.

[14] SPECIAL MASTER: And then Mizrahi — [15] I can't pronounce it right.

[16] MR. HERRMANN: Mizrahi, Your Honor.

[17] SPECIAL MASTER: You are saying on [18] 16, Mizrahi sent that to McKenzie and Poplawski?

[19] MR. McDOLE: Yes, Your Honor.

[20] SPECIAL MASTER: And if it's [21] important to be discoverable, that it go to the [22] client. How is that a client?

[23] MR. McDOLE: The client is M. Frost. [24] M. Frost is actually providing it to Mr. Mizrahi

**Page 85**

[1] as receiving.

[2] SPECIAL MASTER: So he's corporate [3] counsel at this time; right?

[4] MR. McDOLE: Yes, Your Honor.

[5] SPECIAL MASTER: There was some [6] reference when he left and Mr. McCoy took over or [7] something, '03 or something.

[8] MR. MIN: Yes, Your Honor. In July [9] of 2003, Mr. Frost left ECHO, and Mr. McCoy took [10] over his duties.

[11] SPECIAL MASTER: 7/03, okay. That [12] was just kind of a side thing.

[13] MR. McDOLE: And the argument is [14] two-fold, Your Honor.

[15] The first is that they've waived it [16] as a result of relying on the advice of counsel. [17] But the second thought of the argument is advice [18] of counsel aside, the description is exactly the [19] same.

[20] The Court has already found that the [21] same exact description went to

advice of counsel [22] or was waived. And if that's a waiver in and of [23] itself, then this document would flow directly [24] from it.

**Page 86**

[1] SPECIAL MASTER: All right. 16, [2] waived.

[3] 17.

[4] MR. McDOLE: Your Honor, 17 is — [5] the first part of it is almost identical to the [6] descriptions in 14 and 16.

[7] SPECIAL MASTER: All right.

[8] MR. McDOLE: It states Email [9] communication, re log item 15, which has already [10] been waived. And Visa and ECHO's relationship.

[11] Again, this is copied or the [12] recipient — this is from the firm that had [13] provided one of the opinions of counsel, [14] Mr. Poplawski, and was received by Mr. Mizrahi, [15] and another opinion counsel, Denise McKenzie.

[16] MR. DiGIOVANNI: Your Honor, this is [17] exactly the type of information, the type of [18] document that Judge McKelvie in Thorn, and Judge [19] Robinson in Cytyc said cannot be waived. This is [20] internal communications between attorneys never [21] communicated to the client.

[22] And the Thorn case is exactly on [23] point, and the Cytyc case is exactly on point. [24] This type of work product cannot be waived by

**Page 87**

[1] this, by reliance on opinion of counsel.

[2] Judge Robinson has held that. The [3] Thorn case which Judge Robinson has repeatedly [4] adopted holds that this work product cannot be [5] waived.

[6] There's no evidence that this was [7] ever received by the client. And it was never [8] received by a client. It was only retrieved from [9] the files of the attorney.

[10] SPECIAL MASTER: Well, okay. 14 [11] tells us — it looks like Frost, which is the [12] client, right, sending Item Number 15 before [13] item — forward of Item Number 15; right?

[14] MR. DiGIOVANNI: That is correct.

[15] SPECIAL MASTER: Doesn't 17 say [16] Email communications regarding Log 15, and Visa [17] and ECHO's relationship?

[18] MR. DiGIOVANNI: Sure, Your Honor.

[19] What is happening — what is happening in 17 —

[20] SPECIAL MASTER: Yeah.

[21] MR. DiGIOVANNI: — is an internal [22] communication between the attorneys passing along [23] client information, information received by the [24] client. So they're discussing materials from the

**Page 88**

[1] client, and there's nothing wrong with that.

[2] SPECIAL MASTER: Okay. Your view is [3] that while this may have come from the client, in [4] this particular Item 17, you just have a [5] discussion between Mizrahi, McKenzie and [6] Poplawski; right?

[7] MR. DiGIOVANNI: That is exactly [8] right. 16 and 17, in fact, is — there is no [9] transfer of those materials to the client or even [10] from the client. It's internal communications [11] among the attorneys, which under Thorn and under [12] Cytyc cannot be waived.

[13] MR. McDOLE: Your Honor, by the very [14] nature of that description, the client must have [15] had in order provide it to them. It relates to [16] ECHO and Visa's relationship.

[17] SPECIAL MASTER: Well, I'm reading [18] the first sentence of 17, and the attorneys are [19] with us talking among themselves. Possession, the [20] question about the contents of what Frost sent to [21] them.

[22] MR. McDOLE: Mm-hmm.

[23] SPECIAL MASTER: So that didn't go [24] to Frost. It didn't go to the client what that

**Page 89**

[1] communication was between Poplawski and Mizrahi [2] and McKenzie, that thought or process.

[3] MR. McDOLE: And Your Honor, just [4] for the record, I disagree with his line of cases [5] where he's saying that something that doesn't go [6] to the client is not discoverable. The Federal [7] Circuit, after Judge Robinson and after all those [8] opinions, has come out with its own opinion on [9] the matter.

[10] They're the binding Court in this [11] situation. They've made the comments that state [12] if a client communicates information to his [13] attorney under the understanding that the [14] information —

[15] SPECIAL MASTER: Not so fast. The [16] court reporter can't get that.

[17] MR. McDOLE: I apologize, that it [18] states if a client communicates information to [19] his attorney with the understanding that the [20] information will be revealed to others, that [21] information as well as the details underlying the [22] data which was to be published, will not enjoy [23] privilege.

[24] What I am stating here is that any

**Page 90**

[1] information that the attorneys are discussing [2] here naturally came from the client. They can't [3] now try to claim privilege on that.

[4] SPECIAL MASTER: All right. Let me [5] see that. We'll take a brief recess.

[6] MR. McDOLE: I believe you have —

[7] SPECIAL MASTER: What you just [8] read, —

[9] MR. McDOLE: Yeah.

[10] MR. HERRMANN: Why don't you put [11] on the record what the opinion is?

[12] MR. McDOLE: The opinion — I [13] apologize Fort James Corporation v. Solo [14] Cup [14] Company.

[15] SPECIAL MASTER: Oh, yes. Mm-hmm.

[16] MR. McDOLE: The cite is 412 F.3d [17] 1340.

[18] SPECIAL MASTER: All right.

[19] MR. McDOLE: And where I was reading [20] from, Your Honor, is actually on Page 1351.

[21] SPECIAL MASTER: All right. Let me [22] look at this and then we'll take a brief recess, [23] and we'll come back.

[24] You say you're reading from 13?

**Page 91**

[1] MR. McDOLE: 1351, Your Honor.

[2] SPECIAL MASTER: All right. Thank [3] you.

[4] Yeah. Some of these doctrines are [5] just not that, as they say, separated by such a [6] bright line.

[7] I mean, there has to be an [8] understanding, I think, of a number of facts [9] before the dominant rules come into play, and [10] we'll see.

[11] MR. McDOLE: Your Honor, just for [12] the record, after you read that opinion, you'll [13] realize there is no dominant rule. The Federal [14] Circuit says it's a fact-intensive inquiry, that [15] there is no bright line rule.

[16] SPECIAL MASTER: That's what I am [17] trying to say that you begin with the notion, [18] somewhat based on logic. But if the client [19] didn't know, how could the client become part of [20] the client's state of mind?

[21] So if it wasn't communicated, that's [22] kind of relatively simple and basic, because it [23] gives you a good starting point. But then it [24] begins there, and you have to consider all the

**Page 92**

[1] facts, including the goal you're trying to [2] achieve in deciding, in this circumstance, [3] whether or not that makes any difference of [4] communication.

[5] All right. We'll take a brief [6] recess.

[7] MR. HERRMANN: Your Honor, off the [8] record.

[9] (A brief recess was taken.)

[10] SPECIAL MASTER: Okay. Thanks for [11] the water.

[12] MR. HERRMANN: My pleasure.

[13] SPECIAL MASTER: Something I wasn't [14] familiar with.

[15] MR. McDOLE: Your Honor, may I make [16] one more comment?

[17] SPECIAL MASTER: Yes.

[18] MR. McDOLE: As Mr. Herrmann pointed [19] out to me in the hall, and as we argued in our [20] brief, these documents are things that appear on [21] ECHO's privileged log. So for them to — I know [22] Mr. DiGiovanni has said that the client never [23] received them.

[24] But they're on ECHO's privileged

**Page 93**

[1] log, which means they are in ECHO's possession. [2] So, you know, for them to appear on their [3] privileged log and for them to say that they [4] haven't had possession of them, I think is not [5] correct.

[6] SPECIAL MASTER: Okay. Mr. Min, are [7] you with us?

[8] MR. MIN: Yes, I am, Your Honor.

[9] SPECIAL MASTER: Okay. Thanks.

[10] MR. MIN: I'd like to respond to [11] Mr. McDole.

[12] SPECIAL MASTER: Yes.

[13] MR. MIN: It's not in their [14] possession, but it is in their control. [15] Obviously, at any time a client can request [16] counsel provide them with the files, so it's not [17] in possession. It's in possession, custody or [18] control.

[19] SPECIAL MASTER: All right. The [20] court reporter has that record.

[21] Yes, Mr. DiGiovanni.

[22] MR. DiGIOVANNI: May I respond?

[23] SPECIAL MASTER: Yes.

[24] MR. DiGIOVANNI: So the submission

**Page 94**

[1] of the Fort James case, —

[2] SPECIAL MASTER: Yes.

[3] MR. DiGIOVANNI: — I disagree with [4] that Fort James reverses or overrules, in any [5] way, Thorn, the Thorn case by Judge McKelvie, as [6] well as the Cytyc case and the Allergan case by [7] Judge Robinson.

[8] The Fort James case, which I had [9] never seen before, and I was sort of surprised to [10] hear that there was this critical case. It has [11] nothing to do with work product. The words work [12] product are not mentioned at all in this case.

[13] And number two, this case has [14] nothing to do with the waiver, the scope of the [15] waiver in the context of reliance on the opinion [16] of counsel. As the Thorn case makes clear, Judge [17] Robinson in the Cytyc case makes clear,

in that [18] context, the only issue is the infringer's state [19] of mind.

[20] And as Judge Robinson has held [21] several times, if a document is transferred [22] between attorneys, yet never goes to the client, [23] this work product is not waived.

[24] **SPECIAL MASTER:** All right. Okay.

Page 95

[1] I think I had a chance to look at [2] that case, the Fort James case. And I think the [3] Fort James case at 412 F3d 1340, I understand [4] what the Federal Circuit is saying there. I [5] think the notion of communication in regard to [6] discoverability of work product kind of sits in a [7] little different ground.

[8] I think these are two separate ideas [9] and notions that the Fort James case and the [10] somewhat well established notion that [11] communication can play a part in deciding whether [12] it's a waiver. I think in this instance, the [13] communication on 17 just between these three [14] attorneys and no one else is sufficient to [15] protect it.

[16] 16 is not waived. 17 is not waived.

[17] **MR. DiGIOVANNI:** Your Honor, if I [18] may, maybe this will help speed things up. We [19] have the same arguments with regards to 18.

[20] **MR. McDOLE:** And I disagree. [21] Document 18 is actually different, you know, [22] taking the premise that Your Honor just stated.

[23] **SPECIAL MASTER:** Yes.

[24] **MR. McDOLE:** Document 18, the

Page 96

[1] description is Email communication re agenda for [2] teleconference with Jodi Barry, the CEO of ECHO.

[3] Re procedures available to [4] invalidate and or handle patent infringement [5] allegations by LML. The subject matter is the [6] same as the subject matter of number two, which [7] Your Honor has already found waived.

[8] While this document is between [9] simply outside counsel, again, I'd reiterate that [10] my argument — that Mr. Mizrahi, at this point, [11] is simply acting as a go between between opinion [12] counsel and the client. He is simply a [13] go between. ECHO is essentially protecting the [14] communications between, because Mr. Mizrahi is [15] receiving them and passing them on to ECHO.

[16] That can't be the case. You can't [17] have a shell corporation essentially protecting [18] that privilege.

[19] **SPECIAL MASTER:** Okay. On 18, this [20] is going from Mr. Mizrahi, Mark B. Mizrahi; [21] right? And it goes to Edward Poplawski and [22] Denise McKenzie.

[23] **MR. McDOLE:** Correct, Your Honor. [24] But it specifically discusses what they're going

Page 97

[1] to talk about with the client, Jodi Barry, the [2] CEO of ECHO. That's the difference here.

[3] I understand your premise that this [4] is just attorneys, but what they're discussing [5] actually what — they're going to talk about the [6] client.

[7] **SPECIAL MASTER:** Well, what if they [8] never had the conversation? What if they never [9] had the teleconference for some reason?

[10] What if it didn't go off? Then it [11] would never get to the client; right?

[12] **MR. McDOLE:** You would be correct, [13] Your Honor.

[14] **SPECIAL MASTER:** Yeah. So we don't [15] know if the instance this was sent whether we [16] have a teleconference or not. Maybe the [17] conference is somewhere else, entirely different [18] than what the attorneys expected to be [19] discussing.

[20] Isn't this still between the [21] attorneys?

[22] **MR. McDOLE:** It is still between the [23] attorneys. And the second point I'd still like [24] to make, Your Honor, with respect to the

Page 98

[1] attorneys, we're talking about the attorneys [2] themselves. And we're talking about the advice [3] of counsel defense.

[4] The second prong of our argument is [5] that it's the same subject matter regardless of [6] advice of counsel. And this document, you've [7] already allowed us to have Document Number 2. [8] You've ordered that earlier in the day.

[9] This is the same subject matter, and [10] therefore, there's a waiver, just a subject [11] matter waiver outside advice of counsel that [12] relates to this. So it's a two-prong argument.

[13] **SPECIAL MASTER:** Okay.

[14] **MR. DiGIOVANNI:** And Your Honor, I [15] have two points.

[16] The first is it's very different [17] than Document 2. Document 2 was received by the [18] Board of Directors of ECHO.

[19] **SPECIAL MASTER:** Let's talk about [20] 18.

[21] **MR. DiGIOVANNI:** Okay. Document 18 [22] is solely internal, and I'm going to ask [23] Mr. Min to speak on that point in terms of who [24] the attorneys were at this time. And I believe

Page 99

[1] that characterization of Mr. Mizrahi is

[2] incorrect.

[3] Mr. Min.

[4] **MR. MIN:** Mr. Mizrahi — ECHO was [5] Mr. Mizrahi's client. Most of — the opinion [6] counsel, Denise McKenzie, was in constant contact [7] with in-house counsel, Marshall Frost, during [8] whose — related to issues related to the opinion [9] that was rendered.

