## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LML PATENT CORP. | ) |
| | ) |
| Plaintiff, | ) Civil Action No.: 04-858-SLR |
| vs. | ) |
| | ) |
| TELECHECK SERVICES, INC. | ) |
| ELECTRONIC CLEARING HOUSE, INC., | ) **PUBLIC VERSION** |
| XPRESSCHEX, INC., AND | ) |
| NOVA INFORMATION SYSTEMS, INC. | ) |
| | ) |
| Defendants. | ) |
| | ) |

### PLAINTIFF LML PATENT CORP.'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF INVALIDITY

Originally filed: November 15, 2005
Public version filed: November 22, 2005

Richard K. Herrmann #405
Mary B. Matterer #2696
MORRIS JAMES HITCHENS &
WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
(302) 888-6800
rherrmann@morrisjames.com
mmatterer@morrisjames.com

Russell E. Levine, P.C.
Jamie H. McDole
Edward K. Runyan
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

*Counsel for LML Patent Corp.*

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................1

II.   STATEMENT OF FACTS ......................................................................................3

      A.    The Invention Described In The '988 Patent................................................3

      B.    The '682 Patent (Higashiyama) ....................................................................5

III.  LEGAL STANDARDS ...........................................................................................6

      A.    Summary Judgment .......................................................................................6

      B.    Defendants' "Clear and Convincing" Burden of Proof ................................7

IV.   ARGUMENT ..........................................................................................................8

      A.    Defendants' Motion Is Based On Attorney Argument And
            Conjecture, Not Admissible Evidence..........................................................9

      B.    The '682 Patent Does Not Anticipate Any Asserted Claims
            Of The '988 Patent......................................................................................10

            1.   *Legal Standard For Anticipation*...................................................11

            2.   *The '682 patent does not disclose a "central
                 computer system" as required by claims 1, 2, 4-6,
                 9-11, 14, 16 and 18* .........................................................................12

            3.   *The '682 patent does not disclose a "first
                 communication means integral to a point of sale
                 terminal" as required by claims 1, 2, 4-6, 9-11, and
                 14*......................................................................................................15

            4.   *The '682 patent does not disclose a "second
                 communication means enabling said central
                 computer system to communicate with external
                 databases" as required by claims 1, 2, 4-6, 9-11
                 and 14*..............................................................................................19

            5.   *The '682 patent does not disclose a "resident third
                 party database wherein consumer banking account
                 status information is stored" as required by claims
                 5 and 11*...........................................................................................23

6.    *The '682 patent does not disclose a "system subscriber database comprising information regarding merchants and service providers that are authorized to use the checkwriting point of sale system" as required by claim 6* ...................................25

C.    The '988 Patent Is Not Invalid For Lack Of Enablement ...........................26

1.    *Legal Standard For Enablement* ......................................27

2.    *The asserted claims of the '988 patent are fully enabled* ........................................................29

D.    The '988 Patent Is Not Invalid For Claim Indefiniteness .........................32

1.    *Legal Standard For Claim Indefiniteness* ......................................33

2.    *The claim term "without using the check (or bank check) as a negotiable instrument" is not indefinite* ....................34

3.    *The claim terms "any bank check" and "any consumer bank check" are not indefinite* ......................38

V.    CONCLUSION .............................................................................................40

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242, 250 (1986) ................................................................. 7

*Arthrocare Corporation v. Smith & Nephew, Inc.,*
  2003 WL 1856436 at (D. Del. 2003) ........................................... 8, 9, 14

*Atlas Powder Co. v. E.I. duPont De Nemours & Co.,*
  750 F.2d 1569 (Fed. Cir. 1984)...................................................... 28

*Bancorp Services, L.L.C. v. Hartford Life Ins. Co.,*
  359 F.3d 1367 (Fed. Cir. 2004).................................................. 33, 34

*Bickling v. Kent General Hosp., Inc.,*
  872 F.Supp. 1299 (D. Del. 1994) ................................................ 6, 7

*Biotec Biologische Nat. GmbH & Co. KG v. Biocorp, Inc.,*
  249 F.3d 1341 (Fed. Cir. 2001)....................................................... 9

*Boston Scientific Scimed, Inc. v. Cordis Corp.,*
  392 F.Supp.2d 676 (D. Del. 2005) ................................................ 28

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986)...................................................................... 6

*Chipollini v. Spencer Gifts, Inc.,*
  814 F.2d 893 (3d. Cir. 1991).......................................................... 6

*Datamize, LLC v. Plumtree Software, Inc.,*
  417 F.3d 1342 (Fed. Cir. 2005)................................................. 33, 34

*DeGeorge v. Bernier,*
  768 F.2d 1318 (Fed. Cir. 1985).................................................... 27

*Eli Lilly & Co. v. Barr Labs., Inc.,*
  251 F.3d 955 (Fed. Cir. 2001)...................................................... 7-8

*Exxon Research & Eng'g Co. v. United States,*
  265 F.3d 1371 (Fed. Cir. 2001)................................................ 34, 36

*Fisher-Price, Inc. v. Graco Children's Prod., Inc. et al.,*
  2005 WL 2899289 (Fed. Cir. 2005)............................................... 35

*Genentech Inc. v. Novo Nordisk A/S,*
  108 F.3d 1361 (Fed. Cir. 1997).................................................... 27

*Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.,*
45 F.3d 1550 (Fed. Cir. 1995)........................................................ 7

*Honeywell Int'l, Inc. v. Int'l Trade Comm'n,*
341 F.3d 1332 (Fed. Cir. 2003 ..................................................... 34

*Hybritech Inc. v. Monoclonal Antibodies, Inc.,*
802 F.2d 1367 (Fed. Cir. 1986)..................................................... 7

*Interconnect Planning Corp. v. Feil,*
774 F.2d 1132 (Fed. Cir. 1985)..................................................... 8

*Key Pharms. v. Hercon Labs. Corp.,*
161 F.3d 709 (Fed. Cir. 1998)..................................................... 11

*Koito Manufacturing Co., Ltd. v. Turn-Key-Tech, LLC,*
381 F.3d 1142, 1155 (Fed. Cir. 2004) ...................................... 27, 29

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574 (1986)..................................................................... 7

*Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings,*
370 F.3d 1354 (Fed. Cir. 2004)..................................................... 8

*Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH,*
139 F.3d 877 (Fed. Cir. 1998)..................................................... 7

*Monon Corp. v. Stoughton Trailers, Inc.,*
239 F.3d 1253 (Fed. Cir. 2001)..................................................... 8

*Nat'l State Bank v. Fed. Res. Bank,*
979 F.2d 1579 (3d. Cir. 1992)..................................................... 7

*Northern Telecom, Inc. v. Datapoint Corp.,*
908 F.2d 931 (Fed. Cir. 1990)..................................................... 27

*Schumer v. Lab. Computer Sys., Inc.,*
308 F.3d 1304 (Fed. Cir. 2002)..................................................... 8

*Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc.,*
183 F.3d 1347 (Fed. Cir. 1999)................................................... 11

*In re Spada*
911 F.2d 705 (Fed.Cir.1990)..................................................... 11

*Symbol Technologies, Inc., v. Proxim Inc.,*
2003 WL 21840774 (D. Del. 2003) ............................................... 7

**OUTSIDE COUNSEL'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER**

*Thorn EMI North America v. Intel Corp.*,
    936 F. Supp. 1186 (D. Del. 1996).............................................................. 9

*Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*,
    308 F.3d 1167 (Fed. Cir. 2002).............................................................. 11

*United States v. Telectronics, Inc.*,
    857 F.2d 778 (Fed. Cir. 1988)......................................................... 28, 32

*Verve, LLC v. Crane Cams, Inc.*,
    311 F.3d 1116 (Fed. Cir. 2002).............................................................. 11

**Statutes**

35 U.S.C. § 112, ¶ 1 ............................................................................ 26

35 U.S.C. § 112, ¶ 2 ................................................................... 32, 34, 38

35 U.S.C. § 112, ¶6 ...................................................................... 19, 33

35 U.S.C. § 282............................................................................... 7, 8

**Rules**

Fed. R. Civ. P. 56(c) ............................................................................ 6

Fed. R. Evid. 401 and 402..................................................................... 37

Fed. R. Evid. 801 ............................................................................... 37

**OUTSIDE COUNSEL'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER**

## I.    INTRODUCTION

Defendants' motion for Summary Judgment of Invalidity of the '988 patent should be denied.  Defendants' motion is limited to three arguments, all of which lack merit.  Defendants argue that the asserted claims are invalid for (1) anticipation, (2) lack of enablement and (3) indefiniteness.  But Defendants' arguments rest entirely on attorney argument as opposed to actual evidence.  Moreover, Defendants' arguments do not coincide with the law or the factual record.  At the very least, a genuine issue of material fact exists with respect to each of these issues, thus precluding summary judgment.

