**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| LML PATENT CORP. | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.: 04-858-SLR |
| vs. | ) | |
| | ) | |
| TELECHECK SERVICES, INC. | ) | |
| ELECTRONIC CLEARING HOUSE, INC., | ) | **PUBLIC VERSION** |
| XPRESSCHEX, INC., AND | ) | |
| NOVA INFORMATION SYSTEMS, INC. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DECLARATION OF EDWARD K. RUNYAN IN SUPPORT OF
PLAINTIFF LML PATENT CORP.'S MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF INVALIDITY**

Originally filed:  November 15, 2005
Public version filed:  November 22, 2005

Richard K. Herrmann #405
Mary B. Matterer #2696
MORRIS JAMES HITCHENS &
WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware  19801
(302) 888-6800
rherrmann@morrisjames.com
mmatterer@morrisjames.com

Russell E. Levine, P.C.
Jamie H. McDole
Edward K. Runyan
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois  60601
(312) 861-2000

*Counsel for LML Patent Corp.*

## DECLARATION OF EDWARD K. RUNYAN

I, Edward K. Runyan, declare as follows:

1. I am an associate of the law firm of Kirkland & Ellis LLP, and counsel for plaintiff LML Patent Corp. ("LML"). I am a member in good standing of the bar of the State of Illinois, and I am admitted to practice *pro hac vice* in the United States District Court for the District of Delaware for this case. The facts set forth below are known to me personally and I could competently testify thereto if called as a witness in this action..

2. Attached hereto as Exhibit 1 is a true and correct copy of United States Patent Number 5,484,988 to Hills.

3. Attached hereto as Exhibit 2 is a true and correct copy of U.S. Patent No. 5,175,682 to Higashiyama.

4. Attached hereto as Exhibit 3 is the Declaration of Gary Tinkel in support of LML'S Memorandum In Opposition To Defendants' Motion For Summary Judgment Of Invalidity.

5. Attached hereto as Exhibit 4 is a true and correct copy of production document LML-EP-052494, an excerpt from the 1996 ACH Rules.

6. Attached hereto as Exhibit 5 is a true and correct copy of United States Patent Number 6,164,528 to Hills.

7. Attached hereto as Exhibit 6 is a true and correct copy of United States Patent Number 6,283,366 to Hills.

8. Attached hereto as Exhibit 7 is a true and correct copy of portions of the July 21, 2005, deposition of Amy Goodson.

9. Attached hereto as Exhibit 8 is a true and correct copy of Exhibit L to Defendants' Opening Brief -- Marked FOCO.

10. Attached hereto as Exhibit 9 is a true and correct copy of the parties' Joint Claim Construction Statement.

11. Attached hereto as Exhibit 10 is a true and correct copy of various pages of production document LML-EP-055336-944, excerpts from the 2005 ACH Rules.

12. Attached hereto as Exhibit 11 is a true and correct copy of portions of the July 28, 2005 deposition of Jane Larimer.

13. Attached hereto as Exhibit 12 is a true and correct copy of portions of the July 11, 2005 deposition of Elliott McEntee.

14. Attached hereto as Exhibit 13 is a true and correct copy of portions of the August 12, 2005 Expert Report of David P. Kurrasch Regarding Invalidity.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on this *15TH* day of November 2005 in Chicago, Illinois.

Edward K. Runyan

# EXHIBIT  1

US005484988A

# United States Patent [19]

## Hills et al.

[11] Patent Number: 5,484,988

[45] Date of Patent: Jan. 16, 1996

[54] CHECKWRITING POINT OF SALE SYSTEM

[75] Inventors: Robert R. Hills, St. Augustine, Fla.; Henry R. Nichols, McLean, Va.

[73] Assignee: Resource Technology Services, Inc., Vienna, Va.

[21] Appl. No.: 257,390

[22] Filed: Jun. 9, 1994

### Related U.S. Application Data

[63] Continuation of Ser. No. 975,717, Nov. 13, 1992, abandoned.

[51] Int. Cl.⁶ .................................... G06F 15/30
[52] U.S. Cl. ............................ 235/379; 235/380
[58] Field of Search .................... 235/379, 380

[56] References Cited

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,824,544 | 7/1974 | Simjian | 340/147 A |
| 3,845,470 | 10/1974 | Schuller | 340/149 A |
| 4,270,042 | 5/1981 | Case | 235/379 |
| 4,404,649 | 9/1983 | Nunley et al. | 364/900 |
| 4,523,330 | 6/1985 | Cain | 382/7 |
| 4,580,040 | 4/1986 | Granzow et al. | 235/379 |
| 4,617,457 | 10/1986 | Granzow et al. | 235/379 |
| 4,672,377 | 6/1987 | Murphy et al. | 340/825.34 |
| 4,673,802 | 6/1987 | Ohmae et al. | 235/379 |
| 4,678,895 | 7/1987 | Tateisi et al. | 235/379 |
| 4,678,896 | 7/1987 | Carlson et al. | 235/380 |
| 4,743,743 | 5/1988 | Fukatsu | 235/379 |
| 4,810,866 | 3/1989 | Lord, Jr. | 235/379 |
| 4,823,264 | 4/1989 | Deming | 235/379 |
| 4,933,536 | 6/1990 | Lindemann et al. | 235/375 |
| 4,934,772 | 6/1990 | Sakuma et al. | 350/6.5 |
| 5,053,607 | 10/1991 | Carlson et al. | 235/379 |

Primary Examiner—Harold Pitts
Attorney, Agent, or Firm—Thomas M. Champagne; Jon L. Roberts; Roberts & Associates

[57] ABSTRACT

A point of sale system designed to read information from a consumer's check, credit card, or manual input with a subsequent debiting of a consumer's account and crediting a merchant's account for the goods or services provided. Point of sale terminals are designed to accept a form of credit card with a consumer's bank account information encoded thereon or in the alternative to read the MICR number from a consumer's check in order to verify that a consumer has an appropriate balance to conduct the transaction with a given merchant. Thereafter the transaction of that information is transmitted to a central computer system which verifies the consumer's credit worthiness and stores the transaction event information for subsequent bank reconciliation via the ACH network. The invention eliminates the need for paper checks with all bank reconciliation being accomplished electronically.

20 Claims, 8 Drawing Sheets



LML v. Telecheck
CA No. 04-cv-00858
PX 1
Espinoza 4/18/05

CONFIDENTIAL

U.S. Patent          Jan. 16, 1996.       Sheet 1 of 8          5,484,988



FIG. 1



FIG. 2

CONFIDENTIAL

U.S. Patent          Jan. 16, 1996          Sheet 2 of 8          5,484,988



FIG. 3

CONFIDENTIAL

LML-EP 000003

U.S. Patent          Jan. 16, 1996      Sheet 3 of 8          5,484,988



FIG. 4

CONFIDENTIAL

LML-EP 000004

U.S. Patent    Jan. 16, 1996    Sheet 4 of 8    5,484,988



FIG. 5

CONFIDENTIAL

LML-EP 000005

U.S. Patent          Jan. 16, 1996          Sheet 5 of 8          5,484,988



```
                    ( A )
                      │
                      ▼
            ┌──────────────────┐  ╭─ 114
            │     COMPARE      │
            │     CHECK        │
            │    TO TERM       │
            └──────────────────┘
                      │
                      ▼              ╭─ 116
                 ╱─────────╲      YES
               ╱  #'S COMPARE ╲─────────►( B )
               ╲             ╱              ▲
                 ╲─────────╱                │
                      │ NO                  │
                      ▼                     │
  118 ─╮    ┌──────────────────┐            │
       │    │    CLEAR         │            │
       └────│  POS TERM        │            │
            │   REINIT.        │            │
            └──────────────────┘            │
                      │                     │
                      ▼                     │
  130 ─╮    ┌──────────────────┐            │
       │    │    ENTER         │            │
       └────│    MICR          │            │
            │    NO.           │            │
            └──────────────────┘            │
                      │                     │
                      ▼              ╭─ 132 │
                 ╱─────────╲      YES       │
               ╱  #'S COMPARE ╲─────────────┘
               ╲             ╱
                 ╲─────────╱
                      │ NO
                      ▼
            ┌──────────────────┐  ╭─ 136
            │    RETURN        │
            │    CHECKS        │
            └──────────────────┘
                      │
                      ▼
            ┌──────────────────┐  ╭─ 137
            │     END          │
            │   SESSION        │
            └──────────────────┘
```

FIG. 6

CONFIDENTIAL

LML-EP 000006



FIG. 7

CONFIDENTIAL

LML-EP 000007

U.S. Patent          Jan. 16, 1996          Sheet 7 of 8          5,484,988

Merchant Name
Street Address
City, ST Zip
Merchant Acct #

TIME 00:00 _M                    DATE 00/00/00
BANK ACCT. NO. 000000000000
TRANSIT NO. 000000000

SALE AMOUNT                      $ 0,000.00

TERMINAL ID 0000000000

I herewith authorize ChequeMARK Systems
to electronically access my designated
checking account for the payment of the
above referenced purchase.

