# EXHIBIT   3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LML PATENT CORP. ) | |
| ) | |
| ) | |
| Plaintiff, ) | Civil Action No.: 04-858-SLR |
| v. ) | |
| ) | Judge Sue L. Robinson |
| TELECHECK SERVICES, INC. ELECTRONIC ) | |
| CLEARING HOUSE, INC., XPRESSCHEX, INC., ) | |
| AND NOVA INFORMATION SYSTEMS, INC. | |
| ) | |
| Defendant. ) | |
| ) | |

## DECLARATION OF GARY TINKEL IN SUPPORT OF LML'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF INVALIDITY

1. My name is Gary Tinkel and I am president of HilBren Consulting Services. The facts set forth below are known to me personally and I could competently testify hereto if called as a witness in this action.

2. My name is Gary Tinkel. I have a Bachelor of Science Degree in Electrical Engineering from Polytechnic Institute of Brooklyn and a Masters of Science Degree in Operations Research from Polytechnic Institute of Brooklyn. I also attended finance courses towards an MBA in Finance at New York University from 1975 through 1978 towards a MBA in Finance. I have been retained as an expert in this case by LML Patent Corp. ("LML").

## I.    EXPERT QUALIFICATIONS

3. I am the president of HilBren Consulting Services, a software consulting firm headquartered in North Brunswick, New Jersey, and have worked in that capacity since 1988. In that capacity, I have, and continue to, consult for banks, brokerage firms and the federal government, including the Department of Defense, in designing and programming financial systems. This includes payment and check processing systems, direct deposit, and electronic funds transfer ("EFT") systems and most commercial banking applications.

4. As my curriculum vitae (attached at Tab A) details, I have extensive experience in electronic payment processing, including check processing systems and electronic funds transfer systems. For instance, I received a B.S. in Electrical Engineering from Polytechnic Institute of Brooklyn in 1970. I also received an M.S. in Operations Research from Polytechnic Institute of Brooklyn in 1973. I also attended finance courses towards an MBA in Finance at New York University from 1975 through

1978 towards a MBA in Finance. I have also attended many seminars and training classes which included such topics as foreign exchange and money transfer, database design (ORACLE, Sybase, SQL Server, Access, and others), operating systems, programming languages (C, COBOL, FORTRAN, Visual Basic, SQL) and various design courses.

5. In addition, from 1974 to 1977, I was employed as the project leader for systems and programming for the Federal Reserve Bank, New York Branch where my responsibilities included supporting and maintaining the Federal Reserve Reporting and Discount Loan Rate system including supporting an on-line data transmission to other Federal Reserve Banks. While there, I acquired in-depth knowledge of the Federal Banking system and the operations of the Federal Reserve. From 1977 to 1984, I was manager of systems and programming for various New York City banks including CitiBank and Chemical Bank where I worked on payment processing, electronic fund transfers (EFT), foreign exchange and accounting systems. From 1984 to 1987, I was the manager of the Financial Products Development and Support Group for General Automation, a computer manufacturer where I designed and programmed EFT payment systems using the Society of Worldwide Interbank Financial Telecommunications (SWIFT) network and the New York Clearing House (CHIPS) network.

6. Additionally, I have been a member of the Independent Computer Consultants Association (ICCA) for the past sixteen years. I have served the ICCA in various capacities, including president of the New Jersey Chapter, director, and treasurer. I

2

have also designed, programmed and maintained databases for various clients using such packages as Oracle, Sybase ASA, and Access.

7. I believe my extensive experience in electronic payment processing, including check processing systems and electronic funds transfer systems, qualify me to render an accurate technical opinion regarding the technical issues in the pending litigation between LML and TeleCheck, ECHO, and Nova.

8. A list of cases in which I have provided expert testimony is attached also at Tab A. For my work as an expert in this case, I am being compensated at a rate of $ 125 per hour. My compensation does not depend upon the outcome of this litigation, the opinions I express, or my testimony.

## II.    MATERIALS REVIEWED

9. In formulating my opinions, I considered and relied upon the claims and the specification of the '988, '528, and '366 patents; my analysis of the complete file histories of those patents; the parties' interrogatory responses; deposition testimony of numerous LML, TeleCheck, ECHO, and Nova personnel, as well as third parties; documents produced by LML, the Defendants, and third parties during this litigation; the Expert Report of David P. Kurrasch Regarding Invalidity; the Supplemental Expert Report of David P. Kurrasch Regarding Invalidity; all of the documents cited to in both the Expert Report of David P. Kurrasch Regarding Invalidity and the Supplemental Expert Report of David P. Kurrasch Regarding Invalidity; The Expert Report of Alan J. Cox, Ph.D.; and my extensive experience in electronic payment processing, including check processing systems and electronic funds transfer systems. At any hearings or trial of this case, I expect to have exhibits in support of my

testimony consisting of documents produced during discovery in this case, or excerpts and/or enlargements thereof. I also expect to prepare and use demonstrative exhibits to explain and support my opinions and testimony.

### iii.     OVERVIEW OF ELECTRONIC CHECK CONVERSION

10. Simply put, Electronic Check Conversion is the process whereby a paper check is converted into an electronic item, which is then used in place of the actual check for payment. The paper check is never presented for payment to the originating or issuing bank, because it has been replaced by its electronic item. Point-of-Purchase (POP)[1] is one such method of payment, used for the purchase of goods or services by the consumer, whereby the account information contained on the consumer's check is obtained at the POP and that information is used in place of the paper check for payment of goods.

### A.     History of the Old Method

11. Before electronic check conversion, when a consumer purchased an item (goods, services or both) using a paper check, the merchant had to physically travel to their bank to deposit the paper check, which in turn transferred the paper check to the Federal Reserve Bank, which in turn was routed to the Consumers' bank for payment.

---

[1] In the years since the issue of the '988 patent, the industry has developed rules and regulations governing electronic transactions. The National Automated Clearing House Association ("NACHA"), the industry's leading rulemaking body, has developed a serious of codes for the most common forms of electronic transactions, including transactions at the point of purchase (POP), transactions over the telephone (TEL), transactions over the internet (WEB), accounts receievable (ARC) and others. (*See generally* LML-EP-055354-6).



(NOVA 1464). This process of transferring a paper check through and to several different banks is extremely expensive and time consuming as a result of handling costs, personnel expenses, and increased instances of fraud.

**B.     The Patents-In-Suit**

12. In the early 1990's, two inventors, Robert Hills and Henry Nichols, developed a new way of processing checks at the point of sale. (Deposition of Henry Nichols at 50-54). Their innovative process greatly simplified check processing and helped the merchants facilitate the way that they received payment on checks presented by their costumers. *See generally* Ex. 1 '988 Patent. Instead of traditional processing as

5

shown above, one method of their invention permitted the merchant to obtain approval for a transaction at the point of sale in the presence of the consumer and then process the check electronically, as shown in Fig. 1 of the '988 Patent:



FIG. 1

(Ex. 1 '988 Patent, Fig. 1). This process negated the need for physically taking the check to the issuing bank, thereby eliminating the significant cost and expense associated with traditional processing of paper checks and reducing the merchant's risk of fraud.

13. In general terms, one of Mr. Nichols' and Mr. Hills' innovative processes allowed merchants to accept paper checks whereby the MICR data[2] contained on the check is captured at the retailer's point of sale terminal, using either a commercially available MICR reader, optical character recognition scanner or physically inputting the information to the terminal keypad, in order to capture a consumer's bank account information. (*Id.* at col. 5, lns. 45-49, col. 6, lns. 62-63).

---

[2] All printed checks for funds in the United States have a Magnetic Ink Character Recognition (MICR) line imprinted on the bottom of each check. This line is printed using an ink with iron-oxide pigments capable of being magnetized. In this way the characters encoded on this line can be read either magnetically or optically. The MICR line typically, contains the following information: (1) Bank Routing Number – A number that uniquely identifies the bank at which the checking account is established (sometimes known as the ABA number); (2) Account number of the consumer's checking account; and (3) Check Serial Number. *See generally* Ex. 10, LML-EP-055363; Ex. 11, Deposition of Jane Larimer p. 77).

14. The amount of the transaction is then entered into the terminal keypad. (*Id.* at col. 8, lns. 11-13). Information relating to the merchant's location, date and time of transaction along with other information, such as the MICR information may be automatically captured by the terminal as well. The terminal then sends data to an electronic check processing provider by modem or other such communication methods to transfer packets of information electronically. The electronic check processing provider may run verification/risk analysis for the account and the bank routing number (i.e. the bank that the consumers account is located at) may also be verified.

15. The point of sale terminal prints out a customer authorization receipt which authorizes the retailer to initiate an ACH or EFT transaction from the customer's checking account. The customer signs the authorization form and the retailer often voids the paper check. The consumer bank account and transaction information is formatted by the electronic check processing provider so that it can be read and processed by the Automated Clearing House ("ACH")[3] or other Electronic Funds Transfer ("EFT") networks. The ACH or other EFT networks, in turn, transmits the payment information to the consumer's bank, where their account is debited and the retailer's bank, sometimes called the Originating Depository Financial Institution (ODFI), is credited via an electronic funds transfer.

---

[3] The ACH network is a group of independent operators who are governed by rules developed collectively by the National Automated Clearing House Association ("NACHA"). The rules developed by NACHA include those governing POP transactions. (*See, e.g.,* Ex. 4, LML-EP-052494).

**C.    Electronic Check Conversion Has Been a Commercial Success**

16. As early as 1996, Mr. Hills and his company, ChequeMARK Systems presented a brief description of his system to NACHA's Electronic Check Council, a body that was developing a structure to govern the electronic transfer of funds using checks at the time. (LML-EP-011547-65). Employees from a number of the Defendants attended this presentation (a list of members present included representatives of TeleCheck, TeleCheck's parent First Data Corporation, Nova, Kerry Sellen, who would later move to TeleCheck, and Gerri Calabrese, and Amy Goodson who would later move to Nova). (LML-EP-011564-5).

17. NACHA conducted its formal point of purchase electronic check conversion pilot in 1998-9, approximately two years after Mr. Hills first presented his system. (NACHA 004633). NACHA then adopted and implemented final rules governing point of purchase transactions in September 2000. (NACHA 004637). Electronic check conversion became an instant success. Not only did banks see the advantage of saving substantial sums of money, but merchants saw decrease fraud and lower costs with respect to processing checks.

**Iv.    Level Of Ordinary Skill In The Art**

18. It is my opinion, based upon my years of experience in the electronic payment and computer systems industries and research that I have done in connection with this case, a person of ordinary skill in the art with respect to the patent-in-suit would have a high school education plus one to three years of experience or equivalent training in the electronic payment industry and some experience or training in computer systems.

8

19. For example, Kerry Sellen, Vice President, Electronic Payment Processing, has a certificate from Computer Learning Center, attended cosmetology school and teacher training and industry experience. (Deposition of Kerry Sellen p. 11-12). Similarly, Nova's Gerri Calabrese, Senior Director in Business Development responsible for Nova's Check Product Line, has an associate of arts degree and industry experience. (Deposition of Gerri Calabrese p. 11-15). Even Steve Geiler, TeleCheck's Director of Product Development, who has an unrelated chemical engineering degree, never worked in the electronic payment industry before beginning at TeleCheck as a Senior Project Manager. His only knowledge in the electronic payment industry was obtained through industry experience. (Deposition of Steve Geiler p. 12-3). Amy Goodson, Nova's Vice President of Business Development, has an unrelated B.S. in Business and a minor in English, and a certificate from the American Banking Association. (Deposition of Amy Goodson p. 8-9). Also, Jutta Beekman, LML Payment System's Director of Electronic Checking, holds a high school degree with some classes at Hughes School of Retailing. (Deposition of Jutta Beekman p. 4). At the time she joined LML, she had no experience in the electronic payments industry.

20. Henry Nichols, one of the inventors, has an unrelated degree in Mechanical Engineering (with a little focus on nuclear engineering), and obtained training in the electronic payment industry on the job. (Deposition of Henry Nichols p. 14-30). Similarly, the second inventor, Robert Hills, only has an unrelated degree of Bachelor of the Arts degree majoring in History and Political Science. (LML-EP-016987).

