# EXHIBIT  6

US006283366B1

(12) **United States Patent**
Hills et al.

(10) Patent No.: **US 6,283,366 B1**
(45) Date of Patent: ***Sep. 4, 2001**

(54) **CHECK WRITING POINT OF SALE SYSTEM**

(75) Inventors: **Robert R. Hills**, St Augustine, FL (US); **Henry R. Nichols**, McLean, VA (US)

(73) Assignee: **ChequeMark Patent Inc.**, Vancouver (CA)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/562,303**

(22) Filed: **May 1, 2000**

**Related U.S. Application Data**

(63) Continuation of application No. 08/775,400, filed on Dec. 31, 1996, now Pat. No. 6,164,528.

(51) Int. Cl.7 ........................................ G06R 17/60
(52) U.S. Cl. .............................. 235/379; 235/380
(58) Field of Search ........................... 235/379, 380

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,824,544 | 7/1974 | Simjian . |
| 3,845,470 | 10/1974 | Schuller . |
| 4,270,042 | 5/1981 | Case . |
| 4,321,672 | 3/1982 | Braun et al. . |
| 4,404,649 | 9/1983 | Nunley et al. . |
| 4,523,330 | 6/1985 | Caine . |
| 4,580,040 | 4/1986 | Granzow et al. . |
| 4,617,457 | 10/1986 | Granzow et al. . |
| 4,672,377 | 6/1987 | Murphy et al. . |
| 4,673,802 | 6/1987 | Ohmae et al. . |
| 4,678,895 | 7/1987 | Tateisi et al. . |
| 4,678,896 | 7/1987 | Carlson et al. . |
| 4,743,743 | 5/1988 | Fukatsu . |

| | | |
|---|---|---|
| 4,810,866 | 3/1989 | Lord, Jr. . |
| 4,823,264 | 4/1989 | Deming . |
| 4,933,536 | 6/1990 | Lindemann et al. . |
| 4,934,772 | 6/1990 | Sakuma et al. . |
| 5,053,607 | 10/1991 | Carlson et al. . |
| 5,175,682 | 12/1992 | Higashiyama et al. . |
| 6,164,528 | * 12/2000 | Hisss et al. ................ 235/378 |

FOREIGN PATENT DOCUMENTS

54-119859 * 9/1979 (JP) .

* cited by examiner

*Primary Examiner*—Harold I. Pitts
(74) *Attorney, Agent, or Firm*—Roberts Abokhair & Mardula, LLC

(57) **ABSTRACT**

A point of sale system designed to read information from a consumer's check, credit card, or manual input with a subsequent debiting of a consumer's account and crediting merchant's account for the goods or services provided. Point of sale terminals are designed to accept a form of credit card with a consumer's bank account information encoded thereon or in the alternative to read the MICR number from a consumer's check in order to verify that a consumer has an appropriate balance to conduct the transaction with a given merchant. Thereafter the transaction of that information is transmitted to a central computer system which verifies the consumer's credit worthiness and stores the transaction event information for subsequent bank reconciliation via the ACH or other competing network. The invention eliminates the need for paper checks with all bank reconciliation being accomplished electronically. The present invention also includes fraud protection provisions such as velocity controls, social security checks, and scans. The present invention has the further flexibility to differentiate between "first time" consumer usage and those limits otherwise assigned to "known" consumer accounts. Additionally, there is not need for the present system to retain the consumer's check after verification.

**28 Claims, 8 Drawing Sheets**





**FIG. 1**



**FIG. 2**



FIG. 3



FIG. 4



*FIG. 5*



*FIG. 6*



**FIG. 7**

```
                              Merchant Name
                              Street Address
                              City, ST  Zip
                              Merchant Acct #

      TIME 00:00 _M                    DATE 00/00/00
      BANK ACCT. NO. 000000000000
      TRANSIT NO.  000000000


      SALE AMOUNT                      $ 0,000.00


      TERMINAL ID  0000000000

      I herewith authorize ChequeMARK Systems
      to  electronically  access  my  designated
      checking  account for the  payment  of the
      above referenced purchase.

      Name (PRINT) _____

      Street _____

      City _____ST_____ Zip _____

      Tel. Number:  (_____) _____ — _____


      I ACKNOWLEDGE THAT RETURN FEES WILL BE
      IMPOSED SHOULD MY PAYMENT BE DISHONORED
      AND UNDERSTAND THAT IT IS UNLAWFUL TO
      AUTHORIZE PAYMENTS FOR WHICH ADEQUATE
      MONIES  ARE  NOT  AVAILABLE  WITHIN  MY
      ACCOUNT.


      X_____
          Authorizing Signature
```

## FIG. 8

Merchant Name
Street Address
City, ST Zip
Merchant Acct #

CUSTOMER BANKING INFORMATION:

BANK ACCT. NO. _____

TRANSIT NO. _____

SALE AMOUNT . . . . . . . . . . . . . . . . . . $ _____

I herewith authorize ChequeMARK Systems to electronically access my designated checking account for the payment of the above referenced purchase amount. I acknowledge that sufficient funds are available for the payment of this sale.

Name (PRINT) _____

Street _____

City _____ ST _____ Zip _____

Tel. Number: (_____) _____ — _____

I FURTHER ACKNOWLEDGE THAT RETURN FEES WILL BE IMPOSED SHOULD MY PAYMENT BE DISHONORED AND UNDERSTAND THAT IT IS UNLAWFUL TO AUTHORIZE PAYMENTS FOR WHICH ADEQUATE MONIES ARE NOT AVAILABLE WITHIN MY ACCOUNT.

X_____
Authorizing Signature

*FIG. 9*

US 6,283,366 B1

1

### CHECK WRITING POINT OF SALE SYSTEM

This application is a continuation application of U.S. patent application Ser. No. 08/775,400 filed Dec. 31, 1996 now U.S. Pat. No. 6,164,528.

### RELATED PATENTS

This application is an improvement to U.S. Pat. No. 5,484,988 to Hills et al. entitled "Check Writing Point of Sale System."

### FIELD OF THE INVENTION

This invention relates to the field of Point-of-Sale systems and more particularly to the integration and processing of purchases whereby a check or encoded card is used as the basic source of identification of the individual and of the individual's bank and whereby the bank account is debited electronically.

### BACKGROUND ART

Numerous devices exist for processing checks. For example, U.S. Pat. No. 4,933,536 to Lindemann, et al., describes a check processing device which is used together with a Point-of-Sale terminal. This particular device involves copying and taking a picture of an individual whereby a dishonored check could then be traced to the person who has offered it.

U.S. Pat. No. 4,810,866 to Lloyd. Jr., describes a check validation system again located together with a Point-of-Sale system for imprinting and otherwise physically dealing with a check.

Other systems also deal with an apparatus for handling checks at a point of sale. For example, U.S. Pat. No. 4,743,743 to Fukatsu describes one such transaction apparatus where a check is examined by a reader. U.S. Pat. No. 4,672,377 to Murhy, et al. describes a check authorization system wherein a check is imprinted with a bar code and information concerning customers which are stored in a database. U.S. Pat. No. 3,845,470 to Schuller discloses a vending system using a modified form of a check which is imprinted with identification codes, when someone attempts to use the check in purchasing goods and services, a vending operation will not place the order if information associated with the check is not valid in a particular database.

Other check-based financial systems have also been the subject of invention. U.S. Pat. No. 4,617,457 addresses an ATM or automatic teller machine form of cashing checks. Such systems create a picture of the check involved and also involves checking against a specialized database to insure that the check is a "valid" one (see also U.S. Pat. No. 4,580,040 to Granzow et al.).

Another generic category of financial systems deals with methods of handling the financial transactions apart from the physical handling of the check itself. For example, U.S. Pat. No. 3,824,544 to Simjian describes a merchant issued "check" which can be used in the purchase of goods and services and upon purchase, a specialized code is evaluated to determine if the check is being validly utilized.

U.S. Pat. No. 4,404,649 to Nunley et al. describes a document processing system which generally discloses a method of reading checks for processing a wide variety of financial documents.

U.S. Pat. No. 4,523,330 to Caine also describes a method for processing financial documents which systems also includes a Point-of-Sale terminal for generating image data

2

from checks as they are being processed. This patent is drawn principally to the actual terminal itself.

U.S. Pat. No. 4,673,802 to Ohmae et al. describes a central processing system having stored data relating to the counts of users. Users are approved or disapproved at the Point-of-Sale based upon information in the database.

U.S. Pat. No. 4,270,042 to Case discloses a point of sale system that requires a consumer to prepay a sum of money into a special account that is accessed only by the system. This amount is inscribed on the card, and when a transaction made using the system, the amount of the transaction is punched out of a designated area on the card. This amount along with a signature and other information, is supplied on a draft negotiable instrument, which is given to the merchant at the time of the transaction. Thus, the Case system does away with the use of bank checks in effecting the transaction, but requires the use of specialized prepaid draft negotiable instruments that must be surrendered to the merchant.

U.S. Pat. No. 4,823,264 to Deming discloses a home banking system that can be used to transfer funds to different payees in satisfaction of debts incurred through previous purchases, use of utilities, etc. The system is consumer driven; that is, it is contemplated for use by the payor on a home personal computer. While the Deming system does away with the use of bank checks, account and other information must be keyed into the system. The Deming system cannot be used to read account and other information directly from an ordinary bank check and has no use for bank checks as instruments other than negotiable paper. Further, the Deming system cannot be used to transfer funds at the time of purchase and is not workable at the point of sale; the system can only be used to pay debts that have been incurred in the past and have accumulated.

Finally, U.S. Pat. No. 4,678,896 to Carlson et al. describes a Point-of-Sale system whereby an apparatus is provided to secure the processing and imprinting of checks.

All of these above patents deal with the specific problem of how to accept a check from a customer for the purchase of goods and services. They do not in any way address the subsequent processing of checks nor do they address the process by which checks are cleared through the normal automatic check handling clearinghouse operations that exist in the financial world. Thus, the interaction of these systems with the automated clearing house ("ACH") process is not addressed in any way. This is particularly important since if any Point-of-Sale check handling system is to interact with the ACH mechanism it must adhere to that processing scheme and must lend itself to use with a processing scheme.

Further, some of the currently used systems described above require the use of a bank check as a negotiable instrument which must be surrendered to a merchant. Some of the systems do away with the use of a bank checks altogether, but require a debit card or a specialized draft instrument to be used only with the particular system. None of these systems completely does away with the need and use for a negotiable draft instrument while using the consumer's bank check for identification and verification only. That is, current technologies such as check truncation, electronic check presentment and representment all require a consumer's initial issuance of a "paper" check. It is therefore an objective of the present invention to provide such a system.

It is an objective of the present invention to be adaptable for use with the ACH system and to be smoothly incorpo-

3

rated into it. In this fashion, the present invention will immediately be useful for a much wider range of financial transactions above and beyond those contemplated and disclosed in the background references discussed above.

## SUMMARY OF THE INVENTION

The present invention comprises a process and apparatus which may be employed for the purpose of effecting payments for point-of-sale purchases of goods and services paid from consumer funds secured in bank checking or depository accounts. Each sale or "Transaction Event" would be an electronic and "paperless" event thereby eliminating reliance on accepting and processing commercial bank drafts (personal or corporate checks) and the physical handling of those bank drafts thus replacing commercial bank drafts at the point-of-sale.

In contrast to known systems, the present invention is a merchant driven system that can be used to process a transaction at the point of sale and at the time of purchase. The system is intended to be made available to subscribing merchants, businesses, and individuals herein referred to as "system subscribers" wishing to employ the method and apparatus of the present invention for the electronic processing and settlement of consumer purchases. Further, operational parameters of the present invention allow freedom from customary state or other geographically limiting criteria typical when accepting and processing "paper" checks. The system is designed to act with the national authorization networks and the electronic settlement network known as the ACH system as regulated by the National Automated Clearing House Association ("NACHA") or other comparable systems including but not limited to ECCHO, the Cactus Switch, First Tennessee Bank, regional networks, the VISA network, and others. The present invention contemplates Transaction Events processed in a manner hereinafter referred to as "Electronic Checks" or "Electronic Checking."

The system is designed to perform in a fully automated manner enabling each Transaction Event to be processed by a system subscriber as a point-of-sale transaction in the presence of the consumer. Subsequent to a Transaction Event's being "Approved", funds are debited from an authorized consumer account for credit to the system subscriber, and electronic settlement by ACH deposit of the transaction amount to the subscriber's designated depository account. Authorized access to consumer accounts and credits to system subscriber depository accounts are performed as "Off-Line" transactions by means of Electronic Funds Transfer ("EFT") through the ACH Network or through the Federal Reserve System. "On-Line" transactions are also contemplated by the present invention once national networking and other present and proposed support mechanisms have become functional.

The present invention comprises a point-of-sale processing system having electronic data processing equipment which supports various individual service selections or transactions types each of which provide automated, electronic processing from consumer bank checking or depository accounts in payment of goods or services incurred at a system subscriber's point-of-sale. It is the objective of the present invention to automate the point-of-sale environment for processing consumer purchases of goods and services would customarily necessitate the more traditional acceptance and processing of commercial bank drafts (personal and/or corporate checks). Individual Transaction Events are administered under the system of the present invention by

4

initiating a terminal authorization inquiry and continuing through the electronic settlement of funds representing the Transaction Event. As a result of the above procedure, approved consumer banking accounts are debited and system subscribers' designated depository accounts are credited.

It is a further objective of the present invention to eliminate the need for "paper" checks as an accepted means of consumer payment. In the place of personal and business checks, consumers would be provided greater access to funds secured in bank accounts to effect purchases initiated from the point-of-sale. System subscribers electronically communicate with the data center of the present invention for individual Transaction Event authorizations which, upon reconciliation of a day's activity, result in an EFT processed by means of the Automated Clearing House accommodating an "Off-Line" or "On-Line" debiting of preauthorized consumer Transaction Events from approved accounts. Thereafter, each system subscriber is credited with the total of all such daily authorized Transaction Events to its designated bank depository account. The present invention also accommodates paper transactions as requested by the subscribing merchant or consumer. By way of example, transactions can be supported where the consumer prepared a "paper" check. The transaction would proceed in a fully electronic manner with the consumer retaining the "paper" check as an additional receipt.

The present invention comprises logic which allows the following services each of which, when individually performed or are combined with other services, establish a wholly unique processing medium enabling preauthorized access to consumers' checking account or bank depository reserves in payment of and settlement for purchases conducted from a system subscriber's point-of-sale.

Authorization

This service supports electronic communication from point-of-sale to the system's central computer. The data center stores positive and negative files concerning consumer accounts thereby providing accurate inquiry responses regarding the current posting status of a consumer's banking account and signaling the system subscriber that said account may be reasonably relied upon for consummating a Transaction Event (i.e., an "Approval") or, here listed as delinquent, indicating that the account may not be so relied upon (i.e., a "Denial"). The system also contemplates "On-Line" services that would also permit Fund Verification.

Check Replacement

This capability operates as an extension of Authorization enabling the system subscriber the capability of completing a Transaction Event by electronically logging the sale whereupon a Transaction Event slip will be printed or manually prepared for consumer execution at the point-of-sale. By execution of the Transaction Event Slip, the consumer authorizes the electronic processing of funds secured in his/her authorized banking count in lieu of the more traditional method of issuing personal and business checks. Funding settlement to the system subscriber would be effectuated by means of Electronic Funds Transfer via ACH, the Federal Reserve system or other competing facility as opposed to physically processing and transferring checks among banks. If preferred or requested by the subscribing merchant, the present invention would further allow for a consumer's check to be written and thereafter voided, canceled, and returned to the consumer, or, in the alternate, submitted to lock box or similar storage facilities.

