IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LML PATENT CORP., | |
| Plaintiff, | |
| v. | C.A. 04-858 (SLR) |
| TELECHECK SERVICES, INC., ELECTRONIC CLEARING HOUSE, INC., XPRESSCHEX, INC. and NOVA INFORMATION SYSTEMS, INC., | **PUBLIC VERSION** |
| Defendants. | |

## DEFENDANTS' ANSWERING BRIEF IN OPPOSITION TO LML'S MOTION FOR SUMMARY JUDGMENT NO. 4: FOR A RULING THAT CLAIMS 1, 2, 4-6, 9-11, 14, 16 AND 18 OF THE '988 PATENT ARE NOT ANTICIPATED

William J. Marsden (#2247)
Timothy Devlin (#4241)
Tara D. Elliott (#4483)
FISH & RICHARDSON P.C
919 N. Market Street, Suite 1100
Wilmington, DE 19899-1114

*Attorneys for TeleCheck Services, Inc.*

Collins J. Seitz, Jr. (#2237)
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19801

*Attorneys for Electronic Clearing House, Inc. and XpressChex, Inc.*

Richard D. Kirk. (#922)
THE BAYARD FIRM
222 Delaware Avenue, Suite 900
Wilmington, DE 19801

*Attorneys for Nova Information Systems, Inc.*

Dated: November 15, 2005
Public Version: November 22, 2005

**TABLE OF CONTENTS**

**Page**

I.    NATURE AND STAGE OF PROCEEDINGS .....................................................1

II.    SUMMARY OF ARGUMENT ........................................................................1

III.    Statement of facts..........................................................................................3

    A.    The '988 Patent System and Prior Art Systems..........................................3

        1.    Higashiyama Describes a Point of Sale Electronic Check System and Method Developed Before the '988 Patent ..................................................4

        2.    The '714 and '607 Patents Describe Point of Sale Electronic Check Systems and Methods Developed Before the '988 Patent ..................................................9

IV.    Argument ......................................................................................................13

    A.    Legal Standards for Summary Judgment..................................................13

    B.    Every Asserted Claim Is Anticipated by Higashiyama...........................13

        1.    The Higashiyama Patent Is Prior Art that Was Never Considered by the Examiner ...............................14

        2.    Higashiyama Discloses a "central computer system" Having a "second communication means" as Recited by the Claims..................................15

        3.    Higashiyama Discloses a "first communication means integral to a point of sale terminal" ...................17

        4.    Higashiyama Discloses a "resident third party database" and a "system subscriber database"............................19

    C.    Claims 1, 2, 4-6, 8-10, 14, and 18 Are Anticipated By The '607 Patent .......................................................................20

        1.    The '607 Patent Discloses a "central computer system".....................................................................20

        2.    The '607 Patent Discloses a "second communication means"...............................................21

    D.    Claims 1, 2, 4, and 8-10 Are Anticipated By The '714 Patent.........................................................................22

i

## TABLE OF CONTENTS (cont'd)

**Page**

      1.    The '714 Patent Discloses a "central computer
system" and a "second communication means" .........................23

E.    The Remainder of LML's Allegations Are Meritless or
Irrelevant ...............................................................................................26

      1.    David Kurrasch's Invalidity Expert Report
Supplements Were Proper, and Defendants Have
Provided Evidence That The '988 Patent Is
Anticipated ..............................................................................26

      2.    LML Improperly Seeks Reliance On Unrelated
Patents To Avoid Anticipation.......................................28

V.    CONCLUSION.................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

*Advanced Display System, Inc. v. Kent State University,*
212 F.3d 1272 (Fed. Cir. 2000)..................................................................15

*Horowitz v. Federal Kemper Life Assurance Co.,*
57 F.3d 300 (3d Cir. 1995)...........................................................................13

*In re Lonardo,*
119 F.3d 960 (Fed. Cir. 1997).....................................................................28

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.,*
475 U.S. 574 (1986)......................................................................................13

*Medtronic, Inc. v. Cardiac Pacemakers, Inc.,*
721 F.2d 1563 (Fed. Cir. 1983)..............................................................17, 22

*Meyers v. Pennypack Woods Home Ownership Association,*
559 F.2d 894 (3d Cir. 1977), *overruled on other grounds, Goodman v.
Lukens Steel Co.,* 777 F.2d 113 (3d Cir. 1985), *aff'd,* 482 U.S. 656 (1987)....27

*Pa. Coal Association v. Babbitt,*
63 F.3d 231 (3d Cir. 1995)...........................................................................13

*Rosco, Inc. v. Mirror Lite Co.,*
304 F.3d 1373 (Fed. Cir. 2002).....................................................................28

*SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.,*
225 F.3d 1349 (Fed. Cir. 2000).....................................................................14

*Tracinda Corp. v. DaimlerChrysler AG,*
362 F. Supp. 2d 487 (D. Del. 2005)..............................................................27

## STATUTES

35 U.S.C. § 101.............................................................................................28

35 U.S.C. § 102...................................................................................1, 9, 14, 20

Fed. R. Civ. P. 26(a)(2)(B), 26(e)(1) .............................................................27

Fed. R. Civ. P. 56(c) ......................................................................................13

## I.    NATURE AND STAGE OF PROCEEDINGS

This is a patent infringement litigation initiated by LML Patent Corporation ("LML") against defendants TeleCheck Services, Inc. ("TeleCheck"), Electronic Clearing House, Inc. ("ECHO"), XpressChex, Inc. ("XpressChex") and Nova Information Systems, Inc. ("Nova") (collectively, "Defendants"). The patent in suit is U.S. Patent No. 5,484,988 ("the '988 patent"). Fact and expert discovery has concluded, and claim construction briefing is complete.

On October 28, 2005, LML filed six summary judgment motions related to numerous issues in this matter, including a motion for summary judgment for a ruling that claims 1, 2, 4-6, 9-11, 14, 16, and 18 of the '988 patent are not anticipated. Defendants submit this reply brief in opposition.

## II.    SUMMARY OF ARGUMENT

U.S. Patent No. 5,175,682 to Higashiyama ("Higashiyama") anticipates claims 1, 2, 4-6, 9-11, 14, 16 and 18 of the '988 patent under 35 U.S.C. § 102. Higashiyama teaches the very concepts that LML seeks to find infringing here: reading a check to obtain bank account information, using that information to conduct an electronic check transaction, and handing the check back to the consumer so there is no need for the merchant to retain the check or carry it to a bank. There is no dispute that Higashiyama is prior art to the '988 patent, because the application leading to the Higashiyama patent was filed before the earliest asserted invention date of the '988 patent.

