IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LML PATENT CORP.,

        Plaintiff,

    v.

TELECHECK SERVICES, INC.,
ELECTRONIC CLEARING HOUSE, INC.,
XPRESSCHEX, INC. and NOVA
INFORMATION SYSTEMS, INC.,

        Defendants.

C.A. 04-858 (SLR)

**PUBLIC VERSION**

---

**DEFENDANTS' ANSWERING BRIEF IN OPPOSITION TO LML'S MOTION
FOR SUMMARY JUDGMENT NO. 5: FOR A RULING THAT CLAIMS 1, 2, 4, 5,
6, 9, 10, 11, 14, 16 AND 18 OF THE '988 PATENT ARE NOT INVALID UNDER 35
U.S.C. §§ 112 AND 132**

William J. Marsden (#2247)
Timothy Devlin (#4241)
Tara D. Elliott (#4483)
FISH & RICHARDSON P.C
919 N. Market Street, Suite 1100
Wilmington, DE 19899-1114

*Attorneys for TeleCheck Services, Inc*

Richard D. Kirk. (#922)
THE BAYARD FIRM
222 Delaware Avenue, Suite 900
Wilmington, DE 19801

*Attorney for Nova Information Systems,
Inc.*

Collins J. Seitz, Jr. (#2237)
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19801

*Attorney for Electronic Clearing House, Inc.
and XpressChex, Inc.*

Dated: November 15, 2005

## TABLE OF CONTENTS

**Page**

I.    NATURE AND STAGE OF THE PROCEEDINGS ...........................................1

II.   SUMMARY OF THE ARGUMENT .................................................................1

III.  STATEMENT OF RELEVANT FACTS ...........................................................3

     A.    The '988 Patent ...................................................................................3

     B.    Prosecution History of the Patent-in-Suit .................................................4

           1.    The Original November 13, 1992 Patent Application...................................................................................4

           2.    The June, 1994 Continuation Application ....................................6

     C.    The Parties' Relevant Proposed Claim Constructions .............................9

     D.    Defendants' Timely Disclosed their Section 112 and 132 Contentions ...........................................................................................10

IV.  ARGUMENT ...................................................................................................11

     A.    Legal Standards Governing Summary Judgment ...................................11

     B.    LML Is Not Entitled To Summary Judgment That The Written Description Of The Original 1992 Application Supported The Asserted Claims Of The '988 Patent, As Required By 35 U.S.C. § 112 .................................................................12

           1.    Legal Standards Governing Sufficiency of Written Description....................................................................12

           2.    A Reasonable Jury Could Find that Applicants Failed to Satisfy the § 112 Written Description Requirement as to the Asserted Claims ......................................14

           3.    Defendants' Written Description Arguments Are Wholly Consistent With Their Claim Construction Positions ...............................................................16

     C.    LML Is Not Entitled to Summary Judgment that the Asserted Claims Contain No New Matter Under 35 U.S.C. § 132..................................................................................................17

# TABLE OF CONTENTS (cont'd)

Page

1. Legal Standards Governing The § 132 New Matter Prohibition ........................................................ 17

2. A Reasonable Jury Could Find That The June 1994 Preliminary Amendment Contains "New Matter" Prohibited By § 132 ........................................ 18

D. LML Is Not Entitled To Summary Judgment That The Asserted Claims Are Not Invalid Under 35 U.S.C. § 112 For Lack Of Enablement ........................................ 20

    1. Legal Standards Governing The § 112 Enablement Requirement ........................................ 21

    2. A Genuine Issue of Material Fact Exists as to Whether Claim Elements Reciting Reading Information from "Any Bank Check" or "Any Consumer Bank Check" Are Enabled ........................... 23

    3. Defendants' Enablement Arguments Are Fully Consistent With Their Claim Construction Positions ........................................................ 26

E. LML Is Not Entitled to Summary Judgment that the Asserted Claims Are Not Invalid Under 35 U.S.C. § 112 for Indefiniteness ........................................ 26

    1. Legal Standards Governing The § 112 Definiteness Requirement ........................................ 27

    2. LML's Construction of the "Negotiable Instrument" Limitations Leads to Indefiniteness ........................ 28

    3. The Terms "Any Bank Check" and "Any Consumer Bank Check" Are Indefinite Under LML's Proposed Construction ........................................ 30

    4. Defendants' Indefiniteness Arguments Are Fully Consistent With Their Proposed Claim Constructions ........................................................ 31

F. TeleCheck Made Adequate and Timely Disclosures of Its Section 112 and 132 Defenses ........................................ 31

V. CONCLUSION ........................................................ 33

# TABLE OF AUTHORITIES

**Page(s)**

*AK Steel Corp. v. Sollac,*
    344 F.3d 1234 (Fed. Cir. 2003)...................................................................12, 19, 22, 23

*Adler v. Pataki,*
    185 F.3d 35 (2d Cir. 1999).................................................................................17, 27, 32

*Allen Engineering Corp. v. Bartell Industrial, Inc.,*
    299 F.3d 1336 (Fed. Cir. 2002)...............................................................................28, 29

*Amtel Corp. v. Information Storage Devices, Inc.,*
    198 F.3d 1374 (Fed. Cir. 1999).....................................................................................28

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)......................................................................................................12

*Avia Group International Inc. v. L.A. Gear Cal., Inc.,*
    853 F.2d 1557 (Fed. Cir. 1988).....................................................................................12

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,*
    489 U.S. 141 (1989)......................................................................................................23

*Chiron Corp. v. Genentech, Inc.,*
    363 F.3d 1247 (Fed. Cir. 2004)............................................................................ passim

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Industrial, Inc.,*
    145 F.3d 1303 (Fed. Cir. 1988).....................................................................................12

*Crown Ops. International, Ltd. v. Solutia Inc.,*
    289 F.3d 1367 (Fed. Cir. 2002)...............................................................................14, 23, 26

*Elan Pharma., Inc. v. Mayo Fdtn. for Medical Education & Research,*
    246 F.3d 1051 (Fed. Cir. 2003)...............................................................................22, 23

*Enzo Biochem, Inc. v. General-Probe Inc.,*
    323 F.3d 956 (Fed. Cir. 2002)...............................................................................12, 13, 14

*General Electric v. Wabash Appliance Corp.,*
    304 U.S. 364 (1938)......................................................................................................29

*Hyatt v. Boone,*
    146 F.3d 1348 (Fed. Cir. 1998).....................................................................................14

*Innova/Pure Water, Inc. v. Safari Water Filtration System, Inc.,*
    381 F.3d 1111 (Fed. Cir. 2004).....................................................................................17

*Lockwood v. American Airlines, Inc.*,
   107 F.3d 1565 (Fed. Cir. 1997) ..................................................................................18

*London v. Carson Pirie Scott & Co.*,
   946 F.2d 1534 (Fed. Cir. 1991) .........................................................................12, 28, 30

*Markman v. Westview Instr., Inc.*,
   517 U.S. 370 (1996) ...........................................................................................23, 29

*Merrill v. Yeomans*,
   94 U.S. 568, 570, 573 (1876) ..........................................................................27, 28, 29

*New Railhead Manufacturing, L.L.C. v. Vermeer Manufacturing Co.*,
   298 F.3d 1290 (Fed. Cir. 2002) .............................................................................12, 14

*Noelle v. Lederman*,
   355 F.3d 1343 (Fed. Cir. 2004) ..................................................................................14

*Novo Industrial, L.P. v. Micro Molds Corp.*,
   350 F.3d 1348 (Fed. Cir. 2003) .............................................................................20, 30

*Permutit Co. v. Graver Corp.*,
   284 U.S. 52 (1931) .............................................................................................30, 31

*Schering Corp. v. Amgen Inc.*,
   222 F.3d 1347 (Fed. Cir. 2000) .............................................................................18, 20

*Standard Oil Co. v. American Cyanamid Co.*,
   774 F.2d 448 (1985) ...........................................................................................30, 31

*Suntiger, Inc. v. Scientific Research Funding Group*,
   189 F.3d 1327 (Fed. Cir. 1999) .........................................................................14, 15, 16

*Turbocare Division of Demag Delaval Turbomachinery Corp. v.
General Electric Co.*, 264 F.3d 1111 (Fed. Cir. 2001) ....................................................14

*U.S. v. Newell*,
   239 F.3d 917 (7th Cir. 2001) ...........................................................................17, 27, 32

*Union Pac. Resources Co. v. Chesapeake Energy Co.*,
   236 F.3d 684 (Fed. Cir. 2001) ...............................................................................28, 30

*United Carbon Co. v. Binney & Smith Co.*,
   317 U.S. 228 (1942) ................................................................................................29

*Vas-Cath Inc. v. Mahurkar*,
   935 F.2d 1555 (Fed. Cir. 1991) ..................................................................................13

*In re Wallach*,
    378 F.3d 1330 (Fed. Cir. 2004).............................................................16, 17

*In re Wands*,
    858 F.2d 731 (Fed. Cir. 1988)....................................................................23

## STATUTES

35 U.S.C. § 112.................................................................................... passim

35 U.S.C. § 132..........................................................................2, 13, 18, 19

Fed. R. Civ. P. 26(e) ...............................................................................33

Fed. R. Civ. P. 56...................................................................................12

Fed. R. Civ. P. 56(c) ...............................................................................12

## I.    NATURE AND STAGE OF THE PROCEEDINGS

This is a patent infringement litigation initiated by LML Patent Corporation ("LML") against defendants TeleCheck Services, Inc. ("TeleCheck"), Electronic Clearing House, Inc. ("ECHO"), XpressChex, Inc. ("XpressChex") and Nova Information Systems, Inc. ("Nova") (collectively, "Defendants").  The patent-in-suit is U.S. Patent No. 5,484,988 ("the '988 patent").  Fact and expert discovery has concluded, and claim construction briefing is complete.

