IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LML PATENT CORP.,

      Plaintiff,

v.

TELECHECK SERVICES, INC.,
ELECTRONIC CLEARING HOUSE, INC.,
XPRESSCHEX, INC. and NOVA
INFORMATION SYSTEMS, INC.,

      Defendants.

C.A. 04-858 (SLR)

**FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER
"OUTSIDE COUNSEL'S EYES ONLY"**

## ECHO AND XPRESSCHEX'S BRIEF IN OPPOSITION TO "LML'S MOTION FOR SUMMARY JUDGMENT NO. 2: FOR A RULING THAT ECHO INFRINGES CLAIMS 1, 2, 4, 5, 6, 9, 10, 11, AND 16 OF THE '988 PATENT"

Francis DiGiovanni, Esq. (#3189)
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 North Orange Street
Wilmington, DE 19801
Phone: 302-658-9141
Fax: 302-658-5614

OF COUNSEL:
Robert Jacobs, Esq. (Pro Hac Vice)
Mark Mizrahi, Esq. (Pro Hac Vice)
Don H. Min, Esq. (Pro Hac Vice)
BELASCO JACOBS & TOWNSLEY, LLP
6100 Center Drive, Suite 630
Los Angeles, CA 90045
Phone: (310) 743-1188
Fax: (310) 743-1189

Attorneys for Electronic Clearing House, Inc.
and XpressChex, Inc.

i

## TABLE OF CONTENTS

Page

I.    NATURE AND STAGE OF PROCEEDINGS. ....................................................1

III.   SUMMARY OF ARGUMENT ........................................................................3

IV.   STATEMENT OF FACTS .............................................................................5

   A.   The '988 Patent System and Prior Art Systems ...............................................5

     1.   Amendments Adding the "Negotiable Instrument" Limitations............................. 7

     2.   Amendments Adding the "Any Bank Check" Limitations ..................................... 8

     3.   Amendments Adding the "Sole Purpose" Limitations ......................................... 8

     4.   Arguments Regarding the "Any Bank Check," "Negotiable Instrument," and "Sole Purpose" Limitations Secured Allowance of the Claims ......................... 9

   C.   ECHO's Accused Electronic Check Acceptance Service................................... 10

   B.   Under Either Parties' Construction, ECHO Does Not Infringe the Asserted Claims Because ECHO's ECC Service Does Not Conduct Electronic Checking Transactions "Without Using the [Bank] Check as a Negotiable Instrument" ...................................... 17

     1.   ECHO Does Not Meet This Limitation Under LML's Construction...................... 18

     2.   ECHO Does Not Meet This Limitation Under Defendants' Construction............. 20

   C.   Under Either Parties' Construction, ECHO Does Not Infringe the Asserted Claims Because ECHO's ECC Service Does Not Accept and Process "Any Check" ................. 22

     1.   ECHO'S ECC Service Does Not Have "a point of sale terminal adapted to receive consumer bank account information from any bank check,"as Required in Independent Claim 1 ............................................................... 22

     2.   ECHO's ECC Service Does Not Include the Step of "presenting any bank check to a point of sale terminal," as Required in Independent Claim 8 ..................................... 28

     3.   ECHO's ECC Service Does Not Have "reading means for reading magnetic ink ........ character recognition numbers on any consumer bank check," as Required in ............ Independent Claim 9 ............................................................................ 30

     4.   ECHO'S ECC Service Does Not Communicate with the ACH Network to ........... Transfer of Funds Based on "*Any Bank Check*" ..................................... 31

ii

D. ECHO Does Not Infringe the Asserted Claims 2, 8, 9, 10, 11, And 16 Of The '988 Patent Because ECHO's ECC Service Reads The MICR Information For More Than Just Identifying Consumer Bank Account Information ................................ 34

E. ECHO Does Not Infringe the Asserted Claims 8 And 16 Of The '988 Patent Because ECHO's ECC Service Does not Include the Step of *"verifying that account numbers were accurately read at the point of sale terminal"* ................. 37

F. ECHO Does Not Infringe Any Dependent Claim of the Patent-in-Suit Because ECHO Does Not Infringe Any Independent Claim of the Patent-in-Suit ................. 39

VI. CONCLUSION ................................................................................ 39

<u>**TABLE OF AUTHORITIES**</u>

<u>Page</u>

CASES

*Bell Atlantic Network Servs., Inc. v. Covad Communications Group, Inc.*
   262 F.3d 1258 (Fed. Cir. 2001) ................................................................ 38

*General Electric v. Nintendo Company*
   179 F.3d 1350 (Fed. Cir. 1999)
   *quoting, Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*
   145 F.3d 13037 (Fed. Cir. 1998) ............................................................ 17

*Jeneric/Pentron Inc. v. Dillon Co.*
   205 F.3d 1377 (Fed. Cir. 2000) ......................................................... 17, 38

*Rockwell Int'l Corp. v. U.S.*
   147 F.3d 1358 (Fed. Cir. 1998) ............................................................ 17

*Toro Co. v. White Consol. Indus., Inc.*
   199 F.3d 1295 (Fed. Cir. 1999) ............................................................ 38

*Transclean Corporation v. Bridgewood Services, Inc*
   290 F.3d 1364 (Fed. Cir. 2002)
   *quoting, Anderson v. Liberty Lobby, Inc.*
   477 U.S. 242 106 S.Ct. 2505, 2514 (1986) ......................................... 17, 20

*Wang Labs., Inc. v. America Online, Inc.*
   197 F.3d 1377 (Fed. Cir. 1999) ............................................................ 38

*Zodiac Pool Care, Inc. v. Hoffinger Indus., Inc.*
   206 F.3d 1408 (Fed. Cir. 2000) ........................................................ 3, 17

STATUTES

Fed. R. Civ. P. 56(c). ....................................................................... 17

## I.    NATURE AND STAGE OF PROCEEDINGS

This is a patent infringement litigation initiated by LML Patent Corporation ("LML") against defendants TeleCheck Services, Inc., Electronic Clearing House, Inc. ("Electronic Clearing House"), XpressChex, Inc. ("XpressChex") and Nova Information Systems, Inc (collectively, "Defendants"). The patent in suit is U.S. Patent No. 5,484,988 ("the '988 patent").

Electronic Clearing House and XpressChex (collectively "ECHO") submit this brief in opposition to "LML's Motion For Summary Judgment No. 2: For A Ruling That ECHO Infringes Claims 1, 2, 4, 5, 6, 9, 10, 11, And 16 Of The '988 Patent" (hereinafter "LML's Motion").

## II.    INTRODUCTION

It may appear at first glance that LML's Motion is the mirror-image of ECHO's Motion for Summary Judgment of Non-infringement filed on October 28, 2005. As set forth below, however, LML's Motion hinges on numerous incorrect factual assertions and claim constructions that ignore the patentee's intentional surrender of claim scope during the course of prosecution of the '988 patent before the USPTO.

LML's Motion is predicated only on LML's own claim construction of all terms. The adoption of proposed constructions proposed by Defendants will moot LML's Motion as to all claims reciting that element, either directly or by dependency, therefore precluding a finding of infringement.

ECHO disputes LML's characterization of "Uncontested Facts," which are largely comprised of unsupported conclusory arguments and citations to LML's own expert's report in which he often speculates as to how ECHO's system operates. The existing factual disputes, alone, would preclude a finding of infringement by a reasonable fact-finder. In fact, the undisputed and unbiased facts support ECHO's motion for summary judgment of non-infringement. For the reasons set forth hereinbelow, contrary to LML's assertion, even under LML's constructions, LML's Motion ought to be denied, because, at the very least, a jury could reasonably find in favor of ECHO on all of the elements presented by LML in its Motion.

The '988 patent generally relates to a specific system and method for processing electronic check transactions at the check-out counter, or "point of sale." There are two non-infringement issues that relate to every asserted claim. First, each asserted claim requires that the system and

1

method function "without using the [bank] check as a negotiable instrument." Second, all of the asserted claims require that the check processing system of the '988 patent be capable of functioning with "any bank check" or "any consumer bank check."

These two limitations are not merely two among many seized upon by Defendants to support their non-infringement positions. Rather, these two limitations comprise two of only three substantive amendments made by the patentees during prosecution that ultimately resulted in allowance of the application. Indeed, the claims of '988 patent were rendered extremely narrow because of these two amendments -- a fact that is evident from even a cursory review of the '988 patent file history.

Specifically, the patentees initially applied for a broad patent, but were forced to narrow the scope of its claims during prosecution because of the plethora of prior art that existed at the time. The claims were repeatedly rejected during a four year prosecution period until the patentees narrowed the claims sufficiently for the examiner to allow them to issue. The issued claims now being asserted were based on a narrow construction of the claim terms that both the Patent Office and the patentee believed was necessary to avoid the prior art. In its claim construction brief and motions for summary judgment on infringement, LML tries to escape that narrow construction and the prosecution history that defines the patent.

