# MIN EXHIBIT B



5484988

| UTILITY SERIAL NUMBER | PATENT DATE | PATENT NUMBER |
|---|---|---|
| 08/257390 | JAN 16 1996 | |

| SERIAL NUMBER | FILING DATE | CLASS | SUBCLASS | GROUP ART UNIT | EXAMINER |
|---|---|---|---|---|---|
| 08/257,390 | 06/09/94 | 235 | 37 | 2505 | Pitts |

APPLICANTS

ROBERT R. HILLS, ST. AUGUSTINE, FL; HENRY R. NICHOLS, MC LEAN, VA.

**CONTINUING DATA*****************
VERIFIED    THIS APPLN IS A CON OF    07/975,717 11/13/92, NOW ABANDONED

**FOREIGN/PCT APPLICATIONS************
VERIFIED

FOREIGN FILING LICENSE GRANTED 07/28/94    ***** SMALL ENTITY *****

| Foreign priority claimed ☐ yes ☑ no 35 USC 119 conditions met ☐ yes ☐ no Verified and Acknowledged Examiner's Initials | AS FILED | STATE OR COUNTRY | SHEETS DRWGS. | TOTAL CLAIMS | INDEP. CLAIMS | FILING FEE RECEIVED | ATTORNEY'S DOCKET NO. |
|---|---|---|---|---|---|---|---|
| | | FL | 8 | 9 | 2 | $355.00 | |

ADDRESS

JON L. ROBERTS
ROBERTS & ASSOCIATES
1953 GALLOWS RD.
SUITE 220
VIENNA, VA 22182

TITLE

CHECKWRITING POINT OF SALE SYSTEM

U.S. DEPT. of COMM.-Pat. & TM Office—PTO-436L (rev. 10-78)

| PARTS OF APPLICATION FILED SEPARATELY | | Application Examiner |
|---|---|---|
| NOTICE OF ALLOWANCE MAILED | | CLAIMS ALLOWED |
| 8-7-95 | Assistant Examiner | Total Claims 20  Print Claim 1 |
| ISSUE FEE | | DRAWING |
| Amount Due $605.00 | Date Paid 9-27-95 | Sheets Drwg. 8  Figs. Drwg.  Print Fig. |
| | HAROLD PITTS PRIMARY EXAMINER GROUP 2500  Primary Examiner | ISSUE BATCH NUMBER  N97 |
| Label Area | PREPARED FOR ISSUE | |
| | WARNING: The information disclosed herein may be restricted. Unauthorized disclosure may be prohibited by the United States Code Title 35, Sections 122, 181 and 368. Possession outside the U.S. Patent & Trademark Office is restricted to authorized employees and contractors only. | |

Form PTO-436A
(Rev. 8/92)

(FACE)

LML-EP 000054

| | 07/975717 | PATENT DATE | PATENT NUMBER |
|---|---|---|---|

| SERIAL NUMBER<br>07/975,717 | FILING DATE<br>11/13/92 | CLASS<br>235 | SUBCLASS<br>379 | GROUP ART UNIT<br>2505 | EXAMINER<br>HAROLD PITTS |
|---|---|---|---|---|---|

APPLICANTS

ROBERT R. HILLS, ST. AUGUSTINE, FL.; HENRY R. NICHOLS, MCLEAN, VA.

```
**CONTINUING DATA********************
   VERIFIED

   --------




**FOREIGN/PCT APPLICATIONS************
   VERIFIED

   --------




   FOREIGN FILING LICENSE GRANTED 12/02/92      ***** SMALL ENTITY *****
```

| Foreign priority claimed ☐ yes ☐ no<br>35 USC 119 conditions met ☐ yes ☐ no | AS FILED → | STATE OR COUNTRY<br>FL | SHEETS DRWGS.<br>8 | TOTAL CLAIMS<br>9 | INDEP. CLAIMS<br>2 | FILING FEE RECEIVED<br>$355.00 | ATTORNEY'S DOCKET NO. |
|---|---|---|---|---|---|---|---|
| Verified and Acknowledged    Examiner's Initials | | | | | | | |

ADDRESS

```
JON L. ROBERTS
ARTER & HADDEN
1801 K STREET, N.W.
SUITE 400K
WASHINGTON, DC  20006
```

TITLE

CHECKWRITING POINT OF SALE SYSTEM

U.S. DEPT. of COMM.-Pat. & TM Office—PTO-436L (rev. 10-78)

PARTS OF APPLICATION FILED SEPARATELY

| NOTICE OF ALLOWANCE MAILED | | PREPARED FOR ISSUE | | CLAIMS ALLOWED | |
|---|---|---|---|---|---|
| | | Assistant Examiner | Docket Clerk | Total Claims | Print Claim |
| ISSUE FEE | | | | DRAWINGS | |
| Amount Due | Date Paid | | Primary Examiner | Sheets Drwg. | Figs. Drwg. |
| | | ISSUE CLASSIFICATION | | ISSUE BATCH NUMBER | |
| Label Area | | Class | Subclass | | |

WARNING: The information disclosed herein may be restricted. Unauthorized disclosure may be prohibited by the United States Code Title 35, Sections 122, 181 and 368. Possession outside the U.S. Patent & Trademark Office is restricted to authorized employees and contractors only.

RECEIVED

APPROVED FOR LICENSE

JUL 16     DEC 1 7 '93

INITIALS     1 28 PM '93

U.S. PATENT AND
TRADEMARK OFFICE

07/975717

| Entered or Counted | | CONTENTS | Received or Mailed |
|---|---|---|---|
| _____ | 1. Application | papers. | |
| _____ | 2. | | 1/04/93 |
| _____ | 3. Proposal to Amend Drawings | | 2/8/93 |
| 7/19 | 4. P.C. Amato | | 2/8/93 |
| 9/20 | 4½. I. S. S | R&J (3mos) | 9/88/93 |
| 1-5-94 | 5. | | 9/88/93 |
| | 6. Amdt B | | 12-22-93 |
| 3/7 | 7. FIN R&J (3mos) | | 3.9.94 |
| _____ | 8. | | |
| _____ | 9. | | |
| _____ | 10. | | |
| _____ | 11. | | |
| _____ | 12. | | |
| _____ | 13. | | |
| _____ | 14. | | |
| _____ | 15. | | |
| _____ | 16. | | |
| _____ | 17. | | |
| _____ | 18. | | |
| _____ | 19. | | |
| _____ | 20. | | |
| _____ | 21. | | |
| _____ | 22. | | |
| _____ | 23. | | |
| _____ | 24. | | |
| _____ | 25. | | |
| _____ | 26. | | |
| _____ | 27. | | |
| _____ | 28. | | |
| _____ | 29. | | |
| _____ | 30. | | |
| _____ | 31. | | |
| _____ | 32. | | |

LML-EP 000056



08/257390

APPROVED FOR LICENSE ☐

INITIALS

08257390

**CONTENTS**

Date
Entered
or
Counted

Date
Received
or
Mailed

RECEIVED

AUG 0 4 1994

GROUP 2500

1. Application _____ papers.

| | | |
|---|---|---|
| 8-19-94 | 8. Pre Amdt C | 6-9-94 |
| 10-26-94 | 9. Rsp j (3 mos) | 10/28/94 |
| 1-26-95 | 10. Amdt D | 1-31-95 |
| 4-10-95 | 11. Rcst (30 DAYS) | 4-13-95 |
| 5/05/95 | 12. Option | 5-9-95 |
| 8/7/95 | 13. ✓ P+0-737 | 3-7-95 |
| 10/20/95 | 14. Formal Drawings (  hts) set 1 | 4-04-95 |
| | 15. PTO GRANT JAN 16 1996 | |
| | 16. | |
| | 17. | |
| | 18. | |
| | 19. | |
| | 20. | |
| | 21. | |
| | 22. | |
| | 23. | |
| | 24. | |
| | 25. | |
| | 26. | |
| | 27. | |
| | 28. | |
| | 29. | |
| | 30. | |
| | 31. | |
| | 32. | |
| | 33. | |
| | 34. | |
| | 35. | |
| | 36. | |
| | 37. | |
| | 38. | |

(FRONT)

LML-EP 000057



| SEARCHED | | | |
|---|---|---|---|
| Class | Sub. | Date | Exmr. |
| 235 | 379 380 | 9/8/95 | HD |
| | clit | 3/1/94 | HF |

| SEARCH NOTES | | |
|---|---|---|
| | Date | Exmr. |
| | | |

| INTERFERENCE SEARCHED | | | |
|---|---|---|---|
| Class | Sub. | Date | Exmr. |
| | | | |

LML-EP 000058



## SEARCHED

| Class | Sub. | Date | Exmr. |
|-------|------|------|-------|
| 235 | 379 380 | 11/20/94 | DP |
|  |  | 4/4/95 | HP |
|  | Jeb | 8/8/95 | HP |

## SEARCH NOTES

|  | Date | Exmr. |
|--|------|-------|
| NONE |  |  |

## INTERFERENCE SEARCHED

| Class | Sub. | Date | Exmr. |
|-------|------|------|-------|
| 235 | 379 | 8/8/95 | HP |
| 235 | 380 |  |  |

(RIGHT OUTSIDE)

LML-EP 000059

Staple Issue Slip Here

| POSITION | | INIT. | DATE |
|---|---|---|---|
| CLASSIFIER | | | 12-1-92 |
| EXAMINER | | 348 | 12-2-92 |
| TYPIST | | T328 | 12-2-92 |
| VERIFIER | | 338 | 773 |
| CORPS CORR. | | | |
| SPEC. HAND | | | |
| FILE MAINT. | | | |

## INDEX OF CLAIMS

SYMBOLS
- — .......... Rejected
- = .......... Allowed
- (Through numeral) Canceled
- + .......... Restricted
- N .......... Non-elected
- I .......... Interference
- A .......... Appeal
- O .......... Objected

| Claim (Final / Original) | Date |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |
| 29 | |
| 30 | |
| 31 | |
| 32 | |
| 33 | |
| 34 | |
| 35 | |
| 36 | |
| 37 | |
| 38 | |
| 39 | |
| 40 | |
| 41 | |
| 42 | |
| 43 | |
| 44 | |
| 45 | |
| 46 | |
| 47 | |
| 48 | |
| 49 | |
| 50 | |

| Claim (Final / Original) | Date |
|---|---|
| 51 | |
| 52 | |
| 53 | |
| 54 | |
| 55 | |
| 56 | |
| 57 | |
| 58 | |
| 59 | |
| 60 | |
| 61 | |
| 62 | |
| 63 | |
| 64 | |
| 65 | |
| 66 | |
| 67 | |
| 68 | |
| 69 | |
| 70 | |
| 71 | |
| 72 | |
| 73 | |
| 74 | |
| 75 | |
| 76 | |
| 77 | |
| 78 | |
| 79 | |
| 80 | |
| 81 | |
| 82 | |
| 83 | |
| 84 | |
| 85 | |
| 86 | |
| 87 | |
| 88 | |
| 89 | |
| 90 | |
| 91 | |
| 92 | |
| 93 | |
| 94 | |
| 95 | |
| 96 | |
| 97 | |
| 98 | |
| 99 | |
| 100 | |

LML-EP 000060



| POSITION | ID NO. | DATE |
|---|---|---|
| CLASSIFIER | | |
| EXAMINER | A 2 2 | 7-25-79 |
| TYPIST | 323 | 7/28 |
| VERIFIER | 088 | 7/ |
| CORPS CORR. | | |
| SPEC. HAND | | |
| FILE MAINT. | | |
| DRAFTING | | |

