## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

LML PATENT CORP.                                )
                                                )
                    Plaintiff,                  )    Civil Action No.: 04-858-SLR
          vs.                                   )
                                                )
TELECHECK SERVICES, INC.                        )
ELECTRONIC CLEARING HOUSE, INC.,                )    **PUBLIC VERSION**
XPRESSCHEX, INC., AND                           )
NOVA INFORMATION SYSTEMS, INC.                  )
                                                )
                    Defendants.                 )
                                                )

## DECLARATION OF LESLEY G. SMITH IN SUPPORT OF
## LML'S MEMORANDUM IN OPPOSITION TO TELECHECK'S
## MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT

Originally filed: November 15, 2005
Public version filed: November 22, 2005

Richard K. Herrmann #405
Mary B. Matterer #2696
MORRIS JAMES HITCHENS &
WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
(302) 888-6800
rherrmann@morrisjames.com
mmatterer@morrisjames.com

Russell E. Levine, P.C.
Jamie H. McDole
Edward K. Runyan
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

*Counsel for LML Patent Corp.*

## DECLARATION OF LESLEY G. SMITH

I, Lesley G. Smith, declare as follows:

1. I am an associate of the law firm of Kirkland & Ellis LLP, and counsel for plaintiff LML Patent Corp. ("LML"). I am a member in good standing of the bar of the state of Illinois, and I am admitted to practice *pro hac vice* in the United States District Court for the District of Delaware for this case. The facts set forth below are known to me personally and I could competently testify hereto if called as a witness in this action.

2. Attached hereto as Exhibit 1 is a true and correct copy of United States Patent Number 5,484,988.

3. Attached hereto as Exhibit 2 is a true and correct copy of the Declaration of Gary Tinkel in Support of LML's Memorandum in Opposition to TeleCheck's Motion for Summary Judgment of Non-Infringement designated For Outside Counsel's Eyes Only by LML.

4. Attached hereto as Exhibit 3 is a true and correct copy of LML-EP-055363 - LML-EP-055769 (selected pages). This document has been designated confidential by LML.

5. Attached hereto as Exhibit 4 is a true and correct copy of portions of the Deposition of Jane Larimer. This document has been designated For Outside Counsel's Eyes Only by NACHA.

6. Attached hereto as Exhibit 6 is a true and correct copy of TeleCheck's Fourth Supplemental Responses to LML's Amended First Set of Interrogatories (No. 6).

7. Attached hereto as Exhibit 7 is a true and correct copy of FDC 00068 - FDC 00103. This document has been designated confidential and For Outside Counsel's Eyes Only by Telecheck.

8. Attached hereto as Exhibit 8 is a true and correct copy of FDC 12375 - FDC 12532. This document has been designated confidential and For Outside Counsel's Eyes Only by Telecheck.

9. Attached hereto as Exhibit 9 is a true and correct copy of portions of the Deposition of Cassandra Mollett. This document has been designated For Outside Counsel's Eyes Only by TeleCheck.

10. Attached hereto as Exhibit 10 is a true and correct copy of FDC 13156 - FDC 13204. This document has been designated confidential and For Outside Counsel's Eyes Only by TeleCheck.

11. Attached hereto as Exhibit 11 is a true and correct copy of FDC 1259904 – 1259934. This document has been designated For Outside Counsel's Eyes Only by TeleCheck.

12. Attached hereto as Exhibit 12 is a true and correct copy of a document entitled "ACH Volume Grows 20.7 Percent in 2nd Quarter 2004" and "ACH Volume Grows 21.3 Percent in 4th Quarter 2004."

13. Attached hereto as Exhibit 13 is a true and correct copy of a document marked as PX 1018. This document has been designated For Outside Counsel's Eyes Only by TeleCheck.

14. Attached hereto as Exhibit 14 is a true and correct copy of portions of the Deposition of Kerry Sellen. This document has been designated For Outside Counsel's Eyes Only by TeleCheck.

15. Attached hereto as Exhibit 15 is a true and correct copy of portions of the Deposition of Elliot McEntee.  This document has been designated For Outside Counsel's Eyes Only by NACHA.

16. Attached hereto as Exhibit 16 is a true and correct copy of the Joint Proposed Claim Construction Chart filed with the Court on October 7, 2005.

17. Attached hereto as Exhibit 17 is a true and correct copy of portions of the Deposition of Steve Geiler.  This document has been designated For Outside Counsel's Eyes Only by TeleCheck.

18. Attached hereto as Exhibit 18 is a true and correct copy of FDC 08532 – FDC 08533.

19. Attached hereto as Exhibit 19 is a true and correct copy of FDC 12929 – FDC 12963. This document has been designated confidential and For Outside Counsel's Eyes Only by TeleCheck.

20. Attached hereto as Exhibit 20 is a true and correct copy of FDC 01415 – FDC 01473. This document has been designated confidential and For Outside Counsel's Eyes Only by TeleCheck.

21. Attached hereto as Exhibit 21 is a true and correct copy of FDC 00136 – FDC 00237. This document has been designated confidential and For Outside Counsel's Eyes Only by TeleCheck.

22. Attached hereto as Exhibit 22 is a true and correct copy of FDC 07016 – FDC 07031. This document has been designated confidential and For Outside Counsel's Eyes Only by TeleCheck.

23. Attached hereto as Exhibit 23 is a true and correct copy of FDC 06441 – FDC 06471. This document has been designated confidential and For Outside Counsel's Eyes Only by TeleCheck.

24. Attached hereto as Exhibit 24 is a true and correct copy of FDC 12892 – FDC 12902. This document has been designated confidential and For Outside Counsel's Eyes Only by TeleCheck.

25. Attached hereto as Exhibit 25 is a true and correct copy of FDC 04619 – FDC 04645. This document has been designated confidential and For Outside Counsel's Eyes Only by TeleCheck.

26. Attached hereto as Exhibit 26 is a true and correct copy of FDC 08266 - FDC 08280. This document has been designated confidential and For Outside Counsel's Eyes Only by TeleCheck.

27. Attached hereto as Exhibit 28 is a true and correct copy of LML-EP-1516 - LML-EP-1518. This document has been designated confidential by TeleCheck.

28. Attached hereto as Exhibit 29 is a true and correct copy of portions of the Deposition of Jay Iler. This document has been designated For Outside Counsel's Eyes Only by TeleCheck.

     I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on this 15th day of November 2005 in Chicago, Illinois.

Lesley G. Smith

# EXHIBIT   1

US005484988A

# United States Patent [19]

Hills et al.

[11] Patent Number: 5,484,988

[45] Date of Patent: Jan. 16, 1996

[54] CHECKWRITING POINT OF SALE SYSTEM

[75] Inventors: Robert R. Hills, St. Augustine, Fla.; Henry R. Nichols, McLean, Va.

[73] Assignee: Resource Technology Services, Inc., Vienna, Va.

[21] Appl. No.: 257,390

[22] Filed: Jun. 9, 1994

Related U.S. Application Data

[63] Continuation of Ser. No. 975,717, Nov. 13, 1992, abandoned.

[51] Int. Cl.6 .................................................. G06F 15/30
[52] U.S. Cl. ................................ 235/379; 235/380
[58] Field of Search ........................... 235/379, 380

[56]                  References Cited

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,824,544 | 7/1974 | Strajan | 340/147 A |
| 3,845,470 | 10/1974 | Schuller | 340/149 A |
| 4,270,042 | 5/1981 | Case | 235/379 |
| 4,404,649 | 9/1983 | Nunley et al. | 364/900 |
| 4,523,330 | 6/1985 | Cain | 382/7 |
| 4,580,040 | 4/1986 | Granzow et al. | 235/379 |
| 4,617,457 | 10/1986 | Granzow et al. | 235/379 |
| 4,672,377 | 6/1987 | Murphy et al. | 340/825.34 |
| 4,673,802 | 6/1987 | Ohmae et al. | 235/379 |
| 4,678,895 | 7/1987 | Tateisi et al. | 235/379 |
| 4,678,896 | 7/1987 | Carlson et al. | 235/380 |
| 4,743,743 | 5/1988 | Fukatsu | 235/379 |
| 4,810,866 | 3/1989 | Lord, Jr. | 235/379 |
| 4,823,264 | 4/1989 | Deming | 235/379 |
| 4,933,536 | 6/1990 | Lindemann et al. | 235/375 |
| 4,934,772 | 6/1990 | Sakuma et al. | 350/6.5 |
| 5,053,607 | 10/1991 | Carlson et al. | 235/379 |

Primary Examiner—Harold Pitts
Attorney, Agent, or Firm—Thomas M. Champagne; Jon L. Roberts; Roberts & Associates

[57]                  ABSTRACT

A point of sale system designed to read information from a consumer's check, credit card, or manual input with a subsequent debiting of a consumer's account and crediting a merchant's account for the goods or services provided. Point of sale terminals are designed to accept a form of credit card with a consumer's bank account information encoded thereon or in the alternative to read the MICR number from a consumer's check in order to verify that a consumer has an appropriate balance to conduct the transaction with a given merchant. Thereafter the transaction of that information is transmitted to a central computer system which verifies the consumer's credit worthiness and stores the transaction event information for subsequent bank reconciliation via the ACH network. The invention eliminates the need for paper checks with all bank reconciliation being accomplished electronically.

20 Claims, 8 Drawing Sheets



LML v. Telecheck
CA No. 04-cv-00858
PX 1
Espinoza 8/19/05

CONFIDENTIAL

U.S. Patent        Jan. 16, 1996.    Sheet 1 of 8        5,484,988



FIG. 1



FIG. 2

CONFIDENTIAL

LML-EP 000002

U.S. Patent        Jan. 16, 1996·    Sheet 2 of 8        5,484,988



**FIG. 3**

CONFIDENTIAL

LML-EP 000003



FIG. 4

CONFIDENTIAL



FIG. 5

CONFIDENTIAL

LML-EP 000005



FIG. 6

CONFIDENTIAL

LML-EP 000006

U.S. Patent        Jan. 16, 1996        Sheet 6 of 8        5,484,988



FIG. 7

CONFIDENTIAL

LML-EP 000007

Merchant Name
Street Address
City, ST Zip
Merchant Acct #

TIME 00:00 _M                    DATE 00/00/00
BANK ACCT. NO. 000000000000
TRANSIT NO. 000000000

SALE AMOUNT                      $ 0,000.00

TERMINAL ID 0000000000

I herewith authorize ChequeMARK Systems
to electronically access my designated
checking account for the payment of the
above referenced purchase.

Name (PRINT) _____
Street _____
City _____ ST_____ Zip _____
Tel. Number: (____) _____ — _____

I ACKNOWLEDGE THAT RETURN FEES WILL BE
IMPOSED SHOULD MY PAYMENT BE DISHONORED
AND UNDERSTAND THAT IT IS UNLAWFUL TO
AUTHORIZE PAYMENTS FOR WHICH ADEQUATE
MONIES ARE NOT AVAILABLE WITHIN MY
ACCOUNT.

X_____
Authorizing Signature

*FIG. 8*

CONFIDENTIAL

LML-EP 000008

Merchant Name
Street Address
City, ST Zip
Merchant Acct #

CUSTOMER BANKING INFORMATION:

BANK ACCT. NO. _____

TRANSIT NO. _____

SALE AMOUNT . . . . . . . . . . . . . . . . . $ _____

I herewith authorize ChequeMARK Systems to electronically
access my designated checking account for the payment of the above
referenced purchase amount. I acknowledge that sufficient funds
are available for the payment of this sale.

Name (PRINT) _____

Street _____

City _____ ST _____ Zip _____

Tel. Number: (_____) _____ — _____

I FURTHER ACKNOWLEDGE THAT RETURN FEES WILL BE IMPOSED SHOULD MY
PAYMENT BE DISHONORED AND UNDERSTAND THAT IT IS UNLAWFUL TO
AUTHORIZE PAYMENTS FOR WHICH ADEQUATE MONIES ARE NOT AVAILABLE
WITHIN MY ACCOUNT.

X _____
Authorizing Signature

## FIG. 9

CONFIDENTIAL

LML-EP 000009

5,484,988

1

## CHECKWRITING POINT OF SALE SYSTEM

### RELATED APPLICATION

This application is a continuation of Ser. No. 07/975,717 filed Nov. 13, 1992, now abandoned.

### FIELD OF THE INVENTION

This invention relates to the field of Point-of-Sale systems and more particularly to the integration and processing of purchases whereby a check is used as the basic source of identification of the individual and of the individual's bank and whereby the bank account is debited.

