

US005484988A

# United States Patent [19]

## Hills et al.

[11] **Patent Number:** 5,484,988

[45] **Date of Patent:** Jan. 16, 1996

[54] **CHECKWRITING POINT OF SALE SYSTEM**

[75] Inventors: **Robert R. Hills,** St. Augustine, Fla.;
**Henry R. Nichols,** McLean, Va.

[73] Assignee: **Resource Technology Services, Inc.,**
Vienna, Va.

[21] Appl. No.: **257,390**

[22] Filed: **Jun. 9, 1994**

**Related U.S. Application Data**

[63] Continuation of Ser. No. 975,717, Nov. 13, 1992, abandoned.

[51] Int. Cl.⁶ .................................................. G06F 15/30
[52] U.S. Cl. .......................................... 235/379; 235/380
[58] Field of Search ................................... 235/379, 380

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 3,824,544 | 7/1974 | Simjian | 340/147 A |
| 3,845,470 | 10/1974 | Schuller | 340/149 A |
| 4,270,042 | 5/1981 | Case | 235/379 |
| 4,404,649 | 9/1983 | Nunley et al. | 364/900 |
| 4,523,330 | 6/1985 | Cain | 382/7 |
| 4,580,040 | 4/1986 | Granzow et al. | 235/379 |
| 4,617,457 | 10/1986 | Granzow et al. | 235/379 |
| 4,672,377 | 6/1987 | Murphy et al. | 340/825.34 |
| 4,673,802 | 6/1987 | Ohmae et al. | 235/379 |
| 4,678,895 | 7/1987 | Tateisi et al. | 235/379 |
| 4,678,896 | 7/1987 | Carlson et al. | 235/380 |
| 4,743,743 | 5/1988 | Fukatsu | 235/379 |
| 4,810,866 | 3/1989 | Lord, Jr. | 235/379 |
| 4,823,264 | 4/1989 | Deming | 235/379 |
| 4,933,536 | 6/1990 | Lindemann et al. | 235/375 |
| 4,934,772 | 6/1990 | Sakuma et al. | 350/6.5 |
| 5,053,607 | 10/1991 | Carlson et al. | 235/379 |

*Primary Examiner*—Harold Pitts
*Attorney, Agent, or Firm*—Thomas M. Champagne; Jon L. Roberts; Roberts & Associates

[57] **ABSTRACT**

A point of sale system designed to read information from a consumer's check, credit card, or manual input with a subsequent debiting of a consumer's account and crediting a merchant's account for the goods or services provided. Point of sale terminals are designed to accept a form of credit card with a consumer's bank account information encoded thereon or in the alternative to read the MICR number from a consumer's check in order to verify that a consumer has an appropriate balance to conduct the transaction with a given merchant. Thereafter the transaction of that information is transmitted to a central computer system which verifies the consumer's credit worthiness and stores the transaction event information for subsequent bank reconciliation via the ACH network. The invention eliminates the need for paper checks with all bank reconciliation being accomplished electronically.

**20 Claims, 8 Drawing Sheets**



FDC5000159



## FIG. 1



## FIG. 2

FDC5000160



*FIG. 3*

FDC5000161

U.S. Patent          Jan. 16, 1996      Sheet 3 of 8          5,484,988



**FIG. 4**



FIG. 5

FDC5000163

U.S. Patent          Jan. 16, 1996     Sheet 5 of 8          5,484,988



*FIG. 6*



FIG. 7

FDC5000165

**U.S. Patent**     Jan. 16, 1996     Sheet 7 of 8     **5,484,988**

Merchant Name
Street Address
City, ST  Zip
Merchant Acct #

TIME 00:00 _M                              DATE 00/00/00
BANK ACCT. NO. 000000000000
TRANSIT NO. 000000000

SALE AMOUNT                              $ 0,000.00

TERMINAL ID 0000000000

I herewith authorize ChequeMARK Systems to electronically access my designated checking account for the payment of the above referenced purchase.

Name (PRINT) _____

Street _____

City _____ ST_____ Zip _____

Tel. Number: (_____) _____ — _____

**I ACKNOWLEDGE THAT RETURN FEES WILL BE IMPOSED SHOULD MY PAYMENT BE DISHONORED AND UNDERSTAND THAT IT IS UNLAWFUL TO AUTHORIZE PAYMENTS FOR WHICH ADEQUATE MONIES ARE NOT AVAILABLE WITHIN MY ACCOUNT.**

X_____
   Authorizing Signature

## FIG. 8

FDC5000166

Merchant Name
Street Address
City, ST  Zip
Merchant Acct #

CUSTOMER BANKING INFORMATION:

BANK ACCT. NO. _____

TRANSIT NO. _____

SALE AMOUNT . . . . . . . . . . . . . . . . . . $ _____

I herewith authorize ChequeMARK Systems to electronically access my designated checking account for the payment of the above referenced purchase amount. I acknowledge that sufficient funds are available for the payment of this sale.

Name (PRINT) _____
Street _____
City _____ ST _____ Zip _____
Tel. Number: (_____) _____ — _____

I FURTHER ACKNOWLEDGE THAT RETURN FEES WILL BE IMPOSED SHOULD MY PAYMENT BE DISHONORED AND UNDERSTAND THAT IT IS UNLAWFUL TO AUTHORIZE PAYMENTS FOR WHICH ADEQUATE MONIES ARE NOT AVAILABLE WITHIN MY ACCOUNT.

X_____
Authorizing Signature

## FIG. 9

FDC5000167

5,484,988

1

# CHECKWRITING POINT OF SALE SYSTEM

## RELATED APPLICATION

This application is a continuation of Ser. No. 07/975,717 filed Nov. 13, 1992, now abandoned.

## FIELD OF THE INVENTION

This invention relates to the field of Point-of-Sale systems and more particularly to the integration and processing of purchases whereby a check is used as the basic source of identification of the individual and of the individual's bank and whereby the bank account is debited.

## Background Art

Numerous devices exist for processing checks. For example, U.S. Pat. No. 4,933,536 to Lindemann, et al., describes a check processing device which is used together with a Point-of-Sale terminal. This particular device involves copying and taking a picture of an individual whereby a dishonored check could then be traced to the person who has offered it.

U.S. Pat. No. 4,810,866 to Lloyd, Jr., describes a check validation system again located together with a Point-of-Sale system for imprinting and otherwise physically dealing with a check.

Other systems also deal an apparatus for handling checks at a point of sale. For example, U.S. Pat. No. 4,743,743 to Fukatsu describes one such transaction apparatus where a check is examined by a reader. U.S. Pat. No. 4,672,377 to Murphy, et al. describes a check authorization system wherein a check is imprinted with a bar code and information concerning customers which are stored in a database. U.S. Pat. No. 3,845,470 to Schuller discloses a vending system using a modified form of a check which is imprinted with identification codes, when someone attempts to use the check in purchasing goods and services, a vending operation will not place the order if information associated with the check is not valid in a particular database.

Other check-based financial systems have also been the subject of invention. U.S. Pat. No. 4,617,457 addresses an ATM or automatic teller machine form of cashing checks. Such systems create a picture of the check involved and also involves checking against a specialized database to insure that the check is a "valid" one (see also U.S. Pat. No. 4,580,040 to Granzow et al.).

Another generic category of financial systems deals with methods of handling the financial transactions apart from the physical handling of the check itself. For example, U.S. Pat. No. 3,824,544 to Simjian describes a merchant issued "check" which can be used in the purchase of goods and services and upon purchase, a specialized code is evaluated to determine if the check is being validly utilized.

U.S. Pat. No. 4,404,649 to Nunley et al. describes a document processing system which generally discloses a method of reading checks for processing a wide variety of financial documents.

U.S. Pat. No. 4,523,330 to Caine also describes a method for processing financial documents which systems also includes a Point-of-Sale terminal for generating image data from checks as they are being processed. This patent is drawn principally to the actual terminal itself.

2

U.S. Pat. No. 4,673,802 to Ohmae et al. describes a central processing system having stored data relating to the accounts of users. Users are approved or disapproved at the Point-of-Sale based upon information in the database.

U.S. Patent No. 4,270,042 to Case discloses a point of sale system that requires a consumer to prepay a sum of money into a special account that is accessed only by the system. This amount is inscribed on the card, and when a transaction is made using the system, the amount of the transaction is punched out of a designated area on the card. This amount, along with a signature and other information, is supplied on a draft negotiable instrument, which is given to the merchant at the time of the transaction. Thus, the Case system does away with the use of bank checks in effecting the transaction, but requires the use of specialized prepaid draft negotiable instruments that must be surrendered to the merchant.

U.S. Patent No. 4,823,264 to Deming discloses a home banking system that can be used to transfer funds to different payees in satisfaction of debts incurred through previous purchases, use of utilities, etc. The system is consumer driven; that is, it is contemplated for use by the payor on a home personal computer. While the Deming system does away with the use of bank checks, account and other information must be keyed into the system. The Deming system cannot be used to read account and other information directly from an ordinary bank check and has no use for bank checks as instruments other than negotiable paper. Further, the Deming system cannot be used to transfer funds at the time of purchase and is not workable at the point of sale; the system can only be used to pay debts that have been incurred in the past and have accumulated.

Finally, U.S. Pat. No. 4,678,896 to Carlson et al. describes a Point-of-Sale system whereby an apparatus is provided to secure the processing and imprinting of checks.

All of these above patents deal with the specific problem of how to accept a check from a customer for the purchase of goods and services. They do not in any way address the subsequent processing of checks nor do they address the process by which checks are cleared through the normal automatic check handling clearinghouse operations that exist in the financial world. Thus, the interaction of these systems with the automated clearing house ("ACH") process is not addressed in any way. This is particularly important since if any Point-of-Sale check handling system is to interact with the ACH mechanism it must adhere to that processing scheme and must lend itself to use with a processing scheme.

Further, some of the currently used systems described above require the use of a bank check as a negotiable instrument which must be surrendered to a merchant. Some of the systems do away with the use of a bank check altogether, but require a debit card or a specialized draft instrument to be used only with the particular system. None of these systems completely does away with the need and use for a negotiable draft instrument while using the consumer's bank check for identification and verification only. It is therefore an objective of the present invention to provide such a system.

It is an objective of the present invention to be adaptable for use with the ACH system and to be smoothly incorporated into it. In this fashion, the present invention will immediately be useful for a much wider range of financial transactions above and beyond those contemplated and disclosed in the background references discussed above.

## Summary of the Invention

The present invention comprises a process and apparatus which may be employed for the purpose of effecting pay-

FDC5000168

5,484,988

3

ments for point-of-sale purchases of goods and services paid from consumer funds secured in bank checking or depository accounts. Each sale or "Transaction Event" would be an electronic and "paperless" event thereby eliminating reliance on accepting and processing commercial bank drafts (personal or corporate checks) and the physical handling of those bank drafts thus replacing commercial bank drafts at the point-of-sale.

In contrast to known systems, the present invention is a merchant driven system that can be used to process a transaction at the point of sale and at the time of purchase. The system is intended to be made available to subscribing merchants, businesses, and individuals herein referred to as "system subscribers" wishing to employ the method and apparatus of the present invention for the electronic processing and settlement of consumer purchases. Further, operational parameters of the present invention allow freedom from customary state or other geographically limiting criteria typical when accepting and processing "paper" checks. The system is designed to act with the national authorization and electronic settlement network known as the ACH system.

The system is designed to perform in a fully automated manner enabling each Transaction Event to be processed by a system subscriber as a point-of-sale transaction in the presence of the consumer. When the transaction event is "approved" funds are debited from an authorized consumer account for credit to the system subscriber and electronic settlement by ACH deposits the transaction amount to the subscriber's designated depository account. Authorized access to consumer accounts and credits to system subscriber depository accounts are performed as "Off-Line" transactions by means of Electronic Funds Transfer ("EFT") through the ACH Network or through the Federal Reserve System.

The invention comprises a point-of-sale processing system comprising electronic data processing equipment which allows individual services selections which provide automated, electronic processing from bank checking or depository accounts. It is the objective of the present invention to automate the point-of-sale environment for processing consumer purchases of goods and services which, other than for the system of the present invention, would necessitate the more traditional acceptance and processing of commercial bank drafts (personal and/or corporate checks). Individual Transaction Events are administered under the system of the present invention by initiating a terminal authorization inquiry and continuing through the electronic settlement of funds representing the Transaction Event from the pre-approved consumer banking accounts.

It is a further objective of the present invention to eliminate the need for "paper" checks as an accepted means of consumer payment. In the place of personal and business checks, consumers would be provided free and unrestricted access to funds secured in bank accounts of various types by means of preauthorized electronic events. System subscribers electronically communicate with the data center of the present invention for individual Transaction Event authorizations which, upon reconciliation of a day's activity, result in an EFT by means of the Automated Clearing House accommodating an "Off-Line" debiting of preauthorized consumer Transaction Events from authorized accounts. Thereafter, each system subscriber is credited with the total of all such daily authorized Transaction Events to its designated banking depository account.

The present invention comprises logic which allows the following services which when individually performed or

4

where combined with other services establish a wholly unique processing medium enabling preauthorized access to consumers' checking account or bank depository reserves.

Authorization—This service supports electronic communication from point-of-sale to the system's central computer. The data center stores positive and negative files concerning consumer accounts thereby providing accurate inquiry responses regarding the current posting status of a consumer's banking account and signaling the system subscriber that said account may be reasonably relied upon for consummating a Transaction Event (i.e., an "Approval") or, where listed as delinquent, indicating that the account may not be so relied upon (i.e., a "Denial").

Check Replacement—This capability operates as an extension of Authorization enabling the system subscriber the capability of completing a Transaction Event by electronically logging the sale whereupon a Transaction Event Slip will be printed or manually prepared for consumer execution at the point-of-sale. By execution of the Transaction Event Slip, the consumer authorizes the electronic accessing of funds secured in his/her authorized banking account in lieu of the more traditional method of issuing personal and business checks. Funding settlement to the system subscriber would be effectuated by means of Electronic Funds Transfer via ACH or the Federal Reserve System as opposed to physically processing and transferring checks among banks.

Bank Transaction Card—As part of this invention an "Off-Line" Debit Card is established on which is stored the information relating to the banking account from which funds representing the Transaction Event would be debited for payment to the system subscriber. This information may be stored on the card itself in encrypted or unencrypted form or may be stored in the central computer where access to such information is gained via special control characters or access codes stored on the card. Electronic authorization for withdrawal of funds from the cardholder's account and subsequent electronic settlement procedures remain essentially identical to processing under the Check Replacement service described above. Information relating to the consumer-cardholder and the appropriate banking account to be debited for a Transaction Event will be encoded upon the magnetic stripe portion of the plastic, and terminal-readable, card.

