1

# EXHIBIT REDACTED IN ITS ENTIRETY

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LML PATENT CORP.,

   Plaintiff,

  v.

TELECHECK SERVICES, INC.,
ELECTRONIC CLEARING HOUSE, INC.,
XPRESSCHEX, INC. and NOVA
INFORMATION SYSTEMS, INC.,

   Defendants.

C.A. 04-858 (SLR)

### TELECHECK'S FIRST SUPPLEMENTAL RESPONSE TO LML'S AMENDED FIRST SET OF INTERROGATORIES

### RESERVATION OF RIGHTS

   Pursuant to Rules 26 and 33, TeleCheck Services, Inc. ("TeleCheck") hereby provides a First Supplemental Response to LML Patent Corp.'s ("LML") Amended First Set of Interrogatories, Nos. 1-9 ("Interrogatories"). TeleCheck provides these supplemental responses without waiving any present or future objection, for example such as any objection as to the relevance or admissibility of any information provided by TeleCheck. TeleCheck's investigation regarding this litigation is ongoing, as is TeleCheck's development of any contentions. These responses are provided subject to TeleCheck's future investigation, supplementation, or modification. TeleCheck's agreement to investigate the subject matter of any interrogatory or to provide responsive information does not constitute an admission that relevant, non-privileged information responsive to that interrogatory exists. All responses are subject to each of the General Objections and specific Objections set forth in TeleCheck's original Response to LML's Amended First Set of Interrogatories.

**FIRST SUPPLEMENTAL RESPONSES TO INTERROGATORIES**

**INTERROGATORY NO. 1:**

Describe in detail all bases for TeleCheck's contention that it does not infringe the Asserted Claims of the Patents-In-Suit, either literally or under the doctrine of equivalents, and its contention that it has not contributed to the infringement by others and/or has not induced others to infringe any Asserted Claim of the Patents-In-Suit including a claim chart explaining in detail all specific structural or functional differences between each Accused Product and the Asserted Claims.

(As used herein, "Patents-in-Suit" means U.S. Patent Nos. 5,484,988, 6,164,528, 6,283,366; "TeleCheck's Accused Products," "Accused Product," or "product" means any equipment, component, system, or services manufactured, sold, offered for sale, used, or imported by TeleCheck for or associated with the conversion of checks, presented at points of sale, to electronic transactions, including but not limited to, TeleCheck's "Electronic Check Acceptance Service"; and "Asserted Claims" means claims 1-6, 8-11, and 13 of the '988 patent, claims 11 and 18 of the '528 patent, and claims 3 and 25 of the '366 patent).

**RESPONSE TO INTERROGATORY NO. 1:**

TeleCheck objects to this interrogatory as premature, in that it seeks expert discovery and contentions which TeleCheck has not yet fully developed at this stage of the litigation. TeleCheck further objects to this interrogatory as premature, because it requires contentions regarding claim construction, and is therefore in conflict with the Scheduling Order governing this case. TeleCheck further objects to LML's definition of "TeleCheck's Accused Products," "Accused Product," or "product" as vague, overly broad and unduly burdensome. TeleCheck further objects to this interrogatory insofar as LML is attempting to shift its burden of proof on infringement to TeleCheck. Plaintiffs, not defendants, bear the burden of proving infringement. TeleCheck has only recently received LML's infringement contentions and asserted claims. Subject to these objections, TeleCheck will supplement its responses as necessary to reflect its contentions in a time and manner agreed-upon by the parties, or other reasonable time as contentions are developed.

2

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:**

TeleCheck incorporates by reference its initial objections and response as though fully set forth herein. TeleCheck expressly reserves the right to supplement this response as discovery proceeds, and provides the following information in response to this Interrogatory:

TeleCheck does not infringe any of claims 1-6, 8-11, and 13 of the '988 patent; any of claims 11 and 18 of the '528 patent; nor any of claims 3 and 25 of the '366 patent, at least because the Accused Products do not meet the limitation "without using the check as a negotiable instrument" (the "negotiable instrument" limitation) either literally or (if available) under the doctrine of equivalents.

The TeleCheck Accused Products do not meet this limitation because the consumer bank check is in fact used as a negotiable instrument. In the TeleCheck system, the magnetic ink character recognition ("MICR") reader reads not only bank account information, but also the bank check number. Using the check number, the host system then clears and voids the check during the transaction. TeleCheck's scanning of the check number and subsequent cancellation of the check is consistent with use of the check as a negotiable instrument.

The electronic submission of the check information (including the check number, amount of the check and other MICR information) through the TeleCheck system constitutes a presentment of the check and is the time at which all of the warranties of presentment attach. This is also consistent with using the check as a negotiable instrument. Having undergone presentment, the spent and voided check is returned to the customer, in materially the same way a customer receives presented and voided checks in the mail along with their monthly bank statements.

TeleCheck further requires its merchants to have consumers fill out and sign checks before handing them to the merchant. The signed bank check constitutes a negotiable instrument, and is used as such in the TeleCheck system. The signed bank check itself may be retained as part of a normal checking transaction, rather than carrying on the transaction electronically. This may occur in the TeleCheck system, when certain banks disallow conversion of the paper check to an electronic check at the terminal. In

3

such cases, the terminal displays an appropriate prompt, and the merchant simply retains the signed bank check without any further information from the consumer. This treatment of the check is only possible because the signed check meets all criteria of a negotiable instrument, and is used as a negotiable instrument.

The "negotiable instrument" limitation can not be expanded to cover "equivalents." In general, negative limitations are not entitled to any scope of equivalents. *See Athletic Alternatives Inc. v. Prince Mfg.*, 73 F.3d 1573 (Fed. Cir. 1996); *Pennwalt v. Durand-Wayland Inc.*, 833 F.2d 931 (Fed. Cir. 1987). Further, with respect to the '988 patent, the limitation was added to each independent claim during prosecution to overcome prior art. (*See* Preliminary Amendment dated June 9, 1994, LML-EP-000170-175.) As a result, the *Festo* presumption applies to this limitation within the '988 patent and precludes any scope of equivalents.

The Applicants further relied on the "negotiable instrument" limitation during prosecution to obtain allowance of all Asserted Claims over the prior art. For example, during prosecution of the '528 patent the Applicants argued:

> As a convenience to the consumer, bank account information is read off of a check. However, the check is not utilized as a negotiable instrument. As such the check need not even be signed by the consumer. All of the information is stored in the check writing point of sale system, and transfer of the funds is handled electronically.

(Response dated May 20, 1999; *see also* Response dated January 30, 1995, LML-EP-000189-209; Response dated May 21, 1998, LML-EP 000414-18.) This disavowal of claim scope further precludes any application of the doctrine of equivalents.

Even if resort to the doctrine of equivalents is available, the Accused Products do not meet the "negotiable instrument" limitation because the differences between the Accused Products and the limitation (as described above) are not insubstantial.

TeleCheck does not infringe any of claims 2 and 8-11 of the '988 patent; nor any of claims 11 and 18 of the '528 patent at least because the Accused Product do not meet the limitation of reading MICR information for the "sole purpose of obtaining consumer bank account information," either literally or (if available) under the doctrine of equivalents.

4

In the TeleCheck system the check number is also read by the terminal. This additional information is not obtained for the "sole purpose" of obtaining bank account information, and therefore this limitation is not literally met by the TeleCheck system.

The "sole purpose" limitation was added to the claims during prosecution of the '988 patent. (Compare original claims, LML0EP 000104-06, with Preliminary Amendment dated June 8, 1994, LM-EP 000170-79.) As a result, the *Festo* presumption applies to this limitation within the '988 patent and precludes any scope of equivalents.

The Applicants expressly relied on this limitation to obtain allowance of the claims over the prior art. (*See, e.g.*, Amendment dated January 30, 1995, LML-EP-000189-209; "None of the references discloses a point-of-sale system that uses any bank check solely for the purposes of gathering customer information and not as a negotiable instrument;" *see also* Preliminary Amendment dated June 9, 1994, LML-EP-000170-000175.) This clear disavowal of claim scope precludes any scope of equivalents.

Even if resort to the doctrine of equivalents is available, the Accused Products do not meet the "sole purpose" limitation because the differences between the Accused Products and the limitation (as described above) are not insubstantial.

TeleCheck does not infringe any of claims 1-6, 8-11, and 13 of the '988 patent; nor claim 3 of the '366 patent, at least because the Accused Products do not meet the limitation of a terminal adapted to receive consumer bank account information from "any bank check," either literally or (if available) under the doctrine of equivalents.

The TeleCheck system cannot be used with foreign checks such as Canadian checks, or with checks from credit card companies (*i.e.*, checks that act as a cash advance from the credit card issuer).

The "any bank check" limitation was added to the claims during prosecution of the '988 patent to overcome the prior art. (Compare original claims, LML-EP 000104-06, with Response dated January 30, 1995, LML-EP 000183-209.) As a result, the *Festo* presumption applies to this limitation within the '988 patent and precludes any scope of equivalents. The Applicants further relied on this limitation to distinguish the prior art (*see* LML-EP 000207). Accordingly, no scope of equivalents is available.

5

Even if the doctrine of equivalents is applicable, the Accused Products do not infringe under the doctrine of equivalents because the differences between the Accused Products and the claim limitation are not insubstantial.

## INTERROGATORY NO. 2:

Separately for each Asserted Claim of the Patents-In-Suit, describe in detail all legal and factual bases for TeleCheck's contention that the Asserted Claims of the Patents-In-Suit are invalid, and for each piece of alleged prior art, and/or combination of alleged prior art, that TeleCheck contends invalidates each Asserted Claim, provide a detailed claim chart that identifies each element of the Asserted Claims that TeleCheck contends is disclosed or taught by the prior art with citations to each instance where such element is allegedly disclosed or taught by the prior art.

## RESPONSE TO INTERROGATORY NO. 2:

TeleCheck objects to this interrogatory as premature, in that it seeks expert discovery and contentions which TeleCheck has not yet fully developed at this stage of the litigation. TeleCheck further objects to this interrogatory as premature, because it requires contentions regarding claim construction, and is therefore in conflict with the Scheduling Order governing this case. Subject to these objections, TeleCheck will produce charts and other information as necessary, reflecting its contentions in a time and manner agreed-upon by the parties.

## FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:

TeleCheck incorporates by reference its initial objections and response as though fully set forth herein. TeleCheck expressly reserves the right to supplement this response as discovery proceeds, and provides the following information in response to this Interrogatory:

Based on the claim construction apparently asserted by LML, as presently understood by TeleCheck, the Asserted Claims are invalid as set forth below:

6

1.    **The '988 Patent**

Claims 1, 4, 9-10, and 13 of the '988 patent are invalid under as anticipated 35
U.S.C. § 102 by U.S. Patent No. 5,175,682 to Higashiyama ("Higashiyama"). Each and
every element of claims 1, 4, 9-10 and 13 of the '988 patent is taught by Higashiyama.

| The '988 Patent | Higashiyama |
|---|---|
| 1. A checkwriting point of sale system comprising: | A system for processing checks presented at the point of sale. (*See* col. 2, lines 43-46; col. 3, lines 11-14.) |
| a point of sale terminal adapted to receive consumer bank account information from any bank check; | Point of sale system 210 including a MICR reader 202 used for reading the magnetic account number printed on checks. (*See* col. 3, lines 13-18.) |
| a central computer system; | Backroom processor 204 to which one or more point of sale systems are connected. (*See* Figure 2; col. 3, lines 13-14, 29-33.) |
| first communications means integral to said point of sale terminal for electronically communicating with the central computer system; | POS terminal 201 (which is part of the point of sale system) is connected to the backroom processor 204. (*See* col. 3, lines 29-30.) |
| memory means integral to said point of sale terminal for temporarily storing the consumer bank account information; | Data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201. (*See* col. 3, lines 55-62; col. 5, lines 1-4.) |
| the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; | Backroom processor 204 receives data records from the POS terminal 201. (*See* col. 5, lines 1-10.) Since the backroom processor 204 is connected to one or more point of sale systems 210, each having a POS terminal 201 that supplies data records, the backroom processor 204 receives data records from one or more (plurality) of point of sale systems 210. |
| the central computer system second communication means enabling | Backroom processor 204 will take the data records it has accumulated and upload them |

7

| | |
|---|---|
| said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the bank check as a negotiable instrument. | to a clearing house. (*See* col. 5, lines 11-13.) The data record is also used to verify check authorization by being compared to a file. (*See* col. 4, lines 14-24.) The information from the paper check is electronically processed and the check is returned to the customer at the point of sale. (*See* col. 4, lines 54-57.) |
| 4. The checkwriting point of sale system according to claim 1 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip. | Printer 203 for printing a sales slip. (*See* col. 3, lines 25-27.) |
| 9. A checkwriting point of sale system comprising: | A system for processing checks presented at the point of sale. (*See* col. 2, lines 43-46; col. 3, lines 11-14.) |
| a point of sale terminal adapted to receive consumer bank account information; | Point of sale system 210 including a MICR reader 202 used for reading the magnetic account number printed on checks. (*See* col. 3, lines 13-18.) |
| a central computer system; | Backroom processor 204 to which one or more point of sale systems are connected. (*See* Figure 2; col. 3, lines 13- 14, 29-33.) |
| first communications means integral to said point of sale terminal for electronically communicating with the central computer system; and | POS terminal 201 (which is part of the point of sale system) is connected to the backroom processor 204. (*See* col. 3, lines 29-30.) |
| memory means integral to said point of sale terminal for temporarily storing the consumer bank account information; | Data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201. (*See* col. 3, lines 55-62; col. 5, lines 1-4.) |
| the point of sale terminal comprising reading means for reading magnetic ink character recognition numbers on any consumer bank check for the sole | MICR reader 202 reads the account information on the check. (*See* col. 3, lines 48-50.) |

8

| | |
|---|---|
| purpose of eliciting consumer bank account information; | |
| the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; | Backroom processor 204 receives data records from the POS terminal 201. (*See* col. 5, lines 1-10.) Since the backroom processor 204 is connected to one or more point of sale systems 210, each having a POS terminal 201 that supplies data records, the backroom processor 204 receives data records from one or more (plurality) of point of sale systems 210. |
| the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using a bank check as a negotiable instrument. | Backroom processor 204 will take the data records it has accumulated and upload them to a clearing house. (*See* col. 5, lines 11-13.) The data record is also used to verify check authorization by being compared to a file. (*See* col. 4, lines 14-24.) Further, the information from the paper check is electronically processed, and the check is returned to the customer at the point of sale. (*See* col. 4, lines 54-57.) |
| 10. The checkwriting point of sale system according to claim 9 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip. | Printer 203 for printing a sales slip. (*See* col. 3, lines 25-27.) |
| 13. The checkwriting point of sale system according to claim 4, wherein the sales slip includes means for execution by the consumer for proof of bank account access authorization. | A fully automated system generally comprises a dual-port terminal with magnetic stripe reading capabilities interfaced with a logging printer capable of providing individual transaction event slips for consumer execution. (*See* col. 5, lines 44-47.) |

Claim 2 of the '988 patent is obvious under 35 U.S.C. § 103 as unpatentable over Higashiyama.

9

| The '988 Patent | Higashiyama |
|---|---|
| 2. The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further includes means for reading magnetic ink character recognition numbers appearing on a consumer check for the sole purpose of identifying and reading the consumer bank account information. | MICR reader 202, which is disclosed as part of the point of sale system 210, reads the consumer account information.  (*See* col. 3, lines 47-50.) |

Claim 3 of the '988 patent is obvious under 35 U.S.C. § 103 as unpatentable over

Higashiyama in view of U.S. Patent No. 5,053,607 to Carlson ("Carlson").

| The '988 Patent | Higashiyama + Carlson |
|---|---|
| 3. The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further comprises an alphanumeric display means for receiving said consumer bank account information from the memory means and for displaying the consumer bank account information. | Carlson teaches an alphanumeric display used in connection with a point-of-sale device for reading MICR numbers from checks. When the MICR data is entered manually by the merchant, the MICR data is displayed digit-for-digit/stroke-for-stroke at the display. (*See* col. 21, lines 5-8.) It would have been obvious to include alphanumeric display means in the system described by Higashiyama. |

Claim 6 of the '988 patent is obvious under 35 U.S.C. § 103 as unpatentable over

Higashiyama in view of an article about a POS terminal network known as the Cactus

Switch ("Cactus Switch article").  The Cactus Switch article was published September

1986 and constitutes § 102(b) prior art against the '988, '528 and '366 patents.

| The '988 Patent | Higashiyama + Cactus Switch article |
|---|---|
| 6. The checkwriting point of sale system according to claim 1 wherein the central computer system further comprises a system subscriber database, the system subscriber database comprising | The central computer of Higashiyama serves one or more POS terminals of a single merchant. The Cactus Switch network serves multiple merchants and the transaction is cleared through the Arizona Clearing House Association.  It would have been obvious to |

10

| | |
|---|---|
| information regarding merchants and service providers that are authorized to use the checkwriting point of sale system. | modify Higashiyama's POS system to service multiple merchants (e.g., multiple merchants belonging to the same retail chain) such that its central computer comprises a system subscriber database so that proper accounting of sales and credits can be made. |

Claim 13 of the '988 patent is further invalid as obvious under 35 U.S.C. § 103 over Higashiyama in view of another article about the Cactus Switch ("second Cactus Switch article"). The second Cactus Switch article was published on November 17, 1986 and constitutes § 102(b) prior art against the '988, '528 and '366 patents.

| The '988 Patent | Higashiyama + second Cactus Switch article |
|---|---|
| 13. The checkwriting point of sale system according to claim 4, wherein the sales slip includes means for execution by the consumer for proof of bank account access authorization. | The second Cactus Switch article teaches that checking account debit authorizations may be provided by personal identification numbers or signatures. (*See* p. 4.) In view of this teaching, it would have been obvious to modify Higashiyama's POS system to include a sales receipt with a signature space for the consumer to provide authorization to debit his or her checking account. |

Claim 8 of the '988 patent is obvious under 35 U.S.C. § 103 as unpatentable over Higashiyama in view of U.S. Patent No. 4,321,672 to Braun ("Braun").

| The '988 Patent | Higashiyama + Braun[1] |
|---|---|
| 8. A checkwriting point of sale process comprising: | A method for processing checks presented at the point of sale. (*See* col. 2, lines 43-46; col. 3, lines 11-14.) |
| a) presenting any bank check specimen to a point of sale terminal located at a merchant or | Customer provides a check to the merchant. (*See* col. 3, lines 47-48.) |

---

[1] Unless otherwise noted, citations are to Higashiyama.

11

| service provider, | |
|---|---|
| b) reading the magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument, | MICR reader 202 reads the account information on the check. (*See* col. 3, lines 48-50.) |
| c) storing the consumer bank account information obtained from the check and verifying that account numbers were accurately read at the point of sale terminal, | Data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201, i.e., stored at the POS terminal 201. (*See* col. 3, lines 55-62; col. 5, lines 1-4.) The step of verifying is made obvious in view of Braun, which teaches use of error detector circuits 52 which identify errors in the ABA code from the reader 38. (*See* Braun, col. 7, lines 31-33; col. 19, lines 46-49.) |
| d) providing transaction event information to the point of sale terminal, | The amount the check is written for is provided by the merchant via the POS keypad. (*See* col. 3, lines 64-66.) |
| e) transmitting the transaction event information and consumer bank account information to a central computer system, | POS terminal 201 sends the data record to the backroom processor 204. (*See* col. 5, lines 1-10.) |
| f) storing the transaction event information and consumer banking account information, and | Backroom processor 204 accumulates the data records that it receives. (*See* col. 5, lines 11-12.) |
| g) subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations. | The data records are batch uploaded to a clearing house. (*See* col. 5, lines 11-13.) |

Claims 1, 8 and 9, and the asserted claims of the '988 patent which depend from claims 1, 8 and 9 are further invalid under 35 U.S.C. § 112, first paragraph, because the original disclosure failed to provide sufficient written description for claim language

12

subsequently added in a June 1994 Office Action response.  Further, the subsequent addition to the written description constituted new matter, in violation of 35 U.S.C. § 132.

Claims 1-6, 9-11 and 13 are further invalid under 35 U.S.C. § 112, first paragraph, for failure to provide in the patent specification an enabling disclosure for a second communication means "enabling automated clearing house communications for transferring funds without using the bank check as a negotiable instrument."

Claim 8 is further invalid under 35 U.S.C. § 112, first paragraph, for failure to provide in the patent specification an enabling disclosure for a checkwriting point of sale process comprising the step of "reading the magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument."

