5



US005484988A

# United States Patent [19]

Hills et al.

[11] Patent Number: 5,484,988

[45] Date of Patent: Jan. 16, 1996

[54] CHECKWRITING POINT OF SALE SYSTEM

[75] Inventors: Robert R. Hills, St. Augustine, Fla.; Henry R. Nichols, McLean, Va.

[73] Assignee: Resource Technology Services, Inc., Vienna, Va.

[21] Appl. No.: 257,390

[22] Filed: Jun. 9, 1994

## Related U.S. Application Data

[63] Continuation of Ser. No. 975,717, Nov. 13, 1992, abandoned.

[51] Int. Cl.⁶ ............................................. G06F 15/30
[52] U.S. Cl. ............................... 235/379; 235/380
[58] Field of Search ............................ 235/379, 380

[56] References Cited

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,824,544 | 7/1974 | Simjian ....................... 340/147 A |
| 3,845,470 | 10/1974 | Schuller ....................... 340/149 A |
| 4,270,042 | 5/1981 | Case ............................. 235/379 |
| 4,404,649 | 9/1983 | Nunley et al. ................. 364/900 |
| 4,523,330 | 6/1985 | Cain ............................... 382/7 |
| 4,580,040 | 4/1986 | Granzow et al. ............... 235/379 |
| 4,617,457 | 10/1986 | Granzow et al. ............... 235/379 |
| 4,672,377 | 6/1987 | Murphy et al. ............ 340/825.34 |
| 4,673,802 | 6/1987 | Ohmae et al. ................. 235/379 |
| 4,678,895 | 7/1987 | Tateisi et al. ................. 235/379 |
| 4,678,896 | 7/1987 | Carlson et al. ............... 235/380 |
| 4,743,743 | 5/1988 | Fukatsu ........................ 235/379 |
| 4,810,866 | 3/1989 | Lord, Jr. ...................... 235/379 |
| 4,823,264 | 4/1989 | Deming ......................... 235/379 |
| 4,922,536 | 6/1990 | Lindeman et al. ............ 235/375 |
| 4,954,772 | 6/1990 | Buitman et al. ................. 350/6.5 |
| 5,053,607 | 10/1991 | Carlson et al. ............... 235/379 |

Primary Examiner—Harold Pitts
Attorney, Agent, or Firm—Thomas M. Champagne; Jon L. Roberts; Roberts & Associates

[57] ABSTRACT

A point of sale system designed to read information from a consumer's check, credit card, or manual input with a subsequent debiting of a consumer's account and crediting a merchant's account for the goods or services provided. Point of sale terminals are designed to accept a form of credit card with a consumer's bank account information encoded thereon or in the alternative to read the MICR number from a consumer's check in order to verify that a consumer has an appropriate balance to conduct the transaction with a given merchant. Thereafter the transaction of that information is transmitted to a central computer system which verifies the consumer's credit worthiness and stores the transaction event information for subsequent bank reconciliation via the ACH network. The invention eliminates the need for paper checks with all bank reconciliation being accomplished electronically.

20 Claims, 5 Drawing Sheets



**U.S. Patent**     Jan. 16, 1996     Sheet 1 of 8     **5,484,988**



**FIG. 1**



**FIG. 2**

LML-EP 000064

U.S. Patent          Jan. 16, 1996          Sheet 2 of 8          5,484,988



**FIG. 3**

LML-EP 000065



**FIG. 4**

LML-EP 000066



U.S. Patent          Jan. 16, 1996          Sheet 4 of 8          5,484,988

FIG. 5

LML-EP 000067



FIG. 6



**FIG. 7**

LML-EP 000069

**U.S. Patent**    Jan. 16, 1996    Sheet 7 of 8    **5,484,988**

```
                    Merchant Name
                    Street Address
                    City, ST Zip
                    Merchant Acct #

    TIME 00:00 _M              DATE 00/00/00
    BANK ACCT. NO. 000000000000
    TRANSIT NO. 000000000


    SALE AMOUNT               $ 0,000.00


    TERMINAL ID 0000000000

    I herewith authorize ChequeMARK Systems
    to electronically access my designated
    checking account for the payment of the
    above referenced purchase.

    Name (PRINT) _____

    Street _____

    City _____ST_____ Zip _____

    Tel. Number: (_____) _____ — _____


    I ACKNOWLEDGE THAT RETURN FEES WILL BE
    IMPOSED SHOULD MY PAYMENT BE DISHONORED
    AND UNDERSTAND THAT IT IS UNLAWFUL TO
    AUTHORIZE PAYMENTS FOR WHICH ADEQUATE
    MONIES ARE NOT AVAILABLE WITHIN MY
    ACCOUNT.


    X_____
        Authorizing Signature
```

*FIG. 8*

LML-EP 000070

Merchant Name
Street Address
City, ST Zip
Merchant Acct #

CUSTOMER BANKING INFORMATION:

BANK ACCT. NO. _____

TRANSIT NO. _____

SALE AMOUNT . . . . . . . . . . . . . . . . . . $_____

I herewith authorize ChequeMARK Systems to electronically access my designated checking account for the payment of the above referenced purchase amount. I acknowledge that sufficient funds are available for the payment of this sale.

Name (PRINT) _____

Street _____

City _____ ST _____ Zip _____

Tel. Number: (_____) _____ — _____

I FURTHER ACKNOWLEDGE THAT RETURN FEES WILL BE IMPOSED SHOULD MY PAYMENT BE DISHONORED AND UNDERSTAND THAT IT IS UNLAWFUL TO AUTHORIZE PAYMENTS FOR WHICH ADEQUATE MONIES ARE NOT AVAILABLE WITHIN MY ACCOUNT.

X_____
Authorizing Signature

**FIG. 9**

LML-EP 000071

5,484,988

1

# CHECKWRITING POINT OF SALE SYSTEM

## RELATED APPLICATION

This application is a continuation of Ser. No. 07/975,717 filed Nov. 13, 1992, now abandoned.

## FIELD OF THE INVENTION

This invention relates to the field of Point-of-Sale systems and more particularly to the integration and processing of purchases whereby a check is used as the basic source of identification of the individual and of the individual's bank and whereby the bank account is debited.

## Background Art

Numerous devices exist for processing checks. For example, U.S. Pat. No. 4,933,536 to Lindemann, et al., describes a check processing device which is used together with a Point-of-Sale terminal. This particular device involves copying and taking a picture of as individual whereby a dishonored check could then be traced to the person who has offered it.

U.S. Pat. No. 4,810,866 to Lloyd, Jr., describes a check validation system again located together with a Point-of-Sale system for imprinting and otherwise physically dealing with a check.

Other systems also deal as apparatus for handling checks at a point of sale. For example, U.S. Pat. No. 4,743,743 to Fukatsu describes one such transaction apparatus where a check is examined by a camera. U.S. Pat. No. 4,672,377 to Murphy, et al. describes a check authorization system wherein a check is imprinted with a bar code and information concerning customers which are stored in a database. U.S. Pat. No. 3,845,470 to Schuller discloses a vending system using a modified form of check which is imprinted with identification codes, when someone attempts to use the check in purchasing goods and services, a vending operation will not place the order if information associated with the check is not valid in a particular database.

Other check-based financial systems have also been the subject of invention. U.S. Pat. No. 4,517,457 addresses an ATM or automatic teller machine form of cashing checks. Such systems create a picture of the check involved and also involves checking against a specialized database to insure that the check is a "valid" one (see also U.S. Pat. No. 4,580,040 to Grunow et al.).

Another generic category of financial systems deals with methods of handling the financial transactions apart from the physical handling of the check itself. For example, U.S. Pat. No. 3,824,544 to Simjian describes a merchant issued "check" which can be used in the purchase of goods and services and upon purchase, a specialized code is evaluated to determine if the check is being validly utilized.

U.S. Pat. No. 4,404,649 to Nunley et al. describes a document processing system which generally discloses a method of reading checks for processing a wide variety of financial documents.

U.S. Pat. No. 4,523,330 to Caine also describes a method for processing financial documents which systems also includes a Point-of-Sale terminal for generating image data from checks as they are being processed. This patent is drawn principally to the actual terminal itself.

2

U.S. Pat. No. 4,673,802 to Ohmae et al. describes a central processing system having stored data relating to the accounts of users. Users are approved or disapproved at the Point-of-Sale based upon information in the database.

U.S. Patent No. 4,270,042 to Case discloses a point of sale system that requires a consumer to prepay a sum of money into a special account that is accessed only by the system. This amount is inscribed on the card, and when a transaction is made using the system, the amount of the transaction is punched out of a designated area on the card. This amount, along with a signature and other information, is supplied on a draft negotiable instrument, which is given to the merchant at the time of the transaction. Thus, the Case system does away with the use of bank checks in effecting the transaction, but requires the use of specialized prepaid draft negotiable instruments that must be surrendered to the merchant.

U.S. Patent No. 4,823,264 to Deming discloses a home banking system that can be used to transfer funds to different payees in satisfaction of debts incurred through previous purchases, use of utilities, etc. The system is consumer driven; that is, it is contemplated for use by the payor on a home personal computer. While the Deming system does away with the use of bank checks, account and other information must be keyed into the system. The Deming system cannot be used to read account and other information directly from an ordinary bank check and has no use for bank checks as instruments other than negotiable paper. Further, the Deming system cannot be used to transfer funds at the time of purchase and is not workable at the point of sale; the system can only be used to pay debts that have been incurred in the past and have accumulated.

Finally, U.S. Pat. No. 4,678,896 to Carlson et al. describes a Point-of-Sale system whereby an apparatus is provided to secure the processing and imprinting of checks.

