**8**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LML PATENT CORP.,

        Plaintiff,

    v.

TELECHECK SERVICES, INC.,
ELECTRONIC CLEARING HOUSE, INC.,
XPRESSCHEX, INC. and NOVA
INFORMATION SYSTEMS, INC.,

        Defendants.

C.A. 04-858 (SLR)

---

**DECLARATION OF DAVID P. KURRASCH IN SUPPORT OF DEFENDANTS'
RESPONSE TO LML'S MOTION FOR SUMMARY JUDGMENT NO. 5: FOR A
RULING THAT CLAIMS 1, 2, 4, 5, 6, 9, 10, 11, 14, 16 AND 18 OF THE '988 PATENT
ARE NOT INVALID UNDER 35 U.S.C. §§ 112 AND 132**

William J. Marsden (#2247)
Timothy Devlin (#4241)
Tara D. Elliott (#4483)
FISH & RICHARDSON P.C
919 N. Market Street, Suite 1100
Wilmington, DE 19899-1114

*Attorneys for Telecheck Services, Inc*

Collins J. Seitz, Jr. (#2237)
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19801

*Attorney for Electronic Clearing House, Inc.
and XpressChex, Inc.*

Richard D. Kirk. (#922)
THE BAYARD FIRM
222 Delaware Avenue, Suite 900
Wilmington, DE 19801

*Attorney for Nova Information Systems,
Inc.*

Dated: November 15, 2005

I, DAVID P. KURRASCH, declare as follows:

1.      My name is David P. Kurrasch and I am the President of Global Payment
Advisors, Inc. ("GPA") in Alameda, California.  I have been retained as an expert in this action
by Defendants TeleCheck Services, Inc. ("TeleCheck"), Electronic Clearing House, Inc.
("ECHO"), XpressChex, Inc. ("XpressChex") and Nova Information Systems, Inc. ("Nova")
(collectively, "Defendants").  I submit this declaration in support of Defendants' Response to
LML's Motion For Summary Judgment No. 5: For a Ruling That Claims 1, 2, 4, 5, 6, 9, 10, 11,
14, 16 and 18 of the '988 Patent Are Not Invalid Under 35 U.S.C. §§ 112 and 132.  I make this
declaration of my own personal knowledge, and if called upon as a witness would competently
testify to the facts set forth below.

2.      As reflected in my curriculum vitae, a true and correct copy of which is attached
hereto as **Tab A**, I received a Bachelor of Arts degree with majors in Economics,
Communications and History, with a minor in Mathematics, from the University of Wisconsin –
Madison in 1973.  In 1975, I received a Masters of International Management degree, with an
emphasis in Finance, from the American Graduate School of International Management in
Glendale, Arizona.  I completed the Graduate School of Credit and Financial Management
curriculum at the Amos Tuck School at Dartmouth College in 1992.

3.      From 1976 until 1982, I served as Manager of Cash Management for The
Greyhound Corporation ("TGC") in Phoenix, Arizona.  While at TGC, I oversaw the firm's
working capital management and its relations with approximately 200 domestic and international
banks.  I was also responsible for all payment services utilized by TGC, including credit card,
lockbox, Automated Clearing House ("ACH"), check disbursements and wire transfer payments.

4.      From 1982 until 1995, I served as Vice President and later was promoted to
Senior Vice President at Wells Fargo Bank in San Francisco, California.  From 1982 until 1988,
I was Wells Fargo's National Sales Manager for Wholesale Non-Credit Products.  In that role, I
was responsible for all non-credit relationships in the bank's wholesale unit, as well as for all for

all of the bank's relationships with other financial institutions, including correspondent banks, title companies, mutual funds, dealer-brokers and investment houses.

     5.    I was promoted to Head of Product Management and Development in 1988 and continued in that role until 1995. As Head of Product Development, I was responsible for the development, design, management and profitability of Wells Fargo's wholesale banking products, including its commercial credit card, ACH, wire transfer, lockbox, Wholesale Demand Deposit Accounts ("DDA"), and wholesale loan and check processing services. I was also responsible for the cash vault, balance/transaction reporting, account reconcilement and controlled disbursement services at Wells Fargo. My responsibilities also included creating and executing each wholesale banking product's rolling, five-year business plan. As Head of Product Development, I was also responsible for wholesale risk and credit policies, bank-wide float management, unit costing, and preparing and analyzing all product financials. My duties also included responsibility for designing all non-credit incentive compensation programs, product marketing and training for the wholesale bank.

     6.    From 1995 through 1997, I served as Vice President of Cash Management Operations for Fidelity Management and Research Company in Boston, Massachusetts. In that role, I oversaw all cash-related issues in the Fidelity Group of Mutual Funds; assessed operating, compliance and financial risks; and managed over $30 billion of average daily cash in- and outflows from the Fidelity Group of Mutual Funds.

     7.    From 1999 through 2001, I served as President of Virtual Purchase Card, Inc. ("VPC") in Alameda, California. As President, I wrote the company's business plan, raised approximately $18 million of equity, and designed, constructed and introduced a secure online payments tool for business-to-business purchase transactions. The VPC product eventually was sold to RaboBank of the Netherlands.

     8.    From 1998 through the present, I have served as President of GPA. GPA provides financial services and payments product development, and cash and risk management consulting. GPA offers cash and product management assistance to corporate and financial

services firms worldwide. As President of GPA, I am responsible for the design and

development of payment and related products; marketing and strategy support; audit, risk

assessment and compliance projects; and working capital advisory services relating to inventory,

payables, receivables, short-term borrowings and investment; and cash. Representative clients of

GPA include the University of California, Intuit Corporation, eBay Corporation, VISA

International, Wells Fargo Bank, JP MorganChase, BankBoston, PNC Bank, BankWest and

Thompson Financial Products.

9.    Throughout my tenure in the financial services and payment processing

industries, I have participated in a number of industry-related professional organizations,

committees, and associations. Since 1977, I have been a member of the Treasury Management

Association and its successor entities. From 1988 through 1991, I served as Chairman of the

California Automated Clearinghouse Association ("CACHA"). From 1989 through 1995, I was

a member of the VISA Payments Advisory Committee. From 1993 through 1995, I served as a

member of the Board of Directors of the Electronic Check Clearinghouse Organization

("ECCHO") and a member of the MasterCard Commercial Card Advisory Committee. From

1996 through 1998, I served as a member of the Federal Reserve Board High Dollar Transfer

Risk Advisory Committee. I serve as an instructor of working capital finance at Golden Gate

University in San Francisco, California and as an advisor to several payments-related companies

and investment firms, and I have testified as an expert witness before the California State

Banking Committee on payments-related matters.

10.    As a result of my experience, I am familiar with the history of electronic

payments processing and, in particular, with the history of electronic check processing. I have

also personally designed, implemented, analyzed and managed electronic payment processing

tools.

11.    In the course of formulating my opinions relating to the patent-in-suit, U.S. Patent

No. 5,484,988 ("the '988 patent"), I considered and relied upon the claims and specifications of

the '988 patent; the complete file history of the '988 patent; the parties' interrogatory responses;

transcripts of depositions taken in this matter; documents produced by the parties and third parties during this litigation; the August 12, 2005 Expert Report of Gary Tinkel Regarding Infringement and the documents cited therein; the September 20, 2005 Rebuttal Expert Report of Gary Tinkel Regarding Validity and the documents cited therein; LML Patent Corporation's ("LML") Motion for Summary Judgment No. 5: For a Ruling That Claims 1, 2, 4, 5, 6, 9, 10, 11, 14, 16 and 18 of the '988 Patent Are Not Invalid Under 35 U.S.C. §§ 112 and 132; the Declaration of Lesley G. Smith in Support of LML's Motion for Summary Judgment No. 5: For a Ruling That Claims 1, 2, 4, 5, 6, 9, 10, 11, 14, 16 and 18 of the '988 Patent are Not Invalid Under 35 U.S.C. §§ 112 and 132 and the documents appended thereto, including the October 27, 2005 Declaration of Gary Tinkel in Support of LML's Motion for Summary Judgment No. 5: For a Ruling That Claims 1, 2, 4, 5, 6, 9, 10, 11, 14, 16 and 18 of the '988 Patent are Not Invalid Under 35 U.S.C. §§ 112 and 132; and my extensive experience in the electronic payments processing industry, including check processing and electronic funds transfer systems.

12.     In my opinion, a person of ordinary skill in the art of electronic check processing on November 13, 1992, the effective filing date of the original application for what eventually issued as the '988 patent, would have had a bachelors degree and at least three to five years experience in the checking, electronic payments and corporate cash management industries, along with a working knowledge of applicable rules and regulations. I have applied this definition of one of ordinary skill in formulating my previous opinions and in the analysis that follows.

13.     It is my understanding that a patent claim violates the "written description" requirement of 35 U.S.C. § 112, first paragraph, if the patent specification does not contain "a written description of the invention," including all of its claimed elements and limitations. I also understand that the patent specification, for purposes of the "written description" requirement, includes the patent specification and claims as they appeared in the earliest-filed application leading to the issuance of the patent in question. I understand further that any "new matter" added to the specification by amendment after the date of the earliest-filed application may not

be used to satisfy the Section 112 "written description" requirement, and that such "new matter" is prohibited by 35 U.S.C. Section 132. I understand this "new matter" prohibition to mean that any material added by amendment after the original patent application was filed must be necessarily supported by the disclosure contained in that original application, and that "new matter" that is not inherently disclosed in the earliest-filed application may not be used as a basis to support the sufficiency of a patent's written description. I also understand that failure to comply with the requirements of 35 U.S.C. Sections 112 and 132 must be proven by the accused infringer by "clear and convincing" evidence.

14.     Based on my review of the file history of the '988 patent, it is evident to me that the claim element "without using the [bank] check as a negotiable instrument" was not part of the specification or claims contained in the original November 13, 1992 application leading to the issuance of the '988 patent. This claim limitation was first added during prosecution by a June 8, 1994 Preliminary Amendment, and expanded to apply to independent claim 9 by Applicants' January 30, 1995 Response to Office Action. Based on my review of the file history, it is apparent to me that the limitation "without using the [bank] check as a negotiable instrument" was added to the pending application in order to overcome prior art references such as Case and Deming cited by the Case Examiner. In the Applicants' subsequent January 30, 1995 Response to Office Action, Applicants also used this new "negotiable instrument" limitation to distinguish the cited prior art references, including the '607 patent to Carlson, arguing that the Carlson system requires negotiation of the check presented at the point-of-sale. The Carlson '607 patent, however, teaches that a check may be scanned to obtain consumer bank account information, that information is used to verify the check and transfer funds via an automated clearing house, and the check may be returned to the consumer at the point-of-sale.

15.     Based on my review of the original 1992 patent application and Applicants' subsequent amendments in response to exceptions noted by the Case Examiner, it is my opinion that the claim element "without using the [bank] check as a negotiable instrument" added by Applicants via Preliminary Amendment in 1994 has no support in the written description of the

original November 13, 1992 application. In fact, the original 1992 application is silent with respect to whether a paper check processed by the purported invention is to be processed "without using the [bank] check as "negotiable instrument." Further, the original November 13, 1992 application provides no indication whatsoever that checks processed using the described system and method should or should not be used or treated as a negotiable instrument. I believe that a person of ordinary skill in the art at the time of the original 1992 application would not perceive nor apply this claim limitation to be a necessary element or limitation of the claims, and consequently, it is my conclusion that the addition of this new claim element by Preliminary Amendment in 1994 violated the written description requirement set forth in 35 U.S.C. § 112.

16.     Based on my reading of the original 1992 application, it was not apparent to me that Applicants intended to include the limitation "without using the [bank] check as a negotiable instrument" as an element of their claimed invention. The original 1992 application contains no mention of whether instruments processed by the system should or should not be treated as negotiable instruments. To the contrary, the description contained in that application relating to the treatment of paper checks presented at the point-of-sale is clearly consistent, at the time of the original application filing, with use of those checks as negotiable instruments. References contained in the original application relating to use of the check as a source of information and the enablement of "paperless" transactions at the point-of-sale, cited by Mr. Tinkel in paragraph 15 of his October 27, 2005 Declaration in Support of LML's Motion for Summary Judgment No. 5, are not inconsistent with the use of the paper check as a "negotiable instrument" as that term was defined as of the time of the earliest-filed application.

17.     In my opinion, none of the excerpts from the original 1992 application upon which LML and its expert rely to support the inherency of the "negotiable instrument" limitation in that earliest-filed disclosure have any relevance to whether a check presented at the point-of-sale is used as a negotiable instrument during electronic check conversion. None of those excerpts reference any of the hallmarks of negotiability under the governing statutory, legal and regulatory regimes applicable at the time the original application was filed. At the time of the

original 1992 application, the Uniform Commercial Code ("UCC") (the statute governing transactions in which paper checks are processed by traditional methods) defined a "negotiable instrument" as "a written and signed unconditional promise or order to pay a specified sum of money." In 1992 and still today, when a customer issues a check to a merchant as payment for goods or services received, that check is immediately "negotiable" within the meaning of the UCC. Under Regulation E, the regulatory scheme enacted to implement the Electronic Funds Transfer Act, negotiability of an instrument was defined in 1992 as requiring written, pre-authorization for the electronic debit to a consumer's bank account to be properly authorized. Moreover, state laws in existence in 1992 adopted disparate definitions of what constitutes a negotiable instrument including various interpretations of the words draft, payable through draft, warrant, and check. For example, the State of California uses a very specific definition of the word warrant which, in most other jurisdictions, is a check.

18.    In my opinion, the claim limitation "without using the [bank] check as a negotiable instrument" added by 1994 Preliminary Amendment and Applicants' January 30, 2005 Response to Office Action does not merely clarify or "more distinctly point out" the invention described in the original 1992 application, as LML and its expert argue. In my opinion, the later-added limitation "without using the [bank] check as a negotiable instrument" redefines the scope of the originally-claimed invention by imposing an entirely new requirement relating to the use of checks in the claimed system and method as "negotiable instruments" in an effort to overcome the cited prior art. Because this claim limitation was not inherent or necessarily present in the written description of the original 1992 application, I have concluded that the "negotiable instrument" limitation added by 1994 Preliminary Amendment constitutes improper "new matter" under 35 U.S.C. Section 132 and violates the written description requirement set forth in 35 U.S.C. Section 112.

19.    I understand that a patent claim is invalid for lack of enablement under the first paragraph of 35 U.S.C. §§ Section 112 if the specification contained in the earliest-filed application leading to the patent in question does not contain a description of the "manner and

process of making and using" the invention "in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains" to make and use the invention without undue experimentation. I also understand that "new matter" added to the specification after the original application is filed may not be used to satisfy the Section 112 enablement requirement.

20.    Based on my review of the original 1992 patent application and the '988 patent, it is my opinion that no enabling description exists in the original application, or in the patent as issued, to describe how transactions may be conducted using business checks or foreign bank checks, which constitute "any bank check" and/or "any consumer bank check." The original specification does not describe how to electronically transfer funds using "any bank check," and one of ordinary skill in the art at the time of the original application would not have been familiar with the regulatory, technical and currency translation requirements essential to the electronic processing of "any bank check" drawn on a foreign bank account. Nothing in the specification or claims of the '988 patent teaches one of ordinary skill in the art, without undue experimentation, to address issues relating to foreign currency translation, the various MICR line fonts used by foreign banks, or any of the myriad foreign regulatory requirements governing the processing of checks presented for payment. In many foreign countries, for example, MICR numbers may represent different information and are often printed in a different font from MICR numbers appearing on checks drawn on United States bank accounts. It is my belief that transfers of funds that would require translation to currencies in which there are not active trading markets, such as the currencies of many lesser developed nations or countries with highly regulated currency controls, would obligate the implementer to engage in more than undue experimentation. Additionally, while the American Bankers Association has published easy to implement MICR standards, including fonts, for all U.S. banks to use, similar standards simply are not available in other nations around the world making reading of foreign check MICR lines at the point of sale very difficult and again obligating the implementer to engage in extreme levels of experimentation to enable the described system. Finally, the legal and regulatory prohibitions against conversion of checks at the point of sale in certain countries around the

world would also require the implementer to complete excessive experimentation, ultimately failing in many countries (Canada, for instance, where the Canadian Payments Association presently prohibits the conversion of paper checks to electronic debits).

