## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

LML PATENT CORP.              )
                                      )
             Plaintiff,           )    Civil Action No.: 04-858-SLR
      vs.                            )
                                      )
TELECHECK SERVICES, INC.      )
ELECTRONIC CLEARING HOUSE, INC.,   )
XPRESSCHEX, INC., AND         )
NOVA INFORMATION SYSTEMS, INC.   )
                                      )
             Defendants.       )
                                      )

---

### DECLARATION OF LESLEY G. SMITH IN SUPPORT OF
### LML'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
### NO. 6: FOR A RULING THAT CLAIMS 1, 2, 4, 5, 6, 9, 10, 11, 14, 16 AND 18
### OF THE '988 PATENT ARE NOT INVALID
### FOR IMPROPER INVENTORSHIP UNDER 35 U.S.C. § 102(f)

Dated: November 23, 2005

Richard K. Herrmann #405
Mary B. Matterer #2696
MORRIS JAMES HITCHENS &
WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
(302) 888-6800
rherrmann@morrisjames.com
mmatterer@morrisjames.com

Russell E. Levine, P.C.
Jamie H. McDole
Edward K. Runyan
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

*Counsel for LML Patent Corp.*

## DECLARATION OF LESLEY G. SMITH

I, Lesley G. Smith, declare as follows:

1.  I am an associate of the law firm of Kirkland & Ellis LLP, and counsel for plaintiff LML Patent Corp. ("LML"). I am a member in good standing of the bar of the state of Illinois, and I am admitted to practice *pro hac vice* in the United States District Court for the District of Delaware for this case. The facts set forth below are known to me personally and I could competently testify hereto if called as a witness in this action.

2.  Attached hereto as Exhibit A is a true and copy of selected portions of the deposition of Steven R. Carlson.

3.  Attached hereto as Exhibit B is a true and correct copy of an email dated October 26, 2005 from Jamie McDole to Defendants' counsel, including Timothy Devlin, William Marsden, Robert Jacobs, Mark Mizrahi, Vision Winter, and Mark Scarsi.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on this 22nd day of November, 2005 in Chicago, Illinois.

_____
Lesley G. Smith

# EXHIBIT   A

**7/15/2005 Carlson, Steve**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LML PATENT CORP., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| -vs- | ) C.A. 04-858 (SLR) |
| | ) |
| TELECHECK SERVICES, INC., | ) |
| ELECTRONIC CLEARING HOUSE, INC., | ) |
| XPRESSCHEX, INC., and NOVA | ) |
| INFORMATION SYSTEMS, INC., | ) |
| | ) |
| Defendants. | ) |

TRANSCRIPT OF VIDEOTAPED

DEPOSITION OF STEVEN R. CARLSON

Taken At

Executive Conference Room

Radisson Inn

Bismarck, North Dakota

July 15, 2005

(APPEARANCES AS NOTED HEREIN)

**7/15/2005  Carlson, Steve**

1   "marketing firm"?

2          MS. SMITH:  Objection, calls for

3   speculation, lacks personal knowledge.

4          THE WITNESS:  It's probably what I told

5   her, because here's the thing.  We were in this         12:13:42

6   meeting with Bill Bares.  Phone goes.  Okay.  I

7   answer the phone.  Hi, this is so-and-so.  Have you

8   got a minute?  Yeah, sure.  I says, Mom, I'm going

9   to go downstairs in the office, I'm going to talk

10  to this guy.  I said, I'm sorry, Bill.  Can I?  He    12:13:58

11  says, Yeah, sure, go ahead.  So I go downstairs, I

12  sit at dad's gray metal desk, and I'm taking notes

13  like crazy, and this guy is talking to me.

14     Q.   (MS. MACK CONTINUING)  Had you ever spoken

15  to this person before?                                12:14:08

16     A.   I didn't -- I hadn't a clue who he was.

17  It came -- I mean, I'm in the middle of a meeting

18  and the phone goes.  I mean, this is --

19          MS. SMITH:  I'm going to object to the

20  last question.  Foundation.                           12:14:16

21          THE WITNESS:  Well, it was a phone call

22  from Mars.  I never heard of this guy before, you

23  know.  And so we had a conversation.

24     Q.   (MS. MACK CONTINUING)  And what did he

25  tell you his name was?                                12:14:24

7/15/2005  Carlson, Steve

1      MS. SMITH:  Objection, foundation, calls

2   for speculation.

3      THE WITNESS:  Hill or Hills or something

4   like that, I think.

5      Q.   (MS. MACK CONTINUING)  Do you remember how   12:14:34

6   long your conversation with him lasted?

7      A.   It was quite lengthy, I'm thinking,

8   because I remember going back upstairs and having

9   to apologize to Bill and saying, Gosh, I'm sorry.

10   It might have been 45 minutes or so.  It was quite   12:14:46

11   lengthy.

12      Q.   Do you remember what you discussed with

13   Mr. Hills?

14      A.   Well, remember where we were now.  We were

15   looking for people to help us with our patents.  We   12:15:02

16   were looking for people who wanted to invest.  We

17   were looking for people who maybe would say, Hey,

18   we'll do a prototype for you, we'll partner with

19   you in any useful way.

20      And so I think I have some notes on this   12:15:16

21   somewhere.  They're not in front of me now.

22   Obviously we were talking about our patents.  We

23   were talking about where we saw the industry

24   growing, what transACT could bring to the table.

25   We were saying, you know, this is what we're doing.   12:15:32

### 7/15/2005  Carlson, Steve

```
1          And I noticed that the curious thing was,

2     he didn't have a lot to say.  I mean, he was asking

3     lots of questions, and I was telling him things,

4     because I thought he was interested in becoming a

5     partner.  So I don't know as I was guarding my          12:15:50

6     conversation much.

7          Q.   What gave you the impression that he was

8     interested in becoming a partner?

9          A.   Well, maybe he didn't say as much.  Maybe

10    I assumed it, hopefully.  Maybe I thought, gosh,        12:16:00

11    this guy can help us, and, in my North Dakota

12    innocence, opened up my mouth and talked, you know,

13    because obviously I didn't have any reason not to

14    say things to him.

15          And then after a while I kind of got -- I          12:16:18

16    don't want to say cold feet, but it didn't ring

17    quite right, you know, it didn't seem right

18    somehow.  When I got away from the conversation I

19    thought, huh, that was funny, that was curious.

20    And then I re-engaged immediately in talking to         12:16:36

21    Mr. Bares.  But I did make some notes during

22    talking to him.

23          Q.   Did Mr. Hills ask you about your patent

24    specifically?

25          A.   I'm sure he did, yeah.                        12:16:48
```

120

1      Q.    Did he ask you if you had any patents?

2      A.    Well, I mean, you have to look at the

3   facts.  The facts were, if I hadn't had a patent,

4   why on earth would he have called me if he didn't

5   suspect that we had something or he could            12:17:12

6   contribute something or whatever, we were a threat.

7   I don't know.

8            MS. SMITH:  Move to strike witness's --

9   sorry.  You can finish.

