IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LML PATENT CORP.,

        Plaintiff,

v.

TELECHECK SERVICES, INC.,
ELECTRONIC CLEARING HOUSE, INC.,
XPRESSCHEX, INC. and NOVA
INFORMATION SYSTEMS, INC.,

        Defendants.

C.A. 04-858 (SLR)

**FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER
"OUTSIDE COUNSEL'S EYES ONLY"**

## ECHO AND XPRESSCHEX'S BRIEF IN REPLY BRIEF IN SUPPORT OF ECHO'S MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT

Francis DiGiovanni, Esq. (#3189)
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 North Orange Street
Wilmington, DE 19801
Phone: 302-658-9141
Fax: 302-658-5614
Attorneys for Electronic Clearing House, Inc.
and XpressChex, Inc.

OF COUNSEL:
Robert Jacobs, Esq. (Pro Hac Vice)
Mark Mizrahi, Esq. (Pro Hac Vice)
Don H. Min, Esq. (Pro Hac Vice)
BELASCO JACOBS & TOWNSLEY, LLP
6100 Center Drive, Suite 630
Los Angeles, CA 90045
Phone: (310) 743-1188
Fax: (310) 743-1189

Dated: November 23, 2005

## <u>TABLE OF CONTENTS</u>

Page

I.    INTRODUCTION ........................................................................................... 1

II.   RESPONSE TO LML's "STATEMENT OF FACTS" ....................................... 3

      B. Completing and signing the check  ................................................................ 6

III.  RESPONSE TO LML'S ARGUMENT ........................................................... 6

      A. The Declaration of Kris Winckler and the Exhibits Attached Therein Meet the
         Requirements of FRCP 56(e), and Should Not Be Stricken ............................... 6

         1.   ECHO Provided LML with Exhibits Relied Upon by Mr. Winckler ............................ 6

              a.   Source Code Exhibits................................................................. 6

              b.   Revised Manuals and Specification Exhibits........................................... 7

              c.   Publicly Available Exhibits ......................................................... 8

         2.   Mr. Winckler's Declaration is Based on Personal Knowledge and Competency to
              Testify on the Matters Stated Therein............................................... 8

         3.   Mr. Winckler's Declaration is Consistent with His Prior Deposition Testimony .......... 9

      B. Under Either Parties' Construction, ECHO Does Not Infringe the Asserted Claims Because
         ECHO's ECC Service Does Not Accept and Process "Any Check"..................................... 9

         1.   LML's Complaints Relating to Mr. Schutze Declaration Are Unfounded................. 10

         2.   ECHO'S ECC Service Does Not Communicate with the ACH Network to Transfer
              Funds Based on "Any Bank Check".................................................. 11

         3.   Defendants' Construction Is Consistent with the Preferred     Embodiment Described
              in the Specification ........................................................... 13

      C. Under Either Parties' Construction, ECHO Does Not Infringe the Asserted    Claims
         Because ECHO's ECC Service Does Not Conduct Electronic     Checking Transactions
         "Without Using the [Bank] Check as a Negotiable     Instrument" ...................... 14

         1.   ECHO Does Not Meet This Limitation Under Defendants' Construction................. 14

         2.   LML's strained attempt to show that the term "the check, at no time, takes on the status
              of a negotiable instrument" is met because Redacted                    does not raise a
              genuine issue of material fact ................................................. 16

i

3. LML's argument that mere capability to process transactions without using the check as a negotiable instrument is legally flawed and insufficient to raise a genuine issue of material fact ............................................................................................................ 17

4. Intel Did Not Promulgate a Broad Rule of Law Regarding Infringement.................... 20

## TABLE OF AUTHORITIES

**Cases**

*Application of Benson,*
  418 F.2d 1251 (C.C.P.A. 1969) ............................................................................... 21

*Barthelemy v. Air Line Pilots Association,*
  897 F2d 999 (9th Cir. 1990) ...................................................................................... 9

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.,*
  424 F.3d 1293 (Fed. Cir. 2005) ............................................................................... 20

*Fantasy Sports,* [need full citation]
  287 F.3d at 1117 ........................................................................................................ 20

*High Tech Medical Instrumentation v. New Image Indus.,*
  49 F.3d 1551 (Fed. Cir. 1995) .......................................................................... 19, 20

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,*
  381 F.3d 1111 (Fed. Cir. 2004) ............................................................................... 12

*Intel Corp v. Int'l Trade Comm'n,*
  946 F.2d 821 (Fed. Cir. 1991) .......................................................................... 19, 20

*Maxwell v. J. Baker, Inc.,*
  86 F.3d 1098, 39 U.S.P.Q.2d 1001,1006 (Fed. Cir. 1996),
  cert. denied, 117 S. Ct. 1244 (1997) ......................................................................... 2

*Pause Techn., LLC v. TiVo Inc.,*
  419 F.3d 1326 (Fed. Cir. 2005) ............................................................................... 12

*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005) ............................................................................... 14

*ZMI Corp. v. Cardiac Resuscitator Corp.,*
  844 F.2d 1576 (Fed. Cir. 1988) ............................................................................... 21

*Zygo Corp. v. Wyko Corp.,*
  79 F.3d 1563 (Fed. Cir. 1996) ................................................................................. 20

## I.    INTRODUCTION

In its Opposition, LML falsely suggests that the patentees of U.S. Patent No. 5,484,988 (the "patent-in-suit") invented the first checkwriting point of sale system that negates the need for the merchant to physically take the check to the issuing bank; and that the Patent Office recognized this revolutionary system by awarding the patentees a very broad patent. The arguments in LML's Opposition, and the claim constructions LML propose, are premised on this grossly inaccurate portrayal of the facts. In reality, there were many prior art patents disclosing checkwriting point of sale systems that negated the need for the merchant to physically take the check to the issuing bank. Further, despite the patentees' attempt to obtain a patent with broad scope, their application was repeatedly rejected and amended over a period of 4 years until the claims were narrowed sufficiently for the Patent Office to allow the claims to issue.

