# EXHIBIT 4

# United States Patent [19]

## Carlson et al.

[11]  **Patent Number:**  **5,053,607**

[45]  **Date of Patent:**  **Oct. 1, 1991**

[54]  **POINT-OF-SALE DEVICE PARTICULARLY ADAPTED FOR PROCESSING CHECKS**

[76]  Inventors: **Steven R. Carlson; Paul R. Carlson,** both of 417 2nd Ave., Beach, N. Dak. 58621

[21]  Appl. No.: **362,164**

[22]  Filed:  **Jun. 6, 1989**

### Related U.S. Application Data

[63]  Continuation-in-part of Ser. No. 219,735, Jul. 15, 1988, which is a continuation-in-part of Ser. No. 70,816, Jul. 6, 1987, Pat. No. 4,758,714, which is a continuation-in-part of Ser. No. 915,505, Oct. 6, 1986, Pat. No. 4,678,896.

[51]  Int. Cl.⁵ ............................................. G06F 15/30
[52]  U.S. Cl. ..................................... 235/379; 235/432; 902/18; 902/39; 364/406
[58]  Field of Search .............. 235/379, 432, 433, 435; 902/18, 20; 364/406

[56]  **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 3,786,421 | 1/1974 | Wostl et al. | 340/149 |
| 4,027,142 | 5/1977 | Paup et al. | 235/475 X |
| 4,404,649 | 9/1983 | Nunley et al. | 235/379 X |
| 4,439,670 | 3/1984 | Bassett et al. | 235/382 |
| 4,453,074 | 6/1984 | Weinstein | 235/380 |
| 4,617,457 | 10/1986 | Granzow et al. | 902/18 X |
| 4,678,895 | 7/1987 | Tateisi et al. | 235/379 |
| 4,810,866 | 3/1989 | Lord | 235/379 |

*Primary Examiner*—David L. Trafton
*Attorney, Agent, or Firm*—Dorr, Carson, Sloan & Peterson

[57]  **ABSTRACT**

A check processing device is particularly adapted for retailer/customer use at the point-of-sale through use of a MICR read head means, printer means and keypad means which feed information into a CPU which communicates, through an existing telecommunication system, with the customer's bank and the retailer's bank in order to transfer funds from the account of the customer to the account of the retailer.

**18 Claims, 5 Drawing Sheets**





Fig. 1

ECHO0001633

**U.S. Patent**          Oct. 1, 1991          Sheet 2 of 5          **5,053,607**



*Fig. 2*



*Fig. 3*

ECHO0001634



*Fig. 4*



*Fig. 5*

ECHO0001635



*Fig. 6*

**U.S. Patent**        Oct. 1, 1991        Sheet 5 of 5        **5,053,607**



*Fig. 7*

ECHO0001637

5,053,607

1

## POINT-OF-SALE DEVICE PARTICULARLY ADAPTED FOR PROCESSING CHECKS

### CROSS REFERENCE TO RELATED APPLICATIONS

This patent application is a continuation-in-part of our co-pending U.S. patent application Ser. No. 219,735 filed July 15, 1988 which is a continuation-in-part of U.S. patent application Ser. No. 70,816 filed July 6, 1987, now U.S. Pat. No. 4,758,714 which, in turn, is a continuation-in-part of U.S. patent application Ser. No. 915,505 filed Oct. 6, 1986, now U.S. Pat. No. 4,678,896.

### FIELD OF THE INVENTION

Although there are several different ways to pay for goods or services today at the point of sale, among them cash, checks, credit cards, debit cards, drafts, the consensus seems to remain that a "cashless/checkless" society is not far in the future. Credit card trade is now highly competitive since it is profitable for the sponsoring banks as well as the merchant making the sale. Electronically transferred funds are made possible by "debit cards" which require "on line" or full-time hookups to the issuing bank, that is the bank of the cardholder [customer] and to the payee's bank (e.g., to the retailer's bank). However, this type of full time hookup requires sophisticated networking resources and a complicated interface switch system between the various participants.

