## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

LML PATENT CORP.     )
          )
    Plaintiff,   ) Civil Action No.: 04-858-SLR
  vs.      )
          )
TELECHECK SERVICES, INC.   )
ELECTRONIC CLEARING HOUSE, INC., ) **PUBLIC VERSION**
XPRESSCHEX, INC., AND    )
NOVA INFORMATION SYSTEMS, INC. )
          )
    Defendants.  )
          )

## DECLARATION OF JAMIE H. MCDOLE IN SUPPORT OF
## PLAINTIFF LML PATENT CORP.'S DAUBERT MOTION NO. 1:
## FOR A RULING LIMITING THE TESTIMONY OF DAVID P. KURRASCH

Originally filed: November 21, 2005
Public version filed: November 29, 2005

Richard K. Herrmann #405
Mary B. Matterer #2696
MORRIS JAMES HITCHENS &
WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
(302) 888-6800
rherrmann@morrisjames.com
mmatterer@morrisjames.com

Russell E. Levine, P.C.
Jamie H. McDole
Edward K. Runyan
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

*Counsel for LML Patent Corp.*

## DECLARATION OF JAMIE H. MCDOLE

I, Jamie H. McDole, declare as follows:

1. I am a partner of the law firm of Kirkland & Ellis LLP, and counsel for plaintiff LML Patent Corp. ("LML"). I am a member in good standing of the bar of the state of Illinois, and I am admitted to practice *pro hac vice* in the United States District Court for the District of Delaware for this case. The facts set forth below are known to me personally and I could competently testify hereto if called as a witness in this action..

2. Attached hereto as Exhibit A is a true and correct copy of portions of the September 29, 2005, deposition of David P. Kurrasch.

3. Attached hereto as Exhibit B is a comparison of TeleCheck's First Supplemental Response To LML's Amended First Set Of Interrogatories and a claim chart from the Expert Report of David P. Kurrasch Regarding Invalidity.

4. Attached hereto as Exhibit C is a true and correct copy of TeleCheck's First Supplemental Response To LML's Amended First Set Of Interrogatories.

5. Attached hereto as Exhibit D is a true and correct copy of an excerpt claim chart from the Expert Report of David P. Kurrasch Regarding Invalidity.

6. Attached hereto as Exhibit E is the declaration of Richard K. Herrmann, Esq.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on this 21st day of November 2005 in Chicago, Illinois.

Jamie H. McDole

2

# EXHIBIT   A

# EXHIBIT REDACTED
# IN ITS ENTIRETY

# EXHIBIT   B

| The '988 Patent | (Defendants' Rog Response)<br><br>Higashiyama | (Kurrasch Expert Report)<br><br>Higashiyama |
|---|---|---|
| 1. A checkwriting point of sale system comprising: | A systems for processing checks presented at the point of sale. (*See* col. 2, lines 43-46; col. 3, lines 11-14). | A systems for processing checks presented at the point of sale. (*See* col. 2, lines 43-46; col. 3, lines 11-14). |
| a point of sale terminal adapted to receive consumer bank account information from any bank check; | Point of sale system 210 including a MICR reader 202 used for reading the magnetic account number printed on checks. (*See* col. 3, lines 13-18). | Point of sale system 210 including a MICR reader 202 used for reading the magnetic account number printed on checks. (*See* col. 3, lines 13-18). |
| a central computer system; | Backroom processor 204 to which one or more point of sale systems are connected. (*See* Figure 2; col. 3, lines 13-14, 29-33.) | Backroom processor 204 to which one or more point of sale systems are connected. (*See* Figure 2; col. 3, lines 13-14, 29-33.) |
| first communications means integral to said point of sale terminal for electronically communicating with the central computer system; | POS terminal 201 (which is part of the point of sale system) is connected to the backroom processor 204. (*See* col. 3, lines 29-30.) | POS terminal 201 (which is part of the point of sale system) is connected to the backroom processor 204. (*See* col. 3, lines 29-30.) |
| memory means integral to said point of sale terminal for temporarily storing the consumer bank account information; | Data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201. (*See* col. 3, lines 55-62; col. 5, lines 1-4.) | Data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201. (*See* col. 3, lines 55-62; col. 5, lines 1-4.) |
| the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; | Backroom processor 204 receives data records from the POS terminal 201. (*See* col. 5, lines 1-10.) Since the backroom processor 204 is connected to one or more point of sale systems 210, each having a POS terminal 201 that supplies data records, the backroom processor 204 receives data records from one or more (plurality) of point of sale | Backroom processor 204 receives data records from the POS terminal 201. (*See* col. 5, lines 1-10.) Since the backroom processor 204 is connected to one or more point of sale systems 210, each having a POS terminal 201 that supplies data records, the backroom processor 204 receives data records from one or more (plurality) of point of sale |

