P

# EXHIBIT REDACTED IN ITS ENTIRETY

Q

# EXHIBIT REDACTED IN ITS ENTIRETY

R

# EXHIBIT REDACTED IN ITS ENTIRETY

S

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LML PATENT CORP.,

          Plaintiff,

    v.

TELECHECK SERVICES, INC.,
ELECTRONIC CLEARING HOUSE, INC.,
XPRESSCHEX, INC. and NOVA
INFORMATION SYSTEMS, INC.,

          Defendants.

C.A. 04-858 (SLR)

## EXPERT REPORT OF DAVID P. KURRASCH

## REGARDING INVALIDITY

321.    I have reviewed the file histories of the '988, '528 and '366 patents. It is my opinion that all of the claims of the patents-in-suit are invalid for failure to comply with the written description, enablement, definiteness and/or "no new matter" requirements described above.

### 2.    Lack of Written Description and New Matter

322.    If the June 8, 1994 Preliminary Amendment is not considered part of the as-filed subject matter of the 1994 application, it is my opinion that claims 1-6, 8-11, 13-14, 16, 18 of the '988 patent and their dependent claims are invalid under 35 U.S.C. §112, first paragraph, because the original patent disclosure failed to provide sufficient written description for claim language subsequently added in the June 8, 1994 Preliminary Amendment. In particular, the claim limitations "without using the check as a negotiable instrument" and "without using the bank check as a negotiable instrument" have no support in the '988 patent specification outside of the disclosure added by the June 8, 1994 Preliminary Amendment.

323.    If it is determined that the disclosure added by the June 8, 1994 Preliminary Amendment should not be construed as part of the original 1994 application disclosure, then in my opinion, the asserted claims of the '988 patent are further invalid under 35 U.S.C. § 132 based on the inclusion of "new matter" within the specification. As set forth above, it is my opinion that the description added by the June 8, 1994 amendment constitutes new matter compared to the original disclosure of the 1992 application. As set forth above, it is also my opinion that all asserted claims of the '988 patent require at least this disclosure as support. Accordingly, if the disclosure added by the June 8, 1994 Preliminary Amendment is not treated as part of the as-filed 1994 application, then the claims are invalid under 35 U.S.C. § 132.

### 3.    Lack of Enablement

324.    It is my opinion that claims 1-6, 8-11, 13-14, 16 and 18 of the '988 patent, and claims 1-3 of the '366 patent are further invalid under 35 U.S.C. § 112, first

73

paragraph, for failure to provide in the patent specification an enabling disclosure for the limitations of reading information from "any bank check" or "any consumer bank check." There is no enabling disclosure in the specification for conducting transactions using, for example, business checks or foreign bank checks. For many foreign bank checks, conducting transactions as described and claimed would at least require knowledge of currency translations and regulatory and technical issues not addressed in the specifications of the '988 patent or '366 patent.

### 4.    Indefiniteness

325.    It is also my opinion that, under the current claim construction proposed by LML as presently understood, all of the asserted claims of the patents-in-suit are invalid under the second paragraph of 35 U.S.C. § 112 because the claims either recite or depend from a claim that recites the limitation "without using the check [or bank check] as a negotiable instrument," rendering the claims indefinite. At the time the patent applications leading to the '988 patent were filed, the interpretation of the phrase "without using the check [or bank check] as a negotiable instrument" as applied to electronic transactions was uncertain. The limitation "without using the check [or bank check] as a negotiable instrument," would have been subject to various interpretations, including various interpretations imposed by state law, the UCC and/or other regulatory sources such as Regulation E, and therefore renders each of these claims ambiguous and indefinite.

### H.    Improper Inventorship

326.    I understand that 35 U.S.C. §§ 102(f) and 116 provide that a patent is invalid for improper inventorship.

327.    In my opinion all of the asserted claims of the '528 patent and '366 patent are invalid under § 102(f) and/or § 116 for improper inventorship. Mr. Hills, the first-named inventor of the patents-in-suit conceded publicly that the named inventors did not invent various elements of the subject matter of the asserted claims. Mr. Hills, the first-

Applicants did not cite to the Examiner the earlier rejections during the '988 patent, and the Applicants' amendments regarding "any" check. In my opinion, this information was material to the prosecution of the '528 and '366 patent, and was not cumulative to the prior art before the Examiner.


Dated:  August 12, 2005          _____ /s/ David P. Kurrasch _____

                                         David P. Kurrasch

T

5484988

| UTILITY SERIAL NUMBER | 08/257390 | PATENT DATE JAN 16 1996 | PATENT NUMBER |
|---|---|---|---|

| SERIAL NUMBER | FILING DATE | CLASS | SUBCLASS | GROUP ART UNIT | EXAMINER |
|---|---|---|---|---|---|
| 08/257,390 | 06/09/94 | 235 | 3 7 | 2505 | Pitts |

**APPLICANTS**
ROBERT R. HILLS, ST. AUGUSTINE, FL; HENRY R. NICHOLS, MC LEAN, VA.

**CONTINUING DATA**************************
VERIFIED      THIS APPLN IS A CON OF   07/975,717 11/13/92, NOW ABANDONED

**FOREIGN/PCT APPLICATIONS************
VERIFIED

FOREIGN FILING LICENSE GRANTED 07/28/94      ***** SMALL ENTITY *****

| Foreign priority claimed ☐ yes ☐ no | AS FILED | STATE OR COUNTRY | SHEETS DRWGS. | TOTAL CLAIMS | INDEP. CLAIMS | FILING FEE RECEIVED | ATTORNEY'S DOCKET NO. |
|---|---|---|---|---|---|---|---|
| 35 USC 119 conditions met ☐ yes ☐ no | | | | | | | |
| Verified and Acknowledged  Examiner's Initials | | FL | 8 | 9 | 2 | $355.00 | |

**ADDRESS**
JON L. ROBERTS
ROBERTS & ASSOCIATES
1953 GALLOWS RD.
SUITE 220
VIENNA, VA 22182

**TITLE**
CHECKWRITING POINT OF SALE SYSTEM

U.S. DEPT. of COMM.-Pat. & TM Office — PTO-436L (rev. 10-78)

| PARTS OF APPLICATION FILED SEPARATELY | | | |
|---|---|---|---|

Applicantal Examiner   8/8/95

| NOTICE OF ALLOWANCE MAILED | | CLAIMS ALLOWED | |
|---|---|---|---|
| 8-7-95 | Assistant Examiner | Total Claims | Print Claim |
| | | 20 | |
| **ISSUE FEE** | | **DRAWING** | |
| Amount Due | Date Paid | Sheets Drwg. | Figs. Drwg. | Print Fig. |
| $605.00 | 9-27-95 | 8 | 9 | |
| | HAROLD PITTS PRIMARY EXAMINER GROUP 2500 | **ISSUE BATCH NUMBER** | |
| Label Area | Primary Examiner | | 09 |
| | PREPARED FOR ISSUE | | |

WARNING: The information disclosed herein may be restricted. Unauthorized disclosure may be prohibited by the United States Code Title 35, Sections 122, 181 and 368. Possession outside the U.S. Patent & Trademark Office is restricted to authorized employees and contractors only.

Form PTO-436A
(Rev. 8/92)

(FACE)

LML-EP 000054

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of Robert H. Hills and Henry R. Nichols

Serial No. NOV 13 1992

Group Art Unit:

Filed:

Examiner:

FOR:   CHECKWRITING POINT OF SALE SYSTEM

\*      \*      \*      \*      \*

Hon. Commissioner of Patent
   and Trademarks
Washington, D.C. 20231

Dear Sir:

   Enclosed please find the following:

1.   Declaration and Power of Attorney of Henry R. Nichols and
     Robert R. Hills (separate documents)

2.   Verified Statement Claiming Small Entity (Inventor)
     (separate documents)

3.   Specification, 9 Claims, and Abstract

4.   8 informal drawing sheets (11 figures)

5.   Submitted herewith is a check for $395.00 to cover the
     cost of the filing.  Any deficiency or overpayment should
     be charged or credited to the Deposit Account of Arter &
     Hadden, No. 01-2520.

                         Respectfully submitted,

                         Jon L. Roberts
                         Registration No. 31,293
                         Arter & Hadden
                         1801 K Street, N.W.
                         Suite 400K
                         Washington, D.C. 20006

DATED:  November 13, 1992

LML-EP 000080

1  ABSTRACT

2      A point of sale system designed to read information from a

3  consumer's check, credit card, or manual input with a subsequent

4  debiting of a consumer's account and crediting a merchant's account

5  for the goods or services provided.  Point of sale terminals are

6  designed to accept a form of credit card with a consumer's bank

7  account information encoded thereon or in the alternative to read

8  the MICR number from a consumer's check in order to verify that a

9  consumer has appropriate credit to conduct the transaction with a

10  given merchant.  Thereafter the transaction of that information is

11  transmitted to a central computer system which verifies the

12  consumer's credit worthiness and stores the transaction event

13  information for subsequent bank reconciliation via the ACH network.

14  The invention eliminates the need for paper checks with all bank

15  reconciliation being accomplished electronically.

16

17

18

19  Jtr-1808

20

-31-

LML-EP 000081

395-201- 07/97571

CHECKWRITING POINT OF SALE SYSTEM

1   INVENTORS:   ROBERT H. HILLS AND HENRY R. NICHOLS
     RELATED APPLICATION
2   This application is a continuation of 07/975717 now abandoned.

3   FIELD OF THE INVENTION

4        This invention relates to the field of Point-of-Sale systems

5   and more particularly, the integration and processing of purchases

6   whereby a check is used as the basic source of identification of

7   the individual and the bank and bank account be debited.

8

9   BACKGROUND ART

10       Numerous devices exist for processing checks.  For example,

11   U.S. patent number 4,933,536 to Lindemann, et al., describes a check

12   processing device which is used together a Point-of-Sale terminal.

13   This particular device involves copying and taking a picture of an

14   individual whereby a dishonored check could then be traced to the

15   person who has offered it.

16       U.S. Patent No. 4,810,866 to Lloyd, Jr., describes a check

17   validation system again located together with a Point-of-Sale

18   system for imprinting and otherwise physically dealing with a

19   check.

20       Other systems also deal with an apparatus for handling checks

21   at a point sale.  For example, U.S. Patent No. 4,743,743 to Fukatsu

22   describes one such transaction apparatus where a check is examined

23   by a reader.  U.S. Patent No. 4,672,377 to Murphy, et al. describes a

24   check authorization system wherein a check is imprinted with a bar

25   code and information concerning customers which are stored in a

26   database.  U.S. Patent No. 3,845,470 to Schuller, discloses a vending

27   system using a modified form of a check which is imprinted with

28   identification codes, when someone attempts to use the check in

-1-

LML-EP 000082

1  purchasing goods and services, and wherein a vending operation will

2  not place, if information associated with the check is not valid in

3  a particular database.

