Y

INVALIDITY CLAIM CHART

| '988 PATENT | ANTICIPATION BY HIGASHIYAMA, INCLUDING 1990 ACH RULES AND 1990 NACHA OPERATING RULES INCORPORATED BY REFERENCE[1] |
|---|---|
| 1. A checkwriting point of sale system comprising: | A system for processing checks presented at the point of sale. (*See* col. 2, lines 43-46; col. 3, lines 11-14.)<br><br>Mr. Hills admitted Higashiyama discloses processing checks. (Hills Depo. 404:18-405:9.) |
| a point of sale terminal adapted to receive consumer bank account information from any bank check; | Point of sale system 210 including a MICR reader 202 used for reading the magnetic account number printed on checks. (*See* col. 3, lines 13-18.)<br><br>Mr. Hills admitted that Higashiyama describes using a MICR reader to read MICR information from a check, and passing the information to a terminal. (See Hills Depo. 408:6-23; 421:10-14.)<br><br>To the extent this claim is construed as being applicable to voided checks, ". . . the transit/routing number and account number can best be obtained and transcribed from the preprinting on a voided check." (NACHA 016800; DK 000332.) "The DFI Account number, the RDFI's customer identification, is obtained from the 'on-us' field of the MICR line of a voided check or deposit ticket." (ECHO 0022759; DK 000220.) |
| a central computer system; | Backroom processor 204 to which one or more point of sale systems are connected. (*See* Figure 2; col. 3, lines 13-14, 29-33.)<br><br>"POS terminal 201 is connected to backroom processor 204 . . . ." (Col. 3, lines 29-33.)<br><br>"A merchant having multiple stores benefits in that a central location may be used for consolidating check data . . . ." (Col. 7, lines 25-27.) |

---

[1]    Higashiyama incorporates by reference the "1990 ACH Rules" and the "1990 NACHA Operating Rules, Corporate Edition." (Col. 6, lines 32-36). Therefore, Higashiyama is treated as containing the complete disclosures of the "1990 ACH Rules" and the "1990 NACHA Operating Rules."

| '988 PATENT | ANTICIPATION BY HIGASHIYAMA, INCLUDING 1990 ACH RULES AND 1990 NACHA OPERATING RULES INCORPORATED BY REFERENCE[1] |
|---|---|
| first communications means integral to said point of sale terminal for electronically communicating with the central computer system; | POS terminal 201 (which is part of the point of sale system) is connected to the backroom processor 204. (*See* col. 3, lines 29-30.)<br><br>"POS terminal 201 is connected to backroom processor 204 . . . ." (Col. 3, lines 29-33.)<br><br>The telecommunications unit *may be* connected to POS terminal 201, "if desired." (Col. 3, lines 33-34.) The terminal itself must have means to facilitate the direct connection to backroom processor. This is the very arrangement shown in Figure 2. |
| memory means integral to said point of sale terminal for temporarily storing the consumer bank account information | The MICR account information and transaction information is gathered and stored. (*See* col. 2, lines 56-58.)<br><br>"POS terminal 201 then provides additional information in order to create a data record for this transaction which is being paid by check." (Col. 3, lines 50-53.)<br><br>Data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201. (*See* col. 3, lines 55-62; col. 5, lines 1-4.) |
| the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; | Backroom processor 204 receives data records from the POS terminal 201. (*See* col. 5, lines 1-10.) Since the backroom processor 204 is connected to one or more point of sale systems 210, each having a POS terminal 201 that supplies data records, the backroom processor 204 receives data records from one or more (plurality) of point of sale systems 210.<br><br>"A merchant having multiple stores benefits in that a central location may be used for consolidating check data . . . ." (Col. 7, lines 25-27.)<br><br>Mr. Hills testified that he was aware of nothing |

| '988 PATENT | ANTICIPATION BY HIGASHIYAMA, INCLUDING 1990 ACH RULES AND 1990 NACHA OPERATING RULES INCORPORATED BY REFERENCE[1] |
|---|---|
| | that would limit his system to multiple merchants, and that his system would include a single merchant having multiple locations. (Hills Depo. 347:7-348:8.) |
| the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the bank check as a negotiable instrument. | Backroom processor 204 will take the data records it has accumulated and upload them to a clearing house. (*See* col. 5, lines 11-13.) The data record is also used to verify check authorization by being compared to a file. (*See* col. 4, lines 14-24.) The information from the paper check is electronically processed and the check is returned to the customer at the point of sale. (*See* col. 4, lines 54-57.)<br><br>Mr. Hills admitted that Higashiyama describes a dial-up authorization. (Hills Depo. 438:12-439:14.)<br><br>Mr. Hills admitted that Higashiyama describes sending transactions in a batch to a clearinghouse such as the ACH for processing. (*See* Hills Depo. 415:22-416:13, 450:2-10.)<br><br>In one embodiment, the data record generated by the point of sale terminal is sent to the backroom processor immediately. (*See* col. 4, lines 5-6.) Otherwise, the data record would not be "immediately" sent to the backroom processor. Accordingly, any communication with the third party database to perform the described verification must take place through the backroom processor, not the point of sale terminal. |
| 2. The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further includes means for reading magnetic ink character recognition numbers appearing on a consumer check for the sole purpose of identifying and reading the consumer bank account information. | Point of sale system 210 including a MICR reader 202 used for reading the magnetic account number printed on checks. (*See* col. 3, lines 13-18.)<br><br>Mr. Hills admitted that Higashiyama describes using a MICR reader to read MICR information from a check, and passing the information to a terminal. (*See* Hills Depo. 408:6-23; 421:10- |

3

| '988 PATENT | ANTICIPATION BY HIGASHIYAMA, INCLUDING 1990 ACH RULES AND 1990 NACHA OPERATING RULES INCORPORATED BY REFERENCE[1] |
|---|---|
| | 14.) |
| | Mr. Hills admitted that Higashiyama describes sending transactions in a batch to a clearing house such as the ACH for processing. (*See* Hills Depo. 415:22-416:13, 450:2-10.) |
| | To the extent this claim is construed as being applicable to voided checks, ". . . the transit/routing number and account number can best be obtained and transcribed from the preprinting on a voided check." (NACHA 016800; DK 000332.) |
| 4. The checkwriting point of sale system according to claim 1 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip. | Data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201. (*See* col. 3, lines 55-62; col. 5, lines 1-4.) |
| | Printer 203 for printing a sales slip. (*See* col. 3, lines 25-27.) |
| | The MICR account information and transaction information is gathered and stored. (*See* col. 2, lines 56-58.) |
| | "POS terminal 201 then provides additional information in order to create a data record for this transaction which is being paid for by check." (Col. 3, lines 50-53.) |
| | "Printer 203 is used by POS terminal 201 for a variety of tasks, if desired, for example, printing a sales slip, printing validation information on a check, or printing a check receipt . . . ." (Col. 3, lines 25-27.) |
| | Mr. Hills testified in his deposition that an express authorization was required for electronic account debiting, including ACH debits. (Hills Depo. 70:22-71:8; *see also* Hills Depo. 450:25-451:25, 469:25-470:6.) |