[10] Mr. Mizrahi was in contact with [11] others, as any client would be with — as any [12] counsel would be with their client, because on [13] issues that didn't really have necessarily to do [14] with the opinions, for example, the CEO didn't [15] know who was rendering the opinions, who was [16] actually posturing it.

[17] He only knew Mark Mizrahi, his name [18] and who he was, and that he was the [19] representative of Sidley Austin at the time. So [20] that he was in contact with Mr. Mizrahi just out [21] of convenience.

[22] **MR. DiGIOVANNI:** Your Honor, the [23] point being all three attorneys were at Sidley [24] Austin at the time, and it was internal

Page 100

[1] communication between them —

[2] **SPECIAL MASTER:** Well —

[3] **MR. DiGIOVANNI:** — that never was [4] sent to the client.

[5] **SPECIAL MASTER:** So how is it [6] attorney-client privilege?

[7] **MR. MIN:** Well, the message — [8] implicit in the message is the request from the [9] client about the agenda, about what they could [10] do, what actions, what prospective actions they [11] could take.

[12] **SPECIAL MASTER:** Edward Poplawski is [13] counsel for who?

[14] **MR. DiGIOVANNI:** He's a partner at [15] Sidley and Austin at this time.

[16] **SPECIAL MASTER:** Yes.

[17] **MR. DiGIOVANNI:** And Denise [18] McKenzie, I don't know if she's a partner or [19] associate.

[20] But Mark Mizrahi, Denise McKenzie [21] and Edward Poplawski are the only people who are [22] copied on this Email are all attorneys at Sidley [23] Austin at the time.

[24] **SPECIAL MASTER:** And Poplawski

Page 101

[1] represented ECHO here?

[2] **MR. DiGIOVANNI:** All three [3] represented ECHO at the time.

[4] **SPECIAL MASTER:** Mm-hmm.

[5] Well, okay. If it's work product, [6] it's waived. Work product is waived. So it [7] will [7] be disclosed on that ground.

[8] It has to do with the topic of the [9] LML patent, and options and things like that.

[10] So, 18 is waived.

[11] MR. McDOLE: Document 19, Your [12] Honor.

[13] SPECIAL MASTER: 19. Let's see, 19, [14] 20 and 21 are connected? Maybe not.

[15] MR. McDOLE: I don't believe so, [16] Your Honor. We should probably take those one at [17] a time.

[18] They are all the same day; right? [19] They're all the same date?

[20] MR. DiGIOVANNI: They're all part of [21] the same Email chain.

[22] SPECIAL MASTER: It's an Email [23] chain, so to speak.

[24] MR. McDOLE: Okay.

Page 102

[1] MR. DiGIOVANNI: As is 22, I [2] believe. Yes.

[3] MR. McDOLE: Your Honor has more [4] information than I do on that.

[5] SPECIAL MASTER: Just look at the [6] log. The date is the same; right?

[7] MR. McDOLE: Yeah. The dates are [8] the same. I agree.

[9] SPECIAL MASTER: And they seem to be [10] coming from kind of the same people and going to [11] the same people pretty much.

[12] MR. McDOLE: We can address them [13] altogether. That's fine.

[14] I was unaware.

[15] SPECIAL MASTER: I want to get [16] through this. I don't want to nitpick all these.

[17] If I get it on — these logs are the [18] ones that — all right. Let's go over that.

[19] Let's go with where we are. 18. We [20] did 18; right?

[21] MR. McDOLE: Yes. We can handle 19 [22] through 21 together.

[23] SPECIAL MASTER: 19, 20, 21, let's [24] try to do it together, if we can.

Page 103

[1] MR. McDOLE: These documents have [2] been waived. The opinions of counsel, you've [3] already heard the arguments, Your Honor.

[4] I won't repeat them. But LML [5] believes the opinion goes to more than just [6] validity. They go to infringement.

[7] SPECIAL MASTER: Okay.

[8] MR. McDOLE: 19, for instance, just [9] says Email communication, re status of patent [10] analysis, opinion of counsel. This is a patent [11] analysis.

[12] Presumably that means LML's patents. [13] Since it's on the log, it's got to be a relevant [14] document. So I assume that and the rest of it is [15] information that's being requested by outside [16] counsel, and it's being provided.

Page 104

[1] similar argument as to the one we made before. [2] They do not relate to the subject matter of the [3] '988 opinion. They do not relate to invalidity [4] of the '988 patent.

[5] And, also, we have the issue of the [6] date 2001 that was after their rendering of the [7] '988 opinion.

[8] SPECIAL MASTER: Let me get this [9] first.

[10] MR. DiGIOVANNI: And it — in num-[11]ber 20, Your Honor, —

[12] SPECIAL MASTER: Yes.

[13] MR. DiGIOVANNI: — you'll see a [14] discussion of particular specifications, you [15] could say, or description of the accused system. [16] Again, that relates only to noninfringement, not [17] to invalidity, which is the subject matter of [18] the '988 opinion.

[19] SPECIAL MASTER: Yes.

[20] MR. DiGIOVANNI: And    Your Honor, [21] again, I don't know if you want me to read you the [22] summary of the con-clusions of the opinion of [23] counsel, again, that's stated on Page 2 of the [24] March 7th, 2003 opinion. And there's similar

Page 105

[1] statements in the other opinion. But the [2] opinion — counsel specifically provided an [3] opinion on non-infringement. It is incorrect to [4] say that this opinion is only on validity.

[5] He discusses not addressing at least [6] five, six claims, maybe seven here. Claims 8, [7] and 13 through 18, and according to information [8] received by you, being ECHO, including the [9] functional spec-ification and related documents [10] that you provided to us, Electronic Clearing [11] House, ECHO, does not make, use, sell any [12] products/services which contain the elements that [13] were cited in Claims 8 and 13 through 18.

[14] And it specifically cites to a [15] footnote of the information that was provided to [16] them, that infringement is whether the company [17] makes, uses, sells, offers for sale, or imports [18] into the United States an infringing product.

[19] SPECIAL MASTER: And that's an [20] opinion where?

[21] MR. McDOLE: This is the opinion, [22]

Page 2 of the March 7th, 2003 opinion. It's in [23] the last two sentences of the summary of [24] conclusions in the '988 patent.

Page 106

[1] In the May 5th, 2000 opinion, [2] there's a statement regarding Claim 6 in that [3] regard.

[4] SPECIAL MASTER: Is 22 tied into [5] this, too?

[6] MR. DiGIOVANNI: No, Your Honor. [7] That's not been challenged.

[8] SPECIAL MASTER: Okay. All right. [9] I think it's waived.

[10] MR. McDOLE: Thank you.

[11] SPECIAL MASTER: All right.

[12] MR. McDOLE: Your Honor, the next [13] document is Document Number 24. This is —

[14] SPECIAL MASTER: Was 24 one that [15] was — okay. Go ahead.

[16] MR. McDOLE: 24, the description [17] here is Email communication, re prior art [18] and prospective actions. Again, this is from [19] Mr. Poplawski who is at the same firm as where [20] the opinions of counsel are coming from.

[21] And it is — it does go to [22] Mr. Mizrahi, who is ECHO's counsel as well.

[23] MR. DiGIOVANNI: Actually it's the [24] other way around.

Page 107

[1] MR. McDOLE: I'm sorry. It goes [2] from Mr. Mizrahi to Mr. Poplawski, again, [3] regarding prior art and prospective actions. So [4] there is no client involved here.

[5] But I reiterate my position that [6] this goes to a subject matter waiver of prior [7] art. Part of the opinions do relate to [8] invalidity. They're discussing prior art.

[9] And we believe on that basis [10] outside, while we believe advice of counsel and [11] the reliance thereon waives that privilege, we [12] also believe that there's a subject matter waiver [13] as well with respect to simply having other [14] documents produced in on the same subject matter.

[15] MR. DiGIOVANNI: Your Honor, this [16] document is claimed as attorney-client work [17] product. But with specific reference to the work [18] product claim, I, again, reiterate that neither [19] the Thorn case nor the Cytyc case have been [20] overruled by that Federal Circuit case, which is [21] not on point.

[22] Thus, the governing authority that [23] Judge Robinson has relied on con-sistently states [24] that work product —

Page 108

[1] SPECIAL MASTER: Well, so [2] attor-ney-client privilege was claimed; right?

LML Patent Corp.  v.
Telecheck Services, Inc., et al.

[3] MR. DiGIOVANNI: Attorney client and [4] work product privilege. The attorney-client [5] privilege does not require that the document be [6] communicated, the document itself be sent to the [7] client.

[8] SPECIAL MASTER: Right.

[9] MR. DiGIOVANNI: This was [10] attorney-client matters that were discussed [11] amongst two members of the same law firm. This [12] document was never put in possession of a client.

[13] It's pure work product. And under [14] Cytyc and Thorn, it cannot — there is no waiver [15] of the work product.

[16] SPECIAL MASTER: Well, I think it's [17] a waiver in its content, contents of the message. [18] It makes it plain that it's waived. And if I [19] might say, that's very similar to the description [20] reference to prior art.

[21] MR. McDOLE: Your Honor, the next [22] document is 25. And —

[23] SPECIAL MASTER: Let me get this. [24] 24. Keep it straight here. I'm doing it the

---

Page 109

[1] best I can.

[2] All right. Wait one second.

[3] MR. McDOLE: I actually believe 25 [4] through 27 or 25 through 29 — I know we have [5] different arguments with respect to 28 and 29, [6] but at least documents 25 and 27 are all maybe an [7] Email chain.

[8] MR. DiGIOVANNI: 25 and 26 are, and [9] the other chain is 27 through 29.

[10] SPECIAL MASTER: I have here 25 and [11] 26 in one folder.

[12] MR. McDOLE: Okay.

[13] SPECIAL MASTER: Should we address [14] that?

[15] MR. McDOLE: That sounds good.

[16] MR. DiGIOVANNI: Yes.

[17] SPECIAL MASTER: All right.

[18] MR. McDOLE: Your Honor, here we're [19] talking — the argument we have here is just [20] inadequate description for a claim of privilege. [21] The description that's provided is Email [22] communication re NACHA contact information.

[23] That is not, at least from the [24] description that we have, is not rendering any

---

Page 110

[1] legal advice. There's no privilege there.

[2] Simply because it is communicated [3] with an attorney doesn't mean effectively that [4] it's privileged. There has to be some sort of [5] legal advice contained therein.

[6] And if it's simply an Email [7] com-

munication regarding NACHA contact [8] information, that is not privilege.

[9] SPECIAL MASTER: This is [10] communication to Mr. Dick, who is the official [11] with ECHO, RMRS Division of ECHO; right?

[12] MR. MIN: Right.

[13] SPECIAL MASTER: All right. As for [14] Mr. Mizrahi. 25, 26. Let me just see it now. [15] Let's see.

[16] MR. DiGIOVANNI: Your Honor.

[17] SPECIAL MASTER: Yes.

[18] MR. DiGIOVANNI: The document — the [19] two documents, 25 and 26, are an exchange [20] regarding investigation in anticipation of [21] litigation, in anticipation and in furtherance of [22] providing legal advice.

[23] So you have work product, and [24] attorney-client communications. You have the

---

Page 111

[1] attorney communicating directly with the client.

[2] And the purpose of doing that is to [3] provide legal advice. As I understand it, the [4] only argument that is being made, in fact, the [5] only argument that is being made with regard to [6] 25 and 26 is that there was inadequate [7] description.

[8] We disagree with that. It says [9] Email communication regarding NACHA contact [10] information. It clearly shows on the log entry [11] that it was from Mr. Mizrahi to Mr. Dick. And [12] the statement work-product immunity lets the [13] reader of the log know that this was made in [14] anticipation of litigation.

[15] And the same is said with regard to [16] the attorney-client designation, which says the [17] communication was made in furtherance of [18] providing legal advice. So we think the [19] description was sufficient.

[20] MR. McDOLE: And Your Honor, I would [21] simply submit that the description that [22] Mr. DiGiovanni provided is completely different [23] than the description that's in the log here. The [24] description in the log simply makes this out to

---

Page 112

[1] be, you know, an Email regarding some contact [2] information for notch.

[3] That's not legal advice. And that's [4] why our claim is with respect to inadequate [5] description, because based on the description, [6] there's simply no legal advice being sought.

[7] SPECIAL MASTER: Okay. All right. [8] This has happened — the problem [9] with the description is it doesn't — it's so [10] neutral, it doesn't tell anything from the [11] viewpoint of adversary counsel

advising his [12] counsel.

[13] The client would say — LML would [14] say to its counsel, look at the log saying, Do we [15] have a basis to get that document? There's no [16] way to tell.

[17] There's no indication either way. [18] It's exactly — it's so neutral that, you know, [19] in the first place, nobody requires the [20] description space to be, what is it, an eighth of [21] an inch wide?

[22] I just — I just think on this topic [23] that the descriptions just don't help. It [24] doesn't help.

---

Page 113

[1] It's got to be some, if you will, [2] willingness of counsel receiving this, like LML [3] to make the leap between what's given and some [4] judgment to its client. And I think that's [5] considered, because you can't disclose, if it's [6] privileged, everything in the description.

[7] So it's understood in some [8] professional balance there, but this doesn't [9] really say anything. This isn't much better than [10] simply saying, We think it's privileged. I mean, [11] how does that help?

[12] So let's start just with that. Now, [13] while it's true, as I look at the document, that [14] that description would fit part of it. But the [15] context suggests that there's more to it than [16] just the name of a person.

[17] There's something in here that [18] relates to the reason that person would be [19] contacted. And I think that — I think that [20] topic has been waived.

[21] 25, 26, waived.

[22] MR. McDOLE: Your Honor, with [23] respect to — it sounds like from Mr. DiGiovanni, [24] 27 through 29 are an Email chain.

---

Page 114

[1] SPECIAL MASTER: Let me get that. [2] One second, please.

[3] Put this one away. Mark something [4] on here.

[5] MR. DiGIOVANNI: 30 and 31 are also [6] part of that chain. We can address those [7] altogether.

[8] SPECIAL MASTER: Let me see 25, 26. [9] Put this one away.

[10] The next one is 27 through 31. I [11] have that in a group here. This is just, [12] again, a chain of Emails; right?

[13] That may not be correct.

[14] MR. McDOLE: Your Honor, I [15] understand that this is an Email chain. The [16] problem I have with this is there's [17] different arguments.

[18] There's five different entries that [19] have — some of them have different descriptions.

[20] SPECIAL MASTER: Right.