*First*, Defendants argue that the Higashiyama '682 patent anticipates the asserted claims of the '988 patent.  Defendants provide no actual evidence to support their attorney arguments.  Instead, Defendants' motion is based on a series of conclusory statements that simply are not supported by the factual record.  Indeed, the '682 patent is completely devoid of, and does not disclose, the following elements of the asserted claims:  (1) "a central computer system" as required by claims 1, 2, 4-6, 9-11, 14, 16 and 18;  (2) a "first communication means integral to a point of sale terminal" as required by claims 1, 2, 4-6, 9-11, and 14; (3) "a second communication means enabling said central computer system to communicate with external databases" as required by claims 1, 2, 4-6, 9-11 and 14; (4) "a resident third party database" as required by claims 5 and 11; or (5) "a system subscriber database" as required by claim 6.  In fact, Defendants do not even provide any argument with respect to the additional elements presented by dependent claims 5, 6 and 11.  Consequently, Defendants' motion on this issue should be denied.

**Second**, Defendants argue that the asserted claims lack an enabling disclosure with respect to the claim term "any bank check", but once again, they fail to provide any actual *evidence* to support their attorney argument. Defendants again make only unsupported and conclusory statements as to the amount of experimentation that would be required to practice the claimed invention. In fact, Defendants, without support, point to only two possible issues allegedly not addressed by the specification of the '988 patent: foreign currency translations and foreign regulatory issues. But, by their very nature, currency translations and regulatory issues would be easily accessible to one of ordinary skill in the art. In any event, the '988 patent provides a detailed description of the claimed system and further describes in detail "How to Use" that system. ('988 Patent, Ex. 1[1], 6:48-11:20). Accordingly, Defendants' motion on this issue should be denied.

**Third**, Defendants argue that the claim terms "without using the check as a negotiable instrument" and "any bank check" are indefinite, rendering the asserted claims of the '988 patent invalid. Once again, however, Defendants provide no *evidence* that these claim terms are indefinite. In fact, Defendants' arguments are more of an attempt to get a "second-bite at the apple" with respect to claim construction as opposed to a legitimate invalidity defense, as Defendants' arguments for indefiniteness are actually arguments as to why LML's *claim construction*, not the claims of the patent, is allegedly indefinite. This is simply an incorrect analysis as a matter of law. Indeed, Defendants

---

[1] Exhibits are attached as the Declaration of Edward K. Runyan in Support of LML Patent Corp.'s Memorandum in Opposition to Defendants' Motion for Summary Judgment of Invalidity, hereinafter "Ex. __".

concede that these claim terms are amenable to interpretation, thus precluding indefiniteness.   As such, Defendants motion on this issue should be denied.

## II.        STATEMENT OF FACTS

### A.        The Invention Described In The '988 Patent

In the early 1990's, two inventors, Robert Hills and Henry Nichols, developed a new way of processing checks at the point of sale, *i.e.* at the merchant's location.   Their innovative process greatly simplified traditional check processing and helped merchants facilitate the way that they received payment on checks presented by their customer.   (*See generally*, Ex. 1, '988 Patent).   Instead of traditional processing where the merchant accepted a check and physically took it to the bank, the invention disclosed in the '988 Patent permitted the merchant to obtain approval for a transaction at the point of sale in the presence of the consumer and then process the check electronically, as shown in Fig. 1 of the '988 Patent:



### FIG. 1

(Ex. 1 at Fig. 1).   This process negated the need for physically taking the check to the issuing bank, eliminating the significant cost and expense associated with traditional processing of paper checks.   (*See generally,* Ex. 1 at "Abstract" and 3:3-8).

-3-

In general, the '988 patent allowed merchants to use a paper check presented by a consumer whereby the MICR data[2] contained on the check is captured at the retailer's point of sale terminal, using either a commercially available MICR reader, optical character recognition scanner or keypad to physically input the information into the terminal. (*Id.* at 5:45-49, 6:62-63). The amount of the transaction is then entered into the terminal keypad. (*Id.* at 8:11-13). Information relating to the merchant's location, date and time of transaction may be automatically captured by the terminal as well. (*Id.* at 5:18-21). The terminal then sends data to an electronic check processing provider by modem or other such communication methods that transfer packets of information electronically. (*Id.* at 5:62-6:8, 6:20-38).

The electronic check processing provider may run verification/risk analysis for the account and the bank routing number (i.e. the bank that the consumers account is located at). (*Id.* at 6:9-19). If the transaction is approved, the point of sale terminal prints out a customer authorization receipt which authorizes the retailer to initiate an ACH or EFT transaction from the customer's checking account. (*Id.* at 8:18-23). The customer signs the authorization form and the retailer often voids the paper check. (*Id*). The consumer bank account and transaction information is formatted by the electronic

---

[2] All printed checks for funds in the United States have a Magnetic Ink Character Recognition (MICR) line imprinted on the bottom of each check. This line is printed using an ink with iron-oxide pigments capable of being magnetized. In this way the characters encoded on this line can be read either magnetically or optically. The MICR line typically, contains the following information: (1) Bank Routing Number – A number that uniquely identifies the bank at which the checking account is established (sometimes known as the ABA number); (2) Account number of the consumer's checking account; and (3) Check Serial Number. *See generally,* Ex. 3, (Tinkel Declaration) at ¶ 13; Ex. 10, LML-EP-055363; and Ex. 11, Deposition of Jane Larimer at 77.

check processing provider so that it can be read and processed by the Automated Clearing House ("ACH") or other Electronic Funds Transfer ("EFT") networks.  (*Id.* at 8:30-42). The ACH or other EFT networks, in turn, transmits the payment information to the consumer's bank, where their account is debited and the retailer's bank, sometimes called the Originating Depository Financial Institution (ODFI), is credited via an electronic funds transfer.

The '988 Patent contains three independent claims, 1, 8, and 9.  Claims 1 and 9 are system claims, and claim 8 is a method claim.  The patent also contains a number of dependent claims, 2-7 and 10-20.  LML is asserting infringement by ECHO's accused products of claims 1, 2, 4, 5, 6, 9, 10, 11, 14, 16, and 18 (the "Asserted Claims").

### B.    The '682 Patent (Higashiyama)

The Higashiyama reference or '682 patent discloses a system for large retail merchants, such as grocery stores, to more efficiently process paper checks using "a reader for reading the MICR account information printed" on checks to create data records that may be used by a "backroom processor" for "future batch data transmission to a clearing house or the issuing bank itself." (Ex. 2, Abstract; Ex. 3, Tinkel Declaration ¶ 49).  In the preferred embodiment of the '682 patent, each merchant system includes a backroom processor, resulting in a system of distributed backroom processors rather than a central computer system.   (Ex. 2, 3:31-33). The backroom processor is of a type "known in the prior art for maintaining sales information, performing price lookups, and inventory adjustment during the course of business." (Ex. 2, 3:30-33).

While the backroom processor of '682 patent may upload data to a bank or clearing house "on a periodic basis or at the end of a shift" (e.g., after transactions have

completed), any check verifications or authorizations are performed by a POS terminal before transactions are completed. (Ex. 2, 5:4; Ex. 3, Tinkel Declaration ¶ 56-58). In fact, the point of sale terminal performs such verification or authorizations through a telecommunications unit which is external (i.e. non-integral) to the point of sale terminal and the entire point of sale system for that matter. (Ex. 2, Fig. 2; Ex. 3, Tinkel Declaration ¶ 73). Therefore, the '682 patent does not disclose "a central computer system," a "first communication means *integral* to a point of sale terminal," "a second communication means enabling said central computer system to communicate with external databases," "a resident third party database," or "a system subscriber database" as claimed by the '988 patent.