Name (PRINT) _____
Street _____
City_____ ST_____ Zip _____
Tel. Number: (_____)_____ — _____

I ACKNOWLEDGE THAT RETURN FEES WILL BE
IMPOSED SHOULD MY PAYMENT BE DISHONORED
AND UNDERSTAND THAT IT IS UNLAWFUL TO
AUTHORIZE PAYMENTS FOR WHICH ADEQUATE
MONIES ARE NOT AVAILABLE WITHIN MY
ACCOUNT.

X_____
   Authorizing Signature

FIG. 8

CONFIDENTIAL

LML-EP 000008

5,484,988

| 1 | 2 |

# CHECKWRITING POINT OF SALE SYSTEM

## RELATED APPLICATION

This application is a continuation of Ser. No. 07/975,717 filed Nov. 13, 1992, now abandoned.

## FIELD OF THE INVENTION

This invention relates to the field of Point-of-Sale systems and more particularly to the integration and processing of purchases whereby a check is used as the basic source of identification of the individual and of the individual's bank and whereby the bank account is debited.

## Background Art

Numerous devices exist for processing checks. For example, U.S. Pat. No. 4,933,536 to Lindemann, et al., describes a check processing device which is used together with a Point-of-Sale terminal. This particular device involves copying and taking a picture of an individual, whereby a dishonored check could then be traced to the person who has offered it.

U.S. Pat. No. 4,810,866 to Lloyd Jr., describes a check validation system again located together with a Point-of-Sale system for imprinting and otherwise physically dealing with a check.

Other systems also deal an apparatus for handling checks at a point of sale. For example, U.S. Pat. No. 4,743,743 to Fukatsu describes one such transaction apparatus where a check is examined by a reader. U.S. Pat. No. 4,672,377 to Murphy, et al. describes a check authorization system wherein a check is imprinted with a bar code and information concerning customers which are stored in a database. U.S. Pat. No. 3,845,470 to Schuller discloses a vending system using a modified form of a check which is imprinted with identification codes, when someone attempts to use the check in purchasing goods and services, a vending operation will not place the order if information associated with the check is not valid in a particular database.

Other check-based financial systems have also been the subject of invention. U.S. Pat. No. 4,617,457 addresses an ATM or automatic teller machine form of cashing checks. Such systems create a picture of the check involved and also involves checking against a specialized database to insure that the check is a "valid" one (see also U.S. Pat. No. 4,580,040 to Granzow et al.).

Another generic category of financial systems deals with methods of handling the financial transactions apart from the physical handling of the check itself. For example, U.S. Pat. No. 3,824,544 to Simjian describes a merchant issued "check" which can be used in the purchase of goods and services and upon purchase, a specialized code is evaluated to determine if the check is being validly utilized.

U.S. Pat. No. 4,404,649 to Nunley et al. describes a document processing system which generally discloses a method of reading checks for processing a wide variety of financial documents.

U.S. Pat. No. 4,523,330 to Cane also describes a method for processing financial documents which systems also includes a Point-of-Sale terminal for generating image data as from checks as they are being processed. This patent is drawn principally to the actual terminal itself.

U.S. Pat. No. 4,673,802 to Ohmae et al. describes a central processing system having stored data relating to the accounts of users. Users are approved or disapproved at the Point-of-Sale based upon information in the database.

U.S. Patent No. 4,270,042 to Case discloses a point of sale system that requires a consumer to prepay a sum of money into a special account that is accessed only by the system. This amount is inscribed on the card, and when a transaction is made using the system, the amount of the transaction is punched out of a designated area on the card. This amount, along with a signature and other information, is supplied on a draft negotiable instrument, which is given to the merchant at the time of the transaction. Thus, the Case system does away with the use of bank checks in effecting the transaction, but requires the use of specialized prepaid draft negotiable instruments that must be surrendered to the merchant.

U.S. Patent No. 4,823,264 to Deming discloses a home banking system that can be used to transfer funds to different payees in satisfaction of debts incurred through previous purchases, use of utilities, etc. The system is consumer driven; that is, it is contemplated for use by the payor on a home personal computer. While the Deming system does away with the use of bank checks, account and other information must be keyed into the system. The Deming system cannot be used to read account and other information directly from an ordinary bank check and has no use for bank checks as instruments other than negotiable paper. Further, the Deming system cannot be used to transfer funds at the time of purchase and is not workable at the point of sale; the system can only be used to pay debts that have been incurred in the past and have been accumulated.

Finally, U.S. Pat. No. 4,678,896 to Carlson et al. describes a Point-of-Sale system whereby an apparatus is provided to secure the processing and imprinting of checks.

All of these above patents deal with the specific problem of how to accept a check from a customer for the purchase of goods and services. They do not in any way address the subsequent processing of checks nor do they address the process by which checks are cleared through the normal automatic check handling clearinghouse operations that exist in the financial world. Thus, the interaction of these systems with the automated clearing house ("ACH") process is not addressed in any way. This is particularly important since if any Point-of-Sale check handling system is to interact with the ACH mechanism it must adhere to that processing scheme and must lend itself to use with a processing scheme.

Further, some of the currently used systems described above require the use of a bank check as a negotiable instrument which must be surrendered to a merchant. Some of the systems do away with the use of a bank check altogether, but require a debit card or a specialized draft instrument to be used only with the particular system. None of these systems completely does away with the need and use for a negotiable draft instrument while using the consumer's bank check for identification and verification only. It is therefore an objective of the present invention to provide such a system.

It is an objective of the present invention to be adaptable for use with the ACH system and to be smoothly incorporated into it. In this fashion, the present invention will immediately be useful for a much wider range of financial transactions above and beyond those contemplated and disclosed in the background references discussed above.

## Summary of the Invention

The present invention comprises a process and apparatus which may be employed for the purpose of effecting pay-

CONFIDENTIAL

LML-EP 000010

5,484,988

3

ments for point-of-sale purchases of goods and services paid from consumer funds secured in bank checking or depository accounts. Each sale or "Transaction Event" would be an electronic and "paperless" event thereby eliminating reliance on accepting and processing commercial bank drafts (personal or corporate checks) and the physical handling of those bank drafts thus replacing commercial bank drafts at the point-of-sale.

In contrast to known systems, the present invention is a merchant driven system that can be used to process a transaction at the point of sale and at the time of purchase. The system is intended to be made available to subscribing merchants, businesses, and individuals herein referred to as "system subscribers" wishing to employ the method and apparatus of the present invention for the electronic processing and settlement of consumer purchases. Further, operational parameters of the present invention allow freedom from customary state or other geographically limiting criteria typical when accepting and processing "paper" checks. The system is designed to act with the national authorization and electronic settlement network known as the ACH system.

The system is designed to perform in a fully automated manner enabling each Transaction Event to be processed by a system subscriber as a single transaction in the presence of the consumer. When the transaction event is "approved" funds are debited from an authorized consumer account for credit to the system subscriber and electronic settlement by ACH deposits the transaction amount to the subscriber's designated depository account. Authorized access to consumer accounts and credits to system subscriber depository accounts are performed as "Off-Line" transactions by means of Electronic Funds Transfer ("EFT") through the ACH Network or through the Federal Reserve System.

The invention comprises a point-of-sale processing system comprising electronic data processing equipment which allows individual services selections which provide automated, electronic processing from bank checking or depository accounts. It is the objective of the present invention to automate the point-of-sale environment for processing consumer purchases of goods and services which, other than for the system of the present invention, would necessitate the more traditional acceptance and processing of commercial bank drafts (personal and/or corporate checks). Individual Transaction Events are administered under the present invention by initiating a terminal authorization inquiry and continuing through the electronic settlement of funds representing the Transaction Event from the pre-approved consumer banking accounts.