21. Thus, in my opinion, and based on my experience in the industry, one of ordinary skill in the art of the electronic payment industry would have a high school education

9

plus one to three years of experience or equivalent training in the electronic payment

industry and some experience or training in computer systems.

## V.    Select Examples Of Incorrect Statements In The Background Section In Mr. Kurrasch's Supplemental Report.

22. In Kurrasch's Expert Report at 50, Mr. Kurrasch states that a number of prior art

devices have a "central host computer". However, there is a substantive difference

between this prior art "central host computer" and the actual element disclosed in the

claims, "central computer system" in that a central host computer only requires a

single computer. Mr. Kurrasch begins his discussion by calling the computer a

central host computer and then goes away from the language calling it a central

computer. There is a distinct difference in that a central computer, which can be any

computer that a terminal can be connected to and a Host computer, which is defined

as the basis for receiving and processing information from remote sources for a

particular purpose. It is the Host computer that a system can be programmed and

updated to handle this data. The above refers to a Data center, which is defined as a

location that computer reside (not necessarily a Host) and a Financial Institution's

Central Computer, computer that a POS system vendor would have no control over,

nor would they have any knowledge of what functions were being performed at that

center. (Ex. 1, '988 Patent col. 4, lns. 39-47; col. 5, lns. 7-8, col. 34, lns. 54-65).

Similarly, later in the same paragraph, Mr. Kurrasch discusses a "communication

means between the central computer and each point-of-sale terminal . . ." (Kurrasch

Report at 50 (emphasis added)). Again, the claim element is a "central computer

system" and again there is a substantive difference between that and the devices that

Mr. Kurrasch is discussing. Therefore, I believe that Mr. Kurrasch's references are inapplicable to the claim terms at issue.

23. In Kurrasch Report at footnote 1, Mr. Kurrasch claims that the Braun reference discloses a central computer system. However, as I will discuss in detail below, Braun does not refer to a central computer system, but to either the POS terminal's microprocessor, the financial institution's computer or a Data Center.

24. Similarly in Kurrasch at footnote 1, Mr. Kurrasch cites to the Deaton '620 patent. This patent is not at all material to the '988 Patent. The Deaton '620 patent is directed to an in-store verification system accumulating purchases and checks cashed at the store. The checks are used as negotiable instruments and there is no outside verification. The system uses the account number as its database lookup, so the MICR line must be parsed to get it.

25. In Kurrasch Report footnote 4, Mr. Kurrasch claims that the Carlson '714 and '607 Patents include "a MICR reader for automatically reading the checking account and routing and transit ('R/T' or 'T/R') numbers from the paper check presented at the point-of-sale terminal." (Kurrasch Report at 50). However, as I will discuss in detail below, all of the references he cites refer to only reading a MICR line with no definition of what was read, nor specific inclusion of banking/checking account information.

26. In Kurrasch Report footnote 8, Mr. Kurrasch opines that the Braun reference discloses an internal terminal memory, citing col. 12, lns. 42-50. However, as I will

discuss in detail below, this citation has no reference to an internal device memory, just input circuits.

27. In Kurrasch Report at 52, Mr. Kurrasch opines that the Lord '866 patent discloses confirming that MICR information was accurately read. The Lord patent discloses a check writing system that imprints information on a check. The unit has an undisclosed way to send data to banks. However, the Lord patent does not disclose receiving any information from the banks or what to do with the information even if it is received.

28. In Kurrasch Report at 54 footnote 13, Mr. Kurrasch opines that the Braun reference discloses that the transaction amount is automatically generated by the system disclosed in that patent. First, the claim language requires automatically logging, not automatically generating. Second, in Braun, as I will discuss in detail below, the amount of the transaction is not automatically generated by the device, it must be manually input by the user. Similarly, in the Carlson '714 and '607 patents, as I will discuss in detail below, there is no discussion of anything related to automatically generating the terminal ID, date, time and amount of the transaction.

29. In Kurrasch Report at 54, Mr. Kurrasch opines that in the Braun Reference the point of sale terminal transmits information to the central host computer for authorization against positive and negative customer databases. However, as I will discuss in detail below, the Braun reference makes no mention of transmission to a central host computer—let alone a central computer system. The transmission goes to a financial

institution computer, and has absolutely no mention of any authorization against positive and negative databases.

30. In Kurrasch Report at 57, Mr. Kurrasch lists a number of references as prior art. However, the Checkmate reference includes a notice that it is to be used exclusively as an internal document.

**VI.    The Industry And Defendants' Adoption Of The Hills System.**

31. The '988 Patent issued on January 16, 1996, and as early as that same year, Mr. Hills, holder of the patent and president of ChequeMARK Systems, Inc., presented a brief description of his electronic check conversion system to NACHA's Electronic Check Council, a body that was developing a structure to govern the electronic transfer of funds using checks at the time. (LML-EP-011547-65). A number of the Defendants employees attended Mr. Hills's presentation (a list of members present included representatives of TeleCheck, TeleCheck's parent First Data Corporation, Nova, Kerry Sellen, who would later move to TeleCheck, as well as Gerri Calabrese, and Amy Goodson who would later move to Nova). (LML-EP-011564-5). At that time, the Electronic Check Council and NACHA had been unable to finalize a workable system to convert checks at the point of sale. Messrs. Hills and Nichols's inventions solved their problem.

32. NACHA's development of their Electronic Check Conversion ("ECC") pilot program, drawing from ideas in the '988 Patent, appears to have begun in 1996, just after the issuance of the '988 Patent. In fact, a June 1996 draft of the NACHA pilot guide was given to one of the inventors of the '988 Patent, Bob Hills, some time in 1996 for comment. (LML-EP-010885-903). The ECC Pilot Guide was formalized in

13

September 1996, and NACHA then conducted its formal point of purchase electronic check conversion pilot in 1998-9. (LML-EP-011767-84; NACHA 004633; Deposition of Jane Larimer at pg. 71). After the successful pilot, NACHA then adopted and implemented the final rules governing point of purchase transactions in September 2000. (NACHA 004637).

33. There is also evidence to suggest that the Defendants themselves specifically copied the Hills patents. For example, as discussed above, several TeleCheck employees, including Caroline Hassell, were present during the presentation that Mr. Hills gave to the Electronic Check Council on October 23-24, 1996. (LML-EP-011564-5; FDC 112194-7). Shortly thereafter, TeleCheck began its development of the electronic check conversion product. TeleCheck ran its first "6 Merchant ECA Test" in April 1997. (Deposition of Steve Geiler at pgs. 65-66, 69; FDC1357436). The 200 Merchant Pilot began in September 1997. (Deposition of Steve Geiler at pgs. 69, 77; FDC1357436). TeleCheck quickly followed with a national rollout of its ECC product in May 1998. (Deposition of Steve Geiler at pgs. 77-78; FDC1357436). Moreover, Donald Dick, former president of the Rocky Mountain Retail Systems, a subsidiary of ECHO, copied Mr. Hills's invention after several confidential communications between Mr. Hills and Dr. Dick in the early 1990s about joint product development. (Deposition of Robert Hills at pgs. 134-48 ad 174-77). These ideas were then incorporated into both the ECHO and Nova systems through a series of disclosures and acquisitions. (Id.)

34. Systems for electronic check conversion based on LML's Patents became an instant success. The number of point of sale transactions has greatly increased industry wide

since the issuance of the '988 Patent.  For example, the number of point of sale ECC

transactions increased from a mere pilot study in 1998, to 1.5 million in 1999 and

then 32 million in 2000.  (Expert Report of Alan J. Cox, Ph.D., at pgs. 14-15).  By

2004, that number had increased to 162 million transactions.  Id.

## VII.    VALIDITY ANALYSIS
### A.    Summary Of Opinions
35. In my opinion, none of the references cited in Mr. Kurrasch's invalidity report

anticipate the asserted claims of the '988 Patent.

### B.    Anticipation.
36. I understand that determining whether a claim is anticipated involves a two-step

process.  First, the judge construes the meaning and scope of the patent claim.  Then,

the construed claim is compared against the prior art.

37. I also understand that a patent is presumed valid by nature of the fact that the United

States Patent and Trademark Office has allowed the patent to issue.  Therefore, in

order to succeed on a claim of anticipation under § 102(a) of § 102(b), the accused

infringer must prove by clear and convincing evidence that the prior art contains

every element of the patent claim.  Under § 102(a) a patent is anticipated if the

invention was publicly known or used by others in this country before the applicant's

date of invention.  Under § 102(b), a patent is anticipated if the invention was

patented or described in a "printed publication" more than one year prior to the date

of the application.  I understand that in order for a printed publication to constitute a

piece of prior art it must be publicly accessible at least one year prior to the filing

date.

38. I also understand that if an element is not disclosed, the prior art reference will only anticipate if the missing element must be a natural result flowing from the operation as taught that would result in the performance of the questioned function. Finally, I understand that in addition to disclosing all of the elements of the claimed invention, the reference must enable one skilled in the art to practice the invention.

**D.    The Carlson '714 Patent does not anticipate.**

39. The Asserted Claims of the '988 Patent is not anticipated by the Carlson '714 Patent under § 102(b). As a preliminary matter, the '714 is cumulative (and related) to two other patents, the Carlson '896 and '607 Patents, that were considered by the Examiner during the prosecution of all three Hills patents. In fact, the '714 Patent is a Continuation-In-Part of the Carlson's '896 Patent. The Examiner even cited the '607 and '896 Patents in Office Actions but ultimately permitted the claims to issue. (LML-EP-000192-4).

40. The Examiner realized, at its core, that all of the Carlson references were fundamentally different than the Hills patents, and the '714 patent is no different. Where all of the Hills patents are directed to a device that transfers funds "without using the check as a negotiable instrument", the Carlson '714 patent utilizes the check as a negotiable instrument and the system only serves to expedite processing. (*See generally*, col. 2, lns. 9-20; col. 3, lns. 40-43 ("It is a further object of this invention to use all forms of negotiable instruments at the point of sale and secure the transaction taking place."). (*See also* col. 8, lns. 12-30; col. 8, lns. 55-60; col. 8, lns. 64 to col. 9, lns. 1-4). Because all of the independent claims in the patents prohibit the check from being used as negotiable instruments, the Examiner correctly understood that Carlson

16

'714 patent did not anticipate the Hills patents. I agree with the Examiner, the patents are not anticipated.

41. The '988 Patent is not anticipated by the Carlson '714 patent. First, the '714 patent does not disclose a central computer system as required by the claims. The '714 patent discloses a point of sale device (not a check processing system) where the device directly calls out to the check-writer's bank to request a funds transfer. (Col. 2, lns. 9-20; col. 8, lns. 28-30; col. 8, lns. 55-60). Thus, the '714 patent contemplates that the device will contact a disbursed, and unrelated group of computers, not a centralized computer system.

42. Moreover, the Carlson '714 reference does not disclose a central computer system having a second communication means. Mr. Kurrasch states, without citation, that he believes a second communication means for receiving information from a plurality of point of sale terminals is inherent. This is incorrect. Because the devices are calling out to a number of dispersed computers, not a central computer system, no single computer necessarily needs to be able to receive information from a plurality of terminals. Nor does the reference enable one of ordinary skill in the art to practice the invention, because it is silent on the topic. Similarly, there is no indication that a central computer system is enabled to communicate with external databases or for transferring of funds. The citations in Mr. Kurrasch's claim chart refer to the device at the point of sale directly communicating with the check writer's financial institution, not the central computer system. (Id.) Finally, as discussed above, Carlson '714 does not disclose transferring funds without using the bank check as a negotiable instrument.

**B.    The Carlson '607 patent does not anticipate.**

43. Although Mr. Kurrasch opined that the Asserted Claims of the '988 Patent are anticipated by the Carlson '607 patent, he did not provide any support for his opinion. In any event, the '988 Patent is not anticipated. In fact, the Carlson '607 patent was before the Examiner during the prosecution of the Hills patents. The Examiner realized, at its core, that the Carlson references were fundamentally different than the Hills patents. Where all of the Hills patents are directed to a device that transfers funds "without using the check as a negotiable instrument", the Carlson '607 patent utilizes the check as a negotiable instrument and the system only serves to expedite processing. "Thus in its most general form, our point-of-sale negotiable instrument processing device comprises . . ." ('607 Patent col. 3, lns. 41-42). In fact, both independent claims 1 and 2 of the Carlson '607 patent explicitly require using the check as a negotiable instrument. ("A point-of-sale negotiable instrument processing device comprising . . ."). Because all of the independent claims in the patents prohibit the check from being used as a negotiable instruments, the Examiner correctly understood that Carlson '607 did not anticipate the Hills patents. I agree with the Examiner, the patents are not anticipated.