US 6,283,366 B1

5

**Bank Transaction Card**

As part of this invention an "Off-Line" Debit Card is established on which is stored the information relating to the banking account from which funds representing the Transaction Event would be debited for payment to the system subscriber. This information may be stored on the card itself in encrypted or unencrypted form or may be stored in the central computer where access to such information is gained via special control characters or access codes stored on the card. Electronic authorization for withdrawal of funds from the cardholder's account and subsequent electronic settlement procedures remain essentially identical to processing under the Check Replacement service described above. Information relating to the consumer-cardholder and the appropriate banking account to be debited for a Transaction Event will be encoded upon the Magnetic stripe portion of the plastic, and terminal-readable, card. The present invention is also compatible with SMART card technology.

Thus, the overall objective of the present invention is to provide and support an alternate means for consumer payments for goods and services that operates to replace commercial bank drafts in the point-of-sale environment. Simultaneously, the present invention assures consumers greater access to and use of funds in personal or corporate banking accounts. Further, the system provides system subscribers a significantly improved prospect of collecting the underlying monies for Transaction Events, reduced time for collecting the cash receipts from Transaction Events, and a pronounced lowering of the present cost of cumbersome procedures otherwise mandated by the existing mechanisms for accepting and processing commercial bank drafts.

A further objective of the present invention is to significantly reduce the use of checks as negotiable instruments in effecting the purchases of goods or services and to provide the system's Electronic Checking Service as an equitable alternative for the consumers reliance on credit cards or cash.

**DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT**

The method of the present invention begins with the electronic capturing of consumer information at a system subscriber's location using a point-of-sale terminal and related equipment. This information is obtained in the presence of the consumer and occurs prior to any "Approval" for the Transaction Event or for the ultimate crediting of the System subscriber's designated depository account.

A Transaction Event involves a series of events initiating with a system subscriber's intent to sell goods or services, the payment for which would be finds secured in a consumer's banking account. The consumer's banking account status would first be verified by accessing the central computer files of the present invention. Verification is performed by use of an encoded, magnetic stripe card, where presented by the consumer or by input of account numbers from a consumer's specimen check. The present invention also contemplates compatibility with "SMART card" technology, whereby a consumers "ChequeMark Card" information might co-exists with other consumer data or payment options for alternate verification purposes. In addition to verifying a consumer's account, a more traditional identification of the consumer could also occur including visual examination of driver's license or similar and acceptable picture "ID", however, this is not considered part of the present invention.

For improved identification, security, and fraud purposes, the system is further capable of receiving input of a con-

6

sumer's Social Security Number and retaining the same for use in the approval and settlement processes. The present invention is also capable of validating a Social Security Number, screening out those numbers issued to individuals reported as deceased, and cross-searching the "known" ("Positive") checkwriter database to verify the status of all banking accounts. Cross-searching is seeking a match of the Social Security Number with any over account on which there is a return, including the account which is the subject of the current inquiry. If preferred or requested by either a subscribing merchant or the affected consumer, the consumer's check could be written and, subsequent to processing through the system of the present invention, marked as "Voided" or "Electronically Settled" and returned to the consumer. In the alternative, the consumer's check may be submitted to a lock box or other storage facility.

As an integral portion of each Transaction Event, the system subscriber's location, date and time, and requested sale amount is automatically logged into the system when a system subscriber first accesses the invention. Finally, a Transaction Event Slip ("Sales Slip") will be produced by a printer integral to the point-of-sale terminal and will be executed by the consumer in the amount of the stated purchase with inscribed language defining the Transaction Event and specifically providing consumer authorization for electronic access to his/her banking account. The consumer's specimen check is returned unused or, where written, is returned to the consumer as a receipt. Thereafter, the consumer account will be debited and the proceeds credited to the system subscriber's designated depository account along with all other similar Transaction Events representing the total of the system subscriber's daily activity. Debiting of consumer accounts and settlement deposits to each system subscriber is performed by means of Off-Line electronic funds transfer through and by the ACH or Federal Reserve System. Other competing facilities such as, but not limited to, ECCHO, Cactus Switch, First Tennessee Bank, regional networks, or the VISA network, could also utilized by the present system. The system has the further ability to convert settlement processing to an "On-Line" format which would involve services such as "Funds Verification" (Authorization) or "Reserving of Available Funds" or a combination of both.

**Equipment Configuration**

The present invention can operate with nearly every conceivable point-of-sale equipment system. The central computer system accepts data transmitted from the system subscriber's existing point-of-sale equipment or that which is added to augment service performance. The point of sale terminal of the present invention is implemented in a number of ways, most preferred, however, being activated under a fully automated format. Such a fully automated system generally comprises a dual-port terminal with magnetic stripe reading capabilities interfaced with a logging printer capable of providing individual Transaction Event Slips for consumer execution, and a MICR check reader, optical character recognition ("OCR") equipment, or other device. It is contemplated that services may also in the future be administered using the present invention with a singular point-of-sale hardware device which, as a function of its design, would incorporate all or most of the service capabilities of an integrated terminal, logging printer, and MICR Check Reading device. The present invention also anticipates supporting existing point-of-sale equipment primarily dedicated to bankcard ("credit card") processing and other equipment. Therefore, service subscriber activations may be supported under numerous means of access from the point-

US 6,283,366 B1

7

of-sale. For example, personal computers and electronic
cash registers in addition to variations of the more traditional
stand alone transaction processing equipment including
alternate POS terminal processing equipment such as International
VeriFACT and Hypercom, among others, are contemplated
for use by the present invention.

Additionally, the present invention can be interfaced with
network computers, commonly referred to as "NC's". NC's
are lower end computers for the limited use of Internet
access which are easily adapted for POS Electronic Checking
and other money transfers anticipated by the present
invention.

Communications links from point-of-sale terminals to the
central computer of the present invention will typically be in
the form of telephonic network communications over a
public switched telephone network ("PSTN") or over other
approved networks. Internet access is also supported by the
present system where access is deployed at a merchant POS
for consumer payments. Internet access may also be utilized
to process Electronic Checking inquiries from points other
than the POS to conduct Transaction Events under the
present invention between the merchant and the consumer as
a merchant-initiated payment option. As the use of personal
computers become more prevalent at the POS, utilization of
the Internet to interconnect for approvals and capture for
settlement of Electronic Checking events between a system
subscriber and an affected consumer will become more
routine. Transaction Event verification will occur as a result
of point-of-sale terminal access to the Central computer's
positive and/or negative data files. "Approved" or
"Declined" notifications are returned to the "Point-of-Sale"
device over the PSTN. All data files will be centrally located
and maintained on the invention's central computer databases.
Portions of the database include, but are not limited
to, third party data files such as the Shared Check Authorization
Network ("SCAN") (trademark) database.

Individual transactions or groupings of transactions are
first approved by soliciting an "Authorization" prior to
capturing a Transaction Event for electronic funds transfer.
To maintain an accurate status of file information for authorizations
to subscribing merchants, businesses, and/or
individuals, the system is comprised of three separate but
interactive databases, including a "Merchant,"
"Checkwriter," and "Transaction" database, which are continuously
maintained. The "Merchant" database stores
records of all service subscribers authorized to initiate
Electronic Checking requests. These records include,
amongst others, authorization and initiation codes, as well as
the system subscriber's name and address. The "Checkwriter"
database is a database of "Known" users. This
database stores information that includes, amongst others, a
status field indicating whether the Checkwriter would be
"Approved" or "Declined." Previously unseen Checkwriter
MICR strings, when "Approved", are also added to the
"Checkwriter" database for future inquiries to the system.
The "Transaction" database processes inquiries as well as
stores the transaction records of "Approved" responses for
formatting and electronic settlement through the ACH or
similar facility. Current card holder or checkwriting records
are updated daily and instantly available for point-of-sale
inquiry for Transaction Event authorizations.

System subscribers point-of-sale equipment is interfaced
to the central computer of the present invention by means of
a telephonic network which is able to support communication
from a plurality of point-of-sale terminals. Programming
of the point-of-sale terminal causes an automatic
'Dial-Up' to the central computer and provides an automatic

8

query and response sequence affirming or denying the
Transaction Event. Each Transaction Event which is
"Approved" is captured for electronic settlement within the
transaction database log of the present system. The addition
of local entry hubs may be installed to better facilitate the
speed or economics of communications with the data files.
Alternatively, the use of satellite or cellular communications
or enhanced radio transmissions instead of telephonic networks
may also be used. Similarly, the system's data files
and associated Check Replacement Service are contemplated
to be responsive to emerging point-of-sale devices
intended to seek authorizations and/or improved consumer
identification and security by the alternate means of voice
pattern recognition, POS fingerprint identification, retina
scan, geometrics, biometrics, "smart" chips, consumer or
check imaging and/or signature broadcasting. The present
system further contemplates use of imaging technology as
an enhancement to facilitate POS consumer identification
and electronic settlement for "Approved" Transaction
Events. Imaging technology comprises capturing an impression
of a consumer's check or a "signature capture" followed
by electronic settlement of the consumer's account.

The present system further comprises extensive system
approval and fraud prevention capabilities. The system
processes Transaction Events under a variety of different
service types, each defined at the discretion of the system
subscriber. The resulting flexibility enables the merchant to
respond to his/her relative "comfort level" with a particular
Transaction Event or consumer. Typical service types
include (i) "Access Only" wherein the inquiry bypasses the
present system's approval criteria but the Transaction Event,
including all consumer account information, is automatically
captured and logged within the transaction database for
an electronic settlement attempt; (ii) "Check Replacement"
which seeks the systems transaction "approval" and, where
"Approved", captures the Transaction Event for electronic
settlement; (iii) "Card Acceptance" which operates in a
manner virtually identical to "Check Replacement" as mentioned
above, but the Transactions Event is activated
through the use of an encoded card (versus a specimen
check); or (iv) "Authorization Only" which seeks the system's
approval providing a system subscriber information
regarding the reliability of a subject consumers account, but
does not capture the Transaction Event for electronic settlement.
In the "Access Only" service type, "Access Only"
events bypass the database records and all other approval
and search criteria such as those explained below, e.g.,
velocity controls, social security checks, and scans. It is
contemplated that these "Access Only" events always be
"Approved" and passed immediately to a settlement log for
an attempted consumer debit and service subscriber credit.

The present invention has the additional capability to use
a consumer's Social Security Number to perform a variety
of identification and fraud preventative applications prior to
issuing an "Approved" message for the Transaction Event.
These include searches employing Social Security Number
first to validate the consumer's Social Security Number as a
genuinely issued number. Second, the system cross searches
the system's "Dead File" to screen out Social Security
Numbers which, while validly issued, were issued to individuals
now reported as deceased. To a greater extent,
verification and "Dead File" searches deter access by consumers
attempting to use false identification. Lastly, the
present system utilizes Social Security Numbers to cross
search all "Known" checkwriter banking account records for
negative information before issuing an "Approved" message
for the subject Transaction Event. This capability more fully

9

insulates the system and its system subscribers from abuse and susceptibility to repeat abusers who would commonly seek to process Transaction Events from a multiplicity of banking accounts.

Entry of a consumer's Social Security Number is performed by input of the number from the keypad of a POS terminal used to process Transaction Events. Alternately, the system also supports the use of a pinpad or similar device, interfaced with the POS terminal, for consumer entry of a Social Security Number. This capability supports a consumer's preference for complete privacy as to the entry of pertinent information. Consumers accessing the system by means of a previously issued encoded card will have already logged their Social Security Numbers onto the system's database, and, therefore, would not be required to re-enter their Social Security Numbers or other pertinent information.

The present invention is also equipped with velocity controls which regulate approvals within prescribed purchase limits imposed upon either the system subscriber or a consumer. The present invention has the further flexibility to differentiate between "first time" consumer usage and those limits otherwise assigned to "known" consumer accounts. Merchant variations in velocity limits can also be imposed depending upon the type, nature, and consumer purchasing statistics for a particular merchant category or location.

Inquiries seeking an "Approved" response for a Transaction Event which meets all other criteria of the system's approval process, including velocity controls, and when involving previously unknown banking accounts but carrying verified Social Security Numbers which have revealed no negative information following a cross search of the database and where the numbers are also not entries in the "Dead File", are "Approved". Consequently, each consumer's banking account and Social Security Number, along with other information, is automatically logged into the "Known" checkwriter database of the present invention at the time the "Approved" response is transmitted to the inquiring POS terminal. In addition to other identification and fraud preventative measures, the system's access to Social Security Numbers significantly improves settlement features relating to matters of proper authority when "Approved" and captured Transaction Events are transmitted to the consumer's financial institution for settlement in the form of electronic debit and credit notations.

The system further contemplates other fraud and enhanced identification capabilities. These include, but are not limited to, reliance upon such evolving technologies as fingerprint capture and analysis, signature capture and verification, imaging technology, retina scan, biometrics, and other forms or manners of improved identification practices as such either currently exist or as such may, upon further development, be readily integrated in to the system of the present invention.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1—System overview of the present invention
FIG. 2—The point-of-sale equipment
FIG. 3—The Central Computer System
FIGS. 4–7—The Process Data Flow
FIG. 8—transaction Event Sales Slip
FIG. 9—manual Transaction Event Sales Slip

DEFINITIONS

For purposes of the description and claims relative to the system of the present invention, the following terms shall

10

have the meanings set forth below. The following definitions are applied throughout this application.

Card Acceptance:

A service sponsored by the present invention which enables an encoded card to be utilized to access the central computer and thereby denote the subject consumer banking account to be electronically debited in a point-of-sale Transaction Event.

Authorization Only:

A service made available under the present invention as a convenience to its service subscribers where the subscriber can verify the current status of the subject consumer's account. In the preferred embodiment, these events are not captured for electronic settlement.

Check Replacement Service:

This is a service sponsored by the present invention which enables a consumer's specimen ("paper") check to be utilized to access the central computer of the present system thereby denoting the consumer banking account to be electronically captured and settled by presenting a debit notation through the facilities of the ACH, or other competing service, for a purchase conducted from a system subscriber's point-of-sale.

Access Only:

This is a service sponsored by the present invention which enables a consumer's specimen ("paper") check to be utilized to access the central computer of the system thereby denoting the consumer banking account to be electronically captured and settled by presenting a debit notation through the facilities of the ACH, or other competing service, for a purchase conducted from a system subscriber's point-of-sale.

Electronic Checking:

This is a service sponsored by the present invention which collectively enables a system subscriber to electronically debit funds from the consumer's bank account and credit to those funds to the system subscriber's account utilizing various transaction methods and banking rules as envisioned above.

DESCRIPTION OF THE PRESENT INVENTION

Referring to FIG. 1 an overall schematic of the present invention is described. Point-of-sale terminals 300 communicate over normal PSTN telephone lines with a central computer system 302 which in turn communicates with a Banking institution 304 for purposes of debiting consumer accounts and crediting system subscriber accounts. The banking institution performs its function via normal automated clearing house ("ACH") transactions 366 or other competing facility as mentioned above. Alternatively, the system can automatically generate preauthorized drafts to debit consumer checking accounts where more expeditious in settling a particular Transaction_Event. This manner of settlement particularly addresses the "first-time" consumer whose account might otherwise require pre-notification preceding the processing of a "live" debit event. Pre-notification is to become volitional in 1996 which, when effective, will minimize the present system's reliance upon or use of drafts as a mechanism for settling consumer payment requests.