Higashiyama discloses each and every element of the purported inventions of these claims. As set forth in Defendants' motion for summary judgment of invalidity, the elements of many of these claims should be found in Higashiyama as a matter of law.[1]  A

---

[1] While Defendants have moved for summary judgment of anticipation based on the Higashiyama '682 patent, the standard in responding to LML's motion is whether a reasonable juror could find each element of the asserted claims in Higashiyama. Although Defendants will apply this reasonable juror standard here, it should be understood that Defendants maintain their contention that each element is so clearly present in Higashiyama that summary judgment of anticipation is appropriate.

reasonable fact-finder could likewise find each of the elements of the asserted claims present in Higashiyama. Beyond the evidence provided by the patent itself, Defendants' expert Mr. David Kurrasch has rendered an opinion, and will provide testimony at trial, that every element of the asserted claims of the '988 patent is disclosed in Higashiyama. Given the evidence showing the presence of the asserted claim elements within Higashiyama, LML cannot meet its burden to show that no reasonable jury could find the '988 patent anticipated.

LML's motion regarding Higashiyama is largely dependent on its motion to strike Defendants' properly submitted invalidity evidence, namely Mr. Kurrasch's supplemental reports. Mr. Kurrasch's supplemental reports were timely filed in accordance with the Scheduling Order, following the postponed deposition of the first-named inventor Robert Hills. Defendants' invalidity contentions were likewise timely and properly updated. LML's current efforts to ignore this timely and relevant evidence should be rejected.

Claims 1, 2, 4-6, 8-10, 14, and 18 of the '988 are further invalid as anticipated by U.S. Patent No. 5,053,607 to Carlson ("the '607 patent"). Like Higashiyama, the Carlson '607 patent teaches reading a check to obtain account information, using that information to conduct an electronic transaction, and handing the check back to the consumer at the point of sale. The '607 patent discloses each and every element of the purported inventions of these claims. Mr. Kurrasch will provide testimony further showing the anticipation of these claims by the '607 patent. Again, no dispute exists that the '607 patent is prior art to the '988 patent. LML has not met its burden of proving that no reasonable jury could find these claims anticipated by the '607 patent.

Claims 1, 2, 4, and 8-10 of the '988 patent are further invalid as anticipated by U.S. Patent No. 4,758,714 to Carlson ("the '714 patent"). The Carlson '714 patent also teaches the basic process now asserted by LML to be infringing. Each and every element of the purported inventions of these asserted '988 claims are disclosed in the '714 patent. Mr. Kurrasch's opinions and testimony provide further evidence on which a reasonable

2

jury could find anticipation. Yet again, no dispute exists that the '714 patent is prior art to the '988 patent. LML has not met its burden of proving that no reasonable jury could find these claims are anticipated by the '714 patent.

## III.    STATEMENT OF FACTS

### A.    The '988 Patent System and Prior Art Systems

The '988 patent discloses and claims a system and method for conducting electronic check transactions. (*See* Ex. A).[2] As described in the specification, the process begins when a customer making a purchase initiates a transaction by providing the merchant with any bank check, preferably a "specimen" or "blank" check. (*Id.* at 7:48.) This bank check is used only for purposes of obtaining bank account information from the check, and each transaction is "an electronic or 'paperless' event thereby eliminating reliance on accepting and processing commercial bank drafts (personal or corporate checks) and the physical handling of those bank drafts thus replacing commercial bank drafts at the point-of-sale." (*Id.* at 3:3-8.)

Specifically, the merchant obtains bank account information from the Magnetic Ink Character Recognition numbers ("MICR" numbers) located across the bottom of the check. (*Id.* at 6:66; 7:64-65.) The bank account information is the "ABA/Transit" and routing number of the check writer's bank. (*Id.* at 10:29-31.) Once the account information is entered, the merchant can initiate a check "verification" process, a well known prior art process in which one or more databases are accessed to determine if a check transaction is likely to be processed successfully. (*Id.* at 7:19-34, 7:63-8:22.) If the verification is approved, the merchant returns the check to the customer at the point of sale and the terminal prints an authorization receipt for the customer's signature. (*Id.* at

---

[2] Exhibits cited in this brief are attached to the co-filed Declaration of Timothy Devlin in Support of Defendants' Response Brief Regarding LML's Motion for Summary Judgment No. 4. Citations to patent text in this brief are of the form x:y, where "x" represents the column number and "y" the line number.

8:23-29.)  The transaction is later electronically processed for payment through an automated clearinghouse or "ACH" network.  (*Id.* at 8:30-42.)

This type of system and method was well-known in the art long before the effective priority date of the '988 patent.  Systems and methods enabling the electronic processing of paper checks presented at the point of sale have been discussed in the payments industry, disclosed in prior art patents, and implemented by payment processing corporations since the early 1980's.  Three patents directed to such systems and methods are Higashiyama, the '607 patent, and the '714 patent.  Each of these patents is prior art to the '988 patent.

As described in more detail below, Higashiyama and the '607 and '714 patents describe electronic check processing systems having each of the recited features of various claims of the '988 patent.  These references each describe equipment and methods for (1) reading the ABA/transit routing number and bank account number from checks presented at the point of sale, (2) communicating with databases for check verification, (3) handing the check back to the consumer at the point of sale and (4) electronically debiting the consumer's account based on the information obtained from the check.

### 1.    Higashiyama Describes a Point of Sale Electronic Check System and Method Developed Before the '988 Patent

The Higashiyama patent is entitled "Check System and Method Including Prioritizing Checks for Transmission to Banks for Processing."  It issued to Connie Higashiyama, William Melton and Ashok Narasimham on December 29, 1992 from an application filed December 14, 1990, which pre-dates the earliest asserted invention date for the '988 patent.  (Ex. B.)  Higashiyama is therefore prior art to the '988 patent under § 102(e).  A detailed claim chart comparing the disclosure of Higashiyama to the asserted claims is attached as Exhibit C, with a more concise description provided below.

4

Higashiyama discloses a system and method for electronically processing checks presented to merchants by customers using a point of sale terminal, in a manner that treats a check as the "equivalent of an electronic debit card." (*Id.* at 2:43-50; 3:11-16; 6:10-12; 10:27-30.) This is the very purpose espoused by the inventors of the '988 patent,

REDACTED

The point of sale electronic check system described by Higashiyama is comprised of one or more point of sale terminals (*id.* at 3:13-16), each of which includes a MICR reader for reading magnetic character information from the consumer's bank check (*id.* at 3:16-19; 10:24-26); a printer for printing a sales slip, printing validation information on a check, printing a check receipt, and printing summary reports (*id.* at 3:25-28; 5:47-52; 10:12-15); and a keypad (*id.* at 3:66). The point of sale terminal is described as a "typical prior art electronic cash register, or a more sophisticated computer system," in which an alphanumeric keypad may be present (*Id.* at 3:64-66.) A visual display is inherent in the system described by Higashiyama. (*Id.* at 3:38:41.) The terminal described by Higashiyama therefore includes all of the capabilities required by the '988 patent. This comes as no surprise, given that the '988 patent inventors simply utilized existing prior art terminals to implement their invention.          REDACTED

In the system of Higashiyama, point of sale terminals may be located in separate stores, linked by a central check processing system. (Ex. B at 7:25:33.) For example,

> *A merchant having multiple stores benefits in that a central location may be used for consolidating check data*, thereby providing the benefit that a merchant's check processing facilities can be consolidated, if desired, and allow check processing to be accomplished in a timely manner *without delays associated with physically transporting paper checks to the central location prior to electronically processing those checks*.