On October 28, 2005, LML filed six summary judgment motions related to numerous issues in this matter.  Defendants submit this opposition brief in response to Defendants' Motion for Summary Judgment No. 5: For a Ruling That Claims 1, 2, 4, 5, 6, 9, 10, 11, 14, 16 and 18 of the '988 Patent are Not Invalid Under 35 U.S.C. §§ 112 and 132.

## II.    SUMMARY OF THE ARGUMENT

LML's motion regarding Defendants' Section 112 and 132 defenses must be denied because genuine issues of material fact remain for trial with respect to each of the issues raised by LML in its Motion.  LML has failed to carry its burden to establish that, as a matter of law, it has fully satisfied the written description, enablement and indefiniteness requirements of 35 U.S.C. § 112, as well as the new matter prohibition set forth in 35 U.S.C. § 132.

First, LML incorrectly asserts that, as a matter of law, the original 1992 patent application provides an adequate written description of the phrase "without using the check as a negotiable instrument" (and corresponding phrases).  LML similarly asserts that no "new matter" was added during prosecution.  On the contrary, evidence establishes that a reasonable jury could conclude that the original 1992 application did not contain a sufficient written description under 35 U.S.C. § 112, and that new matter was added during prosecution.  That evidence includes

**REDACTED**

**REDACTED**

[1] The subject matter added to the description by that continuation related to these "negotiable instrument" limitations.

Second, evidence precludes summary judgment that asserted claims of the '988 patent are sufficiently enabled pursuant to 35 U.S.C. Section 112. Substantial evidence indicates that the '988 patent is devoid of any disclosure at all to enable one of ordinary skill in the art to make and use a system that could receive information from and transfer funds based on "any [consumer] bank check." For example, nothing in the specification enables one skilled in the art to transfer funds based on foreign bank checks without first engaging in extensive and undue experimentation. This is true under both Defendants' claim construction and LML's construction of "any [consumer] bank check."

Finally, LML cannot establish as a matter of law that one of ordinary skill in the art would be able to discern the metes and bounds of the "any bank check" and "negotiable instrument" limitations, as those phrases have been construed by LML. LML's proposed claim construction of the "negotiable instrument" limitations requires that the check not be "accepted" or "processed." These proposed limitations have no definitions in the patent and no clear boundaries to one of ordinary skill in the art. Likewise, LML's proposed constructions of "any bank check" and "any consumer bank check" are indefinite, because one of ordinary skill in the art would not understand what constitutes a "regular" check or "normal" account under LML's proposed construction. The patent itself provides evidence that these terms have no grounding in the intrinsic record. Summary judgment should be denied.

---

[1] Unless otherwise noted, all exhibits referenced throughout this brief are appended to the Declaration Of Timothy Devlin In Support Of Defendants' Response To LML's Motion For Summary Judgment No. 5, submitted herewith.

### III.    STATEMENT OF RELEVANT FACTS

#### A.    The '988 Patent

The '988 patent issued January 16, 1996 from an application filed June 9, 1994 (Ex. 3) and asserts priority back to an original application filed November 13, 1992 (Ex. 4). The '988 patent generally describes a system and method for converting paper checks to electronic transactions at the point-of-sale, using the check "as the basic source of identification of the individual and of the individual's bank and whereby the bank account is debited." (Ex. 5 at 1:13-15.)[2] The '988 patent claims were not allowed until after the claims were restricted to recite conducting transactions "without using the check as a negotiable instrument" (or equivalent language), and further limited to recite transferring funds using consumer bank account information from "any bank check" or "any consumer bank check." (Ex. 6 at LML-EP-000183-85, LML-EP-000189.)

The '988 patent's system and method for electronically processing paper checks presented at the point-of-sale begins when a customer initiates a transaction by presenting any bank check to a merchant using the '988 system. (Ex. 5 at 7:46-48.) Many bank checks bear Magnetic Ink Character Recognition ("MICR") numbers across the bottom of the check. (*Id.* at 6:66; 7:64-65.) In the United States, this MICR information includes the "ABA/Transit" number of the check writer's bank and the check writer's account number. (*Id.* at 10:29-31.) The MICR line may also include the check number, although in the described system this information can be "dropped" before proceeding with the electronic transaction. (*Id.* at 10:31-34.) In many foreign countries, for example, MICR numbers may represent different information and are often printed in a different font from MICR numbers appearing on checks drawn on United States bank accounts. (Ex. 8, ¶ 20.) According to the '988 patent specification, MICR information may be entered into a point-of-sale terminal via a keypad or a magnetic check reader. (Ex. 5 at 7:57-62.)

---

[2]    In this brief, citations to patent text are of the form x:y, where "x" represents the column number and "y" the line number.

In the '988 system, a merchant verifies that consumer bank account numbers were entered properly by visually confirming them on the terminal display panel, then enters the amount of sale and initiates the check verification process.  (*Id*. at 7:63-8:22.)  As was well known many years before the application for the '988 patent was filed, check verification involves accessing an information database to determine whether a particular check is likely to be processed or "settled" successfully.  (*Id*. at 7:19-31.)  The '988 patent suggests the use of pre-existing verification databases such the SCAN® database.  (*Id*. at 7:31-34.)  If a transaction is approved, the merchant returns the check to the customer at the point-of-sale, and the terminal prints an authorization receipt for the customer to sign.  (*Id*. at 8:23-29.)  The transaction is later processed electronically for payment through an automated clearinghouse or "ACH" network.  (*Id*. at 8:30-42.)

Well before the application leading to the '988 patent was filed, various methods of converting a paper check to an electronic transaction at the point-of-sale were widely known in the extensive prior art.  Systems and methods enabling merchants to process paper checks electronically at the point-of-sale have been discussed in the payment processing industry, disclosed in prior art patents and publications, and implemented by payment processing corporations since the early 1980's.  A number of these references are described in more detail in Defendants' briefing regarding the issues of anticipation, and are not repeated here.

### B.     Prosecution History of the Patent-in-Suit

#### 1.     The Original November 13, 1992 Patent Application

The original application leading to the '988 patent, Serial No. 07/975,717, was filed on November 13, 1992.  (Ex. 4.)  The original application contained nine claims, two of them independent.  Original independent claims 1 and 9 recited a point-of sale electronic payment processing system and method designed to receive consumer bank account information from debit-type plastic cards or checks, transmit that information to

4

a central computer, perform a verification process, and transfer funds through an automated clearing house network. (Ex. 4 at LML-EP-000104-06.)

The original 1992 application was silent with respect to the negotiability of the paper checks, and provided no description of whether a check processed using the described system and method should or should not be used as a negotiable instrument. (Ex. 4; Ex. 8, ¶ 14.) To the contrary, the 1992 description was consistent with the understanding at that time of using a check as a negotiable instrument. (Ex. 4; Ex. 8, ¶¶ 16-17.) For example, as further discussed below, the prior art Carlson '607 patent likewise describes reading a check to obtain account information, using that information to conduct an electronic funds transfer, and handing the check back to the consumer, but the patent also refers to checks as "negotiable instruments."

Rather than focusing on negotiability, the original application sought to distinguish the purported invention over the prior art by stating that earlier check processing systems "deal with the specific problem of how to accept a check from a customer for the purchase of goods and services," and "does not in any way address the subsequent processing of checks nor do they address the process by which checks are cleared through the normal automatic check handling clearinghouse operations that exist in the financial world." (Ex. 4 at LML-EP-000084.)