ECHO markets two point-of-sale electronic check conversion services, one under the generic title "Electronic Check Conversion" and the other under the title "VISA POS Check Service" (hereinafter collectively "ECC Service"). Both services are able to clear only certain types of checks through the U.S. National Automated Clearing House, commonly known as and referred to herein as the ACH Network. The accused ECHO ECC Service is not configured to electronically clear checks through any other automated clearing house.

LML's Motion makes evident that – for the reasons set forth herein and the accompanying declarations – LML either misunderstands the accused services or is smoothing over them in order to force summary judgment of infringement where it is otherwise inappropriate. Regardless, despite LML's assertions to the contrary, in many instances, ECHO disputes LML's assertions regarding how the accused services operate.

No matter how impermissibly broad LML attempts to construe these claims or how LML mischaracterized ECHO's services, the fact is that the accused services simply do not work in the same way as the system and method claimed in the patent. To infringe a patent claim, a product must

satisfy each and every limitation of the claim. The accused services do not meet many of the elements of each of the asserted claims – even applying LML's overly broad claim constructions.

## III.  SUMMARY OF ARGUMENT

1. To prove infringement, LML must prove that ECHO's ECC Service meets each and every limitation of the asserted claims. *See Zodiac Pool Care, Inc. v. Hoffinger Indus., Inc.*, 206 F.3d 1408, 1415 (Fed. Cir. 2000). The accused services do not meet many of the elements of each of the asserted claims – even applying LML's overly broad claim constructions – and therefore cannot be held to infringe any claim of the '988 patent..

2. Each and every asserted claim in the patent requires that transactions occur "without using the check as a negotiable instrument." Importantly, even under LML's proposed construction -- "where the check takes is used as a source of information, and is not accepted *or* processed" – ECHO's ECC Service does not meet this limitation. Under ECHO's ECC Service, the check is *both* accepted and processed. Based on this unmet limitation alone, summary judgment in favor of LML is not appropriate as to any claim of the patent and, in fact, warrants summary judgment in ECHO's favor.

3. ECHO also does not infringe any of the asserted claims applying Defendant's proposed construction of these limitations, because these limitations require that the check *never take on the status* of a negotiable instrument. The accused ECHO ECC Service fails to meet this limitation. Contrary to LML's assertion, consumers at the point of sale are required to complete and sign the check prior to handing it to the merchant, giving the check the status of a negotiable instrument. For example, while filling out and signing the check slows down the overall process; it allows the merchant to simply keep the check as paper when required in many circumstances.

4. Additionally, in contrast to the check processing system of the '988 patent that requires that the point-of-sale system be capable of functioning with "any bank check," the ECC Service allows a merchant to take only limited types of checks from the customer and clear them electronically. Even

3

then, in order to qualify -- unlike the processing system of the '988 patent -- may only be transmitted to ECHO when run through a Magnetic Ink Character Recognition ("MICR") reader that magnetically reads the ABA transit/routing number, account number and check number directly from the check.

5.   Specifically, each and every asserted claim in the patent requires a system or process that can read/receive bank account information from *any* bank check (or *any* consumer bank check. The terminals used in connection with the accused services simply cannot read/receive bank account information from many, if not most, bank checks (or consumer checks) regardless of which party's construction is applied. Based on this unmet limitation alone – even under LML's construction -- summary judgment in favor of LML is not appropriate as to any of the asserted claims.

6.   Each and every asserted claim in the patent also requires a system or process that can communicate bank account information obtained from *any* bank check to an automated clearing house for transferring funds from the account of that check. The accused services, however, contain numerous road blocks to ensure that ECHO's computers will not communicate with an automated clearing house for transferring funds from the account of many, if not most, checks. Based on this unmet limitation alone summary judgment in favor of LML is not appropriate as to any of the asserted claims.

7.   ECHO does not infringe asserted claims 2, 8, 9, 10, 11, and 16 because ECHO's ECC Service reads the MICR information for more than just identifying consumer bank account information. Each of these claims requires reading the MICR information off the check for the "sole purpose" of obtaining the consumer bank account information. As set forth in Defendants' claim construction briefing, consumer bank account information is limited to only the ABA/transit routing number and the bank account number, not the number of the check serial itself (the "check serial number"). There is no dispute that rules governing these types of transactions and ECHO's own computers require inclusion of the check serial number, and so there can be no literal infringement of any of these claims.

4

8. ECHO does not infringe asserted claims 8 and 16 because ECHO's ECC Service does not include the step of "verifying that account numbers were accurately read at the point of sale terminal." Claim 8 – and therefore claim 16 which depends from claim 8 -- requires, as a step in the claimed process, "verifying that account numbers were accurately read at the point of sale terminal." As set forth in Defendants' claim construction briefing, this limitation requires "visually confirming that account numbers were accurately read [at the point of sale terminal] by reference to the source document," *i.e.*, the check. Regardless, whether Defendants' or LML's construction is applied, however, as set forth herein, ECHO's ECC Service does not include such a "verifying" step, so there can be no literal infringement of claim 16.

9. Because each of the independent claims contains one or more elements not present in ECHO's accused ECC Service, none of the claims, including the claims that depend therefrom, can be infringed. *Jeneric/Pentron Inc. v. Dillon Co.*, 205 F.3d 1377, 1383 (Fed. Cir. 2000).

## IV.    STATEMENT OF FACTS

### A.    The '988 Patent System and Prior Art Systems

The '988 patent discloses that the claimed system and method begins when a customer making a purchase initiates a transaction by providing the merchant with any bank check, preferably a "specimen" or "blank" check. (**Ex. A,** 1:13-15)[1] This bank check is used only for purposes of obtaining bank account information from the check, and each transaction is "an electronic or 'paperless' event thereby eliminating reliance on accepting and processing commercial bank drafts (personal or corporate checks) and the physical handling of those bank drafts thus replacing commercial bank drafts at the point of sale." (*Id.* at 3:4-8.)

---

[1] Unless otherwise stated, lettered Exhibits cited in this brief are attached to the concurrently filed Declaration of Don H. Min in Support of Electronic Clearing House, Inc.'s and XpressChex, Inc.'s Brief in Opposition to LML's Motion For Summary Judgment No. 2: For A Ruling That ECHO Infringes Claims 1, 2, 4, 5, 6, 9, 10, 11, And 16 Of The '988 Patent." Citations to patent text in this brief are of the form x:y, where "x" represents the column number and "y" the line number.

Specifically, the merchant obtains bank account information from the Magnetic Ink Character Recognition numbers ("MICR" numbers) across the bottom of the check. (*Id*. at 6:66; 7:64-65.) The bank account information is the "ABA/Transit" routing number of the check writer's bank and the particular account number. (*Id*. at 10:29-31.) Once the account information is entered, the merchant can initiate a check "verification" process, a well known prior art process in which one or more databases are accessed to determine if a check transaction is likely to be processed successfully solely from a check-writer risk standpoint. (*Id*. at 7:19-34, 7:63-8:22.) If the verification is approved, the merchant returns the check to the customer at the point of sale and the terminal prints an authorization receipt for the customer's signature. (*Id*. at 8:23-29.) The transaction is later electronically processed for payment through an automated clearinghouse or "ACH." (*Id*. at 8:30-42.)

This type of system and method was well known in the art long before the effective priority date of the '988 patent. Systems and methods enabling the electronic processing of paper checks presented at the point of sale have been discussed in the payments industry, disclosed in prior art patents, and implemented by payment processing corporations since the early 1980s. Two such patents are U.S. Patent No. 5,053,607 to Carlson ("the '607 patent"), and U.S. Patent No. 5,175,682 to Higashiyama, *et al.* (**Ex. H** "the '682 patent").

Both the '607 patent and '682 patent describe electronic check processing systems having many or all of the features of the '988 patent. The described systems each included a terminal and a MICR reader for automatically reading the ABA/transit routing number and bank account number from checks presented at the point of sale, communication with databases for check verification, and automated electronic debiting of the consumer's account based on the information obtained from the check. (*See* Defendants' Opening Brief on claim construction, D.I. 288, pp. 5-7.)

6

**B.**    **Prosecution History of the '988 Patent**

1.    **Amendments Adding the "Negotiable Instrument" Limitations**

The original application leading to the '988 patent, Serial No. 07/975,717, was filed on November 13, 1992. (See, **Ex. B**.) The original independent claims 1 and 9 recited point-of sale electronic payment processing systems and methods designed to receive consumer bank account information from either debit-type cards or checks, transmit that information to a central computer, perform a verification process, and transfer funds through an automated clearing house network. (*Id.* at LML-EP 000104-06.)

The Examiner initially rejected the pending claims, (*Id.* at LML-EP 000139-43), and the Applicants amended the claims in an attempt to overcome the rejections (*Id.* at LML-EP 000144-161). The Applicants' amendments and related arguments were insufficient to overcome the Examiner's rejections. In a second Office Action, the Examiner maintained rejections based on prior art patents referred to as "Carlson, et al." and "Murphy." (*Id.* at LML-EP 000163.)