## INDEX OF CLAIMS

| Claim Final | Original | Date |  |  |  |  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | | | | | | | | | | | | |
| | 2 | | | | | | | | | | | | |
| | 3 | | | | | | | | | | | | |
| | 4 | | | | | | | | | | | | |
| | 5 | | | | | | | | | | | | |
| | 6 | | | | | | | | | | | | |
| | 7 | | | | | | | | | | | | |
| | 8 | | | | | | | | | | | | |
| | 9 | | | | | | | | | | | | |
| | 10 | | | | | | | | | | | | |
| | 11 | | | | | | | | | | | | |
| | 12 | | | | | | | | | | | | |
| | 13 | | | | | | | | | | | | |
| | 14 | | | | | | | | | | | | |
| | 15 | | | | | | | | | | | | |
| | 16 | | | | | | | | | | | | |
| | 17 | | | | | | | | | | | | |
| | 18 | | | | | | | | | | | | |
| | 19 | | | | | | | | | | | | |
| | 20 | | | | | | | | | | | | |
| | 21 | | | | | | | | | | | | |
| | 22 | | | | | | | | | | | | |
| | 23 | | | | | | | | | | | | |
| | 24 | | | | | | | | | | | | |
| | 25 | | | | | | | | | | | | |
| | 26 | | | | | | | | | | | | |
| | 27 | | | | | | | | | | | | |
| | 28 | | | | | | | | | | | | |
| | 29 | | | | | | | | | | | | |
| | 30 | | | | | | | | | | | | |
| | 31 | | | | | | | | | | | | |
| | 32 | | | | | | | | | | | | |
| | 33 | | | | | | | | | | | | |
| | 34 | | | | | | | | | | | | |
| | 35 | | | | | | | | | | | | |
| | 36 | | | | | | | | | | | | |
| | 37 | | | | | | | | | | | | |
| | 38 | | | | | | | | | | | | |
| | 39 | | | | | | | | | | | | |
| | 40 | | | | | | | | | | | | |
| | 41 | | | | | | | | | | | | |
| | 42 | | | | | | | | | | | | |
| | 43 | | | | | | | | | | | | |
| | 44 | | | | | | | | | | | | |
| | 45 | | | | | | | | | | | | |
| | 46 | | | | | | | | | | | | |
| | 47 | | | | | | | | | | | | |
| | 48 | | | | | | | | | | | | |
| | 49 | | | | | | | | | | | | |
| | 50 | | | | | | | | | | | | |

| Claim Final | Original | Date |  |  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 51 | | | | | | | | | | |
| | 52 | | | | | | | | | | |
| | 53 | | | | | | | | | | |
| | 54 | | | | | | | | | | |
| | 55 | | | | | | | | | | |
| | 56 | | | | | | | | | | |
| | 57 | | | | | | | | | | |
| | 58 | | | | | | | | | | |
| | 59 | | | | | | | | | | |
| | 60 | | | | | | | | | | |
| | 61 | | | | | | | | | | |
| | 62 | | | | | | | | | | |
| | 63 | | | | | | | | | | |
| | 64 | | | | | | | | | | |
| | 65 | | | | | | | | | | |
| | 66 | | | | | | | | | | |
| | 67 | | | | | | | | | | |
| | 68 | | | | | | | | | | |
| | 69 | | | | | | | | | | |
| | 70 | | | | | | | | | | |
| | 71 | | | | | | | | | | |
| | 72 | | | | | | | | | | |
| | 73 | | | | | | | | | | |
| | 74 | | | | | | | | | | |
| | 75 | | | | | | | | | | |
| | 76 | | | | | | | | | | |
| | 77 | | | | | | | | | | |
| | 78 | | | | | | | | | | |
| | 79 | | | | | | | | | | |
| | 80 | | | | | | | | | | |
| | 81 | | | | | | | | | | |
| | 82 | | | | | | | | | | |
| | 83 | | | | | | | | | | |
| | 84 | | | | | | | | | | |
| | 85 | | | | | | | | | | |
| | 86 | | | | | | | | | | |
| | 87 | | | | | | | | | | |
| | 88 | | | | | | | | | | |
| | 89 | | | | | | | | | | |
| | 90 | | | | | | | | | | |
| | 91 | | | | | | | | | | |
| | 92 | | | | | | | | | | |
| | 93 | | | | | | | | | | |
| | 94 | | | | | | | | | | |
| | 95 | | | | | | | | | | |
| | 96 | | | | | | | | | | |
| | 97 | | | | | | | | | | |
| | 98 | | | | | | | | | | |
| | 99 | | | | | | | | | | |
| | 100 | | | | | | | | | | |

SYMBOLS
✓ ........................ Rejected
= ........................ Allowed
— (Through numeral) Cancelled
+ ........................ Restricted
N ........................ Non-elected
I ........................ Interference
A ........................ Appeal
O ........................ Objected

(LEFT INSIDE)

LML-EP 000061



LML-EP 000062



US005484988A

# United States Patent [19]

## Hills et al.

[11] **Patent Number:** 5,484,988

[45] **Date of Patent:** Jan. 16, 1996

[54] CHECKWRITING POINT OF SALE SYSTEM

[75] Inventors: **Robert R. Hills**, St. Augustine, Fla.; **Henry R. Nichols**, McLean, Va.

[73] Assignee: **Resource Technology Services, Inc.**, Vienna, Va.

[21] Appl. No.: 257,390

[22] Filed: **Jun. 9, 1994**

### Related U.S. Application Data

[63] Continuation of Ser. No. 975,717, Nov. 13, 1992, abandoned.

[51] Int. Cl.⁶ ............................................ G06F 15/30
[52] U.S. Cl. ............................... 235/379; 235/380
[58] Field of Search ........................... 235/379, 380

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,824,544 | 7/1974 | Sinjian | 340/147 A |
| 3,845,470 | 10/1974 | Schaller | 340/149 A |
| 4,270,042 | 5/1981 | Case | 235/379 |
| 4,404,649 | 9/1983 | Nunley et al. | 364/900 |
| 4,523,330 | 6/1985 | Cain | 382/7 |
| 4,580,040 | 4/1986 | Granzow et al. | 235/379 |
| 4,617,457 | 10/1986 | Granzow et al. | 235/379 |
| 4,672,377 | 6/1987 | Murphy et al. | 340/825.34 |
| 4,673,802 | 6/1987 | Ohmae et al. | 235/379 |

| | | | |
|---|---|---|---|
| 4,678,895 | 7/1987 | Tateisi et al. | 235/379 |
| 3,678,896 | 7/1987 | Carlson et al. | 235/380 |
| 4,743,743 | 5/1988 | Fukatsu | 235/379 |
| 4,810,866 | 3/1989 | Lord, Jr. | 235/379 |
| 4,823,264 | 4/1989 | Deming | 235/379 |
| 4,933,536 | 6/1990 | Lindemann et al. | 235/375 |
| 4,934,772 | 6/1990 | Sakuma et al. | 350/6.5 |
| 5,053,607 | 10/1991 | Carlson et al. | 235/379 |

*Primary Examiner*—Harold Pitts
*Attorney, Agent, or Firm*—Thomas M. Champagne; Jon L. Roberts; Roberts & Associates

[57] **ABSTRACT**

A point of sale system designed to read information from a consumer's check, credit card, or manual input with a subsequent debiting of a consumer's account and crediting a merchant's account for the goods or services provided. Point of sale terminals are designed to accept a form of credit card with a consumer's bank account information encoded thereon or in the alternative to read the MICR number from a consumer's check in order to verify that a consumer has an appropriate balance to conduct the transaction with a given merchant. Thereafter the transaction of that information is transmitted to a central computer system which verifies the consumer's credit worthiness and stores the transaction event information for subsequent bank reconciliation via the ACH network. The invention eliminates the need for paper checks with all bank reconciliation being accomplished electronically.

**20 Claims, 8 Drawing Sheets**



**U.S. Patent**          Jan. 16, 1996          Sheet 1 of 8          **5,484,988**



**FIG. 1**



**FIG. 2**

LML-EP 000064

**U.S. Patent**          Jan. 16, 1996          Sheet 2 of 8          **5,484,988**



**FIG. 3**

LML-EP 000065



**FIG. 4**

LML-EP 000066



**FIG. 5**



FIG. 6



FIG. 7

LML-EP 000069

**U.S. Patent**       Jan. 16, 1996       Sheet 7 of 8       **5,484,988**

```
                        Merchant Name
                        Street Address
                        City, ST  Zip
                        Merchant Acct #

    TIME 00:00 _M                    DATE 00/00/00
    BANK ACCT. NO. 000000000000
    TRANSIT NO.  000000000


    SALE AMOUNT                    $ 0,000.00


    TERMINAL ID  0000000000

    I herewith authorize ChequeMARK Systems
    to  electronically  access  my  designated
    checking  account  for  the  payment  of  the
    above referenced purchase.


    Name (PRINT) _____

    Street _____

    City _____ST_____ Zip _____

    Tel. Number:  (_____) _____ — _____


    I ACKNOWLEDGE THAT RETURN FEES WILL BE
    IMPOSED SHOULD MY PAYMENT BE DISHONORED
    AND UNDERSTAND THAT IT IS UNLAWFUL TO
    AUTHORIZE PAYMENTS FOR WHICH ADEQUATE
    MONIES  ARE  NOT  AVAILABLE  WITHIN  MY
    ACCOUNT.



    X_____
        Authorizing Signature
```

*FIG. 8*

LML-EP 000070

**U.S. Patent**     Jan. 16, 1996     Sheet 8 of 8     **5,484,988**

Merchant Name
Street Address
City, ST  Zip
Merchant Acct #

CUSTOMER BANKING INFORMATION:

BANK ACCT. NO. _____

TRANSIT NO. _____

SALE AMOUNT . . . . . . . . . . . . . . . . . . $ _____

I herewith authorize ChequeMARK Systems to electronically access my designated checking account for the payment of the above referenced purchase amount.   I acknowledge that sufficient funds are available for the payment of this sale.

Name (PRINT) _____

Street _____

City _____ ST _____ Zip _____

Tel. Number:  (_____) _____ — _____

I FURTHER ACKNOWLEDGE THAT RETURN FEES WILL BE IMPOSED SHOULD MY PAYMENT BE DISHONORED AND UNDERSTAND THAT IT IS UNLAWFUL TO AUTHORIZE PAYMENTS FOR WHICH ADEQUATE MONIES ARE NOT AVAILABLE WITHIN MY ACCOUNT.

X_____
Authorizing Signature

## FIG. 9



5,484,988

1

# CHECKWRITING POINT OF SALE SYSTEM

## RELATED APPLICATION

This application is a continuation of Ser. No. 07/975,717 filed Nov. 13, 1992, now abandoned.

## FIELD OF THE INVENTION

This invention relates to the field of Point-of-Sale systems and more particularly to the integration and processing of purchases whereby a check is used as the basic source of identification of the individual and of the individual's bank and whereby the bank account is debited.

## Background Art

Numerous devices exist for processing checks. For example, U.S. Pat. No. 4,933,536 to Lindemann, et al., describes a check processing device which is used together with a Point-of-Sale terminal. This particular device involves copying and taking a picture of an individual whereby a dishonored check could then be traced to the person who has offered it.

U.S. Pat. No. 4,810,866 to Lloyd, Jr., describes a check validation system again located together with a Point-of-Sale system for imprinting and otherwise physically dealing with a check.

Other systems also deal an apparatus for handling checks at a point of sale. For example, U.S. Pat. No. 4,743,743 to Fukatsu describes one such transaction apparatus where a check is examined by a reader. U.S. Pat. No. 4,672,377 to Murphy, et al. describes a check authorization system wherein a check is imprinted with a bar code and information concerning customers which are stored in a database. U.S. Pat. No. 3,845,470 to Schuller discloses a vending system using a modified form of a check which is imprinted with identification codes, when someone attempts to use the check in purchasing goods and services, a vending operation will not place the order if information associated with the check is not valid in a particular database.

Other check-based financial systems have also been the subject of invention. U.S. Pat. No. 4,617,457 addresses an ATM or automatic teller machine form of cashing checks. Such systems create a picture of the check involved and also involves checking against a specialized database to insure that the check is a "valid" one (see also U.S. Pat. No. 4,580,040 to Granzow et al.).

Another generic category of financial systems deals with methods of handling the financial transactions apart from the physical handling of the check itself. For example, U.S. Pat. No. 3,824,544 to Simjian describes a merchant issued "check" which can be used in the purchase of goods and services and upon purchase, a specialized code is evaluated to determine if the check is being validly utilized.

U.S. Pat. No. 4,404,649 to Nunley et al. describes a document processing system which generally discloses a method of reading checks for processing a wide variety of financial documents.

U.S. Pat. No. 4,523,330 to Caine also describes a method for processing financial documents which systems also includes a Point-of-Sale terminal for generating image data from checks as they are being processed. This patent is drawn principally to the actual terminal itself.