### Background Art

Numerous devices exist for processing checks. For example, U.S. Pat. No. 4,933,536 to Lindemann, et al., describes a check processing device which is used together with a Point-of-Sale terminal. This particular device involves copying and taking a picture of an individual whereby a dishonored check could then be traced to the person who has offered it.

U.S. Pat. No. 4,810,866 to Lloyd, Jr., describes a check validation system again located together with a Point-of-Sale system for imprinting and otherwise physically dealing with a check.

Other systems also deal as apparatus for handling checks at a point of sale. For example, U.S. Pat. No. 4,743,743 to Fukatsu describes one such transaction apparatus where a check is examined by a reader. U.S. Pat. No. 4,672,377 to Murphy, et al. describes a check authorization system wherein a check is imprinted with a bar code and information concerning customers which are stored in a database. U.S. Pat. No. 3,845,470 to Schuller discloses a vending system using a modified form of a check which is imprinted with identification codes, when someone attempts to use the check in purchasing goods and services, a vending operation will not place the order if information associated with the check is not valid in a particular database.

Other check-based financial systems have also been the subject of invention. U.S. Pat. No. 4,617,457 addresses an ATM or automatic teller machine form of cashing checks. Such systems create a picture of the check involved and also involves checking against a specialized database to insure that the check is a "valid" one (see also U.S. Pat. No. 4,580,040 to Granzow et al.).

Another generic category of financial systems deals with methods of handling the financial transactions apart from the physical handling of the check itself. For example, U.S. Pat. No. 3,824,544 to Simjian describes a merchant issued "check" which can be used in the purchase of goods and services and upon purchase, a specialized code is evaluated to determine if the check is being validly utilized.

U.S. Pat. No. 4,404,649 to Nunley et al. describes a document processing system which generally discloses a method of reading checks for processing a wide variety of financial documents.

U.S. Pat. No. 4,523,330 to Cain also describes a method for processing financial documents which systems also includes a Point-of-Sale terminal for generating image data as from checks as they are being processed. This patent is drawn principally to the actual terminal itself.

2

U.S. Pat. No. 4,673,802 to Ohmae et al. describes a central processing system having stored data relating to the accounts of users. Users are approved or disapproved at the Point-of-Sale based upon information in the database.

U.S. Patent No. 4,270,042 to Case discloses a point of sale system that requires a consumer to prepay a sum of money into a special account that is accessed only by the system. This amount is inscribed on the card, and when a transaction is made using the system, the amount of the transaction is punched out of a designated area on the card. This amount, along with a signature and other information, is supplied on a draft negotiable instrument, which is given to the merchant at the time of the transaction. Thus, the Case system does away with the use of bank checks in effecting the transaction, but requires the use of specialized prepaid draft negotiable instruments that must be surrendered to the merchant.

U.S. Patent No. 4,823,264 to Deming discloses a home banking system that can be used to transfer funds to different payees in satisfaction of debts incurred through previous purchases, use of utilities, etc. The system is consumer driven; that is, it is contemplated for use by the payor on a home personal computer. While the Deming system does away with the use of bank checks, account and other information must be keyed into the system. The Deming system cannot be used to read account and other information directly from an ordinary bank check and has no use for bank checks as instruments other than negotiable paper. Further, the Deming system cannot be used to transfer funds at the time of purchase and is not workable at the point of sale; the system can only be used to pay debts that have been incurred in the past and have accumulated.

Finally, U.S. Pat. No. 4,678,896 to Carlson et al. describes a Point-of-Sale system whereby an apparatus is provided to secure the processing and imprinting of checks.

All of these above patents deal with the specific problem of how to accept a check from a customer for the purchase of goods and services. They do not in any way address the subsequent processing of checks nor do they address the process by which checks are cleared through the normal automatic check handling clearinghouse operations that exist in the financial world. Thus, the interaction of these systems with the automated clearing house ("ACH") process is not addressed in any way. This is particularly important since if any Point-of-Sale check handling system is to interact with the ACH mechanism it must adhere to that processing scheme and must lend itself to use with a processing scheme.

Further, some of the currently used systems described above require the use of a bank check as a negotiable instrument which must be surrendered to a merchant. Some of the systems do away with the use of a bank check altogether, but require a debit card or a specialized draft instrument to be used only with the particular system. None of these systems completely does away with the need and use for a negotiable draft instrument while using the consumer's bank check for identification and verification only. It is therefore an objective of the present invention to provide such a system.

It is an objective of the present invention to be adaptable for use with the ACH system and to be smoothly incorporated into it. In this fashion, the present invention will immediately be useful for a much wider range of financial transactions above and beyond those contemplated and disclosed in the background references discussed above.

### Summary of the Invention

The present invention comprises a process and apparatus which may be employed for the purpose of effecting pay-

CONFIDENTIAL

LML-EP 000010

5,484,988

3

ments for point-of-sale purchases of goods and services paid from consumer funds secured in bank checking or depository accounts. Each sale or "Transaction Event" would be an electronic and "paperless" event thereby eliminating reliance on accepting and processing commercial bank drafts (personal or corporate checks) and the physical handling of those bank drafts thus replacing commercial bank drafts at the point-of-sale.

In contrast to known systems, the present invention is a merchant driven system that can be used to process a transaction at the point of sale and at the time of purchase. The system is intended to be made available to subscribing merchants, businesses, and individuals herein referred to as "system subscribers" wishing to employ the method and apparatus of the present invention for the electronic processing and settlement of consumer purchases. Further, operational parameters of the present invention allow freedom from customary state or other geographically limiting criteria typical when accepting and processing "paper" checks. The system is designed to act with the national authorization and electronic settlement network known as the ACH system.

The system is designed to perform in a fully automated manner enabling each Transaction Event to be processed by a system subscriber as a point-of-sale transaction in the presence of the consumer. When the transaction event is "approved" funds are debited from an authorized consumer account for credit to the system subscriber and electronic settlement by ACH deposits the transaction amount to the subscriber's designated depository account. Authorized access to consumer accounts and credits to system subscriber depository accounts are performed as "Off-Line" transactions by means of Electronic Funds Transfer ("EFT") through the ACH Network or through the Federal Reserve System.

The invention comprises a point-of-sale processing system comprising electronic data processing equipment which allows individual services selections which provide automated, electronic processing from bank checking or depository accounts. It is the objective of the present invention to automate the point-of-sale environment for processing consumer purchases of goods and services which, other than for the system of the present invention, would necessitate the more traditional acceptance and processing of commercial bank drafts (personal and/or corporate checks). Individual Transaction Events are administered under the system of the present invention by initiating a terminal authorization inquiry and continuing through the electronic settlement of funds representing the Transaction Event from the pre-approved consumer banking accounts.

It is a further objective of the present invention to eliminate the need for "paper" checks as an accepted means of consumer payment. In the place of personal and business checks, consumers would be provided free and unrestricted access to funds secured in bank accounts of various types by means of preauthorized electronic events. System subscribers electronically communicate with the data center of the present invention for individual Transaction Event authorizations which, upon reconciliation of a day's activity, result in an EFT by means of the Automated Clearing House accommodating an "Off-Line" debiting of preauthorized consumer Transaction Events from authorized accounts. Thereafter, each system subscriber is credited with the total of all such daily authorized Transaction Events to its designated banking depository account.

The present invention comprises logic which allows the following services which when individually performed or

4

where combined with other services establish a wholly unique processing medium enabling preauthorized access to consumers' checking account or bank depository reserves.

Authorization—This service supports electronic communication from point-of-sale to the system's central computer. The data center stores positive and negative files concerning consumer accounts thereby providing accurate inquiry responses regarding the current posting status of a consumer's banking account and signaling the system subscriber that said account may be reasonably relied upon for consummating a Transaction Event (i.e., an "Approval") or, where listed as delinquent, indicating that the account may not be so relied upon (i.e., a "Denial").

Check Replacement—This capability operates as an extension of Authorization enabling the system subscriber the capability of completing a Transaction Event by electronically logging the sale whereupon a Transaction Event Slip will be printed or manually prepared for consumer execution at the point-of-sale. By execution of the Transaction Event Slip, the consumer authorizes the electronic accessing of funds secured in his/her authorized banking account in lieu of the more traditional method of issuing personal and business checks. Funding settlement to the system subscriber would be effectuated by means of Electronic Funds Transfer via ACH or the Federal Reserve System as opposed to physically processing and transferring checks among banks.

Bank Transaction Card—As part of this invention on "Off-Line" Debit Card is established on which is stored the information relating to the banking account from which funds representing the Transaction Event would be debited for payment to the system subscriber. This information may be stored on the card itself in encrypted or unencrypted form or may be stored in the central computer where access to such information is gained via special control characters or access codes stored on the card. Electronic authorization for withdrawal of funds from the cardholder's account and subsequent electronic settlement procedures remain essentially identical to processing under the Check Replacement service described above. Information relating to the consumer-cardholder and the appropriate banking account to be debited for a Transaction Event will be encoded upon the magnetic stripe portion of the plastic, and terminal-readable, card.

Thus, the overall objective of the present invention is to provide and support an alternate means for consumer payments for goods and services that operates to replace commercial bank drafts in the point-of-sale environment. Simultaneously, the present invention assures consumers greater access to and use of funds in personal or corporate banking accounts. Further, the system provides system subscribers a significantly improved prospect of collecting the underlying monies for Transaction Events, reduced time for the collecting the cash receipts from Transaction Events, and a pronounced lowering of the present cost of cumbersome procedures otherwise mandated by the existing ACH system for accepting and processing commercial bank drafts.

A further objective of the present invention is to significantly reduce the use of checks as negotiable instruments in effecting the purchases of goods or services and to further reduce the consumers reliance on credit cards or cash for transaction events.

Detailed Description of the Preferred Embodiment

The method of the present invention begins with the electronic recording of consumer information at a system

CONFIDENTIAL

LML-EP 000011

5,484,988

5

subscriber's location using a point-of-sale terminal. This information is obtained in the presence of the consumer and occurs prior to any "Approval" either for the Transaction Event or for the ultimate crediting of the System subscriber's designated depository account. A Transaction Event involves a series of events initiated by a system subscriber's request to sell goods or services by payment from funds secured in a consumer's banking account. First, the consumer's banking account status will be verified through accessing the central computer files of the present invention. Verification that an account may be accessed is established alternatively by means of an encoded, magnetic strip card, or by input of account identification numbers from a consumer's bank account. A more traditional identification of the consumer could also occur including visual examination of driver's license or similar and acceptable picture "ID" however this is not considered part of the present invention.

As an integral portion of each Transaction Event, the system subscriber's location, date and time, and requested sale amount is automatically logged into the system when a system subscriber first accesses the invention. Finally, a Transaction Event Slip ("Sales Slip") will be produced by a printer integral to the point-of-sale terminal and will be executed by the consumer in the amount of the stated purchase with inscribed language defining the Transaction Event and specifically providing consumer authorization for electronic access to his/her banking account. Thereafter, the consumer account will be debited and the proceeds credited to the system subscriber's designated depository account along with all other similar Transaction Events representing the total of the system subscriber's daily activity. Debiting of consumer accounts and settlement deposits to each system subscriber is performed by means of Off-Line electronic funds transfer through and by the ACH or Federal Reserve System.

Equipment Configuration—The present invention can operate with nearly every conceivable point-of-sale equipment system. The central computer system accepts data transmitted from the system subscriber's existing point-of-sale equipment or that which is added to augment service performance. The point of sale terminal of the present invention is implemented in a number of ways, most preferred, however, being activation under a fully automated format. Such a fully automated system generally comprises a dual-port terminal with magnetic stripe reading capabilities interfaced with a logging printer capable of providing individual Transaction Event Slips for consumer execution, and a MICR check reader, optical character recognition ("OCR") equipment, or other device. Variations to this configuration are particularly possible where the system of the present invention is to be activated under a "Split-Dial" feature installed to function within the operational parameters of existing point-of-sale equipment primarily dedicated to bankcard ("credit card") processing. It is contemplated that services may in the future be administered using the present invention with a singular point-of-sale hardware device which, as a function of its design, would incorporate all or most of the service capabilities of an integrated terminal, logging printer, and MICR Check Reading device. The system of the present invention can alternately be interfaced with electronic cash registers now on the market.

Communications links from point-of-sale terminals to the central computer of the present invention will typically be in the form of telephonic network communications over a public switched telephone network ("PSTN") or over other approved networks. Transaction Event verification will occur as a result of point-of-sale terminal access to the

6

central computer's positive and/or negative data files. "Approved" or "Declined" notifications are made to the Point-of-Sale device over the PSTN. All data files will be centrally located and maintained on the invention's central computer data bases. Portions of the data base include but are not limited to third party data files such as the Shared Check Authorization Network ("SCAN") (trademark) data base.