Thus, the overall objective of the present invention is to provide and support an alternate means for consumer payments for goods and services that operates to replace commercial bank drafts in the point-of-sale environment. Simultaneously, the present invention assures consumers greater access to and use of funds in personal or corporate banking accounts. Further, the system provides system subscribers a significantly improved prospect of collecting the underlying monies for Transaction Events, reduced time for the collecting the cash receipts from Transaction Events, and a pronounced lowering of the present cost of cumbersome procedures otherwise mandated by the existing ACH system for accepting and processing commercial bank drafts.

A further objective of the present invention is to significantly reduce the use of checks as negotiable instruments in effecting the purchases of goods or services and to further reduce the consumers reliance on credit cards or cash for transaction events.

Detailed Description of the Preferred Embodiment

The method of the present invention begins with the electronic recording of consumer information at a system

5,484,988

5

subscriber's location using a point-of-sale terminal. This information is obtained in the presence of the consumer and occurs prior to any "Approval" either for the Transaction Event or for the ultimate crediting of the System subscriber's designated depository account. A Transaction Event involves a series of events initiated by a system subscriber's request to sell goods or services by payment from funds secured in a consumer's banking account. First, the consumer's banking account status will be verified through accessing the central computer files of the present invention. Verification that an account may be accessed is established alternatively by means of an encoded, magnetic strip card, or by input of account identification numbers from a consumer's bank account. A more traditional identification of the consumer could also occur including visual examination of driver's license or similar and acceptable picture "ID" however this is not considered part of the present invention.

As an integral portion of each Transaction Event, the system subscriber's location, date and time, and requested sale amount is automatically logged into the system when a system subscriber first accesses the invention. Finally, a Transaction Event Slip ("Sales Slip") will be produced by a printer integral to the point-of-sale terminal and will be executed by the consumer in the amount of the stated purchase with inscribed language defining the Transaction Event and specifically providing consumer authorization for electronic access to his/her banking account. Thereafter, the consumer account will be debited and the proceeds credited to the system subscriber's designated depository account along with all other similar Transaction Events representing the total of the system subscriber's daily activity. Debiting of consumer accounts and settlement deposits to each system subscriber is performed by means of Off-Line electronic funds transfer through and by the ACH or Federal Reserve System.

Equipment Configuration—The present invention can operate with nearly every conceivable point-of-sale equipment system. The central computer system accepts data transmitted from the system subscriber's existing point-of-sale equipment or that which is added to augment service performance. The point of sale terminal of the present invention is implemented in a number of ways, most preferred, however, being activation under a fully automated format. Such a fully automated system generally comprises a dual-port terminal with magnetic stripe reading capabilities interfaced with a logging printer capable of providing individual Transaction Event Slips for consumer execution, and a MICR check reader, optical character recognition ("OCR") equipment, or other device. Variations to this configuration are particularly possible where the system of the present invention is to be activated under a "Split-Dial" feature installed to function within the operational parameters of existing point-of-sale equipment primarily dedicated to bankcard ("credit card") processing. It is contemplated that services may in the future be administered using the present invention with a singular point-of-sale hardware device which, as a function of its design, would incorporate all or most of the service capabilities of an integrated terminal, logging printer, and MICR Check Reading device. The system of the present invention can alternately be interfaced with electronic cash registers now on the market.

Communications links from point-of-sale terminals to the central computer of the present invention will typically be in the form of telephonic network communications over a public switched telephone network ("PSTN") or over other approved networks. Transaction Event verification will occur as a result of point-of-sale terminal access to the

6

central computer's positive and/or negative data files. "Approved" or "Declined" notifications are made to the Point-of-Sale device over the PSTN. All data files will be centrally located and maintained on the invention's central computer data bases. Portions of the data base include but are not limited to third party data files such as the Shared Check Authorization Network ("SCAN") (trademark) data base.

Individual transactions or groupings of transactions are first approved by soliciting an "Authorization" prior to the completion of any requests for electronic funds transfer. To maintain an accurate status of file information for authorizations to subscribing merchants, businesses, and/or individuals, separate data bases are maintained. Current cardholder or banking account status are updated daily and instantly available for point-of-sale inquiry for Transaction Event authorizations. updated daily and are instantly available for point-of-sale inquiry for Transaction Event authorizations.

System subscribers point-of-sale equipment is interfaced to the central computer of the present invention by means of a telephonic network which is able to support communication from a plurality of point-of-sale terminals. Programming of the point-of-sale terminal causes an automatic "Dial-Up" to the central computer and provides an automatic query and response sequence affirming or denying the Transaction Event. The addition of local entry hubs may be installed to better facilitate the speed or economics of communications with the data files. Alternatives to telephonic networks may involve use of satellite communications or enhanced radio transmissions. Similarly, the system's data files and associated Check Replacement Service are contemplated to be responsive to emerging point-of-sale devices intended to seek authorizations by the alternate means of voice pattern recognition, fingerprint identification, retina scan, "smart" chips, and/or consumer or check image and/or signature broadcasting.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1—System overview of the present invention

FIG. 2—The point-of-sale terminal

FIG. 3—The Central Computer System

FIGS. 4–7—The process Data Flow

FIG. 8—Transaction Event Sales Slip

FIG. 9—Manual Transaction Event Sales Slip

DETAILED DESCRIPTION OF THE
PREFERRED EMBODIMENT

Referring to FIG. 1 an overall schematic of the present invention is described. Point-of-sale terminals 300 communicate over normal PSTN telephone lines with a central computer system 302 which in turn communicates with a banking institution 304 for purposes of debiting consumer accounts and crediting system subscriber accounts. The banking institution performs its function via normal automated clearing house ("ACH") transactions 306.

Referring to FIG. 2 the point-of-sale terminal is described. The point-of-sale terminal comprises several different entry means. A key board 310 can be used to input consumer information manually. Alternatively a card reader 312 can be used whereby the magnetic stripe on the card is read by the point-of-sale terminal and finally a check reader 314 is also included to read the MICR number on checks as a substitute for either a specific card or key board input. These various

5,484,988

7

input means provide information to a microprocessor 316 which comprises logic means 318, memory means 320, and communication means 322. The logic means 318 comprises logic which allows the information received from the various input means to be processed and stored in the memory 320. The logic means further drives a display 324 which provides a visual output of the account number of the consumer for verification. The communication means 322 allows the subscriber terminal to communicate with the central computer 302 for purposes of processing the consumer's purchase.

Referring to FIG. 3 the central computer system 329 is described. The central computer system receives input from a plurality of point-of-sale terminals which provide transaction information from a system subscriber and a consumer desiring to purchase goods or services. The central computer system comprises a system subscriber 330 file which is a file of those merchants who have elected to use the present invention for processing purchases. The central system also comprises an approved consumer file 332 which stores the names of those consumers who have already been approved for allowing purchases to take place through the various input means as well as a third party database such as the SCAN (trademark) data base relating to consumer credit. The computer system also comprises a communications means 334. The communication means communicates with other outside third party data bases to allow any consumer that has not been approved by the system to have a rapid check of the status of the consumer's banking account and of whether the consumer has current outstanding returns (i.e. bad checks). Once this SCAN (trademark) or other outside third party data base search is performed and where an approval is given, the approved consumer file 332 is updated with the name of the new approved consumer.

As presently configured the central computer 329 already has a third party database known as the SCAN (trademark) database 333 resident on the central computer. Thus credit worthiness can be checked using this SCAN database. The SCAN (trademark) database is updated daily.

The communication means 334 also communicates with a banking institution 338 to instruct the bank to debit the account of the consumer and credit the account of the system subscriber (merchant) with the amount of the purchase. These transactions then take place via the normal ACH transaction process.

Referring to FIG. 4 the process begins by a consumer presenting a specimen or "blank" check complete with MICR number to the system subscriber (the merchant) 100. The system subscriber next determines if the check meets its appropriate store policy procedures 102, i.e., that the check has appropriate information on the check. If the check does not meet the store policies, it is returned to the consumer 104. If the check does meet appropriate store policies the on-line verification process proceeds 106. The subscriber begins the process by first pressing the appropriate key on a terminal to access the host computer 108. Thereafter the point of sale terminal prompts the system subscriber to enter the appropriate MICR number 110. The system subscriber then enters the appropriate MICR number either manually or by passing the check through a check reader which determines the MICR number 112.

Referring to FIG. 6 the subscriber would verify that the numbers appearing on the terminal match the MICR numbers on the check 114. During the comparison, the subscriber determines that the check number compares accurately 116 to the number displayed on the terminal. If they

8

do compare the verification process proceeds 120. If the check numbers do not compare with that of the terminal the system subscriber clears the terminal and begins the transaction process again 118. If the process is to be reinitiated, the subscriber enters the MICR number into the point of sale terminal 130. Thereafter the system subscriber compares the MICR numbers as before 132. If the MICR numbers compare to the system display 134 the process proceeds. If the numbers do not compare 136 the check is returned to the consumer and the process terminates 137.

Referring to FIG. 5, if the verification process proceeds the terminal next prompts the system subscriber to enter the amount of the sale 122. The subscriber enters the amount of the sale 124 and the terminal thereafter transmits an inquiry to the host data base for verification 126.

The check approval process next takes place 128. If the check is not approved by the central computer the terminal displays a message declining the transaction 140. Thereafter a printer record of the declined transaction is made for purposes of the system subscriber 142 to comply with the Fair Credit Reporting Act and Regulation E of the Board of Governors of the Federal Reserve System.

If the check is approved the terminal displays a message noting the approval 138 and the specimen check is returned to the consumer. The printer further makes a paper record of the transaction 142 and the consumer places any required information on the paper receipt and signs the receipt authorizing the transaction 144.

Referring to FIG. 7, the process description continues. Once the transaction is approved the central computer captures the MICR information and the sale amount and stores that information 146. The central computer subsequently generates a batch message regarding all transaction events for the prior period and transmits all the transaction event information for the day into the ACH network 148.

During the ACH process each checkwriter's account is debited for the exact purchase amount and such an amount is deposited into a system subscriber designated account 150. Thereafter, collected funds for a total day's events are deposited into a subscriber's account 152. The transaction is then complete 154.

How to Use

The present invention will require the establishment and maintenance of three interconnected but separate data files for the purpose of performing access searches. Each data file will be accessible by dial-up procedures operating, in most instances, under "Split Dial" format from a point-of-sale ("POS") terminal device or electronic cash register installed for the primary purpose of bankcard and/or bank draft authorizations. The terminal prompts an operator/user to process one of three optional inquiry types. Any one or all of three primary functions are capable of being performed at a single point-of-sale terminal within the control of the system subscriber. The inquiry types and data base format responses are as follows:

Card Authorization—Having depressed the assigned Split Dial key and thereafter being prompted, the system subscriber "slides" an encoded magnetic stripped transaction card through the point-of-sale terminal and enters the "Sale Amount" requested for authorization. Thereupon, the terminal's dial-up capabilities direct the inquiry to the central computer for authorization against "POSITIVE" file of current cardholders whose accounts were listed in "good standing". Inquiries where such a "Match" are found cause

FDC5000171

5,484,988

9

10

an "Approved" return message from the data file to the
inquiring POS terminal. Conversely, a "No-Match" to
inquiry would result in a "Declined" notice to the POS
terminal. An uploading mode of the present invention causes
forwarding of daily status notifications to the central data
files activating new cardholder accounts in the "POSITIVE"
cardholder file or submitting corrective entries to delete
delinquent or terminated accounts.

Check Authorization—Having depressed the assigned
Split Dial key and thereafter being prompted, the system
subscriber manually enters account numbers from a personal
or business check or, where fully automated, enters a speci-
men check through a MICR Check Reader device interfaced
with the terminal, whereupon the terminal's screen would
display the check's numbers, and hence the account number,
for verification. Thereafter, the operator would enter the
"Sale Amount" requested for authorization. The terminal's
dial-up capabilities then direct the inquiry to the computer
data file center for authorization first against the "POSI-
TIVE" file of "prenoted" bank/checking account numbers
whose accounts were listed in "good standing". A successful
"Match" to an inquiry would result in an "Approved" notice
from the data file to the inquiring terminal. A "No-Match" to
inquiry would not, however, immediately result in a
"Declined" response. Each inquiry preliminarily resulting in
a No-Match would be instantly forwarded/"rolled" to the
third data file preceding any return notice to the inquiring
terminal. This third file is anticipated to be the Shared Check
Authorization Network ("SCAN") a negative data file data
base maintained in the system computer data file center.
Referrals to SCAN or any other positive or negative data
files, enable potential acceptance of Transaction Events
involving consumers "Unknown" to the invention's propri-
etary, "POSITIVE" files. A "Match" on the SCAN "NEGA-
TIVE" file would result in a "Declined" notice; a "No-
Match" would conversely send notification to the inquiring
POS terminal of an "Approved" event. Of significant impor-
tance, the bank/checking account information for each such
"Unknown" consumer's transaction would, subsequent to a
SCAN "Approved" notice, be posted to the invention's
"POSITIVE" file and prenoted through the ACH ("Auto-
mated Clearing House") for future Transaction Events. The
invention, presumably in an automated mode, is capable of
uploading daily corrections to the POSITIVE data file
including notices of new accounts approved through SCAN
(trademark) and deletions where settlement for consumer
checking account events, initially approved, were subse-
quently dishonored. The SCAN data base is similarly
uploaded with daily activity status corrections.

Check Replacement Service—Inquiries initiated as Check
Replacement requests function in nearly an identical manner
as that of Check Authorization. Records for such events,
when culminating in "Approved" notices, are separately
preserved. Check Replacement inquiries are processed first
through the system's "POSITIVE" data file and, where no
match is found, proceed to the SCAN data file or other data
base file prior to transmitting an "Approved" or "Declined"
notice to the inquiring POS terminal. A Match in the system
data file indicates a consumer-user whose account was in
"good standing" and would not be required to "roll" to
SCAN. Check Replacement events are reported to and
stored by the computer data file center under a file classi-
fication identifying the transaction as a Check Replacement
Service. The total of daily, approved Transaction Events are
"checkless" sales whereby the service subscribing merchant
has submitted requests for electronic ACH settlement for all
preauthorized consumer purchases. No commercial bank

note ("Paper Check") is accepted or processed by the service
subscriber. In each Transaction Event, a Consumer, at the
point-of-sale, has executed an electronic access ("Off-Line
Debit") authority "Sales Slip" which is automatically printed
upon a terminal's receipt of an "Approved" notice.