Claims 1-6, 9-11 and 13 are further invalid under 35 U.S.C. § 112, second paragraph, because they recite means-plus-function claims without describing a corresponding structure for such means in the specification as required under 35 U.S.C. § 112, sixth paragraph.

### 2.    The '528 Patent

Claim 10 and asserted claim 11 of the '528 patent are obvious under 35 U.S.C. § 103 as unpatentable over Higashiyama in view of Braun.

| The '528 Patent | Higashiyama + Braun[2] |
|---|---|
| 10. A checkwriting point of sale process comprising: | A method for processing checks presented at the point of sale.  (*See* col. 2, lines 43-46; col. 3, lines 11-14.) |
| (a) presenting a bank check specimen to a point of sale terminal located at a merchant or service | Customer provides a check to the merchant. (*See* col. 3, lines 47-48.) |

---

[2] Unless otherwise noted, citations are to Higashiyama.

| | |
|---|---|
| provider; | |
| (b) reading a magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument; | MICR reader 202 reads the account information on the check. (*See* col. 3, lines 48-50.) |
| (c) storing the consumer bank account information obtained from the check and verifying that account numbers were accurately read at the point of sale terminal; | Data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201, i.e., stored at the POS terminal 201. (*See* col. 3, lines 55-62; col. 5, lines 1-4.) The step of verifying is made obvious in view of Braun, which teaches use of error detector circuits 52 which identify errors in the ABA code from the reader 38. (*See* Braun, col. 7, lines 31-33; col. 19, lines 46-49.) |
| (d) providing transaction event information to the point of sale terminal; | The amount the check is written for is provided by the merchant via the POS keypad. (*See* col. 3, lines 64-66.) |
| (e) transmitting the transaction event information and consumer bank account information to a central computer system; | POS terminal 201 sends the data record to the backroom processor 204. (*See* col. 5, lines 1-10.) |
| (f) storing the transaction event information and consumer banking account information; | Backroom processor 204 accumulates the data records that it receives. (*See* col. 5, lines 11-12.) |
| (g) subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations; and | The data records are batch uploaded to a clearing house. (*See* col. 5, lines 11-13.) |
| (h) returning the bank check specimen to the consumer. | Check is returned to the customer for safekeeping. (*See* col. 4, lines 54-55.) |
| 11. The checkwriting point of sale process of claim 10 further comprising: annotating the bank check specimen before returning the bank check specimen to the | Validation information, indicating that electronic data pertaining to the check has been routed for collection and the check may be considered canceled, is printed on the check. (*See* col. 4, lines 26-32.) The |

14

| consumer. | validated check is returned to the customer. (*See* col. 4, lines 54-55.) |
|---|---|

Claims 11 and 18 of the '528 are invalid under 35 U.S.C. § 112, first paragraph, because the original disclosure failed to provide sufficient written description for a checkwriting point of sale process comprising the step of "reading the magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument."

All Asserted Claims of the '528 are further invalid under 35 U.S.C. § 102(b) based on both the public use bar and the on-sale bar.

### 3.    The '366 Patent

Claim 24 and asserted claim 25 of the '366 patent are invalid under 35 U.S.C. § 103 as unpatentable over a Sacramento Bee article published on November 7, 1995 ("the Sacramento Bee article") in view of Braun or Carlson.

| The '366 Patent | Sacramento Bee Article + Braun/Carlson[3] |
|---|---|
| 24. A checkwriting point of sale process comprising: | Process is referred to as point-of-sale electronic draft capture. (*See* ¶¶ 3, 10.) |
| a payer completing a check for a transaction with a merchant or service provider; | A number of prior art references, including Braun (col. 24, lines 61- 66) and Carlson (col. 22, lines 57-58), teaches a point-of-sale process that includes the step of completing the check, followed by its cancellation and return to the payer.  It would have been obvious to include a step of completing the check with the method of the Sacramento Bee Article.  For example, Braun teaches that upon receipt of the monthly statement, the customer can verify the accuracy of the monthly statement using the cancelled checks.  (*See* Carlson col. 26, lines 58- 62.) |

---

[3] Unless otherwise noted, citations are to the Sacramento Bee article.

15

| | |
|---|---|
| using a point of sale terminal associated with said merchant or service provider to read MICR information on the check to obtain payer bank account information; | The automated system reads the check (account) number and checks the status of the account. (*See* ¶ 10.) |
| inputting transaction information, including at least a transaction amount, into the point of sale terminal; | If the customer's account is in good standing and covers the amount of the purchase, the system authorizes an approval. (*See* ¶ 11.) The purchase amount, which corresponds to transaction event information, had to have been entered. |
| printing an authorization to debit the payer bank account by the transaction amount for the payer to sign; | The system prints out a statement similar to those consumers sign for credit card purchases. (*See* ¶ 11.) |
| the payer signing the authorization; | The customer signs the statement. (*See* ¶ 11.) |
| returning a copy of the signed authorization and the check to the payer; and | The statement is similar to those used for credit card purchases, so a copy of the statement is returned to the customer. (*See* ¶ 11.) The same check may be used over and over again, so the check is also returned to the customer. (*See* ¶ 1.) |
| electronically debiting said payer bank account by said transaction amount based on the signed authorization, without using the check as a negotiable instrument. | Each transaction is electronically debited from the customer's checking account within 24 to 48 hours. (*See* ¶ 12.) Further, the information from the paper check is electronically processed, and the check is returned to the customer at the point of sale. |
| 25. The checkwriting point of sale process of claim 24, further comprising voiding the completed check prior to returning it to the payer. | Carlson teaches cancellation (voiding) of the check prior to returning it to the customer. (*See* Carlson col. 24, lines 58-60.) |

Claims 24 and 25 of the '366 patent are further invalid under 35 U.S.C. § 103 as

unpatentable over a report authored by Robert Ballen ("the Ballen Report") in view of

Higashiyama or Carlson. The Ballen Report was distributed to members of the

16

Electronic Check Council ("ECC") during a meeting on August 3, 1995. ECC members, totaling about 95 in number, represented banks, retailers, remittance processors, and other service providers in the field of check processing. The Ballen Report is § 102(b) prior art against the '528 and '366 patents as a publication, because (i) it was made available without any confidentiality obligations or restrictions as to further distribution, and (ii) it was distributed to the those skilled in the relevant technical field, namely the field of electronic check processing.

The Ballen Report expressly teaches that, in a paper-initiated electronic funds transfer ("PI-EFT"), the amount and the date may or may not be indicated on the check and the payer may or may not sign the check, but that the check merely serves as a source of information to initiate an EFT processed through the ACH. The Ballen Report, in combination with the Sacramento Bee article renders claims 24 and 25 of the '366 invalid.

| The '366 Patent | Ballen Report + Sacramento Bee Article[4] |
|---|---|
| 24. A checkwriting point of sale process comprising: | PI-EFT refers to a model whereby the payer initiates an EFT debit to the payer's account by providing the payee with a check which prescribes the payer's account number and the payer's bank's routing number. (*See* § II.A.I.) |
| a payer completing a check for a transaction with a merchant or service provider; | The payer may sign the check. (*See* § II.A.I.) |
| using a point of sale terminal associated with said merchant or service provider to read MICR information on the check to obtain payer bank account information; | The Ballen Report suggests use of the electronic terminal. § III.D. The Sacramento Bee Article teaches use of an automated system to read the check (account) number and check the status of the account. (See ¶ 11.) It would have been obvious to utilize the automated terminal of the Sacramento Bee article with the system of the Ballen Report for speed and accuracy. |

---

[4] Unless otherwise noted, citations are to the Ballen Report.

17

| inputting transaction information, including at least a transaction amount, into the point of sale terminal; | When an electronic terminal is used for PI-EFT, it is inherent that a transaction amount is inputted into the electronic terminal. |
|---|---|
| printing an authorization to debit the payer bank account by the transaction amount for the payer to sign; | The Ballen Report teaches that a written authorization from the payer is required for the payee to initiate an electronic debit. (*See* § III.B.1.) |
| the payer signing the authorization; | In circumstances where the authorization is printed out for the payer, the payer may sign the authorization. (*See* § III.B.2.) |
| returning a copy of the signed authorization and the check to the payer; and | A copy of the authorization may be provided to the customer. (*See* § III.B.2.) |
| Electronically debiting said payer bank account by said transaction amount based on the signed authorization, without using the check as a negotiable instrument. | In PI-EFT, the check serves as a source of information to initiate an EFT. (*See* § II.A.1.) The payer may provide a blank or partially completed check to initiate the EFT. (*See* § III.4.) |

Claim 3 of the '366 patent is invalid under 35 U.S.C. § 112, second paragraph, because it recites a means-plus-function claim without describing a corresponding structure for such means in the specification as required under 35 U.S.C. § 112, sixth paragraph.

Claim 25 of the '366 patent is further invalid under 35 U.S.C. § 112, first paragraph, because the original disclosure failed to provide sufficient written description support for a checkwriting point of sale process comprising the step of "electronically debiting, . . . without using the check as a negotiable instrument."

All Asserted Claims of the '366 are further invalid under 35 U.S.C. § 102(b) based on both the public use bar and the on-sale bar.

**4. All Patents-in-Suit**

18

All Asserted Claims of the '988, '528 and '366 patents are invalid under 35 U.S.C. § 102(f) and/or § 116 because of improper inventorship.

All Asserted Claims of the patents-in-suit are invalid under the second paragraph of 35 U.S.C. § 112 because the claims either recite, or depend from a claim that recites the negative limitation "without using the check [or bank check] as a negotiable instrument," rendering the claims indefinite.

All Asserted Claims of the patents-in-suit are invalid under the second paragraph of 35 U.S.C. § 112 because the term "negotiable instrument" is a legal term subject to various interpretations, including various interpretations under state law and/or the UCC, and therefore ambiguous.

TeleCheck's investigation into its defenses is continuing, and it reserves the right to supplement these defenses and/or assert additional invalidity defenses as discovery progresses.

Dated:  January 28, 2005

FISH & RICHARDSON P.C.