All of these patents deal with the specific problem of how to accept a check from a customer for the purchase of goods and services. They do not in any way address the subsequent processing of checks nor do they address the process by which checks are cleared through the normal automatic check handling clearinghouse operations that exist in the financial world. Thus, the interaction of these systems with the automated clearing house ("ACH") process is not addressed in any way. This is particularly important since if any Point-of-Sale check handling system is to interact with the ACH mechanism it must adhere to that processing scheme and must lend itself to use with a processing scheme.

Further, some of the currently used systems described above require the use of a bank check as a negotiable instrument which must be surrendered to a merchant. Some of the systems do away with the use of a bank check altogether, but require a debit card or a specialized draft instrument to be used only with the particular system. None of these systems completely does away with the need and use for a negotiable draft instrument while using the consumer's bank check for identification and verification only. It is therefore an objective of the present invention to provide such a system.

It is an objective of the present invention to be adaptable for use with the ACH system and to be smoothly incorporated into it. In this fashion, the present invention will immediately be useful for a much wider range of financial transactions above and beyond those contemplated and disclosed in the background references discussed above.

## Summary of the Invention

The present invention comprises a process and apparatus which may be employed for the purpose of effecting pay-

LML-EP 000072

5,484,988

3

ments for point-of-sale purchases of goods and services paid from consumer funds secured in bank checking or depository accounts. Each sale or "Transaction Event" would be an electronic and "paperless" event thereby eliminating reliance on accepting and processing commercial bank drafts (personal or corporate checks) and the physical handling of those bank drafts thus replacing commercial bank drafts at the point-of-sale.

In contrast to known systems, the present invention is a merchant driven system that can be used to process a transaction at the point of sale and at the time of purchase. The system is intended to be made available to subscribing merchants, businesses, and individuals herein referred to as "system subscribers" wishing to employ the method and apparatus of the present invention for the electronic processing and settlement of consumer purchases. Further, the operational parameters of the present invention allow freedom from customary state or other geographically limiting criteria typical when accepting and processing "paper" checks. The system is designed to act with the national authorization and electronic settlement network known as the ACH system.

The system is designed to perform in a fully automated manner enabling each Transaction Event to be processed by a system subscriber as a point-of-sale transaction in the presence of the consumer. When the transaction event is "approved" funds are debited from an authorized consumer account for credit to the system subscriber and electronic settlement by ACH deposits the transaction amount to the subscriber's designated depository account. Authorized access to consumer accounts and credits to system subscriber depository accounts are performed as "Off-Line" transactions by means of Electronic Funds Transfer ("EFT") through the ACH Network or through the Federal Reserve System.

The invention comprises a point-of-sale processing system comprising electronic data processing equipment which allows individual services selections which provide automated, electronic processing from bank checking or depository accounts. It is the objective of the present invention to automate the point-of-sale environment for processing consumer purchases of goods and services which, other than for the system of the present invention, would necessitate the more traditional acceptance and processing of commercial bank drafts (personal and/or corporate checks). Individual Transaction Events are administered under the system of the present invention by initiating a terminal authorization inquiry and continuing through the electronic settlement of funds representing the Transaction Event from the pre-approved consumer banking accounts.

It is a further objective of the present invention to eliminate the need for "paper" checks as an accepted means of consumer payment. In the place of personal and business checks, consumers would be provided free and unrestricted access to funds secured in bank accounts of various types by means of preauthorized electronic event. System subscribers electronically communications with the data center of the present invention for individual Transaction Event authorizations which, upon reconciliation of a day's activity, result in an EFT by means of the Automated Clearing House accommodating an "Off-Line" debiting of preauthorized consumer Transaction Events from authorized accounts. Thereafter, each system subscriber is credited with the total of all such daily authorized Transaction Events to its designated banking depository account.

The present invention comprises logic which allows the following services which when individually performed or

4

where combined with other services establish a wholly unique processing medium enabling preauthorized access to consumers' depository or bank depository reserves.

Authorization—This service supports electronic communication from point-of-sale to the system's central computer. The data center stores positive and negative files concerning consumer accounts thereby providing accurate inquiry responses regarding the current posting status of a consumer's banking account and signalling the system subscriber that said account may be reasonably relied upon for consummating a Transaction Event (i.e., an "Approval") or, where listed as delinquent, indicating that the account may not be so relied upon (i.e., a "Denial").

Check Replacement—This capability operates as an extension of Authorization enabling the system subscriber the capability of completing a Transaction Event by electronically logging the sale whereupon a Transaction Event Slip will be printed or manually prepared for consumer execution at the point-of-sale. By execution of the Transaction Event Slip, the consumer authorizes the electronic accessing of funds secured in his/her authorized banking account in lieu of the more traditional method of issuing personal and business checks. Funding settlement to the system subscriber would be effectuated by means of Electronic Funds Transfer via ACH or the Federal Reserve System as opposed to physically processing and transferring checks among banks.

Bank Transaction Card—As part of this invention an "Off-Line" Debit Card is established on which is stored the information relating to the banking account from which funds representing the Transaction Event would be debited for payment to the system subscriber. This information may be stored on the card itself in encrypted or unencrypted form or may be stored in the central computer where access to such information is gained via special control characters or access codes stored on the card. Electronic authorization for withdrawal of funds from the cardholder's account and subsequent electronic settlement procedures remain essentially identical to processing under the Check Replacement service described above. Information relating to the consumer-cardholder and the appropriate banking account to be debited for a Transaction Event will be encoded upon the magnetic stripe portion of the plastic, and terminal-readable, card.

Thus, the overall objective of the present invention is to provide and support an alternate means for consumer payments for goods and services that operates to replace commercial bank drafts in the point-of-sale environment. Simultaneously, the present invention assures consumers greater access to and use of funds in personal or corporate banking accounts. Further, the system provides system subscribers a significantly improved prospect of collecting the underlying monies for Transaction Events, reduced time for the collecting the cash receipts from Transaction Events, and a pronounced lowering of the present cost of cumbersome procedures otherwise mandated by the existing ACH system for accepting and processing commercial bank drafts.

A further objective of the present invention is to significantly reduce the use of negotiable instruments in effecting the purchase of goods or services and to further reduce the consumers reliance on credit cards or cash for transaction events.

Detailed Description of the Preferred Embodiment

The method of the present invention begins with the electronic recording of consumer information at a system

LML-EP 000073

5,484,988

| 5 | 6 |

subscriber's location using a point-of-sale terminal. This information is obtained in the presence of the consumer and occurs prior to any "Approval" either for the Transaction Event or for the ultimate crediting of the System subscriber's designated depository account. A Transaction Event involves a series of events initiated by a system subscriber's request to sell goods or services by payment from funds secured in a consumer's banking account. First, the consumer's banking account status will be verified through accessing the central computer files of the present invention. Verification that an account may be accessed is established alternatively by means of an encoded, magnetic strip card, or by input of account identification numbers from a consumer's bank account. A more traditional identification of the consumer could also occur including visual examination of driver's license or similar and acceptable picture "ID" however this is not considered part of the present invention.

As an integral portion of each Transaction Event, the system subscriber's location, date and time, and requested sale amount is automatically logged into the system when a system subscriber first accesses the invention. Finally, as Transaction Event Slip ("Sales Slip") will be produced by a printer integral to the point-of-sale terminal and will be executed by the consumer in the amount of the stated purchase with inscribed language defining the Transaction Event and specifically providing consumer authorization for electronic access to his/her banking account. Thereafter, the consumer account will be debited and the proceeds credited to the system subscriber's designated depository account along with all other similar Transaction Events representing the total of the system subscriber's daily activity. Debiting of consumer accounts and settlement deposits to each system subscriber is performed by means of Off-Line electronic funds transfer through and by the ACH or Federal Reserve System.

Equipment Configuration—The present invention can operate with nearly every conceivable point-of-sale equipment system. The central computer system accepts data transmitted from the system subscriber's existing point-of-sale equipment or that which is added to augment service performance. The point of sale terminal of the present invention is implemented in a number of ways, most preferred, however, being activation under a fully automated format. Such a fully automated system generally comprises a dual-port terminal with magnetic stripe reading capabilities interfaced with a logging printer capable of providing individual Transaction Event Slips for consumer execution, and a MICR check reader, optical character recognition ("OCR") equipment, or other device. Variations to this configuration are particularly possible where the system of the present invention is to be activated under a "Split-Dial" feature installed to function within the operational parameters of existing point-of-sale equipment primarily dedicated to bankcard ("credit card") processing. It is contemplated that services may in the future be administered using the present invention with a singular point-of-sale hardware device which, as a function of its design, would incorporate all or most of the service capabilities of an integrated terminal, logging printer, and MICR Check Reading device. The system of the present invention can alternately be interfaced with electronic cash registers now on the market.

Communications links from point-of-sale terminals to the central computer of the present invention will typically be in the form of telephonic network communications over a public switched telephone network ("PSTN") or over other approved networks. Transaction Event verification will occur as a result of point-of-sale terminal access to the central computer's positive and/or negative data files. "Approved" or "Declined" notifications are made to the Point-of-Sale device over the PSTN. All data files will be centrally located and maintained on the invention's central computer data bases. Portions of the data base include but are not limited to third party data files such as the Shared Check Authorization Network ("SCAN") (trademark) data base.

Individual transactions or groupings of transactions are first approved by soliciting an "Authorization" prior to the completion of any request for electronic funds transfer. To maintain an accurate status of file information for authorizations to subscribing merchants, businesses, and/or individuals, separate data bases are maintained. Current cardholder or banking account status are updated daily and instantly available for point-of-sale inquiry for Transaction Event authorizations. updated daily and are instantly available for point-of-sale inquiry for Transaction Event authorizations.