21.    I believe that Mr. Tinkel's assertion that "the specification of the '988 patent teaches one of ordinary skill to conduct the claimed transactions using business checks and/or foreign checks" is incorrect. I also believe that, in light of the regulatory and technical issues discussed above, Mr. Tinkel's unsupported and conclusory statement that "[t]echnical and regulatory issues, such as currency translation, would have no impact on any of the asserted claims of the '988 patent" is wrong..

22.    Given the state of the art as described above in 1992, the time of the original application leading to the '988 patent, it is my opinion that one of ordinary skill in the art would have had to devote substantial time and energy towards ascertaining the application and scope of such foreign regulatory requirements, identifying those modifications that would be required to process foreign checks printed in MICR fonts deviating from United States standards, and modifying (and likely failing in certain countries with very volatile currencies or regulatory prohibitions) the system to perform any required foreign currency translation. In my opinion, the challenges faced by one of ordinary skill in the art in gathering and processing such voluminous information at the time of the original 1992 application (and today, for that matter) would have been significant.

23.    I understand that a patent claim is invalid under the second paragraph of 35 U.S.C. Section 112 for indefiniteness if those claims do not particularly point out and distinctly claim the subject matter which the applicant regards as his invention. I understand that the purpose of the definiteness requirement is to ensure that a person of ordinary skill in the art would necessarily understand the meaning and scope of the claims after reviewing those claims in light of the patent's specification.

24.    Based on my review of the file history of the '988 patent and the patent-in-suit as issued, it is my opinion that the meaning of the negative limitation "without using the [bank]

check as a negotiable instrument," applying LML's proposed construction of this term, would have been uncertain, ambiguous and indefinite to one of ordinary skill in the art at the time of the original application, and that this limitation remains, today, too indefinite to permit one of ordinary skill in the art to understand the meaning and scope of this claim element even in the patent as issued.

25. I understand that LML currently proposes that this claim term should be construed to mean "where the paper check is used as a source of information, and is not accepted or processed." It is my opinion that the '988 patent itself contains no express definitions of the terms "accept" or "process" that would allow one of ordinary skill in the art to discern what they might mean. Furthermore, the terms "accepted" and "processed" are themselves each subject to multiple and competing interpretations, none of which would have been agreed upon as controlling by persons of ordinary skill in the field of the invention at the time the original 1992 application was filed.

26. It is also my opinion that the very sections of the specification to which LML and its expert refer to support their assertion of the limitation "without using the [bank] check as a negotiable instrument" is sufficiently definite pursuant to Section 112 themselves reflect the lack of precision and clarity LML's proposed construction introduces into that disputed claim term. Those referenced portions of the specification are unrelated to the negotiability of a check presented at the point-of-sale or whether that check is used as a negotiable instrument during a transaction within the meaning of the applicable rules, laws and regulations governing negotiability at the time of the purported invention. As previously explained, at the time of the original 1992 application, a check could be processed electronically, or information obtained from the check to facilitate such electronic processing, consistent with the use of that check as a negotiable instrument.

27. It is my opinion that the meaning of the claim elements "any bank check" and "any consumer bank check," applying LML's proposed construction of those terms, would have been uncertain, ambiguous and indefinite to one of ordinary skill in the art at the time of the

original application, and that under LML's proposed construction, these terms remain too indefinite to permit one of ordinary skill in the art to understand the meaning and scope of this claim element even in the patent as issued. I understand that LML proposes that the term "any bank check" should be construed to mean "any regular check used to draw funds from a normal bank or credit union checking account," and that the term "any consumer bank check" should be construed to mean "any regular check used to draw funds from a normal bank or credit union consumer checking account." In my opinion, the terms "regular check" and "normal bank or credit union checking account" were at the time of the original application and remain today susceptible to multiple interpretations by persons of ordinary skill in the art, and thus lack the necessary precision and clarity required by law.

28. For instance, a "regular" check might have been defined variously by those of ordinary skill in the art at the time of the original application as any check readable by an IBM 3890 check reader/sorter; any check drawn on an account offered to the public, consumers or businesses; or any check that can be posted to a financial institution's general ledger, including internal debit entries (such as a withdrawal ticket processed in a bank or credit union branch). Neither the patent as issued nor the original 1992 application offer any guidance as to which of these definitions of a "regular" check is correct, or whether some other definition is appropriate. Similarly, the phrase "normal bank or credit union checking account" would have had many disparate, reasonable meanings to those of ordinary skill in the art at the time of the original 1992 application, including any checking account offered to the public (whether a consumer, business or state government account); any checking account offered to consumers but not to businesses; any checking account carried on a financial institution's general ledger; any account bearing interest; or any open account against which a check may be written.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed by me in Alameda, California on this 15th day of November, 2005.

David P. Kurrasch

# EXHIBIT A

# RESUME OF
# DAVID P. KURRASCH

**Business Experience:**

**President, Global Payments Advisors, Inc., Alameda, CA**

1998 – Present

Financial Services, Payments Product Development & Cash/Risk Management Consulting.

Offers cash and product management assistance to corporate and financial services businesses worldwide. Practice includes product (principally payment and related product offerings) design and development; marketing and strategy support; audit, risk assessment and compliance projects; and working capital advisory services (inventory, payables, receivables, short-term borrowings and investment, and cash).

Sample clients include:

| | | |
|---|---|---|
| The University of California | Wells Fargo Bank | Thomson |
| Financial Corp | | |
| Intuit Corporation | JP MorganChase | Fidelity |
| Investments | | |
| eBay Corporation | BankBoston | |
| Emergis Corp. (Canada) | PNC Bank | |
| Visa International | BankWest | |

**President, Virtual Purchase Card, Inc., Alameda, CA**

1999 – 2001

Designed, constructed and introduced a highly secure on-line payments tool to transaction Business-to-Business purchase actions. Wrote business plan and led fund raising of $20 million from an investor group that included JPMorganChase, Wells Fargo Bank, Invus Group and Plantagenet Capital.

Sold product to RaboBank of the Netherlands.

**Vice President – Cash Management Operations**
**Fidelity Investments**
**Boston, MA**

1995 – 1997

Provided oversight function for all cash related issues in the Fidelity Group of Mutual Funds. Established policy, assessed operating, compliance and financial risks and managed $30+ billion of average daily cash in- and outflows from the Mutual Funds.

**Vice President/Senior Vice President – Wells Fargo Bank, San Francisco, CA**

1982 – 1995

- National Sales Manager for all Wholesale Non-Credit Products (1982 – 1988)
  - Responsible for all non-credit relationships throughout the Bank's wholesale group
  - Responsible for all Financial Institution relationships (all correspondent banks, all title companies, all mutual funds, all dealer-brokers, all investment houses)
- Head of Product Development (1988-1995)
  - Responsible for development, design, management and profitability of all Wholesale Banking Products including:
    - Credit Card
    - Automated Clearinghouse (ACH)
    - Wire Transfers
    - Lockbox
    - Wholesale Demand Deposit Accounting
    - Account Reconcilement
    - Controlled Disbursement
    - Check processing
    - Cash Vault
    - Wholesale Loans
  - Responsible for creating and executing each product's rolling, 5 year business plan
  - Responsible for Wholesale Risk & Credit Policy
  - Responsible for Bankwide Float Management
  - Responsible for preparation and analysis of all Product Financials
  - Responsible for all Unit Costing
  - Responsible for all compensation programs throughout the Wholesale Bank
  - Responsible for all Product Marketing for the Wholesale Bank
  - Responsible for all Product Training for the Wholesale Bank

1976 – 1982

**Manager, Cash Management, The Greyhound Corporation, Phoenix, AZ**

- Responsible for Working Capital Management for the firm
  - Cash forecasting
  - Cash Management
  - Commercial Paper Issuance and Redemption
  - Domestic & International Bank Relations (200 worldwide banks)
  - All payment services
    - Credit Card
    - Lockbox
    - Automated Clearinghouse (direct deposit & cash concentration)
    - Wire Transfer
    - Account Reconcilement
    - Credit Card portfolio

**Education:**

Bachelors of Arts       University of Wisconsin, Madison, Wisconsin

|                    |                                                                                                      |
|--------------------|------------------------------------------------------------------------------------------------------|
|                    | Majors in Economics, Communications & History<br>Minor in Mathematics<br>Graduated, December 1973     |
| Masters of Finance | American Graduate School of International Management, Glendale, AZ<br>Emphasis in Finance<br>Graduated, May 1975 |
| Post Graduate      | Graduate School of Credit and Financial Management<br>Amos Tuck School at Dartmouth College<br>Graduated, Summer 1992 |

**Work Related Associations:**

| Chairman | California Automated Clearinghouse Association<br>1988 -1991 |
|----------|---------------------------------------------------------------|
| Member   | Electronic Check Clearinghouse Organization<br>Board of Directors<br>1993 – 1995 |
| Member   | Treasury Management Association<br>(and successors)<br>1977 – |
| Member   | VISA Payments Advisory Committee<br>1989 – 1995 |
| Member   | MasterCard Commercial Card Advisory Committee<br>1993 – 1995 |
| Member   | Federal Reserve Board High Dollar Transfer Risk Advisory Committee<br>1996 -- 1998 |

**Other Activities**

| Instructor<br>Advisor<br>Expert Witness | Working Capital Finance (Golden Gate University, San Francisco, CA)<br>To several payments related companies and investment firms<br>Testified before the California State Banking Committee on payments<br>related matters. |
|---|---|

9

# United States Patent [19]

## Carlson et al.

[11]  Patent Number:  **5,053,607**

[45]  Date of Patent:  **Oct. 1, 1991**

[54]  **POINT-OF-SALE DEVICE PARTICULARLY ADAPTED FOR PROCESSING CHECKS**

[76]  Inventors: Steven R. Carlson; Paul R. Carlson, both of 417 2nd Ave., Beach, N. Dak. 58621

[21]  Appl. No.: 362,164

[22]  Filed:  Jun. 6, 1989

### Related U.S. Application Data

[63]  Continuation-in-part of Ser. No. 219,735, Jul. 15, 1988, which is a continuation-in-part of Ser. No. 70,816, Jul. 6, 1987, Pat. No. 4,758,714, which is a continuation-in-part of Ser. No. 915,505, Oct. 6, 1986, Pat. No. 4,678,896.

[51]  Int. Cl.⁵ ................................. G06F 15/30
[52]  U.S. Cl. ...................... 235/379; 235/432; 902/18; 902/39; 364/406
[58]  Field of Search ............... 235/379, 432, 433, 435; 902/18, 20; 364/406

[56]  **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,786,421 | 1/1974 | Wostl et al. | 340/149 |
| 4,027,142 | 5/1977 | Paup et al. | 235/475 X |
| 4,404,649 | 9/1983 | Nunley et al. | 235/379 X |
| 4,439,670 | 3/1984 | Bassett et al. | 235/382 |
| 4,453,074 | 6/1984 | Weinstein | 235/380 |
| 4,617,457 | 10/1986 | Granzow et al. | 902/18 X |
| 4,678,895 | 7/1987 | Tateisi et al. | 235/379 |
| 4,810,866 | 3/1989 | Lord | 235/379 |

*Primary Examiner*—David L. Trafton
*Attorney, Agent, or Firm*—Dorr, Carson, Sloan & Peterson

[57]  **ABSTRACT**

A check processing device is particularly adapted for retailer/customer use at the point-of-sale through use of a MICR read head means, printer means and keypad means which feed information into a CPU which communicates, through an existing telecommunication system, with the customer's bank and the retailer's bank in order to transfer funds from the account of the customer to the account of the retailer.

18 Claims, 5 Drawing Sheets



FDC5000131



*Fig. 1*



*Fig. 2*



*Fig. 3*

FDC5000133



*Fig. 4*



*Fig. 5*

FDC5000134



*Fig. 6*

FDC500136



Fig. 7

5,053,607

1

### POINT-OF-SALE DEVICE PARTICULARLY ADAPTED FOR PROCESSING CHECKS

#### CROSS REFERENCE TO RELATED APPLICATIONS

This patent application is a continuation-in-part of our co-pending U.S. patent application Ser. No. 219,735 filed July 15, 1988 which is a continuation-in-part of U.S. patent application Ser. No. 70,816 filed July 6, 1987, now U.S. Pat. No. 4,758,714 which, in turn, is a continuation-in-part of U.S. patent application Ser. No. 915,505 filed Oct. 6, 1986, now U.S. Pat. No. 4,678,896.

#### FIELD OF THE INVENTION

Although there are several different ways to pay for goods or services today at the point of sale, among them cash, checks, credit cards, debit cards, drafts, the consensus seems to remain that a "cashless/checkless" society is not far in the future. Credit card trade is now highly competitive since it is profitable for the sponsoring banks as well as the merchant making the sale. Electronically transferred funds are made possible by "debit cards" which require "on line" or full-time hookups to the issuing bank, that is the bank of the cardholder [customer] and to the payee's bank (e.g., to the retailer's bank). However, this type of full time hookup requires sophisticated networking resources and a complicated interface switch system between the various participants.

Obviously "cash" sales are the most reliable (assuming no counterfeiting activities take place) for the retailer; that is to say, they are reliable because the retailer has his non-revokable funds in hand before the sale is completed. Most other kinds of transactions involve more risk. For example, credit card sales, even if "approved" by the issuing card company, have associated therewith some uncertainty on the part of the retailer because of the possibility of the sale being rescinded in view of the credit rights of the cardholder, including his right to instruct the issuing bank not to pay the retailer until whatever difficulty encountered by the customer has been resolved. Obviously, this right in effect holds the retailer's funds ransom subject to complete satisfaction of the customer in resolving the complaint whether real or imagined. Credit card sales are not a complete windfall to the card holder either; he or she is charged a percentage fee at usually higher than bank rates for "carrying" the card holder; such rates can range from a few points above prime rate to several points.

Smart cards also have received a great amount of attention; but to date, only a few experiments have been initiated in the United States. Hence the personal check remains one of the most widely used means of payment. The method of using the check has remained virtually unchanged since its conception, but the means of processing such checks has improved considerably over the years. Much of this change has come about by the Federal Reserve system's (FED's) introduction of a Magnetic Ink Character Recognition system (MICR), examples of which can be seen along the bottom of checks and other negotiable instruments. The MICR line allows high speed, electronic reading of that data designating the proper bank and account to be identified and converting such data into electronic messages to be sent through the National Automated Clearing House system.

2

However, the problems of handling the check at the point of sale, verifying the signature, the amount, stamping "for deposit only", etc. still remain. Moreover, the retailer usually does not know whether the presenter of the check has sufficient funds or whether the presentee of the check intends to honor the check by not filing a "stop payment" order at his bank. Several devices have been produced to aid the retailer in these situations.