10           THE WITNESS:  Go ahead.                      12:17:26

11           MS. SMITH:  Move to strike witness's

12   testimony as nonresponsive.

13      Q.    (MS. MACK CONTINUING)  Did you perceive

14   Mr. Hills to be a threat to you?

15           MS. SMITH:  Objection, vague, calls for      12:17:34

16   speculation.

17           THE WITNESS:  I remember being quite

18   excited about this at first.  Mom was very excited.

19   But the fact that we never communicated again says

20   to me caution, or maybe it says he has nothing to    12:17:48

21   offer, maybe it says -- you know, we never

22   communicated again.  Now, if you'll look through

23   the records, people like Don Hayden, for example,

24   who seemed up front and seemed sincere and helped,

25   gosh, we have lots of information.  We got lots of   12:18:14

7/15/2005 Carlson, Steve

```
1    notes, lots of conversations, several times.

2            This guy calls one time out of the blue,

3    boom, he seems interested, we -- me, out of habit,

4    out of hope, out of -- thank God I got a call

5    that's going to actually do something for us,          12:18:34

6    because we didn't get a lot phone calls.  This one

7    sticks out in my mind because it's one of maybe two

8    that we went Eureka out of.  Okay?  That's why it

9    sticks out in my mind.  But the fact that we never

10   called him back or never communicated again says      12:18:50

11   that we said, no, something is wrong, you know.

12       Q.   (MS. MACK CONTINUING)   So you're certain

13   that you never called him back?

14           MS. SMITH:  Objection, leading.

15           THE WITNESS:  I don't think I ever did.  I     12:19:00

16   don't know for sure, but I don't think I did.

17       Q.   (MS. MACK CONTINUING)   Did Mr. Hills tell

18   you whether he was working for a corporation?

19       A.   Seems to me he identified himself as --

20   see, because we were looking for marketing people,     12:19:18

21   we were looking for technology people, and he said

22   to me, I think, something -- he was in marketing or

23   I'm a marketing director or something like that.

24   And I think I made notes of that fact.

25           But I talked to him because at first I         12:19:36
```

122

7/15/2005  Carlson, Steve

1    thought he had something genuinely to offer.  If

2    you look through all of our records, we were

3    looking for marketing people.  And as part of

4    ED&F's helping us, there were some young

5    marketing -- fledgling marketing firms in North        12:19:56

6    Dakota who sent us poop sheets that said, Hey, we

7    can help you out.  We couldn't afford to hire them,

8    you know, but the fact that he was lumped into the

9    marketing, I thought, well, maybe this guy's got

10   something.                                             12:20:08

11         MS. SMITH:  Move to strike witness's

12   testimony as nonresponsive.

13         MS. MACK:  Can we mark as the next exhibit

14   in order a handwritten page that's written on a

15   file folder label called WTC Bob Hills.  And at the    12:20:20

16   same time I'd like to mark the next two exhibits in

17   order, and we'll look at them all together.  The

18   next one is a page of handwritten notes that says

19   Bob Hills, director marketing, at the top, and is

20   dated April 27, 1992.  And as the next exhibit in      12:20:56

21   line, a one-page handwritten document labeled on

22   the left-hand side O'Connell NDC.  And we'll talk

23   about these all three together.

24         (Deposition Exhibits 27, 28 and 29 were

25   marked for identification by the reporter.)            12:21:46

123

**7/15/2005  Carlson, Steve**

1    THE WITNESS:  Well, it's all my

2    handwriting except this here on 29 on the left

3    side.  That's mom's handwriting.

4    Q.  (MS. MACK CONTINUING)  Okay.  Do you

5    remember taking these notes, "these" meaning all    12:22:26

6    three of these exhibits that contain your

7    handwriting?

8    A.  I remember 27 and 28.  29 I don't recall

9    because -- I mean, 29 on the left is my mom's

10   handwriting, you know.  Like I said, she was always   12:22:40

11   taking notes on stuff.  The one on the right

12   obviously is my handwriting, and it must have been

13   a message I gave to dad.  So that one I don't

14   recall very much.  These other two -- this probably

15   was in the heat of the conversation because --    12:22:56

16   Q.  When you say "this," which exhibit are you

17   pointing to?

18   A.  27.

19   Q.  Okay.

20   A.  Because you see how I wrote it.  It's all   12:23:04

21   scattered out.  And I probably -- there was

22   probably a file folder laying there.  And remember

23   he called out of the blue while I was in the

24   meeting with Mr. Bares, mom and dad.  I said, I'm

25   going to go downstairs and take this, because I   12:23:20

**7/15/2005  Carlson, Steve**

```
 1    didn't want to interrupt their conversation.  They

 2    had family things to talk about.

 3           So I went downstairs, and there was

 4    probably a file folder laying there and I started

 5    writing on the first thing I could find, and this        12:23:34

 6    was laying on dad's desk.  And so these are -- I

 7    know for a fact that Number 27 are notes that I

 8    took while I was on the phone with the man.

 9       Q.   And -- I'm sorry.  I didn't mean to

10    interrupt you.                                           12:23:46

11       A.   You had a question?  Well, anyway now,

12    28 -- these might have been notes later on.  Maybe

13    this is the same time frame.  I can't be sure of

14    that.

15       Q.   Let's talk first about this large page,        12:24:02

16    Exhibit 27.  It says at the top:  Bob Hills,

17    director of marketing, WTC Corp.  Had you ever

18    heard of WTC Corp before April 21, 1992?

19       A.   No.

20       Q.   Did Mr. Hills tell you that day what            12:24:20

21    business WTC Corporation was in?

22       A.   Well, he identified himself as director of

23    marketing right off the bat.  So my mind was

24    switching to marketing right away.  Okay.  We

25    talked about lots of things that were going on out      12:24:40
```