Importantly, the claims were not allowed until they were narrowed to require the ability to receive or read information from, and transfer funds from the account of, "any bank check," and further contained the requirement that the point-of-sale transaction occur "without using the bank check as a negotiable instrument." The importance of these claim terms can not be overstated. They constitute the inventive portions of the claims. Without these claim terms, the claims were invalid based upon the art before the Examiner, as repeatedly evidenced by the many Patent Office rejections over 4 years. Any suggestion in LML's Opposition that these terms had no real significance, or that the Court should not consider the many arguments made by the patentees during the application process to differentiate their invention from the prior art to overcome rejections, is disingenuous at best. These terms, and the arguments made during prosecution that gave specific meaning to these terms, define the patentee's invention.

LML's characterizations of the claims and claim construction arguments often hinge on its improper infusion of various unclaimed embodiments and features from the specification into the asserted claims in an effort to reclaim claim scope forfeited during the prosecution. By way of example only, LML has repeatedly asserted that the fact that manual keypad entry of consumer bank account information was disclosed in the *specification*, then it must also be an element of the asserted claims. In truth, however, the manual keypad entry embodiment, like the specialized credit card embodiment, was left unclaimed. The specification discloses three ways for a point-of-sale terminal to obtain information for subsequent debiting of a consumer's account. First, a check reader (magnetic or optical) can be connected to terminal and used to

1

read information directly from the check. Second, a card reader can be connected to the terminal and used to read information directly from a credit card. Third, the information can be manually input via a keypad connected to, or integral with, the terminal. (*See* Ex. A[1], Abstract.) The specification also discloses the ability of the merchant to reject certain checks based on check-writer risk, as discussed in LML's Opposition. The above referenced portions of the specification support the claims, <u>as originally filed</u>, but they do not support the repeatedly amended and narrowed claims that ultimately issued and are asserted in this litigation.

The argument in LML's Opposition, that limitations should be imported from the specification into the claims because they are part of the preferred embodiment, ignores the fact that these are unclaimed limitations that are not in the asserted claims. The original application, and numerous amendments along the way, broadly claimed terminals adapted to receive information without specifying whether that information was received from a check, from a card, or from a person entering it through a keypad. However, the patentees were forced to narrow the claims, specifying that the terminal receives the information <u>from</u> any check, in order to obtain allowance. LML's proposed construction ignores this narrowing amendment, and improperly seeks to put back the disclaimed ability of the terminal to obtain the information from a card or a person, simply because it is discussed in the preferred embodiment. Subject matter that was alternatively disclosed but unclaimed is deemed to have been affirmatively dedicated to the public as the result of accepting the patent protection without seeking review and examination of broader or more specifically directed claims. *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1106-07, 39 U.S.P.Q.2d 1001,1006 (Fed. Cir. 1996), cert. denied, 117 S. Ct. 1244 (1997)

LML incorrectly states that ECHO's arguments do not support a finding of non-infringement under LML's proposed constructions. As stated in ECHO's opening brief (e.g., page 28), ECHO's ECC Service limits the types of checks that can be used and thus ECHO does not meet the specific claim elements in which the "any bank check" limitations appear in each independent claim This holds true under either parties' constructions.

As set forth below, LML incorrectly concludes that ECHO has not shown as a matter of law that it is entitled to summary judgment.

---

[1] Unless otherwise indicated, references to lettered exhibits cited in this reply brief are attached to the previously filed Declaration of Timothy Devlin in Support of Telecheck's Motion for Summary Judgment of Non-infringement. Citations to patent text in this brief are of the form x:y, where "x" represents the column number and "y" the line number.

## II.    RESPONSE TO LML's "STATEMENT OF FACTS"

### A.    Consumer bank account information may not be manually entered

At page 6, lines 2-5 of its Opposition and elsewhere, LML's incorrectly states that the consumer bank account information from the check can be manually entered. None of the exhibits cited by LML, however, support its claim that manual key-pad entry of consumer bank account information into the terminal is permitted with ECHO's ECC Service. For example, nowhere in Ex. 7, Redacted

, does it state that manual entry is permitted for the ECC Service. This manual relates to numerous applications for the terminal, including credit card and debit cards. (*See, e.g.*, Smith Decl. Exhibit 7 at pg.. Redacted )[2] The cited pages by LML in support of its assertion that ECHO's terminals permit hand-key entry for its ECC Service demonstrate either a lack of understanding of ECHO's ECC Service or LML's desire to mislead the Court. While page Redacted relates to ECHO's ECC Service -- as opposed to one of the other services for which the terminal may be used -- Redacted

On the contrary, Redacted

# Redacted

As explained in the Winckler Decl.[3], the "verification only" and "ECC Service" are two mutually exclusive service options, such that when the "verification only" service is selected on the terminal the merchant cannot switch to the ECC Service mid-stream no more than the merchant could switch from a "verification only" transaction to a credit card transaction mid stream. (Winckler Decl., ¶¶ 42-44.)

---

[2] "Smith Decl." refers to the Declaration of Lesley G. Smith in Support of LML's Memorandum in Opposition to ECHO's Motion for Summary Judgment of Non-Infringement and the exhibits attached therein.
[3] "Winckler Decl." refers to the Declaration of Kris Winckler in Support of Electronic Clearing House, Inc.'s and Xpresschex, Inc.'s Motion for Summary Judgment of Non-Infringement and the exhibits referenced therein submitted previously.

# Redacted

Similarly, Redacted

In such an event, the merchant can ignore the risk

recommendation and elect to have the check converted to an electronic item. It is stated expressly

Redacted                                                                    See discussion of

Redacted        above, where it is made clear that in such a scenario the merchant keeps the paper check.

LML's citation to Exhibit 8 of the Smith Decl., pg. Redacted     , is likewise misplaced. In fact,

this marketing piece expressly states: "Your clerk feeds the check through the RDM Scanner/Omni 3200

where the MICR information and check image is captured." LML's citation to the Smith Decl., Exhibit 8,

pg. ECHO000683 favors ECHO's position. Both high-level diagrams on the page state that "Check scanned

in terminal": No other mode of MICR entry is described.