Obviously "cash" sales are the most reliable (assuming no counterfeiting activities take place) for the retailer; that is to say, they are reliable because the retailer has his non-revokable funds in hand before the sale is completed. Most other kinds of transactions involve more risk. For example, credit card sales, even if "approved" by the issuing card company, have associated therewith some uncertainty on the part of the retailer because of the possibility of the sale being rescinded in view of the credit rights of the cardholder, including his right to instruct the issuing bank not to pay the retailer until whatever difficulty encountered by the customer has been resolved. Obviously, this right in effect holds the retailer's funds ransom subject to complete satisfaction of the customer in resolving the complaint whether real or imagined. Credit card sales are not a complete windfall to the card holder either; he or she is charged a percentage fee at usually higher than bank rates for "carrying" the card holder; such rates can range from a few points above prime rate to several points.

Smart cards also have received a great amount of attention; but to date, only a few experiments have been initiated in the United States. Hence the personal check remains one of the most widely used means of payment. The method of using the check has remained virtually unchanged since its conception, but the means of processing such checks has improved considerably over the years. Much of this change has come about by the Federal Reserve system's (FED's) introduction of a Magnetic Ink Character Recognition system (MICR), examples of which can be seen along the bottom of checks and other negotiable instruments. The MICR line allows high speed, electronic reading of that data designating the proper bank and account to be identified and converting such data into electronic messages to be sent through the National Automated Clearing House system.

2

However, the problems of handling the check at the point of sale, verifying the signature, the amount, stamping "for deposit only", etc. still remain. Moreover, the retailer usually does not know whether the presenter of the check has sufficient funds or whether the presentee of the check intends to honor the check by not filing a "stop payment" order at his bank. Several devices have been produced to aid the retailer in these situations.

### BRIEF DESCRIPTION OF THE PRIOR ART

U.S. Pat. No. 3,786,421 to Wolfgang J. Wostl teaches a personal identification code number that is used to insure that the party making the transaction is the person he claims to be. U.S. Pat. No. 4,453,074 teaches a smart card with encrypted material using a private key that is associated with a public key. U.S. Pat. No. 4,439,670 teaches use of a code comparison made upon reaching a predetermined number of rejections. None of these devices is however specifically suited to processing checks at the point-of-sale.

### SUMMARY OF THE INVENTION

The herein-disclosed point-of-sale device is specifically adapted to operate upon checks or other negotiable instruments in order to complete a business transaction such as a retail sale while the retailer and the customer are still face to face. It also gives both the retailer and the customer badly needed security with minimum economic expenditures to both parties. The device also can utilize several algorithm security codes simultaneously. It also can be programmed to give regional or local protection.

In its most fundamental form our point-of-sale device comprises a housing divided into two compartments. The two compartments are presented in an adjacent arrangement wherein the first compartment is located next to the second compartment, but separated from it by a slot. The compartments may be held in place relative to each other by a spacer means which holds the two compartments in their adjacent relationship relative to each other. That is to say a face of one compartment is vis-a-vis a face of the other compartment, but is separated from it by the slot which is, in effect, "sandwiched" between the two compartments. In effect the height of the spacer means is essentially the height of the slot. In some preferred embodiments hereinafter more fully described, the spacer means is provided with a hinge means in order to rotate one compartment away from the other in order to expose the slot region if need be (e.g., if the check becomes caught in said slot).

In a preferred arrangement the first compartment is presented in a stacked configuration over the second compartment. This arrangement is the one depicted in the drawings; but this is by no means the only arrangement possible. The two compartments could, for example, lay side by side. In the preferred "stacked" arrangement, the first compartment (in this case the top compartment) is the preferred compartment for locating a printer means which contacts one side of a check (preferably the rear side of the check) through a face in said first compartment. In the stacked arrangement that face would be the bottom face of the first (top) compartment. The second compartment is preferably the compartment provided with a MICR reader means which reads the other side of the check (preferably the face side of the check, i.e., the side of the check opposite the

ECHO0001638

5,053,607

| 1 | 2 |

## POINT-OF-SALE DEVICE PARTICULARLY ADAPTED FOR PROCESSING CHECKS

### CROSS REFERENCE TO RELATED APPLICATIONS

This patent application is a continuation-in-part of our co-pending U.S. patent application Ser. No. 219,735 filed July 15, 1988 which is a continuation-in-part of U.S. patent application Ser. No. 70,816 filed July 6, 1987, now U.S. Pat. No. 4,758,714 which, in turn, is a continuation-in-part of U.S. patent application Ser. No. 915,505 filed Oct. 6, 1986, now U.S. Pat. No. 4,678,896.