|  | systems 210. | systems 210. |
|---|---|---|
| the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the bank check as a negotiable instrument. | Backroom processor 204 will take the data records it has accumulated and upload them to a clearing house. (*See* col. 5, lines 11-13.) The data record is also used to verify check authorization by being compared to a file. (*See* col. 4, lines 14-24.) The information from the paper check is electronically processed and the check is returned to the customer at the point of sale. (*See* col. 4, lines 54-57.) | Backroom processor 204 will take the data records it has accumulated and upload them to a clearing house. (*See* col. 5, lines 11-13.) The data record is also used to verify check authorization by being compared to a file. (*See* col. 4, lines 14-24.) The information from the paper check is electronically processed and the check is returned to the customer at the point of sale. (*See* col. 4, lines 54-57.) |
| 4.  The checkwriting point of sale system according to claim 1 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip. | Printer 203 for printing a sales slip. (*See* col. 3, lines 25-27.) | Printer 203 for printing a sales slip. (*See* col. 3, lines 25-27.) |
| 9.  A checkwriting point of sale system comprising: | A system for processing checks presented at the point of sale.  (*See* col. 2, lines 43-46; col. 3, lines 11-14.) | A system for processing checks presented at the point of sale.  (*See* col. 2, lines 43-46; col. 3, lines 11-14.) |
| a point of sale terminal adapted to receive consumer bank account information; | Point of sale system 210 including a MICR reader 202 used for reading the magnetic account number printed on checks.  (*See* col. 2; col. 3, lines 13-18.) | Point of sale system 210 including a MICR reader 202 used for reading the magnetic account number printed on checks.  (*See* Figure 2; col. 3, lines 13-18.) |
| a central computer system; | Backroom processor 204 to which one or more point of sale systems are connected.  (*See* Figure 2; col. 3, lines 13-14, 29-33.) | Backroom processor 204 to which one or more point of sale systems are connected.  (*See* Figure 2; col. 3, lines 13-14, 29-33.) |
| first communications means integral to said point of sale terminal for electronically communicating with the central computer system; and | POS terminal 201 (which is part of the point of sale system) is connected to the backroom processor 204.  (*See* col. 3, lines 29-30.) | POS terminal 201 (which is part of the point of sale system) is connected to the backroom processor 204.  (*See* col. 3, lines 29-30.) |
| memory means integral to said | Data record, including customer | Data record, including customer |