4      Other check-based financial systems have also been the subject

5  of invention. Patent No. 4,617,457 addresses an ATM or automatic

6  teller machine form of cashing checks. Such systems create a picture

7  of the check involved and also involves checking against a

8  specialized database to insure that the check is a "valid" one (see

9  also Patent No. 4,580,040 to Granzow et al.).

10      Another generic category of financial systems deals with

11  methods of handling the financial transactions apart from the

12  physical handling of the check itself. For example, Patent No.

13  3,824,544 to Simjian describes a merchant issued "check" which can

14  then be used in the purchase of goods and services and upon

15  purchase, a specialized code is evaluated to determine if the check

16  is being validly utilized.

17      Patent No. 4,404,649 to Nunley et al. describes a document

18  processing system which generally discloses a method of reading

19  checks for processing a wide variety of financial documents.

20      Patent No. 4,523,330 to Caine also describes a method for

21  processing financial documents which systems also includes a Point-

22  of-Sale terminal for generating image data from checks as they are

23  being processed. This patent is drawn principally to the actual

24  terminal itself.

25      Patent No. 4,673,802 to Ohmae et al. describes a central

26  processing system having stored data relating to the accounts of

-2-

LML-EP 000083

1   users, which users are approved or disapproved at the Point-of-Sale

2   based upon information in the database.

3   Finally, Patent No. 4,678,896 to Carlson et al. describes a

4   Point-of-Sale system whereby apparatuses provided to restore the

5   processing and imprinting Checks.

6   All of these above patents deal with the specific problem of

7   how to accept a check from customer for the purchase of goods and

8   services. It does not in anyway address the subsequent processing

9   of checks or indeed address that the issue in anyway of how checks

10  are cleared through the normal automatic check handling

11  clearinghouse operation that exist the financial world. Thus, the

12  interaction of these systems with the ACH process is not addressed

13  in anyway. This is particularly important since if any Point-of-

14  Sale check handling system is to interact with the ACH mechanism it

15  must adhere to that processing scheme and indeed lend itself to use

16  with a processing scheme.

17  It is an objective of the present invention to be adaptable

18  for use with the ACH system and to be smoothly incorporated into

19  it. In this fashion, it will immediately be useful for a much

20  wider range of financial transactions above and beyond those

21  contemplated by the background I discussed above.

22

23  SUMMARY OF THE INVENTION

24  The present invention comprises a process and apparatus which

25  may be employed for the purpose of effecting payments for point-of-

26  sale purchases of goods and services paid from consumer funds

27  secured in bank checking or depository accounts. Each sale or

-3-

LML-EP 000084

1    "Transaction Event" would be an electronic and "paperless" event

2    thereby eliminating reliance on accepting and processing commercial

3    bank drafts (personal or corporate checks) and the physical

4    handling of those bank drafts thus replacing commercial bank drafts

5    at the point-of-sale.

6    The system is intended to be made available to subscribing

7    merchants, businesses, and individuals, referred to in this

8    application as "system subscribers" wishing to employ the method

9    and apparatus of the present invention for the electronic

10   processing and settlement of consumer purchases.   Further, the

11   present invention's operational parameters allow freedom from

12   customary state or other geographically limiting criteria typical

13   when accepting and processing "paper" checks.   The system is

14   designed to act with the national authorization and electronic

15   settlement network know as the ACH ("Automated Clearing House")

16   system.

17          The system is designed to perform in a fully automated manner

18   enabling each Transaction Event to be processed by a system

19   subscriber as a point-of-sale transaction in the presence of the

20   consumer.   When the transaction event is "approved" funds are

21   debited from an authorized consumer account for credit to the

22   system subscriber and electronic settlement by ACH deposit to the

23   subscriber's designated depository account.   Authorized access to

24   consumer accounts and credits to system subscriber depository

25   accounts would be performed as "Off-Line" transactions by means of

26   Electronic Funds Transfer ("EFT") through the ACH Network or

27   through the Federal Reserve System.

-4-

LML-EP 000085

1    The invention comprises a point-of-sale processing system

2    comprising electronic data processing equipment which allows

3    individual services selections which provide automated, electronic

4    processing from bank checking or depository accounts. It is the

5    objective of the present invention to automate the point-of-sale

6    environment for processing consumer purchases of goods and services

7    which, other than for the ~~applicants'~~ system, would necessitate the

8    more traditional acceptance and processing of commercial bank

9    drafts (personal and/or corporate checks). Individual Transaction

10   Events ~~would be~~ administered under the ~~applicants'~~ system

11   initiating a terminal authorization inquiry and continuing through

12   the electronic settlement of funds representing the Transaction

13   Event from the pre-approved consumer banking accounts.

14    It is a further objective of the present invention to

15   eliminate the need for "paper" checks as an accepted means of

16   consumer payment. In the place of personal and business checks,

17   consumers would be provided ~~their~~ free and unrestricted access to

18   funds secured in bank accounts of various types by means of

19   preauthorized electronic events. System subscribers electronically

20   communicate with the ~~invention's~~ data center for individual

21   Transaction Event authorizations which, upon reconciliation of a

22   day's activity, result in an ~~Electronic Funds Transfer ("EFT")~~ by

23   means of the Automated Clearing House accommodating an "Off-Line"

24   debiting of preauthorized consumer Transaction Events from

25   authorized accounts. Thereafter, each system subscriber ~~would be~~

26   credited with the total of all such daily authorized Transaction

27   Events to its designated banking depository account.

-5-

LML-EP 000086

1      The present invention comprises logic which allows the

2   following services which when individually performed or where

3   combined with other services establish a wholly unique processing

4   medium enabling preauthorized access to consumers' checking account

5   or bank depository reserves.

6      Authorization – This service supports electronic communication

7   from point-of-sale to the system's central computer.   The data

8   center stores positive and negative files concerning consumer

9   accounts thereby providing accurate inquiry responses regarding the

10  current posting status of a consumer's banking account and

11  signaling the system subscriber that said account may be reasonably

12  relied upon for consummating a Transaction Event (i.e., an

13  "Approval") or, where listed as delinquent, indicating that the

14  account could not be so relied upon (i.e., a "Denial").

15     Check Replacement – This capability operates as an extension

16  of Authorization enabling the system subscriber the capability of

17  completing a Transaction Event by electronically logging the sale

18  whereupon a Transaction Event .Slip will be printed or manually

19  prepared for consumer execution at the point-of-sale.    By

20  execution, the consumer authorizes the electronic accessing of

21  funds secured in his/her authorized banking account in lieu of the

22  more traditional method of issuing personal and business checks.

23  Funding settlement to the system subscriber would be effectuated by

24  means of Electronic Funds Transfer via ACH or the Federal Reserve

25  System as opposed to physically processing and transferring checks

26  among banks.

-6-

LML-EP 000087

1    Bank Transaction Card - As part of this invention on "Off-
2    Line" Debit Card is established on which is stored the information
3    relating to the banking account from which funds representing the
4    Transaction Event would be debited for payment to the system
5    subscriber. This information may be stored on the card itself in
6    encrypted or unencrypted form or be stored in the central computer
7    where access to such information is gained via special control
8    characters or access codes stored on the card. Electronic
9    authorization for withdrawal of funds from the cardholder's account
10   and subsequent electronic settlement procedures would remain
11   essentially identical to processing under the Check Replacement
12   service described above. Information relating to the consumer-
13   cardholder and the appropriate banking account to be debited for a
14   Transaction Event will be encoded upon the magnetic stripe portion
15   of the plastic, and terminal-readable, card.

16   Thus, the overall objective of the present invention is to
17   provide and support an alternate means for consumer payments for
18   goods and services that operates to replace commercial bank drafts
19   in the point-of-sale environment. Simultaneously, the present
20   invention assures consumers greater access and use to funds in
21   personal or corporate banking accounts. Further, the system
22   provides system subscribers a significantly improved prospect of
23   collecting the underlying monies for Transaction Events, reduced
24   time for the collecting the cash receipts from Transaction Events,
25   and a pronounced lowering of the present cost of cumbersome
26   procedures otherwise mandated by the existing ACH system for
27   accepting and processing commercial bank drafts.

-7-

LML-EP 000088

1    A further objective of the present invention is to

2    significantly reduce the use of checks ~~as a means of conducting~~

3    purchases of goods or services and to further reduce the consumers

4    reliance on credit cards or cash for transaction events ~~as well.~~

5        **DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT**

6    The present invention begins with the electronic recording of

7    consumer information ~~at a system subscribers~~ location using a at a

8    point-of-sale terminal.    This information is obtained in the

9    presence of the consumer and occurs prior to any "Approval" either

10    for the Transaction Event or the ultimate crediting of the System

11    subscriber's designated depository account.    A Transaction Event

12    involves a series of events initiated by a system subscriber's

13    request to sell goods or services by payment from funds secured in

14    a consumer's banking account.    First, the consumer's banking

15    account status will be verified through accessing ~~the invention's~~

16    central computer files.    Verification that an account may be

17    accessed is established alternatively by means of an encoded,

18    magnetic strip card, or by input of account identification numbers

19    from a consumer's bank account.    A more traditional identification

20    of the consumer could also occur including visual examination of

21    driver's license or similar and acceptable picture "ID" however

22    this is not part of the invention.