4

| '988 PATENT | ANTICIPATION BY HIGASHIYAMA, INCLUDING 1990 ACH RULES AND 1990 NACHA OPERATING RULES INCORPORATED BY REFERENCE[1] |
|---|---|
| | "Receiver Authorization and Agreement – Except as provided in subsection 2.1.3, such Receiver shall have authorized such Originator to initiate such entry to such Receiver's account . . . . In the case of debit entries to a consumer account pursuant to a standing authorization, such authorization shall be in writing."  (ECHO 0022688; DK 000150.)<br><br>"Consumer Accounts – Copy of Debit Authorization – In the case of debit entries to a consumer account pursuant to a standing authorization, an Originator shall provide each Receiver with a copy of the Receiver's written authorization."  (ECHO 0022694; DK 000156.)<br><br>"Records – An Originator that initiates an entry to a Receiver's account shall retain an original or a microfilm or [similar] copy of each written authorization of such Receiver authorizing the initiation of such entry for a period of two years . . ., or, in the case of a single entry authorization, after initiating such entry . . . ."  (ECHO 0022694; DK 000156.)  This provision applies to POS entries absent separate contractual arrangements between an RDFI and an ODFI.  (ECHO 0022694; DK 000156.)<br><br>A sample form for "Preauthorized Payments (Debits)" in consumer application is found at NACHA 016802 and DK 000334. |
| 5.  The checkwriting point of sale system according to claim 1 further comprising a resident third party database wherein consumer banking account status information is stored, the consumer banking account status information being used for verification of consumer banking account status. | "[T]he data record is then used to verify check authorization, for example, by being compared to a positive file (which lists all allowable checking account numbers), or more likely against a negative file such as provided by SCAN of Seattle, Washington, TeleCheck of Denver, Colorado or Telecredit of Florida . . . ."  (Col. 4, lines 14-24.)  Nothing in Higashiyama limits the location of where such a database is maintained. |

| '988 PATENT | ANTICIPATION BY HIGASHIYAMA, INCLUDING 1990 ACH RULES AND 1990 NACHA OPERATING RULES INCORPORATED BY REFERENCE[1] |
|---|---|
| | Mr. Hills admitted that Higashiyama describes a dial-up authorization. (Hills Depo. 438:12-439:14.) |
| 6. The checkwriting point of sale system according to claim 1 wherein the central computer system further comprises a system subscriber database, the system subscriber database comprising information regarding merchants and service providers that are authorized to use the checkwriting point of sale system. | "[T]he data record is then used to verify check authorization, for example, by being compared to a positive file (which lists all allowable checking account numbers), or more likely against a negative file such as provided by SCAN of Seattle, Washington, TeleCheck of Denver, Colorado or Telecredit of Florida . . . ." (Col. 4, lines 21.)

"a check recipient, such as a merchant, utility billing department, and the like, utilize hardware and software for quickly gathering data from checks received in order to allow prompt processing of those checks." (Col. 2, lines 47-50.)

Mr. Hills admitted that Higashiyama describes a dial-up authorization. (Hills Depo. 438:12-439:14.)

A list of merchants eligible to utilize the system is inherent. |
| 8. A checkwriting point of sale process comprising: | A system for processing checks presented at the point of sale. (See col. 2, lines 43-46; col. 3, lines 11-14.)

Mr. Hills admitted Higashiyama discloses processing checks. (See Hills Depo. 404:18-405:9.) |
| (a) presenting any bank check specimen to a point of sale terminal located at a merchant or service provider; | "a check recipient, such as a merchant, utility billing department, and the like, utilize hardware and software for quickly gathering data from checks received in order to allow prompt processing of those checks." (Col. 2, lines 47-50.)

Mr. Hills admitted that Higashiyama describes using a MICR reader to read MICR information |

6

| '988 PATENT | ANTICIPATION BY HIGASHIYAMA, INCLUDING 1990 ACH RULES AND 1990 NACHA OPERATING RULES INCORPORATED BY REFERENCE[1] |
|---|---|
| | from a check, and passing the information to a terminal. (*See* Hills Depo. 408:6-23; 421:10-14.)<br><br>"When the customer provides a check, however, the check is read by MICR reader 202 and the account information is provided to POS terminal 201." (Col. 3, lines 47-50.) |
| (b)  reading the magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument. | Point of sale system 210 including a MICR reader 202 used for reading the magnetic account number printed on checks. (*See* col. 3, lines 13-18.)<br><br>Mr. Hills admitted that Higashiyama describes using a MICR reader to read MICR information from a check, and passing the information to a terminal. (*See* Hills Depo. 408:6-23; 421:10-14.)<br><br>Mr. Hills admitted that Higashiyama describes sending transactions in a batch to a clearinghouse such as the ACH for processing. (*See* Hills Depo. 415:22-416:13, 450:2-10.)<br><br>To the extent this claim is construed as being applicable to voided checks, "the transit/routing number and account number can best be obtained and transcribed from the preprinting on a voided check." (NACHA 016800; DK 000332.)<br><br>"The DFI Account number, the RDFI's customer identification, is obtained from the 'on-us' field of the MICR line of a voided check or deposit ticket." (ECHO 0022759; DK 000220.) |
| (c)  storing the consumer bank account information obtained from the check and verifying that account numbers were accurately read at the point of sale terminal; | The MICR account information and transaction information is gathered and stored. (*See* col. 2, lines 56-58.)<br><br>"POS terminal 201 then provides additional information in order to create a data record for |

| '988 PATENT | ANTICIPATION BY HIGASHIYAMA, INCLUDING 1990 ACH RULES AND 1990 NACHA OPERATING RULES INCORPORATED BY REFERENCE[1] |
|---|---|
| | this transaction which is being paid by check." (Col. 3, lines 50-53.)<br><br>"Once authorization is provided (if the authorization step is performed), next the check is placed in printer 203 and validation information is printed on the check, if desired. Such validation information serves as an indication that electronic data pertaining to this check has been routed for collection . . . ." (Col. 4, lines 25-31.)<br><br>"The RDFI must verify the accuracy of the account number and should also verify the account type (checking or savings)." (ECHO 0022936 (emphasis in original); see also DK 000406-407.) |
| (d) providing transaction event information to the point of sale terminal; | The amount the check is written for is provided by the merchant via the POS keypad. (See col. 3, lines 64-66.)<br><br>Point of sale system 210 including a MICR reader 202 used for reading the magnetic account number printed on checks. (See col. 3, lines 13-18.)<br><br>To the extent this claim is construed as being applicable to voided checks, "the transit/routing number and account number can best be obtained and transcribed from the preprinting on a voided check." (NACHA 016800; DK 000332.) |
| (e) transmitting the transaction event information and consumer bank account information to a central computer system; | Backroom processor 204 receives data records from the POS terminal 201. (See col. 5, lines 1-10.)<br><br>"POS terminal 201 is connected to backroom processor 204 . . . ." (Col. 3, lines 29-33.) |
| (f) storing the transaction event information and consumer banking account information; and | "The data record thus created by POS terminal 201 can be added to a data file maintained by POS terminal 201 . . . or POS terminal 201 sends the data record to backroom processor 204 |

| '988 PATENT | ANTICIPATION BY HIGASHIYAMA, INCLUDING 1990 ACH RULES AND 1990 NACHA OPERATING RULES INCORPORATED BY REFERENCE[1] |
|---|---|
| | . . . ." (Col. 5, lines 1-7.) |
| (g) subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations. | Backroom processor 204 uploads the data records to a clearing house. (*See* col. 5, lines 11-13.)<br><br>Mr. Hills admitted that Higashiyama describes sending transactions in a batch to a clearing house such as the ACH for processing. (*See* Hills Depo. 415:22-416:13, 450:2-10.) |
| 9. A checkwriting point of sale system comprising: | A system for processing checks presented at the point of sale. (*See* col. 2, lines 43-46; col. 3, lines 11-14.)<br><br>Mr. Hills admitted Higashiyama discloses processing checks. (*See* Hills Depo. 404:18-405:9.) |
| a point of sale terminal adapted to receive consumer bank account information; | Point of sale system 210 including a MICR reader 202 used for reading the magnetic account number printed on checks. (*See* col. 3, lines 13-18.)<br><br>Mr. Hills admitted that Higashiyama describes using a MICR reader to read MICR information from a check, and passing the information to a terminal. (*See* Hills Depo. 408:6-23; 421:10-14.) |
| a central computer system; | Backroom processor 204 to which one or more point of sale systems are connected. (*See* Figure 2; col. 3, lines 13- 14, 29-33.)<br><br>"POS terminal 201 is connected to backroom processor 204 . . . ." (Col. 3, lines 29-33.) |
| first communications means integral to said point of sale terminal for electronically communicating with the central computer system; and | POS terminal 201 (which is part of the point of sale system) is connected to the backroom processor 204. (*See* col. 3, lines 29-30.)<br><br>"POS terminal 201 is connected to backroom processor 204 . . . ." (Col. 3, lines 29-33.)<br><br>The telecommunications unit *may be* connected to POS terminal 201, "if desired." (Col. 3, lines 33-34.) The terminal itself must have means to |