---

[21] MR. McDOLE: You know, it's going to [22] be difficult for me to argue it all in one [23] context without having the document in front of [24] me. I can go one by one and sort of highlight

Page 115

[1] our argument, evidence arguments for each.

[2] SPECIAL MASTER: Let me just take a [3] minute. I've never seen this before.

[4] They're only a page and a half. [5] They're short snippets of Emails, which is rather [6] common.

[7] Let me just look at it first, and [8] then that might help us guide us through this.

[9] Okay. 30 is sent and 31 is simply [10] resent of the same. That gets us to 29. That is [11] between executives.

[12] 28. Okay. [13] Now, without having looked at that, [14] just let me read the description again.

[15] All right. Mr. DiGiovanni. I want [16] to hear from Mr. DiGiovanni first.

[17] MR. DiGIOVANNI: Yes, Your Honor. [18] This Email chain originated with Document 30. [19] Document 30 is a request from outside counsel, [20] Mr. Mizrahi, to Mr. Barry, the CEO of ECHO.

[21] And it is a — what the log states [22] is an Email communication regarding status of [23] defensive strategies, re LML patents. And as you [24] will see, that is a fair description of what is

Page 116

[1] going on here in terms of strategies, in terms of [2] procedural avenues, and sort of what to do next, [3] getting things organized, investigation —

[4] SPECIAL MASTER: Sure.

[5] MR. DiGIOVANNI: — with regard to [6] proceeding forward with regard to the LML [7] patents.

[8] MR. MIN: I'd also like to add that [9] if you look at the dates on it, it's one month [10] after. Approximately, one month after patent [11] counsel for LML sent a letter to Jodi Barry [12] regarding patents in suit, just to put it in [13] context.

[14] SPECIAL MASTER: All right.

[15] MR. DiGIOVANNI: And the follow-up [16] documents above it, 31, 29, 28 and 27 are [17] follow-up back and forth communications.

[18] SPECIAL MASTER: Yeah. They have a [19] exchange of questions and answers that end up —

[20] MR. DiGIOVANNI: Right.

[21] SPECIAL MASTER: — one line at the [22] end.

[23] MR. DiGIOVANNI: All regarding [24] moving forward with an investigation pertaining

Page 117

[1] to the patents.

[2] SPECIAL MASTER: Okay. These take [3] place in June '01.

[4] Okay. That patent suit has been [5] filed by now; right?

[6] MR. DiGIOVANNI: No.

[7] SPECIAL MASTER: Wasn't that in [8] '01?

[8] MR. DiGIOVANNI: The lawsuit was [9] filed on July 14th of '03.

[10] MR. McDOLE: The opinions —

[11] SPECIAL MASTER: Oh, that's right.

[12] MR. McDOLE: We sent the letter.

[13] SPECIAL MASTER: The 4th or the [14] 14th?

[15] MR. DiGIOVANNI: The 14th.

[16] MR. MIN: The 14th, Your Honor.

[17] SPECIAL MASTER: Bastille.

[18] MR. DiGIOVANNI: Also, my birthday.

[19] SPECIAL MASTER: Okay. But there [20] had been some discussion up to this point, [21] letters and the like.

[22] MR. McDOLE: Yes, Your Honor.

[23] A couple points. First, documents [24] 27, 28 and 29 have the same inadequate

Page 118

[1] description —

[2] SPECIAL MASTER: True.

[3] MR. McDOLE: — as 25 and 26.

[4] SPECIAL MASTER: That's true.

[5] MR. McDOLE: So there's subject [6] matter waiver that would occur there.

[7] Second of all, Documents 27 and 28 [8] do not even have an attorney on them. While Your [9] Honor is looking at an Email chain, these are [10] separate log entries.

[11] And from what we see, there is no [12] attorney listed in Documents 27 and 28. So on [13] top of the inadequate description, you end up [14] with no attorney even being on the document as [15] well. The attorney — Document 30, Document 30 [16] is the same description as documents that have [17] already been waived as Documents 7 and 8.

[18] That have I shouldn't say that [19] have already been waived, that ECHO has [20] voluntarily produced as within the advice of [21] counsel defense relating to the defense in [22] defensive strategies relating to the LML patents.

[23] SPECIAL MASTER: Well, I think [24] they're very similar to those we just spoke of,

Page 119

[1] 25 and 26. That's the same category as [2] that without reading it.

[3] I think it's waived.

[4] MR. DiGIOVANNI: Does that include [5] 31, Your Honor, your ruling?

[6] I'm sorry. I'm sorry.

[7] SPECIAL MASTER: Yeah, 27.

[8] MR. DiGIOVANNI: I meant 30.

[9] SPECIAL MASTER: We're beginning [10] with — okay. The numbers are a little reversed [11] in a way. The earliest one is 30.

[12] MR. DiGIOVANNI: Does your ruling [13] apply to 30? We submit that one is sufficiently [14] different.

[15] SPECIAL MASTER: No. I think that's [16] waived. The content of that is.

[17] MR. McDOLE: And, Your Honor, I [18] would just point out that Mr. DiGiovanni wanted [19] to talk about them all in the same context [20] because they were the same Email.

[21] MR. DiGIOVANNI: Your Honor, if I [22] asked to speak with them in the same context, I'm [23] not saying they have the same exact arguments for [24] each one.

Page 120

[1] SPECIAL MASTER: I understand. I [2] just think it's a thread that runs through this [3] that can't be broken. 27, 28, 29, 30, 31, I [4] think waived.

[5] 31. Okay.

[6] MR. McDOLE: I believe that brings [7] us to document 32, Your Honor.

[8] SPECIAL MASTER: 32.

[9] MR. McDOLE: 31 was included in [10] your —

[11] SPECIAL MASTER: Yes, it was.

[12] MR. McDOLE: Okay. Document 32 is [13] a description on ECHO's July 28th privilege log [14] that states Email communication to assistant, re [15] file history for patents 5,484,988 and 6,164,528. [16] This is a communication between Mr. Mizrahi — [17] from Mr. Mizrahi to his file assistant presumably [18] to order the file histories of the patents.

[19] The reason this is relevant, Your [20] Honor, is the opinions of counsel specifically [21] talk about the prosecution history in detail. [22] And so the patents — something that has been [23] waived, an attorneys' characterization in the [24] opinions of counsel of the prosecution history of

Page 121

[1] the '988 patent is the same subject matter that [2] relates to Document 32.

[3] And I would presume 33 as well. 33 [4] also relates to file histories. Although that [5] one goes to Mr. Poplawski, who is the same firm [6] as where the opinions of counsel came from.

[7] SPECIAL MASTER: All right.

[8] MR. DiGIOVANNI: Your Honor, this is [9] a communication from Mr. Mizrahi,

LML Patent Corp.  v.
Telecheck Services, Inc., et al.

**Hearing**
October 12, 2005

outside [10] counsel, to his paralegal and his secretary, as I [11] understand it —

[12] SPECIAL MASTER: Uh-huh.

[13] MR. DIGIOVANNI: — regarding taking [14] action on a file for a client. The communication [15] was never sent to the client. It was completely [16] internal from Mr. Mizrahi to his staff.

[17] I have never seen the situation, [18] Your Honor, with all due respect, where such a [19] communication is deemed waived or otherwise not [20] privileged or subject to work product.

[21] MR. DIGIOVANNI: And the description [22] is sufficient, Your Honor. Okay.

[23] LML is not challenging it.

[24] SPECIAL MASTER: It looks to me like

Page 122

[1] and 33 have to be read together. It's just a [2] identification of a work assignment among counsel [3] and a subordinate.

[4] So I think that's privileged. I [5] don't think — that's not waived.

[6] 32, 33 not waived.

[7] MR. McDOLE: Your Honor, the next [8] document is Document 35. 34 is not challenged, [9] so we're on 35.

[10] SPECIAL MASTER: I just want to ask [11] one — well, okay.

[12] No, go ahead. 32, 33. [13] 35. All right. [14] I have 35.

[15] MR. McDOLE: The description is [16] Email communication, re discussion with Ed [17] Poplawski.

[18] SPECIAL MASTER: 34 is not — we're [19] not concerned with that; right?

[20] MR. McDOLE: Right. Correct, Your [21] Honor.

[22] SPECIAL MASTER: That's been [23] provided or just no objection?

[24] MR. McDOLE: We just don't have an

Page 123

[1] objection to that.

[2] SPECIAL MASTER: All right. Let me [3] just get this.

[4] I want to keep my box square here. [5] 35 I have. Okay.

[6] MR. McDOLE: Your Honor, this is — [7] the description reads here Email communication, [8] re discussion with Ed Poplawski, Esquire and Mark [9] Mizrahi, Esquire, re LML patent infringement [10] allegation and prospective actions.

[11] Your Honor, a document that has [12] already been produced in this case, Document [13] Number 9 that you've held waived already has the [14] same description. It's the same subject matter.

[15] Again, this relates to how they were [16] handling patent infringement al-

legations. It [17] goes directly to the same subject matter.

[18] SPECIAL MASTER: All right. Is that [19] your understanding that Number 9 has been [20] produced?

[21] MR. DIGIOVANNI: Your Honor, you [22] ruled that Number 9, that was the portion of the [23] minutes. Remember we looked at that?

[24] SPECIAL MASTER: Yes, we did.

Page 124

[1] MR. DIGIOVANNI: You ordered that to [2] be that the privilege is waived.

[3] SPECIAL MASTER: Was that the same [4] as this, essentially?

[5] MR. DIGIOVANNI: It's from a [6] different person. It is a similar subject [7] matter.

[8] Mr. Min, if you have a different [9] understanding, please state so.

[10] MR. MIN: I believe it is a similar [11] subject matter.

[12] It does deal with proceeding forward [13] and does not deal with the substance of the [14] invalidity opinion or even an infringement [15] opinion, but it just deals with moving forward [16] and procedural evidence. I think it's well [17] within the same subject matter in that context.

[18] SPECIAL MASTER: I don't think [19] this — this wouldn't escape waiver, I don't [20] believe, if I read it.

[21] 35, waived.

[22] MR. McDOLE: Your Honor, that brings [23] us to the next document, Document 36, the [24] description reads Email communication containing

Page 125

[1] time estimate re legal opinion.

[2] Now, this is a document between [3] Mr. Mizrahi or from opinion counsel to [4] Mr. Mizrahi.

[5] SPECIAL MASTER: All right.

[6] MR. McDOLE: Presumably from the [7] description, this is a time estimate as to render [8] one of the opinions of counsel that we're talking [9] about. That's the words of legal opinion that [10] comes in there.

[11] And I note that this is more than [12] just a work product claim. This is an [13] attorney-client claim as well.

[14] So you're talking two different [15] things. This goes to the heart of a time [16] estimate, and my argument that Mr. Mizrahi was a [17] go between between opinion counsel and ECHO.

[18] That's why he's getting a time [19] estimate on the opinions of counsel.

[20] SPECIAL MASTER: Well, I guess [21] Denise McKenzie, opinion counsel, is writing to [22] counsel for ECHO; right?

[23] MR. MIN: Yes.

[24] SPECIAL MASTER: Which is the thing

Page 126

[1] to do, professional thing to do; right? I don't [2] see anything wrong with that.

[3] And I would surmise, I guess, it has [4] to do with cost, because it has to do with time [5] and that sort of thing. So I don't know, why is [6] it a problem for anybody? Wouldn't that be the [7] normal thing to do?

[8] What's the objection on producing [9] this?

[10] MR. DIGIOVANNI: Your Honor, it's [11] purely internal work product and attorney-client [12] privilege information being transferred between [13] two attorneys at a law firm. This type of [14] communication and this particular — this [15] specific communication was never transferred to [16] the client.

[17] It's purely work product and [18] attorney-client privilege, and it's not the type [19] of information that was sent to the client. And, [20] thus, the client somehow relied on it or [21] otherwise considered it in terms of determining [22] whether it willfully infringed the patent.

[23] SPECIAL MASTER: What document [24] request did this respond to? I mean, the first

Page 127

[1] decision your client made, ECHO made was to honor [2] the document request between —

[3] MR. DIGIOVANNI: Sure.

[4] SPECIAL MASTER: — why it's [5] relevant or admissible legal evidence or not.

[6] MR. DIGIOVANNI: Yes, that's right.

[7] SPECIAL MASTER: Like if it was — [8] something in your papers here had to do with an [9] annual picnic of ECHO, you wouldn't put that in [10] the log; right?

[11] MR. DIGIOVANNI: Sure.

[12] SPECIAL MASTER: That's an easy one, [13] because that's nothing to do with the case. So [14] why would this be some discovery request?

[15] MR. DIGIOVANNI: My recollection was [16] there was one document request or several [17] document requests that talk about any documents [18] mentioning or otherwise referring to the LML [19] patents. And it —

[20] SPECIAL MASTER: I see. All right.

[21] MR. DIGIOVANNI: — refers to the LML [22] patent; however, it is privileged, and it is work [23] product.

[24] MR. MIN: I also believe that there

Page 128

[1] was another request asking for any sort of [2] opinions analysis of the patent.

Case 1:04-cv-00858-SLR    Document 444-3    Filed 11/21/2005    Page 22 of 33

Hearing                                              LML Patent Corp.    v.
October 12, 2005                           Telecheck Services, Inc., et al.

[3] SPECIAL MASTER: Okay. All right. [4] Well, okay. I have some concern [5] whether it has any relevance or whether [6] it would be admissible for any reason [7] to address any issue [7] in the case. But it [8] would be gathered up in the [8] request [9] for production as described by [9] Mr. DiGiovanni. There's no question about that.

[10] I'll say it's privileged. Work [11] product. I'm not sure about attorney client.

[12] This is at the instance of the [13] attorney doing his work. So maybe the [13] client [14] didn't even know about this. So I won't support [15] attorney client, but I will support work product.

[16] And in my method that would be a Y [17] for work product and an N for attorney client.

[18] MR. McDOLE: By my count, Documents [19] 37 through 43 have been produced.

[20] SPECIAL MASTER: All right. 37 to [21] 43 produced.

[22] MR. DIGIOVANNI: If I may, Document [23] 44 is a duplicate of 9, duplicate of Document 9.

[24] MR. McDOLE: Right.

### Page 129

[1] SPECIAL MASTER: Is that the same [2] minutes we spoke of earlier?

[3] MR. DIGIOVANNI: Yes, Your Honor.

[4] MR. McDOLE: Yes, it looks like [5] we'-ve come to an agreement. This is a duplicate [6] of 9, so I believe your ruling on 9 —

[7] SPECIAL MASTER: That was the same [8] ruling on 9 as on 44; right? Same as 9?