## III.    LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment is appropriate only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "The party moving for summary judgment bears the initial burden to demonstrate the absence of genuine issues of material fact, regardless of which party has the burden of persuasion at trial." *Bickling v. Kent General Hosp., Inc.*, 872 F.Supp. 1299, 1304 (D.Del. 1994) (*citing Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d. Cir. 1991) (en banc). In fact, when "the moving party bears the burden of persuasion at trial, the moving party *must* point to *evidence in the record* that supports the movant's version of all material facts and demonstrates the absence of any

genuine issue of material fact. *Bickling* at 872 F. Supp. 1305, *citing Nat'l State Bank v. Fed. Res. Bank*, 979 F.2d 1579, 1582 (3d. Cir. 1992) (emphasis added). When assessing the factual record, this Court must view all evidence in the light most favorable to LML, the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

To defeat a motion for summary judgment, LML is not required to present evidence conclusively resolving all material factual issues in its favor; "rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury … to resolve the parties' differing versions of the truth at trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal citation omitted); *Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550, 1561 (Fed. Cir. 1995). In fact, where the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied "even if the nonmoving party does not present opposing evidentiary materials." *Bickling* at 872 F. Supp. 1305; *see also Symbol Technologies, Inc., v. Proxim Inc.*, 2003 WL 21840774 (D. Del. 2003) (Robinson, C.J.) (denying motion for summary judgment of invalidity because genuine issues of material fact existed for trial.)

**B.     Defendants' "Clear and Convincing" Burden of Proof**

LML's '988 patent is presumed valid. 35 U.S.C. § 282. *See Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH*, 139 F.3d 877, 881 (Fed. Cir. 1998); *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1375 (Fed. Cir. 1986). Defendants can only overcome this presumption if they meet the heavy burden of establishing invalidity by clear and convincing evidence. *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 962

(Fed. Cir. 2001); *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d 1253, 1257 (Fed. Cir. 2001). When assessing the validity of the claims of a patent, the fact finder must *separately* consider each claim. 35 U.S.C. § 282 ("Each claim of a patent . . . shall be presumed valid independently of the validity of other claims."); *Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1316 (Fed. Cir. 2002). Because patents are presumed valid, defendants in patent infringement cases bear the burden of persuasion at trial regarding invalidity. *Arthrocare Corp. v. Smith & Nephew, Inc.*, 2003 WL 1856436 (D. Del. 2003).

Where "the PTO previously considered the prior art reference, [a defendant] bears an even heavier burden to prove invalidity." *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1368 (Fed. Cir. 2004); *see also Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1139 (Fed. Cir. 1985). This heavier burden applies not only when a defendant cites a *specific* reference that was before the Examiner, but also when the defendant cites prior art that is *cumulative* of the references that the Examiner considered. *Metabolite,* 370 F.3d at 1368.

## IV.      ARGUMENT

Defendants argue, in their brief, that the asserted claims are invalid for (1) anticipation, (2) lack of enablement, and (3) indefiniteness. But, Defendants' contentions are based primarily on attorney argument as opposed to actual "evidence." Moreover, as explained in detail below, Defendants' arguments do not coincide with the law or the factual record. At the very least, a genuine issue of material fact exists with respect to each of these issues, thus precluding summary judgment.

A.     **Defendants' Motion Is Based On Attorney Argument And Conjecture, Not Admissible Evidence**

"Summary judgment is appropriate when the *evidence admissible at trial* fails to demonstrate a genuine issue of material fact." *Thorn EMI North America v. Intel Corp.*, 936 F. Supp. 1186, 1199 (D. Del. 1996) (emphasis added).    "For purposes of summary judgment, evidence is deposition testimony, declarations, admissions, answers to interrogatories, etc." *Arthrocare,* 2003 WL 1856436 at *5.    However, as is the case here, "motions are often deficient for providing only attorney argument." *Id.*; *see also Biotec Biologische Nat. GmbH & Co. KG v. Biocorp, Inc.,* 249 F.3d 1341, 1353 (Fed. Cir. 2001).    Indeed, "[i]t is well established that conclusory statements of counsel or a witness that a patent is invalid do not raise a genuine issue of fact." *Biotec Biologische Nat. GmbH & Co. KG v. Biocorp, Inc.,* 249 F.3d 1341, 1353 (Fed. Cir. 2001).

Despite their "clear and convincing" burden of proof under the appropriate summary judgment standard, Defendants' brief is based primarily on unsupported, attorney argument that is not "evidence."    In fact, Defendants *do not* support their contentions with any expert declaration or affidavit, but instead, make numerous conclusory statements without support -- conclusions they are well aware are contested in this case.    These conclusory attorney statements are not "evidence," and certainly do not overcome Defendants' burden on summary judgment to show that no genuine issues of material fact exist.    *See Arthrocare*, 2003 WL 1856436 at *5.    On this basis alone, Defendants' motion should be denied.    In any event, Defendants' conclusory arguments regarding anticipation, enablement, and indefiniteness also lack merit as a matter of fact

as explained in detail below. At the very least, a genuine issue of material fact exists, precluding summary judgment.

**B.    The '682 Patent Does Not Anticipate Any Asserted Claims Of The '988 Patent**

Defendants contend that the '682 patent anticipates all Asserted Claims (i.e., claims 1, 2, 4-6, 9-11, 14, 16 and 18) of the '988 patent. However, as explained above, the '682 patent ***does not*** teach at least (1) "a central computer system" as required by claims 1, 2, 4-6, 9-11, 14, 16 and 18;  (2) a "first communication means integral to a point of sale terminal" as required by claims 1, 2, 4-6, 9-11, and 14; (3) "a second communication means enabling said central computer system to communicate with external databases" as required by claims 1, 2, 4-6, 9-11 and 14; (4) "a resident third party database" as required by claims 5 and 11; or (5) "a system subscriber database" as required by claim 6[3].  Moreover, Defendants base their entire motion on this issue on a contention they never disclosed during discovery--alleged anticipation based on the '682 patent in combination with the 1990 ACH rules.[4]  (*See* Defendants' Br. at Ex. E).  Thus,

---

[3] Defendants argue that LML allegedly has offered no support, from its expert or in any interrogatory response that Higashiyama does not anticipate claim 6. (Defendants' Br. at 11 n.2).  However, as Defendants concede, LML did contest the presence of this element in its interrogatory responses.  Moreover, Defendants never presented this anticipation argument during discovery and never presented this argument during opening expert reports.  Instead, as explained in LML's motions to strike this new contention (Dkt. # 273 and 291), Defendants waited until only days before LML's expert was to submit his rebuttal report on validity in this case to inject this new contention into the case.  Even if the Court allows Defendants to make this new argument, as explained in LML's expert's (Gary Tinkel) declaration attached hereto as Exhibit 3, Higashiyama does not disclose the additional element in claim 6 of the '988 patent.

[4] LML has moved to strike these late-added defenses in its Motion To Strike Portions Of David P. Kurrasch's Supplemental Expert Report Regarding Invalidity (Dkt. # 273)

Defendants' motion for summary judgment that all the Asserted Claims of the '988 patent are anticipated by Higashiyama '682 must be denied.[5]

### 1.    *Legal Standard For Anticipation*

The first step of an anticipation analysis is to construe the claims of the patent that are alleged to be invalid.  *Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc.*, 183 F.3d 1347, 1353 (Fed. Cir. 1999) ("It is well-established that the first step in any validity analysis is to construe the claims of the invention . . ."); *Key Pharms. v. Hercon Labs. Corp.*, 161 F.3d 709, 714 (Fed. Cir. 1998).   Then, the claims *as construed* must be compared on a limitation-by-limitation basis to the prior art.  *Id at 714*.  In comparing the claim limitations to the prior art, Defendants must also show with "clear and convincing evidence that every limitation of [a patentee's] asserted claims was contained, either expressly or inherently, in a single prior art reference."  *Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*, 308 F.3d 1167, 1188 (Fed. Cir. 2002).  Further, in order to anticipate, a single reference must describe the "claimed invention sufficiently to have placed a person of ordinary skill in the field of the invention in possession of it."  *Verve, LLC v. Crane Cams, Inc.*, 311 F.3d 1116, 1120 (Fed. Cir. 2002), *quoting In re Spada*, 911 F.2d 705, 708 (Fed. Cir. 1990).

---

and its Motion To Strike The Second Supplement To The Expert Report Of David P. Kurrasch Regarding Invalidity (Dkt. # 291).  Indeed, Defendants never even produced the 1990 ACH Rules to LML during discovery, let alone provide the anticipation contentions regarding Higashiyama/1990 ACH Rules that it now offers.  Accordingly, this argument is not even properly in this case.

[5] The '682 patent was considered by the Examiner during prosecution of LML's '528 and '366 patents.  The Examiner allowed the '528 and '366 patents to issue with claims nearly identical to the asserted claims of the '988 patent. (*Compare* Claim 1 of the '988 patent (Ex. 1) with  Claims 1 of the '528 and '366 patents (Exs. 5 and 6)).