It is a further objective of the present invention to eliminate the need for "paper" checks as an accepted means of consumer payment. In the place of personal and business checks, consumers would be provided free and unrestricted access to bank secured in bank accounts of various types by means of preauthorized electronic events. System subscribers electronically communicate with the data center of the present invention for individual Transaction Event authorizations which, upon reconciliation of a day's activity, result in an EFT by means of the Automated Clearing House accommodating an "Off-Line" debiting of preauthorized consumer Transaction Events from authorized accounts. Thereafter, each system subscriber is credited with the total of all such daily authorized Transaction Events to its designated banking depository account.

The present invention comprises logic which allows the following services which when individually performed or

4

where combined with other services establish a wholly unique processing medium enabling preauthorized access to consumers' checking account or bank depository reserves.

Authorization—This service supports electronic communication from point-of-sale to the system's central computer. The data center stores positive and negative files concerning consumer accounts thereby providing accurate inquiry responses regarding the current posting status of a consumer's banking account and signaling the system subscriber that said account may be reasonably relied upon for consummating a Transaction Event (i.e., an "Approval") or, where listed as delinquent, indicating that the account may not be so relied upon (i.e., a "Denial").

Check Replacement—This capability operates as an extension of Authorization enabling the system subscriber the capability of completing a Transaction Event by electronically logging the sale whereupon a Transaction Event Slip will be printed or manually prepared for consumer execution at the point-of-sale. By execution of the Transaction Event Slip, the consumer authorizes the electronic accessing of funds secured in his/her authorized banking account in lieu of the more traditional method of issuing personal and business checks. Funding settlement to the system subscriber would be effectuated by means of Electronic Funds Transfer via ACH or the Federal Reserve System as opposed to physically processing and transferring checks among banks.

Bank Transaction Card—As part of this invention an "Off-Line" Debit Card is established on which is stored the information relating to the banking account from which funds representing the Transaction Event would be debited for payment to the system subscriber. This information may be stored on the card itself in encrypted or unencrypted form or may be stored in the central computer where access to such information is gained via special control characters or access codes stored on the card. Electronic authorization for withdrawal of funds from the cardholder's account and subsequent electronic settlement procedures remain essentially identical to processing under the Check Replacement service described above. Information relating to the consumer-cardholder and the appropriate banking account to be debited for a Transaction Event will be encoded upon the magnetic stripe portion of the plastic, and terminal-readable, card.

Thus, the overall objective of the present invention is to provide and support an alternate means for consumer payments for goods and services that operates to replace commercial bank drafts in the point-of-sale environment. Simultaneously, the present invention assures consumers greater access to and use of funds in personal or corporate banking accounts. Further, the system provides system subscribers a significantly improved prospect of collecting the underlying monies for Transaction Events, reduced time for the collecting the cash receipts from Transaction Events, and a pronounced lowering of the present cost of cumbersome procedures otherwise mandated by the existing ACH system for accepting and processing commercial bank drafts.

A further objective of the present invention is to significantly reduce the use of checks as negotiable instruments in effecting the purchases of goods or services and to further reduce the consumers reliance on credit cards or cash for transaction events.

Detailed Description of the Preferred Embodiment

The method of the present invention begins with the electronic recording of consumer information at a system

CONFIDENTIAL

LML-EP 000011

5,484,988

**5**

subscriber's location using a point-of-sale terminal. This information is obtained in the presence of the consumer and occurs prior to any "Approval" either for the Transaction Event or for the ultimate crediting of the System subscriber's designated depository account. A Transaction Event involves a series of events initiated by a system subscriber's request to sell goods or services by payment from funds secured in a consumer's banking account. First, the consumer's banking account status will be verified through accessing the central computer files of the present invention. Verification that an account may be accessed is established alternatively by means of an encoded, magnetic strip card, or by input of account identification numbers from a consumer's bank account. A more traditional identification of the consumer could also occur including visual examination of driver's license or similar and acceptable picture "ID" however this is not considered part of the present invention.

As an integral portion of each Transaction Event, the system subscriber's location, date and time, and requested sale amount is automatically logged into the system when a system subscriber first accesses the invention. Finally, a Transaction Event Slip ("Sales Slip") will be produced by a printer integral to the point-of-sale terminal and will be executed by the consumer in the amount of the stated purchase with inscribed language defining the Transaction Event and specifically providing consumer authorization for electronic access to his/her banking account. Thereafter, the consumer account will be debited and the proceeds credited to the system subscriber's designated depository account along with all other similar Transaction Events representing the total of the system subscriber's daily activity. Debiting of consumer accounts and settlement deposits to each system subscriber is performed by means of Off-Line electronic funds transfer through and by the ACH or Federal Reserve System.

Equipment Configuration—The present invention can operate with nearly every conceivable point-of-sale equipment system. The central computer system accepts data transmitted from the system subscriber's existing point-of-sale equipment or that which is added to augment service performance. The point of sale terminal of the present invention is implemented in a number of ways, most preferred, however, being activation under a fully automated format. Such a fully automated system generally comprises a dual-port terminal with magnetic stripe reading capabilities interfaced with a logging printer capable of providing individual Transaction Event Slips for consumer execution, and a MICR check reader, optical character recognition ("OCR"), equipment, or other devices. Variations to this configuration are particularly possible where the system of the present invention is to be activated under a "Split-Dial" feature installed to function within the operational parameters of existing point-of-sale equipment primarily dedicated to bankcard ("credit card") processing. It is contemplated that services may in the future be administered using the present invention with a singular point-of-sale hardware device which, as a function of its design, would incorporate all or most of the service capabilities of an integrated terminal, logging printer, and MICR Check Reading device. The system of the present invention can alternately be interfaced with electronic cash registers now on the market.

Communications links from point-of-sale terminals to the central computer of the present invention will typically be in the form of telephonic network communications over a public switched telephone network ("PSTN") or over other approved networks. Transaction Event verification will occur as a result of point-of-sale terminal access to the

**6**

central computer's positive and/or negative data files. "Approved" or "Declined" notifications are made to the Point-of-Sale device over the PSTN. All data files will be centrally located and maintained on the invention's central computer data bases. Portions of the data base include but are not limited to third party data files such as the Shared Check Authorization Network ("SCAN") (trademark) data base.

Individual transactions or groupings of transactions are first approved by soliciting an "Authorization" prior to the completion of any requests for electronic funds transfer. To maintain an accurate status of file information for authorizations to subscribing merchants, businesses, and/or individuals, separate data bases are maintained. Current cardholder or banking account status are updated daily and instantly available for point-of-sale inquiry for Transaction Event authorizations, updated daily and are instantly available for point-of-sale inquiry for Transaction Event authorizations.

System subscribers point-of-sale equipment is interfaced to the central computer of the present invention by means of a telephonic network which is able to support communication from a plurality of point-of-sale terminals. Programming of the point-of-sale terminal causes an automatic "Dial-Up" to the central computer and provides an automatic query and response sequence affirming or denying the Transaction Event. The addition of local entry hubs may be installed to better facilitate the speed or economics of communications with the data files. Alternatives to telephonic networks may involve use of satellite communications or enhanced radio transmissions. Similarly, the system's data files and associated Check Replacement Service are contemplated to be responsive to emerging point-of-sale devices intended to seek authorizations by the alternate means of voice pattern recognition, fingerprint identification, retina scan, "smart" chips, and/or consumer or check image and/or signature broadcasting.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1—System overview of the present invention

FIG. 2—The point-of-sale terminal

FIG. 3—The Central Computer System

FIGS. 4-7—The process Data Flow

FIG. 8—Transaction Event Sales Slip

FIG. 9—Manual Transaction Event Sales Slip

DETAILED DESCRIPTION OF THE
PREFERRED EMBODIMENT

Referring to FIG. 1 an overall schematic of the present invention is described. Point-of-sale terminals 300 communicate over normal PSTN telephone lines with a central computer system 302 which in turn communicates with a banking institution 304 for purposes of debiting consumer accounts and crediting system subscriber accounts. The banking institution performs its function via normal automated clearing house ("ACH") transactions 306.