44. Under any possible construction of a "central computer system", no claims of the '988 Patent are anticipated by the Carlson '607 patent because it does not disclose such a central computer system. Instead, the '607 patent discloses a point-of-sale *device* (rather than a check processing system) that directly communicates with multiple check-writer's banks and merchant's banks to request funds transfers between these banks.

18

45. In addition, the '607 patent does not disclose a second communication means for communicating with a plurality of terminals. The '607 patent makes it clear that the "verification of the existence of the payor's account" is done by the payor's bank CPU and not a central computer: "(a) the payor's bank CPU means encrypts/decrypts the data package as necessary, (b) there is verification of the existence of the payor's account."

46. The '607 patent does not disclose any computer system having a second communication means for communicating with an external database for performing a consumer bank account status search. Instead, the '607 patent makes it clear that any verification that occurs involves a POS device (not a central computer) contacting the "payor's bank CPU" for "verification of the existence of the payor's account" rather than accessing a database of account information. The '607 patent discloses an invention where the check processing device directly communicates with a check-writer's bank to request a funds transfer. Thus, the '607 patent's check processing device must be able to contact a disbursed, unrelated group of computers, not a centralized computer system.

47. Many other elements are notably absent from the Carlson '607 patent. For example, the patent does not disclose a central computer system and/or a second communication means, no communication with external databases and/or enabling automated clearing house communications does not store any transaction information between transactions, requires PIN verification entry to verify account, no transaction slip is printed, no verification that account information correctly read, no resident

third party database, and no automatic logging of information at the point of sale terminal.

## C.    Higashiyama does not anticipate.

48. Mr. Kurrasch opines that the Asserted Claims of the '988 patent are anticipated by United States Patent No. 5,175,682 ("Higashiyama"). I disagree with Mr. Kurrasch's opinion that these claims are anticipated, and I will discuss each claim in turn below.

49. Higashiyama discloses a system for large retail merchants, such as grocery stores, to more efficiently process paper checks using "a reader for reading the MICR account information printed" on checks to create data records that may be used by a "backroom processor" for "future batch data transmission to a clearing house or the issuing bank itself." (Ex. 2, '682 Patent Abstract). In the preferred embodiment of Higashiyama, each merchant location includes a backroom processor, resulting in a system of distributed backroom processors rather than a central computer system.

50. According to the asserted claims of the '988 patent the central computer system communicates with external databases for performing consumer bank account status searches. As I will explain below, any communications for bank account information in Higashiyama are carried out by POS terminal 201, not by a central computer system (as no such system is disclosed by Higashiyama) and not by the backroom processor. Therefore, Higashiyama does not disclose a central computer system enabled to communicate with external databases for performing consumer bank account status searches.

20

51. Defendants allege the "backroom processor" of Higashiyama is a "central computer system" as recited in claim 9 of the '988 patent. (Kurrasch Report Claim Chart 1 of 2 at 26). In my opinion, the backroom processor of Higashiyama is not a central computer system as described in the '988 patent. The central computer system as disclosed in the '988 patent is a system or network of one or more computers that serves multiple merchants. A backroom processor, on the other hand, is not a central computer but can act as a front-end to a central computer. Indeed, one of ordinary skill in the art would recognize that a backroom processor is not a central computer system. (Ex. 7 Deposition of Amy Goodson at 93).

52. According to the asserted claims of the '988 patent the central computer system communicates with external databases for performing consumer bank account status searches. As I will explain below, any communications for bank account information in Higashiyama are carried out by POS terminal 201, not by a central computer system (as no such system is disclosed by Higashiyama) and not by the backroom processor. Therefore, Higashiyama does not disclose a central computer system enabled to communicate with external databases for performing consumer bank account status searches.

53. Claims 1-2, 4-6, 9-11, and 14 of the '988 patent also include a "second communication means for receiving information from a plurality of . . . point of sale terminals." This second communication means enables the "central computer system to communicate with external databases for performing a consumer bank account status search."

21

54. Higashiyama does not disclose a second communication means that enables a central computer system (or even the "backroom processor") to communicate with external databases for performing a consumer bank account status search. The only communication interface shown or discussed in Higashiyama that could be used by the backroom processor for external communications is telecommunications unit 205. (Ex. 1 '988 Patent col. 5, lns. 30-31; Fig. 2). However, as I will discuss below, telecommunications unit 205 of Higashiyama does not enable the backroom processor to communicate with external databases for consumer bank account status searches.

55. Higashiyama makes no mention of the backroom processor communicating with external databases or performing bank account status searches. Instead, the backroom processor merely receives "data file[s] maintained by POS terminal 201," either "on a periodic basis or at the end of a shift." (*Id.* at col. 5, lns. 2-4). The backroom processor uses these data files to upload information to a clearing house or a bank, not for communication with external databases or account verification. (*Id.* at col. 5, lns. 26-27).

56. In Higashiyama, it is not the backroom processor but "POS terminal 201" that performs all communications for authorizing transactions. This is clear from the specification because POS terminal 201 creates data records that are required for check authorizations that must be made during transactions; these data records may not be communicated to backroom processor 204 until well after transactions have been completed. Similarly, when accessing the SCAN database (discussed in Higashiyama), it was typical for POS terminals to communicate directly with the

database system rather than through a central computer system as claimed in the '988

patent. (Ex. 2 '682 Patent col. 4, ln. 18; Deposition of John Waldron at pg. 83).

57. In Higashiyama's system, checks are read by a "MICR reader 202," and "POS

terminal 201 then provides additional information in order to create a data record for

this transaction which is being paid for by check." (Ex. 2 '682 Patent col. 3, lns. 49-

53). "Data records" are created by POS terminal 201, not by the backroom processor

204—let alone a central computer system as required by the claims of the '988

Patent. (*Id.* at col. 5, ln. 1). "If desired, the data record is then used to verify check

authorization, for example, by being compared to a positive file (which lists all

allowable checking account numbers)." (*Id.* at col. 4, lns. 14-17). The data record

can also be compared against a negative file. (*Id.* at col. 4, lns. 17-22). Thus, data

records are required for authorizations of checks since they have critical information

regarding transaction amounts and account numbers.

58. In Higashiyama, after POS terminal 201 creates a data record and performs an

optional authorization, POS terminal 201 can send a data file that includes multiple

data records to the backroom processor. This is usually done "on a periodic basis or

at the end of a shift." (*Id.* at col. 5, ln. 4). In contrast, check authorizations using

Higashiyama's system occur before transactions are completed at the terminal 201.

(*Id.* at col. 4 lns. 22-25). This is clear because if "authorization is not provided, the

transaction can, if desired, be cancelled by the merchant." (*Id.* at col. 4, lns. 22-25).

59. Since the transmittal of data records at the time of transactions are required for

authorizations in Higashiyama, and because the backroom processor typically only

23

receives data records periodically or at the end of a shift, the backroom processor cannot perform "a consumer bank account status search" as required in the '988 patent. This confirms my opinion that Higashiyama's backroom processor does not "communicate with external databases for performing a consumer bank account status search" as required by the claims of the '988 Patent.

60. While Higashiyama states that data records can be sent to the backroom processor immediately, this is only to save memory requirements of the POS terminal, not for account verification purposes as required by the '988 patent. Indeed, if the backroom processor were performing check authorizations, sending data records to it from the point of sale immediately would be a requirement, not an option. (*Id.* at col. 5 lns. 5-7).

61. Higashiyama also fails to disclose a first communications means integral to a point of sale terminal for electronically communicating with a central computer system as required by claim 1. I understand, in order to anticipate, a single reference such as Higashiyama must describe all the elements of the claim. Higashiyama's telecommunications unit 205 is not a first communications means as taught by the '988 patent because it is not integral to POS terminal 201. This is clear because telecommunications unit 205 is shown as a separate device from POS terminal 201 and also because it is used for communications by the backroom processor 204. (Fig. 2).

62. Higashiyama fails to disclose any communications means that is integral to POS terminal 201 as required by claim 1. Figure 2 of Higashiyama merely shows an arrow

24

between POS terminal 201 and backroom processor 204, and the specification says, without further details, that the POS terminal and the backroom processor are "connected." (Ex. 2 '682 Patent col. 3, ln. 29).



**FIGURE 2**

63. It is thus not clear that Higashiyama contemplated an integral communication interface, nor is it clear what kind of "connection" was intended. Furthermore, Higashiyama does not disclose any particular POS terminal that can be referred to in order to determine if an integral communication device was contemplated.

64. The asserted claims of the '988 Patent include a "second communication means for receiving information from a plurality of . . . point of sale terminals." This second

communication means enables the "central computer system to communicate with external databases for performing a consumer bank account status search."

65. Higashiyama does not disclose a second communication means that enables a central computer system (or even the "backroom processor") to communicate with external databases for performing a consumer bank account status search. The only communication interface shown or discussed in Higashiyama that could be used by the backroom processor for external communications is telecommunications unit 205. (Ex. 2 at col. 5 lns. 30-31; Fig. 2). However, as I will discuss below, telecommunications unit 205 of Higashiyama does not enable the backroom processor to communicate with external databases for consumer bank account status searches.

66. Higashiyama makes no mention of the backroom processor communicating with external databases or performing bank account status searches. Instead, the backroom processor merely receives "data file[s] maintained by POS terminal 201," either "on a periodic basis or at the end of a shift." (Id. at col. 5, lns. 2-4). The backroom processor uses these data files to upload information to a clearing house or a bank, not for communication with external databases or account verification. (Id. at col. 5, lns. 26-27).

67. In Higashiyama, it is not the backroom processor but "POS terminal 201" that performs all communications for authorizing transactions. This is clear from the specification because POS terminal 201 creates data records that are required for check authorizations that must be made during transactions; these data records may

not be communicated to backroom processor 204 until well after transactions have been completed, as outlined below.

68. It is my understanding that when accessing the SCAN database (discussed in Higashiyama), it was typical for the POS terminals themselves to communicate directly with the database system rather than through a central computer system as claimed in the '988 Patent. (Ex. 2 at col. 4, ln. 18; Deposition of John Waldron at pg. 83).

69. In Higashiyama's system, checks are read by a "MICR reader 202," and "POS terminal 201 then provides additional information in order to create a data record for this transaction which is being paid for by check." (*Id.* at col. 3, lns. 49-53). "Data records" are created by POS terminal 201, not by backroom processor 204, let alone a central computer system as required by the claims of the '988 Patent. (*Id.* at col. 5, ln. 1). "If desired, the data record is then used to verify check authorization, for example, by being compared to a positive file (which lists all allowable checking account numbers)." (*Id.* at col. 4, lns. 14-17). The data record can also be compared against a negative file. (*Id.* at col. 4, lns. 17-22). Thus, data records are required for authorizations of checks since they have critical information regarding transaction amounts and account numbers.

70. In Higashiyama, after POS terminal 201 creates a data record and performs an optional authorization, POS terminal 201 can send a data file that includes multiple data records to the backroom processor. This is usually done "on a periodic basis or at the end of a shift." (*Id.* at col. 5, ln. 4). In contrast, check authorizations using

Higashiyama's system occur before transactions are completed at terminal 201. (*Id.* at col. 4 lns. 22-25). This is clear because if "authorization is not provided, the transaction can, if desired, be cancelled by the merchant." (*Id.* at col. 4, lns. 22-25).

71. Since the transmittal of data records at the time of transactions is required for authorizations in Higashiyama, and because the backroom processor typically only receives data records periodically or at the end of a shift, the backroom processor cannot perform "a consumer bank account status search" as required in the '988 patent. This confirms my opinion that Higashiyama's backroom processor does not "communicate with external databases for performing a consumer bank account status search" as required by the claims of the '988 patent.