Referring to FIG. 2 the point-of-sale equipment is described. The point-of-sale terminal comprises several different entry means. A key board 310 can be used to input consumer information manually, including both bank routing and consumer account information. The key board 310

11                                                          12

allows the system subscriber to input information such as (i) electronic checking requests, (ii) a void procedure for incorrect, returned, or canceled events, (iii) a preauthorization inquiry for the status of consumer accounts, and (iv) accessing system subscriber's daily activity reports. Alternatively a card reader 312 can be used whereby the magnetic strip on the card is read by the point-of-sale terminal to obtain account information and finally a check reader 314 may alternately be included to read the MICR encoded bank and account numbers which appear on a consumer's specimen check as a substitute for either a specific card or key board input. These various input means provide information to a microprocessor 316 which comprises logic means 318, memory means 320, and communication means 322. The logic means 318 comprises logic which allows the information received from the various input means to be processed and stored in the memory 320. The logic means further drives a display 324 which provides a visual output of the bank and account numbers of the consumer for verification. The communication means 322 allows the subscriber terminal to communicate with the central computer 302 for purposes of processing the consumer's purchase. The communications means 322 is compatible with ECR and PC systems.

Referring to FIG. 3 the central computer system 329 is described. The central computer system receives input from a plurality of point-of-sale terminals which provide transaction information from a system subscriber and a consumer desiring to purchase goods or services. The central computer system comprises a system subscriber 330 file which is a file of those merchants who have elected to use the present invention for processing purchases. The system subscriber 330 comprises the "Merchant" database which, as previously stated, stores records of all service subscribers authorized to initiate Electronic Checking requests, including authorization and initiation codes, and the system subscriber's name and address. The central system also comprises known consumer file 332 which stores the account information and names of those consumers who have already been approved for purchases to take place through various input means. The consumer file 332 comprises "Checkwriter" database. Additional databases are relied upon by the system which assist in approving consumer Transaction Events including, but not limited to, the SCAN (Trademark) database, MOD-10 verification, Social Security Number database, and other proprietary screening criteria which serve to approve, decline, or reject, the latter serving to cancel those inquiries which are inaccurate, incomplete, or contain fraudulent data received by the central computer. The "Transaction" database is another such database provided by the system.

The system of the present invention further comprises a third database defined as a transaction database which stores all activity that is conducted between the plurality of terminals and the central terminals. Those inquiries captured for a settlement attempt are converted by the system for ACH file for preparation and settlement. Inquiries either "DECLINED" or for various reasons rejected are similarly retained by the transaction database. The "DECLINED" or other rejected inquiries are withheld from transfer for settlement.

The computer system also comprises a communications means 334. The communication means is capable of communicating with other external, third party databases to allow the system access to review additional negative records regarding the consumers' banking account prior to issuing an "Approved" response. Once an "Approved"

response is given for a Transaction Event involving a consumer banking account previously unknown to the system, the newly "Approved" consumer record is automatically added to the system's checkwriter database. This new record allows for the entry of the consumer's new address and phone number information.

As presently configured the central computer 329 already houses the third party database known as the SCAN (trademark) database 333 resident on the central computer. Thus credit worthiness can be checked using all current database criteria searches, and further benefit by immediate access to the records from the SCAN (trademark) database. All databases, including proprietary databases and SCAN (trademark) databases, are updated daily.

The communication means 334 also transmits ACH files which are created by the system and communicated with a banking institution 338, including instructions for the bank to debit the account of the consumer and credit the account of the system subscriber (merchant), with the amount of the purchase. These transactions are then settled via the "Off-Line" ACH transaction process. The system of the present invention also contemplates the use of "On-Line" settlements.

Referring to FIG. 4 the process begins by a consumer presenting an encoded card or a specimen or "blank" check complete with MICR number to the system subscriber (the merchant) 100. The subscriber begins the process by first pressing the appropriate key on a terminal to select a particular service prior to accessing the host computer 108. Thereafter the point of sale terminal prompts the system subscriber to enter the appropriate MICR number 110. The system subscriber then enters the appropriate MICR number either manually or by passing the card through a magnetic stripe reader on the terminal or the specimen check through a check reader which determines the consumer's bank and account numbers 112.

Referring to FIG. 6 the subscriber would verify that the numbers appearing on the terminal's display screen match the numbers on the encoded card or the MICR numbers on a consumer's check 114. If the numbers do not compare with that of the terminal the system subscriber clears the terminal and begins the transaction process again 118. If the process is to be reinitiated, the subscriber enters the MICR or card number(s) into the point of sale terminal 130. Thereafter the system subscriber compares the numbers as before 132. If the numbers compare to the system display 134 the process proceeds. If the numbers do not compare 136 the check or card is returned to the consumer and the process terminates 137.

Upon a successful reading of a consumer's specimen check, the check is number embedded thereon id also captured and, once communicated to the System Central Computer, retained for future reference purposes or security matters, such as consumer inquiries or verification of proper authority. Access to the check number proves critical when performing a sequence review to resolve such matters.

Referring to FIG. 5, if the verification process proceeds, the terminal next prompts the system subscriber to enter the amount of the sale 122 and other security or identification information required. The subscriber enters the amount of the sale along with requested information 124 and the terminal thereafter transmits an inquiry to the host database for verification 126.

The check or card approval process next takes place 128. If the inquiry is not approved by the central computer the terminal displays a message declining or rejecting the trans-

US 6,283,366 B1

13

action 140. Thereafter, printer record of the declined or rejected transaction is made for purposes of the system subscriber 142 to comply with the Fair Credit Reporting Act and Regulation of the Board of. Governors of the Federal Reserve System.

If the card or check is approved, the terminal displays a message noting the approval 138 and the specimen card or check is returned to the consumer. The printer further makes a paper record of the transaction 142 and the consumer places any required information on the paper receipt and signs the receipt expressly authorizing the transaction 144. At the election of the system subscriber, or at the request of the consumer, the consumer may write s the check which would then be stamped "Void" or "Electronically Settled" and thereafter returned to the consumer or submitted to lock box or other storage facilities. This procedure is used for security measures or where fraud and/or database searches (which rely on the cancellation of a specimen check) are contemplated.

Referring to FIG. 7, the process description continues. Once the transaction is "Approved", the central computer makes a record of the MICR information and other data captured at the point-of-sale, including the sale amount, permanently storing all the information 146. Upon closeout of a terminal's batch of daily Transaction Events by a system subscriber, the system's central computer reformats the captured activity within its transaction database to ACH format and thereafter, at regular intervals, transmits all of the daily batch activity for every system subscriber into the ACH network as debit and credit notations. The central computer subsequently generates a batch message regarding all Transaction Events for the prior period and transmits all the Transaction Event information for the day into the ACH network 148.

During the ACH process each Checkwriter's account is debited for the exact purchase amount 150. Thereafter, collected funds representing the total of a day's activity, being the aggregate of all Transaction Events processed for consumers by the system subscriber, are deposited into a subscriber's designated account 152. The transaction is then complete 154.

How to Use

The present invention will require the establishment and maintenance of three interconnected but separate data files for the purpose of performing access searches. The system embodied by the present invention, and the interactive databases comprising the system, are accessible by dial-up communication procedures from point-of-sale ("POS") terminal devices, electronic cash registers, and/or personal computers similar to the equipment utilized in the processing of automated bankcard ("credit card") receipts. The terminal prompts an operator/user to process one of four optional inquiry types. Any one or all of four primary functions are capable of being performed at a single point-of-sale terminal within the control of the system subscriber. The inquiry types and database responses for "Approved" Transaction Events are as follows:

Card Acceptance

Having depressed the assigned key and thereafter being prompted, the system subscriber "slides" an encoded magnetic stripped transaction card through the point-of-sale terminal and enters the "Sale Amount" requested for authorization. Thereupon, the terminal's dial-up capabilities direct the inquiry to the central computer for authorization against "KNOWN" (Positive and Negative) file of current cardholders). Inquiries where a "POSITIVE" "Match" are found and where the cardholders' status fields are listed in

14

"good standing" cause an "Approved" return message from the data file to the inquiring POS terminal. In order to accomplish this the present invention's database captures each new MICR string for future reference. Embedded within the data record is a notation identifying the "Status" for that account. In this manner, if a certain signal is generated, for instance a "Y", then the account would be "Approved" for future access to the system. Conversely, a "No-Match" to inquiry or a "Match" where the cardholder's status field were listed in "bad standing" would result in a "Declined" notice to the POS terminal. Daily input to the system for the present invention causes automatic updating of status fields for all cardholder files including the activation of new cardholder accounts, the placement of corrective status entries ("Positive" or "Negative") into the status of existing cardholder files, deletion of terminated accounts or to change other file status in existing accounts. In the case of a "NoMatch" the system of the present invention would generate a different signal such as a "No" and the "Account would be "Declined" upon an attempt to access the system.

Authorization Only

Having depressed the assigned key and thereafter being prompted, the system, subscriber manually enters account numbers from a personal or business check or, where fully automated, enters a specimen check through a MICR Check Reader device interfaced with the terminal, whereupon the terminal's screen would display the check's bank and account numbers for verification. Thereafter, the operator would enter the "Sale Amount" and other security or identification information requested for authorization. The terminal's dial-up capabilities then direct the inquiry to the computer data file center for authorization first against the "Known" file of checkwriting records whereupon the current status field is verified. A successful "Match" to an inquiry, where the current status field lists the checkwriter record as in "good standing", would result in an "Approved" notice from the central computer to the inquiring terminal. Conversely, a successful "Match" to an inquiry, where the current status field lists the checkwriter record as not in "good standing", would result in a "Declined" notice from the central computer ti the inquiring POS terminal. Each inquiry preliminarily resulting in a "No-Match" (first time user) when processed against the system's "Known" checkwriter's database would then be passed through any and all available third party databases which reside on or are available to the system by external link preceding any return notice to the inquiring terminal. This third file is anticipated to be the Shared Check Authorization Network ("SCAN") a negative database currently maintained in the system computer data file center or other databases.

Check Replacement Service

Inquiries initiated as Checked Replacement inquiries are first processed through the system's "Known" checkwriter database and, as necessary, thereafter proceed to the SCAN database, or other database files, prior to the issuance of an "Approved", "Declined", or a rejection message to the. inquiring POS terminal. A "Match" in the system's checkwriter database records indicates a consumer account which is "Known" to the system. If a "Match" is found and where the checkwriter's status field within the database is listed in "good standing", an "Approved" response results. Conversely, a "Match" where the checkwriter's status field were listed in "bad standing" would result in a "Declined" notice. Reliance upon account information available from SCAN or any other positive or negative databases minimizes the risk associated with the system's approval of Transaction Events involving consumer accounts which are previously

US 6,283,366 B1

15

"Unknown" to the invention's proprietary "Known" check-writer database. A Match" in the SCAN "NEGATIVE" file would result in a "Declined" response to the inquiring terminal. Where a "No Match" should occur, and subject to the receipt of no other negative information received from the system criteria searches or from alternate databases, the event would be "Approved" as a "first-time" consumer user. Negative information received from SCAN or the rejection of the Transaction Event for other reasons would result in a "Declined" or one of various reject responses to the POS terminal. Daily input to the system of the present invention causes automatic updating of all checkwriter records and the placement of corrective entries ("Positive" or "Negative") into the status fields of existing checkwriter files. Each newly captured, but previously "Unknown" accounts, would, subsequent to an "Approved" notice, be automatically entered into the system's "Known" checkwriter file. Check Replacement Transaction Events are captured by the system and logged within its transaction database. The total of daily, "Approved" Transaction Events are "paperless" sales whereby the service subscribing merchant has submitted requests for electronic debit via the ACH network, or other competing facilities for each such authorized consumer purchase. Commercial bank drafts ("paper" checks) are not accepted or processed by the service subscriber. For each "Approved" Transaction Event, a "Sales Receipt" is manually prepared or is automatically printed at the point-of-sale. The consumer provides express authorization for an electronic debit by signing individual sales receipts.

Access Only

Access Only Transaction Events are processed in essentially the same manner as Check Replacement events with one significant variance. Access Only events bypass the authorization criteria within the system's central computers established for approving Check Replacement events and are automatically captured within the system's transaction database for a settlement attempt. All other functionality aspects of an Access Only and a Check Replacement Transaction Event remain identical.

All terminal programming and all prompt strings for MICR Check Reader interfacing are stored in the POS terminal and the computer center of the present invention controls interactions between the plurality of terminals and the central system. The following modules are present.

Programming for POS Equipment Interface

system subscriber locations to be activated with the present invention must possess or acquire a Tranz (trademark) 330 or higher grade terminal or alternate terminals, personal computers, or approved electronic cash registers supporting interface capabilities with a MICR check reader.

The MICR check reader interface results in the reading and transmitting to a terminal, in accepted format, of the consumer's entire ABA/Transit, checking account, and specific check number information which when combined with other data keyed directly into the terminal results in a query to the system's central computers. Subsequent to a terminals receipt of the banking account numbers, the terminal's will display the numbers on its screen allowing the operator to verify the accuracy of the captured "read" prior to proceeding. If the consumer's account numbers are correct, the Transaction Event may proceed, or, where incorrect, the operator can "clear" the event and resubmit the consumer's specimen check through the check reader. Alternately, the consumer's bank and account numbers and other requested information may be manually entered directly into the terminal with all other financial and operational advantages of the present invention remaining in effect.

16

The computer data file center receives and processes Transaction Event authorization requests utilizing the entire MICR string for accurate, error-free identification of both the consumer bank and a specific checking or depository account to participate in a sale. ACH settlement criteria mandate exact recall for the bank and checking account numbers to properly complete any debit request. This invention conforms to each and every requirement of the ACH transaction regulations including all pending guidelines and/or proposals and rules changes regarding processing requirements or new classification or submittal types.

The present invention assigns a unique identifier(s) for purposes of accurately identifying individual MICR accounts and Transaction Events. To this end, each new event captured on the "Checkwriter" database is consecutively assigned a unique 15 character account number, checkwriter. This unique same checkwriter identifier is thereafter printed on future receipts for subsequent transactions processed.

Additionally, upon entry of media information from one receipt, an additional code, such as a sixteenth character, is automatically assigned by the present invention. The sixteenth character indicates that the subject MICR account is "known" and "registered" on the system, thereby alleviating the need to supply a Checkwriter's name, address, and phone number on subsequent transaction receipts.

A second unique identifier is assigned to distinguish an individual Transaction Event approved by the system. For purposes of settlement, or other inquiries, this numerical identifier may be employed to recover all salient information pertaining to the Transaction Event, Checkwriter, and the service subscriber. It is also contemplated that under certain circumstances, the check number can be used in lieu of a unique identifier to effect settlement and credit of the Transaction Event Both identifiers (i.e., Checkwriter and event) are retained by the system and printed on the customer's transaction receipt. Moreover, the unique identifiers' satisfy the requirements for the preparation and submittal of electronic debit and credit notations through the ACH in conformance with Federal regulations.

Each Transaction Event is completed with the logging printer generation of a Transaction Event ("Sales") Slip for each "Approved" authorization inquiry processed (FIG. 8). Alternatively, a manually created Transaction Event slip can also be prepared (FIG. 9). Each such Transaction Event Slip must be exacting in its retention of account numbers and the sale amount enabling both the consumer and system subscriber to be provided "hard copy" receipts of the event. Also included would be a clear printing of the transaction type; "Card Acceptance," "Authorization Only"(as appropriate), "Check Replacement," or "Access Only". Authorization language is printed immediately preceding the consumer's signature line specifically authorizing electronic access in payment of the requested transaction sale amount.

Instances will arise where previously "Approved" Transaction Events will require the operational equivalent of a "Void" or "Credit" procedure. The system of the present invention enables communication by a service subscriber with the central computers to effect such corrective adjustments to prior events. By way of example, a "Void" may be initiated by depressing the assigned key on a service subscriber's POS terminal and, once complying with security prompts, the POS terminal will thereafter communicate with the system's central computers and make such requested corrections. In the event of a "Voided" Transaction Event, a separate "Voided" slip will be automatically printed as a permanent record.