(*Id.*)[3]

---

[3] Unless otherwise indicated, emphasis in this Brief has been added.

5

Higashiyama's point of sale terminal can be directly connected to a central "backroom processor," as well as a telecommunications unit. (*Id.* at 3:33-36.) Figure 2 shows a block diagram of one embodiment of the system:



The backroom central processing computer may also be connected to a telecommunications unit capable of data communications with check clearing houses, as well as communication with the "merchant's bank . . . the issuing bank . . . the merchant's collection agency, check authorization services, and check verification services." (*Id.* at 7:55-8:2; *see also id.* at 3:33-36.)

In the check processing method taught by Higashiyama, a customer presents a check to a merchant as payment, and the merchant uses the point of sale terminal's MICR reader to automatically read the customer's account information from the check. (*Id.* at 3:45-50.) The point of sale terminal automatically provides additional information to create a complete transaction record, including the date and time, merchant deposit account number, customer checking account number and routing information, check number, and other discretionary data the merchant wishes, such as the merchant's name, location and a summary of goods or services provided. (*Id.* at 3:50-4:5.) Using the

6

terminal's keypad, the merchant may also enter information such as the amount of the check. (*Id.* at 3:63-66.)

Higashiyama further describes a check verification process with a third party database. Using the data record created by the point of sale terminal, a merchant next compares the customer's checking account number to a positive customer file and/or a negative customer file that can be maintained by an external credit authorization or verification service. (*Id.* at 4:14-22.) In one described embodiment, this verification process can be performed before information is sent to the central backroom processor. (*Id.* at 5:1-4.) In other embodiments, however, information is sent instantaneously to the backroom processor (*id.* at 5:5-7), allowing either the terminal or backroom processor to perform verification or communicate with a verification service. If authorization is declined because of negative information pertaining to the customer's account, the transaction may be cancelled. (*Id.* at 4:22-25.) Transaction-level information may be stored by the backroom central processing computer. (*Id.* at 6:50-53; 9:7-11, 16-19.)

Higashiyama teaches converting the check to an electronic transaction and returning the paper check to the consumer. If the check is approved, the terminal printer can print validation information on the check, including the merchant's name and deposit account number, the date and time of the transaction, and "language indicating that the check has been cancelled." (*Id.* at 4:26-43; 8:55-59.) This validation information indicates that the paper check has been cancelled and converted to an electronic transaction. (*Id.* at 4:28-32.) The merchant then returns the cancelled check to the customer. (*Id.* at 4:54-57 ("*The validated check is then returned to the customer for safekeeping*, thus avoiding the need for the check to be physically transported through the system depicted in Figure 1 for ultimate return to the customer."); 7:16-20, 35-36; 8:60-62.) A separate receipt may also be printed and given to the customer, stating that payment was made by check and that the check is being electronically processed. (*Id.* at 4:61-68; 9:4-6.)

7

Higashiyama describes using the information obtained from the check to conduct an electronic transaction. In fact, Higashiyama describes several methods of transmitting the electronic data record for processing, including (1) adding the data record to a file periodically uploaded to the central processing computer, (2) sending the data record to the central computer immediately for priority upload to the ACH or directly to the payor bank, or (3) sending the data record directly from the point of sale terminal to a bank or clearing house in a real time basis. (*Id.* at 5:1-7, 10-13, 18-20, 28-31, 37-46; 9:12-15.) Thus in Higashiyama, the check is used as a source document for obtaining a consumer's checking account information, and that information is used to conduct an electronic check transaction, without the need for the merchant to retain the consumer's check or carry the check to a bank.

Higashiyama incorporates by reference the "1990 ACH Rules" and the "1990 NACHA Operating Rules, Corporate Edition." (*Id.* at 6:32-36). These Rules require that the customer must execute an agreement or contract authorizing the electronic debiting of his or her bank account. (*See* Ex. G at ECHO 0022688; Ex. H at DK 000150; DK 000156.)

**REDACTED**

REDACTED

2. **The '714 and '607 Patents Describe Point of Sale Electronic Check Systems and Methods Developed Before the '988 Patent**

The '714 patent," (Ex. I), entitled "Point-of-Sale Mechanism," issued to Steven R. Carlson and Paul R. Carlson on July 19, 1988. The '607 patent ("Ex. J), entitled "Point-of-Sale Device Particularly adapted for Processing Checks," issued to the Carlsons on October 1, 1991. The '714 and '607 patents constitute prior art to the '988 patent under 35 U.S.C. § 102(b). Claim charts comparing the disclosures of the '607 patent and '714 patent to selected claims of the '988 patent are attached as Exhibits K and L. For convenience, a description of both patents is provided together below.

As with Higashiyama, the Carlson '714 and '607 patents describe the very concepts that LML now seeks to cover in its overly broad claim construction. Specifically, the '714 patent discloses a system capable of electronic check authorization and electronic funds transfer, in which the customer's check is cancelled and returned at the point of sale. (Ex. J at 1:10-18, 39-42; 2:9-17; 9:62-10:3.) The '607 patent discloses a point of sale device specifically adapted for electronic check processing and electronic funds transfer, and a system for performing check authorization and paper-initiated

9

electronic funds transfer at the point of sale, again while returning the check to the consumer at the point of sale. (Ex. J at 2:24-28; 15:38-42; 22:32-25:10.)

More specifically, the '714 and '607 patents describe a point of sale terminal capable of reading information from a bank check containing a MICR line. (Ex. I at 1:13-18; 11:22-28, 57-63; Ex. J at 3:47-48; 6:38-41, 49-57; 25:27-28.) The point of sale terminals include a merchant numeric keyboard (Ex. I at 8:54; Ex. J at 6:29-30; 13:37-39), a customer numeric keyboard (Ex. I at 6:18-23, 7:41-45; Ex. J at 13:39-40), merchant and customer display screens (Ex. I at 6:24-26, 7:45-49; Ex. J at 9:18-31), a printer (Ex. I at 2:32-37; Ex. J at 4:50-52), memory for storing information within the terminal (Ex. I at 2:25-27; Ex. J at 4:44-46; 19:12-17), and a MICR reader for reading the account, routing and transit numbers from a customer's bank check. (Ex. I at 3:15-28; 9:11-15; 13:35-43; Ex. J at 8:1-3; 11:40-43.) The described point of sale terminals are capable of storing information relating to each day's transactions and displaying that information upon command. (Ex. I at 13:13-20; Ex. J at 18:23-28; 22:19-21.)