In an initial Office Action, the Examiner rejected each of the original application's claims as anticipated by prior art patents to "Deming" and "Case." (Ex. 11.)

In response, Applicants deleted language from claim 9 relating to the card-based embodiment, and added a new claim 10 directed to that embodiment. (Ex. 12 at LML-EP-000151-55.) In the accompanying remarks, Applicants sought to distinguish Case by claiming that their purported invention, unlike the Case reference, enabled customer account information to be "read from the check, which is returned to the consumer." (*Id.* at LML-EP-000157.) Applicants argued over Deming by asserting that their claimed

invention, in contrast to Deming, facilitated transactions at the point of sale "with funds being transferred from the consumer's checking account based on information derived directly from an ordinary bank check," and could "read in account and other information directly from the consumer's ordinary bank check" without requiring manual input of such information.  (*Id*. at LML-EP-000158-59.)

In a Final Office Action dated March 9, 1994, the Examiner again rejected Applicants' amended claims over Case and Deming, as well as U.S. Patent Nos. 5,053,607 and 4,678,896 to Carlson and U.S. Patent No. 4,672,377 to Murphy et al.  (Ex. 13.)

### 2.    The June, 1994 Continuation Application

After receiving the Final Rejection, Applicants filed a continuation application and a Preliminary Amendment on June 8, 1994.  (Exs. 3, 7.)

REDACTED

**REDACTED** [3]

**REDACTED**, both the specification and the claims contained in Applicants' June 1994 Preliminary Amendment contained entirely new subject matter relating to processing checks "without using a bank check as a negotiable instrument."  (Ex. 7 at LML-EP-000170-73, LML-EP-000176.)  These new statements regarding negotiability were interspersed throughout the specification, and included in the amended language of claims 1 and 11.  (*Id*.; Ex. 8, ¶ 13.)

---

[3] Unless otherwise indicated, all emphasis in this Brief has been added.

Within the specification, the newly added language first characterized the Case reference:

> This amount, along with a signature and other information, is supplied on a draft negotiable instrument, which is given to the merchant at the time of the transaction. Thus, the Case system does away with the use of bank checks in effecting the transaction, but requires the use of specialized prepaid draft negotiable instruments that must be surrendered to the merchant.

(*Id*. at LML-EP-000170-71.)

Applicants similarly amended the specification to distinguish Deming based on negotiability:

> While the Deming system does away with the use of bank checks, account and other information must be keyed into the system. The Deming system cannot be used to read account and other information directly from an ordinary bank check and has no use for bank checks as instruments other than negotiable paper.

(*Id*. at LML-EP-000171.)

Summing up the claimed invention's purported distinction from the prior art, Applicants added new language to the specification stating that:

> [S]ome of the currently used systems described above require the use of a bank check as a negotiable instrument which must be surrendered to a merchant. Some of the systems do away with the use of a bank check altogether, but require a debit card or a specialized draft instrument to be used with the particular system. None of these systems completely does away with the need and use for a negotiable draft instrument while using the consumer's bank check for identification and verification only. It is therefore an objective of the present invention to provide such a system.

(*Id*. at LML-EP-000171-72.)

LML cites much of this added language in its motion, but glosses over additional amendments that were directed expressly to the purported invention of the application. For example, the Summary of the Invention was altered to include the new statement that "[a] further object of the present invention is to significantly reduce the use of checks ***as negotiable instruments in effecting the*** purchases of goods or services." (*Id*. at LML-EP-000172, emphasis here identifying amended language.)

7

The June 1994 Preliminary Amendment also narrowed the scope of claims 1 and 9, amending claim 1 to recite that transactions completed using the invention took place "without using a bank check as a negotiable instrument," among other limitations.  (*Id*. at LML-EP 000172-74.)  The Preliminary Amendment also added new independent claim 11, which similarly recited reading MICR information from a paper check "for the sole purpose of eliciting consumer bank account information."  (*Id*. at LML-EP 000175-76.)

Applicants' pending claims, as amended in June 1994, were all rejected as indefinite in an Office Action dated October 28, 1994, which concluded that claim 1 did not capture the argued novelty in the specification.  (Ex. 14 at LML-EP 000181.)  Applicants' claims were also rejected on the grounds that use of the check "solely" for access to a consumer's bank account would be "the most trivial modification of systems" described in the prior art.  (*Id.*)

Applicants subsequently filed a Response to Office Action on January 30, 1995, further narrowing their claims to require that the system and method be capable of processing transactions not just from "a" single bank check, but rather from "any" bank check presented at the point-of-sale.  (Ex. 6.)  Claim 1 was amended to recite a point-of-sale terminal adapted to receive information from "any bank check," claim 9 was amended to recite presenting "any bank check" at the point of sale, and claim 11 was amended to require means for reading information from "any consumer bank check." (*Id*. at LML-EP-000183-85.)  Claim 9 was also amended to include the limitation "without using the check as a negotiable instrument," in accordance with similar limitations added to claims 1 and 11 by Preliminary Amendment dated June 8, 1994.  (*Id*. at LML-EP-000184.)

Applicants repeatedly relied on these limitations to argue over the prior art.  (*Id*. at LML-EP-000190, 207; *see also* LML-EP-000192-206; Ex. 8, ¶ 13.)  Applicants specifically argued that the Carlson '607 patent uses the check as a negotiable instrument:

> Carlson et al. disclose a system adapted for processing checks. The system includes a device that reads MICR information printed on the check. This reading of the MICR data speeds up processing of the check at the point of sale. ***The check is still used as a negotiable instrument, however, and is turned over to the merchant to complete the transaction.*** Thus, Carlson et al. do not disclose the use of a bank check in a point-of-sale transaction solely to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9 and 11. Rather, the Carlson et al. system requires negotiation of the check.

(*Id*. at LML-EP-000192.)

In reality, the '607 patent teaches that a check may be scanned to obtain consumer bank account information (Ex. 9 at 6:38-52), that the information may be used to verify the check and transfer funds (*id*. at 3:35-40; 4:29-42; 24:19-44), and, significantly, that the check may be returned to the consumer at the point of sale (*id*. at 18:52-60; 25:4-7; *see also* Ex. 8, ¶ 13.) Indeed, the Carlson '607 patent clearly states that a paper check may be returned to the consumer at the point-of-sale. (Ex. 9 at 25:4-7; Ex. 8, ¶ 13.) The only difference in this overall process is that Carlson describes this system as processing "negotiable instruments." (*Id*. at 3:41-42.)

These arguments were ultimately successful in obtaining allowance. At issuance, what was claim 9 during prosecution issued as claim 8, and former claim 11 issued as claim 9.[4]

## C.    The Parties' Relevant Proposed Claim Constructions

On October 7, 2005, the parties filed a Joint Proposed Claim Construction Chart. (Ex. 16, D.I. 281.) Two groups of phrases and their proposed constructions are relevant to this response. First, the phrases "without using the bank check as a negotiable instrument," "without using the check as a negotiable instrument" and "without using a bank check as a negotiable instrument," appear in independent claims 1, 8 and 9 of the '988 patent and thus relate to all asserted claims in this action. The parties agree that

---

[4]    In the remainder of this brief, for clarity and convenience Defendants refer to claims 8 and 9 of the '988 patent by these issued claim numbers, recognizing that issued claim 8 was prosecuted as "claim 9," and issued claim 9 was prosecuted as "claim 11."

these phrases should be assigned the same construction. Defendants propose that these phrases be construed to mean "the [bank] check, at no time, takes on the status of a negotiable instrument." (*Id*.) LML proposes that they be construed to mean "where the paper check is used as a source of information, and is not accepted or processed." (*Id*.)

Second, the term "any bank check" is used in claims 1 and 8 of the patent-in-suit. Defendants propose that this term be construed to mean "any type of check drawn on a financial institution." (*Id*.) LML proposes that the term be construed to mean "any regular check used to draw funds from a normal bank or credit union checking account." (*Id*.) The related term "any consumer bank check" is recited in claim 9. Defendants propose that this term be assigned the same meaning as the term "any bank check," with the added limitation that the check be "drawn against a consumer bank account." (*Id*.) LML proposes that this term be construed to mean "any regular check used to draw funds from a normal bank or credit union consumer checking account." (*Id*.)