Following the second rejection, the Applicants filed a continuation application and Preliminary Amendment. (*Id.* at LML-EP 000170-179.)

The Preliminary Amendment included narrowing amendments that limited independent claim 1 to transactions that take place "without using a bank check as a negotiable instrument." (*Id.* at LML-EP 000172-73.) The new independent claim similarly recited transferring funds "without using a bank check as a negotiable instrument." (*Id.* at LML-EP 000175-76.)

The Examiner again rejected all pending claims as indefinite, concluding among other things that claim 1 did not capture the argued novelty in the specification. (*Id.* at LML-EP 000181.) The Examiner re-asserted his rejections set forth in previous Office Actions. (*Id.* at LML-EP 000181.)

Applicants filed another Response on January 30, 1995, further narrowing the claims. Claim 9 was amended to include the limitation "without using the check as a negotiable instrument," similar

to the limitations previously added to claims 1 and 11. (*Id.* at LML-EP-000184.) Accordingly, at the time of the January 30, 1995 amendment, each independent claim recited a limitation that transactions took place "without using the check as a negotiable instrument." As set forth below, these and other amendments were critical in the eventual allowance of the claims.

### 2.    Amendments Adding the "Any Bank Check" Limitations

In the January 30, 1995 Response, the Applicants made other amendments that further narrowed the claims. Each independent claim was also amended to recite processing transactions not from "a" single bank check, but rather from "any" bank check. Specifically, the Applicants amended claim 1 to recite a point of sale terminal adapted to receive information from "any bank check," amended claim 9 to recite presenting "any bank check" at the point of sale, and amended claim 11 to recite means for reading information from "any consumer bank check." (**Ex. B,** LML-EP-000183-85.)

At first blush, the "any bank check" amendments might appear to broaden the claims, but in fact the new limitations narrowed the claims considerably. Before the word "any" was added to the claims, a system capable of receiving information and transferring funds using just a single type of check ("a" check), or a small number of checks, could meet this limitation and potentially infringe the claim. Following the amendment, however, a system that functioned with only one type of check, or just a few types of checks, could no longer meet the limitation. Instead only systems that could receive information and transfer funds using *any* type of check or *any* type of consumer check could potentially infringe.

### 3.    Amendments Adding the "Sole Purpose" Limitations

In the same Preliminary Amendment, the Applicants narrowed pending claim 9 by adding the limitation of reading information from the check "for the sole purpose of obtaining consumer bank account information." (*Id.* at LML-EP-000174.) The Preliminary Amendment further added 12 new claims, including another independent claim that recited a corresponding "sole purpose" limitation.

8

(*Id.* at LML-EP 000176.) These and other amendments were eventually successful in obtaining allowance of the claims.

> ### 4. Arguments Regarding the "Any Bank Check," "Negotiable Instrument," and "Sole Purpose" Limitations Secured Allowance of the Claims

The "any bank check," "negotiable instrument," and "sole purpose" limitations were critical to obtaining allowance of the claims. To overcome the Examiner's rejections, Applicants repeatedly argued that the prior art did not disclose these limitations. The Examiner allowed the claims only after they were narrowed, and only after Applicants relied on these limitations in distinguishing the prior art.

In a Remarks section of the January 30, 1995 Response, the Applicants described the purported invention recited in the amended claim 1:

> The point of sale terminal accepts bank account information from *any bank check.*
> The system transfers funds as part of a transaction *without using the check as a*
> *negotiable instrument.*

(**Ex. B**, LML-EP 000189.)

Likewise, in arguing over the prior art, the Applicants repeatedly relied on the "any bank check" and "negotiable instrument" limitation. Distinguishing one prior art patent, the Applicants asserted that "Case does not disclose the use of *any bank check solely* to derive consumer information and *not for use as a negotiable instrument*, as recited in independent claims 1, 9 and 11." (*Id.* at LML-EP-000190.) The Applicants also argued over other references based on the negotiable instrument limitation. (*See Id.* at LML-EP 000192-206.) In the summary of Applicants' Remarks, the Applicants again highlighted these differences between the purported invention and the prior art, namely that "none of the references discloses a point-of-sale system that uses *any bank check solely* for the purpose of gather customer information and *not as a negotiable instrument* used to pay for goods received in a transaction." (*Id.* at LML-EP 000207.)

These amendments and arguments were essential to securing allowance of the claims. In the following Office Action, the Examiner withdrew the previous rejections based on Carlson, Murphy and other prior art references, instead only asserting a "restriction requirement" that would force the Applicants to "elect" certain of the pending claims. (**Ex. B** at LML-EP 000212.) After Applicants argued that no election between claims was necessary, the claims were allowed and the '988 patent issued on January 16, 1996.

### C.    ECHO's Accused Electronic Check Acceptance Service

To address LML's numerous mischaracterizations of ECHO's ECC Service would be cumbersome and lengthy. Instead, ECHO sets forth hereinbelow a brief explanation of the operation of this service, which is set forth in greater detail in the concurrently filed 2nd Winckler Decl..[2]

As indicated, ECHO markets two point-of-sale electronic check conversion systems, one under the generic title "Electronic Check Conversion" (formerly XpressConversion) and the other under the title VISA POS Check Service (collectively referred to herein as the "ECC Service" for short).[3] (2nd Winckler Decl., ¶ 8.) Contrary to LML's assertions (*e.g.*, LML's Motion at ft. nt. 2, pp. 4-5), under both systems ECHO is able to clear only certain types of checks through the U.S. ACH Network. (2nd Winckler Decl., ¶ 8.) Neither system is able to communicate with any other automated clearinghouse. (Winckler Decl., ¶ 8.)

---

[2] "2nd Winckler Decl." hereinafter refers to the concurrently filed Declaration of Kris Winckler and accompanying numbered exhibits therein in Support of Electronic Clearing House, Inc.'s and XpressChex, Inc.'s Brief in Opposition to "LML's Motion For Summary Judgment No. 2: For A Ruling That ECHO Infringes Claims 1, 2, 4, 5, 6, 9, 10, 11, And 16 Of The '988 Patent."

[3]

# Redacted

In ECHO's ECC Service, the customer hands a check to the merchant and the merchant inspects the check to ensure that it meets the criteria set forth in the ECHO merchant manuals, the ECHO/merchant service agreement, and the individual merchant's check acceptance criteria before presenting it to the point-of-sale device. (2nd Winckler Decl., ¶¶ 13-19.) The ECHO merchant manuals and the ECHO/merchant service agreements represent two among at least eleven (11) roadblocks in place in ECHO's ECC Service to ensure that

# Redacted

(*See generally* 2nd Winckler Decl.). The aforementioned checks will hereinafter be referred to as "acceptable checks." (2nd Winckler Decl., ¶ 10.)

Specifically, the merchant is instructed

# Redacted

(2nd Winckler Decl., ¶ 14.)

If the check has a MICR line and is an acceptable check, the merchant presents the check to the POS terminal's MICR-Reader – the only type of check-reader permitted to be used with the service. (2nd Winckler Decl., ¶ 20.) Redacted

(2nd Winckler Decl., ¶ 40.)

The MICR-Reader then attempts to read the information contained on the bottom of the check, commonly referred to as the MICR line. The MICR line typically includes the routing

number and the ON-US field (which may include the account number, the check number, and other information). (2nd Winckler Decl., ¶ 20.)

Representing a further roadblock as to the types of acceptable checks,

# Redacted

(2nd Winckler Decl., ¶ 20.)

The POS terminals used with ECHO's ECC Service can Redacted                . (2nd Winckler Decl., ¶ 26.) These POS terminals are not adapted to receive consumer bank account information off of foreign checks, or other checks, in which the MICR line is not Redacted including, but not limited to, checks from Japan, Germany, France, Brazil, United Kingdom, Spain, Italy, Austria, Greece, Denmark, Finland, Holland, Netherlands, Norway, Portugal, Scotland, Switzerland, Belgium, Israel, Sweden and Chile. (2nd Winckler Decl., ¶ 30 and exhibits referenced therein and 2nd Schutze Decl., ¶¶ 9-10.)[4]

The fifth roadblock is that

Redacted

. (2nd Winckler Decl., ¶ 41 Exhibit 3

referenced therein at LML-EP-055429.)

The sixth roadblock is

Redacted

---

[4] "2nd Schutze Decl." refers to the concurrently filed Declaration of Stephen A. Schutze in Support of Electronic Clearing House, Inc.'s and XpressChex, Inc.'s Brief in Opposition to "LML'S Motion For Summary Judgment No. 2: For A Ruling That ECHO Infringes Claims 1, 2, 4, 5, 6, 9, 10, 11, And 16 Of The '988 Patent."