2

U.S. Pat. No. 4,673,802 to Ohmae et al. describes a central processing system having stored data relating to the accounts of users. Users are approved or disapproved at the Point-of-Sale based upon information in the database.

U.S. Patent No. 4,270,042 to Case discloses a point of sale system that requires a consumer to prepay a sum of money into a special account that is accessed only by the system. This amount is inscribed on the card, and when a transaction is made using the system, the amount of the transaction is punched out of a designated area on the card. This amount, along with a signature and other information, is supplied on a draft negotiable instrument, which is given to the merchant at the time of the transaction. Thus, the Case system does away with the use of bank checks in effecting the transaction, but requires the use of specialized prepaid draft negotiable instruments that must be surrendered to the merchant.

U.S. Patent No. 4,823,264 to Deming discloses a home banking system that can be used to transfer funds to different payees in satisfaction of debts incurred through previous purchases, use of utilities, etc. The system is consumer driven; that is, it is contemplated for use by the payor on a home personal computer. While the Deming system does away with the use of bank checks, account and other information must be keyed into the system. The Deming system cannot be used to read account and other information directly from an ordinary bank check and has no use for bank checks as instruments other than negotiable paper. Further, the Deming system cannot be used to transfer funds at the time of purchase and is not workable at the point of sale; the system can only be used to pay debts that have been incurred in the past and have accumulated.

Finally, U.S. Pat. No. 4,678,896 to Carlson et al. describes a Point-of-Sale system whereby an apparatus is provided to secure the processing and imprinting of checks.

All of these above patents deal with the specific problem of how to accept a check from a customer for the purchase of goods and services. They do not in any way address the subsequent processing of checks nor do they address the process by which checks are cleared through the normal automatic check handling clearinghouse operations that exist in the financial world. Thus, the interaction of these systems with the automated clearing house ("ACH") process is not addressed in any way. This is particularly important since if any Point-of-Sale check handling system is to interact with the ACH mechanism it must adhere to that processing scheme and must lend itself to use with a processing scheme.

Further, some of the currently used systems described above require the use of a bank check as a negotiable instrument which must be surrendered to a merchant. Some of the systems do away with the use of a bank check altogether, but require a debit card or a specialized draft instrument to be used only with the particular system. None of these systems completely does away with the need and use for a negotiable draft instrument while using the consumer's bank check for identification and verification only. It is therefore an objective of the present invention to provide such a system.

It is an objective of the present invention to be adaptable for use with the ACH system and to be smoothly incorporated into it. In this fashion, the present invention will immediately be useful for a much wider range of financial transactions above and beyond those contemplated and disclosed in the background references discussed above.

## Summary of the Invention

The present invention comprises a process and apparatus which may be employed for the purpose of effecting pay-

LML-EP 000072

5,484,988

3

ments for point-of-sale purchases of goods and services paid from consumer funds secured in bank checking or depository accounts. Each sale or "Transaction Event" would be an electronic and "paperless" event thereby eliminating reliance on accepting and processing commercial bank drafts (personal or corporate checks) and the physical handling of those bank drafts thus replacing commercial bank drafts at the point-of-sale.

In contrast to known systems, the present invention is a merchant driven system that can be used to process a transaction at the point of sale and at the time of purchase. The system is intended to be made available to subscribing merchants, businesses, and individuals herein referred to as "system subscribers" wishing to employ the method and apparatus of the present invention for the electronic processing and settlement of consumer purchases. Further, operational parameters of the present invention allow freedom from customary state or other geographically limiting criteria typical when accepting and processing "paper" checks. The system is designed to act with the national authorization and electronic settlement network known as the ACH system.

The system is designed to perform in a fully automated manner enabling each Transaction Event to be processed by a system subscriber as a point-of-sale transaction in the presence of the consumer. When the transaction event is "approved" funds are debited from an authorized consumer account for credit to the system subscriber and electronic settlement by ACH deposits the transaction amount to the subscriber's designated depository account. Authorized access to consumer accounts and credits to system subscriber depository accounts are performed as "Off-Line" transactions by means of Electronic Funds Transfer ("EFT") through the ACH Network or through the Federal Reserve System.

The invention comprises a point-of-sale processing system comprising electronic data processing equipment which allows individual services selections which provide automated, electronic processing from bank checking or depository accounts. It is the objective of the present invention to automate the point-of-sale environment for processing consumer purchases of goods and services which, other than for the system of the present invention, would necessitate the more traditional acceptance and processing of commercial bank drafts (personal and/or corporate checks). Individual Transaction Events are administered under the system of the present invention by initiating a terminal authorization inquiry and continuing through the electronic settlement of funds representing the Transaction Event from the pre-approved consumer banking accounts.

It is a further objective of the present invention to eliminate the need for "paper" checks as an accepted means of consumer payment. In the place of personal and business checks, consumers would be provided free and unrestricted access to funds secured in bank accounts of various types by means of preauthorized electronic events. System subscribers electronically communicate with the data center of the present invention for individual Transaction Event authorizations which, upon reconciliation of a day's activity, result in an EFT by means of the Automated Clearing House accommodating an "Off-Line" debiting of preauthorized consumer Transaction Events from authorized accounts. Thereafter, each system subscriber is credited with the total of all such daily authorized Transaction Events to its designated banking depository account.

The present invention comprises logic which allows the following services which when individually performed or

4

where combined with other services establish a wholly unique processing medium enabling preauthorized access to consumers' checking account or bank depository reserves.

Authorization—This service supports electronic communication from point-of-sale to the system's central computer. The data center stores positive and negative files concerning consumer accounts thereby providing accurate inquiry responses regarding the current posting status of a consumer's banking account and signaling the system subscriber that said account may be reasonably relied upon for consummating a Transaction Event (i.e., an "Approval") or, where listed as delinquent, indicating that the account may not be so relied upon (i.e., a "Denial").

Check Replacement—This capability operates as an extension of Authorization enabling the system subscriber the capability of completing a Transaction Event by electronically logging the sale whereupon a Transaction Event Slip will be printed or manually prepared for consumer execution at the point-of-sale. By execution of the Transaction Event Slip, the consumer authorizes the electronic accessing of funds secured in his/her authorized banking account in lieu of the more traditional method of issuing personal and business checks. Funding settlement to the system subscriber would be effectuated by means of Electronic Funds Transfer via ACH or the Federal Reserve System as opposed to physically processing and transferring checks among banks.

Bank Transaction Card—As part of this invention an "Off-Line" Debit Card is established on which is stored the information relating to the banking account from which funds representing the Transaction Event would be debited for payment to the system subscriber. This information may be stored on the card itself in encrypted or unencrypted form or may be stored in the central computer where access to such information is gained via special control characters or access codes stored on the card. Electronic authorization for withdrawal of funds from the cardholder's account and subsequent electronic settlement procedures remain essentially identical to processing under the Check Replacement service described above. Information relating to the consumer-cardholder and the appropriate banking account to be debited for a Transaction Event will be encoded upon the magnetic stripe portion of the plastic, and terminal-readable, card.

Thus, the overall objective of the present invention is to provide and support an alternate means for consumer payments for goods and services that operates to replace commercial bank drafts in the point-of-sale environment. Simultaneously, the present invention assures consumers greater access to and use of funds in personal or corporate banking accounts. Further, the system provides system subscribers a significantly improved prospect of collecting the underlying monies for Transaction Events, reduced time for the collecting the cash receipts from Transaction Events, and a pronounced lowering of the present cost of cumbersome procedures otherwise mandated by the existing ACH system for accepting and processing commercial bank drafts.

A further objective of the present invention is to significantly reduce the use of checks as negotiable instruments in effecting the purchase of goods or services and to further reduce the consumers reliance on credit cards or cash for transaction events.

Detailed Description of the Preferred Embodiment

The method of the present invention begins with the electronic recording of consumer information at a system

5,484,988

5

subscriber's location using a point-of-sale terminal. This information is obtained in the presence of the consumer and occurs prior to any "Approval" either for the Transaction Event or for the ultimate crediting of the System subscriber's designated depository account. A Transaction Event involves a series of events initiated by a system subscriber's request to sell goods or services by payment from funds secured in a consumer's banking account. First, the consumer's banking account status will be verified through accessing the central computer files of the present invention. Verification that an account may be accessed is established alternatively by means of an encoded, magnetic strip card, or by input of account identification numbers from a consumer's bank account. A more traditional identification of the consumer could also occur including visual examination of driver's license or similar and acceptable picture "ID" however this is not considered part of the present invention.

As an integral portion of each Transaction Event, the system subscriber's location, date and time, and requested sale amount is automatically logged into the system when a system subscriber first accesses the invention. Finally, a Transaction Event Slip ("Sales Slip") will be produced by a printer integral to the point-of-sale terminal and will be executed by the consumer in the amount of the stated purchase with inscribed language defining the Transaction Event and specifically providing consumer authorization for electronic access to his/her banking account. Thereafter, the consumer account will be debited and the proceeds credited to the system subscriber's designated depository account along with all other similar Transaction Events representing the total of the system subscriber's daily activity. Debiting of consumer accounts and settlement deposits to each system subscriber is performed by means of Off-Line electronic funds transfer through and by the ACH or Federal Reserve System.

Equipment Configuration—The present invention can operate with nearly every conceivable point-of-sale equipment system. The central computer system accepts data transmitted from the system subscriber's existing point-of-sale equipment or that which is added to augment service performance. The point of sale terminal of the present invention is implemented in a number of ways, most preferred, however, being activation under a fully automated format. Such a fully automated system generally comprises a dual-port terminal with magnetic stripe reading capabilities interfaced with a logging printer capable of providing individual Transaction Event Slips for consumer execution, and a MICR check reader, optical character recognition ("OCR") equipment, or other device. Variations to this configuration are particularly possible where the system of the present invention is to be activated under a "Split-Dial" feature installed to function within the operational parameters of existing point-of-sale equipment primarily dedicated to bankcard ("credit card") processing. It is contemplated that services may in the future be administered where the present invention with a singular point-of-sale hardware device which, as a function of its design, would incorporate all or most of the service capabilities of an integrated terminal, logging printer, and MICR Check Reading device. The system of the present invention can alternately be interfaced with electronic cash registers now on the market.

Communications links from point-of-sale terminals to the central computer of the present invention will typically be in the form of telephonic network communications over a public switched telephone network ("PSTN") or over other approved networks. Transaction Event verification will occur as a result of point-of-sale terminal access to the

6

central computer's positive and/or negative data files. "Approved" or "Declined" notifications are made to the Point-of-Sale device over the PSTN. All data files will be centrally located and maintained on the invention's central computer data bases. Portions of the data base include but are not limited to third party data files such as the Shared Check Authorization Network ("SCAN") (trademark) data base.

Individual transactions or groupings of transactions are first approved by soliciting an "Authorization" prior to the completion of any requests for electronic funds transfer. To maintain an accurate status of file information for authorizations to subscribing merchants, businesses, and/or individuals, separate data bases are maintained. Current cardholder or banking account status are updated daily and instantly available for point-of-sale inquiry for Transaction Event authorizations. updated daily and are instantly available for point-of-sale inquiry for Transaction Event authorizations.

System subscribers point-of-sale equipment is interfaced to the central computer of the present invention by means of a telephonic network which is able to support communication from a plurality of point-of-sale terminals. Programming of the point-of-sale terminal causes an automatic "Dial-Up" to the central computer and provides an automatic query and response sequence affirming or denying the Transaction Event. The addition of local entry hubs may be installed to better facilitate the speed or economics of communications within the data files. Alternatives to telephonic networks may involve use of satellite communications or enhanced radio transmissions. Similarly, the system's data files and associated Check Replacement Service are contemplated to be responsive to emerging point-of-sale devices intended to seek authorizations by the alternate means of voice pattern recognition, fingerprint identification, retina scan, "smart" chips, and/or consumer or check image and/or signature broadcasting.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1—System overview of the present invention

FIG. 2—The point-of-sale terminal

FIG. 3—The Central Computer System

FIGS. 4–7—The process Data Flow

FIG. 8—Transaction Event Sales Slip

FIG. 9—Manual Transaction Event Sales Slip

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring to FIG. 1 an overall schematic of the present invention is described. Point-of-sale terminals 300 communicate over normal PSTN telephone lines with a central computer system 302 which in turn communicates with a banking institution 304 for purposes of debiting consumer accounts and crediting system subscriber accounts. The banking institution performs its function via normal automated clearing house ("ACH") transactions 306.