Individual transactions or groupings of transactions are first approved by soliciting an "Authorization" prior to the completion of any requests for electronic funds transfer. To maintain an accurate status of file information for authorizations to subscribing merchants, businesses, and/or individuals, separate data bases are maintained. Current cardholder or banking account status are updated daily and instantly available for point-of-sale inquiry for Transaction Event authorizations, updated daily and are instantly available for point-of-sale inquiry for Transaction Event authorizations.

System subscribers point-of-sale equipment is interfaced to the central computer of the present invention by means of a telephonic network which is able to support communication from a plurality of point-of-sale terminals. Programming of the point-of-sale terminal causes an automatic "Dial-Up" to the central computer and provides an automatic query and response sequence affirming or denying the Transaction Event. The addition of local entry hubs may be installed to better facilitate the speed or economics of communications with the data files. Alternatives in telephonic networks may involve use of satellite communications or enhanced radio transmissions. Similarly, the system's data files and associated Check Replacement Service are contemplated to be responsive to emerging point-of-sale devices intended to seek authorizations by the alternate means of voice pattern recognition, fingerprint identification, retina scan, "smart" chips, and/or consumer or check image and/or signature broadcasting.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1—System overview of the present invention

FIG. 2—The point-of-sale terminal

FIG. 3—The Central Computer System

FIGS. 4-7—The process Data Flow

FIG. 8—Transaction Event Sales Slip

FIG. 9—Manual Transaction Event Sales Slip

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring to FIG. 1 an overall schematic of the present invention is described. Point-of-sale terminals 300 communicate over normal PSTN telephone lines with a central computer system 302 which in turn communicates with a banking institution 304 for purposes of debiting consumer accounts and crediting system subscriber accounts. The banking institution performs its function via normal automated clearing house ("ACH") transactions 306.

Referring to FIG. 2 the point-of-sale terminal is described. The point-of-sale terminal comprises several different entry means. A key board 310 can be used to input consumer information manually. Alternatively a card reader 312 can be used whereby the magnetic stripe on the card is read by the point-of-sale terminal and finally a check reader 314 is also included to read the MICR number on checks as a substitute for either a specific card or key board input. These various

CONFIDENTIAL

LML-EP 000012

5,484,988

7

input means provide information to a microprocessor 316 which comprises logic means 318, memory means 320, and communication means 322. The logic means 318 comprises logic which allows the information received from the various input means to be processed and stored in the memory 320. The logic means further drives a display 324 which provides a visual output of the account number of the consumer for verification. The communication means 322 allows the subscriber terminal to communicate with the central computer 302 for purposes of processing the consumer's purchase.

Referring to FIG. 3 the central computer system 329 is described. The central computer system receives input from a plurality of point-of-sale terminals which provide transaction information from a system subscriber and a consumer desiring to purchase goods or services. The central computer system comprises a system subscriber 330 file which is a file of those merchants who have elected to use the present invention for processing purchases. The central system also comprises an approved consumer file 332 which stores the names of those consumers who have already been approved for allowing purchases to take place through the various input means at well as a third party database such as the SCAN (trademark) data base relating to consumer credit. The computer system also comprises a communications means 334. The communication means communicates with other outside third party data bases to allow any consumer that has not been approved by the system to have a rapid check of the status of the consumer's banking account and of whether the consumer has current outstanding returns (i.e. bad checks). Once this SCAN (trademark) or other outside third party data base search is performed and where an approval is given, the approved consumer file 332 is updated with the name of the new approved consumer.

As presently configured the central computer 329 already has a third party database known as the SCAN (trademark) database 333 resident on the central computer. Thus credit worthiness can be checked using this SCAN database. The SCAN (trademark) database is updated daily.

The communication means 334 also communicates with a banking institution 338 to instruct the bank to debit the account of the consumer and credit the account of the system subscriber (merchant) with the amount of the purchase. These transactions then take place via the normal ACH transaction process.

Referring to FIG. 4 the process begins by a consumer presenting a "specimen or "blank" check complete with MICR number to the system subscriber (the merchant) 100. The system subscriber next determines if the check meets appropriate store policy procedures 102, i.e., that the check has appropriate information on the check. If the check does not meet the store policies, it is returned to the consumer 104. If the check does meet appropriate store policies the on-line verification process proceeds 106. The subscriber begins the process by first pressing the appropriate key on z terminal to access the host computer 108. Thereafter the point of sale terminal prompts the system subscriber to enter the appropriate MICR number 110. The system subscriber then enters the appropriate MICR number either manually or by passing the check through a check reader which determines the MICR number 112.

Referring to FIG. 6 the subscriber would verify that the numbers appearing on the terminal match the MICR numbers on the check 114. During the comparison, the subscriber determines that the check number compares accurately 116 to the number displayed on the terminal. If they

8

do compare the verification process proceeds 120. If the check numbers do not compare with that of the terminal the system subscriber clears the terminal and begins the transaction process again 118. If the process is to be reinitiated the subscriber enters the MICR number into the point of sale terminal 130. Thereafter the system subscriber compares the MICR numbers as before 132. If the MICR numbers compare to the system display 134 the process proceeds. If the numbers do not compare 136 the check is returned to the consumer and the process terminates 137.

Referring to FIG. 5, if the verification process proceeds the terminal next prompts the system subscriber to enter the amount of the sale 122. The subscriber enters the amount of the sale 124 and the terminal thereafter transmits an inquiry to the host data base for verification 126.

The check approval process next takes place 128. If the check is not approved by the central computer the terminal displays a message declining the transaction 140. Thereafter a printer record of the declined transaction is made for purposes of the system subscriber 142 to comply with the Fair Credit Reporting Act and Regulation E of the Board of Governors of the Federal Reserve System.

If the check is approved the terminal displays a message noting the approval 138 and the specimen check is returned to the consumer. The printer further makes a paper record of the transaction 142 and the consumer places any required information on the paper receipt and signs the receipt authorizing the transaction 144.

Referring to FIG. 7, the process description continues. Once the transaction is approved the central computer captures the MICR information and the sale amount and stores that information 146. The central computer subsequently generates a batch message regarding all transaction events for the prior period and transmits all the transaction event information for the day into the ACH network 148.

During the ACH process each checkwriter's account is debited for the exact purchase amount and such an amount is deposited into a system subscriber designated account 150. Thereafter, collected funds for a total day's events are deposited into a subscriber's account 152. The transaction is then complete 154.

### How to Use

The present invention will require the establishment and maintenance of three interconnected but separate data files for the purpose of performing access searches. Each data file will be accessible by dial-up procedures operating, in most instances, under "Split Dial" format from a point-of-sale ("POS") terminal device or electronic cash register installed for the primary purpose of bankcard and/or bank draft authorizations. The terminal prompts an operator/user to process one of three optional inquiry types. Any one or all of three primary functions are capable of being performed at a single point-of-sale terminal within the control of the system subscriber. The inquiry types and data base format responses are as follows:

Card Authorization—Having depressed the assigned Split Dial key and thereafter being prompted, the system subscriber "slides" an encoded magnetic stripped transaction card through the point-of-sale terminal and enters the "Sale Amount" requested for authorization. Thereupon, the terminal's dial-up capabilities direct the inquiry to the central computer for authorization against "POSITIVE" file of current cardholders whose accounts were listed in "good standing". Inquiries where such a "Match" are found cause

CONFIDENTIAL

LML-EP 000013

5,484,988

| 9 | 10 |

an "Approved" return message from the data file to the inquiring POS terminal. Conversely, a "No-Match" to inquiry would result in a "Declined" notice to the POS terminal. An uploading mode of the present invention causes forwarding of daily status notifications to the central data files activating new cardholder accounts in the "POSITIVE" cardholder file or submitting corrective entries to delete delinquent or terminated accounts.

Check Authorization—Having depressed the assigned Split Dial key and thereafter being prompted, the system subscriber manually enters account numbers from a personal or business check or, where fully automated, enters a specimen check through a MICR Check Reader device interfaced with the terminal, whereupon the terminal's screen would display the check's numbers, and hence the account number, for verification. Thereafter, the operator would enter the "Sale Amount" requested for authorization. The terminal's dial-up capabilities then direct the inquiry to the computer data file center for authorization first against the "POSITIVE" file of "prepared" bank/checking account numbers whose accounts were listed in "good standing". A successful "Match" to an inquiry would result in an "Approved" notice from the data file to the inquiring terminal. A "No-Match" to inquiry would not, however, immediately result in a "Declined" response. Each inquiry preliminarily resulting in a No-Match would be instantly forwarded/"rolled" to the third data file preceding any return notice to the inquiring terminal. This third data file is anticipated to be the Shared Check Authorization Network ("SCAN") a negative data file data base maintained in the system computer data file center. Referrals to SCAN or any other positive or negative data files, enable potential acceptance of Transaction Events involving consumers "POSITIVE" files. A "Match" on the SCAN "NEGATIVE" file would result in a "Declined" notice; a "No-Match" would conversely send notification to the inquiring POS terminal of an "Approved" event. Of significant importance, the bank/checking account information for each such "Unknown" consumer's transaction would, subsequent to a SCAN "Approved" notice, be posted to the invention's "POSITIVE" file and processed through the ACH ("Automated Clearing House") for future Transaction Events. The invention, presumedly in an automated mode, is capable of uploading daily corrections to the POSITIVE data file including notices of new accounts approved through SCAN (trademark) and deletions where settlement for consumer checking account events, initially approved, were subsequently dishonored. The SCAN data base is similarly uploaded with daily activity status corrections.

Check Replacement Service—Inquiries initiated as Check Replacement requests function in nearly an identical manner as that of Check Authorization. Records for such events, when culminating in "Approved" notices, are separately preserved. Check Replacement inquiries are processed first through the system's "POSITIVE" data file and, where no match is found, proceed to the SCAN data file or other data base file prior to transmitting an "Approved" or "Declined" notice to the inquiring POS terminal. A Match in the system data file indicates a consumer-user whose account was in "good standing" and would not be required to "roll" to, 60 SCAN. Check Replacement events are reported to and stored by the computer data file center under a file classification identifying the transaction as a "Check Replacement Service. The total of daily, approved Transaction Events are "checkless" sales, whereby the service subscribing merchant has submitted requests for electronic ACH settlement for all preauthorized consumer purchases. No commercial bank

note ("Paper Check") is accepted or processed by the service subscriber. In each Transaction Event, a Consumer, at the point-of-sale, has executed an electronic access ("Off-Line Debit") authority "Sales Slip" which is automatically printed upon a terminal's receipt of an "Approved" notice.

All terminal programming and all prompt strings for MICR Check Reader interfacing are stored in the POS terminal and the computer center of the present invention controls interactions between the plurality of terminals and the central system. The following modules are present.

Programming for MICR/Terminal Interface—system subscriber locations to be activated with the present invention must possess or acquire a terminal. Those utilizing or being upgraded to terminals such as a Tranz (trademark) 330 or other terminals with interface capabilities with the check reader for all suitable point-of-sale terminals.

The preferred format for terminal operations is generated from a singular split dial key. Thereafter, the "prompt string" would proceed in a manner such as 1) "Card=1", "Check=2" requiring operator selection; then, where selecting a checking account inquiry 3), the operator would respond to a secondary prompt of "Auth=1", "Replace=2". These entry selections precede the magnetic stripe "reading" of a card/submittal or a check through the MICR (Account Identification), the entry of the requested sale amount, and the terminal's dial-up for authorization against the computer data file center.

The MICR interface results in the transmittal of a query for data center approval of the entire ABA/Transit and personal or corporate checking account numbers. Instances where printed checks add the individual check's number to the end of the account number can be "dropped" by Check Reader switch settings. Subsequent to a terminal's receipt of the MICR number string but prior to the operator's entry of the requested sale amount and authorization dial-up, a verification prompt "flashing" the ABA and account numbers must be displayed on the terminal's screen requiring the operator to depress "Enter" to proceed, if correct, or "Clear", if incorrect and thereby enabling the terminal operator to resubmit the specimen check through the MICR Check Reader. It is important to note that account information may be entered manually as well as the point of sale with the other financial advantages of the present invention still in effect.

The computer data file center receives and processes Transaction Event authorization requests utilizing the entire MICR string for accurate, error-free identification of both the consumer bank and a specific checking or depository account to participate in a sale. ACH settlement criteria mandate exact recall for the bank and checking account numbers to properly complete any debit request. This invention conforms to each and every requirement of the ACH transaction regulations.