All terminal programming and all prompt strings for
MICR Check Reader interfacing are stored in the POS
terminal and the computer center of the present invention
controls interactions between the plurality of terminals and
the central system. The following modules are presented.

Programming for MICR/Terminal Interface—system sub-
scriber locations to be activated with the present invention
must possess or acquire a terminal. Those utilizing or being
upgraded to terminals such as a Tranz (trademark) 330 or
other terminals with interface capabilities with the check
reader for all suitable point-of-sale terminals.

The preferred format for terminal operations is generated
from a singular split dial key. Thereafter, the "prompt string"
would proceed in a manner such as i) "Card=1"; "Check=2"
requiring operator selection; then, where selecting a check-
ing account inquiry ii) the operator would respond to a
secondary prompt of "Auth=1"; "Replace=2". These entry
selections precede the magnetic stripe "reading" of a card/
submittal or a check through the MICR (Account Identifi-
cation), the entry of the requested sale amount, and the
terminal's dial-up for authorization against the computer
data file center.

The MICR interface results in the transmittal of a query
for data center approval of the entire ABA/Transit and
personal or corporate checking account numbers. Instances
where printed checks add the individual check's number to
the end of the account number can be "dropped" by Check
Reader switch settings. Subsequent to a terminal's receipt of
the MICR number string but prior to the operator's entry of
the requested sale amount and authorization dial-up, a
verification prompt "flashing" the ABA and account num-
bers must be displayed on the terminal's screen requiring the
operator to depress "Enter" to proceed, if correct, or "Clear",
if incorrect and thereby enabling the terminal operator to
resubmit the specimen check through the MICR Check
Reader. It is important to note that account information may
be entered manually as well at the point of sale with the other
financial advantages of the present invention still in effect.

The computer data file center receives and processes
Transaction Event authorization requests utilizing the entire
MICR string for accurate, error-free identification of both
the consumer bank and a specific checking or depository
account to participate in a sale. ACH settlement criteria
mandate exact recall for the bank and checking account
numbers to properly complete any debit request. This inven-
tion conforms to each and every requirement of the ACH
transaction regulations.

Each Transaction Event is completed with the logging
printer generation of a Transaction Event ("Sales") Slip for
each "Approved" authorization inquiry processed (FIG. 8).
Alternatively, a manually created transaction event slip can
also be prepared (FIG. 9). Each such Transaction Event Slip
must be exacting in its retention of account numbers and the
sale amount enabling both the consumer and system sub-
scriber to be provided "hard copy" receipts of the event.
Also included would be a clear printing of the transaction
type; "Bank Card", "Check Authorization", or "Check
Replacement". Authorization language is printed immedi-
ately preceding the consumer's signature line specifically
authorizing electronic access in payment of the requested
transaction sale amount.

5,484,988

11

In addition to the primary functions for POS terminal programming and MICR Check Reader interface, each Point-of-Sale terminal location is capable of generating printed summations of daily activity. These reports list and separately total each authorization/service type, whether produced as a singular report or as the result of multiple terminal "closeout" procedures.

Instances will arise where either the Bank Card or Check Replacement Service were previously authorized Transaction Events will require the operational equivalent of a bankcard "Void" or "Credit" notation. The methodology will be available for Split Dial messages to the computer data file center of a post-authorization "Error" or "Transaction Cancellation" notice. The "Cancel" procedure is instituted by depressing for example the "3" key (i.e. "Cancel=3"). By so doing, the system subscriber may cancel a previously approved and logged event. This Transaction Event which was recorded on the data files and reported on the service subscriber's daily Activity Summation Report, thereafter carries an offsetting, "Flagged" cancellation notice

Summary

A flexible purchase transaction system is described which precisely fits within existing ACH procedures for checking account events for processing of pre-authorized electronic debits as a replacement for commercial bank drafts (paper checks). The main advantage to the proposed invention is the fact that a truly paperless transaction may occur. Departures from the proposed system especially with respect to the Point-of-Sale terminals will be apparent to those skilled in the art without departing from the spirit of the invention as described.

We claim:

1. A checkwriting point of sale system comprising:

a point of sale terminal adapted to receive consumer bank account information from any bank check;

a central computer system;

first communications means integral to said point of sale terminal for electronically communicating with the central computer system;

memory means integral to said point of sale terminal for temporarily storing the consumer bank account information;

the central computer system having second communication means for receiving information from a plurality of said point of sale terminals;

the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the bank check as a negotiable instrument.

2. The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further includes means for reading magnetic ink character recognition numbers appearing on a consumer check for the sole purpose of identifying and reading the consumer bank account information.

3. The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further comprises an alphanumeric display means for receiving said consumer bank account information from the memory means and for displaying the consumer bank account information.

12

4. The checkwriting point of sale system according to claim 1 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip.

5. The checkwriting point of sale system according to claim 1 further comprising a resident third party database wherein consumer banking account status information is stored, the consumer banking account status information being used for verification of consumer banking account status.

6. The checkwriting point of sale system according to claim 1 wherein the central computer system further comprises a system subscriber database, the system subscriber database comprising information regarding merchants and service providers that are authorized to use the checkwriting point of sale system.

7. The checkwriting point of sale system according to claim 6 wherein the central computer system further comprises a database comprising information regarding consumers whose consumer banking account status is not verified as bad.

8. A checkwriting point of sale process comprising:

a) presenting any bank check specimen to a point of sale terminal located at a merchant or service provider,

b) reading the magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument,

c) storing the consumer bank account information obtained from the check and verifying that account numbers were accurately read at the point of sale terminal,

d) providing transaction event information to the point of sale terminal,

e) transmitting the transaction event information and consumer bank account information to a central computer system,

f) storing the transaction event information and consumer banking account information, and

g) subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations.

9. A checkwriting point of sale system comprising:

a point of sale terminal adapted to receive consumer bank account information;

a central computer system;

first communications means integral to said point of sale terminal for electronically communicating with the central computer system; and

memory means integral to said point of sale terminal for temporarily storing the consumer bank account information;

the point of sale terminal comprising reading means for reading magnetic ink character recognition numbers on any consumer bank check for the sole purpose of eliciting consumer bank account information;

the central computer system having second communication means for receiving information from a plurality of said point of sale terminals;

the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using a bank check as a negotiable instrument.

FDC5000173

5,484,988

| 13 | 14 |

**10.** The checkwriting point of sale system according to claim 9 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip.

**11.** The checkwriting point of sale system according to claim 9 further comprising a resident third party database wherein consumer banking account status information is stored, the consumer banking account status information being used for verification of consumer banking account status.

**12.** The checkwriting point of sale system according to claim 9 wherein the central computer system further comprises a system subscriber database, the system subscriber database comprising information regarding merchants and service providers that are authorized to use the checkwriting point of sale system.

**13.** The checkwriting point of sale system according to claim 4, wherein the sales slip includes means for execution by the consumer for proof of bank account access authorization.

**14.** The checkwriting point of sale system of claim 1, wherein the point of sale terminal further comprises means for automatically logging a point of sale terminal location and transaction date, time, and sales amount.

**15.** The checkwriting point of sale process of claim 8, further comprising:

 a) verifying the status of the consumer bank account,

 b) verifying the consumer bank account status of the consumer via a query to a third party database if the consumer bank account is verified as bad, and

 c) sending an approval message to the point of sale terminal if the consumer's banking account status is approved for the transaction.

**16.** The checkwriting point of sale process of claim 8, further comprising:

 (A) printing a transaction event sales slip following the sending of an approval message; and

 (B) executing of the sales slip by the consumer as proof of bank account access authorization.

**17.** The checkwriting point of sale process of claim 15, further comprising:

 (A) printing a transaction event sales slip following the sending of an approval message; and

 (B) executing of the sales slip by the consumer as proof of bank account access authorization.

**18.** The checkwriting point of sale process of claim 8, further comprising automatically logging point of sale terminal location information and transaction date, time, and sales amount information into the point of sale terminal.

**19.** The checkwriting point of sale system according to claim 10, wherein the sales slip includes means for execution by the consumer of proof of bank account access authorization.

**20.** The checkwriting point of sale system of claim 9, wherein the point of sale terminal further comprises means for automatically logging a point of sale terminal location and transaction date, time, and sales amount.

* * * * *

# B

US005175682A

# United States Patent [19]

## Higashiyama et al.

| [11] | Patent Number: | 5,175,682 |
|---|---|---|
| [45] | Date of Patent: | Dec. 29, 1992 |

[54] **CHECK SYSTEM AND METHOD INCLUDING PRIORITIZING CHECKS FOR TRANSMISSION TO BANKS FOR PROCESSING**

[75] Inventors: **Connie Higashiyama**, Redwood City, Calif.; **William Melton**, Herndon, Va.; **Ashok Narasimhan**, Los Altos, Calif.

[73] Assignee: **Verifone, Inc.**, Redwood City, Calif.

[21] Appl. No.: **627,640**

[22] Filed: **Dec. 14, 1990**

[51] Int. Cl.$^5$ ............................................ G06F 15/30
[52] U.S. Cl. .................................... 364/408; 235/379
[58] Field of Search ..................... 364/401, 406, 408; 235/379-383

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,187,498 | 2/1980 | Creekmore | 235/379 |
| 4,321,672 | 3/1982 | Braun et al. . | |
| 4,436,992 | 3/1984 | Simjian | 235/381 |
| 4,454,414 | 6/1984 | Benton | 235/383 |
| 4,948,174 | 8/1990 | Thompson et al. . | |
| 4,972,463 | 11/1990 | Danielson et al. | 235/381 |
| 4,974,878 | 12/1990 | Josephson . | |
| 4,977,595 | 12/1990 | Ohta et al. | 235/381 |
| 5,053,607 | 10/1990 | Carlson et al. | 235/379 |

### OTHER PUBLICATIONS

"A complete guide to rule & Regulations Governing the Ach Network," 1990 Ach Rules, Copyright 1990, *National Automated Clearing House Assoc.*, OR 51–75.

*Primary Examiner*—Gail O. Hayes
*Attorney, Agent, or Firm*—Cooley, Godward, Castro, Huddleson, & Tatum

[57] **ABSTRACT**

A method and structure are provided for processing checks in an extremely timely and cost-effective manner. A check recipient, such as a merchant, utility billing department, and the like, utilize hardware and software for quickly gathering data from checks received in order to allow prompt processing of those checks. Such hardware preferably includes a reader for reading the MICR account information printed on the check, and means for associating that data with information pertaining to the transaction at hand, including for example, the dollar amount of the transaction. This information is combined in a data record which is stored for future batch data transmission to a clearing house or the issuing bank itself. In an alternative embodiment, this data is communicated in real time to the clearing house or issuing bank. In another embodiment, one or more selection criteria are used to determine which checks will be processed in real time, with the remaining checks being processed in the batch mode. For example, checks written above a threshold dollar amount, out of state checks, or any other high risk checks are processed in real time in order to minimize losses due to fraudulent check use.

**19 Claims, 2 Drawing Sheets**





*FIGURE 1*   (PRIOR ART)



**FIGURE 2**

FDC5000153

5,175,682

1

# CHECK SYSTEM AND METHOD INCLUDING PRIORITIZING CHECKS FOR TRANSMISSION TO BANKS FOR PROCESSING

## INTRODUCTION

### 1. Technical Field

This invention pertains to electronic data processing of financial instruments, and more specifically to a method and structure for clearing checks written by a customer.

### 2. Background

FIG. 1 shows the typical path by which a check 101 finds its way to the issuing bank such that the checking account user's account is debited. As shown in FIG. 1, the customer writes check 101 and presents it to merchant 102 as a convenient way for the customer to make a payment to merchant 102. The merchant will then, typically at the end of the day, provide the check (together with others received that day) to the merchant bank 103, as a deposit to the account which merchant 102 maintains in merchant bank 103. Merchant bank 103, after posting the checks to Merchant 102 account, forwards a batch of checks to the automated clearing house (ACH) 104, such as that provided by the National Automated Clearing House Association (NACHA) of Washington, D.C. ACH 104 sorts the checks by their issuing banks, electronically transmits information pertaining to the checks to Federal Reserve Bank 105, and forward the paper checks to the appropriate issuing banks. Federal Reserve Bank 105 in turn electronically transmits information to issuing bank 106 so that each check 101 is debited to the check writer's account maintained in issuing bank 106. Since the vast majority of checks clear without problems, checks are assumed to be valid. If, the account has been closed, or the account contains non-sufficient funds, issuing bank 106 has a certain period of time in which it must issue an exception report indicating that the check has not cleared. This information is communicated to Merchant Bank 103 so that the check amount can be deducted from the merchant's account in order to nullify the deposit to the merchant's account made by Merchant Bank 103 when it assumed that the check was valid.

Table 1 depicts the typical time delay and costs associated with each check taking the prior art path shown in FIG. 1. While these costs and time delays do not seem particularly large to the uninitiated, partly due to the fact that most consumers are accustomed to the time delays involving clearing checks, it is highly advantageous to merchants and financial institutions to speed the check clearing process and reduce the costs associated therewith. Over 55 billion checks are written annually, of which 10 to 15 billion are written to merchants at the point of sale (POS). Thus, the cost associated with processing these checks, as well as the time delays involved in transferring funds (i.e., the "float") result in a very large cost associated with check processing. Magnetically encoded checking account numbers are printed on checks in order to speed this process, yet as shown in Table 1 the process remains inherently slow and costly.

#### TABLE 1

|  | Appropriate Time Delay | Approximate Cost per check |
|---|---|---|
| Merchant to Merchant Bank | 1-5 days | $.05–.10 |
| Merchant Bank to ACH | 1 day | .01–.02 |

2

#### TABLE 1-continued

|  | Appropriate Time Delay | Approximate Cost per check |
|---|---|---|
| ACH to Federal Reserve | 1 day | .01 |
| Federal Reserve to Issuing Bank | 1 day | .01 |

It has been attempted to utilize debit cards in place of checks and credit cards in order to allow merchants to instantly debit a customer's account. However, there are a number of disadvantages with debit card systems. First, debit card systems require processing in real time. Not only does this cause a time delay to both the consumer and the merchant, but the costs of maintaining communication links for real time processing are expensive, on the order of $0.15 per transaction. Furthermore, checking accounts and credit cards are already widely held, and there is some reluctance on the part of consumers to embrace debit cards. Merchants who accept debit cards, such as those gas stations which allow customers to pay using their automated teller machine (ATM) cards, find many consumers unwilling to utilize their ATM cards due to the additional expense (typically $0.15–0.25 per transaction) and perhaps the psychological reluctance to allow a merchant direct debit access to their bank account.