By: _____
    William J. Marsden, Jr. (#2247)
    Timothy Devlin (#4241)
    Tara D. Elliott (#4483)
    919 N. Market Street, Suite 1100
    P.O. Box 1114
    Wilmington, DE  19899-1114
    (302) 652-5070

*Attorneys for Defendant
TeleCheck Services, Inc.*

19

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of February, 2005, a true and correct copy of

**TELECHECK'S FIRST SUPPLEMENTAL RESPONSE TO LML'S AMENDED**

**FIRST SET OF INTERROGATORIES** was caused to be served on the attorneys of

record at the following addresses as indicated:

**BY HAND DELIVERY**
Richard K. Herrmann, Esq.
Mary B. Matterer, Esq.
Blank Rome LLP
1201 North Market Street, Suite 800
Wilmington, DE 19801-4226

**BY EMAIL AND FIRST CLASS MAIL**
Robert Jacobs, Esq.
Belasco Jacobs & Townsley, LLP
Howard Hughes Center
6100 Center Drive, Suite 630
Los Angeles, CA 90045

**BY HAND DELIVERY**
Richard D. Kirk, Esq.
Morris, James Hitchens & Williams LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19899

**BY EMAIL AND FIRST CLASS MAIL**
Russell E. Levine, Esq.
Kirkland & Ellis LLP
200 E. Randolph Dr.
Chicago, IL 60601

**BY HAND DELIVERY**
collins J. Seitz, Jr., Esq.
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19801

**BY EMAIL AND FIRST CLASS MAIL**
Mark C. Scarsi, Esq.
O'Melveny & Myers LLP
400 S Hope Street
Los Angeles, CA 90071

_____
Tara D. Elliott

80022436.doc

2

3

BAR CODE LABEL

## U.S. PATENT APPLICATION

| SERIAL NUMBER | FILING DATE | CLASS | GROUP ART UNIT |
|---|---|---|---|
| 08/257,390 | 06/09/94 | 235 | 2505 |

**APPLICANT**

ROBERT R. HILLS, ST. AUGUSTINE, FL; HENRY R. NICHOLS, MC LEAN, VA.

**CONTINUING DATA********************
VERIFIED     THIS APPLN IS A CON OF   07/975,717 11/13/92

**FOREIGN/PCT APPLICATIONS************
VERIFIED

FOREIGN FILING LICENSE GRANTED 07/28/94     ***** SMALL ENTITY *****

| STATE OR COUNTRY | SHEETS DRAWING | TOTAL CLAIMS | INDEPENDENT CLAIMS | FILING FEE RECEIVED | ATTORNEY DOCKET NO. |
|---|---|---|---|---|---|
| FL | 8 | 9 | 2 | $355.00 | |

**ADDRESS**

JON L. ROBERTS
ROBERTS & ASSOCIATES
1953 GALLOWS RD.
SUITE 220
VIENNA, VA  22182

**TITLE**

CHECKWRITING POINT OF SALE SYSTEM

This is to certify that annexed hereto is a true copy from the records of the United States Patent and Trademark Office of the application which is identified above.

By authority of the
COMMISSIONER OF PATENTS AND TRADEMARKS

Date                    Certifying Officer

LML-EP 000166

08/257390

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In Re Application of Robert H. Hills and Henry R. Nichols

Serial No. 07/975,717                      Group Art Unit: 2505

Filed:  11/13/92                           Examiner: Pitts, H.

For:    CHECKWRITING POINT OF SALE SYSTEM

* * * * *

FILE WRAPPER CONTINUATION APPLICATION
PURSUANT TO 37 C.F.R.  §1.62

* * * * *

Commissioner of Patent and Trademarks
Box AF
Washington, D.C.  20231

Dear Sir:

This is a request for filing a continuation application under
37 C.F.R  §1.62 of the above-captioned prior application.

The correspondence addresses of Applicants are as follows:

100     Robert R. Hills
        5170 Avenue B            FL
        St. Augustine, Florida 32095

200     Henry R. Nichols
        8456 Holly Leaf Drive
        McLean, Virginia 22102
                VA

The above identified prior application, in which no payment of
an issue fee, abandonment, or termination of proceedings has
occurred, is hereby expressly abandoned as of the filing date of
this new application.  Please use all the contents of the prior
application file wrapper, including the drawings, as the basic
papers for the new application.  A verified statement of small
entity status was filed in the parent application and status as a
small entity is still proper and desired.

Please enter the enclosed preliminary amendment.

The prior application is assigned of record to Resource
Technology Services, Inc., 8221 Old Courthouse Road, Suite 202,
Vienna, Virginia 22182.  The power of attorney in the prior
application is to Jon L. Roberts, Reg. No. 31,293.  Address all
future communications to:

                Jon L. Roberts
                Roberts & Associates
                1953 Gallows Road

Suite 220
Vienna, Virginia 22182

It is understood that secrecy under 35 U.S.C. § 122 is hereby waived to the extent that if information or access is available to any one of the applications in the file wrapper of a 37 CFR § 1.62 application, be it either this application or a prior application in the same file wrapper, the Patent and Trademark Office may provide similar information or access to all the other applications in the same file wrapper.

Enclosed is a check in the amount of $355.00 for the filing fee. This filing fee is calculated on the basis of the claims existing in the prior application as amended by the preliminary amendment.

Respectfully submitted,

Jon L. Roberts
Registration No. 31,293
Roberts & Associates
1953 Gallows Road
Suite 220
Vienna, Virginia 22182
(703) 356-7700

June 8, 1994

LML-EP 000168

08/257390

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In Re Application of Robert H. Hills and Henry R. Nichols

Serial No. 07/975,717                    Group Art Unit: 2505

Filed:  11/13/92                         Examiner: Pitts, H.

For:    CHECKWRITING POINT OF SALE SYSTEM

*   *   *   *   *

FILE WRAPPER CONTINUATION APPLICATION
PURSUANT TO 37 CFR § 1.62

*   *   *   *   *

Commissioner of Patents and Trademarks
Box AF
Washington, D.C. 20231

Dear Sir:

Enclosed please find the following:

1.   File wrapper continuation application (2 pages);

2.   Preliminary amendment (10 pages);

3.   Check in the amount of $355.00 for the filing fee; and

4.   Certificate of Express mailing.

Respectfully submitted,

Jon L. Roberts
Reg. No. 31,293
Roberts & Associates
1953 Gallows Road
Suite 220
Vienna, Virginia 22182
(703) 356-7700

June 8, 1994

LML-EP 000169

4

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

In re Application of Robert H. Hills and Henry R. Nichols

Serial No. NOV                          Group Art Unit:
           13
Filed:     1992                         Examiner:

FOR:  CHECKWRITING POINT OF SALE SYSTEM

           *     *     *     *     *

Hon. Commissioner of Patent
   and Trademarks
Washington, D.C. 20231

Dear Sir:

    Enclosed please find the following:

    1.    Declaration and Power of Attorney of Henry R. Nichols and
           Robert R. Hills (separate documents)

    2.    Verified Statement Claiming Small Entity (Inventor)
           (separate documents)

    3.    Specification, 9 Claims, and Abstract

    4.    8 informal drawing sheets (11 figures)

    5.    Submitted herewith is a check for $395.00 to cover the
           cost of the filing.  Any deficiency or overpayment should
           be charged or credited to the Deposit Account of Arter &
           Hadden, No. 01-2520.

                            Respectfully submitted,

                            Jon L. Roberts
                            Registration No. 31,293
                            Arter & Hadden
                            1801 K Street, N.W.
                            Suite 400K
                            Washington, D.C. 20006

DATED:  November 13, 1992

LML-EP 000080

08/ᴏ⸝7390
975717

1    ABSTRACT

2      A point of sale system designed to read information from a

3    consumer's check, credit card, or manual input with a subsequent

4    debiting of a consumer's account and crediting a merchant's account

5    for the goods or services provided.  Point of sale terminals are

6    designed to accept a form of credit card with a consumer's bank

7    account information encoded thereon or in the alternative to read

8    the MICR number from a consumer's check in order to verify that a

9    consumer has an appropriate balance to conduct the transaction with a

10    given merchant.  Thereafter the transaction of that information is

11    transmitted to a central computer system which verifies the

12    consumer's credit worthiness and stores the transaction event

13    information for subsequent bank reconciliation via the ACH network.

14    The invention eliminates the need for paper checks with all bank

15    reconciliation being accomplished electronically.

16

17

18

19    jlr-1808

20

-31-

LML-EP 000081

395-201-A/97571

## CHECKWRITING POINT OF SALE SYSTEM

INVENTORS:    ROBERT H. HILLS AND HENRY R. NICHOLS

This application is a continuation of 07/975717 now abandoned.

### FIELD OF THE INVENTION

This invention relates to the field of Point-of-Sale systems and more particularly the integration and processing of purchases whereby a check is used as the basic source of identification of the individual and the bank and bank account be debited.

### BACKGROUND ART

Numerous devices exist for processing checks. For example, U.S. patent number 4,933,536 to Lindemann, et al., describes a check processing device which is used together a Point-of-Sale terminal. This particular device involves copying and taking a picture of an individual whereby a dishonored check could then be traced to the person who has offered it.

U.S. Patent No. 4,810,866 to Lloyd, Jr., describes a check validation system again located together with a Point-of-Sale system for imprinting and otherwise physically dealing with a check.

Other systems also deal with the apparatus for handling checks at a point of sale. For example, U.S. Patent No. 4,743,743 to Fukatsu describes one such transaction apparatus where a check is examined by a reader. U.S. Patent No. 4,672,377 to Murphy, et al. describes a check authorization system wherein a check is imprinted with a bar code and information concerning customers which are stored in a database. U.S. Patent No. 3,845,470 to Schuller, involving a vending system using a modified form of check which is imprinted with identification codes, is used by someone to use the check in

-1-

LML-EP 000082

1    purchasing goods, and services, and wherein a vending operation will

2    not place, if information associated with the check is not valid in

3    a particular database.

4        Other check-based financial systems have also been the subject

5    of invention. Patent No. 4,617,457 addresses an ATM or automatic

6    teller machine form of cashing checks.  Such systems create a picture

7    of the check involved and also involves checking against a

8    specialized database to insure that the check is a "valid" one (see

9    also Patent No. 4,580,040 to Granzow et al.).

10        Another generic category of financial systems deals with

11    methods of handling the financial transactions apart from the

12    physical handling of the check itself.  For example, Patent No.

13    3,824,544 to Simjian describes a merchant issued "check" which can

14    then be used in the purchase of goods and services and upon

15    purchase, a specialized code is evaluated to determine if the check

16    is being validly utilized.

17        U.S. Patent No. 4,404,649 to Nunley et al. describes a document

18    processing system which generally discloses a method of reading

19    checks for processing a wide variety of financial documents.