System subscribers point-of-sale equipment is interfaced to the central computer of the present invention by means of a telephonic network which is able to support communication from a plurality of point-of-sale terminals. Programming of the point-of-sale terminal causes an automatic "Dial-Up" to the central computer and provides an automatic query and response sequence affirming or denying the Transaction Event. The addition of local entry hubs may be installed to better facilitate the speed or economics of communications with the data files. Alternatives to telephonic networks may involve use of satellite communications or enhanced radio transmissions. Similarly, the system's data files and associated Check Replacement Service are contemplated to be responsive to emerging point-of-sale devices intended to seek authorizations by the alternate means of voice pattern recognition, fingerprint identification, retina scan, "smart" chips, and/or consumer or check image and/or signature broadcasting.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1—System overview of the present invention

FIG. 2—The point-of-sale terminal

FIG. 3—The Central Computer System

FIGS. 4-7—The process Data Flow

FIG. 8—Transaction Event Sales Slip

FIG. 9—Manual Transaction Event Sales Slip

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring to FIG. 1 an overall schematic of the present invention is described. Point-of-sale terminals 300 communicate over normal PSTN telephone lines with a central computer system 302 which in turn communicates with a banking institution 304 for purposes of debiting consumer accounts and crediting system subscriber accounts. The banking institution performs its function via normal automated clearing house ("ACH") transactions 306.

Referring to FIG. 2 the point-of-sale terminal is described. The point-of-sale terminal comprises several different entry means. A key board 310 can be used to input consumer information manually. Alternatively a card reader 312 can be used whereby the magnetic stripe on the card is read by the point-of-sale terminal and check reader 314 is also included to read the MICR number on checks as a subroutine for either a specific card or key board input. These various

5,484,988

7

input means provide information to a microprocessor 316
which comprises logic means 318, memory means 320, and
communication means 322. The logic means 318 comprises
logic which allows the information received from the various
input means to be processed and stored to the memory
320. The logic means further drives a display 324 which
provides a visual output of the account number of the
consumer for verification. The communication means 322
allows the subscriber terminal to communicate with the
central computer 302 for purposes of processing the con-
sumer's purchase.

Referring to FIG. 3 the central computer system 329 is
described. The central computer system receives input from
a plurality of point-of-sale terminals which provide trans-
action information from a system subscriber and a consumer
desiring to purchase goods or services. The central computer
system comprises a system subscriber 330 file which is a file
of those merchants who have elected to use the present
invention for processing purchases. The central system also
comprises an approved consumer file 332 which stores the
names of those consumers who have already been approved
for allowing purchases to take place through the various
input means as well as a third party database such as the
SCAN (trademark) data base relating to consumer credit.
The computer system also comprises a communications
means 334. The communication means communicates with
other outside third party data bases to allow any consumer
that has not been approved by the system to have a rapid
check of the status of the consumer's banking account and
of whether the consumer has current outstanding returns (i.e.
bad checks). Once this SCAN (trademark) or other outside
third party data base search is performed and where an
approval is given, the approved consumer file 332 is updated
with the name of the new approved consumer.

As presently configured the central computer 329 already
has a third party database known as the SCAN (trademark)
database 333 resident on the central computer. This credit
worthiness can be checked using this SCAN database. The
SCAN (trademark) database is updated daily.

The communication means 334 also communicates with a
banking institution 338 to debit the account of the
account of the consumer and credit the account of the system
subscriber (merchant) with the amount of the purchase.
These transactions then take place via the normal ACH
transaction process.

Referring to FIG. 4 the process begins by a consumer
presenting a specimen or "blank" check complete with
MICR number to the system subscriber (the merchant) 100.
The system subscriber next determines if the check meets
appropriate store policy procedures 102, i.e., that the check
has appropriate information on the check. If the check does
not meet the store policies, it is returned to the consumer
104. If the check does meet appropriate store policies the
on-line verification process proceeds 106. The subscriber
begins the process by first pressing the appropriate key on a
terminal to access the host computer 108. Thereafter the
point of sale terminal prompts the system subscriber to enter
the appropriate MICR number 110. The system subscriber
then enters the appropriate MICR number either manually or
by passing the check through a check reader which deter-
mines the MICR number 112.

Referring to FIG. 6 the subscriber would verify that the
numbers appearing on the terminal match the MICR num-
bers on the check 114. During the comparison, the sub-
scriber determines that the check number compares accu-
rately 116 to the number displayed on the terminal, if they

8

do compare the verification process proceeds 120. If the
check numbers do not compare with that of the terminal the
system subscriber clears the terminal and begins the trans-
action process again 118. If the process is to be reinitiated,
the subscriber enters the MICR number into the point of sale
terminal 130. Thereafter the system subscriber compares the
MICR numbers as before 132. If the MICR numbers com-
pare to the system display 134 the process proceeds. If the
numbers do not compare 136 the check is returned to the
consumer and the process terminates 137.

Referring to FIG. 5, if the verification process proceeds
the terminal next prompts the system subscriber to enter the
amount of the sale 122. The subscriber enters the amount of
the sale 124 and the terminal thereafter transmits an inquiry
to the host data base for verification 126.

The check approval process next takes place 128. If the
check is not approved by the central computer the terminal
displays a message declining the transaction 140. Thereafter
a printer record of the declined transaction is made for
purposes of the system subscriber 143 to comply with the
Fair Credit Reporting Act and Regulation B of the Board of
Governors of the Federal Reserve System.

If the check is approved the terminal displays a message
noting the approval 138 and the specimen check is returned
to the consumer. The printer further makes a paper record of
the transaction 142 and the consumer places any required
information on the paper receipt and signs the receipt
authorizing the transaction 144.

Referring to FIG. 7, the process description continues.
Once the transaction is approved the central computer
captures the MICR information and the sale amount and
stores that information 146. The central computer subse-
quently generates a batch message regarding all transaction
events for the prior period and transmits all the transaction
event information for the day into the ACH network 148.

During the ACH process each checkwriter's account is
debited for the exact purchase amount and such an amount
is deposited into a system subscriber designated account
150. Thereafter, collected funds for a total day's events are
deposited into a subscriber's account 152. The transaction is
then complete 154.

How to Use

The present invention will require the establishment and
maintenance of three interconnected but separate data files
for the purpose of performing access searches. Each data file
will be accessible by dial-up procedures operating, in most
instances, under "Split Dial" format from a point-of-sale
("POS") terminal device or electronic cash register installed
for the primary purpose of bankcard and/or bank draft
authorizations. The terminal prompts an operator/user to
process one of three optional inquiry types. Any one or all
of three primary functions are capable of being performed at
a single point-of-sale terminal within the control of the
system subscriber. The inquiry types and data base formats
responses are as follows:

Card Authorization—Having depressed the assigned Split
Dial key and thereafter being prompted, the system sub-
scriber "slides" an encoded magnetic stripped transaction
card through the point-of-sale terminal and enters the "Sale
Amount" requested for authorization. Thereupon, the termi-
nal's dial-up capabilities direct the inquiry to the central
computer for authorization against "POSITIVE" file of
current cardholders whose accounts were listed in "good
standing". Inquiries where such a "Match" are found cause

5,484,988

9

an "Approved" return message from the data file to the inquiring POS terminal. Conversely, a "No-Match" to inquiry would result in a "Declined" notice to the POS terminal. An uploading mode of the present invention causes forwarding of daily status notifications to the central data files activating new cardholder accounts in the "POSITIVE" cardholder file or submitting corrective entries to delete delinquent or terminated accounts.

Check Authorization—Having depressed the assigned Split Dial key and thereafter being prompted, the system subscriber manually enters account numbers from a personal or business check or, where fully automated, enters a specimen check through a MICR Check Reader device interfaced with the terminal, whereupon the terminal's screen would display the check's numbers, and hence the account number, for verification. Thereafter, the operator would enter the "Sale Amount" requested for authorization. The terminal's dial-up capabilities then direct the inquiry to the computer data file center for authorization first against the "POSITIVE" file of "promoted" bank/checking account numbers whose accounts were listed in "good standing". A successful "Match" to an inquiry would result in an "Approved" notice from the data file to the inquiring terminal. A "No-Match" to inquiry would not, however, immediately result in a "Declined" response. Each inquiry preliminarily resulting in a No-Match would be instantly forwarded/'rolled' to the third data file preceding any return notice to the inquiring terminal. This third file is anticipated to be the Shared Check Authorization Network ("SCAN") a negative data file data base maintained in the system computer data file center. Referrals to SCAN or any other positive or negative data files, enable potential acceptance of Transaction Events involving consumers 'Unknown' to the invention's proprietary, "POSITIVE" files. A "Match" on the SCAN "NEGATIVE" file would result in a "Declined" notice; a "No-Match" would conversely send notification to the inquiring POS terminal of an "Approved" event. Of significant importance, the bank/checking account numbers for each such "Unknown" consumer's transaction would, subsequent to a SCAN "Approved" notice, be posted to the invention's "POSITIVE" file and promoted through the ACH ("Automated Clearing House") for future Transaction Events. The invention, presumedly in an automated mode, is capable of uploading daily corrections to the POSITIVE data file including notices of new accounts approved through SCAN (trademark) and deletions where settlement for consumer checking account events, initially approved, were subsequently dishonored. The SCAN data base is similarly uploaded with daily activity status corrections.

Check Replacement Service—Inquiries initiated as Check Replacement requests function in nearly an identical manner as that of Check Authorization. Records for such events, when culminating in "Approved" notices, are separately preserved. Check Replacement inquiries are processed first through the system's "POSITIVE" data file and, where no match is found, proceed to the SCAN data file or other data base file prior to transmitting an "Approved" or "Declined" notice to the inquiring POS terminal. A Match in the current data file indicates a consumer-user whose account was in "good standing" and would not be required to "roll" to SCAN. Check Replacement events are reported to and stored by the computer data file center under a file classification identifying the transaction as a Check Replacement Service. The total of daily, approved Transaction Events are "checkless" sales whereby the service subscribing merchant has submitted requests for electronic ACH settlement for all preauthorized consumer purchases. No commercial bank

10

note ("Paper Check") is accepted or processed by the service subscriber. In each Transaction Event, a Consumer, at the point-of-sale, has executed an electronic access ("Off-Line Debit") authority "Sales Slip" which is automatically printed upon a terminal's receipt of an "Approved" notice.