#### BRIEF DESCRIPTION OF THE PRIOR ART

U.S. Pat. No. 3,786,421 to Wolfgang J. Wostl teaches a personal identification code number that is used to insure that the party making the transaction is the person he claims to be. U.S. Pat. No. 4,453,074 teaches a smart card with encrypted material using a private key that is associated with a public key. U.S. Pat. No. 4,439,670 teaches use of a code comparison made upon reaching a predetermined number of rejections. None of these devices is however specifically suited to processing checks at the point-of-sale.

#### SUMMARY OF THE INVENTION

The herein-disclosed point-of-sale device is specifically adapted to operate upon checks or other negotiable instruments in order to complete a business transaction such as a retail sale while the retailer and the customer are still face to face. It also gives both the retailer and the customer badly needed security with minimum economic expenditures to both parties. The device also can utilize several algorithm security codes simultaneously. It also can be programmed to give regional or local protection.

In its most fundamental form our point-of-sale device comprises a housing divided into two compartments. The two compartments are presented in an adjacent arrangement wherein the first compartment is located next to the second compartment, but separated from it by a slot. The compartments may be held in place relative to each other by a spacer means which holds the two compartments in their adjacent relationship relative to each other. That is to say a face of one compartment is vis-a-vis a face of the other compartment, but is separated from it by the slot which is, in effect, "sandwiched" between the two compartments. In effect the height of the spacer means is essentially the height of the slot. In some preferred embodiments hereinafter more fully described, the spacer means is provided with a hinge means in order to rotate one compartment away from the other in order to expose the slot region if need be (e.g., if the check becomes caught in said slot).

In a preferred arrangement the first compartment is presented in a stacked configuration over the second compartment. This arrangement is the one depicted in the drawings; but this is by no means the only arrangement possible. The two compartments could, for example, lay side by side. In the preferred "stacked" arrangement, the first compartment (in this case the top compartment) is the preferred compartment for locating a printer means which contacts one side of a check (preferably the rear side of the check) through a face in said first compartment. In the stacked arrangement that face would be the bottom face of the first (top) compartment. The second compartment is preferably the compartment provided with a MICR reader means which reads the other side of the check (preferably the face side of the check, i.e., the side of the check opposite the

FDC5000137

5,053,607

3

side contacted by the printer means) through a face in said second compartment.

This is the most practical arrangement, but clearly the second (bottom) compartment might contain the printer and the first (top) compartment might contain the MICR read head. It should also be noted that in the event that FED regulations placed the MICR data on the rear side of a check (or in the event the MICR information could be read through the paper from which the check is made) then both the printer means and MICR read head means could be located in either the first or the second compartment and operate on (read from and print on) the same side of the check.

The slot is also provided with means for transporting a check or other negotiable instrument into and out of said slot, means for positioning the check: (1) while it is being so transported, (2) while its MICR information is being read by the MICR head, and (3) while it is being printed upon by the printer means.

The device is provided with a CPU means which can be located inside the housing (in the first compartment and/or in the second compartment), outside the housing but still in the retail establishment where the business transaction is taking place, or outside the retail establishment in a central location which employs a central CPU to service a system of such point-of-sale devices.

The device also comprises at least one or more alpha/numeric keypad means electrically connected to the CPU. Obviously, the retailer and his customer could use the same keypad, but for reasons hereinafter more fully described, two, separate, but electronically interconnected, keypads, one for the retailer, one for the retailer's customer, are highly preferred for the check processing operations carried by our device.

Finally the device should comprise means for electronically connecting the point-of-sale device to a telecommunications system capable of electronically transferring funds from one bank account (e.g., the customer's bank account) to another bank account (e.g., the retailer's bank account).

Thus in its most general form, our point-of-sale negotiable instrument processing device comprises: (1) a housing having a first compartment, a second compartment and a spacer means which positions the first compartment next to the second compartment so as to define a slot between said first and second compartments; (2) MICR read head means for reading MICR information on a negotiable instrument; (3) printer means for printing on a negotiable instrument; (4) switching means to initiate preprogrammed CPU functions upon the negotiable instrument; (5) motive means for moving the negotiable instrument: (a) into position in the slot so as to be read by the MICR read head means, (b) into position to be printed upon and (c) into and out of the slot; (6) positioning means for positioning the negotiable instrument in the slot so that MICR information on the negotiable instrument can be read by the MICR read head means and for positioning the negotiable instrument in the slot so that the rear side of the negotiable instrument can be printed upon; (7) alpha/numerical keypad means for transmitting information to a CPU; (8) a CPU for receiving information from the alpha/numerical keypad means and the MICR read head means in order to communicate said information to a telecommunications system in order to transfer funds represented by the negotiable instrument from an account of the maker of the negotiable instrument to an account of the payee of the negotiable instrument; and

4

(9) means for electronically connecting the point-of-sale negotiable instrument processing device to a telecommunications system.

Various optional features and preferred embodiments of this device may also be employed to advantage. For example, aside from the printer, the first compartment may also have a plurality of signal devices indicating the condition of a plurality of circuits contained in said device A keypad which is especially adapted for the customer's use (e.g., for entry of the customer's personal identification number) is preferably located outside the housing A keypad which is especially adapted for the retailer's use (e.g., for entry of the retailer's personal identification number) may be located on, or outside of, the housing.

The slot for receiving the monetary negotiable instrument can be disposed between said first and second portions, and further comprise guide means which aid in receiving, locating, electronically processing and dispensing the check from the point-of-sale device. In a preferred embodiment of this device the check travels "through" the device (i.e., in one end of the slot and out the other); however, the check may also exit the device from the same part of the slot through which it entered. Other optional features may serve to identify the payee of said transactions and to establish the transaction selling price to the satisfaction of both the customer and the retailer.

This secured point-of-sale device also can be modified and/or augmented in several other ways to produce several other preferred embodiments thereof. For example, it could include one or more of the following features: (1) means to access a computer system maintained by a system of retailers using one central CPU with which this device is integrated, (2) means to access a computer system maintained by an issuer of a negotiable instrument such as a check and the like; (3) means to access an external communication system to identify a payor of a negotiable instrument (such as through the use of a personal identification number) and to perform an electronic funds transfer only with a proper PIN number; (4) telephonic means (such as a telephone headset and appropriate communication system) to communicate with the issuer of a negotiable instrument; (5) a standard 8 bit microprocessor capable of accessing 64 K bytes of memory; and means connecting a plurality of switching mechanisms to a microprocessor and upon any one of said switching mechanisms not being actuated, said mechanisms seeking an inoperable position; (6) a printing mechanism specially adapted for printing upon the rear side of a negotiable instrument such as a check, (7) an actuating mechanism cooperating with said printing mechanism for producing an imprinted copy of said transaction, (8) read head means for producing movement of said read head means with respect to said negotiable instrument as long as a code is being detected by said read head, (9) PIN identification number entry means connected to a CPU for receiving a PIN number, (10) means, including a CPU connecting the read head means and the PIN identification number entry means to the printing means, so that the printing means is actuated only when certain signals are compatible, (11) a data entry override means, and (12) a personal identification number module having a key tab matrix connected to a CPU, said key tab matrix is set to match a transaction amount to be recorded with the override means connected to the CPU for actuating said printing means.

FDC5000138

5,053,607

5

It is also a preferred object of this invention to provide a secured point-of-sale device that is connected to a CPU that completes all transactions while the device is in a secured mode. It is yet another preferred object of this invention to abort any improper transaction while the device is in a secured mode.

These and other objects and advantages of the invention will more fully appear from the following, more detailed, descriptions, made in connection with the accompanying drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an isometric view of the point-of-sale device;

FIG. 2 is a cut-away side view of the device;

FIG. 3 is a top view of the device in partial cut-away;

FIG. 4 is a front view of the device shown in partial cut-away;

FIG. 5 is a rear view of the device;

FIG. 6 is a bottom view of the device as it is about to receive a check; and

FIG. 7 is a diagrammatic presentation of the device, emphasizing the functions of the keypad devices used by the retailer and the customer.

DESCRIPTION OF THE PREFERRED EMBODIMENTS

The "Point-of-Sale" (POS) check processing device of this patent disclosure is further described in FIGS. 1 through 7 wherein specific detailed items will be numbered by both a figure designation and an item designation as, for example, "1-3" or "1-6." Thus, the first numeral "1" directs the reader to FIG. 1 and the second numeral (following the hyphen) directs him to a specific item, i.e., item 3, item 6, etc., in FIG. 1. It follows that no two specific items will have the same number, however, the same item designation may appear in more than one figure. For example, the designations 1-6 and 6-6 each represent the same specific item, i.e., a check 6 to be processed by this device.

FIG. 1 shows point-of-sale device 100 in a "stacked" configuration wherein 1-1 represents a lower compartment or base which may or may not also act as a main frame for the entire device 100. Item 1-2 represents a table, located on top of the base 1-1, which serves as a guide for the check 6 being processed. Located above the base 1-1 (preferably located by a spacer means, e.g. a "vertical" side element), is an upper compartment 1-5. The upper compartment 1-5 may sometimes be referred to as a "first compartment" for purposes of this patent disclosure, while the lower compartment 1-1 may be referred to as a "second compartment". Item 1-4 represents an extended, tapered portion of the upper compartment 1-5 of said device 100. All parts of the device's housing (including 1-1, 1-4 and 1-5) are preferably constructed of high-impact resistant materials offering optimum durability and longevity. Metals and hard plastic are preferred construction materials. Similarly, all other portions of the device 100 and all associated peripheral key-pads, electronics housings, electrical wires and cables, electrical connectors and any or all mechanical or electrical components are most preferably constructed from materials resistant to normal physical wear and tear, common types of solvents and cleansing solutions, the effects of smog, sunlight, oxidation and the like, as well as to those petroleum products which might be encountered in gasoline service stations. In the same vein, all electrical circuitry are most preferably

6

designed to be unharmed by local, high-energy radio frequency interference, highly inductive or magnetic fields such as those encountered near electric motor windings, electric solenoids and the like.

It is also important that this point-of-sale device 100 be protected against unauthorized intrusion for the purpose of affecting, manipulating, defeating, duplicating, counterfeiting or in any way circumventing the normal, authorized operation of the device 100, its peripherals or any part of the communication network(s) or system(s) connected to said device. Similarly, the central processing unit 16A (see FIGS. 2 and 6) of the device 100 also may be protected from, for example, x-ray penetration, infra-red photography, serial scanning and various types of remote electronic probing techniques known to the art. Finally, this point-of-sale device 100, as well as all its peripherals, also can be designed to be aesthetically pleasing in all respects with due attention given to color coordination, ease of operation and physical refinements.

FIG. 1 also indicates that the base 1-1 preferably will rest upon a system of sturdy, non-marking, non-skid feet 1-3 while the device 100 is in its standard, "right-side-up" orientation depicted in FIG. 1. It should be noted, however, that operation in an optional "lay-down" mode of operation may be more desirable in some cases. Feet to accommodate this lay-down mode are depicted as 4-3A. This laydown mode of operation follows from the fact that the retailer's (operator's) alpha-numeric keypad (see item 2-20), can rest on its normal mounting hinge axis, 2-21, or from another hinge axis rotated 90° as shown in 3-21A or 4-21A or from a "stand-alone" location inferred by FIG. 7. A rugged wire bundle control cable (2-22) of sufficient length connects a retailer's keypad 7-20 with the main housing (1-1) and thereby allowing the retailer a great deal of latitude in locating the keypad 2-20 for convenient use.

Item 1-6 depicts the customer's check (or any negotiable instrument utilizing the FED's MICR system) just as it is about to begin its functional travel into the point-of-sale device 100. In effect the check 1-6 is laid on a table 1-2 (2-2) having a perpendicular (and in this case a vertically perpendicular) rear guide surface 1-2A (2-2A). In effect the table 2-2 forms a substantial portion of the top surface of the base 1-1. A check receiver slot 2-23 is defined between the bottom surface 2-2B of the upper compartment 1-5 and the top surface 2-2B of the table 2-2 which, in turn, rests upon the top of base 1-1. The tapered or "nose" shape 1-4 of the upper compartment 1-5 is employed to facilitate "hands-on" assistance by the operator in placing worn, wrinkled, folded or damaged checks into the device 100. Damage to the MICR line area on the check, which renders it unreadable in the automatic mode of this device, may also be overcome by the operator who can visually read and manually enter the MICR information into the device via his keypad 2-20. In addition to housing certain hereinafter described check guide means 2-2A and certain check transport means and check "feed" apparatus hereinafter described, the housing nose 1-4 also may offer a convenient location for certain condition (prompt) lamps 1-25 which may conveniently indicate certain commands and operations of the device 100 and/or the network(s). These commands will be more fully described in later portions of this patent disclosure.

FIG. 2 represents a side view of the device wherein an upper edge 2-2B and lower edge 2-2C of an "open"

5,053,607

7

slot 23 (see 4-23) are shown facing toward the reader. Such an open slot 23 can extend along essentially the entire bottom surface of the upper part of the case 2-5A and the extension portion 2-4. The arrows titled "INSERT CHECK" and "CHECK EXIT" in FIG. 2 depict a preferred direction of check movement through the device. The check could, however, also be: (1) inserted at the INSERT CHECK location, (2) processed and (3) exited in some other direction e.g., back out at the INSERT CHECK location or out the side opening of the slot 2-23.

It also should be noted that the Federal Reserve Bank's MICR printing regulations strictly dictate the type, size, location, tolerances, etc. of the MICR line (see 6-24) and the distance from the left edge and bottom of the check. However, since checks of different overall size are currently in circulation, an "open slot", feed through path, such as the one depicted in FIG. 2, is probably a preferred form of opening for receiving and processing checks of widely varying sizes.

As is better seen in FIG. 6, proper insertion of a check 6-6 is required to enable the MICR read head 2-15 to scan and interpret information 6-24 shown on said check 6-6. Under present FED regulations and/or custom wherein the MICR information is printed on face 25 side of the check or other negotiable instrument, the operator would place the check inverted (upside down) on the (2-2) guide table taking care that the bottom edge (nearest the MICR line) touches a vertical edge (see 4-2A, 5-2A or 6-2A) of the table 2-2. So placing the 30 check in the device 100 insures that its read head 2-15 will be the correct distance from the bottom edge of the check to properly "scan" or "read" the MICR line 6-24 as it is drawn across the read head 2-15. Although it has been stated that the Federal Reserve Bank's MICR 35 Printing Regulations strictly dictate the height of the 6-24 MICR line above the bottom edge of the check, provisions have been made in order to tolerate small variances in this height allowing for worn edges, water damage, etc.

As the check is first manually introduced into the machine, it preferably automatically passes under the first of several guide means 2-14 (shown here as small springs) to promote the check's smooth and unimpeded progression across the MICR read head 2-15, under and 45 through a printer head means 2-16, and finally on to a smooth exit from the device 100, preferably, at the arrow designated "CHECK EXIT." When the check 6-6 has been moved far enough into the device 100, it preferably encounters and then trips a trigger means 50 2-12 causing contact (or lack thereof) of a switch means 2-13 and thereby alerting a CPU and preferably alerting an on-board central processing unit (CPU) to begin a programmed transaction cycle of the device. This triggering of switch means 2-13 instantly initiates one or a 55 series of (pre-programmed) CPU functions. These functions may include, but are not limited to, the following operations:

1) The CPU 16A memory stands by to receive and store (most preferably, for the duration of this transac- 60 tion only) all necessary MICR information printed on the check (6-6).

2) The CPU 16A stands by to interpret (if necessary) information fed to it by the MICR head 2-15 and to convert said information into useable data for the CPU's 65 memory.