7/15/2005  Carlson, Steve

```
 1    there but -- I forgot your question.  I'm sorry.

 2         Q.    Did he tell you what the business of WTC

 3    Corporation was?

 4         A.    Oh.  Well, other than the fact that he

 5    identified himself as director of marketing, I          12:24:52

 6    assumed that they would -- because we were looking

 7    for a real knowledgeable marketing.  We were

 8    looking for somebody that could get to the big

 9    companies, that could help us open doors, and so

10    on.  So that's probably why I talked to the man.       12:25:08

11         Q.    So did you think that he was a

12    marketing -- that WTC Corporation was a marketing

13    firm when you spoke to him?

14         A.    I think so.  That's why it's written down

15    that way.                                               12:25:20

16         Q.    Did Mr. Hills tell you that WTC

17    Corporation was pursuing a patent of its own?

18         A.    Well, if he would have said that, believe

19    me, I would have made a note of it.

20         Q.    Did he tell you that WTC Corporation was   12:25:34

21    in the business of doing anything but marketing

22    other people's products?

23              MS. SMITH:  Objection, leading.

24              THE WITNESS:  Oh, I can't be a hundred

25    percent sure.  I mean, this is a long time ago.        12:25:48
```

```
 1    But I believe my notes here reflect my concept of

 2    his potential, you know.

 3         Q.   (MS. MACK CONTINUING)  If he had told you

 4    that WTC Corporation was building its own product

 5    of some sort, would you have written that down?      12:26:06

 6              MS. SMITH:  Objection, calls for

 7    speculation.

 8              THE WITNESS:  Yes, ma'am, I sure would

 9    have.  See, that was part of the thing that kind

10    of -- I don't know.  I was kind of -- I was         12:26:26

11    exhilarated by the phone call and yet kind of, you

12    know, warning, warning, beware at the same time,

13    because we were in North Dakota.  We were nobodies.

14    This is a guy who presented himself as a mover and

15    a shaker.                                            12:26:46

16              MS. SMITH:  Move to strike witness's

17    testimony as nonresponsive.

18         Q.   (MS. MACK CONTINUING)  Why do you say that

19    he presented himself as a mover and a shaker?

20         A.   By the fact --                             12:26:58

21              MS. SMITH:  Objection, lacks foundation.

22              THE WITNESS:  I'm sorry.  I keep doing

23    that.

24         Q.   (MS. MACK CONTINUING)  You can answer the

25    question.                                            12:27:06
```

1      A.    Okay.  By the fact that a person always

2    looks at somebody out there as an expert, you know,

3    because you always have this hopeful gaze that this

4    is our savior, this is the person who can help us.

5    Okay.  So he called out of the blue.  I mean,                12:27:24

6    lightning struck; right?  So I'm thinking, how does

7    this guy know us?  The only way he could possibly

8    know about us is from our patents or -- or someone

9    else in the industry who had passed our name along

10   to him.  I mean, how else could he find out about        12:27:42

11   us?  We weren't exactly the most high profile

12   company on the planet, you know.

13      Q.    Did he -- sorry.

14      A.    Well, I guess I was done.

15      Q.    Did he tell you that he had read your            12:27:54

16   patents?

17      A.    I don't recall that remark.

18      Q.    The very center of the page has a notation

19   that reads:  Conceptual design and development

20   work, product design, sales support.  Are those          12:28:12

21   capabilities that Mr. Hills held himself out as

22   being able to offer you during that conversation?

23           MS. SMITH:  Objection, leading.

24      Q.    (MS. MACK CONTINUING)  You can answer.

25      A.    I wrote that down there because that was        12:28:24

7/15/2005  Carlson, Steve

1   probably, What does he do?  And he probably said,

2   We do conceptual design, development work, and I

3   wrote that down.  Otherwise it wouldn't be there.

4   Because that's not something I would write on my

5   own.                                    12:28:40

6       Q.   Did he tell you that he was doing

7   development work on a competitive product of his

8   own?

9            MS. SMITH:  Objection, leading.

10           THE WITNESS:  I didn't get that         12:28:50

11  impression.  See -- can I say something more?

12      Q.   (MS. MACK CONTINUING)  You can say

13  whatever you like.

14      A.   If he would have said things like, Oh, we

15  have our own patents and we're doing this and doing  12:29:04

16  that and you're tromping all over us -- if he'd

17  have been really, really threatening, okay, the

18  phone conversation would have been much, much

19  shorter.  I mean, you know, I wouldn't have hung up

20  on the guy but, Nice talking to you, you know.      12:29:18

21           MS. SMITH:  Objection.  Move to strike

22  witness's testimony as nonresponsive.

23      Q.   (MS. MACK CONTINUING)  Let me ask a

24  different question then.  If Mr. Hills had said

25  something to you like, I'm developing a competitive  12:29:34

7/15/2005 Carlson, Steve

```
1      product, or, I'm applying for a patent of my own in
2      this area, would you have continued to speak to him
3      for 45 minutes?
4          A.   No.
5              MS. SMITH:  Objection, calls for           12:29:46
6      speculation, lacks foundation, improper
7      hypothetical.
8          Q.   (MS. MACK CONTINUING)  You can answer.
9          A.   No.  But if he'd have said something like
10     that, believe me, those notes would be here,        12:29:54
11     because that's what we do.
12         Q.   The next notation down from that on the
13     page says:  Rich Wagner programming at VeriFone.
14     Do you know who Rich Wagner is?
15         A.   Haven't got a clue.                         12:30:08
16         Q.   Did Mr. Hills tell you that VeriFone is
17     "pretty cooperative unless you're threatening
18     them"?
19             MS. SMITH:  Objection, leading.
20             THE WITNESS:  Well, I think it says "is"    12:30:20
21     circled.  I think -- the way I write notes, so
22     spurious.  I think Mr. Hills probably said, Oh, I
23     know a guy named Rich Wagner, a programming guy at
24     VeriFone.  He's pretty cooperative unless you're
25     threatening them.  Something like that.  I mean, I  12:30:42
```

130

**7/15/2005  Carlson, Steve**

1    think the two notes go together.

2         Q.   (MS. MACK CONTINUING)  Did Mr. Hills tell

3    you how he knew that Mr. Wagner was cooperative

4    unless he was being threatened?

5              MS. SMITH:  Objection.                    12:30:52

6              THE WITNESS:  No.

7              MS. SMITH:  Assumes facts not in evidence,

8    foundation, calls for speculation.

9         Q.   (MS. MACK CONTINUING)  You can answer.

10        A.   Sorry.  I'm getting hypersensitive now.    12:30:58

11   The question was -- did he say what?

12        Q.   (MS. MACK CONTINUING)  Did he tell you

13   that Mr. Wagner was -- did he tell you how he knew

14   that Mr. Wagner was cooperative unless he was being

15   threatened?                                         12:31:18

16             MS. SMITH:  Same objections.

17             THE WITNESS:  No.  But, I mean, the

18   implication certainly was that he knew him.

19        Q.   (MS. MACK CONTINUING)  Okay.  Did he --

20   did Mr. Hills tell you anything else about VeriFone  12:31:28

21   during this conversation?

22        A.   Well, the next note down says:  VeriFone

23   is developing a very poor MICR system but it's now

24   on the back burner.

25        Q.   So Mr. Hills told you in 1992 that he knew  12:31:42

7/15/2005 Carlson, Steve

1    that VeriFone was developing a MICR system?

2              MS. SMITH:  Objection, leading, calls for

3    speculation, assumes facts not in evidence.

4              THE WITNESS:  Well, it's on the same page

5    with the same notes.                          12:31:58

6         Q.   (MS. MACK CONTINUING)  Did Mr. Hills ever

7    mention the name Higashiyama to you?  That's

8    H-i-g-a-s-h-i-y-a-m-a.

9         A.   No.  No.

10        Q.   Did Mr. Hills ever tell you how he knew   12:32:12

11   that VeriFone was developing a MICR system?

12             MS. SMITH:  Objection, assumes facts not

13   in evidence, lacks foundation.