Exhibit 11 to the Smith Decl. is the Operating Guide for the Redacted                      . Page

Redacted        referenced by LML explains what to do if the check is unreadable. It explicitly provides

that Redacted

Finally, Exhibit 2 to the Smith Decl., at paragraph 21 (referenced by LML in support of the alleged

three modes of providing MICR lines to the POS terminal) confirms that for ECHO's ECC Service the

MICR line is read, not hand-keyed-in. LML's expert states: Redacted

LML then argues that, because the POS terminals used with ECHO's ECC Service possess

keyboards that can be used for other services (*e.g.*, credit cards, debit cards, check verification, etc.), then the

terminals are adapted to receive consumer bank account information from any bank check in connection with

ECHO's ECC Service. The fact is, however, that the ECC Service is a distinct service from credit card

payments, debit card payments and check verification. Therefore, the fact that the keyboard on a POS

terminal may be used to process credit card transactions is not relevant to whether the keyboard may be used with the ECC Service to enter consumer bank account information.

For each desired service, be it credit card, verification only, ECC Service, etc., the merchant Redacted                          to engage the specific service. For each transaction type, when one such service is selected the other is prevented from being utilized. That is, upon the initiation of a transaction – be it a credit card transaction or ECHO ECC Service transaction -- the merchant is prompted to select the transaction type. This is where the sixth roadblock discussed in ECHO's moving papers and the Winckler Decl. is set up. The sixth roadblock includes Redacted that disables the POS terminals from receiving manual input of bank account information when the ECC Service selection is made by the merchant. This is true for ECHO merchants, whether that merchant contracts for ECHO's ECC Service without the separate "verification only" service or not. Redacted

. (Winckler Decl., ¶ 43.)

Next, LML's asserts that the above evidence proffered by ECHO, Redacted
, conflicts with Mr. Winckler's prior deposition testimony.    Mr. Winckler's testimony at his deposition, however, is entirely consistent. When asked at his deposition whether ECHO permits keypad entry and he responded: Redacted

(See, Smith Decl. Ex. 13, Winckler Depo. at 89:21-90:5.)  After having researched the matter further, as it turns out, Redacted
. (Winckler Decl. ¶43, footnote 1)  Moreover, nothing in any of the exhibits cited by LML, namely Exhs. 7, 11, or 25 discussed above indicate otherwise.

In a last desperate attempt to show that the POS terminals used with ECHO's ECC Service are "adapted to receive consumer bank account information from any bank check," at page 25, lines 2-5 of its Opposition, LML argues that because the POS terminals theoretically "have the capability (through ports on the terminals themselves) to connect to a wide range of commercial [equipment]" then the terminals are themselves adapted to receive information from these peripherals, whether or not such peripherals are actually present. With due respect, this is argument is simply ludicrous. In essence, LML is arguing that if ECHO's ECC Service was different it would infringe. The fact is, as evidenced in the Winckler Decl. e.g., ¶¶ 19-38, that the POS terminals when used with the ECC Service are not capable of receiving consumer

5

bank account information by any means other than through a Redacted

LML's citation to the Smith Decl., Ex. 24 Redacted                          in support

of its argument is equally hopeless.  The document expressly states that Redacted

**B.     Completing and signing the check**

At page 6, line 6 of LML's Opposition, LML quotes ECHO's outdated merchant manual (Smith

Exh. 12 at ECHO000855) in support of its assertion that it is not necessary for the check writer to

compete and sign the check.  In any event, LML fails to state that ECHO000864 of the same Exhibit 12

cited by LML states:  Redacted

                                                                                        "

Significantly, this stated preference has now been formalized into a requirement.  (Winckler Decl. ¶88,

Ex. 1 referenced therein at pg. ECHO00027574 stating Redacted

Regardless, ECHO's research has disclosed that ECHO merchants actually have Redacted

                                                . (Winckler Decl. ¶85.) Redacted

                                        . (Winckler Decl., ¶¶ 85-86).

**III.    RESPONSE TO LML'S ARGUMENT**

**A.     The Declaration of Kris Winckler and the Exhibits Attached Therein Meet
the Requirements of FRCP 56(e), and Should Not Be Stricken**

**1.     ECHO Provided LML with Exhibits Relied Upon by Mr. Winckler**

LML's response brief and the declaration of Jamie McDole submitted therewith contain

numerous misrepresentations and omissions regarding the course of discovery in this Action.  LML's

attempt to challenge the substance of Mr. Winckler's declaration on purely procedural grounds is

misguided.

**a.     Source Code Exhibits**

Exhibits 8-9, 11, 13, 14-18 and 20-26 consist of Redacted        for ECHO's ECC Service; *inter alia,*

Redacted                                    and Redacted                        .  Contrary to LML's

6

contentions, ECHO first offered the aforementioned source code for LML's inspection, but LML adamantly declined ECHO's proposal. As an alternative solution, ECHO offered hard copy versions of portions of source code once specified by LML; but again, LML flatly refused ECHO's offer. (See 2nd Min Decl. ¶3[4] and Ex. 2 referenced therein.) Since the parties could not reach an agreement, they were required to abide by the Court's Default Standard for Access to Source Code (the "Default Standard"). As such, arrangements were made with an escrow agent to allow LML access to ECHO's source code under mutually agreeable terms. (2nd Min Decl. ¶4 and Ex. 3 referenced therein.) For obvious reasons, LML neglects to inform the Court of these facts.

Likewise, LML's assertion that it was "only permitted to *view* portions of the source code" is baseless. (LML's Response Brief, pg. 12, footnote 6.) Pursuant to the Default Standard, the agreement with the escrow agent specifically provided for a procedure whereby LML could print or copy ECHO's source code, if it so desired[5] (see 2nd Min Decl. ¶4 and Ex. 3, referenced therein). Evidently, LML chose not to seek ECHO's authorization or the Court's assistance to print out relevant source code; instead, it now attempts to overcome its failure by completely distorting the events regarding the production of ECHO's source code.[6] In fact, LML previously declined exactly what it now states it was deprived of and should not be heard to complain now regarding its prior ill-advised decisions.