### FIELD OF THE INVENTION

Although there are several different ways to pay for goods or services today at the point of sale, among them cash, checks, credit cards, debit cards, drafts, the consensus seems to remain that a "cashless/checkless" society is not far in the future. Credit card trade is now highly competitive since it is profitable for the sponsoring banks as well as the merchant making the sale. Electronically transferred funds are made possible by "debit cards" which require "on line" or full-time hookups to the issuing bank, that is the bank of the cardholder [customer] and to the payee's bank (e.g., to the retailer's bank). However, this type of full time hookup requires sophisticated networking resources and a complicated interface switch system between the various participants.

Obviously "cash" sales are the most reliable (assuming no counterfeiting activities take place) for the retailer; that is to say, they are reliable because the retailer has his non-revokable funds in hand before the sale is completed. Most other kinds of transactions involve more risk. For example, credit card sales, even if "approved" by the issuing card company, have associated therewith some uncertainty on the part of the retailer because of the possibility of the sale being rescinded in view of the credit rights of the cardholder, including his right to instruct the issuing bank not to pay the retailer until whatever difficulty encountered by the customer has been resolved. Obviously, this right in effect holds the retailer's funds ransom subject to complete satisfaction of the customer in resolving the complaint whether real or imagined. Credit card sales are not a complete windfall to the card holder either; he or she is charged a percentage fee at usually higher than bank rates for "carrying" the card holder; such rates can range from a few points above prime rate to several points.

Smart cards also have received a great amount of attention; but to date, only a few experiments have been initiated in the United States. Hence the personal check remains one of the most widely used means of payment. The method of using the check has remained virtually unchanged since its conception, but the means of processing such checks has improved considerably over the years. Much of this change has come about by the Federal Reserve system's (FED's) introduction of a Magnetic Ink Character Recognition system (MICR), examples of which can be seen along the bottom of checks and other negotiable instruments. The MICR line allows high speed, electronic reading of that data designating the proper bank and account to be identified and converting such data into electronic messages to be sent through the National Automated Clearing House system.

However, the problems of handling the check at the point of sale, verifying the signature, the amount, stamping "for deposit only", etc. still remain. Moreover, the retailer usually does not know whether the presenter of the check has sufficient funds or whether the presentee of the check intends to honor the check by not filing a "stop payment" order at his bank. Several devices have been produced to aid the retailer in these situations.

### BRIEF DESCRIPTION OF THE PRIOR ART

U.S. Pat. No. 3,786,421 to Wolfgang J. Wostl teaches a personal identification code number that is used to insure that the party making the transaction is the person he claims to be. U.S. Pat. No. 4,453,074 teaches a smart card with encrypted material using a private key that is associated with a public key. U.S. Pat. No. 4,439,670 teaches use of a code comparison made upon reaching a predetermined number of rejections. None of these devices is however specifically suited to processing checks at the point-of-sale.

### SUMMARY OF THE INVENTION

The herein-disclosed point-of-sale device is specifically adapted to operate upon checks or other negotiable instruments in order to complete a business transaction such as a retail sale while the retailer and the customer are still face to face. It also gives both the retailer and the customer badly needed security with minimum economic expenditures to both parties. The device also can utilize several algorithm security codes simultaneously. It also can be programmed to give regional or local protection.