2

| | | |
|---|---|---|
| point of sale terminal for temporarily storing the consumer bank account information; | checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201. (*See* col. 3, lines 55-62; col. 5, lines 1-4.) | checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201. (*See* col. 3, lines 55-62; col. 5, lines 1-4.) |
| the point of sale terminal comprising reading means for reading magnetic ink character recognition numbers on any consumer bank check for the sole purpose of eliciting consumer bank account information; | MICR reader 202 reads the account information on the check. (*See* col. 3, lines 48-50.) | MICR reader 202 reads the account information on the check. (*See* col. 3, lines 48-50.) |
| the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; | Backroom processor 204 receives data records from the POS terminal 201. (*See* col. 5, lines 1-10.) Since the backroom processor 204 is connected to one or more point of sale systems 210, each having a POS terminal 201 that supplies data records, the backroom processor 204 receives data records from one or more (plurality) of point of sale systems 210. | Backroom processor 204 receives data records from the POS terminal 201. (*See* col. 5, lines 1-10.) Since the backroom processor 204 is connected to one or more point of sale systems 210, each having a POS terminal 201 that supplies data records, the backroom processor 204 receives data records from one or more (plurality) of point of sale systems 210. |
| the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using a bank check as a negotiable instrument. | Backroom processor 204 will take the data records it has accumulated and upload them to a clearing house. (*See* col. 5, lines 11-13.) The data record is also used to verify check authorization by being compared to a file. (*See* col. 4, lines 14-24.) Further, the information from the paper check is electronically processed, and the check is returned to the customer at the point of sale. (*See* col. 4, lines 54-57.) | Backroom processor 204 will take the data records it has accumulated and upload them to a clearing house. (*See* col. 5, lines 11-13.) The data record is also used to verify check authorization by being compared to a file. (*See* col. 4, lines 14-24.) Further, the information from the paper check is electronically processed, and the check is returned to the customer at the point of sale. (*See* col. 4, lines 54-57.) |
| 10. The checkwriting point of sale system according to claim 9 further comprising a printer means for receiving information from the memory | Printer 203 for printing a sales slip. (*See* col. 3, lines 25-27.) | Printer 203 for printing a sales slip. (*See* col. 3, lines 25-27.) |

3

| | | |
|---|---|---|
| means of the point of sale terminal and for generating a transaction event sale slip. | | |
| 13. The checkwriting point of sale system according to claim 4, wherein the sale slip includes means for execution by the consumer for proof of bank account access authorization. | A fully automated system generally comprises a dual-port terminal with magnetic stripe reading capabilities interfaced with a logging printer capable of providing individual transaction event slips for consumer execution.  (*See* col. 5, lines 44-47.) | A fully automated system generally comprises a dual-port terminal with magnetic stripe reading capabilities interfaced with a logging printer capable of providing individual transaction event slips for consumer execution.  (*See* col. 5, lines 44-47.) |

4

# EXHIBIT   C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LML PATENT CORP.,

        Plaintiff,

    v.

TELECHECK SERVICES, INC.,
ELECTRONIC CLEARING HOUSE, INC.,
XPRESSCHEX, INC. and NOVA
INFORMATION SYSTEMS, INC.,

        Defendants.

C.A. 04-858 (SLR)

## TELECHECK'S FIRST SUPPLEMENTAL RESPONSE TO
## LML'S AMENDED FIRST SET OF INTERROGATORIES

## RESERVATION OF RIGHTS

Pursuant to Rules 26 and 33, TeleCheck Services, Inc. ("TeleCheck") hereby
provides a First Supplemental Response to LML Patent Corp.'s ("LML") Amended First
Set of Interrogatories, Nos. 1-9 ("Interrogatories"). TeleCheck provides these
supplemental responses without waiving any present or future objection, for example
such as any objection as to the relevance or admissibility of any information provided by
TeleCheck. TeleCheck's investigation regarding this litigation is ongoing, as is
TeleCheck's development of any contentions. These responses are provided subject to
TeleCheck's future investigation, supplementation, or modification. TeleCheck's
agreement to investigate the subject matter of any interrogatory or to provide responsive
information does not constitute an admission that relevant, non-privileged information
responsive to that interrogatory exists. All responses are subject to each of the General
Objections and specific Objections set forth in TeleCheck's original Response to LML's
Amended First Set of Interrogatories.