23    As an integral portion of each Transaction Event, the system

24    subscriber's location, date and time, and requested sale amount is

25    automatically logged into the system when a system subscriber first

26    accesses the invention.    Finally, a Transaction Event Slip ("Sales

27    Slip") will be produced by an printer integral to the point-of-sale

-8-

LML-EP 000089

1  terminal and *will be* executed by the consumer in the amount of the stated

2  purchase with inscribed language defining the Transaction Event and

3  specifically providing consumer authorization for electronic access

4  to his/her banking account. Thereafter, the consumer account will

5  be debited and the proceeds credited to the system subscriber's

6  designated depository account along with all other similar

7  Transaction Events representing the total of the system

8  subscriber's daily activity. Debiting of consumer accounts and

9  settlement deposits to each system subscriber is performed by means

10 of Off-Line electronic funds transfer through and by the ACH or

11 Federal Reserve System.

12     Equipment Configuration - The present invention can operate

13 with nearly every conceivable point-of-sale equipment system. The

14 central computer system accepts data transmitted from the system

15 subscriber's existing point-of-sale equipment or that which is

16 added to augment service performance. The point of sale terminal

17 of the present invention is implemented in a number of ways, most

18 preferred, however, being activation under a fully automated

19 format. Such a fully automated system generally comprises a dual-

20 port terminal with magnetic stripe reading capabilities interfaced

21 with a logging printer capable of providing individual Transaction

22 Event Slips for consumer execution, and a MICR check reader, optical

23 character *recognition* ("OCR") equipment, or other device. Variations to this

24 configuration are particularly possible where the ~~applicants'~~

25 system ~~were~~ *of the present invention is* to be activated under a "Split-Dial" feature installed

26 to function within the operational parameters of existing point-of-

27 sale equipment primarily dedicated to bankcard ("credit card")

-9-

LML-EP 000090

processing. *It is contemplated* ~~The present invention contemplates~~ that services ~~may~~ *using the present invention with*
in the future be administered ~~on~~ a singular point-of-sale hardware
device which, as a function of its design, would incorporate all or
most of the service capabilities of an integrated terminal, logging
printer, and MICR Check Reading device. The system *of the present invention* can alternately
be interfaced with electronic cash registers now on the market.

Communications links from point-of-sale terminals to the
central computer of the present invention will typically be in *the* form
of telephonic network communications over a public switched
telephone network *("PSTN") or over* ~~(PSTN) or~~ other approved networks. Transaction
Event verification will occur as a result of point-of-sale terminal
access to the central computer's positive and/or negative data
files. "Approved" or "Declined" notifications are made to the
Point-of-Sale device over the PSTN. All data files will be
centrally located and maintained on the invention's central
computer data bases. Portions of the data base include but are not
limited to third party data files such as the Shared Check
Authorization Network ("SCAN") (trademark) data base.

Individual, *transactions* or groupings of transactions are first approved by
soliciting an "Authorization" prior to the completion of any
requests for electronic funds transfer. To maintain an accurate
status of file information for authorizations to subscribing
merchants, businesses, and/or individuals, separate data bases are
maintained. Current cardholder or banking account status are
updated daily and instantly available for point-of-sale inquiry for
Transaction Event authorizations.

-10-

LML-EP 000091

1  updated daily and instantly available for point-of-sale inquiry for

2  Transaction Event authorizations.

3       System subscribers' point-of-sale equipment are interfaced to

4  the invention's central computer by means of telephonic network

5  able to support communication from a plurality of point-of-sale

6  terminals.  Programming of the point-of-sale terminal causes an

7  automatic "Dial-Up" to the central computer and provides an

8  automatic query and response affirming or denying the Transaction

9  Event.  The addition of local entry hubs may be installed to better

10  facilitate the speed or economics of communications with the data

11  files.   Alternatives to telephonic networks may involve use of

12  satellite  communications  or  enhanced  radio  transmissions.

13  Similarly, the system's data files and associated Check Replacement

14  Service are contemplated to be responsive to emerging point-of-sale

15  devices intended to seek authorizations by the alternate means of

16  voice pattern recognition, fingerprint identification, retina scan,

17  "smart" chips, and/or consumer or check image and/or signature

18  broadcasting.

19  Brief Description of the Drawings

20  Figure 1 -     System overview of the present invention

21  Figure 2 -     The point-of-sale terminal

22  Figure 3 -     The Central Computer System

23  Figures 4 & 5 -  The process Data Flow

24  Figure 7a -    Transaction Event Sales Slip

25  Figure 7b -    Manual Transaction Event Sales Slip

26

-11-

LML-EP 000092

Detailed Description of the Preferred Embodiment

Referring to Figure 1 an overall schematic of the present invention is described. Point-of-sale terminals 300 communicate over normal PSTN telephone lines with a central computer system 302 which in turn communicates with a banking institution 304 for purposes of debiting consumer accounts and crediting system subscriber accounts. The banking institution performs its function via normal automated clearing house ("ACH") transactions 306.

Referring to Figure 2 the point-of-sale terminal is described. The point-of-sale terminal comprises several different entry means. A key board 310 can be used to input consumer information manually. Alternatively a card reader 312 can be used whereby the magnetic stripe on the card is read by the point-of-sale terminal and finally a check reader 314 is also included to read the MICR number on checks as a substitute for either a specific card or key board input. These various input means provide information to a micro-processor 316 which comprises logic means 318, memory means 320, and communication means 322. The logic means 318 comprises logic which allows the information received from the various input means to be processed and stored in the memory 320. The logic means further drives a display 324 which provides a visual output of the account number of the consumer for verification. The communication means 322 allows the subscriber terminal to communicate with the central computer 302 for purposes of processing the consumer's purchase.

Referring to Figure 3 the central computer system 329 is described. The central computer system receives input from a

-12-

LML-EP 000093

1    plurality of point-of-sale terminals which provide transaction

2    information from a system subscriber and a consumer desiring to

3    purchase goods or services.  The central computer system comprises

4    a system subscriber 330 file which is a file of those merchants who

5    have elected to use the present invention for processing purchases.

6    The central system also comprises an approved consumer file 332

7    which stores the names of those consumers who have already been

8    approved for allowing purchases to take place through the various

9    input means as well as a third party database such as the SCAN

10   (trademark) data base relating to consumer credit.  The computer

11   system also comprises a communications means 334.  The

12   communication means communicates with other outside third party

13   data bases which allows the consumer, that has not been approved by

14   the system, to have a rapid check of the status of the consumer's

15   banking account and whether the consumer has current outstanding

16   returns (i.e. bad checks).  Once this SCAN (trademark) or outside

17   third party data base search is performed and where an approval is

18   given, the approved consumer file 332 is updated with the name of

19   the new approved consumer.

20   As presently configured the central computer 329 already has

21   a third party database known as the SCAN (trademark) database 333

22   resident on the central computer.  Thus credit worthiness can be

23   checked using this SCAN database.  The SCAN (trademark) database is

24   updated daily.

25   The communication means 334 also communicates with a banking

26   institution 338 which instructs the bank to debit the account of

27   the consumer and credit the account of the system subscriber

-13-

LML-EP 000094

1   (merchant) with the amount of the purchase.   These transactions

2   then take place via the normal ACH transaction process.

3       Referring to Figure 4 the process begins by a consumer

4   presenting a specimen or "blank" check complete with MICR number to

5   the system subscriber (the merchant) 100.   The system subscriber

6   next determines, if the check meets appropriate store policy

7   procedures 102, that the check has appropriate information on the

8   check.   If the check does not meet the store policies, it is

9   returned to the consumer 104.   If the check does meet appropriate

10  store policies the on-line verification process proceeds 106.   The

11  subscriber enters the process by first pressing the appropriate key

12  on a terminal to access the host computer 108.   Thereafter the

13  point of sale terminal prompts the system subscriber to enter the

14  appropriate MICR number 110.   The system subscriber then enters the

15  appropriate MICR number either manually or by passing the check

16  through a check reader which determines the MICR number 112.

17      Referring to Figure 5 the subscriber would verify that the

18  numbers appearing on the terminal match the MICR numbers on the

19  check 114.   During the comparison, the subscriber determines that

20  the check number compares accurately 116 to the number displayed on

21  the terminal.   If they do compare the verification process proceeds

22  120.   If the check numbers do not compare with that of the terminal

23  the system subscriber clears the terminal and begins the

24  transaction process again 118.   If the process is to be

25  reinitiated, the subscriber enters the MICR number into the point

26  of sale terminal 130.   Thereafter the system subscriber compares

27  the MICR numbers as before 132.   If the MICR numbers compare to the

-14-

LML-EP 000095

1   system display 134  the process proceeds.  If the numbers do not

2   compare 136 the check is returned to the consumer and the process

3   terminates 137.

4        Referring to Figure 5, if the verification process proceeds

5   the terminal next prompts the system subscriber to enter the amount

6   of the sale 122.  The subscriber enters the amount of the sale 124

7   and the terminal thereafter transmits an inquiry to the host data

8   base for verification 126.

9        The check approval process next takes place 128.  If the check

10  is not approved by the central computer the terminal displays a

11  message declining the transaction 140.  Thereafter a printer record

12  of the declined transaction is made for purposes of the system

13  subscriber 141 to comply with the Fair Credit Reporting Act and

14  Regulation E of the Board of Governors of the Federal Reserve

15  System.

16       If the check is approved the terminal displays a message

17  noting the approval 138 and the specimen check is returned to the

18  consumer.  The printer further makes a paper record of the

19  transaction 142 and the consumer places any required information on

20  the paper receipt and signs the receipt authorizing the transaction

21  144.

22       Referring to Figure 7, the process description continues.

23  Once the transaction is approved the central computer captures the

24  MICR information and the sale amount and stores that information

25  146.  The central computer subsequently generates a batch message

26  regarding all transaction events for the prior period and transmits

-15-

LML-EP 000096

1   all the transaction event information for the day into the ACH

2   network 148.

3        During the ACH process each checkwriter's account is debited

4   for the exact purchase amount and such an amount is deposited into

5   a system subscriber designated account 150. Thereafter, collected

6   funds for a total day's events are deposited into a subscriber's
    subscribers

7   account 152. The transaction is then complete 154.

8   HOW TO USE

9        The present invention will require the establishment and

10  maintenance for access searches of three interconnected but

11  separate data files. Each will be accessible by dial-up procedures
    data file

12  operating, in most instances, under "Split Dial" format from a
                                  ("POS")

13  point-of-sale, terminal device or electronic cash register installed

14  for the primary purpose of bankcard and/or bank draft

15  authorizations. Terminal prompts an operator/user to process one
                      The terminal

16  of three optional inquiry types. Any one or all of three primary

17  functions are capable of being performed at a single point-of-sale

18  terminal within the control of the system subscriber. The inquiry

19  types and data base format responses would be as follows :
                                  are

20       Card Authorization - Having depressed the assigned Split Dial

21  key and thereafter being prompted, the system subscriber would
                                                       slides an

22  "slide" a encoded magnetic stripped transaction card through the

23  point-of-sale terminal and enter the "Sale Amount" requested for
                            enters

24  authorization. Thereupon, the terminal's dial-up capabilities

25  direct the inquiry to the central computer for authorization

26  against "POSITIVE" file of current cardholders whose accounts were

27  listed in "good standing". Inquiries where such a "Match" are

-16-

LML-EP 000097

1   found cause an "Approved" return message from the data file to the

2   inquiring POS terminal.  Conversely, a "No-Match" to inquiry would

3   result in a "Declined" notice to the POS terminal.  An uploading

4   mode of the present invention causes forwarding of daily status

5   notifications to the central data files activating new cardholder

6   accounts in the "POSITIVE" cardholder file or submitting corrective

7   entries to delete delinquent or terminated accounts.