9

| '988 PATENT | ANTICIPATION BY HIGASHIYAMA, INCLUDING 1990 ACH RULES AND 1990 NACHA OPERATING RULES INCORPORATED BY REFERENCE[1] |
|---|---|
| | facilitate the direct connection to backroom processor. This is the very arrangement shown in Figure 2. |
| memory means integral to said point of sale terminal for temporarily storing the consumer bank account information; | The MICR account information and transaction information is gathered and stored. (*See* col. 2, lines 56-58.)<br><br>"POS terminal 201 then provides additional information in order to create a data record for this transaction which is being paid by check." (Col. 3, lines 50-53.)<br><br>Data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201. (*See* col. 3, lines 55-62; col. 5, lines 1-4.) |
| the point of sale terminal comprising reading means for reading magnetic ink character recognition numbers on any consumer bank check for the sole purpose of eliciting consumer bank account information; | MICR reader 202 reads the account information on the check. (*See* col. 3, lines 48-50.)<br><br>Mr. Hills admitted that Higashiyama describes using a MICR reader to read MICR information from a check, and passing the information to a terminal. (*See* Hills Depo. 408:6-23; 421:10-14.)<br><br>Mr. Hills admitted that Higashiyama describes sending transactions in a batch to a clearinghouse such as the ACH for processing. (*See* Hills Depo. 415:22-416:13, 450:2-10.)<br><br>To the extent this claim is construed as being applicable to voided checks, "the transit/routing number and account number can best be obtained and transcribed from the preprinting on a voided check." (NACHA 016800; DK 000332.)<br><br>"The DFI Account number, the RDFI's customer identification, is obtained from the 'on-us' field of the MICR line of a voided check or deposit ticket." (ECHO 0022759; DK |

| '988 PATENT | ANTICIPATION BY HIGASHIYAMA, INCLUDING 1990 ACH RULES AND 1990 NACHA OPERATING RULES INCORPORATED BY REFERENCE[1] |
|---|---|
| | 000220.) |
| the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; | Backroom processor 204 receives data records from the POS terminal 201. (*See* col. 5, lines 1-10.)<br><br>"A merchant having multiple stores benefits in that a central location may be used for consolidating check data . . . ." (Col. 7, lines 25-27.)<br><br>Mr. Hills testified that he was aware of nothing that would limit his system to multiple merchants, and that his system would include a single merchant having multiple locations. (Hills Depo. 347:7-348:8.)<br><br>Since the backroom processor 204 is connected to one or more point of sale systems 210, each having a POS terminal 201 that supplies data records, the backroom processor 204 receives data records from one or more (plurality) of point of sale systems 210. |
| the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using a bank check as a negotiable instrument. | Backroom processor 204 will take the data records it has accumulated and upload them to a clearing house. (*See* col. 5, lines 11-13.) The data record is also used to verify check authorization by being compared to a file. (*See* col. 4, lines 14-24.) Further, the information from the paper check is electronically processed, and the check is returned to the customer at the point of sale. (*See* col. 4, lines 54-57.)<br><br>Mr. Hills admitted that Higashiyama describes a dial-up authorization. (Hills Depo. 438:12-439:14.)<br><br>Mr. Hills admitted that Higashiyama describes sending transactions in a batch to a clearinghouse such as the ACH for processing. (*See* Hills Depo. 415:22-416:13, 450:2-10.)<br><br>In one embodiment, the data record generated |

| '988 PATENT | ANTICIPATION BY HIGASHIYAMA, INCLUDING 1990 ACH RULES AND 1990 NACHA OPERATING RULES INCORPORATED BY REFERENCE[1] |
|---|---|
| | by the point of sale terminal is sent to the backroom processor immediately. (*See* col. 4, lines 5-6.) Otherwise, the data record would not be "immediately" sent to the backroom processor. Accordingly, any communication with the third party database to perform the described verification must take place through the backroom processor, not the point of sale terminal. |
| 10. The checkwriting point of sale system according to claim 9 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip. | The MICR account information and transaction information is gathered and stored. (*See* col. 2, lines 56-58.)<br><br>Printer 203 for printing a sales slip. (*See* col. 3, lines 25-27.)<br><br>Data record, including customer checking account number and routing information and check amount, can be added to a data file maintained by POS terminal 201. (See col. 3, lines 55-62; col. 5, lines 1-4.)<br><br>"POS terminal 201 then provides additional information in order to create a data record for this transaction which is being paid for by check." (Col. 3, lines 50-53.)<br><br>"Printer 203 is used by POS terminal 201 for a variety of tasks, if desired, for example, printing a sales slip . . . ." (Col. 3, lines 25-27.)<br><br>"Receiver Authorization and Agreement – Except as provided in subsection 2.1.3, such Receiver shall have authorized such Originator to initiate such entry to such Receiver's account . . . . In the case of debit entries to a consumer account pursuant to a standing authorization, such authorization shall be in writing." (ECHO 0022688; DK 000150.)<br><br>"Consumer Accounts – Copy of Debit Authorization – In the case of debit entries to a |

| '988 PATENT | ANTICIPATION BY HIGASHIYAMA, INCLUDING 1990 ACH RULES AND 1990 NACHA OPERATING RULES INCORPORATED BY REFERENCE[1] |
|---|---|
| | consumer account pursuant to a standing authorization, an Originator shall provide each Receiver with a copy of the Receiver's written authorization." (ECHO 0022694; DK 000156.) <br><br> "Records – An Originator that initiates an entry to a Receiver's account shall retain an original or a microfilm or [similar] copy of each written authorization of such Receiver authorizing the initiation of such entry for a period of two years . . ., or, in the case of a single entry authorization, after initiating such entry . . . ." (ECHO 0022694; DK 000156.)  This provision applies to POS entries absent separate contractual arrangements between an RDFI and an ODFI.  (ECHO 0022694; DK 000156.) <br><br> A sample form for "Preauthorized Payments (Debits)" in consumer application is found at NACHA 016802 and DK 000334. |
| 11. The checkwriting point of sale system according to claim 9 further comprising a resident third party database wherein consumer banking account status information is stored, the consumer banking account status information being used for verification of consumer banking account status. | "[T]he data record is then used to verify check authorization, for example, by being compared to a positive file (which lists all allowable checking account numbers), or more likely against a negative file such as provided by SCAN of Seattle, Washington, TeleCheck of Denver, Colorado or Telecredit of Florida . . . ." (Col. 4, lines 14–24.)  Nothing in Higashiyama limits the location of where such a database is maintained. <br><br> Mr. Hills admitted that Higashiyama describes a dial-up authorization.  (Hills Depo. 438:12-439:14.) |
| 13.  The checkwriting point of sale system according to claim 4, wherein the sales slip includes means for execution by the consumer for proof of bank account access authorization. | A fully automated system generally comprises a dual-port terminal with magnetic stripe reading capabilities interfaced with a logging printer capable of providing individual transaction event slips for consumer execution. (See col. 5, lines 44–47.) |
| 14.  The checkwriting point of sale system according to claim 4, wherein the point of | "POS terminal 201 then provides additional information in order to create a data record for |