[9] MR. DIGIOVANNI: 45 was produced, so [10] was 46. Okay.

[11] SPECIAL MASTER: All right. Next.

[12] MR. McDOLE: ECHO has told us this [13] morning 45 and 46 have been produced.

[14] MR. DIGIOVANNI: Actually to correct [15] the record, we told you long ago that those [16] documents were produced.

[17] SPECIAL MASTER: Yes, you did. And [18] you wrote me a letter. You said that, did you [19] not?

[20] MR. McDOLE: Yes, I did.

[21] SPECIAL MASTER: I recall that.

[22] All right. Next document at issue [23] would be Document 49.

[24] SPECIAL MASTER: 49.

### Page 130

[1] MR. McDOLE: This, again, relates to [2] the Visa issue. The description is memorandum re [3] legal advice, re patents in suit.

[4] There was — the author is Jonathan [5] Scott, who is identified as a Visa attorney, and [6] recipient is Visa U.S.A., Inc.

[7] However, this document is in the [8] possession of Electronic Clearing House, and I [9] think we addressed earlier why the Visa opinion [10] would be relevant with respect to the fact that [11] the client received that opinion, not only [12] internal counsel and the CEO and different [13] technical people at ECHO, but also opinion [14] counsel received this.

[15] MR. McDOLE: And by the very nature [16] of that, the document — the privilege would be [17] waived.

[18] MR. DIGIOVANNI: And Your Honor, [19] Document 49, do you have that document, Your [20] Honor?

[21] SPECIAL MASTER: I do.

[22] MR. DIGIOVANNI: Okay. Thank you. [23] Document 49 is the opinion of [24] counsel that Visa obtained from its outside

### Page 131

[1] counsel. The privilege claimed by ECHO is [2] attorney-client privilege and work product.

[3] And the attorney-client privilege is [4] available to ECHO under the common legal interest [5] document.

[6] Visa and ECHO, at that time, had a [7] common legal interest. Visa was using ECHO's [8] product, and thus, they both could have been [9] subject to suit by LML by its patents.

[10] SPECIAL MASTER: Okay.

[11] MR. DIGIOVANNI: Thus, they had the [12] identical legal interests in terms of they both [13] use the same system, so that they both had the [14] same legal interest of being subject to, [15] potentially subject to an infringement suit based [16] on that same product. So, thus, the common legal [17] interest applies.

[18] Now, the document itself is a clear [19] attorney-client communication. A provision of an [20] opinion on noninfringement/infringement, whatever [21] the case may be to the client Visa.

[22] So an attorney-client communication, [23] it has not been waived, because that opinion of [24] counsel has not been produced and is not being

### Page 132

[1] relied upon with regard to the allegation of [2] infringement of the '988 patent.

[3] Again, the date is after the date of [4] the May 5th or May 3rd opinion, May 3rd, 2000 [5] opinion that ECHO is relying on.

[6] And, thus, the document is — [7] there's no reliance waiver with regard to that [8] opinion.

[9] MR. McDOLE: Your Honor, I would [10] note two things. First, ECHO has not made a [11] common interest claim here. If you refer back to [12] their other claims with respect to Visa, they [13] specifically put common interest here.

[14] It's not in this document as well. [15] I believe that it would have waived that [16] argument.

[17] Second, the issue here is this goes [18] to the heart of — ECHO can't simply make the [19] argument, We're not relying on it, so we don't [20] have to give it to you. This is why we're [21] entitled to a subject matter waiver, so that they [22] don't pick the two best opinions for themselves, [23] take an opinion that they may not agree with, or [24] which may contradict their argument and help us

### Page 133

[1] prove our case of willful infringement that they [2] have in their possession.

[3] This is on their log. And allowing [4] them to keep it without allowing us to [5] investigate what other opinions they have and [6] something that was certainly, as we discussed [7] earlier, given to their client, given to opinion [8] counsel, and seen at that point, whether they [9] want to officially rely on it at trial is [10] completely different.

[11] And then they've seen it, and it [12] affected their decision making when the time [13] counted with respect to whether they continued [14] going the path that they did or not. Especially [15] with respect to the Visa products.

[16] SPECIAL MASTER: Well, let me ask a [17] couple other questions about this Visa situation. [18] Was there any communication between LML and Visa [19] about Visa not being named a party here?

[20] I mean, was there any understanding [21] about that or — because is Visa still subject to [22] suit or?

[23] MR. McDOLE: Your Honor, Visa could [24] technically still officially be subject to suit.

### Page 134

[1] I don't believe that ECHO performs — I would [2] have to go through and do an analysis based on [3] it, but I don't believe ECHO actually has a front [4] end system all the way through a back end system.

[5] They provide a service or a database [6] which ECHO uses, and ECHO prefers that vehicle [7] on Visa's POS system. ECHO has a system that calls [8] out to this Visa system. And the entire system [9] is what is at issue here, and not just an [10] individualized piece of it.

[11] SPECIAL MASTER: All right. So Visa [12] is not confronting litigation in any way, as far [13] as we know?

[14] Been any demands by LML to stop [15]

LML Patent Corp.   v.
Telecheck Services, Inc., et al.

Hearing
October 12, 2005

doing what you're doing or anything?

[16] MR. McDOLE: There may have been a [17] letter sent a few years ago simply identifying [18] the patents.

[19] SPECIAL MASTER: I see.

[20] MR. McDOLE: But no accusations of [21] infringement whatsoever. It depends how you take [22] those kinds of letter. They're simply [23] identified.

[24] SPECIAL MASTER: Can I ask one more

Page 135

[1] thing?

[2] What about the infringement that LML [3] claims, whatever way you want to characterize [4] that, in this trial, will there be evidence that [5] that's ongoing?

[6] MR. McDOLE: That what is ongoing? [7] I apologize.

[8] SPECIAL MASTER: Whatever the [9] infringement is LML says ECHO is doing.

[10] MR. McDOLE: Oh, yes. ECHO is [11] still —

[12] SPECIAL MASTER: Is it happening [13] today?

[14] MR. McDOLE: Yes, Your Honor.

[15] SPECIAL MASTER: ECHO products, [16] whatever they're doing in the marketplace, you [17] construe that to be an infringement of LML's [18] products?

[19] MR. McDOLE: Correct, Your Honor.

[20] SPECIAL MASTER: Are you seeking [21] injunctive relief regarding that?

[22] MR. McDOLE: Correct, Your Honor.

[23] SPECIAL MASTER: Okay. LML's [24] position is you were not infringing?

Page 136

[1] MR. McDOLE: ECHO's position is.

[2] SPECIAL MASTER: I'm sorry. See you [3] do that, we'd be out of here.

[4] ECHO's position, and it's ECHO's [5] position that they're not infringing. And it's a [6] question of validity. And that's the defense.

[7] I see.

[8] MR. McDOLE: Correct.

[9] SPECIAL MASTER: Well, gentleman — [10] MR. DIGIOVANNI: Your Honor, can I [11] address what Mr. McDole said?

[12] SPECIAL MASTER: Oh, yes, please.

[13] MR. DIGIOVANNI: Mr. McDole made [14] reference to the interaction between what Visa [15] does and what ECHO does. ECHO does supply a [16] particular service, but Visa supplies additional [17] materials.

[18] So in terms of an infringement or [19] noninfringement opinion regarding Visa, it would [20] be different than an analysis of infringement or [21] noninfringement of ECHO, because Visa

itself [22] has — does different things, provides different [23] services and has different components. So the [24] issues are not the same.

Page 137

[1] SPECIAL MASTER: Well, there might [2] be some features of that that would be useful.

[3] Could be; right?

[4] MR. DIGIOVANNI: There could be some [5] features.

[6] SPECIAL MASTER: There's not a [7] carbon copy of conduct here, but there could be [8] topics that are common to both, but separately [9] executed by both parties in some way, or [10] separately treated by both parties. I mean, it [11] could be.

[12] MR. DIGIOVANNI: That's right. [13] There could be common topics.

[14] SPECIAL MASTER: I see.

[15] MR. DIGIOVANNI: And in terms of the [16] argument that the common legal interests doctrine [17] was not made, under the Delaware case, any other [18] case law, the common legal interest is just a [19] doctrine that the attorney-client privilege [20] applies.

[21] SPECIAL MASTER: Well, ECHO has a [22] interest in defending pending litigation. Visa [23] does not.

[24] MR. DIGIOVANNI: Well, no, Your

Page 138

[1] Honor. They both have the same, the identical [2] legal interest.

[3] One is not currently in litigation, [4] but they do both have the same identical legal [5] interests of defending against this patent and [6] making sure they are not found to be infringing a [7] valid patent.

[8] So they do have an identical legal [9] interest. One happens to be in litigation right [10] now.

[11] SPECIAL MASTER: What was the date [12] of the opinion given to ECHO?

[13] MR. DIGIOVANNI: By its counsel? It [14] was May 3rd, 2005.

[15] MR. MIN: May 5th, 2000.

[16] SPECIAL MASTER: May 5th. Thanks, [17] Mr. Min. Just to make sure you're still there, [18] Mr. Min, so we have to ask these tough questions, [19] you know.

[20] MR. McDOLE: And   Your   Honor, there's [21] also the other opinion, which is March 7th, 2003.

[22] SPECIAL MASTER: All right. Now, [23] let me ask you this, though, Mr. DiGiovanni, [24] okay, before we do that.

Page 139

[1] Visa knew in March — well, let [2] me — this was communicated in March '01;

right?

[3] MR. DIGIOVANNI: The opinion?

[4] SPECIAL MASTER: The opinion this [5] was dated then, and this was provided to ECHO?

[6] MR. DIGIOVANNI: It was in the files [7] of ECHO. That is correct.

[8] SPECIAL MASTER: All right. So it [9] was after — on or after March 27, '01.

[10] That's the date the lawsuit [11] occurred?

[12] MR. DIGIOVANNI: That's correct.

[13] SPECIAL MASTER: And presumably it [14] was — it's marked as confidential protected by [15] the attorney work product and attorney-client [16] privileges. And so I guess we can presume Visa [17] provided it to ECHO.

[18] MR. DIGIOVANNI: I'll ask Mr. Min to [19] address that. I don't know the specifics.

[20] SPECIAL MASTER: I mean —

[21] MR. MIN: Your Honor, Visa and ECHO [22] had a relationship starting December 2000 for a [23] program which eventually became the accused [24] products at issue. And that joint venture

Page 140

[1] started at December 2000.

[2] SPECIAL MASTER: Right. Well, okay. [3] I would think that when Visa gave [4] this over to ECHO, there was some question about [5] its predicted confidentiality, because of what, [6] in fact, happened here.

[7] Right? In other words, that's [8] certainly a prospect that I'm sure Visa's counsel [9] at Bayard, Weaver & Thomas would consider that if [10] this is given over, it could end up in a [11] discovery production by ECHO, if ECHO — by [12] accepting its own opinion of counsel, which was [13] about a year before it waived the privilege.

[14] So there's some problem here about [15] expected confidentiality; right?

[16] MR. DIGIOVANNI: I would say, no, [17] Your Honor, and because of the common legal [18] interests doctrine. The companies were currently [19] in a customer, I guess, seller or licensor [20] relationship.

[21] They were working together at the [22] time. It was for — at that time, it was [23] approximately a year they were actually moving [24] forward using each other's products. They, thus,

Page 141

[1] had a common legal interest, something that is [2] not uncommon.

[3] Thus, and them both knowing of this [4] patent that potentially could be asserted against [5] them, the concern of one of the two companies [6] sharing

information with the other regarding that [7] legal matter, even privileged information, I [8] would say, no, there wouldn't be a concern [9] because the common legal interests is so clear.

[10] SPECIAL MASTER: Yeah, but the [11] common legal interest isn't going to override [12] waiver. The person who is the party who is going [13] to be subject to a waiver can't protect things [14] that have been given to it that would have to be [15] disclosed.

[16] That would fall within production, [17] if you will, of matters pertinent to the subject [18] matter. So you wouldn't — confidentiality isn't [19] going to flow through that and be protected.

[20] It would seem to me that Visa would [21] have to be alert for that, be aware of that [22] before they give this over. Say, look, maybe [23] this is our opinion. Now, is this going to be [24] given over by you, ECHO, maybe in the future if

### Page 142

[1] you, you know, waive it by accepting opinion [2] counsel on validity or something else?

[3] And I'm just saying I don't think [4] because it's confidential from Visa that [5] confidentiality is going to escape disclosure if [6] there's a waiver by the party that it gave it to. [7] In this case, ECHO.

[8] And a reasonable prospect that could [9] happen, because that happens with some regularity [10] in these cases. I mean, it's not just a rare [11] phenomenon.

[12] You read about it. It's lots of [13] cases.

[14] So I worry about if it is entitled [15] to some protection, whether that's lost because [16] there's not a genuine expectation of [17] confidentiality.

[18] MR. DiGIOVANNI: Your Honor, I would [19] say that the expectation of confidentiality is [20] the same as if it were attorney client.

[21] SPECIAL MASTER: Yeah. But they're [22] going to go into — they're going to go into a [23] circumstance beyond the law when they cross that [24] line that the party they give it to may be

### Page 143

[1] required to disclose it because of waiver. I [2] mean, if ECHO in some way used part of this as a [3] building block for what's happening here, and you [4] have — I said there is a contention here of [5] ongoing infringement, this very day, I don't [6] think Visa can really be 100 percent sure this is [7] going to remain confidential.

[8] Indeed, I think they were kind of on [9] notice that this could very likely be subject to [10] disclosure if it's — if

confidentiality is hoped [11] for, but put at risk. And in this instance, it's [12] at risk.

[13] I don't think the rights that Visa [14] has under the confidentiality can survive that.

[15] MR. DiGIOVANNI: Well, Your Honor, I [16] would say the expectation of con-fidentiality that [17] Visa had would be the same as any client, any [18] company who gets an opinion of counsel. It [19] expects, fully expects that to maintain [20] confidential —

[21] SPECIAL MASTER: Okay.

[22] MR. DiGIOVANNI: — with the [23] under-standing that it could be waived.

[24] SPECIAL MASTER: Yeah. I agree with

### Page 144

[1] that as far as that goes.

[2] But when it's provided to someone [3] who, in this case, Visa, understands it's just [4] not a remote possibility, but it's indeed likely [5] in defending the in-fringement case, infringement [6] claim, that ECHO could do things that its best [7] judgment tells them they should do, which is rely [8] on the opinion of counsel itself; and therefore, [9] waive the privilege.