2. *The '682 patent does not disclose a "central computer system" as required by claims 1, 2, 4-6, 9-11, 14, 16 and 18*

Claims 1, 8 and 9 of the '988 Patent all require a "central computer system,"[6] and accordingly dependent claims 2, 4-6, 10-11, 14, 16 and 18 also require a central computer system. Defendants, in their motion for summary judgment of invalidity, argue that the "backroom processor" of the '682 patent is a "central computer system" as recited in the Asserted Claims of the '988 Patent. This is not only incorrect factually, but Defendants' own evidence *explicitly contradicts* the very position they try to take. At the very least, a genuine issue of material fact exists precluding summary judgment.

a. The "backroom processor" of the '682 patent is not "a central computer system" as claimed by the '988 patent

The evidence of record actually establishes that the '682 patent's "backroom processor" is not "a central computer system" as disclosed by the '988 patent. (Ex. 3, Tinkel Decl., ¶ 50-51). Indeed, the central computer system of the '988 patent, in addition to serving multiple merchants, must also be enabled to communicate with external databases for account verification. (Ex. 1, 11:51-53; 12:62-64; Ex. 3, ¶ 51). The backroom processor of the '682 patent, on the other hand, is not a central computer system but *only a front-end computer.* (Ex. 7, Deposition of Amy Goodson at 92-93).

In addition, the backroom processor of Higashiyama is not enabled to communicate with any external databases. The only suggestion in the '682 patent of any function even requiring the backroom processor to communicate outside of a merchant's system is uploading "data records" to banks or a clearing house. (Ex. 2, 5:11-13:

---

[6] The parties agree that the element "central computer system" is readily understandable to one of ordinary skill in the art and thus requires no construction.

"Periodically, backroom processor 204 will take the data records it has accumulated and upload them to a clearing house.").  As will be explained in detail in the next section, only *POS terminal 201* is enabled to communicate with any external databases in Higashiyama.

        b.      <u>Defendants' own evidence *explicitly* states that the '682 patent *does not* disclose a central computer system</u>

While Defendants argue that the '682 patent discloses a "central computer system," this position is at odds with the little evidence they actually provide in their motion.  At Exhibit "L" to their motion, Defendants provide the Court with a copy of an opinion of counsel from TeleCheck's attorneys discussing the '682 patent.[7]

**REDACTED**

---

[7] Defendants cite to this document in their argument relating to indefiniteness. (Defendants' Br. at 17).

c.    Defendants' entire contention is based on unsupported attorney argument and conjecture

Defendants attempt to support their anticipation argument by drawing the *inference*, without any support, that the backroom processor of the '682 patent is "a central computer system." But, Defendants' inference that any simple computer (such as the backroom processor of the '682 patent) can be "a central computer system" as claimed in the '988 patent. Defendants' argument, plain and simply, ignores the word "system" in the phrase "central computer system."[8]    Defendants provide no support or justification for making such an inference, and accordingly their argument must fail as a matter of law. *See Arthrocare, 2003 WL 1856436 at* *5 ("for purposes of summary judgment, evidence is deposition testimony, declarations, admissions, answers to interrogatories, etc. Defendant's motions are often deficient for providing only attorney argument."). Certainly, on this basis alone, a genuine issue of material fact exists, thus precluding summary judgment in Defendants' favor.

Defendants also attempt to characterize the "backroom processor" of the '682 patent as somehow capable of being used for multiple stores. The passage Defendants cite in the '682 patent for this proposition simply does not support their argument. While the '682 patent states "a merchant having multiple stores benefits in that a central location may be used for consolidating check data," this passage (and in fact the entire paragraph where this passage is found) does not reference in any way the "backroom

---

[8] Indeed, the '988 patent teaches that its "central computer system" is a network of one or more computers that has the capability of serving multiple merchants. (Ex. 1, '988 patent at 7:16-35; Ex. 3, at ¶ 51).

processor." (Ex. 2, at 7:25-30). In fact, the remaining part of this passage specifically eliminates any possibility that this "central location" could be a backroom processor:

> . . . if desired, and allow check processing to be accomplished in a timely manner without delays associated with *physically transporting paper checks to the central location* prior to electronically processing those checks.

(Ex. 2, at 29-33) (emphasis added). Indeed, if a "central location" is somewhere that paper checks are physically transported to, the "central location" cannot be the "backroom processor" -- that simply would not make sense. Instead, the "central location" referred to by this passage is some physical location (as indicated by the plain language of the phrase).

Because the '682 patent does not disclose "a central computer system" as required by claims 1, 2, 4-6, 9-11, 14, 16 and 18 of the '988 patent, Defendants' motion for summary judgment of anticipation should be denied.

> 3. *The '682 patent does not disclose a "first communication means integral to a point of sale terminal" as required by claims 1, 2, 4-6, 9-11, and 14*

In addition to failing to disclose a "central computer system," the '682 patent also fails to disclose a "first communication means integral to a point of sale terminal for electronically communicating with a central computer system" as required by claims 1, 2, 4-6, 9-11 and 14.[9] Not only does the '682 patent fail to disclose this element, but it actually teaches just the opposite -- a communication means separate and apart from the

---

[9] The parties agree that the term "first communication means integral to a point of sale terminal" is clear on its face and needs no construction.

-15-

point of sale terminal.  At the very least, a genuine issue of material fact exists precluding summary judgment.

> a.    The "telecommunications unit" of the '682 patent is not "integral to a point of sale terminal" as required by the '988 patent

While Higashiyama discloses a "telecommunications unit 205" connected to POS terminal 201, this telecommunications unit is not ***integral*** to the POS terminal as required by the claims.  (Ex 3, at ¶61).  Indeed, Figure 2 of Higashiyama '682 (reproduced below) shows a point of sale system 210 defined by a dotted box.  (Ex. 2, Fig. 2 and col. 3 at lines 13-14; Ex 3, at ¶62).  Figure 2 also shows that telecom unit 205 is not only separate from the POS terminal, but separate from the ***entire POS system 210***.  (Ex. 2, Fig. 2 and col. 3 at lines 13-14; Ex. 3, at ¶ 62).



**FIGURE 2**

While the specification states, without further details, that the POS terminal and the backroom processor are "connected," this is *far* from a clear and convincing description of a communication means "integral" to the point of sale terminal. (Ex. 2, 3:29; Ex. 3, at ¶ 62). Here, the '682 patent simply does not disclose or discuss a "first communication means *integral* to [a] point of sale terminal." In fact, the only discussion in the '682 patent regarding the point of sale terminal communicating with the backroom processor (which as explained above is not even a central computer system as required by the '988 patent)[10] is a statement saying that the two are "connected" (without any discussion of

---

[10] Since the backroom processor is not a "central computer system" as claimed in the '988 patent, any communication means would not enable electronic communications

how or by what structure) and the disclosure in Figure 2 which clearly shows that "telecommunications unit 205" is separate and apart from the entire point of sale system. (Ex. 2, Fig. 2 and col. 3:29-33; Ex. 3, at ¶ 62-63). Thus, the '682 patent doesn't disclose this element.

        b.     <u>Defendants' entire contention is based on unsupported attorney argument and conjecture</u>

Defendants' argument with respect to the "first communication means integral to the point of sale terminal . . ." again is based on unsupported, conclusory attorney argument. In fact, Defendants' entire argument rests on the single quote in the '682 patent: "POS terminal 201 is connected to backroom processor 204 . . ." -- nothing else. (Defendants' Br. at 12) (ellipses in original). But, as explained above, this quote is far from clear and convincing evidence that the '682 patent teaches a "first communication means integral to said point of sale terminal." Moreover, Defendants fail to provide expert testimony or any other evidence that the bare reference to "connected" means a "first communication means integral to a point of sale terminal." Further, Defendants do not identify a single specific structure in the '682 patent that is even purportedly *integral* to the POS terminal 201. The '682 patent in no way "expressly discloses" a "first communication means integral to [a] point of sale terminal" as Defendants claim.

Defendants also -- through only attorney argument -- claim that "Higashiyama shows this direct connection between the point of sale terminal and the backroom processor, establishing that the terminal 201 must have some means to facilitate that

---

between the POS terminal and a central computer system, whether made via an integral means or otherwise.

communication." (Defendants' Br. at 12-13). But Defendants' attorneys make a series of unsupported leaps that are simply not disclosed by the '682 patent. Defendants first make the leap that the word "connected" means that "the terminal 201 must have some means to facilitate that communication." (*Id.*). Defendants then take this self-made conclusion and make an even larger leap that "some means" somehow satisfies the element "first communication means integral to the point of sale terminal for electronically communicating with a central computer system" as required by the claims.[11] These unsupported leaps are certainly not clear and convincing evidence.

Because the '682 patent does not disclose "first communication means integral to the point of sale terminal for electronically communicating with a central computer system" as required by claims 1, 2, 4-6, 9-11, and 14 of the '988 patent, Defendants' motion for summary judgment of anticipation should be denied.