Referring to FIG. 2 the point-of-sale terminal is described. The point-of-sale terminal comprises several different entry means. A key board 310 can be used to input consumer information manually. Alternatively a card reader 312 can be used whereby the magnetic stripe on the card is read by the point-of-sale terminal and finally a check reader 314 is also included to read the MICR number on checks as a substitute for either a specific card or key board input. These various

CONFIDENTIAL

LML-EP 000012

5,484,988

7

input means provide information to a microprocessor 316 which comprises logic means 318, memory means 320, and communication means 322. The logic means 318 comprises logic which allows the information received from the various input means to be processed and stored in the memory 320. The logic means further drives a display 324 which provides a visual output of the account number of the consumer for verification. The communication means 322 allows the subscriber terminal to communicate with the central computer 302 for purposes of processing the consumer's purchase.

Referring to FIG. 3 the central computer system 329 is described. The central computer system receives input from a plurality of point-of-sale terminals which provide transaction information from a system subscriber and a consumer desiring to purchase goods or services. The central computer system comprises a system subscriber 330 file which is a file of those merchants who have elected to use the present invention for processing purchases. The central system also comprises an approved consumer file 332 which stores the names of those consumers who have already been approved for allowing purchases to take place through the various input means as well as a third party database such as the SCAN (trademark) data base relating to consumer credit. The computer system also comprises a communications means 334. The communication means communicates with other outside third party data bases to allow any consumer that has not been approved by the system to have a rapid check of the status of the consumer's banking account and of whether the consumer has current outstanding returns (i.e. bad checks). Once this SCAN (trademark) or other outside third party data base search is performed and where an approval is given, the approved consumer file 332 is updated with the name of the new approved consumer.

As presently configured the central computer 329 already has a third party database known as the SCAN (trademark) database 333 resident on the central computer. Thus credit worthiness can be checked using this SCAN database. The SCAN (trademark) database is updated daily.

The communication means 334 also communicates with a banking institution 338 to instruct the bank to debit the account of the consumer and credit the account of the system subscriber (merchant) with the amount of the purchase. These transactions then take place via the normal ACH transaction process.

Referring to FIG. 4 the process begins by a consumer presenting a specimen or "blank" check complete with MICR number to the system subscriber (the merchant) 100. The system subscriber next determines if the check meets appropriate store policy procedures 102, i.e., that the check has appropriate information on the check. If the check does not meet the store policies, it is returned to the consumer 104. If the check does meet appropriate store policies the on-line verification process proceeds 106. The subscriber begins the process by first pressing the appropriate key on a terminal to access the host computer 108. Thereafter the point of sale terminal prompts the system subscriber to enter the appropriate MICR number 110. The system subscriber then enters the appropriate MICR number either manually or by passing the check through a check reader which determines the MICR number 112.

Referring to FIG. 6 the subscriber would verify that the numbers appearing on the terminal match the MICR numbers on the check 114. During the comparison, the subscriber determines that the check number compares accurately 116 to the number displayed on the terminal. If they

8

do compare the verification process proceeds 120. If the check numbers do not compare with that of the terminal the system subscriber clears the terminal and begins the transaction process again 118. If the process is to be reinitiated, the subscriber enters the MICR number into the point of sale terminal 130. Thereafter the system subscriber compares the MICR numbers as before 132. If the MICR numbers compare to the system display 134 the process proceeds. If the numbers do not compare 136 the check is returned to the consumer and the process terminates 137.

Referring to FIG. 5, if the verification process proceeds the terminal next prompts the system subscriber to enter the amount of the sale 122. The subscriber enters the amount of the sale 124 and the terminal thereafter transmits an inquiry to the host data base for verification 126.

The check approval process next takes place 128. If the check is not approved by the central computer the terminal displays a message declining the transaction 140. Thereafter a printer record of the declined transaction is made for purposes of the system subscriber 142 to comply with the Fair Credit Reporting Act and Regulation E of the Board of Governors of the Federal Reserve System.

If the check is approved the terminal displays a message noting the approval 138 and the specimen check is returned to the consumer. The printer makes a paper record of the transaction 142 and the consumer places any required information on the paper receipt and signs the receipt authorizing the transaction 144.

Referring to FIG. 7, the process description continues. Once the transaction is approved the central computer captures the MICR information and the sale amount and stores that information 146. The central computer subsequently generates a batch message regarding all transaction events for the prior period and transmits all the transaction event information for the day into the ACH network 148.

During the ACH process each checkwriter's account is debited for the exact purchase amount and such an amount is deposited into a system subscriber designated account 150. Thereafter, collected funds for a total day's events are deposited into a subscriber's account 152. The transaction is then complete 154.

How to Use

The present invention will require the establishment and maintenance of three interconnected but separate data files for the purpose of performing access searches. Each data file will be accessible by dial-up procedures operating, in most instances, under "Split Dial" format from a point-of-sale ("POS") terminal device or electronic cash register installed for the primary purpose of bankcard and/or bank draft authorizations. The terminal prompts an operator/user to process one of three optional inquiry types. Any one or all of three primary functions are capable of being performed at a single point-of-sale terminal within the control of the system subscriber. The inquiry types and data base format responses are as follows:

Card Authorization—Having depressed the assigned Split Dial key and thereafter being prompted, the system subscriber "slides" an encoded magnetic stripped transaction card through the point-of-sale terminal and enters the "Sale Amount" requested for authorization. Thereupon, the terminal's dial-up capabilities direct the inquiry to the central computer for authorization against "POSITIVE" file of current cardholders whose accounts were listed in "good standing". Inquiries where such a "Match" are found cause

CONFIDENTIAL

5,484,988

9

an "Approved" return message from the data file to the inquiring POS terminal. Conversely, a "No-Match" to inquiry would result in a "Declined" notice to the POS terminal. An uploading mode of the present invention causes forwarding of daily status notifications to the central data files activating new cardholder accounts in the "POSITIVE" cardholder file or submitting corrective entries to delete delinquent or terminated accounts.

Check Authorization—Having depressed the assigned Split Dial key and thereafter being prompted, the system subscriber manually enters account numbers from a personal or business check or, when fully automated, enters a specimen check through a MICR Check Reader device interfaced with the terminal, whereupon the terminal's screen would display the check's numbers, and hence the account number, for verification. Thereafter, the operator would enter the "Sale Amount" requested for authorization. The terminal's dial-up capabilities then direct the inquiry to the computer data file center for authorization first against the "POSI-TIVE" file of "prenoted" bank/checking account numbers whose accounts were listed in "good standing". A successful "Match" to an inquiry would result in an "Approved" notice from the data file to the inquiring terminal. A "No-Match" to inquiry would not, however, immediately result in a "Declined" response. Each inquiry preliminarily resulting in a No-Match would be instantly forwarded/"rolled" to the third data file preceding any return notice to the inquiring terminal. This third file is anticipated to be the Shared Check Authorization Network ("SCAN") a negative data file data base maintained in the system computer data file center. Referrals to SCAN or any other positive or negative data files, enable potential acceptance of Transaction Events involving consumers "Unknown" to the invention's proprietary, "POSITIVE" files. A "Match" on the SCAN "NEGA-TIVE" file would result in a "Declined" notice; a "No-Match" would conversely send notification to the inquiring POS terminal of an "Approved" event. Of significant importance, the bank/checking account information for each such "Unknown" consumer's transaction would, subsequent to a SCAN "Approved" notice, be posted to the invention's "POSITIVE" file and prenoted through the ACH ("Automated Clearing House") for future Transaction Events. The invention, presumably in an automated mode, is capable of uploading daily corrections to the POSITIVE data file including notices of new accounts approved through SCAN (trademark) and deletions where settlement for consumer checking account events, initially approved, were subsequently dishonored. The SCAN data base is similarly uploaded with daily activity status corrections.