72. While Higashiyama states that data records can be sent to the backroom processor immediately, this is only to save memory requirements of the POS terminal, not for account verification purposes as required by the '988 Patent. Indeed, if the backroom processor were performing check authorizations, sending data records to it from the point of sale immediately would be a requirement, not an option. (*Id.* at col. 5 lns. 5-7).

73. Higashiyama also fails to disclose a first communications means integral to a point of sale terminal for electronically communicating with a central computer system as required by the asserted claims of the '988 Patent. Higashiyama's telecommunications unit 205 is not a first communications means as taught by the '988 Patent because it is not integral to POS terminal 201. This is clear because telecommunications unit 205 is shown as a separate device from POS terminal 201

and also because it is used for communications by backroom processor 204, not the terminal 201. (Fig. 2).

74. Higashiyama fails to disclose any communications means that is integral to POS terminal 201 as required by claim 9. For example, Figure 2 of Higashiyama merely shows an arrow between POS terminal 201 and backroom processor 204, and the specification says, without further details, that the POS terminal and the backroom processor are "connected." (Ex. 2, col. 3, ln. 29). It is thus not clear that Higashiyama contemplated an integral communication interface, nor is it clear what kind of "connection" was intended. Furthermore, Higashiyama does not disclose any particular POS terminal that can be referred to in order to determine if an integral communication device was contemplated.

75. Higashiyama does not disclose a resident third party database. Mr. Kurrasch quotes a passage in part 3 of 3 of his untimely supplemental report that says "[T]he data record is then used to verify check authorization, for example, by being compared to a positive file . . . or more likely a negative file such as provided by SCAN of Seattle, Washington, TeleCheck of Denver, Colorado or Telecredit of Florida . . ." master computer program will generate and maintain several data bases." (FDC1389466). There is simply no indication that any of these "databases" are resident to any particular computer. Thus, in my opinion, Higashiyama does not disclose or suggest a resident third party database.

76. In my opinion, Higashiyama does not show or suggest a system subscriber database comprising information about authorized users. Higashiyama mentions "positive

files" and "negative files", but since these "files" are used for check authorization, they must contain information about consumers rather than system subscribers (such as merchants and service providers). I can find no reference to a system subscriber database in Higashiyama. If such a database can even be inferred from Higashiyama, I can find no reference or suggestion that it is included in a central computer system as required by claim 6.

**D.    The Specification Of The '988 Patent Would Enable Those Of Ordinary Skill In The Art To Make And Use The Invention As Claimed**

77. In my opinion, those of ordinary skill in the art at the time of the invention would understand how to make and use the full scope of the claimed invention from studying the '988 specification. The specification not only describes a preferred embodiment with examples of actual hardware, but it also has an entire "How to Use" section that describes how the disclosed system can be used. Further, those of ordinary skill in the art would be able to make adjustments to the claimed system, if desired, to read MICR lines on foreign checks, perform currency translations for compatibility with foreign accounts, and to account for regulatory issues that might be involved with accepting and processing foreign checks.

78. In my opinion, those of ordinary skill in the art at the time of the invention would easily be able to locate information regarding exchange rates between foreign and U.S. currency, and also regarding any regulatory issues needed to make the system operate in a foreign country or to use the system to accept foreign checks in the U.S. in the unlikely event such processing would be deemed desirable.

### D.    The Claims Of The '988 Patent Clearly Point Out What The Inventors Considered To Be Their Invention

79. In my opinion, the claim terms "without using the check (or bank check) as a negotiable instrument," "any bank check," and "any consumer bank check" can each be given at least one reasonable construction, and so are not indefinite. For example, one reasonable construction for the term "without using the check (or bank check) as a negotiable instrument" would be where the paper check is used as a source of information, and is not accepted or processed. It is also my opinion that the terms "not accepted or processed", even though they are not claim terms, are not vague or ambiguous. Similarly, a reasonable construction for the terms "any bank check," and "any consumer bank check" would be any regular check used to draw funds from a normal bank or credit union checking account (or consumer checking account).

## VIII.    EXHIBITS TO BE USED AS A SUMMARY OF OR SUPPORT FOR OPINIONS.

80. To summarize and support my testimony at trial, I may use this report (or a revised/updated version of this report), and any of the various documents to which I have referred, or excerpts of such documents. I may also use charts or other demonstrative exhibits prepared from and/or summarizing this material.

DATED: THIS __14__ TH DAY OF NOVEMBER 2005

Gary Tinkel
Hilbren Consulting Services, Inc.

31

# EXHIBIT 4

# 1 9 9 6

# ACH RULES

A Complete Guide
To Rules &
Regulations
Governing the
ACH Network

Attention:

## Replacement Page

for 1996 ACH Rules and Guidelines

(OR 35)



**Midwest** Automated
Clearing
House
Association

A subsidiary of Chicago Clearing House Association

230 S. LaSalle Street, Suite 600
Chicago, IL 60604
312-913-2500
FAX: 312-913-2599

LML-EP-052444

**SUBSECTION 12.1.3 "ANSI ASC X12.5"** (Interchange Control Structure)

means the standard to define the control structures for the electronic interchange of business transactions encoded in ASC X12-based syntax. This standard provides the interchange envelope of a header and trailer for the electronic interchange through a data transmission, a structure to acknowledge the receipt and processing of this envelope, and optional, interchange-level service request structures.

**SUBSECTION 12.1.4 "ANSI ASC X12.6"** (Application Control Structure)

means the standard used to define the structure of business transactions for computer-to-computer interchange. This structure is expressed using a symbolic representation of X12 data in terms of both the design and use of X12 structures, independent of the physical representation (e.g., character set encoding).

**SUBSECTION 12.1.5 "Article 4A"**

means Article 4A of the Uniform Commercial Code as enacted in the State of New York.

**SUBSECTION 12.1.6 "Association"**

means any member of the National ACH Association.

**SUBSECTION 12.1.7 "Automated Clearing House"** or "ACH"

means a funds transfer system governed by the Rules of the National Automated Clearing House Association which provides for the interbank clearing of electronic entries for participating financial institutions.

**SUBSECTION 2.1.8 "BPR or BPS Data Segment"** or "Beginning Segment for Payment Order/Remittance Advice"

means the beginning segment for the payment order/remittance advice used in ASC X12-based syntax to indicate the beginning of a payment-related transaction set which contains the necessary banking information to process the transaction.

**SUBSECTION 12.1.9 "Banking Day"**

means, with reference to a Participating DFI, any day on which such DFI is open to the public during any part of such day for carrying on substantially all of its banking functions, and, with reference to an ACH Operator, any day on which the appropriate facility of such ACH Operator is being operated.

**SUBSECTION 12.1.10 "Business Day"** means a calendar day other than a Saturday, Sunday, or Federal holiday.

**SUBSECTION 12.1.11 "CCD entry"**

means a credit or debit entry initiated by an organization to consolidate funds of that organization from its branches, franchises or agents, or from other organizations, or to fund the accounts of its branches, franchises or agents, or of another organization. "CCD+" is a CCD entry with one addenda record.

**SUBSECTION 12.1.12 "CIE entry"** or "CIE"

means a credit entry initiated by or on behalf of the holder of a consumer account to effect a transfer of funds to the deposit account of the Receiver.

**SUBSECTION 12.1.13 "Consumer account"**

means a deposit account held by a Participating DFI and established by a natural person primarily for personal, family or household and not for commercial purposes.

**SUBSECTION 12.1.14 "CTX entry"**

means a credit or debit entry initiated by an organization to effect a transfer of funds to or from the deposit account of that organization or another organization and accompanied by Addenda Records that relay information formatted in accordance with the ANSI ASC X12.5 and X12.6 syntax, an ASC X12 transaction set containing a BPR or BPS data segment, or payment related UN/EDIFACT syntax. A CTX entry can contain up to 9,999 addenda records.

**SUBSECTION 12.1.15 "DNE entry"** or "DNE"

means a notice to an RDFI of the death of a Receiver. Only an agency of the Federal Government may originate a DNE entry.

**SUBSECTION 12.1.16 "ENR entry"** or "ENR"

means a credit enrollment entry initiated by a participating DFI to a Federal Government Originator on behalf of a Receiver who is an account holder at the DFI and who requests the initiation of the ENR. An ENR entry may contain up to 9,999 addenda records.

**SUBSECTION 12.1.17 "Entry"**

means an order or request complying with the requirements of Appendix Two (ACH Record Format Specifications) (1) for the deposit of money to the deposit account of a Receiver (a "credit entry"), (2) for the payment of money from the deposit account of a Receiver (a "debit entry"), (3) a zero dollar entry, (4) a DNE entry, or (5) an ENR entry. Each debit entry shall be deemed an "item" within the meaning of Article 4 of the Uniform Commercial Code and that Article shall apply to such entries except where the application is inconsistent with these rules, in which case these rules shall control.

LML-EP-052494

# EXHIBIT  5

US006164528A

# United States Patent [19]

## Hills et al.

[11] **Patent Number:** 6,164,528

[45] **Date of Patent:** *Dec. 26, 2000

[54] **CHECK WRITING POINT OF SALE SYSTEM**

[75] Inventors: **Robert R. Hills**, St Augustine, Fla.; **Henry R. Nichols**, McLean, Va.

[73] Assignee: **ChequeMark Patent, Inc.**, Vancouver, Canada

[ * ] Notice: This patent issued on a continued prosecution application filed under 37 CFR 1.53(d), and is subject to the twenty year patent term provisions of 35 U.S.C. 154(a)(2).

This patent is subject to a terminal disclaimer.

[21] Appl. No.: **08/775,400**

[22] Filed: **Dec. 31, 1996**

[51] Int. Cl.7 ............................................ **G06F 15/30**

[52] U.S. Cl. ................................... **235/379; 235/380**

[58] Field of Search ........................... **235/379, 380**

[56]     **References Cited**

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,824,544 | 7/1974 | Simjian . |
| 3,845,470 | 10/1974 | Schuller . |
| 4,270,042 | 5/1981 | Case . |
| 4,321,672 | 3/1982 | Braun et al. ............... 364/408 |
| 4,404,649 | 9/1983 | Nunley et al. . |
| 4,523,330 | 6/1985 | Caine . |
| 4,580,040 | 4/1986 | Granzow et al. . |
| 4,617,457 | 10/1986 | Granzow et al. . |
| 4,672,377 | 6/1987 | Murphy et al. . |
| 4,673,802 | 6/1987 | Ohmae et al. . |
| 4,678,895 | 7/1987 | Tateisi et al. . |
| 4,678,896 | 7/1987 | Carlson et al. . |
| 4,743,743 | 5/1988 | Fukatsu . |
| 4,810,866 | 3/1989 | Lord, Jr. . |
| 4,823,264 | 4/1989 | Deming . |
| 4,933,536 | 6/1990 | Lindemann et al. . |
| 4,934,772 | 6/1990 | Sakuma et al. . |
| 5,053,607 | 10/1991 | Carlson et al. . |
| 5,175,682 | 12/1992 | Higashiyama et al. ............... 364/408 |
| 5,484,988 | 1/1996 | Hills et al. ............... 235/379 |
| 5,500,513 | 3/1996 | Langhans et al. ............... 235/380 |
| 5,679,938 | 10/1997 | Templeton et al. ............... 235/379 |
| 5,703,344 | 12/1997 | Bezy et al. ............... 235/380 |

*Primary Examiner*—Harold I. Pitts
*Attorney, Agent, or Firm*—Roberts Abokhair & Mardula, LLC

[57]     **ABSTRACT**

A point of sale system designed to read information from a consumer's check, credit card, or manual input with a subsequent debiting of a consumer's account and crediting merchant's account for the goods or services provided. Point of sale terminals are designed to accept a form of credit card with a consumer's bank account information encoded thereon or in the alternative to read the MICR number from a consumer's check in order to verify that a consumer has an appropriate balance to conduct the transaction with a given merchant. Thereafter the transaction of that information is transmitted to a central computer system which verifies the consumer's credit worthiness and stores the transaction event information for subsequent bank reconciliation via the ACH or other competing network. The invention eliminates the need for paper checks with all bank reconciliation being accomplished electronically. The present invention also includes fraud protection provisions such as velocity controls, social security checks, and scans. The present invention has the further flexibility to differentiate between "first time" consumer usage and those limits otherwise assigned to "known" consumer accounts. Additionally, there is no need for the present system to retain the consumer's check after verification.