17

In addition to the primary functions for POS equipment programing, each POS terminal/MICR interface processing location is capable of generating printed activity reports. Activity reports can be printed in either summary or detail formats identifying all "Approved" Transaction Events by service type, approval number, and amount. Reports further provide the total number of events "Approved" and the total captured amount of consumer payments contained within the activity report. Events which were previously recorded on the system's central computers as "Approved" but which have been subsequently "Voided" are also identified, including detail of the originally "Approved" events, with the amount of such "Voided" events deleted from the activity report's total for the captured amount for all Transaction Events.

### SUMMARY

A flexible, transaction processing system is described which permits point-of-sale electronic checking events to be conducted in a "paperless" manner thereby eliminating the necessity of a service subscriber accepting or processing commercial bank drafts ("paper" checks) otherwise presented by consumer's in payment for goods or services. Individual Transaction Events are submitted to the system's database for approval in an automated manner and, where "Approved", captured for electronic settlement. Thus, consumer payments initiated from a service subscriber's point-of-sale are electronically debited against the banking account of the consumer and credited to the designated depository account of the service subscriber. Among the numerous advantages of the current invention, consumers are provided access to their banking account funds, but service subscribers are no longer required to accept or process commercial bank drafts ("paper" checks). Transaction Events captured by the system are settled electronically by the submission of credit and debit notations through the facilities of the ACH network or any competing network. Departures from the proposed system, especially with respect to modifications to the system's service types or the point-of-sale equipment employed, will be apparent to those skilled in the art without departing from the spirit of the invention as described. For example, variances in service type such as "ECK," "RCK," "Check Truncations," and "Electronic Check Presentment" which enables Electronic Checking events to be processed from a merchant's point-of-sale system are also contemplated by the present invention.

What is claimed is:

1. A checkwriting point of sale system comprising:

a point of sale terminal adapted to receive payer bank account information from any bank check;

a central computer system;

first communications means integral to said point of sale terminal for electronically communicating with the central computer system;

memory means integral to said point of sale terminal for temporarily storing the payer bank account information;

the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; and

the central computer system second communication means enabling said central computer system to communicate with external databases for performing a payer bank account status search and further enabling communication with an electronic funds transfer system for transferring funds without using the bank check as a negotiable instrument.

2. The checkwriting point of sale system of claim 1 wherein the pont of sale terminal is further adapted to print activity reports of transaction events occurring at the point of sale terminal.

3. The checkwriting point of sale system of claim 1 wherein the point of sale terminal is further adapted to annotate the bank check that is used at the point of sale terminal to provide the payer bank account information.

4. The checkwriting point of sale system of claim 1 wherein the payer is selected from the group consisting of consumers and businesses.

5. The checkwriting point of sale system of claim 1 further comprising means for service subscriber activation.

6. The checkwriting point of sale system of claim 5 wherein the service subscriber activation means is a personal computer.

7. The checkwriting point of sale system of claim 5 wherein the service subscriber activation means is an electronic cash register.

8. The checkwriting point of sale system of claim 1 further comprising means for biometrically verifying the identify of the payer connected to the point of sale terminal.

9. The checkwriting point of sale system of claim 1 further comprising a reader selected from the group consisting of MICR readers, OCR readers, magnetic stripe debit card readers, and smart card readers connected to the point of sale terminal for input of the payer's bank account information from a check or card.

10. A checkwriting point of sale process comprising:

presenting a check to a point of sale terminal located at a merchant or service provider;

reading a magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument;

storing payer bank account information obtained from the check

providing transaction event information to the point of sale terminal;

transmitting the transaction event information and payer bank account information to a central computer system;

storing the transaction event information and payer banking account information; and

transmitting the transaction event information to a bank for electronic funds transfer from the payer bank account of funds sufficient for the transaction event.

11. The checkwriting point of sale process of claim 10 further comprising disposition of the check by one of the group consisting of: returning a blank check to the payer returning an incomplete check to the payer, returning a completed and voided check to the payer, retaining an incomplete and voided check and retaining a completed and voided check.

12. The checkwriting point of sale process of claim 10 further comprising: receiving and retaining a payer's social security number or federal tax I.D. number.

13. The checkwriting point of sale process of claim 10 wherein the payer is selected from the group consisting of consumers and businesses.

14. The checkwriting point of sale process of claim 12 further comprising cross-searching a known checkwriter database to verify the status of all of the payer's banking accounts.

15. The checkwriting point of sale process of claim 14 further comprising sending an approval message to the point

US 6,283,366 B1

19

of sale terminal if the payer's banking account status is approved for the transaction.

16. The checkwriting point of sale process of claim 15 further comprising by-passing the approval process;
    capturing and logging the transaction event; and
    electronically settling the transaction.

17. The checkwriting point of sale process of claim 14 wherein the cross-searching further comprises conducting a "velocity check" of the payer's expenditure to avoid fraud.

18. The checkwriting point of sale process of claim 10 further comprising performing a "velocity check" on the merchant's or service provider's sales activity to avoid fraud.

19. The checkwriting point of sale system of claim 1, wherein the electronic point of sale system of claim 1.

20. The checkwriting point of sale system of claim 19, wherein the electronic fund transfer is by ACH or Federal Reserve system.

21. The checkwriting point of sale system of claim 1, further comprising printing means associated with said point of sale terminal for printing a transaction event slip authorizing the debit of funds from payer's bank account for payer execution.

22. The checkwriting point of sale process of claim 10, wherein the electronic fund transfer occurs online or offline.

23. The checkwriting point of sale system of claim 22, wherein the electronic fund transfer is by ACH or Federal Reserve system.

24. A checkwriting point of sale process comprising:
    a payer completing a check for a transaction with a merchant or service provider;

20

using a point of sale terminal associated with said merchant or service provider to read MICR information on the check to obtain payer bank account information;

inputting transaction information, including at least a transaction amount, into the point of sale terminal;

printing an authorization to debit the payer bank account by the transaction amount for the payer to sign;

the payer signing the authorization;

returning a copy of the signed authorization and the check to the payer; and

electronically debiting said payer bank account by said transaction amount based on the signed authorization, without using the check as a negotiable instrument.

25. The checkwriting point of sale process of claim 24, further comprising voiding the completed check prior to returning it to the payer.

26. The checkwriting point of sale process of claim 24, wherein the inputting of transaction information is provided by an electronic cash register.

27. The checkwriting point of sale process of claim 24, further comprising checking payer and/or account information on a database for an approval prior to printing the authorization; and

proceeding with the transaction only upon an approval.

28. The checkwriting point of sale process of claim 24, wherein the electronic debiting is performed by an electronic fund transfer accomplish by ACH or Federal Reserve system.

*  *  *  *  *

# EXHIBIT   7

# EXHIBIT REDACTED
# IN ITS ENTIRETY

# EXHIBIT  8

# EXHIBIT  REDACTED
# IN  ITS  ENTIRETY

# EXHIBIT   9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LML PATENT CORP.,

       Plaintiff,

    v.

TELECHECK SERVICES, INC.,
ELECTRONIC CLEARING HOUSE, INC.,
XPRESSCHEX, INC. and NOVA
INFORMATION SYSTEMS, INC.,

       Defendants.

C.A. 04-858 (SLR)

## JOINT PROPOSED CLAIM CONSTRUCTION STATEMENT

Pursuant to the Court's Rule 16 Scheduling Order in this matter, the Parties hereby submit the following claim charts to present their respective, proposed constructions of disputed claim terms and their proposed constructions of agreed claim terms in the patent-in-suit, namely, U.S. Patent No. 5,484,988 ("the '988 patent").

## Proposed Constructions of Disputed Claim Terms

| LML's Disputed Claim Terms | LML's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| any bank check (claims 1, 8) | Any regular check used to draw funds from a normal bank or credit union checking account | any type of check drawn on a financial institution |
| any consumer bank check (claim 9) | Any regular check used to draw funds from a normal bank or credit union consumer checking account | same meaning as the phrase "any bank check" set forth above, with the added limitation that the check be "drawn against a consumer bank account" |
| any (claims 1, 8, 9) | LML believes that this term should not be separately construed from the entire element in which it appears in the claims, namely the "any bank check" or "any consumer bank check" language construed below. In any event, this plain English term needs no construction. | one or some indiscriminately of whatever kind |
| consumer bank account information (claims 1, 2, 3, 8, 9) | Information relating to a consumer's bank account including the MICR line (magnetic ink character recognition line) | only the ABA/transit routing number and bank account number |
| without using the bank check as a negotiable instrument (claim 1) | Where the paper check is used as a source of information, and is not accepted or processed | the bank check, at no time, takes on the status of a negotiable instrument |
| without using the check as a negotiable instrument (claim 8) | Where the paper check is used as a source of information, and is not accepted or processed | the check, at no time, takes on the status of a negotiable instrument |

| [Claim Limitation] | [Plaintiffs' Proposed Construction] | [Defendants' Proposed Construction] |
| --- | --- | --- |
| without using a bank check as a negotiable instrument (claim 9) | Where the paper check is used as a source of information, and is not accepted or processed | the check, at no time, takes on the status of a negotiable instrument |
| subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations (claim 8) | Subsequently transmitting the information relating to the transaction to a bank for subsequent automated clearing house operations | electronically communicating with an automated clearing house for transferring funds electronically based upon the consumer bank account information obtained from any bank check presented at the point-of-sale |
| enabling automated clearing house communication for transferring funds (claim 1, 9) | Enabling communication with an automated clearing house for electronically transferring funds | electronically communicating with an automated clearing house for transferring funds electronically based upon the consumer bank account information obtained from any bank check presented at the point-of-sale |
| for the sole purpose (claims 2, 8 and 9) | For the only purpose | Defendants contend that this term needs no construction. |
| adapted to receive consumer bank account information from any bank check (claim 1) | adapted to receive consumer bank account information from any bank check | adapted to read consumer bank account information directly from any bank check |

| | | |
|---|---|---|
| means for reading magnetic ink character recognition numbers appearing on a consumer check (claim 2) | This limitation should be construed pursuant to 35 U.S.C. Section 112(6). The recited function is "reading magnetic ink character recognition numbers appearing on a consumer check." The structures in the '988 patent that perform that function is any mechanism such as a MICR check reader, optical character recognition ("OCR") equipment, a keyboard for manual entry, or equivalent. | This limitation should be construed pursuant to 35 U.S.C. Section 112(6). The recited function is "reading magnetic ink character recognition numbers appearing on a consumer check." The structures described in the '988 patent that perform that function are a MICR reader and optical character recognition equipment. |
| reading means for reading magnetic ink character recognition numbers on any consumer bank check (claim 9) | This limitation should be construed pursuant to 35 U.S.C. Section 112(6). The recited function is "reading magnetic ink character recognition numbers appearing on a consumer check." The structures in the '988 patent that perform that function is any mechanism such as a MICR check reader, optical character recognition ("OCR") equipment, a keyboard for manual entry, or equivalent. | This limitation should be construed pursuant to 35 U.S.C. Section 112(6). The recited function is "reading magnetic ink character recognition numbers on any consumer bank check." The structures described in the '988 patent that perform that function are a MICR reader and optical character recognition equipment. |
| verifying that account numbers were accurately read at the point of sale (claim 8) | Verifying that the account numbers from the check were read accurately at the point of sale terminal | visually confirming that account numbers were accurately read by reference to the source document |

3

## Proposed Constructions of Agreed Claim Terms

| TERM/PHRASE OF THE CLAIM | PARTIES' AGREED CONSTRUCTION [1] |
|---|---|
| consumer (claim 9) | person, business or corporation |
| second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the bank check as a negotiable instrument (claim 1); second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using a bank check as a negotiable instrument (claim 9) | This function is written in means-plus-function format pursuant to 35 U.S.C. 112(6). The recited function of this limitation is enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the [a] bank check as a negotiable instrument. The structures disclosed in the patent for performing the recited function of this limitation are a modem, network interface, enhanced radio transmission interface, satellite communication interface or equivalent. |
| automated clearing house (claims 1, 8, 9) | an automated clearing house including, but not limited to, the national U.S. clearing house sometimes referred to as the "ACH" |

4

---

[1] While the parties agree to the recited function of this claim element pursuant to 35 U.S.C. 112(6), the parties dispute the meaning of limitations within that function, as set forth in the Parties' Proposed Construction of Disputed Claim Terms and the parties' briefs.

DATED: October 7, 2005

_/s/ Mary B. Matterer_
Richard K. Herrmann (I.D. No. 405)
Mary B. Matterer (I.D. No. 2696)
MORRIS JAMES HITCHENS
& WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
302.888.6800
rherrmann@morrisjames.com
mmatterer@morrisjames.com

_Counsel for Plaintiff_
_LML Patent Corp._

_/s/ Timothy Devlin_
William J. Marsden, Jr. (I.D. No. 2247)
Timothy Devlin (I.D. No. 4241)
Sean Hayes (I.D. No. 4413)
FISH & RICHARDSON P.C.
919 North Market Street, Suite 1000
Wilmington, Delaware 19801
302.652.5070
marsden@fr.com
hayes@fr.com

_Counsel for Defendant_
_TeleCheck Services, Inc._

_/s/ Francis DiGiovanni_
Francis DiGiovanni (I.D. No. 3189)
CONNOLLY BOVE LODGE & HUTZ
LLP
The Nemours Building
1007 N. Orange Street
Wilmington, Delaware 19801
302.658.9141
fdigiovanni@cblh.com

_Counsel for Defendants_
_Electronic Clearing House, Inc._
_and Xpresschex, Inc._

_/s/ Richard D. Kirk (rk0922)_
Richard D. Kirk (I.D. No. 922)
THE BAYARD FIRM
222 Delaware Avenue, Suite 900
Wilmington, DE 19801
302.429.4208
rkirk@bayardfirm.com

_Counsel for Defendant_
_NOVA Information Systems, Inc._

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
**CERTIFICATE OF SERVICE**

I hereby certify that on October 7, 2005, I electronically filed a JOINT PROPOSED
CLAIM CONSTRUCTION STATEMENT with the Clerk of Court using CM/ECF which
will send notification of such filing(s) to the following:

Richard K. Herrmann
Mary B. Matterer, Esq.
Morris James Hitchens & Williams
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801-4226

Richard D. Kirk, Esq.
The Bayard Firm
222 Delaware Avenue, 9th Floor
Wilmington, DE 19899

Collins J. Seitz, Jr., Esq.
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 North Orange Street
Wilmington, DE 19801

I hereby certify that on October 7, 2005, I have sent by Electronic mail, the

document(s) to the following non-registered participants:

Robert Jacobs, Esq.                     Russell E. Levine, Esq.
Belasco Jacobs & Townsley, LLP          Kirkland & Ellis LLP
Howard Hughes Center                    200 E. Randolph Dr.
6100 Center Drive, Suite 630            Chicago, IL 60601
Los Angeles, CA 90045

Mark C. Scarsi, Esq.
O'Melveny & Myers LLP
400 S Hope Street
Los Angeles, CA 90071

_/s/ Timothy Devlin_
Timothy Devlin

6

# EXHIBIT   10



# 2 0 0 5

# A Complete Guide To Rules & Regulations Governing the ACH Network

LML-FP-055336

# 2 0 0 5

# ACH RULES

## A Complete GuideTo Rules &

## Regulations Governing the

## ACH Network

Copyright 2005 by the National Automated Clearing House Association
All Rights Reserved
Printed in the United States of America
13665 Dulles Technology Drive, Suite 300
Herndon, VA 20171
703-561-1100

LML-EP-055337

Case 1:04-cv-00858-SLR    Document 459-3    Filed 11/22/2005    Page 36 of 76

private sector adjustment factor (i.e., profit margin) is included in Federal Reserve processing so that the Federal Reserve Bank charges as though it were operating on a "for profit" basis.