As described in the '714 and '607 patents, the customer "present[s] his check, already filled out in full as per customary procedures," to the merchant at the point of sale. (Ex. I at 8:64-68; Ex. J at 22:57-58 ("[t]he customer would fill out and sign his check (or other MICR document) and pass it to the retailer").) The merchant inserts the check into the terminal, enters the amount of the transaction using the terminal keyboard, and depresses a button to request verification of the check. (Ex. I at 8:12-20; 8:68-9:4; Ex. J at 22:57-23:22; 23:60-24:36.) The terminal reads the MICR information from the check, even if the check is folded or wrinkled or has a torn or partially damaged MICR line. (Ex. I at 8:20-24; 11:22-28, 57-66; 13:35-43; Ex. J at 6:38-52.) The customer enters his or her PIN number at the customer keypad, and the system verifies that the customer's PIN number is valid by connecting to the customer's bank using a modem. (Ex. I at 8:20-24; Ex. J at 23:17-23; 24:13-14.)

10

After the customer's PIN number is verified, the system initiates the check verification process and verifies that sufficient funds exist in the customer's account to complete the transaction. (Ex. I at 2:14-18; 8:24-30; 12:65-13:8; Ex. J at 24:24-36.) This step is performed by contacting the payer bank's computer to determine whether the customer's account balance is sufficient to cover the balance of the transaction (Ex. I at 9:11-15, 40-44; Ex. I at 17:17-31; 23:60-24:44), or by connecting to the appropriate financial institution to complete the transaction electronically. (Ex. I at 23:60-24:44.) Provided sufficient funds are present to cover the check, "the payer's bank computer would electronically transfer the funds and debit the payer's account." (Ex. I at 9:45-48; Ex. J at 24:19-36.)

As described by the '714 patent, if sufficient funds are on deposit, the terminal stamps the word "Verified" on the check. (Ex. I at 8:30-33.) As described by both patents, the printer then prints authorization information on the back of the check. (*Id.* at 9:56-60; 10:17-23; Ex. J at 24:45-60, 10:13-53.) The point of sale terminals store the "retailer's identification number" and print that information automatically on each receipt. (Ex. I at 5:1-2; Ex. J at 15:47-64.)

After the electronic funds transfer, the check or instrument in the device is cancelled at the point of sale. (Ex. I at 8:49-64; *see also* Ex. J at 24:58-63; 10:13-53.) "This would be accomplished in much the same way as [electronic funds transfer] is used with bank credit cards today. Those skilled in the art will readily recognize that this method is preferred should applicable laws allow." (Ex. I at 8:49-64; *see also* Ex. J at 24:19-24.) As noted above, the ability to treat a check like a debit card was one of the features touted by the '988 patent inventors. (Ex. D at 196:21-197:16.)

At the end of a completed transaction, the "*cancelled check would be presented to the customer as part of his receipt.*" (Ex. I at 9:62-65; Ex. J at 18:52-60; 25:4-10.) The point of sale terminal printer prints "check cancellation information" on the back of the check, such as "Point-of-Sale Cancelled – Pay any Bank PEG 011386 FRB MPLS

0911-00036." (Ex. I at 9:62-10:3; *see also* Ex. J at 24:58-63; 10:13-53.) In addition to printing "all appropriate EFT and Point-of-Sale check cancellation information on checks," the terminal printer generates a receipt at the conclusion of each authorized transaction. (Ex. I at 1:55-56; 10:27-32; Ex. J at 24:60-63; 18:17-25, 52-60.)

The terminals are capable of communicating with "a computer system maintained by an issuer of a negotiable instrument" and with "an external communication system to identify a payor of a negotiable instrument . . . and to perform an electronic funds transfer." (Ex. I at 2:9-17; Ex. J at 3:35-40; 4:29-42.) As stated in the '607 patent, this electronic funds transfer can occur through the U.S. national ACH administered by NACHA. "The MICR line allows high speed, electronic reading of that data designating the proper bank and account to be identified and converting such data into electronic messages to be sent through the National Automated Clearing House system." (Ex. J at 1:63-68.)

The point of sale system described by the '607 patent also includes "means to access a computer system maintained by a system of retailers using one central CPU with which this device is integrated." (*Id.* at 4:33:35.) As set forth in the '607 patent,

> [a] specific version of this device, especially adapted for use in a larger installation, would be the device as otherwise described herein, but without its own on site CPU. That is to say, ***all 'CPU' functions may be carried out by a 'PC' computer located somewhere in the building (installation) but not necessarily at the point of sale as in a large department store, or by a centralized, off-site, CPU utilized by several point-of sale mechanisms.***

(*Id.* at 22:1-9.) Additionally, the point of sale terminal could communicate with "a number of financial networks and they in turn with a number of banking institutions." (*Id.* at 13:44-47.)

## IV.     ARGUMENT

### A.     Legal Standards for Summary Judgment

Under the Federal Rules of Civil Procedure, summary judgment should be granted only if a court concludes that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact is in dispute. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10 (1986). Once the movant has carried its initial burden, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 587 (quoting Fed. R. Civ. P. 56(e)).

"Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (citations omitted). The Court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995) (citation omitted).

In the present case, because Higashiyama, the '714 patent, and the '607 patent disclose all of the features of the asserted claims as set forth by Defendants and their expert, a reasonable jury could find anticipation of these claims. LML's motion should be denied.

### B.     Every Asserted Claim Is Anticipated by Higashiyama

LML's motion asserts that only a few of the elements of the '988 patent claims are purportedly missing from Higashiyama. A detailed description of some of these features within Higashiyama is found in Defendants' brief in support of their motion for

13

summary judgment of invalidity, (D.I. 353 at pp. 9-14), and the sections below further address the specific arguments in LML's motion. A claim chart comparing Higashiyama to all elements of the asserted claims of the '988 patent is attached as Exhibit C. This evidence establishes that a reasonable jury could find that the asserted claims are anticipated.

### 1.    The Higashiyama Patent Is Prior Art that Was Never Considered by the Examiner

Claims 1, 8, and 9 and their dependent claims are invalid as anticipated under 35 U.S.C. § 102 by Higashiyama, which discloses each and every element of the purported inventions of the asserted '988 claims. Anticipation based on Higashiyama more readily meets the burden required for finding invalidity, because Higashiyama was never considered by the Examiner during prosecution of the '988 patent. *SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1355-56 (Fed. Cir. 2000).