The "any bank check" issue has another facet that LML overlooks in its Brief. Each independent claim also recites transfer of funds electronically or through an automated clearinghouse. (Ex. 3, 11:52-54; 12:40-42, 63-66.) Consistent with the plain meaning of the claims and the purpose of the patent, Defendants propose that these limitations require the capability to ***transfer funds*** using the information from any bank check. (Ex. 16.) As LML is aware, this is the source of the "transferring funds" language that LML expresses confusion about in its Brief. In its proposed claim construction, LML suggests that the claims merely require receiving information from any bank check, regardless of whether the system has the ability to transfer funds using that information. (*Id*.)

### D. Defendants' Timely Disclosed their Section 112 and 132 Contentions

Defendants' contentions regarding Sections 112 and 132 were first disclosed in TeleCheck's First Supplemental Responses to LML's Amended First Set of Interrogatories, served January 28, 2005. (Ex. 2.) Defendants served the Expert Reports

of David P. Kurrasch regarding invalidity on August 12, 2005, September 6, 2005 and

September 28, 2005. TeleCheck served its supplemental interrogatory responses,

incorporating its experts' opinions on October 5, 2005. This is consistent with LML's

supplementation. LML served its Fourth Supplemental Response to TeleCheck's

Interrogatories on September 21, 2005, after providing its expert reports.

## IV.   ARGUMENT

### A.   Legal Standards Governing Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate only

when the "pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ.

P. 56(c); *see also*, *e.g.*, *New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*, 298 F.3d 1290,

1294 (Fed. Cir. 2002). On a motion for summary judgment, all reasonable factual

inferences must be drawn and all doubts resolved in favor of the non-moving party. *See*,

*e.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *New Railhead Mfg.*, 298

F.3d at 1294; *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 962 (Fed. Cir. 2002).

Summary judgment is to be granted only when "no 'reasonable jury could return a

verdict for the nonmoving party.'" *Chiuminatta Concrete Concepts, Inc. v. Cardinal

Indus., Inc.*, 145 F.3d 1303, 1307 (Fed. Cir. 1988) (quoting *Anderson*, 477 U.S. at 248));

*London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1538 (Fed. Cir. 1991). The evidence

presented by the non-moving party on summary judgment "is to be believed." *See AK

Steel Corp. v. Sollac*, 344 F.3d 1234, 1238 (Fed. Cir. 2003). While an issued patent

enjoys a presumption of validity, that "'presumption is one of law, not fact, and does not

constitute "evidence" to be weighed against the challenger's evidence.'" *See Chiron

Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1258-59 (Fed. Cir. 2004) (quoting *Avia Group

Int'l Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1562 (Fed. Cir. 1988)).

**B.      LML Is Not Entitled To Summary Judgment That The Written Description Of The Original 1992 Application Supported The Asserted Claims Of The '988 Patent, As Required By 35 U.S.C. § 112**

LML is not entitled to summary judgment that the asserted claims satisfy the "written description" requirement of 35 U.S.C. § 112, because the original 1992 application failed to provide sufficient written description to support claim language subsequently added by amendment to overcome cited prior art. (Ex. 1, ¶¶ 212, 371; Ex. 2 at pp. 12-13.)[5] At a minimum, evidence exists from which a reasonable jury could find that the original application disclosure does not provide an adequate written description for the issued claims. Accordingly, LML's motion should be denied.

### 1.      Legal Standards Governing Sufficiency of Written Description

The first paragraph of Section 112 dictates that every patent specification must contain "a written description of the invention, and of the manner and process of making and using it, in . . . full, clear, concise and exact terms" describing all elements and limitations of the claim. 35 U.S.C. § 112; *see also*, *e.g.*, *Enzo Biochem*, 323 F.3d 956. Only the specification and claims set forth in the original description leading to the patent-in-suit are relevant for purposes of determining the sufficiency of a patent's written description. *See*, *e.g.*, *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1562 (Fed. Cir. 1991).

New matter added after the filing of the original application cannot be considered for purposes of satisfying the Section 112 written description requirement. *See*, *e.g*,

---

[5]     Defendants contend that the original 1992 application provides no adequate written description for the "negotiable instrument" limitations added by amendment, and that amendments during prosecution contain "new matter" within the meaning of 35 U.S.C. § 132. The result of such a finding is either invalidity or an adjustment to the priority date, and depends on additional inquiry into Patent Office procedures. In its Motion for Summary Judgment, LML only addresses the initial substantive issues, i.e., whether the original disclosure is adequate and whether new matter is added. Accordingly, in this Response Defendants only address these points, and not the question of how Patent Office procedures affects the result. In short, this Brief establishes that LML's motion should be denied, because there is substantial evidence from which a reasonable jury could find (1) that the original disclosure failed to contain an adequate written description, and (2) that the Applicants' amendments introduced new matter.

*Chiron Corp.*, 363 F.3d at 1259. Whether or not a patent complies with the written description requirement is a question of fact, and must be decided on a case-by-case basis. *See, e.g.*, *Noelle v. Lederman*, 355 F.3d 1343, 1348-49 (Fed. Cir. 2004); *Crown Ops. Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1376 (Fed. Cir. 2002). As such, questions surrounding the adequacy of a patent's written description are particularly appropriate for determination by a jury.

The purpose of the written description requirement is similar to the aim of the Section 132 new matter requirement:

> ***The written description requirement prevents applicants from using the amendment process to update their disclosures (claims or specifications) during their pendency before the patent office.*** Otherwise applicants could add new matter to their disclosures and date them back to their original filing date, thus defeating an accurate accounting of the priority of invention.

*Chiron Corp.*, 363 F.3d at 1255.

Material added to the written description by amendment must be "inherently" or "necessarily" contained in the original application, as judged from the vantage point of one of ordinary skill in the art. *See, e.g.*, *Turbocare Div. of Demag Delaval Turbomachinery Corp. v. General Elec. Co.*, 264 F.3d 1111, 1118-19 (Fed. Cir. 2001); *Hyatt v. Boone*, 146 F.3d 1348, 1354 (Fed. Cir. 1998). A patent holder's bare assertion that the original application demonstrates applicant's "possession" of the invention at the time of application is insufficient to demonstrate the adequacy of a patent's written description. *See, e.g.*, *New Railhead Mfg.*, 298 F.3d at 1295-96 ("the written description requirement 'is not subsumed by the "possession" inquiry'") (citation omitted); *Enzo Biochem*, 323 F.3d at 969.

Summary judgment regarding written description may be denied where the issue would benefit from a full hearing, or where conflicting evidence and/or expert testimony have been submitted. *See Suntiger, Inc. v. Scientific Research Funding Group*, 189 F.3d 1327, 1333-34 (Fed. Cir. 1999).

2.    **A Reasonable Jury Could Find that Applicants Failed to Satisfy the § 112 Written Description Requirement as to the Asserted Claims**

LML cannot demonstrate that no reasonable jury could find in Defendants' favor regarding written description. Substantial evidence indicates that the original 1992 application leading to the '988 patent failed to provide sufficient written description for the "negotiable instrument" limitations.

Indeed, the "negotiable instrument" limitations have no support in the written description of the original 1992 application. (Ex. 1, ¶ 371; Ex. 4; Ex. 8, ¶¶ 14-17.) None of the citations to which LML points in its Brief are relevant to whether a check presented at the point-of-sale is used as a negotiable instrument during electronic check conversion. (Ex. 8, ¶¶ 16-17.) None of those excerpts is relevant to any of the hallmarks of negotiability under the governing statutory, legal and regulatory regimes applicable at the time the original application was filed. (D.I. 325 at 10-11; Ex. 8, ¶ 17.)

At the time of the original 1992 application, the Uniform Commercial Code ("UCC") (the statute governing transactions in which paper checks are processed by traditional methods) defined a "negotiable instrument" as "a written and signed unconditional promise or order to pay a specified sum of money." (Ex. 8, ¶ 17.) In 1992 and still today, when a customer issues a filled out and signed check to a merchant, that check is "negotiable" within the meaning of the UCC. (*Id.*) Under Regulation E, the regulatory scheme enacted to implement the Electronic Funds Transfer Act, negotiability of an instrument was defined in 1992 as requiring written, pre-authorization for the electronic debit to a consumer's bank account to be properly authorized. (*Id.*)

Moreover, state laws in existence in 1992 adopted disparate definitions of what constitutes a negotiable instrument including various interpretations of the words draft, payable through draft, warrant, and check. (*Id.*) For example, the State of California uses a specific definition of the word "warrant" which, in most other jurisdictions, is a check. (*Id.*) The bare statements in the original application relating to the use of a paper

14

check as a source of information have no bearing on whether that check was used as a negotiable instrument under the regulations and rules applicable at the time of the original application. (*Id.*)

The original 1992 application contains no mention of whether instruments processed by the system should or should not be treated as negotiable instruments. (Ex. 4; Ex. 8, ¶¶ 15-16.) The first mention of an instrument's negotiability in connection with the pending claims was introduced by a June 8, 1994 Preliminary Amendment. (Ex. 1, ¶ 371; Ex. 7 at LML-EP-000170-73, 175-76; Ex. 8, ¶ 18.) That the Examiner declined to reject applicants' claims for lack of sufficient written description under Section 112 is simply not dispositive of the issue in later patent infringement litigation. *See*, *e.g.*, *In re Wallach*, 378 F.3d 1330, 1332 (Fed. Cir. 2004).