[5]           Redacted
            (2nd Winckler Decl., ¶ 41, footnote1.)

Redacted                                              Where the MICR line is

read by the MICR-Reader, it is then transmitted to the POS terminal and then, upon being prompted

to do so, the merchant enters the sale amount into the POS terminal. It should be noted, however,

Redacted

(2nd Winckler Decl., ¶ 57.)

Redacted

*Id.*

The information packet containing the MICR line, sale amount, and other indicia to identify

the transaction is sent to ECHO's NCN computer system for a risk determination and

Redacted

. (2nd Winckler Decl., ¶ 58.) The response from NCN informs the merchant whether

Redacted

[6] In many cases, although a check may

Redacted

. (2nd Winckler Decl., ¶¶ 58-69.) Redacted

. Because the check has already

obtained the status of a negotiable instrument, the merchant may simply drop it into the cash register

and process it as a paper check. (2nd Winckler Decl., ¶ 90.)

The seventh roadblock appears at ECHO's NCN system

# Redacted

. (2nd Winckler Decl., ¶ 41).

Specifically, Redacted                    disables automated clearing house communications,

at least, for the following checks types: Redacted

---

[6] Redacted

Redacted

(2nd Winckler Decl., ¶ 62.)

Redacted

(2nd Winckler Decl., ¶ 63.)

In any event, Redacted                                                      then NCN sends the

"approved" files to Redacted

Redacted                                                                                    (2nd

Winckler Decl., ¶ 73.) While some decision-making is undertaken at the ECHO's ACH Engine

level, in many cases, Redacted

(2nd Winckler Decl., ¶¶ 73-81 and exhibits referenced therein.) Based upon

Redacted                                   and ECHO's ACH Engine's own internal checks, unacceptable

checks and Redacted

. (2nd Winckler Decl., ¶¶ 70-81.) This serves as the eighth roadblock for preventing the

transmission of unacceptable checks for clearance through the ACH Network.

---

[7]   It is important to explain that what is referred to as ECHO's "ACH Engine" is not an
"engine," and is not run by the ACH Network. This unfortunate nomenclature can be
confusing. The word "engine" is a reference to routines built into a computer controlled by
ECHO. The reference to "ACH" Redacted
                                                                                     . To summarize,
ECHO's "ACH Engine" Redacted
                                                . (2nd Winckler Decl., ¶ 72.)

14

The fact that ECHO's ACH Engine is not able to communicate with any automated clearinghouse other than the U.S ACH Network serves as the ninth roadblock, thereby further preventing the processing of foreign checks. (2nd Winckler Decl., ¶ 83.) Redacted

Redacted (2nd Winckler Decl., ¶¶ 83-85.)

The tenth roadblock prevents the processing of checks that are not filled-out and signed. (2nd Winckler Decl., ¶ 86.) It is beyond dispute that the documentation for ECHO's ECC system requires the consumer to fill out the check at the point of sale. (**Ex. I**, Tinkel Depo., 138:11-139:4; *see also* 2nd Winckler Decl., ¶¶ 89-92, and Exhibit 1 referenced therein at ECHO0027574.)

The eleventh roadblock prevents the processing of checks that do not contain a check serial number. (2nd Winckler Decl., ¶ 94.) Redacted

Redacted (2nd Winckler Decl., ¶¶ 95-97.) Redacted

Redacted (2nd Winckler Decl., ¶ 95.)

Only if the check transaction survives <u>all</u> of the above-described roadblocks, will the transaction be sent for clearance through the ACH Network. If the check was Redacted for conversion to an electronic item, but was Redacted as a non-ACHable[8] item, then

# Redacted

(2nd Winckler Decl., ¶ 90.)

There is no step in ECHO's ECC Service instructing the merchant to compare the account numbers read by the POS terminal off of the check against the MICR line of the check to verify that the account numbers were accurately read by the MICR-Reader. (2nd Winckler Decl., ¶¶ 100 and 2nd Schutze Decl. at ¶¶ 9-14.) While the POS terminal is capable of determining, at least in some

---

[8] An "ACHable" item is a term of art that describes an item that Redacted . Conversely, a "non-ACHable item" is an item that is <u>not</u> capable of being Redacted

15

instances, whether a MICR line was not read, it cannot actually verify whether the characters were accurately read. (2nd Winckler Decl., ¶ 101.)

In the Visa POS Check Service, ECHO's role with respect to the VISA POS Check Service is primarily Redacted                         . (2nd Winckler Decl., ¶ 102.)

# Redacted

(2nd Winckler Decl., ¶ 102.) Redacted

# Redacted

(2nd Winckler Decl., ¶ 103.)

# Redacted

*Id.*

IV.    ARGUMENT

A.    Legal Standards for Determining Patent Infringement

A motion for summary judgment should be granted only when there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. (*See*, Fed. R. Civ. P. 56(c).). Thus, "[i]n determining whether there is a genuine issue of material fact, the evidence must be viewed in the light most favorable to the party opposing the motion, with doubts resolved in favor of the opponent." *General Electric v. Nintendo Company*, 179 F.3d 1350, 1353 (Fed. Cir. 1999), *quoting*, *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1307 (Fed. Cir. 1998). The burden of proving infringement rests squarely on LML as the patentee. *Rockwell Int'l Corp. v. U.S.*, 147 F.3d 1358, 1362 (Fed. Cir. 1998).

Indeed, in order prove literal infringement,[9] LML must prove that ECHO's ECC Service satisfies *each and every limitation* of the asserted patent claims. *See Zodiac Pool Care, Inc. v. Hoffinger Indus., Inc.*, 206 F.3d 1408, 1415 (Fed. Cir. 2000). If *any* limitation of a claim is absent from the ECHO Electronic Check Service, then ECHO cannot be held to literally infringe that claim. (*See id.*)

Established law requires that "[t]he evidence of the nonmovant [ECHO] is to be believed, and all justifiable inferences are to be drawn in [ECHO's] favor." *Transclean Corporation v. Bridgewood Services, Inc.*, 290 F.3d 1364, 1369 (Fed. Cir. 2002), *quoting*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2514 (1986).

Dependent claims cannot be infringed unless the independent claims from which they depend are infringed. *Jeneric/Pentron Inc. v. Dillon Co.*, 205 F.3d 1377, 1383 (Fed. Cir. 2000).

**B.    Under Either Parties' Construction, ECHO Does Not Infringe the Asserted Claims Because ECHO's ECC Service Does Not Conduct Electronic Checking Transactions "Without Using the [Bank] Check as a Negotiable Instrument"**

Each independent claim of the '988 patent includes the phrase "without using the check as a negotiable instrument" or a corresponding limitation (without using "the bank check" or "a check" as a negotiable instrument). (Ex. A 11:19-20, 12:6-7, and 12:23-24.) The parties agree that these minor

---

[9] LML has only alleged literal infringement. (*See* LML's Motion.)

variations on this limitation ought to be construed the same across the claims. Thus, the absence of this element from ECHO's ECC Service, alone, is grounds for denying LML's Motion.

### 1.   ECHO Does Not Meet This Limitation Under LML's Construction

LML's construction of the term "without using the check as a negotiable instrument" is "where the paper check is used as a source of information, and is not accepted or processed."

Notably, LML did not apply its own construction of this term in analyzing ECHO's ECC Service. Instead, LML applied a newly formulated construction premised upon a version of the NACHA Rules issued numerous years after the '988 patent's priority filing date, presumably, because LML has itself since determined that, under its proposed construction, ECHO's ECC Service does not meet this element and/or would render each of the independent claims invalid. It is inappropriate for LML to now argue a different construction at this point after all parties have fully briefed the issues. Notwithstanding the procedural impropriety of introducing a new construction on summary judgment, this new construction violates a basic rule of claim construction by construing a claim term written in 1994 using standards promulgated in 2005.[10]

This new construction represents yet another construction among LML's numerous and ever-changing proposed constructions in LML's long campaign to force this element on Defendants' products: LML's neutral non-litigation counsel's construction (adopted by Defendants), LML's construction advanced by its prosecution/litigation counsel during negotiations with Telecheck, and at least three different constructions advanced in this litigation.

---

[10]   LML incorrectly states that NACHA regulation 3.8.1 prohibits ECHO's ECC Service from using checks as negotiable instruments. (LML's Motion at pg. 15.) LML does not provide any guidance or analysis as to how it interpreted Subsection 3.8.1 as "not permit[ting] the check to be used as a negotiable instrument." *Id.* at 14. Subsection 3.8.1 of the NACHA operating rules never use the term "negotiable instrument" or similar language. LML further makes the unsupported logical leap that by using the check as a source document, it is also not accepted or processed by the merchant or ECHO. LML does cite to the deposition testimony of NACHA employees. NACHA, however, is not an interpreter of law that dictates whether U.C.C. provisions attach to a transaction, but rather is an industry organization setting forth rules to be followed for participation in an industry network.