Referring to FIG. 2 the point-of-sale terminal is described. The point-of-sale terminal comprises several different entry means. A key board 310 can be used to input consumer information manually. Alternatively a card reader 312 can be used whereby the magnetic stripe on the card is read by the point-of-sale terminal and finally a check reader 314 is also included to read the MICR number on checks as a substitute for either a specific card or key board input. These various

LML-EP 000074



5,484,988

7

input means provide information to a microprocessor 316 which comprises logic means 318, memory means 320, and communication means 322. The logic means 318 comprises logic which allows the information received from the various input means to be processed and stored in the memory 320. The logic means further drives a display 324 which provides a visual output of the account number of the consumer for verification. The communication means 322 allows the subscriber terminal to communicate with the central computer 302 for purposes of processing the consumer's purchase.

Referring to FIG. 3 the central computer system 329 is described. The central computer system receives input from a plurality of point-of-sale terminals which provide transaction information from a system subscriber and a consumer desiring to purchase goods or services. The central computer system comprises a system subscriber 330 file which is a file of those merchants who have elected to use the present invention for processing purchases. The central system also comprises an approved consumer file 332 which stores the names of those consumers who have already been approved for allowing purchases to take place through the various input means as well as a third party database such as the SCAN (trademark) data base relating to consumer credit. The computer system also comprises a communications means 334. The communication means communicates with other outside third party data bases to allow any consumer that has not been approved by the system to have a rapid check of the status of the consumer's banking account and of whether the consumer has current outstanding returns (i.e. bad checks). Once this SCAN (trademark) or other outside third party data base search is performed and where an approval is given, the approved consumer file 332 is updated with the name of the new approved consumer.

As presently configured the central computer 329 already has a third party database known as the SCAN (trademark) database 333 resident on the central computer. Thus credit worthiness can be checked using this SCAN database. The SCAN (trademark) database is updated daily.

The communication means 334 also communicates with a banking institution 338 to instruct the bank to debit the account of the consumer and credit the account of the system subscriber (merchant) with the amount of the purchase. These transactions then take place via the normal ACH transaction process.

Referring to FIG. 4 the process begins by a consumer presenting a specimen or "blank" check complete with MICR number to the system subscriber (the merchant) 100. The system subscriber next determines if the check meets appropriate store policy procedures 102, i.e., that the check has appropriate information on the check. If the check does not meet the store policies, it is returned to the consumer 104. If the check does meet appropriate store policies the on-line verification process proceeds 106. The subscriber begins the process by first pressing the appropriate key on a terminal to access the host computer 108. Thereafter the point of sale terminal prompts the system subscriber to enter the appropriate MICR number 110. The system subscriber then enters the appropriate MICR number either manually or by passing the check through a check reader which determines the MICR number 112.

Referring to FIG. 6 the subscriber would verify that the numbers appearing on the terminal match the MICR numbers on the check 114. During the comparison, the subscriber determines that the check number compares accurately 116 to the number displayed on the terminal. If they

8

do compare the verification process proceeds 120. If the check numbers do not compare with that of the terminal the system subscriber clears the terminal and begins the transaction process again 118. If the process is to be reinitiated, the subscriber enters the MICR number into the point of sale terminal 130. Thereafter the system subscriber compares the MICR numbers as before 132. If the MICR numbers compare to the system display 134 the process proceeds. If the numbers do not compare 136 the check is returned to the consumer and the process terminates 137.

Referring to FIG. 5, if the verification process proceeds the terminal next prompts the system subscriber to enter the amount of the sale 122. The subscriber enters the amount of the sale 124 and the terminal thereafter transmits an inquiry to the host data base for verification 126.

The check approval process next takes place 128. If the check is not approved by the central computer the terminal displays a message declining the transaction 140. Thereafter a printer record of the declined transaction is made for purposes of the system subscriber 142 to comply with the Fair Credit Reporting Act and Regulation E of the Board of Governors of the Federal Reserve System.

If the check is approved the terminal displays a message noting the approval 138 and the specimen check is returned to the consumer. The printer further makes a paper record of the transaction 142 and the consumer places any required information on the paper receipt and signs the receipt authorizing the transaction 144.

Referring to FIG. 7, the process description continues. Once the transaction is approved the central computer captures the MICR information and the sale amount and stores that information 146. The central computer subsequently generates a batch message regarding all transaction events for the prior period and transmits all the transaction event information for the day into the ACH network 148.

During the ACH process each checkwriter's account is debited for the exact purchase amount and such an amount is deposited into a system subscriber designated account 150. Thereafter, collected funds for a total day's events are deposited into a subscriber's account 152. The transaction is then complete 154.

## How to Use

The present invention will require the establishment and maintenance of three interconnected but separate data files for the purpose of performing access searches. Each data file will be accessible by dial-up procedures operating, in most instances, under "Split Dial" format from a point-of-sale ("POS") terminal device or electronic cash register installed for the primary purpose of bankcard and/or bank draft authorizations. The terminal prompts an operator/user to process one of three optional inquiry types. Any one or all of three primary functions are capable of being performed at a single point-of-sale terminal within the control of the system subscriber. The inquiry types and data base format responses are as follows:

Card Authorization—Having depressed the assigned Split Dial key and thereafter being prompted, the system subscriber "slides" an encoded magnetic stripped transaction card through the point-of-sale terminal and enters the "Sale Amount" requested for authorization. Thereupon, the terminal's dial-up capabilities direct the inquiry to the central computer for authorization against "POSITIVE" file of current cardholders whose accounts were listed in "good standing". Inquiries where such a "Match" are found cause

5,484,988

| 9 | 10 |

an "Approved" return message from the data file to the inquiring POS terminal. Conversely, a "No-Match" to inquiry would result in a "Declined" notice to the POS terminal. An uploading mode of the present invention causes forwarding of daily status notifications to the central data files activating new cardholder accounts in the "POSITIVE" cardholder file or submitting corrective entries to delete delinquent or terminated accounts.

Check Authorization—Having depressed the assigned Split Dial key and thereafter being prompted, the system subscriber manually enters account numbers from a personal or business check or, where fully automated, enters a specimen check through a MICR Check Reader device interfaced with the terminal, whereupon the terminal's screen would display the check's numbers, and hence the account number, for verification. Thereafter, the operator would enter the "Sale Amount" requested for authorization. The terminal's dial-up capabilities then direct the inquiry to the computer data file center for authorization first against the "POSITIVE" file of "prenoted" bank/checking account numbers whose accounts were listed in "good standing". A successful "Match" to an inquiry would result in an "Approved" notice from the data file to the inquiring terminal. A "No-Match" to inquiry would not, however, immediately result in a "Declined" response. Each inquiry preliminarily resulting in a No-Match would be instantly forwarded/"rolled" to the third data file preceding any return notice to the inquiring terminal. This third file is anticipated to be the Shared Check Authorization Network ("SCAN") a negative data file data base maintained in the system computer data file center. Referrals to SCAN or any other positive or negative data files, enable potential acceptance of Transaction Events involving consumers "Unknown" to the invention's proprietary, "POSITIVE" files. A "Match" on the SCAN "NEGATIVE" file would result in a "Declined" notice; a "No-Match" would conversely send notification to the inquiring POS terminal of an "Approved" event. Of significant importance, the bank/checking account information for each such "Unknown" consumer's transaction would, subsequent to a SCAN "Approved" notice, be posted to the invention's "POSITIVE" file and prenoted through the ACH ("Automated Clearing House") for future Transaction Events. The invention, presumably in an automated mode, is capable of uploading daily corrections to the POSITIVE data file including notices of new accounts approved through SCAN (trademark) and deletions where settlement for consumer checking account events, initially approved, were subsequently dishonored. The SCAN data base is similarly uploaded with daily activity status corrections.

Check Replacement Service—Inquiries initiated as Check Replacement requests function in nearly an identical manner as that of Check Authorization. Records for such events, when culminating in "Approved" notices, are separately preserved. Check Replacement inquiries are processed first through the system's "POSITIVE" data file and, where no match is found, proceed to the SCAN data file or other data base file prior to transmitting an "Approved" or "Declined" notice to the inquiring POS terminal. A Match in the system data file indicates a consumer-user whose account was in "good standing" and would not be required to "roll" to SCAN. Check Replacement events are reported to and stored by the computer data file center under a file classification identifying the transaction as a Check Replacement Service. The total of daily, approved Transaction Events are "checkless" sales whereby the service subscribing merchant has submitted requests for electronic ACH settlement for all preauthorized consumer purchases. No commercial bank

note ("Paper Check") is accepted or processed by the service subscriber. In each Transaction Event, a Consumer, at the point-of-sale, has executed an electronic access ("Off-Line Debit") authority "Sales Slip" which is automatically printed upon a terminal's receipt of an "Approved" notice.

All terminal programming and all prompt strings for MICR Check Reader interfacing are stored in the POS terminal and the computer center of the present invention controls interactions between the plurality of terminals and the central system. The following modules are present.

Programming for MICR/Terminal Interface—system subscriber locations to be activated with the present invention must possess or acquire a terminal. Those utilizing or being upgraded to terminals such as a Tranz (trademark) 330 or other terminals with interface capabilities with the check reader for all suitable point-of-sale terminals.

The preferred format for terminal operations is generated from a singular split dial key. Thereafter, the "prompt string" would proceed in a manner such as i) "Card=1"; "Check=2" requiring operator selection; then, where selecting a checking account inquiry ii) the operator would respond to a secondary prompt of "Auth=1"; "Replace=2". These entry selections precede the magnetic stripe "reading" of a card/submittal or a check through the MICR (Account Identification), the entry of the requested sale amount, and the terminal's dial-up for authorization against the computer data file center.

The MICR interface results in the transmittal of a query for data center approval of the entire ABA/Transit and personal or corporate checking account numbers. Instances where printed checks add the individual check's number to the end of the account number can be "dropped" by Check Reader switch settings. Subsequent to a terminal's receipt of the MICR number string but prior to the operator's entry of the requested sale amount and authorization dial-up, a verification prompt "flashing" the ABA and account numbers must be displayed on the terminal's screen requiring the operator to depress "Enter" to proceed, if correct, or "Clear", if incorrect and thereby enabling the terminal operator to resubmit the specimen check through the MICR Check Reader. It is important to note that account information may be entered manually as well at the point of sale with the other financial advantages of the present invention still in effect.

The computer data file center receives and processes Transaction Event authorization requests utilizing the entire MICR string for accurate, error-free identification of both the consumer bank and a specific checking or depository account to participate in a sale. ACH settlement criteria mandate exact recall for the bank and checking account numbers to properly complete any debit request. This invention conforms to each and every requirement of the ACH transaction regulations.

Each Transaction Event is completed with the logging printer generation of a Transaction Event ("Sales") Slip for each "Approved" authorization inquiry processed (FIG. 8). Alternatively, a manually created transaction event slip can also be prepared (FIG. 9). Each such Transaction Event Slip must be exacting in its retention of account numbers and the sale amount enabling both the consumer and system subscriber to be provided "hard copy" receipts of the event. Also indicated would be a clear printing of the transaction type; "Bank Card", "Check Authorization", or "Check Replacement". Authorization language is printed immediately preceding the consumer's signature line specifically authorizing electronic access in payment of the requested transaction sale amount.

5,484,988

**11**

In addition to the primary functions for POS terminal programming and MICR Check Reader interface, each Point-of-Sale terminal location is capable of generating printed summations of daily activity. These reports list and separately total each authorization/service type, whether produced as a singular report or as the result of multiple terminal "closeout" procedures.

Instances will arise with either the Bank Card or Check Replacement Service where previously authorized Transaction Events will require the operational equivalent of a bankcard "Void" or "Credit" notation. The methodology will be available for Split Dial messages to the computer data file center of a post-authorization "Error" or "Transaction Cancellation" notice. The "Cancel" procedure is instituted by depressing for example the "3" key (i.e. "Cancel=3"). By so doing, the system subscriber may cancel a previously approved and logged event. This Transaction Event which was recorded on the data files and reported on the service subscriber's daily Activity Summation Report, thereafter carries an offsetting, "Flagged" cancellation notice.