Each Transaction Event is completed with the logging, printer generation of a Transaction Event ("Sales") Slip for each "Approved" authorization inquiry processed (FIG. 8). Alternatively, a manually created transaction event slip can also be prepared (FIG. 9). Each such Transaction Event Slip must be exacting in its retention of account numbers and the sale amount enabling both the consumer and system subscriber to be provided "hard copy" receipts of the event. Also included would be a clear printing of the transaction type; "Bank Card", "Check Authorization", or "Check Replacement". Authorization language is printed immediately preceding the consumer's signature line specifically authorizing electronic access in payment of the requested transaction sale amount.

CONFIDENTIAL

LML-EP 000014

5,484,988

11

In addition to the primary functions for POS terminal programming and MICR Check Reader Interface, each Point-of-Sale terminal location is capable of generating printed summations of daily activity. These reports list and separately total each authorization/service type, whether produced as a singular report or as the result of multiple terminal "closeout" procedures.

Instances will arise with either the Bank Card or Check Replacement Service where previously authorized Transaction Events will require the operational equivalent of a bankcard "Void" or "Credit" notation. The methodology will be available for Split Dial messages to the computer data file center of a post-authorization "Error" or "Transaction Cancellation" notice. The "Cancel" procedure is instituted by depressing for example the "3" key (i.e. "Cancel=3"). By so doing, the system subscriber may cancel a previously approved and logged event. This Transaction Event which was recorded on the data files and reported on the service subscriber's daily Activity Summation Report, thereafter carries an offsetting, "Flagged" cancellation notice

Summary

A flexible purchase transaction system is described which precisely fits within existing ACH procedures for checking account events for processing of pre-authorized electronic debits as a replacement for commercial bank drafts (paper checks). The main advantage to the proposed invention is the fact that a truly paperless transaction may occur. Departures from the proposed system especially with respect to the Point-of-Sale terminals will be apparent to those skilled in the art without departing from the spirit of the invention as described.

We claim:

1. A checkwriting point of sale system comprising:

a point of sale terminal adapted to receive consumer bank account information from any bank check;

a central computer system;

first communications means integral to said point of sale terminal for electronically communicating with the central computer system;

memory means integral to said point of sale terminal for temporarily storing the consumer bank account information;

the central computer system having second communication means for receiving information from a plurality of said point of sale terminals;

the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the bank check as a negotiable instrument.

2. The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further includes means for reading magnetic ink character recognition numbers appearing on a consumer check for the sole purpose of identifying and reading the consumer bank account information.

3. The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further comprises an alphanumeric display means for receiving said consumer bank account information from the memory means and for displaying the consumer bank account information.

12

4. The checkwriting point of sale system according to claim 1 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip.

5. The checkwriting point of sale system according to claim 1 further comprising a resident third party database wherein consumer banking account status information is stored, the consumer banking account status information being used for verification of consumer banking account status.

6. The checkwriting point of sale system according to claim 1 wherein the central computer system further comprises a system subscriber database, the system subscriber database comprising information regarding merchants and service providers that are authorized to use the checkwriting point of sale system.

7. The checkwriting point of sale system according to claim 6 wherein the central computer system further comprises a database comprising information regarding consumers whose consumer banking account status is not verified as bad.

8. A checkwriting point of sale process comprising:

a) presenting any bank check specimen to a point of sale terminal located at a merchant or service provider;

b) reading the magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument;

c) storing the consumer bank account information obtained from the check and verifying that account numbers were accurately read at the point of sale terminal;

d) providing transaction event information to the point of sale terminal;

e) transmitting the transaction event information and consumer bank account information to a central computer system;

f) storing the transaction event information and consumer banking account information, and

g) subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations.

9. A checkwriting point of sale system comprising:

a point of sale terminal adapted to receive consumer bank account information;

a central computer system;

first communications means integral to said point of sale terminal for electronically communicating with the central computer system; and

memory means integral to said point of sale terminal for temporarily storing the consumer bank account information;

the point of sale terminal comprising reading means for reading magnetic ink character recognition numbers on any consumer bank check for the sole purpose of eliciting consumer bank account information;

the central computer system having second communication means for receiving information from a plurality of said point of sale terminals;

the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using a bank check as a negotiable instrument.

CONFIDENTIAL

LML-EP 000015

5,484,988

13

10. The checkwriting point of sale system according to claim 9 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip.

11. The checkwriting point of sale system according to claim 9 further comprising a resident third party database wherein consumer banking account status information is stored, the consumer banking account status information being used for verification of consumer banking account status.

12. The checkwriting point of sale system according to claim 9 wherein the central computer system further comprises a system subscriber database, the system subscriber database comprising information regarding merchants and service providers that are authorized to use the checkwriting point of sale system.

13. The checkwriting point of sale system according to claim 4, wherein the sales slip includes means for execution by the consumer for proof of bank account access authorization.

14. The checkwriting point of sale system of claim 1, wherein the point of sale terminal further comprises means for automatically logging a point of sale terminal location and transaction date, time, and sales amount.

15. The checkwriting point of sale process of claim 8, further comprising:

a) verifying the status of the consumer bank account;

b) verifying the consumer bank account status of the consumer via a query to a third party database if the consumer bank account is verified as bad, and

14

c) sending an approval message to the point of sale terminal if the consumer's banking account status is approved for the transaction.

16. The checkwriting point of sale process of claim 8, further comprising:

(A) printing a transaction event sales slip following the sending of an approval message; and

(B) executing of the sales slip by the consumer as proof of bank account access authorization.

17. The checkwriting point of sale process of claim 15, further comprising:

(A) printing a transaction event sales slip following the sending of an approval message; and

(B) executing of the sales slip by the consumer as proof of bank account access authorization.

18. The checkwriting point of sale process of claim 8, further comprising automatically logging point of sale terminal location information and transaction date, time, and sales amount information into the point of sale terminal.

19. The checkwriting point of sale system according to claim 10, wherein the sales slip includes means for execution by the consumer of proof of bank account access authorization.

20. The checkwriting point of sale system of claim 9, wherein the point of sale terminal further comprises means for automatically logging a point of sale terminal location and transaction date, time, and sales amount.

* * * * *

LML-EP 000016

CONFIDENTIAL

# EXHIBIT   2

# EXHIBIT  REDACTED
# IN  ITS  ENTIRETY

# EXHIBIT   3

# 2 0 0 5

# A Complete Guide To Rules & Regulations Governing the ACH Network

LMLEP-055336

# 2 0 0 5

# ACH RULES

## A Complete GuideTo Rules &

## Regulations Governing the

## ACH Network

Copyright 2005 by the National Automated Clearing House Association
All Rights Reserved
Printed in the United States of America
13665 Dulles Technology Drive, Suite 300
Herndon, VA 20171
703-561-1100

private sector adjustment factor (i.e., profit margin) is included in Federal Reserve processing so that the Federal Reserve Bank charges as though it were operating on a "for profit" basis.

NACHA and the Regional Payments Associations

NACHA oversees America's largest electronic payments network. NACHA's primary roles are to develop and maintain the *NACHA Operating Rules*, to promote growth in ACH volume, and to provide educational services to its members and other ACH participants. NACHA's member payment associations serve over 12,000 financial institutions across the United States, which in turn provide services to over 4 million corporations and one hundred thirty-five million consumers, with a transaction volume of ten billion payments and a dollar value $27.4 trillion in 2003.

Regional payment associations provide management, education, assistance, and services to link all types of financial institutions (commercial banks, saving banks, and credit unions) across the United States. Several of these associations also develop and implement local ACH rules that apply specifically to their own member financial institutions. The regional payment associations offer a wide variety of educational sessions ranging from origination and receipt operations to audit and control.

## H. ACH TERMINOLOGY

This section is intended to provide users of this book with an overview of basic ACH terminology. ACH terms, as defined specifically for purposes of the *NACHA Operating Rules*, may be found within Article Thirteen of the *NACHA Operating Rules*.

**ACH Operator**
means (1) a Federal Reserve Bank that performs all of the following, or (2) an entity that executes an annual agreement with the National Association in which the entity agrees to comply with or perform all of the following:
  (a)  adhere to these rules (except to the extent inconsistent with the policies or practices of the Federal Reserve Banks) and other applicable laws, regulations, and policies;
  (b)  execute agreements with a minimum of twenty independent (i.e., not owned by the same holding company) Participating DFIs that bind such entities to the ACH Operator's rules and to these rules (except that a Federal Reserve Bank shall not be required to bind a Participating DFI to any provision of such rules of the National Association that is not incorporated by the Uniform Operating Circular of the Federal Reserve Banks);
  (c)  (i) provide clearing, delivery, and settlement services for ACH entries, as defined by these rules, between Participating DFIs that have selected that ACH Operator to perform ACH services (intra-ACH Operator services), and (ii) exchange transactions with other ACH Operators (inter-ACH Operator exchange);
  (d)  process and edit files based on the requirements of these rules;
  (e)  evaluate the credit worthiness of and apply risk control measures to their Participating DFIs;
  (f)  adhere to the Federal Reserve's Policy Statement on Privately Operated Multilateral Settlement Systems (as applicable); and
  (g)  adhere to any National ACH Operator Performance Standards of the National Association.

**Addenda Record**
An ACH record type that carries the supplemental data needed to completely identify an account holder(s) or provide information concerning a payment to the RDFI and the Receiver.

**Authorization**
A written agreement with the originating company signed or similarly authenticated by an employee or customer to allow payments processed through the ACH Network to be deposited in or withdrawn from his or her account at a financial institution. (For specific applications, written authorization for debits to consumer accounts is not required. Refer to the *NACHA Operating Rules* for details.) Can also be a written

J MLEP 055361

agreement that defines the terms, conditions and legal relationship between trading partners. For ACH credit entries, authorization may also be by verbal or other non-written means.

**Automated Clearing House (ACH) Network**
A funds transfer system, governed by the *NACHA Operating Rules*, that provides for the interbank clearing of electronic entries for participating financial institutions.

**Banking Day**
Any day on which a participating depository financial institution is open to the public during any part of the day for carrying on substantially all its banking functions.

**Batch**
A group of records or documents considered as a single unit for the purpose of data processing.

**Consumer Account**
A deposit account held by a financial institution and established by a natural person primarily for personal, family, or household use and not for commercial purposes.

**Corporate-to-Corporate Payments**
Any of the class of automated payment formats developed for the ACH Network that allow concurrent exchange of funds and remittance information between trading partners.

**Credit Entry**
An entry to the record of an account to represent the transfer or placement of funds into the account.

**Data Transmission**
The electronic exchange of information between two data processing points.

**Debit Entry**
An entry to the record of an account to represent the transfer or removal of funds from the account.

**Direct Debit**
A method of collection used in the ACH for certain claims, generally those that are repeated over a period of time, under which the debtor gives his or her financial institution authorization to debit his or her account upon the receipt of an entry issued by a creditor.

**Direct Deposit**
An ACH service that provides for the electronic transfer of funds directly into the account of a payee, usually an employee receiving pay or a Social Security beneficiary receiving retirement benefits.

**Direct Payment**
A method of collection used in the ACH Network for certain claims, generally those that are repeated over a period of time, for which the debtor gives the Originator an authorization to debit his or her account.

**EDI Payment**
The computer-to-computer transmission of a payment and related information in a standard format.

**Effective Entry Date**
The date the originating company expects payment to take place. The ACH Operator reads the effective entry date to determine the settlement date.

**Electronic Funds Transfer (EFT)**
A generic term used to describe any ACH or wire transfer.

LML-EP-055362

**Entry**
An electronic item representing the transfer of funds in the ACH.

**Field**
One or more consecutive character positions within an ACH entry mapped to contain specific information. For credit, debit or ATM cards, a defined area within an information track of the magnetic stripe of fixed or variable length.

**File**
A group of ACH batches initiated into the ACH Network or sorted for delivery to ACH receiving point(s). A file must be transmitted electronically via data transmission between the sending point and the receiving point. A file may be delivered to an end-point via direct data transmission, magnetic tape, or floppy diskette. A file may contain one or more batches of entries.

**Financial EDI**
Electronic data interchange for financial transactions/applications between companies and financial institutions, including payment and remittance advice, account analysis, and balance reporting.

**Funds Availability**
The time at which the funds resulting from a funds transfer are made available to the customer.

**Green Book**
A publication assembled by the U.S. Department of the Treasury that specifies the procedures to be used in Automated Clearing House transactions originated on behalf of the United States Federal Government.

**Live Dollar Entry**
"Live" refers to an entry that affects a funds transfer rather than non-dollar entries, such as prenotifications.

**MICR line**
The magnetic ink character recognition inscription at the bottom of a paper check.

**National Automated Clearing House Association (NACHA)**
The national association that establishes the standards, rules and procedures that enable depository financial institutions to exchange payments on a national basis.