Furthermore, due to a lack of industry standards, for example pertaining to electronic networks, personal identification numbers (PINs), and encryption keys, inadequate customer incentives, and high costs, the use of debit cards has not become widely accepted.

Another disadvantage utilizing the present method for clearing checks is that the long time delay allows fraudulent check writers an excessive amount of time during which they are free to write fraudulent checks before their checking account numbers are added to a list of problem checking accounts.

## SUMMARY OF THE INVENTION

In accordance with the teachings of this invention, a novel method and structure are provided for processing checks in an extremely timely and cost-effective manner. In accordance with the teachings of this invention, a check recipient, such as a merchant, utility billing department, and the like, utilize hardware and software for quickly gathering data from checks received in order to allow prompt processing of those checks. Such hardware preferably includes a reader for reading the MICR account information printed on the check, and means for associating that data with information pertaining to the transaction at hand, including for example, the dollar amount of the transaction. This information is combined in a data record which is stored for future batch data transmission to a clearing house or the issuing bank itself. In an alternative embodiment, this data is communicated in real time to the clearing house or issuing bank. In yet another embodiment of this invention, one or more selection criteria are used to determine which checks will be processed in real time, with the remaining checks being processed in the batch mode. For example, checks written above a threshold dollar amount, out of state checks, or any other high risk checks are processed in real time in order to minimize losses due to fraudulent check use.

5,175,682

| 3 | 4 |

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 depicts the typical prior art process by which a check is written and ultimately returned to the issuing bank; and

FIG. 2 is a block diagram depicting one embodiment of a transaction system constructed in accordance with the teachings of this invention.

## DETAILED DESCRIPTION

FIG. 2 depicts one embodiment of a system for use by a merchant in accordance with the teachings of this invention. Merchant system 200 includes one or more point of sale systems 210 including, for example, point of sale terminal 201 such as a typical electronic cash register, or the like. Magnetic Ink Character Recognition (MICR) reader 202 is used for reading the magnetic account number printed on checks, which data is fed to POS terminal 201. Alternatively, the information pertaining to the check's account number, etc. can be entered in any convenient manner, for example via the keypad on the POS terminal 201, or via a customer identification card issued by the merchant. However, the use of the MICR reader allows greatest through put and accuracy. Printer 203 is used by POS terminal 201 for a variety of tasks, if desired, for example, printing a sales slip, printing validation information on a check, or printing a check receipt, as will be described in more detail later. POS terminal 201 is connected to backroom processor 204, such as those which are known in the prior art for maintaining sales information, performing price lookups, and inventory adjustment during the course of business. Telecommunications unit 205 is connected to backroom processor 204 and, if desired, directly to POS terminal 201 to allow data to be communicated to a check clearing house, for example.

The operation of the system of FIG. 2, in one embodiment, is as follows. The merchant utilizes POS terminal 201 to enter a transaction. POS terminal 201 can be, for example, a typical prior art electronic cash register, or a more sophisticated computer system. Alternatively, POS terminal 201 may be an accounts receivable system utilized by a public utility, for example, rather than the typical cash register found at a merchant.

The customer then tenders payment. Payments tendered utilizing credit cards, cash, or debit cards may be processed in a conventional manner. When the customer provides a check, however, the check is read by MICR reader 202 and the account information is provided to POS terminal 201. POS terminal 201 then provides additional information in order to create a data record for this transaction which is being paid for by check. Appropriate fields for this data record are, for example, as follows:

Date and Time

Merchant demand deposit account (DDA) number (checking account number)

Customer checking account No. and Routing information

Amount of check

Check No.

Any other discretionary data (electronic journaling)

Certain of this information can be provided automatically by POS terminal 201. Other information, such as amount the check is written for is provided by the merchant, for example via the POS keypad. Electronic journaling information is additional information which may either be retained by the merchant or used to provide a more precise indication of the nature of the purchase on the customer's monthly checking account statement. Such additional information may include, for example, the name of the merchant, the merchant's location, a summary of the goods for services provided, for example sorted by department in the department store. This electronic journaling information serves, for example, to reward the customer when reviewing his monthly statement that the charges appearing on the monthly statement are in fact correct. The merchant can use such additional information for other purposes, for example, to maintain some indication of a customer's buying preferences.

If desired, the data record is then used to verify check authorization, for example, by being compared to a positive file (which lists all allowable checking account numbers), or more likely against a negative file such as provided by SCAN of Seattle, Washington, Telecheck of Denver, Colorado or Telecredit of Florida, which provide information regarding known troublesome checking accounts. If such authorization is not provided, the transaction can, if desired, be cancelled by the merchant, thereby minimizing losses due to bad checks, as is well known.

Once authorization is provided (if the authorization step is performed), next the check is placed in printer 203 and validation information is printed on the check, if desired. Such validation information serves as an indication that electronic data pertaining to this check has been routed for collection, and that the check may thus be considered "cancelled." Such validation information includes, for example, information similar to a rubber endorsement stamp typically used by merchants who process checks in accordance with prior art techniques. Such information typically includes the merchant's name and the merchant's DDA number. The validation information prints in accordance with the teachings of this invention can also quite easily include the date and time of the transaction and language indicating that the check has been cancelled and is being cleared through to the customer's checking account electronically. Alternatively, other means can be used to provide validation information on the check, for example, a rubber stamp used for this purpose. While this is less desirable than using a printer, in certain circumstances it may obviate the need for additional printer, and a simple rubber stamp, or the like, can serve as a convenient backup in the event of printer failure. However, in a preferred embodiment, printer 203 is used for purposes in addition to providing validation information on a customer's check, for example, to assist in preparing credit card slips and the like.

The validated check is then returned to the customer for safekeeping, thus avoiding the need for the check to be physically transported through the system depicted in FIG. 1 for ultimate return to the customer. Alternatively, the check is retained by the merchant. This has the advantage of allowing the merchant to retain possession of the check in the event that there is a problem with its collection. In either event, whether the check is returned to the customer or retained by the merchant, a receipt is, if desired, printed and given to the customer indicating that payment has been made by check, and the check is being electronically cleared. This receipt can be either a part of or separate from another receipt indicating detailed information regarding the transaction just completed.

5,175,682

5

The data record thus created by POS terminal 201 can be added to a data file maintained by POS terminal 201 for batch uploading to backroom processor 204, for example, on a periodic basis or at the end of a shift. Alternatively, POS terminal 201 sends the data record to backroom processor 204 immediately, or as soon as backroom processor 204 is able to receive it. In this event, POS terminal 201 need only have sufficient storage capacity to serve as a buffer when there are delays in the ability of backroom processor 204 to receive data.

Periodically, backroom processor 204 will take the data records it has accumulated and upload them to a clearing house. Backroom processor 204 may first process the information, if desired. Various types of processing are possible, such as removing that data pertaining to checks written on the one or more banks with which a merchant does its own banking as well as those bank affiliate banks. This data is then uploaded to the appropriate bank directly, without the need of traveling through the clearing house system. Other types of backroom processing may be performed prior to transmitting check data to the clearing house or directly to one or more banks. For example, checks written over a threshold dollar amount, out-of-state checks, or other checks thought to be high risk based upon other criteria can be selected in order to prioritize data to be uploaded to the ACH or directly to a bank.

If desired, priority uploads may be performed either by backroom processor 204 or POS terminal 201 which, in one embodiment, is directly linked to telecommunications unit 205. Such priority uploads may serve a number of functions. For example, small batches of records may be uploaded relatively frequently by backroom processor 204 either directly to a bank or to the clearing house. Such priority uploads may include, for example, those which are greater than a pre-determined dollar amount. In one embodiment, priority uploads are performed by POS terminal 201 in a real time basis, for example, when the check amount exceeds a predetermined dollar amount, when the check is an out-of-state check, or any other criteria which may be programmed or selected by the merchant "on the fly" which may lead the merchant to view a particular check with some suspicion. In this event, the transaction is delayed pending the real time upload, thereby reducing losses due to bad checks.

Following the upload by backroom processor 204 to one or more banks and clearing houses, an exception report is printed by backroom processor 204 indicating problem checks contained within the uploaded data file, for example, checks written on closed accounts, or accounts having non-sufficient funds. This exception report is prepared from information received from the issuing bank, and is either sent electronically or by printed media either directly to the merchant or to the merchant via the Merchant Bank, the Federal Reserve Bank, and/or an automated clearing house. In one embodiment, backroom processor 204 will again upload for clearing those checks which have not cleared. If desired, a predetermined delay can be used prior to uploading this data again, in order to allow the customer to replenish his checking account before the second and subsequent tries. Alternatively, other criteria can be established by the merchant for determining how to handle such problem checks noted in the exception report. For example, the time delay, if any, before uploading for clearing such problem checks which have not cleared, can be selected based upon a predetermined

6

set of criteria. Such criteria can include, for example, the time of day the check was written, the date the check was written, the day of the week the check was written, whether the check was written on an out-of-state bank account, or any other criteria selected by the merchant. For example, the merchant may determine that, statistically, different categories of checks should be handled differently in order to maximize the collection of such checks.

Thus, in accordance with the teachings of this invention, a check has essentially become the equivalent of an electronic debit card, but with significant advantages. The vast majority of consumers already have checking accounts, as compared with a smaller number have electronic debit cards. Therefore, the use of checks as debit cards in accordance with the teachings of this invention avoids the need for distributing or maintaining a separate debit card, with their associated costs. Furthermore, most consumers feel fairly comfortable with utilizing checks as a method of payment, far more comfortable than the use of electronic debit cards. The savings which will accrue to even a small merchant due to reduced bank paper handling fees, reduced losses due to bad checks, and more rapid availability of funds from checks will easily pay for the installation of hardware and software for use in accordance with the teachings of this invention.

In one embodiment to this invention, a primary record is used of, for example, 94 bytes as specified by the National Automated Clearinghouse Association (NACHA) 1990 ACH rules, specifically Appendix I entitled "ACH File Exchange Specifications". The "1990 ACH Rules" and the "1990 NACHA Operating Rules, Corporate Edition" are published by the National Automated Clearinghouse Association of Herndon, Virginia and are hereby incorporated by reference.

When such a primary record alone is used, the customer's monthly checking account statement will indicate for each check the date, check no., and amount without specific merchant information. Alternatively, each primary record is used with one or more appended records, for example each of an additional 94 bytes, to provide information such as the merchant's name and location and, if desired, more specific information such as the type of goods or services purchased, the quantity, and/or the exact name of the goods or services purchased can be included in such appended records for each purchase.

Due to the relatively small percentage of disputed checks, a preferred embodiment provides that the merchant electronically store all sales receipt line items, and provide to the clearing house a primary record only. In the case of disputed charges, the clearing house will request further information from the merchant, and the merchant transmits additional information to the clearing house as appended records to allow the clearing house to address the disputed charges. This minimizes the amount of information being transmitted, but allows full documentation to be transmitted in the event a particular check is disputed.

There are advantages in utilizing the teachings of this invention to the consumer, the merchant, and the banking system. The consumer advantages are that their time spent at a point of sale is reduced, as checks can be processed more quickly. Savings associated with bank processing of a customer's checking account may be passed on to the consumer.

FDC5000156

5,175,682

7

The merchant benefits from a number of advantages in accordance with the teachings of this invention. Merchants can receive a quicker deposit and thus faster access to funds from checks received from customers. Deposit fees will likely be less, since the merchant is providing electronic data, rather than a paper check. Additional deposit fees can be saved if the merchant provides encoding on each check, such as MICR encoding, indicating the amount of the check. Since this encoding of the check amount saves the merchant bank processing time, merchant banks typically charge the merchant approximately 10 cents per check deposited if the merchant encodes the amount on each check, as compared with approximately 15 cents per check deposited which are not so encoded by the merchant. Depositing is much easier as a merchant need not fill out paper deposit slips, including various information pertaining to each check, as well as a total, and need not physically transport a batch of checks with their deposit slips to a bank. Checks which do not clear, for example because they are drawn on an account which is closed or an account with non-sufficient funds, are detected much quicker, thereby allowing a greater likelihood of collecting on returned checks as it is well known that collectibility decreases rapidly with age. A merchant having multiple stores benefits in that a central location may be used for consolidating check data, thereby providing the benefit that a merchant's check processing facilities can be consolidated, if desired, and allow check processing to be accomplished in a timely manner without delays associated with physically transporting paper checks to the central location prior to electronically processing those checks. The merchants are also afforded a greater flexibility on check deposits and bank relationships in that, because paper checks need not be physically transported to the merchant's bank, the merchant can select a bank solely on the basis of business consideration rather than the banks geographical proximity to the merchant.

The advantages to the banks are decreased processing costs, decreased float, and an ability to achieve their desired automated transaction plans which have not been achieved to date in large part due to the failure in the debit card programs. Furthermore, the banks are able to compete on a national basis with greater ease since the need not be geographically close to their customers for the purposes of depositing checks. Also, the banks are capable of eliminating handling of the physical check and its ultimate return to the consumer. This saves a great deal of physical infrastructure, as well as costs. Furthermore, the banks are able to receive the benefits of a debit card system without the need to educate consumers and without the attendant costs involved in the issuance of separate debit cards.

Other benefits are available as well. For example, in one embodiment of this invention, notification to a number of parties who are interested in learning of problem checks is made automatically, routinely, and in a cost effective and timely manner. For example, when the issuing bank does not honor a check, the issuing bank issues an exception report. If desired, this exception report can be used by either the issuing bank, the Federal Reserve Bank, the Automated Clearing House, the merchant's bank, or the merchant itself in order to notify other interested parties. Such other interested parties include the merchant's bank which must deduct the amount of the check which has not been honored by the issuing bank, the merchant, the merchant's collec-

8

tion agency, check authorization services, and check verification services. By promptly notifying each of these parties, collections can be speeded, and problem checks can be minimized. Furthermore, by notifying each of these parties automatically, notification costs are decreased.

Accordingly, the teachings of this invention provide a novel method and structure for handling checks having significant advantages over the prior art check clearing system. In accordance with the teachings of this invention, check are utilized much as are debit cards, but without the attendant disadvantages experienced in debit cards which have thus far lead to their poor acceptance.