20        U.S. Patent No. 4,523,330 to Caine also describes a method for

21    processing financial documents which system also includes a Point-

22    of-Sale terminal for generating image data from checks as they are

23    being processed.  This patent is drawn principally to the actual

24    terminal itself.

25        U.S. Patent No. 4,673,802 to Ohmae et al. describes a central

26    processing system having stored data relating to the accounts of

-2-

LML-EP 000083

1    users, which users are approved or disapproved at the Point-of-Sale

2    based upon information in the database.

3    Finally, Patent No. 4,678,896 to Carlson et al. describes a

4    Point-of-Sale system whereby apparatuses provided to restore the

5    processing and imprinting of checks.

6    All of these above patents deal with the specific problem of

7    how to accept a check from customer for the purchase of goods and

8    services. It does not in anyway address the subsequent processing

9    of checks or indeed address that the issue in anyway of how checks

10    are cleared through the normal automatic check handling

11    clearinghouse operation that exist the financial world. Thus, the

12    interaction of these systems with the ACH process is not addressed

13    in anyway. This is particularly important since if any Point-of-

14    Sale check handling system is to interact with the ACH mechanism it

15    must adhere to that processing scheme and indeed lend itself to use

16    with a processing scheme.

17    It is an objective of the present invention to be adaptable

18    for use with the ACH system and to be smoothly incorporated into

19    it. In this fashion, it will immediately be useful for a much

20    wider range of financial transactions above and beyond those

21    contemplated by the background I discussed above.

22

23    SUMMARY OF THE INVENTION

24    The present invention comprises a process and apparatus which

25    may be employed for the purpose of effecting payments for point-of-

26    sale purchases of goods and services paid from consumer funds

27    secured in bank checking or depository accounts. Each sale or

-3-

1  "Transaction Event" would be an electronic and "paperless" event

2  thereby eliminating reliance on accepting and processing commercial

3  bank drafts (personal or corporate checks) and the physical

4  handling of those bank drafts thus replacing commercial bank drafts

5  at the point-of-sale.

6  The system is intended to be made available to subscribing

7  merchants, businesses, and individuals, referred to in this

8  application as "system subscribers" wishing to employ the method

9  and apparatus of the present invention for the electronic

10  processing and settlement of consumer purchases. Further, the

11  present invention's operational parameters allow freedom from

12  customary state or other geographically limiting criteria typical

13  when accepting and processing "paper" checks. The system is

14  designed to act with the national authorization and electronic

15  settlement network known as the ACH ("Automated Clearing House")

16  system.

17  The system is designed to perform in a fully automated manner

18  enabling each Transaction Event to be processed by a system

19  subscriber as a point-of-sale transaction in the presence of the

20  consumer. When the transaction event is "approved" funds are

21  debited from an authorized consumer account for credit to the

22  system subscriber and electronic settlement by ACH deposit to the

23  subscriber's designated depository account. Authorized access to

24  consumer accounts and credits to system subscriber depository

25  accounts would be performed as "Off-Line" transactions by means of

26  Electronic Funds Transfer ("EFT") through the ACH Network or

27  through the Federal Reserve System.

-4-

LML-EP 000085

1   The invention comprises a point-of-sale processing system
2   comprising electronic data processing equipment which allows
3   individual services selections which provide automated, electronic
4   processing from bank checking or depository accounts.  It is the
5   objective of the present invention to automate the point-of-sale
6   environment for processing consumer purchases of goods and services
7   which, other than for the ~~applicants~~ *of the present invention* system, would necessitate the
8   more traditional acceptance and processing of commercial bank
9   drafts (personal and/or corporate checks).  Individual Transaction
10  Events ~~would~~ *are* be administered under *of the present invention by* the ~~applicants~~ system,
11  initiating a terminal authorization inquiry and continuing through
12  the electronic settlement of funds representing the Transaction
13  Event from the pre-approved consumer banking accounts.

14      It is a further objective of the present invention to
15  eliminate the need for "paper" checks as an accepted means of
16  consumer payment.  In the place of personal and business checks,
17  consumers would be provided ~~their~~ free and unrestricted access to
18  funds secured in bank accounts of various types by means of
19  preauthorized electronic events. System subscribers electronically *of the present invention*
20  communicate with the ~~invention's~~ data center for individual
21  Transaction Event authorizations which, upon reconciliation of a
22  day's activity, result in an ~~Electronic Funds Transfer (EFTR)~~ *EFT* by
23  means of the Automated Clearing House accommodating an "Off-Line"
24  debiting of preauthorized consumer Transaction Events from
25  authorized accounts. Thereafter, each system subscriber ~~would be~~
26  credited with the total of all such daily authorized Transaction
27  Events to its designated banking depository account.

-5-

LML-EP 000086

1    The present invention comprises logic which allows the

2    following services which when individually performed or where

3    combined with other services establish a wholly unique processing

4    medium enabling preauthorized access to consumers' checking account

5    or bank depository reserves.

6        Authorization - This service supports electronic communication

7    from point-of-sale to the system's central computer.    The data

8    center stores positive and negative files concerning consumer

9    accounts thereby providing accurate inquiry responses regarding the

10   current posting status of a consumer's banking account and

11   signaling the system subscriber that said account may be reasonably

12   relied upon for consummating a Transaction Event (i.e., an

13   "Approval") or, where listed as delinquent, indicating that the

14   account could not be so relied upon (i.e., a "Denial").

15       Check Replacement - This capability operates as an extension

16   of Authorization enabling the system subscriber the capability of

17   completing a Transaction Event by electronically logging the sale

18   whereupon a Transaction Event Slip will be printed or manually

19   prepared for consumer execution at the point-of-sale.    By

20   execution, the consumer authorizes the electronic accessing of

21   funds secured in his/her authorized banking account in lieu of the

22   more traditional method of issuing personal and business checks.

23   Funding settlement to the system subscriber would be effectuated by

24   means of Electronic Funds Transfer via ACH or the Federal Reserve

25   System as opposed to physically processing and transferring checks

26   among banks.

-6-

LML-EP 000087

1     Bank Transaction Card - As part of this invention on "Off-
2    Line" Debit Card is established on which is stored the information
3    relating to the banking account from which funds representing the
4    Transaction Event would be debited for payment to the system
5    subscriber. This information may be stored on the card itself in
6    encrypted or unencrypted form or be stored in the central computer
7    where access to such information is gained via special control
8    characters or access codes stored on the card. Electronic
9    authorization for withdrawal of funds from the cardholder's account
10   and subsequent electronic settlement procedures would remain
11   essentially identical to processing under the Check Replacement
12   service described above. Information relating to the consumer-
13   cardholder and the appropriate banking account to be debited for a
14   Transaction Event will be encoded upon the magnetic stripe portion
15   of the plastic, and terminal-readable, card.

16     Thus, the overall objective of the present invention is to
17   provide and support an alternate means for consumer payments for
18   goods and services that operates to replace commercial bank drafts
19   in the point-of-sale environment. Simultaneously, the present
20   invention assures consumers greater access to and use of funds in
21   personal or corporate banking accounts. Further, the system
22   provides system subscribers a significantly improved prospect of
23   collecting the underlying monies for Transaction Events, reduced
24   time for the collecting the cash receipts from Transaction Events,
25   and a pronounced lowering of the present cost of cumbersome
26   procedures otherwise mandated by the existing ACH system for
27   accepting and processing commercial bank drafts.

-7-

LML-EP 000088

1     A further objective of the present invention is to

2     significantly reduce the use of checks ~~as a means of conducting~~

3     purchases of goods or services and to further reduce the consumers

4     reliance on credit cards or cash for transaction events ~~as well~~.

**DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT**

6     The present invention begins with the electronic recording of

7     consumer information ~~at a~~ system ~~subscribers~~ location using a ~~at a~~

8     point-of-sale terminal.   This information is obtained in the

9     presence of the consumer and occurs prior to any "Approval" either

10    for the Transaction Event or the ultimate crediting of the System

11    subscriber's designated depository account.  A Transaction Event

12    involves a series of events initiated by a system subscriber's

13    request to sell goods or services by payment from funds secured in

14    a consumer's banking account.   First, the consumer's banking

15    account status will be verified through accessing ~~the invention's~~

16    central computer files.   Verification that an account may be

17    accessed is established alternatively by means of an encoded,

18    magnetic strip card, or by input of account identification numbers

19    from a consumer's bank account. A more traditional identification

20    of the consumer could also occur including visual examination of

21    driver's license or similar and acceptable picture "ID" however

22    this is not part of the invention.

23     As an integral portion of each Transaction Event, the system

24    subscriber's location, date and time, and requested sale amount is

25    automatically logged into the system when a system subscriber first

26    accesses the invention.  Finally, a Transaction Event Slip ("Sales

27    Slip") will be produced by an printer integral to the point-of-sale

-8-

LML-EP 000089

1   terminal and executed *will be* by the consumer in the amount of the stated

2   purchase with inscribed language defining the Transaction Event and

3   specifically providing consumer authorization for electronic access

4   to his/her banking account. Thereafter, the consumer account will

5   be debited and the proceeds credited to the system subscriber's

6   designated depository account along with all other similar

7   Transaction Events representing the total of the system

8   subscriber's daily activity. Debiting of consumer accounts and

9   settlement deposits to each system subscriber is performed by means

10   of Off-Line electronic funds transfer through and by the ACH or

11   Federal Reserve System.

12       Equipment Configuration - The present invention can operate

13   with nearly every conceivable point-of-sale equipment system. The

14   central computer system accepts data transmitted from the system

15   subscriber's existing point-of-sale equipment or that which is

16   added to augment service performance. The point of sale terminal

17   of the present invention is implemented in a number of ways, most

18   preferred, however, being activation under a fully automated

19   format. Such a fully automated system generally comprises a dual-

20   port terminal with magnetic stripe reading capabilities interfaced

21   with a logging printer capable of providing individual Transaction

22   Event Slips for consumer execution, and a MICR check reader, optical

23   character recognition ("OCR") equipment, or other device. Variations to this

24   configuration are particularly possible where the ~~applicants'~~

25   system *of the present invention* were to be activated under a "Split-Dial" feature installed

26   to function within the operational parameters of existing point-of-

27   sale equipment primarily dedicated to bankcard ("credit card")

-9-

LML-EP 000090

*It is contemplated*

1  processing. ~~The present invention contemplates~~ that services may

2  in the future be administered *using the present invention with* on a singular point-of-sale hardware

3  device which, as a function of its design, would incorporate all or

4  most of the service capabilities of an integrated terminal, logging

5  printer, and MICR Check Reading device. The system/can alternately *of the present invention*

6  be interfaced with electronic cash registers now on the market.