All terminal programming and all prompt strings for MICR Check Reader interfacing are stored in the POS terminal and the computer center of the present invention controls interactions between the plurality of terminals and the central system. The following modules are present.

Programming for MICR/Terminal Interface—system subscriber locations to be activated with the present invention must possess or acquire a terminal. Those utilizing or being upgraded to terminals such as a Tranz (trademark) 330 or other terminals with interface capabilities with the check reader for all suitable point-of-sale terminals.

The preferred format for terminal operations is generated from a singular split dial key. Thereafter, the "prompt string" would proceed in a manner such as () "Card=1"; "Check=2" requiring operator selection; then, where selecting a checking account inquiry #2 the operator would respond to a secondary prompt of "Auth=1"; "Replace=2". These entry selections precede the magnetic stripe "reading" of a card/ submittal or a check through the MICR (Account Identification), the entry of the requested sale amount, and the terminal's dial-up for authorization against the computer data file center.

The MICR interface results in the transmittal of a query for data center approval of the entire ABA/Transit and personal or corporate checking account numbers. Instances where printed checks add the individual check's number to the end of the account number can be "dropped" by Check Reader switch settings. Subsequent to a terminal's receipt of the MICR number string but prior to the operator's entry of the requested sale amount and authorization dial-up, a verification prompt "flashing" the ABA and account numbers must be displayed on the terminal's screen requiring the operator to depress "Enter" to proceed, if correct, or "Clear", if incorrect and thereby enabling the terminal operator to manroll the specimen check through the MICR Check Reader. It is important to note that account information may be entered manually as well at the point of sale with the other financial advantages of the present invention still in effect.

The computer data file center receives and processes Transaction Event authorization requests utilizing the entire MICR string for accurate, error-free identification of both the consumer bank and a specific checking or depository account to participate in a sale. ACH settlement criteria mandate exact recall for the bank and checking account numbers to properly compose any debit request. This invention conforms to each and every requirement of the ACH transaction regulations.

Each Transaction Event is completed with the logging printer generation of a Transaction Event ("Sales") Slip for each "Approved" authorization inquiry processed (FIG. 8). Alternatively, a manually created transaction event slip can also be prepared (FIG. 9). Each such Transaction Event Slip must be exacting in its notation of account numbers and the sale amount enabling both the consumer and system subscriber to be provided "hard copy" receipts of the event. Also included would be a clear printing of the transaction type; "Bank Card", "Check Authorization", or "Check Replacement". Authorization language is printed immediately providing the consumer's signature lines specifically authorizing electronic access in payment of the requested transaction sale amount.

LML-EP 000076

5,484,988

**11**

In addition to the primary functions for POS terminal programming and MICR Check Reader interface, each Point-of-Sale terminal location is capable of generating printed summations of daily activity. These reports list and separately total each authorization/service type, whether produced as a singular report or as the result of multiple terminal "closeout" procedures.

Instances will arise with either the Bank Card or Check Replacement Service where previously authorized Transaction Events will require the operational equivalent of a bankcard "Void" or "Credit" notation. The methodology will be available for Split Dial messages to the computer data file center of a post-authorization "Error" or "Transaction Cancellation" notice. The "Cancel" procedure is instituted by depressing for example the "3" key (i.e. "Cancel=3"). By so doing, the system subscriber may cancel a previously approved and logged event. This Transaction Event which was recorded on the data files and reported on the service subscriber's daily Activity Summation Report, thereafter carries an offsetting, "Flagged" cancellation notice.

**Summary**

A flexible purchase transaction system is described which precisely fits within existing ACH procedures for checking account events for processing of pre-authorized electronic debits as a replacement for commercial bank drafts (paper checks). The main advantage to the proposed invention is the fact that a truly paperless transaction may occur. Departures from the proposed system especially with respect to the Point-of-Sale terminals will be apparent to those skilled in the art without departing from the spirit of the invention as described.

We claim:

1. A checkwriting point of sale system comprising:

a point of sale terminal adapted to receive consumer bank account information from any bank check;

a central computer system;

first communications means integral to said point of sale terminal for electronically communicating with the central computer system;

memory means integral to said point of sale terminal for temporarily storing the consumer bank account information;

the central computer system having second communication means for receiving information from a plurality of said point of sale terminals;

the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communications for transferring funds without using the bank check as a negotiable instrument.

2. The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further includes means for reading magnetic ink character recognition numbers appearing on a consumer check for the sole purpose of identifying and reading the consumer bank account information.

3. The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further comprises an alphanumeric display means for receiving said consumer bank account information from the memory means and for displaying the consumer bank account information.

**12**

4. The checkwriting point of sale system according to claim 1 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip.

5. The checkwriting point of sale system according to claim 1 further comprising a resident third party database wherein consumer banking account status information is stored, the consumer banking account status information being used for verification of consumer banking account status.

6. The checkwriting point of sale system according to claim 1 wherein the central computer system further comprises a system subscriber database, the system subscriber database comprising information regarding merchants and service providers that are authorized to use the checkwriting point of sale system.

7. The checkwriting point of sale system according to claim 6 wherein the central computer system further comprises a database comprising information regarding consumers whose consumer banking account status is not verified as bad.

8. A checkwriting point of sale process comprising:

a) presenting any bank check specimen to a point of sale terminal located at a merchant or service provider;

b) reading the magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument;

c) storing the consumer bank account information obtained from the check and verifying that account numbers were accurately read at the point of sale terminal;

d) providing transaction event information to the point of sale terminal;

e) transmitting the transaction event information and consumer bank account information to a central computer system;

f) storing the transaction event information and consumer banking account information; and

g) subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations.

9. A checkwriting point of sale system comprising:

a point of sale terminal adapted to receive consumer bank account information;

a central computer system;

first communications means integral to said point of sale terminal for electronically communicating with the central computer system; and

memory means integral to said point of sale terminal for temporarily storing the consumer bank account information;

the point of sale terminal comprising reading means for reading magnetic ink character recognition numbers on any consumer bank check for the sole purpose of eliciting consumer bank account information;

the central computer system having second communication means for receiving information from a plurality of said point of sale terminals;

the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using a bank check as a negotiable instrument.

LML-EP 000077

5,484,988

13

10. The checkwriting point of sale system according to claim 9 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip.

11. The checkwriting point of sale system according to claim 9 further comprising a resident third party database wherein consumer banking account status information is stored, the consumer banking account status information being used for verification of consumer banking account status.

12. The checkwriting point of sale system according to claim 9 wherein the central computer system further comprises a system subscriber database, the system subscriber database comprising information regarding merchants and service providers that are authorized to use the checkwriting point of sale system.

13. The checkwriting point of sale system according to claim 4, wherein the sales slip includes means for execution by the consumer for proof of bank account access authorization.

14. The checkwriting point of sale system of claim 1, wherein the point of sale terminal further comprises means for automatically logging a point of sale terminal location and transaction date, time, and sales amount.

15. The checkwriting point of sale process of claim 8, further comprising:

a) verifying the status of the consumer bank account,

b) verifying the consumer bank account status of the consumer via a query to a third party database if the consumer bank account is verified as bad, and

14

c) sending an approval message to the point of sale terminal if the consumer's banking account status is approved for the transaction.

16. The checkwriting point of sale process of claim 8, further comprising:

(A) printing a transaction event sales slip following the sending of an approval message; and

(B) executing of the sales slip by the consumer as proof of bank account access authorization.

17. The checkwriting point of sale process of claim 15, further comprising:

(A) printing a transaction event sales slip following the sending of an approval message; and

(B) executing of the sales slip by the consumer as proof of bank account access authorization.

18. The checkwriting point of sale process of claim 8, further comprising automatically logging point of sale terminal location information and transaction date, time, and sales amount information into the point of sale terminal.

19. The checkwriting point of sale system according to claim 10, wherein the sales slip includes means for execution by the consumer of proof of bank account access authorization.

20. The checkwriting point of sale system of claim 9, wherein the point of sale terminal further comprises means for automatically logging a point of sale terminal location and transaction date, time, and sales amount.

* * * * *

LML-EP 000078

6

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In Re Application of Robert H. Hills and Henry R. Nichols

Serial No. 08/257,390                    Group Art Unit: 2514

Filed: 06/09/94                          Examiner: Pitts, H.

For:   CHECKWRITING POINT OF SALE SYSTEM

*       *       *       *       *

RESPONSE TO OFFICE ACTION OF 10/28/94

*       *       *       *       *

Commissioner of Patents and Trademarks
Box Non-Fee Amendment
Washington, D.C. 20231

Sir:

Enclosed please find the following:

1.    Response to Office action dated 10/28/94 (27 pages); and

2.    Certificate of First Class mailing.

Respectfully submitted,

Jon L. Roberts
Registration No. 31,293
Roberts & Associates
1953 Gallows Road
Suite 220
Vienna, Virginia 22182
Phone: (703) 356-7700

January 7, 1995

LML-EP 000182

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In Re Application of Robert H. Hills and Henry R. Nichols

Serial No. 08/257,390                    Group Art Unit: 2514

Filed:  06/09/94                         Examiner: Pitts, H.

For:    CHECKWRITING POINT OF SALE SYSTEM

\*      \*      \*      \*      \*

RESPONSE TO OFFICE ACTION OF 10/28/94

\*      \*      \*      \*      \*

RECEIVED
FEB 0 6 1995
GROUP 2500

Commissioner of Patents and Trademarks
Box Non-Fee Amendment
Washington, D.C. 20231

Sir:

Applicant hereby submits the following response to the Office

action of 10/28/94.