3) The CPU 16A signals a motive means such as an electric motor 2-7 to operate a document "feed" means

8

such as wheels (2-8 and 2-9) and thereby drawing the check 6-6 across the MICR read head 2-15. The MICR data (see 6-24) is read and stored; a MICR "stop code" (see 6-24 and 6-24B) could be employed to cause the CPU 16A to stop motor means 2-7 at appropriate times in the processing of said check.

4) An "ENTER PIN" prompt lamp 7-20D and 7-27D preferably lights and the CPU 16A stands by to receive and store (again, for the duration of this transaction only) the customer's personal identification number (PIN) which the customer preferably enters at a keypad 7-27 which is, preferably, separately provided for the customer's private use. A second or retailer's keypad 20 is also depicted. As the customer keys in his appropriate PIN, it is preferably displayed digit-for-digit/stroke-for-stroke at a customer's display window 7-29 depicted on keypad 7-27. Thus, if the customer, while watching his PIN entry on display window 7-29, notices a mistake, he can cancel his entry by pressing a "CANCEL ERROR" button, 7-31 (located on keypad 7-27), and begin again. When the customer has entered the proper PIN digits on the keypad, for example four digits, "OK the PIN" prompt lamps 7-27H and 7-20H will preferably light; thereafter the customer pushes an "OK" button 7-33, located on the customer's keypad 7-27.

To this end, the CPU 16A could be programmed to recognize a four digit (for example) PIN entry as a "complete" PIN entry and to automatically "accept" it as the customer's preferred entry. More preferably, however, to allow the customer sufficient time to visually verify the correctness of his PIN entry and consequently the chance to change and/or correct it even after the final digit has been entered, the CPU 16A means can be programmed to allow a time interval such as for example a three second (interval variable and programmable) delay period between the time of entry of the final PIN digit and the time when the CPU 16A means "accepts" it as the customer's desired entry and consequently lights the "OK THE PIN" prompt lamps, 7-20-H and 7-27-H. The CPU 16A could also be programmed to immediately light the "OK THE PIN" prompt lamps, e.g., 7-H following the entry of the final digit to help draw the customer's attention to his task of visually verifying the PIN at 7-29 and still allow the customer the prescribed time delay for a possible correction of the entry. By this means the customer could recognize a mistake in his pin entry, even after all digits have been entered, and cancel it for correction by pressing the 7-31 "CANCEL ERROR" button and begin again. Another embodiment may include a case where the CPU 16A will not accept the PIN entry unless or until the customer presses the "OK" button 7-33 within say one minute, for example, time limit (here again, the time limit is variable and programmable). In this case the CPU 16A would leave lit the "OK THE PIN" prompt lamps 7-20-H and 7-27-H until either the customer presses the "OK" button 7-33 or the time limit is reached. If the time limit is reached before the customer "OK's" the PIN, the CPU 16A most preferably will automatically abort the transaction.

Still another embodiment may be a case where the "ENTER PIN" lamps 7-20-D and 7-27-D prompt the customer to enter his PIN. When the desired PIN is entered, the customer would press a "ENTER PIN" button 7-30A, whereupon the CPU 16A would accept the entry, extinguish said "ENTER PIN" prompt lamps and light the "OK THE PIN" prompt lamps 7-20-H and 7-27-H calling on the customer to press the "OK" but-

FDC5000140

5,053,607

9

ton 7-33 which would cause the CPU 16A to recognize
the PIN as valid, place it into the appropriate 16A mem-
ory means for all described and intended functional
uses. In any of the above embodiments, when the en-
tered PIN is "OK'd" by the customer, and received and
stored by the CPU, the prompt lamps at 7-20-D and
7-27-D ("ENTER PIN") plus 7-20-H and 7-27-H ("OK
the PIN") lamps will preferably extinguish. Under these
operating circumstances, the customer's secret PIN
number is not displayed on the retailer's (operator's)
7-28 display window.

5) An "ENTER CHECK AMOUNT" prompt lamp
7-20-C, preferably lights at the retailer's keypad (2-20,
7-20) and the CPU 16A stands by to receive and store
(again for the duration of this transaction only) the face
value, e.g. the $8.16 shown as 6-24D of the check 6-6
which is entered by the retailer on the retailer's keypad
7-20. As the retailer keys in the check amount, it is
displayed digit-for-digit/stroke-for-stroke at a retailer's
display window 7-28 shown on retailer's keypad 7-20. If
the retailer, while watching his check amount entry
coming up on display window 7-28 notices a mistake in
check amount, he can cancel his entry by pressing a
"CANCEL ERROR" button 7-32 (located on the re-
tailer's keypad 7-20), and begin again. After the retailer
has keyed in the proper amount of the check, he then
presses a "ENTER" key 7-30 (also located on retailer's
keypad 7-20, 2-20); this extinguishes an "ENTER
CHECK AMOUNT" lamp 7-20-C. The check amount
6-24D is then displayed on the customer's display win-
dow 7-29 and "OK THE AMOUNT" prompt lamps
7-20-F and 7-27-F respectively light on the retailer's
keypad 7-20 and on the customer's keypad 7-27. The
check amount 6-24D remains displayed on the retailer's
window 7-28. After the check amount entered by the
retailer is "OK'd" by the customer's pushing of an
"OK" (amount) button 7-33 located on customer key-
pad 7-27 and the CPU 16A has received and stored the
"OK" command, the "OK THE AMOUNT" prompt
lamps 7-20-F and 7-27-F are extinguished. The CPU
16A is now ready to access the communication means
to the (financial) network(s) and complete the pre-
scribed electronic funds transfer. The CPU 16A may
also interface with electronic cash registers, local area
networks (LANS), or other peripheral gear at this time
as desired.

As noted above, once switch means 2-13 is engaged,
the check is drawn or pulled into the device 100 by the
action of a motive means such as electric motor 2-7
which mechanically drives (via drive means not shown,
but known to the art) one or more feed means such as
"feed wheels" 2-8 and 2-9. Said feed wheels 2-8 and 2-9
touch and in turn drive respective idle or "slave"
wheels 2-10 and 2-11 and thereby rotate them in the
opposite rotational direction. Operating in concert, the
counter-rotating action of said document feed wheels
2-8 and 2-9 propels the check 6-6 through the device
100 at appropriate speeds, times and distances which are
controlled by the CPU 16A or other appropriate con-
trol means known to this art.

A document printer matrix head 2-16 is shown in
association with an associated printer head drive means
2-17 which propels the matrix printer head in a pre-
ferred, customary lateral "back and forth", i.e., in the
direction of arrow 3-17, field of motion defined, by the
region depicted as 3-17A. Item 2-18 generally depicts a
printer control electronics system (if necessary) which
controls the printer head drive means 2-17 and printer

10

matrix head 2-16. The printer head 2-16 may or may not
interface and interact with the CPU 16A, the document
feed means (2-7, 2-8 and 2-9 with 2-10 and 2-11) and/or
certain commands such as may originate from associ-
ated electronic cash register(s), local area network(s)
(LAN), financial network(s) services and/or financial
institutions. The region of motion 3-17A, in cooperation
with the described document feed means, should be
adapted to allow for clear and accurate printing (by
printer head 2-16) on the check or other negotiable
instrument· (preferably on their back surfaces) in all
forms, fashions and locations required by the FED or
other regulatory agency. For example the information
printed may include, but not be limited to:

1) The payee's legal printed endorsement in its cor-
rect location as mandated by the FED's Reg. CC. En-
dorsement example:

FOR DEPOSIT ONLY

METROPOLITAN STATE BANK OF IDAHO

ABC HARDWARE COMPANY

2) Use of bold and clear letters, the exact amount of
funds transferred from the payor account to the payee's
account as entered by the retailer on keypad 2-20 (7-20)
AND "OK'd" by the customer on his "OK (the
amount)" button 7-33. ALSO, in equally bold letters
next to the amount transferred, the fact that the check is
"truncated" or cancelled at the point of sale by this
device. Example:

·FUNDS TRANSFERRED

$18.07

CHECK CANCELLED—POS

19·08 hrs.—19Jun1989

3) Use of all such language, numbers, dates, codes and
data as is, or may be, required by law and the Federal
Reserve System's Rules and Regulations. For Example:

PAY ANY BANK

·P.E.G.

Spruce Nat'l Bank

Bennet, Idaho 71838-4066

19 June 1989

Again. it should be noted that all printing on the
check such as the endorsement(s), date(s), amount, etc.
and other data with regard to content and location or
placement is strictly regulated by the U.S. Federal Re-
serve Bank System and its Board of Governors includ-
ing Regulation CC as it may change from time to time.
This device 100 may or may not utilize "Stop Codes"
(see for example items 6-24 and 6-24B) contained within
the FED's MICR line, 6-24, to control the "Start/Stop"
mode(s) of the document feed motor 2-7. It should also
be appreciated that by "keying" from these "stop co-
des"—using them as bench marks of location—it is .
possible to locate the desired "target zone" for the cor-
rect placement of regulated printing on the back side of
the check. Such stop codes, integral parts of the FED's
MICR system, may enter the device's CPU 16A along
with all other MICR data, and are, in fact, a part of that
data. However, the CPU 16A also can be programmed
to "under-shoot" or "overshoot" the stop code loca-
tions for the sake of the printing and document feeding
processes.

FDC5000141

5,053,607

11

FIG. 2 also depicts a magnetic stripe ("magstripe")
read head means 2-19 which is shown as an optional
feature in anticipation of any future use of a magnetic
strip, much the same as the mag-stripe found on the
back of common credit/debit cards, to contain, capture,
record or disseminate any such transaction information
or identification means as may be mandated by laws,
conventions, convenience and/or regulation. This mag-
stripe read head means (see for example items 2-19, 3-19,
4-19 and 7-19) also may be replaced by and/or aug-
mented with an optical read head means to optically
scan and retrieve printed data employing "Optical
Character Recognition" (OCR) technology and/or an
appropriate read head to capture "Universal Product
Code" (UPC) data printed on the check or other nego-
tiable instruments processed by this device 100. Again
such additional read head means are optional. More-
over, they could read the face of the check as well as its
rear side as suggested in FIG. 2.

FIG. 3 depicts a top view of the device 100 showing
certain other preferred embodiments. For example, it
shows the preferred direction of the check 6 as it passes
across the MICR read head 3-15 (and/or optical or an
optional mag-stripe head 3-19), through the printer and
out of the device 100. In a less preferred embodiment,
the check could be inserted as shown in FIG. 3, pro-
cessed and then be ejected back to the place where it
was originally introduced. Item 3-14 indicates a pre-
ferred guide means strategically located to minimize
paper jamming of the documents and any adverse reac-
tion of said documents to the printing process. Again,
item 3-17A generally shows the region or reciprocating
field of motion of the printer head 2-16 which prefera-
bly moves perpendicularly to the travel of the check 6-6
in the manner suggested by the printer head arrow 16-B
shown in FIG. 2. Item 3-34 depicts a prescribed dis-
tance between the MICR read head 3-15 and the printer
matrix field 3-16A. Use of such a distance 3-34 insures
that after the check 3-6 trips trigger means 2-12 (thereby
starting the document feed process), all necessary
MICR information is read by the MICR head 3-15 be-
fore the MICR "stop code" stops the document feed
process. Generally speaking the "stop code" can be
used to halt the check's travel beneath the print head
means 2-16 at or just before the location of the first line
to be printed. To optimize motion efficiency, it is pre-
ferred that the check 3-6 will not have to back up or
reverse its direction of travel, and travel minimum dis-
tances (if any), before the printing process begins. The
actual printing process most preferably will resemble
any common, high quality ticket printer in that the
matrix will print while moving in either direction and
the document will advance line by line as necessary by
means known to the art.

It should also be noted that, as of the date of this
patent application, actual printer control may or may
not be accomplished totally on-board within the device
itself, but may in fact be partially or wholly dictated by
financial network services and/or the financial institu-
tions connected thereby. Some determining factors
include financial security of the entire system, available
and/or required network "connect time", software
availability (for high speed printer control and high
speed encryption/decryption of sensitive data), Federal
Reserve regulations (if any) and legal restraints (if any),
among others may dictate these features. As software
and signal processing develops allowing shorter and
shorter network "connect" times, the CPU 16A and

12

printer buffer may receive the necessary transaction
data to print the check faster than the printer can trans-
fer it to the check. At that time, total check truncating
control may or may not be a totally on-board function
of the device.

FIG. 3 also shows an alternative hinge mount loca-
tion 3-21A, e.g., alternative to the hinge mount depicted
as 2-21 for the retailer keypad 2-20. This alternative
location 3-21 could be used when the device is operat-
ing in a "lay-down" position. In such a position, the
check would be inserted from the left and progress to
and exit from the right. Again, this lay-down position
may be beneficial in certain applications where the user
has limited operating space (see for example, FIG. 4
which shows the 2-20 keypad attached at such an alter-
nate 3-21A (4-21A) site).

FIG. 4 represents a front view of the device 100; it
particularly demonstrates an open slot or "open shoe"
(generally depicted by item 4-23) whose upper edge 2B
and lower edge 2C were described earlier in this patent
disclosure in conjunction with FIGS. 1 and 2. FIG. 4
also shows how hinge system 4-35, which allows the
upper housing and components attached thereto to be
conveniently swung up and pivoted away (on the radi-
ally direction generally depicted by arrow 35A) in
order to provide physical access to the interior compo-
nents exposed by this action. Item 4-36 shows a release
means by which the operator or service person unlocks
or releases the upper portion(s), e.g., upper compart-
ments 4-4 (and/or 4-5), swinging it open to clear paper
jams, adjust or service interior components or to access
any seldom used data entry means which may be lo-
cated within the housing(s) 1-5 and/or 1-1. Associated
with the release means 4-36 is an appropriate switch
means 4-36A which preferably indicates to the 16A
CPU that the release means 4-36 has been activated.
Said activation of the release 4-36 and subsequent simul-
taneous activation of the release switch 4-36A, 7-36A
most preferably causes the CPU to automatically abort
a transaction if said transaction has not already entered
the network means.

The MICR 4-15 read head as well as the document
feed means 4-7, 4-8 and 4-10 are depicted in their respec-
tive relative positions to the table 4-2 and its vertical
guide edge 4-2A. When a check is inserted in the de-
scribed manner, it will be positioned in its proper func-
tional alignment with certain important operational
elements of the device, including the trigger means
2-12, the document feed means 2-8, 2-9, etc., the MICR
read head means 4-15, as well as any anticipated mag-
stripe read head means, and/or optic read head means
generally shown as item 4-19. FIG. 4 also shows the
counter rotating motion of drive wheel 4-8 and idle
wheel 4-10 which cause a pinching and drawing action
which propels the check or other negotiable instrument
through the device 100.

FIG. 5 is a rear view of the point-of-sale device 100
wherein arrow 5-37 depicts the rotational path taken by
the upper housing 5-5 following release of the release
means 5-36. A main power switch 5-26, controls the
flow of AC current to the device and a condition lamp
(see 1-25-A) may indicate, when lit, the presence of said
current. Electric cable entry points are shown as 5-38,
5-39, 5-40, 5-41 and 5-42; each may or may not utilize
suitable connectors or plugs allowing connection to
components or functions previously described. For
example, the retailer's (operator's) keypad 7-20 can be
connected via suitable cable and connector means to the

FDC5000142

5,053,607

**13**

device's lower housing 5-1 at cable entry point 5-38. In like fashion, the customer's (PIN entry) keypad 7-27 can be connected at cable entry point 5-39. The device connects to a network means (e.g., AT&T and/or LAN) at cable entry point 5-40. Suitable AC power enters at cable entry point 5-42. Cable entry point 5-41 depicts an optional but anticipated connection to an electronic cash register or similar device. The device may or may not operate on suitable 110 volt and/or 220 volt power requiring a voltage selector switch 7-43, which may be located inside the lower 1-1 housing as is generally indicated by 5-43.