14             THE WITNESS:  No.

15        Q.   (MS. MACK CONTINUING)  Did Mr. Hills tell  12:32:26

16   you how he knew that VeriFone's MICR system was

17   being back burnered?

18             MS. SMITH:  Objection, lacks foundation,

19   assumes facts not in evidence.

20             THE WITNESS:  No.  No.  I mean, my notes   12:32:40

21   are -- I was making notes as he was talking, and

22   that's all I know.

23        Q.   (MS. MACK CONTINUING)  Before your

24   conversation on the 21st of April with Mr. Hills,

25   were you aware of any program at VeriFone to        12:33:14

132

**7/15/2005 Carlson, Steve**

1   develop a MICR system?

2       A.   No.

3       Q.   Did you know who VeriFone was in 1992?

4       A.   Oh, sure.

5       Q.   Is the fact that this notation is on the          12:33:34

6   page a reflection of the fact that Mr. Hills told

7   you that VeriFone was developing a MICR system?

8            MS. SMITH:  Objection, leading.

9       Q.   (MS. MACK CONTINUING)  You can answer.

10      A.   Absolutely, because that's why it was          12:33:48

11  written down, because this was, oh, my God,

12  somebody else is going where we're going.  It

13  was --

14      Q.   Okay.  So you didn't write that down

15  because you knew that --                                  12:33:58

16      A.   No.

17      Q.   -- as background information?

18           MS. SMITH:  Objection, leading.

19      Q.   (MS. MACK CONTINUING)  You can answer.

20      A.   I didn't write that down because what?          12:34:06

21      Q.   You didn't write that down because you

22  knew that on your own, did you?

23      A.   Oh, no.  How would I know that?

24           MS. SMITH:  Same objection.

25      Q.   (MS. MACK CONTINUING)  What was Fargo          12:34:16

7/15/2005  Carlson, Steve

1    Equipment?

2        A.    Fargo Equipment is -- let's see.  What was

3    that guy's name?  A young fellow I met through

4    church was starting to go into electronics

5    manufacture.  I don't know why that's on there.        12:34:30

6    Maybe I told him about Fargo Equipment or

7    something.

8        Q.    Why would you have mentioned Fargo

9    Equipment to Mr. Hills?

10        A.    I have no idea.  I'm trying to make that      12:34:42

11    connection myself.

12        Q.    Do you know what an Onyx MICR is?

13        A.    No.  Maybe that's the Fargo Equipment

14    connection.  I don't know.

15        Q.    Could the Onyx -- strike that.  Did          12:34:52

16    Mr. Hills tell you that the Onyx MICR system was

17    the name of the system VeriFone was developing?

18            MS. SMITH:  Objection, leading.

19            THE WITNESS:  The fact that it's on this

20    page of notes, it probably came from Mr. Hills        12:35:08

21    because I wouldn't have known anything about that

22    by myself.

23        Q.    (MS. MACK CONTINUING)  What is Columbus

24    Bank & Trust in Columbus, Georgia?

25        A.    Where do you see that?  Oh.                  12:35:24

134

7/15/2005 Carlson, Steve

1      Q.    It's in the box here on the side.

2      A.    That obviously came from Mr. Hills too, or

3    this conversation.  Maybe it was -- I don't know.

4    I can't make that connection.  He might have -- I

5    never knew there was a Columbus Bank & Trust until    12:35:46

6    this conversation.  I don't know what we talked

7    about with that one.

8      Q.    Why did Mr. Hills -- strike that.  Did

9    Mr. Hills ask you to phone -- ask you to phone him

10   back after this conversation?                         12:36:00

11     A.    I don't recall that.  I don't know.

12     Q.    Did he ask you to send him copies of your

13   patents during this conversation?

14     A.    Oh, I don't know.

15     Q.    Did he ask you detailed questions about      12:36:26

16   any of your three patents during this conversation

17   on April 21st?

18     A.    Quite a few.

19           MS. SMITH:  Objection, leading.

20           THE WITNESS:  Quite a few.                    12:36:38

21     Q.    (MS. MACK CONTINUING)  Do you remember any

22   of those specifically?

23     A.    No, but --

24           MS. SMITH:  Objection, calls for

25   speculation.                                          12:36:42

135

7/15/2005  Carlson, Steve

1          THE WITNESS:  No.  It's so long ago.  I

2    mean, you know, we were kind of excited about this

3    guy, and then, you know, there's another note here

4    on the next page, on 28, that says:  4-27, Bob will

5    talk to Henry Nichols, whoever the heck that is.     12:36:56

6         Q.    (MS. MACK CONTINUING)   Have you ever heard

7    the name Henry R. Nichols before?

8         A.    I have it written here.

9         Q.    Had you heard it before April 27, '92?

10        A.    No.                                         12:37:10

11        Q.    Have you ever heard the name Chip Nichols?

12        A.    No.

13        Q.    Is the fact that 4-27-92 is written on

14   Exhibit 28 a reflection of the fact that Bob Hills

15   called you again on April 27, 1992?                   12:37:22

16        MS. SMITH:  Objection, leading.

17        THE WITNESS:  He must have.

18        Q.    (MS. MACK CONTINUING)   And Mr. Hills told

19   you that Mr. Nichols was a VeriFone employee?

20        MS. SMITH:  Objection, leading, lack of          12:37:44

21   foundation.

22        THE WITNESS:  Well, to answer your

23   question, I would say look at Exhibit 28, and then

24   on the side it says -- let's see.  What does it

25   say?  Command performance.  I can't hardly read       12:37:56

136

7/15/2005 Carlson, Steve

```
1     that.  Anyway, it says:  Will talk to Henry R.
2     Nichols, original VeriFone men.
3         Q.   (MS. MACK CONTINUING)   Did you write that
4     because you knew that Henry R. Nichols was an
5     original VeriFone man?                          12:38:14
6              MS. SMITH:  Objection, leading.
7              THE WITNESS:  Well, I would have -- I
8     wouldn't have known that if it wasn't -- where else
9     was that?  Well, it's here, this 4-27-92.  I had no
10    idea who that was.  I didn't have a clue.  I mean,   12:38:26
11    all of this stuff, it's Bob Hills' notes.  You
12    know, I wasn't telling him anything except what he
13    asked me.  These names, I didn't know them.  I
14    didn't make them up.
15             MS. SMITH:  Objection.  Move to strike    12:38:42
16    witness's testimony as nonresponsive.
17             MS. MACK:  Why don't we take a lunch
18    break.  Is that all right?
19             THE WITNESS:  Thank you.
20             THE VIDEOGRAPHER:  We're off the video at   12:38:50
21    12:39.
22             (Recessed at 12:39 P.M. until 2:02 P.M.)
23             THE VIDEOGRAPHER:  We're back on the video
24    at 2:02.
25        Q.   (MS. MACK CONTINUING)   Welcome back from   14:02:10
```