**b.    Revised Manuals and Specification Exhibits**

Exhibits 1 and 19 to the Winckler Declaration consist of ECHO's manual for its merchants regarding its POS check conversion service and a specification for ECHO's ACH Engine, respectively. LML again neglects to mention that versions of these same documents were produced during discovery. During the course of this Action, however, ECHO published revised versions of its literature containing minor changes and provided the revised documents to LML as mandated by Fed. R. Civ. P 26(e) – including Exhibits 1 and

---

[4] "2nd Min Decl." refers to the Declaration of Don H. Min in support of Electronic Clearing House, Inc.'s and Xpresschex, Inc.'s Reply Brief to Its Motion for Summary Judgment of Non-Infringement and Exhibits Attached therein submitted herewith.
[5] Electronic Discovery Service Agreement, Exhibit 6 at ¶6.1 provides: "Pursuant to paragraph 5 of the Court's Default Standard for Access to Source Code, the Source code may not be printed or copied without the agreement of the producing party, ECHO, or further order of the Court."
[6] LML's other contention that software and source code relating to ECHO's POS terminals and related peripherals, specifically Exhibits 8-9, 11 and 13, were not included with the deposit materials provided to the escrow agent is equally baseless. ECHO's deposit materials with the escrow agent consisted of "ACH Source Code" and "POS Terminal Source Code." ( See Electronic Discovery Service Agreement, Exhibit 1.)

19. (*See* 2nd Min Decl. ¶7.) Accordingly, LML simply ignores the Federal Rules and attempts to have this Court penalize ECHO for fulfilling its duty to supplement its discovery responses.

Regardless, the aforementioned revisions have no bearing on the non-infringement analysis of ECHO's ECC Service; therefore, even if one were to substitute Mr. Winckler's references to Exhibits 1 and 19 with the corresponding prior versions produced during the discovery period, ECHO's ECC Service still does not infringe the patent-in-suit.

### c.    Publicly Available Exhibits

The remaining complained of exhibits by LML consists of materials ECHO obtained prior to filing its summary judgment motion. Exhibits 4-7 consist of manuals and other instructional materials authored and published by Redacted                    (e.g. Redacted          ) used in conjunction with ECHO's ECC Service available through the manufacturers. In fact, an updated version of Exhibit 5 (document    entitled    Redacted       )    appears    on    Redacted

. Moreover, ECHO produced tens of thousands of documents in this case including tomes of technical specifications. Regardless, LML should not be heard to complain now since throughout discovery it was informed of the MICR Readers used in conjunction with ECHO's POS check conversion services and had equal access to the specific documents.

### 2.    Mr. Winckler's Declaration is Based on Personal Knowledge and Competency to Testify on the Matters Stated Therein

Fed. R. Civ. P 56(e) provides, in part:

> Supporting and opposing affidavits shall be made on *personal knowledge*, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is *competent* to testify to the matters stated herein. (emphasis added)

LML's efforts to pigeon-hole Mr. Winckler as a "lay witness" and not an "expert" is misguided and misses the point. As evidenced in his declaration, Mr. Winckler possesses qualifications unique to his status as Senior Vice President and Co-General Manager of ECHO's check conversion system. (See Winckler Decl. ¶¶1-4.) His background in software programming combined with his intimate familiarity of the accused products underscore his competency to testify to the matters asserted in his declaration. Moreover, Mr. Winckler's statements with respect to source code authored by ECHO employees is based on his own personal knowledge and responsibilities as an officer of ECHO, not on opinion or hearsay. As Senior VP

8

and Co-GM, Mr. Winckler is responsible for oversight of various aspects of the development of ECHO's system, including the drafting of source code.

Indeed, Mr. Winckler was the Rule 30(b)(6) designee on behalf of ECHO to testify regarding the technical aspects of the accused products. See, *Barthelemy v. Air Line Pilots Association*, 897 F2d 999, 1018 (9th Cir. 1990) (personal knowledge may be reasonably inferred from the declarant's position and the nature of participation in matter). Furthermore, Mr. Winckler's familiarity with POS terminal software stands to reason, being that Mr. Winckler was himself the author of (albeit now outdated) POS terminal software. It is telling that LML tries to keep out evidence on purported technicalities when its own expert claims software expertise who purportedly could address Mr. Winckler's assertions on the merits. LML does not address the merits of Mr. Winckler's assertions because these assertions are accurate. Regardless, the fact remains that Mr. Winckler is qualified to read and analyze the software that he testified to in his declaration. As such, Mr. Winckler's declaration satisfies Fed. R. Civ. P. 56(e).

### 3. Mr. Winckler's Declaration is Consistent with His Prior Deposition Testimony

As detailed herein, Mr. Winckler's deposition testimony regarding hand key entry and completing and signing the check is in accord with his statements and exhibits attached to Mr. Winckler's declaration. *See* Sections II(B) and III(B)(1). Accordingly, LML's purported issues with Mr. Winckler's declaration and the evidence attached therein, simply lack merit and should be disregarded.

### B. Under Either Parties' Construction, ECHO Does Not Infringe the Asserted Claims Because ECHO's ECC Service Does Not Accept and Process "Any Check"

At the outset, LML incorrectly states that ECHO's arguments do not support a finding of non-infringement under LML's proposed constructions. As stated in ECHO's opening brief (e.g., Opposition at page 28), ECHO's ECC Service limits the types of checks that can be used and thus ECHO does not meet the limitations (Claim 1) "a point of sale terminal adapted to receive consumer bank account information from any bank check;" (Claim 8) "presenting any bank check specimen to a point of sale terminal;" or (Claim 9) "a point of sale terminal comprising reading means for reading [MICR] numbers on any consumer bank check." This holds true under either parties' constructions, as set forth in detail in ECHO's Sealed Answering Brief in Opposition To LML's Motion for Summary Judgment No. 2: For A Ruling That ECHO Infringes Claims 1, 2, 4, 5, 6, 9, 10, 11 and 16 of the '988 Patent, D.I. 418 and supporting declarations D.I.

419-421. ECHO also provided overwhelming evidence that the POS terminals used with the ECC Service are Redacted

. (*See* Winckler Decl., ¶¶ 26-27; *see also* Schutze Decl.[7], ¶¶ 9-13.)

Similarly, under the ECC Service, the merchant is Redacted

. (*See* Winckler Decl., ¶¶ 14-18.)