In its most fundamental form our point-of-sale device comprises a housing divided into two compartments. The two compartments are presented in an adjacent arrangement wherein the first compartment is located next to the second compartment, but separated from it by a slot. The compartments may be held in place relative to each other by a spacer means which holds the two compartments in their adjacent relationship relative to each other. That is to say a face of one compartment is vis-a-vis a face of the other compartment, but is separated from it by the slot which is, in effect, "sandwiched" between the two compartments. In effect the height of the spacer means is essentially the height of the slot. In some preferred embodiments hereinafter more fully described, the spacer means is provided with a hinge means in order to rotate one compartment away from the other in order to expose the slot region if need be (e.g., if the check becomes caught in said slot).

In a preferred arrangement the first compartment is presented in a stacked configuration over the second compartment. This arrangement is the one depicted in the drawings; but this is by no means the only arrangement possible. The two compartments could, for example, lay side by side. In the preferred "stacked" arrangement, the first compartment (in this case the top compartment) is the preferred compartment for locating a printer means which contacts one side of a check (preferably the rear side of the check) through a face in said first compartment. In the stacked arrangement that face would be the bottom face of the first (top) compartment. The second compartment is preferably the compartment provided with a MICR reader means which reads the other side of the check (preferably the face side of the check, i.e., the side of the check opposite the

5,053,607

3

side contacted by the printer means) through a face in said second compartment.

This is the most practical arrangement, but clearly the second (bottom) compartment might contain the printer and the first (top) compartment might contain the MICR read head. It should also be noted that in the event that FED regulations placed the MICR data on the rear side of a check (or in the event the MICR information could be read through the paper from which the check is made) then both the printer means and MICR read head means could be located in either the first or the second compartment and operate on (read from and print on) the same side of the check.

The slot is also provided with means for transporting a check or other negotiable instrument into and out of said slot, means for positioning the check: (1) while it is being so transported, (2) while its MICR information is being read by the MICR head, and (3) while it is being printed upon by the printer means.

The device is provided with a CPU means which can be located inside the housing (in the first compartment and/or in the second compartment), outside the housing but still in the retail establishment where the business transaction is taking place, or outside the retail establishment in a central location which employs a central CPU to service a system of such point-of-sale devices.

The device also comprises at least one or more alpha/numeric keypad means electrically connected to the CPU. Obviously, the retailer and his customer could use the same keypad, but for reasons hereinafter more fully described, two, separate, but electronically interconnected, keypads, one for the retailer, one for the retailer's customer, are highly preferred for the check processing operations carried by our device.

Finally the device should comprise means for electronically connecting the point-of-sale device to a telecommunications system capable of electronically transferring funds from one bank account (e.g., the customer's bank account) to another bank account (e.g., the retailer's bank account).

Thus in its most general form, our point-of-sale negotiable instrument processing device comprises: (1) a housing having a first compartment, a second compartment and a spacer means which positions the first compartment next to the second compartment so as to define a slot between said first and second compartments; (2) MICR read head means for reading MICR information on a negotiable instrument; (3) printer means for printing on a negotiable instrument; (4) switching means to initiate preprogrammed CPU functions upon the negotiable instrument; (5) motive means for moving the negotiable instrument: (a) into position in the slot so as to be read by the MICR read head means, (b) into position to be printed upon and (c) into and out of the slot; (6) positioning means for positioning the negotiable instrument in the slot so that MICR information on the negotiable instrument can be read by the MICR read head means and for positioning the negotiable instrument in the slot so that the rear side of the negotiable instrument can be printed upon; (7) alpha/numerical keypad means for transmitting information to a CPU; (8) a CPU for receiving information from the alpha/numerical keypad means and the MICR read head means in order to communicate said information to a telecommunications system in order to transfer funds represented by the negotiable instrument from an account of the maker of the negotiable instrument to an account of the payee of the negotiable instrument; and

4

(9) means for electronically connecting the point-of-sale negotiable instrument processing device to a telecommunications system.

Various optional features and preferred embodiments of this device may also be employed to advantage. For example, aside from the printer, the first compartment may also have a plurality of signal devices indicating the condition of a plurality of circuits contained in said device A keypad which is especially adapted for the customer's use (e.g., for entry of the customer's personal identification number) is preferably located outside the housing A keypad which is especially adapted for the retailer's use (e.g., for entry of the retailer's personal identification number) may be located on, or outside of, the housing.