1.    **The '988 Patent**

Claims 1, 4, 9-10, and 13 of the '988 patent are invalid under as anticipated 35 U.S.C. § 102 by U.S. Patent No. 5,175,682 to Higashiyama ("Higashiyama"). Each and every element of claims 1, 4, 9-10 and 13 of the '988 patent is taught by Higashiyama.

| The '988 Patent | Higashiyama |
|---|---|
| 1. A checkwriting point of sale system comprising: | A system for processing checks presented at the point of sale. (*See* col. 2, lines 43-46; col. 3, lines 11-14.) |
| a point of sale terminal adapted to receive consumer bank account information from any bank check; | Point of sale system 210 including a MICR reader 202 used for reading the magnetic account number printed on checks. (*See* col. 3, lines 13-18.) |
| a central computer system; | Backroom processor 204 to which one or more point of sale systems are connected. (*See* Figure 2; col. 3, lines 13-14, 29-33.) |
| first communications means integral to said point of sale terminal for electronically communicating with the central computer system; | POS terminal 201 (which is part of the point of sale system) is connected to the backroom processor 204. (*See* col. 3, lines 29-30.) |
| memory means integral to said point of sale terminal for temporarily storing the consumer bank account information; | Data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201. (*See* col. 3, lines 55-62; col. 5, lines 1-4.) |
| the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; | Backroom processor 204 receives data records from the POS terminal 201. (*See* col. 5, lines 1-10.) Since the backroom processor 204 is connected to one or more point of sale systems 210, each having a POS terminal 201 that supplies data records, the backroom processor 204 receives data records from one or more (plurality) of point of sale systems 210. |
| the central computer system second communication means enabling | Backroom processor 204 will take the data records it has accumulated and upload them |

7

| | |
|---|---|
| said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the bank check as a negotiable instrument. | to a clearing house. (*See* col. 5, lines 11-13.) The data record is also used to verify check authorization by being compared to a file. (*See* col. 4, lines 14-24.) The information from the paper check is electronically processed and the check is returned to the customer at the point of sale. (*See* col. 4, lines 54-57.) |
| 4. The checkwriting point of sale system according to claim 1 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip. | Printer 203 for printing a sales slip. (*See* col. 3, lines 25-27.) |
| 9. A checkwriting point of sale system comprising: | A system for processing checks presented at the point of sale. (*See* col. 2, lines 43-46; col. 3, lines 11-14.) |
| a point of sale terminal adapted to receive consumer bank account information; | Point of sale system 210 including a MICR reader 202 used for reading the magnetic account number printed on checks. (*See* col. 3, lines 13-18.) |
| a central computer system; | Backroom processor 204 to which one or more point of sale systems are connected. (*See* Figure 2; col. 3, lines 13- 14, 29-33.) |
| first communications means integral to said point of sale terminal for electronically communicating with the central computer system; and | POS terminal 201 (which is part of the point of sale system) is connected to the backroom processor 204. (*See* col. 3, lines 29-30.) |
| memory means integral to said point of sale terminal for temporarily storing the consumer bank account information; | Data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201. (*See* col. 3, lines 55-62; col. 5, lines 1-4.) |
| the point of sale terminal comprising reading means for reading magnetic ink character recognition numbers on any consumer bank check for the sole | MICR reader 202 reads the account information on the check. (*See* col. 3, lines 48-50.) |

8

| | |
|---|---|
| purpose of eliciting consumer bank account information; | |
| the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; | Backroom processor 204 receives data records from the POS terminal 201. (*See* col. 5, lines 1-10.) Since the backroom processor 204 is connected to one or more point of sale systems 210, each having a POS terminal 201 that supplies data records, the backroom processor 204 receives data records from one or more (plurality) of point of sale systems 210. |
| the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using a bank check as a negotiable instrument. | Backroom processor 204 will take the data records it has accumulated and upload them to a clearing house. (*See* col. 5, lines 11-13.) The data record is also used to verify check authorization by being compared to a file. (*See* col. 4, lines 14-24.) Further, the information from the paper check is electronically processed, and the check is returned to the customer at the point of sale. (*See* col. 4, lines 54-57.) |
| 10. The checkwriting point of sale system according to claim 9 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip. | Printer 203 for printing a sales slip. (*See* col. 3, lines 25-27.) |
| 13. The checkwriting point of sale system according to claim 4, wherein the sales slip includes means for execution by the consumer for proof of bank account access authorization. | A fully automated system generally comprises a dual-port terminal with magnetic stripe reading capabilities interfaced with a logging printer capable of providing individual transaction event slips for consumer execution. (*See* col. 5, lines 44-47.) |

Claim 2 of the '988 patent is obvious under 35 U.S.C. § 103 as unpatentable over Higashiyama.