8       Check Authorization - Having depressed the assigned Split Dial

9   key and thereafter being prompted, the system subscriber manually

10   enters account numbers from a personal or business check or, where

11   fully automated, enter a specimen check through a MICR Check Reader

12   device interfaced with the terminal, whereupon the terminal's

13   screen would display the check's numbers, and hence the account number

14   for verification.  Thereafter, the operator would enter the "Sale

15   Amount" requested for authorization.  The terminal's dial-up

16   capabilities then direct the inquiry to the computer data file

17   center for authorization first against the "POSITIVE" file of

18   "prenoted" bank/checking account numbers whose accounts were listed

19   in "good standing".  A successful "Match" to an inquiry would

20   result in an "Approved" notice from the data file to the inquiring

21   terminal.  A "No-Match" to inquiry would not, however, immediately

22   result in a "Declined" response.  Each inquiry preliminarily

23   resulting in a No-Match would be instantly forwarded/"rolled" to

24   the third data file preceding any return notice to the inquiring

25   terminal.  This third file is anticipated to be the Shared Check

26   Authorization Network ("SCAN") a negative data file data base

27   maintained in the system computer data file center.  Referrals to

-17-

LML-EP 000098

1    SCAN or any other positive or negative data files, enable potential

2    acceptance of Transaction Events involving consumers "Unknown" to

3    the invention's proprietary, "POSITIVE" files.  A "Match" on the

4    SCAN "NEGATIVE" file would result in a "Declined" notice; a

5    "No-Match" would conversely send notification to the inquiring POS

6    terminal of an "Approved" event.  Of significant importance, the

7    bank/checking   account   information   for   each   such   "Unknown"

8    consumer's transaction would, subsequent to a SCAN "Approved"

9    notice, be posted to the invention's "POSITIVE" file and prenoted

10   through the ACH ("Automated Clearing House") for future Transaction

11   Events.  The invention, presumably in an automated mode, is capable

12   of uploading daily corrections to the POSITIVE data file including

13   notices of new accounts approved through SCAN (trademark) and

14   deletions where settlement for consumer checking account events,

15   initially approved, were subsequently dishonored.  The SCAN data

16   base is similarly uploaded with daily activity status corrections.

17       Check Replacement Service - Inquiries initiated as Check

18   Replacement requests function in nearly an identical manner as that

19   of Check Authorization.  Records for such events, when culminating

20   in "Approved" notices, are separately preserved.  Check Replacement

21   inquiries are processed first through the system's "POSITIVE" data

22   file and, where no match is found, proceed to the SCAN data file or

23   other data base file prior to transmitting an "Approved" or

24   "Declined" notice to the inquiring POS terminal.  A Match in the

25   system data file indicates a consumer-user, whose account was in

26   "good standing" and would not be required to "roll" to SCAN.  Check

27   Replacement events are reported to and stored by the computer data

-18-

LML-EP 000099

1    file center under a file classification identifying the transaction

2    ~~was~~ a Check Replacement Service. The total of daily, approved

3    Transaction Events are "checkless" sales whereby the service

4    subscribing merchant has submitted requests for electronic ACH

5    settlement for all preauthorized consumer purchases. No commercial

6    bank note ("Paper Check") is accepted or processed by the service

7    subscriber. In each Transaction Event, a Consumer, at the

8    point-of-sale, has executed an electronic access ("Off-Line Debit")

9    authority "Sales Slip" which ~~are~~ automatically printed upon a

10    terminal's receipt of an "Approved" notice.

11    All terminal programming and all prompt strings for MICR Check

12    Reader interfacing are stored in the POS terminal and the

13    ~~invention's~~ computer center controls interactions between the

14    plurality of terminals and the central system. The following

15    modules are present.

16    Programming for MICR/Terminal Interface – system subscriber

17    locations to be activated with the present invention must possess or

18    acquire a terminal. Those utilizing or being upgraded to terminals

19    such as a Tranz (trademark) 330 or other terminals with interface

20    capabilities with the check reader for all suitable point-of-sale

21    terminals.

22    The preferred format for terminal operations ~~are~~ is generated from a

23    singular split dial key. Thereafter, the "prompt string" would

24    proceed in a manner such as i) "Card = 1" ; "Check = 2" requiring

25    operator selection; then, where selecting a checking account

26    inquiry ii) the operator would respond to a secondary prompt of

27    "Auth = 1" ; "Replace = 2". These entry selections precede the

-19-

LML-EP 000100

1   magnetic  stripe "reading" of a card/submittal or a check through

2   the MICR (Account Identification), the entry of the requested sale

3   amount, and the terminal's dial-up for authorization against the

4   computer data file center.

5       The MICR interface results in the transmittal of a query for

6   data center approval of the entire ABA/Transit and personal or

7   corporate checking account numbers.  Instances where printed checks

8   add the individual check's number to the end of the account number

9   can be "dropped" by Check Reader switch settings.  Subsequent to a

10  terminal's receipt of the MICR number string but prior to the

11  operator's entry of the requested sale amount and authorization

12  dial-up, a verification prompt "flashing" the ABA and account

13  numbers must be displayed on the terminal's screen requiring the

14  operator to depress "Enter" to proceed, if correct, or "Clear", if

15  incorrect and thereby enabling the terminal operator to resubmit

16  the specimen check through the MICR Check Reader.  It is important

17  to note that account information may be entered manually as well at

18  the point of sale with the other financial advantages of present

19  invention still in effect.

20      The  computer  data  file  center  receives  and  processes

21  Transaction Event authorization requests utilizing the entire MICR

22  string for accurate, error-free identification of both the consumer

23  bank and specific checking or depository account to participate in

24  a sale.  ACH settlement criteria mandate exact recall for the bank

25  and  checking  account  numbers  to  properly  complete  any  debit

26  request.  This invention conforms to each and every requirement of

27  the ACH transaction regulations.

-20-

LML-EP 000101

1    Each Transaction Event is completed with the logging printer

2    generation of a Transaction Event ("Sales") Slip for each

3    "Approved" authorization inquiry processed (Figure X).

4    Alternatively, a manually created transaction event slip can also

5    be prepared (Figure N). Each such Transaction Event Slip must be

6    exacting in its retention of account numbers and the sale amount

7    enabling both the consumer and system subscriber to be provided

8    "hard copy" receipts of the event. Also included would be a clear

9    printing of the transaction type; "Bank Card", "Check

10   Authorization", or "Check Replacement". Authorization language is

11   printed immediately preceding the consumer's signature line

12   specifically authorizing electronic access in payment of the

13   requested transaction sale amount.

14   In addition to the primary functions for POS terminal

15   programming and MICR Check Reader interface, each Point-of-Sale

16   terminal location is capable of generating printed summations of

17   daily activity. These reports list and separately total each

18   authorization/service type, whether produced as a singular report

19   or the result of multiple terminal "closeout" procedures.

20   Instances will arise with either the Bank Card or Check

21   Replacement Service where previously authorized Transaction Events

22   will require the operational equivalent of a bankcard "Void" or

23   "Credit" notation. The methodology will be available for Split

24   Dial messages to the computer data file center of a

25   post-authorization "Error" or "Transaction Cancellation" notice.

26   The "Cancel" procedure is instituted by depressing for example the

27   "3" key (i.e. "Cancel = 3"). By so doing, the system subscriber

-21-

LML-EP 000102

1   may cancel a previously approved and logged event.  This

2   Transaction Event which was recorded on the data files and reported

3   on the service subscriber's daily Activity Summation Report,

4   thereafter carries an offsetting, "Flagged" cancellation notice.

5

6   SUMMARY

7       A flexible purchase transaction system is described which

8   precisely fits within existing ACH procedures for checking account

9   events for processing of pre-authorized electronic debits as a

10  replacement for commercial bank drafts (paper checks).  The main

11  advantage to the proposed invention is the fact that a truly

12  paperless transaction may occur.  Departures from the proposed

13  system especially with respect to the Point-of-Sale terminals will

14  be apparent to those skilled in the art, ~~with~~ _without_ departing from the

15  spirit of the invention as described.

-22-

LML-EP 000103

1    We claim:

2        1.   A checkwriting point of sale system comprising;

3        a point of sale terminal adapted to receive consumer bank

4    account information and further adapted to accept such information

5    from consumer cards on which the bank account information is

6    stored;

7        a communications means integral to said point of sale terminal

8    to electronically communicate with a central computer;

9        a memory means integral to said point of sale terminal that

10   allows the temporary storage of the consumer bank account

11   information from the consumer cards;

12       the central computer system having communication means

13   capability adapted to receive information from a plurality of point

14   of sale terminals;

15       the central computer system communication means allowing said

16   central computer system to communicate with external data bases for

17   consumer credit verification and to allow communication with

18   banking institutions for purposes of transfer of funds.

19       2.   A checkwriting point of sales system according to claim

20   1 wherein said point of sale terminal is further adapted to read

21   MICR numbers appearing on a consumer check and wherein said

22   consumer check is used to identify the consumer bank account

23   information.

24       3.   The checkwriting point of sale according to claim 1

25   wherein said point of sale terminal further comprises an alpha

26   numeric display adapted to receive consumer bank account

23
-25-

LML-EP 000104

1   information from the memory of the point of sale terminal and

2   display the consumer bank account information.

3        4.    The checkwriting point of sale system according to claim

4   1 further comprising a printer adapted to receive information from

5   the memory of the point of sale terminal to create point of sale

6   slips.

7        5.    The checkwriting point of sale system according to claim

8   1 wherein said central computer system communication means

9   comprises means for communicating with third party data bases for

10  verification of consumer credit.

11       6.    The checkwriting point of sale system according to claim

12  1 further comprising a resident third party data base wherein

13  consumer credit information is stored and used for verification of

14  consumer credit.

15       7.    The checkwriting point of sale system according to claim

16  1 wherein the central computer system further comprises a system

17  subscriber data base comprising those merchants and service

18  providers authorized to use the invention.

19       8.    The checkwriting point of sale system according to claim

20  7 wherein the central computer further comprises a database

21  comprising those consumers approved to use the invention.