13

| '988 PATENT | ANTICIPATION BY HIGASHIYAMA, INCLUDING 1990 ACH RULES AND 1990 NACHA OPERATING RULES INCORPORATED BY REFERENCE[1] |
|---|---|
| sale terminal further comprises means for automatically logging a point of sale terminal location and transaction date, time, and sales amount. | this transaction which is being paid for by check." (Col. 3, lines 50-53.) |
| 16. The checkwriting point of sale process of claim 8, further comprising:<br>(A) printing a transaction event sales slip following the sending of an approval message; and<br>(B) executing of the sales slip by the consumer as proof of bank account access authorization. | "Printer 203 is used by POS terminal 201 for a variety of tasks, if desired, for example, printing a sales slip, printing validation information on a check, or printing a check receipt . . . ." (Col. 3, lines 25-27.)<br><br>Mr. Hills testified in his deposition that an express authorization was required for electronic account debiting, including ACH debits. (Hills Depo. 70:22-71:8; *see also* Hills Depo. 450:25-451:25, 469:25-470:6.)<br><br>"Receiver Authorization and Agreement – Except as provided in subsection 2.1.3, such Receiver shall have authorized such Originator to initiate such entry to such Receiver's account . . . . In the case of debit entries to a consumer account pursuant to a standing authorization, such authorization shall be in writing." (ECHO 0022688; DK 000150.)<br><br>"Consumer Accounts – Copy of Debit Authorization – In the case of debit entries to a consumer account pursuant to a standing authorization, an Originator shall provide each Receiver with a copy of the Receiver's written authorization." (ECHO 0022694; DK 000156.)<br><br>"Records – An Originator that initiates an entry to a Receiver's account shall retain an original or a microfilm or [similar] copy of each written authorization of such Receiver authorizing the initiation of such entry for a period of two years . . ., or, in the case of a single entry authorization, after initiating such entry . . . ." (ECHO 0022694; DK 000156.) This provision applies to POS entries absent separate contractual arrangements between an RDFI and |

14

| '988 PATENT | ANTICIPATION BY HIGASHIYAMA, INCLUDING 1990 ACH RULES AND 1990 NACHA OPERATING RULES INCORPORATED BY REFERENCE[1] |
|---|---|
| | an ODFI.  (ECHO 0022694; DK 000156.)<br><br>A sample form for "Preauthorized Payments (Debits)" in consumer application is found at NACHA 016802 and DK 000334. |
| 18.  The checkwriting point of sale process of claim 8, further comprising automatically logging point of sale terminal location information and transaction date, time, and sales amount information into the point of sale terminal. | "POS terminal 201 then provides additional information in order to create a data record for this transaction which is being paid for by check." (Col. 3, lines 50-53.) |

15

Z

INVALIDITY CLAIM CHART

| '988 PATENT | CARLSON '607 PATENT |
|---|---|
| 1. A checkwriting point of sale system comprising: | "The herein-disclosed point-of-sale device is specifically adapted to operate upon checks or other negotiable instruments in order to complete a business transaction such as a retail sale while the retailer and the customer are still face to face." (Col. 2, lines 24-28.)<br><br>The "Point-of-Sale (POS) check processing device of this patent disclosure is further described . . . ." (Col. 5, lines 28-29.) |
| a point of sale terminal adapted to receive consumer bank account information from any bank check; | "Item 1-6 depicts the customer's check (or any negotiable instrument utilizing the FED's MICR system) just as it is about to begin its functional travel into the point-of-sale device 100." (Col. 6, lines 38-42.)<br><br>"The tapered or 'nose' shape 1-5 of the upper compartment 1-5 is employed to facilitate 'hands-on' assistance by the operating in placing worn, wrinkled, folded or damaged checks into the device 100. Damage to the MICR line area on the check, which renders it unreadable in the automatic mode of this device, may also be overcome by the operator who can visually read and manually enter the MICR information into the device via his keypad 2-20." (Col. 6, lines 49-57.)<br><br>"provisions have been made in order to tolerate small variances in this height allowing for worn edges, water damage, etc. [on the check]." (Col. 7, lines 38-40.) |
| a central computer system; | "The device is provided with a CPU means which can be located inside the housing (in the first compartment and/or in the second compartment), outside the housing but still in the retail establishment where the business transaction is taking place, or outside the retail establishment in a central location which employs a central CPU to service a system of such point of sale devices." (Col. 3, lines 20-26.)<br><br>The point of sale terminal includes "means to |

INVALIDITY CLAIM CHART

| '988 PATENT | CARLSON '607 PATENT |
|---|---|
| | access a computer system maintained by a system of retailers using one central CPU with which this device is integrated." (Col. 4, lines 33-35.)<br><br>"all 'CPU' functions [of the point of sale terminal] may be carried out by a . . . centralized, off-site CPU utilized by several point-of-sale mechanisms." (Col. 22, lines 1-9.) |
| first communication means integral to said point of sale terminal for electronically communicating with the central computer system; | The point-of-sale device "could include one or more of the following features: (1) means to access a computer system maintained y a system of retailers using one central CPU which this device is integrated . . . ." (Col. 4, lines 29-35)<br><br>"A specific version of this device . . . would be the device as otherwise described herein, but without its own on site CPU. That is to say, all 'CPU' functions may be carried out by a 'PC' computer located somewhere in the building (installation) but not necessarily at the point of sale as in a large department store, or by a centralized off-site, CPU utilized by several point-of-sale mechanisms. In such case the on-site point-of-sale device would require only the MICR read head and means to connect it to the LAN and thereby transmit the MICR data along with the amount of the check as entered by the retailer . . . ." (Col. 22, lines 1-13.) |
| memory means integral to said point of sale terminal for temporarily storing the consumer bank account information | "The device is provided with a CPU means which can be located inside the housing . . . ." (Col. 3, lines 20-21.)<br><br>"Given that the retailer entered transaction data is stored within the CPU's memory means for automatic and constant use, the CPU's memory means need only capture the point of sale transaction data to form a complete transaction memory 'package.' . . . Having completed the transaction data 'package', the CPU now automatically cites the access codes and numbers to connect with the appropriate financial network(s) means and transmits all |

2

INVALIDITY CLAIM CHART

| '988 PATENT | CARLSON '607 PATENT |
|---|---|
| | necessary transaction data to complete the prescribed funds transfer and all associated designed functions of this device." (Col.19, lines 12-28.)<br><br>The point-of-sale device could include "a standard 8 bit microprocessor capable of accessing 64 K bytes of memory . . . ." (Col. 4, lines 44-46.)<br><br>"The CPU 16A memory stands by to receive and store (most preferably, for the duration of this transaction only) all necessary MICR information printed on the check (6-6)." (Col. 7, lines 59-62.)<br><br>"after each transaction is completed, and after the network communications connection has been dropped, the CPU's memory means will most probably completely 'dump' (erase from memory' all data that was required for the previous transaction. Thus, when not in use between transaction, the device will, most probably, not contain means or data which can be used to transfer funds. Hence, the device will begin each transaction with a clear memory ready to receive MICR and PIN information as well as the entered check amount." (Col. 3, line 65 through Col.14, line 7.) |
| the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; | "A specific version of this device . . . would be the device as otherwise described herein, but without its own on site CPU. That is to say, all 'CPU' functions may be carried out by a 'PC' computer located somewhere in the building (installation) but not necessarily at the point of sale as in a large department store, or by a centralized off-site, CPU utilized by several point-of-sale mechanisms." (Col. 22, lines1-9.)<br><br>"The device is provided with a CPU means which can be located inside the housing (in the first compartment and/or in the second compartment), outside the housing but still in |