[10] And include in, whether it's waived, [11] the documents it has, one of which happens to be [12] Visa's opinion having to do with the topic, the [13] opinion, the infringement opinion. So I don't [14] think there's a reasonable expectation of [15] confidentiality when they gave it over to a party [16] whose in litigation for patent infringement on [17] this very subject.

[18] MR. DiGIOVANNI: If I could add one [19] more thing. I think the expectation is there, [20] because Visa would not have an understanding that [21] ECHO would rely on an opinion of counsel that [22] deals with Visa's noninfringement, bec-ause that [23] is very different than ECHO's noninfringement.

[24] SPECIAL MASTER: Well, that depends

### Page 145

[1] on what the opinion says. I mean, it could be, [2] see, where we are is ECHO now has this in its [3] file. ECHO has the knowledge, and how that [4] knowledge plays on its state of mind is something [5] that's at issue here.

[6] And they may not agree with any of [7] this. They may agree with some of it.

[8] But I think the plaintiff has a [9] right to test what this information is that ECHO [10] has and how it bears upon their contention here [11] that their opinion of counsel is what caused them [12] to do what they're doing.

[13] So I think it's waived as to these. [14] I don't think the confidentiality that Visa

could [15] normally expect obtains here.

[16] I think Visa has good counsel, good [17] lawyers. They know what's hap-pening here.

[18] It's the same product. I think they [19] should have expected this could be discoverable, [20] and indeed it's almost likely it would be [21] discoverable, which means they don't have the [22] necessary expectation of confidentiality that [23] would allow the privilege, either attorney client [24] or work product to protect it —

### Page 146

[1] MR. DiGIOVANNI: Okay.

[2] SPECIAL MASTER: — on the waiver [3] that binds —

[4] MR. DiGIOVANNI: Thank you.

[5] SPECIAL MASTER: — ECHO here.

[6] MR. DiGIOVANNI: Thank you, Your [7] Honor.

[8] SPECIAL MASTER: 49 is waived.

[9] MR. McDOLE: Your Honor, that takes [10] us to the next disputed topic or next disputed [11] document, which is Doc-ument 53.

[12] SPECIAL MASTER: Okay. Let me [13] get — I thank you very much, Mr. DiGiovanni, for [14] giving me this folder. It's been very useful for [15] these doc-uments that are before us today.

[16] MR. DiGIOVANNI: You're welcome, [17] Your Honor.

[18] SPECIAL MASTER: I appreciate that. [19] Okay. The next is document?

[20] MR. McDOLE: 53.

[21] SPECIAL MASTER: 53. I have 53. [22] Yes.

[23] MR. McDOLE: This document is [24] described on ECHO's July 28th priv-ileged log as

### Page 147

[1] Email communication re LML's March 27th, 2000 [2] press release re '988 patent.

[3] And our argument here is that this [4] is an inadequate description, and from the list [5] that we had received from ECHO, there are several [6] people on here that are simply not ECHO [7] employees. They're third parties.

[8] Those include Mr. Gouffray, [9] Mr. Philips, Mr. Lynch and Mr. D. Brown. So [10] there's four individuals that belong to the [11] client or customer of ECHO, and not ECHO itself.

[12] There can be no privilege as it was [13] disclosed to a third party there. And, again, [14] there's no common interest argument here, and [15] none would exist in any event, because they're in [16] completely different situations.

[17] SPECIAL MASTER: NBDS, Inc. is

LML Patent Corp. v.
Telecheck Services, Inc., et al.

Hearing
October 12, 2005

who?

[18] MR. MIN: That's National Bank [19] Drafting Service, Inc., Your Honor.

[20] SPECIAL MASTER: And what part [21] do they play in all this?

[22] MR. MIN: From 1999 to 2001, ECHO [23] was developing process on-line checking services [24] on behalf of NBDS.

Page 148

[1] SPECIAL MASTER: Okay. Like, am I [2] saying this right, like a customer, or client, or [3] something?

[4] MR. MIN: Yes, Your Honor.

[5] SPECIAL MASTER: Okay. All right.

[6] Mr. DiGiovanni, any quarrel with the [7] notion that this went to persons outside the [8] protected circle, so to speak?

[9] MR. DiGIOVANNI: Well, Your Honor, [10] we don't quarrel with the statement that it was [11] sent to persons outside the company. However, [12] because the common legal interest doctrine, they [13] were within the protected circle in terms of [14] preserving the privilege.

[15] They had, just as in the Visa [16] situation, they had identical legal interests.

[17] SPECIAL MASTER: I don't agree with [18] that. In this I think they're too remote in the [19] context of that doctrine. I mean, they can [20] have — they could have common commercial [21] interest, common other interests, but common [22] legal interests, persons facing the same legal [23] predicament, so to speak, are considered to be [24] within, I think, the protective bubble. I just

Page 149

[1] think it's too remote, I think.

[2] MR. DiGIOVANNI: Well, I would [3] submit that the case law bears out that —

[4] SPECIAL MASTER: You can find a case [5] for everything. Now, tell me about your case.

[6] MR. DiGIOVANNI: Well, okay, in this [7] case, just as in Visa's situation, —

[8] SPECIAL MASTER: Yes.

[9] MR. DiGIOVANNI: — NBDS is a current [10] customer that was currently operating the ECHO [11] product.

[12] SPECIAL MASTER: Right.

[13] MR. DiGIOVANNI: So they have the [14] same legal interests in terms of prospects of [15] being sued and of having to defend the suit [16] against the LML patent.

[17] SPECIAL MASTER: Does that remain [18] against them?

[19] MR. DiGIOVANNI: NBDS?  I don't know [20] the answer to that.

[21] SPECIAL MASTER: Well,  anybody can [22] sue anybody for everything,

anything, anywhere [23] any time.

[24] But this is more remote. I think it

Page 150

[1] has to be likely litigation in order to carry the [2] day there.

[3] I just think it's too remote. Your [4] arguments, they're good. I don't think they [5] carry the day, though.

[6] MR. DiGIOVANNI: Thank you, Your [7] Honor.

[8] SPECIAL MASTER: To be produced.

[9] MR. McDOLE: Your Honor, I just [10] raise for the sake of time at this point that [11] it's 12:30. We would be happy to continue going [12] through.

[13] We know we're coming to the end of [14] the list and offer to Your Honor to take a lunch. [15] We offer that up. We have a few more.

[16] We maybe have 15 more.

[17] SPECIAL MASTER: How many?

[18] MR. McDOLE: We're on the last Page. [19] Fifteen more.

[20] MR. DiGIOVANNI: I would say there's [21] less actually.

[22] SPECIAL MASTER: I have about eight [23] folders. Let's do this: Let's take a brief [24] recess. Okay.

Page 151

[1] Let's see if we can get through this [2] rather than break and come back. I think we have [3] about seven or eight documents.

[4] MR. DiGIOVANNI: Well, we have, I [5] think, 14 left.

[6] SPECIAL MASTER: Oh, 14. We can get [7] through those. Let's take a break.

[8] Is that all right with you?

[9] THE REPORTER: That's fine.

[10] SPECIAL MASTER: That's the most [11] important person. We'll take a brief recess, and [12] then we'll come back and move quickly.

[13] How does that sound?

[14] MR. McDOLE: That sounds great.

[15] MR. DiGIOVANNI: Excellent.

[16] SPECIAL MASTER: Anything  else? [17] All right. Mr. Min, about 10 [18] minutes.

[19] MR. MIN: Yes, Your Honor. Thank [20] you.

[21] (A brief recess was taken.)

[22] SPECIAL MASTER: All right. I think [23] we have a few more minutes, and we'll see if we [24] can go to the end now.

Page 152

[1] Okay. So the document we'll now be [2] looking at will be?

[3] MR. McDOLE: Number 54, Your Honor.

[4] SPECIAL MASTER: 54.

[5] MR. McDOLE: And if I were to have [6] to venture a guess, I would say it coincides with [7] Number 55. Whether it's an Email chain or not, [8] I'm not sure.

[9] MR. DiGIOVANNI: It's not an Email [10] chain.

[11] MR. McDOLE: It had the same date on [12] it, same description.

[13] SPECIAL MASTER: All right. 54.

[14] All right. Why don't you just begin [15] Mr. McDole and take it from there.

[16] MR. McDOLE: Your Honor, Document [17] 54 has a description on ECHO's July 28th privileged [18] log of Email communication, re background and [19] discovery of potential prior art of patents in [20] suit.

[21] This is a document that was authored [22] by the CEO of ECHO, Jodi Barry. Copied several [23] other people that are at ECHO, to M. Frost, the [24] legal counsel or corporate counsel at the time

Page 153

[1] for ECHO.

[2] This relates to potential prior art, [3] which is invalidity of the patents in suit. Goes [4] directly to the heart of the opinions.

[5] By ECHO's own admission, the [6] opinions relate to validity and should be [7] produced.

[8] We'll just leave it at 54 for now, [9] but I believe 55 is very similar.

[10] MR. DiGIOVANNI: Your Honor, [11] Document 54 involves actions taken by the client [12] and counsel to discover prior art. It does not, [13] in any way, discuss, or reveal, or even deal with [14] the quality of the prior art or any invalidity [15] arguments regarding that prior art. It purely [16] pertains to activities undertaken by counsel.

[17] The first words in the entire [18] document is the name of counsel, and it describes [19] the first name, I guess, Don.

[20] SPECIAL MASTER: Yeah. Sure.

[21] MR. DiGIOVANNI: Actually —

[22] SPECIAL MASTER: And that is —

[23] MR. DiGIOVANNI: Actually I'm not [24] sure.

Page 154

[1] MR. MIN: Don Dick is — again, he's [2] the president of or former president of Rocky [3] Mountain, which was acquired by ECHO. And at the [4] time this message was sent, he was an ECHO [5] employee.

[6] MR. DiGIOVANNI: He was an ECHO [7] employee, not counsel.

[8] MR. MIN: Marshall Frost was [9] in-house counsel.

[10] MR. DiGIOVANNI: So it pertains to [11] activities undertaken to move forward

and unearth [12] or investigate prior art. It had nothing to do [13] with the substance of it or anything to do with [14] the opinion of counsel.

[15] SPECIAL MASTER: Well, isn't prior [16] art a central issue?

[17] MR. DiGIOVANNI: Prior art does [18] relate to invalidity. That is correct.

[19] SPECIAL MASTER: I don't know how [20] you separate that.

[21] MR. DiGIOVANNI: Well, the way we [22] separate it is it doesn't relate to the prior [23] art. It's talking about methods, and [24] investigation, and activities that are going to

---

Page 155

[1] move forward to potentially obtain prior art. It [2] doesn't mention any of the prior art.

[3] MR. MIN: Also, the prior art [4] mentioned in this message was not a part of the [5] '988 opinion letter.

[6] MR. DiGIOVANNI: There was — okay. [7] I do take back what I said.

[8] It doesn't mention the prior art in [9] that second paragraph. There is a general [10] reference to a prior art system.

[11] And this message deals with efforts [12] to follow up on that and related — potentially [13] related prior art.

[14] SPECIAL MASTER: Okay.

[15] MR. McDOLE: And, Your Honor, I [16] would just note that this is three weeks before [17] their opinion of counsel on the [18] '988 patent.

[18] One other point on that, Your Honor.

[19] SPECIAL MASTER: Yes.

[20] MR. McDOLE: With respect to whether [21] the prior art in the '988 opinion makes it even [22] more important, because there may be prior art [23] that wasn't discussed or discarded by opinions or [24] by opinion counsel. It all relates to the same

---

Page 156

[1] subject matter.

[2] It doesn't have to be a minute piece [3] of prior art. Now, what they've done is they not [4] only want to limit it to validity when the [5] opinions dealt with validity and infringement, [6] but now they want to take validity from these and [7] further narrow it to just a piece of prior art [8] within the validity spectrum that were discussed. [9] They're constantly trying to narrow the scope of [10] privilege.

[11] For instance, this answer, that is [12] just improper. This piece of prior art is [13] terrible.

[14] We would never rely on that. And [15] now they're trying to assert that here at trial [16] that shows, you know, willful infringement.

---

[17] It all goes to their state of mind.

[18] SPECIAL MASTER: Let me look at the [19] letter — Email.

[20] Mr. Griffin is who, Mr. Min?

[21] MR. MIN: Mr. Griffin has — he's in [22] the sales of national accounts for ECHO.

[23] SPECIAL MASTER: Okay. I see that. [24] I think waiver covers this. Content

---

Page 157

[1] convinces me. Waiver covers it.

[2] 54.

[3] MR. McDOLE: Your Honor, Document 55 [4] has the same description, except the reason I [5] pursed this one out a little differently is [6] because G. Milano is identified in ECHO's [7] response to our letter as a third party.

[8] He belongs to California Clearing [9] House, which is just a clearing house that clears [10] checks. He's clearly a third party here.

[11] And that's an additional reason that [12] there's no privilege with respect to this [13] document.

[14] MR. DiGIOVANNI: Your Honor, this is [15] further investigation into that prior art issue, [16] and along the same vein of investigating, trying [17] to obtain prior art. We say it's work product, [18] attorney-client privilege.

[19] MR. McDOLE: And Your Honor, if I [20] can read the description that they have for [21] Mr. Milano, just outside this, this just clears [22] the issue up.

[23] His company is California Bankers [24] Clearing House. And the notes on him is he was a

---

Page 158

[1] speaker at the June 19, '97 Electronic Check [2] Council meeting attended by Don Dick on behalf of [3] ECHO.

[4] Simply because Mr. Dick attended a [5] meeting where this man spoke doesn't somehow [6] bring him into the entrusted circle of trust, as [7] you would put it, for common interests.

[8] He's a third party. And that [9] document is simply not privileged.

[10] SPECIAL MASTER: What was the [11] Electronic Check Council?

[12] MR. DiGIOVANNI: Your —

[13] SPECIAL MASTER: Does Mr. Min [14] know that?

[15] MR. DiGIOVANNI: Mr. Min?

[16] MR. MIN: Yes. The Electronic Check [17] Council was a subcommittee of the NACHA entity.

[18] SPECIAL MASTER: NACHA is like an [19] association?

[20] MR. MIN: Yes.

[21] SPECIAL MASTER: I'll call it trade [22] association, industry association.

---

[23] MR. MIN: Yes, that would be more [24] accurate.

---

Page 159

[1] SPECIAL MASTER: Well, okay. I [2] guess it has — that's waived.

[3] That is waived as to that. Thank [4] you.

[5] MR. McDOLE: 56 is very similar in [6] scope to 54 and 55. The description on document [7] 56 of ECHO's July 28th privilege log reads Email [8] communication, re follow-up with discovery of [9] potential prior art of patents in suit.