    4.    *The '682 patent does not disclose a "second communication means enabling said central computer system to communicate with external databases" as required by claims 1, 2, 4-6, 9-11 and 14*

The '682 patent also fails to disclose a "second communication means that enables a central computer system to communicate with external databases for performing a consumer bank account status search."[12] Not only does the '682 patent not

---

[11] In fact, Defendants never really even state how "some means" satisfies the "integral" language of this claim term -- they simply ignore the presence of this word in the element. This is likely because the '682 patent contains no support for their argument.

[12] The parties have agreed that this term should be interpreted under 35 U.S.C. § 112, ¶6 as follows:

This function is written in means-plus-function format pursuant to 35 U.S.C. § 112(6)

disclose a "central computer system," the '682 patent also fails to disclose any communication means of a "central computer system" (or a "backroom processor" for that matter) to enable communication with external databases.     Indeed, any communication with external databases in the '682 patent is through the point of sale terminal, not the backroom processor.  At the very least, a genuine issue of material fact exists precluding summary judgment.

        a.      The '682 patent teaches that only ***the point of sale terminal*** communicates with "external databases for performing a consumer bank account status search"

In the '682 patent, it is not the backroom processor (assuming *arguendo* that a backroom processor is a central computer system -- which it is not) but "POS terminal 201" that performs all communications for authorizing transactions.[13]  (Ex. 3, ¶ 67). Indeed, the specification of the '682 patent teaches that the ***POS terminal 201*** creates data records that are required for check authorizations that must be made during transactions; these data records may not be communicated to backroom processor 204 until well *after* transactions have been completed.  (Ex. 3, ¶ 67-72).

---

The recited function of this limitation is enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the [a] bank check as a negotiable instrument.

The structures disclosed in the patent for performing the recited function of this limitation are a modem, network interface, enhanced radio transmission interface, satellite communication interface or equivalent.

(Ex. 9, Joint Claim Construction Statement).

[13] Contrary to Defendants' statement on page 14 of their brief, LML disputes -- and always has -- the disclosure of this claimed element.

Higashiyama makes *no mention* of its "backroom processor" communicating with external databases or performing bank account status searches. Instead, the backroom processor merely receives "data file[s] maintained by POS terminal 201," either "on a periodic basis or at the end of a shift." (Ex. 2, 5:2-4; Ex. 3, ¶ 66).    The backroom processor uses these data files to upload information to a clearing house or a bank, not for communication with external databases or for account verification. (Ex. 2, 5:26-27; Ex. 3, ¶ 66). Defendants present *no* evidence linking their *argument* that telecommunications unit 205 enables backroom processor 204 to communicate with external databases to the *fact* that Higashiyama's backroom processor uploads data records periodically to a clearing house.

Indeed, the '682 patent discloses that check authorizations occur ***before*** transactions are completed at the terminal 201. (Ex. 2, 4: 22-25; Ex. 3, ¶ 70). According to the '682 patent, if "authorization is not provided, the transaction can, if desired, be cancelled ***by the merchant***," thus indicating that any authorization (and thus communication with an external database) is taking place at the point of sale terminal -- not the backroom processor. (Ex. 2, 4:22-25; Ex. 3, at ¶ 70). The backroom processor is not even used in the system described in the '682 patent until *after* POS terminal 201 creates a data record and performs an optional authorization. (Ex. 2, 5:4; Ex. 3, at ¶ 70). Only then does the POS terminal 201 send a data file that includes multiple data records to the backroom processor. (*Id.*). This is usually done "on a periodic basis or at the end of a shift." (*Id.*).

Moreover, the '682 patent's entire discussion of any communication with an external database relates to the description of the process where the "customer tenders

payment" by check and  the merchant presents the check to the point of sale terminal to seek authorization for such check--and long before the "backroom processor" of the '682 patent comes into play.  (Ex. 2, at 3:45-4:68).  In fact, throughout this entire discussion, not once does the term "backroom processor" appear.  (*Id.*)  There is simply no disclosure by the '682 patent of the "backroom processor" having any means to communicate with "external databases for performing a consumer bank account status search."

> b.    Defendants' entire contention is based on unsupported attorney argument and conjecture

As with their other arguments, Defendants have again based their motion with respect to this element entirely on attorney argument and not admissible *evidence*. Defendants, without support, make the convoluted argument that since the backroom processor 204 of the '682 patent uploads "data records" at some point in time, it somehow has the ability (although not disclosed by the '682 patent) to communicate with a third party database for performing verification." (Defendants' Br. at 13).  The only passage Defendants cite in an attempt to support their argument is a passage that merely says a "data record" may be used "to verify check authorization" -- nothing else.  In fact, the '682 patent is completely devoid of any disclosure of the backroom processor using this "data record" to communicate with "external databases for performing a consumer bank account status search." Defendants manufacture this argument out of thin air.

Defendants also argue -- again without support -- that the '682 patent allows for a "data record" to be sent to the backroom processor "immediately" and therefore somehow enables the backroom processor to "communicate with external databases for performing a consumer bank account status search."  (Defendants' Br. at 14).  But, as

-22-

explained above, while a "data record" may be sent to the backroom processor "immediately," the '682 patent is completely devoid of any disclosure of the backroom processor using this "data record" to communicate with "external databases for performing a consumer bank account status search." Indeed, the entire paragraph that Defendants cite for their alleged support makes absolutely no reference to communications with "external databases." (Ex. 2, '682 patent at 5:1-10; Ex. 3, ¶ 55-56). More importantly, the exact opposite is true--as explained above, the backroom processor does not communicate with external databases. (Ex. 3, ¶ 55-56).

Because the '682 patent does not disclose a "second communication means that enables a central computer system to communicate with external databases for performing a consumer bank account status search" as required by claims 1, 2, 4-6, 9-11, and 14, Defendants' motion for summary judgment on this basis should be denied.

     5.    *The '682 patent does not disclose a "resident third party database wherein consumer banking account status information is stored" as required by claims 5 and 11*

While Defendants' motion argues that the '682 patent anticipates all the asserted claims of the '988 patent, Defendants utterly fail to address the additional element of "a resident third party database wherein consumer banking account status information is stored" as required by claims 5 and 11.[14] The only mention of these claims is in Defendants' claim chart attached to their motion  This claim chart is not evidence, it is not a sworn and verified document, and Defendants do not even *assert* that it is a "true and correct copy" of any document in evidence. (Declaration of Timothy Devlin, ¶ 7:

---

[14] The parties agree that the term "resident third party database" is clear on its face and needs no construction.

"Attached hereto as Exhibit E is a copy of an Invalidity Claim Chart comparing U.S. Patent No. 5,175,682 to U.S. Patent No. 5,484,988.")

The claim chart is *nothing* but attorney argument in chart form. Accordingly, it has no more legal significance than the defendant's attorney's unsupported conclusion in *Arthrocare* that undue experimentation would be required to practice an invention. *Id.,* 2003 WL 1856436 at *5. Defendants' failure to point to any evidence in the record supporting their motion to invalidate claims 5 and 11, in and of itself, precludes summary judgment with respect to claims 5 and 11. In any event, the '682 patent does not disclose a "resident third party database wherein consumer banking account status information is stored" (Ex. 3, at ¶ 75).

In their claim chart, Defendants claim that the '682 patent discloses "a resident third party database wherein consumer banking account status information is stored." But the only passage Defendants can muster to support their argument is the following quote from the '682 patent:

> [T]he data record is then used to verify check authorization, for example, by being compared to a positive file (which lists all allowable checking account numbers), or more likely against a negative file such as provided by SCAN of Seattle, Washington, TeleCheck of Denver, Colorado or Telecredit of Florida . . .

(Ex. E attached to Defendants' Brief, at 4 (claim 5) and 10 (claim 11)). This passage falls far short of showing a "resident third party database wherein consumer banking account status information is stored." Indeed, the '682 patent makes no disclosure of any resident third party database (Ex. 3, ¶ 75), and Defendants present no evidence that the "positive file" or the "negative file" referred to is a "resident third party database" as required by claims 5 and 11.

Because the '682 patent does not disclose a "resident third party database wherein consumer banking account status information is stored" as required by claims 5 and 11, Defendants' motion for summary judgment of anticipation should be denied.