Check Replacement Service—Inquiries initiated as Check Replacement requests function in nearly an identical manner as that of Check Authorization. Records for such events, when culminating in "Approved" notices, are separately preserved. Check Replacement inquiries are processed first through the system's "POSITIVE" data file and, where no match is found, proceed to the SCAN data file or other data base file prior to transmitting an "Approved" or "Declined" notice to the inquiring POS terminal. A Match in the system data file indicates a consumer-user whose account was in "good standing" and would not be required to "roll" to SCAN. Check Replacement events are reported to and stored by the computer data file center under a file classification identifying the transaction as a Check Replacement Service. The total of daily, approved Transaction Events are "checkless" sales, whereby the service subscribing merchant has submitted requests for electronic ACH settlement for all preauthorized consumer purchases. No commercial bank

10

note ("Paper Check") is accepted or processed by the service subscriber. In each Transaction Event, a Consumer, at the point-of-sale, has executed an electronic access ("Off-Line Debit") authority "Sales Slip" which is automatically printed upon a terminal's receipt of an "Approved" notice.

All terminal programming and all prompt strings for MICR Check Reader interfacing are stored in the POS terminal and the computer center of the present invention controls interactions between the plurality of terminals and the central system. The following modules are present.

Programming for MICR/Terminal Interface—system sub-scriber locations to be activated with the present invention must possess or acquire a terminal. Those utilizing or being upgraded to terminals such as a Tranz (trademark) 330 or other terminals with interface capabilities with the check reader for all suitable point-of-sale terminals.

The preferred format for terminal operations is generated from a singular split dial key. Thereafter, the "prompt string" would proceed in a manner such as 1) "Card=1"; "Check=2" requiring operator selection; then, where selecting a check-ing account inquiry II) the operator would respond to a secondary prompt of "Auth=1"; "Replace=2". These entry selections precede the magnetic stripe "reading" of a card/ submittal or a check through the MICR (Account Identification), the entry of the requested sale amount, and the terminal's dial-up for authorization against the computer data file center.

The MICR interface results in the transmittal of a query for data center approval of the entire ABA/Transit and personal or corporate checking account numbers. Instances where printed checks add the individual check's number to the end of the account number can be "dropped" by Check Reader switch settings. Subsequent to a terminal's receipt of the MICR number string but prior to the operator's entry of the requested sale amount and authorization dial-up, a verification prompt "flashing" the ABA and account numbers must be displayed on the terminal's screen requiring the operator to depress "Enter" to proceed, if correct, or "Clear", if incorrect and thereby enabling the terminal operator to resubmit the specimen check through the MICR Check Reader. It is important to note that account information may be entered manually as well at the point of sale with the other financial advantages of the present invention still in effect.

The computer data file center receives and processes Transaction Event authorization requests utilizing the entire MICR string for accurate, error-free identification of both the consumer bank and a specific checking or depository account to participate in a sale. ACH settlement criteria mandate exact recall for the bank and checking account numbers to properly complete any debit request. This invention conforms to each and every requirement of the ACH transaction regulations.

Each Transaction Event is completed with the logging printer generation of a Transaction Event ("Sales") Slip for each "Approved" authorization inquiry processed (FIG. 8). Alternatively, a manually created transaction event slip can also be prepared (FIG. 9). Each such Transaction Event Slip must be exacting in its retention of account numbers and the sale amount enabling both the consumer and system sub-scriber to be provided "hard copy" receipts of the event. Also included would be a clear printing of the transaction type; "Bank Card", "Check Authorization", or "Check Replacement". Authorization language is printed immediately preceding the consumer's signature line specifically authorizing electronic access in payment of the requested transaction sale amount.

CONFIDENTIAL

LML-EP 000014

5,484,988

11

In addition to the primary functions for POS terminal programming and MICR Check Reader Interface, each Point-of-Sale terminal location is capable of generating printed summations of daily activity. These reports list and separately total each authorization/service type, whether produced as a singular report or as the result of multiple terminal "closeout" procedures.

Instances will arise with either the Bank Card or Check Replacement Service where previously authorized Transaction Events will require the operational equivalent of a bankcard "Void" or "Credit" notation. The methodology will be available for Split Dial messages to the computer data file center of a post-authorization "Error" or "Transaction Cancellation" notice. The "Cancel" procedure is instituted by depressing for example the "3" key (i.e. "Cancel=3"). By so doing, the system subscriber may cancel a previously approved and logged event. This Transaction Event which was recorded on the data files and reported on the service subscriber's daily Activity Summation Report, thereafter carries an offsetting, "Flagged" cancellation notice

Summary

A flexible purchase transaction system is described which precisely fits within existing ACH procedures for checking account events for processing of pre-authorized electronic debits as a replacement for commercial bank drafts (paper checks). The main advantage to the proposed invention is the fact that a truly paperless transaction may occur. Departures from the proposed system especially with respect to the Point-of-Sale terminals will be apparent to those skilled in the art without departing from the spirit of the invention as described.

We claim:

1. A checkwriting point of sale system comprising:

a point of sale terminal adapted to receive consumer bank account information from any bank check;

a central computer system;

first communications means integral to said point of sale terminal for electronically communicating with the central computer system;

memory means integral to said point of sale terminal for temporarily storing the consumer bank account information;

the central computer system having second communication means for receiving information from a plurality of said point of sale terminals;

the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the bank check as a negotiable instrument.

2. The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further includes means for reading magnetic ink character recognition numbers appearing on a consumer check for the sole purpose of identifying and reading the consumer bank account information.

3. The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further comprises an alphanumeric display means for receiving said consumer bank account information from the memory means and for displaying the consumer bank account information.

12

4. The checkwriting point of sale system according to claim 1 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip.

5. The checkwriting point of sale system according to claim 1 further comprising a resident third party database wherein consumer banking account status information is stored, the consumer banking account status information being used for verification of consumer banking account status.

6. The checkwriting point of sale system according to claim 1 wherein the central computer system further comprises a system subscriber database, the system subscriber database comprising information regarding merchants and service providers that are authorized to use the checkwriting point of sale system.

7. The checkwriting point of sale system according to claim 6 wherein the central computer system further comprises a database comprising information regarding consumers whose consumer banking account status is not verified as bad.

8. A checkwriting point of sale process comprising:

a) presenting any bank check specimen to a point of sale terminal located at a merchant or service provider;

b) reading the magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument;

c) storing the consumer bank account information obtained from the check and verifying that account numbers were accurately read at the point of sale terminal;

d) providing transaction event information to the point of sale terminal;

e) transmitting the transaction event information and consumer bank account information to a central computer system;

f) storing the transaction event information and consumer banking account information, and

g) subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations.

9. A checkwriting point of sale system comprising:

a point of sale terminal adapted to receive consumer bank account information;

a central computer system;

first communications means integral to said point of sale terminal for electronically communicating with the central computer system; and

memory means integral to said point of sale terminal for temporarily storing the consumer bank account information;

the point of sale terminal comprising reading means for reading magnetic ink character recognition numbers on any consumer bank check for the sole purpose of eliciting consumer bank account information;

the central computer system having second communication means for receiving information from a plurality of said point of sale terminals;

the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using a bank check as a negotiable instrument.

CONFIDENTIAL

5,484,988

| 13 | 14 |

10. The checkwriting point of sale system according to claim 9 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip.

11. The checkwriting point of sale system according to claim 9 further comprising a resident third party database wherein consumer banking account status information is stored, the consumer banking account status information being used for verification of consumer banking account status.

12. The checkwriting point of sale system according to claim 9 wherein the central computer system further comprises a system subscriber database, the system subscriber database comprising information regarding merchants and service providers that are authorized to use the checkwriting point of sale system.

13. The checkwriting point of sale system according to claim 4, wherein the sales slip includes means for execution by the consumer for proof of bank account access authorization.

14. The checkwriting point of sale system of claim 1, wherein the point of sale terminal further comprises means for automatically logging a point of sale terminal location and transaction date, time, and sales amount.

15. The checkwriting point of sale process of claim 8, further comprising:

a) verifying the status of the consumer bank account,

b) verifying the consumer bank account status of the consumer via a query to a third party database if the consumer bank account is verified as bad, and

c) sending an approval message to the point of sale terminal if the consumer's banking account status is approved for the transaction.

16. The checkwriting point of sale process of claim 8, further comprising:

(A) printing a transaction event sales slip following the sending of an approval message; and

(B) executing of the sales slip by the consumer as proof of bank account access authorization.

17. The checkwriting point of sale process of claim 15, further comprising:

(A) printing a transaction event sales slip following the sending of an approval message; and

(B) executing of the sales slip by the consumer as proof of bank account access authorization.