**18 Claims, 8 Drawing Sheets**





*FIG. 1*



*FIG. 2*



## FIG. 3

**U.S. Patent**          Dec. 26, 2000          Sheet 3 of 8          6,164,528



*FIG. 4*



FIG. 5



FIG. 6



*FIG. 7*

Merchant Name
Street Address
City, ST Zip
Merchant Acct #

TIME 00:00 _M                    DATE 00/00/00

BANK ACCT. NO. 000000000000

TRANSIT NO. 000000000

SALE AMOUNT                    $ 0,000.00

TERMINAL ID 0000000000

I herewith authorize ChequeMARK Systems to electronically access my designated checking account for the payment of the above referenced purchase.

Name (PRINT) _____

Street _____

City _____ ST_____ Zip _____

Tel. Number: (_____) _____—_____

I ACKNOWLEDGE THAT RETURN FEES WILL BE IMPOSED SHOULD MY PAYMENT BE DISHONORED AND UNDERSTAND THAT IT IS UNLAWFUL TO AUTHORIZE PAYMENTS FOR WHICH ADEQUATE MONIES ARE NOT AVAILABLE WITHIN MY ACCOUNT.

X_____
    Authorizing Signature

*FIG. 8*

Merchant Name
Street Address
City, ST  Zip
Merchant Acct #


CUSTOMER BANKING INFORMATION:

        BANK ACCT. NO. _____

        TRANSIT NO. _____


SALE AMOUNT . . . . . . . . . . . . . . . . . . $ _____


I herewith authorize ChequeMARK Systems to electronically access my designated checking account for the payment of the above referenced purchase amount.   I acknowledge that sufficient funds are available for the payment of this sale.


    Name (PRINT) _____

    Street _____

    City _____ ST\_\_\_\_\_ Zip _____

    Tel. Number: (\_\_\_\_\_) _____ — _____


I FURTHER ACKNOWLEDGE THAT RETURN FEES WILL BE IMPOSED SHOULD MY PAYMENT BE DISHONORED AND UNDERSTAND THAT IT IS UNLAWFUL TO AUTHORIZE PAYMENTS FOR WHICH ADEQUATE MONIES ARE NOT AVAILABLE WITHIN MY ACCOUNT.


    X_____
       Authorizing Signature

*FIG. 9*

6,164,528

1

# CHECK WRITING POINT OF SALE SYSTEM

## RELATED APPLICATION

This application is an improvement of U.S. Pat. No. 5,484,988 to Hills et al. entitled "Check Writing Point of Sale System."

## BACKGROUND OF THE INVENTION

This invention relates to the field of Point-of-Sale systems and more particularly to the integration and processing of purchases whereby a check or encoded card is used as the basic source of identification of the individual and of the individual's bank and whereby the bank account is debited electronically.

Numerous devices exist for processing checks. For example, U.S. Pat. No. 4,933,536 to Lindemann, et al., describes a check processing device which is used together with a Point-of-Sale terminal. This particular device involves copying and taking a picture of an individual whereby a dishonored check could then be traced to the person who has offered it.

U.S. Pat. No. 4,810,866 to Lloyd, Jr., describes a check validation system again located together with a Point-of-Sale system for imprinting and otherwise physically dealing with a check.

Other systems also deal with an apparatus for handling checks at a point of sale. For example, U.S. Pat. No. 4,743,743 to Fukatsu describes one such transaction apparatus where a check is examined by a reader. U.S. Pat. No. 4,672,377 to Murphy, et al. describes a check authorization system wherein a check is imprinted with a bar code and information concerning customers which are stored in a database. U.S. Pat. No. 3,845,470 to Schuller discloses a vending system using a modified form of a check which is imprinted with identification codes, when someone attempts to use the check in purchasing goods and services, a vending operation will not place the order if information associated with the check is not valid in a particular database.

Other check-based financial systems have also been the subject of invention. U.S. Pat. No. 4,617,457 addresses an ATM or automatic teller machine form of cashing check. Such systems create a picture of the check involved and also involves checking against a specialized database to insure that the check is a "valid" one (see also U.S. Pat. No. 4,580,040 to Granzow et al.).

Another generic category of financial systems deals with methods of handling the financial transactions apart from the physical handling of the check itself. For example, U.S. Pat. No. 3,824,544 to Simjian describes a merchant issued "check" which can be used in the purchase of goods and services and upon purchase, a specialized code is evaluated to determine if the check is being validly utilized.

U.S. Pat. No. 4,404,649 to Nunley et al. describes a document processing system which generally discloses a method of reading checks for processing a wide variety of financial documents.

U.S. Pat. No. 4,523,330 to Caine also describes a method for processing financial documents which systems also includes a Point-of-Sale terminal for generating image data from checks as they are being processed. This patent is drawn principally to the actual terminal itself.

U.S. Pat. No. 4,673,802 to Ohmae et al. describes a central processing system having stored data relating to the counts of users. Users are approved or disapproved at the Point-of-Sale based upon information in the database.

2

U.S. Pat. No. 4,270,042 to Case discloses a point of sale system that requires a consumer to prepay a sum of money into a special account that is accessed only by the system. This amount is inscribed on the card, and when a transaction made using the system, the amount of the transaction is punched out of a designated area on the card. This amount along with a signature and other information, is supplied on a draft negotiable instrument, which is given to the merchant at the time of the transaction. Thus, the Case system does away with the use of bank checks in effecting the transaction, but requires the use of specialized prepaid draft negotiable instruments that must be surrendered to the merchant.

U.S. Pat. No. 4,823,264 to Deming discloses a home banking system that can be used to transfer funds to different payees in satisfaction of debts incurred through previous purchases, use of utilities, etc. The system is consumer driven; that is, it is contemplated for use by the payor on a home personal computer. While the Deming system does away with the use of bank checks, account and other information must be keyed into the system. The Deming system cannot be used to read account and other information directly from an ordinary bank check and has no use for bank checks as instruments other than negotiable paper. Further, the Deming system cannot be used to transfer funds at the time of purchase and is not workable at the point of sale; the system can only be used to pay debts that have been incurred in the past and have accumulated.

Finally, U.S. Pat. No. 4,678,896 to Carlson et al. describes a Point-of-Sale system whereby an apparatus is provided to secure the processing and imprinting of checks.

All of these above patents deal with the specific problem of how to accept a check from a customer for the purchase of goods and services. They do not in any way address the subsequent processing of checks nor do they address the process by which checks are cleared through the normal automatic check handling clearinghouse operations that exist in the financial world. Thus, the interaction of these systems with the automated clearing house ("ACH") process is not addressed in any way. This is particularly important since if any Point-of-Sale check handling system is to interact with the ACH mechanism it must adhere to that processing scheme and must lend itself to use with a processing scheme.

Further, some of the currently used systems described above require the use of a bank check as a negotiable instrument which must be surrendered to a merchant. Some of the systems do away with the use of a bank checks altogether, but require a debit card or a specialized draft instrument to be used only with the particular system. None of these systems completely does away with the need and use for a negotiable draft instrument while using the consumer's bank check for identification and verification only. That is, current technologies such as check truncation, electronic check presentment and representment all require a consumer's initial issuance of a "paper" check. It is therefore an objective of the present invention to provide such a system.

It is an objective of the present invention to be adaptable for use with the ACH system and to be smoothly incorporated into it. In this fashion, the present invention will immediately be useful for a much wider range of financial transactions above and beyond those contemplated and disclosed in the background references discussed above.

## SUMMARY OF THE INVENTION

The present invention comprises a process and apparatus which may be employed for the purpose of effecting pay-

6,164,528

3

ments for point-of-sale purchases of goods and services paid from consumer funds secured in bank checking or depository accounts. Each sale or "Transaction Event" would be an electronic and "paperless" event thereby eliminating reliance on accepting and processing commercial bank drafts (personal or corporate checks) and the physical handling of those bank drafts thus replacing commercial bank drafts at the point-of-sale.

In contrast to known systems, the present invention is a merchant driven system that can be used to process a transaction at the point of sale and at the time of purchase. The system is intended to be made available to subscribing merchants, businesses, and individuals herein referred to as "system subscribers" wishing to employ the method and apparatus of the present invention for the electronic processing and settlement of consumer purchases. Further, operational parameters of the present invention allow freedom from customary state or other geographically limiting criteria typical when accepting and processing "paper" checks. The system is designed to act with the national authorization networks and the electronic settlement network known as the ACH system as regulated by the National Automated Clearing House Association ("NACHA") or other comparable systems including but not limited to ECCHO, the Cactus Switch, First Tennessee Bank, regional networks, the VISA network, and others. The present invention contemplates Transaction Events processed in a manner hereinafter referred to as "Electronic Checks" or "Electronic Checking."

The system is designed to perform in a fully automated manner enabling each Transaction Event to be processed by a system subscriber as a point-of-sale transaction in the presence of the consumer. Subsequent to a Transaction Event's being "Approved", funds are debited from an authorized consumer account for credit to the system subscriber, and electronic settlement by ACH deposit of the transaction amount to the subscriber's designated depository account. Authorized access to consumer accounts and credits to system subscriber depository accounts are performed as "Off-Line" transactions by means of Electronic Funds Transfer ("EFT") through the ACH Network or through the Federal Reserve System. "On-Line" transactions are also contemplated by the present invention once national networking and other present and proposed support mechanisms have become functional.

The present invention comprises a point-of-sale processing system having electronic data processing equipment which supports various individual service selections or transactions types each of which provide automated, electronic processing from consumer bank checking or depository accounts in payment of goods or services incurred at a system subscriber's point-of-sale. It is the objective of the present invention to automate the point-of-sale environment for processing consumer purchases of goods and services would customarily necessitate the more traditional acceptance and processing of commercial bank drafts (personal and/or corporate checks). Individual Transaction Events are administered under the system of the present invention by initiating a terminal authorization inquiry and continuing through the electronic settlement of funds representing the Transaction Event. As a result of the above procedure, approved consumer banking accounts are debited and system subscribers' designated depository accounts are credited.

It is a further objective of the present invention to eliminate the need for "paper" checks as an accepted means of consumer payment. In the place of personal and business

4

checks, consumers would be provided greater access to funds secured in bank accounts to effect purchases initiated from the point-of-sale. System subscribers electronically communicate with the data center of the present invention for individual Transaction Event authorizations which, upon reconciliation of a day's activity, result in an EFT processed by means of the Automated Clearing House accommodating an "Off-Line" or "On-Line" debiting of preauthorized consumer Transaction Events from approved accounts. Thereafter, each system subscriber is credited with the total of all such daily authorized Transaction Events to its designated bank depository account. The present invention also accommodates paper transactions as requested by the subscribing merchant or consumer. By way of example, transactions can be supported where the consumer prepared a "paper" check. The transaction would proceed in a fully electronic manner with the consumer retaining the "paper" check as an additional receipt.

The present invention comprises logic which allows the following services each of which, when individually performed or are combined with other services, establish a wholly unique processing medium enabling preauthorized access to consumers' checking account or bank depository reserves in payment of and settlement for purchases conducted from a system subscriber's point-of-sale.

Authorization—This service supports electronic communication from point-of-sale to the system's central computer. The data center stores positive and negative files concerning consumer accounts thereby providing accurate inquiry responses regarding the current posting status of a consumer's banking account and signaling the system subscriber that said account may be reasonably relied upon for consummating a Transaction Event (i.e., an "Approval") or, here listed as delinquent, indicating that the account may not be so relied upon (i.e., a "Denial"). The system also contemplates "On-Line" services that would also permit Fund Verification.

Check Replacement—This capability operates as an extension of Authorization enabling the system subscriber the capability of completing a Transaction Event by electronically logging the sale whereupon a Transaction Event slip will be printed or manually prepared for consumer execution at the point-of-sale. By execution of the Transaction Event Slip, the consumer authorizes the electronic processing of funds secured in his/her authorized banking count in lieu of the more traditional method of issuing personal and business checks. Funding settlement to the system subscriber would be effectuated by means of Electronic Funds Transfer via ACH, the Federal Reserve system or other competing facility as opposed to physically processing and transferring checks among banks. If preferred or requested by the subscribing merchant, the present invention would further allow for a consumer's check to be written and thereafter voided, canceled, and returned to the consumer, or, in the alternate, submitted to lock box or similar storage facilities.