<u>NACHA and the Regional Payments Associations</u>

NACHA oversees America's largest electronic payments network. NACHA's primary roles are to develop and maintain the *NACHA Operating Rules*, to promote growth in ACH volume, and to provide educational services to its members and other ACH participants. NACHA's member payment associations serve over 12,000 financial institutions across the United States, which in turn provide services to over 4 million corporations and one hundred thirty-five million consumers, with a transaction volume of ten billion payments and a dollar value $27.4 trillion in 2003.

Regional payment associations provide management, education, assistance, and services to link all types of financial institutions (commercial banks, saving banks, and credit unions) across the United States. Several of these associations also develop and implement local ACH rules that apply specifically to their own member financial institutions. The regional payment associations offer a wide variety of educational sessions ranging from origination and receipt operations to audit and control.

## H. ACH TERMINOLOGY

This section is intended to provide users of this book with an overview of basic ACH terminology. ACH terms, as defined specifically for purposes of the *NACHA Operating Rules*, may be found within Article Thirteen of the *NACHA Operating Rules*.

**ACH Operator**
means (1) a Federal Reserve Bank that performs all of the following, or (2) an entity that executes an annual agreement with the National Association in which the entity agrees to comply with or perform all of the following:
  (a)  adhere to these rules (except to the extent inconsistent with the policies or practices of the Federal Reserve Banks) and other applicable laws, regulations, and policies;
  (b)  execute agreements with a minimum of twenty independent (i.e., not owned by the same holding company) Participating DFIs that bind such entities to the ACH Operator's rules and to these rules (except that a Federal Reserve Bank shall not be required to bind a Participating DFI to any provision of such rules of the National Association that is not incorporated by the Uniform Operating Circular of the Federal Reserve Banks);
  (c)  (i) provide clearing, delivery, and settlement services for ACH entries, as defined by these rules, between Participating DFIs that have selected that ACH Operator to perform ACH services (intra-ACH Operator services), and (ii) exchange transactions with other ACH Operators (inter-ACH Operator exchange);
  (d)  process and edit files based on the requirements of these rules;
  (e)  evaluate the credit worthiness of and apply risk control measures to their Participating DFIs;
  (f)  adhere to the Federal Reserve's Policy Statement on Privately Operated Multilateral Settlement Systems (as applicable); and
  (g)  adhere to any National ACH Operator Performance Standards of the National Association.

**Addenda Record**
An ACH record type that carries the supplemental data needed to completely identify an account holder(s) or provide information concerning a payment to the RDFI and the Receiver.

**Authorization**
A written agreement with the originating company signed or similarly authenticated by an employee or customer to allow payments processed through the ACH Network to be deposited in or withdrawn from his or her account at a financial institution. (For specific applications, written authorization for debits to consumer accounts is not required. Refer to the *NACHA Operating Rules* for details.) Can also be a written

LMI-FP-055361

agreement that defines the terms, conditions and legal relationship between trading partners. For ACH credit entries, authorization may also be by verbal or other non-written means.

**Automated Clearing House (ACH) Network**
A funds transfer system, governed by the *NACHA Operating Rules*, that provides for the interbank clearing of electronic entries for participating financial institutions.

**Banking Day**
Any day on which a participating depository financial institution is open to the public during any part of the day for carrying on substantially all its banking functions.

**Batch**
A group of records or documents considered as a single unit for the purpose of data processing.

**Consumer Account**
A deposit account held by a financial institution and established by a natural person primarily for personal, family, or household use and not for commercial purposes.

**Corporate-to-Corporate Payments**
Any of the class of automated payment formats developed for the ACH Network that allow concurrent exchange of funds and remittance information between trading partners.

**Credit Entry**
An entry to the record of an account to represent the transfer or placement of funds into the account.

**Data Transmission**
The electronic exchange of information between two data processing points.

**Debit Entry**
An entry to the record of an account to represent the transfer or removal of funds from the account.

**Direct Debit**
A method of collection used in the ACH for certain claims, generally those that are repeated over a period of time, under which the debtor gives his or her financial institution authorization to debit his or her account upon the receipt of an entry issued by a creditor.

**Direct Deposit**
An ACH service that provides for the electronic transfer of funds directly into the account of a payee, usually an employee receiving pay or a Social Security beneficiary receiving retirement benefits.

**Direct Payment**
A method of collection used in the ACH Network for certain claims, generally those that are repeated over a period of time, for which the debtor gives the Originator an authorization to debit his or her account.

**EDI Payment**
The computer-to-computer transmission of a payment and related information in a standard format.

**Effective Entry Date**
The date the originating company expects payment to take place. The ACH Operator reads the effective entry date to determine the settlement date.

**Electronic Funds Transfer (EFT)**
A generic term used to describe any ACH or wire transfer.

LML-EP-055362

**Entry**
An electronic item representing the transfer of funds in the ACH.

**Field**
One or more consecutive character positions within an ACH entry mapped to contain specific information. For credit, debit or ATM cards, a defined area within an information track of the magnetic stripe of fixed or variable length.

**File**
A group of ACH batches initiated into the ACH Network or sorted for delivery to ACH receiving point(s). A file must be transmitted electronically via data transmission between the sending point and the receiving point. A file may be delivered to an end-point via direct data transmission, magnetic tape, or floppy diskette. A file may contain one or more batches of entries.

**Financial EDI**
Electronic data interchange for financial transactions/applications between companies and financial institutions, including payment and remittance advice, account analysis, and balance reporting.

**Funds Availability**
The time at which the funds resulting from a funds transfer are made available to the customer.

**Green Book**
A publication assembled by the U.S. Department of the Treasury that specifies the procedures to be used in Automated Clearing House transactions originated on behalf of the United States Federal Government.

**Live Dollar Entry**
"Live" refers to an entry that affects a funds transfer rather than non-dollar entries, such as prenotifications.

**MICR line**
The magnetic ink character recognition inscription at the bottom of a paper check.

**National Automated Clearing House Association (NACHA)**
The national association that establishes the standards, rules and procedures that enable depository financial institutions to exchange payments on a national basis.

**NACHA Formats**
The ACH record format specifications described in the *NACHA Operating Rules and Guidelines* are the accepted and warranted payment format standards for payments delivered through the ACH.

**Notification of Change (NOC)**
Information sent by an RDFI to notify the ODFI that previously valid information for a receiver has become outdated or that information contained in a prenotification is erroneous. The standard entry class code is COR.

**On-Us Entries**
Entries within an ACH file destined for accounts held at the ODFI.

**Originating Depository Financial Institution (ODFI)**
A participating financial institution that initiates ACH entries at the request of and by agreement with its customers. ODFIs must abide by the provisions of the *NACHA Operating Rules and Guidelines*.

**Originator**
Any individual, corporation or other entity that initiates entries into the Automated Clearing House Network.

LML-EP-055363

**Posting**
The process of recording debits and credits to individual account balances.

**Prenotification**
A non-dollar entry that may be sent through the ACH Network by an Originator to alert an RDFI that a live-dollar transaction will be forthcoming and that verification of the Receiver's account number is required.

**Receiver**
An individual, corporation or other entity who has authorized an originator to initiate a credit or debit entry to an account held at an RDFI.

**Receiving Depository Financial Institution (RDFI)**
Any financial institution qualified to receive ACH entries that agrees to abide by the *NACHA Operating Rules and Guidelines*.

**Receiving Point**
A site where entries are received from an ACH Operator for processing. It may be the RDFI, its data center or a data processing service bureau authorized to receive entries on behalf of a RDFI.

**Regulation E**
A regulation promulgated by the Federal Reserve Board of Governors in order to ensure consumers of a minimum level of protection in disputes arising from electronic funds transfers.

**Returns**
Any ACH entry that has been returned to the ODFI by the RDFI or by the ACH Operator because it cannot be processed. The reason for each return is included with the return in the form of a "return reason code." (See the *NACHA Operating Rules and Guidelines* for complete return reason code listing.)

**Reversals**
Any ACH entries or files sent within required deadlines to "correct" or reverse previously originated erroneous entries or files.

**Routing Number**
A nine-digit number (eight digits and a check digit) that identifies a specific financial institution. Also referred to as the ABA number. Numbers are assigned by the Thomson Financial Publishing and are listed in its publication entitled *Key to Routing Numbers*.

**Sending Point**
A processing site from which entries are transmitted to the ACH Operator. It may be the ODFI on its own behalf or a financial institution or private data processing service bureau on behalf of the ODFI.

**Settlement**
A transfer of funds between two parties in cash, or on the books of a mutual depository institution, to complete one or more prior transactions, made subject to final accounting. Settlement for the ACH Network usually occurs through the Federal Reserve.

**Settlement Date**
The date on which an exchange of funds with respect to an entry is reflected on the books of the Federal Reserve Bank(s).

**Standard Entry Class Codes**
Three character code within an ACH company/batch header record that identifies payment types within an ACH batch (e.g., CCD, CTX, etc.).

LML-EP-055364

**Transaction Code**
The two digit code in the ACH record that determines whether an entry is a debit or a credit to a DDA account, savings account, or general ledger account, or whether an entry is a credit to a loan account.

LML-EP-055365

## SECTION 3.7 Obligations of Originators of ARC Entries

### SUBSECTION 3.7.1 Notice Obligation

The Originator must, in advance of receiving from the Receiver each source document used as the basis for the origination of an ARC entry, provide the Receiver with notice that clearly and conspicuously states that receipt of the Receiver's source document will authorize an ACH debit entry to the Receiver's account in accordance with the terms of the source document. If the Originator has received notice in accordance with the reasonable procedures established by the Originator that the receipt of the check does not authorize an ACH debit entry, then receipt of a check by the Originator does not authorize an ACH debit entry to the account on which the check is drawn.

### SUBSECTION 3.7.2 Source Documents

For an ARC entry, a check or sharedraft provided to the Originator by the Receiver via the U.S. mail or at a dropbox location must be used by the Originator as the source document for the Receiver's routing number, account number, check serial number, and dollar amount. To be used as the source document for an ARC entry, a check or sharedraft must (1) contain a pre-printed serial number, (2) be drawn on a Consumer Account, and (3) be completed and signed by the Receiver.

The following may not be used as the source document for ARC entries: (1) checks drawn on corporate or business accounts, (2) third-party checks, (3) demand drafts and third-party drafts that do not contain the signature of the Receiver, (4) credit card checks, (5) obligations of a financial institution (e.g, travelers checks, cashier's checks, official checks, money orders, etc.), (6) checks drawn on the Treasury of the United States, a Federal Reserve Bank, or a Federal Home Loan Bank, (7) checks drawn on a state or local government, or (8) checks payable in a medium other than United States currency.

### SUBSECTION 3.7.3 Copy of Source Document

The Originator must retain a reproducible, legible, image, microfilm, or copy of the front of the Receiver's source document for each ARC entry for two years from the Settlement Date of the ARC entry. At the request of the ODFI, the Originator must provide a copy of the front of the source document to the ODFI for its use or for the use of an RDFI requesting such information pursuant to subsection 2.9.3.2 (Copy of Source Document).

### SUBSECTION 3.7.4 Source Document Will Not Be Presented for Payment

The source document to which the ARC entry relates may not be used by the Originator as a check to obtain payment.

### SUBSECTION 3.7.5 Destruction of Source Document

The source document to which the ARC entry relates must be destroyed within fourteen days of the Settlement Date of the entry.

### SUBSECTION 3.7.6 Capture of MICR Information

During initial processing of an ARC entry, the Originator may not key-enter the routing number, account number, or check serial number from the Receiver's source document. An Originator may, however, key-enter such information to correct errors relating to MICR misreads, miscoding, or processing rejects.

## SECTION 3.8 Obligations of Originators of POP Entries

### SUBSECTION 3.8.1 Source Documents

For a POP entry, a check or sharedraft provided by the Receiver at the point-of-purchase must be used by the Originator as a source document for the Receiver's routing number, account number, and check serial number. The source document must then be voided by the Originator. Only a check or sharedraft that contains a pre-printed serial number and that is drawn on a Consumer Account may be used as a source document for this type of transaction.

For POP entries, the following may not be used as source documents: (1) checks drawn on corporate or business deposit accounts, (2) third-party checks, (3) credit card checks, (4) obligations of a financial institution (e.g., traveler's checks, cashier's checks, official checks, money orders, etc.), (5) checks drawn on the Treasury of the United States, a Federal Reserve Bank, or a Federal Home Loan Bank, (6) checks drawn on a state or local government, or (7) checks payable in a medium other than United States currency. For POP entries, a previously voided check or sharedraft that has been used by the Receiver for a prior POP entry may not be used as a source document for this type of transaction.

### SUBSECTION 3.8.2 Capture of MICR Information

The Originator may not key-enter the routing number, account number, or check serial number from the Receiver's source document.

### SUBSECTION 3.8.3 Receipts

An Originator must provide to each Receiver a receipt containing the following information with respect to each POP entry to the Receiver's account:

(a)   Originator name (merchant)
(b)   company (merchant)/third-party service provider telephone number;
(c)   date of transaction;
(d)   transaction amount;

LML-EP-055429

(e)     source document check serial number;
(f)     merchant number (or other unique number that identifies the location of the transaction);
(g)     Terminal City; and
(h)     Terminal State.

The National Association strongly recommends, but these rules do not require, that the Originator also provide the following information on the receipt provided to the Receiver:

(a)     merchant address;
(b)     merchant identification number;
(c)     Receiver's financial institution routing number;
(d)     Receiver's truncated account number;
(e)     Receiver's truncated identification number; and
(f)     transaction reference number.

Note: The Receiver's complete account number and complete identification number are not permitted to be placed on the receipt.

### SECTION 3.9 Obligations of Originators of Internet-Initiated Entries

SUBSECTION 3.9.1 Fraud Detection Systems

Each Originator originating WEB entries must employ a commercially reasonable fraudulent transaction detection system to screen each entry.

SUBSECTION 3.9.2 Verification of Routing Numbers

Each Originator that originates WEB entries must use commercially reasonable procedures to verify that routing numbers are valid.

◆ [SUBSECTION 3.9.3 *Verification of Receiver's Identity*

*Each Originator that originates WEB entries must employ commercially reasonable methods of authentication to verify the identity of the Receiver.*]

SUBSECTION 3.9.4 Security of Internet Session

Each Originator that originates WEB entries must establish a secure Internet session with each Receiver utilizing a commercially reasonable security technology providing a level of security that, at a minimum, is equivalent to 128-bit encryption technology prior to the Receiver's key entry and through transmission to the Originator of any banking information, including, but not limited to, the Receiver's routing number, account number, and personal identification number (PIN) or other identification symbol.

SUBSECTION 3.9.5 WEB Annual Audit

Each Originator that originates WEB entries shall conduct or have conducted annual audits to ensure that the financial information it obtains from Receivers is

protected by security practices and procedures that include, at a minimum, adequate levels of (1) physical security to protect against theft, tampering, or damage, (2) personnel and access controls to protect against unauthorized access and use, and (3) network security to ensure secure capture, storage, and distribution.

### SECTION 3.10 Obligations of Originators of Telephone-Initiated Entries

SUBSECTION 3.10.1 Verification of Receiver Identity

Each Originator that initiates TEL entries must employ commercially reasonable procedures to verify the identity of the Receiver.

SUBSECTION 3.10.2 Verification of Routing Numbers

Each Originator that initiates TEL entries must use commercially reasonable procedures to verify that routing numbers are valid.