The '988 patent itself, as well as its prosecution history, establish that the Examiner did not review or consider Higashiyama when examining the application that became the '988 patent. Although the Examiner indicated his field of search when examining the application, no evidence exists that the Examiner reviewed Higashiyama when considering whether to reject or allow the claims. The Manual of Patent Examining Procedure ("MPEP") states that "[a]ll references which have been cited by the examiner during the prosecution [. . .] must be listed on either a form PTO-892 or on an Information Disclosure Statement (PTO/SB/08, old PTO-1449) and initialed. All such reference citations will be printed in the patent." Here it is clear that Higashiyama was never listed by the Examiner during prosecution, nor does Higashiyama appear in the listing of prior art references on the face of the patent.

Moreover, Higashiyama incorporates by reference the "1990 ACH Rules" and the "1990 NACHA Operating Rules, Corporate Edition." (Ex. B at Col. 6, lines 32-36). Higashiyama is thus treated as containing the complete disclosures of the "1990 ACH

14

Rules" and the "1990 NACHA Operating Rules." *See Advanced Display Sys., Inc. v.*
*Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000). As with Higashiyama itself,
there is no evidence in the prosecution history or otherwise to suggest that the Examiner
had access to these Rules or reviewed them during examination of the '988 patent.

> **2.    Higashiyama Discloses a "central computer system" Having a
> "second communication means" as Recited by the Claims**

Claims 1, 8, and 9 and their dependent claims recite a "central computer system."
(Ex. B at 11:39 and 12:46.) No party has proposed a construction for the term "central
computer system," and it should take on its ordinary meaning. Based on its ordinary
meaning, a reasonable juror could find that Higashiyama describes a "central computer
system."

LML does not dispute that Higashiyama discloses a computer, "backroom
processor 204," that communicates with the point of sale terminal. Instead LML only
disputes that this computer (1) serves multiple merchants, and (2) includes a recited
"second communications means" to communicate with an external database for verifying
transactions. (*See* D.I. 322 at pp. 21-28.)

The first issue is a red herring; there is no limitation in the '988 patent claims that
requires the system and method function for multiple merchants.

## REDACTED

Moreover, Higashiyama describes a system with terminals in separate merchant
locations, connected to a centralized processing system. (Ex. B at 7:25:33.)

With respect to the second issue, evidence establishes that the Higashiyama
backroom processor includes a communication means (termed the "second"
communication means to distinguish the one associated with the point of sale terminal).
Evidence also establishes that the backroom processor can communicate with third party
databases to verify transactions. Importantly, there is no dispute that the backroom

processor includes *some* communication means.  LML concedes that the backroom processor can at least communicate to upload "data records" to a bank or clearinghouse. (D.I. 322 p. 22.)  Also, there is no dispute that Higashiyama discloses communicating with an external databases such as the SCAN database for verifying transactions.  (*Id.* at p. 24.)

The crux of LML's argument is that, despite this undisputed teaching, no one of ordinary skill in the art could understand from the disclosure of Higashiyama that the backroom processor could communicate with the external database.  As both the text of Higashiyama and Defendants' expert establish, however, certain embodiments of Higashiyama support such a finding.  Both Higashiyama itself and the anticipated testimony of Defendants' expert, as set forth in his expert report, provide evidence from which a reasonable juror could determine that the "backroom processor" of Higashiyama performs all the functions of the recited "central computer system" and "second communication means" of the '988 patent.

Specifically, Higashiyama discloses a backroom processor 204 to which one or more point of sale systems are connected.  (*See* Ex. B at Fig. 2; 3:13-14, 29-33; *see also id.* at 3:29-33 ("POS terminal 201 is connected to backroom processor 204 . . . .".)  This backroom processor may support point of sale terminals located in separate geographic locations.  (*See Id.* at 7:25-27.)  Consequently, the backroom processor must have a communication means that facilitates communication with the point of sale terminal.  Moreover, Higashiyama teaches that the backroom processor may periodically take data records and "upload them to a clearing house."  (*Id.* at 5:12-13.)  This further confirms that the backroom processor includes a communication means.  Since the "first" communication means is located in the point of sale terminal, the "second" communication means resides within the backroom processor.

LML's arguments regarding Higashiyama focus on one embodiment in which the transaction is complete before information is provided to the backroom processor, but

16

this argument ignores the entirety of the reference. Higashiyama also discloses an embodiment wherein the data record generated by the point of sale terminal is sent to the backroom processor *immediately*. (*Id.* at 5:5-6.)

**REDACTED**

When immediately sending the data record to the backroom processor, any communication with the third party database to perform the described verification must take place through the backroom processor, not the point of sale terminal. Otherwise, the data record would not be "immediately" sent to the backroom processor. Accordingly, the backroom processor communication means (*i.e.*, the second communication means) enables communication with a third party database for performing verification. The evidence provided by Higashiyama is supported by the anticipated testimony of Defendants expert on this point. (Ex. N at 47, 57; Ex. 7; Ex. O at Part 3.)

There is no support for LML's narrow reading of Higashiyama that ignores one of the embodiments expressly described in the patent. In any invalidity analysis, the prior art reference must be viewed as a whole. *See, e.g., Medtronic, Inc. v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563, 1579 (Fed. Cir. 1983). Contrary to LML's assertions, Higashiyama itself provides evidence that one of ordinary skill in the art would understand that the second communication means could communicate with the external database. Mr. Kurrasch will also provide testimony in this regard. A reasonable juror could rely on this evidence in finding anticipation. Therefore, LML cannot meet its burden for summary judgment on this issue.

### 3.  Higashiyama Discloses a "first communication means integral to a point of sale terminal"

Claims 1 and 9 recite a "first communications means integral to said point of sale terminal for electronically communicating with the central computer system." (*Id.* at 11:40-43; 12:47-49.) Higashiyama expressly discloses this element. (Ex. B at 3:29-33

17

("POS terminal 201 is connected to backroom processor 204 . . . .").) Figure 2 of Higashiyama shows this direct connection between the point of sale terminal 201 and the backroom processor 204, establishing that the terminal 201 must have some means to facilitate that communication:



LML does not dispute that Higashiyama discloses a telecommunications unit connected to the terminal. (*See* D.I. 322 at pp.21-28.) LML's only attempt to distinguish Higashiyama is to assert that the telecommunications unit is not "integral." (*Id.*) LML's argument again ignores an embodiment expressly described in the prior art reference. Higashiyama specifically teaches that the point of sale terminal is connected to the backroom processor. (Ex. B at 3:29-33.) In the same paragraph, Higashiyama discloses that the telecommunications unit *may be* connected to POS terminal 201, "if desired." (*Id.* at 3:33-34.) Thus the terminal itself must have means to facilitate the direct connection to backroom processor. Indeed, this is the very arrangement shown in Figure 2.

Mr. Kurrasch's anticipated testimony, as set forth in his expert report, further demonstrates that one of ordinary skill in the art would understand the that the point of

sale terminal includes a communication means. A reasonable juror could rely on Mr. Kurrasch's testimony as well as Higashiyama itself in finding this element present in Higashiyama. LML has not met its burden that no reasonable jury could find that Higashiyama does not contain this claim element, and it is not entitled to summary judgment on this issue.