In fact, the description contained in the original 1992 application relating to the treatment of paper checks presented at the point-of-sale is actually *consistent* with use of those checks as negotiable instruments, at least under certain of the various definitions of "negotiable instrument" applicable in 1992. (Ex. 8, ¶ 17.)

The statements on which LML seeks to rely in its brief relate to other features recited in the claims before introduction of the "negotiable instrument" limitations. As set forth in the original 1992 application, independent claim 1 recited a checkwriting point of sale system including "a point of sale terminal adapted to receive consumer bank account information" and included communication means "to allow communication with banking institutions for purposes of transfer of funds." (Ex. 6 at LML-EP-000104.) Dependent claim 2 recited a system "wherein said consumer check is used to identify the consumer bank account information." (*Id.*) Independent claim 9 further recited a checkwriting point of sale process including the steps of "reading the magnetic stripe or MICR number information on the credit card or consumer check" and "subsequently transmitting the transaction event information to a bank for subsequent ACH operations."

15

(*Id*. at LML-EP-000105-06.)  The excerpts cited by LML in its Brief relate to these features of scanning the check and using that information to transfer funds.

The "negotiable instrument" limitations were an ***additional*** feature that must have some other meaning than the features already claimed.  *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,* 381 F.3d 1111, 1119 (Fed. Cir. 2004) ("[W]hen an applicant uses different terms in a claim it is permissible to infer that he intended his choice of different terms to reflect a differentiation in the meaning of those terms.").  The only written description for this new feature was provided, if at all, but the subject matter added to the specification in 1994.


**REDACTED**


LML's effort to sweep the "negotiable instrument" limitations into the same net as pre-existing limitations in the claims must be rejected. Indeed, a reasonable juror could infer that the original disclosure failed to support this limitation, based on the simple fact that the Applicants felt the need to amend the specification when the limitation was added.

### 3.    Defendants' Written Description Arguments Are Wholly Consistent With Their Claim Construction Positions

In its Brief, LML incorrectly argues that Defendants' contentions regarding written description are somehow contradicted by the fact that Defendants offered a proposed construction for the "negotiable instrument" limitations.  (D.I. 325 at 6.)  LML ignores the elementary principle that parties may offer arguments in the alternative during civil litigation, and indeed must do so in patent infringement litigation when claim construction and summary judgment issues are resolved simultaneously.  *See*, *e.g*., *U.S. v. Newell*, 239 F.3d 917, 921-22 (7th Cir. 2001); *Adler v. Pataki*, 185 F.3d 35, 41 (2d Cir. 1999).

In addition, LML ignores the fact that while claim construction looks at the entire intrinsic record, including the specification as issued, the written description requirement focuses on the content of the earliest-filed application leading to the patent-in-suit. *See*, *e.g.*, *Lockwood v. American Airlines, Inc.*, 107 F.3d 1565, 1571-72 (Fed. Cir. 1997). The fact that Defendants' opening claim construction brief cited portions of the issued '988 patent has no bearing on arguments relating to the content of the original application. Even where the original specification fails to support a claim limitation, text from the original specification can be relevant to claim construction when viewed in light of the entire amended specification. No inconsistency can result from Defendants' arguments offered with respect to separate inquiries directed towards different time frames.

### C.    LML Is Not Entitled to Summary Judgment that the Asserted Claims Contain No New Matter Under 35 U.S.C. § 132

Likewise, all asserted claims rely on "new matter" added to the specification within the meaning of 35 U.S.C. § 132. Substantial evidence exists to support a finding that additions to the written description made by way of a June 1994 Preliminary Amendment constituted prohibited "new matter" not contained in the original 1992 application, and a reasonable jury could come to this conclusion.

### 1.    Legal Standards Governing The § 132 New Matter Prohibition

35 U.S.C. § 132 provides that, during prosecution of a patent, "[n]o amendment shall introduce new matter into the disclosure of the invention." "The fundamental inquiry is whether the material added by amendment was ***inherently contained*** in the ***original specification***." *Schering Corp. v. Amgen Inc.*, 222 F.3d 1347, 1352 (Fed. Cir. 2000). The new matter prohibition is "closely related to the adequate disclosure requirements of 35 U.S.C. § 112." *Id*. To avoid invalidity based on the addition of new matter, the patent holder must demonstrate that the original application supports each element and limitation of the amended subject matter. *Id*.

Contrary to LML's assertion (D.I. 325 at 14), the Federal Circuit no longer recognizes an "especially weighty presumption of validity" in cases where the PTO declined to reject pending claims on invalidity grounds. *See AK Steel*, 344 F.3d at 1245 ("[W]e dispel the notion that the failure to the PTO to issue an enablement rejection automatically creates an 'especially weighty presumption' of compliance with 35 U.S.C. § 112.").

The disclosure of the invention, for purposes of the new matter prohibition, consists of both the specification and the claims – the entire written description of the invention. LML seems to confuse this issue, suggesting that the new matter requirement only applies to claims, even though the statute prohibits introducing "new matter into the disclosure." 35 U.S.C. § 132. Contrary to LML's assertion (D.I. 325 at 12-13), Defendants maintain that new matter was added by the 1994 Preliminary Amendment both to the patent description and the claims.

2.    **A Reasonable Jury Could Find That The June 1994 Preliminary Amendment Contains "New Matter" Prohibited By § 132**

The text added to the specification and claims by Applicants' June 8, 1994 and subsequent amendments constituted "new matter" compared to the disclosures contained in Applicants' original application. (Ex. 1, ¶¶ 110-112, 213, 372.)

**REDACTED**

Even a cursory comparison of the 1992 original application with the 1994 continuation application reveals that the "additional system features"          **REDACTED**          relate to the "negotiable instrument" limitations.

18

The newly added claim limitation "without using the [bank] check as a negotiable instrument" and its variants do not merely clarify or "more distinctly point out" the invention described in the original application, as LML argues.  (D.I. 325 at 13.)  Rather, they introduced into the purported invention a brand new limitation in an effort to overcome the cited prior art.  (Ex. 7 at LML-EP-000170-73, LML-EP-000176; Ex. 6 at LML-EP-000184, 190, 192-207; Ex. 1, ¶ 372; Ex. 8, ¶ 18.)  As discussed in Section III(D)(2) above, Applicants sought to overcome prior art patents, including those issued to Carlson which described the use of a check as a source of information in an electronic check conversion transaction and further taught returning the paper check to the consumer at the conclusion of the point-of-sale transaction.  (Ex. 6 at LML-EP-000192; Ex. 9 at 3:35-40; 4:29-42; 6:38-52; 18:52-60; 24:19-44; 25:4-7)  The addition of such a new claim limitation to overcome prior art relevant indicates on its face that the amendment was substantive, not merely cosmetic.  *See Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1358 (Fed. Cir. 2003).

As set forth above, contrary to LML's argument, no disclosure relating to the subsequently-added claim limitation "without using the [bank] check as a negotiable instrument" was inherently contained in Applicants' original 1992 Application.  (Ex. 1, ¶ 372; Ex. 4; Ex. 8, ¶¶ 14-17.)  *See Schering Corp.*, 222 F.3d at 1352.  Nothing in the original 1992 application speaks to negotiability.  (Ex. 4; Ex. 8, ¶¶ 15-16.)  The features described in LML's cited excerpts were consistent with the use of a check as a negotiable instrument.  (Ex. 8, ¶¶ 16-17.)  If the amendment adding the "negotiable instrument" limitations did not inject new matter, there would have been no reason to amend the specification.  Applicants are free to amend claims as long as such amendments are supported by the original specification.  *See Schering Corp.*, 222 F.3d at 1352.  A reasonable juror could infer based on the amendment alone that new matter was added.

19

Because sufficient evidence exists to permit a jury to find that the matter added to the pending application during prosecution, LML's motion for summary judgment regarding Section 132 should be denied.