Regardless, ECHO herein applies the construction LML proposed in the Proposed Constructions of Disputed Claims – the only LML construction properly before this Court: "where the paper check is used as a source of information, and is not accepted or processed." Under LML's construction, this limitation has two elements: (1) the paper check is used as a source of information, and (2) the paper check is not accepted *or* processed. At the outset, LML proffers no evidence that, under ECHO's ECC Service, ECHO does not accept or process checks. In fact, under ECHO's ECC Service, the paper check is accepted *and* processed. (*See* 2nd Winckler Decl., ¶ 10 and Exhibit 29 referenced therein.)

There is no dispute that paper checks are accepted by the merchants who use ECHO's ECC Service. ECHO's ECC Service merchant manual (**Ex. A.**) expressly states that Redacted

(Emphasis added) (2nd Winckler Decl., ¶ 10 and Exhibit 1 attached therein at ECHO0027572). The manual further provides that the ECHO merchant Redacted

(Emphasis added) (*Id.* at ECHO0027578.) In addition, Redacted

(Emphasis added) (*See* 2nd Winckler Decl., ¶ 110 and Exhibit 29 referenced therein.) Additionally, under ECHO's ECC Service, Redacted

(2nd Winckler Decl., ¶¶ 57-69, 86-93.)

There is also no dispute that Redacted

. The manual instructs the merchant to Redacted

(Emphasis added) (ECHO0027573.) Moreover, the manual instructs the merchant Redacted
(*Id.*)

ECHO suspects that LML is now trying to shift away from its new fangled construction because it realizes that ECHO does not meet this limitation when LML's construction proposed in

the Proposed Constructions of Disputed Claim Terms is applied. Regardless of the games that LML continues to play as they try to mold the construction to fit the facts, the fact remains that merchants using ECHO's ECC Services do accept the check as payment and do process the checks. LML's proposed construction, which is their basis for their summary judgment motion, states that the check *is not accepted or processed*. ECHO does not meet this limitation as it was construed by LML in the Proposed Constructions of disputed Claim Terms; therefore LML has failed to meet its burden of showing that there is no issue of material fact entitling LML to a judgment as a mater of law. On this basis alone, LML's Motion should be denied and summary judgment on all claims should be granted to ECHO *sua sponte*.

### 2. ECHO Does Not Meet This Limitation Under Defendants' Construction

As set forth in Defendants' claim construction briefing, these limitations should be construed to mean "the [bank] check, at no time, takes on the status of a negotiable instrument." In contrast, in ECHO's ECC Service, the check takes on the status of the negotiable instrument, and thus fails to meet this limitation. (*See* 2nd Schutze Decl., ¶ 15; *see also* 2nd Winckler Decl., ¶ 10.)

Under the Uniform Commercial Code, a check becomes a negotiable instrument when (1) at the time it is provided or "issued" to another party, it specifies the party to be paid, a date, and the amount, and (2) the customer has signed the check. (**Ex. D**, UCC at § 3-104.) This was the definition used by LML's pre-litigation opinion counsel in reviewing the scope and validity of the '988 patent claims. (**Ex. E** at LML-EP 061869.)

As LML's expert has stated, Redacted

. (**Ex. I**, Tinkel Depo, 138:11-139:4; *See* 2nd Winckler Decl., ¶ 89.) Likewise, ECHO understands that ECHO merchants have all along had Redacted . (2nd Winckler Decl., ¶¶ 89-93.) This is also confirmed in ECHO's current documentation provided to its merchants. (*Id.* and **Ex. 1** referenced therein.) Nothing LML says can change this fact. Furthermore,

Redacted

# Redacted

From the consumer's perspective, the procedure for handing over a check as payment is no different regardless of whether the check is processed as paper or through ECHO's ECC Service. Unlike the instance of handing over a blank or unsigned check, as described in the '988 patent, a consumer purchasing goods at an ECHO's ECC merchant simply pays by check as usual, *i.e.*, using the check as a negotiable instrument. The check's status as a negotiable instrument allows flexibility for ECC merchants in how checks are ultimately processed. In situations when ECHO's ECC Service is not permitted for a specific check Redacted

. (2nd Winckler Decl., ¶ 90.) For example, certain checks are not eligible to be processed electronically, or consumers may refuse to sign the authorization receipt necessary for electronic debiting. Redacted

*Id.* This treatment of the check is only possible because the check has taken on the status of a negotiable instrument.

Other evidence confirms that the check takes on the status of a negotiable instrument. Redacted

(2nd Winckler Decl., ¶ 93.) This is consistent with NACHA Operating Rule 3.8.1, which states that the check is voided after it is provided to the merchant by the consumer. (Ex. C at LML-EP 055429.) Where the check has been fully filled out and signed, it remains a negotiable instrument until it is canceled in this manner. Testimony from NACHA witnesses confirms that it is the fact of voiding the check that renders the check non-negotiable. (*See* Ex. F, 14:15-17:22, 41:1-16.)

LML's own prosecution and litigation counsel, Mr. Jon Roberts, stated that

# Redacted

# Redacted

(**Ex. G** at FDC 1389398.) This is true even though, as Mr. Roberts acknowledges, Redacted . (*Id.* at FDC 1389399; *see also* **Ex. H**, Higashiyama patent, at 4:54-57.) Similarly, as detailed in Defendants' claim construction briefing, Defendants construction of this claim element is the same as the construction promulgated by LML's own neutral pre-litigation patent attorneys. (**Ex. G.**)

In contrast, contrary to LML's assertion at pg. 3:13-14 of LML's Memorandum in Support of LML's Motion for Summary Judgment No. 1 (against defendant Telecheck), the '988 does not teach voiding the check. LML's cited portion of the specification in support of this proposition relates to an entirely different issue, where a check is declined after a risk determination was made.[11] In fact, the '988 teaches re-using the check over and over again. As set forth in Defendant's claim construction briefing, it is this capability – of re-using the blank check – that keeps a check from taking on the status of a negotiable instrument.

In short, there can be no legitimate dispute that checks permitted to be used in ECHO's ECC Service take on the status of negotiable instruments.

**C. Under Either Parties' Construction, ECHO Does Not Infringe the Asserted Claims Because ECHO's ECC Service Does Not Accept and Process "Any Check"**

   1. ECHO'S ECC Service Does Not Have *"a point of sale terminal adapted to receive consumer bank account information from any bank check,"*as Required in Independent Claim 1

      a. ECHO Does Not Meet this Limitation Under LML's Construction

---

[11] The '988 Patent, **Ex. A,** states at col. 8, lines 18-23: "The check approval process next takes place 128. If the check is not approved by the central computer the terminal displays a message declining the transaction 140. Thereafter a printer record of the declined transaction is made for purposes of the system subscriber 142 to comply with the Fair Credit Reporting Act and Regulation E of the Board of Governors of the Federal Reserve System."

LML construes the element "a point of sale terminal adapted to receive consumer bank account information from any bank check" to mean "a point of sale terminal adapted to receive consumer bank account information from any regular check used to draw funds from a normal bank or credit union checking account." Even under LML's construction, this element is simply absent from the accused services.

Putting aside the indefiniteness of LML's construction as to the meaning of the words "regular" and "normal," one thing is clear: Redacted

(See **Ex. I**, Tinkel Depo., at pp. 101:7-102:2, 105:3-15, and 128:19-129:9, Redacted

[12] Moreover, in his report, Mr. Tinkel cited

# Redacted

In fact, LML summarily concludes, albeit incorrectly, that Redacted

(LML's Motion at pg. 10:2-5, emphasis added) – evidencing that LML also concedes that foreign checks are included in the definition of "any bank check."

Likewise, foreign checks are clearly anticipated by the disclosure that there are no geographical boundaries to using the patented system. (See **Ex. A**, 3:15-19.) Further, Mr. Tinkel testified, for example, Redacted

---

[12] There are a number of Redacted
However, for purposes of this argument, ECHO will focus on an entire category of checks that cannot be read, meaning that the system cannot satisfy the "reading or adapted to receive consumer bank account information from any check" limitation.

[13] The truth is that ECHO can only perform a check-writer risk determination for Canadian checks, but cannot convert such items to electronic items.

Redacted                                                                    (Ex. I,

155:19-24), Redacted

⬚⬚⬚⬚⬚⬚⬚⬚ (*Id.* at 88:23-89:2 and 2nd Schutze Decl., ¶ 16.) These facts are undisputed, and

demonstrate that the claimed system is adapted to function with foreign checks for which consumer

bank account information was captured at the point of sale.