Summary

A flexible purchase transaction system is described which precisely fits within existing ACH procedures for checking account events for processing of pre-authorized electronic debits as a replacement for commercial bank drafts (paper checks). The main advantage to the proposed invention is the fact that a truly paperless transaction may occur. Departures from the proposed system especially with respect to the Point-of-Sale terminals will be apparent to those skilled in the art without departing from the spirit of the invention as described.

We claim:

1. A checkwriting point of sale system comprising:

a point of sale terminal adapted to receive consumer bank account information from any bank check;

a central computer system;

first communications means integral to said point of sale terminal for electronically communicating with the central computer system;

memory means integral to said point of sale terminal for temporarily storing the consumer bank account information;

the central computer system having second communication means for receiving information from a plurality of said point of sale terminals;

the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the bank check as a negotiable instrument.

2. The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further comprises means for reading magnetic ink character recognition numbers appearing on a consumer check for the sole purpose of identifying and reading the consumer bank account information.

3. The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further comprises an alphanumeric display means for receiving said consumer bank account information from the memory means and/or displaying the consumer bank account information.

**12**

4. The checkwriting point of sale system according to claim 1 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip.

5. The checkwriting point of sale system according to claim 1 further comprising a resident third party database wherein consumer banking account status information is stored, the consumer banking account status information being used for verification of consumer banking account status.

6. The checkwriting point of sale system according to claim 1 wherein the central computer system further comprises a system subscriber database, the system subscriber database comprising information regarding merchants and service providers that are authorized to use the checkwriting point of sale system.

7. The checkwriting point of sale system according to claim 6 wherein the central computer system further comprises a database comprising information regarding consumers whose consumer banking account status is not verified as bad.

8. A checkwriting point of sale process comprising:

a) presenting any bank check specimen to a point of sale terminal located at a merchant or service provider,

b) reading the magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument,

c) storing the consumer bank account information obtained from the check and verifying that account numbers were accurately read at the point of sale terminal,

d) providing transaction event information to the point of sale terminal,

e) transmitting the transaction event information and consumer bank account information to a central computer system,

f) storing the transaction event information and consumer banking account information, and

g) subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations.

9. A checkwriting point of sale system comprising:

a point of sale terminal adapted to receive consumer bank account information;

a central computer system;

first communications means integral to said point of sale terminal for electronically communicating with the central computer system; and

memory means integral to said point of sale terminal for temporarily storing the consumer bank account information;

the point of sale terminal comprising reading means for reading magnetic ink character recognition numbers on any consumer bank check for the sole purpose of eliciting consumer bank account information;

the central computer system having second communication means for receiving information from a plurality of said point of sale terminals;

the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using a bank check as a negotiable instrument.

LML-EP 000077

5,484,988

**13**

10. The checkwriting point of sale system according to claim 9 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip.

11. The checkwriting point of sale system according to claim 9 further comprising a resident third party database wherein consumer banking account status information is stored, the consumer banking account status information being used for verification of consumer banking account status.

12. The checkwriting point of sale system according to claim 9 wherein the central computer system further comprises a system subscriber database, the system subscriber database comprising information regarding merchants and service providers that are authorized to use the checkwriting point of sale system.

13. The checkwriting point of sale system according to claim 4, wherein the sales slip includes means for execution by the consumer for proof of bank account access authorization.

14. The checkwriting point of sale system of claim 1, wherein the point of sale terminal further comprises means for automatically logging a point of sale terminal location and transaction date, time, and sales amount.

15. The checkwriting point of sale process of claim 8, further comprising:

a) verifying the status of the consumer bank account,

b) verifying the consumer bank account status of the consumer via a query to a third party database if the consumer bank account is verified as bad, and

**14**

c) sending an approval message to the point of sale terminal if the consumer's banking account status is approved for the transaction.

16. The checkwriting point of sale process of claim 8, further comprising:

(A) printing a transaction event sales slip following the sending of an approval message; and

(B) executing of the sales slip by the consumer as proof of bank account access authorization.

17. The checkwriting point of sale process of claim 15, further comprising:

(A) printing a transaction event sales slip following the sending of an approval message; and

(B) executing of the sales slip by the consumer as proof of bank account access authorization.

18. The checkwriting point of sale process of claim 8, further comprising automatically logging point of sale terminal location information and transaction date, time, and sales amount information into the point of sale terminal.

19. The checkwriting point of sale system according to claim 10, wherein the sales slip includes means for execution by the consumer of proof of bank account access authorization.

20. The checkwriting point of sale system of claim 9, wherein the point of sale terminal further comprises means for automatically logging a point of sale terminal location and transaction date, time, and sales amount.

* * * * *

LML-EP 000078

PATENT APPLICATION SERIAL NO. 07/975717

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE
FEE RECORD SHEET

060 MG 11/27/92 07975717                    1 201    395.00 CK

030020  12/10/92  07975717        01-2629  130  201      40.00CR

PTO-1556
(5/87)

LML-EP 000079

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of Robert H. Hills and Henry R. Nichols

Serial No.    NOV
                13
Filed:        1992                    Group Art Unit:

                                      Examiner:

FOR:  CHECKWRITING POINT OF SALE SYSTEM

                *    *    *    *    *

Hon. Commissioner of Patent
   and Trademarks
Washington, D.C. 20231

Dear Sir:

        Enclosed please find the following:

        1.    Declaration and Power of Attorney of Henry R. Nichols and
              Robert R. Hills (separate documents)

        2.    Verified Statement Claiming Small Entity (Inventor)
              (separate documents)

        3.    Specification, 9 Claims, and Abstract

        4.    8 informal drawing sheets (11 figures)

        5.    Submitted herewith is a check for $395.00 to cover the
              cost of the filing.  Any deficiency or overpayment should
              be charged or credited to the Deposit Account of Arter &
              Hadden, No. 01-2520.


                            Respectfully submitted,


                            Jon L. Roberts
                            Registration No. 31,293
                            Arter & Hadden
                            1801 K Street, N.W.
                            Suite 400K
                            Washington, D.C. 20006

DATED:  November 13, 1992

LML-EP 000080

08/157390

975717

1    ABSTRACT

2        A point of sale system designed to read information from a

3    consumer's check, credit card, or manual input with a subsequent

4    debiting of a consumer's account and crediting a merchant's account

5    for the goods or services provided.  Point of sale terminals are

6    designed to accept a form of credit card with a consumer's bank

7    account information encoded thereon or in the alternative to read

8    the MICR number from a consumer's check in order to verify that a

9    consumer has an appropriate balance to conduct the transaction with a

10   given merchant.  Thereafter the transaction of that information is

11   transmitted to a central computer system which verifies the

12   consumer's credit worthiness and stores the transaction event

13   information for subsequent bank reconciliation via the ACH network.

14   The invention eliminates the need for paper checks with all bank

15   reconciliation being accomplished electronically.

16

17

18

19   jlr-1808

20

-31-

LML-EP 000081

395-201-A 07/97571

# CHECKWRITING POINT OF SALE SYSTEM

INVENTORS:    ROBERT H. HILLS AND HENRY R. NICHOLS

*This application is a continuation of 07/975,717 now abandoned.*

## FIELD OF THE INVENTION

This invention relates to the field of Point-of-Sale systems and more particularly to the integration and processing of purchases whereby a check is used as the basic source of identification of the individual and the bank and bank account whereby the individual's is debited.

## BACKGROUND ART

Numerous devices exist for processing checks. For example, U.S. patent number 4,933,536 to Lindemann, et al., describes a check processing device which is used together with a Point-of-Sale terminal. This particular device involves copying and taking a picture of an individual whereby a dishonored check could then be traced to the person who has offered it.

U.S. Patent No. 4,810,866 to Lloyd, Jr., describes a check validation system again located together with a Point-of-Sale system for imprinting and otherwise physically dealing with a check.

Other systems also deal with an apparatus for handling checks at a point of sale. For example, U.S. Patent No. 4,743,743 to Fukatsu describes one such transaction apparatus where a check is examined by a reader. U.S. Patent No. 4,672,377 to Murphy, et al. describes a check authorization system wherein a check is imprinted with a bar code and information concerning customers which are stored in a database. U.S. Patent No. 3,845,470 to Schuller, discloses a vending system using a modified form of a check which is imprinted with identification codes, when someone attempts to use the check in

-1-

LML-EP 000082

1  purchasing goods and services, ~~and wherein~~ a vending operation will

2  not place ^the order if information associated with the check is not valid in

3  a particular database.

4      Other check-based financial systems have also been the subject

5  of invention. ^U.S. Patent No. 4,617,457 addresses an ATM or automatic

6  ~~telemachine~~ ^teller machine form of cashing checks.  Such systems create a picture

7  of the check involved and also involves checking against a

8  specialized database to insure that the check is a "valid" one (see

9  also ^U.S. Patent No. 4,580,040 to Granzow et al.).

10     Another generic category of financial systems deals with

11  methods of handling the financial transactions apart from the

12  physical handling of the check itself.  For example, ^U.S. Patent No.

13  3,824,544 to Simjian describes a merchant issued "check" which can

14  ~~then~~ be used in the purchase of goods and services and upon

15  purchase, a specialized code is evaluated to determine if the check

16  is being validly utilized.

17  ^U.S. Patent No. 4,404,649 to Nunley et al. describes a document

18  processing system which generally discloses a method of reading

19  checks for processing a wide variety of financial documents.

20  ^U.S. Patent No. 4,523,330 to Caine also describes a method for

21  processing financial documents which systems also includes a Point-

22  of-Sale terminal for generating image data from checks as they are

23  being processed.  This patent is drawn principally to the actual

24  terminal itself.

25  ^U.S. Patent No. 4,673,802 to Ohmae et al. describes a central

26  processing system having stored data relating to the accounts of

LML-EP 000083

1   users, ~~which users~~ are approved or disapproved at the Point-of-Sale

2   based upon information in the database.

3       Finally, ~~C~~ Patent No. 4,678,896 to Carlson et al. describes a

4   Point-of-Sale system whereby ~~apparatuses~~ provided to ~~restore~~ the

5   processing and imprinting ~~of~~ checks.

6       All of these above patents deal with the specific problem of

7   how to accept a check from customer for the purchase of goods and

8   services. ~~It does~~ not in ~~anyway~~ address the subsequent processing

9   of checks ~~or indeed~~ address ~~that the issue in anyway of how~~ checks

10  are cleared through the normal automatic check handling

11  clearinghouse ~~operation~~ that exist ~~the~~ financial world. Thus, the

12  interaction of these systems with the ~~ACH~~ process is not addressed

13  in ~~anyway~~. This is particularly important since if any Point-of-

14  Sale check handling system is to interact with the ACH mechanism it

15  must adhere to that processing scheme and ~~indeed~~ lend itself to use

16  with a processing scheme.

17      It is an objective of the present invention to be adaptable

18  for use with the ACH system and to be smoothly incorporated into

19  it. In this fashion, ~~it~~ will immediately be useful for a much

20  wider range of financial transactions above and beyond those

21  contemplated ~~by the background I~~ discussed above.

22

23  <u>SUMMARY OF THE INVENTION</u>

24      The present invention comprises a process and apparatus which

25  may be employed for the purpose of effecting payments for point-of-

26  sale purchases  of goods and services paid from consumer funds

27  secured in bank checking or depository accounts.  Each sale or

-3-

1  "Transaction Event" would be an electronic and "paperless" event

2  thereby eliminating reliance on accepting and processing commercial

3  bank drafts (personal or corporate checks) and the physical

4  handling of those bank drafts thus replacing commercial bank drafts

5  at the point-of-sale.

6  The system is intended to be made available to subscribing

7  merchants, businesses, and individuals, *herein* referred to ~~in this~~

8  ~~application~~ as "system subscribers" wishing to employ the method

9  and apparatus of the present invention for the electronic

10  processing and settlement of consumer purchases.  Further, ~~the~~

11  ~~present invention's~~ operational parameters, *of the present invention* allow freedom from

12  customary state or other geographically limiting criteria typical

13  when accepting and processing "paper" checks.  The system is

14  designed to act with the national authorization and electronic

15  settlement network *known* ~~know~~ as the ACH ~~("Automated Clearing House")~~

16  system.