**NACHA Formats**
The ACH record format specifications described in the *NACHA Operating Rules and Guidelines* are the accepted and warranted payment format standards for payments delivered through the ACH.

**Notification of Change (NOC)**
Information sent by an RDFI to notify the ODFI that previously valid information for a receiver has become outdated or that information contained in a prenotification is erroneous. The standard entry class code is COR.

**On-Us Entries**
Entries within an ACH file destined for accounts held at the ODFI.

**Originating Depository Financial Institution (ODFI)**
A participating financial institution that initiates ACH entries at the request of and by agreement with its customers. ODFIs must abide by the provisions of the *NACHA Operating Rules and Guidelines*.

**Originator**
Any individual, corporation or other entity that initiates entries into the Automated Clearing House Network.

LML-EP-055363

**Posting**
The process of recording debits and credits to individual account balances.

**Prenotification**
A non-dollar entry that may be sent through the ACH Network by an Originator to alert an RDFI that a live-dollar transaction will be forthcoming and that verification of the Receiver's account number is required.

**Receiver**
An individual, corporation or other entity who has authorized an originator to initiate a credit or debit entry to an account held at an RDFI.

**Receiving Depository Financial Institution (RDFI)**
Any financial institution qualified to receive ACH entries that agrees to abide by the *NACHA Operating Rules and Guidelines*.

**Receiving Point**
A site where entries are received from an ACH Operator for processing. It may be the RDFI, its data center or a data processing service bureau authorized to receive entries on behalf of a RDFI.

**Regulation E**
A regulation promulgated by the Federal Reserve Board of Governors in order to ensure consumers of a minimum level of protection in disputes arising from electronic funds transfers.

**Returns**
Any ACH entry that has been returned to the ODFI by the RDFI or by the ACH Operator because it cannot be processed. The reason for each return is included with the return in the form of a "return reason code." (See the *NACHA Operating Rules and Guidelines* for complete return reason code listing.)

**Reversals**
Any ACH entries or files sent within required deadlines to "correct" or reverse previously originated erroneous entries or files.

**Routing Number**
A nine-digit number (eight digits and a check digit) that identifies a specific financial institution. Also referred to as the ABA number. Numbers are assigned by the Thomson Financial Publishing and are listed in its publication entitled *Key to Routing Numbers*.

**Sending Point**
A processing site from which entries are transmitted to the ACH Operator. It may be the ODFI on its own behalf or a financial institution or private data processing service bureau on behalf of the ODFI.

**Settlement**
A transfer of funds between two parties in cash, or on the books of a mutual depository institution, to complete one or more prior transactions, made subject to final accounting. Settlement for the ACH Network usually occurs through the Federal Reserve.

**Settlement Date**
The date on which an exchange of funds with respect to an entry is reflected on the books of the Federal Reserve Bank(s).

**Standard Entry Class Codes**
Three character code within an ACH company/batch header record that identifies payment types within an ACH batch (e.g., CCD, CTX, etc.).

LML-EP-055364

**Transaction Code**
The two digit code in the ACH record that determines whether an entry is a debit or a credit to a DDA account, savings account, or general ledger account, or whether an entry is a credit to a loan account.

LML-EP-055365

## SECTION 3.7 Obligations of Originators of ARC Entries

### SUBSECTION 3.7.1 Notice Obligation

The Originator must, in advance of receiving from the Receiver each source document used as the basis for the origination of an ARC entry, provide the Receiver with notice that clearly and conspicuously states that receipt of the Receiver's source document will authorize an ACH debit entry to the Receiver's account in accordance with the terms of the source document. If the Originator has received notice in accordance with the reasonable procedures established by the Originator that the receipt of the check does not authorize an ACH debit entry, then receipt of a check by the Originator does not authorize an ACH debit entry to the account on which the check is drawn.

### SUBSECTION 3.7.2 Source Documents

For an ARC entry, a check or sharedraft provided to the Originator by the Receiver via the U.S. mail or at a dropbox location must be used by the Originator as the source document for the Receiver's routing number, account number, check serial number, and dollar amount. To be used as the source document for an ARC entry, a check or sharedraft must (1) contain a pre-printed serial number, (2) be drawn on a Consumer Account, and (3) be completed and signed by the Receiver.

The following may not be used as the source document for ARC entries: (1) checks drawn on corporate or business accounts, (2) third-party checks, (3) demand drafts and third-party drafts that do not contain the signature of the Receiver, (4) credit card checks, (5) obligations of a financial institution (e.g., travelers checks, cashier's checks, official checks, money orders, etc.), (6) checks drawn on the Treasury of the United States, a Federal Reserve Bank, or a Federal Home Loan Bank, (7) checks drawn on a state or local government, or (8) checks payable in a medium other than United States currency.

### SUBSECTION 3.7.3 Copy of Source Document

The Originator must retain a reproducible, legible, image, microfilm, or copy of the front of the Receiver's source document for each ARC entry for two years from the Settlement Date of the ARC entry. At the request of the ODFI, the Originator must provide a copy of the front of the source document to the ODFI for its use or for the use of an RDFI requesting such information pursuant to subsection 2.9.3.2 (Copy of Source Document).

### SUBSECTION 3.7.4 Source Document Will Not Be Presented for Payment

The source document to which the ARC entry relates may not be used by the Originator as a check to obtain payment.

### SUBSECTION 3.7.5 Destruction of Source Document

The source document to which the ARC entry relates must be destroyed within fourteen days of the Settlement Date of the entry.

### SUBSECTION 3.7.6 Capture of MICR Information

During initial processing of an ARC entry, the Originator may not key-enter the routing number, account number, or check serial number from the Receiver's source document. An Originator may, however, key-enter such information to correct errors relating to MICR misreads, miscoding, or processing rejects.

## SECTION 3.8 Obligations of Originators of POP Entries

### SUBSECTION 3.8.1 Source Documents

For a POP entry, a check or sharedraft provided by the Receiver at the point-of-purchase must be used by the Originator as a source document for the Receiver's routing number, account number, and check serial number. The source document must then be voided by the Originator. Only a check or sharedraft that contains a pre-printed serial number and that is drawn on a Consumer Account may be used as a source document for this type of transaction.

For POP entries, the following may not be used as source documents: (1) checks drawn on corporate or business deposit accounts, (2) third-party checks, (3) credit card checks, (4) obligations of a financial institution (e.g., traveler's checks, cashier's checks, official checks, money orders, etc.), (5) checks drawn on the Treasury of the United States, a Federal Reserve Bank, or a Federal Home Loan Bank, (6) checks drawn on a state or local government, or (7) checks payable in a medium other than United States currency. For POP entries, a previously voided check or sharedraft that has been used by the Receiver for a prior POP entry may not be used as a source document for this type of transaction.

### SUBSECTION 3.8.2 Capture of MICR Information

The Originator may not key-enter the routing number, account number, or check serial number from the Receiver's source document.

### SUBSECTION 3.8.3 Receipts

An Originator must provide to each Receiver a receipt containing the following information with respect to each POP entry to the Receiver's account:

(a)  Originator name (merchant)
(b)  company (merchant)/third-party service provider telephone number;
(c)  date of transaction;
(d)  transaction amount;

LML-EP-055429

(e)   source document check serial number;
(f)   merchant number (or other unique number that identifies the location of the transaction);
(g)   Terminal City; and
(h)   Terminal State.

The National Association strongly recommends, but these rules do not require, that the Originator also provide the following information on the receipt provided to the Receiver:

(a)   merchant address;
(b)   merchant identification number;
(c)   Receiver's financial institution routing number;
(d)   Receiver's truncated account number;
(e)   Receiver's truncated identification number; and
(f)   transaction reference number.

Note: The Receiver's complete account number and complete identification number are not permitted to be placed on the receipt.

### SECTION 3.9 Obligations of Originators of Internet-Initiated Entries

#### SUBSECTION 3.9.1 Fraud Detection Systems

Each Originator originating WEB entries must employ a commercially reasonable fraudulent transaction detection system to screen each entry.

#### SUBSECTION 3.9.2 Verification of Routing Numbers

Each Originator that originates WEB entries must use commercially reasonable procedures to verify that routing numbers are valid.

#### ♦ [SUBSECTION 3.9.3 *Verification of Receiver's Identity*

*Each Originator that originates WEB entries must employ commercially reasonable methods of authentication to verify the identity of the Receiver.*]

#### SUBSECTION 3.9.4 Security of Internet Session

Each Originator that originates WEB entries must establish a secure Internet session with each Receiver utilizing a commercially reasonable security technology providing a level of security that, at a minimum, is equivalent to 128-bit encryption technology prior to the Receiver's key entry and through transmission to the Originator of any banking information, including, but not limited to, the Receiver's routing number, account number, and personal identification number (PIN) or other identification symbol.

#### SUBSECTION 3.9.5 WEB Annual Audit

Each Originator that originates WEB entries shall conduct or have conducted annual audits to ensure that the financial information it obtains from Receivers is

protected by security practices and procedures that include, at a minimum, adequate levels of (1) physical security to protect against theft, tampering, or damage, (2) personnel and access controls to protect against unauthorized access and use, and (3) network security to ensure secure capture, storage, and distribution.

### SECTION 3.10 Obligations of Originators of Telephone-Initiated Entries

#### SUBSECTION 3.10.1 Verification of Receiver Identity

Each Originator that initiates TEL entries must employ commercially reasonable procedures to verify the identity of the Receiver.

#### SUBSECTION 3.10.2 Verification of Routing Numbers

Each Originator that initiates TEL entries must use commercially reasonable procedures to verify that routing numbers are valid.

### ◊ SECTION 3.11 Payment to ODFI

Each Originator that utilizes a Third-Party Sender to authorize an ODFI to transmit credit or debit entries agrees to make payment to the ODFI for any such credit entries originated and for any debit entries returned by the RDFI to the extent that the ODFI does not receive payment from the Third-Party Sender.

### SECTION 3.12 Record of Authorization

An Originator must retain the original or a microfilm or microfilm-equivalent copy of each authorization of a Receiver for two years from the termination or revocation of the authorization. In the case of TEL entries, the Originator must retain the original or a microfilm or microfilm-equivalent copy of the written notice or the original or a duplicate tape recording of the oral authorization for two years from the date of the authorization. At the request of its ODFI, the Originator must provide the original or copy of the authorization to the ODFI for its use or for the use of an RDFI requesting the information pursuant to subsection 4.1.1 (Right to Information Regarding Entries). This section 3.12 does not apply to SHR or MTE entries if the ODFI and RDFI are parties to an agreement (other than these rules) for the provision of services relating to SHR or MTE entries.

---

♦ *Approved November 9, 2004; Effective March 18, 2005*
◊ *Approved December 2, 2003; Effective December 10, 2004*

LML-EP-055430

R36    *Return of Improper Credit Entry*

- ACH credit entries (with the exception of reversals) are not permitted for use with the ARC Standard Entry Class Code.

- ACH credit entries (with the exception of reversals) are not permitted for use with the POP Standard Entry Class Code.

- RCK entries must be limited to debits to demand accounts, with the exception of reversals to correct erroneous entries.

- ACH credit entries (with the exception of reversals) are not permitted for use with the WEB Standard Entry Class Code.

- ACH credit entries (with the exception of reversals) are not permitted for use with the TEL Standard Entry Class Code.

Creation of the resulting automated return entries shall be in accordance with the specifications in Appendix Five (Return Entries).

# APPENDIX FOUR - MINIMUM DESCRIPTION STANDARDS

These rules require each RDFI to send or make available to each Receiver specific minimum descriptive information concerning each credit or debit entry to the Receiver's account. This descriptive information, which is consistent with the requirements of Section 205.9(b) of Federal Regulation E, is as follows:

(a) Posting date to customer's account
(b) Dollar amount of the entry
(c) Company name
(d) Company entry description
(e) Type of account (e.g., checking)
(f) Number of the account
(g) Amount of any charges assessed against the account for electronic fund transfer services
(h) Balances in the customer's account at the beginning and at the close of the statement
(i) Terminal Identification Code (MTE, POS, and SHR entries)
(j) Terminal Location (MTE, POS, and SHR entries)
(k) Terminal City (MTE, POP, POS, and SHR entries)
(l) Terminal State (MTE, POP, POS, and SHR entries)
(m) Address and telephone number to be used for inquiries or notices of errors preceded by "Direct Inquiries To" or similar language

The above requirements do not apply to Receivers' passbook accounts which may not be accessed by electronic fund transfers other than preauthorized credit transfers. However, they do apply whether or not Regulation E imposes certain of those requirements on a person other than the RDFI and whether or not the Regulation exempts a Participating DFI from all such requirements with respect to certain types of entries.