The invention now being fully described, it will be apparent to one of ordinary skill in the art that many changes and modifications can be made thereto without departing from the spirit or scope of the appended claims.

All publications and patent applications mentioned in this specification are herein incorporated by reference to the same extent as if each individual publication or patent application was specifically and individually indicated to be incorporated by reference.

What is claimed is:

1. A method for processing a check written on an account provided by a financial institution comprising the steps of:

   receiving from a customer a check as a method of payment;

   creating an electronic data record containing information pertaining to said check; and

   electronically transmitting said data record to said financial institution to obtain payment of said check by said financial institution, said step of transmitting said electronic record to said bank comprising the steps of:

   determining if said electronic record meets a test indicating said electronic record should be transmitted to said bank in real time;

   if said test is met, transmitting said electronic record to said bank in real time; and

   if said test is not met, adding said electronic record to a file including other electronic records pertaining to other checks, and transmitting said file to said bank in a batch mode.

2. A method as in claim 1 wherein said test indicating said electronic record should be transmitted to said bank in real time serve to detect one or more of the following conditions: the amount of the check is greater than a threshold amount, the check is an out-of-state check, the check has not been preapproved by a check verification or check guarantee service, and the check is deemed to be of high risk.

3. A method as in claim 1 which further comprises the step of, after creating said electronic data record, imprinting information on the check indicating that the check has been cancelled and sent for collection by electronic data transfer.

4. A method as in claim 3 which further comprises the step of, after said step of printing, returning said check to the customer.

5. A method as in the claim 3 which further comprises the step of, after said step of printing, causing said merchant to retain said check.

6. A method as in claim 5 wherein, when the check is retained by the merchant, a receipt for the check is issued to the customer.

5,175,682

9

10

7. A method as in claim 6 wherein said receipt for the check comprises a portion of the standard sales receipt issued by the merchant.

8. A method as in claim 6 wherein said check receipt comprises a receipt separate from the normal sales receipt issued to the customer by the merchant.

9. A method as in claim 1 which further comprises the step of creating one or more additional electronic data records associated with said electronic data record for storing discretionary information regarding the sales transaction.

10. A method as in claim 9 which further comprises the step of electronically transmitting one or more of said additional data records with said data record to said financial institution.

11. A method as in claim 9 wherein said one or more additional data records are retained by the merchant in the event they are needed to verify a disputed transaction.

12. A method as in claim 11 wherein said one or more of said additional data records are electronically transmitted to said bank in the event of a disputed charge.

13. A method as in claim 1 which further comprises the steps of:

receiving an exception report indicating whether said check has not been honored by said financial institution; and

if said check has not been honored, again electronically transmitting said data record to said financial institution to obtain payment of said check by said financial institution after a predetermined period of time.

14. A method as in claim 13 wherein said predetermined period of time is selected in accordance with a set of one or more parameters of said check.

15. A method as in claim 14 wherein said one or more parameters are selected from the group of parameters consisting of: time the check was written, date the check was written, amount of the check, location of said financial institution, and other criteria for believing said check to be high risk.

16. A method as in claim 1 which further comprises the steps of:

issuing an exception report if said check has not been honored by said financial institution; and

automatically notifying one or more of said merchant, said merchant's bank, a check verification service, a check authorization service, and a collection firm.

17. A method as in claim 1 wherein said electronic data record comprises transaction information provided by an electronic device and information from said check.

18. A method as in claim 17 wherein at least some of said information from said check is detected by a MICR reader.

19. A method as in claim 17 wherein said electronic device comprises a POS terminal or a computer system controlling the transaction information for which payment is being made by said check.

*  *  *  *  *

35

40

45

50

55

60

65

FDC5000158



# EXHIBIT REDACTED IN ITS ENTIRETY



# EXHIBIT REDACTED IN ITS ENTIRETY

E

# BANK TECHNOLOGY NEWS

Vol. 9/No. 8

BANKING'S INFORMATION SOURCE FOR SYSTEMS PURCHASING

August 1996

$7.50

## A Little Closer To A Checkless Society?

Psst. Want to get rid of checks in a hurry? Convert them to automated clearing house (ACH) transactions. It's not a novel idea; bankers have been trying that tact for years. But still, consumers continue to write checks, at the point-of-sale and just about every place else.

Now comes word out of Palm Coast, Fl., that ChequeMark Systems has patented a solution to rid retailers of the need to handle checks. The Cheque-Mark System, linked to a VeriFone ter-minal and a Soricon check reader, lets retailers convert paper checks to ACH debits at the point-of-sale, says company President Robert Hills. Once the check is run through the reader, a receipt is print-ed, which the customer is asked to sign to authorize the debit. There is no longer any need for the check; it can be handed back to the customer or destroyed.

"Essentially, what we've done is make the check work like a credit card," Hills explains. Hills first applied for a patent on ChequeMark in 1992 and has been testing the system with several merchants for about two years. The ACH debits originate through Commer-cial Banking Co., Valdosta, GA. Hills said that at least one large bank is look-ing at the system, and that several retail-ers have also expressed interest.

ATTORNEY'S EYES ONLY

LML-EP-043277



# EXHIBIT REDACTED IN ITS ENTIRETY

# G

# 1 9 9 1

# ACH RULES

## A Complete Guide To Rules & Regulations Governing the ACH Network

Copyright 1991 by the National Automated Clearing House Association
All Rights Reserved
Printed in the United States of America
607 Herndon Parkway, Suite 200
Herndon, VA 22070
703/742-9190

## With The New Operating Guidelines

ECHO0022655

ARTICLE TWO

2.1.6 <u>Originator Authorization and Agreement</u> — Such Originator shall have authorized the ODFI to transmit one or more such entries to such account and the crediting or debiting of the amount of such entries to such account, and, except in the case of CIE entries, shall have entered into an agreement with such ODFI under the terms of which such Originator shall have agreed to be bound by these rules as in effect from time to time; and

2.1.7 <u>Receiver Authorization and Agreement</u> — Except as provided in subsection 2.1.3, such Receiver shall have authorized such Originator to initiate such entry to such Receiver's account, and, in the case of CCD, CTP and CTX entries, such Receiver shall have entered into an agreement with such Originator under the terms of which such Receiver shall have agreed to be bound by these rules as in effect from time to time. In the case of debit entries to a consumer account pursuant to a standing authorization, such authorization shall be in writing.

2.1.8 <u>Exception to Authorization Requirement</u> — No authorization by a Receiver shall be required with respect to the initiation of credit entries, and no warranty with respect to such authorization shall be deemed made by an ODFI, provided both the Originator and the Receiver are natural persons. The provisions of section 3.5 and subsection 4.1.1 shall have no application to such entries.

2.2 <u>Warranties and Liabilities of Originating Depository Financial Institutions</u>

2.2.1 <u>Warranties</u> — Each ODFI shall be deemed to warrant to each RDFI, ACH and Association that:

2.2.1.1 <u>Authorization by Originator and Receiver</u> — Each entry transmitted by such ODFI to an ACH is in accordance with an authorization of an Originator authorizing the ODFI to transmit such entry to a Receiver's account, and in accordance with an authorization of a Receiver authorizing the initiation of such entry to such Receiver's account.

2.2.1.2 <u>Timeliness of Entries</u> — Each such credit entry is timely, and each debit entry is for a sum which, on the settlement date with respect to such entry, will be due and owing to the Originator from a Receiver, is for a sum specified by the Receiver to be paid to the Originator or is a correction of a previously transmitted erroneous credit entry;

2.2.1.3 <u>Compliance With Other Requirements</u> — All other applicable requirements of section 2.1 with respect to such authorization and entry have been satisfied, that such entry has not been reinitiated in violation of section 2.5, and that such entry is otherwise in conformity with these rules;

2.2.1.4 <u>Revocation of Authorization</u> — At the time such entry is transmitted to an Originating ACH, the Originator's authorization has not been revoked or the agreement between the ODFI and Originator with respect to such entry terminated, and neither such ODFI nor such Originator has actual knowledge of the revocation of the Receiver's authorization or of the termination of the arrangement between the RDFI and Receiver with respect to such entry;

OR 4

ECHO0022688

# H

# 1 9 9 0

# ACH RULES

## A Complete Guide To Rules & Regulations Governing the ACH Network

Copyright 1990 by the National Automated Clearing House Association
All Rights Reserved
Printed in the United States of America
607 Herndon Parkway, Suite 200
Herndon, VA 22070
703/742-9190



NACHA
America's Largest
Electronic Payments
Network

DK 000129

# ARTICLE TWO -- ORIGINATION OF ENTRIES

2.1    Prerequisites to Origination -- Prior to the initiation of the first credit or
debit entry by an Originator to a Receiver's account with an RDFI or to a
Receiver, the following shall have occurred:

    2.1.1    Originator Authorization and Agreement -- Such Originator shall
have authorized the ODFI to transmit one or more such entries to
such account and the crediting or debiting of the amount of such
entries to such account, and, except in the case of CIE entries, shall
have entered into an agreement with such ODFI under the terms of
which such Originator shall have agreed to be bound by these rules
as in effect from time to time; and

    2.1.2    Receiver Authorization and Agreement -- Except as provided in
subsection 2.1.3, such Receiver shall have authorized such Originator
to initiate such entry to such Receiver's account, and, in the case of
CCD, CTP and CTX entries, such Receiver shall have entered into
an agreement with such Originator under the terms of which such
Receiver shall have agreed to be bound by these rules as in effect
from time to time. In the case of
debit entries to a consumer account pursuant to a standing
authorization, such authorization shall be in writing.

    2.1.3    Exception to Authorization Requirement -- No authorization by a
Receiver shall be required with respect to the initiation of credit
entries, and no warranty with respect to such authorization shall
be deemed made by an ODFI, provided both the Originator and the
Receiver are natural persons. The provisions of section 3.5 and
subsection 4.1.1 shall have no application to such entries.

2.2    Warranties and Liabilities of Originating Depository Financial Institutions

    2.2.1    Warranties -- Each ODFI shall be deemed to warrant to each RDFI,
ACH and Association that:

        2.2.1.1    Authorization by Originator and Receiver -- Each entry
transmitted by such ODFI to an ACH is in accordance
with an authorization of an Originator authorizing the
ODFI to transmit such entry to a Receiver's account, and
in accordance with an authorization of a Receiver
authorizing the initiation of such entry to such Receiver's
account.

OR    3

**DK 000150**



debited to such account. For the purposes of the preceding sentence, variation because of Saturdays, Sundays or holidays in the date on or after which entries are to be debited shall not be deemed a change in such date.

3.3.4    Limits on Application -- This section shall have no application to (1) an entry initiated pursuant to a single entry authorization, or (2) an entry initiated for the purpose of correcting an erroneous credit entry previously initiated to a Receiver's account, provided (i) the correcting entry is transmitted to the Receiving ACH in such time as to be delivered or made available to the RDFI by midnight of the fifth banking day next following settlement for the erroneous entry, (ii) the Receiver has authorized the initiation of such correcting entry, and (iii) prior to the time the correcting entry is transmitted to the Originating ACH, the Originator has sent or delivered to the Receiver written notification of such correction and the reason therefore.

3.4    Consumer Accounts -- Copy of Debit Authorization -- In the case of debit entries to a consumer account pursuant to a standing authorization, an Originator shall provide each Receiver with a copy of the Receiver's written authorization.

3.5    Records -- An Originator that initiates an entry to a Receiver's account shall retain the original or a microfilm or other copy equivalent to a microfilm record of each written authorization of such Receiver authorizing the initiation of such entry for a period of two years after the termination or revocation of such authorization, or, in the case of a single entry authorization, after initiating such entry, and shall, upon request of its ODFI, furnish such original or such copy of such authorization to such ODFI either for the use of such ODFI or for such ODFI to furnish to the RDFI pursuant to a request of the latter in accordance with subsection 4.1.1. This section shall have no application to MTE, POS, or SHR entries if the ODFI and the RDFI are parties to an agreement (other than these rules) for the provision of services relating to such entries).

OR    10

**DK 000156**

I

# United States Patent [19]

## Carlson et al.

[11] **Patent Number:** 4,758,714

[45] **Date of Patent:** Jul. 19, 1988

[54] POINT-OF-SALE MECHANISM

[76] Inventors: Steven R. Carlson; Paul R. Carlson, both of 417 2nd Ave., S.E. Beach, N. Dak. 58621

[21] Appl. No.: 70,816

[22] Filed: Jul. 6, 1987

### Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 915,505, Oct. 6, 1986.

[51] Int. Cl.⁴ ........................................ G06K 5/00
[52] U.S. Cl. ............................ 235/380; 235/448; 235/449
[58] Field of Search ............ 235/380, 382, 492, 448, 235/449

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

3,821,518  6/1974  Miller ........................ 235/492

*Primary Examiner*—Harold L Pitts

*Attorney, Agent, or Firm*—Dorr, Carson, Sloan & Peterson

[57] **ABSTRACT**

A secured point-of-sale mechanism is provided by a closable two compartment housing having (1) a secured portion which includes a printer and a plurality of signal devices for verifying that the mechanism is in a "locked" state and (2) an unsecured portion which co-operates with said secured portion in such a manner that transactions involving credit cards, negotiable instruments and the like are protected against unauthorized intervention. In certain preferred embodiments of this invention, the mechanism further comprises (a) means for accessing a computer system maintained by issuers of credit cards, negotiable instruments, etc., (b) means to access an external communication in order to identify a payor of a negotiable instrument and to perform an electronic funds transfer, (c) telephonic means to communicate with issuers of credit cards, negotiable instruments etc., and (d) a keypad, for customer use, which is located outside the closable two compartment housing.

13 Claims, 7 Drawing Sheets



FK 001248



FIG. I

FIG. 2

FK 001249

Case 1:04-cv-00858-SLR    Document 479-2    Filed 11/23/2005    Page 45 of 58



FIG. 3



FIG. 5

FIG. 6

FK 001250



FIG. 4

FK 001251

Case 1:04-cv-00858-SLR    Document 479-2    Filed 11/23/2005    Page 47 of 58



FIG. 7



FIG. 8

FK 001253

U.S. Patent    Jul. 19, 1988    Sheet 5 of 7    4,758,714



FIG. 9

FIG. 10

FIG. 11

FIG. 12

FK 001254

U.S. Patent        Jul. 19, 1988        Sheet 6 of 7        4,758,714



FIG. 13



FIG. 14

FK 001255



FIG. 15

FIG.15A

FIG. 16

FK 001256

4,758,714

1

## POINT-OF-SALE MECHANISM

### REFERENCE TO RELATED APPLICATION

This patent application is a continuation-in-part of our copending patent application Ser. No. 915,505 filed Oct. 6, 1986.