7       Communications links from point-of-sale terminals to the

8  central computer of the present invention will typically be in form *The*

9  of telephonic network communications over a public switched

10  telephone network ~~(PSTN)~~ *("PSTN") at over* or other approved networks. Transaction

11  Event verification will occur as a result of point-of-sale terminal

12  access to the central computer's positive and/or negative data

13  files. "Approved" or "Declined" notifications are made to the

14  Point-of-Sale device over the PSTN. All data files will be

15  centrally located and maintained on the invention's central

16  computer data bases. Portions of the data base include but are not

17  limited to third party data files such as the Shared Check

18  Authorization Network ("SCAN") (trademark) data base.

19       Individual *transactions* or groupings of transactions are first approved by

20  soliciting an "Authorization" prior to the completion of any

21  requests for electronic funds transfer. To maintain an accurate

22  status of file information for authorizations to subscribing

23  merchants, businesses, and/or individuals, separate data bases are

24  maintained. Current cardholder or banking account status are

25  updated daily and instantly available for point-of-sale inquiry for

26  Transaction Event authorizations.

-10-

LML-EP 000091

1  updated daily and instantly available for point-of-sale inquiry for

2  Transaction Event authorizations.

3      System subscribers' point-of-sale equipment are interfaced to

4  the invention's central computer by means of telephonic network

5  able to support communication from a plurality of point-of-sale

6  terminals.  Programming of the point-of-sale terminal causes an

7  automatic "Dial-Up" to the central computer and provides an

8  automatic query and response affirming or denying the Transaction

9  Event.  The addition of local entry hubs may be installed to better

10 facilitate the speed or economics of communications with the data

11 files.  Alternatives to telephonic networks may involve use of

12 satellite communications or enhanced radio transmissions.

13 Similarly, the system's data files and associated Check Replacement

14 Service are contemplated to be responsive to emerging point-of-sale

15 devices intended to seek authorizations by the alternate means of

16 voice pattern recognition, fingerprint identification, retina scan,

17 "smart" chips, and/or consumer or check image and/or signature

18 broadcasting.

19 Brief Description of the Drawings

20 Figure 1 -    System overview of the present invention

21 Figure 2 -    The point-of-sale terminal

22 Figure 3 -    The central Computer System

23 Figures 4 -   The process Data Flow

24 Figure 5 -    Transaction Event Sales Slip

25 Figure 6 -    Manual Transaction Event Sales Slip

26

-11-

LML-EP 000092

Detailed Description of the Preferred Embodiment

1

2    Referring to Figure 1 an overall schematic of the present

3    invention is described.  Point-of-sale terminals 300 communicate

4    over normal PSTN telephone lines with a central computer system 302

5    which in turn communicates with a banking institution 304 for

6    purposes of debiting consumer accounts and crediting system

7    subscriber accounts.  The banking institution performs its function

8    via normal automated clearing house ("ACH") transactions 306.

9    Referring to Figure 2 the point-of-sale terminal is described.

10   The point-of-sale terminal comprises several different entry means.

11   A key board 310 can be used to input consumer information manually.

12   Alternatively a card reader 312 can be used whereby the magnetic

13   stripe on the card is read by the point-of-sale terminal and

14   finally a check reader 314 is also included to read the MICR number

15   on checks as a substitute for either a specific card or key board

16   input.  These various input means provide information to a micro-

17   processor 316 which comprises logic means 318, memory means 320,

18   and communication means 322.  The logic means 318 comprises logic

19   which allows the information received from the various input means

20   to be processed and stored in the memory 320.  The logic means

21   further drives a display 324 which provides a visual output of the

22   account number of the consumer for verification.  The communication

23   means 322 allows the subscriber terminal to communicate with the

24   central computer 302 for purposes of processing the consumer's

25   purchase.

26   Referring to Figure 3 the central computer system 329 is

27   described.  The central computer system receives input from a

-12-

LML-EP 000093

1  plurality of point-of-sale terminals which provide transaction

2  information from a system subscriber and a consumer desiring to

3  purchase goods or services. The central computer system comprises

4  a system subscriber 330 file which is a file of those merchants who

5  have elected to use the present invention for processing purchases.

6  The central system also comprises an approved consumer file 332

7  which stores the names of those consumers who have already been

8  approved for allowing purchases to take place through the various

9  input means as well as a third party database such as the SCAN

10 (trademark) data base relating to consumer credit. The computer

11 system also comprises a communications means 334.    The

12 communication means communicates with other outside third party

13 data bases which allows the consumer, that has not been approved by

14 the system, to have a rapid check of the status of the consumer's

15 banking account and whether the consumer has current outstanding

16 returns (i.e. bad checks). Once this SCAN (trademark) or outside

17 third party data base search is performed and where an approval is

18 given, the approved consumer file 332 is updated with the name of

19 the new approved consumer.

20      As presently configured the central computer 329 already has

21 a third party database known as the SCAN (trademark) database 333

22 resident on the central computer.  Thus credit worthiness can be

23 checked using this SCAN database.  The SCAN (trademark) database is

24 updated daily.

25      The communication means 334 also communicates with a banking

26 institution 338 which instructs the bank to debit the account of

27 the consumer and credit the account of the system subscriber

-13-

LML-EP 000094

1   (merchant) with the amount of the purchase. These transactions

2   then take place via the normal ACH transaction process.

3       Referring to Figure 4 the process begins by a consumer

4   presenting a specimen or "blank" check complete with MICR number to

5   the system subscriber (the merchant) 100. The system subscriber

6   next determines, if the check meets appropriate store policy

7   procedures 102, that the check has appropriate information on the

8   check. If the check does not meet the store policies, it is

9   returned to the consumer 104. If the check does meet appropriate

10  store policies the on-line verification process proceeds 106. The

11  subscriber, enters the process by first pressing the appropriate key

12  on a terminal to access the host computer 108. Thereafter the

13  point of sale terminal prompts the system subscriber to enter the

14  appropriate MICR number 110. The system subscriber then enters the

15  appropriate MICR number either manually or by passing the check

16  through a check reader which determines the MICR number 112.

17      Referring to Figure 5 the subscriber would verify that the

18  numbers appearing on the terminal match the MICR numbers on the

19  check 114. During the comparison, the subscriber determines that

20  the check number compares accurately 116 to the number displayed on

21  the terminal. If they do compare the verification process proceeds

22  120. If the check numbers do not compare with that of the terminal

23  the system subscriber clears the terminal and begins the

24  transaction process again 118. If the process is to be

25  reinitiated, the subscriber enters the MICR number into the point

26  of sale terminal 130. Thereafter the system subscriber compares

27  the MICR numbers as before 132. If the MICR numbers compare to the

-14-

LML-EP 000095

1   system display 134  the process proceeds.  If the numbers do not

2   compare 136 the check is returned to the consumer and the process

3   terminates 137.

4       Referring to Figure 5, if the verification process proceeds

5   the terminal next prompts the system subscriber to enter the amount

6   of the sale 122.  The subscriber enters the amount of the sale 124

7   and the terminal thereafter transmits an inquiry to the host data

8   base for verification 126.

9       The check approval process next takes place 128.  If the check

10  is not approved by the central computer the terminal displays a

11  message declining the transaction 140.  Thereafter a printer record

12  of the declined transaction is made for purposes of the system

13  subscriber 141 to comply with the Fair Credit Reporting Act and

14  Regulation E of the Board of Governors of the Federal Reserve

15  System.

16      If the check is approved the terminal displays a message

17  noting the approval 138 and the specimen check is returned to the

18  consumer.    The printer further makes a paper record of the

19  transaction 142 and the consumer places any required information on

20  the paper receipt and signs the receipt authorizing the transaction

21  144.

22      Referring to Figure 7, the process description continues.

23  Once the transaction is approved the central computer captures the

24  MICR information and the sale amount and stores that information

25  146.  The central computer subsequently generates a batch message

26  regarding all transaction events for the prior period and transmits

-15-

LML-EP 000096

1    all the transaction event information for the day into the ACH

2    network 148.

3         During the ACH process each checkwriter's account is debited

4    for the exact purchase amount and such an amount is deposited into

5    a system subscriber designated account 150.  Thereafter, collected

6    funds for a total day's events are deposited into a ~~subscribers~~ _subscriber's_

7    account 152.  The transaction is then complete 154.

8    HOW TO USE

9         The present invention will require the establishment and

10   maintenance for ~~access-sertyhes~~ of three interconnected but

11   separate data files.  Each will be accessible by dial-up procedures _data file_

12   operating, in most _153_ instances, under "Split Dial" format from a

13   point-of-sale _("POS")_ terminal device or electronic cash register installed

14   for the primary purpose of bankcard and/or bank draft

15   authorizations.  ~~Terminal~~ _The terminal_ prompts an operator/user to process one

16   of three optional inquiry types.  Any one or all of three primary

17   functions are capable of being performed at a single point-of-sale

18   terminal within the control of the system subscriber.  The inquiry

19   types and data base format responses ~~would be~~ _are_ as follows :

20        Card Authorization - Having depressed the assigned Split Dial

21   key and thereafter being prompted, the system subscriber ~~would~~ _slides an_

22   ~~"slide"~~ a encoded magnetic stripped transaction card through the

23   point-of-sale terminal and ~~enter~~ _enters_ the "Sale Amount" requested for

24   authorization.  Thereupon, the terminal's dial-up capabilities

25   direct the inquiry to the central computer for authorization

26   against "POSITIVE" file of current cardholders whose accounts were

27   listed in "good standing".  Inquiries where such a "Match" are

-16-

LML-EP 000097

1   found cause an "Approved" return message from the data file to the
2   inquiring POS terminal. Conversely, a "No-Match" to inquiry would
3   result in a "Declined" notice to the POS terminal. An uploading
4   mode of the present invention causes forwarding of daily status
5   notifications to the central data files activating new cardholder
6   accounts in the "POSITIVE" cardholder file or submitting corrective
7   entries to delete delinquent or terminated accounts.