In the Claims:

1.   (Twice Amended)    A checkwriting point of sale system

comprising:

a point of sale terminal adapted to receive consumer bank

account information from any bank check;

a central computer system;

first communications means integral to said point of sale

terminal for electronically communicating with the central computer

system;

memory means integral to said point of sale terminal for

temporarily storing the consumer bank account information;

LML-EP 000183

the central computer system having second communication means for receiving information from a plurality of said point of sale terminals;

the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using [a] the bank check as a negotiable instrument.

9. (Twice Amended)    A checkwriting point of sale process comprising [the steps of]:

a)    presenting [a] any bank check specimen to a point of sale terminal located at a merchant or service provider,

b)    reading the magnetic ink character recognition number information on the check for the sole purpose of obtaining *without using the check as a negotiable instrument,* consumer bank account information,

c)    storing the consumer bank account information obtained from the check and verifying that account numbers were accurately read at the point of sale terminal,

d)    [inputting] providing transaction event information [into] to the point of sale terminal,

e)    transmitting the transaction event information and consumer bank account information to a central computer system,

f)    storing the transaction event information and consumer banking account information, and

2

g) subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations.

11. (Amended) A checkwriting point of sale system comprising:

a point of sale terminal adapted to receive consumer bank account information;

a central computer system;

first communications means integral to said point of sale terminal for electronically communicating with the central computer system; and

memory means integral to said point of sale terminal for temporarily storing the consumer bank account information;

the point of sale terminal comprising reading means for reading magnetic ink character recognition numbers on any consumer bank [checks] check for the sole purpose of eliciting consumer bank account information;

the central computer system having second communication means for receiving information from a plurality of said point of sale terminals;

the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using a bank check as a negotiable instrument.

3

LML-EP 000185

15 17. (Amended) The checkwriting point of sale process of claim 8 9, further comprising [the steps of]:

    a) verifying the status of the consumer bank account,

    b) verifying the consumer bank account status of the consumer via a query to a third party database if the consumer bank account is verified as bad, and

    c) sending an approval message to the point of sale terminal if the consumer's banking account status is approved for the transaction.

16 18. (Amended) The checkwriting point of sale process of claim 8 9, further comprising [the steps of]:

    (A) printing a transaction event sales slip following the sending of an approval message; and

    (B) executing of the sales slip by the consumer as proof of bank account access authorization.

17 19. (Amended) The checkwriting point of sale process of claim 15 17, further comprising [the steps of]:

    (A) printing a transaction event sales slip following the sending of an approval message; and

    (B) executing of the sales slip by the consumer as proof of bank account access authorization.

18 20. (Amended) The checkwriting point of sale process of claim 8 9, further comprising [the step of] automatically logging point of sale terminal location information and transaction date, time, and sales amount information into the point of sale terminal.

4

## REMARKS

Claims 1-4, 6-9, and 11-22 are pending in the application. Claims 1-4, 6-9, and 11-21 were rejected. It is assumed that claim 22 has been overlooked and was intended to be rejected as well. Claims 1, 9, 11, and 17-20 have been amended. Claims 1, 9, and 11 are the independent claims.

The Examiner rejected claims 1-4, 6-9, and 11-21 (and presumably claim 22) under 35 U.S.C. § 112 as being indefinite for failing to particularly point out and distinctly claim the subject matter that Applicants regard as the invention. The Examiner stated that Applicants have discussed the Case and Deming patents in the specification but have not claimed the argued novelty. The Examiner further stated that there has been no specific comparison of claim language vis-a-vis the references cited in the previously submitted I.D.S. or the references cited in combination by the Examiner in the previous final rejection. The Examiner also stated that only one set of claims should be selected as the three sets of claims appear to embody separate inventions.

The Examiner concluded by stating that the claims are rejected as set forth in the previous final rejection, with the further notation that to use the check "solely" for access would be the most trivial modification of systems such as Granzow etc.

The specification was previously amended to discuss the patents to Case and Deming in the Background section. Applicants consider these patents to provide good background material for understanding their invention, which is an improvement on previous

5

LML-EP 000187

systems. The Case and Deming patents were merely discussed in this manner; no matters of novelty were argued. The Examiner stated that Applicants have not claimed the novelty of the invention. Applicants assert that the claims, as presented in the preliminary amendment, do in fact recite such novelty, which will be pointed out in the paragraphs that follow.

Applicants respectfully assert that, contrary to the Examiner's contention, specific claim language has been compared to the teachings of the references cited in prior Office actions in order to overcome the Examiner's previous rejections. An examination of responses to prior Office actions will confirm this. Applicants have taken pains to completely review all prior responses to Office actions in this regard. Unfortunately, a comparison of cited references to particular claim language was not provided in the most recent Office action. Nevertheless, in the following paragraphs, each reference, whether cited by Applicants or by the Examiner, will be compared with specific claim language in order to overcome what Applicants presume the Examiner's rejection to be. It will be shown that it is not necessary to compare each element of every claim with each referenced patent because there is at least one element recited in all the independent claims that is not disclosed by any of the referenced patents, and thus any combination of the references could not render the claims obvious.

6

LML-EP 000188

Applicants' Invention

The following are brief summaries of the elements recited in Applicants' independent claims.

Claim 1

Claim 1 recites a checkwriting point-of-sale system comprising a point of sale terminal, a central computer, first and second communication means, and memory. The point of sale terminal accepts bank account information from any bank check. The system transfers funds as part of a transaction without using the bank check as a negotiable instrument.

Claim 9

Claim 9 recites a checkwriting point-of-sale process comprising presenting any bank check to a merchant's terminal, reading MICR information from the check for the sole purpose of obtaining bank account information, storing the information, providing transaction event information to the terminal, transmitting the transaction information to a central computer, storing all the information, and transmitting the transaction information to a bank for clearing house functions.

Claim 11

Claim 11 recites a checkwriting point-of-sale system comprising a point of sale terminal, a central computer, first and second communication means, and memory. The point of sale terminal accepts bank account information by reading the MICR information from any bank check. The system transfers funds as part of a

7

LML-EP 000189

transaction without using the bank check as a negotiable instrument.

Case 4,270,042

Case discloses an electronic funds transfer system. The system includes use of a letter of credit card and a draft instrument unique to the Case system. Case does not disclose the use of any bank check solely to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11. Rather, Case uses a combination of letter of credit card and system-unique negotiable instrument that is negotiated as part of the transaction. Consumer information is provided by the letter of credit card, and the negotiable draft instrument is given to the vendor to pay for the transaction.

Thus, an element recited in all of Applicants' claims is not disclosed by Case. Further, it would not be trivial to modify Case so that an ordinary bank draft is used for informational purposes only. The entire Case system is set up around a unique pre-paid (and therefore pre-authorized) account in which a system-unique draft instrument is given up, that is, negotiated as part of the transaction. To include the missing elements of Applicants' claims would be to change the entire nature of the Case system from a closed, pre-paid system using unique draft negotiable instruments to one which electronically debits a bank account based on information derived from any ordinary check. Including elements of Applicants' claims is unecessary for Case because each transaction is preauthorized through prepayment. Thus, it is neither possible

8

LML-EP 000190

nor proper to combine the system of Case with another system in an effort to result in Applicants' claimed system.

Deming 4,823,264

Deming discloses an electronic funds transfer system used in conjunction with home banking, not a point-of-sale transaction. Deming does not disclose the use of a bank check in a point-of-sale transaction solely to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11. Rather, Deming discloses a home banking method by which all payor and payee information is entered manually into a computer. A bank check is never used, except when a routing and transfer number is not available for the payee, in which case a paper check is issued and mailed for later negotiation by the payee.

Thus, an element recited in all of Applicants' claims is not disclosed by Deming. Further, it would not be trivial to modify Deming so that a bank draft is used for informational purposes only. The Deming system is a home banking system used by a single payor to pay a number of payees. Thus, the payor's information will always be stored on the system; there is no reason to read it from a check. In contrast, Applicants' system will always be used at the payee's place of business, and information must be gathered from a great number of payors. Therefore, the payee's information will always be stored on the system and the payor's information will have to be entered. This is done by reading it from the check. To include the missing elements of Applicants' claims would

9

LML-EP 000191

be to change the very nature of the Deming system from a personal bank at home system to a point-of-sale system. Thus, it is neither possible nor proper to combine the system of Deming with a point-of-sale system in an effort to assemble Applicants' claimed system.

Carlson et al. 5,053,607

Carlson et al. disclose a system adapted for processing checks. The system includes a device that reads MICR information printed on the check. This reading of the MICR data speeds up processing of the check at the point of sale. The check is still used as a negotiated instrument, however, and is turned over to the merchant to complete the transaction. Thus, Carlson et al. do not disclose the use of a bank check in a point-of-sale transaction solely to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11. Rather, the Carlson et al. system requires negotiation of the check.

Thus, an element recited in all of Applicants' claims is not disclosed by Carlson et al. Further, it would not be trivial to modify Carlson et al. so that a bank draft is used for informational purposes only. The entire Carlson et al. system is set up to process checks in order to speed the debiting and crediting of the negotiated amount at a later date. To include the missing elements of Applicants' claims would be to change the very nature of the Carlson et al. system from a system that prepares checks for negotiation to one which doesn't negotiate checks at all. Thus, it is neither possible nor proper to combine the system

10

LML-EP 000192

of Carlson et al. with another system in an effort to result in
Applicants' claimed system.

Carlson et al. 4,678,896

Carlson et al. here disclose a mechanism that includes
security features to prevent unauthorized tampering. This device
includes a MICR reader, but again only processes instruments that
are negotiated as part of the transaction taking place at the point
of sale. Thus, Carlson et al. do not disclose the use of a bank
check in a point-of-sale transaction in order to derive consumer
information and not for use as a negotiable instrument, as recited
in independent claims 1, 9, and 11. Rather, Carlson et al. require
negotiation of the check.