FIG. 6 shows a (partial) bottom view of the device 100 wherein the preferred insertion and direction of movement of the 6-6 check or other suitable negotiable instruments is illustrated. The check 6-6 is inserted upside down as shown using the table 6-2 and vertical guide 6-2A to help insure proper alignment of the MICR line 6-24 with the MICR read head 6-15. The table 6-2 and vertical guide means 6-2A may at the same time align other forms of readable transaction and/or identification data with a proper read head such as previously depicted as item 2-19, 3-19, and 4-19. It is anticipated that such other forms of transaction data will either be magnetic in nature requiring a suitable "magstripe" similar to that found on a common credit/debit card and/or of an optically scanned ("read") type similar to the common "bar code" (UPC) or one requiring an optical character recognition (OCR) technology. However, regardless of the form of such additional operations, transactions and/or identification, the read mechanism depicted as item 2-19 and 7-19 will be of a type to scan and read it and it will be processed with the aid of suitable software so that the CPU 16A can effectively decipher and process it in ways well known to the art.

FIG. 7 is a component block diagram of this device which particularly illustrates the retailer's alphanumeric keypad 7-20 and the customer's alphanumeric (PIN entry) keypad 7-27. Certain numbered items depicted on FIG. 7 have been heretofore discussed and, others will be more specifically described in later portions of this patent disclosure.

Since it is anticipated that this device 100 and its associated components (if any) will interact with a number of financial networks and they in turn with a number of banking institutions, many obvious, and some proprietary security precautions, may be taken to promote the security interests of those involved. The retailer's keypad 7-20 and the customer's keypad 7-27 will play an important role in these matters. For example, use of a personal identification number (PIN) by the customer at the time of point-of-sale transaction is an obvious example of such a precaution. Proprietary encryption and decryption methods also may be employed to "scramble" or encode financial data transmitted to and from certain locations on the network system. Each banking institution and/or each network participant may or may not have its own encryption/decryption methods and/or other security requirements. Therefore, it would not be possible to describe future developments in detail in this area, that is as they relate to the point-of-sale check processing device of this patent disclosure. However, it most probably can be said that at that point in time, as now, after each transaction is completed, and after the network communications connection has been dropped, the CPU's memory means will most probably completely "dump" (erase from

**14**

memory) all data that was required for the previous transaction. Thus, when not in use between transactions, the device will, most probably, not contain means or data which can be used to transfer funds. Hence, the device will begin each transaction with a clear memory ready to receive MICR and PIN information as well as the entered check amount.

Before describing a typical verification/transaction/print cycle of this device, a few background conditions should be understood. First, the "MICR" (magnetic ink character recognition) line 6-24 was developed to allow high speed, computer controlled processing of checks by the twelve Federal Reserve Banks (and their branches) and the various Automated Clearing Houses throughout the country. The MICR characters themselves are exactly what the name implies, "magnetic," thereby causing electric current pulses in a circuit when "read" by a proper electronic read head such as the one generally depicted herein as MICR read head 2-15. The Federal Reserve Bank has published many regulations and booklets describing their MICR system. Suffice it to say for our purposes that each check 6-6 has a unique MICR number 6-24 enabling a central computer(s) system to identify, sort it, and process it as an individual item. The characters in the MICR line identify the customer's bank and the FED district in which it is located, his check account number as well as the check's serial number. Specifically, from left to right, the MICR line identifies:

1) The first two digits identify the bank's Federal Reserve District.

2) The third digit identifies the Federal Reserve Office (head office or branch) or a special collection arrangement.

3) The fourth digit shows the bank's state or a special collection arrangement and completes the check's "routing symbol."

4) The next four digits are the bank's "Institutional Identifier." Each bank has its own identifier.

5) The next number is the "check digit." This number, combined with the first eight digits, verifies the routing number's accuracy in computer processing.

6) The next group of numbers (digits may vary) identify the customer's account number.

7) The next group of numbers (digits may vary) identifies the customer's check serial number.

8) Cancelled checks that have passed through the FED's (and/or ACH) collection system as it exists at the date of this patent application will have a final group of numbers located at the right (under the signature) indicating the dollar amount of the check. This dollar amount is printed by the first bank receiving the check.

It should also be understood that the personal identification number (PIN) with which the customer identifies himself or herself to the appropriate (and necessary) computer(s) is normally a matter between the individual customer and his bank since each bank may insist on its own means of generating and protecting the PINs. In like manner, each bank may insist on its own encryption/decryption means to protect its own computer (and/or LAN) from unlawful entry. In these cases, the individual bank would be responsible for that software/hardware which produces a secure interface with the network(s). In turn, the financial network(s) may insist on its own security arrangements and would assume responsibility for fulfilling its own hardware/software needs. Further, it is assumed that banking institutions wishing to participate in a national EFT or "check

5,053,607

**15**

debit" network will voluntarily make prior arrangements with their customers in the event that any EFT check transaction places the customer's account in a "non-sufficient funds" (NSF) status. Such arrangements may be similar to those made between banks and their debit card customers or may take the direction of automatic loans, sometimes called "overdraft protection", for the amount overdrawn by a customer's debit check transaction. Upper limits of said overdraft protection and the number of days of allowable "float" (a time period between the customer's writing of a check and his depositing into his account of sufficient funds to "cover" the (NSF) check he has written) afforded the customer again are matters between the bank and its customers. Limiting overdraft protection and "float" time is merely a matter of computer programming at the bank. It is anticipated that the topics discussed briefly in this paragraph may become the target of existing and-/or new Federal Reserve regulations and/or local, State or Federal legislation similar to that body of debit card law which already exists.

However, it should be understood that before the device 100 of this patent disclosure can function automatically as designed, the retailer must first make suitable arrangements with a financial network and/or carrier. Second, the retailer must, upon taking delivery of this device, "program" or enter his security "password" into the device's CPU and then the desired payee account number. This account number may or may not be (subject to applicable law and regulations) the same MICR information as is presently found on a standard check used to withdraw funds from that account. It is anticipated that the retailer may wish to deposit EFT check credits to another bank account not associated with check withdrawal. In any case, the correct account number must be entered along with the remainder of the necessary MICR information allowing the network to "locate" the desired payee account. If, for example, a retailer purchases a machine and wants the debit check deposits (EFT credits) made directly to his company's checking account immediately at each check transaction made with this device, he may easily do so. In such case the retailer would first activate the housing release 4-36 (5-36) and swing open the upper housing 1-5 (4-5) thereby gaining access to the switch means 7-45 (5-45) located inside the upper and/or lower housing(s). He would then enter, using a proprietary series of alpha-numeric entries at keypad 7-20 in conjunction with switch means 7-45, a (personal and secret) "password" of his choosing to activate the programmable portion of the device's CPU 16A; this password limits access to the CPU 16A to inhibit unauthorized reprogramming of any such data as might be contained therein. Next the retailer would enter a "retailer identification number" using a series of keystrokes at keypad 7-20 in conjunction with switch 7-45. This retailer identification number (RIN) identifies this retail location to the network and consequently to the appropriate banks. The RIN also would be recorded at the retailer's bank (payee's account location) to provide various means of security and to connect the RIN with a proper name and address of the retail establishment to be printed on the back of the check for endorsement, etc. In the same manner, using keypad 7-20 with 7-45, the retailer enters his payee account number and its (bank) location by entering the appropriate FED MICR data for this account such as that data outlined in sub-paragraphs 1 through 5 of the MICR line description

**16**

6-24 discussed previously. In like fashion, using the same keypad 7-20 and switch means 7-45, the retailer will program the correct network and/or carrier access codes to allow this device to connect to the network and subsequently to the proper financial institutions. The retailer now terminates programming of the device's CPU 16A and closes the housing to begin normal operation. It should be stated that various methods of encryption and decryption of the transaction data and-/or utilization of the PIN's, RIN's, account numbers, etc. also would produce an added measure of security for all stations and parties involved, and said step may be partially or wholly initiated and employed within this device at the point of sale.

To better understand the actual transaction process executed by this device, certain other preferred features, functions and conditions also should be noted; these may include:

1) A "system fault" condition lamp such as the one depicted by 7-20-B (located on keypad 7-20) could indicate one or more of the following conditions: (a) The device is unable to access or establish contact with the network or communications carrier, or; (b) The financial network is unable to access or establish contact with one or a number of the required or appropriate financial institutions in order to complete the transaction, or; (c) the device cannot receive necessary data from either the network (carrier) or any number of necessary financial institution(s) to complete the transaction. Should such a system fault be present, the CPU 16A would most preferably erase or "dump" all entered transaction data; the customer's MICR information (from 6-24), the customer's PIN number and the check amount. The CPU 16A also would direct the document feed means (2-7) to expel the check or MICR document from the device by activating the mechanical means for expelling the check. The motor 2-7 will continue to operate (expulsion mode) until an "exit switch" means 2-46 (3-46, 7-46) indicates (by a proper contact or lack thereof) to the CPU 16A that the document is no longer present, and in fact has exited the device, at which time the CPU 16A would stop motor 2-7. The same transaction can be re-attempted immediately.

2) A "clear paper" prompt lamp 7-20-I could instruct the retailer or operator to open the device (using 4-36 release means) and physically clear or remove any fouled or otherwise impeded document. Lamp 7-20-I can be lit by the CPU 16A after a MICR document has entered the device (indicated by the switch 2-13) but the CPU 16A has not received the expected MICR information and/or the document has not properly activated the "check present/exit" switch 2-46 which indicates that the check 6-6 has not reached its proper position directly under the printer head means 2-16. The retailer could attempt the expulsion or "clearing" process by activating an "index" switch 7-44, (located on keypad 7-20) which will in turn activate feed means 2-7. If the attempted "indexing" does not clear a fouled check, then the retailer must open the housing by utilizing release 4-36. Preferably, either the act of pressing the indexing key 7-44 or releasing release means 4-36, and thereby activating 4-36A switch means, will cause the CPU 16A to dump transaction data and the entire transaction cycle must begin again. This "indexing" (momentary) switch 7-44 may also be useful if, after entering the check into the device to start a transaction, the retailer has forgotten the customer's check amount. Since the CPU 16A should not accept transaction data

17

5,053,607

18

until the switch 2-13 has been activated, the check amount can only be entered after the check has entered the device 100. This would help to insure that the funds being transferred are leaving the account indicated by the MICR line 6-24 held within the device at the time of 5 the transaction. If the "check present/exit" switch 2-46 or the release 4-36 and switch means 4-36A used to notify CPU 16A is prematurely activated before the entire transaction cycle has been completed, the transaction is preferably aborted and the CPU 16A dumps 10 transaction data and expels the document by activating motor 2-7.

3) A "transaction completed" indicator lamp is located on the retailer's keypad 7-20 and is shown as item 7-20-E. "Transaction completed" is also indicated by an 15 analogous lamp 7-27-E on the customer's (PIN) keypad 7-27. These "E" condition lamps are to notify both the retailer and the customer at the earliest moment that the amount of the check, as entered by the retailer at keypad 7-20, has been electronically transferred from the 20 payor's to the payee's account. This amount can be printed on the back of the check as described elsewhere in order that the customer (payor) can verify the figure.

4) An "amount declined" indicator lamp located both on the retailer's keypad and the customer's keypad is 25 shown as 7-20-G and 7-27 G respectively. This 7-20-G condition lamp indicates either/or: (a) The customer has exceeded his checking account balance, and/or; (b) The customer has exceeded his special arrangement with the bank to pay non-sufficient (NSF) (debit) check 30 demands by "overdraft protection" in whatever form that may take, and/or; (c) The amount indicated by the 6-24 MICR line on this particular check (within the device) cannot be reached by the network(s) being used. It is anticipated that the banking community will 35 cause to be printed on the checks of participating customers a small symbol showing which checks can be used in this device. A small symbol of such a type would alert the retailer before accepting the check of the potential, or lack thereof, of transferring electroni- 40 cally the funds represented by the offered check. It is also anticipated that another condition lamp, shown as item 7-20-J, will show the retailer that the check he (the retailer) has inserted into the device is one of a non-participating customer and/or bank and will help avoid 45 any embarrassment at the point of sale for all concerned. This additional lamp, said 7-20-J, will merely indicate that the check in question is that of a non-participating customer and/or bank and will not mean that the check is in any way suspect. 50

5) For the retailer's convenience, an optional "cash ticket" could be easily printed by this device by placing a "no-carbon-required" slip of paper of an appropriate size against the back of the check before inserting the pair into the device. Special paper (e.g., known to the 55 art as NCR paper) may be on the back of the check in order to allow for proper MICR scanning of the device and in order to allow the "no-carbon-required" page to print the necessary information on the check. The resulting NCR page could then be inserted into the retail- 60 er's cash register drawer to represent the (EFT'd) debit-check sale as a written record of a "cash" item.

6) Provision can also be made (e.g., at 5-41) for an appropriate connector and cable means allowing essential and/or useful digitized transaction data to pass to 65 and from common types of electronic cash registers. One example of said data communication would be the automatic entry into the retailer's (appropriate and suit-

able) electronic cash register by this device's CPU means of the "amount tendered" by the customer's check located within this device (see for example the note at the end of this paragraph). The actual "amount tendered" by the check will be the face value of the check as entered by the retailer at 7-20 (as described elsewhere) and "OK'd" by the customer's keystroke at 7-33. However, the "amount tendered" data would not pass from this device's CPU to the (electronic) cash register until after the funds represented by the check had, in fact, been electronically transferred (via financial network means and operations) to the payee's account. At this point the funds transferred from the payor to the payee (to payee's account) amount to "cash tendered" and/or "cash paid" and would require all appropriate treatment as cash.

After the device's CPU 16A had been notified (by the financial network means) that the amount of funds represented by the check had been transferred, the CPU would then electronically enter into the cash register the "amount tendered" yielding the same results as if the retailer had entered it in his customary manner into the register. The retailer's cash register then would proceed in its normal routine by printing the invoice slip (or customer's ticket) and its own running tally means making note of this transaction's total value of purchase, appropriate tax(s), amount tendered, amount of change paid out, etc. From the moment this device's CPU received the appropriate notification that the funds (face value of the check) had been transferred to payee's account, it would resume its normal, prescribed routine as stated elsewhere.

Note: a scenario wherein the customer tenders a check for an amount smaller than the amount of the sale and then tenders the remainder in cash, may or may not require different procedures. Recognizing that different electronic cash register manufacturers' devices and systems may each necessitate its own software protocol, formats, etc., individual software for each cash register model/make/type may or may not be developed by said manufacturers facilitating a proper working interface with this point-of-sale device. Hence, at this time, applicants can only suggest that resolving said scenario would require software allowing the retailer to enter the amount of tendered "cash" in his usual fashion on his register's data entry keypad, and that said cash register software would then add the (cash) amount to the amount tendered by the customer's check via said check device's CPU means. This procedure would yield an overall "total amount tendered" to be recognized by the cash register and the retailer could proceed normally with the transaction. In this particular case, the customer's check would be returned to him verified, endorsed, EFT'd, printed and truncated (processed and cancelled via the financial network means and operations) along with his copy of the cash register receipt (ticket). Thus, the customer would receive a written account of the complete transaction and the retailer's (electronic) cash register means would contain the same information in its own format.