137

**7/15/2005  Carlson, Steve**

```
1     lunch, Steve.   Before we left for lunch we were

2     talking about Exhibits 27, 28 and 29, and I'd just

3     like to go back, I guess, to first Exhibit 27 and

4     take those slowly piece by piece.   Can you read the

5     first line on this page for me of Exhibit 27?      14:02:34

6          A.   Read the first line?

7          Q.   Yes.   Just read it aloud.

8          A.   It says:  Called 4-21-92 while Dr. Bares

9     was here.

10         Q.   And what does that mean?             14:02:48

11         A.   Well, that's probably something I -- after

12    I wrote down the next line which is Bob Hills,

13    director of marketing, I probably went up there and

14    at the close of the conversation or whatever put

15    the notes on it and tried to finalize this thing.   14:03:02

16         Q.   So why did you write "called 4-21-92"?

17         A.   Because that's the day that this Mr. Hills

18    called me.

19         Q.   Okay.  And could you read the third line

20    for me, please?                              14:03:18

21         A.   Third line?

22         Q.   Yeah.

23         A.   Bob Hills, director of marketing.

24         Q.   And what does that mean?

25              MS. SMITH:  Objection, vague.       14:03:26
```

7/15/2005  Carlson, Steve

```
 1            THE WITNESS:  Well, that means that some

 2     fellow by the name of Bob Hills identified himself

 3     as the director of marketing and he called me and I

 4     talked to him.

 5       Q.   (MS. MACK CONTINUING)  And did he          14:03:38

 6     direct -- did he identify himself as the director

 7     of marketing of any particular company?

 8       A.   Well, yes.  He went on to say, I'm Bob

 9     Hills, director of marketing, I'm with the WTC

10     Corporation.  And he later gave me his address, and  14:03:50

11     that's Box 341.

12       Q.   In what city?

13       A.   St. Augustine, Florida.

14       Q.   And to the side of that notation could you

15     read what is written off beside the name Bob Hills?  14:04:04

16       A.   To the left?

17       Q.   Yes.

18       A.   It says:  Automate checks from programming

19     standpoint.

20       Q.   What does that mean?                        14:04:16

21       A.   I'm not sure.  He probably said that to

22     me, something about automate checks from

23     programming standpoint, because that's not language

24     I would have used.  That would have come from him.

25     And I wrote that down simply because it seemed like  14:04:30
```

1    it's something I should be worried about, and I

2    just wrote it down.

3        Q.    Am I -- is there a question mark there, or

4    just like a little tick mark that kind of strayed?

5    I can't tell if that's punctuation or not.          14:04:44

6        A.    After "point"?

7        Q.    Yeah.

8        A.    That's a very hasty period.

9        Q.    Okay.  Could you read what's in the box

10   below the sentence you just read?                  14:04:52

11       A.    It says:  Columbus Bank & Trust, Columbus,

12   Georgia, issuer of AT&T card.

13       Q.    What does that mean?

14       A.    Well, again, it's something that had to

15   come from him, because I wasn't aware that they did 14:05:04

16   that.  But he might have said that in the course of

17   conversation, making a point about something.  I

18   don't know.  I have no idea.

19       Q.    Do you see the notation directly to the

20   right of that?  It starts with speedy network.     14:05:16

21       A.    Yes.  It says:  Speedy network, moves

22   fast.  It says:  Citi-net Corp, Citicorp.  And then

23   it says:  Sioux Falls, South Dakota, for sale.

24       Q.    What does that mean?

25           MS. SMITH:  Objection.  The document        14:05:34

140

1      speaks for itself.

2              THE WITNESS:  Well, he must have told me

3      that this particular thing is for sale, and I don't

4      know why he would have said anything.  But all of

5      this came up in the course of conversation          14:05:42

6      obviously.  I don't know.

7          Q.   (MS. MACK CONTINUING)   Is Citi-net Corp a

8      corporation you were familiar with as of this date?

9          A.   Well, Citicorp, of course, is a big bank.

10     But Citi-net I guess is something I guess I hadn't   14:06:00

11     heard of until I wrote it here.

12         Q.   And the next bracketed sentence below that

13     right in the middle of the page, can you read that

14     aloud?

15         A.   It says:  Conceptual design and           14:06:16

16     development work, product design, sales support.

17         Q.   What does that mean?

18             MS. SMITH:  Objection, document speaks for

19     itself, speculation.

20             THE WITNESS:  Well, obviously it's          14:06:28

21     something that -- he probably said, We do

22     conceptual design and development work and we do

23     product design and sales support.  That's why I

24     would have written something like that down.  And

25     the reason I probably would have written it down is  14:06:40

7/15/2005 Carlson, Steve

1    because that's kind of what we were looking for.

2        Q.    (MS. MACK CONTINUING)  And below that

3    where it says Rich Wagner, could you read that

4    portion of the page, please.

5        A.    Well, the next one says:  Rich Wagner       14:06:50

6    programming at VeriFone.  And that's kind of

7    connected to the one below it.  The whole thing

8    would probably read:  Rich Wagner programming at

9    VeriFone is "pretty cooperative unless you're

10   threatening them."  And it says -- to the right of    14:07:04

11   that it says:  says Bob Hills.

12       Q.    And what does that mean?

13            MS. SMITH:  Objection, asked and answered,

14   document speaks for itself, calls for speculation.

15       Q.    (MS. MACK CONTINUING)  You can answer.       14:07:18

16       A.    Well, it says what it says.  He told me

17   that this Rich Wagner is pretty cooperative unless

18   you're threatening them.  And I'm thinking to

19   myself, Why would I need to know that?  But I'm

20   pretty sure the conversation talked about VeriFone    14:07:36

21   a little bit, and I wouldn't have brought the

22   subject up myself because I'm not VeriFone.

23       Q.    And do you see a bit off to the side left

24   of the bracketed portion you just read that begins

25   with the word "Fargo"?                                14:07:54

142

7/15/2005 Carlson, Steve

1    A.    Yeah, Fargo Equipment.

2    Q.    And why is that on this page?

3         MS. SMITH:  Objection, asked and answered.

4         THE WITNESS:  I'm not really sure why that

5    was there.  That may have been a note to myself.    14:08:04

6    There is a company at that -- well, there was at

7    that time, there may still be, something about

8    Fargo Equipment, and it was a fellow I met through

9    church one time in Fargo, and I don't recall his

10   name.  I could probably find it here somewhere.    14:08:20

11        But he was a bright young lad, and they

12   were working in a company called Fargo Equipment,

13   and they were trying to make stuff.  And I thought

14   maybe this would be a connection, and I might have

15   wrote it down.  I don't know.  I really don't know    14:08:36

16   why that's there.

17   Q.    (MS. MACK CONTINUING)  And can you read

18   the rest of the text there at the bottom of the

19   page, please.

20   A.    Well, to the right of that it says:    14:08:44

21   VeriFone is developing, and underneath the "p" on

22   phone it says:  a very poor MICR system.  And then

23   I have under that -- it says:  Onyx, O-n-y-x, in

24   quotes.  To the right of that it says:  MICR.  And

25   I'm thinking that maybe Onyx is something these    14:09:00

**7/15/2005  Carlson, Steve**

1    guys called their device.  I don't know.  Then it

2    says -- and over there it says:  Is now back

3    burnered.  I wouldn't have known that by myself,

4    and so I wrote it down because I thought it might

5    be useful for us.  And I think maybe -- I think          14:09:14

6    maybe -- maybe I was trying to be discouraged from

7    pursuing MICR because -- I don't know.