Moreover, as to claim 9, "reading means for reading magnetic ink character recognition numbers on any consumer bank check," even putting aside ECHO's proposed construction of this claim element, LML's proposed inclusion of "a keyboard for manual entry" as part of the definition of a reading means "since ECHO's accused products are *technically* capable of reading the MICR line via manual keyboard entry" is senseless. (*See* Opposition at pg. 28:4-6). A keyboard on a point of sale terminal cannot reasonably be argued to be a component of point of sale terminal capable of performing the function of "reading magnetic ink character recognition numbers appearing on a consumer check," as LML describes the recited function. Excluding the keyboard from the structures capable of performing the function as LML describes it, the MICR-Readers used in conjunction with the POS terminals under ECHO's ECC Service are only capable of Redacted

. (Winckler Decl., ¶¶ 15-18, 39-56.)

### 1.    LML's Complaints Relating to Mr. Schutze Declaration Are Unfounded

The testimony presented in Mr. Schutze's Declaration in support of ECHO's Motion is comprised of a series of <u>factual</u> statements of his <u>*first*</u>-hand observations of the operations of his use of ECHO's ECC Service and his industry knowledge of the elements that comprise a negotiable instrument. He offered no opinion on the technical details of ECHO's ECC Service. Regardless, as set forth in Nova's and ECHO's Opposition to LML Patent Corp.'s Daubert Motion No. 2: For a Ruling Limiting the Testimony of Stephen A. Schutze, LML's challenge made to Mr. Schutze expertise is unfounded.

---

[7] "Schutze Decl." refers to the Declaration of Stephen A. Schutze in Support of Electronic Clearing House, Inc.'s and Xpresschex, Inc.'s Motion for Summary Judgment of Non-Infringement submitted previously.

As to the documents cited by, but not attached to, the Schutze Declaration, LML's argument that Mr. Schutze's declaration ought to be stricken because he did not produce the checks he ran through ECHO's ECC Service until after he ran the checks is nonsensical. The futility of LML's argument is amply demonstrated by looking at one of the checks Mr. Schutze references in his declaration -- his own personal check which he wrote and ran through the ECC Service less than two weeks prior to the service of his Expert Report. Naturally, such a document could not have been produced months before it was in existence. The other checks were not ECHO documents but various foreign checks gathered from ECHO's and Nova's counsel's contacts. Even putting aside that they were not ECHO documents, these checks had no relevance until they were run by Mr. Schutze through ECHO's ECC Service. They were merely various checks gathered by counsel. Regardless, it should be noted that none of the checks at issue were attached to Mr. Schutze declaration in support of ECHO's Motion or any of ECHO's other moving papers for that matter.

Moreover, LML's misstatement at pg. 32, lines 14-16 of LML's Opposition notwithstanding, Mr. Schutze never testified at his deposition that he did not know why checks that returned the Redacted " message could not be processed. Rather, he testified that, in conferring with one of the chief architects of ECHO's system, he learned that this message displayed on the POS terminal means Redacted . (See Schutze Deposition transcript, L. Smith Decl., Ex. 21, pg. 163:13-19.) This understanding was further confirmed by Mr. Winckler. (See Winckler Decl., ¶ 30.)

Moreover, as set forth above, Mr. Winckler never stated that "most foreign checks are not written with magnetic ink." (LML's Opposition at pg. 32, lines 3-4.) Rather, while he acknowledged that, like some checks in the U.S., some foreign checks are printed without magnetic ink, Mr. Winckler specifically identified checks printed with CMC-7 MICR font as being printed in magnetic ink. (See Winckler Decl., ¶ 21.)

### 2.    ECHO'S ECC Service Does Not Communicate with the ACH Network to Transfer Funds Based on "Any Bank Check"

LML's attempts to distinguish Claims 1 and 9 from Claim 8 by asserting that the former are "system" claims while the latter is a method claim. LML's argument would improperly read other recited elements out of the claims, and should be rejected. See, e.g., Pause Techn., LLC v. TiVo Inc., 419 F.3d 1326, 1334 (Fed. Cir. 2005). Under LML's proposed construction, the structure of the "second communication

means" that "performs the recited functions" refers simply to a modem or similar device, which could transfer information. (LML's Opening Brief at 22.) If these elements are collectively interpreted to require only a modem, however, then the functional limitation of "further enabling automated clearing house communication for transferring funds" would add nothing to the claim and would effectively be ignored. (**Ex. A** at 11:49-55; 12:60-66.) More specifically, the second communication means is already recited for the function of "enabling said central computer system to communicate with external databases for performing a consumer bank account status search." (*Id.* at 11:49-52; 12:60-63.) This language alone requires the type of structure for communicating electronically that LML deems sufficient to meet the claim. If LML's construction is adopted, the additional function of "further enabling automated clearing house communication for transferring funds" would have no effect whatsoever. This result would be improper. *See, e.g., Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,* 381 F.3d 1111, 1119 (Fed. Cir. 2004). Thus, these disputed phrases must be interpreted according to their functionality as described in the claims.

To distinguish their invention from the prior art, the Applicants claimed specific functionality requirements in the patent, the same functionality requirements that Defendants have included in their constructions. (**Ex. B** at LML-EP-000183-85, 189-90.) If the claims are now construed to only require the basic structural elements, then decades of prior art, including prior art involving only check verification systems (which also would have a modem to communicate with a central computer), would invalidate the claims. The prior art over which Applicants repeatedly sought allowance described point of sale check processing and verification systems having the very same structure required under LML's proposed construction. (*See, e.g.,* 2nd Min Decl., Ex. 4 at 2:24-28; 3:47-48; 4:40-41, 44-46; 6:38-41, 49-57; 8:1-3; 11:40-43; 15:38-42; 19:12-17; 22:32-25:10; 25:27-28; **Ex. V** at 3:13-19, 33-36, 45-50; 5:1-7, 10-13, 18-20, 28-31, 37-46; 7:55-8:2; 9:12-15; 10:24-26.) LML's re-writing of the claim is improper.

It should be noted that LML's own expert in his report adopted Defendants' proposed construction of the element "enabling automated clearing house communication for transferring funds," which appears in both claims 1 and 9 of the patent-in-suit: "One of ordinary skill in the art would generally understand that the second communication means would enable the computer to electronically communicate to the clearing house to transfer funds electronically using information obtained by the way of the paper check at the point

12

of sale." (*See also* 1st Min Decl.[8] **Ex. 1** 158:18-160:24). There is good reason that LML's own expert adopted this construction. From reviewing the claims, it is immediately apparent that the communication to the automated clearing house is based upon the consumer bank account information obtained from any bank check presented at the point of sale. (*See* **Ex. A,** 11:35 – 56, 12:21 – 42, 12:43 - 67.) There is no other option of where the information that is used to conduct the transaction could come from. (*See generally* **Ex. A.**) Common sense also points toward this conclusion, the funds have to be transferred based on the information read from the check at the point of sale terminal.