The slot for receiving the monetary negotiable instrument can be disposed between said first and second portions, and further comprise guide means which aid in receiving, locating, electronically processing and dispensing the check from the point-of-sale device. In a preferred embodiment of this device the check travels "through" the device (i.e., in one end of the slot and out the other); however, the check may also exit the device from the same part of the slot through which it entered. Other optional features may serve to identify the payee of said transactions and to establish the transaction selling price to the satisfaction of both the customer and the retailer.

This secured point-of-sale device also can be modified and/or augmented in several other ways to produce several other preferred embodiments thereof. For example, it could include one or more of the following features: (1) means to access a computer system maintained by a system of retailers using one central CPU with which this device is integrated, (2) means to access a computer system maintained by an issuer of a negotiable instrument such as a check and the like; (3) means to access an external communication system to identify a payor of a negotiable instrument (such as through the use of a personal identification number) and to perform an electronic funds transfer only with a proper PIN number; (4) telephonic means (such as a telephone headset and appropriate communication system) to communicate with the issuer of a negotiable instrument; (5) a standard 8 bit microprocessor capable of accessing 64 K bytes of memory; and means connecting a plurality of switching mechanisms to a microprocessor and upon any one of said switching mechanisms not being actuated, said mechanisms seeking an inoperable position; (6) a printing mechanism specially adapted for printing upon the rear side of a negotiable instrument such as a check, (7) an actuating mechanism cooperating with said printing mechanism for producing an imprinted copy of said transaction, (8) read head means for producing movement of said read head means with respect to said negotiable instrument as long as a code is being detected by said read head, (9) PIN identification number entry means connected to a CPU for receiving a PIN number, (10) means, including a CPU connecting the read head means and the PIN identification number entry means to the printing means, so that the printing means is actuated only when certain signals are compatible, (11) a data entry override means, and (12) a personal identification number module having a key tab matrix connected to a CPU, said key tab matrix is set to match a transaction amount to be recorded with the override means connected to the CPU for actuating said printing means.

5,053,607

| 5 | 6 |

It is also a preferred object of this invention to provide a secured point-of-sale device that is connected to a CPU that completes all transactions while the device is in a secured mode. It is yet another preferred object of this invention to abort any improper transaction while the device is in a secured mode.

These and other objects and advantages of the invention will more fully appear from the following, more detailed, descriptions, made in connection with the accompanying drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an isometric view of the point-of-sale device;

FIG. 2 is a cut-away side view of the device;

FIG. 3 is a top view of the device in partial cut-away;

FIG. 4 is a front view of the device shown in partial cut-away;

FIG. 5 is a rear view of the device;

FIG. 6 is a bottom view of the device as it is about to receive a check; and

FIG. 7 is a diagrammatic presentation of the device, emphasizing the functions of the keypad devices used by the retailer and the customer.

DESCRIPTION OF THE PREFERRED EMBODIMENTS

The "Point-of-Sale" (POS) check processing device of this patent disclosure is further described in FIGS. 1 through 7 wherein specific detailed items will be numbered by both a figure designation and an item designation as, for example, "1-3" or "1-6." Thus, the first numeral "1" directs the reader to FIG. 1 and the second numeral (following the hyphen) directs him to a specific item, i.e., item 3, item 6, etc., in FIG. 1. It follows that no two specific items will have the same number, however, the same item designation may appear in more than one figure. For example, the designations 1-6 and 6-6 each represent the same specific item, i.e., a check 6 to be processed by this device.