9

All Asserted Claims of the '988, '528 and '366 patents are invalid under 35 U.S.C. § 102(f) and/or § 116 because of improper inventorship.

All Asserted Claims of the patents-in-suit are invalid under the second paragraph of 35 U.S.C. § 112 because the claims either recite, or depend from a claim that recites the negative limitation "without using the check [or bank check] as a negotiable instrument," rendering the claims indefinite.

All Asserted Claims of the patents-in-suit are invalid under the second paragraph of 35 U.S.C. § 112 because the term "negotiable instrument" is a legal term subject to various interpretations, including various interpretations under state law and/or the UCC, and therefore ambiguous.

TeleCheck's investigation into its defenses is continuing, and it reserves the right to supplement these defenses and/or assert additional invalidity defenses as discovery progresses.

Dated: January 28, 2005

FISH & RICHARDSON P.C.

By: _____
    William J. Marsden, Jr. (#2247)
    Timothy Devlin (#4241)
    Tara D. Elliott (#4483)
    919 N. Market Street, Suite 1100
    P.O. Box 1114
    Wilmington, DE 19899-1114
    (302) 652-5070

*Attorneys for Defendant
TeleCheck Services, Inc.*



# EXHIBIT  D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LML PATENT CORP., | |
| Plaintiff, | |
| v. | C.A. 04-858 (SLR) |
| TELECHECK SERVICES, INC., ELECTRONIC CLEARING HOUSE, INC., XPRESSCHEX, INC. and NOVA INFORMATION SYSTEMS, INC., | |
| Defendants. | |

## EXPERT REPORT OF DAVID P. KURRASCH

## REGARDING INVALIDITY

| '988 PATENT | HIGASHIYAMA |
|---|---|
| 1. A checkwriting point of sale system comprising: | A system for processing checks presented at the point of sale. (*See* col. 2, lines 43-46; col. 3, lines 11-14.) |
| a point of sale terminal adapted to receive consumer bank account information from any bank check; | Point of sale system 210 including a MICR reader 202 used for reading the magnetic account number printed on checks. (*See* col. 3, lines 13-18.) |
| a central computer system; | Backroom processor 204 to which one or more point of sale systems are connected. (*See* Figure 2; col. 3, lines 13-14, 29-33.) |
| first communications means integral to said point of sale terminal for electronically communicating with the central computer system; | POS terminal 201 (which is part of the point of sale system) is connected to the backroom processor 204. (*See* col. 3, lines 29-30.) |
| memory means integral to said point of sale terminal for temporarily storing the consumer bank account information; | Data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201. (*See* col. 3, lines 55-62; col. 5, lines 1-4.) |
| the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; | Backroom processor 204 receives data records from the POS terminal 201. (*See* col. 5, lines 1-10.) Since the backroom processor 204 is connected to one or more point of sale systems 210, each having a POS terminal 201 that supplies data records, the backroom processor 204 receives data records from one or more (plurality) of point of sale systems 210. |
| the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the bank check as a negotiable instrument. | Backroom processor 204 will take the data records it has accumulated and upload them to a clearing house. (*See* col. 5, lines 11-13.) The data record is also used to verify check authorization by being compared to a file. (*See* col. 4, lines 14-24.) The information from the paper check is electronically processed and the check is returned to the customer at the point of sale. (*See* col. 4, lines 54-57.) |
| 4. The checkwriting point of sale system according to claim 1 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip. | Printer 203 for printing a sales slip. (*See* col. 3, lines 25-27.) |
| 9. A checkwriting point of sale system comprising: | A system for processing checks presented at the point of sale. (*See* col. 2, lines 43-46; col. 3, lines 11-14.) |
| a point of sale terminal adapted to receive consumer bank account | Point of sale system 210 including a MICR reader 202 used for reading the magnetic account number printed |