22       9.    A checkwriting point of sale process comprising the steps

23  of:

24            a)    presenting a check or consumer card to a point of

25  sale terminal located at a merchant or service provider,

26            b)    reading the magnetic stripe or MICR number

27  information on the credit card or consumer check,

-29-

LML-EP 000105

1        c)   storing the consumer bank account information from

2   the card or check and verifying account numbers at the point of

3   sale terminal,

4        d)   inputting transaction event information into the

5   point of sale terminal,

6        e)   transmitting the transaction event information and

7   consumer bank account information to a central computer system,

8        f)   verifying the authorization status of the consumer,

9        g)   if a particular consumer is not authorized to use

10   the system, verifying the credit worthiness of the consumer via a

11   query to a third party data base,

12        h)   sending an "approved" message to the point of sale

13   terminal, if the consumer's credit is approved for the transaction

14   and

15        i)   subsequently transmitting the transaction event

16   information to a bank for subsequent ACH operations.

17

18

19

20

21   Jlr-1808

22

LML-EP 000106

975717

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of Robert R. Hills and Henry R. Nichols

Serial No.:                          Group Art Unit:

Filed:                               Examiner:

FOR:   CHECKWRITING POINT OF SALE SYSTEM

DECLARATION

As below inventors, we hereby declare that:

Our residences, post office address and citizenship are as stated
below next to our name.

We believe we are the original, first and sole inventors of the
subject matter which is claimed and for which a patent is sought on
the invention entitled CHECKWRITING POINT OF SALE SYSTEM the
specification of which is attached hereto.

We hereby state that we have reviewed and understand the contents
of the above identified specification, including the claims, as
amended by any amendment referred to above.

We acknowledge the duty to disclose information which is material
to the examination of this application in accordance with Title 37,
Code of Federal Regulations, § 1.56(a).

POWER OF ATTORNEY

We hereby appoint the following attorney(s) to prosecute this
application and to transaction all business in the Patent and
Trademark Office connected therewith:

                    Jon L. Roberts
                    Arter & Hadden
                 1801 K Street, N.W.
                     Suite 400K
                 Washington, D.C. 20006
                    (202) 775-7980

We declare that all statements made herein of our own knowledge are
true and that all statements made on information and belief are
believed to be true; and further that these statements were made
with the knowledge that willful false statements and the like so
made are punishable by fine or imprisonment, or both, under Section

LML-EP 000107

1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

Full name of inventor __Robert R. Mills_____

Inventor's Signature _____ Date _10-1-92_

Residence_____ _5170 Avenue B_____

_____ _St Augustine (FL 32095_____

Citizenship___ _United States_____

Full name of inventor __Henry R. Nichols_____

Inventor's Signature _____Date_____

Residence_____

_____

_____

Citizenship___ _United States_____

jlr-1883

LML-EP 000108

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of Robert R. Hills and Henry R. Nichols

Serial No.:                          Group Art Unit:

Filed:                               Examiner:

FOR:  CHECKWRITING POINT OF SALE SYSTEM

### DECLARATION

As below inventors, we hereby declare that:

Our residences, post office address and citizenship are as stated below next to our name.

We believe we are the original, first and sole inventors of the subject matter which is claimed and for which a patent is sought on the invention entitled CHECKWRITING POINT OF SALE SYSTEM the specification of which is attached hereto.

We hereby state that we have reviewed and understand the contents of the above identified specification, including the claims, as amended by any amendment referred to above.

We acknowledge the duty to disclose information which is material to the examination of this application in accordance with Title 37, Code of Federal Regulations, § 1.56(a).

### POWER OF ATTORNEY

We hereby appoint the following attorney(s) to prosecute this application and to transaction all business in the Patent and Trademark Office connected therewith:

Jon L. Roberts
Arter & Hadden
1801 K Street, N.W.
Suite 400K
Washington, D.C. 20006
(202) 775-7980

We declare that all statements made herein of our own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section

LML-EP 000109

1001 of Title 18 of the United States Code and that such willful
false statements may jeopardize the validity of the application or
any patent issued thereon.

Full name of inventor __Robert R. Hills_____

Inventor's Signature _____Date_____

Residence_____

_____

Citizenship___United States_____


Full name of inventor __Henry R. Nichols_____

Inventor's Signature _~Henry R. Nichols~_____ Date _10/19/92

Residence____8456 Holly Leaf Dr._____

____McLean, VA  22102_____

Citizenship___United States_____

LML-EP 000110

PTO/SB/01 (8-93)

| VERIFIED STATEMENT CLAIMING SMALL ENTITY STATUS (37 CFR 1.9(f) & 1.27(b))--INDEPENDENT INVENTOR | Docket Number (Optional) |
|---|---|

Applicant or Patentee:    ROBERT R. HILLS AND HENRY R. NICHOLS

Serial or Patent No.: _____

Filed or Issued: _____

Title: _____ CHECKWRITING POINT OF SALE SYSTEM _____

As a below named inventor, I hereby declare that I qualify as an independent inventor as defined in 37 CFR 1.9(c) for purposes of paying reduced fees to the Patent and Trademark Office described in:

[X]  the specification filed herewith with title as listed above.

[ ]  the application identified above.

[ ]  the patent identified above.

I have not assigned, granted, conveyed or licensed and am under no obligation under contract or law to assign, grant, convey or license, any rights in the invention to any person who would not qualify as an independent inventor under 37 CFR 1.9(c) if that person had made the invention, or to any concern which would not qualify as a small business concern under 37 CFR 1.9(d) or a nonprofit organization under 37 CFR 1.9(e).

Each person, concern or organization to which I have assigned, granted, conveyed, or licensed or am under an obligation under contract or law to assign, grant, convey, or license any rights in the invention is listed below:

[ ]  No such person, concern, or organization exists.

[ ]  Each such person, concern or organization is listed below.

Separate verified statements are required from each named person, concern or organization having rights to the invention averring to their status as small entities. (37 CFR 1.27)

I acknowledge the duty to file, in this application or patent, notification of any change in status resulting in loss of entitlement to small entity status prior to paying, or at the time of paying, the earliest of the issue fee or any maintenance fee due after the date on which status as a small entity is no longer appropriate. (37 CFR 1.28(b))

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the application, any patent issuing thereon, or any patent to which this verified statement is directed.

ROBERT R. HILLS                HENRY R. NICHOLS
NAME OF INVENTOR               NAME OF INVENTOR               NAME OF INVENTOR

Signature of inventor          Signature of inventor          Signature of inventor
October 1, 1992
Date                           Date                           Date

PTO/SB/09 (11-90)                              Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE

LML-EP 000111

PTO/SB/09 (11-90)

| VERIFIED STATEMENT CLAIMING SMALL ENTITY STATUS (37 CFR 1.9(f) & 1.27(b))--INDEPENDENT INVENTOR | Docket Number (Optional) |
|---|---|

Applicant or Patentee: ROBERT R. HILLS AND HENRY R. NICHOLS

Serial or Patent No.:

Filed or Issued: 1992

Title: CHECKWRITING POINT OF SALE SYSTEM

As a below named inventor, I hereby declare that I qualify as an independent inventor as defined in 37 CFR 1.9(c) for purposes of paying reduced fees to the Patent and Trademark Office described in:

[X] the specification filed herewith with title as listed above.

[ ] the application identified above.

[ ] the patent identified above.

I have not assigned, granted, conveyed or licensed and am under no obligation under contract or law to assign, grant, convey or license, any rights in the invention to any person who would not qualify as an independent inventor under 37 CFR 1.9(c) if that person had made the invention, or to any concern which would not qualify as a small business concern under 37 CFR 1.9(d) or a nonprofit organization under 37 CFR 1.9(e).

Each person, concern or organization to which I have assigned, granted, conveyed, or licensed or am under an obligation under contract or law to assign, grant, convey, or license any rights in the invention is listed below:

[ ] No such person, concern, or organization exists.

[ ] Each such person, concern or organization is listed below.

Separate verified statements are required from each named person, concern or organization having rights to the invention averring to their status as small entities. (37 CFR 1.27)

I acknowledge the duty to file, in this application or patent, notification of any change in status resulting in loss of entitlement to small entity status prior to paying, or at the time of paying, the earliest of the issue fee or any maintenance fee due after the date on which status as a small entity is no longer appropriate. (37 CFR 1.28(b))

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the application, any patent issuing thereon, or any patent to which this verified statement is directed.

| ROBERT R. HILLS | HENRY R. NICHOLS | |
|---|---|---|
| NAME OF INVENTOR | NAME OF INVENTOR | NAME OF INVENTOR |
| Signature of inventor | Signature of inventor | Signature of inventor |
| Date | Date 10/19/92 | Date |

PTO/SB/09 (11-90)                    Patent and Trademark Office; U.S. DEPATMENT OF COMMERCE

LML-EP 000112



fig. 1



fig 2

LML-EP 000113







figure 3

LML-EP 000114



PRINT OF DRAWINGS
S ORIGINALLY FILED



Fig. 4

LML-EP 000115



figure 5

PRINT OF DRAWINGS
IS ORIGINALLY FILED.

PRINT OF DRAWINGS
AS ORIGINALLY FILED

#4757
08/25/93.



Fig. 6

LML-EP 000117



II. 97571
08/25/39c



fig 7

LML-EP 000118



08/25/3?

Merchant Name
Street Address
City, ST Zip
Merchant Acct #

TIME 00:00 _M              DATE 00/00/00
BANK ACT NO. 000000000000
TRANSIT NO. 000000000

SALE AMOUNT              $ 0,000.00

TERMINAL ID  0000000000

I herewith authorize Chequ-MARK Systems
to electronically access my designated
checking account for the payment of the
above referenced purchase.

Name (PRINT) _____
Street _____
City _____ST ___Zip_____
Tel. Number: (_____) _____ - _____

I ACKNOWLEDGE THAT RETURN FEES WILL BE
IMPOSED SHOULD MY PAYMENT BE DISHONORED
AND UNDERSTAND THAT IT IS UNLAWFUL TO
AUTHORIZE PAYMENTS FOR WHICH ADEQUATE
MONIES ARE NOT AVAILABLE WITHIN MY
ACCOUNT.

X_____
Authorizing Signature

fig. 8

LML-EP 000119

 

08/25739c

```
                        Merchant Name
                        Street Address
                        City, ST Zip
                        Merchant Act #


    CUSTOMER BANKING INFORMATION:


            BANK ACT NO. _____

            TRANSIT NO. _____


    SALE AMOUNT  . . . . . . . . . . . . . . . . . $ _____


        I herewith authorize ChequeMARK Systems to electronically
    access my designated checking account for the payment of the above
    referenced purchase amount.  I acknowledge that sufficient funds
    are available for the payment of this sale.


            Name (PRINT) _____
            Street _____
            City _____ST ___Zip _____
            Tel. Number:  (_____) _____- _____


    I FURTHER ACKNOWLEDGE THAT RETURN FEES WILL BE IMPOSED SHOULD MY
    PAYMENT BE DISHONORED AND UNDERSTAND THAT IT IS UNLAWFUL TO
    AUTHORIZE PAYMENTS FOR WHICH ADEQUATE MONIES ARE NOT AVAILABLE
    WITHIN MY ACCOUNT.


                            X _____
                            Authorizing Signature
```

fig. 9

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In Re Application of Robert H. Hills and Henry R. Nichols

Serial No. 08/257,390                    Group Art Unit: 2514

Filed:  06/09/94                         Examiner: Pitts, H.