3

INVALIDITY CLAIM CHART

| '988 PATENT | CARLSON '607 PATENT |
|---|---|
| | the retail establishment where the business transaction is taking place, or outside the retail establishment in a central location which employs a central CPU to service a system of such point-of-sale devices." (Col. 3, lines 20-26.)<br><br>The point-of-sale device could include "means to access a computer system maintained by a system of retailers using one central CPU with which this device is integrated." (Col. 4, lines 33-35; *see also* Col. 26, lines 39-41.) |
| the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using the bank check as a negotiable instrument. | The central computer can perform "all 'CPU' functions" of the point of sale terminal.  (Col. 22, lines 1-9.)<br><br>"The MICR line allows high speed, electronic reading of that data designating the proper bank and account to be identified and converting such data into electronic messages to be sent through the National Automated Clearing House system." (Col.1, lines 63-68.)<br><br>"Finally the device should comprise means for electronically connecting the point-of-sale device to a telecommunications system capable of electronically transferring funds from one bank account (e.g., the customer's bank account) to another bank account (e.g., the retailer's bank account)." (Col. 3, lines 35-40.)<br><br>The device comprises "means for electronically connecting the point-of-sale negotiable instrument processing device to a telecommunications system." (Col. 4, lines 1-3; *see also* Col. 25, lines 53-55 .)<br><br>The point-of-sale device could include "(2) means to access a computer system maintained by an issuer of a negotiable instrument such as a check and the like; (3) means to access an external communication system to identify a payor of a negotiable instrument . . . and to perform an electronic funds transfer . . . ." (Col. 4, lines 35-42; *see also* Col. 26, lines 36- |

INVALIDITY CLAIM CHART

| '988 PATENT | CARLSON '607 PATENT |
|---|---|
| | 38, 49-52) |
| | "Since it is anticipated that this device 100 and its associated components (if any) will interact with a number of financial networks and they in turn with a number of banking institutions . . . ." (Col. 13, lines 44-47.) |
| | "the 'MICR' (magnetic ink character recognition) line 6-24 was developed to allow high speed, computer controlled processing of checks by the twelve Federal Reserve Banks (and their branches) and the various Automated Clearing Houses throughout the country." (Col. 14, lines 10-15.) |
| | "Having completed the transaction data 'package', the CPU now automatically cites the access codes and numbers to connect with the appropriate financial network(s) means and transmits all necessary transaction data to complete the prescribed funds transfer and all associated designed functions of this device." (Col. 19, lines 22-28.) |
| | "In this particular case, the customer's check would be returned to him verified, endorsed, EFT'd, printed and truncated (processed and cancelled via the financial network means and operations) along with his copy of the cash register receipt (ticket). Thus the customer would receive a written account of the complete transaction and the retailer's (electronic) cash register means would contain the same information in its own format." (Col. 18, lines 52-60.) |
| | After the transaction has been completed, "[t]he retailer can then pass the cancelled check back to the customer as part of the customer's sales record and receipt. If necessary, the retailer could print a 'cash ticket' to place into his cash register by placing an NCR page behind the check and inserting the pair into the device to be printed |

5

INVALIDITY CLAIM CHART

| '988 PATENT | CARLSON '607 PATENT |
|---|---|
| | simultaneously." (Col. 25, lines 4-10.)<br><br>A verification is performed to ensure the consumer's checking account exists. (Col. 23, line 60 through Col. 24, line 13.) The system may route the data to the consumer's banking institution, where the consumer's account number is verified, any desired security checks are performed, and funds are transferred from the consumer's account to the retailer's account. (Col. 23, lines 19-36.) |
| 2. The checkwriting point of sale system according to claim 1 wherein said point of sale terminal further includes means for reading magnetic ink character recognition numbers appearing on a consumer check for the sole purpose of identifying and reading the consumer bank account information. | "The second compartment is preferably the compartment provided with a MICR reader means which reads the other side of the check (preferably the face side of the check, i.e., the side of the check opposite the side contacted by the printer means( through a face in said second compartment." (Col. 2, lines 65-3:2.)<br><br>"The slot is also provided with means for transporting a check or other negotiable instrument into and out of said slot, means for position the check: (1) while it is being so transported, (2) while its MICR information is being read by the MICR head, and (3) while it is being printed upon by the printer means." (Col. 3, lines 14-19.)<br><br>In its most general form, the point-of-sale device comprises, among other features, "MICR read head means for reading MICR information on a negotiable instrument." (Col. 3, lines 47-48; *see also* Col. 25, lines 26-27, 63-65.)<br><br>"The MICR data (see 6-24) is read and stored." (Col. 8, lines 2-3.) |
| 4. The checkwriting point of sale system according to claim 1 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sales slip. | The point-of-sale device comprises "printer means for printing on a negotiable instrument." (Col. 3, lines 48-49; *see also* Col. 5, lines 50-52.)<br><br>"For the retailer's convenience, an optional 'cash ticket' could be easily printed by this device by placing a 'no-carbon-required- slip |

6

INVALIDITY CLAIM CHART

| '988 PATENT | CARLSON '607 PATENT |
|---|---|
|  | of paper of an appropriate size against the back of the check before inserting the pair into the device. Special paper (e.g., known to the art as NCR paper) may be on the back of the check in order to allow for proper MICR scanning of the device and in order to allow the 'no-carbon-required' page to print the necessary information on the check. The resulting NCR page could then be inserted into the retailer's cash register drawer to represent the (EFT'd) debit-check sale as a written record of a 'cash' item." (Col. 17, lines 51-62.)<br><br>"After the device's CPU 16A had been notified (by the financial network means) that the amount of funds represented by the check had been transferred, the CPU would then electronically enter into the cash register the 'amount tendered' yielding the same results as if the retailer had entered it in his customary manner into the register. The retailer's cash register then would proceed in its normal routine by printing the invoice slip (or customer's ticket) . . . ." (Col. 18, lines 17-25.)<br><br>"In this particular case, the customer's check would be returned to him verified, endorsed, EFT'd, printed and truncated (processed and cancelled via the financial network means and operations) along with his copy of the cash register receipt (ticket). Thus the customer would receive a written account of the complete transaction and the retailer's (electronic) cash register means would contain the same information in its own format." (Col. 18, lines 52-60.)<br><br>"The electronic cash register (if used) can now print its sales slip taking note of the transferred funds as 'amount tendered' or 'cash tendered.'" (Col. 24, lines 60-63.) |
| 8. A checkwriting point of sale process comprising: | "The herein-disclosed point-of-sale device is specifically adapted to operate upon checks or other negotiable instruments in order to |