[10] The author of this document is [11] ECHO's CEO, Jodi Barry, and it is given to [12] another ECHO employee, D. Griffin and corporate [13] counsel, M. Frost. For the same reasons as [14] before, we think the document should be produced.

[15] MR. DiGIOVANNI: Your Honor, to put [16] this in context, if you flip back to Document 54, [17] which you have ruled on.

[18] SPECIAL MASTER: I have it right [19] here. Yes.

[20] MR. DiGIOVANNI: Okay. The second [21] paragraph of that document does relate to the [22] Document 56.

[23] SPECIAL MASTER: It does.

[24] MR. DiGIOVANNI: This is further

---

Page 160

[1] follow-up and investigation regarding prior art, [2] not —

[3] SPECIAL MASTER: I think it's going [4] to be in the same category. I mean, I know you [5] differ with it, but I'll put it in the same [6] category.

[7] MR. DiGIOVANNI: Thank you, Your [8] Honor.

[9] SPECIAL MASTER: Waived.

[10] MR. DiGIOVANNI: Your Honor, I [11] believe Documents 57 and 58 probably have [12] virtually the same argument. I'll start with 57, [13] and if it applies to 58 we can —

[14] SPECIAL MASTER: Well, do I have [15] those? I do need those, Mr. DiGiovanni.

[16] Have they been produced or what?

[17] MR. MIN: 57 is a duplicate of 12, [18] Your Honor. And 58 is a duplicate of 21, which [19] we've already covered.

[20] SPECIAL MASTER: All right. So 57 [21] is 12, and 58 is what, Mr. Min?

[22] MR. MIN: It is a duplicate of 21.

[23] SPECIAL MASTER: 21. We ruled on [24] that.

---

Page 161

[1] MR. HERRMANN: 21 has been waived, [2] Your Honor.

[3] SPECIAL MASTER: Whatever it is [4] that applies to these, they're just

---

LML Patent Corp. v.
Telecheck Services, Inc., et al.

Hearing
October 12, 2005

copies of 12 and [5] 21, whatever those rulings were.

[6] Okay. 60.

[7] MR. McDOLE: Document 60, Your [8] Honor, is per your order the necessary parties [9] weren't identified here. The reason we have a [10] problem with this —

[11] MR. HERRMANN: 60 has been produced.

[12] MR. MIN: The underlying document [13] for 60 has been produced.

[14] MR. McDOLE: Okay.

[15] MR. HERRMANN: It's on their chart [16] from today, Your Honor.

[17] MR. DiGIOVANNI: But just to be [18] clear —

[19] SPECIAL MASTER: This is a facsimile [20] cover sheet.

[21] MR. DiGIOVANNI: The fax cover sheet [22] has not been produced, —

[23] MR. McDOLE: Okay.

[24] MR. DiGIOVANNI: — but the

Page 162

[1] underlying letter has been produced.

[2] MR. McDOLE: Your Honor, based on [3] the description that's given to us, fax cover [4] letter response to LML letter to Global Payments, [5] Inc., there's no indication that this is [6] providing any legal advice whatsoever.

[7] You know without the fax cover sheet [8] providing some sort of substance as to what's [9] going on here, I can only assume that Global [10] Payments, who is another company in the industry, [11] may have prior art or, you know, I'm not sure [12] what's going on here. But based on the [13] description, you know, I can — reading it in its [14] broadest sense, I think it would relate to [15] invalidity.

[16] And in fact, the defendants in this [17] case have attempted to impose — Global Payments [18] have subpoenaed them for specific documents [19] relating to prior art.

[20] And that's why we've challenged this [21] document, because we think based on the [22] circumstances in this case and their efforts to [23] subpoena Global Payments, including prior art, [24] that this may relate to the same issue.

Page 163

[1] Now, Your Honor has the document and [2] is more able to figure out from what's on it, [3] but...

[4] MR. DiGIOVANNI: Your Honor, it [5] appears that this document encloses two things. [6] The document that was produced, which was LML's [7] letter to Global Payments, and perhaps a draft or [8] some other document.

[9] So this is providing and requesting [10] approval. So it has to do with advice

between [11] attorneys.

[12] SPECIAL MASTER: Okay. So as I take [13] it, this is Mike McCoy?

[14] MR. MIN: Yes, Your Honor.

[15] SPECIAL MASTER: As I take it [16] McCoy [16] took over for Mr. Frost when Mr. Frost left; [17] right?

[18] And is McCoy an attorney?

[19] MR. MIN: No, he's not, Your Honor.

[20] MR. DIGIOVANNI: No, Your Honor.

[21] SPECIAL MASTER: So we don't [22] have attorney-client privilege; right?

[23] MR. DiGIOVANNI: No, you do. Your [24] Honor, Ms. McKenzie is the attorney here.

Page 164

[1] SPECIAL MASTER: Well, she's the one [2] that's going to — oh, that's right. She was the [3] opinion counsel. Right, Denise McKenzie.

[4] MR. DiGIOVANNI: That's correct.

[5] MR. MIN: Yes, Your Honor.

[6] MR. DiGIOVANNI: It is Mr. McCoy [7] writing to his attorney at Sidley & Austin [8] asking for [8] review and asking for advice.

[9] SPECIAL MASTER: Okay. Let me see [10] if I can understand. What's been produced has [11] been Mr. McCoy's response?

[12] MR. MIN: Yes, Your Honor. What's [13] been produced is the initial letter from LML to [14] Global Payments, and also a draft that Mr. McCoy, [15] I believe, had drafted and is seeking [16] Ms. McKenzie's review of.

[17] SPECIAL MASTER: All right. And [18] both of those have been produced?

[19] MR. MIN: Yes, Your Honor.

[20] SPECIAL MASTER: Well, okay. I [21] guess what I'm saying is — and — okay. [22] I guess I'll ask this. Did [23] Mr. McCoy send a response, do we know?

[24] MR. MIN: I believe eventually he

Page 165

[1] did, Your Honor.

[2] SPECIAL MASTER: So this isn't [3] tweedle dee and tweedle dum. I mean, he's asking [4] should I send it, and it was sent. And you now [5] have copies of it.

[6] So I'm trying to find out what [7] significance there is with any privilege with [8] this. This is like a transmittal.

[9] We know the answer, what Denise [10] McKenzie said, if you sent it, she said yes. I [11] guess, maybe she said no.

[12] MR. DiGIOVANNI: I don't know if [13] changes were made. I know it is a request for [14] legal advice contained in this short fax.

[15] SPECIAL MASTER: And we know that he [16] got it. And then he either ignored it and sent [17] it anyhow, or he followed it and sent it. So [18] there can be no privilege with this.

[19] MR. DiGIOVANNI: Thank you, Your [20] Honor.

[21] SPECIAL MASTER: Privilege not [22] allowed.

[23] 60.

[24] MR. McDOLE: Your Honor, the next

Page 166

[1] document at issue is Document —

[2] SPECIAL MASTER: I think, Mr. [3] McDole, 62 is next.

[4] MR. McDOLE: I believe 62 is the [5] next one.

[6] SPECIAL MASTER: 62, right.

[7] MR. McDOLE: Yes, 62. Right.

[8] SPECIAL MASTER: 62. Right.

[9] MR. McDOLE: And I'll preface my [10] argument, Your Honor, with this is one of the [11] documents you held in your special order number [12] three to obtain the privilege. And while I do [13] not want to reargue the position, I think there's [14] some additional facts that Your Honor was not [15] aware of when you made that ruling that make this [16] different.

[17] The document is sent to — is [18] between Mr. McCoy and a person called S. Spence, [19] Stanford Spence. And it's described as a letter [20] re engagement as an independent contractor.

[21] Mr. Spence is a third party. He is [22] not only a third party, but he is a third party [23] that provided prior art to ECHO, which is [24] specifically referenced in the opinions of

Page 167

[1] counsel in this suit.

[2] On top of that, Mr. Spence has been [3] identified by ECHO on their initial disclosures [4] as having discoverable information in this case.

[5] This is not an instance where [6] Mr. Spence is a non-testifying expert. This is [7] not an instance where he's a testifying expert.

[8] This is simply that he's an [9] independent contractor likely to provide this [10] prior art, search for prior art and provide it to [11] ECHO.

[12] Now, this document certainly goes to [13] bias involved in any work that he would find. [14] He's obviously being paid for his work.

[15] And this is not a privilege [16] document. This is a contract between ECHO and an [17] independent contractor.

[18] So I would submit that to Your Honor [19] and ask you to reconsider that issue.

[20] SPECIAL MASTER: Okay.   [21] Mr.

DiGiovanni.

[22] MR. DIGIOVANNI: Yes.

[23] SPECIAL MASTER: Okay. First of [24] all, I think I held this was a work product;

**Page 168**

[1] right?

[2] MR. DIGIOVANNI: I believe that's [3] correct, Your Honor.

[4] SPECIAL MASTER: Okay.

[5] MR. DIGIOVANNI: That is one of the [6] privileges we asserted, and we still do.

[7] The document relates to engaging [8] Mr. Spence in anticipation of litigation and [9] furtherance of obtaining prior art.

[10] SPECIAL MASTER: Well, okay. One [11] reason I allowed this was I took, I guess, it's [12] fair to say on faith for some of the McCoy [13] rulings that I learned more about, and because I [14] understood from the correspondence that he took [15] over for Mr. Frost in performing some of the work [16] that Mr. Frost was doing.

[17] I wasn't sure what that work was, [18] but in fairness to counsel, whether it was ECHO [19] or Telecheck, I think they said — in fairness, [20] they said he took over, and he was facilitator [21] transmitting things from the office that [22] Mr. Frost would have had he been there.

[23] So he was not represented to be an [24] attorney, a member of the bar and so forth. But

**Page 169**

[1] now that we're here today, I understand and [2] perceive that he is not a lawyer, that he was [3] functioning in the contract office, and there was [4] no lawyer there. He was doing the best he could.

[5] So that gives a real problem of work [6] product, it seems to me, because, or a lot of [7] problem with attorney client. But with work [8] product, you know, if intwined in a communication [9] is some, if you will, theories or expectations of [10] the lawyer in preparing a claim or defense, you [11] could have that in engaging somebody.

[12] But if he's just sending out a [13] contractor, this person who presumably was hired, [14] I guess was hired as far as we know? Engaged as [15] far as we know?

[16] MR. DIGIOVANNI: Yes, Your Honor.

[17] MR. MIN: Yes.

[18] SPECIAL MASTER: Is his deposition [19] to be taken? Was it taken?

[20] MR. McDOLE: It has not been taken [21] yet, Your Honor. Once fact witness [22] lists are provided, if he is identified on [23] there, he will [23] be deposed.

[24] SPECIAL MASTER: Okay. When will

**Page 170**

[1] fact witnesses be provided?

[2] MR. McDOLE: LML provided its list [3] last Friday. And the defendants have a month [4] after that to provide theirs.

[5] SPECIAL MASTER: Is it contemplated [6] depositions will come from that?

[7] MR. McDOLE: If any witnesses on [8] that list such as Mr. Spence appear on defendants [9] list, then we will have the opportunity to depose [10] him.

[11] SPECIAL MASTER: Has a decision been [12] made yet about him? Do you know?

[13] I don't want you to have to guess or [14] anything.

[15] MR. DIGIOVANNI: I don't know.

[16] SPECIAL MASTER: Okay. I don't [17] know.

[18] I just think this is ordinary course [19] of business from a non-lawyer to ECHO to a person [20] who is being written to as a non-lawyer, [21] Mr. Spence, about a contract that's pertinent to [22] the issues in the case. So I don't think any [23] privilege applies to this.

[24] Okay. I put Y before, because I was

**Page 171**

[1] unsure whether he was actually a member of the [2] bar, whether he would be authorized in ECHO in [3] the interim in Mr. Frost's absence to be [4] functioning as a lawyer.

[5] I just didn't want to assume he [6] wasn't until we talked about that. But it seemed [7] like he was not.

[8] But I just didn't want to assume [9] that, so I gave the benefit of the doubt on that [10] 62 ruling. But, indeed, he can't qualify for [11] those, I think the important and strict [12] requirements of either work product protection or [13] attorney-client privilege.

[14] MR. DIGIOVANNI: Your Honor, we [15] would state that —

[16] SPECIAL MASTER: Yeah.

[17] MR. DIGIOVANNI: If it's okay?

[18] SPECIAL MASTER: Yeah.

[19] MR. DIGIOVANNI: That in terms of [20] the work product doctrine, in terms of and taking [21] actions in anticipation of litigation, it makes [22] no difference as to whether Mr. McCoy was an [23] attorney or not an attorney. The work product [24] doctrine in Third Circuit —

**Page 172**

[1] SPECIAL MASTER: Well, somebody has [2] to — the document has to tell us why that is. [3] The document.

[4] MR. DIGIOVANNI: Your Honor, it's [5] very clear that this is in anticipation of [6] litigation.

[7] SPECIAL MASTER: Oh, I see.

[8] MR. DIGIOVANNI: He is preparing, [9] gathering and preparing for trial, preparing for [10] materials by engaging Mr. Spence and to build the [11] case as it would be.

[12] SPECIAL MASTER: Well, I'm not [13] entirely sure anybody can get involved in work [14] product. Somebody that works down at the [15] assembly lot can say I was doing this as work [16] product.

[17] I think it has to be these persons [18] who deal with — and for attorneys, I think when [19] they begin to function that way, when they begin [20] to perform tasks, whether it's the mundane thing [21] of taking pictures, or measurements, or [22] conducting studies, or interviews, that sort of [23] thing under the supervision, I think that's what [24] work product is expected to embody.

**Page 173**

[1] I think this is a stretch in this [2] instance.

[3] MR. MIN: Well, Your Honor, after [4] Marshall Frost left in July of 2003, there was [5] basically no one else left in ECHO to take over [6] his role in communicating with outside counsel [7] regarding the patents in suit, allegations made [8] by LML.

[9] Mr. McCoy thereafter took over [10] Mr. Frost's role. We understand that he's not [11] an [11] attorney, but nevertheless, he was carrying out [12] the instructions and guidance from outside [13] counsel. And if you notice the date of the [14] letter, it's dated November 3, 2003, which is [15] about eight months after the '528 opinion was [16] rendered.

[17] SPECIAL MASTER: Will Mr. Spence [18] be on the witness list?

[19] MR. MIN: I do not know that, Your [20] Honor, yet.

[21] SPECIAL MASTER: When will you [22] know?

[22] MR. MIN: I couldn't say, Your [23] Honor.