> 6.   *The '682 patent does not disclose a "system subscriber database comprising information regarding merchants and service providers that are authorized to use the checkwriting point of sale system" as required by claim 6*

Defendants also fail to address the additional element of "system subscriber database comprising information regarding merchants and service providers that are authorized to use the checkwriting point of sale system" as required by claim 6.  The only mention of this claim is in Defendants' claim chart attached to their motion, which as discussed above is nothing but attorney argument in chart form.  Defendants' failure to point to any evidence in the record, in and of itself, precludes summary judgment with respect to claim 6.   In any event, the '682 patent does not disclose a "system subscriber database comprising information regarding merchants and service providers that are authorized to use the checkwriting point of sale system" as required by claim 6.[15]  (Ex. 3 at ¶ 76).

Defendants' claim chart only cites to the same passage cited with respect to claims 5 and 11 above:

> [T]he data record is then used to verify check authorization, for example, by being compared to a positive file (which lists all allowable checking account numbers), or more likely against a negative file such as provided by SCAN of Seattle, Washington, TeleCheck of Denver, Colorado or Telecredit of Florida . . .

---

[15] The parties agree that the term "system subscriber database" is clear on its face and needs no construction.

(Ex. E attached to Defendants' Br. at 4).   This passage is a far cry from clear and convincing evidence that Higashiyama discloses a "system subscriber database comprising information regarding merchants and service providers that are authorized to use the checkwriting point of sale system".   In fact, the "positive files" and "negative files" discussed in the '682 patent are not "system subscriber databases comprising information regarding merchants and service providers." (Ex. 3, ¶ 76).

In addition, Defendants present no evidence that the "positive file" or the "negative file" referred to is a "system subscriber database" as required by claim 6.   In fact, data files used for check authorizations are much more likely to contain information about consumers rather than merchants and service providers.   Because the '682 patent does not disclose a "system subscriber database comprising information regarding merchants and service providers that are authorized to use the checkwriting point of sale system" as required by claim 6 of the '988 patent, Defendants' motion for summary judgment of anticipation must be denied.

### C.      The '988 Patent Is Not Invalid For Lack Of Enablement

Defendants' second argument is that the asserted claims of the '988 patent are invalid for lack of enablement under 35 U.S.C. § 112, ¶ 1.   But, despite their clear and convincing burden of proof, Defendants' motion lacks any evidence whatsoever on this issue.[16]   In fact, Defendants do not cite once to the '988 patent, to any expert testimony supporting their argument, or any other relevant testimony to support their conclusory

---

[16] In spite of their lack of evidence, Defendants attempt to shift the burden of proof to LML, arguing that "LML has no countervailing evidence on this issue." (Defendants' Br. at 16).   This attempt to shift the burden of proof has no basis in the law.

statements. This deficiency alone is sufficient to deny their motion. However, as shown below, the asserted claims of the '988 patent are fully enabled. At the very least, a genuine issue of material fact exists precluding summary judgment.

       1.   *Legal Standard For Enablement*

"Invalidity for lack of enablement is a conclusion of law and must be supported by facts proved by clear and convincing evidence, for the grant of the patent by the PTO carries with it the presumption of validity including compliance with § 112." *Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 941 (Fed. Cir. 1990). The Federal Circuit has interpreted the enablement provision of § 112 to require that the specification "teach those skilled in the art how to make and use the full scope of the claimed invention without 'undue experimentation.'" *Koito Manufacturing Co., Ltd. v. Turn-Key-Tech, LLC,* 381 F.3d 1142, 1155 (Fed. Cir. 2004) 381 F.3d at 1155 (citing *Genentech Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1365 (Fed. Cir. 1997). "An inventor need not, however, explain every detail [otherwise] patent specifications would turn into product specifications, which they were never intended to be. . . . That some experimentation is necessary does not preclude enablement." *DeGeorge v. Bernier*, 768 F.2d 1318, 1323 (Fed. Cir. 1985) (internal citations omitted). Moreover, the Federal Circuit "has repeatedly explained that a patent applicant does not need to include in the specification that which is already known to and available to one of ordinary skill in the art" such as things that are "standard in the industry." *Koito*, 381 F.3d at 1156. Additionally, only the ***claimed*** invention must be enabled by the specification and not all related, ***unclaimed*** devices or systems with which the claimed invention might interface. *DeGeorge*, 768 F.2d at 1324.

Moreover, "the determination of what constitutes undue experimentation in a given case requires the application of a standard of reasonableness, having due regard for the nature of the invention and the state of the art. The test is not merely quantitative, since a considerable amount of experimentation is permissible, if it is merely routine." *Boston Scientific Scimed, Inc. v. Cordis Corp.*, 392 F. Supp. 2d 676 (D. Del. 2005) (Robinson, C.J.) (denying summary judgment for lack of enablement).

The time and expense that might be required to practice every possible embodiment of the claims of an invention is not determinative, since the time and cost may not be totally due to experimentation: the emphasis is properly placed on *experimentation,* not the time and cost standing alone. *United States v. Telectronics, Inc.,* 857 F.2d 778, 785 (Fed. Cir. 1988). The time and cost of developing an embodiment of an invention are "factors [that] may be taken into account [but] standing alone [do not] show the experimentation to be excessive." *Id.* If one embodiment of an invention is disclosed in a patent specification, it is likely that "other permutations of the invention could be practiced by those skilled in the art without undue experimentation." *Id.* at 786. In determining whether claims are enabled, "[i]t is not a function of the claims to specifically exclude" all possible inoperative embodiments. *Atlas Powder Co. v. E.I. duPont De Nemours & Co.*, 750 F.2d 1569, 1576 (Fed. Cir. 1984).

Thus, to show lack of enablement, Defendants must prove, through clear and convincing evidence, that the specification lacks a specific detail that would be required for one of ordinary skill in the art to practice the claimed invention and that the detail would not be something already known to one of ordinary skill or something that could

be discovered without undue experimentation.    *See Koito*, 381 F.3d at 1155-56. Defendants have not, and cannot, meet this burden.

   2.   *The asserted claims of the '988 patent are fully enabled*

As with Defendants' other arguments, their enablement argument is based solely on attorney argument and not admissible *evidence*.    Defendants make a number of unsupported conclusions in their argument, all of which are incorrect as a matter of law and fact.    Indeed, the disclosure of the '988 patent is more than adequate to enable one of ordinary skill at the time of the invention to practice the full scope of the claimed invention.    (Ex. 3, ¶ 77).    Indeed, the specification of the '988 patent clearly teaches those of ordinary skill in the art how to make and use the invention, and thus the claims are enabled.    For example, the specification not only describes a preferred embodiment with examples of actual components that were commercially available at the time of filing, but it also has an entire "How to Use" section that describes how the disclosed system can be used.    (Ex. 1, 2:65-11:34).    Such a detailed disclosure would enable one of ordinary skill in the art to make and use the full scope of the claimed invention.    (Ex. 3, ¶ 77).

Defendants' entire argument in this regard is based on numerous unsupported statements, none of which has any merit in the law or fact.    ***First***, Defendants do not examine each claim individually as required by law but instead argue that all the claims have the same exact scope.    Defendants attempt to couch all claims of the '988 patent into a single argument, contending the claims lack an enabling disclosure for "reading information from 'any bank check' or 'any consumer bank check,' and transferring funds based on that information from 'any bank check' or 'any consumer bank check.'"

-29-

(Defendants' Br. at 15).   *Yet, no claim of the '988 patent contains such an element.*[17] In fact, the limitation "any bank check" appears only in claim 1 in the element "a point of sale terminal adapted to receive consumer bank account information from any bank check;" in claim 8 in the element "presenting any bank check specimen to a point of sale terminal located at a merchant or service provider;"[18] and in claim 9 in the element "the point of sale terminal comprising reading means for reading magnetic ink character recognition numbers on any consumer bank check."  Each of these elements has different language and requires different things.  More importantly, none of the claims is remotely close to Defendants' characterization of the claims.  Defendants' make no argument that these elements -- as opposed to Defendants' made-up element -- lack an enabling disclosure.  On this basis alone, Defendants' motion should be denied.

   *Second*, Defendants argue, again without any support, that the '988 patent "lacks the disclosure necessary to teach one of ordinary skill in the art" how to use foreign checks in the claimed system.[19]  Defendants offer unsupported explanations of "foreign

---

[17] Defendants also characterize their argument as "there is no enabling disclosure in the specification for conducting transactions using 'any bank check' but again, the language "conducting transactions" appears nowhere in the claims of the '988 patent.

[18] In fact, claim 8 is a process claim and thus, describes a process by which "any" bank check is presented to a point of sale terminal.  Thus, to be enabled, claim 8 (and claims depending therefrom) only requires an enabling disclosure for presenting "any" bank check to the point of sale terminal -- not all types of checks as Defendants' contend.