18. The checkwriting point of sale process of claim 8, further comprising automatically logging point of sale terminal location information and transaction date, time, and sales amount information into the point of sale terminal.

19. The checkwriting point of sale system according to claim 10, wherein the sales slip includes means for execution by the consumer of proof of bank account access authorization.

20. The checkwriting point of sale system of claim 9, wherein the point of sale terminal further comprises means for automatically logging a point of sale terminal location and transaction date, time, and sales amount.

* * * * *

LML-EP 000016

CONFIDENTIAL

# EXHIBIT   2

US005175682A

## United States Patent [19]

### Higashiyama et al.

| | |
|---|---|
| [11] Patent Number: | 5,175,682 |
| [45] Date of Patent: | Dec. 29, 1992 |

[54] CHECK SYSTEM AND METHOD INCLUDING PRIORITIZING CHECKS FOR TRANSMISSION TO BANKS FOR PROCESSING

[75] Inventors: Casule Higashiyama, Redwood City, Calif.; William Melton, Herndon, Va.; Ashok Narasimhan, Los Altos, Calif.

[73] Assignee: Verifone, Inc., Redwood City, Calif.

[21] Appl. No.: 627,640

[22] Filed: Dec. 14, 1990

[51] Int. Cl.⁵ ............................... G06F 15/30
[52] U.S. Cl. ...................... 364/406; 235/379
[58] Field of Search ............ 364/401, 406, 408; 235/379-383

[56]                References Cited

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,187,498 | 2/1990 | Creekmore | 235/379 |
| 4,321,672 | 3/1982 | Braun et al. | |
| 4,436,992 | 3/1984 | Sinjian | 235/381 |
| 4,454,414 | 6/1984 | Benton | 235/383 |
| 4,948,174 | 8/1990 | Thompson et al. | |
| 4,972,463 | 11/1990 | Danielson et al. | 235/381 |
| 4,974,878 | 12/1990 | Josephson | |
| 4,977,595 | 12/1990 | Ohta et al. | 235/381 |
| 5,053,607 | 10/1990 | Carlson et al. | 235/379 |

### OTHER PUBLICATIONS

"A complete guide to rule & Regulations Governing

the Ach Network," 1990 Ach Rules, Copyright 1990, National Automated Clearing House Assoc., OR 51–75.

Primary Examiner—Gail O. Hayes
Attorney, Agent, or Firm—Cooley, Godward, Castro, Huddleson, & Tatum

[57]                ABSTRACT

A method and structure are provided for processing checks in an extremely timely and cost-effective manner. A check recipient, such as a merchant, utility billing department, and the like, utilize hardware and software for quickly gathering data from checks received in order to allow prompt processing of those checks. Such hardware preferably includes a reader for reading the MICR account information printed on the check, and means for associating that data with information pertaining to the transaction at hand, including for example, the dollar amount of the transaction. This information is combined in a data record which is stored for future batch data transmission to a clearing house or the issuing bank itself. In an alternative embodiment, this data is communicated in real time to the clearing house or issuing bank. In another embodiment, one or more selection criteria are used to determine which checks will be processed in real time, with the remaining checks being processed in the batch mode. For example, checks written above a threshold dollar amount, out of state checks, or any other high risk checks are processed in real time in order to minimize losses due to fraudulent check use.

19 Claims, 2 Drawing Sheets







FIGURE 1    (PRIOR ART)



**FIGURE 2**

5,175,682

| 1 | 2 |

**CHECK SYSTEM AND METHOD INCLUDING PRIORITIZING CHECKS FOR TRANSMISSION TO BANKS FOR PROCESSING**

**INTRODUCTION**

**1. Technical Field**

This invention pertains to electronic data processing of financial instruments, and more specifically to a method and structure for clearing checks written by a customer.

**2. Background**

FIG. 1 shows the typical path by which a check 101 finds its way to the issuing bank such that the checking account user's account is debited. As shown in FIG. 1, the customer writes check 101 and presents it to merchant 102 as a convenient way for the customer to make a payment to merchant 102. The merchant will then, typically at the end of the day, provide the check (together with others received that day) to the merchant bank 103, as a deposit to the account which merchant 102 maintains in merchant bank 103. Merchant bank 103, after posting the checks to Merchant 102 account, forwards a batch of checks to the automated clearing house (ACH) 104, such as that provided by the National Automated Clearing House Association (NACHA) of Washington, D.C. ACH 104 sorts the checks by their issuing banks, electronically transmits information pertaining to the checks to Federal Reserve Bank 105, and forward the paper checks to the appropriate issuing banks. Federal Reserve Bank 105 in turn electronically transmits information to issuing bank 106 so that each check 101 is debited to the check writer's account maintained in issuing bank 106. Since the vast majority of checks clear without problems, checks are assumed to be valid. If, the account has been closed, or the account contains non-sufficient funds, issuing bank 106 has a certain period of time in which it must issue an exception report indicating that the check has not cleared. This information is communicated to Merchant Bank 103 so that the check amount can be deducted from the merchant's account in order to nullify the deposit to the merchant's account made by Merchant Bank 103 when it assumed that the check was valid.

Table 1 depicts the typical time delay and costs associated with each check taking the prior art path shown in FIG. 1. While these costs and time delays do not seem particularly large to the uninitiated, partly due to the fact that most consumers are accustomed to the time delays involving clearing checks, it is highly advantageous to merchants and financial institutions to speed the check clearing process and reduce the costs associated therewith. Over 55 billion checks are written annually, of which 10 to 15 billion are written to merchants at the point of sale (POS). Thus, the cost associated with processing these checks, as well as the time delays involved in transferring funds (i.e., the "float") result in a very large cost associated with check processing. Magnetically encoded checking account numbers are printed on checks in order to speed this process, yet as shown in Table 1 the process remains inherently slow and costly.

**TABLE 1**

| | Appropriate Time Delay | Approximate Cost per check |
|---|---|---|
| Merchant to Merchant Bank | 1–3 days | $.05–.10 |
| Merchant Bank to ACH | 1 day | .01–.02 |

**TABLE 1-continued**

| | Appropriate Time Delay | Approximate Cost per check |
|---|---|---|
| 5 ACH to Federal Reserve | 1 day | .01 |
| Federal Reserve to Issuing Bank | 1 day | .01 |

It has been attempted to utilize debit cards in place of checks and credit cards in order to allow merchants to instantly debit a customer's account. However, there are a number of disadvantages with debit card systems. First, debit card systems require processing in real time. Not only does this cause a time delay to both the consumer and the merchant, but the costs of maintaining communication links for real time processing are expensive, on the order of $0.15 per transaction. Furthermore, checking accounts and credit cards are already widely held, and there is some reluctance on the part of consumers to embrace debit cards. Merchants who accept debit cards, such as those gas stations which allow customers to pay using their automated teller machine (ATM) cards, find many consumers unwilling to utilize their ATM cards due to the additional expense (typically $0.15–0.25 per transaction) and perhaps the psychological reluctance to allow a merchant direct debit access to their bank account.

Furthermore, due to a lack of industry standards, for example pertaining to electronic networks, personal identification numbers (PINs), and encryption keys, inadequate customer incentives, and high costs, the use of debit cards has not become widely accepted.

Another disadvantage utilizing the present method for clearing checks is that the long time delay allows fraudulent check writers an excessive amount of time during which they are free to write fraudulent checks before their checking account numbers are added to a list of problem checking accounts.

**SUMMARY OF THE INVENTION**

In accordance with the teachings of this invention, a novel method and structure are provided for processing checks in an extremely timely and cost-effective manner. In accordance with the teachings of this invention, a check recipient, such as a merchant, utility billing department, and the like, utilize hardware and software for quickly gathering data from checks received in order to allow prompt processing of those checks. Such hardware preferably includes a reader for reading the MICR account information printed on the check, and means for associating that data with information pertaining to the transaction at hand, including for example, the dollar amount of the transaction. This information is combined in a data record which is stored for future batch data transmission to a clearing house or the issuing bank itself. In an alternative embodiment, this data is communicated in real time to the clearing house or issuing bank. In yet another embodiment of this invention, one or more selection criteria are used to determine which checks will be processed in real time, with the remaining checks being processed in the batch mode. For example, checks written above a threshold dollar amount, out of state checks, or any other high risk checks are processed in real time in order to minimize losses due to fraudulent check use.