Bank Transaction Card—As part of this invention an "Off-Line" Debit Card is established on which is stored the information relating to the banking account from which funds representing the Transaction Event would be debited for payment to the system subscriber. This information may be stored on the card itself in encrypted or unencrypted form or may be stored in the central computer where access to such information is gained via special control characters or access codes stored on the card. Electronic authorization for withdrawal of funds from the cardholder's account and subsequent electronic settlement procedures remain essen-

6,164,528

| 5 | 6 |

tially identical to processing under the Check Replacement service described above. Information relating to the consumer-cardholder and the appropriate banking account to be debited for a Transaction Event will be encoded upon the Magnetic stripe portion of the plastic, and terminal-readable, card. The present invention is also compatible with SMART card technology.

Thus, the overall objective of the present invention is to provide and support an alternate means for consumer payments for goods and services that operates to replace commercial bank drafts in the point-of-sale environment. Simultaneously, the present invention assures consumers greater access to and use of funds in personal or corporate banking accounts. Further, the system provides system subscribers a significantly improved prospect of collecting the underlying monies for Transaction Events, reduced time for collecting the cash receipts from Transaction Events, and a pronounced lowering of the present cost of cumbersome procedures otherwise mandated by the existing mechanisms for accepting and processing commercial bank drafts.

A further objective of the present invention is to significantly reduce the use of checks as negotiable instruments in effecting the purchases of goods or services and to provide the system's Electronic Checking Service as an equitable alternative for the consumers reliance on credit cards or cash.

The method of the present invention begins with the electronic capturing of consumer information at a system subscriber's location using a point-of-sale terminal and related equipment. This information is obtained in the presence of the consumer and occurs prior to any "Approval" for the Transaction Event or for the ultimate crediting of the System subscriber's designated depository account.

A Transaction Event involves a series of events initiating with a system subscriber's intent to sell goods or services, the payment for which would be funds secured in a consumer's banking account. The consumer's banking account status would first be verified by accessing the central computer files of the present invention. Verification is performed by use of an encoded, magnetic stripe card, where presented by the consumer or by input of account numbers from a consumer's specimen check. The present invention also contemplates compatibility with "SMART card" technology, whereby a consumers "ChequeMark Card" information might co-exists with other consumer data or payment options for alternate verification purposes. In addition to verifying a consumer's account, a more traditional identification of the consumer could also occur including visual examination of driver's license or similar and acceptable picture "ID"; however, this is not considered part of the present invention.

For improved identification, security, and fraud purposes, the system is further capable of receiving input of a consumer's Social Security Number and retaining the same for use in the approval and settlement processes. The present invention is also capable of validating a Social Security Number, screening out those numbers issued to individuals reported as deceased, and cross-searching the "known" ("Positive") checkwriter database to verify the status of all banking accounts. Cross-searching is seeking a match of the Social Security Number with any over account on which there is a return, including the account which is the subject of the current inquiry. If preferred or requested by either a subscribing merchant or the affected consumer, the consumer's check could be written and, subsequent to processing through the system of the present invention, marked as

"Voided" or "Electronically Settled" and returned to the consumer. In the alternative, the consumer's check may be submitted to a lock box or other storage facility.

As an integral portion of each Transaction Event, the system subscriber's location, date and time, and requested sale amount is automatically logged into the system when a system subscriber first accesses the invention. Finally, a Transaction Event Slip ("Sales Slip") will be produced by a printer integral to the point-of-sale terminal and will be executed by the consumer in the amount of the stated purchase with inscribed language defining the Transaction Event and specifically providing consumer authorization for electronic access to his/her banking account. The consumer's specimen check is returned unused or, where written, is returned to the consumer as a receipt. Thereafter, the consumer account will be debited and the proceeds credited to the system subscriber's designated depository account along with all other similar Transaction Events representing the total of the system subscriber's daily activity. Debiting of consumer accounts and settlement deposits to each system subscriber is performed by means of Off-Line electronic funds transfer through and by the ACH or Federal Reserve System. Other competing facilities such as, but not limited to, ECCHO, Cactus Switch, First Tennessee Bank, regional networks, or the VISA network, could also utilized by the present system. The system has the further ability to convert settlement processing to an "On-Line" format which would involve services such as "Funds Verification" (Authorization) or "Reserving of Available Funds" or a combination of both.

Equipment Configuration—The present invention can operate with nearly every conceivable point-of-sale equipment system. The central computer system accepts data transmitted from the system subscriber's existing point-of-sale equipment or that which is added to augment service performance. The point of sale terminal of the present invention is implemented in a number of ways, most preferred, however, being activated under a fully automated format. Such a fully automated system generally comprises a dual-port terminal with magnetic stripe reading capabilities interfaced with a logging printer capable of providing individual Transaction Event Slips for consumer execution, and a MICR check reader, optical character recognition ("OCR") equipment, or other device. It is contemplated that services may also in the future be administered using the present invention with a singular point-of-sale hardware device which, as a function of its design, would incorporate all or most of the service capabilities of an integrated terminal, logging printer, and MICR Check Reading device. The present invention also anticipates supporting existing point-of-sale equipment primarily dedicated to bankcard ("credit card") processing and other equipment. Therefore, service subscriber activations may be supported under numerous means of access from the point-of-sale. For example, personal computers and electronic cash registers in addition to variations of the more traditional stand alone transaction processing equipment including alternate POS terminal processing equipment such as International Veri-FACT and Hypercom, among others, are contemplated for use by the present invention. Additionally, the present invention can be interfaced with network computers, commonly referred to as "NC's", NC's are lower end computers for the limited use of Internet access which are easily adapted for POS Electronic Checking and other money transfers anticipated by the present invention.

Communications links from point-of-sale terminals to the central computer of the present invention will typically be in

6,164,528

7

the form of telephonic network communications over a public switched telephone network ("PSTN") or over other approved networks. Internet access is also supported by the present system where access is deployed at a merchant POS for consumer payments. Internet access may also be utilized to process Electronic Checking inquiries from points other than the POS to conduct Transaction Events under the present invention between the merchant and the consumer as a merchant-initiated payment option. As the use of personal computers become more prevalent at the POS, utilization of the Internet to interconnect for approvals and capture for settlement of Electronic Checking events between a system subscriber and an affected consumer will become more routine. Transaction Event verification will occur as a result of point-of-sale terminal access to the Central computer's positive and/or negative data files. "Approved" or "Declined" notifications are returned to the "Point-of-Sale" device over the PSTN. All data files will be centrally located and maintained on the invention's central computer databases. Portions of the database include, but are not limited to, third party data files such as the Shared Check Authorization Network ("SCAN") database.

Individual transactions or groupings of transactions are first approved by soliciting an "Authorization" prior to capturing a Transaction Event for electronic funds transfer. To maintain an accurate status of file information for authorizations to subscribing merchants, businesses, and/or individuals, the system is comprised of three separate but interactive databases, including a "Merchant," "Checkwriter," and "Transaction" database, which are continuously maintained. The "Merchant" database stores records of all service subscribers authorized to initiate Electronic Checking requests. These records include, amongst others, authorization and initiation codes, as well as the system subscriber's name and address. The "Check-writer" database is a database of "Known" users. This database stores information that includes, amongst others, a status field indicating whether the Checkwriter would be "Approved" or "Declined." Previously unseen Checkwriter MICR strings, when "Approved", are also added to the "Checkwriter" database for future inquiries to the system. The "Transaction" database processes inquiries as well as stores the transaction records of "Approved" responses for formatting and electronic settlement through the ACH or similar facility. Current card holder or checkwriting records are updated daily and instantly available for point-of-sale inquiry for Transaction Event authorizations.

System subscribers point-of-sale equipment is interfaced to the central computer of the present invention by means of a telephonic network which is able to support communication from a plurality of point-of-sale terminals. Programming of the point-of-sale terminal causes an automatic "Dial-Up" to the central computer and provides an automatic query and response sequence affirming or denying the Transaction Event. Each Transaction Event which is "Approved" is captured for electronic settlement within the transaction database log of the present system. The addition of local entry hubs may be installed to better facilitate the speed or economics of communications with the data files. Alternatively, the use of satellite or cellular communications or enhanced radio transmissions instead of telephonic networks may also be used. Similarly, the system's data files and associated Check Replacement Service are contemplated to be responsive to emerging point-of-sale devices intended to seek authorizations and/or improved consumer identification and security by the alternate means of voice pattern recognition, POS fingerprint identification, retina

8

scan, geometries, biometrics, "smart" chips, consumer or check imaging and/or signature broadcasting. The present system further contemplates use of imaging technology as an enhancement to facilitate POS consumer identification and electronic settlement for "Approved" Transaction Events. Imaging technology comprises capturing an impression of a consumer's check or a "signature capture" followed by electronic settlement of the consumer's account.

The present system further comprises extensive system approval and fraud prevention capabilities. The system processes Transaction Events under a variety of different service types, each defined at the discretion of the system subscriber. The resulting flexibility enables the merchant to respond to his/her relative "comfort level" with a particular Transaction Event or consumer. Typical service types include (i) "Access Only" wherein the inquiry bypasses the present system's approval criteria but the Transaction Event, including all consumer account information, is automatically captured and logged within the transaction database for an electronic settlement attempt; (ii) "Check Replacement" which seeks the systems transaction "approval" and, where "Approved", captures the Transaction Event for electronic settlement; (iii) "Card Acceptance" which operates in a manner virtually identical to "Check Replacement" as mentioned above, but the Transactions Event is activated through the use of an encoded card (versus a specimen check); or (iv) "Authorization Only" which seeks the system's approval providing a system subscriber information regarding the reliability of a subject consumers account, but does not capture the Transaction Event for electronic settlement. In the "Access Only" service type, "Access Only" events bypass the database records and all other approval and search criteria such as those explained below, e.g., velocity controls, social security checks, and scans. It is contemplated that these "Access Only" events always be "Approved" and passed immediately to a settlement log for an attempted consumer debit and service subscriber credit.

The present invention has the additional capability to use a consumer's Social Security Number to perform a variety of identification and fraud preventative applications prior to issuing an "Approved" message for the Transaction Event. These include searches employing Social Security Number first to validate the consumer's Social Security Number as a genuinely issued number. Second, the system cross searches the system's "Dead File" to screen out Social Security Numbers which, while validly issued, were issued to individuals now reported as deceased. To a greater extent, verification and "Dead File" searches deter access by consumers attempting to use false identification. Lastly, the present system utilizes Social Security Numbers to cross search all "Known" checkwriter banking account records for negative information before issuing an "Approved" message for the subject Transaction Event. This capability more fully insulates the system and its system subscribers from abuse and susceptibility to repeat abusers who would commonly seek to process Transaction Events from a multiplicity of banking accounts.

Entry of a consumer's Social Security Number is performed by input of the number from the keypad of a POS terminal used to process Transaction Events. Alternately, the system also supports the use of a pinpad or similar device, interfaced with the POS terminal, for consumer entry of a Social Security Number. This capability supports a consumer's preference for complete privacy as to the entry of pertinent information. Consumers accessing the system by means of a previously issued encoded card will have already logged their Social Security Numbers onto the system's

6,164,528

**9**

database, and, therefore, would not be required to re-enter their Social Security Numbers or other pertinent information.

The present invention is also equipped with velocity controls which regulate approvals within prescribed purchase limits imposed upon either the system subscriber or a consumer. The present invention has the further flexibility to differentiate between "first time" consumer usage and those limits otherwise assigned to "known" consumer accounts. Merchant variations in velocity limits can also be imposed depending upon the type, nature, and consumer purchasing statistics for a particular merchant category or location.

Inquiries seeking an "Approved" response for a Transaction Event which meets all other criteria of the system's approval process, including velocity controls, and when involving previously unknown banking accounts but carrying verified Social Security Numbers which have revealed no negative information following a cross search of the database and where the numbers are also not entries in the "Dead File", are "Approved", Consequently, each consumer's banking account and Social Security Number, along with other information, is automatically logged into the "Known" checkwriter database of the present invention at the time the "Approved" response is transmitted to the inquiring POS terminal. In addition to other identification and fraud preventative measures, the system's access to Social Security Numbers significantly improves settlement features relating to matters of proper authority when "Approved" and captured Transaction Events are transmitted to the consumer's financial institution for settlement in the form of electronic debit and credit notations.