◇ SECTION 3.11 Payment to ODFI

Each Originator that utilizes a Third-Party Sender to authorize an ODFI to transmit credit or debit entries agrees to make payment to the ODFI for any such credit entries originated and for any debit entries returned by the RDFI to the extent that the ODFI does not receive payment from the Third-Party Sender.

### SECTION 3.12 Record of Authorization

An Originator must retain the original or a microfilm or microfilm-equivalent copy of each authorization of a Receiver for two years from the termination or revocation of the authorization. In the case of TEL entries, the Originator must retain the original or a microfilm or microfilm-equivalent copy of the written notice or the original or a duplicate tape recording of the oral authorization for two years from the date of the authorization. At the request of its ODFI, the Originator must provide the original or copy of the authorization to the ODFI for its use or for the use of an RDFI requesting the information pursuant to subsection 4.1.1 (Right to Information Regarding Entries). This section 3.12 does not apply to SHR or MTE entries if the ODFI and RDFI are parties to an agreement (other than these rules) for the provision of services relating to SHR or MTE entries.

---

◆ *Approved November 9, 2004; Effective March 18, 2005*
◇ *Approved December 2, 2003; Effective December 10, 2004*

LML-EP-055430

# SECTION IV
# SPECIAL TOPICS

# CHAPTER XII
# POINT-OF-PURCHASE ENTRIES

## A. INTRODUCTION

The *NACHA Operating Rules* support an application that enables Originators (i.e., merchants, billers, etc.) to initiate a Single-Entry ACH debit entry to a Receiver's account for in-person purchases made at the point-of-purchase. This application, which is based on a written authorization and account information drawn from a source document (check) obtained from the consumer at the point-of-purchase, provides Originators with an alternative to accepting consumers' checks as the method of payment. This chapter addresses issues relating to the origination and receipt of Point-of-Purchase Entries (POP.

A POP entry is a Single-Entry ACH debit used by Originators as an alternative method of payment for goods or services purchased in person. These one-time debit entries are initiated by the Originator to the consumer's account based on a written authorization and account information drawn from a source document (a check) obtained from the consumer at the point-of-purchase. To initiate a POP entry, the consumer must present a check or sharedraft that has not been previously voided or negotiated to the Originator. The Originator uses a check reading device to capture the MICR information from the check (i.e., routing number, account number, and serial number), which will be used by the Originator to generate a debit entry to the consumer's account. The Originator may not key enter the MICR information from the check, nor may the Originator key enter the MICR information after the check reader has captured this data. The Originator then key enters the amount of the transaction, after which an authorization will be provided to the consumer to sign, authorizing the debit to his account. The Originator must provide to the consumer (1) the consumer's source document, which the Originator has voided, (2) a copy of the consumer's authorization, and (3) a receipt containing specific information relating to the purchase.

## B. LEGAL FRAMEWORK

POP entries are subject to the requirements of the *NACHA Operating Rules*, the Electronic Fund Transfer Act, and the Federal Reserve's Regulation E. POP entries are considered to be ACH entries from start to finish, with the consumer's check used by the Originator solely as a source document for the consumer's routing and account number information. Such transactions are not considered

to be truncated checks and do not fall under the requirements of check law or the Uniform Commercial Code for the following reasons:

(1) the check is not accepted by the merchant as a negotiable instrument; and
(2) the check is not negotiated by the merchant or accepted into the check collection system.

## C. OBLIGATIONS OF ORIGINATORS

### 1. AGREEMENTS WITH ODFIs

Originators choosing to utilize the ACH Network for POP transactions should consider modifications to their agreements with their ODFIs to address the origination of these entries. These modifications should address the extent to which the Originator and ODFI will share liability for point-of-purchase transactions and should define any specific processing obligations relating to such transactions.

### 2. AUTHORIZATION REQUIREMENT

Originators of POP entries must obtain the consumer's written authorization prior to initiating a debit entry under this application. Although the *NACHA Operating Rules* do not prescribe specific authorization language for the point-of-purchase application, the authorization must conform to the requirements of the *NACHA Operating Rules*, which require that the authorization (1) be in writing, signed or similarly authenticated by the Receiver, (2) be readily identifiable as an ACH debit authorization, and (3) clearly and conspicuously state its terms. It is strongly recommended that authorization language for point-of-purchase entries specifically state that the check will not be processed. This will assist consumers in understanding the nature of the transaction. Originators must provide a copy of the authorization to the consumer as required by the *NACHA Operating Rules*.

Unlike authorization requirements for most consumer debit entries, Originators of point-of-purchase entries need not include on the authorization the method by which the consumer must revoke the authorization, as these entries can not be returned using Return Reason Code R07 (Authorization Revoked). Consumers retain their rights to stop payment on the ACH entry (R08) or to have it returned as unauthorized/improper (R10) when appropriate.

### 3. SOURCE DOCUMENTS

*Acceptable Source Documents*

Originators may only accept a check or sharedraft as a source document for a point-of-purchase debit entry if the check or sharedraft:

- has not been previously negotiated;

LML-EP-055765

*SECTION IV – SPECIAL TOPICS*
*CHAPTER XII – POINT-OF-PURCHASE ENTRIES*

- has not been previously voided;
- contains a pre-printed serial number; and
- is drawn on a consumer account.

### Unacceptable Source Documents

Checks that may not be used as source documents for point-of-purchase entries include:

- corporate checks;
- third-party checks;
- credit card checks;
- obligations of a financial institution (e.g., cashier's checks, money orders, traveler's checks, official checks, etc.);
- checks drawn on the Treasury of the United States, a Federal Reserve Bank, or a Federal Home Loan Bank;
- checks drawn on a state or local government; or
- checks payable in a medium other than United States currency.

### 4. RECEIPT REQUIREMENTS

Originators must, at the point-of-purchase, provide Receivers with a receipt that contains the following minimum amount of information:

- Originator name (merchant);
- company (merchant)/third-party service provider telephone number;
- date of transaction;
- transaction amount;
- source document check serial number;
- merchant number (or other unique number that identifies the location of the transaction);
- Terminal City; and
- Terminal State.

Note: The Federal Reserve Board's Official Staff Commentary on Regulation E requires the inclusion of terminal location information on the receipt provided to the consumer at the point of purchase. When a POS terminal is used to capture data electronically to initiate an EFT, the Regulation E Official Staff Commentary considers the POS terminal to be an electronic terminal, even if no access device is used, such as when a check is used to capture information to initiate a one-time EFT. As a result, when a check is used as a source document at the point of purchase and run through a terminal to read the MICR information, as is the case with POP entries, it is necessary to ensure compliance with Regulation E's requirements for electronic terminals, which mandate the inclusion of the terminal location on the receipt for POP entries.

It is also recommended, but not required, that the Originator provide the following information on the receipt provided to the Receiver:

- merchant address;
- merchant identification number;
- Receiver's financial institution routing number;
- Receiver's truncated account number;
- Receiver's truncated identification number; and
- transaction reference number.

Originators must be aware that the Receiver's complete account number and complete identification number are not permitted to be placed on the receipt. At the Originator's discretion, the receipt and the authorization required for point-of-purchase entries may be provided to the consumer on the same document or on different documents.

### 5. FORMATTING REQUIREMENTS

- Individual Name

  Originators should be aware that, with the POP SEC Code, the inclusion of information in the Individual Name Field is optional. If the Originator chooses to utilize this field, it must include either (1) the Receiver's (consumer's) name, or (2) a reference number, identification number, or code that the merchant uses to identify a particular transaction or customer. (Note: When a reference number, identification number, or code is used to identify the transaction or customer, it should be uniquely related to the individual or transaction. A generic description is not an acceptable means to identify the Receiver or transaction.)

- Check Serial Number

  The rules governing POP entries require that the Originator ensure that the check serial number from the Receiver's source document is placed within the Check Serial Number Field of the POP entry. Originators should understand that the *NACHA Operating Rules* permit Originators to place only the check serial number within the Check Serial Number Field of the POP Entry Detail Record. The word "check," abbreviations such as "ck" or "chk," or other merchant codes must not be included within the field. Because the Check Serial Number Field is defined as an alphanumeric one, the *NACHA Operating Rules* require information within this field to be left justified and space filled. The serial number of the check must begin in the leftmost position of the Check Serial Number field, and any unused spaces within the field must be left blank.

| INCORRECT | |
|---|---|
| | 0001234 |
| | 000000000001234 |
| | CK# 001234 |
| | CK1234 |
| | 1234 6532986002 |
| | CK1234 48832817 |

LML-EP-055766

CORRECT        1234

Originators should be aware that the *NACHA Operating Rules* require RDFIs to print the check serial number on the consumer's bank statement.

Terminal City/Terminal State

To ensure compliance with both the *NACHA Operating Rules* and Regulation E, which require the inclusion of terminal location information on the consumer's monthly bank account statement for POP entries, Originators must ensure that they have included a four-character name or abbreviation of the city in which the electronic terminal is located within the Terminal City Field, and a two-character abbreviation for the state in which the electronic terminal is located within the Terminal State Field of the POP Entry Detail Record. This information is used to identify the location of the electronic terminal used to originate the POP entry.

## 6. RETURN OF POINT-OF-PURCHASE ENTRIES

Originators should be aware that POP entries, like other ACH transactions, may be returned for a variety of reasons. Originators should be aware, however, that RDFIs can not return POP entries based on a consumer's claim that his authorization had been revoked (R07) since these are one-time transactions where the Originator will generally process the transactions immediately after the purchase is complete. As appropriate, however, the consumer may (1) request his RDFI to stop the payment of a POP entry (Return Reason Code R08), (2) request his RDFI to return an unauthorized/improper POP entry (Return Reason Code R10), or (3) go directly to the Originator (merchant) to request a refund of the transaction.

Originators should also be aware that, because the POP entry application does not require the Originator to capture the consumer's name for inclusion on the point-of-purchase entry, the RDFI must rely on the ODFI's warranty regarding the validity of the consumer's account number for posting purposes. The RDFI, therefore, may not return a point-of-purchase entry using Return Reason Codes R03 or R17 solely because the consumer's name is not included in the Individual Name Field of the entry. The RDFI may, however, use these Return Reason Codes if otherwise appropriate.

Originators must be prepared to handle returned point-of-purchase entries and must establish procedures that enable them to identify and contact the Receiver relating to any unpaid debit entry. Because the Originator does not retain the consumer's voided check as a source document, and because the consumer's name and address are not included as part of the MICR-capture process, Originators will need to develop alternative methods for retaining information necessary to identify the consumer for whom a point-of-purchase debit has been returned. The *NACHA Operating Rules* limit the number of times an entry returned due to insufficient or uncollected funds may be reinitiated to no more than two times following the return of the original entry. Originators should establish procedures to ensure that returned POP entries are not reinitiated in excess of the limits prescribed by the *NACHA Operating Rules*.

## D. RESPONSIBILITIES OF ODFIs

### 1. WARRANTIES AND LIABILITIES

In addition to all other general ODFI warranties contained within the *NACHA Operating Rules*, each ODFI that chooses to transmit POP entries on behalf of its Originator also warrants to each RDFI, ACH Operator, and ACH Association that:

- the source document provided to the Originator for use in obtaining the Receiver's routing number, account number, and check serial number for the initiation of the POP entry

  - is returned voided to the Receiver after use by the Originator, and

  - has not been provided by the Receiver for use in any prior POP entry.

ODFIs should consider modifications to their agreements with their Originators to address the origination of POP entries on behalf of their Originators. These modifications should address the extent to which the Originator and ODFI would share liability for POP transactions and should define any specific processing obligations relating to such transactions.

### 2. FORMATTING REQUIREMENTS

ODFIs must ensure that, prior to transmission to the ACH Operator, POP entries comply with all technical specifications and formatting requirements in accordance with the *NACHA Operating Rules*. ODFIs must ensure that:

- the check serial number from the Receiver's source document is placed within the Check Serial Number Field of the POP entry.

  ODFIs should understand that the *NACHA Operating Rules* permit Originators to place only the check serial number within the Check Serial Number Field of the POP Entry Detail Record. The word "check," abbreviations such as "ck" or "chk," or other merchant codes must not be included within the field. Because the Check Serial Number Field is defined as an alphanumeric one, the *NACHA Operating Rules* require information within this field to be left justified and space filled. The serial number of the

LML-EP-055767

check must begin in the leftmost position of the Check Serial Number field, and any unused spaces within the field must be left blank.

| INCORRECT | 0001234 |
| | 000000000001234 |
| | CK# 001234 |
| | CK1234 |
| | 1234 6532986002 |
| | CK1234 48832817 |

| CORRECT | 1234 |

ODFIs should be aware that the *NACHA Operating Rules* require RDFIs to print the check serial number on the consumer's bank statement.



- they are aware that use of the Individual Name Field by the Originator is optional. When used, it must contain either (1) the Receiver's name, or (2) a reference number, identification number, or code that the merchant uses to identify a particular transaction or customer. (Note: When a reference number, identification number, or code is used to identify the transaction or customer, it should be uniquely related to the individual or transaction. A generic description is not an acceptable means to identify the Receiver or transaction.)

## 3. RETURN OF POINT-OF-PURCHASE ENTRIES

ODFIs should be aware that POP entries, like other ACH transactions, may be returned for a variety of reasons in accordance with the return time frames prescribed by the *NACHA Operating Rules*. ODFIs should be aware, however, that RDFIs can not return POP entries based on a consumer's claim that his authorization had been revoked (R07) since these are single entry transactions where the Originator will generally process the transactions immediately after the purchase is complete. As appropriate, however, the consumer may (1) request his RDFI to stop the payment of a POP entry (Return Reason Code R08), (2) request his RDFI to return an unauthorized/improper POP entry (Return Reason Code R10, R37), or (3) go directly to the Originator (merchant) to request a refund of the transaction.

ODFIs should also be aware that, because the Point of Purchase application does not require the Originator to capture the consumer's name for inclusion on the POP entry, the RDFI must rely on the ODFI's warranty regarding the validity of the consumer's account number for posting purposes. The RDFI, therefore, may not return a point-of-purchase entry using Return Reason Codes R03 or R17 solely because the consumer's name is not included in the Individual Name Field of the entry. The RDFI may, however, use these Return Reason Codes if otherwise appropriate.

ODFIs should ensure that their Originators are prepared to handle returned POP entries and have established procedures that enable them to identify and contact the Receiver relating to any unpaid debit entry. Because the Originator does not retain the consumer's voided check as a source document, and because the consumer's name and address are not included as part of the MICR-capture process, ODFIs should ensure that their Originators understand the need to develop alternative methods for retaining information necessary to identify the consumer for whom a point-of-purchase debit entry has been returned. ODFIs must ensure that their Originators have established policies and practices to ensure that POP entries that are returned because of insufficient or uncollected funds are not reinitiated more than two times following the return of the original entry.

## 4. STOP PAYMENTS ON POINT-OF-PURCHASE ENTRIES

ODFIs should be aware that, in general, the *NACHA Operating Rules* regarding ACH stop payments require consumers to place a stop payment order on a debit at least three banking days prior to the scheduled date of the entry. Because the merchant will generally process POP transactions quickly, consumers are unlikely to be able to meet the three-day advance notice requirement for placing a stop payment order on such entries. To ensure that a consumer has the ability to place a stop payment order on a POP entry, the *NACHA Operating Rules* require a consumer to provide a stop payment order to his financial institution in such a time and manner that allows the RDFI a reasonable opportunity to act on the stop payment order prior to acting on the debit entry.