### 4.    Higashiyama Discloses a "resident third party database" and a "system subscriber database"

Claims 5 and 11 further require a "resident third party database," (Ex. B at 12:6; 13:6.) and claim 6 requires a "system subscriber database." (*Id.* at 12:13.) Both of these elements are disclosed in Higashiyama. LML does not dispute that Higashiyama discloses a third party database. Instead, LML suggests one of skill would not understand from Higashiyama that the database could reside on the central computer. (D.I. 322 at p. 30.)

Higashiyama describes verifying check authorization by using a databases such as the SCAN database or databases offered by TeleCheck or Telecredit. (Ex. B at 4:14-24.) Nothing in Higashiyama limits the location of where such a database is maintained. Mr. Kurrasch's anticipated testimony provides further evidence that one of ordinary skill in the art, reading the disclosure of Higashiyama, would understand the third party database could be stored or resident on the central computer. The '988 patent itself confirms the understanding of one of ordinary skill in the art: "As presently configured the central computer 329 already has a third party database known as the SCAN (trademark) database 333 resident on the central computer. Thus, credit worthiness can be checked using this SCAN database. The SCAN (trademark) database is updated daily." (Ex. B at 7:35-39.)

As for the "system subscriber database,"

REDACTED

19

doubt that in order for Higashiyama's dial-up authorization to function properly, a database of eligible merchants must be maintained. Mr. Kurrasch's anticipated testimony, as set forth in his expert report, provides further evidence that one of ordinary skill in the art would find it inherent to have a system subscriber database comprising a list of merchants eligible or authorized to use the system. LML's assertion that Higashiyama does not teach this element is meritless.

In short, LML has not and cannot show that no reasonable jury could find the '988 patent anticipated by Higashiyama. LML's motion for summary judgment, therefore, should be denied.

### C.    Claims 1, 2, 4-6, 8-10, 14, and 18 Are Anticipated By The '607 Patent

Claims 1, 2, 4-6, 8-10, 14, and 18 of the '988 are invalid as anticipated under 35 U.S.C. § 102 by the '607 patent, which discloses each and every element of the purported inventions of these asserted claims. A reasonable jury could find that claims 1, 2, 4, 8-10, 14 and 18 are anticipated, and LML's motion for summary judgment should be denied.

LML asserts that the '607 patent does not disclose a "central computer system" as required by claims 1-4, 8-10, 14, and 18 or a "second communication means" as required in claims 1-4, 9-10, and 14 of the '988 patent. LML does not contest that the '607 patent discloses or teaches the remaining features of claims 1, 2, 4, 8-10, 14, 16, and 18 of the '988 patent, and so these other features have been excluded from this discussion. While Defendants have attached a claim chart showing the presence of all elements within the '607 patent, Defendants address only LML's specific contentions below.

### 1.    The '607 Patent Discloses a "central computer system"

Claims 1, 2, 4, 8-10, 14, and 18 require a "central computer system." (Ex. J at 11:39; 12:46.) The parties have not construed the term "central computer system," and its ordinary meaning should apply. LML mistakenly contends that a "central computer system" is not described in the '607 patent. LML's contention demonstrates that, yet

again, LML has read the prior art selectively to exclude certain described embodiments. The '607 patent itself, as well as Mr. Kurrasch's anticipated testimony set forth in his expert report, establish that the '607 patent teaches one skilled in the art the element of a central computer system.     **REDACTED**

Indeed, the '607 patent expressly discloses a point of sale device that uses a central computer:

> ***The device is provided with a CPU means which can be located*** inside the housing (in the first compartment and/or in the second compartment), outside the housing but still in the retail establishment where the business transaction is taking place, or ***outside the retail establishment in a central location which employs a central CPU to service a system of such point of sale devices***.

(Ex. J at 3:20-26; *see also id.* at 4:29-42.)

In another embodiment, the point of sale terminal includes "means to access a computer system maintained by a system of retailers using one central CPU with which this device is integrated." (*Id.* at 4:33-35). The '607 patent teaches that "all 'CPU' functions [of the point of sale terminal] may be carried out by a . . . ***centralized***, off-site CPU utilized by several point-of-sale mechanisms." (*Id.* at 22:1-9.)

There is no doubt that the '607 patent teaches a "central computer system" and a reasonable juror could make that finding.

### 2.     The '607 Patent Discloses a "second communication means"

Claims 1 and 9 of the '988 patent and their dependent claims recite a "second communication means for receiving information from a plurality of said point of sale terminals" and a "second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search." (Ex. J at 11:47-55; 12:57-67.) These features also are disclosed in the '607 patent, and LML has not met its burden for summary judgment on this issue.

As discussed above, the '607 patent describes a central computer system. The central computer system is capable of servicing a plurality of point of sale devices, and

21

can perform "all 'CPU' functions" of the point of sale terminal. (*Id.* at 22:1-9.) The functions of the point of sale terminal can include "means to access an external communication system to identify a payor of a negotiable instrument . . . and to perform an electronic funds transfer only with a proper PIN number." (*Id.* at 4:37-42.) The functions also include interacting "with a number of financial networks and they in turn with a number of banking institutions . . . ." (*Id.* at 44-47.) The '607 patent expressly teaches that the central computer system may perform these functions. (*Id.* at 22:1-9.).

These communication steps include verification. For example, a verification is performed to ensure the consumer's checking account exists. (*Id.* at 23:60-24:13.) The system may route the data to the consumer's banking institution, where the consumer's account number is verified, any desired security checks are performed, and funds are transferred from the consumer's account to the retailer's account. (*Id.* at 23:19-36.) Thus the central computer system performs a computer bank account status search via an external database when processing checks for electronic funds transfers. Defendants' expert, Mr. Kurrasch, will provide additional evidence that one of ordinary skill in the art, reading the disclosure of the '607 patent, would understand the disclosure of a "second communication means" as recited in the '988 patent claims.    REDACTED

LML's arguments rely on a selective reading of the prior art that is legally incorrect. *See, e.g., Medtronic, Inc. v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563, 1579 (Fed. Cir. 1983). A reasonable jury could find that these '988 patent claims are anticipated when the '607 patent is viewed as a whole. Accordingly, LML's motion for summary judgment should be denied.

**D.    Claims 1, 2, 4, and 8-10 Are Anticipated By The '714 Patent**

Claims 1, 2, 4, and 8-10 of the '988 patent are invalid as anticipated by the '714 patent, which discloses each and every element of the purported inventions of these asserted '988 claims. As with other references, a claim chart comparing the '714 patent

22

to these claims of the '988 is attached to this brief as Exhibit L.  The sections below
address only those issues raised by LML in its motion.