### D. LML Is Not Entitled To Summary Judgment That The Asserted Claims Are Not Invalid Under 35 U.S.C. § 112 For Lack Of Enablement

None of the asserted claims are enabled under 35 U.S.C. § 112 because the written description of the '988 patent fails to sufficiently describe the manner and process of receiving information and transferring funds using "any bank check" or "any consumer bank check."[6]  In its motion, LML apparently ignores relevant aspects of Defendants' proposed claim construction.  As explained in Defendants' claim construction papers, the asserted claims must be construed to require the capability to receive information ***and transfer funds*** using any type of check, including business checks and foreign checks. [D.I. 288 at pp. 18-20; D.I. 297 at pp. 9-11.]  This is true even under LML's proposed construction of the phrases "any bank check" and "any consumer bank check," which encompass "regular" foreign checks drawn on "normal" foreign bank accounts.

The '988 patent, however, contains no description in the specification, drawings or claims explaining how one of ordinary skill in the art would conduct transactions using "any bank check" or "any consumer bank check."  Many of these "regular" foreign and/or business checks cannot be read by the types of check readers described in the '988 patent, and the patent itself contains no guidance as to how checks printed with different font conventions and other variations would be readable in the claimed system, nor does the '988 patent explain how funds could be transferred using even a "normal" foreign check.

---

[6]    Defendants have filed a separate Motion For Summary Judgment Of Invalidity seeking summary judgment of the asserted claims for lack of enablement and indefiniteness, and Defendants hereby incorporate that brief, dated October 28, 2005, by reference.

1.    **Legal Standards Governing The § 112 Enablement Requirement**

The requirement that a patent claim be "enabled" stems from 35 U.S.C. Section 112, which requires that:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to *enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same*. . . .

The Section 112 enablement requirement is satisfied "only if one skilled in the art, after reading their disclosures, could practice the invention claimed in the [] patent without undue experimentation." *Chiron Corp.*, 363 F.3d at 1253; *see also AK Steel*, 344 F.3d at 1244. How much experimentation is "undue" is a matter of degree, but must not be "unduly excessive." *See, e.g.*, *id*. Whether or not the patented claims require undue experimentation is in part a qualitative inquiry, and "'requires the application of a standard of reasonableness, having due regard for the nature of the invention and the state of the art.'" *Elan Pharma., Inc. v. Mayo Fdtn. for Med. Educ. & Research*, 246 F.3d 1051, 1055 (Fed. Cir. 2003) (citation omitted).

An issued patent is entitled to no "especially weighty presumption" of compliance with the enablement requirement simply because the Patent Office did not issue an enablement rejection. In fact, the Federal Circuit continues to invalidate claims for lack of enablement where the Patent Office allowed those claims without raising enablement objections. *See AK Steel*, 344 F.3d at 1245. The determination of whether or not a claim is enabled is a question of law based on underlying facts. *See, e.g.*, *Chiron Corp.*, 363 F.3d at 1253; *AK Steel*, 344 F.3d at 1238. In particular, the question of whether undue experimentation is required to enable the claims is a "factually intensive inquiry." *AK Steel*, 344 F.3d at 1245.

The requirement that each claim of a patent be fully enabled is at the heart of the bargain struck between the patentee and the public in exchange for the exclusive patent

grant the inventor receives. *Markman v. Westview Instr., Inc.*, 517 U.S. 370, 377-78 (1996). In order to justify restricting the public's right to the territory claimed by the patent, a patentee must teach those of ordinary skill in the art how to make and use each aspect of the claimed invention. *Crown Ops.*, 289 F.3d at 1378-79; *Markman*, 517 U.S. at 390. This enablement *quid pro quo* is recognized as an essential aspect of the United States patent system. *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 150-51 (1989); *AK Steel*, 344 F.3d at 1244.

Whether or not a claim is sufficiently enabled is determined as of the date of the original application. *Chiron Corp.*, 363 F.3d at 1254; *Elan Pharma.*, 246 F.3d 1051, 1056-57. In other words, the original application from which the patent stems must have enabled one of ordinary skill in the art at the time of the application to practice the full scope of the claimed invention. *Chiron Corp.*, 363 F.3d at 1253; *AK Steel*, 344 F.3d at 1241. The Federal Circuit applies an eight-pronged test to determine whether an invention is properly enabled, evaluating (1) the quantity of experimentation necessary; (2) the amount of direction or guidance presented; (3) the presence or absence of working examples; (4) the nature of the invention; (5) the state of the prior art; (6) the relative skill of those in the art; (7) the predictability or unpredictability of the art; and (8) the breadth of the claims. *Chiron Corp.*, 363 F.3d at 1256; *In re Wands*, 858 F.2d 731, 736-37 (Fed. Cir. 1988). Inventions in rapidly evolving or nascent industries require more detailed enabling descriptions of patented claims. *Chiron Corp.*, 363 F.3d at 1254.

> 2.     **A Genuine Issue of Material Fact Exists as to Whether Claim Elements Reciting Reading Information from "Any Bank Check" or "Any Consumer Bank Check" Are Enabled[7]**

A reasonable jury could find that the asserted claims of the '988 patent are invalid for failing to set forth in the patent specification an enabling disclosure for the "any bank check" limitations, including the limitations of transferring funds. No enabling description exists describing how transactions may be conducted, for example, using foreign bank checks, which constitute "any bank check" under either proposed construction of that phrase. (Ex. 1, ¶ 373; Ex. 8, ¶¶ 20-22.)

Neither the specification nor the claims, for instance, provide any guidance enabling one of ordinary skill in the art to electronically process checks drawn on foreign bank accounts. (*Id.*) Nothing in the specification or claims of the '988 patent teaches one of ordinary skill in the art, without undue experimentation, to address issues relating to foreign currency translation, the various MICR line fonts used by foreign banks, or any of the myriad foreign regulatory requirements governing the processing of checks presented for payment. (Ex. 1, ¶ 373; Ex. 8, ¶¶ 20-22.) The specification provides no guidance or working examples relating to the processing of foreign bank checks.

At the time the original '988 application was filed, one of ordinary skill in the art would have had to devote substantial time and energy towards evaluating foreign regulatory requirements, identifying those modifications that would be required to process foreign checks printed in MICR fonts deviating from United States standards, and modifying the system to perform any required foreign currency translation. (Ex. 1, ¶ 373; Ex. 8, ¶¶ 20-22.) The challenges faced by one of ordinary skill in the art in

---

[7]  While Defendants originally raised additional enablement arguments with respect to the asserted claims relating to their inclusion of the claim elements describing a second communication means "enabling automated clearing house communications for transferring funds" and describing "reading the magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information" (Ex. 2 at 13), Defendants no longer maintain invalidity defenses based on non-enablement of those two claim elements and do not address them further in this brief.

developing such a system would have been significant, especially since the Internet had not yet come into widespread use by that time. (D.I. 325 at 23 n. 11; Ex. 8, ¶¶ 20-22.)

In many foreign countries, for example, MICR numbers may represent different information and are often printed in a different font from MICR numbers appearing on checks drawn on United States bank accounts. (Ex. 8, ¶ 20.) Moreover, processing transactions that require currencies for which there are not active trading markets, such as the currencies of many lesser developed nations or countries with highly regulated currency controls, would require undue experimentation. (*Id.*)

Additionally, while the American Bankers Association has published MICR standards, including fonts, for all U.S. banks to use, similar standards simply are not available in other nations around the world. (*Id.*) This makes reading foreign check MICR lines at the point of sale difficult, and again requires undue levels of experimentation to enable the purported invention. (*Id.*) Finally, the legal and regulatory prohibitions against conversion of checks at the point of sale in certain countries around the world would also require excessive experimentation, ultimately failing in many countries (for instance Canada, where the Canadian Payments Association presently prohibits the conversion of paper checks to electronic debits). (*Id.*)

That the level of experimentation required to enable this aspect of the invention would have been undue is confirmed by

**REDACTED**

The quantity of experimentation necessary to enable the claimed invention would be particularly excessive under LML's proposed definition of one of ordinary skill in the art, requiring that a person of "ordinary skill" in the field of the invention have only a high school education and minimal industry experience. (Ex. 19. at pp. 12-13; Ex. 8, ¶ 22.)

24

Because the specification and claims demonstrate on their face that the "any bank check" limitations are not enabled, LML is reduced to arguing that its own unsupportable construction of this disputed claim term proves its enablement. LML first proffers a construction of the term "any bank check" that improperly divorces the function of the check from the object of the invention –facilitating the paperless electronic transfer of funds. Each independent claim has the stated objective of allowing merchants to "conduct[] transactions." (D.I. 325 at 22; Ex. 5 at 11:36-55; 12:22-67.)