   Not all checks are formatted the same way. For example, there are different types of fonts

used in the MICR lines on checks. Two of the most popular fonts used throughout the world are the

E13-B MICR font, which is used on checks from U.S. banks, and the CMC-7 MICR font, which is

used by many foreign banks. (2nd Winckler Decl., ¶¶ 21-22, 24 and 30; *see also* 2nd Schutze Decl., ¶¶

9-14.) While there are clear differences between the fonts even to an untrained eye, it cannot be

disputed that checks printed in CMC-7 are "regular" checks and that foreign banks are "normal"

banks. Likewise, many checks in the U.S. are printed with non-magnetic ink (or ink containing

magnetic particles outside the required range able to be read by a MICR-Reader). Checks that lack

the appropriate magnetization to be read by a MICR-Reader are also included in the category of

regular checks, as they are commonly encountered in the marketplace. (*See* **Ex. I,** 2nd Winckler

Decl., ¶ 25.)

   In contrast to the subject claim element, the MICR-Readers used in conjunction with the

point of sale terminals under the accused services are Redacted

                    , such as CMC-7 font, and checks lacking proper magnetization. (2nd

Winckler Decl., ¶¶ 26-27; *see also* 2nd Schutze Decl., ¶¶ 9-13.) Thus, LML's statement that

rejections of checks by ECHO for ECC processing "only occur *after* the check is scanned at the point

of sale, and the information is sent and validated by the ECHO central computer" is false. (*See*

LML's Motion at pg. 10:13-16.)

   The only other ways a point of sale terminal can receive consumer bank account information

from a check that cannot be read magnetically is: (1) for the MICR line to be read optically, rather

than magnetically, from the check; or (2) for the merchant to obtain the consumer bank information

and then hand-key it into the POS terminal. Notwithstanding LML's assertions to the contrary, the

POS terminals used with the accused services are Redacted

(2nd Winckler Decl., ¶¶ 26-39.) While LML proffers evidence that certain, specified MICR-Readers are used in conjunction with POS terminals under the accused services, LML fails to provide any evidence – nor could it -- that ECHO supported terminals are designed to read "any bank check," "*including foreign and specialized check readers*." (LML's Motion at pg. 10:2-5.) In fact, check readers that Redacted

(2nd Winckler Decl., ¶¶ 27-39.) Whether the ECHO terminals are capable or not of theoretically "connecting to" such "foreign and specialized check readers," the fact remains that they are not so connected in the marketplace.

Likewise, Redacted

: The check must be run through a MICR reader. (2nd Winckler Decl., ¶ 40.)

Indeed, Redacted

. (*See* 2nd Winckler Decl., ¶¶ 41-57.)

In a weak attempt to "prove" that terminals used in conjunction with ECHO's ECC Service can accept or read consumer bank account information from any bank check, LML cites to the deposition of Kris Winckler, Senior Vice President and Co-General Manager in charge of ECHO's Check Conversion and Verification, where LML mischaracterizes Mr. Winckler's testimony to support LML's summary conclusion that "point of sale terminal can capture MICR information from any check." (LML's Motion at pg. 10:12-13.) Nowhere in the transcript, however, does Mr. Winckler make such a statement. In fact, the evidence submitted by ECHO in this opposition, as summarized above and in Mr. Winckler's Declaration submitted in support hereof, demonstrates just the opposite. None of the references made by LML to statements made by ECHO in its documents or in the depositions of ECHO personnel supports LML's position.

Despite bald statements that ECHO's terminals can obtain consumer bank account information from "any" bank check, LML only offers documentation to support that ECHO accepts "a" (*i.e.*, some) check – an embodiment that was specifically disclaimed during the prosecution of the

25

patent-in-suit -- or that ECHO reader/scanners are connected to point of sale terminals, or that consumer bank account information must be captured from the check's MICR line, or that terminals have keypads or that terminals must be used with check readers. While not suggesting that LML has proven that any of these elements are present, no evidence, other than unsupported assertions, have been offered to prove that ECHO can read or accept consumer bank account information from any bank check. LML ignores the key word "any" in the limitation to make it appear that ECHO satisfies this element. By showing that ECHO can process "a" check LML asserts that it has proven that this element is satisfied. "Any" is the key to this limitation and LML again sidesteps the real issue.

Thus, even under LML's proposed construction of this element, this claim element is absent from the accused services.

### b. ECHO Does Not Meet this Limitation Under Defendants' Construction

As set forth in Defendants' claim constructions briefs, this element is properly construed to mean "a point of sale terminal adapted to read consumer bank account information directly from any type of check drawn on a financial institution." In short, this construction is consistent with the claim language itself that requires that the POS terminal – which includes an integrated or peripheral check reader – obtain the consumer bank information from any check. Stated another way, the only way that a POS terminal can receive consumer bank account information from any check is through a check reader. Manual entry does not represent a scenario where the POS terminal gets the information from the check; rather, in such a case the POS terminal would be receiving the information from a human who first received the information from the check. Thus, the only way for a POS terminal to receive the consumer bank account information from the check is to read it from check.[14]

LML's own infringement/validity expert, Mr. Tinkel, confirmed the aforementioned understanding of the meaning of this claim element. For example, at his deposition, when asked

---

[14] Keypad MICR entry, while mentioned in the specification, is an unclaimed embodiment, much like the specialized "credit card" described in detail in the specification.

Redacted

Tinkel stated,            :

# Redacted

(*See* **Ex. I**, Tinkel Deposition, at 120:14-22).

Contrast this element with the first element of claim 9, which reads "a point of sale terminal adapted to receive consumer bank account information." In claim 9, element 1, the limitation that the POS terminal receive the information "from any bank check" is not included. Under LML's proposed construction, LML, in essence, improperly is attempting to read-out the phrase "from any bank check" from this claim element.

Similarly, it is evident from the file history, where the applicants amended the word "a" to "any," that the term should include any type of check drawn on a financial institution. LML's inclusion of the modifiers "regular" and "normal," aside from being unsupported, renders this claim indefinite.

In sum, Defendants' proposed construction for this element ought to be adopted by the Court. When Defendants' construction is applied to the accused services, it is evident that this element is absent therefrom.

The only check readers used in connection with the accused services are MICR-Readers that are incapable of reading numerous check types, including foreign checks printed with Redacted and checks lacking MICR characters lying within a specified magnetic range. (2nd Winckler Decl., ¶¶ 22-29; *see also* 2nd Schutze Decl. ¶¶ 9-13.) Thus, these MICR-Readers cannot be said to be

adapted to read consumer bank account information from any bank check and, therefore, this element is absent from the accused services.

### 2. ECHO's ECC Service Does Not Include the Step of "presenting any bank check to a point of sale terminal," as Required in Independent Claim 8

LML construes the element "presenting any bank check to a point of sale terminal" to mean "presenting any regular check used to draw funds from a normal bank or credit union checking account to a point of sale terminal." Even under LML's construction, this element is absent from the accused services.

As set forth above with respect to element 1 of claim 1, foreign checks printed with CMC-7 MICR font are included under the category of "any regular check used to draw funds from a normal bank or credit union checking account." In addition, LML's expert further concedes that the following documents

# Redacted

. No evidence has been – nor could be -- proffered that these checks are not "regular checks used to draw funds from a normal bank or credit union checking account."

28

In fact, LML's expert further testified, Redacted

Redacted (*Id.*, 155:19-24),

Redacted (*Id.*, 88:23-89:2). (*See also* 2nd Schutze Decl., ¶ 16.) These facts are undisputed, and demonstrate that the claimed system is adapted to function with checks payable in foreign currencies. In addition, business checks and corporate checks are specifically disclosed to be used with the claimed system (*see* **Ex. A**, 3:1-8; 4:14-23.) Furthermore, the '988 patent teaches that the check serial number is not necessary for processing checks electronically under the patented system. (*See* **Ex. A**, 10:29-34 -- "Instances where printed checks add the individual check's number to the end of the account number can be "dropped" by Check Reader switch settings."

Under the ECC Service, in contrast, Redacted

Redacted (*See* 2nd Winckler Decl., ¶¶ 14-16.) Under the ECC Service, Redacted

Redacted . (*See* 2nd Winckler Decl., ¶ 15.)

Thus, under LML's proposed construction of this element, this claim element is absent from the accused services.

As set forth in Defendants' claim constructions briefs, this element is properly construed to mean a step in a process of "presenting any type of check drawn on a financial institution to a point of sale terminal." *See*, Defendants' Opening Brief on Claim Construction, D.I. 288, pp. 13-18. Each of the above-listed checks also falls within the universe of "any type of check drawn on a financial institution." Thus, because merchants are prohibited under the ECC Service from presenting such checks to the POS terminal, also under Defendants' proposed construction of this element, this claim element is absent from the accused services.

3.     ECHO's ECC Service Does Not Have "reading means for reading magnetic ink character recognition numbers on any consumer bank check," as Required in Independent Claim 9

a.    ECHO Does Not Meet this Limitation Under LML's Construction

LML construes the element "reading means for reading magnetic ink character recognition numbers on any consumer bank check" to mean "any mechanism such as a MICR check reader, optical character recognition ("OCR") equipment, a keyboard for manual entry, or equivalent for reading magnetic ink character recognition numbers on any regular check used to draw funds from a normal bank or credit union consumer checking account." *See*, Joint Proposed Claim Construction Statement, D.I. 281, p. 3. Even under LML's proposed construction, once clarified appropriately to exclude "manual entry" as a reading means, this element is simply absent from the accused services.