17  The system is designed to perform in a fully automated manner

18  enabling each Transaction Event to be processed by a system

19  subscriber as a point-of-sale transaction in the presence of the

20  consumer.  When the transaction event is "approved" funds are

21  debited from an authorized consumer account for credit to the

22  system subscriber and electronic settlement by ACH *deposits the transaction amount* ~~deposit~~ to the

23  subscriber's designated depository account.  Authorized access to

24  consumer accounts and credits to system subscriber depository

25  accounts *are* ~~would be~~ performed as "Off-Line" transactions by means of

26  Electronic Funds Transfer ("EFT") through the ACH Network or

27  through the Federal Reserve System.

-4-

LML-EP 000085

1   The invention comprises a point-of-sale processing system

2   comprising electronic data processing equipment which allows

3   individual services selections which provide automated, electronic

4   processing from bank checking or depository accounts. It is the

5   objective of the present invention to automate the point-of-sale

6   environment for processing consumer purchases of goods and services

7   which, other than for the ~~applicants'~~ system, would necessitate the

8   more traditional acceptance and processing of commercial bank

9   drafts (personal and/or corporate checks). Individual Transaction

10  Events ~~would be~~ administered under the ~~applicants'~~ system,

11  initiating a terminal authorization inquiry and continuing through

12  the electronic settlement of funds representing the Transaction

13  Event from the pre-approved consumer banking accounts.

14   It is a further objective of the present invention to

15  eliminate the need for "paper" checks as an accepted means of

16  consumer payment. In the place of personal and business checks,

17  consumers would be provided ~~their~~ free and unrestricted access to

18  funds secured in bank accounts of various types by means of

19  preauthorized electronic events. System subscribers electronically

20  communicate with the ~~invention's~~ data center for individual

21  Transaction Event authorizations which, upon reconciliation of a

22  day's activity, result in an ~~Electronic Funds Transfer ("EFT")~~ by

23  means of the Automated Clearing House accommodating an "Off-Line"

24  debiting of preauthorized consumer Transaction Events from

25  authorized accounts. Thereafter, each system subscriber ~~would be~~

26  credited with the total of all such daily authorized Transaction

27  Events to its designated banking depository account.

-5-

1   The present invention comprises logic which allows the
2   following services which when individually performed or where
3   combined with other services establish a wholly unique processing
4   medium enabling preauthorized access to consumers' checking account
5   or bank depository reserves.

6   Authorization – This service supports electronic communication
7   from point-of-sale to the system's central computer.  The data
8   center stores positive and negative files concerning consumer
9   accounts thereby providing accurate inquiry responses regarding the
10   current posting status of a consumer's banking account and
11   signaling the system subscriber that said account may be reasonably
12   relied upon for consummating a Transaction Event (i.e., an
13   "Approval") or, where listed as delinquent, indicating that the
14   account may not be so relied upon (i.e., a "Denial").

15   Check Replacement – This capability operates as an extension
16   of Authorization enabling the system subscriber the capability of
17   completing a Transaction Event by electronically logging the sale
18   whereupon a Transaction Event .Slip will be printed or manually
19   prepared for consumer execution at the point-of-sale.   By
20   execution of the Transaction Event Slip the consumer authorizes the electronic accessing of
21   funds secured in his/her authorized banking account in lieu of the
22   more traditional method of issuing personal and business checks.
23   Funding settlement to the system subscriber would be effectuated by
24   means of Electronic Funds Transfer via ACH or the Federal Reserve
25   System as opposed to physically processing and transferring checks
26   among banks.

-6-

LML-EP 000087

1    Bank Transaction Card - As part of this invention on "Off-

2    Line" Debit Card is established on which is stored the information

3    relating to the banking account from which funds representing the

4    Transaction Event would be debited for payment to the system

5    subscriber.  This information may be stored on the card itself in

6    encrypted or unencrypted form or be stored in the central computer

7    where access to such information is gained via special control

8    characters or access codes stored on the card.    Electronic

9    authorization for withdrawal of funds from the cardholder's account

10   and subsequent electronic settlement procedures would remain

11   essentially identical to processing under the Check Replacement

12   service described above.   Information relating to the consumer-

13   cardholder and the appropriate banking account to be debited for a

14   Transaction Event will be encoded upon the magnetic stripe portion

15   of the plastic, and terminal-readable, card.

16       Thus, the overall objective of the present invention is to

17   provide and support an alternate means for consumer payments for

18   goods and services that operates to replace commercial bank drafts

19   in the point-of-sale environment.   Simultaneously, the present

20   invention assures consumers greater access to and use of funds in

21   personal or corporate banking accounts.    Further, the system

22   provides  system subscribers a significantly improved prospect of

23   collecting the underlying monies for Transaction Events, reduced

24   time for the collecting the cash receipts from Transaction Events,

25   and a pronounced lowering of the present cost of cumbersome

26   procedures otherwise mandated by the existing ACH system for

27   accepting and processing commercial bank drafts.

-7-

LML-EP 000088

1    A further objective of the present invention is to

2    significantly reduce the use of checks ~~as a means of conducting~~

3    purchases of goods or services and to further reduce the consumers

4    reliance on credit cards or cash for transaction events ~~as well~~.

5    DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

6    The present invention begins with the electronic recording of

7    consumer information ~~at a system subscribers~~ location using a at a

8    point-of-sale terminal.  This information is obtained in the

9    presence of the consumer and occurs prior to any "Approval" either

10   for the Transaction Event or the ultimate crediting of the System

11   subscriber's designated depository account.  A Transaction Event

12   involves a series of events initiated by a system subscriber's

13   request to sell goods or services by payment from funds secured in

14   a consumer's banking account.  First, the consumer's banking

15   account status will be verified through accessing ~~the invention's~~

16   central computer files.  Verification that an account may be

17   accessed is established alternatively by means of an encoded,

18   magnetic strip card, or by input of account identification numbers

19   from a consumer's bank account.  A more traditional identification

20   of the consumer could also occur including visual examination of

21   driver's license or similar and acceptable picture "ID" however

22   this is not part of the invention.

23   As an integral portion of each Transaction Event, the system

24   subscriber's location, date and time, and requested sale amount is

25   automatically logged into the system when a system subscriber first

26   accesses the invention.  Finally, a Transaction Event Slip ("Sales

27   Slip") will be produced by an printer integral to the point-of-sale

-8-

LML-EP 000089

terminal and *will be* executed by the consumer in the amount of the stated purchase with inscribed language defining the Transaction Event and specifically providing consumer authorization for electronic access to his/her banking account. Thereafter, the consumer account will be debited and the proceeds credited to the system subscriber's designated depository account along with all other similar Transaction Events representing the total of the system subscriber's daily activity. Debiting of consumer accounts and settlement deposits to each system subscriber is performed by means of Off-Line electronic funds transfer through and by the ACH or Federal Reserve System.

Equipment Configuration - The present invention can operate with nearly every conceivable point-of-sale equipment system. The central computer system accepts data transmitted from the system subscriber's existing point-of-sale equipment or that which is added to augment service performance. The point of sale terminal of the present invention is implemented in a number of ways, most preferred, however, being activation under a fully automated format. Such a fully automated system generally comprises a dual-port terminal with magnetic stripe reading capabilities interfaced with a logging printer capable of providing individual Transaction Event Slips for consumer execution, and a MICR check reader, optical character *recognition* ("OCR") equipment, or other device. Variations to this configuration are particularly possible where the ~~applicants'~~ *of the present invention is* system ~~were~~ to be activated under a "Split-Dial" feature installed to function within the operational parameters of existing point-of-sale equipment primarily dedicated to bankcard ("credit card")

-9-

LML-EP 000090

processing. *It is contemplated* ~~The present invention contemplates~~ that services may in the future be administered *using the present invention with* on a singular point-of-sale hardware device which, as a function of its design, would incorporate all or most of the service capabilities of an integrated terminal, logging printer, and MICR Check Reading device. The ~~system~~ *of the present invention* can alternately be interfaced with electronic cash registers now on the market.

Communications links from point-of-sale terminals to the central computer of the present invention will typically be in *the* form of telephonic network communications over a public switched telephone network *("PSTN") or over* ~~(PSTN) or~~ other approved networks. Transaction Event verification will occur as a result of point-of-sale terminal access to the central computer's positive and/or negative data files. "Approved" or "Declined" notifications are made to the Point-of-Sale device over the PSTN. All data files will be centrally located and maintained on the invention's central computer data bases. Portions of the data base include but are not limited to third party data files such as the Shared Check Authorization Network ("SCAN") (trademark) data base.

Individual *transactions* or groupings of transactions are first approved by soliciting an "Authorization" prior to the completion of any requests for electronic funds transfer. To maintain an accurate status of file information for authorizations to subscribing merchants, businesses, and/or individuals, separate data bases are maintained. Current cardholder or banking account status are updated daily and instantly available for point-of-sale inquiry for Transaction Event authorizations.

-10-

LML-EP 000091

1   updated daily and instantly available for point-of-sale inquiry for

2   Transaction Event authorizations.

3       System subscribers' point-of-sale equipment are interfaced to

4   the invention's central computer by means of telephonic network

5   able to support communication from a plurality of point-of-sale

6   terminals.  Programming of the point-of-sale terminal causes an

7   automatic "Dial-Up" to the central computer and provides an

8   automatic query and response affirming or denying the Transaction

9   Event.  The addition of local entry hubs may be installed to better

10  facilitate the speed or economics of communications with the data

11  files.  Alternatives to telephonic networks may involve use of

12  satellite communications or enhanced radio transmissions.

13  Similarly, the system's data files and associated Check Replacement

14  Service are contemplated to be responsive to emerging point-of-sale

15  devices intended to seek authorizations by the alternate means of

16  voice pattern recognition, fingerprint identification, retina scan,

17  "smart" chips, and/or consumer or check image and/or signature

18  broadcasting.

19  Brief Description of the Drawings

20  Figure 1 -    System overview of the present invention

21  Figure 2 -    The point-of-sale terminal

22  Figure 3 -    The Central Computer System

23  Figures 4 - 9 -    The process Data Flow

24  Figure 1a -    Transaction Event Sales Slip

25  Figure 11 -    Manual Transaction Event Sales Slip

26

-11-

LML-EP 000092

Detailed Description of the Preferred Embodiment

2    Referring to Figure 1 an overall schematic of the present
3 invention is described.  Point-of-sale terminals 300 communicate
4 normal PSTN telephone lines with a central computer system 302
5 which in turn communicates with a banking institution 304 for
6 purposes of debiting consumer accounts and crediting system
7 subscriber accounts.  The banking institution performs its function
8 via normal automated clearing house ("ACH") transactions 306.

9    Referring to Figure 2 the point-of-sale terminal is described.
10 The point-of-sale terminal comprises several different entry means.
11 A key board 310 can be used to input consumer information manually.
12 Alternatively a card reader 312 can be used whereby the magnetic
13 stripe on the card is read by the point-of-sale terminal and
14 finally a check reader 314 is also included to read the MICR number
15 on checks as a substitute for either a specific card or key board
16 input.  These various input means provide information to a micro-
17 processor 316 which comprises logic means 318, memory means 320,
18 and communication means 322.  The logic means 318 comprises logic
19 which allows the information received from the various input means
20 to be processed and stored in the memory 320.  The logic means
21 further drives a display 324 which provides a visual output of the
22 account number of the consumer for verification.  The communication
23 means 322 allows the subscriber terminal to communicate with the
24 central computer 302 for purposes of processing the consumer's
25 purchase.

26    Referring to Figure 3 the central computer system 329 is
27 described.  The central computer system receives input from a

-12-

LML-EP 000093

1  plurality of point-of-sale terminals which provide transaction

2  information from a system subscriber and a consumer desiring to

3  purchase goods or services. The central computer system comprises

4  a system subscriber 330 file which is a file of those merchants who

5  have elected to use the present invention for processing purchases.