For Accounts Receivable (ARC) Entries, Destroyed Check Entries (XCK) Entries, Re-presented Check (RCK) Entries and Point-of-Purchase (POP) Entries, these rules require that, in addition to the information noted above, the RDFI also provide the Receiver with the following information relating to the entry:

(a) Check Serial Number.

NACHA strongly recommends, but these Rules do not require, that a RDFI also send or make available to each of its Receivers the following additional information with respect to a credit or debit entry made to such Receiver's account.

(a) Company Descriptive Date
(b) Individual Identification Number/ Identification Number

Terms used herein shall have the meanings set forth in Appendix Two (ACH Record Format Specifications) of these Rules.

# APPENDIX FIVE - RETURN ENTRIES

Except as otherwise provided in Article Six, section 6.1 (Return of Entries) of these rules, an RDFI may return entries for any reason, provided it uses an appropriate Return Reason Code as specified in this Appendix and, if it uses Return Reason Code R11 or R17, provided it specifies the reason for the return. If no appropriate Return Reason Code is specified in this Appendix Five, the RDFI shall use the code which most closely approximates the reason for return.

### SECTION 5.1 Automated Return Entries

NOTE: Throughout this section, DFIs will always be designated by their original names. For example, the ODFI is the DFI that initially prepared the original entry, and which will eventually have the Automated Return Entry delivered to it. The RDFI is the DFI that was supposed to receive the original entry and will usually be preparing the Automated Return Entry. In some cases an Automated Return Entry may be prepared by an intervening ACH Operator if the entry cannot be delivered or if it contains an erroneous condition.

LML-EP-055504

Case 1:04-cv-00858-SLR    Document 477    Filed 11/22/2005    Page 35 of 57

# SECTION IV
# SPECIAL TOPICS

# CHAPTER XII
# POINT-OF-PURCHASE ENTRIES

## A. INTRODUCTION

The *NACHA Operating Rules* support an application that enables Originators (i.e., merchants, billers, etc.) to initiate a Single-Entry ACH debit entry to a Receiver's account for in-person purchases made at the point-of-purchase. This application, which is based on a written authorization and account information drawn from a source document (check) obtained from the consumer at the point-of-purchase, provides Originators with an alternative to accepting consumers' checks as the method of payment. This chapter addresses issues relating to the origination and receipt of Point-of-Purchase Entries (POP).

A POP entry is a Single-Entry ACH debit used by Originators as an alternative method of payment for goods or services purchased in person. These one-time debit entries are initiated by the Originator to the consumer's account based on a written authorization and account information drawn from a source document (a check) obtained from the consumer at the point-of-purchase. To initiate a POP entry, the consumer must present a check or sharedraft that has not been previously voided or negotiated to the Originator. The Originator uses a check reading device to capture the MICR information from the check (i.e., routing number, account number, and serial number), which will be used by the Originator to generate a debit entry to the consumer's account. The Originator may not key enter the MICR information from the check, nor may the Originator key enter the MICR information after the check reader has captured this data. The Originator then key enters the amount of the transaction, after which an authorization will be provided to the consumer to sign, authorizing the debit to his account. The Originator must provide to the consumer (1) the consumer's source document, which the Originator has voided, (2) a copy of the consumer's authorization, and (3) a receipt containing specific information relating to the purchase.

## B. LEGAL FRAMEWORK

POP entries are subject to the requirements of the *NACHA Operating Rules*, the Electronic Fund Transfer Act, and the Federal Reserve's Regulation E. POP entries are considered to be ACH entries from start to finish, with the consumer's check used by the Originator solely as a source document for the consumer's routing and account number information. Such transactions are not considered

to be truncated checks and do not fall under the requirements of check law or the Uniform Commercial Code for the following reasons:

(1) the check is not accepted by the merchant as a negotiable instrument; and
(2) the check is not negotiated by the merchant or accepted into the check collection system.

## C. OBLIGATIONS OF ORIGINATORS

### 1. AGREEMENTS WITH ODFIs

Originators choosing to utilize the ACH Network for POP transactions should consider modifications to their agreements with their ODFIs to address the origination of these entries. These modifications should address the extent to which the Originator and ODFI will share liability for point-of-purchase transactions and should define any specific processing obligations relating to such transactions.

### 2. AUTHORIZATION REQUIREMENT

Originators of POP entries must obtain the consumer's written authorization prior to initiating a debit entry under this application. Although the *NACHA Operating Rules* do not prescribe specific authorization language for the point-of-purchase application, the authorization must conform to the requirements of the *NACHA Operating Rules*, which require that the authorization (1) be in writing, signed or similarly authenticated by the Receiver, (2) be readily identifiable as an ACH debit authorization, and (3) clearly and conspicuously state its terms. It is strongly recommended that authorization language for point-of-purchase entries specifically state that the check will not be processed. This will assist consumers in understanding the nature of the transaction. Originators must provide a copy of the authorization to the consumer as required by the *NACHA Operating Rules*.

Unlike authorization requirements for most consumer debit entries, Originators of point-of-purchase entries need not include on the authorization the method by which the consumer must revoke the authorization, as these entries can not be returned using Return Reason Code R07 (Authorization Revoked). Consumers retain their rights to stop payment on the ACH entry (R08) or to have it returned as unauthorized/improper (R10) when appropriate.

### 3. SOURCE DOCUMENTS

*Acceptable Source Documents*

Originators may only accept a check or sharedraft as a source document for a point-of-purchase debit entry if the check or sharedraft:

- has not been previously negotiated;

LML-EP-055765

- has not been previously voided;
- contains a pre-printed serial number; and
- is drawn on a consumer account.

*Unacceptable Source Documents*

Checks that may not be used as source documents for point-of-purchase entries include:

- corporate checks;
- third-party checks;
- credit card checks;
- obligations of a financial institution (e.g., cashier's checks, money orders, traveler's checks, official checks, etc.);
- checks drawn on the Treasury of the United States, a Federal Reserve Bank, or a Federal Home Loan Bank;
- checks drawn on a state or local government; or
- checks payable in a medium other than United States currency.

### 4. RECEIPT REQUIREMENTS

Originators must, at the point-of-purchase, provide Receivers with a receipt that contains the following minimum amount of information:

- Originator name (merchant);
- company (merchant)/third-party service provider telephone number;
- date of transaction;
- transaction amount;
- source document check serial number;
- merchant number (or other unique number that identifies the location of the transaction);
- Terminal City; and
- Terminal State.

Note: The Federal Reserve Board's Official Staff Commentary on Regulation E requires the inclusion of terminal location information on the receipt provided to the consumer at the point of purchase. When a POS terminal is used to capture data electronically to initiate an EFT, the Regulation E Official Staff Commentary considers the POS terminal to be an electronic terminal, even if no access device is used, such as when a check is used to capture information to initiate a one-time EFT. As a result, when a check is used as a source document at the point of purchase and run through a terminal to read the MICR information, as is the case with POP entries, it is necessary to ensure compliance with Regulation E's requirements for electronic terminals, which mandate the inclusion of the terminal location on the receipt for POP entries.

It is also recommended, but not required, that the Originator provide the following information on the receipt provided to the Receiver:

- merchant address;
- merchant identification number;
- Receiver's financial institution routing number;
- Receiver's truncated account number;
- Receiver's truncated identification number; and
- transaction reference number.

Originators must be aware that the Receiver's complete account number and complete identification number are not permitted to be placed on the receipt. At the Originator's discretion, the receipt and the authorization required for point-of-purchase entries may be provided to the consumer on the same document or on different documents.

### 5. FORMATTING REQUIREMENTS

- Individual Name

  Originators should be aware that, with the POP SEC Code, the inclusion of information in the Individual Name Field is optional. If the Originator chooses to utilize this field, it must include either (1) the Receiver's (consumer's) name, or (2) a reference number, identification number, or code that the merchant uses to identify a particular transaction or customer. (Note: When a reference number, identification number, or code is used to identify the transaction or customer, it should be uniquely related to the individual or transaction. A generic description is not an acceptable means to identify the Receiver or transaction.)

- Check Serial Number

  The rules governing POP entries require that the Originator ensure that the check serial number from the Receiver's source document is placed within the Check Serial Number Field of the POP entry. Originators should understand that the *NACHA Operating Rules* permit Originators to place *only* the check serial number within the Check Serial Number Field of the POP Entry Detail Record. The word "check," abbreviations such as "ck" or "chk," or other merchant codes must not be included within the field. Because the Check Serial Number Field is defined as an alphanumeric one, the *NACHA Operating Rules* require information within this field to be left justified and space filled. The serial number of the check must begin in the leftmost position of the Check Serial Number field, and any unused spaces within the field must be left blank.

  | INCORRECT | 0001234 |
  |-----------|---------|
  |           | 000000000001234 |
  |           | CK# 001234 |
  |           | CK1234 |
  |           | 1234 6532986002 |
  |           | CK1234 48832817 |

LML-EP-055766

CORRECT          1234

Originators should be aware that the *NACHA Operating Rules* require RDFIs to print the check serial number on the consumer's bank statement.

• Terminal City/Terminal State

To ensure compliance with both the *NACHA Operating Rules* and Regulation E, which require the inclusion of terminal location information on the consumer's monthly bank account statement for POP entries, Originators must ensure that they have included a four-character name or abbreviation of the city in which the electronic terminal is located within the Terminal City Field, and a two-character abbreviation for the state in which the electronic terminal is located within the Terminal State Field of the POP Entry Detail Record. This information is used to identify the location of the electronic terminal used to originate the POP entry.

## 6. RETURN OF POINT-OF-PURCHASE ENTRIES

Originators should be aware that POP entries, like other ACH transactions, may be returned for a variety of reasons. Originators should be aware, however, that RDFIs can not return POP entries based on a consumer's claim that his authorization had been revoked (R07) since these are one-time transactions where the Originator will generally process the transactions immediately after the purchase is complete. As appropriate, however, the consumer may (1) request his RDFI to stop the payment of a POP entry (Return Reason Code R08), (2) request his RDFI to return an unauthorized/improper POP entry (Return Reason Code R10), or (3) go directly to the Originator (merchant) to request a refund of the transaction.

Originators should also be aware that, because the POP entry application does not require the Originator to capture the consumer's name for inclusion on the point-of-purchase entry, the RDFI must rely on the POP's warranty regarding the validity of the consumer's account number for posting purposes. The RDFI, therefore, may not return a point-of-purchase entry using Return Reason Codes R03 or R17 solely because the consumer's name is not included in the Individual Name Field of the entry. The RDFI may, however, use these Return Reason Codes if otherwise appropriate.

Originators must be prepared to handle returned point-of-purchase entries and must establish procedures that enable them to identify and contact the Receiver relating to any unpaid debit entry. Because the Originator does not retain the consumer's voided check as a source document, and because the consumer's name and address are not included as part of the MICR-capture process, Originators will need to develop alternative methods for retaining information necessary to identify the consumer for whom

a point-of-purchase debit has been returned. The *NACHA Operating Rules* limit the number of times an entry returned due to insufficient or uncollected funds may be reinitiated to no more than two times following the return of the original entry. Originators should establish procedures to ensure that returned POP entries are not reinitiated in excess of the limits prescribed by the *NACHA Operating Rules*.

## D. RESPONSIBILITIES OF ODFIs

### 1. WARRANTIES AND LIABILITIES

In addition to all other general ODFI warranties contained within the *NACHA Operating Rules*, each ODFI that chooses to transmit POP entries on behalf of its Originator also warrants to each RDFI, ACH Operator, and ACH Association that:

• the source document provided to the Originator for use in obtaining the Receiver's routing number, account number, and check serial number for the initiation of the POP entry

   – is returned voided to the Receiver after use by the Originator, and

   – has not been provided by the Receiver for use in any prior POP entry.

ODFIs should consider modifications to their agreements with their Originators to address the origination of POP entries on behalf of their Originators. These modifications should address the extent to which the Originator and ODFI would share liability for POP transactions and should define any specific processing obligations relating to such transactions.

### 2. FORMATTING REQUIREMENTS

ODFIs must ensure that, prior to transmission to the ACH Operator, POP entries comply with all technical specifications and formatting requirements in accordance with the *NACHA Operating Rules*. ODFIs must ensure that:

• the check serial number from the Receiver's source document is placed within the Check Serial Number Field of the POP entry.