### FIELD OF THE INVENTION

This invention relates to point-of-sale devices and more particularly to point-of-sale devices in which all of the transactions are completed without possible outside intervention. It is directed to cost-effective, OEM address-o-graph style mechanisms designed to utilize several types of existing credit cards such as a "PIN/ALGORITHM" or verifiable consumer oriented point-of-sale format plug all types of checks using the Federal magnetic ink character recognition (MICR) system.

### BRIEF DESCRIPTION OF THE PRIOR ART

U.S. Pat. No. 3,786,421 to Wolfgang J. Wostl teaches a personal identification code number that is used to inside that the party making the transaction is the person he claims to be. Another relevant reference is U.S. Pat. No. 4,453,074. It teaches a smart card with encrypted material using a private key that is associated with a public key. U.S. Pat. No. 4,439,670 teaches use of a code comparison upon reaching a predetermined number of rejections.

### SUMMARY OF THE INVENTION

Our point-of-sale mechanism provides a mechanism which operates in a highly desirable mode by locking both the card, the invoices, and any other negotiable instruments during the entire transaction. Any attempts to interfere with the transaction creates an abort and the system returns to its status quo. It gives the retailer badly needed security with minimum expenditures. With certain modular options, the mechanism also permits verification of travelers checks, smart card capability, electronic funds transfer from cards or checks, and lost or stolen credit card verification. The system can utilize several algorithm security codes simultaneously and can be programmed to give regional or local protection.

Our secured point-of-sale mechanism comprises a closable two compartment housing having (a) a secured portion including a printer means and a plurality of signal devices indicating the condition of a plurality of circuits contained in said secured portion of said housing; (b) an unsecured door portion cooperating with said secured portion for completing said two compartment housing; (c) a monetary negotiable instrument section disposed within said unsecured portion having first part for retaining a credit card, a second part for retaining an invoice of a point-of-sale transaction, a third part for retaining a check for a point-of-sale transaction, a fourth part for retaining any monetary negotiable instrument, a fifth part for identifying the payee of said transactions, and a sixth part for establishing the transaction selling price; (d) a transaction price index settable to the correct sales amount purchased by a customer; (e) a first plurality of switching mechanisms having a first part fixed in said secured portion of said housing and a second part extending into said unsecured portion of said housing to be actuated by said unsecured door portion; (f) a second plurality of switching mechanisms having a first part fixed in said secured portion of

2

said housing and a second part extending into said unsecured portion of said housing to be actuated by a combination of monetary negotiable instruments; and (g) a locking mechanism connected to said plurality of switching mechanisms and disposed between said secured and unsecured portions of said housing for securing said housing against invasion as long as said plurality of switching mechanisms are actuated.

Our secured point-of-sale mechanism also can be modified and/or augmented in several ways. For example it could include one or more of the following features: (I) means to access a computer system maintained by an issuer of a negotiable instrument, credit card and the like; (II) means to access an external communication system to identify a payor of a negotiable instrument (such as through the use of a personal identification number) and to perform an electronic funds transfer; (III) telephonic means (such as a telephone headset and appropriate communication system) to communicate with the issuer of a negotiable instrument; (IV) telephonic means specifically adapted to communicate with the issuer of a credit card; (V) a keypad which is adapted for customer use (e.g., for entry of the customer's personal identification number) which is located outside the closable two compartment housing; (VI) a standard 8 bit microprocessor capble of accessing 64K bytes of memory; and means connecting the plurality of switching mechanisms and the locking mechanisms to the microprocessor and upon any one of said switching mechanisms not being actuated, said locking mechanisms seeking an inoperable position; (VII) a printing mechanism specially adapted for printing upon an invoice, negotiable instrument, etc. by means of a pair of plates spatially disposed about any of said credit cards, invoices, checks or other monetary negotiable instruments; an actuating mechanism cooperating with said printing mechanism for producing an imprinted inevitment of said transaction; and a lock disabling mechanism connected to said actuating mechanism being disposable after creating an imprinted monetary negotiable instrument; (VIII) read head means connected to said microprocessor and disposed adjacent said credit card for reading any magnetic code that is detectable in said card; and read head transport means for producing movement of said read head means under said credit card as long as said code is being detected by said read head; (IX) a monetary negotiable instrument carrying a MICA stripe on its surface disposed within said secured portion having a first part for retaining said magnetic stripe with said negotiable instrument also carrying a magnetic stripe on its surface disposed within said secured portion having a first part for retaining said magnetic stripe; read head means connected to said microprocessor and disposed adjacent said monetary netogiable instrument to read any code impressed therein; PIN identification number entry means connected to said microprocessor for receiving PIN number; and means including said microprocessor connecting said read head means and said PIN identification number entry means to said printing mechanism and said actuating mechanism said printing mechanism to be actuated when said signals are the same; (X) an override mechanism; a smart key pad connected to said override mechanism having detection means for detecting the presence of said smart card; and a personal identification number module having a key tab matrix connected to said microprocessor, said key tab matrix having been set

FK 001257

4,758,714

3

to match the transaction amount to be recorded with said override mechanism being connected to said micro-processor for actuating said printing mechanism and said locking disabling mechanism; (XI) a high strength steel drawer slidable within said secured portion of said two compartment housing, said drawer having individual electrical compartments for containing said security modules; wide flange means formed on the outside of said steel drawer to engage said two compartment housing; a connector electrically connected to said individual electrical compartments in said steel drawer and to said microprocessor; and locking means securing said steel drawer within said two compartment housing and further securing said security modules to said steel drawer; and (XII) a first read head connected to said microprocessor and disposed adjacent a first monetary negotiable instrument within said section; a second head connected to said microprocessor and disposed adjacent a second monetary negotiable instrument within said section; a track mechanism for guiding a transport means; first transport means producing movement of said first read head over said track mechanism; second transport means producing movement of said second read head over said track mechanism; and means connecting said first and second transport means to said microprocessor and causing movement of the same as long as a code is being detected by said first and second read heads.

It is therefore a general object of this invention to provide a secured point-of-sale mechanism that is secured against invasion from the outside.

It is another object of this invention to provide a secured point-of-sale mechanism that is connected to a micro-processor that completes all transactions while the mechanism is secured.

It is yet another object of this invention to abort any transaction while the mechanism is secured where invasion from the outside occurs.

It is a further object of this invention to use all forms of negotiable instruments at the point of sale and secure the transaction taking place.

It is still another object of this invention to provide a printed record of the transaction taking place at the point of sale.

It is still another object of this invention to provide a lock disabling mechanism actuated upon the printing mechanism printing a record of the transaction taking place.

These and other objects and advantages of the invention will more fully appear form the following description, made in connection with the accompanying drawings, wherein like reference characters refer to the same or similar parts throughout the several views, and in which:

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an isometric view of the point of sale device;

FIG. 2 is an isometric view of the invention with the cover broken away;

FIG. 3 is a sectional view of the invention taken along lines 3—3 of FIG. 1;

FIG. 4 is a schematic diagram of the components of the invention;

FIG. 5 is a partial side section of the invention taken along lines 505 of FIG. 1;

FIG. 6 is a partial rear section of the invention taken along lines 606 of FIG. 1;

4

FIG. 7 is a sectional view of the printing mechanism in its lower position;

FIG. 8 is a sectional view of the printing mechanism in its upper or print position;

FIG. 9 is a diagrammatic view of a check; FIG. 10 is a diagrammatic view of a travelers check;

FIG. 10 is a diagrammatic view of a travelers check;

FIG. 11 is a diagrammatic view of a modified travelers check;

FIG. 12 is a diagrammatic rear view of the modified travelers check;

FIG. 13 is a partial side view of the read head detection mechanisms;

FIG. 14 is a diagrammatic view showing both top and bottom views of the use of credit cards, checks, invoices, and travelers checks;

FIGS. 15, 15A are diagrammatic views of the use of credit cards, checks, invoices and travelers checks with appropriate PIN'S and detection devices; and

FIG. 16 is a diagrammatic view of the mechanism for detecting travelers checks.

DETAILED DESCRIPTION OF THE INVENTION

The sturdy main case of the device, 1-1, is formed of metal and skillfully designed to be aesthetically pleasing with careful attention to color coordination and physical refinements. The case, along with the heavily constructed steel cover, 1-2, protects the internal electronics from harmful magnetic and RF fields, dirt, corrosion, etc., as well as providing system integrity from vandalism, abuse, tampering, and so on. Reference to the first number goes to the Figure and the second number goes to the identification or reference number in that Figure. The cover, itself a vital part of the printing process, hinges upward at 1-4 exposing the retailer-operated functions. Lamps 1-3 are "condition lights" relating systems and procedures statuses. Switch 1-5 is the main power switch controlling both mainframe and all outboard module current. Indicator 1-23 displays the total sale to the operator equally well in all light, from direct sunlight to total darkness. FIG. 1 also shows an optional standard telephone headset, 1-97, and its associated hanger, 1-98. The function(s) of the headset will be described later in this patent disclosure.

FIG. 2 shows the device with the cover, 2-2, removed, although the system cannot be operated in this condition as explained later. A customary manual "purchase amount" matrix is pictured at 2-12 with its associated manual control at 2-10. However, an alternative electronically controlled matrix using a numeric keyboard at 2-10 may prove more reliable and workable in conveying sales amounts and other information to the outboard modules. Although the cover 1-2 is shown as completely enclosing and covering the sales amount entry keypad, whether it be the traditional manual type of an electronic, alpha-numeric keypad, an optional cover which does not enclose the keypad can also be employed and it is shown as 1-95 thereby omitting that portion shown as 1-96. The optional cover, 1-95, will not in any way alter or jeopardize the described security of the entire device since the keypad, 2-10, will become inert and inoperable once the 1-2 or (1-95 optional) cover is closed since it triggers the 2-15 cover switch(s) and all functions associated therewith leaving the credit cards, appropriate invoices, checks, traveler's checks and other appropriate negotiable instruments locked under cover during the actual verification/authoriza-

FK 001258

4,758,714

5

tion and transaction cycle. The retailer's identification number is printed by his cast matrix 2-13 on an invoice, 2-8. The customer's credit card, 2-7, is placed face up in its normal position (the positioning guides 15-72 may be replaced by a recession slightly larger than the size of the card) directly over the verifier access door, 206, located beneath the invoice and the card. The verifier access door is actually a part of the verifier traction mechanism, as shown in 2-24, and more particularly as disclosed at 5-24 and 6-24. The cover, 1-2, fits down over the main deck housing 2-37, and onto the rabbet, 2-11 activating the nondefestable cover switches, 2-15, (only one shown in FIG. 2) and in this closed position is able to be secured by the locking pins shown as 2-9. These locking pins fit into recesses in the lid at 3-22.

FIG. 3 shows the printing mechanism consisting of a lightly convex-shaped steel "spring plate" 3-14 mounted into the cover 3-2, a heavy, rigid "printer plate" 3-19 and the print actuator, 3-17. This printing mechanism, whether it be of the "spring plate printer plate" type described herein or any other means of printing appropriate information on any negotiable instrument used in this device will be securely locked under the metal deck shown as 2-37 (12-37 and 15-37) which is in fact part of the main case shown as 1-1. The 2-37 deck, which is part of and becomes part of the 1-1 main case, cooperates at all times with 1-1 to maintain the security of the device. The 2-37 deck can only be removed (for servicing of the device) by authorized service personnel using proper identification means. When all security and transaction conditions have been correctly met, the actuator carries the "floating" matrices 2-12, 2-13 and the credit card upward and squeezes them and the invoice between plates 3-14 and 3-19 to print the invoice. The convex shape of the spring plate "rolls" the printing process to the outside edges of the invoice assuring clear printing. An optional printing means to imprint proper and appropriate data on any of the mentioned negotiable instruments may include a "dot matrix" printer means. The choice of printer means will be dictated by cost considerations, available and desirable options, and the size, shape and type of invoices and negotiable instruments that may be used.

Closing the cover automatically signals the onboard CPU to ask the following (and other) questions: (A) Is the cover locked (signified by the 3-20 solenoids being engaged)? (B) Is there a valid smart card inserted at 4-66 or a credit card and invoice present (proper responses from 3-18 and 3-18A)? (D) Does the purchase price matrix mechanism (3-16), or the numeric keypad, show an entry? (E) Does the PIN entered by the customer match the one interpolated by the onboard algorithm decryption systems from the card mag-stripe or the smart card? (F) Does the search reveal a terminated, stolen, counterfeit or over-extended card? Only if all questions are correctly answered will the CPU allow completion of the transaction. Completion involves recording of the transaction, charging the smart card the appropriate amount (and recording same) and actuation of the print mechanism, 3-17, moving it upward to print the invoice. When the print mechanism has cycled, whether it be mechanical, dot matrix, electrical or other, the cover automatically pops open which clears the computer and the process begins again.

FIG. 3 also shows the relative position of the matrix control mechanism, 3-16 used in the traditional mechanical means, to the print plate, 3-19, and the cover sole-

6

noid lock mechanism, 3-20, which slides the large steel pins, 2-9, into the recesses shown at 3-22.

FIG. 4 shows the positioning of the security electronics iin the heavy metal drawer, 4-28. This drawer completely encloses the vital security and interface modules and protects them from outside probing, tampering and vandalism. The security drawer is externally locked by a high quality lock, 4-27, and when fully inserted into the system mainframe, connects with associated internal electronics via a reliable multi-pin connector, 4-29. The wide flange on the drawer, 4-26, assures that the security modules 4-39 will disconnect from 4-29 and destroy themselves (via self-destruct circuitry) before any probes can be introduced into the module area. Each 4-39 module contains electronics (and algorithm decryption circuits) unique to each card or check issuer.

The actual transaction printing process beings when the retailer lifts the normally unlocked cover, 1-2. Lifting the cover off the switches at 3-15 (3-15A) triggers the security systems and alerts the electronics (CPU) to receive the customer's personal identification number (PIN) which is conveniently entered on the numeric keyboard FIG. 4-44. Meanwhile, and not necessarily in this order, the retailer will enter the purchase price at 2-10 or 4-64 which will read out automatically to the customer and the retailer at 2-23 and 4-65 and 4-40, and insert the credit card and the invoice in the system which triggers the "card/invoice present" switches at 3-18 and 3-18A. Insertion of a valid smart card in slot 4-66 overrides the "card present" function of 3-18A.