8       Check Authorization - Having depressed the assigned Split Dial
9   key and thereafter being prompted, the system subscriber manually
10  enters account numbers from a personal or business check or, where
11  fully automated, enters a specimen check through a MICR Check Reader
12  device interfaced with the terminal, whereupon the terminal's
13  screen would display the check's numbers, and hence the account number,
14  for verification. Thereafter, the operator would enter the "Sale
15  Amount" requested for authorization. The terminal's dial-up
16  capabilities then direct the inquiry to the computer data file
17  center for authorization first against the "POSITIVE" file of
18  "prenoted" bank/checking account numbers whose accounts were listed
19  in "good standing". A successful "Match" to an inquiry would
20  result in an "Approved" notice from the data file to the inquiring
21  terminal. A "No-Match" to inquiry would not, however, immediately
22  result in a "Declined" response. Each inquiry preliminarily
23  resulting in a No-Match would be instantly forwarded/"rolled" to
24  the third data file preceding any return notice to the inquiring
25  terminal. This third file is anticipated to be the Shared Check
26  Authorization Network ("SCAN") a negative data file data base
27  maintained in the system computer data file center. Referrals to

-17-

LML-EP 000098

1   SCAN or any other positive or negative data files, enable potential
2   acceptance of Transaction Events involving consumers "Unknown" to
3   the invention's proprietary, "POSITIVE" files.  A "Match" on the
4   SCAN "NEGATIVE" file would result in a "Declined" notice; a
5   "No-Match" would conversely send notification to the inquiring POS
6   terminal of an "Approved" event.  Of significant importance, the
7   bank/checking  account  information  for  each  such  "Unknown"
8   consumer's transaction would, subsequent to a SCAN "Approved"
9   notice, be posted to the invention's "POSITIVE" file and prenoted
10  through the ACH ("Automated Clearing House") for future Transaction
11  Events.  The invention, presumably in an automated mode, is capable
12  of uploading daily corrections to the POSITIVE data file including
13  notices of new accounts approved through SCAN (trademark) and
14  deletions where settlement for consumer checking account events,
15  initially approved, were subsequently dishonored.  The SCAN data
16  base is similarly uploaded with daily activity status corrections.
17      Check Replacement Service - Inquiries initiated as Check
18  Replacement requests function in nearly an identical manner as that
19  of Check Authorization.  Records for such events, when culminating
20  in "Approved" notices, are separately preserved. Check Replacement
21  inquiries are processed first through the system's "POSITIVE" data
22  file and, where no match is found, proceed to the SCAN data file or
23  other data base file prior to transmitting an "Approved" or
24  "Declined" notice to the inquiring POS terminal.  A Match in the
25  system data file indicates a consumer-user, whose account was in
26  "good standing" and would not be required to "roll" to SCAN.  Check
27  Replacement events are reported to and stored by the computer data

-18-

LML-EP 000099

1    file center under a file classification identifying the transaction
2    was a Check Replacement Service.  The total of daily, approved
3    Transaction Events are "checkless" sales whereby the service
4    subscribing merchant has submitted requests for electronic ACH
5    settlement for all preauthorized consumer purchases.  No commercial
6    bank note ("Paper Check") is accepted or processed by the service
7    subscriber.  In each Transaction Event, a Consumer, at the
8    point-of-sale, has executed an electronic access ("Off-Line Debit")
9    authority "Sales Slip" which are automatically printed upon a
10   terminal's receipt of an "Approved" notice.

11       All terminal programming and all prompt strings for MICR Check
12   Reader interfacing are stored in the POS terminal and the
13   invention's computer center/controls interactions between the
14   plurality of terminals and the central system.  The following
15   modules are present.

16       Programming for MICR/Terminal Interface - system subscriber
17   locations to be activated with the invention must possess or
18   acquire a terminal.  Those utilizing or being upgraded to terminals
19   such as a Tranz (trademark) 330 or other terminals with interface
20   capabilities with the check reader/all suitable point-of-sale
21   terminals.

22       The preferred format for terminal operations are from a
23   singular split dial key.  Thereafter, the "prompt string" would
24   proceed in a manner such as i) "Card = 1" ; "Check = 2" requiring
25   operator selection; then, where selecting a checking account
26   inquiry ii) the operator would respond to a secondary prompt of
27   "Auth = 1" ; "Replace = 2".  These entry selections precede the

-19-

LML-EP 000100

1   magnetic stripe "reading" of a card/submittal or a check through

2   the MICR (Account Identification), the entry of the requested sale

3   amount, and the terminal's dial-up for authorization against the

4   computer data file center.

5       The MICR interface results in the transmittal of a query for

6   data center approval of the entire ABA/Transit and personal or

7   corporate checking account numbers. Instances where printed checks

8   add the individual check's number to the end of the account number

9   can be "dropped" by Check Reader switch settings. Subsequent to a

10  terminal's receipt of the MICR number string but prior to the

11  operator's entry of the requested sale amount and authorization

12  dial-up, a verification prompt "flashing" the ABA and account

13  numbers must be displayed on the terminal's screen requiring the

14  operator to depress "Enter" to proceed, if correct, or "Clear", if

15  incorrect and thereby enabling the terminal operator to resubmit

16  the specimen check through the MICR Check Reader. It is important

17  to note that account information may be entered manually as well at

18  the point of sale with the other financial advantages of the present

19  invention still in effect.

20      The computer data file center receives and processes

21  Transaction Event authorization requests utilizing the entire MICR

22  string for accurate, error-free identification of both the consumer

23  bank and specific checking or depository account to participate in

24  a sale. ACH settlement criteria mandate exact recall for the bank

25  and checking account numbers to properly complete any debit

26  request. This invention conforms to each and every requirement of

27  the ACH transaction regulations.

-20-

LML-EP 000101

1   Each Transaction Event is completed with the logging printer
2   generation of a Transaction Event ("Sales") Slip for each
3   "Approved" authorization inquiry processed (Figure 20).
4   Alternatively, a manually created transaction event slip can also
5   be prepared (Figure 19). Each such Transaction Event Slip must be
6   exacting in its retention of account numbers and the sale amount
7   enabling both the consumer and system subscriber to be provided
8   "hard copy" receipts of the event. Also included would be a clear
9   printing of the transaction type; "Bank Card", "Check
10  Authorization", or "Check Replacement". Authorization language is
11  printed immediately preceding the consumer's signature line
12  specifically authorizing electronic access in payment of the
13  requested transaction sale amount.

14      In addition to the primary functions for POS terminal
15  programming and MICR Check Reader interface, each Point-of-Sale
16  terminal location is capable of generating printed summations of
17  daily activity.  These reports list and separately total each
18  authorization/service type, whether produced as a singular report
19  or the result of multiple terminal "closeout" procedures.

20      Instances will arise with either the Bank Card or Check
21  Replacement Service where previously authorized Transaction Events
22  will require the operational equivalent of a bankcard "Void" or
23  "Credit" notation.  The methodology will be available for Split
24  Dial messages to the computer data file center of a
25  post-authorization "Error" or "Transaction Cancellation" notice.
26  The "Cancel" procedure is instituted by depressing for example the
27  "3" key (i.e. "Cancel = 3").  By so doing, the system subscriber

-21-

LML-EP 000102

1    may cancel a previously approved and logged event. This

2    Transaction Event which was recorded on the data files and reported

3    on the service subscriber's daily Activity Summation Report,

4    thereafter carries an offsetting, "Flagged" cancellation notice.

5

6    <u>SUMMARY</u>

7       A flexible purchase transaction system is described which

8    precisely fits within existing ACH procedures for checking account

9    events for processing of pre-authorized electronic debits as a

10    replacement for commercial bank drafts (paper checks). The main

11    advantage to the proposed invention is the fact that a truly

12    paperless transaction may occur. Departures from the proposed

13    system especially with respect to the Point-of-Sale terminals will

14    be apparent to those skilled in the art, without departing from the

15    spirit of the invention as described.

-22-

LML-EP 000103

1   We claim:

1.   A checkwriting point of sale system comprising:

a point of sale terminal adapted to receive consumer bank

4   account information and further adapted to accept such information

5   from consumer cards on which the bank account information is

6   stored;

7   a communications means integral to said point of sale terminal

8   to electronically communicate with a central computer;

9   a memory means integral to said point of sale terminal that

10   allows the temporary storage of the consumer bank account

11   information from the consumer cards;

12   the central computer system having communication means

13   capability adapted to receive information from a plurality of point

14   of sale terminals;

15   the central computer system communication means allowing said

16   central computer system to communicate with external data bases for

17   consumer credit verification and to allow communication with

18   banking institutions for purposes of transfer of funds.

19   2.   A checkwriting point of sales system according to claim

20   1 wherein said point of sale terminal is further adapted to read

21   MICR numbers appearing on a consumer check and wherein said

22   consumer check is used to identify the consumer bank account

23   information.

24   3.   The checkwriting point of sale according to claim 1

25   wherein said point of sale terminal further comprises an alpha

26   numeric display adapted to receive consumer bank account

LML-EP 000104

1   information from the memory of the point of sale terminal and

2   display the consumer bank account information.

3       4.   The checkwriting point of sale system according to claim

4   1 further comprising a printer adapted to receive information from

5   the memory of the point of sale terminal to create point of sale

6   slips.

7       5.   The checkwriting point of sale system according to claim

8   1 wherein said central computer system communication means

9   comprises means for communicating with third party data bases for

10   verification of consumer credit.

11       6.   The checkwriting point of sale system according to claim

12   1 further comprising a resident third party data base wherein

13   consumer credit information is stored and used for verification of

14   consumer credit.

15       7.   The checkwriting point of sale system according to claim

16   1 wherein the central computer system further comprises a system

17   subscriber data base comprising those merchants and service

18   providers authorized to use the invention.

19       8.   The checkwriting point of sale system according to claim

20   7 wherein the central computer further comprises a database

21   comprising those consumers approved to use the invention.

22       9.   A checkwriting point of sale process comprising the steps

23   of:

24          a)   presenting a check or consumer card to a point of

25   sale terminal located at a merchant or service provider,

26          b)   reading the magnetic stripe or MICR number

27   information on the credit card or consumer check,

-29-

LML-EP 000105

1        c)  storing the consumer bank account information from
2  the card or check and verifying account numbers at the point of
3  sale terminal,

4        d)  inputting transaction event information into the
5  point of sale terminal,

6        e)  transmitting the transaction event information and
7  consumer bank account information to a central computer system,

8        f)  verifying the authorization status of the consumer,

9        g)  if a particular consumer is not authorized to use
10  the system, verifying the credit worthiness of the consumer via a
11  query to a third party data base,

12        h)  sending an "approved" message to the point of sale
13  terminal, if the consumer's credit is approved for the transaction
14  and

15        i)  subsequently transmitting the transaction event
16  information to a bank for subsequent ACH operations.