Thus, an element recited in all of Applicants' claims is not
disclosed by Carlson et al. Further, it would not be trivial to
modify Carlson et al. so that a bank draft is used for
informational purposes only. The entire Carlson et al. system is
set up to process checks in order to speed the debiting and
crediting of the negotiated amount at a later date and to provide
security against tampering with checks accepted to complete the
transaction. To include the missing elements of Applicants' claims
would be to change the very nature of the Carlson et al. system
from a system that prepares checks for negotiation to one which
doesn't negotiate checks at all. Further, the protection of
negotiated checks after the transaction provided by Carlson et al.
is completely unnecessary using Applicants' system as the vendor
never takes a check from the purchaser. The check is only

11

LML-EP 000193

temporarily given to the vendor so that information may be read.
Thus, it is neither possible nor proper to combine the system of
Carlson et al. with another system in an effort to result in
Applicants' claimed system.

Murphy et al. 4,672,377

Murphy et al. disclose a check authorization system whereby a
supermarket customer is assigned a UPC code which is used to access
a database used to check the credit status of the customer at each
transaction. If the customer's credit is good, acceptance of the
check in payment for the transaction is authorized. The check is
then negotiated as it would be in any normal transaction. Thus,
Murphy et al. do not disclose the use of a bank check in a point-
of-sale transaction in order to derive consumer information and not
for use as a negotiable instrument, as recited in independent
claims 1, 9, and 11. Rather, Murphy et al. provide a credit check
before a check is negotiated.

Thus, an element recited in all of Applicants' claims is not
disclosed by Murphy et al. Further, it would not be trivial to
modify Murphy et al. so that a bank draft is used for informational
purposes only. The entire Murphy et al. system is set up to
authorize the acceptance of a check as a negotiable instrument in
payment for goods. To include the missing elements of Applicants'
claims would be to change the very nature of the Murphy et al.
system from a system that authorizes the acceptance of negotiable
instruments to one which does not accept negotiable instruments at
all. To process checks in the manner provided by Applicants'

12

LML-EP 000194

invention would go beyond modification of the Murphy et al. invention; it would do away with the entire purpose behind the Murphy et al. invention. Thus, it is neither possible nor proper to combine the system of Murphy et al. with another system in an effort to result in Applicants' claimed system.

Lindemann et al. 4,933,536

Lindemann et al. disclose a check processing device whereby some form of customer identification, such as a photograph, is reproduced on a bank check that is presented for tender. This identification feature is used as a deterrence to the passing of bad checks. After the identification has been added to the check, the check is processed as it would in any normal transaction, including acceptance of the check as a negotiable instrument in payment for goods and services. Thus, Lindemann et al. do not disclose the use of a bank check in a point-of-sale transaction in order to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11. Rather, Lindemann et al. provide an identification feature before the check is negotiated.

Thus, an element recited in all of Applicants' claims is not disclosed by Lindemann et al. Further, it would not be trivial to modify Lindemann et al. so that a bank draft is used for informational purposes only. The entire Lindemann et al. system is set up to add an identification feature to a check in order to deter passing bad checks as negotiable instruments. To include the missing elements of Applicants' claims would be to change the very

13

LML-EP 000195

nature of the Lindemann et al. system from one which provides
security against the acceptance in payment of bad checks to one
that doesn't accept checks for payment at all. To process checks
in the manner provided by Applicants' invention would go beyond
modification of the Lindemann et al. invention; it would do away
with the entire purpose behind the Lindemann et al. invention.
Thus, it is neither possible nor proper to combine the system of
Lindemann et al. with another system in an effort to result in
Applicants' claimed system.

Lord, Jr. 4,810,866

Lord discloses a check validation and check writing system
whereby coded information is read from a consumer's bank check in
order to determine if the associated bank account has sufficient
funds to cover a transaction taking place. If sufficient funds are
present, a blank check is printed using the device, which imprints
the date, transaction total, etc. and presents the check to the
customer for signature. Once the check is executed, it is given to
the merchant as payment and is negotiated as would be any normal
check in such a transaction. Thus, Lord does not disclose the use
of a bank check in a point-of-sale transaction in order to derive
consumer account information and not for use as a negotiable
instrument, as recited in independent claims 1, 9, and 11. Rather,
Lord requires the negotiation of a system-unique check as payment
for a transaction.

Thus, an element recited in all of Applicants' claims is not
disclosed by Lord. Further, it would not be trivial to modify Lord

14

LML-EP 000196

so that a bank draft is used for informational purposes only. The entire Lord system is set up to print transaction information on a check so that it can be used as a negotiable instrument. To include the missing elements of Applicants' claims would be to change the very nature of the Lord system from one which produces a negotiable instrument to one which does not use a negotiable instrument. To process checks in the manner provided by Lord is contrary to the entire purpose behind Applicants' invention. Printing of transaction information on checks using Applicants' system is unnecessary because the checks are never surrendered to the vendor. Thus, it is neither possible nor proper to combine the system of Lord with another system in an effort to result in Applicants' claimed system.

Fukatsu 4,743,743

Fukatsu discloses a transaction apparatus. This apparatus is not part of a point-of-sale system, but rather is an automatic teller machine system. The machine accepts checks along with a "bill" which indicates whether money is to be deposited, withdrawn, etc. As a check is entered into the machine, the MICR code is read, simplifying post-processing, which takes place manually at a later time. Thus, Fukatsu does not disclose the use of a bank check in a point-of-sale transaction in order to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11. Rather, Fukatsu discloses a system for processing negotiable instruments prior to later manual reconciliation of the checking account.

15

Thus, an element recited in all of Applicants' claims is not disclosed by Fukatsu. Further, it would not be trivial to modify Fukatsu so that a bank draft is used for informational purposes only. The entire Fukatsu system is set up to accept and process checks for deposit to a bank. To include the missing elements of Applicants' claims would be to change the very nature of the Fukatsu system to one which does not process negotiated checks at all. To process checks in the manner provided by Applicants' invention is not necessary, beneficial, or consistent with the service provided by Fukatsu, which is not contemplated for use in a merchant setting and would not work in such a setting. Thus, it is neither possible nor proper to combine the system of Fukatsu with another system in an effort to result in Applicants' claimed system.

Cain 4,523,330

Cain discloses a banking system used to process checks. This system scans checks deposited with the bank in order to read MICR data printed on the checks, and also to read handwritten data using character recognition software. Once character recognition is accomplished, the data is converted to MICR data and printed on the check. Thus, Cain does not disclose the use of a bank check in a point-of-sale transaction in order to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11. Rather, Cain discloses a system for processing previously negotiated checks.

16

LML-EP 000198

Thus, an element recited in all of Applicants' claims is not disclosed by Cain. Further, it would not be trivial to modify Cain so that a bank draft is used for informational purposes only. The entire Cain system is set up to accept and process checks that have been deposited to a bank. To include the missing elements of Applicants' claims would be to change the very nature of the Cain system to one which does not accept negotiated checks at all. To process checks in the manner provided by Applicants' invention is not necessary, beneficial, or consistent with the service provided by Cain. Thus, it is neither possible nor proper to combine the system of Cain with another system in an effort to result in Applicants' claimed system.

Nunley et al. 4,404,649

Nunley et al. disclose a document processing system. This system scans checks deposited with a bank in order to read MICR data printed on the checks, and to tag the check with a source item control number. Thus, Nunley et al. do not disclose the use of a bank check in a point-of-sale transaction in order to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11. Rather, Nunley et al. provide processing of previously negotiated checks.

Thus, an element recited in all of Applicants' claims is not disclosed by Nunley et al. Further, it would not be trivial to modify Nunley et al. so that a bank draft is used for informational purposes only. The entire Nunley et al. system is set up to accept and process checks that have been deposited to a bank. To include

17

LML-EP 000199

the missing elements of Applicants' claims would be to change the
very nature of the Nunley et al. system to one which does not
accept negotiated checks at all. To process checks in the manner
provided by Applicants' invention is not necessary, beneficial, or
consistent with the service provided by Nunley et al, which is not
contemplated for use in a merchant setting and would not work in
such a setting. In fact, Nunley et al. specifically rule out the
possible use of the system at the point-of-sale. Thus, it is
neither possible nor proper to combine the system of Nunley et al.
with another system in an effort to result in Applicants' claimed
system.

Graznow et al. 4,580,040

Graznow et al. disclose a teller-assisted, customer-operated
automatic teller machine check cashing system. According to this
system, the automatic teller machine is linked to a teller station
equiped with a MICR data reader. When a customer presents a check
to be cashed, the MICR data is read, the customer's or the third
party payor's checking account balance is check for sufficiency of
funds, and cash is dispensed if the account balance is sufficient.
Thus, Graznow et al. do not disclose the use of a bank check in a
point-of-sale transaction in order to derive consumer information
and not for use as a negotiable instrument, as recited in
independent claims 1, 9, and 11. Rather, Graznow et al. disclose
a bank system for verifying checks to be negotiated.

Thus, an element recited in all of Applicants' claims is not
disclosed by Graznow et al. Further, it would not be trivial to

18

LML-EP 000200

modify Graznow et al. so that a bank draft is used for informational purposes only. The entire Graznow et al. system is set up to cash checks that have been presented to a bank. To include the missing elements of Applicants' claims would be to change the very nature of the Graznow et al. system from one that has the sole function of accepting checks for negotiation to one which is used as part of a point-of-sale transaction and does not accept the check for negotiation. To process checks in the manner provided by Applicants' invention is not necessary, beneficial, or consistent with the service provided by Graznow et al. Thus, it is neither possible nor proper to combine the system of Graznow et al. with another point-of-sale system in an effort to assemble Applicants' claimed system.