7) A preferred embodiment of this device also would employ and utilize an appropriate and suitable "liquid" crystal display" (LCD) means or similar means at 7-28 and 7-29 in preference to the "condition prompt lamps" mentioned throughout this text. Said LCD means may or may not be accompanied by a audible alarm means alerting both customer and retailer when appropriate conditions and functions are spelled out on the LCD.

5,053,607

19

Said LCD display means would be controlled by suitable CPU means and software and would have adequate capacity to spell out letter-for-letter and/or numeral-for-numeral and convey the appropriate message(s) and/or data to the appropriate person(s).

The preceding retailer entered data—namely the RIN, the access codes, phone number(s), etc., need only be entered once under normal conditions and can only be "re-programmed" by the retailer or his authorized agent(s) having access to the CPU "password" and then only by following similar proprietary procedure (using 7-20 and 7-45) as was used previously. Given that the retailer entered transaction data is stored within the CPU's memory means for automatic and constant use, the CPU's memory means need only capture the point of sale transaction data to form a complete transaction memory "package." Said point of sale transaction data would generally comprise: (a) The customer's PIN as entered by same at 7-27 and the required "OK" as entered at 7-33, and; (b) The customer's check amount as entered by the retailer at 7-20 and the customer's required "OK" response entered at 7-33. Having completed the transaction data "package", the CPU now automatically cites the access codes and numbers to connect with the appropriate financial network(s) means and transmits all necessary transaction data to complete the prescribed funds transfer and all associated designed functions of this device. A preferred embodiment of this device would include automatic "re-dialing" or repeated network access attempts until a suitable, working connection has been established. This re-dialing feature of the device's CPU means would help insure minimal time frames for customers and retailers alike at the point of sale during busy seasons and periods for the networks and retail establishments.

9) As previously mentioned, another feature of this device is its ability, via suitable CPU means and program(s), to allow the retailer to manually overcome random and occasional failures of the automatic MICR read function. Such failure would most likely be resultant from mutilated or damaged 6-24 MICR data which would preclude the 2-15(7-15) MICR read head means from properly scanning and/or "reading" said MICR document data. (The Federal Reserve Bank's high speed MICR read means typically experience a 1% to 2% "rejection" rate with said rejections having to be entered manually at the FED.) Failure of the designed automatic MICR read function (via the 2-15[6-15] read head means and connected, suitable CPU means) can be overcome manually be using the 7-20 keypad. The following scenario will describe this function. Expecting a normal "automatic" MICR scan and EFT/cancellation of the check, the retailer has entered the check into the device in the normal fashion. Instead of the device's normal "holding" of the check within itself directly under the 2-16 print means and the CPU's normal "waiting" for proper entry of PIN, check amount, "OK's", etc., the check is "indexed" or passed right out of the machine (for example, in the direction of the arrows seen on FIG. 2) by the CPU's engaging of the document feed means 2-7 (until the 2-46 "exit" switch determines the check has completely exited and notifies the CPU to stop 2-7). The check should automatically be expelled from the device when the device's CPU 16A means has NOT received and/or recorded the expected proper 6-5 and suitable MICR data immediately following the triggering of the 2-13 switch means and subsequent MICR scan made possible by the action of the docu-

20

ment feed means 2-7. Since the 2-13 switch began a normal cycle and the 2-7 was engaged, but a suitable MICR data package was not read and/or received by the CPU, the CPU means assumes that a MICR scan/read malfunction has occurred. The CPU may or may not trigger the "CLEAR PAPER" prompt means. If the retailer has determined that a fouled document is the cause of the MICR read malfunction, he can: (1) push the 7-44 index button to try to clear the impeded document which will automatically abort the entire transaction cycle, in which case no PIN, or "OK's" will be accepted, and/or (2) release the 4-36 (5-36) means to lift the 4-5 housing and physically remove said jammed document (if any). Said releasing of the 4-36 (5-36) means will activate the associated 4-36A switch means and notify the CPU 16A to abort the transaction cycle and no PIN or "OK's" or check amount can be accepted by the CPU. If a fouled document was the cause of the MICR read malfunction, then the retailer can clear the check from the device, attempt to restore and refurbish the document, and re-enter the document for a second trial of the transaction. Since the retailer cleared the fouled document by activating the (document) index button 7-44 and/or the release means 4-36 (5-36) and its associated 4-36A switch, and thereby "aborting" the normal transaction cycle, the device's CPU means 16A will view said "re-entry" of the (previously fouled) document as a new and separate transaction and operate accordingly. If the document in question is NOT fouled or "jammed" and instead the CPU (for lack of suitable, automatically entered [via 7-15 read head] MICR data) indexed the MICR document completely through and out of the device as confirmed by an indicative response light, the device's CPU concludes that a MICR read malfunction has occurred. In such case it could begin a second countdown (e.g., 30 second, but the time period is programmable and variable) in which time the customer must enter his PIN and "OK" the PIN when asked (prompted) by the CPU. This PIN entry and "OK" of PIN by customer will be received and placed in transaction memory by the CPU as if this were a normal transaction of the type previously described; but in this case, if the PIN is NOT received and "OK'd" within the allotted time, the CPU will abort the transaction (preparing itself for the next transaction automatically). However, assuming that the PIN and PIN "OK" have been (will be) received within the allotted time period, the CPU begins (at the same instant it began the PIN countdown) a similar 30 second countdown (here again, the time period is programmable and variable) in which the device's appropriate CPU (memory) means stands by to receive the MICR data from the document in question which will be manually entered by the retailer at the 2-20 (7-20) keypad means. Reading from left to right (in the same direction as if the check were normally inserted into the device for automatic scanning of the MICR) the retailer would enter digit-for-digit the entire MICR line which includes the elements of routing and transfer, Institutional Identifier, account number and check serial number as described previously. The retailer will read and enter the first nine digits, which include the check routing symbols, the institutional identifier and the check digit, and then press the 7-30 "ENTER" key. Then the retailer (continuing from left to right) will then enter the customer's account number and press (7-30) "ENTER" and likewise the check (serial) number and depress the (7-30) "ENTER" key. Pressing the (7-30) "ENTER" key in

FDC5000146

5,053,607

21

this case duplicates the "stop codes" of the (6-24) MICR
line as if the 7-15 MICR read head means were being
employed at this time and tells the CPU means how
long to operate the 2-7(7-7) document feed means to
correctly position the check within the device. While
entering said MICR line manually, said MICR data is
displayed digit-for-digit/stroke-for-stroke at the 7-28
retailer display means and if the retailer (operator) rec-
ognizes a mistake in his entry, he can press the 7-32
("CANCEL ERROR" button which will restart auto-
matically the timed (MICR entry) countdown and he
may begin again.

After he has entered all required (6-24) MICR data,
except the check amount, the retailer again enters the
same check into the device (normally, as if manual entry
had not been required) to complete the transaction.
However, since the MICR data has already been en-
tered (into CPU's memory) using the 2-20(7-20) keypad
and the customer's PIN entry and "OK" is incoming
and/or expected by the CPU, the re-triggering (this
time) of the 2-13(7-13) switch (due to the re-entry of the
check): (1) alerts the on-board CPU to begin operation
of the 2-7(7-7) document feed means for proper and
suitable positioning of the MICR document within the
device with regard to all designed functions of said
device, (2) causes the CPU to activate the 7-20-C
"ENTER CHECK AMOUNT" prompt lamp and to
stand by for the retailer's entry (at 7-20) of the check
amount and thereby to receive said amount into the
appropriate CPU memory means. (3) extinguish the
7-20-C "ENTER CHECK AMOUNT" prompt lamp
upon the receiving of the check amount into memory,
and cause the entered check amount to be displayed at
both 7-28 and 7-29, (4) cause the CPU to light the 7-20-F
and 7-27-F "OK THE AMOUNT" prompt lamps and
to stand by to receive the "OK" from 7-33 (customer's
"OK" button) and (5) cause the CPU, after receiving
the "OK'd" check amount, to extinguish the 7-20-F and
7-27-F "OK THE AMOUNT" prompt lamps (or some
other type of suitable prompt means). In such manner a
"normal automatic" MICR entry made by the
7-15(2-15) read head means and associated CPU means
which was "rejected" can be manually introduced into
the device and the transaction can thereby proceed
normally to completion.

10) A common, established printer means (2-16 and 2-17)
with its electronic printer control means (2-18), if re-
quired, should also offer ease of service and/or replace-
ment by qualified service personnel. It may or may not
use a common ink "ribbon" which could be replaced by
the retailer. Applicants anticipate use of printer means
already in manufacture as of the date of this patent
application.

11) Since pressing the 7-44 "index" key prior to the
device's (CPU's) automatic network access results in an
aborted transaction, this same 7-44 "index" key can be
thought of as an "abort" key. It should be noted, how-
ever, that due to (financial) network and/or financial
institution(s) software, once the transaction data pack-
age has "entered" the network (LAN) this abortion
function may not operate effectively. It is intended that
pushing key 7-44 to achieve an "abort" function will be
effective if it is pressed prior to the device's (CPU)
connection to the network means.

12) Software and/or hardware means and functions
other than those described in this patent disclosure may
also be employed in ways well known to this art.

22

13) A specific version of this device, especially
adapted for use in a larger installation, would be the
device as otherwise described herein, but without its
own on site CPU. That is to say, all "CPU" functions
may be carried out by a "PC" computer located some-
where in the building (installation) but not necessarily at
the point of sale as in a large department store, or by a
centralized, off-site, CPU utilized by several point-of-
sale mechanisms. In such case the on-site point-of-sale
device would require only the MICR read head and
means to connect it to the LAN and thereby transmit
the MICR data along with the amount of the check as
entered by the retailer at 7-20 and the PIN and the PIN
OK and the "OK the amount" as entered by the cus-
tomer at 7-27. The retailer identification number(s) and
the network access code(s) and all required network
numbers to access the carrier and/or network(s) also
could be supplied by an "outboard" computer such as a
suitable PC. Said PC or similar means could also tally
the transferred (EFT'd) total for the retailer at the end
of each shift or day. Said PC may also, if necessary,
control the printing of the negotiable MICR documents
and thereby eliminating the 7-18 "printer control" elec-
tronics. Thus the machine would contain the MICR
read head means and communication means to the cen-
tral (LAN) computer. It would also contain the key-
pads, both 7-20 and 7-27 and all their functions. Also, it
would contain the print means to endorse the check and
print all required data on the reverse side of the check
and, of course, the 2-7 document feed means.

TRANSACTION/VERIFICATION/EFT/CAN-
CEL CYCLE

A normal transaction cycle would begin with the
device and it's CPU completely void of any transaction
data from the previous transaction; namely, the device
would NOT contain the previous customer's personal
identification number, his "OK" of PIN command, his
"OK the amount" command or the amount of the check
as entered by the retailer at 7-20. The CPU means (if
NOT connected to a LAN and/or central computer)
would however have at its continual disposal the re-
tailer identification number(s), and the network(s) and
carrier(s) access codes or means enabling the device to
automatically "dial" and access the appropriate carriers
and networks and to identify this particular retailer to
all required network(s), financial institutions, carriers,
etc. The device's CPU means (whether external or on-
board [internal]) automatically "dumps" or erases all
customer transaction data (PIN, OK's, check amount)
immediately upon completion of each transaction, but
retains for each use the retailer transaction information.
A typical transaction scenario would include:

1) The retailer would verbally or by means of his cash
register means, indicate to the customer the amount of
the sale.

2) The customer would fill out and sign his check (or
other MICR document) and pass it to the retailer.

3) Retailer could visually examine the check and
perform any personal identification procedures he
wishes at this time. If a printed symbol on the check
indicating a participating bank and customer is used, the
retailer could note such at this time. If such a symbol
will be used in the future by check printing companies,
and if this check has said symbol, the retailer could
enter the check into the device as described elsewhere.

4) Immediately upon the check entering the device
and engaging the 7-13 switch, the CPU performs a

FDC5000147

5,053,607

23

number of functions including: (A) The "ENTER PIN" prompt lamps light at 7-20 and 7-27; (B) the "ENTER CHECK AMOUNT" prompt lamp lights at 7-20.

5) The CPU can receive data in any order and/or simultaneously from both keypads 7-20 and 7-27; and if used receive data from a proper and suitable electronic cash register connected to said device in the previously described manner. The retailer would then enter the amount of the check using keypad 7-20. As the retailer enters the amount of the check, it is displayed at window 7-28 digit-for-digit/stroke-for-stroke and should the retailer notice an error in his entry of the amount, he can depress the "CANCEL ERROR" button 7-32 and re-enter the amount. If the amount entered is correct, then the retailer would press the "ENTER" button 7-30.

6) At the same time as #5 above, the customer would see the "ENTER PIN" prompt lamp and enter his PIN. If the customer notices that he has erred, he can press his "CANCEL ERROR" 7-31 button and begin again. When the customer has entered his correct PIN, he would then press the "ENTER" button 7-30A which would place the PIN entry into the CPU memory means (or send it to the LAN CPU). This pressing of the "ENTER" (PIN) button 7-30A would extinguish the "ENTER PIN" prompt lamps 7-20 and 7-27 and the "OK THE PIN" prompt lamps 7-20 and 7-27 would light. Several embodiments of PIN entry and PIN "OK" processes are described elsewhere.

7) Immediately after the retailer's entry of the check amount and his pressing of the "ENTER" (amount) key 7-30, the "ENTER CHECK AMOUNT" prompt lamp 7-20 would extinguish and (a) the check amount would be displayed at the customer's amount display means 7-29; (b) the check amount, which was being displayed digit-by-digit at window 7-28 as the retailer entered it, would continue to be displayed at 7-28. (c) the "OK THE AMOUNT" prompt lamp would light at the customer's keypad 7-27 and 7-20. When the customer presses the "OK" (the amount) key 7-33, the "OK THE AMOUNT" prompt lamps extinguish at 7-20 and 7-27 and the "OK'd" amount then enters the appropriate CPU memory and is sent to the electronic cash register (if used) to become a part of the cash register's tally and printing.

It also should be understood that when the "OK" the amount button 7-33 is pushed, said action allows the entered amount to become part of the transaction information. However, it is NOT tallied or recorded as a part of the completed sale UNTIL AFTER the amount has actually been transferred into the payee's account and acknowledgement of this fact is received from the computer means governing the payee's account. Only when this amount is paid to payee's account and verification of that fact received is the amount entered into the CPU 16A, the LAN computer or electronic cash register to become part of a record of cash paid and received by the retailer.

8) When all "local" transaction data has been entered, namely the check amount, the PIN and customer's "OK" of both the PIN and the check amount, the device's CPU means 16A immediately calls up the carrier and/or network access codes and begins the process of contacting the carrier(s) and/or network(s). The CPU 16A would complete the transaction data package by adding to the customer's transaction data the stored retailer transaction data which includes his retailer iden-

24

tification number and any other such security data as may be required by the network.

9) When the complete transaction data "package" is in the network means, the network means would automatically route the "package" to the appropriate payor's bank using the FED's routing and transit symbols to locate the payor's bank institution. The transaction from here (and perhaps from the point the data package enters the network) resembles a common "debit card" transaction in that: (a) the payor's bank CPU means encrypts/decrypts the data package as necessary, (b) there is verification of the existence of the payor's account, (c) there is verification of the PIN through whatever means this particular institution chooses to use, (d) recordation of the transaction is made and, (e) the transaction data package is transmitted back to the appropriate network means.