8         MS. SMITH:  Objection.  Move to strike as

9    nonresponsive.

10       Q.  (MS. MACK CONTINUING)  Did you feel like     14:09:34

11   Mr. Hills was trying to discourage you from

12   developing a MICR system?

13       MS. SMITH:  Objection, calls for

14   speculation, lacks foundation.

15       Q.  (MS. MACK CONTINUING)  You can answer.        14:09:42

16       A.  I guess that's where I was going.  It kind

17   of -- that's -- we were in a very defensive mode.

18   You know what I'm saying?  We were protecting

19   ourselves, and yet I was reaching out trying to

20   find something that could help us.  And if I          14:09:56

21   thought something was threatening, I would have

22   written it down.  And if I thought something was

23   prospective, I would have written it down.  I mean,

24   anything that would help our cause one way or

25   another, I would have written it down.  And that's    14:10:08

144

1    why these particular notes are here.

2        Q.    Did Mr. Hills tell you that VeriFone is

3    developing a very poor MICR system?

4        A.    Well, obviously he did because it's here,

5    and I had no idea they were doing that. How would    14:10:26

6    I know?  I'm in North Dakota.  I'm not in the --

7    exactly in the loop.

8        Q.    And what did you mean when you wrote "is

9    now back burnered"?

10        MS. SMITH:   Objection, document speaks for    14:10:38

11    itself, asked and answered.

12        THE WITNESS:  Well, I got from the

13    conversation that they were developing a very poor

14    MICR system and they kind of decided to put it on

15    the back burner, not worry about it, not pursue it    14:10:50

16    too hard for a while, because back burnered means

17    put it off for a while, table it for a while.

18        Q.    (MS. MACK CONTINUING)  Okay.  Aside from

19    what is on this page, do you recall any additional

20    details of your discussion on this day with    14:11:04

21    Mr. Hills?

22        A.    Not really, no.

23        Q.    Okay.  Let's go to Exhibit 28.  Could you

24    read the first four lines on Exhibit 28 aloud?

25        A.    Bob Hills, director of marketing, WTC    14:11:38

7/15/2005  Carlson, Steve

1    Corporation, St. Augustine, Florida, zip code

2    32085, and a phone number, 904/826-0135.  It's

3    probably how to get a hold of Bob, that phone

4    number.

5        Q.    (MS. MACK CONTINUING)   Do you see a date        14:11:52

6    anywhere on that page?

7        A.    Sure.

8        Q.    And what is that date?

9        A.    It says 4-27-92.

10       Q.    What does that mean?                            14:11:58

11            MS. SMITH:   Objection, document speaks for

12   itself, calls for speculation.

13            THE WITNESS:   Well, I may have talked to

14   Bob Hills again on that day, and Bob will -- it

15   says here:  Bob will talk to Henry R. Nichols who       14:12:14

16   was ground floor at VeriFone and talk to him about

17   us.

18            Now, he either called me again on the

19   27th, which I don't remember, but if it's here and

20   he did, that's there, or he was going to call him       14:12:26

21   on 4-27.  But the way it's put here, I would think

22   that somehow we had a conversation with Bob via

23   letter or phone or something, and Bob said, I'll

24   talk to Henry Nichols, and so forth, and I wrote

25   down "who was on the ground floor at VeriFone and       14:12:48

146

7/15/2005 Carlson, Steve

1    talk to him about us," in other words, about

2    transACT.

3        Q.    (MS. MACK CONTINUING)  Did Mr. Hills tell

4    you what he was going to talk to Mr. Nichols about?

5        A.    Well, I assumed that he would talk to us      14:12:58

6    about our patents, but I have no -- I mean, that's

7    the way this reads, and I was pretty -- I thought,

8    well, gee, you know, VeriFone is someone to stay

9    away from.  Why talk to him about us?  I guess I

10   was a little confused.  I'm really not sure what he    14:13:14

11   was going to talk about, but it says about us.  And

12   by "us" I mean probably the three patents that we

13   had.

14       Q.    Okay.  Can you read that sentence again

15   where Bob will talk to Henry R. Nichols who was       14:13:30

16   ground floor at VeriFone?  What does "ground floor

17   at VeriFone" mean?

18           MS. SMITH:  Objection, document speaks for

19   itself, calls for speculation.

20           THE WITNESS:  Well, when I use the term        14:13:46

21   "ground floor" and I think when most people use the

22   term "ground floor," that means one of the founders

23   probably at VeriFone or very, very close -- one of

24   the first few hired perhaps.

25       Q.    (MS. MACK CONTINUING)  Okay.  And if you     14:13:58

147

**7/15/2005 Carlson, Steve**

1   can turn to what's written on the right margin of

2   the page, can you read the text that's slanting up

3   the right side vertically?

4       A.   Well, my copy may be not as good as

5   others.  Mine says:  Command performance.  And then     14:14:14

6   it says -- I think it says:  S-a-t.  I can't read

7   that.  Does it say satellite or something?  I can't

8   read that.  And then it says something else.

9   V-o-a -- I don't know if my copy is any better than

10  anyone else's.  Anyway, it says here again:  Will      14:14:32

11  talk to Henry R. Nichols, original VeriFone men.

12      Q.   And what does that mean?

13          MS. SMITH:  Objection, document speaks for

14  itself, calls for speculation.  I'd also like to

15  note for the record that there's a line between       14:14:46

16  "Nichols" and "VeriFone."

17          THE WITNESS:  Yeah, there is.  Well, what

18  does it mean?  I don't know.  Command performance.

19  If I could read that next word, I might be able to

20  answer your question.                                 14:14:58

21      Q.   (MS. MACK CONTINUING)  What does the

22  sentence "Will talk to Henry R. Nichols" mean?

23          MS. SMITH:  Objection, asked and answered,

24  document speaks for itself.

25          THE WITNESS:  Well, in this connection, I    14:15:10

                                                              148

7/15/2005 Carlson, Steve

1    don't know what that means.  I think, again, being

2    in the hopeful mood that we were, we were -- we

3    would be -- at that time would be happy that

4    somebody is going to talk with somebody else on our

5    behalf and perhaps get something moving for us.      14:15:24

6    That's probably the context in which I wrote it.

7        Q.    (MS. MACK CONTINUING)  And who is the

8    person who was going to talk to Mr. Nichols?

9        MS. SMITH:  Objection, lacks foundation,

10   calls for speculation.                              14:15:34

11       THE WITNESS:  Well, since it's on the same

12   page as the Bob Hills paper, I have to assume

13   it's -- I'd have to assume it was Mr. Hills.