Even if LML prevailed on the argument that the point of sale terminal can receive information from "any" bank check (which as discussed below, it should not) it is not possible to transfer funds through the ACH based on that information. Whole classes of checks are non-ACHable[9]. (**Ex. S** LML-EP-055429.) The ACH can only process a certain subset of all the checks that are used. (*Id.*)[10] (*See* 2nd Winckler Decl., ¶ 18.)[11]

### 3.    Defendants' Construction Is Consistent with the Preferred Embodiment Described in the Specification

Under Defendants construction, in order to meet the limitation of transferring funds from any bank check, the ECC Service would have to be designed to transfer funds from any *type* of check drawn on a financial institution, which as stated above and in Defendants' claim construction briefs is the most reasonable construction of the limitation "any bank check." Approvals or declines based on risk determinations made by the merchant or the ECC Service are not based on the type of checks but on the check-writer's check-writing history. Thus, while the '988 patent system is designed to transfer funds based on any *type* of check drawn on a financial institution, the accused services are not. In fact, under the ECC Service, a check from an account or check-writer that has never been encountered before is not typically rejected, from a risk standpoint, but will be approved, again, from a risk standpoint. But, if the check-type is

---

[8] "1st Min Decl." refers to the Declaration of Don H. Min in Support of Electronic Clearing House, Inc.'s and XpressChex, Inc.'s Motion for Summary Judgment and Non-Infringement submitted previously."
[9] "Non-ACHable" refers to the inability to process a check through the ACH.
[10] LML argues that VISA Net is an automated clearinghouse, which ECHO disputes. Regardless, Redacted
Redacted
                                                    . (*See* 2nd Winckler Decl. at ¶ 105.)[not in original
Winckler Decl.]
[11] "2nd Winckler Decl." refers to the Declaration of Kris Winckler in Support of Electronic Clearing House, Inc.'s and Xpresschex, Inc.'s Brief in Opposition to "LML's Motion For Summary Judgment No. 2: For a Ruling That ECHO Infringges Claims 1, 2, 4, 5, 6, 9, 10, 11, and 16 of the '988 Patent and the exhibits therein submitted, D.I. 420.

not one of the *types* that can be cleared through the ACH Network it will not be communicated to the ACH Network irrespective of check-writer history.

Thus, LML's argument that because a check is authorized from a risk standpoint it is converted to an electronic item and cleared through the ACH Network is false. (LML's Opposition pg. 21, 6-8). (See, Smith Decl. Ex. 14 at pg. ECHO0000804.) As stated above, a check may be authorized from a risk standpoint, but declined for conversion to an electronic item. In this case, the merchant, while receiving a positive response regarding check-writer risk may still be instructed to keep the paper check. (*See also*, e.g., Winckler Decl. ¶50 and Ex. 12 referenced therein.)

### C.    Under Either Parties' Construction, ECHO Does Not Infringe the Asserted Claims Because ECHO's ECC Service Does Not Conduct Electronic Checking Transactions "Without Using the [Bank] Check as a Negotiable Instrument"

#### 1.    ECHO Does Not Meet This Limitation Under Defendants' Construction

LML's pre-litigation patent counsel construed the phrase "without using the check as a negotiable instrument" to mean "that the check, at no time, takes on the status of a negotiable instrument." In fact, in his opinion letter[12], LML's pre-litigation patent counsel stated that this construction (hereinafter "LML's Pre-litigation Construction") was required to maintain the validity of the claims of the '988 patent. LML's own President adopted LML's Pre-litigation Construction when he shared the opinion letter containing LML's Pre-litigation Construction with Mr. Winckler, now ECHO's Senior Vice President and Co-General Manager in charge of Check Conversion and Verification services, stating that it accurately defines the scope of the patent. Defendants have merely adopted LML's Pre-litigation Construction. It is LML that has moved away from its own construction, for the obvious reason that it results in non-infringement.

Because the check is completed and signed it takes on the status of a negotiable instrument and is used as a negotiable instrument by the check-writer and merchant, in part, because payment by the customer

---

[12] As to LML's relevancy objection, the document is directly on point and, unlike LML's current position, is an accurate representation of what this element actually means. Moreover, the Federal Circuit has expressly stated that extrinsic evidence may be considered in construing the claims. *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005). As to the hearsay objection, this opinion is an "admission by party-opponent" and therefore does not constitute hearsay at all. At the very least, it is a "record of regularly conducted activity" and thus an exception to the hearsay rule.

is made in exchange for the goods irrespective of how the check will ultimately be cleared by the merchant,

be it through Redacted

. Under ECHO's ECC Service, often-times, Redacted

Because the check has already obtained the status of a negotiable instrument, the merchant may simply drop

it into the cash register and process it as a paper check. This is only possible because the check as presented

is used as a negotiable instrument. The check's status as a negotiable instrument allows flexibility for ECC

merchants in how checks are ultimately processed. Redacted

(Winckler Decl., ¶86.)

As LML points out, the '988 patent, at column 7, lines 47-49, states that "the process begins by a

consumer presenting a "specimen or blank check . . . to the (merchant)." This is clearly what was

contemplated by the patentees.

LML's argument that, at one time, ECHO Redacted

. Regardless, as LML's expert has stated, the documentation for ECHO's

ECC system Redacted                                                . ( 1st Min Decl. **Ex. 1**, Tinkel

Depo, 138:11-139:4; *see also* Winckler Decl., ¶88.)   This is also confirmed in ECHO's current

documentation provided to its merchants. (*Id.* and **Ex. 1** referenced therein at pg. ECHO0027574.) Nothing

LML says can change this fact. Redacted

The evidence establishes that once this negotiable instrument is created, it is then used as such in the ECHO system. Redacted

. In this manner, transactions in the ECHO system are based on the check itself, and so the check is used as a negotiable instrument.