FIG. 1 shows point-of-sale device 100 in a "stacked" configuration wherein 1-1 represents a lower compartment or base which may or may not also act as a main frame for the entire device 100. Item 1-2 represents a table, located on top of the base 1-1, which serves as a guide for the check 6 being processed. Located above the base 1-1 (preferably located by a spacer means, e.g. a "vertical" side element), is an upper compartment 1-5. The upper compartment 1-5 may sometimes be referred to as a "first compartment" for purposes of this patent disclosure, while the lower compartment 1-1 may be referred to as a "second compartment". Item 1-4 represents an extended, tapered portion of the upper compartment 1-5 of said device 100. All parts of the device's housing (including 1-1, 1-4 and 1-5) are preferably constructed of high-impact resistant materials offering optimum durability and longevity. Metals and hard plastic are preferred construction materials. Similarly, all other portions of the device 100 and all associated peripheral key-pads, electronics housings, electrical wires and cables, electrical connectors and any or all mechanical or electrical components are most preferably constructed from materials resistant to normal physical wear and tear, common types of solvents and cleansing solutions, the effects of smog, sunlight, oxidation and the like, as well as to those petroleum products which might be encountered in gasoline service stations. In the same vein, all electrical circuitry are most preferably

designed to be unharmed by local, high-energy radio frequency interference, highly inductive or magnetic fields such as those encountered near electric motor windings, electric solenoids and the like.

It is also important that this point-of-sale device 100 be protected against unauthorized intrusion for the purpose of affecting, manipulating, defeating, duplicating, counterfeiting or in any way circumventing the normal, authorized operation of the device 100, its peripherals or any part of the communication network(s) or system(s) connected to said device. Similarly, the central processing unit 16A (see FIGS. 2 and 6) of the device 100 also may be protected from, for example, x-ray penetration, infra-red photography, serial scanning and various types of remote electronic probing techniques known to the art. Finally, this point-of-sale device 100, as well as all its peripherals, also can be designed to be aesthetically pleasing in all respects with due attention given to color coordination, ease of operation and physical refinements.

FIG. 1 also indicates that the base 1-1 preferably will rest upon a system of sturdy, non-marking, non-skid feet 1-3 while the device 100 is in its standard, "right-side-up" orientation depicted in FIG. 1. It should be noted, however, that operation in an optional "lay-down" mode of operation may be more desirable in some cases. Feet to accommodate this lay-down mode are depicted as 4-3A. This laydown mode of operation follows from the fact that the retailer's (operator's) alpha-numeric keypad (see item 2-20), can rest on its normal mounting hinge axis, 2-21, or from another hinge axis rotated 90° as shown in 3-21A or 4-21A or from a "stand-alone" location inferred by FIG. 7. A rugged wire bundle control cable (2-22) of sufficient length connects a retailer's keypad 7-20 with the main housing (1-1) and thereby allowing the retailer a great deal of latitude in locating the keypad 2-20 for convenient use.

Item 1-6 depicts the customer's check (or any negotiable instrument utilizing the FED's MICR system) just as it is about to begin its functional travel into the point-of-sale device 100. In effect the check 1-6 is laid on a table 1-2 (2-2) having a perpendicular (and in this case a vertically perpendicular) rear guide surface 1-2A (2-2A). In effect the table 2-2 forms a substantial portion of the top surface of the base 1-1. A check receiver slot 2-23 is defined between the bottom surface 2-2B of the upper compartment 1-5 and the top surface 2-2C of the table 2-2 which, in turn, rests upon the top of base 1-1. The tapered or "nose" shape 1-4 of the upper compartment 1-5 is employed to facilitate "hands-on" assistance by the operator in placing worn, wrinkled, folded or damaged checks into the device 100. Damage to the MICR line area on the check, which renders it unreadable in the automatic mode of this device, may also be overcome by the operator who can visually read and manually enter the MICR information into the device via his keypad 2-20. In addition to housing certain hereinafter described check guide means such table 2-2 and its associated guide means 2-2A and certain check transport means and check "feed" apparatus hereinafter described, the housing nose 1-4 also may offer a convenient location for certain condition (prompt) lamps 1-25 which may conveniently indicate certain commands and operations of the device 100 and/or the network(s). These commands will be more fully described in later portions of this patent disclosure.

FIG. 2 represents a side view of the device wherein an upper edge 2-2B and lower edge 2-2C of an "open"

ECHO0001641