| '988 PATENT | HIGASHIYAMA |
|---|---|
| information; | on checks. (*See* col. 3, lines 13-18.) |
| a central computer system; | Backroom processor 204 to which one or more point of sale systems are connected. (*See* Figure 2; col. 3, lines 13- 14, 29-33.) |
| first communications means integral to said point of sale terminal for electronically communicating with the central computer system; and | POS terminal 201 (which is part of the point of sale system) is connected to the backroom processor 204. (*See* col. 3, lines 29-30.) |
| memory means integral to said point of sale terminal for temporarily storing the consumer bank account information; | Data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201. (*See* col. 3, lines 55-62; col. 5, lines 1-4.) |
| the point of sale terminal comprising reading means for reading magnetic ink character recognition numbers on any consumer bank check for the sole purpose of eliciting consumer bank account information; | MICR reader 202 reads the account information on the check. (*See* col. 3, lines 48-50.) |
| the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; | Backroom processor 204 receives data records from the POS terminal 201. (*See* col. 5, lines 1-10.) Since the backroom processor 204 is connected to one or more point of sale systems 210, each having a POS terminal 201 that supplies data records, the backroom processor 204 receives data records from one or more (plurality) of point of sale systems 210. |
| the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using a bank check as a negotiable instrument. | Backroom processor 204 will take the data records it has accumulated and upload them to a clearing house. (*See* col. 5, lines 11-13.) The data record is also used to verify check authorization by being compared to a file. (*See* col. 4, lines 14-24.) Further, the information from the paper check is electronically processed, and the check is returned to the customer at the point of sale. (*See* col. 4, lines 54-57.) |
| 10. The checkwriting point of sale system according to claim 9 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip. | Printer 203 for printing a sales slip. (*See* col. 3, lines 25-27.) |
| 13. The checkwriting point of sale system according to claim 4, wherein the sales slip includes means for | A fully automated system generally comprises a dual-port terminal with magnetic stripe reading capabilities interfaced with a logging printer capable of providing |

| '988 PATENT | HIGASHIYAMA |
|---|---|
| execution by the consumer for proof of bank account access authorization. | individual transaction event slips for consumer execution. (*See* col. 5, lines 44–47.) |

| '988 PATENT | HIGASHIYAMA + CARLSON |
|---|---|
| 3. The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further comprises an alphanumeric display means for receiving said consumer bank account information from the memory means and for displaying the consumer bank account information. | Carlson teaches an alphanumeric display used in connection with a point-of-sale device for reading MICR numbers from checks. When the MICR data is entered manually by the merchant, the MICR data is displayed digit-for-digit/stroke-for-stroke at the display. (*See* col. 21, lines 5-8.) Therefore, one of ordinary skill in the art would have been motivated to combine the teachings of both references to include alphanumeric display means in the system described by Higashiyama, which discloses a keypad. (*See* Higashiyama, col. 3, lines 19-22.) |

| '988 PATENT | HIGASHIYAMA + CACTUS SWITCH ARTICLE |
|---|---|
| 6. The checkwriting point of sale system according to claim 1 wherein the central computer system further comprises a system subscriber database, the system subscriber database comprising information regarding merchants and service providers that are authorized to use the checkwriting point of sale system. | The central computer of Higashiyama serves one or more POS terminals of a single merchant. The Cactus Switch network serves multiple merchants and the transaction is cleared through the Arizona Clearing House Association. Therefore, one of ordinary skill in the art would have been motivated to combine the teachings of the references to modify Higashiyama's POS system to service multiple merchants such that its central computer comprises a system subscriber database so that proper accounting of sales and credits can be made. |