For:   CHECKWRITING POINT OF SALE SYSTEM

*      *      *      *      *

RESPONSE TO OFFICE ACTION OF 10/28/94

*      *      *      *      *

Commissioner of Patents and Trademarks
Box Non-Fee Amendment
Washington, D.C. 20231

Sir:

Enclosed please find the following:

1.    Response to Office action dated 10/28/94 (27 pages); and

2.    Certificate of First Class mailing.

Respectfully submitted,

Jon L. Roberts
Registration No. 31,293
Roberts & Associates
1953 Gallows Road
Suite 220
Vienna, Virginia 22182
Phone: (703) 356-7700

January 30, 1995

LML-EP 000182

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In Re Application of Robert H. Hills and Henry R. Nichols

Serial No. 08/257,390                    Group Art Unit: 2514

Filed:  06/09/94                         Examiner: Pitts, H.

For:    CHECKWRITING POINT OF SALE SYSTEM

                *    *    *    *    *

          RESPONSE TO OFFICE ACTION OF 10/28/94

                *    *    *    *    *

                                    RECEIVED
                                    FEB 0 6 1995
                                    GROUP 2500

Commissioner of Patents and Trademarks
Box Non-Fee Amendment
Washington, D.C. 20231

Sir:

        Applicant hereby submits the following response to the Office

action of 10/28/94.

In the Claims:

        1.  (Twice Amended)     A checkwriting point of sale system

comprising:

        a point of sale terminal adapted to receive consumer bank

account information from any bank check;

        a central computer system;

        first communications means integral to said point of sale

terminal for electronically communicating with the central computer

system;

        memory means integral to said point of sale terminal for

temporarily storing the consumer bank account information;

the central computer system having second communication means for receiving information from a plurality of said point of sale terminals;

the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using [a] the bank check as a negotiable instrument.

9. (Twice Amended)    A checkwriting point of sale process comprising [the steps of]:

a)    presenting [a] any bank check specimen to a point of sale terminal located at a merchant or service provider,

b)    reading the magnetic ink character recognition number information on the check for the sole purpose of obtaining WITHOUT USING THE CHECK AS A NEGOTIABLE INSTRUMENT, consumer bank account information,

c)    storing the consumer bank account information obtained from the check and verifying that account numbers were accurately read at the point of sale terminal,

d)    [inputting] providing transaction event information [into] to the point of sale terminal,

e)    transmitting the transaction event information and consumer bank account information to a central computer system,

f)    storing the transaction event information and consumer banking account information, and

2

g) subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations.

1. (Amended) A checkwriting point of sale system comprising:

a point of sale terminal adapted to receive consumer bank account information;

a central computer system;

first communications means integral to said point of sale terminal for electronically communicating with the central computer system; and

memory means integral to said point of sale terminal for temporarily storing the consumer bank account information;

the point of sale terminal comprising reading means for reading magnetic ink character recognition numbers on any consumer bank [checks] check for the sole purpose of eliciting consumer bank account information;

the central computer system having second communication means for receiving information from a plurality of said point of sale terminals;

the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using a bank check as a negotiable instrument.

3

LML-EP 000185

17. (Amended) The checkwriting point of sale process of claim 8, further comprising [the steps of]:

a)    verifying the status of the consumer bank account,

b)    verifying the consumer bank account status of the consumer via a query to a third party database if the consumer bank account is verified as bad, and

c)    sending an approval message to the point of sale terminal if the consumer's banking account status is approved for the transaction.

18. (Amended) The checkwriting point of sale process of claim 8, further comprising [the steps of]:

(A)    printing a transaction event sales slip following the sending of an approval message; and

(B)    executing of the sales slip by the consumer as proof of bank account access authorization.

19. (Amended) The checkwriting point of sale process of claim 17, further comprising [the steps of]:

(A)    printing a transaction event sales slip following the sending of an approval message; and

(B)    executing of the sales slip by the consumer as proof of bank account access authorization.

20. (Amended) The checkwriting point of sale process of claim 8, further comprising [the step of] automatically logging point of sale terminal location information and transaction date, time, and sales amount information into the point of sale terminal.

4

LML-EP 000186

REMARKS

Claims 1-4, 6-9, and 11-22 are pending in the application. Claims 1-4, 6-9, and 11-21 were rejected. It is assumed that claim 22 has been overlooked and was intended to be rejected as well. Claims 1, 9, 11, and 17-20 have been amended. Claims 1, 9, and 11 are the independent claims.

The Examiner rejected claims 1-4, 6-9, and 11-21 (and presumably claim 22) under 35 U.S.C. § 112 as being indefinite for failing to particularly point out and distinctly claim the subject matter that Applicants regard as the invention. The Examiner stated that Applicants have discussed the Case and Deming patents in the specification but have not claimed the argued novelty. The Examiner further stated that there has been no specific comparison of claim language vis-a-vis the references cited in the previously submitted I.D.S. or the references cited in combination by the Examiner in the previous final rejection. The Examiner also stated that only one set of claims should be selected as the three sets of claims appear to embody separate inventions.

The Examiner concluded by stating that the claims are rejected as set forth in the previous final rejection, with the further notation that to use the check "solely" for access would be the most trivial modification of systems such as Granzow etc.

The specification was previously amended to discuss the patents to Case and Deming in the Background section. Applicants consider these patents to provide good background material for understanding their invention, which is an improvement on previous

5

LML-EP 000187

systems. The Case and Deming patents were merely discussed in this manner; no matters of novelty were argued. The Examiner stated that Applicants have not claimed the novelty of the invention. Applicants assert that the claims, as presented in the preliminary amendment, do in fact recite such novelty, which will be pointed out in the paragraphs that follow.

Applicants respectfully assert that, contrary to the Examiner's contention, specific claim language has been compared to the teachings of the references cited in prior Office actions in order to overcome the Examiner's previous rejections. An examination of responses to prior Office actions will confirm this. Applicants have taken pains to completely review all prior responses to Office actions in this regard. Unfortunately, a comparison of cited references to particular claim language was not provided in the most recent Office action. Nevertheless, in the following paragraphs, each reference, whether cited by Applicants or by the Examiner, will be compared with specific claim language in order to overcome what Applicants presume the Examiner's rejection to be. It will be shown that it is not necessary to compare each element of every claim with each referenced patent because there is at least one element recited in all the independent claims that is not disclosed by any of the referenced patents, and thus any combination of the references could not render the claims obvious.

6

LML-EP 000188

Applicants' Invention

The following are brief summaries of the elements recited in Applicants' independent claims.

Claim 1

Claim 1 recites a checkwriting point-of-sale system comprising a point of sale terminal, a central computer, first and second communication means, and memory. The point of sale terminal accepts bank account information from any bank check. The system transfers funds as part of a transaction without using the bank check as a negotiable instrument.

Claim 9

Claim 9 recites a checkwriting point-of-sale process comprising presenting any bank check to a merchant's terminal, reading MICR information from the check for the sole purpose of obtaining bank account information, storing the information, providing transaction event information to the terminal, transmitting the transaction information to a central computer, storing all the information, and transmitting the transaction information to a bank for clearing house functions.

Claim 11

Claim 11 recites a checkwriting point-of-sale system comprising a point of sale terminal, a central computer, first and second communication means, and memory. The point of sale terminal accepts bank account information by reading the MICR information from any bank check. The system transfers funds as part of a

7

LML-EP 000189

transaction without using the bank check as a negotiable instrument.

## Case 4,270,042

Case discloses an electronic funds transfer system. The system includes use of a letter of credit card and a draft instrument unique to the Case system. Case does not disclose the use of any bank check solely to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11. Rather, Case uses a combination of letter of credit card and system-unique negotiable instrument that is negotiated as part of the transaction. Consumer information is provided by the letter of credit card, and the negotiable draft instrument is given to the vendor to pay for the transaction.

Thus, an element recited in all of Applicants' claims is not disclosed by Case. Further, it would not be trivial to modify Case so that an ordinary bank draft is used for informational purposes only. The entire Case system is set up around a unique pre-paid (and therefore pre-authorized) account in which a system-unique draft instrument is given up, that is, negotiated as part of the transaction. To include the missing elements of Applicants' claims would be to change the entire nature of the Case system from a closed, pre-paid system using unique draft negotiable instruments to one which electronically debits a bank account based on information derived from any ordinary check. Including elements of Applicants' claims is unecessary for Case because each transaction is preauthorized through prepayment. Thus, it is neither possible

8

LML-EP 000190

nor proper to combine the system of Case with another system in an effort to result in Applicants' claimed system.

Deming 4,823,264

Deming discloses an electronic funds transfer system used in conjunction with home banking, not a point-of-sale transaction. Deming does not disclose the use of a bank check in a point-of-sale transaction solely to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11. Rather, Deming discloses a home banking method by which all payor and payee information is entered manually into a computer. A bank check is never used, except when a routing and transfer number is not available for the payee, in which case a paper check is issued and mailed for later negotiation by the payee.

Thus, an element recited in all of Applicants' claims is not disclosed by Deming. Further, it would not be trivial to modify Deming so that a bank draft is used for informational purposes only. The Deming system is a home banking system used by a single payor to pay a number of payees. Thus, the payor's information will always be stored on the system; there is no reason to read it from a check. In contrast, Applicants' system will always be used at the payee's place of business, and information must be gathered from a great number of payors. Therefore, the payee's information will always be stored on the system and the payor's information will have to be entered. This is done by reading it from the check. To include the missing elements of Applicants' claims would

9

LML-EP 000191

be to change the very nature of the Deming system from a personal bank at home system to a point-of-sale system. Thus, it is neither possible nor proper to combine the system of Deming with a point-of-sale system in an effort to assemble Applicants' claimed system.

Carlson et al. 5,053,607

Carlson et al. disclose a system adapted for processing checks. The system includes a device that reads MICR information printed on the check. This reading of the MICR data speeds up processing of the check at the point of sale. The check is still used as a negotiated instrument, however, and is turned over to the merchant to complete the transaction. Thus, Carlson et al. do not disclose the use of a bank check in a point-of-sale transaction solely to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11. Rather, the Carlson et al. system requires negotiation of the check.