7

INVALIDITY CLAIM CHART

| '988 PATENT | CARLSON '607 PATENT |
|---|---|
| | complete a business transaction such as a retail sale while the retailer and the customer are still face to face." (Col. 2, lines 24-28.)<br><br>The "Point-of-Sale (POS) check processing device of this patent disclosure is further described . . . ." (Col. 5, lines 28-29.)<br><br>A checkwriting point of sale process is described. (Col. 22, lines 32-52.) |
| (a)  presenting any bank check specimen to a point of sale terminal located at a merchant or service provider; | "The customer would fill out and sign his check (or other MICR document) and pass it to the retailer." (Col. 22, lines 57-58.) |
| (b) reading the magnetic ink character recognition number information on the check for the sole purpose of obtaining consumer bank account information, without using the check as a negotiable instrument. | In its most general form, the point-of-sale device comprises, among other features, "MICR read head means for reading MICR information on a negotiable instrument." (Col. 3, lines 47-48; *see also* Col. 25, lines 26-27, 63-65.)<br><br>"The MICR data (see 6-24) is read and stored." (Col. 8, lines2-3.)<br><br>"The retailer can then pass the cancelled check back to the customer as part of the customer's sales record and receipt.  If necessary, the retailer could print a 'cash ticket' to place into his cash register by placing an NCR page behind the check and inserting the pair into the device to be printed simultaneously." (Col. 25, lines 4-10.)<br><br>"In this particular case, the customer's check would be returned to him verified, endorsed, EFT'd, printed and truncated (processed and cancelled via the financial network means and operations) along with his copy of the cash register receipt (ticket).  Thus the customer would receive a written account of the complete transaction and the retailer's (electronic) cash register means would contain the same information in its own format." (Col. 18, lines 52-60.) |
| (c) storing the consumer bank account information obtained from the check and | "The MICR data (see 6-24) is read and stored." (Col. 8, lines 2-3.) |

8

INVALIDITY CLAIM CHART

| '988 PATENT | CARLSON '607 PATENT |
|---|---|
| verifying that account numbers were accurately read at the point of sale terminal; | "While entering said MICR line manually, said MICR data is displayed digit-for-digit/stroke-for-stroke at the 7-28 retailer display means . . . . After he has entered all required (6-24) MICR data, except the check amount, the retailer again enters the same check into the device (normally, as if manual entry had not been required) to complete the transaction." (Col. 21, lines 5-16.)<br><br>"a MICR 'stop code' (see 6-24 and 6-24B) could be employed to cause the CPU 16A to stop motor means 2-7 at appropriate times in the processing of said check." (Col. 8, lines 3-5.) |
| (d) providing transaction event information to the point of sale terminal; | "The retailer would then enter the amount of the check using keypad 7-20. As the retailer enters the amount of the check, it is displayed at window 7-28 digit-for-digit/stroke-for-stroke . . . If the amount entered is correct, then the retailer would press the 'ENTER' button 7-30." (Col. 23, lines 9-16.) When the customer accepts the amount by pressing the "OK" key 7-33, "said action said action allows the entered amount to become part of the transaction information." (Col. 23, lines 30-49; *see also* Col. 9, lines 12-25.) |
| (e) transmitting the transaction event information and consumer bank account information to a central computer system; | "When all 'local' transaction data has been entered . . . the device's CPU means 16A immediately calls up the carrier and or network access codes and begins the process of contacting the carrier(s) and/or network(s). The CPU 16A would complete the transaction data package by adding to the customer's transaction data the stores retailer transaction data which includes his retailer identification number and any other such security data as may be required by the network. . . . When the complete transaction data 'package' is in the network means, the network means would automatically route the 'package' to the appropriate payor's bank using the FED's routing and transit symbols to locate the payor's bank institution." (Col. 23, line 60 |

9

INVALIDITY CLAIM CHART

| '988 PATENT | CARLSON '607 PATENT |
|---|---|
| | through Col. 24, line 7.) |
| | "A specific version of this device . . . would be the device as otherwise described herein, but without its own on site CPU.  That is to say, all 'CPU' functions may be carried out by a 'PC' computer located somewhere in the building (installation) but not necessarily at the point of sale as in a large department store, or by a centralized off-site, CPU utilized by several point-of-sale mechanisms.  In such case the on-site point-of-sale device would require only the MICR read head and means to connect it to the LAN and thereby transmit the MICR data along with the amount of the check as entered by the retailer at 7-20 . . . The retailer identification number(s) and the network access code(s) and all required network numbers to access the carrier and/or network(s) also could be supplied by an 'outboard' computer such as a suitable PC." (Col. 22, lines 1-19.) |
| (f) storing the transaction event information and consumer banking account information; and | "The device is provided with a CPU means which can be located inside the housing . . . ." (Col. 3, lines 20-21.) |
| | "Given that the retailer entered transaction data is stored within the CPU's memory means for automatic and constant use, the CPU's memory means need only capture the point of sale transaction data to form a complete transaction memory 'package.' . . . Having completed the transaction data 'package', the CPU now automatically cites the access codes and numbers to connect with the appropriate financial network(s) means and transmits all necessary transaction data to complete the prescribed funds transfer and all associated designed functions of this device." (Col. 19, lines 12-28.) |
| | The point-of-sale device could include "a standard 8 bit microprocessor capable of accessing 64 K bytes of memory . . . ." (Col. 4, lines 44-46.) |

10

INVALIDITY CLAIM CHART

| '988 PATENT | CARLSON '607 PATENT |
|---|---|
| | "The CPU 16A memory stands by to receive and store (most preferably, for the duration of this transaction only) all necessary MICR information printed on the check (6-6)." (Col. 7, lines 59-62.) |
| (g) subsequently transmitting the transaction event information to a bank for subsequent automated clearing house operations. | "The MICR line allows high speed, electronic reading of that data designating the proper bank and account to be identified and converting such data into electronic messages to be sent through the National Automated Clearing House system." (Col. 1, lines 63-68.)

"Finally the device should comprise means for electronically connecting the point-of-sale device to a telecommunications system capable of electronically transferring funds from one bank account (e.g., the customer's bank account) to another bank account (e.g., the retailer's bank account)." (Col. 3, lines 35-40.)

The device comprises "means for electronically connecting the point-of-sale negotiable instrument processing device to a telecommunications system." (Col. 4, lines 1-3; *see also* Col. 25, lines 53-55 .)

"Since it is anticipated that this device 100 and its associated components (if any) will interact with a number of financial networks and they in turn with a number of banking institutions . . . ." (Col. 13, lines 44-47.)

"the 'MICR' (magnetic ink character recognition) line 6-24 was developed to allow high speed, computer controlled processing of checks by the twelve Federal Reserve Banks (and their branches) and the various Automated Clearing Houses throughout the country." (Col. 14, lines 10-15.)