[24] SPECIAL MASTER: Well, when do you

**Page 174**

[1] have to file your list?

[2] MR. MIN: By November 7th, I think.

[3] SPECIAL MASTER: November what, [4] 10th?

[5] MR. MIN: 7th.

[6] SPECIAL MASTER: 7th. Well, let's [7] wait and see the list. I'll withhold ruling on [8] this.

[9] MR. DIGIOVANNI: All right, Your [10] Honor.

[11] SPECIAL MASTER: All right. We'll [12] withhold ruling on 62 to see if he's

going to be [13] identified as a fact witness.

[14] MR. DiGIOVANNI: Thank you, Your [15] Honor. Let me just also —

[16] SPECIAL MASTER: I'll say pre- [17] sumably if he is, then we'll let this document be [18] discovered.

[19] MR. DiGIOVANNI: Okay. Document 69 [20] is virtually the same document.

[21] SPECIAL MASTER: Okay. I have 69. [22] 69 is the same? Okay. [23] I'll put 62, 69, we'll withhold [24] ruling until we see if he's going to be a

**Page 175**

[1] witness, and then we'll take that up again.

[2] I might say it could be, hearing the [3] description for Mr. DiGiovanni and Mr. Min, this [4] could be within the realm of work product. If a [5] subordinate was carrying out, and appears to, he [6] may be carrying out instruction relative to the [7] development of a position re- garding litigation.

[8] Yes.

[9] MR. McDOLE: And, Your Honor, I [10] would just note for the record that while we seem [11] to be basing this on whether he's going to be [12] called as a witness or not, —

[13] SPECIAL MASTER: Yes.

[14] MR. McDOLE: — his specific findings [15] of prior art appear in the '528 patent. They [16] specifically talk about Stanford Spence's system.

[17] And it's a prior art that is relied [18] on in the opinion. So even if he is not a [19] witness, that is directly relevant. If they want [20] to trot out Mr. Spence's system, the least LML [21] would be able to do with respect to Mr. Spence's [22] system is show that this is a higher gun. This [23] is somebody who is getting paid and would fall [24] under that waiver of privilege, and in any event

**Page 176**

[1] with respect to advice of counsel.

[2] SPECIAL MASTER: Okay. And what do [3] you suspect he'll be called for, to authenticate [4] prior art?

[5] MR. McDOLE: He'll likely — yes. [6] There is prior art that his company has set [7] forth. And there's documents that defendants [8] have relied on in this case. Their experts have [9] relied on his system to try to invalidate the [10] patents.

[11] The opinions of counsel rely on [12] them. He is — even if he's not physically [13] called as a witness at trial, his name is all [14] over the documents, and certainly we should be [15] able to show, especially with respect to the [16] opinion of counsel, that the prior art and the [17]

information that he provided to opinion counsel [18] was not reliable in that respect.

[19] And that's something that Judge [20] Robinson and the Federal Circuit have [21] specifically condoned to make sure.

[22] SPECIAL MASTER: All right. Here's [23] what we'll do. I'm going to wait on 62 and 69 [24] until we see what the witness list shows. I'm

**Page 177**

[1] not saying that is going to be the decision [2] maker, but that will be a factor, number one.

[3] Number two, and I'd like just to [4] have a reference, Mr. McDole, if you could give [5] me a reference, not now, where you say it appears [6] in the opinion.

[7] MR. McDOLE: Your Honor, [8] Mr. Spence's POS system prototype appears on Page [9] 12 of the March 7, 2003 opinion. There's a [10] paragraph cited there entitled J. Stanford [11] Spence's POS system prototype.

[12] SPECIAL MASTER: Okay.

[13] MR. McDOLE: On the document I have, [14] the Bates number of that page is ECHO OP00012.

[15] MR. DiGIOVANNI: Your Honor, we will [16] note that there is no such reference to [17] Mr. Spence whatsoever in the opinion on the '988 [18] patent, which is the only patent in issue in this [19] case, and the only opinion that ECHO is relying [20] on.

[21] MR. McDOLE: I don't think you want [22] to hear. I won't even respond.

[23] SPECIAL MASTER: Well, no. You can [24] respond.

**Page 178**

[1] You should, because if some stranger [2] some place in some Court some day reads this, [3] they will say I wonder what Mr. McDole had to say [4] about that.

[5] MR. McDOLE: Your Honor.

[6] SPECIAL MASTER: You said it before, [7] but say it again.

[8] MR. McDOLE: I just don't want to [9] beat a dead horse.

[10] SPECIAL MASTER: No, you're not. [11] No, if it's important.

[12] He keeps bringing life into the dead [13] horse. You've got to beat it down again.

[14] MR. McDOLE: Mr. DiGiovanni said [15] that Stanford Spence is not men- tioned in the [16] '988 patent. That is correct with respect to the [17] opinion.

[18] However, I don't want to say I'm 100 [19] percent sure, but I'm 99 percent sure that ECHO [20] is asserting an invalidity position in this [21] litigation based on the

'988 patent based on [22] Mr. Spence's prototype system.

[23] SPECIAL MASTER: Okay. All right. [24] Thank you.

**Page 179**

[1] MR. McDOLE: That brings us to [2] Number 63.

[3] SPECIAL MASTER: Did we — yeah, 63.

[4] All right. We have a couple more to [5] go. We're almost finished.

[6] MR. McDOLE: Almost. Your Honor, [7] Document 63 on ECHO's June 28th privilege log [8] is identified as Email communication, re prospective [9] actions, re discovery of potential prior art [10] documents, re patents in suit.

[11] This is essentially the same [12] description of Documents 54 and 55 that have [13] already been ordered by Your Honor are waived.

[14] We would submit that the same [15] argument —

[16] SPECIAL MASTER: I think this is [17] somewhat connected to the other doc- ument a moment [18] ago. Don't you, Mr. DiGiovanni?

[19] MR. DiGIOVANNI: I agree it's [20] con- nected. I do ask that the first line of the [21] document, it clearly shows that that is relaying [22] information from counsel, outside counsel that [23] says, in review- ing the material I received from [24] Sidley Austin, and it goes on to describe matters

**Page 180**

[1] that, in fact, were transferred under the [2] attorney-client privilege from Sidley & Austin, [3] their outside counsel.

[4] SPECIAL MASTER: Well —

[5] MR. DiGIOVANNI: And you know, it [6] talks about areas that should be — well, I don't [7] want to give it away, but that first line is [8] clearly transferring advice Sidley & Austin had [9] given them, legal advice. And that this is [10] transferring that advice.

[11] SPECIAL MASTER: I am not sure about [12] that, but I think the second part of that [13] sentence may very well mean that what's being [14] requested here was different than what was given [15] by counsel.

[16] MR. DiGIOVANNI: Well, it's [17] sele- cting from the advice given from the outside [18] counsel.

[19] MR. McDOLE: No, but it [20] ex- presses an independent opinion about the author [21] of this Email, what should be gathered; right?

[22] MR. DiGIOVANNI: Correct.

[23] SPECIAL MASTER: An independent [24] evaluation of the various materials

and opinions

Page 181

[1] given by counsel; right?

[2] MR. DiGIOVANNI: So it is, but [3] nonetheless, it is an opinion. It is legal [4] advice.

[5] SPECIAL MASTER: But he's not a [6] lawyer.

[7] MR. DiGIOVANNI: No. No.

[8] SPECIAL MASTER: He's not a member [9] of the bar.

[10] MR. DiGIOVANNI: No.

[11] SPECIAL MASTER: He can't be [12] practicing law.

[13] MR. DiGIOVANNI: No, I understand. [14] But he's passing on advice from Sidley & Austin [15] in this Email.

[16] SPECIAL MASTER: Okay.   Reading that [17] first sentence I —

[18] MR. DiGIOVANNI: He's passing on and [19] commenting.

[20] SPECIAL MASTER: This is what I got, [21] and this is what I think you should, too. And [22] there are two different notions; right?

[23] Isn't that what it says?

[24] MR. DiGIOVANNI: He is certainly

Page 182

[1] giving his own judgment on certain materials and [2] opinions given by Sidley Austin.

[3] SPECIAL MASTER: No, he's giving his [4] judgment on what steps should now be taken. He [5] doesn't say counsel has — here is what counsel [6] said you should do. Here's the letter.

[7] MR. DiGIOVANNI: Yeah, but —

[8] SPECIAL MASTER: I don't want to get [9] into this, but you're kind of making me do it. [10] He said he received this from Sidley Austin, and [11] I feel the following, and then he goes into what [12] he thinks should happen.

[13] That is the thing. So Mr. McCoy is [14] a very capable employee.

[15] MR. DiGIOVANNI: But, Your Honor, [16] that's the way legal advice is always dispensed [17] or often is. The attorney will give the advice, [18] the executive will turn around then to his fellow [19] board members or whoever his fellow executives [20] are and say, I now have the advice from outside [21] counsel. Here's what they advised me, A, B, C, [22] D. Here is what I think we should do, A, B, C, [23] and let's do D a little differently.

[24] He's still passing along advice from

Page 183

[1] counsel. It's just he's adding his own personal [2] opinions on it, also.

[3] SPECIAL MASTER: I can't tell. [4]

Where is that?

[5] MR. DiGIOVANNI: The entire thing is [6] in reviewing the material I received from Sidley [7] Austin, and then he says, here's how we should [8] move forward, one, two, three.

[9] And he's passing along advice from [10] Sidley & Austin.

[11] SPECIAL MASTER: I disagree with [12] that. No privilege.

[13] MR. DiGIOVANNI: Thank you.

[14] SPECIAL MASTER: It's not advice by [15] a member of the bar. Not advice by a lawyer. [16] It's expressing his judgment, what he thinks [17] should happen.

[18] I think he picked the words. I [19] didn't.

[20] I have to take the plain meaning of [21] the words. It may include some of what was given [22] to him by Sidley Austin. It may have [23] differences.

[24] It may omit some things. I don't

Page 184

[1] know.

[2] MR. McDOLE: Your Honor, that brings [3] up an interesting —

[4] SPECIAL MASTER: Well, on this [5] document?

[6] MR. McDOLE: Well, I'm just — your [7] order had also said that any privilege would have [8] been waived as advice of counsel, and I'm just [9] wondering if we're getting into an argument that [10] we don't even need to get into, because it [11] relates to prior art and infringement.

[12] I understand you are saying no [13] privilege asserts and I don't want to argue with [14] you on that. I'll accept that.

[15] I just —

[16] SPECIAL MASTER: Was   there   a waiver [17] argument asserted on this?

[18] MR. McDOLE: Yes, Your Honor.

[19] SPECIAL MASTER: It was?

[20] MR. McDOLE: Yes, as it relates to [21] potential prior art documents. Again, [22] invalidity.

[23] SPECIAL MASTER: Well, that's an [24] additional reason why it should be produced.

Page 185

[1] Waiver.

[2] MR. McDOLE: The offer is for me to [3] beat a dead horse, I figured I should still take [4] the opportunity.

[5] SPECIAL MASTER: Okay. Next.

[6] MR. McDOLE: Document 64 has been [7] produced.

[8] SPECIAL MASTER: Okay.

[9] MR. McDOLE: Document 65 and 66

[10] appear to be Email communications forwarding [11] Document 67. I don't know if we should just [12] address that.

[13] SPECIAL MASTER: I have that change [14] here. Mr. DiGiovanni has given it to me in that [15] form.

[16] I appreciate it.

[17] MR. McDOLE: Okay. Email 66 or [18] Document Number 67 is described on ECHO's July [19] 28th log as an Email communication, re LML's [20] 3/1/02 press release, re notice of allowance for [21] application not involved in this action.

[22] SPECIAL MASTER: Not too fast. The [23] court reporter has got to get all of this [24] down.

[24] I know she can do it, but she

Page 186

[1] shouldn't be expected to.

[2] MR. McDOLE: Sorry, Your Honor. [3] From the list that ECHO has provided, there are [4] no attorneys listed in this exchange.

[5] Document 65 and 66 simply forward [6] this Email around, and there's simply just not a [7] basis for privilege there. There's no legal [8] advice being given.

[9] There's no attorneys present on this [10] list. And, therefore, we'll ask for it to be [11] produced.

[12] SPECIAL MASTER: There's ten or [13] more executives here or employees here, and McCoy [14] is included in here. But it's not enough to carry [15] the day, so...

[16] MR. DiGIOVANNI: Your Honor, we [17] would go ahead and have the same argument, the [18] same issue with this document in terms of it does [19] not deal with the — it does not transmit the [20] substance of the opinion of counsel that we're [21] relying on.

[22] It talks about an entirely new [23] patent application as opposed to the [24] '988 patent.

[24] SPECIAL MASTER: No privilege

Page 187

[1] permitted here. This is between — all between [2] non-attorneys.

[3] MR. DiGIOVANNI: Thank you, Your [4] Honor.

[5] SPECIAL MASTER: I think it makes a [6] difference.

[7] MR. McDOLE: Your Honor that brings [8] us to Document 68, Document 68 on ECHO's July [9] 28th privilege log.

[10] SPECIAL MASTER: All right.

[11] MR. McDOLE: It reads Email [12] communication, re LML's 12/02/03 press [13] release. Now, again, Your Honor has the document [14] in front of him.

[15] SPECIAL MASTER: Yes.

[16] MR. McDOLE: Our argument on this is [17] that the description as provided shows that [18] there's — it is so cursory that we can't find [19] any legal advice that's taking place.

[20] One of the recipients is an [21] attorney. We admit that.

[22] But simply, for instance, if [23] Mr. Barry, ECHO's CEO sends outside counsel an [24] Email that says, Hey, attached is a copy of LML's

Page 188

[1] 12/2/03 press release, that's not a [2] privileged [2] communication.

[3] You know, the description doesn't [4] give us enough to be able to make that [5] determination that, yes, there is a privilege [6] associated with this document.

[7] SPECIAL MASTER: Okay. [8] Mr. DiGiovanni.

[9] MR. DIGIOVANNI: Your Honor, this is [10] pure attorney-client privilege and work product. [11] But we're talking about the client communicating [12] directly to the attorney regarding legal issues.

[13] SPECIAL MASTER: Jodi Barry, right?

[14] MR. DIGIOVANNI: Jodi Barry is the [15] CEO of ECHO.

[16] SPECIAL MASTER: Right. And she's [17] communicating to?

[18] MR. DIGIOVANNI: He's communicating [19] to Joe Stubbs.

[20] SPECIAL MASTER: Joe Stubbs.

[21] MR. MIN: Stubbs took over between [22] or after Marshall Frost had left.