[19] As explained in LML's claim construction briefing, the applicants, during prosecution of the '988 patent expressly stated that their invention related to any "regular check" drawn on a "normal" checking account.  Defendants' effort to include foreign checks with non-magnetic and foreign fonts is simply not something the applicants intended their invention to cover.

currency translations and foreign regulatory issues" as disclosures required to practice the invention that are not present in the '988 patent specification. Notwithstanding the fact that Defendants have absolutely no support for this statement, Defendants do not even provide any specific "foreign currency translations and foreign regulatory issues" which would be required to practice the inventions and offers no evidence that these "issues" would not already be known to one of ordinary skill or that one of ordinary skill would not be able acquire the necessary knowledge needed to deal with these "issues" without undue experimentation. By their very nature, currency translations and regulatory issues[20] would be easily accessible to one of ordinary skill in the art. (Ex. 3, at ¶ 77-78). In fact, regulations and currency translations are types of information that could be easily located by *anyone,* let alone by one of ordinary skill in the art.

   *Third*, Defendants argue, without support, that "the amount of experimentation required to make such systems work would have been substantial." Defendants are simply grasping at straws with this argument. Defendants attempt to argue that because "no working system within the scope of the claim was developed until 1998,"[21] that somehow suggests that undue experimentation would be required to make such systems work. Defendants are making illogical leaps to support their motion. Regardless of when the first system was "working", Defendants have not shown, and cannot show, that any

---

[20] Defendants provide no support that any so-called "regulatory issues" existed at the time of filing of the '988 patent. In fact, no electronic check conversion system even existed until at least 1997, and thus no regulations existed regarding it.

[21] This statement is amazing given that Defendants' own expert argues that the claimed system was on-sale at least by June 9, 1993. (Ex. 13, ¶ 258: "[C]laims 1-6, 8-11, 13 and 16 of the '988 patent [are] invalid because their subject matter was on sale more than one year before their priority date.").

delay in developing any system was due to experimentation as opposed to other factors. Defendants simply assume this nexus. But even assuming Defendants' statement was true (which it is not), it would still fall far short of the required clear and convincing evidence required to prove lack of enablement. Indeed, the time and cost of developing an embodiment of an invention are "factors [that] may be taken into account [but] standing alone [do not] show the experimentation to be excessive."[22]  *United States v. Telectronics, Inc.* 857 F.2d 778, 785 (Fed. Cir. 1988).

Defendants simply have offered no legitimate "evidence" that the asserted claims of the '988 patent are invalid for lack of enablement. Indeed, Defendants do not provide any evidence that any experimentation would be necessary to practice the claim invention, let alone undue experimentation. As such, Defendants' motion on this basis must be denied as a matter of law.

### D.    The '988 Patent Is Not Invalid For Claim Indefiniteness

Defendants' final argument is that the asserted claims of the '988 patent are invalid for claim indefiniteness under 35 U.S.C. § 112, ¶ 2 based on the limitations "without using the check (or bank check) as a negotiable instrument" and "any bank check."[23] Defendants' arguments here are more of an attempt to get a "second-bite at the

---

[22] In *Telectronics,* the Court found that one embodiment of the patent-in-suit was clearly enabled, but another embodiment would require a study that would be both time consuming and expensive. *Id.* The Federal Circuit in *Telectronics* held that "[s]ince one embodiment is admittedly disclosed . . . other permutations of the invention could be practiced by those skilled in the art without undue experimentation." *Id.* at 786.

[23] Claims 16 and 18 are method claims that require the step of "presenting any bank check specimen to a point of sale terminal," so it is not even *arguable* that they *require* a point of sale terminal "adapted to receive consumer bank account information from any bank check" as the remaining claims do. Certainly, Defendants

apple" with respect to claim construction as opposed to a legitimate invalidity defense. Indeed, Defendants' arguments for indefiniteness are actually arguments as to why words used in LML's construction are allegedly indefinite, not the elements of the asserted claims. This is simply an incorrect analysis as a matter of law. Regardless, the asserted claims of the '988 patent are not indefinite as explained below.

        1.    *Legal Standard For Claim Indefiniteness*

The "definiteness" requirement of § 112 requires that the specification "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention" 35 U.S.C. § 112, ¶ 6. 2. However the definiteness requirement does not "compel absolute clarity." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005). In ruling on an assertion of claim indefiniteness, "a court must determine whether those skilled in the art would understand what is claimed when the claim is read in light of the specification." *Bancorp Services, L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1371 (Fed. Cir. 2004). A determination that a patent claim is invalid for failure to meet the definiteness requirement is a conclusion "that is drawn from [a] court's performance of its duty as the construer of patent claims," and likewise is a question of law. *Id.*

**Only claims "not amenable to construction" or "insolubly ambiguous" are indefinite.** *Datamize*, 417 F.3d at 1347 (internal citations omitted) (emphasis added). "Thus, the definiteness of claim terms depends on whether those terms can be given *any*

---

cannot argue that claims 16 and 18 are not enabled adequately to read "any" check. Instead, Defendants' argument seems to be the '988 patent is not enabled to read *all* checks (or bank checks).

reasonable meaning." *Id.* (emphasis added). The law is clear that a claim is not indefinite merely because it poses a difficult question of claim construction. *Bancorp*, 359 F.3d at 1371 (citing *Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1338-39 (Fed. Cir. 2003). In other words, if the meaning of a claim is discernable, "even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, . . . the claim [is] sufficiently clear to avoid invalidity on indefiniteness grounds." *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001). Moreover, in assessing indefiniteness, "general principles of claim construction apply." *Datamize*, 417 F.3d at 1348. This means that "intrinsic evidence in the form of the patent specification and file history should guide a court." *Id.*

The Federal Circuit has noted that "[b]y finding claims indefinite only if reasonable efforts at claim construction prove futile, we accord respect to the statutory presumption of patent validity, *see* 35 U.S.C. § 282, and 'we protect the inventive contribution of patentees, even when the drafting of their patents has been less than ideal.'" *Bancorp*, 359 F.3d at 1371 (quoting *Exxon*, 265 F.3d at 1375). Thus, "close questions of indefiniteness in litigation involving issued patents are properly resolved in favor of the patentee." *Exxon*, 265 F.3d at 1380.

   2.   *The claim term "without using the check (or bank check) as a negotiable instrument" is not indefinite*

Defendants contend that the '988 patent is invalid for claim indefiniteness under 35 U.S.C. § 112, ¶ 2 based on the limitation "without using the check (or bank check) as a negotiable instrument." Defendants' argument must fail because one of ordinary skill in the art would be able to determine *at least* one reasonable construction for the term,

and thus determine the scope of what is claimed. (Ex. 3, Tinkel Decl. at ¶ 79). In fact, both parties have proposed constructions for such element, all parties' experts understand what the element means (by proposing a construction and offering opinions under those constructions), and industry rules and guidelines (known and used by ones of ordinary skill in the art) use the same exact terms.[24]

First, as explained in detail in LML's claim construction briefing, the term "without using the [bank] check as a negotiable instrument" is amenable to construction and thus, is definite. The specification and prosecution history of the '988 patent explain in detail that this element means that the check is being used as a source document, and is not accepted or processed.

Second, Defendants' conclusory arguments are far from sufficient to carry their clear and convincing burden of proof. In fact, Defendants have shown the claims are amenable to interpretation by offering a construction they admit gives the "limitation . . . clear and definite scope." (Defendants' Br. at 17). In effect, Defendants concede that this claim term is amenable to interpretation:

> Only by grounding the interpretation of this phrase within the intrinsic record of the patent and prosecution history, as set forth in Defendants' proposed claim construction and supporting briefs, does the limitation obtain any clear and definite scope.

---

[24] Indeed, this case is similar to a recent unpublished decision by the Federal Circuit in *Fisher-Price, Inc. v. Graco Children's Prod., Inc. et al.*, 2005 WL 2899289 (Fed. Cir. 2005) * 3. In that decision, the Court reversed a finding of indefiniteness by the district court because "two very plausible constructions have emerged" and the invention was understood by both experts and laypersons -- "the words used in the limitation are simple, with well-known ordinary meanings." *Id.*

(Defendants' Br. at 17).  Thus, even though LML disagrees with the claim construction proposed by Defendants for this term, the term is conclusively *not* "insolubly ambiguous."  Indeed, this case is similar to *Exxon* where there were at least two possible constructions, over which the parties simply disagree.  *See Exxon*, 265 F.3d at 1375 ("If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds.").