5,175,682

3

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 depicts the typical prior art process by which a check is written and ultimately returned to the issuing bank; and

FIG. 2 is a block diagram depicting one embodiment of a transaction system constructed in accordance with the teachings of this invention.

## DETAILED DESCRIPTION

FIG. 2 depicts one embodiment of a system for use by a merchant in accordance with the teachings of this invention. Merchant system 200 includes one or more point of sale systems 210 including, for example, point of sale terminal 201 such as a typical electronic cash register, or the like. Magnetic Ink Character Recognition (MICR) reader 202 is used for reading the magnetic account number printed on checks, which data is fed to POS terminal 201. Alternatively, the information pertaining to the check's account number, etc. can be entered in any convenient manner, for example via the keypad on the POS terminal 201, or via a customer identification card issued by the merchant. However, the use of the MICR reader allows greatest through put and accuracy. Printer 203 is used by POS terminal 201 for a variety of tasks, if desired, for example, printing a sales slip, printing validation information on a check, or printing a check receipt, as will be described in more detail later. POS terminal 201 is connected to backroom processor 204, such as those which are known in the prior art for maintaining sales information, performing price lookups, and inventory adjustment during the course of business. Telecommunications unit 205 is connected to backroom processor 204 and, if desired, directly to POS terminal 201 to allow data to be communicated to a check clearing house, for example.

The operation of the system of FIG. 2, in one embodiment, is as follows. The merchant utilizes POS terminal 201 to enter a transaction. POS terminal 201 can be, for example, a typical prior art electronic cash register, or a more sophisticated computer system. Alternatively, POS terminal 201 may be an accounts receivable system utilized by a public utility, for example, rather than the typical cash register found at a merchant.

The customer then tenders payment. Payments tendered utilizing credit cards, cash, or debit cards may be processed in a conventional manner. When the customer provides a check, however, the data is read by MICR reader 202 and the account information is provided to POS terminal 201. POS terminal 201 then provides additional information in order to create a data record for this transaction which is being paid for by check. Appropriate fields for this data record are, for example, as follows:

Date and Time
Merchant demand deposit account (DDA) number (checking account number)
Customer checking account No. and Routing information
Amount of check
Check No.
Any other discretionary data (electronic journaling)

Certain of this information can be provided automatically by POS terminal 201. Other information, such as amount the check is written for is provided by the merchant, for example via the POS keypad. Electronic journaling information is additional information which may either be retained by the merchant or used to pro-

4

vide a more precise indication of the nature of the purchase on the customer's monthly checking account statement. Such additional information may include, for example, the name of the merchant, the merchant's location, a summary of the goods for services provided, for example sorted by department in the department store. This electronic journaling information serves, for example, to reward the customer when reviewing his monthly statement that the charges appearing on the monthly statement are in fact correct. The merchant can use such additional information for other purposes, for example, to maintain some indication of a customer's buying preferences.

If desired, the data record is then used to verify check authorization, for example, by being compared to a positive file (which lists all allowable checking account numbers), or more likely against a negative file such as provided by SCAN of Seattle, Washington, Telecheck of Denver, Colorado or Telecredit of Florida, which provide information regarding known troublesome checking accounts. If such authorization is not provided, the transaction can, if desired, be cancelled by the merchant, thereby minimizing losses due to bad checks, as is well known.

Once authorization is provided (if the authorization step is performed), next the check is placed in printer 203 and validation information is printed on the check, if desired. Such validation information serves as an indication that electronic data pertaining to this check has been routed for collection, and that the check may thus be considered "cancelled." Such validation information includes, for example, information similar to a rubber endorsement stamp typically used by merchants who process checks in accordance with prior art techniques. Such information typically includes the merchant's name and the merchant's DDA number. The validation information prints in accordance with the teachings of this invention can also quite easily include the date and time of the transaction and language indicating that the check has been cancelled and is being cleared through to the customer's checking account electronically. Alternatively, other means can be used to provide validation information on the check, for example, a rubber stamp used for this purpose. While this is less desirable than using a printer, in certain circumstances it may obviate the need for additional printer, and a simple rubber stamp, or the like, can serve as a convenient backup in the event of printer failure. However, in a preferred embodiment, printer 203 is used for purposes in addition to providing validation information on a customer's check, for example, to assist in preparing credit card slips and the like.

The validated check is then returned to the customer for safekeeping, thus avoiding the need for the check to be physically transported through the system depicted in FIG. 1 for ultimate return to the customer. Alternatively, the check is retained by the merchant. This has the advantage of allowing the merchant to retain possession of the check in the event that there is a problem with its collection. In either event, whether the check is returned to the customer or retained by the merchant, a receipt is, if desired, printed and given to the customer indicating that payment has been made by check, and the check is being electronically cleared. This receipt can be either a part of or separate from another receipt indicating detailed information regarding the transaction just completed.

5,175,682

5

The data record thus created by POS terminal 201 can be added to a data file maintained by POS terminal 201 for batch uploading to backroom processor 204, for example, on a periodic basis or at the end of a shift. Alternatively, POS terminal 201 sends the data record to backroom processor 204 immediately, or as soon as backroom processor 204 is able to receive it. In this event, POS terminal 201 need only have sufficient storage capacity to serve as a buffer when there are delays in the ability of backroom processor 204 to receive data.

Periodically, backroom processor 204 will take the data records it has accumulated and upload them to a clearing house. Backroom processor 204 may first process the information, if desired. Various types of processing are possible, such as removing that data pertaining to checks written on the one or more banks with which a merchant does its own banking as well as those bank affiliate banks. This data is then uploaded to the appropriate bank directly, without the need of traveling through the clearing house system. Other types of backroom processing may be performed prior to transmitting check data to the clearing house or directly to one or more banks. For example, checks written over a threshold dollar amount, out-of-state checks, or other checks thought to be high risk based upon other criteria can be selected in order to prioritize data to be uploaded to the ACH or directly to a bank.

If desired, priority uploads may be performed either by backroom processor 204 or POS terminal 201 which, in one embodiment, is directly linked to telecommunications unit 205. Such priority uploads may serve a number of functions. For example, small batches of records may be uploaded relatively frequently by backroom processor 204 either directly to a bank or to the clearing house. Such priority uploads may include, for example, those which are greater than a pre-determined dollar amount. In one embodiment, priority uploads are performed by POS terminal 201 in a real time basis, for example, when the check amount exceeds a predetermined dollar amount, when the check is an out-of-state check, or any other criteria which may be programmed or selected by the merchant "on the fly" which may lead the merchant to view a particular check with some suspicion. In this event, the transaction is delayed pending the real time upload, thereby reducing losses due to bad checks.

Following the upload by backroom processor 204 to one or more banks and clearing houses, an exception report is printed by backroom processor 204 indicating problem checks contained within the uploaded data file, for example, checks written on closed accounts, or accounts having non-sufficient funds. This exception report is prepared from information received from the issuing bank, and is either sent electronically, or by printed media either directly to the merchant or to the merchant via the Merchant Bank, the Federal Reserve Bank, and/or an automated clearing house. In one embodiment, backroom processor 204 will again upload for clearing those checks which have not cleared. If desired, a predetermined delay can be used prior to uploading this data again, in order to allow the customer to replenish his checking account before the second and subsequent tries. Alternatively, other criteria can be established by the merchant for determining how to handle such problem checks noted in the exception report. For example, the time delay, if any, before uploading for clearing such problem checks which have not cleared, can be selected based upon a predetermined

6

set of criteria. Such criteria can include, for example, the time of day the check was written, the date the check was written, the day of the week the check was written, whether the check was written on an out-of-state bank account, or any other criteria selected by the merchant. For example, the merchant may determine that, statistically, different categories of checks should be handled differently in order to maximize the collection of such checks.

Thus, in accordance with the teachings of this invention, a check has essentially become the equivalent of an electronic debit card, but with significant advantages. The vast majority of consumers already have checking accounts, as compared with a smaller number have electronic debit cards. Therefore, the use of checks as debit cards in accordance with the teachings of this invention avoids the need for distributing or maintaining a separate debit card, with their associated costs. Furthermore, most consumers feel fairly comfortable with utilizing checks as a method of payment, far more comfortable than the use of electronic debit cards. The savings which will accrue to even a small merchant due to reduced bank paper handling fees, reduced losses due to bad checks, and more rapid availability of funds from checks will easily pay for the installation of hardware and software for use in accordance with the teachings of this invention.