The system further contemplates other fraud and enhanced identification capabilities. These include, but are not limited to, reliance upon such evolving technologies as fingerprint capture and analysis, signature capture and verification, imaging technology, retina scan, biometrics, and other forms or manners of improved identification practices as such either currently exist or as such may, upon further development, be readily integrated in to the system of the present invention.

BRIEF DESCRIPTION OF THE SEVERAL
VIEWS OF THE DRAWINGS

FIG. 1—System overview of the present invention
FIG. 2—The point-of-sale equipment.
FIG. 3—The Central Computer System
FIGS. 4–7—The process Data Flow
FIG. 8—transaction Event Sales Slip
FIG. 9—manual Transaction Event Sales Slip

For purposes of the description and claims relative to the system of the present invention, the following terms shall have the meanings set forth below. The following definitions are applied throughout this application.

Card Acceptance: A service sponsored by the present invention which enables an encoded card to be utilized to access the central computer and thereby denote the subject consumer banking account to be electronically debited in a point-of-sale Transaction Event.

Authorization Only: A service made available under the present invention as a convenience to its service subscribers where the subscriber can verify the current status of the subject consumer's account. In the preferred embodiment, these events are not captured for electronic settlement.

Check Replacement Service: This is a service sponsored by the present invention which enables a consumer's speci-

**10**

men ("paper") check to be utilized to access the central computer of the present system thereby denoting the consumer banking account to be electronically captured and settled by presenting a debit notation through the facilities of the ACH, or other competing service, for a purchase conducted from a system subscriber's point-of-sale.

Access Only: This is a service sponsored by the present invention which enables a consumer's specimen ("paper") check to be utilized to access the central computer of the system thereby denoting the consumer banking account to be electronically captured and settled by presenting a debit notation through the facilities of the ACH, or other competing service, for a purchase conducted from a system subscriber's point-of-sale.

Electronic Checking: This is a service sponsored by the present invention which collectively enables a system subscriber to electronically debit funds from the consumer's bank account and credit to those funds to the system subscriber's account utilizing various transaction methods and banking rules as envisioned above.

DETAILED DESCRIPTION OF THE
INVENTION

Referring to FIG. 1 an overall schematic of the present invention is described. Point-of-sale terminals 300 communicate over normal PSTN telephone lines with a central computer system 302 which in turn communicates with a Banking institution 304 for purposes of debiting consumer accounts and crediting system subscriber accounts. The banking institution performs its function via normal automated clearing house ("ACH") transactions 306 or other competing facility as mentioned above. Alternatively, the system can automatically generate preauthorized drafts to debit consumer checking accounts where more expeditious in settling a particular Transaction Event. This manner of settlement particularly addresses the "first-time" consumer whose account might otherwise require pre-notification preceding the processing of a "live" debit event. Pre-notification is to become volitional in 1996 which, when effective, will minimize the present system's reliance upon or use of drafts as a mechanism for settling consumer payment requests.

Referring to FIG. 2 the point-of-sale equipment is described. The point-of-sale terminal comprises several different entry means. A key board 310 can be used to input consumer information manually, including both bank routing and consumer account information. The key board 310 allows the system subscriber to input information such as (i) electronic checking requests, (ii) a void procedure for incorrect, returned, or canceled events, (iii) a preauthorization inquiry for the status of consumer accounts, and (iv) accessing system subscriber's daily activity reports. Alternatively a card reader 312 can be used whereby the magnetic strip on the card is read by the point-of-sale terminal to obtain account information and finally a check reader 314 may alternately be included to read the MICR encoded bank and account numbers which appear on a consumer's specimen check as a substitute for either a specific card or key board input. These various input means provide information to a microprocessor 316 which comprises logic means 318, memory means 320, and communication means 322. The logic means 318 comprises logic which allows the information received from the various input means to be processed and stored in the memory 320. The logic means further drives a display 324 which provides a visual output of the bank and account numbers of the consumer for verification.

6,164,528

11

The communication means 322 allows the subscriber terminal to communicate with the central computer 302 for purposes of processing the consumer's purchase. The communications means 322 is compatible with ECR and PC systems.

Referring to FIG. 3 the central computer system 329 is described. The central computer system receives input from a plurality of point-of-sale terminals which provide transaction information from a system subscriber and a consumer desiring to purchase goods or services. The central computer system comprises a system subscriber 330 file which is a file of those merchants who have elected to use the present invention for processing purchases. The system subscriber 330 comprises the "Merchant" database which, as previously stated, stores records of all service subscribers authorized to initiate Electronic Checking requests, including authorization and initiation codes, and the system subscriber's name and address. The central system also comprises known consumer file 332 which stores information, mation and names of those consumers who have already been approved for purchases to take place through various input means. The consumer file 332 comprises "Checkwriter" database. Additional databases relied upon by the system which assist in approving consumer Transaction Events including, but not limited to, the SCAN (Trademark) database, MOD-10 verification, Social Security Number database, and other proprietary screening criteria which serve to approve, decline, or reject, the latter serving to cancel those inquiries which are inaccurate, incomplete, or contain fraudulent data received by the central computer. The "Transaction" database is another such database provided by the system.

The system of the present invention further comprises a third database defined as a transaction database which stores all activity that is conducted between the plurality of terminals and the central terminals. Those inquiries captured for a settlement attempt are converted by the system for ACH file for preparation and settlement. Inquiries either "DECLINED" or for various reasons rejected are similarly retained by the transaction database. The "DECLINED" or other rejected inquiries are withheld from transfer for settlement.

The computer system also comprises a communications means 334. The communication means is capable of communicating with other external, third party databases to allow the system access to review additional negative records regarding the consumers' banking account prior to issuing an "Approved" response. Once an "Approved" response is given for a Transaction Event involving a consumer banking account previously unknown to the system, the newly "Approved" consumer record is automatically added to the system's checkwriter database. This new record allows for the entry of the consumer's new address and phone number information.

As presently configured the central computer 329 already houses the third party database known as the SCAN (trademark) database 333 resident on the central computer. Thus credit worthiness can be checked using all current database criteria searches, and further benefit by immediate access to the records from the SCAN (trademark) database. All databases, including proprietary databases and SCAN (trademark) databases, are updated daily.

The communication means 334 also transmits ACH files which are created by the system and communicated with a banking institution 338, including instructions for the bank to debit the account of the consumer and credit the account

12

of the system subscriber (merchant), with the amount of the purchase. These transactions are then settled via the "Off-Line" ACH transaction process. The system of the present invention also contemplates the use of "On-Line" settlements.

Referring to FIG. 4 the process begins by a consumer presenting an encoded card or a specimen or "blank" check complete with MICR number to the system subscriber (the merchant) 100. The subscriber begins the process by first pressing the appropriate key on a terminal to select a particular service prior to accessing the host computer 108. Thereafter the point of sale terminal prompts the system subscriber to enter the appropriate MICR number 110. The system subscriber then enters the appropriate MICR number either manually or by passing the card through a magnetic stripe reader on the terminal or the specimen check through a check reader which determines the consumer's bank and account numbers 112.

Referring to FIG. 6 the subscriber would verify that the numbers appearing on the terminal's display screen match the numbers on the encoded card or the MICR numbers on a consumer's check 114. If the numbers do not compare with that of the terminal the system subscriber clears the terminal and begins the transaction process again 118. If the process is to be reinitiated, the subscriber enters the MICR or card number(s) into the point of sale terminal 130. Thereafter the system subscriber compares the numbers as before 132. If the numbers compare to the system display 134 the process proceeds. If the numbers do not compare 136 the check or card is returned to the consumer and the process terminates 137.

Upon a successful reading of a consumer's specimen check, the check is number embedded thereon id also captured and, once communicated to the System Central Computer, retained for future reference purposes or security matters, such as consumer inquiries or verification of proper authority. Access to the check number proves critical when performing a sequence review to resolve such matters.

Referring to FIG. 5, if the verification process proceeds, the terminal next prompts the system subscriber to enter the amount of the sale 122 and other security or identification information required. The subscriber enters the amount of the sale along with requested information 124 and the terminal thereafter transmits an inquiry to the host database for verification 126.

The check or card approval process next takes place 128. If the inquiry is not approved by the central computer the terminal displays a message declining or rejecting the transaction 140. Thereafter, printer record of the declined or rejected transaction is made for purposes of the system subscriber 142 to comply with the Fair Credit Reporting Act and Regulation of the Board of Governors of the Federal Reserve System.

If the card or check is approved, the terminal displays a message noting the approval 138 and the specimen card or check is returned to the consumer. The printer further makes a paper record of the transaction 142 and the consumer places any required information on the paper receipt and signs the receipt expressly authorizing the transaction 144. At the election of the system subscriber, or at the request of the consumer, the consumer may write the check which would then be stamped "Void" or "Electronically Settled" and thereafter returned to the consumer or submitted to lock box or other storage facilities. This procedure is used for security measures or where fraud and/or database searches (which rely on the cancellation of a specimen check) are contemplated.

6,164,528

**13**

Referring to FIG. 7, the process description continues. Once the transaction is "Approved", the central computer makes a record of the MICR information and other data captured at the point-of-sale, including the sale amount, permanently storing all the information 146. Upon closeout of a terminal's batch of daily Transaction Events by a system subscriber, the system's central computer reformats the captured activity within its transaction database to ACH format and thereafter, at regular intervals, transmits all of the daily batch activity for every system subscriber into the ACH network as debit and credit notations. The central computer subsequently generates a batch message regarding all Transaction Events for the prior period and transmits all the Transaction Event information for the day into the ACH network 148.

During the ACH process each Checkwriter's account is debited for the exact purchase amount 150. Thereafter, collected funds representing the total of a day's activity, being the aggregate of all Transaction Events processed for consumers by the system subscriber, are deposited into a subscriber's designated account 152. The transaction is then complete 154.

HOW TO USE

The present invention will require the establishment and maintenance of three interconnected but separate data files for the purpose of performing access searches. The system embodied by the present invention, and the interactive databases comprising the system, are accessible by dial-up communication procedures from point-of-sale ("POS") terminal devices, electronic cash registers, and/or personal computers similar to the equipment utilized in the processing of automated bankcard ("credit card") receipts. The terminal prompts an operator/user to process one of four optional inquiry types. Any one or all of four primary functions are capable of being performed at a single point-of-sale terminal within the control of the system subscriber. The inquiry types and database responses for "Approved" Transaction Events are as follows:

Card Acceptance—Having depressed the assigned key and thereafter being prompted, the system subscriber "slides" an encoded magnetic stripped transaction card through the point-of-sale terminal and enters the "Sale Amount" requested for authorization. Thereupon, the terminal's dial-up capabilities direct the inquiry to the central computer for authorization against "KNOWN" ("Positive and Negative" file of current cardholders). Inquiries where a "POSITIVE" "Match" are found and where the cardholders' status fields are listed in "good standing" cause an "Approved" return message from the data file to the inquiring POS terminal. In order to accomplish this the present invention's database captures each new MICR string for future reference. Embedded within the data record is a notation identifying the "Status" for that account. In this manner, if a certain signal is generated, for instance a "Y", then the account would be "Approved" for future access to the system. Conversely, a "No-Match" to inquiry or a "Match" where the cardholder's status field were listed in "bad standing" would result in a "Declined" notice to the POS terminal. Daily input to the system for the present invention causes automatic updating of status fields for all cardholder files including the activation of new cardholder accounts, the placement of corrective status entries, ("Positive" or "Negative") into the status of existing cardholder files, deletion of terminated accounts or to change other file status in existing accounts. In the case of a "No-Match" the system of the present invention would generate a different signal such as a "No" and the "Account would be Declined" upon an attempt to access the system.