## E. RESPONSIBILITIES OF RDFIs

## 1. RETURN OF POINT-OF-PURCHASE ENTRIES

POP entries may be returned for a variety of reasons in accordance with the requirements of the *NACHA Operating Rules*. With the exception of entries for which the consumer claims there was no authorization, the source document used for the POP entry is improper, and the source document to which the POP entry relates has also been presented for payment, the RDFI must transmit POP entry returns by its ACH Operator's deposit deadline for the return entry to be made available to the ODFI no later than the opening of business on the second banking day following the settlement date of the original entry. For an entry that the consumer claims is unauthorized/improper (R10) or (R37), the RDFI must transmit the return by its ACH Operator's deposit deadline for the return to be made available to the ODFI no later than the opening of business on the banking day following the sixtieth calendar day following the settlement date of the original entry. For the return of unauthorized entries, the RDFI must obtain a written statement under penalty of perjury from the consumer stating that the entry was not authorized. (Note: For

LML-EP-055768

additional information on written statements under penalty of perjury, refer to the RDFIs chapter within Section II of these Guidelines.)

RDFIs must be aware that, under certain circumstances, specific Return Reason Codes may not be used with POP entries:

- **Return Reason Code R03** (*No Account/Unable to Locate Account*) **and Return Reason Code R17** (*File Record Edit Criteria*)

    RDFIs must be aware that, for transactions initiated at the point-of-purchase, it is difficult for the Originator to capture the Receiver's name in an automated fashion. For this reason, the Originator is not required to include the individual's name in the POP entry, and the RDFI must rely on the ODFI's warranty regarding the validity of the consumer's account number for posting purposes.

    The RDFI can not return POP entries solely because they lack an Individual Name. In general, typical Return Reason Codes used to return entries for which there is no Individual Name (e.g., R03, R17) may not be used by the RDFI to return POP entries under these circumstances. These Return Reason Codes may, however, be used with POP entries for other valid reasons.

- **Return Reason Code R07** (*Authorization Revoked by Customer*)

    If appropriate, the consumer may (1) request his RDFI to stop the payment of a POP entry (Return Reason Code R08); (2) request his RDFI to return an unauthorized/improper point-of-purchase entry using Return Reason Code R10 or R37 (Reminder: the RDFI must obtain a written statement under penalty of perjury when using these Return Reason Codes); or (3) go directly to the Originator (merchant or biller) to request a refund for the transaction.

    RDFIs must be aware that they are prohibited from returning POP entries using Return Reason Code R07 (Authorization Revoked by Customer) based on a consumer's claim that his authorization had been revoked since these are single entry payments where the Originator will generally process the transactions immediately after the purchase is complete.

## 2. STOP PAYMENTS ON POINT-OF-PURCHASE ENTRIES

In general, the *NACHA Operating Rules* regarding ACH stop payments require consumers to place a stop payment order on a debit at least three banking days prior to the scheduled date of the entry. Because the merchant will generally process POP transactions quickly, consumers are unlikely to be able to meet the three-day advance

notice requirement for placing a stop payment order on such entries. To ensure that a consumer has the ability to place a stop payment order on a POP entry, the *NACHA Operating Rules* require a consumer to provide a stop payment order to his financial institution in such a time and manner that allows the RDFI a reasonable opportunity to act on the stop payment order prior to acting on the debit entry.

## 3. STATEMENT REQUIREMENTS

RDFIs are required to provide the Check Serial Number of the consumer's source document on the consumer's monthly bank account statement for all POP entries. The RDFI must also provide on the statement the Terminal City and the Terminal State in which the POP entry was originated. RDFIs need to ensure that this information is provided on the consumer's statement.

Note: The Federal Reserve Board's Official Staff Commentary on Regulation E requires the inclusion of terminal location information on the consumer's monthly bank account statement. When a POS terminal is used to capture data electronically to initiate an EFT, the Regulation E Official Staff Commentary considers the POS terminal to be an electronic terminal, even if no access device is used, such as when a check is used to capture information to initiate a one-time EFT. As a result, when a check is used as a source document at the point of purchase and run through a terminal to read the MICR information, as is the case with POP entries, it is necessary to ensure compliance with Regulation E's requirements for electronic terminals, which mandate the inclusion of the terminal location on the monthly bank statement.

# SECTION IV
# SPECIAL TOPICS

# CHAPTER XIII
# ACCOUNTS RECEIVABLE
# ENTRIES

## A. INTRODUCTION

Accounts Receivable Entries (ARC) are Single-Entry debits used by Originators for the conversion of a consumer check received via the U.S. mail or at a dropbox location for the payment of goods or services. This application enhances the efficiency of the ACH Network by expanding the scope of consumer electronic check activity.

LML-EP-055769

# EXHIBIT  11

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF VIRGINIA

3

4      ---------------------------------X

5    LML PATENT CORP.,                    :

6              v.                         : Civil Action No.:

7    TELECHECK SERVICES, INC.,            : 04-858-SLR

8    ELECTRONIC CLEARING HOUSE, INC.,     : District of

9    XPRESSCHEX, INC., and NOVA           : Delaware

10   INFORMATION SYSTEMS, INC.,           :

11              Defendants.               :

12     ---------------------------------X

13

14         Videotaped Deposition of JANE E. LARIMER

15                  McLean, Virginia

16               Thursday, July 28, 2005

17                     10:00 a.m.

18

19

20

21

22   Job No.:  22-60395

23   Pages 1 - 202

24   Reported by:  Ellen L. Scheg, RPR

25

**7/28/2005  Larimer, Jane**

1      after this document that indicate the date of a

2      notebook source from which it came.

3                  But I leave that to you as to how clear

4      you want the record to be.

5          Q      Is --

6          A      Early.  Probably '97 or '98.

7          Q      Is this -- is the point of sale with the

8      Consumer As Keeper transaction also referred to as a

9      POP transaction?

10         A      Today?

11         Q      Today.

12         A      Today it is.

13         Q      At what point did that become a POP

14     transaction?

15         A      I believe 2001.

16         Q      Prior to that what was it known as?

·17                MR. MARSDEN, JR.:  Objection.  Lack of

18     foundation.

19         A      We had an interim PPD rule.  So it was one

20     class of a PPD transaction that was from an interim

21     rule that went from the effective date of the rule

22     until software changes could be made to identify them

23     as POP transactions.

24         How long that interim rule was in place, probably

25     approximately a year, may -- and before that there

**7/28/2005  Larimer, Jane**

1    were -- if they were flowing through the Network they

2    were going through at PPDs.

3         Q    Okay.  If you could turn to NACHA 4897

4    please.  The middle slide - and again I would like to

5    limit this to the '97, '98 timeframe that you believe

6    that these slides may have been created - do those

7    rules appear to be the rules that are applicable to

8    the ACH transactions at that time?

9         A    Yes.

10        Q    If you then move to Page 4902 still on PX

11   2004, on the bottom is a check conversion at the point

12   of sale definition.

13        Was that definition correct in the '97/'98

14   timeframe?

15                  MR. MARSDEN, JR.:  Objection.  Lack of

16   foundation.

·17        A    Yes.

18        Q    Has that definition changed since the

19   '97/'98 timeframe?

20        A    Not substantively.

21        Q    Okay.  If you could turn to the next page,

22   please which is NACHA 4903 still on PX 2004.

23        The top slide, POP Rules Amendment/Legal

24   Framework.  Do you see that?

25        A    Yes.

1         Q     Is the information there contained there

2     correct in the '97/'98 timeframe?

3         A     Yes.

4         Q     Is it correct as of today?

5         A     Yes.

6         Q     The second bullet point says, "The check is

7     used as a source document at the point of sale."  What

8     does it mean by "source document"?

9         A     It's not a check.  It's not a negotiable

10    instrument.  It hasn't been negotiated.

11        If this thing was completely filled out and

12    tendered and endorsed it would fall under Negotiable

13    Instruments Law not Regulation E.

14        Q     And when you say "Negotiable Instruments

15    Law", you mean the UCC?

16        A     Yes, Articles 3 and 4.  At the time this was

17    very important because all of these electronic check

18    applications had never -- there was -- we were trying

19    to create a legal foundation.  And I -- people would

20    say this is like a law school exam question.  How do

21    you take something that had been in Check Law, or the

22    thing that we think of always as the Check Law and

23    create an electronic payment out of it?

24        So coming up with a terminology of Source

25    Document was very important because you didn't want

1    you know all of the baggage that goes along with a

2    truncated check with Negotiable Instruments Law, with

3    Uniform Commercial Code.  All of that baggage you

4    didn't want attendant to this kind of a transaction.

5        Another point that was very important is that the

6    check is being returned to the customer.  Very

7    important because under Regulation E you wanted to

8    void that check, you wanted to return it to the

9    customer and not have the check used again and again,

10   you know, keep giving it back as payment because it

11   could have fallen under the definition of Access

12   Device under Regulation E.

13       So we were really trying to cobble together a

14   legal framework to create these transactions.

15       Q    And I think you said the check is never

16   negotiated?

17       A    Yes.

18       Q    What do you mean by it's never negotiated?

19       A    If the check is negotiated then it falls

20   under Uniform Commercial Codes Article 3 and 4.

21       Negotiation usually takes place when a check is

22   completed, filled out and signed and then tendered for

23   payment.

24       Now, some folks would say it would also have to

25   then be endorsed to create the full negotiation so the

**7/28/2005 Larimer, Jane**

1    endorsement would occur.

2        Q    When you say "endorse", what do you mean by

3    "endorsed"?

4        A    When the payee signs the back of the check.

5        Q    So for example if I went to a store and I

6    wanted to purchase something, I would fill the check

7    out and hand it to the merchant and then the merchant

8    would sign their name to the back, is that what you

9    mean by endorsement?

10       A    Or stamp it and deposit it.

11       Q    Or stamp it and deposit it.  Okay.

12           In the '97/'98 timeframe, was it a rule for the

13   financial institutions and ACH operators that the POP

14   transactions had to use the check as a Source Document

15   only?

16               MR. MARSDEN, JR.:  Objection.  Vague,

17   lack of foundation.

18       A    In the '97/'98 timeframe we did not have a

19   POP rule.

20       Q    So could --

21       A    We had a Pilot --

22       Q    Okay.

23       A    -- that was running and I - I don't know the

24   exact dates of the Pilot - whereby Pilot participants

25   signed Pilot Operating Rules.

**7/28/2005 Larimer, Jane**

1        And the Pilot Operating Rules at that time I

2    believe required the check to be voided and returned.

3    I believe that's what the Pilot participants agreed to

4    do that.

5        We didn't have a legal foundation in the

6    Operating Rules at that time to do it outside of the

7    Pilot -- to convert checks outside of the Pilot.

8        Q    But they were contractually obligated to use

9    the checks as a Source Document only.

10       A    Correct.

11       Q    And as part of this contractual obligation,

12   were the financial institutions or members of this

13   Pilot required to have any for example originators or

14   merchants contractually obligated to also use it as a

15   Source Document only?

16           MR. MARSDEN, JR.: Objection. Vague,

·17   lack of foundation as to only.

18       A    The Consumer's Keeper Model also envisioned

19   the check being returned -- the Source Document being

20   returned to the consumer at the point of sale. That's

21   what distinguishes it between that and the Merchant Is

22   Keeper Model.

23       The Merchant Is Keeper Model would have been

24   where the merchant would have kept the check. And

25   there was big discussions about whether or not we

1     obligations as well.

2          So the assumption would be that they would push

3     those out to the folks who are actually running the

4     Pilot, the merchants.

5          Q     And are those warranties and obligations in

6     place today in the Operating Rules?

7          A     There is an originator obligation that they

8     void the check and return it to the consumer.

9          Q     Is there an obligation that the check only

10    be used as a Source Document?

11         A     I don't understand the question.

12         Q     Well, you said that the check needs to be

13    voided and returned to the consumer.

14         A     Well, okay.  Whenever we say check in the

15    POP lingo I mean Source Document.

16         Q     Okay.

17         A     So the check can be -- that thing with which

18    we strip the MICR information - the Source Document -

19    can be filled out or blank, but it's always voided and

20    returned.

21         And we call it a Source Document because it's not

22    going to be collected through the check collection

23    system.

24         Q     And so that's synonymous with never being

25    negotiated.

1            MR. MARSDEN, JR.:  Objection.

2       A    Correct.

3       Q    And I think you mentioned it doesn't matter

4  if it's filled out or not, is that correct?

5       A    Correct.

6       Q    Why not?

7       A    Because it's voided and returned to the

8  customer.

9       Q    So for example if the customer went to a

10  merchant and put the wrong merchant's name on a check,

11  it doesn't make any difference because the check is

12  voided and returned as never a negotiable instrument

13  anyway?

14       A    Correct.  One of the -- in the best

15  world -- in the perfect world, consumers who do this

16  more than once, they hand a blank check and it's

17  voided and returned to them.

18       Because merchant don't want that time at checkout

19  to be spent filling out a check.  This is to hopefully

20  keep traffic flowing through the checkout.

21       But what we knew was is that consumers, until

22  they learned that, might continue to fill out that

23  information until they received it back and realized

24  they didn't have to do that any more.

25       So we didn't want it preclude the use of those

**7/28/2005  Larimer, Jane**

1    checks, hand that back to the consumer and say no, but

2    what I really need is the blank check.

3         Q    Can the merchant keep any part of the check?

4              MR. MARSDEN, JR.:  Objection.  Vague,

5    lack of foundation.

6         A    They can keep an image of the check, but

7    that's not -- so I guess the answer is no, they have

8    to give back the whole check, but they could keep an

9    image of it if they desired to.

10        Q    What is the purpose of keeping an image?

11        A    An image would be kept to keep name and

12   address information in case the ACH entry is returned

13   NSF, or in case the ACH entry is returned as an

14   administrative return.

15        Oftentimes -- or sometimes, when the MICR

16   information from the check or the Source Document is

17   taken, it has a routing and trans -- the routing,

18   transit number, the check number are to access

19   checking accounts.

20        So at credit unions or at small community banks

21   an ACH transaction might reject because it can't

22   access an ACH account, it can only access the DDA.

23        So sometimes those reject and so the retailer may

24   want to have an image so they can, you know, contact

25   the consumer and say we need a different form of

1    payment.

2         That's why an image usually -- or at least at the

3    beginning, this is why that was kept at that time.

4         One of the big legal questions that came up with

5    the Consumer's Keeper Model is the fact that a

6    merchant wouldn't have a negotiable instrument to

7    enforce on.

8         So if you have a consumer who, you know, the

9    check comes back and it bounces, the question was can

10   you collect this under Bad Check Law or Bad Debt Law

11   and that makes a big difference to merchants.

12        And with the Consumer's Keeper Model, what you

13   have is a written authorization you don't have a check

14   anymore.  So it falls under Bad Debt Law, which is

15   more difficult from what I understand - I'm not a

16   collections attorney - but it's more difficult to

17   collect on bad debt than it is a bad check.

18        But a lot of times all they would have is this

19   written receipt so they wanted to have an image so

20   they would have a name and address to go back to

21   collect that bad debt from the consumer.

22        Q    But the merchant couldn't say print off that

23   image and go up to that customer and say here's your

24   check -- you know, present that check to the

25   customer's bank and say pay me on this check, correct?

1          MR. MARSDEN, JR.:  Objection.  Vague,

2    lack of foundation, hypothetical.

3      A    The NACHA Operating Rules govern the ACH

4    Network, not the Check Network.  So the purpose of

5    our -- you know, we don't speak to -- at least with

6    POP, we don't speak to an image at all.

7          What retailers or anybody else did with their

8    image, as long as it didn't go through the ACH

9    Network, that wasn't really relevant to us.

10          I don't know if they were using that -- if they

11    had a bad debt, if they were creating an image

12    replacement document and trying to collect it on the

13    check side.  I don't know.