Specifically, LML asserts that the '714 patent does not disclose a "central
computer system" and a "second communication means" as called for in certain claims of
the '988 patent.  Defendants set forth below the reasons why LML erred in its assertions
with respect to these two claim elements.  LML does not contest that the '714 patent
discloses or teaches the other features of claims 1-2, 4 and 8-10 of the '988 patent, and a
discussion of these other features is not included in this Brief.  In short, a reasonable jury
could find that these claims are anticipated by the '714 patent, and LML's motion for
summary judgment should be denied.

### 1.  The '714 Patent Discloses a "central computer system" and a "second communication means"

Claims 1, 2, 4, and 8-10 call for a "central computer system," a "second
communication means for receiving information from a plurality of said point of sale
terminals," and a "second communication means enabling said central computer system
to communicate with external databases for performing a consumer bank account status
search."  (Ex. I at 11:39, 47-55; 12:46, 57-67.)  As mentioned previously, the term
"central computer system" has not been construed by the parties, and its ordinary
meaning applies.

LML does not dispute that the '714 patent discloses a computer that
communicates with the point of sale terminal.  Instead, LML disputes that this computer,
(1) contacts an unrelated group of computers, and (2) includes a recited "second
communication means to communicate with a plurality of terminals, communicate with
external databases, or transfer funds.  (*See* LML Brief No. 4, pp. 17-20.)

The '714 patent discloses a point of sale device could include "means to access a
*computer system* maintained by an issuer of a negotiable instrument, credit card and the
like . . . ."  (Ex. I at 2:9-13.)  It does not state that it is limited to a "check-writer's bank,"

23

as LML wrongly suggests. (D.I. 322 at p. 17.) This generalized description of a "central computer system" in the '714 patent flatly contradicts LML's assertion. Mr. Kurrasch's anticipated testimony as set forth in his report further establishes that one of ordinary skill in the art would recognize the element of a centralized computer system is present in the '714 patent.            REDACTED            Based on this evidence, a reasonable juror could determine that the "central computer system" of the '988 patent is described by the '714 patent.

LML's assertion that the '714 patent somehow relates only to a merchant with a single point of sale terminal is likewise contradicted by the reference itself. The '714 patent states that the "invention relates to point of sale *devices* . . . ." (Ex. I at 1:10-12.) Also, the patent describes the invention as applied to a "retailer." (*See, e.g., id.* at 6:17-62, 8:12-33, 11:7-32, 12:5-13:34.) Nothing in the '714 patent limits its disclosure to a retailer that only has one point of sale terminal.

As with other elements, Mr. Kurrasch's anticipated testimony provides further evidence that one of ordinary skill in the art would understand the '714 patent to apply to multiple point of sale terminals.            REDACTED            Based on all of this evidence, a reasonable jury could find that the central computer system described in the '714 patent is capable of receiving information from a plurality of point of sale terminals.

LML's allegation that the '714 patent does not "enable" communications with multiple terminals is also incorrect. The '714 patent description provided above is at least as enabling as the text of the '988 patent. Indeed, the '988 patent itself states only that "[t]he central computer system receives input from a plurality of point-of-sale terminals . . . ." via "a telephonic network which is able to support communication from a plurality of point-of-sale terminals." (Ex. I at 6:20-23, 7:13-14.)

There is no discussion in the '988 patent as to how the telephonic network functions or how the central computer system prioritizes input from different terminals

24

.received at the same time. One of ordinary skill in the art would have understood how to attach multiple terminals to a central computer, and coordinate communications between those various components. This must be true, or else the '988 patent itself fails to enable its claims. Likewise, one of ordinary skill would understand how to connect and coordinate the multiple "devices" described in the '714 patent.

LML finally asserts that the '714 patent central computer system does not communicate with external databases or communicate to transfer funds. These arguments are also incorrect. First, the '714 patent describes an embodiment in which a point of sale terminal "could include . . . means to access an external communication system to identify a payor of a negotiable instrument (such as through the use of a personal identification number) and to perform an electronic funds transfer . . . ." (Ex. I at 2:11-16.) If the point of sale terminal does not include these features, they would be performed by the central computer system. Second, one embodiment described in the '714 patent includes connecting to a third party computer to verify consumer's bank account information:

> If the PINS match, the[n] the CPU would activate the "Phone in Verification Module" which would include a suitable modem for an AT&T hook-up with the Fed's MICA system. This would connect the system to the customer's own bank and the check could be verified for sufficient funds and proper I.D.

(*Id.* at 8:24-30; *see also* 8:49-9:65.) Third, the '714 patent discloses performing electronic funds transfers by having the point of sale terminal communicate with a central computer system. (*See id.* at 8:49-9:65.) The patent states, "In the case of personal checks . . . [a] preferred method would be to depress and engage the 15-92 EFT (electronic fund transfer) switch. This would initiate the EFT process . . . ." (*Id.* at 12:61-13:3.)

LML has not met its burden.  A reasonable jury could find that the '988 is anticipated based on this evidence.  Accordingly, LML's motion for summary judgment should be denied.

### E.    The Remainder of LML's Allegations Are Meritless or Irrelevant

LML makes several allegations in its Motion which find no support in the law. Several of LML's arguments have been addressed above.  The remaining allegations are likewise meritless or irrelevant.

#### 1.    David Kurrasch's Invalidity Expert Report Supplements Were Proper, and Defendants Have Provided Evidence That The '988 Patent Is Anticipated

Throughout LML's brief in support of its summary judgment motion, LML ignores the evidence provided in Mr. Kurrasch's supplemental expert reports and Defendants' supplemental interrogatory responses, all of which were properly and timely filed in accordance with the Scheduling Order.  LML chose to challenge Mr. Kurrasch's supplemental reports' admissibility rather than address them on the merits, particularly the evidence regarding invalidity of the '988 patent based on Higashiyama as it incorporates the 1990 Rules.  LML also has sought to attack Mr. Kurrasch's report based on claim construction, and these arguments are addressed in Defendants' response to LML's Daubert Motion No. 1 Nov. 14, 2005 (D.I. 404).

This Court issued a Scheduling Order that permitted the parties to supplement expert reports as a result of the delayed deposition of the first-named inventor, Mr. Robert Hills.  Mr. Hills was unavailable for a deposition until the end of August 2005, which was after the close of fact discovery.  In accordance with the Scheduling Order, Mr. Kurrasch supplemented his invalidity report on September 6, 2005, based on testimony from Mr. Hills and documents about which Mr. Hills testified, including Higashiyama and the 1990 Rules.  LML incorrectly refers to the citations to Mr. Hills' testimony as "gratuitous citations," even though the Scheduling Order expressly permitted Mr. Kurrasch to supplement his report.  (D.I. 322 at p. 11 n.4.)  LML has yet to

cite *any case law* that makes it improper to follow a scheduling order, repeatedly ignoring the standards set forth by the Third Circuit.