The only other evidence LML offers regarding enablement is the unsupported and conclusory assertion of its expert that the specification of the '988 patent teaches one of ordinary skill "to conduct the claimed transactions using business checks and/or foreign checks." (Ex. 17 at 100.) Given this meager showing in support of LML's argument, and in light of the countervailing evidence marshaled by Defendants demonstrating its lack of enablement, a reasonable jury could find for Defendants on this issue. (Ex. 1, ¶ 373; Ex. 8, ¶¶ 20, 22.)

While LML devotes more than a full page to pointlessly arguing with Defendants' proposed claim construction in its Motion (D.I. 325 at 21-22), the fact remains that, even under the claim construction proposed by LML, the lack of enablement discussed above invalidates at least claims 1 and 8 and their dependent claims. Claims 1 and 8 both require obtaining information "from" a consumer bank check. Both claims should be construed, as set forth in Defendants' claim construction brief, to require "reading" information from "any bank check." (D.I. 288 at pp. 32-37.) As set forth above, reading information from "any" foreign bank check would require undue experimentation due to lack of standards in foreign countries, and the variety of MICR arrangements that result.

The law requires that "the novel aspects of the invention must be disclosed and not left to inference, that is, a patentee may not rely on the inference of a person or ordinary skill in the pertinent art to supply such novel aspects." *Crown Ops.*, 289 F.3d at 1380; *Genentech*, 108 F.3d at 1366. A reasonable jury could find that the specification of

the '988 patent fails to enable its purportedly novel aspects. LML's motion should be denied.

### 3. Defendants' Enablement Arguments Are Fully Consistent With Their Claim Construction Positions

Finally, LML wrongly asserts that by taking a position during claim construction with respect to the proper interpretation of the term "any bank check," Defendants have effectively waived their right to now challenge the validity of that term for lack of enablement. (D.I. 325 at 2.) LML's assertion is meritless, as it is well settled that parties in litigation may assert positions in the alternative. *See, e.g.*, *Newell*, 239 F.3d at 921-22; *Adler*, 185 F.3d at 41. Indeed, when claim construction and summary judgment issues are resolved in tandem, prudence requires the assertion of arguments in the alternative to prepare for the possibility that their preferred claim construction is not adopted. LML's attempts to confuse these issues should be ignored.

### E. LML Is Not Entitled to Summary Judgment that the Asserted Claims Are Not Invalid Under 35 U.S.C. § 112 for Indefiniteness

For two separate reasons, if LML's construction is adopted one of ordinary skill would not be able to determine the metes and bounds of the invention purportedly described in the asserted claims. First, under LML's proposed construction of the "negotiable instrument" limitations, one of ordinary skill in the art would have no clear understanding of the limits of the terms "accepted" and "processed." Second, under LML's proposed construction of the "any bank check" limitations, the claims are indefinite because one of ordinary skill in the art would not understand what constitutes a "regular" check or a "normal" account.

The only evidence required here is the patent itself, along with LML's construction. The patent does not provide any definition of the terms "accepted" or "processed," nor does it provide any meaning to a "regular" check or "normal" account. A reasonable jury seeking to apply these constructions could find that they are indefinite.

1.    **Legal Standards Governing The § 112 Definiteness Requirement**

The requirement that a patent's claims be sufficiently definite is codified in the second paragraph of 35 U.S.C. § 112, which states that the "specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." *See also*, *e.g*., *Amtel Corp. v. Information Storage Devices*, *Inc*., 198 F.3d 1374, 1381 (Fed. Cir. 1999). Whether a claim is invalid for indefiniteness turns on whether a person of ordinary skill in the art would understand what is claimed, and what is not claimed, in light of the specification. *See*, *e.g*., *Allen Eng'g Corp. v. Bartell Indus.*, *Inc*., 299 F.3d 1336, 1348 (Fed. Cir. 2002); *Union Pac. Resources Co. v. Chesapeake Energy Co*., 236 F.3d 684, 692 (Fed. Cir. 2001). "Claims must be 'particular' and 'distinct,' as required by 35 U.S.C. § 112, so that the public has fair notice of what the patentee and the Patent and Trademark Office have agreed constitute the metes and bounds of the claimed invention." *London*, 946 F.2d at 1538; *see also Amtel Corp.*, 198 F.3d at 1381 ("Paragraph 2 requires claims that particularly and distinctly indicate the subject matter that the inventor considers to be his or her invention.").

The policy rationale justifying the Section 112 definiteness requirement has long been recognized as the need to put the public and competitors on fair notice of what is and is not covered by a patent's claims. As the Supreme Court explained in *Merrill v. Yeomans*:

> Turning our attention to the first claim, we are compelled to say that the language is far from possessing that ***precision and clearness of statement*** with which one who proposes to secure a monopoly at the expense of the public ought to describe the thing which no one but himself can use or enjoy, without paying him for the privilege of doing so.
>
> \*       \*       \*
>
> The developed and improved condition of the patent law, and of the principles which govern the exclusive rights conferred by it, leave ***no excuse for ambiguous language or vague descriptions. The public should not be deprived of rights supposed to belong to it, without being clearly told what it is that limits these rights***.

27

94 U.S. 568, 570, 573 (1876); *see also Markman v. Westview Instr., Inc*., 517 U.S. 370,

390 (1996) (*citing United Carbon Co. v. Binney & Smith Co*., 317 U.S. 228, 236 (1942));

*General Elec. v. Wabash Appliance Corp*., 304 U.S. 364, 369 (1938).  The determination

of whether a patent claim is invalid for indefiniteness is a question of law.  *See, e.g.*,

*Allen Eng'g*, 299 F.3d at 1344.

### 2. LML's Construction of the "Negotiable Instrument" Limitations Leads to Indefiniteness

Under LML's proposed claim construction of the "negotiable instrument"

limitations, all of the asserted claims of the '988 patent are invalid under 35 U.S.C. § 112,

second paragraph, for indefiniteness.  (Ex. 1, ¶ 374.)  Only the construction of this term

proposed by Defendants in their claim construction brief and supporting papers (D.I. 288

at pp. 21-25; D.I. 297 at 12-20) properly grounds the interpretation of the phrase in the

patent's intrinsic record and prosecution history, and gives this limitation any clear and

definite scope.  Defendants' construction is the only construction that provides

sufficiently definite bounds to these limitations to satisfy the fundamental notice function

of the claims.

If LML's proposed construction of the disputed term "without using the [bank]

check as a negotiable instrument" is adopted, each asserted claim of the '988 patent

would be rendered fatally ambiguous and indefinite.  (Ex. 1, ¶¶ 212, 374.)  LML suggests

that this term should be construed to mean "where the paper check is used as a source of

information, and is not ***accepted*** or ***processed***."  (D.I. 281 at 9.)  The terms "accepted"

and "processed" are themselves each subject to multiple and competing interpretations,

none of which would be agreed upon as controlling by persons of ordinary skill in the

field of the invention at the time the original 1992 application was filed.  (Ex. 1, ¶ 374;

Ex. 8, ¶ 26.)

The '988 patent itself contains no express definitions of the terms "accept" or

"process" that would allow one of ordinary skill in the art to discern what they might

mean (Ex. 1, ¶ 374; Ex. 8, ¶ 26), and the terms "accepted" and "processed" were never defined in the specification or claims of the '988 patent. These ambiguities, left unresolved by the specification and claims, render the "negotiable instrument" claim element hopelessly ambiguous and indefinite under LML's construction. *See, e.g.*, *Novo Indus.*, 350 F. 3d at 1358 (court should not have to "guess as to what was intended" by claim limitations); *Union Pac. Resources Co.*, 236 F.3d at 692 (claim language indefinite where susceptible to different reasonable meanings).

If the terms "accepted" and "processed" are to be included as limitations to the asserted claims, they must be clear from the text of the '988 patent itself. *See, e.g.*, *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 453 (1985). "[C]laims must be 'particular' and 'distinct,' as required by 35 U.S.C. § 112, so that the public has fair notice of what the patentee and the Patent and Trademark Office have agreed constitute the metes and bounds of the claimed invention." *London*, 946 F.2d at 1538; *see also Permutit Co. v. Graver Corp.*, 284 U.S. 52, 60 (1931). Since the specification of the patent-in-suit fails to provide any guidance as to what might be meant by the terms "accepted" and "processed," LML's proposed construction of this disputed claim term is inherently indefinite and ambiguous, and represents exactly the sort of moving target that the public policy undergirding Section 112's definiteness requirement sought to eliminate.