At the outset, even putting aside ECHO's proposed construction of this claim element, LML's proposed inclusion of "a keyboard for manual entry" as part of the definition of a reading means is senseless. A keyboard on a point of sale terminal cannot reasonably be argued to be a component of point of sale terminal capable of performing the function of "reading magnetic ink character recognition numbers appearing on a consumer check," as LML describes the recited function.

Excluding the keyboard from the structures capable of performing the function as LML describes it, as set forth above in section V(c)(1), the MICR-Readers used in conjunction with the POS terminals under ECHO's ECC Service are only capable of magnetically reading the MICR lines Redacted          and possessing magnetically charged MICR characters lying within the proper magnetic range. Thus, because numerous checks worldwide are printed in MICR font formats[Redacted] than Redacted numerous checks lack magnetically charged MICR characters lying within the proper magnetic range, ECHO's ECC Service lacks a mechanism such as a MICR check reader, optical character recognition ("OCR") equipment, or equivalent for reading magnetic ink character recognition numbers on any regular check used to draw funds from a normal bank or credit union consumer checking account.

30

Even applying LML's strained construction of the term "reading means" to include "a keyboard for manual entry," as set forth above in section V(c)(1), with the exception of a single ECHO merchant, MICR information may not be entered into the POS terminal keypad. Indeed, Redacted                                prohibited contractually and is prevented by Redacted                . (2nd Winckler Decl., ¶¶ 16-19, 42-57.)

Thus, even under LML's proposed construction of this element, this claim element is absent from the accused services.

      b.     ECHO Does Not Meet this Limitation Under Defendants' Construction

Defendants construe the element "reading means for reading magnetic ink character recognition numbers on any consumer bank check" to mean "a MICR check reader or optical character recognition ("OCR") equipment for reading magnetic ink character recognition numbers on any type of check drawn against a consumer bank account at a financial intuition." *See*, Defendants' Opening Brief on Claim Construction, D.I. 288, pp. 34-37. Under Defendants' construction, this element is absent from the accused services.

As set forth above in sections V(c)(1) – (2) hereto, the MICR-Readers used in connection with the accused services simply are not capable of reading the MICR numbers on any type of check drawn against a consumer bank account at a financial intuition.

Thus, under Defendants' proposed construction of this element, this claim element is absent from the accused services.

      4.     ECHO'S ECC Service Does Not Communicate with the ACH Network to Transfer of Funds Based on "*Any Bank Check*"

As discussed above, each of independent claims 1, 8 and 9 includes the phrase "any bank check." (**Ex. A,** 11:38, 12:22 and 12:56.) Each independent claim also includes a limitation requiring an electronic transaction based on the information obtained from the bank check. For example, independent claims 1 and 9 each recite "enabling automated clearing house communication for transferring funds." (*Id*. at 11:50-55 and 12:61-66.) Claim 8 recites "subsequently transmitting

31

the transaction event information to a bank for subsequent automated clearinghouse operations."[15]
(*Id.* at 12:40-42.)

      As set forth in Defendants' claim construction briefing, these limitations should be construed to mean that the claims require receiving information and transferring funds using any bank check. These phrases should be construed to mean "electronically communicating with an automated clearing house for transferring funds electronically based upon the consumer bank account information obtained from any bank check presented at the point-of-sale." The "any bank check" portion of this element should be construed to mean "any type of check drawn on a financial institution."

      It should be noted that LML's own expert witness Redacted

which appears in both claims 1 and 9 of the patent-in-suit. Specifically, Mr. Tinkel stated in Redacted

" (*See also* **Ex. I** 158:18-160:24).

      There is good reason that LML's own expert adopted this construction. From reviewing the claims, it is immediately apparent that the communication to the automated clearing house is based upon the consumer bank account information obtained from any bank check presented at the point of sale. (*See* **Ex. A**, 11:35 – 56, 12:21 – 42, 12:43 - 67.) There is no other option of where the information that is used to conduct the transaction could come from. (*See generally* **Ex. A**.) Common sense also points toward this conclusion, the funds have to be transferred based on the information read from the check at the point of sale terminal.

---

[15] Redacted

LML's construction clearly is at odds with its own expert's construction and renders the claim indefinite. It is no wonder that LML now seeks to advance that differs from its own expert's construction: The construction proffered by Mr. Tinkel supports Defendants' assertion that

# Redacted

Under its newly-fashioned construction, LML attempts to disavow both the file history relating to the amendments of the claims to add the term "any" and its own expert's construction.

Even if LML prevailed on the argument that the point of sale terminal can receive information from "any" bank check (which they should not) it is not possible to transfer funds through the ACH based on that information. Whole classes of checks are non-ACHable. (**Ex. C** LML-EP-055429.) The ACH can only process a certain subset of all the checks that are used. (*Id.*) None of the Defendants' systems meets the "any bank check" limitations because the very rules governing these types of transactions expressly prohibit the use of certain types of checks to transfer funds. Specifically, ECHO complies with NACHA's rules governing "Point of Purchase" or "POP" transactions. (*See* 2nd Winckler Decl., ¶ 14.)

Because ECHO complies with NACHA rules limiting the types of checks that can be used, the ECC Service cannot meet these "any bank check" limitations. The evidence discussed above and set forth in detail in the concurrently filed 2nd Winckler Declaration regarding ECHO's ECC Service confirms the fact that the Redacted

including (1) known checks drawn on corporate or business deposit accounts, (2) known third-party checks, (3) credit card checks, (4) obligations of a financial institution (e.g., traveler's checks, cashier's checks, official checks, money orders, etc.), (5) checks drawn on the Treasury of the United States, a Federal Reserve Bank, or a Federal Home Loan Bank, (6) checks drawn on a state or local government, or (7) checks payable in a medium other than United States currency. Nor can ECHO's ECC Service transfer funds via

foreign automated clearinghouses, as ECHO's computers are not configured to communication with any automated clearinghouse other than the U.S. ACH Network.[16] (*See* 2nd Winckler Decl., ¶ 18.)

In instances where ECHO acts as an acquirer processor for VISA, LML attempts to cast even transactions which VISA clears itself through its VisaNet network as infringing transactions. (*See* LML's Motion at p. 15:1-4.) This twisted argument is premised upon the false assumption that VisaNet is an automated clearinghouse, such that transactions communicated to VISA and cleared by VISA, without ECHO, comprise "automated clearing house communications." Even putting aside the fact that VISA is not capable of debiting check-writers' accounts for "any bank check," the fact remains that VisaNet is not an automated clearing house as that term in understood by one of ordinary skill in the art. (*See* 2nd Schutze Decl., ¶ .) Thus LML's attempt to force VISA "participating bank" transactions into the wording of the claims fails.

LML has never confronted the real issue here, where does the consumer bank account information come from? The only possible explanation is that the consumer bank account information comes from the bank check presented at the point of sale. Because ECHO cannot transfer funds thought the ACH based on many types of checks, ECHO's ECC Service does not meet this limitation.

### D. ECHO Does Not Infringe the Asserted Claims 2, 8, 9, 10, 11, And 16 Of The '988 Patent Because ECHO's ECC Service Reads The MICR Information For More Than Just Identifying Consumer Bank Account Information

As the Defendants have detailed in their claim construction brief, claims 2, 8, 9, 10, 11, and 16 all require that a system read the MICR information off the check for the *sole purpose* of reading the consumer bank account information.[17] Consumer bank account information is limited to only the

---

[16] LML argues that VISA Net is an automated clearinghouse, which ECHO disputes. Regardless, Redacted

(*See* 2nd Winckler Decl. at ¶ 105.)

[17] Claim 2 recites "reading magnetic ink character recognition numbers appearing on a consumer check for the sole purpose of identifying and reading the consumer bank account information." Claim 8 recites "reading the magnetic ink character recognition number information on the check for the sole purpose of obtaining the consumer bank account

34

ABA/transit routing number and the bank account number. (*See also* Joint Proposed Claim Construction Statement, D.I. 281, p. 1.)

LML construed "for the sole purpose" to mean "for the only purpose"; while Defendants did not content that the term needed to be specifically construed. *Id.*, p. 2.

Whichever "construction" is applied, it is undisputed that ECHO's ECC Service Redacted . When ECHO reads the MICR line off the consumer's check, ECHO's ECC Service captures the Redacted . (2nd Winckler Decl., ¶¶ 95-97.) Each of these Redacted is required in order to process an Electronic Check transaction, such that the absence of the Redacted will prevent the check from being processed electronically. *Id.* The ECC Service complies with NACHA rules governing "point of purchase" transactions. These regulations preclude infringement of the "sole purpose" limitations because they require that customers be provided with a receipt that includes the "source document check serial number." (2nd Winckler Decl., ¶ 97).