6  The central system also comprises an approved consumer file 332

7  which stores the names of those consumers who have already been

8  approved for allowing purchases to take place through the various

9  input means as well as a third party database such as the SCAN

10  (trademark) data base relating to consumer credit. The computer

11  system also comprises a communications means 334. The

12  communication means communicates with other outside third party

13  data bases ~~which allows the consumer,~~ _to allow any Consumer_ that has not been approved by

14  the system _to_ have a rapid check of the status of the consumer's

15  banking account and whether the consumer has current outstanding

16  returns (i.e. bad checks). Once this SCAN (trademark) or _other_ outside

17  third party data base search is performed and where an approval is

18  given, the approved consumer file 332 is updated with the name of

19  the new approved consumer.

20      As presently configured the central computer 329 already has

21  a third party database known as the SCAN (trademark) database 333

22  resident on the central computer. Thus credit worthiness can be

23  checked using this SCAN database. The SCAN (trademark) database is

24  updated daily.

25      The communication means 334 also communicates with a banking

26  institution 338 ~~which instructs~~ _to instruct_ the bank to debit the account of

27  the consumer and credit the account of the system subscriber

-13-

LML-EP 000094

1   (merchant) with the amount of the purchase.  These transactions

2   then take place via the normal ACH transaction process.

3       Referring to Figure 4 the process begins by a consumer

4   presenting a specimen or "blank" check complete with MICR number to

5   the system subscriber (the merchant) 100.  The system subscriber

6   next determines, if the check meets appropriate store policy

7   procedures 102, that the check has appropriate information on the

8   check.  If the check does not meet the store policies, it is

9   returned to the consumer 104.  If the check does meet appropriate

10  store policies the on-line verification process proceeds 106.  The

11  subscriber enters the process by first pressing the appropriate key

12  on a terminal to access the host computer 108.  Thereafter the

13  point of sale terminal prompts the system subscriber to enter the

14  appropriate MICR number 110.  The system subscriber then enters the

15  appropriate MICR number either manually or by passing the check

16  through a check reader which determines the MICR number 112.

17      Referring to Figure 5 the subscriber would verify that the

18  numbers appearing on the terminal match the MICR numbers on the

19  check 114.  During the comparison, the subscriber determines that

20  the check number compares accurately 116 to the number displayed on

21  the terminal.  If they do compare the verification process proceeds

22  120.  If the check numbers do not compare with that of the terminal

23  the system subscriber clears the terminal and begins the

24  transaction process again 118.   If the process is to be

25  reinitiated, the subscriber enters the MICR number into the point

26  of sale terminal 130.  Thereafter the system subscriber compares

27  the MICR numbers as before 132.  If the MICR numbers compare to the

-14-

1  system display 134 the process proceeds.  If the numbers do not

2  compare 136 the check is returned to the consumer and the process

3  terminates 137.

4       Referring to Figure 5, if the verification process proceeds

5  the terminal next prompts the system subscriber to enter the amount

6  of the sale 122.  The subscriber enters the amount of the sale 124

7  and the terminal thereafter transmits an inquiry to the host data

8  base for verification 126.

9       The check approval process next takes place 128.  If the check

10  is not approved by the central computer the terminal displays a

11  message declining the transaction 140.  Thereafter a printer record

12  of the declined transaction is made for purposes of the system

13  subscriber 141 to comply with the Fair Credit Reporting Act and

14  Regulation E of the Board of Governors of the Federal Reserve

15  System.

16       If the check is approved the terminal displays a message

17  noting the approval 138 and the specimen check is returned to the

18  consumer.  The printer further makes a paper record of the

19  transaction 142 and the consumer places any required information on

20  the paper receipt and signs the receipt authorizing the transaction

21  144.

22       Referring to Figure 7, the process description continues.

23  Once the transaction is approved the central computer captures the

24  MICR information and the sale amount and stores that information

25  146.  The central computer subsequently generates a batch message

26  regarding all transaction events for the prior period and transmits

-15-

1    all the transaction event information for the day into the ACH

2    network 148.

3        During the ACH process each checkwriter's account is debited

4    for the exact purchase amount and such an amount is deposited into

5    a system subscriber designated account 150. Thereafter, collected

6    funds for a total day's events are deposited into a ~~subscribers~~ _subscriber's_

7    account 152. The transaction is then complete 154.

8    HOW TO USE

9        The present invention will require the establishment and

10   maintenance ~~for access searches~~ of three interconnected but

11   separate data files. Each _data file_ will be accessible by dial-up procedures

12   operating, in most instances, under "Split Dial" format from a

13   point-of-sale _("POS")_ terminal device or electronic cash register installed

14   for the primary purpose of bankcard and/or bank draft

15   authorizations. ~~Terminal~~ _The terminal_ prompts an operator/user to process one

16   of three optional inquiry types. Any one or all of three primary

17   functions are capable of being performed at a single point-of-sale

18   terminal within the control of the system subscriber. The inquiry

19   types and data base format responses ~~would be~~ _are_ as follows :

20       Card Authorization - Having depressed the assigned Split Dial

21   key and thereafter being prompted, the system subscriber ~~would~~

22   ~~"slide" a~~ _"slides" an_ encoded magnetic stripped transaction card through the

23   point-of-sale terminal and ~~enter~~ _enters_ the "Sale Amount" requested for

24   authorization. Thereupon, the terminal's dial-up capabilities

25   direct the inquiry to the central computer for authorization

26   against "POSITIVE" file of current cardholders whose accounts were

27   listed in "good standing". Inquiries where such a "Match" are

-16-

1    found cause an "Approved" return message from the data file to the

2    inquiring POS terminal.  Conversely, a "No-Match" to inquiry would

3    result in a "Declined" notice to the POS terminal.  An uploading

4    mode of the present invention causes forwarding of daily status

5    notifications to the central data files activating new cardholder

6    accounts in the "POSITIVE" cardholder file or submitting corrective

7    entries to delete delinquent or terminated accounts.

8        Check Authorization - Having depressed the assigned Split Dial

9    key and thereafter being prompted, the system subscriber manually

10   enters account numbers from a personal or business check or, where

11   fully automated, enter a specimen check through a MICR Check Reader

12   device interfaced with the terminal, whereupon the terminal's

13   screen would display the check's numbers, and hence the account

14   for verification.  Thereafter, the operator would enter the "Sale

15   Amount" requested for authorization.  The terminal's dial-up

16   capabilities then direct the inquiry to the computer data file

17   center for authorization first against the "POSITIVE" file of

18   "prenoted" bank/checking account numbers whose accounts were listed

19   in "good standing".  A successful "Match" to an inquiry would

20   result in an "Approved" notice from the data file to the inquiring

21   terminal. A "No-Match" to inquiry would not, however, immediately

22   result in a "Declined" response.   Each inquiry preliminarily

23   resulting in a No-Match would be instantly forwarded/"rolled" to

24   the third data file preceding any return notice to the inquiring

25   terminal.  This third file is anticipated to be the Shared Check

26   Authorization Network ("SCAN") a negative data file data base

27   maintained in the system computer data file center.  Referrals to

-17-

1    SCAN or any other positive or negative data files, enable potential
2    acceptance of Transaction Events involving consumers "Unknown" to
3    the invention's proprietary, "POSITIVE" files.  A "Match" on the
4    SCAN "NEGATIVE" file would result in a "Declined" notice; a
5    "No-Match" would conversely send notification to the inquiring POS
6    terminal of an "Approved" event.  Of significant importance, the
7    bank/checking  account  information  for  each  such  "Unknown"
8    consumer's transaction would, subsequent to a SCAN "Approved"
9    notice, be posted to the invention's "POSITIVE" file and prenoted
10   through the ACH ("Automated Clearing House") for future Transaction
11   Events.  The invention, presumably in an automated mode, is capable
12   of uploading daily corrections to the POSITIVE data file including
13   notices of new accounts approved through SCAN (trademark) and
14   deletions where settlement for consumer checking account events,
15   initially approved, were subsequently dishonored.  The SCAN data
16   base is similarly uploaded with daily activity status corrections.
17       Check Replacement Service - Inquiries initiated as Check
18   Replacement requests function in nearly an identical manner as that
19   of Check Authorization.  Records for such events, when culminating
20   in "Approved" notices, are separately preserved.  Check Replacement
21   inquiries are processed first through the system's "POSITIVE" data
22   file and, where no match is found, proceed to the SCAN data file or
23   other data base file prior to transmitting an "Approved" or
24   "Declined" notice to the inquiring POS terminal.  A Match in the
25   system data file indicates a consumer-user whose account was in
26   "good standing" and would not be required to "roll" to SCAN.  Check
27   Replacement events are reported to and stored by the computer data

-18-

1  file center under a file classification identifying the transaction

2  was a Check Replacement Service.  The total of daily, approved

3  Transaction Events are "checkless" sales whereby the service

4  subscribing merchant has submitted requests for electronic ACH

5  settlement for all preauthorized consumer purchases.  No commercial

6  bank note ("Paper Check") is accepted or processed by the service

7  subscriber.  In each Transaction Event, a Consumer, at the

8  point-of-sale, has executed an electronic access ("Off-Line Debit")

9  authority "Sales Slip" which are automatically printed upon a

10  terminal's receipt of an "Approved" notice.

11     All terminal programming and all prompt strings for MICR Check

12  Reader interfacing are stored in the POS terminal and the

13  invention's computer center controls interactions between the

14  plurality of terminals and the central system.  The following

15  modules are present.

16     Programming for MICR/Terminal Interface — system subscriber

17  locations to be activated with the invention must possess or

18  acquire a terminal.  Those utilizing or being upgraded to terminals

19  such as a Tranz (trademark) 330 or other terminals with interface

20  capabilities with the check reader all suitable point-of-sale

21  terminals.

22     The preferred format for terminal operations are from a

23  singular split dial key.  Thereafter, the "prompt string" would

24  proceed in a manner such as i) "Card = 1" ; "Check = 2" requiring

25  operator selection; then, where selecting a checking account

26  inquiry ii) the operator would respond to a secondary prompt of

27  "Auth = 1" ; "Replace = 2".  These entry selections precede the

-19-

1   magnetic  stripe  "reading"  of  a  card/submittal  or  a  check  through

2   the  MICR  (Account  Identification),  the  entry  of  the  requested  sale

3   amount,  and  the  terminal's  dial-up  for  authorization  against  the

4   computer  data  file  center.

5        The  MICR  interface  results  in  the  transmittal  of  a  query  for

6   data  center  approval  of  the  entire  ABA/Transit  and  personal  or

7   corporate  checking  account  numbers.   Instances  where  printed  checks

8   add  the  individual  check's  number  to  the  end  of  the  account  number

9   can  be  "dropped"  by  Check  Reader  switch  settings.   Subsequent  to  a

10  terminal's  receipt  of  the  MICR  number  string  but  prior  to  the

11  operator's  entry  of  the  requested  sale  amount  and  authorization

12  dial-up,  a  verification  prompt  "flashing"  the  ABA  and  account

13  numbers  must  be  displayed  on  the  terminal's  screen  requiring  the

14  operator  to  depress  "Enter"  to  proceed,  if  correct,  or  "Clear",  if

15  incorrect  and  thereby  enabling  the  terminal  operator  to  resubmit

16  the  specimen  check  through  the  MICR  Check  Reader.   It  is  important

17  to  note  that  account  information  may  be  entered  manually  as  well  at

18  the  point  of  sale  with  the  other  financial  advantages  of  *the*  present

19  invention  still  in  effect.

20       The   computer   data   file   center   receives   and   processes

21  Transaction  Event  authorization  requests  utilizing  the  entire  MICR

22  string  for  accurate,  error-free  identification  of  both  the  consumer

23  bank  and  *a*  specific  checking  or  depository  account  to  participate  in

24  a  sale.   ACH  settlement  criteria  mandate  exact  recall  for  the  bank

25  and  checking  account  numbers  to  properly  complete  any  debit

26  request.  This  invention  conforms  to  each  and  every  requirement  of

27  the  ACH  transaction  regulations.

-20-

1    Each Transaction Event is completed with the logging printer

2    generation of a Transaction Event ("Sales") Slip for each

3    "Approved" authorization inquiry processed (Figure 30).