ODFIs should understand that the *NACHA Operating Rules* permit Originators to place only the check serial number within the Check Serial Number Field of the POP Entry Detail Record. The word "check," abbreviations such as "ck," or "chk," or other merchant codes must not be included within the field. Because the Check Serial Number Field is defined as an alphanumeric one, the *NACHA Operating Rules* require information within this field to be left justified and space filled. The serial number of the

LML-EP-055767

check must begin in the leftmost position of the Check Serial Number field, and any unused spaces within the field must be left blank.

| INCORRECT | 0001234 |
|---|---|
| | 000000000001234 |
| | CK# 001234 |
| | CK1234 |
| | 1234 6532986002 |
| | CK1234 48832817 |
| CORRECT | 1234 |

ODFIs should be aware that the *NACHA Operating Rules* require RDFIs to print the check serial number on the consumer's bank statement.



- they are aware that use of the Individual Name Field by the Originator is optional. When used, it must contain either (1) the Receiver's name, or (2) a reference number, identification number, or code that the merchant uses to identify a particular transaction or customer. (Note: When a reference number, identification number, or code is used to identify the transaction or customer, it should be uniquely related to the individual or transaction. A generic description is not an acceptable means to identify the Receiver or transaction.)

### 3. RETURN OF POINT-OF-PURCHASE ENTRIES

ODFIs should be aware that POP entries, like other ACH transactions, may be returned for a variety of reasons in accordance with the return time frames prescribed by the *NACHA Operating Rules*. ODFIs should be aware, however, that RDFIs can not return POP entries based on a consumer's claim that his authorization had been revoked (R07) since these are single entry transactions where the Originator will generally process the transactions immediately after the purchase is complete. As appropriate, however, the consumer may (1) request his RDFI to stop the payment of a POP entry (Return Reason Code R08), (2) request his RDFI to return an unauthorized/improper POP entry (Return Reason Code R10, R37), or (3) go directly to the Originator (merchant) to request a refund of the transaction.

ODFIs should also be aware that, because the Point of Purchase application does not require the Originator to capture the consumer's name for inclusion on the POP entry, the RDFI must rely on the ODFI's warranty regarding the validity of the consumer's account number for posting purposes. The RDFI, therefore, may not return a point-of-purchase entry using Return Reason Codes R03 or R17 solely because the consumer's name is not included in the Individual Name Field of the entry. The RDFI may, however, use these Return Reason Codes if otherwise appropriate.

ODFIs should ensure that their Originators are prepared to handle returned POP entries and have established procedures that enable them to identify and contact the Receiver relating to any unpaid debit entry. Because the Originator does not retain the consumer's voided check as a source document, and because the consumer's name and address are not included as part of the MICR-capture process, ODFIs should ensure that their Originators understand the need to develop alternative methods for retaining information necessary to identify the consumer for whom a point-of-purchase debit entry has been returned. ODFIs must ensure that their Originators have established policies and practices to ensure that POP entries that are returned because of insufficient or uncollected funds are not reinitiated more than two times following the return of the original entry.

### 4. STOP PAYMENTS ON POINT-OF-PURCHASE ENTRIES

ODFIs should be aware that, in general, the *NACHA Operating Rules* regarding ACH stop payments require consumers to place a stop payment order on a debit at least three banking days prior to the scheduled date of the entry. Because the merchant will generally process POP transactions quickly, consumers are unlikely to be able to meet the three-day advance notice requirement for placing a stop payment order on such entries. To ensure that a consumer has the ability to place a stop payment order on a POP entry, the *NACHA Operating Rules* require a consumer to provide a stop payment order to his financial institution in such a time and manner that allows the RDFI a reasonable opportunity to act on the stop payment order prior to acting on the debit entry.

### E. RESPONSIBILITIES OF RDFIs

### 1. RETURN OF POINT-OF-PURCHASE ENTRIES

POP entries may be returned for a variety of reasons in accordance with the requirements of the *NACHA Operating Rules*. With the exception of entries for which the consumer claims there was no authorization, the source document used for the POP entry is improper, and the source document to which the POP entry relates has also been presented for payment, the RDFI must transmit POP entry returns by its ACH Operator's deposit deadline for the return entry to be made available to the ODFI no later than the opening of business on the second banking day following the settlement date of the original entry. For an entry that the consumer claims is unauthorized/improper (R10) or (R37), the RDFI must transmit the return by its ACH Operator's deposit deadline for the return to be made available to the ODFI no later than the opening of business on the banking day following the sixtieth calendar day following the settlement date of the original entry. For the return of unauthorized entries, the RDFI must obtain a written statement under penalty of perjury from the consumer stating that the entry was not authorized. (Note: For

LML-EP-055768

additional information on written statements under penalty of perjury, refer to the RDFIs chapter within Section II of these Guidelines.)

RDFIs must be aware that, under certain circumstances, specific Return Reason Codes may not be used with POP entries:

- **Return Reason Code R03** (*No Account/Unable to Locate Account*) **and Return Reason Code R17** (*File Record Edit Criteria*)

  RDFIs must be aware that, for transactions initiated at the point-of-purchase, it is difficult for the Originator to capture the Receiver's name in an automated fashion. For this reason, the Originator is not required to include the individual's name in the POP entry, and the RDFI must rely on the ODFI's warranty regarding the validity of the consumer's account number for posting purposes.

  The RDFI can not return POP entries solely because they lack an Individual Name. In general, typical Return Reason Codes used to return entries for which there is no Individual Name (e.g., R03, R17) may not be used by the RDFI to return POP entries under these circumstances. These Return Reason Codes may, however, be used with POP entries for other valid reasons.

- **Return Reason Code R07** (*Authorization Revoked by Customer*)

  If appropriate, the consumer may (1) request his RDFI to stop the payment of a POP entry (Return Reason Code R08); (2) request his RDFI to return an unauthorized/improper point-of-purchase entry using Return Reason Code R10 or R37 (Reminder: the RDFI must obtain a written statement under penalty of perjury when using these Return Reason Codes); or (3) go directly to the Originator (merchant or biller) to request a refund for the transaction.

  RDFIs must be aware that they are prohibited from returning POP entries using Return Reason Code R07 (Authorization Revoked by Customer) based on a consumer's claim that his authorization had been revoked since these are single entry payments where the Originator will generally process the transactions immediately after the purchase is complete.

## 2. STOP PAYMENTS ON POINT-OF-PURCHASE ENTRIES

In general, the *NACHA Operating Rules* regarding ACH stop payments require consumers to place a stop payment order on a debit at least three banking days prior to the scheduled date of the entry. Because the merchant will generally process POP transactions quickly, consumers are unlikely to be able to meet the three-day advance

notice requirement for placing a stop payment order on such entries. To ensure that a consumer has the ability to place a stop payment order on a POP entry, the *NACHA Operating Rules* require a consumer to provide a stop payment order to his financial institution in such a time and manner that allows the RDFI a reasonable opportunity to act on the stop payment order prior to acting on the debit entry.

## 3. STATEMENT REQUIREMENTS

RDFIs are required to provide the Check Serial Number of the consumer's source document on the consumer's monthly bank account statement for all POP entries. The RDFI must also provide on the statement the Terminal City and the Terminal State in which the POP entry was originated. RDFIs need to ensure that this information is provided on the consumer's statement.

Note: The Federal Reserve Board's Official Staff Commentary on Regulation E requires the inclusion of terminal location information on the consumer's monthly bank account statement. When a POS terminal is used to capture data electronically to initiate an EFT, the Regulation E Official Staff Commentary considers the POS terminal to be an electronic terminal, even if no access device is used, such as when a check is used to capture information to initiate a one-time EFT. As a result, when a check is used as a source document at the point of purchase and run through a terminal to read the MICR information, as is the case with POP entries, it is necessary to ensure compliance with Regulation E's requirements for electronic terminals, which mandate the inclusion of the terminal location on the monthly bank statement.

# SECTION IV
# SPECIAL TOPICS

# CHAPTER XIII
# ACCOUNTS RECEIVABLE
# ENTRIES

## A. INTRODUCTION

Accounts Receivable Entries (ARC) are Single-Entry debits used by Originators for the conversion of a consumer check received via the U.S. mail or at a dropbox location for the payment of goods or services. This application enhances the efficiency of the ACH Network by expanding the scope of consumer electronic check activity.

LML-EP-055769

# EXHIBIT   4

7/28/2005 Larimer, Jane

1        UNITED STATES DISTRICT COURT

2        EASTERN DISTRICT OF VIRGINIA

3

4    -----------------------------------X

5    LML PATENT CORP.,                    :

6            v.                           : Civil Action No.:

7    TELECHECK SERVICES, INC.,            : 04-858-SLR

8    ELECTRONIC CLEARING HOUSE, INC.,     : District of

9    XPRESSCHEX, INC., and NOVA           : Delaware

10   INFORMATION SYSTEMS, INC.,           :

11           Defendants.                  :

12   -----------------------------------X

13

14       Videotaped Deposition of JANE E. LARIMER

15               McLean, Virginia

16            Thursday, July 28, 2005

17                 10:00 a.m.

18

19

20

21

22   Job No.:  22-60395

23   Pages 1 - 202

24   Reported by:  Ellen L. Scheg, RPR

25

1    after this document that indicate the date of a

2    notebook source from which it came.

3            But I leave that to you as to how clear

4    you want the record to be.

5        Q    Is --

6        A    Early.  Probably '97 or '98.

7        Q    Is this -- is the point of sale with the

8    Consumer As Keeper transaction also referred to as a

9    POP transaction?

10       A    Today?

11       Q    Today.

12       A    Today it is.

13       Q    At what point did that become a POP

14   transaction?

15       A    I believe 2001.

16       Q    Prior to that what was it known as?

17           MR. MARSDEN, JR.:  Objection.  Lack of

18   foundation.

19       A    We had an interim PPD rule.  So it was one

20   class of a PPD transaction that was from an interim

21   rule that went from the effective date of the rule

22   until software changes could be made to identify them

23   as POP transactions.

24       How long that interim rule was in place, probably

25   approximately a year, may -- and before that there

7/28/2005 Larimer, Jane

1    were -- if they were flowing through the Network they

2    were going through at PPDs.

3         Q    Okay.  If you could turn to NACHA 4897

4    please.  The middle slide - and again I would like to

5    limit this to the '97, '98 timeframe that you believe

6    that these slides may have been created - do those

7    rules appear to be the rules that are applicable to

8    the ACH transactions at that time?

9         A    Yes.

10        Q    If you then move to Page 4902 still on PX

11   2004, on the bottom is a check conversion at the point

12   of sale definition.

13        Was that definition correct in the '97/'98

14   timeframe?

15             MR. MARSDEN, JR.:  Objection.  Lack of

16   foundation.

17        A    Yes.

18        Q    Has that definition changed since the

19   '97/'98 timeframe?

20        A    Not substantively.

21        Q    Okay.  If you could turn to the next page,

22   please which is NACHA 4903 still on PX 2004.

23        The top slide, POP Rules Amendment/Legal

24   Framework.  Do you see that?

25        A    Yes.

7/28/2005 Larimer, Jane

1    Q    Is the information there contained there
2    correct in the '97/'98 timeframe?
3    A    Yes.
4    Q    Is it correct as of today?
5    A    Yes.
6    Q    The second bullet point says, "The check is
7    used as a source document at the point of sale."  What
8    does it mean by "source document"?
9    A    It's not a check.  It's not a negotiable
10   instrument.  It hasn't been negotiated.
11       If this thing was completely filled out and
12   tendered and endorsed it would fall under Negotiable
13   Instruments Law not Regulation E.
14   Q    And when you say "Negotiable Instruments
15   Law", you mean the UCC?
16   A    Yes, Articles 3 and 4.  At the time this was
17   very important because all of these electronic check
18   applications had never -- there was -- we were trying
19   to create a legal foundation.  And I -- people would
20   say this is like a law school exam question.  How do
21   you take something that had been in Check Law, or the
22   thing that we think of always as the Check Law and
23   create an electronic payment out of it?
24       So coming up with a terminology of Source
25   Document was very important because you didn't want

7/28/2005 Larimer, Jane

1    you know all of the baggage that goes along with a

2    truncated check with Negotiable Instruments Law, with

3    Uniform Commercial Code. All of that baggage you

4    didn't want attendant to this kind of a transaction.

5        Another point that was very important is that the

6    check is being returned to the customer. Very

7    important because under Regulation E you wanted to

8    void that check, you wanted to return it to the

9    customer and not have the check used again and again,

10   you know, keep giving it back as payment because it

11   could have fallen under the definition of Access

12   Device under Regulation E.

13       So we were really trying to cobble together a

14   legal framework to create these transactions.

15       Q    And I think you said the check is never

16   negotiated?

17       A    Yes.

18       Q    What do you mean by it's never negotiated?

19       A    If the check is negotiated then it falls

20   under Uniform Commercial Codes Article 3 and 4.