Rather than having separate housings for the PIN keyboard 4-45 and the "smart card reader" 4-64 as shown, the units could be contained in the main housing unit 1-1 to eliminate the need for outboard mechanisms.

When the cover (1-2) is closed for the verification-/authorization and printed cycle, a present tension of the print plate 3-19 squeezes the card and/or invoice against the spring plate (3-14) just hard enough to insure proper operation of the "card/invoice present" switch and to offer card stability during the mag-stripe scan but not hard enough to print. In the event that an optional "dot matrix" or other printer means is employed, the 1-2 cover may still use pressure means to hold the various cards and/or negotiable instruments in place during the described device functions.

When the retailer closes the cover to print the invoice, the 3-15 (3-15A) switches activate the solenoid cover locks and signal the CPU to being the system analysis and card verification/authorization functions. The credit card, invoice and purchase price matrix remain locked under the cover until either (A) the successful verification/authorization and transaction cycle opens it, or (B) the transaction is aborted due to a security breach in the system or a premature removal of the smart card, or (C) the transaction is terminated because an incorrect PIN is detected or not received within 30 seconds, a smart card reveals insufficient funds, or a system search reveals an invalidated, bogus or stolen card has been presented. Any detected fault will automatically abort the transaction and the cover will unlock and open without printing the invoice and/or charging the purchase to the smart card.

FIG. 5 illustrates the system's mag-stripe scanning mechanism. This figure is a side view showing the credit card, 5-7, being held in place by the curved spring-plate 5-14 and the recess in the printer-plate deck housing, 5-37, which limits the card's lateral movement. Since printing pressure need only be applied beneath

4,758,714

7

the card's embossments at 5-38, the retailer's matrix
(2-13) and the purchase amount matrix 2-12. the print
plate 5-19 leaves the card's mag stripe readily exposed
for scanning by the mag-stripe reader, 5-36 and MICA
read head 4-76. During scanning, the reader's transac-
tion unit, 5-24, 6-24, moves read head 5-36 and MICA
read head 4-76 from left to right following a precision
path afforded by a ball bearing and track system, 5-34
and 6-34. The read head scans all three tracks of the
mag-stripe simultaneously and the CPUs decipher ap-
propriate information and automatically select the cor-
rect security module 4-39 to deal with the PIN verifica-
tion process. In the case that "MICA" information is
required due to the presentation of a check, Traveler's
check, etc., that information is automatically read and
appropriate security modules selected in the same man-
ner. If the correct module is faulty, damaged or nonexis-
tant, or if the customer has entered the wrong PIN, the
transaction is aborted and the cover opens automati-
cally resetting of the machine. This allows another
attempt for the correct PIN by the customer or easy
removal of the card and invoice. Should more than one
attempt be made for the transaction with the systems
automatic functions repeatedly yielding an abort com-
mand and denying the transaction, a telephone headset,
1-97, may be provided for direct voice contact with the
appropriate company or bank to resolve the situation
via personal contact. The phone headset will rest in a
suitable hanger, 1-98, when not in use.

The mag-stripe reader 6-36 and the MICA reader are
assured effective and reliable contact with the mag-
stripe by "floating" over the stripe with the aid of a
sensitive suspension system, 6-35, which allows opera-
tion in attitude. The read head begins its course in al-
most direct contact with the mag-stripe due to its loca-
tion in relation to the card and the verifier access door,
6-6 and 2-6. This access door immediately precedes the
read head on its path across the mag-stripe and returns
with it to offer secure protection against dust, intrusion
and vandalism.

FIG. 4 illustrates the customer's PIN entry keyboard
module, that has a main housing, 4-45. The keyboard,
4-44 uses reliable, long life, magnetic contact keys resis-
tant to dust, moisture, sunlight, most common solvents
and cleaners and reasonable abuse. A purchase amount
display, 4-40, which matches the mainframe display
1-23 allows the customer and the retailer to monitor the
purchase being selected by the retailer on the print
matrix. The keyboard is connected to the main body by
means of a high quality multi-conductor cable, 4-43. As
mentioned elsewhere, this PIN entry keyboard module
may be mounted, as an option, directly onto the custom-
er's side of the 1-1 main case. This would possible take
less space in an environment where there is no room for
the PIN entry keypad.

FIG. 7 and 8 are more detailed drawings of the print
actuator mechanism previously shown as 3-17. It con-
sists of two cam wheels, 7-51, driven in opposite direc-
tions by means of gear teeth. Both are driven by the cam
motor 7-48, through its drive shaft (7-49) and cam drive
gear (7-50). Each cam wheel gear (7-51) has two "high"
lobes and two "low" lobes indicated by "H" and "L"
markings respectively. The cams are "timed" so that
all four print-plate lift wheels, 7-52, center on either H
or L positions simultaneously to achieve equal lift
throughout the print cycle. Only one-half revolution of
each cam-wheel is required to complete each print
cycle so that cam motor (7-48) may be gear (speed)

8

reduced to achieve a slow enough rotation and ade-
quate torque to lift the print-plate through its cycle. The
7-51 cams, the print-plate support body, 7-58, and the
cam table (ball) bearing (7-56) and bearing race (7-55)
are all precisely aligned by the two cam shafts, 7-53.
These shafts drift upward with the print-plate and its
support mechanisms (and the matrices) while the cam
gears and table bearings remain firmly seated on the
main-frame body represented by 7-54. The print-plate
support body is construed so as to allow sufficient clear-
ance for the purchase-price matrix assembly (7-16).

Regarding the check verification function, suppose
an unknown customer from Montana, for example, out
of state, would find himself without cash or credit
cards. The customer would present his check to the
retailer with this system. The retailer would insert it in
the proper fashion into the system, enter the check
amount at the keypad (2-10) and close the lid. The re-
tailer would then press the "verify" button on top of the
system ( in the area of 1-3) and wait. The system would
activate the verification mechanism, FIG. 5 and 6,
which would "read" the MICA information and com-
pare the offset or PVV number and subsequent PIN
with the PIN entered by the customer at 4-44. If the
PINS match, the the CPU would activate the "Phone in
Verification Module" which would include a suitable
modem for an AT&T hook-up with the Fed's MICA
system. This would connect the system to the custom-
er's own bank and the check could be verified for suffi-
cient funds and proper I.D. If all is correct, the system
would stamp the word "Verified" on the check and the
lid would pop open resetting the machine for the next
transaction.

This invention anticipates the use of checks as they
currently exist using the Fed MICA system. However,
a modified check may be used in the future which is a
standard check save for the addition of an "NCR" (no
carbon required) slip on the back entitled D-8 and a
mag-stripe adhered to the front labeled D-17/D-18
shown in FIG. 11. The NCR page would include the
amount of the check, D-16 and the serial number of the
check D-15 as well as the company's logo and other
regulated information. It may or may not include the
duplication of the payer's signature and countersigna-
ture, D-11 and D-13. However, it would naturally re-
produce the Payee's name, D-12 and the date, D-14.
D-11 and D-13 could possibly be obscured by a vision
blocking ink screen such as seen on common personal
checks with NCR pages. However, a preferred method
to handle personal checks, Gov't checks, Travelers
checks or any negotiable instrument using the Fed's
MICA system would be to utilize the optional "dot
matrix" or comparable type printer together with the
optional alphanumeric keypad at 2-10 (15-10 and 14-10)
and the onboard CPU's and verification circuitry to
automatically contact the issuer's bank computer, elec-
tronically transfer the required funds directly to the
payee's bank account ("electronic funds transfer" also
known as "EFT") and then cancel the check or instru-
ment in the device all at the point-of-sale. This would be
accomplished in much the same way as EFT is used
with bank credit cards today. Those skilled in the art
will readily recognize that this method is preferred
should applicable laws allow. The scenario of the EFT-
/POS-CANCELLATION will be as follows: Mr. XYZ
is out of town and wants to make a purchase at a strang-
er's establishment. He would present his check, already
filled out in full as per customary procedures. The re-

4,758,714

9

tailer would punch in the check amount at 2-10 which
would read out at 2-23 for the retailer and the customer
to see and then place the check in the device and close
the 1-2 lid. The customer would then enter his personal
identification number at the PIN keypad. It should be
noted here that the machine will only take a PIN entry
a certain number of second before the 1-2 lid is closed
and will accept a PIN entry only a certain number of
second after the 1-2 lid is closed. This is to help prevent
a "residual" PI entry from incorrectly hindering a legit-
imate sale and enhance the security of the device. When
the 1-2 lid closes the device's CPU (which may or may
not contain the customer's PIN entry at this time) will
trigger the function of the MICA read head assembly to
"read" the data on the check. If a mag-stripe is located
on the check, it will also read that information. The
CPU will then compare the PIN entered by the cus-
tomer to that interbolated from the MICA information.
This interbolation process may utilize the onboard algo-
rithm modules in the module drawer or may depend
upon onboard interbolation. Outboard interbolation
would allow each bank to solely hold their own encryp-
tion/decryption methods and algorithm thus maintain-
ing a higher state of security. Returning to the scenario;
if the onboard CPU cannot interpret the PIN matchup,
then it would automatically call up the MICA network
and using the routing and transit numbers on the face of
the check would locate the very bank this particular
check issued from. The MICA information sent from
the onboard CPU would enter the bank's computer via
suitable circuitry whereupon the bank's computer
would use the encryption/decryption methods and/or
algorithms known only to it to make the PIN compari-
son. For example, the bank's computer may use a com-
bination of routing and transit numbers, account num-
bers and even individual check numbers in conjunction
with their own security algorithm (known only to this
bank's computer and perhaps key personnel) to arrive at
a PIN which would either match or not match with that
entered by the customer at the point-of-sale. At an ap-
propriate time, the bank's computer would be told the
amount of the check and its individual number as sup-
plied by the POS terminal, examine whether the cus-
tomer's balance is sufficient to cover the check, receive
the payee's bank number and account number, and if all
functions are deemed desirable, the payer's bank com-
puter would electronically transfer the funds and debit
the payer's account. The payee's routing and transfer
and bank numbers and the payee's account number
would be transferred to the payer's bank computer only
after a satisfactory PIN match had been made. It should
be noted that the POS device described herein can be
programmed with the retailers (payee's) routing and
transit numbers, bank numbers and account numbers
quite easily via the 2-10 keypad by qualified personnel.
Then, after the EFT had taken place, the payer's bank
computer would wire the appropriate check cancella-
tion information to the POS terminal which would then
(A) print it on the back of the check via the dot matrix
printer and (B) if the "daily totals" option is onboard,
would add the amount of the EFT to the daily total.
The 1-2 cover would then pop open and the cancelled
check would be presented to the customer as part of his
receipt. Thus, the banks are shifting much of their check
handling to the point-of-sale.

The above mentioned check cancellation information
would usually include something like, "Point-of-Sale
Cancelled - Pay any Bank PEG 011386 FRB MPLS

10

0911-00036" and so on. The advantages of POS cancel-
lation are numerous and obvious to one skilled in the art
and make the use of checks more desirable and secure.
For example, a traveler's check serial number, part of
the transmitted MICA information would only clear the
traveler's check issuer's bank once. Their computer
would only accept that serial number once; all addi-
tional attempts to cash a Traveler's check with the same
serial number would be regarded as counterfeit and
rejected. The same sort of safeguard would apply to
personal checks, each with its own check number,
Gov't checks and the like.

FIG. 3 shows the described printing mechanism con-
sisting of a convex shaped, steel "spring plate" (3-14)
mounted in the cover (3-3), with a corresponding flat
steel "print Plate" (3-19) and the print propulsion sys-
tem or actuator shown as 3-17. When all security, verifi-
cation/authorization and transaction conditions have
been correctly met, the 3-17 actuator carries the appro-
priate embossments and matrices upward and squeezes
them and the invoice or check between plates 3-14 and
3-19 thereby printing the information on the check or
invoice. The convex shape of the spring plate "rolls"
the printing process to the outside edges of the invoice
assuring legible reproduction. This "squeezing" method
eliminates the "shearing" action of many common
printers and the problem associated therewith. The dot
matrix type of printer may be preferable since it would
more easily print the card authorization numbers on
card invoices and be able to print all appropriate EFT
and Point-Of-Sale check cancellation information on
checks.

When the cover (1-2) is closed for the verification
and print cycle, a preset tension of the print plate and-
/or spring plate (3-19 and/or 3-14) squeezes the card
and invoice or traveler's check, personal check, Gov-
ernment check (all types), food stamp etc., against the
spring plate and/or print plate just hard enough to in-
sure proper operation of the "card/invoice/check pres-
ent" switches and to offer card stability during the mag-
stripe or MICA scan but not hard enough to print.

All security sensors and devices relating in any way
to the system Main-frame and its modules, AT&T
phone modems and the like, are continually being moni-
tored by their associated CPU's to insure uninterrupted
integrity of the system device and the algorithm mod-
ules located at 4-39. Back-up battery power provided by
the system main-frame will have its own internal char-
ger to assure power should the AC line fail.

The 4-39 security modules will be powered during
shipment to individual systems locations by their own
inboard lithium batteries (or suitable substitute) and will
have the ability to monitor their own security during
said transit. Should modules sense serial scanning, X-
rays, infra-red rays (used for disarming etc.), or other
types of "electronic tampering" designed to disarm
security or otherwise compromise the integrity of the
security modules, the battery power will last a minimum
of ninety (90) days from the date of manufacture and
should the ninety days pass before a 4-39 module is
installed, it will automatically "dump" the secure algo-
rithm chips. The security chip will destroy itself auto-
matically upon any interference of power.

OPERATIONAL/TRANSACTION/VERIFICA-
TION/PRINT CYCLE

The actual transaction/verification/print cycle be-
gins when the retailer lifts the (normally closed) cover,

4,758,714

**11**

1-2, to insert the credit card, invoice, check, food stamp etc. Lifting the cover off the non-defeatable switches at 3-15 far enough (this is a two stage switch as will be explained later) alerts the system's CPU to begin a thirty (30) second countdown in which the customer must enter his PIN number at the keypad (4-44).

The retailer will enter the purchase price amount at 2-10 (or if a smart card is being used, 4-64) which automatically sets the entered amount at 2-12 which then reads out to the customer and the retailer at 4-40 and 2-23 and 4-65, only if a smart card is being used.