17

18

19

20

21  /lr-1808

22

-50-

LML-EP 000106

975717

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of Robert R. Hills and Henry R. Nichols

Serial No.:                          Group Art Unit:

Filed:                               Examiner:

FOR:  CHECKWRITING POINT OF SALE SYSTEM

DECLARATION

As below inventors, we hereby declare that:

Our residences, post office address and citizenship are as stated below next to our name.

We believe we are the original, first and sole inventors of the subject matter which is claimed and for which a patent is sought on the invention entitled CHECKWRITING POINT OF SALE SYSTEM the specification of which is attached hereto.

We hereby state that we have reviewed and understand the contents of the above identified specification, including the claims, as amended by any amendment referred to above.

We acknowledge the duty to disclose information which is material to the examination of this application in accordance with Title 37, Code of Federal Regulations, § 1.56(a).

POWER OF ATTORNEY

We hereby appoint the following attorney(s) to prosecute this application and to transaction all business in the Patent and Trademark Office connected therewith:

Jon L. Roberts
Arter & Hadden
1801 K Street, N.W.
Suite 400K
Washington, D.C. 20006
(202) 775-7980

We declare that all statements made herein of our own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section

LML-EP 000107

1001 of Title 18 of the United States Code and that such willful
false statements may jeopardize the validity of the application or
any patent issued thereon.

Full name of inventor  Robert R. Mills

Inventor's Signature _____  Date _10-1-92_

Residence___ _5170 Avenue B_

___ _St Augustine (FL 32095_

Citizenship___ United States

Full name of inventor __Henry R. Nichols_

Inventor's Signature _____ Date_____

Residence_____

_____

Citizenship___ United States

jlr-1883

LML-EP 000108

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of Robert R. Hills and Henry R. Nichols

Serial No.:                          Group Art Unit:

Filed:                               Examiner:

FOR:  CHECKWRITING POINT OF SALE SYSTEM

### DECLARATION

As below inventors, we hereby declare that:

Our residences, post office address and citizenship are as stated below next to our name.

We believe we are the original, first and sole inventors of the subject matter which is claimed and for which a patent is sought on the invention entitled CHECKWRITING POINT OF SALE SYSTEM the specification of which is attached hereto.

We hereby state that we have reviewed and understand the contents of the above identified specification, including the claims, as amended by any amendment referred to above.

We acknowledge the duty to disclose information which is material to the examination of this application in accordance with Title 37, Code of Federal Regulations, § 1.56(a).

### POWER OF ATTORNEY

We hereby appoint the following attorney(s) to prosecute this application and to transaction all business in the Patent and Trademark Office connected therewith:

Jon L. Roberts
Arter & Hadden
1801 K Street, N.W.
Suite 400K
Washington, D.C. 20006
(202) 775-7980

We declare that all statements made herein of our own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section

LML-EP 000109

1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

Full name of inventor __Robert R. Hills_____

Inventor's Signature _____ Date_____

Residence_____

_____

Citizenship___ United States_____

Full name of inventor __Henry R. Nichols_____

Inventor's Signature _____*Henry R Nichols*_____ Date _10/19/92_

Residence___ 8456 Holly Leaf Dr._____

_____ McLean, VA  22102_____

Citizenship___ United States_____

LML-EP 000110

07975 71

| VERIFIED STATEMENT CLAIMING SMALL ENTITY STATUS<br>(37 CFR 1.9(f) & 1.27(b))—INDEPENDENT INVENTOR | Docket Number (Optional) |
|---|---|

Applicant or Patentee:     ROBERT R. HILLS AND HENRY R. NICHOLS

Serial or Patent No.: _____

Filed or Issued: _____

Title:    CHECKWRITING POINT OF SALE SYSTEM

As a below named inventor, I hereby declare that I qualify as an independent inventor as defined in 37 CFR 1.9(c) for purposes of paying reduced fees to the Patent and Trademark Office described in:

☒ the specification filed herewith with title as listed above.

☐ the application identified above.

☐ the patent identified above.

I have not assigned, granted, conveyed or licensed and am under no obligation under contract or law to assign, grant, convey or license, any rights in the invention to any person who would not qualify as an independent inventor under 37 CFR 1.9(c) if that person had made the invention, or to any concern which would not qualify as a small business concern under 37 CFR 1.9(d) or a nonprofit organization under 37 CFR 1.9(e).

Each person, concern or organization to which I have assigned, granted, conveyed, or licensed or am under an obligation under contract or law to assign, grant, convey, or license any rights in the invention is listed below:

☐ No such person, concern, or organization exists.

☐ Each such person, concern or organization is listed below.

Separate verified statements are required from each named person, concern or organization having rights to the invention averring to their status as small entities. (37 CFR 1.27)

I acknowledge the duty to file, in this application or patent, notification of any change in status resulting in loss of entitlement to small entity status prior to paying, or at the time of paying, the earliest of the issue fee or any maintenance fee due after the date on which status as a small entity is no longer appropriate. (37 CFR 1.28(b))

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the application, any patent issuing thereon, or any patent to which this verified statement is directed.

| ROBERT R. HILLS | HENRY R. NICHOLS | |
|---|---|---|
| NAME OF INVENTOR | NAME OF INVENTOR | NAME OF INVENTOR |
| Signature of inventor | Signature of inventor | Signature of inventor |
| October 1, 1992 | | |
| Date | Date | Date |

PTO/SB/09 (11-90)           Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

LML-EP 000111

PTO/SB/09 (11-90)

| VERIFIED STATEMENT CLAIMING SMALL ENTITY STATUS (37 CFR 1.9(f) & 1.27(b))--INDEPENDENT INVENTOR | Docket Number (Optional) |
|---|---|

Applicant or Patentee:    ROBERT R. HILLS AND HENRY R. NICHOLS

Serial or Patent No.:

Filed or Issued:    1992

Title:    CHECKWRITING POINT OF SALE SYSTEM

As a below named inventor, I hereby declare that I qualify as an independent inventor as defined in 37 CFR 1.9(c) for purposes of paying reduced fees to the Patent and Trademark Office described in:

[X] the specification filed herewith with title as listed above.

[ ] the application identified above.

[ ] the patent identified above.

I have not assigned, granted, conveyed or licensed and am under no obligation under contract or law to assign, grant, convey or license, any rights in the invention to any person who would not qualify as an independent inventor under 37 CFR 1.9(c) if that person had made the invention, or to any concern which would not qualify as a small business concern under 37 CFR 1.9(d) or a nonprofit organization under 37 CFR 1.9(e).

Each person, concern or organization to which I have assigned, granted, conveyed, or licensed or am under an obligation under contract or law to assign, grant, convey, or license any rights in the invention is listed below:

[ ] No such person, concern, or organization exists.

[ ] Each such person, concern or organization is listed below.

Separate verified statements are required from each named person, concern or organization having rights to the invention averring to their status as small entities. (37 CFR 1.27)

I acknowledge the duty to file, in this application or patent, notification of any change in status resulting in loss of entitlement to small entity status prior to paying, or at the time of paying, the earliest of the issue fee or any maintenance fee due after the date on which status as a small entity is no longer appropriate. (37 CFR 1.28(b))

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the application, any patent issuing thereon, or any patent to which this verified statement is directed.

| ROBERT R. HILLS | HENRY R. NICHOLS | |
|---|---|---|
| NAME OF INVENTOR | NAME OF INVENTOR | NAME OF INVENTOR |
| Signature of inventor | Signature of inventor | Signature of inventor |
| Date | Date 10/9/92 | Date |

PTO/SB/09 (11-90)    Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

LML-EP 000112



fig. 1



fig 2

LML-EP 000113







figure 3

LML-EP 000114

PRINT OF DRAWINGS
S ORIGINALLY FILED

08/25/9?



Fig. 4



figure 5

PRINT OF DRAWINGS
IS ORIGINALLY FILED.

LML-EP 000116

PRINT OF DRAWINGS
AS ORIGINALLY FILED



Fig. 6

LML-EP 000117


PRINT OF DRAWINGS
ORIGINALLY FILED

08/257390



C

ACCOUNT NO. TO CENT. COMP. — 146

BATCH GENERATION + TRANSMIT — 148

ACH DEBIT + DEPOSIT — 150

FUNDS TO SUBSCRIBER ACCOUNT — 152

COMPLETE TRANSACT. — 154

fig 7

LML-EP 000118



08/25/73

Merchant Name
Street Address
City, ST Zip
Merchant Act #

TIME 00:00 _N              DATE 00/00/00
BANK ACT NO. 000000000000
TRANSIT NO. 000000000

SALE AMOUNT              $ 4,999.99

TERMINAL ID  0000000000

I herewith authorize ChequeMARK Systems
to electronically access my designated
checking account for the payment of the
above referenced purchase.

Name (PRINT) _____
Street _____
City _____ ST _____ Zip _____
Tel. Number: ( _____ ) _____ - _____

I ACKNOWLEDGE THAT RETURN FEES WILL BE
IMPOSED SHOULD MY PAYMENT BE DISHONORED
AND UNDERSTAND THAT IT IS UNLAWFUL TO
AUTHORIZE PAYMENTS FOR WHICH ADEQUATE
MONIES ARE NOT AVAILABLE WITHIN MY
ACCOUNT.

X_____
  Authorizing Signature

fig. 8

LML-EP 000119



PRINT OF DRAWINGS
AS ORIGINALLY FILED

08/253739c

Merchant Name
Street Address
City, ST Zip
Merchant Acct #

CUSTOMER BANKING INFORMATION:

BANK ACCT NO. _____

TRANSIT NO. _____

SALE AMOUNT . . . . . . . . . . . . . . . . . . . $ _____

    I herewith authorize ChequeMARK Systems to electronically
access my designated checking account for the payment of the above
referenced purchase amount.  I acknowledge that sufficient funds
are available for the payment of this sale.

        Name (PRINT) _____
        Street _____
        City _____ ST ___ Zip _____
        Tel. Number: (____) ____-____

I FURTHER ACKNOWLEDGE THAT RETURN FEES WILL BE IMPOSED SHOULD MY
PAYMENT BE DISHONORED AND UNDERSTAND THAT IT IS UNLAWFUL TO
AUTHORIZE PAYMENTS FOR WHICH ADEQUATE MONIES ARE NOT AVAILABLE
WITHIN MY ACCOUNT.

        X _____
          Authorizing Signature

fig. 9

LML-EP 000120