<u>Graznow et al. 4,617,457</u>

Here, Graznow et al. disclose the same invention as that discussed above, with the addition of an image for presenting an image of the check to be cashed to the teller present at the teller station. Again, Graznow et al. do not disclose the use of a bank check in a point-of-sale transaction in order to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11. Rather, Graznow et al. disclose a bank system for verifying checks to be negotiated.

Thus, an element recited in all of Applicants' claims is not disclosed by Graznow et al. Further, it would not be trivial to modify Graznow et al. so that a bank draft is used for informational purposes only. The entire Graznow et al. system is

19

LML-EP 000201

set up to cash checks that have been presented to a bank.   To
include the missing elements of Applicants' claims would be to
change the very nature of the Graznow et al. system from one that
has the sole function of accepting checks for negotiation to one
which is used as part of a point-of-sale transaction and does not
accept the check for negotiation.   To process checks in the manner
provided by Applicants' invention is not necessary, beneficial, or
consistent with the service provided by Graznow et al.  Thus, it is
neither possible nor proper to combine the system of Graznow et al.
with another system in an effort to result in Applicants' claimed
system.

Simjian 3,824,544

Simjian discloses a merchandizing arrangement utilizing a
coded sales ticket.  The customer obtains the coded sales ticket by
selecting an item for purchase and paying for the item.  The coded
ticket is then brought to a merchandise dispensing area and is
exchanged for the purchased item.  Thus, Simjian does not disclose
the use of a bank check in a point-of-sale transaction in order to
derive consumer information and not for use as a negotiable
instrument, as recited in independent claims 1, 9, and 11.  Rather,
Simjian discloses a merchandise vending security system, the point-
of-sale aspect of which is conventional.

Thus, an element recited in all of Applicants' claims is not
disclosed by Simjian.  Further, it would not be trivial to modify
Simjian so that a bank draft is used for informational purposes
only.  The entire Simjian system is set up to provide security

20

LML-EP 000202

against shoplifting by controlling access to merchandise. The invention is not even directed to the payment part of the transaction. To include the missing elements of Applicants' claims would be to change the very nature of the Simjian system by adding a new inventive element to the system. To process checks in the manner provided by Applicants' invention is not necessary, beneficial, or consistent with the service provided by Simjian. Thus, it is neither possible nor proper to combine the system of Simjian with another system in an effort to result in Applicants' claimed system.

Schuller 3,845,470

Schuller discloses a check-controlled vending system. This system uses pre-paid tickets, or "checks", as a payment means for a vending machine. These tickets are coded to provide security features. Thus, Schuller does not disclose the use of a bank check in a point-of-sale transaction in order to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11. Rather, Schuller discloses a payment system for vending machines which uses specialized tickets as negotiable instruments.

Thus, an element recited in all of Applicants' claims is not disclosed by Schuller. Further, it would not be trivial to modify Schuller so that a bank draft is used for informational purposes only. The entire Schuller system is set up to provide security against shoplifting by controlling access to merchandise using pre-paid tickets. The invention is not even directed to the payment

21

LML-EP 000203

part of the transaction. To include the missing elements of Applicants' claims would be to change the very nature of the Schuller system by adding a new inventive element to the system. To process checks in the manner provided by Applicants' invention is not necessary, beneficial, or consistent with the service provided by Schuller. Thus, it is neither possible nor proper to combine the system of Schuller with another system in an effort to result in Applicants' claimed system.

Ohmae et al. 4,673,802

Ohmae et al. disclose a system for using a bank debit card to pay for merchandise at a point of sale. Unlike normal debit card transactions, the Ohmae et al. system allows for a grace period between the time the sale is made and the time the cash is debited from the customer's account. Thus, Ohmae et al. do not disclose the use of a bank check in a point-of-sale transaction in order to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11. Rather, Ohmae et al. disclose a system for delaying the posting of a debit to a user's account.

Thus, an element recited in all of Applicants' claims is not disclosed by Ohmae et al. Further, it would not be trivial to modify Ohmae et al. so that a bank draft is used for informational purposes only. The entire Ohmae et al. system is set around the use of a debit card. To include the missing elements of Applicants' claims would be to change the very nature of the Ohmae et al. system to one which electronically debits a bank account

22

LML-EP 000204

based only on information derived from a bank check to complete a point-of-sale transaction. To process checks in the manner provided by Applicants' invention is not necessary, beneficial, or consistent with the service provided by Ohmae et al. Thus, it is neither possible nor proper to combine the system of Ohmae et al. with another system in an effort to result in Applicants' claimed system.

Tateisi et al. 4,678,895

Tateisi et al. disclose a normal system for using a bank debit card to pay for merchandise at a point of sale. The system includes a terminal device, connected to a cash register, for performing the account debit function while the cash register rings up the sale. Thus, Tateisi et al. do not disclose the use of a bank check in a point-of-sale transaction in order to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11. Rather, Tateisi et al. disclose a system for performing a debit function separate from a tallying function in order to speed transactions.

Thus, an element recited in all of Applicants' claims is not disclosed by Tateisi et al. Further, it would not be trivial to modify Tateisi et al. so that a bank draft is used for informational purposes only. The entire Tateisi et al. system is set around the use of a debit card. To include the missing elements of Applicants' claims would be to change the very nature of the Tateisi et al. system to one which electronically debits a bank account based only on information derived from a bank check to

23

LML-EP 000205

complete a point-of-sale transaction. To process checks in the manner provided by Applicants' invention is not necessary, beneficial, or consistent with the service provided by Tateisi et al. Thus, it is neither possible nor proper to combine the system of Tateisi et al. with another system in an effort to result in Applicants' claimed system.

Sakuma et al. 4,934,772

Sakuma et al. disclose a light beam scanning lens and light beam scanning device. Sakuma et al. disclose a scanning system that has potential utility in scanning information from a check, but such use is not disclosed. Thus, Sakuma et al. do not disclose the use of a bank check in a point-of-sale transaction in order to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11. Rather, Sakuma et al. disclose a light beam scanning device.

Thus, an element recited in all of Applicants' claims is not disclosed by Sakuma et al. Further, it would not be trivial to modify Sakuma et al. so that a bank draft is used for informational purposes only. Sakuma et al. merely disclose the optical scanning elements of an undisclosed system. To include the missing elements of Applicants' claims would be to completely redefine the Sakuma et al. invention and is beyond the scope of the Sakuma et al. invention. Thus, it is neither possible nor proper to combine the device of Sakuma et al. with a point-of-sale system in an effort to assemble Applicants' claimed system.

24

LML-EP 000206

Summary

None of the referenced patents discloses at least one element recited in all of Applicants' claims. That is, none of the references discloses a point-of-sale system that uses any bank check solely for the purposes of gathering customer information and not as a negotiable instrument used to pay for goods received in a transaction. Because none of these references discloses this element, no combination of these references can disclose Applicants' claimed system, because such a combination would also be missing this element. Further, the addition of this missing element to any of the references is not trivial or obvious, and in fact is not compatible with the stated purpose of the references. None of the references teaches or suggests the utility of adding features of Applicants' claimed invention to the cited reference inventions. Thus, Applicants' claimed invention cannot be rendered obvious by any combination of these references, nor is the combination of these references proper.

It is important to note that Applicants have focussed on only one particular element of the claimed invention in response to the Examiner's rejection. Applicants in no way acknowledge the disclosure of any of the other claimed elements in any of the references, nor do Applicants concede that the chosen element is the only novel and non-obvious aspect of the claimed invention. For organizational ease and clarity in response to the Examiner's broad rejection of the claims, in which no particular reference was applied to any particular claim or element, Applicants chose to

25

LML-EP 000207

rely on one novel element in order to overcome the rejection. As shown in the above discussion, one element that is missing from all cited references is enough to show that the claimed invention is novel and non-obvious.

Regarding the Examiner's contention that three separate inventions are present, and that only one set of claims should be selected for continued prosecution, Applicants respectfully traverse. There are in fact three sets of claims. The first set includes independent claim 1 and dependent claims 2-4, 6-8, 15, and 16. The second set includes independent claim 9 and dependent claims 17-20. The third set includes independent claim 11 and dependent claims 12-14, 21, and 22. The first set and the third set recite the system of the present invention as an apparatus. Although the claims differ in scope and in the particular terms used, they do not recite patentably distinct inventions. See MPEP 806.03. The second set of claims recites the system of the present invention as a process. Claiming an invention in terms of two different statutory classes of invention does not in itself render the two sets of claims patentably distinct. These differences among these claims do not satisfy the criteria for a proper restriction under MPEP 803. Applicants will respond to a formal restriction requirement from the Examiner, but respectfully decline to voluntarily cancel two sets of properly submitted claims in response to the Examiner's comments.

It is respectfully urged that all rejections have been overcome. It is therefore respectfully requested that this

26

LML-EP 000208

amendment be entered, the claims allowed, and the case passed to issue. Because Applicants have compared all cited references with the recited elements of Applicants' claims, it would be appreciated if the Examiner would reject with more particularity in the future, should more rejections be forthcoming. That is, it would be helpful if the Examiner would compare cited references to the rejected claims and point out which aspects of Applicants' traversal he finds lacking. Please see MPEP 707.07 (d)-(f).

Respectfully submitted,

Jon L. Roberts
Registration No. 31,293
Roberts & Associates
1953 Gallows Road
Suite 220
Vienna, Virginia 22182
Phone: (703) 356-7700

January 3, 1995

27

LML-EP 000209



CERTIFICATE OF FIRST CLASS MAILING

Date of Mailing: _____January 30, 1995_____

I hereby certify that the Response to Office Action dated 10/28/94 (27 pages) directed to the application of Robert H. Hills and Henry R. Nichols  for a CHECKWRITING POINT OF SALE SYSTEM, Serial No. 08/257,390, filed 06/09/94, is being deposited with the United States Postal Service as first class mail under 37 C.F.R. § 1.8 on the date indicated above and is addressed to Commissioner of Patents and Trademarks, Box Non-Fee Amendment, Washington, D.C. 20231.