10) The network means, receiving the appropriate transaction package back along with the cash transfer, would then route said package to the payee's banking institution using the payor's routing and transit numbers (entered when the retailer bought the device as described elsewhere). When the data package has reached the payee's financial institution, it would also proceed much the same as if this were a common debit card transaction. Among other things, said institution would: (a) encrypt and decrypt the information as necessary, (b) verify the retailer identification number (RIN), (c) verify the payee account number and perform any security checks which connect the RIN with the payee account number as it chooses, (d) deposit the funds into the payee account, (e) verify that the funds have been deposited, and (f) return verification of deposited funds along with endorsement data and all necessary routing data back to the network. The RIN and/or payee's account number or other proprietary means may be used to enable the payee's bank's CPU means to transmit a (partially prerecorded) endorsement and cancellation data package to properly endorse the check with the payee's required name and bank, amount deposited, time, etc. as previously described. Time affected data, such as time of day and amount deposited would not be "prerecorded."

11) When the transaction data package returns from the network to the device's CPU means, said device's CPU means: (a) verifies that the amount has been deposited, (b) records all endorsement data and all other such necessary data to endorse and cancel the check upon verification of transfer of funds, (c) and all necessary information to associated electronic cash register means upon receiving verification that the funds have been transferred in order that it might take notice of the "amount tendered", which in this case is the same as "cash tendered" and (d) disconnects from all network means upon receiving of the data returned from the network so recorded.

12) At this point the CFU will engage the print means to print the endorsement and cancellation data on the check as described elsewhere. The electronic cash register (if used) can now print its sales slip taking note of the transferred funds as "amount tendered" or "cash tendered."

13) The check is printed and expelled from the device and the CPU erases or dumps from memory all entered customer transaction data AND all cancellation data which includes the endorsement data, the amount time, etc. The CPU only retains the retailer transaction data

FDC5000148

5,053,607

25

as described elsewhere. When this transaction is completed and the check has been expelled as verified by the "exit switch" 7-46, the "TRANSACTION COMPLETE" prompt lamps 7-20-E and 7-27-E light. The retailer can then pass the cancelled check back to the customer as part of the customer's sales record and receipt. If necessary, the retailer could print a "cash ticket" to place into his cash register by placing an NCR page behind the check and inserting the pair into the device to be printed simultaneously.

It will, of course, be understood that various changes may be made in the form, details and arrangements of the components, as well as in the procedures and functions carried out by them, without departing from the scope of the invention which consists of the matter shown and described herein and set forth in the appended claims.

Thus having disclosed our invention; we claim:

1. A point-of-sale negotiable instrument processing device comprising:

(1) a housing having a first compartment, a second compartment and a spacer means which positions the first compartment next to the second compartment so as to define a slot between said first and second compartments;

(2) MICR read head means for reading MICR information on a negotiable instrument;

(3) printer means for printing on a negotiable instrument;

(4) switching means to initiate preprogrammed CPU functions upon the negotiable instrument;

(5) motive means for moving the negotiable instrument: (a) into position in the slot so as to be read by the MICR read head means, (b) into position to be printed upon and (c) into and out of the slot;

(6) positioning means for positioning the negotiable instrument in the slot so that MICR information on the negotiable instrument can be read by the MICR read head means and for positioning the negotiable instrument in the slot so that the rear side of the negotiable instrument can be printed upon;

(7) alpha/numerical keypad means for transmitting information to a CPU;

(8) a CPU for receiving information from the alpha/-numerical keypad means and the MICR read head means in order to communicate said information to a telecommunications system in order to transfer funds represented by the negotiable instrument from an account of the maker of the negotiable instrument to an account of the payee of the negotiable instrument; and

(9) means for electronically connecting the point-of-sale negotiable instrument processing device to a telecommunications system.

2. A point-of-sale negotiable instrument processing device comprising:

(1) a housing having a first compartment, a second compartment and a spacer means which positions the first compartment above the second compartment in a stacked configuration so as to define a slot between said first and second compartments;

(2) MICR read head means, located in said second compartment, for reading MICR information on a face side of a negotiable instrument;

(3) printer means, located in said first compartment, for printing on a rear side of the negotiable instrument;

26

(4) switching means to initiate preprogrammed CPU functions upon the negotiable instrument;

(5) motor means for moving the negotiable instrument (a) into position in the slot so that MICR information on the negotiable instrument can be read by the MICR read head means, (b) moving the negotiable instrument into position in the slot so that the rear side of the negotiable instrument can be printed upon and (c) moving the negotiable instrument out of the slot;

(6) means for positioning the negotiable instrument so that MICR information on said negotiable instrument can be read by the MICR read head means;

(7) means for positioning the negotiable instrument so that the printer means can print on said negotiable instrument;

(8) a retailer's alpha/numerical keypad for transmitting information to a CPU;

(9) a customer's alpha/numerical keypad for transmitting information to a CPU;

(10) a CPU for receiving information from the retailer's alpha/numerical keypad, the customer's alpha/numerical keypad and the MICR read head means in order to communicate said information to a telecommunications system in order to transfer funds represented by the negotiable instrument from an account of the maker of the negotiable instrument to an account of the payee of the negotiable instrument; and

(11) means for electronically connecting the point-of-sale negotiable instrument processing device to a telecommunications system.

3. The device of claim 2 which further comprises a security code system.

4. The device of claim 2 which further comprises means to access a computer system maintained by an issuer of a negotiable instrument.

5. The device of claim 2 which further comprises means to access a computer system maintained by a group of retailers using a centralized CPU system.

6. The device of claim 2 which further comprises means to enter a customer's PIN identification number.

7. The device of claim 2 which further comprises means to connect the MICR read head means and a PIN identification number entry means to the printing means so that the printing means is actuated only when signals are compatible.

8. The device of claim 2 which further comprises means to access an external communications system to identify a payor of a negotiable instrument through use of a personal identification number.

9. The device of claim 2 which further comprises a plurality of signal devices indicating the condition of a plurality of circuits contained in said device.

10. The device of claim 2 which further comprises means to display the amount of the transaction, as indicated on the negotiable instrument, to both the retailer and the customer.

11. The device of claim 2 which further comprises means to produce an imprinted copy of a transaction processed by use of the device.

12. The device of claim 2 which further comprises a data entry override means.

13. The device of claim 2 which further comprises a personal identification number module having a key tab matrix connected to the CPU, wherein said key tab matrix is set to match a transaction amount to be re-

FDC5000149

5,053,607

27                                                                      28

corded with an override means connected to the CPU    of, and MICR head reading of, the negotiable instru-
for actuating said printing means.                    ment while it is in the slot.

14. The device of claim 2 which further comprises       16. The device of claim 2 which further comprises
hinge means to separate the first compartment from the  magnetic stripe read head means.
second compartment and thereby expose a space de-       17. The device of claim 2 which further comprises
fined by the slot.                                      means to read Universal Product Code data.

15. The device of claim 2 which further comprises a     18. The device of claim 2 which employs optical read
table having a perpendicular edge which table is located  head means in place of the MICR read head means.
on the second compartment in order to facilitate travel

*    *    *    *    *

10

15

20

25

30

35

40

45

50

55

60

65

FDC5000150

**10**

US005175682A

# United States Patent [19]

## Higashiyama et al.

| | |
|---|---|
| [11] Patent Number: | **5,175,682** |
| [45] Date of Patent: | **Dec. 29, 1992** |

[54] **CHECK SYSTEM AND METHOD INCLUDING PRIORITIZING CHECKS FOR TRANSMISSION TO BANKS FOR PROCESSING**

[75] Inventors: Connie Higashiyama, Redwood City, Calif.; William Melton, Herndon, Va.; Ashok Narasimhan, Los Altos, Calif.

[73] Assignee: **Verifone, Inc.,** Redwood City, Calif.

[21] Appl. No.: **627,640**

[22] Filed: **Dec. 14, 1990**

[51] Int. Cl.⁵ ............................................. G06F 15/30
[52] U.S. Cl. ................................... 364/408; 235/379
[58] Field of Search .................... 364/401, 406, 408; 235/379-383

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,187,498 | 2/1980 | Creekmore | 235/379 |
| 4,321,672 | 3/1982 | Braun et al. . | |
| 4,436,992 | 3/1984 | Simjian | 235/381 |
| 4,454,414 | 6/1984 | Benton | 235/383 |
| 4,948,174 | 8/1990 | Thompson et al. . | |
| 4,972,463 | 11/1990 | Danielson et al. | 235/381 |
| 4,974,878 | 12/1990 | Josephson | |
| 4,977,595 | 12/1990 | Ohta et al. | 235/381 |
| 5,053,607 | 10/1990 | Carlson et al. | 235/379 |

### OTHER PUBLICATIONS

"A complete guide to rule & Regulations Governing

the Ach Network," 1990 Ach Rules, Copyright 1990, *National Automated Clearing House Assoc.,* OR 51–75.

*Primary Examiner*—Gail O. Hayes
*Attorney, Agent, or Firm*—Cooley, Godward, Castro, Huddleson, & Tatum

[57] **ABSTRACT**

A method and structure are provided for processing checks in an extremely timely and cost-effective manner. A check recipient, such as a merchant, utility billing department, and the like, utilize hardware and software for quickly gathering data from checks received in order to allow prompt processing of those checks. Such hardware preferably includes a reader for reading the MICR account information printed on the check, and means for associating that data with information pertaining to the transaction at hand, including for example, the dollar amount of the transaction. This information is combined in a data record which is stored for future batch data transmission to a clearing house or the issuing bank itself. In an alternative embodiment, this data is communicated in real time to the clearing house or issuing bank. In another embodiment, one or more selection criteria are used to determine which checks will be processed in real time, with the remaining checks being processed in the batch mode. For example, checks written above a threshold dollar amount, out of state checks, or any other high risk checks are processed in real time in order to minimize losses due to fraudulent check use.

**19 Claims, 2 Drawing Sheets**





FIGURE 1   (PRIOR ART)

FDC5000152



*FIGURE 2*

FDC5000153

5,175,682

# CHECK SYSTEM AND METHOD INCLUDING PRIORITIZING CHECKS FOR TRANSMISSION TO BANKS FOR PROCESSING

## INTRODUCTION

### 1. Technical Field

This invention pertains to electronic data processing of financial instruments, and more specifically to a method and structure for clearing checks written by a customer.

### 2. Background

FIG. 1 shows the typical path by which a check 101 finds its way to the issuing bank such that the checking account user's account is debited. As shown in FIG. 1, the customer writes check 101 and presents it to merchant 102 as a convenient way for the customer to make a payment to merchant 102. The merchant will then, typically at the end of the day, provide the check (together with others received that day) to the merchant bank 103, as a deposit to the account which merchant 102 maintains in merchant bank 103. Merchant bank 103, after posting the checks to Merchant 102 account, forwards a batch of checks to the automated clearing house (ACH) 104, such as that provided by the National Automated Clearing House Association (NACHA) of Washington, D.C. ACH 104 sorts the checks by their issuing banks, electronically transmits information pertaining to the checks to Federal Reserve Bank 105, and forward the paper checks to the appropriate issuing banks. Federal Reserve Bank 105 in turn electronically transmits information to issuing bank 106 so that each check 101 is debited to the check writer's account maintained in issuing bank 106. Since the vast majority of checks clear without problems, checks are assumed to be valid. If, the account has been closed, or the account contains non-sufficient funds, issuing bank 106 has a certain period of time in which it must issue an exception report indicating that the check has not cleared. This information is communicated to Merchant Bank 103 so that the check amount can be deducted from the merchant's account in order to nullify the deposit to the merchant's account made by Merchant Bank 103 when it assumed that the check was valid.

Table 1 depicts the typical time delay and costs associated with each check taking the prior art path shown in FIG. 1. While these costs and time delays do not seem particularly large to the uninitiated, partly due to the fact that most consumers are accustomed to the time delays involving clearing checks, it is highly advantageous to merchants and financial institutions to speed the check clearing process and reduce the costs associated therewith. Over 55 billion checks are written annually, of which 10 to 15 billion are written to merchants at the point of sale (POS). Thus, the cost associated with processing these checks, as well as the time delays involved in transferring funds (i.e., the "float") result in a very large cost associated with check processing. Magnetically encoded checking account numbers are printed on checks in order to speed this process, yet as shown in Table 1 the process remains inherently slow and costly.

### TABLE 1

| | Appropriate Time Delay | Approximate Cost per check |
|---|---|---|
| Merchant to Merchant Bank | 1–5 days | $.05–.10 |
| Merchant Bank to ACH | 1 day | .01–.02 |

### TABLE 1-continued

| | Appropriate Time Delay | Approximate Cost per check |
|---|---|---|
| ACH to Federal Reserve | 1 day | .01 |
| Federal Reserve to Issuing Bank | 1 day | .01 |

It has been attempted to utilize debit cards in place of checks and credit cards in order to allow merchants to instantly debit a customer's account. However, there are a number of disadvantages with debit card systems. First, debit card systems require processing in real time. Not only does this cause a time delay to both the consumer and the merchant, but the costs of maintaining communication links for real time processing are expensive, on the order of $0.15 per transaction. Furthermore, checking accounts and credit cards are already widely held, and there is some reluctance on the part of consumers to embrace debit cards. Merchants who accept debit cards, such as those gas stations which allow customers to pay using their automated teller machine (ATM) cards, find many consumers unwilling to utilize their ATM cards due to the additional expense (typically $0.15–0.25 per transaction) and perhaps the psychological reluctance to allow a merchant direct debit access to their bank account.

Furthermore, due to a lack of industry standards, for example pertaining to electronic networks, personal identification numbers (PINs), and encryption keys, inadequate customer incentives, and high costs, the use of debit cards has not become widely accepted.

Another disadvantage utilizing the present method for clearing checks is that the long time delay allows fraudulent check writers an excessive amount of time during which they are free to write fraudulent checks before their checking account numbers are added to a list of problem checking accounts.

## SUMMARY OF THE INVENTION

In accordance with the teachings of this invention, a novel method and structure are provided for processing checks in an extremely timely and cost-effective manner. In accordance with the teachings of this invention, a check recipient, such as a merchant, utility billing department, and the like, utilize hardware and software for quickly gathering data from checks received in order to allow prompt processing of those checks. Such hardware preferably includes a reader for reading the MICR account information printed on the check, and means for associating that data with information pertaining to the transaction at hand, including for example, the dollar amount of the transaction. This information is combined in a data record which is stored for future batch data transmission to a clearing house or the issuing bank itself. In an alternative embodiment, this data is communicated in real time to the clearing house or issuing bank. In yet another embodiment of this invention, one or more selection criteria are used to determine which checks will be processed in real time, with the remaining checks being processed in the batch mode. For example, checks written above a threshold dollar amount, out of state checks, or any other high risk checks are processed in real time in order to minimize losses due to fraudulent check use.

FDC5000154

5,175,682

| 3 | 4 |

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 depicts the typical prior art process by which a check is written and ultimately returned to the issuing bank; and

FIG. 2 is a block diagram depicting one embodiment of a transaction system constructed in accordance with the teachings of this invention.

## DETAILED DESCRIPTION

FIG. 2 depicts one embodiment of a system for use by a merchant in accordance with the teachings of this invention. Merchant station 200 includes one or more point of sale systems 210 including, for example, point of sale terminal 201 such as a typical electronic cash register, or the like. Magnetic Ink Character Recognition (MICR) reader 202 is used for reading the magnetic account number printed on checks, which data is fed to POS terminal 201. Alternatively, the information pertaining to the check's account number, etc. can be entered in any convenient manner, for example via the keypad on the POS terminal 201, or via a customer identification card issued by the merchant. However, the use of the MICR reader allows greatest through put and accuracy. Printer 203 is used by POS terminal 201 for a variety of tasks, if desired, for example, printing a sales slip, printing validation information on a check, or printing a check receipt, as will be described in more detail later. POS terminal 201 is connected to backroom processor 204, such as those which are known in the prior art for maintaining sales information, performing price lookups, and inventory adjustment during the course of business. Telecommunications unit 205 is connected to backroom processor 204 and, if desired, directly to POS terminal 201 to allow data to be communicated to a check clearing house, for example.