14       Q.    (MS. MACK CONTINUING)  And did you put a

15   line between Henry R. Nichols and VeriFone to       14:15:46

16   signify that they have no relationship?

17       MS. SMITH:  Objection, calls for

18   speculation.

19       THE WITNESS:  I don't know.  This could be

20   just doodling too.  You know, there's doodling all  14:15:56

21   over these things.  Like the brackets on Exhibit

22   27, I doodle sometimes like that.  It doesn't mean

23   that they're separate events.  It just means I

24   doodle, you know, talking on the phone.  Nervous

25   habit maybe.  I don't know.                         14:16:18

149

**7/15/2005 Carlson, Steve**

1    Q.    (MS. MACK CONTINUING)    When you're talking

2    about the doodling that you do when you're on the

3    phone, can you tell me what notations on the page

4    you're referencing?

5    A.    On this page?                           14:16:28

6    Q.    Yeah.

7    A.    On 28?

8    Q.    Yeah.

9    A.    Well, like, for example, sometimes I try

10    to make things stand out.    Like where it says on    14:16:42

11    the right-hand side -- it says, excuse me, 5-1/2

12    cents to 30 cents for transaction.    Sometimes I do

13    that to try to make things stand out.    And I think

14    if you look through all my materials, you'll see a

15    lot of that kind of thing.    I circle things, I put    14:16:58

16    boxes around them to draw my attention to them so

17    that they stand out more.

18    Q.    Did you put a box around "original

19    VeriFone men" to make that stand out?

20         MS. SMITH:    Objection, calls for             14:17:12

21    speculation.

22         THE WITNESS:    Possibly.

23    Q.    (MS. MACK CONTINUING)    Did you understand

24    that Mr. Hills was telling you that Henry R.

25    Nichols was an original VeriFone man?             14:17:20

150

7/15/2005  Carlson, Steve

1        MS. SMITH:  Objection, leading, calls for

2    speculation.

3        THE WITNESS:  Well, yeah, because over

4    here I have it again where it says 4-27-92.  I

5    mean, there's no doubt in my mind that Mr. Hills       14:17:32

6    told me that this Mr. Nichols fellow was on the

7    ground floor, one of the first employees of

8    VeriFone.  There's no doubt in my mind that that's

9    what this page says.

10       Q.   (MS. MACK CONTINUING)  And can you read       14:17:48

11   what's written below the line horizontally

12   splitting the page?

13       A.   It says:  Limited amount of incentives for

14   R&D.

15       Q.   What does that mean?                          14:17:58

16       MS. SMITH:  Objection, calls for

17   speculation, document speaks for itself.

18       THE WITNESS:  I probably asked him if he

19   had any money for R&D that we could tap, and he

20   probably responded, We have a limited amount of       14:18:12

21   incentives, and so forth and so on.  Because, you

22   know, I can't make any other connection since it's

23   on this page.

24       Q.   (MS. MACK CONTINUING)  You see where it

25   says 5-1/2 cents/30 something?                         14:18:34

7/15/2005 Carlson, Steve

1    A.    S-e -- does that say 30 seconds?  Is that

2    what that says?  It's hard to read here.  But it

3    says transaction.  Possibly it means 5-1/2 cents

4    and it takes 30 seconds per transaction, something

5    like that.                                    14:18:52

6          MS. SMITH:  Objection.  Move to strike as

7    nonresponsive.

8    Q.    (MS. MACK CONTINUING)  Will you read that

9    aloud and please tell me what it means.

10   A.    Well, in this little box it says:  5-1/2    14:19:04

11   cents/30 seconds, I believe is what that means, and

12   I take that -- I take that to mean that Bob had

13   told me that it takes 5-1/2 cents and about 30

14   seconds to do each TeleCheck or electronic funds

15   check perhaps.                                14:19:30

16   Q.    And can you read the portion in the box

17   below that beginning with "AT&T" and tell me what

18   that means?

19   A.    Well, that says:  AT&T Mega Com Plus.  And

20   it says:  Get our own network going, says Bob.    14:19:46

21   Now, apparently Bob had said AT&T has a new

22   communication thing called Mega Com Plux -- Mega

23   Com Plus, I'm sorry, and maybe we could get our own

24   network going or something.  Or maybe he said, You

25   should get your own network going or something.    14:20:10

**7/15/2005  Carlson, Steve**

```
1    Because AT&T -- we were talking to AT&T at one time

2    about communications.  But anyway --

3         MS. SMITH:  Move to strike as

4    nonresponsive.

5         Q.   (MS. MACK CONTINUING)  Were you ever     14:20:20

6    speaking to AT&T at any point about your

7    inventions?

8         A.   Yes.

9         Q.   And what did you disclose to them?

10        A.   To AT&T?                                  14:20:26

11        Q.   To AT&T.

12        A.   Well, as I recall, at that time the

13   chairman of the board of AT&T was a North Dakota

14   native, and probably the connection was made

15   probably from the Governor's office or AT&T or one  14:20:42

16   of our senators that said, Hey, you ought to call

17   up so-and-so at AT&T, he's the chairman of the

18   board, he's from North Dakota, maybe he can help

19   you out.  And so I -- we talked to him a little

20   bit.                                                14:21:00

21        Q.   Can you read the portion in the middle

22   that begins with "I told" and follows with a series

23   of numbers?

24        A.   Well, again, that's the same kind of

25   doodling as on this other exhibit, Number 27.  But  14:21:12
```

153

7/15/2005  Carlson, Steve

1   I told apparently -- this is obvious to me.  It

2   says:  I told Bob Hills that we were looking

3   somewhere between five hundred and nine hundred

4   thousand dollars that we needed for R&D to make a

5   prototype.                                14:21:26

6        MS. SMITH:  Objection.  Move to strike as

7   nonresponsive.

8     Q.  (MS. MACK CONTINUING)  Will you read that

9   again, and please tell me what it means.

10       MS. SMITH:  Objection to taking the words   14:21:32

11  of the document out of context.

12    Q.  (MS. MACK CONTINUING)  You can answer the

13  question exactly the way it was posed.

14    A.   Well, by what's written here, I told --

15  and I told -- it's on the same Bob Hills page, so   14:21:50

16  obviously I told Bob that we needed somewhere

17  between five hundred and nine hundred thousand

18  dollars for R&D.  That probably connects to the

19  line above it that says:  Limited amount of

20  incentives for R&D.  And that's probably -- they   14:22:08

21  probably connect somehow.

22    Q.  And the box to the left that says "get

23  IRS," can you read that and tell me what it means?

24       MS. SMITH:  Objection, taking the words of

25  the document out of context, calls for speculation.  14:22:24

7/15/2005  Carlson, Steve

1    Q.    (MS. MACK CONTINUING)   You can answer.

2    A.    Well, this is a note to myself probably

3    that I should get the IRS Form 6765 because somehow

4    it pertained to this conversation.   I don't recall

5    I ever did that.                              14:22:40

6    Q.    Do you recall in what way it pertained to

7    this conversation?