The additional steps and features of the ECC Service are particularly important in the infringement analysis here, because the "negotiable instrument" limitations are written in "negative" form. The limitations each begin with the phrase "*without* using," and therefore require the *absence* of a feature. As a result, the *addition* of features over those required by NACHA can bring an accused system outside the scope of the claim. This differs from the typical analysis in patent cases, in which a claim simply recites what is required to find infringement. In those cases, adding features tends to be irrelevant to the question of infringement, but that is not the situation here. Even if LML's argument regarding the NACHA guidelines were proper, a reasonable juror could find that the additional features present in the ECHO system preclude infringement.

    2.    **LML's strained attempt to show that the term "the check, at no time, takes on the status of a negotiable instrument" is met because** Redacted **does not raise a genuine issue of material fact**

LML offers the novel but flawed argument that, Redacted

. The fact that the check is d Redacte does not support LML's argument that "the check, at no time, takes on the status of the negotiable instrument. The words in the construed limitation are clear: *at no time* does the check take on the status of a negotiable instrument.

LML tries to support its position by arguing that the "negotiable instrument" is modified by "enabling automated clearing house communications." This argument, while creative, is at odds with the way the Applicants argued this limitation impacted the claim, during prosecution in order to obtain allowance. In the "Summary" of Applicants' Remarks relating to the January 30, 1995 amendment, the Applicants specifically asserted that this feature distinguished the purported invention from the prior art. "[N]one of the references discloses a point-of-sale system that uses any bank check solely for the purpose of gather customer information and not as a negotiable instrument used to pay for goods received in a

16

transaction." (**Ex. B** at LML-EP 000207.)  Under ECHO's ECC Service, only a negotiable instrument can be used to pay for goods.

Even assuming *arguendo* that the part of the clause should be read as "enabling automated clearing house communications where the check, at no time, takes on the status of a negotiable instrument" LML still has not raised a genuine issue of material fact.  The *communication is enabled* only by a completed and signed check, the negotiable instrument in the ECC Service.  Because the ultimate funds transfer may occur after the check has been        simply does not support LML's argument that the check, at no time, takes on the status of a negotiable instrument.

3.    **LML's argument that mere capability to process transactions without using the check as a negotiable instrument is legally flawed and insufficient to raise a genuine issue of material fact**

LML also argues that, because the system used in connection with the ECC Service is technically capable of processing blank checks, the "without using the bank check as a negotiable instrument" limitation is met.  This argument is also flawed because it in essence reads out this vital claim element from the claims – a claim element which served as one of only two bases of patentability for the claims.  As stated above, the '988 patent did not generally teach converting checks to electronic transactions at the point of sale thereby obviating the need for the merchant to process the paper check.  Such a process was known in the prior art well before the application underlying the '988 patent was even filed, e.g., the '672 and '607 patents discussed above and in ECHO's moving papers.

If there is any invention here, it is the fact that the process taught by the '988 patent can operate with "any bank check" and that the check at no time takes on the status of a "negotiable instrument," *i.e.*, is blank at the time it is presented to the merchant.  This is not an optional limitation, it has been characterized as the "entire thrust of the patent,"[13] it is a mandatory explicit limitation in every claim.  The '988 patent claims were not allowed until *after* the claims were narrowed to recite conducting transactions "without using the check as a negotiable instrument" (or equivalent language), and further narrowed to recite transferring funds using consumer bank account information "from any bank check."  During prosecution, this limitation was added to every claim and argued to distinguish the invention from cited prior art.  In fact, the patentee

---

[13] See LML's Opening Brief On Issues Of Claim Construction at 24 (stating that the patent focuses on whether the check is used as a negotiable instrument and the "entire thrust" of the patent is alleviating the merchant's need to keep the check and process it through traditional means).

distinguished 17 separate references (including the Carlson '607 reference discussed below) on the grounds that "none of the references discloses a point of sale system that uses any bank check solely for the purpose of gathering customer information and not as a negotiable instrument . . . ."

The '607 patent, for instance, discloses a point-of-sale device adapted for electronic check processing and funds transfer and a system for performing check authorization and electronic funds transfer at the point-of-sale. (2nd Min Decl., Ex. 4 at 2:24-28; 15:38-42; 22:32-25:10.) To initiate the checkwriting process described by the '607 patent, the merchant inserts the check into the terminal, enters the amount of the transaction using alphanumeric keypad and requests check verification. (*Id.* at 22:57-23:22; 23:60-24:36.) The terminal reads the MICR information from the check, even if the check is folded, wrinkled, or has a torn or partially damaged MICR line. (*Id.* at 6:38-52.) The customer enters his or her PIN number at the customer keypad, providing his or her electronic authorization for the transaction to proceed, and the system verifies that the customer's PIN number is valid by connecting to the customer's bank using a modem. (*Id.* at 23:17-23; 24:13-14.) Once the customer's PIN number is verified, the system then initiates the verification process to confirm that sufficient funds exist in the customer's account. (*Id.* at 24:24-36.) The terminal communicates with "a computer system maintained by an issuer of a negotiable instrument" and with "an external communication system to identify a payor of a negotiable instrument . . . and to perform an electronic funds transfer." (*Id.* at 3:35-40; 4:29-42.) The printer prints authorization information on the check. (*Id.* at 24:45-60, 10:13-53.) The terminal stores the "retailer's identification number" and prints it automatically on each invoice. (*Id.* at 15:47-64.) If insufficient funds are available, the transaction is terminated. (*Id.* at 17:24-31.) At the end of a completed transaction, the "cancelled check would be presented to the customer as part of his receipt." (*Id.* at 18:52-60; 25:4-10.)

The Applicants differentiated the 17 prior art references on the ground that none of them used a check as a negotiable instrument. After obtaining allowance based on these arguments, LML now seeks a claim construction that the Applicants expressly disclaimed during the file history. It is black letter law that express disavowment of claim scope during prosecution cannot be reclaimed after the patent is issued. *N. Am. Container, Inc. v. Plastipak Packaging, Inc.,* 415 F.3d 1335, 1345 (Fed Cir. 2005).

There is no genuine issue of material fact, LML tries to manufacture a issue of fact by arguing two new meritless infringement theories that are unpersuasive logically and legally. LML has failed to argue any

18

other facts under Defendants' construction of "without using the check as a negotiable instrument," so ECHO is entitled to summary judgment of non-infringement as to all asserted claims in the patent-in-suit under the proper construction of this term. LML's detailed (albeit repetitive) claim construction re-argument does absolutely nothing as far as showing that there is a genuine issue of material fact under Defendants construction.