| '988 PATENT | HIGASHIYAMA + SECOND CACTUS SWITCH ARTICLE |
|---|---|
| 13. The checkwriting point of sale system according to claim 4, wherein the sales slip includes means for execution by the consumer for proof of bank account access authorization. | The second Cactus Switch article teaches that checking account debit authorizations may be provided by personal identification numbers or signatures. (*See* p. 4.) In view of this teaching, it would have been obvious to one of ordinary skill in the art to modify Higashiyama's POS system to include a sales receipt with a signature space for the consumer to provide authorization to debit his or her checking account. Additionally, it would be obvious to a person of ordinary skill in the art to implement such a system in a way that would comply with the relevant regulatory framework at the time of the invention, including Regulation E, which requires the consumer's signature to authorize consumer account |

# EXHIBIT  E

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| LML PATENT CORP. | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.  04-858-SLR |
| vs. | ) | |
| | ) | |
| TELECHECK SERVICES, INC. | ) | |
| ELECTRONIC CLEARING HOUSE, INC., | ) | |
| XPRESSCHEX, INC., AND | ) | |
| NOVA INFORMATION SYSTEMS, INC. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF RICHARD K. HERRMANN, ESQ.

I, Richard K. Herrmann, Esq., declare as follows:

1. I serve as one of the Delaware counsel of record for the plaintiff LML in this action.

2. I have reviewed the Defendants' memoranda in opposition to LML's *Daubert* Motions filed pursuant to paragraph 2(c)(3) of the Case Scheduling Order on October 28, 2005.

3. In those briefs, Defendants criticize LML for filing *Daubert* Motions without engaging in the meet and confer process and without filing a Delaware Local Rule 7.1.1 certificate.

4. Since the filing of *Daubert* motions is specifically permitted in case scheduling orders, and because the deadline for filing such motions is the same as that for dispositive motions, I do not advise lead counsel of the need to file a Rule 7.1.1 certificate with the filing of a *Daubert* motion, and, accordingly, I did not do so in this case.  I have never been informed of a deficiency for not attaching a Rule 7.1.1 certificate to a *Daubert* motion.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on this 21st day of November 2005 in Wilmington, Delaware.

Richard K. Herrmann, Esq.

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of November, 2005, I electronically filed the foregoing document, **PUBLIC VERSION OF DECLARATION OF JAMIE H. MCDOLE IN SUPPORT OF PLAINTIFF LML PATENT CORP.'S DAUBERT MOTION NO. 1: FOR A RULING LIMITING THE TESTIMONY OF DAVID P. KURRASCH**, with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Collins J. Seitz, Jr., Esq.
Francis DiGiovanni, Esq.
Connolly Bove Lodge & Hutz LLP
1007 North Orange Street
Wilmington, DE  19801

William J. Marsden, Jr., Esq.
Timothy Devlin, Esq.
Fish & Richardson, P.C.
919 North Market Street, Suite 1100
Wilmington, DE  19801

Richard D. Kirk, Esq.
The Bayard Firm
222 Delaware Avenue, 9th Floor
Wilmington, DE  19801

Additionally, I hereby certify that on the 29th day of November, 2005, the foregoing document was served via email on the following non-registered participants:

Robert Jacobs, Esq.
Mark B. Mizrahi, Esq.
Belasco Jacobs & Townsley, LLP
Howard Hughes Center
6100 Center Drive, Suite 630
Los Angeles, CA  90045

Mark C. Scarsi, Esq.
Vision L. Winter, Esq.
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA  90071

*/s/ Mary B. Matterer*
Richard K. Herrmann (#405)
Mary B. Matterer (#2696)
MORRIS, JAMES, HITCHENS
& WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
(302) 888-6800
mmatterer@morrisjames.com

*Counsel for Plaintiff LML PATENT CORP.*