Thus, an element recited in all of Applicants' claims is not disclosed by Carlson et al. Further, it would not be trivial to modify Carlson et al. so that a bank draft is used for informational purposes only. The entire Carlson et al. system is set up to process checks in order to speed the debiting and crediting of the negotiated amount at a later date. To include the missing elements of Applicants' claims would be to change the very nature of the Carlson et al. system from a system that prepares checks for negotiation to one which doesn't negotiate checks at all. Thus, it is neither possible nor proper to combine the system

10

LML-EP 000192

of Carlson et al. with another system in an effort to result in Applicants' claimed system.

Carlson et al. 4,678,896

Carlson et al. here disclose a mechanism that includes security features to prevent unauthorized tampering. This device includes a MICR reader, but again only processes instruments that are negotiated as part of the transaction taking place at the point of sale. Thus, Carlson et al. do not disclose the use of a bank check in a point-of-sale transaction in order to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11. Rather, Carlson et al. require negotiation of the check.

Thus, an element recited in all of Applicants' claims is not disclosed by Carlson et al. Further, it would not be trivial to modify Carlson et al. so that a bank draft is used for informational purposes only. The entire Carlson et al. system is set up to process checks in order to speed the debiting and crediting of the negotiated amount at a later date and to provide security against tampering with checks accepted to complete the transaction. To include the missing elements of Applicants' claims would be to change the very nature of the Carlson et al. system from a system that prepares checks for negotiation to one which doesn't negotiate checks at all. Further, the protection of negotiated checks after the transaction provided by Carlson et al. is completely unnecessary using Applicants' system as the vendor never takes a check from the purchaser. The check is only

11

LML-EP 000193

temporarily given to the vendor so that information may be read.
Thus, it is neither possible nor proper to combine the system of
Carlson et al. with another system in an effort to result in
Applicants' claimed system.

Murphy et al. 4,672,377

Murphy et al. disclose a check authorization system whereby a
supermarket customer is assigned a UPC code which is used to access
a database used to check the credit status of the customer at each
transaction. If the customer's credit is good, acceptance of the
check in payment for the transaction is authorized. The check is
then negotiated as it would be in any normal transaction. Thus,
Murphy et al. do not disclose the use of a bank check in a point-
of-sale transaction in order to derive consumer information and not
for use as a negotiable instrument, as recited in independent
claims 1, 9, and 11. Rather, Murphy et al. provide a credit check
before a check is negotiated.

Thus, an element recited in all of Applicants' claims is not
disclosed by Murphy et al. Further, it would not be trivial to
modify Murphy et al. so that a bank draft is used for informational
purposes only. The entire Murphy et al. system is set up to
authorize the acceptance of a check as a negotiable instrument in
payment for goods. To include the missing elements of Applicants'
claims would be to change the very nature of the Murphy et al.
system from a system that authorizes the acceptance of negotiable
instruments to one which does not accept negotiable instruments at
all. To process checks in the manner provided by Applicants'

12

LML-EP 000194

invention would go beyond modification of the Murphy et al. invention; it would do away with the entire purpose behind the Murphy et al. invention. Thus, it is neither possible nor proper to combine the system of Murphy et al. with another system in an effort to result in Applicants' claimed system.

Lindemann et al. 4,933,536

Lindemann et al. disclose a check processing device whereby some form of customer identification, such as a photograph, is reproduced on a bank check that is presented for tender. This identification feature is used as a deterrence to the passing of bad checks. After the identification has been added to the check, the check is processed as it would in any normal transaction, including acceptance of the check as a negotiable instrument in payment for goods and services. Thus, Lindemann et al. do not disclose the use of a bank check in a point-of-sale transaction in order to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11. Rather, Lindemann et al. provide an identification feature before the check is negotiated.

Thus, an element recited in all of Applicants' claims is not disclosed by Lindemann et al. Further, it would not be trivial to modify Lindemann et al. so that a bank draft is used for informational purposes only. The entire Lindemann et al. system is set up to add an identification feature to a check in order to deter passing bad checks as negotiable instruments. To include the missing elements of Applicants' claims would be to change the very

13

nature of the Lindemann et al. system from one which provides
security against the acceptance in payment of bad checks to one
that doesn't accept checks for payment at all. To process checks
in the manner provided by Applicants' invention would go beyond
modification of the Lindemann et al. invention; it would do away
with the entire purpose behind the Lindemann et al. invention.
Thus, it is neither possible nor proper to combine the system of
Lindemann et al. with another system in an effort to result in
Applicants' claimed system.

Lord, Jr. 4,810,866

Lord discloses a check validation and check writing system
whereby coded information is read from a consumer's bank check in
order to determine if the associated bank account has sufficient
funds to cover a transaction taking place. If sufficient funds are
present, a blank check is printed using the device, which imprints
the date, transaction total, etc. and presents the check to the
customer for signature. Once the check is executed, it is given to
the merchant as payment and is negotiated as would be any normal
check in such a transaction. Thus, Lord does not disclose the use
of a bank check in a point-of-sale transaction in order to derive
consumer account information and not for use as a negotiable
instrument, as recited in independent claims 1, 9, and 11. Rather,
Lord requires the negotiation of a system-unique check as payment
for a transaction.

Thus, an element recited in all of Applicants' claims is not
disclosed by Lord. Further, it would not be trivial to modify Lord

14

LML-EP 000196

so that a bank draft is used for informational purposes only. The entire Lord system is set up to print transaction information on a check so that it can be used as a negotiable instrument. To include the missing elements of Applicants' claims would be to change the very nature of the Lord system from one which produces a negotiable instrument to one which does not use a negotiable instrument. To process checks in the manner provided by Lord is contrary to the entire purpose behind Applicants' invention. Printing of transaction information on checks using Applicants' system is unnecessary because the checks are never surrendered to the vendor. Thus, it is neither possible nor proper to combine the system of Lord with another system in an effort to result in Applicants' claimed system.

<u>Fukatsu 4,743,743</u>

Fukatsu discloses a transaction apparatus. This apparatus is not part of a point-of-sale system, but rather is an automatic teller machine system. The machine accepts checks along with a "bill" which indicates whether money is to be deposited, withdrawn, etc. As a check is entered into the machine, the MICR code is read, simplifying post-processing, which takes place manually at a later time. Thus, Fukatsu does not disclose the use of a bank check in a point-of-sale transaction in order to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11. Rather, Fukatsu discloses a system for processing negotiable instruments prior to later manual reconciliation of the checking account.

15

LML-EP 000197

Thus, an element recited in all of Applicants' claims is not disclosed by Fukatsu. Further, it would not be trivial to modify Fukatsu so that a bank draft is used for informational purposes only. The entire Fukatsu system is set up to accept and process checks for deposit to a bank. To include the missing elements of Applicants' claims would be to change the very nature of the Fukatsu system to one which does not process negotiated checks at all. To process checks in the manner provided by Applicants' invention is not necessary, beneficial, or consistent with the service provided by Fukatsu, which is not contemplated for use in a merchant setting and would not work in such a setting. Thus, it is neither possible nor proper to combine the system of Fukatsu with another system in an effort to result in Applicants' claimed system.

Cain 4,523,330

Cain discloses a banking system used to process checks. This system scans checks deposited with the bank in order to read MICR data printed on the checks, and also to read handwritten data using character recognition software. Once character recognition is accomplished, the data is converted to MICR data and printed on the check. Thus, Cain does not disclose the use of a bank check in a point-of-sale transaction in order to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11. Rather, Cain discloses a system for processing previously negotiated checks.

16

LML-EP 000198

Thus, an element recited in all of Applicants' claims is not disclosed by Cain. Further, it would not be trivial to modify Cain so that a bank draft is used for informational purposes only. The entire Cain system is set up to accept and process checks that have been deposited to a bank. To include the missing elements of Applicants' claims would be to change the very nature of the Cain system to one which does not accept negotiated checks at all. To process checks in the manner provided by Applicants' invention is not necessary, beneficial, or consistent with the service provided by Cain. Thus, it is neither possible nor proper to combine the system of Cain with another system in an effort to result in Applicants' claimed system.

Nunley et al. 4,404,649

Nunley et al. disclose a document processing system. This system scans checks deposited with a bank in order to read MICR data printed on the checks, and to tag the check with a source item control number. Thus, Nunley et al. do not disclose the use of a bank check in a point-of-sale transaction in order to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11. Rather, Nunley et al. provide processing of previously negotiated checks.

Thus, an element recited in all of Applicants' claims is not disclosed by Nunley et al. Further, it would not be trivial to modify Nunley et al. so that a bank draft is used for informational purposes only. The entire Nunley et al. system is set up to accept and process checks that have been deposited to a bank. To include

17

LML-EP 000199

the missing elements of Applicants' claims would be to change the very nature of the Nunley et al. system to one which does not accept negotiated checks at all.  To process checks in the manner provided by Applicants' invention is not necessary, beneficial, or consistent with the service provided by Nunley et al, which is not contemplated for use in a merchant setting and would not work in such a setting.  In fact, Nunley et al. specifically rule out the possible use of the system at the point-of-sale.  Thus, it is neither possible nor proper to combine the system of Nunley et al. with another system in an effort to result in Applicants' claimed system.

Granzow et al. 4,580,040

Graznow et al. disclose a teller-assisted, customer-operated automatic teller machine check cashing system.  According to this system, the automatic teller machine is linked to a teller station equiped with a MICR data reader.  When a customer presents a check to be cashed, the MICR data is read, the customer's or the third party payor's checking account balance is check for sufficiency of funds, and cash is dispensed if the account balance is sufficient.  Thus, Graznow et al. do not disclose the use of a bank check in a point-of-sale transaction in order to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11.  Rather, Graznow et al. disclose a bank system for verifying checks to be negotiated.

Thus, an element recited in all of Applicants' claims is not disclosed by Graznow et al.  Further, it would not be trivial to

18

LML-EP 000200

modify Graznow et al. so that a bank draft is used for
informational purposes only. The entire Graznow et al. system is
set up to cash checks that have been presented to a bank.    To
include the missing elements of Applicants' claims would be to
change the very nature of the Graznow et al. system from one that
has the sole function of accepting checks for negotiation to one
which is used as part of a point-of-sale transaction and does not
accept the check for negotiation.  To process checks in the manner
provided by Applicants' invention is not necessary, beneficial, or
consistent with the service provided by Graznow et al. Thus, it is
neither possible nor proper to combine the system of Graznow et al.
with another point-of-sale system in an effort to assemble
Applicants' claimed system.