"Having completed the transaction data 'package', the CPU now automatically cites the access codes and numbers to connect with the appropriate financial network(s) means and |

INVALIDITY CLAIM CHART

| '988 PATENT | CARLSON '607 PATENT |
|---|---|
| | transmits all necessary transaction data to complete the prescribed funds transfer and all associated designed functions of this device." (Col. 19, lines 22-28.) |
| 9. A checkwriting point of sale system comprising: | "The herein-disclosed point-of-sale device is specifically adapted to operate upon checks or other negotiable instruments in order to complete a business transaction such as a retail sale while the retailer and the customer are still face to face." (Col. 2, lines 24-28.) <br><br> The "Point-of-Sale (POS) check processing device of this patent disclosure is further described . . . ." (Col. 5, lines 28-29.) |
| a point of sale terminal adapted to receive consumer bank account information; | "Item 1-6 depicts the customer's check (or any negotiable instrument utilizing the FED's MICR system) just as it is about to begin its functional travel into the point-of-sale device 100." (Col. 6, lines 38-42.) <br><br> "The tapered or 'nose' shape 1-4 of the upper compartment 1-5 is employed to facilitate 'hands-on' assistance by the operating in placing worn, wrinkled, folded or damaged checks into the device 100. Damage to the MICR line area on the check, which renders it unreadable in the automatic mode of this device, may also be overcome by the operator who can visually read and manually enter the MICR information into the device via his keypad 2-20." (Col. 6, lines 49-57) |
| a central computer system; | "The device is provided with a CPU means which can be located inside the housing (in the first compartment and/or in the second compartment), outside the housing but still in the retail establishment where the business transaction is taking place, or outside the retail establishment in a central location which employs a central CPU to service a system of such point of sale devices." (Col. 3, lines 20-26; see also Col. 4, lines 29-42.) <br><br> The point of sale terminal includes "means to access a computer system maintained by a system of retailers using one central CPU with |

INVALIDITY CLAIM CHART

| '988 PATENT | CARLSON '607 PATENT |
|---|---|
| | which this device is integrated." (Col. 4, lines 33-35.)<br><br>"all 'CPU' functions [of the point of sale terminal] may be carried out by a . . . centralized, off-site CPU utilized by several point-of-sale mechanisms." (Col. 22, lines 1-9.) |
| first communication means integral to said point of sale terminal for electronically communicating with the central computer system; and | The point-of-sale device "could include one or more of the following features: (1) means to access a computer system maintained y a system of retailers using one central CPU which this device is integrated . . . ." (Col. 4, lines 29-35)<br><br>"A specific version of this device . . . would be the device as otherwise described herein, but without its own on site CPU. That is to say, all 'CPU' functions may be carried out by a 'PC' computer located somewhere in the building (installation) but not necessarily at the point of sale as in a large department store, or by a centralized off-site, CPU utilized by several point-of-sale mechanisms. In such case the on-site point-of-sale device would require only the MICR read head and means to connect it to the LAN and thereby transmit the MICR data along with the amount of the check as entered by the retailer . . . ." (Col. 22, lines 1-13.) |
| memory means integral to said point of sale terminal for temporarily storing the consumer bank account information; | "The device is provided with a CPU means which can be located inside the housing . . . ." (Col. 3, lines 20-21.)<br><br>"Given that the retailer entered transaction data is stored within the CPU's memory means for automatic and constant use, the CPU's memory means need only capture the point of sale transaction data to form a complete transaction memory 'package.' . . . Having completed the transaction data 'package', the CPU now automatically cites the access codes and numbers to connect with the appropriate financial network(s) means and transmits all necessary transaction data to complete the prescribed funds transfer and all associated |

13

INVALIDITY CLAIM CHART

| '988 PATENT | CARLSON '607 PATENT |
|---|---|
| | designed functions of this device." (Col. 19, lines 12-28.)<br><br>The point-of-sale device could include "a standard 8 bit microprocessor capable of accessing 64 K bytes of memory . . . ." (Col. 4, lines 44-46.)<br><br>"The CPU 16A memory stands by to receive and store (most preferably, for the duration of this transaction only) all necessary MICR information printed on the check (6-6)." (Col. 7, lines 59-62.)<br><br>"after each transaction is completed, and after the network communications connection has been dropped, the CPU's memory means will most probably completely 'dump' (erase from memory' all data that was required for the previous transaction. Thus, when not in use between transaction, the device will, most probably, not contain means or data which can be used to transfer funds. Hence, the device will begin each transaction with a clear memory ready to receive MICR and PIN information as well as the entered check amount." (Col. 13, lines 65-14:7.) |
| the point of sale terminal comprising reading means for reading magnetic ink character recognition numbers on any consumer bank check for the sole purpose of eliciting consumer bank account information; | "The second compartment is preferably the compartment provided with a MICR reader means which reads the other side of the check (preferably the face side of the check, i.e., the side of the check opposite the side contacted by the printer means( through a face in said second compartment." (Col. 2, lines 65-3:2.)<br><br>"The slot is also provided with means for transporting a check or other negotiable instrument into and out of said slot, means for position the check: (1) while it is being so transported, (2) while its MICR information is being read by the MICR head, and (3) while it is being printed upon by the printer means." (Col. 3, lines 14-19.)<br><br>In its most general form, the point-of-sale |

14

INVALIDITY CLAIM CHART

| '988 PATENT | CARLSON '607 PATENT |
|---|---|
| | device comprises, among other features, "MICR read head means for reading MICR information on a negotiable instrument." (Col. 3, lines 47-48; *see also* Col. 25, lines 26-27, 63-65.)<br><br>"The MICR data (see 6-24) is read and stored." (Col. 8, lines 2-3.)<br><br>"The retailer can then pass the cancelled check back to the customer as part of the customer's sales record and receipt.  If necessary, the retailer could print a 'cash ticket' to place into his cash register by placing an NCR page behind the check and inserting the pair into the device to be printed simultaneously." (Col. 25, lines 4-10.) |
| the central computer system having second communication means for receiving information from a plurality of said point of sale terminals; | "A specific version of this device . . . would be the device as otherwise described herein, but without its own on site CPU.  That is to say, all 'CPU' functions may be carried out by a 'PC' computer located somewhere in the building (installation) but not necessarily at the point of sale as in a large department store, or by a centralized off-site, CPU utilized by several point-of-sale mechanisms." (Col. 22, lines 1-9.)<br><br>"The device is provided with a CPU means which can be located inside the housing (in the first compartment and/or in the second compartment), outside the housing but still in the retail establishment where the business transaction is taking place, or outside the retail establishment in a central location which employs a central CPU to service a system of such point-of-sale devices." (Col. 3, lines 20-26.)<br><br>The point-of-sale device could include "means to access a computer system maintained by a system of retailers using one central CPU with which this device is integrated." (Col. 4, lines 33-35; *see also* Col. 26, lines 39-41.) |

15

INVALIDITY CLAIM CHART

| '988 PATENT | CARLSON '607 PATENT |
|---|---|
| | "A specific version of this device . . . would be the device as otherwise described herein, but without its own on site CPU. That is to say, all 'CPU' functions may be carried out by a 'PC' computer located somewhere in the building (installation) but not necessarily at the point of sale as in a large department store, or by a centralized off-site, CPU utilized by several point-of-sale mechanisms." (Col. 22, lines 1-9.) |
| the central computer system second communication means enabling said central computer system to communicate with external databases for performing a consumer bank account status search and further enabling automated clearing house communication for transferring funds without using a bank check as a negotiable instrument. | The central computer can perform "all 'CPU' functions" of the point of sale terminal. (Col. 22, lines 1-9.) |
| | "The MICR line allows high speed, electronic reading of that data designating the proper bank and account to be identified and converting such data into electronic messages to be sent through the National Automated Clearing House system." (Col.1, lines 63-68.) |
| | "Finally the device should comprise means for electronically connecting the point-of-sale device to a telecommunications system capable of electronically transferring funds from one bank account (e.g., the customer's bank account) to another bank account (e.g., the retailer's bank account)." (Col. 3, lines 35-40.) |
| | The device comprises "means for electronically connecting the point-of-sale negotiable instrument processing device to a telecommunications system." (Col. 4, lines 1-3; *see also* Col. 25, lines 53-55 .) |
| | The point-of-sale device could include "(2) means to access a computer system maintained by an issuer of a negotiable instrument such as a check and the like; (3) means to access an external communication system to identify a payor of a negotiable instrument . . . and to perform an electronic funds transfer . . . ." (Col. 4, lines 35-42; *see also* Col. 26, lines 36-38, 49-52) |