[23] SPECIAL MASTER: Okay.

[24] MR. DIGIOVANNI: So it's an

Page 189

[1] attorney-client communication. The complaint [2] made by LML is that the description is [3] inaccurate.

[4] But, Your Honor, I would — if you [5] look at the log, it shows it's from J. Stubbs, [6] Esquire, an attorney.

[7] SPECIAL MASTER: Yes.

[8] MR. DIGIOVANNI: To J. Barry, the [9] CEO. Email communication regarding LML's [10] December 2, '03 press release. Attorney client [11] to attorney regarding a —

[12] SPECIAL MASTER: You know, I think [13] that's privileged. LML can get the press release [14] out and look at that.

[15] They know what they're talking [16] about. They're not necessarily entitled to know [17] what they're saying about it.

[18] But it does appear a client is [19] communicating with the attorney; right?

[20] MR. McDOLE: And that's correct, [21] Your Honor. But based on the description, our [22] argument is — you have

the document in front of [23] you and you can tell that there's legal advice in [24] the description. We're left — it could just be

Page 190

[1] forwarding it.

[2] That's our problem.

[3] SPECIAL MASTER: Let me focus just [4] on description.

[5] MR. McDOLE: Okay.

[6] SPECIAL MASTER: If you don't see [7] this paper, okay. So what you know is there's [8] an Email from Barry. Who is that, the CEO?

[9] MR. MIN: Yes, Your Honor.

[10] SPECIAL MASTER: CEO of ECHO and [11] communicating with the attorney, and that's a [12] communication.

[13] And the subject is LML's 12/02/03 [14] press release. So LML can get that out, and they [15] know this is what they're talking about. But [16] we're here to talk about the communication; [17] right?

[18] And that's what's protected. [19] Attorney-client privilege.

[20] MR. DIGIOVANNI: Thank you, Your [21] Honor.

[22] SPECIAL MASTER: I mean, if it just [23] said Email communication, re a press release, I'd [24] say, Well, what is LML going to do with that?

Page 191

[1] You know, they'd have no idea what the subject [2] matter is.

[3] At least you know what the subject [4] is, and they know they can't get what these two [5] other people are talking about. So anyhow, [6] that's privileged.

[7] MR. McDOLE: I understand, Your [8] Honor.

[9] SPECIAL MASTER: That is 60. A [10] couple more.

[11] MR. McDOLE: I think 69, we're [12] treating the same as Number 62.

[13] SPECIAL MASTER: 69.

[14] MR. McDOLE: That deals with the [15] contract with Mr. Spence.

[16] MR. DIGIOVANNI: Your Honor, it's [17] the same document.

[18] SPECIAL MASTER: I think we said [19] that before.

[20] MR. DIGIOVANNI: That's correct.

[21] MR. MIN: Your Honor, for the [22] record, I just wanted to mention that the page [23] that Mr. McDole had referred you to, which is [24] Page 12 of the '528 patent, which mentioned

Page 192

[1] Mr. Spence, it's physically — as you look at the [2] last sentence of that paragraph, it states, [3] "Subject to proof of such facts, the specified [4] Spence

work may qualify as prior art to the '528 [5] patent under 35 U.S.C. Section 102(a) or (g) or [6] other provisions of the patent laws."

[7] The key angle there is may qualify. [8] If you look further down the page at Footnote 5 [9] it explains that opinion counsel took a look at [10] defense documents.

[11] But, and the last sentence says, "We [12] have not completed part of that, the application [13] with respect to the investigation as provided." [14] So that cannot be the basis of this opinion that [15] was rendered.

[16] SPECIAL MASTER: All right. Let me [17] just — what I'll do — this is kind of important [18] to get to those opinions. I'll just ask counsel [19] to both give me something, not to exceed two [20] pages, on that topic, and having to do with 62 [21] and 69.

[22] MR. McDOLE: Okay.

[23] SPECIAL MASTER: All right. Thank [24] you, Mr. Min.

Page 193

[1] Then I can get the papers out and [2] look at them, and put them in the right context.

[3] MR. McDOLE: Would you like ECHO to [4] go first on that, and then LML respond, or how [5] would you like that?

[6] SPECIAL MASTER: I want LML to give [7] its position. I think you said your position is [8] on this page, this opinion.

[9] There's a reference to Mr. Spence [10] and prior art, et cetera. And you think [11] that's —

[12] MR. McDOLE: Okay.

[13] SPECIAL MASTER: That makes it [14] discoverable, and they have a response to that.

[15] MR. McDOLE: Okay.

[16] SPECIAL MASTER: Okay?

[17] MR. McDOLE: Sounds good.

[18] SPECIAL MASTER: That was 69. [19] Okay, 72.

[20] MR. McDOLE: 72, Your Honor, the [21] description identified on — ECHO identified 72 [22] as letter re potential prior art provided by [23] third party.

[24] And, again, the recipient or the

Page 194

[1] author is Stanford Spence. The recipient is [2] Mr. McCoy, who we've held is not an attorney.

[3] So there's no attorney present in [4] this. And we're also talking about prior art [5] that, by its very description in that, ECHO [6] admits that it's a third party.

[7] So, you know, on top of which [8] there's been a waiver of privilege with respect [9] to potential prior art based on

the invalidity [10] side of the opinions of counsel. And there is [11] waiver as a result of advice of counsel on that [12] fact as well.

[13] And that's what you held in your [14] special master order number three.

[15] MR. DIGIOVANNI: Your Honor, we have [16] similar issues here. This is from Mr. Spence, [17] and it again is work product.

[18] Mr. Spence, as Mr. Min had [19] described, his information was not used or [20] referenced whatsoever in the '988 patent opinion. [21] And it was only referenced in that one small [22] provision that Mr. Min recited in terms of in [23] terms of a possibility.

[24] But no opinion was based on it, even

Page 195

[1] in the second opinion which relates to the '528 [2] patent, which is no longer at issue. This is a [3] work product document.

[4] Again, Mr. McCoy is working in place [5] of counsel and is communicating directly with [6] outside counsel.

[7] SPECIAL MASTER: So isn't this work [8] product being communicated with a client?

[9] MR. DIGIOVANNI: Yes, Your Honor.

[10] SPECIAL MASTER: Well, then the [11] client has knowledge of this. This goes into the [12] total universe of knowledge the client has. That [13] is the state of mind.

[14] It is not about the subject matter [15] here. I mean we said before work product may not [16] be discoverable if it never got to the client, [17] because it doesn't intrude into the client's [18] state of mind, but...

[19] MR. DIGIOVANNI: In this instance it [20] goes to the client. However, it does not relate [21] to the opinion of counsel, the actual opinion of [22] invalidity on the '988 patent.

[23] SPECIAL MASTER: Not privileged.

[24] MR. DIGIOVANNI: Thank you.

Page 196

[1] MR. McDOLE: Your Honor, I believe [2] that ECHO has produced the last two, according to [3] their chart, which would bring us to the end of [4] the day.

[5] SPECIAL MASTER: Okay.

[6] MR. McDOLE: I would like to request [7] that Your Honor allow us to submit an application [8] for fees with respect to this with an appropriate [9] declaration. We think that Your Honor's [10] ruling — we think a lot of these issues, as Your [11] Honor has recognized, there's been a ton of [12] briefing.

[13] SPECIAL MASTER: Let's do this [14] couple things I want to do here.

[15] Number one, I'm going to ask LML to [16] prepare a schedule such as I've attached to [17] special order three, mark the document, mark the [18] rulings, and in keeping with the codes I've used.

[19] LML will attach that to an order [20] that says following conference, these are the [21] rulings, right, and the transcript is going to [22] give us the reasoning for the rulings. So we [23] just need the codes and what it is.

[24] There's a couple we've held out.

Page 197

[1] number one.

[2] Number two, I think the declaration [3] that I'd like you to make, if you will, this is [4] kind of just a little list of facts. I guess, [5] we talked about them here today.

[6] And I think I asked you just to give [7] me the declaration of dates LML sent the letter [8] to Telecheck and or ECHO concerning the possible [9] misuse of the patented product, whatever dates [10] they were.

[11] I'd like to also know the date that, [12] on or about that the defendants retained counsel [13] for this claim. You know, counsel here.

[14] Okay. Counsel in this civil action, [15] the civil action.

[16] MR. McDOLE: Do you want the dates [17] that LML retained its counsel or the date that [18] all their counsel retained their —

[19] SPECIAL MASTER: In connection with [20] this lawsuit. I'm interested when ECHO and LML [21] retained their counsel.

[22] Okay. I don't need the exact date. [23] If it's a month, it's okay. Just July '03 or [24] whatever it is.

Page 198

[1] And we — okay. I think they are [2] the only things. I mentioned before the other [3] things was just put them, if you will, the dates [4] of the two opinions.

[5] I have them, but this will just be [6] in a worksheet. This will be useful, because, I [7] guess, some instance is going to be, not you [8] probably.

[9] Telecheck is coming up too, so this [10] is more LML. Okay.

[11] Did Telecheck and ECHO come in this [12] together, this case kind of at the same time?

[13] MR. McDOLE: They were sued in the [14] same complaint, Your Honor.

[15] SPECIAL MASTER: Sued in the same [16] complaint. All right.

[17] They're the only dates I wanted to [18] have. And the other thing I mentioned, which [19] you've written down. But other than that, we [20] just had a copy of the final chart here, which [21] can be

appealed with Judge Robinson.

[22] So I'll attach it to an order [23] saying, following hearing, and then you can do [24] whatever you do with that.

Page 199

[1] And the one or two little memor- andum [2] you are going to give me, we mentioned that. [3] Okay.

[4] And anything else?

[5] MR. DIGIOVANNI: Nothing from ECHO, [6] Your Honor.

[7] MR. McDOLE: Nothing from LML.

[8] SPECIAL MASTER: All right. Well, I [9] do appreciate counsel's preparation for this [10] hearing, and we'll proceed next week with [11] Telecheck.

[12] We'll kind of follow the same [13] format. We'll see what happens.

[14] We'll see what develops. Obviously, [15] I did receive — I'm almost finished. I did [16] receive a letter, I believe, from Telecheck. It [17] mentioned a number of documents that they're [18] going to produce or something.

[19] MR. McDOLE: Yes, Your Honor. After [20] their second hard look, they pro- duced [21] something, it looks like.

[22] SPECIAL MASTER: Is that ongoing or [23] is that finished now?

[24] MR. McDOLE: I think that is

Page 200

[1] finished. The documents should be back in my [2] office today.

[3] SPECIAL MASTER: We'll do the [4] same. I would appreciate doing the same way. If I [5] could have a copy of the documents, boxes, [6] whatever they are, and in some format.

[7] And we'll see if we can develop a [8] plan with Telecheck's counsel on how to proceed. [9] But it's essentially going to go like we're doing [10] it here.

[11] So with that, is there anything [12] else?

[13] MR. McDOLE: No, Your Honor.

[14] SPECIAL MASTER: Okay. And you may [15] file your application that you mentioned earlier. [16] And we'll take up any issues that are to be [17] decided by me based upon anything in that [18] application, whatever ruling you have to make, [19] I'll make it from that application and response.

[20] MR. McDOLE: Your Honor, I guess [21] there is one issue, and it may be my ignorance [22] with respect to special master law. But with [23] respect to you mentioning an appeal, we have [24] summary judgment motions coming up that will be

Page 201

[1] due at the end of October.

[2] I was wondering if you could set [3] some sort of deadline, if ECHO is going to do, [4] that we can get that issue moving along, so it's [5] not drug out forever.

[6] SPECIAL MASTER: Okay. Well, I'm [7] here on the authority of Rule 53.

[8] MR. McDOLE: Okay.

[9] SPECIAL MASTER: And I suppose that [10] Rule 53 at the moment provides for 20 days. I [11] can't change that.

[12] But there may be some local rule [13] having to do with that.

[14] I think it's different with [15] magistrate judges. And Judge Robinson can change [16] it, because unless it's otherwise ordered by the [17] Court.

[18] So what I'm saying, to the extent, [19] that is, to which that's something you should do, [20] look at Rule 53 first. I don't know if I have [21] the authority to change that.

[22] I don't think I do. I think the [23] Court has to do that.

[24] But you think that's the way to go.

Page 202

[1] And if it is, you know, obviously a response to [2] that, then it might. Judge Robinson will do one [3] or the other.

[4] MR. HERRMANN: But, Your Honor, in [5] terms of whatever it says, can we have the date [6] of the ruling be today as opposed to when Your [7] Honor —

[8] SPECIAL MASTER: I'm ruling today [9] from the bench.

[10] MR. HERRMANN: Thank you.

[11] SPECIAL MASTER: We'll have a [12] transcript in a few days, you know. So you made [13] your notes. You can begin, Mr. DiGiovanni, and [14] develop some thoughts that you have with [15] Mr. Min on this.

[16] And there may be certain groupings [17] that you want to appeal. That is your call.

[18] I'll be giving some thinking on that [19] now. Because you have all the knowledge you're [20] going to have. There's nothing else to add to [21] it.

[22] You have a transcript of it, of [23] course. But you may — well, time begins to run [24] 9:00 a.m. tomorrow.

Page 203

[1] Give you a chance to get your papers [2] together. So the time will begin to run [3] tomorrow. That will be the first day.

[4] MR. HERRMANN: Thanks, Your Honor.

[5] SPECIAL MASTER: But then it will [6] just run according to Rule 53 or what Judge [7] Robinson agrees to, or you may stipulate and say, [8] Judge Robinson, We agreed, and she'll sign the [9] stipulation. That may be one thing.

[10] But that's up to you, not up to me.

[11] MR. HERRMANN: Thank you.

[12] SPECIAL MASTER: Thank you very much [13] for everything.

[14] Thank you. [15] I want to thank the court reporter. [16] She hasn't complained about anything.

[17] And I'm sure the record will be [18] useful, and I'll go forward and proceed. Thank [19] you.

[20] MR. HERRMANN: Thank you, Your [21] Honor.

[22] MR. DiGIOVANNI: Thank you.

[23] (Court was recessed at 1:45 p.m.)

Page 204

State of Delaware        )
New Castle County        )
    CERTIFICATE OF REPORTER
    I, Heather M. Triozzi, Registered Professional Reporter, Certified Shorthand Reporter, and Notary Public, do hereby certify that the foregoing record, Pages 1 to 205 inclusive, is a true and accurate transcript of my stenographic notes taken on October 12, 2005, in the above-captioned matter.
    IN WITNESS WHEREOF, I have hereunto set my hand and seal this 13th day of October, 2005, at Wilmington.

        Heather M. Triozzi, RPR, CSR