In addition to Defendants' effective admission that the claim term here *is* amenable to construction, those of ordinary skill in the art would also understand the meaning of the term, for the following reason.  According to NACHA regulation 3.8.1, any check used for a point of purchase transaction (*i.e.* POP entry code[25]) "must be used . . . as a source document [and] must then be voided by the Originator."  (Ex. 10 at LML-EP-055429) (emphasis added); *see also* Ex. 12, McEntee Dep. at 42-45, 124; Ex. 11; Larimer Dep. at 42-47, 49-54, 63, 68).  Indeed, Defendants do not argue that the phrase "without using the check as a negotiable instrument" is indefinite, but that the terms "accepted" and "processed", used in LML's construction, are ambiguous and indefinite. The terms "accepted" and "processed" do not appear in the claims themselves.  Not only is it irrelevant that "accepted" and "processed" are ambiguous, it is not true, as the NACHA Operating Rules use these terms in the same context as the claims.  (Ex.10 at LML-EP-055765).  ("the check is *not negotiated* by the merchant or *accepted* into the

---

[25] The entry code on a specific electronic transaction identifies the origin of the transaction.  For instance, the only transaction at issue in this case -- point of purchase transactions -- have the entry code POP.

check collection system.") (emphasis added). Certainly, terms used by NACHA, the industry's main standards body, would be understandable to one of skill in the art. Moreover, terms such as "accepted" or "processed" are terms readily understandable to a jury.

Defendants' argument is simply an inappropriate attempt to reargue claim construction.[26] Indeed, Defendants' motive is revealed by their concluding sentence of this section: "LML's proposed construction is ambiguous and indefinite, and if accepted, renders the claims invalid." (emphasis added). Defendants do not even *argue* that the claims themselves are indefinite, but instead merely argue their irrelevant disagreement with LML's claim construction.[27] This is just not the appropriate legal standard for indefiniteness.

Defendants have offered no legitimate evidence[28] that the claim element "without using the check as a negotiable instrument" is invalid for indefiniteness. The

---

[26] LML stands by its claim construction briefing on this issue and refers the Court to such briefing if it is inclined to entertain Defendants' inappropriate effort to reargue claim construction. Despite Defendants' efforts to characterize LML's construction of this term in a negative light, LML has always maintained a consistent construction of this term -- a construction that is fully supported by the intrinsic evidence of record.

[27] Defendants appear to mistake the doctrine of claim indefiniteness with a claim construction argument that leaves a factual issue for the jury to decide. LML's construction uses everyday terms that any juror would understand as opposed to Defendants' claim construction which uses terms already appearing in the claim element and which require legal interpretation (such as negotiable instrument).

[28] Defendants have quoted an unidentified, unauthenticated "opinion of [LML's] due diligence counsel" to construe the claim term "without using the check as a negotiable instrument." (Defendants' Br. at 17). A quote or paraphrase of hearsay such as this is inadmissible "hearsay within hearsay" under Fed. R. Evid. 801. Because Defendants have neither 1) shown the alleged document is not hearsay; 2) identified any exception to the hearsay rule nor 3) laid any foundation for any such

phrase "without using the check as a negotiable instrument" distinctly points out the subject matter of the invention and therefore is not indefinite. (Ex. 3, Tinkel Decl., ¶ 79). As such, Defendants' motion for summary judgment on this issue should be denied .

        3.    *The claim terms "any bank check" and "any consumer bank check" are not indefinite*

Defendants also contend that the '988 patent is invalid for claim indefiniteness under 35 U.S.C. § 112, ¶ 2 based on the limitations "any bank check" and "any consumer bank check." While Defendants make this argument for the first time in the brief (it was not disclosed during discovery),[29] Defendants' argument cannot succeed as a matter of law because one of ordinary skill in the art would be able to determine *at least* one reasonable construction for the term, and thus determine the scope of what is claimed. (Ex. 3, ¶ 79). Again, both parties have proposed constructions for such element, all parties' experts understand what the element means (by proposing a construction and offering opinions under those constructions).

First, as explained in detail in LML's claim construction briefing, the term "any bank check" is amenable to construction and thus, is definite. The specification and

---

exception for the alleged document, LML objects to the admissibility of both the alleged document in question and any statements quoting or paraphrasing the document. Moreover, LML objects to this document under Fed. R. Evid. 401 and 402.

[29] Defendants' did not disclose this indefiniteness contention during discovery despite LML's contention interrogatory requesting Defendants to state all bases for its contention that the patents-in-suit were invalid. Not even Defendants' expert, David Kurrasch, made this argument in his expert report. This is simply the first time Defendants have ever made this argument. As such, Defendants' contention in this regard should be stricken.

prosecution history of the '988 patent explain in detail that this element means a regular check used to draw funds from a normal bank or credit union checking account.

Second, as with the term "without using the check as a negotiable instrument" discussed above, Defendants fall far short of carrying their burden for summary judgment. Indeed, Defendants effectively concede that the asserted claims are amenable to interpretation by offering a construction for these terms, as shown below in an excerpt from the Parties' Joint Proposed Claim Construction Statement (Dkt. # 281).

**Proposed Constructions of Disputed Claim Terms**

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| any bank check (claims 1, 8) | Any regular check used to draw funds from a normal bank or credit union checking account | any type of check drawn on a financial institution |
| any consumer bank check (claim 9) | Any regular check used to draw funds from a normal bank or credit union consumer checking account | same meaning as the phrase "any bank check" set forth above, with the added limitation that the check be "drawn against a consumer bank account" |

Once again, even though LML disagrees with Defendants' proposed claim construction, there is at least one construction that gives the claims definite scope.

The *only* evidence Defendants offer in support of their argument here is the same Parties' Joint Proposed Claim Construction Statement (Dkt. # 281) reproduced in part above. Defendants offer <u>no</u> other deposition testimony, admission, pleading, interrogatory answer, declaration, or affidavit in support of their argument that the terms "any bank check" and "any consumer bank check" are indefinite. Indeed, Defendants do not appear to even *argue* that the claim terms themselves are indefinite, but instead argue that specific terms, namely "regular check" and "normal bank" in LML's *proposed construction* are indefinite. As explained above, these are everyday terms that any juror

-39-

would understand. Defendants' argument simply uses the wrong legal standard for indefiniteness. This strawman argument should be rejected.

Defendants have offered no legitimate *evidence* that the claim term "any bank check" is invalid for indefiniteness. In fact, Defendants' argument is once again a thinly disguised attempt to reargue claim construction. The phrase "any bank check" distinctly points out the subject matter of the invention and therefore is not indefinite. (Ex. 3, Tinkel Decl., ¶ 79). As such, Defendants' motion for judgment that the claims are indefinite should be denied as a matter of law.

## V.    CONCLUSION

For the foregoing reasons, LML respectfully requests that this Court deny Defendants' motion for summary judgment that the Asserted Claims (1, 2, 4-6, 9-11, 14, 16 and 18) of the '988 Patent are invalid.

Richard K. Herrmann (I.D. No. 405)
Mary B. Matterer (I. D. No. 2696)
MORRIS JAMES HITCHENS & WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
302.888.6800
mmatterer@morrisjames.com

Russell E. Levine, P.C.
Jamie H. McDole
Edward K. Runyan
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
312.861.2000

*Counsel for Plaintiff LML Patent Corp.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of November, 2005, I electronically filed the foregoing document, **PUBLIC VERSION OF PLAINTIFF LML PATENT CORP.'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF INVALIDITY**, with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Collins J. Seitz, Jr., Esq.
Francis DiGiovanni, Esq.
Connolly Bove Lodge & Hutz LLP
1007 North Orange Street
Wilmington, DE  19801

William J. Marsden, Jr., Esq.
Timothy Devlin, Esq.
Fish & Richardson, P.C.
919 North Market Street, Suite 1100
Wilmington, DE  19801

Richard D. Kirk, Esq.
The Bayard Firm
222 Delaware Avenue, 9th Floor
Wilmington, DE  19801

Additionally, I hereby certify that on the 22nd day of November, 2005, the foregoing document was served via email on the following non-registered participants:

Robert Jacobs, Esq.
Mark B. Mizrahi, Esq.
Belasco Jacobs & Townsley, LLP
Howard Hughes Center
6100 Center Drive, Suite 630
Los Angeles, CA  90045

Mark C. Scarsi, Esq.
Vision L. Winter, Esq.
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA  90071

> _/s/ Mary B. Matterer_
> Richard K. Herrmann (#405)
> Mary B. Matterer (#2696)
> MORRIS, JAMES, HITCHENS
> & WILLIAMS LLP
> 222 Delaware Avenue, 10th Floor
> Wilmington, Delaware 19801
> (302) 888-6800
> mmatterer@morrisjames.com
>
> _Counsel for Plaintiff LML PATENT CORP._