In one embodiment to this invention, a primary record is used of, for example, 94 bytes as specified by the National Automated Clearinghouse Association (NACHA) 1990 ACH rules, specifically Appendix I entitled "ACH File Exchange Specifications". The "1990 ACH Rules" and the "1990 NACHA Operating Rules, Corporate Edition" are published by the National Automated Clearinghouse Association of Herndon, Virginia and are hereby incorporated by reference.

When such a primary record alone is used, the customer's monthly checking account statement will indicate for each check the date, check no., and amount without specific merchant information. Alternatively, each primary record is used with one or more appended records, for example each of an additional 94 bytes, to provide information such as the merchant's name and location and, if desired, more specific information such as the type of goods or services purchased, the quantity, and/or the exact name of the goods or services purchased can be included in such appended records for each purchase.

Due to the relatively small percentage of disputed checks, a preferred embodiment provides that the merchant electronically store all sales receipt line items, and provide to the clearing house a primary record only. In the case of disputed charges, the clearing house will request further information from the merchant, and the merchant transmits additional information to the clearing house as appended records to allow the clearing house to address the disputed charges. This minimizes the amount of information being transmitted, but allows full documentation to be transmitted in the event a particular check is disputed.

There are advantages in utilizing the teachings of this invention to the consumer, the merchant, and the banking system. The consumer advantages are that their time spent at a point of sale is reduced, as checks can be processed more quickly. Savings associated with bank processing of a customer's checking account may be passed on to the consumer.

5,175,682

7

The merchant benefits from a number of advantages in accordance with the teachings of this invention. Merchants can receive a quicker deposit and thus faster access to funds from checks received from customers. Deposit fees will likely be less, since the merchant is providing electronic data, rather than a paper check. Additional deposit fees can be saved if the merchant provides encoding on each check, such as MICR encoding, indicating the amount of the check. Since this encoding of the check amount saves the merchant bank processing time, merchant banks typically charge the merchant approximately 10 cents per check deposited if the merchant encodes the amount on each check, as compared with approximately 15 cents per check deposited which are not so encoded by the merchant. Depositing is much easier as a merchant need not fill out paper deposit slips, including various information pertaining to each check, as well as a total, and need not physically transport a batch of checks with their deposit slips to a bank. Checks which do not clear, for example because they are drawn on an account which is closed or an account with non-sufficient funds, are detected much quicker, thereby allowing a greater likelihood of collecting on returned checks as it is well known that collectibility decreases rapidly with age. A merchant having multiple stores benefits in that a central location may be used for consolidating check data, thereby providing the benefit that a merchant's check processing facilities can be consolidated, if desired, and allow check processing to be accomplished in a timely manner without delays associated with physically transporting paper checks to the central location prior to electronically processing those checks. The merchants are also afforded a greater flexibility on check deposits and bank relationships in that, because paper checks need not be physically transported to the merchant's bank, the merchant can select a bank solely on the basis of business consideration rather than the banks geographical proximity to the merchant.

The advantages to the banks are decreased processing costs, decreased float, and an ability to achieve their desired automated transaction plans which have not been achieved to date in large part due to the failure in the debit card programs. Furthermore, the banks are able to compete on a national basis with greater ease since the need not be geographically close to their customers for the purposes of depositing checks. Also, the banks are capable of eliminating handling of the physical check and its ultimate return to the consumer. This saves a great deal of physical infrastructure, as well as costs. Furthermore, the banks are able to receive the benefits of a debit card system without the need to educate consumers and without the attendant costs involved in the issuance of separate debit cards.

Other benefits are available as well. For example, in one embodiment of this invention, notification to a number of parties who are interested in learning of problem checks is made automatically, routinely, and in a cost effective and timely manner. For example, when the issuing bank does not honor a check, the issuing bank issues an exception report. If desired, this exception report can be used by either the issuing bank, the Federal Reserve Bank, the Automated Clearing House, the merchant's bank, or the merchant itself in order to notify other interested parties. Such other interested parties include the merchant's bank which must deduct the amount of the check which has not be honored by the issuing bank, the merchant, the merchant's collec-

8

tion agency, check authorization services, and check verification services. By promptly notifying each of these parties, collections can be speeded, and problem checks can be minimized. Furthermore, by notifying each of these parties automatically, notification costs are decreased.

Accordingly, the teachings of this invention provide a novel method and structure for handling checks having significant advantages over the prior art check clearing system. In accordance with the teachings of this invention, check are utilized much as are debit cards, but without the attendant disadvantages experienced in debit cards which have thus far lead to their poor acceptance.

The invention now being fully described, it will be apparent to one of ordinary skill in the art that many changes and modifications can be made thereto without departing from the spirit or scope of the appended claims.

All publications and patent applications mentioned in this specification are herein incorporated by reference to the same extent as if each individual publication or patent application was specifically and individually indicated to be incorporated by reference.

What is claimed is:

1. A method for processing a check written on an account provided by a financial institution comprising the steps of:

receiving from a customer a check as a method of payment;

creating an electronic data record containing information pertaining to said check; and

electronically transmitting said data record to said financial institution to obtain payment of said check by said financial institution, said step of transmitting said electronic record to said bank comprising the steps of:

determining if said electronic record meets a test indicating said electronic record should be transmitted to said bank in real time;

if said test is met, transmitting said electronic record to said bank in real time; and

if said test is not met, adding said electronic record to a file including other electronic records pertaining to other checks, and transmitting said file to said bank in a batch mode.

2. A method as in claim 1 wherein said test indicating said electronic record should be transmitted to said bank in real time serve to detect one or more of the following conditions: the amount of the check is greater than a threshold amount, the check is an out-of-state check, the check has not been preapproved by a check verification or check guarantee service, and the check is deemed to be of high risk.

3. A method as in claim 1 which further comprises the step of, after creating said electronic data record, imprinting information on the check indicating that the check has been cancelled and sent for collection by electronic data transfer.

4. A method as in claim 3 which further comprises the step of, after said step of printing, returning said check to the customer.

5. A method as in the claim 3 which further comprises the step of, after said step of printing, causing said merchant to retain said check.

6. A method as in claim 5 wherein, when the check is retained by the merchant, a receipt for the check is issued to the customer.

5,175,682

9

7. A method as in claim 6 wherein said receipt for the check comprises a portion of the standard sales receipt issued by the merchant.

8. A method as in claim 6 wherein said check receipt comprises a receipt separate from the normal sales receipt issued to the customer by the merchant.

9. A method as in claim 1 which further comprises the step of creating one or more additional electronic data records associated with said electronic data record for storing discretionary information regarding the sales transaction.

10. A method as in claim 9 which further comprises the step of electronically transmitting one or more of said additional data records with said data record to said financial institution.

11. A method as in claim 9 wherein said one or more additional data records are retained by the merchant in the event they are needed to verify a disputed transaction.

12. A method as in claim 11 wherein said one or more of said additional data records are electronically transmitted to said bank in the event of a disputed charge.

13. A method as in claim 1 which further comprises the steps of:

receiving an exception report indicating whether said check has not been honored by said financial institution; and

if said check has not been honored, again electronically transmitting said data record to said financial institution to obtain payment of said check by said

10

financial institution after a predetermined period of time.

14. A method as in claim 13 wherein said predetermined period of time is selected in accordance with a set of one or more parameters of said check.

15. A method as in claim 14 wherein said one or more parameters are selected from the group of parameters consisting of: time the check was written, date the check was written, amount of the check, location of said financial institution, and other criteria for believing said check to be high risk.

16. A method as in claim 1 which further comprises the steps of:

issuing an exception report if said check has not been honored by said financial institution; and

automatically notifying one or more of said merchant, said merchant's bank, a check verification service, a check authorization service, and a collection firm.

17. A method as in claim 1 wherein said electronic data record comprises transaction information provided by an electronic device and information from said check.

18. A method as in claim 17 wherein at least some of said information from said check is detected by a MICR reader.

19. A method as in claim 17 wherein said electronic device comprises a POS terminal or a computer system controlling the transaction information for which payment is being made by said check.

* * * * *