**14**

Authorization Only—Having depressed the assigned key and thereafter being prompted, the system, subscriber manually enters account numbers from a personal or business check or, where fully automated, enters a specimen check through a MICR Check Reader device interfaced with the terminal, whereupon the terminal's screen would display the check's bank and account numbers for verification. Thereafter, the operator would enter the "Sale Amount" and other security or identification information requested for authorization. The terminal's dial-up capabilities then direct the inquiry to the computer data file center for authorization first against the "Known" file of checkwriting records whereupon the current status field is verified. A successful "Match" to an inquiry, where the current status field lists the checkwriter record as in "good standing", would result in an "Approved" notice from the central computer to the inquiring terminal. Conversely, a successful "Match" to an inquiry, where the current status field lists the checkwriter record as not in "good standing", would result in a "Declined" notice from the central computer ti the inquiring POS terminal. Each inquiry preliminarily resulting in a "No-Match" (first time user) when processed against the system's "Known" checkwriter's database would then be passed through any and all available third party databases which reside on or are available to the system by external link preceding any return notice to the inquiring terminal. This third file is anticipated to be the Shared Check Authorization Network ("SCAN") a negative database currently maintained in the system computer data file center or other databases.

Check Replacement Service—Inquiries initiated as Checked Replacement inquiries are first processed through the system's "Known" checkwriter database and, as necessary, thereafter proceed to the SCAN database, or other database files, prior to the issuance of an "Approved", "Declined", or a rejection message to the inquiring POS terminal. A "Match" in the system's checkwriter database records indicates a consumer account which is "Known" to the system. If a "Match" is found and where the checkwriter's status field within the database is listed in "good standing", an "Approved" response results. Conversely, a "Match" where the checkwriter's status field were listed in "bad standing" would result in a "Declined" notice. Reliance upon account information available from SCAN or any other positive or negative databases minimizes the risk associated with the system's approval of Transaction Events involving consumer accounts which are previously "Unknown" to the invention's proprietary "Known" checkwriter database. A "Match" in the SCAN "NEGATIVE" file would result in a "Declined" response to the inquiring terminal. Where a "No Match" should occur, and subject to the receipt of no other negative information received from the system criteria searches or from alternate databases, the event would be "Approved" as a "first-time" consumer user. Negative information received from SCAN or the rejection of the Transaction Event for other reasons would result in a "Declined" or one of various reject responses to the POS terminal. Daily input to the system of the present invention causes automatic updating of all checkwriter records and the placement of corrective entries ("Positive" or "Negative") into the status fields of existing checkwriter files. Each newly captured, but previously "Unknown" accounts, would, subsequent to an "Approved" notice, be automatically entered into the system's "Known" checkwriter file. Check Replacement Transaction Events are captured by the system and logged within its transaction database. The total of daily, "Approved" Transaction Events are "paperless" sales whereby the service subscribing merchant has submitted requests for elec-

6,164,528

15                                          16

tronic debit via the ACH network, or other competing
facilities for each such authorized consumer purchase. Com-
mercial bank drafts ("paper" checks) are not accepted or
processed by the service subscriber. For each "Approved"
Transaction Event, a "Sales Receipt" is manually prepared
or is automatically printed at the point-of-sale. The con-
sumer provides express authorization for an electronic debit
by signing individual sales receipts.

Access Only—Access Only Transaction Events are pro-
cessed in essentially the same manner as Check Replace-
ment events with one significant variance. Access Only
events bypass the authorization criteria within the system's
central computers established for approving Check Replace-
ment events and are automatically captured within the
system's transaction database for a settlement attempt. All
other functionality aspects of an Access Only and a Check
Replacement Transaction Event remain identical.

All terminal programming and all prompt strings for
MICR Check Reader interfacing are stored in the POS
terminal and the computer center of the present invention
controls interactions between the plurality of terminals and
the central system. The following modules are present.

Programming for POS Equipment Interface—system sub-
scriber locations to be activated with the present invention
must possess or acquire a Tranz (trademark) 330 or higher
grade terminal or alternate terminals, personal computers, or
approved electronic cash registers supporting interface capa-
bilities with a MICR check reader.

The MICR check reader interface results in the reading
and transmitting to a terminal, in accepted format, of the
consumer's entire ABA/Transit, checking account, and spe-
cific check number information which when combined with
other data keyed directly into the terminal results in a query
to the system's central computers. Subsequent to a terminals
receipt of the banking account numbers, the terminal's will
display the numbers on its screen allowing the operator to
verify the accuracy of the captured "read" prior to proceed-
ing. If the consumer's account numbers are correct, the
Transaction Event may proceed, or, where incorrect, the
operator can "clear" the event and resubmit the consumer's
specimen check through the check reader. Alternately, the
consumer's bank and account numbers and other requested
information may be manually entered directly into the
terminal with all other financial and operational advantages
of the present invention remaining in effect.

The computer data file center receives and processes
Transaction Event authorization requests utilizing the entire
MICR string for accurate, error-free identification of both
the consumer bank and a specific checking or depository
account to participate in a sale. ACH settlement criteria
mandate exact recall for the bank and checking account
numbers to properly complete any debit request. This inven-
tion conforms to each and every requirement of the ACH
transaction regulations including all pending guidelines and/
or proposals and rules changes regarding processing require-
ments or new classification or submittal types.

The present invention assigns a unique identifier(s) for
purposes of accurately identifying individual MICR
accounts and Transaction Events. To this end, each new
event captured on the "Checkwriter" database is consecu-
tively assigned a unique 15 character account number,
checkwriter. This unique same checkwriter identifier is
thereafter printed on future receipts for subsequent transac-
tions processed.

Additionally, upon entry of media information from one
receipt, an additional code, such as a sixteenth character, is
automatically assigned by the present invention. The six-

teenth character indicates that the subject MICR account is
"known" and "registered" on the system, thereby alleviating
the need to supply a Checkwriter's name, address, and
phone number on subsequent transaction receipts.

A second unique identifier is assigned to distinguish an
individual Transaction Event approved by the system. For
purposes of settlement, or other inquiries, this numerical
identifier may be employed to recover all salient information
pertaining to the Transaction Event, Checkwriter, and the
service subscriber. It is also contemplated that under certain
circumstances, the check number can be used in lieu of a
unique identifier to effect settlement and credit of the Trans-
action Event. Both identifiers (i.e., Checkwriter and event)
are retained by the system and printed on the customer's
transaction receipt. Moreover, the unique identifiers' satisfy
the requirements for the preparation and submittal of elec-
tronic debit and credit notations through the ACH in con-
formance with Federal regulations.

Each Transaction Event is completed with the logging
printer generation of a Transaction Event ("Sales") Slip for
each "Approved" authorization inquiry processed (FIG. 8).
Alternatively, a manually created Transaction Event slip can
also be prepared (FIG. 9). Each such Transaction Event Slip
must be exacting in its retention of account numbers and the
sale amount enabling both the consumer and system sub-
scriber to be provided "hard copy" receipts of the event.
Also included would be a clear printing of the transaction
type: "Card Acceptance," "Authorization Only" (as
appropriate), "Check Replacement," or "Access Only",
Authorization language is printed immediately preceding
the consumer's signature line specifically authorizing elec-
tronic access in payment of the requested transaction sale
amount.

Instances will arise where previously "Approved" Trans-
action Events will require the operational equivalent of a
"Void" or "Credit" procedure. The system of the present
invention enables communication by a service subscriber
with the central computers to effect such corrective adjust-
ments to prior events. By way of example, a "Void" may be
initiated by depressing the assigned key on a service sub-
scriber's POS terminal and, once complying with security
prompts, the POS terminal will thereafter communicate with
the system's central computers and make such requested
corrections. In the event of a "Voided" Transaction Event, a
separate "Voided" slip will be automatically printed as a
permanent record.

In addition to the primary functions for POS equipment
programing, each POS terminal/MICR interface processing
location is capable of generating printed activity reports.
Activity reports can be printed in either summary or detail
formats identifying all "Approved" Transaction Events by
service type, approval number, and amount. Reports further
provide the total number of events "Approved" and the total
captured amount of consumer payments contained within
the activity report. Events which were previously recorded
on the system's central computers as "Approved" but which
have been subsequently "Voided" are also identified, includ-
ing detail of the originally "Approved" events, with the
amount of such "Voided" events deleted from the activity
report's total for the captured amount for all Transaction
Events.

A flexible, transaction processing system is described
which permits point-of-sale electronic checking events to be
conducted in a "paperless" manner thereby eliminating the
necessity of a service subscriber accepting or processing
commercial bank drafts ("paper" checks) otherwise pre-
sented by consumer's in payment for goods or services.

6,164,528

17

Individual Transaction Events are submitted to the system's database for approval in an automated manner and, where "Approved", captured for electronic settlement. Thus, consumer payments initiated from a service subscriber's point-of-sale are electronically debited against the banking account of the consumer and credited to the designated depository account of the service subscriber. Among the numerous advantages of the current invention, consumers are provided access to their banking account funds, but service subscribers are no longer required to accept or process commercial bank drafts ("paper" checks). Transaction Events captured by the system are settled electronically by the submission of credit and debit notations through the facilities of the ACH network or any competing network. Departures from the proposed system, especially with respect to modifications to the system's service types or the point-of-sale equipment employed, will be apparent to those skilled in the art without departing from the spirit of the invention as described. For example, variances in service type such as "ECK," "RCK," "Check Truncations," and "Electronic Check Presentment" which enables Electronic Checking events to be processed from a merchant's point-of-sale system are also contemplated by the present invention.

What is claimed is:

1. A checkwriting point of sale system comprising:

(a) a point of sale terminal adapted to receive consumer bank account information from any bank check;

(b) the point of sale terminal further adapted to receive consumer bank account information from a consumer communicating with the point of sale terminal over the Internet;

(c) a central computer system;

(d) first communications means integral to said point of sale terminal for electronically communicating with the central computer system;

(e) memory means integral to said point of sale terminal for temporarily storing the consumer bank account information;

(f) the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; and

(g) the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the bank check as a negotiable instrument.

2. The checkwriting point of sale system of claim 1 wherein the pont of sale terminal is further adapted to print activity reports of transaction events occurring at the point of sale terminal.

3. The checkwriting point of sale system of claim 1 wherein the point of sale terminal is further adapted to annotate the bank check that is used at the point of sale terminal to provide the consumer bank account information.

4. The checkwriting point of sale system of claim 1 wherein the consumer bank account information provided by the consumer over the Internet originates from network computers (NC's).

5. The checkwriting point of sale system of claim 1 further comprising means for service subscriber activation.

6. The checkwriting point of sale system of claim 5 wherein the service subscriber activation means is a personal computer.

18

7. The checkwriting point of sale system of claim 5 wherein the service subscriber activation means is an electronic cash register.

8. The checkwriting point of sale system of claim 1 further comprising means for biometrically verifying the identify of the consumer connected to the point of sale terminal.

9. The checkwriting point of sale system of claim 1 further comprising a smart card reader connected to the point of sale terminal for input of the consumer's bank account information.

10. A checkwriting point of sale process comprising:

(a) presenting a bank check specimen to a point of sale terminal located at a merchant or service provider;

(b) reading a magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument;

(c) storing the consumer bank account information obtained from the check and verifying that account numbers were accurately read at the point of sale terminal;

(d) providing transaction event information to the point of sale terminal;

(e) transmitting the transaction event information and consumer bank account information to a central computer system;

(f) storing the transaction event information and consumer banking account information;

(g) subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations; and

(h) returning the bank check specimen to the consumer.

11. The checkwriting point of sale process of claim 10 further comprising:

annotating the bank check specimen before returning the bank check specimen to the consumer.

12. The checkwriting point of sale process of claim 10 further comprising:

receiving and retaining a consumer's social security number.

13. The checkwriting point of sale process of claim 12 further comprising validating the social security number against those numbers issued to individuals reported as deceased.

14. The checkwriting point of sale process of claim 12 further comprising cross-searching a known checkwriter database to verify the status of all of the consumer's banking accounts.

15. The checkwriting point of sale process of claim 14 further comprising sending an approval message to the point of sale terminal if the consumer's banking account status is approved for the transaction.

16. The checkwriting point of sale process of claim 15 further comprising by-passing the approval process;

capturing and logging the transaction event; and

electronically settling the transaction.

17. The checkwriting point of sale process of claim 14 wherein the cross-searching further comprises conducting a "velocity check" of the consumer's expenditure to avoid fraud.

18. The checkwriting point of sale process of claim 10 further comprising performing a "velocity check" on the merchants sales activity to avoid fraud.

* * * * *