14      Q    If a transaction actually proceeded through

15    the ACH network, did the NACHA Guidelines prohibit a

16    merchant from printing off a copy of an image and

17    presenting that to a bank for payment?

18          MR. MARSDEN, JR.:  Objection.  Asked

19    and answered.

20      A    The POP rules -- this isn't a check.  The

21    POP rules I believe just speak -- in the ARC, in the

22    accounts receivable, where you have -- we have a

23    prohibition against collecting twice on the same debt.

24          What would happen in the ACH world is if that

25    check actually was collected and the ACH was paid, the

1    consumer would go into their financial institution,

2    the ACH would be returned.  Because it's much easier

3    to return a transaction through the ACH Network than

4    it is through the Check Network.

5        Q    Does the taking of an image of the check

6    change the check from being a Source Document in any

7    way?

8                    MR. MARSDEN, JR.:  Objection.  Vague,

9    lack of foundation.

10       A    We don't -- the Source Document is handed to

11   the merchant and handed back.  We don't speak to the

12   image at all.

13       Q    So if an image is taken of a check at the

14   merchant, that would not necessarily make that check a

15   negotiable instrument if it's handed back in the

16   process of an ACH transaction.

17       A    It would not make the Source Document a

18   negotiable instrument.

19                    MR. CHARFOOS:  Take a break?

20                    MR. DUNN:  The witness wants to take a

21   break.

22                    MR. CHARFOOS:  Absolutely.

23                    VIDEOGRAPHER:  We are going off the

24   record.  The time is 11:16 a.m.

25   (Recess taken.)

**7/28/2005 Larimer, Jane**

1          We're now talking, I assume, in a 1999

2     and later timeframe when there was a POP rule?

3                MR. CHARFOOS:   Correct.

4     Q    But for a POP transaction, once the check is

5     negotiated you can't do a POP transaction --

6     A    Correct.

7     Q    -- because it doesn't fall within Reg E and

8     it wouldn't fall --

9     A    You would be violating the rules.

10    Q    And those are the Federal rules?

11    A    No.  You would be violating the NACHA

12    Operating Rules.  Regulation E just wouldn't apply to

13    it.

14    Q    Okay.  And if you turn to NOVA 13763, the

15    top slide.  Again, you're reiterating in this

16    presentation that the check is used as a Source

17    Document, it's returned to the customers and it's

18    never negotiated, is that correct?

19    A    Correct.

20                THE WITNESS:  It's good to know

21    somebody is paying attention and taking notes.

22    Q    At any point since the POP Standard Entry

23    Class was adopted, has anybody been able to use the

24    check as a negotiable instrument in a POP transaction?

25                MR. MARSDEN, JR.:  Objection.  Vague,

**7/28/2005  Larimer, Jane**

1    A    Yes.  Also remember as part of our

2    legal -- the Legal Work Group in the early years, we

3    did have a Federal Reserve Bank, I believe the Retail

4    Payments Office, attorney who participated in those.

5    So he was in the development -- I mean, the big

6    issues with check conversion truncation in the day

7    were legal, so we had the Federal Reserve Bank staff

8    and, as I said, the American Bar Association

9    staff -- I'm sorry, American Banker's Association

10   staff attorney working on this as well.  And we always

11   kept the Division of Consumer and Community Affairs in

12   the loop.

13   Q    So as part of the development of the POP

14   transactions there was an effort to ensure that the

15   check was not used as a negotiable instrument.

16             MR. MARSDEN, JR.:  Objection.  Vague.

17   A    Yes.

18   Q    I'm going to hand you what I'm going to mark

19   as PX 2007 which for the record is NACHA 05190 through

20   5225.

21             (PX 2007 - NACHA 05190 through 5225 - marked for

22   identification.)

23   BY MR. CHARFOOS:

24   Q    I would like to ask you to take a look

25   through that please.

1              MR. MARSDEN, JR.:   Objection.   Vague,

2     lack of foundation.   For purposes this document, is

3     that the question?

4         A    For purposes of this document, yes.

5         Q    Why do you say for purposes this of

6     document?

7         A    No.   I'm just saying this is how we've

8     chosen to articulate the concept.

9         Q    So NACHA uses consumer bank information to

10    refer to the information contained in the MICR lane,

11    is that what I'm understanding you to say?

12        A    I would say we -- I would call it the

13    information on the MICR line.   I mean, the audience

14    that we're writing to here at the time is we're trying

15    to explain it in a way that folks understand it.

16        Q    Mm-hmm.

17        A    The consumer bank information, generally

18    speaking, is their account number and the check serial

19    number.   I guess you could add the routing and transit

20    number if you wanted.

21        Q    Okay.   And again, in this guide it says

22    that, "the transactions were not considered to be

23    truncated checks and do not fall under the

24    requirements of Check Law or the UCC because, number

25    one, the check is not accepted by the merchant as a

# EXHIBIT 12

```
 1                IN THE DISTRICT COURT

 2            FOR THE DISTRICT OF DELAWARE

 3     - - - - - - - - - - - - - - - x

 4     LML PATENT CORP.,              :

 5                   Plaintiff,       :

 6             vs.                    :  Civil Action

 7     TELECHECK SERVICES, INC.,      :  No. 04-858-SLR

 8     ELECTRONIC CLEARING HOUSE, INC. :

 9     XPRESSCHEX, INC., and          :

10     NOVA INFORMATION SYSTEMS, INC.  :

11               Defendants.     :  PAGES 1 - 275

12     - - - - - - - - - - - - - - - x

13

14     Videotaped deposition of ELLIOTT McENTEE, held at

15     the offices of Pillsbury, Winthrop, Shaw, Pittman,

16     1650 Tysons Boulevard, McLean, Virginia,

17     commencing at 10:20 a.m., Monday, July 11, 2005,

18     before Elizabeth Mingione, Notary Public.

19

20

21

22

23

24

25
```

1

**7/11/2005 McEntee, Elliott**

1    that the ACH Network supports is probably the most

2    successful model from a volume standpoint.

3              Another model is where the company,

4    which I'll call the payor, the party that's

5    actually writing the check, can designate that

6    their check is eligible for conversion.  In the

7    NACHA model, it's the payee.  It's the party that

8    the check is written to that makes a decision to

9    convert that check to an ACH transaction.

10              So those are two models on who makes

11    the decision to convert the check.  There's

12    another one that's -- is being developed as a

13    result of legislation passed by Congress called

14    Check 21 Act that allows a bank to receive a paper

15    check and create an image of the paper check,

16    transmit that image to another party who could

17    then take that image, convert it back to a piece

18    of paper or substitute check and present that to

19    the paying bank for payment.

20              So those are the basic three different

21    models.  And then within those models, there's

22    lots of variations.

23         Q.    So these are three different models of

24    electronic check conversion?

25         A.    Yes, where someplace in the process the

### 7/11/2005 McEntee, Elliott

1    paper check or what we refer to is a source

2    document.  In the ACH Network, or in our rules,

3    quite a few of the applications do not call a

4    check a check.  Because when you call something a

5    check, you could bring into play the Uniform

6    Commercial Code.  We call it a source of

7    information, not a check.

8        Q.    So what the customer gives to the

9    merchant isn't a check in the -- in the fact that

10   it's not a negotiated -- it's a negotiable

11   instrument?

12       A.    That's correct.

13             MR. MARSDEN:  Objection to the form.

14   Vague.

15       A.    Yeah.  That's -- that's correct.  It's

16   not -- I'm sorry.  I didn't hear the other

17   gentleman.

18             MR. MARSDEN:  I'm sorry.  If I do

19   object, or anybody objects, for that matter, if

20   you can wait to answer after the objection.

21             THE WITNESS:  Okay.  I'm sorry.

22             MR. MARSDEN:  No, I --

23             THE WITNESS:  I didn't hear what you

24   said.  I just heard you say something, I didn't

25   know what the words were.

1          MR. MARSDEN:  I'm sorry.  It came

2     quickly.  But my objection was to the form of the

3     question and that the question was vague.

4          MR. DUNN:  And if you understand the

5     question, you can go ahead and answer.

6          THE WITNESS:  Okay.

7          BY MS. FREY:

8     Q.   So just to make it clear on the record,

9     I was asking so the check that's presented in the

10    ACH model is not considered a negotiable

11    instrument?

12    A.   I don't use the word "presented"

13    because use presentment on the side of it being

14    presented to the bank that's paying the

15    transaction, whether it's a check or an ACH

16    transaction.  It would be the piece of paper that

17    the consumer gives to the retailer at the point of

18    sale, or mails in to the -- to the biller in

19    paying a bill.

20          We view that as a document that

21    provides information to the retailer or the biller

22    to create an ACH transaction.

23    Q.   Okay.  So the piece of paper given to

24    the clerk at the point of sale is not considered a

25    negotiable instrument?

1              MR. MARSDEN:  Same objection.

2        A.    That's correct.

3        Q.    So besides electronic check conversion,

4    what are alternatives, if you understand the

5    question?

6        A.    Alternatives to?

7        Q.    Alternatives to electronic.  So if you

8    are not going to electronically convert the check,

9    are there any other alternatives?

10       A.    Okay.  If the consumer writes a check

11   and --

12       Q.    Right.

13       A.    -- gives it to the retail and how is it

14   collected in the traditional way?

15       Q.    Yeah.

16       A.    Yeah.  The consumer would write a

17   check.  And we'll talk about a retailer, because

18   there's lots of different versions of how checks

19   are processed, but the retailer would typically

20   deposit the check with their financial

21   institution.

22             The paper check could take several

23   different paths.  It could be sent directly from

24   the bank in which it was deposited in, directly to

25   the bank in which the check was drawn on.

1    represent the physical item for collection?

2        A.   Because you wouldn't want the

3    transaction processed twice both in electronic

4    form and in paper form.  So when a bank is

5    originating the ACH transaction, they are

6    warranting to us that they are not attempting to

7    collect that same item through the paper-based

8    system.

9        Q.   So the physical check can't be used

10    once it's been converted?

11       A.   The physical check, now you are talking

12    about the represented check or the point-of-sale?

13    I'm not too sure as to what rule you are talking

14    about.

15       Q.   Well, just looking what this says, it

16    will not represent the physical item, so --

17       A.  Okay.  Then you are talking about -- in

18    this case you are talking about a check that's

19    been returned unpaid.  And if the attempt is made

20    to collect it through the ACH's network and that

21    collection is successful, then they are warranting

22    that they can't present the paper check.

23        If I remember correctly, it does not

24    state that they could not use the paper check

25    again, if the payment was not successfully

# EXHIBIT   13

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LML PATENT CORP.,

        Plaintiff,

    v.

TELECHECK SERVICES, INC.,
ELECTRONIC CLEARING HOUSE, INC.,
XPRESSCHEX, INC. and NOVA
INFORMATION SYSTEMS, INC.,

        Defendants.

C.A. 04-858 (SLR)

**EXPERT REPORT OF DAVID P. KURRASCH**

**REGARDING INVALIDITY**

"Beginning in 1991, did you and/or Mr. Nichols ever license the technology which would later become subject to this patent to any other companies?" Mr. Hills replied that "At some point, I – at some point, ChequeMARK Systems received exclusive marketing rights." The Sacramento Bee article shows that ChequeMARK Systems, Inc. ("CSI") offered for sale and sold a point-of-sale system covered by the '988 patent more than one year prior to the December 31, 1996 priority date of the '528 and '366 patents.

255.    In addition, on November 7, 1995, the Sacramento Bee published a news article about a point-of-sale check processing system being marketed by CSI. A description of the Sacramento Bee article is attached to this Report as Exhibit 17. As indicated in that article, at the time of its publication in November 1995, the CSI system had been marketed within the United States, more than one year prior to the December 31, 1996 priority date of the '528 and '366 patents.

256.    The Sacramento Bee article provides a detailed description of the CSI point-of-sale system and process. The system and process described in the Sacramento Bee article, in conjunction with other prior art references, renders obvious claims 24-27 of the '366 patent. A claim chart comparing the Sacramento Bee description with these claims is set forth in Exhibit 32.

257.    In 1993, Mr. Hills and CSI publicly disclosed each and every element of each asserted claim of the '528 and '366 patents more than one year before their December 31, 1996 priority date. In a letter from Mr. Hills to Mr. Don Dick, Rocky Mountain Retail Services ("RMRS") (ECHO 0002719-0002748), Applicants disclosed a system and method within the scope of the '988 patent, and within the scope of claim 10 of the '528 patent and claims 1-2 of the '366 patent. A claim chart comparing the 1993 ChequeMARK marketing materials sent by Mr. Hills to Mr. Dick to these claims is set forth in Exhibit 32.

258.    If the claims of the '988 patent are determined to have a priority date of June 8, 1994, then the asserted claims of the 1993 ChequeMARK marketing materials

62

also constitute prior art to these claims, rendering the claims 1-6, 8-11, 13 and 16 of the '988 patent invalid because their subject matter was on sale more than one year before their priority date. A claim chart comparing the 1993 ChequeMARK marketing materials sent by Mr. Hills to Mr. Dick to these claims of the '988 patent is set forth in Exhibit 32.

### E.    Obviousness

259.    I understand that a patent claim is invalid as "obvious" under 35 U.S.C. § 103(a) if the "differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person of ordinary skill in the art to which said subject matter pertains."

260.    I understand that an obviousness determination involves analysis of four factors: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the prior art and the claims at issue; and (4) objective evidence of nonobviousness.

261.    In my opinion, a person of ordinary skill in the art of electronic check processing on November 13, 1992, the filing date of the original application for what eventually issued as the '988 patent, would have had a bachelors degree and at least three to five years experience in the checking, electronic payments and corporate cash management industry, along with a working knowledge of applicable rules and regulations. I applied this definition of one of ordinary skill in the art in the analysis that follows.

### 1.    Combination of CheckMate Electronics and Carlson '607 References

262.    In my opinion, claims 1-6, 8-11, 13-14, 16 and 18 of the '988 patent, claims 10, 11 and 18 of the '528 patent and claims 1-3, 24-25 and 27 of the '366 patent are obvious under § 103(a) as unpatentable over May 19, 1987 and August, 1989 CheckMate Electronic Inc. Business Analyses and Plans in view of Carlson '607.

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of November, 2005, I electronically filed the foregoing document, **PUBLIC VERSION OF DECLARATION OF EDWARD K. RUNYAN IN SUPPORT OF PLAINTIFF LML PATENT CORP.'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF INVALIDITY**, with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Collins J. Seitz, Jr., Esq.
Francis DiGiovanni, Esq.
Connolly Bove Lodge & Hutz LLP
1007 North Orange Street
Wilmington, DE 19801

William J. Marsden, Jr., Esq.
Timothy Devlin, Esq.
Fish & Richardson, P.C.
919 North Market Street, Suite 1100
Wilmington, DE 19801

Richard D. Kirk, Esq.
The Bayard Firm
222 Delaware Avenue, 9th Floor
Wilmington, DE 19801

Additionally, I hereby certify that on the 22nd day of November, 2005, the foregoing document was served via email on the following non-registered participants:

Robert Jacobs, Esq.
Mark B. Mizrahi, Esq.
Belasco Jacobs & Townsley, LLP
Howard Hughes Center
6100 Center Drive, Suite 630
Los Angeles, CA 90045

Mark C. Scarsi, Esq.
Vision L. Winter, Esq.
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071

_____/s/ Mary B. Matterer_____
Richard K. Herrmann (#405)
Mary B. Matterer (#2696)
MORRIS, JAMES, HITCHENS
& WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
(302) 888-6800
mmatterer@morrisjames.com

*Counsel for Plaintiff LML PATENT CORP.*