Mr. Kurrasch's Second Supplement only adjusted citations, once Mr. Kurrasch obtained a complete set of 1990 Rules, which had not previously been produced by any party. These amended citations did not affect the substance of Mr. Kurrasch's opinion in any manner; no substantive text changed and only citations to the 1990 Rules were added in the supplementation. This citation to newly found evidence is not only permitted, but *required* by the Federal Rules. *See* Fed. R. Civ. P. 26(a)(2)(B), 26(e)(1).)

Likewise, the applicable factors specified by the Third Circuit weigh against LML's assertion. *See, e.g., Tracinda Corp. v. DaimlerChrysler AG*, 362 F. Supp. 2d 487, 506 (D. Del. 2005) (citing *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904-05 (3d Cir. 1977), *overruled on other grounds, Goodman v. Lukens Steel Co.*, 777 F.2d 113 (3d Cir. 1985), *aff'd*, 482 U.S. 656 (1987)). Additional information regarding the appropriateness of Mr. Kurrasch's Expert Report is found in Defendants' replies to LML's motions to strike. (*See* D.I. 279 and D.I. 298.)

Furthermore, LML seeks to sidestep the evidence of anticipation by arguing that "[d]uring discovery, Defendants made no argument, and presented no evidence through response to interrogatories or otherwise, that claims 5, 6, 11, 14, 16 and 18 of the '988 patent were invalid as anticipated by any reference." (D.I. 322 at p. 32.) This assertion likewise expressly ignores the Court's Scheduling Order, implemented due to the delay in taking the deposition of Mr. Hills. Promptly after Mr. Kurrasch's supplemental report was filed, TeleCheck properly supplemented its interrogatory responses to refer to the reports. (*See* D.I. 285.) LML can hardly complain about this procedure, since LML also supplemented its interrogatory responses after its own expert supplemented his report. (D.I. 267.)

Mr. Kurrasch properly supplemented his report and Defendants provided evidence in accordance with the Scheduling Order. As a result, LML's assertions are without merit.

### 2. LML Improperly Seeks Reliance On Unrelated Patents To Avoid Anticipation.

LML wrongly argues that, because the Examiner considered Higashiyama in examining *different, unrelated* patents, that somehow Higashiyama does not anticipate the '988 patent claims. (D.I. 322 at p. 21 n.10.) The facts are that the Examiner never considered Higashiyama when examining the '988 patent, and neither the '528 and '366 patents are related to the '988 patent. Legally, the claims of these two unrelated patents must be different than the claims of the '988 patent, otherwise the claims would violate Section 101 of the patent laws. *See* 35 U.S.C. § 101; *see also In re Lonardo*, 119 F.3d 960, 965 (Fed. Cir. 1997). Even LML acknowledges – as it must – that the claims of the '528 and '366 patent are *not* identical to claims of the '988 patent.

Because the claims of these unrelated patents are not identical to those of the '988 patent, their scopes differ. This varying claim scope has a direct effect on how prior art is applied when examining the claims. It is irrelevant that Higashiyama was considered when examining the '528 and '366 patents because the '988 patent has different claims. Each claim must be reviewed on its own when conducting a validity analysis. *See Rosco, Inc. v. Mirror Lite Co.*, 304 F.3d 1373, 1379-80 (Fed. Cir. 2002). This is true even as to claims within a single patent, and is obviously true as to claims of different, unrelated patents.

Similarly, LML suggests that the '714 patent is merely cumulative to the '896 patent, a separate patent to Carlson cited during prosecution of the '988 patent. (D.I. 322 at p. 16.) LML's argument would make sense if the '714 patent and '896 patents contained identical disclosure, but they do not. The '714 patent is a continuation-in-part of the '896 patent. This means the '714 patent describes subject matter that is not present

in the '896 patent.  As a result of the '714's additional disclosure, it describes additional

features not available to the Examiner through the earlier '896 patent.  Nothing in the

prosecution history makes the '714 patent "cumulative," thus there is no basis for LML's

allegations, and they should be disregarded.

Nothing in LML's brief supports a grant of summary judgment here.  A

reasonable jury could find anticipation of each of these claims based on the references set

forth by Defendants.  LML's motion should be denied.

## V.     CONCLUSION

For the foregoing reasons, LML's motion for summary judgment of no

anticipation should be denied.

Dated:  November 15, 2005          FISH & RICHARDSON P.C.

                                   By:/s/ Timothy Devlin
                                        William J. Marsden, Jr. (#2247)
                                        Timothy Devlin (#4241)
                                        Tara D. Elliott (#4483)
                                        919 N. Market Street, Suite 1100
                                        P.O. Box 1114
                                        Wilmington, DE  19801
                                        302.652.5070

                                   *Attorneys for Defendant TeleCheck Services, Inc.*


                                   CONNOLLY BOVE LODGE & HUTZ LLP

                                   By:/s/ Collins J. Seitz, Jr.
                                        Collins J. Seitz, Jr. (I.D. No. 2237)
                                        The Nemours Building
                                        1007 N. Orange Street
                                        Wilmington, Delaware 19801
                                        302.658.9141

                                   *Attorneys for Defendants Electronic Clearing
                                   House, Inc.  and XpressChex, Inc.*

29

THE BAYARD FIRM

By: /s/ Richard D. Kirk
      Richard D. Kirk (I.D. No. 922)
      222 Delaware Avenue, Suite 900
      Wilmington, DE  19801
      302.429.4208

*Attorneys for Defendant*
*NOVA Information Systems, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2005, I electronically filed the PUBLIC

VERSION OF DEFENDANTS' OPPOSITION TO MOTION FOR SUMMARY

JUDGMENT NO. 4: FOR A RULING THAT CLAIMS 1, 2, 4-6, 9-11, 14, 16 AND 18

OF THE '988 PATENT ARE NOT ANTICIPATED with the Clerk of the Court using

CM/ECF which will send notification of such filing to the following:

Richard K. Herrmann, Esq.
Morris, James Hitchens & Williams LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19899

Collins J. Seitz, Jr., Esq.
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19801

Richard D. Kirk, Esq.
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, DE 19801

Additionally, I hereby certify that on the 22nd day of November, the foregoing
document was served via email on the following non-registered participants.

Robert Jacobs, Esq.
Belasco Jacobs & Townsley, LLP
Howard Hughes Center
6100 Center Drive, Suite 630
Los Angeles, CA 90045

Russell E. Levine, Esq.
Kirkland & Ellis LLP
200 E. Randolph Dr.
Chicago, IL 60601

Mark C. Scarsi, Esq.
O'Melveny & Myers LLP
400 S Hope Street
Los Angeles, CA 90071

_/s/ Timothy Devlin_
Timothy Devlin