The lack of particularity and clarity generated by LML's proposed construction of the "negotiable instrument" limitations is highlighted by the inconsistency between

**REDACTED**

By departing from the clear and definite constructions of this claim limitation                **REDACTED**

, LML stripped this disputed claim term of the clarity and particularity required by Section 112's definiteness requirement.

Finally, the very portions of the specification to which LML points in its Motion reflect the lack of precision and clarity LML's proposed to introduce into the "negotiable instrument" limitations.  (D.I. 325 at 26.)  Those sections of the specification are wholly unrelated to the negotiability of a check presented at the point-of-sale or whether that check is used as a negotiable instrument within the meaning of the applicable rules, laws and regulations governing negotiability at the time of the purported invention.  (*Id.*; Ex. 8, ¶ 27.)  As described above, a check may be processed electronically, yet still be used as a negotiable instrument.  In light of the countervailing evidence, LML has failed to demonstrate that no reasonable jury could find indefiniteness.  LML's Motion on this issue should be denied.

### 3.    The Terms "Any Bank Check" and "Any Consumer Bank Check" Are Indefinite Under LML's Proposed Construction

Under the constructions of the disputed claim terms "any bank check" and "any consumer bank check" proposed by LML (Ex. 16), all asserted claims of the '988 patent are invalid under the second paragraph of 35 U.S.C. § 112 because those limitations are indefinite.  LML proposes that the term "any bank check" should be construed to mean "any ***regular*** check used to draw funds from a ***normal*** bank or credit union checking account."  (*Id.*)  By importing the inherently subjective and ambiguous terms "regular" and "normal" into its construction of these disputed terms, LML advances a claim construction that again includes indefinite terms requiring additional construction.  As with the terms "accepted" and "processed," these terms are susceptible to multiple interpretations by persons of ordinary skill in the art, and thus lack the necessary precision and clearness of statement required by law.  (Ex. 8, ¶¶ 28-29.)  *See, e.g.*, *Standard Oil*, 774 F.2d at 453.

For instance, a "regular" check might have been defined variously by those of ordinary skill in the art at the time of the invention as any check readable by an Veriphone 3890 check reader (a common check reader at the time); any check drawn on

30

an account offered to the public, consumers or businesses; or any check that can be posted to a financial institution's general ledger, including internal debit entries.  (Ex. 8, ¶ 29.)  The '988 patent offers no guidance as to which of these definitions of a "regular" check is correct, or whether some other definition is appropriate.  (Ex. 4; Ex. 5; Ex. 8, ¶¶ 28-29.)  Likewise, the phrase "normal bank or credit union checking account" would have had many disparate reasonable meanings to those of ordinary skill in the art at the time of the original 1992 application, including any checking account offered to the public (whether a consumer, business or state government account); any checking account offered to consumers but not to businesses; any checking account carried on a financial institution's general ledger; any account bearing interest; or any open account against which a check may be written.  (Ex. 8, ¶ 29.)

If adopted, LML's construction, combined with the substantial evidence discussed above, would render the claim terms "any bank check" and "any consumer bank check" invalid for indefiniteness.  LML's Motion should be denied.

### 4.    Defendants' Indefiniteness Arguments Are Fully Consistent With Their Proposed Claim Constructions

Again, LML mistakenly asserts that Defendants have effectively waived the right to forward invalidity arguments based on indefiniteness by choosing to submit constructions of disputed claim terms during claim construction briefing.  (D.I. 325 at 2.) Defendants in patent infringement actions, like any other civil litigants, are permitted to assert positions in the alternative in claim construction and summary judgment briefs, particularly when those issues are resolved concurrently by the Court.  *See*, *e.g*., *Newell*, 239 F.3d at 921-22; *Adler*, 185 F.3d at 41.  LML's improper argument should be ignored.

### F.    Defendants Made Adequate and Timely Disclosures of Its Section 112 and 132 Defenses

LML preemptively asserts, without argument or factual support, that "Defendants cannot raise, new, undisclosed contentions in response to [LML's motion for summary judgment]."  (D.I. 325 at 4-5 n.3.)  This answering brief in response to LML's motion

sets forth defenses that were disclosed to LML as early as January 2005 in response to LML's interrogatories. Defendants also timely served the expert reports of David P. Kurrasch regarding invalidity, which were substantively consistent with Defendants' interrogatory responses. Defendants' Section 112 and 132 defenses have not changed in any material way from what has been previously disclosed to LML long before the summary judgment stage.

Not only is LML's statement regarding "undisclosed contentions" without purpose, it misrepresents the Federal Rules. Rule 26 actually ***requires*** supplementation of discovery, Fed. R. Civ. P. 26(e), while Rule 37 prohibits use of information if a party fails to supplement as required by Rule 26(e).

As with the Federal Rules, LML's cited cases fail to support its assertion, nor are they relevant given Defendants' prior disclosure of its contentions. LML cites to *Kalis v. Colgate-Palmolive* as "denying request for additional discovery to oppose motion for summary judgment." Additionally, LML cites *Trebor Sportswear Co., Inc. v. The Limited Stores, Inc*. as "denying further discovery when the party opposing summary judgment had a 'fully adequate opportunity for discovery.'" Neither of these cases are relevant here. Defendants have not and do not seek further discovery to oppose LML's summary judgment motion. TeleCheck's discovery responses and expert disclosures have adequately set forth its defenses.

LML's other cited cases are also irrelevant. According to LML, these cases relate to situations in which a party "failed to disclose identity of expert and the substance of his testimony until five months after retaining him and over three months after the close of an extended period of discovery" and where an expert was "not disclosed until after the close of discovery, and plaintiff failed to seasonably supplement its interrogatory responses to identify the expert in a timely manner pursuant to Rule 26(e) of the Federal Rules of Civil Procedure."

In the present case, Defendants disclosed the identity of expert David Kurrasch within days of his engagement.  His reports regarding invalidity were timely served, and Defendants' contention interrogatories were timely updated.  Indeed, LML likewise supplemented its contentions following service of its own expert reports – after the close of fact discovery and after its expert reports were served.  None of the cases LML cites in support of its proposition have facts even remotely similar to the facts of this case.

## V.     CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court deny LML's Motion for Summary Judgment No. 5.

FISH & RICHARDSON P.C.

By:    */s/ Timothy Devlin*
     William J. Marsden, Jr. (#2247)
     Timothy Devlin (#4241)
     Tara D. Elliott (#4483)
     919 N. Market Street, Suite 1100
     P.O. Box 1114
     Wilmington, DE  19801

*Attorneys for Defendant TeleCheck*
*Services, Inc.*


THE BAYARD FIRM

By:    */s/ Richard D. Kirk*
     Richard D. Kirk (I.D. No. 922)
     222 Delaware Avenue, Suite 900
     Wilmington, DE  19801
     302.429.4208
     rkirk@bayardfirm.com

*Attorney for Defendant*
*NOVA Information Systems, Inc*


CONNOLLY BOVE LODGE &
     HUTZ LLP


By:        */s/ Colin Seitz*
     Colin Seitz (I.D. No. 2237)
     The Nemours Building
     1007 N. Orange Street
     Wilmington, Delaware 19801
     302.658.9141
     cjs@cblh.com

*Attorney for Defendants Electronic*
*Clearing House, Inc.  and Xpresschex,*
*Inc.*


Dated:  November 15, 2005

redacted version of MSJ #5.doc

## CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2005, I electronically filed the PUBLIC

VERSION OF DEFENDANTS' ANSWERING BRIEF IN OPPOSITION TO LML'S

MOTION FOR SUMMARY JUDGMENT NO. 5: FOR A RULING THAT CLAIMS 1,

2, 4, 5, 6, 9, 10, 11, 14, 16 AND 18 OF THE '988 PATENT ARE NOT INVALID

UNDER 35 U.S.C. §§ 112 AND 132 with the Clerk of the Court using CM/ECF which

will send notification of such filing to the following:

Richard K. Herrmann, Esq.
Morris, James Hitchens & Williams LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19899

Richard D. Kirk, Esq.
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, DE 19801

Collins J. Seitz, Jr., Esq.
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19801

Additionally, I hereby certify that on the 22nd day of November, the foregoing document was served via email on the following non-registered participants.

Robert Jacobs, Esq.
Belasco Jacobs & Townsley, LLP
Howard Hughes Center
6100 Center Drive, Suite 630
Los Angeles, CA 90045

Mark C. Scarsi, Esq.
O'Melveny & Myers LLP
400 S Hope Street
Los Angeles, CA 90071

Russell E. Levine, Esq.
Kirkland & Ellis LLP
200 E. Randolph Dr.
Chicago, IL 60601

_/s/ Timothy Devlin_____
Timothy Devlin (#4241)