The crux of LML's argument in support of its assertion that this element is present in ECHO's ECC Service is that "consumer bank account information" is equated with "MICR information." (*See* Joint Proposed Claim Construction Statement, D.I. 281, p. 1.)[18] One need only look at the claim language itself, *e.g.*, claim 8, where these are each distinct claim terms: "reading the magnetic ink character recognition number information on the check for the sole purpose of *obtaining* consumer bank account information." (**Ex. A,** 12:24-27.)

LML criticizes Defendants' construction of limiting consumer bank account information to ABA/Transit routing number and account number as "arbitrarily" excluding the Redacted There is nothing arbitrary about excluding the Redacted from the '988 patent's use of the

---

[18] The incongruity of LML's position is amply demonstrated in Defendants' claim construction briefing and will only be summarized here.

information." Claim 9 reads: "reading magnetic ink character recognition numbers on any consumer bank check for the sole purpose of eliciting consumer bank account information."

term "consumer bank account information." The references in the patent show that consumer bank account information is limited to bank and account information that *does not* include the Redacted

.

The specification and the drawings limit consumer bank account information (or consumer banking information) to the ABA/Routing Transit Number (or Transit Number) and Bank Account Number.



**Fig. 4.  Portion of Fig. 9 from '988 patent showing "Customer Banking Information"**

**limited to bank account number and transit number**

The patent-in-suit contemplates transmitting a query for data center approval of the entire ABA/Transit **and personal or corporate checking account numbers.**" (*Id.* at 10:29–31) (emphasis added). The specification is specific about what information constitutes "consumer bank account information," stating that "ACH settlement criteria mandate exact recall for the bank and checking account numbers to properly complete any debit request." (*Id.* at 10:49-51). Likewise, it is the "bank/checking account information" that is used by the system's central computer to determine whether the customer's account is in good standing. (*Id.* at 9:17-21, 37-42). Finally, the specification even contemplates dropping the check serial number if it is captured. (*Id.* at 10:31-34).

Given that the ECC Service reads the MICR information for a purpose other than reading only the consumer bank account information, ECHO does not meet this limitation and, therefore, cannot infringe claims 2, 8, 9, 10, 11, and 16.

### E. ECHO Does Not Infringe the Asserted Claims 8 And 16 Of The '988 Patent Because ECHO's ECC Service Does not Include the Step of "*verifying that account numbers were accurately read at the point of sale terminal*"

As the Defendants have detailed in their claim construction brief, claims 8 and 16 require that the process include a step of "verifying that account numbers were accurately read at the point of sale terminal." Under the patent-in-suit, this is accomplished by "visually confirming that account numbers were accurately read [at the point of sale terminal] by reference to the source document," *i.e.*, the check. (Defendants' Opening Brief on Claim Construction, D.I. 288, pp. 30-31.)

It is undisputed that under ECHO's ECC Service, Redacted

(*See* 2nd Winckler Decl., ¶¶ 99-101 and 2nd Schutze Decl., ¶¶ 10-14.) Thus, no infringement can be found under Defendants' construction.

Even applying LML's proposed construction, to wit "verifying that the account numbers from the check were accurately read at the point of sale terminal," ECHO's ECC Service

Redacted    . As set forth in LML's Motion, the only argument proffered by LML in support of its assertion that ECHO's ECC Service infringes this claim is that if the check is misread at the POS terminal and the terminal prompts for a second read that the terminal has verified that the MICR information was accurately read. It does not follow, however, from the fact that the terminal detects a mis-read that the terminal has <u>verified</u> whether or not the account numbers were <u>accurately</u> read by the point-of-sale terminal.

Dictionary definitions of "verify" require determination of the truth or accuracy by, for example, comparison.[19] Re-reading based on an error message could not be considered

---

[19] Verify: To determine or test the truth or accuracy of, as by comparison, investigation, or reference. American Heritage Dictionary (2nd Coll. Ed. 1991); same definition, Webster's II New College Dictionary (1995); To establish the truth, accuracy, reality of, Merriman Webster's Collegiate Dictionary (10th Ed. 1998).

"verification" that account numbers were accurately read. Each read by the POS terminal is a separate event, without any cross-referencing being done by the terminal of the two reads. The only way to verify the accuracy of a read off of the check by the POS terminal is to refer to a document that contains the information which can serve as a cross-check. (*See* 2nd Winckler Decl., ¶¶ 99-101.) Otherwise, the point-of-sale cannot verify what was read against any information source. The terminals used in conjunction with ECHO's ECC Services lack this ability. *Id.  See also* 2nd Schutze Decl., ¶ 14.

Mr. Tinkel, LML's own expert on the issue of infringement stated Redacted

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ [20] When the preferred embodiment of a claim limitation is the *only* embodiment, the claims may be limited to that embodiment. *Toro Co.* v. *White Consol. Indus., Inc.,* 199 F.3d 1295, 1301-02 (Fed. Cir. 1999); *Wang Labs., Inc. v. America Online, Inc.,* 197 F.3d 1377, 1382-83 (Fed. Cir. 1999). The Federal Circuit has held that "when a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term 'by implication.'" *Bell Atlantic Network Servs., Inc. v. Covad Communications Group, Inc.,* 262 F.3d 1258, 1271 (Fed. Cir. 2001).

Similarly, in the instant case, no other possible method of verification is contemplated in the patent-in-suit. Verification by comparison to the original check is not just the preferred embodiment, it is the only embodiment. (*See* **Ex. A.**)

In addition, because this limitation appears in a process claim, this step in the process must occur with every transaction. If the prompt for an additional read is the verification step (which it is not), then it would have to occur with each and every transaction, something that does not happen. Given that ECHO's ECC Service does not require this step recited in claim 8 of the patent, ECHO does not meet this limitation and, therefore, cannot infringe claim 16.

---

[20] Redacted

**F.**    **ECHO Does Not Infringe Any Dependent Claim of the Patent-in-Suit Because ECHO Does Not Infringe Any Independent Claim of the Patent-in-Suit**

Dependent claims 2, 4, 5, 6, 10, 11 and 16 depend from independent claims. LML's statement that ECHO "has never contested" the dependent claims is false. ECHO has repeatedly contended that it does not satisfy any dependent claim because ECHO does not satisfy any of the independent claims of the '988 patent. *See Jeneric/Pentron, Inc. v. Dillon Co., Inc.*, 205 F.3d 1377, 1383 (Fed. Cir. 2000) (stating that it is a fundamental principle of patent law that dependent claims cannot be found infringed unless the claims from which they depend have been found to have been infringed). Because evidence exists to support a finding of no infringement as to each independent claim, that same evidence supports a finding of no infringement for each dependent claim.

**VI.    CONCLUSION**

For the foregoing reasons, "LML's Motion For Summary Judgment No. 2: For A Ruling That ECHO Infringes Claims 1, 2, 4, 5, 6, 9, 10, 11, And 15 Of The '988 Patent" should be denied.

/s/ Francis DiGiovanni
Francis DiGiovanni, Esq. (#3189)
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 North Orange Street
Wilmington, DE 19801
Phone: 302-658-9141
Fax: 302-658-5614

OF COUNSEL:
Robert Jacobs, Esq. (Pro Hac Vice)
Mark Mizrahi, Esq. (Pro Hac Vice)
Don H. Min, Esq. (Pro Hac Vice)
BELASCO JACOBS & TOWNSLEY, LLP
6100 Center Drive, Suite 630
Los Angeles, CA 90045
Phone: (310) 743-1188
Fax: (310) 743-1189

Attorneys for Electronic Clearing House, Inc.
and XpressChex, Inc.

39

### CERTIFICATE OF SERVICE

I, Francis DiGiovanni, hereby certify that on November 15, 2005, a true and correct copy of the foregoing document was caused to be served in the manner indicated on the attorneys of record at the following addresses:

**VIA E-MAIL AND HAND DELIVERY**
Richard K. Herrmann, Esquire
Morris James Hitchens
 & Williams LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801

**VIA E-MAIL AND HAND DELIVERY**
Richard D. Kirk, Esquire
The Bayard Firm
222 Delaware Avenue, 9th Floor
P.O. Box 25130
Wilmington, DE 19899

**VIA E-MAIL AND FIRST CLASS MAIL**
Mark C. Scarsi, Esquire
O'Melveny & Myers LLP
400 S. Hope Street
Los Angeles, CA 90071

**VIA E-MAIL AND HAND DELIVERY**
William J. Marsden, Esquire
Fish & Richardson, P.C.
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE 19899-1114

**VIA E-MAIL AND FIRST CLASS MAIL**
Russell E. Levine, Esquire, P.C.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois 60601

**VIA E-MAIL AND FIRST CLASS MAIL**
Dale M. Cendali, Esquire
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036

/s/ Francis DiGiovanni
Francis DiGiovanni (#3189)