4    Alternatively, a manually created transaction event slip can also

5    be prepared (Figure 11). Each such Transaction Event Slip must be

6    exacting in its retention of account numbers and the sale amount

7    enabling both the consumer and system subscriber to be provided

8    "hard copy" receipts of the event. Also included would be a clear

9    printing of the transaction type; "Bank Card", "Check

10   Authorization", or "Check Replacement". Authorization language is

11   printed immediately preceding the consumer's signature line

12   specifically authorizing electronic access in payment of the

13   requested transaction sale amount.

14    In addition to the primary functions for POS terminal

15   programming and MICR Check Reader interface, each Point-of-Sale

16   terminal location is capable of generating printed summations of

17   daily activity. These reports list and separately total each

18   authorization/service type, whether produced as a singular report

19   or as the result of multiple terminal "closeout" procedures.

20    Instances will arise with either the Bank Card or Check

21   Replacement Service where previously authorized Transaction Events

22   will require the operational equivalent of a bankcard "Void" or

23   "Credit" notation. The methodology will be available for Split

24   Dial messages to the computer data file center of a

25   post-authorization "Error" or "Transaction Cancellation" notice.

26   The "Cancel" procedure is instituted by depressing for example the

27   "3" key (i.e. "Cancel = 3"). By so doing, the system subscriber

-21-

1    may cancel a previously approved and logged event. This

2    Transaction Event which was recorded on the data files and reported

3    on the service subscriber's daily Activity Summation Report,

4    thereafter carries an offsetting, "Flagged" cancellation notice.

5

6    <u>SUMMARY</u>

7        A flexible purchase transaction system is described which

8    precisely fits within existing ACH procedures for checking account

9    events for processing of pre-authorized electronic debits as a

10   replacement for commercial bank drafts (paper checks). The main

11   advantage to the proposed invention is the fact that a truly

12   paperless transaction may occur. Departures from the proposed

13   system especially with respect to the Point-of-Sale terminals will

14   be apparent to those skilled in the art, *without* departing from the

15   spirit of the invention as described.

-22-

LML-EP 000103

1    We claim:

2        1.    A checkwriting point of sale system comprising:

3        a point of sale terminal adapted to receive consumer bank

4    account information and further adapted to accept such information

5    from consumer cards on which the bank account information is

6    stored;

7        a communications means integral to said point of sale terminal

8    to electronically communicate with a central computer;

9        a memory means integral to said point of sale terminal that

10   allows the temporary storage of the consumer bank account

11   information from the consumer cards;

12       the central computer system having communication means

13   capability adapted to receive information from a plurality of point

14   of sale terminals;

15       the central computer system communication means allowing said

16   central computer system to communicate with external data bases for

17   consumer credit verification and to allow communication with

18   banking institutions for purposes of transfer of funds.

19       2.    A checkwriting point of sales system according to claim

20   1 wherein said point of sale terminal is further adapted to read

21   MICR numbers appearing on a consumer check and wherein said

22   consumer check is used to identify the consumer bank account

23   information.

24       3.    The checkwriting point of sale according to claim 1

25   wherein said point of sale terminal further comprises an alpha

26   numeric display adapted to receive consumer bank account

LML-EP 000104

1 information from the memory of the point of sale terminal and
2 display the consumer bank account information.

3     4. The checkwriting point of sale system according to claim
4 1 further comprising a printer adapted to receive information from
5 the memory of the point of sale terminal to create point of sale
6 slips.

7     5. The checkwriting point of sale system according to claim
8 1 wherein said central computer system communication means
9 comprises means for communicating with third party data bases for
10 verification of consumer credit.

11     6. The checkwriting point of sale system according to claim
12 1 further comprising a resident third party data base wherein
13 consumer credit information is stored and used for verification of
14 consumer credit.

15     7. The checkwriting point of sale system according to claim
16 1 wherein the central computer system further comprises a system
17 subscriber data base comprising those merchants and service
18 providers authorized to use the invention.

19     8. The checkwriting point of sale system according to claim
20 7 wherein the central computer further comprises a database
21 comprising those consumers approved to use the invention.

22     9. A checkwriting point of sale process comprising the steps
23 of:

24     a) presenting a check or consumer card to a point of
25 sale terminal located at a merchant or service provider,

26     b) reading the magnetic stripe or MICR number
27 information on the credit card or consumer check,

-29-

c) storing the consumer bank account information from the card or check and verifying account numbers at the point of sale terminal,

d) inputting transaction event information into the point of sale terminal,

e) transmitting the transaction event information and consumer bank account information to a central computer system,

f) verifying the authorization status of the consumer,

g) if a particular consumer is not authorized to use the system, verifying the credit worthiness of the consumer via a query to a third party data base,

h) sending an "approved" message to the point of sale terminal, if the consumer's credit is approved for the transaction and

i) subsequently transmitting the transaction event information to a bank for subsequent ACH operations.

Jlr-1808

LML-EP 000106

975717

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of Robert R. Hills and Henry R. Nichols

Serial No.:                          Group Art Unit:

Filed:                               Examiner:

FOR:  **CHECKWRITING POINT OF SALE SYSTEM**

### DECLARATION

As below inventors, we hereby declare that:

Our residences, post office address and citizenship are as stated below next to our name.

We believe we are the original, first and sole inventors of the subject matter which is claimed and for which a patent is sought on the invention entitled CHECKWRITING POINT OF SALE SYSTEM the specification of which is attached hereto.

We hereby state that we have reviewed and understand the contents of the above identified specification, including the claims, as amended by any amendment referred to above.

We acknowledge the duty to disclose information which is material to the examination of this application in accordance with Title 37, Code of Federal Regulations, § 1.56(a).

### POWER OF ATTORNEY

We hereby appoint the following attorney(s) to prosecute this application and to transaction all business in the Patent and Trademark Office connected therewith:

Jon L. Roberts
Arter & Hadden
1801 K Street, N.W.
Suite 400K
Washington, D.C. 20006
(202) 775-7980

We declare that all statements made herein of our own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section

LML-EP 000107

1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

Full name of inventor  Robert R. Hills

Inventor's Signature _____ Date 10-1-92

Residence____ 5170 Avenue B

St Augustine (FL 32095

Citizenship___ United States

Full name of inventor  Henry R. Nichols

Inventor's Signature _____ Date_____

Residence_____

Citizenship___ United States

jlr-1883

LML-EP 000108

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of Robert R. Hills and Henry R. Nichols

Serial No.:                              Group Art Unit:

Filed:                                   Examiner:

FOR:  **CHECKWRITING POINT OF SALE SYSTEM**

DECLARATION

As below inventors, we hereby declare that:

Our residences, post office address and citizenship are as stated
below next to our name.

We believe we are the original, first and sole inventors of the
subject matter which is claimed and for which a patent is sought on
the invention entitled CHECKWRITING POINT OF SALE SYSTEM the
specification of which is attached hereto.

We hereby state that we have reviewed and understand the contents
of the above identified specification, including the claims, as
amended by any amendment referred to above.

We acknowledge the duty to disclose information which is material
to the examination of this application in accordance with Title 37,
Code of Federal Regulations, § 1.56(a).

POWER OF ATTORNEY

We hereby appoint the following attorney(s) to prosecute this
application and to transaction all business in the Patent and
Trademark Office connected therewith:

Jon L. Roberts<br>
Arter & Hadden<br>
1801 K Street, N.W.<br>
Suite 400K<br>
Washington, D.C. 20006<br>
(202) 775-7980

We declare that all statements made herein of our own knowledge are
true and that all statements made on information and belief are
believed to be true; and further that these statements were made
with the knowledge that willful false statements and the like so
made are punishable by fine or imprisonment, or both, under Section

LML-EP 000109

1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

Full name of inventor  Robert R. Hills

Inventor's Signature _____  Date_____

Residence_____

_____

Citizenship_  United States

Full name of inventor  Henry R. Nichols

Inventor's Signature  _Henry R. Nichols_  Date 10/19/92

Residence____ 8456 Holly Leaf Dr,

McLean, VA  22102

Citizenship__ United States

LML-EP 000110

PTO/SB/07 9 71

| VERIFIED STATEMENT CLAIMING SMALL ENTITY STATUS (37 CFR 1.9(f) & 1.27(b))--INDEPENDENT INVENTOR | Docket Number (Optional) |
|---|---|

Applicant or Patentee:  ROBERT R. HILLS AND HENRY R. NICHOLS

Serial or Patent No.: _____

Filed or Issued: _____

Title:  CHECKWRITING POINT OF SALE SYSTEM

As a below named inventor, I hereby declare that I qualify as an independent inventor as defined in 37 CFR 1.9(c) for purposes of paying reduced fees to the Patent and Trademark Office described in:

[X] the specification filed herewith with title as listed above.

[ ] the application identified above.

[ ] the patent identified above.

I have not assigned, granted, conveyed or licensed and am under no obligation under contract or law to assign, grant, convey or license, any rights in the invention to any person who would not qualify as an independent inventor under 37 CFR 1.9(c) if that person had made the invention, or to any concern which would not qualify as a small business concern under 37 CFR 1.9(d) or a nonprofit organization under 37 CFR 1.9(e).

Each person, concern or organization to which I have assigned, granted, conveyed, or licensed or am under an obligation under contract or law to assign, grant, convey, or license any rights in the invention is listed below:

[ ] No such person, concern, or organization exists.

[ ] Each such person, concern or organization is listed below.

Separate verified statements are required from each named person, concern or organization having rights to the invention averring to their status as small entities. (37 CFR 1.27)

I acknowledge the duty to file, in this application or patent, notification of any change in status resulting in loss of entitlement to small entity status prior to paying, or at the time of paying, the earliest of the issue fee or any maintenance fee due after the date on which status as a small entity is no longer appropriate. (37 CFR 1.28(b))

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the application, any patent issuing thereon, or any patent to which this verified statement is directed.

ROBERT R. HILLS          HENRY R. NICHOLS
NAME OF INVENTOR          NAME OF INVENTOR          NAME OF INVENTOR

Signature of inventor          Signature of inventor          Signature of inventor
October 1, 1992
Date          Date          Date

PTO/SB/09 (11-90)          Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

LML-EP 000111

PTO/SB/09 (11-90)

| VERIFIED STATEMENT CLAIMING SMALL ENTITY STATUS (37 CFR 1.9(f) & 1.27(b))--INDEPENDENT INVENTOR | Docket Number (Optional) |
|---|---|

Applicant or Patentee:    ROBERT R. HILLS AND HENRY R. NICHOLS

Serial or Patent No.:

Filed or Issued:    1992

Title:    CHECKWRITING POINT OF SALE SYSTEM

As a below named inventor, I hereby declare that I qualify as an independent inventor as defined in 37 CFR 1.9(c) for purposes of paying reduced fees to the Patent and Trademark Office described in:

[X] the specification filed herewith with title as listed above.

[ ] the application identified above.

[ ] the patent identified above.

I have not assigned, granted, conveyed or licensed and am under no obligation under contract or law to assign, grant, convey or license, any rights in the invention to any person who would not qualify as an independent inventor under 37 CFR 1.9(c) if that person had made the invention, or to any concern which would not qualify as a small business concern under 37 CFR 1.9(d) or a nonprofit organization under 37 CFR 1.9(e).

Each person, concern or organization to which I have assigned, granted, conveyed, or licensed or am under an obligation under contract or law to assign, grant, convey, or license any rights in the invention is listed below:

[ ] No such person, concern, or organization exists.

[ ] Each such person, concern or organization is listed below.

Separate verified statements are required from each named person, concern or organization having rights to the invention averring to their status as small entities. (37 CFR 1.27)

I acknowledge the duty to file, in this application or patent, notification of any change in status resulting in loss of entitlement to small entity status prior to paying, or at the time of paying, the earliest of the issue fee or any maintenance fee due after the date on which status as a small entity is no longer appropriate. (37 CFR 1.28(b))

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the application, any patent issuing thereon, or any patent to which this verified statement is directed.

| ROBERT R. HILLS | HENRY R. NICHOLS | |
|---|---|---|
| NAME OF INVENTOR | NAME OF INVENTOR | NAME OF INVENTOR |
| Signature of inventor | _Henry R. Nichols_ | Signature of inventor |
| Date | 10/19/92 | Date |

PTO/SB/09 (11-90)    Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

LML-EP 000112



fig. 1



fig 2

LML-EP 000113







figure 3

LML-EP 000114