21       Negotiation usually takes place when a check is

22   completed, filled out and signed and then tendered for

23   payment.

24       Now, some folks would say it would also have to

25   then be endorsed to create the full negotiation so the

7/28/2005 Larimer, Jane

1    endorsement would occur.

2        Q    When you say "endorse", what do you mean by

3    "endorsed"?

4        A    When the payee signs the back of the check.

5        Q    So for example if I went to a store and I

6    wanted to purchase something, I would fill the check

7    out and hand it to the merchant and then the merchant

8    would sign their name to the back, is that what you

9    mean by endorsement?

10       A    Or stamp it and deposit it.

11       Q    Or stamp it and deposit it.  Okay.

12           In the '97/'98 timeframe, was it a rule for the

13   financial institutions and ACH operators that the POP

14   transactions had to use the check as a Source Document

15   only?

16               MR. MARSDEN, JR.:  Objection.  Vague,

17   lack of foundation.

18       A    In the '97/'98 timeframe we did not have a

19   POP rule.

20       Q    So could --

21       A    We had a Pilot --

22       Q    Okay.

23       A    -- that was running and I - I don't know the

24   exact dates of the Pilot - whereby Pilot participants

25   signed Pilot Operating Rules.

7/28/2005 Larimer, Jane

1       And the Pilot Operating Rules at that time I

2   believe required the check to be voided and returned.

3   I believe that's what the Pilot participants agreed to

4   do that.

5       We didn't have a legal foundation in the

6   Operating Rules at that time to do it outside of the

7   Pilot -- to convert checks outside of the Pilot.

8       Q    But they were contractually obligated to use

9   the checks as a Source Document only.

10      A    Correct.

11      Q    And as part of this contractual obligation,

12  were the financial institutions or members of this

13  Pilot required to have any for example originators or

14  merchants contractually obligated to also use it as a

15  Source Document only?

16             MR. MARSDEN, JR.:  Objection.  Vague,

17  lack of foundation as to only.

18      A    The Consumer's Keeper Model also envisioned

19  the check being returned -- the Source Document being

20  returned to the consumer at the point of sale.  That's

21  what distinguishes it between that and the Merchant Is

22  Keeper Model.

23      The Merchant Is Keeper Model would have been

24  where the merchant would have kept the check.  And

25  there was big discussions about whether or not we

1    obligations as well.

2        So the assumption would be that they would push

3    those out to the folks who are actually running the

4    Pilot, the merchants.

5        Q    And are those warranties and obligations in

6    place today in the Operating Rules?

7        A    There is an originator obligation that they

8    void the check and return it to the consumer.

9        Q    Is there an obligation that the check only

10   be used as a Source Document?

11       A    I don't understand the question.

12       Q    Well, you said that the check needs to be

13   voided and returned to the consumer.

14       A    Well, okay.  Whenever we say check in the

15   POP lingo I mean Source Document.

16       Q    Okay.

17       A    So the check can be -- that thing with which

18   we strip the MICR information - the Source Document -

19   can be filled out or blank, but it's always voided and

20   returned.

21       And we call it a Source Document because it's not

22   going to be collected through the check collection

23   system.

24       Q    And so that's synonymous with never being

25   negotiated.

7/28/2005 Larimer, Jane

```
 1              MR. MARSDEN, JR.:  Objection.

 2       A    Correct.

 3       Q    And I think you mentioned it doesn't matter

 4  if it's filled out or not, is that correct?

 5       A    Correct.

 6       Q    Why not?

 7       A    Because it's voided and returned to the

 8  customer.

 9       Q    So for example if the customer went to a

10  merchant and put the wrong merchant's name on a check,

11  it doesn't make any difference because the check is

12  voided and returned as never a negotiable instrument

13  anyway?

14       A    Correct.  One of the -- in the best

15  world -- in the perfect world, consumers who do this

16  more than once, they hand a blank check and it's

17  voided and returned to them.

18       Because merchant don't want that time at checkout

19  to be spent filling out a check.  This is to hopefully

20  keep traffic flowing through the checkout.

21       But what we knew was is that consumers, until

22  they learned that, might continue to fill out that

23  information until they received it back and realized

24  they didn't have to do that any more.

25       So we didn't want it preclude the use of those
```

7/28/2005 Larimer, Jane

1    checks, hand that back to the consumer and say no, but

2    what I really need is the blank check.

3        Q    Can the merchant keep any part of the check?

4                MR. MARSDEN, JR.:  Objection.  Vague,

5    lack of foundation.

6        A    They can keep an image of the check, but

7    that's not -- so I guess the answer is no, they have

8    to give back the whole check, but they could keep an

9    image of it if they desired to.

10       Q    What is the purpose of keeping an image?

11       A    An image would be kept to keep name and

12   address information in case the ACH entry is returned

13   NSF, or in case the ACH entry is returned as an

14   administrative return.

15       Oftentimes -- or sometimes, when the MICR

16   information from the check or the Source Document is

17   taken, it has a routing and trans -- the routing,

18   transit number, the check number are to access

19   checking accounts.

20       So at credit unions or at small community banks

21   an ACH transaction might reject because it can't

22   access an ACH account, it can only access the DDA.

23       So sometimes those reject and so the retailer may

24   want to have an image so they can, you know, contact

25   the consumer and say we need a different form of

7/28/2005 Larimer, Jane

1    payment.

2        That's why an image usually -- or at least at the

3    beginning, this is why that was kept at that time.

4        One of the big legal questions that came up with

5    the Consumer's Keeper Model is the fact that a

6    merchant wouldn't have a negotiable instrument to

7    enforce on.

8        So if you have a consumer who, you know, the

9    check comes back and it bounces, the question was can

10   you collect this under Bad Check Law or Bad Debt Law

11   and that makes a big difference to merchants.

12       And with the Consumer's Keeper Model, what you

13   have is a written authorization you don't have a check

14   anymore.  So it falls under Bad Debt Law, which is

15   more difficult from what I understand - I'm not a

16   collections attorney - but it's more difficult to

17   collect on bad debt than it is a bad check.

18       But a lot of times all they would have is this

19   written receipt so they wanted to have an image so

20   they would have a name and address to go back to

21   collect that bad debt from the consumer.

22       Q    But the merchant couldn't say print off that

23   image and go up to that customer and say here's your

24   check -- you know, present that check to the

25   customer's bank and say pay me on this check, correct?

7/28/2005 Larimer, Jane

1          MR. MARSDEN, JR.: Objection.  Vague,

2     lack of foundation, hypothetical.

3          A    The NACHA Operating Rules govern the ACH

4     Network, not the Check Network.  So the purpose of

5     our -- you know, we don't speak to -- at least with

6     POP, we don't speak to an image at all.

7          What retailers or anybody else did with their

8     image, as long as it didn't go through the ACH

9     Network, that wasn't really relevant to us.

10         I don't know if they were using that -- if they

11    had a bad debt, if they were creating an image

12    replacement document and trying to collect it on the

13    check side.  I don't know.

14         Q    If a transaction actually proceeded through

15    the ACH network, did the NACHA Guidelines prohibit a

16    merchant from printing off a copy of an image and

17    presenting that to a bank for payment?

18         MR. MARSDEN, JR.: Objection.  Asked

19    and answered.

20         A    The POP rules -- this isn't a check.  The

21    POP rules I believe just speak -- in the ARC, in the

22    accounts receivable, where you have -- we have a

23    prohibition against collecting twice on the same debt.

24         What would happen in the ACH world is if that

25    check actually was collected and the ACH was paid, the

7/28/2005 Larimer, Jane

1    consumer would go into their financial institution,

2    the ACH would be returned.  Because it's much easier

3    to return a transaction through the ACH Network than

4    it is through the Check Network.

5        Q    Does the taking of an image of the check

6    change the check from being a Source Document in any

7    way?

8                MR. MARSDEN, JR.:  Objection.  Vague,

9    lack of foundation.

10       A    We don't -- the Source Document is handed to

11   the merchant and handed back.  We don't speak to the

12   image at all.

13       Q    So if an image is taken of a check at the

14   merchant, that would not necessarily make that check a

15   negotiable instrument if it's handed back in the

16   process of an ACH transaction.

17       A    It would not make the Source Document a

18   negotiable instrument.

19               MR. CHARFOOS:  Take a break?

20               MR. DUNN:  The witness wants to take a

21   break.

22               MR. CHARFOOS:  Absolutely.

23               VIDEOGRAPHER:  We are going off the

24   record.  The time is 11:16 a.m.

25   (Recess taken.)

7/28/2005 Larimer, Jane

1      We're now talking, I assume, in a 1999

2  and later timeframe when there was a POP rule?

3          MR. CHARFOOS:  Correct.

4      Q    But for a POP transaction, once the check is

5  negotiated you can't do a POP transaction --

6      A    Correct.

7      Q    -- because it doesn't fall within Reg E and

8  it wouldn't fall --

9      A    You would be violating the rules.

10     Q    And those are the Federal rules?

11     A    No.  You would be violating the NACHA

12  Operating Rules.  Regulation E just wouldn't apply to

13  it.

14     Q    Okay.  And if you turn to NOVA 13763, the

15  top slide.  Again, you're reiterating in this

16  presentation that the check is used as a Source

17  Document, it's returned to the customers and it's

18  never negotiated, is that correct?

19     A    Correct.

20          THE WITNESS:  It's good to know

21  somebody is paying attention and taking notes.

22     Q    At any point since the POP Standard Entry

23  Class was adopted, has anybody been able to use the

24  check as a negotiable instrument in a POP transaction?

25          MR. MARSDEN, JR.:  Objection.  Vague,

0063

7/28/2005 Larimer, Jane

1    lack of foundation.

2         A     No.

3         Q     I'm going to hand you what I've marked as PX

4    2006 which for the record is NACHA 20359 through

5    20385.

6              (PX 2006 - NACHA 20359 through 20385 - marked

7    for identification.)

8    BY MR. CHARFOOS:

9         Q     If you could take a moment to look at that.

10   Do you recognize this document?

11        A     Yes.

12        Q     What is this document?

13        A     This is a presentation for a tele seminar.

14        Q     Was this a presentation at least in part

15   that you provided?

16        A     Yes.

17        Q     And was this presentation given in the

18   ordinary course of your business?

19        A     Yes.

20        Q     And were these slides prepared in the

21   ordinary course of your business?

22        A     Yes.

23        Q     If you could turn to NACHA 20362 still on PX

24   2006.

25              The middle slide, the POP legal framework.

**7/28/2005 Larimer, Jane**

1      A    Yes.  Also remember as part of our

2    legal -- the Legal Work Group in the early years, we

3    did have a Federal Reserve Bank, I believe the Retail

4    Payments Office, attorney who participated in those.

5      So he was in the development -- I mean, the big

6    issues with check conversion truncation in the day

7    were legal, so we had the Federal Reserve Bank staff

8    and, as I said, the American Bar Association

9    staff -- I'm sorry, American Banker's Association

10   staff attorney working on this as well.  And we always

11   kept the Division of Consumer and Community Affairs in

12   the loop.

13     Q    So as part of the development of the POP

14   transactions there was an effort to ensure that the

15   check was not used as a negotiable instrument.

16           MR. MARSDEN, JR.:  Objection.  Vague.

17     A    Yes.

18     Q    I'm going to hand you what I'm going to mark

19   as PX 2007 which for the record is NACHA 05190 through

20   5225.

21           (PX 2007 - NACHA 05190 through 5225 - marked for

22   identification.)

23   BY MR. CHARFOOS:

24     Q    I would like to ask you to take a look

25   through that please.

7/28/2005 Larimer, Jane

1          MR. MARSDEN, JR.:  Objection.  Vague,

2    lack of foundation.  For purposes this document, is

3    that the question?

4          A    For purposes of this document, yes.

5          Q    Why do you say for purposes this of

6    document?

7          A    No.  I'm just saying this is how we've

8    chosen to articulate the concept.

9          Q    So NACHA uses consumer bank information to

10   refer to the information contained in the MICR lane,

11   is that what I'm understanding you to say?

12         A    I would say we -- I would call it the

13   information on the MICR line.  I mean, the audience

14   that we're writing to here at the time is we're trying

15   to explain it in a way that folks understand it.

16         Q    Mm-hmm.

17         A    The consumer bank information, generally

18   speaking, is their account number and the check serial

19   number.  I guess you could add the routing and transit

20   number if you wanted.

21         Q    Okay.  And again, in this guide it says

22   that, "the transactions were not considered to be

23   truncated checks and do not fall under the

24   requirements of Check Law or the UCC because, number

25   one, the check is not accepted by the merchant as a