The retailer will insert the credit card, travelers check, personal check, food stamp and/or invoice in the system at their proper location as seen by FIG. 15. These will be held in place prior to spring plate pressure by the retractable pin guides, 13-72 and 15-72, guides at 15-88 (or the alternative slot 16-91 and/or appropriate recesses in the deck housing). It consists basically of a lengthened 14-70 reader housing thereby creating a slot or groove long enough to insert the entire (long) edge of a 15-78 check. It may in fact be long enough for common larger checks such as payroll checks, etc. This groove 16-91 in the 16-16A verifier access door insures reliable reading of the MICA line and all tracks of the credit cards. This is accomplished since proper insertion by the retailer will necessarily eliminate folds and wrinkles in checks and food stamps and may even accommodate minor tears and destruction of the MICA line area. The "bottom" of the 16-91 groove will correspond to the location of the 15-88 guides. Obviously, the 15-36 and 15-76 heads will begin and end their ready cycle in the same location seen as 14-77.

Triggering the 15-18 switch tells the CPU that a card is present and to switch to "Card Mode." The CPU will automatically select the mag-stripe reader head (15-36) and all "Card Mode" verification systems and functions. The 15-18 switch may be overridden by the 4-94 slot switch indicating a smart card is present. Triggering of both switches 4-94 and 15-18, will cause an abort. Triggering of either the 4-94 switch or 15-18 without proper triggering of 15-18A, indicating an invoice is present will cause an abort. Triggering of switch 15-36 in conjunction with either 4-94 slot switch or switch 15-18 will cause an abort.

Triggering the 4-94 slot switch tells the CPU that a "smart card" is present and to switch to the "Smart Card" mode. The CPU will automatically cancel the "cycle command" of the verifier head traction mechanism (4-24) since its function is not necessary in the "Smart Card" mode. Additionally, the CPU will automatically select all "Smart Card" verification/authorization and transaction functions with respect to record keeping, printing of the invoice, etc. Triggering of the 4-94 slot switch demands that an invoice be present and that the 15-36 not show a check present. A violation of either condition will cause an abort.

Triggering the 15-86 signals the CPU that a "check" is present and to switch to the "Check Mode." For the purposes of this disclosure, the term "Check" shall mean traveler's checks, government checks, personal checks, food stamps or any means of monetary payment which utilizes the Federal Reserve Bank's MICA system. The CPU will automatically select the 15-76 MICA reader head and all "check" verification systems and functions which shall include the phone-in module, the disk-drive, etc. Simultaneous triggering of the 4-94 slot switch, the 15-18 or the 15-18A with the 15-86 will cause an abort of the T/V/P Cycle.

**12**

Triggering the 15-18A signals the CPU that an invoice is present. It must be triggered with the 4-94 slot switch or the 15-18 to become usable information to the CPU.

After the retailer has inserted the proper combination of invoice, card, and check and has made the proper keypad entries, he will close the 1-2 lid to being the T/V/P Cycle. (Note: As mentioned in the first paragraph of the T/V/P Cycle text, the 3-15 switch is a dual function device. The two functions shall be entitled "3-15" and "3-15A." When the 1-2 cover is in its "rest" position between transactions, neither 3-15 or 3-15A is activated. Lifting the cover off the 3-15 switch triggers the CPU to receive the customer's PIN entry within 30 seconds. Once triggered, the 3-15 then becomes inert until the next cycle begins. Closing the 1-2 lid with the application of 6 oz. of pressure or more then triggers the 3-15A function which signals the CPU to begin the entire T/V/P Cycle.) When the 3-15A switch is triggered, the CPU then begins to ask a series of questions. All questions will be on an "if yes,' proceed" and an "if 'no,' abort" basis. "Abort" shall mean that the 1-2 cover will "pop" open and the system will not have printed the invoice or caused any funds to be transferred in any way whatever including EFT. One option may be that an attempted purchase with a proven lost, stolen or counterfeit check or card will be recorded with the date, account number and dealer I.D. number (for location) to help the police in the apprehension of criminals. The questions might include:

(1) Does the system have standard 110 v. (220 v. for export) power? This shall be within the limits described elsewhere. If 'yes,' proceed—if 'no,' abort . . .

(2) Is the 1-2 or the optional 1095 cover locked as signified by the 3-20's being engaged?

(3) Are any of the onboard/outboard security systems or any of the 4-39 module security systems compromised?

(4) What mode is the system to function in as designated by responses from 15-18, 15-18A, 15-36 and 4-94 slot switches.

(5) Does the purchase price matrix mechanism (3-16, 15-10, 15-12) show an entry?

(6) Has a verified correct PIN number been entered at 4-44 within the 30 second time limit? The 30 second limit may be modified for more time if research mandates such a change. Verifying the PIN will involve comparison of the PIN entered by the customer with that computed by the 4-39 security modules, the PIN returned from the issuer's computer via a phone in module or verification via the MICA system.

(7) NOTE: If the retailer desires his funds to be electronically transferred to his account from the customer's card issuer, then the retailer must engage the "EFT" button shown at 15-92. This EFT process is an optional transaction process because using the EFT requires the use of phone lines which, if long distance, may be an additional operating cost. If the retailer desires his money immediately, he simply depresses switch 15-92.

(8) In the case of personal checks, does the account the check is drawn on show sufficient funds? The system anticipates the use of PIN's with personal checks to identify the writer and bearer of the check to be in fact the valid bearer. Also, a check of the account balance that shows sufficient funds would warrant the automatic stamping of "VERI." on the check. This would in some degree insure payment to the retailer. The

FK 001262

4,758,714

13

14

"VER1." stamp is described as either 15-81 or 15-85. A preferred method would be to depress and engage the 15-92 EFT (electronic fund transfer) switch. This would initiate the EFT process as mentioned above. Again, this is the retailer's option since in a small community the customer may be known to the retailer, or for other reasons, the EFT process may not be cost effective and/or necessary.

(9) If in the "smart card" mode, does the card show sufficient funds? Does the card show a verified correct PIN entry? Has the card been prematurely removed from the 4-66 slot as indicated by the 4-94 slot switch?

The main system CPU keeps a running total of all sales for a given day or shift and will display them following a predescribed key command at 4-23. This display will show the total of funds paid to the retailer by cash, check or credit card at the POS; a separate total of all "EFT" funds transferred to the retailer's account in his bank (as per common practice) and a grand total of both.

The 4-39 modules will mount into the 4-28 drawer by sliding into appropriately spaced slots or "rails" and will be secured in place by a suitable machine screw. When the 4-39's are inserted fully into the drawer, they make contact via a reliable multi-pin connector with a parallel-wired circuit rail which in turn plugs into the system at 4-29. Thus, all 4-39 modules are wired similarly in parallel or "gangs" and all receive identically the same information. However, when one module "recognizes" its algorithm, processes the input and returns an "accept" signal to the system, the passive outputs (at this stage) of the other 4-39's will not impede the transmission of this "accept" command to the system.

FIGS. 13 and 16 show an alternative design to that discussed so far in this section. This alternative design more readily accommodates traveler's checks, personal checks, food stamps, etc. and in fact constitutes refinement and improvement over that system shown in FIGS. 5 and 6. A MICA reader device, 14-76, 15-76, and 16-76, such as that in common use by the Federal Reserve Banking System is installed adjacent to the 13-36 (14-36 and 15-36) mag-stripe reader head. This is possible since the three mag-stripe tracks on common credit cards and the MICA line on all checks are in such close proximity as shown by Figure 15. Due to strict Standard's regulations, this phenomenon is likely to remain indefinitely. As has been previously stated, the selection of which "head" to use is automatically made prior to verifier movement by the system's CPU in association with the switches numbered 15-18, 15-18A and 15-86. The position of the MICA, PIN, or offset number on the 15-78 check is shown at 15-75A and will be read as a part of the routing and transit numbers and account numbers preceding it in the MICA line.

FIGS. 14 and 16 show the correct method of inserting the travelers checks and all instruments with MICA line information to allow MICA reading. They are inserted into the 16-91 slot upside down with the MICA line toward the front of the machine, which means the MICA line must be closest to the 14-76, 16-70 read-head assembly. Since the 14-78 and 16-16A devices are attached forming a single unit, reliable tracking is assured during the entire field of motion. This device has been designed to be field up-gradable. This is to say, if a 65 buyer operates in an area where certain functions described herein may not be cost-effective or are simply not applicable or necessary to his business operations,

he may purchase the device without, for example, the EFT circuitry. Further, perhaps the buyer does not need the MICA check functions, he doesn't have to purchase them. However, the 1-1 main case, 1-2 cover include all provisions for field installation of the additional functions described herein and some which may not be described and are the subject of future patent work. A further example would be a new, American made pick-up truck which may be ordered without a radio but provisions have usually been made so that the dealer can add one.

If in the event certain functions (but *not* security measures) should fail in this device or outboard devices such as Payer's Bank's hardware/software, provision has been made for a standard telephone headset which would allow the retailer to get into direct voice contact with the appropriate issuer. This voice contact would allow for authorization or credit/debit card transactions and check transactions in the event of a malfunction. However, it should be noted that the customer's PIN number entered at the PIN keypad will be transmitted as encrypted digital information to the issuer thereby denying the PIN number to onlookers, passer-by, retail clerks, etc. Further, in the event of certain types of malfunctions and/or difficulties such as a card or check reported stolen or counterfeited to the issuer's computer, the "phone in" light on top of the device shown at 1-3-G would light alerting the retailer to pick up the headset for a verbal message for appropriate actions. The issuer may be required to signal the device in an encrypted manner and means to allow the device to function properly and allow the transaction to proceed to completion. This is in no way a compromise of system/device security nor should be construed as such.

It will, of course, be understood that various changes may be made in the form, details, arrangement and proportions of the parts without departing from the scope of the invention which consists of the matter shown and described herein and set forth in the appended claims.

What is claimed is:

1. A secured point-of-sale mechanism comprising:

(a) a closable two compartment housing having a secured portion which includes printer means and a plurality of signal devices indicating the condition of a plurality of circuits contained in said secured portion of said housing;

(b) an unsecured door portion cooperating with said secured portion for completing said two compartment housing;

(c) a monetary negotiable instrument section disposed within said unsecured portion having a first part for retaining a credit card, a second part for retaining an invoice of a point-of-sale transaction, a third part for retaining a check for a point-of-sale transaction, a fourth part for retaining any monetary negotiable instrument, a fifth part for identifying the payee of said transactions, and a sixth part for establishing the transaction selling price;

(d) a transaction price index settable to the correct sales amount purchased by a customer;

(e) a first plurality of switching mechanisms having a first part fixed in said secured portion of said housing and a second part extending into said unsecured portion of said housing to be actuated by said unsecured door portion;

(f) printer means;

**FK 001263**

4,758,714

15

(g) a second plurality of switching mechanisms having a first part fixed in said secured portion of said housing and a second part extending into said unsecured portion of said housing to be actuated by a combination of monetary negotiable instruments; and

(h) a locking mechanism connected to said plurality of switching mechanisms and disposed between said secured and unsecured portions of said housing for securing said housing against invasion as long as said plurality of switching mechanisms are actuated.

2. The invention as set forth in claim 1 which further comprises means to access a computer system maintained by an issuer of a negotiable instrument.

3. The invention as set forth in claim 1 which further comprises means to access an external communication system to identify a payor of a negotiable instrument and perform an electronic funds transfer.

4. The invention as set forth in claim 1 which further comprises telephonic means to communicate with the issuer of a negotiable instrument.

5. The invention as set forth in claim 1 which further comprises telephonic means to communicate with the issuer of a credit card.

6. The invention as set forth in claim 1 which further comprises a keypad, for customer use, which is located outside the closable two compartment housing.

7. The invention as set forth in claim 1 which further comprises:

a standard 8 bit microprocessor capable of accessing 64 K bytes of memory; and

means connecting said plurality of switching mechanisms and said locking mechanisms to said microprocessor and upon any one of said switching mechanisms not being actuated, said locking mechanism seeking an inoperable position.

8. The invention as set forth in claim 2 including:

a printing mechanism having a pair of plates spatially disposed about any of said credit cards, invoices, checks or other monetary negotiable instruments; and

an actuating mechanism cooperating with said printing mechanism for producing an imprinted instrument of said transaction; and

a lock disabling mechanism connected to said actuating mechanism and said locking mechanism, said locking mechanism being disable after creating an imprinted monetary negotiable instrument.

9. The invention as set forth in claim 1 which further rcomprises:

read head means connected to said microprocessor and disposed adjacent said credit card for reading any magnetic code that is detectable in said card; and

read head transport means producing movement of said read head means under said credit card as long as said code is being detected by said read head.

10. The invention as set forth in claim 1 which further comprises:

a monetary negotiable instrument carrying a MICA stripe on its surface disposed within said secured

16

portion having a first part for retaining said MICA stripe;

said monetary negotiable instrument also carrying a magnetic stripe on its surface disposed within said secured portion having a first part for retaining said magnetic stripe;

read head means connected to said microprocessor and disposed adjacent said monetary negotiable instrument to read any code impressed therein;

PIN identification number entry means connected to said microprocessor for receiving a PIN number; and

means including said microprocessor connecting said read head means and said PIN identification number entry means to said printing mechanism and said actuating mechanism said printing mechanism to be actuated when said signals are the same.

11. The invention as set forth in claim 1 which further comprises:

an override mechanism;

a smart card key pad connected to said override mechanism having detection means for detecting the presence of said smart card;

a personal identification number module having a key tab matrix connected to said microprocessor, said key tab matrix having been set to match the transaction amount to be recorded; and

said override mechanism being connected to said microprocessor for actuating said printing mechanism and said lock disabling mechanism.

12. The invention as set forth in claim 1 which further comprises:

a high strength steel drawer slidable within said secured portion of said two compartment housing, said drawer having individual electrical compartments for containing said security modules;

wide flange means formed on the outside of said steel drawer to engage said two compartment housing;

a connector electrically connected to said individual electrical compartments in said steel drawer and to said microprocessor; and

locking means securing said steel drawer within said two compartment housing and further securing said security modules to said steel drawer.

13. The invention as set forth in claim 1 which further comprises:

a first read head connected to said microprocessor and disposed adjacent a first monetary negotiable instrument within said section;

a second read head connected to said microprocessor and disposed adjacent a second monetary negotiable instrument within said section;

a track mechanism for guiding a transport means;

first transport means producing movement of said first read head over said track mechanism;

second transport means producing movement of said second read head over said track mechanism; and

means connecting said first and second transport means to said microprocessor and causing movement of the same as long as a code is being detected by said first and second read heads.

* * * * *

65

FK 001264