Jon L. Roberts, Esq.
Roberts & Associates
1953 Gallows Road
Suite 220
Vienna, Virginia 22182

LML-EP 000210

7

08/257390

8/C
8-19-94
p.D

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In Re Application of Robert H. Hills and Henry R. Nichols

Serial No.                              Group Art Unit:

Filed:  Herewith                        Examiner:

For:    CHECKWRITING POINT OF SALE SYSTEM

*   *   *   *   *

PRELIMINARY AMENDMENT

*   *   *   *   *

Commissioner of Patents and Trademarks
Washington, D.C. 20231

Sir:

Applicants hereby submit the following preliminary amendment
to the above captioned patent application.

In the Specification:

Please amend the specification as follows:

Page 3, between lines 2 and 3, insert the following
paragraphs:

-- U.S. Patent No. 4,270,042 to Case discloses a point of sale
system that requires a consumer to prepay a sum of money into a
special account that is accessed only by the system.  This amount
is inscribed on the card, and when a transaction is made using the
system, the amount of the transaction is punched out of a
designated area on the card.  This amount, along with a signature
and other information, is supplied on a draft negotiable
instrument, which is given to the merchant at the time of the
transaction.  Thus, the Case system does away with the use of bank
checks in effecting the transacion, but requires the use of

C1

9

LML-EP 000170

spacialized prepaid draft negotiable instruments that must be surrendered to the merchant.

U.S. Patent No. 4,823,264 to Deming discloses a home banking system that can be used to transfer funds to different payees in satisfaction of debts incurred through previous purchases, use of utilities, etc.  The system is consumer driven; that is, it is contemplated for use by the payor on a home personal computer.  While the Deming system does away with the use of bank checks, account and other information must be keyed into the system.  The Deming system cannot be used to read account and other information directly from an ordinary bank check and has no use for bank checks as instruments other than negotiable paper.  Further, the Deming system cannot be used to transfer funds at the time of purchase and is not workable at the point of sale; the system can only be used to pay debts that have been incurred in the past and have accumulated. --.

Page 3, between lines 16 and 17, insert the following paragraph:

-- Further, some of the currently used systems described above require the use of a bank check as a negotiable instrument which must be surrendered to a merchant.  Some of the systems do away with the use of a bank check altogether, but require a debit card or a specialized draft instrument to be used only with the particular system.  None of these systems completely does away with the need and use for a negotiable draft instrument while using the consumer's bank check for identification and verification only.  It

2

LML-EP 000171

is therefore an objective of the present invention to provide such a system. ╫

Page 4, line 6, before "The system is intended" insert ── In contrast to known systems, the present invention is a merchant driven system that can be used to process a transaction at the point of sale and at the time of purchase. ╵╷.

Page 8, line 2, delete "as a means of conducting" and insert ╫ as negotiable instruments in effecting the ╫.

In the Claims:

Please cancel claims 5 and 10.

Please amend the remaining claims as follows:

1.    (Amended) A checkwriting point of sale system comprising: a point of sale terminal adapted to receive consumer bank account information [and further adapted to accept such information from consumer cards on which the bank account information is stored];

a central computer system;

[a] first communications means integral to said point of sale terminal for electronically communicating with [a] the central computer system;

[a] memory means integral to said point of sale terminal for [allowing the temporary storage of] temporarily storing the consumer bank account information [from the consumer cards];

the central computer system having second communication means [capability adapted to receive] for receiving information from a plurality of said point of sale terminals;

3

LML-EP 000172

the central computer system second communication means [allowing] enabling said central computer system to communicate with external [data bases] databases for performing a consumer bank account status [verification] search and [allowing] further enabling automated clearing house communication [with banking institutions] for [purposes of transfer of] transferring funds without using a bank check as a negotiable instrument.

2. (Amended) [A] The checkwriting point of sale system according to claim 1 wherein said point of sale terminal [is] further [adapted to read MICR] includes means for reading magnetic ink character recognition numbers appearing on a consumer check [and wherein said consumer check is used to identify] for the sole purpose of identifying and reading the consumer bank account information.

3. (Amended) The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further comprises an alphanumeric display means [adapted to receive] for receiving said consumer bank account information from the memory means [of the point of sale terminal such that said point of sale terminal is adapted to display] and for displaying the consumer bank account information.

4. (Amended) The checkwriting point of sale system according to claim 1 further comprising a printer means for [adapted to receive] receiving information from the memory means of the point of sale terminal [to create point of] and for generating a transaction event sale slip[s].

4

LML-EP 000173

5. 8. (Amended) The checkwriting point of sale system according
to claim 1 further comprising a resident third party [data base]
database wherein consumer banking account status information is
stored, the consumer banking account status information being
[which is] used for verification of consumer banking account
status.

6. 7. (Amended) The checkwriting point of sale system according
to claim 1 wherein the central computer system further comprises a
system subscriber. [data base] database, the system subscriber
database comprising information regarding merchants and service
providers that are authorized to use the checkwriting point of sale
system.

7. 8. (Amended) The checkwriting point of sale system according
to claim 7 wherein the central computer system further comprises a
database comprising information regarding consumers [approved to
use the checkwriting point of sale system] whose consumer banking
account status is not verified as bad.

9. (Amended) A checkwriting point of sale process comprising
the steps of:

    a)   presenting a bank check specimen to a point of sale
terminal located at a merchant or service provider,

    b)   reading the [MICR] magnetic ink character
recognition number information on the check for the sole purpose of
obtaining consumer bank account information,

5

LML-EP 000174

c) storing the consumer bank account information obtained from the check and verifying that account numbers were accurately read at the point of sale terminal,

d) inputting transaction event information into the point of sale terminal,

e) transmitting the transaction event information and consumer bank account information to a central computer system,

[f) verifying the authorization status of the consumer,

g) verifying the banking account status of the consumer via a query to a third party data base if a particular consumer is not authorized to use the system ,

h) sending an "approved" message to the point of sale terminal, if the consumer's banking account status is approved for the transaction, and]

f) storing the transaction event information and consumer banking account information, and

[i)]g) subsequently transmitting the transaction event information to a bank for subsequent [ACH] automated clearing house operations.

Please add the following new claims:

31. (New) A checkwriting point of sale system comprising:

a point of sale terminal adapted to receive consumer bank account information;

a central computer system;

6

first communications means integral to said point of sale terminal for electronically communicating with the central computer system; and

memory means integral to said point of sale terminal for temporarily storing the consumer bank account information;

the point of sale terminal comprising reading means for reading magnetic ink character recognition numbers on consumer bank checks for the sole purpose of eliciting consumer bank account information;

the central computer system having second communication means for receiving information from a plurality of said point of sale terminals;

the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using a bank check as a negotiable instrument.

10   17. 9 (New)    The checkwriting point of sale system according to claim 11 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip.

11   18. 9 (New)    The checkwriting point of sale system according to claim 11 further comprising a resident third party database wherein consumer banking account status information is stored, the

7

LML-EP 000176

consumer banking account status information being used for
verification of consumer banking account status.

12. (New)    The checkwriting point of sale system according
to claim 11 wherein the central computer system further comprises
a system subscriber database, the system subscriber database
comprising information regarding merchants and service providers
that are authorized to use the checkwriting point of sale system.

13. (New)    The checkwriting point of sale system according
to claim 4, wherein the sales slip includes means for execution by
the consumer for proof of bank account access authorization.

14. (New)    The checkwriting point of sale system of claim
1, wherein the point of sale terminal further comprises means for
automatically logging a point of sale terminal location and
transaction date, time, and sales amount.

17. (New)    The checkwriting point of sale process of claim
9, further comprising the steps of:

        a)    verifying the status of the consumer bank account,

        b)    verifying the consumer bank account status of the
consumer via a query to a third party database if the consumer bank
account is verified as bad, and

        c)    sending an approval message to the point of sale
terminal if the consumer's banking account status is approved for
the transaction.

    18. (New)    The checkwriting point of sale process of claim
9, further comprising the steps of:

8

LML-EP 000177

(A) printing a transaction event sales slip following the sending of an approval message; and

(B) executing of the sales slip by the consumer as proof of bank account access authorization.

19.  (New)    The checkwriting point of sale process of claim 17, further comprising the steps of:

(A) printing a transaction event sales slip following the sending of an approval message; and

(B) executing of the sales slip by the consumer as proof of bank account access authorization.

20.  (New)    The checkwriting point of sale process of claim 9, further comprising the step of automatically logging point of sale terminal location information and transaction date, time, and sales amount information into the point of sale terminal.

21.  (New)    The checkwriting point of sale system according to claim 12, wherein the sales slip includes means for execution by the consumer of proof of bank account access authorization.

22.  (New)    The checkwriting point of sale system of claim 9, wherein the point of sale terminal further comprises means for automatically logging a point of sale terminal location and transaction date, time, and sales amount.

9

LML-EP 000178

### REMARKS

This preliminary amendment is being filed as part of the above-captioned file wrapper continuation application, the parent application of which is Serial No. 07/975,717, filed November 13, 1992. No new matter has been added by this amendment. The parent application is abandoned as of the filing date of the present application. It is respectfully requested that this amendment be entered, the claims allowed, and the case passed to issue.

Respectfully submitted,

Jon L. Roberts
Registration No. 31,293
Roberts & Associates
1953 Gallows Road
Suite 220
Vienna, Virginia 22182
(703) 356-7700

June 8, 1994

10

LML-EP 000179