The operation of the system of FIG. 2, in one embodiment, is as follows. The merchant utilizes POS terminal 201 to enter a transaction. POS terminal 201 can be, for example, a typical prior art electronic cash register, or a more sophisticated computer system. Alternatively, POS terminal 201 may be an accounts receivable system utilized by a public utility, for example, rather than the typical cash register found at a merchant.

The customer then tenders payment. Payments tendered utilizing credit cards, cash, or debit cards may be processed in a conventional manner. When the customer provides a check, however, the check is read by MICR reader 202 and the account information is provided to POS terminal 201. POS terminal 201 then provides additional information in order to create a data record for this transaction which is being paid for by check. Appropriate fields for this data record are, for example, as follows:

Date and Time

Merchant demand deposit account (DDA) number (checking account number)

Customer checking account No. and Routing information

Amount of check

Check No.

Any other discretionary data (electronic journaling)

Certain of this information can be provided automatically by POS terminal 201. Other information, such as amount the check is written for is provided by the merchant, for example via the POS keypad. Electronic journaling information is additional information which may either be retained by the merchant or used to provide a more precise indication of the nature of the purchase on the customer's monthly checking account statement. Such additional information may include, for example, the name of the merchant, the merchant's location, a summary of the goods for services provided, for example sorted by department in the department store. This electronic journaling information serves, for example, to reward the customer when reviewing his monthly statement that the charges appearing on the monthly statement are in fact correct. The merchant can use such additional information for other purposes, for example, to maintain some indication of a customer's buying preferences.

If desired, the data record is then used to verify check authorization, for example, by being compared to a positive file (which lists all allowable checking account numbers), or more likely against a negative file such as provided by SCAN of Seattle, Washington, Telecheck of Denver, Colorado or Telecredit of Florida, which provide information regarding known troublesome checking accounts. If such authorization is not provided, the transaction can, if desired, be cancelled by the merchant, thereby minimizing losses due to bad checks, as is well known.

Once authorization is provided (if the authorization step is performed), next the check is placed in printer 203 and validation information is printed on the check, if desired. Such validation information serves as an indication that electronic data pertaining to this check has been routed for collection, and that the check may thus be considered "cancelled." Such validation information includes, for example, information similar to a rubber endorsement stamp typically used by merchants who process checks in accordance with prior art techniques. Such information typically includes the merchant's name and the merchant's DDA number. The validation information prints in accordance with the teachings of this invention can also quite easily include the date and time of the transaction and language indicating that the check has been cancelled and is being cleared through to the customer's checking account electronically. Alternatively, other means can be used to provide validation information on the check, for example, a rubber stamp used for this purpose. While this is less desirable than using a printer, in certain circumstances it may obviate the need for additional printer, and a simple rubber stamp, or the like, can serve as a convenient backup in the event of printer failure. However, in a preferred embodiment, printer 203 is used for purposes in addition to providing validation information on a customer's check, for example, to assist in preparing credit card slips and the like.

The validated check is then returned to the customer for safekeeping, thus avoiding the need for the check to be physically transported through the system depicted in FIG. 1 for ultimate return to the customer. Alternatively, the check is retained by the merchant. This has the advantage of allowing the merchant to retain possession of the check in the event that there is a problem with its collection. In either event, whether the check is returned to the customer or retained by the merchant, a receipt is, if desired, printed and given to the customer indicating that payment has been made by check, and the check is being electronically cleared. This receipt can be either a part of or separate from another receipt indicating detailed information regarding the transaction just completed.

5,175,682

| 5 | 6 |

The data record thus created by POS terminal 201 can be added to a data file maintained by POS terminal 201 for batch uploading to backroom processor 204, for example, on a periodic basis or at the end of a shift. Alternatively, POS terminal 201 sends the data record to backroom processor 204 immediately, or as soon as backroom processor 204 is able to receive it. In this event, POS terminal 201 need only have sufficient storage capacity to serve as a buffer when there are delays in the ability of backroom processor 204 to receive data.

Periodically, backroom processor 204 will take the data records it has accumulated and upload them to a clearing house. Backroom processor 204 may first process the information, if desired. Various types of processing are possible, such as removing, that data pertaining to checks written on the one or more banks with which a merchant does its own banking as well as those bank affiliate banks. This data is then uploaded to the appropriate bank directly, without the need of traveling through the clearing house system. Other types of backroom processing may be performed prior to transmitting check data to the clearing house or directly to one or more banks. For example, checks written over a threshold dollar amount, out-of-state checks, or other checks thought to be high risk based upon other criteria can be selected in order to prioritize data to be uploaded to the ACH or directly to a bank.

If desired, priority uploads may be performed either by backroom processor 204 or POS terminal 201 which, in one embodiment, is directly linked to telecommunications unit 205. Such priority uploads may serve a number of functions. For example, small batches of records may be uploaded relatively frequently by backroom processor 204 either directly to a bank or to the clearing house. Such priority uploads may include, for example, those which are greater than a pre-determined dollar amount. In one embodiment, priority uploads are performed by POS terminal 201 in a real time basis, for example, when the check amount exceeds a predetermined dollar amount, when the check is an out-of-state check, or any other criteria which may be programmed or selected by the merchant "on the fly" which may lead the merchant to view a particular check with some suspicion. In this event, the transaction is delayed pending the real time upload, thereby reducing losses due to bad checks.

Following the upload by backroom processor 204 to one or more banks and clearing houses, an exception report is printed by backroom processor 204 indicating problem checks contained within the uploaded data file, for example, checks written on closed accounts, or accounts having non-sufficient funds. This exception report is prepared from information received from the issuing bank, and is either sent electronically or by printed media either directly to the merchant or to the merchant via the Merchant Bank, the Federal Reserve Bank, and/or an automated clearing house. In one embodiment, backroom processor 204 will again upload for clearing those checks which have not cleared. If desired, a predetermined delay can be used prior to uploading this data again, in order to allow the customer to replenish his checking account before the second and subsequent tries. Alternatively, other criteria can be established by the merchant for determining how to handle such problem checks noted in the exception report. For example, the time delay, if any, before uploading for clearing such problem checks which have not cleared, can be selected based upon a predetermined

set of criteria. Such criteria can include, for example, the time of day the check was written, the date the check was written, the day of the week the check was written, whether the check was written on an out-of-state bank account, or any other criteria selected by the merchant. For example, the merchant may determine that, statistically, different categories of checks should be handled differently in order to maximize the collection of such checks.

Thus, in accordance with the teachings of this invention, a check has essentially become the equivalent of an electronic debit card, but with significant advantages. The vast majority of consumers already have checking accounts, as compared with a smaller number have electronic debit cards. Therefore, the use of checks as debit cards in accordance with the teachings of this invention avoids the need for distributing or maintaining a separate debit card, with their associated costs. Furthermore, most consumers feel fairly comfortable with utilizing checks as a method of payment, far more comfortable than the use of electronic debit cards. The savings which will accrue to even a small merchant due to reduced bank paper handling fees, reduced losses due to bad checks, and more rapid availability of funds from checks will easily pay for the installation of hardware and software for use in accordance with the teachings of this invention.

In one embodiment to this invention, a primary record is used of, for example, 94 bytes as specified by the National Automated Clearinghouse Association (NACHA) 1990 ACH rules, specifically Appendix I entitled "ACH File Exchange Specifications". The "1990 ACH Rules" and the "1990 NACHA Operating Rules, Corporate Edition" are published by the National Automated Clearinghouse Association of Herndon, Virginia and are hereby incorporated by reference.

When such a primary record alone is used, the customer's monthly checking account statement will indicate for each check the date, check no., and amount without specific merchant information. Alternatively, each primary record is used with one or more appended records, for example each of an additional 94 bytes, to provide information such as the merchant's name and location and, if desired, more specific information such as the type of goods or services purchased, the quantity, and/or the exact name of the goods or services purchased can be included in such appended records for each purchase.

Due to the relatively small percentage of disputed checks, a preferred embodiment provides that the merchant electronically store all sales receipt line items, and provide to the clearing house a primary record only. In the case of disputed charges, the clearing house will request further information from the merchant, and the merchant transmits additional information to the clearing house as appended records to allow the clearing house to address the disputed charges. This minimizes the amount of information being transmitted, but allows full documentation to be transmitted in the event a particular check is disputed.

There are advantages in utilizing the teachings of this invention to the consumer, the merchant, and the banking system. The consumer advantages are that their time spent at a point of sale is reduced, as checks can be processed more quickly. Savings associated with bank processing of a customer's checking account may be passed on to the consumer.

FDC5000156

5,175,682

7

The merchant benefits from a number of advantages in accordance with the teachings of this invention. Merchants can receive a quicker deposit and thus faster access to funds from checks received from customers. Deposit fees will likely be less, since the merchant is providing electronic data, rather than a paper check. Additional deposit fees can be saved if the merchant provides encoding on each check, such as MICR encoding, indicating the amount of the check. Since this encoding of the check amount saves the merchant bank processing time, merchant banks typically charge the merchant approximately 10 cents per check deposited if the merchant encodes the amount on each check, as compared with approximately 15 cents per check deposited which are not so encoded by the merchant. Depositing is much easier as a merchant need not fill out paper deposit slips, including various information pertaining to each check, as well as a total, and need not physically transport a batch of checks with their deposit slips to a bank. Checks which do not clear, for example because they are drawn on an account which is closed or an account with non-sufficient funds, are detected much quicker, thereby allowing a greater likelihood of collecting on returned checks as it is well known that collectibility decreases rapidly with age. A merchant having multiple stores benefits in that a central location may be used for consolidating check data, thereby providing the benefit that a merchant's check processing facilities can be consolidated, if desired, and allow check processing to be accomplished in a timely manner without delays associated with physically transporting paper checks to the central location prior to electronically processing those checks. The merchants are also afforded a greater flexibility on check deposits and bank relationships in that, because paper checks need not be physically transported to the merchant's bank, the merchant can select a bank solely on the basis of business consideration rather than the banks geographical proximity to the merchant.

The advantages to the banks are decreased processing costs, decreased float, and an ability to achieve their desired automated transaction plans which have not been achieved to date in large part due to the failure in the debit card programs. Furthermore, the banks are able to compete on a national basis with greater ease since the need not be geographically close to their customers for the purposes of depositing checks. Also, the banks are capable of eliminating handling of the physical check and its ultimate return to the consumer. This saves a great deal of physical infrastructure, as well as costs. Furthermore, the banks are able to receive the benefits of a debit card system without the need to educate consumers and without the attendant costs involved in the issuance of separate debit cards.

Other benefits are available as well. For example, in one embodiment of this invention, notification to a number of parties who are interested in learning of problem checks is made automatically, routinely, and in a cost effective and timely manner. For example, when the issuing bank does not honor a check, the issuing bank issues an exception report. If desired, this exception report can be used by either the issuing bank, the Federal Reserve Bank, the Automated Clearing House, the merchant's bank, or the merchant itself in order to notify other interested parties. Such other interested parties include the merchant's bank which must deduct the amount of the check which has not be honored by the issuing bank, the merchant, the merchant's collec-

8

tion agency, check authorization services, and check verification services. By promptly notifying each of these parties, collections can be speeded, and problem checks can be minimized. Furthermore, by notifying each of these parties automatically, notification costs are decreased.

Accordingly, the teachings of this invention provide a novel method and structure for handling checks having significant advantages over the prior art check clearing system. In accordance with the teachings of this invention, check are utilized much as are debit cards, but without the attendant disadvantages experienced in debit cards which have thus far lead to their poor acceptance.

The invention now being fully described, it will be apparent to one of ordinary skill in the art that many changes and modifications can be made thereto without departing from the spirit or scope of the appended claims.

All publications and patent applications mentioned in this specification are herein incorporated by reference to the same extent as if each individual publication or patent application was specifically and individually indicated to be incorporated by reference.

What is claimed is:

1. A method for processing a check written on an account provided by a financial institution comprising the steps of:
   receiving from a customer a check as a method of payment;
   creating an electronic data record containing information pertaining to said check; and
   electronically transmitting said data record to said financial institution to obtain payment of said check by said financial institution, said step of transmitting said electronic record to said bank comprising the steps of:
      determining if said electronic record meets a test indicating said electronic record should be transmitted to said bank in real time;
      if said test is met, transmitting said electronic record to said bank in real time; and
      if said test is not met, adding said electronic record to a file including other electronic records pertaining to other checks, and transmitting said file to said bank in a batch mode.

2. A method as in claim 1 wherein said test indicating said electronic record should be transmitted to said bank in real time serve to detect one or more of the following conditions: the amount of the check is greater than a threshold amount, the check is an out-of-state check, the check has not been preapproved by a check verification or check guarantee service, and the check is deemed to be of high risk.

3. A method as in claim 1 which further comprises the step of, after creating said electronic data record, imprinting information on the check indicating that the check has been cancelled and sent for collection by electronic data transfer.

4. A method as in claim 3 which further comprises the step of, after said step of printing, returning said check to the customer.

5. A method as in the claim 3 which further comprises the step of, after step of printing, causing said merchant to retain said check.

6. A method as in claim 5 wherein, when the check is retained by the merchant, a receipt for the check is issued to the customer.

5,175,682

**9**

7. A method as in claim 6 wherein said receipt for the check comprises a portion of the standard sales receipt issued by the merchant.

8. A method as in claim 6 wherein said check receipt comprises a receipt separate from the normal sales receipt issued to the customer by the merchant.

9. A method as in claim 1 which further comprises the step of creating one or more additional electronic data records associated with said electronic data record for storing discretionary information regarding the sales transaction.

10. A method as in claim 9 which further comprises the step of electronically transmitting one or more of said additional data records with said data record to said financial institution.

11. A method as in claim 9 wherein said one or more additional data records are retained by the merchant in the event they are needed to verify a disputed transaction.

12. A method as in claim 11 wherein said one or more of said additional data records are electronically transmitted to said bank in the event of a disputed charge.

13. A method as in claim 1 which further comprises the steps of:

receiving an exception report indicating whether said check has not been honored by said financial institution; and

if said check has not been honored, again electronically transmitting said data record to said financial institution to obtain payment of said check by said

**10**

financial institution after a predetermined period of time.

14. A method as in claim 13 wherein said predetermined period of time is selected in accordance with a set of one or more parameters of said check.

15. A method as in claim 14 wherein said one or more parameters are selected from the group of parameters consisting of: time the check was written, date the check was written, amount of the check, location of said financial institution, and other criteria for believing said check to be high risk.

16. A method as in claim 1 which further comprises the steps of:

issuing an exception report if said check has not been honored by said financial institution; and

automatically notifying one or more of said merchant, said merchant's bank, a check verification service, a check authorization service, and a collection firm.

17. A method as in claim 1 wherein said electronic data record comprises transaction information provided by an electronic device and information from said check.

18. A method as in claim 17 wherein at least some of said information from said check is detected by a MICR reader.

19. A method as in claim 17 wherein said electronic device comprises a POS terminal or a computer system controlling the transaction information for which payment is being made by said check.

* * * * *

FDC5000158