8    A.    No, I don't.

9    Q.    Do you recall if Mr. Hills asked you

10   anything else about your inventions during this    14:22:48

11   conversation?

12   A.    Well, it was quite a lengthy conversation

13   and, you know, being excited to find somebody that

14   may help us, I probably told him a lot more than I

15   should have.  But specifically what I told him, I   14:23:10

16   wouldn't have talked about much of anything else

17   except here's our patents and we need some money.

18   Q.    Did you ever learn whether Mr. Hills spoke

19   to Mr. Nichols about your inventions?

20   A.    No.  I have no record or recollection of     14:23:26

21   that at all, whether he talked to this Nichols

22   fellow at all.

23   Q.    Were you ever contacted personally by

24   Mr. Nichols?

25   A.    Not to my recollection.                      14:23:36

155

7/15/2005 Carlson, Steve

1       Q.    Were you ever contacted again personally

2    by Mr. Hills?

3       A.    After this 4-27?

4       Q.    Right.

5       A.    I don't think so, and I don't think I have    14:23:44

6    any record of this either.

7       Q.    Did Mr. Hills tell you during this

8    discussion that he was filing a patent application

9    for the same subject matter covered in your

10    patents?                                               14:23:52

11       A.    No.

12            MS. SMITH:  Objection, calls for

13    speculation, lacks foundation.

14       Q.    (MS. MACK CONTINUING)  You can answer.

15       A.    No.  I got no indication.  See, he -- we    14:24:00

16    thought he was a marketing guy.  We thought he was

17    going to help us market it, open doors for us, get

18    us to the right people.  I had no indication that

19    he was a manufacturer or inventor or anything.  I

20    thought he was a marketing guy.                       14:24:14

21            MS. SMITH:  Move to strike witness's

22    testimony as nonresponsive.

23       Q.    (MS. MACK CONTINUING)  What did you

24    believe Mr. Hills was calling you in his capacity

25    for at WTC Corporation?                               14:24:24

156

7/15/2005 Carlson, Steve

 1          MS. SMITH:  Objection, lacks foundation,

 2   calls for speculation.

 3          Q.   (MS. MACK CONTINUING)   You can answer.

 4          A.   Why was he calling me?

 5          Q.   Mm-hmm.  What capacity did he tell you he      14:24:34

 6   was calling you in?

 7          MS. SMITH:  Objection.

 8          THE WITNESS:  Well, the note on the

 9   other -- on 27, it says he identified himself as

10   the director of marketing.                              14:24:44

11          Q.   (MS. MACK CONTINUING)   On 28, how did he

12   identify himself?

13          A.   On 28?  Well --

14          MS. SMITH:  Same objections.

15          THE WITNESS:  I suppose I said, Oh, this          14:24:54

16   is Bob Hills, and I said, I just talked to him a

17   few days ago or whatever, and I probably made the

18   same connection, he's a marketing guy.  And being a

19   marketing guy, I would have told him all the cool

20   things about our device because maybe he could use      14:25:06

21   this information to help sell our stuff to maybe

22   these VeriFone people or something.  I didn't know

23   where he was going with it.  I mean, he came at me

24   like a marketing guy.

25          MS. SMITH:  Move to strike witness's             14:25:18

157

7/15/2005 Carlson, Steve

1    testimony as nonresponsive.

2        Q.   (MS. MACK CONTINUING)   Did he offer to

3    sell your product to anyone else?

4        A.   I don't think so.

5        Q.   Did he tell you that he had invented any    14:25:34

6    technology of his own of any nature?

7        A.   I don't recall that at all.

8        Q.   Did he tell you that he ever had plans to

9    file a patent of any nature?

10       A.   No, ma'am.                                   14:25:48

11       Q.   Let's go to Exhibit 29.   And can you tell

12   me who O'Connell at NDC is?

13           MS. SMITH:   Objection, lacks foundation,

14   calls for speculation.

15       Q.   (MS. MACK CONTINUING)   You can answer.      14:26:10

16       A.   If I knew what NDC was, I maybe -- who's

17   NDC?  See, this is my mom's handwriting, so I don't

18   know what that means.  O'Connell is a name that

19   comes to mind.  I mean, I recognize the name.  NDC.

20   What does that stand for?  Obviously this O'Connell   14:26:34

21   fellow is connected with NDC.

22       Q.   Have you heard of National Data

23   Corporation?

24       A.   Ah, there you go.  That's what it is,

25   yeah.                                                 14:26:44

158

# EXHIBIT   B

| | | |
|---|---|---|
| Jamie McDole/Chicago/Kirkland-Ellis | To | tdevlin@fr.com, marsden@fr.com, RJacobs@bjtlaw.com, mmizrahi@bjtlaw.com, vwinter@omm.com, mscarsi@omm.com |
| 10/26/2005 11:28 AM | cc | "Herrmann, Richard " <rherrmann@morrisjames.com>, Russell Levine/Chicago/Kirkland-Ellis |
| | bcc | |
| | Subject | LML v. TeleCheck – Improper Inventorship Defense |

Counsel:

Could you please let us know if Defendants intend to maintain their improper inventorship defense with respect to the '988 patent.  While the defense is briefly mentioned in interrogatory responses, no detailed supplement has ever been made and the issue was not raised in Mr. Kurrasch's report.  We would like to know so as to avoid filing motions (and excessive paper) before Judge Robinson that are no longer contested or at issue.

Thanks,

Jamie McDole

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of November, 2005, I electronically filed the foregoing document, **DECLARATION OF LESLEY G. SMITH IN SUPPORT OF LML'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT NO. 6: FOR A RULING THAT CLAIMS 1, 2, 4, 5, 6, 9, 10, 11, 14, 16 AND 18 OF THE '988 PATENT ARE NOT INVALID FOR IMPROPER INVENTORSHIP UNDER 35 U.S.C. § 102(f)**, with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Collins J. Seitz, Jr., Esq.
Francis DiGiovanni, Esq.
Connolly Bove Lodge & Hutz LLP
1007 North Orange Street
Wilmington, DE  19801

William J. Marsden, Jr., Esq.
Timothy Devlin, Esq.
Fish & Richardson, P.C.
919 North Market Street, Suite 1100
Wilmington, DE  19801

Richard D. Kirk, Esq.
The Bayard Firm
222 Delaware Avenue, 9th Floor
Wilmington, DE  19801

Additionally, I hereby certify that on the 23rd day of November, 2005, the foregoing document was served via email and federal express on the following non-registered participants:

Robert Jacobs, Esq.
Mark B. Mizrahi, Esq.
Belasco Jacobs & Townsley, LLP
Howard Hughes Center
6100 Center Drive, Suite 630
Los Angeles, CA  90045

Mark C. Scarsi, Esq.
Vision L. Winter, Esq.
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA  90071

Richard K. Herrmann (#405)
Mary B. Matterer (#2696)
MORRIS, JAMES, HITCHENS
& WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
(302) 888-6800
mmatterer@morrisjames.com

*Counsel for Plaintiff LML PATENT CORP.*