LML cites to *Intel Corp v. Int'l Trade Comm'n*, 946 F.2d 821 (Fed. Cir. 1991) to support it argument that it is only the capabilities of the accused system that are important for analyzing infringement. LML's reliance is misplaced. In *Intel* the patent claimed a EPROM memory chip with page mode addressing capability. The Administrative Law Judge construed the claim as "[the EPROM] *can* implement page mode addressing when directed to do so by the programmable selection means." *Id.* at 831. Accordingly, the claim covered devices that had the capability to implement page mode addressing. *Intel* properly focused on what the claim required; if the claim only required that a device have the *capacity* to perform a function, one who makes a device with that capacity may infringe even though the maker's customers do not use the capacity. On the other hand, if the claim *requires* a structure or function, one who makes a device without that structure or function is not a direct infringer. *See High Tech Medical Instrumentation v. New Image Indus.*, 49 F.3d 1551, 1555-56 (Fed. Cir. 1995). *Intel* is not applicable in our case because it dealt with permissive claim language instead of a specific mandatory limitation. *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1570 (Fed. Cir. 1996) ("[b]y its literal terms, the claim involved in *Intel* only required 'capability' (i.e., 'programmable selection means')"); *High Tech*, 49 F.3d at 1555-56 (distinguishing Intel based on the permissive language of the claim at issue); *See Fantasy Sports*, 287 F.3d at 1117-18 (stressing the "programmable" language of the claim at issue in Intel).

Our case is more similar to the decision in *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc. Cross Medical Products* dealt with a claim that required an anchor seat be in contact with bone. The court there distinguished *Intel* in finding that "[t]he claim at issue in *Intel* called for a "programmable selection means "and thus required only that an accused device be capable of operating in the enumerated mode." 424 F.3d 1293, 1311-1312 (Fed. Cir. 2005) (citing *Intel*, 946 F.2d at 832). The court continued "[h]ere, the claim does not require that the interface be merely "capable" of contacting bone; the claim has a structural limitation that the anchor seat be in contact with bone." *Id.* Similarly, in the present case, the claims of the

19

patent-in-suit do not require the mere "capability" of conducting transactions "without using the check [or bank check] as a negotiable instrument;" the claims *require* that the system conducts transactions "without using the check [or bank check] as a negotiable instrument." The patentees added this specific limitation during prosecution and used it explicitly to argue patentability over multiple prior art references.

**4.    Intel Did Not Promulgate a Broad Rule of Law Regarding Infringement**

LML cites to *Intel* for the proposition that "a device claim was infringed if it was capable of operating in the claimed mode and that actual operation in the claimed mode was not required." *Intel*, however, does not promulgate a broad rule of law regarding infringement analysis; rather, its ruling was tied to specific facts. The text of the opinion reads:

> *Because the language of claim 1* refers to "programmable selection means" and states "whereby *when said alternate addressing mode is selected*" (emphases added), the accused device, to be infringing, need only be capable of operating in the page mode.

The expression of the negotiable instrument limitation in the claims of the '988 patent are inapposite. The '988 patent does **not** state "when the check is not used as a negotiable instrument;" the claims recite *"without using* the check as a negotiable instrument." This limitation narrows infringing systems to those which do not use the check as a negotiable instrument. Claims 1 and 9 of the '988 patent do not simply recite a device or apparatus that is only structural in form. These claims recite systems that within them embed procedure or process. *See Application of Benson*, 418 F.2d 1251, 1254 (C.C.P.A. 1969) ("Sometimes, as here, a material is as well defined by its intended use as by its dimensions or other physical characteristics, and in this case we know of no reason why the limitation in terms of use should not be placed in the claims and given meaning in their interpretation."). This procedure or intended use should not be read out of the claims as having no meaning or limitation, especially when the patentee overcame prior art by adding the limitation. *See ZMI Corp. v. Cardiac Resuscitator Corp.*, 844 F.2d 1576, 1581 (Fed. Circ. 1988) (interpreting device claim to have a functional limitation, where such interpretation was further supported by rejection of independent claims during prosecution).

/s/ Francis DiGiovanni _____
Francis DiGiovanni, Esq. (#3189)
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 North Orange Street

20

Wilmington, DE 19801
Phone: 302-658-9141
Fax: 302-658-5614
Attorneys for Electronic Clearing House, Inc.
and XpressChex, Inc.

OF COUNSEL:
Robert Jacobs, Esq. (Pro Hac Vice)
Mark Mizrahi, Esq. (Pro Hac Vice)
Don H. Min, Esq. (Pro Hac Vice)
BELASCO JACOBS & TOWNSLEY, LLP
6100 Center Drive, Suite 630
Los Angeles, CA 90045
Phone: (310) 743-1188
Fax:  (310) 743-1189

Dated:  November 23, 2005

## CERTIFICATE OF SERVICE

I, Francis DiGiovanni, hereby certify that on November 23, 2005, a true and correct copy of the foregoing document was caused to be served in the manner indicated on the attorneys of record at the following addresses:

**VIA E-MAIL AND HAND DELIVERY**
Richard K. Herrmann, Esquire
Morris James Hitchens
 & Williams LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801

**VIA E-MAIL AND HAND DELIVERY**
William J. Marsden, Esquire
Fish & Richardson, P.C.
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE 19899-1114

**VIA E-MAIL AND HAND DELIVERY**
Richard D. Kirk, Esquire
The Bayard Firm
222 Delaware Avenue, 9th Floor
P.O. Box 25130
Wilmington, DE 19899

**VIA E-MAIL AND FIRST CLASS MAIL**
Russell E. Levine, Esquire, P.C.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois 60601

**VIA E-MAIL AND FIRST CLASS MAIL**
Mark C. Scarsi, Esquire
O'Melveny & Myers LLP
400 S. Hope Street
Los Angeles, CA 90071

**VIA E-MAIL AND FIRST CLASS MAIL**
Dale M. Cendali, Esquire
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036

/s/ Francis DiGiovanni
Francis DiGiovanni (#3189)