Granzow et al. 4,617,457

    Here, Graznow et al. disclose the same invention as that
discussed above, with the addition of an image for presenting an
image of the check to be cashed to the teller present at the teller
station.  Again, Graznow et al. do not disclose the use of a bank
check in a point-of-sale transaction in order to derive consumer
information and not for use as a negotiable instrument, as recited
in independent claims 1, 9, and 11.   Rather, Graznow et al.
disclose a bank system for verifying checks to be negotiated.

    Thus, an element recited in all of Applicants' claims is not
disclosed by Graznow et al.  Further, it would not be trivial to
modify Graznow et al. so that a bank draft is used for
informational purposes only.  The entire Graznow et al. system is

19

set up to cash checks that have been presented to a bank. To include the missing elements of Applicants' claims would be to change the very nature of the Graznow et al. system from one that has the sole function of accepting checks for negotiation to one which is used as part of a point-of-sale transaction and does not accept the check for negotiation. To process checks in the manner provided by Applicants' invention is not necessary, beneficial, or consistent with the service provided by Graznow et al. Thus, it is neither possible nor proper to combine the system of Graznow et al. with another system in an effort to result in Applicants' claimed system.

Simjian 3,824,544

Simjian discloses a merchandizing arrangement utilizing a coded sales ticket. The customer obtains the coded sales ticket by selecting an item for purchase and paying for the item. The coded ticket is then brought to a merchandise dispensing area and is exchanged for the purchased item. Thus, Simjian does not disclose the use of a bank check in a point-of-sale transaction in order to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11. Rather, Simjian discloses a merchandise vending security system, the point-of-sale aspect of which is conventional.

Thus, an element recited in all of Applicants' claims is not disclosed by Simjian. Further, it would not be trivial to modify Simjian so that a bank draft is used for informational purposes only. The entire Simjian system is set up to provide security

20

against shoplifting by controlling access to merchandise.  The
invention is not even directed to the payment part of the
transaction.  To include the missing elements of Applicants' claims
would be to change the very nature of the Simjian system by adding
a new inventive element to the system.  To process checks in the
manner provided by Applicants' invention is not necessary,
beneficial, or consistent with the service provided by Simjian.
Thus, it is neither possible nor proper to combine the system of
Simjian with another system in an effort to result in Applicants'
claimed system.

<u>Schuller 3,845,470</u>

    Schuller discloses a check-controlled vending system.  This
system uses pre-paid tickets, or "checks", as a payment means for
a vending machine.  These tickets are coded to provide security
features.  Thus, Schuller does not disclose the use of a bank check
in a point-of-sale transaction in order to derive consumer
information and not for use as a negotiable instrument, as recited
in independent claims 1, 9, and 11.  Rather, Schuller discloses a
payment system for vending machines which uses specialized tickets
as negotiable instruments.

    Thus, an element recited in all of Applicants' claims is not
disclosed by Schuller.  Further, it would not be trivial to modify
Schuller so that a bank draft is used for informational purposes
only.  The entire Schuller system is set up to provide security
against shoplifting by controlling access to merchandise using pre-
paid tickets.  The invention is not even directed to the payment

21

LML-EP 000203

part of the transaction.   To include the missing elements of
Applicants' claims would be to change the very nature of the
Schuller system by adding a new inventive element to the system.
To process checks in the manner provided by Applicants' invention
is not necessary, beneficial, or consistent with the service
provided by Schuller.  Thus, it is neither possible nor proper to
combine the system of Schuller with another system in an effort to
result in Applicants' claimed system.

Ohmae et al. 4,673,802

Ohmae et al. disclose a system for using a bank debit card to
pay for merchandise at a point of sale.  Unlike normal debit card
transactions, the Ohmae et al. system allows for a grace period
between the time the sale is made and the time the cash is debited
from the customer's account.  Thus, Ohmae et al. do not disclose
the use of a bank check in a point-of-sale transaction in order to
derive consumer information and not for use as a negotiable
instrument, as recited in independent claims 1, 9, and 11.  Rather,
Ohmae et al. disclose a system for delaying the posting of a debit
to a user's account.

Thus, an element recited in all of Applicants' claims is not
disclosed by Ohmae et al.  Further, it would not be trivial to
modify Ohmae et al. so that a bank draft is used for informational
purposes only.  The entire Ohmae et al. system is set around the
use of a debit card.   To include the missing elements of
Applicants' claims would be to change the very nature of the Ohmae
et al. system to one which electronically debits a bank account

22

LML-EP 000204

based only on information derived from a bank check to complete a point-of-sale transaction. To process checks in the manner provided by Applicants' invention is not necessary, beneficial, or consistent with the service provided by Ohmae et al. Thus, it is neither possible nor proper to combine the system of Ohmae et al. with another system in an effort to result in Applicants' claimed system.

<u>Tateisi et al. 4,678,895</u>

Tateisi et al. disclose a normal system for using a bank debit card to pay for merchandise at a point of sale. The system includes a terminal device, connected to a cash register, for performing the account debit function while the cash register rings up the sale. Thus, Tateisi et al. do not disclose the use of a bank check in a point-of-sale transaction in order to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11. Rather, Tateisi et al. disclose a system for performing a debit function separate from a tallying function in order to speed transactions.

Thus, an element recited in all of Applicants' claims is not disclosed by Tateisi et al. Further, it would not be trivial to modify Tateisi et al. so that a bank draft is used for informational purposes only. The entire Tateisi et al. system is set around the use of a debit card. To include the missing elements of Applicants' claims would be to change the very nature of the Tateisi et al. system to one which electronically debits a bank account based only on information derived from a bank check to

23

LML-EP 000205

complete a point-of-sale transaction.  To process checks in the manner provided by Applicants' invention is not necessary, beneficial, or consistent with the service provided by Tateisi et al.  Thus, it is neither possible nor proper to combine the system of Tateisi et al. with another system in an effort to result in Applicants' claimed system.

Sakuma et al. 4,934,772

Sakuma et al. disclose a light beam scanning lens and light beam scanning device.  Sakuma et al. disclose a scanning system that has potential utility in scanning information from a check, but such use is not disclosed.  Thus, Sakuma et al. do not disclose the use of a bank check in a point-of-sale transaction in order to derive consumer information and not for use as a negotiable instrument, as recited in independent claims 1, 9, and 11.  Rather, Sakuma et al. disclose a light beam scanning device.

Thus, an element recited in all of Applicants' claims is not disclosed by Sakuma et al.  Further, it would not be trivial to modify Sakuma et al. so that a bank draft is used for informational purposes only.  Sakuma et al. merely disclose the optical scanning elements of an undisclosed system.  To include the missing elements of Applicants' claims would be to completely redefine the Sakuma et al. invention and is beyond the scope of the Sakuma et al. invention.  Thus, it is neither possible nor proper to combine the device of Sakuma et al. with a point-of-sale system in an effort to assemble Applicants' claimed system.

24

LML-EP 000206

Summary

None of the referenced patents discloses at least one element recited in all of Applicants' claims. That is, none of the references discloses a point-of-sale system that uses any bank check solely for the purposes of gathering customer information and not as a negotiable instrument used to pay for goods received in a transaction. Because none of these references discloses this element, no combination of these references can disclose Applicants' claimed system, because such a combination would also be missing this element. Further, the addition of this missing element to any of the references is not trivial or obvious, and in fact is not compatible with the stated purpose of the references. None of the references teaches or suggests the utility of adding features of Applicants' claimed invention to the cited reference inventions. Thus, Applicants' claimed invention cannot be rendered obvious by any combination of these references, nor is the combination of these references proper.

It is important to note that Applicants have focussed on only one particular element of the claimed invention in response to the Examiner's rejection. Applicants in no way acknowledge the disclosure of any of the other claimed elements in any of the references, nor do Applicants concede that the chosen element is the only novel and non-obvious aspect of the claimed invention. For organizational ease and clarity in response to the Examiner's broad rejection of the claims, in which no particular reference was applied to any particular claim or element, Applicants chose to

25

LML-EP 000207

rely on one novel element in order to overcome the rejection. As shown in the above discussion, one element that is missing from all cited references is enough to show that the claimed invention is novel and non-obvious.

Regarding the Examiner's contention that three separate inventions are present, and that only one set of claims should be selected for continued prosecution, Applicants respectfully traverse. There are in fact three sets of claims. The first set includes independent claim 1 and dependent claims 2-4, 6-8, 15, and 16. The second set includes independent claim 9 and dependent claims 17-20. The third set includes independent claim 11 and dependent claims 12-14, 21, and 22. The first set and the third set recite the system of the present invention as an apparatus. Although the claims differ in scope and in the particular terms used, they do not recite patentably distinct inventions. See MPEP 806.03. The second set of claims recites the system of the present invention as a process. Claiming an invention in terms of two different statutory classes of invention does not in itself render the two sets of claims patentably distinct. These differences among these claims do not satisfy the criteria for a proper restriction under MPEP 803. Applicants will respond to a formal restriction requirement from the Examiner, but respectfully decline to voluntarily cancel two sets of properly submitted claims in response to the Examiner's comments.

It is respectfully urged that all rejections have been overcome. It is therefore respectfully requested that this

26

LML-EP 000208

amendment be entered, the claims allowed, and the case passed to issue. Because Applicants have compared all cited references with the recited elements of Applicants' claims, it would be appreciated if the Examiner would reject with more particularity in the future, should more rejections be forthcoming. That is, it would be helpful if the Examiner would compare cited references to the rejected claims and point out which aspects of Applicants' traversal he finds lacking. Please see MPEP 707.07 (d)-(f).

Respectfully submitted,

Jon L. Roberts
Registration No. 31,293
Roberts & Associates
1953 Gallows Road
Suite 220
Vienna, Virginia 22182
Phone: (703) 356-7700

January 30, 1995

27

LML-EP 000209



<u>CERTIFICATE OF FIRST CLASS MAILING</u>

Date of Mailing: _____<u>January 30, 1995</u>_____

I hereby certify that the Response to Office Action dated
10/28/94 (27 pages) directed to the application of Robert H. Hills
and Henry R. Nichols  for a CHECKWRITING POINT OF SALE SYSTEM,
Serial No. 08/257,390, filed 06/09/94, is being deposited with the
United States Postal Service as first class mail under 37 C.F.R. §
1.8 on the date indicated above and is addressed to Commissioner of
Patents and Trademarks, Box Non-Fee Amendment, Washington, D.C.
20231.

Jon L. Roberts, Esq.
Roberts & Associates
1953 Gallows Road
Suite 220
Vienna, Virginia 22182

LML-EP 000210

U

# EXHIBIT REDACTED IN ITS ENTIRETY

V

# EXHIBIT REDACTED
# IN ITS ENTIRETY