16

INVALIDITY CLAIM CHART

| '988 PATENT | CARLSON '607 PATENT |
|---|---|
| | "Since it is anticipated that this device 100 and its associated components (if any) will interact with a number of financial networks and they in turn with a number of banking institutions . . . ." (Col. 13, lines 44-47.)<br><br>"the 'MICR' (magnetic ink character recognition) line 6-24 was developed to allow high speed, computer controlled processing of checks by the twelve Federal Reserve Banks (and their branches) and the various Automated Clearing Houses throughout the country." (Col. 14, lines 10-15.)<br><br>"Having completed the transaction data 'package', the CPU now automatically cites the access codes and numbers to connect with the appropriate financial network(s) means and transmits all necessary transaction data to complete the prescribed funds transfer and all associated designed functions of this device." (Col. 19, lines 22-28.)<br><br>"In this particular case, the customer's check would be returned to him verified, endorsed, EFT'd, printed and truncated (processed and cancelled via the financial network means and operations) along with his copy of the cash register receipt (ticket). Thus the customer would receive a written account of the complete transaction and the retailer's (electronic) cash register means would contain the same information in its own format." (Col. 18, lines 52-60.)<br><br>After the transaction has been completed, "[t]he retailer can then pass the cancelled check back to the customer as part of the customer's sales record and receipt. If necessary, the retailer could print a 'cash ticket' to place into his cash register by placing an NCR page behind the check and inserting the pair into the device to be printed simultaneously." (Col. 25, lines 4-10.) |

17

INVALIDITY CLAIM CHART

| '988 PATENT | CARLSON '607 PATENT |
| --- | --- |
|  | A verification is performed to ensure the consumer's checking account exists. (Col. 23, line 60 through Col. 24, line 13.) The system may route the data to the consumer's banking institution, where the consumer's account number is verified, any desired security checks are performed, and funds are transferred from the consumer's account to the retailer's account. (Col. 23, lines 19-36.) |
| 10. The checkwriting point of sale system according to claim 9 further comprising a printer means for receiving information from the memory means of the point of sale terminal and for generating a transaction event sale slip. | The point-of-sale device comprises "printer means for printing on a negotiable instrument." (Col. 3, lines 48-49; *see also* Col. 5, lines 50-52.)<br><br>"For the retailer's convenience, an optional 'cash ticket' could be easily printed by this device by placing a 'no-carbon-required- slip of paper of an appropriate size against the back of the check before inserting the pair into the device. Special paper (e.g., known to the art as NCR paper) may be on the back of the check in order to allow for proper MICR scanning of the device and in order to allow the 'no-carbon-required' page to print the necessary information on the check. The resulting NCR page could then be inserted into the retailer's cash register drawer to represent the (EFT'd) debit-check sale as a written record of a 'cash' item." (Col. 17, lines 51-62.)<br><br>"After the device's CPU 16A had been notified (by the financial network means) that the amount of funds represented by the check had been transferred, the CPU would then electronically enter into the cash register the 'amount tendered' yielding the same results as if the retailer had entered it in his customary manner into the register. The retailer's cash register then would proceed in its normal routine by printing the invoice slip (or customer's ticket) . . . ." (Col. 18, lines 17-25.)<br><br>"In this particular case, the customer's check would be returned to him verified, endorsed, EFT'd, printed and truncated (processed and |

18

INVALIDITY CLAIM CHART

| '988 PATENT | CARLSON '607 PATENT |
|---|---|
|  | cancelled via the financial network means and operations) along with his copy of the cash register receipt (ticket). Thus the customer would receive a written account of the complete transaction and the retailer's (electronic) cash register means would contain the same information in its own format." (Col. 18, lines 52-60.)<br><br>"The electronic cash register (if used) can now print its sales slip taking note of the transferred funds as 'amount tendered' or 'cash tendered.'" (Col. 24, lines 60-63.) |
| 14. The checkwriting point of sale system according to claim 4, wherein the point of sale terminal further comprises means for automatically logging a point of sale terminal location and transaction date, time and sales amount. | "Other optional features may serve to identify the payee of said transactions and to establish the transaction selling price to the satisfaction of both the customer and the retailer." (Col. 4, lines 25-28.)<br><br>The CPU 16A would complete the transaction data package by adding to the customer's transaction data the stores retailer transaction data which includes his retailer identification number and any other such security data as may be required by the network." (Col. 23, line 65 through Col. 24, line 2)<br><br>"The printer head 2-16 may or may not interface and interact with the CPU 16A, the document feed means (2-7, 2-8 and 2-9 with 2-10 and 2-11) and/or certain commands such as may originate from associated electronic cash register(s) . . . ." (Col. 10, lines 1-5.)<br><br>"[T]he information printed may include . . . [u]se of all such language, numbers, dates, codes and data as is, or may be, required by law and the Federal Reserve System's Rules and Regulations." (Col. 10, lines 13-39.)<br><br>"Provision can also be made (e.g., at 5-41) for an appropriate connector and cable means allowing essential and/or useful digitized transaction data to pass to and from common types of electronic cash registers. One |

19

INVALIDITY CLAIM CHART

| '988 PATENT | CARLSON '607 PATENT |
|---|---|
| | example of said data communication would be the automatic entry into the retailer's (appropriate and suitable) electronic cash register by this device's CPU means of the 'amount tendered' by the customer's check located within this device . . . ." (Col. 17, line 67 through Col. 18, line 4)<br><br>"The RIN [retailer identification number] and/or payee's account number or other proprietary means may be used to enable the payee's bank's CPU means to transmit a (partially recorded) endorsement and cancellation data package to properly endorse the check with the payee's required name and bank, amount deposited, time, etc. as previously described. Time affected data, such as time of day and amount deposited would not be 'prerecorded.'" (Col. 24, lines 36-44.)<br><br>"After the device's CPU 16A had been notified (by the financial network means) that the amount of funds represented by the check had been transferred, the CPU would then electronically enter into the cash register the 'amount tendered' yielding the same results as if the retailer had entered it in his customary manner into the register. The retailer's cash register then would proceed in its normal routine by printing the invoice slip (or customer's ticket) . . . ." (Col. 18, lines 17-25.) |
| 18. The checkwriting point of sale process of claim 8, further comprising automatically logging point of sale terminal location information and transaction date, time, and sales amount information into the point of sale terminal. | "The RIN [retailer identification number] and/or payee's account number or other proprietary means may be used to enable the payee's bank's CPU means to transmit a (partially recorded) endorsement and cancellation data package to properly endorse the check with the payee's required name and bank, amount deposited, time, etc. as previously described. Time affected data, such as time of day and amount deposited would not be 'prerecorded.'" (Col. 24, lines 36-44.)<br><br>The CPU 16A would complete the transaction |

20

INVALIDITY CLAIM CHART

| '988 PATENT | CARLSON '607 PATENT |
|---|---|
| | data package by adding to the customer's transaction data the stores retailer transaction data which includes his retailer identification number and any other such security data as may be required by the network." (Col. 23, line 65 through Col. 24, line 2.)

"The printer head 2-16 may or may not interface and interact with the CPU 16A, the document feed means (2-7, 2-8 and 2-9 with 2-10 and 2-11) and/or certain commands such as may originate from associated electronic cash register(s) . . . ." (Col. 10, lines 1-5.)

"Provision can also be made (e.g., at 5-41) for an appropriate connector and cable means allowing essential and/or useful digitized transaction data to pass to and from common types of electronic cash registers. One example of said data communication would be the automatic entry into the retailer's (appropriate and suitable) electronic cash register by this device's CPU means of the 'amount tendered' by the customer's check located within this device . . . ." (Col. 17, line 67 through Col. 18, line 4.) |